UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA :

-v.- : S1 15 Cr. 093 (VEC)

SHELDON SILVER, :

Defendant. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

# GOVERNMENT'S MOTIONS *IN LIMINE*

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Carrie H. Cohen
Howard S. Master
Andrew D. Goldstein
James M. McDonald
Assistant United States Attorneys
-Of Counsel-

**TABLE OF CONTENTS**

FACTUAL BACKGROUND……………………………………………………………………3

ARGUMENT………………………………………………………………………………….5

I. Silver's Efforts to Prevent the Opening of a Substance Abuse Clinic Near Developer-1's Building Are Admissible……………………………………………5

A. Background……………………………………………………………...5

B. Applicable Law…………………………………………………………6

C. Discussion……………………………………………………………..8

II. Evidence Showing the State of Mind of Participants in Silver's Schemes Is Relevant and Admissible……………………………………………………...10

A. Background……………………………………………………………10

B. Applicable Law………………………………………………………..12

C. Discussion……………………………………………………………15

III. The Government Should Be Allowed To Cross-Examine Any Character Witness and/or Silver with Relevant Instances of Silver's Conduct…16

A. Background……………………………………………………………..16

B. Applicable Law…………………………………………………………18

C. Discussion……...………………………………………………………19

IV. Limited Evidence Related to Certain Arrests and Convictions of Other State Public Officials Should Be Admitted…………………………………………20

V. Silver Should Be Precluded From Eliciting Testimony about Compliance or Non-Compliance with Attorney Ethics Rules and State Law………………...25

A. Background……………………………………………………………..26

B. Applicable Law……………………………………………………………29

C. Discussion……...…………………………………………………………31

VI. Evidence Related to an Approximately 40-Year Old Specific Instance of Non-Relevant Conduct By Doctor-1 Is Not Probative of Truthfulness and Should Be Precluded…………………………………………………………35

A. Background…………………………………………………………..35

B. Applicable Law……………………………………………………………35

C. Discussion……...…………………………………………………………37

VII. Cross-Examination of Witnesses Concerning *United States* v. *Skelos* Should Be Limited…………………………………………………………37

VIII. The Defendant Should Be Required To Provide Expert Notice by October 2, 2015……………………………………………….38

CONCLUSION………………………………………………………………………….39

.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| -v.- | : | S1 15 Cr. 093 (VEC) |
| SHELDON SILVER, | : | |
| Defendant. | : | |

---

## GOVERNMENT'S MOTIONS *IN LIMINE*

The Government respectfully submits this memorandum of law in support of the Government's first pre-trial application for *in limine* rulings from the Court. As set forth in more detail below, the Government seeks the following rulings with respect to certain evidence:[1]

- Admission of additional official acts not specifically enumerated in the Superseding Indictment that were taken by Sheldon Silver ("Silver" or "the defendant") on behalf of the real estate developer identified in the Superseding Indictment as Developer-1.

- Admission of certain statements made by participants in Silver's extortion and bribery schemes, including the individual identified in the Superseding Indictment as Doctor-1, representatives of Developer-1, and the individual identified in the Superseding Indictment as the Real Estate Lawyer concerning their relationships and dealings with the defendant.

---

[1] In advance of this filing, the Government raised each of the issues discussed herein with counsel for the defendant. For each issue, counsel stated that the defendant either objected to the Government's position or could not yet determine what position the defendant would take at trial. In addition, the Government has disclosed to the defense that it currently is investigating two particular subject matters that may give rise to an additional motion or motions *in limine* prior to trial and the defense has agreed not to argue that any such motion(s) would be untimely as long as it is filed by October 12, 2015.

- Admission of specific and limited evidence related to arrests and convictions of certain former New York State legislators.

- If the defendant testifies or introduces evidence of his good character through other witnesses (either on cross examination of Government witnesses or in the defendant's direct case), leave to cross examine the defendant or other witnesses on, and potentially admit evidence of, among other things: (a) the defendant's use of his official position to obtain from the New York City Department of Finance a reduction in the local property taxes of the building in which he resides (along with adjacent buildings) without disclosing that he would personally benefit from a reduction; and (b) the defendant's attempt to conceal his involvement in preventing development of low-income housing near his residence in part by falsely representing to the public that he had been confused with another individual named Sheldon Silver.

- To preclude the defendant from (a) offering evidence regarding a law professor's inquiry, after charges in this case had been publicly filed, into whether Weitz & Luxenberg, P.C. ("Weitz & Luxenberg") violated the New York State Rules of Professional Conduct in employing Silver in an "of counsel" position; (b) offering opinion or other evidence regarding Silver's purported compliance with New York State law or ethics rules in connection with the disclosure forms he filed with the New York State Legislative Ethics Commission (the "LEC"); and (c) cross examining a Government witness on conduct unrelated to credibility that occurred approximately forty years ago.

- To limit testimony related to the conduct charged in *United States* v. *Dean Skelos and Adam Skelos*, 15 Cr. 317 (KMW), to issues that bear on the credibility of trial witnesses or are otherwise inextricably intertwined with the conduct charged in this case.

- To require the defendant to provide any expert disclosure no later than October 2, 2015, one month prior to trial, in order to provide the parties and Court with ample time to assess whether and to what extent such testimony is proper, and to conduct any necessary pre-trial proceedings.

## FACTUAL BACKGROUND

As set forth in the Superseding Indictment, for more than 20 years, from in or about 1994 until in or about February 2015, the defendant served as Speaker of the New York State Assembly (the "Assembly"), having been elected as a member of the Assembly in or about 1977 to represent an Assembly District that comprises much of lower Manhattan. (Superseding Indictment ¶ 1). The Superseding Indictment alleges that from at least in or about 2000 up to and including in or about January 2015, the defendant engaged in a secret and corrupt scheme to deprive the citizens of the State of New York (the "State") of his honest services as an elected legislator and as Speaker of the Assembly, and to extort others under color of official right, by using the power and influence of his official position to obtain for himself millions of dollars in corrupt payments. (*Id.* ¶ 7). More specifically, from at least in or about 2000 through in or about January 2015, the defendant received nearly $4 million in corrupt payments through two law firms, the Real Estate Law Firm and Weitz & Luxenberg. (*Id.* ¶ 8).

With respect to Counts One, Two, and Five of the Superseding Indictment, relating to the defendant's receipt of millions of dollars from asbestos cases (the "Asbestos Scheme"), beginning in or about late 2003 through at least in or about August 2014, the defendant is charged with engaging in a corrupt scheme whereby he used his official position to obtain the names and identifying information of unrepresented patients with mesothelioma (the "Mesothelioma Leads"), and the valuable legal claims connected thereto, from Doctor-1, resulting in millions of dollars paid to the defendant. In exchange, the defendant secretly directed $500,000 in State funds to Doctor-1's research and provided other official benefits to Doctor-1 and his family. (*Id.* ¶¶ 16-25).

With respect to Counts Three, Four, and Six, relating to the defendant's receipt of a share of the fees for real estate tax certiorari business (the "Real Estate Scheme"), beginning at least in or about 2000, the defendant is charged with using the power and influence of his official position to secure for the Real Estate Law Firm tax certiorari legal claims of two real estate developers (Developer-1 and "Developer-2"), both of which had significant business before the State and owned properties located within the defendant's Assembly District. In exchange and in return for the defendant's use of his official position, the defendant obtained hundreds of thousands of dollars in illegal payments through the Real Estate Law Firm that were disguised as attorney referral fees. (*Id.* ¶¶ 10-15).

With respect to Count Seven, engaging in financial transactions involving crime proceeds (the "Money Laundering Scheme"), the Superseding Indictment alleges that from in or about 2006 through January 2015, the defendant engaged in a series of transactions in which he moved his criminal proceeds through financial institutions in amounts greater than $10,000. (*Id.* ¶¶ 28-32). In particular, the defendant used his personal and political relationship with an investor who had access to private, high-yield investment opportunities to distribute his millions of dollars in proceeds obtained from the offenses charged in Counts One through Six across numerous high-yield investment vehicles not available to the general public. (*Id.*).

The Government expects to prove each of the charges against Silver beyond a reasonable doubt through, among other evidence, the testimony of numerous witnesses who were used by Silver in various ways to facilitate his criminal conduct, many of whom were lied to or otherwise deceived by Silver, and the introduction of documentary and physical evidence, including

documents from the Assembly showing Silver's secret direction of funds and the provision of other official benefits to Doctor-1; emails, calendar entries, and telephone records establishing Silver's secret financial relationship with the Developers and the Real Estate Law Firm; audio recordings, made by Silver and his staff, of Silver lying to the press and public about, among other things, the nature and source of his outside income; and financial records showing how Silver transferred his illicit payouts into private, high-yield financial vehicles in ways that, among other things, obscured the amount of wealth he had amassed.

## ARGUMENT

### I. Silver's Efforts to Prevent the Opening of a Substance Abuse Clinic Near Developer-1's Building Are Admissible

#### A. Background

As set forth in the Superseding Indictment, while Silver was being paid hundreds of thousands of dollars by Developer-1, he took numerous official actions for the benefit of Developer-1. (Superseding Indictment ¶ 13). In addition to the actions specifically enumerated in the Superseding Indictment, Silver used his official power to assist Developer-1 in preventing a substance abuse clinic from opening near a Developer-1 building.[2] Specifically, in or about

---

[2] Defense counsel has agreed that certain other evidence of official action taken by Silver on behalf of Developer-1 that is not specifically enumerated in the Superseding Indictment is admissible on the Government's case-in-chief, namely, Silver's sending college letters of recommendation on Assembly letterhead on behalf of relatives of the owner of Developer-1. Defense counsel also has agreed that certain evidence not specifically enumerated in the Superseding Indictment relating to additional official actions taken by Silver on behalf of Doctor-1, including efforts relating to organizing a charity run/walk event near Ground Zero to benefit mesothelioma research called "Miles for Meso" and certain other assistance Silver provided to Doctor-1 and his family, is admissible in the Government's case-in-chief.

November 2011, after the relevant State agency had tentatively approved the relocation of a methadone clinic to a location near one of Developer-1's buildings, Developer-1 asked for Silver's assistance to prevent such clinic from opening. Silver responded by intervening with the relevant State agency and further advocating against the opening of the clinic. After it was announced that the clinic would not open near Developer-1's building, a lobbyist for Developer-1 drafted a letter to the building's residents praising "the outstanding efforts of Assemblyman Sheldon Silver" and noting that Silver "sprung into action as soon as it was revealed that this application was pending." (*See* Exhibit A attached hereto.) Then, in or about October 2013, when another substance abuse center was proposed to be relocated near that same building, a representative of Developer-1 remarked: "I thought Shelly killed this damn thing?!" (*Id.*) A lobbyist for Developer-1 responded: "We need to kill this again." (*Id.*) Again, the center did not relocate near Developer-1's building. At no time did Silver disclose that he was receiving hundreds of thousands of dollars in fees paid by Developer-1 who had significant business before the State.

### B. Applicable Law

Relevant evidence is admissible pursuant to Rules 401 and 402 of the Federal Rules of Evidence regardless of whether all such evidence is detailed in the charging instrument. *See, e.g.*, *United States* v. *Amrep Corp.*, 545 F.2d 797, 800 (2d Cir. 1976) ("Relevant evidence should be admitted and not excluded[;] [i]t makes no difference whether such evidence is particularized in the indictment."); *United States* v. *Jefferson*, 562 F. Supp. 2d 719, 724 (E.D. Va. 2008) (in bribery case, permitting Government to introduce additional facts and legal theories not specifically enumerated in indictment on grounds that "the Indictment need not enumerate every possible legal

and factual theory of defendant's guilt so long as the Indictment, as here, recites the elements of the statutory offense"), *aff'd*, 674 F.3d 332 (4th Cir. 2012).

In addition, evidence of conduct of the defendant may be admitted without reference to Rule 404(b) of the Federal Rules of Evidence if it constitutes direct proof of charged criminal conduct, if it is inextricably linked with the charged conduct, or if it is necessary to complete the story of the crimes on trial. *See United States* v. *Quinones*, 511 F.3d 289, 309 (2d Cir. 2007):

> [E]vidence of uncharged criminal conduct is not evidence of "other crimes, wrongs, or acts" under Rule 404(b) if that conduct is "inextricably intertwined with the evidence regarding the charged offense." *United States* v. *Towne*, 870 F.2d 880, 886 (2d Cir. 1989). In such circumstances, the uncharged crime evidence is necessary to "complete the story of the crime on trial," *id.*, and, thus, appropriately treated as "part of the very act charged," or, at least, proof of that act, *United States* v. *Concepcion*, 983 F.2d [369, 392 (2d Cir. 1992)].

*See also Towne*, 870 F.2d at 886 ("evidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial") (internal alterations and quotation marks omitted). Moreover, "'other acts' evidence is admissible to show the background of a . . . relationship of trust." *United States* v. *Araujo*, 79 F.3d 7, 8 (2d Cir. 1996); *see United States* v. *Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) ("'it is within the [trial] court's discretion to admit evidence of prior acts . . . in order to help explain how the illegal relationship between the participants in the crime developed.'") (quoting *United States* v. *Rosa*, 11 F.3d 315, 334 (2d Cir. 1999)).

Evidence of other acts taken by the defendant also can be admissible pursuant to Rule 404(b) of the Federal Rules of Evidence. The Second Circuit "has adopted an 'inclusionary' approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." *United States* v. *LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004); *see also United States* v. *McCallum*, 584 F.3d 471, 474-75 (2d Cir. 2009). The Second Circuit has repeatedly held that proof of elements of a defendant's state of mind – such as knowledge and intent – is a "'proper purpose'" for admitting evidence of other bad acts under Rule 404(b). *United States* v. *Teague*, 93 F.3d 81, 84 (2d Cir. 1996) (quoting *Huddleston* v. *United States*, 485 U.S. 681, 691 (1988)); *United States* v. *Caputo*, 808 F.2d 963, 968 (2d Cir. 1987) ("[w]here intent to commit the crime charged is clearly at issue, evidence of prior similar acts may be introduced to prove that intent"). It is well settled that "other acts" evidence, including evidence of knowledge and intent, is admissible under Rule 404(b) so long as the evidence: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; and (3) has probative value that is not substantially outweighed by any unfair prejudicial effect. *See United States* v. *Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993).

### C. **Discussion**

The acts set forth above involving Silver's efforts, using his official position, to assist Developer-1 are admissible as direct proof of charged criminal conduct, as they are part of the charged schemes and thus are highly probative of the existence of those schemes. The Superseding Indictment lists several official acts that the defendant took in furtherance of the charged honest services fraud and extortion schemes related to Developer-1, and also made clear that the lists provided were intended to be illustrative, rather than exhaustive. For example,

paragraph 13 of the Superseding Indictment, describing official actions taken in furtherance of the Real Estate Scheme, alleges that Silver took "*numerous actions* under the color of his official authority and in his official capacity as an elected legislator and as Speaker of the Assembly as the opportunities arose, including *but not limited to*" items specifically enumerated in the Superseding Indictment. (Superseding Indictment ¶ 13 (emphasis added)). The acts related to the substance abuse clinic were performed during the course of the charged schemes and are direct evidence of Silver's use of his official position to benefit Developer-1.

Moreover, each act Silver took to benefit Developer-1, including but not limited to seeking to block the substance abuse clinic at Developer-1's request, is circumstantial evidence that Silver sought to benefit Developer-1 in order to secure continued tax certiorari business from Developer-1 for the Real Estate Law Firm, which, in turn, would result in continued payment to him of hundreds of thousands of dollars.

In addition, the evidence described above is inextricably linked with the charged conduct and is necessary to complete the "story of the crime[s] on trial." *See Towne*, 870 F.2d at 886. A significant aspect of the story of the crimes on trial is Silver's provision of official benefits to Developer-1, which includes evidence that Silver "spr[a]ng into action" at Developer-1's request to prevent a substance abuse clinic from opening near one of Developer-1's buildings. Moreover, such evidence provides further background regarding the relationship of trust between the defendant and Developer-1 and also helps to explain the relationship between the defendant and Developer-1. *See Rosa*, 11 F.3d at 334; *Brennan*, 798 F.2d at 589-90. Finally, such evidence also is admissible under Rule 404(b) of the Federal Rules of Evidence as relevant to the

defendant's motive, intent, and plan with respect to Developer-1, principally, his motive, intent, and plan to provide official benefits to Developer-1 so that he would continue to receive hundreds of thousands of dollars in fees paid by Developer-1.

For all of these reasons, evidence of the defendant's conduct with respect to the substance abuse clinic should be admitted at trial.

## II. Evidence Showing the State of Mind of Participants in Silver's Schemes Is Relevant and Admissible

### A. Background

The Government intends to introduce certain statements made by participants in Silver's extortion and honest services fraud schemes that show the participants' then-existing states of mind, namely, that certain actions and conduct taken by the participants in Silver's corrupt schemes were motivated by the defendant's control or influence related to his official position. In particular, the Government intends to introduce the following evidence, among other related statements:

1. As noted above, the Government intends to introduce evidence concerning the defendant's offer in or about 2011 to provide official assistance to Doctor-1 relating to Miles for Meso. In connection with this evidence, the Government intends to introduce certain statements made by Doctor-1 reflecting his then-existing state of mind. For example, when the organizers of the event had difficulty securing the requisite permits and approvals, after Doctor-1 approached Silver, Silver offered his assistance (stating in a letter, "[m]y office can help you navigate this process"). (*See* Exhibit B attached hereto.) As Doctor-1 considered enlisting the defendant's help, Doctor-1 made statements to organizers of the event, some of which were set forth in emails

that are evidence of Doctor-1's then-existing state of mind with respect to Silver. For example, on or about August 28, 2011, in response to a request from a Miles for Meso organizer, Doctor-1 wrote in an e-mail to the organizer: "It will probably cost us. [Silver] is very good at getting people to owe him. But if he says he will deliver, he does." (*Id.*) Similarly, on or about September 13, 2011, after Doctor-1 personally requested Silver's assistance to help with Milos for Meso permits and other approvals, Doctor-1 wrote in an email to the organizer: "I added a line to the letter to Shelley Silver – if he delivers, I am sure it will cost me." (*Id.*)

2. Doctor-1 made other statements expressing relevant states of mind that reflect the existence of the charged Asbestos Scheme, including expressions of concern about a relative for whom Silver later helped obtain employment using his official position, expressions of disapproval of Weitz & Luxenberg's failure to support mesothelioma research, and expressions of concern about his ability to obtain funding for his research.

3. During the course of the Real Estate Scheme, representatives of Developer-1 made statements to others, including to lobbyists for Developer-1 who had met with Silver, relating to, among other things, their concerns about continuing to provide payments to the Real Estate Law Firm that they knew would be passed on in part to Silver, their understanding that Silver wanted such payments to continue, and their belief that they needed to continue to provide such payments because of the power Silver exercised over specific legislation and other matters critical to Developer-1's business. During the course of the Real Estate Scheme, the Real Estate Lawyer also made statements to others, including in emails, about Silver's role in securing the tax

certiorari business of Developer-1 and Developer-2, and about efforts to obtain additional business from those developers.

B. **Applicable Law**

Rule 803(3) of the Federal Rules of Evidence provides an exception to the hearsay rule for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) . . . , but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." Fed. R. Evid. 803(3). The reasons for this so-called "state of mind" exception "focus on the contemporaneity of the statement and the unlikelihood of deliberate or conscious misrepresentation." *United States* v. *Cardascia*, 951 F.2d 474, 487 (2d Cir. 1991). "[U]nder Rule 803(3)," moreover, "hearsay statements reflecting a declarant's intentions or future plans are admissible to prove subsequent acts." *United States* v. *DeJesus*, 806 F.2d 31, 35 (2d Cir. 1986). The Second Circuit has made clear that statements that meet the requirements of Rule 803(3) may be admitted without regard to their apparent credibility or trustworthiness. *See Cardascia*, 951 F.2d at 487; *United States* v. *DiMaria*, 727 F.2d 265, 271-72 (2d Cir. 1984). Declarations that fall within the parameters of Rule 803(3) "are *categorically* admissible even if they are self-serving and made under circumstances which undermine trustworthiness." *United States* v. *Lawal*, 736 F.2d 5, 8 (2d Cir. 1984) (emphasis in original).

In prosecutions for extortion under color of official right, courts routinely admit out-of-court statements reflecting the extorted party's state of mind as non-hearsay under Rule 801 and under the state of mind hearsay exception of Rule 803(3). "In order for a jury to find a defendant guilty of extortion under color of official right, the government must prove beyond a

reasonable doubt," among other things, "that the victims were motivated to make payments as a result of the defendant's control or influence." *United States* v. *McDonough*, 56 F.3d 381, 388 (2d Cir. 1995); *see also United States* v. *Margiotta*, 688 F.2d 108, 132-33 (2d Cir. 1982) (explaining that "a public official may be guilty of obtaining money under color of official right if the [extorted party's] payments are motivated as a result of [the public official's] exercise of the powers of his public office and he is aware of this fact"), *cert. denied*, 461 U.S. 913 (1983). The relevance of the bribe payor's state of mind to proving extortion under color of official right charges consistently has been recognized by other Circuits. *See United States* v. *McDonnell*, 792 F.3d 478, 511-12 (4th Cir. 2015) ("we have no difficulty recognizing that proof of a bribe payor's subjective belief in the recipient's power or influence over a matter will support a conviction for extortion under color of official right"); *United States* v. *Fountain*, 792 F.3d 310, 316-17 (3d Cir. 2015); *United States* v. *Bencivengo*, 749 F.3d 205, 212–13 (3d Cir. 2014); *United States* v. *Blackwood*, 768 F.2d 131, 134–35 (7th Cir. 1985); *United States* v. *Bibby*, 752 F.2d 1116 (6th Cir. 1985); *United States* v. *Rabbitt*, 583 F.2d 1014, 1027 (8th Cir. 1978) ("The official need not control the function in question if the extorted party possesses a reasonable belief in the official's powers."); *United States* v. *Hathaway*, 534 F.2d 386, 394 (1st Cir. 1976).

These legal principles have supported admission of out-of-court statements by participants in an extortion scheme concerning their relevant states of mind. In *United States* v. *Biaggi*, 705 F. Supp. 830, 841 (S.D.N.Y. 1988), for example, which involved, among other things, the prosecution of former Congressman Mario Biaggi for extortion under color of official right, the District Court admitted certain out-of-court statements of a participant in the extortion scheme, in

which the participant had promised to pay an associate of Biaggi's $50,000. As the court in *Biaggi* explained, the statements at issue reflected the participant's "intent to pay the $50,000," and thus were admissible as reflecting the participant's then-existing state of mind under Rule 803(3). *Biaggi*, 705 F. Supp. at 841.

Similarly, in *United States* v. *Kelly*, 722 F.2d 873, 878 (1st Cir. 1983), a Massachusetts state senator (James Kelly) was convicted of extortion under color of official right for seeking money and other items of value in exchange for awarding or continuing certain government contracts to other participants in the extortion scheme. The district court permitted the Government to introduce several out-of-court statements of the participants, which showed their states of mind when dealing with the senator. For example, one victim (Masiello) testified that another victim asked him if he "if thought that . . . Senator Kelly could, in fact, do the type of things that he alluded to, such as having our contracts canceled in Massachusetts or if he could help us." *Id.* at 877. Masiello further testified that Senator Kelly "never got mad. He just got even with people. I feared him for that reason." *Id.* The First Circuit explained that "[t]he district court did not err in admitting the testimony under the state of mind exception to the hearsay rule." *Id.* at 878. Extortion under color of official right "requires as an essential element of proof the state of mind of the victim," and the testimony at issue "bore directly on what 'under color of official right' encompasses: the ever-present opportunity of a public official to misuse his power under the guise of official duty." *Id.*

Other courts also have admitted out-of-court statements of participants in extortion schemes as relevant to their states of mind. *See, e.g.*, *United States* v. *Tuchow*, 768 F.2d 855,

865-866 (7th Cir. 1985) (allowing the Government to introduce, among other statements, a conversation in which an associate of the defendant's told an extortion victim that "he had to 'drop a little here and drop a little there,'" to get a building permit); *United States* v. *Adcock*, 558 F.2d 397, 401, 404 (8th Cir. 1977) ("[I]t is well settled that testimony showing the state of mind of the victim through out-of-court statements is admissible in an extortion case. . . . The testimony of victims as to what others said to them, and the testimony of others as to what they said to victims is admitted not for the truth of the information in the statements but for the fact that the victim heard them and that they would have tended to produce fear in his mind.") (quoting *United States* v. *Hyde*, 448 F.2d 815, 845 (5th Cir. 1971), *cert. denied*, 404 U.S. 1058 (1972)); *Margiotta*, 688 F.2d at 116-18, 136 (allowing the introduction of out-of-court statements made by an insurance executive who was deceased by the time of trial, through the executive's son, as relevant to the decedent's "design" or "plan").

### C. Discussion

Pursuant to the case law set forth above, out-of-court statements made by Doctor-1, representatives of Developer-1, and the Real Estate Lawyer concerning their relationships and dealings with Silver are admissible because they bear directly on the declarants' states of mind at relevant points during the extortion and bribery offenses and demonstrate that they took certain actions because of the defendant's control or influence related to his official position. For example, when Doctor-1 said "[i]t will probably cost us," and "if [Silver] delivers, I am sure it will cost me," Doctor-1 was conveying his then-existing belief – while the charged extortion and bribery offenses were ongoing – that, if Silver exercised his official power to perform a favor for Doctor-1, Doctor-1 believed that Silver would expect a reciprocal favor in exchange. Such

statements are akin to the statements in *Kelly* concerning the declarant's belief that the defendant in that case "never got mad. He just got even with people," and accordingly are admissible under Rule 803(3). *Kelly*, 722 F.2d at 877. Similarly, statements by representatives of Developer-1 expressing concern about continuing to make payments that would enrich Silver, and statements by the Real Estate Lawyer about the business secured for him by Silver, also are admissible because they reveal the state of mind of the declarants. *See Biaggi*, 705 F. Supp. at 841; *Kelly*, 722 F.2d at 877-88; *Adcock*, 558 F.2d at 401, 404; *Tuchow*, 768 F.2d at 865-66; *Margiotta*, 688 F.2d at 136.

## III. The Government Should Be Allowed To Cross-Examine Any Character Witness and/or Silver with Relevant Instances of Silver's Conduct

### A. Background

Should the defendant seek to admit character evidence, through reputation or opinion testimony, concerning his good moral character, the Government seeks permission, pursuant to Rule 405(a) of the Federal Rules of Evidence, to cross-examine those witnesses with the following relevant specific instances of conduct by Silver: (a) use of his official Assembly letterhead and Assembly staff to attempt to obtain a reduction in local real estate taxes for the building in which he resides, among others, without disclosing that he stood to benefit financially from any reduction; and (b) an attempt to conceal his involvement in preventing development of the Seward Park Urban Renewal Area ("SPURA") in part by representing to the public that certain news reports had mistaken him for another individual named Sheldon Silver. In addition, should Silver testify, the Government seeks a ruling from the Court permitting it to introduce such evidence to

contradict his testimony and to prove specific instances of untruthfulness pursuant to Rule 608(b) of the Federal Rules of Evidence.

First, in or about 2009, Silver sent a letter on his official Assembly letterhead to the New York City Department of Finance seeking a reduction in the assessed tax value of certain properties that the Real Estate Lawyer represented, one of which serves as his personal residence. (*See* Exhibit C attached hereto.) The letter, however, did not disclose that Silver himself was a resident of one of the buildings and thus potentially stood to gain personally from any reduction. Instead, the letter gave the false impression that Silver's interest in the tax assessment was simply a matter of constituent services. After receiving Silver's letter – and further communications from Silver's Assembly office – the Department of Finance immediately undertook a review of the tax assessments of the properties and substantially reduced the assessment for one of the buildings identified by Silver, although not the one in which he resided.

Second, with regard to SPURA, after a *New York Times* article in March 2014 about the decades-long efforts by Silver and others that successfully blocked the development of low-income housing on a large, barren site in Silver's district near his personal residence, Silver attempted to distance himself from the controversy by claiming that he had been confused with another man named Sheldon E. Silver, who had died in 2001.[3] At the State Democratic Party

---

3 *See* Ross Buettner, *They Kept a Lower East Side Lot Vacant for Decades*, N.Y. Times, Mar. 21, 2014, *available at* http://www.nytimes.com/2014/03/23/nyregion/they-kept-a-lower-east-side-lot-vacant-for-decades.html; Ross Buettner, *Assembly Speaker Finds Fall Guy: Another Sheldon Silver*, available at http://www.nytimes.com/2014/05/23/nyregion/assembly-speaker-sheldon-silver-claim-of-mistaken-identity.html.

convention in May 2014, Silver told reporters: "I was forever confused with this guy. . . . Even after he left there, I got phone calls from people who I knew," and Silver had his spokesman try to get the *New York Times* to print a correction. *Id.* The truth, however, is that documents concerning SPURA show that it was the defendant, and not another individual named Sheldon E. Silver, who was involved for years in opposing the development of low-income housing on the site, and the widow of Sheldon E. Silver has stated that her husband worked for an organization that was involved in the issue only for a brief period, from 1973-1974.

**B. Applicable Law**

Where evidence of character is admitted by way of testimony as to reputation or opinion, Rule 405(a) of the Federal Rules of Evidence permits cross-examination "into relevant specific instances of conduct." Fed. R. Evid. 405(a). Indeed, "[o]nce a defendant offers character testimony, the prosecution is afforded substantial latitude to rebut such evidence." *United States* v. *Russo*, 110 F.3d 948, 952 (2d Cir. 1997). In cross-examining a character witness, the Government need not offer extrinsic evidence so long as it can point to a good-faith basis for its questions. *See United States* v. *Payton*, 159 F.3d 49, 58-59 (2d Cir. 1998). However, "[w]hen a defendant offers an exculpatory explanation for the government's evidence, he 'opens the door' to impeachment of his credibility, even by previously inadmissible evidence." *United States* v. *Desposito*, 704 F.3d 221, 233-34 (2d Cir. 2013); *see United States* v. *Shyne*, No. S4 05 Cr. 1067 (S.D.N.Y. Apr. 12, 2007 - May 10, 2007) (KMK) (allowing the cross-examination of a character witness regarding the extramarital affair of a defendant after the character witness testified that the defendant carried himself in an honorable manner), *aff'd*, 388 Fed. App'x 65, 71-72 (2d Cir. 2010). Accordingly, "[w]here a defendant testifies on direct about a specific fact, the prosecution is