FB35sil1                    CORRECTED TRANSCRIPT

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                          15 Cr. 0093(VEC)

 5   SHELDON SILVER,

 6              Defendant.

 7   ------------------------------x

 8                                          November 3, 2015
                                            11:10 a.m.
 9

10   Before:

11                 HON. VALERIE E. CAPRONI,

12                                          District Judge
                                              and a Jury
13                           APPEARANCES

14   PREET BHARARA
          United States Attorney for the
15        Southern District of New York
     BY:  CARRIE H. COHEN,
16        ANDREW D. GOLDSTEIN,
          HOWARD S. MASTER,
17        JAMES M. McDONALD,
               Assistant United States Attorneys
18
     STROOCK & STROOCK & LAVAN LP
19        Attorneys for Defendant
     BY:  JOEL COHEN
20             - and -
     MOLOLAMKEN, LLP
21   BY:  STEVEN F. MOLO
          JUSTIN SHUR
22        JUSTIN ELLIS
          ROBERT KRY
23        TUONGVY LE

24

25
```

FB35sil1                          CORRECTED TRANSCRIPT

1          (Case called)

2          THE COURT:  Okay, ladies and gentlemen.  Are you ready

3     to open?

4          MS. COHEN:  The government is ready, your Honor.

5          MR. MOLO:  Defense is ready, your Honor.

6          THE COURT:  Terrific.  Bring in the jury, please.

7          (Jury present)

8          THE COURT:  Members of the jury:  Now that you have

9     been sworn I will tell you about your duties as jurors and give

10    you instructions that will help you understand what will be

11    presented during trial.  At the end of the trial I will give

12    you instructions again.  Those instructions will be much more

13    detailed and will control your deliberations.

14          At the outset, let me impress upon you that you are,

15    in every sense of the word, judges, judges without robes -- the

16    sole judges of the facts in this case.  I am the judge of the

17    law but you are the judges of the facts.  It is customary for

18    people to rise as a judge enters and leaves the courtroom, not

19    necessarily as a mark of respect for the judge as a person, but

20    as a mark of respect for the position that he or she occupies.

21    You will soon become aware that as you enter and leave the

22    courtroom, the parties and I will be standing as a mark of

23    respect for the position you occupy as judges of the facts in

24    this case.  You will determine the facts solely from the

25    evidence that will be presented during the course of the trial.

FB35sil1                        CORRECTED TRANSCRIPT

1         You must not infer from my questions or rulings on

2    objections or anything else that I may do during the trial,

3    that I have a view on the credibility of the witnesses or an

4    opinion about the facts or how you should decide the case.  As

5    the sole judges of the facts you are about to determine which

6    of the -- you will have to determine which of the witnesses you

7    believe, what portions of their testimony you accept, and what

8    weight you attach to it.

9         It is the duty of the attorneys to object when the

10   other side offers testimony or other evidence that the attorney

11   believes is not properly admissible.  Therefore, you should

12   draw no inference if an attorney objects to some evidence.  Nor

13   should you draw any inference from my ruling on an objection.

14        If I sustain an objection, I will not permit the

15   witness to answer, or if the witness has already answered, I

16   will instruct that the answer be stricken from the record and

17   that you disregard it.  If I overrule an objection, the witness

18   will be allowed to answer.  You should not give any added

19   weight to the answer to a question that was objected to and you

20   should not speculate about what the answer would have been if

21   an objection to a question is sustained.

22        You will decide the facts from the evidence that will

23   be presented in court.  That evidence will consist of the

24   testimony of witnesses on both direct and cross-examination,

25   documents and other things received into evidence as exhibits,

FB35sil1                          CORRECTED TRANSCRIPT

1    and any facts that the attorneys agree to or admit or I may

2    instruct you to find.

3                There is no magic formula that you should use to

4    evaluate the evidence.  I will, however, give you some general

5    guidelines for determining the credibility of witnesses at the

6    end of the case.  Right now I will just tell you to bring into

7    this courtroom all of the experiences and backgrounds of your

8    lives.  You should not leave your common sense at home.  The

9    same types of judgments that you use every day in order to make

10   important decisions in your own life are the judgments that you

11   should bring to bear on your consideration of the evidence in

12   this case.

13               I want to take a moment to describe to you what is not

14   evidence in the case.  Questions by the lawyers are not

15   evidence.  It is only the witnesses' answers that are evidence.

16   Similarly, arguments by attorneys are not evidence.  Their

17   opening and closing statements are intended to help you

18   understand the evidence and to reach your verdict.  If your

19   recollection of the facts differs from what an attorney says,

20   it is your recollection that governs.  Anything that I may say

21   concerning the evidence is not evidence.  Testimony that has

22   been stricken or excluded is not evidence and may not be

23   considered by you in rendering your verdict.  Finally, anything

24   you may have seen or heard outside of the courtroom is not

25   evidence.

FB35sil1                    CORRECTED TRANSCRIPT

1          I am now going to tell you a little bit about the law

2     that you will have to apply to the facts as you find them.

3     These are only preliminary and summary instructions.  They are

4     designed to help you evaluate the evidence as you hear and see

5     it in light of what you will be asked to decide after you have

6     heard all of the evidence.

7          The final instructions that I will give you at the end

8     of the trial will contain more details about the applicable

9     law.  To the extent that there are any differences between my

10    preliminary instructions and the final instructions at the end

11    of the trial, the final instructions will be controlling.

12         The government has charged the defendant, Sheldon

13    Silver, with honest services fraud, extortion, and money

14    laundering.  The government has the burden of proving every

15    element of each crime charged beyond a reasonable doubt.

16         Counts One through Four of the indictment charge

17    honest services, mail, and wire fraud.  Honest services fraud

18    involves a scheme to defraud the public of its right to a

19    public official's honest services and involves the use of the

20    mails or interstate wire communications to further the scheme.

21    The government has charged two separate schemes.  In one

22    scheme, Mr. Silver is alleged to have received fees from the

23    law firm Weitz & Luxenberg for mesothelioma cases referred by a

24    doctor in exchange for official acts by Mr. Silver.  In the

25    second scheme, Mr. Silver is alleged to have received payments

1    from the law firm Goldberg & Iryami for two real estate

2    developer's tax certiorari business in exchange for official

3    acts by Mr. Silver.

4              In order to sustain its burden of proof the government

5    must prove a number of elements including that there was a

6    scheme to defraud the State of New York and its citizens of

7    their intangible right to Mr. Silver's honest services.  The

8    government must prove that as part of the scheme, the defendant

9    received bribes or kickbacks as a *quid pro quo* for official

10   actions that he took.  *Quid pro quo* is Latin and it just means

11   this for that, or these for those.  Thus, the government must

12   prove that Mr. Silver received things of value in the form of

13   bribes or kickbacks and that he knew when he accepted those

14   things he was expected, in exchange, to take official action as

15   the opportunity arose.  The government must also prove that

16   Mr. Silver knowingly and willfully participated in the scheme

17   with knowledge of its fraudulent nature and with a specific

18   intent to defraud.

19             In addition to honest services fraud, the government

20   has charged Mr. Silver with extortion under color of official

21   right.  As with the fraud charges, the government has charged

22   two separate extortion schemes.  In Count Five, the government

23   alleges that Mr. Silver, as an elected legislator and Speaker

24   of the Assembly, obtained things of value -- specifically

25   valuable legal referrals for mesothelioma cases and fees

1    resulting from those cases -- in exchange for official action.

2            In Count Six the government alleges that Mr. Silver

3    obtained tax certiorari business and related fees from two real

4    estate developers in exchange for official action.

5            In order to sustain its burden of proof with respect

6    to the extortion charges, among other elements the government

7    must prove beyond a reasonable doubt first that Mr. Silver was

8    a public official at the time of the events charged; second,

9    that Mr. Silver obtained property not legitimately due or owed

10   to him as a public official; and third, that the property or

11   service was given to Mr. Silver voluntarily and that Mr. Silver

12   knew that the property was given in exchange for him exercising

13   his official powers.

14           Finally, the government has charged Mr. Silver with

15   money laundering.  In Count Seven the government charges that

16   Mr. Silver knowingly transferred more than $10,000 of

17   criminally derived money into various investments.  In order to

18   sustain its burden of proof with respect to the money

19   laundering allegations, the government generally must prove,

20   first, that Mr. Silver engaged or attempted to engage in a

21   monetary transaction.  The term monetary transaction means the

22   deposit, withdrawal, transfer or exchange of money by, through,

23   or to a financial institution.

24           The government must also prove that the monetary

25   transaction involved criminally derived property worth more

FB35sil1                    CORRECTED TRANSCRIPT

1    than $10,000, that the property was derived from particular

2    criminal activity, and that Mr. Silver knew that the

3    transaction involved proceeds of a crime.

4            As to each of the crimes charged, there are other

5    elements that the government must prove but for now that gives

6    you an idea of some of the things you will be asked to decide

7    at the end of the trial.  Keep in mind that these are only

8    preliminary instructions.  I will give you complete

9    instructions at the end of the trial and those instructions

10   will control your deliberations.

11           At the conclusion of the trial I will explain, in

12   detail, what the government must prove in order to convict the

13   defendant.  For the moment, I will just ask you to remember

14   throughout the trial that the defendant is presumed innocent

15   and the government has the burden of proving guilt beyond a

16   reasonable doubt.  The indictment against the defendant is only

17   an accusation, it is not proof of guilt or anything else.  The

18   defendant starts with a clean slate and it keeps that clean

19   slate throughout the trial until you retire to deliberate.

20           The burden of proof remains on the government

21   throughout the case.  I will tell you more when I instruct you

22   at the conclusion of the trial concerning the government's

23   burden of proof and the defendant's presumption of innocence.

24   For the moment, I will just say that this burden means that a

25   defendant and his lawyer need not present any evidence in the

FB35sil1                         CORRECTED TRANSCRIPT

1    case if they choose not to do so.  They can sit in silence

2    throughout all of these proceedings without ever saying a word

3    and you can draw no inference against the defendant.  You

4    cannot find a defendant guilty unless and until you are

5    unanimously convinced beyond a reasonable doubt of his guilt

6    based on the evidence in the case.

7         You have each been given memo books in which you may

8    take notes.  You don't have to take notes but you may if you

9    want to.  Please be sure, though, that any note-taking does not

10   interfere with your listening and considering the evidence.

11   Also, if you do take notes, you must not show them to or

12   discuss them with any other juror or anyone else either before

13   or during your deliberations.  Any notes you take may be used

14   solely to assist you and your notes are not a substitute for

15   your recollection of the evidence.  The fact that a particular

16   juror takes notes entitles that juror's view to no greater

17   weight than those of any other juror.  If, during your

18   deliberations, you have any doubt about any of the testimony or

19   just need your recollection refreshed, you will be permitted to

20   ask that the official transcript that is being made of these

21   proceedings be read to you.

22        I will ask you to leave your notebooks on your seat

23   when you leave the courtroom.  Mr. Brantley, my deputy, will

24   collect your notebooks at the end of each day to safeguard

25   them.  After the trial has concluded, your notes will be

FB35sil1                          CORRECTED TRANSCRIPT

1   collected and destroyed.

2              I need to caution you about certain rules that govern

3   your conduct as jurors.

4              First, you must keep an open mind during the trial.

5   You cannot decide the case based on little bits and pieces of

6   evidence and it is not fair to the parties for you to start

7   making up your mind until you have heard all of the evidence.

8              Along those lines, do not talk to each other about

9   this case until all of the evidence has been received and you

10  have been charged on the law and sent to the jury room to

11  deliberate.

12             Do not talk with anyone else about the case or about

13  anyone who has anything to do with it until the trial has end

14  and you have been discharged as jurors.  By anyone else I mean

15  everyone -- members of your family, your friends, your

16  co-workers, and people on the subway.  If you are asked you may

17  say that you are a juror in a criminal case that is expected to

18  last four to six weeks, but you may not tell anyone anything

19  about the case until after you have been discharged from the

20  jury by me.

21             Do not let anyone talk to you about the case or about

22  anyone who has anything to do with it.  If someone tries to

23  talk to you, please report it to me immediately through

24  Mr. Brantley.  You should not, however, discuss with your

25  fellow jurors either that fact or any other fact that you feel

FB35sil1                    CORRECTED TRANSCRIPT

1    is necessary to bring to the attention of the Court.

2              Do not talk to any of the parties or the attorneys or

3    any witness.  By this I mean do not talk at all, even to pass

4    the time of day or to say good morning.  The lawyers and the

5    parties know that they are not supposed to speak to you or even

6    to acknowledge you with a hello or a good morning outside of

7    the courtroom.  So, while it may seem odd not to say hello or

8    to acknowledge the parties or attorneys, if you run into them

9    coming into the court house or the elevator, you will be

10   creating an awkward situation for everyone if you speak to them

11   or acknowledge their presence with a smile or a nod.  They know

12   they cannot speak to you, even just to exchange pleasantries,

13   so please don't put them in a position where they seem to snub

14   you because you acknowledge them.

15             There will be press coverage in this case.  As

16   tempting as it might be to read about what you are

17   experiencing, do not read any news stories or articles, or

18   listen to any radio or television reports about the case or

19   about anyone who has anything to do with it.  That admonition

20   extends to less formal writings about the trial including blog

21   postings and tweets.  The reason for this is it is important

22   that you decide the case based solely on what you see and hear

23   during trial in the courtroom, not based on what a reporter

24   thinks he or she saw or heard in the courtroom.

25             Do not do any research or any investigation about the

FB35sil1                    CORRECTED TRANSCRIPT

1    case on your own.  You, as jurors, must decide this case based

2    solely on the evidence presented in the courtroom.  This means

3    that during trial you must not conduct any independent research

4    about this case, the matters in the case, the parties involved,

5    their attorneys, or any witnesses.  Do not consult dictionaries

6    or reference materials, search the internet, visit websites or

7    blogs, or use any other electronic tool to obtain information

8    about the case.  Do not visit any place you might hear

9    described during the trial.

10           I know that many of you use cell phones and iPhones,

11   iPads, Blackberries, the Internet, social media, and other

12   tools of technology.  My direction that you not talk about the

13   case until you retire to deliberate includes use of those sorts

14   of tools to communicate electronically with anyone about the

15   case or even about your experience as a juror.  You can't

16   complain that it is too hot or too cold.  You can't talk about

17   it at all.  You may not communicate with anyone about the case

18   or about your juror experience through e-mail, text messaging,

19   Twitter, through a blog or website, or in any other way through

20   a social networking websites including Facebook, LinkedIn,

21   SnapChat, or YouTube.  I have probably missed services, maybe

22   even your current favorite.  I have not done so intentionally.

23   Do not communicate about the case or about your experience as a

24   juror through any means until you have completed your

25   deliberations and have been excused.  I stress this at some

FB35sil1                         CORRECTED TRANSCRIPT

1    length because I know that some people have become so

2    accustomed to posting everything they do on certain sites that

3    they might do so even without thinking about it.  If you are

4    one of those people, you have to squelch that desire until the

5    case is over.

6            If you become aware that any other juror is violating

7    this instruction, you should bring it to my attention through

8    Mr. Brantley but, please, do not make it known to any other

9    juror.

10           Finally, I would like to summarize the stages of the

11   trial for you.

12           First, each side may but does not have to make an

13   opening statement.  An opening statement is not evidence, it is

14   just an outline of what that party intends to prove and it is

15   offered to help you follow the evidence.

16           After opening statements the government will present

17   witnesses and the defendant may cross-examine them.  Then, if

18   desired, the defendant will present witnesses and the

19   government may cross-examine them.  After the defendant rests,

20   the government may call additional witnesses to rebut the

21   defendant's evidence.

22           After all of that, the parties will make their closing

23   arguments to summarize and give you their interpretation of the

24   evidence.  Obviously, like opening statements, the closing

25   arguments are not evidence.  After the closing arguments I will

FB35sil1                    CORRECTED TRANSCRIPT

1   give you instructions on the law and then you will retire to

2   deliberate on your verdict.  Keep an open mind until I have

3   instructed you on the law and the end of the case and after you

4   and your fellow jurors have discussed the evidence.

5            In terms of the conduct of the trial, we will sit from

6   9:30 in the morning until 5:30.  And except for openings and

7   summations, the trial will be held in the courtroom where we

8   did jury selection.  So that we can start promptly at 9:30, I

9   am asking all of you to get here between 9:00 and 9:15.

10  Remember that it always takes a little bit of time to get

11  through security so allow a little extra time.  We will have

12  coffee and light breakfast available for you starting at 9:00.

13  Let me stress how important it is for you to arrive on time.  I

14  have estimated that this trial will last four to six weeks but

15  that schedule depends on us starting on time every day.  We

16  cannot do that if you are not here on time.  We will break for

17  lunch between 12:30 and 1:00 for one hour and we will have a

18  10-minute break in the middle of the morning and in the middle

19  of the afternoon.  We will take no other breaks so, please,

20  plan accordingly.

21           We generally will have sandwiches and sodas for you

22  for lunch.  That allows us to keep the lunch to exactly one

23  hour.  Most weeks we will sit just Monday through Thursday.

24  Next week we will not sit on Veterans' Day which is Wednesday,

25  November the 11th, but we will sit on Friday that week which is

FB35sil1                          Opening – Ms. Cohen

November the 13th.  The Court will break early on the Wednesday

before Thanksgiving and we will not sit the Friday after

Thanksgiving.

          Let me stress again:  If you are late you will keep

all of your fellow jurors, me, and the attorneys waiting.  We

cannot start without all of our jurors and alternates so,

please, be on time.

          The lawyers and I will be here no later than 9:15 so

that we can be sure not to keep you waiting.  That said, if

there are times that we do keep you waiting in the jury room,

rest assured that we are working in the courtroom and we will

do everything within our power to make efficient use of your

time.

          Ms. Cohen.

          MS. COHEN:  Thank you, your Honor.

          Power.  Greed.  Corruption.  This is a case about a

powerful politician who betrayed those that he was supposed to

serve in order to line his pockets.  Year, after year, after

year, Sheldon Silver was on the take.  He collected nearly $4

million in bribes and kickbacks.  This man, the defendant,

Sheldon Silver, abused the power that he had as the leader of

the New York State Assembly to make himself rich.  And because

the defendant was on the take, he kept secrets from everyone

and told lie after lie about how he made his fortune.  That's

what this case is about:  Power.  Greed.  Corruption.

1          Sheldon Silver did not meet his bribers in dark, shady
2     alleys to take bags of cash.  He was far too calculating for
3     that.  You will learn that the defendant found a way to use his
4     law license to disguise millions of dollars in bribes and
5     kickbacks as so-called attorney referral fees.  He got those
6     bribes and kickbacks in two ways, first, through a law firm
7     that represented asbestos patients; and second, through a
8     different law firm that represented real estate developers.
9     You will learn all about how the defendant obtained those
10    so-called attorney referral fees in exchange for abusing the
11    great power of his office.  This was not politics as usual,
12    this was bribes and kickbacks, illegal criminal conduct.
13         So, let me tell you a bit more about the defendant's
14    two corrupt schemes.  First, the defendant funneled half a
15    million dollars of taxpayer money and other official benefits
16    to a doctor who, in turn, steered patients who had valuable
17    asbestos-related illnesses to a law firm that shared its
18    million dollar fees with the defendant, referral fees the
19    defendant got through bribes and kickbacks.
20         The second scheme involved the real estate industry.
21    You will learn that the defendant, as Speaker of the New York
22    State Assembly, held enormous power over New York real estate.
23    The real estate industry was absolutely captive to the state
24    legislature generally, and to Sheldon Silver, the Speaker, in
25    particular, and the defendant took full advantage of that

FB35sil1                              Opening — Ms. Cohen

1    power.  He steered certain wealthy real estate developers to

2    another law firm so that a share of those millions in

3    attorney's fees secretly would be kicked back to him.

4            Together, these two schemes netted the defendant

5    nearly $4 million, some of which the defendant then laundered

6    through exclusive private investments that made him nearly

7    another million dollars.  In other words, the defendant took

8    the power given to him by the people of the State of New York

9    and abused it to enrich himself to the tune of $5 million.

10           For years Sheldon Silver went out of his way to hide

11   the truth.  He told lie after lie and kept secret after secret.

12   But at this trial the truth will finally come out, the truth

13   about the defendant's power, the truth about the defendant's

14   greed, and the truth about the defendant's corruption.  That's

15   what this case is about.

16           During the rest of this opening statement I'm going to

17   do three things.  First, I will describe for you what the

18   government expects the evidence to show during the trial.

19   Second, I will explain for you how we will prove our case to

20   you.  Third, I will tell you a little bit about the charges

21   against the defendant.

22           First, let's talk about the defendant's bribery scheme

23   involving the doctor.

24           The scheme begins with the defendant getting on the

25   payroll of an asbestos law firm called Weitz & Luxenberg.  You

FB35sil1                              Opening - Ms. Cohen

1    will learn that state legislators are not barred from having a

2    private job on the side but politicians cannot use their

3    official position on the inside to get money on the outside

4    through bribes and kickbacks.  But that is just what the

5    evidence will show the defendant did.

6           You see, you will learn that Weitz & Luxenberg is a

7    firm that focused on asbestos cases including people that have

8    a deadly type of cancer called mesothelioma.  Patients

9    suffering from mesothelioma can sue companies that manufactured

10   or dealt with asbestos and they can win millions of dollars in

11   compensation.  The lawyers who bring those cases, they get paid

12   on something called a contingency fee which means they receive

13   a percentage of the money they recover for their clients.  That

14   percentage itself often amounts to millions of dollars.

15          So, about 10 years ago Weitz & Luxenberg hired the

16   defendant, the Speaker of the New York State Assembly even back

17   then.  You will learn that the firm did not hire this

18   politician to do any actual work.  The defendant had no

19   experience in asbestos cases.  In fact, although he had a law

20   degree, the defendant didn't really practice law at all.  He

21   didn't go to court, he didn't meet with clients, he didn't

22   negotiate settlements, he didn't draft legal papers.  Rather,

23   Weitz & Luxenberg hired the defendant because he was the

24   speaker of the New York State Assembly.

25          The Weitz & Luxenberg firm paid the defendant a

1   regular salary but you will learn there was a way for the

2   defendant to make even more money, and that was by finding

3   people who had mesothelioma.  As I mentioned, when

4   Weitz & Luxenberg got millions for people who had mesothelioma,

5   the firm got paid a percentage of those millions and gave part

6   of that to any attorney that had referred the client to the

7   firm, something that is called a referral fee.  So, when the

8   defendant went to Weitz & Luxenberg firm he knew that the key

9   to unlocking millions of dollars was to find patients with

10  mesothelioma before they hired another law firm.  But where to

11  find those patients?  Well, the very good place, you will

12  learn, are the doctors who treated them and the defendant knew

13  of one such doctor, Dr. Robert Taub.

14          Now, Dr. Taub had plenty of patients with

15  mesothelioma, patients with legal claims worth millions of

16  dollars but there was one problem and the defendant knew it --

17  Dr. Taub believed that law firms that make millions from

18  representing patients with mesothelioma, Dr. Taub believed they

19  should give back by donating money for research to treat and

20  cure the disease but Weitz & Luxenberg firm did not donate to

21  research and Dr. Taub knew that.  So, the defendant had a

22  problem but he came up with an answer, a corrupt answer.  He

23  would take the people's money, taxpayer money that he firmly

24  controlled as a part of the power of the being the Speaker, the

25  defendant would direct that State money to Dr. Taub's research

1    so that Dr. Taub would then send him patients at

2    Weitz & Luxenberg and that, in turn, that would lead to

3    millions in kickbacks for Silver.

4            That's what a bribery scheme is, an illegal *quid pro*

5    *quo*.  This, for that.

6            So, the defendant made it known to Dr. Taub that he

7    wanted case referrals and that State money was available for

8    Dr. Taub's research.  Dr. Taub then sent the defendant a letter

9    asking for $250,000 in State grant money for his research.

10   Almost immediately after the defendant got that letter he told

11   his Assembly staff he was very interested in funding the

12   request.  But the defendant didn't fund it right away, he was

13   calculating.  He waited to make sure that he would get what he

14   wanted in return.  This, for that.  And while the defendant

15   waited, Dr. Taub started referring patient after patient to the

16   defendant, hoping to get that State funding for his research.

17   And just as the defendant planned, those patients turned into a

18   gold mine.  Within about a year of Dr. Taub's letter requesting

19   that State funding, Dr. Taub's referrals to the defendant led

20   to $175,000 check going right in the defendant's pocket.  That

21   was more money in just that one check than the defendant made

22   from his annual salary as Speaker of the New York State

23   Assembly.  Once that money began to flow the defendant arranged

24   for that first State grant to go to Dr. Taub's research.  And,

25   as the patients kept coming, a year later the defendant sent

1   Dr. Taub a second State grant.  That's bribery.  That's what
2   Silver did.
3           And, ladies and gentlemen, the defendant, he did no
4   work on any of the asbestos cases referred to him.  He had no
5   ability to evaluate much less litigate a mesothelioma case.  He
6   simply passed on the patient name, contact information, and a
7   brief description of the disease that he got from Dr. Taub to
8   the attorneys at Weitz & Luxenberg who actually worked on the
9   cases.  These were extremely valuable leads that proved to be
10  very lucrative to the defendant.  Sending that taxpayer money
11  to Dr. Taub, it is not an act a private lawyer can do.  It is
12  not an act a private citizen can do.  The defendant was only
13  able to do it because he was the Speaker of the New York State
14  Assembly, abuse of his official power.  The only way the
15  defendant got Dr. Taub's patients was by sending half a million
16  dollars of taxpayer money to Dr. Taub's research.  Not the
17  defendant's own money, not Weitz & Luxenberg's money, but the
18  People's money, picking the People's pocket to line his own.
19  That is what the defendant did.
20          And where did the taxpayer money that the defendant
21  gave to Dr. Taub, where did it come from?  This, too, is very
22  telling.  You will learn during this trial that the money came
23  from a secret pot of money that Silver, and Silver alone,
24  controlled.  No advertisement to the public that state money
25  was available.  No open competition for grant proposals.  No

FB35sil1                        Opening - Ms. Cohen

1   review by other doctors to see if the research was something

2   that the state should spend its health care dollars on.  None

3   of that.  The power to distribute the money was Silver's and

4   Silver's alone.

5          You will learn that there were literally thousands of

6   requests made to the defendant and other members of the

7   Assembly for funding of various worthy projects -- hospitals

8   that needed new emergency rooms, schools that needed repair,

9   organizations that served those in need.  The Assembly had

10  various pots of money to fund these requests but could fund

11  only a small portion of them, only a fraction, and the

12  defendant and the defendant alone made those funding decisions.

13         When the defendant wanted something funded, it got

14  funded.  The defendant had total control, total say-so, total

15  power.  In this case the defendant chose to fund Dr. Taub's

16  research above many other worthy requests.  Why did he do that?

17  He didn't do it for friendship.  The defendant and Dr. Taub

18  barely knew each other when the defendant directed that State

19  money to Dr. Taub's research.  Silver did it for the money.

20  You scratch my back and I'll scratch yours.  I give you State

21  money and you give me private asbestos referrals.  This, for

22  that.

23         Here is an important fact to keep in mind as this

24  trial unfolds:  Before the defendant came along, Dr. Taub did

25  not refer cases to Weitz & Luxenberg but after the defendant

FB35sil1                         Opening - Ms. Cohen

1    dangled the possibility of that State grant money and then

2    followed through with half a million dollars of taxpayer money,

3    Weitz & Luxenberg got case after case referred to Silver from

4    Dr. Taub and the defendant began to make millions from those

5    cases.  The defendant got dozens of cases just in the first few

6    years of his *quid pro quo* relationship with Dr. Taub.

7            What else will you hear about how the defendant

8    steered the state funds?  The defendant was a skilled

9    politician, someone who routinely appeared in public to take

10   credit for things that he did.  But you will hear the defendant

11   didn't publicize or speak about those grants he made to

12   Dr. Taub's research, not a word.  The defendant deliberately

13   kept those grants entirely secret.  Not a single press release,

14   not a single mention by the defendant about those grants to the

15   public.  Not a single word about them to anyone even though

16   Dr. Taub's own grant requests said his research might one day

17   help people sickened with asbestos after the World Trade

18   Center, something that was in Silver's own Assembly district,

19   something you would think the defendant would publicize his

20   support of.  A secret deal.  A secret deal known only to the

21   defendant and Dr. Taub.  No one else knew.  And this secrecy

22   was very important to the defendant.  You are going to hear

23   that a few years into the arrangement the defendant's gravy

24   train was about to come to a screeching halt.

25           State law changed and the grants like the one the

FB35sil1                          Opening - Ms. Cohen

1    defendant sent to Dr. Taub's research, they have to be publicly

2    disclosed.  So, what happened when Dr. Taub again wrote to the

3    defendant for the next year of funding for another $125,000?

4    What did the defendant do?  He didn't fund it.  He didn't want

5    the public to know about his secret arrangement with Dr. Taub,

6    a secret arrangement that was funneling millions of dollars

7    into Silver's pocket.  He didn't want to get caught.  But the

8    defendant wanted the gravy train to keep rolling so what did he

9    do?  He found other ways to use his official position to get

10   those referrals and benefit Dr. Taub.  In fact, at this point,

11   the point when the defendant could no longer send secret State

12   money to Dr. Taub, the defendant used his official position to

13   help just about everyone in Dr. Taub's family.

14        Silver steered State money to Dr. Taub's wife's

15   charity.  The defendant reached out to a state court judge to

16   help get an internship for Dr. Taub's daughter.  The defendant

17   urged another charity that was dependent on Silver for state

18   funding to hire Dr. Taub's son, the only time Silver had ever

19   asked that organization to do that.  The defendant even got the

20   Assembly to issue an official proclamation and pass a

21   legislative resolution honoring Dr. Taub.  Why did the

22   defendant do all of this?  He did it for the money.  The

23   defendant took these official actions for Dr. Taub in order to

24   keep those lucrative referrals coming his way and lining his

25   pockets.

FB35sil1                    Opening - Ms. Cohen

1          All tolled, by the end of this long-running scheme in

2     return for the half million in State money and all those

3     official benefits, the defendant got about 50 cases referred to

4     him from Dr. Taub, 50 cases that equal nearly or a little more

5     than $3 million in Silver's pocket, $3 million in corrupt

6     referral fees.  The defendant got $3 million through bribes and

7     kickbacks disguised as attorney referral fees.

8          Power.  Greed.  Corruption.  That is what the asbestos

9     scheme is about.

10          Now let me turn to the defendant's second scheme, the

11     real estate scheme.  For this scheme there are different names

12     and a different law firm but the defendant had the very same

13     playbook, abused his official position for private gain, used

14     his law license to take bribes and kickbacks and disguise them

15     as attorney referral fees.

16          How did this scheme work?  The evidence will show that

17     the defendant caused two major real estate developers, Glenwood

18     Management and The Witkoff Group, to hire a lawyer who was an

19     acquaintance of Silver's, a man named Jay Goldberg.  In

20     exchange, Goldberg agreed to kick back a portion of his fees to

21     the defendant.  As for the real estate scheme, the defendant

22     performed no work at all to get this money.  Really, none.  The

23     defendant got paid hundreds of thousands of dollars for having

24     arranged the business through his official power and influence.

25     Same as with the asbestos scheme, same playbook, same game

FB35sil1                           Opening - Ms. Cohen

1    plan.

2             How did this scheme begin?  You will learn during this

3    trial that years ago Glenwood and Witkoff talked with Sheldon

4    Silver and Silver told them he wanted them to hire Goldberg.

5    These developers, you will learn, had massive amounts of

6    business before the State and they were totally dependent on

7    favorable state laws and favorable state regulations.  So, what

8    did the developers say when the powerful Speaker of the

9    Assembly told them he wanted them to hire Goldberg?  The

10   developers did exactly as they were asked.  They said yes, of

11   course.

12            After the developers hired Goldberg and Goldberg

13   started paying kickbacks to the defendant, the money from this

14   scheme started rolling in to the defendant.  The defendant got

15   hundreds and thousands of dollars through nothing more than

16   abusing his official position to steer business to that

17   attorney.  This, for that.  The defendant used his official

18   position to get the real estate developers to hire Goldberg

19   and, in exchange, Goldberg kicked back part of his money to the

20   defendant disguised as attorney referral fees -- an illegal

21   *quid pro quo*.

22            Like with that secret pot of State money that the

23   defendant used to send to Dr. Taub's research, you will learn

24   at this trial just how much power and influence the defendant,

25   as Speaker of the New York State Assembly, also had over large

1   real estate developers such as Glenwood and Witkoff.  The

2   defendant held the fate of their business in his hands.

3          As the Speaker of the New York State Assembly, a

4   position the defendant held for more than 20 years, the

5   defendant exercised immense and unrivaled power over the real

6   estate industry.  The defendant controlled billions of dollars

7   in state real estate financing.  The defendant controlled what

8   real estate laws got introduced.  The defendant negotiated key

9   pieces of legislation important to the real estate industry.

10         So, the state was critical to both Glenwood and

11  Witkoff.  The state provided huge real estate tax breaks to

12  developers of new buildings and controlled rent regulation laws

13  that had a huge impact on the profits of those real estate

14  developers.  These real estate tax and rent control laws, they

15  are not permanent, they expire after a set period of time and

16  so those laws are renegotiated with the state legislature every

17  few years.  The renewal of these laws is worth hundreds of

18  millions of dollars to the developers.  And guess who had the

19  power to renegotiate the renewals of those laws?  The

20  defendant, Sheldon Silver.

21         The State is so vital to Glenwood's interest that it

22  had a team of lobbyists devoted to persuading elected officials

23  in the state legislature to keep those tax breaks and other

24  favorable laws on the books.  The State is so vital to

25  Glenwood's business that Glenwood was the single largest

FB35sil1                         Opening - Ms. Cohen

1      contributor in the entire state to state politicians and their

2      political committees.  Number one in political contributions in

3      the entire state.

4              The defendant understood how much power he wielded

5      over the real estate industry.  He negotiated the very laws

6      that they depended on and the defendant abused that power, just

7      as he did in the asbestos scheme to line his pockets.

8              While the defendant was on the take getting hundreds

9      of thousands of dollars in corrupt payments from Goldberg, the

10     defendant took critical official action that benefited the

11     developers.  For example, while the defendant publicly was

12     known as an advocate for the tenants, when the real

13     negotiations over the most important piece of real estate

14     legislation in years were about to take place behind closed

15     doors in the State Capitol, the defendant had a private meeting

16     with Glenwood's lobbyists and then signed off on a version of

17     the law that Glenwood supported.  That law kept Glenwood's

18     favorable tax break program in place for another four years

19     without hurting Glenwood on rent regulation or other

20     legislation.  Silver did not bite the hand that fed him.

21             At the same time that the defendant was negotiating

22     these incredibly important laws that could make or break

23     Glenwood and the real estate industry, as you will learn what

24     was hidden from the public.

25                  (Continued on next page)

1          MS. COHEN:  The defendant was secretly being paid

2     hundreds of thousands of dollars by Glenwood.  He was on

3     Glenwood's payroll as well as Witkoff's payroll with those

4     payouts routed through the Goldberg firm.

5          You'll learn that the defendant took other official

6     acts that benefited Glenwood.  The defendant signed off on a

7     what totaled more than $1,000,000,000 in tax-exempt financing

8     for Glenwood's buildings.  When Glenwood needed help to stop

9     the drug treatment center from relocating near one of its

10    buildings, Silver sprang into action and intervened with a

11    state licensing agency.

12         All told, at the end of this long-running scheme, the

13    defendant pocketed another 3 quarters of a million dollars.

14    Power, greed, corruption.  That is what the real estate scheme,

15    as well as the asbestos scheme, were all about.

16         So what did the defendant do with all the money he got

17    from his corrupt schemes?  The defendant took in more than

18    $3,000,000 from the asbestos scheme and got another 3 quarters

19    of a million dollars from the real estate scheme for a total of

20    nearly $4,000,000.

21         What did he do with his riches?  The defendant took

22    some of those criminal proceeds, and he moved them through

23    various bank accounts into exclusive, private investments.  You

24    will hear more about these investments during this trial and

25    how the defendant gained access to them.

1              In short, the defendant netted himself nearly another

2    million dollars through laundering his criminal proceeds,

3    totaling about five million dollars.  A total of five million

4    corrupt dollars, all money the defendant got by abusing his

5    public position -- converting the power and the influence given

6    to him by the people of the state of New York into millions for

7    himself, for millions in his pocket.

8              So how will the government prove all this to you

9    during the trial?

10             You will hear from a number of witnesses and see many

11   documents.  You will hear from Dr. Taub, the founders and

12   attorneys at Weitz & Luxenberg, members of Silver's own

13   assembly staff, representatives of Glenwood, an attorney from

14   the Goldberg firm, and the businessman who gave the defendant

15   access to those exclusive, private investments, just to name a

16   few.

17             Some of those witnesses have entered into what are

18   nonprosecution agreements with the government, or they have

19   court-ordered immunity so they cannot be charged in connection

20   with the defendant's schemes as long as they tell the truth.

21             So, for these witnesses, as well as all the other

22   witnesses, you should scrutinize their testimony.  You should

23   see their testimony is corroborated by all the other evidence

24   that you will see and hear during this trial and make sure is

25   it corroborated by your common sense, the same common sense you

1    use this your everyday lives.

2              You will see lots of other evidence.  You will see the

3    state grant documents.  You will see phone records.  You will

4    see the secret side letter signed by Glenwood, Goldberg, and

5    the defendant.

6              You will see check after check from Weitz & Luxenberg

7    and all the kickback checks from Goldberg to the defendant.

8    You will also see evidence showing how the defendant lied and

9    tried to cover his tracks every step of the way.

10             These lies and secrets will confirm for you what your

11   common sense will tell you.  The grant money to Dr. Taub's

12   research, the official acts for the real estate developers --

13   they were not ordinary exercises of official power, not

14   politics as usual.

15             Rather, they are evidence of an illegal quid pro quo,

16   this for that.  The lies and secrets of the defendant will help

17   prove that to you.

18             During this trial, you will hear some of the lies in

19   the defendant's own words in taped statements he made to the

20   press long before he thought he might get caught.

21             You will hear the defendant say -- and I quote -- "I

22   don't represent corporations who have business before the

23   legislature."  The defendant didn't represent corporations?

24   Glenwood is a corporation.  It is a billion-dollar corporation.

25             The defendant didn't represent corporations that have

1    business before the legislature?  The defendant signed a secret

2    deal with Glenwood about his representation of Glenwood and the

3    fees he was getting from them, and Glenwood's entire business

4    is before the state legislature.

5           You will hear the defendant say on tape that he earned

6    his outside income from individuals who had heard of him

7    because -- and I quote -- "I've been a lawyer for 40 years.  A

8    lot of people have, in some way, recommended people to me."

9           The defendant got clients because people recommended

10   him because he's been a lawyer for 40 years?  Dr. Taub sent the

11   defendant clients, not because the defendant had been a lawyer

12   for 40 years, but because the defendant had helped him with

13   that state money and official benefits.

14          The defendant got clients through the recommendations

15   of a lot of people?  Dr. Taub was the only one who recommended

16   all those asbestos clients to the defendant.

17          And Glenwood and Witkoff weren't recommended to

18   Silver.  Quite the opposite.  The defendant directed them to go

19   to Goldberg, who agreed to pay him kickbacks for those

20   recommendations.

21          You will not only hear the defendant's lies on those

22   tapes, you will see his lies in official documents filed with

23   the state.  You will learn that while elected members of the

24   assembly can hold other jobs, they must disclose the sources of

25   all their outside income in written financial disclosure forms

FB3YSIL2                          Opening - Ms. Cohen

1    each year.

2          You will see those disclosure documents that the

3    defendant filed every year.  They're filled with lies year

4    after year.  The defendant lied about the nature of his law

5    practice and the source of his outside income.

6          The defendant stated that he had a personal injury

7    practice at Weitz & Luxenberg, not a word about asbestos, which

8    might have caused the public to wonder what the defendant was

9    doing to get those lucrative asbestos referrals.

10         Not a word about the Goldberg firm and all those

11   hundreds of thousands of dollars in real estate payments,

12   hiding the fact that the defendant was on retainer for the real

13   estate industry and specifically for developers whose

14   businesses depended on the state.

15         Some more secrets the defendant kept to hide his

16   corrupt schemes.  The defendant made sure that people who knew

17   one side of his scheme, the quid, also did not know the other

18   side, the quo, and vice versa.

19         So some staff members of the assembly knew that the

20   defendant was sending state money to Dr. Taub's research, but

21   the defendant kept secret from all of them that Dr. Taub sent

22   cases to him in return and that he was making millions of

23   dollars off of his relationship with Dr. Taub.

24         And the founders of Weitz & Luxenberg and the

25   attorneys there who actually worked on the asbestos cases

1    referred to the firm by Dr. Taub -- they knew Dr. Taub was

2    referring cases to the defendant, but the defendant kept secret

3    from all of them that he was using taxpayer money and other

4    official benefits to get those referrals.

5            And remember all of the other secrets I told you the

6    evidence would show you earlier:  The secret pot of money that

7    the defendant used to fund Dr. Taub's research.

8            No disclosure to the public or publicity about the

9    grants the defendant made to Dr. Taub's research.  For the real

10   estate scheme, no one in the assembly, no one, knew that at the

11   same time the defendant was giving favorable treatment to

12   Glenwood's interests in official legislation vital to Glenwood

13   or when the defendant was signing off on more than a billion

14   dollars of state-subsidized tax funding for Glenwood's

15   building.  No one in the assembly knew that Silver himself was

16   getting hundreds and thousands of dollars from Glenwood.

17           The defendant also went to great lengths to keep the

18   public from knowing how much money he had amassed from his

19   corrupt schemes.

20           In what now should be a familiar refrain, the

21   defendant hid from the businessman who got him access to those

22   exclusive and private investments, hid from him the truth about

23   how he had come to have so much money or where such money

24   actually came from.

25           Here is one more blatant lie you'll learn about during

1    this trial.  While the defendant had to report the exclusive

2    investments on those annual financial disclosure forms I talked

3    about, you will learn the defendant hid the truth from the

4    public about the money he made on those investments.

5         When those state-required annual financial disclosure

6    forms changed so that the defendant had to show the public how

7    much money he actually had amassed, he put hundreds and

8    thousands of dollars of his ill-gotten gains in the name of his

9    wife to deceive the public about how much money he actually

10   had.

11        In fact, you will learn that with respect to all these

12   schemes, the defendant was so concerned about his criminal

13   activity being revealed that he fought a New York State

14   government commission from getting information about his

15   outside income.

16        The commission never found out.  It never learned the

17   truth.  But, ladies and gentlemen, over the course of this

18   trial, through the witnesses, the documents, the tape

19   recordings, the government will bring you behind Silver's wall

20   of lies and secrets.

21        You will learn the truth during this trial.  You will

22   learn the truth about the defendant's outside income; that he

23   got it through bribes and kickbacks.  You will learn that the

24   defendant committed federal crimes.

25        So what are the charges against the defendant?  The

FB3YSIL2                    Opening - Ms. Cohen

1   defendant is charged in six counts related to the asbestos and

2   real estate schemes.  Judge Caproni will instruct you about the

3   law for each charge, and you should pay very careful attention

4   to her instructions.

5           But, in general, the defendant is charged with honest

6   services fraud and a crime called extortion under color of

7   official right for abusing his public office in exchange for

8   bribes and kickbacks.

9           And the defendant also is charged in a seventh count

10  with money laundering for his transfer of those criminal

11  proceeds to those exclusive investments.

12          Power, greed, corruption.  That is what this case is

13  about.  During the course of this trial, I ask that you do

14  three things:  First, listen carefully to the evidence as it

15  comes in during the trial.

16          Second, listen and follow Judge Caproni's instructions

17  about the law.

18          Third, use your common sense, the same common sense

19  you use in your everyday lives.

20          If you do those three things, at the end of this

21  trial, you will return the only verdict that is consistent with

22  the facts, the law, and your common sense, that the defendant,

23  Sheldon Silver, is guilty beyond a reasonable doubt.

24          Thank you, your Honor.

25          THE COURT:  Thank you, Ms. Cohen.

1              Mr. Molo.

2              MR. MOLO:  Judge, there was one issue that we had

3    upstairs.

4              THE COURT:  I thought we resolved that.

5              MR. MOLO:  I thought we had as well, but I just want

6    to make sure.

7              (At the sidebar)

8              MR. MOLO:  We contacted counsel from Weitz &

9    Luxenberg, and the managing partner says that this appears to

10   be a website that they had in 2002.  They're even going through

11   an extra step further.

12             THE COURT:  Okay.  I'm going to allow it.

13             MR. MOLO:  Thank you.

14             (In open court)

15             MR. MOLO:  May I proceed, your Honor?

16             THE COURT:  Yes, you may.

17             MR. MOLO:  Quid quo pro, power, greed, corruption.

18   Make no mistake about it.  The charge that these prosecutors

19   have bought is that Sheldon Silver sold his office.  That is

20   what they're charging him with.  That did not happen.  He is

21   not guilty.  He has not committed a crime.

22             Good morning.  We're approaching the afternoon.  I'm

23   Steve Molo as the judge told you yesterday.  It's my honor to

24   represent Mr. Sheldon Silver who is here.

25             Mr. Silver, could you stand up for just one second.

1          He is along with my colleagues Justin Shur and Joel
2     Cohen.

3          We're here today, and I have the opportunity to make
4     for you this morning an opening statement, an opening statement
5     to basically take you through and show you what confidently the
6     evidence in this case will demonstrate, will prove to you.

7          When I say this case, it is a very odd case.  This is
8     a very unusual case.  This is one of the most unusual criminal
9     cases you will ever hear about.

10         There's a presumption of innocence, as the judge
11    explained to you, and I think that's foremost in everyone's
12    mind in these settings, and it should be in this sort of a
13    case.

14         That presumption of innocence is something that each
15    of us share.  You know, Ms. Cohen said use your common sense.
16    Common sense tells us all that politicians are not the most
17    popular people in America.

18         A lot of people don't like politicians.  All the polls
19    say that.  In fact, there are a lot of reasons why people might
20    not like politicians.

21         Just because he's a politician doesn't mean that
22    Mr. Silver is not entitled to that same presumption of
23    innocence that all of us, every one in this room, enjoys.  We
24    thank you for keeping that foremost and affording him that
25    privilege.  It's more than a privilege.  It's a right.  It's a

1    right under our constitution.

2            Because the prosecution gets to go first and has this

3    burden of proof beyond a reasonable doubt that Judge Caproni

4    explained, I don't have to make an opening statement.  I could

5    sit there and play solitaire if I wanted to, and it wouldn't

6    matter.

7            We wouldn't have to put on a witness.  We don't have

8    to do anything.  We don't have to cross-examine a witness.  It

9    is the prosecution's burden to prove their case beyond a

10   reasonable doubt.

11           Now, I welcome though the opportunity to get up here

12   and talk about the evidence.  That's because they want to

13   convince you of something that they don't like and say that

14   that something is somehow illegal when it is not illegal.

15           I want you to know that there are things that the

16   prosecutors have chosen not to tell you so that you can see for

17   yourselves, throughout this case, that Mr. Silver committed no

18   crime.

19           Now, Judge Caproni told you that opening statements

20   are not evidence, and that's true.  They're not evidence.  But

21   they're also not like some press conference someone can hold on

22   a courtroom step or a courthouse step and proclaim all kinds of

23   things and not be held accountable.

24           We are here in a court of law deciding very serious

25   charges under the law.  I want you to hold me accountable for

1    everything that I say to you in this opening statement, and I

2    want you to hold those prosecutors accountable for everything

3    that they tell you as well.

4            Now, they told you a little bit about Mr. Silver, and

5    you heard a little bit about him yesterday.  Some of you may

6    have heard his name before.  I think during jury selection we

7    heard that from most people.

8            Mr. Silver is about as New York as New York gets.  He

9    grew up not far from here on the Lower East Side in an orthodox

10   Jewish family where his father ran a hardware store.

11           He still lives in the Lower East Side.  He and his

12   wife, Rosa, have raised a family there.  He's 71 years old as

13   we sit here today.

14           He's been a lawyer since 1969.  He went to Yoshida

15   University, and he went to Brooklyn Law School.  He got his law

16   license, and he's practiced primarily in the area of personal

17   injury law, people who are injured, people who suffer from

18   either being in an accident, being hurt by a product, whatever

19   it may be.  That's the kind of law that he's done.

20           Like many lawyers, sometimes he gets a case that isn't

21   within his specialty, and he sends that off to someone else.

22   And that someone else is another lawyer who has that specialty,

23   and that lawyer pays a referral fee.  You're going to hear

24   evidence in this case that that's a very, very common thing in

25   the legal profession.

```
 1            In addition to being a lawyer, he's also a member of
 2      the New York assembly.  I'll just flip up quickly, and it's
 3      blurred there for a reason so that you can't read the details,
 4      but you see a picture of Mr. Silver.
 5            The judge told you can't go on the Internet, and you
 6      can't for good reason, because there are legal protections that
 7      are afforded by not learning about the case outside this
 8      courtroom.
 9            Were you to go on the Internet and look at his web
10      page, this is what it would look like.  It will tell you about
11      his strong work for the people of New York in the areas of
12      housing and health care, education, the environment, the
13      redevelopment of lower Manhattan following 9/11 --
14            MS. COHEN:  Objection, your Honor.
15            THE COURT:  Overruled.
16            MR. MOLO:  -- which is in his district.
17            In fact, this courthouse is right near his district.
18      It's not actually in his district, but you could probably go
19      out on the steps and throw a baseball, and it would land on his
20      district.  At one point in time, he actually represented the
21      Statue of Liberty.  Liberty Island was in his district.  It's
22      always been in this area.
23            Since 1976, he has represented the people of the Lower
24      East Side.  For 21 years, he served as the speaker of the
25      assembly.
```

1          Now, the speaker's job is to lead the assembly.  There

2     are two branches of the legislature in New York.  There's the

3     assembly, and then there's the senate.  The speaker is the

4     leader of the senate.

5          So he has to get, in the first instance, elected by

6     the population of his district, the voters in his district.

7     But then he also gets elected by the members of the assembly.

8          Some of you may have seen this on TV.  Some of this

9     may be new to you.  That's what the assembly is.  That's the

10    chamber hall.

11         You'll notice that there are all these seats here.

12    All these seats are people who are themselves representatives

13    who work with the speaker and who eventually elect the speaker.

14         They themselves each represent over 100,000

15    New Yorkers in their various districts.  The speaker works with

16    the leader of the senate and works with the governor on behalf

17    of his chamber to pass laws and make things work for New York.

18         In doing that, varying interests have to get taken

19    into consideration.  You might imagine that when you look at

20    just the assembly, putting aside the senate and the governor,

21    there are a lot of different points of view that are going to

22    be represented by people in different parts of the city who

23    have different interests.

24         If you live on the Lower East Side of New York, you

25    might have a different interest from somebody who lives on the

1   Upper West Side for that matter but certainly different than

2   somebody who lives in Buffalo, somebody who lives in Albany.

3   Somebody would lives in Syracuse is going to have a different

4   interest than a person who lives in New York City.

5           So one way or another, all of this needs to get worked

6   out, and some kind of agreement has to be come to in order for

7   the process to work and for people to be served by the

8   government.

9           Now, I said to you, when I started, that this is a

10  highly unusual criminal case, perhaps as unusual a criminal

11  case as you'll ever see.

12          Do you know why?  Because these are the issues that

13  are here -- maintaining affordable housing; state support for

14  finding a cure for cancer, and not just any cancer but a cancer

15  that really affects blue-color workers; obtaining justice for

16  people who have suffered that cancer at the hands of large

17  corporations that manufactured asbestos or used it in their

18  products; and also helping worthy charities.

19          These are the things that are central to this case.

20  You're going to ask yourself how could that possibly get

21  twisted into some kind of a criminal charge?  But it's twisted

22  into a criminal charge based on a point of view.

23          How do you look at something?  Are you looking out at

24  something, and are you seeing it clearly with clean windows?

25  Or are you looking out at something, and do you have dirty

1    windows so that everything you see outside is dirty and is not

2    clear?

3            The prosecutors here have adopted a point of view

4    through dirty windows.  They look at conduct which is legal,

5    conduct which is normal, conduct which allows government to

6    function consistent with the way that our founding fathers of

7    the state of New York wanted it to function, and they say, this

8    is illegal.

9            There are a whole bunch of things they don't like.  We

10   heard about them.  They don't like the fact that serving in the

11   assembly is a part-time job.

12           They don't like the fact that there's no limit on the

13   amount of income that you can make serving in one of these

14   outside jobs and still be a person in the assembly.

15           They don't like the fact -- and you heard it loud and

16   clear -- that a lawyer can actually work in a law firm, not

17   work on a case, and be paid, do no work, perfectly legal; that

18   legislators must compromise on positions that they strongly,

19   strongly believe in.

20           They don't like the fact that legislators have private

21   meetings with lobbyists or that people in positions of

22   influence have people that come to them and want to be around

23   them, want to have a connection.  They don't like the fact that

24   friends might do favors for friends.

25           They may not like those things, and they may not like

FB3YSIL2                      Opening - Mr. Molo

1    them in the specific context of this case, but none of those

2    things are a crime.  None of them amount to Sheldon Silver

3    selling his office.

4           Now, you may be surprised to know -- and a lot of

5    people are.  I know when I became involved in this matter, I

6    stopped people on the street and asked them -- a lot of people

7    don't know that New York legislators, the senate and the

8    assembly, are part-time.

9           This wasn't just some idea that somebody had.  This

10   goes back to the New York Constitution.  The New York

11   Constitution requires, since the 1700's, that legislators be

12   part-time.  The constitution has been amended several times

13   since then, and it's never changed.

14          Many people don't know that, and they think that

15   New York State legislators are like the legislators in

16   congress, the United States senators and congressmen, who are

17   really full-time and get the opportunity to make a little bit

18   of extra money, but they're really full-time.  That's not the

19   case in New York.  We see that by what happens in congress, the

20   gridlock that occurs.

21          New York has adopted a citizen legislature model; that

22   the people who make the laws not only live under those laws,

23   but they work under those laws, and they see the results of

24   what's there.

25          What that does is allows for a broader set of voices

1   to be heard.  So we have people right now serving in the

2   New York legislature -- one is a farmer.  We have a

3   veterinarian.  We have an auctioneer.  We have a pharmacist.

4          These are different points of view that get brought

5   into our government through the system that New York has

6   adopted of the citizen legislature.  Now, New York is not alone

7   in that.  Actually, all 50 states allow their legislators to

8   also work in another job.

9          Now, this model has a lot of good qualities.  As I

10  say, it allows for the expression of many points of view and

11  just a different sort of perspective than somebody who is a

12  full-time bureaucrat.

13         But, you know, there's a tradeoff.  The members bring

14  their experiences and their relationships from their

15  professional lives outside the legislature into the assembly,

16  into Albany.

17         But they also bring inherent conflicts of interest.

18  It's impossible, absolutely impossible, for a member of the

19  assembly to do his or her job and to go out, make laws, deal

20  with people, do the job that a person in the assembly does, and

21  not have some form of conflict of interest.

22         And you know what.  That may make you uncomfortable.

23  It makes some people uncomfortable.  But that is the system

24  that New York has chosen, and it is not a crime.  The

25  prosecutors here are trying to make that a crime.  It is not.

1        The specific charges here, by the way, illustrate the

2    point.  You know, they say that Mr. Silver sold his office

3    through actions he took on an assembly bill in 2011.

4    Absolutely not true.

5        This is the assembly in Albany.  This is the building

6    where the senate, the governor's office, and the assembly are.

7    The senate is over here on this half.  The assembly is over

8    here on this part.

9        What you have though between the red and the blue, as

10   we always hear about the red and the blue, is great, great,

11   great disagreement.

12       To be an effective legislature, to be an effective

13   government, somehow the red, the senate, which is republican

14   majority, and the assembly, the blue, which is democratic

15   majority, have to find a way to get together.  Now, both sides,

16   in some form or another, need to find a way to compromise if

17   they're going to get anything done.

18       In the context of this specific real estate

19   legislation, it involved tenants' rights.  And Mr. Silver is

20   one of the great, great champions of tenants' rights.  The

21   evidence is going to show you that.

22       In fact, there's this great line that I read where he

23   says he's not going to let New York become a gated community,

24   the world's largest gated community.

25       MS. COHEN:  Objection.

1          THE COURT:  Sustained.

2          MR. MOLO:  The ability to get things done for tenants

3    though still requires Mr. Silver to deal with the senate, no

4    matter how strongly he believes in tenants' rights.

5          Now, the senate, which is republican, generally favors

6    developers over tenants' rights.  Notwithstanding the fact that

7    the assembly and the senate may not agree on a particular

8    issue, the senate has a foundation for what it believes in, in

9    the causes its advancing.

10         Developers need new buildings.  It helps the city and

11   the state grow.  It creates jobs.  So there's something to be

12   said for the developers in the context of all of this.

13         So you have this balancing and sometimes this clash

14   over tenant rights and tenant regulations and landlords and

15   developers on the other hand.  So, in this fight, in this

16   balance, the senate holds a unique card, a unique trump card.

17         These rent regulation laws expire every so often,

18   every number of years.  It happened in 2003 that they expired,

19   and it happened actually in the summer for five days that it

20   expired.

21         So, if you have a rent regulation law that somehow

22   controls how rents are going to get charged and different

23   things about what landlords can do and it expires, there's no

24   law.  There's no regulation.

25         So, if the senate does nothing and refuses to work

FB3YSIL2                    Opening - Mr. Molo

1    with the assembly and work with the governor, the assembly's

2    cause for tenants is lost.

3           You don't have to take my word for it.  It actually

4    happened.  Like I said, it happened in 2003, and it happened

5    just this summer.

6           Despite all of that, despite those odds, the assembly

7    in 2011 got a bill passed that actually benefited tenants, and

8    it benefited tenants more greatly than any legislation had in

9    years.  It was the first meaningful advancement for tenants in

10   many years.

11          That was the result not of some corrupt agreement.  It

12   was the result -- and you're going to hear this -- of the

13   skillful legislative diplomacy of a man named Jim Yates.

14          Jim Yates was Mr. Silver's counsel.  He was also a

15   retired judge who was serving in the assembly.  You'll hear

16   people say that he is a man of great judgment and a man who was

17   able to get things done and was empowered by Mr. Silver to do

18   that, and he did that the with rent regulation.

19          Do you suppose bribers, the developers that they're

20   talking about, Glenwood and Witkoff -- you're going to hear

21   they didn't even think they were paying a bribe.  Some bribe

22   scheme.

23          Mr. Silver is selling his office in exchange for

24   favorable treatment on real estate legislation that actually

25   helped tenants.  It didn't happen.  There was no crime.

1          The second part of this case we heard about is

2     Mr. Silver's relationship with Dr. Taub.  Dr. Taub is at

3     Columbia University and is one of the most distinguished

4     doctors dealing with cancer issues in our city and probably in

5     our country.

6          He runs something called the Mesothelioma Center at

7     Columbia University.  And, for a time, that was a joint venture

8     between Columbia and Presbyterian hospital.  There is a

9     relationship there.

10          He happens to be also a member of the orthodox

11     community, as is Mr. Silver.  He and Mr. Silver have been

12     friends for a number of years, not close friends, not the kind

13     of friend that you go and bare your soul to, but they would see

14     each other from time to time.  They would see each other at

15     Passover with their families, and he is someone that he has

16     known for a long time.

17          This mesothelioma that we've heard about, this

18     cancer -- the prosecutors didn't tell you about this either --

19     it is a terrible, terrible, disease, awful.  You die usually

20     within a year of diagnosis.

21          It's rare, relatively rare.  There are maybe 3,000

22     cases of mesothelioma a year in the United States compared to

23     cancer that people acquire, lung cancer from smoking

24     cigarettes, much, much, much more.  So there's less funding for

25     it.

FB3YSIL2                      Opening - Mr. Molo

1          If people get this exposure from asbestos, a skilled

2   lawyer, a good lawyer, one that's competent, can ferret out a

3   claim and sue the manufacturers of asbestos and sue people who

4   used asbestos in their products and get some justice, some

5   economic justice at least, for these people who are these

6   mesothelioma victims, these people that were unfairly and

7   unjustly contracting this disease and have contracted this

8   disease.

9          These are people who worked in factories, people who

10  worked around -- you'll see big pipes that sometimes had

11  asbestos covering.  This was not a disease that strikes people

12  equally.  It's a disease that really does have a much heavier

13  weight on the working man and woman.

14         Now, from time to time, Dr. Taub suggested -- that's

15  the word he's used -- suggested that patients contact Weitz &

16  Luxenberg.

17         Weitz & Luxenberg -- I'm going to put up one more

18  screen here.  This is a website, the homepage.  I'm sorry that

19  it's hard to read.  We'll get you something better during the

20  trial.  It illustrates a point.

21         Weitz & Luxenberg was the premiere -- and it is

22  today -- the premiere, premiere firm for people bringing claims

23  as a result of exposure to asbestos.

24         You'll see that -- this was on the front page of the

25  website.  In blue are the cases that Weitz & Luxenberg had in

1    New York, and the green is every other law firm.

2            This chart says Weitz & Luxenberg's percentage of

3    New York State mesothelioma and lung cancer cases in the year

4    2000.  That's what this shows.

5            If we can move over here, you'll see the kinds of

6    outcomes Weitz & Luxenberg was getting for people --

7    $104,000,000 awarded in asbestos cases; four asbestos

8    plaintiffs awarded $64,000,000; $44,000,000 awarded to families

9    of five killed by asbestos.

10           Weitz & Luxenberg was and is the gold standard.  Now,

11   one thing that makes them particularly extraordinary, although

12   this is something that occurs with others in this field, is

13   they do all of this, but they do it on what's known as a

14   contingent-fee basis, meaning they get zero money, zero money,

15   if they lose the case or if they get no recovery for the

16   injured person.

17           If they win the case or they settle the case, they get

18   a settlement.  They traditionally get one third of the amount

19   of the settlement after expenses, and they then pay one third

20   of the amount that they get, their fee, as a referral fee.

21           That is what Mr. Silver, who was of counsel to the

22   firm and had experience, contrary again to what the prosecutors

23   told you, in the personal injury area; that Mr. Silver might

24   bring into the firm or that any other lawyer would bring into

25   the firm or actually a lawyer who's outside the firm.

1          If some lawyer in another firm sent them a case,

2     whether it was an asbestos case or some other sort of case,

3     they would pay this one-third referral fee.

4          And you will hear that that is common in the industry,

5     not just in the area of asbestos or the personal injury claims

6     based on asbestos but on all kinds of legal fees that get sent

7     from one lawyer to another.

8          Now, the decision whether to hire Weitz & Luxenberg,

9     contrary to what the prosecution would have you believe --

10    Dr. Taub didn't control that.  That rested 100 percent with the

11    patients, 100 percent.

12         The patients got to choose.  It wasn't Dr. Taub that

13    got to choose.  It wasn't Mr. Silver.  It wasn't Weitz &

14    Luxenberg.  It was those patients' choice.  And you know what,

15    those patients made a good choice when they went to Weitz &

16    Luxenberg.

17         Now, Dr. Taub did suggest that patients contact other

18    lawyers at Weitz & Luxenberg.  He suggested that patients

19    contact other lawyers outside of Weitz & Luxenberg, some of the

20    other firms that do this sort of work.  He gave them sometimes

21    a list of names.

22         Unquestionably, some Taub patients were choosing to go

23    to Weitz & Luxenberg and do so through Mr. Silver.  Dr. Taub

24    will tell you that, based on their friendship.

25         Based on the fact that Mr. Silver would see that

1    things got done within the firm, he would tell people, when

2    making the suggestion, that Mr. Silver would be the person to

3    contact.

4           Now, they claim that those patients making their

5    decision to come to Weitz & Luxenberg was somehow a bribe, and

6    that is is not true.  That is not true.  It is not Sheldon

7    Silver selling his office.

8           Now, they claim that Mr. Silver directed two state

9    grants in 2005 and 2006, not to Dr. Taub.  These state grant

10   were directed to Columbia University and to New York

11   Presbyterian Hospital.

12          Dr. Taub did not make any money from these grants.

13   These grants were from a state health care fund.  This

14   statement about the people's money -- yes, it is true.

15          It was the people's money, the people's money in the

16   sense that the people had made a decision that there would be a

17   fund that would go and make health care grants, and health care

18   grants were made to all sorts of medical institutions.

19          I challenge the prosecutors -- and I challenge anyone

20   in this room -- to identify institutions, more appropriate,

21   more apt, and more prominent in the city of New York than

22   Columbia University and New York Presbyterian Hospital.

23          We have a lot of great medical institutions.  We're

24   blessed with that in New York City.  Those are certainly at the

25   top.  Maybe with others, but those are certainly at the top.

1          Now, in making these grants, Mr. Silver did ask

2     Dr. Taub that his work in trying to cure cancer and deal with

3     these patients address the issue of early detection and

4     treatment of mesothelioma among people following 9/11 due to

5     the pollution in the air that occurred when the Twin Towers

6     came down and a lot of those floors had asbestos floor tiles.

7     So there was concern about that.

8          You'll see the contract between Columbia and Dr. Taub

9     specifically talks about that purpose being in there.

10    Unfortunately, his work did not address that.  The fund ended,

11    and there were no more grants to Columbia and to Presbyterian.

12         You know what's curious is the prosecutors, in search

13    of a theory, in search of a crime here, come up with this idea

14    that somehow or another there were other referrals and that

15    Mr. Silver was somehow being bribed.

16         I want to put up a chart, and this is based on

17    statistics that the prosecutors have given us.  This shows the

18    number of referrals year by year that the prosecutors are

19    claiming came to Weitz & Luxenberg as a result of this

20    relationship between Dr. Taub and Mr. Silver that they're

21    claiming is a corrupt relationship.

22         You'll see in 2003, one patient; in 2004, six; 2005,

23    six; 2006, eight; 2007, five; 2008, two; 2009; seven; 2010,

24    one; 2011, four; 2012, six, 2013, two.

25         The grant money had long been appropriated, spent, put

FB3YSIL2                    Opening - Mr. Molo

1     to great use, great use, in helping to promote, foster, and

2     allow Dr. Taub's good work.  Yet these referrals keep coming.

3            Now, they claim that Mr. Silver helped his friend,

4     Dr. Taub's son, who he had met through family.  They had met

5     during the Jewish holidays.

6            He helped his son get a job in one of the great

7     not-for-profits in New York called Ohel.  Ohel is one of the

8     great Jewish services, community organizations.

9            They employ about 1,500 people, and they provide

10    great, great services to the people of New York.  Mr. Silver

11    and his family had long been associated with Ohel.  Some called

12    him the celebrity spokesman for Ohel.

13           Unquestionably, there was a resume.  The son's resume

14    was sent to Ohel.  His son, by the way, has two Ivy League

15    degrees.  One is from the University of Pennsylvania, and a

16    master's in special education from Columbia.  You didn't hear

17    that from the prosecutors.

18           And that son got a job doing what he is trained to do,

19    working with people who are disadvantaged, at Ohel, working

20    within his field, two Ivy League degrees and a master's in

21    special education.

22           They claim that Mr. Silver helped his friend,

23    Dr. Taub's daughter, get an unpaid -- underscored unpaid --

24    internship working for a judge for seven weeks in Manhattan, a

25    judge who also grew up on the Lower East Side of New York, a

FB3YSIL2                     Opening - Mr. Molo

1    judge who also knew Mr. Silver from the legal community.

2              That daughter graduated from Fordham University Law

3    School and has gone on to have a very successful career.

4              They're claiming that it's corruption.  They use this

5    word again.  I want to warn you about this, this quid pro quo.

6              Did he sell his office.  Do you think that Mr. Silver

7    sold his office or Dr. Taub would be sending these referrals

8    for an unpaid, seven-week internship for his daughter, for his

9    son getting a job doing the work that he's going to be doing,

10   that he was trained to do and educated to do?

11             They claim that Mr. Silver helped another worthwhile

12   not-for-profit that Dr. Taub's wife happened to be on the board

13   of, and it's a not-for-profit that deals with domestic

14   violence, a very worthy organization.  That is simply not true.

15   The motivations for helping that organization within the

16   assembly came from other people.

17             And they also claim that Dr. Taub was somehow involved

18   in a corrupt relationship with Mr. Silver because Mr. Silver

19   gave him an award at an American Cancer Society dinner like a

20   certificate that gets passed all the time by the assembly.

21             They do hundreds and hundreds of these things a year

22   congratulating somebody on being happen of the year,

23   congratulating someone on their 100th birthday, congratulating

24   someone on being high school lacrosse champions that year.

25             And he gave Dr. Taub, passed by the assembly,

1    presented him at an American Cancer Society dinner one of those

2    certificates.

3            They also challenge him for helping Dr. Taub -- they

4    weren't really successful -- organize a walk to raise awareness

5    of mesothelioma, not just Dr. Taub but with a competitor of

6    Weitz & Luxenberg.

7            These allegations are insulting to the work, the fine

8    work, that Dr. Taub has done throughout his career.  These

9    allegations also ignore the realities of relationships.

10           It has been claimed that Mr. Silver had invested money

11   from his law practice into private investments.  Yes, they were

12   private investments that other people were also allowed to

13   invest in that were not illegal and are not illegal.

14           They say this issue about disclosure and disclosure

15   forms, and the disclosure doesn't rise to the level that the

16   prosecutors want it to be.  They don't get to pick.  It's not a

17   crime, not a federal crime, for someone to not have a

18   disclosure sufficient to what the prosecutors might think it

19   would be.

20           When they talked about this Moreland Commission thing,

21   that was one of the most misleading statements that we heard

22   this morning.

23           This Moreland Commission that was impaneld by

24   Governor Cuomo -- they say Mr. Silver tried to put an end to

25   it.  Do you know what Mr. Silver did to put an end to it?  He

1    turned to Jim Yates, the same person I talked about a few

2    minutes ago, the former judge, and some other very competent

3    people on the assembly staff, well-trained lawyers, who looked

4    at what Governor Cuomo was doing and decided this is illegal.

5    This is not consistent with New York law or the New York

6    Constitution.  This is exceeding the powers of the governor.

7          And they didn't stop there.  They went out and hired

8    three very prominent law firms -- the Kasowitz Benson firm,

9    which is one of the finest firms in New York, very skilled

10   litigators.

11         They hired Loeb & Loeb and a lawyer by the name of Jay

12   Musoff -- he was hired by the senate -- and Mr. Musoff actually

13   was a former federal prosecutor, just like these lawyers here.

14         The third firm that they hired, that the senate hired

15   because the senate looked at it and came to the same

16   conclusion -- the senate hired Kirkland & Ellis.  Kirkland &

17   Ellis is one of the largest and most prestigious law firms in

18   the country, if not the world.

19         MS. COHEN:  Objection, your Honor.

20         THE COURT:  Overruled.

21         MR. MOLO:  It has one other person in that firm that

22   was particularly uniquely well suited to deal with that issue

23   and also to address the issue that they didn't tell you about.

24         That person was Michael Garcia.  Michael Garcia used

25   to be the United States Attorney for the Southern District of

1    New York, the person that's the boss of the office that these

2    people occupy.

3           That person filed a pleading in public right here in

4    Manhattan in the Supreme Court signing his name to it saying

5    the Moreland Commission has exceeded its authority.  The

6    request for information that they were seeking was

7    unconstitutional, illegal, and should be stopped, the full

8    facts, not just accusations, not just quid pro quo, not just

9    greed, power.

10          You know, I invite you -- I invite you -- I ask you,

11   as sincerely as I can, search serially every piece of evidence

12   that you hear and see in this case.  Listen to the witnesses.

13   Look at the documents.

14          Don't just listen to what somebody says in an

15   argument.  You will not find -- you will not find that

16   Mr. Silver had a corrupt intent.  You will not find that there

17   was a bribery scheme.

18          You know, the people of New York established a system

19   when the state was founded, and Mr. Silver has served in that

20   system and served the people of New York consistent with that

21   system.

22          If the prosecutors don't like that system, they can do

23   what democracies do.  They can go to the people, and they can

24   seek change the way democracies do it, through legislation, not

25   through taking bits and pieces of allegations, little facts

FB3YSIL2                    Opening - Mr. Molo

1     that you snatch out and say, aha.  This is sinister.  Aha.

2     This is criminal, pulling them together and then leveling false

3     criminal charges against one of the senior legislative

4     officials, senior government officials in this state.

5              Make no mistake.  Mr. Silver did not sell his office.

6     That did not happen.  We have looked forward to this day to get

7     here and to start this trial and to put these charges behind

8     Mr. Silver.

9              We thank you for your service and look forward to that

10    happening with a not-guilty verdict at the conclusion of the

11    evidence.  Thank you.

12             THE COURT:  Thank you, Mr. Molo.

13             Okay.  We're going to break for lunch at this time.

14             Ladies and gentlemen, we're going to ask you to go

15    back to the jury room.  We're going to start again at 2:00

16    upstairs in room 443.

17             For your purposes, stay in the jury room.

18    Mr. Brantley will take you where you need to go.  Don't discuss

19    the case.  Enjoy your lunch.

20             (Jury not present)

21             THE COURT:  Okay.  2:00 folks.

22             MS. COHEN:  Thank you, your Honor.

23             (Luncheon recess)

24             (Continued on next page)

25

FB35sil3

```
1                A F T E R N O O N   S E S S I O N

2                            2:10 p.m.

3              THE COURT:  Please, be seated.

4              Are we ready to bring the jury out?  That seems like

5    no.

6              MS. COHEN:  We just want to make sure our witness is

7    outside.

8              MR. MASTER:  She went to the restroom.

9              THE COURT:  You didn't go with her?

10             MS. COHEN:  We did not.

11             THE COURT:  She could be lost.

12             MR. MASTER:  Someone is with her.  I did not go.

13             THE COURT:  That's all that matters.  I didn't mean

14   you personally.

15             MS. COHEN:  I meant us the royal us.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25
```

FB35sil3

1              (Jury present)

2              THE COURT:  Okay, Ms. Cohen, call your first witness.

3              MS. COHEN:  Your Honor, the government calls Amy

4    Paulin.

5     AMY PAULIN,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8              THE DEPUTY CLERK:  Please state your full name and

9    spell your last name, slowly, for the record.

10             THE WITNESS:  Amy Paulin.  P-A-U-L-I-N.

11             THE DEPUTY CLERK:  Thank you.  Please, be seated.

12             MR. MOLO:  Excuse me, your Honor.  That screen, is

13   there a way that that can be turned so that the witness' face

14   isn't blocked?

15             THE COURT:  Are you going to be using the screen with

16   her?

17             MR. MASTER:  I will, your Honor.

18             THE WITNESS:  I can move over.

19             MR. MOLO:  That would be helpful.

20             THE COURT:  I don't want you to fall off.

21             THE WITNESS:  It's fine.  It's fine.  It's fine.

22             THE COURT:  At the break we will move it up onto here.

23             MR. MOLO:  Thank you.

24             THE COURT:  Okay.

25   DIRECT EXAMINATION

1    BY MR. MASTER:

2    Q.   Good afternoon.

3    A.   Good afternoon.

4    Q.   Where do you work, Ms. Paulin?

5    A.   The New York State Assembly.

6    Q.   What is your current position with the New York State

7    Assembly?

8              THE COURT:  You are going to have to keep your voice

9    up.  I am having difficulty hearing you.

10   Q.   What is your current position with the New York State

11   Assembly?

12   A.   I am a member of the New York State Assembly.

13   Q.   And how did you get that position?

14   A.   I was elected by the constituents in the 88th Assembly

15   District.

16   Q.   And where, in what county is your district located?

17   A.   Westchester County.

18   Q.   And how many people do you serve in your Assembly district?

19   A.   Approximately 130,000.

20   Q.   Describe the community you represent to the members of the

21   jury.

22   A.   It is a suburban community, suburban towns and villages, a

23   couple of cities.  Bedroom communities for the most part.  Many

24   people or most people have one member of their family who

25   commute to Manhattan, were very close to the City of New York,

FB35SIL3                        Paulin - direct

1    and it's -- although many people do work in Westchester,

2    obviously, but my district is very affluent and it is very

3    common to have someone work in the city.

4    Q.  And when were you first elected to office?

5    A.  In November 2000, taking office in January 2001.

6    Q.  And how often do you stand for election as a member of the

7    Assembly?

8    A.  Every two years.

9    Q.  Let me ask you -- and have you been re-elected every two

10   years since initially taking office?

11   A.  Yes.

12   Q.  Let me ask you some general questions about how the

13   Assembly operates based on your experience and the different

14   types of work you do as a member of the Assembly.  How many

15   elected members are there of the New York State Assembly?

16   A.  150.

17   Q.  Is that one of the houses of the New York State

18   Legislature?

19   A.  Yes, it is.

20   Q.  And what is the name of the other house?

21   A.  The State Senate.

22   Q.  Are there as many members of the Senate as there are of the

23   Assembly?

24   A.  No.

25   Q.  What, if any nickname, does the Assembly use to distinguish

FB35SIL3                         Paulin - direct

1    itself from the Senate?

2    A.   We call ourself The People's House.

3    Q.   What is the title given to the leader of the Assembly?

4    A.   The Speaker.

5    Q.   Until earlier this year, who was the Speaker of the

6    Assembly for your entire time in the Assembly?

7    A.   Sheldon Silver.

8    Q.   Where did the Assembly sit when it is in session?

9    A.   In Albany, in the Capitol.

10   Q.   Assembly Paulin, if you wouldn't mind looking in the binder

11   and take a look at what has been identified as Government's

12   Exhibits 267, 268, 269, 270 and 271?

13              MR. MOLO:  Your Honor may we have copies, please?

14              MS. COHEN:  Your Honor, we provided a full set.

15              THE COURT:  So you have them, Mr. Molo?

16              MR. MOLO:  They would have a full set.  I figure if

17   they would use it with the witness we would have a copy here.

18              THE COURT:  If you have an extra one hand it to the

19   defense.  Otherwise, you have your own set.

20              MS. COHEN:  We have one, your Honor.

21              THE WITNESS:  I have looked at them.

22   BY MR. MASTER:

23   Q.   Do you recognize what is depicted in those photos?

24   A.   Yes.  It is the chamber and the capitol -- the Capitol

25   Building.

FB35SIL3                        Paulin - direct

 1            MR. MOLO:  I'm sorry.  I request they give us a copy.

 2    I want to know --

 3            THE COURT:  Can I see the attorneys, please?

 4            Excuse me.  This is one of those events where I need

 5    to talk to the lawyers.  Whenever we are at side bar, you are

 6    free to stand up and I sort of recommend that you do.  You are

 7    not used to just sitting in a warm room all the time so sit up

 8    and stretch or stand up and stretch.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FB35SIL3                          Paulin - direct

1           (At side bar)

2           THE COURT:  Mr. Molo, the government gave you an

3     entire set of exhibits.  The reason for that is so that you

4     have a set.  You have computers in here, you can load them on

5     your computers and pull them up.  We are not going to stop the

6     presentation of witnesses because you don't have the exhibits

7     out here.

8           MR. MOLO:  Your Honor, I agree, but typically from my

9     experience people either, they put them on a screen where the

10    counsel and the Court can see them or they hand them a copy and

11    that's what I have done and have prepared to do that.  I mean,

12    as a matter of courtesy deliver me 1,500 exhibits and say I am

13    supposed to fumble through binders and find them on the fly

14    while the witness is testifying.  It really isn't fair.

15          THE COURT:  Is it on your screen?  It is on my screen.

16          MS. COHEN:  I assume it is on your screen and we gave

17    a full version of the binder and extras in the cart.  We have

18    given it a hundred different ways to you.

19          MR. MOLO:  I'm sorry.

20          THE COURT:  Are you set up so that when the witness is

21    handed a binder there is also going to be an electronic

22    version?

23          MS. COHEN:  We have the paralegal pulling, by hand,

24    extra copies, your Honor.

25          MR. MASTER:  As well.

1              THE COURT:  Okay.

2              MS. COHEN:  We will do both, your Honor.

3              MR. MOLO:  Thank you.

4              MS. COHEN:  You're welcome.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FB35SIL3                            Paulin - direct

1              (In open court)

2              THE COURT:  What exhibit number are you dealing with

3       again?

4              MR. MASTER:  267, 268, 269, 270 and 271.

5              THE COURT:  How about one at a time.  Right now you

6       have just identified 267?

7              MR. MASTER:  Sure.

8              THE COURT:  Has the witness identified it?

9              MR. MASTER:  I believe she has, your Honor.

10             THE COURT:  Go ahead.

11             MR. MASTER:  The government offers Government's

12      Exhibit 267.

13             MR. MOLO:  No objection.

14             THE COURT:  267 is received.

15             (Government's Exhibit 267 received in evidence)

16      BY MR. MASTER:

17      Q.  Now, Assemblywoman Paulin if you wouldn't mind looking at

18      Government Exhibit 268.  Do you recognize 268?

19      A.  Yes.

20      Q.  What is that?

21      A.  It is a picture of the Chamber.

22             MR. MASTER:  Government offers 268.

23             THE COURT:  Any objection?

24             MR. MOLO:  No objection.

25             THE COURT:  268 is received.

FB35SIL3                          Paulin - direct

 1            (Government's Exhibit 268 received in evidence)

 2            MR. MASTER:  Government offers 269.

 3            THE COURT:  269 hasn't been identified yet.

 4    BY MR. MASTER:

 5    Q.  What is depicted in Government Exhibit 269?

 6    A.  It is another picture of the Chamber.

 7            THE COURT:  Assembly Chamber?

 8            THE WITNESS:  Yes, Assembly Chamber.

 9            MR. MASTER:  Government offers 269.

10            MR. MOLO:  No objection.

11            THE COURT:  269 is received.

12            (Government's Exhibit 269 received in evidence)

13    BY MR. MASTER:

14    Q.  If you wouldn't mind turning to Government Exhibit 270,

15    would you identify what is depicted in 270?

16    A.  That's the Capitol, Chambers inside the Capitol.

17            MR. MASTER:  Government offers Government Exhibit 270.

18            THE COURT:  Any objection?

19            MR. MOLO:  No objection.

20            THE COURT:  270 is received.

21            (Government's Exhibit 270 received in evidence)

22    BY MR. MASTER:

23    Q.  If you wouldn't mind turning to Government Exhibit 271, do

24    you recognize what is depicted in Government Exhibit 271?

25    A.  It is another picture of the Capitol.

FB35SIL3                        Paulin - direct

1              MR. MOLO:  No objection.

2              THE COURT:  He didn't offer it yet.

3              MR. MOLO:  Okay.

4              MR. MASTER:   The government offers Government Exhibit

5    271.

6              THE COURT:  271 is received.

7              (Government's Exhibit 271 received in evidence)

8    BY MR. MASTER:

9    Q.  First, let's take a look at Government Exhibit 271.  What

10   is depicted in that, if you wouldn't mind describing that for

11   the members of the jury?

12   A.  That's the building where we conduct legislative affairs.

13   It is the building that the governor has an office, we call it

14   the Capitol.

15   Q.  And again, in what city is it located?

16   A.  It is in Albany, New York.

17   Q.  And where does the State Senate sit when it is in session?

18   A.  In the same building.

19   Q.  Now let's take a look at Government Exhibit 267, if you

20   wouldn't mind publishing that?  Now, Government Exhibit 268, if

21   you wouldn't mind publishing that?  And Government Exhibit 269?

22              What do those photos depict?

23   A.  Those are all different shots of the Chamber where the

24   Assembly sits.

25   Q.  And just turning back to Government Exhibit 268,

FB35SIL3                          Paulin - direct

1   Mr. Coccaro, are elected members of the Assembly assigned any

2   seating within the chamber for when the Assembly is in session?

3   A.  Yes.  We all have assigned seats.

4   Q.  And where is your assigned seat in the picture?

5   A.  If I point on this will they see?

6           THE COURT:  No.

7   A.  I guess my finger doesn't show, it is -- if you are on the

8   left-hand side of the chamber and it's the second row --

9           MR. MASTER:  I'm sorry.  May I approach?

10          THE COURT:  A pointer?

11          THE WITNESS:  Okay, here is my seat right there.

12          THE COURT:  So you are on the second row on the

13   left-hand side?

14          THE WITNESS:  Second row on the left-hand side.

15          THE COURT:  Is that by seniority do you get closer and

16   closer to the front?

17          THE WITNESS:  You can.  With seniority you get to

18   choose but most people, after they sit in a seat for a little

19   while or a side of the Chamber, they get used to it so they

20   stay where they are.

21          THE COURT:  All right.

22   BY MR. MASTER:

23   Q.  Now what, if any spots in the Assembly Chamber, are

24   reserved for the Speaker of the Assembly?

25          THE WITNESS:  Should I use this thing?

FB35SIL3                        Paulin - direct

```
 1              THE COURT:  Yes.
 2    Q.  Sure.
 3    A.  There.
 4              THE COURT:  So, describing a spot right in the middle
 5    of the Chamber?
 6              THE WITNESS:  Yeah.  It's elevated a little bit, it is
 7    like a little dais.
 8    BY MR. MASTER:
 9    Q.  And so, when Speaker Silver presided over an Assembly
10    session, where did he sit?
11    A.  He sat in that seat.
12    Q.  Who sat there with him?
13    A.  Staff.  Staff sits over there and there, and the clerk and
14    they -- the people who are running things sat there, running
15    things.
16              THE COURT:  Sit in the area in front of the Speaker's
17    chair?
18              THE WITNESS:  There is staff all over down here, and
19    here counsel to the speaker might be sitting or that's most
20    common, or someone who is high up, staff who is helping usually
21    if not the Speaker, the Speaker Pro Tem run the business of the
22    house.
23    BY MR. MASTER:
24    Q.  Now, how many offices do you have as an elected member of
25    the Assembly?
```

FB35SIL3                          Paulin - direct

1    A.  I have two.

2    Q.  And where are they located?

3    A.  I have one in my district right in Eastchester, New York,

4    and I have one in Albany in the legislative office building

5    which is the building adjacent to the capitol.

6    Q.  Let's first talk about what you do up in the legislative

7    office building.

8              When is the Assembly typically in session?

9    A.  January to June.

10   Q.  And what types of legislation does the legislature, the

11   State legislature have the power to enact?

12   A.  A large assortment of different things; health care,

13   education, public protection.

14             (Record read)

15   A.  Many other things related to transportation, housing.  You

16   know, anything that the federal government gives the authority

17   to the State to do we have the power to enact and those are

18   some of the subjects that we do.

19   Q.  Now, what, if any types of legislation, have you focused on

20   during your legislative career?

21   A.  Personally, I work on a lot of bills related to women's

22   issues, domestic violence, sexual assault, human trafficking,

23   as well as transparency issues.  I have spent a lot of time

24   in -- I was president of the League of Women Voters.  I have

25   background in or huge concern on transparency so I do a lot of

FB35SIL3                         Paulin - direct

1    open government types of bills.  I have, in recent years, done

2    animal rights bills.  And then really just an assortment of --

3    I am the Energy Chair currently so I do energy bills as well

4    now.

5              Really, whatever comes my way.  I have a huge interest

6    in a lot of subjects.

7    Q.  And how successful have you been in getting legislation

8    passed?

9    A.  I am usually one of the top bill passers in the Assembly.

10   Q.  And what role do committees play in reviewing and approving

11   potential legislation proposed by members of the Assembly?

12   A.  Well, committee chairs review and put bills on an agenda so

13   that's -- you know, that's the role that committee chair would

14   play.

15   Q.  And what, if any committees, do you sit on?

16   A.  I sit on the health, education, higher education, and I am

17   Chair of Energy, as I stated before.

18   Q.  Now, what, if any committees, did you chair before the

19   Energy Committee?

20   A.  Most recently before the Energy Committee, Children and

21   Families, but I have also been chair of Libraries, People with

22   Disabilities, Oversight and a few others that I can't remember

23   at this moment.

24   Q.  Now, let me ask you some questions about the role that

25   Sheldon Silver played as Speaker with respect to legislation.

1          During Sheldon Silver's tenure as Speaker, who

2     appointed the chairs of each committee?

3     A.   The Speaker appoints the chairs.

4     Q.   And so Sheldon Silver did that?

5     A.   Yes.

6     Q.   And who appointed each of the members of each of the

7     committees?

8     A.   Sheldon Silver.

9     Q.   And so, whose support was needed for someone to become a

10    committee chair and stay a committee chair?

11    A.   The Speaker.

12    Q.   And whose support was needed if you wanted to join certain

13    committees?

14    A.   Speaker.

15    Q.   And, what needs to happen before a piece of potential

16    legislation can emerge from a committee?

17    A.   Well, you introduce the bill language, get a number, it

18    goes into a committee and then a committee chair will -- they

19    have agendas once a month, usually, and a bill would have to go

20    on to a committee agenda in order to get through that committee

21    on to, eventually, the floor.

22    Q.   So, for example, with respect to the human trafficking

23    legislation that you have described, what committee or

24    committees did it need to go through and get approved by?

25    A.   It was primarily a Penal Code bill so it went to the Code's

FB35SIL3                          Paulin - direct

1    Committee and from there went to the floor.

2    Q.  And who is authorized to vote on a bill that is before a

3    committee?

4    A.  The committee members.

5    Q.  What, if any staff, support the committees that are

6    responsible for considering legislation?

7    A.  There is a central staff.

8    Q.  And during the tenure of Sheldon Silver as Speaker, who

9    appointed the central staff?

10   A.  The Speaker -- it is the Speaker's staff so the central

11   staff he is in charge of appointing there.

12   Q.  And even after a bill is voted out of a committee, could it

13   become a law without getting onto the floor of the Assembly for

14   a vote?

15   A.  No.  It would need to be on the floor for a vote.

16   Q.  And what would happen at the end of each legislative

17   session as committees would report out their bills?

18   A.  Well, at the end of session in June an additional committee

19   is established or kicks in, it is called Rules, and all bills

20   go into Rules.

21   Q.  And during the tenure of Sheldon Silver as Speaker, who was

22   head of the Rules Committee?

23   A.  The Speaker was head of the Rules Committee -- Chair of the

24   Rules Committee.

25   Q.  Who appointed Sheldon Silver to that position?

FB35SIL3                         Paulin - direct

1    A.  I presume himself.

2    Q.  And so, during Sheldon Silver's tenure as Speaker, whose

3    support did you need to get your legislation considered by the

4    whole Assembly at the end of a legislative session?

5    A.  At the end you need the Speaker's support in order to come

6    out of the Rules Committee.

7    Q.  Let's say that your legislation made it onto the floor and

8    was passed by the Assembly.  Does it automatically become a

9    law?

10   A.  No.  It needs to pass the Senate and be signed by the

11   governor.

12   Q.  What happens when a bill touches on a subject matter on

13   which the Assembly, the Senate, and the Governor have different

14   views?

15   A.  Well, for us regular members we negotiate our own bills,

16   usually, with the Senate, for example, and then if -- sometimes

17   we can engage the Governor's office in advance but more

18   commonly it goes up to the Governor and then the negotiation

19   with the Governor will happen after those two houses agree.

20   This is for a common bill, one of my bills, for example.  And

21   if it is vetoed, you have a chance next year of bringing it

22   back and engaging those same parties and trying to figure it

23   out.  If it is a bill that is a bill that the whole house is

24   involved in, you know, a very -- not a bill of significance

25   though all bills are of significance but a bill of consequence

FB35SIL3                        Paulin - direct

1    to many people in the legislature, then that might be done by

2    leadership by the Governor, Majority Leader and Speaker in a

3    three-way conversation during the budget or at the end of

4    session depending on when that issue came about.

5    Q.   And you mentioned something about three-way negotiations.

6    What does that refer to?

7    A.   That's usually the Speaker, the Majority Leader of the

8    Senate, and the Governor, and I would presume any staff that

9    they would bring into it a leader's meeting.  That's what those

10   three-way conversations are.  Sometimes the three-way

11   conversations can be at a lower level of staff during the

12   budget but if it is an important issue then it's usually those

13   three then.

14   Q.   Now, did you have any personal involvement with

15   negotiations over the rent laws?

16   A.   No.

17   Q.   Without getting into detail about the nature of the

18   negotiations, while Sheldon Silver was Speaker were rent laws

19   among those matters that Sheldon Silver, as Speaker, was

20   personally involved in negotiating on behalf of the Assembly?

21   A.   Yes.  I believe so.

22   Q.   Now, when Sheldon Silver was personally involved where, if

23   at all, would you receive updates about the status of those

24   negotiations?

25   A.   We have what we call the Democratic Conference which are --

FB35SIL3                    Paulin - direct

1    which is -- which we meet in, Democrats in the Assembly --

2    there are four conferences -- Republicans in the Assembly,

3    Democrats in the Senate, Republicans in the Senate.  So, we

4    have what we call our respective conferences so we would meet

5    to learn about information and that's where we, Democrats in

6    the Assembly, learned about a negotiation by our leader, the

7    Speaker, when he would come back from one of those meetings.

8    Q.  And who presides over those conference meetings?

9    A.  Sheldon Silver, or sometimes the majority leader.

10   Q.  Now, typically in negotiations over the rent laws, whose

11   interests were the democratic conference interested in

12   advancing?

13   A.  The majority of our conference were interested in the

14   tenants' issues.

15   Q.  When, if ever, did Sheldon Silver disclose, in conference

16   concerning the rent laws, that he received any personal

17   financial benefits from any landlords?

18              MR. MOLO:  Objection.

19              THE COURT:  Overruled.

20   A.  There was no disclosure in Conference.

21   Q.  And when, if ever, did he disclose to the Conference that

22   he had a financial relationship with any individual or entity

23   in the real estate industry?

24   A.  There was no disclosure in Conference.

25   Q.  And when, if ever, did he disclose that to you personally?

FB35SIL3                         Paulin - direct

1   A.   There was no time that it was disclosed to me personally.

2   Q.   Typically when in the legislative session are controversial

3   matters actually addressed and voted on by the legislature?

4   A.   Controversial matters are usually done in two times, during

5   the budget there is many, many, many negotiations that are

6   going on during that period of time.  Budget is supposed to be

7   and has most of the time been done by its deadline which is

8   March 31st.  It could get extended so those negotiations could

9   be all through session but usually March 31st so there is a lot

10  of issues then.  And then they could come up almost at any time

11  but it is much more common that there is a high-level

12  negotiations of issues at the end of session.  So, you have

13  budget and then you have end of session.

14  Q.   And during the end of session, is that when the Rules

15  Committee was in effect?

16  A.   Yes.

17  Q.   And so whose support was necessary to get those

18  controversial matters onto the floor of the Assembly for a

19  vote?

20  A.   The Speaker.

21            THE COURT:  When is the end of session?

22            THE WITNESS:  June.  The end of June.

23            THE COURT:  June.

24  BY MR. MASTER:

25  Q.   Now, how large is the democratic majority?

1    A.  About a hundred.  Little more, about 105 or 106, something

2    like that.

3    Q.  How many members in the Assembly?

4    A.  150.

5    Q.  Has that proportion changed significantly over the amount

6    of time you have been in the Assembly?

7    A.  It has change a little bit.  I think I came in in the 90s

8    and then now it is a hundred.  It fluctuates in that range.

9    Q.  How many votes does it take to approve proposed legislation

10   in the Assembly?

11   A.  It's -- by our rules it's majority.  Informally, though, in

12   order for a bill to get to the floor we usually have acquired,

13   at least during my time there, 76 democrats' support but that's

14   informal.  You know, it is the actual number is majority.

15   Q.  And how would the end product --

16             THE COURT:  I'm sorry.  Can I interrupt for a second?

17             So, are you saying that sort of by practice if there

18   wasn't a majority of the democrats voting in favor it wouldn't

19   even get to the floor?

20             THE WITNESS:  Yes.  That's right.  The concern is that

21   the democrats want to be in charge of their own destiny, so to

22   speak, or the legislation, so there is a tacit understanding

23   that we are going to be supporting the bills that come to the

24   floor.

25   BY MR. MASTER:

1   Q.  Now, how would the end product of these leaders' meetings

2   that you described be presented to the members?

3   A.  How does the end -- say that question again?

4   Q.  How would you learn about the end result of the

5   negotiations?

6   A.  Oh.  In conference.

7        So, there would be a discussion and then in conference

8   we would learn about whatever the outcome of the agreement or

9   lack of agreement was.

10  Q.  And how much time would you be given -- well, withdrawn.

11       Once you learn about this resolution, first of all,

12  how would you learn about the resolution?

13  A.  If there was a -- usually if there was a resolution there

14  would have to be a bill, there would have to be proposed

15  legislation so we would learn about the generalities of the

16  bill usually, never the specifics, never the actual bill

17  language, orally in conference.  You know, we would learn what

18  the negotiation, you know whether -- you know, if there were

19  general provisions of, you know, of a certain bill we would

20  hear about them in conference at the conclusion of the leaders'

21  meeting.  So, it would be, you know, we have agreed do this, we

22  have agreed to do that.  And it would be, again, usually a

23  general outline.

24  Q.  How much time would you typically have to review the

25  details, the bill that would result from those negotiations?

FB35SIL3                         Paulin - direct

1    A.  Well, a bill has to be -- has to age for three days unless

2    it is -- unless there is -- you know, unless we, there is a

3    message of necessity by the governor or, you know, or something

4    like that.  So, we would have those three days from the time

5    the bill was actually printed and sometimes on very -- on big

6    negotiated bills those we would be given messages and we didn't

7    have as much time.

8    Q.  Well how much time would you have where there would be

9    messages?

10   A.  Oh, it could be -- oh, the bill is printed and it is like

11   ready and it is now on the floor.  So, very little time.

12   Q.  Now let's turn to --

13              THE COURT:  I'm sorry.

14              Then you would have to vote?

15              THE WITNESS:  Then we would have to vote.

16              THE COURT:  Without having read the bill?

17              THE WITNESS:  You would read it quickly as it is going

18   along and a lot of times -- it is mostly the budget that that

19   would happen because the negotiation would be so much last

20   minute.  So, yeah, a lot of times, you know, we would be

21   reading the bill as we are sitting there.

22              THE COURT:  Okay.

23   BY MR. MASTER:

24   Q.  Who would tell the conference about the end result of

25   negotiations?

1    A.  Well, if it was budget very commonly it might be the

2    respective chair of that budget subject matter so, you know,

3    there is a lot of health, for example, in the budget, there is

4    a lot of education in the budget.  That's just a big portion of

5    what we spend money on.  So, the respective chair of the Health

6    Committee and the Education Committee may get up and talk about

7    the general provisions.  Most of that information, though, has

8    been prepared by the staff -- by central staff who is part of

9    the actual conversations, you know, in the negotiations.  So,

10   we would get, like, a sheet because Energy doesn't have a big

11   budget component but to the extent that it has any, you know, I

12   am given a sheet by central staff and I read what that is and

13   hopefully the chairs know a lot about it.  But, it is not a lot

14   of details given at those meetings.

15   Q.  Who proposes a budget for the state each year?

16   A.  The governor.

17   Q.  And how large is the state budget?

18   A.  A little more than $142 billion.

19        THE COURT:  Billion with a B?

20   A.  B.

21   Q.  Annually?

22   A.  Annually.

23   Q.  And when is the budget introduced?

24   A.  In January, except for in the year that the governor is

25   elected and then it could be the first week in February.

FB35SIL3                          Paulin - direct

1   Q.  And what role does the Assembly play with respect to the

2   budget that is proposed by the governor?

3   A.  The Assembly and Senate both play the role of review and

4   negotiation with the Governor.  So, the governor will propose X

5   amount for health care and the Senate will say, no, we want Y

6   and the Assembly might say I want Z, and then there is a

7   three-way conversation and hopefully you come out with some

8   common ground at the end of that.

9   Q.  And again, can a budget pass without the approval of the

10  two houses of the state Legislature?

11  A.  No, it is a law like all other laws.

12  Q.  And you talked about leaders' meetings earlier.  Is the

13  budget typically one of those matters that are resolved, in

14  part, through leaders' meetings?

15  A.  Yes.  This is a lot of detail in the budget.  You know,

16  with $142 billion you would expect a lot of detail so not every

17  single thing is -- not every single piece of language is

18  negotiated at the three-way level but the very large items

19  certainly are and conceptually those things are negotiated at

20  the three-way level, at the leadership level, but little

21  sentences here and there are done by individual chairs like me.

22  Q.  Now, what is the Ways and Means Committee?

23  A.  That's the fiscal committee that oversees all fiscal

24  matters such as the budget.

25  Q.  And who has been chair of the Ways and Means Committee

FB35SIL3                         Paulin - direct

1   during your time there?

2   A.   Denny Farrell has been the chair for the entire time I have

3   been there.

4   Q.   And what, if any staff, works for the Ways and Means

5   Committee?

6   A.   Well, I presumed Denny has some of his own staff, counsel

7   that he has, but then also central staff.  There is a large

8   central staff for Ways and Means.

9   Q.   Again, who appoints the central staff?

10  A.   Well, the Speaker's -- that's the Speaker's staff, central

11  staff.

12  Q.   What, if any documents, would you prepare during the budget

13  cycle to request that items be funded in the budget?

14  A.   Well, there is two ways.  There is two things that a member

15  does, one is a chairman's letter.  So, as Chair of the Energy

16  Committee I write the Speaker a letter and I say, Dear Speaker,

17  these are things that are in the budget related to energy and

18  this is the one I like, this is the one I don't like, this is

19  what I would like changed, this is what I would like added to,

20  this is why.  So, it is an analysis of what it is in my subject

21  matter, I think, and that we call the Chairman's Letter, that

22  goes to the Speaker.

23          A second mechanism is that -- because every member --

24  a lot of members are not chairs and aside from that even chairs

25  have other interests.  So, then you have a letter that you can

FB35SIL3                          Paulin - direct

1    do on a different subject matter.  So, for example, I have

2    often done the family planning letter, I have done a letter on

3    human trafficking, I commonly did a letter on education

4    especially trying to coordinate the suburban districts in

5    common thought on education.

6            So, you do a letter on subject matters relating to

7    your constituents and relating to other personal issues that

8    you might be interested in.

9    Q.  And during Sheldon Silver's tenure as Speaker, to whom were

10   all of those letters addressed?

11   A.  They're all addressed to the Speaker.

12   Q.  And are those also known -- commonly known as budget

13   letters?

14   A.  Yes.

15   Q.  And so what type of information do you include in a budget

16   letter to the Speaker?

17   A.  Well, you know, chairman's letter I think I described,

18   that's where you analyze your portfolio as chair.  In a letter

19   on a subject matter, so let's say human trafficking which is a

20   letter I have done in the last couple of years, you know, it

21   would be we think there should be blank amount of money for

22   this purpose and then it goes into an analysis of what the

23   money would be used for and why it would be important to spend.

24           So, it is really you are advocating for the money so

25   it is an advocacy letter.

FB35SIL3                          Paulin - direct

1    Q.  And to whom were you advocating?

2    A.  To the Speaker.  And then you get members to sign it with

3    you.

4    Q.  Why do you get members to sign it with you?

5    A.  Because we -- you know, we are of the belief that the more

6    members that sign a letter it would give more credence or

7    weight to that issue so we try to get more majority members to

8    our leader, the Speaker, to tell him that the majority believes

9    that there should be money for human trafficking, family

10   planning, or what have you.

11   Q.  And is it your understanding that other members of the

12   Assembly did the same thing that you did, that is, write

13   letters to the Speaker seeking amount?

14   A.  Yes.  We are all walking around the floor all the time

15   getting signatures from each other.

16   Q.  And what is your understanding about the amount of money

17   requested through all these budget letters compared to the

18   amount of money actually available to meet the needs identified

19   in the budget letters?

20   A.  Well, you know, it is hard to know that a hundred percent

21   but it would be spoken, or the Speaker sometimes would say in

22   jest, you know, if we funded all of your budget letters it

23   would be three times what the budget would be or something like

24   that, you know, to make you -- so, my belief was always that we

25   were asking for a lot more than was available.

FB35SIL3                          Paulin - direct

1    Q.  And would you have the ability to see all of the budget

2    letters that were submitted to the speaker?

3    A.  Well, no, because the chairman letters I wouldn't

4    necessarily be able to see.  I'm sure it is all FOILable but I

5    never thought to FOIL it.

6            THE COURT:  Can you explain what it means to FOIL a

7    document?

8            THE WITNESS:  Sure.  Yes.

9            So, Freedom of Information Request, if it is -- you as

10   a citizen or me as a citizen, we have the right to see

11   government documents, there is a law in place that we actually

12   passed in the legislature that gives you that right.

13           THE COURT:  And is the name of that law is called

14   FOIL?

15           THE WITNESS:  Yes, Freedom of Information.

16           THE COURT:  Law.

17           THE WITNESS:  Law.  So that's the --

18           So, I could have accessed it if I thought about or if

19   I had any desire to see them.  The letters that everybody

20   signs, I usually keep the letters that I signed.  So I didn't

21   sign everybody's letter although -- and everybody has a

22   different philosophy about signing letters.  Some people don't

23   want to sign any letters because they think if I sign a letter

24   I'm not going to get what I want, I want one thing.  I ask for

25   a lot of signatures on my letters so I sign anybody's letter

FB35SIL3                          Paulin - direct

1     who signs mine.  So, I have a lot of copies of the letters but

2     it is not because I tried, it is just because I like to know

3     what I signed.

4     BY MR. MASTER:

5     Q.  And, given Sheldon Silver's role in negotiating the budget,

6     whose support did you understand you needed for one of your

7     budget letters to have a chance of being funded in the budget?

8     A.  His support.

9     Q.  And, do you have any non-profit institutions that serve

10    your community?

11    A.  Yes.  Many.

12    Q.  What types?

13    A.  I have YMCA, YWCA, JCC, I have mental health organizations,

14    I have Planned Parenthood in my district.  They're all

15    501(c)(3)s.  Many foundations, little ones, big ones.  A whole

16    assortment of 501(c)(3)s.

17    Q.  Is 501(c)(3) a term that refers to a type of non-profit

18    organization?

19    A.  Tax-free organization.

20    Q.  When did those organizations in your community seek your

21    assistance with meeting their funding needs?

22    A.  They ask all the time but they do -- they request what we

23    call member items.

24    Q.  And since you have been in the Assembly, what, if any

25    funds, have you been provided to help meet the needs of

1   organizations in your community?

2   A.  Most years, not all, there were a couple of years that we

3   didn't -- that there were no member items but most years there

4   have been some member item money available for members and I

5   did take member items for most of my years.  I think two years

6   I did not take member items but most the years I have.

7   Q.  One moment?  (Pause)

8          Now, during Sheldon Silver's tenure as Speaker, who

9   decided how large of a member item allocation you would get?

10  A.  I would assume he did.  The letter that we received was

11  from the Speaker.

12  Q.  Now, I would like you to take a look at what's been marked

13  as Government Exhibit 113.

14         THE COURT:  113?

15         MR. MASTER:  Yes.

16  Q.  It is in your binder.  Do you recognize what has been

17  identified as Government Exhibit 113?

18  A.  Yes.

19  Q.  What do you recognize it to be?

20  A.  It's the letter that we receive indicating how much we are

21  going to be allocated for us for our member items.

22         MR. MASTER:  Government offers Government Exhibit 113.

23         THE COURT:  Any objection?

24         MR. MOLO:  No objection, your Honor.

25         THE COURT:  113 is received.

 1              (Government's Exhibit 113 received in evidence)

 2     BY MR. MASTER:

 3     Q.  Please publish.

 4              So, can you please explain for the members of the jury

 5     what is on the screen there as Government Exhibit 113?

 6     A.  Yes.

 7              So, it is a letter to me from Shelly Silver, the then

 8     Speaker, who is informing me that I have an allocation of

 9     $60,000, and in there there is going to be -- there is forms

10     that accompany this letter and they want the forms to be

11     delivered to the Ways and Means, attention to Steve August or

12     whomever, by -- usually there is -- I don't see a date in here

13     so maybe the date is -- oh, due on Friday, March 5.  So, yeah.

14              So, it is a one-pager and usually, again, it

15     accompanies with that forms to be filled out for each of the

16     not-for-profits that you have decided to allocate money to.

17     Q.  And, would your allotment be the same every year or would

18     it change over time?

19     A.  Well, it changed.  One year I remember it changed because

20     there was -- we used to get, when I first came, there was

21     member items for individuals and then there was a delegation --

22     a delegation for me being Westchester County, delegation for

23     Manhattan, there is a delegation, Bronx is a delegation,

24     Suffolk is a delegation.

25              THE COURT:  By delegation do you mean group?

FB35SIL3                          Paulin - direct

1              THE WITNESS:  A group of legislators who represent the

2      county.  We organize ourselves usually by county.

3              So, there was a money allotment for that group of

4      legislators.  For example, there was some agencies in

5      Westchester that serve all of Westchester, they don't just

6      serve my community.  So, by giving a lump sum to the entire

7      county, those legislators got together and were able to fund

8      things that were broader than their own individual -- you know

9      the arts council, a county-wide organization.  Things like

10     that.

11             So, but then at some point, I don't really know why,

12     those were disbanded.  Could be that we increased our

13     members -- I am making this up a little bit, I don't know why.

14     I really don't know why.

15             THE COURT:  Don't speculate.

16             THE WITNESS:  Yes, I won't speculate.

17             So, it was -- we didn't -- we no longer got delegation

18     items.  When that happened we were told that our allocations

19     were going to go up and mine did.  So I, over time, I started

20     receiving $60,000 and now, toward the end after 15 years,

21     $210,000 for my district.

22             THE COURT:  Does everybody get the same amount?

23             THE WITNESS:  I wouldn't know because all of these

24     letters are individually sent and --

25             THE COURT:  You don't compare with your buddies?

FB35SIL3                         Paulin - direct

1          THE WITNESS:  I have never compared.  People don't

2     compare.  There is almost, I don't know, I can only speak for

3     myself but a fear that they're going to get more than you or

4     less than you and you are going to find out and not know what

5     to do about that.  So, there is just no sharing of information.

6     BY MR. MASTER:

7     Q.  Now, are you familiar with something called capital

8     funding?

9     A.  Yes.

10    Q.  What is capital funding?

11    A.  Capital funding, so just to distinguish between operating

12    money and capital money.  So, if you looked around this

13    courtroom, paying a staff is an ongoing expense; she's

14    operating money.

15          THE COURT:  A very important operating money.

16          THE WITNESS:  Your operating money.  Capital is this

17    desk; it is going to be around for a while, right?  It is your

18    chairs, although probably chairs can go either way.  But it's

19    the desk, it's the carpeting, it is the lighting.  It is the

20    bricks and mortar.  So, that's the difference between capital

21    and operating.

22          So, the money that we got for capital is for those

23    kinds of expenses, things that are non-recurring expenses.

24    BY MR. MASTER:

25    Q.  Were there times when you would get allocations of capital

FB35SIL3                        Paulin - direct

1    funding, again, that you could spend on organizations in your

2    community?

3    A.   Yes.  Not every year but a lot of years.

4    Q.   During Sheldon Silver's tenure as Speaker who would decide

5    how much in capital funding allocations you would get?

6    A.   The Speaker decided.

7    Q.   And how would you learn when you received an allotment of

8    capital funding?

9    A.   A couple of different ways.

10         Sometimes Shelly would just announce it because that

11   was, as far as I know, evenly distributed so it would be

12   announced.  Oh, everybody here in this room is going to get,

13   you know, whatever the amount is.  But more times more often it

14   was through an individual contact either from a phone call or a

15   meeting that you would have with the speaker and then he would

16   tell you individually.  And we did, for some reason, we did

17   talk about capital to each other so we all knew we got the same

18   thing.  So, I -- you know, but that's probably because, you

19   know, there was some announcements in conference so we had

20   the -- we had that as knowledge.

21   Q.   Now, other than occasions on which they were announced

22   publicly -- well, withdrawn.

23         If you needed more funding beyond the member item

24   allocations and the capital allocations we just discussed

25   either for special projects in your community or for matters

FB35SIL3                          Paulin - direct

1   that affected a broader group of members, how would you go

2   about addressing that?

3   A.  You would request the Speaker -- you would submit a request

4   to the Speaker.  It was request to the Speaker.

5   Q.  How would you go about making sure that your requests were

6   favorably received by the Speaker?

7   A.  You would meet with the Speaker, you would plead with the

8   Speaker.  You would have to make a good case to the Speaker.

9   Q.  Now, were all of your requests for funding granted?

10  A.  I tended not to -- I asked -- no.  I mean, I guess let's

11  talk about the different kinds of requests for a minute, right?

12          So, member items, this is a letter so those are

13  granted and there is no additional conversation.  The letters

14  that I would write as chair, a lot of -- most of the time those

15  were honored, on rare occasion they weren't.  The letters that

16  I circulated asking for funding for special projects of

17  interest to me, many times they were not funded and additional

18  requests specific to my district, I really didn't ask for very

19  often.  I remember asking once for New Rochelle very early in

20  my tenure and that was granted.

21  Q.  Now what, if any information, did you get as a member of

22  the Assembly about the amounts of discretionary funding that

23  Sheldon Silver had available in reserve to satisfy requests of

24  members such as yourself?

25  A.  I didn't know of any specific -- I knew there were reserves

FB35SIL3                          Paulin - direct

 1    because my experience of getting the money for New Rochelle, I
 2    knew there had to have been some money somewhere to give me and
 3    another member because we both share that city, but I wasn't
 4    aware of an amount or where the reserves were or how they were
 5    controlled or anything like that.
 6    Q.  How, if at all, would you be informed when Sheldon Silver
 7    decided to award some of that reserve money, wherever it came
 8    from, to another member of the Assembly?
 9    A.  I wouldn't know.
10    Q.  How, if at all, would you be informed when Sheldon Silver
11    decided to award some of that reserve discretionary money to an
12    item of his on choosing?
13    A.  I wouldn't know.
14    Q.  And how, if at all, were you informed of the various
15    sources of money that Sheldon Silver would draw on to meet
16    discretionary funding needs?
17    A.  I wouldn't know.
18    Q.  Do you know about something called a Health Care Reform Act
19    or HCRA?
20    A.  Yes.
21    Q.  What do you understand HCRA to be?
22    A.  What I had thought HCRA was was it was health care funding
23    so it goes to our hospitals and other health care agencies and
24    I had always been under the impression that that was done by
25    formula and when we re-did HCRA we recreated or changed those

1  formulas.  So, for example, a hospital gets a certain amount of

2  money for their uninsured, you know, those people who come into

3  Montefiore, big hospitals -- and little hospitals in my

4  district, too -- and there is a good number of people who are

5  uninsured.  So, there was a -- I thought there was some fair

6  allocation of -- or some allocation, maybe not fair in

7  everybody's mind but, you know, some allocation that was

8  designed by formula.

9           That's what I had always thought it was.

10 Q.  And when, if ever, were you informed by Sheldon Silver that

11 there was discretionary funding available under HCRA to meet

12 health care needs in your community?

13 A.  I was unaware of discretionary funding.

14 Q.  And when, if ever, were you informed that Sheldon Silver

15 was sending discretionary money to Columbia University?

16 A.  I didn't know that there was money going to Columbia.

17 Q.  And when, if ever, did Sheldon Silver tell you that, inform

18 the conference that he was receiving asbestos referrals from a

19 doctor at Columbia University?

20 A.  We did not know --

21           MR. MOLO:  Objection.

22           THE COURT:  Overruled.

23           THE WITNESS:  I did not know that.

24 Q.  And when, if ever, did Sheldon Silver inform the conference

25 that he was sending discretionary money to a research center of

FB35SIL3                         Paulin - direct

1    that doctor at the same time he was receiving the referrals?

2    A.   I did not know that.

3    Q.   What is a lulu?

4    A.   It is an additional salary stipend when you have a

5    responsibility either as a committee chair or as leadership

6    position in the democratic conference or in a -- one of the

7    four conferences that I mentioned.

8              THE COURT:  Is that lulu, L-U-L-U?

9    BY MR. MASTER:

10   Q.   Yes.

11             Is that a colloquial term for the salary supplement?

12   A.   Yes.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

FB3YSIL4                        Paulin - Direct

1   BY MR. MASTER:

2   Q.   What's the base salary for members of the assembly?

3   A.   $79,500.

4   Q.   So as a committee chair, did you receive a lulu?

5   A.   Yes.

6   Q.   During the tenure of Sheldon Silver as speaker, who decided

7   which members of the assembly got lulus?

8   A.   Well, it was usually based on -- after you reached a

9   certain level of seniority, there were -- the speaker would

10  appoint you to be a committee chair or to one of the

11  responsibilities that receives a lulu.

12  Q.   But ultimately, who had to make that appointment?

13  A.   The speaker.

14  Q.   So, could you get a lulu or a salary supplement without the

15  support of the speaker?

16  A.   No.

17  Q.   We've been talking about the legislative session in Albany

18  to this point.

19  A.   Yes.

20  Q.   Is your office in Albany your only legislative office?

21  A.   No.  I have an office in Eastchester, which is in my

22  district.

23  Q.   Do you have any staff who work in your Albany office and

24  your district office?

25  A.   Yes.  I have staff in both places.

FB3YSIL4                         Paulin - Direct

1    Q.  How many and in which offices?

2    A.  I have two full-time people in my Albany office, and then I

3    have -- in my district office, I have six part-timers that job

4    share.  So amounting to, I guess, maybe another three full-time

5    or 2 1/2 full-time.

6    Q.  During Sheldon Silver's tenure as speaker, who set the

7    budget for your district office and for all of your staff?

8    A.  The speaker set the budget.

9    Q.  So, if you wanted more money for your staff or if you

10   wanted to move to a better office, whose support would you

11   need?

12   A.  You would go to the speaker for more money to get staff.

13   Q.  Who is Judy Rapfogel?

14   A.  Judy is Shelly's chief of staff.

15   Q.  During Sheldon Silver's tenure as speaker of the assembly,

16   what role, if any, did she play in fielding requests from

17   members of the assembly such as yourself for budget increases

18   or other matters related to funding?

19   A.  You knew that Judy and Shelly were very close and talked a

20   lot.  So, if you couldn't get to the speaker, it wasn't

21   uncommon to go to Judy and ask for whatever it is because you

22   knew that she was going to relay it to Shelly, and they would

23   have a conversation and get back to you.

24   Q.  In your experience, what, if any, independent authority did

25   they have to make decisions without approval from the speaker?

FB3YSIL4                              Paulin - Direct

1   A.  It didn't appear to me that she had independent power.

2   Partly, it was her presentation, which is, I have to talk to

3   Shelly.

4             All right.  Just talk to Shelly.  There was always an

5   impression that you thought that she wasn't making the decision

6   without talking to him.

7   Q.  Now, let's talk about what you do out of your district

8   office.

9             Are you familiar with the term "constituent services"?

10  A.  Yes.  That's serving individuals that you represent on

11  matters of concern to them.

12  Q.  How many staff do you employ to assist your constituents

13  with those constituent services?

14  A.  Two of my part of-timers are devoted to constituent

15  service.

16  Q.  What types of needs do your constituents come to you with?

17  A.  They might come to me if they're having a problem with a

18  state agency that they can't -- I'm going to say Department of

19  Motor Vehicles, because everybody is familiar with how many

20  obstacles sometimes you can have there.

21            That's not the only one.  There could be social

22  services, the Department of Transportation.  There are a lot of

23  state agencies, and there are licenses and things like that.

24            So we could have issues related to that.  There are --

25  but many, many other types.  For example, yesterday someone

FB3YSIL4                        Paulin - Direct

1    came in and had a problem with their school district and wanted

2    to see whether we could help talk to the superintendent about

3    this child.  So that's another type of constituent service.

4              I have a lot of lawyers in my district who go all the

5    way to the Court of Appeals, let's say, in the state.  They

6    might come to me and say, oh, this law needs to be changed.  So

7    that's a type of constituent service.  So I'll look at their

8    case and decide whether or not we want to introduce a bill.

9              There are utility issues.  For example, during Storm

10   Sandy, we were right in the middle of that problem.  Our lights

11   were out a lot.

12             So I was on the phone with Con Edison daily, sometimes

13   three times a day, to get schools open, nursing homes open and

14   be the place where people could come and sometimes plug in

15   their -- because my office happened to have electricity by

16   accident.  So we would have school children sometimes come.  So

17   we play a lot of different roles.

18   Q.  When you are seeking assistance in writing for a

19   constituent in your capacity as a legislator, what letterhead

20   do you use?

21   A.  My assembly letterhead.

22   Q.  Does your assembly letterhead identify yourself as a member

23   of the assembly?

24   A.  Yes.  It has a picture with the little capital at the top

25   and then my name, and it says assembly member and the 88th

1    Assembly with an address.  Yes.  You would know that it's

2    coming from an official.

3    Q.  Again, why do you use assembly letterhead when you're

4    seeking assistance in writing?

5    A.  Well, if it's an assembly matter, I'm an assembly member.

6    I want -- it just -- it's what I would use so I would be

7    rightfully communicating the matter to whatever party I'm

8    communicating.

9            So, if I'm writing to a state agency and I'm an

10   assembly member and if I'm writing in that capacity on behalf

11   of someone, then I want to make the other person at other end

12   of the letter aware of that I am an assembly member.

13   Q.  When you're helping someone in your personal capacity, what

14   letterhead do you use?

15   A.  Well, if it's a personal letter, I would use my personal

16   stationery.

17   Q.  What if you determine that one of your constituents merits

18   special recognition or honor?  What types of vehicles do you

19   have to recognize that constituent?

20   A.  We have what we call citations.  Sometimes people call them

21   proclamations.  We have a few forms, but they're pretty much

22   the same, a small form when you don't have a lot of information

23   and you say, this person is an outstanding person and is

24   receiving this honor because of all their hard work in this

25   matter.

 1          And then we have a longer version.  It's more like a

 2   resolution, resolved that this person is the greatest person on

 3   earth for doing this thing.  And then we have an even larger

 4   one.  But they're all pretty much the same.

 5          The only one that's a little different is there's a

 6   resolution that we can actually pass on the floor of the

 7   assembly, and that's actually voted on by the members honoring

 8   the individual or the cause or something.

 9          That looks a little different.  It's a little

10   prettier, and it's got a nice seal on it.  Those are the types

11   of ways we can honor someone.

12   Q.  Is that one of the services that you perform in your

13   capacity as --

14   A.  Yes.  All the time.

15   Q.  Before I conclude, there are two other topics that I want

16   to cover briefly.

17          First, are you familiar with something called the

18   Moreland Commission to investigate public corruption?

19   A.  Yes.

20   Q.  How did you become familiar with it?

21   A.  I can't remember the exact moment I learned about it, but I

22   know we discussed it in conference.  I read about it obviously

23   in the newspaper.  I heard about it or talked about it with

24   other members.

25          The first moment I learned about it, it was likely in

FB3YSIL4                          Paulin - Direct

1   conference, but I don't remember exactly.

2   Q.  At some point, did you learn that the Moreland Commission

3   had begun to make certain inquiries of the legislature?

4   A.  Yes.

5   Q.  How did you learn about that?

6   A.  That I learned in conference.

7   Q.  Did there come a time when you received a letter from

8   Sheldon Silver concerning those inquiries?

9   A.  Yes.  We received a few letters.  But, yes, I remember

10  them.

11  Q.  If you wouldn't mind looking in your binder at what's been

12  marked as 175.

13          Do you recognize that document?

14  A.  Yes.  I remember this letter.

15  Q.  What is the letter?

16  A.  The letter is telling us that there may be -- any member

17  who is called before the Moreland Commission that the assembly

18  has retained counsel, and it mentions the firm and the fact

19  that they have background in complex litigation and would be

20  available to us.

21          MR. MASTER:  The government offers Government Exhibit

22  175.

23          MR. MOLO:  No objection.

24          THE COURT:  175 is received.

25          (Government's Exhibit 175 received in evidence)

FB3YSIL4                         Paulin - Direct

1    BY MR. MASTER:

2    Q.  There's a fax header on that.  What's the date of that?

3    A.  The fax is August 29, 2013.

4    Q.  Now, did there come a time when you learned that the

5    Moreland Commission had begun making inquiries about certain

6    legislators' outside income?

7    A.  Yes.

8    Q.  Who was retained by the assembly to respond to those

9    inquiries?

10   A.  The law firm that was mentioned in the letter.

11   Q.  Now, what outside income do you have personally?

12   A.  I don't have outside income.

13   Q.  And so what, if any, involvement did you have in responding

14   to any inquiries from the Moreland Commission about this

15   matter?

16   A.  The Moreland Commission didn't try to see me.

17   Q.  Finally, are you familiar with the term "oath of office"?

18   A.  Yes.

19   Q.  Did you take an oath of office when you were initially

20   sworn in as a member of the New York State assembly?

21   A.  Yes.  And each time I was re-elected, I took the same oath.

22   Q.  Where do you take the oath?

23   A.  You take the oath in the chamber, as well as you sign the

24   oath.  You actually physically sign the same thing that you

25   recite in the chamber.

FB3YSIL4                              Paulin - Direct

1           MR. MASTER:  Do you mind pulling up Government's

2    Exhibit 268, which is already admitted.

3    BY MR. MASTER:

4    Q.   Where do you stand when you're taking the oath of office?

5    A.   You stand by your chair.  Everybody stands by your chair.

6    Q.   When you say "everybody," are you by yourself when you take

7    the oath of office?

8    A.   No.  We all take it together, all 150 of us.  So, democrats

9    and republicans alike, we all state it together.

10   Q.   And you say, in addition to taking the oath of office in

11   the chamber, you take the oath in written form?

12   A.   Yes.

13   Q.   How often do you sign that oath?

14   A.   Every two years we sign the oath.  Every time we're

15   re-elected.

16   Q.   In preparation for your testimony today, did you review the

17   written oath of office for members of the assembly that is

18   maintained by the New York State Department of State?

19   A.   Yes.

20   Q.   And do you recognize that as the oath of office that you

21   take when you're sworn in?

22   A.   Yes.

23   Q.   I'd like you to take a look at what's been identified as

24   Government Exhibit 102-1, please.

25           Do you recognize that?

FB3YSIL4                          Paulin - Direct

1   A.   Yes.

2   Q.   Is that the oath of office that you remember taking

3   A.   Yes.

4            MR. MASTER:  The government offers 102-1.

5            MR. MOLO:  No objection.

6            THE COURT:  102-1 is received.

7

8            (Government's Exhibit 102-1 received in evidence)

9            MR. MASTER:  If you wouldn't mind publishing that.

10  BY MR. MASTER:

11  Q.   Assemblywoman Amy Paulin.  Is that a sworn document?

12  A.   Yes.

13  Q.   If you wouldn't mind reading into the record the language

14  of the oath that you take each time you're sworn in as a member

15  of the New York State assembly.

16  A.   Sure.  "I do solemnly swear that I will support the

17  constitution of the United States and the Constitution of the

18  State of New York and that I will faithfully discharge the

19  duties of the office of --" and then you state your office.

20  Q.   And then how does it conclude?

21  A.   "Discharge the duties of the Office of the New York State

22  Assembly."

23  Q.   And then there's some language at the very bottom.

24  A.   Do you mean the title of position?

25  Q.   And then under "House of legislature," it states --

FB3YSIL4                         Paulin - Cross

1    A.  "According to the best of my ability."

2              MR. MASTER:  Just a moment, your Honor.

3              Nothing further, your Honor.

4              MR. MOLO:  Judge, can we have a very short break?

5              THE COURT:  Ladies and gentlemen, we're going to take

6    our afternoon break a little early.  Enjoy your break.  Don't

7    talk about the case.  I'll bring you back into the courtroom in

8    about ten minutes.

9              (Jury not present)

10             THE COURT:  Ten-minute break.

11             MS. COHEN:  Thank you, your Honor.

12             (Recess)

13             (Jury present)

14             THE COURT:  Please be seated, everybody.

15             Okay, Mr. Molo.

16   CROSS-EXAMINATION

17   BY MR. MOLO:

18   Q.  Good afternoon.  I'm Steve Molo.  I don't think we've ever

19   met, have we?

20   A.  No.

21   Q.  I represent Mr. Silver.

22             Can you tell me:  How was it that you came to be a

23   witness in this case?

24   A.  The prosecutors called my office and said -- and I

25   understand I was one of many members that were called down to

FB3YSIL4                         Paulin - Cross

 1   their office or actually to a lawyer's office that the assembly

 2   had hired to represent us.  And they asked us a lot of

 3   questions, and they picked me.

 4   Q.  Do you know why you were selected from among your

 5   colleagues?

 6   A.  No.

 7   Q.  I take it you're an honest legislator?

 8   A.  I believe I am.

 9   Q.  And you follow the laws of New York?

10   A.  I do.

11   Q.  You follow the rules of the assembly?

12   A.  Yes.

13   Q.  And, you can violate a rule of the assembly without

14   necessarily violating a law of New York; correct?

15            MR. MASTER:  Objection.

16            THE WITNESS:  I don't know.

17            THE COURT:  Overruled.

18   BY MR. MOLO:

19   Q.  You talked a lot, in response to questions of the

20   prosecutor, about the speaker.

21            How does somebody become a speaker?

22   A.  We elect him speaker.

23   Q.  You elect him speaker?

24   A.  Yes.  We vote in conference.  First there's a vote in the

25   democratic conference, because we are the majority.  So, if we

1   agree, then when that vote goes to the floor, because it's an

2   actual vote of all of the legislators, but if the majority

3   agrees, then we're going to carry the -- we're going to carry

4   the vote.  So first we vote informally in conference, and then

5   we go to the floor.

6   Q.  Who is eligible to become speaker?

7   A.  Anyone is eligible, any member.

8   Q.  Any member of the 150?

9   A.  Yes.

10  Q.  And Mr. Silver was elected speaker; correct?

11  A.  Yes.

12  Q.  And how many times has he been elected speaker while you've

13  served?

14  A.  He's been speaker the entire time.

15  Q.  How many times did you vote for him?

16  A.  I guess seven.

17  Q.  Seven out of seven; right?

18  A.  Seven or eight.  Yes.

19  Q.  Every time?

20  A.  Yes.

21  Q.  The person who serves as speaker is effectively the leader

22  of the assembly; right?

23  A.  Yes.

24  Q.  So that person negotiates with the leader of the senate?

25  A.  Yes.

FB3YSIL4                         Paulin - Cross

1   Q.  And also with the governor; correct?

2   A.  Yes.

3   Q.  You agree that the assembly needs a leader; right?

4   A.  Yes.

5   Q.  Someone has to be in charge; correct?

6   A.  Yes.

7   Q.  And Mr. Silver, while serving as speaker, was the person

8   that was put in charge.

9   A.  Yes.

10  Q.  Mr. Silver never asked you to report a bill out of your

11  committee, did he?

12  A.  No, not that I remember.

13  Q.  Now, New York State legislators are allowed to have outside

14  income apart from their legislative salary; correct?

15  A.  Yes.

16  Q.  And that outside income is permitted under the New York

17  Officers Law.

18          Do you know that?

19  A.  Yes.

20  Q.  New York legislators in that respect are different from

21  members of congress; correct?

22  A.  Uh-huh.

23  Q.  Is that yes?

24  A.  Yes.

25  Q.  You have to answer yes.

FB3YSIL4                           Paulin - Cross

 1    A.  Sorry.

 2    Q.  And that system is not unusual, is it, from your

 3    experience, compared to other states?

 4    A.  I think every state is structured very differently from

 5    each other.  I think there are many states that allow outside

 6    income and, in fact, have very little salary for their

 7    legislators compared to ours.

 8    Q.  Do you know of any state that bans legislators from having

 9    outside income?

10    A.  I don't, but I'm not familiar with every legislator either.

11    Q.  And you mentioned that the New York Legislature is in

12    session from January to June; correct?

13    A.  Yes.

14    Q.  That's not five days a week, January to June, is it?

15    A.  I work five days a week or six days, seven days a week all

16    year around.

17    Q.  That wasn't my question, ma'am.  My question to you is:

18    The legislature is in session from January to June, and it's

19    not in session five days a week during that period of time;

20    right?

21    A.  No, it's not.

22    Q.  Sometimes it's only one day a week?

23    A.  It's almost always never one day a week.  It's almost

24    always two to five, two to four and five.

25    Q.  Two to four and five?

1    A.  Yes.  Two, three.  It depends. January and February it's

2    two.  March is usually four.  April and May is usually three,

3    and June is usually four.

4              THE COURT:  Who determines the schedule?

5              THE WITNESS:  The speaker working with the senate

6    majority leader.

7              THE COURT:  So when you're in session, you're in

8    session at the same time?

9              THE WITNESS:  All but one year that I remember we were

10   always exactly the same.  One year I guess they didn't agree.

11   I don't know what happened, but it wasn't -- it didn't match

12   100 percent.

13   BY MR. MOLO:

14   Q.  The New York Constitution allows legislators to be

15   part-time; correct?

16   A.  I'm not sure under what authority we're allowed to be

17   part-time, but I know we're allowed to be part-time.

18   Q.  These part-time legislators then -- obviously you don't.

19   You've told us -- but others have other jobs; right?

20   A.  Yes.  Some have other jobs.

21   Q.  For example, Assemblyman Katz is a veterinarian; right?

22   A.  Yes.  I believe so.

23   Q.  And Assemblyman Skartados is a farmer; right?

24   A.  I'm not familiar with what he does, but I know he does

25   something else, yes.

FB3YSIL4                        Paulin - Cross

1    Q.  I'm sorry.

2    A.  I don't know what his job is.  I didn't know he was a

3    farmer until you just stated that.

4    Q.  Is it of any interest to you?

5    A.  Well, it's of interest if there was a farming matter.

6    Perhaps he would be someone that I could ask a question of.

7    But, generally, not that interesting to me, no.

8    Q.  So, in essence, he brings some diversity to the

9    legislature?

10   A.  We all bring diversity to the legislature.  We're all

11   individuals with lots of different experiences.

12   Q.  Assemblyman McDonough is a pharmacist; right?

13   A.  Yes.

14   Q.  And is Senator McGee is an auctioneer; correct?

15   A.  Assembly.

16   Q.  Excuse me.  Assemblyman MaGee is an auctioneer?

17   A.  I've heard that, yes.

18   Q.  And the law does not limit the amount of money that

19   legislators can make outside their jobs.

20   A.  No, it doesn't.

21   Q.  And it doesn't limit what spouses can earn either, does it?

22   A.  No.

23   Q.  Members of the assembly vote on issues that directly affect

24   their financial interests all the time, don't they?

25   A.  Yes.  I presume.  Because the state budget impacts all of

FB3YSIL4                        Paulin - Cross

1    us.

2    Q.  Even beyond that.  For example, Assemblyman Katz, the

3    veterinarian, in 2012 voted on Bill A.697 that benefited

4    veterinarians by requiring all pet dealers to have an attending

5    veterinarian care for the pets animals.

6                MR. MASTER:  Objection.

7                THE COURT:  Sustained.

8                THE WITNESS:  I don't know if he voted on it or not.

9                THE COURT:  Don't answer that.

10   BY MR. MOLO:

11   Q.  You regularly take legislative actions that affect your own

12   personal interests, don't you?

13   A.  I guess you'd have to give me an example for me to

14   understand that better.

15   Q.  Sure.  You're the wealthiest member of the assembly, aren't

16   you?

17   A.  Well, I'm not personally wealthy.  But I understand that,

18   you know, income-wise my husband makes -- this is not my

19   income.  It's his -- makes one of the higher levels of salary,

20   yes.

21   Q.  Well, I believe it's the highest that's reported; correct?

22   Your annual household income for common cause is reported at

23   $2.4 and $2.58 million; is that right?

24                MR. MASTER:  Objection.

25                THE COURT:  Sustained.

FB3YSIL4                          Paulin - Cross

1    BY MR. MOLO:

2    Q.  Your husband you mentioned -- you disclose his financial

3    dealings on your disclosure form; correct?

4    A.  Yes.

5    Q.  Because you live together, and you share assets I take it?

6    A.  Yes.

7    Q.  Now, your husband is a very senior executive in the real

8    estate world; correct?

9    A.  Yes.  He's a real estate broker.

10   Q.  With an international real estate firm; correct?

11   A.  Yes.  It was recently bought by an international firm.

12   Q.  In 2012, his company worked on a deal with the Witkoff

13   Group for a $65,000,000 sale for a building in Manhattan;

14   right?

15   A.  His office did?

16   Q.  Yes?

17   A.  I would be unaware of what members of his office worked on.

18   Q.  How about your husband himself brokered a deal to sell a

19   parcel on the Upper West Side to Excel Development for

20   $45,000,000 in 2014.

21            Are you aware of that?

22   A.  No, I'm not.

23   Q.  And your husband also did deals for Silverstein Properties

24   as well.  Are you aware of that?

25   A.  No, I'm not.

FB3YSIL4                    Paulin - Cross

1   Q.  Did you disclose any fees from Witkoff to your husband's

2   firm on your financial disclosure form?

3   A.  We disclose our own financial -- our own incomes.  We don't

4   disclose our spouse's income except in a lump sum.  We don't

5   specify different deals or anything like that.  So, no.  I

6   wouldn't have disclosed it.

7   Q.  I take it you didn't disclose anything about the Excel

8   Development deal on your disclosure forms either; right?

9   A.  I don't even know if that's his personal deal.  You're

10  saying it is, but I have no knowledge of that.  If it's a firm

11  deal, he might have had nothing to do with it.  I don't know.

12  Q.  Your husband's name is Harry Schulman, S-h-u-l-m-a-n?

13  A.  S-c-h-u-l-m-a-n.

14  Q.  Do you follow your husband's career at all?

15  A.  I don't ask him about his clients, no.

16  Q.  Do you know whether that deal was publicly reported?  You

17  don't know?

18  A.  I have no idea.

19  Q.  Now, you mentioned that the speaker appointed you to chair

20  the assembly energy committee; right?

21  A.  Yes.

22  Q.  And in May 2014, you chaired a committee hearing regulating

23  gas and electric companies; correct?

24  A.  Yes.

25  Q.  The president of Con Ed, Craig Ivey, testified in the

FB3YSIL4                    Paulin - Cross

 1   hearing?

 2   A.  Yes.  I believe he did.

 3   Q.  At the same time your husband owned Con Ed stock valued

 4   between $150,000 and $250,000?

 5   A.  It's possible.  I'm not familiar with the stock that we

 6   own.  He is the investor in the family.  So it's possible.

 7   Q.  Let me show you what's been marked Defense Exhibit Paulin

 8   1.

 9          THE COURT:  Can we just say Defense 1?  Or do you

10   already have a numbering system?

11          MR. MOLO:  If it's okay, Judge, what I propose to do

12   is by witness name, 1, 2, 3.

13          THE COURT:  I prefer just sequential numbers.

14          MR. MOLO:  Okay.  So just Defense Exhibit 1.  All

15   right.

16          THE COURT:  It's got to be identified first, and it's

17   got to be moved into evidence.  You can't put it on the

18   screen --

19          MR. MOLO:  Can I lay the foundation to let her see it?

20          THE COURT:  You can let us see it.

21          MR. MOLO:  That's what I meant.  I didn't mean that

22   screen.  Excuse me.

23          THE COURT:  Can you see it okay?

24          THE WITNESS:  Yes, I can.

25   BY MR. MOLO:

FB3YSIL4                           Paulin - Cross

1   Q.  Can you see that document?

2   A.  I do.

3   Q.  If you go to -- that's your disclosure form?

4   A.  Yes, it is.

5   Q.  The pages are not sequentially numbered, but answer to

6   question 16.

7                MR. MASTER:  Your Honor, we don't have a copy.

8                THE COURT:  Is it not on your screen?

9                MR. MASTER:  We'd like a copy to be able to review the

10  whole document.

11               MR. MOLO:  We have a copy.

12               MR. MASTER:  Thank you.

13  BY MR. MOLO:

14  Q.  This is the disclosure form that you prepared and filed

15  with the State of New York?

16  A.  Yes.

17  Q.  It's your disclosure form as a legislator; correct?

18  A.  Yes.

19  Q.  And you're disclosing your financial interests?

20  A.  Yes.  And my spouse's.

21  Q.  And your spouse's.

22  A.  Yes.

23  Q.  I move for the admission of Defense Exhibit 1.

24               THE COURT:  Any objection?

25               MR. MASTER:  No, your Honor.

FB3YSIL4                          Paulin - Cross

1           THE COURT:  Defense 1 is received.

2           (Defendant's Exhibit 1 received in evidence)

3           THE COURT:  That's the 2014 financial disclosure form?

4           THE WITNESS:  Yes.

5    BY MR. MOLO:

6    Q.  If you go to the annual statement of financial disclosure,

7    question 16, the answer.  If we look at five from the bottom.

8    Do you see Consolidated Edison stock, category 1.  Correct?

9    A.  Yes.

10           THE COURT:  I think that's category I.

11           MR. MOLO:  Excuse me.  Category I.

12   BY MR. MOLO:

13   Q.  If we go to page 13, which is ahead of that, Table II,

14   which is the table where you are identifying the value of the

15   stock --

16   A.  Yes.

17   Q.  -- and we go to category I, it says $150,000 to $250,000;

18   correct?

19   A.  Yes.

20   Q.  So the value of your husband's stock with Con Ed was

21   $150,000 to $250,000 at the time; correct?

22   A.  Right.

23   Q.  At the same time, you voted for Bill S.6357 or the assembly

24   bill was 8557, which was a budget bill for dealing with energy

25   issues, didn't you?

FB3YSIL4                          Paulin - Cross

1    A.  Without having the bill copy in front of me, I really don't

2    know.  If you want to show it to me, I'm sure -- this was a

3    bill you're suggesting had a lot to do with Con Edison?

4    Q.  It's bill number S.6357/A.557.

5    A.  And the language of the bill?

6              THE COURT:  I think they're getting it.

7              Are you pulling up the bill?

8    BY MR. MOLO:

9    Q.  If I showed you a report of the activity of your committee

10   during that period of time, might that refresh your

11   recollection?

12             THE COURT:  It's just come up.

13             THE WITNESS:  This is a budget bill?

14             MR. MOLO:  Yes.  It's the bill that I just mentioned.

15             THE COURT:  Is that going to refresh your recollection

16   about what this bill does?

17             THE WITNESS:  Not really.

18   BY MR. MOLO:

19   Q.  Do you know whether you voted for that bill?  That's my

20   question.

21   A.  I honestly, without seeing -- I don't memorize the numbers

22   of the different bills for the budget.

23   Q.  Okay.

24   A.  So I don't know if that is the final budget that we passed.

25   I guess this is the part that would tell me.  So, yes.  So this

1    looks like the budget bill that, yes, that I voted for.

2    Q.  In fact, maybe this will help refresh your recollection.

3    A.  Yes.

4    Q.  Turning to the third page of that, does that refresh your

5    recollection as to whether you voted for that bill?

6              THE COURT:  Mr. Molo, do you have copies for the

7    prosecutor or for me?

8              MR. MOLO:  It's on the screen, Judge.

9              THE WITNESS:  Yes.  I'm familiar with what you're

10   suggesting, which is 18A, eliminating 18A, which is the

11   surcharge, which is transferred on to rate payers.

12             So that's an amount of money that rate payers will no

13   longer have to pay on their electricity bills.  It does not

14   benefit a utility.  It benefits rate payers.

15             THE COURT:  When you say "rate payers," is that

16   anybody who pays an electric bill?

17             THE WITNESS:  Exactly.  So what happens is it's an

18   assessment on the utility that the utility is allowed to

19   transfer completely over to our bills.

20             So by eliminating it, we were eliminating a fee that

21   the rate payer would pay.  It doesn't go into the pockets of

22   the utility.  It's a pass-through.  It would have no financial

23   benefit to Con Edison.

24             Frankly, I find it a little sexist that a stock that

25   is owned by my husband that I receive no financial -- that I

FB3YSIL4                          Paulin - Cross

1     have no part in -- or he's the one that makes the decision

2     about it.  He's the one who also is the owner of the stock, and

3     it had no bearing on this work.

4     BY MR. MOLO:

5     Q.  It's not a question of sexism, ma'am.

6          THE COURT:  Please don't argue.  Just ask the

7     question.

8     BY MR. MOLO:

9     Q.  It's a question of you disclosing the fact that your

10    husband owned this stock, and you were chairing hearings that

11    the president of the company was appearing before your

12    committee.

13         THE COURT:  What's the question?

14    BY MR. MOLO:

15    Q.  Did you go to Mr. Silver and say, Mr. Silver, I'm about to

16    chair this committee hearing, and my husband is a significant

17    investor in Con Ed, and I want you to know that?

18         THE COURT:  The question is did you tell Mr. Silver.

19         THE WITNESS:  No.  I didn't tell him that my husband

20    owned stock in Con Edison.

21    BY MR. MOLO:

22    Q.  And you chaired a hearing.

23    A.  I co-chaired it.

24    Q.  You repeatedly sponsored a bill in the assembly that

25    required millions of children in New York to be vaccinated with

FB3YSIL4                    Paulin - Cross

1   a Merck vaccine; correct?

2   A.  Yes, I did.

3   Q.  In 2014 your husband held between $150,000 -- or $100,000

4   or $150,000 in Merck stock; correct?

5   A.  Yes.  If it's on the financial disclosure, he did.

6   Q.  Had that bill passed, Merck stood to make hundreds of

7   millions of dollars; correct?

8   A.  Yes, but it was not -- the implication that somehow that

9   Merck -- first, stock can go up and down for various reasons.

10  So we don't know whether it would have gone up or down, or

11  maybe there would have been some other drug that would have

12  caused it to go down.

13          We have no idea whether the stock is going to be

14  impacted positively or negatively based on this act.

15  Q.  How about the revenue?  It would have sold a lot of this

16  vaccine; right?

17  A.  You're talking about the HPV; right?  That's the vaccine

18  you're talking about?

19  Q.  I'm talking about the bill that you sponsored several years

20  in a row calling for New York school children -- I'm not

21  quarreling with whether it's a good bill or not.

22          I'm just saying that you sponsored this several years

23  in a row, and it called for children to be vaccinated with a

24  Merck vaccine; correct?

25  A.  Right, which is already recommended by CDC, and children

FB3YSIL4                          Paulin - Cross

1    are getting it now.  So, yes.  Was that bill hoping to get more

2    children who were at risk vaccinated, yes.

3    Q.  That wasn't my question.

4    A.  Okay.

5    Q.  Your husband at the same time owned between $100,000 and

6    $150,000 in Merck stock; right?

7    A.  Right.

8    Q.  Did you go to Mr. Silver and say, Mr. Silver, I want you to

9    know I'm sponsoring this bill, and my husband owns between

10   $100,000 and $150,000 of Merck stock?  Did you go to him and

11   tell him that?

12   A.  No.

13   Q.  Is there anything wrong with what you did?

14   A.  You're making me think about it.

15   Q.  I don't know.

16   A.  Well, I'm actually going to be much more careful and

17   perhaps advise my husband that we should not be owning stock

18   that I have any relationship to.

19   Q.  You didn't violate the law, did you?

20   A.  No, I did not violate the law.

21             MR. MASTER:  Objection.

22             THE COURT:  Sustained.

23   BY MR. MOLO:

24   Q.  These resolutions that you just talked about a few moments

25   ago they give great praise that so-and-so is the greatest

FB3YSIL4                         Paulin - Cross

1    person in the world -- those are sort of light-hearted;

2    correct?

3    A.   Yes.  You go to dinners, and there's an honoree, and you

4    give them a citation or proclamation.

5    Q.   And these could sometimes be fun events; right?  The giving

6    of the resolution.

7    A.   Yes.  They can be fun events.  They're dinners.

8    Q.   And you sponsored resolutions for things like the winners

9    of US savings bond 2001 poster contest.

10   A.   You know what, I don't remember 2001.  It's possible.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FB35sil5                          Paulin - cross

1    BY MR. MOLO:

2    Q.  How about for commending Linda Kelly, the former

3    superintendent of the New Rochelle School System, upon the

4    occasion of her retirement?

5    A.  Yes.  I probably did that.

6    Q.  Okay.

7            And you have also sponsored resolutions in exchange

8    for people having done things for you?

9    A.  Like what?

10   Q.  Well, you sponsored a resolution making April 15th through

11   21st, 2007 Library Week in the State of New York, right?

12   A.  All chairs usually -- all library chairs do that, yes.

13   Q.  My question is in 2007 you sponsored a resolution making

14   April 15th to the 21st Library Week?

15   A.  I don't remember doing it but I certainly, it is very

16   possible because all library chairs make a library week and all

17   library chairs sponsor, you know, whatever the week is that's

18   appropriate to the calendar.

19   Q.  Okay, in, like, 2009 you introduce another resolution

20   making April 16th Library Assistants day in New York, right?

21   A.  I don't remember doing that but it's possible.  If I was

22   library chair I probably did.  If I wasn't I might have signed

23   on to somebody else's resolution.

24   Q.  The resolution in 2007 making Friends of Library week, do

25   you recall that, sponsoring that?

FB35sil5                         Paulin - cross

1   A.  Not specifically, because I do a lot of resolutions or a

2   lot of these citations so I don't remember -- I don't remember

3   it specifically but it is possible.

4   Q.  Because they're not that big a deal?

5   A.  Because we do them all the time and they're there to honor

6   the occasion you are going to or as part of your responsibility

7   as a member a committee member of a certain subject matter so

8   you do resolutions.

9   Q.  New Yorkers for Better Libraries Pact -- which I would

10  support if they asked me -- New Yorkers for Better Library

11  Pact --

12          THE COURT:  Mr. Molo, please don't editorialize.

13          MR. MOLO:  Sorry.

14  Q.  It is one your leading contributors, right?

15  A.  Yes, they do contribute to me.

16  Q.  So you were making these library resolutions at the same

17  time the Library Pact was giving you money?

18  A.  Yes; it is on my publicly disclosed campaign financial

19  form, yes.

20  Q.  Did you do the resolutions in exchange for those campaign

21  contributions?

22  A.  No.  Certainly not.

23  Q.  Is there anything wrong with giving those people those

24  resolutions?

25  A.  No.  Resolutions such as those were part of my

1    responsibility as library chair.  They were expected of me.

2    Q.  You handed out proclamations as you mentioned as well too,

3    right?

4    A.  Yes.  Citations.

5    Q.  Okay.

6    A.  Yes.

7    Q.  Citations you call them?

8    A.  Yeah.  You can call them whatever you want, it's fine.

9    Same thing.

10   Q.  You gave a citation or proclamation to Michael McGill upon

11   his retirement as superintendent of the Scarsdale schools?

12   A.  Yes.

13   Q.  Is that right?

14   A.  Yes.

15   Q.  Is that someone that you knew?

16   A.  What?

17   Q.  Is that someone that you knew at the time you gave him

18   that?

19   A.  Mike McGill, yes.

20   Q.  Is he a friend of yours?

21   A.  No, he is superintendent of Scarsdale Schools.  I knew him

22   in a professional capacity.

23   Q.  Is there anything wrong with you giving him that?

24   A.  No.

25   Q.  You talked about grants, you were asked about those, these

FB35sil5                      Paulin - cross

1    are sometimes called member items, is that right?

2    A.   Well, what -- are you talking about member items or talking

3    about other types of grants?

4    Q.   Let's talk about member items.

5              You were asked about the amount of money that you had

6    available to direct to causes in your community, correct?

7    A.   Yes.

8    Q.   And I think you mentioned that in your community there were

9    causes like YMCA and Planned Parenthood and JCC and various

10   foundations I think is what you said, right?

11   A.   Yes.

12   Q.   Are you suggesting that you were not given money to support

13   those organizations?

14   A.   I'm not sure I understand what you are asking me.

15   Q.   Were you suggesting, when you testified about the YMCA,

16   Planned Parenthood, JCC, and various foundations, were you

17   testifying that you weren't being given grant money, member

18   item money to support those organizations?

19   A.   No.  I was given grant money and it was my discretion as to

20   what I would give them for.

21   Q.   Okay.  And, generally, the more senior you are the more

22   member item money you have, right?

23   A.   I really don't know because it was all secret.

24   Q.   Okay.

25             You mentioned that after 15 years you had $210,000

FB35sil5                    Paulin - cross

1    available to you when you were looking at Government Exhibit

2    113; is that right?

3    A.  Yes.  For several years until -- yes, for I think four or

4    five years I had $210,000 as soon as they disbanded with the

5    delegation.

6    Q.  Actually, it was as early as 2008, according to Government

7    Exhibit 113 that was introduced earlier, that you got the

8    $210,000, right?

9    A.  I don't have -- I mean I could look but, yes, I remember it

10   was for several years.

11   Q.  Well --

12   A.  Do you want me to look?

13   Q.  Sure.  You tell me the year that you got -- because it

14   wasn't after 15 years, it was after about six or seven, right?

15   A.  Right.  There was a change in the system which I described

16   which was the elimination of the delegation item and it was

17   distributed among the delegation so we each got more money than

18   we had gotten before.

19   Q.  That's not my question.  My question to you was you didn't

20   have to wait 15 years to get the $210,000, you got it after

21   about seven years?

22   A.  Yeah, and then it stayed that amount until now.

23   Q.  Okay.

24   A.  Yes.

25   Q.  All right.

FB35sil5                              Paulin - cross

1    A.  So there were two bumps, I think.

2    Q.  Okay.

3            And you, yourself, had sponsored grants for using

4    member items for health care issues, correct?

5    A.  I'm not averse to doing that.  You would have to name

6    something for that.

7    Q.  How about the Hemophilia Association of New York?  Did you

8    sponsor a member item for that?

9    A.  Hemophilia?

10   Q.  Yes.

11   A.  As a member item?

12   Q.  Yes.

13   A.  I actually don't remember that one but it is possible.

14   Q.  How about the Kidney and Urology Foundation, is that

15   somebody that you provided member item money for?

16   A.  I don't remember doing that either.

17   Q.  Did you sponsor member items for or direct member item

18   money to groups outside of your district?

19   A.  Member items?

20   Q.  Yes.

21   A.  Well, when we had delegation items, yes.

22   Q.  Okay.

23   A.  But I always tried to keep the money within my district.

24   Q.  You always tried to --

25           THE COURT:  For member items.

FB35sil5                         Paulin - cross

1          THE WITNESS:  For member items I did try.

2    BY MR. MOLO:

3    Q.  Okay, and in fact you have actually sponsored those items

4    to organizations with which you have a personal affiliation, is

5    that right?

6    A.  No.  I don't have a personal affiliation with either the

7    kidney or the hemo -- whatever.

8    Q.  What about My Sister's Place, that's an organization that

9    you once were the executive director of, right?

10   A.  Yes, a long time ago.

11   Q.  And you gave member item money to My Sister's Place in 2003

12   and 2004, is that right?

13   A.  It's -- yes --

14   Q.  In 2006 and 2007, correct?

15   A.  -- an agency that serves battered women.

16   Q.  2009 and 2010, right?

17   A.  Uh-huh.

18   Q.  Is there anything wrong with you having directed member

19   item money to an organization that you were once the executive

20   director of?

21   A.  I was the interim executive director for a year.  I was

22   very familiar with their work and I made sure that those grants

23   served women in my district.  I didn't personally gain anything

24   by that.

25          THE COURT:  Were you the executive director when the

1    member item was given to the --

2              THE WITNESS:  No.  I was executive director in 1999

3    and then once I was elected, which was in 2001 -- I had left to

4    run -- and I was not the executive director during the time,

5    nor was I on the board, nor did I have any family members on

6    the board or staff on the board.

7    BY MR. MOLO:

8    Q.  Right, and I didn't mean to suggest that you did.  I

9    could --

10             THE COURT:  Again, please don't go along with the

11   witness, just ask questions.

12             MR. MASTER:  Objection.

13   BY MR. MOLO:

14   Q.  Was there anything wrong in you directing those member item

15   dollars to My Sister's Place?

16   A.  No.  They were a good cause.

17   Q.  Okay.

18             You mentioned that you weren't aware of HCRA money,

19   grant money?

20   A.  I wasn't aware of discretionary money.  I was aware of

21   HCRA.

22   Q.  How would that money have become available since it is part

23   of a budget, right?

24   A.  I'm not sure what you are saying.

25   Q.  Well, the money that the Speaker was able to direct through

FB35sil5                          Paulin - cross

1    HCRA --

2    A.  Right.

3    Q.   -- that was budgeted, wasn't it?

4    A.  Yes.  And $142 billion is a lot of line items and you

5    don't -- I wouldn't know what fund -- you know, it is so hard

6    to find even things that you are following in that budget.

7    Q.  Okay.

8    A.  It is so detailed.  So, I wouldn't know if something was

9    coming out of a certain fund or a different fund easily.

10   Q.  So, you don't -- do you know whether you voted for the

11   budget appropriation that allowed for the HCRA fund?

12   A.  Yes.  I voted -- well, I didn't vote for every single

13   budget bill but I likely voted for a budget bill over the

14   course of my tenure that authorized HCRA, yes.

15   Q.  And that was money that was dedicated to helping health

16   care organizations, correct?

17   A.  Yes.

18   Q.  You are not suggesting there was anything wrong with that,

19   are you?

20             MR. MASTER:  Objection.

21             THE COURT:  Sustained.

22   BY MR. MOLO:

23   Q.  Were you a patron of the opera?

24   A.  No.

25   Q.  You attend the New Rochelle Opera?

FB35sil5                        Paulin - cross

1    A.  No, I have never actually attended the New Rochelle Opera.

2    I have gone to their dinner.

3    Q.  You have gone to their dinner.

4    A.  Yes.

5    Q.  And you have actually directed member item money to the New

6    Rochelle Opera, correct?

7    A.  I have directed member item money for them to be able to

8    serve underprivileged kids and teach them the opera and to

9    bring them to the opera.

10   Q.  Okay, anything wrong with that?

11   A.  No.

12   Q.  Okay.

13        Let me ask you about the legislative process that you

14   talked about.  You mentioned that an Assembly member or a

15   senator has to propose a bill.  Is that the way the process

16   begins?

17   A.  Yes.

18   Q.  And that bill then goes to a committee, correct?

19   A.  Yes.

20   Q.  And the bill is considered by the committee, right?

21   A.  Yes.

22   Q.  And on each stage of the way the Assembly members that are

23   part of that opportunity to have a say on that bill, right?

24   A.  Yes.

25   Q.  Okay, express their views, and then there is a floor

1    debate; is that right?

2    A.  Most times, no.

3    Q.  Okay but there is a vote, right?

4    A.  There is a vote.

5    Q.  And the bill has to pass by majority, right?

6    A.  Yes.

7    Q.  And then this has to go to the other house?

8    A.  Well, yes, or it is going in the House at the same time.

9    Q.  After it goes to the other house -- Senate and Assembly

10   don't always agree, right?

11   A.  Right.

12   Q.  And the Senate is, you know, predominantly republican,

13   correct?

14   A.  Yes.

15   Q.  And the Assembly, as you have mentioned, testified earlier,

16   is largely democratic by almost two thirds?

17   A.  Yes.

18   Q.  The two houses often have to engage in some level of

19   compromise in order to get a bill passed, don't they?

20   A.  Yes.  Yes.

21   Q.  That is a good thing, isn't it?

22   A.  Yes.

23   Q.  If you didn't compromise you couldn't make laws, right?

24   A.  Most of the time, yes.

25   Q.  And even if the Senate and the Assembly agree you have to

FB35sil5                          Paulin - cross

1    get the governor to sign it, right?

2    A.  Right.

3    Q.  So the governor has a voice in this process as well, right?

4    A.  Yes.

5    Q.  So there needs to be negotiation among the Senate, the

6    Assembly and the Governor to even get anything of significance

7    done?

8    A.  You know, on a -- you know on a small level, yes.  Yes.

9    Q.  The budget bill -- excuse me, the real estate bill in 2011,

10   Jim Yates was substantially involved in that, wasn't he?

11   A.  In 2011?

12   Q.  Yes.

13   A.  I don't remember when Jim started.

14   Q.  Okay.

15   A.  But if he was there he would have been very involved

16   because he was very involved in all high-level conversations.

17   Q.  Okay, and that's somebody that Mr. Silver relied on

18   extensively?

19   A.  Yes.

20   Q.  In fact, Mr. Silver himself does not get involved in all

21   bills, right?

22   A.  Right.

23   Q.  He puts people in trust in places, right?

24   A.  Yes.

25   Q.  In fact, he did that with you and the Energy Committee,

FB35sil5                          Paulin - cross

1    right?

2    A.  Yes.

3    Q.  And Mr. Silver did that in having Mr. Yates negotiate with

4    the republicans on behalf of the Assembly in terms of the real

5    estate legislation?

6    A.  You know, again, I don't know exactly how that was

7    negotiated but I would -- I know that if Jim was counsel at the

8    time there was a lot of trust that we all had in Jim and

9    chances are he had some role.

10   Q.  Did you go to Mr. Yates and talk to him about your

11   husband's real estate dealings when that bill was being

12   negotiated?

13   A.  My husband isn't a tenant or a landlord.  You know,

14   those -- he is a broker.

15   Q.  But he is in deals all the time with landlords, correct?

16   A.  For commercial buildings.  This was a tenant -- this was

17   residential.

18   Q.  The Moreland Commission you talked about.

19   A.  Yes.

20   Q.  Now, Governor Cuomo had repeatedly threatened to institute

21   something called this Moreland Commission if the legislature

22   didn't pass legislation he wanted, right?

23   A.  Yes.

24   Q.  And the Commission, in July of 2013, began issuing

25   subpoenas, correct?

FB35sil5                         Paulin - cross

1    A.  I don't know exactly because I never received one, but that

2    sounds right.

3    Q.  Okay.

4            The Assembly had staffers who were lawyers at that

5    time, right?

6    A.  Staffers who were lawyers?

7    Q.  Lawyers.

8    A.  Yes, we have many lawyers on staff.

9    Q.  And Jim Yates was one of them, right?

10   A.  Yes, Jim is a lawyer.

11   Q.  And also Joanne Barker, is that another lawyer?

12   A.  She is a lawyer, I believe.

13   Q.  And those lawyers carefully studied the Moreland Commission

14   issues and the constitutionality, didn't they?

15           MR. MASTER:  Objection.

16           THE WITNESS:  I don't know.

17           THE COURT:  Sustained.

18   BY MR. MOLO:

19   Q.  You know that the Assembly went out and brought in top

20   legal talent to look at these issue, didn't it?

21   A.  I don't know their talent.  I know they brought in lawyers.

22   Q.  Well, actually the letter that was shown to you as --

23   A.  Yes, they were advertised as top talent.

24           THE COURT:  But you don't know that.

25           THE WITNESS:  I have no independent knowledge of

FB35sil5                          Paulin - cross

1    whether they were good or not good.  They were certainly

2    represented to be good vis-a-vis the letter.

3    BY MR. MOLO:

4    Q.  Well, Government Exhibit 175, if we can put that back up on

5    the screen, mentions the law firm Kasowitz, Benson, Torres &

6    Friedman and says that the named partner, Marc Kasowitz,

7    founding management partner, has an extensive background in

8    complex litigation and also conducted numerous investigations

9    and he would be an important resource.

10              So, I mean, you got the named partner from what is

11   considered a top firm representing you, right?

12              MR. MASTER:  Objection.

13              THE WITNESS:  I have no idea.

14              THE COURT:  Overruled.

15              THE WITNESS:  I have no idea.  I don't know anything

16   about the law firm.

17              THE COURT:  She made very clear she doesn't know how

18   good they are.

19   BY MR. MOLO:

20   Q.  How about the Senate, the Senate brought in top legal

21   people?

22   A.  I don't know.

23   Q.  They brought in lawyers?

24   A.  I don't know.

25   Q.  You didn't follow any of this?

FB35sil5                    Paulin - cross

1   A.  Honestly I wasn't -- I didn't go before the Moreland

2   Commission, I don't have outside income.  I knew that both the

3   Senate and the Assembly members who did have outside income

4   were being subpoenaed.  They didn't really talk about what

5   happened if they did even go.  I always believe that it was --

6   that was people who didn't like it, frankly, were people who

7   made a lot of money and didn't want to have their income

8   questioned.  So, the Moreland Commission never bothered me like

9   it bothered other members.

10  Q.  How about the fact that the Governor was doing something

11  that exceeded his constitutional authority?  Did that bother

12  you as a sworn legislator in New York?  We saw your oath, did

13  that bother you that the Governor was exceeding his

14  constitutional authority?

15          MR. MASTER:  Objection.

16          THE COURT:  Overruled.

17          THE WITNESS:  What bothered me is that there were so

18  many members that were doing wrong things and --

19  Q.  Listen to me, ma'am.  Ma'am, that's not my question.

20          THE WITNESS:  And so I was not bothered.

21          MR. MOLO:  Judge, can I ask --

22          THE COURT:  You have to --

23          THE WITNESS:  I have to answer his question.

24          So --

25          THE COURT:  His question is did it bother you that the

FB35sil5                         Paulin - cross

1    Governor was exceeding his authority, if you thought he was

2    exceeding his authority.

3              THE WITNESS:  I had no idea if he was really exceeding

4    his authority.  I was told he was but the truth is that I was

5    happy that somebody was looking at some of these things and I

6    was not bothered by the fact that the Moreland Commission was

7    investigating potential corruption in the legislature.  I think

8    that it is good to expose that because I value the institution,

9    I think it is important to protect it, and I think that all of

10   the corruption needs to be -- needs to stop.

11   BY MR. MOLO:

12   Q.  And in valuing the institution you value the notion of

13   separation of powers?

14   A.  Yes.

15   Q.  And the fact that some of the best lawyers in America were

16   brought in and challenged -- this was of no interest to you

17   that the governor was exceeding his authority consistent with

18   the filings that they were making in open court?

19             THE COURT:  Ladies and gentlemen, let me just remind

20   you, the questions aren't evidence, it is the answer that is

21   evidence.  Okay?

22             Do you understand his question?

23             THE WITNESS:  Yes, I understand it.  He is asking me

24   if I was bothered by the fact that the Moreland Commission

25   could possibly have been in violation of the Constitution.

FB35sil5                              Paulin - cross

1           Is that the question?

2    BY MR. MOLO:

3    Q.  Well, I would think it would be of concern to you.

4           THE COURT:  Don't argue with the witness, just ask a

5    question.

6           THE WITNESS:  That's because you're assuming that it

7    was in violation of the Constitution.  I have no -- I was told

8    that it could possibly be in violation of the Constitution.  I

9    don't believe it ever went to court to challenge whether it was

10   really in violation of the Constitution so we don't really know

11   if a court of law would have deemed it to be unconstitutional.

12   BY MR. MOLO:

13   Q.  You don't know whether it went to court?

14   A.  That the -- well, I do know that it went to court.

15   Q.  So it did go to court.

16          So, legal papers will --

17          THE COURT:  Stop.

18          THE WITNESS:  It wasn't binding.

19          THE COURT:  Do not argue with the witness.

20          THE WITNESS:  There was no --

21          THE COURT:  You wait, too.  Don't argue with him.

22   Okay?

23          THE WITNESS:  Sorry.

24          THE COURT:  Here is the way this works.  He gets to

25   ask questions, you get to answer the questions.

1          THE WITNESS:  That's fine.

2          THE COURT:  I'm going to not let him argue with you.

3    I am going to ask you not to argue with him.

4          THE WITNESS:  That's fine.

5          THE COURT:  Mr. Molo, what is your question?

6          MR. MOLO:  I need to think of one.

7          THE COURT:  I'm sorry?

8    BY MR. MOLO:

9    Q.  The question is you are aware that there was a court action

10   filed challenging the Moreland Commission's authority, correct?

11   A.  Yes.

12   Q.  It was in New York Supreme Court?

13   A.  I am aware, yes.

14   Q.  Are you aware that the Senate hired the former United

15   States Attorney for the Southern District of New York as their

16   lawyer?

17   A.  I remember that they hired an important lawyer, I didn't

18   remember the name.

19   Q.  And the Senate and the Assembly together challenged the

20   Moreland Commission's authority, correct?

21   A.  Yes.

22   Q.  As a politician you often speak to the media?

23   A.  Yes.

24   Q.  Do you consider the media friend or foe?

25   A.  I like the media.  I don't mind them.

FB35sil5                           Paulin - cross

1    Q.  Have you ever been --

2              THE COURT:  You just got a bunch of friends in here.

3              MR. MOLO:  Good answer.

4              Have you ever been treated unfairly by the media?

5              THE COURT:  By the press.

6              MR. MASTER:  Objection.

7    A.  If you want to say a misquote, yes, there is times where I

8    would have preferred that my quote looked different, yes.

9    Q.  And you have been quoted out of context, right?

10   A.  Yes.

11   Q.  And have you said things in the media that turned out later

12   not to be true?

13   A.  What do you mean?

14   Q.  Well, I mean you said, for example, that you would refuse

15   to seek or accept member items in the Westchester Journal in

16   2010, didn't you?

17   A.  I didn't accept member items for two years.

18   Q.  But you eventually did, right?

19   A.  I did.

20   Q.  And as we talked about, you used them for a variety of

21   different organizations, right?

22   A.  Right.

23   Q.  And how about the fact that you said you wouldn't -- you

24   were against soft money, right?

25   A.  I don't remember -- I mean it is possible I might have said

1   that.  I don't know what that means in terms of what you are

2   asking me.

3   Q.  Well, you criticized the notion of soft money, right?

4   A.  Soft money being what?

5   Q.  Well, you've -- money that isn't directly contributed to an

6   individual member and is given to an organization and that

7   organization then gives money to campaigns?

8            THE COURT:  Are you talking about political

9   contributions?

10           MR. MOLO:  These are political contributions.

11           THE COURT:  That was not clear from your question.

12           MR. MOLO:  Okay.

13           THE WITNESS:  Soft money?

14           MR. MOLO:  Yes.

15           THE COURT:  Are you familiar with what soft money is?

16           THE WITNESS:  Yes, explain it better?

17   BY MR. MOLO:

18   Q.  Money that is given to an organization that then gives that

19   money to --

20   A.  You mean like a third-party?

21   Q.  Yes.

22   A.  Third-party.

23   Q.  Do you criticize that?

24   A.  I don't remember in what context I might have been

25   criticizing what, so.

FB35sil5                          Paulin - redirect

1    Q.   Have you taken soft money?

2    A.   Third-party money?

3    Q.   Right.

4    A.   You mean somebody else is spending money on my behalf?

5    Q.   Correct.

6    A.   When I ran, yes, the democratic campaign committee

7    supported my race so, yes, I guess if that's soft money then I

8    took soft money.

9    Q.   And you have actually hosted fundraisers for that

10   organization in your home, right?

11   A.   I did.

12   Q.   And you are an honest legislator, right?

13   A.   Yes, I am.

14        MR. MOLO:  No further questions, Judge.

15        THE COURT:  Okay.

16        MR. MASTER:  If you wouldn't mind pulling up

17   Government Exhibit 102-1, Mr. Coccaro?

18        THE COURT:  Do you want that on the screen for the

19   jury as well?

20        MR. MASTER:  Yes.

21   REDIRECT EXAMINATION

22   BY MR. MASTER:

23   Q.   Assemblywoman Paulin, where on this form does it say that

24   the duty to faithfully discharge the office of a member of

25   Assembly applies only part-time?

1   A.   It doesn't.

2   Q.   Where on this form does it say that it doesn't apply to any

3   outside income that you receive as a legislator?

4   A.   It doesn't.

5   Q.   You were asked questions about votes you took for Sheldon

6   Silver as Speaker of the Assembly?

7   A.   Yes.

8   Q.   Do you remember that?

9   A.   Yes.

10  Q.   And you were asked how many times you voted for him?

11  A.   Uh-huh.

12  Q.   Right?

13  A.   Yes.

14  Q.   Who ran against Sheldon Silver in each of the times that

15  you voted for him?

16  A.   Well, remember it was a two-step process, the first is the

17  democratic majority agreeing on who should be Speaker and there

18  was no one that ran against him within the democratic

19  conference during my tenure.

20  Q.   In fact the democratic -- you testified earlier about how

21  the democratic majority is so strong that --

22  A.   Right, so you want to decide who when you go to the floor.

23  But on the floor the republican minority leaders usually

24  propose to run against the Speaker but that's after the

25  majority has already made the decision that it is going to be

FB35sil5                          Paulin - redirect

1   the Speaker and they know it is going to be the Speaker.  So,

2   it is a bit of a game, you know, on the floor, because we all

3   know that the majority is going to go for the person that they

4   elected informally in their conference.

5   Q.  And so, with respect to the vote that actually mattered

6   within the democratic majority, how much opposition did Sheldon

7   Silver have during each of the times?

8   A.  During my time there I think one or two people didn't end

9   up voting for him but there was -- but not real opposition.

10  Not any real opposition, no.  No opposition.

11  Q.  And what happened to the last Assembly member who actually

12  ran against Sheldon Silver for Speaker?

13             THE COURT:  In the democratic caucus?

14             MR. MASTER:  Yes.

15  A.  It was actually on the floor because it was a challenge to

16  the floor, it was right before I got there, it was in 1999 or

17  2000, it was Bragman, an Assembly member from upstate New York

18  and he didn't win.  He tried to take over as Speaker and he was

19  ostracized, really, until he left.

20  Q.  And what happened to members of the Assembly who supported

21  Mr. Bragman instead of Sheldon Silver?

22             MR. MOLO:  Objection, your Honor.  The witness was not

23  there.

24             THE COURT:  How do you know this?

25             THE WITNESS:  I know this because many of my friends

1    were there and they told me and they were some of the people

2    who voted for Bragman and so I know what happened to them and

3    so that's how I know.

4           THE COURT:  Can you answer his question without

5    telling us or relying on what other people told you but just

6    rely on what you yourself saw happen to those people?

7           THE WITNESS:  Their committee assignments were

8    diminished.

9           THE COURT:  Even after you came to the Assembly?

10          THE WITNESS:  I came right after the coup, right after

11   that.

12          THE COURT:  I think that would be attempted coup.

13          THE WITNESS:  Right, unsuccessful coup.

14          So, I came and I saw committee assignments be

15   diminished.  So, that's the first-hand knowledge that I have.

16          THE COURT:  Okay.

17   BY MR. MASTER:

18   Q.  In addition, when you first took that seat, if you wouldn't

19   mind pulling up Government Exhibit 268, who sat next to you

20   when you first joined the Assembly?

21   A.  Oh, I sat actually -- where is that thing -- I was given a

22   seat -- when we start we are given a seat where our predecessor

23   sits and my predecessor who was Audrey Hochburg sat around here

24   somewhere, I don't remember.

25          THE COURT:  Right around where the Government Exhibit

FB35sil5                          Paulin - redirect

1   sticker is?

2              THE WITNESS:  Yes, yes, either that side or that side.

3   I can't remember exactly because it was one of the back rows

4   and right next to me was Marty Bragman when I first got elected

5   until he left and he used to say, you know, don't talk to me

6   because that's not good for you.

7              So, that's the only additional first-hand knowledge I

8   have.

9   BY MR. MASTER:

10  Q.  And it was only after that that Sheldon Silver ran

11  unopposed in the elections where you did vote for him?

12  A.  Right.  After -- I only voted for Sheldon Silver.  As I

13  came in after that time and he won as Speaker through that

14  attempted coup, and then following that there was never another

15  one.

16  Q.  Now, you were asked some questions about your financial

17  disclosure form, Defense Exhibit 1.  Now, you actually

18  disclosed that you -- your husband owns stock in Con Edison?

19  A.  Yes.

20  Q.  Correct?

21  A.  Yes.  It is all public.

22  Q.  So that the Speaker didn't need to talk to you about

23  whatever financial interest your family had in Con Edison

24  because he could read the form; isn't that right?

25  A.  Yes.

FB35sil5                              Paulin - redirect

1    Q.  When, if ever, did you decide to hide any assets that you

2    or your husband owned on these forms?

3    A.  I disclose everything I'm aware of.

4    Q.  And why do you disclose everything that you're aware of?

5    A.  So that you -- so the public -- I mean transparency

6    generally is so that the public has a clear understanding of

7    who you are, why you are voting, what you are doing, and that's

8    just very important for government to operate well.

9    Q.  And so, because you disclosed your husband's interest in

10   Con Edison, what were people able to do when they evaluated

11   your actions with respect to Con Ed?

12            MR. MOLO:  Objection.

13            THE COURT:  Sustained.

14   Q.  When, if ever, did you ask your husband to purchase

15   Con Edison stock --

16            MR. MOLO:  Objection.

17   Q.  -- so that --

18            When, if ever, did you ask your husband to purchase

19   Con Edison stock so that you could make money off of your

20   legislative action?

21            MR. MOLO:  Objection.

22            THE COURT:  Overruled.

23   A.  I never asked my husband to purchase any stock.  I am only

24   aware of the stock when I either am involved in the taxes or in

25   a form like this.

1   Q.  And when, if ever, did you take any official action in

2   order to increase the value of your husband's Con Edison stock?

3   A.  I never took any action directly to increase any value of

4   any stock.

5   Q.  And when, if ever, did you have an agreement with Con

6   Edison to take actions beneficial to Con Edison in exchange for

7   increasing the value of Con Edison stock?

8   A.  Never.

9   Q.  You were asked whether your actions were wrong.  Do you

10  remember that?

11  A.  Yeah.

12  Q.  Would it be wrong to take official action --

13          MR. MOLO:  Objection.

14  Q.  -- in exchange for increasing the value of an asset that

15  you own?

16          MR. MOLO:  Objection.

17          THE COURT:  Sustained.

18  Q.  Again, you were asked questions about a position that your

19  husband had as a commercial real estate broker.  Do you

20  remember this?

21  A.  Yes.

22  Q.  Did you also disclose your husband's position as a

23  commercial real estate broker on those financial disclosure

24  forms?

25  A.  Yes.

FB35sil5                        Paulin - redirect

1   Q.  So, was the public able to actually see that your husband

2   had an interest as a commercial real estate broker?

3   A.  Yes.

4   Q.  And why did you do that?

5   A.  The form -- you know, again, it is the same answer.

6   Transparency allows the public to be clear of any conflict of

7   interest that you might have and any interest just generally so

8   that they can get a clear picture of who you are and what

9   your -- what makes you tick and what your voting would be like

10  based on your portfolio as a person.

11  Q.  And when, if ever, did you take -- did your husband ever

12  ask you to take any official action beneficial to his business?

13  A.  Never.

14  Q.  And when, if ever, did you offer to take any official

15  action beneficial to your husband's business?

16  A.  Never.

17  Q.  And, in fact, with respect to the negotiations over major

18  real estate legislation, what role did you play?

19  A.  I played no role.

20  Q.  Who actually played the lead role in the New York State

21  Assembly with respect to real estate legislation?

22  A.  The Speaker.

23  Q.  Who was?

24  A.  Shelly Silver.

25  Q.  And when you were part of those conference meetings where

FB35sil5                        Paulin - redirect

1   Shelly Silver was updating the Conference on the rent laws,

2   again what, if anything, did he disclose to you and to his

3   fellow conference members about his financial interest in the

4   real estate industry?

5   A.   There was no disclosure in the Conference.

6   Q.   And how would it have affected you had you known --

7              MR. MOLO:  Objection.

8              THE COURT:  Let him finish the question.

9   Q.   -- had you known that he had any financial interest in the

10  real estate industry?

11             MR. MOLO:  Objection.

12             THE COURT:  Sustained.

13  BY MR. MASTER:

14  Q.   Well, how important is it to you to know if -- well, first

15  of all, withdrawn.

16             Whose representations were you relying on concerning

17  the status of negotiations and the conduct of negotiations with

18  respect to matters such as rent regulation?

19  A.   The Speaker, as we did with all matters.  He always was the

20  one to represent all of the negotiations to the conference.

21  Q.   And how important is it -- well, how effectively can you

22  review a representation that's made to you if you don't know

23  all the motivation behind the representation?

24  A.   It makes it harder.  It makes it hard.

25  Q.   You were asked questions about entities in your community

1   that received member items.  Do you remember that?

2   A.  Yeah.

3   Q.  My Sister's Place, do you remember that?

4   A.  Yes.

5   Q.  When, if ever, did My Sister's Place offer you a financial

6   benefit so that you would send member item money to My Sister's

7   Place?

8   A.  Never.

9   Q.  When, if ever, did you offer member item money to My

10  Sister's Place so that they would provide a private benefit to

11  you?

12  A.  No private benefit, it was only to my constituents for work

13  with both school districts and with women -- battered women in

14  communities that were hard to serve.  I have some remote areas

15  in my district that were underserved for battered women.  I am

16  very familiar with the issue and wanted to have that outreach

17  which is why I wanted them to -- which is why I gave them a

18  member item.

19  Q.  A member item is taxpayer money, correct?

20  A.  Yes.

21  Q.  And you were asked specifically by Mr. Molo was there

22  anything wrong with giving money to My Sister's Place.  Do you

23  remember this?

24  A.  Yes.

25  Q.  Was there anything wrong with giving money to a battered

1   women's organization?

2   A.   They're also the only battered women's organization in

3   Westchester so if you want to help battered women in

4   Westchester, you have to fund My Sister's Place.   There is one

5   smaller agency but it is in the northern part of the county so

6   it would mean that I was never going to be able to help

7   battered women which is just not acceptable to me.

8   Q.   And had My Sister's Place offered you something of

9   financial value in exchange?

10  A.   No.

11          MR. MOLO:   Objection.

12          THE COURT:   Overruled.

13  A.   No.   There was no value except if you value helping women.

14  That's the value that we received from the member item.

15          THE COURT:   I think the question was value, direct

16  financial benefit to you.

17          THE WITNESS:   No.   No direct benefit to me.

18  BY MR. MASTER:

19  Q.   And had they offered that to you, would there have been

20  anything wrong with that?

21  A.   Yes.   I would have never taken money from them if I was

22  giving them a member item.   It is against our rules, I believe.

23  You can't be on the board, you know.   We have a whole list of

24  rules.   You can't have any connection.   I don't think my staff

25  can be on the board of an agency, you know, if there is a

1    member item involved.

2    Q.  And you were asked about the amount of your husband's

3    outside income.  Do you know who had the most outside income of

4    any member of the Assembly?

5    A.  I do now.

6              MR. MOLO:  Objection.

7              THE COURT:  Overruled.

8    A.  I believe it's Shelly Silver.

9              MR. MASTER:  Just a moment, your Honor?

10             (Counsel conferring)

11             MR. MASTER:  Nothing further, your Honor.

12             THE COURT:  Okay, Mr. Molo, anything?

13             MR. MOLO:  Very short.

14             THE COURT:  Very short.

15   RECROSS EXAMINATION

16   BY MR. MOLO:

17   Q.  Do you always issue a press release when you make these

18   grants?

19   A.  Not always.  I sometimes do and I sometimes don't.

20   Q.  And he was asking you about were members able to see

21   financial interests that were at issue.  No one in the Assembly

22   was able to see that your husband had business dealings with

23   Witkoff, Excel or Silver, correct?

24   A.  No, they wouldn't have been able to see and I frankly

25   wouldn't have known so I couldn't have even told them.

FB35sil5                          Paulin - recross

1   Q.  And you did take official action that would have benefited

2   Merck, correct?

3   A.  That they would have sold a few more vaccines, yes, I guess

4   that's true.

5   Q.  A few more vaccines?  It was a bill to require all New York

6   school children of a certain age to receive this vaccine,

7   correct?

8   A.  Yes.

9   Q.  All right.

10          And as far as the real estate legislation, you say

11  that the Speaker was primarily responsible for negotiating it,

12  is that right?

13  A.  Yes.

14  Q.  Jim Yates was his point man on that, wasn't he?

15  A.  I assume so because he's the point person on so many

16  things.

17  Q.  And you were in attendance at meetings of your conference

18  where all sorts of legislation was discussed, correct?

19  A.  Yes.

20  Q.  And in fact you presented at the conference on certain

21  legislation, didn't you?

22  A.  Yes.

23  Q.  So it wasn't merely the Speaker standing up there and

24  telling you things, others had an opportunity to participate?

25  A.  But I think you asked me about the negotiations or -- and

FB35sil5                          Paulin - redirect

1   so negotiations were always presented by the Speaker.

2   Q.  No, that's not what I asked you about.  I said at these

3   conferences all sorts of legislation was discussed, correct?

4   A.  Yes.

5   Q.  And you had an opportunity to present, correct?

6   A.  Yes, as part of the budget I presented it, yes.

7   Q.  And other members of the Assembly had the opportunity to

8   present, correct?

9   A.  Yes, but they didn't really negotiate.  Central staff gave

10  us a piece of paper to read.

11  Q.  That wasn't my question.

12          THE COURT:  Please don't argue.

13  Q.  So others had the opportunity to present, correct?

14  A.  Yes, other people spoke, yes.

15  Q.  And if you wanted to you could run for Speaker, right?

16  A.  Yes.

17          THE COURT:  One more.

18          THE WITNESS:  I wouldn't have gotten elected Speaker,

19  though.

20  REDIRECT EXAMINATION

21  BY MR. MASTER:

22  Q.  Did you disclose your husband's financial interest in

23  Merck?

24  A.  Yes.  It is on the form.

25  Q.  And what, if any official action, did you take in exchange

FB35sil5                          Weitz – direct

1    for increasing the value of your Merck stock?

2    A.   None.

3              MR. MASTER:  Thank you.  Nothing further.

4              THE COURT:  Okay.  You can step down.

5              THE WITNESS:  Thank you.

6              (Witness excused)

7              THE COURT:  Call your next witness.

8              MS. COHEN:  Your Honor, the government calls Perry

9    Weitz.

10    PERRY WEITZ,

11        called as a witness by the Government,

12        having been duly sworn, testified as follows:

13             THE DEPUTY CLERK:  Please state your full name and

14   spell your last name, slowly, for the record.

15             THE WITNESS:  Perry Weitz.  W-E-I-T-Z.

16             THE DEPUTY CLERK:  Thank you.  Please, be seated.

17   DIRECT EXAMINATION

18   BY MS. COHEN:

19   Q.  Mr. Weitz, what do you do for a living?

20   A.  I'm an attorney at Weitz & Luxenberg.

21   Q.  What type of practice does Weitz & Luxenberg have?

22   A.  It is a mass tort practice which is basically asbestos

23   cases, cases that involve litigation where hundreds or

24   thousands of people are injured from a product defect.

25   Q.  Who founded Weitz & Luxenberg?

FB35sil5                         Weitz - direct

1    A.   I founded Weitz & Luxenberg.

2    Q.   When did you form Weitz & Luxenberg?

3    A.   I formed Weitz & Luxenberg in 1989.

4    Q.   Let's go back in time.  Where did you go to college?

5    A.   I went to George Washington University and then went to

6    Hofstra Law School.

7    Q.   When did you graduate Hofstra Law School?

8    A.   In 1983.

9    Q.   Where did you work after graduating from Hofstra Law

10   School?

11   A.   I worked for a personal injury firm Morris Eisen.

12   Q.   When you say personal injury, what do you mean?

13             MR. COHEN:  Excuse me, your Honor.  If Mr. Weitz could

14   speak into the microphone?

15             THE COURT:  Please.

16   A.   Basically a firm that handles motor vehicle accidents, trip

17   and fall cases, construction cases like when somebody falls

18   from a building.  Things like that.

19   Q.   How long did you work at the Eisen firm?

20   A.   I worked at the Eisen firm -- well, I worked during law

21   school and then I worked from when I was a lawyer from '85

22   until about '88.

23   Q.   And what did you do after you worked at the Eisen firm?

24   A.   Well, at the Eisen firm I tried personal injury cases and

25   then while I was at the Eisen firm I began to get asbestos

FB35sil5                        Weitz - direct

1    cases and that consumed most of my time, and I left and pursued

2    asbestos litigation.

3    Q.   How did it come about that you started working on asbestos

4    cases at the Eisen firm?

5    A.   Well, in about 1985 people couldn't bring cases in New York

6    if they had asbestos disease because there was an inequitable

7    statute that didn't allow them to sue, their statute of

8    limitations was barred.  And so, the unions, most of the men

9    and women that were exposed to asbestos were people that worked

10   in the construction trades.  So, the AFL-CIO had been working

11   with the New York Legislature to change the law so that people

12   that were dying from this disease and sick from it could bring

13   a lawsuit, and that law eventually changed in 1986.  And

14   lawyers for the AFL-CIO were looking for plaintiff lawyers,

15   lawyers that represent victims, like me, to represent some of

16   their union members.  And a lot of these people had died in the

17   '50s and '60s and '70s but couldn't bring lawsuits and the

18   Legislature changed the law so that they could bring cases from

19   1986 to 1987.  However, the unions were having difficulty

20   finding a plaintiff's lawyer that wanted to handle the cases

21   because most of these personal injury firms were small law

22   firms, only five or 10 lawyers, and they had to sue some of the

23   biggest corporations in the country and they were afraid to

24   take on these corporations because it was very expensive to

25   handle those cases.

1          A friend of mine from law school's father was one of

2    the lawyers for the AFL-CIO and they came to me and asked me if

3    I would be interested in pursuing some of these cases.  And I

4    said, well, I didn't really know anything about them at that

5    time because I was trying these other motor vehicle cases and

6    things like that.

7          So, I went around the country to other states where

8    they allowed asbestos cases to go forward and I met with some

9    lawyers who had handled these cases and read some of the

10   transcripts of those trials and saw some of the documents and

11   was outraged by the outrageous conduct of these companies who

12   basically knew they were killing these men that were working in

13   the construction trades throughout our country since the turn

14   of the century.  And they basically were making too much money

15   and they decided that it was a cost-benefit analysis and that

16   they would rather continue to not tell anybody that asbestos

17   caused these terrible diseases because they were making so much

18   money.

19         And so that -- I was a young, ambitious lawyer at the

20   time, I was in my late 20s, and it inspired me.  These families

21   had been ruined as a result of this terrible exposure to

22   asbestos and these terrible illnesses so I decided to go out on

23   my own and begin this asbestos practice.

24   Q.  Please explain for the jury what are the different types of

25   asbestos-related illnesses that your clients typically have?

FB35sil5                         Weitz - direct

1    A.  So, there are basically two categories of asbestos-related

2    illness, one are non-malignant diseases and one are malignant

3    diseases.  The non-malignant diseases are asbestosis disease,

4    termed after asbestos, and what is called pleural disease.

5            Asbestos is a mineral that's mined in the ground --

6    mined from the ground and then it is milled and it is turned

7    into thousands of different construction products.  So, they

8    take the rock, they mill it, and they turn it into cement, pipe

9    covering, block, asbestos sheets, asbestos gaskets.  Literally

10   thousands of products.

11           Asbestos is an indestructible fiber and it can't be --

12   it is fire retardant and it can't be destroyed so they used

13   asbestos to build ships in World War II and every building

14   since the turn of the century, up until the '70s when OSHA no

15   longer allowed asbestos to be used in this country, had

16   asbestos in it because of that fire retardant quality.

17           The problem is that when asbestos fibers get into --

18   when somebody is working with it, because they're indestructive

19   and because they're aerodynamic they stay in the air, they stay

20   in the air forever, and people breathe them in and even after

21   they sweep the floors they stay in the air and they fall to the

22   ground.  And since they can't be destroyed these men are

23   working with it, day in and day out, and they're constantly

24   breathing it in.

25           So, the different kinds of diseases, getting back to

1     your question -- I'm sorry -- is the non-malignant diseases,

2     asbestosis, which is a scarring of the interstitium, your lung

3     tissue.  Your inside lung tissue gets scarred by the asbestos

4     fibers being breathed in and your lung actually gets scar

5     tissue on it.

6           Pleural disease, the outside lining of your lung, has

7     a thin membrane like cellophane called the pleura and that

8     is -- and that pleural tissue gets scarred and the problem that

9     occurs with these diseases, even though they aren't a cancer,

10    the scarring becomes so bad that it affects your breathing.  It

11    causes what's called restrictive impairment.  And so, when your

12    lungs are operating properly there is a diffusion capacity.

13    You get oxygen from your alveoli into your blood stream and the

14    oxygen goes to all the different parts of our body and it feeds

15    our organs and that's how we stay alive.  When the scar tissue

16    is blocking that transfer of oxygen from the alveoli to the

17    blood you have deprivation of oxygen and you have shortness of

18    breath.  So, many of these men end up on oxygen machines and

19    dying of, basically, shortness of breath.  That's the

20    non-malignant side of asbestos disease.

21          The malignant side of asbestos disease are various

22    forms of cancer that you get from breathing in asbestos.  So,

23    you breathe asbestos in through your nose, through your mouth,

24    and anything that would go down what is called the mucociliary

25    escalator you can get cancer from because it is causing a

1    cellular reaction that causes an irritation and a mutation of

2    the cells, your body reacts to it which causes the cancer.  So

3    your laryngeal cancer, you get esophageal cancer, you get colon

4    cancer, and you get lung cancer from asbestos exposure.

5            Now, asbestosis and pleural disease, there is no other

6    cause for those diseases other than asbestos exposure.

7    Nothing.  Cigarette smoking doesn't cause that, only asbestos

8    exposure.  The cancers I just mentioned, there is other causes

9    for those cancers, one of them being cigarette smoking.  The

10   difference is that when you're exposed to asbestos you have

11   five times greater chance of getting one of those -- getting

12   lung cancer than somebody who isn't exposed to asbestos.

13           If you smoke cigarettes you have an 11 times greater

14   chance of getting lung cancer than somebody who doesn't smoke

15   cigarettes but when you are exposed to asbestos and you smoke

16   cigarettes there is a synergistic effect, a multiplying effect

17   so you have 11 times 5, a 55 times greater chance of getting

18   lung cancer than somebody who doesn't smoke cigarettes and

19   isn't exposed to asbestos.

20           So that's why, even though you are exposed to asbestos

21   and you smoke cigarettes, both are significant contributing

22   factors to causing the disease.

23           Then the most fatal type of asbestos-related cancer is

24   something called mesothelioma.  Mesothelioma is only caused by

25   asbestos exposure.  There is no other known type of cause of

1    mesothelioma than asbestos.  Cigarette smoking doesn't matter.

2    Nothing else matters.  Only asbestos causes mesothelioma and it

3    is 100 percent fatal, it is incurable, and it is a horribly

4    insidious disease that most people don't survive for more than

5    two years after going through excruciating treatment and

6    basically dwindling to, you know, a 75-pound person.

7    Q.  And your firm represents clients who have all the different

8    forms of illnesses that you just described?

9    A.  Yes.

10   Q.  Is that right?

11   A.  That's correct.

12   Q.  And how are those cases valued over the spectrum of

13   different illnesses?  Can you please describe that for the

14   jury?

15   A.  Well, the non-malignant diseases, some people just have

16   scarring on their lungs and don't have shortness of breath and

17   they're able to continue to go to work and their life isn't

18   dramatically affected by having that non-malignant disease.

19   They are at increased risk of getting cancer in the future but

20   basically they can continue their daily customary activities.

21            Others, as I said to you, they're scarring so bad that

22   they need oxygen and that are completely disabled and they

23   eventually die as a result of that.

24            So, those are very significant cases.  There are less

25   and less of those types of cases because with the non-malignant

FB35sil5                        Weitz - direct

1    diseases like asbestosis and pleural disease and lung cancer

2    and the other cancers, those are dose-related diseases meaning

3    that you have to be occupationally exposed to get those

4    diseases.  That means you have to work in the construction

5    trades pretty much every day and be breathing in the products

6    to get those diseases.  Mesothelioma is completely different.

7    You need a very little dose to get mesothelioma.

8            So, we have mesothelioma cases of not only men and

9    women in the construction trades but housewives who have -- who

10   do their husband's laundry when they come home and the asbestos

11   is in the laundry and then done the laundry for years, they've

12   gotten mesothelioma.  School teachers have gotten mesothelioma

13   because they're doing renovation work in the building and

14   asbestos fibers get into the ventilation system and they're

15   breathing it in.  Dentists in medical schools who have worked

16   with dental molds that have asbestos in it have gotten

17   mesothelioma.

18           So, you need a very low dose.  You don't have to be

19   occupationally exposed to get mesothelioma.

20   Q.  And what are the value of, for example, mesothelioma cases

21   to the client or the patient that has that as compared to some

22   of the other diseases that we just talked about?

23           THE COURT:  Do you mean if they file a lawsuit and

24   collect?

25           MS. COHEN:  Correct, your Honor.

1              THE COURT:  When you are talking about valuing the

2       disease?

3              MS. COHEN:  Correct, your Honor.

4              THE WITNESS:  It varies from jurisdiction to

5       jurisdiction, state to state, city to city, and it also varies

6       based upon the law in each state but, basically, there is two

7       types of a case and the first part of the case is the liability

8       and the exposure.  And the plaintiff -- the lawyer that brings

9       the case, the plaintiff, has to prove that the company was

10      responsible, that they knew or should have known of the

11      disease -- that the product was dangerous and that it caused

12      disease, and that the client was exposed to that product.  So,

13      that's one part of the case.

14             The damages part of the case is something called

15      compensatory damages and punitive damages.  Compensatory

16      damages are the pain and suffering the person suffers as a

17      result of that disease and that differs greatly from person to

18      person.  Some people, you know, don't have any operations and

19      they die relatively quickly from mesothelioma.  Other people

20      have very painful operations where they peel your lung and then

21      they go through chemotherapy and radiation therapy and they

22      live for three years.  That's one element, pain and suffering

23      of compensatory damages.

24             Another element of compensatory damages is economic

25      loss.  If it is the husband or the wife that is the bread

1   winner of the family and their job and the money they make from

2   their job pays for the family and they can no longer work, the

3   economic loss claim for being unable to work as a result of

4   that disease is part of the case so that could be substantial

5   depending upon the person's age.  And then, you know, if there

6   are young children and somebody dies, loss of parental guidance

7   is part of a claim, and also the husband's loss of services to

8   his wife is a big part of the case that the husband can no

9   longer perform duties as a husband and he can no longer do

10  things around the house and provide for the family as he did

11  before and that's called loss of consortium claim.

12          So, these cases tend to be very, very substantial,

13  worth millions and millions of dollars.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. COHEN:

2    Q.  So the mesothelioma cases tend, as you just said, to be

3    worth millions and millions of dollars; is that correct?

4    A.  Yes.

5    Q.  And that's millions and millions of dollars, both to the

6    person that has mesothelioma or their family that survives them

7    and to the firm; is that right?

8    A.  Well, the firm gets a third of the recovery of whatever --

9    whatever the settlement or the eventually collected judgment

10   amount would be.

11   Q.  Let's just back up a little bit.

12   A.  Sure.

13   Q.  When Weitz & Luxenberg was founded, who did you form the

14   firm with?

15   A.  I formed the firm with Arthur Luxenberg.  Arthur Luxenberg

16   and I worked at the personal injury firm that I mentioned

17   together.

18           He was a law guy; I was a trial guy.  We were both the

19   bottom guys on the totem pole.  We were put together, and there

20   was a love affair that hasn't ended.

21   Q.  When you formed the firm back many years ago, how has the

22   firm grown in size in terms of number of attorneys?

23   A.  So, when we first started, we had a few personal injury

24   cases.  And, because the statute changed and people were

25   allowed to sue all within that one year from 1986 to 1987, we

FB3YSIL6                          Weitz - Direct

1    had -- the firm was primarily asbestos cases.

2            And then after 1987, people were able to sue within

3    three years from when they discovered their injury.  So the

4    statute was corrected.  So we were primarily an asbestos firm

5    in the late 80's/early 90's.  And then I diversified the firm.

6    And we were about five attorneys when I left.

7            And then I started to in the early 90's, go into

8    pharmaceutical litigation, defective drugs like Vioxx and other

9    drugs where people had heart attacks and strokes or diabetes as

10   a result of drugs given and improper warnings for the drugs.

11           So I started to do that, and then we expanded into

12   doing environmental litigation.  Those are cases, if any of you

13   have ever seen the movie Erin Brockovich.  She works for our

14   firm.

15           We handle cases where there is contamination from a

16   factory into a community and there are people in that community

17   who get cancer or their water is contaminated, and we handle

18   those cases.

19           So over the years, the firm has grown to about 100

20   lawyers and approximately 400 people.

21   Q.  And, as the firm has grown over time over the last five

22   years or so, how much of the firm's practice remains asbestos

23   cases?

24   A.  It has diminished since the late 80's, early 90's, but it's

25   still a significant part of the business.  Some years, you

1    know, asbestos, you know, is still our primary revenue.  And in

2    other years, some of the other litigations, you know, will be

3    more of our primary revenue.

4    Q.  And you said, when you started, your firm still handled

5    some personal injury cases.

6         Does the firm still have a personal injury practice?

7    As you describe it, as you define personal injury.

8    A.  In comparison to the environmental, pharmaceutical, and

9    asbestos practice, it's much smaller.  But, yes, he we still

10   handle significant personal injury cases.

11   Q.  What percentage of the firm now is devoted to personal

12   injury cases?

13   A.  A very small percentage.

14   Q.  You said that the firm, when it represents a client, is

15   entitled to one third of the recovery.

16         Is that something called a contingency fee?

17   A.  Yes, it is.

18   Q.  How do attorneys at the firm -- how are they paid?

19   A.  Well, so a contingency fee is we don't charge our clients

20   any money, and we don't bill by the hour.  We only take a fee

21   if we recover money for our clients.

22         So they don't get charged any money unless we get them

23   money.  And then whatever the total amount of that recovery

24   would be -- so if it was $1,000,000, the firm would get

25   $333,000.

1          And so that's basically how a contingency fee works.

2    We pay for all the expenses of the cases, and then that gets

3    deducted, if we're successful, at the end of the case.

4    Q.   Who are the partners of Weitz & Luxenberg?

5    A.   Perry Weitz and Arthur Luxenberg.  We had another very

6    minor partner, Rob Gordon, and he retired pretty much.

7    Q.   How are the other attorneys at Weitz & Luxenberg, other

8    than yourself -- how are they compensated for the work they do

9    for the firm?

10   A.   So all the lawyers in the office are paid a salary.  Most

11   of the lawyers with the salary -- most of the lawyers, as I

12   like to tell them when I'm interviewing them, that they're not

13   going to get rich from the salary; that, you know, the

14   structure of this firm is not a partnership structure.

15         But I've created this structure, and it's not me who

16   created it, but the personal injury structure in the business

17   has always been somebody gets a modest salary, and then they're

18   encouraged to bring in cases themselves.

19         So we create basically their own law firm within our

20   law firm, but they're employees of the firm.  It's sort of an

21   entrepreneurial spirit.  So we encourage, you know, people to

22   use their good reputations, use the good reputation of the

23   firm, and try to bring in business.

24   Q.   How do those attorneys who bring in business -- do they get

25   paid for bringing in that business by the firm?

1    A.  They get a third of the third that the firm gets.

2    Q.  And is that true whether the attorney at the firm works on

3    the case they bring in or not?

4    A.  Yes, because there are different departments in our firm.

5    If a person in the environmental department brought in an

6    asbestos case, they wouldn't do any work on that case.  Only

7    the asbestos lawyers that are experts in handling asbestos

8    cases will work on that case.

9    Q.  But the person in the environmental practice, using your

10   example, would still get paid their one third of the third

11   earned by the firm?

12   A.  Correct.

13   Q.  Does the firm get cases referred to it by attorneys outside

14   of the firm?

15   A.  Yes, we do.

16   Q.  How, if at all, does the firm compensate those attorneys

17   outside the firm who may refer clients to it?

18   A.  The same way.

19   Q.  Meaning that attorneys outside the firm also get a third of

20   whatever the firm's third is?

21   A.  That's correct.  There's also one other element of the

22   payment structure in our firm, and that's a bonus, a

23   discretionary bonus, by the partners to the lawyers because not

24   every lawyer is able to bring in cases.

25            Some of the lawyers are just trial lawyers.  They're

1   in court all day.  They don't have the ability or the

2   relationships to get cases.  So we take that into consideration

3   when we give bonuses.

4              THE COURT:  I'm sorry.  So if a lawyer is just trying

5   cases but isn't bringing in clients themselves, their

6   compensation is their salary plus whatever bonus?

7              THE WITNESS:  That's correct.

8   BY MS. COHEN:

9   Q.  Who decides what bonuses go to the attorneys at your firm?

10  A.  Myself, Arthur Luxenberg, and the division head that runs

11  that unit.

12  Q.  You said before that certain types of asbestos-related

13  illnesses you're not seeing so much of anymore.

14             Is that true with mesothelioma?

15  A.  No.

16  Q.  Why not?

17  A.  There's about 3,000 mesothelioma cases a year, and really

18  mesothelioma and its notoriety really just came about because

19  of a doctor here in New York, a very famous man who is known as

20  the father of asbestos disease.

21             His name was Irving Selikoff, S-e-l-i-k-o-f-f.  He's

22  passed away.  The Mount Sinai Occupational Disease Department

23  was named after him.

24             And I, fortunately, got to know him when I first

25  started through the 90's.  He was an extraordinary man, and he

1    was the first one to --

2              He had a practice in Manville, New Jersey, and there

3    was a Manville asbestos plant there, and he started seeing all

4    these workers with diseases.

5              So he did epidemiological studies which proved for the

6    first time -- well, it wasn't the first time because there was

7    an anecdotal literature going back to the turn of the century,

8    but these epidemiological studies proved the relationship

9    between asbestos and these diseases.

10             Mesothelioma was misdiagnosed throughout the 1920's,

11   30's, 40's, 50's as lung cancer.  Dr. Selikoff helped define it

12   as this unique only asbestos-related disease in the early 60's.

13             Therefore, people started to recognize it, and then

14   people were able to then file cases as a result of that because

15   they knew that this was unique to their asbestos exposure.

16             So today, anybody who gets mesothelioma, because it's

17   diagnosed correctly -- they know that they have a case, and

18   they bring that case.

19   Q.  How are people getting mesothelioma today years after

20   asbestos has stopped being used?  Is there a latency period for

21   mesothelioma?

22   A.  Yes.  One of the interesting parts of asbestos disease is

23   you don't get sick from asbestos exposure until 20, 30, 40

24   years.  Very rarely is there a disease that occurs from an

25   exposure prior to 20 years before that exposure.

1          So, like if you're with somebody who has a terrible

2     cold and they're sneezing on you, you don't get sick in an

3     hour.  You might get sick, you know, three days, four days,

4     five days later.

5          That time from the onset of the exposure until the

6     onset of the disease actually showing up is called the latency

7     period.  With asbestos disease, and especially mesothelioma,

8     it's 20, 30, 40, 50 years.

9     Q.  Do you know the defendant, Sheldon Silver?

10    A.  I do.

11    Q.  How do you know him?

12    A.  I know him because he was of counsel to Weitz & Luxenberg

13    for -- I think since 2002.

14    Q.  You how did it come about that Sheldon Silver was hired by

15    Weitz & Luxenberg as of counsel?

16    A.  Shelly worked for a very prominent personal injury firm in

17    the business for many years before I met him.  I didn't even

18    know him, but I knew that he was the speaker, and I knew that

19    he had worked for this prominent firm, Schneider Kleinick &

20    Weitz, no relationship to me, for many years.

21    Q.  And the firm that Sheldon Silver used to work for -- you

22    said it did personal injury law?

23    A.  Yes.

24    Q.  Is that the same way you used personal injury law before?

25    Motor vehicle accidents.

1   A.   Yes.  But they were one of the premiere firms in the city,

2   and they handled very significant cases.

3   Q.   Did that firm handle any asbestos cases to your knowledge?

4   A.   Not to my knowledge.

5   Q.   Whose decision was it to hire Sheldon Silver?

6   A.   I didn't know Shelly prior to my partner, Arthur Luxenberg,

7   who had known Shelly, prior to Arthur saying to me that some of

8   these guys at this other firm, Schneider Kleinick & Weitz, were

9   older and were thinking about retiring and that Shelly was

10  looking for a new office.

11          Arthur had a good relationship with Shelly.  He said,

12  I think that we should bring him on as of counsel.

13  Q.   And who made the decision to hire Sheldon Silver?

14  A.   We did.

15  Q.   "We" meaning?

16  A.   Me and Arthur Luxenberg.

17  Q.   Why did you decide to hire Sheldon Silver?

18  A.   Well, Shelly was -- first he was speaker of the house.  He

19  was a very prominent, prestigious guy in New York.  It would

20  help the prestige of the firm.

21          We were a big, national firm.  We were handling cases

22  all over the country.  We have offices in California and New

23  Jersey and Delaware.  We thought that it would help with the

24  brand of the firm.

25          Shelly also was very well known within the

1   trial-lawyer community in New York.  He grew up in the courts.

2   He worked for a very famous judge that handled -- he was a

3   clerk for him.  He knew everybody.

4   Q.  Did you expect Sheldon Silver to bring in any cases to the

5   firm?

6   A.  Well, I knew that he had had some negligence cases with

7   Schneider Kleinick & Weitz.  But we were not relying on him to

8   bring in cases one way or the other.

9   Q.  Did you expect Sheldon Silver to do any work for the firm?

10  A.  Work on cases?

11  Q.  Correct.

12  A.  No, we did not.

13  Q.  What court appearances did you expect Sheldon Silver to

14  make on behalf of clients of the firm?

15  A.  None.

16  Q.  What negotiations did you expect Sheldon Silver to handle

17  when he worked at the firm?

18  A.  None.

19  Q.  What asbestos cases did you expect Sheldon Silver to bring

20  into the firm?

21  A.  None.

22  Q.  When you hired Sheldon Silver, what was his salary?

23  A.  $120,000.

24  Q.  Was that per year or per month?

25  A.  Per year.

1    Q.  Did that salary change over time?

2    A.  No.

3    Q.  Are there any other lawyers at your firm who receive a

4    salary but whom you don't expect to do any work for the firm?

5    A.  There are some that don't do any work and receive a salary.

6    But no.  No.

7    Q.  When Sheldon Silver started working at the firm, what work

8    did your firm have related to the State of New York?

9    A.  We had some cases involving some defective highways where

10   people were killed in car accidents because the highway was

11   defective and some other cases where there was state-owned

12   property involved I think at the time but not a lot.  Very few.

13   Q.  What happened to those cases involving the State of

14   New York?

15   A.  We continued to handle those cases but decided not to

16   handle any more.

17   Q.  Why did the firm decide not to handle any more cases

18   involving the State of New York after it hired Sheldon Silver?

19   A.  We just didn't want to have any conflict of interest.

20   Q.  Beginning when Sheldon Silver joined your firm in 2002,

21   what work did he do for the firm on cases?

22   A.  He did not work on any cases.

23   Q.  Did there come a time when you learned that Sheldon Silver

24   was getting referrals of asbestos cases?

25   A.  I did.

FB3YSIL6                         Weitz - Direct

1   Q.  How did you learn that Sheldon Silver was getting asbestos

2   referrals?

3   A.  I think we have sort of like lunches, open lunches, in one

4   of our conference rooms every day, and the lawyers are free to

5   come and go.

6        Usually the senior lawyers in the firm have lunch

7   there every day, and some of the young lawyers will come in to

8   speak with us.  It's sort of like a meeting/lunch.

9        I think during one of those lunches, I think Charles

10  Ferguson, who is the head of the asbestos department, had told

11  me that Shelly had brought in some cases from Dr. Taub.

12  Q.  What did you learn about how Sheldon Silver knew Dr. Taub?

13  A.  I don't really know how I learned, but I would think -- I

14  think that it was probably Arthur who had told me that Shelly

15  knew him for years.  I believe it was because they're from the

16  same religious community.

17  Q.  What conversations did you have with Sheldon Silver about

18  the asbestos cases that were being referred to him by Dr. Taub?

19  If anything.

20  A.  He would just mention to me, once in a while, that he had

21  gotten a case from Dr. Taub, but we never had any in-depth

22  conversation about things other than he got the case.

23        He was at one of these lunches talking to Charles

24  about what the status of the case was, how is it going?  What

25  are the settlements?

1    Q.  When Sheldon Silver would tell you that he had gotten a

2    case from Dr. Taub, what did he tell you about any state

3    funding that he was providing to Dr. Taub's research?

4    A.  He never told me about any state funding.

5    Q.  What knowledge do you have about whether Sheldon Silver was

6    directing any state funding to Dr. Taub's research when

7    Dr. Taub was referring cases to Sheldon Silver at your firm?

8    A.  I have no knowledge about that.

9    Q.  When you had those conversations with Sheldon Silver where

10   he would say he got a new case, what do you recall discussing

11   with Sheldon Silver about mesothelioma?

12   A.  As I said, my only conversations with Shelly about, you

13   know, mesothelioma were about cases that he had just brought in

14   or hearing him talk to Charles about the status of the case.

15   There was no other conversation.

16   Q.  Other than the status of the case where he brought one in,

17   did you have any other discussions with Sheldon Silver about

18   mesothelioma?

19   A.  No.

20   Q.  What discussions do you recall having with Sheldon Silver

21   about asbestos that was released into the air after the World

22   Trade Centers?

23   A.  I don't remember any conversation about that.

24   Q.  Are you familiar with the Fairness in Asbestos Injury

25   Resolution Act of 2005?

1   A.  Very familiar.

2   Q.  Would you just briefly describe what that act is and how it

3   came about.

4   A.  It was a piece of legislation promoted by asbestos

5   companies and the insurance industry to try to get an

6   administrative system so that they pay a very small amount of

7   money into an administrative system preventing people, asbestos

8   victims and their families, from ever going to court and

9   pursuing them in court and basically giving them immunity and

10  allowing them to get off the hook for all of the terrible

11  things that they did to these people and not having to have

12  jurors answer for that.

13          So they'd go into the system.  The amount of money

14  these people could get would be capped.  They'd get a fraction

15  of what they would get in the tort system or in front of

16  juries, and the defendants would never have to -- the

17  corporations and the insurance companies would never have to

18  pay again.

19  Q.  When did this act first become introduced as federal

20  legislation?

21  A.  Early 2000's in the house, and then a little later in the

22  senate.

23  Q.  What involvement did your firm have in that legislation?

24  Starting from 2000.

25  A.  I personally was very involved in going door to door to the

1    senators in Washington and trying to explain to them about

2    asbestos, asbestos disease, how bad these corporations were and

3    what they've done to millions of people in our country, the

4    working men and women of our country; and that this bill would

5    have been the worst piece of legislation that they could ever

6    pass.

7          A lot of them didn't know about this, and a lot of the

8    corporations put a lot of money into lobbying and trying to get

9    them to pass them, to pass the bill.  It was very close, the

10   vote.  But, fortunately for the victims of asbestos disease in

11   this country, it was defeated.

12   Q.  Are you familiar with an organization called MARF, the

13   Mesothelioma Applied Research Foundation?

14   A.  I know of it now.

15   Q.  What conversations do you recall having with Sheldon Silver

16   about your firm giving any money to MARF?

17   A.  We didn't have any.

18   Q.  What conversations do you recall with Sheldon Silver about

19   the firm giving money to Dr. Taub's research?

20   A.  We didn't have any.

21   Q.  What conversations do you recall about you personally

22   donating money to MARF that you had with Sheldon Silver?

23   A.  I didn't have any.

24   Q.  What money does your firm donate to MARF?

25   A.  I think that we've given them a small amount of money over

1    the years.  It wasn't a significant amount of money.

2    Q.  What money do you give personally to MARF?

3    A.  I don't.

4    Q.  In general, what money does your firm donate to

5    mesothelioma research?

6    A.  For many years, having worked with the doctors and the

7    unions working with the doctors of Mount Sinai in the

8    occupational disease department, these doctors were treating my

9    clients who were dying of asbestos disease.

10           And they would come into court and testify for us.

11   Weitz & Luxenberg tried more cases than any other asbestos firm

12   in the last 30 years.  So these doctors were constantly on

13   trial with us.

14           And so one of the things that the defendants would do

15   in cross-examining a doctor for the victim would ask, how much

16   money was Weitz & Luxenberg paying you?  How much money have

17   you received from Weitz & Luxenberg?

18           So we never made it a habit of giving money to that

19   institution because it would have actually hurt a future

20   plaintiff and would hurt the actual doctor's credibility

21   because they would have thought that if we gave all this money

22   to the hospital, that the doctor's testimony wasn't credible.

23           So we avoided giving any money to a specific doctor's

24   research.  And, quite frankly, in those days, there weren't any

25   doctors that had any research funds for mesothelioma.  So we

1    just gave money to hospitals in general.

2    Q.  Before Sheldon Silver mentioned to you that he was getting

3    asbestos cases and you learned those cases came from Dr. Taub,

4    had you ever met Dr. Taub?

5    A.  I never met Dr. Taub or ever spoke to him.

6    Q.  Prior to Sheldon Silver joining your firm, what cases did

7    Dr. Taub refer to your firm?

8    A.  Well, I had come to find out that a young asbestos attorney

9    in our office had gotten one or two cases from Dr. Taub prior

10   to I think Sheldon Silver getting any cases from Dr. Taub.

11   Q.  So, prior to Sheldon Silver joining your firm, at most your

12   firm got one or two cases from Dr. Taub through that one

13   particular lawyer?

14   A.  I don't know the specifics of that, but that's what I've

15   heard.

16   Q.  Did there come a time when you learned -- withdrawn,

17   your Honor.

18          What is the Simmons firm?

19   A.  The Simmons firm is a very well-known asbestos firm in

20   Chicago and St. Louis.

21   Q.  What do you know about whether the Simmons firm has funded

22   Dr. Taub's research?

23   A.  There was a time that I found out that the Simmons firm was

24   giving a lot of money to Dr. Taub's research foundation.

25   Q.  Do you remember about how long ago that was?

1    A.  Maybe seven or eight years ago, maybe six, something like
2    that.
3               THE COURT:  That's when you discovered it?  Or that's
4    when they were making the contributions?
5               THE WITNESS:  That's when I discovered it.
6    BY MS. COHEN:
7    Q.  Could it have been less time than that?
8    A.  It could be, yes.  I really don't know.  That was a guess.
9               THE COURT:  Don't guess.  You know you shouldn't have
10   guessed.
11              THE WITNESS:  Yes.
12              THE COURT:  If you don't know the answer to a
13   question, just say you don't know.
14              THE WITNESS:  I'm not sure of the time.
15              MS. COHEN:  I'm almost done, your Honor.
16              THE COURT:  Perfect.
17   BY MS. COHEN:
18   Q.  What discussions did you have with Sheldon Silver about the
19   Simmons firm's funding of Dr. Taub's research?
20   A.  I didn't.  I just knew that -- I think there might have
21   been a conversation that -- I don't know if it was specifically
22   with Shelly but that the Simmons firm started to give Dr. Taub
23   a lot of money and that he wasn't getting any more cases.
24              MS. COHEN:  Actually, your Honor, perhaps this is a
25   good time to break before I go into another area, which may be

1    the last area, but it may take a little bit of time.

2              THE COURT:  It may take a bit of time.  So if it's

3    going to take a little bit of time, we should stop for the day.

4    We've had a full day today.

5              So, ladies and gentlemen, we're going to stop for the

6    day.  Remember my admonition.  Don't talk about the case.

7    Don't read anything about the case.  Don't watch TV.

8              If there's a report on TV about the case, turn it off.

9    If it's on the radio, don't listen to it.  Most importantly,

10   don't talk to each other about the evidence that you've heard

11   so far.

12             Leave your notebooks on your chair.  I need you here

13   tomorrow no later than 9:15.  Remember we can't start without

14   all of you.  So, if you're late, you're holding up everybody.

15   Please be here on time.  Have a good evening.

16             (Jury not present)

17             THE COURT:  About how much more time are you going to

18   need, Ms. Cohen, with this witness?

19             MS. COHEN:  About 15 minutes, your Honor.

20             THE COURT:  Okay.

21             You can step down.

22             THE WITNESS:  Thank you, your Honor.

23             THE COURT:  I have some requests for the parties.

24             Can the technical people get together and make sure

25   that you all are in sync so things move seamlessly.  That's the

1   word.  Thank you.

2          Can you make sure that if we've got multiple-page

3   documents that you're going to need people to see, that you

4   have a copy for your adversary and that you have a copy for me.

5          If it's in the government's exhibit binder, that's

6   fine.  I can deal with it in the exhibit binder.  If it's a

7   defense exhibit, I probably don't have it since you haven't

8   given me an exhibit list.  I would like to see the document

9   when you're giving it to the witness.

10          Last but not least, there may be enough string so that

11   we can do this, but can we move this string up to here so it

12   doesn't block the witness from seeing the defense attorneys.

13          MS. COHEN:  Your Honor, we'll have our tech people

14   come in the morning and will try to do that.  We also perhaps

15   will try to get a microphone to put there so that the court

16   reporter can also hear the questioner better.

17          THE COURT:  I don't know if they can do that.  If so,

18   that would be great.

19          MS. COHEN:  One thing, your Honor, with respect to

20   defense exhibits -- you had asked the defense to give us

21   exhibits ahead of time.  We obviously did not get any exhibits.

22   I would like to get the exhibits not while the witness is on

23   the stand.

24          THE COURT:  Yes.  I think the problem is what he's

25   going to say is he's using them for cross, and he doesn't know,

1     until he asks the question, whether he's going to give them a

2     document to refresh their recollection.

3              Am I streaming your thoughts?

4              MR. COHEN:  You're speaking like a defense lawyer,

5     your Honor.

6              THE COURT:  Perhaps for a minute and 30 seconds.

7              MR. MOLO:  I wouldn't say it's a problem.

8              THE COURT:  With that said, if you have reason to

9     believe you're going to be refreshing the witness'

10    recollection, if you could please give the government the

11    document.

12             I presume most of these documents you've seen before,

13    but maybe not.  Maybe not.  The body language says no, I've

14    never seen some of these.

15             If you could both please just try to be courteous to

16    each other.  That's going to make my life much nicer.

17    Otherwise, I'm going to feel like I'm at family Thanksgiving

18    every day when we're squabbling about the sweet potatoes for

19    the 80th time.

20             Is there anything we can do for the government before

21    we leave for the evening?

22             MS. COHEN:  No, your Honor.  Tomorrow we will finish

23    with Perry Weitz, and we will call Dr. Taub.

24             THE COURT:  I presume that is going to take up all of

25    tomorrow?

FB3YSIL6                         Weitz - Direct

1            MS. COHEN:  That is my presumption, your Honor.  If at

2      lunch we see that it is going much, much faster, we will tell

3      the defense who our next witness will be.

4            THE COURT:  Anything from the defense before we leave?

5            MR. MOLO:  No, your Honor.

6            THE COURT:  Okay.  Thank you all.  Have a good

7      evening.  Be here at 9:15.  If there's anything that has come

8      up overnight and you need to talk to me, tell Mr. Brantley, and

9      I'll come up.  I want to bring the jury out at 9:30.  Okay?

10           MS. COHEN:  We will be here, your Honor.

11           THE COURT:  Thank you.

12           (Adjourned to November 4, 2015, at 9:15 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                               Page

 3    AMY PAULIN

 4    Direct By Mr. Master . . . . . . . . . . . .64

 5    Cross By Mr. Molo  . . . . . . . . . . . . . 112

 6    Redirect By Mr. Master . . . . . . . . . . . 152

 7    Recross By Mr. Molo  . . . . . . . . . . . . 163

 8    Redirect By Mr. Master . . . . . . . . . . . 165

 9    PERRY WEITZ

10    Direct By Ms. Cohen  . . . . . . . . . . . . 166

11                       GOVERNMENT EXHIBITS

12    Exhibit No.                               Received

13     267   . . . . . . . . . . . . . . . . . . .70

14     268   . . . . . . . . . . . . . . . . . . .71

15     269   . . . . . . . . . . . . . . . . . . .71

16     270   . . . . . . . . . . . . . . . . . . .71

17     271   . . . . . . . . . . . . . . . . . . .72

18     113   . . . . . . . . . . . . . . . . . . .94

19     175   . . . . . . . . . . . . . . . . . . 108

20     102-1   . . . . . . . . . . . . . . . . . 111

21                        DEFENDANT EXHIBITS

22    Exhibit No.                               Received

23     1   . . . . . . . . . . . . . . . . . . . 124

24

25
```