FB45sil1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                           15 Cr. 0093(VEC)

5    SHELDON SILVER,

6               Defendant.

7    ------------------------------x

8                                          November 4, 2015
                                           9:35 a.m.
9

10   Before:

11                    HON. VALERIE E. CAPRONI,

12                                         District Judge
                                             and a Jury
13                              APPEARANCES

14   PREET BHARARA
          United States Attorney for the
15        Southern District of New York
     BY:  CARRIE H. COHEN,
16        ANDREW D. GOLDSTEIN,
          HOWARD S. MASTER,
17        JAMES M. McDONALD,
             Assistant United States Attorneys
18
     STROOCK & STROOCK & LAVAN LP
19        Attorneys for Defendant
     BY:  JOEL COHEN
20             - and -
     MOLOLAMKEN, LLP
21   BY:  STEVEN F. MOLO
          JUSTIN SHUR
22        JUSTIN ELLIS
          ROBERT KRY
23        TUONGVY LE

24

25
```

FB45sil1

|  |  |
|---|---|
| 1 | (Trial resumed; jury not present) |
| 2 | THE COURT:  Okay, ladies and gentlemen.  I have a note |
| 3 | from juror no. 4, we will mark it Court Exhibit 1.  It says: |
| 4 | Employer stated that because I'm the only person in this |
| 5 | position, my absence from four to six weeks can have a bad |
| 6 | impact on the company.  Is there possibility of being excused |
| 7 | for this case?  They are willing to provide a written |
| 8 | statement. |
| 9 | Juror no. 4 is Raquel Morel, according to her note, |
| 10 | last name Morel, M-O-R-E-L.  If the parties want to think about |
| 11 | it, why don't we proceed today and think about it and tell her |
| 12 | we will get back to her. |
| 13 | MS. COHEN:  We can talk about it at lunch? |
| 14 | THE COURT:  Tell her she will sit for the day and we |
| 15 | will deal with this later in the day. |
| 16 | Are they ready? |
| 17 | THE DEPUTY CLERK:  Yes. |
| 18 | THE COURT:  Bring them out. |
| 19 | THE DEPUTY CLERK:  Do you want the witness on the |
| 20 | stand? |
| 21 | THE COURT:  Oh yes, where is the witness. |
| 22 | MS. COHEN:  One moment, your Honor. |
| 23 | (Continued on next page) |
| 24 |  |
| 25 |  |

FB45sil1                        Weitz - direct

1              (Jury present)

2              THE COURT:  Good morning, everybody.

3              THE JURY:  Good morning.

4              THE COURT:  Ladies and gentlemen we took the extra

5     chairs out of the jury box so you have a little extra room.

6              A JUROR:  Yes, more room.

7              THE COURT:  Ms. Cohen?

8              MS. COHEN:  Thank you, your Honor.

9              THE COURT:  Mr. Weitz, you are still under oath.

10             THE WITNESS:  Yes, your Honor.

11     PERRY WEITZ, resumed.

12    DIRECT EXAMINATION

13    BY MS. COHEN:

14    Q.  Mr. Weitz, you testified yesterday about firm lunches where

15    mesothelioma and other firm matters were discussed.  Do you

16    recall that testimony?

17    A.  I do.

18    Q.  How often did Sheldon Silver attend those lunches?

19    A.  When he wasn't in Albany and he was in New York City, all

20    the time.

21    Q.  What do you recall Sheldon Silver saying at any of those

22    lunches about the state funding of mesothelioma research?

23    A.  He never discussed that.

24    Q.  What do you recall Sheldon Silver saying at either at one

25    of those lunches or directly to you about possible state

FB45sil1                     Weitz - direct

1   funding that was available for mesothelioma research?

2   A.   There weren't any discussions about that.

3   Q.   What did Sheldon Silver tell you about any opportunities

4   for you or your firm to support mesothelioma research?

5   A.   We didn't have any conversations about our funding for

6   mesothelioma research with Shelly.

7   Q.   Did Sheldon Silver ever tell that you he was giving state

8   money to Dr. Taub's research?

9   A.   No.

10  Q.   You testified yesterday that you hired Sheldon Silver

11  because he was a powerful person as Speaker of the New York

12  State Assembly.  Do you recall that testimony?

13  A.   I do.

14  Q.   When you hired Sheldon Silver, what expectation did you

15  have that Sheldon Silver would use his official position to

16  bring business to the firm?

17  A.   I didn't.

18  Q.   What did you know about whether Sheldon Silver used his

19  official position to get the referrals from Dr. Taub to your

20  firm?

21  A.   I know nothing about that.

22  Q.   What discussions did you have with Sheldon Silver about

23  real estate tax work?

24  A.   I never had any conversation about any real estate tax

25  work.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FB45sil1                    Weitz - cross

1   Q.  Have you ever heard of Jay Goldberg?

2   A.  No.

3   Q.  Have you ever heard of the law firm --

4   A.  I should say I have heard about him now, not prior to this

5   case.

6   Q.  Prior to this case have you ever heard of the law firm

7   Goldberg & Iryami?

8   A.  No.

9   Q.  What do you know about any money Sheldon Silver got by

10  referring clients to Jay Goldberg or his law firm

11  Goldberg & Iryami?

12  A.  I don't know anything about that.

13         MS. COHEN:  No further questions, your Honor.

14         THE COURT:  Mr. Cohen?

15         MR. COHEN:  Thank you, your Honor.

16  CROSS EXAMINATION

17  BY MR. COHEN:

18  Q.  Mr. Weitz, I'm Joel Cohen, and together with my colleagues

19  I represent Mr. Silver.  And, of course, you know Mr. Silver,

20  correct?

21  A.  I do.

22  Q.  Now, you told us yesterday, Mr. Weitz, that when you were

23  starting your law firm you were outraged by the fact that

24  corporations were abandoning the people who had been afflicted

25  with mesothelioma as a result of them putting mesothelioma or

FB45sil1                      Weitz - cross

1   asbestos into those buildings, or creating the wherewithal that

2   there would be asbestos problems, correct?

3   A.   That is correct.

4   Q.   And you, having been outraged by that, were inspired to be

5   the guy to create the firm to look out for the little guy

6   because other firms weren't willing to tackle those

7   corporations and you built your firm on that model inspired by

8   what had happened, correct?

9   A.   That is correct.

10  Q.   And you wanted to build that firm, you started by yourself

11  before you joined up with Mr. Luxenberg; is that correct?

12  A.   That's correct.

13  Q.   And you built up that firm on the model to accomplish that

14  for those little guys --

15  A.   Absolutely.

16  Q.   -- to handle cases of personal injury whether they were

17  personal injuries involving accidents, construction accidents,

18  whether they were personal injuries resulting from malpractice

19  or doctors screwed up in cases, or personal injuries resulting

20  from exposure to asbestos, correct?

21  A.   That's correct.

22  Q.   And those were also all personal injury cases, correct?

23  A.   Yes.

24  Q.   Now, having done that, you wanted to create the expertise

25  in your firm particularly with respect to mesothelioma,

FB45sil1                          Weitz - cross

1   correct?

2   A.  Well, all asbestos-related diseases.

3   Q.  Okay, and having done that you brought lawyers into your

4   firm.  First, you joined up with Mr. Luxenberg; is that

5   correct?

6   A.  Well, he left with me even, you know, before we formed

7   Weitz & Luxenberg.

8   Q.  And then the firm became Weitz & Luxenberg, ultimately?

9   A.  Yes.  Shortly thereafter.

10  Q.  And how many lawyers, by say 2002, did you put together in

11  that boutique firm?

12  A.  I would say at that time probably about 50 lawyers.

13  Q.  About 50 lawyers.

14         And that group of 50 lawyers, was it not the largest

15  group concentrating in handling mesothelioma cases, correct?

16  A.  Yes.

17  Q.  And in a short period of time, up through, say, 2002, you

18  had made significant cases for plaintiffs against defendants in

19  mesothelioma cases, correct?

20  A.  Yes.

21  Q.  And, in fact, by 2002 your website would report that you

22  had accomplished a lawsuit against asbestos defendants to the

23  tune of $64.5 million, correct?

24  A.  I don't remember what the website said in 2002.

25  Q.  But how about that case?

FB45sil1                         Weitz - cross

1    A.   That there was a verdict of $64 million?

2    Q.   Yes.

3    A.   Yes.

4    Q.   Do you remember who the defendants in that case were?

5    A.   No.

6    Q.   But that was brought by your law firm?

7    A.   Yeah.  I mean we've had, you know, hundreds of verdicts

8    like -- not hundreds but over a hundred verdicts for, you know,

9    for eight-figure numbers so there have been a lot of verdicts

10   over the last 25 years involving $10 million-plus verdicts.

11   Q.   And basically the mesothelioma community, so to speak, knew

12   that your firm was the firm that was accomplishing those great

13   verdicts or settlements on behalf of plaintiffs in mesothelioma

14   cases?

15   A.   We tried the most cases and we got the highest verdicts.

16   Q.   And if one were to create a pie chart of the amount of work

17   in mesothelioma that you were doing in your firm as opposed to

18   all the other law firms, say, in New York, you would have been

19   accomplishing roughly more than 75 percent of all of the work

20   in that field?

21   A.   Well, depending on the given time.  We had a very large

22   percentage of all of the asbestos cases on the docket in New

23   York City and to this day we still do.

24   Q.   And anybody who was paying attention would recognize that

25   your law firm were the go-to guys in the field of mesothelioma

FB45sil1                         Weitz - cross

1   plaintiff's work, correct?

2   A.  Well, I would hope so.  All I could state are the facts.

3   We were -- our success rate was extraordinarily high, beyond 95

4   percent in winning our cases and our settlement and our verdict

5   values, the values the juries returned, were much higher than

6   most and our settlement values were some of the highest in the

7   country.

8   Q.  And you recognized, did you not, from your work in the

9   field, that basically mesothelioma was a killer disease,

10  correct?

11  A.  Incurable and a hundred percent fatal.

12  Q.  And by the time that a person was diagnosed with

13  mesothelioma he would probably have a life span of maybe two

14  years, correct?

15  A.  On average.

16  Q.  And it would be a horrible circumstance for those last two

17  years?

18  A.  It's the worst type of death that somebody can suffer from.

19  Q.  And it was your goal, in bringing these lawsuits, if you

20  couldn't accomplish curing the disease obviously or extending

21  life, that at least you would be able to get some kind of

22  compensation for the plaintiffs in the case, or their families?

23  A.  I'm sorry.  Could you read back that question, please?

24           THE COURT:  Yes, rephrase that question.  I don't

25  think he was involved in curing mesothelioma.

FB45sil1                          Weitz - cross

1    BY MR. COHEN:

2    Q.  Obviously; but recognizing that there was no cure for it at

3    the time, you thought you would be able to give some semblance

4    of compensation to the plaintiffs in the case, or to their

5    surviving families?

6    A.  Well, I live with these people trying the cases.  One case

7    that I tried I tried for 38 families and lived with them for a

8    year and a half and not only are, you know, is the actual

9    person that is sick affected by the disease but their wife,

10   their children, their grandchildren, the entire family, and the

11   economics involved for not only, you know, the sick person and

12   his wife or her husband and their children but their

13   grandchildren and future generations are affected by it.

14   Q.  And in terms of building the model of your firm, as you

15   testified yesterday, it was somewhat different than other firms

16   in the personal injury field.  You weren't making partners of

17   new lawyers or other lawyers who were coming into the firm,

18   correct?

19   A.  Correct.

20   Q.  But you were giving them an entrepreneurial experience by

21   which they would participate in the cases in the recoveries

22   that the Weitz & Luxenberg firm received, correct?

23   A.  Yes.  The entire model of the personal injury structure for

24   almost every firm that I know of is to encourage the lawyers at

25   your firm to try to get cases.

FB45sil1                              Weitz - cross

1    Q.  And with respect to those cases, if a case were to come in,

2    for example -- by the way, the structure on contingency cases

3    is such that the lawyers who brought the case would receive one

4    third of the total recovery of the plaintiffs in the case,

5    correct?

6    A.  Any lawyer that was admitted and working for the firm and a

7    member in good standing of the bar whether they were a lawyer

8    for, you know, a week or a lawyer for 40 years, would be

9    entitled to get a referral fee if they brought in the case.

10   Q.  But basically the whole contingency process with respect to

11   which Weitz & Luxenberg firm would receive one third of the

12   recovery of the plaintiffs, that's not unique to

13   Weitz & Luxenberg, that's the case with respect to all personal

14   injury firms in New York, correct?

15   A.  Yes.  The fees fluctuate between a third and 40 percent.

16   Q.  And with respect to asbestos cases, though, you were

17   charging one third of the recovery, correct?

18   A.  In New York you charge one third of recovery.

19   Q.  And the reason that seems like a lot of money, a lot of

20   percentage, but you would do that because you were taking a

21   risk with the plaintiffs in the case so that in the event that

22   there was not a recovery or at the end of the day there was

23   nobody who you could collect from or your client could collect

24   from, that you were out of luck, that you would not get a dime

25   notwithstanding all the work that you had put into the case?

FB45sil1                      Weitz - cross

1   A.  And we would lose money because we paid for all of the

2   investigation and the expenses of the case.

3   Q.  And that system of a one-third contingency fee is not

4   unique to Weitz & Luxenberg, correct?

5   A.  Not at all.

6   Q.  And not only that, it is endorsed by the Courts, the Courts

7   in their rules with respect to contingency allow for one third

8   of the recovery, correct?

9   A.  Well, the reason that there is contingency fee is so that

10  the indigent person or a person that doesn't have the means to

11  pay for a lawyer for an hourly fee and have to come up with

12  money every month would have an opportunity to bring his case

13  to court and fight some large corporation who has a lot of

14  money and can pay the lawyers a lot of money to defend them.

15  Somebody who doesn't have any money couldn't pay for a lawyer

16  if they had a great case.  So, the contingency fee was created

17  so that they could come to somebody like my firm and not have

18  to pay any money and we would get paid only after we recovered

19  money for them.

20  Q.  So, supposing somebody was a lawyer totally unaffiliated

21  with your firm and he practiced state law, or criminal law, or

22  real estate law, or some other area of law, but he knew clients

23  or potential clients because he knew some doctor in a hospital

24  or something like that, and he could bring the case to your

25  firm but couldn't handle it himself or herself because they

FB45sil1                           Weitz - cross

1    don't have the expertise in the case, what kind of an

2    arrangement would you make with those outside lawyers

3    unaffiliated with your firm?

4              MS. COHEN:  Objection, your Honor.

5              THE COURT:  Overruled.

6              THE WITNESS:  Could you read that back to me?

7              MR. COHEN:  Pardon me.  Shall I rephrase it?

8              THE COURT:  Just rephrase it.

9              THE WITNESS:  Okay.

10   BY MR. COHEN:

11   Q.  Some lawyer totally unaffiliated with your firm refers a

12   case to your firm because you have the expertise.

13   A.  An asbestos case?

14   Q.  Asbestos case or negligence case.

15   A.  Okay.

16   Q.  What would be the transaction or financial arrangement that

17   you would have with that outside lawyer?

18   A.  That lawyer would also receive a third of the fee, referral

19   fee.

20   Q.  Even if he had nothing to do with the case other than

21   handing it off to you, correct?

22   A.  Well, different referring attorneys -- we have a lot of

23   different referring attorneys that don't work at our firm that

24   are outside referring attorneys and they do all different

25   things.  Some of them will sign up the case, some of them will

FB45sil1                           Weitz - cross

1   maintain a relationship with the client.  Some of them will

2   order medical records, some of them don't do anything but have

3   joint responsibility on the case and are held accountable for

4   the case.

5   Q.  But for the most part, in this latter category, all they're

6   doing is basically handing over the case to you guys who are

7   the experts, correct?

8   A.  It differs.  There is a wide variety of things that are

9   done or not done by a referring attorney.

10  Q.  And you would give that particular lawyer in that last

11  category one third of the recovery that you received?

12  A.  That's correct.

13          THE COURT:  I want you to rephrase that question.  I'm

14  not sure what you are referring to by "that last category."

15  BY MR. COHEN:

16  Q.  The last lawyers that do nothing other than hand the case

17  off, those lawyers would also receive one third of what

18  Weitz & Luxenberg received at the end of the day, right?

19  A.  That's correct.

20  Q.  And supposing some outside lawyer actually knew a doctor

21  who referred cases to him, okay, and that guy couldn't handle

22  the case, he refers it to Weitz & Luxenberg, same thing, you

23  would continue to give him one third of every recovery that the

24  Weitz & Luxenberg firm received in a case, correct?

25  A.  That's correct.

FB45sil1                    Weitz - cross

1   Q.  So, taking the example that you used the other day --

2   yesterday -- of, say, the client receives the recovery of $1

3   million, so after expenses your firm would receive one third of

4   a million, roughly $330,000, the client would receive $666,000,

5   correct?

6   A.  Correct.

7   Q.  And basically the referring lawyer would get one third of

8   what Weitz & Luxenberg got, correct?

9   A.  Approximately $110,000 in that scenario that you just said.

10  Q.  Would the client, in any way, be harmed financially by that

11  $110,000 that you were giving to the outside lawyer?

12  A.  No.  The client's retainer, and it is usually a joint

13  retainer with the referring attorney on it, says you will get

14  one third of the gross amount of the settlement minus expenses

15  and that the referring attorney would get one third of our

16  third so they're never impacted by what the referring attorney

17  gets the client.

18  Q.  And the deal that you structured with the lawyers in your

19  firm, none of whom are partners except Mr. Luxenberg and one

20  gentleman you said had a minimal percentage?

21  A.  Right.

22  Q.  The deal that you had with them is the same and that is

23  that if somebody in your firm brought in a case and there is a

24  recovery of a million dollars, he or she would receive

25  basically $110,000 of that recovery, correct?

FB45sil1                         Weitz - cross

1   A.  Correct.

2   Q.  And that would be the case whether that particular lawyer

3   who brought in the case worked on the case at all or was in a

4   different department of your firm, correct?

5   A.  Correct.  Most of the time the lawyer bringing in the case

6   doesn't necessarily work on the case.

7   Q.  So he might work or she might work on a negligence case or

8   on a malpractice case, doesn't do mesothelioma work, brings in

9   the case, hands it off to more capable people in that area and

10  receives $110,000 at the end of the day if there is a recovery

11  of a million dollars?

12  A.  That's correct.  It would go to that department that

13  specializes and are experts in that area and those are the

14  litigators that would handle that case.

15  Q.  And it wouldn't matter, would it, whether that particular

16  lawyer who brought in the case is a seasoned lawyer in his 50s

17  or 60s or whether he was a 25-year-old just out of law school

18  who maybe couldn't find his way to the court house without a

19  map, that person would get $110,000, too, for that case?

20  A.  Well, there are some young lawyers in our office who make

21  multiples of their salary by bringing in a case.

22  Q.  Now, based on what you had said before about the tremendous

23  verdicts that you received, the marriage between you and

24  Mr. Luxenberg that you spoke of yesterday seemed to have worked

25  well for you and your clients, correct?

1   A.  It has.

2   Q.  Now, the government is intending to prove that Mr. Silver

3   received more than $3 million as a result of cases referred to

4   your law firm, ultimately, and we will talk about Mr. Silver in

5   a moment.  That would mean $10 million to your law firm and

6   roughly, give or take, $20 million in recoveries to the clients

7   that Mr. Silver had a hand in bringing into your law firm,

8   correct?

9   A.  Correct.

10  Q.  What does that represent in terms of the total -- and

11  that's over a period of 10 or 12 years, correct?

12  A.  Correct.

13  Q.  What does that represent in terms of the overall

14  accomplishment of your firm in seeking recoveries for clients

15  of your firm?

16  A.  Mr. Silver's referrals, to the best of my recollection over

17  the 12 years that he was with us, were -- in the asbestos cases

18  were, on average, I think three or four cases a year and our

19  firm, during some years, brought in thousands of cases of

20  asbestos cases, not to mention pharmaceutical cases and

21  environmental cases.  But, you know, as far as the total firm

22  is concerned, we brought in thousands of cases every year and

23  Mr. Silver's asbestos referrals were three or four cases a

24  year.

25  Q.  Now, you talked about -- we have talked about so far that

FB45sil1                    Weitz - cross

```
1   the asbestos cases that Mr. Silver had a hand in bringing into
2   your firm, he also brought in negligence cases as well,
3   correct?
4   A.  Yes.
5   Q.  Now, returning to the period of time when you testified
6   that Mr. Luxenberg presented the idea of bringing Mr. Silver
7   into the firm, you thought it would add to, I think you used
8   the word, brand of your law firm, correct?
9   A.  Prestige and brand.
10  Q.  Prestige of your firm because he is a significant political
11  figure and in fact knows a lot of people, correct?
12  A.  Very well respected, was a very well respected man in the
13  legal community and, you know, I can't speak for outside the
14  legal community but, you know, was known as a very powerful man
15  in the state and everybody within the legal community that I
16  knew had liked him.
17  Q.  And you thought bringing him into the firm after talking to
18  Mr. Luxenberg would add, as you said, to the prestige of your
19  law firm, correct?
20  A.  Correct.
21  Q.  It is not uncommon, is it, for law firms to bring in
22  prestigious people in the law firm to accomplish helping their
23  brand, helping their prestige; is that correct?
24  A.  Not at all.  People from government or retired judges are
25  hired all the time by law firms for exactly the same reason.
```

FB45sil1                      Weitz - cross

1   Q.  And they're not particularly expecting those people to do

2   work on the cases and go into court and do depositions and read

3   over briefs and stuff like that, correct?

4   A.  Well, I think sometimes they are and sometimes they aren't.

5   Q.  But it is not particularly unique that you were not

6   expecting Mr. Silver to actually get his fingers dirty with

7   actually doing the hard work that experts in mesothelioma do?

8   A.  No.  We knew that Mr. Silver was not going to be litigating

9   the cases that we handled.  We --

10  Q.  But -- I'm sorry.

11  A.  We handle complex cases that take years of training for

12  people to become -- for these lawyers to become experts in and

13  we had no expectation of that.

14  Q.  But, if he was able to bring in cases that would be gravy,

15  correct?

16  A.  Right.  Absolutely.

17  Q.  And that's what happened?

18  A.  That's right.

19  Q.  Now, I take it, Mr. Weitz, that you weren't involved in any

20  of the day-to-day of Mr. Silver bringing in cases into the

21  firm, correct?  You wouldn't know how that happened, correct?

22  A.  No.

23  Q.  Did you come to know that he was receiving the case

24  recommendations from Dr. Taub at Columbia Presbyterian?

25  A.  There was a time when I found that out, yes.

FB45sil1                         Weitz - cross

1   Q.  And did you know who Dr. Taub was?

2   A.  I had heard of Dr. Taub, yes.

3   Q.  What had you heard of him?

4   A.  You know, I had heard that he was a mesothelioma doctor at

5   Columbia.

6   Q.  And, in fact, from time to time your firm, you came to

7   learn, used him as an expert in cases?

8   A.  No.  I never used Dr. Taub as an expert so I couldn't

9   really tell you that.  I know what I knew was that he had

10  recommended some patients to a young lawyer in our office that

11  had worked with him.

12  Q.  So, with respect to recommendations, if a doctor recommends

13  a law firm such as yours to a patient of his or hers and he

14  might give one name, maybe your firm and another firm, whose

15  decision, ultimately, is it for the patient to then become a

16  client, say, of your law firm?

17  A.  It is always the patient's decision.

18  Q.  So, what happens?  Is there an intake process?

19  A.  Well, usually what happens is -- and it is an interesting

20  process but, you know, a lot of times the adult children of

21  these people will get involved because I would say the average

22  age of these mesothelioma victims are in their mid to late 60s

23  and so their children are usually adults at that point and they

24  get involved and they -- they'll Google us and they'll find

25  research and they'll make sure that they're going to the best

1   place.

2   Q.  And in many cases, obviously, they come to your law firm?

3   A.  Well, I would hope they would come to us for that reason.

4   Q.  Now, obviously Dr. Taub, it will be established at the

5   trial, referred cases to Mr. Silver and then, in turn, to your

6   law firm, correct?

7   A.  Correct.

8   Q.  Is that unique that a doctor, particularly somebody in the

9   mesothelioma field, would refer his or her patients to a law

10  firm?

11  A.  No.

12  Q.  Well, what is the experience at Weitz & Luxenberg?  There

13  is a member of your firm, say Michael Roberts, I'm told, has

14  many doctors, does he not, that he has relationships with and

15  they refer cases to Mr. Roberts?

16  A.  Correct.

17  Q.  Are there other lawyers in your law firm who have those

18  relationships with doctors who refer cases to your law firm?

19  A.  Yes, and it is not only with respect to asbestos cases, it

20  is with respect to all personal injury cases.  You know, the

21  doctor sees somebody that is injured in a car accident and

22  they're very badly injured and if, you know, they know of a

23  very good lawyer they might recommend them.  But, it is up to

24  the client, the patient to decide whether or not they want

25  it -- the patient might know somebody.

FB45sil1                     Weitz - cross

1   Q.  And if the doctor is looking out for his patient he may

2   take it upon himself it say, hey, you might want to consider a

3   law firm, you might have a lawsuit here and maybe you want to

4   go to Weitz & Luxenberg or another law firm but in this

5   particular case the Weitz & Luxenberg firm, correct?

6   A.  Well, believe it or not, when I first started doing this in

7   the '80s a lot of people didn't know that mesothelioma was

8   caused only by asbestos.  A lot of people that got lung cancer

9   or these other diseases thought that their cancer was caused by

10  something else and not asbestos.  And the doctors tell them

11  that it was caused by asbestos and, you know, and then they

12  don't know what to do and so doctors sometimes will recommend

13  one or two or three law firms for them to go see and they do

14  sometimes go to one of those law firms or they know somebody

15  themselves or they do their own due diligence afterwards and

16  find their own firm.

17  Q.  And doctors steeped in this field would likely know that

18  there was potential for this lawsuit in this area on behalf

19  of -- as a result of the personal injury suffered from

20  mesothelioma, correct?

21  A.  Absolutely.

22  Q.  When you engage a client or a client engages your law firm,

23  rather, what happens is you enter into, for lack of a better

24  word, a contract with the client in terms of the representation

25  and in terms of what the legal fees and breakdown and all of

FB45sil1                          Weitz - cross

1    that is, correct?

2    A.   Correct.

3    Q.   If I can -- your Honor, did you say you wanted a hard copy?

4              THE COURT:  Yes, please.

5              MR. COHEN:  If we can put up Exhibit 2, please?

6              THE COURT:  Just on our screens, right?  Just on our

7    screen, Mr. Cohen?

8              MR. COHEN:  Yes, please.

9              THE COURT:  The document is not in evidence.

10   BY MR. COHEN:

11   Q.   Do you see that document, Mr. Weitz?

12   A.   I do.

13   Q.   Could you identify what that is?

14   A.   It is a retainer agreement.  It is a contract of

15   representation between the law firm of Weitz & Luxenberg and a

16   potential client.

17   Q.   So this is basically a prototype, a form agreement that you

18   use.  It has no names on it, it is not a particular patient,

19   correct?

20   A.   That's correct.

21   Q.   Is that a contract that has been used by your law firm in

22   mesothelioma cases?

23   A.   I mean, I would have to read it and it is pretty lengthy

24   and it is updated all the time to stay abreast of all of the

25   guidelines and then rules of the State but it looks like it

FB45sil1                        Weitz - cross

1    would be one that we have used.

2    Q.  If you look at the lower right-hand column it has the

3    number WL000827?

4    A.  Uh-huh.

5    Q.  A document produced by the Weitz & Luxenberg firm?

6    A.  I see that, yes.

7    Q.  This is a contract from your law firm?

8    A.  At some time this was -- I mean, without reading every word

9    this would be -- this would seem like the contract that we

10   would have used, yes.

11              MR. COHEN:  Your Honor, I will offer it into evidence.

12              MS. COHEN:  No objection, your Honor.

13              THE COURT:  Defendant's Exhibit 2 is received.

14              (Defendant's Exhibit 2 received in evidence)

15   BY MR. COHEN:

16   Q.  Recognizing that this is a form and not a particular

17   client's, would you read the first paragraph after it says

18   Contract of Representation?  Out loud, please?

19              THE COURT:  I'm sorry, what do you want him to read?

20              MR. COHEN:  Starting I/we.

21   A.  I/we, blank, residing at, blank, hereby retain

22   Weitz & Luxenberg, P.C., at 700 Broadway, New York, New York,

23   10003 as my/our attorney, to prosecute a cause of action or

24   claims for personal injuries and/or wrongful death as a result

25   of injuries sustained from exposure to asbestos related

FB45sil1                           Weitz - cross

1    materials.

2    Q.  So, armed with the caveat you mentioned before, this is a

3    contract of representation at some point during the course of

4    the last number of years for particularly asbestos-related

5    injury, correct?

6    A.  Correct.

7    Q.  And you refer to that as a cause of action or a claim for

8    personal injuries and/or wrongful death, correct?

9    A.  Yes.

10   Q.  You can put this aside.  Thank you.

11             Now, needless to say, your law firm doesn't handle tax

12   certiorari work or anything like that, correct?

13   A.  No.  Never have.

14   Q.  Your firm has no expertise in that area.

15             By the way, how many lawyers do you have roughly now?

16   A.  Approximately a hundred.  It fluctuates between, you

17   know -- it could fluctuate between 90 and a hundred-plus.

18   Q.  Did you have a written agreement with Mr. Silver

19   concerning, you testified, that he was receiving, I believe,

20   $120,000 a year as a base salary?  Do you have a written

21   agreement with him?

22   A.  I don't believe so.

23   Q.  Was there anything in your understanding with Mr. Silver

24   that would preclude him, in the event that he had a case having

25   nothing whatsoever to do with personal injury, mesothelioma,

FB45sil1                      Weitz - cross

1   malpractice or accidents, any term of personal injury, to refer

2   a case to another law firm that handled something?

3   A.   Nothing would have prohibited him from doing that.

4   Q.   Now, Ms. Cohen asked you some questions about whether you

5   had conversations with Mr. Silver in which you talked about

6   grants to Columbia University or New York Presbyterian

7   Hospital, correct?

8   A.   Correct.

9   Q.   And I think you testified that you didn't have

10  conversations with him --

11  A.   That's correct.

12  Q.   -- about that.

13       Mr. Silver is not a particularly talkative person in

14  terms of what he does, is that correct?

15  A.   No.  We didn't have many conversations about what he did in

16  Albany.

17  Q.   So, if he was involved in DNA legislation or death penalty

18  legislation -- if that even happens anymore -- or real estate

19  legislation or anything, he wouldn't be talking to you about

20  what he is doing in Albany in terms of any of those things,

21  correct?

22       MS. COHEN:  Objection, your Honor.

23       THE COURT:  Sustained.

24  Q.   Well, would he talk to you about the kind of things that

25  were coming up before the legislature?

FB45sil1                         Weitz - cross

1    A.  No.

2    Q.  Or things that were coming up before him in his capacity as

3    a legislator?

4    A.  We didn't talk about things that were going on in the

5    legislature.

6               MR. COHEN:  Would you give me a moment, your Honor?

7               THE COURT:  Sure.

8               (Pause)

9    Q.  So, Mr. Weitz, I think you testified yesterday about

10   contributions that your law firm has made.  Over the course of

11   time you have made -- your firm has made contributions with

12   respect to, I think it is Massachusetts General Hospital?

13   A.  Dr. Poznansky and his team have done some very good

14   research which we have been committed to involving mesothelioma

15   since, I believe, 2011 or '12.

16   Q.  And did you not make a grant also to the, is it Brigham and

17   Women's Hospital?

18   A.  Brigham and Women's University; Dr. Sugarbaker created a

19   program there very similar to the Ronald McDonald house with

20   North Shore Hospital and LIJ that is for family that come for

21   mesothelioma treatment because they have to be there for

22   extended period of times.  So, this particular facility that we

23   donate to takes care of the families while their loved one is

24   being treated at Brigham and Women's for mesothelioma.

25   Q.  Do you remember how much that was?

FB45sil1                      Weitz - redirect

1   A.  I think the last one was $150,000.

2              MR. COHEN:  I have no further questions, your Honor.

3              THE COURT:  Okay.

4              Ms. Cohen?

5   REDIRECT EXAMINATION

6   BY MS. COHEN:

7   Q.  You testified earlier on cross-examination about the

8   settlements of mesothelioma cases that were in the high

9   millions.  Do you recall that testimony?

10  A.  Yes.

11  Q.  Did you discuss those settlements and verdicts at the

12  lunches you talked about that Sheldon Silver attended?

13  A.  Yes.

14  Q.  So Sheldon Silver would have been aware of how valuable the

15  mesothelioma cases were to your firm?

16  A.  Absolutely.

17  Q.  And you also testified on cross-examination that the

18  asbestos cases referred to your firm by Sheldon Silver were a

19  small percentage of the overall number of cases that your firm

20  handled in a given year?

21  A.  That's correct.

22  Q.  But those cases that were referred to Sheldon Silver, the

23  asbestos cases by Dr. Taub, they ended up netting Sheldon

24  Silver a significant amount of money; is that right?

25  A.  He would receive one third of whatever the recovery was and

FB45sil1                    Weitz - redirect

1   based upon what I have read, because I didn't add it up before
2   that, it was, I think, somewhere around $3 million.
3   Q.  And you said that it is not uncommon for firms to hire, for
4   example, retired judges to bring prestige to their firm.  Do
5   you recall that testimony on cross?
6   A.  Yes.
7   Q.  And when a firm hires a retired judge, they're no longer in
8   government service, right?
9   A.  That's correct.
10  Q.  And so, the retired judge, when they're at that firm, for
11  example, doesn't use their official position to bring in
12  business to that firm, that's correct?
13  A.  Correct.
14  Q.  And you testified on cross about an attorney at your firm,
15  Michael Roberts --
16  A.  Yes.
17  Q.  -- who knows a doctor who sometimes refers asbestos cases
18  to him at the firm.  Do you recall that testimony?
19  A.  Yes.
20  Q.  What money did Michael Roberts give to the doctor who
21  referred patients to him at your firm in exchange for those
22  referrals?
23  A.  He doesn't give them any money.
24  Q.  What access to State money did Michael Roberts have to give
25  to the doctor who refers him asbestos cases at your firm?

FB45sil1                          Weitz - redirect

1    A.   He has no access to State money.

2    Q.   You testified on cross that Sheldon Silver didn't discuss

3    things in Albany with you that often.  Do you recall that?

4    A.   Yes.

5    Q.   How important was it to you that Sheldon Silver not use his

6    official position to bring in business to your firm?

7              MR. COHEN:  Objection, your Honor.

8              THE COURT:  Yes, rephrase that.

9              MS. COHEN:  Sure, your Honor.

10   BY MS. COHEN:

11   Q.   How important was it to you that Sheldon Silver did not use

12   his public position in connection with your firm?

13             MR. COHEN:  Objection, your Honor.

14             THE COURT:  I think that's the same question.

15             Did you care whether he used his official position to

16   bring business to your firm?

17             THE WITNESS:  It never -- it never occurred so I never

18   was faced with that situation.

19   BY MS. COHEN:

20   Q.   Mr. Weitz, did your firm take any precautions with respect

21   to representing the State of New York after Sheldon Silver

22   joined the firm?

23   A.   Yes, we did.  We wanted to avoid conflicts of interest.

24   Q.   And why did you want to avoid that by not taking cases

25   related to the State of New York after Sheldon Silver joined

FB45sil1                          Weitz - redirect

1    the firm?

2    A.   Because we didn't want any appearance of impropriety even

3    though there might not have been, but the media was always, you

4    know -- Weitz & Luxenberg was always a prominent firm in New

5    York City and Shelly was always in the newspapers for one thing

6    or another and we didn't want to have any appearance of

7    impropriety.

8    Q.   And you testified on cross-examination about the donations

9    your firm has made to Mass General in the past couple years.

10   Do you recall that?

11   A.   Yes.

12   Q.   What referrals of patients has the firm received from

13   doctors at Mass General after the firm began donating to Mass

14   General?

15   A.   We haven't received any.

16   Q.   Why not?

17   A.   They haven't sent one yet.

18   Q.   What about referrals of -- you testified, sorry, on

19   cross-examination, about money the firm has given to Brigham

20   and Women's hospital?

21   A.   Yes.

22   Q.   What referrals of mesothelioma cases has the firm received

23   from doctors at Brigham and Women's hospital?

24   A.   None.

25   Q.   And you talked about a Dr. Sugarbaker; what referrals of

FB45sil1                          Weitz - redirect

1   cases has the firm gotten from Dr. Sugarbaker after you started

2   funding?

3   A.  To the best of my knowledge, none.

4           MS. COHEN:  A moment, your Honor -- oh, I'm sorry.

5   Q.  Looking again, can we pull up Defendant's Exhibit 2?  If

6   you have it in front of you Mr. Weitz if you can turn to the

7   third page, it is the third paragraph.

8           Mr. Coccaro -- the defense can pull it up?

9           MR. COHEN:  Yes, can we pull up Exhibit 2, please?

10          MS. COHEN:  Highlight the third paragraph, please.

11          THE COURT:  Page 3 or the third paragraph?

12          MS. COHEN:  The third paragraph on page 3.

13  BY MS. COHEN:

14  Q.  Can we please highlight the third page, third paragraph,

15  please?  Thank you.

16          Mr. Weitz, if you can read that third paragraph and

17  explain to the jury what it is and why it is in your standard

18  retainer agreement?

19  A.  An attorney may divide the legal fees with another lawyer

20  who is not associated in the same law firm and such lawyer may

21  receive a share in an amount to be disclosed to the client in a

22  separate writing, and that the total fee shall not be excessive

23  (not exceeding the agreed upon retainer fee).  The client

24  understands and agrees to this.  Client will either receive a

25  letter setting forth same or there may be an addendum attached

FB45sil1                         Weitz - redirect

1    to this retainer stating forth said information.

2    Q.  Why is that language -- first, what does it mean, please?

3    A.  Well, you are required, at the end of every case when it is

4    finished against every possible defendant, to file a closing

5    statement and that closing statement sets forth that

6    information, and also you have to list the expenses that you

7    deducted for the client.

8              THE COURT:  Required by whom to file that where?

9              THE WITNESS:  Court -- the Office of Court

10   Administration.

11             THE COURT:  So you are required, under New York State

12   law, to file such a document?

13             THE WITNESS:  Yes, your Honor.

14   BY MS. COHEN:

15   Q.  And the first line that talks about attorney may divide the

16   legal fees with another attorney who is not associated with

17   that same law firm --

18   A.  Sorry.  Say that again?

19   Q.  If you would look at the first sentence of this paragraph

20   3?

21   A.  Yes.

22   Q.  What is that referring to?

23   A.  *An attorney may divide the legal fees with another attorney*

24   *who is not associated in the same law firm.*  That would be the

25   outside referring attorney that doesn't work for

FB45sil1                          Weitz - redirect

1    Weitz & Luxenberg.

2    Q.   And the last line of that paragraph: *Client will receive a*

3    *letter setting forth same.*   What is being referred to there?

4    Is that informing the client about any fees shared with another

5    lawyer outside the firm?

6    A.   That's correct.

7    Q.   Just to be clear, you testified that you had no knowledge

8    of any State money that Sheldon Silver was sending to Dr. Taub

9    when he was at your firm, correct?

10   A.   Correct.

11              THE COURT:   Are you finished with this document?

12              MS. COHEN:   Yes.   Sorry, your Honor.

13              MR. COHEN:   Your Honor, I don't think this was

14   addressed in cross, this question.

15              THE COURT:   Sorry, I was focused on getting lights

16   back on.   Let me read it.

17              Can I see the parties?

18              MS. COHEN:   Sure.

19

20

21

22

23

24

25

FB45sil1                          Weitz - redirect

```
 1              (At side bar)
 2              THE COURT:  Mr. Cohen, I thought you did ask about
 3     that.
 4              MR. COHEN:  I'm sorry.  Can we hear back the question?
 5              THE COURT:  The question is:  You testified that you
 6     had no knowledge of State money that Silver was sending to
 7     Taub.
 8              MR. COHEN:  I didn't raise that in cross.  The only
 9     thing he said is he doesn't talk about a lot of stuff going on
10     in Albany.  I don't think I addressed it in cross.
11              THE COURT:  Okay.  I think you need to jump off of
12     that question.
13              MS. COHEN:  That was my last question, your Honor.
14              THE COURT:  Okay.
15              MR. COHEN:  Even better.
16              THE COURT:  And, it was answered.
17
18
19
20
21
22
23
24
25
```

1          (In open court)

2          MS. COHEN:  No further questions, your Honor.

3          THE COURT:  Okay.  The objection was overruled.

4          MS. COHEN:  Sorry, your Honor.  If we could perhaps

5     read back the question and have the witness answer it?

6          THE COURT:  He did answer it.

7          MS. COHEN:  People were moving around, can we have it

8     read back, and the answer?

9          (Record read)

10          MS. COHEN:  Thank you.  No further questions for the

11     government.

12          MR. COHEN:  Just one or two questions, your Honor.

13     RECROSS EXAMINATION

14     BY MR. COHEN:

15     Q.  You said -- you were referring to that agreement that is up

16     on the board that is in your prototype agreement.

17     A.  Yes.

18     Q.  You said that was a rule of law, I think you meant a rule

19     of the Court, Court rules?

20     A.  That's what I said, Court rules.

21     Q.  And that's a rule that has changed over time, correct?

22     A.  Correct, and I'm really not that familiar with it.  Other

23     people in my office deal with the closing statements.

24     Q.  And, in fact, that was not necessarily with respect to your

25     firm, that's not a rule that's always honored, it is often

1   honored in the brief; is that correct?

2           MS. COHEN:  Objection, your Honor.

3           THE COURT:  Sustained.

4           MR. COHEN:  I have no further questions, your Honor.

5           THE COURT:  You may step down, Mr. Weitz.

6           THE WITNESS:  Thank you.

7           (Witness steps down)

8           THE COURT:  Call your next witness.

9           MS. COHEN:  The government has two stipulations it

10  would like to read at this point, into evidence.

11          THE COURT:  Ladies and gentlemen, a stipulation is a

12  fancy way to say an agreement so it is an agreement of facts

13  that should move the case along.

14          Go ahead, Ms. Cohen.

15          MS. COHEN:  Your Honor, I am reading from what has

16  been marked for identification as Government Exhibit S-6, the

17  stipulation with the case caption and stipulated between the

18  parties; I won't read that standard language into the record,

19  if that's okay with your Honor.

20          THE COURT:  That's fine.

21          MS. COHEN:  If called to testify, a custodian of

22  records from the --

23          THE COURT:  I'm sorry, do you have the S exhibits

24  listed on your exhibit list?

25          MS. COHEN:  We didn't, because they were signed later.

1    I have copies for your Honor.

2              THE COURT:  That's fine.  Go ahead and read it.

3              MS. COHEN:  Government Exhibit S-6:  If called to

4    testify, a custodian of records from the New York State

5    Assembly, the Assembly, would testify, as follows:

6              Government's Exhibits 102, 103, 106, 107, 108, 110,

7    111, 111-1, 112 through 115, 117, 120 through 122, 124 through

8    127, 129 through 133, 136, 139, 144, 145, 148 through 154, 156,

9    158, 160 through 163, 165, 166, 167-1, 167-2, 167-3, 172

10   through 174, 176, 179, 182, 185, 193 through 195, 201 through

11   208, 211 through 213, 215, 216, 218, 221, 222, 226, 228 through

12   230, 233 through 271, 281 through 287, 932 and 934 are full and

13   complete records of the acts, transactions and events described

14   therein, were made and/or received and thereafter maintained in

15   the regular course of the New York State Assembly, were made at

16   or near the time of the acts, transactions and events recorded

17   therein, and contain information set forth by or obtained from

18   persons with knowledge of those matters.

19             Government's Exhibits 108, 110, 114, 125, 126, 127,

20   129, 130, 144, 160, 162, 165, 166, 167.1, 167-2, 167-3, 174,

21   179, 185, 220, 225, 226, 228 and 281 are true and correct

22   copies of documents found in the Assembly offices of Sheldon

23   Silver, the defendant.  The documents contained in Government's

24   Exhibits 220 and 225 were found on the defendant's desk at one

25   of his Assembly offices.

1          Government Exhibit 102 contains true and correct

2     copies of the oaths of office on file with the State of New

3     York for Sheldon Silver, the defendant, for the time period

4     1993 through 2014.

5          Government Exhibit 103 is a true and correct copy of a

6     document entitled Speaker's Appointment Schedule which is the

7     daily schedule of appointments for Sheldon Silver, the

8     defendant, for the time period January 1, 1994 through February

9     10, 2015.

10          Government's Exhibits 242 through 266 are true and

11     correct copies of documents entitled Speaker's Call List which

12     is a list of telephone calls for Sheldon Silver, the defendant,

13     on certain dates set forth in the exhibits.

14          Government Exhibit 222 is a true and correct copy of

15     an Assembly document reflecting the annual salary, special

16     allowance, and total gross pay received by Sheldon Silver, the

17     defendant, from the State of New York from 1997 through 2014.

18          Government's Exhibits 267 through 271 are true and

19     correct copies of photographs of the Assembly and its chamber.

20          Government's Exhibits 229 and 230 are true and correct

21     copies of maps of the Assembly district represented by Sheldon

22     Silver, the defendant.

23          If called to testify, a custodian of records from the

24     Office of the Governor of the State of New York would testify,

25     as follows:

1            Government Exhibit 901 is a true and correct copy of

2    the public calendar for governor Andrew M. Cuomo for the period

3    June 1 through June 30th, 2011.  Government Exhibit 901 is a

4    full and complete record of the acts, transactions and events

5    described therein, was made and/or received and thereafter

6    maintained in the regular course of business, was made at or

7    near the time of the acts, transactions and events recorded

8    therein, and contains information set forth by or obtained from

9    persons with knowledge of those matters.

10           It is further stipulated and agreed that this

11   stipulation may be received, in evidence, as a Government

12   exhibit at trial.

13           It is dated and signed by both parties.

14           Your Honor, the government moves Government Exhibit

15   S-6 into evidence.

16           THE COURT:  That is received.

17           (Government's Exhibit S-6 received in evidence)

18           MS. COHEN:  At this time the government would also

19   like to move into evidence some of the exhibits on this stip,

20   Government Exhibit 102, 107 --

21           THE COURT:  Slow down.

22           MS. COHEN:  Sorry, your Honor.

23           THE COURT:  Okay.  102.

24           MS. COHEN:  107, subject to connection; and 120.

25           THE COURT:  Okay, any objection?  Okay, all right.

240

FB45sil1                         Weitz - recross

1    So, 102, 107 and 120?

2              MS. COHEN:  Correct, your Honor.

3              THE COURT:  They're received.

4              (Government's Exhibits 102, 107, 120 received in

5    evidence)

6              MS. COHEN:  Your Honor, we would like to publish

7    Government Exhibit 102 at this time.

8              THE COURT:  Sure.  Can you highlight it and make it a

9    little bigger?

10             (continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FB4YSIL2

1          THE COURT:  I think that's it for 102.

2          MS. COHEN:  Thank you, your Honor.

3          If you could publish Government Exhibit 107, please.

4          THE COURT:  Any particular --

5          MS. COHEN:  Yes.  If you could just focus in on

6    perhaps the first half of the first page of Government Exhibit

7    107.

8          Your Honor, if I could just read the handwriting into

9    the record.

10          THE COURT:  Okay.

11          MS. COHEN:  Thank you.

12          "$250,000 annual request."  "Shelly is very interested

13    in this.  Please include as a 2004-05 request," with an initial

14    D.

15          MR. COHEN:  Your Honor, I think Ms. Cohen didn't read

16    the date at the top, 2/1.

17          MS. COHEN:  2/1.  It says, "Kristin/Betty," which I

18    believe is highlighted, "/Steve A.," and the date on the letter

19    on the left is January 7, 2004, to the Honorable Sheldon

20    Silver, speaker, New York State Assembly, and then there are

21    some initials in the left-hand corner.

22          Your Honor, I'll just read the first sentence if I

23    can, and then we'll move on.

24          THE COURT:  Okay.

25          MS. COHEN:  Thank you, your Honor.

FB4YSIL2

1   "Dr. Mr. Silver --" the letterhead on top is from Robert N.

2   Taub, MD/Ph.D., Mesothelioma Center, Columbia University.

3   Honorable Sheldon Silver, Speaker of the U.S. Assembly, dated

4   January 7, 2004.

5         "Dear, Mr. Silver, I am pleased to learn that our

6   program in mesothelioma might be considered for support through

7   New York State."

8         Your Honor, if we could publish Government Exhibit

9   120.

10        Again, perhaps if you could zoom in on the first

11  paragraph there.

12        Just for the record, it's a letter on letterhead from

13  Columbia University Medical Center, Robert N. Taub, MD/Ph.D.,

14  dated October 11, 2006, to the Honorable Sheldon Silver,

15  Speaker, New York State Assembly, in the legislative office

16  building, Albany, New York.  There appears to be a stamp

17  received, assembly received October 16, 2006.

18        "Dear Mr. Silver, I greatly appreciate the opportunity

19  to once again inform you of the current activities and

20  accomplishments of our mesothelioma center at the Columbia

21  University Medical Center.  We are most grateful that our

22  program is being considered for continuing support."

23        Your Honor, I'd like to read another stipulation into

24  the record at this time, please.  It's marked for

25  identification as Government Exhibit S-1.

FB4YSIL2

1          THE COURT:  Go ahead.

2          MS. COHEN:  Your Honor, I think the stipulations have

3     now been loaded.  So the jury can read along if that's helpful.

4          THE COURT:  That's terrific, particularly since

5     they're going to have a quiz on all these numbers.

6          MS. COHEN:  I thought you were going to quiz me,

7     your Honor.

8          What's been marked for identification as Government

9     Exhibit S-1 is a stipulation with the caption of this case.

10    "It's agreed to between the parties.  "Number one, if called to

11    testify, a custodian of records for the New York State

12    Department of Health, NYSDOH, would testify as follows:

13          "A, the documents marked for identification as

14    Government Exhibits 366, 367-1 through 367-4 and 368-1 through

15    368-4 are true and correct copies of records that were created

16    and/or maintained by the New York State Department of Health in

17    the ordinary course of its activities or made or received at or

18    near the time of the acts and events recorded therein and

19    contain information set forth by or obtained from persons with

20    knowledge of those matters.

21          "If called to testify, a custodian of records for the

22    New York State Office of Children and Family Services, OCFS,

23    would testify as follows:

24          "The documents marked for identification as government

25    Exhibits 389-1, 398-2, and 398-3 are true and correct copies of

FB4YSIL2

records that were created and/or maintained by OCFS in the
ordinary course of its activities or made or received at or
near the time of the acts and events recorded therein and
contained information set forth by or obtained from persons
with knowledge of those matters.

          "It's further stipulated and agreed that this
stipulation may be received in evidence as a government exhibit
at trial dated and signed by the parties."

          Your Honor, the government moves Government Exhibit
S-1 into evidence.

          THE COURT:  Any objection?

          MR. SHUR:  No.

          THE COURT:  All right.  It's received.  S-1 is
received.

          (Government's Exhibit S-1 received in evidence)

          MS. COHEN:  Pursuant to Government Exhibit S-1, the
government would move government Exhibits 367-1, 368-1, 389-1,
389-2, and 389-3.

          THE COURT:  Any objection?

          MR. SHUR:  No.

          THE COURT:  367-1, 368-1, 389-1, -2, and -3 are all
received.

          (Government's Exhibit 367-1, 368-1, 389-1, 389-2, and
389-3 received in evidence)

          MS. COHEN:  If you could publish government Exhibit

FB4YSIL2

367-1 and perhaps zoom in on the text.  It's a letter on the

assembly letterhead from Sheldon Silver, Speaker, dated July 6,

2005.

          Your Honor, I'll just read the first paragraph into

the record.

          THE COURT:  Sure.

          MS. COHEN:  "Dear Deputy Commissioner Whalen, please

accept this letter and the enclosed initiative form for the

distribution of a $250,000 grant to New York Presbyterian

Hospital-Mesothelioma Center Research account from the 2002-03

health care initiatives pool pursuant to the Health Care Reform

Act."  And then it's signed, "Sincerely, Sheldon Silver,

speaker."

          If you could publish Government Exhibit 368-1.

          This is a letter on assembly letterhead from Sheldon

Silver, Speaker, dated November 30, 2006.  Again, it's

addressed to Mr. Dennis Whalen, the executive deputy

commissioner of the New York State Department of Health.

          "Dear Executive Deputy Commissioner Whalen, please

accept this letter and the enclosed initiative forms for the

distribution of a grant to ten health care facility programs

totaling $1,878,000 from the 2003, 2004 health care initiatives

pool pursuant to the Health Care Reform Act."

          It's signed, "Sincerely, Sheldon Silver, Speaker."

          On the second page of the document, just zoom in,

FB4YSIL2

1   please, to the first half of the page.  It's a list of assembly

2   HCRA grants, November 30, 2006, from the 2003-04 pool.  The

3   second one up from the bottom is Columbia University Medical

4   Center.  $250,000.

5           The next document, if you could publish Government

6   Exhibit 389-1.

7           Your Honor, the title of Government Exhibit 398-1 is

8   SFY 2008/2009 legislative initiative form for the Shalom Task

9   Force, and the amount of the legislative initiative funded this

10  year, $25,000.

11          If we could publish Government Exhibit 389-2.

12  Government 389-2 is a letter dated May 30, 2003, to the Shalom

13  Task Force, re: award amount $25,000.

14          If we could publish Government Exhibit 389-3.  If you

15  can somehow get to the second-to-the-last page of that

16  document.

17          What this is, Judge, just for the record, it's the

18  contract between the New York State Office of Children and

19  Family Services and the Shalom Task Force for the grant in the

20  amount of $25,000 for the contract period April 2008 through

21  March of 2009.

22          The second-to-the-last page of Government Exhibit

23  389-1 is a disclosure and accountability certification.  If you

24  look at IV.  If you could enlarge that.

25          The contractor name on this disclosure and

FB4YSIL2                         Taub - Direct

1    accountability certificate is Shalom Task Force.  If you go to

2    IV, it says, "Sponsoring Members.  The sponsoring member of the

3    local legislative initiative pursuant to which this contract

4    will be funded is Assemblyman Sheldon Silver."

5            Thank you, your Honor.  At this time the government is

6    ready to call its next witness unless you want to do our

7    morning break.

8            THE COURT:  Why don't you go ahead and call him and

9    get started.

10           MS. COHEN:  Okay, your Honor.  The government calls

11   Dr. Robert Taub.

12    ROBERT TAUB,

13       called as a witness by the Government,

14       having been duly sworn, testified as follows:

15   DIRECT EXAMINATION

16   BY MR. GOLDSTEIN:

17   Q.  Good morning, Dr. Taub.

18   A.  Good morning.

19   Q.  Dr. Taub, where do you live?

20   A.  In Manhattan.

21   Q.  Have you lived in the New York area for most of your life?

22   A.  Yes.

23   Q.  Are you married?

24   A.  Yes.

25   Q.  For how long have you been married?

1    A.  Forty-seven years.

2    Q.  You have any children?

3    A.  Yes.

4    Q.  What are their names, and how old are they?

5    A.  Jonathan is 45; Amy is 42.

6    Q.  Do you have any grandchildren?

7    A.  Yes.

8    Q.  How many?

9    A.  Three.

10   Q.  Dr. Taub, starting after high school, if you could tell the

11   jury, what's your educational background?

12   A.  I went to college at Yeshiva University in New York.  I

13   graduated in 1957.  I was the first student from Yeshiva to be

14   admitted to the Yale University School of Medicine, and I got

15   an MD degree, a doctor degree, from Yale in 1961.

16          I then did a postgraduate work at Yale in pathology.

17   I took a pathology internship and did an internship and

18   residency in medicine and in hematology at the New England

19   Medical Center in Boston.

20   Q.  Did you get a Ph.D., Dr. Taub?

21   A.  Following that, I went to the National Institute for

22   Medical Research in London and was there for two years.  I got

23   a Ph.D. degree in 1969 from the University of London.  That's

24   my educational background.

25   Q.  Dr. Taub, after receiving your Ph.D., where have you

1  worked?

2  A.  I came back from England and started at the Mount Sinai

3  School of Medicine here in New York as an instructor and then

4  an assistant professor, and I rose to associate professor

5  there.

6          I then went to the Medical College of Virginia where I

7  spent 3 1/2 years there as the chairman of medical oncology,

8  the chief doctor, the chief oncologist of four of the hospitals

9  in the area at that time.

10         I was an American Cancer Society professor of

11  oncology, which is an honorary title, but that was part of my

12  work.

13  Q.  Where did you go after you were in Virginia?

14  A.  I came back to -- after Virginia, I came back to New York,

15  and I've been -- I came back to New York in 1981 and have been

16  at Columbia Presbyterian since that time as a professor of

17  medicine.  I have tenure of title and have had a variety of

18  posts at Columbia since that time.

19  Q.  You said that you are at Columbia Presbyterian.  What's the

20  relationship between Columbia University Medical Center and

21  Presbyterian Hospital?

22  A.  Columbia University College of Physicians and Surgeons is

23  the medical school where they teach doctors.  And the hospital,

24  the main hospital affiliated with the medical school where the

25  students would practice but also was a big hospital, was the

1    Presbyterian Hospital originally.  It's now merged with many

2    other hospitals.

3    Q.  Dr. Taub, do you have any board certifications?

4    A.  Yes.  I'm board certified to practice in four

5    subspecialities:  In internal medicine, in hematology and

6    oncology, and also in allergy immunology.

7    Q.  If you could tell the jury:  What does it mean to have a

8    board certification?

9    A.  It means that you're an expert in a certain sense.  You

10   have to take tests.  There are tests for that.  You have to

11   take residencies, and you have had to have both training and

12   tests.  Then you get a certification if you pass the test.

13   Q.  At some point in your career, did you begin to focus on a

14   disease called mesothelioma?

15   A.  Yes.

16   Q.  About when was that?

17   A.  In the early 90's.

18   Q.  What is mesothelioma?

19   A.  Mesothelioma is a disease of the lining membranes, the

20   lining tissue, of the lung, also the lining tissue of the bowel

21   and the lining tissue of the heart and the testes.

22         It's a disease where that lining turns into cancer and

23   grows and thickens.  It's a bad disease to have, a terrible

24   disease.

25   Q.  What are the known causes of mesothelioma?

FB4YSIL2                          Taub - Direct

1    A.  The two main causes of mesothelioma are, first and

2    foremost, exposure to asbestos.  That's the foremost reason why

3    you get it.  We also know that some patients who have had

4    medical radiation of some type will also get mesothelioma.

5    Q.  About how many other doctors across the country focus or

6    specialize in mesothelioma?

7    A.  Less than ten.

8    Q.  I want to direct your attention to the year 2000.  What

9    happened in that year to your position at Columbia?

10   A.  At that time I was named to be the Vivian and Seymour

11   Milstein family professor of clinical medicine.  That's called

12   an endowed professorship.

13   Q.  What did it mean to have an endowed professorship?

14   A.  That's a portion -- a donation was made to the institution

15   to support my salary so that I can work in mesothelioma in a

16   bit more freeway, in a freer way.

17   Q.  What was your relationship to the Milsteins?

18   A.  I was a physician to one of the Milsteins.

19   Q.  Now, at that time, in or about 2000, what kind of patients

20   did you see in your medical practice?

21   A.  By the year 2000, I would say close to half of my practice

22   was mesothelioma at that time.  Mesothelioma is a rare disease.

23   Q.  What type of treatments did you give to your patients?

24   A.  I'm a medical oncologist.  Medical oncologists generally

25   give the patients chemotherapy.  They don't operate on the

1    patients, but they give them chemotherapy, and I devised a

2    number of new treatments for the disease and gave them what was

3    conventional at the time as well.

4    Q.   Where do your patients with mesothelioma typically come

5    from?

6              THE COURT:   What do you mean by that?  Where do they

7    live or who sent them to him?

8    BY MR. GOLDSTEIN:

9    Q.   Where do your patients typically live?

10   A.   The patients that I saw came from all over the world, all

11   over America.  There are only about 100 new patients with

12   mesothelioma that are diagnosed in the New York area.  So most

13   of them come from outside the state.

14   Q.   Is that 100 new cases in the New York area per year

15   approximately?

16   A.   Per year, yes.

17   Q.   So about what percentage of your patients were New Yorkers

18   as compared to from all over the country?

19   A.   I would say about a third.

20   Q.   Dr. Taub, how do you feel about the patient treatment that

21   you do?

22   A.   I love the work that I do.  That's the only thing I can

23   say.  I really feel very privileged to be able to take care of

24   these people.  This is a very terrible disease.  I feel that

25   I'm good at it.

FB4YSIL2                         Taub - Direct

1           I love teaching about medicine.  I love doing

2    research, and I'm very, very passionate about finding a cure

3    for the disease and treating it well.

4    Q.  About how many mesothelioma patients have you treated over

5    your career?

6    A.  The estimate is about 2,000.

7    Q.  How old are you you now?

8    A.  I'm 79.

9    Q.  Are you still seeing patients with mesothelioma?

10   A.  Yes, I am.

11   Q.  Now, in addition to your treatment of patients, have you

12   also conducted research into mesothelioma?

13   A.  Yes.

14   Q.  What areas has your research focused on?

15   A.  Pretty much all the areas that are relevant to

16   mesothelioma.  We have research going on in treatment,

17   treatment programs and clinical trials.

18           We have programs which are aimed at better diagnosing

19   it, looking under the microphone and diagnosing the disease.

20   We have programs dealing with how patients cope with the

21   disease.  We look at the quality of life of treatment because

22   the treatments sometimes are very strong.

23           We have now programs which are looking at the genetics

24   of the mesothelioma to find what is the gene that actually goes

25   wrong in this disease.

FB4YSIL2                           Taub - Direct

1    Q.  Dr. Taub, have you published any scientific works over the

2    course of your career?

3    A.  Yes, I have.

4    Q.  Can you give us an approximation of about how many articles

5    you published in scientific or medical journals.

6    A.  It's about 150, a little over 150.

7    Q.  What breakthroughs, if any, has your research led to?

8    A.  Nobody works in a vacuum, but we have been, I would say, at

9    the forefront of a lot of new developments in mesothelioma

10   having to do with how chemotherapy is given.  Sometimes we

11   devise new techniques for giving chemotherapy right into the

12   belly, also into the chest.

13          Over time, let's say when I started in the 90's,

14   patients with peritoneal mesothelioma, which is one of the

15   things that I see most of, have lived under a year.

16          Our average now is four years, and some of the

17   patients just go on and on for 10 or 12 years longer than that.

18   So there's been a big change in the actual survival of these

19   patients and the quality of their life.

20   Q.  You mentioned peritoneal mesothelioma.  If you could just

21   briefly explain for the jury the difference between that and

22   pleural mesothelioma.

23   A.  As I said, pleural mesothelioma is when the disease hits

24   the lining of the lung.  To is becomes very difficult to

25   breath, and the patients usually die of some type of pneumonia.

1           Peritoneal mesothelioma is when it hits the same

2   membranes that are all over the bowel.  What happens then is

3   that the bowel simply shuts down, and you get bowel

4   obstruction.  That's what patients usually will die from.

5   Q.  Dr. Taub, did there come a time when a mesothelioma center

6   was established at Columbia?

7   A.  Yes.

8   Q.  When was that?

9   A.  It was established for me at about the same time, in about

10  2000.

11  Q.  Was that about the same time that you became the Milstein

12  professor?

13  A.  Yes.

14  Q.  What was the mesothelioma center at Columbia?

15  A.  The mesothelioma center really was a concept where these

16  kinds of programs -- you can't do this alone.  So it was a

17  concept where the center was given sort of -- it was an

18  endowment so that I could get people together and get doctors

19  to cooperate -- surgeons, pathologists, and other people -- to

20  develop these kinds of programs and to study the disease and to

21  help it.

22          THE COURT:  Mr. Goldstein, do you want to look for a

23  good place to stop, and we'll stop for the morning.

24          MR. GOLDSTEIN:  This is a perfect place to stop.

25          THE COURT:  Ladies and gentlemen, we're going to take

1  our morning break.  Please don't talk about the case.  I see
2  some of you are shivering.  The temperature in this courtroom
3  can range from a little chilly to swelteringly hot.  It's a
4  little better to be chilly than swelteringly hot.  So don't
5  discuss the case during your break.
6           (Jury not present)
7           THE COURT:  Ten minutes, folks.
8           MS. COHEN:  Thank you, your Honor.
9           (Recess)
10          THE COURT:  Okay.  Mr. Goldstein.
11          Dr. Taub, you're still under oath.
12          THE WITNESS:  Thank you.
13          MR. GOLDSTEIN:  Thank you, your Honor.
14 BY MR. GOLDSTEIN:
15 Q.  Dr. Taub, before we took that break, you were testifying
16 about the mesothelioma center at Columbia that started in 2000.
17          Do you recall that?
18 A.  Yes.
19 Q.  When the mesothelioma center started, where did it get its
20 funding from?
21 A.  It started -- its initial funding began with an endowment
22 from the Milstein family.
23 Q.  Approximately how much was the gift that the Milstein
24 family made for the mesothelioma center to get it started?
25 A.  I believe around $7,000,000 and $8,000,000 is what I think.

Q.  Dr. Taub, in your experience doing mesothelioma research

over the years, how have you found -- to what extent is

research money available for research into mesothelioma?

A.  Well, not as much as one would wish if you're doing

mesothelioma research.  Mesothelioma is a rare disease.  There

are only 3,000 new patients a year in the United States as

opposed to, let's say, 180,000 patients with Colon cancer,

250,000 with prostate cancer.

        So it's not a very high priority, let's say, for

government funding.  So that the funding for mesothelioma

research is by donation, either from private foundations or

private individuals.  And funding will sometimes come from the

government, but government grants are very care.

Q.  Has funding for mesothelioma research also come from law

firms?

A.  It does come from law firms or from foundations which are

supported by law firms.

Q.  Now, has your mesothelioma center applied for government

grant money?

A.  Yes.

Q.  And other than grants from New York State, which we will

discuss later on, what government grants has the mesothelioma

center applied for?

A.  We have applied for funding from the defense department,

the DOD.

1    Q.  That's the United States Department of Defense?

2    A.  Yes.

3    Q.  What would you have used the money for, if you got it, from

4    the Department of Defense?

5    A.  The money we have used has been for programs for

6    diagnosing, for treating, new treatment programs, for clinical

7    trials, and for basic research to find out more about how the

8    disease is caused and what happens with it.

9    Q.  Why did the Department of Defense have potential money

10   available for mesothelioma research?

11   A.  Well, the Department of Defense and the government feels

12   that many of the people in the military, particularly in the

13   Navy, were heavily exposed to asbestos during World War II,

14   particularly in the Navy because large amounts of asbestos were

15   used in the ships.  They were used to spray the engine rooms,

16   and asbestos was all over the walls and in the air that the

17   people were breathing.

18   Q.  When you applied for this Department of Defense grant, what

19   was your understanding as to how your application would be

20   reviewed?

21   A.  Like all applications to the government, it's viewed by a

22   process called peer review, which means there is a group of

23   people who will read the grant and decide whether or not it's

24   meritorious, whether it deserves to be funded, whether it's the

25   right thing for the government to support.

```
 1    Q.  Were you successful in obtaining the grant from the
 2    Department of Defense?
 3    A.  Not at that particular time.
 4    Q.  Now, are you familiar with an organization called the
 5    Mesothelioma Applied Research Foundation or MARF?
 6    A.  Yes.
 7    Q.  What is the Mesothelioma Applied Research Foundation?
 8    A.  The Mesothelioma Applied Research Foundation was started in
 9    order to help bridge the gap in funding for mesothelioma
10    research.
11            It was an organization which would provide funds that
12    were donated to it.  It was a non-profit organization.  Funds
13    would be donated to it, and then funds would be given to
14    patients -- not to patients.
15            Funds would be given to researchers who wanted to
16    apply for the grants, and they would apply, and the funds would
17    then be allocated according to merit.
18    Q.  This organization is referred to as MARF?
19    A.  Yes.
20    Q.  What was your relationship with MARF?
21    A.  I was one of the early members of MARF.  I was on their
22    scientific committee when MARF was formed.
23    Q.  And how did MARF get its funding?
24    A.  MARF got its funding -- my understanding was that MARF got
25    its funding initially by a contribution from a mesothelioma
```

1    attorney who then got several of his colleagues from other law

2    firms to contribute as well.  And it also got donations from

3    patients, particularly those who had gotten settlements for

4    their mesothelioma.

5           The government had set aside a huge amount of money in

6    a mesothelioma trust fund which came from companies which went

7    bankrupt.  So those funds were theoretically possible to use

8    for mesothelioma research as well.

9    Q.  You testified that MARF then gets money from lawyers and

10   others.

11          What does MARF do with the money that it receives?

12   A.  MARF will give out grants to researchers who apply for it

13   and will support the research and will highlight the research

14   and has other functions as well, all having to do with

15   treatment and care of mesothelioma patients.

16   Q.  If one is to apply for a grant from MARF, what is the

17   review process for those grant applications?

18   A.  The review process is very similar to that used by the

19   government, and that is we have committees.  I'm on that

20   scientific advisory board.  That was one of my functions.

21          We have committees set up which will evaluate the

22   grants and give it a score.  If we think it's very good work or

23   if we think it's very important work, if we think it's

24   innovative work, if it's new, if it's going to advance the

25   field, we assign it a score.

FB4YSIL2                          Taub - Direct

1              And then we all meet and count up the scores and see

2       how much money there is available to give, and then we give it

3       according to that rank.  We rank the applications in terms of

4       their worth.

5       Q.   Are you familiar with an individual names Mary Hesdorffer?

6       A.   Yes.

7       Q.   Who is Mary Hesdorffer?

8       A.   Mary Hesdorffer is currently the executive director of

9       MARF.  She's a nurse practitioner who spends a great deal of

10      her time caring for patients as well, and Mary Hesdorffer was a

11      nurse who worked with me for nine years.

12      Q.   How would you describe your relationship with Mary

13      Hesdorffer?

14      A.   It's a very good relationship.  We're really good friends.

15      Q.   You testified a moment ago about funding from law firms and

16      lawyers.

17              In your years of treating patients with mesothelioma,

18      have you dealt directly with lawyers who represent mesothelioma

19      patients?

20      A.   Yes.

21      Q.   Have you served as an expert for law firms that bring

22      mesothelioma cases?

23      A.   Yes.  On occasion, yes.

24      Q.   And have you referred your patients to law firms for

25      representation?

1   A.  Yes.

2   Q.  What is your understanding as to how valuable mesothelioma

3   patients are to law firms?

4   A.  I think they're very valuable.

5   Q.  What is the basis for that understanding?

6   A.  There is a trust fund available from the government which

7   was put together from the bankruptcies of very, very large

8   corporations that had exposed patients knowingly, exposed

9   people knowingly, to asbestos.  And that trust fund is in the

10  neighborhood of $20,000,000,000 to $30,000,000,000.  And that

11  money is available only through law firms to compensate victims

12  of mesothelioma.

13          So the law firms will earn fees from getting

14  settlements for their clients.  I think that's a source of

15  income, and the settlements are large, in the millions usually.

16  Q.  Do you have a view as to whether law firms who represent

17  patients with mesothelioma should donate to research?

18  A.  Yes, I do.

19          THE COURT:  Repeat the question.

20  BY MR. GOLDSTEIN:

21  Q.  Dr. Taub, do you have a view as to whether law firms who

22  represent patients with mesothelioma should donate to research

23  into mesothelioma?

24  A.  Yes.

25  Q.  What is your belief or what is your view?

FB4YSIL2                          Taub - Direct

1    A.   I believe law firms who represent these clients in the hope

2    of getting settlements from them in the trust fund should also

3    have a social responsibility to donate some of the profits that

4    they make to research.

5    Q.   Why do you believe that's a social responsibility?

6                MR. MOLO:   Objection.

7                THE COURT:   Overruled.

8                Go ahead.

9                THE WITNESS:   Because the funds are essentially set

10   aside for mesothelioma victims, and the money is sitting there,

11   and it's not going to be completely used because of the number

12   of new mesothelioma patients and because the money earns

13   interests and it has not really diminished that much over the

14   years, and it should be used to help future victims.

15   BY MR. GOLDSTEIN:

16   Q.   Through your career, have you wanted to receive money from

17   law firms for your mesothelioma research?

18   A.   Yes.

19   Q.   Why did you want that?

20   A.   Because I -- well, I'm put on this earth to help these

21   people.   That's the way I feel about it.   I mean, that's what I

22   want to do.

23                I believe that to do that requires research, and the

24   research is very important, and I believe that research

25   requires funds.   You can't do research without money.

FB4YSIL2                           Taub - Direct

1   Q.  Given that view, have you tried in your career to refer

2   patients to law firms that support mesothelioma research?

3   A.  Yes.

4   Q.  Are you familiar with the law firm Weitz & Luxenberg?

5   A.  Yes.

6   Q.  How did you first become familiar with Weitz & Luxenberg?

7   A.  Some of my patients actually were clients of Weitz &

8   Luxenberg.

9   Q.  As far as you were aware, did Weitz & Luxenberg support

10  mesothelioma research?

11  A.  They did not.

12  Q.  Did Weitz & Luxenberg provide any funding to MARF?

13  A.  I don't believe so.

14  Q.  Did Weitz & Luxenberg provide any funding for your

15  research?

16  A.  They did not.

17  Q.  What did you think of Weitz & Luxenberg's lack of funding

18  for mesothelioma research?

19  A.  I thought it was a situation that should be remedied,

20  should be corrected, and they should recognize that they have a

21  social responsibility to give back something to the research

22  and those patients.

23  Q.  Was the issue of whether Weitz & Luxenberg gave funding to

24  mesothelioma research discussed at MARF meetings that you

25  attended?

1    A.  Yes, it was.

2    Q.  What was the subject of those discussions?

3    A.  That, as apart from other law firms that are donating to

4    MARF and helping MARF get on its feet, Weitz & Luxenberg was

5    singularly absent from that group.

6    Q.  Let me direct your attention to the year 2003.  Prior to

7    the year 2003, had you referred any of your patients to Weitz &

8    Luxenberg?

9    A.  I don't believe so.

10   Q.  Now, are you familiar with Sheldon Silver?

11   A.  Yes.

12   Q.  How did you first meet Sheldon Silver?

13   A.  I believe I was introduced to Mr. Silver in 1984 by my

14   close family friend, Mr. Daniel Chill.

15   Q.  What was your relationship with Mr. Daniel Chill?

16   A.  Daniel Chill and I were friends since childhood, and we

17   went through college and high school together.  And, when I

18   went to Yale Medical School, he went to Yale Law School.  So we

19   have stayed in contact, and our families have stayed in contact

20   since.

21   Q.  How did Mr. Chill know Mr. Silver?

22   A.  Mr. Chill I understand worked in Albany.  He went into

23   politics after law school, and he worked as the counsel for a

24   previous speaker of the assembly, Mr. Stanley Steingut.  Much

25   more than that, I don't know.  But I know he had other

FB4YSIL2                          Taub - Direct

1   functions in Albany since then.

2   Q.  Did you know whether Mr. Chill had a relationship with

3   Sheldon Silver?

4   A.  Mr. Chill knew Mr. Silver well.

5   Q.  So, back to that first encounter in 1984, what do you

6   recall about meeting Sheldon Silver then?

7   A.  I was introduced to Mr. Silver as a friend of Mr. Chill.

8   Q.  Following that introduction, what was your relationship

9   with Mr. Silver, if any, between 1984 and 2003?

10  A.  We may have seen each other at Jewish events or at weddings

11  or at vacations.  We would vacation often in the same hotel for

12  Passover.

13  Q.  Did you have any personal relationship with him at that

14  time?

15  A.  No.

16  Q.  Did there come a time when you learned that Silver worked

17  at Weitz & Luxenberg?

18  A.  Yes.

19  Q.  How did you learn that?

20  A.  I learned that because the law firm of Weitz & Luxenberg

21  sent a request for medical records on one of its clients, and I

22  saw on the stationery on the upper right-hand corner that

23  Mr.Silver was listed as of counsel to Weitz & Luxenberg.

24  That's how I knew he was a member of the firm.

25  Q.  At the time that you saw that, did you know what position

FB4YSIL2                          Taub - Direct

1    Sheldon Silver had in state government?

2    A.  Yes.

3    Q.  What did you know?

4    A.  I knew he was speaker of the assembly.

5    Q.  Now, after you learned from that piece of stationery that

6    Sheldon Silver was of counsel to Weitz & Luxenberg, did there

7    come a time when you had an encounter with him?

8    A.  Yes.

9    Q.  Tell the jury what the circumstances were of that

10   encounter.

11   A.  It was in 2003, and I believe it was at some time when we

12   were vacationing, but I'm not certain.

13   Q.  Who introduced you to Sheldon Silver?

14   A.  Mr. Chill.

15   Q.  What, if anything, did you say to Sheldon Silver during

16   that meeting in 2003?

17   A.  I explained to Mr. Silver that I was a mesothelioma

18   physician and that I had now been specializing in that disease

19   to a certain extent and that I was also on the board of

20   directors of an organization called MARF.

21        And I explained to him that we would like his help, if

22   possible, to influence Weitz & Luxenberg to donate funds to

23   MARF.

24   Q.  Why did you ask him if he could get -- if you could get his

25   help in getting Weitz & Luxenberg to donate funds to MARF?

FB4YSIL2                          Taub - Direct

1    A.   Because I felt that he was a senior member of the firm.  He

2    would have influence in order to be able to discuss this and

3    would allow us access.  We had tried to speak to -- I believe

4    to Mr. Weitz and were unsuccessful, and we had tried some

5    approaches.  I know MARF.  I felt that Mr. Silver might be able

6    to help in that regard.

7              MR. MASTER:

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FB45sil3                          Taub – direct

1   BY MR. GOLDSTEIN:

2   Q.  Did you discuss with Mr. Silver the fact that there were

3   other law firms that were giving money to mesothelioma

4   research?

5   A.  Yes.

6   Q.  How did Sheldon Silver respond to your request for his help

7   in getting Weitz & Luxenberg to fund mesothelioma research?

8   A.  I don't remember details of that conversation but I felt

9   that it was in the negative, he could not -- did not feel he

10  could do it.

11  Q.  Now, you testified that it was Chill who introduced to you

12  to Silver?

13  A.  Yes.

14  Q.  Did you tell Chill about this conversation that you had

15  with Sheldon Silver?

16  A.  Yes.

17  Q.  Did you tell him about your request to Silver for help in

18  trying to get funding from Weitz & Luxenberg?

19  A.  Yes, I did.

20  Q.  At some point after that encounter with Sheldon Silver, did

21  you come to learn that Sheldon Silver wanted you to send him

22  mesothelioma cases?

23  A.  Yes.

24  Q.  Was that a specific request made to you?

25  A.  Yes, it was.

FB45sil3                          Taub – direct

1   Q.  And what was your understanding of what Sheldon Silver

2   wanted by wanting cases?

3   A.  Mr. Silver indicated, through -- through Mr. Chill,

4   actually --

5              MR. MOLO:  Objection, your Honor.

6              THE COURT:  Sustained.

7   Q.  What did you understand the desire for cases to mean?

8              THE COURT:  Can I see the parties at side bar?  I

9   don't think that's going to solve the problem.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At side bar)

2          THE COURT:  Okay.  So, do I understand correctly that

3     his conversation was with Chill, not with Silver?

4          MR. SHUR:  As he remembers it Chill came to him and

5     said Shelly wants cases.

6          THE COURT:  Okay.  Why isn't that hearsay?

7          MR. GOLDSTEIN:  I think that Chill was the messenger

8     of that communication.

9          THE COURT:  How are you going to prove that?

10         MR. GOLDSTEIN:  We had a discussion with defense

11    before this about trying to get around this hearsay issue and

12    my understanding is that there is no dispute that it was

13    Sheldon Silver who communicated to Dr. Taub his desire for

14    cases.  And so, whether or not it came from Mr. Chill is what I

15    was trying actually to ask around and so I appreciated your

16    Honor sustaining the objection but his understanding that

17    Sheldon Silver wanted cases is the basis for why he started

18    sending him the cases.

19         THE COURT:  So what was the deal that you all were

20    going to work around?

21         MR. MOLO:  They weren't going to introduce the

22    conversation that just almost came in but for my objection.

23         THE COURT:  Okay.

24         MR. MOLO:  And in fact asked -- it hasn't come in

25    completely.

FB45sil3                          Taub - direct

1         THE COURT:  It hasn't come in at all.

2         MR. MOLO:  Okay, so --

3         THE COURT:  So, do I correctly understand that the

4    defense is not objecting to the next question that I

5    interrupted which is what was your understanding of what

6    Mr. Silver wanted?

7         MR. MOLO:  I think if the question is did you believe

8    that Mr. Silver, as a part of Weitz & Luxenberg, wanted

9    mesothelioma cases, the answer to that is yes and I have no

10   problem with that.

11        MR. GOLDSTEIN:  I just want -- the idea that he wants

12   cases, I don't think the jury fully understood what that means.

13   All I want him to say is that that meant he wanted me to refer

14   my patients.

15        THE COURT:  To him?

16        MR. GOLDSTEIN:  To him.

17        MR. MOLO:  That's fine.

18        THE COURT:  Okay.

19        MR. GOLDSTEIN:  Thank you, Judge.

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Okay, Mr. Goldstein you need to re-put the

3    question.

4    BY MR. GOLDSTEIN:

5    Q.  Dr. Taub, you came to testify that Sheldon Silver wanted

6    cases?

7    A.  Yes.

8    Q.  Can you tell the jury what it means to want a case, in your

9    view?

10   A.  What that meant was that he would like referrals to the law

11   firm that he represented to be given through him, that he would

12   be the person who would take on the case for the law firm.

13   Q.  Now, approximately how much time had passed between that

14   encounter that you described with Sheldon Silver where you

15   asked him for his help in obtaining funding from

16   Weitz & Luxenberg and the request that you received to send

17   Sheldon Silver cases?

18   A.  Between a week and two weeks.

19   Q.  Now, what understanding did you have as to how valuable a

20   mesothelioma case could be for a law firm?

21   A.  For a law firm?  Could be very valuable, yes.

22   Q.  Now, in response to Sheldon Silver's request, did you in

23   fact start sending patients of yours to Sheldon Silver for

24   legal representation?

25   A.  Yes.

FB45sil3                          Taub - direct

1    Q.  What were you hoping to accomplish by sending him cases?

2    A.  I hoped to develop a relationship with him that would help

3    fund mesothelioma research and would help my patients as well.

4    Q.  What benefit, if any, did you expect Sheldon Silver to

5    receive from these referrals?

6    A.  I knew it would benefit his standing in the firm.  That was

7    the way I had thought about it and I didn't know precisely how

8    it would benefit him otherwise.

9    Q.  Were you aware of any financial benefit that Silver could

10   receive from obtaining cases from you?

11   A.  I thought it was possible, yes.

12   Q.  Did you know what the financial arrangement was between

13   Sheldon Silver and Weitz & Luxenberg?

14   A.  I had no idea.

15   Q.  When you started sending cases to Sheldon Silver, how did

16   he react?

17   A.  I think that he conveyed that he was pleased with the

18   referrals that he was getting.

19   Q.  Did you discuss with Daniel Chill the fact that you had

20   started referring cases to Sheldon Silver?

21            MR. MOLO:  Objection, your Honor.

22            THE COURT:  Overruled.

23   A.  Yes.

24   Q.  After you started sending cases to Sheldon Silver, did

25   there come a time when you learned that he wanted you to write

1   a letter to him about state funding for your research program?

2   A.  Yes.

3   Q.  And in response to what you learned, did you in fact draft

4   the letter to Silver making a request for state funding for

5   your research?

6   A.  Yes.

7   Q.  About how soon after you started making referrals to Silver

8   did you write that letter seeking state funding for your

9   research?

10  A.  I'm not sure.  Several months.

11  Q.  And who helped you write the letter to Silver?

12  A.  Mr. Chill.

13  Q.  I am going to ask you some more questions about that letter

14  in some more detail in a moment, but at some point after you

15  sent that letter to Silver, did your research program in fact

16  receive state funding?

17  A.  Yes, it did.

18  Q.  How many total grants did your program receive from New

19  York State?

20  A.  Columbia University received two contracts from the State

21  for $250,000 each.

22  Q.  So it was a total of $500,000?

23  A.  Correct.

24  Q.  At the time that Columbia University received those state

25  funds, were you sending cases to Sheldon Silver?

FB45sil3                          Taub - direct

1   A.  Yes.

2   Q.  Did you keep track of the cases that you sent to Silver?

3   A.  I did not.

4   Q.  Did you keep any record each time that you sent him a case?

5   A.  I did not.

6   Q.  Starting in late 2003, for how long of a period did you

7   refer cases to Sheldon Silver?

8   A.  I referred cases to him for a period of about 10 years.

9   Q.  Looking back over that 10-year period, do you know about

10  how many cases you sent to Sheldon Silver?

11  A.  I don't know exactly.  I would estimate it somewhere

12  between 25 and 50.  Closer to 25.

13  Q.  What was your purpose in sending all of those cases to

14  Sheldon Silver?

15  A.  I wanted to maintain a relationship with him such that he

16  would be incentivized to be an advocate for mesothelioma

17  research and that he would feel -- he would help us in

18  obtaining funding for mesothelioma research.

19  Q.  Did you want him to help fund your program in particular?

20  A.  Of course.

21  Q.  During this time period where you were referring cases to

22  Silver, in addition to asking for state money for your

23  research, did you also ask Silver for other types of

24  assistance?

25  A.  Yes.

FB45sil3                          Taub - direct

1    Q.  Did you seek his help in getting your daughter an

2    internship with a state judge?

3    A.  Yes.

4    Q.  Did you seek his help in getting your son a job?

5    A.  Yes.

6    Q.  Did you seek his help with an event to raise awareness and

7    funding for mesothelioma?

8    A.  Yes.

9    Q.  And did Silver in fact provide assistance with those

10   requests?

11   A.  Yes, he did.

12   Q.  I want to call your attention to the summer of 2014.  Did

13   there come a time when investigators from the government came

14   to your apartment?

15   A.  Oh yes.

16   Q.  What time of day was it?

17   A.  It was 6:00 in the morning.

18   Q.  How many investigators came to your apartment?

19   A.  Two.

20   Q.  What did the investigators ask you?

21   A.  They asked me if I had referred cases to Mr. Silver.

22   Q.  How did you respond to that question?

23   A.  I denied doing so.

24   Q.  Why did you deny sending cases to Sheldon Silver?

25   A.  Because I was terrified and panicked and I irrationally

FB45sil3                        Taub - direct

```
 1   wanted to divorce myself from any pending investigation.
 2   Q.  Now, after you lied to the investigators did there come a
 3   time when you decided to meet with the government?
 4   A.  Yes.
 5   Q.  Why did you make that decision?
 6   A.  Because I realized I made a mistake.
 7   Q.  So, did you in fact come in and meet with the government
 8   after that first encounter at your apartment?
 9   A.  Yes.
10   Q.  When you met with the government this next time, did you
11   tell the government that you had in fact referred cases to
12   Sheldon Silver?
13   A.  Yes, I did.
14   Q.  Did you tell the government that you received grant money
15   from the state?
16   A.  Yes.
17   Q.  Did you tell the government that Silver helped your son get
18   a job?
19   A.  Yes.
20   Q.  Did you tell the full truth about why you were sending all
21   those cases to Sheldon Silver?
22   A.  I initially minimized all of the -- all of those events.
23   Q.  Why did you minimize the reasons for making those
24   referrals?
25   A.  I was still reluctant to get involved in the investigation.
```

FB45sil3                           Taub - direct

1   Q.  Did you ultimately tell the government the truth about the

2   connection between the referrals you were making to Silver and

3   your requests for state funding?

4   A.  At some point I arrived at that point and we went -- went

5   into it in detail, yes.

6   Q.  And what was that connection?

7   A.  The connection is that I gave referrals to Mr. Silver in

8   order to develop a relationship whereby he would help fund

9   mesothelioma research and help those patients.

10  Q.  In your meetings with the government, did you tell the

11  government about any other conduct of yours that you wanted the

12  government to know about?

13  A.  Yes.

14  Q.  In particular, did you tell the government about an issue

15  with prescription drugs for your wife?

16  A.  Yes.

17  Q.  What did you tell the government about that?

18  A.  I told the government that on maybe one to three occasions

19  I had asked a colleague to write prescriptions for narcotics

20  for myself because my wife, who has a very severe, chronic pain

21  problem, had run out of her pills.

22  Q.  What is your wife's medical condition?

23  A.  She has chronic pain syndrome which is very severe, among

24  other things.

25  Q.  And why did you not just write the prescription yourself?

1    A.  It's not a good idea for a doctor to write prescriptions

2    for narcotics for his family because it can become a habit.

3    Q.  And how many times did you get a prescription for your wife

4    where you said it was for yourself?

5    A.  I think twice, possibly a third time, but I think twice all

6    together, over the years.

7    Q.  Did there come a time when you entered into an agreement

8    with the government?

9    A.  Yes.

10   Q.  If you can look in the binder that's in front of you and

11   look at the first document in the binder; do you recognize that

12   document, Dr. Taub?

13   A.  Yes.

14   Q.  That's marked for identification as Government Exhibit

15   3638-06?

16           THE COURT:  3538.

17           MR. GOLDSTEIN:  3538-06.  Thank you, your Honor.

18   Q.  What is this document, Dr. Taub?

19   A.  It is a non-prosecution agreement.

20           THE COURT:  Dr. Taub, you are going to have to talk

21   into the mic and you have to keep your voice up.

22   A.  Sorry.

23           It is a non-prosecution agreement.

24   Q.  Is that the agreement you entered into with the government?

25   A.  Yes.

FB45sil3                              Taub - direct

1   Q.  Did you sign this document?

2   A.  Yes.

3   Q.  You can set the document aside, Dr. Taub.

4           What is your understanding of what that agreement

5   requires you to do?

6   A.  It requires me to tell the truth.

7   Q.  And if you do that, what is your understanding of what the

8   government's obligations are under the agreement?

9   A.  It is a non-prosecution agreement, they will not prosecute

10  me for wrongdoing.

11  Q.  Is that wrongdoing related to your referrals of patients to

12  Sheldon Silver and when you lied to the investigators?

13  A.  I think it refers to my lying to the investigators.  I

14  don't know about the other.

15  Q.  Dr. Taub, if you can open up, go back to 3538-06?  If you

16  would look at the first paragraph of the agreement?

17  A.  Yes.

18  Q.  Does that refresh your recollection as to whether or not

19  the government, if you tell the truth, has agreed not to

20  prosecute you for conduct relating to your referrals to Sheldon

21  Silver?

22  A.  Yes, it does.  It is very specific in paragraph C.

23  Q.  Now, after -- you can set that aside, Dr. Taub.

24          After the charges in this case became public, what

25  happened to your job at Columbia?

FB45sil3                        Taub - direct

1    A.  I was terminated from Columbia.

2    Q.  At that time for how long had you been a professor at

3    Columbia?

4    A.  35 years.

5    Q.  What did you do in response to being terminated from

6    Columbia?

7    A.  I was terminated from Columbia without cause and

8    peremptorily and I am a tenured -- I have tenure of title at

9    Columbia and the bylaws of Columbia specify that in order to

10   terminate me there must be a due process, which I did not

11   receive.  So, I have sued Columbia asking for that due process.

12   Q.  What is the status of your lawsuit against Columbia?

13   A.  It is ongoing.  I'm still working at Columbia.  They're

14   under an injunction that says I must continue to work, that I

15   am allowed to continue to work and see patients, which I do.

16   Q.  Who is it that put that injunction in place that has

17   allowed you to keep working and seeing patients at Columbia?

18   A.  The state court.

19   Q.  Dr. Taub, I want to now go back in time again and talk in

20   some more detail about the referrals that you made to Sheldon

21   Silver.  As an initial matter, since you were a treating

22   physician, why did you speak with your patients at all about

23   legal representation?

24   A.  Because patients who were exposed to asbestos and who have

25   this disease, this is a devastating, horrible disease, the

1    treatments are very costly, and in order for a patient to cope

2    with this disease requires funding -- funds to help them and

3    this is part of their treatment, this is part of their care.

4            So, when a patient came to my office who I found out

5    or by history, or was obviously exposed to asbestos, one of the

6    things that I would ask is whether they had legal

7    representation so that they could get a settlement which would

8    help them cope with the illness.

9    Q.  Dr. Taub, about how many new mesothelioma patients did you

10   see each month?

11   A.  Zero to four.

12   Q.  And when you spoke with your patients about legal

13   representation, did you ask if they already had a lawyer?

14   A.  Yes.

15   Q.  And about what percentage of the patients that came in

16   already had lawyers?

17   A.  About two thirds.

18   Q.  And if a patient already had a lawyer, did you attempt to

19   refer them to a law firm?

20   A.  Not usually, because if they already had representation.

21   Q.  So, how frequently did you have new mesothelioma patients

22   who did not already have legal representation?

23   A.  I estimate about one in three.

24   Q.  One in three per what?

25   A.  One in three patients, new patients that I saw would not

1   have representation.

2                THE COURT:  Is that about one a month?

3                THE WITNESS:  I'm sorry?

4                THE COURT:  Did that amount to one a month, one every

5   two months?

6                THE WITNESS:  It could be three or four a year.

7                It was very, very sporadic.

8   BY MR. GOLDSTEIN:

9   Q.  Could it also be more than three or four per year?

10  A.  Could be.  Depends on the year.

11  Q.  Now, for those patients who did not already have a lawyer,

12  if you wanted to refer them to Sheldon Silver, what did you

13  tell them?

14  A.  I told them that Weitz & Luxenberg is a very good law firm

15  and that Mr. Silver would and had, because of his stature in

16  the State and because he was a member of that law firm as well,

17  that it would enhance their legal treatment at the firm; they

18  would do better, they would have a good representation in the

19  firm.

20  Q.  If a patient was receptive to that, what did you ask the

21  patient for?

22  A.  I would ask the patient for contact information.

23  Q.  Contact information for whom?

24  A.  So that I could pass it along to Mr. Silver.

25  Q.  Did you get their permission to send that information to

1    Mr. Silver?

2    A.   Absolutely.

3    Q.   Were there patients who did not give their permission?

4    A.   Yes.

5    Q.   If they did not give their permission, would you still send

6    their information to Mr. Silver?

7    A.   No.

8    Q.   Now, when you referred a patient to Sheldon Silver, did you

9    mention other law firms as well, or just Sheldon Silver and

10   Weitz & Luxenberg?

11   A.   Occasionally I would mention other firms but mainly I would

12   mention Weitz & Luxenberg.

13   Q.   You said that you got their name, their contact

14   information; how did you convey that information to Sheldon

15   Silver?

16   A.   I called him.

17   Q.   What number of Sheldon Silver's did you call?

18   A.   I called his State office.

19   Q.   Dr. Taub, how many cell phones do you have?

20   A.   Two.

21   Q.   And before your testimony today did you look in both of

22   your phones to see what contact information you had for Sheldon

23   Silver?

24   A.   Yes.

25   Q.   I want you to look in your binder at what's been marked for

1    identification as Government Exhibit 3538-14.

2    A.  Yes.

3    Q.  Prior to your testimony today, did you look through your

4    cell phones to see what contact information you had on your

5    phones for Sheldon Silver?

6    A.  Yes.

7    Q.  What was the number that you had for Sheldon Silver?

8    A.  212-312-1400.

9    Q.  Is that the only number that you had for Sheldon Silver?

10   A.  Yes.

11   Q.  In either one of your phones?

12   A.  Yes.

13   Q.  Is it your understanding that that is the number of his

14   Assembly office?

15   A.  Yes.

16   Q.  Did you have a cell phone number for Sheldon Silver?

17   A.  I did not.

18   Q.  Did you know what his home phone number was?

19   A.  I did not.

20   Q.  Now, when you called his state office who, typically,

21   answered the phone when you called?

22   A.  A receptionist or an administrative person.

23   Q.  What, if anything, did you say to that secretary or

24   receptionist to get through to Silver?

25   A.  I would say I would like to speak to Mr. Silver about a

FB45sil3                          Taub - direct

1   referral.

2   Q.  And what happened after you told that to the person who

3   answered the call?

4   A.  Mr. Silver would call back.

5   Q.  Did you provide any other detail to the receptionist

6   besides that you wanted to speak with Mr. Silver about a

7   referral?

8   A.  Not usually.

9   Q.  Do you recall ever providing additional detail to a

10  receptionist or a secretary in the office?

11  A.  I think over the years, I think perhaps once when

12  Mr. Silver was totally not available and his secretary asked

13  that I provide her with the information.  I'm not sure who it

14  was.

15  Q.  And then when you did in fact speak with Sheldon Silver,

16  what information did you provide to him?

17  A.  I provided him with the name and a contact phone number for

18  a prospective referral.

19  Q.  And did you tell Silver that this was a patient of yours

20  who had recently been diagnosed with mesothelioma?

21  A.  Yes.

22  Q.  Did you give him any information about the potential

23  exposure to asbestos?

24  A.  On some occasions I did do that, yes, that I can recall.

25  Q.  What did Silver say to you after you provided him with this

1   information?

2   A.   He generally thanks me for the referral.

3   Q.   How long were these conversations that you had with Sheldon

4   Silver?

5   A.   Generally brief.

6   Q.   Now, after you first began referring cases to Sheldon

7   Silver, did there come a time when Sheldon Silver brought up

8   your friend Daniel Chill?

9   A.   Yes.

10  Q.   What did Silver say to you about Daniel Chill?

11  A.   He said I should not tell Mr. Chill about any referrals --

12  any further referrals.

13  Q.   What did you take that to mean?

14  A.   I didn't know what to make of it, actually.  He just wanted

15  it kept between me and Mr. Silver, between me and him.

16  Q.   Approximately how early in the time period was this when

17  you were referring cases to Sheldon Silver did this request

18  come?

19  A.   I'm really not sure.  Fairly early.

20  Q.   And after that request from Silver not to speak with

21  Mr. Chill about the referrals, did you ever raise the issue of

22  referrals again with Daniel Chill?

23  A.   I don't think so.

24  Q.   Why not?

25  A.   Because Mr. Silver asked me not to and I felt that I would

FB45sil3                              Taub - direct

1   honor that request.  Why not.

2   Q.  You testified earlier that after you began sending cases to

3   Silver you sent --

4              MR. COHEN:  Your Honor, I am sure Mr. Goldstein means

5   to refer to Mr. Silver.

6              MR. GOLDSTEIN:  I can refer to him as the defendant, I

7   can refer to him as Silver or Mr. Silver.

8              THE COURT:  I'm not sure what the objection was.

9              MR. COHEN:  He is calling him Silver.  It is

10  Mr. Silver.  It seems to me appropriate.

11             THE COURT:  Okay.  Go ahead.

12  BY MR. GOLDSTEIN:

13  Q.  You testified earlier that after you began sending cases to

14  the defendant you sent him a letter asking about State funding

15  for your research program.  Do you recall that?

16  A.  Yes.

17  Q.  Now, prior to your testimony here today, did you search

18  through the files on your home computer looking for documents

19  pertaining to Sheldon Silver?

20  A.  Yes, I did.

21  Q.  I want you to look in your binder at what's been marked for

22  identification as Government Exhibit 302.

23  A.  302?

24             THE COURT:  302.

25  Q.  302.

1   A.  I don't see a 302.

2            THE COURT:  It is right towards the front.

3   Q.  It should be the third tab in the binder, Dr. Taub.

4   A.  Yes, I have got it.  Okay.

5   Q.  Do you recognize this document?

6   A.  Yes.

7   Q.  What is it?

8   A.  It is a letter that I drafted to Mr. Silver.

9   Q.  Dr. Taub, when did you draft this document?

10  A.  The date created was December 29th, 2003.

11  Q.  What names did you reference in the file name for this

12  document?

13  A.  The file name is a letter to Sheldon Silver via Danny

14  Chill, December 30 2003.doc.  That's the file name.

15  Q.  Dr. Taub, did you in fact also reference Daniel Chill in

16  this draft of the document?

17  A.  Yes.

18  Q.  You can set that aside.

19           If you can turn to what's been marked in your binder

20  as Government Exhibit 107-1?

21           MR. GOLDSTEIN:  Your Honor, the government offers 302.

22           THE COURT:  Any objection?

23           MR. MOLO:  No objection.

24           THE COURT:  302 is received.

25           (Government's Exhibit 302 received in evidence)

FB45sil3                          Taub - direct

1   BY MR. GOLDSTEIN:

2   Q.  Dr. Taub if you can look at Government Exhibit 107-1?

3          Actually, can we publish 302, please?  Mr. Coccaro,

4   can you please focus in on the metadata at the top of the

5   document?

6          Dr. Taub, the file name, is that what you read to the

7   jury earlier?

8   A.  Yes.

9   Q.  And the date created, can you read that into the record,

10  please?

11  A.  December 29th, 2003.

12  Q.  Mr. Coccaro, if we can turn to the first page of this

13  document and just focus in on the top, the letterhead and the

14  first few sentences?

15         Is that your letterhead, Dr. Taub?

16  A.  Yes.

17  Q.  What is the date of the letter?

18  A.  The date is January 7, 2004.

19  Q.  And can you please read for the jury the first line of the

20  letter?

21  A.  It reads:  I was gratified to learn from Mr. Daniel Chill

22  that our program in mesothelioma might be considered for

23  support through New York State.

24  Q.  Did you in fact learn from Daniel Chill that your program

25  in mesothelioma might be considered for support through New

FB45sil3                          Taub – direct

1   York State?

2   A.   Yes.

3   Q.   Now let's look at Government Exhibit 107-1 --

4                THE COURT:   Before we do that, can I see the parties

5   for just a second?

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FB45sil3                               Taub – direct

1                    (At side bar)

2                    THE COURT:  I just want to make sure I have got the

3          document right.  So, this is the document as it appears which

4          attaches the Milstein Report.  Is that how the document is

5          going into evidence?

6                    MR. GOLDSTEIN:  Yes, your Honor.

7                    THE COURT:  And on page 2 the metadata indicates it is

8          a letter to Milstein.

9                    MR. GOLDSTEIN:  It was a draft.

10                    THE COURT:  That's fine.  I want to make sure that I

11          have the document correct.

12                    MR. GOLDSTEIN:  Yes.

13                    THE COURT:  Okay.  That's all.  I just wanted to make

14          sure there wasn't a SNAFU in copying.

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     BY MR. GOLDSTEIN:

3     Q.  Dr. Taub, if you can now look in your binder to Government

4     Exhibit 107-1?  Do you recognize that document?

5     A.  Yes.

6     Q.  What is that document?

7     A.  That is a letter that I wrote to Mr. Silver.

8     Q.  And if you could turn to the second page of the document,

9     is that your signature on the document?

10    A.  Yes, it is.

11         MR. GOLDSTEIN:  Your Honor, the government offers

12    107-1 which is a redacted version of 107 which is already

13    admitted into evidence.

14         THE COURT:  Any objection?

15         MR. MOLO:  No objection.

16         THE COURT:  Received.

17         (Government's Exhibit 107-1 received in evidence)

18    BY MR. GOLDSTEIN:

19    Q.  If we can publish that, Mr. Coccaro?  Mr. Coccaro, can we,

20    again, focus on the first part of the letter?

21         Dr. Taub, the address on the letter just says:

22    Honorable Sheldon Silver, Speaker, New York State Assembly,

23    with no mailing address.  Do you recall how you transmitted

24    this letter to Sheldon Silver?

25    A.  I don't really.

FB45sil3                          Taub - direct

1   Q.  What are the possible ways that you could have transmitted

2   it to him?

3           MR. MOLO:  Objection.

4           THE COURT:  Overruled.

5   A.  I could have mailed it to his State office or I could have

6   given it to Mr. Chill.

7   Q.  If you gave it to Mr. Chill, would that have been to give

8   to Mr. Silver?

9   A.  Yes.

10  Q.  If you can read the first line -- before I ask you that,

11  Dr. Taub, is this the final version of the letter that we

12  looked at the draft of earlier?

13  A.  I believe so.

14  Q.  Is this the one that you signed?

15  A.  Yes.

16  Q.  So, can you please read for the jury the first line of this

17  letter?

18  A.  I am pleased to learn that our program in mesothelioma

19  might be considered for support through New York State.

20  Q.  The previous version of the letter, the draft, said that

21  you had learned from Daniel Chill and his name was mentioned.

22  Why did you not mention him in the final version of the letter?

23  A.  Because Mr. Chill asked me not to put his name in the

24  letter.

25  Q.  If we can look at the rest of this paragraph?  *There is an*

1    *urgent need for better mesothelioma treatment for our citizens.*

2    *Mesothelioma and related cancers are responsible for thousands*

3    *of agonizing deaths each year, many arising from exposure to*

4    *asbestos in shipyards in our area or in regional towns with*

5    *asbestos insulation manufacturing plants.  There has been an*

6    *influx of immigrants from Turkey and its neighbors that have*

7    *high levels of environmental asbestos and many potential*

8    *mesothelioma victims.  In New York City, additional populations*

9    *may have been exposed to asbestos-laden air during the*

10   *September 11, 2001 terrorist attack on the World Trade Center,*

11   *in which the floor tiles are said to have contained asbestos.*

12   *The incidence of mesothelioma is still rising and is not*

13   *expected to peak until about 2020.  There is currently no cure*

14   *for mesothelioma.  Life expectancy after diagnosis is six to 12*

15   *months; this must improve.*

16           What was your purpose in including this information in

17   the letter to Sheldon Silver?

18   A.   This was important because we were interested to know if

19   New York State would be interested in supporting mesothelioma

20   research and this was a matter of some importance to the

21   citizens of New York State which made it relevant to ask the

22   legislature to support it.

23   Q.   Did you consult with Daniel Chill on the language of this

24   letter?

25           MR. MOLO:  Objection.

1          THE COURT:  Overruled.

2   A.  Yes, I did.

3   Q.  Why did you consult with Daniel Chill on the language of

4   this letter?

5   A.  Because the concept of asking the State for support arose

6   during conversations I had with Mr. Chill earlier, particularly

7   about --

8   Q.  I don't want you to go into the nature of those

9   conversations, Dr. Taub.

10  A.  Okay.

11  Q.  But, did you turn to Mr. Chill, in part, because of his

12  knowledge of New York State government?

13  A.  Certainly.

14  Q.  If I can direct your attention to the second page of the

15  letter and we could enlarge the "I wish to propose" paragraph,

16  Mr. Coccaro?

17          *I wish to propose that the state New York appropriate*

18  *$250,000 yearly for comprehensive support of ongoing*

19  *mesothelioma research at the only university-designated,*

20  *hospital-affiliated mesothelioma center in our area.*

21          Why did you ask for $250,000 per year?

22  A.  That was an amount, I believe, that was suggested by

23  Mr. Chill, but it was also an amount that I would traditionally

24  use for research proposals.

25  Q.  And what did you want to do with the state money if you got

FB45sil3                          Taub - direct

1   it?

2   A.  What we wanted to do was to develop clinical programs and

3   clinical trials and investigative trials to determine asbestos

4   exposure in people with mesothelioma.

5   Q.  And how important to the Mesothelioma Center was it to get

6   state funding?

7   A.  It's always good to get funds.  The center was pretty well

8   funded at that time so it was not crucial, but the more money

9   you get for research the more research you can do.  So, it is

10  helpful.

11  Q.  Was there a benefit to receiving money from the state in

12  particular as compared to a private source?

13  A.  Yes.

14  Q.  What was that benefit?

15  A.  Well, usually funds from the government have been vetted

16  and have been given and the perception is that those funds are

17  given on merit.  So, it's meritorious and it is a plus for your

18  reputation to have funds which were given to you on merit, that

19  means people evaluated your research and found it was good.

20  And we thought our program was excellent.

21  Q.  What was your understanding as to what was going to happen

22  after you sent this letter to Sheldon Silver?

23  A.  I assumed that the funds would be sent to the Department of

24  Health and they would --

25  Q.  Doctor, let me just stop you there.

FB45sil3                              Taub - direct

```
1    A.   -- that the proposal --

2    Q.   What did you think was going to be transmitted to the

3    Department of Health?

4    A.   The proposal.  The proposal was going to be transmitted to

5    the Department of Health for their evaluation and they may then

6    have contacted me for further discussions.

7    Q.   Now, after you sent this letter to Sheldon Silver, did you

8    refer additional cases to Silver?

9    A.   Yes.

10   Q.   What did you hope the effect would be of referring those

11   additional cases to Silver?

12   A.   I wanted to maintain the relationship where he would be an

13   advocate and he would be incentivized to help fund mesothelioma

14   research.

15   Q.   Did you hope that it would help with the grant?

16   A.   It might.  Sure.

17   Q.   Now, you testified earlier that you had other experiences

18   in your career in applying for grant funding from the

19   government.  Based on that experience, what kind of review did

20   you expect this request for funding to receive?

21              MR. MOLO:  Objection, your Honor.  It was a federal

22   grant, this is a state grant.

23              THE COURT:  Overruled.

24   A.   I had received federal funding for 25 years from the

25   government and from other foundations.  It's always been on
```

1   merit and peer review.

2   Q.  Now, you also testified that your program in mesothelioma

3   has received gifts from donors and from foundations and

4   lawyers.  What's the difference between a gift and a grant?

5   A.  A gift is a person who has money or a foundation that has

6   money and they wish to donate it.  They will donate it if they

7   feel it's appropriate.  Money given by a government is public

8   money and public money has to be allocated by a process which

9   is fair to the people and a -- which should be given

10  impartially by a process which is either peer-reviewed or

11  certainly on merit, should be given on merit.

12  Q.  In your experience, do government entities give gifts or do

13  they give grants?

14  A.  Government entities do not give donations, they give

15  grants.

16  Q.  And which government entity did you expect would review

17  your request for funding that you sent to Sheldon Silver?

18  A.  The Department of Health, New York State.

19  Q.  How long did you think that review process would take?

20  A.  Ordinarily those grants are reviewed within about six

21  months.

22  Q.  What was your objective in sending that letter to Sheldon

23  Silver directly as opposed to the Department of Health?

24  A.  I was asked to send a letter to Mr. Silver.  I thought he

25  would pass it along to the Department of Health and they would

FB45sil3                           Taub - direct

1    take it in a certain sense from there if they thought -- if

2    they thought that our center was worth supporting.

3    Q.  Did you want Sheldon Silver to help you with the process?

4    A.  Yes.

5    Q.  Is that one reason why you sent him cases?

6    A.  I, among other things, I wanted him to help, help fund

7    mesothelioma research.  Within that general category, yes.

8    Q.  After you sent that letter to Sheldon Silver, for the first

9    several months did you receive any response?

10   A.  I did not.

11   Q.  Did there come a time when you received an invitation to

12   attend an event in Albany for Sheldon Silver?

13   A.  Yes.

14   Q.  What was that event?

15   A.  His inauguration as Speaker.

16   Q.  Was that his first inauguration as Speaker?

17   A.  I don't believe so.

18   Q.  And approximately when was this inauguration to be?

19   A.  I think 2004.  Late 2004.

20   Q.  Where did the invitation to the event come from?

21   A.  From the Speaker's office in Albany.

22   Q.  Did you in fact go?

23   A.  Yes.

24   Q.  Who did you go with?

25   A.  I went with Mr. Chill.

1    Q.  And at this inauguration did you meet with Sheldon Silver?

2    A.  Yes.

3    Q.  Did you meet with him by yourself or in a group?

4    A.  I think it was in a group.

5    Q.  And to what extent, if any, do you recall discussing your

6    grant request with Silver?

7    A.  I think it was discussed briefly.  Very briefly.

8    Q.  And did Silver also introduce you to someone on his staff?

9    A.  I believe so.

10   Q.  And did you then speak with that staff member?

11   A.  Yes.

12   Q.  And based on that discussion, what was your impression

13   about the status of your grant request?

14   A.  That it was being actively considered for funding.

15   Q.  Now, after that inauguration, did you write a second letter

16   to Sheldon Silver?

17   A.  Yes.

18   Q.  If you can look in your binder at Government Exhibit 303,

19   do you recognize this document, Dr. Taub?

20   A.  Yes.

21   Q.  What is this document?

22   A.  This is a letter that I wrote to Mr. Silver in January of

23   2005.

24   Q.  Is this one of the documents that you found on your home

25   computer when you were looking for files relating to Sheldon

1   Silver?

2   A.  Yes.

3           MR. GOLDSTEIN:  Your Honor, the government offers 303.

4           THE COURT:  Any objection?

5           MR. MOLO:  No objection.

6           THE COURT:  303 is received.

7           (Government's Exhibit 303 received in evidence)

8   BY MR. GOLDSTEIN:

9   Q.  Mr. Coccaro, can we publish the metadata on the first page

10  of this document?  Can you zoom in on the metadata so that the

11  jury can read it?

12          Dr. Taub, what was the file name of this document?

13  A.  Letter to Sheldon Silver January 102005.

14  Q.  And what was the date that it was created?

15  A.  January 9th, 2005.

16  Q.  If we can turn to the first page of the letter and just

17  zoom in on the top part of that, Mr. Coccaro?

18          Now, the date on the letter here says January 7, 2004.

19  Is that the correct date where you drafted the letter?

20  A.  It's a typographical error, it should have been 2005.

21  Q.  How do you know that?

22  A.  Well, the other pages are marked 2005 and also it says:

23  Congratulations upon your re-election as Speaker, which did not

24  happen in 2004.

25  Q.  Did you draft this letter after you went to the

FB45sil3                        Taub - direct

1    inauguration?

2    A.  Yes.

3    Q.  If we can just look at the top of the second page of this

4    letter, the top of the second page, Mr. Coccaro?

5           Can you see that says:  Letter to Honorable Sheldon

6    Silver, January 12, 2005?

7    A.  Yes.

8    Q.  So, let's, if you can turn in your binder to Government

9    Exhibit 108-1; do you recognize that document?

10   A.  Yes.

11   Q.  If you would turn to the second page of that document; is

12   that your signature?

13   A.  Yes.

14   Q.  Is this the final, signed version of the document, the

15   draft of which we just looked at?

16   A.  Yes.

17          MR. GOLDSTEIN:  Your Honor, the government offers

18   108-1.

19          MR. MOLO:  No objection.

20          THE COURT:  All right.  108-1 -- 108-1 or 108?

21          MR. GOLDSTEIN:  108-1, your Honor, because this has

22   redactions.

23          THE COURT:  108-1 is received.

24          (Government's Exhibit 108-1 received in evidence)

25   BY MR. GOLDSTEIN:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.  If we can publish the first part of this, Mr. Coccaro.

2            Who did you address this letter to, Dr. Taub?

3   A.  To Mr. Silver's State Assembly office.

4   Q.  250 Broadway?

5   A.  Yes.

6   Q.  Again, the letter says January 7, 2004; what was the

7   correct year, Dr. Taub?

8   A.  2005.

9   Q.  Mr. Coccaro, if you can scroll down to the top part of the

10  first paragraph?

11           It says:  I was gratified to learn that our program in

12  mesothelioma would be considered this year for support by New

13  York State.

14           How did you know that your program would be considered

15  this year for support by New York State?

16  A.  I believe I was told that by Mr. Silver's associate.

17           MR. MOLO:  Objection.  I'm sorry.

18           THE COURT:  He was told that by an associate.

19  Overruled.

20           MR. MOLO:  I'm sorry.

21  Q.  If I can direct your attention to the last paragraph on the

22  first page of this letter starting with the sentence:  *I wish*

23  *to request that the legislature consider supporting this*

24  *program* --

25           THE COURT:  It should be on your screen as well,

FB45sil3                        Taub - direct

1   Dr. Taub.

2   A.  Okay, yes.  Okay.  I see it.

3   Q.  Thank you.

4           *I wish to request that the legislature consider*

5   *supporting this program in the amount of $250,000 for this*

6   *budget year, to be renewed annually, for an additional three*

7   *years.*

8           How much total funding were you asking the state to

9   provide over a four-year period?

10  A.  I was hoping for about $1 million.

11  Q.  And if we could look at the bottom of the second page, the

12  signature and the cc line, you cc'd Dr. Herbert Pardes and

13  Ms. Lynn Roth.  Who is Dr. Herbert Pardes?

14  A.  Dr. Herbert Pardes was the President and Chief Executive

15  Officer of the New York Presbyterian Hospital.  He had

16  previously been dean of the medical school.

17  Q.  Who was Lynn Roth?

18  A.  Lynn Roth was the director of development.  She oversaw

19  gifts and grants to the hospital.

20  Q.  And why did you cc them on this letter?

21  A.  Because I had discussed the program with them and explained

22  to them that funding from New York State for these kinds of

23  programs would bring good publicity to the Presbyterian

24  Hospital; and they were supportive of it.

25  Q.  Had you discussed with Dr. Pardes that you had referred or

FB45sil3                           Taub - direct

1    were referring cases to Mr. Silver?

2    A.  No.

3    Q.  Did you discuss with Mrs. Roth that you had referred or

4    were referring cases to Mr. Silver?

5    A.  I did not.

6    Q.  Did you discuss that with anyone in the administration at

7    either Columbia or New York Presbyterian?

8    A.  I did not.

9    Q.  Dr. Taub, if you can look in your binder at Government

10   Exhibit 304 marked for identification?  Do you recognize this

11   document?

12   A.  Yes.

13   Q.  Was this a document that you found while looking through

14   your files?

15   A.  Yes, it is.

16   Q.  And what is this document?

17   A.  This is a memo that I received, by fax, from Mr. August.

18          MR. GOLDSTEIN:  Your Honor, the government offers 304.

19          THE COURT:  Any objection?

20          MR. MOLO:  No objection.

21          THE COURT:  304 is received.

22          (Government's Exhibit 304 received in evidence)

23   BY MR. GOLDSTEIN:

24   Q.  Can we publish 304, please?

25          Looking at the top, when did you receive -- is this a

1    fax, Dr. Taub?

2    A.  Yes.

3    Q.  What is the date that you received this fax?

4    A.  June 9th, 2005.

5    Q.  And who is the fax from?

6    A.  Mr. Steve August.

7    Q.  What was your understanding as to who Steve August was?

8    A.  I understood that he was an associate of Mr. Silver's.

9    Q.  In the New York State government?

10   A.  Yes.

11   Q.  The fax has a comments section, can we highlight the

12   comments section?

13          *Please comment on whether the attached is appropriate*

14   *to your proposal and is sufficiently inclusive of what you may*

15   *want to do with the funding.  My e-mail is*

16   *AugustS@assembly.state.NY.U.S.*

17          If we can look at the attached, the second page and

18   let's enlarge that, Mr. Coccaro?

19          Dr. Taub, did you draft this language?

20   A.  I did not.

21   Q.  Let's look at the first line:  *Funds will be used for*

22   *expenses of research into the clinical diagnosis and treatment*

23   *of mesothelioma and related cancers, and study of the*

24   *occurrences of such cancers in individuals exposed to asbestos*

25   *and other materials released into the air during the attacks of*

1    *September 11, 2001.*

2              Was that language an accurate description of what you

3    intended to do with the funding?

4    A.   Generally, yes.

5    Q.   Again, was that your language?

6    A.   No.

7              MR. MOLO:  Objection.  Asked and answered.

8              THE COURT:  Overruled.

9    Q.  And the second sentence says:  *Services may include*

10   *education and outreach to residents and workers in Lower*

11   *Manhattan who may be at risk of mesothelioma and other cancers*

12   *because of such exposure.*

13             Was that an accurate description of the work that you

14   planned to do with the funding?

15   A.  Not immediately, but it was certainly a possibility.

16   Q.  Do you recall how you responded to Steve August after you

17   received this?

18   A.  I don't recall.  But, I think I spoke to him but I don't

19   recall.  I don't have any good memory of it.

20   Q.  With regard to education and outreach relating to September

21   11th, why was that something that you were envisioning could be

22   done in the future but not in 2005 or 2006?

23             MR. MOLO:  Objection.  That's not been the testimony.

24             THE COURT:  He said he -- rephrase the question.

25   Q.  Dr. Taub, I'm going to rephrase the question.

1    A.   Okay.

2    Q.   You testified that education and outreach is something that

3    you considered to do in the future but were not going to do at

4    this time.  Why was that?

5    A.   We did not -- we were just beginning to acquire personnel

6    and expertise in that area so we were not ready to do that but

7    we were ready to do what we would do additionally about the

8    clinical diagnosis and treatment.

9    Q.   To what extent at this time, in 2005 and 2006, were you

10   aware of actual cases of mesothelioma connected to 9/11?

11   A.   I did not expect any cases of mesothelioma to come from

12   9/11 until about 10 to 15 years had passed.

13   Q.   Why is that?

14   A.   Because there is an average duration that we know of about

15   30 years, 32 years between the time of exposure to asbestos and

16   the time you develop mesothelioma that's diagnosed.  The

17   possibility existed that with 9/11 that may have been shorter

18   because of the tremendous intense exposure to asbestos and

19   other materials at the same time, so that was a possibility.

20   But I did not expect cases to, say, to occur within a year or

21   two.

22   Q.   So, was the research that you intended to do with this

23   state funding limited to asbestos that was directly connected

24   to 9/11?

25   A.   No, it was not necessarily connected to 9/11 because the

FB45sil3                          Taub - direct

1   patients with 9/11 who were going to come were going to come

2   later, but in order to be prepared for them you would need to

3   do research in order to know how to treat them.  So, I think it

4   is important that that research be funded generally about

5   mesothelioma, which was the purpose of the funds.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FB4YSIL4                              Taub - Direct

1    BY MR. GOLDSTEIN:

2    Q.  Now, soon after you received this fax from Steve August

3    with the description of the potential uses of the grant, did

4    your program receive notice that it was going to get a grant

5    from New York State?

6    A.  Yes.

7    Q.  If you can turn in your binder to Government Exhibit 320.

8                Dr. Taub, do you recognize this document?

9    A.  Yes.

10   Q.  What is this document?

11   A.  This is a notification from the Department of Health of the

12   State of New York that we are the recipient of a Health Care

13   Reform Act grant.

14               MR. GOLDSTEIN:  Your Honor, the government offers

15   Government Exhibit 320.

16               MR. SHUR:  No objection.

17               THE COURT:  Okay.  Government Exhibit 320 is received.

18               (Government's Exhibit 320 received in evidence)

19   BY MR. GOLDSTEIN:

20   Q.  If we can look at the top portion of the document up

21   through the first sentence.

22               Dr. Taub, which government agency did you receive this

23   notice of award from?

24   A.  The New York State Department of Health.

25   Q.  Prior to receiving this letter, had you had any contact

1   with the New York State Department of Health?

2   A.  No.

3   Q.  The first line of the letter says, "The purpose of this

4   letter is to advise that your organization is the recipient of

5   a 2002 Health Care Reform Act grant in the amount of $250,000

6   from the New York State Assembly allotment in the Health Care

7   Initiatives Pool."

8           What, if anything, did you know about the 2002 Health

9   Care Reform Act?

10  A.  Nothing.

11  Q.  What, if anything, did you know about the Health Care

12  Initiatives Pool?

13  A.  Nothing.

14          MR. GOLDSTEIN:  Mr. Coccaro, if we would look at the

15  signature lines on this letter.

16  BY MR. GOLDSTEIN:

17  Q.  Who signed this document, Dr. Taub?

18  A.  It is signed by a Robert W. Reed.

19  Q.  Have you ever spoken with Robert W. Reed?

20  A.  No.

21  Q.  It's cc'd to a Dennis Whalen.

22          Had you ever spoken with Dennis Whalen?

23  A.  I have not.

24  Q.  Do you know who Dennis Whalen was?

25  A.  I don't.

1    Q.  Do you see the name Mark Van Guysling?  Have you ever

2    spoken with Mark Van Guysling?

3    A.  I have not.

4    Q.  Did you know who he was?

5    A.  No.

6    Q.  Once your program received the grant, what did you end up

7    using the money for?

8    A.  We used it for studies of mesothelioma pathogenesis and to

9    help fund clinical trials.

10   Q.  And for how long of a period of time did the grant fund

11   those expenses?

12   A.  For one year.  The second one was given later.

13   Q.  What expectation, if any, did you have that you could get a

14   second grant?

15   A.  I had hoped that we could.

16   Q.  To what extent, if any, was your compensation at Columbia

17   affected by receiving this grant from the state?

18   A.  I'm sorry.  I don't understand the question.

19   Q.  To what extent, if any, was your financial compensation

20   from Columbia affected by the fact that you received this grant

21   or your program received in grant from New York State?

22   A.  My personal compensation?

23   Q.  Correct.

24   A.  It was not affected.

25   Q.  Who pays your salary?

1    A.  Columbia University.

2    Q.  Is your salary contingent on your ability to raise money?

3    A.  It is not.

4    Q.  Is there an expectation from Columbia that you need to

5    raise money over time?

6    A.  There might well be.  I don't know.

7    Q.  Now, after you received this first grant, how often, if

8    ever, did Sheldon Silver ask for reports from you about the

9    status of your research?

10   A.  I don't believe he did ask for a status report.

11   Q.  How often, if ever, did Silver invite you to explain to the

12   Department of Health what you were doing with your research?

13   A.  He had not.

14   Q.  How often, if ever, did Silver invite you to explain to

15   anyone in state government about the status or the progress of

16   your research?

17   A.  He had not.

18   Q.  And how often, if ever, did Silver ask you about the extent

19   to which you were doing outreach or education to people exposed

20   to asbestos in the 9/11 attacks?

21   A.  He did not.

22          MR. GOLDSTEIN:  Your Honor, I don't know if this is a

23   good time for lunch, a breaking point.  Or I can continue.

24          THE COURT:  We'll check.  We'll go ahead and break for

25   lunch.

1      Ladies and gentlemen, if you want to check your phones

2    over the lunch hour, that's fine.  I'm going to ask you to do

3    it at the beginning of the lunch hour so that you're back in

4    the room ready to go when the lunch hour is over.

5      The second thing that came up this morning is there

6    were some early birds who made it into the cafeteria in this

7    building.  I'm going to ask you not to go to the cafeteria in

8    this building.  It's going to increase the likelihood that

9    you're going to run into lawyers or witnesses in this case.

10      There is a lovely cafeteria, however, across the

11    street in the other courthouse, the courthouse that you started

12    your jury duty in.  It's up on the 8th floor.  It has nice

13    views.  The food is better over there.

14      So, if you want to come early and get breakfast on

15    your own, go to the courthouse across the street, but you still

16    have to be here at 9:15.  So enjoy your lunch.  We'll bring you

17    back into the courtroom in about an hour.  Don't discuss the

18    case.

19      (Jury not present)

20      THE COURT:  It seems to me we have two issues that

21    probably need to be taken up at the lunch hour.

22      Mr. Molo, you want me to order the government to turn

23    over drafts.

24      MR. MOLO:  It's a little bit more complex than that.

25    It's clear to us from the communication that we've had with the

1    government and, frankly, with Dr. Taub's counsel, that there

2    were drafts prepared of the cooperation agreement.

3            This cooperation agreement is unlike, frankly, any

4    I've seen, perhaps any the Court has seen, in that there is

5    sort of a recital of a factual basis in this that is much more

6    detail than you would typically say.

7            It is our belief that this language was negotiated and

8    that at times the language in these drafts will show that it

9    was a more severe or onerous recitation of facts; that the

10   witness' counsel pushed back on that, and that, in fact, there

11   are things that this witness has effectively said he did not do

12   that the government was attempting to include in the agreement,

13   which were, in fact, inculpatory.

14           Under the Stein case, which we cite in our papers,

15   we're clearly entitled to this.  So we'd ask for it.

16           THE COURT:  I'm trying to think -- so if the

17   government thinks Dr. Taub did acts and Dr. Taub doesn't, says,

18   I didn't do acts, how -- I'll hear from the government.

19           MR. GOLDSTEIN:  Thank you, your Honor.  The government

20   has been very careful and in fact has intended to disclose as

21   much as possible about any communications with Dr. Taub that

22   we've had and communications with Dr. Taub's counsel about any

23   statement that Dr. Taub has made either to us or through

24   counsel.

25           All of that has been provided to the defense.  We've

1    reviewed the communications relating to the nonprosecution

2    agreement.  We're prepared to give them to your Honor for an

3    in-camera review if your Honor would like it.

4           In our view, none of those communications contain any

5    statements of Dr. Taub that are in any way different than what

6    the defense already has.

7           THE COURT:  That would just say they're not 3500

8    material.  They're not Brady if they're the same as what

9    they've already got.  I guess the question is could it somehow

10   be used to impeach him.

11          Am I getting your drift, Mr. Molo?

12          MR. MOLO:  That, and to the extent it is not the same

13   and it could be Brady because that's what the issue was --

14          THE COURT:  Forget the KPMG case.  That was a little

15   different.  Tell me what you're -- I'm trying to understand

16   what you're looking for.  What nugget do you think you're going

17   to get in a draft cooperation agreement -- a draft nonpros

18   agreement that was not signed?  So it does not govern

19   Dr. Taub's agreement with the government.

20          MR. MOLO:  I think that it is certainly possible --

21   and I have a strong reason to believe that there does exist

22   some kind of draft language, whether it's a draft wording in an

23   email, whether it's an actual draft of the letter, whatever it

24   may be -- that tends to paint Dr. Taub's relationship with

25   Mr. Silver in a far more sinister and culpable light than that

1   which is contained in the current cooperation agreement.

2              THE COURT:  How is that helpful to the defense?

3              MR. MOLO:  Because Dr. Taub pushed back on it and

4   would not agree that he engaged in what effectively is a

5   criminal conspiracy.

6              THE COURT:  His opinion about what it was is neither

7   here nor there.  You can't prove your guy is innocent because

8   somebody else thinks he's innocent.

9              MR. MOLO:  He's the person that's supposedly paying

10  bribes to Mr. Silver, as I've heard the testimony today, by

11  sending these referrals in exchange for these grants.

12             If he says, no.  I didn't do that or I'm not going to

13  agree to that in an agreement that says that, I'm entitled to

14  that.  I'm entitled to that as Brady.  I'm also entitled to

15  that generally as impeachment material.  It's probably also

16  Giglio material in some fashion.

17             THE COURT:  If his testimony here is inconsistent with

18  the letter.  It sounds to me like you're suggesting it would be

19  consistent with perhaps more express language than was used

20  previously in the nonpros.

21             The government has offered them to me.  I'll take a

22  look at them.  I have to say I don't quite understand your

23  theory how it is helpful -- put aside whether it is helpful in

24  the sense that you may be able to use it to dirty up the

25  government, which is kind of what it sounds like you want to

 1   use it for, which is not the purpose of Giglio and Brady.

 2            MR. MOLO:  I agree.  I think Judge Kaplan's decision

 3   in Stein is informative.  I think the point is he has clearly

 4   said that there are certain things -- my surmise is that this

 5   language, again, is far more inculpatory than what was included

 6   in this letter.

 7            THE COURT:  But my problem with your theory is let's

 8   assume that's true.

 9            MR. MOLO:  Okay.

10            THE COURT:  I'm not saying it is true, but let's

11   assume it's true.  How is that Giglio?  How does that tend to

12   inculpate Taub, and how does it help your client?

13            MR. MOLO:  It helps me client, I believe, again --

14            THE COURT:  Beyond just dirtying up somehow, sort of

15   feeding into your argument that somehow or another the

16   prosecutors have a more devious and evil view of your client

17   than Dr. Taub does.

18            MR. MOLO:  It's not a more devious and evil view that

19   the prosecutors have.  It's the fact that there was a

20   recitation of the events which Dr. Taub says clearly did not

21   happen.

22            That's what I believe.  So, in other words --

23            THE COURT:  Let's assume that's true.  Let's say in

24   addition to the four things that they have agreed not to

25   prosecute him for, in addition to that, he killed a cat.  That

 1    didn't make it into the nonpros, just to keep this away from

 2    Mr. Silver.

 3              So what?  How does that tend to inculpate?

 4              MR. MOLO:  Assuming that they tried to get him to say

 5    that he had engaged in a criminal agreement, a criminal

 6    conspiracy --

 7              THE COURT:  To kill the cat?

 8              MR. MOLO:  Well, to kill the cat or to pay bribes more

 9    specifically, and he said, no, I didn't.

10              THE COURT:  And he didn't testify that he did.

11              MR. MOLO:  Well, I --

12              THE COURT:  I'm still struggling for how a proposed

13    statement in a nonpros agreement that he says, I didn't do

14    that.  He said that then, and he did not testify to it just

15    now.

16              How are you going to use that to impeach him?

17              MR. MOLO:  First of all, his testimony is not over.

18    Secondly --

19              THE COURT:  Fair enough.

20              MR. MOLO:  Secondly, we're faced with -- I'm not

21    complaining here.  I'm talking about the reality of a highly

22    unusual situation where the government's main cooperating

23    witness has not given testimony to the grand jury.

24              THE COURT:  I've heard all this before.

25              MR. MOLO:  I'm not telling you that to complain to

1   you.  I'm explaining the realities, Judge, that in terms of

2   impeaching this witness, I'm left with eight sets of

3   handwritten notes and a half a page in the morning that they

4   woke him up at 6:00 in the morning and knocked on his door.

5   That's the only typed thing I've got.

6          If this is there, it will shed some light.  We're not

7   talking about some onerous production.  We're not talking about

8   the change in the U.S. Attorney's policy.

9          We're talking about them turning over a page or two or

10  three, whatever it may be.  For this case to ask for that I

11  don't think is all that much.

12         THE COURT:  I'm going to review it.  I don't think the

13  rules on Brady and Giglio change because the government decided

14  not to put him before the grand jury and used investigators

15  that don't write 302s rather than the FBI.  I understand your

16  frustration.

17         MR. MOLO:  I'm talking about the reality of what I'm

18  faced with here.  This is material, as Judge Kaplan said, could

19  be relevant.  Thank you.

20         THE COURT:  I'll take a look.

21         MR. MOLO:  Thank you.

22         MR. GOLDSTEIN:  Just to be clear, what we'll provide

23  to you is all of the communications that we were able to find

24  between the government and counsel to Dr. Taub relating to the

25  nonprosecution agreement.

1          THE COURT:  Are there actual prior drafts of the

2     nonpros agreement?

3          MR. GOLDSTEIN:  There is a prior draft that was sent

4     from counsel, and there's some email back and forth.

5          THE COURT:  Thank you.

6          MR. MOLO:  My learned colleague, Mr. Cohen, reminded

7     me --

8          THE COURT:  You let him talk?

9          MR. MOLO:  Every once in a while.  We keep him on a

10    short leash.  He did a wonderful job cross-examining a witness.

11          -- to the extent that Dr. Taub or those drafts try to

12    say that Dr. Taub is saying something that Mr. Silver did or

13    said, that would be relevant, and he refused to say that.

14          THE COURT:  I'm going to review them because I don't

15    want to fight over the relevance of a theory that you have of

16    why they're relevant that I don't understand if it's not even

17    in here.

18          MR. MOLO:  I don't know what's in there.  I agree.

19          THE COURT:  Then we're just wasting time.

20          Do the parties want to be heard on juror number 4?

21          MR. MOLO:  Could we do this right -- so I have an

22    opportunity to consult with my client?  We haven't really had

23    time.

24          THE COURT:  Absolutely.  Okay.

25          MS. COHEN:  Thank you, your Honor.

FB4YSIL4                         Taub - Direct

1              THE COURT:  I'll see you again at 1:40.

2              MS. COHEN:  Thank you, your Honor.

3              (Luncheon recess)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FB4YSIL4                           Taub - Direct

                              AFTERNOON SESSION

                                  1:45 p.m.

1                  THE COURT:  Are we ready?

2                  MS. COHEN:  The government is ready, your Honor.

3                  THE COURT:  How much longer is your direct,

4    Mr. Goldstein?

5                  MR. GOLDSTEIN:  Two to three hours, your Honor.

6                  THE COURT:  I think I'm going to defer the issue of

7    the documents because we've got time to deal with it.  I think

8    I'm going to need an ex parte conversation because I need to

9    better understand the documents that I was given.

10                 In fact, one of the documents I was given I believe

11   was a mistake because it is the nonpros agreement from the

12   Marmato trial.

13                 MR. GOLDSTEIN:  That was attached to an email.

14                 THE COURT:  This was an attachment to show this is

15   what our form nonpros is?

16                 MR. GOLDSTEIN:  Correct, your Honor.

17                 THE COURT:  Or something along those lines.  Okay.  I

18   thought maybe it was a stray document that showed up.

19                 Anything else before we bring the jury out?

20                 MS. COHEN:  Not from the government, your Honor.

21                 THE COURT:  Mr. Molo?

22                 MR. MOLO:  Nothing, your Honor.

23                 (Jury present)

 1              THE COURT:  Dr. Taub, you're still under oath.

 2              Mr. Goldstein.

 3    BY MR. GOLDSTEIN:

 4    Q.  Dr. Taub, if you could move the microphone back in front of

 5    you.

 6              Dr. Taub, before lunch, you testified about this first

 7    state grant that you received from New York State.

 8              Do you recall that?

 9    A.  Yes.

10    Q.  Did there come a time after you received that first grant

11    that you informed Sheldon Silver about a conference at

12    Mount Sinai Medical School?

13    A.  Yes.

14    Q.  Mount Sinai.

15    A.  Yes.

16    Q.  I want you to look in your binder at Government Exhibit

17    321.

18    A.  Okay.

19    Q.  Do you recognize that document, Dr. Taub?

20    A.  Yes.

21    Q.  What is that document?

22    A.  Well, it's a letter I wrote to Mr. Silver.

23    Q.  What was the general subject matter of the letter?

24    A.  The subject matter of the letter was that there was an

25    asbestos awareness day presentation being hosted by the

1   American Asbestos Awareness Organization, but it was at Mount

2   Sinai.

3               MR. GOLDSTEIN:  Your Honor, the government offers 321.

4               THE COURT:  Okay.  321 is received.

5               (Government's Exhibit 321 received in evidence)

6               MR. GOLDSTEIN:  If we could publish that, Mr. Coccaro.

7               If we could, again, enlarge the top part of the

8   letter, Mr. Coccaro.

9   BY MR. GOLDSTEIN:

10  Q.  Dr. Taub, what was asbestos awareness day?

11  A.  This was a day that was sponsored by this organization to

12  raise people's consciences about the dangers of asbestos in

13  relation to a host of human diseases.

14  Q.  Why was this conference at Mount Sinai?

15  A.  It was at Mount Sinai because Mount Sinai was one of the

16  first places where the dangers of asbestos were first exposed.

17  There was a famous doctor there who did this named Selikoff.

18  Q.  Are you familiar with Dr. Philip Landrigan?

19  A.  Yes.

20  Q.  Who was Dr. Landrigan?

21  A.  Dr. Landrigan is an occupational medicine physician who

22  carries on some of the work of Dr. Selikoff and is a very good

23  epidemiologist and was one of the hosts for this asbestos

24  awareness day.

25  Q.  What kind of research are you aware of that Dr. Landrigan

FB4YSIL4                          Taub - Direct

1   does with relation to asbestos exposure and 9/11?

2   A.   Occupational medicine is what he does and epidemiology,

3   which means he studies various cases of the disease and looks

4   around to see which of the patients were exposed to asbestos.

5           He takes a history from the patients and knows who was

6   exposed to asbestos and then decides what the dangers are.

7   Q.   Is he a prominent doctor in this field?

8   A.   Yes, he is.

9   Q.   I'd like to call your attention to the fourth paragraph of

10  the letter -- the fifth paragraph of the letter beginning with,

11  "One of the session topics."

12          It says, "One of the session topics will be devoted to

13  national and global legislation related to asbestos and its

14  victims.  Because of your expressed interest in this topic,"

15  Dr. Taub, before I continue to read, who was this letter

16  addressed to?

17  A.   Mr. Silver.

18  Q.   So, "Because of your expressed interests in this topic,

19  especially related to those in your own congressional district,

20  I thought it appropriate to ask if someone from your office

21  would wish to address us briefly on this or a closely-related

22  topic."

23          Other than the fact that your first grant had been

24  funded, how had Sheldon Silver expressed interest in this

25  topic?

FB4YSIL4                          Taub - Direct

1    A.  Well, I think he expressed interest in this topic by asking

2    me to write a letter to him about it, and he certainly would be

3    interested on that basis.

4    Q.  Are you referring to the request for you to write a letter,

5    the first letter that you made to Mr. Silver for money?

6    A.  Well, but before that, I had asked whether or not New York

7    State would be interested in supporting mesothelioma research,

8    and that was the response I got from Mr. Silver.

9    Q.  Did you end up attending this event at Mount Sinai?

10   A.  It was on the Jewish Sabbath, and I could not attend.

11   Q.  Did Silver attend?

12   A.  I don't believe so.  He's orthodox as well.

13   Q.  Did anyone from Silver's office attend?

14   A.  I don't believe so.  I don't know.

15   Q.  If you could look at the next document in your binder,

16   Government Exhibit 581, marked for identification.

17        Do you recognize this document?

18   A.  Yes.

19   Q.  Is this one of the documents you found on your home

20   computer?

21   A.  Yes, it is.

22        MR. GOLDSTEIN:  Your Honor, the government offers

23   Government Exhibit 581.

24        THE COURT:  Any objection?

25        Are you withdrawing it?

1         MR. GOLDSTEIN:  I'm going to withdraw the request for

2    admission.

3         THE COURT:  Okay.

4    BY MR. GOLDSTEIN:

5    Q.  Dr. Taub, after your research program received that first

6    two $50,000 grant in 2005, did you seek additional state

7    funding for your research?

8    A.  Yes.

9    Q.  How did you go about seeking additional state funding?

10   A.  I wrote a subsequent letter.

11   Q.  Who did you write that subsequent letter to?

12   A.  Mr. Silver.

13   Q.  If you could look in your binder at Government Exhibit 120.

14        Do you recognize this document?

15   A.  Yes.

16   Q.  Is this one of the letters that you wrote to Sheldon

17   Silver?

18   A.  Yes, it is.

19   Q.  Is that your signature on the second page?

20   A.  Yes, it is.

21        MR. GOLDSTEIN:  Your Honor, the government offers 120.

22        THE COURT:  I've got that 120 is already in evidence.

23        MR. GOLDSTEIN:  Yes, your Honor.  That's correct.

24        If we could publish this and zero in on the top part

25   of the letter.

FB4YSIL4                          Taub - Direct

1   BY MR. GOLDSTEIN:

2   Q.  What was the date of this letter, Dr. Taub?

3   A.  October 11, 2006.

4   Q.  I direct your attention to the first paragraph of the

5   letter, "I greatly appreciate the opportunity to once again

6   inform you of the current activities and accomplishments of our

7   mesothelioma center at Columbia University Medical Center.  We

8   are most grateful that our program is being considered for

9   continuing support."

10          How did you get the understanding that your program

11  was being considered for continuing support?

12  A.  I don't know.  I don't recall.

13  Q.  Who could you have gotten that understanding from?

14  A.  Either from Mr. Silver or Mr. Chill.

15          THE COURT:  Mr. Molo, is that an objection?

16          MR. MOLO:  No.  I'm sorry.

17          THE COURT:  You just need to be louder if you're going

18  to object because it sort of just sounds like murmuring.

19  BY MR. GOLDSTEIN:

20  Q.  I want to direct your attention to the second paragraph of

21  the letter.  It starts off with, "I wrote to you in April

22  regarding the urgent, intense need for new treatments for

23  malignant mesothelioma."

24          Do you recall having written a previous letter to

25  Silver?

FB4YSIL4                        Taub - Direct

1    A.  At this moment, I'm not sure when, but I've written him a

2    number of letters.  So I'm sure I did.

3    Q.  This paragraph, if you review it -- it contains a more

4    detailed discussion of the relationship between mesothelioma

5    and the September 11 terrorist attacks.

6           What had happened between the time of the first

7    request for funding that you had made and this one?

8    A.  There was a mesothelioma victim that had emerged who had

9    been exposed to asbestos at 9/11, which would upend the

10   previous dictum that you have to wait for 10 or 11 years before

11   a patient gets the disease.  So that was an interesting find.

12   Q.  If I can direct your attention to the second page of this

13   letter, the second paragraph, "As we wrote in April 2006, many

14   aspects of this program have been greatly aided by a grant from

15   New York State for which we are profoundly grateful and which

16   has helped lead to treatment breakthroughs in this disease.

17          "Our request is that the legislature continue its

18   annual support in the amount of $250,000 for this budget year.

19   We also hope that the legislature can review our progress and

20   consider renewing the support in future years as well until

21   effective treatment is developed."

22          What was your objective in asking for continued

23   funding on an annual basis?

24   A.  I was hoping to get it.

25   Q.  If we can look at the paragraph starting with "The purposes

```
1    of these funds."
2              "The purposes of these funds, as set forth in our
3    prior letter, would help our invaluable clinical trial
4    specialists, data managers, and physicians in training, all of
5    whom live within New York City, to remain here."
6              Is that what you wanted the grant money that you were
7    requesting to pay for?
8    A.  Among other things, yes.  As well as support and supplies
9    and ancillary things needed for research.
10   Q.  The grant funding that you were asking for -- was it
11   specific to research relating to 9/11, or was it more general
12   for your center?
13   A.  It was general for the center, and 9/11 served to highlight
14   the need but was not specifically related to 9/11 direct
15   research.  Mesothelioma was a more general problem.
16   Q.  Now, when you sent this letter seeking an additional
17   $250,000 annually, did you continue to send cases to Sheldon
18   Silver?
19   A.  Yes.
20   Q.  Why did you continue to send him cases?
21   A.  I wished to keep the relationship strong, and I wished him
22   to continue being an advocate for mesothelioma, and I wished
23   him to continue, if he could, to help us raise funds for it.
24   Q.  Did your program, in fact, get this second grant?
25   A.  Yes.
```

FB4YSIL4                           Taub - Direct

1    Q.  I want to direct your attention to what's been marked for

2    identification as Government Exhibit 368-2.

3          Do you recognize this document?

4    A.  Yes.

5    Q.  What is this document?

6    A.  It is a letter from the Department of Health informing us

7    that we are the recipient of a Health Care Reform Act grant.

8          MR. GOLDSTEIN:  Your Honor, the government offers

9    368-2.

10         THE COURT:  Any objection?

11         MR. MOLO:  No objection.

12         THE COURT:  All right.  368-2 is received.

13         (Government's Exhibit 368-2 received in evidence)

14         MR. GOLDSTEIN:  If we can publish 368-2.

15   BY MR. GOLDSTEIN:

16   Q.  Dr. Taub, which state government agency sent you this

17   letter?

18   A.  The Department of Health.

19   Q.  Is that the same agency that sent you the first letter

20   announcing that you got your first grant?

21   A.  It is.

22   Q.  Prior to receiving this letter with notice of the second

23   grant, had you had any contact with the Department of Health

24   about your request?

25   A.  No.

 1              MR. GOLDSTEIN:  If we could read the first line of the

 2     letter and zero in.

 3              THE WITNESS:  "The purpose of this letter is to advise

 4     that your organization is the recipient of a 2003-2004 Health

 5     Care Reform Act grant in the amount of $250,000 from the

 6     New York State Assembly's allotment in the Health Care

 7     Initiatives Pool."

 8     Q.  Dr. Taub, what was your knowledge, if any, of your 2003 to

 9     2004 Health Care Reform Act?

10     A.  None.

11     Q.  What was your knowledge, if any, of the Health Care

12     Initiatives Pool as referenced here?

13     A.  I didn't know anything about it.

14     Q.  Now, when we looked at the first letter from the Department

15     of Health that we looked at earlier, I asked you about some of

16     the names on that letter.

17              MR. GOLDSTEIN:  Mr. Coccaro, if we could look at the

18     signature block and the CCs on this one.

19              THE WITNESS:  I think they're the same names.

20     BY MR. GOLDSTEIN:

21     Q.  So between the first grant and this one, have you had any

22     contact with Robert Reed?

23     A.  No.

24     Q.  How about with Dennis Whalen?

25     A.  No.

FB4YSIL4                          Taub - Direct

1    Q.   Or Mark Van Guysling?

2    A.   No.

3    Q.   Now, after your program received the second grant, did

4    there come a time when you asked Silver for his help in

5    securing a third grant from New York State?

6    A.   Yes.

7    Q.   If we could look at Government Exhibit 129.

8              Is that in your binder?

9    A.   Yes.

10   Q.   Take a look at that.

11             Do you recognize that document?

12   A.   Yes.

13   Q.   Is this a letter that you sent to Sheldon Silver?

14   A.   Yes.

15             MR. GOLDSTEIN:  Your Honor, the government offers 129.

16             MR. MOLO:  No objection.

17             THE COURT:  129 is received.

18             (Government's Exhibit 129 received in evidence)

19             MR. GOLDSTEIN:  If we could publish 129.  If we can

20   zoom in on the top portion of this letter, please.

21   BY MR. GOLDSTEIN:

22   Q.   Dr. Taub, what was the date of this letter?

23   A.   October 11, 2007.

24   Q.   And there's handwriting on the letter, "Shelly-FYI only."

25             Whose handwriting is that?

1   A.  Mine.

2           MR. GOLDSTEIN:  Mr. Coccaro, can we scroll back so we

3   can see the larger part of the first page of the letter.

4   BY MR. GOLDSTEIN:

5   Q.  This letter contains explanatory notes; is that right?

6   A.  Yes.

7   Q.  Why did you include explanatory notes in this letter?

8   A.  I was told that much of the language of the letter, the

9   text of the letter without the notes, was very technical and

10  Mr. Silver would have liked to have explanations for the

11  technical terms in the letter so it would be more

12  comprehensible.

13  Q.  Did Sheldon Silver also ask you to provide him with a

14  letter that did not have the explanatory notes?

15  A.  Yes.  I didn't remember exactly the format of the request,

16  but he wanted the original letter, which was the letter without

17  the explanatory notes.  And, I think, when he said it was too

18  technical, I rewrote the letter and added explanatory notes.

19  That's what happened.

20  Q.  So let's look at Government Exhibit 130.

21          What is this document, Dr. Taub?

22  A.  That is the letter that I first wrote without explaining

23  the technical terms.

24          MR. GOLDSTEIN:  Your Honor, the government offers 130.

25          MR. MOLO:  No objection.

FB4YSIL4                          Taub - Direct

1          THE COURT:  130 is received.

2          (Government's Exhibit 130 received in evidence)

3          MR. GOLDSTEIN:  If we could zoom to the top of this

4    document.

5    BY MR. GOLDSTEIN:

6    Q.  What's the date on this document, Dr. Taub?

7    A.  October 11, 2007.

8    Q.  Is that the same date as on the version of the letter with

9    the explanatory notes, Government Exhibit 129?

10   A.  Yes.

11   Q.  I want to direct your attention on Government Exhibit 130

12   to the second page, fourth paragraph, "Many aspects of this

13   program have been greatly aided by support from New York State,

14   for which we are deeply appreciative, and which has helped lead

15   to major refinements in diagnosis and exciting, novel

16   treatments for this disease.

17          "Our request is that the legislature continue its

18   annual support in the amount of $250,000 for this budget year.

19   We also hope that the legislature continues to review our

20   progress and considers further support in future years."

21          At the time that you sent this letter, was it your

22   understanding that your program was still being considered for

23   funding for this year?

24   A.  I didn't know, but I thought I would write to it.  I

25   suspected that it would be, yes.

1    Q.  Did you receive any response to this letter?

2    A.  No response to that letter.

3    Q.  You can set that aside.

4          Now, did there come a time when you heard from Sheldon

5    Silver directly about your request for a third grant from

6    New York State?

7    A.  Yes.

8    Q.  Where did that conversation take place?

9    A.  In my office.

10   Q.  In your office at Columbia?

11   A.  Yes.

12   Q.  So he came there personally?

13   A.  Yes.

14   Q.  What happened when he saw you?

15   A.  During that conversation, he said that the third grant

16   would not be funded or could not be funded.

17   Q.  Were those his exact words?

18   A.  I don't think so.  I don't know exactly, but that was -- he

19   just said it just could not be funded.

20          THE COURT:  Could not be funded?  Is that what you're

21   saying?

22          THE WITNESS:  I don't think he used that term.  I

23   don't think he used those words.

24   BY MR. GOLDSTEIN:

25   Q.  What's your best recollection of the words that he used?

1   A.  He said, "I can't do this anymore."  That's my

2   recollection.

3   Q.  When he came to your office and said that to you, was that

4   after you had sent the letters in October of 2007?

5   A.  Yes.

6   Q.  How did you react to what Sheldon Silver told you?

7   A.  I was disappointed.

8   Q.  When he told you that, what, if anything, did Silver tell

9   you about Mount Sinai?

10  A.  I don't think Mount Sinai was discussed.  I don't recall

11  Mount Sinai being discussed then.

12  Q.  When he told you that he couldn't fund the grant anymore,

13  what, if anything, did Silver tell you about outreach or

14  education to those who were exposed to asbestos in the 9/11

15  attacks?

16  A.  I don't remember that being discussed.

17  Q.  Now, even after Sheldon Silver told you that you weren't

18  going to receive any more state funding, did you continue to

19  send patients to Sheldon Silver?

20  A.  Yes.

21  Q.  Why did you continue to send patients to Silver?

22  A.  I condition to send patients to Mr. Silver because I wished

23  to maintain that relationship.  I felt that he was incentivized

24  to support mesothelioma research, and I was to continue to do

25  so if he could.

FB4YSIL4                        Taub - Direct

1    Q.  You testified earlier that you sought Silver's assistance

2    in helping your daughter get an internship.

3    A.  Yes.

4    Q.  Was she in law school at the time?

5    A.  Yes.

6    Q.  Approximately when was this?

7    A.  I think this was in her second year of law school.  I think

8    2006 or 2005.  I'm not sure.  Probably 2006.  She was looking

9    for a summer internship, an unpaid internship.

10          I think she had one prospect, and she wanted to know

11   if there were others.  I told her to write to Mr. Silver and

12   see if he knew anyone who would be willing to mentor her over

13   the summer.

14   Q.  Prior to this, had your daughter gotten married?

15   A.  Yes.

16   Q.  Was Silver invited to your daughter's wedding?

17   A.  No, he was not.

18   Q.  About how many people attended your daughter's wedding?

19   A.  A little over 400.

20   Q.  Was Silver invited to one of the events after your

21   daughter's wedding?

22   A.  Yes, he was.

23   Q.  What was he invited to?

24   A.  In Hebrew, it's called a Sheva Brochos.

25   Q.  What is a Sheva Brochos?

1    A.  Well, it's a celebration that you hold for seven

2    consecutive days after the wedding, and it is to continue to

3    bless the couple.  There are other reasons, but that's the main

4    reason.

5    Q.  Did you invite Silver to one of the seven days of

6    blessings?

7    A.  Yes.  We invited him to the first one.

8    Q.  Did he come?

9    A.  Yes, he did.

10   Q.  Did he come alone or with anybody?

11   A.  I think he came by himself.

12   Q.  Returning to the request for help with your daughter to get

13   an internship, what, if anything, did Silver do when your

14   daughter reached out to him?

15   A.  I think he arranged for her to have an internship with a

16   Judge Schoenefeld.

17   Q.  Did you know who Judge Schoenefeld was?

18   A.  I did not.

19   Q.  Did your daughter get that internship?

20   A.  Yes.

21   Q.  Did there also come a time when an organization that your

22   wife was involved in reached out to Sheldon Silver for

23   assistance?

24   A.  Yes.

25   Q.  What is the Shalom Task Force?

1   A.   The Shalom Task Force is an organization put together by a

2   group of Jewish women because they discovered that there was a

3   great deal of domestic abuse going on in that community, and

4   they wished to found an organization to combat it.

5   Q.   What is your wife's role with the Shalom Task Force?

6   A.   She was one of the founding members and remains on the

7   board to this day.

8   Q.   I want you to look in your binder at Government Exhibit 310

9   marked for identification.

10          Do you recognize that document, Dr. Taub?

11  A.   Yes.

12  Q.   Did you help your wife write a letter to Sheldon Silver

13  seeking funding for Shalom Task Force?

14  A.   I don't believe my wife wrote this letter, but I helped the

15  director of the organization -- I edited his letter to

16  Mr. Silver.

17  Q.   If you could then turn to -- before we turn to that

18  actually, Dr. Taub.

19          MR. GOLDSTEIN:  Your Honor, the government offers 310.

20          THE COURT:  Any objection?

21          MR. MOLO:  No objection.

22          THE COURT:  All right.  310 is received.

23          (Government's Exhibit 310 received in evidence)

24          MR. GOLDSTEIN:  If you could publish 310, Mr. Coccaro.

25          If you could look at the meta data at the top of the

1    document.

2    BY MR. GOLDSTEIN:

3    Q.  What's the file name of this document, Dr. Taub?

4    A.  The file name is assembly letter revised by Taub (2).doc.

5    Q.  Was this a document that you found on your computer?

6    A.  Yes.

7    Q.  What was the date that the document was created?

8    A.  January, 21, 2008.

9    Q.  Will you look at the first page of the document.

10              MR. GOLDSTEIN:  If we could zoom in on the top portion

11   of the document.

12              THE WITNESS:  Right.

13   BY MR. GOLDSTEIN:

14   Q.  Are these the edits that you talked about a minute ago?

15   A.  I don't remember clearly, but I was the only one who had

16   access to my computer.  So I assume those are the edits.

17   Q.  Do you recall speaking with Sheldon Silver about this

18   request in particular?

19   A.  I do not.

20   Q.  Now, if you could turn in your binder to Government Exhibit

21   311.

22              Do you recognize that document?

23   A.  Yes.

24   Q.  What is that document?

25   A.  The file name?

FB4YSIL4                          Taub - Direct

1   Q.  What is the substance of it?

2   A.  The substance is I scanned a letter that we got from the

3   executive director of the Shalom Task Force.

4          MR. GOLDSTEIN:  Your Honor, the government offers 311.

5          MR. MOLO:  No objection.

6          THE COURT:  311 is received.

7          (Government's Exhibit 311 received in evidence)

8          MR. GOLDSTEIN:  Mr. Coccaro, if we could turn actually

9   to the second page of the document.

10  BY MR. GOLDSTEIN:

11  Q.  Who is this letter from, Dr. Taub?

12  A.  It's from Rabbi Schonbuch.

13  Q.  Who is Rabbi Schonbuch?

14  A.  He is the executive director of the Shalom Task Force.

15  Q.  "Dear Dr. Robert and Susan, on behalf of Shalom Task Force,

16  I want to take this opportunity to acknowledge with deepest

17  sincerity your help in obtaining funding from Assemblyman

18  Sheldon Silver.

19          "We received the news that we will be getting a total

20  of $40,000 from the state, $25,000 from Sheldon Silver, $15,000

21  from other assemblymen."

22          The stamp that's on the document on the lower right

23  side -- why did you include that?

24  A.  Because I often stamped documents that I would scan and

25  then shred.  So this way I would know -- when I put them in a

FB4YSIL4                        Taub - Direct

1    pile, I would know which documents were to be scanned.  That's

2    my way of stamping them.

3    Q.  This is addressed to Dr. Robert and Susan.  Is Susan Taub

4    your wife?

5    A.  Yes.

6    Q.  You can set that aside.

7            We're going to move to a different topic, Dr. Taub.

8            After Sheldon Silver told you that he could no longer

9    get the state to fund your research, did there come a time when

10   you heard about potential funding from the Simmons law firm?

11   A.  Yes.

12   Q.  What was the Simmons law firm?

13   A.  The Simmons law firm is a personal injury law firm based in

14   St. Louis, Missouri, at that time.  And they did large numbers

15   of mesothelioma cases as well.

16   Q.  Did they represent patients with mesothelioma?

17   A.  Some of my patients.

18   Q.  Now, how did you learn about funding from the Simmons law

19   firm?

20   A.  I was approached at a meeting in Washington by Joy

21   Wheeler --

22            MR. MOLO:  Objection.

23            THE COURT:  Overruled.

24            THE WITNESS:  I was at a mesothelioma meeting by Joy

25   Wheeler, who was a patient liaison, among other things, who

1    worked for the Simmons foundation, and she approached us and

2    indicated she wished to support our research through the

3    Simmons Foundation.

4    BY MR. GOLDSTEIN:

5    Q.  At the point when you heard this from Joy Wheeler, had you

6    referred any of your patients to the Simmons law firm?

7    A.  I don't think so.

8    Q.  Did you then engage in discussions with the Simmons law

9    firm about funding your research?

10   A.  I first discussed this with MARF, the Mesothelioma Applied

11   Research Foundation.  Ultimately, with those discussions in

12   mind, I proceeded to arrange for that kind of funding with the

13   law firm, yes.

14   Q.  Why did you first discuss it with MARF?

15   A.  Because I felt that the Simmons law firm should support

16   MARF primarily.  And, although they told me they were

17   supporting 16 other universities throughout the country and

18   wished to pursue this on their own initiative, I wanted MARF to

19   be clearly aware of that situation.

20   Q.  In talking about MARF, at that point, who was the executive

21   director of MARF?

22   A.  I'm not sure whether Mary was the executive director, but

23   she already occupied a high position in MARF.

24   Q.  When you spoke with MARF, are you referring to speaking to

25   her?

1   A.   Yes.

2   Q.   And if you could remind the jury what was your relationship

3   with Mary Hesdorfer.

4   A.   We were close.  As I mentioned before, she had been my

5   nurse for nine years.  I'm a big supporter of hers as well.

6   Q.   Did she ultimately give her blessing for you to receive

7   funding from Simmons?

8   A.   She felt it should be done, yes.

9   Q.   I want you to look in your binder at Government Exhibit

10  598.

11  A.   598?

12  Q.   598, Dr. Taub.

13            MR. MOLO:  May I be heard?  I do have an objection.

14            THE COURT:  Okay.  Sure.

15            (At the sidebar)

16            MR. MOLO:  Your Honor, my objection is that the

17  Simmons law firm's involvement in this case -- I see it as

18  pretty much there was a Miles for Meso walk which was

19  referenced earlier that Mr. Silver tried to help Dr. Taub and

20  the Simmons folk organize in lower Manhattan that doesn't pan

21  out.  The Simmons firm is a firm that's out there doing this

22  sort of work.

23            I don't see how Dr. Taub's business relationship with

24  the Simmons firm, including their funding of his organization,

25  is in any way relevant.

1          It's highly prejudicial in that it suggests that this

2    relationship that he has with Simmons, Dr. Taub, is the kind of

3    relationship that he was either expecting from Mr. Silver or

4    Weitz & Luxenberg.

5          It's what he had with Simmons.  That's fine.  This was

6    after the state grants stopped from New York, the two state

7    grants.

8          It's highly prejudicial.  There's a suggestion that

9    there's some kind of a pay for play.  It doesn't add anything

10   to the case.  It adds a great deal of confusion to the case.

11   There is limited involvement by Simmons, and that's what ought

12   to be gotten into.

13         MR. GOLDSTEIN:  Your Honor, the government intends to

14   offer a series of evidence that is all directly relevant to

15   Silver.  Once he received this $3.15-million gift from Simmons,

16   Dr. Taub started referring his patients to Simmons.

17         Sheldon Silver then -- from testimony, Sheldon Silver

18   then came to Dr. Taub and said, why so few patients?  Dr. Taub

19   told him that he was sending patients to Simmons because

20   Simmons was funding his research.

21         Then there was both an event with the American Cancer

22   Society that Simmons helped sponsor that Silver showed up, and

23   then there was this Miles for Meso run that also Silver was

24   involved in with Dr. Taub when the Simmons people reached out

25   for Silver's help.

1          Those were some of the emails that were part of the

2   motions in limine.  So all of those emails are directly

3   relevant to Simmons as and Dr. Taub's state of mind.

4          MR. COHEN:  At the end of the day, the Weitz &

5   Luxenberg firm wasn't giving money.  It was the Simmons firm.

6   As to what Mr. Silver had done with the grants years before --

7          THE COURT:  It shows that Taub was referring his

8   patients to Weitz & Luxenberg via Silver in exchange for grants

9   and that when the grants stopped, the referrals stopped.

10          MR. MOLO:  But they didn't.

11          MR. COHEN:  That goes to Dr. Taub's state of mind.

12          THE COURT:  Right.  Dr. Taub's state of mind is

13   circumstantial evidence.  You can never prove state of mind

14   directly.  You have to prove it circumstantially.

15          So all of these conversations between Taub and Silver

16   that talk about why he didn't get referrals anymore, because

17   they're going to this other organization that's willing to pay,

18   is some evidence -- I'm not saying it's dispositive, but it is

19   some evidence of what was going on relative to Taub and Silver.

20   It certainly reflects what was going on in Taub's head.

21          (In open court)

22          THE COURT:  I understand that someone needs a bathroom

23   break.  Why don't we take a five-minute break.  Don't get too

24   comfortable back there because I'm going to bring you out as

25   quickly as possible.  Don't discuss the case.

1          MR. MOLO:  If the allegations were charging Dr. Taub

2    with bribery, then the evidence might be relevant.  As to

3    Mr. Silver's state of mind, it's not probative I don't think at

4    all.  To the extent they can make any argument that it is is

5    highly prejudicial.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE COURT:  I don't understand your prejudice

2  argument.  How is it prejudicial to Mr. Silver that a different

3  organization made very substantial grants to Columbia for the

4  mesothelioma research program that Dr. Taub was running?  How

5  does that harm Mr. Silver?

6      MR. MOLO:  Because they're going to argue that that

7  was a very explicit direct relationship where the Simmons grant

8  money is going to Dr. Taub and Dr. Taub is sending the patients

9  and that is not what happened with respect to the state money,

10 it is a very different set of is circumstances.  There is no

11 middle agency that is looking at this like there is at the

12 state.  There is no involvement as --

13     THE COURT:  As far as I can tell, Mr. Molo, with all

14 due respect, now we may hear something further on cross, but

15 there was a shocking lack of oversight of the grant that the

16 state gave the man.  They didn't contact him before they gave

17 him the money and as far as I can tell from his direct -- maybe

18 there will be something that will come out different on

19 cross -- he didn't seem to have to report back on what he was

20 doing with the money.

21     MR. MOLO:  Actually, both of those things are not

22 borne out by the facts.

23     THE COURT:  Okay.

24     MR. MOLO:  And, so, there are very different sets of

25 circumstances and the second one just opposed to the first, the

FB45sil5                          Taub - direct

same situation compared to what happened with the state looks

much more sinister.  It may not have been because of what the

Simmons situation was, their ability to give money directly to

Dr. Taub for whatever basis they did and whatever Dr. Taub was

willing to do with them, that's fine.  The fact that there was

this later involvement in this Miles for Meso, we don't dispute

that they can raise that issue, but getting into the details of

the Taub-Simmons relationship is irrelevant and highly

prejudicial.

          THE COURT:  What happened after he started receiving

grants from the Simmons Foundation?  Did he cut off his

referrals to Silver?

          MR. GOLDSTEIN:  In a very significant way.  Even in

the chart that Mr. Molo used in his opening statement it showed

one referral for all of 2010 and that's the time period where

Simmons starts funding his research.  The testimony will be

that Sheldon Silver, again, came to Dr. Taub's office and said,

effectively, why so few referrals?  And Dr. Taub told him,

among other things, that he was now receiving money from

Simmons and he was giving patients to Simmons in part because

of that funding.  That goes to Sheldon Silver's state of mind

in that it helps -- part of what the defense has argued again

and again in its motions *in limine*, is need for Dr. Taub to

have communicated to Sheldon Silver his interest in receiving

funding as part of the relationship that they had.

1           THE COURT:  But this sounds like it was after.  I

2    mean, the fact that he is telling Mr. Silver in 2010 you are

3    not getting my business because Simmons is contributing to the

4    research and you are not, how does that tell me what was in

5    Mr. Silver's mind four years prior?

6           MR. GOLDSTEIN:  Because what happens next is that

7    Sheldon Silver then starts to give other official benefits to

8    Dr. Taub.  He scrambles to provide him with a resolution and a

9    proclamation at the last minute for an event by the American

10   Cancer Society, he provides his -- he uses his power, we will

11   argue, to provide Dr. Taub's son Jonathan with a job that was

12   heavily dependent on grants from Silver.

13          THE COURT:  So, chronologically these other things

14   that have been mushed in in terms of when precisely they

15   occurred, you are saying occurred after Dr. Taub alters his

16   referral practice from Weitz & Luxenberg to Simmons?

17          MR. GOLDSTEIN:  That's correct.  And then the

18   referrals --

19          THE COURT:  And when is the conversation that takes

20   place between Taub and Silver relative to when Mr. Silver says

21   *Why have you quit sending me patients?* and there is an express

22   conversation between Dr. Taub and Mr. Silver; when is that?

23          MR. GOLDSTEIN:  In middle 2010.

24          THE COURT:  When are these other things?

25          MR. GOLDSTEIN:  The ACS event is in 2011.  The help

1    that Sheldon Silver provides for the Miles for Meso is a few

2    months after that, and then it is in late 2011, early 2012 when

3    Dr. Taub seeks help with getting his son a job and your Honor

4    will be able to see that the referrals picked up at the time

5    periods that he was asking for those types of assistance.

6                THE COURT:  Okay.  I got it.  Okay.

7                MR. MOLO:  As I heard Dr. Taub's testimony today,

8    according to him he had three or four cases a year to refer but

9    actually -- I'm using the chart.

10               THE COURT:  We have the stats so we know that those

11   numbers are higher.

12               MR. MOLO:  Yes, that the government provided, I agree,

13   and on those stats, which is what I used in my opening

14   statement, 2005, the heart of this alleged scheme there are six

15   referrals; 2011 there is four; 2012 there are six.  You know,

16   however many he has it is not as if he is so cutting back on

17   the Weitz & Luxenberg.  Again, it is sort of an apples and

18   oranges in terms of the nature of the relationship in the sense

19   of what may be permitted but yet very close, from the jury's

20   point of view, in terms of here is a doctor getting funding and

21   in this case big dollar funding.  This is much more money than

22   we are talking about, these $250,000 grants from the state, and

23   I just think that the inherent prejudice in that is going to be

24   very difficult to overcome.  I don't see how we can --

25               THE COURT:  I don't see how it is prejudicial.  Tell

1   me again how it harms your client.

2              MR. MOLO:  Because the jury is going to be led to

3   believe that this is the way Taub does business, it is a

4   pay-for-play sort of situation and that that must have been the

5   way he was doing business with Mr. Silver because --

6              THE COURT:  But this isn't a pay for -- there is

7   nothing in this -- I mean, I have looked at it fairly quickly,

8   there is nothing in this that expressly says you give me a

9   grant I'll send you patients.

10             MR. MOLO:  That's what they're going to argue.

11  Mr. Goldstein said as much.

12             MR. GOLDSTEIN:  Your Honor, it is actually very

13  similar to the relationship he had with Sheldon Silver.  He has

14  testified already very clearly that he referred patients in an

15  effort to get research funding.

16             THE COURT:  To curry favor --

17             MR. GOLDSTEIN:  Correct.

18             THE COURT:  -- is what I heard.  He referred patients

19  as a way to curry favor and maintain a relationship with

20  Mr. Silver in hopes that Mr. Silver would then return the favor

21  as he was able to by sending state grant money his way or

22  whatever other favors he needed from the state.

23             MR. GOLDSTEIN:  He, in fact, made those requests

24  specifically and received benefits in return.

25             THE COURT:  So that's his testimony.  And when he was

1    unable to curry sufficient favor with Weitz & Luxenberg and

2    Sheldon Silver, he turned his affections elsewhere.

3              MR. MOLO:  To the tune of $3.15 million over five

4    years with the Simmons firm and --

5              THE COURT:  I don't see how the amount of money that

6    he got from Simmons harms your client.  I just don't understand

7    how it -- I don't get the prejudice to Sheldon Silver that

8    another -- I see the prejudice to Weitz & Luxenberg but not to

9    Sheldon Silver.

10             MR. MOLO:  They're going to argue that that's the

11   value of these referrals.  That's what the government is going

12   to argue.

13             THE COURT:  That's one of the things they have to

14   prove.

15             MR. MOLO:  Yes, but they've got to prove it with

16   relevant evidence that is not unfairly prejudicial and that's

17   what this is.  I mean, if they want to -- they've had their

18   shot to try to say that this, somehow, was a *quid pro quo*, that

19   there was a direct bribe scheme and now to get into evidence

20   about whatever Taub did with somebody else for whatever amount

21   of money but it happens to be in this case a great deal of

22   money, is wholly irrelevant.  It is irrelevant to Mr. Silver's

23   standpoint.  Forget about Dr. Taub's standpoint, it may be

24   relevant to his state of mind but he is not charged with a

25   crime here.  It is not relevant.

1              MR. GOLDSTEIN:  Your Honor, this conduct was part of

2     the government's complaint.  The defense has had all of the

3     discovery on this issue for months.  They chose not to make an

4     *in limine* motion on it I think because it is quite clear it is

5     both relevant and it is not unfairly prejudicial.  I don't

6     think we need to speak more on it.

7              THE COURT:  I still don't see the prejudice.  Would

8     you like a limiting instruction?  What would you like for me to

9     tell the jury?

10             MR. MOLO:  I guess if I could hear from them a -- we

11    don't have to take up your time but here a proffer as to what

12    the evidence would be, then we could discuss an *in limine*

13    instruction.

14             THE COURT:  I think you have just heard what the

15    evidence is.

16             MR. MOLO:  I don't see how an *in limine* instruction

17    will cure this.

18             THE COURT:  Okay, then I'm not going to give one.

19    Let's bring the jury in.

20             MR. COHEN:  Your Honor, one moment, please?

21             THE DEPUTY CLERK:  Shall I get the witness?

22             THE COURT:  Where is the witness?

23             MR. MOLO:  Would you offer an instruction that says --

24    I don't believe this cures this but says that this doesn't

25    reflect Mr. Silver's state of mind?

1             THE COURT:  It doesn't tend to prove Mr. Silver's

2    state of mind.  I don't know that Mr. Silver would have known

3    about this but I'm not sure what that means.  This is

4    circumstantial evidence.  It is circumstantial evidence of what

5    the whole relationship was all about, what was motivating

6    Dr. Taub, how Dr. Taub was dealing with people.  So, it is a

7    piece of circumstantial evidence.  I personally don't think it

8    is all that -- in and of itself the amount of money is some

9    evidence of what the value of receiving these mesothelioma

10   leads are but I think you have heard -- I think the jury has

11   heard, in no uncertain terms, that mesothelioma cases yield

12   huge amounts of money for the lawyers who are bringing lawsuits

13   for them.  That seems clear to me, enough so that the

14   foundation set up by one of these law firms was in a position

15   to give $3.1 million to Columbia University which is pretty

16   impressive, more impressive I think than the dollar amounts

17   that Mr. Weitz testified that Weitz & Luxenberg has given.

18            MR. MOLO:  So, the point is, though, that they look a

19   lot alike to a juror.  They're going to look a lot alike but

20   yet they are fundamentally different and it is that fundamental

21   difference, this being state money, this being Mr. Silver and

22   all of it surrounding Dr. Taub's state of mind not Mr. Silver's

23   state of mind, that's the problem.  There is an inherent

24   prejudice here to Mr. Silver by -- why is Dr. Taub's state of

25   mind with respect to Simmons, how is that relevant?

1          THE COURT:  His dealings with -- we are going around

2    and around.  I am going to bring the jury back out.

3          His dealings with Simmons are relevant because it

4    corroborates that the reason he was dealing with Silver was in

5    order to -- corroborates his testimony that he referred cases

6    to Silver to maintain a good relationship with Silver so that

7    Silver would repay that -- would, as the opportunity arose,

8    send state funds to Taub.

9          MR. COHEN:  So, your Honor, I don't think it cures the

10   problem, as my colleague says.  Can't you just say that this

11   evidence that they're going to hear about, the Simmons Taub

12   relationship, does not bear on Mr. Silver's state of mind?  And

13   it doesn't.

14         THE COURT:  Again, it is some circumstantial evidence

15   of the relationship between Taub and Silver.

16         MR. COHEN:  But bearing on his state of mind, not

17   Mr. Silver's.

18         THE COURT:  Yes.  What's the government's -- you can't

19   use this to prove his state of mind.  It does prove Taub's

20   state of mind.

21         MR. GOLDSTEIN:  I think, your Honor, as the testimony

22   will come in, that sort of an instruction would be too broad

23   because there are parts of what happens with Simmons where it

24   does go directly to Mr. Silver's state of mind because of the

25   way that he responded, both in terms of the conversation that

FB45sil5                          Taub - direct

1  he had when he came to Dr. Taub and said why so few referrals

2  and what he did afterwards.

3            THE COURT:  I was going to say this letter.

4            MR. GOLDSTEIN:  This letter.

5            THE COURT:  This letter.

6            MR. GOLDSTEIN:  This letter -- this letter, the

7  government agrees, does not go to Sheldon Silver's state of

8  mind.

9            THE COURT:  Okay.

10           MS. COHEN:  Your Honor, if can I briefly be heard?

11           You are giving a limiting instruction about a certain

12  document versus all the other documents and how they should

13  consider it.  I think that is wildly confusing to the jury

14  because, of course, circumstantial evidence is how we prove

15  criminal intent of this defendant.  And so, I don't think the

16  limiting instruction about a particular document because, of

17  course, we are going to argue that all the evidence they heard

18  is circumstantial or direct proof depending on the evidence, of

19  the defendant's criminal intent, and I don't want the jury to

20  think that certain pieces of evidence are not evidence of his

21  criminal intent.

22           THE COURT:  You are hard pressed to say that this

23  document -- this document -- is circumstantial evidence of

24  Mr. Silver's intent.  You have a long string to get there.  It

25  is circumstantial evidence of what Dr. Taub was going on and I

FB45sil5                         Taub – direct

1    am never going to instruct them that they can't consider what

2    was going on in Dr. Taub's head as part of the circumstantial

3    evidence that they will consider against Mr. Silver because it

4    clearly is circumstantial evidence.

5             MS. COHEN:  Correct; but I don't think you are going

6    to go through each piece of document or witness testimony and

7    explain to them what is evidence of the defendant's intent

8    versus another witness and I think it is extremely confusing to

9    instruct them on one document versus the others.

10            THE COURT:  Okay.  I disagree.

11            Bring the jury in.  Where is the witness?

12            (Continued on next page)

1          (Jury present)

2               THE COURT:  Okay, Mr. Goldstein.

3               MR. GOLDSTEIN:  Thank you, your Honor.  Your Honor the

4    government offers Government Exhibit 598.

5               MR. MOLO:  Objection.

6               THE COURT:  Objection overruled.

7          Ladies and gentlemen, this document can be considered

8    by you in trying to determine what Dr. Taub's state of mind at

9    this period of time was.  You can't consider it for determining

10   what Mr. Silver's state of mind was.

11              (Government's Exhibit 598 received in evidence)

12   BY MR. GOLDSTEIN:

13   Q.  Thank you, your Honor.

14          Dr. Taub, if we can look at the top portion of this

15   document?  Dr. Taub, is this the agreement that Columbia had

16   with the Simmons Foundation regarding funding for your research

17   program?

18   A.  Yes, it is.

19   Q.  And what was the Simmons Mesothelioma Foundation?

20   A.  The Simmons Mesothelioma Foundation was set up by the

21   Simmons firm and they donated much of their profits -- or some

22   of their profits -- to the Foundation which they set up which

23   would, in turn, support research and to support patient

24   activity.

25   Q.  And that foundation they set up was the Simmons

1    Mesothelioma Foundation?

2    A.  Yes.

3    Q.  Looking at the first paragraph of this letter, this is

4    addressed to Lee Goldman, MD.  Did you know who he was?

5    A.  He is the dean of the medical school.

6    Q.  It says:  Dear Dr. Goldman:  The Simmons Mesothelioma

7    Foundation is pleased to formalize its promise to give

8    $3,150,000 to Columbia University for the benefit of its

9    College of Physicians and Surgeons, Mesothelioma Center, in the

10   Department of Medicine.

11          Is that center, is that your program?

12   A.  Yes.

13   Q.  It says:  This gift is made in honor of Robert Taub, MD.

14          So, was this a gift or a grant?

15   A.  It was a gift.

16   Q.  What was your understanding of what the Simmons Foundation

17   expected you to do with the money that they were providing?

18   A.  Cure mesothelioma.

19   Q.  I want to direct your attention to the third paragraph of

20   the agreement, "The Foundation will pay."

21          The Foundation will pay $3,150,000 to the University

22   per the following schedule... and there is a schedule of

23   payments for each year.  Dr. Taub, who came up with the total

24   amount and the payment schedule between your program and the

25   Simmons Foundation?

1   A.   I did.   It was a detailed budget projection for those five

2   years.

3   Q.   Why does the funding go down year after year?

4   A.   It goes down for two reasons.   The first is that these

5   kinds of grants or gifts were given for the purpose of

6   establishing laboratory programs so the first couple of years

7   you have to buy a lot of equipment and you have to renovate a

8   lot of inventory which is one of the things we did in the

9   beginning and as time goes on and you solve some of the

10  problems, you can't predict what kind of research you are going

11  to have in five years so that covers sort of a five-year

12  period.   I don't think many researchers can figure out what

13  they're going to be doing five years hence and we probably, if

14  we thought there were exciting things to do five years from now

15  we would put in another request -- which we did, actually.

16  Q.   And Mr. Coccaro, if we could look at the second paragraph

17  of this letter?

18       It says:   It is our understanding that Dr. Robert Taub

19  shall provide quarterly updates to the Foundation detailing the

20  prior quarter's activities supported by the pledge and the

21  projected budget for the upcoming year, or upon any other times

22  as reasonably requested by the Foundation.

23       Did you, in fact, provide quarterly or regular updates

24  to the Foundation?

25  A.   Yes.

1    Q.  And when you did that, who from the Foundation did you

2    report to?

3    A.  Usually a Mr. Greg Kirkland, a Chris Guinn who was one of

4    the lawyers, but Greg Kirkland was the CEO of the Simmons firm

5    and also one of the heads of the Foundation and others were

6    members of the Foundation.  And Joy Wheeler came, who was the

7    patient advocate, she came also, I think, for the first three

8    years.  Two or three years, yeah.

9    Q.  You mentioned a Greg Kirkland.

10   A.  Yes.

11   Q.  Was he somebody who you knew to be affiliated with the

12   Simmons firm?

13   A.  Yes.

14   Q.  And you mentioned Joy Wheeler, is that the person you

15   testified earlier was the person who first reached out to you

16   about funding from Simmons?

17   A.  Yes.

18   Q.  And those updates, reports that you provided, how long

19   would those meetings or those presentations take place?

20   A.  Well, they usually took place at the very least at a

21   dinner.  They would host a dinner for us at which I would come

22   and also a number of my staff would come because they wanted to

23   see the young people that were working with me.

24   Q.  And did you do a slide show?  How did you present to the

25   Simmons people?

FB45sil5                              Taub - direct

1  A.   Initially, when they came, we did a luncheon meeting and I
2  presented for a couple of hours a slide show, and in I think
3  year four -- 2014 -- I went down to the Simmons firm and
4  lectured to them for over two hours with slides.
5  Q.   Returning to the State grants that you received what, if
6  any reports, did you give to anybody at the State regarding how
7  you were using the State money?
8  A.   We gave a single report at the end of the grant period, a
9  brief report as part of the contractual obligation.
10  Q.   Did you speak with Sheldon Silver about the substance of
11  that report?
12  A.   No.
13  Q.   Did you speak with anybody at the Department of Health
14  about the substance of that report?
15  A.   I did not.
16  Q.   And does that apply for both the first grant and the second
17  grant?
18  A.   Yes.
19          THE COURT:  Did you have to give a budget at the
20  beginning of the state grants?
21          THE WITNESS:  The budget was put together by the
22  fiscal people who assisted in the administration of the
23  Foundation, they belonged to the department of foundation and
24  the budget.
25          THE COURT:  For the state.  I just want to make sure.

FB45sil5                          Taub - direct

1              THE WITNESS:  That was the internal accounting of the

2      budget and they're the ones who interfaced with the state.

3              THE COURT:  Okay.

4              THE WITNESS:  It was all done through university

5      administration.

6      BY MR. GOLDSTEIN:

7      Q.  With regard to the reports that you provided to Simmons --

8      A.  Yes.

9      Q.  -- was the purpose of those reports to show what you were

10     using Simmons' money to do?

11     A.  Yes.

12     Q.  Now, once the Simmons firm -- let me withdraw that.

13             Once the Simmons Foundation had agreed to provide your

14     program with this $3.15 million in funding, where did you start

15     to send your patients?

16             MR. MOLO:  Objection.

17             THE COURT:  Overruled.

18     A.  In addition to -- in addition to Mr. Silver, I started

19     sending patients to Simmons.

20     Q.  Why did you start to send patients to Simmons?

21     A.  Because Simmons was a law firm who was supporting research.

22     Q.  Was it because, in part, they were supporting your

23     research?

24     A.  Yes.

25     Q.  When you sent a patient to Simmons, who at Simmons did you

1    contact when you initially started sending patients to Simmons?

2    A.  Joy Wheeler.

3    Q.  And what information did you provide to Joy Wheeler about

4    the patients that you were sending to them?

5    A.  Essentially the same information that this is a patient but

6    she was a nurse, so essentially the same information, perhaps a

7    little detail or two about asbestos exposure and contact

8    information that the patient had given me with instructions to

9    arrange a referral.

10   Q.  When you say essentially the same information, were you

11   providing Joy Wheeler with the same information as you had been

12   providing to Sheldon Silver?

13   A.  Correct.

14   Q.  And with regard to Joy Wheeler, did you provide that

15   information by phone or by e-mail?

16   A.  Mostly by phone, sometimes by e-mail.

17   Q.  If you could look in your binder at what's been marked for

18   identification Government Exhibit 525-6; do you recognize that

19   document?

20   A.  Yes.

21   Q.  What is this document?

22           MR. MOLO:  Objection.

23   A.  It's an e-mail.

24           THE COURT:  Hang on a second.

25   A.  An e-mail to Joy Wheeler.

FB45sil5                        Taub - direct

1            THE COURT:  Hang on a second.

2            MR. MOLO:  Objection.

3            MR. GOLDSTEIN:  Hang on, Dr. Taub.

4            THE COURT:  I'm sorry.  What exhibit are you on?

5            MR. GOLDSTEIN:  Government Exhibit 525-6.  And if we

6    could be heard at side bar, your Honor?

7            THE COURT:  Okay.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At side bar)

2          MR. GOLDSTEIN:  We want to introduce this e-mail and

3    there is a couple of these not for hearsay purpose but because

4    this is the thing that the government will argue is the

5    property that is being transferred from Dr. Taub to the Simmons

6    firm in this case and it is the same information that he

7    already testified he provided to Silver; it is the name, the

8    contact information, and a brief mention of mesothelioma and

9    nothing else.

10          MR. MOLO:  My objection, it is not relevant, it is

11   hearsay, and it doesn't have -- it doesn't have any business in

12   the case.  I mean, this is the exact same prejudice we were

13   talking about before, how we are going to get into the details

14   of patient referrals.

15          THE COURT:  This is going to be quick.  We have taken

16   up more time talking about it than to actually do it.  It is

17   not coming in for the truth, it is not coming in to say that

18   Deanna Lane, native of Tulsa, has peritoneal mesothelioma.  It

19   is coming in to show this is the sort of information that was

20   conveyed.  So, it is coming in for a non-hearsay purpose.

21          MR. MOLO:   It highlights the point that I was making

22   before, now they're taking a different aspects of the

23   relationship and trying to say it is the same thing.

24          THE COURT:  He just testified it is the same thing.  I

25   mean, you can cross him on it but he testified it is the same

FB45sil5                          Taub - direct

1    thing.   This just shows them what he was conveying.

2              MR. MOLO:   Objection.

3              THE COURT:   Overruled.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (In open court)

2                MR. GOLDSTEIN:  Your Honor, the government offers --

3                THE COURT:  Hang on a second.  Can you have him

4     identify it again?  I think there was an objection in the

5     middle of that.

6     BY MR. GOLDSTEIN:

7     Q.  Dr. Taub, what is this document?

8     A.  This is an e-mail that I wrote to Joy Wheeler.

9     Q.  And what is the date on the e-mail?

10    A.  Wednesday March 24th, 2010.

11               MR. GOLDSTEIN:  Your Honor, the government offers

12    525-6.

13               THE COURT:  And it is an e-mail for what purpose?

14               THE WITNESS:  The purpose was to give Joy Wheeler a

15    referral of a patient to the Simmons firm.

16               MR. MOLO:  Objection.

17               THE COURT:  Overruled, so 526-06 is received.

18               MR. GOLDSTEIN:  Your Honor, it is 525-06.

19               THE COURT:  I'm sorry, 525-06.

20               (Government's Exhibit 525-06 received in evidence)

21    BY MR. GOLDSTEIN:

22    Q.  If we can publish that, Mr. Coccaro?

23               Can you read the e-mail that you sent to Joy Wheeler?

24    A.  We saw a new peritoneal mesothelioma patient who might

25    benefit from legal input.  She is expecting a call.  Her name

1    is Deanna Lane, native of Tulsa, telephone cell number is

2    918-dash-dash something-or-other.

3    Q.  Dr. Taub, is this the information or the kind of

4    information that you provided to Sheldon Silver when you made

5    referrals to him by phone?

6    A.  Yes.

7    Q.  And when you say here she is expecting a call, does that

8    refer to the consent that you received from the patient that

9    you testified about earlier?

10   A.  Yes.

11             MR. MOLO:  Objection.

12             THE COURT:  Overruled.

13   Q.  Dr. Taub, if you could turn to Government Exhibit 525-7; do

14   you recognize this document, Dr. Taub?

15   A.  Yes.

16   Q.  Is this an e-mail that you sent to Joy Wheeler as well?

17   A.  Yes.

18   Q.  And what was the purpose of sending this e-mail?

19   A.  The purpose, again, was to refer a patient to the Simmons

20   law firm and this would pass along the information.

21             MR. GOLDSTEIN:  Your Honor, the government offers

22   525-7.

23             MR. MOLO:  Objection.

24             THE COURT:  Overruled.  Is this the last one of these?

25             MR. GOLDSTEIN:  Yes, it is, your Honor.

1           THE COURT:  Overruled.  So 525-7 is received.

2           (Government's Exhibit 525-7 received in evidence)

3    BY MR. GOLDSTEIN:

4    Q.  If we could publish 525-7?  If we can highlight the top

5    part of the e-mail?

6           What is the date of this e-mail, Dr. Taub?

7    A.  Thursday, August 26, 2010.

8    Q.  And it says:  Dear Joy:  I tried to call you this a.m. with

9    this information.

10          Did you generally try to call Ms. Wheeler first before

11   you would send an e-mail?

12   A.  Yes.

13   Q.  Our patient, Mr. George -- and it is redacted -- a 79 YO --

14   is that-year-old?

15   A.  Yes.

16   Q.  Former engineering/construction manager is considering

17   legal counsel regarding his mesothelioma diagnosis.  He has

18   both pleural and abdominal disease, has undergone treatment,

19   and is advancing.  I have given him your name.

20          Again, is this the same kind of information you

21   provided to Sheldon Silver when you referred cases to Sheldon

22   Silver?

23   A.  Yes.

24   Q.  You can set that aside, Dr. Taub.

25          Now, in 2010 you testified that you started sending

FB45sil5                              Taub – direct

```
 1   cases of yours to the Simmons firm; is that right?

 2   A.  Yes.

 3   Q.  Now, after you started sending patients of yours to the

 4   Simmons firm, did you start referring fewer cases to Sheldon

 5   Silver?

 6   A.  Yes.

 7   Q.  Did there come a time when Sheldon Silver came and spoke to

 8   you about what was happening with the referrals to him?

 9   A.  Yes.

10   Q.  Where did that conversation take place?

11   A.  I believe in my office.

12   Q.  Had you invited Silver to your office?

13   A.  He was passing by and I agreed to see him.

14            THE COURT:  So he asked for the meeting?

15            THE WITNESS:  I'm sorry?

16            THE COURT:  So did he ask for the meeting?

17            THE WITNESS:  He was at the medical center for other

18   medical purposes and while he was there he passed by my office

19   and asked my secretary if he could talk to me, yes.

20            THE COURT:  Okay.

21   BY MR. GOLDSTEIN:

22   Q.  When you said that he was at the medical center for other

23   purposes, did you know that personally or is that what he told

24   you?

25   A.  That's what he told me.
```

FB45sil5                           Taub - direct

1    Q.  So had you invited him to come?

2    A.  No.

3    Q.  When he came to your office what did he say to you?

4    A.  I don't recall the total conversation but he said that he

5    is not getting as many referrals as he did before, he is

6    getting fewer referrals.

7    Q.  Did he ask you why he wasn't getting so many referrals?

8    A.  I don't remember if he did.

9    Q.  What did you say in response to what he said to you?

10   A.  I said two things.  I said I was seeing more pleural cases

11   than peritoneal cases recently, and almost all of the pleural

12   cases that I saw had already been referred to Weitz & Luxenberg

13   probably by the surgeons who took care of them so that the

14   patients who did not have legal representation usually belonged

15   to the peritoneal category which were not seen by surgeons

16   before they were seen by me.  I also informed him that I was

17   sending cases to the Simmons firm and that they had given me a

18   pledge of $3,150,000.

19   Q.  And did you tell him that you were sending patients to

20   Simmons in part because of the pledge that they had made to

21   your research?

22   A.  I don't know if I said because of that but I think that was

23   certainly the inference that he should draw.

24   Q.  What did you take away from that conversation with Sheldon

25   Silver?

```
 1   A.  Just what I said.
 2              THE COURT:  Did he walk away thinking you were going
 3   to send him more cases or less cases?  What do you think?
 4              THE WITNESS:  I have no --
 5              THE COURT:  You don't know.
 6              THE WITNESS:  Okay.
 7              THE COURT:  Was it a friendly conversation?
 8              THE WITNESS:  Yes.  Very.
 9   BY MR. GOLDSTEIN:
10   Q.  Did you understand that he wanted more cases?
11   A.  Yes.
12   Q.  And following that conversation, did you in fact send any
13   additional cases of yours to Sheldon Silver?
14   A.  I had been sending cases to him and I continued to send
15   cases to him, just not as many.
16   Q.  At that point, since he had already told you that the state
17   wasn't going to fund your research program, why did you
18   continue to send any cases to Sheldon Silver?
19   A.  Because Mr. Silver was an important state legislator,
20   because I had a relationship with him which I hoped would
21   incentivize himself so that when an opportunity arose to help
22   us fund mesothelioma research, he would.
23   Q.  Dr. Taub, did there come a time when you learned that you
24   were going to receive an honor from the American Cancer
25   Society?
```

379

FB45sil5                                Taub - direct

1    A.  Yes.

2    Q.  What was that honor?

3    A.  I was going to get an award called the Collaborator Award.

4    Q.  What did you understand the award was going to be for?

5    A.  The award is basically for fundraising for the American

6    Cancer Society and you were set up to be an honoree which means

7    that you were going to help them raise funds.

8    Q.  And was there a connection between this American Cancer

9    Society event and something called the Hope Lodge?

10   A.  Yes.

11   Q.  What was the Hope Lodge?

12   A.  The Hope Lodge was a facility which was sponsored and built

13   by the American Cancer Society for accommodating patients who

14   are out-of-state who are being treated in New York, the New

15   York branch, and this provided facility for them so that they

16   could stay at a lower cost than it would cost to stay in a New

17   York Hotel.  It was a very good idea.

18   Q.  Was the purpose of this event to raise money for the Hope

19   Lodge?

20   A.  Yes.

21   Q.  Do you know how it came to be that you were selected for

22   this award?

23   A.  Well, I had, as I mentioned before, many of my patients are

24   from out-of-state and they were using the facility so they felt

25   that this helped publicize the facility as well.

FB45sil5                           Taub - direct

1    Q.  Did you ask the Simmons law firm or the Simmons Foundation

2    to give a donation to the Hope Lodge?

3    A.  Absolutely.

4    Q.  What did you initially ask for?

5    A.  I asked them for $100,000 to be a sponsor of the event.

6    Q.  And how did they respond to that?

7    A.  They gave $6,500 for a table.

8    Q.  Were you happy with that?

9    A.  Yes.

10   Q.  And as the event approached, did there come a time where

11   you suggested to the American Cancer Society that they reach

12   out to Sheldon Silver?

13   A.  Yes.

14   Q.  Why did you ask the American Cancer Society to reach out to

15   Sheldon Silver?

16   A.  Because I thought Mr. Silver would lend prestige to the

17   event and perhaps help in fundraising by his presence, and that

18   the Hope Lodge was in his Congressional district.

19   Q.  Did you contact Silver directly or did the American Cancer

20   Society contact Silver directly?

21   A.  I did not run the event so I suggested it to those who were

22   running the event that they might want to do that.

23   Q.  And did Sheldon Silver end up coming to the event?

24   A.  Yes.

25   Q.  About how soon before the event did you learn that Silver

FB45sil5                            Taub - direct

1   would come?

2   A.  About a week.  I'm not sure.

3   Q.  And if you could look in your binder at what's been marked

4   for identification as Government Exhibit 525-13?

5   A.  525-13?

6           THE COURT:  It is on the screen, Dr. Taub.

7           THE WITNESS:  What?

8           THE COURT:  It is on the screen.

9           THE WITNESS:  Okay.  Let's do that.

10  BY MR. GOLDSTEIN:

11  Q.  I want you to turn your attention to the second page of

12  this.  Do you recognize this document, Dr. Taub?

13  A.  Yes.

14  Q.  And was this the original timeline for the event at the

15  American Cancer Society?

16  A.  Yes.  I believe so.

17          MR. GOLDSTEIN:  Your Honor, the government offers

18  525-13.

19          THE COURT:  Any objection?

20          MR. MOLO:  I do, because there is some other stuff on

21  the other side that I don't know what it is.

22          MR. GOLDSTEIN:  We will redact and only publish the

23  second page, your Honor.

24          MR. MOLO:  I have no problem with --

25          THE COURT:  Okay, so the second page of 525-13 is

FB45sil5                           Taub - direct

 1   received.

 2                MR. GOLDSTEIN:  Thank you, your Honor.

 3                (Government's Exhibit 525-13 received in evidence)

 4   BY MR. GOLDSTEIN:

 5   Q.  If we can publish only the second page of 525-13?

 6   A.  That is 525-16?

 7   Q.  13, Dr. Taub.

 8                Mr. Coccaro, is there a way we can zoom in on the Run

 9   of Show so that the jury can see it?  I mean actually the full

10   sequence of events for the evening.  Thank you, that's much

11   better.

12                Dr. Taub, in this version of the Run of Show for the

13   event was Sheldon Silver listed as giving any remarks or making

14   any presentation?

15   A.  I don't see it there, no.

16                MR. GOLDSTEIN:  Your Honor, at this point I want to

17   read into the record a stipulation concerning the American

18   Cancer Society, it is S-4.

19                THE COURT:  Okay.

20                Again, this is just an agreement between the parties.

21                MR. GOLDSTEIN:  Is there any objection to us

22   publishing it so I can read it to the jury?

23                MR. MOLO:  This?

24                MR. GOLDSTEIN:  The S-4 stipulation.

25                MR. MOLO:  No.  A stipulation, I guess not.

FB45sil5                              Taub - direct

```
 1          THE COURT:  No, it is stipulated so you can put it on
 2   the screen.
 3          MR. MOLO:  I'm sorry.  I don't understand what is
 4   being asked of us.
 5          THE COURT:  He asked if you have any objection to
 6   having S-4 published.
 7          MR. GOLDSTEIN:  I thought the jury would prefer to
 8   read along.
 9          Mr. Coccaro, if we can start with the:  If called to
10   testify?
11          If called to testify, a custodian of records from
12   American Cancer Society, (ACS), would testify, as follows:
13          Mr. Coccaro, can you enlarge that so that I can read
14   the numbers?  Thank you.
15          Government's Exhibits 380 through 383, 375, 376, and
16   379 are full and complete records of the acts, transactions and
17   events described or shown therein; were made and/or received,
18   and thereafter maintained, in the regular course of business of
19   ACS; were made at or near the time of the acts, transactions
20   and events recorded therein; and contain information set forth
21   by or obtained from persons with knowledge of those matters.
22          It is further stipulated and agreed that this
23   stipulation may be received in evidence as a Government Exhibit
24   at trial.
25          Your Honor, the government offers S-4.
```

1              And, Mr. Coccaro, if you can go back to the numbers

2      again so I get them right?

3              The government also offers Government's Exhibits 380

4      through 383, 375, 376, and 379.

5              THE COURT:  So 375, 376, 379, 380, 381, 382 and 383

6      are received as well as S-4.

7              MR. GOLDSTEIN:  Thank you, your Honor.

8              (Government's Exhibits 375, 376, 379, 380, 381, 382,

9      383 and S-4 received in evidence)

10     BY MR. GOLDSTEIN:

11     Q.  So, if we can turn to Government Exhibit 379, Mr. Coccaro,

12     and publish that?

13             Dr. Taub, are you able to find this in your binder?

14     A.  I have 380.

15             THE COURT:  379.

16             THE WITNESS:  But I don't seem to see 379.

17     Q.  Dr. Taub, do you recognize this as an invitation list for

18     the American Cancer Society event?

19     A.  I don't remember it.

20     Q.  You don't recognize this document?

21     A.  No.

22     Q.  Will you just turn to the second page of the document and

23     if we can highlight that middle line where it says:  Sheldon

24     Silver?

25     A.  Yes.

1    Q.  Was Sheldon Silver your guest at this event?

2    A.  Yes.

3    Q.  Did you pay for his ticket?

4    A.  Yes.

5    Q.  If we could then turn to Government Exhibit 375, which

6    should be the next document in your binder and we can publish

7    375.

8           Do you see at the bottom of this Run of Show that

9    there is now a reference to Sheldon Silver making remarks?

10   A.  Yes.

11   Q.  Do you recall Sheldon Silver making remarks at the event

12   when he did come?

13   A.  Yes, I do.

14   Q.  If you could turn in your binder to Government Exhibit 376;

15   what do you recognize this to be?

16   A.  I'm not sure.  The cover of a pamphlet from American Cancer

17   Society or cover of an invitation?  I'm not sure what it is.

18   Q.  Was this the program for the event?

19   A.  It looks like it might be, yes.

20   Q.  Let me direct your attention to the second page of the

21   document.  If you can enlarge the awards honoring those, those

22   three names?

23          Do you recall being honored along with two other

24   individuals?

25   A.  Yes.

FB45sil5                          Taub - direct

1    Q.  And were those two other individuals Alisan Goldfarb and

2    Susan Rotenstreich?

3    A.  Yes.

4    Q.  Rotenstreich.  I apologize.

5         If we can turn to the sixth page of the document,

6    under the Awards in Medical Excellence:  Special thanks to our

7    2011 benefactor supporters and contributors.

8         And who was listed as a platinum benefactor for the

9    event?

10   A.  Yes.

11   Q.  Who was listed as a platinum benefactor for the event?

12   A.  Yes, they were; the Simmons firm was.

13   Q.  The Simmons firm?

14   A.  Yes; Simmons Mesothelioma Foundation.

15   Q.  That's the Foundation, not the firm?

16   A.  Correct.

17   Q.  The Foundation is what purchased the table for the event

18   for the $6,500?

19   A.  I believe so.

20   Q.  Then if you could turn, Mr. Coccaro, to the next page and

21   you see that there is -- you can scroll ahead a couple more

22   pages and I will tell you when to stop -- stop right here.

23        Do you see the ad on the right side of the program

24   here?

25   A.  Yes.

1    Q.  It is only by working together that we will take treatments

2    for mesothelioma patients to new heights.  We are proud to

3    support Dr. Robert Taub, a true leader in the fight against

4    mesothelioma.

5         It says:  The Simmons Mesothelioma Foundation.

6         This is the foundation that was now supporting your

7    research?

8    A.  They were donating to it, yes.

9    Q.  Now, before your testimony today did you have a chance to

10   look through this document?

11   A.  I saw it at the time but I have not -- did not review it

12   until right now.

13   Q.  Can you briefly look through the document?  Do you see any

14   reference in this program to either Sheldon Silver or to

15   Weitz & Luxenberg?

16   A.  In the advertisements or in the program?

17   Q.  Anywhere in the program, and we can flip through.

18        MR. GOLDSTEIN:  Judge, I don't know if you want to do

19   an afternoon break now?

20   A.  I don't think he is listed on the program in that

21   particular listing.

22   Q.  Mr. Coccaro, if you could go back to the program part of

23   this document, page, if we can go to the next page, right

24   there, program, Thursday, May 12, 2011.  Do you see Sheldon

25   Silver listed in the program?

1    A.  In that same document I do not see him listed.

2    Q.  Did you make remarks at this event?

3    A.  Did I what?

4    Q.  Did you make remarks at this event?

5    A.  Yes, I spoke.

6    Q.  And you testified that Sheldon Silver also gave remarks.

7    Did Sheldon Silver also present you with anything?

8    A.  Yes, he did.

9    Q.  You can look in your binder as Government Exhibit 314.  I

10   am going to give this to you.

11           Do you recognize Government Exhibit 314?

12   A.  Yes.

13   Q.  What is that?

14   A.  It is a legislative resolution by the New York State

15   Assembly saying nice things about me.

16           MR. GOLDSTEIN:  Your Honor, the government offers 314.

17           THE COURT:  Any objection?

18           MR. MOLO:  No objection, your Honor.

19           THE COURT:  314 is received.

20           (Government's Exhibit 314 received in evidence)

21   BY MR. GOLDSTEIN:

22   Q.  If we can publish that, Mr. Coccaro?

23           Was this presented to you at this event?

24   A.  Yes, it was.

25   Q.  Can we enlarge the first page in the first paragraph?  The

1   entire first half of that page, if we can, and scroll up a

2   little bit, please?

3          Do you see where it says:  Assembly no. 486.  State of

4   New York Legislative Resolution.  By:  M. of A. Silver.  It

5   says:  Honoring Dr. Robert Taub, Ph.D, on the occasion of his

6   designation as recipient of the Collaborator Award by the

7   American Cancer Society.

8          I will not read the entire thing but if we can a

9   little bit more?  It says:  Whereas, it is the sense of this

10  legislative body to recognize and pay tribute to those

11  individuals within the medical field who distinguish themselves

12  through professional excellence and who have made significant

13  contributions to the quality of life of citizen in the State of

14  New York.

15         If we can scroll down a little bit further to be able

16  to do the whereas a leader within?

17         Whereas, a leader within the medical community,

18  Dr. Robert Taub is receiving this meritorious award for his

19  significant contributions to the fight against cancer.

20         And then if we can look at the bottom of that page,

21  the last two paragraphs?

22         Whereas, as a leader in his profession, Dr. Robert

23  Taub has proven himself to be a great asset to medicine and to

24  the health and welfare of the citizens of the State of New

25  York.

1              Dr. Taub, after you received this resolution did you

2    receive any additional funding from the State of New York?

3    A.   No.

4    Q.   And does this resolution anywhere mention that Sheldon

5    Silver had provided or helped provide funding to your program?

6    A.   It does not.

7    Q.   If we could look at Government Exhibit 315?

8              THE COURT:  315?

9              MR. GOLDSTEIN:  315, your Honor, which is a thing --

10             THE COURT:  Okay, not in my book.

11             MR. GOLDSTEIN:  Correct.

12             MS. COHEN:  There is a Xerox of it, I believe.

13             THE COURT:  That's fine.

14   BY MR. GOLDSTEIN:

15   Q.   Do you recognize that, Dr. Taub?

16   A.   Yes.

17   Q.   Is that something that was also presented to you by Sheldon

18   Silver at this event?

19   A.   Yes.

20   Q.   What does it say at the top?

21   A.   The Assembly, State of New York, proclamation honoring

22   Dr. Robert Taub, Ph.D, upon the occasion of his designation as

23   recipient --

24             THE COURT:  Dr. Taub, use the mic.

25   A.   As recipient of the Collaborator Award.

1   Q.  I will stop you there.

2   A.  Good.

3           MR. GOLDSTEIN:  Your Honor, the government offers 315.

4           THE COURT:  Any objection?

5           MR. MOLO:  No objection.

6           THE COURT:  315 is received.

7           (Government's Exhibit 315 received in evidence)

8           THE COURT:  Does it come framed, Dr. Taub?

9           THE WITNESS:  It came exactly as you see it.

10          THE COURT:  Okay, as framed.  All right.

11  BY MR. GOLDSTEIN:

12  Q.  And what did you do with this after Sheldon Silver

13  presented this to you?

14  A.  I hung it in my office.

15  Q.  Dr. Taub, Government Exhibit 314, which was the resolution

16  that we looked at, was this presented to you also in this form?

17  A.  I believe so.

18          THE COURT:  This form, just for the record, seems to

19  be a blue folder that has it inside maybe?

20          MR. GOLDSTEIN:  It does, your Honor; and for the

21  record, on the cover of the blue folder it says New York State

22  Assembly.

23          THE COURT:  In gold.

24          MR. GOLDSTEIN:  In gold; and inside there is a gold

25  embossed emblem with blue ribbon on the right side.

FB45sil5                          Taub – direct

1              THE COURT:  Are you getting to a good time to stop for
2    our afternoon break?
3              MR. GOLDSTEIN:  Yes.  We can stop right now.
4              THE COURT:  Don't let me interrupt your train of
5    thought, but if this is a good time to stop we can stop now.
6              MR. GOLDSTEIN:  I just have a few more questions about
7    this event.
8              THE COURT:  Finish those and then we will take the
9    afternoon break.
10             (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    BY MR. GOLDSTEIN:

2    Q.  Dr. Taub, did you know in advance of the event whether you

3    would be receiving either a proclamation or a resolution?

4    A.  I did not.

5    Q.  What did it mean to you to receive this recognition?

6    A.  It was very nice.

7    Q.  Who was at --

8                 THE COURT:  Talk into the mic.

9                 THE WITNESS:  It was very nice.

10   BY MR. GOLDSTEIN:

11   Q.  Who was at the event with you?

12   A.  My family and my laboratory staff and members of the

13   department of medicine of Columbia.

14   Q.  So was it important to you in front of those people to

15   receive these recognitions from Sheldon Silver?

16   A.  It was nice.

17               MR. GOLDSTEIN:  Mr. Coccaro, if we can look at

18   Government Exhibit 380, which has been admitted.  383,

19   Mr. Coccaro, first.

20   BY MR. GOLDSTEIN:

21   Q.  Let's look at 383 to begin with since it's up on the

22   screen, and you can see it up on your screen, Dr. Taub.

23   A.  Yes.

24   Q.  Who was that speaking at the podium?

25   A.  Mr. Silver.

FB4YSIL6                          Taub - Direct

1   Q.  Who is that to his right standing behind him with his arms

2   clasped?

3   A.  That's me with a bow tie.

4   Q.  Was this picture taken, as you can recall, at the event?

5   A.  Yes.

6   Q.  If we can look at Government Exhibit 382.

7           What is happening in this photograph, Dr. Taub?

8   A.  It looks like we are holding up the proclamation for a

9   photograph.

10  Q.  Who is to the right of you?

11  A.  Mr. Silver.

12  Q.  What do you see in Mr. Silver's left hand?

13  A.  I think it's that blue folder, but I'm not sure.

14  Q.  In his right hand -- is that the proclamation?  Government

15  Exhibit 315?

16  A.  Yes.

17          MR. GOLDSTEIN:  Perfect time for a break, your Honor.

18          THE COURT:  Okay.  Let's take about a ten-minute

19  break.  Be back in the courtroom at 3:45.  Don't talk about the

20  case.

21          (Jury not present)

22          THE COURT:  Ten-minute break.

23          (Recess)

24          (Jury present)

25          THE COURT:  Dr. Taub, you're still under oath.

1          Mr. Goldstein.

2          MR. GOLDSTEIN:  Thank you, your Honor.

3    BY MR. GOLDSTEIN:

4    Q.  Dr. Taub, we've been talking about this event with the

5    American Cancer Society.

6          Did you make remarks at this event?

7    A.  Yes.  I spoke.

8    Q.  Would you look in your binder at Government Exhibit 313.

9          What is Government Exhibit 313, Dr. Taub?

10   A.  That's the text of my remarks.

11         MR. GOLDSTEIN:  Your Honor, the government offers 313.

12         THE COURT:  Any objection?

13         MR. MOLO:  No objection.

14         THE COURT:  313 is received.

15         (Government's Exhibit 313 received in evidence)

16         MR. GOLDSTEIN:  Mr. Coccaro, if we could turn to the

17   second page of 313.  Let's look at the second half middle of

18   these remarks.

19   BY MR. GOLDSTEIN:

20   Q.  Dr. Taub, do you recall whether you gave these remarks --

21   did you have a copy of your remarks with you when you gave your

22   remarks?

23   A.  Yes.

24   Q.  So it says, "Our mesothelioma center could not have taken

25   root without the initial support of the Vivian and Seymour

1   Milstein family and the Margie and Mark Gershwind family, both

2   of whom have been longstanding supporters of the Columbia

3   Presbyterian Medical Center.

4          "Some of our earlier research efforts were supported

5   by the New York State Department of Health, which clearly

6   recognized the hazards posed by asbestos for the citizens of

7   New York state and New York city."

8          And then you say, "I am pleased to acknowledge the

9   presence of the Honorable Sheldon Silver, Speaker of the

10   New York Assembly and an untiring advocate for the health of

11   New York City citizens."

12          Dr. Taub, why in this speech did you not reference

13   Sheldon Silver's assistance with providing the New York State

14   funding?

15   A.   Because I thought that this was -- Sheldon Silver's role

16   was to pass along the request to the New York State Department

17   of Health and that the funding was coming from New York State.

18   Q.   Now, after you spoke at this event, did Sheldon Silver

19   speak?

20   A.   Yes.

21   Q.   And do you recall, in his remarks, if he said anything

22   about state funding for your research?

23   A.   I don't recall.

24   Q.   Now, after the event at the American Cancer Society, was

25   there a dinner held afterwards?

1    A.  There was a dinner at the American Cancer Society, a brief

2    dinner.  But then there was another dinner of the Simmons firm.

3    Q.  Who paid for the second dinner with the Simmons firm?

4    A.  The Simmons firm.

5    Q.  Did you attend that second dinner?

6    A.  Yes.

7    Q.  Where did that take place?

8    A.  I believe it took place at the Solo restaurant in New York

9    which no longer exists at that location.

10             THE COURT:  Was this all in the same night?  There

11   were two dinners?

12             THE WITNESS:  Well, the dinner at the American Cancer

13   Society was really just hors d'oeuvres.

14   BY MR. GOLDSTEIN:

15   Q.  So there was a dinner at the Solo restaurant that the

16   Simmons firm paid for after the American Cancer Society event;

17   is that right?

18   A.  Yes.  That was one of their quarterly dinners that they

19   would sponsor in order to discuss my research with me and my

20   staff.

21   Q.  Did Sheldon Silver come to that dinner?

22   A.  Yes.

23   Q.  Was Joy Wheeler from the Simmons firm at that dinner?

24   A.  Yes.

25   Q.  Did you introduce Sheldon Silver to Joy Wheeler?

FB4YSIL6                        Taub - Direct

1    A.  Yes.

2    Q.  If you could look in your binder at Government Exhibit 327.

3    It should be going forward in your binder after the pictures.

4    A.  Right after the pictures?  I think my binder was

5    rearranged.  Okay.  Yes.  Okay.

6    Q.  Do you recognize this document, Dr. Taub?

7    A.  Yes.

8    Q.  What is this document?

9    A.  It's a letter that I wrote him thanking him for his kind

10   words at the ACS awards and for providing me with a handsome

11   plaque for my office.

12   Q.  When did you write this letter?

13   A.  May 13.

14            MR. GOLDSTEIN:  The government offers 327.

15            MR. MOLO:  No objection.

16            THE COURT:  327 is received.

17            (Government's Exhibit 327 received in evidence)

18            MR. GOLDSTEIN:  Can we publish this.  Again zoom in on

19   the text of the letter.

20   BY MR. GOLDSTEIN:

21   Q.  "Dear Shelly, Susan and I wish to thank you for your very

22   kind words at the ACS awards and for providing me with a

23   handsome plaque for my office.  I greatly value your

24   friendship," and then from you.

25            Why did you write, "I greatly value your friendship"?

FB4YSIL6                           Taub - Direct

1    A.  Because he was acting as a friend, and I valued that.

2    Q.  How close of a friend at this point did you consider

3    Sheldon Silver to be?

4    A.  We had a friendly relationship.

5    Q.  Now, after this awards, the ACS awards, did there come a

6    time when you worked with people at the Simmons firm on a

7    fundraising event for mesothelioma?

8    A.  Yes.

9    Q.  What was that event?

10   A.  The Simmons firm had sponsored sportsmanlike runs, usually

11   5-K, but it could also be 10-K runs.  The runners would

12   support -- the runners and their supporters would donate to

13   mesothelioma research through the Simmons Foundation.

14          They had sponsored these all over the country, and

15   they wished to do one in New York.  They had not done one in

16   New York.

17   Q.  How did you get involved in the New York run?

18   A.  Joy asked me to get involved in it and to offer my ideas

19   about it, and my idea was to organize a run around the World

20   Trade Center site, which I thought would be very attractive to

21   perspective runners because they didn't have a run there before

22   and that we should try to organize it to do that because,

23   again, the World Trade Center was the source of a lot of

24   asbestos pollution in the air.

25   Q.  In order to make this run happen, did you turn to Sheldon

1    Silver for assistance?

2    A.  Yes.

3    Q.  Why did you turn to him?

4    A.  Because it turned out that we would need certain permits

5    from the city to organize that kind of a run on a Sunday

6    morning, and we had to know the state agencies to approach and

7    various other items.  And I thought there Sheldon Silver, since

8    that's in his congressional district, could help facilitate

9    that.

10   Q.  Did you end up working on trying to get these permits and

11   other approvals with Joy Wheeler from the Simmons firm?

12   A.  Yes.

13   Q.  Dr. Taub, if you can turn in your binder to Government

14   Exhibit 525-16.  We can pull that up on your screen if you're

15   getting lost in your binder.

16   A.  I have 525-17.

17   Q.  Before that.

18   A.  I've got it.  Yes.  I have it.

19   Q.  Do you recognize this document?

20   A.  Yes.

21   Q.  Is it an email?

22   A.  Yes, it is.

23   Q.  Between who and whom?

24   A.  It was to Joy Wheeler.

25   Q.  And from yourself?

FB4YSIL6                          Taub - Direct

1    A.  Yes.

2    Q.  Does this concern the Miles for Meso run that you were just

3    testifying about?

4    A.  Yes.

5            MR. GOLDSTEIN:  Your Honor, the government offers

6    525-16.

7            MR. MOLO:  No objection.

8            THE COURT:  Okay.  525-16 is received.

9            (Government's Exhibit 525-16 received in evidence)

10           MR. GOLDSTEIN:  If we can put this up on the screen

11   and publish.  Let's look at the bottom email first from Joy

12   Wheeler to others.

13   BY MR. GOLDSTEIN:

14   Q.  This is an email from August 23, 2011.  It's from Joy

15   Wheeler.  The first two is Leslie Kemerling.

16           Who is that?

17   A.  Leslie Kemerling is my secretary, and her husband is in the

18   business of helping organizing those rungs.  He runs a

19   sportswear store.

20   Q.  Did her husband help with this Miles for Meso run that you

21   were trying to plan?

22   A.  I believe he did.

23   Q.  You are cc'd on this email, and it says, "Hello, all

24   this a.m.  I talked with Assemblyman Silver regarding our

25   difficulty in getting authorization for the walk on

1  September 23, 2012."

2           Now, you had introduced Joy Wheeler to Sheldon Silver

3  previously?

4  A.  Yes.

5  Q.  It says that, "He is happy to assist.  Yae.  Please send

6  him all the documents to:  Assemblyman Sheldon Silver, 250

7  Broadway, 23rd floor, New York, New York, 2007.  Mark the

8  envelope personal and confidential.

9           "I am greatly appreciative of his willingness to

10 assist.  Please send the documents ASAP.  Thx, Joy."

11          Now can we look at how you responded to this email.

12 A.  I responded to Joy.

13 Q.  You responded to Joy?

14 A.  Yes.

15 Q.  Can you read to the jury your response to Joy.

16 A.  Sure.  "You are a real pro.  Be glad to help with this when

17 I get back."  I must have been away at the time.  I don't

18 recall.

19          "It will probably cost us.  He is very good at getting

20 people to owe him, but if he says he will deliver, he does."

21 Q.  Now, when you say, "It will probably cost us," what are you

22 referring to?

23 A.  I'm not sure what I was referring to at the time, but one

24 possibility in my mind was that he was going to ask for

25 referrals.

1          THE COURT:  He was going to ask for what?

2          THE WITNESS:  That Sheldon Silver was going to ask for

3    referrals.

4    BY MR. GOLDSTEIN:

5    Q.  So the next line is, "He is very good at getting people to

6    owe him, but if he says he will deliver, he does."

7          What did you mean by that?

8    A.  Just what it says.  If you ask him for something, he is a

9    very good negotiator.

10   Q.  What do you mean by "he is a very good negotiator"?

11   A.  If I would ask him to do something, he would ask for

12   something in return.

13   Q.  You testified a couple of minutes ago that at this time

14   period, you considered Sheldon Silver to be a friend.

15   A.  Yes.

16   Q.  How many of your friends, when you ask them for something,

17   ask for something in return?

18          MR. MOLO:  Objection.

19          THE COURT:  Overruled.

20          THE WITNESS:  If you have a very close family friend,

21   that's not what you expect.  We had a very friendly

22   relationship, and under those circumstances, there are

23   negotiations involved in it.

24   BY MR. GOLDSTEIN:

25   Q.  If you could turn in your binder to Government Exhibit 526.

 1              Now, before we look at that document, did the people

 2       who you were working with on trying to arrange this run put

 3       together a letter to send to Sheldon Silver seeking his

 4       assistance?

 5       A.   Yes.  They put together this letter.

 6       Q.   So, looking at Government Exhibit 526, is that the letter?

 7       A.   Yes.

 8              MR. GOLDSTEIN:  Your Honor, the government offers 526.

 9              MR. MOLO:  No objection.

10              THE COURT:  526 is received.

11              (Government's Exhibit 526 received in evidence)

12              MR. GOLDSTEIN:  We'll look just at the top portion of

13       this letter.

14       BY MR. GOLDSTEIN:

15       Q.   The front part of this is from the Westchester Roadrunner.

16              Do you know what that is?

17       A.   I believe that is the entity that Mr. Kemerling runs.

18       Q.   And Mr. Kemerling -- was that the husband of your

19       secretary?

20       A.   Right.

21       Q.   It's dated September 8, 2011, to Assemblyman Sheldon

22       Silver.  "Dear Assemblyman Silver, the Simmons Mesothelioma

23       Foundation sponsored by the Simmons firm has been sponsoring

24       Miles for Meso run/walk races over the past three years in

25       small communities.

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300

1              "The goal is to raise funds for research, increase the

2     public awareness of the dangers of asbestos, and provide

3     education on current treatment for mesothelioma."

4              And then the last two lines say, "It is our hope that

5     this New York City event can be held at Ground Zero."

6              Was that your idea to try to hold the event at Ground

7     Zero?

8     A.  I think so.

9     Q.  "To also recognize and honor the 9/11 responders who were

10    exposed to tremendous amounts of asbestos.  Joy Wheeler and

11    Dr. Taub are appreciative of any assistance you can provide to

12    make that happen."

13             If we can now look at the bottom half of the letter.

14             It says, "We need your assistance in securing

15    necessary permits in order to use a course running near the

16    World Trade Center on the Westside Highway starting and

17    finishing near the footprint of the World Trade Center."

18             And then there's handwriting at the bottom of this

19    document.

20             Whose handwriting is that?

21    A.  Mine.

22    Q.  What does it say?

23    A.  It says, "Hi, Shelly.  I would appreciate anything you can

24    do," and I sign it.

25    Q.  Was this letter sent to Sheldon Silver?

1    A.  I believe so.

2    Q.  If you could then turn in your binder to Government Exhibit

3    525-17.

4           Looking just at the top email of this exchange, is

5    this an email between you and Joy Wheeler?

6    A.  Yes.

7    Q.  Does this concern the letter that we just looked at?

8    A.  Yes.

9           MR. GOLDSTEIN:  Your Honor, the government offers

10   525-17525-16.

11          THE COURT:  Any objection?

12          MR. MOLO:  No objection.

13          THE COURT:  525-17 is received.

14          (Government's Exhibit 525-16 received in evidence)

15          MR. GOLDSTEIN:  If we could just publish the top

16   portion of this email exchange.

17   BY MR. GOLDSTEIN:

18   Q.  This is from you to Joy Wheeler; is that right?

19   A.  Yes.

20   Q.  It says, "Monday October 3 or Monday October 10 seem okay.

21   Would love to see you.  How can we make progress on the

22   website?"  And then it says, "I added a line to the letter to

23   Shelly Silver."

24          Is that the handwritten note that we just looked at?

25   A.  Yes.

1    Q.  It says, "If he delivers, I am sure it will cost me."

2           What did you mean by that?

3    A.  The same as what I just said for the other letter.  I

4    thought it would really be very possible that he would ask for

5    more referrals.

6    Q.  What was it about your relationship with Sheldon Silver

7    that made you think that he would ask you for referrals if you

8    asked for his help with this event?

9    A.  I had asked -- at the beginning of our relationship, at the

10   very beginning, I had asked if he would convince his company to

11   send -- to donate funds to MARF, and he asked for referrals.

12   That was a pattern.

13   Q.  Now, after the letter that we looked at a minute ago that

14   had the handwritten note by you, did Silver agree to meet with

15   you and Joy Wheeler to discuss this matter?

16   A.  Yes, he did.

17   Q.  Where did you meet with Sheldon Silver?

18   A.  We met at his office downtown, at the state office.

19   Q.  Who came with you?

20   A.  Joy Wheeler.

21   Q.  Who did you meet with at Sheldon Silver's state office?

22   A.  We met initially with Mr. Silver and with Judy Rapfogel,

23   and then Mr. Silver had another meeting, and we discussed

24   further details with Judy Rapfogel.

25   Q.  From those meetings, first with Silver and then with Judy

FB4YSIL6                          Taub - Direct

1   Rapfogel, what was your understanding as to whether or not they

2   could help secure the necessary permits for the event?

3   A.  I don't know if they could help, but they certainly

4   indicated a willingness to help.

5   Q.  Now, after you had that meeting in Silver's office, did you

6   receive a letter from Silver concerning your request for help

7   with this event?

8   A.  Yes.

9   Q.  Let me direct your attention to Government Exhibit 525-21

10  in your binder.

11  A.  Right.

12  Q.  Do you recognize 525-21?

13  A.  Yes.

14  Q.  What is that?

15  A.  It's a memo I sent to Joy Wheeler.

16  Q.  What did you attach to the memo that you sent to Joy

17  Wheeler?

18  A.  The letter I got from Mr. Silver.

19          MR. GOLDSTEIN:  Your Honor, the government offers

20  525-21.

21          THE COURT:  Any objection?

22          MR. MOLO:  No objection.

23          THE COURT:  525-21 is received.

24          (Government's Exhibit 525-21 received in evidence)

25          MR. GOLDSTEIN:  Let's just look at the cover email.

FB4YSIL6                        Taub - Direct

1   BY MR. GOLDSTEIN:

2   Q.  This is from you to joy, and you're attaching a PDF, and it

3   says, "This is the letter I received from Shelly.  Did you get

4   a copy?  What is the next step?"

5         Then let's look at the letter.  Let's look at just the

6   top part of the memorandum letter.

7   A.  The top part is a memo from Mr. Silver to myself, and it

8   outlines some of the necessary steps in order to get a permit

9   to do this.

10  Q.  If we could look at the bottom of the letter, the last two

11  paragraphs.  It says, "It is common that these events are

12  subject to review by the local community board which plays an

13  advisory role.

14        "Some local neighborhoods, including Battery Park City

15  and to a lesser degree the Seaport, have complained about the

16  number of these types of events and the inconveniences they

17  cause -- traffic disruptions, large crowds, loud public address

18  systems.

19        "You should be prepared to discuss how you plan to

20  manage the event and such issues utilizing both your own staff

21  and the NYPD.  My office can help you navigate this process if

22  needed."

23        So at this point, what did you understand Silver to be

24  offering?

25  A.  Help.  He was offering help in negotiating the various

1    procedures that needed to be followed to get this done.  This

2    is standard operating procedures for all major runs in the

3    city.

4    Q.  After you received this letter, what ended up happening

5    with the event?

6    A.  It was not held because the Simmons Foundation changed its

7    mind and decided not to participate.

8    Q.  So was any further assistance from Sheldon Silver sought?

9    A.  Not for that, no.

10   Q.  If you could look at Government Exhibit 525-23.

11          What is that document?

12   A.  That is a letter to the Mesothelioma Center from Mr. Greg

13   Kirkland.

14   Q.  Did you receive this letter?

15   A.  Yes.

16          MR. GOLDSTEIN:  Your Honor, the government offers

17   525-23.

18          THE COURT:  Any objection?

19          MR. MOLO:  No.

20          THE COURT:  525-23 is received.

21          (Government's Exhibit 525-23 received in evidence)

22          MR. GOLDSTEIN:  Let's just look at the cover email.

23   BY MR. GOLDSTEIN:

24   Q.  This is from Greg Kirkland.

25          Can you remind the jury who Greg Kirkland was.

FB4YSIL6                          Taub - Direct

```
 1   A.  He was the CEO of the Simmons firm, and he was the head
 2   administrator, I believe, for the foundation as well.  He was
 3   on the foundation's board.
 4              MR. MOLO:  Your Honor, no objection subject to the
 5   rulings earlier on these issues.
 6              THE COURT:  Okay.
 7              Proceed.
 8   BY MR. GOLDSTEIN:
 9   Q.  The "To" line is to RNT1@columbia.edu.
10              Is that your email address?
11   A.  Yes.
12   Q.  It is cc'd to Joy Wheeler.  It says, Dr. Taub, please find
13   attached an important letter with regards to the foundation.
14   Regards, Greg."
15              If you could turn to the second page of the letter
16   itself.
17              Let's look at the first paragraph of the letter.  In
18   2009, the Simmons firm established the Simmons Mesothelioma
19   Foundation, and then it ends with, "We have decided to not
20   pursue new funding commitments for the foundation."
21              We can then look at the next paragraph.
22   A.  They would continue to fund us.
23   Q.  Is that what's said in the next paragraph?
24   A.  Yes.
25   Q.  Let's look at that paragraph.
```

1            "The foundation will continue to honor its current and

2      outstanding commitment to the Columbia University Mesothelioma

3      Center to support mesothelioma research under your direction

4      for years 2012, $600,000; 2013, $500,000; and 2014, $400,000.

5            "We have decided to not pursue the website development

6      project and the New York City Miles for Meso.  I will be

7      sending a letter to Assemblyman Silver advising him of our

8      decision and thanking him for his assistance."

9            And then just look at the beginning of the next

10     paragraph as well.  "Additionally, because of our changes in

11     the foundation, it is with regret that I announce Joy Wheeler

12     will be transitioning out of her role with the Simmons firm and

13     the Simmons Mesothelioma Foundation effective December 31,

14     2011."

15           Dr. Taub, what was your reaction to receiving this

16     letter?

17     A.  I was a bit saddened.

18     Q.  Why were you saddened?

19     A.  Because I thought that the run would have been a very good

20     way of consolidating lot of mesothelioma support, and I was

21     sorry that it didn't happen.

22           I also liked Joy Wheeler very much because I thought

23     she was a very passionate advocate for mesothelioma people.

24     She was leaving the foundation.

25     Q.  After you received this letter, who became your principal

1    point of contact at the Simmons firm?

2    A.  Joy told me to contact Greg directly.

3    Q.  Greg Kirkland?

4    A.  Yes.

5    Q.  Did you continue to refer patients of yours to Simmons

6    after you received this letter?

7    A.  Yes.

8    Q.  Why did you keep referring patients to Simmons?

9    A.  We had had a good relationship.  I wanted to keep it

10   strong, and the Simmons Foundation had other projects besides

11   the direct funding which I thought were extremely important for

12   mesothelioma patients.

13   Q.  How would continuing to refer patients to the Simmons firm

14   help further those other projects that you just mentioned?

15   A.  I believed that, as I said earlier, firms which support

16   research will give back some of their profits, and I think

17   patients should be referred to those firms preferentially.

18   Q.  Did the Simmons firm, the Simmons Foundation, end up

19   fulfilling its commitment to your research program?

20   A.  I believe so.

21   Q.  Did there come a time when you asked -- withdraw that.

22          You testified earlier -- it seems like hours ago.  It

23   may have been hours ago -- that Sheldon Silver helped your son

24   find a job.

25   A.  Yes.

1   Q.   What is your son's name?

2   A.   Jonathan Taub.

3   Q.   How did it come about that you asked Sheldon Silver for

4   help getting your son a job?

5   A.   My son was working in the garment industry, but he had

6   credentials to work in a nonprofit Jewish organization, which

7   is what he wanted to do.

8        Mr. Silver, in addition to being a mesothelioma lawyer

9   and an important state official, also was well known and

10  respected in the Jewish community.  Since we had had a friendly

11  relationship over the years, I thought it was appropriate to

12  ask him if he knew anyone who could help my son find a job in

13  that sector.

14  Q.   Was your son having difficulty finding a job at the time?

15  A.   I believe he did not find one that he wanted.  So he was

16  having difficulty.

17  Q.   If we can look at Government Exhibit 316.

18       Do you recognize that document?

19  A.   Yes.

20  Q.   What is this document?

21  A.   It's a letter that my son wrote I believe on my computer

22  just sending along his resume to Mr. Silver.

23       MR. GOLDSTEIN:  Your Honor, the government offers 316.

24       MR. MOLO:  No objection.

25       THE COURT:  316 is received.

1          (Government's Exhibit 316 received in evidence)

2          MR. GOLDSTEIN:  Let's look at the second page of the

3   document.  Let's highlight from "Personal and confidential"

4   down to the signature line.

5          It's to the Honorable Sheldon Silver.  "Dear

6   Mr. Silver.  Thank you very much for your consideration.  As

7   requested, I am enclosing my resume.  Please let me know if you

8   require any additional materials or information.  Thank you

9   again for your help.  Sincerely, Jonathan Taub."

10          Dr. Taub, did you speak with Sheldon Silver directly

11   about getting his help in finding your son a job?

12   A.  Yes.

13   Q.  After you made that request and your son sent him that

14   information, what did Silver do?

15   A.  I don't know exactly what he did, but he helped get my son

16   a job in a nonprofit Jewish organization, yes.

17   Q.  Do you know whether your son met with Sheldon Silver?

18   A.  I believe he did.

19   Q.  Do you know if it was Sheldon Silver directly or somebody

20   in his office?

21   A.  I don't know.

22   Q.  Now, at the time that you asked for help getting your son

23   this job, were you sending cases to Sheldon Silver?

24   A.  Yes.

25   Q.  What was the connection, if any, between the cases you were

1  sending Sheldon Silver and this request for your son?

2  A.  I sent the cases to Sheldon Silver in his role as a

3  mesothelioma lawyer and as an important person in New York

4  State, but he also was an important person in the Jewish

5  community, and I really didn't make much of a distinction

6  between those two roles.

7  Q.  Did you believe that sending patients to Silver might help

8  in getting him to provide assistance to your son?

9  A.  It could.

10 Q.  And did Sheldon Silver end up getting your son a job?

11 A.  He helped, yes.

12 Q.  What was the organization that your son got a job with?

13 A.  He got a job with an organization called Ohel, which is a

14 large family services organization in Brooklyn that serves many

15 functions.  It will take care of poor families.  It will take

16 care of special-needs children and adults.  It provides those

17 types of family services.

18 Q.  Dr. Taub, what knowledge, if any, did you have as to

19 whether this organization, Ohel, receives state funding?

20 A.  I have no knowledge.

21 Q.  What knowledge do you have, if any, as to whether Ohel

22 received grants from Sheldon Silver?

23 A.  No knowledge whatsoever.

24 Q.  Dr. Taub, a couple of minutes ago in your testimony, you

25 referred to Sheldon Silver as a mesothelioma attorney.

FB4YSIL6                        Taub - Cross

1    A.  Yes.

2    Q.  What knowledge, if any, did you have as to whether Sheldon

3    Silver had any experience with asbestos cases?

4    A.  He was of counsel to probably the largest mesothelioma firm

5    in the city; otherwise, I had no knowledge of his function.

6    Q.  When you sent Sheldon Silver cases, do you know whether he

7    made any contact with the patients of yours who you sent to

8    him?

9    A.  I did not know.

10             MR. GOLDSTEIN:  Nothing further, your Honor.

11             THE COURT:  Okay.

12             Mr. Molo.

13             MR. MOLO:  We don't need to do it now, but there is

14   that one issue.

15             THE COURT:  There is.

16   CROSS-EXAMINATION

17   BY MR. GOLDSTEIN:

18   Q.  Good afternoon, Dr. Taub.

19   A.  Good afternoon.

20   Q.  I'm Steve Molo.  I represent Mr. Silver.  We have not met

21   before, have we?

22   A.  No.

23   Q.  First do no harm.  You know what that means; right?

24   A.  Yes.

25   Q.  It's a well-known saying in the medical profession that the

1    patient comes first.

2    A.  Yes.

3    Q.  When you became a doctor, you also took a hippocratic oath;

4    is that right?

5    A.  Yes.

6    Q.  In doing so, you vowed to put your patients' interests

7    first?

8    A.  The specifics of the hippocratic oath are not quite that,

9    but I do put the patients' interests first, yes.

10   Q.  I was going to say, hippocratic oath aside, you've always

11   put your patients' interests first; correct?

12   A.  Pretty much.

13   Q.  That included when you made suggestions about them seeing a

14   lawyer; correct?

15   A.  Yes.

16   Q.  You gave them names of law firms to consider representing

17   patients if they had a legal claim?

18   A.  Yes.

19   Q.  And you, in doing so, put the patients' interests first?

20   A.  That's true.

21   Q.  And, in suggesting that some patients consider Weitz &

22   Luxenberg, you were acting in the interests of your patients?

23   A.  That's correct.

24   Q.  I'm going to ask you a little bit more about your career

25   because it's extraordinary.

1          You've had what?  Fifty years in medicine?

2     A.  A little more than that.

3     Q.  And your medical degree was from Yale; right?

4     A.  Yes.

5     Q.  Ph.D. in transplantation biology?  Is that what it was from

6     London University?

7     A.  Yes.  From London University.  It was in the faculty

8     biology, and it was in transplantation biology because of my

9     professor.

10    Q.  And you were also a research fellow at the National

11    Institute for Medical Research in London?

12    A.  Yes.

13    Q.  You served as an intern at the New England Medical Center

14    in Boston?

15    A.  Yes.

16    Q.  You're an associate professor at Mount Sinai here in

17    New York?

18    A.  Yes.

19    Q.  And actually, the chairman of the Division of Medical

20    Oncology at the Medical College of Virginia; is that right?

21    A.  That's correct.

22    Q.  And then the American Cancer Society professor for clinical

23    oncology?

24    A.  Yes.

25    Q.  And since 1981, you've held a series of prestigious

1  positions at Columbia; correct?

2  A.  That's right.

3  Q.  There's probably not a whole lot of people in the medical

4  faculty that have an association with the medical school longer

5  than yours, are there?

6  A.  There are a few.

7  Q.  Not many; right?

8  A.  No.

9  Q.  You have the rare distinction -- you were rather modest on

10 your direct examination about being board certified in actually

11 four medical specialties; right?

12 A.  Yes.

13 Q.  There are not many doctors that have four board

14 certifications, are there?

15 A.  No.  There are very few.

16 Q.  I just want to show you -- we don't have to spend a lot of

17 time on it -- Defense Exhibit 2 I believe.

18             THE COURT:  Three I think.

19             MR. MOLO:  If you would just take a look through it.

20 BY MR. MOLO:

21 Q.  I'm going to direct your attention specifically to the last

22 page which indicates when it was prepared.

23 A.  September 2013.

24 Q.  Can you say what it is generally.

25 A.  I'm sorry?

1    Q.  Can you say what this is.

2    A.  This is my curriculum vitae.

3    Q.  Did you prepare it?

4    A.  With some assistance.

5            MR. MOLO:  Your Honor, I move for admission of Defense

6    Exhibit 3.

7            MR. GOLDSTEIN:  No objection.

8            THE COURT:  Defense Exhibit 3 is received.

9            (Defendant's Exhibit 3 marked for identification)

10   BY MR. MOLO:

11   Q.  This, at least of 2013, a full listing of your medical work

12   and professional accomplishments; is that right?

13   A.  That's a pretty good listing.

14   Q.  It indicates that you've won fellowships and awards from

15   the National Institute of Health; is that right?

16   A.  Yes.

17   Q.  The Leukemia Society Scholar Award as well; right?

18   A.  Yes.

19   Q.  The Emil Conason Memorial Research Award from Mount Sinai?

20   A.  Correct.

21   Q.  And also the Elliot Osserman Award from the Israel Cancer

22   Research Fund; right?

23   A.  Yes.

24   Q.  I counted them up, and I may have it wrong, but it looks

25   like you've published, at least as of this version of your CV,

FB4YSIL6                          Taub - Cross

1    155 scholarly articles.  Is that right?

2    A.  Yes.  That's right.

3    Q.  There have probably been some more since then?

4    A.  Yes, there have.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FB45sil7                          Taub - Cross

1   BY MR. MOLO:

2   Q.  And these articles have appeared in, some of them in some

3   of the most prestigious publications in your field like Nature?

4   A.  Yes.

5   Q.  In Lancet, yes?

6   A.  Yes.

7   Q.  The New England Journal of Medicine?

8   A.  Yes.

9   Q.  And your work at Columbia, you have been an extraordinary

10  researcher as well as a leader there at the medical school,

11  right?

12  A.  I -- I like what I do and I'm having a good time at

13  Columbia.  I had a good time at Columbia.

14  Q.  Your work has had a positive impact on a lot of people's

15  lives, hasn't it?

16  A.  I hope.

17  Q.  You are a healer as well as a scholar, aren't you?

18  A.  I'm -- I was put on this earth, I think, to take care of

19  those patients.  So, I'm very passionate about that.

20  Q.  And you would not engage in a bribery scheme involving your

21  patients, would you?

22          MR. GOLDSTEIN:  Objection, your Honor.

23          THE COURT:  Sustained.

24  Q.  You would not have some explicit agreement to send patients

25  in exchange for grants, would you?

FB45sil7                          Taub - Cross

1                  MR. GOLDSTEIN:  Objection, your Honor.

2                  THE COURT:  Just rephrase the question.

3      Q.  You would not have --

4                  THE COURT:  Did you.

5      Q.  You did not have an explicit agreement to exchange patients

6      for grants, did you?

7      A.  I did not.

8      Q.  Now, you founded the Meso Center at Columbia in 2002, is

9      that right?

10     A.  Around that time.

11     Q.  And the title that you hold, the Vivian and Seymour

12     Milstein Family Professor of Medicine at Columbia, that is

13     named after the Milstein family, right?

14     A.  Yes.

15     Q.  And they have been great supporters of your Mesothelioma

16     Center, correct?

17     A.  They have been, yes.

18     Q.  As I understand it, it is a tremendously wealthy family

19     that made a fortune in building supplies and real estate and

20     they own Emigrant bank; is that right?

21     A.  Correct.

22     Q.  Wasn't there some history in the family, too, involving

23     asbestos and someone who was ill?  They owned a factory or

24     something?

25     A.  I believe there was, yes.

FB45sil7                          Taub - Cross

1  Q.  And the Gershwin family as well, they're also a wealthy New

2  York family that supports you?

3  A.  Yes, they are.

4  Q.  And I guess you also received funding from pharmaceutical

5  companies, is that correct?

6  A.  The Mesothelioma Center conducted some clinical trials with

7  pharmaceutical company support.

8  Q.  And it would be financial support from pharmaceutical

9  companies?

10  A.  For the trial.

11  Q.  For the trials.  Of course.

12  A.  Yes.

13  Q.  And that would be companies like, I think Lily -- Eli-Lily

14  was one?

15  A.  Certainly.

16  Q.  J&J -- Johnson & Johnson?

17  A.  Yes.

18  Q.  Genentech?

19  A.  Yes.

20  Q.  Schering?

21  A.  Yes.

22  Q.  Pharmeon?

23  A.  I don't recall Pharmeon but it is possible.  They may have

24  merged with someone else.

25  Q.  How about Sanofi?

FB45sil7                          Taub - Cross

1    A.  Sanofi, yes.

2    Q.  So you did a lot of great work at the Meso Center before

3    you got these two state grants that we have heard about today,

4    correct?

5    A.  Yes.

6    Q.  And donors like the Milsteins and the Gershwins are

7    important to your success?

8    A.  They were a big help.

9    Q.  Do you feel like you owe a responsibility to them?

10   A.  I certainly owe them progress reports.

11   Q.  And so you do report with them, you meet with them, right?

12   A.  I have met with them, yes.

13   Q.  Do you feel a sense of accountability to them?

14   A.  Well, I feel the sense of accountability in the sense that

15   donated funds should be used in a manner which is transparent.

16   Q.  Now, Columbia has rules that govern the conduct of tenured

17   faculty like you, is that right?

18   A.  I believe so.

19   Q.  And those rules would prohibit doctors from engaging in

20   bribery schemes where they refer patients in exchange for grant

21   money, right?

22           MR. GOLDSTEIN:  Objection, your Honor.

23   A.  I'm not familiar with those rules.

24   Q.  Okay --

25           THE COURT:  I haven't -- he has answered.  He doesn't

FB45sil7                              Taub - Cross

1    know.

2    A.  I don't know is the answer.

3    Q.  Well, I mean, you wouldn't expect that if you were to have

4    engaged in bribery schemes Columbia would want you on the

5    faculty, right?

6              MR. GOLDSTEIN:  Objection, your Honor.

7              THE COURT:  Sustained.

8    Q.  Do the rules of Columbia prohibit you from using a patient

9    to gain some kind of financial interest for the medical center?

10             MR. GOLDSTEIN:  Objection.

11             THE COURT:  Overruled.

12             If you know.

13   A.  Please repeat the question.

14   Q.  Sure.

15             The rules of Columbia, would they allow you to use a

16   patient to gain some kind of financial interest for the medical

17   center?  Let me re-ask the question.  I can tell by the look

18   your Honor face it is a bad question.

19   A.  I don't know what you're talking about.

20   Q.  It is a bad question.

21   A.  Yes.

22   Q.  The rules of Columbia would not allow a doctor to refer

23   patients to some source in order for the hospital to again a

24   financial gain for that, right?  There is anti-kickback rules,

25   aren't there.

1    A.   If I refer a patient to an orthopedist who works in the

2    hospital, the hospital is going to get some benefit when you

3    refer a patient to another doctor.  So, I mean, that revenue.

4    I'm not sure what you are driving at.

5    Q.   Okay, and those kinds of referrals happen from time to

6    time?

7    A.   Yes.  Of course.

8    Q.   Since your appointment to the Columbia faculty have you

9    faithfully and professionally satisfied your obligations of

10   your employment, title, and tenure?

11             MR. GOLDSTEIN:  Objection.

12             THE COURT:  Overruled.

13   A.   I believe I have, yes.

14   Q.   In fact, every year you certify to Columbia that you

15   observe all of the ethical principles of your profession, don't

16   you?

17   A.   I don't do it every year but I sign a conflict of interest

18   form, yes.

19   Q.   And I take this those ethical principles would prohibit you

20   from engaging in bribery schemes involving your patients,

21   correct?

22             MR. GOLDSTEIN:  Objection.

23             THE COURT:  Overruled.

24   A.   I don't know if it specifically said that but I would

25   not -- one is expected to have ethical conduct in general.

FB45sil7                        Taub - Cross

1    Q.  Okay.  And I'm going to show you what's marked Defendant's

2    Exhibit 4 and ask you to take a look at it.  One moment,

3    please?  (Pause)

4              Doctor, do you recognize that document?

5    A.  I'm sorry?  Yes.

6    Q.  Do you recognize this document?

7    A.  Yes.

8    Q.  Without going into detail, can you describe, generally,

9    what it is?

10   A.  It's a for reappointment -- it is the application for

11   reappointment to the medical staff.

12   Q.  And did you fill one of these out periodically?

13   A.  Yes.

14   Q.  Is your signature on the back of this document?

15   A.  One second --

16   Q.  Last page.

17   A.  Yes.

18   Q.  And the first page, that is for New York Presbyterian

19   Hospital, right?  Columbia Presbyterian Medical Center?

20   A.  Yes.

21             MR. MOLO:  Your Honor, I move admission of Defendant's

22   Exhibit 4.

23             MR. GOLDSTEIN:  No objection.

24             THE COURT:  Defense 4 is received.

25             (Defendant's Exhibit 4 received in evidence)

FB45sil7                          Taub - Cross

1   BY MR. MOLO:

2   Q.  If you turn to the last page and if we can put this up on

3   the screen, please, and you look at the very first paragraph

4   and the second to the last sentence of it which I have

5   highlighted, it says that:  I also agree to observe all of the

6   ethical principles of my profession.

7            Correct?

8   A.  Yes.

9   Q.  And you signed that and put your signature at the bottom of

10  that page, right?

11  A.  Yes.

12  Q.  We can take that down, please.

13           After the publicity surrounding the criminal charges

14  against Mr. Silver Columbia made a decision, you said, to

15  remove you from your tenured position; is that correct?

16  A.  They did that, yes.  They made a decision to do that.

17  Q.  Mr. Silver was charged on January 22nd of 2015?  Do you

18  recall?

19           MR. GOLDSTEIN:  Objection, your Honor.

20  A.  I don't recall the date.

21           THE COURT:  Overruled.

22  Q.  Okay.

23  A.  But that's okay.

24  Q.  And January 23rd, 2015, the very next day, you were told

25  you would have no position or job duties or salary as of July

FB45sil7                         Taub - Cross

1    22nd of 2015, correct?

2    A.  Yes.

3    Q.  And you were also told that your appointment as the Vivian

4    and Seymour Milstein Family Professor of Medicine would not be

5    renewed beyond July 22nd of 2015, correct?

6    A.  That's correct.

7    Q.  You disagreed with that decision, right?

8    A.  I did disagree with that, yes.

9    Q.  Sure, because it was wrong; correct?

10   A.  I believe that it may be misguided.  It did not follow the

11   procedures.

12   Q.  And you knew that you had faithfully and professionally

13   satisfied your obligations of your employment and your title

14   and your tenure, correct?

15   A.  I had no reason to doubt it at the time.

16   Q.  Sure.

17           And, in fact, you were sufficiently upset about being

18   wronged that you went and saw a lawyer about it, right?

19   A.  Yes.

20   Q.  And the lawyer that you saw was an experienced lawyer who

21   understood issues like this, correct?

22   A.  Yes.

23   Q.  And you retained this lawyer?

24   A.  Yes, I am.

25   Q.  And you have faith in your lawyer?

1   A.  I guess I do.

2   Q.  And your lawyer, on your behalf, sued Columbia in the New

3   York County Supreme Court because of the action they took

4   against you?

5   A.  He sued them for due process.

6   Q.  Must have been very painful given your long association

7   with Columbia.

8   A.  I love my job at Columbia and, yes, I'm very distressed

9   about it.

10  Q.  But you still went ahead and filed the suit, right?

11  A.  I wanted to continue working.

12  Q.  Sure.

13          I'm going to show you what's marked Plaintiff's

14  Exhibit 5.  Would you take a moment to look at the document?

15  Do you recognize the document, Doctor?

16  A.  Yes.

17  Q.  Is it the lawsuit that you filed against Columbia in New

18  York County Supreme Court?

19  A.  It's related to the lawsuit, yes.

20  Q.  And is your signature that appears on the last page, your

21  verification?

22  A.  Yes.

23          MR. MOLO:  Your Honor, I would move for admission of

24  Defendant's Exhibit 5.

25          MR. GOLDSTEIN:  No objection, your Honor.

1              THE COURT:  Okay.  Defendant's Exhibit 5 will be

2      received.

3              (Defendant's Exhibit 5 received in evidence)

4      BY MR. MOLO:

5      Q.  May we publish this, please?

6              So, that's the caption of the case, correct,

7      Dr. Robert Taub versus Columbia University?

8      A.  Yes, it is.

9      Q.  And if we go to paragraph 44 there are no page numbers on

10     the bottom of the document but paragraph 44 it says:

11     Plaintiff-Petitioner accepted Defendant-Respondent's offer of

12     employment, title, and tenure following Respondents' December

13     10, 1980, letter, correct?

14     A.  Yes.

15     Q.  Then the next paragraph, paragraph 45 says that:

16     Plaintiff-Petitioner -- that's you, correct?

17     A.  Yes.

18     Q.  Has faithfully -- can we highlight this, please -- has

19     faithfully and professionally satisfied the obligations of his

20     employment, title, and tenure since that time, correct?

21     A.  Yes.

22     Q.  And on the very back page, Doctor, you stated that, Robert

23     Taub, being duly sworn, states as follows:  I am the

24     Petitioner.  I have reviewed the contents of the foregoing

25     complaint and the verified Article 78 petition.  The

FB45sil7                          Taub - Cross

1    information contained therein is true and correct to the best

2    of my knowledge.

3                And you signed that, right?

4    A.  Yes.

5    Q.  You swore that before a notary public, right?

6    A.  Yes, I did.

7    Q.  You are currently still serving in your position at

8    Columbia, correct?

9    A.  Yes.

10   Q.  And you very much feel rightfully so, correct?

11   A.  Yes, I do.

12   Q.  You have served as an expert witness in asbestos personal

13   injury cases, correct?

14   A.  Yes.

15   Q.  You are sometimes asked to testify as a treating physician

16   in asbestos personal injury cases?

17   A.  Yes.

18   Q.  How many asbestos personal injury cases would you estimate

19   that you have been involved in either as a treating physician

20   or as an expert witness?

21   A.  Five.  Maybe six, seven.  Not more.

22   Q.  Not more than that in terms of court testimony or generally

23   at all?

24   A.  Both.

25   Q.  Both, okay.

1   A.  Yes, I have testified in other -- a long time ago I

2   testified in many other types of cases but recently I have done

3   very little.

4   Q.  And a good lawyer can provide great assistance to a

5   mesothelioma victim, correct?

6   A.  Absolutely.

7   Q.  If a patient has been exposed to asbestos it may be

8   possible to bring a personal injury claim against the party

9   that exposed them to that asbestos, right?

10  A.  Correct.

11  Q.  That could be the manufacturer of the asbestos?

12  A.  Yes.

13  Q.  It might also be a company that used asbestos in their

14  products?

15  A.  Yes.

16  Q.  And I believe you said a good lawyer can ferret out the

17  patient's exposure, right?

18  A.  It requires investigation and requires a lot of work.

19  Q.  So, it is important -- let me just back up and ask you one

20  more questions.

21          Usually, very sadly, most of these patients that you

22  see have very little time to live when you see them, is that

23  right?

24  A.  Yes.  That's true.

25  Q.  So, if they are going to pursue a legal claim and be part

1   of that pursuit there is not a lot of time to do that for them,

2   sadly?

3   A.  It's good that it should get done quickly.

4   Q.  Okay.

5   A.  Reasonably quickly.

6   Q.  So, it is particularly important that a mesothelioma victim

7   find a good lawyer in order to bring a successful personal

8   injury claim, correct?

9   A.  Yes.

10  Q.  And you know that the lawyers that handle these cases

11  handle them on a contingent fee basis, right?

12  A.  I do.

13  Q.  You say that your patients come from all over the country?

14  A.  Yes.

15  Q.  As of about a year ago half of your patients were using

16  Weitz & Luxenberg; is that right?

17  A.  I don't know exactly, but it would not be a surprising

18  figure.

19  Q.  Because even if you didn't refer a patient to

20  Weitz & Luxenberg it is quite possible that they would go to

21  Weitz & Luxenberg on their own, correct?

22  A.  Yes.

23  Q.  And, in fact, patients have come to you already represented

24  by Weitz & Luxenberg?

25  A.  Yes.

1   Q.   Now, Weitz & Luxenberg gets cases because they are a very

2   good firm, correct?

3   A.   Yes.

4   Q.   And, in fact, the Simmons firm that we have heard about, I

5   think they've actually referred cases to Weitz & Luxenberg; is

6   that right?

7   A.   And visa versa, I think, but I think that, yes, you're

8   correct.

9   Q.   And you have had relationships with Weitz & Luxenberg

10  lawyers apart from Mr. Silver, correct?

11  A.   Yes.

12  Q.   In fact, there was a lawyer named Bonnie Steinwolf that you

13  had a relationship with, correct?

14  A.   When she worked there, yes.

15  Q.   When she was at Weitz & Luxenberg?

16  A.   Yes.

17  Q.   And also a lawyer named Jim Long who was at

18  Weitz & Luxenberg?

19  A.   Correct.

20  Q.   And you suggested their names to patients, correct?

21  A.   I referred a patient to Bonnie Steinwolf after she left

22  Weitz & Luxenberg but, still to her, yes.

23  Q.   While she was at Weitz & Luxenberg didn't she and Mr. Long

24  also have a patient of yours that you had suggested that --

25  A.   I think that they had a patient and they sent a patient to

FB45sil7                            Taub - Cross

1    me.

2    Q.  Okay, so Weitz & Luxenberg has actually sent patients to

3    you?

4    A.  Yes.

5    Q.  So in that sense there is a --

6    A.  For treatment, yes.

7    Q.  Of course, because you are -- you are the Weitz & Luxenberg

8    of the medical world and Weitz & Luxenberg is the Robert Taub

9    of the legal word, correct?

10              MR. GOLDSTEIN:  Objection.

11              THE COURT:  Sustained.

12   A.  I'm not sure --

13              THE COURT:  Don't answer the question, Dr. Taub.

14   Q.  What I mean to say is that it would make sense for a firm

15   like Weitz & Luxenberg to send someone with your skill and

16   ability, correct?

17              MR. GOLDSTEIN:  Objection.

18              THE COURT:  Sustained.

19   Q.  You have colleagues, as I understand it, that have

20   suggested that their patients go to Weitz & Luxenberg?

21              THE COURT:  If you know.

22   A.  I believe so.  I don't know chapter and verse, but I

23   believe so.  Yes.

24   Q.  Dr. Mark Ginsburg, is he a prominent cancer doctor?

25   A.  Yes.

439

1    Q.  He's at Columbia?

2    A.  Yes.

3    Q.  And he regularly refers patients to, or suggests that

4    patients go to a lawyer named Michael Roberts at

5    Weitz & Luxenberg?

6            MR. GOLDSTEIN:  Objection.

7            THE COURT:  Sustained.

8    Q.  If you know.

9    A.  I don't know.

10           MR. GOLDSTEIN:  Objection.

11           THE COURT:  He doesn't know.

12   Q.  Okay.

13           Do you know of other doctors throughout the country

14   that have sent, suggested that their patients see

15   Weitz & Luxenberg?

16   A.  As I said earlier, a number of my patients have already

17   been referred to Weitz & Luxenberg when I see them so I assume

18   that that's the case.

19   Q.  But how about other doctors that you know?  Do you know

20   other doctors that have suggested that their patients see

21   Weitz & Luxenberg?

22           MR. GOLDSTEIN:  Objection.

23           THE COURT:  Sustained.

24   Q.  In fact, of the handful of times that you have served as an

25   expert witness you have actually served as an expert witness

FB45sil7                         Taub - Cross

1    for Weitz & Luxenberg, haven't you?

2    A.  On at least on two occasions.

3    Q.  On two occasions.

4    A.  That I can recall, yes.

5    Q.  Okay.

6         And on those occasions you were paid for your time,

7    correct?

8    A.  Yes.

9    Q.  And I believe your time is charged, it should be, at like

10   $1,750 an hour for expert witness work?

11   A.  Yes.

12   Q.  And are you sure it wasn't more than time times that you

13   worked for Weitz & Luxenberg as an expert?

14   A.  Those are the two I remember.

15   Q.  It is possible there was more?

16   A.  Not much more.  It may have been three but that's about it.

17   I don't -- yeah.

18   Q.  Thank you.

19        Now, Dr. Taub, you are not licensed to practice law,

20   are you?

21   A.  No.

22   Q.  You are not a lawyer with a law degree, I should say.  You

23   don't have a law degree either, do you?

24   A.  No.

25   Q.  Your patients come to you because of your medical skills?

FB45sil7                          Taub - Cross

1    A.  Yes.

2    Q.  And you have suggested to some of these patients that they

3    hire a lawyer, right?

4    A.  Yes, I have.

5    Q.  And if they don't have lawyers and you make the suggestion

6    the patient is -- well, let me ask a different question.

7           You have actually suggested several specific law firms

8    to patients over time, correct?

9    A.  Yes.

10   Q.  In addition to Weitz & Luxenberg there is a firm called

11   Belluck and Fox; you have suggested that firm?

12   A.  Yes.

13   Q.  And you have suggested patients to see the Simmons firm,

14   correct?

15   A.  Yes.

16   Q.  In fact, are there other names that you can recall that you

17   may have suggested?

18   A.  Yes.

19   Q.  Do you recall their names?

20   A.  One is Levy, Phillips & Konigsberg.

21   Q.  A patient is free to reject your suggestion, correct?

22   A.  Yes.

23   Q.  A patient can take what you tell them and go think about

24   it, right?

25   A.  Yes.

FB45sil7                          Taub - Cross

1    Q.  You can choose to do independent research on the Internet

2    about these law firms?

3    A.  Yes.

4    Q.  They can talk to their friends and family about these law

5    firms, is that right?

6    A.  Yes.

7    Q.  They can talk to other doctors about your suggestion,

8    correct?

9    A.  Yes.

10   Q.  A patient can choose to talk to other lawyers besides the

11   ones that you might suggest, correct?

12   A.  Correct.

13   Q.  A patient can choose to meet with the law firm once you

14   suggest it, correct?

15   A.  Yes.

16   Q.  The patient can choose to ask that law firm about its

17   experience, correct?

18   A.  Yes.

19   Q.  The patient could choose to ask to meet with the actual

20   lawyer who will try their case if it went to trial, correct?

21   A.  Yes.  That's correct.

22   Q.  And the patient can ask the law firm about the strategy

23   that it might use, right?  It can choose to do this?

24   A.  Yes.

25   Q.  The patient can choose to meet with the law firm more than

1   once before making a decision on hiring it, right?

2   A.  That's right.

3   Q.  And, ultimately, though -- ultimately -- the patient

4   decides whether to retain any law firm that you might suggest,

5   correct?

6   A.  That's right.

7   Q.  Some patients take your suggestions?

8   A.  Yes.  Some have.

9   Q.  Some patients reject your suggestions, right?

10  A.  Yes.  That's true.

11  Q.  And there is probably situations where, I don't know if you

12  know this is happening, where you suggested a law firm and the

13  law firm decided not to represent the patient for some reason?

14  A.  That's happened.

15  Q.  I take it, though, that in all of these circumstances, you

16  only suggested that your patients contact law firms that are

17  excellent in representing mesothelioma victims?

18  A.  That's correct.

19  Q.  Okay, and I take it you actually know individuals at

20  various law firms?

21  A.  Yes, I do.

22  Q.  And if a patient lived in New York City there might be more

23  incentive to use Weitz & Luxenberg?

24  A.  If the patient lived in the New York area of course it

25  would be better to send them to a local firm like

```
 1   Weitz & Luxenberg, sure.
 2   Q.   Sure.
 3        And sometimes you might even give a patient a list of
 4   firms, right?
 5   A.   We have generally not done that as a formal list, no, but I
 6   would suggest more than –– I have, on occasion, suggested more
 7   than one law firm.
 8   Q.   Okay.  You, yourself, have no personal financial stake in
 9   which lawyer your patient chooses, correct?
10   A.   No, I do not.
11   Q.   You are not paid any money as a result of your patient
12   choosing Weitz & Luxenberg, correct?
13   A.   No.
14   Q.   As you have explained, and I think we heard a little
15   earlier today from Mr. Weitz himself, mesothelioma is just an
16   awful disease, right?
17   A.   Horrible.
18             MR. GOLDSTEIN:  Objection, your Honor.
19             THE COURT:  Overruled.  I doubt he heard Mr. Weitz'
20   testimony.
21             MR. MOLO:  I'm sorry, that's not a good question in
22   terms about incorporating Mr. Weitz.
23             THE COURT:  That is a terrible question.
24             MR. MOLO:  I was being kind to myself; it was a bad
25   question, terrible question.
```

FB45sil7                              Taub - Cross

1   BY MR. MOLO:

2   Q.  Anyway, mesothelioma is an awful disease, correct?

3   A.  Yes.

4   Q.  I guess you talked a little bit about some of the symptoms

5   that they include things like severe chest wall pain for some

6   people?

7   A.  Yes.

8   Q.  Abdominal pain?

9   A.  It can be quite painful, yes.

10  Q.  Coughing up blood?

11  A.  That's uncommon but it can happen.

12  Q.  You mentioned bowel function?

13  A.  That's typical for peritoneal mesothelioma.

14  Q.  And blood clotting as well?

15  A.  No, that's not a main symptom of mesothelioma.  You can

16  have problems with veinous return but that's a very advanced

17  disease.

18  Q.  Are there other significant symptoms?

19  A.  Those are bad enough.

20  Q.  I would say.  Yeah, I would say.

21          This disease, mesothelioma, you said it is certainly

22  not as common as the lung cancer that people get from smoking

23  cigarettes, right?

24  A.  It is 180,000 to 200,000 lung cancers from cigarettes and

25  3,000 to 3300 cases of mesothelioma.  So, it is a 150 to 3

FB45sil7                         Taub - Cross

1   ratio.

2   Q.  And so I take it this is reflected somewhat in the research

3   finding that is available, right?

4   A.  Yes.

5   Q.  With less money generally available for mesothelioma?

6   A.  Yes.

7   Q.  Mesothelioma affects New Yorkers to a significant extent,

8   doesn't it?

9           THE COURT:  Rephrase the question.  I don't know what

10  that means.

11  Q.  Sure.

12          Let me be more precise, Doctor.  In terms of

13  statistics you have seen about rankings of states with the

14  largest number of mesothelioma victims, doesn't New York

15  usually rank around the fourth?

16  A.  Yes.  The New York area.

17  Q.  The New York area.

18  A.  Yes.

19  Q.  Is fourth in terms of most cases of mesothelioma a year?

20  A.  Yes.

21  Q.  Is that due to the historical factories that have been here

22  and --

23  A.  It is due mainly to two entities, one of them was Johns

24  Manville, in Manville, New Jersey, and the other was the

25  Brooklyn Navy Yard.  Those two were the two largest polluters

1    of asbestos.   The World Trade Center, the lower 55 floors of

2    Tower One and Tower Two were floored with asbestos tile.

3    Q.   So when those tiles -- those floors came down --

4    A.   Those tiles were vaporized.

5    Q.   And all of that asbestos went into the air?

6    A.   Yes.

7    Q.   All throughout Manhattan?

8    A.   There were tons of asbestos in those two buildings.

9    Q.   I believe that we have had some very sad situations where

10   some early responders to the scene have actually died from

11   mesothelioma already?

12   A.   We have only identified I think one or two cases but I

13   suspect there will be more.

14   Q.   Obviously a very real threat.

15   A.   Uh-huh.

16   Q.   You have to say yes or no.   I'm sorry.

17   A.   Yes.   I'm sorry.

18   Q.   Now, it is also, I understand it, not a disease that people

19   inherit through their genes like some other diseases, right?

20   A.   Actually, in the last year or two we have identified some

21   genes which are familial which may predispose you to

22   mesothelioma; gene BAP-1.

23             THE COURT:   Can I see the attorneys at side bar?

24             MR. MOLO:   Sure.

25

1              (At side bar)

2              THE COURT:  Walking through the symptoms which we have

3    now done several times is fascinating but I have the feeling

4    that you are filibustering to get to the end of the day.  What

5    point are you trying to make?

6              MR. MOLO:  With this?

7              THE COURT:  Yes.

8              MR. MOLO:  You want the punch line before you have got

9    it?  The funding was well justified.

10             THE COURT:  Is it going to come soon?

11             MR. MOLO:  It is coming soon.  I have moved through

12   quite a lot of material in a very short period of time.

13             THE COURT:  You have gone through several folders.

14             MR. MOLO:  I have.

15             THE COURT:  I am concerned about the last half hour

16   where we are talking about symptoms we have talked about

17   before.

18             MR. MOLO:  I was already moving on to the propensity

19   of it or how common it is in New York, I guess.

20             THE COURT:  We have already done that.

21             MR. MOLO:  I am moving.  I am moving.  I moved through

22   a lot -- if we are going to weigh through quickness I have done

23   a lot in a short time.

24             THE COURT:  But you are done on this, on the symptoms?

25             MR. MOLO:  Yes.  I'm not going to ask him any more

FB45sil7                         Taub - Cross

1    symptoms.

2              THE COURT:  What is the relevance of the funding, that

3    it is important?  No one is saying that it is not an important

4    disease.

5              MR. MOLO:  Relevant or important.

6              THE COURT:  No one is saying that mesothelioma is not

7    a disease that warrants funding to study it.  I'm not sure why

8    that's relevant.

9              MR. MOLO:  Because they're claiming the only reason he

10   got the money was because of private -- Judge, I have been

11   laser-like in getting through this and I am cross-examining.

12             THE COURT:  You were doing quite well until you

13   wandered through 10 minutes on symptoms.

14             MR. MOLO:  He is tired, by the way.

15             THE COURT:  I know he is tired.

16             MR. MOLO:  So, I mean.

17             THE COURT:  All right.

18             MR. MOLO:  All right.

19

20

21

22

23

24

25

FB45sil7                              Taub - Cross

1              (In open court)

2    BY MR. MOLO:

3    Q.  The people that get it, mesothelioma, often are some

4    working class people that have been exposed to it through the

5    kinds of things that you have talked about?

6    A.  Many of them.

7    Q.  In fact, workers who had come home with it on their clothes

8    it might be -- the household might contract it from that,

9    right?

10   A.  Yes.

11   Q.  So, the people of New York, specifically, benefit greatly

12   from your research on mesothelioma, correct?

13   A.  I hope that they have some benefit.  I don't know exactly

14   how much benefit they get but, yes, I would agree.

15   Q.  So the State of New York was doing the right thing for New

16   Yorkers in helping to fund your research?

17              MR. GOLDSTEIN:  Objection.

18              THE COURT:  In his opinion.

19              What was your opinion?  Was it a good research grant?

20              THE WITNESS:  Are you asking me?

21              THE COURT:  Yeah.  What's your opinion.  That's what

22   he is asking you.

23   BY MR. MOLO:

24   Q.  For New Yorkers, was the State of New York doing the right

25   thing?

1          THE COURT:  In his opinion.

2          MR. MOLO:  Yes.

3          THE WITNESS:  Absolutely, yes.

4          THE COURT:  It would have been right or they would

5    have given you more money, I bet.

6          THE WITNESS:  Correct.

7    BY MR. MOLO:

8    Q.  Because you were doing good work for the people of New

9    York, right?

10   A.  I would hope so, yes.

11   Q.  I am going to ask you some questions about that very nice

12   award that you received from the American Cancer Society.

13   A.  Okay.

14   Q.  The award was called the Collaborator Award; what was it?

15   A.  The Collaborator Award was awarded because of the fact that

16   many of my patients were admitted for therapy at Columbia to

17   the Hope Lodge.

18   Q.  And they called it part of its awards, Awards in Medical

19   Excellence, correct?

20   A.  Yes.

21   Q.  And this was an annual event?

22   A.  It is annual event, yes.

23   Q.  Have you been more than once?

24   A.  I have not been awarded more than once.  The one, Dr. Owen

25   O'Connor was one of the awardees who is a colleague of mine the

1    year before.

2    Q.  I don't want to presume anyone's knowledge so can you just

3    briefly describe to the jury what the American Cancer Society

4    is?

5    A.  The American Cancer Society is simply the largest society

6    in the country which is devoted to the general education for

7    patients and doctors about cancer and to maintaining cancer

8    statistics and to familiarize patients and doctors with the

9    latest research.  That's what they do.  They also have people

10   like me go around the state and educate people about cancer,

11   doctors about cancer.  That's what I did in 1977.

12   Q.  It is a long affiliation with the organization?

13   A.  What?

14   Q.  It is a long affiliation you have had with the

15   organization?

16   A.  Yes, it is.

17   Q.  Now, these awards were given, I think the Judge asked you

18   about was there a dinner -- was there a reception first, is

19   that more of what the awards ceremony was, a cocktail party?

20   A.  This was a fund raising event for the American Cancer

21   Society, that's what it was, and you were supposed to buy

22   tables for their hors d'oeuvres and contribute.

23   Q.  Do you know how much they raised at the event?

24   A.  I don't.  I know it was over something like $200,000.

25   Something like that.

FB45sil7                          Taub - Cross

1    Q.  It was in a ball room, right, at a Hotel here in New York?

2    A.  Yes.

3    Q.  The Westin, I believe?

4    A.  Yes.

5    Q.  And as with all of these events we saw there was a printed

6    program, right?

7    A.  Yes.

8    Q.  I forget the government exhibit number but can we put the

9    program up, please?

10            Can we go to the inside --

11            MR. GOLDSTEIN:  376.

12            THE COURT:  Exhibit 376.

13   Q.  Yes, Government Exhibit 376.

14            Can we go to the inside page of that?  I am going to

15   focus over on the right side, if we can make that larger,

16   Awards of Medical Excellence, the honoring part.

17            So, inside the program it is actually listing the

18   honorees, correct?

19   A.  Yes.

20   Q.  You were not the only honoree at that event, were you?

21   A.  No, I was not.

22   Q.  Okay, the first honoree was Dr. Alisan Goldfarb, right?

23   A.  Correct.

24   Q.  And Alisan Goldfarb is a breast surgeon here in New York?

25   A.  Yes.

FB45sil7                          Taub - Cross

1    Q.  And assistant professor at Mount Sinai, correct?

2    A.  Yes.

3    Q.  I think she received her medical degree at Mount Sinai in

4    1975?

5    A.  Yes.

6    Q.  So she has been a doctor for a long time?

7    A.  Yes.

8    Q.  Do you know her?

9    A.  Yes.

10   Q.  Have you worked with her?

11   A.  No, I have not.

12   Q.  But you know of her reputation?

13   A.  Yes.

14   Q.  Her reputation is excellent, correct?

15   A.  Yes.

16   Q.  And she received the Physician of Distinction Award.  Do

17   you know what that means?

18   A.  She received the Physician of Distinction Award for her

19   help also, as well, as she's well known.

20   Q.  And well-regarded in the medical community?

21   A.  Yes.

22   Q.  You would agree she was a worthy recipient of the Physician

23   of Distinction Award?

24   A.  Do I agree?  I don't determine it but I certainly don't

25   think it is misplaced.

```
 1   Q.  Okay.
 2           And the third honoree down there was a woman named
 3   Susan Rotenstreich, correct?
 4   A.  Yes.
 5   Q.  And she received the Humanitarian Award, correct?
 6   A.  Yes.
 7   Q.  And she is a certified health care professional in what is
 8   referred to as complementary medicine?
 9   A.  I don't know those details.
10   Q.  Do you know what complementary medicine is?
11   A.  Yes.  It is medicine that is not doctoring.
12   Q.  And as far as -- had you known Ms. Rotenstreich before she
13   got this award?
14   A.  I did not but I did meet her there.
15   Q.  And she, too, was a worthy recipient of the award, as far
16   as you knew?
17   A.  Well, yes.
18   Q.  Okay.  And both, all three of your bios are in the program,
19   correct?
20   A.  Yes.
21   Q.  Now, I heard your testimony -- there is yours and
22   Dr. Goldfarb's.  We can take that down.  Thank you.
23           As I understand it Mr. Silver was invited by the
24   American Cancer Society at this event, right?
25   A.  Yes.
```

FB45sil7                         Taub - Cross

1   Q.  And, however, you paid for his ticket, correct?

2   A.  Yes.

3   Q.  You did that as an act of friendship?

4   A.  Well, I did it also because if he were to be invited, they

5   could not pay his expenses.

6   Q.  American Cancer Society could not pay for his ticket?

7   A.  Correct, so they asked if I would, and I did.

8   Q.  And as an act of friendship you did this?

9   A.  Yes.

10  Q.  Now, Mr. Silver has supported the American Cancer Society

11  apart from this event, hasn't he?

12  A.  I don't know that he has.  I'm not aware of it, actually,

13  but it is possible.

14  Q.  Okay.

15          He actually left that event early, didn't he?

16          THE COURT:  The question is did he leave the event

17  early.

18  A.  I don't know.  Because this was late in the event.  He may

19  have left before the hors d'oeuvres but I don't remember.

20  Q.  I'm sorry, he may have left before?

21  A.  Before the hors d'oeuvres were served.

22  Q.  Do you know how many events like that Mr. Silver attended

23  in May of 2011?

24  A.  I don't.

25  Q.  Would you be surprised to know it was many?

FB45sil7                         Taub - Cross

1           MR. GOLDSTEIN:  Objection, your Honor.

2           THE COURT:  Sustained.

3  A.  It would not surprise me.

4           THE COURT:  The objection was sustained.

5  Q.  Okay.  You're his friend, right?

6  A.  I'm sorry?

7  Q.  You are Mr. Silver's friend, aren't you?

8  A.  We had a friendly relationship, yes.

9  Q.  So you knew him to be out in the community to great extent,

10 correct?

11 A.  Yes, I did.

12 Q.  Particularly with Jewish causes, right?

13 A.  That's true.

14 Q.  But otherwise he was very generous and is very generous

15 with his time, correct?

16 A.  I understand that to be correct.

17 Q.  Now, the prosecutor asked you about this resolution that

18 you were presented with that night, in fact they put it up on

19 the screen and then we saw a framed version of it and it sits

20 in a handsome plaque on your wall?

21 A.  Yes.

22 Q.  And we saw the photographs of you and Mr. Silver together,

23 correct?

24 A.  Yes.

25 Q.  You were not trying to hide your relationship with

1    Mr. Silver, were you?

2    A.   No.

3    Q.   In fact, being photographed at such a public event,

4    correct?

5    A.   Correct.

6    Q.   And, in addition to the resolution that you received,

7    Dr. Goldfarb received a resolution, didn't she?

8    A.   Yes.

9    Q.   And in addition to the resolution that you received and

10   Dr. Goldfarb received, Ms. Rotenstreich received a resolution,

11   didn't she?

12   A.   I don't know but it may have happened.  I don't know if she

13   did.

14   Q.   So, it wasn't as if you were singled out -- I mean, as nice

15   as it is and I don't mean to diminish it, it is a very nice

16   award and one that you are worthy of receiving, but Mr. Silver

17   didn't single you out to bring it, correct?

18   A.   No.

19   Q.   But he is your friend so it made sense for to him come and

20   present it to you?

21   A.   Yes.

22   Q.   At the invitation of the American Cancer Society?

23   A.   Yes.

24   Q.   Are you aware -- and again, I don't mean to diminish your

25   award in the least, but are you aware that in May of 2011 Russ

FB45sil7                          Taub - Cross

1    Crispell of Tonawanda, New York --

2              MR. GOLDSTEIN:  Objection.

3              THE COURT:  Let him finish the question.

4    Q.  Russ Crispell, of Tonawanda, New York, received the same

5    resolution, not the same words, but for his induction into the

6    Buffalo Tennis Hall of Fame?

7              MR. GOLDSTEIN:  Objection.

8              THE COURT:  Overruled.

9              Do you know?

10             THE WITNESS:  I just don't know that.

11   Q.  Are you aware that in May of 2011, in addition to

12   yourselves, the people at the American Cancer Society that

13   night and Russ Crispell, that the Liberty Middle School 7th and

14   8th Grade Band and the Middle School Jazz Ensemble received the

15   same kind of resolution upon the occasion of their

16   participation in the Music in Our Schools Month on March 23rd

17   of 2011?

18   A.  I did not know that.

19   Q.  Okay.

20             And are you aware that Chautauqua County, upon the

21   occasion of celebrating its bi-centennial on February 9th,

22   2011, also got a resolution?

23   A.  Again, I did not know that.

24   Q.  I take it there was no gathering of the recipients of the

25   resolutions in the first quarter of 2011?

1    A.  Not that I know of.

2    Q.  First half.  Excuse me.  All right.

3         Again, I don't mean to diminish the award, you are

4    very deserving.

5    A.  That's okay.

6    Q.  But are you aware that there is hundreds -- hundreds -- of

7    these resolutions that are passed for the Assembly for things

8    like that all the time?

9    A.  I was not fully aware of it but it certainly is possible.

10   Q.  Okay, and that also there is hundreds of resolutions passed

11   like that by the Senate?  Are you aware?

12   A.  Most likely.

13   Q.  And I take it you would not send patients to

14   Weitz & Luxenberg in exchange for receiving a resolution?

15   A.  It was nice to get the plaque.

16   Q.  Not to get the plaque, okay.

17        Judge, it is 5:20, if this is a convenient point.

18        THE COURT:  If this is a good stopping point, this is

19   a good stopping point.

20        Okay, ladies and gentlemen, we are going to stop for

21   the evening.  I am going to ask juror no. 4 to stay in the jury

22   room so we can discuss the note that you sent me.  Everybody

23   else, have a very good evening.  Don't discuss the case, don't

24   read any press about the case, don't listen to any reports

25   about the case or watch any TV about the case.  I need you to

FB45sil7                              Taub - Cross

1    be here tomorrow morning at 9:15.  Please, don't be late.  You

2    were all great this morning.  We need to keep moving with this

3    trial.

4              Have a good evening and see you all tomorrow.

5              A JUROR:  You too.

6              A JUROR:  Thank you.  Good night.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Okay.  Please, be seated.  Let's deal with

3     first things first, let's deal with juror no. 4 first so that

4     we can get her out of here.

5              What is the parties' position?

6              MS. COHEN:  Your Honor, we haven't had a chance to

7     confer with defense counsel but I do think it requires more

8     follow-up questions from your Honor to determine if perhaps a

9     call to the employer will be helpful or harmful to her.  I put

10    it to your Honor to sort of do that inquiry with her.

11             MR. MOLO:  I agree for the main reason, Judge, that we

12    are on day two.

13             THE COURT:  I am well aware.

14             MR. MOLO:  The person a week from now who decides this

15    is no longer fun is going to come up with a similar excuse.

16    So, whatever -- but, that's your job.

17             THE COURT:  It is impossible to believe that anyone

18    would, in a week from now, think that this is not fun.

19             Can you bring out juror no. 4?

20             (Juror 4 present)

21             THE COURT:  Have a seat.  We are going to follow up on

22    your note.

23             Remind me what you do and who you work for.

24             A JUROR:  Okay, so I am the outreach coordinator and I

25    work for Care for the Homeless.  So, I am the supervisor of

FB45sil7                          Taub - Cross

1    three other members and we are also hiring more people to work

2    as a peer program.  So, we work with people that are homeless

3    and we provide medical, dental, and health services in general.

4    I am the only person in my position right now.

5            THE COURT:  So let me ask you something.  You say you

6    are supervising three people?

7            A JUROR:  Right now.

8            THE COURT:  Right now.

9            Take the employ of those three who have been with you

10   the longest, how long has that person been with you?

11           A JUROR:  Two years.  The person is currently on

12   vacation, though.

13           THE COURT:  When does he or she come back from

14   vacation?

15           A JUROR:  Next week.

16           THE COURT:  And how about the second person, second

17   longest?

18           A JUROR:  One year.

19           THE COURT:  Okay, and is he or she around or on

20   vacation?

21           A JUROR:  Yes, she's around.

22           THE COURT:  The last person?

23           A JUROR:  Same thing, one year.

24           THE COURT:  So, I understand that your boss thinks

25   that he or she needs you desperately back and I am sure that

FB45sil7                          Taub - Cross

1    you are great at what you do.  Do you think that either of

2    these people could sort of step into your position for a couple

3    of weeks while you are sitting on this trial?

4              A JUROR:  When it comes to the service that I provide

5    at the clinics they're able to do it but the paperwork and

6    things like that, they're not able to do it because they don't

7    have the training for that.

8              THE COURT:  So there is paperwork requirements that

9    you need to do?

10             A JUROR:  Yes; and proposals to submit and things like

11   that to fix and change and implement programs.

12             THE COURT:  So, I don't want to put you in a bad

13   position with your employer but what I would like to do is talk

14   to your boss to see if I can persuade your boss that they can

15   do without you for the period of this jury so that you can

16   continue to serve.

17             A JUROR:  Okay.

18             THE COURT:  Can you tell me your boss' name and phone

19   number?

20             A JUROR:  Supervisor or assistant executive director?

21             THE COURT:  Tell me who to call.  Who told you they

22   need you back?

23             A JUROR:  Oh, my direct supervisor.  I don't have my

24   cell phone with me.

25             THE COURT:  Okay.

1          A JUROR:  But I can give you the office number.

2          THE COURT:  Okay.

3          A JUROR:  That is 212-366-4459, and her name is

4    Lynette, L-Y-N-N-E-T-T-E, and last name Berges, B-E-R-G-E-S.

5          THE COURT:  And who is above Ms. Berges?

6          THE JUROR:  Her name is Vivian Fletcher-Blake.

7          THE COURT:  Same number?

8          A JUROR:  It will be the same number, you have to

9    transfer to the correct extension.

10         THE COURT:  How late is the office open?

11         A JUROR:  Until about 5:00.

12         THE COURT:  So I'm going to need you to come back

13   tomorrow.  We will deal with this tomorrow because it is 5:30

14   now so I'm probably not going to get anybody at your office.

15         A JUROR:  Another thing?

16         THE COURT:  Okay, another thing.

17         A JUROR:  I spoke to her last night and this is what

18   she said to me.  During the lunch break today I called HR and

19   they said they only pay me for 10 days out of this jury

20   process.  After the 10 days, that's it.  So, I would not

21   receive no payments after day number ten.

22         THE COURT:  I am hearing you say that would be a

23   hardship?

24         A JUROR:  Yes.  It will be a hardship for me.

25         THE COURT:  Okay.  Let me ask you to wait in the jury

FB45sil7                          Taub - Cross

```
 1    room, okay?

 2              A JUROR:  Okay.  No problem.

 3              (Juror not present)

 4              THE COURT:  I would be prepared to harangue her boss

 5    about the possibility to get along without her for six weeks,

 6    but if she had told us from the get-go we would have excused

 7    her on the ground of hardship.  So, I am inclined to remove her

 8    on the ground of hardship and put Alternate 1 in her seat.

 9              MS. COHEN:  The only thought I had, I'm not sure if it

10    is possible to ask her boss to pay beyond their policy but I'm

11    not sure that is something that your Honor can get into.

12              THE COURT:  I am sure that is a fool's errand.

13              Mr. Molo?

14              MR. MOLO:  We would like her to serve on the jury but

15    I understand, you can't --

16              THE COURT:  There is no question that if we had heard

17    this during voir dire we would have excused her on that ground

18    of hardship and so I feel like I can't hold on to her under the

19    circumstances.

20              We have three alternates so it is going to be

21    difficult from here on out for anybody else to get off this

22    jury.

23              Bring her back out.

24              (Continued on next page)

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FB4Ysil8

1              (Juror present)

2              THE COURT:  We're going to excuse from this case.  We

3      thank you for your service.  You're now free to discuss the

4      case.  Have a good night.

5              JUROR:  Thank you very much.

6              THE COURT:  Any issues beyond the nonpros agreement to

7      discuss?

8              MR. MOLO:  I guess we probably should have cautioned

9      Dr. Taub about not -- obviously, the government is not going to

10     talk to him I take it.

11             THE COURT:  If they do, you can cross-examine on it.

12     I am assuming that they are professional prosecutors and they

13     understand the risk of talking to their cooperator while he's

14     on cross.  I usually do caution them.

15             MR. GOLDSTEIN:  We will not be talking to Dr. Taub

16     while he's a witness.

17             THE COURT:  Anything else?

18             MR. MOLO:  Just the cooperation agreement.

19             THE COURT:  Okay.

20             MS. COHEN:  Your Honor, if the defense intends to use

21     exhibits tomorrow with Dr. Taub, if we could get a copy of the

22     exhibits.

23             THE COURT:  Are there any other exhibits you plan to

24     introduce?

25             MR. MOLO:  I don't know.

FB4Ysil8

1          THE COURT:  It's the same answer as yesterday, it

2    depends.  It depends on what he says.  It would be nice,

3    however, to the extent you could create a list of all the

4    possible defense exhibits, and then there will be a defense

5    exhibit list, like the government exhibit list, I can just

6    check off.

7          MR. MOLO:  Okay.

8          THE COURT:  Do you want to be heard again on the

9    issue?  Or are have you said everything you want to say on

10   whether you're entitled to the various versions -- and I think

11   there are two or three.

12         MR. GOLDSTEIN:  It depends on if you consider the

13   email a version.

14         MR. MOLO:  Just to be clear, it's the drafts that went

15   to Dr. Taub's lawyer.

16         THE COURT:  A draft went to Dr. Taub's lawyer.  It

17   looks like a mark-up came back, and then there was a final.

18         MR. MOLO:  That's correct.

19         THE COURT:  Is there a paragraph that differs from the

20   final that went in between?

21         MR. GOLDSTEIN:  There was one other email.

22         THE COURT:  Was it your edit?  Or was it his lawyer's

23   edits?  Was it from you to her or from her to you?  It's her to

24   you.

25         MR. GOLDSTEIN:  There was an initial version.  Then

FB4Ysil8

1   there were edits that were communicated by telephone from

2   counsel to the government, and that's reflected in a mark-up

3   with the date of January 6, 2015, with a redaction in the

4   version that we gave you.

5           THE COURT:  This document?

6           MR. GOLDSTEIN:  That document.

7           THE COURT:  So that's what was communicated orally?

8           MR. GOLDSTEIN:  Orally by counsel from Dr. Taub to

9   counsel for the government.

10          THE COURT:  And an AUSA was making the edits as they

11  were being communicated?

12          MR. GOLDSTEIN:  Or there was a substantive discussion

13  followed by these edits being made.

14          THE COURT:  Okay.

15          MR. GOLDSTEIN:  After that, there was an email that

16  was sent from counsel for Dr. Taub on January 9, 2015, which

17  contained two paragraphs with suggested language that was

18  slightly different than that mark-up that we had discussed.

19          And then at the end, there is one more email about the

20  deletion of a single word, and then there's the file version.

21          THE COURT:  Okay.  I've got them all.

22          Do you want to say anything else?

23          MR. MOLO:  We had an argument this morning.

24          THE COURT:  I'm going to have an ex parte conversation

25  with the prosecutors because I want to understand a little

FB4Ysil8

1    better what they know about this in terms of what the witness

2    saw and what they saw.

3              MR. COHEN:  Are you going to do that now?

4              THE COURT:  That's my plan.

5              Do you all need a brief break?  I need a brief break.

6              (Recess)

7              (Pages 471 -476 SEALED by order of the Court)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FB4Ysil8

```
 1                (In open court)
 2                THE COURT:  Please be seated.
 3                I've conferred with the government.  The record is
 4     sealed.  The government is going to disclose the various drafts
 5     of the nonpros agreement and the communications with Dr. Taub's
 6     lawyer.
 7                Anything further?
 8                MS. COHEN:  Yes, your Honor.  Just for our planning
 9     purposes, can we get a sense of how much more cross so we can
10     have witnesses ready.
11                THE COURT:  How much more cross?
12                MR. MOLO:  Gee, I don't know.  A couple of hours I
13     think maybe, two or three hours.
14                THE COURT:  It seems like you will probably need a
15     witness before lunch.
16                MS. COHEN:  Okay, your Honor.
17                THE COURT:  We may not get to it.  I'm skeptical that
18     he's got three more hours of cross with all due respect.  Maybe
19     you do.
20                (At the sidebar; discussion off the record)
21                THE COURT:  Everybody have a good night.
22                MS. COHEN:  Thank you, your Honor.
23                (Adjourned to November 5, 2015, at 9:15 a.m)
24
25
```

                         INDEX OF EXAMINATION

Examination of:                                    Page

PERRY WEITZ

Direct By Ms. Cohen  . . . . . . . . . . . . 202

Cross By Mr. Cohen . . . . . . . . . . . . . 204

Redirect By Ms. Cohen  . . . . . . . . . . . 227

Recross By Mr. Cohen . . . . . . . . . . . . 235

ROBERT TAUB

Direct By Mr. Goldstein  . . . . . . . . . . 247

Cross By Mr. Goldstein . . . . . . . . . . . 417

                         GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 S-6  . . . . . . . . . . . . . . . . . . . . 239

 102, 107, 120  . . . . . . . . . . . . . . . 240

 S-1  . . . . . . . . . . . . . . . . . . . . 244

 367-1, 368-1, 389-1, 389-2, and 389-3  . . . 244

 302  . . . . . . . . . . . . . . . . . . . . 290

 107-1  . . . . . . . . . . . . . . . . . . . 294

 303  . . . . . . . . . . . . . . . . . . . . 303

 108-1  . . . . . . . . . . . . . . . . . . . 304

 304  . . . . . . . . . . . . . . . . . . . . 307

 320  . . . . . . . . . . . . . . . . . . . . 312

 321  . . . . . . . . . . . . . . . . . . . . 327

 368-2  . . . . . . . . . . . . . . . . . . . 334

 129  . . . . . . . . . . . . . . . . . . . . 336

479

 1   130    . . . . . . . . . . . . . . . . 338

 2   310    . . . . . . . . . . . . . . . . 343

 3   311    . . . . . . . . . . . . . . . . 345

 4   598    . . . . . . . . . . . . . . . . 363

 5   525-06    . . . . . . . . . . . . . . 373

 6   525-7    . . . . . . . . . . . . . . . 375

 7   525-13    . . . . . . . . . . . . . . 382

 8   375, 376, 379, 380, 381, 382, 383 and . . . . 384

 9          S-4

10   375, 376, 379, 380, 381, 382, 383 and S-4  . 384

11   314    . . . . . . . . . . . . . . . . 388

12   315    . . . . . . . . . . . . . . . . 391

13   313    . . . . . . . . . . . . . . . . 395

14   327    . . . . . . . . . . . . . . . . 398

15   525-16    . . . . . . . . . . . . . . 401

16   526    . . . . . . . . . . . . . . . . 404

17   525-16    . . . . . . . . . . . . . . 406

18   525-21    . . . . . . . . . . . . . . 408

19   525-23    . . . . . . . . . . . . . . 410

20   316    . . . . . . . . . . . . . . . . 415

21

22

23

24

25

DEFENDANT EXHIBITS

Exhibit No.                                              Received

2    . . . . . . . . . . . . . . . . . . . 223

4    . . . . . . . . . . . . . . . . . . . 429

5    . . . . . . . . . . . . . . . . . . . 433

3    . . . . . . . . . . . . . . . . . . . 421