FB5XSIL1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        S1 15 Cr. 93 VEC

5   SHELDON SILVER,

6              Defendant.

7   ------------------------------x
                                        November 5, 2015
8                                       9:45 a.m.

9

10  Before:

11                  HON. VALERIE E. CAPRONI,

12                                      District Judge
                                         and a jury
13

14                      APPEARANCES

15  PREET BHARARA,
         United States Attorney for the
16       Southern District of New York
    CARRIE HEATHER COHEN,
17  HOWARD SETH MASTER,
    ANDREW DANIEL GOLDSTEIN,
18  JAMES M. McDONALD,
         Assistant United States Attorneys
19

20  STROOCK & STROOCK & LAVAN, LLP
         Attorneys for defendant Silver
21  BY:  JOEL COHEN, Esq.
         – and –
22  MOLOLAMKEN, LLP
    BY:  STEVEN FRANCIS MOLO, Esq.
23       ROBERT KELSEY KRY, Esq.
         JUSTIN VAUN SHUR, Esq.
24       JUSTIN M. ELLIS, Esq.
         TUONGVY LE, Esq.
25                      Of counsel

```
 1                 (Trial resumed)

 2            THE COURT:  Mr. Molo, what is your latest estimate on

 3   cross?  I was hoping over the evening you've reconsidered.

 4            MR. MOLO:  I think it's 2 1/2 hours at the outside I

 5   hope.  There is one issue I haven't raised with the government.

 6            THE COURT:  That's fine.

 7            MR. MOLO:  It's just that there was a document -- the

 8   government -- we stipped to the foundation for -- it's the

 9   contracts.

10            MS. COHEN:  Your Honor, I think when we admitted that

11   that was the Department of Health stip, we actually admitted --

12   my colleague tells me we didn't.

13            MR. MOLO:  36 7- 3 and 36-

14            MS. COHEN:  Your Honor, let me just review them.

15            THE COURT:  Okay.  You moved in very few.

16            MS. COHEN:  Correct, because the defense wouldn't

17   stipulate to the admissibility.

18            Your Honor, at this time the government moves

19   Government Exhibits 366, 367-2, 367-3, and 368-3.

20            THE COURT:  Okay.  So the Court will receive

21   Government Exhibits 366, 367-2, 367-3, and 368-3.

22            (Government's Exhibit 366, 367-2, 367-3, and 368-3

23   received in evidence)

24            MS. COHEN:  Thank you, your Honor.

25            THE COURT:  You're welcome.
```

 1              Anything else we can possibly do while we wait for the

 2   last juror?  Our last juror has arrived.

 3              Mr. Molo, are there any defense exhibits that you're

 4   reasonably confident that you're going to use with this

 5   witness?

 6              MR. MOLO:  The contracts that I just mentioned.

 7              THE COURT:  Those are government exhibits.  So I have

 8   them.

 9              (Jury present)

10              THE COURT:  Good morning, everybody.

11              Mr. Molo.

12              Okay, Dr. Taub.  You're still under oath.

13   CROSS-EXAMINATION (Cont'd)

14   BY MR. MOLO:

15   Q.  Good morning, Mr. Taub.

16   A.  Good morning.

17   Q.  Dr. Taub, you talked yesterday about this Meso walk that

18   was going to be done -- I'm calling it a Meso walk.  The walk

19   to raise awareness for mesothelioma that the Simmons firm had

20   been trying to put together; is that right?

21   A.  Miles for Meso.

22   Q.  Miles for Meso.  That was when?

23   A.  2011.

24   Q.  As I understand it, you went to your friend, Mr. Silver,

25   and sought his help in organizing this walk in some way; right?

1    A.  Yes.

2    Q.  That was being done, as I just mentioned, with the Simmons

3    firm?

4    A.  Yes.

5    Q.  And the Simmons firm is a competitor of Weitz & Luxenberg;

6    correct?

7    A.  Yes, it is.

8    Q.  So Mr. Silver was willing to help you even though he was at

9    Weitz & Luxenberg and Simmons was a competitor?

10   A.  It was the intention actually of several law firms to get

11   together, yes.

12   Q.  So the idea might be that all these firms to get together

13   and hopefully organize something; correct?

14   A.  Yes.

15   Q.  And he did meet with you; correct?

16   A.  I'm sorry.  He did meet with us, yes.

17   Q.  And your meeting was not the issue of passing some kind of

18   New York State law; right?

19   A.  No.

20   Q.  All right.  This was a very local event here in lower

21   Manhattan; correct?

22   A.  Yes.

23   Q.  And there issues surrounding the community itself being in

24   favor of doing something like this; is that right?

25   A.  I don't know if the community was in favor or not.

1    Q.  Because it never went forward; right?

2    A.  It did not take place.

3    Q.  I heard your testimony yesterday.  At some point in time,

4    you decided that you would make an effort to get some New York

5    State grant money to support the research you were doing at the

6    Mesothelioma Center; correct?

7    A.  Yes.

8    Q.  You had a patient who at one point mentioned to you that

9    New York State offered grant money.  Is that right?

10   A.  A patient?

11   Q.  Didn't you treat a gentleman by the name of Stanley

12   Michaels?

13   A.  I did treat Stanley Michaels, but I don't think he ever

14   mentioned to me about state money.

15   Q.  He never mentioned to you that state funding was available?

16   He was a public official himself; correct?

17   A.  I don't know what his position was when I spoke to him, but

18   he had been a public official, yes.

19   Q.  You don't recall him speaking with you or perhaps some of

20   your staff, Mary Hesdorffer, and suggesting that Stanley might

21   be available?

22   A.  I actually don't recall that.

23   Q.  Is it possible that it happened nonetheless?

24            MR. GOLDSTEIN:  Objection.

25            THE WITNESS:  I don't recall that.

 1            THE COURT:  He doesn't remember.

 2   BY MR. MOLO:

 3   Q.  Now, it wasn't until late in December of 2003 that you

 4   decided to request state grant money; correct?

 5   A.  I don't know exactly when in 2003, but it was in 2003.

 6   Q.  It was certainly after you had recommended Mr. Silver and

 7   Weitz & Luxenberg to a number of patients; is that right?

 8   A.  Yes.

 9   Q.  And you did so because you believed that the citizens of

10   New York State had an interest in understanding mesothelioma

11   research?

12   A.  I believed there was a reason for New York State to at

13   least think about funding mesothelioma research, yes.

14   Q.  I think you mentioned yesterday that's because New York is

15   a heavy pollutant.

16   A.  It had the sources of pollution, a number of sources, of

17   asbestos pollution, yes.

18   Q.  And, as we mentioned yesterday, the 9/11 factor in the air

19   following the World Trade Center coming down was an issue as

20   well; correct?

21   A.  Yes.

22   Q.  As far as the World Trade Center issue and the potential

23   for asbestos diseases as a result of that, you believe that it

24   was important to get out in front of that issue; is that right?

25   A.  I believe that one had to plan for a later influx or a

F5YSIL1                          Taub Cross

1   later development of a group of these victims, yes.

2   Q.  And you had heard, hadn't you, that there was some

3   consideration about funding being given for 9/11 diseases?

4   A.  Yes.

5   Q.  It was your understanding that this funding might be spread

6   among several hospitals?

7   A.  I don't know the details of the funding at all.  I knew

8   there was an initiative.

9   Q.  And the initiative might involve funding, not just one

10  hospital but multiple hospitals; correct?

11  A.  I'm not sure whether it had anything to do with hospitals

12  or whether it was going to be directed to patients only who had

13  diseases which could be associated with 9/11.

14  Q.  Did you believe that one of the ways that New York

15  Presbyterian and Columbia could attract funding was to stress

16  the importance of its Mesothelioma Center apart from other

17  programs?

18  A.  Yes.

19  Q.  You thought that this might be of particular interest to

20  Mr. Silver, given the fact that he, as an assemblyman,

21  represents the area in which the World Trade Center itself was

22  located?

23  A.  Correct.

24  Q.  So you approached Mr. Silver about it; is that right?

25  A.  That was one of the reasons why I thought Mr. Silver should

 1   be approached, yes.

 2   Q.  In making your approach, you were approaching on behalf of

 3   the Mesothelioma Center at Columbia; correct?

 4   A.  Yes.

 5   Q.  Government Exhibit 303 -- if we could put that up, please,

 6   which is in evidence.  We talked about this yesterday.  It will

 7   appear on your monitor.

 8            This is in evidence.  May I publish it, Judge?

 9            THE COURT:  Yes.

10            MR. MOLO:  It's in evidence.

11   BY MR. MOLO:

12   Q.  This is the letter dated January 7 of 2004; right?

13   A.  It's 2005.

14   Q.  But we know it's 2005; correct?

15   A.  Yes.

16   Q.  And this is a letter that you authored; right?

17   A.  Yes.

18   Q.  And in the letter, you specifically mention -- if you would

19   highlight that, please -- that "Right now a large cohort of

20   downtown New York City residents may be at risk after having

21   been exposed to asbestos latent air released from

22   disintegrating buildings during the September 11, 2001,

23   terrorist attack on World Trade Center;" correct?

24   A.  Yes.

25   Q.  So in the very beginning in the context of reaching out to

FB5XSIL1                          Taub-Cross

1   Mr. Silver, you were making the connection to September 11;

2   correct?  The air.

3   A.  Yes, I was.

4   Q.  In June of 2005, five months after you had submitted your

5   letter, you were contacted by a Mr. Steve August, who was then

6   the director of budget studies at the assembly Ways and Means

7   Committee.

8   A.  I didn't know what his post was.

9   Q.  You recall receiving a fax from him; correct?

10  A.  Yes.

11          MR. MOLO:  Can we put up Government Exhibit 304,

12  please.

13  BY MR. MOLO:

14  Q.  The comments in the coversheet of the fax from Mr. August

15  to you say, "Please comment on whether the attached is

16  appropriate to your proposal and is such inclusive of what you

17  may want to do with the funding."

18          Correct?

19  A.  Yes.

20  Q.  And then the next page, we go to the attached.  The clear

21  definition that he's giving you is he's saying that "The funds

22  will be used for expenses of research into the clinical

23  diagnosis and treatment of mesothelioma and related cancers and

24  a study of the occurrences of such cancers in individuals

25  exposed to asbestos and other materials released into the air

1   during the attacks of September 11."

2           And then it goes on significantly to say, "Services

3   may include education and outreach to residents and to workers

4   in lower Manhattan."

5           Correct?

6   A.  Yes.

7   Q.  And you indicated to him that that was acceptable; correct?

8   A.  Yes.

9   Q.  And so the state proceeded on the basis of that

10  representation that you made; correct?

11          MR. GOLDSTEIN:  Objection.

12          THE COURT:  Sustained.

13  BY MR. MOLO:

14  Q.  In addition to what you understood that the Ways and Means

15  Committee was doing, you understood that the Mesothelioma

16  Center's request for funding would be independently evaluated

17  by the Department of Health; correct?

18  A.  That was my understanding.

19  Q.  There would be some decision made by the Department of

20  Health as to whether funding would be appropriate; correct?

21  A.  Yes.

22  Q.  Now, your letter, Government Exhibit 303 -- if we can put

23  that up again, January 2005.

24          You requested funding not just for 2005 but actually

25  for an additional three years.

1              Is that right?  Do you recall asking for three years'

2    funding rather than just a single year?

3    A.  I had hoped for more than one year of funding, yes.  I had

4    hoped for a total of four years.

5    Q.  You hoped for what?

6    A.  A total of four years.

7    Q.  A total of four years.  Okay.  You say there, "I wish to

8    request the legislature supporting the program in the amount of

9    $250,000 for this budget year to be renewed annually for an

10   additional three years."

11             So that would be four years; correct?

12   A.  Correct.

13   Q.  So from the outset, that was your request?

14   A.  Was my hope.

15   Q.  Was your hope.

16   A.  Of course.

17   Q.  So, in March of 2006 -- backing up, the funding that you

18   were approved for in response to your first letter was just for

19   one year; right?

20   A.  Yes.

21   Q.  So in March of 2006, you write a letter to Mr. Silver

22   asking for additional funding; correct?

23   A.  Yes.

24   Q.  And that came in the form of Government Exhibit 305.

25             The letter, please.

 1              THE COURT:  305 is not in evidence.

 2   BY MR. MOLO:

 3   Q.  Let me show you Defendant's Exhibit 20.  Just take a moment

 4   and look it over, sir, please.

 5              MR. GOLDSTEIN:  Your Honor, Defense Exhibit 20 is the

 6   same as Government Exhibit 305 which you're correct is not in

 7   evidence yet.

 8              THE COURT:  Okay.

 9              MR. MOLO:  Is what?

10              THE COURT:  He's saying it's not in evidence yet.

11   He's just saying it's the same document.

12              MR. MOLO:  It is.

13              THE COURT:  It will get a new number since it's being

14   put in by the defendant.

15   BY MR. MOLO:

16   Q.  Do you recognize the document, Doctor?

17   A.  Yes.  I recognize the letter, yes.

18   Q.  It's a letter you wrote; is that correct?

19   A.  Yes.

20              MR. MOLO:  I move for admission of Defendant's Exhibit

21   20.

22              THE COURT:  Any objection?

23              MR. GOLDSTEIN:  No objection.

24              THE COURT:  Defense 20 is received.

25              (Defendant's Exhibit 20 received in evidence)

```
 1              MR. MOLO:  Can we put it up on screen, please.

 2   BY MR. MOLO:

 3   Q.  So you wrote the second letter, then, on March 29 of 2006;

 4   correct?

 5   A.  Yes.

 6   Q.  It's not even a year since you've gotten your funding for

 7   the first grant; correct?

 8   A.  Yes.

 9   Q.  And in the second grant request, if we go to the bottom of

10   the second paragraph, the last three sentences there, you again

11   appeal to the risk to lower Manhattan and the air quality

12   following the terrorist attack on the World Trade Center;

13   correct?

14   A.  Yes.

15   Q.  And you mention that these groups can now be added, the

16   rescue workers, and again you mention the attack.  You also say

17   in the very last sense, if we can highlight that, please, now

18   "The first such mesothelioma victim, a 41-year-old 9/11

19   paramedic, was laid to her eternal rest only one week ago."

20   Correct?

21   A.  Yes.

22   Q.  So as early, if you will, as March of 2006, there were

23   already beginning to be people whose disease of mesothelioma

24   was being attributed to the World Trade Center.

25   A.  That's accurate.  Yes.
```

 1   Q.  Now, you didn't receive a response from Mr. Silver right

 2   away in connection with that second request; correct?

 3   A.  Right.  I did not.

 4   Q.  Several months passed; correct?

 5   A.  Yes.

 6   Q.  And you weren't sure whether the second request would be

 7   approved; is that right?

 8   A.  Yes.

 9   Q.  And at some point, Mr. Silver expressed to you concern that

10   the Mesothelioma Center might not be doing enough to address

11   the lower Manhattan air issue.  Is that right?

12           By "air issue," I mean the asbestos problem caused by

13   the World Trade Center.

14   A.  I don't think it was in those terms.  He mentioned that

15   there was an initiative in the city, and I'm not sure whether

16   he meant that Columbia should or should not participate.

17   Q.  Okay.  But in September of 2006 -- now some six months had

18   passed since your March letter -- and you prepared what I think

19   we saw yesterday as Government Exhibit 581, which were these

20   talking points; right?

21   A.  Yes.

22   Q.  And these talking points were effectively your effort to

23   prepare yourself to engage with Mr. Silver and explain to him

24   why it was that he should continue your funding; correct?

25           MR. GOLDSTEIN:  Your Honor, 581 is not admitted.

```
 1              THE COURT:  581 is not in evidence.

 2              MR. MOLO:  Okay.

 3   BY MR. MOLO:

 4   Q.  Dr. Taub, I've handed you what's been marked as Defendant's

 5   Exhibit 22.

 6              Do you recognize this?

 7   A.  Yes.

 8   Q.  Are these the talking points that you prepared in

 9   anticipation of the conversation with Mr. Silver?

10   A.  Correct.

11   Q.  These were created sometime in the fall of 2006; is that

12   right?

13   A.  Yes.

14              MR. MOLO:  I move for admission of Defendant's Exhibit

15   22.

16              MR. GOLDSTEIN:  Objection.

17              THE COURT:  Can you all come up.

18              (At the sidebar)

19              MR. GOLDSTEIN:  These are talking points that were on

20   his computer.  He might have had a conversation with Silver.

21   He doesn't remember ever having the conversation with Silver

22   and telling Silver this.  So it's a hearsay objection.

23              MR. MOLO:  First of all, it's a document he authored.

24              THE COURT:  That doesn't keep it from being hearsay.

25              MR. MOLO:  Secondly, to the extent we can treat it as
```

1    nonhearsay, it's certainly circumstantial evidence of his state

2    of mind if you want to offer it for the truth but not what he's

3    thinking at the time.  Or you could say under 803(3) it could

4    be offered for his state of mind.

5              THE COURT:  What state of mind -- I may be missing

6    something.

7              MR. MOLO:  His state of mind in terms of what he is

8    communicating, what he has been communicating to Mr. Silver in

9    terms of getting funding.  Thirdly, it's a business record

10   under 803(6).

11             THE COURT:  It's not a business record.  I'm pretty

12   sure it's not a business record.  He doesn't have a duty to

13   prepare these sorts of documents.

14             MR. MOLO:  Sure, he is.

15             THE COURT:  No, he's not.  He's a doctor.

16             MR. MOLO:  He's a doctor receiving funding.  Under

17   803(3), it's state of mind.

18             THE COURT:  What state of mind are you trying to

19   prove?  That he wanted funding?

20             MR. MOLO:  That he wanted funding and that he is

21   saying that 9/11 is the basis for wanting to do so and that he

22   wants to keep his funding as opposed from necessarily clumping

23   it together with another institution.

24             The fact that he went to the effort to prepare these,

25   I think, also is significant in the sense that it's more than

```
 1            just he'd been thinking about it.
 2                    MR. GOLDSTEIN:  I think he can ask questions about all
 3            of the information that's in here, but the document itself --
 4            I'm not sure how this --
 5                    THE COURT:  Why not state of mind?  Why isn't this a
 6            hearsay statement that reflects his state of mind at the time?
 7                    MS. COHEN:  I think, your Honor, unless he says
 8            something inconsistent with that then to impeach his
 9            statement --
10                    THE COURT:  Hearsay is admissible if it reflects state
11            of mind at the time.  That's an exception to the hearsay rule.
12            I'm going to admit it.
13                    MR. MOLO:  Thank you, your Honor.
14                    THE COURT:  But I am going to tell them that they can
15            only consider it for what he was thinking at the time.
16                    MR. MOLO:  That's fine.
17                    (In open court)
18                    THE COURT:  Objection.  Overruled.  The document will
19            be admitted.
20                    Ladies and gentlemen, this document is coming in.  You
21            can only consider it as evidence of what Dr. Taub was thinking
22            about at the time.
23            BY MR. MOLO:
24            Q.  So, Dr. Taub, this is a document, the talking points of
25            which you repaired in October of 2006; right?
```

1   A.   Right.

2   Q.   In it you are stating that you'd spoken to some

3   administration officials at Columbia Presbyterian; correct?

4   A.   Yes.

5   Q.   You say at first that the Mesothelioma Center pretty much

6   is the property of Columbia University and the Presbyterian

7   Hospital, meaning that the funding you get for the Meso center

8   goes to Columbia University and Presbyterian Hospital; correct?

9   A.   Yes.

10  Q.   And you say that your mission is cancer related as opposed

11  to lung disease related; right?

12  A.   Yes.

13  Q.   So any funding you get you would want for your cancer

14  research as opposed to just general research.

15  A.   That was my thought.

16  Q.   You say, "We currently hope to treat and cure many patients

17  with mesothelioma, and our hospital means to keep them,"

18  meaning that if patients are coming to your Mesothelioma

19  Center, the idea wouldn't be that they would then go off to

20  Mount Sinai.  They would stay at the Columbia Presbyterian

21  Hospital; right?

22  A.   If we had the proper program for these patients, yes.  They

23  would come to us, and I thought it would be advantageous for

24  the Presbyterian Hospital to have such a program.

25  Q.   You're also stating again here in these notes that you are

1  preparing the best treatments for expected onslot of the

2  disease from the fallout of September 11, which probably won't

3  happen yet for several years; right?

4  A.  Yes.

5  Q.  That would be the onslot won't happen.  It already started

6  happening as we saw.

7  A.  Perhaps.

8  Q.  And then you go on in the next paragraph to say, "For that

9  reason, I think it is important that you keep our funding

10  intact and separate from any programs that are going on at

11  other institutions in the city."

12          Is that right?

13  A.  Yes.

14  Q.  So there was maybe some concern that your program or the

15  funding for your program might somehow get consolidated with

16  that of Mount Sinai?

17  A.  Well, it would be diluted because it would have a large

18  component of lung cancer-related research.

19  Q.  And you go on to qualify your statement a little bit.  In

20  other words, if it's not going to happen for you completely,

21  you say, "Having said that, I do believe we do have much to

22  contribute to such a program in terms of informing the public

23  and taking care of patients with cancer.

24          "And, in fact, we did just that this year in a joint

25  program with Mount Sinai, and we would be happy to get together

 1  with them in any context that you think appropriate;" correct?

 2  A.  Yes.

 3  Q.  So you at that point were thinking that if in fact it

 4  wasn't going to happen for you in terms of the grant, you would

 5  be willing to at least cooperate with Mount Sinai in order to

 6  continue working?

 7  A.  We do cooperate with Mount Sinai.  There was another

 8  context besides that.  There was the Asbestos Awareness

 9  Organization.  Both myself and Ms. Hesdorffer were on that

10  board.

11  Q.  I just said to continue working, to continue working with

12  whatever state money you would get, some state money.

13  A.  That's right.

14  Q.  You were obviously going to continue working.

15          Now, Dr. Taub, when you got these two grants, what did

16  you do?  Did you send in a coupon, and they sent you a check

17  for $250,000?

18          MR. GOLDSTEIN:  Objection.

19          THE COURT:  Overruled.

20          THE WITNESS:  No.

21          MR. MOLO:  I'm being facetious, and I shouldn't be.

22  BY MR. MOLO:

23  Q.  What I meant to say, it was a complex process to get this

24  grant money; correct?

25  A.  It was complex.

 1   Q.  There was a lot of red tape that you had to deal with;

 2   right?

 3   A.  I'm sorry?

 4   Q.  There was a lot of red tape that you had to deal with.

 5   A.  There are administrative hurdles to it, yes.

 6   Q.  Before Columbia or Presbyterian got these grants, they had

 7   to be processed by multiple state agencies; correct?

 8   A.  I'm not familiar with what happened at the state.

 9   Q.  But you are aware that there were multiple state agencies

10   involved, even though you don't know what they were doing;

11   correct?

12   A.  Yes.

13   Q.  In fact, the administrations of both Columbia University

14   for one of the grants and New York Presbyterian Hospital for

15   the other grant -- there were multiple administrators from both

16   of those organizations that were involved as well.

17   A.  Correct.

18   Q.  And, just to be clear too, the grant money did not go to

19   your Mesothelioma Center; correct?

20   A.  It went to a department.

21   Q.  It went to, in the first instance, the earlier of the two,

22   to Presbyterian Hospital; correct?

23   A.  Yes.

24   Q.  And the second grant recipient was Columbia University or

25   the trustees of Columbia University; correct?

```
 1   A.  That's correct.

 2   Q.  Forgive me, but I'm going to take you through that process

 3   again.  Again, there's some red tape.  It's going to take a few

 4   minutes, but I just want to walk you through it.

 5            So the first grant you received a July 12, 2005,

 6   letter from the New York Department of Health advising you of

 7   the grant.

 8            Is that right?  Do you recall?

 9   A.  Yes, I do.

10   Q.  I'm going to show you what's marked Defendant's Exhibit

11   6-A.

12            Could you take a moment and look at that, Dr. Taub.

13   A.  Yes.

14   Q.  Do you recall having seen that?

15   A.  Yes.

16   Q.  And that is, in fact, the letter that you received from the

17   New York Department of Health; correct?

18   A.  I believe so.

19   Q.  It related to the grant; correct?

20   A.  Yes.

21            MR. MOLO:  I move for admission of Defendant's Exhibit

22   6-A.

23            MR. GOLDSTEIN:  No objection.

24            THE COURT:  6-A is received.

25            (Defendant's Exhibit 6-A received in evidence)
```

1          MR. MOLO:  Can we put it up on the screen, please.

2    BY MR. MOLO:

3    Q.  So, Dr. Taub, Exhibit 6-A specified that the grant would be

4    for research into the diagnosis -- in the very first paragraph,

5    it says that "The grant would be for the research into the

6    diagnosis and treatment of mesothelioma and other related

7    cancers in individuals exposed to asbestos and other materials

8    during the 9/11 terrorist attack."

9          Correct?

10   A.  Yes.

11   Q.  The letter goes on to describe -- if you look to the third

12   paragraph, the enclosure to the letter, it says, "The

13   procedures that should be followed to apply for the grant."

14         Correct?

15   A.  Yes.

16   Q.  So, on the other hand, they're saying the purpose of this

17   letter is to advise you that you're the recipient of the grant.

18   But yet you still have to go through an application process

19   after you receive this letter; correct?

20   A.  Yes.

21   Q.  And by applying, that means that it's possible that you

22   might not get it still; correct?

23   A.  I don't know what that implies if we already are the

24   recipient.  I'm not really sure how one should interpret that.

25   Q.  This letter actually includes an enclosure; correct?

 1   A.   Yes.

 2   Q.   And that enclosure includes something called a grantee

 3   information sheet that had to be filled out.

 4   A.   Yes.

 5   Q.   And then there was a program work plan and a narrative

 6   sheet that had to be filled out; correct?

 7   A.   Yes.

 8   Q.   And then a budget sheet that had to be filled out?

 9   A.   Yes.

10   Q.   And then a Department of Health waiver of interest

11   payments; correct?

12   A.   Yes.

13   Q.   A Department of Health grant application checklist;

14   correct?

15   A.   Yes.

16   Q.   And then a Department of Health instructions for recipients

17   of legislative grants; correct?

18   A.   Yes.

19   Q.   So these were all enclosures and things that you had to do

20   in order to apply for the grant at this point; correct?

21   A.   We had to do it collectively.  In other words, the

22   department did a number of things, and I did some of the

23   things.

24   Q.   This was not something that you did by yourself in your

25   office; correct?

 1   A.  No.

 2   Q.  You relied on other people at New York Presbyterian

 3   Hospital; correct?

 4   A.  Yes.

 5   Q.  And the letter required you to submit the information

 6   within 30 days; is that right?

 7        If we go could back to the letter, please.

 8   A.  Yes.

 9   Q.  Right in that third paragraph, it says, "Please submit the

10   requested information for your grant within 30 days."

11        So it was quite a lot of work to get done in 30 days;

12   right?

13   A.  It's a fair amount of work, yes.

14   Q.  It also directs you, in the very final paragraph, "If you

15   have any questions about the grant or application procedures,

16   please feel free to contact Earl Seguine of my staff," and it

17   gives you a phone number; correct?

18   A.  Yes.

19   Q.  Had you known Earl Seguine?

20   A.  I had not known him, no.

21   Q.  And it's signed by a Mr. Robert Reed; correct?

22   A.  Yes.

23   Q.  Who is the director of fiscal management at the Department

24   of Health; right?

25   A.  Yes.

1   Q.  And it actually copies the chair of the New York Assembly

2   Ways and Means Committee; correct?

3   A.  Yes.

4   Q.  And Dennis Whalen, who was a senior executive of the

5   New York Department of Health; correct?

6   A.  Yes.

7   Q.  And also Mark Van Guysling.

8            Already there are quite a few who are very much aware

9   of this letter being sent to you inviting you to apply for the

10  grant; correct?

11  A.  The letter informs me that I am the recipient of a grant;

12  that my organization was a recipient of a grant, and there are

13  procedures that need to be followed to apply.

14           I'm not sure how that was interpreted, but I

15  interpreted it as we received a grant.

16  Q.  Please go ahead.

17  A.  And then there were procedures to be followed to sort of

18  formalize the recipient of the grant, yes.

19  Q.  If those procedures weren't followed, the money wouldn't

20  actually come to you; correct?

21           MR. GOLDSTEIN:  Objection.

22           THE COURT:  Sustained.

23  BY MR. MOLO:

24  Q.  Did you expect that if you didn't follow the procedures,

25  the money wouldn't come?

1   A.   Not really, no.  I thought that we had received the grant.

2   Q.   Okay.

3   A.   And that they would eventually be followed one way or the

4   other.

5   Q.   Eventually the procedures would be followed?

6   A.   Yes.

7   Q.   In fact, they assigned to you or they said that they would

8   be assigning to you yet another person at the Department of

9   Health.

10           The very last sense to the second-to-the-last

11  paragraph says, "When we receive your completed package, it

12  will be assigned to a project manager who will be responsible

13  for your contract and will work with you over the life of the

14  contract."

15           Correct?

16  A.   Yes.

17  Q.   Now, when you received this, as you said, it looked like a

18  fair amount of work that needed to get done in 30 days; right?

19  A.   I agree.

20  Q.   So you reached out to Lynn Roth at New York Presbyterian

21  Hospital; correct?

22  A.   I had done that before we applied.

23  Q.   So you had already notified Lynn Roth?

24  A.   Yes.

25  Q.   And she is a senior vice-president for development at

1   New York Presbyterian?

2   A.  She was at that time.

3   Q.  She was.  Okay.  So that's a pretty senior person at the

4   hospital; right?

5   A.  Yes.

6   Q.  She brought another New York Presbyterian development

7   person into the loop, someone named Ahema Asare.

8   A.  I don't know Ahema, but I assume that that's what happened.

9   Q.  Well, in fact, I'm going to show you a document marked

10  Defendant's Exhibit 7.

11          MR. MOLO:  Which, Judge, I believe you have and the

12  prosecutors have.

13          THE COURT:  I have 7-A.  Is that the same?

14          MR. MOLO:  Yes.

15  BY MR. MOLO:

16  Q.  Do you recognize this?

17  A.  Yes, I do.

18  Q.  Is that an email that you prepared at Columbia to Ahema

19  Asare?

20  A.  Yes.

21  Q.  It's dated July 26, 2005; correct?

22  A.  Yes, it is.

23  Q.  And it relates to the grant application; correct?

24  A.  Yes.

25          MR. MOLO:  Your Honor, I move for admission of Defense

Exhibit 7-A.

        MR. GOLDSTEIN:  No objection.

        THE COURT:  7-A will be received.

        (Defendant's Exhibit 7-A received in evidence)

BY MR. MOLO:

Q.  In the document, Doctor, you are telling Ms. Asare -- by

the way, it says, "Attachments:  DOH grant ap draft" when we

look at what the title of the attachments are.

        You say, "This is the material I received from the

state last week."  You say, "I've tried to fill it out as best

I can but obviously need your help.  Lynn Roth suggested that I

contact you."

        Correct?

A.  Yes.

Q.  So you begin to work with Ms. Asare to try to complete the

grant application; correct?

A.  That's correct.

Q.  Did you meet with Ms. Asare?  Do you recall?

A.  I don't recall now, but I think this does refresh my memory

that there was a contact between us.

Q.  Do you recall she brought in yet another New York

Presbyterian administrator named Sameh Elhadidi, an accounting

manager into the process?

A.  I've known Mr. Elhadidi in other connections, but I don't

recall that.

1    Q.  Do you recall that he in fact brought in -- do you recall a

2    Karen Colon or a David Liss?

3    A.  I don't recall that.

4    Q.  I will show you something that might refresh your

5    recollection.  I'll show you Defendant's Exhibit 8 and ask you

6    to take a look at this, please, Dr. Taub.

7    A.  Yes.

8    Q.  Just read it to yourself.  Don't read it aloud.

9    A.  Okay.

10   Q.  If you just look first, again, reading to yourself and not

11   out loud, to the from and to and the CC.

12          THE COURT:  The question, Dr. Taub, is going to be

13   does that refresh your recollection about who was involved.  I

14   think that's going to be the question.

15          MR. MOLO:  You read my mind, your Honor.

16   BY MR. MOLO:

17   Q.  Have you had a chance to look at it, Dr. Taub?

18   A.  Yes.

19   Q.  Specifically looking at the very top of the first page,

20   does that refresh your recollection -- does it help you

21   remember -- that Karen Colon and David Liss and Sameh Elhadidi

22   were also involved?

23   A.  My memory is vague about this, but --

24          THE COURT:  The question is does it refresh your

25   recollection.  If the answer is no, the answer is no.

1    THE WITNESS:  It does not.

2    BY MR. MOLO:

3    Q.  Do you recall there being multiple people from New York

4    Presbyterian involved in the process?

5    A.  Yes, I do.

6    Q.  Do you recall having discussions with them?

7    A.  Yes.

8    Q.  I'm going to show you now what's marked as Defendant's

9    Exhibit 9.  Take a moment to look at that.

10           Do you recall this document?

11   A.  I don't recall it specifically.

12   Q.  Do you recognize it as an email?

13   A.  Yes.

14   Q.  That was sent from you to others at New York Presbyterian;

15   correct?

16   A.  Yes.

17   Q.  And this related to the grant application?

18   A.  Yes.

19           MR. MOLO:  I move for admission of Defendant's Exhibit

20   9.

21           MR. GOLDSTEIN:  No objection.

22           THE COURT:  Defense Exhibit 9 will be received.

23           (Defendant's Exhibit 9 received in evidence)

24           MR. MOLO:  Can we put it up on the screen, please.

25   BY MR. MOLO:

1   Q.   This is now dated July 28.  So this is 16 days after the

2   date of the letter that you received; correct?

3   A.   Yes.

4   Q.   So the clock is running on the 30 days; right?

5   A.   Yes.

6   Q.   And in this July 28 email, it's sent from you to -- it says

7   "COLONKA" -- that's Karen Colon; right?

8   A.   Yes.

9   Q.   And then someone named Sharon Mias?

10  A.   Sharon Mias was the administrator for the Department of

11  Medical Oncology at the time and hematology.

12  Q.   So this is another doctor then?

13  A.   Yes.

14  Q.   It sounds like a pretty senior doctor.

15  A.   Yes.

16  Q.   And then James Wildman.  Who is James Wildman?

17  A.   One of the administrators as well.

18  Q.   This is again the New York State grant application for

19  Mesothelioma Center.  And you say you added the additional

20  information that they requested.

21          So at some point they made a request of you?

22  A.   Yes.

23  Q.   And you're asking them to let you know what else is needed,

24  and you'll try to supply it as quickly as possible so the

25  application can move forward.

1              Is that right?

2    A.  Yes, it is.

3    Q.  At this point, you've had at least I think seven different

4    New York Presbyterian doctors or administrators that were aware

5    of this grant application; correct?

6    A.  Yes.

7    Q.  This was hardly a secret within New York Presbyterian

8    Hospital; correct?

9    A.  The grant was not a secret at all.  No.

10   Q.  Did you tell any of those people that this grant was part

11   of a bribery scheme?

12              MR. GOLDSTEIN:  Objection.

13              THE COURT:  Sustained.

14   BY MR. MOLO:

15   Q.  Did you provide whatever additional information that they

16   requested?

17   A.  I believe so.

18   Q.  It got sent off; right?  The application got sent off?

19   A.  Yes.

20   Q.  Now, you next receive a letter dated October 12 of 2005,

21   didn't you, from the Department of Health?

22   A.  I don't recall.

23   Q.  Let me show you what's been marked as Defendant's Exhibit

24   10.

25              Just take a moment and read that to yourself, just the

FB5YSIL1                          TaHD   Cross

1    first page if you would.

2              Do you recall receiving this?

3    A.  Yes.

4    Q.  It's a letter to you from the Department of Health; is that

5    correct?

6    A.  Yes.

7    Q.  And it related to that grant; is that correct?

8    A.  Yes.

9              MR. MOLO:  I move for admission of Defendant's Exhibit

10   10.

11             MR. GOLDSTEIN:  No objection.

12             THE COURT:  Defense 10 is received.

13             (Defendant's Exhibit 10 received in evidence)

14             MR. MOLO:  Can we put it on the screen, please.

15   BY MR. MOLO:

16   Q.  This is another letter from the State Department of health,

17   and it says to you that -- if we can blow up the first

18   paragraph -- "Enclosed are two copies of a contract between the

19   New York State Department of Health and the New York

20   Presbyterian Hospital for the period July 1 through June 30 of

21   2006."

22             It says, "This contract is necessary to process your

23   HCRA grant for payment; correct?

24   A.  Yes.

25   Q.  It goes on, the letter, to say, "Please have the enclosed

1   documents signed by appropriate parties --" obviously not just

2   one party but appropriate parties "-- and return to the

3   department."And then it talks about having to have it

4   notarized.

5           It says, "Additionally, it is important for you to

6   review the entire contract so that you are familiar with all

7   the requirements.

8           "Particularly we call your attention to Appendix A-I,

9   the administrative rules and audits, pages 11 to 12, and

10  Appendix C-II, progress and final reports."

11          Correct?

12  A.   Yes.

13  Q.   And I think you testified yesterday that you did prepare

14  final reports for both grants, the one to Columbia and the one

15  to Presbyterian; right?

16  A.   Yes.

17  Q.   It also states that, "Enclosed please find a vendor

18  responsibility questionnaire."

19          Correct?

20  A.   Yes.

21  Q.   And instruction sheet.  It tells you about having that

22  signed.  The letter further on states that "State procurement

23  laws require that state agencies award contracts only to

24  responsible contractors" and that "effective January 1, 2005,"

25  which was obviously before this letter, because this letter is

1   dated October 12, 2005, "the comptroller must be satisfied that

2   a proposed contractor is responsible before approving the

3   contract award under Section 112 of the state finance laws."

4           Is that right?

5   A.   Yes.

6   Q.   So they were informing you that the New York State

7   comptroller would have to review the contract as well; correct?

8   A.   Yes.

9   Q.   Further on, the letter states, on the next page, that,

10  additionally -- if we can go to the second page.

11  A.   That's not it.

12  Q.   That's actually not the second page.

13          The letter though on the second page -- you have it

14  before you.  Here we go -- tells you that the worker's

15  compensation law requires that you must prove that you provide

16  worker's compensation and disability benefits; correct?

17  A.   Yes.

18  Q.   And it also close a form ST-220, the contractor

19  certification; correct?

20  A.   Yes.

21  Q.   And it goes on to say that there's a grant information form

22  and that all this must be completed, and, "Please return this

23  form with your signed contracts."  Correct?

24  A.   Yes.

25  Q.   It happens to be signed by yet another person at the

1   Department of Health, Muriel Dempsey.

2           Is that right?

3   A.  Yes.

4   Q.  Did you know Muriel Dempsey?

5   A.  No.

6   Q.  Did you have any doubt that this was a bona fide letter?

7   A.  Not at all.  I had no doubt.

8   Q.  You didn't think this letter was part of some fraud scheme,

9   did you?

10          MR. GOLDSTEIN:  Objection.

11          THE COURT:  Sustained.

12  BY MR. MOLO:

13  Q.  Now, additionally, there were a series of enclosures and

14  appendices that required more work by Presbyterian and/or you,

15  I guess.  There's the contractor certification form.

16  A.  Yes.

17  Q.  And there was the individual cooperation partnership or LLC

18  acknowledgment; correct?

19  A.  Yes.

20  Q.  And then there are instructions for completing that;

21  correct?

22  A.  Yes.

23  Q.  And there's the New York State vendor responsibility

24  questionnaire that had to be completed; correct?

25  A.  Yes.

 1   Q.  And then there was the State of New York office of the

 2   state comptroller vendor responsibility questionnaire that

 3   needed to be completed; correct?

 4   A.  Yes.

 5   Q.  And there was the certification of that questionnaire.

 6   That questionnaire actually had to be certified and sworn to

 7   before a notary.

 8        You can see the notary spot there.  It's actually

 9   quite a serious document.  If you could scroll just a little

10   bit.

11        THE COURT:  Mr. Molo, no editorializing.  Just ask the

12   question.

13   BY MR. MOLO:

14   Q.  It requires the undersigned to certify that they have not

15   altered the content of the questions of the questionnaire;

16   they've read and understand all the items, supplied full and

17   complete responses to each item; that they're knowledgeable

18   about the vendors' businesses.  And yet they're under a duty to

19   notify the procuring state agency of any material changes.

20        Correct?

21   A.  Correct.

22   Q.  And then, in addition to that, there are questions and

23   answers concerning tax law that were attached; correct?

24   A.  Yes.

25   Q.  And you had the grant contract.  And then there was

1    Appendix A to the grant contract with standard clauses for

2    New York State contracts.  And then there were agency-specific

3    clauses; correct?

4    A.  Yes.

5    Q.  There was a budget sheet; correct?

6    A.  Yes.

7    Q.  And payment and reporting schedules; correct?

8    A.  Yes.

9    Q.  And then there was the program work plan narratives.

10            By this point, I guess this was actually filled out by

11   you; is that right?  Describing background of the grantee, the

12   Mesothelioma Center and yourself; is that right?

13   A.  Yes.

14   Q.  In addition to that, there is the work plan narrative.

15   Beyond that, there's the next document was the specific clauses

16   for Health Care Reform Act grants, which are a little different

17   from standard grants.

18            THE COURT:  Please don't editorialize.  Just ask the

19   question.

20   BY MR. MOLO:

21   Q.  And then there's worker's compensation information.  Is

22   that right?

23   A.  Yes.

24   Q.  And then disability information; correct?

25   A.  Yes.

1   Q.  You took this document and what was contained in it to

2   David Liss, who was another administrator or one of the

3   administrators at New York Presbyterian; is that right?

4   A.  I believe so.

5   Q.  And, in fact, Karen Colon emailed you to follow up to make

6   sure that happened; correct?

7   A.  Yes.

8   Q.  And I'll show you what's marked Defendant's Exhibit 11.

9   And that's an email from you to Karen Colon; correct?

10  A.  Yes.

11  Q.  And this was relating to the contract that we just

12  discussed; correct?

13  A.  Yes.

14          MR. MOLO:  I move for admission of Defense 11.

15          MR. GOLDSTEIN:  No objection.

16          THE COURT:  Defense 11 is received.

17          (Defendant's Exhibit 11 received in evidence)

18  BY MR. MOLO:

19  Q.  And in there Karen Colon is saying, Dr. Taub, did you drop

20  off one or two contracts to David Liss' office?"

21          And you say to her, "One copy.  He said he would copy

22  it;" correct?

23  A.  Yes.

24  Q.  So you actually had a conversation with David Liss about

25  the contract as well; correct?

 1   A.  Yes.

 2   Q.  Eventually all of that gets filled out; correct?

 3   A.  Yes.

 4   Q.  And it gets sent to the Department of Health yet again;

 5   correct?

 6   A.  Yes.

 7   Q.  All right.  And at last, a contract is entered into.

 8   A.  Yes.

 9   Q.  I'm going to show you what's been marked as Government's

10   Exhibit 367-3, which is in evidence.  I'll ask you to put it up

11   on your screen for a second.  That's the grant contract; right?

12   A.  Yes.

13   Q.  If we go to the second page, we see that the contractor,

14   again, the recipient of the grant, is actually New York

15   Presbyterian Hospital; right?

16   A.  Yes.

17   Q.  And the state agency is the New York Department of Health;

18   right?

19   A.  Yes.

20   Q.  And it's signed by someone named David Wollner, another

21   name that I don't believe appeared before for the agency;

22   correct?

23   A.  Yes.

24            (Continued on next page)

25

 1  BY MR. MOLO:

 2  Q.  And on behalf of New York Presbyterian it is signed by

 3  William A. Polf, Ph.D?

 4  A.  I don't know who that is.  It looks like he is the senior

 5  vice president.

 6  Q.  Senior vice president for external relations?

 7  A.  Yes.

 8  Q.  So that's a senior person at New York Presbyterian?

 9  A.  Yes.

10  Q.  All right.

11          And beneath there, if we could take the the full page

12  where it says State of New York there, do you see it says

13  Approved as to Form, New York State Attorney General, correct?

14  A.  Yes.

15  Q.  And then it is also approved by the Department of Audit and

16  Control for the State Comptroller as well, correct?

17  A.  Yes.

18  Q.  All right, and we see the comptroller on the bottom.

19          THE COURT:  Mr. Molo, ask questions.

20  Q.  If we go to page 8 of your records -- do we have that, can

21  we make that larger, please -- it says the contractor, which

22  would be New York Presbyterian, shall establish and maintain

23  complete and accurate books, records, documents, accounts and

24  other evidence directly pertinent to performance under this

25  contract hereinafter, collectively, the records.  The records

1   must be kept for the balance of the calendar year it in which

2   they were made and for six additional years thereafter,

3   correct?

4   A.  That's what it says.

5   Q.  And then the next sentence, can we highlight that?

6          It says that the state comptroller, the attorney

7   general, and any other person or entity authorized to conduct

8   an examination shall have access to the records, right?

9   A.  Yes.

10  Q.  So, you would agree that the inspection rights concerning

11  this are pretty broad?

12  A.  Yes.

13  Q.  Contract was subject to audit?

14  A.  Yes.

15  Q.  By not just the state agencies but New York Presbyterian

16  could audit it as well, correct?

17  A.  Yes.

18  Q.  All right, so that same red tape was required for the

19  second contract as well, correct?

20  A.  I would imagine so.

21  Q.  And while I don't want to belabor this I think if I can

22  show you the second grant, defense exhibit, the letter you

23  received, I show you what is marked Defendant's Exhibit 12 and

24  that's -- do you recognize that document?

25  A.  Yes.

 1   Q.  It is a letter that you received from Robert Reed of the

 2   New York state Department of Health in January of 2007?

 3   A.  Yes, it is.

 4            MR. MOLO:  Move admission of Defendant's Exhibit 12.

 5            MS. COHEN:  No objection, your Honor.

 6            THE COURT:  Defendant's Exhibit 12 is received.

 7            (Defendant's Exhibit 12 received in evidence)

 8            MR. MOLO:  This letter, if we can put it up on the

 9   screen, please?

10            THE COURT:  While he is pulling that up, could I see

11   the parties for just a second?

12            MR. MOLO:  Sure.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At side bar)

2                    THE COURT:  So, I let you use him as a prop to walk

3       through the grant process once, I'm not going to let you do it

4       again.  You can ask him questions that he knows the answer to.

5       Do not editorialize.

6                    MR. MOLO:  Okay.  I won't.

7                    THE COURT:  We are not going to go through this grant

8       in the same excruciating detail as the last.

9                    MR. MOLO:  It was certainly not my intention.

10                   THE COURT:  I wanted to stop it before it started.

11                   MR. MOLO:  I can ask him whether it follows a similar

12      process?

13                   THE COURT:  But not document by document.

14                   MR. MOLO:  No, but there may be one or two, that's

15      small.

16                   THE COURT:  It is, but he hasn't seen these documents

17      so what you are doing is using him as a prop for what is

18      essentially summation to argue what an onerous New York State

19      grant process there is.  I sincerely doubt he has read any of

20      these documents.

21                   MR. MOLO:  Well, his signature --

22                   THE COURT:  He may answer the question but ask

23      questions; don't testify, which you have been doing.

24                   MR. MOLO:  All right.

25                   THE COURT:  So I'm telling you, just ask questions.

1              MR. MOLO:  Okay.

2              THE COURT:  Okay.

```
 1                    (In open court)
 2              THE COURT:  Okay, Defendant's Exhibit 12 is on the
 3    screen now.
 4    BY MR. MOLO:
 5    Q.  Dr. Taub, this letter is similar to the one that you
 6    received previously related to the New York Presbyterian grant,
 7    correct?
 8    A.  Yes.
 9    Q.  And again, you are being told the grant is for research for
10    expenses on mesothelioma and related cancers for the study of
11    the effects of 9/11, correct?
12    A.  Yes.
13    Q.  And --
14              THE COURT:  It is actually and for the study.
15    Q.  Yes, and for the study, that is right; mesothelioma and
16    related cancers, and it contains a packet of information that
17    needs to be filled out, correct?
18    A.  Yes.
19    Q.  Was the packet of information for this letter essentially
20    identical to the packet of information that was submitted for
21    the Presbyterian grant a year earlier?
22    A.  Pretty much.
23    Q.  I'm sorry?
24    A.  Pretty much the same.
25    Q.  Pretty much the same.
```

1           To be clear, though, this grant, because it was

2    directed to the Columbia University Medical Center, required a

3    different set of administrators than the administrators that

4    were at New York Presbyterian for the New York Presbyterian

5    grant, correct?

6    A.   That's right.

7    Q.   And do you recall, was the process followed?

8    A.   I don't recall but I presumed it was at this point.

9    Q.   Okay.  And in doing so, were there multiple people, to the

10   best of your recollection, at Columbia University that were

11   involved?

12   A.   Yes.

13   Q.   I am going to show you what's marked as Government Exhibit

14   3683 which is in evidence.  I ask you to take a look at that.

15   Is that familiar?

16   A.   One second.

17   Q.   Or maybe to put it differently, is that correct?

18   A.   It is a very similar contract.

19   Q.   Is it the contract for Columbia to get the second HCRA

20   grant that you had applied for?

21   A.   Yes, it is.

22   Q.   And if you turn to the second page of that contract,

23   Government Exhibit 3683, second page, you see that it is signed

24   by someone named Joanne Berdepes, MPH, Associate Director of

25   Research Administration at Columbia?

 1    A.  Yes.

 2    Q.  That's a pretty senior person at Columbia?

 3    A.  Yes.  At that time, yes.

 4    Q.  And on behalf of the state agency, the New York Department

 5    of Health, it is signed by James W. Clyne?

 6    A.  Yes.

 7    Q.  His title is Deputy Commissioner?

 8    A.  Yes.

 9    Q.  That's different than the person who signed for the

10    Columbia Presbyterian health side?

11    A.  Yes.

12    Q.  If we go down again to the bottom of that document we see

13    that it is approved, as to form by the New York State attorney

14    general, correct?

15    A.  Yes.

16    Q.  Signed by Peter Favretto, Associate Attorney General, and

17    then it says also approved by the Department of Audit and

18    Control, Roseanne Courter, for the state comptroller, correct?

19    A.  Yes.

20    Q.  Having completed the process and having the signed contract

21    at that point you were able to get the grant money, correct?

22    A.  Yes.

23    Q.  When I say you I mean Columbia University.

24    A.  Yes.

25    Q.  All right.

1        One point about this contract that I will call your

2    attention to, at some point do you recall that you were asked

3    to clarify the grant purpose?

4    A.  At some point.  I don't really recall that right now.

5    Q.  Okay, I'm going to show you a document and ask you if it

6    helps you remember that the document I am showing is

7    Defendant's Exhibit 14 used just for purposes of refreshing

8    recollection at this point.

9    A.  I do recognize it.

10            THE COURT:  He says I do recognize it.

11            The question was does it refresh your recollection.

12            THE WITNESS:  Yes.

13   Q.  Do you recall that you were asked to clarify, revise the

14   grant purpose?

15   A.  To specify the grant purpose.

16   Q.  And on the second page of that document it says Grant

17   Purpose, and your name is on the bottom; is that right?

18   A.  Yes.

19   Q.  Did you prepare this document?

20            THE COURT:  Which document?

21            MR. MOLO:  It is the second page of -- it was attached

22   to this, yes, second page.

23            THE COURT:  The second page of the letter or the

24   second page of the document?

25            MR. MOLO:  Second page of the letter, third page of

1   what has been presented to you.

2   Q.   The third page of what is marked Defendant's Exhibit 14,

3   Doctor.

4   A.   Excuse me.   The page marked 271?

5   Q.   Yes.

6   A.   Yes, I prepared that.

7   Q.   You prepared that document?

8   A.   Yes.

9   Q.   I am going to refer to that document as Defendant's Exhibit

10  14A, if that's okay, and that document was prepared by you in

11  connection with applying for the grant to Columbia University?

12  A.   Yes.

13           MR. MOLO:   Move for admission, just of that page, that

14  third page prepared by Dr. Taub.

15           MR. GOLDSTEIN:   No objection.

16           THE COURT:   14A is received.

17           (Defendant's Exhibit 14A received in evidence)

18  BY MR. MOLO:

19  Q.   In there, for the grant purpose, you state the revised

20  grant purpose, mesothelioma, a disease caused by asbestos

21  exposure, is an especially cruel blight in the New York area

22  highlighted by the release of atmospheric pollutants such as

23  asbestos during the horrific events of 2001, correct?

24  A.   Yes.

25  Q.   So, at no point you are referring to the air quality

 1   following the World Trade Center, correct?

 2   A.  Yes.

 3   Q.  By the way, do you recall that there was an OSHA problem

 4   that held up the first grant, Occupational Safety and Health

 5   Administration?

 6   A.  I don't recall that.

 7   Q.  Okay.  Do you recall picking up the phone and telling

 8   Mr. Silver, *Hurry up and get these grants to me*?

 9          THE COURT:  Overruled.

10   A.  I don't recall.

11          I didn't hear the objection.

12          THE COURT:  You answered the question.  I overruled

13   the objection.

14          THE WITNESS:  Okay.

15          THE COURT:  You're fine.

16          THE COURT:  The answer was "I don't recall," just in

17   case we were talking over each other.

18   BY MR. MOLO:

19   Q.  Now, so you got the grant money for both grants, correct?

20   A.  Columbia got it.

21   Q.  Exactly, Columbia got the money for the second grant and

22   New York Presbyterian got the money for the first grant?

23   A.  Correct.

24   Q.  And you properly accounted for the use of that money?

25   A.  Yes.

1   Q.  You didn't disguise how it was being spent?

2   A.  No.

3   Q.  You reported publicly on the research that you were doing

4   with the help of those grants and the much larger other funding

5   you were receiving, right?

6   A.  Yes.

7   Q.  And in 2006 and 2007, the Mesothelioma Center conducted

8   clinical trials of experimental chemotherapy drugs and clinical

9   regimens, correct?

10  A.  Yes.

11  Q.  And you developed new techniques for the treatment of

12  pleural mesothelioma?

13  A.  Yes.

14  Q.  You continued to develop and refine your peritoneal

15  mesothelioma multi-modal therapy programs?

16  A.  Yes, we did.

17  Q.  And you also compiled an extensive tissue bank for medical

18  research?

19  A.  Yes.

20  Q.  You conducted life quality surveys of your patients?

21  A.  We began to do that.

22  Q.  Okay.

23         THE COURT:  What did you say?

24  A.  I said we began to do that.

25         THE COURT:  If you could sit back a little bit?

 1   BY MR. MOLO:

 2   Q.   And you published the results of your work in medical

 3   journals, correct?

 4   A.   Yes.

 5   Q.   I am going to show you what's marked Defendant's Exhibit

 6   17.   I ask you to take a momento look it over yourself, Doctor.

 7   Have you had a chance to look at it?

 8   A.   Yes.

 9   Q.   Do you recognize it?

10   A.   Yes.

11   Q.   Is it a document that you prepared in your role at the

12   Mesothelioma Center?

13   A.   Yes.

14          MR. MOLO:  Move for admission of Defendant's Exhibit

15   17.

16          MR. GOLDSTEIN:  No objection, your Honor.

17          THE COURT:  Okay.  Defendant's Exhibit 17 is received.

18          (Defendant's Exhibit 17 received in evidence)

19   BY MR. MOLO:

20   Q.   This is a report concerning progress, at least as of the

21   date of March 2006, of your work at the time, correct?

22   A.   Yes.

23   Q.   And does this describe, fairly, the work that you were

24   doing at the Mesothelioma Center at the time this report was

25   prepared?

 1   A.   It does.

 2   Q.   And the work over the next few years pretty much continued

 3   on course with this work?

 4   A.   Yes.

 5            MR. MOLO:  Move for --

 6            THE COURT:  It is in.

 7            MR. MOLO:  We admitted 17.  Okay.

 8   Q.   And Mr. Milstein is one of your, maybe your greatest

 9   benefactor, correct?

10   A.   He was.  He was a strong benefactor, yes.

11   Q.   Dr. Taub, I think we established Mr. Silver is your friend,

12   correct?

13   A.   We had a friendly relationship, yes.

14   Q.   And I think you testified you were both members of the

15   Orthodox Jewish community, correct?

16   A.   Yes.

17   Q.   Sometimes you would stay in the same hotel over Passover?

18   A.   Yes.

19   Q.   I believe you said this dated back to as early as 1984, is

20   that right?

21   A.   That happened in 1984, yes.

22   Q.   And periodically, from 1984 forward, you would sometimes

23   stay in the same hotel over Passover?

24   A.   It's possible.

25   Q.   He would sometimes give you a small gift like handmade

1   matzoh, is that right?

2   A.   Yes.

3   Q.   And I think you testified yesterday that he attended one of

4   your daughter's wedding celebration dinners.  I'm not going to

5   attempt the Hebrew pronunciation.

6   A.   It is called Sheva Brachot.

7   Q.   And you also knew Mr. Silver's late brother, correct?

8   A.   No, his brother-in-law.

9   Q.   Oh, you knew his late brother-in-law.  Okay.

10  A.   Yes.

11  Q.   Who was a doctor as well, correct?

12  A.   Yes.

13  Q.   And he was married to Mr. Silver's sister?

14  A.   Yes.

15  Q.   Did you -- after you met him did you follow what Mr. Silver

16  was doing in the press like, the newspapers like the Jewish

17  press?

18  A.   Occasionally I would see his name in the Jewish press.

19  Yes, I read the Jewish press but didn't follow it closely.

20  Q.   And you would occasionally see one another at various

21  social functions?

22  A.   Yes.

23  Q.   I take it when you would be at these hotels for Passovers

24  your families would be there as well?

25  A.   Yes.

1    Q.  You had an opportunity to meet his wife and family, right?

2    A.  Yes.

3    Q.  And he met your wife and family, correct?

4    A.  Yes, he did.

5    Q.  And, in fact, he once introduced you to Joe Lieberman,

6    right?

7    A.  That's correct.

8    Q.  So, when he got to Weitz & Luxenberg you had a friend

9    there, correct?

10   A.  Yes.

11   Q.  Now, you testified yesterday that you would call Mr. Silver

12   at his state office and basically tell him that someone, you

13   were suggesting Weitz & Luxenberg to a potential patient,

14   correct?

15   A.  Yes.

16   Q.  That is where you would usually call.

17           He would end up calling you back, correct?

18   A.  I'm sorry?

19   Q.  He would call you back?

20   A.  He would call back, yes.

21   Q.  And when you called and left a message, would you say it

22   relates to a patient who is looking for legal representation?

23   A.  Correct.

24   Q.  So you were making no secret of the fact that you were

25   contacting Mr. Silver at his state office about this, correct?

 1    A.  No.

 2    Q.  And you knew, by the way, he was a part-time legislator,

 3    right?

 4    A.  I'm sorry?

 5    Q.  You knew, by the way, he was a part-time legislator, right?

 6    A.  Yes.

 7    Q.  Because obviously you knew he was at Weitz & Luxenberg,

 8    correct?

 9    A.  Yes.

10    Q.  And you new that legislature is only in session for roughly

11    six months a year, correct?

12    A.  That I don't know.

13    Q.  Okay.  And you certainly referred -- excuse me, you

14    suggested to patients that they contact Weitz & Luxenberg

15    before you had the idea to ask Mr. Silver for funding from the

16    state, correct?

17    A.  I don't recall that specifically, but we had discussed

18    firms and the fact that they should have legal representation.

19    Q.  Do you recall that you were interviewed by the prosecutors

20    here on December 15th of 2014?

21    A.  Please repeat the question.  I didn't hear.

22    Q.  Sure.

23         Do you recall that you were interviewed by the

24    prosecutors here in December 15th of 2014, or on December 15th

25    of 2014?

 1  A.  I recall being interviewed by the prosecutors.  I don't

 2  recall the exact date.

 3  Q.  Do you recall a date in mid-December that that happened?

 4  A.  Yes.

 5  Q.  You were there with your lawyer, right?

 6  A.  Yes.

 7          MR. MOLO:  For the benefit of the Court and the

 8  prosecutors, I'm showing the witness notes from December 15th,

 9  2014.

10          THE COURT:  Does it have a number?

11          MR. MOLO:  They don't.

12          THE COURT:  They don't have a 3500 number?

13          MR. MOLO:  I'm looking at what I have.

14          THE COURT:  Okay.

15  BY MR. MOLO:

16  Q.  I am going to show you this, Dr. Taub; there is some

17  highlighting there.

18          MS. COHEN:  Your Honor, all the notes are marked with

19  3500.

20          THE COURT:  Do you know what document?

21          MS. COHEN:  I have no idea.

22          MR. GOLDSTEIN:  I believe it is 3538-04.

23          MR. MOLO:  There is no stamp.

24  BY MR. MOLO:

25  Q.  Do you see the first page there, Doctor?  If you go to the

1  first page --

2  A.  Yes.

3  Q.  -- the very top, does that help you remember that you were

4  meeting with the prosecutors on December 15th of 2014?

5  A.  If that's the date then I'm guessing that that was the

6  date.

7           THE COURT:  Again, Dr. Taub, the question is does it

8  refresh your recollection.  If it doesn't, say no.  The fact

9  that it is written down doesn't mean it is right.

10          THE WITNESS:  That's correct.  It doesn't directly

11  reflect my recollection.

12  Q.  As to the date, if you go to the third page, does that help

13  you recall whether you were referring cases to Mr. Silver

14  before you had the idea to ask for funding?

15  A.  I don't think that's entirely accurate.

16  Q.  Do you recall meeting with the prosecutors then in

17  mid-December of 2014?

18  A.  Yes.

19  Q.  And while you were meeting them they asked you,

20  effectively, when you had the idea to ask for funding, and you

21  told them I referred cases to Sheldon Silver before I had the

22  idea to ask for funding.

23  A.  I was referring to state funding.  I had initially

24  approached him for getting funding from --

25  Q.  Okay.

 1   A.  -- from --

 2          THE COURT:  Don't.  Stop.  Please, don't interrupt.

 3   A.  I didn't say to ask for state funding.  When I first met

 4   with Mr. Silver I asked him if he could influence his firm to

 5   donate funds to MARF.

 6   Q.  Okay.

 7   A.  So it is not taken correct but certainly in terms of, if

 8   this were amended to say state funding, that would be correct.

 9   Q.  Okay.

10   A.  I did refer cases to him before asking for state funding.

11   Q.  I'm sorry.  Are you done?

12   A.  Okay.

13   Q.  Okay.  I want to make sure I don't talk over you

14   A.  Yes.

15   Q.  Do you recall then -- withdraw that question.

16          So, you did refer cases to Weitz & Luxenberg or you

17   suggested that patients contact Weitz & Luxenberg through

18   Mr. Silver prior to ever discussing state funding and state

19   grants with Mr. Silver?

20   A.  That's right.

21          THE COURT:  Mr. Molo, about how much longer do you

22   think you have?

23          MR. MOLO:  Maybe an hour.

24          THE COURT:  Okay, so in about five minutes find a good

25   place to stop.

 1          MR. MOLO:  We can stop right now if you would like.

 2          THE COURT:  In about five minutes find a good place to

 3     stop.

 4     BY MR. MOLO:

 5     Q.  And when you contacted Mr. Silver about cases, you didn't

 6     understand that you were giving him property, did you?

 7          MR. GOLDSTEIN:  Objection.

 8          THE COURT:  Sustained.  Sustained.

 9     Q.  When you referred cases -- I'm sorry, when you suggested to

10     patients that they contact Mr. Silver at Weitz & Luxenberg

11     Mr. Silver wasn't depriving you of anything, was he?

12          MR. GOLDSTEIN:  Objection.

13          THE COURT:  Sustained.

14     Q.  When you contacted Mr. Silver and said you had suggested

15     that a patient contact Weitz & Luxenberg through him, the

16     patient was still free to not do so, correct?

17     A.  Yes.

18     Q.  And, in fact, the patient could go to another law firm if

19     it chose to do so, correct?

20     A.  Yes.

21     Q.  And, in fact, you know of times when patients did not go to

22     Weitz & Luxenberg?

23     A.  Yes.

24          THE COURT:  I think we went through all of this

25     yesterday, Mr. Molo.

1   Q.  It was generally important for you to have goodwill with

2   Mr. Silver, wasn't it?

3   A.  I believe so, yes.

4   Q.  And in suggesting the patients contact Mr. Silver, that

5   generated goodwill?

6   A.  I'm sorry.  On the part of the patient or?

7   Q.  On the part of Mr. Silver.

8   A.  Certainly.

9   Q.  And it certainly deepened your friendship, correct?

10  A.  Over time, yes.

11          MR. MOLO:  Do you want me to stop now?  I'm going to

12  start another line of cross-examination, Judge.  It is up to

13  you.

14          THE COURT:  Ladies and gentlemen, we are going to take

15  our morning break.  Don't discuss the case.  10-minute break,

16  we will bring you back out in the courtroom.

17          (Continued on next page)

18

19

20

21

22

23

24

25

```
 1                (Jury not present)

 2                THE COURT:  Okay.  10 minutes.

 3                (Recess)

 4                THE COURT:  Okay, Mr. Molo, have you gotten your

 5   thoughts together now?

 6                MR. MOLO:  I did.

 7                THE COURT:  How much longer are you going to be?

 8                MR. MOLO:  I think that I should end before lunch,

 9   maybe a little bit before lunch but not a lot.  I would say an

10   hour or less.

11                THE COURT:  Okay.  We are going to go until close to

12   1:00.

13                MR. MOLO:  Then I definitely will end before lunch.

14                THE COURT:  About how long is your redirect going to

15   be, based on what you have heard so far?

16                MR. GOLDSTEIN:  45 minutes.

17                THE COURT:  Okay.

18                (Continued on next page)

19

20

21

22

23

24

25
```

```
 1              (Jury present)

 2              THE COURT:  Okay, Dr. Taub, you are still under oath.

 3              Mr. Molo.

 4   BY MR. MOLO:

 5   Q.  Dr. Taub, you testified yesterday that Mr. Silver sometimes

 6   would stop by your office at Columbia; is that right?

 7   A.  Yes.

 8   Q.  He has doctors that he sees for his health that are at

 9   Columbia, correct?

10              MR. GOLDSTEIN:  Objection.

11              THE COURT:  Sustained.

12   Q.  Do you know, did he see doctors that were near your office?

13   A.  I don't know specifically.

14   Q.  Do you know that he sought -- you don't know if he had

15   doctors that were in the same suite that you were in?

16              MR. GOLDSTEIN:  Objection.

17              THE COURT:  Sustained.

18   Q.  Did you see him go into a doctor's office around you?

19   A.  No.

20   Q.  Did he tell you he was seeing doctors at Columbia?

21              MR. GOLDSTEIN:  Objection.

22              THE COURT:  Sustained.

23   Q.  And this would happen from time to time, he would drop by

24   your office, right?

25   A.  Yes.
```

1    Q.  Just to pay a friendly visit?

2    A.  I don't know whether it was to pay a visit or not.  He was

3    at Columbia so he stopped by the office.

4    Q.  And you would chat, correct?

5    A.  I'm sorry?

6    Q.  You would chat?

7    A.  Yes.

8    Q.  Have a cup of coffee maybe?

9    A.  I -- we don't -- I don't drink coffee.

10   Q.  Okay, cup of tea, some Ovaltine, I don't know what you

11   drink, Doctor; but in any event would you have a visit, right?

12   A.  Yes.

13   Q.  Now, I understand that your wife is ill, correct?

14   A.  Yes.

15   Q.  And she's had a chronic illness, is that right?

16   A.  Yes.

17   Q.  I take it that she does not travel without you; is that

18   right?

19   A.  Not for a while.

20   Q.  She's never gone to Albany without you that you're aware

21   of?

22   A.  She did not go to Albany with me.

23   Q.  Or without you, correct?

24   A.  No.

25   Q.  Now, your wife does serve on the board of an organization I

1    guess called Shalom Task Force, is that correct?

2    A.  I'm sorry.  Please repeat the question.

3    Q.  Your wife serves on the board of an organization called the

4    Shalom Task Force?

5    A.  Yes.

6    Q.  And she's been on that board for more than 10 years; is

7    that right?

8    A.  I believe so.

9    Q.  It is an important social services organization in that it

10   helps people dealing with domestic violence, correct?

11   A.  Yes, it does.

12   Q.  And it tries to prevent domestic violence, correct?

13   A.  It has education programs to do so.

14   Q.  I believe you said yesterday that you learned sometime in

15   2007 that Shalom Task Force might be seeking some funding from

16   the state, correct?

17   A.  I learned that.

18   Q.  And I think you testified that you helped the director of

19   the Shalom Task Force edit a letter; is that correct?

20   A.  That's what I recall.

21   Q.  You don't know whether your edits were ever incorporated

22   into a letter that was sent to the State, correct?

23   A.  No, I don't.

24   Q.  And it was not a letter that was signed by you, correct?

25   A.  No, it was not.

1    Q.  And you testified yesterday that you received a thank you

2    note from the executive director, I guess, of the Shalom Task

3    Force; is that right?

4    A.  I did receive such a letter.  I believe I testified to that

5    effect.  I don't recall --

6    Q.  Okay?

7    A.  -- what I said yesterday.

8    Q.  I can understand.

9           Is that a -- it was a form letter that you got?

10   A.  I'm sorry?

11   Q.  It was a form letter?

12           MR. GOLDSTEIN:  Objection.

13           THE COURT:  Sustained.

14   Q.  Did it appear to be a generic thank you note?

15           MR. GOLDSTEIN:  Objection.

16           THE COURT:  Thank you notes are all kind of generic,

17   so sustained.

18           MR. MOLO:  Sometimes they're very personalized.

19           THE COURT:  You are required to say thank you.

20           MR. MOLO:  Well, that part of it is generic, I guess.

21   BY MR. MOLO:

22   Q.  Dr. Taub, you didn't refer patients to Weitz & Luxenberg in

23   exchange for any kind of state grant to Shalom Task Force, did

24   you?

25   A.  No.

 1   Q.   Now, you testified that you have got -- you testified

 2   yesterday you have got two children that I am sure you are

 3   quite proud of that one of them is a son who has two ivy league

 4   degrees, correct?

 5   A.   Yes.

 6   Q.   An undergraduate degree from the University of

 7   Pennsylvania?

 8   A.   Yes.

 9   Q.   And he has a Master's from Columbia in special education,

10   correct?

11   A.   Yes.

12   Q.   After he graduated from Columbia he worked in a number of

13   social services organizations, correct?

14   A.   Yes.

15   Q.   He worked for the National Council for the Disabled?

16   A.   I believe he did, yes.

17   Q.   And he worked for the Hebrew Academy for Special Children?

18   A.   Yes.

19   Q.   And he worked for the Devereux Millwood Learning Center,

20   correct?

21   A.   I don't recall that but -- I don't recall that.

22   Q.   Clearly a man whose interests lie in helping others,

23   correct?

24   A.   Definitely.

25   Q.   Now, he at some point did a bit of a career switch and went

1  and was working in the government industry, you said?

2  A.  Yes.

3  Q.  And at some point I guess he was laid off, is that right?

4  A.  I think he did not like working there.  I think he left

5  there, he left the job.

6  Q.  But it is a job he held for several years before he left,

7  correct?

8  A.  Yes.

9  Q.  And you thought that Mr. Silver could be helpful in your

10 son's job search because he knows so many people, correct?

11 A.  That's correct.

12 Q.  And especially because your son was interested in going

13 back into the social services world and wanted to go to work

14 for a Jewish-related social service organization, correct?

15 A.  That was my thought.

16 Q.  And since you and Mr. Silver are friends you went and

17 sought the help of a friend, correct?

18 A.  At that point in time we had had a -- we had a friendship,

19 yes.

20 Q.  And so your son wrote Mr. Silver sending his resume,

21 correct?

22 A.  Yes, he did.

23 Q.  Or Mr. Silver's office perhaps, is that right?

24 A.  Yes.

25 Q.  And in doing so your son had met Mr. Silver himself before,

```
 1  right?  As a boy growing up?

 2  A.  I don't recall whether there was a specific meeting but --

 3  I don't recall that.

 4  Q.  Given the vacations over Passover the kids met one another,

 5  right?

 6  A.  I don't recall.

 7  Q.  You are familiar with the organization OHEL?

 8  A.  I have only known it because I get mail from them yearly.

 9  Q.  It is a prominent Jewish social services organization based

10  in New York, correct?

11  A.  Yes, it is.

12  Q.  And you know Mr. Silver and his family have had association

13  with OHEL?

14          MR. GOLDSTEIN:  Objection.

15          THE COURT:  Overruled.

16          Do you know?

17  A.  I don't know.

18  Q.  You have sometimes heard Sheldon Silver referred to as a

19  celebrity spokesperson for OHEL?

20  A.  I don't know that.

21  Q.  And OHEL did a great deal of work for the people in the

22  community of New York, it has community health services?

23  A.  From their brochures I agree with that.

24  Q.  Foster care services?

25  A.  I'm sorry?
```

 1   Q.  Foster care services?

 2               THE COURT:  Is all you know from their brochure?

 3               THE WITNESS:  Yes.

 4               THE COURT:  Sustained.

 5   BY MR. MOLO:

 6   Q.  Do you know, though, from your son, that it has services

 7   for children with disabilities including developmentally

 8   challenged children?

 9               MR. GOLDSTEIN:  Objection.

10               THE COURT:  Sustained.

11   Q.  Do you know how many people OHEL employs?

12               THE COURT:  Sustained.  He doesn't know anything about

13   OHEL beside what he has read in the brochure.

14               MR. MOLO:  He may have read it in the brochure.

15               THE COURT:  It is still hearsay.

16               THE WITNESS:  I don't recall.

17               MR. MOLO:  I'm not asking him to repeat the brochure,

18   Judge.

19   Q.  But, in any event, you -- have you ever attend an OHEL

20   dinner with Mr. Silver?

21   A.  No.

22   Q.  At some point your son gets connected with OHEL, correct?

23   A.  Yes.

24   Q.  And with some help from Mr. Silver, correct?

25   A.  Yes.

1   Q.  And your son went through an interview process at OHEL

2   A.  Yes.  I believe so.

3   Q.  And he got a job there, right?

4   A.  Yes.

5   Q.  It was about 2010?

6   A.  I'm sorry?

7   Q.  It was around 2010 that that happened?

8   A.  I don't recall the exact time.

9   Q.  But he has worked at OHEL now for about five years, right?

10  A.  Yes.

11  Q.  He is working there today, correct?

12  A.  Yes.

13  Q.  Do you know whether he has been promoted?

14  A.  What?

15  Q.  Do you know will he has been promoted?

16  A.  I think he was promoted once.

17  Q.  So he is putting his education, his ivy league education to

18  good use in helping less fortunate people?

19          MR. GOLDSTEIN:  Objection.

20          THE COURT:  Overruled.

21  A.  Yes.

22  Q.  And you would not trade referrals of patients to

23  Weitz & Luxenberg in exchange for your son getting a job at

24  OHEL, would you?

25          MR. GOLDSTEIN:  Objection.

1          THE COURT:  Sustained.

2    Q.  You did not exchange referrals of patients to

3    Weitz & Luxenberg for your son getting a job -- your ivy-league

4    son getting a job at OHEL?

5    A.  No.

6    Q.  And in addition to your son you have, as I understand, a

7    very bright daughter; correct?

8    A.  I can't hear you.  I'm sorry.

9    Q.  In addition to your son you have a bright daughter?

10         THE COURT:  You are not contrasting the two kids, are

11   you?

12         MR. MOLO:  No.  The son has two ivy league degrees,

13   so.

14         THE COURT:  I'm just saying.

15         MR. MOLO:  So, I am not contrasting them, Judge, but

16   thank you for pointing that out.

17   BY MR. MOLO:

18   Q.  In addition to a very bright son you have a very bright

19   daughter.

20   A.  My son has a third degree also, he has an MBA also.

21   Q.  He has three degrees, excuse me.  I don't mean to undersell

22   him.

23         Your daughter has graduated from Barnard, is that

24   right?

25   A.  Yes.

1   Q.   With honors, correct?

2   A.   Yes.

3   Q.   And she worked as an editor at Penguin, I guess, for five

4   or six years?

5   A.   Yes.

6   Q.   And after that she went to law school at Fordham, correct?

7   A.   Correct.

8   Q.   And while she was at Fordham she served on the Journal of

9   Corporate and Financial Law?

10  A.   Yes.

11  Q.   And she did well enough in law school to get hired by the

12  prestigious Proskauer firm?

13  A.   That's correct.

14  Q.   And she now works as a lawyer at the Depository Trust and

15  Clearing Corporation?

16  A.   Yes.

17  Q.   Now, while she was in law school she did an unpaid

18  seven-week internship for a New York State Judge in Manhattan,

19  right?

20  A.   Yes.

21  Q.   And that was Judge Schoenfeld, is that right?

22  A.   That's my understanding.

23  Q.   Did you know whether she had classmates of hers from

24  Fordham that were also doing these unpaid internships for

25  judges?

 1  A.  I believe that was pretty standard for them to try and get

 2  unpaid internships during their school.

 3  Q.  It was just part of their legal training, right?

 4  A.  Yes.

 5  Q.  And at some point you asked Mr. Silver to help your

 6  daughter maybe try and find such an unpaid internship?

 7  A.  I don't recall whether I asked Mr. Silver.  I just told my

 8  daughter to ask him.

 9  Q.  Okay, but at one point or another your daughter connected

10  with Mr. Silver about this internship, correct?

11  A.  Yes.

12  Q.  Mr. Silver has been a lawyer since -- for quite a long time

13  so he knows a lot of judges?

14          MR. GOLDSTEIN:  Objection.

15          THE COURT:  Sustained.

16  Q.  Was that the thinking?

17          MR. GOLDSTEIN:  Objection.

18  A.  I'm sorry?

19  Q.  Is the --

20          THE COURT:  Overruled.

21  Q.  Let me ask a different question.

22          You know Mr. Silver grew up on the Lower East Side of

23  Manhattan, right?

24  A.  Yes.

25  Q.  And Judge Schoenfeld grew up on the Lower East Side of

1    Manhattan?

2    A.  I don't know that.

3    Q.  Do you know whether Mr. Silver and Judge Schoenfeld had

4    known each other through the legal community?

5    A.  I don't know that either.

6    Q.  When Judge Schoenfeld's name came up it was quite a

7    coincidence for your daughter, wasn't it?

8    A.  I am not sure what the question was, please.

9    Q.  When she actually went to grammar school with Judge

10   Schoenfeld's son.

11            THE COURT:  Is there a question there?

12            MR. MOLO:  It was a statement.

13            THE COURT:  Mr. Molo, you can't make a statement.

14            MR. MOLO:  It is cross-examination, Judge.

15            THE COURT:  Ask a question.

16            MR. MOLO:  Okay.

17   BY MR. MOLO:

18   Q.  She went to grammar school --

19            THE COURT:  Did she.

20   Q.  She went to grammar school with Judge Schoenfeld's son,

21   isn't that true?

22   A.  I have no idea.

23   Q.  And did your daughter become a better lawyer for having

24   done that unpaid internship?

25   A.  I imagine that she became a better lawyer by her education.

1    That was probably part of it.

2    Q.   And you did not refer patients to Weitz & Luxenberg in

3    exchange for an unpaid internship for your daughter, did you?

4    A.   No.

5    Q.   Dr. Taub, I want to briefly direct your attention again to

6    Government Exhibit 304, the second page.  May we put it up on

7    the screen?  It is in evidence.

8             This was the attachment to the fax from Steve August

9    when this grant process with the state was just beginning,

10   correct?

11   A.   Yes.

12   Q.   And they were saying that this was appropriately inclusive

13   of what you would do with the funds were you to get state

14   grants, correct?

15   A.   I'm not sure exactly what they said.

16   Q.   Sure, but you agreed that this was a description of what

17   you would be doing with the state funds, correct?

18             MR. GOLDSTEIN:  Objection.

19   A.   I believe so.

20             THE COURT:  Overruled.

21   A.   I believe so.

22   Q.   Okay.

23   A.   I don't remember with -- I don't remember my specific

24   response to Mr. August's request.

25   Q.   You don't have any reason to doubt that this was your

1  response?

2  A.  I'm not sure what my response was exactly but I don't

3  really recall.  I don't have any reason to doubt it, no.

4  Q.  Okay, because it appeared later in your request, correct?

5  A.  Yes.

6  Q.  And, in fact, the contracts themselves contain reference to

7  language like this; is that right?

8  A.  I'm sorry?

9  Q.  The contracts themselves, the contracts that we went

10  through from Presbyterian and -- between Presbyterian and

11  Department of Health at Columbia and the Department of Health

12  talk about this sort of purpose for the work, correct?

13  A.  These kinds of purposes.  Not the precise wording but

14  close, yes.

15  Q.  After you got the two grants and had the benefit of some

16  opportunity to work with whatever assistance they additionally

17  provided, you had some follow-up conversation with Mr. Silver

18  in which he asked that you provide a letter that summarized

19  what it was that you were doing.  Is that right?

20  A.  I don't recall that.

21  Q.  Well, I will show you what's marked Government Exhibit 129

22  which was put in evidence yesterday and if you could look at --

23  can we go to the very top?

24  A.  Ah yes.  Okay.

25  Q.  You prepared this letter.  That's what you said, yes?

FB55sil2                    TauB1 direct

1   A.  Yes.

2   Q.  The note at the top that says:  Shelly FYI only; that's

3   your handwriting, right?

4   A.  Yes.

5   Q.  And as you understood it there was a letter, sort of

6   prepared, and then you prepared these explanatory notes to the

7   letter, right?

8   A.  Yes, they were.

9   Q.  Mr. Silver asked you to do this, right?

10  A.  I'm not sure whether he asked directly or whether it was

11  asked of me.

12  Q.  It was asked of you to prepare explanatory notes to more

13  clearly communicate the work that you were doing, is that a

14  fair statement?

15  A.  To -- no, that's not accurate.

16  Q.  The explanatory notes were there to basically, in simpler

17  language, state what was in the letter; is that fair?

18  A.  I think that's more accurate.

19  Q.  And if we go to the letter then it says, at the very

20  beginning:  Thank you for this opportunity to inform you of

21  recent clinical and research achievements of our

22  multi-disciplinary Mesothelioma Center programs at the Columbia

23  University Medical Center, doesn't it?  That's what the letter

24  said?

25  A.  Yes.

1    Q.  And that's what you were intending to do, correct?

2    A.  Yes.

3              MR. MOLO:  Do we have another copy of the letter?

4              THE COURT:  It should be in the binder.

5              Do you have the binder, Doctor?

6              THE WITNESS:  I think someone took it.

7              THE COURT:  That's okay.

8              THE WITNESS:  Yes, okay.

9    BY MR. MOLO:

10   Q.  Is that the letter with the explanatory notes?

11   A.  Yes.

12   Q.  I took a look at it, can we put it back and so it is not

13   zoomed out?

14             As you read through it on the second page is where you

15   discuss 9/11 work, is that right?

16   A.  Yes, and it explained to them.

17   Q.  What you are saying is you are talking about the scope of

18   the problem has led to the nationwide ban.  In New York there

19   is continuing asbestos risk posed to firefighters, electrical

20   workers, police, transit workers and general population.  You

21   said this risk has been compounded by the horrible tragedy of

22   September 11, 2001, in which large amounts of asbestos-laden

23   debris were hurled into the atmosphere by the disintegration of

24   the floors, insulation in condemned buildings near Ground Zero

25   and in the aged electrical and steampipe infrastructures under

1    many streets throughout the City of New York.

2              You are talking about two things there, one is the

3    9/11 asbestos and the other is the aged industrial and steam

4    pipe infrastructure, that's a separate risk, right?

5    A.   Yes.

6    Q.   And then when you go to your explanation, which is right

7    below it, you mention again what you have testified to here

8    about all 55 floors of the World Trade Center were constructed

9    with large quantities of asbestos and talk about the tiles and

10   then, again, the last four lines, or I'm sorry three of the

11   last four you talk about before 1972, most commercial and many

12   household steampipes were insulated with loosely bound asbestos

13   fibers or even asbestos wool, both the 9/11 disaster and recent

14   midtown steampipe explosion are examples of such occurrences.

15             So, in your report and in your explanation, that's

16   your explanation concerning 9/11, right?

17   A.   Yes.

18   Q.   And at no point --

19   A.   Also about steam pipe fibers and other materials in the

20   city.

21   Q.   Right, so it wasn't just limited to 9/11.  At no point you

22   described services that you had provided that included

23   education and outreach to residents and workers in lower

24   Manhattan who may be at risk of mesothelioma and other cancers

25   because of such exposure, correct?

1    A.   Yes.

2    Q.   Which was the information in the proposal that Mr. August

3    had sent you, correct?  I could put it up if you want.

4    A.   The proposal of who, please?  Yes, that's consonant with

5    that.

6              (Continued on next page)

1   BY MR. MOLO:

2   Q.  By the way, none of the patients that you had suggested

3   contact Mr. Silver or Weitz & Luxenberg -- none of them were

4   connected to 9/11; is that right?

5   A.  Not that I remember.  I don't recall that.

6   Q.  I'm going to ask you some questions about your involvement

7   in this investigation, Dr. Taub, beginning on the morning of

8   August 8 of 2014.

9           THE COURT:  2000 what?

10          MR. MOLO:  August 8 of 2014.

11          THE COURT:  Okay.

12  BY MR. MOLO:

13  Q.  Do you recall that morning?

14  A.  I believe so.

15  Q.  It would be pretty hard to forget; right?

16  A.  I recall it, yes.

17  Q.  Two investigators working for the prosecutors showed up at

18  6:15 in the morning at your apartment; is that right?

19  A.  I thought it was a little earlier.  I thought it was at

20  6:00.

21  Q.  It was 6:00 a.m.?

22  A.  Yes.

23  Q.  And you live here in the city.  That's where you reside; is

24  that right?

25  A.  Yes.

1  Q.  Did they make an appointment to come see you?

2  A.  No.

3  Q.  Did they call you first and say, "We're coming over"?

4  A.  No.

5  Q.  They just showed up?

6  A.  Yes.

7  Q.  And they woke you up?

8  A.  Yes.

9  Q.  Were you startled that you were waken up by two criminal

10 investigators coming from the prosecutors?

11 A.  I was terrified.

12 Q.  It was upsetting to you, wasn't it?  You were terrified?

13 A.  Yes.

14 Q.  Did they have badges that they wore?

15 A.  I don't recall.

16 Q.  They woke your wife as well; right?

17 A.  Yes.

18 Q.  Was your wife present?

19 A.  My wife was present, yes.

20         THE COURT:  Sustained.

21 BY MR. MOLO:

22 Q.  How old were you at the time, Doctor, that they came and

23 did this in 2014?

24 A.  Seventy-eight.

25 Q.  And your wife was how old?

1   A.   Sixty-six at that time.

2   Q.   Had you ever had criminal investigators come to your door

3   and wake you up in the morning like that before?

4   A.   No.

5   Q.   Do you have a doorman at your building?

6   A.   Yes.

7   Q.   Do you know whether they announced to your doormen that

8   there were criminal investigators coming to see you at 6:00 in

9   the morning?

10              MR. GOLDSTEIN:  Objection.

11              THE COURT:  Sustained.

12              MR. MOLO:  If he knows.

13              THE COURT:  Sustained.

14   BY MR. MOLO:

15   Q.   Did they come in the door and pound on the door?

16   A.   No.  The doormen let them up.

17   Q.   Did they then knock on the door?

18   A.   I don't recall.  I think I let them in.

19   Q.   Do you recall what you were wearing?

20   A.   The doorman called up and said that there were two

21   investigators downstairs.

22   Q.   Do you recall what you were wearing when you came to the

23   door?

24   A.   Can you please repeat that.

25   Q.   Do you recall what you were wearing?

 1    A.  I was in my pajamas and my underwear.

 2    Q.  And I take it your wife was in her pajamas as well?

 3    A.  Yes.

 4    Q.  Were you wearing slippers or shoes?

 5    A.  I don't remember.

 6    Q.  When they came to the door, did they tell you that you

 7    could make an appointment to come see them at their office?

 8    A.  That's not accurate.  That's not what they said.

 9    Q.  Did they say, "Dr. Taub, we'd like to make an appointment

10    to come see you at your office"?

11    A.  They did not say that.

12    Q.  Did they say, "Dr. Taub, we think you ought to call a

13    lawyer right now"?

14              MR. GOLDSTEIN:  Objection.

15              THE COURT:  Overruled.

16              THE WITNESS:  They did not.

17    BY MR. MOLO:

18    Q.  Did they tell you their questions of you could wait until

19    you called a lawyer?

20    A.  They did not.

21    Q.  They just began asking you questions?

22    A.  No.  That's not accurate.

23    Q.  But they sat down with you and did begin asking you

24    questions?

25    A.  No, they did not.

 1   Q.  Did they tell you that there was an investigation, a

 2   criminal investigation, and they needed your information?

 3   A.  I'm not really sure of that.

 4   Q.  Where in the apartment when you were talking to these

 5   investigators?

 6   A.  We spoke to them in my living room.

 7   Q.  In your living room?

 8   A.  Yes.

 9   Q.  Was your wife present?

10   A.  Yes, she was.

11   Q.  Your wife takes medication; is that right?

12   A.  She had just gotten over some surgeries several weeks

13   before, and she takes many medications, yes.

14   Q.  At the time that the investigators were sitting in your

15   living room, she was recovering from surgery?

16   A.  Yes.

17   Q.  Were you concerned about her wellbeing?

18   A.  That occupies most of my life.  I consider her wellbeing,

19   yes.

20   Q.  Particularly her health in light of the fact that she was

21   recovering from surgery.

22   A.  Yes.

23   Q.  Did you want these investigators to stay in your apartment?

24   A.  I was terrified and confused.

25   Q.  And you wanted them gone as quickly as possible.

1    A.  I wanted them to be gone as quickly as possible is a way

2    that I would phrase it.

3    Q.  Of course, at that point in time, Sheldon Silver had been

4    your friend for many years; is that right?

5    A.  At that time, we had developed a friendship.

6    Q.  On August 8 of 2014, at the time those investigators were

7    at the door, you knew that there was a controversy about the

8    State Moreland Commission investigating outside income of

9    New York State legislators, and that included Mr. Silver; is

10   that right?

11   A.  I'm not sure.  I don't know.  I don't recall if I recall

12   what I knew then.

13   Q.  Did you meet with the prosecutors later on September 15 of

14   2015?

15           THE COURT:  '15 or '14?

16           MR. MOLO:  I'm sorry.  2015.

17   BY MR. MOLO:

18   Q.  Do you recall meeting with them just about six months ago?

19   A.  2015?

20   Q.  I'm sorry.  2014.

21           MR. MOLO:  2014, Judge.  You were correct.

22           THE COURT:  I wasn't correct or incorrect.  I was just

23   asking for clarification.

24           THE WITNESS:  I don't remember the date.

25           MR. MOLO:  I'm going to show you some notes that were

```
 1   taken of --

 2              THE COURT:  You're going to show him some notes.

 3   What's the number on them?

 4              MR. MOLO:  I received them without a number.

 5              MR. GOLDSTEIN:  353802, your Honor.

 6              THE COURT:  I've got them.

 7              Take a look at the document and see if it refreshes

 8   your recollection.

 9   BY MR. MOLO:

10   Q.  Do you recall if there was a meeting with the prosecutors

11   on that date?

12   A.  I know we met with the prosecutors.  I don't recall the

13   date.  This document doesn't refresh my recollection about it.

14   Q.  I'm going to direct your attention to the last page that's

15   highlighted there.

16   A.  I don't recall --

17              THE COURT:  Give him a second.  He's shown you the

18   last page.  Let him ask you a question.

19              THE WITNESS:  Okay.

20   BY MR. MOLO:

21   Q.  After looking at that note that's highlighted, does that

22   refresh your recollection that at the time the investigators

23   came to your door, you had some knowledge of this Moreland

24   Commission investigation?

25   A.  This does not refresh my recollection.  I don't know.  I
```

1   knew that there was an investigation.  I don't know whether I

2   knew it was the Moreland Commission or anything else.

3   Q.  So the point is in August of 2014, at the time the

4   investigators were there, you knew that there was some

5   investigation relating to --

6   A.  I knew there was an investigation, yes.

7   Q.  -- state legislators.  Okay.

8           Are you aware that Mr. Silver's connection with Weitz

9   & Luxenberg was scrutinized -- let me rephrase the question.

10          In August of 2014, when the investigators had come to

11  your door, were you aware that Mr. Silver's connection with

12  Weitz & Luxenberg, his association with the firm, had been

13  scrutinized in the press before that?

14  A.  I was aware of the scrutiny, but I have no recollection, no

15  specific recollection, of it, no specific recollection of

16  reading anything in the press.  I have to be very specific

17  about that.

18  Q.  So when these investigators came to your house at 6:00 in

19  the morning and asked you about referring patients to Weitz &

20  Luxenberg, you knew that that presented the possibility of you

21  being mixed up in a rather public issue at the time; correct?

22  A.  Yes.

23  Q.  And that would generally not be a good thing.

24  A.  It would not be a good thing.

25  Q.  And you were terrified.

1   A.  Yes.

2   Q.  Were you confused?

3   A.  Yes, I was.

4   Q.  You panicked, didn't you?

5   A.  Yes.

6   Q.  And this posed jeopardy to your job you thought.

7   A.  Yes.

8   Q.  And you thought that if these agents were there, it must be

9   serious business coming to your door at 6:00 a.m.

10  A.  I don't know what other thoughts I had beyond the panic and

11  the knowledge that there was an investigation.

12  Q.  And, as you did panic, you lied to the agents when they

13  asked you, "Have you ever referred a patient to Mr. Silver at

14  Weitz & Luxenberg?"  Correct?

15  A.  That's correct.

16  Q.  And you told them that lie and hoped that they would leave

17  you alone?

18  A.  It was irrational, but that's what I had hoped.

19  Q.  It didn't quite work out that way, did it?

20  A.  Not at all.

21  Q.  Because at that point, you were concerned -- you had known

22  you lied; right?

23  A.  Yes.

24  Q.  And you're a distinguished man.  You have had and still

25  have quite a career.  And you knew that this could be a problem

1    for you; right?

2    A.  The fact that I lied was an error.

3    Q.  Okay.

4    A.  I didn't think beyond that.

5           THE COURT:  Mr. Molo, please don't interrupt.  Let him

6    finish his answers.

7           THE WITNESS:  The fact that I lied I knew was an

8    error, and I knew it needed to be corrected.  I didn't really

9    think about anything else.

10   BY MR. MOLO:

11   Q.  I'm not suggesting it was anything other than an error.

12   But you called Mr. Silver --

13   A.  Yes.

14   Q.  -- shortly after that?

15   A.  Yes.

16   Q.  And he told you he wasn't going to discuss this with you;

17   correct?

18           MR. GOLDSTEIN:  Objection.

19           THE COURT:  Sustained.

20   BY MR. MOLO:

21   Q.  He did not discuss it with you.  He directed you to contact

22   Mr. Cohen.

23           MR. GOLDSTEIN:  Objection.

24           THE COURT:  Break it into two questions.

25   BY MR. MOLO:

 1   Q.  He directed you to contact Mr. Cohen; right?

 2            MR. GOLDSTEIN:  Objection.

 3            MR. MOLO:  It goes to his state of mind, Judge.

 4            THE COURT:  Let me see you at sidebar.

 5            (At the sidebar)

 6            THE COURT:  The pending question relates to what

 7   Silver told Taub.  What's the answer going to be?  I'm focused

 8   on the hearsay.  The hearsay is state of mind.

 9            MR. MOLO:  The answer is going to be, don't talk to

10   me.  Call Mr. Cohen.

11            MR. GOLDSTEIN:  The "Don't talk to me" is a statement

12   about Silver that is just hearsay.  It doesn't go to Taub's

13   state of mind.  The fact that Taub had called Mr. Cohen is

14   something that he did.  But the fact that Silver said, "Call

15   Joel Cohen" doesn't go to Taub's state of mind.

16            MR. MOLO:  It absolutely does.  Police officer after

17   police officer after police officer testifies in this

18   courthouse and next door, why did you go to this house?  Why

19   did you go do this thing --

20            THE COURT:  That would prove why he called Cohen, but

21   why is him calling Cohen relevant?

22            MR. MOLO:  Because --

23            THE COURT:  Please tell me you're not trying to get

24   out what he told an attorney at this trial.

25            MR. COHEN:  Your Honor, may we talk for a moment?

 1              THE COURT:  Perhaps you should.

 2              MR. MOLO:  I'm going to withdraw the questions.

 3              THE COURT:  Okay.  Terrific.

 4              (In open court)

 5    BY MR. MOLO:

 6    Q.  At some point, Dr. Taub, you spoke to your daughter who is

 7    a lawyer; right?

 8    A.  Yes.

 9    Q.  And she put you in touch with someone who is a criminal

10    lawyer; right?

11    A.  Yes.

12              THE COURT:  I think you would like to say a lawyer who

13    specializes in criminal defense.

14              MR. COHEN:  We certainly do like that, your Honor.

15    BY MR. MOLO:

16    Q.  You learned, Dr. Taub, that lying to investigators or these

17    prosecutors is a federal felony; correct?

18              MR. GOLDSTEIN:  Objection.

19              THE COURT:  Overruled.

20              THE WITNESS:  I don't recall that specific

21    conversation, but I learned that it was an error, and I knew it

22    was an error that subsequently needed to be corrected.

23    BY MR. MOLO:

24    Q.  Dr. Taub --

25    A.  Yes.

1  Q.  -- you know that making a false statement to a government

2  agent in an investigation is a felony.

3  A.  I didn't realize that at the time.

4  Q.  You know it now, don't you?

5  A.  Oh, yes.

6  Q.  You knew it pretty soon after you made the statement;

7  right?

8  A.  Yes.

9  Q.  You knew you were in a lot of trouble.

10 A.  It was big trouble.  That's correct.

11 Q.  You were facing the possibility of a felony prosecution.

12 A.  I'm sorry?

13 Q.  You were facing the possibility of a felony prosecution.

14 A.  That's what I learned, yes.

15 Q.  And the whole career that we talked about --

16 A.  I'm sorry?

17 Q.  The whole career that we talked about -- that would be

18 gone; right?

19 A.  It certainly would be in terrific jeopardy, yes.

20 Q.  Does Columbia have a lot of convicted felons working there

21 that you're aware of?

22         MR. GOLDSTEIN:  Objection.

23         THE COURT:  Sustained.

24 BY MR. MOLO:

25 Q.  In addition to that, there was a possibility that you would

1   go to prison; right?

2   A.   Certainly.

3   Q.   And, in learning that, you became upset; right?

4   A.   I'm sorry.  I couldn't hear you.

5   Q.   You became upset.

6   A.   I have been upset right from the start of the

7   investigation.  I have not stopped being upset.

8   Q.   Did you weep when you learned that there was a possibility

9   that you might go to prison?

10  A.   I'm sorry?

11          MR. GOLDSTEIN:  Objection.

12  BY MR. MOLO:

13  Q.   Did you weep when you learned there was a possibility that

14  you might go to prison?

15          MR. GOLDSTEIN:  Objection.

16          THE COURT:  Sustained.

17  BY MR. MOLO:

18  Q.   Did you talk about it with your wife?

19          MR. GOLDSTEIN:  Objection.

20          THE WITNESS:  Certainly.

21          THE COURT:  Overruled.

22          THE WITNESS:  Yes.

23  BY MR. MOLO:

24  Q.   Did you lose sleep over it?

25  A.   Did I what?

1   Q.  Lose sleep over this.

2   A.  I certainly did.

3   Q.  Did you become depressed?

4          THE COURT:  I don't think he's asking for in a

5   clinical sense.

6          THE WITNESS:  I was very unhappy about it.

7   BY MR. MOLO:

8   Q.  Did you have trouble eating?

9   A.  I don't recall.

10  Q.  Don't you feel like you were tricked by the investigators

11  coming to your apartment at 6:00 in the morning and knocking on

12  your door like that?

13         MR. GOLDSTEIN:  Objection.

14         THE COURT:  Sustained.

15  BY MR. MOLO:

16  Q.  Were you a little bit angry at them?

17         MR. GOLDSTEIN:  Objection.

18         THE COURT:  Sustained.

19         MR. MOLO:  It goes to his state of mind, Judge.

20         THE COURT:  Sustained.

21  BY MR. MOLO:

22  Q.  So you consulted with this lawyer who does criminal defense

23  work; is that right?

24  A.  I did consult with her, yes.

25  Q.  Did you meet with her on multiple occasions shortly after

1    the August 8, 2014, visit?

2    A.   I did meet with her on several occasions, yes.

3    Q.   In doing so, did you meet with her alone?  Or did she have

4    other partners?  I'm not asking about what you said, but did

5    they have other people at her firm there meeting with you and

6    her?

7    A.   At times I believe there were other lawyers involved, yes.

8    Q.   And she contacted the prosecutors -- correct? -- on your

9    behalf?

10   A.   Yes.

11   Q.   With your agreement, she contacted them about you working

12   out some kind of a deal to be a witness in this criminal

13   prosecution; correct?

14            MR. GOLDSTEIN:  Objection.

15            THE COURT:  Overruled.

16            Go ahead.

17            THE WITNESS:  I'm not aware of what she did at the

18   time.  I trusted her to meet with the prosecutors.

19   BY MR. MOLO:

20   Q.   With the primary goal of saving your skin.

21   A.   With the primary goal of correcting the record and, of

22   course --

23   Q.   How would it have been for you --

24            THE COURT:  Again, Mr. Molo, please let him finish.

25   BY MR. MOLO:

FB5XSIL3                      Taub - Cross                          580

1    Q.  How would it have been for you if the record was corrected

2    and you lost your job and went to prison?

3    A.  I had not considered that, and I don't know how to answer

4    that.

5    Q.  All you cared about was correcting the record?

6    A.  All I thought about was correcting it first and then seeing

7    what happened.

8    Q.  Because you had known you had committed a crime.

9    A.  I had known I had committed a crime, yes.

10   Q.  Do you know whether the prosecutors were excited when this

11   lawyer called?

12           MR. GOLDSTEIN:  Objection.

13           THE COURT:  Sustained.

14   BY MR. MOLO:

15   Q.  So, by mid September of 2014, you were at the prosecutors'

16   offices meeting with them and answering questions; correct?

17   A.  I'm not sure of the date, but yes.  I did meet with the

18   prosecutors.

19   Q.  We heard about an agreement that you had yesterday,

20   although it wasn't entered into evidence.  There were actually

21   multiple agreements, at least two agreements, that you entered

22   into with the prosecutors.

23           Right?

24   A.  I don't recall how many agreements.  I'm sorry.

25   Q.  Let me show you what's marked Defendant's Exhibit 23.  I'll

```
 1    ask you to take a moment to look at that.  In particular, look
 2    at the second page.  Take your time.
 3              Are you ready for me to ask you a question?
 4    A.  Please.
 5    Q.  That's your signature that's on the second page of the
 6    document; correct?
 7    A.  Yes.
 8    Q.  Was this a document that was given to you by the
 9    prosecutors to sign?
10    A.  Yes.
11              MR. MOLO:  I move for admission of Defendant's Exhibit
12    23.
13              MR. GOLDSTEIN:  Objection.
14              THE COURT:  Can I see you at sidebar.
15              (At the sidebar)
16              THE COURT:  What's the objection?
17              MR. GOLDSTEIN:  It's a hearsay objection.  Is there a
18    prior inconsistent statement?
19              THE COURT:  Why are you trying to get it in?
20              MR. MOLO:  This is a --
21              THE COURT:  I know what it is.  Why are you trying to
22    get it in?
23              MR. MOLO:  I'm trying to get it in to show that this
24    is the first agreement that he had, and then he had another
25    agreement which was much more favorable after he met with them
```

 1   several times.

 2          THE COURT:  It's not that the second agreement was

 3   more favorable.

 4          MR. MOLO:  It is because he provides information and

 5   says things in a way that was favorable to the prosecutors, and

 6   he eventually gets that second agreement.  It's classic Giglio

 7   and classic impeachment material, and we can have whoever from

 8   the prosecutor's office who signed this come and authenticate

 9   it.

10          THE COURT:  The nonpros is going to come in; right?

11          MR. MOLO:  It is going to come in.  It was testified

12   to yesterday without being admitted.  It's going to come in.

13          THE COURT:  I'm going to admit it.

14          (In open court)

15          THE COURT:  Objection overruled.  Defense 23 is

16   admitted.

17          (Defendant's Exhibit 23 received in evidence)

18          MR. MOLO:  Can we put it up on the board, please.

19   BY MR. MOLO:

20   Q.  So this agreement that you have with the prosecutors which

21   is signed -- the very first paragraph says this it's dated

22   September 15 of 2014.

23          The first paragraph of the first page.  You were asked

24   yesterday some questions about an agreement you had with the

25   government, now a cooperation agreement.  That's not what this

1    is; right?

2    A.   No, I don't think so.

3    Q.   It's dated September 15 of 2014.

4          Was this at the first meeting that you had with the

5    prosecutors?

6    A.   I don't recall.

7    Q.   Then it says specifically this is not a cooperation

8    agreement; correct?

9    A.   Yes.

10   Q.   And, in fact, you understood that you were still at peril

11   of being prosecuted for the crime that you had committed even

12   though you had this agreement; right?

13   A.   I don't remember what my thoughts were at that time.

14   Q.   It says that the client -- that would be you in this

15   agreement; correct?  -- has greed to provide the government

16   with information with respect to questions so the government

17   may evaluate the client's information and responses in making

18   prosecutive decisions.

19          Correct?

20   A.   Yes.

21   Q.   And those prosecutive decisions were about you; correct?

22   A.   Yes.

23          MR. GOLDSTEIN:  Objection.

24   MR. MOLO:

25   Q.   And any prosecution brought against you by this office,

1   being the prosecutors here -- the government will not offer

2   evidence in its case in chief or in connection with sentencing

3   of any statements made by you except false statements made in

4   the interview or at a time following the meeting if you become

5   a fugitive.

6           But then, the next paragraph, 3, has big

7   qualifications.  It says that notwithstanding that item 2, the

8   government may use information derived directly or indirectly

9   from the meeting for the purpose of obtaining leads to other

10  evidence, which evidence may be used in prosecuting the client,

11  you, by the government.

12          In any prosecution brought against you, the client,

13  the government may use statements made by you and all evidence

14  obtained directly or indirectly therefrom for purposes of

15  cross-examination.

16          It also says the government may use statements made by

17  the client, you, at the meeting to rebut any evidence or

18  arguments offered on behalf of the client.

19          MR. GOLDSTEIN:  Is there a question, your Honor?

20          THE COURT:  I'm sure he's going to get to it.

21  BY MR. MOLO:

22  Q.  So this was hardly a get-out-of-jail-free card, was it?

23          MR. GOLDSTEIN:  Objection.

24          THE COURT:  Sustained.

25  BY MR. MOLO:

1   Q.  You were certainly not immune from prosecution by signing

2   this agreement; correct?

3   A.  Right now I don't know the answer to that.

4   Q.  Well, you certainly at that time understood that by signing

5   this agreement -- it says at the very top in big, bold letters,

6   "This is not a cooperation agreement."

7        Correct?

8   A.  No, it's not.  That's what it says.

9   Q.  So you met with the prosecutors on September 15 of 2014.

10  Your lawyer was there at the time; right?

11  A.  Yes.

12  Q.  And Ms. Cohen here was there; is that correct?

13  A.  Who?

14  Q.  Ms. Cohen.

15  A.  Yes.

16  Q.  And Mr. Master.

17  A.  Yes.

18  Q.  And there were two agents, government agents, that were

19  there; correct?

20  A.  Yes.

21  Q.  You told them that you referred 20 or 25 cases to

22  Mr. Silver over the years; is that right?

23  A.  I believe so.

24  Q.  You also told them that Mr. Silver was your friend; is that

25  right?

1  A.  I don't recall what I said at that time.

2  Q.  But, at or around that time, you told a number of people

3  that you had done nothing wrong; correct?

4  A.  I don't recall that.

5  Q.  But you recall telling Mary Hesdorffer that they were going

6  after Mr. Silver and he had nothing to do with it.  Everything

7  is fine.  You're not in trouble?

8              MR. GOLDSTEIN:  Objection.

9              THE COURT:  Overruled.

10             THE WITNESS:  I don't recall that conversation.

11 BY MR. MOLO:

12 Q.  You knew you were in trouble for the false statement, but

13 other than that, you hadn't done anything wrong.  Right?

14 A.  Again, I don't recall thinking that.  That was not my

15 recollection at the time.

16 Q.  Again, just so I'm clear, your recollection is it was this

17 false statement that you had made that was concerning you.

18             MR. GOLDSTEIN:  Asked-and-answered objection.

19             THE COURT:  Overruled.

20             THE WITNESS:  Again, I don't really know what my state

21 of mind was besides panic and fear at the time.

22 BY MR. MOLO:

23 Q.  They made you meet with them again on December 15, 2015.

24             MR. GOLDSTEIN:  Objection.

25             THE COURT:  Sustained.  Rephrase the question.

1   BY MR. MOLO:

2   Q.  You met with them -- they requested a meeting with you

3   again on December 15, 2015?

4          MR. GOLDSTEIN:  Objection.

5          THE COURT:  2015?

6          MR. MOLO:  2014.  I'm sorry.  I'm having the same

7   problem that was in the letter.  2014.

8          THE COURT:  So did you meet with them in December?

9          THE WITNESS:  I believe I did, yes.

10  BY MR. MOLO:

11  Q.  At that meeting, Ms. Cohen and Mr. Master and Mr. Goldstein

12  were there.  And Agent Ryan was there; is that right?

13  A.  I know that they were there.  I don't remember which

14  investigator was there.

15  Q.  Was he one of the investigators that showed up at your

16  house at 6:00 in the morning?

17  A.  I know there was Mr. Ryan, and there was another one.  I

18  forget his name at the moment.

19  Q.  And at that meeting, you told them that you didn't really

20  remember how many cases you had referred to Mr. Silver;

21  correct?

22  A.  I don't recall the precise conversation at the moment.

23  Q.  You told them you didn't remember the second grant;

24  correct?

25  A.  I did not remember the second grant that I recall.  Yes.

FB5XSIL3                         Taub - Cross

1    Q.  Now, on December 30, right in the middle of the holidays,

2    the prosecutors requested a meeting with you again.

3    December 30 of 2014.

4           Do you recall that?

5    A.  I don't recall the exact date again.

6    Q.  But you recall at the very end of the year that you met

7    with the prosecutors for a third time?

8    A.  Yes.  I do remember I met with them for the third time,

9    yes.

10   Q.  And your lawyer was there; is that right?

11   A.  Who?

12   Q.  Your lawyer.

13   A.  Yes.

14   Q.  And Mr. Goldstein was there; correct?

15   A.  Yes.

16   Q.  And, in addition to Mr. Goldstein, the boss of these

17   prosecutors, a Mr. Arlo Devlin-Brown was there; right?

18   A.  I don't remember him.

19   Q.  Now, you knew at this point in time though you were still

20   very much in harm's way; correct?

21   A.  Oh, yes.

22   Q.  And it was only at this time at that meeting that you told

23   them that Mr. Silver told you not to discuss cases with

24   Mr. Chill; is that correct?

25   A.  I don't remember that specifically.

1   Q.  That's the first time you told them that; correct?

2   A.  I don't recall.

3   Q.  Let me ask you this:  Do you recall saying that to the

4   prosecutors at any time before December 30 of 2014?

5   A.  I don't know the dates that I recall saying what.  Please

6   be explicit.

7   Q.  That Mr. Silver told you not to discuss any referrals with

8   Mr. Chill.

9   A.  At what time?

10  Q.  December 30 of 2014.

11  A.  I don't recall that specifically.

12  Q.  If I show you some notes of that conversation.

13          MR. MOLO:  The December 30 notes.

14          MR. GOLDSTEIN:  Your Honor, 353805.

15          THE COURT:  I have it.  Thank you.

16          THE WITNESS:  These are the notes from what date?

17  BY MR. MOLO:

18  Q.  December 30 of 2014.  Does that refresh your recollection?

19  A.  That would pinpoint the date.  At some point, I did say

20  that.  That would be a reasonable pinpointing of the date, yes.

21  Q.  After you said that, criminal charges were brought against

22  Mr. Silver a few weeks later; correct?

23  A.  Again, I'm not -- I don't remember the dates.

24  Q.  You got your cooperation agreement; correct?

25  A.  I did have an agreement, but I don't remember the date

1     again.

2     Q.  And the cooperation agreement that you got was something

3     that was actually negotiated over time between your lawyer and

4     the prosecutors; correct?

5     A.  I don't know the details of this.

6     Q.  Do you recall that the prosecutors wanted you to say that

7     you referred patients to Mr. Silver for legal representation

8     from in or about 2003 up through and including in or about 2013

9     and Columbia University and Dr. Taub did this in exchange for

10    receipt of benefits, and your lawyer told them that you would

11    not agree to say that any referral was in exchange for

12    benefits?

13              MR. GOLDSTEIN:  Objection.

14              THE COURT:  Overruled.

15              THE WITNESS:  I don't recall the prosecutors asking me

16    to say anything.  I do not recall that.

17    BY MR. MOLO:

18    Q.  Do you recall drafts --

19              THE COURT:  Mr. Molo.

20              MR. MOLO:  I'm sorry.

21              THE WITNESS:  I don't recall the prosecutors asking me

22    to say anything.

23    BY MR. MOLO:

24    Q.  Do you recall drafts of this agreement?

25              THE COURT:  Drafts of which agreement?

 1           MR. MOLO:  The cooperation agreement.

 2           THE WITNESS:  There were several drafts, yes.

 3   BY MR. MOLO:

 4   Q.  And your lawyer shared those drafts with you?

 5   A.  I'm sorry?

 6   Q.  Your lawyer shared those drafts with you?

 7   A.  Yes.  My lawyer did share those drafts.

 8   Q.  Those were incredibly important to you; correct?

 9   A.  My lawyer was a very good resource, an excellent resource,

10   and I trusted her judgment.

11   Q.  And to you this agreement was extremely important; correct?

12   A.  Oh, yes.

13   Q.  So you wanted to make sure that you had the most protection

14   you could possibly have; correct?

15   A.  No.  I wanted it to reflect what's necessary.  And, yes.

16   It certainly was meant to afford me protection.  Yes.

17   Q.  You wanted it to be truthful; correct?

18   A.  That was a given, yes.

19   Q.  A draft was sent to you or to your lawyer on January 6 of

20   2018.

21           THE COURT:  2018?

22           MR. MOLO:  2015.  I've got timing issues today, Judge,

23   I guess.  January 6 of 2015.

24   BY MR. MOLO:

25   Q.  I'm going to show you what's marked as Defendant's Exhibit

25.

           I direct your attention, Dr. Taub, to the second page

of that -- the first page of that document shows that it was

generated January 6 of 2015.  Is that right?

A.  Yes.

Q.  And it's an email from Mr. Goldstein to your lawyer; is

that right?

A.  Yes.  To my lawyer.

           MR. MOLO:  I move for the admission of Defendant's

Exhibit 25.

           MR. GOLDSTEIN:  Objection, your Honor.

           THE COURT:  Have you ever seen this document before

now?

           THE WITNESS:  Yes.  It was shown to me.

           THE COURT:  Overruled.  Defense 25 is received.

           (Defendant's Exhibit 25 received in evidence)

BY MR. MOLO:

Q.  The first page is a transmittal email saying that "Lisa,

here is our proposed NPA --" that's a nonprosecution agreement

"-- for Dr. Taub.  Please let us know if you would like to

discuss.  We would like to have this signed by Friday at the

latest.  Signed, Andrew, Carrie, and Howard."

           And then, if you go to the next page, the first page

of the letter itself, Dr. Taub, dated January 6, 2015, at the

top, if you look down, starting from the beginning, I guess,

1   "On the understanding specified below, the Office of the

2   United States Attorney for the Southern District of New York

3   will not criminally prosecute Robert Taub for any crimes except

4   criminal tax violations as to which this office cannot and does

5   not make any agreement related to, A, his referral of patients

6   to Sheldon Silver --"

7   A.  Hang on a second.

8   Q.  I'm sorry.  It's the very first page.

9   A.  Yes.  I see.  Okay.

10  Q.  Do you see that?

11  A.  Yes.

12  Q.  It will not criminally prosecute Robert Taub, you, for any

13  crimes, again, with the exception of tax violations related to,

14  A, his referral of patients to Sheldon Silver for legal

15  representation from in or about 2013 up through and including

16  through in or about 2014 in exchange for Taub's receipt of

17  benefits.

18          Do you see that?

19  A.  Yes.

20  Q.  You didn't sign that January 6, 2015, letter; correct?

21  A.  I don't think so.

22  Q.  Because your lawyer sent back edits to the prosecutors.

23  And, in her concern that you make only truthful statements, she

24  struck the language "In exchange for."  Correct?

25          MR. GOLDSTEIN:  Objection.

FB5XSIL3                          Taub - Cross

1          THE COURT:  Overruled.

2          Do you know what she sent back?

3          THE WITNESS:  I discussed this with her, but I'm not

4   sure at this point what she actually sent back.  I'd have to

5   look at it.

6   BY MR. MOLO:

7   Q.  That letter also said that --

8          THE COURT:  Which letter?

9          MR. MOLO:  I'm sorry.  The January 6, 2015, letter,

10  Defendant's Exhibit 25.

11  BY MR. MOLO:

12  Q.  It also said that Dr. Taub has previously admitted and

13  affirms -- this is 10 lines -- Dr. Taub has previously admitted

14  and hereby affirms that at Silver's request, you will go ahead

15  and -- that you knowingly referred numerous patients.

16         Correct?

17         THE COURT:  Are you asking is that what the letter

18  says?

19         MR. MOLO:  Correct.

20         THE COURT:  The document speaks for itself.

21         THE WITNESS:  That was in this.  I don't know what was

22  in this -- this is the first document.  That's what it says.

23         THE COURT:  The letter speaks for itself.

24  BY MR. MOLO:

25  Q.  Your lawyer did not allow the language "at Silver's

1    request" to be included in the agreement either, did she?

2    A.   Right now I don't know.  I don't know that.  I know that

3    she had modified the language.

4    Q.   Yesterday you were shown the cooperation agreement that you

5    have with the prosecutors, but they didn't put it into evidence

6    for the jury to see for themselves, did they?

7            MR. GOLDSTEIN:  Objection.

8            THE COURT:  Sustained.

9    BY MR. MOLO:

10   Q.   Let me show you what's marked Defendant's Exhibit 27.

11           THE COURT:  I presume this is a government exhibit

12   sticker on this as well, the same document?

13           MR. GOLDSTEIN:  It was not, your Honor.  It was a 3500

14   number.

15           THE COURT:  Okay.  That's fine.

16   BY MR. MOLO:

17   Q.   Would you take a moment to read the first paragraph.

18           Have you seen this letter before, Doctor?

19           THE COURT:  The pending question, Doctor, is have you

20   seen Exhibit 27 before.

21           THE WITNESS:  Yes, I have.

22   BY MR. MOLO:

23   Q.   In fact, is your signature present on the third page of the

24   document?

25   A.   Yes, it is.

1   Q.  It was also signed by your lawyer; is that right?

2   A.  Yes.

3   Q.  It's signed by Ms. Cohen here; correct?

4   A.  Yes.

5   Q.  And it's dated January 13; correct?

6   A.  Yes.

7            THE COURT:  The letter is dated January 12.

8            MR. MOLO:  The signature dates -- excuse me, Judge --

9   are dated January 13.  The signatures.

10           THE WITNESS:  January 13.

11  BY MR. MOLO:

12  Q.  So it took six or seven days between getting this January 6

13  letter and this final version being signed.  Is that right?

14  A.  Yes.

15  Q.  When you look at that first paragraph --

16           THE COURT:  Of which letter?

17           MR. MOLO:  Of Defendant's Exhibit 27, the January 12

18  letter.

19  BY MR. MOLO:

20  Q.  Do you see that?

21  A.  Yes.

22  Q.  The words "in exchange for," which appears in the January 6

23  draft, are gone; right?

24  A.  That's correct.

25  Q.  And in fact, the words "at Silver's request" are also gone;

FB5XSIL3                    Taub - Cross

1   correct?

2   A.  Yes.

3   Q.  And, in addition, if you go back to the January 6 letter,

4   which is Defendant's Exhibit 26.

5           MR. MOLO:  If we could put that up for one second.

6           THE COURT:  25.  For the record, it's 25, not 26.

7           MR. COHEN:  Your Honor, I'm not sure it's in evidence.

8           THE COURT:  25 is in evidence.  27 is not.  What's on

9   the screen right now?  That's 25.

10          MR. MOLO:  That's 25.

11  BY MR. MOLO:

12  Q.  If you go to 25 and you look at subparagraph B there where

13  it says, "Dr. Taub was aware that Silver would benefit

14  financially," do you see that?

15  A.  Yes.

16  Q.  Now, when we go to 27, we see that the word "financially"

17  is struck as well.  Correct?

18  A.  Yes.

19  Q.  Okay.

20          MR. MOLO:  I move for admission of Defendant's Exhibit

21  27.

22          MR. GOLDSTEIN:  No objection.

23          THE COURT:  27 is received.

24          (Defendant's Exhibit 27 received in evidence)

25  BY MR. MOLO:

1  Q.  Dr. Taub, the risk that you were facing at the time you got

2  this agreement, this cooperation agreement, was the possibility

3  of a felony for a false statement to the federal government;

4  correct?

5  A.  Is that a question?

6  Q.  You were facing the possibility of a criminal prosecution

7  for having made a false statement to federal law enforcement

8  officials; correct?

9  A.  Yes.

10 Q.  And I take it at the point in time that you were

11 negotiating this cooperation agreement, it was first and

12 foremost in your mind that you were not going to give false

13 information to a federal law enforcement agency in this letter;

14 is that right?

15 A.  It was in my mind fairly continuously.

16 Q.  I'm sorry?

17 A.  At that time it was in my mind, yes.

18 Q.  You wanted to get the agreement done; correct?

19 A.  I wanted the agreement to be accurate.  I wanted to get it

20 done as an accurate way -- in as accurate a manner as possible.

21 Q.  And the agreement guaranteed that you would not be

22 criminally prosecuted; correct?

23        MR. GOLDSTEIN:  Objection.

24        THE COURT:  Sustained.

25 BY MR. MOLO:

1   Q.  With the limitation of having made false statements to the

2   prosecutors in connection with this investigation now -- you're

3   not going to be criminally prosecuted for that false statement

4   that you made in your apartment early in the morning; correct?

5          MR. GOLDSTEIN:  Objection.

6          THE COURT:  Sustained.

7   BY MR. MOLO:

8   Q.  This agreement prohibits the prosecutors from prosecuting

9   you for making a false statement to them in August of 2014 when

10  the investigators came to your home.

11         MR. GOLDSTEIN:  Objection.

12         THE COURT:  Overruled.

13         Do you know what the agreement is, Dr. Taub?

14         THE WITNESS:  Yes.  The agreement was that the

15  government would not prosecute me for the offenses listed in

16  the first paragraph under the condition that I agree to tell

17  the truth.

18  BY MR. MOLO:

19  Q.  As far as you're concerned right now, there's no reason for

20  you to worry about being prosecuted for that false statement in

21  your apartment?

22         MR. GOLDSTEIN:  Objection.

23         THE COURT:  Overruled.

24         THE WITNESS:  I'm still concerned about the fact that

25  I irrationally lied to the investigators, and that still is in

1    my mind.

2    BY MR. MOLO:

3    Q.  But you wouldn't go so far as to put false information in

4    an agreement that said that in exchange for your receipt of

5    benefits, you referred cases to Mr. Silver; correct?  You

6    wouldn't go so far as to make a false statement like that;

7    right?

8    A.  In drafting this agreement, I relied on discussions with my

9    attorney.  I'm not sure exactly what transpired.  And, in

10   general, I would not want to make any false statement.

11          MR. MOLO:  Nothing further, Judge.

12          THE COURT:  This would be a good time for us to take

13   our lunch break then.  We're going to break for an hour.  That

14   means you'll be back in the courtroom at 10 till 2:00.

15          Enjoy your lunch.  Don't talk about the case.  If you

16   have to go check your cell phone, that's fine.  Do it now so

17   you're ready to go at 10 till 2:00.

18          THE WITNESS:  Thank you.

19          (Jury not present)

20          THE COURT:  Ten till 2:00.

21          MS. COHEN:  Thank you, your Honor.

22          (Luncheon recess)

23

24

25

```
 1                A F T E R N O O N   S E S S I O N

 2                            2:50 p.m.

 3          (Trial resumed; jury not present)

 4          THE COURT:  Okay, please, be seated.  So I was just

 5   handed the Cosentino case which I say is very, very old from

 6   back when I used to prosecute cases.

 7          MS. COHEN:  Well, your Honor, what it stands for,

 8   though, is a well-established principle which is that the

 9   government can't introduce, on direct examination of their

10   cooperating witness or nonpros --

11          THE COURT:  That's why I sustained the objection.

12          MS. COHEN:  Correct, you did, but Mr. Molo's question

13   said the government implied that it intentionally hid the

14   document from the jury.

15          THE COURT:  His questions are not evidence and I have

16   told them that separately.

17          MS. COHEN:  Your Honor, it goes also to the danger

18   that the government was worried about with using drafts of

19   documents that clearly were negotiations between counsel which

20   the witness said I don't know why certain language is not there

21   because it was a negotiation between my defense counsel and the

22   government.

23          THE COURT:  Right.

24          MS. COHEN:  I think the jury is left with a

25   misimpression that there was something more to it and I just
```

1    think it would be advisable to advise the jury just that (a),

2    it is often that these documents are often negotiated between

3    defense counsel and the prosecution, there is nothing wrong

4    with that, that is not unusual; and second, that the government

5    was not hiding any of the non-prosecution agreement from you.

6    There are rules of evidence that govern who can put in

7    documents.

8         Very simple, I think the jury is confused by the

9    defense when they knew the government could not do things.

10        THE COURT:  Mr. Molo.

11        MR. MOLO:  As far as the agreements themselves, the

12   two agreements, I don't see why we need a limiting instruction.

13   The documents are what they are, the testimony is what it is.

14   They clearly wanted key language in that agreement that was

15   rejected because the witness would not go along with their

16   language.  It is not just what the color of the car was that

17   was going by, it is the in exchange for, the key language in

18   the case.  The witness wouldn't do it and they wanted him to do

19   it and I think the jury is entitled to see that and hear it and

20   there is no need for a limiting instruction.

21        I don't understand why we need a limiting instruction

22   on it.  What are they going to limit it to?  That the

23   prosecutors tried to put something in an agreement and that the

24   guy wouldn't say something he didn't agree to?  If that's true,

25   if that's what the instruction says I'm okay with that one.

```
 1    Otherwise, I don't see what there is to limit.

 2              THE COURT:  I'm not going to give a limiting

 3    instruction.  I have sustained the objection which was an

 4    improper question.  The question itself, Mr. Molo, the problem

 5    with it was not so much the question but the commentary that

 6    you put into the question.  Please, don't do that.

 7              MR. MOLO:  Okay.

 8              THE COURT:  Ask questions.

 9              MR. MOLO:  Okay.

10              THE COURT:  That is about the third time I have warned

11    you on that.

12              MR. MOLO:  Okay.

13              THE COURT:  If you just ask questions a lot of this

14    will stop.

15              Bring them out.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25
```

1                    (Jury present)

2                    THE COURT:  Mr. Goldstein.

3                    MR. GOLDSTEIN:  Thank you, your Honor.

4    BY MR. GOLDSTEIN:

5    Q.  Good afternoon, Dr. Taub.

6    A.  Good afternoon.  Can you hear me?  Go ahead.

7    Q.  You haven't spoken with myself or the government since

8    Mr. Molo began his cross-examination, is that right?

9    A.  Yes.

10   Q.  Now, you were asked questions on cross-examination about

11   the morning in August of 2014 when the investigators came to

12   your apartment.  Do you remember those?

13   A.  Yes.

14   Q.  Now, when the investigators came to your apartment, they --

15   you have a doorman in your building, correct?

16   A.  Yes.

17   Q.  And you learned that the investigators were there because

18   the doorman called up and told you that there were

19   investigators downstairs who wanted to meet with you; is that

20   right?

21   A.  Yes.

22   Q.  Then the investigators came up and you let them into your

23   apartment, right?

24   A.  Yes.

25   Q.  Did they bang on your door?

1   A.  No.

2   Q.  Then you sat down with then in your living room --

3   A.  Yes.

4   Q.  -- before you started talking, right?

5   A.  Yes.

6   Q.  And then they asked you questions, right?

7   A.  Yes.

8   Q.  Were they polite?

9   A.  They were -- let me just say I was terrified.

10  Q.  Of course.

11          Did they threaten you in any way?

12  A.  I felt threatened and terrified.

13  Q.  Why did you feel threatened?

14  A.  It was a primal response.  I -- it was my first encounter

15  with any investigators walking into my office at 6:00 in the

16  morning when I was just getting up.

17  Q.  And when they sat down with you they told you that the

18  government was investigating Sheldon Silver; didn't they tell

19  you that?

20  A.  First they told me that they were going to -- that they

21  were investigating me at my home at 6:00 a.m. because they

22  didn't want to come publicly to my office.  That's what they

23  told me.  So, I had a premonition that this was going to be --

24  I had a feeling I was going to be escorted, in public, out of

25  my office.  That was the impression I had.  That's quite

 1   intimidating.

 2   Q.  Did the investigators hide who they were in any way?

 3   A.  No.

 4   Q.  And you felt threatened but did they threaten you?

 5   A.  I don't know.  I'm sure they didn't physically threaten me

 6   but they are imposing looking and they were investigating me in

 7   their large investigation which I had previously not thought I

 8   was going to be involved in.

 9   Q.  And then, when they asked you about referrals to Sheldon

10   Silver, you have already testified that you lied to them,

11   right?

12   A.  Yes.

13   Q.  And you did that because you didn't want to be part of that

14   investigation?

15   A.  Yes.

16   Q.  Now, Dr. Taub, you were asked a lot of questions on

17   cross-examination about the nature of your relationship with

18   Sheldon Silver?

19   A.  Yes.

20   Q.  Do you remember all of those questions?

21   A.  I remember them, yes.

22   Q.  What was the basis of your relationship with Sheldon

23   Silver?

24   A.  The relationship would be -- the basis of the relationship

25   was the fact that I had referred patients to him over a period

1   of time and the relationship developed over time on that basis,

2   pretty much.

3   Q.  Let's go back to 2003 when you first made that request to

4   Sheldon Silver to get his help in getting research funding from

5   Weitz & Luxenberg.  At that time you didn't have any personal

6   relationship with Sheldon Silver at all; isn't that right?

7   A.  That's correct.

8   Q.  You knew who he was?

9   A.  Yes.

10  Q.  And you traveled in the same circles?

11  A.  Yes.

12  Q.  But that was pretty much it?

13  A.  I would say so.

14  Q.  In fact, when you were introduced to him by your friend,

15  Mr. Daniel Chill at that encounter where you asked him about

16  funding from Weitz & Luxenberg, you had to introduce yourself

17  to the defendant; is that right?

18  A.  He knew I was a physician.

19          MR. MOLO:  Objection.  I'm sorry.  Go ahead.

20  Withdrawn.

21          THE COURT:  Go ahead.

22  A.  I don't know whether he knew exactly who I was.  He knew I

23  was a physician and a friend of Danny's.

24  Q.  You told him that you had --

25          MR. MOLO:  Objection.  Leading.

1              THE COURT:  Sustained.

2              MR. GOLDSTEIN:  I will rephrase.

3    Q.  Did you tell him about your association with MARF?

4    A.  Yes.

5    Q.  And did you tell him -- why did you tell him about that?

6    A.  Because I wanted to ask him to convince his firm or

7    influence his firm to donate to MARF.

8    Q.  Had you told him that information previously?

9    A.  No.

10   Q.  In response to your request to get his help in getting

11   Weitz & Luxenberg to fund mesothelioma research, what did he

12   tell you?

13   A.  I don't remember the conversation exactly but he told me he

14   just could not do that.

15   Q.  And then within just a few days you got a specific request

16   to send cases to Sheldon Silver?

17             MR. MOLO:  Objection, your Honor.  This is outside the

18   scope of the cross-examination.  I asked no questions on this

19   point.

20             THE COURT:  Can I see the parties at side bar?

21

22

23

24

25

1                    (At side bar)

2          THE COURT:  My recollection is that you asked lots of

3    questions about him referring and why did he refer and what was

4    the basis of and what was the agreement, etc.

5          MR. MOLO:  I didn't ask any questions about MARF.  I

6    didn't ask any questions about getting money from

7    Weitz & Luxenberg.  This is a repeat of the direct examination.

8    I asked no questions about those things.  I did ask questions

9    about him suggesting that patients contact Mr. Silver at

10   Weitz & Luxenberg, nothing about MARF or funds from

11   Weitz & Luxenberg.

12         THE COURT:  I'm not going to interpret the scope of

13   cross to be that narrow.

14         MR. MOLO:  Okay.

15         THE COURT:  Okay.  Overruled.

16

17

18

19

20

21

22

23

24

25

```
 1                (In open court)

 2   BY MR. GOLDSTEIN:

 3   Q.  Dr. Taub, just days after you asked Sheldon Silver for his

 4   help in getting research money from Weitz & Luxenberg you got a

 5   specific request to send him cases; is that right?

 6   A.  Yes.

 7   Q.  That wasn't your idea?

 8   A.  No, it was not.

 9   Q.  And at the time that you made the initial request to

10   Sheldon Silver for his help in getting research money from

11   Weitz & Luxenberg, what patients had you ever sent him before?

12   A.  I had not.

13   Q.  Then, after you got that request to send cases to Sheldon

14   Silver, who was it who invited you to send a letter to Sheldon

15   Silver seeking research funding?

16   A.  Mr. Daniel Chill.

17   Q.  And in that letter what were you asking for?  What did you

18   ask Mr. Silver to do?

19   A.  I asked that --

20             MR. MOLO:  Objection.  Which letter?

21             THE COURT:  The first letter, the letter that was

22   written at the request of Mr. Chill.

23             Is that the letter you are asking about?

24             MR. GOLDSTEIN:  Yes, your Honor.

25   A.  The first letter stated that I had heard that -- I had
```

1    heard from Mr. Daniel Chill that New York State might be

2    interested in supporting research into mesothelioma.

3    Q.  And when you thought that New York State might be

4    interested, was that Daniel Chill who --

5              MR. MOLO:  Objection.  Leading.

6              THE COURT:  Overruled.  Let him finish the question.

7    Q.  When you understood that New York State might be interested

8    in funding your research, whose interest did you believe that

9    was?

10             MR. MOLO:  Objection.

11             THE COURT:  Sustained.  Rephrase the question.  I'm

12   not sure what you are asking.

13   A.  I don't understand it, so please.

14             THE COURT:  Nobody understands it, so try again.

15             MR. GOLDSTEIN:  Thank you, Judge.

16   BY MR. GOLDSTEIN:

17   Q.  Who did you think might be interested in funding your

18   research?

19             MR. MOLO:  Objection.

20             THE COURT:  Overruled.

21   A.  New York State.

22   Q.  Based on a request to whom?

23   A.  The request would have been made to the State through

24   Mr. Silver.

25   Q.  So, at the time that you first started sending cases to

1    Sheldon Silver and then when you learned that the State might

2    be interested in funding your research, were you friends with

3    Sheldon Silver at that time?

4    A.   We were acquaintances and a friendship was beginning to

5    develop.

6    Q.   Develop based on what?

7    A.   Mainly the referrals.

8             MR. MOLO:  Objection.

9             THE COURT:  Overruled.

10            THE WITNESS:  I apologize.

11   Q.   Dr. Taub, in the 10 years or so that you referred cases to

12   Sheldon Silver how often, if ever, did Sheldon Silver invite

13   you to a family event of his?

14   A.   No, he did not.

15   Q.   How much, if ever, have you been in his apartment in the

16   City?

17   A.   I have not.

18   Q.   How often have you been at his house in the Catskills?

19   A.   I have not.

20   Q.   How often did you meet with him for a meal, for breakfast,

21   or lunch or dinner?

22   A.   I did not.

23   Q.   How often did you watch sporting events with him?

24   A.   That neither.

25   Q.   You testified that there were occasions where you spent the

1   holiday of Passover at the same hotel?

2   A.  Yes.

3   Q.  About how many people would celebrate Passover at that same

4   hotel?

5   A.  Between 900 and 1,200.

6   Q.  Yesterday during cross-examination Mr. Molo asked you if

7   you were acting in your patient's best interests when you

8   referred your patients to Weitz & Luxenberg.

9        Do you recall being asked that?

10  A.  Yes.

11  Q.  Now, is it true that you thought that by getting research

12  money that would help your patients?

13  A.  Yes.

14  Q.  When you sent patients to Weitz & Luxenberg, were you

15  sending them to the firm in general or were you sending them to

16  Sheldon Silver?

17  A.  I was referring the patients to Weitz & Luxenberg through

18  Mr. Silver.  I believe that the Weitz & Luxenberg firm was a

19  good firm and they would handle the case and their handling of

20  the case would be enhanced by having it -- having the case

21  referred through Mr. Silver.

22  Q.  Did you think that Silver would make sure that the firm

23  provided good service to your patients?

24  A.  I think it's automatic that if you have a very senior

25  person in the firm bringing in a case that that case would be

FB5XSIL3                          Taub - Cross

```
 1   handled with a bit more care.
 2   Q.  Did Sheldon Silver ask you, after you made a referral to
 3   Sheldon Silver, did he ever ask you about how that patient was
 4   doing?
 5   A.  No, he did not.
 6   Q.  Did he ever ask you about whether or not they were getting
 7   good service at Weitz & Luxenberg, as far as you knew?
 8             MR. MOLO:  Objection.
 9   A.  Not that I recall.
10             THE COURT:  Overruled.
11   Q.  You testified that you thought that Weitz & Luxenberg was a
12   good firm, right?
13   A.  Yes.
14   Q.  But how fond of you were of Weitz & Luxenberg?
15             MR. MOLO:  Objection.
16   Q.  How fond of you were of Weitz & Luxenberg?
17             THE COURT:  I think I know what you are asking but try
18   it one more time.
19             Did you like the firm?
20             THE WITNESS:  Did I like the firm or not like the firm
21   is not the issue.  I'm not fond of any firm.  Weitz & Luxenberg
22   was a firm that had a reputation as being a good firm and some
23   of the patients that I had spoken to were well served by
24   Weitz & Luxenberg, yes.
25   BY MR. GOLDSTEIN:
```

1   Q.   Did Weitz & Luxenberg support mesothelioma research?

2   A.   They did not, as far as I --

3   Q.   What did you think of that?

4   A.   I'm not happy with that.  It should be changed, as I said.

5   Q.   How do you feel about the Simmons Law Firm?

6   A.   I think the Simmons Law Firm is more socially responsible.

7   Q.   Why is that?

8   A.   Because they give a lot of support to a number of

9   institutions that study mesothelioma and they are also

10  charitable in other ways.  They have a hospital named after

11  them in St. Louis.

12  Q.   Dr. Taub, I want to give you what's been marked for

13  identification as Government Exhibit 525-9.  Do you recognize

14  this e-mail?

15  A.   Yes.

16  Q.   Who is this between?

17  A.   It is between me and Joy Wheeler.

18  Q.   And where did Joy Wheeler work again?

19  A.   Joy Wheeler was an employee of the Simmons firm, as far as

20  I know.  Yes.

21  Q.   Did this e-mail express --

22               MR. MOLO:  I object, your Honor.

23               THE COURT:  Overruled.

24               MR. MOLO:  Outside the scope.

25               THE COURT:  Overruled.

1   BY MR. GOLDSTEIN:

2   Q.  Dr. Taub, did this e-mail express your view at the time

3   about Weitz & Luxenberg and the Simmons firm?

4           MR. MOLO:  Objection.  There is no mention of

5   Weitz & Luxenberg.

6           THE COURT:  Overruled.

7   A.  This is not the complete e-mail so I can't -- I can't fully

8   comment on it.  There were some other phrases in there that

9   have been blacked out.

10          THE COURT:  Can you give him the unredacted version?

11          MR. GOLDSTEIN:  Yes.

12          THE WITNESS:  Please.

13  BY MR. GOLDSTEIN:

14  Q.  Dr. Taub, while we are trying to pull this up, if you could

15  read to yourself the second paragraph of this e-mail?

16  A.  Anyway --

17          THE COURT:  No, no.  Read it to yourself.

18          THE WITNESS:  I have read it.

19          MR. GOLDSTEIN:  Your Honor, we will try to move on as

20  we are waiting.

21          THE COURT:  Okay.

22  Q.  Dr. Taub, at the time that you began -- you testified on

23  direct examination that you started sending patients to the

24  Simmons law firm.  Do you recall that?

25  A.  Yes.

1   Q.  At the time that you started sending patients to the

2   Simmons law firm did you believe -- did you know whether the

3   Simmons law firm was supporting mesothelioma research not just

4   for yourself but around the country?

5   A.  Yes.

6   Q.  And how did that compare to what Weitz & Luxenberg was

7   doing?

8   A.  Weitz & Luxenberg was not doing that.

9   Q.  How do you feel about that?

10  A.  As I said, I think it needs to be remedied.

11  Weitz & Luxenberg should, in my opinion --

12          MR. MOLO:  I object.

13  A.  -- in my opinion, fund mesothelioma research.

14          THE COURT:  Overruled.

15  Q.  Did you, in fact, communicate your view about

16  Weitz & Luxenberg to Sheldon Silver?

17          MR. MOLO:  Objection.  Foundation.

18          THE COURT:  At any time?

19  A.  At which time?

20  Q.  Did you communicate your view about Weitz & Luxenberg in

21  that first meeting in 2003?

22  A.  Yes.

23  Q.  And when he came back to your office?

24  A.  I didn't -- no, I correct that.  I did not convey my view

25  of that but I did convey the fact that Weitz & Luxenberg had

 1   not contributed and that it should be corrected and I asked

 2   Mr. Silver to help.

 3   Q.  And then, in 2010, when Sheldon Silver came to your office

 4   at Columbia -- where is your office at Columbia, by the way?

 5   A.  It is in the Herbert Irving Pavilion on 165th Street and

 6   Fort Washington Avenue.  I'm on the ninth floor.

 7   Q.  Is that in Sheldon Silver's district?

 8   A.  No.

 9   Q.  When Sheldon Silver came to your office in 2010 and asked

10   about why you weren't sending him as many cases anymore, didn't

11   you also tell him about --

12            MR. MOLO:  Objection.

13            THE COURT:  Sustained.  Please, don't lead.

14            MR. GOLDSTEIN:  Thank you, your Honor.

15            THE COURT:  Did you discuss it at that point?

16            THE WITNESS:  Did I discuss?

17            THE COURT:  The issue of Weitz & Luxenberg not

18   supporting mesothelioma research.

19            THE WITNESS:  Not specifically but by implication only

20   I think.

21   BY MR. GOLDSTEIN:

22   Q.  Did you discuss with him --

23            MR. MOLO:  Objection.

24            THE COURT:  *Did you discuss with him* -- You don't even

25   know what he is going to ask.  You have to wait.

```
 1   Q.  Did you discuss with him what the Simmons law firm was

 2   doing?

 3   A.  Yes.

 4             MR. MOLO:  Objection.

 5             THE COURT:  Overruled.

 6             THE COURT:  Is that why you said by implication?

 7             THE WITNESS:  Yes.

 8   BY MR. GOLDSTEIN:

 9   Q.  Dr. Taub, I'm going to show you what's been marked for

10   identification as Government Exhibit 595-1.

11             THE COURT:  595?

12             MR. GOLDSTEIN:  595-1.

13   Q.  If you could turn to the second page of that document?

14   A.  Okay.

15   Q.  Dr. Taub, is this an e-mail between yourself and

16   Ms. Hesdorffer?

17   A.  Yes.

18   Q.  Remind the jury; who is Mary Hesdorffer?

19   A.  Mary Hesdorffer is the Executive Director of MARF and she

20   is a good friend, close friend, who worked with me for nine

21   years as my nurse.

22   Q.  And did you communicate with Mary Hesdorffer about what you

23   had told Sheldon Silver when he met with you?

24             MR. MOLO:  I object, your Honor.

25             THE COURT:  Sustained.
```

 1   Q.  I will rephrase, your Honor.

 2            Dr. Taub, looking at this e-mail, does this refresh

 3   your recollection as to what you told Sheldon Silver when he

 4   met with you in 2010?

 5            MR. MOLO:  Objection, your Honor.  It doesn't --

 6            THE COURT:  Overruled.  You can refresh someone's

 7   recollection with anything.

 8            MR. MOLO:  If they say they don't understand or don't

 9   recall -- excuse me.

10            THE COURT:  The question was does this refresh your

11   recollection.

12            MR. MOLO:  There was no lack of recollection.  That's

13   the point.

14            THE COURT:  Overruled.

15            THE WITNESS:  Let me understand the question.  Does

16   this, please --

17   BY MR. GOLDSTEIN:

18   Q.  I will rephrase it, Dr. Taub.

19   A.  Yes.

20   Q.  Does this refresh your recollection of what you told

21   Sheldon Silver about Weitz & Luxenberg or Perry Weitz?

22            THE COURT:  Relative to contributing to meso research.

23   Q.  Mesothelioma research.

24   A.  I don't know this, even though it is in quotes I don't, on

25   reading this, I don't think that this is quite the language

 1    that I would use and I'm still not positive about whether that

 2    phrase was by implication or by direction or whether I directly

 3    said it.  So, I don't really know.  I did tell him about the

 4    Simmons funding and, by implication, he should draw the fact

 5    that Weitz & Luxenberg did not give research funds which I had

 6    told him before.

 7            THE COURT:  Did you draw the connection between the

 8    amount of money law firms were giving to research and your

 9    willingness to make referrals?

10            THE WITNESS:  I didn't draw it out as a diagram but it

11    certainly conveyed what I wished to tell him, yes.  I told him

12    that the Simmons firm was giving us a large donation.

13    BY MR. GOLDSTEIN:

14    Q.  Did you tell him that -- I will rephrase, your Honor.

15            What did you tell him about the connection between

16    that donation and the referrals?

17    A.  And I said I was referring cases to Simmons.  I don't

18    remember whether I said directly that he was going to be

19    getting less referrals but he had asked me why he was getting

20    less referrals, so --

21            MR. MOLO:  Objection as to what he --

22    A.  -- I thought that he should take the implication.

23            THE COURT:  Overruled.

24    Q.  Now, Dr. Taub, after the Simmons firm started funding your

25    research did you, nevertheless, continue to send some cases to

1    Sheldon Silver?

2    A.   Yes.

3    Q.   Even though Weitz & Luxenberg still wasn't funding any

4    research?

5    A.   Correct.

6    Q.   And even though at that point the State wasn't funding your

7    research either?

8    A.   Correct.

9    Q.   Dr. Taub, if you can look at the first page of Government

10   Exhibit 595-1; does that convey your viewpoint at the time as

11   to one of the reasons you continue to refer cases to Sheldon

12   Silver?

13            MR. MOLO:  Objection.

14            THE COURT:  Sustained.  Rephrase the question.

15   Q.   In this e-mail, Dr. Taub, what were you trying to convey to

16   Mary Hesdorffer?

17            MR. MOLO:  Objection.  The document speaks for itself.

18            THE COURT:  The document is not in evidence.

19            MR. MOLO:  Well then --

20            MR. GOLDSTEIN:  Your Honor, the government offers

21   595-1.

22            MR. MOLO:  Objection.

23            THE COURT:  Let me see the parties at side bar.

24

25

 1                   (At side bar)

 2          THE COURT:  This document has lots of different things

 3     in it and there are various and sundry objections and so let's

 4     start with what you want to get in.

 5          MR. GOLDSTEIN:  The reason we tried to redact it was

 6     to get what his state of mind was in continuing to refer cases

 7     to Sheldon Silver which he articulates quite clearly in this

 8     e-mail to Mary Hesdorffer and so the two parts that we would

 9     like to be admitted are, number one, the portion at the bottom

10     when he talks about meeting Sheldon Silver in the future; and

11     number two, the e-mail at the top where he talks about how

12     patient care is the righteous aspect of what MARF does.  That

13     is his state of mind about research.

14          MR. COHEN:  What about the rest document, Judge?  We

15     are seeing it out of context.

16          THE COURT:  Hold on.  Let me read the top part.  I

17     hadn't read it yet.

18          So, he is trying to introduce it for state of mind

19     evidence meaning that you are okay on the second page of the

20     document.

21          MR. GOLDSTEIN:  I would be happy to put the second

22     page in for completeness.

23          THE COURT:  Okay.

24          MR. MOLO:  First of all, it is hearsay so it can't

25     come in for the truth.  Secondly, to the extent that they're

1    offering it for state of mind, his state of mind, when he is

2    e-mailing on May 25th, 2010 Mary Hesdorffer regarding U Penn is

3    irrelevant and it is highly prejudicial to be interjecting

4    again.

5              THE COURT:  This is this part.

6              MR. MOLO:  I understand -- oh, it's May 24th.

7              THE COURT:  He is saying -- let's focus on the piece

8    he wants to get in.

9              MR. MOLO:  But it is still the Hesdorffer, right?

10             THE COURT:  Let's focus on this portion of the e-mail.

11             MR. MOLO:  I'm sorry.

12             So this is being offered for the truth.  It is only

13   relevant if it is true and --

14             THE COURT:  No, it is being offered to explain what

15   his state of mind is, that this is why he was doing it.

16             MR. MOLO:  The why is his being offered for the truth.

17             THE COURT:  It's not being introduced to show he is

18   the most powerful man in New York State, it is being offered to

19   show --

20             MR. MOLO:  No.

21             THE COURT:  That's the matter asserted.  It is being

22   offered to prove that the reason that his, what was motivating

23   him, his state of mind, was that he was currying favor.

24             MR. MOLO:  This is being offered that he will keep

25   doing that and so in that sense it is being offered for the

1   truth.  This is a redacted document, it has -- it is an e-mail

2   from --

3            MR. GOLDSTEIN:  You have seen the unredacted version.

4            MR. MOLO:  No, no, no, but --

5            THE COURT:  So the redaction is irrelevant.  So what

6   it is redacted.

7            MR. MOLO:  This is from Hesdorffer, right?

8            MR. GOLDSTEIN:  Yes.

9            THE COURT:  This one is not.  They redacted out hers.

10  They have --

11           MR. MOLO:  I'm sorry.

12           THE COURT:  This is his statement.

13           MR. MOLO:  Okay.

14           MR. COHEN:  May I?

15           MR. MOLO:  Go ahead.

16           MR. COHEN:  It is also three years after the grants

17  are over.  He's not getting any more money.  He is not -- I'm

18  sorry, Mr. Goldstein is talking about his state of mind three

19  years after the grants are over and Mr. Silver -- and rather

20  Dr. Taub is assuming they're right, that he is trying to get

21  benefits for his daughter and all of that stuff.  He is not

22  getting any money anymore.  He is not looking for money.

23           THE COURT:  But, gentlemen, your entire defense is

24  that the reason these referrals occurred was not to get

25  benefits from the State via Shelly Silver, it was because they

 1   were friends.  I heard you ask at least a thousand times:  *You*
 2   *and Shelly were friends?*  So, your defense is they were
 3   friends.  This tends to support the government's argument that
 4   it was not a referral and a friendship but in fact what
 5   Dr. Taub was thinking at the time was that he needed to
 6   continue to make referrals for the -- because what he wanted
 7   back from Silver was benefits that he could deliver by virtue
 8   of his official role.  That is a lot more words than is in
 9   there but that's what he is saying.

10            MR. COHEN:  What he is really looking for in terms of
11   this is the money and the money he is looking for is from
12   Weitz & Luxenberg, not from the State.  That's not an official
13   act.

14            THE COURT:  He wanted money wherever it was going to
15   come from.  He has been very clear on that.

16            MR. COHEN:  I hear you, but at this stage he knows
17   there is no more money from the State, if he is getting money.

18            THE COURT:  Just because they quit giving him a grant
19   this one year does not mean the New York State spigot was
20   turned off forever as far as he knew because presumably he did
21   not know that the reason the spigot was turned off was because
22   the member items were going to be disclosed.

23            MR. MOLO:  There is no evidence of that.

24            THE COURT:  That's the government's theory of why but
25   he didn't know that.  There is no evidence he knew that.  So,

1   he had, based on hope springing eternal that money was going to

2   come again and therefore it was in his interest to maintain a

3   relationship -- a positive relationship with the man who

4   controlled the money.

5          MR. COHEN:  But from the day that Mr. Silver said I

6   can't give you more State money you don't hear about money from

7   the State ever again.

8          THE COURT:  I can't give you any more State money.  It

9   was that they didn't get the money.  That doesn't mean that it

10  is never going to come again.

11         MR. MOLO:  Judge, in fairness, there is no discussion

12  about State money between 2007, when he writes the last letter

13  and he is told, in the conversation, they don't do this

14  anymore, and at this point in 2010, that's a huge time gap and

15  this, you know, creates a very, very unfair suggestion and I

16  mean, my God, if this is what the United States government has

17  to rely on, either this man is going to say what they claim he

18  was going to say or he is not.

19         THE COURT:  That would be good for you, then.

20         MR. MOLO:  Well, it would be good to me to not have

21  unfairly prejudicial documents in.

22         THE COURT:  I don't think it is unfair.

23         MR. MOLO:  State of mind three years after the fact,

24  this is hugely prejudicial.

25         MR. COHEN:  Judge, we don't know what the rest of the

 1   document is.

 2           MR. GOLDSTEIN:  Among other things.

 3           THE COURT:  They'll put the whole thing in if you want

 4   it.

 5           MS. COHEN:  You have it.

 6           MR. COHEN:  We don't have it --

 7           MS. COHEN:  That was yours.

 8           THE COURT:  I'm not going to listen to arguments about

 9   completeness.  If the documents comes in and the defense

10   objects it is redacted, they'll put the whole document in.

11   Okay?  So, if you have a completeness argument, that's the

12   answer to that.

13           MR. COHEN:  I would like to see it.

14           THE COURT:  You have it.

15           MR. COHEN:  We have a million and a half documents,

16   Judge.  A million and a half documents.

17           THE COURT:  We have talked about this document before.

18           MS. COHEN:  Correct.

19           MR. COHEN:  Good.

20           MS. COHEN:  And recently.

21           MS. COHEN:  I'm sorry, 1.7 million.

22           MR. MOLO:  This is so far afield and it is so far

23   afield in terms of state funding.

24           MS. COHEN:  Your Honor, if I can remind Mr. Molo that

25   the Doctor testified on direct that he continued to hope,

1    despite Mr. Silver saying that the state funding, he couldn't

2    give it anymore, that he still hoped that he would get state

3    funding in the future.

4              THE COURT:  I thought I remembered that but I

5    wasn't --

6              MS. COHEN:  You did, your Honor, correctly.

7              THE COURT:  Okay.  I disagree that it is unduly

8    prejudicial.  I disagree that it is.

9              MR. COHEN:  We will look into it to see whether we

10   object to it going in unredacted.

11             THE COURT:  I will overrule.  If you want the whole

12   thing to go in you can have the whole thing go in.  You can

13   deal with that at the next break.

14

15

16

17

18

19

20

21

22

23

24

25

 1                (In open court)

 2                THE COURT:  Objection overruled.  Government Exhibit

 3    595-1 received.

 4                (Government's Exhibit 595-1 received in evidence)

 5    BY MR. GOLDSTEIN:

 6    Q.  Mr. Coccaro, if we can publish the first page of Government

 7    Exhibit 595-1?

 8                MR. MOLO:  Objection.

 9                THE COURT:  This is what we just talked about.  You

10    don't have to say it twice.

11                MR. MOLO:  I know.  I had a premonition what your

12    ruling was going to be, but.

13                THE COURT:  It is going to be a redacted document at

14    the moment.  It may or may not remain a redacted document.  We

15    will see about that but for now the government is introducing

16    it.

17    BY MR. GOLDSTEIN:

18    Q.  Dr. Taub, what is the date of this e-mail between yourself

19    and Ms. Hesdorffer?

20    A.  May 25th, 2010.

21    Q.  Was this after the Simmons firm had committed to pay more

22    than -- the Simmons Foundation had committed to pay a little

23    more than $3 million for your research?

24    A.  Yes.

25    Q.  Can you read, for the jury, what you wrote to Mary

1    Hesdorffer?

2    A.  *Of course they will all be nice to you for the cases, and*

3    *hate you if they don't get them.  I will keep giving cases to*

4    *Shelly because I may need him in the future -- he is the most*

5    *powerful man in New York State.*

6          THE COURT:  Okay, ladies and gentlemen, this is being

7    introduced to prove what Dr. Taub was thinking at the time.

8    Okay?  So it only goes to what was in his head at that time.

9    Q.  Mr. Coccaro, if we can look at the top e-mail?  Can you

10   read that, Dr. Taub, that exchange between yourself and

11   Ms. Hesdorffer?

12   A.  *As the Bible says, "We need to get past the time when 'each*

13   *man does as is righteous in his own eyes'.  No enterprise*

14   *(excluding patient care) ever, ever grew or succeeded as a*

15   *result of pure righteousness.  Usually success is propelled by*

16   *greed, envy, or both.  I thought you knew that.  That's why I*

17   *think the patient care aspects of MARF are the most deserving.*

18         THE COURT:  Again, same here.  This goes to what was

19   going on in Dr. Taub's head at the time.

20         THE WITNESS:  Yes.

21   Q.  We can take that down, Mr. Coccaro.

22         Dr. Taub, on cross-examination you were asked a few

23   questions about referrals that you made to other law firms

24   besides Weitz & Luxenberg.  Do you remember that?

25   A.  Yes.

1  Q.  One of the law firms you were asked about was a firm called

2  Belluck & Fox?

3  A.  Yes.

4  Q.  Do you recall making a referral or more than one referral

5  to that law firm?

6  A.  At this point I remember one referral.

7  Q.  And had Belluck & Fox given money for mesothelioma

8  research?

9  A.  I believe they had.

10 Q.  Another firm that was asked, that you were asked about was

11 the law firm Levy, Phillips, Konigsberg.  Did you make

12 referrals to Levy, Phillips, Konigsberg?

13 A.  I called them about referrals and I know I sent them one

14 patient whom they could not help.  That's what I remember at

15 this point.

16 Q.  And did Levy, Phillips, Konigsberg give money to

17 mesothelioma research?

18 A.  Yes.

19 Q.  And you have already testified about sending patients of

20 yours to the Simmons law firm and they provide money to

21 mesothelioma research, right?

22 A.  Yes.

23 Q.  Dr. Taub, what law firm, other than Weitz & Luxenberg, have

24 you referred patients to that has not funded mesothelioma

25 research?

1   A.  I don't recall any.

2   Q.  You also were asked questions on cross-examination about

3   whether or not the patients who you spoke with about

4   potentially using Weitz & Luxenberg listened to your

5   recommendations.  Do you remember those questions?

6   A.  I'm not sure what you -- could you rephrase the question,

7   because I'm not sure what you meant by it.

8   Q.  I will do so, Dr. Taub.

9           You were asked questions on cross-examination about

10  the communications that you had with your patients when you

11  were referring them to a law firm.

12  A.  Okay.

13  Q.  Do you remember that?

14  A.  Yes.

15  Q.  You testified that there are some patients of yours, or

16  there were some patients of yours that did not end up deciding

17  to use Weitz & Luxenberg even when you mentioned Sheldon Silver

18  to them.  Is that right?

19  A.  Yes.

20  Q.  Dr. Taub, would you say that you have a relationship of

21  trust with your patients?

22  A.  I don't remember saying that, but I do.

23  Q.  My question actually was do you have a relationship of

24  trust with your patients?

25  A.  I should hope so.

1   Q.  And over the years that you made referrals to Sheldon

2   Silver how often, if you can recall, did your patients end up

3   telling you, no, I don't want to do that?

4   A.  I don't have a specific number but there were patients who

5   told me that they don't want to do that; either they don't want

6   to go to Sheldon Silver or they don't want to get legal

7   counsel, legal representation at all.

8   Q.  Would you say that the majority of your patients did end up

9   using Weitz & Luxenberg?

10          MR. MOLO:  Objection.

11  A.  I don't know.

12  Q.  Dr. Taub, you were asked a lot of questions on

13  cross-examination earlier today about the paperwork that was

14  involved in the contracts for the grants.

15          Do you recall those questions?

16  A.  Yes.

17  Q.  And the defense introduced a series of exhibits that they

18  had you look through.  Do you recall that?

19  A.  Yes.

20  Q.  Now, when you got the notice telling you that first time

21  that you received a grant from New York State from the

22  Department of Health, had you put in any paperwork at all to

23  the Department of Health?

24  A.  No.

25  Q.  The only thing that you had sent were those letters to

1    Sheldon Silver, is that right?

2    A.   I believe so.

3    Q.   Did you make any sort of substantive presentation to the

4    Department of Health?

5    A.   No.

6    Q.   A formal application for a grant?

7    A.   Not at that time.  It was after the notice was received we

8    had to fill out a formal application.

9    Q.   And that was the document that Mr. Molo showed you?

10   A.   Yes.

11   Q.   How did that process compare to the other government grants

12   that you have gotten in your career?

13          MR. MOLO:  Objection.  Irrelevant.

14          THE COURT:  Overruled.

15   A.   I would -- the process usually was the opposite which is

16   first you filled out the application, then you got the grant.

17   Q.   And all that paperwork that you looked through, where in

18   any of that paperwork does it say that Sheldon Silver helped

19   secure that funding?

20   A.   I don't recall that it said that.

21   Q.   And where in any of that paperwork did it say that you were

22   sending cases to Sheldon Silver?

23   A.   It didn't.  It did not.

24   Q.   Now, Dr. Taub, you testified that after you got the first

25   two grants you made an application and you sent a letter to

1   Sheldon Silver seeking money for a third grant, a third year of

2   funding.  Do you recall that?

3   A.  Yes.

4   Q.  And at that point how was your research going?

5   A.  Very well.

6           MR. MOLO:  Objection.

7           THE COURT:  Overruled.

8   Q.  You said very well.  In what ways was it going very well?

9   A.  The Mesothelioma Center was very productive both in terms

10  of its clinical trials and its publication record and its

11  research.

12  Q.  And was there still work to be done?

13  A.  The work is never ending.

14  Q.  And when Sheldon Silver came to your office and told you

15  that he couldn't do it anymore --

16          MR. MOLO:  Objection.

17          THE COURT:  What's the objection?

18          MR. MOLO:  It's a leading question.  It misstates

19  testimony.

20          THE COURT:  He hasn't finished the question so he is

21  not leading yet.

22  Q.  Did he tell you why?

23          MR. MOLO:  Now I object.

24          THE COURT:  Overruled.

25  A.  His words were, or to that effect, I don't remember the

1    exact words, was that he can't do this anymore.  But I'm not

2    sure that's exactly his wording.

3    Q.  Did he ask you in that conversation about your research?

4    A.  I don't believe so.

5    Q.  Did he ask you about the connection between mesothelioma

6    and what happened in 9/11?

7    A.  No.

8    Q.  In all of the years where you were referring cases to

9    Sheldon Silver when, if ever, did he ask you about how your

10   research was proceeding?

11   A.  I don't recall any specific instance.

12   Q.  When he told you that he couldn't do it anymore, did

13   Sheldon Silver --

14        MR. MOLO:  Objection.  That's not what he said.  He

15   said he doesn't recall the words that he used.

16        THE COURT:  He has told you in substance that he

17   couldn't do it anymore.

18   BY MR. GOLDSTEIN:

19   Q.  He told you in substance that he couldn't do it anymore.

20   Did Sheldon Silver tell you that he had found a better way to

21   use that funding?

22   A.  No.

23        THE COURT:  I'm sorry, I'm not sure if you ever

24   answered the question.  Did he tell you why he couldn't do it

25   anymore?

FB5XSIL3                          Tawb - Cross

1          THE WITNESS:  Not that I remember.

2          THE COURT:  Did you ask him why?

3          THE WITNESS:  I did not.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. GOLDSTEIN:

2   Q.  Dr. Taub, you were asked questions yesterday about whether

3   or not the State of New York was doing the right thing by

4   funding your research.

5         Do you remember those questions?

6   A.  Yes.

7   Q.  You don't know why Sheldon Silver decided to fund your

8   research, do you?

9         MR. SHUR:  Objection.

10        THE COURT:  Rephrase the question.

11  BY MR. GOLDSTEIN:

12  Q.  Dr. Taub, do you know how the state made the decision to

13  fund your research?

14  A.  I don't exactly know, no.

15  Q.  Do you know what was motivating Sheldon Silver in helping

16  you?

17        MR. SHUR:  Objection.

18        THE COURT:  Overruled.

19        THE WITNESS:  I believe that Sheldon Silver was

20  referring -- I was referring cases to Mr. Silver, and I hoped

21  that that would incentivize him to help raise money for

22  mesothelioma research.  So I presume that that was certainly a

23  factor.

24        MR. GOLDSTEIN:  Nothing further, Your Honor.

25        THE COURT:  Mr. Molo.

 1          MR. MOLO:  Briefly, Judge.

 2   RECROSS EXAMINATION

 3   BY MR. MOLO:

 4   Q.  You wanted money from Weitz & Luxenberg; is that right?

 5   A.  I'm sorry?

 6   Q.  You wanted money from Weitz & Luxenberg.

 7   A.  I wanted Weitz & Luxenberg to donate money.  Yes, I did.

 8          THE COURT:  For research.

 9          THE WITNESS:  For research.

10   BY MR. MOLO:

11   Q.  And this Mary Hesdorffer -- you said that was your friend;

12   right?

13   A.  Yes.

14   Q.  And you were candid with her; correct?

15   A.  Yes.

16   Q.  Dr. Taub, I've handed you Exhibit 64.  It's an email

17   between you and Mary Hesdorffer; is that right?

18   A.  Yes.

19          MR. MOLO:  I move to admit Defendant's Exhibit 64.

20          THE WITNESS:  Yes.

21          THE COURT:  What we typically do is I look to the

22   government to see whether they're going to object, and then I

23   make a ruling.

24          MR. GOLDSTEIN:  Your Honor, the government does not

25   object to 64.

FB5XSIL5                    Taub - Recross

1          THE COURT:  Does his 64 look like my 64?

2          MR. MOLO:  I believe so.  Only his is highlighted.

3          THE COURT:  I'm going to ask that one be substituted

4    out without the meta data.  With no objection, then I will

5    receive 64.

6          (Defendant's Exhibit 64 received in evidence)

7    BY MR. MOLO:

8    Q.  In 64, writing your good friend Mary Hesdorffer, you tell

9    her -- can you read the highlighted portion.

10   A.  "Just so you should know, there is no current arrangement

11   between Weitz & Luxenberg or its lawyers or New York State with

12   the Mesothelioma Center."

13   Q.  So you told her there was no current arrangement between

14   the Mesothelioma Center -- that's the Mesothelioma Center that

15   you run; right?

16   A.  Yes.

17   Q.  -- and Weitz & Luxenberg or New York State; correct?

18   A.  That's correct.

19   Q.  And this document that the prosecutors were showing you,

20   595-1, the second page of that document --

21          May I inquire into that?

22          MR. GOLDSTEIN:  Can we have a sidebar.

23          THE COURT:  Yes.

24          (At the sidebar)

25          MR. GOLDSTEIN:  We only published the first page

FB5YSIL5                       Taub - Recross

1    because I thought that there was an objection to the second

2    page coming in.  So we didn't have the ability to front it with

3    Dr. Taub in any way.

4           If he's going to use the second page now, ultimately

5    we don't object to it coming in.  I certainly wouldn't want the

6    implication that we were concealing some information from the

7    witness or from the jury.

8           One reason why we did not object to it or try to put

9    this in is because this email is significantly more confusing

10   than the first page.

11          MR. MOLO:  Significantly what?

12          MR. GOLDSTEIN:  Significantly more confusing because

13   built into this is a discussion about these are the law firms

14   and what was going on here with regard to MARF.

15          THE COURT:  Certainly you referred to this in your

16   questioning of him.  I don't quite understand what you're

17   concerned about here.

18          Does this mean that you have no objection to the

19   entirety?

20          MR. MOLO:  The "entirety" being these three pages.

21          THE COURT:  What I admitted was these two with the

22   opening of the defense.  If you wanted, for completeness, the

23   balance in, I was going to leave it in.  We didn't get to this

24   part because the government said that this was not what they

25   were particularly trying to get in.

```
 1              MR. GOLDSTEIN:  That's fine with us.

 2              MR. MOLO:  That's fine.  I don't care.

 3              THE COURT:  I don't know what I would tell the jury.

 4              MR. MOLO:  I don't either.

 5              THE COURT:  You're withdrawing your objection?

 6              MR. GOLDSTEIN:  I'm withdrawing our objection.

 7              THE COURT:  Let's go.

 8              (In open court)

 9   BY MR. MOLO:

10   Q.  Directing your attention to the second page of 595-1,

11   Dr. Taub, you wrote to your friend, Mary Hesdorffer, directing

12   your attention to the second page, five lines down and the

13   sixth line, "I sent a case to Sheldon Silver today and told him

14   about Simmons' $3.15 million gift which might impact the volume

15   of referrals to Weitz & Luxenberg in the future.  Although,

16   since he is my friend, I will try to accommodate him."

17              Correct?

18   A.  Yes.

19   Q.  And he was your friend; correct?

20   A.  There was a friendship there, yes.

21   Q.  Sure.  He was a good-enough friend that you felt

22   comfortable having your son seek his help in working for a

23   Jewish not-for-profit when he was looking for a job; right?

24   A.  Yes.

25   Q.  And he was a good-enough friend that you felt comfortable
```

1   in having your daughter seek his help in getting an unpaid

2   internship; correct?

3   A.  Yes.

4   Q.  And he was a good-enough friend that you invited him to the

5   first night of your daughter's Sheva Brochot?

6   A.  Yes.

7   Q.  And he was a good-enough friend that you paid for his

8   ticket to the ACS event; correct?

9   A.  It's not particularly accurate the way you're

10  characterizing it.  If you'll permit me.

11  Q.  Doctor, I'm asking you:  You were friendly enough --

12          THE COURT:  Let him answer.

13          Go ahead, Dr. Taub.

14          THE WITNESS:  A friend in business, and over time it

15  acquired additional dimensions, yes.  And he became a better

16  friend over time, yes.

17  BY MR. MOLO:

18  Q.  And he was a good-enough friend that he accepted his gifts

19  of handmade matzo.

20  A.  Yes.

21  Q.  You refused to meet with me before the trial; right?

22  A.  I refused?

23  Q.  Right.

24  A.  I did not meet with you before the trial.

25  Q.  You're aware that we requested the opportunity to meet with

1   you?

2              MR. GOLDSTEIN:  Objection, your Honor.

3              THE COURT:  Overruled.

4              THE WITNESS:  I trust what my lawyer said.  I don't

5   remember personally refusing.

6   BY MR. MOLO:

7   Q.  You met with the prosecutors a dozen times before trial;

8   correct?

9   A.  I met with them a number of times, yes.

10  Q.  At least 12; correct?

11  A.  I don't know the number.  At least 12?  I don't know.

12  Q.  You were not receiving any money from these grants; is that

13  correct?

14  A.  No.

15             MR. MOLO:  Nothing further.

16             THE COURT:  Mr. Goldstein.

17             MR. GOLDSTEIN:  Mr. Coccaro, could we put back up

18  595-1, the second page.

19  REDIRECT EXAMINATION

20  BY MR. GOLDSTEIN:

21  Q.  Dr. Taub, this email that's here on the second page of

22  Government Exhibit 595-1 -- that's part of the same email chain

23  that we looked at before where you stated that you will keep

24  giving cases to Shelly because "I may need him in the future.

25  He is the most powerful man in New York State."

1           Is that right?

2  A.  Yes.

3  Q.  If we could look back at the second page.  We'll set that

4  aside.

5           Mr. Molo also asked you about Defense Exhibit 64.  I

6  don't know if that's still in front of you.

7  A.  No.

8           THE COURT:  He's got it.

9           MR. GOLDSTEIN:  Thank you, your Honor.

10 BY MR. GOLDSTEIN:

11 Q.  Dr. Taub, this is the email where you say, "Just so you

12 know, there is no current arrangement between Weitz & Luxenberg

13 or its lawyers or New York State with the Mesothelioma Center."

14 A.  Yes.

15 Q.  What is the date of this email?

16 A.  Friday, November 21, 2008.

17 Q.  Was that after the state had stopped funding your research?

18 A.  Yes.

19           MR. GOLDSTEIN:  Nothing further, your Honor.

20           MR. MOLO:  Nothing, Judge.

21           THE COURT:  Thank you, Dr. Taub.  You can step down.

22           (Witness excused)

23           THE COURT:  Call your next witness.

24           MS. COHEN:  Your Honor, we're checking to make sure.

25 He's here, your Honor.

1           The government calls Victor Franco.

2           MR. SHUR:  Your Honor, can the parties approach with

3    respect to this next witness?

4           THE COURT:  Sure.

5           (At sidebar)

6           THE COURT:  What's the issue?

7           MR. SHUR:  Your Honor, I'm not sure if the government

8    plans to elicit this or not, but in the Jencks material for

9    Mr. Franco, he describes a conversation where Mr. Silver called

10   him within the past month -- so I guess this is March 2015, in

11   which Mr. Silver asked Mr. Franco for the status of certain

12   grants.

13          I guess my concern is that -- this is what I wanted to

14   raise.  I understand that Mr. Silver, at the direction of

15   counsel, had collected documents in connection with the

16   investigation.

17          I don't know if this is one and the same in terms of

18   that incident.

19          MS. COHEN:  There was a time in December prior to

20   Mr. Silver's arrest when Mr. Silver asked his staff in the

21   assembly to pull certain HCRA grant contracts including the

22   grant to Columbia and New York Presbyterian.

23          We are certainly going to introduce evidence as to

24   that.  I don't know if what you're referring to is different

25   because it was a month ago.

1          MR. SHUR:  This is what the Jencks material is.

2          MS. COHEN:  Is this a request Mr. Silver made

3   supposedly a month ago?

4          MR. SHUR:  I don't know.

5          THE COURT:  That would be a March request.

6          MR. SHUR:  That's correct.

7          MS. COHEN:  Could the parties talk about this?

8          THE COURT:  I would love for the parties to talk.

9          (In open court)

10          THE COURT:  Okay, Mr. Master.

11          MR. MASTER:  Thank you, your Honor.

12   VICTOR E. FRANCO,

13       called as a witness by the Government,

14       having been duly sworn, testified as follows:

15   DIRECT EXAMINATION

16   BY MR. MASTER:

17   Q.  Good afternoon, Mr. Franco.  Where are you employed?

18   A.  New York State Assembly.

19   Q.  Are you testifying here today pursuant to a subpoena from

20   the government?

21   A.  Yes.

22   Q.  What's your educational background?

23   A.  I have a bachelor's from Syracuse University in political

24   science, a master's in public administration from Rockefeller

25   College, and an advanced master's degree in not-for-profit

1    management.

2    Q.  Where did you start working after graduation?

3    A.  At the New York State Assembly.

4    Q.  For how long were you in that position?

5    A.  I was in -- in January of 2005, I was employed as the

6    deputy budget director for budget studies.  Yes.

7           THE COURT:  Was that your first job at the assembly?

8           THE WITNESS:  No.  My first job in the assembly was

9    back in '97 working for the Puerto Rican Hispanic task force

10   and then after that working for the assembly.

11   BY MR. MASTER:

12   Q.  Where did you go after that first time in the assembly?

13   A.  After that first time in the assembly, I left.  I got my

14   master's degree.  I came back to the assembly, and then I was

15   employed by the Committee of Ways and Means because I did my

16   master's thesis on the New York State budget process.

17          After that, I left the assembly again, came back a

18   year and a half later, and then in January of 2005 was hired as

19   deputy budget director.

20          THE COURT:  Is that an assembly job, or is that from

21   the governor?

22          THE WITNESS:  All three positions were for the

23   New York State Assembly.

24   BY MR. MASTER:

25   Q.  Are you still in that position?

FB5XSIL5                          Franco - Direct

1   A.   Yes.

2   Q.   Now, let me ask you some questions about the structure of

3   the Ways and Means Committee.

4        In general, what does the Ways and Means Committee do?

5   A.   We're the central standing committee that oversees any

6   piece of legislation that has a fiscal impact to the State of

7   New York, primarily the New York State budget.

8   Q.   What is the top staffer on Ways and Means called?

9   A.   Secretary.

10  Q.   During the tenure of Sheldon Silver as Speaker of the

11  Assembly, who appointed the Secretary of Ways and Means?

12  A.   You'd be appointed by the speaker, as all staff.

13  Q.   So, during the tenure of Sheldon Silver as Speaker of the

14  Assembly, who was your ultimate boss?

15  A.   At the top of my chain of command was the speaker.

16  Q.   Meaning the defendant, Sheldon Silver?

17  A.   Correct.  The speaker at the time.

18  Q.   Briefly, what are the different divisions within the Ways

19  and Means staff?

20  A.   There are three main groups:  One is the economics group,

21  the other is the revenue local fiscal group, and then the third

22  is the budget group.

23  Q.   What do each of those divisions do?

24  A.   The economics group basically forecasts the federal and

25  state economy and then gives the results of that modeling to

FB5XSIL5                         Franco - Direct

1  the revenue group, where they forecast and estimate the

2  revenues that come into the State of New York.

3        Then they give those numbers to the budget group, and

4  we basically determine or use that as the basis of the state

5  budget.

6  Q.  How about the fiscal group?

7  A.  The fiscal group is very similar to the revenue group.  It

8  is essentially the same group.  They also forecast state

9  revenue and basically look at that and bonding and financial

10 impact, financial plan impacts, stuff like that.

11       THE COURT:  Is fiscal a different group?  Or is it

12 revenue/fiscal?

13       THE WITNESS:  Revenue/fiscal.

14 BY MR. MASTER:

15 Q.  How about the budget group?  What does the budget group do?

16 A.  The budget group basically takes the amount of revenue

17 that's going to be available and puts it into the state budget

18 as appropriations.

19 Q.  Are you part of that budget group?

20 A.  Yes.

21       THE COURT:  So you figure out how to spend our tax

22 dollars.

23       THE WITNESS:  Correct.

24       THE COURT:  Is that, in laymen's terms, what the

25 budget group does?

 1                THE WITNESS:  Correct.

 2   BY MR. MASTER:

 3   Q.  Approximately how large is the state budget, Mr. Franco?

 4   A.  Last year the state budget was $142,000,000,000.

 5                THE COURT:  Billion with a B?

 6                THE WITNESS:  With a B.

 7   BY MR. MASTER:

 8   Q.  So, again, as the judge already inquired, is it your group

 9   that determines the different aspects of the state budget and

10   how to spend the money?

11   A.  Correct.

12   Q.  How many other deputy directors of budget are there besides

13   yourself?

14   A.  There are four other people at my level.

15   Q.  Does each of those deputies have an assigned area of

16   responsibility?

17   A.  Yes.

18   Q.  What is your assigned area of responsibility?

19   A.  I oversee the economic development budget, as well as act

20   as the central budget services function, as well as oversee all

21   the discretionary funding for the state assembly.

22   Q.  What do you mean by the term "discretionary funding"?

23   A.  "Discretionary" means that the members determine where

24   those grants are going to go.

25   Q.  Is discretionary funding under something called the Health

FB5XSI15                    Franco - Direct

1   Care Reform Act or HCRA one of the things that has been under

2   your assigned area of responsibility?

3   A.   Yes.

4   Q.   What was the source of the money for the HCRA grants?

5   A.   The source of the Health Care Reform Act funding basically

6   came from surcharges and fees assessed to health care

7   facilities and providers.

8   Q.   So what does the term "appropriation" mean?

9   A.   An appropriation is an authority to spend cash given any

10  fiscal year starting from April 1 of that year to the next

11  March 31 of the following year.

12  Q.   How does something get appropriated?

13  A.   It has to be basically put into budget language, and then

14  that budget bill has to be voted on by both houses of the

15  legislature and signed into law by the governor.

16  Q.   So were those HCRA funds that were obtained through fees

17  and assessments appropriated through the state budget?

18  A.   Initially, yes.

19  Q.   And what type of appropriation was the HCRA discretionary

20  appropriation?

21  A.   I'm sorry.  Can you repeat the question.

22  Q.   You said at least initially.  Are you familiar with the

23  term lump sum appropriation?

24  A.   Yes.

25  Q.   What is a lump sum appropriation?

 1  A.  A lump sum appropriation is an appropriation that is either

 2  problematic in nature or doesn't distinctly identify the

 3  ultimate grant recipient.

 4  Q.  Are there other types of appropriations besides a lump sum

 5  appropriation?

 6  A.  Yes.

 7  Q.  What is the other type or main type of appropriation?

 8  A.  There is a discrete appropriation which identifies the

 9  grantee, sometimes the purpose of the funds, and the grant

10  amount.

11  Q.  And what is that called?

12  A.  A lineout.

13          THE COURT:  A what?

14          THE WITNESS:  A lineout appropriation.

15          THE COURT:  A lineout.  Okay.

16  BY MR. MASTER:

17  Q.  What type of appropriation was the HCRA discretionary

18  appropriation?  A lineout or a lump sum?

19  A.  Lump sum.

20  Q.  So, given that HCRA was a lump sum appropriation rather

21  than a lineout appropriation, was it possible for the public to

22  determine, by reading the budget, who the ultimate recipients

23  were of the assembly's discretionary HCRA grants?

24  A.  No.

25  Q.  Was it possible to learn by reading a budget which

1    legislator was sponsoring any HCRA funding to any recipient?

2    A.   No.

3    Q.   What is the HCRA assembly initiatives pool?

4    A.   It's the share of funding made available to the assembly.

5    The senate was assigned a share as well as the executive.

6    Q.   So how large was the assembly share of this lump sum

7    appropriation?

8              THE COURT:  In what year?

9              THE WITNESS:  $8.5 million starting in 2000 going up

10   until 2006 annually.

11             THE COURT:  So it was $8.5 million each of those six

12   years?

13             THE WITNESS:  $8.5 million annually in those six

14   years.

15   BY MR. MASTER:

16   Q.   If there wasn't any direction in the budget concerning how

17   to spend the lump sum appropriated under this HCRA pool, who

18   decided how to spend the HCRA lump sum appropriation during

19   Sheldon Silver's tenure as speaker?

20   A.   The speaker would make designations and assembly Ways and

21   Means would process the paperwork identifying the legislative

22   intent to the Department of Health, which was the administering

23   state agency.

24   Q.   So, again, the ultimate decision-maker was who?

25   A.   The Speaker of the Assembly.

FB5YSIL5                           Franco - Direct

1   Q.   Who at the time that the HCRA funds were available was?

2   A.   The defendant.

3   Q.   Was anyone else, other than Sheldon Silver, empowered to

4   make the final decision about what entities would receive the

5   funds and how much in funds they would receive?

6   A.   The speaker was the ultimate decision-maker.

7   Q.   What, if any, restrictions were there on the use of those

8   funds?

9   A.   It had to meet the problematic guidelines and parameters as

10  outlined within the enabling legislation, the grantee had to be

11  a health care facility or a health care provider, and the

12  purpose had to be for health care purposes for a public good.

13  Q.   Other than that, were there any limits on Sheldon Silver's

14  discretion as to where to award the funds?

15  A.   The total amount of the share made available to the

16  assembly.

17  Q.   Up to the amount, he had discretion.

18  A.   Correct.

19  Q.   Again, that amount being $8.5 million per year for those

20  years that you stated?

21  A.   Correct.

22  Q.   How would you learn when Sheldon Silver had decided to

23  award funds under HCRA?

24  A.   I would get direction from my principals.

25  Q.   Who were your principals at the time that HCRA was

1    available?

2    A.  The chain of command was Steve August was my budget

3    director, Dean Fuleihan was the secretary, and the defendant

4    was the speaker.

5    Q.  During your time in the assembly, what, if any, notice was

6    given to the public concerning the possible availability of

7    HCRA discretionary funds to meet health care needs?

8    A.  None that I'm aware of.

9    Q.  What, if any, formal grant applications listing

10   qualifications or the merits of any proposal were required?

11   A.  Basically, you know, it was up to the -- I'm sorry.  Can

12   you restate the question.

13   Q.  What, if any, formal grant applications were required in

14   order to obtain funds under HCRA?

15   A.  No formal applications at the time of initiation.  Once the

16   assembly had designated funding, then there was a formal

17   application process from the grantee to the Department of

18   Health, and they went back and forth until the contract

19   materialized.

20   Q.  With respect to that contract that you're talking about,

21   what, if any, competitive review was there by the Department of

22   Health before the contract was actually awarded?

23   A.  The assembly Ways and Means Committee is not responsible

24   for facilitating the contract, but none that I was aware of.

25   Q.  So your understanding is that once funds were designated by

1   the speaker to be spent from that HCRA discretionary pool,

2   assuming that the paperwork was filled out properly, what was

3   supposed to happen?

4   A.  The Department of Health would have issued a letter to the

5   grantee along with a blank application.  The grantee would have

6   filled out that application, sent it back to the Department of

7   Health.

8          They would have reviewed it to make sure that it fits

9   the enabling legislation and various problematic guidelines and

10  protocols.  And then it would have moved through the process to

11  get a fully executed contract.

12         THE COURT:  By "the process," do you mean kind of the

13  normal state contracting process?

14         THE WITNESS:  Correct.

15  BY MR. MASTER:

16  Q.  Now, during your time in the assembly, to your knowledge,

17  what, if any, competitive review was conducted by Sheldon

18  Silver before he decided which requests for funding under HCRA

19  would be granted and which would not?

20  A.  I was not privy to those conversations, but none to my

21  knowledge.

22  Q.  Once funds were awarded, what, if any, status updates or

23  progress reports were provided by the New York State Assembly

24  or by Sheldon Silver personally to make sure the funds were

25  used in a manner consistent with the request?

F B5XSIL5                Franco - Direct

 1  A.  Typically, we'd never follow up on stuff like that unless

 2  we were notified by the grantee that there was a problem or an

 3  issue or something along those lines.

 4  Q.  Again, once an award was made, because this was a lump sum

 5  appropriation, what, if any, disclosure to the public occurred

 6  concerning the recipient of the award, the amount of the award,

 7  or the sponsor of the award?

 8  A.  None that I'm aware of.

 9  Q.  What, if any, records does the assembly's Ways and Means

10  Committee maintain concerning requests for health care-related

11  funding and actual commitments of funding under HCRA?

12  A.  Typically, within the context of budget negotiations,

13  members of the assembly would send to the speaker what we call

14  budget request letters making recommendations of how they want

15  to see the executive budget changed.

16       And then central staff would track those letters and

17  basically compile a list to basically outline the assembly's

18  needs or priorities.

19  Q.  And beyond that, did you actually maintain records of

20  budget letters that were submitted?

21  A.  Yes.

22  Q.  Did you maintain records related to grants that Sheldon

23  Silver had decided to award under HCRA?

24  A.  Yes.

25  Q.  In response to subpoena and in preparation for your

1    testimony here today, have you reviewed files of the Ways and

2    Means Committee to determine whether there were any state funds

3    requested by Dr. Robert Taub and any funds committed from the

4    HCRA assembly lump sum pool to Dr. Taub?

5    A.  Yes.

6    Q.  I'd like to show you -- if you wouldn't mind taking a look

7    in your binder -- what's previously been admitted as Government

8    Exhibits 107 and 120.

9           MR. MASTER:  If you wouldn't mind pulling up,

10   Mr. Coccaro, Government's Exhibit which has previously been

11   admitted.

12   BY MR. MASTER:

13   Q.  Are those two documents that you found in your search of

14   the Ways and Means Committee files?

15   A.  Yes.

16   Q.  How many grants under HCRA did Sheldon Silver issue to

17   Dr. Taub's Mesothelioma Center?

18   A.  Two.

19   Q.  What was the amount of each grant?

20   A.  $250,000 each.

21          MR. MASTER:  This might actually be a good time to

22   take a break.  If you want me to continue, I can continue.

23          THE COURT:  Can you find another convenient time to

24   break in about ten minutes?

25          MR. MASTER:  Absolutely.

1          Let's take a look at some of that other paperwork.  If

2   you wouldn't mind pulling up for identification Government

3   Exhibit 115.

4   BY MR. MASTER:

5   Q.  What is depicted in that exhibit?

6   A.  This is a letter to the Department of Health from the

7   speaker designating $250,000 from the HCRA pool.

8   Q.  Where did you find this paperwork?

9   A.  This was in the Ways and Means central files.

10          MR. MASTER:  The government offers Government Exhibit

11  115.

12          THE COURT:  Any objection?

13          MR. SHUR:  No objection.

14          THE COURT:  115 is received.

15          (Government's Exhibit 115 received in evidence)

16  BY MR. MASTER:

17  Q.  Turning to the first page, who drafted that letter?

18  A.  I did.

19  Q.  How do you know that?

20  A.  My initials are towards the bottom left-hand corner.

21  Q.  Is that VEF?

22  A.  Correct.

23  Q.  What was the purpose of that letter?

24  A.  This is how the assembly designated or informed the

25  Department of Health about our legislative intent.

1   Q.  When you say "legislative intent," do you mean the intent

2   to award the funds?

3   A.  Correct.

4   Q.  Now, what does the term "commitment" mean in this context?

5   That is, in terms of the commitment of funds.

6   A.  It means that the paperwork was filed in order to designate

7   a particular amount for a particular entity from a particular

8   funding stream.

9   Q.  And what commitment of funds is reflected in this letter?

10  A.  A $250,000 grant to New York Presbyterian Hospital.

11  Q.  It says from the 2002/2003 Health Care Initiatives Pool

12  pursuant to the Health Care Reform Act.

13         Can you just explain for the jury what that means.

14  A.  Yes.  During the Health Care Reform Act, there were pools

15  that were basically made available to both houses of the

16  legislature, as well as the executive.

17         This was one of the years that was made available to

18  the assembly.  For accounting purposes, we had to designate

19  which year -- what year the pool was being charged for this

20  particular item.

21  Q.  So, without getting too technical, you said earlier that

22  there was $8.5 million per year from 2000 to 2006.

23         Did you have to spend it within that year that it was

24  appropriated?

25  A.  No.

 1  Q.  And so, in this particular instance, which of the

 2  $8.5 million pools was actually used to fund this grant?

 3  A.  The 2002/2003 pool.

 4  Q.  Now, where would you send the paperwork once the speaker

 5  had decided to commit the funds?

 6  A.  To the Department of Health.

 7          MR. MASTER:  Mr. Coccaro, if you wouldn't mind zooming

 8  out.  It's addressed to Mr. Dennis Whalen.

 9  BY MR. MASTER:

10  Q.  Is that just the designee for these commitment letters?

11  A.  Yes.

12  Q.  You stated that your initials were there at the bottom?

13  A.  That's correct.

14  Q.  It says "SS:SA:VEF."  Who are the other people's initials

15  that are referenced in this me though?

16  A.  SS is the defendant, SA is Steve August who is my direct

17  report, and the other person.

18  Q.  Being you?

19  A.  Unfortunately, yes.

20  Q.  Now, what, if any, competitive review did you understand

21  Sheldon Silver to have conducted before committing the funds

22  listed in this letter?

23  A.  Typically, I wasn't involved in those types of

24  conversations, but to my knowledge, none.

25  Q.  Are you familiar with the term "peer review"?

1   A.   Yes.

2   Q.   Are you aware of any peer review that was conducted before

3   these funds were committed by Sheldon Silver?

4   A.   None to my knowledge.

5   Q.   Again, what was the Department of Health expected to do

6   when it received this letter?

7   A.   They would take our legislative intent, generate an award

8   letter, send it out to the designated grantee with the blank

9   application.

10          The grantee would fill out the blank application, send

11  it back to the Department of Health.  They would process it and

12  review it according to the enabling legislation in the

13  parameters of the particular funding stream.

14          And then it would go through their review process.

15  Sometimes the comptroller or the EG was involved in reviewing

16  it depending on the grant amount.  And then it would go to

17  contract to be executed and disbursed.

18  Q.   Now, again, the letter references someone named Steve

19  August.  You stated earlier that he was your principal.

20          Why was he listed in the letter?

21  A.   That was just our standard protocol.  The direction that I

22  got was from him.  I always reported up the chain.  So that was

23  just our standard protocol.

24  Q.   Also it says here that the letter is signed by Sheldon

25  Silver, Speaker.

1          Why was the letter from Sheldon Silver as speaker?

2    A.  Because he was the ultimate decision-maker for the assembly

3    just like the present pro temp was the ultimate decision-maker

4    for the senate.

5    Q.  So does the fact that the letter was from Sheldon Silver

6    reflect that Sheldon Silver was the sponsor of this item?

7    A.  No.

8    Q.  Why is that?

9    A.  Because, again, as the principal for the assembly, his name

10   went on all the letters that went out designating funding

11   through the HCRA stream and other funding sources.

12   Q.  If you wouldn't mind looking in your binder at what's been

13   marked for identification as Government Exhibit 283.  We're

14   putting it up on the screen.  If you wouldn't mind just

15   flipping through that.

16          Do you recognize what's depicted in Government

17   Exhibit 283?

18   A.  Yes.

19   Q.  Are those additional HCRA-related items that you found in

20   response to subpoenas?

21   A.  Yes.

22          MR. MASTER:  The government offers Government

23   Exhibit 283.

24          THE COURT:  Any objection?

25          MR. COHEN:  No objection.

1           THE COURT:  283 is received.

2           (Government's Exhibit 283 received in evidence)

3           MR. MASTER:  If you wouldn't mind publishing that.

4    BY MR. MASTER:

5    Q.  What is reflected in the first page of Government

6    Exhibit 283?

7    A.  It's a letter to a former assembly member from the speaker

8    acknowledging their commitment to a particular entity.

9           MR. MASTER:  If you wouldn't mind just zooming in,

10   Mr. Coccaro, on the first couple paragraphs.

11   BY MR. MASTER:

12   Q.  Again, it's from the speaker, Sheldon Silver, to a Charles

13   Norman.  It states, "I am pleased to inform you that as a

14   result of your advocacy, Kingsbrook Jewish Medical Center has

15   been selected to receive funding in the amount of $250,000

16   through the Health Care Reform Act, Health Care Initiatives

17   Pool."

18           Is that the lump sum appropriation that we've been

19   talking about?

20   A.  Yes.

21   Q.  It states, "The New York Department of Health, which acts

22   as the grant administrator of the HCRA Health Care Initiatives

23   Pool, will be notified of the grant award for Kingsbrook Jewish

24   Medical Center.

25           "Accordingly, the Health Department will be mailing

1   Dr. Linda Brady a grant packet within the next couple of weeks

2   for the $250,000 grant."

3          Do you see that?

4   A.  Yes.

5   Q.  Again, as you discussed earlier, what was your

6   understanding as to whether the Department of Health would

7   conduct any additional competitive review or merits evaluation

8   before issuing that grant award letter?

9   A.  There was review but no competitive review that I'm aware

10  of.

11  Q.  If you wouldn't mind just turning to the next page of that

12  document.

13         Is that another one of these letters from Sheldon

14  Silver?

15  A.  Correct.

16  Q.  Again, to another member of the assembly concerning an

17  award under HCRA?

18  A.  Correct.

19  Q.  Turn to the third page of that document.

20  A.  Okay.

21  Q.  What is the third page of the document?

22  A.  The third page of the document is something similar to

23  another government exhibit that we just saw initiating two

24  health care grants out of the HCRA pool.

25  Q.  So you stated -- this is dated June 6, 2005.  Government

1    Exhibit 115 -- what's the date on that?  If you wouldn't mind

2    pulling it up side by side.

3         July 5, 2005.  You stated -- again, this is the third

4    page on the right-hand side of the screen, just for

5    identification, of Government Exhibit 283.  And then on the

6    left-hand side of the page is Government Exhibit 115.

7         What, if any, difference is there between these two

8    letters?

9    A.  The date, the title of the executive deputy commissioner at

10   the time, the grant amount, I'm missing my middle initial.

11   Q.  So was it possible for the Department of Health to figure

12   out, based on the transmittal letter, who the sponsors were of

13   the grants that were committed by each of those letters?

14   A.  No.

15   Q.  Is that because both are signed by the speaker?

16   A.  Correct.

17   Q.  Again, if you wouldn't mind just turning to the fourth page

18   of Government Exhibit 283.

19        Which grants are listed in the fourth page of

20   Government Exhibit 283?

21   A.  Long Island Health Network for $50,000 and Kingsbrook

22   Jewish Medical Center for $250,000.

23   Q.  Are those the two grants that were the subject of the

24   letter from Sheldon Silver that we just saw?

25   A.  Yes.

1   Q.   Those are the grants that were actually sponsored by which

2   members of the assembly?

3   A.   Former Member DiNapoli and Former Member Norman.

4   Q.   And then, if you wouldn't mind turning to the fifth page of

5   Government Exhibit 283.

6        What is reflected on the fifth page of Government

7   Exhibit 283?

8   A.   This is a copy of a legislative initiative form.

9   Q.   What is a legislative initiative form?

10  A.   It's the instrument that we use in order to communicate

11  legislative intent to the respective agency.

12  Q.   Where on the form does it identify the assemblyman which

13  sponsored the particular HCRA grant here which you stated was

14  in fact Former Assembly Member DiNapoli?

15  A.   It does not.

16  Q.   Why is that?

17  A.   That was just not part of our protocol.

18  Q.   If you wouldn't mind just turning to page 5 of that.  Page

19  6.  I'm sorry.

20       Again, where on this legislative initiative form does

21  it reflect that the sponsor of that item is Former Member

22  Norman?

23  A.   It does not.

24  Q.   If you wouldn't mind just turning to what's been marked for

25  identification as Government Exhibit 284.

 1              THE COURT:  Before we go to that, I think it's

 2    probably time for a break.

 3              MR. MASTER:  Okay.

 4              THE COURT:  Ladies and gentlemen, let's take our

 5    afternoon break, about a ten-minute break.  We'll bring you

 6    back out in about ten minutes.

 7              Don't discuss the case.

 8              (Jury not present)

 9              (At sidebar)

10              MR. GOLDSTEIN:  First off, the issue before, Mr. Shur

11    and I are no longer concerned about.  We've worked it out.

12              Secondly, over lunch, I got an email from a member of

13    the press wanting exhibits of this morning, and I don't want to

14    do that without your permission.

15              THE COURT:  Is it exhibits that are in evidence?

16              MR. COHEN:  They're in evidence.

17              THE COURT:  That's fine.

18              (In open court)

19              THE COURT:  Okay.  Ten minutes.  More like eight

20    minutes at this point.

21              (Recess)

22              (Continued on next page)

23

24

25

FB5Ssi16                          Franco - direct

 1                (Jury present)

 2                THE COURT:  Okay, Mr. Master.

 3                MR. MASTER:  Thank you, your Honor.

 4    BY MR. MASTER:

 5    Q.  Mr. Franco first, before we proceed, just a few follow-up

 6    questions about some technical terms that you have used during

 7    your initial questioning.

 8                Why do you call a type -- one of the types of

 9    probations a lineout?

10    A.  Because it's literally a line of appropriation that

11    contains the name of the grantee, sometimes the purpose, and

12    the dollar amount for that appropriation.

13    Q.  And a lump sum appropriation is essentially a pot of money

14    that is appropriated in the budget?

15    A.  Correct.  Sometimes there will be appropriation language

16    that gives parameters or sets boundaries for the use of those

17    funds but typically within a lump sum appropriation you won't

18    have a discrete item identified.

19    Q.  And here the only boundaries, as you described it, were

20    that it go to an eligible organization for a health-care

21    related purpose, is that right, with respect to the HCRA lump

22    sum?

23    A.  Correct.

24    Q.  And then you were asked some questions about this

25    legislative initiative form and Mr. Coccaro, if you wouldn't

1   mind pulling up the fifth page of Government Exhibit 283 -- was

2   the sample?

3           When you say communicate legislative intent, are you

4   just simply referring to the Speaker's decision to award and a

5   description of the project and the recipient?

6   A.   Yes.  It is basically all of the information needed in

7   order to communicate -- for the agency to communicate with the

8   grantee to draft the contract and, you know, in the parameters

9   of what the funds are going to be used for.

10  Q.   And does the Assembly provide any more detail than that

11  one-page form to the Department of Health?

12  A.   Typically, no.

13  Q.   And, you were also asked, and if you wouldn't mind going to

14  page one of this document on 283, Mr. Coccaro, if you would go

15  back to page 1?

16          Those are the letters from the Speaker to different

17  members of the Assembly, here to a particular former member of

18  the Assembly.  Again, what would have needed to happen first in

19  order for this letter to get generated?

20  A.   There would have had to have been a decision made in order

21  to advance this item for funding.

22  Q.   And, again, who was the ultimate decision maker of all

23  these HCRA lump sums?

24  A.   The Speaker is the ultimate decision maker.

25  Q.   And here there is -- this is a letter from the Speaker

1    congratulating Clarence Norman.  What did Clarence Norman need

2    to do in order to get the money?

3    A.  He would have had to submit a budget request letter to the

4    Speaker's office.

5    Q.  And getting back, comparing that to Government Exhibit 115

6    which was one of the first grants to Dr. Taub, is there any

7    such letter congratulating another member of the Assembly from

8    the Speaker?

9    A.  No, because typically we wouldn't send a letter from the

10   Speaker to the Speaker.

11   Q.  And again, you wouldn't need to send a letter from the

12   Speaker to the Speaker because he himself was the sponsor of

13   this particular grant?

14   A.  That's correct.

15   Q.  Now, again, if you wouldn't mind, Mr. Coccaro, just going

16   to the second page of this document?

17           Is that the same type of legislative initiative form

18   that was looked at in Government Exhibit 283?

19   A.  Yes.

20           THE COURT:  Sorry, what document is this?

21           MR. MASTER:  115.

22   Q.  Again, what, if any, direction or description beyond this

23   one-pager would have been provided to the Department of Health

24   concerning this particular grant?

25   A.  Typically none.

1    Q.  And again, the letter would have had to come from the

2    Speaker to the Speaker because not only was the Speaker the

3    sponsor of this grant but he was the ultimate decision maker to

4    award those funds that are reflected in that legislative

5    initiative form, correct?

6    A.  Correct.

7    Q.  Now, if you wouldn't mind just taking a look at Government

8    Exhibit 284?  Do you recognize what is depicted in that

9    exhibit?

10   A.  Yes.

11   Q.  Is that also a document that you found in your search of

12   Ways and Means Committee records?

13   A.  Yes.

14   Q.  What, if anything, does this document relate to?

15   A.  This is a letter from the Speaker to the Department of

16   Health initiating 10 HCRA grants.

17            MR. MASTER:  Government offers Government Exhibit 284.

18            THE COURT:  Any objection?

19            MR. SHUR:  No objection.

20            THE COURT:  284 is received.

21            (Government's Exhibit 284 received in evidence)

22   BY MR. MASTER:

23   Q.  If you wouldn't mind publishing that, Mr. Coccaro?

24            Is this the transmittal letter through which the

25   second of the grants to Dr. Taub was made?

1    A.   Yes.

2    Q.   What is the date on that letter?

3    A.   November 30th, 2006.

4    Q.   And if you wouldn't mind turning to the second page of that

5    document, you stated that there were 10 grants that were

6    committed via this letter?

7    A.   Yes.

8    Q.   Again, was it possible for the New York State Department of

9    Health to determine, based on the paperwork that was submitted

10   of which, if any, of these grants were sponsored by Sheldon

11   Silver?

12   A.   No.

13   Q.   If you wouldn't mind turning in your binder to what's been

14   marked for identification as Government Exhibit 117; do you

15   recognize that document?

16   A.   Yes.

17   Q.   What is that document?

18   A.   It's an e-mail from myself to my direct report outlining

19   the HCRA grants that needed to be processed.

20           MR. MASTER:  Government offers Government Exhibit 117.

21           MR. SHUR:  No objection.

22           THE COURT:  117 is received.

23           (Government's Exhibit 117 received in evidence)

24   BY MR. MASTER:

25   Q.   The ultimate date, or the date of the letter that was just

FB55si15                    Franco - direct

1   looked at was November 30th, 2006.  What is the date of this

2   e-mail?

3   A.  Friday, August 25th, 2006.

4   Q.  Does it reflect an intent to process $250,000 to the New

5   York Presbyterian Hospital Mesothelioma Research Center

6   account?

7   A.  These were the commitments that were pending at the time.

8           THE COURT:  I'm sorry.  What do you mean by that, the

9   commitments were pending?

10          THE WITNESS:  In other words decisions were made and

11  just needed to basically process the paperwork.

12  BY MR. MASTER:

13  Q.  So, as of August 25th, 2006, based on this e-mail, the

14  decision had been made by the Speaker to commit an additional

15  $250,000 to the Mesothelioma Center Research account?

16  A.  Yes.

17  Q.  And it was via that transmittal letter dated November 30th,

18  2006, that the Department of Health was actually informed of

19  that commitment decision?

20  A.  Correct.

21  Q.  Now, at the time you were processing these two grants to

22  Dr. Taub that were sponsored by Sheldon Silver, and that's

23  Government's Exhibits 115, if you wouldn't mind putting those

24  side by side, 115 and 284 -- actually, first, 284, did you play

25  a role in processing that second grant?

FB55si16                   Franco - direct

```
 1   A.  Yes.

 2   Q.  How do you know that?

 3   A.  My initials are in the lower left-hand corner.

 4   Q.  At the time you were processing those two grants that were

 5   sponsored by Sheldon Silver what, if any knowledge, did you

 6   have that Sheldon Silver was obtaining mesothelioma cases from

 7   Dr. Taub at the same time that those grants were being awarded?

 8   A.  None.

 9   Q.  When, if ever, were you informed of that?

10   A.  Never.

11   Q.  Now, you talked about an $8.5 million annual lump sum or

12   pot of money.  Did the Assembly end up spending all of the

13   money in those pots?

14   A.  No.

15   Q.  Now what, if any practices, did the former Speaker have

16   with respect to keeping funds in reserve?

17   A.  Unlike our republican counterparts, we were always very

18   conservative in our spending, ironically speaking.

19           THE COURT:  That was a good advertisement for the

20   democrats' fiscal responsibility.

21           THE WITNESS:  I'm a party man.

22           THE COURT:  Maybe you can give a more specific answer.

23           THE WITNESS:  Yes.

24           Can you repeat the question, please?

25   BY MR. MASTER:
```

```
 1   Q.  Sure.

 2           What, if any practices, did the former speaker have,

 3   that is Sheldon Silver have, with respect to keeping funds in

 4   reserve?

 5   A.  We kept funds on reserve, yes.

 6   Q.  And even though there were funds in reserve, were all of

 7   the requests for health care-related funding from people such

 8   as Dr. Taub or other members of the Assembly granted by Sheldon

 9   Silver?

10   A.  Yes.  Typically we, you know, would make decisions within

11   the context of the budget or if there were needs by any of our

12   members throughout the year those funds could be utilized for

13   those purposes.

14   Q.  Let me just clarify.  Meaning that the funds that were in

15   reserve could be utilized throughout the year to meet various

16   needs?

17   A.  Correct.

18           THE COURT:  Did these pools get entirely spent?

19           THE WITNESS:  No.

20   Q.  To get to the punchline, what ended up happening with those

21   pools?

22   A.  Those pools were ultimately vetoed by the governor.

23   Q.  And what happens to a pool of money once it is vetoed?

24   A.  The authority to spend the cash that's behind those

25   appropriations ceases to exist and the money gets swept back.
```

1  Q.  When you say swept back, what does that mean?

2  A.  It is a financial plan term that just means funding gets --

3  the actual cash dollar gets transferred from one account to

4  another.

5          THE COURT:  It is used for other state purposes?

6          THE WITNESS:  Correct.

7  Q.  While these lump sums or pots of money were in existence,

8  how did the amount of the request for health care related

9  funding compare to the amount of money that the Speaker

10  actually decided to commit from these HCRA pots?

11  A.  Annually our requests always far exceeded our resources.

12  Q.  I would like you to take a look at what's been identified

13  as Government Exhibit 111.  Actually, while you do that,

14  approximately when was the Assembly lump sum appropriation,

15  when were they vetoed?

16  A.  Approximately 2008 or 2009.

17  Q.  Even before the veto what, if any political issues, arose

18  with respect to spending out of the HCRA lump sum?

19  A.  Our ability to create new lump sums as legislature was

20  eliminated because of the Budget Reform Act.

21  Q.  We will get to the Budget Reform Act a little bit later

22  but, essentially, does that mean that even before 2008 or

23  before the time of the veto it became difficult to, after a

24  certain point, to commit additional funds out of those HCRA

25  pots?

FB55si15
Franco - Direct

1    A.  Correct, because once they were vetoed they ceased to exist

2    and we could no longer utilize that as a source of funding.

3    Q.  Now, let's go to Government Exhibit 111.  What is reflected

4    in Government Exhibit 111?

5    A.  These are various budget request letters.

6    Q.  Are these the requests in particular for health care

7    related funding, among other things?

8    A.  Yes.

9    Q.  And are these all budget request letters that the Ways and

10   Means Committee maintains in the regular conducted course of

11   its activities?

12   A.  Yes.

13           MR. MASTER:  Government offers 111.

14           MR. SHUR:  No objection.

15           THE COURT:  Government Exhibit 111 is received.

16           (Government's Exhibit 111 received in evidence)

17           THE COURT:  This is a large document, is it for a

18   four-year period?

19   BY MR. MASTER:

20   Q.  Is this just one budget request letter or are there

21   multiple budget request letters?

22   A.  Multiple budget request letters from multiple sources

23   covering multiple years.

24   Q.  What is the date of the first budget request letter here?

25   A.  The date of the first letter within this exhibit is January

Franco - direct

1  28, 2004.

2  Q.  What is the date of the last in this exhibit?

3  A.  February 6, 2008.

4  Q.  So it is approximately -- covers approximately a four-year

5  period?

6  A.  Correct.

7  Q.  And in preparation for your testimony today -- if you

8  wouldn't mind turning to page 2 of Government Exhibit 111 --

9  were you asked to determine whether certain of these requests

10  set forth in the budget request letters were ultimately funded

11  by the Speaker?

12  A.  Yes.

13  Q.  And so, with respect to this one that's dated February 9,

14  2004 from a Michael J. Cusick, member of the Assembly, what was

15  the item that was requested by this budget request letter?

16  A.  $150,000 for Staten Island University Hospital to expand

17  their emergency room.

18  Q.  If you wouldn't mind zooming in on that, Mr. Coccaro; first

19  paragraph.

20         Did there come a time when you searched the Assembly's

21  files to determine what happened to that budget request?

22  A.  It did not get funded.

23  Q.  Now, before we move on from the topic of HCRA let me direct

24  your attention to December 2014.  Did there come a time when

25  you were asked to perform a research project concerning HCRA?

1  A.  Yes.

2  Q.  What were you asked to do initially?

3  A.  Initially I was asked to verify a list and match it against

4  Assembly records.

5  Q.  I would like to show you what's been marked Government

6  Exhibit 203 for identification.  Do you recognize that

7  document?

8  A.  Yes.

9  Q.  What is that document?

10  A.  This is a list of Assembly HCRA commitments from 2002 to

11  the present.

12  Q.  Do you recognize that document?

13  A.  Yes.

14          MR. MASTER:  Government offers Government Exhibit 203.

15          MR. SHUR:  No objection.

16          THE COURT:  203 is received.

17          (Government's Exhibit 203 received in evidence)

18  BY MR. MASTER:

19  Q.  Is that a part of that research project that you were asked

20  to conduct?

21  A.  Yes.

22  Q.  Mr. Coccaro, what is the date of that e-mail?

23          Mr. Coccaro, please zoom in and Mr. Franco, who is the

24  actual witness, please state the date of that e-mail?

25  A.  Wednesday, December 10, 2014.

1   Q.  Thank you.

2          And from whom is it sent and to whom is it sent?

3   A.  It is sent from Blake Washington to Victor Franco.

4   Q.  Would you mind turning to page 2 and 3 of that document?

5   What was the assignment that you were asked to perform?

6   A.  Initially it was to basically confirm a list against

7   Assembly records and then, from there, to basically identify

8   the highlighted organizations and pull letters and initiative

9   forms for the highlighted items.

10  Q.  Actually, Mr. Coccaro, could you just turn to the last page

11  of that exhibit?  Would you zoom in on that?

12          Does that chart reflect what you have been telling the

13  members of the jury earlier about the amount of the HCRA lump

14  sums?

15  A.  Yes.

16  Q.  And you talked about how it was $8.5 million from 2000 to

17  2006.  Were there additional funds that were actually

18  appropriated even in the prior years?

19  A.  Yes.  After HCRA was enacted there was $7.5 million for

20  three years, '97, '98 and '99.

21  Q.  Then it states -- explain what the different columns mean,

22  Enacted Amount, Authorized Allocations and Uncommitted?

23  A.  Enacted Amount was the Assembly share of the HCRA pool,

24  Authorized Allocations is commitments that actually went out

25  the door to the Department of Health, and Uncommitted was just

FB55si16                        Franco - direct

1    the math subtracting one column from the other.

2    Q.  And you talked earlier about how the Speaker liked to keep

3    funds in reserve.  Is the reserve what is reflected in

4    uncommitted pot?

5    A.  Correct.  Yes.

6    Q.  And then there is an asterisk there and some language

7    underneath and it states:  *Reappropriations for all uncommitted*

8    *balances have been vetoed.*  Is that what you were talking about

9    earlier when you stated that at the time of the veto there was

10   still money left in these various pots?

11   A.  Yes.

12   Q.  Now, did there come a time when you learned where this

13   research request was coming from?

14   A.  Initially, I did not know where the request was coming

15   from, but ultimately I learned that it was coming from the

16   Speaker's office.

17   Q.  And again, what's the date of that e-mail?

18   A.  Wednesday, December 10th, 2014.

19   Q.  And which particular entities did the Speaker's office ask

20   you to do follow-up on?

21   A.  Well, the Speaker's office didn't ask me anything, it was

22   my direct reports.

23   Q.  Okay, and who was your direct report?

24   A.  At the time, Blake Washington, who was my budget director.

25   Q.  Just looking at page 2 of Government Exhibit 203, what was

1  the instruction that was coming down to you via your direct

2  reports about what you needed to follow up on?

3          MR. SHUR:  Judge, I'm sorry to interrupt.  Can we

4  approach?

5          THE COURT:  Okay.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At side bar)

2          MR. COHEN:  I'm not sure what the testimony is going

3    to be here but I thought that the note in the 3500 that we were

4    concerned about was for something later.

5          MR. MASTER:  Yes.

6          THE COURT:  That was resolved.

7          MR. SHUR:  That was resolved.

8          MR. COHEN:  This appears to be, if the government

9    could proffer what this testimony is going to be, I will

10   explain.

11         MS. COHEN:  Sure.

12         Your Honor, the proffered testimony is going to be

13   that he was instructed by his superiors to pull certain HCRA

14   documents and the request got narrowed over a couple of days to

15   the very grants that are at issue in this case.

16         MR. COHEN:  Is there a suggestion that Mr. Silver

17   asked for it?

18         MS. COHEN:  Yes.  Not through this witness as so, but

19   through another witness.

20         MR. COHEN:  The problem is Mr. Silver will say we were

21   preparing to try to persuade the government not to bring a

22   charge.  I asked Mr. Silver to find out about the grants -- you

23   are talking about the grants in question?

24         MS. COHEN:  Correct, the Columbia grant and the New

25   York and Presbyterian grant.

1            MR. COHEN:  So, Mr. Silver was doing that at my

2   request.  They wouldn't know that, but I'm telling it to your

3   Honor.  And if they bring out testimony suggesting that

4   Mr. Silver is asking for documents and they're suggesting some

5   wrongdoing on that part, needless to say I have to testify, I

6   would not ideally like to testify although I am sure Ms. Cohen

7   would like to cross-examine me, but that's a problem where he

8   is doing something at my request and they wouldn't know that

9   until I have told that to them.

10           MS. COHEN:  Two-fold, your Honor.  The one is the fact

11  he knew exactly what grants to get and where to get them is

12  relevant whether or not he was asked but --

13           THE COURT:  I was going to say, this may be a longer

14  conversation but I guess we need to have it because you are to

15  this point.  Had the government communicated to counsel for

16  Silver at that point what activities y'all specifically were

17  looking at?

18           MS. COHEN:  No, but the government intends to put on

19  evidence through other witnesses that attorneys at the

20  Weitz & Luxenberg firm told Mr. Silver on the same day or the

21  day before the search for the documents started that they --

22  the government -- wanted witnesses from Weitz & Luxenberg to go

23  into the grand jury.  Even if it was a request from counsel I

24  don't know what the difference is or why we can't go into it.

25           THE COURT:  It depends on what the request was because

1    you -- I guess the inference I'm drawing is Silver starts

2    hearing footsteps or understands that people are being

3    approached, one thing and another, and what does he do?  But he

4    realizes immediately that what you're interested in is these

5    grants.  That's incriminating.

6              MS. COHEN:  Correct.

7              THE COURT:  But it is not incriminating if his

8    attorney figured out from the government what you were

9    interested in and asked him to pull it.

10             So, the question is how did you know they were

11   interested in the grants that Silver had directed to

12   Weitz & Luxenberg's attorney Sheldon Silver?

13             MR. COHEN:  I should think about whether I want to

14   answer that question -- not out of disrespect.

15             THE COURT:  You should.  No, no.

16             MR. COHEN:  I don't want to go into my work product

17   and make that proffer.

18             THE COURT:  Or into attorney-client privilege.

19             MS. COHEN:  Correct.

20             THE COURT:  Because if Sheldon Silver tells you the

21   thing that I'm worried about are the grants that I directed to

22   Dr. Taub --

23             MR. COHEN:  And I think it is entirely appropriate

24   that I would know, as work product, of knowing there was a

25   subpoena issued to the Weitz & Luxenberg firm that I would -- I

1   would talk about that; *What are they looking at?*  That would be

2   of interest to me that I would say to my client, let's find out

3   about that.   Let's find out the documents which I wouldn't have

4   and if I called up --

FB55si16                    Franco - direct

1              (In open court)

2              THE COURT:  Ladies and gentlemen, this is going to

3    take a little bit longer than I would hope so I am going to let

4    you go back into the jury room and stretch while we talk.

5    Okay?  So don't discuss the case, have a good break.  I hope to

6    get you out in a few minutes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Mr. Franco, would you go with Investigator

3    Barry?

4          (Witness steps down)

5          THE COURT:  For this to be incriminating it has to

6    have come from the head of the defendant.  The question is -- I

7    am hearing -- that maybe it didn't.  So, how do you close that

8    off?  That is, had there been subpoenas issued that would have

9    tipped him off?

10         MS. COHEN:  Your Honor, there would not necessarily

11   have been subpoenas.  The subpoenas that were served on

12   Weitz & Luxenberg, Weitz & Luxenberg, as Perry Weitz testified,

13   didn't know anything about these state grants so the fact that

14   Weitz & Luxenberg attorneys were going into the grand jury --

15         THE COURT:  And that's the only thing had happened at

16   that point?

17         MS. COHEN:  That is correct, your Honor.  Of course

18   other things had happened, I don't know what Silver knew when,

19   but what was happening at this point in time, we had not had

20   any contact with defense counsel --

21         THE COURT:  With Silver.

22         MS. COHEN:  With Silver's defense counsel or with

23   Silver himself.

24         THE COURT:  Okay.

25         MS. COHEN:  What was happening at this time was that

 1    the government had told counsel for Weitz & Luxenberg and its

 2    attorneys that we intended to put attorneys at

 3    Weitz & Luxenberg into the grand jury this exact same day as

 4    the search for these documents.  Weitz & Luxenberg did not know

 5    about the existence of these documents, nor would defense

 6    counsel on their own have known about these documents other

 7    than it coming from the head of their client.

 8            MR. COHEN:  In addition to Weitz & Luxenberg, although

 9    Dr. Taub did not testify to it on the day that he was visited

10    in that visit from the agents that you heard about in some long

11    detail today, after that he called Mr. Silver, Mr. Silver

12    wouldn't talk to him, and he called me.  Okay.  It would be

13    natural that I would inquire *Who is Taub?*  What is this?

14            MS. COHEN:  Your Honor?

15            THE COURT:  Yes.

16            MS. COHEN:  But then if Joel Cohen communicated to his

17    client that he got a call from Dr. Taub, the information about

18    these state grants, necessarily, would have come from the

19    defendant himself to Mr. Cohen.  Mr. Cohen wouldn't have known

20    about this on his own.

21            MR. COHEN:  I am asking him about this as a result of

22    having spoken to Dr. Taub.

23            THE COURT:  Well, then one would have expected the

24    pull of the grant information would have happened in August.

25            MR. COHEN:  Correct.

1          THE COURT:  But it happened in December when

2     Weitz & Luxenberg people were about to go in the grand jury,

3     not when Dr. Taub was visited.

4          MR. COHEN:  I don't remember the precise moment in

5     time standing here now.

6          THE COURT:  I only remember the date in August.  I

7     don't remember the exact date, it was August --

8          MS. COHEN:  It was August 8th, your Honor.

9          THE COURT:  Whatever.  As I recall he didn't know but

10    then there was a long gap before anything else happened with

11    Dr. Taub.

12         MR. COHEN:  And then I get a call from the government

13    and they say you had spoken to Mr. Master some considerable

14    time before, do you want to talk with us?  And I say, yes, we

15    want to talk to you.  And Mr. Molo and I go to see the

16    government and that is in, I believe, early December.  I'm

17    trying to reconstruct the date right now and --

18         THE COURT:  There is vigorous head shaking on the

19    front row.

20         MR. COHEN:  Frequently.

21         MS. COHEN:  Your Honor, we can confirm by looking at

22    our e-mails with Mr. Cohen but the meeting between government

23    and defense counsel was way after these documents were pulled

24    at Mr. Silver's request by the Assembly staff and the date that

25    these documents started getting pulled is the very same day or

1    the next morning that the government informed Weitz & Luxenberg

2    attorneys, through their counsel, that we intended to put those

3    attorneys into the grand jury.

4            THE COURT:  So assuming -- I think, if I got the

5    logical string, if it was Weitz & Luxenberg people, their

6    lawyers talking to you as part of joint defense, formal joint

7    defense or not formal joint defense, the Weitz & Luxenberg

8    people don't know that there was money that flowed to Taub,

9    they don't know anything about that, at least according to the

10   testimony of Perry Weitz.  So, that trigger, the fact that the

11   Weitz & Luxenberg people were going into the grand jury would

12   not have triggered, absent exactly the inference that the

13   government wants the jury to draw, would not have triggered

14   pulling grants to Taub.  So, whether it was that you told

15   Silver to do that, the only way you would have known to tell

16   Silver to do that is if Mr. Silver had told you that there had

17   been grants made to Dr. Taub.

18           MR. COHEN:  And if so?  What is the consequence of

19   that?

20           THE COURT:  Again, from a circumstantial perspective

21   the inference the government wants the jury to draw is when

22   they start hearing footsteps all of a sudden Mr. Silver wants

23   to get his ducks in a row.

24           MR. COHEN:  His lawyer wants him to get his ducks in a

25   row and isn't that part of work product?

1              If I called up Mr. Franco or his superior and say,

2    Hey, give me some documents.  Who are you?  So, I say to my

3    client, let's get the documents so I can take a look at them so

4    I can make a decent presentation to the government.

5              THE COURT:  But you weren't even talking to the

6    government at that point.

7              MR. COHEN:  I had gotten a call from the government --

8    pardon me.  I had called the government some time before.  The

9    government said at that point we have nothing to talk to you

10   about.  I now hear that there are grand jury people involved

11   and I want to find out about it -- I'm sorry, grand jury

12   witnesses and subpoenas.

13             THE COURT:  What else had happened in the

14   investigation before this and what was the impetus beyond

15   Mr. Cohen telling his client to pull the documents?  I mean,

16   because Taub was approached in August so I was not hanging on

17   to every drib and drab that appeared in the press during this

18   period of time so I don't really remember before the arrest of

19   Mr. Silver what was in the press relative to the investigation.

20   I remember that the Moreland Commission had gotten shut down.

21   I remember that your office subpoenaed their records.  That was

22   in the summer, as I recall.

23             MS. COHEN:  That's correct, your Honor.  There was

24   nothing in the press about the Moreland Commission about these

25   state grants.  That absolutely had not been uncovered at all by

1    the Moreland Commission so there was nothing in that about

2    that.

3              THE COURT:  So that was not the impetus about this.

4              MS. COHEN:  No, not at all.  There was nothing in the

5    press about these state grants at all.  There was press on

6    December 8th or December 9th, the same day as the e-mails about

7    the real estate side of the scheme but nothing about the state

8    grants.  This has nothing to do with any press reports.

9              THE COURT:  Okay, so I guess then the question would

10   be why is the fact that on August 10 Silver starts to pull

11   these documents?  If there was no reason, nothing you can point

12   to that would suggest that Silver knew that the government was

13   concerned about these, I'm not sure why this is inculpatory.

14             MS. COHEN:  Silver knew what he had done.  Silver knew

15   that he had directed these state grants to Dr. Taub.  No one

16   else knew that.  He knew that.  And so, when the government was

17   starting to put Weitz & Luxenberg witnesses into the grand jury

18   to seek an indictment, the defendant knew exactly what he had

19   done and he wanted to get and see whatever documents existed

20   about that.  He wanted to see (A) what evidence there was.  He

21   knew exactly what grants to go pull.  It was wasn't like he

22   didn't remember this or he didn't know exactly what pool of

23   money to fund it.  And he called up Matthew Howard, who is

24   Blake Washington's boss, and asked Matthew Howard to pull these

25   grants without telling him why.  He said he needed them on an

1    expedited basis, he didn't give him a reason because he knew

2    what he had done and wanted the documents.  The government can

3    put it in as circumstantial evidence of guilty conscience, your

4    Honor.

5            MR. COHEN:  What is the guilty conscience?  It seems

6    to me, your Honor, if I talk to my client and hypothetically he

7    tells me -- I say, What's the story with Dr. Taub?  I gave him

8    or his meso center grants.  And I say, okay, let me see the

9    paperwork on that.  What is the value to this, given what I'm

10   telling the Court about the other side of this story has the

11   value of consciousness of guilt that the government has to

12   raise this issue in a way that may require me to testify, hey,

13   I told him to try to get that information from his staff.

14           THE COURT:  So I think we can avoid that problem.  It

15   seems to me I suspect that the government would be willing to

16   stipulate to that.

17           MR. COHEN:  I think they really want to cross-examine

18   me, Judge.

19           MS. COHEN:  Well, that would be fun, your Honor.

20           MR. COHEN:  For two days, your Honor.

21           MS. COHEN:  For at least two days, your Honor.  That

22   would probably be great fun.

23           THE COURT:  I could probably sell tickets to that.

24           MR. COHEN:  Please, don't.

25           MS. COHEN:  Cohen versus Cohen.

1              MR. COHEN:  I have too many enemies, please, don't.

2              THE COURT:  I don't think that is necessary.

3         It seems to me the problem of creating an advocate

4    witness can be obviated through a stipulation.  So, it doesn't

5    involve your name so it is just:  *On or about that time the*

6    *request from the attorney was made...* or the -- however you

7    want to craft it.

8         I don't know that that actually obviates or eradicates

9    the circumstantial evidence that the government wants to put

10   in.  I will say I don't think it is the most, you know,

11   standing alone it is not a smoking gun but this is a case that

12   is being built by the government incrementally with

13   circumstantial evidence.

14        So, it does seem to me that it is somewhat probative

15   that he knew when things are starting to happen and there is an

16   investigation and Dr. Taub is being visited, he doesn't have

17   Weitz & Luxenberg pull referral information, he has the

18   Assembly pull grant information which would tend to suggest

19   whether it was because, through his conversations with his

20   attorneys he realized there was a problem or he realized there

21   was a problem on his own.  It is circumstantial evidence.  From

22   a probative, prejudicial perspective I don't see the prejudice.

23   I don't see it being unfairly prejudicial.

24             MR. COHEN:  Well, do they need to elicit that right

25   now?

1          THE COURT:  I don't know.  How much more do you have

2     for Mr. Franco?

3          MR. MASTER:  Your Honor, I have another 45 minutes but

4     not very much more on this, and he had no direct interaction

5     with the defendant.

6          THE COURT:  The point being --

7          MR. COHEN:  Pardon me, your Honor.

8          I am hearing something.  Excuse me.  If he is saying

9     that there is no direct action with Mr. Franco on this and I

10    believe they have another witness that they're thinking about

11    putting on the stand who may have had direct action, maybe we

12    can obviate the issue for today, they can finish their

13    examination of Mr. Franco.

14         In any event, it seems clear to me that Mr. Franco is

15    not going to get off the stand, Mr. Shur is going to need to

16    examine him on Monday.  Why don't they defer this issue to the

17    end of the direct and let us work it out -- hopefully -- over

18    the weekend and Mr. Shur can begin his cross-examination on

19    Monday.  Does that make sense?

20         MS. COHEN:  It is fine with the government, your

21    Honor.  We have sort of now introduced some of it.  It is a

22    little awkward.  Perhaps you can tell the jury we are going to

23    go back to this later so it doesn't seem like adverse inference

24    on the government.

25         MR. COHEN:  I still think that the issue is not

1   important that a person who would be a hearsay witness,

2   clearly, he did not, I'm told, have direct contact with

3   Mr. Silver over this, why don't they skip this witness on this

4   and go to the witness, if there is one, who has direct contact

5   with Mr. Silver?

6          THE COURT:  I think they're going to need him as well

7   to close the loop on what happened.  But, be that as it may,

8   for now we will get off of this document, we will work it out

9   over the weekend if we finish with him today.  If not, he is

10  going to be back on Monday anyway.  So, if you don't finish you

11  have to come back to this document Monday morning, you can

12  finish your direct on Monday morning.  Okay?

13         MR. MASTER:  Absolutely, your Honor.

14         MR. COHEN:  And we will need the ceremonial courtroom

15  if I testify, your Honor.

16         THE COURT:  I think we will have to take out the

17  Coliseum.

18             Bring the jury back.
                (Continued on next page)

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Okay, ladies and gentlemen.  There are

3    some issues that we need to work out, some legal issues with

4    this document, so I have asked Mr. Master to move on.  We may

5    come back to it at another time.

6            Okay, Mr. Master.

7            Mr. Franco, you are still under oath.

8    BY MR. MASTER:

9    Q.  Please, take that down.  As the Judge stated, we are going

10   to move on to another topic and we are going to talk about

11   another type of discretionary funding.

12           What is the Community Projects Fund?

13   A.  Community Projects Fund is a fund that basically supports

14   legislative initiatives both individually for members and their

15   districts, grants for items in their district or programmatic

16   items statewide.

17   Q.  And so there were some technical terms there, we will just

18   try to break those down.  What is a legislative initiative?

19   A.  Legislative initiative is similar to what people call

20   so-called member items and programmatic is AIDS research or,

21   you know, homeless prevention; those types of programs that are

22   statewide that don't have a direct benefit to one particular

23   Assembly district but, you know, anybody in the state could

24   benefit.

25   Q.  So, just to break it down further with respect to Community

 1    Projects Fund, the funds could be used for items that were

 2    directed by individual members and those are what you called

 3    member items?

 4    A.   Yes.

 5    Q.   Or to sort of supplement funds that would be otherwise

 6    unavailable for statewide purposes?

 7    A.   Correct.

 8    Q.   And so, when you arrived in 2005, how large was this

 9    Community Projects Fund annually?

10    A.   $200 million annually.

11    Q.   And what was the Assembly's share of that $200 million?

12    A.   Each house got $85 million out of the 200 total.

13    Q.   So, meaning that the Assembly's share of it annually was

14    $85 million?

15    A.   Correct.

16    Q.   Now, when you arrived, what type of appropriation was it?

17    Was it this lump sum or pot of funds or was it a lined out

18    appropriation?

19    A.   It was a lump sum appropriation of $200 million.

20    Q.   And for what purposes could members use Community Projects

21    Funds?

22    A.   They could use Community Projects Funds for any eligible

23    grantee, not-for-profit organizations, school districts,

24    colleges, universities, municipalities, agencies in departments

25    of municipalities or any other public entity for any eligible

1   public purpose that basically conformed with the Assembly

2   guidelines.

3   Q.  So, in other words, a very broad spectrum --

4   A.  Correct.

5   Q.   -- of purposes?

6   A.  Correct.

7   Q.  Now, you mentioned earlier that the HCRA Assembly pot of

8   money or the pool could only be used for health care purposes.

9   Do you remember testifying about that?

10  A.  Yes.

11  Q.  Could funds out of the Community Project Fund also be used

12  for health care purposes?

13  A.  Yes.

14  Q.  And, again, because it was a lump sum appropriation in 2005

15  when you arrived, what, if any ability, did the public have to

16  see the identity of the ultimate recipients of the funds that

17  were committed out of that $85 million annual pot?

18  A.  None.

19  Q.  What ability did the public have to know which Assembly

20  members were sponsoring grants to those ultimate recipients?

21  A.  Unless the respective Assembly member informed that

22  particular grantee directly, none.

23  Q.  Now, how is the Assembly's $85 million share of the

24  Community Projects Fund actually divided up?

25  A.  It's divided up, again, two halves one through member

FB55si.16                          Franco - direct

1     allotments and another half to meet programmatic needs based

2     within the context of budget negotiations.

3     Q.  And so the programmatic needs, that meant to supplement

4     these statewide gaps in the budget?

5     A.  To supplement or to restore, yes.

6     Q.  And so let's then focus on the allotments to members.

7              So, who would decide how much of the fund this $85

8     million pot, would be allocated to members?

9     A.  Ultimately the decision, final decision was made by the

10    Speaker.

11    Q.  And who decided how much money would be allotted to each

12    member each year?

13    A.  Ultimately the final decision was made by the Speaker.

14    Q.  And you stated that there was a reserve that was kept and

15    we saw some documents with respect to a reserve that was kept

16    in the HCRA pots of funds.  Do you remember testifying about

17    that?

18    A.  Yes.

19    Q.  Did the Speaker also keep a reserve available in the

20    Community Projects Fund pot of money?

21    A.  Yes.

22    Q.  So, essentially there was really three categories of funds;

23    one was the member allocations or the items allocated to

24    members, the second was this filling gaps in programs and then

25    there was a third pot that was a reserve or third piece that

FB55si16                         Franco - direct

 1    was a reserve?

 2    A.  Yes.  Yes.

 3    Q.  Now, how were the allegations that Sheldon Silver awarded

 4    to it, each member, communicated to the members?

 5    A.  Through a letter from the Speaker to the respective member.

 6    Q.  Mr. Coccaro, if you wouldn't mind pulling up, and

 7    Mr. Franco if you wouldn't mind turning in your binder to

 8    what's previously been admitted as Government Exhibit 113?  Do

 9    you recognize that document?

10    A.  Yes.

11    Q.  What is that document?

12    A.  It's an example of an allotment letter from the Speaker to

13    a member.

14    Q.  Is that an allotment out of the Community Projects Fund pot

15    of money that you are talking about?

16    A.  Yes.

17    Q.  And which particular member does it relate to?

18    A.  Assemblywoman Paulin.

19    Q.  What's the date of that letter?

20    A.  February 9, 2004.

21    Q.  And what is the amount of the allocation to Amy Paulin in

22    that letter?

23    A.  $60,000.

24    Q.  And for what fiscal year?

25    A.  Fiscal year 2004-05.

1   Q.  Again, when does the fiscal year run from?

2   A.  April 1st of that respective year to March 31st of the

3   following year.

4   Q.  Now, were similar letters sent to each member of the

5   Assembly from the Speaker?

6   A.  Typically, yes.

7   Q.  And again, I should note for the record, who is the letter

8   written from?

9   A.  The Speaker.

10  Q.  Now what, if any, disclosure to the public did Sheldon

11  Silver make concerning the allocations that he had decided to

12  award to each of the members of the Assembly?

13  A.  What allocations?

14  Q.  Yes.

15  A.  I'm sorry.  Can you say that again?

16  Q.  Yes.

17          So what, if any, disclosure to the public was there

18  about the allocation decisions that he had made?

19  A.  None.

20  Q.  And what, if any --

21          THE COURT:  I'm sorry.

22          Did he allocate money to both democrats and

23  republicans or just to democrats?

24          THE WITNESS:  To both.

25          THE COURT:  Okay.

FB55si16                        Franco - direct

1   BY MR. MASTER:

2   Q.  What percentage of the total allocation was given to the

3   republicans?

4   A.  Typically the resources made available to republicans were

5   far less than the democratic super majority.

6   Q.  We will get back into that in a moment.

7           So, what, if any, disclosures to members of the

8   Assembly did Sheldon Silver make about the total amount of

9   funds that he had allocated and the amount of funds he had

10  allocated to each member?

11  A.  He only informed the respective member of their respective

12  allotment.

13  Q.  And who was the chair of Ways and Means Committee during

14  the tenure of Sheldon Silver as Speaker?

15  A.  Herman Denny Farrell, Jr.

16  Q.  What, if any, access did Denny Farrell, as chair of the

17  Ways and Means Committee, have to the information about which

18  allocation decisions Sheldon Silver had made to each of the

19  members?

20  A.  None, that I'm aware of.

21  Q.  In addition to maintaining records of allotment records to

22  members each year, did the Ways and Means Committee maintain a

23  spreadsheet reflecting the Speaker's allotment decisions over

24  time?

25  A.  Yes, the Committee maintained a spreadsheet.

Franco - direct

 1   Q.   I would like you to take a look at what's been marked for

 2   identification as Government Exhibit 218.  Do you recognize

 3   that document?

 4   A.   Yes.

 5   Q.   Is that a document that was prepared and maintained by the

 6   Ways and Means Committee in the course of its regularly

 7   conducted activities?

 8   A.   Yes.

 9   Q.   And so, what is Government Exhibit 218?

10   A.   It's an allotment list.

11   Q.   Is that the record that you were describing that the Ways

12   and Means Committee maintained of the Speaker's allotment

13   decisions over time?

14   A.   Yes.

15             MR. MASTER:  Government offers Government Exhibit 218.

16             MR. SHUR:  No objection.

17             THE COURT:  Received.

18             (Government's Exhibit 218 received in evidence)

19   BY MR. MASTER:

20   Q.   Mr. Coccaro, I think we are going to need to go from the

21   top and just if you can, wouldn't mind zooming in on the first

22   few lines of the detailed spreadsheet.  Let's zoom in further.

23             So, if you wouldn't mind walking the jury through this

24   spreadsheet?

25   A.   Okay.

1    Q.   What is the first column in the spreadsheet?

2    A.   The first column is the class or the year that the member

3    became an Assembly member.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. MASTER:

2   Q.  And then the next Columbia.  It's under the title "Current

3   Members."  It's the last name of the member.

4          And then the next Columbia states "SFY 2002 initial

5   ALLOC."

6          What does that mean?

7   A.  That was there initial allocation during that respective

8   fiscal year.

9   Q.  Again, who made all those allocation decisions?

10  A.  The final decision-maker was the speaker.

11  Q.  And then what --

12          MR. MASTER:  If you wouldn't mind just scrolling

13  through the subsequent columns, Mr. Coccaro.

14  BY MR. MASTER:

15  Q.  What do the subsequent columns reflect?

16  A.  Subsequent years.

17  Q.  Again, go to I guess the fifth row down.

18          Is there a row associated with Assembly Member Silver?

19  A.  Yes.

20  Q.  That's the defendant?

21  A.  Yes.

22  Q.  Now, are there any numbers on the row associated with

23  Sheldon Silver in this spreadsheet?

24  A.  Yes.

25  Q.  How did the Ways and Means staff determine what number to

 1   place in the row associated with the defendant?

 2   A.   We were directed by our principals.

 3   Q.   To fill in the information based on what?  What

 4   information?

 5   A.   The decisions made by the speaker's office.

 6   Q.   To do what?

 7   A.   To fund any amount of local initiatives and community

 8   organizations for local initiative grants.

 9   Q.   So, as far as you were able to determine -- withdrawn.

10            So is it fair to say that the items on the row

11   associated with Sheldon Silver were not based on any amount

12   that was allocated but on the actual amounts that the speaker

13   decided to spend on member items of his choosing?

14   A.   Correct.

15   Q.   As far as you could tell, did Sheldon Silver place any

16   specific limits on his own allocations?

17   A.   None that I'm aware of.

18   Q.   This allocation table -- it extends -- it starts in SFY

19   2002 to '03.

20            Does it extend beyond 2005/2006?

21   A.   Yes.

22   Q.   It goes into 2007 and 2008?

23   A.   Yes.

24   Q.   And so, for each of those years, was the Ways and Means

25   Committee staff actually putting in the row associated with

1    Sheldon Silver the amounts that Sheldon Silver had decided to

2    allocate to member items of his choosing?

3    A.  Yes.

4    Q.  So, for example, in state fiscal year 2007/2008, which

5    began in what?  April 1, 2007?

6    A.  Correct.

7    Q.  How much did Sheldon Silver actually spend in Community

8    Projects Funds on projects of his choosing?

9    A.  The commitments totaled approximately $2.5 million.

10   Q.  Just to read into the record, is it $2,560,500?

11   A.  Correct.

12   Q.  Again, just look down that Columbia.  What is the highest

13   allocation that Sheldon Silver gave to any other member of the

14   assembly that year?

15   A.  There was a body at 235.

16   Q.  So, in other words, Sheldon Silver actually spent on his

17   own member items more than ten times the amount that he had

18   allocated to any other member.

19   A.  Correct.

20   Q.  Again, what period was covered by the periods SFY '07/'08?

21   A.  Yes.

22   Q.  That April is period 2007 to March 31, 2008?

23   A.  Yes.

24   Q.  Again, for the next fiscal year, which was April 1, 2008,

25   to March 31, 2009, did the speaker spend a substantial amount

1   on his own member items during SFY '08/'09?

2   A.  His commitments totaled $2,747,000.

3   Q.  Again, what, if any, prohibition was there on Sheldon

4   Silver spending that money on health care-related purposes?

5   A.  None.

6   Q.  What if a member wanted to spend more on member items than

7   the allocation that Sheldon Silver had made to that member?

8   Who would need to approve the expenditure of that additional

9   allocation?

10  A.  The speaker would.

11  Q.  How would members request additional funding from the

12  Community Projects Fund beyond the funds that Sheldon Silver

13  had decided to allocate to them?

14  A.  They would write a letter.

15  Q.  Were those the types of budget letters that were reflected

16  in Government Exhibit 111?

17  A.  Yes.

18  Q.  Could members of the public submit budget letters as well?

19  A.  Yes.

20  Q.  To whom are all of those budget members addressed?

21  A.  To the speaker.

22  Q.  You stated that the assembly received -- actually, what was

23  the volume, approximately, of budget request letters?

24  A.  In the hundreds.

25  Q.  In preparation for your testimony here today, were you able

 1  to review certain records maintained by the Ways and Means

 2  Committee logging those budget request letters as they came in?

 3  A.  Yes.

 4  Q.  I'd like you to take a look at what's been marked for

 5  identification as Government Exhibits 211, 212, and 213.

 6         Do you recognize Government Exhibits 211, 212, and

 7  213?

 8  A.  Yes.

 9  Q.  Are those logs of budget request letters as they came in?

10  A.  From the committee, yes.

11         MR. MASTER:  The government offers Government Exhibits

12  211, 212, and 213.

13         THE COURT:  Any objection?

14         MR. SHUR:  No objection.

15         THE COURT:  211, 212, and 213 are received.

16         (Government's Exhibit 211, 212, and 213 received in

17  evidence)

18  BY MR. MASTER:

19  Q.  Just turning first to Government Exhibit 211, approximately

20  how many budget request letters came in from members of the

21  assembly that year?

22  A.  Approximately 780.

23  Q.  Is there another list there in Government Exhibit 211

24  concerning budget request letters from chairs, committee

25  chairs, and delegations?

```
 1   A.   Yes.

 2   Q.   Do committee chairs typically submit their own budget

 3   request letters on behalf of the committees?

 4   A.   Yes.

 5   Q.   What is a delegation?

 6   A.   A delegation is geographical organization members.

 7   Q.   How many budget request letters came in that year from

 8   chairs and delegations?

 9   A.   Approximately 120.

10   Q.   And then is there another list, including budget request

11   letters, from members of the public and others?

12   A.   Yes.

13   Q.   Approximately how many budget request letters came in from

14   members of the public during that particular year?

15   A.   Approximately 200.

16   Q.   So if fair to say that there were over 1,000 budget request

17   letters that were received by the Ways and Means committee in

18   fiscal year 2007?

19   A.   A thousand?

20   Q.   780 plus.

21   A.   Yes.  That's a fair assumption.

22   Q.   Did the volume of budget request letters stay relatively

23   consistent over time?

24   A.   It all depended on the state of the economy.  In worse

25   financial times when the governor made cuts to various programs
```

1   that the majority cared about, members were more vocal in

2   trying to protect those programs and services.

3   Q.  Is it fair to say that there was never a year in which

4   there were not many hundreds of budget request letters?

5   A.  Correct.

6   Q.  And both predating SFY '07 and postdating SFY '07.

7   A.  Correct.

8   Q.  Again, who made the ultimate decision about -- other than

9   funds that were contained in member item allocations, who made

10  the ultimate decision as to which of these budget request

11  letters, both from members, chairs and delegations, and members

12  of the public, would be funded and which would not?

13  A.  Well, the main purpose of these letters was to amend the

14  executive budget, and that is a three-way process where that

15  gets negotiated out.

16          But, if you're deferring to a discretionary source of

17  funds, then the ultimate decision-maker was the speaker.

18  Q.  And, again, were HCRA funds among the discretionary funds

19  that you're talking about?

20  A.  Yes.

21  Q.  And were Community Project Funds among the discretionary

22  funds that you're talking about?

23  A.  Yes.

24  Q.  So did the volume of requests -- is it fair to say? -- far

25  exceed the amount of funds that Sheldon Silver had set aside

FB5XSIL5                      Franco - Direct

1    for these discretionary requests?

2    A.  Yes.

3    Q.  Did the Ways and Means Committee maintain a list of the

4    speaker's own member items?

5    A.  Yes.

6    Q.  I'd like you to take a look at what's been marked for

7    identification as Government Exhibit 216.

8             Do you recognize that document?

9    A.  Yes.

10   Q.  What is that document?

11   A.  This document is a list of local initiatives, as well as

12   problematic grants that the speaker had sponsored.

13   Q.  Is this maintained by the Ways and Means Committee in the

14   course of its regularly conducted activities?

15   A.  Yes.

16            MR. MASTER:  The government offers Government

17   Exhibit 216.

18            MR. SHUR:  No objection.

19            THE COURT:  216 is received.

20            (Government's Exhibit 216 received in evidence)

21   BY MR. MASTER:

22   Q.  Is this the list where you tracked those allocations that

23   you've just been describing?

24   A.  Yes.

25   Q.  Again, what's the purpose of this particular list?

FB5XSIL5                         Franco - Direct

```
 1  A.  To track commitments made by the speaker.

 2  Q.  Now, how did you use this list to keep track of the

 3  speaker's allocation decisions?

 4  A.  The grantee would be listed, and then whatever funding

 5  decision was made would be put in that respective column.

 6  Q.  Why did you keep track of these allocations using a

 7  spreadsheet?

 8  A.  To make sure that, you know, annual grants kept reoccurring

 9  and to make sure that nothing fell through the cracks.

10  Q.  Now, I'd like you to turn to page 2 of the exhibit.  Take a

11  look at lines 48 and 49.

12          Do you see an organization called Ohel, Children's

13  Home and Family Services, listed there?

14  A.  Yes.

15  Q.  Is Ohel an entity that received funding from Sheldon

16  Silver?

17  A.  Yes.

18  Q.  On one occasion or on more than one occasion?

19  A.  More than one occasion.

20  Q.  Did Ohel receive member items from Sheldon Silver?

21  A.  They received money from the community projects fund, yes.

22  Q.  Which, again, is colloquially known sometimes as member

23  items?

24  A.  For certain purposes, yes.

25  Q.  In addition to receiving member items from Sheldon Silver,
```

 1   did Ohel receive any of what is known as capital funding from

 2   Sheldon Silver?

 3   A.   Yes.

 4   Q.   And what is capital funding?  If you could just provide a

 5   brief overview for the members of the jury.

 6   A.   Capital funding is another source of discretionary funding

 7   where the actual cash dollar comes from bonded proceeds from

 8   the State of New York where the life span of the actual public

 9   benefit has to have a life span of seven years or more

10   typically used for construction purposes.

11   Q.   So it's essentially for a longer-term asset?

12   A.   Yes.

13   Q.   You stated they were bonded funds, meaning that the state

14   actually issues debt bonds, that is, a type of debt to pay for

15   these capital items.

16   A.   Correct.

17   Q.   For what purposes do you know that Sheldon Silver provided

18   capital funding to Ohel?

19   A.   To construct a summer camp.

20   Q.   Did there come a time when you were asked to arrange for

21   $2,000,000 in capital funding to be given to Ohel for purposes

22   related to that summer camp?

23   A.   I was directed by my principals to initiate a grant for

24   $2,000,000 for a summer camp.

25   Q.   Who was the sponsor for that $2,000,000 grant?

1   A.  The speaker.

2   Q.  How long did it take for that capital funding grant to be

3   awarded?

4   A.  I don't know the exact amount of time, but typically it can

5   take several months for a commitment to materialize and an

6   award letter -- an initiative to be sent out and an award

7   letter to be sent to the grantee.

8   Q.  All those HCRA grants that were talked about earlier --

9   through what state agency were those grants awarded?

10  A.  Department of Health.

11  Q.  Was the capital funding, the $2,000,000 that you just

12  talked about -- was that awarded through the Department of

13  Health or through another state agency?

14  A.  Through another state authority.

15  Q.  What was the name of the state authority that that was

16  awarded through?

17  A.  The Empire State Development Corporation.

18  Q.  When you say "authority," is that a type of corporation or

19  state-sponsored entity?

20  A.  Yes.  Agencies technically are a part of the state.

21  Authorities technically are not.

22  Q.  Do they ultimately have all their leadership appointed by

23  state leaders?

24  A.  Yes.

25  Q.  Do they have certain aspects that are the same as the

FB5XSIL5                    Franco - Direct

1    state?

2    A.  Yes.

3    Q.  Again, are these state-bonded funds that were provided to

4    Ohel?  The $2,000,000 grant.

5    A.  The capital funds, yes.

6    Q.  Now, I'd like you to take a look at what's been marked for

7    identification in your binder as Government Exhibit 167-1.

8            Do you recognize that document?

9    A.  Yes.

10   Q.  What is that document?

11   A.  That document is a letter from Empire State Development

12   Corporation to myself.

13   Q.  Concerning what?

14   A.  Concerning a $2,000,000 grant to Ohel for summer camp

15   improvements.

16           MR. MASTER:  The government offers Government Exhibit

17   167-1.

18           MR. SHUR:  No objection.

19           THE COURT:  167-1 is received.

20           (Government's Exhibit 167-1 received in evidence)

21           MR. MASTER:  If you wouldn't mind zooming in,

22   Mr. Coccaro, on the top part of the letter.

23   BY MR. MASTER:

24   Q.  What is the date of that letter?

25   A.  March 1, 2012.

1    Q.  Again, it states, "Dear Mr. Franco --" it says, "Victor, as

2    requested by the assembly Ways and Means Committee, the Empire

3    State Development Cooperation, (ESD), has completed its initial

4    review of the following preliminary grant application for the

5    Community Enhancement Facilities Assistance Program (CEFAP)."

6    And then there's a description there.  "Ohel, Children's Home

7    and Family Services, Inc.  Summer camp improvements.

8    $2,000,000."

9           Just to decipher a technical term for the jury, what

10   is CEFAP?

11   A.  It's one of the capital programs that's authorized to the

12   budget.

13   Q.  Again, with respect to that capital program, who was the

14   ultimate decision-maker as to any allocation or expenditure of

15   the assembly's allotment under CEFAP?

16   A.  The speaker was the final decision-making authority.

17   Q.  And here, in this particular case, the speaker -- that is,

18   Sheldon Silver -- had decided himself to award $2,000,000 in

19   CEFAP funds to Ohel; is that correct?

20   A.  As far as I'm aware, yes.

21   Q.  Now, again, the date of that letter is March 1, 2012.  I'd

22   like you to take a look at Government Exhibit 161.  It's in

23   your binder.

24           Do you recognize that document?

25   A.  Yes.

1   Q.  What is it?

2   A.  These are handwritten notes.

3   Q.  Who took those handwritten notes?

4   A.  Me.

5   Q.  Are these notes that you use to keep track, in part, of the

6   Ohel $2,000,000 capital request?

7   A.  Yes.  These are notes that I take in my normal course of

8   business.

9           MR. MASTER:  The government offers Government Exhibit

10  161.

11          MR. SHUR:  No objection.

12          THE COURT:  161 is received.

13          (Government's Exhibit 161 received in evidence)

14          MR. MASTER:  If you wouldn't mind publishing.

15          The date on top is 10-19- 11.  If you wouldn't mind

16  just, the top half of that where there's a little arrow, and it

17  says, "Per SS."

18          If you wouldn't mind zooming in on that, Mr. Coccaro.

19  BY MR. MASTER:

20  Q.  Mr. Franco, it says, "Per SS 2M for Ohel summer camp."

21          Again, what were the purposes of that summer camp?  Or

22  the purposes of the funds.

23  A.  The purposes of the summer camp was for disabled youth, and

24  the purposes of the funds were to construct that summer camp.

25  Q.  Do you know if that was the first allocation of capital

1   items to this summer camp by Sheldon Silver, or were there

2   prior allocations?

3   A.  There was a prior commitment.

4          MR. MASTER:  If you wouldn't mind just going to the

5   third page of that document, Mr. Coccaro.  The very top.

6   BY MR. MASTER:

7   Q.  Did you take a note -- actually, back to the first page,

8   just to make sure that the shorthand is clear.  When you write,

9   "Per SS," who does "SS" stand for?

10  A.  The initials of the defendant.

11  Q.  Now, if you wouldn't mind just going to the third page of

12  that document.

13         Did you take notes of a message that you received

14  concerning from someone associated with Ohel that day?

15  A.  Yes.

16  Q.  What is the date?

17  A.  March 2, 2012.

18  Q.  Who was the message from?

19  A.  David Mandel.

20  Q.  What was the message?

21  A.  "Thanks."

22  Q.  How does the date of that note compare to the date of

23  167-1?

24  A.  This note came after.

25  Q.  The day after; correct?

```
 1   A.  Correct.

 2   Q.  I'd like you to take a look at what's been marked for

 3   identification as Government Exhibit 172.

 4        Do you recognize that document?

 5   A.  Yes.

 6   Q.  What is that document?

 7   A.  It's an email from my direct report to me.

 8   Q.  Is Ohel one of the subject matters addressed in that email?

 9   A.  Yes.

10   Q.  Was that an email just informing you of matters that occur

11   in the course of your regularly conducted activities?

12   A.  Yes.

13        MR. MASTER:  The government offers Government Exhibit

14   172.

15        MR. SHUR:  No objection.

16        THE COURT:  172 is received.

17        (Government's Exhibit 172 received in evidence)

18   BY MR. MASTER:

19   Q.  Again, what's the date of that email?

20   A.  Monday, December 10, 2012.

21   Q.  If you wouldn't mind just looking at the second bullet

22   there.

23        What does it say concerning Ohel?

24   A.  "Ohel received their funds from ESDC.  So no additional

25   followup required."
```

1   Q.  Again, who was Blake Washington?

2   A.  He was my direct report at the time, the budget director.

3   Q.  So, again, between March 1 of 2012 and December 10 of 2012,

4   Ohel had received the $2,000,000 that was reflected in that

5   letter?

6   A.  Correct.

7   Q.  What, if any, knowledge did you have at that time about

8   Sheldon Silver's efforts to get a job for Dr. Robert Taub's son

9   with Ohel at the same time you were enabling Ohel to get that

10  $2,000,000 in state funding?

11  A.  None.

12  Q.  And what, if any, knowledge did you have of any efforts

13  that Sheldon Silver made to get Dr. Taub's son a job at Ohel at

14  any time?

15  A.  None.

16  Q.  Now, returning to Government Exhibit 216.

17          MR. MASTER:  If you wouldn't mind, Mr. Coccaro,

18  turning to page 2, line 53.

19  BY MR. MASTER:

20  Q.  Do you see an entity there describing Shalom Task Force?

21  A.  Yes.

22  Q.  Did Shalom Task Force receive certain Community Project

23  Funds or member items from Sheldon Silver?

24  A.  Yes.

25  Q.  I'd like to direct your attention to Government Exhibit

1    132.

2              Do you recognize that document?

3    A.   Yes.

4    Q.   What is that document?

5    A.   This is a document used to communicate budget decisions to

6    various members or entities.

7    Q.   Is this a document that you prepared or you played a role

8    in preparing?

9    A.   Yes.

10             MR. MASTER:  The government offers Government Exhibit

11   132.

12             MR. SHUR:  No objection.

13             THE COURT:  132 is received.

14             (Government's Exhibit 132 received in evidence)

15   BY MR. MASTER:

16   Q.   It's called JR's post budget call list.  April 10, 2008.

17             Who do the initials JR stand for?

18   A.   Judy Rapfogel.

19   Q.   What role did Judy Rapfogel play in post budget calls?

20   A.   She was the speaker's chief of staff.

21   Q.   What role did she play in calling members to inform them of

22   decisions being made in budget negotiations or by the speaker?

23   A.   She would help with the communication efforts of the

24   assembly.

25   Q.   If you wouldn't mind turning to page 5 of this document.

1    Do you see any reference to funds that Sheldon Silver

2    had agreed to provide to Shalom Task Force in 2008?

3    A.  Yes.

4    Q.  What's the amount that Sheldon Silver had agreed to provide

5    to Shalom Task Force?

6    A.  $25,000.

7    Q.  Again, what, if any, knowledge did you have at the time --

8    it states that "SS provided in budget as match."

9        Can you just explain what "match" means.

10   A.  Typically members would request various items of funding.

11   You know, just like any other budgetary item, in this instance

12   Former Assembly Woman Feffer requested funding for Shalom Task

13   Force along with a couple other members, and the match was they

14   provided funding from their allotments, and funds would be

15   available to kind of add on to that commitment.

16   Q.  Where did those additional funds come from?

17   A.  The Community Projects Fund.

18   Q.  Who decided to allocate those additional funds?

19   A.  The speaker was the ultimate decision-maker.

20   Q.  In fact, did the speaker himself decide here to allocate

21   those additional funds?

22   A.  Yes.  That is what was conveyed to me.

23   Q.  Again, what, if any, knowledge did you have at the time

24   that this information was conveyed to you about any connection

25   between Dr. Robert Taub and Shalom Task Force?

1   A.   None.

2   Q.   Now, if you wouldn't mind putting that aside.

3          Mr. Franco, we've been talking to this point about

4   disclosure rules that apply to the Community Projects Fund when

5   you arrived in 2005.

6          Prior to late 2006, were items committed by members

7   using those allotments from the Community Projects Fund subject

8   to any public disclosure?

9   A.   No.

10  Q.   What, if anything, changed in late 2006?

11  A.   The legislature, both the assembly and the senate, were

12  sued by the Times Union.

13          THE COURT:  By who?

14          THE WITNESS:  The Albany Times Union.  It's a

15  newspaper upstate.

16  BY MR. MASTER:

17  Q.   What did the Albany Times Union --

18          MR. SHUR:  Objection.  Judge, can we approach on this

19  issue?

20          THE COURT:  No.  Overruled.

21  BY MR. MASTER:

22  Q.   What was the result of --

23          THE COURT:  What was the lawsuit about?

24          THE WITNESS:  The lawsuit was suing the legislature to

25  get the names affiliated with items from the Community Projects

1    Fund.

2    BY MR. MASTER:

3    Q.   What ended up happening with the lawsuit?

4    A.   The legislature lost that lawsuit.

5    Q.   So, as a result of that result, what began happening with

6    the Community Projects Fund in late 2006?

7    A.   We, along with the senate, posted publicly all the items

8    from the Community Projects Fund and matched that against the

9    sponsoring member.

10   Q.   So you began to identify the -- as of late 2006, you began

11   to identify publicly the items that were granted from the

12   Community Projects Fund?

13   A.   Yes.

14   Q.   As well as the members who sponsored those particular

15   items?

16   A.   Correct.

17   Q.   Where was that information posted?

18   A.   On the respective house's website.

19   Q.   And would your staff be involved actually in that posting

20   process?

21   A.   Yes.

22   Q.   Has the posting process continued since that date?

23   A.   Yes.

24   Q.   So, returning to Government Exhibit 216, are there certain

25   items on this list that relate to funding for health

1    care-related purposes?

2    A.   Yes.  Any item that was assigned to an agency where it was

3    designated as DOH, which stands for the Department of Health,

4    which can be found in column C.

5    Q.   And so, on this spreadsheet, there are certain items that

6    the speaker decided to fund out of the Community Projects Fund

7    that relate to health care?

8    A.   Yes.

9    Q.   So, if you wouldn't mind taking a look at Government

10   Exhibit 216, line I think it's 23-related to something called

11   Gouvehneur.

12            MR. MASTER:  If you wouldn't mind zooming in on that,

13   Mr. Coccaro.

14   BY MR. MASTER:

15   Q.   It states that the source -- the funding source is 007.

16            What is 007 short for in the parlance of the Ways and

17   Means Committee?

18   A.   Yes.  That's the fund code.

19   Q.   For what?

20   A.   The Community Projects Fund.

21   Q.   So, in other words, you sometimes use a term 007 to refer

22   to the Community Projects Fund?

23   A.   Yes.  That code is not only with the statewide financial

24   system but also in the budget language as well.  It's just a

25   technical code that's assigned to that fund.

1    Q.  It states here that there was a particular allocation that

2    the speaker had made to an entity called Gouvehneur Nursing

3    Facility/Diagnostic and Treatment Center.  Then in parentheses

4    it states, "formerly HCRA and CAP sources."

5         Do you see that?

6    A.  Yes.

7    Q.  What does that statement in the parentheses mean?

8    A.  Because the spreadsheet was only so big, it was identified

9    through this parentheses that this item was funded through

10   other funding streams at different points in time.

11   Q.  Had Gouvehneur in the past been funded through the HCRA

12   lump sum that we've talked about?

13   A.  Yes.

14   Q.  And, as of the date of this spreadsheet, were HCRA funds

15   still available?

16   A.  Of this spreadsheet, no.

17   Q.  But, again, were Community Projects Funds still available?

18   A.  Yes.

19   Q.  So, in this particular instance, there was an allocation

20   reflected in 2013 of $30,000 by the speaker.

21        Do you see that?

22   A.  Yes.

23        MR. MASTER:  If you wouldn't mind going to page 2,

24   line 47, Mr. Coccaro.

25   BY MR. MASTER:

FB5XSIL5                     Franco - Direct

1   Q.   Is there another health care related allocation from the

2   Community Projects Fund reflected there?

3   A.   Yes.

4   Q.   To what entity is that?

5   A.   NYU Downtown Hospital.

6   Q.   Again, does that also reflect that in the past NYU Downtown

7   Hospital had received funding through HCRA?

8   A.   Yes.

9   Q.   But, in this particular case, for the year -- I think it's

10  2012 -- it received funding from the Community Projects Fund;

11  is that correct?

12  A.   Yes.

13  Q.   How much money did it receive?

14  A.   $25,000 from the Community Projects Fund.

15  Q.   Again, could Community Projects Fund money be used as

16  health care purposes just as HCRA funds could have been?

17  A.   Yes.

18  Q.   Pursuant to the result of that Times Union litigation,

19  what, if any, public posting was there of commitments to NYU

20  Downtown and Gouvehneur?

21  A.   We posted publicly on our website the initiative forms for

22  these items, which also included the sponsor of the grants.

23  Q.   Please take a look in your government exhibit binder at

24  Government Exhibits 121 and 122.

25           Do you recognize these documents?

1   A.   Yes.

2   Q.   What are they?

3   A.   These are the documents that we posted publicly on the

4   website.

5   Q.   Concerning what grants?

6   A.   The Gouvehneur grant for 121, and for 122 the NYU Downtown

7   Hospital.

8           MR. MASTER:  The government offers Government Exhibits

9   121 and 122.

10          MR. SHUR:  No objection.

11          THE COURT:  121 and 122 are received.

12          (Government's Exhibit 121 and 122 received in

13   evidence)

14  BY MR. MASTER:

15  Q.   Now, again, where are these made available to the public?

16  A.   On our website.

17  Q.   Just first looking at Government Exhibit 121, that's

18  related to the Gouvehneur grant that was reflected in the

19  speaker's list of member items we were just talking about?

20  A.   Yes.

21  Q.   Again, it is a legislative initiative form.  It's the same

22  type of legislative initiative form that you've described

23  earlier?

24  A.   Yes.

25  Q.   Here there's a new different entry than the ones that you

1   were talking about earlier concerning HCRA.

2          Do you see an entry stated "Requested by"?

3   A.  Yes.

4   Q.  Who is this particular member item or community projects

5   fund allocation requested by?

6   A.  The defendant.

7   Q.  Was the public thus able to see that the defendant had been

8   the requestor of this particular item from the Community

9   Projects Fund?

10  A.  Yes.

11  Q.  Again, was the public able to see that the defendant was

12  the requestor of the two grants to Dr. Taub from the HCRA pool

13  in 2005 and 2006?

14  A.  No.  There were no posting requirements at that time.

15          MR. MASTER:  Your Honor, this would be a fine time to

16  break.

17          THE COURT:  All right, ladies and gentlemen.  We're

18  going to stop for the day as well as for the week.  Remember

19  that we're not sitting tomorrow.  So you can go back to work.

20          If anybody asks you what you're doing, you can say

21  you're sitting on a criminal jury and you'll be here four to

22  six weeks.

23          I anticipate that maybe some people in your workplace

24  may talk about the case.  They may have read about the case.

25  You need to walk away.  If you can tell them, because of who

1   they are and who you are, "Don't talk about that in front of

2   me," do that.  If not, walk away from it.

3          Don't read about the case.  Don't listen to the case.

4   Don't talk to anybody about the case.  I need you back here

5   9:15 Monday morning.

6          Just a reminder.  Next week we're going to sit Monday

7   and Tuesday.  You'll be off on Wednesday, and you'll be back on

8   Thursday and Friday.  I'll remind you of all this next week as

9   well.

10          Have a wonderful weekend.  Don't talk about the case,

11   and I'll see you all Monday.

12          (Jury not present)

13          THE COURT:  So you need to work out this issue on the

14   pulling the file.  Let me just remind you of a couple of items.

15          Government Exhibit 595-1 the defense is going to

16   decide whether you want the complete document put in or not.

17   Let me know Monday morning.

18          Defense Exhibit 64 is this email from Taub to

19   Hesdorffer, November 21, 2008.  The version that the defense

20   marked does not look like a regular email.

21          It's got a lot of the meta data in kind of weird ways.

22   So, if we can get one that looks like a regular email and

23   substitute that for 64, I think that would be worthwhile.

24          Lastly, just the government did not move 525-9 into

25   evidence; correct?

 1              MR. GOLDSTEIN:  Correct, your Honor.

 2              THE COURT:  Okay.  That was all of the dribs and drabs

 3      that I had.

 4              Is there anything that the parties have that we need

 5      to talk about before you all go away?

 6              MS. COHEN:  Not from the government, your Honor.

 7              MR. MOLO:  Nothing, your Honor.

 8              THE COURT:  Okay.  Terrific.  Everybody have a nice

 9      weekend.  Monday morning.  9:15.

10              MS. COHEN:  Thank you, your Honor.

11              THE COURT:  Thank you.

12              (Adjourned to November 9, 2015, at 9:15 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:        ROBERT TAUB, resumed.     Page

Cross By Mr. Molo  . . . . . . . . . . . . . 483
Recross By Mr. Molo  . . . . . . . . . . . . 640
Redirect By Mr. Goldstein  . . . . . . . . . 645

VICTOR E. FRANCO

Direct By Mr. Master . . . . . . . . . . . . 648

GOVERNMENT EXHIBITS

Exhibit No.                                Received

366, 367-2, 367-3, and 368-3   . . . . . . . 482

595-1   . . . . . . . . . . . . . . . . . . 630

115   . . . . . . . . . . . . . . . . . . . 661

283   . . . . . . . . . . . . . . . . . . . 666

284   . . . . . . . . . . . . . . . . . . . 674

117   . . . . . . . . . . . . . . . . . . . 675

111   . . . . . . . . . . . . . . . . . . . 680

203   . . . . . . . . . . . . . . . . . . . 682

218   . . . . . . . . . . . . . . . . . . . 708

211, 212, and 213   . . . . . . . . . . . . 714

216   . . . . . . . . . . . . . . . . . . . 717

167-1   . . . . . . . . . . . . . . . . . . 721

161   . . . . . . . . . . . . . . . . . . . 723

172   . . . . . . . . . . . . . . . . . . . 725

132   . . . . . . . . . . . . . . . . . . . 727

121 and 122   . . . . . . . . . . . . . . . 734

                      DEFENDANT EXHIBITS

Exhibit No.                                Received

20   . . . . . . . . . . . . . . . . . . . 492

6-A  . . . . . . . . . . . . . . . . . . . 502

7-A  . . . . . . . . . . . . . . . . . . . 509

9    . . . . . . . . . . . . . . . . . . . 511

10   . . . . . . . . . . . . . . . . . . . 514

11   . . . . . . . . . . . . . . . . . . . 520

12   . . . . . . . . . . . . . . . . . . . 524

14A  . . . . . . . . . . . . . . . . . . . 531

17   . . . . . . . . . . . . . . . . . . . 534

23   . . . . . . . . . . . . . . . . . . . 582

25   . . . . . . . . . . . . . . . . . . . 592

27   . . . . . . . . . . . . . . . . . . . 597

64   . . . . . . . . . . . . . . . . . . . 641