FB95sil1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                New York, N.Y.

4                   v.                       15 Cr. 0093(VEC)

5   SHELDON SILVER,

6                   Defendant.

7   ------------------------------x

8                                            November 9, 2015
                                             9:25 a.m.
9

10  Before:

11                  HON. VALERIE E. CAPRONI,

12                                           District Judge
                                               and a Jury
13                          APPEARANCES

14  PREET BHARARA
         United States Attorney for the
15       Southern District of New York
    BY:  CARRIE H. COHEN,
16       ANDREW D. GOLDSTEIN,
         HOWARD S. MASTER,
17       JAMES M. McDONALD,
             Assistant United States Attorneys
18
    STROOCK & STROOCK & LAVAN LP
19       Attorneys for Defendant
    BY:  JOEL COHEN
20           - and -
    MOLOLAMKEN, LLP
21  BY:  STEVEN F. MOLO
         JUSTIN SHUR
22       JUSTIN ELLIS
         ROBERT KRY
23       TUONGVY LE

24

25

FB95sil1

1              (Trial resumed; jury not present)

2              THE COURT:  Okay.  I got a letter this morning from

3    the government.

4              MS. COHEN:  Yes, your Honor.  Good morning.

5              THE COURT:  Mr. Molo, do you want to be heard?

6              MR. MOLO:  Frankly, Judge, I'm just reading it.  I

7    just got it.  If there is something that you want us to respond

8    to we would be happy to put a letter in a little later today.

9    I'm sorry, I just -- they sent it --

10             THE COURT:  I'm sorry.  I thought you were all ready

11   to talk about it.  That's why I came up.

12             MR. MOLO:  They sent it this morning, I was on my way

13   here, I didn't have a chance to read it.  I just printed it

14   out.

15             THE COURT:  Go ahead and read it.

16             MR. MOLO:  Okay.

17             THE COURT:  I have to sign in anyway.

18             MR. MOLO:  I don't see any need for any instruction on

19   this point and in fact this is contrary to the arguments we

20   have heard from the government throughout the trial about the

21   importance of Dr. Taub's state of mind so this is a complete

22   180 degree turn from everything that they have said.  You have

23   correctly noted, Judge, that you were not inclined to give

24   instructions throughout the course of the case with respect to

25   individuals unless it was truly necessary.  I don't see how

FB95sil1

1    this is in any way necessary and, in fact, as they have it, I

2    think it would add to more juror confusion rather than relieve

3    juror confusion.

4              THE COURT:  Ms. Cohen?

5              MS. COHEN:  Your Honor, I don't see how charging the

6    jury that the defendant's criminal intent at issue would

7    confuse them in any way and I think the charge that we suggest

8    to the Court is necessary based on the defense counsel's

9    intentional questions that he intentionally asked in a way to

10   purposefully confuse the jury to make the jury think that

11   Dr. Taub had to have criminal intent in the same way that the

12   defendant does which is absolutely not the law.  He asked

13   question after question, he introduced the non-prosecution

14   agreement against our objection.  When Dr. Taub said that he

15   relied on his counsel to negotiate that language he continued

16   to ask questions with the intent to mislead the jury.  So, we

17   just want a very narrowly tailored instruction, your Honor, to

18   just remind the jury that that is what is at issue.  I don't

19   see how it confuses anything in any way.

20             THE COURT:  I think it is a correct statement of the

21   law but I don't think it is necessary.  I think if the defense

22   continues this tack with further witnesses I will give a charge

23   along those lines.

24             I don't think it is 180 degrees, Mr. Molo, but I

25   understand your point that there is a certain amount of tension

FB95sil1

1    but the reality is that Dr. Taub's state of mind can be

2    circumstantial evidence of Mr. Silver's state of mind but the

3    fact that he may not be, that Dr. Taub didn't intentionally

4    bribe doesn't mean that Silver didn't have the correct state of

5    mind to be guilty of extortion or mail fraud.  But, there is a

6    certain amount of tension there.  So, I'm not inclined to give

7    the charge at this time but if things change, I will consider

8    it.

9            Are you ready for me to bring out the jury?  We have

10   the entire jury here on time and early so I feel like I should

11   reward them.

12           MS. COHEN:  Yes, your Honor.  We will put Victor

13   Franco back on the witness stand.

14           THE COURT:  Okay.  How much longer is the direct going

15   to be?

16           MR. MASTER:  Probably another 20 minutes to half an

17   hour.

18           THE COURT:  How long is cross going to be?

19           MR. SHUR:  Probably a couple of hours.

20           THE COURT:  Really?

21           MR. SHUR:  Yes.

22           THE COURT:  Good morning, Mr. Franco.

23           THE WITNESS:  Good morning.

24           THE COURT:  How are you?

25           THE WITNESS:  Hanging in there.
             (Continued on next page)

FB95sil1                          Franco - direct

1                  (Jury present)

2                  THE COURT:  Good morning, everybody.

3                  THE JURY:  Good morning.

4                  THE COURT:  Thank you for getting here on time so we

5      are going to start.

6                  Mr. Master.

7                  MR. MASTER:  Thank you, your Honor.

8                  THE COURT:  Mr. Franco, you are still under oath.

9       VICTOR E. FRANCO, resumed.

10                 THE COURT:  All right, Mr. Master.

11                 MR. MASTER:  Thank you, your Honor.

12     DIRECT EXAMINATION

13     BY MR. MASTER:

14     Q.  Good morning, Mr. Franco.

15     A.  Good morning.

16     Q.  Before, when we concluded on Thursday, we were talking

17     about changes to disclosure rules that occurred after the Times

18     Union litigation.  Just to reorient the jury, prior to late

19     2006 were items that were committed or spent by members out of

20     the Community Projects Fund subject to public disclosure?

21     A.  No.

22     Q.  And so what effect did the Times Union litigation have on

23     public disclosure?

24     A.  It required both houses of legislature to post publicly the

25     sponsors of each grant that were supported by the Community

FB95sil1                         Franco - direct

1    Projects Fund.

2    Q.  And what information would be contained in that public

3    posting?

4    A.  Typically would be the name of the grantee, the mailing

5    address, the phone number, the contact person, the amount of

6    the grant, the purpose of the grant, the sponsoring member and

7    the administrating state agency as well as the year that the --

8    the fiscal year that the item was being supported out of.

9    Q.  So, Mr. Coccaro, could you please just pull up Government

10   Exhibit 216 again?

11          While Mr. Coccaro does that -- we will pull that up in

12   a moment but while we are dealing with the technical issues,

13   can you take a look in your binder at Government's Exhibits

14   216?

15   A.  I'm ready.

16   Q.  What is depicted in Government Exhibit 216 again?

17   A.  This is the list of items that were funded through the

18   Community Projects Fund or other sources that primarily

19   involved the Speaker.

20   Q.  And just looking at the top columns of Government Exhibit

21   216, which the jury will be seeing again momentarily, what time

22   periods are covered by that exhibit?  There is a number of

23   columns on top which, again, the jury will see shortly, but if

24   you could just explain to the members of the jury what time

25   periods are covered by that?

FB95sil1                          Franco - direct

1  A.  Primarily state fiscal year 2012-'13 going backwards to

2  2009-'10.

3  Q.  So it is basically from fiscal year 2009 through 2013 or

4  '12-'13?

5  A.  '12-'13.

6  Q.  And the fiscal year starts when?

7  A.  April 1st of the respective year to March 31st of the

8  following year.

9  Q.  So the fiscal year '12-'13 is April 1st, 2012 through March

10  31st, 2013?

11  A.  Correct.

12  Q.  And so, are all the periods that are covered in Government

13  Exhibit 216, do those post-date the Budget Reform Act?

14  A.  Do all of the items?

15  Q.  All of the years, right, '09 through -- I'm sorry, post --

16  withdrawn -- post Times Union litigation?

17  A.  Yes.

18  Q.  Again, who would decide which entities would be funded and

19  how much funding they would get on that list?

20  A.  On this list, primarily the Speaker was the ultimate

21  decision maker.

22  Q.  And Mr. Franco, have you ever attended meetings where the

23  Speaker would decide what items should be funded for his own

24  member items and which items should be funded out of other

25  discretionary pools?

FB95sil1                          Franco - direct

1   A.   Typically the meetings I attended were in the construct of

2   budget negotiations attended by various members of senior staff

3   and this was part of that conversation.

4   Q.   Now, on Thursday you were talking about grants to two

5   healthcare-related entities in 2012 and 2013.  Do you see there

6   was one to Gouverneur Hospital on page 1?

7   A.   Uh-huh.

8   Q.   And there was another to NYU Downtown on page 2?

9   A.   Yes.

10  Q.   Are those both healthcare-related items?

11  A.   Yes.

12  Q.   And, again, could member item money or Community Projects

13  Fund money be used for healthcare purposes?

14  A.   Yes.

15  Q.   And also on Friday or on Thursday you reviewed public

16  postings concerning those grants.  Do you recall that?

17  A.   Yes.

18  Q.   Now, I think we are still working on the technical issues

19  but do you recall when those items were posted publicly on the

20  Assembly's website?

21  A.   The items that we would consider 2012-'13 commitments were

22  posted publicly on the Assembly's website in January of 2013.

23  Q.   Now, even though --

24            THE COURT:  I'm sorry.

25            That's for the '12-'13 fiscal year?

FB95sil1                        Franco - direct

1              THE WITNESS:  Correct.

2              THE COURT:  So it gets posted towards the end of the

3     fiscal year?

4              THE WITNESS:  It all varies.  There is no direct

5     correlation between a fiscal year of when the commitment was

6     made to when we actually initiate the item because of various

7     either technical or political reasons.

8              THE COURT:  Okay.

9              MS. COHEN:  Your Honor, I'm sorry.  The system is

10    frozen, if we can maybe have a minute?

11             THE COURT:  Sure.

12             MS. COHEN:  Thank you, your Honor.

13             Your Honor, we are going to try to reboot it.

14             THE COURT:  When in doubt, turn it off and turn it

15    back on.

16             MS. COHEN:  I apologize.

17    BY MR. MASTER:

18    Q.  Now, while we do that let's just move on to another topic

19    so that we are not just sitting around waiting for a computer

20    to restart.

21             Mr. Franco, you talked about the change associated

22    with the Times Union litigation.  Are you familiar with

23    something called the Budget Reform Act?

24    A.  Yes.

25    Q.  What is the Budget Reform Act?

749

FB95sil1                          Franco - direct

1   A.   Budget Reform Act was a piece of legislation that was

2   three-way negotiated in order to bring different reforms to

3   different elements of the budget process.

4   Q.   Is that a piece of legislation that was sponsored by then

5   Governor Spitzer?

6   A.   I believe so.

7   Q.   What happened as a result of the Budget Reform Act with

8   respect to the availability of what we were talking about on

9   Thursday as lump sum appropriations?

10  A.   It removed the ability of the legislature to add any lump

11  sum appropriations prospectively but did not eliminate any lump

12  sum appropriations that were already in the budget as

13  re-appropriations.  Future items of spending from discretionary

14  sources would have to be lined out discretely identifying the

15  name of the grant recipient, sometimes the purpose and grant

16  amount.

17  Q.   So, let's break that down.  So, going forward -- first of

18  all, when was the Budget Reform Act of 2007?  When was the

19  Budget Reform Act?

20  A.   I think earlier in the year prior to the enactment of the

21  budget of that year.

22  Q.   Of which year?

23  A.   2007.

24  Q.   So, as a result of this Budget Reform Act, in future years,

25  if an Assembly member wanted to use new funds to fund a member

1    item, what information would have to be lined out or publicly

2    disclosed in the budget?

3    A.   Any new item of appropriation would have to be lined out in

4    the budget within the respective state agency, the name of the

5    grantee, sometimes the purpose, and the respective dollar

6    amount.

7    Q.   And would the sponsoring member also be listed?

8    A.   Not in the appropriation bill.

9    Q.   How about in the public posting associated with the future

10   appropriation?

11   A.   Both houses would be required to post publicly the sponsor

12   of each discretionary grant, yes.

13   Q.   And, again, the budget itself would contain, going forward

14   after the Budget Reform Act, details concerning the ultimate

15   recipient of the funds, correct?

16   A.   Correct.

17   Q.   Now, so we talked on Thursday about these, the lump sum or

18   the pots of money, the HCRA pot of money, the Community

19   Projects Fund pot of money.  What ability did the legislature

20   have going forward to create new pots of money where the

21   ultimate recipient of the money was not known to the public?

22   A.   The Budget Reform Act prohibited any lump sum

23   appropriations but there were still member items in the budget

24   because we conformed with the Act by lining them out

25   discretely.

FB95sil1                    Franco - direct

1    Q.  Now let me also ask you about a third change that occurred
2    in 2007.  Are you familiar with something called disclosure and
3    accountability forms?
4    A.  I'm familiar with it, yes.
5    Q.  And what are disclosure and accountability forms?
6    A.  It's a document that's required by the attorney general's
7    office given to grantees to basically identify their
8    legislative sponsor and to attest that there is no conflicts of
9    interest present.
10   Q.  What do you mean by conflicts of interest?
11   A.  That there is no unethical or, you know, bad, for lack of a
12   better term, relationships or connections between the two.
13   Q.  What do you mean by the two?
14   A.  Grantee and the sponsoring member.
15   Q.  Again, what is your understanding of when those started to
16   be required by the attorney general?
17   A.  Because that's not within my realm of responsibility I
18   didn't work on that directly but from what I can recall, around
19   2007.
20   Q.  Mr. Franco, what do you mean by sponsoring member?
21   A.  The member that nominated that particular grantee for
22   funding within that respective year.
23   Q.  And let me ask you about a fourth change that occurred at
24   approximately that time.  Starting in late 2006 and early 2007
25   what, if any additional scrutiny, did the Assembly Ways and

FB95sil1                    Franco - direct

1    Means Committee begin placing on discretionary funding?

2    A.  We did a rigorous review of our internal guidelines making

3    sure that the projects that the Assembly majority nominated

4    were in fact worthwhile public entities, that they were doing

5    public good, that there were no conflicts of interest, that we

6    would try to ramp up our vetting in order to catch any type of

7    criminalities or any conflicts of interest or any type of

8    ethical quandaries or dilemmas because the backbone of a lot of

9    these not-for-profits do good quality community work are the

10   source of funding.

11   Q.  Now, Mr. Coccaro, are we ready to go back?

12           MR. COCCARO:  Just one second.

13   Q.  So, while we do that, let me just ask you, at the very

14   beginning of your testimony you talked about two grants to

15   Dr. Robert Taub's Mesothelioma Center in 2005 and 2006.

16           Do you remember that?

17   A.  Yes.

18   Q.  Now, were there sufficient member item funds available in

19   2007 to have given an additional $250,000 to Dr. Taub's

20   Mesothelioma Center?

21   A.  There was sufficient re-appropriation authority, yes.

22   Q.  And again, after the Budget Reform Act was it possible

23   to -- would it have been possible to include a re-appropriation

24   in the 2007-2008 budget?

25   A.  Technically, yes.

FB95sil1                    Franco - direct

1   Q.  When you say technically, meaning that it was possible?

2   A.  Yes.  But sometimes, you know, with the economy or certain

3   political situations it might not have been possible, but I

4   wasn't privy to those conversations.

5   Q.  So, Mr. Franco, if you wouldn't mind turning to Government

6   Exhibit 218, that's the detail concerning member item

7   allocations.  Do you remember that?

8   A.  Yes.

9   Q.  We are back online.

10           Now, Mr. Coccaro, can you just zoom in on the line

11  associated with Sheldon Silver and in particular the rows, the

12  portions related to fiscal years 2006, '07-'08, FSY '08-'09,

13  sort of in the middle?  If you wouldn't mind including the

14  column headings?  Okay.

15           So, again, fair to say that Sheldon Silver's member

16  items were about 10 times the size of any other member's member

17  items?

18  A.  Yes.

19  Q.  And so in this it particular case Sheldon Silver actually

20  had allocated to his own member items $2,560,500 in SFY

21  '07-'08.  Is that correct?

22  A.  Yes.  That's what the commitments totaled.

23  Q.  And so, based on that document there was sufficient funds

24  within that to have funded a $250,000 subsequent allocation to

25  Dr. Taub, correct?

1    A.  Well, that -- if you look at it that way then would you

2    have had to take away funding from other entities like schools

3    and other not-for-profit organizations in order to, you know,

4    be within the 2.5.

5    Q.  Sure.  But Mr. Franco, again, what was the size of the

6    Assembly's share of the Community Projects Fund?

7    A.  $85 million.

8    Q.  And did the speaker in fact spend all of the $85 million

9    each year?

10   A.  No.

11   Q.  Now, Mr. Franco, SFY '08-'09, how much did Sheldon Silver

12   allocate to member items of his choosing?

13   A.  $2,747,000.

14   Q.  And SFY '09-'10, how much did Sheldon Silver allocate to

15   member items of his choosing?

16   A.  $2,540,500.

17   Q.  And again, was there any prohibition on using these funds

18   to fund healthcare-related items?

19   A.  No.

20   Q.  Now, if Sheldon Silver had wanted to post a new $250,000

21   member item to Dr. Taub after 2007 what, if any, public

22   disclosure would have been required?

23   A.  Using the Community Projects Fund we would have posted

24   publicly online as with other postings.

25   Q.  And had it been in the budget what would you have had to

FB95sil1                      Franco - direct

1    disclose?

2    A.   It depends.  If it was going to be a new item of

3    appropriation we would have had to identify the grant recipient

4    and the dollar amount but if we used our re-appropriations then

5    we would have still posted that publicly.

6    Q.   Mr. Coccaro, if you wouldn't mind going back to, now that

7    we are back online, if you wouldn't mind going back to

8    Government Exhibit 211?

9              Mr. Franco, I just have a follow-up question from

10   Thursday.  If you wouldn't mind just going to page 25 of this.

11   Mr. Franco, you testified about this document on Thursday, it

12   was the 2007 list of budget request letters.  Do you recall

13   testifying that there were over a thousand budget request

14   letters that were received that year?

15   A.   Yes.

16   Q.   If you wouldn't mind just going ahead and looking,

17   approximately how many budget letter requests came from

18   entities or individuals other than members of the Assembly?

19   A.   Approximately 200.

20   Q.   Now, Mr. Franco, if you wouldn't mind just taking a look at

21   line 14 on page 25 -- Mr. Coccaro, if you wouldn't mind zooming

22   in -- do you see a request there for American Cancer Society?

23   A.   Yes.

24   Q.   It is for creation of Hope Lodge.  Do you see that?

25   A.   Yes.

FB95sil1                          Franco - direct

1   Q.  Do you recall taking -- actually, Mr. Coccaro, would you

2   mind pulling up Government Exhibit 127.

3         Do you see that in your binder?

4   A.  Yes.

5         MR. MASTER:  Your Honor, this was an item that was

6   previously listed in Government Exhibit S-6, it is a

7   stipulation, that was described as an item that was found in

8   the defendant's Assembly office and the government moves its

9   admission.

10         THE COURT:  Any objection?

11         MR. SHUR:  No objection.

12         THE COURT:  127 is received.

13         (Government's Exhibit 127 received in evidence)

14  BY MR. MASTER:

15  Q.  Mr. Franco, could you just describe what this is?

16  A.  It is a request letter for funding.

17  Q.  So it is a type of budget request letter?

18  A.  Yes.

19  Q.  Is this a budget request letter that was received in fiscal

20  year '07 for the American Cancer Society Hope Lodge?

21  A.  Yes.

22  Q.  How much funds were requested?

23  A.  $1.5 million.

24  Q.  And you stated in your testimony on Thursday that there

25  were more budget request letters than funds that the Speaker

1    allocated out of the various pots of money that were available?

2    A.  Yes.

3    Q.  Now, did there come a time when you searched your records

4    to determine what happened with this particular budget request?

5    A.  Under subpoena and in preparation for my appearance here on

6    this trial, yes.

7    Q.  And what was the result of your search?

8    A.  This item was not funded.

9    Q.  Mr. Franco, if you wouldn't mind paging through, were there

10   letters in support of this budget request?

11   A.  Yes.

12   Q.  If you wouldn't mind turning to the last page, is there a

13   letter in support there from Columbia University?

14   A.  Yes.  There is two.

15   Q.  And what's the name of the doctor who is listed as

16   supporting?

17   A.  Looks like Alfred Ashford.

18   Q.  You can set that aside.

19          Now, Mr. Franco, when we were having some technical

20   difficulties you were explaining how the various appropriations

21   worked.  So, when you were talking about Government Exhibit

22   216, those Speaker items for Gouverneur Hospital and NYU

23   Hospital downtown; do you recall that?

24   A.  Yes.

25   Q.  Mr. Coccaro, would you mind pulling up Exhibits 211 and

FB95sil1                         Franco - direct

1   212?  I'm sorry, 121 and 122, those are in evidence.  I just

2   want to clarify something from your testimony on Thursday.  You

3   say that those were publicly posted in January 2013?

4   A.  Correct.

5   Q.  Now, at the top of each of those pages it says SFY

6   2006-2007 Legislative Initiative Form.  Do you see that?

7   A.  Yes.

8   Q.  Now, what does that mean at the top?  Does that mean that

9   the funds were actually issued in 2006 and 2007 or does it mean

10  something?

11  A.  No.  Just like I explained to the Judge, there is often a

12  disconnect between the timing periods.  The state fiscal year

13  that is represented at the top of a Legislative Initiative Form

14  represents the fiscal year of the appropriation where the item

15  is being funded through.  We identified this as so because the

16  division of budget as well as the respective state agency needs

17  to know how to charge this particular item.

18  Q.  Does this reflect that there were funds still available in

19  the SFY '06-'07 pot of money that is the Community Projects pot

20  of money as of January 2013?

21  A.  Yes.

22  Q.  If you wouldn't mind just going to Government Exhibit 131,

23  it is marked in your binder.  Do you recognize that document?

24  A.  Yes.

25  Q.  What is reflected in that document?

FB95sil1                         Franco - direct

1   A.   These are balances for the Community Projects Fund from the

2   Assembly share.

3            MR. MASTER:  Government offers Government Exhibit 131.

4            MR. SHUR:  No objection.

5            THE COURT:  Government Exhibit 131 is received.

6            (Government's Exhibit 131 received in evidence)

7   BY MR. MASTER:

8   Q.   Could you just explain for the members of the jury what is

9   the date of this document?

10  A.   March 2nd, 2008.

11  Q.   And does this reflect the amount of money that was still

12  available as of that date in each of those $85 million pots of

13  money in the Community Projects Fund?

14  A.   It represented the uncommitted balance.

15  Q.   And what does it mean for there to be an uncommitted

16  balance?

17  A.   There is two sides of the coin.  There is the spending

18  authority which represents either appropriation or

19  re-appropriation.  On the other side of the coin is the actual

20  cash or the disbursement so it is possible to have a contract

21  that's committed but not fully disbursed.  So, if you go on a

22  cash basis it could be misleading because you might think you

23  have more cash than which you actually have.  So, therefore, it

24  is important to look at things from an uncommitted perspective

25  because then this way you won't run into problems where you

FB95sil1                    Franco - direct

1    made commitments that you can't fund or you can't support

2    through cash.

3    Q.  Well, there is a few different concepts in there but I

4    think the only one that I wanted to ask you about was it says

5    Amount Available, right, at the top from 2003 up through 2007

6    it says Amount Available and that's the $85 million Assembly

7    share of the Community Projects Fund; is that correct?

8    A.  Yes.  That's our appropriation authority, yes.

9    Q.  And then just on the far right there is something called

10   CSPAP from 2001.  Is that a separate program that predated the

11   Community Projects Fund?

12   A.  Yes.

13   Q.  Underneath there is a row that says Amount Committed,

14   right; is that the amount that, as you were just describing,

15   was actually committed to various member items and legislative

16   initiatives as of the date of this table?

17   A.  Yes.

18   Q.  And then the bottom line is uncommitted balance, that's the

19   amount that was available at these to be committed?

20   A.  Subtracting one row from the other, yes.

21   Q.  And so, for example, with respect to the 211 and 212, there

22   was almost $30 million in 2008 available in the Community

23   Projects Fund -- I'm sorry.  Withdrawn.

24          In 2013 there was still money available in 2006-2007

25   Community Projects Fund lump sum, correct?

FB95sil1                              Franco - direct

1    A.  Correct.

2               THE COURT:  I'm sorry.  Can I interrupt?  This

3    document says it is as of '08.

4               MR. MASTER:  Correct.

5               THE COURT:  Not as of '13.

6               MR. MASTER:  Correct.

7               THE COURT:  So he is testifying from memory as to what

8    was available from '13?

9               MR. MASTER:  Well, Mr. Coccaro, if you wouldn't mind

10   pulling up Government's Exhibits 121 and 122 again?

11   BY MR. MASTER:

12   Q.  So, again, at the top it says SFY 2006-2007 Legislative

13   Initiative Form, right?  And again, when were those funds

14   posted and committed?

15   A.  They were committed prior to the close of the year but

16   initiated or posted January of 2013.

17   Q.  Again, those were funded out of which pot of money?

18   A.  The 2006-'07 Community Projects Fund re-appropriation.

19   Q.  And that was the pot of money that is reflected in

20   Government Exhibit 131?

21   A.  Correct.

22   Q.  So again, there was still funds left in the Community

23   Projects Fund as of 2013?

24   A.  Yes.

25   Q.  And, Mr. Coccaro, just quickly go back to Government

FB95sil1                         Franco - direct

1   Exhibit 131 so there is an asterisk next to 2007 and there is a

2   description there underneath the asterisk, it states --

3   Mr. Coccaro, if you wouldn't mind zooming in -- items lined out

4   in SFY '07-'08 enacted:  Amount committed does not include

5   additional items that are currently pending on supplemental

6   list.

7            Can you just explain what that means?

8   A.  So.  During that year both houses of the legislature

9   received $85 million of appropriation authority which they

10  could line out against and that amount committed represented

11  the total of our legislative initiatives as well as our

12  programmatic adds, and I believe that year we didn't know if we

13  were coming back for a supplemental budget process and

14  therefore that's why there it would be on a supplemental list.

15  Q.  Again, as of that date there was over $38 million available

16  uncommitted in the 2007 $85 million Assembly share?

17  A.  Correct.

18  Q.  And there were pots of money where there were still funds

19  available for prior years, correct?

20  A.  Yes.

21  Q.  You can set that aside.

22           Just to conclude, Mr. Franco, as of that 2008 date or

23  2007 -- withdrawn.

24           Had Sheldon Silver ought to use Community Projects

25  Fund money to fund Dr. Taub after 2008, what posting would be

FB95sil1                          Franco - direct

1   required?

2   A.   The same posting that was demonstrated here in the

3   courtroom.

4   Q.   And you talked on Thursday about the HCRA balances.  Do you

5   recall that?

6   A.   Yes.

7   Q.   The HCRA pots of money?

8   A.   Yes.

9   Q.   Again, if you could just explain to the jury what ended up

10   developing with respect to continued use of the HCRA pots of

11   money after the Budget Reform Act passed?

12   A.   Those re-appropriations were reviewed by the vetoed by the

13   governor.

14   Q.   Before the governor's veto, what difficulties did you have

15   during the Spitzer and Paterson administrations?

16   A.   From what I recall there was difficulty processing stuff

17   out of those pools.

18          MR. MASTER:   Just a moment, your Honor?

19          (counsel conferring)

20   Q.   Now, when you say posted as described in the courtroom, you

21   mean the posting that was just shown to the members of the

22   jury?

23   A.   Right; the exhibits that were shown to the members of the

24   jury, yes.

25   Q.   And again, beginning in 2008, that was after the attorney

FB95sil1                        Franco - cross

```
1    general began requiring disclosure and accountability forms, to

2    your knowledge?

3    A.  Yes.

4    Q.  And it was after the Assembly began scrutinizing

5    discretionary funding in greater detail?

6    A.  Yes.

7            MR. MASTER:  Nothing further, your Honor.

8            THE COURT:  Okay.

9            Mr. Shur?

10           MR. SHUR:  Thank you, Judge.  Judge, if it is okay, I

11   am going to move the podium closer to the table.

12           THE COURT:  That's fine.

13   CROSS EXAMINATION

14   BY MR. SHUR:

15   Q.  Mr. Franco, good morning.

16   A.  Good morning.

17   Q.  On direct examination you were asked a lot of questions

18   about the New York State grant process.  Is it fair to say that

19   New York State provides hundreds if not thousands of grants a

20   year?

21   A.  Absolutely.

22   Q.  And the Speaker of the Assembly, Mr. Silver, has supported

23   New York State grants for a wide range of organizations; is

24   that right?

25   A.  Yes.
```

```
1    Q.  Mr. Silver supported grants for a variety of different

2    projects, correct?

3    A.  Yes.

4    Q.  You already testified about New York State grants that

5    Mr. Silver supported with respect to healthcare projects.  I

6    want to ask you about projects that Mr. Silver supported to

7    fund education projects.

8               MR. MASTER:  Objection, your Honor.

9               THE COURT:  Overruled.

10   Q.  If I may, I would like to show you what's been marked

11   Defense Exhibit 28 for identification.  The let me know once

12   you have had an opportunity to review this exhibit.

13   A.  Done.

14   Q.  Mr. Franco, these are Legislative Initiative Forms, right?

15   A.  Yes.

16   Q.  Similar to some of the Legislative Initiative Forms that

17   you were looking at on direct examination, right?

18   A.  Yes.

19   Q.  And these forms that are contained in Defendant's Exhibit

20   28, are these made and kept in the ordinary course of the

21   Assembly's business?

22   A.  Yes.

23               MR. SHUR:  At this time, your Honor, I would move for

24   admission of Defendant's Exhibit 28.

25               MR. MASTER:  No objection.
```

FB95sil1                          Franco - cross

1          THE COURT:  Defendant's Exhibit 28 is received.

2          (Defendant's Exhibit 28 received in evidence)

3    BY MR. SHUR:

4    Q.  If you would take a look at the first Legislative

5    Initiative Form in this exhibit.  This is a grant that was

6    sponsored to -- actually, I'm sorry, if you would take a look

7    at the second -- I apologize.  Can I have one moment?

8          If you would take a look at the second document in

9    this exhibit, this is a Legislative Initiative Form for a grant

10   that was sponsored by Mr. Silver, right?

11   A.  Correct.

12   Q.  It is for $92,000?

13   A.  Yes.

14   Q.  It was for money to go to University Settlement Society of

15   New York, correct?

16   A.  Correct.

17   Q.  And the funds that were to be distributed under this grant

18   were to be used for the talent search bridge program, right?

19   A.  Yes.

20   Q.  And that's to help maintain ongoing summer components

21   including educational enhancement classes and work experience,

22   right?

23   A.  Yes.

24   Q.  And, in addition, the funds were going to be used to

25   strengthen year-round services to junior high school services,

FB95sil1                         Franco - cross

1    correct?

2    A.   Correct.

3    Q.   That includes youth leadership and work experiences,

4    correct?

5    A.   Yes.

6    Q.   If you take a look at the next Legislative Initiative Form

7    in the packet this is another grant sponsored by Mr. Silver,

8    correct?

9    A.   Yes.

10   Q.   This grant was to the Outstanding Renewal Enterprises,

11   Inc., correct?

12   A.   Yes.

13   Q.   It was for $70,000, right?

14   A.   Yes.

15              THE COURT:  Mr. Shur, can I see y'all at side bar?

16

17

18

19

20

21

22

23

24

25

FB95sil1                         Franco - cross

 1              (At side bar)

 2              THE COURT:  What's the relevance?

 3              MR. SHUR:  So, Judge, the government opened very

 4    clearly suggesting that Mr. Silver funded the Columbia grants

 5    and did not -- had a huge pool of money that was sort of a

 6    slush fund and did not fund worthy causes including other

 7    hospitals, including educational services.  There were a number

 8    of things that the government rattled off and I think that the

 9    direct examination of this witness, they also elicited that

10    type of testimony as well.  So, I don't plan to go into each

11    and every grant that Mr. Silver supported in connection with

12    these different topics but I do want to highlight at least two

13    or three.

14              THE COURT:  Did you turn off my white noise?

15              THE DEPUTY CLERK:  I think so.

16              THE COURT:  Turn it back on, please.

17              So I didn't remember them arguing that he wasn't

18    funding valuable services so much as a dollar spent on X is not

19    a dollar spent on Y.

20              MR. SHUR:  Right.  They opened on it.

21              THE COURT:  I will let you do it but I'm not going to

22    let you use him as a prop and go through every one of these.

23    The documents speak for themselves.

24              MR. SHUR:  Judge, I will tell you exactly what I plan

25    to do so there is no surprises:  For education, for two other

769
FB95sil1                      Franco - cross

1   different areas to highlight two from each and a group exhibit

2   and I will move on.  I don't plan to belabor this.

3              THE COURT:  You are going to read the whole purpose of

4   the project.

5              MR. SHUR:  Just what it was for.  I'm not going to

6   read all the.

7              THE COURT:  The first one you read the entire text.

8   The document speaks for itself.

9              MS. COHEN:  Your Honor, the witness has no idea if it

10  is used for that purpose.

11             THE COURT:  It is in for a business record.  You guys

12  were doing the same thing.

13

14

15

16

17

18

19

20

21

22

23

24

25

FB95sil1                         Franco - cross

1              (In open court)

2    BY MR. SHUR:

3    Q.  Mr. Franco, we are looking at Defendant's Exhibit 28 and in

4    particular the third page of that document.  This was a grant

5    sponsored by Mr. Silver, right?

6    A.  Yes.

7    Q.  And it was to the Outstanding Renewal Enterprises, right?

8    A.  Yes.

9    Q.  And the grant -- the purpose of the grant was to be used

10   for workshops and clinics which focused on environmental

11   education for over 1,000 children and adults; is that right?

12   A.  Yes.

13   Q.  There were also, pursuant to the purpose of the grant,

14   there would be workshops both in classrooms and at the water's

15   edge in East River Park including free catch and release

16   fishing; correct?

17   A.  Yes.

18   Q.  If we can take a look at the next document in this exhibit,

19   this is another grant that was sponsored by Mr. Silver, right?

20   A.  Yes.

21   Q.  And it was to the Henry Street Settlement?

22   A.  Yes.

23   Q.  And it was for $196,000, right?

24   A.  Yes.

25   Q.  And the funds were to be used to assist disadvantaged young

FB95sil1                    Franco - cross

1    people get on the college-bound track or gain admissions to

2    college by providing academic counseling, SAT prep, and

3    guidance through the college and financial aid process;

4    correct?

5    A.  Yes.

6    Q.  And the other Legislative Initiative Forms that are

7    contained in this exhibit are also for grants that were

8    sponsored by Mr. Silver for educational purposes, correct?

9    A.  Yes.

10   Q.  And you would agree that this is just a subset of grants

11   that were sponsored by Mr. Silver to support education, right?

12   A.  Yes.

13   Q.  Over the course of the years there were many, many grants

14   that were similar to this, correct?

15   A.  Yes.

16   Q.  Mr. Silver, in addition to education, he also supported

17   grants to fund public services, right?

18   A.  Yes.

19   Q.  I would like to show you what's been marked for

20   identification as Defendant's Exhibit 29.  If you take a look

21   at the first -- actually, are these also Legislative Initiative

22   Forms?

23   A.  Yes.

24   Q.  And these are forms that are made and kept in the ordinary

25   course of the Assembly's business?

FB95sil1                          Franco - cross

```
1    A.  Yes.

2            MR. SHUR:  Your Honor, I would move for the admission

3    of Defendant's Exhibit 29.

4            MR. MASTER:  Your Honor, we object.

5            THE COURT:  Overruled; but with the same warning.

6            MR. SHUR:  Understood, Judge.

7            (Defendant's Exhibit 29 received in evidence)

8    BY MR. SHUR:

9    Q.  Mr. Franco, if you can take a look at the first page of the

10   exhibit.  This is a Legislative Initiative Form that was

11   sponsored by Mr. Silver, right?

12   A.  Yes.

13   Q.  The recipient of the grant was the New York Legal

14   Assistance Group, correct?

15   A.  Yes.

16   Q.  And the purpose of the grant was to provide money to be

17   used for emergency legal services to victims of domestic

18   violence, right?

19   A.  Yes.

20   Q.  If you would take a look at the second document in this

21   exhibit, please?  This is a Legislative Initiative Form for

22   another grant that Mr. Silver sponsored, right?

23   A.  Yes.

24   Q.  It is for $50,000, correct?

25   A.  Correct.
```

FB95sil1                              Franco - cross

1    Q.  It is to the Manhattan Youth Recreation and Resources

2    entity, correct?

3    A.  Yes.

4    Q.  And the money was being provided for programs including a

5    teen lounge, a basketball league, karate, art, in-state trips,

6    and after school programs, correct?

7    A.  Yes.

8    Q.  And the remaining Legislative Initiative Forms in this

9    exhibit are for other grants that Mr. Silver sponsored,

10   correct?

11   A.  Yes.

12   Q.  And these were all grants to fund public services, correct?

13   A.  Public and community services, yes.

14   Q.  And again, this is just a subset of the grants that

15   Mr. Silver sponsored to fund public services and community

16   services, correct?

17   A.  Yes.

18   Q.  Over the course of his tenure there were many, many more

19   just like this, correct?

20   A.  Yes.

21   Q.  In addition to education, in addition to public and

22   community services, Mr. Silver sponsored legislative grants to

23   fund the redevelopment of lower Manhattan, correct?

24   A.  That I can recall, yes.

25   Q.  I would like to show you what's been marked Defendant's

FB95sil1                          Franco - cross

1   Exhibit 30.  Mr. Franco, these are also Legislative Initiative

2   Forms, right?

3   A.  Yes.

4   Q.  These are also made and kept in the ordinary course of the

5   Assembly's business?

6   A.  Yes.

7             MR. SHUR:  Your Honor, I move for admission of

8   Defendant's Exhibit 30.

9             MR. MASTER:  No objection, your Honor.

10            THE COURT:  30 is received.

11            (Government's Exhibit 30 received in evidence)

12  BY MR. SHUR:

13  Q.  If you would take a look at the first document, this is a

14  Legislative Initiative Form for a grant that was sponsored by

15  Mr. Silver, right?

16  A.  Yes.

17  Q.  It is in the amount of $340,000, correct?

18  A.  Correct.

19  Q.  And the grantee, the recipient of the grant was the

20  Alliance for Downtown New York?

21  A.  Yes.

22  Q.  And the funds were being provided for business attraction

23  and retention and to support a business-to-business marketing

24  and branding program, correct?

25  A.  Yes.

FB95sil1                    Franco - cross

1    Q.  As well as to support promotion of tourism in lower

2    Manhattan, correct?

3    A.  Yes.

4    Q.  At the top of this form it says SFY 2005 to 2006, correct?

5    A.  Correct.

6    Q.  Was this an instance that you mentioned on direct

7    examination where the funds that were being used to support a

8    particular program or grants were reserve funds from earlier

9    years?

10   A.  I wouldn't call them reserve funds but they were unutilized

11   resources available, yes.

12   Q.  If you would take a look at the second document in this

13   exhibit, please?  This is a Legislative Initiative Form for

14   another grant that Mr. Silver sponsored, right?

15   A.  Yes.

16   Q.  For $12,000?

17   A.  Yes.

18   Q.  And it is to the Council for a Cleaner Chinatown, right?

19   A.  Yes.

20   Q.  And the purpose of the grant was to achieve a cleaner and

21   more beautiful Chinatown through self-policing by community

22   business and residents, right?

23   A.  Yes.

24   Q.  And the program would also educate the community and

25   involve residents, schools, and businesses who participated,

FB95sil1                          Franco - cross

1    correct?

2    A.  Yes.

3    Q.  Mr. Franco, the other legislative initiative forms in this

4    particular packet were also for grants that Mr. Silver

5    sponsored, right, to fund the redevelopment of Lower Manhattan?

6              MR. MASTER:  Objection.

7              THE COURT:  I don't know if a cleaner Chinatown is the

8    redevelopment of Lower Manhattan.

9              THE WITNESS:  I agree.

10             THE COURT:  I'm not saying it is not a good project, I

11   just don't agree.

12   BY MR. SHUR:

13   Q.  To fund community projects in Lower Manhattan.

14   A.  Yes.  That is accurate.

15   Q.  And this is just a small -- a very small subset of

16   Legislative Initiative Forms for grants that Mr. Silver

17   sponsored for those efforts, right?

18   A.  Yes.

19   Q.  During the course of his career there were dozens and

20   dozens more just like this one, right?

21   A.  Yes.

22   Q.  Mr. Franco, when funding a New York State grant there are

23   different sources of money that can be used, right?

24   A.  Correct.

25   Q.  The grants to the New York Presbyterian Hospital and the

FB95sil1                          Franco - cross

1    Columbia University Medical Center that the prosecutor asked

2    you about were funded using money provided by a law called

3    HCRA?

4    A.  Yes.

5    Q.  And HCRA stands for the Health Care Reform Act, right?

6    A.  Correct.

7    Q.  It is a New York State law?

8    A.  Yes.

9    Q.  It was passed in 1996, right?

10   A.  It predates me.

11   Q.  Okay.

12        It is part of the New York Public Health Laws in this

13   state, right?

14   A.  I'm not responsible for the New York State Health Law.

15   Q.  But you know it is --

16        THE COURT:  Does that mean you don't know?

17        THE WITNESS:  I don't know.

18   Q.  But you know it is a New York State law, right?

19   A.  I would assume so if we are funding grants out of it.

20   Q.  And the HCRA law allotted certain funds to be used

21   specifically for public health projects, right?

22   A.  Yes.

23   Q.  I believe you testified on direct examination that the HCRA

24   money provided for by the statute could only go to an eligible

25   organization, right?

FB95sil1                        Franco - cross

 1   A.  Correct.

 2   Q.  And that it had to be for a healthcare-related purpose?

 3   A.  Correct.

 4   Q.  And that the purpose had to be for a public good, right?

 5   A.  Yes.

 6   Q.  Now, with respect to the two grants to Columbia and to New

 7   York Presbyterian Hospital that the prosecutor asked you about,

 8   those were HCRA law grants that were sponsored by Mr. Silver,

 9   right?

10   A.  Correct.

11   Q.  Fair to say that those two organizations, New York

12   Presbyterian Hospital and Columbia University Medical Center,

13   are eligible organizations?

14   A.  Yes, they were.

15   Q.  They're two of the most prominent hospitals in the city,

16   right?

17   A.  Again, healthcare is not my field of expertise.

18   Q.  Okay.

19         Those two grants were for a healthcare-related

20   purpose, right?

21   A.  Yes, they were.

22   Q.  They were to fund cancer research, right?

23   A.  Yes.

24   Q.  And you would agree that that purpose, to fund cancer

25   research, is a public good?

FB95sil1                         Franco - cross

1    A.  Yes.

2    Q.  Now, under the Health Care Reform Act the funds provided

3    for these public health projects were divided up into different

4    pools of money, right?

5    A.  Correct.

6    Q.  And one of these pools was called, I believe you referred

7    to it on direct as the healthcare initiatives pool; is that

8    right?

9    A.  I didn't refer to it as such but, yes, that's one of the

10   names given to it.

11   Q.  Is it also called the priority distribution pool or the

12   priority pool?

13   A.  That I don't know.

14   Q.  Well, this pool consists of discretionary funds, right?

15            THE COURT:  Which pool?  I'm now confused.

16   Q.  The healthcare initiatives pools that was referred to on

17   direct examination when the prosecutor asked you about this pot

18   of money under HCRA, those were discretionary funds, right?

19   A.  Correct.

20   Q.  That pool of money is what I would like to talk about,

21   okay?

22   A.  Okay.

23   Q.  That was the same pool of money that was used to fund the

24   two grants, the one to New York Presbyterian Hospital and the

25   one to Columbia University Medical Center?

1    A.  Okay.

2    Q.  Is that right?

3    A.  You divided up the grants to two separate grantees.  I

4    can't recall if there were two separate ones or if they were

5    one, in fact the actual same grantee.

6    Q.  But the question, Mr. Franco, is that the funding source

7    was this HCRA discretionary money, right?

8    A.  Yes.

9    Q.  For both.

10   A.  Correct.

11   Q.  Now, this pool of money that the prosecutor asked you

12   about --

13            THE COURT:  Hang on a second.

14   Q.  -- was not totally under the control of the Assembly,

15   correct?

16   A.  Not totally, no.

17   Q.  Because the HCRA law established that the Assembly would

18   receive a certain share of that pool of money, right?

19   A.  Correct.

20            THE COURT:  Hang on a second.

21            Do you need a break?  A quick, very quick jury break.

22            A JUROR:  Should we all go?

23            THE COURT:  Yes, y'all go.  Don't talk about the case.

24            (Continued on next page)

25

FB95sil1                          Franco - cross

1              (Jury not present)

2              THE COURT:  Don't go away.  I'm going to bring them

3    back as quickly as possible.

4              (Recess)

5              (continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FB9YSIL2                              Franco - Cross

1            (Jury present)

2            THE COURT:  Okay, Mr. Shur.

3            THE WITNESS:  Just to clarify my comments from before

4     the break, yes.  Government Exhibit 115 demonstrates one grant

5     to New York Presbyterian Hospital, and Exhibit 284 represents

6     Columbia University.  So you were correct.

7     BY MR. SHUR:

8     Q.  Mr. Franco, I think where we left off, we were talking

9     about this HCRA-pooled money; right?

10    A.  Yes.

11    Q.  So the assembly doesn't totally control that pool; correct?

12    A.  Correct.

13    Q.  That's because the HCRA law established that there was a

14    certain share of that pool that would go to the assembly;

15    right?

16    A.  Yes.

17    Q.  And the HCRA law established that there's a certain share

18    of that pool that would go to the senate; right?

19    A.  Yes.

20    Q.  And the HCRA law established that there was a certain share

21    of that pool that would go to the Department of Health.

22    A.  Yes.  Again, the creation of that law was not within my

23    purview.  So I don't know if the shares were outlined either by

24    law or an MOU.  So I just want to make that clear.

25            But yes, all three entities got a part of that pool.

1           THE COURT:  By "MOU," do you mean a memorandum of

2    understanding?

3           THE WITNESS:  Memorandum of understanding.  Correct.

4    BY MR. SHUR:

5    Q.  And that would be basically an agreement between the

6    assembly, the senate, and the governor pursuant to the statute.

7    A.  Yes.  So however it was effectuated, there was a three-way

8    deal reached.  Correct.

9    Q.  So now let's talk about the different shares that would go

10   to these different entities.

11          So under the HCRA law, the assembly was allocated

12   $8.5 million annually; right?

13   A.  Again, I can't state if it's under the law or not.  But

14   yes.  The assembly did get $8.5 million through the HCRA

15   account.

16   Q.  And the senate was allocated $8.5 million; correct?

17   A.  Correct.

18   Q.  And the Department of Health was allocated $8.5 million.

19   A.  From my knowledge, yes.

20   Q.  And the HCRA law granted the Speaker of the Assembly

21   discretion as to how to distribute that share of the pool that

22   was allocated to the assembly.

23   A.  Again, I don't know if it's the law or some other three-way

24   mechanism.  But, yes.  Whatever the three-way deal was, the

25   leaders of each respective house would have the sole authority

FB9YSIL2                        Franco - Cross

1    over those resources.

2    Q.  That's because essentially the Speaker of the Assembly,

3    for example, had complete discretion as to which public health

4    projects would be funded with the share of money that the

5    assembly received; right?

6    A.  That's correct.

7    Q.  That's because the speaker is the leader of the assembly;

8    right?

9    A.  That's correct.

10   Q.  And the senate majority leader had complete discretion as

11   to which public health projects would be funded with the share

12   of money that the senate received.

13   A.  Correct.

14   Q.  That's because the senate majority leader is the leader of

15   the senate; light?

16   A.  Right.

17   Q.  And the commissioner of the Department of Health had

18   complete discretion as to which public health projects would be

19   funded using the share of money that the Health Department

20   received under the law; right?

21   A.  Well, that would depend on which governor he was working

22   for.

23   Q.  Okay.  Well, either the governor or the commissioner of the

24   Department of Health would have that discretion; correct?

25   A.  Correct.

1   Q.  And that's because the commissioner is the leader of the

2   Department of Health; right?

3   A.  Right.  Under the direction of the governor, yes.

4   Q.  Under the direction of the governor.  Okay.

5        Now, the HCRA law and this process that you just

6   testified about -- that's not unique in New York State law;

7   right?

8        MR. MASTER:  Objection.

9        THE COURT:  Sustained.

10  BY MR. SHUR:

11  Q.  It's not unique as far as how funds were distributed for

12  purposes of legislative grants; correct?

13  A.  Those mechanisms were not unique, correct.

14  Q.  There were other pools of money where the legislative

15  leaders of the respective houses -- right? -- the Speaker of

16  the Assembly and the senate majority leader of the senate and

17  the executive branch agency like the governor had discretionary

18  authority over those funds; correct?

19  A.  That's correct, yes.

20  Q.  There was the capital projects pool of money; right?

21  A.  Capital projects, yes.

22  Q.  And that was also a discretionary fund; correct?

23  A.  Those are discretionary resources, correct.

24  Q.  There's the multimodal funds?

25  A.  Yes.

1    Q.  And there's also a discretionary pool of money?

2    A.  Yes.

3    Q.  And there was programmatic ads; correct?

4    A.  Yes.

5    Q.  And that's also a discretionary pool of money; correct?

6    A.  Not entirely.  The programmatic ads are various programs

7    within the state, and they would get funded using discretionary

8    sources.  Programmatic ads in and of itself is not a

9    discretionary funding source.

10   Q.  What about Community Project Funds?

11   A.  Yes.

12   Q.  Those are discretionary funds; right?

13   A.  Yes.  Three-way agreed to and three-way chaired.

14   Q.  And those funds I believe you referred to as member items.

15   That's another name for them; right?

16   A.  Yes.

17   Q.  And these communities funds or member items were

18   established by the New York State finance law; correct?

19   A.  The Community Projects Fund was established under the state

20   finance law, yes.

21   Q.  And the New York State Finance Law granted the same

22   discretionary authority over the Community Project Funds like

23   the HCRA law established; correct?

24   A.  Yes, but through that, there were MOUs which agreed to

25   three-way which kind of governed or guided each round of money.

FB9YSIL2                        Franco - Cross

1   Q.  But there was a pool or a share of Community Project Funds

2   that were distributed to the assembly; right?

3   A.  Correct.

4   Q.  That the speaker had discretion over; right?

5   A.  Correct.

6   Q.  Because he's the leader over the assembly; right?

7   A.  Yes.

8   Q.  And there was a pool of Community Project funds that was

9   distributed to the senate; right?

10  A.  Correct.

11  Q.  That the senate majority leader had complete discretion

12  over; right?

13  A.  Yes.

14  Q.  Because he's the leader of the senate.

15  A.  Exactly.

16  Q.  And then there was a share of Community Project Funds that

17  were distributed to the governor; correct?

18  A.  Yes.

19  Q.  And he had complete discretion over those funds; right?

20  A.  Yes.

21  Q.  Mr. Franco, there was nothing improper about the speaker of

22  the assembly carrying out his duty to allocate the Community

23  Project Funds to the various members of the assembly; right?

24          MR. MASTER:  Objection.

25          THE COURT:  Sustained.

FB9YSIL2                          Franco - Cross

 1   BY MR. SHUR:
 2   Q.  Let me ask you this, Mr. Franco:  The speaker exercised
 3   this authority by apportioning the Community Project Funds to
 4   the members of the assembly based on seniority; correct?
 5   A.  Correct.
 6   Q.  So members of each legislative class receive more or less
 7   the same amount of spending; right?
 8   A.  Correct.
 9   Q.  And the members' allotment increased with each year's
10   seniority more or less lockstep; right?
11   A.  Correct.  We tried to preserve the integrity of each class.
12   Q.  So, if there was a freshman class of members, they received
13   essentially the same amount; correct?
14   A.  Essentially, yes.
15   Q.  As they became more senior as a class, they each got bumped
16   up in the amount that they received; right?
17   A.  So long as -- yes.  Yes.
18   Q.  With their allotment -- meaning each member would get an
19   allotment of Community Project Funds -- each member had total
20   discretion to give funding to whatever community projects he or
21   she felt worthy of supporting; right?
22   A.  Discretion within the bounds of our guidelines, yes.
23   Q.  And the guidelines being that they need to be used for
24   community projects; right?
25   A.  That they needed to be supported or run through an eligible

789

FB9YSIL2                        Franco - Cross

1    grantee that, yes.  The funds would be used for public benefit
2    and then a page and a half of other things that we required.
3    Q.  And these funding decisions that these members made were
4    never subject to a competitive bidding processes; right?
5    A.  Not that I'm aware of.
6    Q.  They weren't peer reviewed; right?
7    A.  Not that I'm aware of.
8    Q.  There was no formal merits evaluation; correct?
9    A.  Each member had potentially their own merit system.  I know
10   one member -- they actually hold a competition within their
11   district in order to spear community support, as well as to
12   improve the entire district.  But that's unique, and each
13   member is left to make their own decisions.
14   Q.  They have complete discretion; correct?
15   A.  Within the bounds of our assembly guidelines.
16   Q.  But a competitive bidding process wasn't required at that
17   time; right?
18   A.  No.
19   Q.  There was no peer review that was required; correct?
20   A.  None that I'm aware of.
21   Q.  A merits evaluation wasn't required; right?
22   A.  None that I'm aware of.
23   Q.  It wasn't required by the law; correct?
24   A.  Not that I'm aware of.
25   Q.  It wasn't required by assembly rules; right?

790

FB9YSIL2                    Franco - Cross

1    A.   No.

2    Q.   If I could show you what's been marked Defense Exhibit 31

3    for identification.

4    A.   Thank you.

5    Q.   Defense Exhibit 31 contains legislative initiative forms;

6    right?

7    A.   Yes.

8    Q.   And these are similar to the forms that we were looking at

9    earlier; right?

10   A.   Yes.

11   Q.   They're made and kept in the regular course of the

12   assembly's business?

13   A.   Yes.

14          MR. SHUR:  Your Honor, I move for admission of

15   Defendant's Exhibit 31.

16          MR. MASTER:  Objection.

17          THE COURT:  Let me see you at sidebar, please.

18          (At the sidebar)

19          THE COURT:  I don't understand the relevance.

20          MR. SHUR:  Judge, the government on direct made a big

21   showing of how there's no peer review.  There's no merits

22   evaluation.

23          THE COURT:  What's the relevance of this document?

24          MR. SHUR:  I just want to show an example.  This is a

25   particular grant.  I was using the pool of money that we're

FB9YSIL2                          Franco - Cross

1     talking about and that there was no merits evaluation.  There's

2     no peer review.  There's no competitive bidding process with

3     respect to this particular grant.

4              THE COURT:  I'm going to sustain the objection.

5              (In open court)

6              THE COURT:  Objection sustained.

7     BY MR. SHUR:

8     Q.  Mr. Franco, we were talking about the use of Community

9     Project Funds.

10             Do you remember that?

11    A.  Yes.

12    Q.  And the fact that each member received their own allotment,

13    and each member has complete discretion as to how they're going

14    to use that within the confines you discussed, meaning that

15    they're used for public or community projects; correct?

16    A.  Correct.

17    Q.  Okay.  Now, during the years 2005 and 2006, over 3,000

18    grants were distributed this way by the members of the

19    assembly; correct?  Each year.

20    A.  Approximately, yes.

21    Q.  And this was at the sole discretion of each assembly

22    member; correct?

23    A.  Within the confines of the assembly guidelines, yes.

24    Q.  Understood.

25             Just to go back for a moment to the Health Care Reform

FB9YSIL2                          Franco - Cross

```
 1   Act.  It was introduced as a bill by the chair of the assembly
 2   health committee; correct?
 3           MR. MASTER:  Objection.
 4           THE COURT:  Sustained.  He's already said that that
 5   all happened before his time.
 6   BY MR. SHUR:
 7   Q.  Are you familiar with the legislative process in Albany,
 8   Mr. Franco?
 9   A.  Would you hold it against me if I said yes?
10           THE COURT:  A bill has to be introduced before it
11   becomes a law.  If that's the point you're making, I think the
12   government would probably stipulate that every bill is
13   introduced before it becomes a law.
14           MR. SHUR:  Judge, what I was planning on doing is
15   simply walking through those steps.  The government has
16   suggested this is some type of secret law, and certainly that's
17   not the case.
18           MR. MASTER:  Objection.
19           THE COURT:  Sustained.
20           Don't make a speaking objection.  If we need to talk
21   at sidebar, we will.  Ask your next question.  He said he was
22   not present -- he wasn't working in Albany at the time that
23   bill passed.
24           MR. SHUR:  I understand.
25           THE COURT:  So it would be just a basic civics lesson,
```

1    how a bill becomes a law in New York State?

2               MR. SHUR:  Judge, I think the process is important.

3               MR. MASTER:  Objection.  Can we handle this at

4    sidebar, your Honor?

5               THE COURT:  Yes.  Come on up.

6               (At the sidebar)

7               MR. SHUR:  Judge --

8               THE COURT:  I think they went through how a bill

9    becomes a law on direct.

10              MR. SHUR:  There are two things I want to mention.

11   First I went back and reviewed the government's opening, and

12   they must have said a dozen times that this was a secret pot of

13   money and it was all very secret.

14              Ms. Paulin --

15              THE COURT:  I don't think that's what they said.  They

16   said how it was spent was not transparent.

17              MR. SHUR:  They called it a secret pot of money,

18   Judge.  The prosecutor is here.  We can ask her.

19              In addition, Ms. Paulin, who is an assemblywoman, said

20   she had never heard of HCRA.  So I think it's important to make

21   clear it's not as if this was some secret bill that was slid

22   under someone's door.  This was out in the open and went

23   through a process.

24              THE COURT:  I understand that.  He wasn't there.  To

25   the extent that you're trying to prove that, he's not a witness

1  who can testify to it beyond the basic civics lesson of how a

2  bill becomes a law.

3          MR. SHUR:  I think that I can walk him through the

4  process, the fact that there's no reason to believe this

5  particular bill was handled any differently.

6          MS. COHEN:  This witness has no knowledge.

7          MR. SHUR:  Judge, on direct examination, they asked

8  him all sorts of questions where he wasn't there.  He was just

9  testifying based on business records.

10          THE COURT:  This isn't a business record.  You're

11  asking him based on his --

12          MR. SHUR:  About his personal knowledge of the

13  process, yes.

14          THE COURT:  Again, I'm perfectly happy to allow you to

15  do a short civics lesson on how a bill becomes a law.  But he

16  doesn't know --

17          MR. SHUR:  I understand.

18          THE COURT:  You can't ask him that.

19          MR. SHUR:  Can I ask him whether he has any reason to

20  believe that the HCRA law was treated any differently from his

21  understanding of the process?

22          THE COURT:  You can ask that question.  The answer is

23  meaningless.

24          (In open court)

25  BY MR. SHUR:

1    Q.  Mr. Franco, if you'll bear with me just for a brief civics
2    lesson.
3            So the question I believe I asked was:  A bill is
4    typically introduced by the chair of a committee; correct?
5    A.  No.
6    Q.  No?
7    A.  A bill can be introduced by any member of the assembly.
8    Q.  Okay.  Including the chair of a committee?
9    A.  Correct.
10   Q.  And then the legislative bill drafting service drafts the
11   bill?
12   A.  If directed by a member, yes.
13   Q.  Okay.  And the bill draft is made available to members of
14   the public; correct?
15   A.  Correct.  Once it gets into print form, it becomes publicly
16   available through various means.
17   Q.  And then the draft bill gets referred to the committee that
18   handles that particular subject matter; right?
19   A.  Correct.  Often called the standing committee.
20   Q.  And there are meeting agendas for that particular
21   committee, and these agendas are also available to the public;
22   correct?
23   A.  Correct.
24   Q.  And then the assembly Ways and Means Committee reviews the
25   bill?

FB9YSIL2                     Franco - Cross

1   A.   Only if it has a fiscal impact.  There are primary standing

2   committees just like we spoke of health and education and so on

3   and so forth.  If those bills have an impact on, say, like

4   judicial penal system, then they have to be referred to a

5   secondary standing committee like codes or judiciary.

6        But if it has a fiscal impact to the State of

7   New York, then the secondary standing committee would be Ways

8   and Means.  And then from there, if passed out of Ways and

9   Means, then it goes to the Rules Committee.

10        If reported out of the Rules Committee, then it goes

11   to either the floor or for pending consideration by the

12   speaker.

13   Q.   When it leaves the Rules Committee and it goes to the floor

14   of the assembly, there's a public debate on the floor; correct?

15   A.   Sometimes, yes.

16   Q.   The chamber of the assembly is public; correct?  The public

17   can access that?

18   A.   Correct.  But not every bill is debated.

19   Q.   Let me ask you this:  For a bill to be passed, it needs to

20   be passed by a majority of the assembly; correct?

21   A.   Correct.

22   Q.   Do you know if the HCRA bill was unanimously voted on by

23   the assembly?

24   A.   As I stated in my direct testimony, there are five deputy

25   directors total.  Each one of us has our area of expertise.

FB9YSIL2                       Franco - Cross

1   Health care is not my area of expertise.  So, therefore, I

2   don't track health legislation.

3              THE COURT:  The short answer is no, you don't know

4   whether it was unanimous?

5              THE WITNESS:  I have no knowledge of that.

6   BY MR. SHUR:

7   Q.  So it gets voted on.  It has to be voted on by a majority

8   of the assembly; right?

9   A.  Correct.

10  Q.  And it has to be voted on by a majority of the senate?

11  A.  Correct.

12  Q.  And it has to be sent in for law by the governor; correct?

13  A.  Correct.

14  Q.  The law itself is publicly available; right?

15  A.  Yes.

16  Q.  It's available through the legislative retrieval service?

17  A.  Yes.

18  Q.  And it's available electronically; correct?

19  A.  Yes.

20  Q.  And it's also printed on paper as well?

21  A.  Yes.  At your local library.

22  Q.  So, if we walk over to the New York public library, we

23  could find laws such as HCRA right there; correct?

24  A.  You would hopefully find all the laws in New York State,

25  yes.

1          THE COURT:  Just to reiterate, the jury is not doing

2     any independent research in this case.

3          THE WITNESS:  You're lucky.

4     BY MR. SHUR:

5     Q.  These laws and this process -- it's not a secret; right?

6     A.  Correct.

7     Q.  Now, this pool of HCRA money that we've been talking

8     about -- it was well known within the assembly that this money

9     was available; correct?

10    A.  After enactment, yes.

11    Q.  If I could just show you Defense Exhibit 32.  There are two

12    documents here.

13          Do you recognize these as budget request letters?

14    A.  Yes.

15    Q.  Are these letters made and kept in the regular course of

16    the assembly's business?

17    A.  Yes.

18          MR. SHUR:  Move for admission of Defendant's Exhibit

19    32.

20          MR. MASTER:  Yes, your Honor.  I believe these are

21    already part of a previously admitted exhibit packet.  So no

22    objection.

23          THE COURT:  Defense Exhibit 32 will be received.

24          (Defendant's Exhibit 32 received in evidence)

25          THE COURT:  What are they the same exhibit as?

1           MR. SHUR:  111.

2    BY MR. SHUR:

3    Q.  I believe you testified on direct examination that the

4    speaker would receive hundreds of these types of budget request

5    letters; right?

6    A.  Correct.

7    Q.  These are essentially letters from other members of the

8    assembly asking to fund a particular project; right?

9    A.  Correct.

10   Q.  So, if we could take a look at the November 2, 2005 letter.

11   This is a letter from assemblyman John Lavalle; right?

12   A.  God rest his soul, yes.

13   Q.  And it's to the speaker, to Mr. Silver; right?

14   A.  Yes.

15   Q.  And in this letter, there's a request for funding; correct?

16   A.  Yes.

17   Q.  If you take a look at the highlighted portion of the letter

18   here, it says, "I am requesting $500,000 in HCRA monies from

19   the speaker's priority fund."

20           Right?

21   A.  Yes.

22   Q.  And this was a reference to this discretionary HCRA fund

23   that we've been talking about; correct?

24   A.  Correct.

25   Q.  If we could take a look at the second letter.

FB9YSIL2                     Franco - Cross

1              This is a June 6, 2006, letter; right?

2    A.   Yes.

3    Q.   From Assemblywoman Crystal Peoples.

4    A.   Yes.

5    Q.   And it's to Sheldon Silver; correct?

6    A.   Yes.

7    Q.   And like the other letter, it's requesting funding for a

8    particular project; right?

9    A.   Yes.

10   Q.   And in the second sentence of the first paragraph -- let me

11   read the sentence.  "I'm writing to reaffirm my overwhelming

12   support for the innovative and community-minded HCRA funding

13   proposal."

14              That reference to HCRA funding proposal -- that again

15   is the HCRA discretionary fund we've been talking about;

16   correct?

17   A.   Yes.

18   Q.   And there in the third paragraph, the first sentence reads,

19   "The amount of funding requested from the speaker's designated

20   HCRA-funding pool totals $486,000."

21              Again, this was the same pool of money; correct?

22   A.   Yes.

23   Q.   In addition to the HCRA law, this pool of money, this HCRA

24   pool of money, was referenced in the budget every year; right?

25   A.   Yes.

1  Q.  New York State passed a budget each year that clearly

2  allocated HCRA funds to the speaker; right?

3  A.  Again, I wasn't responsible for those reappropriations,

4  making sure that they were there.  So I don't recall how the

5  actual language of the appropriation read.  But I do know

6  in fact that, yes.  There were pools reappropriated every

7  single year.

8  Q.  The HCRA pool was -- there was a pool of money for the

9  assembly; right?

10  A.  Within the confines of the program, yes.  They were funding

11  designated for assembly purposes.

12  Q.  This is the $8.5 million that we were talking about;

13  correct?

14  A.  Yes.

15  Q.  And the $8.5 million in the senate was also contained in

16  the budget; right?

17  A.  Yes.

18  Q.  And the $8.5 million to the governor or the Department of

19  Health, if he directed so, was also in the budget; right?

20  A.  Yes.

21  Q.  And the budget, like the HCRA law itself, had to be

22  approved by the assembly; correct?

23  A.  Yes.

24  Q.  Had to be approved by the senate; right?

25  A.  Yes.

FB9YSIL2                        Franco - Cross

1    Q.   And it had to be approved by the governor; correct?

2    A.   Yes.

3    Q.   And the New York State budget is also not a secret; right?

4    A.   Correct.

5    Q.   It's available to the public; correct?

6    A.   Yes.

7    Q.   So, similar to the two letters we were looking at, as the

8    Speaker of the Assembly, Mr. Silver received various requests

9    for funding; correct?

10   A.   Multiple requests, yes.

11   Q.   And these are the budget request letters we were looking

12   at; right?  That's typically the form it took.

13   A.   Yes.

14   Q.   These letters, the budget request letters, would often come

15   from organizations outside of the assembly seeking funding;

16   right?

17   A.   Anybody who had an interest in the outcome of the state

18   budget, yes.

19   Q.   So it would also include folks from within the assembly

20   like the assembly members we were just looking at; right?

21   A.   Correct.

22   Q.   I think you just said each year hundreds of budget request

23   letters would come to the speaker?

24   A.   Approximately.

25   Q.   If I remember correctly, you testified on

1    direct examination that in 2007 alone the speaker received over

2    1,000 of these requests.

3    A.  Yes.  Multiple.  Many, many, many.  Yes.

4    Q.  And these requests for funding far exceeded the amount of

5    funds that were available; correct?

6    A.  Always.

7    Q.  So it was not possible to fund each and every one of those

8    projects; right?

9    A.  No.

10   Q.  Mr. Franco, because it was impossible to fund each and

11   every request, someone had to make a decision as to which

12   requests to fund; right?

13   A.  Yes.

14   Q.  Because, if there was no one to make a decision, then no

15   request would be funded; correct?

16   A.  Hypothetically, yes.

17   Q.  And if no requests were funded, then none of the

18   organizations seeking money were going to get help; right?

19   A.  Correct.

20   Q.  On direct examination, you explained that within the Ways

21   and Means Committee, there's an organizational structure;

22   right?

23   A.  Yes.

24   Q.  So, for example, I think you testified that you would learn

25   when Mr. Silver decided to award funds under HCRA when you

FB9YSIL2                          Franco - Cross

1   received direction from -- I think you referred to them as your

2   principals; right?

3   A.  Yes.

4   Q.  And those are simply the folks that you report to; right?

5   A.  Yes.

6   Q.  And that type of organizational structure existed

7   throughout the assembly; right?

8   A.  Correct.

9   Q.  And it exists in the senate?

10  A.  Yes.  That I'm aware of.

11  Q.  And in executive branch agencies; correct?

12  A.  Yes.

13  Q.  In the federal government, there's that organizational

14  structure as well; right?

15          MR. MASTER:  Objection.

16          THE COURT:  Sustained.

17  BY MR. SHUR:

18  Q.  Within any organizational structure, you would agree that

19  there needs to be a leader; right?

20          MR. MASTER:  Objection.

21          THE COURT:  Sustained.

22  BY MR. SHUR:

23  Q.  Mr. Franco, as the leader of the assembly, the speaker made

24  those decisions with respect to how to distribute the HCRA

25  funds; correct?

1   A.  He was the ultimate decision-maker.

2   Q.  And he was authorized to do that; correct?

3   A.  Yes.

4            MR. MASTER:  Objection.

5            THE COURT:  Sustained.  It's been asked and answered

6   several times.

7   BY MR. SHUR:

8   Q.  Mr. Franco, while Mr. Silver as the speaker made decisions

9   about which requests to fund, he often did so based on inputs

10  from the assembly; right?

11  A.  Yes.

12  Q.  Mr. Silver had a staff as the speaker?

13  A.  Correct.

14  Q.  How big was the staff?

15  A.  I don't know exactly.  It was larger than the typical

16  member.

17  Q.  Well, were there a dozen people on his staff?

18  A.  Now, when you say "staff," you're implying people that

19  directly report to him?  Or are you talking about the members

20  of the central staff of the assembly?

21  Q.  Both.

22  A.  Okay.  Central staff, you know, hundreds of people that

23  work for, you know, the speaker indirectly.  Because he's the

24  ultimate appointed authority, we serve at the pleasure of the

25  speaker.

1                And then, of course, because he is, in addition to the

2     Speaker of the Assembly, has his own, you know, staff working

3     in his district and working in his Albany office that report

4     directly, you know, ultimately to him.

5     Q.  And his staff was important; right?

6     A.  I would hope so.

7     Q.  Because it was impossible for Mr. Silver to personally

8     handle each and every task that the speaker was responsible

9     for; right?

10              MR. MASTER:  Objection.

11              THE COURT:  Sustained.

12    BY MR. SHUR:

13    Q.  Mr. Franco, Mr. Silver delegated projects to the members of

14    his staff; right?

15    A.  As far as I'm aware, yes.

16    Q.  And those staff members --

17              THE COURT:  You're not on Silver's staff; right?

18              THE WITNESS:  No.  I'm a member of central staff.

19    BY MR. SHUR:

20    Q.  The central staff that you just talked about that

21    indirectly reports to Mr. Silver; correct?

22    A.  The speaker is the ultimate authority.  We serve at the

23    pleasure of the speaker.

24    Q.  Mr. Silver's staff members included people like Jim Yates.

25    Are you familiar with Mr. Yates?

1    A.  Yes.  I know Jim Yates.

2    Q.  He's a highly respected lawyer; right?

3              MR. MASTER:  Objection.

4              THE COURT:  Sustained.

5    BY MR. SHUR:

6    Q.  Are you aware that Mr. Silver delegated certain projects to

7    Mr. Yates?

8              MR. MASTER:  Objection.

9              THE COURT:  Sustained.

10   BY MR. SHUR:

11   Q.  When it came to funding decisions, Mr. Silver would seek

12   and receive recommendations from his staff members; correct?

13             MR. MASTER:  Objection.

14             THE COURT:  Sustained.

15             Were you ever present in any of those meetings?

16             THE WITNESS:  Yes.  I was present at some of the

17   meetings.

18             THE COURT:  Okay.  You can say what you heard at the

19   meeting.

20   BY MR. SHUR:

21   Q.  The question is:  Would Mr. Silver, when making funding

22   decisions, seek and receive recommendations from the people

23   around him, including his staff?

24             MR. MASTER:  Objection.

25             THE COURT:  Sustained.  Rephrase it.

FB9YSIL2                    Franco - Cross

1            In a meeting that you were present at, did you ever

2     hear Mr. Silver seek or receive recommendations for funding?

3            THE WITNESS:  Yes.  It was a collaborative effort

4     amongst various disciplines.  Members of the senior staff would

5     come together, and we would, you know, review the budget needs,

6     review the current state of the budget, reflect on the

7     executive budget compared to our own assembly one-house and

8     ensure that the priorities for the democratic assembly were

9     intact protected.

10    BY MR. SHUR:

11    Q.  And, when you say "senior staff," does that include people

12    like Judy Rapfogel?

13    A.  Yes.

14    Q.  Judy Rapfogel is Mr. Silver's chief of staff; right?

15    A.  I don't know her current status, but she was at the time

16    when I was at these meetings, yes.

17    Q.  And, during these meetings, she would, in addition to

18    others, provide recommendations to Mr. Silver about which

19    projects to fund?

20    A.  Correct.  She was at these meetings.

21    Q.  And, in addition to the budget request letters we were

22    looking at, the Ways and Means Committee staff such as

23    yourself, would attend meetings where members of the assembly

24    discussed budget items; right?

25    A.  Depending on the topic of conversation, would determine who

FB9YSIL2                          Franco - Cross

1    was in attendance.

2    Q.  Have you attended those types of meetings?

3    A.  Yes.

4    Q.  At those meetings, assembly members would discuss requests

5    for funding; correct?

6    A.  Assembly members themselves?

7    Q.  Right.  Or their staff.

8    A.  It depends on the topic of conversation.  Because of my

9    area, typically there were no other members in the room.

10   Q.  Would the staff members for members be present at these

11   meetings?

12   A.  Not at the meetings that I was present.

13   Q.  Are you aware of meetings where the Ways and Means

14   Committee would participate where there was discussion among

15   members about certain requests?  Whether or not to fund them.

16              MR. MASTER:  Objection.

17              THE COURT:  The question is were you aware of such

18   meetings.

19              MR. SHUR:  Right.

20              THE COURT:  Overruled.

21              THE WITNESS:  I would hear side conversation from my

22   colleagues about how their day went and stuff like that.  So,

23   you know, I guess I can infer that, yeah.  They were there, and

24   other people were there.

25   BY MR. SHUR:

1    Q.  When you were at the Ways and Means Committee and you

2    mentioned that there would be meetings, there was a

3    collaborative process I believe is what you referred to it as;

4    right?

5    A.  Yes.

6    Q.  During these meetings, would there be staff, Ways and Means

7    Committee staff, that would bring back to the Ways and Means

8    Committee assembly member X is interested in this particular

9    project or assembly member Y is interested in that particular

10   project?

11   A.  Yes.

12   Q.  Mr. Silver often recommended that projects be funded using

13   the HCRA discretionary pool based on the requests of staff and

14   other assembly members; right?

15               MR. MASTER:  Objection.

16               THE COURT:  Sustained.

17   BY MR. SHUR:

18   Q.  Are you aware that Mr. Silver --

19               THE COURT:  That's not going to cure the problem.

20               MR. SHUR:  Judge, I'm not sure what the problem is.

21               THE COURT:  It's hearsay.

22               MR. SHUR:  Maybe some exhibits will cure the problem.

23   Let's take a look at Government Exhibit 284.

24   BY MR. SHUR:

25   Q.  I believe you looked at this letter on direct examination.

1          Do you remember this?

2   A.  Yes.

3   Q.  This is the letter in which the assembly is notifying the

4   Department of Health that it seeks to fund a number of

5   different projects using the assembly's HCRA discretionary

6   fund; right?

7   A.  Yes.

8   Q.  If you take a look at the second page of this exhibit, one

9   of the projects which the government highlighted during your

10  direct examination is the $250,000 grant to Columbia University

11  Medical Center.

12          Do you see it there?  It's the second from the bottom.

13  A.  Yes.

14  Q.  That was a grant that Mr. Silver sponsored; right?

15  A.  Correct.

16  Q.  There are a number of grants listed here on this page that

17  Mr. Silver sponsored at the request of other members.  Isn't

18  that right?

19  A.  Correct.

20  Q.  If you take a look at the third page of this exhibit -- let

21  me show you another exhibit, Defendant's Exhibit 33.

22          THE COURT:  Isn't this the same exhibit?

23          MR. SHUR:  It is not, Judge.

24          THE COURT:  The cover letter is the same.

25          MR. SHUR:  That's correct.

FB9YSIL2                          Franco - Cross

1    BY MR. SHUR:

2    Q.   The first two pages of this document is the letter and

3    attachment to the Department of Health we were just looking at;

4    correct?

5    A.   Yes.

6    Q.   And then the remaining pages of this exhibit include budget

7    request letters and legislative initiative forms; correct?

8    A.   Correct.

9    Q.   And these are all documents that are made and kept in the

10   ordinary course of the assembly's business?

11   A.   Yes.

12           MR. SHUR:  Your Honor, I move for the admission of

13   Defendant's Exhibit 33.

14           THE COURT:  I'm not sure I quite understand what

15   you've done.  Can you come up to sidebar.

16           (At the sidebar)

17           THE COURT:  Government Exhibit 284 was introduced as a

18   record that's kept in the ordinary course of business the

19   assembly.  I understand that to mean the document as it is

20   stapled together is how it appears in assembly files.

21           What is this?  This appears to be an accumulation of

22   documents that you have put together for the ease of dealing

23   with this witness but that is not maintained in this form in

24   the ordinary course of business.

25           MR. SHUR:  I'm happy to clarify that, Judge.  I'll

FB9YSIL2                         Franco - Cross

1    tell you exactly what this is.  This is the same as that.

2              THE COURT:  It's part of this exhibit.

3              MR. SHUR:  Right.  That's correct.  The following are

4    the budget request letters to Mr. Silver for each or the

5    majority of the grants listed here along with the legislative

6    initiative forms which show that these particular grants were

7    sponsored by Mr. Silver at the request of other members.

8              THE COURT:  How do you get over the hump of knowing

9    that that's what happened?  You've put it together as a

10   document as though he sponsored the Foundling Hospital on

11   Staten Island because of all this.  He does this because of

12   this, and, therefore, it gets to the accumulation.

13             We don't know, without Mr. Silver testifying, that the

14   reason he sponsored that was because whoever asked for it.

15             MR. SHUR:  It doesn't need to be the sole reason.

16             THE COURT:  That's what you've asked him.

17             MR. SHUR:  At the request -- that there was a request

18   made of Mr. Silver to sponsor this grant, and he did.  Now,

19   there whether there were other members who requested it or

20   whether the organization itself also made the recommendation,

21   that doesn't --

22             THE COURT:  I'm not going to let you put it in as a

23   made-up document.

24             MR. SHUR:  I'm happy to clarify.

25             THE COURT:  No.  I'm not going to let you put it in as

1    a made-up document.  This is not a document.  It does not exist

2    anywhere in the ordinary course of business other than in the

3    defense files put together for convenience.  So you've got all

4    the constituent pieces of this in evidence already.

5              MR. SHUR:  Judge, I believe the government submitted

6    exhibits on direct examination that were compilations that were

7    put together by the government.

8              THE COURT:  If so, I didn't hear an objection to that.

9              MR. SHUR:  That's right.  Because ultimately, all of

10   those different pieces are business records of the assembly.

11             THE COURT:  Or he testified that he accumulated it.

12             MR. SHUR:  Right.

13             THE COURT:  This though -- you have taken various

14   documents and crammed them together as though this is one

15   document, and it's not.

16             MR. SHUR:  I'm not suggesting that it is.  I'm happy

17   to make clear that that's not the case.

18             I think the witness already testified that many of

19   these projects were sponsored by Mr. Silver at the request of

20   other members.

21             THE COURT:  Then it's asked and answered.

22             MS. COHEN:  It's also very misleading that of course

23   Mr. Whalen does not receive the underlying meta request.

24             MR. SHUR:  I would disagree with that

25   characterization.  That's neither here nor there.

1            THE COURT:  Don't argue at sidebar.  The objection is

2       going to be sustained.  If you want to ask him or show him the

3       letter and the initiative, I think that's already been done.

4            MR. SHUR:  Okay.  Fair enough.

5            THE COURT:  You've got your evidence for purposes of

6       summation, which is all you want anyway, all you need.

7            MR. SHUR:  Understood, Judge.

8            THE COURT:  All right.

9            (In open court)

10            THE COURT:  The objection is sustained.

11            About how much longer are you going to be, Mr. Shur?

12            MR. SHUR:  I'm sorry, Judge.  I didn't hear you.

13            THE COURT:  About how much longer are you going to be?

14            MR. SHUR:  Maybe an hour or so.

15            THE COURT:  Find a convenient stopping point in about

16       ten minutes, please.

17            MR. SHUR:  Yes, Judge.

18       BY MR. SHUR:

19       Q.  Mr. Franco, based on the meetings that you attended at the

20       Ways and Means Committee, is it fair to say that Mr. Silver was

21       attentive to other assembly members' requests to fund projects?

22            MR. MASTER:  Objection.

23            THE COURT:  Sustained.

24            MR. SHUR:  Can we put up Government Exhibit 284 again.

25       BY MR. SHUR:

FB9YSIL2                         Franco - Cross

1    Q.  This was the letter to the Department of Health regarding a

2    number of grants, including the Columbia University Medical

3    Center grant; right?

4    A.  Yes.

5    Q.  You prepared this letter?  I think, if you'll take a look

6    at the bottom of the letter on the left-hand side, your

7    initials appear.

8    A.  Yes.  Unfortunately.

9            MR. SHUR:  If you would blow up the letter again,

10   please.

11   BY MR. SHUR:

12   Q.  That's a signature stamp that was applied; is that right?

13   A.  Correct.

14   Q.  Mr. Silver didn't personally sign this letter; is that

15   correct?

16   A.  No.

17   Q.  When you say you prepared the letter, this is a form

18   letter; correct?

19   A.  Correct.

20   Q.  Meaning with the hundreds and thousands of different grants

21   that are submitted to different agencies, a letter just like

22   this one is prepared; correct?

23   A.  Correct.

24   Q.  And the language, with the exception of the grantee and the

25   dollar amount, is virtually identical?

FB9YSIL2                    Franco - Cross

```
1    A.  And the funding stream, yes.

2            MR. SHUR:  You can take it down.  Thank you.

3    BY MR. SHUR:

4    Q.  Mr. Franco, with respect to the HCRA discretionary funds,

5    Mr. Silver, if he wanted to, could have simply funded programs

6    in his district and only his district.

7            Is that right?

8    A.  Yes.

9    Q.  He had that authority; correct?

10   A.  Yes.

11   Q.  There was nothing that prohibited him from doing that;

12   right?

13   A.  No.

14   Q.  But he didn't do that; correct?

15   A.  No.

16   Q.  Mr. Silver requested that this HCRA law funding be provided

17   to organizations throughout New York State; correct?

18           MR. MASTER:  Objection.

19           THE COURT:  Overruled.

20           THE WITNESS:  I don't know if he required that the law

21   do it, but I know that in the speaker's practice, he would

22   always be concerned about statewide impacts.

23   BY MR. SHUR:

24   Q.  Just to make sure that I'm clear about your answer, many of

25   the HCRA grants that Mr. Silver sponsored went to projects
```

1  outside of his district.

2  A.  Yes.

3  Q.  In fact, is it fair to say that over 90 percent of the HCRA

4  grants that Mr. Silver sponsored went to projects outside of

5  his district?

6  A.  As a numbers guy who likes to be precise about numbers, I'm

7  very reluctant to give a percentage.  But, yes, a vast majority

8  was outside of his district.

9  Q.  I'd like to show you what's been marked Defendant's Exhibit

10  34-1 for identification.

11  A.  Thanks.

12         MR. SHUR:  Judge, I'm happy to take a break now, or we

13  could finish this exhibit.

14         THE COURT:  How long is it going to take?

15         MR. SHUR:  Maybe five or ten minutes.

16         THE COURT:  Let's go ahead and do it.

17         MR. SHUR:  Okay.

18  BY MR. SHUR:

19  Q.  Mr. Franco, this is a record of HCRA grant expenditures --

20         THE COURT:  Okay.  So normally you ask him what is

21  this?  You don't testify about what you've just handed him.

22         MR. SHUR:  Understood, Judge.

23  BY MR. SHUR:

24  Q.  Mr. Franco, do you recognize this document?

25  A.  Yes.

FB9YSIL2                          Franco - Cross

1    Q.   What is it?

2    A.   This is a report that periodically we would get from the

3    New York State Department of Health reflecting commitments made

4    against HCRA discretionary pools.

5    Q.   Is it a document that's kept by the New York State

6    legislature in the regular course of its business?

7    A.   Yes.

8             MR. SHUR:   Your Honor, I'd move for admission of

9    Defendant's Exhibit 34-1.

10            THE COURT:   Any objection?

11            MR. MASTER:   No objection.

12            THE COURT:   All right.   34-1 is received.

13            (Defendant's Exhibit 34-1 received in evidence)

14            MR. SHUR:   If we could publish it to the jury, please.

15   BY MR. SHUR:

16   Q.   If you could actually go to the third page of the document.

17            As I think you just mentioned, this document contains

18   HCRA grants for a period of time; right?

19   A.   Yes.

20   Q.   Is it from '97 to 2006?

21   A.   Yes.   Those were the years where the pools were made

22   available.

23            MR. MASTER:   Your Honor, I'm going to object to the

24   highlighting.   I don't think that's how the document is

25   maintained in the regular course.

FB9YSIL2                         Franco - Cross

1              MR. SHUR:  That's right.

2              THE COURT:  Disregard the highlighting.

3     BY MR. SHUR:

4     Q.  This document contains HCRA grants that were made by both

5     the assembly and the senate; right?

6     A.  The entire document, yes.

7              THE COURT:  This is over a period of years; right?

8              THE WITNESS:  Correct.

9              THE COURT:  So at the top of the document it tells you

10    what year the grant was made?

11             THE WITNESS:  No.  At the top of the document -- the

12    first date that you see on line 3, March 2009 -- that's the

13    date of the report.  Then underneath it, year 1997 -- that's

14    the year of the respective HCRA pool where the following grants

15    are basically funded through.

16             THE COURT:  So it's the pool.  It's not necessarily

17    when the grant was made?

18             THE WITNESS:  Correct.  So, if you're interested to

19    see the date the grant was initiated, you would see on the

20    fifth Columbia in DOH target date and DOH notified date are the

21    dates that designate when the Department of Health was notified

22    of legislative intent.

23    BY MR. SHUR:

24    Q.  Mr. Franco, the version that you have -- does it contain

25    highlighting?

1    A.  It does.

2    Q.  The grants that are highlighted -- are those grants that

3    were HCRA grants that were outside of Mr. Silver's district?

4    A.  I can't speak to that just eyeballing it.

5    Q.  Let's take a look at a few of them.

6           If you take a look at page --

7    A.  Albany Medical Center, which is the first one -- that's

8    clearly outside of his district.

9    Q.  What about -- if you take a look at page, just to get a

10   sample here, page 9.  When I say page 9, at the bottom

11   right-hand corner, there are numbers.  So we're looking at page

12   9 of 22.

13   A.  I'm with you.  Go.

14   Q.  So, if you take a look at the fourth entry from the bottom,

15   that's a grant for Rochester General Hospital; right?

16   A.  Yes.

17   Q.  And it's in the amount of -- is it $3,000,000?

18   A.  Yes.

19   Q.  Rochester, New York, is not in Mr. Silver's district;

20   right?

21   A.  No.

22   Q.  What about page 15 of 22?  The first entry is also for

23   Albany Medical Center; right?

24   A.  Yes.

25   Q.  This is a grant for $250,000?

FB9YSIL2                         Franco - Cross

1    A.   Yes.

2    Q.   This is a HCRA grant that Mr. Silver sponsored?

3    A.   Not to my knowledge.

4    Q.   It's a HCRA grant that Mr. Silver approved; right?  That

5    was sent out to the Department of Health?

6    A.   That we were directed to initiate, yes.

7    Q.   By Mr. Silver.  Yes?

8    A.   Yes.  I mean, I assume so.

9    Q.   I don't want you to assume.

10            Any of the HCRA grants that you requested funding

11   for -- that authority was Mr. Silver; correct?

12   A.   Correct.

13   Q.   And, if you take a look at page 17 of 22, the seventh entry

14   from the top, the grant recipient is Long Island Health Network

15   Education.  It's a grant for $25,000.

16            Do you see that?

17   A.   Yes.

18   Q.   That's also outside of Mr. Silver's district; right?

19   A.   Yes.

20   Q.   Just to be clear, for some of the HCRA grants, there was

21   another member of the assembly that would request it, and there

22   Mr. Silver would approve the request and pass it on; correct?

23   A.   Yes.

24   Q.   And then for some of the HCRA grants, Mr. Silver would

25   initiate the request all by himself even if there was no other

1    request from another member of the assembly; correct?

2    A.   Right.  Like I stated in my direct, he wouldn't write a

3    letter to himself.

4              MR. SHUR:  I think we can take this document down.

5              Is this okay with the Court?

6              THE COURT:  Ladies and gentlemen, we're going to take

7    our morning break.  So we're going to take about a ten-minute

8    break.  Don't discuss the case.

9              Just for your planning purposes, I have a lunch

10   meeting at 1:00.  So we're going to go right up until about

11   1:00 when we break for lunch.

12             (Jury not present)

13             THE COURT:  Okay.  On the actual Defense Exhibit 34-1,

14   the defense's directive to substitute a document that is not

15   highlighted -- the highlighting is not in the ordinary course

16   of business maintained.

17             Moreover, there's no way he can testify to this

18   because you've highlighted Planned Parenthood of New York City.

19   I don't know under what theory that's not in his district.  I'm

20   quite confident there are women in his district and men who

21   take advantage of Planned Parenthood New York.

22             MR. SHUR:  Judge, if I may -- I'm happy to discuss

23   this in front of the witness.

24             THE COURT:  No.  Step down.

25             Mr. Franco, you should go back to the holding pen.

1          (Witness temporarily excused)

2          MR. SHUR:  Judge, based on our calculations,

3    96 percent of the HCRA grants --

4          THE COURT:  That's fine, but you're not a witness.

5          MR. SHUR:  I'm raising that point for a reason, Judge.

6    We're certainly able to proffer it up through maybe not

7    necessarily Mr. Franco but through additional witnesses.

8          If the government is willing to stipulate to that

9    fact, then it's not necessary.

10         THE COURT:  Talk to the government.  That's between

11   you and the government.  My point is you can't put an exhibit

12   in as a document that's maintained in the ordinary course of

13   business if you've altered the document in ways that reflects

14   the defense theory of life.

15         And, while I don't have an objection to saying that

16   Albany is not in his district -- it clearly isn't -- as

17   highlighted, I have some concerns about accuracy.

18         MR. SHUR:  Understood.

19         THE COURT:  Okay.

20         MR. SHUR:  Thank you, Judge.

21         THE COURT:  Ten-minute break.

22         MS. COHEN:  Thank you, your Honor.

23         (Recess)

24         MR. SHUR:  Judge, if I may.

25         THE COURT:  Yes.

FB9YSIL2                          Franco – Cross

1            MR. SHUR:  This is just a clean version of Defendant's

2       Exhibit 43-1.

3            THE COURT:  Thank you.

4            (Continued on next page)

FB95sil3                          Franco - cross

1                THE COURT:  Does the government have another witness

2     before lunch?

3                MS. COHEN:  Yes, we do, your Honor.  I'm not sure we

4     will get to him, depending on cross but we do have him here and

5     ready to go.

6                THE COURT:  Good.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Okay, Mr. Franco.  You are still under

3    oath.

4              THE WITNESS:  Okay.

5              MR. SHUR:  If I may, Judge?

6              THE COURT:  Please.

7    BY MR. SHUR:

8    Q.  Mr. Franco, if we can briefly take a look again at

9    Defendant's Exhibit 34-1, in particular if we can take a look

10   at the first page, I guess it is the third page of the document

11   but the first page of the chart that we were looking at.  Let's

12   take a look at this page for a moment as an example.

13             You said Albany Medical Center; that is not in

14   Mr. Silver's district, right?

15   A.  Correct.

16   Q.  And again, these are all grants that were issued with HCRA

17   discretionary funds, right?

18   A.  Correct.

19   Q.  If you look down you will see Brookdale Hospital Medical

20   Center?

21   A.  Yes.

22   Q.  That's not in Mr. Silver's district, correct?

23   A.  No.

24   Q.  Brookhaven Memorial Hospital, that's not in Mr. Silver's

25   district, right?

1   A.   No.

2   Q.   Brunswick Hospital Center, that's not in Mr. Silver's

3   district, correct?

4   A.   No.

5   Q.   Greater New York Hospital Association, is that in

6   Mr. Silver's district?

7   A.   I don't know.

8   Q.   What about a few down further from that, Long Island Jewish

9   Medical Center; that's not in Mr. Silver's district, right?

10   A.   No.

11   Q.   If you look further down, Northshore Long Island Jewish

12   Hospital, that's not in Mr. Silver's district?

13   A.   No.

14   Q.   And then you is see there is three for Northern Westchester

15   Hospital Center, that's not in Mr. Silver's district?

16   A.   No.

17   Q.   That's in Amy Paulin's?

18   A.   I would have to AD those.  I don't know.

19   Q.   A few further down, Rochester General Hospital; also not in

20   Mr. Silver's district, right?

21   A.   Correct.

22   Q.   The two grants that the prosecutor focused on with you were

23   the New York Presbyterian and Columbia University Medical

24   Center grants that we have talked about, those were for cancer

25   research or medical research, right?

FB95sil3                    Franco - cross

1    A.  Yes.

2    Q.  Those weren't the only grants that Mr. Silver sponsored for

3    medical research, right?

4    A.  No.  No.

5    Q.  There were others, yes?

6    A.  Yes.

7    Q.  I would like to show you Defendant's Exhibit 35 for

8    identification, it is actually Defendant's Exhibit 35-1 through

9    Defendant's Exhibit 35-8.  Mr. Franco, let me know once you

10   have had a chance to take a look at this exhibit.  Let me start

11   with 35-1, let me take them one at a time.

12   A.  Okay.

13   Q.  Have you had an opportunity to review it?

14   A.  Yes.

15   Q.  Do you recognize it?

16   A.  This is something that looks very similar to the letters

17   that I would do.

18   Q.  And when you say letters that you would do, it's a letter

19   from the Assembly to the Department of Health regarding a HCRA

20   grant?

21   A.  Correct.

22   Q.  And is this letter in particular made and kept in the

23   ordinary course of business at the Assembly?

24   A.  Yes.

25            MR. SHUR:  Move for admission of Defendant's Exhibit

1    35-1.

2              MR. MASTER:  Objection, your Honor.  He said it was

3    before.

4              THE COURT:  Overruled.

5              MR. SHUR:  Was that received into evidence, Judge?

6              THE COURT:  Yes.

7              (Defendant's Exhibit 35-1 received in evidence)

8    BY MR. SHUR:

9    Q.  If we can publish to the jury, please?

10             If you actually take a look -- so, this is the cover

11   letter to the Department of Health, is that right?

12   A.  Yes.

13   Q.  And the letter mentions a number of different projects, it

14   says 20 projects, right?

15   A.  Yes.

16   Q.  If you take a look at the second page, the highlighting is

17   not on the original, if you take a look at the second page this

18   lists out the various projects that the Assembly is asking the

19   Department of Health to fund; is that right?

20   A.  Correct.

21   Q.  I want to focus in on the one that is highlighted on the

22   screen here which is the grant to the Health Care Association

23   of New York State.

24             Do you see that?

25   A.  Yes, I do see that.

FB95sil3                         Franco - cross

1   Q.  It was for $150,000, right?

2   A.  Yes.

3   Q.  If you take a look at the third page of the document, this

4   is the Legislative Initiative Form for that particular grant;

5   is that right?

6   A.  The document is entitled Health Care Reform Act Initiative

7   Form.

8   Q.  Right.

9          THE COURT:  Do you know beyond what the document

10  itself says?

11         THE WITNESS:  No.

12         THE COURT:  You are not familiar with this form?

13         THE WITNESS:  This predates me.

14  BY MR. SHUR:

15  Q.  Is this the same Legislative Initiative Form that was used

16  during your tenure at the Ways and Means Committee?

17  A.  It is similar but not the same.

18  Q.  Okay, but it is a Legislative Initiative Form for the

19  Healthcare Association of New York State, is that right?

20  A.  No.  The title says Health Care Reform Act Initiative Form.

21  Q.  I understand.

22         The grant recipient listed on the form is the

23  Healthcare Association of New York State, correct?

24  A.  Correct.

25  Q.  It is a HCRA initiative Legislative Initiative Form, right?

1  A.  Yes.

2           MR. MASTER:  Objection.

3           THE COURT:  Overruled.

4  Q.  Which this is a discretionary fund that Mr. Silver had

5  discretion over, correct?

6  A.  Correct.

7  Q.  The title says Breast Cancer Treatment Demonstration

8  Program, right?

9  A.  Yes.

10 Q.  And the purpose of the project is for services and expenses

11 related to research and design of a network model for high

12 quality breast health services and the dissemination of that

13 information throughout New York State; correct?

14 A.  That's what the form says.

15 Q.  Okay.

16          Why don't we take a look at Defendant's Exhibit 35-3.

17 Have you had a chance to take a look at it?

18 A.  Yes.

19 Q.  Do you recognize it?

20 A.  I do recognize it.

21 Q.  This is also a letter to the Department of Health

22 requesting funding for a HCRA grant, correct?

23 A.  Yes.

24 Q.  And this is the same type of document we have been talking

25 about that's made and kept in the regular course of the

833

FB95sil3                              Franco - cross

1   Assembly's business?

2   A.  Yes.

3           MR. SHUR:  I offer Defendant's Exhibit 35-3 into

4   evidence.

5           THE COURT:  Actually, I think you just said this is a

6   letter requesting a grant.  This is not a letter requesting a

7   grant, it is a letter granting a grant.

8           MR. SHUR:  Okay.

9           THE COURT:  Just to be clear.

10  BY MR. SHUR:

11  Q.  It's a letter from the Ways and Means Committee to the

12  Department of Health, right?

13  A.  Yes.

14  Q.  Regarding a HCRA grant?

15  A.  Yes.

16          MR. MASTER:  Objection, your Honor.

17          THE COURT:  Overruled.  35-3 will be received.

18          (Defendant's Exhibit 35-3 received in evidence)

19  BY MR. SHUR:

20  Q.  And it is regarding a grant for $250,000, right?

21  A.  Yes.

22  Q.  If you take a look at the second page it mentions the

23  project or the grant recipient and it is listed as Medical and

24  Health Research Association of New York, right?

25  A.  Yes.

FB95sil3                          Franco - cross

1   Q.  And also for $250,000, is that right?

2   A.  Yes.

3   Q.  And if you take a look at the third page, this is the same

4   type of Legislative Initiative Form we have been looking at,

5   right?

6   A.  Yes.

7   Q.  And grant recipient is the Medical and Health Research

8   Association of New York City, correct?

9   A.  Yes.

10  Q.  And the project title is early Childhood Obesity Prevention

11  Initiative, correct?

12  A.  Yes.

13  Q.  And the purpose of the project is for funds to be used for

14  the development of the early childhood obesity prevention

15  initiative that will build partnerships between community-based

16  organizations serving young children in low-income

17  neighborhoods, and researchers and investigators, correct?

18  A.  That's what the form says.

19  Q.  It is for $250,000, correct?

20  A.  Yes.

21  Q.  You can take it down.  Thank you.

22         So, Mr. Franco, the two grants that the government

23  focused on to New York Presbyterian and Columbia, the purpose

24  of the grants, medical research, was not unusual, right?

25  A.  No.

FB95sil3                        Franco - cross

1  Q.  There were many HCRA grants that Mr. Silver sponsored or

2  approved that went to fund medical research, correct?

3  A.  Yes.

4  Q.  And grant recipients, the New York Presbyterian Hospital

5  and the Columbia University Medical Center, that wasn't an

6  unusual grantee, correct?

7          THE COURT:  I don't know what that means.

8  Q.  Over the years those two prominent hospitals, New York

9  Presbyterian Hospital and Columbia University Medical Center,

10  they received other New York State grant money, right?

11          MR. MASTER:  Objection.

12          THE COURT:  Overruled.

13          If you know.

14  A.  Yeah.  I mean I -- I don't have my computer in front of me

15  but I would assume that they received other funding.

16  Q.  Let me show you what's been marked Defendant's Exhibit 36

17  for identification.  Have you had a chance to take a look at

18  the exhibit?

19  A.  Yes.

20  Q.  What is it?

21  A.  This is a similar HCRA letter along with Legislative

22  Initiative Form for HCRA.

23  Q.  And this letter is made and kept in the ordinary course of

24  the Assembly's business?

25  A.  Yes.

FB95sil3                          Franco - cross

1          MR. SHUR:  Your Honor, I move to admit Defendant's

2    Exhibit 36.

3          THE COURT:  Any objection?

4          MR. MASTER:  Objection.

5          THE COURT:  Overruled.

6          36 is received.

7          (Defendant's Exhibit 36 received in evidence)

8    BY MR. SHUR:

9    Q.  If we can publish this to the jury, please?

10         This is the form letter we have seen, right, to the

11   Department of Health?

12   A.  Yes.

13   Q.  From the Ways and Means Committee, yes?

14   A.  Yes.

15   Q.  And if you take a look at the second page of the exhibit,

16   and again the highlighting was added, there is two grants that

17   are the subject of this letter to the Department of Health,

18   correct?

19   A.  Yes.

20   Q.  And one of them is New York Presbyterian Hospital, right?

21   A.  Yes.

22   Q.  And it's for a grant to the hospital in the amount of $2

23   million, correct?

24   A.  Yes.

25   Q.  And if you turn to the third page of the document this is

```
 1   the Legislative Initiative Form that we are all very familiar
 2   with now, right?
 3   A.  Yes.
 4   Q.  And the grantee, as you can see on the form, is New York
 5   Presbyterian Hospital, right?
 6   A.  Yes.
 7   Q.  And the bottom you can see the amount of the grant is $2
 8   million, right?
 9   A.  Uh-huh.
10   Q.  And the project title says:  Allen Pavilion Emergency Room
11   Expansion, right?
12   A.  Yes.
13   Q.  So the funds, as you can see from the purpose of the
14   project, were to be used for the expansion and renovation of
15   the Allen emergency room at New York Presbyterian Hospital;
16   right?
17   A.  Yes.
18   Q.  Mr. Franco, do you know whether this particular grant was
19   requested by another member other than Mr. Silver?
20   A.  Again, I don't have my computer with me so I wouldn't be
21   able to pull that up for you.
22   Q.  Okay.  Well, regardless, Mr. Silver, because he has the
23   authority over these discretionary funds, authorized this
24   particular grant, correct?
25   A.  Yes.
```

FB95sil3                    Franco - cross

1    Q.  And sent it to the Department of Health for consideration,

2    right?

3    A.  Correct.

4    Q.  Okay.

5         I want to talk about the dollar amounts of the two

6    grants and when I say the two grants I'm referring to the grant

7    to New York Presbyterian and Columbia Hospitals, okay?

8    A.  Okay.

9    Q.  Each grant was in the amount of $250,000; is that right?

10   A.  Correct.

11   Q.  Mr. Franco, grants under HCRA law were not capped at

12   $250,000, right?

13   A.  Correct.

14   Q.  So each share we talked about this, right, the -- each

15   year, rather, the Assembly's share of discretionary HCRA funds

16   is $8.5 million?

17   A.  Yes, it was.

18   Q.  There is no statutory dollar limit on the amount of a HCRA

19   grant, correct?

20   A.  None that I'm aware of.

21   Q.  So the only limit that the Speaker had in terms of how much

22   to give in any given situation was this $8.5 million ceiling

23   basically, right?

24   A.  On an annual basis, yes.

25   Q.  So up to that amount, up to the amount of $8.5 million the

FB95sil3                         Franco - cross

1   speaker had complete discretion as to how much to give; is that

2   right?

3   A.   Correct.

4   Q.   So, is it fair to say if he wanted to, Mr. Silver could

5   have recommended that New York Presbyterian Hospital and

6   Columbia University Medical Center receive the entire amount,

7   the entire $8.5 million?

8   A.   That would be unprecedented but, yes, that technically

9   could occur.

10  Q.   He had that authority, right?

11  A.   Yes.

12  Q.   And he could have recommended that they receive $2 million?

13  A.   Yes.

14  Q.   Or $1 million?

15  A.   Yes.

16  Q.   Certainly he could have recommended that they receive more

17  than $250,000, right?

18  A.   Yes.

19  Q.   And that would not have been unusual, correct?

20  A.   No.

21  Q.   And in fact often times grants, under the HCRA law, were

22  for amounts greater than $250,000, right?

23  A.   Yes.

24  Q.   If we can take a look at -- this is already in evidence,

25  Defendant's Exhibit 34-1.  If we can highlight on this all of

FB95sil3                          Franco - cross

1    the grants that are in amounts in excess of $250,000, please?

2              THE COURT:  While he is highlighting can I see the

3    parties at side bar, please?

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FB95sil3                              Franco – cross

1                 (At side bar)

2                 THE COURT:  Although the government is not objecting I

3      have an obligation to move this trial forward.  You are using

4      the witness as a prop.  He has answered your question:  The

5      $250,000 is not the limit and many are more than that.  Going

6      through now this document and highlighting them is just a waste

7      of time.  You have made your point.

8                 MR. SHUR:  Judge, it will take no longer than five

9      seconds.

10                THE COURT:  But all of these five seconds are adding

11     up.  You have entirely used him as a prop.  You have not

12     adduced any new facts.  Your new facts could have been adduced

13     in a half an hour of focused cross-examination.

14                MR. SHUR:  Judge, I think this is actually a very

15     significant point.

16                THE COURT:  I disagree with its significance but, be

17     that as it may, you have now have the evidence out.  The reason

18     you want the evidence out is so you can sum up on it.  You have

19     the evidence out; $250,000 was not the limit, many are more

20     than that.  Moreover, the document is in evidence.  The

21     document speaks for itself.

22                MR. SHUR:  Can I ask one question?

23                THE COURT:  Reading documents to the jury is waste of

24     time.

25                MR. SHUR:  One question, Judge?

FB95sil3                          Franco - cross

1          THE COURT:  What question?

2          MR. SHUR:  To ask the witness regarding this and then

3   I will move on.

4          THE COURT:  What's the question?

5          MR. SHUR:  Just that the vast majority of grants on

6   this --

7          THE COURT:  No.  I'm not going to let you ask him that

8   question because he would have to count.  They can count, you

9   can count.  That's not cross-examination, that's not evidence.

10  You are trying to sum up the case.  That's not the purpose of

11  cross-examination.

12         MR. SHUR:  Judge, I think it is actually -- for this

13  document just to be submitted into evidence without any

14  illustrations to the jury, I think actually it aids the jury to

15  have to walk through the actual evidence and the government has

16  done that on direct examination as well.

17         THE COURT:  The question you asked did.  You have

18  established that he had up to $8.5 million, $250,000, many were

19  more than that.  You have established that.

20         MR. SHUR:  I understand, Judge.

21         THE COURT:  Okay.  So, do you really have an hour of

22  cross-examination left?  If it is like this it's a waste of

23  time.  Make your points.

24         MR. SHUR:  I understand, Judge.  I probably have

25  another 45 minutes.  Half hour, 45 minutes.

FB95sil3                          Franco - cross

1              THE COURT:  Think hard about that.  I find that hard

2      to believe.

3              MR. SHUR:  Okay.  I hear you, Judge.

4              THE COURT:  Okay.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FB95sil3                          Franco - cross

1              (In open court)

2              MR. SHUR:  You can take that exhibit down.  Thank you.

3    BY MR. SHUR:

4    Q.  Mr. Franco, you testified on direct examination that the

5    Assembly was not required to spend its entire share of the

6    discretionary HCRA funds within the year it was appropriated?

7    A.  Correct.

8    Q.  But it wasn't use it or lose it, right?

9    A.  Correct.

10   Q.  So if the Assembly was allocated $8.5 million in, say,

11   2003, and it only spent $6 million that year, the Assembly

12   would still be able to use the balance, the $2.5 million, say,

13   in 2004, or 2005, or 2006?

14   A.  As long as the source is continually reappropriated, yes.

15   Q.  And I believe you testified that the Assembly, under

16   Mr. Silver's leadership, was conservative and did not spend the

17   Assembly's entire share of discretionary HCRA funds within the

18   year it was appropriated?

19   A.  Extremely conservative.

20   Q.  Mr. Silver kept funds in reserve, right?

21             THE COURT:  Monies were not spent.  He can't testify

22   to what's in Mr. Silver's head.

23   A.  Right.  Yeah.  There was clearly a balance available to the

24   Assembly.

25   Q.  That was fiscally responsible, correct?

1              MR. MASTER:  Objection.

2              THE COURT:  Sustained.

3    Q.  Mr. Franco, discretionary funds, whether it is HCRA or

4    community programs funding or capital funding, they're not

5    guaranteed every year, right?

6    A.  No.

7    Q.  In fact, due to the state of the economy there have been

8    years where there has been no new discretionary funds allocated

9    to the Assembly, correct?

10   A.  Correct.

11   Q.  But because monies weren't spent and they were kept in

12   reserve during those years the Assembly was still able to fund

13   certain projects, right?

14   A.  I mean, yes.  I mean to answer your question --

15             THE COURT:  It is more complicated than that, right?

16             THE WITNESS:  Yes.  The answer is a lot more

17   complicated than yes or no, but yes.

18             THE COURT:  Because those funds still had to be

19   reappropriated, right?

20             THE WITNESS:  Correct.

21             THE COURT:  And if the cash wasn't available, it had

22   to be spent, right?

23             THE WITNESS:  Right, and sometimes in certain years

24   the cash would be swept out of the Community Projects Fund

25   making any contract almost null and void even though we had

1   appropriation authority.

2            So, again, it's a lot more complicated than just yes

3   or no but, technically, yes.

4   BY MR. SHUR:

5   Q.  And that was important to have those funds available,

6   right?

7            MR. MASTER:  Objection.

8            THE COURT:  Sustained.

9   Q.  Mr. Franco --

10           MR. MASTER:  Objection.

11           THE COURT:  He just said "Mr. Franco."  That's okay.

12           MR. MASTER:  No, no, no.  I'm good with that, totally

13   good with that.

14           THE WITNESS:  Do I need to change it?

15   BY MR. SHUR:

16   Q.  Mr. Franco, if you're aware, there are certain non-profit

17   organizations where state money is critical to the operation of

18   their organization, right?

19           MR. MASTER:  Objection.

20           THE COURT:  Sustained.

21   Q.  Do you know if there are non-profit organizations that rely

22   on state funding every year?

23           THE COURT:  How would he know that?  They rely on

24   state funding in what sense?  They rely on state funding in the

25   sense they're going to close their doors if they don't get a

FB95sil3                        Franco - cross

1   grant from New York?

2            MR. SHUR:  Correct.

3            THE COURT:  Do you know whether there are such

4   organizations?

5            THE WITNESS:  I have had conversations with executives

6   from such organizations, yes.

7   BY MR. SHUR:

8   Q.  So you're aware that that is the case, yes?

9            THE COURT:  No.  He is aware that people have said

10  that's the case.

11           MR. SHUR:  Okay.

12           THE WITNESS:  Whether it is true or not remains to be

13  seen.

14           THE COURT:  He's the man with the money.  They want

15  money.

16           THE WITNESS:  Right.  People cry broke when often

17  they're not, you know.

18           THE COURT:  People would say that to you?  Okay.

19  BY MR. SHUR:

20  Q.  Mr. Franco, you had mentioned, I believe, on direct

21  examination, I think you had used the words, Mr. Silver was the

22  ultimate decision maker with respect to the HCRA grants.

23           Do you remember that?

24  A.  No.  I said the Speaker was the ultimate decision maker.

25  Q.  And Mr. Silver was the Speaker during the 2005 and 2006

FB95sil3                          Franco - cross

1    time period, right?

2    A.  At the time, yes.

3    Q.  But let me ask you, before a single dollar of New York

4    State money was ever provided to New York Presbyterian Hospital

5    and the Columbia University Medical Center or any other HCRA

6    grant recipient, the grants had to go through a review process,

7    right?

8    A.  Within the state agencies, yes.

9    Q.  Well, the review process involved folks other than

10   Mr. Silver, right?

11   A.  Oh, I see what you are getting at.  Yes, I mean, there was

12   a deliberative decision-making process within the Assembly,

13   yes.

14   Q.  Within the Ways and Means Committee?

15   A.  Well, within the Assembly, not in isolation of the

16   Speaker's office, no.

17   Q.  Let me ask you this.  At the time, so we are talking about

18   2005 and 2006, right; for good or for bad the process that was

19   in place as far as reviewing HCRA grants didn't require a

20   competitive review, right?

21              MR. MASTER:  Objection.

22              THE COURT:  Overruled.

23              You are talking about within the Assembly?

24              MR. SHUR:  Correct.

25              THE WITNESS:  Right.

FB95sil3                              Franco - cross

1          THE COURT:  I think that's been asked and answered

2     several times.

3          THE WITNESS:  Correct.  I mean there was -- yeah.

4     Correct.

5     BY MR. SHUR:

6     Q.  And if I have asked you that already, I apologize.

7          So, it didn't involve a competitive review but there

8     was a process in place, right?

9     A.  Yes.

10    Q.  And the two grants to Columbia University Medical Center

11    and to the New York Presbyterian Hospital, they went through

12    that review process, right?

13    A.  They went through a decision-making process, yes.

14    Q.  Just like every other HCRA grant that was processed at that

15    time, right?

16    A.  Correct.

17    Q.  They weren't treated any differently, correct?

18         MR. MASTER:  Objection.

19         THE COURT:  Sustained.

20    Q.  Did the Columbia University or the New York Presbyterian

21    Hospital grants go through a different process than other HCRA

22    grants?

23         MR. MASTER:  Objection.

24         THE COURT:  Sustained.

25    Q.  If you know.

FB95sil3                          Franco - cross

1            MR. MASTER:  Objection.

2            THE COURT:  Do you know what the process within the

3   Speaker's office was as to those two grants in particular?

4            THE WITNESS:  I mean, as far as I'm aware it's

5   followed the exact same process -- decision-making process that

6   the Assembly did for other grants.

7   BY MR. SHUR:

8   Q.  In addition to this review process by the Ways and Means

9   Committee, the grants had to be signed off on by the Department

10  of Health, right?

11  A.  The contracts, yes.

12  Q.  And the grants had to be signed off on by the New York

13  State Attorney General's office, right?

14           THE COURT:  Wait a minute.  I'm sorry.  You said the

15  review process of the Ways and Means Committee.  Was the Ways

16  and Means Committee reviewing each of these grant proposals?

17           THE WITNESS:  Review is subjective.  Actually, strike

18  that please, if possible.  So, --

19           THE COURT:  What do you mean when you say that?

20           THE WITNESS:  When you review it, part of my job is

21  making sure that the words within the form were spelled

22  correctly, that we had a correct address, that the project

23  director on the form wasn't deceased.  You know, sort of things

24  like that.

25           THE COURT:  But you weren't weighing one grant against

FB95sil3                          Franco - cross

1   another in a review process?

2            THE WITNESS:  No.  Not me in my capacity but there was

3   a deliberative decision-making process above my level, yes.

4   BY MR. SHUR:

5   Q.  And that was the process that was in place at the time,

6   right?

7   A.  Correct.

8   Q.  So I think that the question I had asked was in addition to

9   Ways and Means, in addition to the Department of Health, the

10  grants had to be signed off on by the New York State Attorney

11  General's office?

12  A.  At the time --

13           MR. MASTER:  Objection.

14           THE COURT:  Overruled.

15           Do you know what the attorney general's review process

16  was, if any?

17           THE WITNESS:  No, I don't.

18           THE COURT:  Okay.

19           THE WITNESS:  Because I don't work for the attorney

20  general I don't know exactly, you know, but I know that their

21  office was involved in certain reviews with certain grants.  I

22  definitely know the comptroller was involved in certain grants

23  if the grant amount was above a certain level.

24  BY MR. SHUR:

25  Q.  Do you know whether the New York State comptroller's office

1    had to sign off on the grants?

2    A.  Like I just explained, yes, when they were above a certain

3    level.

4    Q.  Mr. Franco, is it fair to say that as a staff member of the

5    Ways and Means Committee it's not unusual for you to receive

6    calls from members of the Assembly?

7    A.  No, it is not unusual.

8    Q.  Members of the Assembly sometimes contact you to follow up

9    on the status of a particular request for funding?

10   A.  Yes.

11   Q.  Are you aware that with respect to the 2005 grant that it

12   took eight months for it to be processed and approved?

13   A.  I'm not aware of the exact time frame but that's not

14   uncommon.

15   Q.  During that time frame did Mr. Silver ever contact you to

16   follow up on the status of the grant request?

17   A.  No.

18   Q.  He didn't contact you to say, Victor, what's the story?

19   Why is this taking so long?

20           MR. MASTER:  Objection.

21           THE COURT:  Sustained.

22   Q.  As the Speaker, Mr. Silver could have taken steps to try to

23   expedite the process, right?

24   A.  Yeah.

25   Q.  He could have tried to cut through some of the red tape,

```
1    right?

2              MR. MASTER:  Objection.

3              THE COURT:  Do you know?  Do you know what his ability

4    to do things are once he gets out of the Ways and Means and is

5    over at the Department of Health?

6              THE WITNESS:  No, I mean other than just, you know,

7    kind of professional courtesy, not really.

8              THE COURT:  Okay.  Sustained.

9    BY MR. SHUR:

10   Q.  To be clear, you never received any direction from your

11   supervisors or from Mr. Silver to expedite these two grants,

12   correct?

13   A.  Those particular two grants?  No.

14   Q.  On direct examination the prosecutor asked you whether you

15   had any knowledge about any efforts by Mr. Silver to assist

16   Jonathan Taub with getting a job.  Do you remember that?

17   A.  Yes.

18   Q.  And you said none, right?

19   A.  Right, none that I'm aware of.  Yes.

20   Q.  Mr. Franco, what, if any knowledge, do you have about

21   Mr. Silver's efforts to help Julia Weprin obtain a teaching

22   position at PS 110?

23             MR. MASTER:  Objection.

24             THE COURT:  Do you have any knowledge?

25   A.  No, I have no knowledge of that.
```

1    Q.   Okay, what about do you have any knowledge about

2    Mr. Silver's recommendation on behalf of Mitchell Dinters for

3    his administration into Hofstra Law School?

4              MR. MASTER:  Objection, your Honor.

5              THE COURT:  Sustained.

6    Q.   The prosecutor asked you about what, if any knowledge, you

7    have about referrals that Dr. Robert Taub made to

8    Weitz & Luxenberg.  Do you remember that?

9    A.   Yes.

10   Q.   What, if any knowledge, Mr. Franco, do you have about the

11   Stanley Levinson litigation?

12             THE COURT:  The what?

13   Q.   Stanley Levinson litigation.  Do you know anything about

14   that?

15   A.   No, I don't know anything about that.

16   Q.   Mr. Silver didn't talk with you about the cases that he

17   handled or the cases that were handled by his firm

18   Weitz & Luxenberg, right?

19             MR. MASTER:  Objection.

20             THE COURT:  Overruled.

21   A.   Yeah.  I mean, I'm kind of like the middle man on the totem

22   pole.  We typically wouldn't have those types of conversations

23   with the Speaker, so no.

24   Q.   Fair to say he didn't talk with you about his law practice?

25   A.   No.

FB95sil3                       Franco - cross

1   Q.  How often did you talk with Mr. Silver?

2   A.  Maybe once a year.  Twice if I got lucky.

3   Q.  Mr. Franco, you testified on direct examination about lump

4   sum appropriations.  Do you remember that?

5   A.  Yes.

6   Q.  And you mentioned that the discretionary HCRA law funds,

7   the discretionary pool we have been talking about were

8   appropriated through the budget as a lump sum appropriation,

9   right?

10  A.  Yes.

11  Q.  And as a result the two grants, meaning the grant to New

12  York Presbyterian Hospital and the grant to Columbia University

13  Medical Center, were not individually identified as a lineout

14  in the budget, right?

15  A.  Correct.

16  Q.  Did Mr. Silver ever come to you and say I don't want these

17  two grants to be listed as a lineout in a budget?

18          MR. MASTER:  Objection.

19          THE COURT:  Sustained.

20  Q.  Mr. Franco, at that point in time all of the HCRA grants

21  were listed as a lump sum appropriation, right?

22  A.  No, they weren't listed at all.

23  Q.  They weren't listed at all, right?

24  A.  Right.

25  Q.  So this is the entire universe of HCRA grants?

FB95sil3                    Franco - cross

1   A.  Right.

2   Q.  So these two particular grants weren't treated any

3   differently, right?

4   A.  Right.  They were all supported through lump sum

5   appropriation.

6   Q.  And just so I understand, this was, when you say through a

7   lump sum appropriation, this was voted on as part of the

8   budget, right?

9   A.  Yes.

10  Q.  The same budget we talked about where the Assembly approves

11  it, the Senate approves it, and the governor signs it into law?

12  A.  Correct.

13  Q.  Okay.

14         There was a practical reason for why the HCRA funds

15  were treated as a lump sum appropriation, isn't that right?

16         MR. MASTER:  Objection.

17         THE COURT:  Sustained.

18  Q.  If you know.

19         MR. MASTER:  Objection.

20         THE COURT:  How would he know?

21         MR. SHUR:  Because he works in the Ways and Means

22  Committee.

23         THE WITNESS:  You give me too much credit.

24         THE COURT:  Sustained.

25  A.  Um --

FB95sil3                         Franco - cross

1          THE COURT:  Sustained.  Don't answer the question.

2          THE WITNESS:  Okay.

3     BY MR. SHUR:

4     Q.  Mr. Franco, the budget was passed at the beginning of the

5     year, right?

6          THE COURT:  The budget passed when the budget is

7     passed.  It is frequently late so what do you mean by the

8     beginning of the year?

9     Q.  Let me ask it this way:  There were often times when grants

10    would be requested during the year after the budget passed?

11    A.  Yeah.  We collected requests for funding throughout the

12    calendar year.

13    Q.  Now, other sources of funding were appropriated as a lump

14    sum too, right?  This wasn't just limited to HCRA?

15    A.  Correct.

16    Q.  Community project funds were appropriated as a lump sum

17    appropriation, right?

18    A.  Yes.

19    Q.  Capital projects?

20    A.  Yes.

21         THE COURT:  I think you went through all of these

22    earlier in the cross-examination.

23         MR. SHUR:  Okay.

24         THE WITNESS:  Correct.

25    Q.  It wasn't unique to HCRA, correct?

1   A.  Correct.

2   Q.  You were asked about the Budget Reform Act.  Do you

3   remember that?

4   A.  Yes.

5   Q.  This provided additional disclosure?

6   A.  Yes.

7   Q.  Mr. Silver voted in favor of the Budget Reform Act, right?

8   A.  It's not my job responsibility to track votes.

9   Q.  Okay.  Are you aware that --

10          THE COURT:  Does that mean I don't know?

11          THE WITNESS:  Yeah.  I don't know.

12  Q.  Are you aware that Mr. Silver actually co-sponsored the

13  Budget Reform Act?

14          MR. MASTER:  Objection.

15          THE COURT:  I think he just said he's not aware of --

16  that's not within his job description.

17  Q.  The prosecutor asked you about funding for the Shalom Task

18  Force.  Do you remember that?

19  A.  Yes.

20  Q.  The Shalom Task Force is a New York-based non-profit

21  organization, right?

22  A.  Yes.

23  Q.  Its mission is to promote help -- excuse me.

24          Its mission is to help women and families who are

25  victims of domestic violence, right?

FB95sil3                          Franco - cross

1          MR. MASTER:  Objection.

2          THE COURT:  Do you know?

3          THE WITNESS:  No, I don't know.

4   Q.  Do you know whether the Shalom Task Force relies on grants

5   to fund its operation?

6   A.  I know that the Assembly gives grants to the Shalom Task

7   Force, yes.

8   Q.  And over the years it's been a recipient of grants by

9   various members of the Assembly?

10  A.  Correct.

11  Q.  Okay.

12          Are you aware that the Shalom Task Force received

13  other government funding?

14  A.  Besides discretionary funding?

15  Q.  Are you aware that -- I will give you an example -- that

16  they received a Healthy Marriage grant from the Department of

17  Health and Human Services?

18          MR. MASTER:  Objection.

19          THE COURT:  Do you know?

20          THE WITNESS:  Yeah, that's outside my area.

21  Q.  Do you know that the Justice Department awarded the Shalom

22  Task Force $1.5 million?

23          THE COURT:  Sustained.

24          Remember that the questions aren't evidence, it is

25  only his answers.

FB95sil3                          Franco - cross

1  Q.  Mr. Franco, the prosecutor asked you specifically about a

2  grant to the Shalom Task Force that Mr. Silver sponsored in

3  2008.  Are you aware that Mr. Silver's office had discussed

4  funding with the Shalom Task Force long before 2008?

5              MR. MASTER:  Objection.

6              THE COURT:  Sustained.

7  Q.  Mr. Franco, are you aware that Vivian Waldman, who is a

8  long-time volunteer at the Shalom Task Force, has a

9  relationship with Mr. Silver's office?

10             MR. MASTER:  Objection, your Honor.

11             THE COURT:  Sustained.

12             MR. MASTER:  Can we please be seen at side bar?

13             THE COURT:  Yes.

14

15

16

17

18

19

20

21

22

23

24

25

1              (At side bar)

2              MR. MASTER:  Your Honor, this has been a continued

3    issue with defense counsel's questions.  Clearly Mr. Franco has

4    no ability to know about all of these things that he is asking

5    about in these declarative sentences and Mr. Franco has already

6    stated that he doesn't know about how Shalom Task Force.

7              THE COURT:  I don't know how he could possibly know.

8    Stop.  Stop it.

9              MR. SHUR:  I think they're fair questions, Judge.

10             THE COURT:  No, no, no.  You are testifying.  Mr. Molo

11   was doing it and you're doing it.  You are making a statement

12   that is not possibly within --

13             MR. SHUR:  It is a leading question.

14             THE COURT:  But it had nothing to do with a leading

15   question.  You are free to lead.

16             MR. SHUR:  I understand.

17             THE COURT:  But you are not free to testify.

18             MR. SHUR:  Judge, Mr. Franco is a --

19             THE COURT:  But he has also told you that he doesn't

20   know and you know he doesn't know.  This isn't within the scope

21   of what he might know and he isn't resisting.  He is, by far,

22   the most neutral witness that I have ever seen.  He is the

23   unhappiest witness to be here.  It is not like you have to drag

24   facts out of him.

25             MR. SHUR:  I understand.

1              THE COURT:  If he knows them, he gives them to you.

2              MR. SHUR:  I'm almost done, Judge.

3              THE COURT:  Good.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FB95sil3                          Franco - cross

1              (In open court)

2      BY MR. SHUR:

3      Q.  Mr. Franco, let's talk about the 2008 Shalom Task Force

4      grant that the prosecutor asked you about.  I believe this is a

5      document that was shown to you earlier but we can show you --

6      let me ask you, to try to streamline things.

7              There were three Assemblywomen -- Assemblywoman Fiver,

8      Audrey Pheffer, Assemblywoman Nettie Mayersohn, and

9      Assemblywoman Helene Weinstein that wrote Mr. Silver requesting

10     funds to the Shalom Task Force, right?

11     A.  Correct.

12     Q.  As we have seen that is not uncommon, right?

13     A.  Correct.

14     Q.  And there was discussion within the Ways and Means

15     Committee about that request, correct?

16     A.  There is discussion amongst senior staff, yes.

17     Q.  And there was a decision that was made about the funding

18     request, right?

19     A.  Yes.

20     Q.  And the decision was that Mr. Silver would match the funds

21     that those three assemblywomen were providing to the Shalom

22     Task Force, correct?

23     A.  Yes.

24              Under subpoena in preparation for this trial the

25     request letter asked for $50,000, they only got 25.

FB95sil3                        Franco - cross

1    Q.  So the three Assemblywomen gave a certain amount and

2    Mr. Silver matched that amount, right?

3    A.  Yeah, what we would call a match, yeah.

4    Q.  Mr. Franco, you were asked about a non-profit organization

5    based here in New York called OHEL; do you remember that?

6    A.  Yes.

7    Q.  That's a prominent Jewish service organization?

8               MR. MASTER:  Objection.

9               THE COURT:  Sustained.

10   Q.  Do you know what OHEL does, Mr. Franco?

11   A.  Yes.

12   Q.  What do they do?

13   A.  They're a community services organization that primarily

14   focuses on the Jewish population.

15   Q.  And I believe one of the grants to OHEL that you were asked

16   to fund was something called Camp Kaylie?

17   A.  Yes.

18   Q.  Do you know what Camp Kaylie is?

19   A.  It is a camp for disabled individuals.

20   Q.  Are you aware of whether other members, in addition to

21   Mr. Silver, provide state funding to OHEL?

22   A.  Yes, they do.

23   Q.  Are you aware that Assemblyman Peter Abbate --

24   A.  Abbate.

25   Q.  -- that he provides funding to OHEL?

FB95sil3                          Franco - cross

1    A.  Yes, he does.

2    Q.  Assemblyman Steve Cymbrowitz?

3    A.  Yes, he does.

4    Q.  He provides funding to OHEL?

5    A.  Yes.

6    Q.  Assemblyman James Brennan?

7    A.  I know he's requested funding.  I don't know if he actually

8    funded them, but.

9    Q.  We will return to him in a moment.

10             What about Assemblywoman Nettie Mayersohn?

11   A.  Yes.

12   Q.  She provides money?

13   A.  She used to when she was in the Assembly, yes.

14   Q.  State funding, right?

15   A.  Yes.

16   Q.  Assemblywoman Helene Weinstein?

17   A.  Yes.  She was a strong supporter, yes.

18   Q.  The last thing I want to ask you about, Mr. Franco, are

19   just generally we have looked at a lot of documents from the

20   Assembly, in particular from the Ways and Means Committee

21   during the course of your testimony.  The Assembly maintains

22   all of these documents, right?

23   A.  Yes.

24   Q.  So, for example, the correspondence between the Ways and

25   Means Committee and the Department of Health, those letters are

FB95sil3                           Franco - cross

1   maintained by the Ways and Means Committee, right?

2   A.  Yes.

3   Q.  And that's the case for all legislative grants that come

4   out of the Assembly, correct?

5   A.  All of -- yes.  Yes.

6   Q.  Do you know if the Department of Health also maintains

7   documents relating to the grants?

8   A.  I don't work for the Department of Health.  I can only

9   assume that they do or would.

10  Q.  And the Assembly maintains these records because they're

11  public grants, they're public records, right?

12          MR. MASTER:  Objection.

13          THE COURT:  Sustained.

14  Q.  Do you know why the Assembly maintains these reports?

15  A.  Okay, if we ever have to ask or answer a question what did

16  we do for X organization, it is one of the ways that we can,

17  you know, accurately answer that question.

18  Q.  Okay.

19          But these are public grants, right?

20  A.  Yes.

21  Q.  Mr. Franco, are you familiar with the New York Freedom of

22  Information Law?

23  A.  Yes.

24  Q.  That law grants every citizen the right to request and

25  obtain public records, right?

FB95sil3                        Franco - redirect

1    A.  Yes. it does.

2    Q.  That includes public records maintained by New York State,

3    right?

4    A.  Yes, in certain instances.

5             MR. SHUR:  One moment, your Honor?

6             (Counsel conferring)

7             MR. SHUR:  I have no further questions.

8             Thank you, Mr. Franco.

9             THE COURT:  Mr. Master?

10            MR. MASTER:  Thank you, your Honor.

11            THE COURT:  No, no, no, Mr. Franco.  Not so fast.

12            THE WITNESS:  So close.  Wishful thinking.

13            THE COURT:  You will get back to Albany today.

14            THE WITNESS:  Not a problem, your Honor.  Whatever

15   needs to be done.

16            MR. MASTER:  Wishful thinking.

17            THE WITNESS:  Absolutely.

18   REDIRECT EXAMINATION

19   BY MR. MASTER:

20   Q.  So, Mr. Franco, the first thing that defense counsel showed

21   you were Defendant's Exhibit 28, 29 and 30, those relate to

22   several grants that Sheldon Silver sponsored out of the

23   Community Projects Fund.  Do you remember that?

24   A.  Yes.

25   Q.  If you wouldn't mind pulling up Defendant's Exhibit 28?

1                Mr. Franco, you know that Mr. Silver sponsored that

2      because his name is right on there; isn't that right?

3      A.   Yes.

4      Q.   And that form was provided to the public?

5      A.   Yes.  Posted publicly along with Assemblywoman Glick.

6      Q.   And the HCRA grants that were sent to Dr. Taub, those were

7      not publicly posted, correct?

8      A.   Correct.

9      Q.   You can take that down.

10               You were asked if you could go into a library and read

11     the New York Public Health Law to see if there was a reference

12     to HCRA in there.  Do you remember that?

13     A.   I remember the back and forth, yes.

14     Q.   Could you go into a library and see who the recipients were

15     of all those millions in HCRA grants that the defendant

16     controlled?

17     A.   No.

18     Q.   And that's because there was no public disclosure of who

19     the ultimate recipients were of the HCRA grants, right?

20     A.   Correct.  Correct.

21     Q.   Now, you were also shown, and the defense counsel read to

22     you from all of these Legislative Initiative Forms talking

23     about all these entities that were receiving funds.  Do you

24     remember?

25     A.   Yes.

FB95sil3                         Franco - redirect

1   Q.   Now, do you know whether those funds were actually used for

2   the purpose that were listed in those Legislative Initiative

3   Forms?

4   A.   The purpose as within these forms is typically the bounds

5   for the contract.  Anything that is outside those bounds cannot

6   be funded or will not be reimbursed by the agency or the state

7   comptroller so I only assume that in fact it got used for those

8   respective purposes.

9   Q.   But do you know, based on your -- and others -- do you know

10  of any follow-up, does the Ways and Means Committee do any

11  follow-up to find out if the funds were used for their intended

12  purpose?

13  A.   Do I do follow-up?  In some instances I do follow-up but

14  it's very rare.

15         THE COURT:  You don't have an auditing staff that goes

16  out to all these grant recipients?

17         THE WITNESS:  No.  That's not the function of the

18  Assembly.

19  Q.   Now, you were also asked a lot of questions about the

20  requirement that these grants be made within the Assembly

21  guidelines.  Do you remember that?

22  A.   Yes.

23  Q.   I'm sorry.  You stated on your cross-examination these

24  funds needed to be distributed within the Assembly guidelines?

25  A.   Yes.

FB95sil3                          Franco - redirect

1  Q.  Do you remember testifying on direct examination about the

2  increased scrutiny that you began giving to member items such

3  as the ones listed in 28, 29 and 30 starting in around late

4  2006?  Do you remember that?

5  A.  Yes.

6  Q.  And, in fact, you began giving greater scrutiny to all

7  sorts of discretionary spending after that, correct?

8  A.  Correct.  Correct.

9  Q.  Now, among those legislative guidelines are a prohibition

10  on using member item money to benefit yourself financially,

11  right?

12  A.  The current guidelines state that, yes.  During the

13  original reiteration when I first started in my current

14  capacity, I believe the guidelines didn't contain that type of

15  language.

16  Q.  But based on experience and your greater scrutiny you

17  imposed and enforced that prohibition, correct?

18  A.  Correct.  As time went on, you know, and more attention

19  started to become paid to these various funding streams, you

20  know, the guidelines got more detail and became more expansive.

21  It wasn't an overnight type of thing, it was an annual

22  exercise.

23  Q.  Right.  So over time, year by year, your level of scrutiny

24  got greater and greater?

25          MR. SHUR:  Objection.

1            THE COURT:  Overruled.

2    A.  Correct.  The Ways and Means Committee's level of scrutiny

3    increased, yes.

4    Q.  And in your personal experience, based on your review of

5    these grants which, again, began as you said in late 2006, you

6    have seen grants that appear on their face good but then based

7    on your investigation turned out to have violated those

8    guidelines?

9    A.  Well, we don't investigate anything.  We do a certain

10   amount of due diligence and if there is anything that violated

11   the Assembly guidelines we would not let them move forward.

12   Q.  Right.

13            So, based on that due diligence you have personally

14   identified certain grants or proposed grants that appear on

15   their face to be good but that, in fact, based on your due

16   diligence, turn out to have a real problem?

17            MR. SHUR:  Objection.

18            THE COURT:  Sustained.  Rephrase the question.

19            MR. MASTER:  Sure.

20            THE COURT:  Are you saying there was a conflict of

21   interest?  Is that what you mean by revealed after due

22   diligence?

23   BY MR. MASTER:

24   Q.  Have you, based on your experience, found conflicts of

25   interest based on your due diligence?

FB95sil3                      Franco - redirect

1    A.   Yes.

2    Q.   And in some of those instances, without getting into

3    specific members of the Assembly or the circumstances in which

4    you found this, in certain instances the grants appeared good

5    on their face but --

6              MR. SHUR:  Objection.

7              THE COURT:  Sustained.  Good on their face is the

8    problem.

9              MR. MASTER:  Okay.

10             THE COURT:  What does that mean?

11   BY MR. MASTER:

12   Q.   Just by reading, could you tell by reading the Legislative

13   Initiative Form that there was a conflict of interest?

14   A.   Sometimes you could.

15   Q.   Could you in every case?

16   A.   Not in every case.

17   Q.   And could you tell, based on the Legislative Initiative

18   Form alone, whether the member of the Assembly who is

19   sponsoring the legislative initiative or discretionary item was

20   benefiting personally from the entity that was receiving the

21   funding?

22             MR. SHUR:  Objection.

23             THE COURT:  Overruled.

24   A.   Not in all instances.

25   Q.   And, for those instances where you did identify problems,

```
 1   the member of the Assembly who had the problematic form, they
 2   could have say 50 member items that did not have an issue and
 3   one that did?
 4              MR. SHUR:  Objection.
 5              THE COURT:  Overruled.
 6   A.  Yes.  Hypothetically that could happen.
 7   Q.  And again, in your personal experience, you have identified
 8   grants where there was a conflict of interest or where there
 9   was personal financial benefit or potential financial benefit
10   to the member?
11              MR. SHUR:  Objection.  Asked and answered.
12              THE COURT:  Overruled.
13   A.  The personal financial benefit is slightly harder to prove
14   but if there was any linkage that was unethical or
15   inappropriate then, yes, we would not allow that grant to move
16   forward.
17   Q.  And again, this is scrutiny that began after you had
18   authorized -- I'm sorry, after you had processed the grants to
19   Dr. Taub?
20   A.  Correct.
21   Q.  Mr. Franco, you were asked about the process that was gone
22   through in which the Speaker identified which discretionary
23   items he would fund and which he would not.  Do you recall
24   that?
25   A.  Yes.
```

FB95sil3                        Franco - redirect

1   Q.  Do you recall going to the Speaker's district office to

2   discuss discretionary funding?

3   A.  Yes.  Early in either 2005 or 2006, yes.

4   Q.  And who made the decisions about which items to fund and

5   which he would not fund?

6   A.  Again, when we were reviewing the totality of the requests

7   made it was the Speaker that was the final decision maker.

8   Q.  Now, you were asked about grants, again how the grants to

9   Dr. Taub compared to the grants to other entities.  Do you

10  remember that?

11  A.  Yes.  I remember defense counsel comparing them, yes.

12  Q.  So, take a look at Government Exhibit 107 -- if you

13  wouldn't mind pulling that up, Mr. Coccaro -- and just look at

14  page 2 of that?  What did Dr. Taub request?  If you just

15  wouldn't mind reading the first sentence of the first full

16  paragraph on that page.

17          Mr. Coccaro, please, zoom in.

18          MR. SHUR:  Objection, Judge.  I don't think this

19  witness has any personal knowledge of this document.

20          MR. MASTER:  Your Honor, I believe it was admitted

21  through him and he stated it was maintained by the Assembly.

22          THE COURT:  I think the document speaks for itself.

23  BY MR. MASTER:

24  Q.  And the document states it was a $250,000 annual request,

25  correct?

1            MR. SHUR:  Objection.

2            THE COURT:  Overruled.

3    A.   Yes, it does state that.

4    Q.   And again, you also found Government Exhibit 120 in the

5    files of the Assembly.  If you wouldn't mind just pulling that

6    up?  Actually, you know what, Mr. Coccaro?  I'm sorry, before

7    you do, before you do just go back to 107 and go to the first

8    page.  You stated in your cross-examination that you were the

9    middleman on the totem pole.  Do you know why that document

10   states:  Shelly is very interested in this?

11           MR. SHUR:  Objection.

12           THE COURT:  Sustained.

13           Did you sign that?  Is that your note?

14           THE WITNESS:  No, that's not my handwriting and this

15   letter predates me in my capacity.

16           THE COURT:  Sustained.

17   BY MR. MASTER:

18   Q.   You also, just turning to Government Exhibit 120 to page 2,

19   again, is there an amount requested by Dr. Taub in this budget

20   letter?

21           MR. SHUR:  Objection.

22           THE COURT:  Overruled.

23   A.   Yes.  On page 2, second paragraph it says:  Our request is

24   that the legislature continue its annual support in the amount

25   of $250,000 for this budget year.

1    Q.  And so, Dr. Taub's requests were fully funded for the two

2    years that funding was provided?

3    A.  Yes.

4    Q.  And again, after that, no funding was provided to Dr. Taub,

5    correct?

6    A.  Correct.

7    Q.  And again, in those subsequent years that post-dates the

8    Budget Reform Act?

9    A.  Yes.

10   Q.  It post-dates posting?

11   A.  Yes.

12   Q.  It post-dates your increased level of scrutiny on the

13   Assembly discretionary items?

14   A.  Yes.

15   Q.  And it post-dates those disclosure and accountability forms

16   that require disclosure of conflicts of interest?

17   A.  Yes.

18   Q.  In your personal experience, if a budget letter requests a

19   specific amount of funding did you ever see an instance where

20   Sheldon Silver gave more than the amount that was actually

21   requested?

22   A.  Not that I can recall but what I do know is that often

23   members ask for more than what they really need and they pad

24   their request.

25          THE COURT:  That's going in the opposite direction.

```
 1              THE WITNESS:  Right.
 2   Q.  So, in fact in your experience, Sheldon Silver would grant
 3   less than the amount requested, typically?
 4   A.  It varied.  It could either be the actual request or less
 5   than or there could be a match required so it could vary.
 6   Q.  Right, but did you ever see an instance where Sheldon
 7   Silver decided to give more than the amount requested?
 8              MR. SHUR:  Objection.
 9              THE COURT:  Asked and answered.
10              MR. MASTER:  Yes.
11              THE COURT:  Sustained.
12              MR. MASTER:  Thank you, your Honor.
13   Q.  Now, you were asked questions about the documents that were
14   maintained by the New York State Assembly concerning those
15   grants, correct?
16   A.  Yes.
17   Q.  Are there any documents in the New York State Assembly that
18   reflect the financial benefits that Sheldon Silver was
19   obtaining from Dr. Taub?
20              MR. SHUR:  Objection.
21              THE COURT:  Overruled.
22              THE WITNESS:  No.
23              THE COURT:  If you know.
24              THE WITNESS:  No.  I mean, not that I'm aware of.
25   BY MR. MASTER:
```

1  Q.  And you were asked questions about the process through

2  which Sheldon Silver would make decisions, right, about which

3  discretionary funding requests he would grant and which he

4  would not?  Do you recall that?

5  A.  Yes.

6  Q.  Was that process -- when Sheldon Silver was making

7  decisions about which discretionary funding requests to grant

8  and which he would deny, were members of a staff other than

9  Ways and Means welcome to attend and hear his decision-making

10  process?

11  A.  Without being invited?  No.

12  Q.  And were other members of the Assembly welcome to sit in

13  and attend and observe his decision-making process?

14  A.  No, and that was typical for any meeting.  It wasn't just

15  discretionary funding.  You just -- you know, it wouldn't be

16  protocol to show up to a meeting you weren't invited to.

17  Q.  And again, other members of the Assembly and other staff

18  were not invited to the meetings where Sheldon Silver made

19  these decisions?

20          MR. SHUR:  Objection.

21          THE COURT:  Overruled.

22  A.  Correct.  I mean, you just didn't attend meetings you

23  weren't invited to.

24  Q.  And, in fact, once Sheldon Silver had made certain

25  decisions, other than instances where he would inform members

1   which discretionary funding request he was going to grant and

2   which he would deny, there was no disclosure to other members

3   of the Assembly about the results of his decision-making

4   process?

5              MR. SHUR:  Objection.

6              THE COURT:  I'm not sure I understand the question.

7   Q.  What if any -- withdrawn.

8              What, if any steps, Mr. Franco, did you take to in

9   fact conceal or not reveal the amount of discretionary funding

10  that Sheldon Silver had allocated to items of his own choosing?

11  A.  Typically it was our protocol not to print reports or

12  anything that was specifically related to the Speaker.

13  Q.  And so how would you carry out that protocol?

14  A.  If it was an Excel spreadsheet we would suppress the line

15  that had his name on it.  Stuff like that.

16  Q.  And how about if a report that listed sponsors of various

17  member items would otherwise have the Speaker's name on it,

18  what would you do?

19  A.  Just not include it.

20  Q.  So, in other words, you would delete the references to the

21  Speaker from that spreadsheet?

22  A.  I wouldn't include it.

23  Q.  When you say suppress a line, for those who are not

24  familiar with Excel, the fortunate few, what do you mean by

25  that?

FB95sil3                     Franco - redirect

1    A.  Yeah, you take your cursor, you put it on a line, you right

2    click it, it gives you various options, and then you select

3    "hide" and it basically suppresses that row.

4             THE COURT:  So, meaning if you print it out it doesn't

5    show up?

6             THE WITNESS:  Correct.

7             THE COURT:  That's what you mean by suppression?

8             THE WITNESS:  But it is included in the totals.

9    BY MR. MASTER:

10   Q.  Mr. Coccaro, if you wouldn't mind pulling up Government

11   Exhibit 218?  That's the member allocation spreadsheet?

12   A.  Correct.

13   Q.  And again, Mr. Coccaro, if you wouldn't mind zooming in on

14   that line, the lines that included Sheldon Silver and the

15   amounts that he allocated to himself?

16             So, just explain for the members of the jury what your

17   protocol was when you were printing out this spreadsheet.

18   A.  So, when I would print out this spreadsheet I would

19   suppress the line that included the Speaker and then print it

20   out for staff review and consideration.

21   Q.  And again, as a result of suppressing that line what, if

22   any ability, did the other staff have to see how much the

23   Speaker had allocated to items of his own choosing?

24   A.  Well, none, based on that report.  But, again, we had other

25   reports that we shared amongst the staff and it clearly

1    outlined everything.  So, it is not like we were trying to hide

2    anything from staff, it was just that for the purposes of this

3    review, the purposes of this exercise was to allocate

4    allocations to other members, not, you know, to the Speaker.

5    Q.  But again, even in other reports as you said that you

6    generated, you would remove the Speaker's name from those

7    reports before they were circulated?

8    A.  I would not include the Speaker's name.

9    Q.  You were asked questions about OHEL.  Who provides the most

10   funding to OHEL of any member?

11   A.  That I can't recall off the top of my head.

12   Q.  Do you recall any other member of the Assembly who provided

13   the $2 million in capital to OHEL?

14   A.  Yes.  That would be the Speaker.

15   Q.  And you were asked some questions about, I think

16   Defendant's Exhibit 34-1, that's the report of HCRA grants,

17   expenditures.  Do you recall that?

18   A.  Yes.

19   Q.  Where, on this document that states New York State

20   Department of Health, where does it reveal that Sheldon Silver

21   was the sponsor of those two grants to Dr. Taub?

22   A.  It doesn't.

23              MR. MASTER:  Just a moment, your Honor.

24              (counsel conferring)

25              MR. MASTER:  Nothing further.

 1              MR. SHUR:  Very, very briefly, Judge.

 2              THE COURT:  Very briefly.

 3   RECROSS EXAMINATION

 4   BY MR. SHUR:

 5   Q.  Mr. Franco, you never tried to conceal Mr. Silver's role in

 6   making any grants, right?

 7   A.  Conceal his role in making the grants?

 8   Q.  Yes.

 9   A.  No.  Never.

10   Q.  You never attempted to deceive the public about

11   Mr. Silver's role in the grant process, right?

12   A.  No.

13   Q.  Mr. Silver did not need to put his name on the HCRA

14   Legislative Initiative Form because, by law and by the

15   memorandum of understanding that you mentioned, all HCRA grants

16   were at the discretion of the Speaker, right?

17   A.  Correct.

18              MR. MASTER:  Objection.

19              THE COURT:  Overruled.

20   Q.  And the law was made public about that, right?

21   A.  Yes.

22              THE COURT:  Asked and answered.  We went through all

23   of that on your first cross.

24              MR. SHUR:  Yes, Judge.

25   Q.  There was mention on redirect examination of posting

Legislative Initiative Forms on the Assembly's website.  Do you

remember that?

A.  Yes.

Q.  The Assembly was required, initially, to post Legislative

Initiative Forms for Community Projects Funding, right?

A.  Correct.  That was the requirement.

Q.  Okay, and Mr. Silver went above that requirement and

required that HCRA grant Legislative Initiative Forms be posted

on the website too, correct?

            MR. MASTER:  Objection.

            THE COURT:  Overruled.

A.  I don't recall that but he did go above and beyond and we

posted sponsors for our capital requests which far outnumbered

HCRA.

Q.  Mr. Silver implemented that practice, right?

A.  The Speaker, yes.

Q.  And as far as the guidelines that you just talked about

where there was this additional scrutiny in terms of your

review of the legislative grant requests, do you remember that?

A.  Yes.

Q.  Those guidelines were approved by Mr. Silver, correct?

A.  Correct.

Q.  Let me ask you, the prosecutor asked you about any

follow-up that you did with respect to the grant to New York

Presbyterian Hospital and the grant to Columbia University.

1   You have no reason to doubt, Mr. Franco, that Dr. Taub used

2   those grant funds to help find a cure for mesothelioma, do you?

3           MR. MASTER:  Objection.

4           THE COURT:  Sustained.

5   Q.  Mr. Franco, in terms of follow-up on legislative grants,

6   there is an administrating agency for each grant, correct?

7   A.  Yes.

8   Q.  So for the HCRA grant it is the Department of Health,

9   right?

10  A.  Yes.

11  Q.  And they follow up on the grant, right?

12          MR. MASTER:  Objection.

13          THE COURT:  Overruled.

14  A.  Correct.  Again, it is not the Assembly or legislature's

15  responsibility or role to audit any type of contracts, to

16  ensure compliance.  So, to obfuscate or make it appear as it

17  was our role is grossly inappropriate.

18  Q.  Right.  It's the Department of Health's role to do that,

19  right?

20  A.  Yes.

21          MR. SHUR:  No further questions.

22          THE COURT:  Thank you, Mr. Franco.  You may now escape

23  but stay where you are for now.

24          Ladies and gentlemen, we will take the lunch break

25  now.  We will come back at 2:00.  If you want to check your

FB95sil3                         Franco - recross

1    phones, do it now, please.  Don't discuss the case.

2              (Continued on next page)

 1              (Jury not present)

 2              THE COURT:  The jury just wants to know what time I'm

 3    going to let them go on the Wednesday before Thanksgiving.

 4              Who is your next witness?

 5              MS. COHEN:  Your Honor, the government will call Steve

 6    August.

 7              THE COURT:  About how long is his direct going to be?

 8              MS. COHEN:  About a half hour.  No more.

 9              THE COURT:  All right.  See you at 2:00.

10              MS. COHEN:  Thank you, your Honor.

11              (Luncheon recess)

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    A F T E R N O O N   S E S S I O N

2                                 2:00 p.m.

3              THE COURT:  Anything before we bring out the jury?

4              MS. COHEN:  Nothing from the government, your Honor.

5              THE COURT:  Mr. Molo?

6              MS. COHEN:  Would you like us to bring the witness out

7    before the jury comes out?

8              THE COURT:  Go ahead and bring him out and put him in

9    the front row.

10             Bring the jury in.

11             MS. COHEN:  Thank you, your Honor.

12             (Continued on next page)
```

FB95sil3                         Franco - recross

 1              (Jury present)

 2              THE COURT:  Ladies and gentlemen, I got your note

 3    before the break asking me when you will be allowed to leave on

 4    Wednesday, the day before Thanksgiving.  My plan is to let you

 5    go at noon.  Okay?  That should give those of you who are

 6    cooking plenty of time, and those who are traveling to get on

 7    the road.

 8              Okay.  Call your next witness.

 9              MS. COHEN:  Your Honor, the government calls Steve

10    August.

11              THE WITNESS:

12     STEVEN AUGUST,

13         called as a witness by the Government,

14         having been duly sworn, testified as follows:

15              THE DEPUTY CLERK:  Please state your full name for the

16    record and spell your last name slowly.

17              THE WITNESS:  Steven August.

18              THE COURT:  Are you Steven with a V or PH?

19              THE WITNESS:  V.

20    BY MS. COHEN:

21    Q.  Mr. August, are you appearing here pursuant to subpoena?

22    A.  Yes.

23    Q.  Are you retired now?

24    A.  I am.

25    Q.  Where do you live now?

1    A.  I live in Bath, Maine.

2    Q.  Where did you work before you retired?

3    A.  I worked for the New York State Assembly.

4    Q.  When did you retire from the New York State Assembly?

5    A.  I retired in 2008.

6    Q.  How long did you work for the New York State Assembly?

7    A.  From 1986 to 2008.

8    Q.  Can you please step back a little bit in time and describe

9    your educational background?

10   A.  I have a bachelors degree from the University of Maine, a

11   Master's degree from the University of Colorado.

12   Q.  What is your Master's degree in?

13   A.  Political science.

14   Q.  What did you do after earning your Master's degree in

15   political science?

16   A.  Well, I was in the military for a period and then worked at

17   the -- or pursued a Ph.D at the university in Albany, and then

18   worked on a grant at the university in Albany.

19   Q.  What did you do after you worked on the grant at the

20   University of Albany?

21   A.  Went to work at the Assembly.

22   Q.  So, did you begin your work at the New York State Assembly,

23   I believe you said, in 1986?

24   A.  Correct.

25   Q.  What was your first job, if you could actually briefly run

1    through the different jobs that you held at the New York State

2    Assembly beginning in 1986?

3    A.   I was hired in 1986 as the director of a joint legislative

4    commission that examined issues related to skills development

5    and vocational education.

6    Q.   What did you do after that?

7    A.   After that I was assigned to the Committee on Ways and

8    Means.

9              MR. COHEN:   Excuse me, your Honor.  I don't think

10   Mr. August's microphone is on or he is not speaking into it.

11             THE COURT:   It is on, just pull it a little bit closer

12   to you.  Don't get too close but closer than what you are now.

13             THE WITNESS:   I am a dedicated mumbler.

14             I went to work for the Committee on Ways and Means as

15   Deputy Budget Director.

16   BY MS. COHEN:

17   Q.   What year did you become Deputy Budget Director in the Ways

18   and Means Committee?

19   A.   2001.

20   Q.   In general, what were your responsibilities as Deputy

21   Director?

22   A.   I had responsibility of oversight on two or three analysts

23   and we focused on Department of Labor -- we did budget analysis

24   with Department of Labor, some of the other small agencies, and

25   I also was responsible for member items and legislative

1    initiatives.

2    Q.  And how long did you serve as the Deputy Director?

3    A.  Until 2005.

4    Q.  What happened in 2005?

5    A.  In 2005 I became the Director of Budget Studies.

6    Q.  And who promoted you to be the Director of Budget Studies?

7    A.  Sheldon Silver.

8    Q.  And from the time you were Deputy Director in 2001 through

9    2008 when you retired, who was the Speaker of the New York

10   State Assembly?

11   A.  Shelly Silver.

12   Q.  And when you were promoted by Sheldon Silver to Director of

13   Budget Studies, who replaced you as Deputy Director?

14   A.  Victor Franco.

15   Q.  In general, how did your job responsibility as Director of

16   Budget Studies differ from when you were Deputy Director?

17   A.  Well, as Director I had much broader responsibilities over

18   the entire range of the budget including transportation, health

19   issues, education, and supervised around 20 to 25 analysts.

20   Q.  And as the Director of Budget Studies, did you retain

21   supervision over member items and legislative initiatives?

22   A.  That largely fell to Victor but I was still involved in

23   that process.

24   Q.  Please describe for the jury what you mean by member items.

25   A.  To me member items were smaller grants that were allocated

1    to the members annually.

2    Q.  And who decided how much money each Assembly member was

3    allocated annually to distribute to organizations in their

4    district?

5    A.  It was the Speaker, based on a list that we had created for

6    him.

7    Q.  So why don't you please explain for the jury what list you

8    are talking about.

9    A.  Well, the list was largely based on the seniority or the

10   amount largely based on the seniority of the members, so

11   members who entered the Assembly in a particular year typically

12   received the same amount of money and then all the members were

13   ranged, again, according to their seniority.

14   Q.  And where was the list of what each Assembly member's

15   allocation was for member items?  Where was that kept?

16   A.  It was kept very quietly.  I think physically I kept it in

17   my desk drawer.  It was not distributed.  It was not

18   distributed.

19   Q.  Did other Assembly members know how much each other got in

20   member item allocations?

21   A.  It was not -- it was not information that we provided.

22   They may have known from their own conversations among each

23   other.

24   Q.  And what would the public know about how much money Sheldon

25   Silver had allocated to an Assembly member for use in their

1    district?

2    A.  I'm not sure the public would know anything about it.

3    Q.  And did Sheldon Silver, was he able to have money as a

4    member item to allocate to organizations of his choosing in his

5    district?

6    A.  Yes, he did use the member item process.

7    Q.  And who decided how much money Sheldon Silver had to

8    distribute as member items in his district?

9    A.  It was Mr. Silver -- Shelly.

10   Q.  Was there any limit on the amount of money Sheldon Silver

11   could distribute or decide to distribute to organizations of

12   his choosing using the member item money?

13   A.  No.

14   Q.  And how would another Assembly member know how much money

15   Sheldon Silver had to distribute himself to organizations in

16   his district?

17   A.  I'm not sure how they would know.

18   Q.  You mentioned legislative initiatives was something you

19   oversaw both as Deputy Director and as Director of Budget

20   Studies?

21   A.  That's correct.

22   Q.  What do you mean by legislative initiatives?

23   A.  Legislative initiative, again, done at the request of

24   individual members, were typically grants that were larger in

25   terms of the amount of money provided and perhaps more regional

FB95sil3                        Franco - recross

1   in scope.

2   Q.   And how did you, as Deputy Director and then Director, keep

3   track of the legislative initiative requests?

4   A.   Through the Speaker's office we would receive letters that

5   had been addressed to him.  We would collect those letters and

6   enter them into a database.

7   Q.   And then what would you do after you entered the letters

8   into the database?

9   A.   At various points in time during the year we would have an

10  opportunity to sit with the Speaker and review the list.

11  Q.   And when you sat with -- and were you present at the

12  meetings with Sheldon Silver when you were Deputy Director and

13  Director, where the list of letter requests for legislative

14  initiative was reviewed?

15  A.   I believe I was in most of those meetings, yes.

16  Q.   And at those meetings who made the decision about what

17  grants to award the money to?

18  A.   Mr. Silver -- Shelly Silver.

19  Q.   How would you learn of just -- actually, withdrawn, your

20  Honor.

21          Did you bring a copy of the database that you created,

22  did you bring a printout with you to the meetings with Sheldon

23  Silver?

24  A.   Yes, I did.

25  Q.   In general, what was on the database?  Was it the letter

1   request that you gathered from the Speaker's office?

2   A.   Typically people would bring the letters as backup but the

3   database would just include the member who requested the grant,

4   the title of the grant, the amount of money requested, and a

5   brief description of what the grant was -- of what the request

6   was.

7   Q.   And what pools of money were available to fund the

8   legislative initiatives?

9   A.   There were lump sum appropriations that were included in

10  the approved budget typically year to year and those were the

11  funds that were accessed for this purpose.

12  Q.   And is one of those lump sum appropriations something

13  called HCRA, the Health Care Reform Act, the Assembly pool?

14  A.   Yes, there was such a pool.

15  Q.   Mr. Coccaro, if you could pull up what's in evidence,

16  subject to connection, Government Exhibit 107, please?

17          While that's being pulled up, Mr. August, at the

18  meetings with Speaker Silver would you go through the list of

19  different letter requests that the Speaker's office and the

20  Assembly had received to fund legislative initiatives?

21  A.   We would review the requests, yes.

22  Q.   Who would decide whether to fund something or not to fund

23  something?

24  A.   The Speaker.

25  Q.   And what would the Speaker tell you about why you had

FB95sil3                          Franco - recross

1   decided to fund something or not to fund something?

2   A.  There was no fixed amount of conversation on any particular

3   item.  He may just say yes or no.  There may be some brief

4   conversation but nothing more than yes or no, typically.

5   Q.  And the yes or no was from the Speaker?

6   A.  Yes.

7   Q.  If you can please pull up Government Exhibit 107, please?

8   I believe, Mr. August, it is in your binder, it should be at

9   the first tab.

10          Mr. August, do you recognize Government Exhibit 107?

11  A.  Yes.

12  Q.  What is it?

13  A.  This is a typical letter requesting support from the

14  Assembly.

15  Q.  And there is handwriting on the upper right-hand corner.

16  Do you recognize that handwriting?

17  A.  I do.

18          MS. COHEN:  Your Honor, the government moves

19  Government Exhibit 107 into evidence.

20          THE COURT:  I thought 107 was already in evidence.

21          MS. COHEN:  It was in evidence subject to connection

22  for the handwriting.

23          THE COURT:  Oh, okay.

24          So he says he recognizes it; who is it?

25          THE WITNESS:  The handwriting?

1          THE COURT:  Yes.

2          THE WITNESS:  Dean Fuleihan.

3          THE COURT:  Any objection to 107?

4          MR. SHUR:  No objection.

5          THE COURT:  Okay.  107 is received.

6          (Government's Exhibit 107 received in evidence)

7   BY MS. COHEN:

8   Q.  Thank you, your Honor.

9          Mr. August, who is Dean Fuleihan?

10  A.  Dean, at the time, would be the top staff member of the

11  Assembly.  At this point I'm not sure exactly what his title

12  would have been.  He was the Secretary to the Committee of Ways

13  and Means.

14  Q.  And the "D" that's highlighted on the screen there, is the

15  D for Dean?

16  A.  Yes.

17  Q.  Is that sometimes how Dean Fuleihan signs his name?

18  A.  Yes.

19  Q.  Who is, on the top you see it is addressed to

20  Kristin/Patty/Steve A.; can you tell the jury who those people

21  are?

22  A.  Kristin would be Kristin Proud who I believe at the time

23  was Deputy Secretary to the Committee on Ways and Means; Patty,

24  Patty Warrington, who was the Director of Budget Studies at

25  that time; and I'm Steve A., Deputy Director of Budget Studies.

FB95sil3                      Franco - recross

1   Q.  And who did Dean Fuleihan report to at the time of this

2   letter?  And the letter is dated, if you move it over to the

3   left it says January 7, 2004.

4   A.  He reported to the Speaker.

5   Q.  And just going back to the handwriting on the right --

6   thank you, Mr. Coccaro -- it is 2/1 and in quotes it says

7   "$250,000 annual request," Shelly is very interested in this.

8   Please include as a 2004-'05 request.  D.

9            How many letters like Government Exhibit 107 were

10  logged into the database each Assembly session?

11  A.  There could be over a thousand.  I really don't have a

12  count.

13  Q.  And were all of the letter requests funded by the Speaker?

14  A.  No.  No.

15  Q.  What happened if Sheldon Silver said he did not want to

16  fund a request?  What would happen to the request letter?  What

17  would happen to the request for the grant?

18  A.  It simply wouldn't be done.

19  Q.  And if Sheldon Silver said that, yes, he wanted to fund it,

20  what would happen to the grant request?

21  A.  We would move forward and process the request.

22  Q.  And when you say process the request, what was the next

23  step that you did if a grant -- if Sheldon Silver decided he

24  wanted to fund the grant?

25  A.  Well, at some point we would initiate a letter to the

1    agency that would be identified as responsible to execute the

2    grant and request that they begin an application process with

3    the prospective grantor or grantee.

4    Q.   And going back to Government Exhibit 107, the grant request

5    from Robert Taub to Sheldon Silver requesting $250,000 for his

6    Mesothelioma Center, what happened to Dr. Taub's request to

7    Silver for funding?

8    A.   It was ultimately funded.

9    Q.   And do you recall what pot of money was used to fund

10   Dr. Taub's request?

11   A.   It was funded through HCRA.

12   Q.   And what public disclosure was there about grants that were

13   funded through the HCRA Assembly pool?

14   A.   I don't believe there was any specific disclosure of

15   grants.

16   Q.   And what advertisement to the public was there of the

17   availability of money under HCRA to fund healthcare?

18   A.   None that I'm aware of.

19   Q.   What grant application was filled out by entities that

20   wanted HCRA funding?

21   A.   I'm not sure I understand.

22   Q.   Sure.

23        Was there any -- was there any grant application

24   filled out by entities that wanted to get a grant under HCRA?

25   A.   Who would contact us indicating that they wanted HCRA

1   funding?

2   Q.   Correct.

3   A.   I'm not aware of any.

4   Q.   After Sheldon Silver decided to fund a letter request for

5   legislative initiative you said you would fill out some of the

6   paperwork.   What is the Legislative Initiative Form?

7   A.   The legislative Initiative Form was the form that we used

8   to communicate our -- the description and contact information

9   for the grant to the agencies.

10  Q.   And what information was on a Legislative Initiative Form?

11  A.   There would be the name of the contact -- the name of the

12  entity, the name of the organization, the name of the contact

13  person, the amount of the grant, and a description of what the

14  purpose of the grant should be.

15  Q.   If you can look in your binder at what's in evidence

16  Government Exhibit 367-1, please?

17          Mr. Coccaro, if you could pull that up?  Thank you.

18          Mr. August, do you recognize Government Exhibit 367-1?

19  A.   I do.

20  Q.   If you look at the second page of it, which is entitled SFY

21  2002-'03 Legislative Initiative Form; what is that?

22  A.   That is the internal -- or it is not internal but it is the

23  form that we used to it identify information for the agency on

24  the grant.

25  Q.   And who filled out this form for the grant to New York

FB95sil3                              Franco - recross

1    Presbyterian Hospital for Dr. Taub's Mesothelioma Center?

2    A.  I would have.  Our office would have.

3    Q.  And where did you get the information for the Legislative

4    Initiative Form from?

5    A.  Typically it was pulled off the letter, whatever

6    documentation we had in hand.  On occasion we would contact the

7    grantee if we needed clarification or additional information.

8    Q.  And by the letter you are referring to a letter like

9    Government Exhibit 107, the letter from Dr. Taub to the Speaker

10   requesting the funding?

11   A.  Yes.

12   Q.  If you can look, please, at Government Exhibit 304 in

13   evidence, the next tab in your book?

14        Mr. Coccaro, if you can pull that up on the screen,

15   please?

16        Do you recognize Government Exhibit 304?

17   A.  I do.

18   Q.  What is it?

19   A.  That was a fax that I sent to Dr. Taub asking him to, as

20   the comments suggest, to comment on the description of the

21   grant and to let me know if it was appropriate.

22   Q.  And the description on the grant, are you referring to the

23   typewritten page which is page 2?

24   A.  Yes.

25   Q.  Mr. Coccaro, if you could put that up?

1              Where did you get the information on page 2 from?

2     A.   I pulled it off his letter.

3     Q.   By his letter you are talking about the letter from

4     Dr. Taub to Sheldon Silver?

5     A.   Correct.

6     Q.   And why were you the person who was dealing with Dr. Taub

7     about this grant from Sheldon Silver?

8     A.   I felt that I was responsible for the Speaker's items and I

9     was particularly attentive to those.

10    Q.   Why were you particularly attentive to the Speaker's items?

11    A.   Well, the Speaker is my principal and I felt that it was my

12    responsibility to assure that they were done appropriately.

13    Q.   So, this grant to Dr. Taub's research center at New York

14    Presbyterian Hospital was a grant that Sheldon Silver himself

15    wanted to send there?

16    A.   It was logged as his request.

17    Q.   If you can look back at the first page, please, of

18    Government Exhibit 3467-1 and look at the initials at the

19    bottom left-hand corner?

20    A.   Yes.

21    Q.   Whose initials are those?

22    A.   Well, SS would be Sheldon Silver; SA, me; and VEF, I

23    believe is Victor Franco.

24    Q.   If you can explain to the jury what happened after the

25    Legislative Initiative Form was finished, what did you do with

1    it?

2    A.   The forms were sent to the respective agencies, in this

3    case the Department of Health.  This was a form letter,

4    essentially, that we used for all grants to all the agencies.

5    Q.   And this particular letter was to Dennis Whalen who was

6    Deputy Commissioner of the Department of Health at that time;

7    is that right?

8    A.   Correct.

9    Q.   It was informing Mr. Whalen that there was a $250,000 grant

10   to New York Presbyterian from the Assembly's HCRA pool; is that

11   right?

12   A.   Yes.

13   Q.   What would Dennis Whalen know about what Assembly member

14   had sponsored the grant?

15           MR. SHUR:  Objection.

16           THE COURT:  Sustained.

17   Q.   Mr. August, in this letter it is signed by Sheldon Silver

18   as Speaker, correct?

19   A.   It is an electronic signature, correct.

20   Q.   And for all distributions of money from the Assembly HCRA

21   pool were the letters signed with the electronic stamp of

22   Sheldon Silver?

23   A.   I believe for all legislative initiatives, regardless of

24   the pool, the letter went out over the Speaker's signature.

25   Q.   What communications were there to the organization that was

FB95sil3                         Franco - recross

1   going to sign the grant contract, in this case the Department

2   of Health, about who was the actual sponsor of the grant?

3   A.   We did not provide that information to the agency.

4   Q.   What would the Department of Health do as an example after

5   it got a letter like this from Sheldon Silver?

6   A.   I'm not sure.  My understanding is that an application

7   package would be sent to the recipient, the contract would be

8   prepared, and the agency would move forward to execute the

9   correct amount.

10                  (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1   BY MS. COHEN:

 2   Q.  The second paragraph of this letter, Government Exhibit

 3   367-1, it says, "If you or your staff require additional

 4   information in order to process these grants, please call Steve

 5   August, director of budget studies."

 6   A.  Yes.

 7   Q.  Do you recall any telephone calls you got from Dennis

 8   Whalen related to these HCRA assembly pool grants?

 9   A.  I don't recall any, no.

10   Q.  What recollection do you have of any time when the

11   contracting agency denied an assembly request like Government

12   Exhibit 367-1?

13            MR. COHEN:  Objection.

14            THE COURT:  Overruled.

15            THE WITNESS:  For legislative initiatives, I have no

16   recollection of them being rejected.

17   BY MS. COHEN:

18   Q.  After the assembly sent a letter like Government Exhibit

19   367-1 to the contracting agency, in this case for HCRA to the

20   Department of Health, what progress reports were sent by the

21   entity receiving the grant to the assembly about work being

22   done on the grant?

23   A.  Typically we did not receive any reports.

24   Q.  When Sheldon Silver decided to fund a particular grant for

25   a particular year, what happened the next year with respect to

1  any grant to that organization?

2  A.   The grant -- the request would be placed -- grants that

3  were awarded would be placed on the list and were reviewed,

4  once again, with the speaker.

5  Q.   Why did the grants appear again on the next year's list?

6  A.   We generally listed all grants approved as well as new

7  requests and reviewed those.  So it just would have been picked

8  up as a previously funded request.

9  Q.   Whose decision was it the following year about whether to

10  say yes or no to the grant for the next year?

11  A.   It would be the speaker's.

12  Q.   And, during the time you worked at the assembly, was the

13  HCRA assembly pool always in existence?

14  A.   I believe the pools were established in 2000.  So, no, they

15  weren't.  I went to work there before that period of time.

16  Q.   And later in your tenure as director, were the assembly

17  pools some point abolished, the HCRA assembly pools?

18  A.   They were discontinued, yes.

19  Q.   Did there come a time in your tenure at the assembly when

20  the disclosure rules changed for initiatives and member items?

21  A.   Yes.

22  Q.   Just in general, how did that change?

23  A.   We began to post items on the assembly website.

24  Q.   And do you recall if that was later in your tenure as

25  director?

1    A.  It was.  I don't have a specific recollection, but I

2    believe it was mid-term, mid-term in my tenure.

3              MS. COHEN:  A moment to confer, your Honor.

4    BY MS. COHEN:

5    Q.  Mr. August, when you were filling out the paperwork for the

6    $250,000 grants to Dr. Taub's Mesothelioma Center, what did you

7    know about whether Dr. Taub was providing any patient referrals

8    to Sheldon Silver?

9    A.  I knew nothing of their relationship.

10   Q.  If you could just have you look in your binder at one more

11   document, 368-1.

12             MS. COHEN:  If you can put that on the screen,

13   Mr. Coccaro.  Thank you.

14   BY MS. COHEN:

15   Q.  Do you recognize Government Exhibit 368-1?

16   A.  I do.

17   Q.  What is it?

18   A.  It's again a letter to Dennis Whalen, and attached is a

19   list of several projects that were approved, and we were

20   requesting that applications be generated for those.

21   Q.  Whose decision was it to approve the grants listed in

22   Government Exhibit 368-1?

23   A.  It would be the speaker's.

24   Q.  And why in Government Exhibit 368-1 are there more than one

25   grant listed?

1    A.  It would just be a matter of happenstance that there were

2    more than one grant approved and just an opportunity to

3    initiate all grants at once.

4    Q.  If you look at the last page, please.

5          MS. COHEN:  Mr. Coccaro, if you could, please pull

6    that up, the legislative initiative referral form.

7    BY MS. COHEN:

8    Q.  Was this form prepared in the same manner as the prior

9    initiative legislative form?

10   A.  Yes.

11   Q.  Where would you have gotten the purpose of that project

12   fund?

13   A.  Knowing it was the same grant being repeated for a second

14   year, we probably just pulled the previous year's description

15   and put it on a new coversheet.

16   Q.  What did you know about whether at this time Sheldon Silver

17   was receiving any patient referrals from Dr. Taub?

18   A.  I knew nothing about that.

19         MS. COHEN:  No further questions, your Honor.

20         THE COURT:  Mr. Molo.

21         Mr. Shur.

22         MR. MOLO:  Mr. Shur.

23   CROSS−EXAMINATION

24   BY MR. SHUR:

25   Q.  Good afternoon, Mr. August.

1    A.  Hi.

2    Q.  Mr. August, the prosecutor asked you about a letter dated

3    January 7, 2004, from Dr. Robert Taub to Mr. Silver.

4    A.  Yes.

5    Q.  Government's Exhibit 107.

6    A.  Yes.

7    Q.  This letter wasn't unique; right?

8    A.  It was not.

9    Q.  You had said that the speaker would receive over 1,000

10   requests for funding a year; is that right?

11   A.  It could be.

12   Q.  And those requests were very similar to this request here?

13            MS. COHEN:  Objection, your Honor.

14            THE COURT:  Sustained.

15            What do you mean by that?  Rephrase the question.  Was

16   it a request for money?

17   BY MR. SHUR:

18   Q.  It would be a request for funds; correct?

19   A.  Many of the letters came from members on behalf of a

20   particular group, but this was a similar letter.

21   Q.  So some of the budget request letters that Mr. Silver would

22   receive would come from the organizations that were requesting

23   funding themselves; right?  Outside organizations; is that

24   right?

25   A.  It could be.

1    Q.  That would include nonprofit organizations; right?

2    A.  Yes.

3    Q.  Like hospitals.  Yes?

4    A.  Yes.

5    Q.  Some of those requests would come from other members of the

6    assembly; right?

7    A.  That's correct.

8    Q.  On behalf of those organizations?

9    A.  On behalf of those organizations.

10            THE COURT:  Hang on a second.

11            Mr. August, you need to keep your voice up.  You tend

12   to trail off at the very end.

13            THE WITNESS:  I'm sorry.

14   BY MR. SHUR:

15   Q.  When these budget request letters would come in, there

16   would come a time afterwards where you would meet with

17   Mr. Silver to discuss them; right?

18   A.  That's correct.

19   Q.  Would that take place in a group setting?

20   A.  It would, yes.

21   Q.  Who would typically be present?  Let's focus in on the

22   2004/2005 time period.

23   A.  Well, do you want names?  Specific names?

24   Q.  Sure.

25   A.  Very likely Dean would be present.

1   Q.  Dean Fuleihan?

2   A.  Dean Fuleihan.  He would be present.  There could be other

3   staff members in the room.  It varied considerably.

4   Q.  Those meetings were not unusual; right?

5          MS. COHEN:  Objection, your Honor.

6          THE COURT:  Sustained.  Rephrase the question.

7   BY MR. SHUR:

8   Q.  Those were fairly common meetings?  They were periodic?

9          THE COURT:  I don't know what you mean.

10         MR. SHUR:  Sure.

11  BY MR. SHUR:

12  Q.  How often would those meetings take place?

13         THE COURT:  The meetings to discuss member items

14  specifically?

15  BY MR. SHUR:

16  Q.  The meetings to discuss budget request items, Mr. August.

17         THE COURT:  That's the question.  Requested member

18  items.

19         THE WITNESS:  The meetings could take place at any

20  point in time, and there could be several -- there could be

21  multiple meetings during the week or none at all for several

22  weeks.

23  BY MR. SHUR:

24  Q.  Is it fair to say it depended on what was going on at the

25  assembly?

1    A.  It depended on availability.  Correct.

2    Q.  So, if folks were busy, then it might take some time to sit

3    down and discuss these letters; right?

4    A.  That's correct.

5    Q.  Is it fair to say that when the budget was being

6    negotiated, that was a busy time at the assembly?

7    A.  That's correct.

8    Q.  Now, once there was a decision to recommend funding for a

9    particular project, the Ways and Means staff would process it;

10   right?

11   A.  Yes.

12   Q.  Eventually, they would send a letter to the administering

13   agency along with a legislative initiative form; right?

14   A.  Yes.

15   Q.  And I believe we looked at your letter, at least for this

16   particular grant, to the Department of Health.

17          With respect to HCRA grants, the Department of Health

18   was the ad agency; right?

19   A.  Yes.

20   Q.  And that's because it was a health care related project

21   that was being funded; right?

22   A.  It's a health care related project, and the HCRA funds were

23   appropriated within the health budget.

24   Q.  The prosecutor asked you about progress reports; right?

25   A.  Yes.

1  Q.  And asked if outside entities that were seeking funding or

2  that received state funding -- whether they sent properties to

3  the assembly.  That didn't happen; right?

4  A.  It did not.

5  Q.  Progress reports were sent to the administering agency, the

6  Department of Health; right?

7              MS. COHEN:  Objection, Your Honor.

8              THE COURT:  Do you know?

9              THE WITNESS:  I do not know.

10             THE COURT:  Okay.

11 BY MR. SHUR:

12 Q.  But the assembly did not receive progress reports; right?

13 A.  That's correct.

14 Q.  It didn't request progress reports; right?

15 A.  We did not.

16 Q.  There was no competitive bidding process that the assembly

17 did; correct?

18 A.  We did not.

19 Q.  That was not required at the time; right?

20             MS. COHEN:  Objection, your Honor.

21             THE COURT:  Overruled.

22 BY MR. SHUR:

23 Q.  That was not required at the time; right?

24 A.  There was no competitive process.

25 Q.  Right.  It wasn't required by law; correct?

1          MS. COHEN:  Objection, your Honor.

2          THE COURT:  Overruled.

3   BY MR. SHUR:

4   Q.  It wasn't required by law; correct?

5   A.  Not that I'm aware of, no.

6   Q.  And it wasn't required by the assembly's rules; right?

7   A.  Correct.

8   Q.  Mr. August, you were involved in processing this particular

9   grant; correct?

10  A.  Yes.

11  Q.  Is it fair to say that the processing of this grant was

12  handled in the same manner as the processing of other HCRA

13  grants that you were involved in?

14  A.  Yes.

15  Q.  It complied with the process that was in place at the time;

16  is that right?

17          MS. COHEN:  Objection, your Honor.

18          THE COURT:  I'm not quite sure what that means,

19  "Complied with the process."

20          MR. SHUR:  Sure.

21  BY MR. SHUR:

22  Q.  The Ways and Means staff had a process that it followed to

23  process HCRA grant requests; right?

24  A.  Well, we had a process that we used for all grant requests

25  regardless of the funding source.

1    Q.  Right.  Did this particular request -- was that process

2    followed here?

3    A.  Yes.

4    Q.  Mr. Silver didn't ask you to give this request any

5    preferential treatment; right?

6              MS. COHEN:  Objection, your Honor.

7              THE COURT:  Overruled.

8              THE WITNESS:  He did not.

9    BY MR. SHUR:

10   Q.  Mr. Silver didn't do anything to indicate that he had a

11   special interest in this particular grant request; right?

12   A.  I don't recall any conversation with him on this, no.

13   Q.  As part of the review process at Ways and Means, you often

14   gathered additional information about the proposed grant or the

15   grantee; right?

16   A.  Not necessarily.  I'm not sure.

17   Q.  Let me ask a more pointed question.

18              During the review process, would there be times when

19   you would reach out to the grantee organization to follow up,

20   to request additional information or clarification?

21   A.  There would be time for it.  Our due diligence was

22   primarily limited to confirming that it was a not-for-profit

23   organization; they were eligible to receive public funds; and,

24   again, just to verify contact information.

25   Q.  With respect to the grant for New York Presbyterian

```
 1    Hospital, do you recall reaching out to Dr. Robert Taub?
 2    A.  I do.
 3    Q.  I'm sorry.  I didn't hear you.
 4    A.  I did.
 5    Q.  Okay.
 6            THE COURT:  Do you remember it?  Or do you just base
 7    it on the fact that you see the document in front of you?
 8            THE WITNESS:  Right.  I see the document.
 9            THE COURT:  Do you have an independent recollection
10    even once you see that document?
11            THE WITNESS:  I do recall speaking with Dr. Taub, if
12    that's what you're --
13    BY MR. SHUR:
14    Q.  And you reached out to Dr. Taub because his name was on the
15    letter; right?
16    A.  Correct.
17    Q.  Mr. Silver didn't ask you to reach out to Dr. Taub; right?
18    A.  No, not that I recall.
19    Q.  I believe Government Exhibit 304 is in evidence.
20            Do you have it in front of you, Mr. August?
21    A.  I do.
22    Q.  This is a fax from you to Dr. Taub; correct?
23    A.  Yes.
24    Q.  Following up on the grant request?
25    A.  Yes.
```

1    Q.   Before faxing this to Dr. Taub, did you try reaching him by

2    phone?

3    A.   I may have.  I certainly tried.  I certainly reached out to

4    him after I sent the fax.

5    Q.   To be clear, you were reaching out to Dr. Taub to confirm

6    that the language that you were going to include in the

7    legislative initiative form regarding the purpose of the grant

8    was accurate.

9    A.   Correct.

10   Q.   That was the purpose of this fax?

11   A.   The fax was to -- yes.  The fax was to make sure that the

12   description was accurate.

13   Q.   The second page of Government Exhibit 304 -- this was

14   language that you included in the fax.  This was the language

15   you wanted Dr. Taub to confirm was accurate; right?

16   A.   Yes.

17   Q.   It would be listed as the purpose of the grant; correct?

18   A.   Correct.

19   Q.   You obtained this language from the letter request that

20   Dr. Taub had sent to Mr. Silver; right?

21   A.   That was the source of the information, yes.

22   Q.   Mr. Silver didn't provide you with this language.

23   A.   No.  I don't believe so.

24   Q.   Now, the language talks about the purpose of the grant

25   would be to conduct research, cancer research; right?

1    A.  Yes.

2    Q.  And, in particular, it mentions cancers in individuals who

3    were exposed to asbestos after the attacks on September 11;

4    right?

5    A.  Yes.

6    Q.  Mr. August, if you know, was Mr. Silver at that time

7    attentive to issues regarding 9/11?

8    A.  He was.  9/11 was in his district.

9    Q.  After you sent this fax to Dr. Taub, did you have any

10   followup discussions with him about the language?

11   A.  With Dr. Taub?

12   Q.  Yes.

13   A.  He did not respond to the email -- or to the fax.  I

14   reached out to him by phone to get his confirmation.

15   Q.  Did Dr. Taub, in fact, confirm that the language you sent

16   him was an accurate description of the purpose of the grant?

17   A.  Yes.  We had a very brief conversation, and he indicated

18   the language was okay.

19   Q.  Did you have any additional conversations with Dr. Taub?

20   A.  I did not.

21   Q.  Have you ever met Dr. Taub in person?

22   A.  I have not.

23   Q.  The language in this fax that we're looking at is

24   ultimately what appears in the legislative initiative form;

25   right?

 1   A.  Yes.

 2   Q.  This was the standard process that was followed with

 3   respect to legislative grants; correct?

 4   A.  Correct.

 5   Q.  Mr. August, have you met with the prosecutors before today?

 6   A.  Yes.

 7   Q.  When was the very first time you met with the prosecutors?

 8   Tell us how that came about.

 9   A.  I don't know the date.  It was January of this year.  They

10   came up to Maine, and requested that I speak with them.

11   Q.  And they called you first before doing that?

12   A.  They did not, no.

13   Q.  They didn't make an appointment to see you?

14   A.  No.

15   Q.  They just showed up?

16   A.  They did.

17   Q.  This is in Bath, Main?

18   A.  It is.

19   Q.  Where is Bath, Main?

20   A.  We're about 35 miles north of Portland.

21           THE COURT:  This is New York.  Where is Portland?

22           THE WITNESS:  Portland, Maine.  We're in the mid-coast

23   area of Maine.  I'm sorry.  I thought everyone knew where

24   Portland was.

25   BY MR. SHUR:

1    Q.  This is a rural area I take it?

2    A.  Bath is a town of about 8,000.

3    Q.  And you mentioned you've retired.

4    A.  Correct.

5    Q.  Were you home?  Did they knock on the door?

6    A.  My wife and I were out for a walk.  I recall it was

7    mid-afternoon.  They were in the driveway when we returned

8    home.

9    Q.  Who was there?  Was Ms. Cohen there?

10   A.  Yes.

11   Q.  What about Mr. Master and Mr. Goldstein?  Were they there?

12   A.  No.

13   Q.  What about the investigators?  Were the investigators with

14   Ms. Cohen?

15   A.  There were investigators there, yes.

16   Q.  Had you ever had that happen before?  Where criminal

17   investigators came to your house?

18   A.  No.

19   Q.  Were you surprised to see them there?

20   A.  I was.

21            MR. SHUR:  One moment, your Honor.

22   BY MR. SHUR:

23   Q.  Mr. August, you didn't do anything or take any steps to

24   conceal any information in connection with these grants from

25   the public, did you?

1    A.  I did not.

2    Q.  And no one instructed you to do that, did they?

3    A.  No.

4          MR. SHUR:  No further questions.

5          MS. COHEN:  Briefly, your Honor.

6          THE COURT:  Briefly.

7    REDIRECT EXAMINATION

8    BY MS. COHEN:

9    Q.  Mr. August, when the government showed up at your house in

10   Main in January of this year, did you agree to speak with them

11   voluntarily?

12   A.  I did.

13   Q.  Have you spoken with defense counsel prior to testifying

14   here today?

15   A.  I have.

16   Q.  Mr. August, what did you know about why Sheldon Silver

17   decided to fund Dr. Taub's research?

18   A.  If I thought of it at all, I connected it to the events of

19   9/11 and the description.  It also occurred to me that the

20   speaker's brother had been a medical professional, a doctor.

21   Perhaps there was some connection there, but that was the

22   extent of my thoughts on it.

23   Q.  Were those thoughts just based on your own assumptions or

24   on something the speaker said to you?

25   A.  No.  Just a random thought.

1  Q.  The speaker never told you that he wanted to fund

2  Dr. Taub's research because it was related to 9/11?

3  A.  I don't recall a detailed conversation on it, no.

4  Q.  You had no conversation with the speaker about that; right?

5  A.  I don't recall.  No.

6  Q.  You don't recall having one; is that correct?

7  A.  I don't recall.  Yes.  I don't recall.

8  Q.  Before you sent that fax to Dr. Taub with the language for

9  the legislative initiative form, prior to that, the speaker had

10  approved the grant to Dr. Taub; correct?

11  A.  Yes.

12  Q.  When you reached out to Dr. Taub, you sent him that fax

13  regarding the language for the legislative initiative form,

14  what did you know about any financial benefit Sheldon Silver

15  was getting from Dr. Taub?

16  A.  I knew of none.

17  Q.  Did all budget request letters say that Sheldon Silver was

18  very interested in funding the request?

19  A.  Not all of them, but it didn't strike me as unusual.  But

20  not all of them.

21  Q.  Not all the letters had that notation on them; right?

22  A.  That's correct.

23          MS. COHEN:  No further questions, your Honor.

24          THE COURT:  You can step down.

25          THE WITNESS:  Thank you.

1          (Witness excused)

2          MS. COHEN:  Your Honor, the government calls Dennis

3  Whalen.

4          THE COURT:  Where is Mr. Whalen?

5          MS. COHEN:  I believe they went to get him,

6  your Honor.  He was just in the other witness room.  He's

7  coming, your Honor.

8   DENNIS PATRICK WHALEN,

9       called as a witness by the Government,

10      having been duly sworn, testified as follows:

11  DIRECT EXAMINATION

12  BY MS. COHEN:

13  Q.  Mr. Whalen, are you appearing here pursuant to a subpoena?

14  A.  Yes, I am.

15  Q.  Where do you work now?

16  A.  I work at the Health Care Association of New York State.

17  Q.  What is the Health Care Association of New York State?

18  A.  That's an education and advocacy organization for hospitals

19  and health systems in New York.

20  Q.  How long have you been at the Health Care Association of

21  New York State?

22  A.  I've been there now for about 6 1/2 years.

23  Q.  What is your title at the Health Care Association of New

24  York State?

25  A.  President.

FB97SIL4                       Whalen - Direct

1    Q.  In genral, what are your duties and responsibilities as

2    president of the Health Care Association of New York State.

3    A.  I lead the organization, represent the members, supervise

4    out staff, and advocate on behalf of hospitals and health

5    systems.

6    Q.  Where is the Health Care Association of New York State

7    located?

8    A.  In Rensselaer, New York.

9    Q.  Is Rensselaer near Albany, New York?

10   A.  Just across the river.

11            THE COURT:  Mr. Whalen, you need to keep your voice

12   up.

13            THE WITNESS:  Thank you.

14   BY MS. COHEN:

15   Q.  Where did you work before you were the president of the

16   Health Care Association of New York State?

17   A.  I worked for New York State for about 35 years.

18   Q.  What was the last position you had with the state?

19   A.  I was the director of state operations.

20   Q.  Who appointed you the director of state operations?

21   A.  Governor the David Patterson.

22   Q.  In general, what were your duties and responsibilities as

23   director of state operations?

24   A.  As the chief administrative officer of the state, you

25   supervise the policy staff in the governor's office and

FB97SIL4                      Whalen - Direct

 1   supervise the state agencies.

 2   Q.  What was your position with the state prior to being

 3   appointed the director of state operations?

 4   A.  I was the Deputy Secretary for Health and Human Services.

 5   Q.  Who appointed you the Deputy Secretary of Health and Human

 6   Services?

 7   A.  First Governor Spitzer.  Then Governor Patterson.

 8   Q.  How long did you serve as the Deputy Secretary of Health

 9   and Human Services?

10   A.  About two years.

11   Q.  And, in general, what were your duties and responsibilities

12   as Deputy Secretary of Health and Human Services?

13   A.  As the chief health care adviser to the governor, and you

14   supervise all of the state agencies and the health, mental

15   health, and social service area.

16   Q.  Prior to being the Deputy Secretary of Health and Human

17   Services, did you work at the Department of Health?

18   A.  I did.

19   Q.  How long did you work for the Department of Health?

20   A.  I was there from '89 through 2000, through 2006.

21   Q.  If you can just take us back a little bit farther.

22           What was your educational background?  College.

23   A.  I'm a graduate of Marist College and the National

24   Preparedness Leadership Institute at the Kennedy School.

25   Q.  Where did you work after you graduated college?

1  A.  My first job was with the Health Department in 1974.

2  Q.  That's the New York State Department of Health?

3  A.  Sorry.  New York State Health Department.

4  Q.  If you can just walk us through your career at the State

5  Department of Health, please.

6  A.  Out of college, I was a public educator for two years at

7  the Department of Health.  I then got laid off from the

8  Department of Health, and I went to the Office of Alcoholism

9  and Substance Abuse Services for 12 years.

10         Then in '89, I came back to the Department of Health

11  where I worked for the AIDS Institute for six years.  I then

12  moved to the Office of Health Systems Management for a year and

13  then moved into the executive deputy commissioner job.

14  Q.  How long did you hold the position of Executive Deputy

15  Commissioner of the Department of Health?

16  A.  Ten years.

17  Q.  What years were those?

18  A.  Approximately '96 through 2006.

19  Q.  Can you describe your general duties and responsibilities

20  as the Executive Deputy Commissioner of the New York State

21  Department of Health?

22  A.  It's the number two job in the agency.  It reports to the

23  commissioner and advises the commissioner on policy issues but

24  also supervises the senior staff in the department.

25  Q.  Are you familiar with the Health Care Reform Act commonly

1    referred to by its initials HCRA?

2    A.  Yes.

3    Q.  Can you please explain for the jury what HCRA is.

4    A.  HCRA replaced a system in New York that regulated hospital

5    prices, and HCRA moved that to a base of negotiations.  So

6    hospitals negotiating with health insurers for reimbursement.

7         But at the same time, it also raised a considerable

8    amount of dollars through taxes and various other means to fund

9    particular programs that the state was interested in

10   continuing.

11        These are programs such as graduate medical education,

12   charity care for hospitals, various insurance programs, and a

13   variety of public health programs.

14   Q.  Are you familiar with the term the HCRA assembly pool?

15   A.  Yes.

16   Q.  What is the HCRA assembly pool?

17   A.  Within HCRA, there were what we call discretionary pools

18   that were controlled by the assembly, the senate, and the

19   commissioner of health.

20   Q.  And did each, the assembly itself, the senate itself, and

21   Commissioner of Health have their own pool?

22   A.  Correct.

23   Q.  When was the HCRA assembly pool created?

24   A.  I believe it was in 1996 -- sorry.  1999 late in the year,

25   and then it took effect in the 2000 budget.

FB97SIL4                    Whalen - Direct

1   Q.   Who negotiated the amount of money that was put into the

2   HCRA assembly pool?

3   A.   I don't know.  I wasn't in a position then to know.  That

4   was negotiated as part of the budget deals.

5   Q.   In general, who would negotiate the budget deals each year?

6   A.   It would be parties from the senate, the assembly, and the

7   governor's office.

8   Q.   How long did the HCRA assembly pool get funded for?

9   A.   I think the pools continued until Eliot Spitzer's first

10  budget.  So 2007.

11  Q.   What happened in Eliot Spitzer's first budget year 2007 to

12  the HCRA assembly pools?

13  A.   We eliminated all three pools.

14  Q.   Who made the decisions on what institutions or

15  organizations received funding from the HCRA assembly pool?

16  A.   The assembly.

17  Q.   What role did the Department of Health have related to the

18  HCRA assembly pool grants?

19  A.   We were -- I guess you could say we were the banker and the

20  bookkeeper.  We would receive communications from the assembly

21  indicating the amount of dollars and the recipient of the

22  dollars, and we would proceed to do a contract with that

23  entity.

24  Q.   What ability to the Department of Health have to reject a

25  request from the assembly to use the HCRA assembly pools to

1    give them to a certain organization?

2    A.  We had none.  I think the language in the HCRA bill would

3    say something like pursuant to a memorandum.  So we were told

4    that that simply meant that we didn't have anything to say

5    about who got the money or how much.  We were just to process

6    the contract.

7    Q.  How did the Department of Health, in general, process the

8    contracts that were using the HCRA assembly pool money?

9    A.  We issued a standard state contract following all the

10   guidelines that were required.

11   Q.  What do you mean by a "standard state contract"?

12   A.  There's a contract, a series of contract provisions, that

13   are specified in state law and guidance from the Attorney

14   General's office, the controller's office that detail what must

15   be contained in a state contract, what the form of the contract

16   is.

17   Q.  Are you familiar with the term "competitive grant review"?

18   A.  Yes.

19   Q.  What does it mean?

20   A.  A competitive grant review means there's a process where

21   applications are sought for grant dollars, and it's

22   competitive.  You get multiple applications, and those are

23   reviewed through a process in order to choose the most worthy

24   program.

25   Q.  Were the grants given under the HCRA assembly pool

1    competitively reviewed?

2    A.  I don't know what the assembly process was to choose those.

3    So I can't comment on that.

4    Q.  With respect to DOH's role, Department of Health's role, as

5    the banker and processer of the grants, did the Department of

6    Health do any competitive review of the grants?

7    A.  Of the assembly grants.

8    Q.  Correct.  I'll rephrase the question.

9             What competitive review did the New York State

10   Department of Health do of the grants that it administered

11   under the HCRA assembly pool?

12   A.  We did none.

13   Q.  Why is that?

14   A.  Again, because the language in the law said that the

15   recipients were chosen pursuant to a memorandum or a

16   communication from the assembly or the senate.

17   Q.  And what information did the Department of Health have

18   about other entities that may have applied or asked for state

19   funding under HCRA to the assembly?

20   A.  None.

21   Q.  Are you familiar with the term "peer review" as it applies

22   to research grants?

23   A.  Yes.

24   Q.  What is peer review?

25   A.  Peer review means that you choose a group that is expert in

FB97SIL4                     Whalen - Direct

1   the topic for which you are awarded research dollars so that

2   they review either the proposals that are going to be let or

3   the responses that come into a proposal and use their expertise

4   to determine which is the best proposal or whether results from

5   a particular study or program meet scientific standards.

6   Q.  What peer review did the Department of Health do with

7   respect to grants given with money from the HCRA assembly pool?

8   A.  We did none.

9   Q.  Are you familiar with the Wadsworth Center?

10  A.  Yes.

11  Q.  What is the Wadsworth Center?

12  A.  The Wadsworth Center is the division of laboratories and

13  research in the State Health Department.

14  Q.  In general, what health care research does the Wadsworth

15  Center fund?

16  A.  They fund a pretty limited number of research programs --

17  breast cancer research is one, I think prostate and testicular

18  cancer is a second, and certainly stem cell research also.

19  Q.  What peer review is done by the Wadsworth Center before it

20  gives out a grant?

21  A.  In those categories?

22  Q.  Yes.

23  A.  Each of those --

24          MR. SHUR:  Judge, I'm going to object.

25          MS. COHEN:  If we can have a sidebar, your Honor, if

1     it's going to be a speaking objection.

2               THE COURT:  Okay.  Why don't we come to sidebar.

3               (At the sidebar)

4               THE COURT:  What's the relevance?

5               MS. COHEN:  Just to show that there were state funds

6     available.  I'm almost done with this line of questioning.

7               MR. SHUR:  Judge, we've now heard three witnesses say

8     that pier review is not required.  I let Ms. Cohen ask the same

9     questions of this witness, but now we're actually going to

10    contrast to talk about entities that have nothing to do with

11    this process to say that they have some other process that

12    wasn't required by law with respect to the grants that we're

13    talking about.

14              How is that remotely relevant?

15              MS. COHEN:  Your Honor, it's not a random entity.

16    It's another state entity that gives out health care grants.

17              THE COURT:  I think it's been established that there

18    was no peer review.  He's described what peer review is.  So I

19    don't think it's necessary.

20              MS. COHEN:  I only had one more question.

21              THE COURT:  One less.

22              MS. COHEN:  Thank you.

23              (In open court)

24    BY MS. COHEN:

25    Q.  Mr. Whalen, what involvement did the State Wadsworth Center

1    have in any of the grants made using the HCRA assembly pool

2    money?

3    A.   None.

4    Q.   How did the Department of Health learn about a particular

5    HCRA grant from the assembly HCRA pool?

6    A.   We would receive written communications from the assembly.

7    I think most usually in the form of a letter.  And attached to

8    that would usually be a sheet that contained information, brief

9    information, on the grant, who the recipient was, and the

10   purpose.

11          MS. COHEN:  Mr. Coccaro, if we could pull you have

12   what's in evidence Government Exhibit 367-1 and 368-1 side by

13   side.

14   BY MS. COHEN:

15   Q.   Mr. Whalen, they're also in the binder in front of you if

16   that's easier.

17          Mr. Whalen, do you recognize Government Exhibit 367-1

18   and 368-1?

19   A.   Well, yes.  They're letters to me at the Department of

20   Health from the speaker providing the grant amount in the one

21   instance, in 367-1.  And then in 368-1, it references an

22   attachment that includes a number of programs that would be

23   funded.

24   Q.   Based on these letters, Government Exhibit 367-1 and 368-1,

25   what would the Department of Health have known about who was

1   the assembly person who actually sponsored the grant?

2   A.  We would not know.

3   Q.  After the Department of Health got a letter from Sheldon

4   Silver like Government Exhibit 367-1 or 368-1, what did the

5   Department of Health do?

6   A.  This would have been directed to our finance and

7   administration office, and they would have started the contract

8   process which would have typically involved reaching out to the

9   recipients, providing them with information that needed to be

10  submitted back to the department so that a contract could be

11  put together.

12  Q.  If you can look in your binder either on the screen at

13  Government Exhibit 367-2 and 368-2.

14          MS. COHEN:  Mr. Coccaro, if you could put those up

15  side by side, please.

16  BY MS. COHEN:

17  Q.  Mr. Whalen, do you recognize Government Exhibits 367-2 and

18  368-2?

19  A.  These are both letters from Bob Reed, who is the director

20  of our finance group in 367-2 and then promoted to deputy

21  commissioner for administration in 368-2 but in both jobs head

22  of the finance office at the Department of Health.

23  Q.  What would Mr. Reed have known about who was the sponsoring

24  assembly person for the grant?

25          MR. SHUR:  Objection.

1          THE COURT:  Overruled.

2          If you know the process.  Do you know if there was any

3   process for notifying finance who sponsored them?

4          THE WITNESS:  Only the letters that were previously

5   shown.

6   BY MS. COHEN:

7   Q.  And the letters all came from the speaker, Sheldon Silver;

8   is that right?

9   A.  Those two did, yes.

10  Q.  In general, when letters were sent from the HCRA assembly

11  pool or for the Department of Health to release money under the

12  HCRA assembly pool, did the letters come from Sheldon Silver

13  from the assembly's pool?

14  A.  That's correct.

15  Q.  And there was nothing in those letters that indicated what

16  assembly person had sponsored the grant; is that right?

17  A.  That's correct.

18  Q.  If you could look, please, at Government Exhibit 367-3 as

19  an example, please.

20         MS. COHEN:  Mr. Coccaro, if you could pull that one

21  up.

22  BY MS. COHEN:

23  Q.  Do you recognize this document?

24  A.  That's the coversheet for a typical New York State

25  contract.

1  Q.  If you can look at page 2.  There are two stamps at the

2  bottom by the Attorney General and the Office of the State

3  Comptroller.

4  A.  Yes.

5  Q.  Do you know what review either of those entities did to

6  DOH's contract?

7  A.  The Attorney General would review it to ensure that it is

8  in fact the typical state contract and that it meets all of the

9  legal requirements, in their view, for a state contract.

10         The Office of the State Comptroller also reviewed it

11  as to form.  They have audit and financial review

12  responsibility.  So, depending on when this happened and

13  whether or not HCRA was on or off budget at this time, they

14  would have had the ability to audit and do other things.

15         But they were mostly both form reviews to ensure that

16  the standard contract was standard.

17  Q.  What disclosure to the public was there about the grants

18  that were made from the HCRA assembly pool?

19  A.  The department made no notification of the grants.

20  Q.  After the Department of Health had a signed contract from

21  an entity that received funds from the HCRA assembly pool, what

22  else did the grant recipient have to file with the Department

23  of Health in order to get paid for that grant?

24  A.  Well, there are a number of attestations and other

25  documents that need to be submitted for a contract to move

1    forward.

2            One of those is a budget; that upon discussion with

3    the Department of Health, there's a payment plan that's put

4    into place.  And then certification has to come back from the

5    grantee, the place receiving the grant dollars, to demonstrate

6    or to attest that expenditures had been made before the state

7    payment goes out.

8    Q.  If you can look in your binder, please, at Government

9    Exhibits 2003, 2004, 2005, and 2006.

10           Just if you recognize them, what are they?

11   A.  These are standard state vouchers.  This is the method by

12   which the payment is made.  The cover memo is to the finance

13   office at the Department of Health from the grants office and

14   the Office of Health Systems Management that indicates that the

15   payment should be made.

16           MS. COHEN:  Your Honor, the government moves

17   Government Exhibits 2003, 2004, 2005, and 2006 into evidence.

18           MR. SHUR:  No objection.

19           THE COURT:  Okay.  2003, 2004, 2005, and 2006 are

20   received.

21           (Government's Exhibit 2003, 2004, 2005, and 2006

22   received in evidence)

23           MS. COHEN:  Mr. Coccaro, just as an example, if you

24   would pull up, please, Government Exhibit 2003 for the jury.

25   BY MS. COHEN:

1   Q.  Mr. Whalen, if you could just tell the jury what the memo

2   is and behind it what the next pages are, the standard voucher

3   for payment.

4   A.  So this is an internal Health Department memo that is going

5   to the finance office from the Office of Health Systems

6   Management, the grant office, indicating that it's okay to move

7   ahead with paying the voucher that's attached to this memo.

8          MS. COHEN:  Mr. Coccaro, if you could turn to the

9   third page of Government Exhibit 2003.

10  BY MS. COHEN:

11  Q.  Mr. Whalen, what is this standard voucher?

12  A.  That's the method by which the state is told how much to

13  pay and who to pay.

14  Q.  If you can look at the last page of Government

15  Exhibit 2003, which appears to just be a budget.  Can you just

16  explain what it is, please.

17  A.  This is a budget that is derived from the contract.  So it

18  specifies that for New York Presbyterian Hospital and the

19  contract numbered that the budget categories are essentially

20  personnel.  So there's a salary, a line fringe benefits, and

21  then indirect costs.

22          So you can see how that's broken down in the budgeted

23  amount.  And then the current expenditures indicate the amount

24  that should be paid.

25  Q.  So the entity getting the HCRA assembly pool grant, in this

1    case, New York Presbyterian Hospital, submits the budget

2    showing they've used the money and the standard voucher in

3    order to get paid?

4    A.  Correct.

5    Q.  Mr. Whalen, if the public knew about the contract between

6    the Department of Health and New York Presbyterian Hospital

7    that you were shown, Government Exhibit 367-3, and the one for

8    Columbia University, 368-3, what would the public have known

9    about what politician had directed the state money to those two

10   entities?

11              MR. SHUR:  Objection.

12              THE COURT:  Sustained.

13   BY MS. COHEN:

14   Q.  Looking at Government Exhibit 637-3, please, for a minute,

15   which is in your binder.

16              MS. COHEN:  Mr. Coccaro, if you could put that up.

17   BY MS. COHEN:

18   Q.  It's the standard grant contract you testified to a minute

19   ago.

20   A.  Yes.

21   Q.  Between the Department of Health and New York Presbyterian?

22   A.  Right.

23   Q.  Where in this grant contract, Government Exhibit 367-3,

24   does it say which assembly member had sponsored this grant

25   contract?

FB97SIL4                    Whalen - Cross

1    A.  It does not.

2    Q.  Looking at Government Exhibit 368-3, which is another grant

3    contract to the trustees of Columbia University for $250,000,

4    where in Government Exhibit 368-3 does it say what politician

5    had directed the state money to Columbia University?

6    A.  It does not.

7              MS. COHEN:  No further questions, your Honor.

8              THE COURT:  Mr. Shur.

9    CROSS-EXAMINATION

10   BY MR. SHUR:

11   Q.  Good afternoon, Mr. Whalen.

12   A.  Good afternoon.

13   Q.  Taking a step back, when the Department of Health receives

14   notification from the Ways and Means Committee or from the

15   assembly about a HCRA grant, there's a process that then

16   unfolds; is that right?

17   A.  That's correct.

18   Q.  And that process involves the grants having to be signed

19   off by the Department of Health?  Yes?

20   A.  Correct.

21   Q.  And the grants having to be signed off on by the New York

22   State Attorney General's office?

23   A.  That's right.

24   Q.  And the grants having to be signed off by the New York

25   State Comptroller's Office.

1    A.  Yes.

2    Q.  And that process involves a number of different steps;

3    right?

4    A.  That's right.

5    Q.  By several different agencies?

6    A.  Correct.

7    Q.  And by a number of different people at those different

8    agencies; right?

9    A.  I'm sure.  Yes.

10   Q.  Would it surprise you to know that 20 different New York

11   State officials were involved in reviewing these two grants?

12           MS. COHEN:  Objection, your Honor.

13           THE COURT:  Overruled.

14           THE WITNESS:  No.

15   BY MR. SHUR:

16   Q.  That would be fairly common?

17   A.  Yes.

18   Q.  Now, the prosecutor made reference to competitive review

19   process, peer review process.  Those processes were not

20   required with respect to the HCRA grants; right?

21   A.  That's correct.

22   Q.  They weren't required by law with respect to the HCRA

23   grants; right?

24   A.  That's correct.

25   Q.  Or the assembly's rules; right?

1    A.  I don't know what the assembly's rules were.

2    Q.  They weren't required by the Department of Health's rules;

3    right?

4    A.  That's correct.

5    Q.  But there was a process that these HCRA grants followed;

6    correct?

7    A.  Yes.

8    Q.  And these two grants, the one to New York Presbyterian

9    Hospital and the one to Columbia University Medical Center --

10   they followed that process; right?

11   A.  Yes, they did.

12   Q.  They weren't handled any differently from any other HCRA

13   grants; right?

14   A.  That's right.

15   Q.  Now, the reason that the assembly notified the Department

16   of Health about these grants is that under the law, the

17   Department of Health was the administering agency; right?

18   A.  For those entities that were under the regulation of the

19   Department of Health.

20   Q.  Okay.  Let's specifically talk about these two grants which

21   were going to Columbia University Medical Center and the

22   New York Presbyterian Hospital.

23        The administering agency was the Department of Health;

24   right?

25   A.  That's correct.

FB97SIL4                    Whalen – Cross

1   Q.  As an initial step, once the Department of Health receives

2   the legislative initiative form and the cover letter we took a

3   look at, the department sent a grant application to the

4   grantee; is that right?

5   A.  That's correct.

6   Q.  I'd like to show you what's been marked Defense Exhibit 38

7   and Defense Exhibit 39 for identification.

8           Mr. Whalen, let me know once you've had a chance to

9   take a look at these two exhibits.

10  A.  Okay.

11  Q.  What are these documents, Mr. Whalen?

12  A.  These are responses from New York Presbyterian Hospital and

13  Columbia University on a form that was provided by the Health

14  Department for the grant to move forward.  It collects

15  information on the proposed budget, work plan, and various

16  other documents.

17  Q.  Are these the completed grant applications that were sent

18  to the Department of Health and that were returned from the

19  hospitals?

20  A.  They appear to be.

21  Q.  Are those grant applications, the completed versions of

22  them -- are those documents that are kept in the ordinary

23  course of business of the Department of Health?

24  A.  Yes.

25          MR. SHUR:  Your Honor, at this time I would move for

1   admission of Defendant's Exhibits 38 and 39.

2            MS. COHEN:  No objection, your Honor.

3            THE COURT:  All right.  38 and 39 are received.

4            (Defendant's Exhibit 38 and 39 received in evidence)

5   BY MR. SHUR:

6   Q.  Mr. Whalen, the grant applications that are in front of you

7   contain a number of different documents; right?

8   A.  Yes.  That's correct.

9   Q.  And these are documents that the Department of Health is

10  sending to the hospitals to complete; correct?

11  A.  That's right.

12  Q.  The application includes a grantee information sheet; is

13  that right?

14  A.  Yes.

15  Q.  Where the hospital has to complete information about its

16  organization.

17  A.  Correct.

18  Q.  The application includes a program work plan narrative

19  sheet; is that right?

20  A.  That's correct.

21  Q.  And that's where the hospital is required to provide the

22  Department of Health a description of the history of its

23  organization and its purpose and goals; right?

24  A.  That's correct.

25  Q.  And the hospitals are required to provide to the Department

FB97SIL4                    Whalen - Cross

1    of Health a description of the purpose of the grant; right?

2    A.   Correct.

3    Q.   And also required to provide to the Department of Health

4    what the grantee hoped to achieve with the use of the grant

5    funds; right?

6    A.   That's correct.

7    Q.   The grant application packet also includes a budget sheet;

8    right?

9    A.   Yes.

10   Q.   The budget sheet requires the hospitals to furnish to the

11   Department of Health an estimated use of grant funds for

12   various costs and expenses; right?

13   A.   That's correct.

14   Q.   The application packet includes a payment and reporting

15   schedule sheet; is that right?

16   A.   Yes.

17   Q.   The application indicates that over the life of the grant,

18   the grantee, here, the two hospitals, were required to submit

19   to the Department of Health progress and expenditure reports.

20        Is that right?

21   A.   That's correct.

22   Q.   And, to be clear, for the HCRA grants, if you know,

23   progress reports were required, not on a quarterly basis but

24   just at the end of the grant process; is that right?

25   A.   That's what this specifies, yes.

FB97SIL4                    Whalen - Cross

1   Q.   Sure.  So, once the Department of Health receives the

2   completed application packet from, here, New York Presbyterian

3   and Columbia, it reviews all these materials?

4   A.   That's right.

5   Q.   It reviewed the grantee information sheet; right?

6   A.   That's correct.

7   Q.   And the work plan narrative sheet that we talked about;

8   right?

9   A.   Yes.

10  Q.   The Department of Health reviews the budget sheet and the

11  payment and reporting schedule; right?

12  A.   Correct.

13  Q.   And that happened with respect to both of these grants;

14  correct?

15  A.   That's correct.

16  Q.   Now, at that point in the process, after the department

17  receives this completed application, a project manager is

18  assigned to the grant; is that right?

19  A.   That's correct.

20  Q.   For the 2005 grant, the project manager was Muriel Dempsey?

21  A.   Yes.

22  Q.   And for the 2006 grant, the project manager was Catherine

23  Fletcher; is that right?

24  A.   That's correct.

25  Q.   And Ms. Dempsey was the health program director for the

1  Department of Health's grant clearing house?

2  A.  In the health system, yes.

3  Q.  And Ms. Fletcher was the co-director of the Department of

4  Health's grant clearing house?

5  A.  Correct.

6  Q.  So, after the project manager is assigned, the next step is

7  for the project manager to develop a grant contract; right?

8  A.  That's right.

9  Q.  Because the grants were governed by a contract.

10  A.  That's correct.

11  Q.  And this is a contract between the Department of Health and

12  the grantee; right?

13  A.  That's correct.

14  Q.  The assembly is not a party to this contract; is that

15  right?

16  A.  The assembly directs that the money is to get paid.

17  Q.  Right.  But the contract is between the Department of

18  Health and the grantee.

19  A.  Correct.

20  Q.  I believe the two contracts are already in evidence as

21  Government Exhibit 367-3 and 368-3.

22        Mr. Whalen, like any contract, each party to it, here,

23  the Department of Health and New York Presbyterian and

24  Columbia, had certain rights and certain responsibilities;

25  right?

1    A.   That's correct.

2    Q.   The contract provided that the contractor, which was the

3    hospital, shall perform all services to the satisfaction of the

4    state.   Here, the state is the Department of Health; right?

5    A.   That's correct.

6    Q.   And the services the hospitals were required to perform

7    under the contract included meeting the program objectives that

8    were summarized in the work plan that was submitted to the

9    Department of Health; correct?

10   A.   That's correct.

11   Q.   The contract also provided that the Department of Health

12   could terminate the agreement if the hospitals failed to comply

13   with the terms and the conditions of the agreement; right?

14   A.   Yes.

15   Q.   This was a standard contract; right?

16   A.   That's correct.

17   Q.   And this process was standard; right?

18   A.   That's correct.

19   Q.   And these two grant contracts followed the standard

20   process.

21   A.   Yes.

22   Q.   I'd like to show you Defendant's Exhibit 14-A for

23   identification.

24            THE COURT:   14-A is in evidence.   At least page 3 is.

25   Only page 3 is.

1              MR. SHUR:  Okay.

2    BY MR. SHUR:

3    Q.  Let me know once you've had a chance to review the

4    document, Mr. Whalen.

5    A.  Yes.

6    Q.  Mr. Whalen, what is this document?

7    A.  This is a fax of the letter from Columbia University

8    Medical Center to Mr. Reed that's attaching additional details

9    of Dr. Taub of his project.

10   Q.  Okay.

11   A.  The letter also requests that the grant period be changed

12   and notifies us that the legal name of the entity is the

13   trustees of Columbia University.

14   Q.  Mr. Whalen, this is in connection with the HCRA grants

15   we've been talking about.  Yes?

16   A.  That's correct.

17   Q.  Is this document a document that is made in connection with

18   the ordinary course of the Department of Health's business?

19   A.  Yes.

20              MR. SHUR:  At this time, your Honor, I would move for

21   admission of Defendant's Exhibit 14-A.

22              MS. COHEN:  No objection, your Honor.

23              THE COURT:  All right.  The rest of 14-A will be

24   received.

25              MR. SHUR:  If you would publish this for the jury,

1     please.

2                THE COURT:  You're marking this as 14-A, but I think

3     14 was identified as the entire fax.

4                MR. SHUR:  Okay.  Then it probably makes sense to move

5     it in as 14, your Honor.

6                THE COURT:  I think that's right.

7                MR. SHUR:  Thank you, Judge.

8                THE COURT:  So 14 is received.

9                (Defendant's Exhibit 14 received in evidence)

10               MR. SHUR:  If we may publish it to the jury, please.

11    BY MR. SHUR:

12    Q.  While we're waiting for it to come up, the first page is a

13    fax coversheet; right?

14    A.  That's correct.

15    Q.  It says it's from Cheryl Mapou; is that right?

16    A.  Your guess is as good as mine.

17    Q.  That name does not sound familiar to you?

18    A.  No.

19    Q.  That's not someone from the Department of Health?

20    A.  No.

21    Q.  Someone from Columbia University?

22    A.  It looks that way, yes.

23    Q.  And it's to Earl; yes?

24    A.  That's correct.

25    Q.  Is Earl Earl Seguine?

1   A.  It's possible.  I don't know for certain.

2   Q.  Did Earl Seguine work in the Department of Health?

3   A.  He worked in our fiscal office.

4   Q.  This fax shows that after the Department of Health received

5   the grant application from Columbia, they had some follow-up

6   questions; correct?

7   A.  Correct.

8   Q.  And they asked Columbia to submit revised documentation.

9   Yes?

10  A.  Well, I don't know who asked for it.  It doesn't indicate

11  that.  It simply says that they are providing a revised

12  application.

13  Q.  To provide additional detail about the planned studies;

14  right?

15          MS. COHEN:  Objection, your Honor.  The witness

16  obviously doesn't know this document.

17          THE COURT:  Overruled.

18  BY MR. SHUR:

19  Q.  Would you like me to repeat the question?

20  A.  Yes, please.

21  Q.  Sure.  They're providing -- this is Columbia is providing

22  additional details to the planned studies under the grant;

23  right?

24  A.  Correct.

25  Q.  And also modifying the grant period.  Yes?

1   A.  Requesting that, yes.

2   Q.  And also clarifying the legal name of Columbia; right?

3   A.  That's right.

4   Q.  These things were important.  This was a contract between

5   the State of New York and Columbia University.  They wanted to

6   make sure to get it right; correct?

7              MS. COHEN:  Objection, your Honor.

8              THE COURT:  Sustained.

9   BY MR. SHUR:

10  Q.  This was an important matter.  Right, Mr. Whalen?

11             MS. COHEN:  Objection, your Honor.

12             THE COURT:  Sustained.

13  BY MR. SHUR:

14  Q.  Robert Reed is who Columbia sends this letter to; right?

15  A.  That's correct.

16  Q.  He was the acting deputy commissioner for administration

17  for the Department of Health; right?

18  A.  That's correct.

19  Q.  So, as we can see from the exhibits, at some point the

20  contracts get executed; right?

21  A.  That's right.

22  Q.  But, in addition to the New York State Department of

23  Health, as you mentioned, the New York State Attorney General

24  had to sign off on these grants; right?

25  A.  They were reviewed as to form.  Correct.

1    Q.  And under the law, the grant contract -- it's not valid.

2    It's not effective.  It's not binding until the Attorney

3    General reviews and approves it; correct?

4    A.  That's correct.

5    Q.  And the New York Attorney General in fact reviewed and

6    approved the two grant contracts here; right?

7    A.  Yes.

8    Q.  In addition to the Department of Health and the New York

9    Attorney General's office, the New York State Comptroller's

10   Office had to sign off on these grants; right?

11   A.  That's correct.

12   Q.  One of the things the comptroller reviews in connection

13   with the grants is what's called the vendor responsibility

14   questionnaire.  Is that right?

15   A.  That's correct.

16   Q.  I'd like to show you Defense Exhibits 40 and 41.

17              Mr. Whalen, let me know once you've had a chance to

18   review the documents.

19              MR. SHUR:  Your Honor, I don't know if this is a good

20   time to take a break or if you'd like to continue.

21              THE COURT:  How much longer are you going to be with

22   this witness?

23              MR. SHUR:  I would guesstimate maybe 20 minutes.

24              THE COURT:  Okay.  Why don't you keep going.

25              MR. SHUR:  Yes, Judge.

1          THE COURT:  Have you ever seen these questionnaires

2     before?

3          THE WITNESS:  No, Judge.

4          Okay.

5     BY MR. SHUR:

6     Q.  Mr. Whalen, to be clear, the vendor responsibility

7     questionnaire is sent to Columbia and New York Presbyterian

8     Hospital; right?  To complete.

9          MS. COHEN:  Objection, your Honor.

10          THE COURT:  Overruled.

11          Was that part of the package that the grantor sends

12     out when you send out the grant package?

13          THE WITNESS:  I don't know that for certain,

14     your Honor.

15          THE COURT:  Okay.

16     BY MR. SHUR:

17     Q.  I'm going to ask you this, Mr. Whalen:  The Department of

18     Health, in addition to the New York State Comptroller's

19     Office -- they review the vendor responsibility questionnaire;

20     right?

21     A.  I don't know whether or not that is part of the review

22     procedure or whether we simply rely on the Office of the

23     Comptroller to indicate that it's been reviewed.

24     Q.  You're familiar with the fact that this form is completed

25     by the course of the process and it's reviewed by the

1    comptroller's office?

2    A.   Yes.

3    Q.   The questionnaire -- I'm not going to walk through it in

4    great detail, but it asks questions of Columbia and New York

5    Presbyterian Hospital about the grantee's business integrity;

6    right?

7    A.   True.

8              MS. COHEN:  Objection, your Honor.

9              THE COURT:  Overruled.

10             He doesn't know anything about this form.  So you can

11   explore it with a different witness, what a vendor

12   responsibility questionnaire is.

13             MR. SHUR:  I have two more questions, judge, and I'll

14   move on.

15             THE COURT:  All right.

16   BY MR. SHUR:

17   Q.   The questionnaire asks questions about the grantee's

18   financial and organizational capacity; right?

19   A.   It does.

20   Q.   And the grantee's performance history.

21   A.   Correct.

22   Q.   Mr. Whalen, the 2005 grant contract took eight months to be

23   approved.

24             Are you aware of that?

25   A.   I wasn't aware of the timing.

1  Q.  The reason for the delay, if you know, was because the

2  comptroller's office identified --

3          MS. COHEN:  Objection, your Honor.  He's testifying.

4          THE COURT:  Sustained.

5          Are you going to tell him why the delay happened?

6  BY MR. SHUR:

7  Q.  Do you know why there was a delay?

8  A.  No.

9  Q.  Let me see if I can refresh your recollection.

10          THE COURT:  He doesn't know why there's a delay.  He

11  didn't indicate a lack of recollection.  He said he does not

12  know.

13  BY MR. SHUR:

14  Q.  Mr. Whalen, does the comptroller's office review the vendor

15  responsibility questionnaire for OSHA violations?  Do you know

16  what an OSHA violation is?

17  A.  I know what an OSHA violation is.  I have no idea whether

18  they do.

19  Q.  After the contracts are reviewed, approved, the Department

20  of Health's role is still not complete; right?

21  A.  That's correct.

22  Q.  Because they actually oversee the administration of the

23  grants; correct?

24  A.  The payments.  Correct.

25  Q.  So, as we talked about, over the life of the grant,

1    New York Presbyterian and Columbia are required to submit

2    detailed expenditure reports to the Department of Health;

3    right?

4    A.  That's correct.

5    Q.  And the Department of Health reviews these expenditure

6    reports?

7    A.  That's right.

8    Q.  And New York Presbyterian and Columbia are required to

9    submit final progress reports to the Department of Health;

10   correct?

11   A.  That's correct.

12   Q.  And the Department of Health reviews these progress

13   reports; correct?

14   A.  That's correct.

15   Q.  So, in order to receive any actual funds under the

16   contract -- and I think you mentioned this on

17   direct examination -- the hospitals have to submit vouchers for

18   claims; right?

19   A.  That's correct.

20   Q.  And before any money is actually provided to the hospitals,

21   the Department of Health signs off on those vouchers; right?

22   A.  That's right.

23   Q.  As does the comptroller's office?

24   A.  That's correct.

25   Q.  Mr. Whalen, if I heard you correctly, you're the --

1  currently you're the president of the Health Care Association

2  of New York State; is that right?

3  A.  That's correct.

4  Q.  That's a private organization?

5  A.  Correct.  It's a not-for-profit.

6  Q.  What's the shorthand version of the organization?

7  A.  HAMYS, H-A-M-Y-S.

8  Q.  Does HAMYS lobby?

9  A.  We do.

10  Q.  To be clear, when I say "lobby," there are lobbyists at

11  your organization; correct?

12          MS. COHEN:  Objection, your Honor.

13          THE COURT:  Overruled.

14  BY MR. SHUR:

15  Q.  There are lobbyists at your organization; correct?

16  A.  Correct.

17  Q.  A lobbyist is simply a person who communicates with public

18  officials on behalf of their clients in connection with

19  legislative and administrative issues.  Yes?

20  A.  That's correct.

21  Q.  When you were with the Department of Health, hospitals were

22  often in contact with you; right?

23  A.  That's correct.

24  Q.  And, when these hospitals contacted you, sometimes it was

25  the hospital executives themselves that reached out to you.

1    Yes?

2    A.  Correct.

3    Q.  And sometimes these hospitals contacted you through

4    lobbyists?

5    A.  Correct.

6    Q.  And there were times when you met with lobbyists for

7    hospitals?

8    A.  Correct.

9    Q.  And the lobbyists would advocate on behalf of their

10   clients?

11   A.  That's right.

12   Q.  They might ask you to take a particular action; right?

13   A.  Correct.

14   Q.  Or they might ask you not to take a particular action;

15   correct?

16   A.  Correct.

17   Q.  Just because the lobbyist asks you to do something or not

18   do something doesn't mean you did it; right?

19            MS. COHEN:  Objection, your Honor.

20            THE COURT:  Overruled.

21            THE WITNESS:  Correct.

22   BY MR. SHUR:

23   Q.  But you would listen to them.  Yes?

24   A.  Mostly.

25            THE COURT:  Some more than others I suspect.

FB97SIL4                        Whalen - Cross

1    BY MR. SHUR:

2    Q.   There's nothing wrong or improper about you meeting with

3    these lobbyists; correct?

4    A.   Correct.

5    Q.   So you left government service.  You're now at HAMYS.  Did

6    I get that right?

7    A.   HAMYS.

8    Q.   And HAMYS represents hospitals and nursing homes and other

9    health care organizations.  Yes?

10   A.   That's correct.

11   Q.   And on behalf of those clients, you lobby congress?

12   A.   Yes.

13   Q.   You lobby members of the U.S. House of Representatives?

14   A.   Yes.

15   Q.   And U.S. senators?

16   A.   Yes.

17   Q.   And you also lobby executive branch agencies in Washington,

18   DC?

19   A.   Correct.

20   Q.   And on behalf of your clients, you also lobby the New York

21   state Legislature; correct?

22   A.   That's correct.

23   Q.   You lobby members of the New York State Assembly?

24   A.   Yes.

25   Q.   And members of the New York State Senate.  Yes?

FB97SIL4                        Whalen - Cross

1    A.  Yes.

2    Q.  And you lobby New York State executive branch agencies as

3    well?

4    A.  Correct.

5    Q.  That includes the Department of Health; right?

6    A.  That's correct.

7    Q.  Where a lot of your former colleagues still work?

8    A.  A few.

9    Q.  And there's nothing wrong or improper about that; correct?

10   A.  That's correct.

11   Q.  Mr. Whalen, HAMYS makes campaign contributions.  Yes?

12   A.  Yes.

13   Q.  And your company has made campaign contributions to members

14   of the New York State Assembly?

15           MS. COHEN:  Objection, your Honor.

16           THE COURT:  Maybe you should come up.

17           (At the sidebar)

18           THE COURT:  Okay.  So I let you get into that his

19   current employer is a lobbyist because the government adduced

20   what he does for a living.

21           But getting into campaign contributions seems way

22   beyond, way beyond the scope of direct.

23           MR. SHUR:  Well, Judge, obviously campaign

24   contributions are an issue.  I understand the government is

25   going to illicit testimony from Glenwood.

```
 1              THE COURT:  I'm sure.  But why isn't it beyond the
 2    scope of this man's direct?
 3              MR. SHUR:  Judge, technically it is.  But instead of
 4    us calling a bunch of witnesses to talk about campaign
 5    contributions, I could offer it here in five minutes.
 6              THE COURT:  Perhaps you could, but it's beyond the
 7    scope.  So I'll sustain the objection.
 8              (In open court)
 9              THE COURT:  The objection is sustained.
10              How much more do you have, Mr. Shur?
11              MR. SHUR:  I would say five minutes, Judge.
12              THE COURT:  Perfect.
13    BY MR. SHUR:
14    Q.  If we could take a look at Defense Exhibit 38 first.
15              Do you have that in front of you, Mr. Whalen?
16    A.  I do.
17    Q.  In particular, if we could publish to the jury Appendix B,
18    which is the budget sheet.
19              THE COURT:  38 is Presbyterian's.
20              MR. SHUR:  Yes.  This is the other.  This is 39.  Why
21    don't we start with 39.
22              Thank you, Judge.
23    BY MR. SHUR:
24    Q.  Do you have it in front of you?
25    A.  I do.
```

1   Q.  So this is the budget sheet that in this case New York

2   Presbyterian had completed as part of the grant application

3   process; right?

4   A.  That's right.

5   Q.  And it shows a breakdown of how the money, the New York

6   State grant money, is going to be used for purposes of that

7   project; right?

8   A.  That's correct.

9   Q.  It shows expenses for a research nurse; right?

10  A.  Yes.

11  Q.  And data coordinator; right?

12  A.  Yes.

13  Q.  And funds for administrative assistant, administrative

14  coordinator; right?

15  A.  Correct.

16  Q.  And then there's a budget for supplies, travel, and

17  insurance; correct?

18  A.  Correct.

19  Q.  And equipment; right?  Yes?

20  A.  Yes.

21  Q.  Dr. Robert Taub, the project director, didn't receive

22  personally any money in connection with this grant; correct?

23            MS. COHEN:  Objection, your Honor.

24            THE COURT:  Overruled.

25            THE WITNESS:  Correct.

964

1    BY MR. SHUR:

2    Q.   The same is true with respect to the contract with New York

3    Presbyterian Hospital; right?

4    A.   That is correct.

5    Q.   Mr. Whalen, a minute ago you were talking about the fact

6    that, as a lobbyist, you meet with legislators sometimes;

7    right?

8    A.   Correct.

9    Q.   To discuss various legislative issues that are of interest

10   to your clients; right?

11   A.   That's correct.

12   Q.   Have you ever had a one-on-one conversation with a

13   legislator?

14   A.   Sure.  Yes.

15   Q.   Was there a requirement that that meeting be public in some

16   fashion?

17   A.   No.

18   Q.   One last thing.  During the course of the grant review

19   process, does the Department of Health communicate with the

20   comptroller's office regarding their respective review?

21   A.   I'm sure that we do, but I don't know the details of that.

22   Q.   Are the communications between those two agencies as part

23   of the review documents that are kept in the ordinary course of

24   the Department of Health's business?

25   A.   I don't know.

FB97SIL4                       Whalen - Redirect

1    Q.  You don't know?

2    A.  I don't know.

3              MR. SHUR:  One moment, your Honor.

4              Nothing further, your Honor.  Thank you.

5              Thank you, Mr. Whalen.

6              THE COURT:  Ms. Cohen?

7              MS. COHEN:  Very briefly, your Honor.

8    REDIRECT EXAMINATION

9    BY MS. COHEN:

10   Q.  Mr. Whalen, assuming all that paperwork, Defense Exhibit 38

11   and 39 related to the contract, is filled out correctly, what

12   discretion did the Department of Health have to deny one of the

13   assembly HCRA grants?

14   A.  None.

15   Q.  And what would the state agency or any state agency that

16   looked at the contract know about any financial benefit Sheldon

17   Silver was getting from directing that money to Columbia and

18   New York Presbyterian Hospital?

19             MR. SHUR:  Objection.

20             THE COURT:  Sustained.

21   BY MS. COHEN:

22   Q.  Where in the paperwork, Defense Exhibit 38 and 39, did it

23   disclose any financial relationship that Sheldon Silver had

24   with Dr. Taub?

25   A.  Nowhere.

966

FB97SIL4                    Whalen - Redirect

1   Q.  In your role now at the Health Care Association of New York

2   State, when you meet with legislators to lobby them on various

3   issues, what financial benefit is the Health Care Association

4   providing to those legislators?

5            MR. SHUR:  Objection.

6            THE COURT:  Overruled.

7            THE WITNESS:  None.

8            MS. COHEN:  No further questions.

9            MR. SHUR:  Judge, if I may.  This might require a very

10  brief bench conference.

11           THE COURT:  All right.  Ladies and gentlemen, we're

12  going to take a break because he may be finished at this point.

13           You can take your afternoon break.  Don't discuss the

14  case.  We'll bring you back in about ten minutes.

15           (Jury not present)

16           THE COURT:  I suspect they're going to want you out in

17  the hallway for this.

18           MS. COHEN:  Correct, your Honor.  If the witness can

19  be used.

20           (Witness temporarily excused)

21           THE COURT:  Please be seated, everybody.

22           MR. SHUR:  Your Honor, I understand at the bench

23  earlier you precluded the defense from getting into campaign

24  contributions with this witness, but I believe the government

25  just opened the door by asking whether there was any financial

1    benefit that was given to the legislator.

2            Arguably, a campaign contribution would fall into that

3    category.  I think that opens the door into inquiring about the

4    giving of campaign contributions to legislators who these

5    lobbyists appear before and the connection between the two.

6            MS. COHEN:  Your Honor, it didn't open the door at

7    all.  It was directly related to a question that Mr. Shur asked

8    on cross related to there was nothing wrong when as a lobbyist

9    met with the legislators.  It had nothing to do with campaign

10   donations.

11           MR. SHUR:  I did not ask about financial benefit,

12   your Honor.

13           THE COURT:  So the question that was asked was when

14   you, in your role now at the Health Care Association of

15   New York State, when you meet with legislators to lobby them on

16   various issues, what financial benefit is the Health Care

17   Association providing to those legislators?

18           Why doesn't that open the door for whether they're

19   providing campaign contributions?

20           MS. COHEN:  I mean, your Honor, this was also the

21   subject of the motions in limine that we filed where there was

22   a great distinction made by the defense between benefits

23   provided or money provided to legislators and money provided to

24   their campaign committees.

25           Of course, no one -- even when money is brought to the

1    campaign committee.  This is something the defense wanted out

2    in the motions in limine.

3            THE COURT:  Well, they were concerned about financial

4    contributions to Silver in particular as I recall.

5            Mr. Shur, so you want to establish that the Health

6    Care Association makes political contributions?

7            MR. SHUR:  Contributions that legislators that sit on

8    health care committees in Albany and Washington, DC and

9    legislators that they appear before.

10           THE COURT:  That the lobby organization provides

11   campaign contributions to the legislators they are lobbying.

12           MR. SHUR:  Correct.

13           THE COURT:  I think you've opened the door.

14           MS. COHEN:  Your Honor, I will also have some

15   additional followup.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

FB95sil5                    Whalen - recross

1          THE COURT:  Yeah, yeah, yeah, yeah, yeah.  You opened

2     the door.  What can I say?

3          10 minutes.

4          MS. COHEN:  Thank you, your Honor.

5          (Recess)

6          THE COURT:  Can I have everybody together again?

7          MS. COHEN:  The government is ready, your Honor.

8          THE COURT:  Do I have everyone?

9          MS. COHEN:  The government is ready, your Honor.

10          THE COURT:  Yes, I heard that.  I heard that before,

11     Eddie Haskell.

12          THE COURT:  Mr. Molo?

13          MR. MOLO:  I was just standing out there.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

FB95sil5                    Whalen - recross

1              (Jury present)

2              THE COURT:  Okay, Mr. Shur, you had a couple more

3    questions?

4              MR. SHUR:  Thank you, Judge.

5    BY MR. SHUR:

6    Q.  Mr. Whalen, the company that you are president of,

7    Healthcare Association of New York State?

8    A.  Correct.

9    Q.  The company makes campaign contributions, yes?

10   A.  That's correct.

11   Q.  Campaign contributions to members of the New York State

12   Assembly?

13   A.  Correct.

14   Q.  And campaign contributions to the members of New York State

15   Senate?

16   A.  Yes.

17   Q.  And that includes, for example, campaign contributions to

18   the State Senator Marty Golden?

19   A.  I don't know the specifics.

20   Q.  If I -- actually, before I do that, as a general matter you

21   are aware that campaign contributions are available to both

22   Senate and Assembly?

23   A.  Yes.

24   Q.  Are there members of the Senate and maybe of the Assembly

25   that your company lobbies?

```
 1   A.  Correct.
 2   Q.  Members on healthcare committees?
 3   A.  Yes.
 4   Q.  Both at the Assembly and the Senate?
 5   A.  That's correct.
 6   Q.  And those committees consider bills that deal with
 7   hospitals and other healthcare issues?
 8   A.  Certainly.
 9   Q.  Bills that your clients are interested in?
10   A.  That's right.
11   Q.  When you are lobbying those legislators who you are giving
12   campaign contributions to it is on behalf of your clients,
13   right?
14   A.  That's correct.
15   Q.  In connection with healthcare legislative issues?
16   A.  That's right.
17   Q.  And there is nothing improper about that, right?
18   A.  That's correct.
19           THE COURT:  Ladies and gentlemen, we are going down
20   this line of questions about campaign contributions.  Campaign
21   contributions, as the witness just said, are perfectly legal.
22   There is nothing illegal about campaign contributions.  This
23   case is not about campaign contributions, this case is -- the
24   question is whether there is a *quid pro quo*, that is, you give
25   me money, I give you back what you want in terms of
```

1   legislation.

2            So, just it may be relevant to something but we are

3   going to keep straight in your head that there is nothing

4   illegal about campaign contributions.  That's how we finance

5   campaigns in this country.

6            MR. SHUR:  Your Honor, with that instruction, I will

7   conclude my examination.

8            THE COURT:  Okay.

9            MS. COHEN:  Brief redirect?

10           THE COURT:  Very brief.

11  REDIRECT EXAMINATION

12  BY MS. COHEN:

13  Q.  Mr. Whalen the members of the state legislature, both in

14  the Assembly and Senate that you lobby on behalf of the

15  healthcare association and to which the healthcare association

16  makes campaign contributions, your organization does not have

17  any of those legislators on its payroll, does it?

18  A.  We do not.

19  Q.  And your organization does not have any of those

20  legislators on retainer for your organization?

21           MR. SHUR:  Objection.

22           THE COURT:  Overruled.

23  A.  That's correct.

24  Q.  And your organization is not making any payments directly

25  to those state legislators either directly or through a

1    third-party?

2    A.   That's right.

3    Q.   And if you did any of those three things that would be

4    wrong, wouldn't it?

5    A.   Correct.

6            MS. COHEN:  No further questions.

7            THE COURT:  You can step down.

8            THE WITNESS:  Thank you, your Honor.

9            (Witness steps down)

10           THE COURT:  Call your next witness.

11           MS. COHEN:  Your Honor, the government calls Richard

12   Rodgers.

13    RICHARD RODGERS,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16           THE DEPUTY CLERK:  Please state your full name and

17   spell your last name, slowly, for the record.

18           THE WITNESS:  Richard Rodgers, spelled R-O-D-G-E-R-S.

19           THE DEPUTY CLERK:  Thank you.  Please, be seated.

20           THE WITNESS:  Thank you.

21   DIRECT EXAMINATION

22   BY MS. COHEN:

23   Q.   Mr. Rodgers, where do you work?

24   A.   I work for the New York State Attorney General.

25   Q.   What is your title with the New York State Attorney

1   General's office?

2   A.  I am assistant attorney general.

3   Q.  How can have you been an assistant attorney general at the

4   Attorney General's office?

5   A.  A little over 14 years.

6   Q.  In what office of the Attorney General do you work?

7   A.  Civil recoveries.

8   Q.  In general, what are your duties and responsibilities as an

9   assistant attorney general in civil recoveries?

10  A.  I basically have one client, The Lawyers' Fund for Client

11  Protection, and I do litigation for them and I also give advice

12  and counsel to them.

13  Q.  And just for the jury, what do you do?

14  A.  I do litigation for them, I try to -- The Lawyers' Fund

15  actually pays law clients whose attorneys have stolen from

16  them.  They will pay them, get their rights assigned to them,

17  and then try to collect the money to reimburse themselves for

18  what they pay the victims and I try to collect that money.

19  Q.  Please tell us your educational background, starting with

20  college?

21  A.  I graduated from Cornell University in 1978 with a bachelor

22  of arts and I graduated from Albany Law School in 1982.

23  Q.  Where did you work after graduating from Albany Law School?

24  A.  I worked for several private firms.  I started out with a

25  firm in Albany known as Nolan & Heller which then became

1    Cooper, Erving, Savage, Nolan & Heller.  I went to another firm

2    in Albany known as Roamer & Featherstone.  I went to a firm in

3    Massachusetts called Cain, Hibbard, Myers & Cook, and then

4    finally I practiced, before I went to the Attorney General's,

5    with a firm called McKenzie & Rowland, again, all within the

6    Albany, New York area.

7    Q.  When you were in private practice in what area of law did

8    you do private practice?

9    A.  I did commercial litigation.  And unlike now, where I often

10   sue banks, I represented banks in private practice.

11   Q.  Did there come a time that you were assigned by the

12   Attorney General to a special project?

13   A.  Yes.

14   Q.  What was that project?

15   A.  It was called the Member Item Review Project.

16   Q.  And when did the project -- the Member Item Review

17   Project -- begin?

18   A.  It began in January of 2007.

19   Q.  And whose idea was it to begin the member item review?

20   A.  The newly elected at that point Attorney General, Andrew

21   Cuomo.

22   Q.  And who else was assigned to work on the member item

23   review?

24   A.  Besides myself there were seven other assistant attorneys

25   general in Albany assigned, and there was also a deputy

1   attorney general to whom we reported.

2   Q.  And did this group of assistant attorneys general have a

3   name for the group as a whole?

4   A.  It was called MIRT which stood for the Member Item Review

5   Team.

6   Q.  And what was the project that MIRT was supposed to work on?

7   A.  MIRT was to review contract for the budget year 2006-2007.

8   Q.  And what was the purpose of the MIRT review of member item

9   contracts for 2006 through '07?

10  A.  There were basically three things that we looked for.  One

11  was whether there was any financial benefit or interest on

12  behalf of the legislator who was sponsoring this contract, this

13  grant.  The second was to determine if the organization to whom

14  the money was to be paid had any legal problems, primarily

15  since they were not-for-profits making sure that they had their

16  required filings with our Attorney General's Charity Bureau,

17  and also that they weren't under any investigation.  And then

18  finally also to make sure that the money that to be spent --

19  the public money that was to be spent on these grants, that

20  they served what was called a public purpose.

21          In the New York State Constitution it describes what

22  public monies can be spent for, say for healthcare or for

23  police care or for helping kids.  We made sure that whatever

24  was proposed fit the definition -- the legal definition of the

25  public purpose.

1    Q.  Prior to January of 2007 when Attorney General Cuomo formed

2    the MIRT team, what review did the Attorney General's office do

3    of member item or discretionary funding contracts?

4    A.  The member item -- there wasn't any specific review of it.

5    We have what's called a contract review unit in the Attorney

6    General's office which reviews all contracts with a value of

7    $50,000 or more.  So, to the extent there were member items

8    before our review team of $50,000 or more, the contract review

9    unit would review them primarily for form, though, and by form

10   I mean making sure that what services or materials were to be

11   provided were described, making sure there was a dollar amount

12   that was to be paid to the contractor if they in fact provided

13   those materials and services, and also making sure that there

14   was a beginning and an end date and certain protections that

15   New York State needs, they have to make sure that any

16   contractor they work with has unemployment insurance and

17   certain things like that.

18          So, that was what the review was from our contract

19   review unit prior to our formation.

20   Q.  You stated one of the reasons for your formation was so

21   that the MIRT could review member item contracts to determine

22   if there was any financial benefit being provided to the

23   sponsoring member and from the entity getting the contract; is

24   that right?

25   A.  Correct.

1    Q.  And what did the MIRT team do to be able to figure that

2    out?

3    A.  Well, ultimately, as part of -- after its formation there

4    was a new part included in member item contracts, a

5    certification.  What that was was an affirmation by the

6    organization that was to review the money -- receive the money,

7    pardon me -- that there was no financial benefit to the Senator

8    or Assemblyman sponsoring that, that legislator had no

9    financial interest in the organization, and it also included as

10   well affirm that that organization was in good legal standing,

11   filed all the things it should have with our Attorney General's

12   office, and also that this money was to be used for a public

13   purpose.

14         So, there was those three things that were part of

15   that review.

16   Q.  Are you familiar with the term "disclosure and

17   accountability certification"?

18   A.  Yes.  That is the certification that I described that was

19   ultimately included in the member item contracts.

20   Q.  When did the Disclosure and Accountability Certification

21   come about?

22   A.  I believe it was mid-March of 2007.

23   Q.  And who decided the language of the Disclosure and

24   Accountability Certification?

25   A.  It was more senior people than I in the Attorney General's

1   office, and I think senior staff in the legislature as well.

2   Q.  How was this new Disclosure and Accountability

3   Certification announced to the public?

4   A.  I know there was a press conference and the Attorney

5   General's office also put out a press release on it.

6   Q.  Do you know if then Speaker Silver attended the press

7   conference to announce the Disclosure and Accountability

8   Certification?

9   A.  I was there briefly.  I believe he was there, yes.

10  Q.  You said the MIRT team was formed in January 2007 by then

11  Attorney General Cuomo?

12  A.  Correct.

13  Q.  When did the accountability certifications start?

14  A.  Well, once it was agreed upon they were, actually became

15  part of the contracts in March.  We had reviewed some contracts

16  between January when we were formed and March when the language

17  was agreed to.  We had basically held those -- we had reviewed

18  them for the other things for the legal status as far as the

19  charities were concerned and also the public purpose, and then

20  once the certifications were approved we attached those to

21  those contracts and sent them to their various agencies -- the

22  agencies would administer these -- and told them that those now

23  had to be signed by the organization before final approval was

24  given.  Then, from there on in as new contracts came in after

25  the agreement in March on the language, those certifications

1    were to be part of the contract.

2    Q.  And the year we are talking about now for January when you

3    were formed in March when the certifications started was 2007;

4    is that right?

5    A.  That's correct.

6    Q.  And what contracts was MIRT assigned to review?

7    A.  Well, we were assigned member items and they would be sent

8    to us by the agencies administering them so.  They were to send

9    them to our attention for our review.  However, just briefly to

10   go over the New York State budget year, the budget year in New

11   York goes from April 1st through March 31st of the following

12   year.  So, when we were created we were halfway into the

13   2006-2007 budget year.  Some of the member items had been

14   already processed and paid before our formation.  We were not

15   to review those.  The member items that we reviewed for that

16   budget year -- and it is only that budget year that was

17   assigned to us -- the only ones we reviewed were those that had

18   not been paid prior to our formation going forward.  So, some

19   in that budget year had already been processed and we didn't

20   call them back to review them.

21   Q.  What knowledge did the assistant attorneys general on the

22   MIRT have about what pool of money was used to fund the grant

23   contracts that MIRT was reviewing?

24   A.  We didn't have any.  That wasn't part of our review

25   process.

1   Q.  Did assistant attorneys general on MIRT know where funds

2   came from that was going to fund the grants that they were

3   reviewing?

4   A.  We just knew they were budgetary funds but what specific

5   ones we did not know.

6   Q.  If I can have you look, please, at Government's Exhibits

7   925 and 926 for identification and if you recognize them, what

8   are they?

9   A.  Yes.  These are the certification -- these are the

10  certifications I testified to.  The first one, which is marked

11  GX 925, is the certification that was used for member item

12  contracts in the amount of $50,000 or above, and the second

13  one, GX 926, is the certification used for member items below

14  $50,000.

15          MS. COHEN:  Your Honor, the government moves

16  Government Exhibit 925 and 926 into evidence.

17          MR. SHUR:  No objection.

18          THE COURT:  925 and 926 are received.

19          (Government's Exhibits 925 and 926 received in

20  evidence)

21  BY MS. COHEN:

22  Q.  Mr. Coccaro, if you can put up, side by side, 925 and 926?

23          Mr. Rodgers, can you tell the jury what is the

24  difference between 925 and 926?

25  A.  My understanding was the difference concerned what is

1   called good standing, basically, Roman numeral II, there were,

2   as far as the larger contracts there were more things that had

3   to be certified to.  I forget offhand what they were but I

4   think they would be seen there.  If the organization had

5   received overall unsatisfactory performance from prior

6   contracts.  Let's see, what else?  Been declared in default,

7   certain things like that.  But that's the only difference that

8   I know of between the two in those provisions in the Roman II,

9   good standing.  I think the others were identical.

10  Q.  So, Government Exhibit 925 was used for those grant

11  contracts that were $50,000 or above, is that correct?

12  A.  That's correct.

13  Q.  And Government Exhibit 926 was used for grant contracts

14  that were below $50,000?

15  A.  That's correct.

16  Q.  So let's look, please, as an example, on Government Exhibit

17  925 let's focus on Roman numeral I, No Conflict of Interest.

18  A.  Correct.

19  Q.  Mr. Coccaro, if you could zoom in on no. I?

20           What is meant or explain for the jury, please, no. I?

21  A.  Basically, that was the first item I testified to.  They

22  are certifying that the legislator who sponsored this has no

23  financial interest in the organization and is not the benefit

24  of these monies that are part of the grant, just to sum it up.

25  Q.  And in Roman numeral I what is meant by the term sponsoring

1    member?

2    A.   Sponsoring member is the legislator who is directing this

3    money to the particular organization that we see.

4    Q.   If you look at the definitions in this document, Roman

5    numeral V on page 2 and it carries over to no. IV on the third

6    page of Government Exhibit 925 --

7    A.   Correct.

8    Q.   How did the document define sponsoring member?

9    A.   Sponsoring member means sponsoring Assembly Member or State

10   Senator that sponsored the grant related to this contract in

11   the fiscal year -- in this particular one it is 2007-2008 but

12   in the one we looked at, the first one, it was fiscal year

13   2006-2007.  And it also then applies to any gubernatorial

14   allocations against this.  Since this one is a year later the

15   governor was Eliot Spitzer but in the year we reviewed,

16   2006-2007 it was Governor George Pataki.

17   Q.   If you go back one page to page 2 under Roman IV of 925,

18   sponsoring member --

19   A.   Correct.

20   Q.   -- explain that, please, for the jury?

21   A.   Again, the sponsoring member is the legislator who is

22   directing that this money be paid to the organization

23   certifying to this contract.  So it would be filled in by the

24   legislator's name, the Senator or the Assemblyman who was

25   sponsoring it.

1   Q.  So if a grant was being sponsored by Assemblyman Silver you

2   would see Sheldon Silver's name in Roman numeral IV; is that

3   right?

4   A.  That's correct.

5   Q.  Looking at page 3 of Government Exhibit 925 there is a

6   paragraph before the signature on the notary?

7   A.  Correct.

8   Q.  What is the purpose of that paragraph?

9   A.  That is to underscore to whoever is filling out the

10  certification that they're signing this, they're attesting to

11  the truth of this under penalty of perjury.

12  Q.  And who filled out the Disclosure and Accountability

13  Certifications?

14  A.  It would be an officer on behalf of the organization

15  receiving the money.

16  Q.  And after the MIRT team -- withdrawn, your Honor.

17          You said the MIRT team reviewed only discretionary

18  contracts for the fiscal year 2006 through 2007; is that right?

19  A.  Again, I'm not sure what discretionary funding is.  We

20  reviewed member items for 2006-2007.  I don't know the source

21  other than they were budgetary monies.

22  Q.  And what happened -- what other contracts did the MIRT team

23  review other than the '06-'07 budget year contracts?

24  A.  That was it.  Once the certification was adopted we, in

25  effect, I guess became obsolete.  The review wasn't needed for

1    subsequent years it wasn't believed because this certification

2    would really provide the disclosure that we were looking for.

3    So, we only looked at the '06-'07.  We did continue to review

4    the '06-'07 after the certification language was adopted.  I

5    think part of that was to make sure that the certification

6    process really was engrained into the member item review

7    process since it was new.  So, we continued on but we only

8    reviewed '06-'07 -- budget year '06-'07.  We didn't review any

9    thereafter.

10   Q.  If you can look, please, in your binder, at Government

11   Exhibit 637-3?

12           Mr. Coccaro, if you could pull that up please?

13           THE COURT:  367-3?

14           MS. COHEN:  I'm sorry.  I misspoke.

15   Q.  367-3?

16   A.  Got it.

17   Q.  Mr. Rodgers, other than in connection with this case, have

18   you ever seen Government Exhibit 367-3 before?

19   A.  I have not.  No.

20   Q.  What review of this contract did the MIRT do?

21   A.  We didn't do any because I see it was for the contract

22   period July 1st, 2005 to June 30th, 2006, and then looking on

23   the second page I see it was approved for form by our Contract

24   Review Unit on February 6, 2006.  All those dates predate our

25   formation in January of 2007 so we had no review of that.

1   Q.  And what Disclosure and Accountability Certification is

2   contained in Government Exhibit 367-3?

3   A.  I will look.  I would assume none because there wasn't a

4   certification form at that time but let me just -- I see none.

5   Q.  Looking, please, at Government Exhibit 368-3, which is the

6   next document in your binder.

7        Mr. Coccaro, if you could pull up the first page of

8   that state grant contract between the Department of Health and

9   the Trustees of Columbia University?

10       Other than in connection with this case, have you ever

11  seen Government Exhibit 368-3 before?

12  A.  I have not.

13  Q.  And did the MIRT team review Government Exhibit 368-3?

14  A.  No, we did not.  If we had -- a few things about that.

15       If we had reviewed it we would have had a cover sheet.

16  All the member items we reviewed we had a cover sheet saying

17  that we approved it or it was to be modified or we rejected it.

18  There is no such cover sheet there.

19       Quite frankly, too, the year we reviewed member items,

20  I see there is what is on this called a New York State

21  Comptroller's number.  That number identified the numbers of

22  contracts in a year we reviewed.  This is a C.  It started with

23  an M for those that were $50,000 or more or a TM for those

24  below $50,000.  So, there is a C here.  I don't recall ever

25  reviewing a C.  And then, let's see if there is a disclosure

1    statement on this.  Yes, I don't see a certification either.

2             So, for those reasons, the fact that there is no cover

3    sheet from our team saying we reviewed it; the C, which I'm not

4    quite sure what that means but I know we didn't review any Cs;

5    and the fact there is no certification I'm confident we did not

6    review this.

7    Q.  Looking back for a moment in your binder to Government

8    Exhibit 367-3, the first page of that contract has a number?

9    A.  Yes.

10   Q.  Is it an M number?

11   A.  It is an M number, yes.

12   Q.  And the MIRT, I believe you just testified, typically

13   reviewed contracts that had Ms on them?

14   A.  Ms or TMs.

15   Q.  Looking, please, at Government Exhibit 389-3, which is in

16   evidence?

17   A.  Yes.

18   Q.  It is a contract between the New York State Office of

19   Children and Family Services and the Shalom Task Force?

20   A.  Correct.

21   Q.  Other than in connection with this investigation, have you

22   ever seen Government Exhibit 389-3 before?

23   A.  I have not.

24   Q.  Does Government Exhibit 389-3 have a Disclosure and

25   Accountability Certification?

FB95sil5                          Rodgers - direct

1              MR. SHUR:  Objection.

2              THE COURT:  Overruled.

3              MR. SHUR:  Judge, not to the specific question but to

4    this whole line of cross or --

5              THE COURT:  This is direct.

6              MR. SHUR:  This whole direct examination, rather, with

7    respect to this contract.  It might make more sense to discuss

8    it at side bar.

9              THE COURT:  All right.  Come on up.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At side bar)

2              MR. SHUR:  Judge, my understanding of this witness'

3     testimony, since what he is discussing took place after the two

4     grants at issue is --

5              THE COURT:  It was after one and before the other.

6              MR. SHUR:  It was after one but before the other,

7     okay.  Well, maybe I misheard him but what I thought he said

8     was that his review process wouldn't have touched either of

9     these two grants.  Maybe I misunderstood his testimony.

10             THE COURT:  Right, but he also said that they were

11    supposed to have the accountability certification and neither

12    of them does which creates a huge mystery that I can't wait to

13    hear what the explanation is.

14             MR. SHUR:  So, in any event, I don't understand what

15    the Shalom Task Force grant and this testimony --

16             THE COURT:  You just asked a ton of questions about

17    Shalom Task Force with the last witness so Shalom Task Force

18    comes in.  There was some grant given to it because somebody

19    worked there.

20             MS. COHEN:  Dr. Taub's wife was on the Board.

21             THE COURT:  Okay.  That's the alleged benefit or one

22    of the alleged benefits.

23             MR. SHUR:  I guess I would ask where exactly is this

24    going.  I just don't see it.

25             THE COURT:  So you have the same mystery I do.

1              Where is it going?

2              MS. COHEN:  I'm asking one question.  Does it have a

3    Disclosure and Accountability Certificate and who.

4              THE COURT:  How is that supposed to happen, isn't that

5    evidence?

6              MS. COHEN:  Yes, they were, and this one --

7              THE COURT:  Did or did not?

8              MR. SHUR:  I'm sorry.  I missed it.  The 2006 grant

9    was supposed to have a disclosure form as well?

10             MS. COHEN:  No.

11             THE COURT:  Not the 2006 grant because that was

12   before.

13             MR. SHUR:  Right.

14             THE COURT:  The other two, Shalom and the Columbia

15   grant should have.

16             MR. SHUR:  I don't think that's accurate.

17             MS. COHEN:  Not necessarily, your Honor.

18             MR. SHUR:  It is yes or no?

19             MS. COHEN:  It has nothing to do with this question,

20   which is to show the Shalom Task Force --

21             THE COURT:  So there is one with the Shalom Task

22   Force?

23             MS. COHEN:  Correct, your Honor.

24             MR. SHUR:  Okay.

25

FB95sil5                        Rodgers - direct

1                   (In open court)

2    BY MS. COHEN:

3    Q.  Mr. Coccaro, if you could just pull up the last two pages

4    of Government Exhibit 389-3?

5                   Mr. Rodgers, is there a Disclosure and Accountability

6    Certification for the contract to Shalom Task Force, Government

7    Exhibit 389-3?

8    A.  There is.  The last two pages of that exhibit.

9    Q.  And who is listed under Roman numeral IV and the sponsoring

10   member?

11   A.  Assemblyman Sheldon Silver.

12   Q.  Mr. Coccaro, if you could just highlight that?

13                  If you can look, please, in your binder, at what's

14   been marked Government Exhibit -- sorry, I'm waiting for the

15   zoom in.

16                  Thank you, Mr. Coccaro.

17                  If you can look in your binder at what is marked for

18   identification Government Exhibit 2008?

19   A.  Yes, it's GX 2008.

20   Q.  Correct, marked in your binder Government Exhibit 2008.

21   A.  Yes.

22   Q.  If you recognize it, just what is it, briefly, without

23   describing it?

24   A.  It appears to be a contract from the Department of Health

25   for $300,000.  The contractor is Public Health Solutions.  It

FB95sil5                    Rodgers - direct

1    appears to have been approved by the Attorney General's

2    contract review unit on September 1st, 2010.

3              MS. COHEN:  Your Honor, the government moves

4    Government Exhibit 2008 into evidence.

5              THE COURT:  Any objection?

6              MR. SHUR:  Objection, Judge.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              (At side bar)
2              THE COURT:  What's the relevance?
3              MS. COHEN:  Your Honor, it's this simple.  This is a
4    contract under HCRA.  It has a Disclosure and Accountability
5    Certification.  That is all I'm going to have the witness
6    explain.
7              MR. SHUR:  I don't understand how that is relevant.
8              MS. COHEN:  Disclosing Sheldon Silver as the grantor.
9              THE COURT:  So the point is that being for some of the
10   grants he did --
11             MS. COHEN:  After a certain period the grants would
12   have had a Disclosure and Accountability Certificate with his
13   name on it.
14             THE COURT:  Got it.  Okay.
15             MR. SHUR:  Isn't that what happened with the Shalom
16   Task Force?  Didn't we already see that?
17             THE COURT:  That was below $50,000, different grant.
18             MR. SHUR:  It is a different form.
19             THE COURT:  Different form, bigger amount and
20   disclosure.
21             MR. SHUR:  Okay.
22             THE COURT:  Then is that it on this line?
23             MS. COHEN:  Correct, your Honor.
24             THE COURT:  All right.
25
```

1              (In open court)

2              THE COURT:  2008 is received.

3              (Government's Exhibit 2008 received in evidence)

4    BY MS. COHEN:

5    Q.  Mr. Coccaro, if you could just pull up Government Exhibit

6    2008, the first page, is there a contract number associated

7    with this contract?

8    A.  It's listed as C704017.

9    Q.  If you could turn to the fifth page of Government Exhibit

10   2008?

11   A.  Yes.

12   Q.  What is that document?

13   A.  That is the certification appendix that we have discussed

14   previously.

15   Q.  And if you look at the third page of the Disclosure and

16   Accountability Certification for this contract, who was the

17   sponsoring member?

18   A.  The sponsoring member is listed as Senator Silver.

19   Q.  Do you know if that is a misprint?  Do you know if there is

20   any Senator Silver?

21   A.  I don't know if there are any Senator Silvers.

22   Q.  If you look, please, six pages in, there is a letter to

23   Richard Baines from Sheldon Silver?

24   A.  Yes.

25   Q.  Directing the grant from the HCRA, the healthcare

1    initiatives pool to the Health Care Reform Act.  Do you see
2    that language?
3    A.  Yes, and I see that language in the first paragraph there.
4    Q.  How many Disclosure and Accountability Certifications did
5    MIRT review that disclosed a conflict?
6    A.  You mean the first part, a conflict with the sponsoring
7    member -- with the legislator?
8    Q.  Correct.
9    A.  We received none.
10   Q.  What was the purpose, then, of MIRT's review of the grant
11   if you received none that had conflicts between the sponsor
12   listed an the entity getting the grant?
13              MR. SHUR:  Objection.
14              THE COURT:  Overruled.
15   A.  Well the purpose, again, we have gone over a couple of the
16   purposes.  One was to disclose information about the contract
17   and also the relationship of the organization with the
18   legislator who was sponsoring it.  Another was to show the
19   standing of the entity and also whether there was a public
20   purpose, but also one of the purposes was to deter
21   organizations where there may have been problems that would
22   have been disclosed in those three categories to deter them
23   from submitting contracts in the first place.
24              MS. COHEN:  No further questions, your Honor.
25   CROSS EXAMINATION

FB95sil5                          Rodgers - cross

1   BY MR. SHUR:

2   Q.  Mr. Rodgers, good afternoon.

3   A.  Good afternoon.

4   Q.  The two contracts that you reviewed that you were shown

5   during your direct examination, this is Government's Exhibits

6   367-3 and 368-3?

7   A.  Correct.  Got it.  Yes.

8   Q.  So these are the two HCRA grants, one to New York

9   Presbyterian Hospital, one to Columbia University?

10  A.  Okay.

11  Q.  Are you familiar with the two contracts I am referring to?

12  A.  Only as far as I reviewed them for the context of this

13  trial.

14  Q.  To be clear, you work at the Attorney General's office but

15  you didn't review these two contracts --

16  A.  Neither I nor the Member Item Review Team reviewed either

17  of these two, that's correct.

18  Q.  But the Attorney General's office reviewed them, correct?

19  A.  The government review unit did, that's correct.

20  Q.  And at the time that was part of the grant, state grant

21  review process, right?

22  A.  It was.  For those over $50,000, that's correct.

23  Q.  Right; and the two contracts, the grant contracts weren't

24  valid or binding or effective until the Attorney General

25  reviewed and approved them, correct?

1   A.   The bottom line is they wouldn't have been paid without

2   that approval.

3   Q.   Okay.  And so those two contracts went through the process

4   that was in place at the time, yes?

5   A.   Judging by -- I wasn't familiar with them or involved with

6   them, but judging by the stamp on the respective spots they're

7   from that review team; yes, that's correct.

8   Q.   And so they weren't required at the time to go through a

9   MIRT review, right?

10  A.   The one in -- the first one for -- let me get this right,

11  367-3, preceded the Member Item Review Team.  The second one

12  was during the period of time that MIRT was in business, so to

13  speak, however it was never referred to us, as I testified

14  because this has a C and the identification, the comptroller's

15  number, and we only received Ms and TMs, contracts that began

16  with those identifications.  So, neither one did go through us.

17  We were referred contracts, too, we didn't ask for specific

18  ones so why it didn't get referred to us I don't know but we

19  didn't -- as far as the second one is concerned.

20  Q.   But when you say referred to you it would have been

21  referred to you by your office, right?

22  A.   It would have been referred to us by the agency.

23  Q.   The Department of Health?

24  A.   In this case, yes.  Yes.

25  Q.   But the Department of Health did send it to the Attorney

FB95sil5                         Rodgers - cross

1   General's office, just a different unit within your office?

2   A.   They sent it to the unit in the Attorney General's office

3   that reviewed all contracts whether they were member items or

4   not that were for over $50,000.

5   Q.   I see.

6        And they reviewed it and approved it, yes?

7   A.   I see the stamp is there so, yes, they apparently did.

8   Q.   You testified about a Disclosure and Accountability

9   Certification, there is actually two of the certifications you

10  testified about, right?

11  A.   Correct.

12  Q.   And those were required for these two particular grants we

13  are looking at, is that right?

14  A.   The first one, 367-3 preceded the creation and

15  implementation of the certification so that obviously was not.

16  The second one, I don't know if it was required or not because

17  it wasn't referred to us.

18  Q.   Okay.

19  A.   So I don't know if it was required but it was not given to

20  us for our review.

21  Q.   Okay.

22       You have no reason to believe and you are not aware

23  that anyone tried to evade that process at your office with

24  respect to that second grant?

25  A.   Evade -- in our office or with our office?

FB95sil5                           Rodgers - cross

1    Q.   In your office or within your office.

2    A.   Within, definitely not.

3    Q.   Okay.

4    A.   We have heard of nothing where there was an attempt to

5    evade.

6    Q.   Okay.

7    A.   So I know of nothing as I sit here today.

8    Q.   Okay.

9              The certifications that you talked about, Mr. Silver

10   supported those certifications, right?

11             MS. COHEN:  Objection, your Honor.

12             THE COURT:  Sustained.

13   Q.   Mr. Silver worked with the Attorney General's office in

14   coming up with the certifications?

15             THE COURT:  Were you a part of that process?

16             THE WITNESS:  Pardon me?

17             THE COURT:  Were you part of that process?

18             THE WITNESS:  That's what I was going to say, I was

19   not part of the negotiation of the certification within our

20   office.

21             THE COURT:  Okay.

22   BY MR. SHUR:

23   Q.   You mentioned that there was a press conference with the

24   Attorney General, is that right?

25   A.   That's correct.

1  Q.  And do you recall that the Attorney General thanked the

2  leadership of both the Assembly and the Senate in coming up

3  with these certifications together?

4  A.  Fortunately the Attorney General is no longer my boss

5  because I only stayed for a couple minutes so I didn't hear his

6  speech.

7          THE COURT:  Your secret is safe with us.

8          THE WITNESS:  It is not on the record or anything,

9  right?

10  Q.  Do you know whether the attorney general thanked the

11  leadership of both the Assembly and Senate?

12          THE COURT:  He left.

13          THE WITNESS:  I don't know offhand.

14  Q.  Let me show you Defendant's Exhibit 65.

15          MS. COHEN:  Your Honor, I don't have a copy but I

16  guess we have an objection to it.

17          MR. SHUR:  It is on the screen but I will get

18  Ms. Cohen a hard copy as well.

19          THE WITNESS:  I will continue to read.

20          MS. COHEN:  I have an objection.

21          THE COURT:  What is your question?  Is your question

22  going to be does that refresh your recollection?  He doesn't

23  have a lack of recollection.

24          I can't imagine how is he going to be able to testify

25  about this document, Mr. Shur, but do you have a theory that

FB95sil5                    Rodgers - cross

1   you would like to share with me at side bar?

2           MR. SHUR:  Sure.

3           THE COURT:  Okay.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FB95sil5                       Rodgers – cross

1     (At side bar)

2          THE COURT:  Do you have a theory?

3          MR. COHEN:  I have a theory.  Is he going to show up

4     at a press conference if he is not supporting it?

5          THE COURT:  He could have come with, essentially, a

6     gun to his head so what does support mean?  He may have

7     wandered into this holding his nose.

8          MR. SHUR:  Well, I was going to A, see if it would

9     refresh his recollection; and B ask him about the press

10    conference itself.

11         THE COURT:  He said he left the press conference so he

12    can't testify about the press conference.

13         MR. SHUR:  He can testify about the part of the press

14    conference he was present for.  I understand he can't testify

15    certainly to the part he was not present for.

16         THE COURT:  And this is hearsay and it's not even his.

17    He's a lawyer in the AG's office, he is not in the press.

18         MR. SHUR:  I was going ask if he prepared or helped

19    prepare the press release.

20         THE COURT:  You can ask him if he helped prepare the

21    press release.

22         MR. COHEN:  He has also said that he is being

23    presented as a custodian of records on documents he knew

24    nothing about but they've been admitted through him.

25         THE COURT:  I don't think so.

FB95sil5                              Rodgers - cross

1            MR. COHEN:  The documents that he said he had nothing

2      to do with those reviews, he never saw those.

3            THE COURT:  I said that was the certification that

4      came out, right?

5            MR. COHEN:  Well, he has reviewed those records for

6      the purposes of this trial he said, your Honor.

7            THE COURT:  He hasn't reviewed this document for the

8      purpose of this trial.

9            MR. COHEN:  That may be.  Ms. Cohen has been very

10     limiting in what she shows him.

11           THE COURT:  Imagine that.

12           Okay.  You can ask him if he prepped or helped prepare

13     the press release.  I suspect he is going to say no and that's

14     going to be the end of this.

15           MR. SHUR:  But I can ask him about his observations at

16     the press conference.

17           THE COURT:  He said he left after a couple minutes.

18     You can ask him what does he recall.

19           MS. COHEN:  You can ask him if there is a press

20     release because I don't think the jury knows that there is one.

21           THE COURT:  He has it in his hands.

22           MS. COHEN:  They don't know.

23           THE COURT:  My point is now.

24           MS. COHEN:  He can ask him if he knows this was a

25     press release.

1        MR. SHUR:  Sure.

2        THE COURT:  Yes.

FB95sil5                    Rodgers - cross

1                    (In open court)

2    BY MR. SHUR:

3    Q.  Mr. Rodgers, you mentioned that the Attorney General had a

4    press conference in connection with these new reforms meaning

5    the MIRT review process and these certifications; is that

6    right?

7    A.  That's correct.

8    Q.  Do you know if there was a press release that followed the

9    press conference?

10   A.  I believe it came before or right after it, yes.

11   Q.  Were you involved or participated in all in involving that

12   press release?

13   A.  No, I did not.

14   Q.  You mentioned you were at the press conference but you left

15   early?

16   A.  I admitted that, yes.

17   Q.  Mr. Silver was present at the press conference when you

18   were there?

19   A.  Yes.

20   Q.  And were there other leaders of New York State Legislature

21   that were present?

22   A.  I believe all the leaders being the head of the Senate, and

23   I think the two minority leaders were present as well.

24   Q.  In support of what the Attorney General was telling the

25   public?

FB95sil5                          Rodgers - cross

1    A.  In agreement to the certification.

2    Q.  Because Mr. Silver encouraged these reforms, correct?

3    A.  I don't know.

4              MR. SHUR:  One moment, your Honor?

5              (Counsel conferring)

6              MR. SHUR:  Nothing further, your Honor.

7         Thank you, Mr. Rodgers.

8              THE COURT:  Redirect?

9              MS. COHEN:  No, your Honor.

10             THE COURT:  Thank you.

11             THE WITNESS:  Thank you, your Honor.

12             (Witness steps down)

13             MR. MASTER:  The government calls Gary Klein.

14             THE COURT:  Gary Klein?

15             MR. MASTER:  Just a moment, your Honor.  We need to

16   switch out the binders.

17             THE COURT:  Okay.

18    GARY KLEIN,

19        called as a witness by the Government,

20        having duly affirmed, testified as follows:

21             THE DEPUTY CLERK:  Please state your full name and

22   spell your last name, slowly, for the record.

23             THE WITNESS:  Gary Klein, K-L-E-I-N.

24             THE DEPUTY CLERK:  Thank you.  Please, be seated.

25   DIRECT EXAMINATION

FB95sil5                       Klein - direct

1    BY MR. MASTER:

2    Q.  Good afternoon, Mr. Klein.

3    A.  Good afternoon.

4    Q.  Where are you employed, sir?

5    A.  I'm employed with the firm of Weitz & Luxenberg.

6    Q.  For how long have you been employed there?

7    A.  Over 25 years.

8    Q.  Where did you work before joining Weitz & Luxenberg?

9    A.  I worked at the law firm of Morris Eisen, PC.

10   Q.  Is that the same firm that Perry Weitz and Arthur Luxenberg

11   worked at?

12   A.  Yes.

13   Q.  Is that how you got hired at Weitz & Luxenberg?

14   A.  Yes, it is.

15   Q.  Please describe your educational background for the members

16   of the jury?

17   A.  I graduated Hofstra University Law School in 1988 and went

18   straight to work from there.

19   Q.  What is your current position with Weitz & Luxenberg?

20   A.  I'm the managing attorney of the firm.

21   Q.  What does it mean to be the managing attorney of the firm?

22   A.  I'm responsible to oversee day-to-day operations, knowing

23   where the attorneys are, knowing where the paralegals are, what

24   they're working on, reviewing their work, and making sure that

25   everything is handled properly.

FB95sil5                          Klein - direct

1    Q.  And how many attorneys are there at Weitz & Luxenberg?

2    A.  There are over 80.

3    Q.  And how many other staff are there?

4    A.  There is about 300, 325 support staff.

5    Q.  Do you know Sheldon Silver, the defendant?

6    A.  Yes, I do.

7    Q.  How do you know him?

8    A.  He's a colleague -- he was a colleague at the firm.

9    Q.  Prior to Sheldon Silver joining the firm, did you know him

10   personally?

11   A.  I did not know him personally.

12   Q.  Did you play any role in the decision to hire him?

13   A.  No, I did not.

14   Q.  What, if any cases, did Sheldon Silver bring with him to

15   the firm when he joined?

16   A.  He brought no cases with him.

17   Q.  Since Sheldon Silver joined the firm, have you had meals

18   with him?

19   A.  Yes, I have.

20   Q.  Where?

21   A.  I have had meals with him in the office as well as at a

22   couple of restaurants.

23   Q.  Have you attended any sporting events with him?

24   A.  Yes, I have.

25   Q.  Have you ever attended family events of Sheldon Silver's?

FB95sil5                          Klein - direct

1    A.  I believe on one occasion, yes.

2    Q.  Do you know the name Dr. Robert Taub?

3    A.  I have heard the name, yes.

4    Q.  Have you ever met Dr. Taub?

5    A.  I have not.

6    Q.  Has Sheldon Silver ever spoken of Dr. Taub as a friend of

7    his?

8    A.  No.  Not to my knowledge.

9    Q.  How, if at all, did you hear his name come up?

10   A.  It was during banter during a lunch session in our office.

11   Q.  And in what context does it come up?

12   A.  I don't recall.

13   Q.  How have you seen the name or heard the name Dr. Taub in

14   the context of your firm?

15   A.  I have seen his name on cases that have been referred to

16   the office.

17   Q.  And when, if ever, have you met Dr. Taub?

18   A.  I have never met him.

19   Q.  What, if any fees, does Weitz & Luxenberg pay to attorneys

20   who bring in cases to the firm?

21   A.  Depends on the type of case that's brought in.

22   Q.  What are the types of cases and what are the fees

23   associated with that?

24   A.  In a general negligence case, which would be like a motor

25   vehicle accident or a premises case where someone falls, the

1    referring attorney inside the firm would receive 50 percent of

2    the fee.  An asbestos litigation they would get one third of

3    the fee.

4    Q.  In your capacity as managing attorney of the firm, are you

5    responsible for supervising the maintenance of certain computer

6    systems and financial systems maintained by Weitz & Luxenberg?

7    A.  I oversee the staff that enters data into the computer.  I

8    also oversee the IT department to some extent to make sure the

9    systems are operational.

10   Q.  Are those systems kept in the course of Weitz & Luxenberg's

11   regularly-conducted business activities?

12   A.  Yes, they are.

13   Q.  Do you have knowledge of the information shown in those

14   systems?

15   A.  Yes, I do.

16   Q.  Among other things, do Weitz & Luxenberg's computer systems

17   track referrals of cases by attorneys inside or outside the

18   firm to the firm?

19   A.  Yes, it does.

20   Q.  I would like you to take a look at what's in binder 1 of 3

21   there and marked for identification as GX 441.  Do you

22   recognize that document?

23   A.  Yes, I do.

24   Q.  Is that a document that you prepared using

25   Weitz & Luxenberg's computer systems?

1   A.   That's a document that was generated at my instruction

2   identifying the cases that were referred by Sheldon Silver.

3           MR. MASTER:   The government offers Government Exhibit

4   441.

5           THE COURT:   Any objection?

6           MR. SHUR:   No objection, Judge.

7           THE COURT:   441 is received.

8           (Government's Exhibit 441 received in evidence)

9   BY MR. MASTER:

10  Q.   Again, just explain to the members of the jury how you

11  prepared Government Exhibit 441.

12  A.   At my instruction, the computer department compiled a list

13  of all cases that are in our system that are identified as

14  referred by Sheldon Silver and this is the compilation of that

15  report.

16  Q.   And how many pages is it?

17  A.   It's three pages.

18  Q.   If you wouldn't mind paging through that?

19          Now, Mr. Coccaro, if you wouldn't mind going back to

20  the first page?

21          What does the file number column represent?

22  A.   The file number represents the number that's attributed to

23  the case in our computer system.

24  Q.   And so does each case have a unique file number?

25  A.   Yes, they do.

FB95sil5                        Klein - direct

1    Q.   So that column number represents the unique number that

2    your system assigns to the case?

3    A.   That's correct.

4    Q.   And then under the Lit column, what does that represent?

5    A.   That's the type of litigation that the case falls under.

6    Q.   And so when it says NEG, what type of case is that?

7    A.   That would be a general negligence case.

8    Q.   And what does the code ASB stand for?

9    A.   That would stand for asbestos.

10   Q.   And what is the information -- well, client name is the

11   name of the client associated with that file?

12   A.   Yes, it is.

13   Q.   And what does Intake Date represent?

14   A.   That would be the date that the case was either entered

15   into the system or the date the case was signed up, the

16   retainer would have been signed that day.

17   Q.   What does the Status column represent?

18   A.   That refers to the status of the case on the date that this

19   report was generated.

20   Q.   And what date was this report generated?

21   A.   November 21st, 2014.

22   Q.   And there are some different entries there under status --

23   Mr. Coccaro if you could zoom in so it is easier -- what does

24   Active represent?

25   A.   That means that the case on that date was an active case.

1   Q.   There are some entries that say rejected by or rejected by

2   W&L; what does that represent?

3   A.   That would represent that the case had been rejected.

4   Q.   Then there is another type of entry, closed/all cases

5   settled; what does that represent?

6   A.   That the case was closed and the matter was resolved.

7   Q.   Then there is another entry, it is called Referred Out.

8            If you wouldn't mind zooming or scrolling down,

9   Mr. Coccaro, so the jury can see all of the different types of

10  entries?

11           So, further down towards the bottom number towards

12  Avon.  What does "referred out" mean?

13  A.   The particular case was referred out of our office to

14  another firm.

15  Q.   And then there is another type of entry called Suspended;

16  what does that mean?

17  A.   Suspended would mean that the case is in a suspended status

18  because we didn't have sufficient medical information on the

19  file.

20  Q.   Then if you wouldn't mind going to the top again,

21  Mr. Coccaro, and explaining then there is a final column called

22  Fee and what does the fee represent?

23  A.   That fee would represent the percentage that Sheldon Silver

24  would receive of the firm's fee.

25  Q.   Let's set that aside for the moment, Mr. Klein.

FB95sil5                          Klein - direct

1           Do your computer systems also track amounts paid to

2    attorneys at the firm in terms of referral fees?

3    A.  Yes, it does.

4    Q.  And in preparation for your testimony today, did you query

5    your systems to prepare reports of attorney referral fees paid

6    by the firm to Sheldon Silver over time?

7    A.  Yes, I did.

8    Q.  And how many reports did you generate, based on your query?

9    A.  We would have queried a separate report for negligence, one

10   report for negligence, and another for asbestos.

11   Q.  I would like you to take a look at what is in that binder

12   that you were just looking at Government's Exhibits 521 and

13   522.  Do you recognize those documents?

14   A.  Yes, I do.

15   Q.  And what are those two documents?

16   A.  521 is a list of negligence cases that were referred by

17   Sheldon Silver and the fees that were paid out on it, and

18   document 522 is a list of asbestos cases wherein a fee was paid

19   to Sheldon Silver.

20   Q.  Are those the reports that you asked your staff to

21   generate?

22   A.  Yes, it is.

23           MR. MASTER:  The government offers 521 and 522.

24           MR. SHUR:  No objection.

25           THE COURT:  521 and 522 are received.

1                    (Government's Exhibits 521 and 522 received in

2       evidence)

3       BY MR. MASTER:

4       Q.   Let's first talk about 522.

5                    Mr. Coccaro, if you wouldn't mind pulling up 522?

6                    What does each row on this chart represent?

7       A.   Each row would represent a settlement or distribution of

8       sums on particular cases.  Distributions.

9       Q.   So, in other words, a referral fee -- among other things a

10      referral fee payout to Sheldon Silver?

11      A.   That's correct.

12      Q.   And so, when there are multiple rows for a given client

13      name, what does each row represent?

14      A.   They were multiple settlements, different settlements with

15      different defendants.

16      Q.   And what's the date of this chart?

17      A.   This chart is dated May 15th, 2015.

18      Q.   And, Mr. Klein, how many pages are there of this chart?

19                   And Mr. Coccaro, if you could just page through?

20      A.   There are 14 pages.

21      Q.   And if you would return to the last page, are there totals

22      listed there?

23      A.   Yes, there are.

24      Q.   What was the total amount of attorneys' fees paid to

25      Sheldon Silver for asbestos cases?

1  A.  The total amount would be $3,366,362.60.

2  Q.  Now, if you wouldn't mind just going back to the first page

3  so that we can go through the lines in each column so you can

4  just explain to the members of the jury?

5          Mr. Coccaro, if you wouldn't mind zooming in on sort

6  of the top row in the column headings?

7          Now, again, there is client name listed, is that the

8  client for whom referral fee is generated?

9  A.  Yes.  That's correct.

10 Q.  Then there is a column heading called Ref Att percent; what

11 does that represent?

12 A.  That's the percentage that the referring attorney would

13 receive.

14 Q.  And then distributed, retainer amount, attorney fee, and

15 WL; what do those represent?

16 A.  The distributed would be the amount received for that line,

17 retainer amount is the overall retainer fee and it breaks down

18 the fee to Weitz & Luxenberg and then following, by the

19 attorney fee, to Sheldon Silver.

20 Q.  It is that column that totals up to the $3,366,362?

21 A.  That's correct.

22 Q.  And again, just so the record is clear, because it is not

23 listed in the beginning of this, the attorney fee where it says

24 attorney fee Silver, Sheldon; that's Sheldon Silver's

25 attorney's fees?

FB95sil5                          Klein - direct

1    A.   That's the share that he would receive, yes.

2    Q.   Now, there are two additional columns here where it says

3    Attorney Fee Other and then Other Attorney Name.  Do you see

4    those?

5    A.   Yes, I do.

6    Q.   Are there a couple of cases where there are entries in that

7    column?

8    A.   There are a few cases, yes.

9    Q.   If you wouldn't mind just turning to page 3 where it says

10   Evans Monroe?

11   A.   Yes.

12   Q.   So there are entries with respect to that particular case.

13   Can you just explain what that means?

14   A.    That means that in addition to Sheldon Silver receiving a

15   fee there is another law firm that had referred the case over

16   to Sheldon Silver and our firm and they received a fee as well.

17   It identifies the name of that firm and the fee that they

18   received.

19              (Continued on next page)

20

21

22

23

24

25

1    BY MR. MASTER:

2    Q.  So, in the particular case of Monroe Evans, it reflects

3    that that case was referred to Sheldon Silver by the different

4    law firm?

5    A.  That's correct.

6    Q.  And, when the entries here are blank, does that mean that

7    no other law firm referred him the case?

8    A.  Yes.

9    Q.  Now, just turning briefly to Government Exhibit 521.

10             What does this chart represent?

11   A.  This chart represents fees -- well, this chart represents

12   settlements and fees paid out in general negligence cases where

13   Sheldon Silver did earn a fee.

14   Q.  Again, is it the same as in the asbestos case where each

15   row represents a particular payout?

16   A.  Yes, it does.

17   Q.  How many pages is this report?

18   A.  One page.

19   Q.  What is the total amount of attorney fees paid to Sheldon

20   Silver on all these negligence cases?

21   A.  It's $804,371.21.

22   Q.  Is it fair to say that that represents less than a quarter

23   of the asbestos referral fees that Sheldon Silver obtained over

24   the course of his time at the firm?

25   A.  It would be fair to say that.

FB9YSIL6                          Klein - Direct

1   Q.  Now, you testified earlier about Government Exhibit 441,

2   the list of attorney referrals to Sheldon Silver.

3          MR. MASTER:  If you couldn't mind, Mr. Coccaro, just

4   pulling that up again.  If you wouldn't mind zooming in on the

5   first few entries.

6   BY MR. MASTER:

7   Q.  Now, can you tell from this system and from your review of

8   522, as well as other records maintained by the firm, what is

9   the date of the first referral by Dr. Robert Taub to Sheldon

10  Silver that you were able to find on the firm's systems.

11  A.  From this report I wouldn't be able to tell, but from other

12  records that I've reviewed, I believe it would be Monroe Evans.

13  Q.  I'm sorry.

14  A.  I believe Monroe Evans was referred by the Ziff law firm to

15  Sheldon Silver, and Catherine O'Leary is the first case.

16  Q.  What is the date of that referral from Dr. Taub to Sheldon

17  Silver?

18  A.  It's identified as November 6, 2003.

19         THE COURT:  Well, that was the date it came into the

20  firm.  Wasn't your question when Taub referred it to Sheldon

21  Silver?

22  BY MR. MASTER:

23  Q.  Yes.  When was it brought into the firm?  When was it

24  referred to Dr. Taub?

25  A.  I would have to look at the other records.

1    Q.  Mr. Klein, so it's clear, if you wouldn't mind looking at

2    Government Exhibit 42-2.

3            Do you recognize that document?

4    A.  Yes, I do.

5    Q.  Now, could you just explain.

6            MR. MOLO:  Is this document in evidence?

7            THE COURT:  Not yet.

8    BY MR. MASTER:

9    Q.  Mr. Klein, while we get the paperwork associated with that,

10   let me just ask you a few other questions.

11           Did Sheldon Silver ever tell you how it came about

12   that Dr. Dr. Taub began referring cases such as the O'Leary

13   case to him?

14   A.  No, he did not.

15   Q.  Did Sheldon Silver ever tell you on or after that intake

16   date of November 6, 2003, that he was considering sending state

17   money to Dr. Taub's research?

18   A.  No, he did not.

19   Q.  Did he tell you at any time that he was considering sending

20   state money to Dr. Taub's research?

21   A.  No.

22   Q.  Now, just let me ask you some general questions about how

23   your firm prepares and maintains client intake-related records.

24           What types of records do you maintain concerning

25   intakes of clients?

1    A.  We maintain as many as we can.  We start with the retainer

2    statement, which is a letter of engagement with the client,

3    intake sheets which describe the initial intake of the case

4    taken generally over the telephone if that's how we speak to

5    the client.  Or, if an investigator goes out and meets with the

6    client, that's how it will be created.

7            Whatever information we can initially, we put into the

8    system.

9    Q.  Is that information that, once you gather, you maintain in

10   the course of your regularly conducted activities?

11   A.  Yes, we do.

12   Q.  Where do you maintain that information?

13   A.  We maintain that in our computer system.

14   Q.  Do you also maintain paper copies of records related to

15   intakes?

16   A.  We do, yes.

17   Q.  What's the name of the form your firm typically uses to

18   track or to gather and track intake information?

19   A.  It's a data entry initial intake form.

20   Q.  Do those intake forms reflect the identity of the attorneys

21   within your firm who are to get referral fee credit for those

22   intakes?

23   A.  They generally do, yes.

24   Q.  What do you do with those intake forms once they are

25   prepared?

1    A.  We give it to a computer person who enters the information

2    into the computer system so it's easier to generate.

3    Q.  Under what circumstances do you maintain records concerning

4    any nonlawyers, for example, doctors, who serve as a source of

5    the referral to an attorney?

6    A.  We don't -- we generally don't maintain such records.

7    Q.  If those records are provided to you or to your staff which

8    is responsible for intake, do you maintain those in the file?

9    A.  Handwritten notes, yes.  But we don't enter it into a

10   computer.

11   Q.  Is the information that's contained within the file

12   maintained in the course of the firm's regularly conducted

13   activity?

14   A.  Yes, they are.

15   Q.  What does maintaining referral source information, to the

16   extent it happens to be in your files, allow you to do?

17   A.  It just allows us to see where the referral might have come

18   from.

19   Q.  And, again, where would you maintain that information about

20   referral source when it is provided to you?

21   A.  It would be contained in the hard copy file, or it would be

22   scanned into the system as a PDF.

23   Q.  In preparation for your testimony today, have you reviewed

24   some of your firm's intake files to determine whether any of

25   those intake files reference Dr. Taub, either as a treating

FB9YSIL6                         Klein - Direct

1   physician or specifically as a referring source?

2   A.  Yes, I have.

3   Q.  Showing you -- I'd like you to take a look at what's in

4   your binder, binder one, marked for identification as

5   government Exhibits 442-2, 442-3, 442-4, 442-5, 442-6, 442-7,

6   442-8, 442-14, 442-25, 442-26, 442-27, and 442-28.

7            Whenever you're ready, Mr. Klein.  I know you're still

8   working.

9   A.  I'm up to the last one.  Okay.

10  Q.  So, having reviewed all those, do you recognize them?

11  A.  Yes, I do.

12  Q.  Are those the intake forms and supporting documents that

13  you just described?

14  A.  Yes, they are.

15  Q.  Do these all relate to cases that are listed on Government

16  Exhibit 441 as being referred to the firm by Sheldon Silver?

17  A.  Yes, they do.

18  Q.  Are they all of the records or just some of them?

19  A.  They are some of the records from the files.

20  Q.  Well, do they relate to some of the cases that were listed

21  on 441?

22  A.  Yes.

23  Q.  Or all of the cases?

24  A.  No.  It's just some of the cases.

25            MR. MASTER:  The government offers the exhibits that

1024

1    I've just listed.  I can read them into the record again.

2               THE COURT:  No.  That's okay.

3               Any objection?

4               MR. SHUR:  No objection, Judge.

5               THE COURT:  Okay.  The Court receives Government

6    Exhibit 442-2, 442-3, 442-4, 442-5, 442-6, 442-7, 442-8,

7    442-14, 442-25, 442-26, 442-27, and 442-28.

8               (Government's Exhibits 442-2, 442-3, 442-4, 442-5,

9    442-6, 442-7, 442-8, 442-14, 442-25, 442-26, 442-27, and 442-28

10   received in evidence.)

11              MR. MASTER:  Mr. Coccaro, if you wouldn't mind

12   publishing 442-2.  If you could just do that side by side with

13   441.  Just zoom in again, Mr. Coccaro, on the intake that is

14   associated with Catherine O'Leary and the date on 441.

15   BY MR. MASTERS:

16   Q.  Again, this is a case that is listed with an intake date of

17   November 6, 2003.

18              Do you see that?

19   A.  Yes.  That's correct.

20   Q.  And 442-2 -- are those intake files associated with that

21   case?

22   A.  Yes, it is.

23   Q.  What is the state of residence of Catherine O'Leary as

24   reflected in the intake?

25   A.  It's reflected as New Jersey.

1          MR. MASTER:  If you wouldn't mind turning to the

2     second page, Mr. Coccaro, and Mr. Klein.

3     BY MR. MASTER:

4     Q.  Does this reflect, on the top of the page, that Sheldon

5     Silver is listed as the intake referring attorney?

6     A.  Yes, it does.

7     Q.  If you wouldn't mind, then, turning to the fourth page of

8     the document.  Actually, turn to the fifth page of the

9     document.

10         Do you see there where it's written Catherine O'Leary

11    and then underneath Dr. Taub?

12    A.  Yes, it does.

13    Q.  And then there an email on the sixth page of the document

14    that contains some of that information about referring source

15    that you described earlier?

16    A.  Yes, it does.

17    Q.  What's the date of that email?

18    A.  That email is dated November 6.

19    Q.  Who are the people who are listed on that email?

20    A.  The sender is Erik Jacobs, an attorney in our firm, to

21    Charles Ferguson, another attorney in our firm, regarding the

22    client, Catherine O'Leary.

23    Q.  Does that contain information about the referral source to

24    Sheldon Silver?

25    A.  It identifies Dr. Taub as suggesting that the client call

1    Sheldon Silver.

2    Q.  Again, what's the date of that email?

3    A.  November 6.

4    Q.  Is that the same date that is listed as the intake on

5    Government Exhibit 441?

6    A.  Yes, it is.

7    Q.  If you wouldn't mind just setting that aside.  We'll get to

8    the others later.  Let's talk about how those referral fees

9    were actually paid to Sheldon Silver.

10            How were the referral fees paid?

11   A.  Generally by check.

12   Q.  How was the check distributed to Sheldon Silver initially?

13   A.  Initially referral fee checks were mailed to his home

14   address.

15   Q.  Did you attach to those checks any particular reports or

16   records reflecting the basis for payment of the referral fees,

17   including the clients whose cases generated those fees?

18   A.  It was a practice of our accounting department to include a

19   distribution -- what's the right word?  A referral fee report

20   that would go along with the check to identify what the

21   check -- what the amount came from.

22   Q.  So that every time Sheldon Silver was provided with a

23   referral fee check, he would be informed about the clients

24   whose cases served as a source of those fees?

25   A.  That was the general way it was done, yes.

1    Q.  In response to subpoena and in preparation for your

2    testimony today, did there come a time when you produced

3    referral fee checks and supporting referral fee reports that

4    were provided to Sheldon Silver over the years?

5    A.  Yes, I did.

6    Q.  Also in preparation for your testimony today, did you

7    review the exhibits that are listed in binder number three

8    there reflecting each referral fee check to Sheldon Silver with

9    its supporting referral fee reports?

10   A.  Yes.

11   Q.  Having reviewed that binder, are those the checks with

12   supporting referral fee reports that you produced in response

13   to subpoena?

14   A.  Yes, they are.

15           MR. MASTER:  Your Honor, these are marked as

16   Government Exhibits 514-1 through 514-155.

17   BY MR. MASTER:

18   Q.  Mr. Klein, again, prior to taking the stand today, did you

19   review that binder and confirm that that is information that

20   you provided in response to subpoena?

21   A.  Yes, it is.  I did review the binder material.

22           MR. MASTER:  The government offers Government Exhibits

23   514-1 through 514-155.

24           THE COURT:  Any objection?

25           MR. MOLO:  No objection, Judge.

1          THE COURT:  Government Exhibits 514-1 through 514-155

2     are received.

3          (Government's Exhibit 514-1 through 514-155 received

4     in evidence)

5     BY MR. MASTER:

6     Q.  And, again, each of those 155 sub exhibits represents a

7     separate check to Sheldon Silver?

8     A.  Yes, they do.

9          THE COURT:  Is it a separate check or multiple checks?

10    The very first one in the binder seems to be three checks.

11         MR. MASTER:  Yes, your Honor.  We'll explain --

12         THE COURT:  You're going to get to that?

13         MR. MASTER:  Yes.  We're going to get into that right

14    now without delay.

15         If you wouldn't mind publishing 514-1, Mr. Coccaro.

16    BY MR. MASTER:

17    Q.  In the meantime, Mr. Klein, just to end the mystery here,

18    which is the referral fee check associated with the supporting

19    referral fee documents?  Which of the three?

20    A.  On this page, the second one.

21    Q.  What are the other two checks on either side?  They're both

22    the same amount.

23    A.  Those are payroll checks.

24    Q.  Did Sheldon Silver get paid a regular salary?

25    A.  Yes, he did.

FB9YSIL6                         Klein - Direct

1   Q.  What was the amount of each of those payroll checks?

2   A.  $4,615.39.

3   Q.  What was the amount of the referral fee check that is

4   associated with the referral fee payment?

5   A.  That check is $176,048.02.

6   Q.  Again, was that the first referral fee check that Sheldon

7   Silver received?

8   A.  To my knowledge, that contained the referral fees, the

9   first referral fees, that he received.

10  Q.  What is the date of that check?

11  A.  That check is dated March 18, 2005.

12  Q.  Turn to page 2.

13          Does that report also reflect when that check was

14  deposited into Sheldon Silver's bank account?

15  A.  It appears that it was deposited on March 30, 2005.

16  Q.  And then, if you wouldn't mind going to the -- well, first

17  of all, where are the referral fee reports associated with that

18  referral fee check?

19  A.  They are pages 3, 4, 5 -- 3, 4, and 5 of this same exhibit.

20  Q.  If you wouldn't mind turning to -- actually, Mr. Klein, can

21  you determine what types of cases served as the basis for this

22  several fee check.

23  A.  These cases were asbestos cases.

24  Q.  If you wouldn't mind turning to the second of the three

25  reports that are listed there.  I guess that would be page four

1    of five.

2              MR. MASTER:  If you wouldn't mind zooming in on that

3    second page.  Just zoom in, Mr. Coccaro, to the top.

4    BY MR. MASTER:

5    Q.  Do you see a Catherine O'Leary listed there?

6    A.  Yes, I do.

7    Q.  Is that the same client who you were just talking about

8    with respect to the intake forms?

9    A.  Yes, it is.

10   Q.  What is the amount of the referral fee that the O'Leary

11   referral generated for Sheldon Silver on this particular date?

12   A.  That referral fee was $25,000.

13   Q.  Where is that reflected on this report?

14   A.  If you look at the name Catherine O'Leary, it's to the

15   right of it under the heading called REF at fee, which means

16   referral attorney fee.

17   Q.  What other clients are listed as being sources of referral

18   fees on this particular report?

19   A.  Donald Pieper as well as William J. Zimmerman.

20   Q.  How much in referral fees did Sheldon Silver get for those

21   two clients on that date?

22   A.  For Pieper it was $32,669.98.  And for Zimmerman, it was

23   $35,853.16.

24   Q.  Now, have you reviewed the intake files for Mr. Pieper and

25   Mr. Zimmerman to determine whether they make any reference to

1   Dr. Taub?

2   A.  I did.

3        MR. MASTER:  Mr. Coccaro, if you wouldn't mind going

4   to Government Exhibit 442-4.  Just zoom in on that.

5   BY MR. MASTER:

6   Q.  Do you see any reference to a Dr. Taub there?

7   A.  Yes, I do.

8   Q.  What is the state from which William Zimmerman, the client,

9   was located?

10  A.  He was located in Pennsylvania.

11  Q.  It states it's a mesothelioma case.  If I could just read

12  into the record, "Has been most recently been treating with

13  Dr. Taub at Columbia Presbyterian."  It says, "Please note that

14  this potential case is a direct referral to Sheldon Silver."

15  Is that correct?

16  A.  That's correct, yes.

17  Q.  What's the date of that email?

18  A.  That email is dated June 25, 2004.

19  Q.  Now, if you wouldn't mind going to 442-6.  Is that the

20  intake packet associated with Mr. Pieper?

21  A.  Yes, it is.

22  Q.  If you wouldn't mind going to page 4 of that document.

23        Is there any reference to Dr. Taub in that document?

24  A.  That document says "Dr. Taub.  Columbia University Medical

25  Center.  Reason:  Oncology consultation," and there's a date.

1   Q.  What was the date of that consultation?

2   A.  10-25 of 2004.

3   Q.  Okay.  So now we've gone through the three clients who are

4   listed on that referral fee report or one of the three referral

5   fee reports.

6           MR. MASTER:  Mr. Coccaro, if you wouldn't mind going

7   back to page 3 of 514-1.

8   BY MR. MASTER:

9   Q.  Mr. Klein as well.

10          What is the name of the client who is listed as the

11  basis for the referral fee on this page of the backup to that

12  $176,000 check?

13  A.  Stanley Levinson.

14  Q.  What was the amount of the attorney referral fee to Sheldon

15  Silver?

16  A.  It was $21,356.40.

17  Q.  Again, have you reviewed intake files to determine whether

18  the intake file for Mr. Levinson makes any reference to

19  Dr. Taub?

20  A.  Yes, I did.

21  Q.  If you wouldn't mind going to 442-5.

22          Is that the intake packet associated with Stanley

23  Levinson?

24  A.  Yes, it is.

25  Q.  If you wouldn't mind just turning to page 3 of that

1    document.

2              Does it list Dr. Robert Taub as a physician?

3    A.  It does, yes.

4    Q.  If you wouldn't mind turning to page 4 of that document.

5              Is there a reference in there to the referring source

6    to Sheldon Silver?

7    A.  It identifies Dr. Taub as recommending Shelly Silver.

8              THE COURT:  Are you getting close to a good stopping

9    point?

10             MR. MASTER:  That would be fine, your Honor.

11             THE COURT:  Why don't we stop here for the day then,

12   ladies and gentlemen.  Have a good evening.  Don't discuss the

13   case.

14             We'll see you tomorrow morning at 9:15.  Please don't

15   be late.  Don't read anything in the press either.

16             (Jury not present)

17             THE COURT:  About how much longer are you going to be

18   with this witness?

19             MR. MASTER:  Because he's admitting a line of

20   documents, I probably have another hour to an hour and a half.

21             (Witness temporarily excused)

22             THE COURT:  Who is going to do the cross?

23             MR. SHUR:  I will, Judge.

24             THE COURT:  About how long is your cross going to be?

25             MR. SHUR:  I would say an hour.

1    THE COURT:  And you've told them who your next

2  witnesses are going to be?

3    MS. COHEN:  We will tell them depending on how long we

4  go today.  We'll tell them.

5    THE COURT:  Would you all like your binders back to

6  recycle them for witnesses that have there are finished?

7    MS. COHEN:  Sure, your Honor.

8    THE COURT:  Anything further this evening?

9    MS. COHEN:  Nothing from the government, your Honor.

10    THE COURT:  Anything from the defense?

11    MR. MOLO:  Nothing further.

12    THE COURT:  Perfect.  We'll see you all tomorrow.

13    (Adjourned to November 10, 2015, at 9:15 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   VICTOR E. FRANCO

 4   Direct By Mr. Master . . . . . . . . . . . . 744

 5   Cross By Mr. Shur . . . . . . . . . . . . 764

 6   Redirect By Mr. Master . . . . . . . . . . 867

 7   Recross By Mr. Shur . . . . . . . . . . . 882

 8   STEVEN AUGUST

 9   Cross By Mr. Shur . . . . . . . . . . . . 908

10   Redirect By Ms. Cohen . . . . . . . . . . 921

11   DENNIS PATRICK WHALEN

12   Direct By Ms. Cohen . . . . . . . . . . . 923

13   Cross By Mr. Shur . . . . . . . . . . . . 940

14   Redirect By Ms. Cohen . . . . . . . . . . 965

15   Redirect By Ms. Cohen . . . . . . . . . . 972

16   RICHARD RODGERS

17   Direct By Ms. Cohen . . . . . . . . . . . 973

18   Cross By Mr. Shur . . . . . . . . . . . . 996

19   GARY KLEIN

20   Direct By Mr. Master . . . . . . . . . . . .1007

21

22

23

24

25
```

```
1                          GOVERNMENT EXHIBITS

2    Exhibit No.                                       Received

3    127   . . . . . . . . . . . . . . . . . . . 756

4    131   . . . . . . . . . . . . . . . . . . . 759

5    30    . . . . . . . . . . . . . . . . . . . 774

6    107   . . . . . . . . . . . . . . . . . . . 897

7    2003, 2004, 2005, and 2006    . . . . . . . 937

8    925 and 926   . . . . . . . . . . . . . . . 981

9    925 and 926   . . . . . . . . . . . . . . . 981

10   2008   . . . . . . . . . . . . . . . . . . . 994

11   441   . . . . . . . . . . . . . . . . . . .1011

12   521 and 522   . . . . . . . . . . . . . . .1015

13   442-2, 442-3, 442-4, 442-5, 442-6,  . . . .1024

14           442-7, 442-8, 442-14, 442-25,

15           442-26, 442-27, and 442-28

16   514-1 through 514-155   . . . . . . . . . .1028

17

18

19

20

21

22

23

24

25
```

1037

```
1                          DEFENDANT EXHIBITS

2     Exhibit No.                                Received

3      28    . . . . . . . . . . . . . . . . . 766

4      29    . . . . . . . . . . . . . . . . . 772

5      32    . . . . . . . . . . . . . . . . . 798

6      34-1  . . . . . . . . . . . . . . . . . 819

7      35-1  . . . . . . . . . . . . . . . . . 830

8      35-3  . . . . . . . . . . . . . . . . . 833

9      36    . . . . . . . . . . . . . . . . . 836

10     38 and 39  . . . . . . . . . . . . . . . 944

11     14    . . . . . . . . . . . . . . . . . 950
```