```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4               v.                        S1 15 Cr. 93 VEC

 5   SHELDON SILVER,

 6               Defendant.

 7   ------------------------------x
                                           November 10, 2015
 8                                         9:35 a.m.

 9

10   Before:

11                  HON. VALERIE E. CAPRONI,

12                                         District Judge
                                             and a jury
13

14                         APPEARANCES

15   PREET BHARARA,
          United States Attorney for the
16        Southern District of New York
     CARRIE HEATHER COHEN,
17   HOWARD SETH MASTER,
     ANDREW DANIEL GOLDSTEIN,
18   JAMES M. McDONALD,
          Assistant United States Attorneys
19

20   STROOCK & STROOCK & LAVAN, LLP
          Attorneys for defendant Silver
21   BY:  JOEL COHEN, Esq.
          - and -
22   MOLOLAMKEN, LLP
     BY:  STEVEN FRANCIS MOLO, Esq.
23        ROBERT KELSEY KRY, Esq.
          JUSTIN VAUN SHUR, Esq.
24        JUSTIN M. ELLIS, Esq.
          TUONGVY LE, Esq.
25                     Of counsel
```

```
 1              (Trial resumed)
 2              THE COURT:  Mr. Brantley tells me there's a scheduling
 3      issue.
 4              MR. MOLO:  Can we approach?
 5              THE COURT:  Yes.  Off the record.
 6              (At the sidebar; discussion off the record)
 7              THE COURT:  Mr. Molo, do you want to be heard?
 8              MR. MOLO:  Certainly, your Honor.
 9              THE COURT:  Quickly.
10              MR. MOLO:  I'm going to keep this at a very high
11      level.
12              THE COURT:  Do you oppose it?
13              MR. MOLO:  Yes.
14              THE COURT:  I have to say I don't see the relevance of
15      that line of questioning.  On the other hand, the government
16      didn't object.  If it would have objected at the time, I would
17      have sustained the objection.  I'm not going to give a limiting
18      instruction at this point.
19              But I will warn you that if you go down that road
20      again, assuming that the government went on a worldwide tour,
21      I'll sustain it.  In the final jury charge we will have a
22      charge that says government tactics are not at issue.
23              Bring out the jury
24              (Jury present)
25              THE COURT:  Good morning, everybody.
```

 1              Mr. Klein, you're still under oath.

 2              MR. MASTER:  May I proceed?

 3              THE COURT:  You may.

 4              MR. MASTER:  Thank you.

 5    DIRECT EXAMINATION (Cont'd)

 6    BY MR. MASTER:

 7    Q.  Good morning, Mr. Klein.

 8    A.  Good morning.

 9    Q.  Now, Mr. Klein, when we left off last night, we were

10    looking at Government Exhibit 514-1, a referral fee check that

11    Sheldon Silver recieved from Weitz & Luxenberg.

12              If you could just go to that binder, please.

13    A.  Yes.

14              MR. MASTER:  If you wouldn't mind pulling it up,

15    Mr. Coccaro.  Again, Mr. Coccaro, if you could zoom in.

16    BY MR. MASTER:

17    Q.  You testified yesterday that the check on the top and the

18    check on the bottom are payroll checks; right?

19    A.  And the middle check contained referral fees.

20    Q.  Now, we went through page 3 of that exhibit, the fees

21    associated with Levinson.

22              MR. MASTER:  Mr. Coccaro, if you could page to that

23    and zoom in on page 3.  That was $21,356.40.

24              And then we looked at the Levinson intake files at

25    442-5.

1    And then, Mr. Coccaro, just go to page 4 of that

2    document.  Just zoom in on that.

3    We talked about the O'Leary intake, which was the

4    first asbestos case from Dr. Taub to Sheldon Silver.

5    And then I think -- I'm not sure if we had looked at

6    the Pieper intake file.  If you wouldn't mind just turning

7    briefly to Government Exhibit 442-6.

8    THE WITNESS:  Okay.

9    BY MR. MASTER:

10   Q.  That's the intake file associated with one of those

11   referral fees?

12   A.  That's correct.

13   Q.  What is the state in which Donald Pieper lived?

14   A.  He was living in Wisconsin.

15   Q.  Again, I think we looked at this.  I'm not sure if we

16   looked at this yesterday, but again, if you wouldn't mind just

17   going and taking a look.  It says the second -- the first page

18   actually says type of intake, and it says intake date.

19   Do you see that?

20   A.  11-18.

21   Q.  '04?

22   A.  Yes.

23   MR. MASTER:  Mr. Coccaro, if you wouldn't mind going

24   back to 514-1, page 4.

25   BY MR. MASTER:

1   Q.  The third name listed there is Zimmerman, William J.

2   Zimmerman.

3   A.  William J. Zimmerman.  Yes.

4   Q.  I think we had looked briefly at that intake.  That was

5   442-4.  If you wouldn't mind just going to that briefly.

6           What's the date of that intake email?

7   A.  The intake email is dated Friday, June 25, 2004.

8   Q.  So, now that we've gone through pages 3 and 4 of 514-1 --

9           MR. MASTER:  Mr. Coccaro, could you just go back to

10  page 5 of 514-1.

11  BY MR. MASTER:

12  Q.  What are the names associated with both of those referral

13  fees?

14  A.  That would be Vincenza Lala.

15  Q.  What is the total amount of referral fees reflected to

16  Sheldon Silver reflected on this referral fee reports?

17  A.  It would be $56,553.09.

18  Q.  If you wouldn't mind going to your binder and looking at

19  442-3.

20          Is that the intake material associated with the

21  Vincenza Lala?

22  A.  Yes, it is.

23  Q.  What's the intake date listed there?

24  A.  The intake date is listed at February 20, 2004.

25  Q.  If you wouldn't mind going to page 3 and just taking a

 1    look.

 2              MR. MASTER:  If you wouldn't mind publishing that

 3    email, Mr. Coccaro.

 4    BY MR. MASTER:

 5    Q.  Is there handwriting at the top of that page?

 6    A.  Yes, there is.

 7    Q.  What does it say?

 8    A.  It says referred by Dr. Taub to Sheldon Silver.

 9    Q.  And then page 4.  Just go to the middle of the page.

10              What does it say?

11    A.  Dr. Taub is the treating oncologist.  Referred to Sheldon

12    Silver.

13    Q.  And then it says "Meso."

14    A.  It says Meso, yes.

15    Q.  So are those the three referral fee reports that are

16    associated with that $176,000 check?

17    A.  Yes, they are.

18    Q.  As we looked at all of the clients whose names are listed

19    on the referral fee reports, all of their intake files make

20    reference to Dr. Taub; correct?

21    A.  Yes, they do.

22    Q.  Now, after that check was issued, when, if ever, did

23    Sheldon Silver tell you that he was going to send any state

24    money to Dr. Taub or his research?

25    A.  He never did.

 1              MR. SHUR:  Objection.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  He never did.

 4   BY MR. MASTER:

 5   Q.  When, if ever, did Sheldon Silver tell you he was going to

 6   be sending state money to Dr. Taub or his research?

 7   A.  He never did.

 8   Q.  Before we proceed, let's go through the remaining exhibits

 9   that were introduced under Government Exhibit 442.

10              Let's take a look at 442-8.

11              MR. MASTER:  Mr. Coccaro, if you wouldn't mind

12   publishing that.

13   BY MR. MASTER:

14   Q.  Are these intake records related to a Henry Ross?

15   A.  Yes, they are.

16              MR. MASTER:  Mr. Coccaro, if you would just start at

17   the bottom email.

18   BY MR. MASTER:

19   Q.  What's the date of that email?

20   A.  The bottom email is dated March 7, 2005.

21   Q.  Who is Nancy Gerber?

22   A.  It's one of the secretaries in our office.

23   Q.  And who is the email copied to?

24   A.  It's copied to Sheldon Silver.

25   Q.  Gist read that into the record.

1    A.  "Nancy, would you please relay a message to Shelly.  Please

2    tell him that the telephone number that he got from Dr. Taub

3    for Henry Ross, 914-949- continues to ring off the hook.

4             "I tried to call Mr. Ross periodically over the

5    weekend and throughout the day today to no avail.  Does Shelly

6    want to speak with Taub to see if there is another contact

7    person?  Thanks."

8    Q.  Now, if you wouldn't mind proceeding to Government Exhibit

9    442-14.

10            MR. MASTER:  Zoom in on that.

11   BY MR. MASTER:

12   Q.  What's the date of that?

13   A.  That email is dated January 25, 2006.

14   Q.  If you wouldn't mind just reading the unredacted portions

15   into the record.

16   A.  "I just got off the phone with the plaintiff's daughter.

17   The father was recently diagnosed with meso in December 2005

18   and is treating with Dr. Taub.  Please send his daughter a new

19   case package at the following address.  New Jersey 07470973865.

20   Please note that this is a direct referral to Sheldon Silver.

21   Thanks.  Charles."

22   Q.  And then if you wouldn't mind going to page 2.

23            Is there a reference to Dr. Taub there?

24   A.  Yes, there is.

25            MR. MASTER:  Just zoom in on the top, Mr. Coccaro.

1   BY MR. MASTER:

2   Q.  It states, "Anthony Bielowicz.  Meso."

3           Do you recognize that handwriting?

4   A.  I do not.

5   Q.  And then, if you wouldn't mind just going to the next one,

6   Government Exhibit 442-25.

7           What's the date of this email?

8   A.  This email is dated October 12, 2011.

9           MR. MASTER:  Just go to the next page, Mr. Coccaro,

10  page 2.  Can you zoom in on that email.

11  BY MR. MASTER:

12  Q.  Just read that into the record.

13  A.  "Joe, would you please do me a favor and call (son) at

14  716-570.  The area code could also be 718 about his father

15  Anjela Reja.

16          "The father is a patient of Dr. Taub.  Taub called

17  Sheldon Silver, and Shelly called me.  The son is expecting a

18  call from us."

19  Q.  So that's dated October 12 of 2011.

20          Can you just take a look at 442-26.

21          Does this relate to someone named Marilyn Flynn?

22  A.  Yes, it does.

23  Q.  What's the date of that email?

24  A.  November 8, 2011.

25  Q.  What does that say?  Could you just read that into the

1    record.

2    A.  "Patty, would you please do me a favor and call at 203-834

3    or 203-216.  His wife was recently diagnosed with meso.  One of

4    their treating doctors is Taub.  Shelly silver referral.

5    They're expecting our call.  Please use both Taub and Shelly's

6    name in the introduction.  Thanks.  Charles."

7    Q.  And then there another -- turn to page 442-27.

8            Does this relate to a client named Bob McKinley?

9    A.  Yes, it does.

10           MR. MASTER:  If you wouldn't mind turning to page 2 of

11   that exhibit.  And just zooming in on the bottom email,

12   Mr. Coccaro.

13   BY MR. MASTER:

14   Q.  If you would just read that into the record.

15   A.  "Hi, Benno.  This is the case that came in from Sheldon

16   Silver.  The client came to New York to consult with Dr. Taub.

17   Mr. McKinley lives in San Diego.  His phone number is 858-7534.

18           "His sister is another contact.  Her name and number.

19   Laurie.  781-910.  We need to sign this up.  I figured it was

20   best to get it to you rather than sending a closure.  Let me

21   know what happens.  Thanks.  Frank."

22   Q.  Who is Frank Ortiz, the sender of that email?

23   A.  Frank is an associate in our firm.

24   Q.  Again, what's the date on this?  Is this also in the fall

25   of 2011?

1    A.  November 23, 2011.

2            MR. MASTER:  And then Government Exhibit 422-28.  If

3    you wouldn't mind just turning to page 2 of that exhibit.  Just

4    zooming in on the email.

5    BY MR. MASTER:

6    Q.  What's the date on that email?

7    A.  December 6, 2011.

8    Q.  It relates to an individual named John Morford?

9    A.  Yes, it does.

10   Q.  It states, "Charles, this is the new case from Sheldon

11   Silver.  John Morford recently had his diagnosis of peritoneal

12   mesothelioma diagnosed by Dr. Taub in NYC.  He lives in the

13   Washington, DC area."

14           Again, that's also in the fall of 2011?

15   A.  Yes.  Winter.

16   Q.  Now, what, if anything, did Sheldon Silver tell you about

17   any official assistance he was offering to Dr. Taub at that

18   time concerning a race called Miles for Meso?

19   A.  Nothing.

20   Q.  Now, before we proceed further, there were a couple of

21   follow-up questions that I had concerning Government Exhibit

22   521.  That's the report related to nonasbestos cases.

23           MR. MASTER:  If you wouldn't mind pulling up that,

24   Mr. Coccaro.

25   BY MR. MASTER:

1  Q.  That's the page that has all of the nonasbestos referral

2  fees; correct?

3  A.  That's correct.

4  Q.  Now, do you have personal knowledge of some of these cases?

5  A.  Yes, I do.

6  Q.  In addition to being managing attorney of the firm, do you

7  have a role in what's known as the firm's general negligence

8  practice?

9  A.  That's correct.

10  Q.  What is your role?

11  A.  I actually run the negligence area responsible for all the

12  intakes of each case as well as the litigation.

13  Q.  Do you have personal knowledge of where these cases come

14  from?

15  A.  I do.

16  Q.  Just describe for the jury where those cases come from.

17  A.  These cases would come from friends of Sheldon Silver,

18  colleagues, neighbors, neighbors in his home area as well as

19  his summer home location.

20  Q.  How does that contrast with the asbestos cases that came in

21  through the means that we've just been discussing?  Where do

22  those cases come from?

23  A.  Those cases come from Dr. Taub.

24  Q.  Where do they come from in terms of geography?

25  A.  They come from all over the country.

1  Q.  Again, we've talked about this earlier, but is it fair to

2  say that nonasbestos fees are less than a quarter of the amount

3  of the asbestos fees that Mr. Silver --

4  A.  That's fair to say.

5        MR. MASTER:  If you could put that aside.

6  BY MR. MASTER:

7  Q.  Now let's talk about how those checks that are in the 514-1

8  through 514-155 were actually delivered to Sheldon Silver and

9  provided to Sheldon Silver.

10        You testified yesterday that initially those checks

11  were sent to Sheldon Silver by mail; is that correct?

12  A.  That's correct.

13  Q.  Did there come a time when that changed?

14  A.  Yes.

15  Q.  Why did it change?

16  A.  It changed because from the time the check was issued until

17  the time it got signed and mailed out, a significant period of

18  time had passed.

19  Q.  What do you define by a "significant period of time"?

20  A.  A couple of weeks.

21  Q.  How did you learn about this issue with a couple of weeks?

22  A.  I learned about it from Sheldon Silver.

23  Q.  What did Sheldon Silver say to you about this

24  couple-of-week delay?

25  A.  He said that he was upset or annoyed that it would take a

1  couple of weeks from when a check gets issued until when it

2  reaches his mail.

3  Q.  You testified earlier about Government Exhibit 514-1, and

4  the check was dated --

5       MR. MASTER:  Mr. Coccaro, I'm sorry.  Would you mind

6  just pulling that back up.

7  BY MR. MASTER:

8  Q.  The check was dated March 18, 2005.

9       Mr. Klein, you were able to see from the second page

10 of that document when the check was actually deposited by

11 Mr. Sheldon Silver.

12      What is the date on which that check was deposited?

13 A.  The check was deposited on March 30.

14 Q.  So about 12 days?

15 A.  Correct.

16 Q.  Is that the kind of delay that the defendant was talking

17 about?

18 A.  It may have been longer.  That check was particularly 12

19 days.

20 Q.  So he stated that he was annoyed.

21      What, if any, financial emergency did he say he was

22 having?

23 A.  No such conversation.

24 Q.  What, if any, reason did he give for needing the checks

25 delivered to him in less than two weeks?

1    MR. SHUR:  Objection.

2    THE COURT:  Sustained.

3    He just said he was annoyed at the delay.

4    Do you remember anything more about that conversation?

5    THE WITNESS:  No.

6  BY MR. MASTER:

7  Q.  What did you decide to do after he complained about the

8  delay?

9  A.  I advised my -- I suggested and advised my accounting

10 department to have the checks delivered to his secretary in the

11 building.

12 Q.  What, if any, issues arose with that hand delivery method

13 over time?

14 A.  His secretary put the checks in a drawer and did nothing

15 with them.

16 Q.  How did you learn about those issues with the secretary?

17 A.  I recall my accounting department pointing out to me that

18 certain checks had not cashed at the time.

19 Q.  So what did you decide to do to address Sheldon Silver's

20 renewed issues with delays in receiving the checks?

21 A.  I advised my accounting department to have the checks

22 delivered to me personally.

23 Q.  What, if anything, did you do with the checks?

24 A.  I would make sure they got deposited the same day or the

25 next day.

1  Q.  What, if anything, did you obtain from Sheldon Silver's

2  secretary to accomplish the deposits?

3  A.  I was given a state deposit stamp.

4  Q.  I'm just going to show you what's been marked for

5  identification as Government Exhibit 591.

6          Do you recognize that item?

7  A.  Yes, I do.

8  Q.  What is it?

9  A.  That's the -- I'll call it a rubber stamp or the

10  self-inking stamp that contained the deposit information.

11          MR. MASTER:  The government offers Government Exhibit

12  591.

13          THE COURT:  Any objection?

14          MR. SHUR:  No objection to the stamp.

15          THE COURT:  591 is received.

16          (Government's Exhibit 591 received in evidence)

17  BY MR. MASTER:

18  Q.  Again, what did you use that stamp to do?

19  A.  To endorse the back of the fee check and to make the

20  deposit.

21  Q.  Again, why did you obtain the stamp?

22  A.  In order to make sure that deposits were more timely.

23  Q.  Where would you go with the checks once you stamped them?

24  A.  Generally, I would go to the HSBC bank.

25  Q.  Is that the bank where Sheldon Silver had the account that

1    is associated with that stamp?

2    A.  Yes, it is.

3    Q.  What would you do once you got to the bank?

4    A.  I would deposit the check.  Give it to the teller to

5    deposit.

6    Q.  When you would go, were there times when you would have no

7    other reason to go to that bank?

8    A.  There were times when I had no other reason to go.

9    Q.  Again, you're the managing attorney of Weitz & Luxenberg;

10   correct?

11   A.  Yes.

12           MR. SHUR:  Objection.

13           THE COURT:  Overruled.

14   BY MR. MASTER:

15   Q.  Is it fair to say that there are over 400 employees,

16   lawyers and employees, of Weitz & Luxenberg?

17           MR. SHUR:  Objection.

18           THE COURT:  Sustained.  I think that's been asked and

19   answered now several times.

20   BY MR. MASTER:

21   Q.  For which of the other employees and staff did you deposit

22   fee checks?  Aside from Sheldon Silver.

23   A.  No one else.

24   Q.  Once you started depositing these referral fee checks for

25   Sheldon Silver, how would you inform Sheldon Silver that those

1    checks were deposited?

2    A.   It could be either by text or email, or I would just leave

3    a copy of the deposit slip on his chair.

4    Q.   And you stated that email was one of the methods that at

5    least at some point you used to inform Sheldon Silver of the

6    deposits?

7    A.   Yes.

8    Q.   I'd like you to take a look in your binder as what's been

9    marked for identification as Government Exhibits 501, 505, 506,

10   and 507.

11             Do you recognize those emails?

12   A.   Yes, I do.

13   Q.   Are those emails related to the referral fee checks that we

14   were just discussing?

15   A.   Yes, they do refer to them.

16             MR. MASTER:   The government offers Government Exhibits

17   501, 505, 506, and 507.

18             MR. SHUR:   Objection.

19             THE COURT:   Objection?

20             MR. SHUR:   Yes, Judge.

21             THE COURT:   Come up.

22             (At the sidebar)

23             THE COURT:   What's the objection?

24             MR. SHUR:   Judge, he's being asked for hearsay.  It

25   actually raises a separate issue.  The intake packets that

 1   we've seen -- I guess I don't question for the government

 2   because the documents that were produced to us by Weitz &

 3   Luxenberg have an intake form, but it doesn't have the emails

 4   that the government has also been showing.

 5        THE COURT:  That's not what we're here for.  Those are

 6   all in evidence.  You should have objected before.

 7        MR. SHUR:  I guess the question is I just want to make

 8   sure I understand even if they're in, think it should be clear

 9   to the jury whether or not those are actually -- that's an

10   intake file or whether the government has basically been taking

11   emails --

12        THE COURT:  We'll deal with that later.  I've got a

13   jury in the box.  Your objection is to the email transmittal to

14   Silver saying the deposit has been made.

15        MR. SHUR:  Correct.

16        THE COURT:  Why isn't it hearsay?

17        MR. MASTER:  It's clearly nonhearsay because the

18   purpose of it is to inform Sheldon Silver that his checks were

19   deposited and --

20        THE COURT:  You're introducing it for the truth.  It's

21   an out-of-court statement.

22        MR. MASTER:  It's not being introduced for the truth.

23   It's being introduced through these emails showing Sheldon

24   Silver was concerned about when the checks were deposited and

25   the source of referral fees.

1    In other words, it shows that he was informed about

2    all of these referral fee checks on a particular date and that

3    he would have been aware of the names of the clients.

4        THE COURT:  How is that not for the truth?  That's

5    exactly what's being asserted in the email.

6        MR. MASTER:  Well, again, it's being sent from Gary

7    Klein to Sheldon Silver.

8        THE COURT:  They're not coconspirators.  It's an

9    informative exception to the hearsay rule.

10        MR. MASTER:  I understand that.  It is being offered

11   for the effect on Sheldon Silver because the purpose of it was

12   already -- he was asked to -- he asked to have the checks

13   deposited the same day.

14        THE COURT:  That has not been adduced, that he asked

15   to have them deposited.  What has been adduced was Mr. Klein

16   took it on himself to deposit it.

17        MR. MASTER:  Fair enough.

18        THE COURT:  I'm going to sustain the objection.  Based

19   on what you've said so far, I don't see a hearsay exception.

20        (In open court)

21        THE COURT:  Objection sustained.

22        MR. MASTER:  Thank you, your Honor.

23   BY MR. MASTER:

24   Q.  So, Mr. Klein, again, what are the different methods that

25   you would use to inform Sheldon Silver of the deposit of fee

1  checks?

2  A.  It would have been either by email or by text or possibly

3  by BDM.

4  Q.  And BDM stands for?

5  A.  It's a Blackberry messenger service.

6  Q.  Again, when you would email him or leave the checks on his

7  chair or otherwise inform him, whenever he would get a check,

8  there would be a referral fee report identifying the source of

9  the referral fees with the check; correct?

10  A.  That would be attached as well, yes.

11  Q.  So, again, Sheldon Silver would be informed about where

12  those cases came from.

13          MR. SHUR:  Objection.

14          THE COURT:  You're leading.  Try not to lead.

15          MR. MASTER:  Sure.  I'll withdraw.

16  BY MR. MASTER:

17  Q.  Now, in response to a subpoena, did you also direct others

18  at your firm to conduct a search of email accounts associated

19  with Sheldon Silver among others?

20  A.  Yes, I do.

21  Q.  Were those emails maintained in the course of your

22  regularly conducted activities?

23  A.  Yes, they were.

24  Q.  I'd like you to take a look in your binder at Government

25  Exhibits 484, 485, 490.

1          THE COURT:  I'm sorry.  What was the number after 484?

2          MR. MASTER:  485.  490, 495, 496.  Just a moment.

3    BY MR. MASTER:

4    Q.  Have you taken a look at those?

5    A.  Yes, I have.

6    Q.  Do you recognize those as emails from the stamp as emails

7    that were obtained pursuant to that search?

8    A.  I recognize them as emails from the firm, yes.

9          MR. MASTER:  The government offers 484, 485, 490, 495,

10   and 496.

11         MR. SHUR:  No objection, Judge.

12         THE COURT:  Okay.  484, 485, 490, and 495 are

13   received.

14         MR. MASTER:  And 496 as well, your Honor.

15         THE COURT:  And 496.

16         (Government's Exhibit 484, 485, 490, 495 and 496

17   received in evidence)

18         MR. MASTER:  If you wouldn't mind just briefly

19   publishing 484, Mr. Coccaro.

20   BY MR. MASTER:

21   Q.  It's to an individual at HSBC.  It says, "Could you

22   possibly deposit $4,000 into Rosa's bank account ending in 6091

23   from my law account."

24         MR. MASTER:  485.  Mr. Coccaro, if you wouldn't mind

25   just briefly publishing that.

1   BY MR. MASTER:

2   Q.  There's an email again from an HSBC person.  If you would

3   start lower down.  It says "The balance in your law account is

4   $80,046.  Rosa's balance is $6,356.81."

5          Do you know who Rosa is?

6   A.  It's Sheldon Silver's wife.

7   Q.  Then at the top, it states, "Can you please transfer $3,000

8   into Rosa's account from my law account."

9          Then are the remaining emails that were introduced

10  also related to transfers or fees associated with HSBC

11  accounts?

12  A.  Yes.

13          MR. MASTER:  You can set that aside.

14  BY MR. MASTER:

15  Q.  Before I proceed, there was a reference to a law account.

16          What is the account name and number on the stamp, that

17  self-inking stamp?

18  A.  On the stamp the account is Sheldon Silver, Counselor at

19  law.  The account number is 646014943.

20  Q.  Now, moving on to another topic, for attorneys and staff

21  who did work on a case, do you have a system that tracks

22  interactions with clients, including telephonic and email

23  interactions?

24  A.  Yes, we do.

25  Q.  Who has access to that system?

1   A.  All employees generally.

2   Q.  Why does the firm track phone and mail interactions related

3   to a particular case?

4   A.  So that each person would know what communication existed

5   between a client and someone in the office.

6   Q.  Do mailings and phone calls related to a case help you

7   service those case files and generate fees?

8   A.  Yes, they do.

9   Q.  I'd like you to take a look at what's been marked in

10  Government Exhibit 512.  It's a binder, another binder.

11          Do you recognize what's in that binder?

12  A.  Yes.  These are printouts of chronicle entries in our

13  computer system.

14  Q.  Is the chronicle system the system we were just talking

15  about that tracks interactions with clients?

16  A.  Yes, it is.

17  Q.  Or interactions related to a client file?

18  A.  That's correct.

19  Q.  Again, do you maintain the records in this chronicle file

20  which are contained in Government Exhibit 512 in the course of

21  your regularly conducted activities?

22  A.  Yes, we do.

23  Q.  I'd also like you to take a look at what's been marked for

24  identification in your binder as Government Exhibit 1520.  It's

25  in your first binder.  Just set aside your chronicle file.

 1              THE COURT:  1520?

 2              MR. MASTER:  Yes, your Honor.

 3    BY MR. MASTER:

 4    Q.  Do you recognize that document?

 5    A.  Yes, I do.

 6    Q.  Is that a chart that summarizes certain of those telephone

 7    and email interactions related to case files?

 8    A.  Yes.  That's what it is.

 9    Q.  Prior to your testimony today, did you confirm the accuracy

10    of the information contained in Government Exhibit 1520?

11    A.  I did.

12    Q.  Now, all of the files -- what do all of the chron entries

13    in Government Exhibit 512 have in common?

14    A.  They're chronicle entries on cases, on asbestos cases that

15    were referred by Sheldon Silver.

16              MR. MASTER:  The government offers Government Exhibits

17    512 and then the summary chart based on 512, Government Exhibit

18    1520.

19              THE COURT:  Any objection?

20              MR. SHUR:  No objection.

21              THE COURT:  Okay.  1520 and 512 are received.

22              (Government's Exhibits 1520 and 512 received in

23    evidence)

24              MR. MASTER:  If you wouldn't mind just publishing

25    1520, Mr. Coccaro.

1063

 1             THE COURT:  512 or 1520?

 2             MR. MASTER:  1520.

 3  BY MR. MASTER:

 4  Q.  Again, what is the exhibit that is the source for the

 5  information contained in 1520?  In other words, there's a

 6  source that's listed at the bottom.

 7  A.  It's GX512, which would be the exhibits in this other

 8  binder?

 9             MR. MASTER:  If you wouldn't mind, Mr. Coccaro, going

10  to the top with the Columbia headings.

11  BY MR. MASTER:

12  Q.  Can you explain, Mr. Klein, what is stated in this chart.

13  What does the first Columbia represent?

14  A.  The first Columbia represents the client name.

15  Q.  And then what is the second Columbia?

16  A.  It would represent an entry in the system stating what type

17  of information, whether it was a mailing, a call, things of

18  that nature.

19  Q.  And then there's an entry that states Bates numbers.

20             Can you just explain for the jury what a Bates number

21  is.

22  A.  A Bates number is just like a page stamp as to what page it

23  is as part of the exhibit.

24  Q.  Are those page stamps that are contained within Government

25  Exhibit 512?

1  A.  Yes, they are.

2  Q.  So, just looking at the first entry there, just to help the

3  jury understand this chart --

4         MR. MASTER:  Mr. Coccaro, just scroll down just a

5  little bit so Mr. Klein can read both entries in that first

6  row.

7  BY MR. MASTER:

8  Q.  So just explain, when you reviewed Government Exhibit 512,

9  what did you see occurring on the Berkowitz client file on

10  January 21, 2011?

11  A.  It was a chronicle entry in our system indicating that a

12  mailing was received by the firm from the client.

13  Q.  Is that on Bates number WL001810?

14  A.  Yes, it is.

15  Q.  And then is there also a reflection on the client file of a

16  client-related call with Weitz & Luxenberg on June 18, 2012?

17  A.  Yes, there is.

18  Q.  Is that entry found in WL001808?

19  A.  Yes.

20  Q.  Again, where is Weitz & Luxenberg's main office?

21  A.  Our main office is at 700 Broadway in Manhattan.

22  Q.  When you're referring to mailings to and from those -- to

23  and from your office location, that would be mail that would be

24  sent from or received by your firm in Manhattan?

25  A.  That's correct.

1   Q.  Now, we looked earlier at the intake forms specifically

2   with respect to a McKinley and a Morford file.

3          Do you recall that?

4   A.  Yes, I do.

5          MR. MASTER:  If you wouldn't mind, Mr. Coccaro, just

6   going back to Government Exhibit 442-27.

7   BY MR. MASTER:

8   Q.  Do you see a reference -- we looked at page 2 earlier where

9   it states that Mr. McKinley lived in San Diego.

10          Here on page 1, what does it state about the then

11   current location of Mr. McKinley?  What state did he live in at

12   that time?

13   A.  On November 23, it appears that he lived in Massachusetts.

14   Q.  So, in other words, he lived out of state.

15   A.  Out of New York, yes.

16   Q.  Then, with respect to 442-28.

17          MR. MASTER:  Mr. Coccaro, just go to page 2 of that.

18   BY MR. MASTER:

19   Q.  Again, where does it reflect that the Morford client

20   resides at the time?

21   A.  It states that he lives in the Washington, DC area.

22   Q.  So, again, out of state?

23   A.  Yes.

24   Q.  And then just return to Government Exhibit 1520.

25          Are there entries of phone calls related to those two

1    clients that are reflected in the Weitz & Luxenberg chron

2    system?

3    A.  Yes, there are.

4    Q.  What are the dates of those communications?  I'm sorry.

5    Where are those reflected in the chart?

6    A.  On McKinley, it's listed under mailing call type, and the

7    same thing for Morford.

8    Q.  In both cases, there were client-related calls that were

9    reflected in the chron system?

10   A.  Yes.

11   Q.  Thank you.  You can set that aside.  Actually, before you

12   do, I just need to ask one concluding question.

13           In other words, because Dr. Taub's clients you said

14   came from all over and, in particular, those two clients came

15   from out of state, would the firm anticipate conducting

16   interstate phone calls with those clients to accomplish the

17   goals of the representation?

18           MR. SHUR:  Objection.

19           THE COURT:  Sustained.  Please don't lead.

20           MR. MASTER:  Yes.

21           If you wouldn't mind just pulling up 1520 once more.

22   BY MR. MASTER:

23   Q.  You testified earlier that Dr. Taub's patients came from

24   all over.

25           First of all, are these all of the Dr. Taub referrals

1   that are reflected in Weitz & Luxenberg systems?

2   A.   These are some of them, yes.

3   Q.   But not all.

4   A.   Right.

5   Q.   So, just to finish this line of inquiry, how, if at all,

6   would you use interstate telephone communications in connection

7   with these out-of-state clients?

8   A.   Calls would be made to clients or received from clients.

9   Q.   How would that help you accomplish the goals of the

10  representation and generate fees?

11  A.   Speaking to clients is a necessity.

12          MR. MASTER:  Set that aside if you wouldn't mind.

13  Thank you, Mr. Klein.

14  Q.   All right.  On to the next topic.  As managing attorney, do

15  you maintain a contact list for attorneys?

16  A.   Yes, I do.

17  Q.   I'd like you to take a look at Government Exhibit 508.

18          Do you recognize that document?

19  A.   Yes, I do.

20  Q.   Is that a redacted version of your attorney contact list?

21  A.   Yes, it is.

22  Q.   Again, what is the purpose for which you maintain an

23  attorney contact list?

24  A.   At the request of the partners.  We want to make sure that

25  we can reach them whenever necessary.

1   Q.  Is that one of your responsibilities as managing attorney,

2   to maintain this contact list?

3   A.  Yes, it is.

4           MR. MASTER:  The government offers Government Exhibit

5   508.

6           MR. SHUR:  Objection.

7           THE COURT:  Overruled.  508 is received.

8           (Government's Exhibit 508 received in evidence)

9   BY MR. MASTER:

10  Q.  So, Mr. Klein, if you wouldn't mind just turning to the

11  second page.

12          Is this the redacted version of the attorney client

13  contact or attorney contact list that you maintain?

14  A.  Yes, it is.

15  Q.  This is dated -- what is the date on which this was

16  produced?  If you wouldn't mind returning to the first page.

17  A.  It was provided on May 22, 2014.

18  Q.  Then just return to page 2.

19          MR. MASTER:  Mr. Coccaro, I know most of that is

20  redacted.

21  BY MR. MASTER:

22  Q.  Are there entries related to cell phones associated with

23  yourself, Mr. Luxenberg, and defendant?

24          THE WITNESS:  Yes, there are.

25          MR. MASTER:  If you wouldn't mind just zooming in on

 1   that.

 2   BY MR. MASTER:

 3   Q.   Again, the cell phone associated with you ends in 2833?

 4   A.   That's correct.

 5   Q.   The cell phone associated with Mr. Luxenberg is 6118, and

 6   then there's a cell phone listed there for the defendant of

 7   917-603-5187.

 8   A.   That's correct.

 9   Q.   Is that a cell phone number that you had obtained for

10   contacting the defendant if needed?

11   A.   At some point in time, yes.  I received that.

12   Q.   Now, was that 5187 cell phone number the only cell phone

13   number that you had for Sheldon Silver?

14   A.   No.

15   Q.   I'd like you to take a look at what's in your binder as the

16   first few pages of 1307-1.

17   A.   Okay.

18   Q.   Do you recognize that document?

19   A.   Yes, I do.

20   Q.   What is that document?

21   A.   It's a Verizon Wireless cell phone bill.

22   Q.   How do you recognize it?

23   A.   It has my name on it.

24          MR. MASTER:  The government offers Government Exhibit

25   1307-1 subject to connection.

 1                MR. SHUR:  No objection.

 2                THE COURT:  Okay.  1307-1 is received subject to

 3   connection.

 4                (Government's Exhibit 1307-1 received in evidence)

 5                MR. MASTER:  If you wouldn't mind pulling up 1307-1.

 6   BY MR. MASTER:

 7   Q.  Now, Mr. Klein, as you stated, the bill here is addressed

 8   to you; correct?

 9   A.  Yes, it is.

10   Q.  Although the street address is redacted, to what address

11   was this sent?

12   A.  To my home address.

13                MR. MASTER:  Again, if you wouldn't mind turning to

14   the third page -- the second page, second page.

15                If you wouldn't mind zooming in on the top.

16   BY MR. MASTER:

17   Q.  It's T states summary for Erin Zimmerman.  There's a phone

18   number associated with that.

19   A.  Yes.

20   Q.  Can you just give the phone number.

21   A.  646-038-0067.

22   Q.  Now, whose cell phone number was 646-438-0067?

23   A.  That was Sheldon Silver's.

24   Q.  So that was a second cell phone number that you had for

25   him?

 1   A.  Yes.

 2   Q.  Can you just explain for the members of the jury how it

 3   came about that Sheldon Silver got that second cell phone.

 4   A.  We were -- Arthur Luxenberg and I were kidding around with

 5   Sheldon Silver telling him he's got to come out of the dark

 6   ages because he only had a flip phone.

 7          We told him that we wanted to be able to reach him.

 8   So I suggested we get him a Blackberry, to which he said, okay.

 9   Give it to me.

10          From what I know, you strike when the iron is hot.  If

11   he says get it to me, I want to get it for you right away

12   rather than waiting.  That's how it came to be that I had Erin

13   Zimmerman go out to the Verizon store to pick up the

14   Blackberry.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1   BY MR. MASTER:

2   Q.  And is Aaron Zuckerman an employee of yours?

3   A.  Yes, he is.

4   Q.  And, how does it end up being billed to your home address?

5   A.  When you go into a Verizon store what they'll do is they'll

6   deal with personal accounts, they won't deal with corporate,

7   you would have to go through your sales rep and it would take

8   three or four days to get.  So, I said the quickest way to get

9   it so I wanted him to have it so he can -- I told him just put

10  it on my account.

11  Q.  And since that date, the date that you got the account, to

12  whom is the Blackberry billed?

13  A.  The Blackberry is billed to me.

14  Q.  Who pays for the account?

15  A.  Either I pay the bill or the firm -- well, the firm

16  reimburses me so I pay it and they reimburse me or it is paid

17  through American Express and they reimburse me for that.

18  Q.  And the date of this, I guess this first page is December

19  28, 2009?  Do you see up top?

20  A.  Yes, it is.

21  Q.  Has that cell phone been -- was that cell phone used by

22  Sheldon Silver since that date?

23  A.  It was used by him from that date until I turned off the

24  account.

25  Q.  And you used that number to contact and speak with Sheldon

1   Silver?

2   A.  On occasion, yes.

3   Q.  Did you ever have possession or use of that phone, other

4   than when you were getting ready to hand it to him?

5   A.  When I got it back to close the account I did.

6   Q.  And so, who is the only person you know to use that phone?

7   A.  Sheldon Silver, as far as I know.

8   Q.  You can set that aside.

9           Now, in addition to maintaining a directory of

10  attorney contacts including cell phone numbers, do you also

11  maintain a directory of office numbers for employees?

12  A.  We do have that, yes.

13  Q.  And, it may not be necessary to introduce the full

14  directory into evidence but if you wouldn't mind just taking a

15  look at Government Exhibit 2007?

16          THE COURT:  2007?

17          MR. MASTER:  Yes.

18  Q.  Mr. Klein, do you know either off the top of your head or

19  using this to refresh your memory, do you know what the direct

20  office phone number was of Arthur Luxenberg?

21  A.  Yes.  I do know.

22  Q.  And what is that phone number?

23  A.  It is 212-558-5613.

24  Q.  And, did Sheldon Silver have a direct dial office extension

25  during his time with the firm?

 1  A.  Yes, he did.

 2  Q.  And what was that direct dial extension?

 3  A.  212-558-5617.

 4  Q.  Now, did there come a time when the firm obtained a

 5  subpoena from the Moreland Commission to investigate public

 6  corruption concerning certain records?

 7  A.  Yes, the firm did.

 8  Q.  I would like you to take a look at what is in your binder

 9  as 582-1 and 582-2.  Do you recognize 582-1 and 582-2?

10  A.  Yes, I do.

11  Q.  Are these documents related to that subpoena from the

12  Moreland Commission?

13  A.  Yes, it is.

14  Q.  And so, 582-1, is that the subpoena that you -- that the

15  firm received?

16  A.  Yes, it is.

17           MR. MASTER:  Government offers 582-1.

18           MR. SHUR:  No objection.

19           THE COURT:  582-1 is received.

20           (Government's Exhibit 582-1 received in evidence)

21  BY MR. MASTER:

22  Q.  Now, who was this subpoena concerning?

23  A.  The subpoena was concerning Shelly Silver.

24  Q.  And what is the date of the subpoena?  It is right at the

25  bottom.

1    A.  The date of the subpoena was October 15th, 2013.

2    Q.  And what kind of records did it seek?

3    A.  It sought records concerning Sheldon Silver's attendance at

4    the firm and whether he had any dealings with, on behalf of the

5    government through the firm showing his compensation as well as

6    benefits, his billable hours, reports, invoices, documents

7    regarding solicitation of any kind of clients, and the general

8    description of the services provided by Sheldon Silver.

9    Q.  Now, who did you speak to at the firm to determine how to

10   respond to the subpoena?

11   A.  I believe I spoke with Arthur Luxenberg.

12   Q.  And who did Arthur Luxenberg ask you to contact in order to

13   respond to the subpoena?

14   A.  I believe he asked me to contact the firm of Kasowitz

15   Benson.

16   Q.  Who had retained the Kasowitz firm?

17   A.  I was led to understand or believed that it was the

18   Assembly.

19   Q.  The New York State Assembly?

20   A.  The New York State Assembly, yes.

21   Q.  Did you end up filing an opposition to the subpoena?

22   A.  Yes, we did.

23   Q.  And what, if any content, did you use to prepare that

24   opposition?

25   A.  I used content provided to me basically by the Kasowitz

1  Benson firm.

2  Q.  Is there a name for the type of brief that you filed?

3  A.  I called it a me too affidavit.

4  Q.  Now, if you wouldn't mind just going to 582-2?  Mr. Klein,

5  what ended up happening to that subpoena?

6  A.  I believe that the subpoena was withdrawn.

7  Q.  And is 582-2 a letter to that effect?

8  A.  Yes, it is.

9  Q.  And was that a publicly filed letter?

10  A.  Yes, it was.

11         MR. MASTER:  The government offers 582-2.

12         THE COURT:  Any objection?

13         MR. SHUR:  No objection, Judge.

14         THE COURT:  582-2 is received.

15         (Government's Exhibit 582-2 received in evidence)

16  BY MR. MASTER:

17  Q.  Again, what is the date of that?

18  A.  The date of the letter is April 22nd, 2014.

19  Q.  And if you wouldn't mind -- just a moment.

20         First of all, what do you mean by a me too brief?

21  A.  Me too brief basically assumes the same position that the

22  other party did and you are just joining in.

23  Q.  And did you actually file that brief?

24  A.  Yes, I did.

25  Q.  And then did the Moreland Commission subpoena seek some of

1   the same records that you just testified about?

2   A.  Yes.

3   Q.  And again, is this the letter that reflects the Moreland

4   Commission subpoena had been withdrawn?

5   A.  Yes, it does.

6   Q.  You can set that aside.

7           Now, if you wouldn't mind just returning to Government

8   Exhibit 441?  If you wouldn't mind just going to an entry

9   related to a Joseph Goldman, it is on page 3.  Do you see an

10  asbestos-related intake credited to Sheldon Silver concerning a

11  Joseph Goldman on that sheet?

12  A.  Yes, I do.

13  Q.  What is the date of that intake?

14  A.  The date is listed as May 17, 2012.

15  Q.  And if you wouldn't mind just taking a look at Government

16  Exhibit 522 and pages 2 and 3?  Has the Goldman case generated

17  substantial referral fees to Sheldon Silver?

18           MR. SHUR:  Objection.

19           THE COURT:  Sustained.

20           MR. MASTER:  Yes.

21  Q.  Well, where on this sheet does it reflect any referral fees

22  paid on the Joseph Goldman case?

23  A.  It appears on page 3 and 4.

24  Q.  Now when, if ever, did Sheldon Silver tell you that

25  Dr. Taub was making requests to him for assistance on behalf of

 1   himself or his family?

 2             MR. SHUR:  Objection.

 3             THE COURT:  Overruled.

 4   A.  He never did.

 5   Q.  And when, if ever, did Sheldon Silver tell you that he was

 6   planning to use his official position to help Dr. Taub or his

 7   family?

 8             MR. SHUR:  Objection.

 9             THE COURT:  Overruled.

10   A.  I never asked.

11             MR. MASTER:  No further questions, your Honor.

12             THE COURT:  Mr. Shur?

13             MR. SHUR:  May I inquire, your Honor?

14             THE COURT:  Please.

15   CROSS EXAMINATION

16   BY MR. SHUR:

17   Q.  Mr. Klein, good morning.

18   A.  Good morning.

19   Q.  I just want to make sure I have your title right.  You are

20   managing attorney at Weitz & Luxenberg?

21   A.  Yes, I am.

22   Q.  So you're not a partner at the firm?

23   A.  No.

24   Q.  Not a shareholder at the firm?

25   A.  No.

1   Q.  In fact, there is only two partners at the firm; is that

2   right?

3   A.  I believe there is three.

4   Q.  Okay.  Mr. Weitz, Mr. Luxenberg, and who is the third?

5   A.  And Rob Gordon.

6   Q.  Okay.

7        And your source of income is Weitz & Luxenberg?

8   A.  Yes, it is.

9   Q.  Before Mr. Silver joined Weitz & Luxenberg he had practiced

10  at other law firms?

11  A.  I know of one.

12  Q.  Schneider, Kleinick & Weitz, is that the one you are

13  familiar with?

14  A.  That's correct.

15  Q.  And that's a prominent personal injury law firm in New

16  York?

17  A.  It definitely was, yes.

18  Q.  Do you know whether he practiced at the Damashek law firm?

19  A.  I thought that Damashek was with the prior firm.

20  Q.  You thought it was the same?

21  A.  Correct.

22  Q.  Okay.

23        Mr. Silver's principal subject area at that firm was

24  personal injury; is that right?

25  A.  That's correct.

1    Q.   And at that firm he handled general negligence cases?

2    A.   At which firm?

3    Q.   I'm sorry, at the Schneider, Kleinick & Weitz law firm?

4    A.   I couldn't tell you if that's all he handled at that firm.

5    Q.   Were you familiar with him handling those types of cases at

6    that firm?

7    A.   Yes.

8    Q.   Just to be clear, when I say general negligence cases,

9    that's a type of personal injury case, right?

10   A.   That's correct.

11   Q.   Such as motor vehicle accidents and slip and fall cases?

12   A.   It's any type of injury that occurs to a person, yes.

13   Q.   And when Mr. Silver joined Weitz & Luxenberg, those are the

14   types of cases that he undertook, that he actually was involved

15   in, right?

16   A.   Those are the kind of cases he brought into the firm during

17   his tenure, yes.

18   Q.   When I say he was involved in them, let me be clear.

19   Mr. Silver didn't handle the day-to-day paperwork on those

20   cases, right?

21   A.   Not the day-to-day, no.

22   Q.   He didn't draft complaints?

23   A.   No, he did not.

24   Q.   He wasn't taking depositions, right?

25   A.   Right.

1    Q.  But he would meet with the client?

2    A.  Yes, he would.

3    Q.  And he would meet with other lawyers at Weitz & Luxenberg

4    to talk about strategy?

5    A.  Yes, he would.

6    Q.  And to check in on the status of the case?

7    A.  Frequently.

8    Q.  So, is it fair to say that after Mr. Silver joined

9    Weitz & Luxenberg his principal subject area continued to be

10   personal injury?

11   A.  Yes, it would be.

12   Q.  Mr. Klein, Mr. Silver has been a plaintiff's lawyer for a

13   long time; is that fair?

14   A.  Yes.

15   Q.  In fact, do you know that he has been a plaintiff's lawyer

16   for over 40 years?

17   A.  I believe that, yes.

18   Q.  And he grew up in the New York Courts?

19   A.  Yes.

20   Q.  He clerked for a well-known judge?

21   A.  I believe so.

22   Q.  And is well known in the plaintiff's lawyer community?

23           MR. MASTER:  Objection.

24   A.  He is well known.

25           THE COURT:  Sustained.

1  Q.  Do you know if Mr. Silver is also well known in the Jewish

2  Orthodox community?

3          MR. MASTER:  Objection.

4          THE COURT:  Sustained.

5  Q.  Fair to say that Mr. Silver knew a lot of people?

6          MR. MASTER:  Objection.

7          THE COURT:  How would he know?

8  Q.  Well you, I believe on direct examination, the prosecutor

9  asked you whether you had meals with Mr. Silver, right?

10  A.  Yes.

11  Q.  And whether you had gone to sporting events with

12  Mr. Silver, right?

13  A.  Yes.

14  Q.  So, fair to say that you socialized with Mr. Silver on

15  those occasions?

16  A.  On those occasions, yes.

17  Q.  And do you know people who also are friends or who

18  socialize with Mr. Silver?

19  A.  I do.

20  Q.  So, fair to say that he knows a lot of people; in your

21  experience, your personal experience?

22          MR. MASTER:  Objection.

23          THE COURT:  How many people do you know who are mutual

24  friends of Mr. Silver?

25          THE WITNESS:  I probably know about a dozen of them.

 1   BY MR. SHUR:

 2   Q.   Okay.

 3            Mr. Klein, Mr. Silver brought in cases to

 4   Weitz & Luxenberg through personal relationships, right?

 5            MR. MASTER:   Objection.

 6            THE COURT:   Sustained.

 7            MR. SHUR:   Judge, the prosecutor actually elicited

 8   that testimony on direct examination based --

 9            THE COURT:   Come to side bar.  Please don't do

10   speaking objections.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At side bar)

2              MR. SHUR:  Your Honor --

3              THE COURT:  My recollection was that they asked where

4    did they live.

5              MR. SHUR:  No, no, no.

6              Judge, on direct examination the prosecutor contrasted

7    and actually used that word that the cases Mr. Silver brought

8    in were general negligence cases he brought in through personal

9    relationships.  The cases he brought in through asbestos cases

10   he brought in through Dr. Taub.  He specifically contrasted the

11   two and Mr. Klein has personal knowledge, he said, of how those

12   cases came in the door.

13             THE COURT:  Okay, again, what was your question to

14   him?

15             MR. MASTER:  My question is do you know where those

16   cases came from, and he said people in his community.

17             THE COURT:  That was my recollection of how it came

18   in, that is, that they were people who lived either near him or

19   near his country house; that that was specifically the answer

20   reflected of where they lived.

21             MR. COHEN:  Doesn't that support this inference?

22             THE COURT:  It supports the inference but you are

23   trying to get in hearsay.  You are trying to get Silver's

24   hearsay in.

25             MR. SHUR:  No, no, no.

```
 1                THE COURT:  How else would he know?

 2                MR. SHUR:  He said he supervised general negligence

 3    cases.

 4                THE COURT:  He said they're friends of Silver and he

 5    knows that from Silver.  How else would he know that?

 6                MR. SHUR:  The clients.

 7                THE COURT:  The clients aren't talking to him.

 8                MR. SHUR:  He meets with the clients.

 9                THE COURT:  What is your exception to get that hearsay

10    in?  Let's assume that he heard it directly from the client.

11                MR. SHUR:  Judge --

12                THE COURT:  What is the hearsay exception?

13                MR. SHUR:  There is business records, right?

14                THE COURT:  It is not going to be in the business

15    record.

16                MR. SHUR:  Sure.  The intake referrals indicate what

17    the relationships are.

18                THE COURT:  Okay.

19                MR. SHUR:  I mean --

20                THE COURT:  Are there intake referrals in negligence

21    cases?

22                MR. SHUR:  I'm not looking to elicit any conversations

23    between Mr. Silver and Mr. Klein if that's the concern.

24                THE COURT:  Let's be clear.  That is a lot of how you

25    get all of this, is via conversations with Silver.  That's how
```

1    he knows things.  Right?  You are just not specifically asking

2    did Mr. Silver tell you that.

3              MR. SHUR:  I am happy to carve that out of the

4    question if that would address the Court's concern.

5              THE COURT:  Okay.

6              MS. COHEN:  Your Honor?

7              THE COURT:  Hang on.

8              MS. COHEN:  Mr. Shur?

9              It doesn't solve the hearsay problem.

10             THE COURT:  It makes it more likely to be a business

11   record, that is that it came in as part and parcel because the

12   only way he would know is via the supervision of the negligence

13   cases.  The government brought out a lot of information about

14   his contrasting -- his negligence cases to his non-negligence

15   cases so it seems to me if he knows that these people are

16   family friends or neighbors or whatever, it is going to be by

17   virtue of the work that he did in the office which would make

18   it business recordy.

19             MS. COHEN:  I don't think that there is anything on

20   any intake form noting that the Mr. Klein knew Mr. Silver from

21   the community or anything like that.  That was what you were

22   alluding to.  That doesn't exist.

23             THE COURT:  If you limit it to what he heard from his

24   clients I will let it in.

25             MR. SHUR:  Yes.

```
 1              (In open court)

 2              THE COURT:  Okay.  Objection is overruled.

 3  BY MR. SHUR:

 4  Q.  I believe the question, Mr. Klein, was Mr. Silver brought

 5  in cases to Weitz & Luxenberg through personal relationships?

 6  A.  Yes.

 7  Q.  And that includes general negligence personal injury cases?

 8  A.  Yes, it does.

 9  Q.  I would like to take a look at Government Exhibit 521.  If

10  we can blow that up?  The print is kind of small.

11              I believe you testified but correct me if I am wrong,

12  Mr. Klein, this is a list of general negligence cases that

13  Mr. Silver brought into the firm?

14  A.  Yes, it is.

15  Q.  Did you learn, from your involvement with those cases, that

16  these cases were referred to Mr. Silver by people who knew him?

17              THE COURT:  That is, putting aside any conversation

18  you might have had with Mr. Silver.

19              THE WITNESS:  Yes, I am fully aware of every one of

20  them except for one.

21  Q.  So these were cases that were referred to Mr. Silver

22  because of their personal relationship?

23  A.  Friends, acquaintances; yes.

24  Q.  People who lived in the neighborhood with Mr. Silver, yes?

25  A.  Some of them, yes.
```

FBA5sil2                         Klein - cross

1  Q.  And these clients, these cases involved people who had been

2  injured in a variety of different ways?

3  A.  Yes.

4  Q.  If you take a look at -- can we look at the last column,

5  the heading is primary attorney.  Do you see that?

6  A.  Yes.

7  Q.  It says:  Sheldon Silver, esquire?

8  A.  That's correct.

9  Q.  And I believe you mentioned on direct examination that

10 there were checks from Weitz & Luxenberg to Mr. Silver that

11 went into his law account; is that right?

12 A.  It's whatever account was identified on the stamp.

13 Q.  And did you know that Mr. Silver had a law practice outside

14 of Weitz & Luxenberg?

15 A.  Yes.

16 Q.  Because he was also not a partner, right?

17 A.  He was not.

18 Q.  He wasn't a shareholder, correct?

19 A.  No.  He was not.

20 Q.  He was of counsel?

21 A.  Yes.

22 Q.  And he was permitted to practice law outside the firm?

23         MR. MASTER:  Objection.

24         THE COURT:  Permitted by whom?

25 Q.  By Weitz & Luxenberg.

 1    A.   I don't know that he was allowed to or not.

 2    Q.   Okay.

 3    A.   It was never discussed.

 4    Q.   Okay.  That wasn't within your purview?

 5    A.   Correct.

 6    Q.   Okay.

 7         But he had an account that was titled Sheldon Silver,

 8    Esquire?

 9    A.   Sheldon Silver, attorney at law, I believe.

10    Q.   Okay.

11    A.   Yes.  Counselor at law it says.

12    Q.   So, if we can take a look -- one of the cases listed here,

13    if we could blow up the client's names?  Thank you.

14         The third from the bottom, is it pronounced Weisz?

15    A.   Weisz.

16    Q.   And you are familiar with this case?

17    A.   Yes, I am.

18    Q.   And Mr. Silver received this case based on a personal

19    relationship?

20    A.   Yes, he did.

21    Q.   He knew the client's mother, right?

22    A.   That's correct.

23    Q.   Another case on the list is the Wiesenfeld case, the second

24    case from the bottom; do you see that?

25    A.   Yes, I do.

1  Q.  In that case the client had been struck by a vehicle while

2  on the sidewalk, right?

3  A.  I believe a vehicle went in reverse and struck her.

4  Q.  And Mr. Silver received that case based on a personal

5  relationship, right?

6  A.  Yes, he did.

7  Q.  The client's son-in-law knew Mr. Silver?

8  A.  Yes.

9  Q.  Another case on this list, right there in the middle,

10  Jacobson.  Do you see that?

11  A.  Yes.

12  Q.  Mr. Silver received this case based on a personal

13  relationship?

14  A.  Yes, he did.

15  Q.  This was a very unfortunate case, if I understand

16  correctly; it involved a 6-year-old boy?

17  A.  Yes, it did.

18  Q.  And he was waiting for the bus to go to summer camp?

19          MR. MASTER:  Objection, your Honor.

20          THE COURT:  Overruled.

21          Get to the point.

22          MR. SHUR:  Yes, Judge.

23  Q.  Is that right?

24  A.  He was going around a school bus, I don't remember the

25  reason why, but I know that a car struck him, a car that

1    apparently just blew the bus.

2    Q.  And there was significant injuries?

3    A.  Yes, there was.

4    Q.  And the law firm, Weitz & Luxenberg, was able to get a

5    favorable outcome, at least monetary-wise for the client,

6    correct?

7    A.  Yes.

8    Q.  It was a multi-million dollar settlement?

9    A.  It was over a million dollars.  I don't remember the total

10   now.

11   Q.  And Mr. Silver had a personal relationship with the

12   client's father, right?

13   A.  I thought it was the grandfather but it could have been the

14   father.

15   Q.  Well, the client's grandfather is Mr. Silver's neighbor,

16   right?

17   A.  Yes.

18   Q.  And Mr. Silver also had played baseball with the client's

19   father?

20           THE COURT:  Really, get to the point.

21           THE WITNESS:  That I don't know.

22           THE COURT:  You have established a personal

23   relationship.

24   BY MR. SHUR:

25   Q.  In addition to the general negligence personal injury cases

1    that Mr. Silver brought into the firm he brought in asbestos

2    personal injury cases, right?

3    A.   That's my understanding, yes.

4    Q.   And those cases were also based on personal relationships,

5    right?

6              MR. MASTER:  Objection.

7              THE COURT:  Define your term.

8              MR. SHUR:  Sure, Judge.

9              THE COURT:  Are we talking about the meso cases that

10   we have been hearing about?

11             MR. SHUR:  Correct.

12             THE COURT:  Okay.

13             THE WITNESS:  Could you repeat the question?

14   BY MR. SHUR:

15   Q.   Why don't I actually show you a document, Defendant's

16   Exhibit 49 for identification purposes.  Have you had a chance

17   to look at the document?

18   A.   Yes, I have.

19   Q.   Do you recognize this?

20   A.   It is a letter contained in the file of William F. Hopkins.

21   Q.   Mr. Hopkins was a client of Weitz & Luxenberg's?

22   A.   Yes, he was.

23   Q.   Is this letter a letter that's made and kept in the

24   ordinary course of business?

25   A.   Yes, it was.

```
 1            MR. SHUR:  Your Honor, I move to admit Defendant's
 2   Exhibit 49.
 3            THE COURT:  Any objection?
 4            MR. MASTER:  No, your Honor.
 5            THE COURT:  Defendant's Exhibit 49 is received.
 6            (Defendant's Exhibit 49 received in evidence)
 7   BY MR. SHUR:
 8   Q.  If we can publish it for the jury, please?
 9            Mr. Klein, the letter is from the Ziff law firm.  Do
10   you see that?
11   A.  Yes, I do.
12   Q.  Are you familiar with that law firm?
13   A.  Only in response to doing searches.
14   Q.  And the Re line is William Hopkins, right?
15   A.  That's correct.
16   Q.  You mentioned that was a client of Weitz & Luxenberg's?
17   A.  It became a client, yes.
18   Q.  And the letter is to Mr. Silver?
19   A.  Yes, it is.
20   Q.  And the first paragraph reads that:  As you may recall --
21   actually, let me back up.
22            It says Mr. Silver and then it is struck and says
23   Shelly?
24   A.  Yes.
25   Q.  It says:  As you may recall, we have referred several
```

1   mesothelioma cases to you in the past, most recently the case

2   of Monroe Evans.  I have a new case that I would like to refer

3   upon the same terms (which I understand to be two thirds to

4   your office and one third to ours).  The plaintiff is William

5   Hopkins -- then it goes on to talk about the client and his

6   medical condition, right?

7   A.  Yes.

8   Q.  Let me ask you, in the parenthetical it says that I

9   understand the terms would be two thirds to your office and one

10  third to ours.  To be clear, I believe you testified on direct

11  examination that Weitz & Luxenberg does contingency work

12  meaning they don't bill by the hour, they only get paid if the

13  client gets paid, right?

14  A.  That's correct.

15  Q.  And for these mesothelioma cases Weitz & Luxenberg, if they

16  got a favorable settlement for the client, would receive one

17  third of that settlement, right?

18  A.  That's correct.

19  Q.  And then the referring attorney, the lawyer at

20  Weitz & Luxenberg who brought in the case, would get a third of

21  that third?

22  A.  That's right.

23  Q.  Okay.

24       Now, in a situation here where you have an outside law

25  firm that's referring a case to a Weitz & Luxenberg lawyer, the

1  Weitz & Luxenberg lawyer would get a referral fee, right?

2  A.  A smaller share, but yes.

3  Q.  And the outside law firm would get a referral fee, right?

4  A.  That's correct.

5  Q.  They would basically be splitting the referral fee, to some

6  extent?

7  A.  To some extent, yes.

8  Q.  That's what is described there?

9  A.  Yes, it is.

10  Q.  Okay.

11          THE COURT:  This describes the split between the

12  referring firm and your firm?

13          THE WITNESS:  That's correct.

14          THE COURT:  It doesn't describe the split to

15  Mr. Silver?

16          THE WITNESS:  That's correct.  It does not.

17          THE COURT:  Okay.

18  BY MR. SHUR:

19  Q.  If we can go to the second page of the document, please?

20  If we can blow up the text?

21          So, it says:  I have informed Bill and Carolyn Hopkins

22  of our intention to associate with your firm for the purpose of

23  pursuing this claim.  I am happy to facilitate your

24  introduction if your office wants to initiate contact by phone.

25  If you wish our personal attendance at any point, you have only

1   to call.  And it is signed by Carl Hayden.  Do you see that?

2   A.  Yes.

3   Q.  He is a lawyer at the Ziff law firm?

4   A.  Presumably, yes.

5   Q.  And Mr. Hayden had worked in state government?  Did you

6   know that?

7           THE COURT:  Do you know Mr. Hayden?

8           THE WITNESS:  I do not.

9   Q.  Do you know if he was a friend of Mr. Silver's?

10  A.  I don't know.

11  Q.  And if you go back to the first page, please, in the first

12  paragraph?

13          The first sentence refers to the fact that the Ziff

14  law firm says we have referred several mesothelioma cases to

15  you in the past, most recently the case of Monroe Evans.  Is

16  Monroe Evans also a mesothelioma case that was brought into the

17  firm?

18  A.  Yes, I believe it is.

19  Q.  And did Mr. Silver receive referral fees in connection with

20  both the Monroe Evans and the William Hopkins cases?

21  A.  Yes, he did.

22  Q.  You can take this exhibit down.  Thank you.

23          Mr. Klein, I would like to show you what's been marked

24  Defendant's Exhibit 51 for identification.  Do you recognize

25  this document?

1   A.  I do not.

2   Q.  Let me ask you this.  It is a memo, right?

3   A.  That it is, yes.

4   Q.  And it is from Charles Ferguson; is that right?

5   A.  Yes.

6   Q.  And Charles Ferguson is the head of the asbestos practice

7   at Weitz & Luxenberg?

8   A.  Yes.

9   Q.  And it's regarding a potential asbestos case, correct?

10          MR. MASTER:  Objection, your Honor.

11          THE COURT:  Yes.  Sustained.  He doesn't recognize the

12  document.

13          MR. SHUR:  Judge, I would nonetheless move this

14  document into evidence as a business record of

15  Weitz & Luxenberg.

16          THE COURT:  I tell you what, it is about time for our

17  morning break anyway so this is probably a good time.  Don't

18  discuss the case.  Let's take about a 10-minute break.

19          (Continued on next page)

20

21

22

23

24

25

 1                    (Jury not present)

 2              MR. SHUR:  Judge, so this is a document that was

 3     produced by the government in response to a subpoena to

 4     Weitz & Luxenberg.  It's from Charles Ferguson who I believe

 5     the government is calling as a witness.  Either the government

 6     can stipulate to it as a business record or we could move it in

 7     subject to connection through Mr. Ferguson when he testifies.

 8              THE COURT:  So it is a novel approach to try to get in

 9     a document that the person says they can't recognize and

10     therefore I have no idea --

11              MR. SHUR:  Judge.

12              THE COURT:  Look.  That's what it looks like to me.

13              MR. SHUR:  I will explain the relevance.

14              So, this is basically an intake of a case, an asbestos

15     case that Mr. Silver is bringing into the firm from someone

16     other than Dr. Taub, from an Assembly member.

17              THE COURT:  Why is that -- just out of curiosity, why

18     is it relevant.

19              MR. SHUR:  Why is it relevant?

20              THE COURT:  Yes.

21              MR. SHUR:  Because the government suggested to the

22     jury that the only asbestos cases that Mr. Silver brought into

23     the firm came from Dr. Taub and that's not correct.

24              THE COURT:  I'm not sure that they've suggested that,

25     but --

1          MR. SHUR:  I think they certainly have.

2          THE COURT:  Just the fact that the defendant does

3     things that aren't illegal isn't relevant to whether he also

4     did things that were illegal.

5          MR. SHUR:  Judge --

6          THE COURT:  So, proving up lack of illegality --

7          MR. SHUR:  That's not what I'm trying to do, Judge.

8          THE COURT:  Okay.

9          MR. SHUR:  Judge, the defendant's state of mind is

10    relevant.  I think we can all agree to that, yes?

11         THE COURT:  Yes.

12         MR. SHUR:  So, the fact that he is receiving cases

13    from people who he has personal relationships with, not just

14    general negligence cases but also asbestos cases, tends to

15    prove that his state of mind when he receives cases from

16    Dr. Taub that it is based on a personal relationship.

17         THE COURT:  No, it doesn't.  That's nonsense.  But

18    talk to the government.  I'm not quite sure why -- I mean,

19    given the fairly broad range of evidence that the government

20    brought in is there really a dispute that this is a business

21    record?

22         MR. MASTER:  I hadn't looked at it recently but it

23    certainly looks authentic, sure.

24         THE COURT:  See if you can work out whether it is a

25    business record or not but, again, there is a limit to my

1    patience on proving all kinds of activities that aren't illegal

2    because that doesn't prove that -- it doesn't tend to disprove

3    that other activities were illegal.

4              MR. SHUR:  That's not the purpose of the evidence,

5    Judge.

6              THE COURT:  Well, it basically is.  That's what you

7    just told me.

8              MR. SHUR:  I said it is to show that the business he

9    generates is based on personal relationships which disproves

10   that the cases that he brought in through Taub were based on

11   something other than a personal relationship.

12             THE COURT:  It doesn't.  That's exactly what I'm

13   saying.  The fact that he brought in other business via

14   somebody he played baseball with, somebody he went to synagogue

15   with, somebody he knew from the corner deli does not prove that

16   the relationship between him and Taub wasn't a corrupt

17   relationship.  I'm not saying it was a corrupt relationship,

18   that's what has to be decided.  But the fact that someone has

19   legitimate relationships does not mean --

20             MR. SHUR:  Right.

21             THE COURT:   -- that other relationships aren't

22   corrupt.

23             MR. SHUR:  Judge, I hear what you are saying.

24             THE COURT:  We don't have to sell you this.  See if

25   you can stipulate to the exhibit.  Short break.  Seven minutes.

```
 1              (Recess)
 2              THE COURT:  Relative to scheduling while they're
 3    fixing the microphones?
 4              MS. COHEN:  Yes, your Honor.
 5              THE COURT:  I have a very full calendar that morning,
 6    the morning of the 20th.  I think, still, I don't want to take
 7    two days off unless you think we are way ahead of where you
 8    might otherwise have thought we were.
 9              MS. COHEN:  Your Honor, I do think we actually are
10    making a lot of progress and are way ahead so that we would be
11    summing up either right before or right after Thanksgiving.
12              THE COURT:  Oh wow.  Okay.  So why don't we do -- I
13    keep losing Mr. Molo.
14              MR. COHEN:  We will speak for him, your Honor.
15              THE COURT:  You will speak for him?  Okay.
16              Let's do this then.  I am happy to accommodate his
17    Thursday issue but I'm going to hold off on telling the jury
18    what exactly the schedule is going to be.  Let's see where we
19    are further in this week.  If we stay on schedule maybe what we
20    will do is take off both of those days because otherwise the
21    Friday schedule -- we wouldn't be able to start probably until
22    11:30 at the earliest that day and it is a Friday so we are
23    going to have to end early because the sun is going down early
24    so it may just not be worth it.  So, let's deal with it again
25    on Friday but Thursday is okay.  We will deal what we are going
```

1   to do on Friday.

2            MR. COHEN:  I should also say for Friday, the

3   government asked me last night when would be a time that would

4   help folks to get home for the sabbath.  3:00 would work.

5            THE COURT:  Can you make it any later than that?

6            MR. COHEN:  Not much.

7            THE COURT:  Okay.  Let's get the jury in.

8            (Continued on next page)

1          (Jury present)

2          THE COURT:  Okay, Mr. Shur.

3          MR. SHUR:  Judge, pursuant to stipulation with the

4    government, the defense would move for the admission of

5    Defendant's Exhibit 51.

6          THE COURT:  Okay.  You stipulated that it is a

7    business record maintained in the ordinary course?

8          MR. MASTER:  Yes, your Honor.

9          THE COURT:  So Defendant's Exhibit 51 is received.

10         (Defendant's Exhibit 51 received in evidence)

11   BY MR. SHUR:

12   Q.  Thank you, Judge.

13         If we can publish it to the jury and blow up the text,

14   please?

15         Mr. Klein, this is a memo and the from line, the name

16   next to it is Charles Ferguson.  Do you see that?

17   A.  Yes, I do.

18   Q.  Is Mr. Ferguson an attorney at Weitz & Luxenberg?

19   A.  Yes, he is.

20   Q.  Is he the co-chair of Weitz & Luxenberg's asbestos

21   litigation practice?

22   A.  Could you rephrase that?

23   Q.  What is his role at Weitz & Luxenberg?

24   A.  I would say he is the supervising attorney of the asbestos

25   unit.

1    Q.  Thank you.

2         The subject line reads:  Pasquale Massullo, potential

3    asbestos case?

4    A.  Yes.  That's right.

5    Q.  Body of the memo reads:  I met with Mr. Massullo, gave him

6    a new case package with a return envelope and will forward this

7    to you as soon as I get it back.  Please note that this case

8    was a referral to Sheldon Silver from Assemblywoman Ann

9    Carrozza.

10        Do you see that?

11   A.  Yes, I do.

12   Q.  Thank you.  You can take it down.

13        Mr. Klein, do you know whether Assembly member James

14   Englebright referred his father Steve Englebright to

15   Mr. Silver?

16   A.  I have no idea.

17   Q.  What about John Benedetto, whether he referred his sister,

18   Carol Gray, to Mr. Silver?

19   A.  Again, I have no idea.

20   Q.  Mr. Klein, is it fair to say that there are lawyers at

21   Weitz & Luxenberg who, similar to Mr. Silver, bring in cases,

22   receive referral fees, but don't necessarily work on the cases

23   themselves?

24   A.  That's fair to say, yes.

25   Q.  You are familiar with Stuart Perry?

 1   A.  Yes, I am.

 2   Q.  He was an attorney at Weitz & Luxenberg?

 3   A.  He is of counsel to the firm, yes.

 4   Q.  And he brought in cases, right?

 5   A.  Yes.

 6   Q.  And would receive a referral fee, correct?

 7   A.  Yes.

 8   Q.  And didn't work on those cases?

 9   A.  He did not.

10   Q.  And Mr. Perry is not alone in that category, there are

11   other lawyers at the firm that do the same thing, correct?

12            MR. MASTER:  Objection.

13            THE COURT:  Overruled.

14            The same thing meaning bring cases in but don't do any

15   work on those cases or other cases?

16            MR. SHUR:  No.  Let me be more clear.

17   Q.  That bring cases into the firm, receive a referral fee for

18   those cases and don't work on those cases?

19   A.  And don't work on those cases.  Yes, that's true.

20   Q.  That's a fairly common practice, yes?

21   A.  Fairly, yes.

22   Q.  There are lawyers outside of Weitz & Luxenberg that do this

23   as well, if you know?

24            THE COURT:  To Weitz & Luxenberg.

25            MR. SHUR:  No.

FBA5si12                          Klein - cross

1    Q.  Lawyers that engage in that same practice that are not

2    employed by Weitz & Luxenberg but are at other law firms, if

3    you know?

4              THE COURT:  I don't understand the question.

5    Q.  Sure.

6              There are lawyers at other firms other than

7    Weitz & Luxenberg, other personal injury firms who bring in

8    cases, receive referral fees, and don't work on the cases?

9              THE COURT:  At those firms?

10             MR. SHUR:  Correct.

11             THE COURT:  Do you know?

12             THE WITNESS:  I wouldn't know.

13   BY MR. SHUR:

14   Q.  Mr. Klein, there are lawyers at Weitz & Luxenberg and who,

15   similar to Mr. Silver, have received referrals from physicians?

16   A.  Yes.

17   Q.  Michael Roberts is a lawyer at Weitz & Luxenberg, right?

18   A.  Yes, he is.

19   Q.  And he receives referrals from doctors?

20   A.  Yes, he does.

21   Q.  One of those doctors is Marc Ginsburg?

22   A.  That's I don't know.

23   Q.  How many doctors would you say, if you know, refer cases to

24   Mr. Roberts at Weitz & Luxenberg?

25   A.  I don't know an exact number.

1   Q.  What about Joe Williams, he was a lawyer at

2   Weitz & Luxenberg; is that right?

3   A.  He was.

4   Q.  He left to start his own firm?

5   A.  Yes, he did.

6   Q.  While he was at Weitz & Luxenberg a number of doctors

7   referred him cases as well?

8   A.  I don't know the source of his referrals.

9   Q.  But there is nothing improper about personal injury lawyers

10  receiving referrals from physicians, right?

11  A.  Not to my knowledge, no.

12  Q.  Mr. Klein, sometimes a Weitz & Luxenberg attorney will be

13  referred a case but the firm isn't interested or is unable to

14  actually accept the case.

15  A.  That's correct.

16  Q.  And that could be for a number of reasons; is that right?

17  A.  Yes.

18  Q.  Weitz & Luxenberg may not want to handle the case because

19  it's outside of the firm's expertise?

20  A.  That could be one reason, yes.

21  Q.  The firm may not want to handle the case because it's too

22  small of a case?

23  A.  That's correct.

24  Q.  The firm might not want to handle the case because there is

25  a conflict with another matter?

1   A.   That's true.

2   Q.   And in that situation, though, the client still needs a

3   lawyer, right?

4   A.   Yes.

5   Q.   And the Weitz & Luxenberg attorney who received the

6   referral is free to refer that client to another law firm,

7   right?

8   A.   That's correct.  Yes.

9   Q.   So that that other law firm could service the needs of the

10  client?

11  A.   Yes.

12  Q.   And the Weitz & Luxenberg attorney who refers the case to

13  that other law firm can receive a referral fee from that firm,

14  right?

15  A.   Yes, they can.

16  Q.   And the referral fee goes to the Weitz & Luxenberg attorney

17  who referred it to the outside firm, not to Weitz & Luxenberg,

18  right?

19  A.   That's correct.

20            (Continued on next page)

21

22

23

24

25

 1    BY MR. SHUR:

 2    Q.   And that happens from time to time.

 3    A.   Yes.

 4    Q.   And it is completely appropriate?

 5    A.   Yes, it is.

 6    Q.   And, in the course of practicing at Weitz & Luxenberg, have

 7    you ever received a referral fee from another law firm?

 8    A.   Yes, I have.

 9    Q.   And, Mr. Silver, while at Weitz & Luxenberg, has referred

10    cases to other law firms; right?

11    A.   Yes, he has.

12    Q.   Are you familiar with the Abraham Norman case?  I'm sorry.

13    Let me reverse that.  Norman Abraham.

14    A.   He had two cases.

15             THE COURT:  Norman Abraham or Abraham Norman?

16             THE WITNESS:  I think it was Abraham Norman.

17             THE COURT:  Okay.

18    BY MR. SHUR:

19    Q.   If I could show you what's been marked as Defendant's

20    Exhibit 40 for identification.

21             THE COURT:  4-0?

22             MR. SHUR:  4-0.

23             THE COURT:  All right.  This is not -- you've

24    previously marked a different document as Defendant's Exhibit

25    40.

 1          MR. SHUR:  I apologize, Judge.  One moment.

 2          Can we mark it as Defendant's Exhibit 80, please.

 3          THE COURT:  Sure.  Did you just pick a big number that

 4   you're pretty sure you hadn't used before?

 5          MR. SHUR:  We'll fill in the gap.

 6   BY MR. SHUR:

 7   Q.  While we're at it, let me also show you Defendant's Exhibit

 8   41 for identification.

 9          THE COURT:  I think that number has also previously

10   been used.

11          MR. SHUR:  I apologize.  Then why don't we make this

12   81.  Thank you.

13   BY MR. SHUR:

14   Q.  If you could take a look and start with Defendant's 81,

15   please.

16          Have you had a chance to review the document?

17   A.  Yes.

18   Q.  Do you recognize this document?

19   A.  They are reports that seem to be generated from our

20   computer system.

21   Q.  It's a report regarding cases that were referred out?

22   A.  Yes.

23          THE COURT:  Number 80 or 81?

24          MR. SHUR:  81.

25          THE COURT:  81.  Okay.

1    THE WITNESS:  Yes.

2    BY MR. SHUR:

3    Q.  The question was:  It's a report of cases -- the status of

4    cases that were referred by Weitz & Luxenberg to other law

5    firms; correct?

6    A.  That's correct.

7    Q.  Is this the type of report that's made and kept in the

8    ordinary course of Weitz & Luxenberg's business?

9    A.  It's a report that exists in the ordinary course of

10   business.  It's generated upon request.

11   Q.  Right.  By a computer that Weitz & Luxenberg --

12   A.  That's correct.

13        MR. SHUR:  Your Honor, I'd move for admission of

14   Defendant's Exhibit 81.

15        THE COURT:  Any objection?

16        MR. MASTER:  No, your Honor.

17        THE COURT:  81 is received.

18        (Defendant's Exhibit 81 received in evidence)

19        MR. SHUR:  Do you want to publish it to the jury,

20   flees.

21   BY MR. SHUR:

22   Q.  The title of the report is referred outs expense status

23   report as of February 2, 2014; right?

24   A.  Yes.

25   Q.  If we could focus in on the first entry.

1      The first entry, under the Columbia client name, it

2   says Abraham Norman or Norman Abraham, and then it says second

3   case; right?

4   A.   That's correct.

5   Q.   Because there were two cases?

6   A.   Yes, there were.

7   Q.   With Mr. Abraham?

8   A.   Yes.

9   Q.   It has a client number next to that; right?

10  A.   That's correct.

11  Q.   And then the referrer is listed as Sheldon Silver,

12  Esquire?

13  A.   Yes.

14  Q.   And then it says referred out.

15       Do you see that?

16  A.   Yes.

17  Q.   And the name listed under that Columbia is Edward Vilinsky,

18  Esquire.

19  A.   That's correct.

20  Q.   So based on this charge, does it tell you that Mr. Silver

21  referred the Abraham case to Mr. Vilinsky?

22  A.   Yes, it does.

23  Q.   And Mr. Vilinsky has his own law firm; correct?

24  A.   Yes, he does.

25  Q.   He has his own personal injury law firm?

 1   A.  Yes, he does.

 2   Q.  If you know, does he engage in the practice of giving

 3   referral fees to people that give him work?

 4   A.  Yes, he does.

 5   Q.  And Mr. Silver in fact received a referral fee in

 6   connection with this case?

 7   A.  Yes, he did.

 8          MR. SHUR:  You can take the exhibit down.  Thank you.

 9   BY MR. SHUR:

10   Q.  Mr. Klein, we talked a moment ago about the fact that

11   physicians will refer cases to Weitz & Luxenberg; right?

12   A.  Yes.

13   Q.  I guess for the cases that Weitz & Luxenberg handles, these

14   are individuals who have sustained some type of injury; right?

15   A.  That's correct.

16   Q.  So is it fair to say that the majority, if not all of them,

17   have treating physicians?

18   A.  Are we talking about asbestos cases or in general?

19   Q.  Why don't we talk about asbestos cases in particular.

20   A.  They have some type of injury, yes.

21   Q.  And they also have a treating physician?

22   A.  Yes, they do.

23   Q.  And Weitz & Luxenberg, in the course of its practice, will

24   make a note of who that treating physician is; right?

25   A.  Yes.

1   Q.   Because they'll need medical records from the treating

2   physician; correct?

3   A.   That's correct.

4   Q.   And they might need the treating physician to testify at

5   some point in time down the road?

6   A.   That's correct.

7   Q.   The treating physician -- just because the physician is

8   treating the client, it doesn't necessarily mean that that

9   physician referred the case to Weitz & Luxenberg; is that

10  correct?

11  A.   That's correct.

12  Q.   The client could have been referred to Weitz & Luxenberg by

13  another lawyer; right?

14  A.   Yes.

15  Q.   Or another physician that he or she is seeing; correct?

16  A.   Yes.

17  Q.   Or a friend or a coworker.

18  A.   It's possible.

19  Q.   They could have seen one of the Weitz & Luxenberg

20  commercials on TV?

21  A.   We hope so.

22  Q.   The intake referral forms -- let's sort of take a step

23  back.

24         So, when a case comes in the door at Weitz &

25  Luxenberg, there's an intake referral form that's completed;

 1    right?

 2    A.   That's correct.

 3    Q.   And there are various pieces of information that are

 4    recorded on the intake referral form; right?

 5    A.   Yes.

 6    Q.   The name and contact information for the client; right?

 7    A.   Yes.

 8    Q.   Oftentimes there's a blurb about what the case is about.

 9    A.   That's right.

10    Q.   And the injuries sustained?

11    A.   Yes.

12    Q.   And potentially a diagnosis.

13    A.   Yes.

14    Q.   And the treating physician is often mentioned as well.

15    A.   Yes.

16    Q.   Because, again, you might need medical records from the

17    treating physician; right?

18    A.   Could be, yes.

19    Q.   I want to talk a little bit about the computer system that

20    tracks referrals of cases by attorneys.

21         There was some testimony about this on

22    direct examination.  Do you recall that?

23    A.   Yes.

24    Q.   Is it fair to say that one of the reasons the firm tracks

25    this information is so that they know who they need to pay if

 1    there's a settlement or a favorable award?

 2    A.   For client purposes, yes.

 3    Q.   Right.  Because the attorney who brings in the case doesn't

 4    actually receive any money unless the client receives money;

 5    right?

 6    A.   That's correct.

 7    Q.   And that can be sometime down the road after the case comes

 8    in the door.

 9    A.   Yes.

10    Q.   So, if there's a settlement or there's a favorable award

11    for the client, the firm needs to know who to pay; right?

12    A.   That's correct.

13    Q.   So they'll look in the computer system and see who the

14    Weitz & Luxenberg lawyer is, who is eligible for a referral

15    fee; right?

16    A.   That's correct.

17    Q.   And also maybe there's an outside law firm that referred

18    the case to the Weitz & Luxenberg lawyer, and they'll get a

19    referral fee as well.

20    A.   Yes.

21    Q.   But the computer system doesn't track individuals who refer

22    the case to Weitz & Luxenberg who are not eligible for referral

23    fees.

24    A.   No, it does not.

25    Q.   And that includes physicians.

 1    A.   Yes.  It does not.

 2    Q.   So you could access the system and look for a -- you could

 3    run a search for a Weitz & Luxenberg lawyer; right?

 4    A.   Yes, you can.

 5    Q.   And you could probably run a search for a client's name as

 6    well?

 7    A.   Yes.

 8    Q.   But you can't run a search for a referring physician;

 9    right?

10    A.   No.  We don't have anything like that.

11    Q.   Because you're not tracking that information?

12    A.   That's correct.

13    Q.   We looked at some documents on direct examination which

14    included, for a particular client of the firm, there was an

15    intake form we saw; right?

16    A.   Yes.

17    Q.   And then there were some emails we looked at as well;

18    right?

19    A.   Yes.

20    Q.   Are those emails part of the intake form, or were they

21    maintained elsewhere within the firm?

22    A.   They are generally maintained separately in our email

23    system.

24    Q.   So is it fair to say that, in collecting these documents in

25    response to a request from the government, you pulled the

1    intake forms for the cases that were opened up where Mr. Silver

2    was the lawyer that generated the case?

3    A.   Yes.

4    Q.   Okay.  And then you went and searched for emails that maybe

5    related to that case.

6    A.   We did that search as well, yes.

7    Q.   And we looked at some of the intake referral forms where it

8    listed Dr. Taub as the treating physician; right?

9    A.   Yes.

10   Q.   Let me ask you:  Based on the intake referral form --

11   right? -- can you be certain that Dr. Taub was the referring

12   source?  Meaning that he referred the case to the firm.

13   A.   Just looking at the intake form, no.

14   Q.   To be clear, the government showed you some of the

15   documents relating to some of the cases that they've identified

16   as cases that Dr. Taub referred to Mr. Silver but not all of

17   them.

18            Correct?

19            THE COURT:  Do you mean here during this trial?

20            MR. SHUR:  Here during the trial.

21            THE WITNESS:  Here during the trial, they showed a

22   sampling, yes.

23   BY MR. SHUR:

24   Q.   Mr. Klein, Dr. Taub had a relationship with Weitz &

25   Luxenberg independent of Mr. Silver.

 1   A.  That's my understanding, yes.

 2   Q.  He had referred a case to another lawyer at the firm?

 3   A.  Yes.

 4   Q.  Bonnie Steinwolf?

 5   A.  Yes.

 6   Q.  She was a lawyer at Weitz & Luxenberg?

 7   A.  Yes.  She was an associate of the firm.

 8   Q.  And Dr. Taub referred Ms. Steinwolf an asbestos case, a

 9   mesothelioma case?

10   A.  Yes.

11   Q.  Was that the Anthony MacDonald case?

12   A.  Yes.

13   Q.  Ms. Steinwolf received a referral fee for that case as

14   well?

15   A.  Yes, she did.

16   Q.  And Jim Long is an attorney at Weitz & Luxenberg; right?

17   A.  Yes.

18   Q.  And he also received a referral fee in connection with a

19   case that Dr. Taub referred; correct?

20   A.  Yes.

21   Q.  In addition, Weitz & Luxenberg retained Dr. Taub as an

22   expert witness in cases that the firm handled; right?

23   A.  Yes.

24   Q.  It's common for law firms involved in asbestos, personal

25   injury matters, to hire expert witnesses; correct?

 1   A.  Yes, it is.

 2   Q.  And one type of expert often retained in these types of

 3   matters is a medical expert?

 4   A.  Yes.

 5   Q.  Weitz & Luxenberg retained Dr. Taub as its medical

 6   expert witness in certain cases; right?

 7   A.  Yes, they did.

 8   Q.  And Weitz & Luxenberg would pay Dr. Taub for serving as an

 9   expert witness.

10   A.  Yes.  We would pay him.

11   Q.  If I could show you what's been marked Defendant's Exhibit

12   87 for identification.

13            Have you had a chance to take a look at it?

14   A.  Yes, I have.

15   Q.  Do you recognize this document?

16   A.  Yes, I do.

17   Q.  What is it?

18   A.  It's a report of cases where Dr. Robert Taub was paid a sum

19   certain for different reasons.

20   Q.  Is this report a report that's made and kept in the

21   ordinary course of Weitz & Luxenberg's business?

22   A.  It was generated, yes, at my request.

23            MR. SHUR:  Your Honor, I would move for admission of

24   Defendant's Exhibit 87.

25            THE COURT:  Any objection?

 1          MR. MASTER:  No objection, your Honor.

 2          THE COURT:  87 is received.

 3          (Defendant's Exhibit 87 received in evidence)

 4          MR. SHUR:  Can you publish it for the jury as well.

 5   BY MR. SHUR:

 6   Q.  While we wait for it to come up, why don't we walk through

 7   the document.

 8          So there's a Columbia that has the client's name;

 9   correct?

10   A.  That's correct.

11   Q.  And then there's a Columbia that says payee name; right?

12   A.  That's correct.  Yes.

13   Q.  And for the entire chart, the payee is listed as Dr. Robert

14   Taub.

15   A.  Yes.

16   Q.  And then there's an amount listed; right?

17   A.  Right.

18   Q.  And there's a date with a check number.

19   A.  A check number and a check date, yes.

20   Q.  And then there's also a comments Columbia; right?

21   A.  Transaction comments.

22   Q.  And that's where there's a very short description of the

23   purpose of the payment; right?

24   A.  Yes.

25   Q.  And there are a number of payments here I see that say --

1   it looks like it's shorthand for medical records; is that

2   right?

3   A.  Yes.

4   Q.  These are payments in the amount of $75 or $100; right?

5   A.  That's correct.

6   Q.  Are these the types of payments that are made for the

7   situation you were talking about earlier where Weitz &

8   Luxenberg needs to get medical records from the treating

9   physician?

10  A.  Yes.

11  Q.  And so Dr. Taub was the treating physician.  You need to

12  get medical records.  You need to pay him for those medical

13  records; is that right?

14  A.  That's correct.

15  Q.  There's nothing wrong with that; right?

16  A.  No.  Not at all.

17  Q.  Then there are other transactions that I want to talk

18  about.  If you scroll down to James Donford, do you see that?

19  A.  Yes, I do.

20  Q.  That's a client of the firm; is that right?

21  A.  That's correct.

22  Q.  The transaction comment says review and report.  Right?

23  A.  Yes, it does.

24  Q.  And then the payment that was made was for $11,000.

25  A.  Yes.

1  Q.  What was Dr. Taub doing for Weitz & Luxenberg that entitled

2  him to $11,000?

3  A.  He would generally review all the medical records that were

4  sent to him or provided to him and then render an expert's

5  report.

6  Q.  So this relates to a case where Dr. Taub was retained as an

7  expert witness?

8  A.  Yes.

9  Q.  If we look at the next line down, this is for Anthony

10 MacDonald.  That's another client of the firm?

11 A.  Yes.

12 Q.  McDonald, Anthony.  Excuse me.

13         That's the case that you mentioned earlier that

14 Dr. Taub had referred to Bonnie Steinwolf; right?

15 A.  Yes.  That's the one.

16 Q.  And in that case Weitz & Luxenberg also hired Dr. Taub as

17 an expert witness; right?

18 A.  Yes, we did.

19 Q.  It looks like here for expert review report he was paid

20 $11,000; is that right?

21 A.  Yes.

22 Q.  If you look further down, there's another entry for Anthony

23 MacDonald in the amount of $5,000.  That's for trial prep.

24         Do you see that?

25 A.  Yes, I do.

1    Q.  And then another one that's $5,000 for testimony.

2             Do you see that?

3    A.  Yes, I do.

4    Q.  Is that also in connection with Dr. Taub serving as an

5    expert witness in that case?

6    A.  Yes, it is.

7    Q.  Was Mr. Silver involved in that case?

8    A.  No, not to my knowledge.

9    Q.  The cases that you mentioned or that the government

10   identified as cases that Dr. Taub had referred to him -- did

11   Dr. Taub serve as an expert witness in any of those cases?

12   A.  I don't know.

13   Q.  Do you see any of their names here listed?

14   A.  No, I do not.

15            MR. SHUR:  You can take the exhibit down.  Thank you.

16   BY MR. SHUR:

17   Q.  Mr. Klein, the prosecutor asked you if Mr. Silver ever told

18   you about state grants.

19            Do you remember that?

20   A.  Yes, I do.

21   Q.  Did Mr. Silver talk with you about legislative business in

22   Albany?

23   A.  No.

24   Q.  He didn't discuss with you the state budget negotiations?

25   A.  No.

 1              MR. MASTER:  Objection.

 2              THE COURT:  Overruled.

 3    BY MR. SHUR:

 4    Q.  He didn't discuss with you drafts of state legislation?

 5    A.  No.

 6    Q.  He didn't discuss with you the awarding of state grants?

 7    A.  Not at all.

 8    Q.  Do you know that Mr. Silver awards hundreds of grants a

 9    year?

10    A.  I have no knowledge of that.

11    Q.  The prosecutor also asked you about the Moreland

12    Commission.

13              Do you remember that?

14    A.  Yes.

15    Q.  So Weitz & Luxenberg received a subpoena from the Moreland

16    Commission; right?

17    A.  Yes, we did.

18    Q.  We looked at that subpoena during direct examination?

19    A.  Yes.

20    Q.  You never had any conversations with Mr. Silver about the

21    subpoena; right?

22    A.  I don't believe I did.

23    Q.  You spoke instead with the principals at your law firm.

24    A.  At least one of them, yes.

25    Q.  And I believe you said that after you spoke with

1   Mr. Luxenberg was it?

2   A.  Yes.

3   Q.  That you reached out to Mark Kasowitz, who is the named

4   partner at the Kasowitz law firm.

5   A.  Yes.

6   Q.  Mr. Kasowitz is a well-known lawyer; right?

7   A.  To my knowledge, yes.

8   Q.  He happens to be a good friend of both Arthur Luxenberg and

9   Perry Weitz; is that right?

10  A.  Yes.

11  Q.  If you know.

12  A.  I do know that.  Yes.

13  Q.  And Mr. Kasowitz was representing the assembly in

14  connection with this matter; right?

15  A.  That was my understanding, yes.

16  Q.  He's experienced in these types of issues; right?

17  A.  I don't know.

18  Q.  Weitz & Luxenberg sent a letter to the Moreland Commission

19  objecting to the subpoena; correct?

20  A.  I believe I did, yes.

21  Q.  And then filed a motion in New York State Supreme Court

22  objecting to the subpoena.

23  A.  Well, we supported the motion I think.

24  Q.  This was the me-too; right?

25  A.  Yes.

1    Q.  Where you were basically echoing comments of other parties

2    that filed motions.

3            Is that fair?

4    A.  Yes.

5    Q.  And you signed the petition; right?  The motion.

6    A.  Yes, I did.

7    Q.  And Weitz & Luxenberg was opposing the subpoena on a number

8    of legal grounds; correct?

9    A.  Yes.

10   Q.  Weitz & Luxenberg was opposing the subpoena because the

11   firm believed that it violated their ethical obligations to

12   respond; correct?

13   A.  Yes.

14   Q.  Because the subpoena, in Weitz & Luxenberg's view, would

15   force the firm to have to disclose confidential client

16   information.

17   A.  That's correct.

18   Q.  And, in Weitz & Luxenberg's view, the subpoena would force

19   Weitz & Luxenberg to violate the attorney-client privilege and

20   the attorney work product protections; right?

21   A.  Yes.

22   Q.  Because communications between lawyers and their client are

23   privileged under the law.  Right?

24   A.  Yes, they are.

25   Q.  Weitz & Luxenberg also opposed the subpoena because, in its

1   view, the governor had no authority under the executive laws to

2   be issuing the subpoena in the first place.

3          Right?

4   A.  I don't recall that, but probably.

5   Q.  Well, let me ask you this:

6          THE COURT:  Just because he says it doesn't mean it's

7   true.  So if you don't know, you don't know.  Remember the

8   questions aren't evidence.

9          THE WITNESS:  All right.

10  BY MR. SHUR:

11  Q.  Mr. Klein, you signed the motion; right?

12  A.  Yes, I did.

13  Q.  Is it fair to say that you wouldn't have signed the motion

14  if you didn't believe that there was a legal basis for the

15  arguments made in that motion?

16  A.  I would have changed the motion.  I would have taken out

17  words that I felt were wrong.

18  Q.  Understood.  After the motion was filed, the subpoena was

19  subsequently withdrawn; correct?

20  A.  Yes.

21         MR. SHUR:  One moment, your Honor.  One housekeeping

22  matter.

23  BY MR. SHUR:

24  Q.  If I could show you what's been marked Defendant's Exhibit

25  88 for identification.

1              Mr. Klein, do you recognize this?

2    A.  This is a home page from a website a number of years ago.

3    Q.  Is it the home site for the firm's web page back in 2002?

4    A.  I couldn't really tell you what year, but I know it's an

5    old one, very old.

6              MR. SHUR:  One moment, your Honor.

7              (Pause)

8    BY MR. SHUR:

9    Q.  Mr. Klein, the picture that's depicted here is from the

10   firm's old offices when it was on --

11   A.  On Maiden Lane.

12   Q.  I'm sorry?

13   A.  On Maiden Lane.

14   Q.  On Maiden Lane.  Okay.

15             The firm is no longer there?

16   A.  No.

17   Q.  Mr. Klein, the Moreland Commission filing that we just

18   talked about -- Weitz & Luxenberg wasn't the only firm that

19   filed a motion opposing the Moreland Commission subpoena; is

20   that right?

21   A.  That's correct.

22   Q.  There was a motion filed by the assembly?

23   A.  Yes.

24   Q.  There was a motion filed by the senate?

25   A.  I'm not exactly sure.  I just remember one other firm name.

1  Q.  There were motions filed by other law firms on behalf of

2  other legislators; correct?

3  A.  Yes.

4       MR. SHUR:  Your Honor, I have no further questions but

5  would offer Defendant's Exhibit 88 into evidence.

6       MR. MASTER:  Your Honor, I believe that this was

7  introduced through Perry Weitz.

8       THE COURT:  I thought the picture looked familiar.

9       MR. SHUR:  It was used in opening statements, Judge.

10       THE COURT:  Putting aside the fact that it may be

11  duplicative, any other objection?

12       MR. MASTER:  No, your Honor.

13       THE COURT:  88 is received.

14       (Defendant's Exhibit 88 received in evidence)

15       MR. SHUR:  Thank you, Mr. Klein.

16       THE WITNESS:  Thank you.

17       THE COURT:  Any redirect?

18       MR. MASTER:  Yes, your Honor.

19  REDIRECT EXAMINATION

20  BY MR. MASTER:

21  Q.  Mr. Klein, were you asked some questions on

22  cross-examination about a dozen or so friends -- I'm sorry.

23  About friends who had introduced or referred cases to Sheldon

24  Silver at Weitz & Luxenberg.

25       Do you recall that?

1   A.  Yes, I do.

2   Q.  Did Sheldon Silver ever describe Dr. Taub as one of those

3   friends?

4   A.  No, not to me.

5   Q.  And you were asked some questions about a particular case,

6   one case, that you believe to have come in to a Bonnie

7   Steinwolf from Dr. Taub.

8          If you could just look at Defendant's Exhibit 87,

9   MacDonald, Anthony.

10  A.  Yes.

11  Q.  Is there an entry related to Dr. Taub on the MacDonald,

12  Anthony, case listed there?

13  A.  Yes, there is.

14  Q.  And what's the date of the first entry related to the

15  MacDonald, Anthony, case?

16  A.  June 17, 2003.

17  Q.  And, as we had talked about earlier, what was the date of

18  the first intake from Sheldon Silver to Dr. Taub?

19          MR. MASTER:  If you wouldn't mind just pulling up

20  Government Exhibit 441.

21          THE WITNESS:  That would be November 6, 2003.

22  BY MR. MASTER:

23  Q.  So, in other words, the MacDonald, Anthony, case, you can

24  tell, just from looking at this record, came in from before

25  Dr. Taub began sending cases to Sheldon Silver?

1    A.  Yes.

2    Q.  Thank you.  Now, you are the managing attorney, and you are

3    with the general negligence practice; correct?

4    A.  Yes.

5    Q.  Are you aware of any referral source to Sheldon Silver for

6    those asbestos cases, aside from the ones that were looked at

7    earlier other than Dr. Taub?

8    A.  I have no independent knowledge, no.

9    Q.  So, in other words, as far as you understand from banter

10   and other things, the only source, other than the ones that

11   were looked at on cross-examination, were Dr. Taub?

12           MR. SHUR:  Objection.

13           THE COURT:  Overruled.

14           Do you know of any other sources?

15           THE WITNESS:  Independently, no, I don't.  I'd have to

16   look at records in the firm to show it.

17   BY MR. MASTER:

18   Q.  Right.  You have reviewed records in preparation for your

19   testimony here today; correct?

20   A.  Yes.

21   Q.  And you're not aware, based on your review of all those

22   records, of any source aside from Dr. Taub and the ones that

23   were discussed by the defense.

24           Correct?

25   A.  Other than those, no.

1   Q.  And, in fact, with respect to the ones that were introduced

2   by the defense, if you wouldn't mind just going to Government

3   Exhibit 522.

4           MR. MASTER:  Mr. Coccaro, if you wouldn't mind paging

5   through it.

6   BY MR. MASTER:

7   Q.  Those cases, the Holinka case and I think the Evans case

8   and the Masulo case -- do you see that?

9           It's quite clear from the records which cases came

10  from those other attorneys; correct?

11  A.  Yes.

12  Q.  And, in fact, that's because, as the government showed you

13  or discussed with you on direct, it's listed under other

14  attorney name; correct?

15  A.  Yes.

16          MR. MASTER:  So, Mr. Coccaro, if you could page

17  through and just see what percentage of those payments have any

18  other attorney name.

19          In that case, actually, Mr. Coccaro, take a look at

20  that one.

21  BY MR. MASTER:

22  Q.  The Masulo case -- how much in fees has that generated to

23  Sheldon Silver?

24          MR. MASTER:  If you wouldn't mind just zooming in.

25  Actually, Mr. Coccaro, I believe that the next line,

 1   $8,889.89 -- that's for McKinley.

 2              THE WITNESS:  I would say it's under $100.

 3   BY MR. MASTER:

 4   Q.  And the Hopkins case.

 5              MR. MASTER:  If you wouldn't mind going to page 5,

 6   back to page 5.

 7   BY MR. MASTER:

 8   Q.  Do you see there's a case?  The Englebright case.

 9              MR. MASTER:  If you wouldn't mind going back to that.

10   BY MR. MASTER:

11   Q.  You were asked about that.

12              MR. MASTER:  Mr. Coccaro, could you just zoom in and

13   see how much that case has generated for Mr. Sheldon Silver.

14   BY MR. MASTER:

15   Q.  Is it fair to say it's $36.04?

16   A.  Yes.  That's correct.

17   Q.  In total?

18   A.  Yes.

19              MR. MASTER:  Thank you.

20              MR. SHUR:  Briefly, Judge.

21              MR. MASTER:  Not quite.

22   BY MR. MASTER:

23   Q.  You were asked on cross-examination about other lawyers who

24   don't work on particular files but nonetheless receive attorney

25   referral fees.

 1              Are you aware of any other person at Weitz & Luxenberg

 2    who is a sitting state public official?

 3    A.  No.

 4    Q.  Are you aware of anyone at Weitz & Luxenberg who receives a

 5    salary like Sheldon Silver but is not actually expected to work

 6    on any case files?

 7    A.  No.

 8    Q.  You were asked questions about Michael Roberts, who

 9    received some cases from physicians.

10              Do you remember that?

11    A.  Yes, I do.

12    Q.  Are you aware of any official state benefits that

13    Mr. Roberts has any ability to take in order to get those

14    cases?

15              MR. SHUR:  Objection.

16              THE COURT:  Rephrase the question.

17    BY MR. MASTER:

18    Q.  Is Michael Roberts a state official?

19    A.  No, he's not.

20    Q.  Does Michael Roberts have the power to dispense state

21    grants?

22              MR. SHUR:  Objection.

23              THE COURT:  Overruled.

24              THE WITNESS:  I have no knowledge that he does.

25    BY MR. MASTER:

1  Q.  Are you aware of any money that Michael Roberts gives in

2  exchange for those referrals?

3  A.  No.

4  Q.  Are you aware of any employment assistance that Michael

5  Roberts gives to those physicians in exchange for those

6  referrals?

7  A.  I'm not aware of any.

8  Q.  Are you aware of any other assistance that Michael Roberts

9  gives to those physicians in exchange for those referrals?

10  A.  No.

11  Q.  Just to be clear, on the Moreland Commission, you were

12  asked some questions about that.

13        That subpoena was withdrawn before any decision was

14  made; correct?

15  A.  Yes.

16  Q.  So there was no final resolution by any court as to whether

17  the objections that were contained in your me-too brief were

18  valid or not; correct?

19  A.  Correct.

20        (Pause)

21        MS. COHEN:  Can we just have a moment, your Honor.

22        THE COURT:  With me?  Or you want a moment with each

23  other?

24        MS. COHEN:  I would like a moment with Mr. Master.

25        THE COURT:  You've got it.

FBAYSIL3                        Klein - Recross

```
 1              MS. COHEN:  Thank you.

 2              (Pause)

 3              MR. MASTER:  Your Honor, there is one matter on which

 4    we need to briefly confer with defense counsel.

 5              THE COURT:  Okay.

 6              (Pause)

 7              THE COURT:  Fine.  Yes.  Stand up and stretch.

 8              (Pause)

 9              MR. MASTER:  Nothing further, your Honor.

10              THE COURT:  Okay.  Mr. Shur.

11    RECROSS EXAMINATION

12    BY MR. SHUR:

13    Q.  Mr. Klein, the prosecutor just asked you about a case that

14    had yielded for Mr. Silver referral feels -- I think it was

15    $36.04.

16              Do you remember that?

17    A.  Yes.

18    Q.  That case is still pending; correct?

19    A.  To my knowledge, yes.

20    Q.  The prosecutor also asked you about the fact that

21    Mr. Silver is a public official and receives a salary and

22    there's no expectation that he should work on cases and that

23    there's no one else on the firm that's like him.

24              Do you remember that?

25    A.  Yes, I do.
```

1   Q.   Is there anything improper with the relationship Mr. Silver

2   had with Weitz & Luxenberg?

3            MR. MASTER:  Objection.

4            THE COURT:  Sustained.

5   BY MR. SHUR:

6   Q.   Did the firm receive ethics advice in connection with --

7            MR. MASTER:  Objection, your Honor.

8            THE COURT:  Sustained.

9   BY MR. SHUR:

10  Q.   The prosecutor asked you if Mr. Roberts, who is a lawyer at

11  Weitz & Luxenberg -- if you had knowledge of him giving

12  anything to a physician in exchange for referrals.

13            Do you remember that?

14  A.   I do remember that, yes.

15  Q.   You said you don't have any personal knowledge of that;

16  right?

17  A.   Yes.

18  Q.   You don't have any personal knowledge of Mr. Silver giving

19  anyone anything in exchange for referrals; right?

20  A.   No.

21  Q.   The prosecutor also asked you about whether you had

22  personal knowledge of how cases came into the firm.  I just

23  want to be clear about this.

24            For the asbestos cases that came into the firm that we

25  looked at, you don't have any personal knowledge of how those

```
 1   cases got to the firm.

 2          Is that right?

 3   A.  That's correct.

 4   Q.  For any of them.  Correct?

 5   A.  That's correct.

 6   Q.  You were just testifying based on the records that were at

 7   the firm; right?

 8   A.  Yes.

 9   Q.  Mr. Klein, Dr. Taub is a friend of Mr. Silver's right?

10          MR. MASTER:  Objection.

11          THE COURT:  Sustained.

12   BY MR. SHUR:

13   Q.  I believe the prosecutor asked you that question on

14   redirect examination.

15          THE COURT:  Please don't do speaking objections.

16          MR. SHUR:  This is a question.

17          THE COURT:  What's the question?

18   BY MR. SHUR:

19   Q.  I believe the prosecutor asked you that question, and I

20   apologize.  I was looking for it on the screen.  I did not hear

21   your answer.

22          THE COURT:  The objection to the question is

23   sustained.

24          What question are you now asking him to answer?

25   BY MR. SHUR:
```

```
 1   Q.  Do you know whether Dr. Taub was a friend of Mr. Silver's?

 2   A.  I don't know.

 3   Q.  Do you recall being interviewed by the government and being

 4   asked that question?

 5            THE COURT:  Being interviewed by the government at

 6   what point in time?

 7            MR. SHUR:  Sure.  I apologize, Judge.

 8   BY MR. SHUR:

 9   Q.  Do you recall being interviewed by the prosecutors on

10   September 10 of 2014?

11            THE COURT:  Can you give me the 3500 number.

12            MR. SHUR:  345601.

13            THE COURT:  The pending question is do you recall

14   being interviewed on September --

15            What was the date?

16            MR. SHUR:  September 10, 2014.

17            THE WITNESS:  I recall being interviewed.  I don't

18   remember the date.

19   BY MR. SHUR:

20   Q.  Do you remember being interviewed in that general time

21   period in September?

22   A.  Yes.

23   Q.  And that was at the U.S. Attorney's Office?

24   A.  Yes.

25   Q.  Your attorney was there; correct?
```

 1   A.  Yes.

 2   Q.  Your attorney for Weitz & Luxenberg.

 3   A.  That's correct.

 4   Q.  And the prosecutors were there; right?

 5   A.  Yes.

 6   Q.  Ms. Cohen was there?

 7   A.  Yes, she was.

 8   Q.  Mr. Master was there?

 9   A.  Yes, he was.

10   Q.  There was an investigator that's working with them -- they

11   were present as well; right?

12   A.  Yes.

13   Q.  At the interview, do you recall stating, "Dr. Taub is a

14   friend of Mr. Silver's"?

15   A.  I don't recall it.

16   Q.  If I showed you the handwritten notes from that

17   interview --

18           THE COURT:  Just show him the handwritten notes, and

19   then ask him if it refreshes his recollection.

20           MR. SHUR:  Understood, Judge.

21   BY MR. SHUR:

22   Q.  I'm showing you what's been marked Defendant's Exhibit 42

23   for identification.

24           MR. SHUR:  If I may, your Honor.

25   BY MR. SHUR:

FBAYSIL3                          Klein - Recross

1   Q.  If I could direct your attention -- the document is

2   11 pages long.  If you could look at the top of page 4.

3          After you've had a chance to review it, please let me

4   know.

5          The question is:  Does that refresh your recollection

6   as to whether in September of last year, when being interviewed

7   by the prosecutors, you stated, "Dr. Taub is a friend of

8   Mr. Silver's"?

9   A.  I had heard that during a lunch session, yes.

10  Q.  Mr. Klein, the prosecutor asked you about the MacDonald

11  case.  This was the case that Dr. Taub had referred to

12  Ms. Steinwolf, another lawyer at Weitz & Luxenberg.

13         Do you remember that?

14  A.  Yes, I do.

15  Q.  And I believe the prosecutor asked you whether that case

16  was brought into the firm before Mr. Silver ever received a

17  referral from Dr. Taub.  Right?

18  A.  I believe so.  Yes.

19  Q.  At the time that the MacDonald case was opened at Weitz &

20  Luxenberg, Mr. Silver was already at the firm practicing there;

21  correct?

22  A.  Yes, he was.

23         MR. SHUR:  I have no further questions.  Thank you.

24         MR. MASTER:  Just one question on the MacDonald case.

25  REDIRECT EXAMINATION

FBAYSIL3                    Klein - Redirect

1   BY MR. MASTER:

2   Q.  You were just asked whether Mr. Silver was practicing at

3   the firm at the time the MacDonald case came in.

4            You stated you have no independent knowledge of how

5   asbestos cases came into the firm.

6            Do you recall saying that?

7   A.  Yes.

8   Q.  And that includes the MacDonald case; correct?

9   A.  That's correct.

10  Q.  And, with respect to the MacDonald case, that case came in

11  to the firm.

12           You recall saying that the case had to have come into

13  the firm by the middle of 2003; correct?

14           MR. SHUR:  Objection.  Leading.

15           THE COURT:  I think this is just leading up to the

16  question.  Overruled.

17  BY MR. MASTER:

18  Q.  Do you know of any conversations that Dr. Taub had had with

19  Sheldon Silver asking for research money at that time?

20           MR. SHUR:  Objection.

21           THE COURT:  Sustained.  How could he is possibly know

22  about that conversation?

23           MR. MASTER:  I can only ask, your Honor.

24           THE WITNESS:  My answer was I have no knowledge.

25           (Pause)

FBAYSIL3                          Ferguson - Direct

1    BY MR. MASTER:

2    Q.  You were also asked about a statement that you remembered

3    hearing at a lunch about the nature of Sheldon Silver's

4    relationship with Dr. Taub.

5            Do you have any personal knowledge as to the nature of

6    their relationship?

7    A.  I do not.

8            MR. MASTER:  Nothing further, your Honor.

9            THE COURT:  Okay.  You can step down.

10           THE WITNESS:  Thank you.

11           (Witness excused)

12           MS. COHEN:  Your Honor, the government calls Charles

13   Ferguson.

14    CHARLES FERGUSON,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. GOLDSTEIN:

19   Q.  Good afternoon, Mr. Ferguson.

20   A.  Good afternoon.

21   Q.  Where are you employed?

22   A.  At the firm of Weitz & Luxenberg.

23   Q.  For how long have you been at Weitz & Luxenberg?

24   A.  For a little more than 25 years.

25   Q.  What did you do prior to working at Weitz & Luxenberg?

1    A.   I was in law school.

2    Q.   What is your position at the law firm of Weitz & Luxenberg?

3    A.   I help to manage the asbestos department at the firm.

4    Q.   For how long have you been managing the asbestos department

5    at the firm?

6    A.   For probably more than 15 years or so.

7    Q.   If you could briefly tell the jury:  What does the asbestos

8    department at Weitz & Luxenberg do?

9    A.   We file claims on behalf of victims of asbestos-related

10   ailments.

11   Q.   Who are the defendants in those cases?

12   A.   Companies that are responsible for manufacturing asbestos

13   products, contractors, equipment manufacturers, things of that

14   nature.

15   Q.   What are your responsibilities in managing the asbestos

16   department at Weitz & Luxenberg?

17   A.   Well, I help to oversee the cases that are filed, both here

18   in New York County as well as throughout New York State and the

19   various satellite offices that we have.

20   Q.   About how many asbestos cases per year does the firm file?

21   A.   Well, it certainly has varied over the years, but it's been

22   more or less around 1,000 cases or so in the last few years.

23   Q.   What type of asbestos cases result in the highest

24   settlement amounts or verdicts?

25   A.   Traditionally mesothelioma cases.

1  Q.  Why do mesothelioma cases traditionally result in higher

2  recoveries?

3  A.  Well, mesothelioma is considered to be a signature-type

4  cancer that's only caused by exposure to asbestos.  So that

5  element, the causation, is really not in question at trial.

6  Q.  How does Weitz & Luxenberg get paid for asbestos cases?

7  A.  We work on a contingency basis.  So we only get paid if

8  we're successful in prosecuting or settling the case.

9  Q.  What are the ways that asbestos cases typically come into

10  the firm?

11  A.  Certainly a number of different ways, but our firm has a

12  longstanding relationship with different building trades in

13  New York City and New York State, a lot of referrals from other

14  lawyers.  Certainly some advertising as well is another way for

15  cases to come in.

16  Q.  Approximately how many attorneys at Weitz & Luxenberg work

17  on asbestos cases?

18  A.  I don't have an exact number, but maybe somewhere around 50

19  or so.

20  Q.  How are those lawyers compensated?

21  A.  With a salary and a yearly bonus and also with -- they're

22  entitled to a fee on cases that they themselves are responsible

23  for bringing in.

24  Q.  Is any attorney at Weitz & Luxenberg able to get a fee if

25  they bring in a case?

FBAYSIL3                      Ferguson - Direct

```
 1   A.  Yes.

 2   Q.  Are you familiar with Sheldon Silver?

 3   A.  Yes, I am.

 4   Q.  How are you familiar with him?

 5   A.  Well, certainly the speaker of the New York State Assembly

 6   and also as an attorney of counsel to Weitz & Luxenberg for a

 7   number of years.

 8   Q.  Prior to when Sheldon Silver came to Weitz & Luxenberg, did

 9   you know him at all personally?

10   A.  No.

11   Q.  What formal role, if any, did Sheldon Silver have in the

12   asbestos department at Weitz & Luxenberg?

13   A.  None.

14   Q.  To your knowledge, what experience or background did

15   Sheldon Silver have with asbestos litigation?

16   A.  I don't believe any.

17   Q.  Did there come a time when you learned that Sheldon Silver

18   was bringing certain asbestos cases into the firm?

19   A.  Yes.

20   Q.  What was the source of those cases?

21   A.  I believe that they were Dr. Taub.

22   Q.  How did you learn -- withdrawn.

23            From whom did you learn that Dr. Taub was the source

24   of those cases?

25   A.  From Mr. Silver.
```

1   Q.  Other than Dr. Taub, how many other sources of asbestos

2   referrals were you aware of that Sheldon Silver had?

3   A.  There might have been others.  It wasn't a lot if there

4   were.

5   Q.  Before Dr. Taub started sending cases to Sheldon Silver,

6   what did you know about him?

7           THE COURT:  Who is "him" in Silver or Taub?

8           MR. GOLDSTEIN:  Dr. Taub.

9   BY MR. GOLDSTEIN:

10  Q.  What did you know about Dr. Taub before Dr. Taub started

11  sending cases to Sheldon Silver?

12  A.  I certainly knew of him by reputation.  He was certainly a

13  well-known figure in the medical community researching and

14  treating mesothelioma victims.

15  Q.  Did you know him personally in any way?

16  A.  No.

17  Q.  Once Dr. Taub started referring cases to Sheldon Silver at

18  Weitz & Luxenberg, did Dr. Taub refer cases to any other Weitz

19  & Luxenberg attorneys?

20  A.  I don't believe so, no.

21  Q.  Let's talk a little bit about what happened when Sheldon

22  Silver brought in a case from Dr. Taub.

23          When Sheldon Silver first began as of counsel to your

24  firm, where was his office in relation to yours?

25  A.  Physically we were situated right next to one another.

FBAY5IL5                     Ferguson - Direct

1   Q.  So, when Silver started bringing in cases from Dr. Taub,

2   what did he typically do?

3   A.  Walk next door and tell me that he had gotten a phone call

4   from Dr. Taub.  He gave me the name of an individual, the

5   patient, the victim, a telephone number, a very brief little

6   history of when that person was diagnosed, maybe a little work

7   history as well, how they might have been exposed to asbestos.

8   Q.  The information that he gave you -- had he typically

9   written that down on a --

10  A.  Yes.  I think so, yes.  For the most part.

11  Q.  What informal term do you use for the information that

12  Sheldon Silver provided to you?

13  A.  We certainly used the word "lead," a lead on a case.

14  Q.  What do you mean by a "lead" on a case?

15  A.  Unfortunately, as I said, these cases are very serious in

16  fate or can be very serious in nature.  So this is a potential

17  case on behalf of this patient, on behalf of this victim and

18  their family.

19  Q.  What was the value of these leads?

20        MR. COHEN:  Objection, your Honor.

21        THE COURT:  Overruled.

22        THE WITNESS:  They had potential value certainly.

23  BY MR. GOLDSTEIN:

24  Q.  Potential to have significant value?

25  A.  Potentially, yes.

1    Q.  Once you obtained the information or the lead from Sheldon

2    Silver, what did you do with it?

3    A.  We would investigate it.

4    Q.  What do you mean by "investigate" it?

5    A.  We'd certainly follow up with the family.  The family was

6    expecting our phone call at the behest of Dr. Taub.  We would

7    start to investigate it, try to collect the medical records, a

8    little medical history and the nature of the exposure itself.

9         So we'd start to investigate the claim, the potential

10   for that claim.

11   Q.  What role, if any, did Sheldon Silver play in that

12   investigation process?

13   A.  None.

14   Q.  Did Weitz & Luxenberg also use intake forms as cases were

15   brought into the firm?

16   A.  Sure.

17        MR. GOLDSTEIN:  If we could show, Mr. Coccaro, what's

18   already been introduced into evidence as Government Exhibit

19   442-2, the first page.

20   BY MR. GOLDSTEIN:

21   Q.  It's also in your binder in front of you, Mr. Ferguson.

22        MR. GOLDSTEIN:  Can you just zoom in on the top part

23   of that.

24   BY MR. GOLDSTEIN:

25   Q.  Is this one of the intake forms you just discussed?

FBAX5IL3                      Ferguson - Direct

1    A.  Yes, it is.

2    Q.  What is the purpose of keeping these intake firms?

3    A.  To track the case, keep tabs on it, track it.

4    Q.  As you track the case, is there also an evaluation process?

5    A.  Sure.  That's part of the investigation, trying to evaluate

6    the potential for the case itself.

7    Q.  When you evaluate the case, what do you look for?

8    A.  Well, certainly confirm the diagnosis and then investigate

9    the exposure, the nature of the exposure, where that person was

10   exposed, and the potential defendants that might be responsible

11   for that exposure.

12           That's part of the evaluation.  There's a lot that

13   goes into it, but generally speaking, that's briefly very

14   accurate I think.

15   Q.  Did Weitz & Luxenberg agree to take every case that was

16   referred to it?

17   A.  From Dr. Taub or Mr. Silver?

18   Q.  No.  Just as a general matter?

19   A.  No.  Absolutely not.

20   Q.  So, was it part of that evaluation process to determine

21   whether or not the firm will take the case?

22   A.  Of course.  Yes.

23   Q.  What role, if any, did Sheldon Silver play in the

24   evaluation of the cases?

25   A.  None.

1   Q.   Now, when Sheldon Silver provided you with the leads that

2   he had obtained from Dr. Taub, what, if anything, did he say

3   about whether he had personally spoken with any of the

4   potential clients?

5   A.   I don't recall him telling me that he had.

6   Q.   What contact, if any, did Sheldon Silver say that he had

7   with any potential client?

8   A.   On these asbestos cases, none that I'm aware of.

9   Q.   What conversations, if any, have you had with Sheldon

10  Silver about the progress of the cases that he referred?

11  A.   From time to time he would ask if we were able to make

12  contact with that individual to sign the case up, to start the

13  investigation process.  But beyond that, very little.

14  Q.   How much interest, if any, did Silver express in the cases

15  once they were brought in and you had made contact?

16  A.   Really none beyond what I just described.

17  Q.   Now, if someone from the asbestos department brought in a

18  case, would they be expected to do work on that case?

19  A.   Not necessarily, but for the most part, they did.

20  Q.   If someone from another department at the law firm who

21  traditionally did not work on asbestos cases brought in a case,

22  an asbestos case, would they be expected to do work on that

23  case?

24  A.   No.

25  Q.   Would those individuals have other assignments at Weitz &

FBAYSIL3                   Ferguson - Direct

1   Luxenberg?

2   A.   Sure.   They would be working in whatever department they

3   were working in separate and apart from the asbestos

4   department.

5   Q.   Now, are some of the defendant companies that you mentioned

6   that are the defendants in these cases -- are some of them

7   still going through the bankruptcy process?

8   A.   Yes, there are.

9   Q.   And what impact on the litigation of these cases does the

10  fact that some of these companies are still going through

11  bankruptcy have?

12  A.   Well, to the extent that there's still a potential claim,

13  future claim toward the bankrupt estate itself, it would remain

14  open.   The case itself would remain open.

15  Q.   In your experience with the asbestos cases that have come

16  in to the firm, including the cases from Sheldon Silver and

17  Dr. Taub, are there still defendants that are in bankruptcy

18  from whom the firm has not yet gotten any recovery?

19  A.   Yes, there are.

20  Q.   Do you expect in the future to get recoveries from those

21  bankrupt corporations?

22  A.   Potential recoveries.

23  Q.   I want to bring you back in time a little bit,

24  Mr. Ferguson.

25          Did there come a time when Sheldon Silver was of

1  counsel to Weitz & Luxenberg that you had a discussion with him

2  about how he was getting these cases from Dr. Taub?

3  A.  Probably the first time.

4  Q.  Where did that conversation between you and Sheldon Silver

5  take place?

6  A.  Most likely in my office.

7  Q.  Was that back when you were at the old offices on Maiden

8  Lane?

9  A.  Yes.

10 Q.  What did Sheldon Silver tell you about how he was getting

11 cases from Dr. Taub?

12 A.  I don't have a very specific recollection of it other than

13 he had run into him at some kind of a function, a family

14 function, some kind of a function, and that they -- that he was

15 going to now start to bring in cases through Dr. Taub.

16 Q.  Other than what Sheldon Silver told you in that brief

17 conversation, were you aware of any other connection between

18 Sheldon Silver and Dr. Taub?

19 A.  No.

20 Q.  Over the years in the office next to him and working at the

21 firm, how frequently did you speak or meet with Sheldon Silver?

22 A.  Well, really the only time I would ever speak to him is in

23 person.  Maybe from time to time on the phone but very, very

24 infrequently.  But whenever he was in the office I guess.

25 Q.  Did you also have lunches where Sheldon Silver and yourself

1    were in attendance?

2    A.   Sure.

3    Q.   When, if ever, did you hear Sheldon Silver talk about any

4    research that was being performed by Dr. Taub?

5    A.   I don't believe I did.  I don't believe I had that

6    conversation with him.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. GOLDSTEIN:

2  Q.  When, if ever, did you hear that Sheldon Silver say that

3  the State of New York was supporting Dr. Taub's research?

4  A.  Never.

5  Q.  Before this case, when, if ever, did you see any publicity

6  about Sheldon Silver's support for Dr. Taub's research?

7  A.  Never.

8  Q.  What discussions, if any, did you have with Sheldon Silver

9  about asbestos and the September 11, 2001 attacks?

10 A.  Discussions?  None.

11 Q.  When, if ever, did you hear from Sheldon Silver about

12 support for asbestos or mesothelioma research of any kind?

13 A.  None.

14         MR. GOLDSTEIN:  Nothing further, your Honor.

15         THE COURT:  Mr. Cohen?

16 CROSS EXAMINATION

17 BY MR. COHEN:

18 Q.  Mr. Ferguson, I'm Joel Cohen.  I represent Mr. Silver along

19 with my colleagues.

20         I believe you testified that mesothelioma is kind of a

21 specialized form of personal injury work?

22 A.  Yes.

23 Q.  And you were aware from the beginning that Mr. Silver

24 didn't have any particular expertise in that area, correct?

25 A.  Correct.

FBA5si14   Ferguson - cross

1   Q.   And there are many lawyers in your law firm who handle

2   negligence cases or malpractice work that have no expertise and

3   wouldn't begin to work on an asbestos case, correct?

4   A.   Correct.

5   Q.   And you understood that Mr. Silver was brought to the law

6   firm by senior partners Mr. Weitz and Mr. Luxenberg because he

7   would bring prestige to the firm?

8   A.   Yes.

9   Q.   And that if Mr. Silver was able to bring cases into the

10  firm, whether negligence or malpractice or mesothelioma or

11  asbestos-related injuries, that that would be gravy to the

12  firm?  That would be good, correct?

13  A.   Yes.  Of course.

14  Q.   And you weren't expecting, as head of the asbestos desk --

15  if I can call it that -- you weren't expecting Mr. Silver to be

16  actually doing depositions or trials or pleadings particularly

17  in the asbestos or mesothelioma areas, correct?

18  A.   Of course not.

19  Q.   And you understood that it ultimately became his role, with

20  respect to the mesothelioma cases, that he was actually

21  bringing the cases into the offices so that the office could

22  ultimately process those cases which ultimately it did

23  favorably for many clients, correct?

24  A.   Yes.

25  Q.   And when Mr. Silver would bring those cases in he would

1   maybe give you one of these little yellow post-its or some

2   other kind of writing in which he would give you the background

3   with which you could then proceed to decide whether the case

4   was proper, to evaluate the case for the law firm; correct?

5   A.  Correct.

6   Q.  And he gave you that information in many cases having

7   spoken to Dr. Taub as far as you understood it, correct?

8           MR. GOLDSTEIN:  Objection.

9           THE COURT:  Overruled.

10  Q.  And he gave that you information on the yellow post-its or

11  some other writing, or maybe he literally walked into your

12  office to give you that information, correct?

13  A.  Yes.

14  Q.  And you took the information down and then, after that,

15  either you or is it Mr. Ortiz, a colleague of yours, would

16  follow up by pursuing -- by talking to the potential client or

17  the family of the potential client, correct?

18  A.  Yes.  Either myself or somebody on my team of attorneys,

19  yes.

20  Q.  And Mr. Ortiz was one of the people on your team?

21  A.  Certainly one of them but it could have been any number of

22  different people.

23  Q.  And you called those folks and said I have received your

24  information that Dr. Taub referred you or whoever referred you

25  to the law firm, correct?

1    A.   Yes.

2    Q.   And were they surprised to hear from you or did they

3    understand that there had been a transfer of the information

4    from Dr. Taub to Weitz & Luxenberg and then to you as the

5    representative of Weitz & Luxenberg?

6    A.   They were expecting our phone call.

7    Q.   And in that process, if the client or the family of the

8    client decided to retain Weitz & Luxenberg, that was a decision

9    of Dr. Taub or a decision of Weitz & Luxenberg or a decision of

10   the client?

11   A.   The family.  The victims and the family.

12   Q.   Not the decision of the law firm, correct?

13   A.   No.

14   Q.   And not the decision of Dr. Taub, correct?

15   A.   Correct.

16   Q.   And you understood in that process that Dr. Taub -- it

17   would have been improper for Dr. Taub to give that information

18   to Mr. Silver or to your law firm without the permission of the

19   family, correct?

20   A.   Correct.

21   Q.   That would violate the HIPAA law if he had done that?

22           MR. GOLDSTEIN:  Objection.

23           THE COURT:  Sustained.

24   Q.   As far as you understood.

25           Do you understand that it would have violated the law

```
1   for him to turn over that information without approval of the

2   client?

3            THE COURT:  Sustained.

4   Q.  That means you can't answer the question.

5            THE COURT:  He is a lawyer.  He understand that.

6   Q.  It would have been improper, would it not, for

7   Weitz & Luxenberg to cold-call a potential client without the

8   approval of the client or the client's family, correct?

9            MR. GOLDSTEIN:  Objection.

10  Q.  Pardon me.

11           THE COURT:  Overruled.

12  A.  Correct.

13  Q.  And you wouldn't have done that, correct?

14  A.  Absolutely not.

15  Q.  Now, so you understood, did you not, from the structure of

16  the law firm, that Mr. Silver was fulfilling his responsibility

17  by turning the client over to somebody who could literally

18  evaluate the case, correct?

19           MR. GOLDSTEIN:  Objection.

20           THE COURT:  Overruled.

21  A.  Yes.  It was turning it over to somebody who would then

22  know what to do in terms of investigating and evaluating it,

23  yes.

24  Q.  Probably with respect to Mr. Silver he wouldn't know what

25  to do with a case any more than I would know what to do with a
```

1   case because it is a very specialized area, correct?

2           MR. GOLDSTEIN:  Objection.

3           THE COURT:  We are confident, Mr. Cohen, that you know

4   how to do everything.

5           MR. COHEN:  Very nice of you, your Honor, but I think

6   you are being overly kind this time.

7           THE COURT:  Objection is sustained.  Rephrase the

8   question.

9   BY MR. COHEN:

10  Q.  You understood that Mr. Silver wouldn't be able to handle a

11  case of this complexity, correct, from his experience?

12  A.  And nor would I expect him to.

13  Q.  Now, after you made that call or one of the people on your

14  team made that call to a potential client, what happened after

15  that?

16  A.  We start to try to collect whatever documentation we could,

17  the work history, certainly as I said earlier confirm the

18  medical diagnosis itself, and then start that process of

19  investigating and evaluating and then ultimately make a

20  decision about whether or not to proceed.

21  Q.  And you did that in many cases and ultimately brought

22  lawsuits on behalf of those people who became clients?

23  A.  Many, yes.

24  Q.  And then some cases you determined that those folks didn't

25  really have a claim because there was nobody to collect from,

or for some other reason the claim would not have borne out a

lawsuit, correct?

A.   Correct.

Q.   And ultimately, when there were recoveries, the firm

received a one third contingency fee in those cases, correct?

A.   Correct.

Q.   And as was the case in all cases in your law firm, whether

they were personal injury, mesothelioma cases, or negligence

cases, or malpractice cases, the lawyer in the firm who brought

the case in would get one third of the one third that the

Weitz & Luxenberg firm was receiving in the recovery of the

case?

A.   In asbestos cases that's how it was structured.  It might

be a different structure for med mal, for general negligence in

terms of that split, but one third of a third, yes.

Q.   Thanks for reminding me.

         So, the split for non-asbestos cases is actually

higher for the lawyer who brings the case into the firm,

correct?

A.   Correct, unless it goes to trial, verdict, appeal.  There

is a bunch of little permutations that are involved.

Q.   There has been testimony before that the reason why the

firm has a contingency structure for personal injury cases, and

that's all of its cases, is because you're taking a risk, you

are doing an awful lot of work on behalf of the client and it

1    may not bear out so therefore you get a contingency -- part of

2    the recovery for having successfully won or settled case on

3    behalf of the client, correct?

4    A.    That's correct, yes.

5    Q.    And that's not unique to the Weitz & Luxenberg firm, that's

6    standard for the entire personal injury bar of New York State?

7    A.    Yes, it is.

8              MR. COHEN:    Excuse me one minute.

9              (Counsel conferring)

10    Q.    Just one short line of inquiry.    The cases that came in

11    through Mr. Silver that you design as mostly coming from

12    Dr. Taub -- before I do that.

13              As I understand it, we have heard testimony from one

14    of your colleagues just this morning, Mr. Klein.    From the

15    records of the computer system of Weitz & Luxenberg you are not

16    able or the firm is not able to determine if a particular

17    doctor is the source or a particular non-lawyer is the source

18    of the referral to the Weitz & Luxenberg firm; is that correct?

19              MR. GOLDSTEIN:    Objection.

20              THE COURT:    Overruled.

21              Are you familiar with what is maintained in your

22    computer systems?

23              THE WITNESS:    Not -- not very.

24    Q.    You are like me.

25              So, let me ask something else.    You know from your

1    expertise in the area that the gestation period of mesothelioma

2    cases can be very, very long, correct?

3    A.   Correct.

4    Q.   And it may be that somebody who has contracted mesothelioma

5    15 or 20 or 25 years ago has not yet been diagnosed with the

6    illness, correct?

7    A.   I think you meant to say someone whose exposure was that

8    long ago.

9    Q.   Please, yes.

10             THE COURT:  Exposed to asbestos.

11   Q.   Exposed to asbestos 25 years ago they may not be diagnosed

12   yet with it because of the --

13   A.   The latency period, right.

14   Q.   Okay.

15             With respect to the cases that you have the expertise

16   with that Mr. Silver does not, the cases that came in,

17   mesothelioma cases through Mr. Silver or through Dr. Taub, have

18   those cases -- did those cases have anything to do with 9/11

19   exposure, to your knowledge?  Bearing in mind that 9/11 was

20   only 15 years ago.

21   A.   Right.  No, I have certainly seen cases in the office where

22   there was exposure during that period.  I can't say that any of

23   them relate to a Mr. Silver referral, though.

24             MR. COHEN:  Very good.  Thank you.

25             I have no further questions.

FBA5si14                    FERGUSON - redirect

1    REDIRECT EXAMINATION

2    BY MR. GOLDSTEIN:

3    Q.  Just to clarify, Mr. Ferguson, in these cases there are

4    typically multiple defendants; is that right?

5    A.  Yes.  For the most part, yes.

6    Q.  And so the recoveries that the firm and the referring

7    lawyer obtained, did they obtain them over time?

8    A.  Yes.  Generally speaking, yes.

9    Q.  So, for any given asbestos case that comes in, you expect

10   to see multiple payouts and recoveries during the life of that

11   case?

12   A.  Yes.

13          THE COURT:  Is that because each defendant settles at

14   a different time?

15   A.  Yes.  There are potentially scores of different defendants

16   that are sued in any given case and each of those defendants is

17   its own separate entity and represented by a separate counsel

18   and we --

19          THE COURT:  Separate insurance policy?

20          THE WITNESS:  All of -- yes.  So, it is done

21   independently of one another, yes.

22   BY MR. GOLDSTEIN:

23   Q.  Defense counsel asked you if when, for these cases that

24   were brought into Weitz & Luxenberg by Sheldon Silver, if they

25   worked out favorably for the clients.  Do you recall that?

1    A.  I'm sorry.  One more time?

2    Q.  Defense counsel asked you if the cases that were brought

3    into the firm by Sheldon Silver worked out favorably for the

4    clients.

5            Do you recall him asking you that?

6    A.  The answer is yes, that yes I do recall that but sometimes

7    it works out favorably for the clients; yes.

8    Q.  Did it also work out favorably for Sheldon Silver?

9    A.  Yes.

10           MR. GOLDSTEIN:  Nothing further, your Honor.

11           MR. COHEN:  No questions, your Honor.

12           THE COURT:  Ladies and gentlemen, we are going to

13   break about -- stay seated, Mr. Ferguson.

14           Ladies and gentlemen, we are going to break for lunch

15   now.  Don't discuss the case.  I will bring you back in at

16   quarter to two.

17           If you want to check your phone, please, do it now.

18           (Continued on next page)

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  You may step down.

3              Be back at quarter till two.

4              (Witness steps down)

5              MS. COHEN:  Thank you, your Honor.

6              (Luncheon recess)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBA5si14                    FERGUSON - redirect

1                     A F T E R N O O N   S E S S I O N

2                              1:55 p.m.

3               (Trial resumed; jury not present)

4               THE COURT:  Ready to start?

5               MS. COHEN:  The government is ready, your Honor.

6               MR. MOLO:  I have one issue I thought I would raise

7    now before the jurors come in.

8               THE COURT:  Go.

9               MR. MOLO:  The government intends to call Mr. Kirkland

10   who is with the Simmons firm after lunch and I want to renew

11   the objection that I made to any testimony concerning the

12   Simmons firms' relationship with Dr. Taub apart from the Miles

13   for Meso situation.  I think we talked about this before.  I

14   don't know what documents they're intending to use with him but

15   there are documents that relate to donations made by the

16   Simmons firm to the Mesothelioma Center at Columbia and New

17   York Presbyterian Hospital.

18              THE COURT:  That's what are you trying to preclude?

19              MR. MOLO:  Yes.  Any of their business dealings with

20   him other than this for this Miles for Meso situation and they

21   also attended the ACS dinner or they sponsored it.  I guess

22   that came out as well.

23              MR. GOLDSTEIN:  Your Honor, we intend, through

24   Mr. Kirkland, who is the former CEO of the Simmons firm, to put

25   on evidence about both the ACS -- American Cancer Society --

FBA5sji14                    FERGUSON - redirect

1    dinner and the Miles for Meso race but also for two other

2    purposes.  One is that Simmons was a competitor with the

3    Weitz & Luxenberg law firm and after they began funding

4    Dr. Taub's research he began sending patients to the Simmons

5    firm and so part of the testimony will be about, to establish

6    again the value of the leads that he provided to Simmons as

7    opposed to providing to Weitz & Luxenberg.  I will make that as

8    short as possible.  But we do not intend to get into or ask any

9    questions about the purpose of the funding or whether or not it

10   was proper or improper for the Simmons firm to give money with

11   a purpose of getting referrals from Dr. Taub because the mental

12   state of the Simmons firm is not something that we think is

13   relevant to the case.

14            THE COURT:  Okay.

15            MR. MOLO:  If they're going to get into it then it is

16   open, it is not a question of whether or not -- I mean, my

17   objection is that nothing beyond the Miles for Meso or the fact

18   that they're competitors or the fact that they attended or

19   sponsored the ACS dinner should come in.  That's it.  Anything

20   beyond that is irrelevant.

21            THE COURT:  I'm sorry.  Why isn't it relevant that

22   after they began to fund -- after the foundation began to fund

23   research associated with Dr. Taub that Dr. Taub then started

24   sending cases their way?

25            MR. MOLO:  I don't think it is logically -- I don't

FBA5si14                  FERGUSON - redirect

1    think under 401 it is logically relevant to prove a fact in

2    this case that is the issue of whether or not Mr. Silver had

3    engaged in corrupt activity in funding Dr. Taub through the use

4    of state grants.

5         THE COURT:  Doesn't it corroborate Taub's testimony

6    for the reason that he was referring cases to Weitz & Luxenberg

7    was in the hopes of getting money back via state grants and,

8    further, it corroborates his testimony that the reason he

9    ceased or at least substantially reduced the number of

10   referrals that went to Weitz & Luxenberg was because of this

11   cessation of state money?

12        MR. MOLO:  He didn't.  I don't think that's his

13   testimony and I don't think that he -- I don't think the facts

14   bear out that he stopped any cases to Weitz & Luxenberg.  In

15   fact, the complaint and then later the indictment have alleged

16   just the opposite, that the referrals continue over an extended

17   period of time over up until just a couple of years ago and I

18   do think that given --

19        THE COURT:  I thought he testified to that, that he

20   reduced the number of cases that he sent to Weitz & Luxenberg.

21   He didn't eliminate them entirely because -- I can't remember

22   exactly what he said but essentially staying in the good graces

23   of someone in power is always a wise choice.

24        MR. MOLO:  But the Simmons firm donated huge amounts

25   of money and to the extent that there is any suggestion -- I

1    think there is a suggestion that is going to be if not

2    expressly made, certainly going to be hanging in the air that

3    this is a pay for play situation and I think that that's

4    unfairly prejudicial and really has nothing to do --

5            THE COURT:  I don't think they're going to suggest

6    that.

7            MR. MOLO:  Of course they're going to suggest that.

8    They're going to suggest by talking about the grants that they

9    gave Dr. Taub and Dr. Taub referring cases to them that somehow

10   or another that this is a pay for play situation.  It has

11   nothing to do with the issue of Mr. Silver and the propriety or

12   impropriety of the state grants that were given to Dr. Taub.

13   And I think that --

14           THE COURT:  That I agree with.  It has nothing do with

15   the propriety of the grants given to Dr. Taub by the state.

16           MR. MOLO:  It is going to suggest --

17           THE COURT:  Is that sufficient, a limiting instruction

18   to that extent?  You can't consider this for purposes of

19   determining whether the grants that the state provided to

20   Dr. Taub were proper.

21           MR. GOLDSTEIN:  Your Honor, my concern about that

22   would be we believe that, and the facts bear this out, that

23   Dr. Taub did in fact substantially reduce his referrals to

24   Weitz & Luxenberg and to the defendant after he started getting

25   the money from Simmons, and in 2010 there is only a single

1   referral the entire year to the defendant.  After that is when,

2   during 2010 when we saw Dr. Taub's e-mail where he said I may

3   need the defendant in the future, he is the most powerful man

4   in New York, and he goes and he asks for additional benefits

5   from the defendant including help with the Miles for Meso race

6   and including help with his son getting a job, both of which

7   the defendant offers and provides.

8           And so, to have a limiting instruction just saying

9   that the grants and his provision of the grants are not

10  relevant to the Simmons testimony, it would be true as a

11  factual matter because Simmons didn't even enter the picture

12  until 2010 but I worry that it unfairly carves up the different

13  benefits that the defendant was giving to Dr. Taub during the

14  course of the scheme.  I'm worried that the jury would, phrased

15  the way that you phrased it, your Honor, I am worried that the

16  jury would think that you were saying that nothing that the

17  defendant did for Dr. Taub is relevant to what is coming in

18  through the Simmons testimony.

19          THE COURT:  Okay, so if I understand correctly, you do

20  or do not want the jury to conclude that the Simmons firm was

21  giving money to Taub in hopes that cases would come their way?

22          MR. MOLO:  I think that any suggestion, because it is

23  a huge amount of money, the pay for play suggestion with

24  Simmons because it is a private foundation, if they choose to

25  do that whatever rules or regulations they violate by that, it

FBA5si14                    FERGUSON - redirect

1    is what it is.  I don't see how it is really relevant here.

2          We have already gone down this path with some of what

3    has gotten in.

4          THE COURT:  I disagree with you that it is not

5    relevant.

6          MR. MOLO:  All right.

7          THE COURT:  I am trying to figure out what you want in

8    terms of a limiting instruction.

9          MR. MOLO:  I guess saying that it is not relevant but

10   you won't give me that one.

11         THE COURT:  That's not a limiting instruction.

12         MR. MOLO:  You asked what I wanted, not what I thought

13   I would get.  I don't know what a limiting instruction in this

14   situation can properly do.  The barn door has been opened.  We

15   had testimony surrounding the Simmons e-mails before with

16   Dr. Taub and I am renewing an objection that I made earlier I

17   guess, so.

18         THE COURT:  Okay.  Denied.  Thank you.

19         MR. GOLDSTEIN:  Thank you, Judge.

20         THE COURT:  If you want a limiting instruction you can

21   figure out what you want me to say.  Let me know.  But if we

22   are revisiting the prior objections, overruled.

23         Bring them in.

24         (Continued on next page)

25

FBA5sj1e4                        FERGUSON - redirect

```
 1                    (Jury present)

 2               THE COURT:  Call your next witness.

 3               MR. GOLDSTEIN:  Your Honor, at this point the

 4    government would like to read a stipulation into the record.

 5               THE COURT:  Okay.  What's its number?

 6               MR. GOLDSTEIN:  S-7, your Honor.  With the Court's

 7    permission, if Mr. Coccaro could publish S-7 so the jury can

 8    read along?

 9               THE COURT:  Sure.

10               MR. GOLDSTEIN:  We will start with paragraph 1.

11               If called to testify, a custodian of records for the

12    Columbia University College of Physicians and Surgeons,

13    (Columbia University) would testify, as follows:

14               Columbia University maintains a faculty practice

15    electronic medical records database that faculty members,

16    including doctors, can access with a password, which is called

17    the Clinical Records Online Web Network database (CROWN).

18    Columbia University also maintains a computerized billing and

19    appointment system for its patients which is referred to as

20    IDX.

21               Government Exhibit 328 contains true and correct

22    copies of images of records maintained in CROWN and/or IDX

23    concerning patients referenced in those images.  These records

24    reflect, where applicable, contact with patients by Dr. Robert

25    Taub.  Government Exhibit 328 was created and maintained by
```

FBA5sil4                           FERGUSON - redirect

1    Columbia University as part of its regularly conducted

2    activity; was made or received at or near the time of the acts,

3    transactions and events recorded therein; and contains

4    information set forth by, or obtained from, persons with

5    knowledge of those matters.

6              2.  If called to testify, a custodian of records for

7    the New York Presbyterian Hospital (NYPH) would testify, as

8    follows:

9              NYPH maintains a computer database called the

10   Enterprise Master Patient Index, (EMPI), which is NYPH's master

11   database of all individuals who have received medical services

12   at NYPH.  Each individual in the EMPI is assigned a medical

13   record number which is a unique identifier that allows NYPH to

14   track medical care provided to that individual.

15             NYPH maintains various electronic health records for

16   its patients, and a system activity log records any time a NYPH

17   clinician, which includes doctors, accesses a patient's medical

18   records.  Dr. Robert Taub was assigned the unique identifier

19   "taubrob," so that the presence of "taubrob" on the system

20   activity log concerning a particular patient indicates that

21   Dr. Taub accessed that NYPH patient's medical records on the

22   dates and times listed in the system activity log.

23             Government's Exhibits 329 to 358 and 548 to 571 are

24   true and correct copies of records maintained by NYPH on EMPI

25   and/or the system activity log concerning patients referenced

FBA5si14                    FERGUSON - redirect

1   in those exhibits reflecting, where applicable, Dr. Taub's

2   contact with patients and/or access of the patient's medical

3   records.  Government's Exhibits 329 to 358 and 548 to 571 were

4   created and maintained by NYPH as part of its regularly

5   conducted activity; were made or received at or near the time

6   of the acts, transmissions and events recorded therein; and

7   contain information set forth by, or obtained from, persons

8   with knowledge of those matters.

9         It is further stipulated and agreed that Government's

10  Exhibits 328 through 358 and 548 through 571, and this

11  stipulation, may be received in evidence as government's

12  exhibits at trial.

13        And the government offers the stipulation S-7 and 328

14  through 358 and 548 through 571.

15        THE COURT:  Hearing no objection, S-7 is received, as

16  are Government's Exhibits 328 through 358 and 548 through 571.

17        (Government's Exhibits S-7, 328 through 358 and 548

18  through 571 received in evidence)

19        MR. GOLDSTEIN:  Thank you, your Honor.

20        The government would like to publish certain of these

21  exhibits and to do so, Mr. Coccaro, if you can, so this makes a

22  little bit of sense, if you can also pull up Government Exhibit

23  441 which is already in evidence?  So, Government Exhibit 441

24  which is already in evidence is titled Sheldon Silver All Cases

25  All Dates as of 11/21/2014.  Now, if we can publish one at a

1    time the exhibit numbers that I read to you from the

2    stipulation and, Mr. Coccaro, if you could highlight the names

3    in Government Exhibit 441 as we go through the exhibits?

4           So, Government Exhibit 350, which is Catherine

5    O'Leary.

6           Government Exhibit 344, Vincenza Lala.

7           To speed this along, Mr. Coccaro, instead of pulling

8    up the exhibits that are unreadable on the left, if you can

9    just simply highlight the names as I read them from the

10   exhibits that are being admitted pursuant to the stipulation?

11          Government Exhibit 357, William Zimmerman.

12          Government Exhibit 346, Stanley Levinson.

13          Government Exhibit 352, Donald Pieper.

14          Government Exhibit 336, Antonio Bussanich.

15          Government Exhibit 345, Krzysztof Leszczynski.

16          Government Exhibit 354, Henry Ross.

17          Government Exhibit 348, Stan Mashensky.

18          Government Exhibit 334, Walter Bernabe.

19          Government Exhibit 555, Antonio Ferro.

20          Government Exhibit 341, Doris Irgang.

21          Government Exhibit 333, Michelle Baetiong.

22          Government Exhibit 335, Antoni Bielewicz.

23          Government Exhibit 332, William Avon.

24          Government Exhibit 347, Benjamin Maniscalco.

25          Government Exhibit 351, Gladys Peters.

1           Government Exhibit 355, Marion Silvester.

2           Government Exhibit 331, Juan Amador.

3           Government Exhibit 340, Christian Holinka.

4           Government Exhibit 338, Yosif Chechik.

5           Government Exhibit 339, Gloria Guevara-Tatum.

6           Government Exhibit 353, Grady Rodgers.

7           Government Exhibit 356, Gerald Woods.

8           Government Exhibit 349, Harold Mindrebo.

9           Government Exhibit 564, Reba Murgio.

10          Government Exhibit 554, John DeMarcus.

11          Government Exhibit 558, William Hight.

12          Government Exhibit 570, Elizabeth Sanders.

13          Government Exhibit 553, Samuel Craper.

14          Government Exhibit 560, Adolfo Jurada.

15          Government Exhibit 565, Stanley Puza.

16          Government Exhibit 551, Alexander Briggin.

17          Government Exhibit 571, Rosa Torres.

18          Government Exhibit 569, John Saladino.

19          Government Exhibit 550, Marjorie Berkowitz.

20          Government Exhibit 559, Itez Setenay.

21          Government Exhibit 566, Aniello Rega.

22          Government Exhibit 556, Marilyn Flynn.

23          If we can go to the next page, Government Exhibit 567,

24   Robert McKinley?  And Government Exhibit 562 is also Robert

25   McKinley.

FBA5sjl4                    Luxenberg - direct

1          Government Exhibit 563, John Morford.

2          Government Exhibit 549, Nerya Begim.

3          Government Exhibit 557, Joseph Goldman.

4          Government Exhibit 561, Lisa LeClaire.

5          Government Exhibit 548, Rudolph Aquino.

6          Government Exhibit 552, Carolee Cohen.

7          Government Exhibit 568, Thomas Robinson.

8          Government Exhibit 342, Jeno Kahan.

9          Mr. Coccaro, just to go back one last time, if you

10   could look at Government Exhibit 342 and pull that up, the last

11   of the names we just read, Jeno Kahan?  Can you just zoom in on

12   the left side to see where it says taubrob under Jeno Kahan's

13   name so the jury can see what these records look like?

14          MR. GOLDSTEIN:  Thank you, your Honor.

15          The government calls Arthur Luxenberg.

16    ARTHUR MARTIN LUXENBERG,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19          THE WITNESS:  Arthur Martin Luxenberg.

20          MR. MASTER:  May I proceed, your Honor?

21          THE COURT:  Please.

22   DIRECT EXAMINATION

23   BY MR. MASTER:

24   Q.  Good afternoon, Mr. Luxenberg.  Where do you work?

25   A.  I'm a lawyer in Manhattan.

FBA5si14                    Luxenberg - direct

1   Q.   Do you work at any particular firm?

2   A.   The name of my firm is Weitz & Luxenberg.

3   Q.   And how did it end up that your firm was named

4   Weitz & Luxenberg?

5   A.   Perry Weitz and myself were at a firm in the '80s and we

6   left that firm and we formed the firm Weitz & Luxenberg.

7   Q.   And how many partners are there of the firm?

8   A.   Just the two of us.

9   Q.   And how long ago did you form the firm?

10  A.   I think it's coming on close to 30 years.

11  Q.   What is your educational background?

12  A.   I'm a graduate of Yeshiva University where I attended

13  college, and I went to the Cardozo Law School here in

14  Manhattan.

15  Q.   And what is your current position?

16  A.   I'm a partner in the law firm.

17  Q.   And what role do you play in managing the affairs of the

18  firm?

19  A.   I have an administrative role.  I work with others in

20  running the office.

21  Q.   Do you know Sheldon Silver, the defendant?

22  A.   Yes, I do.

23  Q.   What role did you play in hiring Sheldon Silver at

24  Weitz & Luxenberg?

25  A.   I was involved in the early discussions that led to his

1  coming on board with us.

2  Q.  How well did you know Sheldon Silver at the time you hired

3  him?

4  A.  Not very well.

5  Q.  Describe the nature of the relationship that developed over

6  time after he was hired.

7  A.  We became very close.

8  Q.  And would you describe it as a close friendship?

9  A.  Yes.

10  Q.  What, if any cases, did Sheldon Silver bring with him to

11  the firm?

12  A.  I'm not aware of any cases that he brought with him.

13  Q.  What kind of background in litigation did you understand

14  him to have?

15  A.  I understood that before he was with the Assembly he had

16  practiced law.

17  Q.  And when you hired Sheldon Silver what, if any asbestos

18  cases, did he say he could bring to the firm?

19  A.  He did not tell us that he would bring asbestos cases to

20  the office.

21  Q.  And approximately when did you hire Sheldon Silver?

22  A.  Approximately 12 years ago.

23  Q.  So, about 2002?

24  A.  Yes.

25  Q.  And what, if any background, did you understand him to have

FBA5si14                    Luxenberg - direct

1    in asbestos when he was hired?

2    A.  I did not understand that he had a background in asbestos.

3    Q.  Why did you decide to hire him?

4    A.  We thought that Sheldon Silver would bring prestige, honor

5    to the firm, and help the name of the firm.

6    Q.  Now, what expectation did you have when you hired Sheldon

7    Silver that he would bring any asbestos cases to the firm?

8    A.  We did not have an expectation that he would bring asbestos

9    cases.

10   Q.  What, if any expectation, did you have that Sheldon Silver

11   would use his official position to bring in cases to the firm?

12              MR. COHEN:  Objection.

13              THE COURT:  Overruled.

14   A.  We didn't think that he would use his position at all to

15   bring in cases to the firm.

16   Q.  In fact, at the time you hired Sheldon Silver what, if any

17   precautions, did you take to avoid possible conflicts of

18   interest or other issues related to Sheldon Silver's official

19   position?

20   A.  I recall that throughout the relationship we wouldn't take

21   cases that involved the State to avoid any appearance of

22   impropriety between of the firm, the State and Sheldon Silver.

23   Q.  And how, if at all, did the decision not to take cases

24   involving the State affect the firm?

25   A.  There were a limited number of times that there were cases

1   that we would have taken that we didn't.

2   Q.   And was the policy of avoiding conflicts of interest with

3   the State generally known within the firm?

4   A.   Yes.

5   Q.   And was Sheldon Silver, to your knowledge, specifically

6   informed of that policy?

7   A.   I think we discussed it.

8   Q.   Now, did there come a time when you learned that Sheldon

9   Silver began bringing asbestos cases to the firm?

10   A.   Yes.

11   Q.   How did you learn that?

12   A.   I learned it either through Charles Ferguson, who was

13   running the asbestos division, or maybe through Sheldon Silver.

14   Q.   And what type of cases did you learn that he was bringing

15   in?

16   A.   He had been bringing in negligence cases but he also was

17   bringing in asbestos cases.

18   Q.   And what type of asbestos cases?

19   A.   Mesothelioma.

20   Q.   Did there come a time after learning about Sheldon Silver's

21   bringing in mesothelioma cases to the firm when you spoke with

22   Sheldon Silver about the source of those cases?

23   A.   Yes.

24   Q.   And who did Sheldon Silver say was the source of those

25   mesothelioma cases?

FBA5sil4                     Luxemberg - direct

1   A.  Dr. Taub.

2   Q.  And what, if anything, did Sheldon Silver tell you about

3   how he knew Dr. Taub?

4   A.  He indicated that he had known him from before he came to

5   the firm but he didn't elaborate on how he knew him.

6   Q.  And what, if anything, did he tell you about how it had

7   come about that Dr. Taub began referring cases to him?

8   A.  He did not elaborate on how that relationship with

9   referrals began.

10  Q.  Again, you described yourself as having a close friendship

11  with Sheldon Silver; who was closer to him, you or Perry Weitz?

12  A.  I would think that I was.

13  Q.  And how often did you see Sheldon Silver after hiring him?

14  A.  I saw him when Sheldon Silver was in the City and he wasn't

15  in Albany, I saw him regularly in the office.

16  Q.  And did you see him only inside the office or did you also

17  see him outside the office?

18  A.  There were times when I would see him outside the office as

19  well.

20  Q.  Did you get to know members of his family?

21  A.  I did.

22  Q.  Did he get to know members of your family?

23  A.  He did.

24  Q.  And have you in fact attended family functions of each

25  other's?

FBA5sil4                    Luxenberg - direct

1   A.  We have.

2   Q.  And did you talk with each other on the phone?

3   A.  Yes.

4   Q.  What numbers did you have for him?

5   A.  I had a cell phone number for him, I believe I had a home

6   number for him, and a number in Albany.

7   Q.  And at which numbers were you able to reach him?

8   A.  I usually reached him on his cell phone.

9   Q.  Were there times when he would call you at the office?

10  A.  Yes.

11  Q.  Did you attend any social events with him?

12  A.  We did.

13  Q.  Did you attend any official events with him in connection

14  with his position as the Speaker of the Assembly?

15  A.  There were times when I went to Albany once a year or once

16  every other year when Sheldon Silver was being sworn in that he

17  made a small gathering after that I would attend.

18  Q.  When, if ever, did you see Dr. Robert Taub at any of these

19  events that you have just been describing?

20  A.  I never saw Dr. Taub.

21  Q.  And when, if ever, did Sheldon Silver describe Dr. Taub as

22  a friend of his?

23  A.  I don't recall that he did.

24  Q.  When, if ever, have you met Dr. Taub at all?

25  A.  I never met Dr. Taub.

FBA5sil4                          Luxenberg - direct

1   Q.   And when Sheldon Silver talked about Dr. Taub with you,

2   what did he talk about?

3   A.   We didn't really have discussions about Dr. Taub.

4   Q.   Were there times when he would discuss referrals from

5   Dr. Taub with you?

6   A.   He would occasionally tell me when he received a referral

7   from Dr. Taub.

8   Q.   When, if ever, did Sheldon Silver talk about any research

9   that was being performed by Dr. Taub?

10  A.   I don't recall him talking about research that Dr. Taub

11  performed.

12  Q.   When, if ever, did Sheldon Silver tell you that he was

13  sending state money to Dr. Taub or to support Dr. Taub's

14  research?

15  A.   He never told me that he was sending state money.

16  Q.   When, if ever, did Sheldon Silver tell you anything at all

17  about his support for asbestos or mesothelioma research of any

18  kind?

19  A.   He did not tell me about any support for mesothelioma

20  research.

21  Q.   Or asbestos research of any kind?

22  A.   He did not tell me about any research of any kind.

23  Q.   Again, what is the largest -- what is the largest practice

24  area in your firm?

25  A.   Asbestos litigation.

1   Q.  Let me ask you about your firm's own charitable practices.

2       What is the firm's practice with respect to charity?

3   A.  We consider ourselves a very charitable firm.  We have

4   given substantial contributions to hospitals, to educational

5   centers, to social services organizations that benefit the

6   hungry, poor people.  We are a very charitable firm both

7   individually and firm-wide.

8   Q.  Is that something that's generally known within the firm?

9   A.  Yes.

10  Q.  Did there come a time when the firm began giving

11  significant sums to support mesothelioma research?

12  A.  Yes.

13  Q.  When did you start giving significant sums to support

14  mesothelioma research?

15  A.  At or around 2011 we made substantial contributions, which

16  are continuing, to Massachusetts General who presented us with

17  a cutting edge opportunity to fund research that was being done

18  at their hospital which would benefit mesothelioma victims.

19  Q.  And how did you respond to that opportunity when it was

20  presented to you?

21  A.  Generously.

22  Q.  In other words, with financial support?

23  A.  Yes.

24  Q.  Now what, if any role, did Sheldon Silver play in bringing

25  this research opportunity to your attention?

FBA5sil4                    Luxenberg - direct

1    A.  He did not.

2    Q.  What, if any role, did he play in facilitating that

3    contribution?

4    A.  He did not facilitate that contribution.

5    Q.  Prior to being presented with that opportunity in 2011,

6    what, if any support, did you give to doctors who were

7    performing mesothelioma research?

8    A.  We were not really presented with the kind of opportunities

9    that we were presented with in 2011 when we made the

10   significant contribution so our support, up to that point, was

11   basic to hospitals, without denominating the type of research

12   or facilities that they would go to, just general

13   contributions.

14   Q.  So, in other words, you did not give any support prior to

15   2011 that was specific to any doctor's mesothelioma research?

16   A.  That's correct.

17   Q.  And what, if any support, have you given to the

18   Mesothelioma Applied Research Foundation or MARF?

19   A.  Apart from what I later learned to be very, very nominal,

20   we did not give any support to that organization.

21   Q.  When, if ever, did Sheldon Silver present you with an

22   opportunity to support MARF?

23   A.  He did not.

24   Q.  When, if ever, did Sheldon Silver present you with the

25   opportunity to support research being conducted by Dr. Taub?

```
1    A.  He did not.

2    Q.  Have you ever supported any research by Dr. Taub?

3    A.  We have not.

4    Q.  When, if ever, did Sheldon Silver bring to your attention

5    any opportunity to support asbestos or mesothelioma research of

6    any kind?

7    A.  He did not.

8    Q.  When, if ever, did he discuss asbestos or mesothelioma

9    research with you?

10   A.  I don't recall discussing mesothelioma research with

11   Sheldon Silver.

12   Q.  What, if anything, do you know about any assistance that

13   Sheldon Silver may have provided to Dr. Taub with respect to

14   the employment of Dr. Taub's children?

15   A.  I'm not aware of that.

16   Q.  What, if any discussions, did you have with Sheldon Silver

17   about any assistance he may have provided to any organizations

18   with which Dr. Taub's wife is affiliated?

19   A.  I am not aware of any discussions.

20   Q.  When, if ever, did Sheldon Silver tell you about any

21   separate law practice that he had outside of Weitz & Luxenberg?

22   A.  He never discussed a separate law practice outside of

23   Weitz & Luxenberg.

24   Q.  What, if any clients, did Sheldon Silver ever say he had in

25   the real estate industry?
```

1  A.  I'm not aware of any clients that he had in the real estate

2  industry.

3  Q.  Now, Mr. Luxenberg, was Sheldon Silver required, as a

4  result of his of counsel relationship with Weitz & Luxenberg,

5  to refrain from having any other clients?

6  A.  No.  He was permitted to have other clients.

7  Q.  Again, what type of relationship would you describe

8  yourself as having with him?

9  A.  Can you --

10      THE COURT:  Professionally or personally?  I don't

11  understand the question.

12      MR. COHEN:  Asked and answered, your Honor.

13      THE COURT:  Sustained.  I think he has testified to

14  that twice.

15      MR. MASTER:  Yes.

16  BY MR. MASTER:

17  Q.  Now, Mr. Luxenberg, did there come a time when you noticed

18  a change -- I'm sorry -- when you learned about a change in the

19  number of cases being sent from Dr. Taub to Sheldon Silver?

20  A.  Yes.

21  Q.  What change did you learn about?

22  A.  I learned that there was a diminishing amount of asbestos

23  cases coming in through Sheldon Silver.

24  Q.  Through Sheldon Silver from Dr. Taub?

25  A.  Yes.

1    Q.   Who did you speak to after learning about this reduction in

2    the number of cases?

3    A.   Charles Ferguson.

4    Q.   And did there come a time when you spoke with Sheldon

5    Silver about the dropoff in cases?

6    A.   Yes.

7    Q.   What, if any explanation, did he give you for the reduction

8    in the number of cases when you spoke to him?

9    A.   He indicated to me that another law firm had made a

10   contribution to Dr. Taub's foundation for research.

11   Q.   Did he tell you the name of that firm?

12   A.   The Simmons firm.

13   Q.   Did he provide that contribution donation as the reason for

14   the dropoff?

15              MR. COHEN:  Objection, your Honor.

16              THE COURT:  Yes.  You're leading.

17              Can you just tell us what the conversation was?  What

18   did you say to him and what did he say to you?

19              THE WITNESS:  He told me that the Simmons firm had

20   made a contribution to the foundation.

21   BY MR. MASTER:

22   Q.   This is to Dr. Taub?

23   A.   Yes; which is the suggested reason why there was a dropoff

24   in the number of cases being referred to Mr. Silver.

25   Q.   And after Mr. Silver said that what, if anything, did

1  Sheldon Silver say he expected to happen in the future with

2  Dr. Taub?

3  A.  He expected referrals to continue.

4  Q.  And what, if any, effect did he say were -- I'm sorry.

5          What, if any concern did he express about the

6  possibility that his referrals were going down?

7  A.  He was unconcerned.

8  Q.  Did he in fact say that he was unconcerned?

9  A.  Yes.

10          (Continued on next page)

 1   BY MR. MASTER:

 2   Q.  And what, if anything, did he tell you he was going to do

 3   to get the volume of cases to go up again?

 4   A.  He did not indicate what he would do.

 5          THE COURT:  I'm sorry.  Did he say that the volume was

 6   going to go up?

 7          THE WITNESS:  No.  The volume -- he didn't indicate

 8   that the volume was going to go up or continue to go down.  He

 9   just indicated that he wasn't concerned and suggested that the

10   cases would continue to be referred.

11          THE COURT:  What did you say?

12          THE WITNESS:  Good.

13   BY MR. MASTER:

14   Q.  When, if ever, did Sheldon Silver tell you about any

15   official actions he was intending to take or had taken on

16   behalf of Dr. Taub, his research, or his family?

17   A.  He never told me about any action that he was going to

18   take.

19          MR. MASTER:  Nothing further.

20          THE COURT:  Mr. Cohen.

21   CROSS-EXAMINATION

22   BY MR. COHEN:

23   Q.  As you know, Mr. Luxenberg, I represent Mr. Silver, along

24   with my colleagues.

25          You know that your law partner, Perry Weitz, testified

1    here last week.

2         MR. MASTER:  Objection, your Honor.

3         THE COURT:  Overruled.

4    BY MR. COHEN:

5    Q.  Do you know that?

6    A.  I do.

7    Q.  I'm wondering whether you would describe it the same way he

8    described the partnership between yourself and Mr. Weitz of

9    over 25 or 30 years as like a marriage.

10        MR. MASTER:  Objection, your Honor.

11   BY MR. COHEN:

12   Q.  Is that a fair statement of how you see it?

13        THE COURT:  Sustained.  The last part is fine.

14        MR. GOLDSTEIN:  "As you see it"?

15        THE COURT:  Is that how you see it?

16        MR. GOLDSTEIN:  Correct.

17   BY MR. GOLDSTEIN:

18   Q.  Is that how you see it?

19   A.  Yes.

20   Q.  I assume your wives are not charging you both with bigamy

21   over this marriage.

22        With respect to the relationship, as Mr. Weitz

23   described it -- and I'm asking you -- as he's sort of the trial

24   guy, and you're the law guy.

25        Correct?

```
 1    A.  That was a long time ago.

 2            THE COURT:  Does that mean he's no longer the trial

 3    guy, and you're no longer a law guy?

 4            THE WITNESS:  Exactly, Judge.

 5    BY MR. COHEN:

 6    Q.  So you would describe yourself this afternoon more in

 7    charge of administration of the firm; correct?

 8    A.  Exactly.

 9    Q.  With respect to that, Mr. Weitz would know -- I don't want

10    to go over the same grounds I did with Mr. Weitz.

11            Mr. Weitz would know about the referral system outside

12    of the firm into the firm or the breakdown in fee structure

13    when somebody in the firm refers a case to the firm and

14    ultimately there's a recovery by the client; correct?

15            MR. MASTER:  I'm going to object, your Honor.

16            THE COURT:  Sustained.

17    BY MR. COHEN:

18    Q.  Is it fair to say that if a lawyer in your firm, whoever

19    that lawyer is, brings in a case, he or she is going to get one

20    third of the recovery of the one third of what Weitz &

21    Luxenberg receives of the case.  Correct?

22    A.  Depending on the kind of case that's referred.

23    Q.  If it's a mesothelioma case.

24    A.  Yes.

25    Q.  One third?
```

FRAYSL15                     Luxenberg - Cross

1   A.  Yes.

2   Q.  If it's a negligence case?

3   A.  It would be 40 percent, or it could be a third, depending

4   on when that case is resolved.

5   Q.  That would be the case whether the lawyer who brings in the

6   case is the Speaker of the Assembly or the lawyer who brings in

7   the case is a young lawyer with not much experience as a

8   lawyer; correct?

9   A.  That's correct.

10  Q.  Now, with respect to cases that come into the firm, whether

11  it's from outside the firm or from a lawyer within the firm,

12  with respect to those, the law firm evaluates the value of the

13  case; correct?

14  A.  Correct.

15  Q.  And the experts in the area, particularly in mesothelioma

16  cases -- they determine whether a case warrants being brought

17  in the courts; correct?

18  A.  Yes.

19  Q.  And ultimately the decision of whether a case is going to

20  be brought is the client's decision; correct?

21  A.  Always the client's decision.

22  Q.  Not the decision of the referring lawyer, not the decision

23  of the expert within Weitz & Luxenberg or any other law firm

24  who's evaluating the case.

25          Correct?

```
 1  A.  Yes.  That's correct.

 2  Q.  In the event that the client says at the end of the day, I

 3  don't want to bring the lawsuit.  This thing is too painful for

 4  me.  I don't want to go through it again or there is a decision

 5  that the case is going to be a hard case, it's ultimately the

 6  client's decision and only the client's decision whether to go

 7  forth with the case.

 8          Correct?

 9  A.  Always the client's decision.

10          THE COURT:  You're not saying the client can decide

11  that you will go forward if you don't want to go forward.

12          THE WITNESS:  That's correct, your Honor.

13          THE COURT:  So it's not always the client's decision.

14  It's the client's decision to file.

15          THE WITNESS:  It's the client's decision to file if we

16  accept the case.

17  BY MR. COHEN:

18  Q.  And the client's decision whether to retain you.

19  A.  Yes.

20  Q.  Or to retain another law firm.

21  A.  That's correct.

22  Q.  Or to retain no firm.

23  A.  Correct.

24  Q.  Or to proceed with the case by himself, however nutty that

25  might be; correct?
```

1   A.  That's correct.

2   Q.  You've been asked a lot of questions by Mr. Goldstein about

3   Mr. Silver didn't tell you this.  He didn't tell you about

4   sponsoring a grant.  He didn't tell you about other things that

5   he talked about during his questions -- Mr. Goldstein.

6        Correct?

7        THE COURT:  Wasn't it Mr. Master?

8        MR. COHEN:  Mr. Master.  Pardon me.

9        MR. MASTER:  No offense taken.

10       MR. COHEN:  I'm sure not.

11       THE COURT:  Mr. Molo, please continue.

12       MR. COHEN:  Touche.

13  BY MR. COHEN:

14  Q.  So Mr. Master asked you about things that Mr. Silver did

15  not tell you about; correct?

16  A.  Correct.

17  Q.  You have known Mr. Silver you say for about 13 years;

18  correct?

19  A.  I have.  People are different idiosyncratically.  Some

20  people are very obtrusive, very emotive, very talkative.

21       How about Mr. Silver in your experience with him?

22  A.  He's not a very talkative man.

23  Q.  He holds things basically close to the vest?  Would that be

24  fair?

25       MR. MASTER:  Objection.

FBAYSIL5                          Luxenberg - Cross

1    THE COURT:  Overruled.

2    THE WITNESS:  Yes.

3  BY MR. COHEN:

4  Q.  With respect to showing emotion, some people show emotion

5  oftentimes favorably, or some people show their emotion in

6  terms of unhappiness; correct?

7  A.  Correct.

8  Q.  How about Mr. Silver?

9  A.  He doesn't express his emotions very often.

10  Q.  So you say you had a conversation first with Mr. Ferguson

11  and then with Mr. Silver.  And the issue in the conversation

12  was that there was a perceived fall-off in cases.

13         Correct?

14  A.  Yes.

15  Q.  Do you know when that conversation happened?

16  A.  I do not.

17  Q.  But with respect to that conversation, you said that

18  Mr. Silver seemed unconcerned; correct?

19  A.  Correct.

20  Q.  Did you previously tell the government that you saw it as

21  he was unphased?

22  A.  I think unconcerned and unphased are fairly similar.

23  Q.  So, basically when he said he was unconcerned or showed

24  that he was unconcerned, did you read anything in particular

25  into that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.   No.

2    Q.   You said good.   He said it would go up he thought.   You

3    said good.

4              You didn't ask for more than that?

5    A.   No.

6    Q.   You didn't expect more than that?

7    A.   No.

8    Q.   Because that's sort of the way he answers questions,

9    quickly, and let's move on?

10   A.   Correct.

11             MR. MASTER:   Objection.

12             THE COURT:   Overruled.

13   BY MR. COHEN:

14   Q.   Now, Mr. Master asked you questions about the generosity of

15   you and your law firm and Mr. Weitz to charitable

16   organizations.

17             Correct?

18   A.   Yes.

19   Q.   I expect you know that there's been testimony in this

20   courtroom that Dr. Taub was concerned that your firm was not

21   contributing to mesothelioma research; correct?

22             MR. MASTER:   Objection.

23             THE COURT:   Yes.   Delete what other evidence there's

24   been in this trial.

25   BY MR. COHEN:

```
 1  Q.  Have you heard that Dr. Taub was concerned about that?

 2          MR. MASTER:  Objection.

 3          THE COURT:  Have you ever spoken to Dr. Taub?

 4          THE WITNESS:  No.

 5          THE COURT:  Sustained.

 6  BY MR. COHEN:

 7  Q.  In any event, Mr. Master was asking you questions about

 8  your generosity, and you described some.

 9          You described giving money to Cardozo Law School, from

10  which you are an alumni?

11  A.  We gave, yes.

12  Q.  Approximately how much money did you give them?

13  A.  Substantial.

14  Q.  Okay.  How about NYU?

15  A.  Less substantial.

16          THE COURT:  NYU Law School or the university?

17          THE WITNESS:  The university.

18  BY MR. COHEN:

19  Q.  And you gave a -- pardon me.  Mr. Weitz basically gave

20  money, perhaps through the law firm, to the Hofstra Law School,

21  which was his alma mater; correct?

22  A.  Yes, he did.

23  Q.  That was to create what's now known as the Weitz Institute

24  for the Study of Mass Torts?

25  A.  I'm honestly not positive what the name is.  I thought it
```

1    was originally for a moot courtroom, which is like a mock

2    courthouse not too dissimilar from this where students would

3    practice.

4    Q.   Since you are sort of shy about telling us sums, would it

5    be fair to say that the contribution from your law firm to

6    Hofstra was to the tune of roughly $1,000,000?

7    A.   I think that's correct.

8    Q.   Now, you said also that your law firm contributed, when it

9    had an opportunity, a substantial amount of money to the

10   Massachusetts General Hospital?

11   A.   Yes.

12   Q.   And you said there was a cutting-edge opportunity there?

13   A.   There was a unique, cutting-edge opportunity.

14   Q.   Explain that cutting-edge opportunity.

15   A.   They were doing very, very novel, innovative research which

16   specifically was going to prolong life in mesothelioma victims.

17   Q.   That's something you wanted to contribute to?

18   A.   Very much so.

19   Q.   And you also gave a fair amount of money, did you, maybe

20   not the same amount, to the Brigham and Women's Hospital in

21   Boston?

22   A.   We gave less money for a different purpose.

23   Q.   What was the purpose there?

24   A.   The purpose there was to help families that were coming to

25   the hospital for treatment find housing and get other aid so

 1   that they would have less stresses while their family members

 2   were undergoing surgeries and other treatment at the hospital.

 3   Q.  And in your experience, Mr. Luxenberg, people decide on

 4   what charities they want to give money to; correct?

 5   A.  Yes.

 6   Q.  Have you also given money, you or your law firm or

 7   Mr. Weitz and your law firm, to the North Shore General

 8   Hospital?

 9   A.  North Shore?

10   Q.  LIJ?

11   A.  North Shore LIJ, yes.

12   Q.  You wouldn't care to tell us that amount, would you?

13   Substantial?

14   A.  Very substantial.

15   Q.  I think we have the general picture, Mr. Luxenberg.

16           MR. COHEN:  If you would give me a moment, your Honor.

17           THE COURT:  Sure.

18           (Pause)

19           MR. COHEN:  I have no further questions,

20   Mr. Luxenberg.

21           MR. MASTER:  Just a couple questions in redirect,

22   your Honor.

23   REDIRECT EXAMINATION

24   BY MR. MASTER:

25   Q.  Mr. Cohen asked you some questions about money that was

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

FBAYSIL5                    Kirkland - Direct/A

1    sent to Massachusetts General Hospital starting in 2011.

2              Whose money did you send?

3    A.  The firm's money.

4    Q.  There was also a contribution to Brigham and Women's

5    Hospital?

6    A.  Yes.

7    Q.  Whose money did you send to Brigham and Women's Hospital?

8    A.  The firm's money.

9    Q.  What, if any, cases did you ask for from Massachusetts

10   General at the time you were offering that contribution?

11   A.  We did not ask for cases.

12   Q.  When you sent money to Brigham Women's for that opportunity

13   that you were talking about, the firm's money?  What, if any,

14   cases did you ask for?

15   A.  We did not ask for cases.

16              MR. MASTER:  Nothing further.

17              THE COURT:  Okay.  Thank you.  You can step down.

18              (Witness excused)

19              Call your next witness.

20              MR. GOLDSTEIN:  The government calls Greg Kirkland.

21    GREG ARTHUR KIRKLAND,

22         called as a witness by the Government,

23         having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25   BY MR. GOLDSTEIN:

FBAY5IL5                    Kirkland - Direct

1   Q.  Good afternoon, Mr. Kirkland.

2   A.  Good afternoon.

3   Q.  Through the beginning of this year, where did you work?

4   A.  I worked for the Simmons law firm.

5   Q.  Where is the Simmons law firm located primarily?

6   A.  It's located in Alton, Illinois, is our headquarters.

7   Q.  What kind of a law firm is the Simmons law firm?

8   A.  A personal injury firm.  We help individuals that have

9   corporation defendants such as exposure to asbestos.

10  Q.  In addition to asbestos cases, what other types of cases

11  does Simmons specialize in?

12  A.  Pharmaceutical medical device cases, those types.

13  Q.  For how long did you work at Simmons?

14  A.  Approximately 13 years.  2002 through 2015.

15  Q.  What was your position there?

16  A.  Chief executive officer.

17  Q.  Briefly, what did you do before joining the Simmons firm?

18  A.  I was in banking when I graduated from college until I came

19  to the Simmons firm.

20  Q.  What type of positions in the banking industry did you

21  have?

22  A.  All sorts from accounting to lending to chief executive

23  officer, president.

24  Q.  Are you an attorney?

25  A.  No, I'm not.

FBAYSI15                          Kirkland - Direct

1   Q.   So, as the CEO of the Simmons firm, what were your

2   responsibilities?

3   A.   I managed the day-to-day operations of the firm.

4   Q.   What does that mean?

5   A.   Oversaw, oversaw the business aspect of 200 employees and

6   what we were doing in the firm, the overall operations of the

7   firm.

8   Q.   Approximately how many attorneys did Simmons have?

9   A.   Seventy.

10  Q.   About how many staff?

11  A.   About 150.

12  Q.   You testified that one of Simmons' specialties is asbestos

13  cases; is that right?

14  A.   Correct.

15  Q.   Was there a particular kind of asbestos case that was most

16  valuable to the firm?

17  A.   Mesothelioma cases.

18  Q.   Why is that?

19  A.   Because the only way you can get that is exposure from

20  asbestos.

21  Q.   As a result of that fact, are recoveries in asbestos

22  mesothelioma cases greater than they are in other types of

23  asbestos cases?

24  A.   Yes, they are.  Mesothelioma unfortunately primarily leads

25  to death.

1   Q.  How did the Simmons firm charge its clients in representing

2   them in mesothelioma cases?

3   A.  It's a contingency law firm.  So the contract is

4   40 percent.  We don't charge anything unless we're successful

5   to the client.

6   Q.  Did the firm always charge 40 percent, or was there

7   sometimes a range in terms of what contingency fee the firm

8   took?

9   A.  Yes.  Depending on the state or depending on the individual

10  contract.  It could vary.

11  Q.  Have you done an analysis as to the average recoveries in

12  mesothelioma cases over time?

13  A.  Yes.

14  Q.  Did you do that in connection with your role as the CEO of

15  the firm?

16  A.  Yes.

17  Q.  What did that analysis show with regard to the value of

18  mesothelioma cases currently?

19  A.  Currently?

20  Q.  Correct.

21  A.  The average gross settlement, the total settlement of the

22  case -- it depends on the case, but the overall average is

23  approximately a million dollars for gross settlement.

24  Q.  So, of the firm's portion of that was 40 percent, how much

25  of a settlement of a million dollars would the firm receive?

 1   A.   $400,000 depending on cocounsel fees.

 2   Q.   Has that number, that million dollar average settlement

 3   number -- has that number changed over time?

 4   A.   Yes.   When I first came to the firm in 2002, it was

 5   probably $2,000,000 to $3,000,000.

 6   Q.   How do those average settlement values compare to other

 7   types of asbestos cases?

 8   A.   They're generally far greater.

 9   Q.   Have you done a similar analysis for lung cancer cases

10   for example?

11   A.   Generally, the cases that our firm handled were in the

12   $50,000 to $100,000 gross recovery.

13   Q.   That's ten times or more less than the mesothelioma value;

14   is that right?

15   A.   Correct.

16   Q.   What are the ways that the Simmons firm found clients with

17   mesothelioma to be able to represent them?

18   A.   Through advertising, through clients, through word of

19   mouth, through Internet advertising, TV -- those type of

20   things.

21   Q.   Approximately how much did Simmons spend on advertising

22   each year?

23   A.   The range was, when I started at the firm, in the

24   $2,000,000 to $3,000,000.   At the time I left the firm,

25   $15,000,000 to $20,000,000, depending on the year.

1   Q.   That's per year?

2   A.   Per year.

3   Q.   What did the advertising get for Simmons?

4   A.   It gave us leads, what we call leads or potential clients

5   that would call from a TV ad, would call the 800 number to

6   potentially have us sign that client, potential client.

7   Q.   What do you mean by a "lead"?

8   A.   A "lead" is a person that calls in inquiring about our firm

9   and how we might represent them.

10  Q.   Now, did Simmons also attempt to obtain leads through the

11  Internet?

12  A.   Yes.

13  Q.   In what way?

14  A.   Through pay-per-click advertising, through organic searches

15  through the Internet.  Mesothelioma is, I think -- I don't know

16  if it's for sure, but I heard it's the most expensive

17  pay-per-click advertising on the Internet.

18          THE COURT:   It's the most expensive what?   Did you say

19  pay per click?

20          THE WITNESS:   Pay per click.

21          THE COURT:   Pay per click.

22          THE WITNESS:   Correct.

23          THE COURT:   So, every time someone clicks on the link,

24  somebody gets paid?

25          THE WITNESS:   Right.   Our firm might be paid for that

FBAYSI15                    Kirkland - Direct

1    advertisement.

2              THE COURT:  Okay.

3    BY MR. GOLDSTEIN:

4    Q.  Did there come a time when the Simmons firm set up a

5    nonprofit foundation to provide money for mesothelioma

6    research?

7    A.  Yes, we did.

8    Q.  What was that foundation called?

9    A.  The Simmons Mesothelioma Foundation.

10   Q.  Approximately when was that foundation established?

11   A.  I believe in 2009.

12   Q.  Where did the funding come from for the foundation?

13   A.  From the law firm.

14   Q.  Who ran the foundation?

15   A.  We had a board of directors, but John Simmons was the

16   chairman.  Mike Angelides was our managing partner.  Myself,

17   Joy Wheeler, and Mark Motley.

18   Q.  Let's just go through those names one more time one by one.

19   A.  Okay.

20   Q.  So you referenced Mr. Simmons.

21             Who was Mr. Simmons?

22   A.  Mr. Simmons is the founder of our law firm.

23   Q.  Is he a partner of the firm?

24   A.  Yes, he was.

25   Q.  What was his role in the foundation?

1    A.  I believe he was chairman.

2    Q.  And you mentioned Mike Angelides.

3        What was his role at the firm?

4    A.  He is the managing partner.

5    Q.  You mentioned a Mark Motley.

6        What was his role at the firm?

7    A.  Public relations, marketing type.  He's not a lawyer.

8    Q.  Did he work underneath you?

9    A.  Yes.

10   Q.  And you mentioned a Joy Wheeler.

11       Who was that?

12   A.  Joy headed up our foundation.  She was a former RN that we

13   hired when we started the foundation.

14   Q.  You say she was a former RN.

15       What is an RN?

16   A.  A nurse.

17   Q.  Was she hired from outside the firm to help run the

18   foundation?

19   A.  Yes.

20   Q.  What type of research did the foundation fund?

21   A.  We supported research for hopefully providing a cure for

22   mesothelioma.

23   Q.  Who made the decisions as to which doctors or hospitals the

24   foundation would provide funding to?

25   A.  Our board.

1  Q.  Are you familiar with Dr. Robert Taub?

2  A.  Yes.

3  Q.  To what extent, if any, did you know Dr. Robert Taub before

4  the foundation?

5  A.  I knew he treated some of our clients in the past, but I

6  did not know him personally until the foundation was formed.

7  Q.  Did there come a time when the Simmons Mesothelioma

8  Foundation decided to fund Dr. Taub's research?

9  A.  Yes.

10 Q.  Approximately when was that?

11 A.  Late 2011/early 2010.

12 Q.  If we can -- I think it's in your binder as Government

13 Exhibit 598, which is already in evidence.

14         MR. GOLDSTEIN:  If we could publish that.

15         MR. MOLO:  This is subject to the objections I made.

16         THE COURT:  Yes.

17 BY MR. GOLDSTEIN:

18 Q.  Mr. Kirkland, do you recognize this document?

19 A.  Yes.

20 Q.  What is this document?

21 A.  It is our agreement with Columbia to fund research for

22 mesothelioma.

23 Q.  So, if we can turn to the second page of the agreement.

24         What are the dates that the agreement was signed?

25 A.  March of 2010.

FBAYSIL5                    Kirkland - Direct

1   Q.  Would you then go back to the first page of the agreement.

2          MR. GOLDSTEIN:  If we can highlight the first

3   paragraph so that we can read along.

4   BY MR. GOLDSTEIN:

5   Q.  Mr. Kirkland, can you read the first sentence of this

6   paragraph.

7   A.  "The Simmons Mesothelioma Foundation is pleased to

8   formalize its promise to give $3,150,000 to Columbia University

9   for the benefit of its colleagues and physicians and surgeons

10  Mesothelioma Center in the Department of Medicine."

11  Q.  And then it says, "This gift is made in honor of Robert

12  Taub, MD."

13         As set forth in this document, whose research was the

14  foundation going to fund to the tune of $3,150,000?

15  A.  Columbia, Dr. Taub's department.

16  Q.  Why was it phrased as a gift in honor of Dr. Robert Taub?

17  A.  I believe, during our talks about the agreement, that's how

18  Dr. Taub and the university wanted it addressed.

19  Q.  Let me call your attention to the third paragraph, the

20  funding amounts.

21  A.  Okay.

22  Q.  Who came up with the overall number of $3,150,000?

23  A.  During discussions with Dr. Taub, that was the amount that

24  he needed to do his research, and it was suggested by him.

25  Q.  Why is it that the dollar amounts are staged over time and

1   go down over time?

2   A.  I believe that's the way he needed it for research.  It

3   worked well for us too.

4   Q.  Why did it work well for you?

5   A.  Like I said earlier, we're a contingency law firm.  So if

6   we're successful -- we don't know if we're going to be

7   successful very far in the future.

8   Q.  Let's look at the last paragraph on the first page.

9       "The above payments shall be used and applied at the

10  direction of the director of the Center of Mesothelioma,

11  currently Dr. Robert Taub, which studies the combined modality

12  treatment for malignant mesothelioma.

13      "Should Dr. Robert Taub no longer be the director of

14  the Mesothelioma Center, the university should immediately

15  notify the foundation and discuss with the foundation

16  continuing research in the mesothelioma lab and how the

17  remaining payments will be utilized by the university.

18      "The university understands that the foundation will

19  have the right to discontinue funding."

20      What was the purpose of that language?

21  A.  I think it served a couple purposes:  One, our relationship

22  was with Dr. Taub.  That's who we knew at Columbia.  So that's

23  who we wanted -- we wanted to support his research.

24      I believe, if I recall Dr. Taub and the political

25  environment of Columbia, if it wasn't specifically ordered like

FBAYSIL5                          Kirkland - Direct

1    that, it may go to another department is what I remember from

2    him.

3    Q.  After this agreement was signed, did the foundation in fact

4    make payments to Columbia to support Dr. Taub's research?

5    A.  Yes, we did.

6    Q.  If you can just look quickly at Government Exhibit 530,

7    which is not yet in evidence.

8            Do you recognize what's in Government Exhibit 530?

9    A.  Yes.

10   Q.  What are these?

11   A.  Receipts that we would receive after a check was delivered

12   to Columbia.

13           MR. GOLDSTEIN:  Your Honor, the government offers 530.

14           THE COURT:  Any objection?

15           MR. MOLO:  No objection.

16           THE COURT:  530 is received.

17           (Government's Exhibit 530 received in evidence)

18           MR. MOLO:  Subject to the same objection.

19           THE COURT:  530 is received.

20           MR. GOLDSTEIN:  If you can publish the first page of

21   530, Mr. Coccaro.  If you can zoom in on the middle so you can

22   see the date and what the initial gift amount was.

23   BY MR. GOLDSTEIN:

24   Q.  So, Mr. Kirkland, what is the date of this gift receipt?

25   A.  April 19, 2010.

FBAYSLI5                         Kirkland - Direct

1   Q.  And it's for how much money?

2   A.  $475,000.

3   Q.  How did you deliver the payments that were made by the

4   foundation for Dr. Taub's research?

5   A.  Either through the mail or we would have quarterly meetings

6   with Dr. Taub, and we would hand deliver those checks.

7   Q.  From 2010 through 2014, the dates that were set forth in

8   the agreement, did the foundation in fact pay to Columbia the

9   amounts that were listed in the agreement?

10  A.  Yes.  I don't know the exact amount, but I know it's over

11  $3,000,000.

12          MR. GOLDSTEIN:  It we would return, Mr. Coccaro, to

13  Government's Exhibit 598, please.  And look at the second

14  paragraph and highlight the second paragraph.

15  BY MR. GOLDSTEIN:

16  Q.  It says, "It is our understanding that Dr. Taub should

17  provide quarterly updates to the foundation detailing the prior

18  quarter's activities supported by the pledge and the projected

19  budget for the upcoming year or upon any other times as

20  reasonably requested by the foundation."

21          Did you in fact receive regular updates from Dr. Taub?

22  A.  Yes, we did.

23  Q.  In what form did those updates take place?

24  A.  They were put-together packets, PowerPoint reports that he

25  would give to us in person or send through PowerPoint through

1   the email.

2   Q.  So some of the updates were paper updates, and some of them

3   were in-person presentations?

4   A.  Yes.

5   Q.  When he gave an in-person presentation as a progress

6   update, who attended those presentations?

7   A.  It would vary, but Joy Wheeler was there all the time.

8   Myself, Mark Motley, and other attorneys in our firm.

9   Q.  Mark Motley is the individual you said who works underneath

10  you?

11  A.  Yes.

12  Q.  And Joy Wheeler was the director of the foundation?

13  A.  Correct.

14  Q.  When you had one of those in-person presentations, about

15  how long did they last?

16  A.  Dr. Taub was pretty enthusiastic.  A few hours.

17  Q.  What did he do during the presentations that lasted a

18  couple hours?

19  A.  He would go through what they're doing in their lab, maybe

20  parts of speeches that he would give at conferences.  He'd go

21  through all those types of materials.  And he also would bring

22  in other doctors that he was working with also.

23  Q.  So the presentations were not just from Dr. Taub, but there

24  were other people from Columbia who came as well?

25  A.  Correct.

FBAYSI15                      Kirkland - Direct

1   Q.   Now, prior to the foundation's decision to fund Dr. Taub's

2   research, had Dr. Taub referred any of his patients to Simmons?

3   A.   Not that I'm aware of.

4   Q.   After the foundation made its commitment to fund Dr. Taub's

5   research, did Dr. Taub start referring patients to Simmons?

6   A.   Yes, he did.

7   Q.   How soon after the commitment was made did Dr. Taub start

8   referring patients to Simmons?

9   A.   A few weeks.

10  Q.   How did Dr. Taub make a referral to the Simmons firm?

11  A.   He would usually try to call.  When Joy Wheeler was there,

12  he would call her and then follow up with an email.

13  Q.   What information did Dr. Taub provide in those calls or

14  emails?

15  A.   Contact information, if the potential client wanted to talk

16  to us, and just background information about the client.

17  Q.   I want you to look in your binder as what's been marked as

18  Government Exhibit 525-26.

19  A.   Yes.

20  Q.   Do you recognize this document?

21  A.   Yes.

22  Q.   What is it?

23  A.   It is an email from Dr. Taub about a potential client, a

24  patient of his, that might want us to help with the case.

25           MR. GOLDSTEIN:  Your Honor, the government offers

FBAYSI15                      Kirkland - Direct

1     525-26.

2              MR. MOLO:  Same objection.

3              THE COURT:  Overruled.  525-26 is received.

4              (Government's Exhibit 525-26 received in evidence)

5              MR. GOLDSTEIN:  Mr. Coccaro, if we could publish the

6     bottom email.

7     BY MR. GOLDSTEIN:

8     Q.  It's from Robert Taub to Greg Kirkland.

9              Is that you?

10    A.  Yes, sir.

11    Q.  What's the date of the email?

12    A.  June 2, 2014.

13    Q.  And the subject line is what?

14    A.  "As per my phone message."

15    Q.  You testified that sometimes he would call, and sometimes

16    he would email.

17             Did he generally try to call first?

18    A.  Yes.

19    Q.  Looking at the information that is presented here, does the

20    name, age, location -- what is "DX"?

21    A.  Diagnosis.

22    Q.  "Pleural meso by biopsy.  Exposure:  Asbestos.  Home

23    phone."

24             MR. MOLO:  Your Honor, I object to Mr. Goldstein

25    reading the document.

1          THE COURT:  You've both been reading documents.  He is

2    your witness.

3    BY MR. GOLDSTEIN:

4    Q.  Mr. Kirkland, can you read the last line of the email,

5    please.

6    A.  "Probably should be contacted very soon."

7    Q.  What was your -- withdraw that for now.

8          That information that's in that email -- is that the

9    type of information that Dr. Taub generally provided when he

10   referred a patient to the firm?

11   A.  Yes.  Generally.

12   Q.  What was your term for that information?

13   A.  That would be a lead.

14   Q.  What did Simmons, the firm, do with the information once

15   Dr. Taub provided it?

16   A.  In June of 2014, I would have forwarded that on to our call

17   center, and they would have made a call to that potential

18   client or to the daughter.

19   Q.  What benefit, if any, was there to Simmons in receiving a

20   lead like this from Dr. Taub before another law firm?

21   A.  Because these are highly competitive cases that we're all

22   competing to get.  If you have a lead where Dr. Taub mentioned

23   our firm and they were interested, it usually turned out to be

24   a good lead.

25         THE COURT:  A "good lead" meaning a lead that would

FBAY5I15                         Kirkland - Direct

1    lead to the client retaining the law firm?

2              THE WITNESS:  That is correct.

3    BY MR. GOLDSTEIN:

4    Q.  You mentioned, in a previous answer, about a call center.

5    A.  Yes.

6    Q.  While you were the CEO of Simmons, was there a procedure in

7    place for handling leads when they came into the firm?

8    A.  Yes.

9    Q.  I want you to take a look in your binder at Government

10   Exhibit 529.

11             Do you recognize this document?

12   A.  Yes.

13   Q.  What is this document?

14   A.  It's an outline for procedures in our call center for

15   Simmons-only asbestos intake.

16   Q.  Is this a document that you prepared and used in the

17   ordinary course of the Simmons law firm's business?

18   A.  Yes.

19   Q.  What was the time period that these procedures were in

20   place?

21   A.  I believe there was generated in early 2010 and has some

22   form of generational use going forward.

23             MR. GOLDSTEIN:  Your Honor, the government offers 529.

24             MR. MOLO:  Subject to the early objection.

25             THE COURT:  Can I see the attorneys.

1                    (At the sidebar)

2                    THE COURT:  This seems to be getting a little far

3       afield.

4                    What is the relevance of the Simmons firm's intake

5       procedures?

6                    MR. GOLDSTEIN:  It's simply, your Honor, one of the

7       things that we have to establish, one of our elements is that

8       what was taken from Dr. Taub through extortion is property.

9       It's our argument that the leads that he provided was property.

10                   So all of the purpose of this evidence is to show that

11      the Simmons firm thought that these leads were extremely

12      valuable.  They called them lead 1s.  That sets forth there.

13                   They actually had a way -- that's the third page of

14      the document -- they tracked leads that came in from Dr. Taub

15      personally and assigned a specific attorney to Dr. Taub's

16      leads.  I believe it's this page, your Honor.

17                   This is a different document.

18                   MR. MOLO:  I'm sorry.

19                   MR. GOLDSTEIN:  This is it.

20                   THE COURT:  This tends to prove that they are property

21      because?

22                   MR. GOLDSTEIN:  Because, as he's already testified,

23      they paid huge sums of money to generate leads.  And once they

24      were in the firm, then ultimately, the information was then

25      used to take the case and to pursue the case.

 1              THE COURT:  Okay.  Your objection was different.  So

 2    your objection is overruled.  I've already overruled that

 3    objection.  I was concerned about the relevance of it.

 4              MR. MOLO:  The same.  This is irrelevant.

 5              THE COURT:  Your objection is overruled.

 6              I'm going to let you go forward with it, but let's

 7    keep it short.

 8              MR. GOLDSTEIN:  I understand.

 9              (In open court)

10              THE COURT:  Objection overruled.

11    BY MR. GOLDSTEIN:

12    Q.  We can look at the first paragraph of this document.

13              THE COURT:  I'm sorry.  What's its number again?

14              MR. GOLDSTEIN:  529, your Honor.

15              THE COURT:  529 is received.

16              (Government's Exhibit 529 received in evidence)

17    BY MR. GOLDSTEIN:

18    Q.  As an initial matter, just to clarify, the title of this is

19    Simmons-only asbestos intake system.

20              Why is it called Simmons-only?

21    A.  That is a classification of the different intakes that we

22    would do in our firm.  I'll explain that if you would like.

23    Q.  Sure.

24    A.  The cases that we receive come from other lawyers, come

25    from advertising through the TV Internet.  What we call

FBAXSIM5                    Kirkland - Direct

1   Simmons-only are just cases that we get that are not associated

2   with another attorney, that are through our own Internet

3   advertising, through referrals from doctors from other clients

4   over time.

5        If we -- they're cases that we don't share the fee

6   with another attorney.

7   Q.  So, for cases that come in only through Simmons,

8   for example, directly from a doctor to the Simmons firm --

9   A.  Right.

10  Q.  -- did you have to share your fee with any outside party?

11  A.  No, we did not.

12  Q.  So were those cases more or less valuable to the firm?

13  A.  They would potentially be more valuable, yes.

14  Q.  Now, the first line refers to "Any intakes we believe to be

15  mesothelioma case lead 1."

16       What was a lead 1?

17  A.  At that point in time in 2010, we classified leads.  Lead 1

18  is someone that has been diagnosed by a doctor like that

19  earlier email had.  It could be that they -- the client said

20  they were taking a certain type of drug that's used in helping

21  mesothelioma patients.

22       And then lead 2 -- I'm sorry.  That is a lead 1.

23  Q.  Is a lead 1 a client with mesothelioma?

24  A.  We may not know yet, but they've said the right things that

25  would make us assume that they have mesothelioma.

1   Q.  How would that compare to a lead 2?

2   A.  A lead 2 is classified as a lung cancer.

3   Q.  Were lead 1s more or less valuable than lead 2s?

4   A.  Lead 1s were more valuable.

5   Q.  Just, if we look at the second paragraph, the first

6   sentence, it says, "It is critical that we do everything

7   possible to schedule an appointment."

8           Why was it so critical to schedule an appointment as

9   quickly as possible?

10  A.  Because this is such a highly competitive -- there are

11  approximately 3,000 to 4,000 of these cases diagnosed a year.

12  So it's a competitive environment to retain those clients.

13          It's just super competitive.  The faster we can get

14  into a person's living room and talk to them about our firm and

15  sign them, the more successful you are.

16  Q.  If you could just turn to the third page of this document.

17  This is called medical referrals.

18          What was a medical referral?

19  A.  A potential client that would come in through a particular

20  university that we were helping fund through our foundation or

21  other doctors that we had supported in the past.

22  Q.  So why is Dr. Taub listed in this group?

23  A.  Because we supported his research.

24  Q.  And the other doctors that are listed here -- did they also

25  receive funding from either the foundation or the firm itself?

1   A.   Yes.

2   Q.   To what extent did the firm track the number of referrals

3   that came in from the doctors who received funding through the

4   foundation?

5   A.   We tracked all of our intakes, including all the intakes

6   from the medical program.

7   Q.   If you could take a look in your binder at Government

8   Exhibit 533.  Actually, let's skip ahead to 535.

9   A.   Okay.

10   Q.   Do you recognize that document?

11   A.   Yes.

12   Q.   What is that document?

13   A.   It is a report from our database showing the referrals that

14   Dr. Taub sent to us over time.

15            MR. GOLDSTEIN:  Your Honor, the government offers 535.

16            MR. MOLO:  Same objection.

17            THE COURT:  Same overruled.  So 535 is received.

18            (Government's Exhibit 535 received in evidence)

19            MR. GOLDSTEIN:  If we can publish 535.

20   BY MR. GOLDSTEIN:

21   Q.   So now that the jury can see this document, the names on

22   the left where there are some redactions of last names, what do

23   all of those names have in common?

24   A.   They are clients of the firm.  Most of them are.

25   Q.   Were these all names that were referred by Dr. Taub?

 1  A.  Yes.

 2          MR. MOLO:  Excuse me.  I have a document 535 that's

 3  different from this.

 4          MR. GOLDSTEIN:  Thank you.

 5  BY MR. GOLDSTEIN:

 6  Q.  So does this document reflect all of the referrals that the

 7  firm tracked that came in from Dr. Taub starting in March of

 8  2010?

 9  A.  Yes with a caveat that you saw earlier.  The leads came in

10  through an email for a phone call from Dr. Taub.  So we got

11  better over time, but I know we did not capture all of the

12  people that were not signed.

13  Q.  So the first date of a referral is listed as what?

14  A.  The incoming date when we received it, March 11, 2010.

15  Q.  And there's a Columbia D, contact status.  It has different

16  identifiers.

17          If you could explain for the jury what each of these

18  are.  So the first one said "Declined."

19          What does "Declined" mean?

20  A.  Declined was we signed that client, and then, after an

21  investigation of the case, we declined, declined the case.

22  Q.  When it says, "Signed," what does that mean?

23  A.  That means we have a contract with that client and we're

24  pursuing a case.

25  Q.  When it says, "Does not wish to pursue," what does that

1    mean?

2    A.  We had contact with the potential client, but for personal

3    reasons or some other reason, they did not want to pursue legal

4    action.

5    Q.  When it says "Rejected," as in line 15, what does

6    "rejected" mean?

7    A.  Primarily the same thing as "Declined."  Just a little

8    different term.

9    Q.  And then it says "Legal representation" at number 18.

10           What did that mean?

11   A.  As we were in the process of investigating signing a

12   client, we found out that they were already represented by

13   another law firm.

14   Q.  So, looking at this chart that was generated by the Simmons

15   firm, how many total patients did Dr. Taub refer from March of

16   2010 through July of 2014?

17   A.  From this report, 29.

18   Q.  And out of those 29 referrals, how many on their own chose

19   not to use the Simmons firm?

20   A.  I believe there are three.

21   Q.  So there are three that chose not to pursue?

22   A.  Right.

23   Q.  Mr. Kirkland, are you familiar with Sheldon Silver?

24   A.  Yes.

25   Q.  How are you familiar with Sheldon Silver?

1   A.  From conversations with Dr. Taub, I knew that they were --

2   I believe he used "lifelong friend."

3   Q.  What knowledge, if any, did you have as to whether Dr. Taub

4   referred patients or had referred patients to Sheldon Silver in

5   the past?

6   A.  Dr. Taub -- I recall him telling Joy and I that he did

7   refer cases to Weitz & Luxenberg, Sheldon Silver.

8   Q.  Once he started referring cases to Simmons, what did you

9   know, if anything, about whether Dr. Taub continued to refer

10  any cases to Sheldon Silver?

11          MR. MOLO:  Objection.

12          THE COURT:  Sustained.

13  BY MR. GOLDSTEIN:

14  Q.  What, if anything, did you know about any research funding

15  that Dr. Taub had received through New York State?

16  A.  I can't recall if Dr. Taub mentioned that.  The only thing

17  I recall about this state was there was an award in his office

18  that was very prominent about something.

19  Q.  What was the Simmons law firm's relationship with Weitz &

20  Luxenberg?

21  A.  They do the same thing we do.  They're asbestos attorneys.

22  We are competitors.  We have in the past referred them cases

23  also.

24  Q.  Has Weitz & Luxenberg referred cases to Simmons?

25  A.  No.

FBAY5115                    Kirkland - Direct

1   Q.  Have you had discussions with Dr. Taub about his view of

2   Weitz & Luxenberg?

3   A.  My impression was that he wasn't -- my impression -- I

4   recall Dr. Taub wasn't too fond of Weitz & Luxenberg because

5   they didn't support research.

6   Q.  If you can take a look in your binder at Government Exhibit

7   525-9.

8   A.  Got it.

9   Q.  Is this an email from Dr. Taub to Joy Wheeler?

10  A.  Yes.

11        MR. GOLDSTEIN:  Your Honor, the government offers

12  525-9.

13        MR. MOLO:  I object.

14        THE COURT:  Do you have any objection to 529-9?

15        MR. MOLO:  I'm sorry?

16        THE COURT:  Is there an objection to 525-9?

17        MR. MOLO:  Yes.  Objection.

18        THE COURT:  Overruled.  525-09 is received.

19        (Government's Exhibit 525-09 received in evidence)

20        MR. GOLDSTEIN:  If we could publish this document.

21  BY MR. GOLDSTEIN:

22  Q.  It's from Robert Taub to Joy Wheeler.

23        What is the date on this email, Mr. Kirkland?

24  A.  November 18, 2010.

25  Q.  If you can read the unredacted portion of the email.

1   A.  "Hi.  Just saw a new patient, Robert, an 80-year-old man

2   with undoubted asbestos exposure who was diagnosed about a week

3   ago with E pleural mesothelioma.  Also his stepson, Jose, whom

4   he lives with told me that the day after his diagnosis he was

5   called out of the blue by someone from Weitz & Luxenberg.

6         "Anyway, I recommended you specifically.  I mentioned

7   that your firm is interested in supporting meso research

8   throughout the country, not just private jets, and said that

9   you would call the stepson Jose, who is at 646.

10        "Boy.  The environment for new cases in New York is

11  K-9 eat K-9.  Regards."

12  Q.  You can set that aside.

13        Did there come a time when you learned that Dr. Taub

14  was to be honored by the American Cancer Society?

15  A.  Yes.

16  Q.  How did you learn that?

17  A.  I believe through Joy Wheeler who Dr. Taub had communicated

18  with.

19  Q.  Approximately when was it that you learned about this honor

20  for Dr. Taub?

21  A.  Do you have something to refresh my memory?

22  Q.  If you'll look in your binder at Government Exhibit 525-10.

23  A.  Yes.

24        MR. GOLDSTEIN:  Mr. Kirkland, if you could look at the

25  document and set it aside and tell us if that refreshes your

1   recollection as to when you learned about this honor for

2   Dr. Taub.

3            THE WITNESS:  Yes.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. GOLDSTEIN:

Q.  When is that?

A.  March 2011.

Q.  What, if anything, did Dr. Taub request of Simmons in connection with this American Cancer Society event?

A.  He wanted us to sponsor a -- I don't know if chair is a right, or a room at the hospital that was a donation of $100,000.

Q.  What was Simmons' response to Dr. Taub's request for $100,000?

A.  We were excited about his award but we didn't have the budget to do the $100,000.

Q.  So what did Simmons decide do instead?

A.  We decided to sponsor a table at the event.

Q.  How much did that cost?

A.  I believe $6,500.

Q.  And did Simmons also pay for ads in the program for the event?

A.  Yes.

Q.  Did there come a time when you learned that Sheldon Silver was going to be invited to sit at the Simmons table at the event?

A.  Yes.

Q.  And who was it who invited Sheldon Silver?

A.  Dr. Taub.

1   Q.  What did you think of that?

2   A.  Just thought it was a little peculiar or strange.

3   Q.  Why is that?

4   A.  Because over time I -- I knew that Sheldon worked at Weitz

5   and was a competitor.

6   Q.  How many people from Simmons were supposed to attend the

7   events?

8   A.  Joy Wheeler.

9   Q.  And was there a dinner afterwards?

10  A.  Yes.

11  Q.  Who paid for that dinner?

12  A.  Simmons firm.

13  Q.  Now, after that event did there come a time when you spoke

14  with Dr. Taub about an event called Miles for Meso?

15  A.  Yes.

16  Q.  What were these Miles for Meso events?

17  A.  In 2008-2009 we developed a 5K race to help fundraise for

18  mesothelioma research and we put one on, we did a few around

19  the country, four or five, roughly.

20  Q.  What about one of these races did you discuss with

21  Dr. Taub?

22  A.  We talked about doing an event here in New York.

23  Q.  To what extent, if any, did you find there to be

24  difficulties in setting up one of these events in New York?

25  A.  After we did some research, it was going to be very costly

1    and hard to put on for us.

2    Q.  What, if anything, did you try to -- let me withdraw that.

3            How did Dr. Taub attempt to help resolve some of those

4    difficulties?

5    A.  Through his relationship with Sheldon Silver, if we did a

6    race at the 9/11 site, I believe that was in his district.

7    Q.  I want to draw your attention to Government Exhibit 526

8    which is already in evidence.  If we can publish that,

9    Mr. Coccaro?  If we can first zoom in on the upper right-hand

10   corner.

11           Mr. Kirkland, do you recognize this document?

12   A.  Yes.

13   Q.  Before we look at the specifics of it, what is this

14   document?

15   A.  It is a letter describing the race to Sheldon Silver.

16   Q.  It is from the Westchester Road Runner.  Do you know what

17   that is?

18   A.  Yes.  They were a race planner, coordinator that Leslie

19   Kimerling who worked for Dr. Taub, her husband ran that

20   company, I believe; Andrew.

21   Q.  The name of the person who ran the Westchester Road Runner

22   was Andrew Kimerling?

23   A.  Yes, the race coordinator.

24   Q.  And that's who signed the letter?

25   A.  Yes.

1  Q.  It is cc'd to Joy Wheeler.  Who is Joy Wheeler?

2  A.  She was at the firm, she ran the foundation, the person in

3  terms of the foundation.

4  Q.  If you can look at the handwriting on the bottom it says:

5  *Hi Shelly.  I would appreciate anything you can do.  R. Taub.*

6         Why was it important for Dr. Taub -- for Dr. Taub's

7  name to be part of this letter?

8         MR. MOLO:  Objection.

9         THE COURT:  Sustained.

10 Q.  As you understood it, who was it who had the relationship

11 with Sheldon Silver?

12 A.  Dr. Taub.

13 Q.  And after this letter was sent, did there come a time when

14 you met with Sheldon Silver about the Miles for Meso event?

15 A.  Yes.

16 Q.  Who set up that meeting?

17 A.  Joy Wheeler through Dr. Taub.

18 Q.  When did that meeting take place?

19 A.  I believe November 2011.

20 Q.  If you can take a look in your binder at Government Exhibit

21 525-20.  If you can read that to yourself and does that refresh

22 your recollection as to the date of the meeting with Sheldon

23 Silver?

24 A.  Yes.

25 Q.  What was the date?

FBA5si15                        Kirkland - direct

1    A.  November 14th, 2011.

2    Q.  What time of day was the meeting?

3    A.  In the morning at 10:30.

4    Q.  Where did the meeting take place?

5    A.  At Sheldon Silver's office.

6    Q.  Was it his Assembly office?

7    A.  Yes.  I believe so.

8    Q.  In Lower Manhattan?

9    A.  Yes; 250 Broadway.

10   Q.  Who was present for the meeting?

11   A.  Myself, Joy Wheeler, Dr. Taub, Sheldon Silver, and Judy.

12   Someone in his office.

13   Q.  The person you knew as Judy, whose name that you recall is

14   Judy?

15   A.  Right.

16   Q.  Is that a staff member?

17   A.  Yes.

18             THE COURT:  One of Mr. Silver's staff?

19             THE WITNESS:  Yes.

20   Q.  Was Sheldon Silver present for the entire meeting?

21   A.  No, not the whole meeting.

22             MR. GOLDSTEIN:  Your Honor, I have just a few more

23   minutes but if this is a good time to break I can --

24             THE COURT:  Why don't you finish and then we will

25   break after, before the cross.

1   Q.  So, you said that he stayed for part of the meeting.  Where

2   did the meeting initially begin?

3   A.  I believe it began in his office and then we moved to a

4   conference room.

5   Q.  And when you moved to the conference room, who was present?

6   A.  Myself, Joy Wheeler, Dr. Taub, and Judy.

7   Q.  And what did you speak to Sheldon Silver about during this

8   meeting?

9   A.  Trying to put this race on at 9/11 and just the mechanics

10  of doing that, possibly, in New York.

11  Q.  And based on that meeting, what assistance did you

12  understand Sheldon Silver was willing to provide?

13  A.  He would help us with the application process and the

14  things, the tools we needed to possibly put on that race.

15  Q.  If you would look at Government Exhibit 525-21 which is

16  already in evidence?  Do you recognize this document?

17  A.  Yes.

18  Q.  Was this document sent to you originally?

19  A.  Not that I'm aware of.

20  Q.  Let's turn to the second page.

21          MR. MOLO:  This is in evidence.

22          MR. GOLDSTEIN:  It is in.

23  Q.  Can we zoom in on the top portion to begin with?

24          It is addressed to Dr. Taub from Sheldon Silver;

25  subject:  Permit process for chartable walk-run event; November

1    14, 2011.

2           Mr. Coccaro, if you could then show the last two

3    paragraphs of the letter?

4           Mr. Kirkland, can you read the last two paragraphs

5    beginning with, *It is common?*

6    A.  It is common that these events are subject to review by the

7    local Community Board which plays an advisory role.  Some local

8    neighbors, including Battery Park City and to a lesser degree

9    the Seaport have complained about the number of these types of

10   events and the inconveniences they cause (traffic disruptions,

11   large crowds, loud public address systems).  You should be

12   prepared to discuss how you plan to manage the event and such

13   issues utilizing both your own staff and the NYPD.

14   Q.  One more, if you could continue?

15   A.  My office can help you navigate this process, if needed.

16   Q.  After you received this letter, what did the Simmons

17   Foundation ultimately decide to do with regard to this event?

18   A.  We decided no the to pursue the event.

19   Q.  Why did you decide not to pursue the event?

20   A.  I remember in my mind thinking, you know, it is one thing

21   to have a race in Alton, Illinois, but to try to pull off a 5K

22   in New York City was a little naive on our part, so.

23   Q.  Mr. Kirkland, what, if anything, did you know about any

24   State money that Dr. Taub had received from or through Sheldon

25   Silver?

1    A.   I don't believe I, during this time period, I knew anything

2    about that.  Of course I now know about that State grant.

3           MR. GOLDSTEIN:  I just move to strike the last portion

4    of the witness' answer.

5           THE COURT:  Okay.

6    Q.   Just to be clear, Mr. Kirkland, you only learned about any

7    State funding through the investigation?

8    A.   I believe.  Yes.

9           MR. GOLDSTEIN:  Nothing further, your Honor.

10          THE COURT:  Okay.  Why don't we take our afternoon

11   break at this point.  About 10 minutes.  Don't discuss the

12   case.  See you in about 10 minutes.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

FBA5si16                  Kirkland - direct                    1241

1                (Jury not present)

2                THE COURT:  Mr. Molo, about how long is your cross

3    going to be?

4                MR. MOLO:  15 minutes, 20 minutes maybe.

5                THE COURT:  Okay.  All right.

6                10 minutes.

7                (Recess)

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBA5si16                    Kirkland - cross

 1              (Jury present)

 2              THE COURT:  Okay, Mr. Kirkland, you are still under

 3   oath.

 4              Mr. Molo?

 5   CROSS EXAMINATION

 6   BY MR. MOLO:

 7   Q.  Good afternoon, Mr. Kirkland.  My name is Steve Molo and I

 8   represent Mr. Silver.  We haven't met?

 9   A.  No.

10   Q.  You said when you met Dr. Taub you said he referred to

11   Mr. Silver as a life-long friend?

12   A.  Yes.

13   Q.  He also told you they went to synagogue from time to time?

14   A.  I believe so.

15   Q.  And he also told you that he would refer cases to his

16   friend Mr. Silver at Weitz & Luxenberg, correct?

17              MR. GOLDSTEIN:  Objection.

18   A.  Correct.

19              THE COURT:  Overruled.

20   Q.  You mentioned Dr. Taub being honored by the American Cancer

21   Society and there was an event and Simmons bought a table,

22   remember?

23   A.  Uh-huh.

24   Q.  And you said that you thought it was a little strange that

25   Mr. Silver was a competitor but he would be sitting at the

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

FBA5si16                      Kirkland - cross

1    Simmons table; is that right?

2    A.   Yes.

3    Q.   But he was there at the invitation of his long-time friend

4    Dr. Taub, correct?

5            MR. GOLDSTEIN:   Objection.

6            THE COURT:   Overruled.

7    A.   Correct.

8    Q.   You mentioned that Simmons, you were the Simmons CEO so

9    that you understood the competitive landscape of the other

10   firms that you competed with?

11   A.   Yes.

12   Q.   And Weitz & Luxenberg was one of those firms?

13   A.   Yes.

14   Q.   Sometimes Simmons would refer clients to Weitz & Luxenberg,

15   correct?

16   A.   Correct.

17   Q.   And in referring a client to another law firm your firm

18   would still retain be able to earn a referral fee, right?

19   A.   That's correct.

20   Q.   And the amount of that fee was dependent upon the quality

21   of the outcome that the firm got that eventually represented

22   the client, right?

23   A.   Not necessarily.

24   Q.   Okay.

25            Well, I mean, the higher the settlement the higher

FBA5si16                    Kirkland - cross

 1   your contingent fee, right, your referral fee?

 2   A.  No.  A referral fee was negotiated up front, usually.

 3   Q.  Not on a percentage basis?

 4   A.  A percentage basis, but that was negotiated up front, if

 5   that's what you're asking.

 6   Q.  No, I'm sorry.  I'm not making myself clear.

 7   A.  Okay.

 8   Q.  When you refer a case to another firm you retained a

 9   referral fee or obtained a referral fee that is based on a

10   percentage of the final settlement amount, right?

11   A.  Correct.

12   Q.  So, getting the highest settlement amount benefits the firm

13   that is referring the case?

14   A.  Yes.

15   Q.  Okay.

16          So, you want to send the case to a firm that you think

17   is going to get a good settlement?

18   A.  Yes.

19   Q.  And there were, I think, 40 to 50 asbestos personal injury

20   cases that Simmons referred to Weitz & Luxenberg over time?

21   A.  Yes.  The time frame, I believe, was in the mid-2000s.

22   Q.  Okay.

23          And, in fact, Simmons actually hired some

24   Weitz & Luxenberg lawyers away from Weitz & Luxenberg, is that

25   right?

FBA5si16                          Kirkland - cross

1    A.   Yes.

2    Q.   How did you learn about Dr. Taub?

3    A.   From -- I learned from clients, certain clients, and then

4    Joy talked to him at a conference.

5    Q.   You consider him a top man in the field?

6    A.   Yes.

7    Q.   And you considered Columbia one of the top medical

8    institutions in the world?

9    A.   Yes.

10   Q.   When Simmons decided to support medical research in the

11   area of mesothelioma did you identify people that you thought

12   were best able to make an impact with their research?

13   A.   Yes.

14   Q.   And Dr. Taub was one of those?

15   A.   Yes.

16   Q.   Did you use a peer review process in deciding to make this

17   gift to Dr. Taub?

18   A.   Not per se.  It was just our board.

19   Q.   And you didn't require some kind of a competitive bid,

20   correct?

21   A.   No.

22   Q.   When Simmons hired you in 2002 you were a businessman,

23   right?

24   A.   Yes.

25   Q.   You're not a lawyer?

```
 1   A.  Correct.

 2   Q.  And they brought you to the firm to impose some kind of a

 3   business discipline that might have been lacking?  Is that

 4   fair?

 5   A.  Correct.  Yes.

 6   Q.  And you mentioned that the firm advertises extensively,

 7   correct?

 8   A.  Yes.

 9   Q.  And it also receives referrals from a variety of sources,

10   correct?

11   A.  Correct.

12   Q.  Doctors only account for about 5 percent of Simmons'

13   referrals, is that fair?

14   A.  If that.

15   Q.  If that.

16   A.  Yes.

17   Q.  So maybe less than 5 percent.

18            And, so I understand it, if the firm is making money

19   on a contingent fee basis it first has to have a successful

20   outcome before it makes any money, right?

21   A.  Correct.

22   Q.  And so the value of having a client is only realized once

23   there has been a successful outcome, correct?

24   A.  Say that again, please?

25   Q.  Sure.
```

1    The value of having a client -- the value, financial

2    value is only realized once there is a successful outcome?

3    A.   Correct.

4    Q.   And for you to get a successful result you first have to

5    have the client retain you, correct?

6    A.   Correct.

7    Q.   And the decision whether to retain you is 100 percent the

8    client's decision, correct?

9    A.   That's correct.

10   Q.   The client could choose to go to a different law firm,

11   correct?

12   A.   Yes.

13   Q.   The client could choose not to pursue a claim, correct?

14   A.   Correct.

15   Q.   And you mentioned some referrals.  There is a chart that

16   the government used that I think I have here.  Can we put up

17   Government Exhibit 535 again, please?

18        I believe you identified this as a chart of referrals

19   from Dr. Taub, is that correct, to the Simmons firm?

20   A.   Yes.

21   Q.   I notice there is a column F where it says Referral there,

22   and if you go down to John Terrance is says:  Bifferato LLC.

23   A.   Yes.

24   Q.   Is Bifferato, LLC, another law firm?

25   A.   Yes; at that time a Delaware law firm that we used as

co-counsel.

Q.  So did they -- did they refer the case along with Dr. Taub?

A.  No.  That came up through our system, it's a co-counsel relationship.  It is more than likely we filed that case in Delaware.

Q.  Okay, but so the case came as a result of a referral from Dr. Taub but not from the Bifferato firm?

A.  Correct.

        THE COURT:  Y'all can't talk over one another.

        MR. MOLO:  I'm sorry.  That's my fault.

        THE COURT:  Yes.

Q.  So, can we go back out to the full chart, though?

        It does reflect however, sir, that there were matters that we see, George 263325, does not wish to pursue; right?

A.  Yes.

Q.  So sometimes these people just didn't decide to pursue or you rejected them?

A.  Right.  Correct.

Q.  Did Dr. Taub ever have a discussion with you where he told you about the funding he was receiving from the Milsteins?

A.  Not that I'm aware of.

Q.  Did Dr. Taub ever have a discussion with you where he discussed with you the funding he was receiving from the Gershwins?

A.  No.

1   Q.  Did Dr. Taub ever have a discussion with you where he

2   discussed the funding he was receiving from Sanofi, the

3   pharmaceutical company?

4   A.  No.

5   Q.  Did Dr. Taub ever have a discussion with you in which he

6   discussed the funding he was receiving from other

7   pharmaceutical companies for his research?

8   A.  No.

9   Q.  Was there any question in your mind that Dr. Taub was

10  trying to eliminate the suffering of people with mesothelioma?

11          MR. GOLDSTEIN:  Objection.

12          THE COURT:  Overruled.

13          You can answer.

14          THE WITNESS:  No doubt.

15  Q.  And the funding that was reflected in the letter of the

16  prosecutor's Exhibit 592, if we can put that up -- the total

17  amount there of that funding is $3,150,000?

18  A.  Yes.

19  Q.  And Simmons did not make that contribution to Dr. Taub as a

20  *quid pro quo* for referrals from Dr. Taub; is that right?

21          MR. GOLDSTEIN:  Objection, your Honor.

22          THE COURT:  Overruled.

23  A.  No.

24          MR. MOLO:  One moment, please, your Honor.

25          (Counsel conferring)

1    MR. MOLO:  Nothing further, your Honor.

2    REDIRECT EXAMINATION

3    BY MR. GOLDSTEIN:

4    Q.  Mr. Kirkland, was one of the reasons the firm decided to

5    fund Dr. Taub's research in order to get referrals from

6    Dr. Taub?

7    A.  We hoped we would get referrals by promoting research, you

8    know, the relationship.  Possibly from time to time we would

9    receive referrals, yeah.

10   Q.  And you tracked those referrals?

11   A.  Yes.  We tracked everything.

12   Q.  Mr. Molo asked you about whether or not you had heard

13   anything from, about Dr. Taub and about the pharmaceutical

14   companies that funded his research.  What meetings did you have

15   with the pharmaceutical companies that were funding Dr. Taub's

16   research?

17   A.  None.

18   Q.  What money was it that your firm used to fund Dr. Taub's

19   research?

20   A.  Profits from the law firm after taxes is what we used to

21   fund the research.

22         MR. GOLDSTEIN:  Nothing further, your Honor.

23         THE COURT:  Okay.  You can step down.

24         Call your next witness.

25         MS. COHEN:  Your Honor, the government calls Deborah

1    Miller.

2              MR. COHEN:  Your Honor, before we call that witness,

3    may I speak with you at side bar with the government?

4              THE COURT:  Sure.  You can still step down.

5              (Witness steps down)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At side bar)

2              MR. COHEN:  As I understand it this woman is an

3    Assembly staffer who will testify about these proclamations and

4    resolutions.  It turns out I was able to find, just the other

5    day, a video of the Assembly session.  They record their

6    sessions, I don't know who listens to it but it is like

7    literally one minute but I haven't shown it to the government.

8    They may object -- I doubt it -- but I haven't shown it to the

9    witness, I didn't know she was testifying now and I don't want

10   to interrupt by showing it to her to see whether she can

11   authenticate it.  If the government is okay with it I will just

12   put it up.  It's literally one minute and basically --

13             MS. COHEN:  I don't know if she can authenticate it

14   for you.  You have known about this witness forever.  Why you

15   don't tell us these things ahead of time so we can avoid it.

16             MR. COHEN:  I haven't spoken to her.

17             THE COURT:  Is the issue you want to show it to her?

18             MR. COHEN:  Yes.

19             THE COURT:  Not on the screen so she sees it, you ask

20   her if she knows what there is.

21             MR. COHEN:  But there is an audio component to it so

22   it will be hard to do on the screen without the jury hearing

23   it.  So, I could show it to the government and to her in two

24   seconds if the jury is not here and it would satisfy that.

25             THE COURT:  How long is your direct going to be?

FBA5si15                    Kirkland - redirect                    1253

1          MS. COHEN:  15 minutes.

2          MR. COHEN:  We can do it afterwards, that's fine.

3          THE COURT:  We will take a quick break in between.

```
1                    (In open court)

2    DEBORAH SUSAN MILLER,

3          called as a witness by the Government,

4          having been duly sworn, testified as follows:

5               THE WITNESS:  Deborah Susan Miller.  M-I-L-L-E-R.

6               THE COURT:  D-E-B-R-A or D-E-B-O-R-A-H?

7               THE WITNESS:  O-R-A-H.

8               MS. COHEN:  Thank you, your Honor.

9               THE COURT:  Ms. Cohen?

10   DIRECT EXAMINATION

11   BY MS. COHEN:

12   Q.  Ms. Miller, where do you work?

13   A.  I work at the New York State Assembly.

14   Q.  How long have you worked for the New York State Assembly?

15   A.  I started employment there in October of 1999, so 16 years

16   now.

17   Q.  What is your current position at the New York State

18   Assembly?

19   A.  I'm the Director of Legislative Services.

20   Q.  How long have you been the Director of Legislative

21   Services?

22   A.  I started there in January 2011.

23   Q.  And, in general, what are your duties and responsibilities

24   as Director of Legislative Services?

25   A.  I am responsible for a variety of obligations related to
```

FBA5si16                     Miller - direct

the session.

          I -- I'm sorry.  I am responsible for reviewing

legislation that is being introduced to the Assembly by members

and referencing them to the Committee of Original Jurisdiction.

I am responsible for reviewing resolutions that are introduced

by members to the Assembly.  My office receives

interdepartmental program bills and departmental bills.  For

example, when the Governor wishes to submit legislation for

consideration to the legislature, it is delivered to my office.

I'm responsible for a variety of session-related scheduling,

committee meetings each week, joint budget conference

committees.  My office is responsible for sending out some

session-related communications.

Q.  When you refer to sessions you are referring to sessions of

the Assembly?

A.  Yes.

Q.  Just stepping back a bit, where did you go to college?

A.  I went to college at the University at Albany.  I have a

bachelors degree in women's studies.

Q.  What was your first job out of college?

A.  I waited tables for a while but then in October of 1999 I

was hired as a waitress -- or not -- I waited tables and then I

was hired as a researcher for the Department of Communications

and Information Services at the New York State Assembly.

Q.  Who did you report to when you worked in the communications

FBA5si16                        Millman - Direct

1  area of the New York State Assembly?

2  A.  My -- I had a direct supervisor, his name was Neil Fisher,

3  but ultimately we worked for the Speaker.

4  Q.  Who was the Speaker when you were hired at the New York

5  State Assembly?

6  A.  Sheldon Silver.

7  Q.  So, when you were a researcher in the communications area

8  you ultimately reported to the defendant Sheldon Silver?

9  A.  Ultimately.

10  Q.  How long did you work as a researcher in the communications

11  area at the Assembly?

12  A.  A couple years.

13  Q.  What was your next position at the Assembly?

14  A.  I was an assistant coordinator and coordinator.  I worked

15  with members on their legislative communications to their

16  constituents.

17  Q.  What was your job after performing those duties?

18  A.  After that I was promoted to a position where I worked

19  processing members' newsletters and other printed materials.

20  Q.  After that were you promoted to Legislative Services as its

21  director?

22  A.  Yes.

23  Q.  Who decided to promote you to the Director of Legislative

24  Services?

25  A.  I'm sorry.  After that job I was Director of Editorial

FBA5sil6                    Millhom - direct

1    Services and then Director of Legislative Services.  The

2    Speaker offered me the job.

3    Q.  When you say the Speaker, you are referring to the

4    defendant, Sheldon Silver?

5    A.  Sheldon Silver.

6    Q.  Is that correct?

7    A.  Yes.

8    Q.  So what year did you become the Director of Legislative

9    Services?

10   A.  January of 2011.

11   Q.  And I think you mentioned before that one of your job

12   responsibilities as Director of Legislative Services is working

13   on resolutions?

14   A.  Yes.

15   Q.  What type of resolutions are asked for by members of the

16   Assembly?

17   A.  We do a number of resolutions in the Assembly.  The vast

18   majority of them are privilege resolutions.  They are a means

19   by which members can honor constituents in their districts for

20   a variety of reasons, hundredth birthdays, wedding

21   anniversaries, championship sports teams.  So on and so forth.

22   There are calendar resolutions.  Those resolutions memorialize

23   the Governor to do something, for example memorializing the

24   Governor to declare October Breast Cancer Awareness Month.  And

25   then there are policy resolutions that are handled similar to

1   bills, they're referenced to committee and they move through

2   the committee process in the same way a bill does.

3         THE COURT:  Excuse me.  Can you keep your voice up?

4         THE WITNESS:  Sure.

5         THE COURT:  You kind of are trailing off.

6         THE WITNESS:  I'm sorry.

7   BY MS. COHEN:

8   Q.  When you say privilege resolution, those are those

9   resolutions that any member of the Assembly can request for

10  someone, a member in their district to honor them in some way?

11  A.  Yes.

12  Q.  And can a non-Assembly member sponsor a resolution?

13  A.  No.

14  Q.  Can you explain, please for the jury, what the process is

15  for an Assembly member who wants to sponsor a resolution?

16  A.  Sure.

17        A member who has someone or an organization that they

18  want to honor will go to the Legislative Bill Drafting

19  Commission to a resolution drafter.  The resolution drafter

20  then drafts that information in the proper format for

21  submission to my office.  Once they are satisfied with the

22  content, it's then submitted to my office in duplicate and

23  signed by the member.  I review it and then it's placed amongst

24  the privileged resolutions for adoption on a particular session

25  day.

FBA5si16                    Millman - direct

1   Q.  And who adopts the resolutions, the privilege resolutions

2   you just talked about on any given day in the Assembly?

3   A.  A majority of the Assembly members vote to accept, to adopt

4   them.

5   Q.  And when the Assembly members vote to adopt the privilege

6   resolution honoring a person or an entity, where do they take

7   that vote?

8   A.  In the Assembly Chamber.

9   Q.  And you mentioned the legislative bill drafter works for a

10  commission, I believe you stated?

11  A.  Yes, the Legislative Bill Drafting Commission is a

12  bipartisan commission responsible for both the drafting of

13  bills and resolutions.

14  Q.  And are the legislative bill drafters, are they state

15  employees?

16  A.  Yes.

17  Q.  And when Sheldon Silver was Speaker of the New York State

18  Assembly, who drafted any privilege resolutions that he wanted?

19  A.  Well, when he wanted them a member his staff would tell me

20  that they wished to -- the Speaker wished to sponsor a

21  resolution.  I was responsible for working with the resolution

22  drafter to draft that resolution.

23  Q.  And why were you the one who was responsible for helping to

24  draft and shepherd through the process resolutions that Sheldon

25  Silver wanted when he was Speaker?

 1   A.  Well, as director I worked -- I was the person responsible

 2   for doing that job, getting them introduced for other members

 3   and it was just the way it was.

 4   Q.  And if a resolution was passed by the Assembly in its

 5   Chamber, what happened to it?

 6   A.  Once it's adopted by the members of the Assembly members

 7   can go to the Journal Clerk's Office and have them engrossed,

 8   they're printed on parchment paper and put in a blue folder and

 9   stamped by the Clerk of the Assembly certified, essentially.

10   Q.  And the Journal Clerk's Office, is that another part of the

11   New York State Assembly?

12   A.  Yes.  The Journal Clerk's Office functions as part of the

13   team that handles the ministerial functions of the Assembly.

14   The journal clerk, she herself sits at the front of the rostrum

15   during session and reads the titles of the bills and announces

16   the votes and certifies the votes of the Assembly but her

17   staff, as well, are responsible for writing the journal of the

18   Assembly and updating the status of bills.  Once they're

19   adopted the electronic record is automatically immediately

20   updated to indicate a bill has passed the Assembly.  And then

21   they are responsible for certifying the votes at the end of

22   session.

23   Q.  If you can look in your binder -- actually, withdrawn.

24            You said who pays for the engrossing and the blue

25   folder that the privilege resolutions, if they are adopted by

1   the Assembly, get put in?

2   A.   New York State taxpayers.

3   Q.   And if I can just show you what's in evidence as Government

4   Exhibit 314.

5          Mr. Coccaro, if you could put a copy on the screen,

6   please?

7          Do you recognize Government Exhibit 314?

8   A.   Yes.  It is a legislative resolution that was adopted by

9   the Assembly.

10  Q.   And is it a legislative resolution that you helped through

11  the process of the Assembly to get passed and to get engrossed?

12  A.   Yes.

13  Q.   And is it a resolution that Sheldon Silver asked, or his

14  office asked you to help out on for Dr. Robert Taub?

15  A.   Yes.

16  Q.   Is there a limit on the number of resolutions an individual

17  Assembly member can request?

18  A.   There is no formal limit of resolutions but there is kind

19  of a -- it is frowned upon to do more than 30.

20  Q.   And was there any limit -- was there any informal limit on

21  the number of resolutions Sheldon Silver could ask for when he

22  was the Speaker?

23  A.   No.

24  Q.   Are you familiar with an Assembly proclamation?

25  A.   Yes.

Miller - direct

1  Q.   What is an Assembly proclamation?

2  A.   An Assembly proclamation, in the same way a resolution,

3  they honor -- there are means by which a member can honor a

4  constituent, a group in their district.  The main difference is

5  that proclamations are honorific but they don't require the

6  Body to vote on them.  Any member can get them at any time

7  whether it is session or not.

8  Q.   And when you say "Body" you are talking about the Assembly

9  Body, is that right?

10  A.   Yes, the Assembly Body.

11  Q.   Can non-Assembly members ask for an Assembly proclamation?

12  A.   No.

13  Q.   Is there any other way in which a proclamation differs from

14  a resolution?

15  A.   They're larger, they're printed on 16 by 20 parchment

16  paper, they have gold foil, they can be framed.

17  Q.   Who pays for the parchment paper, the gold foil, and any

18  frame that is done on a proclamation?

19  A.   The New York State taxpayers.

20  Q.   If I can show you what's in evidence as Government Exhibit

21  315, please?

22          If you can put a copy on the screen?

23          Do you recognize Government Exhibit 315?

24  A.   Yes.  It is a proclamation that was prepared for Dr. Taub.

25  Q.   Was Government Exhibit 315 something that you helped

FBA5si16                          Miller - direct

1  prepare based on Sheldon Silver's request for it?

2  A.   Yes.

3  Q.   Was there any limit on the number of proclamations an

4  individual Assembly member could request?

5  A.   The Speaker's communications directive limits members to 30

6  per calendar year.

7  Q.   When Sheldon Silver was speaker, what limit was there on

8  him for the number of proclamations he could issue?

9  A.   I don't know.

10 Q.   Do you know if there was a limit or there wasn't or you

11 don't know?

12 A.   I don't believe there was a limit, no.

13 Q.   So the two documents I just showed you, both the resolution

14 and the proclamation, Government's Exhibits 314 and 315, you

15 helped get those done; is that right?

16 A.   Yes.

17 Q.   So let's perhaps walk through the process that you took to

18 get those done and that may clarify also how this worked, as

19 you just sort of summarized before.

20 A.   Sure.

21 Q.   And the process you used for Government Exhibit 314 and

22 315, was that different in any way than the process you

23 typically used to get Assembly members proclamations or

24 resolutions that they requested?

25 A.   Well, I don't typically get involved in a member's request

FBA5si16                          Millson - direct

1   for proclamations and resolutions, not that I wouldn't help if

2   there was a need but typically their own staff would handle the

3   drafting and the requesting on the submission of the

4   resolutions.  I would just, when other members do them, I read

5   them and review them but I don't actually get involved in

6   the --

7   Q.  So, the only member of the Assembly for whom you personally

8   got involved and worked on getting the resolution or the

9   proclamation for was Sheldon Silver when he was Speaker; is

10  that right?

11  A.  Generally, yes.

12  Q.  But the process that members' own offices used, they had to

13  use their own staff in order to get a proclamation or

14  resolution through the process; is that accurate?

15  A.  Yes.  Generally, yes.

16  Q.  Is the process that other members' offices used to get a

17  proclamation or resolution the same as the one you used?

18  A.  Yes.

19  Q.  So, if you can look in your binder at Government's Exhibits

20  152-1, 152-2, 152-4, 152-5 and 152-6 for identification and if

21  you recognize them just, in general, without talking about the

22  content of them yet, what are they?

23  A.  They're e-mails regarding a resolution proclamation for the

24  Speaker.

25  Q.  Is the resolution or proclamation for the Speaker that's

FBA5si16                          Millea - direct

1      being discussed in the e-mails the one for Dr. Taub?

2      A.   Yes.

3                MS. COHEN:  Your Honor, the government moves

4      Government's Exhibits 152-1, 152-2, 152-4, 152-5 and 152-6 into

5      evidence.

6                THE COURT:  Just a copy?

7                MR. MOLO:  Just a copy.

8                MR. COHEN:  They're not on the screen.

9                MS. COHEN:  Yes, your Honor, we have given them copies

10     but we will find another.  Your Honor, I will give them my

11     copy.

12               THE COURT:  Okay.  Is one of them that you called

13     152-5?

14               MS. COHEN:  152-1, 152-2, 152-4, 152-5 and 152-6, your

15     Honor.

16               THE COURT:  Dash 5 is not in my binder.

17               MR. COHEN:  No objection, your Honor.

18               THE COURT:  Okay.  So, 152-1, 2, 4, 5 and 6 are

19     received.

20               (Government's Exhibits 152-1, 152-2, 152-4, 152-5 and

21     152-6 received in evidence)

22     BY MS. COHEN:

23     Q.   Just in general, what are these e-mail exhibits 152-1,

24     152-2, 152-4 through 152-6?

25     A.   These are e-mails to the office of editorial services, Dana

FBA5si16                    Millhon - direct

1    Marascia, saying that we are going to be rushing some -- that I

2    was a drafting a resolution honoring Dr. Taub but would need a

3    framed proclamation as well for it because Judy Rapfogel was

4    going to be taking them back to the City with her that evening.

5    Q.   And who is Judy Rapfogel?

6    A.   The Speaker's Chief of Staff.

7    Q.   If we can just perhaps walk through the government's

8    exhibits to just highlight the process that you used to get the

9    Assembly to issue these resolution and proclamation?

10             Looking at Government Exhibit 152-1.

11   A.   Yes.

12   Q.   Can you just tell us what is happening here?

13   A.   I was giving folks a head's up that I was in the process of

14   working with the resolution drafter to have -- to get the

15   language for the resolution but that we would need the framed

16   proclamation before that evening was over.  That's at 1:11 p.m.

17   in the afternoon.

18   Q.   What were you referring to when you said today is going to

19   be a day of rushing?

20   A.   The resolutions would have to be drafted and signed off on

21   by Judy Rapfogel before we could finalize any of the printing

22   of the proclamations to turn them around to get them back.

23   Q.   And was the rushing because you had sat on this request or

24   because you just learned of it from something else?

25   A.   I had just received it.

FBA5si16                          Millon - direct

1  Q.  And who is Dana M. Marascia?

2  A.  He is the Director of Editorial Services.  His unit is

3  responsible for a wide range of things, but printing

4  proclamations.

5  Q.  Is that unit another unit of the Assembly?

6  A.  It's a sub-unit of the Department of Communications and

7  Information Services.

8  Q.  And that Department of Communications is the one you talked

9  about you used to work in which is part of the Assembly?

10 A.  Yes.  I used to do Dana's job.

11 Q.  And who is Laura?

12 A.  Laura is one of his deputies.  She is the Deputy Director

13 for processing, I believe is her title, but it's her unit that

14 actually prints the proclamations under Dana's direction.

15 Q.  And the unit that actually prints the proclamations is

16 another unit of the New York State Assembly, is that right?

17 A.  Yes.

18 Q.  And who, you refer or Dana refers to:  I alerted Doug.  Do

19 you know who Doug is?

20 A.  He prints them.  He sends the proof and prints them once

21 they're signed off on.

22 Q.  And Doug is another person that works in the Assembly?

23 A.  Yes; Doug Santon.

24 Q.  And the proof and the printing of the resolutions and the

25 proclamations, they're done in house in the Assembly; is that

1    right?

2    A.  Yes.  Yes.

3    Q.  If you can look at the next e-mail, Government Exhibit

4    152-2.  Can you explain for the jury what is shown there?

5    A.  This is the language that I received from Karen Habel who

6    is the resolution drafter responsible for drafting the Dr. Taub

7    resolution.

8    Q.  And where would Karen Habel get the information about

9    Dr. Taub that's reflected in this draft resolution for him?

10   A.  I would have provided her information that I either

11   received from the Speaker's office or if it was not sufficient

12   to draft the resolution, I might have Googled the doctor and

13   anyone else by drafting resolution.

14        THE COURT:  Again, I'm going to ask you to keep your

15   voice up.  You are kind of trailing off.

16        THE WITNESS:  Okay.

17   Q.  Is Karen Habel the person at the Legislative Drafting

18   Commission that you talked about earlier as drafting the

19   privilege resolutions as well as other bills for the Assembly?

20   A.  Well, what essentially happens in this case is we take the

21   language that she drafts for the legislative resolution and

22   modify it to proclamation language replacing legislative

23   resolution for legislative proclamation.  There is also a line

24   in resolutions that acknowledges that the resolution is adopted

25   by the Body, resolved that this legislative Body pause to honor

1  Dr. Taub upon the occasion of his designation.  That language

2  can't be in a proclamation since it is not adopted by the Body.

3  Q.  The language you were just talking about, Mr. Coccaro, if

4  you would look at page 2 of Government Exhibit 152-2 -- is that

5  the second to last resolved?

6  A.  Yes.

7  Q.  And so this draft of this resolution was drafted by Karen

8  Habel who works in the Legislative Drafting Commission which

9  drafts all the bills for the Assembly; is that right?

10  A.  The bills and the resolutions; yes.

11  Q.  And what happened next in the process?  I think if you look

12  at Government Exhibit 152-4 --

13  A.  I send the language of the resolution to Laura Koennecke

14  who responds asking if Judy Rapfogel still wanted the

15  resolution that evening, and, yes, she did.

16  Q.  If you look at the next exhibit, Government Exhibit 152-5?

17  A.  I don't have that one.

18        MS. COHEN:  If I can pass it up, your Honor?

19  Q.  It is also on the screen, if that's easier?

20  A.  Yes.

21  Q.  If you can look at Government Exhibit 152-5?

22  A.  Yes.

23  Q.  What is happening here?

24  A.  This is Doug Santon, having sent me a proof of the

25  resolution with the Speaker's signature dropped into it for

FBA5sil6                        Millman - direct

1   signoff of the draft in order to have it printed.

2   Q.  If you look next at Government Exhibit 152-6 which is a

3   series of e-mails that you are copied on, if you could go from

4   the bottom up, what is happening?  It is a continuation of the

5   chain from some prior e-mails?

6   A.  Yes.  It is a continuation of the conversation regarding

7   that the proclamation for Dr. Taub was done.  There were

8   another two people being honored with proclamations at the same

9   event and they wanted to know if I should bring -- they should

10  bring me the Dr. Taub resolution or proclamation or wait until

11  the other two were completed.

12  Q.  Who had requested two other proclamations and resolutions

13  to honor the two other honorees at the event that Dr. Taub was

14  being honored at?

15  A.  The Speaker's office.

16  Q.  And when you were working on getting Sheldon Silver the

17  resolution and the proclamation for Dr. Taub, what did you know

18  about the reasons why Sheldon Silver wanted to honor Dr. Taub

19  in this fashion?

20  A.  I didn't.

21  Q.  Looking at, please, Government Exhibit 149 for

22  identification?

23  A.  Yes.

24  Q.  If you recognize it, what is it without describing it?

25  A.  It is a transcript of the session -- the Assembly session.

FBA5si16                    Miller - direct

1          MS. COHEN:  Your Honor, the government moves

2    Government Exhibit 149 into evidence.

3          MR. COHEN:  No objection, your Honor.

4          THE COURT:  149 is received.

5          (Government's Exhibit 149 received in evidence)

6    BY MS. COHEN:

7    Q.  Mr. Coccaro, if you could turn to page 2 and just highlight

8    in the middle where it says the Clerk Resolution 486, Privilege

9    Resolution by Mr. Silver.  The Clerk will read Resolution

10   no. 486.

11         If you can explain for the jury, what is this

12   document?

13   A.  This is the stenographic record of the adoption of the

14   Dr. Taub resolution.

15   Q.  And by stenographic record, what do you mean?

16   A.  In a similar way to what is happening in court right now,

17   there is a stenographic record kept of every Assembly session

18   when the members are in chambers and voting on bills and

19   acting.

20   Q.  You see here that it appears that the text of the entire

21   legislative resolution appears here on the records of what

22   happened in the Assembly?

23   A.  Yes.

24   Q.  Is the actual complete resolution read into the records of

25   the Assembly?

FBA5si16                    Millhon - direct

1  A.  No.

2  Q.  What happens?

3  A.  Essentially at the end of each day's session there is a

4  dialogue between the majority leader and in this case the

5  Acting Speaker, Naomi Rivera -- Assemblywoman Naomi Rivera --

6  or the Speaker *pro tempore* and the majority leader stands up

7  and says is there any further business?  The Speaker *pro*

8  *tempore* or Acting Speaker will say we have many fine

9  resolutions.  All those in favor signify by saying aye, all

10  those opposed nay.  The resolutions are adopted.  They're

11  adopted by a voice vote of the members.

12          (Continued on next page)

```
 1   BY MS. COHEN:
 2   Q.  So, if you look, please, in your binder as what is marked
 3   for identification Government Exhibit 148.
 4           If you recognize it, what is it?
 5   A.  This is the Assembly Journal record of the adoption of
 6   resolutions for Tuesday, May 10, 2011.
 7   Q.  What is the Assembly Journal?
 8   A.  The Assembly Journal -- where the stenographic record is a
 9   word-by-word record of what happened in session, the Assembly
10   Journal is similar to meeting minutes.
11           It's the actual procedures and votes of the current
12   day day-by-day that we have session the stenographers that take
13   the Assembly Journal and the ones that type up the official
14   record are those employees of the state assembly?
15   A.  Yes, they are.
16           MS. COHEN:  I move for admission of Government Exhibit
17   148.
18           MR. COHEN:  No objection, your Honor.
19           THE COURT:  148 is received.
20           (Government's Exhibit 148 received in evidence)
21           MS. COHEN:  Mr. Coccaro, if you would just pull that
22   up.
23   BY MS. COHEN:
24   Q.  If you look at the last entry on the first page of
25   Government Exhibit 148.
```

1    Is that the actual minutes of what happened in the

2    state assembly when the assembly members voted in favor of the

3    privilege resolution for Dr. Taub that was requested by

4    Mr. Silver?

5    A.  Yes.

6    Q.  Looking, please, in your binding for identification at

7    Government Exhibit 151.

8    A.  Yes.

9    Q.  Without knowing what's in it, just, in general, do you

10   recognize it?  And what is it?

11   A.  It is the record from the Legislative Research Service

12   website regarding a resolution that was adopted in the

13   assembly.

14   Q.  Is it the resolution for Dr. Taub that Sheldon Silver

15   sponsored?

16   A.  Yes.

17        MS. COHEN:  Your Honor, the government moves

18   Government Exhibit 151 into evidence.

19        MR. COHEN:  No objection, your Honor.

20        THE COURT:  Thank you.  151 is received.

21        (Government's Exhibit 151 received in evidence)

22   BY MS. COHEN:

23   Q.  Mr. Coccaro, if you could pull up Exhibit 151, please.

24   BY MS. COHEN:

25   Q.  Where is Government Exhibit 151 posted?

FBAYSIL5                    Millom - Direct

1    A.  It's on a public website where the public would find

2    information about bills and resolutions that are adopted and

3    introduced into the assembly.

4    Q.  If you could look at the third page of Government Exhibit

5    151.

6    A.  Yes.

7              MS. COHEN:  Mr. Coccaro, if you could just turn to the

8    third page.

9    BY MS. COHEN:

10   Q.  What is that?

11   A.  That is the language for the adopted resolution of

12   Dr. Taub.

13   Q.  Where on the resolution does it say that Dr. Taub was

14   sending patients to Sheldon Silver?

15   A.  It doesn't.

16   Q.  When Sheldon Silver was speaker, about how many resolutions

17   did he sponsor in any given year?

18   A.  During the time that I've been director of legislative

19   services, there was a range.  I would say anywhere from as

20   little as 16 or 17 up to maybe 40.

21             THE COURT:  That's per year?

22             THE WITNESS:  Per year.

23   BY MS. COHEN:

24   Q.  How many -- withdrawn, your Honor.

25             When assembly members ask your office to prepare a

FBAYSIL5                         Millon - Direct

1    resolution, do they often typically also ask for a

2    proclamation?

3    A.   No.  I'm not involved in the members' requests for

4    proclamations.

5    Q.   Do you know how many assembly people ask for both a

6    proclamation and a resolution?

7    A.   I don't, but it's not common.

8              MS. COHEN:  No further questions.

9              THE COURT:  Okay.  Is there a change of plan?

10             MR. COHEN:  No.  If we can take a break for a moment,

11   your Honor.

12             THE COURT:  Ladies and gentlemen, we're going to take

13   a short, unusual break.  We just need to do something.  So

14   don't get too comfortable back there because you're going to be

15   back pretty quick.  Don't discuss the case.

16             (Jury not present)

17             MS. COHEN:  If I could just explain briefly.  The

18   defense counsel just wants to show you a clip of the assembly

19   session, which I believe a resolution was read in or part of it

20   was.  That's all.

21             (Video played).

22             MR. COHEN:  That's it.

23             (Video played)

24             (Pause)

25             MR. COHEN:  I'm sorry.  Play it once again.

1            (Video played.

2            MR. COHEN:  We may want to have Ms. Miller

3   authenticate that as to what happened.

4            THE COURT:  Can I ask, Ms. Miller, for you to go back

5   into that room over there.

6            (Witness temporarily excused)

7            THE COURT:  At the risk of chewing up more time

8   talking about why you're going to do this than it would take

9   for you to do it, what are you trying to prove?

10            MR. COHEN:  This is the best evidence about what

11   happened.  No assembly member even saw these resolutions.  Fair

12   enough?

13            THE COURT:  Okay.  Does the government object?

14            MS. COHEN:  No.  The government has no objection.

15            THE COURT:  Okay.  Let's bring out the jury.  Let's

16   bring out the witness.  Let's go.

17            What is this?

18            MR. COHEN:  These are the resolutions for that year.

19            MS. COHEN:  Your Honor, the government objects.

20            THE COURT:  They haven't even done anything yet.

21            MS. COHEN:  They've just handed me a huge binder that

22   I've never seen before, A.  I object.

23            Are we going to take that off the witness stand,

24   your Honor?  I don't want it to be used as a prop, which is

25   what it's being done for.

1           THE COURT:  So be it.

2           Bring the jury out.

3           The jury is entering.

4           (Jury present)

5           THE COURT:  Okay.  Ms. Miller, you're still under

6    oath.

7           THE WITNESS:  Okay.

8           THE COURT:  Mr. Cohen.

9    CROSS-EXAMINATION

10   BY MR. COHEN:

11   Q.  Ms. Miller, my name is Joel Cohen.  I represent Mr. Silver.

12          You testified with respect to three particular

13   resolutions of May 10 of 2011.

14   A.  Yes.

15   Q.  In the course of your experience, approximately how many

16   resolutions are adopted of this nature over the course of a

17   year?  The session starts from January 2 through June 30?

18   A.  In the course of regular session, in my experience, we've

19   adopted as few as 700 and as many as 850.

20   Q.  And those are on the application, for lack of a better

21   word, of different members of the assembly?

22   A.  Yes.

23   Q.  Is there ever a circumstance where a particular assembly

24   member seeks to have a resolution in favor of some individual

25   or entity and it's rejected by the assembly?

F5BAYSIL5                       Miller - Cross

1   A.  For an individual or an entity?

2   Q.  Who is being honored.

3   A.  Yes.  There have been times.

4   Q.  What would be the circumstances of that?

5   A.  They are not accepted because they're not in the nature of

6   a privileged resolution.

7   Q.  What does that mean?

8   A.  Well, since privileged resolutions are adopted en masse, we

9   ask that they be of a nature that we can ask 150 members of the

10  assembly to vote for them blindly.

11          We have a range of members of different political

12  beliefs, different backgrounds, so on and so forth.  So they

13  have to be of a nature that we can ask those members to take

14  them up en masse without worrying about their --

15  Q.  If the resolution proposed is silly or has some racial

16  component to it that's offensive or something like that,

17  obviously it would be rejected under those circumstances;

18  correct?

19  A.  I've never rejected -- we've never rejected a resolution

20  for being silly.  I believe that, yes, if there was a racial

21  component, that it would not be considered a privileged

22  resolution.

23  Q.  As a practical matter, many, many of the resolutions you've

24  estimated, something from 700 to 800 a year -- that those

25  resolutions generally are sort of feel-good resolutions on

FBAYSIL5                    Million - Cross

 1   behalf of the honored person.

 2          Correct?

 3          MS. COHEN:  Objection, your Honor.

 4          THE COURT:  Overruled.

 5          THE WITNESS:  I believe I said before they are

 6   resolutions that recognize 100th birthdays, 50th wedding

 7   anniversaries, championship sports teams.

 8   BY MR. COHEN:

 9   Q.  Nice for the recipient?

10   A.  Yes.

11   Q.  The government has put before you Government Exhibit 149.

12          Correct?

13          MS. COHEN:  If I can put her binder back.

14          MR. COHEN:  I'm sorry.

15          THE WITNESS:  Yes.

16   BY MR. COHEN:

17   Q.  That document -- please describe that document again for

18   us, please.

19   A.  This is the stenographic record of Tuesday, May 10, 2011.

20   Q.  If you notice on the bottom right-hand corner, it says

21   SS04033.

22   A.  Yes.

23   Q.  It goes at the end to 04098; correct?

24   A.  Yes.

25   Q.  If you notice, the second page goes from 040433 to 040490.

1    A.  Yes.

2    Q.  So there is in between some pages that are not contained in

3    the exhibit that the government presented to you?

4    A.  Yes.

5    Q.  If you take a look at Exhibit 89 that I've presented to

6    you, please describe what that is.

7    A.  It is the stenographic record of Tuesday, May 10, 2011.

8    Q.  Do you see the difference between that one and the one

9    number 89?

10   A.  Yes.  This is the complete -- what I would believe is the

11   complete stenographic record.

12   Q.  You haven't seen it before?

13   A.  No.

14          MR. COHEN:  I'll offer Defense Exhibit 89 in evidence,

15   your Honor.

16          MS. COHEN:  No objection.

17          THE COURT:  All right.  89 is received.

18          (Defendant's Exhibit 89 received in evidence)

19   BY MR. COHEN:

20   Q.  Now, at the end of 149 of the government, you had three

21   resolutions -- correct? --  of Dr. Taub, Dr. Rotenstreich,

22   Ms. Rotenstreich, and Dr. Goldfarb; is that correct?

23   A.  I'm sorry.  Which is that?

24   Q.  In Exhibit 149.

25   A.  Yes.  They're in the transcript.  Yes.

1  Q.  And in your preparation for your testimony today, you

2  realized that the three of them were being honored by the

3  American Cancer Society on the night of May 12; correct?

4  A.  Yes.

5  Q.  Let's take a look at Exhibit 89, which is new to you.  It's

6  the complete transcript.

7  A.  Yes.

8  Q.  Go, if you will, to page 29 on the bottom.

9          THE COURT:  Bates number 29 or the actual 29?

10         MR. COHEN:  No.  The actual 29.

11         THE WITNESS:  Okay.

12  BY MR. COHEN:

13  Q.  Do you see toward the bottom that acting speaker is Naomi

14  Rivera says, "We have numerous resolutions."

15         Do you see that in four lines from the bottom?

16  A.  Yes.

17  Q.  Let's see what happened after that.  Start at the bottom,

18  the last line of 29.  It says -- am I right? -- "Legislative

19  resolution commemorating the 200th anniversary of the

20  independence of the Republic of Paraguay."

21  A.  Yes.

22  Q.  So that's what that resolution is honoring that day;

23  correct?

24  A.  Yes.

25  Q.  If you go now to page 32 --

1    A.  Yes.

2    Q.  -- what is that resolution honoring?

3    A.  Legislative resolution congratulating Jonathan James Hoste

4    upon the occasion of receiving the distinguished rank of Eagle

5    Scout.

6    Q.  The most prestigious of Scouting honors; correct?

7    A.  Yes.

8    Q.  If we can go now to page 34.

9    A.  Yes.

10   Q.  What is the resolution there?

11   A.  Resolution number 476, legislative resolution

12   congratulating Sean Thomas Bligh upon the occasion of receiving

13   the distinguished rank of Eagle Scout, the most prestigious of

14   Scouting honors.

15   Q.  If we can go to page 36.

16   A.  Resolution number 477, legislative resolution

17   congratulating Peter Robert --

18            THE COURT:  Whatever.

19            THE WITNESS:  Upon the occasion of receiving this the

20   distinguished rank of Eagle Scout, the most prestigious of

21   Scouting honors.

22   BY MR. COHEN:

23   Q.  If we can go on to page 38.

24   A.  Legislative -- resolution number 478, legislative

25   resolution congratulating Joshua Jeffrey Covell, upon the

FBAXSI15                       Miller - Cross

1    occasion of receiving this the distinguished rank of Eagle

2    Scout, the most prestigious of Scouting honors.

3    Q.  I'll skip a couple of Eagle Scouts.

4            Go to page 42, please.

5            MS. COHEN:  Your Honor, the government will stipulate

6    that there are resolutions for a lot of reasons contained in

7    this document.

8            MR. COHEN:  It will just be a few more minutes,

9    your Honor, please.

10           THE COURT:  It's late in the afternoon, Mr. Cohen.

11   Okay.  480.

12           THE WITNESS:  Legislative 480, legislative resolution

13   commemorating the 100th anniversary of the Wilson Free Library.

14   BY MR. COHEN:

15   Q.  If we can go to page 44.

16   A.  Resolution number 481, legislative resolution honoring

17   Steven Tsai upon the occasion of his designation as New York

18   State champion of the Poetry Out Loud recitation contest.

19   Q.  That's good for now.  Thank you.

20           There were several others after that in that

21   transcript?

22   A.  Yes.

23   Q.  So what exactly happens -- is there a transcript like this

24   made verbatim of what happens when the assembly session

25   basically adopts these resolutions?

1   A.  Are you asking me if these are each read at the end of

2   session?

3   Q.  Yes.

4   A.  No.  They're not.

5          MR. COHEN:  I wonder if we could play, your Honor,

6   Exhibit 90.

7          THE COURT:  I think what we should perhaps get 90 into

8   evidence.

9          MR. COHEN:  Very good.

10  BY MR. COHEN:

11  Q.  Does the assembly record sessions of the assembly?

12  A.  Yes.

13  Q.  On a daily basis?

14  A.  Yes.

15  Q.  Would you recognize a session that occurred on May 10 where

16  these resolutions are adopted?

17  A.  Sure.

18  Q.  Okay.

19  A.  I can't say that I was present for that very moment.

20  Q.  But your knowledge of how the legislature works.

21         THE COURT:  These were played for you at the break.

22         THE WITNESS:  Yes.

23         THE COURT:  Did you indicate that this tape is in fact

24  the end of the session on May 10?

25         THE WITNESS:  Yes.

1    MR. COHEN:  Thank you so much, your Honor.

2    THE COURT:  Would you like to move it into evidence?

3    MR. COHEN:  I would.

4    THE COURT:  Any objection?

5    MS. COHEN:  No objection.

6    THE COURT:  90 is received.

7    (Defendant's Exhibit 90 received in evidence)

8 BY MR. COHEN:

9 Q.  Before you start playing it, what is that we're looking at?

10 A.  That is the rostrum at the front of the assembly chamber.

11 The acting speaker is sitting in the speaker's chair, and then

12 the clerk, the index clerk staff, and the journal clerk's staff

13 are sitting on either side.

14 Q.  So the acting speaker is just to the right of the American

15 flag?

16 A.  Yes.

17 Q.  And there is somebody in particular who sits in the

18 speaker's seat when these resolutions are being adopted?

19 A.  There's always someone sitting in the speaker's seat during

20 session.

21 Q.  Who is the woman sitting there now?

22 A.  That is Former Assemblywoman Naomi Rivera.

23 Q.  What is her responsibility on the day that she's sitting in

24 the speaker's seat?

25 A.  She's acting speaker.  So she leads the session

1    proceedings.

2              (Video played)

3              MR. COHEN:  Thank you.

4    BY MR. COHEN:

5    Q.  So that procedure occurred at the end of the session on

6    May 10 of 2011?

7    A.  Yes.

8    Q.  That is typically when these resolutions are adopted?

9    A.  Yes.

10   Q.  Now, needless to say from that videotape, it does not

11   appear that the members of the assembly actually heard what

12   these resolutions are that we were just talking about.

13             Correct?

14   A.  Correct.

15   Q.  They didn't get a chance to read them?

16   A.  No.

17   Q.  Because they're honorific and basically it's sort of an

18   understanding in the assembly that that's what the intention of

19   it is?

20   A.  I don't believe that's the intention.  All I know is that's

21   the way the session is handled, and the adoption of resolutions

22   are handled that way.

23   Q.  But the members of the assembly didn't actually read the

24   resolutions ever Dr. Taub or Dr. Rotenstreich or the others;

25   correct?

```
 1              MS. COHEN:  Objection.

 2              THE COURT:  Overruled.

 3   BY MR. COHEN:

 4   Q.  Now, I have before you a book.  Could you take a look at

 5   that book and describe what it is.

 6              THE COURT:  Does it have an exhibit number?

 7              MR. COHEN:  Exhibit 91.

 8              THE WITNESS:  They appear to be resolutions.

 9   BY MR. COHEN:

10   Q.  Can you look toward the middle and the back and see what

11   year they are.

12   A.  2011.

13   Q.  Needless to say, you haven't looked at this exhibit before?

14   A.  No.

15   Q.  But you would say that there are obviously a substantial

16   number of resolutions for 2011?

17   A.  Yes.

18              MR. COHEN:  Your Honor, I'm going to move the

19   admission, but I understand the government is obviously going

20   to want to look at that overnight.  I could re-move it Thursday

21   or Friday.

22              THE COURT:  Okay.

23   BY MR. COHEN:

24   Q.  If you look on the inside flap of the book in the front --

25   A.  Yes.
```

FBAYSIL7                          Million - Cross

```
 1   Q.  Please take a look at the first document that says assembly

 2   resolution number 42.

 3         MS. COHEN:  Your Honor, this is not in evidence.  I

 4   don't know how we're going to do this if at all.

 5         THE COURT:  At the moment, these just looking at it.

 6         THE WITNESS:  Yes.

 7   BY MR. COHEN:

 8   Q.  Would you please tell us what that document is.

 9         MS. COHEN:  Your Honor.

10         THE COURT:  Can you identify the document.

11         THE WITNESS:  It reads assembly resolution number 42

12   by M. of A. Hoyt honoring Russ Crispell of Tonawanda, New York,

13   upon occasion of his induction into the Buffalo Tennis Hall of

14   Fame.

15         MR. COHEN:  I'd offer that as an exhibit, your Honor.

16         THE COURT:  Any objection?

17         MS. COHEN:  Relevance, your Honor.  As I said, the

18   government would stipulate there are a lot of resolutions

19   introduced by various assembly members in any given year.

20         THE COURT:  So what are we going to call this,

21   Mr. Cohen?  91-A?

22         MR. COHEN:  91-A is fine.

23         THE COURT:  All right.  91-A is received.

24         (Defendant's Exhibit 91-A received in evidence)

25   BY MR. COHEN:
```

1   Q.  The next document is what, Ms. Miller?

2   A.  It's an assembly resolution number 72 by Assemblywoman

3   Sayward honoring Dana and Mike Seguljic of Lake George,

4   New York, upon the occasion of being named Post-Star Citizens

5   of the year.

6   Q.  And the next one?

7          THE COURT:  Okay, Mr. Cohen.  I think you've just hit

8   my limit.

9          MR. COHEN:  I thought two more would, your Honor.  But

10  okay.  That's fine.

11  BY MR. COHEN:

12  Q.  The tape recording that you saw for May 10 of 2011 -- that

13  would include in the hands of Ms. Rivera, Assembly Member

14  Rivera, the resolution that would have included Dr. Taub and

15  the other two doctors being honored by the American Cancer

16  Society?

17  A.  Yes.

18  Q.  And you said that in the emails it says that Ms. Rapfogel

19  was sort of in a rush because she wanted to take the resolution

20  or the proclamation back to New York.

21  A.  Yes.

22  Q.  Did you understand that she wanted to do that because

23  Dr. Taub and the other two doctors were actually being honored

24  on the evening of May 12 in New York City and she wanted to

25  have it in hand to accomplish that?

 1    A.  Well, I would assume that it was for an event of some sort

 2    that was timely.  Yes.

 3              MR. COHEN:  I don't have any further questions.  Thank

 4    you, your Honor.

 5              MS. COHEN:  No questions, your Honor.

 6              THE COURT:  Thank you, Ms. Miller.  You can step down.

 7              Call your next witness.

 8              MR. GOLDSTEIN:  Your Honor, the government calls David

 9    Mandel.

10     DAVID MANDEL,

11         called as a witness by the Government,

12         having been duly sworn, testified as follows:

13    DIRECT EXAMINATION

14    BY MR. GOLDSTEIN:

15    Q.  Good afternoon, Mr. Mandel.

16              Were you subpoenaed for your testimony here today?

17    A.  Yes.

18    Q.  Where do you work?

19    A.  Ohel Children's Home and Family Services in New York.

20    Q.  What is Ohel Children's Home and Family Services?

21    A.  Ohel is an organization began 46 years ago with the mission

22    to provide services to children who were neglected or abused.

23    It's a foster care agency.

24              Ohel thankfully has been a stellar organization with a

25    top-ranked foster care agency.  We provide services to people

 1  who are in emotional pain suffering from trauma, having various

 2  forms of disabilities.

 3          We provide housing, day programs, shelter for battered

 4  women, outpatient services, serving many thousands of people

 5  every day.

 6  Q.  For how long have you worked at Ohel?

 7  A.  Twenty years.

 8  Q.  What did you do before coming to Ohel?

 9  A.  I worked for a state agency called New York State Office

10  for People with Development Disabilities.

11  Q.  What's your educational background?

12  A.  I have a master's from New York University, and I have an

13  MBA from also New York University.

14  Q.  What is your position at Ohel?

15  A.  I am the chief executive officer.

16  Q.  How long have you held that position?

17  A.  Twenty years.

18  Q.  What are your responsibilities as the chief executive

19  officer of Ohel?

20  A.  My responsibilities are to implement the vision of the

21  board of directors of Ohel as they've established it from the

22  beginning.

23  Q.  What is Ohel's mission?

24  A.  To serve the broad Jewish community throughout

25  New York City, Nassau County, as well as serving individuals

FBAYSIL5                        Mandel - Direct

1    outside of the Jewish community and the many services that I

2    described a few moments ago.

3    Q.  Approximately how many employees does Ohel have?

4    A.  Fifteen hundred.

5    Q.  Has that number grown over time?

6    A.  Yes.

7    Q.  What is the approximate annual budget for Ohel?

8    A.  It's approximately $65,000,000.

9    Q.  Where does Ohel get most of its funding from?

10   A.  About 80 to 85 percent of Ohel's budget comes from city,

11   state, and federal sources heavily funded by Medicaid.  All

12   individuals with disability in some form qualify for Medicaid.

13        About 15 percent of the rest of the funds come from

14   fundraising, grants, tuition that we receive from camp and some

15   outpatient counseling, a sliding scale.  That's primarily how

16   it's broken down, 85 percent and 15 percent.

17   Q.  Has Ohel in the past received legislative grants from the

18   State of New York?

19   A.  Yes.

20   Q.  What has Ohel used those grants to do?

21   A.  The grants come in two forms, for operations or for

22   capital.  The grants for operations enabling Ohel to serve more

23   individuals that may not be funded in some other ways.

24        The grants for capital are to enable the organization

25   to purchase or renovate a building or technology or

FRAYSIL5                    Mandel - Direct

 1    transportation.

 2              Many include ways to be able to utilize the money to

 3    serve more people.

 4    Q.  Has Ohel obtained both of those types of grants, both

 5    operating and capital, from New York State?

 6    A.  Yes.

 7    Q.  Are you familiar with the defendant, Sheldon Silver?

 8    A.  Yes.

 9    Q.  Prior to when you became the CEO of Ohel 20 years ago, did

10    you have any personal relationship with Sheldon Silver?

11    A.  I remember at least one situation a number of years ago,

12    several decades ago, where we played ice hockey together.

13    Q.  And after that time?

14    A.  And he was much better than I was.

15    Q.  After that time, did you have any relationship with him

16    from then until when you began at Ohel?

17    A.  Not directly, no.  Not that I -- no.

18    Q.  When you joined Ohel as its CEO, what did you learn about

19    Sheldon Silver's financial support through New York State for

20    Ohel?

21    A.  I learned about the various sources of funds that the

22    organization received, including the ability to apply for state

23    grants, including with Mr. Silver.

24    Q.  Since you've become Ohel's CEO, what kind of state

25    financial support has Sheldon Silver provided to Ohel?

FBAYSIL7                    Mandel - Direct

1   A.  He has provided various grants for operations and capital

2   that has enabled us to both provide more services to people as

3   I explained and volunteer programs and foster care programs,

4   community-based programs educating the community about issues

5   of disabilities and stigma and also in the area of capital.

6   Q.  So, over past ten years, approximately how much state

7   funding has Ohel received from Sheldon Silver?

8            MR. MOLO:  Objection.

9            THE COURT:  Overruled.

10           THE WITNESS:  About $6 million.

11  BY MR. GOLDSTEIN:

12  Q.  How does that compare to governmental support from any

13  other elected official?

14  A.  We have received grants from other elected officials also

15  in various amounts.  As an individual, that is more than we've

16  received from other individual elected officials.  We've

17  received a number of grants from other city and state and

18  federal elected officials also.

19  Q.  From those other elected officials, have any of them

20  provided the same or close to the same amount of governmental

21  support for your organization as has Sheldon Silver?

22  A.  No.  As an individual, no.

23  Q.  Did there come a time when Sheldon Silver appointed you to

24  serve on an advisory board for a New York State agency?

25  A.  Yes.

1   Q.   Approximately when was that?

2   A.   Ten years ago.

3   Q.   Which state agency was involved?

4   A.   It's called New York State Office of Children and Family

5   Services.

6   Q.   What did you do when you served on the advisory board for

7   the Office of Children and Family Services?

8   A.   I was a member of a group of 20 people or more that were

9   advising the commissioner of the state agency at the time on

10  the development of various policies concerning children in

11  foster care, children who were served by that state agency.  So

12  I was a member of that group.

13  Q.   How did it come to be that Sheldon Silver appointed you to

14  the board of that group?

15  A.   We at Ohel requested -- we had learned that appointments

16  were made through the governor's office or the speaker's

17  office.  And we at Ohel requested if we could be considered to

18  be appointed to that commission.

19  Q.   Did you make that request directly to Sheldon Silver?

20  A.   I'm sorry?

21  Q.   Did you make that request directly to Sheldon Silver?

22  A.   I don't recall if I made the request directly or someone

23  made it on our behalf, but it would have been requested to his

24  office.  But I don't remember exactly would made the request.

25  Q.   How long was your appointment for?

1  A.  I believe it was four years.  One term.

2  Q.  You testified that Ohel has received state legislative

3  grants over the years.

4        Did there come a time when Ohel began to fill out

5  something called a disclosure and accountability form?

6  A.  Yes.

7  Q.  There's a binder that's in front of you.  If you could turn

8  to what's been marked for identification as Government Exhibit

9  125.

10        Mr. Mandel, do you recognize the document that's

11  Government Exhibit 125?

12  A.  Yes.

13  Q.  Who is this document from?

14  A.  From me.

15  Q.  Who is it to?

16  A.  Judy Rapfogel.

17  Q.  Where does Judy Rapfogel work?

18  A.  In Mr. Silver's office.

19        MR. GOLDSTEIN:  Your Honor, the government offers

20  Government Exhibit 125.

21        MR. MOLO:  No objection.

22        THE COURT:  All right.  125 is received.

23        (Government's Exhibit 125 received in evidence)

24  BY MR. GOLDSTEIN:

25  Q.  The date on this is February 21, 2007.  You just testified

FBAXSIL5                          Mandel - Direct

1   that Judy Rapfogel worked in Sheldon Silver's office.

2            What was her position in the office?

3   A.  Chief of staff.

4   Q.  What was your relationship with her as Sheldon Silver's

5   chief of staff?

6   A.  I was communicating with her in my position as the chief

7   executive of Ohel.

8            MR. GOLDSTEIN:  If we can zoom in on the RE line, the

9   to, from, and RE.

10  BY MR. GOLDSTEIN:

11  Q.  It says, "RE special legislative grants."

12           What were those?

13  A.  The grants, the operation or capital grants, were known as

14  special legislative grants.

15  Q.  Are those the grants that you testified about earlier that

16  you received from New York State?

17  A.  Yes.

18           MR. GOLDSTEIN:  It we could then pull back and look at

19  the first paragraph, the comments section of this document.

20  BY MR. GOLDSTEIN:

21  Q.  Can you please read that to the jury.

22  A.  "Shelly and Naftoli Lorch," Ohel's CFO "had a brief

23  conversation in our SLG at the dinner."

24  Q.  I'll stop you for a moment to make sure we understand what

25  this is.

1   It says Shelly.  Who is that a reference to?

2   A.  Mr. Silver.

3   Q.  And who is Naftoli Lorch?

4   A.  Ohel's chief financial officer.

5   Q.  It says "had a brief conversation on our SLG."

6   What is SLG?

7   A.  The state legislative grant.

8   Q.  And there's a reference to at "the dinner."  What is that a

9   reference to?

10  A.  This was in February.  At that time the agency Ohel had its

11  annual fundraising dinner in February.  And this must --

12  Mr. Silver attended the dinner.  So this must mean that our

13  chief financial officer and Mr. Silver spoke at that

14  fundraising event.

15  Q.  Did Sheldon Silver frequently attend Ohel's annual fund

16  raising dinners?

17  A.  Yes.

18  Q.  If you could then read the next sentence.

19  A.  "Shelly asked Naftoli to forward these new disclosure

20  accountability certifications we received from Attorney

21  General's office through OMEDD with respect to the fiscal year

22  ending June 30, 2007."

23  Q.  If we could turn to what it is that you attached to this

24  fax simply, the second page.

25  If you could turn to page 3 of the document.  Look at

1    item 4, sponsoring member.

2           It says, "Sponsoring member means the sponsoring

3    assemblyman or state senator as identified by the member

4    initiative form and listed herein."

5           Who was the sponsoring member for the state

6    legislative grant that is referenced here?

7           MR. MOLO:  Objection, your Honor.  I don't think there

8    is a state legislative grant referenced here.

9    BY MR. GOLDSTEIN:

10   Q.  The cover page references special legislative grants.

11          MR. MOLO:  Okay.

12   BY MR. GOLDSTEIN:

13   Q.  What was your understanding as to who the sponsor of the

14   special legislative grants that Ohel was applying for at this

15   time?

16   A.  Mr. Silver.

17   Q.  If you can turn to the next document that's in your binder,

18   Government Exhibit 126.

19          Do you recognize that document?

20   A.  Yes.

21   Q.  Without describing its contents, what is this document?

22   A.  This is the disclosure and accountability certification

23   form.  I faxed it to Judy Rapfogel.

24          MR. GOLDSTEIN:  Your Honor, the government offers 126.

25          MR. MOLO:  No objection.

1            THE COURT:  126 is received.

2            (Government's Exhibit 126 received in evidence)

3    BY MR. GOLDSTEIN:

4    Q.  So the date on this is February 23 and then February 26,

5    2007.

6            How does that compare to the date of the prior

7    document that we just looked at?

8    A.  It was a few days later.

9    Q.  If you could look at the comments section of this document.

10   Can you read that to the jury, please.

11   A.  "We just received a newly revised disclosure and

12   accountability certification form from the AG office through

13   OMEDD.  It has some new language, including sponsoring member.

14   We wanted you to see this.  Thank you.  David."

15   Q.  If we can turn to page 3 of this document where it says

16   sponsoring member.

17          Mr. Mandel, can you read what it says under

18   "Sponsoring member."

19   A.  "The sponsoring member of the local legislative initiative

20   pursuant to which this contract will be funded is/are."

21   Q.  For the special legislative grants that you were applying

22   for at this time, who would have been listed on this form?

23   A.  It would have been Mr. Silver.

24          MR. GOLDSTEIN:  If we can just return to the front

25   page of this document.

 1  BY MR. GOLDSTEIN:

 2  Q.  You say to Judy Rapfogel, "We wanted you to see this."

 3          Why did you want Judy Rapfogel to see this disclosure

 4  and accountability form?

 5  A.  We talk about that often in the field in the sector.  We

 6  may get an organization, some information from government that

 7  people in government may not see.

 8          So it would not be unusual for us to send something

 9  like this to an individual that we're working with to receive

10  some funds.

11          If we were working with Ms. Rapfogel in Mr. Silver's

12  office and we received something like this, we thought that we

13  should send it along.  It would just make sense.

14  Q.  If you can just turn back to Government Exhibit 125.  In

15  the middle where it says, "Shelly asked Naftoli to forward

16  these new disclosure and accountability certifications we

17  received," is one of the reasons that you sent the new version

18  that's represented in Government Exhibit 126 because Sheldon

19  Silver had asked about it a few days prior?

20  A.  I would imagine.  It's eight years ago.  I would imagine

21  that would make sense.

22  Q.  After these forms were instituted in 2007, what

23  conversations, if any, did you have with Sheldon Silver or his

24  staff about finding other members of the state legislature,

25  besides Sheldon Silver, to sponsor state legislative grants for

1   Ohel?

2   A.  We had always been advised in various circles that it's

3   going to develop relationships with many different elected

4   officials in city, state, and federal government.

5          So that is -- we pursued that strategy.  We invited

6   people to visit Ohel to see our work.  We invited people to our

7   annual fundraising, to other fundraising events so they could

8   see and learn about Ohel's work and the good work that we do.

9   So that would not have been unusual.

10  Q.  Did you hear from anybody in Sheldon Silver's office or

11  were you ever requested by anybody in Sheldon Silver's office

12  to try to find additional sponsors for state legislative grants

13  for Ohel?

14  A.  Yes.

15  Q.  Who from Sheldon Silver's office told you that?

16  A.  Judy Rapfogel advised me that that could be a good idea.

17  That could be a good strategy.

18          MR. GOLDSTEIN:  Your Honor, this would be a good

19  breaking point if you want to break now.

20          THE COURT:  Ladies and gentlemen, we're going to break

21  for the day.  Remember that you have tomorrow, Veteran's Day,

22  off to honor veterans.

23          Don't discuss the case.  Don't read press.  Don't

24  listen to press.  I need you back here Thursday morning at

25  9:15.  Enjoy your day off.

 1                  (Jury not present)

 2          THE COURT:  About how much longer are you going to be?

 3          MR. GOLDSTEIN:  About half an hour, your Honor.

 4          THE COURT:  About how long is the cross going to be?

 5          MR. MOLO:  Twenty, twenty-five minutes.  I don't know.

 6          THE COURT:  Okay.  Is there anything we need to

 7  discuss before we break for the Veteran's Day break?

 8          MR. MOLO:  Just whatever is left on the rest of the

 9  week.  We have two more days this week I guess.

10          MS. COHEN:  We already have let them know.  We will

11  remind them again.

12          THE COURT:  Ms. Cohen, you were doing so well for a

13  couple days.

14          MS. COHEN:  I couldn't hold out any longer.

15          THE COURT:  Let me give you your binders back.

16          Mr. Cohen, I'm going to keep yours because I think I

17  might have the only set of defense exhibits that is complete.

18          Have a good evening.  Have a good day off.

19          MR. GOLDSTEIN:  Your Honor, just one last thing.

20  Mr. Mandel's attorney --

21          THE COURT:  Mr. Whose?

22          MR. GOLDSTEIN:  Mr. Mandel, the witness', attorney has

23  a client who is on trial before Judge Buchwald across the

24  street.  Judge Buchwald only sits until 2:15 each day.

25          He has asked if the Court would allow the government

1    to put Mr. Mandel on in the afternoon and have another witness

2    start first thing on Thursday.

3              MR. MOLO:  No objection.

4              THE COURT:  All right.

5              (Adjourned to November 12, 2015, at 9:15 a.m.)

1                          INDEX OF EXAMINATION

2    Examination of:        GARY KLEIN, resumed                    Page

3    Direct By Mr. Master . . . . . . . . . . . .1040
     Cross By Mr. Shur  . . . . . . . . . . . . . .1078
4    Redirect By Mr. Master . . . . . . . . . . .1130
     Recross By Mr. Shur  . . . . . . . . . . . .1137
5    Redirect By Mr. Master . . . . . . . . . . .1143

6    CHARLES FERGUSON

7    Direct By Mr. Goldstein  . . . . . . . . . .1144
     Cross By Mr. Cohen . . . . . . . . . . . . .1156
8    Redirect By Mr. Goldstein  . . . . . . . . .1165

9    ARTHUR MARTIN LUXENBERG

10   Direct By Mr. Master . . . . . . . . . . . .1179
     Cross By Mr. Cohen . . . . . . . . . . . . .1193
11   Redirect By Mr. Master . . . . . . . . . . .1203

12   GREG ARTHUR KIRKLAND

13   Direct By Mr. Goldstein  . . . . . . . . . .1204
     Cross By Mr. Molo  . . . . . . . . . . . . .1242
14   Redirect By Mr. Goldstein  . . . . . . . . .1250

15   DEBORAH SUSAN MILLER

16   Direct By Ms. Cohen  . . . . . . . . . . . .1254
     Cross By Mr. Cohen . . . . . . . . . . . . .1278
17   Cross By Mr. Cohen . . . . . . . . . . . . .1278

18   DAVID MANDEL

19   Direct By Mr. Goldstein  . . . . . . . . . .1291

20                         GOVERNMENT EXHIBITS

21   Exhibit No.                            Received

22    591  . . . . . . . . . . . . . . . . . . .1053

23    484, 485, 490, 495 and 496   . . . . . . .1059

24    1520 and 512   . . . . . . . . . . . . . .1062

25    508  . . . . . . . . . . . . . . . . . . .1068

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1    1307-1   . . . . . . . . . . . . . . . . . .1070

2    582-1   . . . . . . . . . . . . . . . . . . .1074

3    582-2   . . . . . . . . . . . . . . . . . . .1076

4    S-7, 328 through 358 and 548 through  . . . .1176
              571
5    530  . . . . . . . . . . . . . . . . . . . .1215

6    525-26   . . . . . . . . . . . . . . . . . .1219

7    529  . . . . . . . . . . . . . . . . . . . .1223

8    535  . . . . . . . . . . . . . . . . . . . .1226

9    525-09   . . . . . . . . . . . . . . . . . .1230

10   152-1, 152-2, 152-4, 152-5 and 152-6  . . . .1265

11   149  . . . . . . . . . . . . . . . . . . . .1271

12   148  . . . . . . . . . . . . . . . . . . . .1273

13   151  . . . . . . . . . . . . . . . . . . . .1274

14   125  . . . . . . . . . . . . . . . . . . . .1297

15   126  . . . . . . . . . . . . . . . . . . . .1301

16                    DEFENDANT EXHIBITS

17   Exhibit No.                            Received

18   49   . . . . . . . . . . . . . . . . . . . .1093

19   51   . . . . . . . . . . . . . . . . . . . .1103

20   81   . . . . . . . . . . . . . . . . . . . .1111

21   87   . . . . . . . . . . . . . . . . . . . .1121

22   88   . . . . . . . . . . . . . . . . . . . .1130

23   89   . . . . . . . . . . . . . . . . . . . .1281

24   90   . . . . . . . . . . . . . . . . . . . .1286

25   91-A   . . . . . . . . . . . . . . . . . . .1289