FBC5sil1                    CORRECTED TRANSCRIPT

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          15 Cr. 0093(VEC)

5   SHELDON SILVER,

6              Defendant.

7   ------------------------------x

8                                          November 12, 2015
                                           9:20 a.m.
9

10  Before:

11                  HON. VALERIE E. CAPRONI,

12                                         District Judge
                                             and a Jury
13                        APPEARANCES

14  PREET BHARARA
         United States Attorney for the
15       Southern District of New York
    BY:  CARRIE H. COHEN,
16       ANDREW D. GOLDSTEIN,
         HOWARD S. MASTER,
17       JAMES M. McDONALD,
             Assistant United States Attorneys
18
    STROOCK & STROOCK & LAVAN LP
19       Attorneys for Defendant
    BY:  JOEL COHEN
20            - and -
    MOLOLAMKEN, LLP
21  BY:  STEVEN F. MOLO
         JUSTIN SHUR
22       JUSTIN ELLIS
         ROBERT KRY
23       TUONGVY LE

24

25

FBC5sil1                        CORRECTED TRANSCRIPT

1          (Trial resumed; jury not present)

2          THE COURT:  Mr. Cohen, I am told you have an issue.

3          MR. COHEN:  Your Honor, we do.

4          On October 21st, which was the pretrial conference

5  before the trial, your Honor directed the government to provide

6  us, on Thursday, on each Thursday the witnesses for the next

7  week.  With respect to the witnesses for this week I inquired

8  on Thursday of who those witnesses would be.  The government

9  gave me a list on Friday morning as to the witnesses who would

10  exist at trial for Monday and Tuesday; for the most part they

11  have testified or are continuing today.

12          We were told last night -- we were told by the

13  government, on Tuesday, who were the witnesses for, as we

14  understood it, Thursday and Friday, they were a list and we are

15  prepared for those witnesses but last night, at 7:56 p.m., we

16  were given three more names, two of whom we were told

17  previously on the witness list would be witnesses at trial but

18  we were never told until last night at 7:56 that they were

19  going to testify this week, and a third witness whose name is

20  Darby Putnam we had been given 3500 material for her a week or

21  two ago but were never told she was going to testify.  We were

22  given 3500 material for 66 witnesses although, under your

23  Honor's direction, we were given a list of 35 or 36.  We are

24  placed in a situation that we are preparing for trial today,

25  tomorrow, and obviously next week, but we were told about two

FBC5sil1                          CORRECTED TRANSCRIPT

1   witnesses who were important witnesses that they were going to

2   testify presumably today or tomorrow, maybe carry over until

3   Friday, and it seems the government was asked specifically by

4   your Honor, sua sponte on Tuesday, does the government know who

5   the witnesses will be for Thursday and Friday?  The government

6   told your Honor that we had been told but we would be reminded.

7           So, we were reminded yesterday at 7:56 with three new

8   names, two of whom we had known were going to be called at the

9   trial according to the government's witness list.  We are sort

10  of put in a position, your Honor, of trying to prepare for the

11  witnesses who are testifying and others that we know will

12  testify tomorrow like Mr. Whyland, but now we have two more

13  witnesses, important witnesses and we are put in this position,

14  your Honor, notwithstanding your's order to the government.

15          THE COURT:  Okay.

16          What happened?

17          MS. COHEN:  Your Honor, simply this.  We are moving

18  very fast so when we sat down we wanted to make sure we had

19  enough witnesses to fill up Thursday and Friday.  The two

20  witnesses that Mr. Cohen is referring to, Putnam put is a

21  custodial witness for PACB because the defendant refused to

22  stipulate.  We don't plan on calling that witness today, we

23  plan on calling her if we get to her on Friday which I'm not

24  sure.  The other witness is Lisa Reid about which there has

25  been extensive motion practice.  There is no issue there.

FBC5sil1                    CORRECTED TRANSCRIPT

1    Again, that witness is scheduled for tomorrow, not for today.

2    I am not sure, again, that we will get to her.  And the other

3    witness is Richard Runes who may get on the stand but maybe, my

4    guess, is probably not but we wanted to fill the day.

5            THE COURT:  Who is Richard Runes?

6            MS. COHEN:  Richard runes he is a lobbyist for

7    Glenwood.  We have told the defense numerous times we have to

8    schedule all the witnesses with their schedules and we are

9    doing the best we can.

10           THE COURT:  Things happen.

11           MR. COHEN:  I understand things happen but your Honor

12   directed the government to provide us with the names last

13   Thursday.

14           THE COURT:  But, Mr. Cohen, you and I have all tried

15   cases.  We are all experienced at this.  We all know that

16   things change, schedules change, trial goes faster than you

17   would expect.  I would rather you have the names and the people

18   not be called, which is a possibility.

19           MR. COHEN:  For sure.

20           THE COURT:  If we don't get to them, then you not have

21   the names at all or that we end up without a witness to fill

22   time that we should be filling.

23           So, what are you asking me to do?  To preclude them

24   from calling Rich Runes if they get to him today?

25           MR. COHEN:  Today, correct.

FBC5sil1                          CORRECTED TRANSCRIPT

1          THE COURT:  Well, I'm not going to do that.  Let's see

2     if we get to him.  We may not get to him.

3          Who else is testifying today?

4          MS. COHEN:  Your Honor, there are four or five

5     witnesses before we get to Runes so if we do, we will begin --

6          MR. COHEN:  I ask at the very least, your Honor, if

7     they get to the witness, that we not be required to cross these

8     three new witnesses today.

9          THE COURT:  I can't --

10         Richard Runes is at the end of the day?

11         MS. COHEN:  Yes, your Honor; and his direct is at

12    least an hour.

13         THE COURT:  You will not be required to cross

14    Mr. Runes today if we get to him.

15         MR. COHEN:  Or --

16         THE COURT:  The other two.

17         MR. COHEN:  Ms. Reid is not testifying today, is that

18    true, Ms. Cohen?

19         MS. COHEN:  Lisa Reid, if she testifies, will be

20    tomorrow.

21         THE COURT:  Okay.

22         MR. MOLO:  Who is testifying today, if I can ask?  Who

23    is today?

24         THE COURT:  Who is today?

25         MS. COHEN:  Your Honor, Judge, as we told the defense,

FBC5sil1                          CORRECTED TRANSCRIPT

1    Judge --

2              THE COURT:  Just tell me.

3              MS. COHEN:  Absolutely, your Honor; Judge Schoenfeld.

4              THE COURT:  Judge Schoenfeld.

5              MS. COHEN:  Martin Schoenfeld; Michael Hoenig, Dara

6    Iryami, Brian Meara, and that David Mandel is being called back

7    in the afternoon.

8              THE COURT:  He is not being called back --

9              MS. COHEN:  He is continuing his direct, your Honor.

10             THE COURT:  Okay.

11             MS. COHEN:  And then if we get to him, Mr. Runes.

12             THE COURT:  And we are not getting to Mandel until

13   what time?

14             MS. COHEN:  His counsel is not available until 2:30

15   because he is on trial before Judge Buchwald.

16             THE COURT:  Other than the Mandel issue, is this the

17   order that those folks will testify?

18             MS. COHEN:  Yes, it is, your Honor.

19             MR. COHEN:  Thank you, your Honor.

20             THE COURT:  Okay.  So it strikes me that the

21   likelihood of getting to Runes and definitely the likelihood of

22   the government turning over Runes to you today seems very low.

23             MR. COHEN:  Thank you.

24             THE COURT:  Okay.

25             Anything else before we bring the jury out?

FBC5sil1                    CORRECTED TRANSCRIPT

1          MS. COHEN:  Your Honor, I don't know if it makes sense

2    now before the jury comes out to talk about scheduling for next

3    week?

4          THE COURT:  Yes.  That is what I was going to raise.

5          Actually, for today you tell me that you have to be

6    out of here at 3:00 tomorrow.  Are we accommodating someone

7    other than Mr. Silver?  Because he could crawl home in an hour

8    and a half.

9          MR. COHEN:  You're accommodating me, but if you don't

10   tell my rabbi it is not quite as important to me as it is to

11   Mr. silver.  But it is important to me, but.

12         THE COURT:  If it is important to you, Mr. Cohen, I'm

13   going to get you home in time.  3:00 it is.

14         So I'm going to tell the jury this morning that we are

15   not going to sit next Thursday or Friday having looked at the

16   calendar and taking into account my calendar in the morning and

17   the desire to get the observant Jews home in time for the

18   Sabbath, it does not make sense to pull in an entire jury for

19   what is going to amount for two or three hours of testimony.

20   So, we will not sit Thursday or Friday of next week.  Okay?

21         Do you still think we are going to largely complete

22   this case before Thanksgiving?

23         MS. COHEN:  I do, your Honor, and I actually think

24   there is a chance we would -- the government -- would be

25   resting on Tuesday, so that would --

FBC5sil1                         CORRECTED TRANSCRIPT

1            THE COURT:  Next week?

2            MS. COHEN:  Correct, your Honor.

3            THE COURT:  Wow.  That's much faster.

4            MS. COHEN:  Okay.  That's why we wanted to raise this

5   because we could close on Wednesday which might change the

6   schedule.

7            THE COURT:  That assumes there is no defense case.

8            MS. COHEN:  Which I would love your Honor to ask them.

9            THE COURT:  Is there likely to be a defense case,

10  Mr. Molo?

11           MR. MOLO:  We have not seen the entire prosecution

12  yet.

13           THE COURT:  I understand that.

14           MR. MOLO:  I can't comment at this time, Judge.  I'm

15  not sure.

16           THE COURT:  All right.  Yeah.  Let's keep the press

17  guessing.

18           So, that actually means, though, that you need a draft

19  charge from me probably sooner rather than later.  You really

20  think we are on that schedule?

21           MS. COHEN:  I do, your Honor.

22           THE COURT:  Okay.  We will have to talk about if you

23  rest on Tuesday we are going to sum up before Thanksgiving or

24  whether -- it is going to create an odd dynamic if you sum up

25  before Thanksgiving and we have them off for five days.

FBC5sil1                          CORRECTED TRANSCRIPT

1    Because they can't -- because Wednesday I have told them they

2    can go home by noon.

3              MS. COHEN:  Right; though if we summed up on Wednesday

4    the case could go to the jury on Thursday and they could sit

5    Friday.

6              THE COURT:  I'm sorry.  Have I missed a week?

7              MS. COHEN:  I think you have, your Honor.

8              THE COURT:  So you think you may rest on the 17th,

9    which means if we summed up on the 18th, Mr. Molo, how do you

10   feel about the jury being here when you are off in the Third

11   Circuit?

12             MR. MOLO:  I would have to talk to my client.

13             THE COURT:  You have to talk to your client.  Okay.

14   So we will play it by ear.  Let's see what really happens,

15   okay?

16             MS. COHEN:  Thank you, your Honor.

17             THE COURT:  Anything else before I bring out the jury?

18             MS. COHEN:  No, your Honor.  Not from the government.

19             MR. MOLO:  No, your Honor.

20             THE COURT:  Okay.

21             (Continued on next page)

22

23

24

25

FBC5sil1                    CORRECTED TRANSCRIPT

1          (Jury present)

2          THE COURT:  Good morning, everybody.

3          THE JURY:  Good morning.

4          THE COURT:  Let me tell you a little bit about

5    schedule today.  When we left off on Tuesday, remember when

6    Mr. Mandel was on the stand?  He is coming back but he is not

7    coming back immediately, there are scheduling issues.  So, he

8    will be back later this afternoon.  And for your schedule for

9    tomorrow we will end by 3:00 tomorrow.

10         THE JURY:  Yes.

11         THE COURT:  So, I am -- you are hurting my feelings.

12         THE JURY:  So sorry.

13         A JUROR:  We are emotional.

14         THE COURT:  I thought you were enjoying our quality

15   time together.

16         All right, Ms. Cohen.  Call your next witness.

17         MS. COHEN:  Your Honor, the government calls Martin

18   Schoenfeld.

19   MARTIN SCHOENFELD,

20        called as a witness by the Government,

21        having been duly sworn, testified as follows:

22         THE DEPUTY CLERK:  Please state your full name an

23   spell your last name, slowly, for the record.

24         THE WITNESS:  My name is Martin Schoenfeld.  Last name

25   is spelled S-C-H-O-E-N, F like-in-friend, E-L-D.

1    DIRECT EXAMINATION

2    BY MS. COHEN:

3    Q.  What judicial position do you hold?

4    A.  I'm a Justice of the New York State Supreme Court,

5    Appellate Term.

6    Q.  How long have you been a Justice?

7    A.  I have been a judge for 30 years.  I have had different

8    positions.

9    Q.  And you have always been a Judge in the New York State

10   Court System?

11   A.  Yes.

12   Q.  Where did you grow up?

13   A.  On the Lower East Side.

14   Q.  How do you know Sheldon Silver?

15   A.  Well, first of all, he's my -- he's my legislator and we

16   both grew up and raised our families on the Lower East Side.

17   Q.  Are you personal friends with Sheldon Silver?

18   A.  I'm a friend of his, yes.

19   Q.  Do you socialize with Sheldon Silver?

20   A.  Well, we travel in different social circles but we do, on

21   occasion, meet each other; yes.

22   Q.  How often do you go out to dinner, for example, or have a

23   meal with Sheldon Silver?

24   A.  I don't recall going out to dinner with him.  We may meet

25   at a wedding or something like that, unless there was some sort

1319

FBC5sil1                     Schoenfeld - direct

1  of a legal or judicial type of a dinner.

2  Q.  Other than seeing Sheldon Silver at large social gatherings

3  or at a judicial event, do you have any one-on-one

4  socialization with Sheldon Silver?

5  A.  On occasion.  We would meet -- we would meet on the street

6  and we would speak to each other.

7  Q.  Other than meeting on the street or seeing each other at

8  large gatherings, do you have any one-on-one dinners, lunches

9  or anything like that with Sheldon Silver?

10  A.  Over 30 or 40 years we may have had lunch a couple of

11  times, yes.

12  Q.  Other than a couple of times, were there times when you had

13  one-on-one dinners or lunches with Sheldon Silver?

14  A.  Not on a regular basis,no.

15          THE COURT:  Have you ever been to his apartment?

16          THE WITNESS:  I haven't been to his apartment, no, but

17  my mother plays cards with a lady that's their neighbor, she's

18  probably been there.

19          THE COURT:  Has he ever been to your apartment?

20          THE WITNESS:  Has he ever been to my apartment?  No,

21  he hasn't.

22          THE COURT:  Okay.

23  BY MS. COHEN:

24  Q.  Have you ever been to Sheldon Silver's house in the

25  Catskills?

1320

FBC5sil1                              Schoenfeld - direct

1    A.  No.

2    Q.  Where did you go to undergraduate?

3    A.  I went to Brooklyn College where I received a degree in

4    economics.

5    Q.  Where did you go to law school?

6    A.  Syracuse University College of Law where I was the Junior

7    of the Year recipient, member of Law Review, and member of the

8    Moot Court Board.  I had to get that in because I never get a

9    chance to.

10   Q.  What type of law practice did you have before becoming a

11   Judge?

12   A.  After graduating law school I worked for what today would

13   be called, I guess, a boutique law firm because the principal

14   attorneys had all come from major firms and it was a general

15   practice but primarily we concentrated in commercial

16   litigation.

17   Q.  What was your first job in the New York State Court System?

18   A.  I became a principal court attorney to a New York State

19   Supreme Court judge.

20   Q.  Do you recall what year that was?

21   A.  Quite some time ago.  Probably around 1979.

22   Q.  And how long did you serve as a court attorney?

23   A.  About six years.

24   Q.  What did you do after you served as a court attorney?

25   A.  I ran for civil court.

FBC5sil1                    Schoenfeld - direct

1   Q.  And what organization helped you run for civil court?

2   A.  Well, first of all, you have to know how it works a little

3   bit before you say what organization.  I came out of an

4   independent judicial screening panel as being found to be most

5   highly qualified.

6          THE COURT:  Is that run by the mayor -- by the Mayor's

7   office or Governor's office?

8          THE WITNESS:  No.

9          THE COURT:  Just totally independent?

10          THE WITNESS:  Totally -- this was a democratic

11   screening panel so there would be attorneys, there would be

12   community members of different organizations that you would

13   meet with and there were certain -- the way the system works in

14   New York City or in Manhattan is there are, in the democratic

15   system there are various clubs, organizations that support

16   judges and assemblypeople and actually all the way up to the

17   President, and it is the clubs that ask for a panel to be put

18   together and different -- each year it is different who may be

19   a member of that panel unlike the Mayor who has one panel of

20   the same people each and every year.  But it's on the same

21   basis where they check all your qualifications and they ask you

22   questions and then they make a decision who they feel would be

23   the best candidate.

24   Q.  And was Sheldon Silver a member of the political club that

25   helped you run for office when you first ran 30 or so years

FBC5sil1                        Schoenfeld - direct

1   ago?

2   A.  Well, the point being since I came out as highly qualified,

3   every club in the Second Judicial District supported me.  I

4   didn't have a primary.  So, I'm not quite sure what you mean

5   did this club help me.  They all helped me.

6   Q.  What was Sheldon Silver's involvement in your first race

7   for office?  Judicial office.

8   A.  I understand.

9           I knew about how to be a lawyer and I think I had a

10  good idea of what it took to be a judge, but the elective

11  process is somewhat complex and I was not as familiar -- I

12  wasn't familiar at all at that time with how it works until

13  later on when I had election cases.  And Mr. Silver and my then

14  State Senator Marty Connor, who is an election lawyer, helped

15  me get through that part, for example, to make sure when you

16  ever sign a petition to make sure that the signatures would be

17  people who are validly registered, to know how to put the

18  volumes together so there wouldn't be any mistakes and they

19  couldn't be challenged.

20  Q.  And did you win your first election?

21  A.  Yes, I did.

22  Q.  And how many times have you been re-elected?

23  A.  Well, to civil court, that once, and Supreme Court, and

24  then re-elected to Supreme Court.  So, all tolled, three.

25  Q.  How long are the terms that you have served as Judge?

FBC5sil1                    Schoenfeld - direct

1    A.  A term is 14 years.  I have been a Judge now for 30.

2    Q.  And what Court do you sit in now?

3    A.  I sit in the State Supreme Court but primarily I do

4    appellate term work.

5    Q.  What is appellate term work?  For the jury.

6    A.  Which means that we hear appeals from decisions made by

7    Judges in the lower courts, the civil housing and criminal

8    courts.

9    Q.  Are you familiar with the name Amy Bandler?

10   A.  I am.

11   Q.  Is Amy Bandler's maiden name Taub?

12   A.  Yes.

13   Q.  When did you first learn of Amy Taub?

14   A.  When I first learned of her?

15   Q.  Yes.

16   A.  I received a call, I believe it was from somebody from

17   Mr. Silver's office, requesting that she be interviewed for a

18   position as an unpaid intern.

19   Q.  What were you told during that call about why Silver was

20   recommending Amy Taub to you for an unpaid summer internship?

21   A.  I wasn't told anything.

22   Q.  When Amy Taub was recommended to you by Sheldon Silver, did

23   you know her father, Dr. Robert Taub?

24   A.  No, I didn't.

25   Q.  What documents did Sheldon Silver's office provide to you

FBC5sil1                          Schoenfeld - direct

1  after the Speaker's office called you to recommend Amy Taub to

2  you?

3  A.  Well, I always want to see a resume so I can make a

4  decision and if I am going to speak to the person have

5  something to talk to them about, so I was sent a resume.

6  Q.  I'm going to show you what's been marked for identification

7  Government Exhibit 440.

8        Judge, do you recognize what's been marked

9  Government's Exhibits 440?

10  A.  Yes; that's the fax copy of the resume that I received.

11  Q.  And is this a document that you maintained in your records

12  in chambers regarding different people who have worked for you

13  over time?

14  A.  Yes.  I have to keep these documents because anybody who

15  applies to the State Bar is required to have affidavits from

16  anyone that they've worked for, whether it be paid or not paid,

17  with regard to any legal work done.

18  Q.  And is Government Exhibit 440 a document you found in your

19  files?

20  A.  I did.

21        MS. COHEN:  Your Honor, the government moves

22  Government Exhibit 440 into evidence.

23        MR. COHEN:  No objection, your Honor.

24        THE COURT:  Was that a no objection?

25        MR. COHEN:  No.  I'm sorry.  No objection.

FBC5sil1                    Schoenfeld - direct

1          THE COURT:  440 is received.

2          THE WITNESS:  I heard objection, too.

3          (Government's Exhibit 440 received in evidence)

4    BY MS. COHEN:

5    Q.  Judge, what is the first page of Government Exhibit 440?

6    A.  That's the fax cover sheet.

7    Q.  And who is Judy Rapfogel whose name appears on right as the

8    from, as the sender of the fax?

9    A.  She's an aide to Mr. Silver.

10   Q.  When was this fax sent to you?  If you look up top there is

11   a fax line.

12   A.  It looks like it says January of 2007.  January 8th?

13   Q.  I believe it says January 9th, and if you look below at the

14   date sent in the handwriting I think it says 1/9.

15   A.  Right.  Correct.  Sorry.

16   Q.  Was it sent from Silver's Assembly office?

17   A.  That's what it says.

18   Q.  If you look at the next page of Government Exhibit 440,

19   what is that?

20   A.  That's Amy Bandler's resume.

21   Q.  Did you see there is writing on the top right-hand corner?

22   A.  Yes.

23   Q.  What is that?

24   A.  It has her maiden name.

25   Q.  Of Taub?

FBC5sil1                    Schoenfeld - direct

1   A.  Taub.

2   Q.  Is that your handwriting?

3   A.  Yes, it is.

4   Q.  After receiving Amy Taub's resume from Silver's office, did

5   your chambers interview her for an unpaid summer internship?

6   A.  Well, again, I knew her as Amy Bandler but it is the same

7   person.  I personally do the interviewing.  Whether it was in

8   person or on the telephone it was a long time ago I don't

9   recall, but I did speak to her.

10  Q.  After speaking with Amy Taub, did you offer her a job in

11  your chambers as an unpaid summer internship?

12  A.  She has quite an impressive resume and she was very

13  personable, and I did.

14  Q.  At the time, Amy Taub was in law school, is that right?

15  A.  Right.  I think she was a first-year student at Fordham.

16  Q.  Do you recall what summer Amy Taub worked for you?  What

17  year?

18  A.  I do now.  2007.

19  Q.  And when Amy Taub began to work for you, what did you learn

20  about any connection she had to your family?

21  A.  It turned out, I guess in recognizing my last name, that

22  Ms. Bandler told me that she had gone to school with my older

23  son for a period of time.  And I remember that because of the

24  nice things she said about him.

25  Q.  Prior to the call from Silver's office to recommend Amy

FBC5sil1                          Schoenfeld – direct

1   Taub, did you know that your son knew Amy Taub?

2   A.  No.

3   Q.  How was Amy Taub's work performance as an intern in your

4   office?

5   A.  Excellent.

6   Q.  When Amy Taub worked for you, what did you learn, if

7   anything, about her father's connection to Sheldon Silver?

8   A.  I didn't learn anything.

9   Q.  Prior to hiring Amy Taub, what other times had Sheldon

10  Silver asked you to give someone he knew a position in your

11  chambers?

12          MR. COHEN:  Objection, your Honor.  May we approach?

13          THE COURT:  Okay.

14

15

16

17

18

19

20

21

22

23

24

25

FBC5sil1                      Schoenfeld - direct

1              (At side bar)

2              MR. COHEN:  Your Honor, as I understand it, I think

3     the government intends to seek testimony saying that Mr. Silver

4     had hired, at some point -- I'm sorry, that Judge Schoenfeld at

5     some point hired Mr. Silver's mother-in-law as a secretary.  I

6     can't see what the relevance of this is, if that's what it is,

7     to this case.

8              MS. COHEN:  Your Honor, that is the testimony we are

9     going to elicit and the relevance is simply that the only other

10    time that Sheldon Silver had asked this Judge to do something

11    was for his mother-in-law.  It is completely relevant to show

12    how important Dr. Taub was to Silver.

13             MR. COHEN:  It is an unpaid internship.  This was a

14    paying job, your Honor.  He is employing Mr. Silver's

15    mother-in-law.

16             THE COURT:  That's what cross is for.

17             MR. COHEN:  Okay.

18

19

20

21

22

23

24

25

FBC5sil1                         Schoenfeld - direct

1                  (In open court)

2                  THE COURT:  Objection is overruled.

3                  THE WITNESS:  Can you repeat the question, please?

4     BY MS. COHEN:

5     Q.  Of course.

6                  Prior to hiring Amy Taub, what other times had Sheldon

7     Silver asked you to give someone he knew a position in your

8     chambers?

9     A.  I don't recall him ever asking me that.

10    Q.  Do you recall another time that Silver's mother-in-law --

11    A.  Oh, prior.  Prior.

12    Q.  Prior to hiring Amy Taub?

13    A.  I understand what you are saying.  I'm getting the dates

14    mixed up because it was a lot of years ago.

15                 I am going to ask you again, if you don't mind, just

16    to repeat the question so that I have my chronological order

17    now.

18    Q.  Absolutely, Judge.

19                 Prior to hiring Amy Taub --

20    A.  All right.

21    Q.  -- do you recall any other testimony where Sheldon Silver

22    talked to you about hiring someone else in your chambers?

23    A.  Yes.

24    Q.  What do you recall?

25    A.  His mother-in-law, who happened to be a neighbor of mine,

FBC5sil1                    Schoenfeld - direct

1    worked in the Court system.  She had worked for another Judge,

2    I think, for a number of years, and he passed away and she was

3    still in the court system and he told me that his mother-in-law

4    would like to work for me in the secretarial position.

5    Q.  And, initially, what did you say to Sheldon Silver about

6    his request?

7    A.  Well, I was kind of concerned about it and I told him that

8    I was concerned.

9    Q.  Why were you concerned about Sheldon Silver's request that

10   his mother-in-law would work in your chambers?

11   A.  To the best of my recollection we had somewhat of a close

12   relationship.  We lived, that is, his mother-in-law and her

13   family lived in the same building that I did.  I didn't like

14   the idea of the closeness of what goes on in chambers, what I

15   might say if we don't get along, how it would affect the

16   relationship with the families.  I was uncomfortable about it.

17   Q.  Any other thing that made you feel uncomfortable about

18   Sheldon Silver's request that you hire his mother-in-law for

19   chambers?

20            MR. COHEN:  Objection, your Honor, leading.

21            THE COURT:  Overruled.

22   A.  There wasn't anything unethical about it.  She wasn't a

23   relative of mine but of course I was concerned because of his

24   position and my position that I didn't know if it would look

25   good.  And it might not after today.

FBC5sil1                    Schoenfeld - direct

1   Q.   So you were concerned because of Sheldon Silver's position

2   as an elected official in the Assembly?  That was part of your

3   concern, is that right?

4   A.   I was concerned about the relationship that we had and the

5   relationship that I had with his mother-in-law.

6   Q.   And in addition to that, were you also concerned that

7   Sheldon Silver was asking you this at the time when he was in

8   the Assembly?

9             MR. COHEN:  Objection.  Leading, your Honor.

10            THE COURT:  Overruled.

11  A.   At that time, absolutely not.

12  Q.   I think you just testified part of your concern was because

13  of his position, his meaning Silver's position at the time.

14  A.   I see what you mean.  I thought you asked it a little bit

15  differently, the other question.

16            About both of our positions and having somebody that

17  we were both close to.

18  Q.   And the position that Sheldon Silver had at the time was

19  what?

20  A.   He might have been Speaker though I'm not sure -- it is a

21  lot of years -- or it was just probably around that time.

22  Q.   And who did you discuss your concern with at the time?

23  A.   The Judge that I had worked for.

24  Q.   And why did you discuss your concerns with another Judge

25  that you had worked with?

FBC5sil1                      Schoenfeld - direct

1   A.  It is not another Judge, it is another friend.  These are

2   all friends.  The same reason I just said, because I felt a

3   little uncomfortable.

4   Q.  What did you tell Silver after discussing your concerns

5   with another Judge who was also a friend?

6           MR. COHEN:  Objection, your Honor.

7           THE COURT:  Overruled.

8           THE WITNESS:  First of all, when we had the first

9   conversation -- I just again want to make sure because it is a

10  long time, it is over 20 years ago, after the first

11  conversation I stated my concern, Mr. Silver said that he was

12  going to think about it and I said I would have to think about

13  it.  And then I did speak to a wiser person than me and he came

14  up with a very good answer.

15  BY MS. COHEN:

16  Q.  And what did -- after Silver said to you he would think

17  about your concerns, did there come a time where you had

18  another discussion with Silver about his request to hire his

19  mother-in-law?

20  A.  Yes.

21  Q.  And what was that conversation?

22  A.  Well, the thing is I realized that as a practical matter,

23  Mr. Silver was in a difficult position because he wanted to

24  keep peace in the family and when your mother requests

25  something you try to help them.  And it wasn't that big a deal

FBC5sil1                        Schoenfeld - direct

1   for me on the secretarial line so I said yes.

2   Q.  When Silver -- when you spoke with Silver again, what did

3   Silver tell you about whether you should hire his

4   mother-in-law?

5   A.  He didn't tell me to hire -- he said I spoke to my

6   mother-in-law, she only wants to work for you.

7   Q.  And that was after he had said to you that he would think

8   about your concerns; is that right?

9   A.  Well, I can't read his mind but he probably went back and

10  tried to dissuade her --

11          MS. COHEN:  Your Honor, let's not speculate.

12          THE WITNESS:  You are asking me.

13          THE COURT:  But don't speculate about what was in his

14  head.

15          THE WITNESS:  I'm sorry, Judge.

16          MS. COHEN:  Thank you, your Honor.

17  Q.  How long did Sheldon Silver's mother-in-law work in your

18  chambers?

19  A.  About 10 years.

20  Q.  And when Amy Taub arrived there was Sheldon Silver's

21  mother-in-law still in your chambers?

22  A.  No.  That's why I had gotten confused before.

23  Q.  She had retired by the time Amy Taub came?

24  A.  Amy Taub was 2007.  I think his mother-in-law probably

25  retired 2005.

FBC5sil1                         Schoenfeld - cross

1   Q.  And when you hired Amy Taub in 2007, did you think you were

2   doing anything improper?

3   A.  Oh, absolutely not.  She wasn't my only intern either.

4   Q.  And when you hired Amy Taub, what did you know about

5   Sheldon Silver's relationship with her father Dr. Robert Taub?

6   A.  I think you already asked me that.  I said I didn't know

7   anything about it.

8           MS. COHEN:  No further questions, your Honor.

9           THE COURT:  Mr. Cohen?

10  CROSS EXAMINATION

11  BY MR. COHEN:

12  Q.  Good morning, Judge Schoenfeld.

13  A.  Good morning, sir.

14  Q.  This must be an unusual experience, you are usually sitting

15  in your courtroom where Judge Caproni is sitting here.

16  A.  But it is not the first time.  I have been a witness in

17  both civil and criminal cases, believe it or not.

18  Q.  If can ask you, Judge, when did you graduate law school?

19  A.  1970.

20  Q.  When people of our vintage went to law school, people went

21  to class, they studied in class, they took the law books home,

22  they read the books, they prepared for the next day, and for

23  the most part that's what law school was, correct?

24  A.  We didn't have computers.

25  Q.  Neither did I, but you also didn't typically have clinical

FBC5sil1                    Schoenfeld - cross

1  courses and internships where the law students had an

2  opportunity, when they weren't in class and when they weren't

3  studying, to actually work for a district attorney's office for

4  a summer, work for the Legal Aid Society, work for the

5  Corporation Counsel's office, or intern with Judges.  That

6  didn't exist so much in our day, isn't that correct?

7  A.  Well, again, that goes back quite some time.

8  Q.  It does.

9  A.  I do remember clinical courses starting then, and one of

10  the reasons that I had received the Junior of the Year award

11  was because -- but I guess it was more on a voluntary basis --

12  I was involved with outside clinics but that was as a

13  volunteer; you're right.

14  Q.  Yes.

15  A.  We were just starting to have clinics.

16  Q.  And internships, did folks in your era --

17  A.  I don't recall any internships, no.

18  Q.  But you, sir, believe an internship is part of helping

19  people in the law school process, correct?

20  A.  Absolutely.

21  Q.  And over the course of, say, the last 10 years, how many

22  interns have you had either in the summertime or during the

23  school year?

24  A.  A lot.

25       When I first started 30 years ago I had a lot of

FBC5sil1                          Schoenfeld - cross

1   interns from different programs and different ways that they

2   came to me.  The last couple of years, because of my own

3   situation and the fact that I take most of my vacation in the

4   summertime, I have cut back on that because I like to give

5   interns as much of a good experience as possible and I'm not

6   going to be there as much so --

7   Q.  In terms of --

8   A.  I'm sorry.  If you wanted a number?

9   Q.  Please.

10  A.  I really couldn't say the last 10 years, but over the

11  course of my being a Judge, as a practical matter I don't

12  believe it is a hundred but it will be a pretty high number.

13            THE COURT:  How many do you usually hire per term?

14            THE WITNESS:  That's the thing, Judge.

15            THE COURT:  It varies?

16            THE WITNESS:  It varies.

17            THE COURT:  Okay.

18  BY MR. COHEN:

19  Q.  So, with respect to your hiring -- I'm sorry.  First you

20  said several times that these internships are unpaid, unpaid by

21  you personally and certainly unpaid by the Court system,

22  correct?

23  A.  Right.  Some of the programs that I have been involved with

24  have stipends.  For example, the late Judge Baer for New York

25  County lawyers' Association started a program for minorities

FBC5sil1                         Schoenfeld - cross

1   and they would be paid through some foundation that he had and

2   they would be working the same way with the volunteer interns.

3   Q.  But with respect to the position that Ms. Bandler had, that

4   was an unpaid internship?

5   A.  That's correct.

6   Q.  Neither you nor the Courts paid her?

7   A.  That's correct.  And the same with the other intern that I

8   had that summer.

9   Q.  Now, with respect to the internship program that you have

10  personally run in your chambers, you don't have a formalized

11  process by which you receive a hundred resumes, you separate

12  the better ones from not so better ones and then interview the

13  50 that remain and then hire from the best of that group.  You

14  don't do that, do you?

15  A.  I don't.  My former court attorney who is a Judge now does

16  but, no, that's not the way I operate.  No.

17  Q.  So you use largely recommendations from people whom you

18  trust as making the recommendation, sending you a resume, and

19  then you conclude whether you decide to hire that person,

20  correct?

21  A.  I try to use a combination, quite frankly.  The majority

22  these days are based on recommendations but, as I said, I have

23  also hired people through these various programs through

24  schools and occasionally somebody will send me a letter.  But,

25  for the most part, it would be on recommendations, yes.

FBC5sil1                      Schoenfeld - cross

1    Q.  And in fact, isn't it true that one of the interns that you

2    hired was recommended by a court officer in the courts who is

3    sort of responsible for security in the court house and he

4    wanted you to hire his son or daughter?  Am I correct?

5    A.  Well, when you say wanted I -- everybody is very nice.  We

6    all want things, I wouldn't put it in those terms.  He asked.

7    Q.  He asked.

8    A.  He didn't want.  And again, over the course of 30 years he

9    is not the only person who has had a child from the court

10   system who has interned for me.

11   Q.  And I see that Ms. Bandler attended Fordham Law School.

12   That is a good law school, correct?

13   A.  Absolutely.  She also went to Barnard College.

14   Q.  Okay, fortunately I teach at Fordham Law.  We barely know

15   each other.  If I told you I had a good student and asked you

16   to consider his or her resume you would do that, wouldn't you?

17            MS. COHEN:  Objection, your Honor.

18            THE COURT:  Overruled.

19   A.  Yes.

20   Q.  And if you found the person a proper candidate you might

21   give that person that same unpaid internship in your chambers?

22   A.  If I could accommodate the person, yes.

23   Q.  Now, you said earlier that Ms. Bandler was excellent at

24   what she did, correct?

25   A.  Yes.

1    Q.  And the responsibilities that a summer intern might have in

2    your chambers is an educational experience where you might ask

3    the intern to do research, correct?

4    A.  Right.

5    Q.  And Ms. Bandler had a background in terms of writing, she

6    had been an editor at Penguin Books, she edited the famous

7    writer Kurt Vonnegut's writings, correct?

8    A.  Yes.

9    Q.  You found her writing good?

10   A.  It was an enjoyable summer.  I had two interns that got me

11   excited more than I may have gotten them excited about the

12   work.

13   Q.  And one of the other things that a Judge might do with a

14   young intern is to have the intern sit in in court while the

15   Judge is presiding over arguments or trial, correct?

16   A.  Yes.

17   Q.  Or you might have them sit in in your chambers while

18   lawyers are making their case during a conference?

19   A.  Yes.

20   Q.  And in this way young interns improve their education as

21   aspiring lawyers, correct?

22   A.  Correct.

23   Q.  And Ms. Bandler was good at taking that kind of thing in?

24   A.  Yes.

25   Q.  And you sort of developed a relationship with Ms. Bandler

FBC5sil1                    Schoenfeld - cross

1   such that when her baby was born a few months later you

2   actually sent a baby gift to Ms. Bandler, correct?

3   A.  I did.

4   Q.  And she would, from time to time, would communicate with

5   you in writing about some decision that you had been involved

6   in that she helped you with, correct?

7   A.  Yes.

8   Q.  Now, you actually didn't even speak to Mr. Silver, did you,

9   before hiring Ms. Bandler; correct?

10  A.  That's correct.

11  Q.  You spoke to someone on his staff or perhaps Ms. Rapfogel

12  who sent you the resume that we saw on the board, correct?

13  A.  Right.  Yes.

14  Q.  And when Ms. Rapfogel called you or whoever called you on

15  Mr. Silver's behalf, did they tell you that Mr. Silver, as

16  Speaker of the Assembly, would like you to hire Ms. Bandler as

17  an intern?

18  A.  I'm not sure I understand the question because we know each

19  other for so long I don't know why that would even be said that

20  way.

21  Q.  So, you knew him as a person from the neighborhood, you

22  knew him socially somewhat, you knew him from politics because

23  Judges basically have to be elected to the Supreme Court in the

24  State system unlike Judge Caproni who was appointed by the

25  President of the United States.  It is a different system,

1    correct?

2    A.   Well, I appreciate that she was appointed by the President

3    of the United States but I'm sure she's had recommendations,

4    too.

5            THE COURT:  Alas, yes.

6    Q.   Okay, so let me show you Defendant's Exhibit 117.  I know,

7    your Honor, our numbers are a little --

8            THE COURT:  Now we are up to the hundreds.

9            MR. COHEN:  We will get back.

10   Q.   Would you look at that document and identify it for us?

11   A.   Yes.  I believe as I said on direct, one of the reasons why

12   I keep resumes is that once a student passes their exam, in

13   order to become a member of the State Bar they have to go

14   before an ethics committee and they're required to get

15   affidavits from anybody who either employed them or supervised

16   them with respect to any legal work.

17   Q.   And this is that affidavit that you signed?

18   A.   Yes.

19   Q.   And on the last page it has your signature, Martin

20   Schoenfeld?

21   A.   It does.

22   Q.   And it is kept in the ordinary course of your records, as

23   you said before?

24   A.   Yes, I do.

25            MR. COHEN:  I will offer this now, your Honor, as

FBC5sil1                    Schoenfeld - cross

1    Defendant's Exhibit 117.

2              THE COURT:  Any objection?

3              MS. COHEN:  No objection, your Honor.

4              THE COURT:  117 is received.

5              (Defendant's Exhibit 117 received in evidence)

6    BY MR. COHEN:

7    Q.  Now, on the last page -- I'm sorry, the bottom line of the

8    next to the last page it says:  I hereby provide any other

9    facts within my knowledge of which I have information which, in

10   my opinion, have any bearing on applicant's qualifications and

11   moral character or fitness to practice law which would be

12   helpful to the Appellate Division or its committee on character

13   and fitness in determining applicant's character and fitness.

14             There is a committee called the Character and Fitness

15   Committee that reviews the moral character of every applicant

16   who has passed the bar that want to become a lawyer, correct?

17   A.  That's right.

18   Q.  Would you read what your entry is after that?

19   A.  Applicant is an extremely intelligent, enthusiastic, and

20   diligent individual of the highest moral character.  She will

21   be a most capable attorney, and an excellent addition to our

22   Bar.

23   Q.  Now, you stated that and it was sworn before a notary

24   public on December 21st, 2009, correct?

25   A.  Yes.

FBC5sil1                         Schoenfeld - cross

1    Q.  And the notary public is a gentleman named Charles L.

2    Brieant, the III.  Who is the Mr. Brieant who is the notary

3    public on this document?

4    A.  Charles Brieant is an attorney who now works in, I believe

5    the Law Pool in the Commercial Division of our State Court and

6    he is the son of the late Judge, Federal Judge Charles Brieant.

7    Q.  Charles Brieant, who was the Chief Judge of this very

8    court?

9    A.  Yes, sir.

10   Q.  How did he become your notary public on that particular

11   date?

12   A.  He had been assigned to my chambers -- or worked in my

13   chambers, I should say.

14   Q.  Did he get the job as a result of a mass interviewing

15   process that you conducted?

16   A.  No.

17   Q.  How did he come to be your law secretary?

18   A.  As part of my job as the appellate term is -- again, I have

19   to -- it has been a long time -- to try and put these things

20   together without making things up so I don't know the specific

21   wording.  But, in addition to being on the appellate term I

22   have a number of other positions that I have to handle and I

23   received a phone call from the then presiding judge of the

24   Appellate Division who said we know you have a lot of work, we

25   would like to send one of our court attorneys to work in

FBC5sil1                      Schoenfeld - cross

1    chambers with you.

2    Q.  And you accepted the recommendation of the presiding judge,

3    correct?

4    A.  I did.

5    Q.  And Mr. Brieant was an effective employee in your chambers,

6    correct?

7    A.  Yes.  And still a friend.  I mean now as a friend.  Since

8    he worked for me we became friends.

9    Q.  This is a paying job --

10             THE COURT:  Don't talk over the Judge.

11             THE WITNESS:  I'm sorry.

12             MR. COHEN:  Pardon me?

13             THE COURT:  Don't talk over the judge.

14             THE WITNESS:  That's my fault.  I did answer your

15   question.  I just thought about to say that since we met we

16   have become friends.

17   BY MR. COHEN:

18   Q.  You are the first Judge who has ever apologized to me,

19   Judge.

20             But, that was a paying job that Mr. Brieant had as

21   opposed to the summer internship that was not for pay, correct?

22   A.  That's correct.

23   Q.  And you know that Ms. Bandler went on to a successful

24   career with the esteemed law firm of Proskauer in New York

25   City?

FBC5sil1                    Hoenig – direct

1   A.  So I have been told.  Yes.

2           MR. COHEN:  I won't ask any questions about a

3   mother-in-law, your Honor.

4           Thank you.

5           MS. COHEN:  One quick question, your Honor.

6   REDIRECT EXAMINATION

7   BY MS. COHEN:

8   Q.  Judge, what other law students did Sheldon Silver recommend

9   you to hire?

10  A.  Law students?  None.

11          MS. COHEN:  No further questions, your Honor.

12          THE COURT:  Okay.  Thank you.

13          THE WITNESS:  Thank you, Judge.

14          THE COURT:  Judge Schoenfeld, you may step down.

15          (Witness steps down)

16          THE COURT:  Call your next witness.

17          MS. COHEN:  Your Honor, the government calls Michael

18  Hoenig.

19   MICHAEL HOENIG,

20       called as a witness by the Government,

21       having been duly sworn, testified as follows:

22          THE WITNESS:  Michael Hoenig.  H-O-E-N-I-G.

23  DIRECT EXAMINATION

24  BY MR. GOLDSTEIN:

25  Q.  Good morning, Mr. Hoenig.

1346

FBC5sil1                           Hoenig – direct

1   A.   Good morning.

2   Q.   Where do you work?

3   A.   I work at Glenwood Management Corp.

4   Q.   What is Glenwood Management Corp.?

5   A.   We are a real estate management company.

6   Q.   For how long have you worked at Glenwood Management Corp.?

7   A.   Almost 29 years.

8   Q.   What's your educational background?

9   A.   I have a BBA from Hofstra University.

10  Q.   What is a BBA?

11  A.   Bachelor of Business Associates.

12  Q.   What did you do after you graduated from Hofstra?

13  A.   I went to work in a public accounting firm, Peat Marwick

14  Mitchell.

15  Q.   When did you come to Glenwood?

16  A.   1987.

17  Q.   When you came to Glenwood, what was your first job?

18  A.   I was assistant controller.

19  Q.   What did you do as the assistant controller?

20  A.   Kept the books and records of the company.

21  Q.   And, since 1987 through today, have your responsibilities

22  at Glenwood increased over time?

23  A.   Yes.

24  Q.   What is your current position at Glenwood?

25  A.   I am vice president of finance.

FBC5sil1                              Hoenig - direct

1    Q.  Are you the highest ranking financial officer of Glenwood

2    Management company?

3    A.  Yes.

4    Q.  What are your responsibilities in that position?

5    A.  I still keep the books and records of the company.  I have

6    other responsibilities as well; tax work.  Things like that.

7    Q.  I want to ask you a few questions about Glenwood Management

8    Corporation.

9    A.  Okay.

10   Q.  What does Glenwood Management Corporation do?

11   A.  We build, own, and manage apartment buildings in Manhattan.

12   Q.  What kind of apartment buildings?

13   A.  They're luxury high-rise buildings.

14   Q.  Up through about 2013, who ran Glenwood?

15   A.  Leonard Litwin.

16         THE COURT:  L-I-T-W-I-N?

17         THE WITNESS:  L-I-T-W-I-N, yes.

18         THE COURT:  Okay.

19   BY MR. GOLDSTEIN:

20   Q.  Besides Mr. Litwin, who were the top executives of Glenwood

21   Management Corp.?

22   A.  Carole Pittelman, Gary Jacob, Charlie Dorego.

23   Q.  Let's go through that one by one.  Who is Carole Pittelman?

24   A.  Carole Pittelman is Mr. Litwin's daughter.

25   Q.  What was her job at the company?

FBC5sil1                         Hoenig - direct

1   A.  She was executive vice president.

2   Q.  Gary Jacob, what was his job?

3   A.  Also executive vice president.

4   Q.  And Charles Dorego?

5   A.  Senior vice president and general counsel.

6   Q.  How was -- you said that Glenwood owns and manages real

7   estate -- withdrawn.

8           You said that Glenwood owns and manages buildings,

9   real estate properties in New York.  How is the ownership of

10  the buildings structured?

11  A.  Each building is owned by a separate LLC.

12  Q.  What is an LLC?

13  A.  Limited liability company.

14  Q.  What is the reason that each of the Glenwood buildings is

15  owned as by a separate LLC?

16  A.  There are tax reasons.

17  Q.  Of the Glenwood LLCs, the buildings, who owns those LLCs?

18  A.  Currently, Carroll Pittelman.

19  Q.  And up through about 2013, who owned those LLCs?

20  A.  Leonard Litwin.

21          THE COURT:  So he is the sole member of each of the

22  LLCs that owns the building?

23          THE WITNESS:  He is the manager of the building, those

24  LLCs, yes.

25  Q.  So, as a practical matter, up through 2013, which person

FBC5sil1                        Hoenig - direct

1   owned the Glenwood buildings?

2   A.   Leonard Litwin.

3   Q.   And which person ran the Glenwood buildings?

4   A.   Leonard Litwin.

5   Q.   And which person owned 100 percent of the stock in Glenwood

6   Management Corporation?

7   A.   Again, Leonard Litwin.

8   Q.   And who made the decisions at the company?

9   A.   Mr. Litwin.

10  Q.   How would you describe his leadership style?

11  A.   He was hands on all the way.

12  Q.   What do you mean by he was hands on?

13  A.   He made the final decision on just about everything.

14  Q.   How involved was he in the details of the company?

15  A.   Very.  Detail oriented.

16  Q.   In about 2013 how old was Leonard Litwin?

17  A.   2013 he was in his 90s.

18  Q.   And up through that time did he still run the company?

19  A.   Yes.

20  Q.   And did he run it in 2013 in his 90s the same way he always

21  had?

22  A.   Yeah.

23  Q.   What happened to Mr. Litwin's health in or about 2013?

24  A.   I guess because of his age his health kind of deteriorated

25  and he stopped coming in the office.

1   Q.   So who runs the company now?

2   A.   Carole Pittelman.

3   Q.   Now, does Mitchell Litwin have any role in running the

4   company?

5   A.   Not that I'm aware of, no.

6   Q.   And again, just to remind the jury, who is Carole

7   Pittelman?

8   A.   Mr. Litwin's daughter.

9   Q.   About how many buildings does Glenwood Management run?

10  A.   Twenty-some odd buildings.  23, 24.  Somewhere around

11  there.

12  Q.   Where is the company's office located?

13  A.   We are at 1200 Union Turnpike, New Hyde Park, on Long

14  Island.

15  Q.   About how many employees work in the company's office?

16  A.   There are about a hundred employees in the main office.

17  Q.   Does that office manage all of the Glenwood buildings?

18  A.   Yes.

19  Q.   Which entity manages the books and records of all of the

20  Glenwood buildings?

21  A.   Glenwood Management Corp.

22  Q.   Are you employed by Glenwood Management Corp?

23  A.   Yes.

24  Q.   If you can look, there is a binder in front of you, if you

25  look at what's been marked for identification as Government

FBC5sil1                           Hoenig - direct

1    Exhibit 752.

2    A.   Okay.

3    Q.   Do you recognize that document?

4    A.   Yes.

5    Q.   What is this a list of?

6    A.   This is a list of all our buildings, building name,

7    addresses, the LLC name, and federal I.D. numbers.

8              MR. GOLDSTEIN:  Your Honor, the government offers 752.

9              MR. SHUR:  No objection.

10             THE COURT:  752 is received.

11             (Government's Exhibit 752 received in evidence)

12   BY MR. GOLDSTEIN:

13   Q.   If we can publish that, Mr. Coccaro, and let's zoom in on

14   the top part of this document so we can understand what it

15   says.

16             So, there is a number 102 and then a building

17   Cambridge.  What is Cambridge?

18   A.   Cambridge is one of our buildings.

19   Q.   And then there is an address, 500 East 85th Street and

20   there is a corporation name; what is the corporation name for

21   the Cambridge building?

22   A.   East 85th Realty LLC.

23   Q.   Does each of the Glenwood buildings have a different LLC

24   corporation name?

25   A.   Yes.

FBC5sil1                          Hoenig - direct

1   Q.  Does each of the Glenwood buildings also have a different
2   building name?
3   A.  Yes.
4   Q.  Such as the Cambridge or the Stratford?
5   A.  Yes.  That's correct.
6   Q.  Who is it who came up with the names for the buildings?
7   A.  Mr. Litwin.
8   Q.  Mr. Coccaro, if we can scroll through to see how many
9   buildings there are?
10          This is the first page, the second page, and then the
11  third page.  We can set that aside.
12          Mr. Hoenig, has Glenwood made political contributions
13  through its LLCs?
14  A.  Yes.
15  Q.  Up through 2013, who determined which public officials were
16  candidates to provide donations to?
17  A.  Mr. Litwin.
18  Q.  And when Mr. Litwin decided to make a donation to a
19  particular candidate or public official, how is that
20  accomplished?
21  A.  He would tell me to draw checks to the different political
22  parties.
23  Q.  And on which account were the checks drawn from?
24  A.  They were drawn from the accounts of the various LLCs.
25  Q.  Were they drawn from the general Glenwood Management

FBC5sil1                            Hoenig - direct

1    account or from the LLC accounts?

2    A.   No, from the LLC accounts.

3    Q.   And how would the company determine which of the LLC

4    accounts to draw from?

5    A.   How was it determined?  He would just tell me which ones to

6    draw from or he would tell me that we need four checks from

7    four different LLCs and I would pick the LLCs.  We tried to

8    rotate so one particular LLC wouldn't get overly burdened.

9    Q.   So, let's look in your binder at Government Exhibit 754.

10   Do you recognize that document?

11   A.   Yes.

12   Q.   What is it?

13   A.   This is a list of contributions from the LLCs.

14   Q.   And over what time period is the list of the contributions?

15   A.   It is 2005 through 2014.

16   Q.   How is this list generated?

17   A.   This is generated from our computer system.

18   Q.   Is this a computer system that you oversee?

19   A.   Yes.

20   Q.   Is it from your accounts payable system?

21   A.   Yes, it is.

22              MR. GOLDSTEIN:  Your Honor, the government offers 754.

23              MR. SHUR:  No objection.

24              THE COURT:  754 is received.

25              (Government's Exhibit 754 received in evidence)

FBC5sil1                    Hoenig – direct

BY MR. GOLDSTEIN:

Q.  Mr. Coccaro, if we can look at the top portion of this
document, top quarter of the document?

          Mr. Hoenig, looking at where it says building 102 500
East 85th Street.  This first page of the document, what is
this a list of?

A.  This is a list of contributions from this particular
building, Building 102.

Q.  That were drawn out of the account of that particular
building?

A.  Yes.

Q.  And it says for period 1/1/2005 to 12/31/2014; is that the
time period for all of these contributions?

A.  Yes.

Q.  Under -- there is an item -- there is a header that says
G/L; what does that stand for?

A.  G/L is general ledger.  That's our general ledger account
number for contributions.

Q.  And so, where it says 6319, what does that code represent?

A.  6319 is a contributions expense.

Q.  Does that include anything other than political
contributions?

A.  It could include all contributions.  Generally they're not
made out of the LLCs, though.  This is usually all political.

Q.  Could there be some charitable contributions included?

FBC5sil1                          Hoenig - direct

1    A.  Could be.  Yeah, there could be a few.

2    Q.  So, if we can look, Mr. Coccaro, at -- you see at the

3    bottom of what is highlighted there it says, you see there is

4    some donations to the NYS Senate Republican Campaign.  So,

5    there is an invoice date of August 7, 2008 and what is the

6    amount that is listed there?

7    A.  $10,000.

8    Q.  Then if you can scroll down, Mr. Coccaro, just a few more?

9         You see there is also an entry for the democratic

10   senatorial campaign?  And how much is that contribution for?

11   A.  $12,500.

12   Q.  And who was it who determined which contributions were

13   made?

14   A.  Mr. Litwin.

15   Q.  If we can turn to the second page of this document and look

16   at Total, so this says total paid and that's how much is the

17   total that this LLC paid during this time period?

18   A.  $684,164.71.

19   Q.  Again, that is the total contributions from this one

20   building -- paid from this building's account over this 10-year

21   time period?

22   A.  Yes.  That's correct.

23   Q.  And if we could look at the next page of the document, what

24   is the next page of the document?

25   A.  Same type of list from a different building.

1356

FBC5sil1                        Hoenig - direct

1    Q.  If we can zoom in at the top?

2              So this building is 112 1385 York Avenue; is that one

3    of the Glenwood buildings?

4    A.  That's correct, yes.

5    Q.  You testified that this was drawn from Glenwood's accounts

6    payable system, is that right?

7    A.  That's correct, yeah.

8    Q.  Are all of the finances for all of the buildings managed in

9    the same system?

10   A.  Yes.

11   Q.  And that's the system that is at your office in New Hyde

12   Park?

13   A.  That's correct.

14   Q.  And who supervised all of the accounts?

15   A.  I do.

16   Q.  At the top of this document, Mr. Coccaro, if you can go

17   back and zoom in at the top of this document there is the first

18   item that says American Cancer Society, $100.  Would that be a

19   contribution, a charitable contribution?

20   A.  Charitable contribution, yes.

21   Q.  Why would that be included in this list?

22   A.  Because it is the same general ledger account number for

23   political and for charitable contributions.  It is just

24   contributions of any kind.

25   Q.  And having looked through this document, approximately --

1357

FBC5sil1                         Hoenig - direct

1    about how much of what's listed as coming out of the 6319

2    ledger account are charitable contributions as compared to

3    political contributions?

4    A.   There are some.  It's very little.  The majority --

5             THE COURT:  Charitable versus political.

6             THE WITNESS:  Charitable, mostly political.

7    BY MR. GOLDSTEIN:

8    Q.   If we can turn to the second page, the next page of the

9    document and if we can zoom in on the total on this one?

10            So, over this 10-year period out of this building's

11   account, how much was paid in total political contributions?

12   A.   $675,850.

13   Q.   Now, looking at the rest of Government Exhibit 754, does it

14   list contributions from the other Glenwood buildings?

15   A.   Yes, it does.

16   Q.   And who was it who wrote the checks for these political

17   contributions?

18   A.   Most of them I did.

19   Q.   At whose direction?

20   A.   At Mr. Litwin's.

21   Q.   Mr. Coccaro, if you can scroll through this document, just

22   to give the jury an idea of the size of it?  Have we made it

23   through it?

24            Mr. Hoenig, do you know why Glenwood made so many

25   political contributions over the years?

FBC5sil1                    Hoenig - direct

1    A.  No.

2              (Continued on next page)

FBCYSIL2                          Hoenig - Direct

1    BY MR. GOLDSTEIN:

2    Q.  Were you part of the discussions as to whether or not to

3    make such donations?

4    A.  No.  I was just told to draw the checks.

5    Q.  Who at the company was involved in the discussions about

6    which political donations to make?

7    A.  Mr. Litwin and later Charlie Dorego.

8    Q.  Again, for the jury, who was Charlie Dorego?

9    A.  Charlie Dorego is our vice-president and general counsel.

10   Q.  If you could turn in your binder to Government Exhibit

11   755-07.

12           Do you recognizes what's contained in Government

13   Exhibit 755-07?

14   A.  Yes.

15   Q.  Who are these?

16   A.  These are copies of checks.

17   Q.  Are they checks that you signed?

18   A.  Checks that I signed, yes.

19           MR. GOLDSTEIN:  Your Honor, the government offers

20   755-7.

21           MR. SHUR:  No objections.

22           THE COURT:  755-07 is received.

23           (Government's Exhibit 755-07 received in evidence)

24           MR. GOLDSTEIN:  Is it possible just to make it easier

25   to read just to zoom in on the top two checks.

FBCYSIL2                    Hoenig - Direct

1    BY MR. GOLDSTEIN:

2    Q.  Mr. Hoenig, at whose direction did you write these checks?

3    A.  Mr. Litwin.

4    Q.  Who were they made out to?

5    A.  Friends of Silver.

6    Q.  Do you know what that organization is?

7    A.  No.  A political campaign I would imagine.

8    Q.  The first one is from River New York Barclay LLC.

9         What is that?

10   A.  That's one of our LLCs.

11   Q.  When you say one of your LLCs, is that one of your

12   buildings?

13   A.  Yes.

14   Q.  And the next one is from Tribeca North End LLC.

15        What is that?

16   A.  Another LLC, another one of our buildings.

17   Q.  What is 94th Realty LLC?

18   A.  Another LLC in another building.

19   Q.  What is the date on all three of these checks?

20   A.  March 17, 2009.

21   Q.  Why is it that you had three different of your buildings

22   write three different checks for $1,250 on the same date?

23   A.  I don't know.  I'm usually told to draw several checks and

24   given the amounts.

25   Q.  Do you know whether or not the residents of River York

FBCYSIL2                          Hoenig - Direct

1    Barclay LLC directed that the check for $1,250 to Friends of

2    Silver was made?

3    A.  The residents?

4    Q.  Correct.

5    A.  No.

6    Q.  Who directed that that check be directed?

7    A.  Mr. Litwin.

8    BY THE COURT:

9    Q.  These were all rental buildings; right?

10   A.  These were rentals.  Yes.

11   Q.  If we could turn to the fourth page of document and look at

12   the third check that's on the fourth page.

13            THE COURT:  The fourth page is the back of the checks.

14            Is that what you want?

15            MR. GOLDSTEIN:  No.  I think they are just lousy

16   copies of additional checks.

17            THE COURT:  Okay.

18            MR. GOLDSTEIN:  Mr. Coccaro, can you zoom in on the

19   bottom check on this page to see if there's any way that the

20   jury can actually read that.

21   BY MR. GOLDSTEIN:

22   Q.  Which of the buildings is that check from?

23   A.  It's coming out 92nd Realty LLC.

24   Q.  That's one of the Glenwood buildings?

25   A.  That's one of our buildings, yes.

FBCYSIL2                          Hoenig - Direct

1   Q.  How much is this check for?

2   A.  This check is for $10,000.

3   Q.  It says pay to the order of DACC?

4   A.  Correct.

5   Q.  Do you know what that entity is?

6   A.  No.

7   Q.  You can set that aside.

8           Now, we talked about campaign contributions.  Did

9   Glenwood management corporation also employ lobbyists?

10  A.  Yes.

11  Q.  And who determined which lobbyists to hire?

12  A.  Leonard Litwin.

13  Q.  Who determined how many lobbyists to hire?

14  A.  Mr. Litwin.

15  Q.  If you can look in your binder at a series of exhibits, and

16  they are Government Exhibits 757-1, 757-2, 757-3, 767, 768,

17  769, 770, 772, and 773.

18  A.  Okay.

19  Q.  What are all of these documents, Mr. Hoenig?

20  A.  These are semiannual filings for lobbyists.

21  Q.  Are they filings that were done by Glenwood Management

22  Corporation?

23  A.  Yes.

24  Q.  Are these maintained in the books and records of Glenwood

25  Management Corporation?

FBCYSIL2                          Hoenig - Direct

1   A.  Yes.

2           MR. GOLDSTEIN:  Your Honor, the government offers

3   Government Exhibits 757-1, 757-2, 757-3, 767, 768, 769, 770,

4   772, and 773.

5           THE COURT:  Any objection?

6           MR. SHUR:  No, Judge.

7           THE COURT:  Okay.  Those exhibits are all received.

8           (Government's Exhibits 757-1, 757-2, 757-3 received in

9   evidence)

10          (Government's Exhibits 767, 768, 769 received in

11  evidence)

12          (Government's Exhibits 770, 772, and 773 received in

13  evidence)

14  BY MR. GOLDSTEIN:

15  Q.  We're just going to look at one of these documents,

16  Mr. Hoenig.

17          MR. GOLDSTEIN:  If we could turn, Mr. Coccaro, to

18  757-2.  Let's look at the top of this document.

19          It says, "Client semiannual report."

20  BY MR. GOLDSTEIN:

21  Q.  For which reporting year does this document list?

22  A.  2012.

23  Q.  What is contained on this document, Mr. Hoenig?

24  A.  What is contained.  It's just our name and address and the

25  name and lobbyist.

1364

FBCYSIL2                        Hoenig - Direct

1   Q.  Does this list the names of the lobbyists that Glenwood has

2   hired as set forth in the document?

3   A.  Yes.

4   Q.  So the reporting period here says 2012 is the year.

5           For which time period of the year?

6   A.  This is January through June.

7   Q.  So this is for half of the year?

8   A.  Six months, yes.

9   Q.  And the chief administrative officer is listed as whom on

10  this document?

11  A.  Charles Dorego.

12  Q.  And the client business name is listed as what?

13  A.  Glenwood Management Corp.

14  Q.  That's the company that you work for?

15  A.  That's correct.

16  Q.  If we could then look at the bottom of this document, the

17  bottom of this first page.

18          Is Mark Lieberman one of the lobbyists hired by

19  Glenwood during this six-month time period?

20  A.  Yes.

21  Q.  How much did Glenwood pay Mark Lieberman during this

22  six-month time period?

23  A.  $45,000.

24  Q.  If we could turn to the second page of this document.  Look

25  just at the first entry.

1          Brian R. Meara Public Relations, Inc.  What is that?

2    A.  Another lobbyist.

3    Q.  How much did Glenwood pay Brian Meara Public Relations

4    during this time period?

5    A.  $60,000.

6    Q.  If you could look at the next one.

7          Pitta Bishop Del Giorno & Giblin LLC.

8          What is that?

9    A.  Another lobbyist.

10   Q.  How much did Glenwood pay Pitta Bishop?

11   A.  $75,000.

12        MR. GOLDSTEIN:  Mr. Coccaro, if we could go back up to

13   the Brian Meara entry.

14   BY MR. GOLDSTEIN:

15   Q.  It says level of government lobbied.  What is the entry for

16   Brian Meara?

17   A.  State.

18   Q.  If you could just look again at the Pitta Bishop.

19        What does that say for level of government lobbied?

20   A.  Both.

21   Q.  Is that both state and local?

22   A.  That's correct.

23   Q.  Let's look at the third entry on this page.

24        What is Sanzillo, Francis & Associates?

25   A.  Another lobbyist.

FBCYSIL2                          Hoenig - Direct

1    Q.  What level of government was lobbied by this lobbyist?

2    A.  State.

3    Q.  How much did Glenwood pay for this lobbyist?

4    A.  $45,000.

5    Q.  It starts with Richard Runes here, and it carries over to

6    the next page.  Who was Richard Runes.

7    A.  Another lobbyist.

8    Q.  What level of government was Richard Runes hired to lobby?

9    A.  State.

10   Q.  What was his compensation for the six-month period?

11   A.  $30,000.

12   Q.  Let's go to the next month.

13             What is Empire Strategic Planning, Inc.?

14   A.  Another lobbyist.

15   Q.  What level of government does that lobby?

16   A.  This was state.

17   Q.  And how much did Glenwood pay Empire Strategic Planning?

18   A.  $72,000.

19   Q.  And then let's look at the next one.

20             What was Carl Andrews & Associates?

21   A.  Another lobbyist.

22   Q.  What level of government did Carl Andrews & Associates

23   lobby?

24   A.  State.

25   Q.  How much did Glenwood pay Carl Andrews & Associates?

FBCYSIL2                          Hoenig - Direct

1    A.  $72,000.

2              MR. GOLDSTEIN:  Mr. Coccaro, I did not ask the

3    question before.  If we could go back to the first entry, Mark

4    Lieberman, on the first page of this document.

5    BY MR. GOLDSTEIN:

6    Q.  What level of government did Glenwood pay Mark Lieberman to

7    lobby?

8    A.  State.

9    Q.  If you could then turn to the bottom of the third page of

10   the document.

11             What is listed as the total compensation paid to all

12   of the Glenwood lobbyists for this six-month time period?

13   A.  $399,000.

14   Q.  Looking at the other, so we don't have to go through all of

15   the other exhibits that were admitted previously, how does that

16   number compare to the other six-month periods in recent years

17   in terms of payments to lobbyists by Glenwood?

18   A.  Probably similar.

19   Q.  So is it fair to say that Glenwood paid about $800,000 per

20   year in recent years for lobbyists?

21   A.  Yes.

22   Q.  Do you know what the purpose of paying that amount of money

23   for lobbying was?

24   A.  No.

25   Q.  If you can turn in your binder to Government Exhibit 828,

FBCYSIL2                          Hoenig - Direct

1   which is at the end of the binder.

2            Do you recognize that document?

3   A.  Yes.

4   Q.  Is that a document that you prepared at the request of the

5   government?

6   A.  Yes.

7   Q.  Where did you get the information to be able to prepare

8   this document?

9   A.  From our books and records.

10           MR. GOLDSTEIN:  Your Honor, the government offers

11  Government Exhibit 828.

12           MR. SHUR:  No objection.

13           THE COURT:  828 is received.

14           (Government's Exhibit 828 received in evidence)

15           MR. GOLDSTEIN:  If we can look at the top of this

16  document.

17  BY MR. GOLDSTEIN:

18  Q.  So on the left-hand side, it says building name and

19  address.  And then there's a list of the Cambridge and the

20  Stratford and the Pavilion.

21           What are those?

22  A.  Those are all buildings.

23  Q.  And then it says block-lot.

24           What does that mean?

25  A.  Block-lot is for real estate tax purposes is where the

FBCYSIL2                          Hoenig - Direct

1    property is located.

2    Q.   Do each of the Glenwood buildings have a separate block and

3    lot number?

4    A.   Yes.

5    Q.   Is that block and lot number used as the buildings have to

6    pay real estate taxes?

7    A.   Yes.

8    Q.   And then it says LLC name.

9             What is that?

10   A.   That's the name of the LLC that owns the building.

11   Q.   Is that what we looked at the list of previously.

12   A.   That's correct.

13   Q.   And then there are three entries there -- 421a

14   rent-regulated apartments and PACB financing.  Let's just talk

15   about them one by one.

16            What is 421a as you know it?

17   A.   421a is an exemption for real estate taxes.

18            MR. GOLDSTEIN:  If we can scroll back or zoom back,

19   Mr. Coccaro.

20   BY MR. GOLDSTEIN:

21   Q.   On this document did you identify which Glenwood buildings

22   received the 421a real estate tax exemptions?

23   A.   Yes.

24   Q.   So on this first page, how many Glenwood buildings received

25   the 421a exemption?

FBCYSIL2                          Hoenig - Direct

1    A.   Two.

2    Q.   If you would turn to the second page of the document.

3              How many Glenwood buildings received a 421a exemption

4    on this page?

5    A.   Seven.

6    Q.   What's the total number of 421a buildings?

7    A.   Nine .

8    Q.   Has Glenwood used the 421a program more or less frequently

9    in recent years?

10   A.   In recent years, more frequently.

11   Q.   I've used the term and you used the term "exemption," real

12   estate tax" exemption."

13             What does that mean?

14   A.   It's a reduction of the real estate taxes.

15   Q.   So how important is it for the buildings that receive the

16   421a exemption -- how important is it to those buildings'

17   finances?

18   A.   It's very important.  It reduces the real estate tax

19   expense significantly.

20   Q.   The next column, if we go back to the first page, is

21   rent-regulated apartments.

22             What does that mean?

23   A.   Those where you see the X are the buildings that have

24   regulated apartments.

25   Q.   For the jury, what does it mean to have a regulated

FBCYSIL2                              Hoenig - Direct

1   apartment?

2   A.   Regulated apartments mean that you can only increase the

3   rents when the lease expires by a small percentage.

4   Q.   How does having a rent-regulated apartment affect the

5   finances of the Glenwood buildings?

6   A.   It affects negatively.

7   Q.   Why does it effect negatively?

8   A.   The more regulated apartments you have, the lower your

9   income is.

10  Q.   And that is because it makes it harder to charge higher

11  rents?

12  A.   Yes.

13  Q.   So, looking at the first page of the document, how many of

14  the Glenwood buildings have regulated apartments?

15  A.   Twelve.

16  Q.   Turning to the second page, how many of the Glenwood

17  apartments on the second page have regulated apartments?

18  A.   Thirteen.

19  Q.   So a total of 25?

20  A.   Twenty-five.

21  Q.   Now, looking at the third column for PACB financing, what

22  does PACB stand for?

23  A.   Public Authority Control Board.

24  Q.   Is that a reference to bond financing?

25  A.   Bond financing, yes.

FBCYSIL2                        Hoenig - Direct

1    Q.  How many Glenwood buildings received bond financing through

2    the PACB?

3    A.  Nine .

4          THE COURT:  When you say "bond financing," do you mean

5    bond financing that's issued by the state?

6          THE WITNESS:  By the state, yes.

7          MR. GOLDSTEIN:  Thank you, your Honor.

8    BY MR. GOLDSTEIN:

9    Q.  As you know it, does the 421a tax program -- is that a

10   state program?

11   A.  Yes, it is.

12         MR. GOLDSTEIN:  Your Honor, I'm going to move on to a

13   new topic.  I don't know if you want to take a break now or if

14   I should continue for a little bit.

15         THE COURT:  It's a little early for our morning break.

16         MR. GOLDSTEIN:  I'll move on.

17         THE COURT:  Maybe not.  Let's take our morning break.

18         Don't discuss the case.  We'll take a ten-minute

19   break.

20         (Jury not present)

21         THE COURT:  Ten minutes.

22         MS. COHEN:  Thank you, your Honor.

23         (Recess)

24         THE COURT:  Okay.

25         MR. GOLDSTEIN:  Thank you, your Honor.

FBCYSIL2                         Hoenig - Direct

1   BY MR. GOLDSTEIN:

2   Q.  Mr. Hoenig, you testified previously about the ownership of

3   the LLCs.

4   A.  Yes.

5   Q.  Just to be clear, besides Mr. Litwin, are there some other

6   members or shareholders in some of the LLCs?

7   A.  There are some other members.

8   Q.  But who was the principal owner of the LLCs?

9   A.  Mr. Litwin.

10  Q.  As part of your responsibilities as the chief financial

11  officer of the company, do you also handle Glenwood's tax work?

12  A.  Yes.

13  Q.  Is there a term called "text certiorari" that you're

14  familiar with?

15  A.  Yes.

16  Q.  What does that term mean?

17  A.  Tax certiorari is an annual filing which generally uses the

18  assessed value of the building which will reduce the real

19  estate tax expense.

20  Q.  So let's try to break that down a little bit step-by-step.

21  So you talked about an assessed value.

22          What is assessed on an annual basis?

23  A.  The city places a value on the property.

24  Q.  They do that on each property?

25  A.  On each property, yes.

FBCYSIL2                          Hoenig - Direct

1   Q.   That's done every year?

2   A.   Annually, yes.

3   Q.   What impact does the assessed value that the city places on

4   a building -- what impact does that have on the taxes that

5   Glenwood has to pay?

6   A.   Well, the higher the assessed value, the higher the real

7   estate tax expense is going to be.

8   Q.   So what does Glenwood try to do on an annual basis?

9   A.   We try to reduce the assessed value.

10  Q.   What does Glenwood do in order to try to reduce the

11  assessed value on the properties?

12  A.   We file tax certioraris.

13  Q.   What is involved in the filing of these tax certioraris?

14  A.   A certiorari is basically a financial statement of the

15  building that is filed with the city.  We send it to an

16  attorney who in turn takes it to the city.

17  Q.   Who prepares the financial statements that end up getting

18  sent to the city?

19  A.   I do.

20  Q.   What information is contained in those financial

21  statements?

22  A.   Income and expenses for the property.

23  Q.   And do you do that for each of the Glenwood buildings?

24  A.   Most of them, yes.  We determine which ones we're going to

25  file.

FBCYSIL2                      Hoenig - Direct

1   Q.  And the financial statements that you prepare -- are those

2   audited?

3   A.  Yes, they are.

4   Q.  Who audits them?

5   A.  An outside CPA firm.

6   Q.  Who oversees or takes care of making sure that the

7   financial statements are audited?

8   A.  I do.

9   Q.  So, after the financial statements are prepared by you and

10  then audited, what happens next?

11  A.  They are sent to the attorneys for filing.

12  Q.  Are these attorneys who work for Glenwood or who work --

13  A.  They're outside attorneys.

14  Q.  What role, if any, do the attorneys play in putting

15  together the financial statement?

16  A.  They don't.  We do it in house.

17  Q.  These outside attorneys -- does Glenwood use one outside

18  attorney or multiple outside attorneys?

19  A.  No.  We use several.

20  Q.  Who determined which attorneys to use to file the financial

21  statements?

22  A.  Mr. Litwin did.

23  Q.  Did there come a time when Glenwood switched some of its

24  buildings from other attorneys to the law firm of Golberg &

25  Iryami?

1    A.  Yes.

2    Q.  Who was it who made that decision?

3    A.  Leonard Litwin did.

4    Q.  I want you to look in your binder as what's been marked as

5    Government Exhibit 750.

6            MR. GOLDSTEIN:  I'm going to ask Mr. Coccaro to pull

7    up on your screen the Excel version of what's printed out as

8    Government Exhibit 750.  If we could call the Excel version

9    750-A.

10   BY MR. GOLDSTEIN:

11   Q.  Do you recognize this document?

12   A.  Yes.

13   Q.  What is it?

14   A.  This is my year end checklist for the annual filings.

15   Q.  Is this something that you created and maintained in the

16   ordinary course of your business managing the tax cert process

17   for Glenwood?

18   A.  Yes.

19           MR. GOLDSTEIN:  Your Honor, the government offers both

20   750, the printed version, and 750-A, the Excel.

21           MR. SHUR:  No objection.

22           THE COURT:  Okay.  750 and 750A are received.

23           (Government's Exhibits 750 and 750A received in

24   evidence)

25           MR. GOLDSTEIN:  Mr. Coccaro, if we could publish the

FBCYSIL2                        Hoenig - Direct

1   first page of the Excel file.

2   BY MR. GOLDSTEIN:

3   Q.  Mr. Hoenig, what time period does this spreadsheet cover?

4   A.  This is 2000.

5   Q.  For the entire spreadsheet, what time period does it cover?

6   From 2000 until when?

7   A.  Probably current.  Up to date through last year.

8   Q.  So, looking at the 2000 version of this --

9           MR. GOLDSTEIN:  Mr. Coccaro, can you scroll down so we

10  can see the properties that are listed.  Go back up.

11  BY MR. GOLDSTEIN:

12  Q.  There's a property name Williams Street.

13          Is that one of the Glenwood buildings?

14  A.  It was, yes.

15  Q.  And underneath that East 39th Street, is that another

16  Glenwood building?

17  A.  Yes.

18  Q.  And then there's the block-lot number.  What is that used

19  for?

20  A.  It's used to identify the property.

21          THE COURT:  For the taxing authorities?

22          THE WITNESS:  For the taxing, yes.

23  BY MR. GOLDSTEIN:

24  Q.  And then it says, "Mailed to attorney."

25          What is that a reference to?

FBCYSIL2                    Hoenig - Direct

1    A.  That's the date that I sent the forms to the attorneys.

2    Q.  And then there's a list of attorneys.

3            Who are the attorneys that are listed here?

4    A.  There are several.  There's Katz, Pollack, Goldberg,

5    Strook, Podell.

6    Q.  Are these the different tax turns that you use to file the

7    financial statements when you were contesting the property

8    values?

9    A.  Yes.

10   Q.  So let's just go through then one by one.

11           What do you know about Katz?

12   A.  It was one of the firms that we used at the time.  It was

13   Tuchman Katz -- there were some other names.  I don't remember.

14   Q.  And Pollack?  Who was Pollack?

15   A.  Marcus & Pollack, another firm that we used.

16   Q.  And Goldberg -- who was Goldberg?

17   A.  Jay Arthur Goldberg, another firm.

18   Q.  And Podell?

19   A.  I don't remember the name of the firm, but it was another

20   tax certiorari firm.

21   Q.  And how about Strook?

22   A.  Strook Strook & Lavan.  Another one.

23   Q.  As of 2000, how many of the Glenwood buildings used

24   Goldberg to do the tax certiorari filing?

25   A.  Two.

FBCYSIL2                         Hoenig - Direct

1   Q.   Who was it at Glenwood who would interact with the tax

2   certiorari attorneys?

3   A.   I did.

4   Q.   Other than yourself, is there anybody else at Glenwood?

5   A.   Yes.  It could be Charlie Dorego.

6   Q.   Again, what was Charlie Dorego's position at the company?

7   A.   Vice-president and general counsel.

8   Q.   From your perspective, in terms of managing this process

9   for the company, what was the difference between these law

10  firms?

11  A.   There was no difference.

12  Q.   What difference, if any, did you see over the years in the

13  performance of these firms?

14  A.   Not much of a difference.

15  Q.   When, if ever, did you recommend moving any of the

16  buildings from one firm to another firm?

17  A.   I never recommended one over another.

18  Q.   Do you recall any conversations you had in which you

19  recommended any of these particular firms?

20  A.   No.

21  Q.   So who was it who determined which buildings went to which

22  of these firms?

23  A.   Usually Mr. Litwin.

24  Q.   Were you part of any conversations or discussions about how

25  to make that decision?

FBCYSIL2                         Hoenig - Direct

1    A.  No.

2    Q.  If Glenwood was to decide to contest one of the assessed

3    values of one of the buildings, who made that decision?

4    A.  We put some preliminary numbers together and decided

5    whether it was worth our while to protest the assessment.

6    Q.  Did Glenwood make that decision, or did the attorney make

7    that decision?

8    A.  Glenwood made that decision.

9    Q.  So how would you describe the work that the tax attorney

10   actually does?

11   A.  They do the filings as far as I know.  We give them a

12   complete form filled out, which is a financial statement.  And

13   they'll go to the city and do the -- file it.

14   Q.  Let's look at the year 2004 in your spreadsheet.  There's a

15   building listed as the Regent in red.

16       Do you see that?

17   A.  Yes.

18       MR. GOLDSTEIN:  Mr. Coccaro, could you highlight or

19   put the cursor over to the little triangle next to Goldberg.

20   BY MR. GOLDSTEIN:

21   Q.  What does that say, Mr. Hoenig?

22   A.  "Changed from Katz".

23   Q.  Is this something that you put into the spreadsheet?

24   A.  Yes.

25   Q.  At the time that this happened?

1381

FBCYSIL2                          Hoenig - Direct

1   A.  Yes.  To note that we made a change in attorneys.

2   Q.  Do you know why in 2004 the company moved the Regent from

3   Katz to Goldberg?

4   A.  No.

5           MR. GOLDSTEIN:  If we could scroll down, Mr. Coccaro.

6   And look at the next one under Hamilton.

7   BY MR. GOLDSTEIN:

8   Q.  Can you also look at that.

9           What does that say when you put the cursor over, the

10  little triangle next to Goldberg in column E?

11  A.  "Changed from Katz".

12  Q.  Do you know why Glenwood decided to move the Hamilton from

13  Katz to Goldberg?

14  A.  No.

15  Q.  So, as of 2004, how many total Glenwood buildings did

16  Goldberg have?

17  A.  Four.

18  Q.  If we could turn to 2005 and scroll down and look at the

19  green Lucerne.

20          Mr. Coccaro, if you could hover the cursor over again.

21  BY MR. GOLDSTEIN:

22  Q.  What does that say, Mr. Hoenig?

23  A.  "Switched from Katz."

24  Q.  Do you know why in 2005 the Lucerne was switched from Katz

25  to Goldberg?

FBCYSIL2                          Hoenig – Direct

1    A.  No.

2    Q.  So as of 2005, how many total buildings did Jay Goldberg

3    have of the Glenwood buildings?

4    A.  Seven.

5    Q.  If we could then look at 2007.

6            MR. GOLDSTEIN:  Mr. Coccaro, if you could scroll to

7    the second part of the 2007 list.  It makes it easier to see.

8    BY MR. GOLDSTEIN:

9    Q.  How many total buildings as of 2007 is the Goldberg firm

10   have?

11   A.  Six.

12   Q.  And then if we could look at the same page of 2008.

13           MR. GOLDSTEIN:  If you can scroll to the bottom part

14   of that.

15   BY MR. GOLDSTEIN:

16   Q.  How many total buildings did Goldberg have in 2008?

17   A.  Sixteen.

18   Q.  What knowledge do you have as to why from 2007 until

19   2008 -- from 2007 to 2008 there was an increase of ten

20   buildings that were given to the Goldberg firm?

21   A.  I couldn't tell you why we switched.  I don't know.

22   Q.  At whose direction did they switch?

23   A.  Leonard Litwin.

24           MR. GOLDSTEIN:  Mr. Coccaro, if we could hover over

25   some of the triangles here.

FBCYSIL2                          Hoenig - Direct

1    BY MR. GOLDSTEIN:

2    Q.  425 Realty.

3            Is that one of the Glenwood buildings?

4    A.  Yes, it is.

5    Q.  What does that say in the box?

6    A.  That says "Formerly Katz."

7    Q.  If we could go to the next one.  Also "Formerly Katz"?

8    A.  Right.

9    Q.  And the one below?

10   A.  Same, "Formerly Katz."

11   Q.  And the next one?

12   A.  "Formerly Strook."

13   Q.  Who at Glenwood had worked previously in his career at

14   Strook?

15   A.  Charlie Dorego worked for Strook Strook.

16   Q.  Did he do tax certiorari work for Strook?

17   A.  I believe so.

18   Q.  And the next one -- what does that one say?

19   A.  It says "Formerly Strook."

20   Q.  Also "Formerly Strook."

21           And the next one?

22   A.  "Formerly Strook."

23   Q.  The next one?

24   A.  "Formerly Katz."

25   Q.  And the next one?

FBCYSIL2                          Hoenig - Direct

1    A.  "Formerly Pollack."

2    Q.  And the next one?

3    A.  "Formerly Katz."

4    Q.  And the next one?

5    A.  "Formerly Katz."

6    Q.  Mr. Hoenig, what knowledge did you have of any state

7    legislation that was favorable to Glenwood that was passed in

8    between 2007 and 2008?

9    A.  None.

10   Q.  If you could turn in your binder to Government Exhibit 786.

11           Do you recognize that document?

12   A.  Yes.

13   Q.  What is this document?

14   A.  It's a letter from Jay Arthur Goldberg asking for some

15   information because we switched attorneys.

16           MR. GOLDSTEIN:  Your Honor, the government offers

17   Government Exhibit 786.

18           THE COURT:  Any objection?

19           MR. SHUR:  No objection, Judge.

20           THE COURT:  786 is received.

21           (Government's Exhibit 786 received in evidence)

22           MR. GOLDSTEIN:  If we can publish that, Mr. Coccaro.

23   BY MR. GOLDSTEIN:

24   Q.  So, just looking at the top of the document, law office Jay

25   Arthur Goldberg, PC -- is that the attorney that was referenced

FBCYSIL2                        Hoenig - Direct

1    in your spreadsheet as Goldberg?

2    A.  Yes.

3    Q.  What is the current name of that law firm?

4    A.  The current name is Golberg & Iryami.

5    Q.  The letter is dated May 12, 2009.

6            MR. GOLDSTEIN:  If we could zoom in just so it's

7    readable, Mr. Coccaro.

8    BY MR. GOLDSTEIN:

9    Q.  Was this sent to your attention?

10   A.  Yes.

11   Q.  It says, "Re:  Block 1571 Lots 22 and 30, Manhattan River

12   York Barclay LLC."

13           What is that?

14   A.  That is one of our LLCs.  It's one of our buildings as

15   well.

16   Q.  Can you read what's contained in the letter, "Dear

17   Michael."

18   A.  Yes.  "In order for our office to be substituted for that

19   of Strook Strook & Lavan LLP and to proceed with the litigation

20   of real estate tax assessment challenges for the 2005/06

21   through 2007/08 tax years for the above-captioned property,

22   kindly have the enclosed consent to substitution of attorney

23   executed by Carol Pottelman before a notary public and return

24   same to our office as soon as possible.  Please call with any

25   questions.  Thank you."

FBCYSIL2                        Hoenig - Direct

1    Q.  Where it says Carol Pottelman, who is that?

2    A.  That's a typo.  It should be Carol Pittelman.  It should be

3    an I, not an O.  It's a typo.

4    Q.  Was this one of the buildings that was transferred from a

5    different law firm, Strook Strook & Lavan to Jay Goldberg?

6    A.  Yes.

7    Q.  And again, who worked at Strook Strook & Lavan before

8    coming to Glenwood?

9    A.  Charlie Dorego.

10   Q.  Now, in employing the attorneys such as Jay Goldberg to do

11   this work, how did Glenwood pay them?

12   A.  Paid them by check, a fee based on the amount that -- it's

13   a percentage of the tax cut.

14   Q.  Did they work on contingency?

15   A.  They worked on contingency, yes.

16   Q.  When you say, "It's a percentage of the tax cut," what do

17   you mean by that?

18   A.  The amount that's cut in terms of tax rate times their

19   percentage.

20   Q.  That's the amount that the law firm itself would receive?

21   A.  Correct.

22   Q.  So, to look at this with some specifics, if you could turn

23   in your binder to 646-3.  It should be the first document in

24   your binder.

25            Do you recognize this document?

FBCYSIL2                          Hoenig - Direct

1    A.  Yes.

2    Q.  What is it?

3    A.  That's one of their invoices.  That's the calculation of

4    how they determine their fee.

5    Q.  Does this document also contain the checks that were then

6    written based on those invoices?

7    A.  Yes.

8              MR. GOLDSTEIN:  Your Honor, the government offers

9    646-3.

10             MR. SHUR:  No objection.

11             THE COURT:  646-3 is received.

12             (Government's Exhibit 646-3 received in evidence)

13   BY MR. GOLDSTEIN:

14   Q.  So what is reflected on the first page of this document,

15   Mr. Hoenig?

16   A.  The block and lot of the building, the building address,

17   and the amount of the tax reduction.

18   Q.  Is this an invoice from the Jay Goldberg law firm to

19   Glenwood?

20   A.  Yes.

21             MR. GOLDSTEIN:  If we could zoom in on the top portion

22   of this.

23   BY MR. GOLDSTEIN:

24   Q.  Was is the date of this invoice?

25   A.  May 31, 2005.

1          MR. GOLDSTEIN:  If we could scroll down so we can look

2     at the whole first section of that, the "In obtaining."

3     BY MR. GOLDSTEIN:

4     Q.  It says "For professional services rendered," and then the

5     Re line.

6              What is listed in the Re line?

7     A.  The address and block-lot number of the building that they

8     got the tax cut for.

9     Q.  Is that one of the Glenwood buildings?

10    A.  Yes.

11    Q.  It says, "In obtaining reduction of real property tax

12    assessment for the 2005/06 tax year from $34,650,000 to

13    $31,000,600, what was the total assessment reduction?"

14    A.  The total says $3,050,000.

15    Q.  To make this clear for the jury, what does that $3,000,000

16    number represent?

17    A.  It's the reduction in the assessed value for that building.

18    Q.  The total value of that building has been lowered from a

19    little more than $34,000,000 to a little more than $31,000,000?

20    A.  Correct.

21    Q.  And then there's the tax rate at 12.216.

22              Is that a percentage?

23    A.  Yes.

24    Q.  How is that tax rate determined?

25    A.  By the city.

FBCYSIL2                          Hoenig - Direct

1    Q.  So the tax savings that's listed there -- how is that

2    calculated?

3    A.  That is the annual savings in real estate taxes for that

4    particular year.

5    Q.  So, for this filing for that particular year, the building

6    ended up reducing its taxes by that amount?

7    A.  Yes.  That's correct.

8    Q.  And what was the fee that then of that that went to Jay

9    Goldberg?

10   A.  They get 25 percent.  It was $93,147.

11   Q.  So that's 25 percent of what?

12   A.  Of the tax savings.

13   Q.  How is it determined that Jay Goldberg would get 25 percent

14   of the tax savings?

15   A.  Probably it was negotiated when we first started using him

16   with Mr. Litwin.

17   Q.  Were you involved in negotiating that number?

18   A.  No.

19          THE COURT:  Is that pretty standard?

20          THE WITNESS:  It's about.  Yes.

21   BY MR. GOLDSTEIN:

22   Q.  Is that the about the number that the other attorneys also

23   charge?

24   A.  Yes.  They're in that area.

25   Q.  So what was the total amount here that Jay Goldberg's law

FBCYSIL2                        Hoenig - Direct

1   firm was paid as a result of that reduction in property value?

2   A.  That was $93,147 for that year.

3   Q.  What knowledge, if any, did you have that Jay Goldberg

4   would then pay a percentage of that $93,000 amount to Sheldon

5   Silver?

6   A.  No knowledge.

7   Q.  If we could look at the next one.

8           "In obtaining reduction of real property tax

9   assessment for the 2004/05 tax year from $33,000,000 to

10  $31,000,000 --"

11          Is that the same building, 21 Columbus Avenue?

12  A.  Yes.

13  Q.  But for a different tax year?

14  A.  For a different year.

15  Q.  What was the reduction for the 2004/05 tax year?

16  A.  Assessment reduction of $2,150,000.

17  Q.  So what was the total tax savings?

18  A.  $262,644.

19  Q.  And the amount that went to Jay Goldberg?

20  A.  $65,661.

21  Q.  So if we could go to the bottom of this invoice, what was

22  the total amount invoiced by Jay Goldberg to Glenwood for this

23  property for those two years?

24  A.  $158,808.

25  Q.  If you could turn to the third page of the document.

FBCYSIL2                          Hoenig – Direct

1       MR. GOLDSTEIN:  Is there a way to rotate that?

2    BY MR. GOLDSTEIN:

3    Q.  Is that a check to Jay Goldberg?

4    A.  Yes, it is.

5    Q.  Is that in the amount that was invoiced by Jay Goldberg for

6    a property during those two time periods that we just

7    discussed?

8    A.  Yes.

9    Q.  Why is it that the check was paid from Glenwood Management

10   Corp. and not out of the account of the building?

11   A.  Glenwood Management Corp., as managing agent for the

12   building, collects all the rents and pays all the invoices,

13   this included.

14   Q.  So, when Glenwood Management Corp. pays this amount to Jay

15   Goldberg, how is that reflected on the books of the building

16   itself?

17   A.  Well, it's charged to the building that it services.  As

18   you can see from the stub, it's got the address.  Building

19   number 210 would be that building, 45 West 60th Street.  So

20   this expense ends up on the books of the LLC.

21   Q.  Are those books maintained by you?

22   A.  By me, yes.

23   Q.  Of this check to Jay Arthur Goldberg, PC for $158,808, what

24   knowledge did you have, if any, that a portion of that money

25   was then paid to Sheldon Silver?

FBCYSIL2                          Hoenig - Direct

```
 1    A.  None.
 2              MR. GOLDSTEIN:  We can set that aside, Mr. Coccaro.
 3    BY MR. GOLDSTEIN:
 4    Q.  Mr. Hoenig, in your office, how did you maintain the
 5    records for the different tax certiorari attorneys that
 6    Glenwood used?
 7    A.  What kind of records?
 8    Q.  Well, how did you keep the records for the different tax
 9    cert attorneys that we've been discussing?
10    A.  We kept everything in the file by attorney.
11    Q.  So was there a separate file for each attorney?
12    A.  For each attorney, yes.
13    Q.  What documents did you maintain in those files?
14    A.  Any kind of correspondence, filings, copies of invoices,
15    items like that.
16    Q.  Do you also put any retainer letters into those files?
17    A.  Yes.
18    Q.  I want you to take a look at what's in your binder as
19    Government Exhibit 785.
20              Do you recognize this document?
21    A.  Yes.
22    Q.  What is this document?
23    A.  This is a letter accompanying retainer agreements.
24    Q.  Which firm is this?
25    A.  Jay Arthur Goldberg.
```

FBCYSIL2                        Hoenig – Direct

1    Q.  Was this letter and accompanying agreements located within

2    the file that you maintained for the Jay Arthur Goldberg law

3    firm?

4    A.  Yes.

5              MR. GOLDSTEIN:  Your Honor, the government offers

6    Government Exhibit 785.

7              THE COURT:  Any objection?

8              MR. SHUR:  Objection, your Honor.  If we could

9    approach briefly.

10              THE COURT:  Okay.

11              (At the sidebar)

12              MR. SHUR:  Judge, my objection is just it doesn't seem

13    like all of these letters are maintained in the same file.

14    This is like a group exhibit where they've basically taken

15    letters from different files and jammed them together.

16              THE COURT:  He just said he kept everything in one

17    file related to that law firm, including retainer agreements.

18    So they probably weren't stapled together.

19              MR. SHUR:  But it was all together in one folder?

20              THE COURT:  Correct.

21              MR. SHUR:  I withdraw my objection.

22              (In open court)

23              THE COURT:  785 is received.

24              (Government's Exhibit 785 received in evidence)

25              MR. GOLDSTEIN:  Thank you, your Honor.

FBCYSIL2                              Hoenig - Direct

1          Mr. Coccaro, could we publish 785, please.

2     BY MR. GOLDSTEIN:

3     Q.  Mr. Hoenig, who is this letter from?

4     A.  From Jay Arthur Goldberg.

5     Q.  What's the date of the letter?

6     A.  January 18, 2012.

7     Q.  Who is it addressed to?

8     A.  Charles Dorego.

9     Q.  What is listed in the Re section of the letter?

10    A.  That would be all the block and lots that he handled for

11    us.

12          MR. GOLDSTEIN:  If you could zoom in on the text of

13    the letter.

14    BY MR. GOLDSTEIN:

15    Q.  Can you read that, please.

16    A.  "As discussed, kindly have the enclosed retainers signed by

17    the appropriate party.  Please call with any questions.  Thank

18    you.  Jay Arthur Goldberg."

19    Q.  If we could then look at the second page of this document.

20          MR. GOLDSTEIN:  And zoom in on the top portion up

21    through the address.

22    BY MR. GOLDSTEIN:

23    Q.  The next two pages of this exhibit is a retainer agreement

24    for which building?

25    A.  That would be the Regent.

1  Q.  It says Columbus 60th Realty LLC.  That's for the Regent?

2  A.  Correct.

3  Q.  That's one of the Glenwood buildings?

4  A.  Correct.

5  Q.  If we could look below that to the first two paragraphs of

6  the document.

7          It says, "Ladies and gentlemen, this is to confirm

8  that you have engaged our firm as your attorney to represent

9  you in negotiations and proceedings for correction of the

10  assessed valuations for the 2012/13 tax year, as well as all

11  preceding and succeeding tax years of the following property."

12         What is the property that's listed there, Mr. Hoenig?

13  A.  45 West 60th Street.  That's the Regent.

14  Q.  If we could then look at the next paragraph of the letter.

15         Can you read that, please.

16  A.  "As discussed and explained, it is agreed that the fee to

17  Jay Arthur Goldberg PC for legal services rendered as herein

18  above set forth will be 25 percent of any reductions in the

19  assessed valuation of each property, multiplied by the tax rate

20  for the tax years involved.

21         "In addition, all disbursements necessarily incurred

22  by us in these proceedings shall be reimbursed to us upon

23  demand.  You will be liable for our fee as set forth above

24  notwithstanding the fact that an exemption may exist on the

25  relevant property.

1        "The fee shall be paid upon our notification to you of

2    the reduction in the tentative or final actual assessment,

3    regardless of refund status."

4    Q.  Now, Mr. Hoenig, is this a retainer agreement?

5    A.  Yes.

6    Q.  What's the purpose of a retainer agreement?

7    A.  So his fee would be set forth -- we would know ahead of

8    time what his fee is going to be.

9    Q.  If we can look at the second page of the document of this

10   retainer agreement.

11       Who signed this retainer agreement?

12   A.  Charles Dorego.

13   Q.  Let's look at the signature from Glenwood.

14       Mr. Hoenig, looking at the text of this document,

15   where in this retainer agreement does it say that Sheldon

16   Silver would be receiving a percentage of the fees paid to Jay

17   Goldberg?

18   A.  It doesn't.

19   Q.  If we could turn to the next page of the document.

20       Is this another retainer letter?

21   A.  Yes.

22   Q.  For which building is this retainer letter?

23   A.  This would be the Belmont, East 46th Realty LLC.

24   Q.  What is the date of this agreement?

25   A.  January 18, 2012.

FBCYSIL2                         Hoenig - Direct

1   Q.  Is that the same as the previous one?

2   A.  Yes.

3   Q.  Who signed this agreement on behalf of Glenwood?

4   A.  Charles Dorego.

5   Q.  Where in this agreement, if anywhere, does it say that

6   Sheldon Silver would be receiving a portion of the fees paid to

7   Jay Goldberg?

8   A.  It doesn't.

9   Q.  Does Government Exhibit 785 contain retainers for other

10  buildings that were represented by Jay Goldberg?

11  A.  Yes, it does.

12  Q.  Were they all dated with the same January 18 date?

13  A.  It looks like it, yes.

14  Q.  Who signed all of these retainer letters?

15  A.  Charles Dorego signed all of them.

16  Q.  Were all of these retainer letters found in your file --

17  A.  Yes.

18  Q.  -- for the Goldberg firm?

19  A.  Yes.

20  Q.  Were there any other retainer agreements found in your file

21  for the Goldberg firm, other than those set forth in Government

22  Exhibit 785?

23  A.  No.

24  Q.  Where in any of these retainer agreements does it say that

25  Jay Goldberg would be paying a fee, paying a portion of its

FBCYSIL2                          Hoenig - Direct

1   fee, to Sheldon Silver?

2   A.  It doesn't.

3   Q.  If you could look in your binder at Government Exhibit 692.

4          Mr. Hoenig, looking at the documents that are

5   contained in Government Exhibit 692, do you recognize those

6   documents?

7   A.  I've seen them, yes.

8   Q.  Had you seen them prior to preparing for your testimony for

9   this case?

10  A.  No.

11         MR. GOLDSTEIN:  Your Honor, the government would seek

12  to admit these or offer these documents subject to connection.

13         MR. SHUR:  No objection.

14         THE COURT:  Okay.  692 is received subject to

15  connection.

16         (Government's Exhibit 692 received in evidence)

17         MR. GOLDSTEIN:  Can we publish 692.

18  BY MR. GOLDSTEIN:

19  Q.  What is the date of this document?

20  A.  January 5, 2012.

21  Q.  Turning to the second page of the document, is it signed?

22  A.  No, it's not.

23  Q.  Turning back to the first page of the document, who is this

24  addressed to?

25  A.  Carol Pittelman.

FBCYSIL2                    Hoenig - Direct

Q.  How does that compare to the retainer agreements that we

looked at before?  Who were those retainer agreements addressed

to?

A.  Those were addressed to Charlie Dorego.

Q.  If we could look at the "By signing below" paragraph.

          It says, "By signing below, you consent to the

employment of Sheldon Silver, Esquire, who shall assume joint

responsibility for the representation.  You are hereby advised

that a proportionate division of fees will be made between Jay

Arthur Goldberg, PC, and Sheldon Silver, Esquire."

          Prior to your preparing for your testimony today, had

you ever seen that language?

A.  No.

Q.  Is that language contained in any of your files for tax

certiorari work done by Glenwood?

A.  No.

Q.  If you look through Government Exhibit 692.

          Are there other such agreements dated January 5, 2012?

A.  Yes.

Q.  Were any of these agreements found in your files at

Glenwood management company?

A.  No.

Q.  If we could turn in binder to Government Exhibit 700.

          MR. GOLDSTEIN:  Your Honor, the government would also

seek to offer Government Exhibit 700 subject to connection.

FBCYSIL2                         Hoenig - Direct

1            MR. SHUR:  No objection.

2            THE COURT:  Okay.  700 is received subject to

3    connection.

4            (Government's Exhibit 700 received in evidence)

5    BY MR. GOLDSTEIN:

6    Q.  Mr. Hoenig, what is the date of this document?

7    A.  January 18, 2012.

8    Q.  Prior to preparing for your testimony today, had you ever

9    seen this document before?

10   A.  No.

11           MR. GOLDSTEIN:  If we can zoom in on the top portion

12   of the document through the properties.

13   BY MR. GOLDSTEIN:

14   Q.  Who is this letter addressed to?

15   A.  Sheldon Silver.

16   Q.  What is listed in the Re line?

17   A.  All the properties that Jay Arthur Goldberg handled for us

18   for tax work.

19   Q.  Let's look at the bottom half of the letter from the "Dear

20   Mr. Silver" to the signatures.

21           It says, "Dear Mr. Silver, this letter is to

22   acknowledge that you have assumed joint responsibility with our

23   firm for the tax certiorari representation of the above

24   properties.  As agreed, a proportionate division of fees will

25   be made between Jay Arthur Goldberg PC and Sheldon Silver,

FBCYSIL2                        Hoenig - Direct

1    Esquire."

2            Again, had you ever seen this letter prior to

3    preparing for your testimony?

4    A.  No.

5    Q.  And was this letter maintained or kept in the books and

6    records of Glenwood?

7    A.  No.

8    Q.  Who signed this letter?

9    A.  Sheldon Silver.

10   Q.  Who signed on behalf of the Glenwood properties?

11   A.  Charlie Dorego.

12   Q.  Mr. Hoenig, what discussions, if any, did you have with

13   Leonard Litwin or Charlie Dorego or anyone else at Glenwood

14   about whether Sheldon Silver was going to get a percentage of

15   Jay Goldberg's fee?

16   A.  None.

17           (Pause)

18   BY MR. GOLDSTEIN:

19   Q.  Mr. Hoenig, again, what is your position at the company?

20   A.  The vice-president of finance.

21           (Continued on next page)

22

23

24

25

1402

1  BY MR. GOLDSTEIN:

2  Q.  Are you the top financial officer at the company?

3  A.  Yes.

4  Q.  And who is it who handles the tax certiorari matters for

5  the company?

6  A.  I do.

7  Q.  And who is it who deals with the Goldberg firm?

8  A.  For reporting purposes, I do.

9  Q.  And what, if anything, did either Jay Goldberg or Dara

10  Iryami ever tell you about whether they were splitting their

11  fee with Sheldon Silver?

12  A.  Nothing.

13  Q.  Mr. Coccaro, if we can pull back up Government Exhibit 785

14  and turn to the tenth page?

15          Mr. Hoenig, you can look on the screen if it might be

16  easier.

17          Government Exhibit 785, is this one of the signed

18  retainer letters?

19  A.  I don't see the bottom on the screen -- yes, it is.

20  Q.  Go back to the first page.

21          East 81st Realty LLC, which building is that?

22  A.  That is the Marlowe.

23  Q.  And if we could then look at -- I'm sorry, is the Marlowe

24  one of the buildings that Jay Goldberg represented?

25  A.  Yes.

FBC5sil3                          Hoenig - cross

1    Q.  If we can go back and look at 755-7, the fifth page of that

2    document?  Do you see a check there from the same building, the

3    Marlowe, East 81st Street Realty LLC?

4    A.  Yes.

5    Q.  Who is that check made out to?

6    A.  DACC.

7    Q.  And for how much?

8    A.  $25,000.

9    Q.  So is that check drawn on the same account, the account of

10   the building that was represented by Jay Goldberg?

11   A.  Yes.

12   Q.  If you can look at the previous page of Government Exhibit

13   755-7, the bottom check from 92nd Realty LLC, we looked at that

14   check before; is 92nd Realty LLC one of the buildings that

15   Glenwood has that Jay Goldberg represents?

16   A.  Yes.

17            MR. GOLDSTEIN:  Nothing further, your Honor.

18            THE COURT:  Okay.

19            Mr. Shur?

20   CROSS EXAMINATION

21   BY MR. SHUR:

22   Q.  I can just squeeze it in; Mr. Hoenig, good morning.

23   A.  Good morning.

24   Q.  I want to talk about Goldberg & Iryami.

25   A.  Okay.

FBC5sil3                    Hoenig - cross

1  Q.  Fair to say that Glenwood had a long relationship with the

2  law firm of Goldberg & Iryami?

3  A.  Yes.

4  Q.  Glenwood first hired the firm in 1987, is that right?

5  A.  I don't remember the exact year but that sounds about

6  right.

7  Q.  Well, it had a relationship for about, say, 10 to 15 years,

8  is that fair?

9  A.  Yes.

10  Q.  Is that a yes?

11  A.  Yes.  Sorry.

12  Q.  Since the time that Glenwood first hired Goldberg & Iryami,

13  Glenwood had a continuous relationship with the law firm,

14  right?

15  A.  Correct.

16  Q.  Goldberg & Iryami was an experienced tax certiorarial firm,

17  is that right?

18  A.  Yes.

19  Q.  And that's often referred to as tax cert work?

20  A.  That's correct, yes.

21  Q.  Jay Goldberg is one of the principals of the law firm,

22  senator?

23  A.  Yes.

24  Q.  He has decades of experience in the tax cert field, is that

25  right?

1405

FBC5sil3                        Hoenig - cross

1  A.  I don't know how many years experience he has.

2  Q.  Is that because you didn't personally vet the law firm, is

3  that right?

4  A.  That's correct.

5  Q.  You were not involved in choosing which tax cert firm

6  Glenwood was going to use?

7  A.  Correct.

8  Q.  You were instructed by Charles Dorego as to which firm was

9  going to be used, is that right?

10 A.  Or Mr. Litwin.

11 Q.  Or Mr. Litwin.

12 A.  Yeah.

13 Q.  I think you mentioned on direct examination that the

14 Goldberg law firm was paid on a contingency basis?

15 A.  Correct.

16 Q.  And that's standard in the tax cert field?

17 A.  Yes.

18 Q.  So, the firm only got paid if they successfully reduced

19 Glenwood's tax assessment on one of its properties?

20 A.  Correct.

21 Q.  So, if the firm was able to reduce the tax assessment they

22 got a percentage of the tax savings?

23 A.  That's right.

24 Q.  So, if the firm wasn't able to reduce Glenwood's tax

25 assessment they didn't get paid anything, right?

1   A.  Correct.

2   Q.  And I believe the retainer agreement we just looked at

3   indicated that the contingency fee that the Goldberg firm would

4   receive was 25 percent of the tax savings; is that right?

5   A.  Right.

6   Q.  And that's fairly standard in the industry?

7   A.  Pretty standard, yeah.

8   Q.  I think you mentioned that the Goldberg firm wasn't the

9   only tax cert firm that Glenwood used?

10  A.  Correct.

11  Q.  They used a number of different firms?

12  A.  Several.  Yeah.

13  Q.  I think you mentioned, is it the law firm of Podell

14  Schwartz?

15  A.  Yes.

16  Q.  That was another tax cert firm that Glenwood used?

17  A.  Yes.

18          THE COURT:  Try not to talk over each other.  Let him

19  finish his question before you start answering.

20  Q.  The Tuchman Katz firm was also a Tax cert firm?

21  A.  Yes.

22  Q.  That was another tax cert firm that Glenwood used?

23  A.  Yes.

24  Q.  And there were others, right?

25  A.  There were others, yeah.

FBC5sil3                         Hoenig - cross

1    Q.  Fair to say it was a good practice of using a number of

2    different tax cert firms?

3    A.  Yes.

4    Q.  You don't want to put all of your eggs in one basket,

5    right?

6    A.  Exactly.

7    Q.  It keeps the firms competitive, right?

8    A.  Yes.

9    Q.  And the Glenwood properties, each law firm handled varied

10   over time, right?

11   A.  Correct.

12   Q.  As did the properties for which Glenwood was seeking a tax

13   reduction, that also varied over time?

14   A.  Yes.

15   Q.  And over the years different properties went to different

16   law firms?

17   A.  Right.

18   Q.  And I believe we looked at the Katz law firm.  Glenwood

19   doesn't use the Katz law firm anymore; is that right?

20   A.  No.

21   Q.  That was the law firm that we saw Glenwood changing from

22   Katz to Goldberg, right?

23   A.  Correct, yes.

24   Q.  Now, none of the properties that Glenwood owns goes to

25   Katz, is that right?

FBC5sil3                         Hoenig - cross

1    A.   Correct.

2    Q.   Mr. Hoenig, the Goldberg firm did good work for Glenwood,

3    right?

4    A.   Yes.

5    Q.   And over the years the property with which Glenwood gave to

6    Goldberg to do tax cert work steadily increased, correct?

7    A.   Yes.

8    Q.   If you would take a look at Government Exhibit 750, which I

9    think you should have in front of you and if you don't I can

10   provide you with a copy.

11   A.   I have it.

12   Q.   So, you mentioned that the work with which Glenwood gave to

13   Goldberg steadily increased over time so, if you take a look at

14   this document, this is a document that came from Glenwood's

15   records; is that right?

16   A.   Yes.

17   Q.   So, in 2002 or 2000 Glenwood did work for two of the 29

18   properties, right?

19   A.   You mean Goldberg did.

20   Q.   I'm sorry.  Goldberg did.

21   A.   Yes.

22   Q.   And it is also 2001, it was also the case that Goldberg

23   represented two of Glenwood's properties?

24   A.   That's correct.

25   Q.   And the same for 2003, right?

FBC5sil3                          Hoenig - cross

```
 1   A.  Correct.
 2   Q.  And then in 2004 they received four other properties,
 3   right?
 4   A.  Correct.
 5   Q.  And then in 2005 it was seven, right?
 6   A.  Yeah.
 7   Q.  And then in 2006 it was seven as well, right?
 8   A.  Yes.
 9   Q.  And that's seven out of 42, correct?
10   A.  Yes.
11   Q.  And then in 2007 it went down to six, that's six out of 41,
12   right?
13   A.  Right.
14   Q.  And in 2008 it went up to 16, right?
15   A.  Right.
16   Q.  2009, 16, and that's out of 43 properties, right?
17   A.  Yes.
18   Q.  2010, also 16 out of 44, right?
19   A.  Yes.
20   Q.  2011 it was 16 out of 44?
21   A.  Yes.
22   Q.  Right.
23           2012 it was 22 out of 50, right?
24   A.  Looks like it, yeah.
25   Q.  And then in 2013 it went down to 17 out of 45, right?
```

FBC5sil3                              Hoenig - cross

1   A.  Yes.

2   Q.  And then 2014 it was 16 out of 47, right?

3   A.  Yeah.

4   Q.  And so, fair to say it sort of fluctuated over time, right?

5   A.  Yes.

6   Q.  And fair to say the Goldberg firm reduced Glenwood's tax

7   assessments by millions of dollars?

8   A.  Yes.

9   Q.  I believe we looked at Government Exhibit 646-3 which you

10  should still have in front of you.

11  A.  Yes.

12  Q.  And so this was where the tax savings, due to Goldberg's

13  work, was $400,000 -- nearly $400,000?

14  A.  What I'm looking at says a bill for $158,000.

15          THE COURT:  I believe the question was how much was

16  the tax savings.

17  A.  Yes.  Yes, that's correct.

18  Q.  Nearly $400,000?

19  A.  Yes, $372,000.

20  Q.  That's the Goldberg firm, the savings they provided for

21  Glenwood?

22  A.  Correct.

23  Q.  That's a good outcome, right?

24  A.  Yes.

25  Q.  And that's one of the properties that Glenwood had switched

FBC5sil3                    Hoenig - cross

1    from the Katz firm to the Goldberg firm, right?

2    A.  I believe so, yes.

3    Q.  And the Katz firm is a firm that Glenwood is no longer

4    using?

5    A.  Correct.

6    Q.  And I believe you mentioned that the tax cert firms that

7    Glenwood uses are more or less sort of the same; is that right?

8    A.  Yes.

9    Q.  Were you referring to sort of the quality of the work?

10   A.  Yeah.

11   Q.  Do you recall there was one year in particular where

12   Goldberg, the Goldberg firm was able to obtain significant tax

13   reductions, they did better than the other law firms?

14   A.  I'm not sure.

15   Q.  You don't recall that?

16   A.  No.

17   Q.  But you understood Glenwood was happy with the

18   representation it received from the Goldberg law firm?

19   A.  Yes.

20   Q.  And while they were happy with the representation they

21   received, they still continued to retain and use other tax cert

22   firms?

23   A.  Correct.

24   Q.  The prosecutor showed you some retainer letters or

25   agreements.  Do you remember that?

1412

1   A.  Yes.

2   Q.  You weren't involved in drafting those, right?

3   A.  No.

4   Q.  Or negotiating them?

5   A.  No.

6   Q.  You didn't discuss them with Jay Goldberg?

7   A.  No.

8   Q.  You didn't discuss them with Dara Iryami, the other

9   principal at the Goldberg law firm?

10  A.  No.

11  Q.  And I think the prosecutor asked you if you had any

12  discussions with either Charles Dorego or Leonard Litwin about

13  those agreements?

14  A.  Yes.

15  Q.  Fair to say you didn't, right?

16  A.  Yes.

17  Q.  Fair to say there were a lot of things that you didn't

18  discuss with Charles Dorego and Leonard Litwin?

19  A.  Yes.

20  Q.  And business decisions that Charles Dorego and Leonard

21  Litwin made that they didn't discuss with you?

22  A.  Yes.

23  Q.  You would see them meeting in their offices, right?

24  A.  I didn't actually see them but, yeah, we had offices, I'm

25  sure they had meetings.

FBC5sil3                          Hoenig - cross

1    Q.  And those meetings didn't include you, right?

2    A.  No.

3    Q.  So they made investment decisions without you?

4    A.  Not -- I don't think so.

5    Q.  No.  Okay.

6    A.  Probably not.

7    Q.  So there were times that you learned of investment

8    decisions after the fact?

9    A.  There might have been, yeah.

10   Q.  And what about did they make personnel decisions without

11   you?

12   A.  Sure.

13   Q.  And what about employment compensation decisions?

14   A.  Sure.

15   Q.  They made those without you as well?

16   A.  Yes.  Yeah.

17   Q.  Okay.

18   A.  I would imagine.

19   Q.  And they decided which tax cert firms to use without you?

20   A.  Correct.

21   Q.  And they decided what the financial arrangement would be

22   with those tax cert firms without you?

23   A.  Correct.

24   Q.  Mr. Hoenig, you were also asked by the prosecutor about

25   campaign contributions by Glenwood.  Do you remember that?

FBC5sil3                        Hoenig - cross

1    A.   Yes.

2    Q.   Each year Glenwood has made contributions to a number of

3    different political campaign committees, is that right?

4    A.   Yes.

5    Q.   Glenwood has made contributions to the campaign committees

6    of New York State Assembly members?

7    A.   Yes.

8    Q.   Fair to say that that includes dozens of different Assembly

9    members?

10   A.   Yeah.  That would be correct.

11   Q.   Glenwood has made contribution to the campaign committees

12   of New York State senators?

13   A.   Yes.

14   Q.   And again, fair to say that that would include dozens of

15   different state senators?

16   A.   I would say so.  Probably.

17   Q.   Glenwood has also made campaign contributions to the

18   committees of Executive Branch officials, right?

19   A.   Yes.

20   Q.   Nothing improper about any of Glenwood's campaign

21   contributions, right?

22   A.   Correct.

23   Q.   And they have also made not just at the state level but at

24   the local level, correct?

25   A.   Yes.

FBC5sil3                         Hoenig - cross

1   Q.  So, Glenwood contributed to the campaign of Kathleen Rice

2   when she was running for Nassau County District Attorney,

3   right?

4   A.  Possibly.  I would have to look but sounds about right.

5   Q.  Okay.  And also Judge Lesley Crocker Snyder when she was

6   running for the District Attorney for New York County?

7   A.  Could be.

8   Q.  What about non-political contributions; Glenwood makes

9   those as well, right?

10  A.  Yeah.  Occasionally.

11  Q.  We saw one from the American Cancer Society?

12  A.  Cancer society, right.

13  Q.  What about the Rye Police Department?

14  A.  Possibly.

15  Q.  Okay.  We will get back to that contribution in a moment.

16          Some of the officials who Glenwood contributed to are

17  officials who Glenwood has lobbied, right?

18  A.  Could be, yes.

19  Q.  We saw that Glenwood retains a number of lobbyists, right?

20  A.  Right.

21  Q.  And those lobbyists go up to Albany and meet and talk with

22  various members of the Assembly?

23  A.  Could be.  I'm not sure what they do.

24  Q.  Well, the prosecutor showed you those lobbying disclosure

25  reports.  Do you remember that?

FBC5sil3                        Hoenig - cross

1    A.  We do employ lobbyists, yeah.

2    Q.  You don't know what they do?

3    A.  I don't know what they do.

4    Q.  Okay.

5            THE COURT:  You just write the checks?

6    A.  Right.

7    Q.  Are you responsible, are you in discussions with Charles

8    Dorego and Leonard Litwin about which lobbyist to retain?

9    A.  No.  I pay the bills.

10   Q.  Let me give you an example.

11           The prosecutor asked you about Glenwood's use of LLCs;

12   do you remember that, that's limited liability companies?

13   A.  Yes.

14   Q.  And asked -- we saw, I guess, that Glenwood made campaign

15   contributions through LLCs?

16   A.  Correct.

17   Q.  The LLCs that Glenwood established, they weren't

18   established for the purposes of making campaign contributions,

19   right?

20   A.  No.

21   Q.  They were established -- each property that Glenwood owns

22   they establish a separate LLC, right?

23   A.  Correct.

24   Q.  That's fairly common in the real estate industry?

25   A.  I believe so.  Yes.

FBC5sil3                           Hoenig - cross

1   Q.  Sort of a preferred form of business entity to hold a title

2   to a piece of real estate?

3   A.  Right.

4   Q.  And that's done for legitimate business purposes?

5   A.  Yes.

6   Q.  I think you said it is done for tax purposes or tax

7   reasons?

8   A.  Yes.

9   Q.  What are those tax reasons?

10  A.  I'm not sure what the tax implications are.

11  Q.  You are not involved in --

12  A.  I don't do tax returns.

13  Q.  But it is perfectly legal for Glenwood to make campaign

14  contributions through these LLCs, right?

15  A.  Yes.

16  Q.  Nothing improper about that?

17  A.  No.

18  Q.  And Glenwood wasn't trying to hide or conceal its campaign

19  contributions by making them through these LLCs, right?

20  A.  No.

21  Q.  In fact, Glenwood's campaign contributions, like all

22  contributions, are public record, right?

23  A.  Yes.

24  Q.  And the LLCs are in the name of Leonard Litwin, right?

25  A.  Correct.

FBC5sil3                        Hoenig - cross

1    Q.  And Leonard Litwin is the president of Glenwood?

2    A.  Yes.

3    Q.  Right, that's not a secret?

4    A.  No.

5    Q.  Okay.

6            The prosecutor showed you a check and if we could pull

7    up Government Exhibit 755-7 and if we could blow up the middle

8    check, please?

9            So, this is a check from Tribeca North End LLC.

10   That's a Glenwood LLC, is that right?

11   A.  Yes.

12   Q.  And actually on the check it says Glenwood Management,

13   right?

14   A.  Yes.

15   Q.  No mistake that Tribeca@ North End LLC is a Glenwood

16   Management LLC, right?

17   A.  That's correct.

18   Q.  And the check is made to Friends of Silver.  Do you know

19   what Friends of Silver is?

20   A.  No.

21   Q.  Okay.

22           Fair to say that the government showed you Government

23   Exhibit 754.  Do you have that still in front of you?

24   A.  Probably.  Yes.

25   Q.  This includes campaign contributions made by Glenwood over

1    the course of many years, maybe 10 years; is that right?

2    A.  It's 10 years, yes.

3    Q.  Okay, and fair to say the volume of campaign contributions

4    we are talking about is millions of dollars?

5    A.  From all of the LLCs combined, yes.

6    Q.  Right.  We looked at one of the LLCs the government showed

7    you was something about $600,000, right?

8    A.  About, yes.

9    Q.  And the contributions that Glenwood made to Friends of

10   Silver is a very, very small amount compared to the overall

11   contributions, political contributions made by Glenwood; isn't

12   that right?

13   A.  Yes.

14   Q.  Just to be clear, Mr. Hoenig, you have never met

15   Mr. Silver, right?

16   A.  No.

17   Q.  Ever talked to Mr. Silver?

18   A.  No.

19   Q.  I also just -- so, I think Leonard Litwin is 101 years old,

20   right?

21   A.  Yes.

22   Q.  And I think you --

23            THE COURT:  Currently 101?

24            THE WITNESS:  Correct, yeah.  Now.

25   Q.  Do you know if he received a resolution from the New York

FBC5sil3                          Hoenig - cross

1   State Assembly on his hundredth birthday?

2   A.  I don't know.

3   Q.  So, I think you said in 2013 the prosecutor asked you that

4   he was in his 90s, he was actually 99 years old in 2013, right?

5   A.  Correct.

6   Q.  One moment, your Honor?  Actually, I did find it.

7         Let me, if I may, this is Government Exhibit 754 and

8   if you take a look at the arrow there, that's a contribution to

9   the Rye Police Department; is that right?

10  A.  That's correct.

11  Q.  Do you know if anyone employed by Glenwood lives in Rye,

12  New York?

13  A.  No one -- not that I know of, no.

14  Q.  Okay.  I will take that back from you.  Thank you.

15        One moment, your Honor?

16        Mr. Hoenig, if you take a look back at Government

17  Exhibit 755-7; other than the checks on this exhibit are you

18  aware of any other contributions that Glenwood made to friends

19  of Silver?

20  A.  Offhand, no.  It could be.  I don't know.

21  Q.  But sitting the here right now you are not aware of any?

22  A.  No.

23        MR. SHUR:  No further questions, Judge.

24        THE COURT:  Okay.

25        Any redirect?

FBC5sil3                          Iryami - direct

1          MR. GOLDSTEIN:  Yes, your Honor.

2   REDIRECT EXAMINATION

3   BY MR. GOLDSTEIN:

4   Q.  Mr. Hoenig, Mr. Shur asked you if the contributions that

5   Glenwood made to Sheldon Silver and others was part of the

6   public record.  Do you recall that?

7   A.  Yes.

8   Q.  Were there any other payments to Sheldon Silver from

9   Glenwood part of the public record?

10  A.  Not that I know of.

11         MR. GOLDSTEIN:  Nothing further, your Honor.

12         THE COURT:  Okay.

13         You can step down.

14         (Witness steps down)

15         THE COURT:  Call your next witness.

16         MR. GOLDSTEIN:  The government calls Dara Iryami.

17   DARA IRYAMI,

18      called as a witness by the Government,

19      having been duly sworn, testified as follows:

20         THE DEPUTY CLERK:  Please state your full name and

21  spell your last name, slowly, for the record.

22         THE WITNESS:  Dara Iryami.  I-R-Y-A-M-I.

23  DIRECT EXAMINATION

24  BY MR. GOLDSTEIN:

25  Q.  Good afternoon, Ms. Iryami.  Where do you work?

1   A.  Goldberg & Iryami PC.

2   Q.  What is Goldberg & Iryami PC?

3   A.  It is a law firm.  We concentrate in real estate tax

4   certiorari work.

5   Q.  For how long have you worked at that law firm?

6   A.  Since I worked at it part-time in law school.

7   Q.  When was that?

8   A.  1992.

9   Q.  So you have been at the law firm since 1992?

10  A.  Yes.

11  Q.  Is this your only job that you have had after law school?

12  A.  Yes.

13  Q.  Who do you work with?

14  A.  Jay Arthur Goldberg.

15  Q.  How did it come to be that you began to work with Jay

16  Arthur Goldberg?

17  A.  I answered an ad at my law school.

18  Q.  What was the name of the law firm when you started working

19  with Jay Goldberg?

20  A.  Jay Arthur Goldberg, PC.

21  Q.  When you first joined it, what was your position at the

22  firm?

23  A.  Associate.

24  Q.  What was Jay Goldberg's background in tax certiorari work?

25  A.  He was a former tax commissioner for the City of New York

1    and he was of counsel to another tax certiorari firm, Sherman

2    and Gordon.

3    Q.  When Mr. Goldberg was tax commissioner for the City of New

4    York, did he also practice law at the same time?

5    A.  Yes.

6    Q.  Is being a tax commissioner a part-time job?

7    A.  Yes.

8    Q.  Has your position at the law firm changed over time?

9    A.  I became a partner.

10   Q.  When did you become a partner?

11   A.  About 2007-08 I became a partner and in 2013 I became a

12   named partner.

13   Q.  And so in 2013 what is the -- what did the name of the law

14   firm change to?

15   A.  Goldberg & Iryami, PC.

16   Q.  What does it mean to be a partner?

17   A.  You get a percentage of the profits.

18   Q.  Other than yourself and Jay Goldberg, have any other

19   attorneys worked for either Jay Arthur Goldberg PC or

20   Goldberg & Iryami?

21   A.  No.

22   Q.  So since 1992 it has just been the two of you?

23   A.  Yes.

24   Q.  Ms. Iryami, were you subpoenaed for your testimony here

25   today?

FBC5sil3                        Iryami - direct

1    A.  Yes, I was.

2    Q.  Are you testifying pursuant to what is called an immunity

3    order?

4    A.  Yes, I am.

5    Q.  What is your understanding of what that means?

6    A.  That I am required to testify at this trial and I won't be

7    prosecuted as long as I tell the truth.

8    Q.  You said that your firm focuses on tax certiorari work?

9    A.  Yes.

10   Q.  Can you explain to the jury what tax certiorari work is?

11   A.  Sure.

12           Every property in New York is assigned a value.  The

13   assessments are assigned each January every year and the taxes

14   that they pay -- real estate taxes they pay are based on that

15   assessment and we try to lower those assessments to save our

16   clients money and taxes.

17   Q.  Which government agency determines the yearly tax

18   assessments?

19   A.  The Department of Finance.

20   Q.  Of New York City?

21   A.  Yes.

22   Q.  What are the annual property tax assessments based on?

23   A.  On the assessed value, value of the building.

24   Q.  The value of the building?

25   A.  Yeah.

FBC5sil3                         Iryami - direct

1    Q.   Why does the assessed value of the building that is done on

2    a yearly basis, why did that matter?

3    A.   The higher the assessment, the more taxes people pay.

4    Q.   So, in general, how does a tax cert -- is it called tax

5    cert, is that a good shorthand?

6    A.   Yes.

7    Q.   How does a tax cert attorney go about challenging real

8    estate assessments for buildings in New York?

9    A.   Sure.

10        Every January 15th the new assessments are published

11   and we have until March 1st to file a protest with the New York

12   City Tax Commission in order to start that challenge.

13   Q.   What is a protest?

14   A.   There is prescribed forms from the tax commission that have

15   to be completed in order to challenge those assessments.

16   Q.   And those forms are submitted with the New York City Tax

17   Commission?

18   A.   Yes; by March 1st.

19   Q.   And when a building decides to pursue a challenge to the

20   assessment, what information does the building provide to the

21   tax commission?

22   A.   Basically everything about the property; where it is

23   located, its usage, what's on each floor of the building, the

24   square footage, if it's owner-occupied, if it is income

25   producing the financials, sale information, construction

FBC5sil3                        Iryami - direct

1   information.

2   Q.   Where did you get the information from to be able to

3   provide that information to the tax commission?

4   A.   Some information comes from City records and most of it

5   from the client.

6   Q.   About how many of these protest applications does your firm

7   bring before the tax commission each year?

8   A.   We file on about 2,000 properties a year.

9   Q.   How does your firm make money from doing this sort of work?

10  A.   By reducing the tax assessments.  The more we reduce it the

11  more tax savings, and then we get a contingency fee based on

12  those tax savings.

13  Q.   What contingency fee do you typically charge?

14  A.   25 percent.

15  Q.   Is that a range that you have or is it almost always 25

16  percent?

17  A.   We try to get 25 percent but I would say the range is 15 to

18  25, a couple less and a bunch over, more than 25 percent.

19  Q.   So, just to take an example, if a building's property taxes

20  are reduced by $10,000 and you have a 25 percent contingency

21  fee, how much does your firm make?

22  A.   It would be $2500; $10,000 savings times the contingency

23  fee of 25 percent.

24  Q.   At the firm -- at your firm -- what was the division of

25  labor between yourself and Jay Goldberg?

FBC5sil3                    Iryami - direct

1   A.  It changed over time.

2           At the beginning we would review all the cases

3   together but over time I became responsible for all the case

4   preparation, meeting all the deadlines, making sure we had all

5   the documentation, and Mr. Goldberg became primarily

6   responsible for getting new clients, retainers, dealing with

7   fee arrangements or fee issues.

8   Q.  So, over the last 10 or so years, who actually does the

9   work before the tax commission?

10  A.  I do.

11  Q.  What role, if any, have you played in obtaining clients for

12  the firm?

13  A.  Very little.

14  Q.  What role, if any, have you had in negotiating retainer

15  agreements for the firm?

16  A.  Very little.

17  Q.  Did there come a time when Glenwood Management Corporation

18  became a client of the firm?

19  A.  Yes.

20  Q.  Approximately when was that?

21  A.  1997.

22  Q.  How did Glenwood become a client of firm?

23  A.  Mr. Silver referred them to Mr. Goldberg.

24  Q.  What role, if any, did you play in obtaining Glenwood as a

25  client?

FBC5sil3                         Iryami - direct

1    A.  None.

2    Q.  What discussions, if any, did you have with anyone at

3    Glenwood about bringing its tax certiorari business to your

4    firm?

5    A.  None.

6    Q.  What discussions, if any, did you have with Sheldon Silver

7    about how he was able to refer Glenwood to your firm?

8    A.  None.

9    Q.  What was your understanding of the relationship between Jay

10   Goldberg and Sheldon Silver?

11   A.  They were friends since childhood.

12   Q.  What relationship, if any, did you have with Sheldon

13   Silver?

14   A.  None.

15   Q.  Who was the owner of the Glenwood Management?

16   A.  Leonard Litwin.

17   Q.  And what relation, if any, did Leonard Litwin have with Jay

18   Goldberg?

19   A.  None.

20   Q.  What relationship, if any, did he have with you?

21   A.  None.

22   Q.  Have you ever met with Leonard Litwin?

23   A.  No.

24   Q.  To your knowledge, has Jay Goldberg ever met with Leonard

25   Litwin?

1429

FBC5sil3                        Iryami - direct

1    A.   No.

2    Q.   How did Glenwood Management and its buildings compare to

3    other clients that your firm has?

4    A.   They had more buildings with very high assessed values.

5    Q.   And so, what is the impact of having more buildings and

6    higher assessed values than your other clients?

7    A.   Higher assessed values generally mean higher fees.

8    Q.   So, if you could explain that; if a building has a $10,000

9    assessed value and a Glenwood building has a $1 million

10   assessed value, how does that have an impact on the money that

11   your firm can make?

12   A.   If you are getting a 10 percent reduction on a $100,000

13   assessment it is a lot smaller than 10 percent of a million.

14          THE COURT:  Is it the same amount of work whether you

15   are working on a $100,000 building or a million dollar

16   building?

17          THE WITNESS:  Depends on the case.  Larger are

18   sometimes more complicated because the financials are more

19   complicated.

20          THE COURT:  Okay.

21   BY MR. GOLDSTEIN:

22   Q.   For Glenwood's buildings, how did you receive the financial

23   information from Glenwood?

24   A.   Usually from Michael Hoenig.

25   Q.   And how would you consider the -- how did you consider the,

1430

1    compared to your other clients, what kind of order were the

2    Glenwood records in as compared to some of your other clients?

3    A.  They were in very good order.

4    Q.  Is part of what you have to do when you represent people in

5    this field is to chase them down to get their books and

6    records?

7    A.  Yes.

8    Q.  Did you have to do that with Glenwood?

9    A.  No.

10   Q.  When Sheldon Silver referred Glenwood to your firm, how

11   many Glenwood buildings did your firm first represent?

12   A.  Two.

13   Q.  Did that number grow over time?

14   A.  Yes.

15   Q.  As of 2014, approximately how many Glenwood buildings had

16   been referred to your firm?

17   A.  I think it is about 15 to 20.

18   Q.  Were those buildings represented by other attorneys before

19   being referred to Goldberg & Iryami?

20   A.  Yes.

21   Q.  What did you have to do in order to replace the other

22   attorneys?

23   A.  Well, in order to settle a case you would either need the

24   other attorney to sign a consent to a substitution of attorney

25   or a stipulation of discontinuance.

FBC5sil3                        Iryami - direct

1    Q.  Now, prior to this trial, was your law firm subpoenaed for

2    its records?

3    A.  Yes.

4    Q.  And did you help collect documents for your firm in

5    response to the subpoena?

6    A.  Yes, I did.

7    Q.  What did you do to collect those records?

8    A.  I collected all the files we had in the office and then we

9    went to storage to get all the old files that had been put in

10   storage and I did electronic searches with agreed upon terms to

11   find everything that was electronically stored.

12   Q.  You did all of that pursuant to the subpoena?

13   A.  Yes.

14   Q.  If you could look in your -- there are some binders in

15   front of you, looking in binder 1 if you would look at

16   Government Exhibit 642-2?

17   A.  I don't see it.

18   Q.  I don't see it in my binder either?

19          THE COURT:  It is at the top, the tab is hiding

20   behind --

21   Q.  Ms. Iryami, if you can look at the screen and disregard

22   your binder for that?  Do you recognize this document?

23   A.  Yes.

24   Q.  What is it?

25   A.  It's a consent to substitution of attorney.

FBC5sil3                         Iryami - direct

1    Q.  Is this to substitute your firm for another law firm?

2    A.  Yes.

3            MR. GOLDSTEIN:  The government offers 642-2.

4            THE COURT:  Any objection?

5            MR. MOLO:  No objection.

6            THE COURT:  642-2 is received.

7            (Government's Exhibit 642-2 received in evidence)

8    BY MR. GOLDSTEIN:

9    Q.  If we can publish this document?

10           It says:  *In the matter of the application of 40th*

11   *Realty Company.*  What is 40th Realty Company?

12   A.  It is the owner of that building.

13   Q.  Is that one of the Glenwood buildings?

14   A.  Yes.

15   Q.  If you can pull back, it says, if you can read the "It is

16   hereby stipulated" language?

17   A.  It is hereby stipulated and agreed, by and between the

18   undersigned attorneys with the consent of the petitioner

19   herein, that Jay Arthur Goldberg, PC, 521 Fifth Avenue, 34th

20   Floor, New York, New York, 10175 is substituted as attorney for

21   the petitioner in the above-captioned proceedings as of the

22   date hereof.

23   Q.  Who is the petitioner?

24   A.  40th Realty Co.

25   Q.  And who signed on behalf of 40th Realty Company?

FBC5sil3                         Iryami - direct

1    A.   Leonard Litwin.

2    Q.   Who is Leonard Litwin?

3    A.   The owner.

4    Q.   The owner of what?

5    A.   Of that building and of Glenwood.

6    Q.   Which law firm was being substituted for your law firm?

7    A.   Tuchman Katz.

8    Q.   What kind of a law firm is Tuchman Katz?

9    A.   They also concentrate in real estate tax certiorari work.

10   Q.   And how large of a firm was Tuchman Katz as compared to

11   your firm?

12   A.   They're larger.  They have more buildings.

13   Q.   And does Tuchman Katz still do tax certiorari work?

14   A.   Yes.

15   Q.   Are they still larger than yours?

16   A.   Yes.

17   Q.   You said they represent a larger number of buildings.  Do

18   they also have a larger number of attorneys?

19   A.   Yes.

20   Q.   If we can look at Government Exhibit 786, which hopefully

21   is in your binder towards the end; do you recognize that

22   document?

23   A.   Yes.

24   Q.   What is this document?

25   A.   That is a letter from our firm -- it is a letter from our

FBC5sil3                     Iryami - direct

1   firm to Glenwood Management regarding a substitution of

2   attorney.

3            MR. GOLDSTEIN:  Your Honor, the government offers 786.

4            THE COURT:  786 is already in evidence.

5            MR. GOLDSTEIN:  Very good, your Honor.

6   Q.  If we can publish 786?

7            Is this in reference to another Glenwood building?

8   A.  Yes.

9   Q.  Which firm -- if we can zoom in a little bit, Mr. Coccaro,

10  on the letter -- which firm is your firm substituting for for

11  this building?

12  A.  Stroock.

13  Q.  What is Stroock?

14  A.  A large law firm.

15  Q.  And does Stroock do tax certiorari work?

16  A.  They have a tax cert department, yes.

17  Q.  And how large is that tax department compared to

18  Goldberg & Iryami?

19  A.  I don't know.

20  Q.  How large is the law firm of Stroock compared to

21  Goldberg & Iryami?

22  A.  Substantially larger.

23  Q.  We can take that down.

24            Are you familiar with a real estate developer called

25  The Witkoff Group?

FBC5sil3                         Iryami - direct

1   A.  Yes.

2   Q.  What is The Witkoff Group?

3   A.  Another real estate property owner developer, management

4   company.

5   Q.  Did there come a time when The Witkoff Group became a

6   client of your firm?

7   A.  Yes.

8   Q.  Approximately when was that?

9   A.  Approximately 2005.

10  Q.  How did The Witkoff Group become a client of your firm?

11  A.  Mr. Silver referred them to Mr. Goldberg.

12  Q.  By Mr. Silver do you mean Sheldon Silver, the defendant?

13  A.  Yes.

14  Q.  What role, if any, did you play in obtaining The Witkoff

15  Group as a client?

16  A.  None.

17  Q.  Who is the principal of The Witkoff Group?

18  A.  Steven Witkoff.

19  Q.  What relationship, if any, did he have with you?

20  A.  None.

21  Q.  And as far as you knew what relationship, if any, did he

22  have with with Jay Goldberg?

23  A.  None.

24  Q.  What discussions, if any, did you have with anyone at

25  Witkoff about bringing its tax certiorari business into your

FBC5sil3                              Iryami – direct

1   firm?

2   A.   I didn't have any.

3   Q.   What discussions, if any, did you have with Sheldon Silver

4   about how he was able to refer Witkoff to your firm?

5   A.   None.

6   Q.   Over time, approximately how many Witkoff buildings has

7   your firm represented?

8   A.   About five to ten.

9   Q.   And as with the Glenwood buildings, were some of the

10   Witkoff buildings represented by other attorneys before they

11   began being represented by your firm?

12   A.   Yes.

13   Q.   If you can look at Government Exhibit 649, do you recognize

14   that document?

15   A.   Yes.

16   Q.   What is that document?

17   A.   Letter from my firm to another law firm regarding a consent

18   to substitution of attorney.

19              MR. GOLDSTEIN:   Your Honor, the government offers 649.

20              THE COURT:   Any objection?

21              MR. MOLO:   No objection.

22              THE COURT:   649 is received.

23              (Government's Exhibit 649 received in evidence)

24   BY MR. GOLDSTEIN:

25   Q.   If we can publish that document?

FBC5sil3                          Iryami - direct

1              Is this on the letterhead of your firm?

2    A.  Yes.

3    Q.  If we could -- the date on this is January 12, 2006; who is

4    this addressed to?

5    A.  The Podell firm.

6    Q.  What is the Podell firm?

7    A.  Another firm that concentrates in real estate tax

8    certiorari work.

9    Q.  To what extent does your firm compete with the Podell firm?

10   A.  I wouldn't call it compete.  We are colleagues and we do

11   the same type work in the same arena.

12   Q.  And what size firm is Podell as compared to your firm?

13   A.  They're larger.

14   Q.  What kind of buildings does Podell represent as compared to

15   your firm?

16   A.  Probably the same types, just more of them.

17   Q.  Did they also -- did Podell have a larger number of lawyers

18   than your firm?

19   A.  Yes.

20   Q.  We can take that down.  I'm sorry, if you can leave that

21   up?

22              It says Re: Block 1307, lot 1001 Manhattan, 866 3rd

23   Next Generation LLC; what is that?

24   A.  That's the block assigned to that condominium lot and the

25   owner of that lot.

FBC5sil3                          Iryami - direct

1    Q.   And the owner of the lot is 866 3rd next generation LLC?

2    A.   Correct.

3    Q.   Who controlled or managed that building?

4    A.   The Witkoff Group.

5    Q.   We can set that aside.

6            In addition to Sheldon Silver, have other attorneys

7    referred clients to your firm?

8    A.   Yes.

9    Q.   To what extent did those other attorneys refer large real

10   estate developers such as Glenwood and Witkoff?

11   A.   Not as large.

12   Q.   Which other attorneys, that you know of, have referred some

13   significant business to your firm?

14   A.   Aaron Cohen has referred the most number of properties.

15   Q.   And who is Aaron Cohen?

16   A.   He is another attorney and he -- he does -- I believe he

17   does tax certiorari work outside of the City.

18   Q.   Is he a real estate attorney?

19   A.   Yes.

20   Q.   When you say outside, he does real estate tax certiorari

21   work outside of the City.  Do you know where outside of the

22   city?

23   A.   I think in Rockland.

24   Q.   Are you familiar with the law firm Wenig Saltiel?

25   A.   Yes.

FBC5sil3                        Iryami - direct

1    Q.  S-A-L-T-I-E-L.

2            Did that law firm refer any business to your firm?

3    A.  Yes.

4    Q.  Approximately how many clients?

5    A.  Two, I think.

6    Q.  And did your law firm pay Wenig Saltiel referral fees for

7    the clients that it referred?

8    A.  If -- if we were successful we did.  I don't -- I didn't

9    look that up.

10   Q.  What kind of work does Wenig Saltiel do?

11   A.  Real estate.

12   Q.  Are you familiar with a lawyer named Yair Maman?

13   A.  Yes.

14   Q.  Who is he?

15   A.  He is another real estate attorney.

16   Q.  Did he refer business to Glenwood -- to Goldberg?

17   A.  Yes.

18   Q.  And what kind of buildings did he refer to your firm?

19   A.  Various commercial buildings, different types, apartment

20   buildings.

21           THE COURT:  You need to keep your voice up.

22           THE WITNESS:  I'm sorry.  I'm getting over a cold.  I

23   apologize.

24           THE COURT:  Okay.

25           THE WITNESS:  Different types of apartment buildings,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   warehouses, stores.

2   BY MR. GOLDSTEIN:

3   Q.  The buildings that were referred, how did they compare in

4   size or assessed buildings than the Glenwood buildings?

5   A.  They were much lower.

6   Q.  And are you familiar with a lawyer named Peter Kolodny?

7   A.  Yes, I am.

8   Q.  Has he referred business to your firm?

9   A.  Yes.

10  Q.  What kind of a lawyer is Peter Kolodny?

11  A.  I believe he focuses mostly on landlord/tenant work.

12  Q.  In the real estate field?

13  A.  Yes.

14  Q.  So, just among the lawyers and the law firms that we just

15  discussed, did they all practice real estate law in some form

16  for another?

17  A.  In some form.

18  Q.  And which of them, if any, referred buildings with the kind

19  of assessed values that Glenwood has?

20  A.  None of them.

21  Q.  You testified that Sheldon Silver referred Glenwood and

22  Witkoff to your firm.  Did your firm, in turn, pay fees to

23  Sheldon Silver when you obtained reductions in the assessments

24  of their properties?

25  A.  Yes.

FBC5sil3                         Iryami - direct

1    Q.   For the Glenwood buildings, what percentage did you pay to

2    Sheldon Silver?

3    A.   25 percent.

4    Q.   For the Witkoff buildings, what percentage did you pay to

5    Sheldon Silver?

6    A.   15 percent.

7    Q.   Why did you only pay 15 percent of the Witkoff buildings?

8    A.   When you pay other attorneys it is the same percentage as

9    the client is paying, so Glenwood paid 25 percent, we paid

10   Mr. Silver 25 percent; and Witkoff paid 15 percent, we paid

11   Mr. Silver 15 percent.

12   Q.   Do you know, why was it that you only received 15 percent

13   of the reductions in assessed values from The Witkoff Group as

14   compared to the 25 percent you got from Glenwood?

15   A.   They insisted on reducing the fee.

16   Q.   I want to direct your attention to the year 2009.

17   A.   Okay.

18   Q.   As of that year, was there any written retainer agreement

19   between your firm and Glenwood?

20   A.   No.

21   Q.   Was there any written retainer agreement between your firm

22   and Witkoff?

23   A.   No.

24   Q.   Was there any written agreement between your firm and

25   Sheldon Silver about the fees that he was receiving?

1   A.  No.

2   Q.  Had your firm in fact been paying fees to Sheldon Silver

3   prior to 2009?

4   A.  Yes.

5   Q.  So what, if anything, changed in 2009?

6   A.  In 2009 we became aware of a different rule, ethics rule to

7   include language about joint representation and -- joint

8   responsibility and fees being paid to other attorneys.

9   Q.  So just to be clear, in 2009 you became aware, you said, of

10   an ethics rule change?

11   A.  Yes.

12   Q.  And what was your understanding of this change in the

13   ethics rules?

14   A.  To put joint representation language -- joint

15   responsibility language and fees paid to the other attorney in

16   writing.

17   Q.  And when you became aware, as you understood it, of this

18   change in the rules, what did you do?

19   A.  We changed our retainer for new properties coming into the

20   firm.

21   Q.  How did you change your retainer?

22   A.  We added a paragraph about the joint responsibility and fee

23   percentage.

24   Q.  I want you to look at what is in your binder marked as

25   Government Exhibit 662.  Do you recognize that document?

FBC5sil3                          Iryami - direct

1    A.  Yes, I do.

2    Q.  What is it?

3    A.  It is a retainer agreement with a client.

4    Q.  And what is the date on this document?

5    A.  February 19th, 2010.

6    Q.  Is this one of the new retainers that you did after you

7    became aware of the change in the rules?

8    A.  Yes.

9              MR. GOLDSTEIN:  Your Honor, the government offers 662.

10             MR. MOLO:  I am just looking at it, Judge.  Sorry.

11             No objection.

12             THE COURT:  662 is received.

13             (Government's Exhibit 662 received in evidence)

14   BY MR. GOLDSTEIN:

15   Q.  If we can publish that?

16             If we can look just at the top portion of this letter,

17   who drafted this document?

18   A.  Mr. Goldberg.

19   Q.  And who was this document sent to?

20   A.  It is a letter that we sent to our client, Ms. Lee, to sign

21   that she is hiring us.

22   Q.  This is a retainer agreement between your law firm and the

23   owner of the buildings that you were representing?

24   A.  Yes.

25   Q.  And how did your firm obtain these buildings as clients?

FBC5sil3                        Iryami - direct

1   A.  They were recommended by Peter Kolodny.

2   Q.  If we can look at the last paragraph of the letter, can you

3   read that to the jury?

4   A.  *By signing below, client consents to the employment of*

5   *Peter Kolodny, Esq, who shall assume joint responsibility for*

6   *the representation.  Client is on notice that a division of*

7   *fees will be made between Jay Arthur Goldberg, PC, and Peter*

8   *Kolodny, Esq.*

9   Q.  Why did you include that language in this retainer

10  agreement?

11  A.  To comply with the ethics rules.

12  Q.  Who was it who handled the retainer letters with the

13  clients at your firm?

14  A.  Mr. Goldberg mostly.

15  Q.  What role did you have in sending retainer letters to the

16  clients?

17  A.  Very little.

18  Q.  If we can pull up that language again, Mr. Coccaro, the

19  last paragraph?

20          As you understood it, what did it mean to have in

21  these letters the language "who shall assume joint

22  responsibility for the representation."

23  A.  I'm sorry.  Could you rephrase or --

24  Q.  So, the new retainer has language that says:  By signing

25  below, client consents to the employment of Peter Kolodny Esq.

1    Peter Kolodny Esq, is that the firm that referred

2    these clients to your firm?

3    A.  Yes.

4    Q.  And was your firm going to pay a portion of its fee to

5    Peter Kolodny?

6    A.  Yes.

7    Q.  So the language that's in the letter says:  *Who shall*

8    *assume joint responsibility for the representation.*

9    What did that mean?

10   A.  That he would be responsible for the downside as well as

11   the upside.  So, if something went wrong, he was on the hook.

12   Q.  And what do you mean by on the hook?

13   A.  Responsible if there is any malpractice.

14   Q.  Did your law firm draft similar letters for other clients

15   who had been referred by outside attorneys?

16   A.  For all new clients, yes.

17   Q.  And during this time period in 2009, what conversations, if

18   any, did you have with Jay Goldberg about doing similar

19   retainer letters for Glenwood and Witkoff?

20   A.  We discussed it at that time but we had lost focus, it got

21   put on the back burner.

22   Q.  And so, at that time did you send any new retainer letters

23   to Witkoff or Glenwood noting payments that were being made to

24   Sheldon Silver?

25   A.  Not at that time.

FBC5sil3                     Iryami - direct

1    Q.  Prior to this time period what conversations, if any, did

2    you have with anyone at Glenwood that your firm was sharing its

3    fee with Sheldon Silver?

4    A.  I did not.

5    Q.  And prior to this 2009 time period what conversations, if

6    any, did you have with anyone at Witkoff that your firm was

7    sharing its fee with Sheldon Silver?

8    A.  I didn't have any.

9            THE COURT:  How much longer do you have with this

10   witness?

11           MR. GOLDSTEIN:  About 40 minutes, 30 minutes.

12           THE COURT:  Why don't we go ahead and break for lunch.

13           Is this a convenient time to break?

14           MR. GOLDSTEIN:  It is a perfect time to break.

15           THE COURT:  I felt that was coming.

16           We are going to break for lunch, don't discuss the

17   case.  I will see you at about 10 until 2:00.

18           (Continued on next page)

19

20

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

FBC5sil3                          Iryami - direct

1                    (Jury not present)

2                    THE COURT:  Okay, see you at 10 until two.

3                    MS. COHEN:  Thank you, your Honor.

4                    (Luncheon recess)

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          AFTERNOON SESSION

                             1:55 p.m.

 3          (At the sidebar)

 4          THE COURT:  Okay.

 5          MR. MOLO:  Based on the 3500 material, Judge, this

 6   witness -- we're right at a point in the testimony, I think,

 7   where we're going to hear from the witness about why in 2012

 8   they sent out this new agreement.

 9          Right?

10          MR. GOLDSTEIN:  That's correct.

11          MR. MOLO:  She says that she read some articles about

12   a change in state law that prompted -- or rules.

13          THE COURT:  Changing rules in '09.

14          MR. MOLO:  That was '09.  But now in 2011 --

15          MR. GOLDSTEIN:  She came to believe that the

16   disclosure rules were going to change.  The state official

17   disclosure rules and would end up requiring Sheldon Silver to

18   disclose that he was receiving fees from Golberg & Iryami.

19          That prompted her that -- she got nervous and got

20   concerned.  That prompted her to get Jay Goldberg to send out

21   these retainer letters.

22          MR. MOLO:  The fact of the matter is they didn't

23   change in a way that would require something different in terms

24   of the income wasn't reported at the time in the way that it

25   was reported, which we can argue about what that pertains to.

1          My concern is this:  If this witness says that the

2     rules changed and now he was going to be required to disclose

3     something, it suggests that there was some nefarious holding

4     back of information or nondisclosure.

5          It's not based on anything she knows clearly

6     understanding the law, and that wasn't what happened.

7          THE COURT:  That's irrelevant to why she prepared the

8     document.  I'm sure your questions will make it clear that it's

9     her understanding of the law.

10         MR. MOLO:  I do think that the prejudicial effect of

11    that in this context outweighs the probative value.

12         THE COURT:  I think the probative value of the

13    proposed change of the agreement that was never adopted is

14    incredibly relevant.  So you're going to have to outweigh that

15    probative value.

16         MR. MOLO:  It's sort of like saying they weren't

17    disclosing something that should have been disclosed for a

18    different reason, not the state bar ethical reason.  Now she's

19    saying it's like a state legislative --

20         THE COURT:  It was her understanding that the rules

21    were going to change.  Whether it did or it didn't, it doesn't

22    seem to me that that's all that prejudicial to you.

23         MR. MOLO:  Okay.

24         THE COURT:  What's prejudicial to you is the fact that

25    there was a paragraph that was originally in the retainer

FBCYSIL4                        Iryami – Direct

```
 1   agreement that made it very clear that Silver was getting fees
 2   and that that dropped out of the letter before he was actually
 3   signed up.  That to me should be much more your concern.
 4             MR. MOLO:  There was that side letter.
 5             (In open court)
 6             THE COURT:  Ms. Iryami, you're still under oath.
 7             Mr. Goldberg.
 8             MR. GOLDSTEIN:  Thank you, your Honor.
 9   BY MR. GOLDSTEIN:
10   Q.  Ms. Iryami, before we broke for lunch, you said that in
11   around 2009, you raised the issue of putting in writing the
12   fact that your firm was splitting its fee for the Glenwood and
13   Witkoff buildings with Sheldon Silver.
14             Do you remember that?
15   A.  Yes.
16             THE COURT:  We need you to speak up.
17             THE WITNESS:  Sorry.  Yes.
18   BY MR. GOLDSTEIN:
19   Q.  Whose responsibility was it to send out new retainer
20   agreements to clients such as Glenwood and Witkoff?
21   A.  Mr. Goldberg would have made the calls to those clients and
22   would have been responsible.
23   Q.  In order to put out new retainers, would that have been
24   both drafting new retainers and making calls to the clients?
25   A.  Yes.
```

FBCYSIL4                        Iryami - Direct

1    Q.  Who would have been responsible for doing that?

2    A.  Mr. Goldberg.

3    Q.  The conversations that you had, based on what you

4    understood to be a change in the ethics rule -- that was in

5    2009?

6    A.  Yes.

7    Q.  So let me direct your attention to 2011, a couple of years

8    later.

9              What happened that year with respect to your

10   understanding or your view of having these retainer agreements

11   sent to Witkoff and to Glenwood?

12   A.  There were articles about new disclosure rules in Albany

13   for legislators to disclose income, and it was a trigger for me

14   to go back to it and take care of those retainers.

15   Q.  Just to be clear, this was your understanding based on what

16   you had read; is that right?

17   A.  Well, what I read about the disclosures?  That was just a

18   trigger for me to take care of the retainers.

19   Q.  What was it in terms of what you had read that made this

20   trigger?

21              MR. SHUR:  Objection.

22              THE COURT:  Overruled.

23              THE WITNESS:  Because Mr. Silver is a legislator that

24   would be part of that disclosure, any disclosure rules.

25   BY MR. GOLDSTEIN:

FBCYSIL4                          Iryami - Direct

1    Q.  So what did you understand -- from your understanding, what

2    did you understand might end up being disclosed?

3               MR. MOLO:  Objection.

4               THE COURT:  Overruled.

5               THE WITNESS:  Whatever income is paid to him from our

6    firm.

7    BY MR. GOLDSTEIN:

8    Q.  So, given that you were concerned about that information,

9    what did you decide to do?

10   A.  We went back and took care of the retainers we had

11   previously discussed, and Mr. Goldberg took care of that.

12   Q.  So, after you came to this understanding based on what you

13   had read, did you go back to Mr. Goldberg and raise the issue

14   of putting out new retainer letters?

15   A.  Yes.

16   Q.  How did he respond to your request?

17   A.  He took care of it.

18   Q.  I want to direct your attention to what's in your binder as

19   Government Exhibit 692.

20               Do you recognize the documents contained in Government

21   Exhibit 692?

22   A.  Yes.

23   Q.  What are those documents?

24   A.  They were a draft of retainers for Glenwood.

25   Q.  Who prepared these draft retainers?

FBCYSIL4                    Iryami - Direct

1    A.  Mr. Goldberg, together with an assistant.

2    Q.  Were these found on -- you testified earlier that you

3    collected documents from both paper records and from your

4    office's computers.

5             Were these documents found on your office's computers?

6    A.  Yes.

7             MR. GOLDSTEIN:  Your Honor, the government had offered

8    these subject to connection previously.  We now offer them into

9    evidence.

10             MR. MOLO:  No objection.

11             THE COURT:  So 692 is now received for all purposes.

12             (Government's Exhibit 692 received in evidence)

13             MR. GOLDSTEIN:  Mr. Coccaro, if we could publish the

14   first page of 692.

15   BY MR. GOLDSTEIN:

16   Q.  What are these documents in Government Exhibit 692?

17   A.  They were a draft of retainer agreements to go to Glenwood.

18   Q.  Who prepared these documents?

19   A.  Mr. Goldberg, together with an assistant.

20             MR. GOLDSTEIN:  If we can zoom in on the top portion

21   of this document.

22   BY MR. GOLDSTEIN:

23   Q.  The date of this January 5, 2012.

24             Is that after you had come to the understanding

25   that -- I'll withdraw that, your Honor.

FBCYSIL4                          Iryami - Direct

1          Were these retainers, these drafts, prepared after you

2     had gone back to Jay Goldberg to make sure there were retainers

3     in writing with Glenwood and Witkoff?

4     A.  Yes.

5     Q.  Again, who was Ms. Carroll Pittelman?

6     A.  I believe she is Mr. Litwin's daughter.

7     Q.  If we can look at the "By signing below" paragraph.

8     A.  Yes.

9     Q.  Can you read that to the jury, please.

10    A.  "By signing below, you consent to the employment of Sheldon

11    Silver, Esquire, who shall assume joint responsibility for the

12    representation.  You are hereby advised that a proportionate

13    division of fees will be made between Jay Arthur Goldberg, PC

14    and Sheldon Silver, Esquire."

15    Q.  What was the purpose of that language?

16    A.  To comply with the ethics rules.

17              THE COURT:  The attorneys' ethics rules?

18              THE WITNESS:  Yes.

19    BY MR. GOLDSTEIN:

20    Q.  What did it mean, as you understood it, that Sheldon Silver

21    would assume joint responsibility for the representation?

22    A.  He would be responsible for the downside as well as the

23    upside.

24    Q.  What is the downside?

25    A.  Malpractice.

FBCYSIL4                    Iryami - Direct

1   Q.  Did you ever confirm whether Sheldon Silver had malpractice

2   insurance?

3   A.  No.

4   Q.  Did you ever confirm whether Sheldon Silver did in fact

5   take responsibility for any downside?

6           MR. MOLO:  Objection.

7           THE COURT:  Overruled.

8           THE WITNESS:  Myself, no.

9   BY MR. GOLDSTEIN:

10  Q.  Now, were similar -- if we can look back at who this is

11  addressed to.

12          This one is addressed Columbus 60th Realty LLC.  Was

13  that one of the Glenwood buildings?

14  A.  Yes.

15  Q.  Were similar letters prepared for all of the different

16  Glenwood buildings that your firm represented during this time

17  period?

18  A.  Yes.

19  Q.  Are those the other documents reflected in Government's

20  Exhibit 692?

21  A.  Yes.

22  Q.  Did each of those letters in Government's Exhibit 692

23  contain the same language about the employment of Sheldon

24  Silver?

25  A.  Yes.

1    Q.  After these retainers were prepared, what did your firm do

2    with them?

3    A.  They were sent -- I don't know if this draft specifically,

4    but retainers were sent to Glenwood and Witkoff.

5    Q.  After they were sent, what discussions, if any, did you

6    have with Glenwood about these letters?

7    A.  None.

8    Q.  Who was your main point of contact at Glenwood?

9    A.  Michael Hoenig.

10   Q.  What discussions, if any, did you have with Mr. Hoenig

11   about sharing a fee with Sheldon Silver?

12   A.  None.

13   Q.  To your knowledge, were any of these draft agreements that

14   are contained in Government Exhibit 692 -- were any of them

15   signed by Glenwood?

16   A.  No.

17   Q.  Was there a separate agreement that was ultimately signed

18   by Glenwood?

19   A.  Yes.

20   Q.  If you look in your binder at Government Exhibit 700, which

21   had been previously admitted subject to connection.

22            Is this the separate agreement that you just testified

23   about?

24   A.  Yes.

25            MR. GOLDSTEIN:  Your Honor, the government now offers

FBCYSIL4                      Iryami - Direct

1    this without subject to connection.

2              THE COURT:  Any objection?

3              MR. MOLO:  No objection.

4              THE COURT:  Okay.  700 is received for all purposes.

5              (Government's Exhibit 700 received in evidence)

6    BY MR. GOLDSTEIN:

7    Q.  Ms. Iryami, where was this document found?

8    A.  Well, we would have had it on our -- this was our hard

9    copy.  Probably in our retainer binder.

10             MR. GOLDSTEIN:  If we can zoom at the top of this

11   letter.

12   BY MR. GOLDSTEIN:

13   Q.  Who is this letter addressed to?

14   A.  Sheldon Silver, Esquire.

15   Q.  Did you prepare this letter?

16   A.  No.

17   Q.  Were you involved in any negotiations about the preparation

18   of this letter?

19   A.  No.

20   Q.  Do you know how it came to be that this letter was signed

21   as opposed to the draft agreements in Government Exhibit 692?

22             MR. MOLO:  Objection.

23             THE COURT:  Overruled.

24             THE WITNESS:  My understanding was that Glenwood

25   requested changes.

```
 1   BY MR. GOLDSTEIN:
 2   Q.  Who did you get that understanding from?
 3   A.  Mr. Goldberg.
 4   Q.  This is addressed to Sheldon Silver, Esquire.
 5           What is contained in the Re line?
 6   A.  All the Glenwood block and lots that we represented.
 7           MR. GOLDSTEIN:  Could we then look at the content of
 8   the letter.
 9   BY MR. GOLDSTEIN:
10   Q.  Can you read that letter to the jury.
11   A.  "This letter is to acknowledge that you have assumed joint
12   responsibility with our firm for the tax certiorari
13   representation of the above properties.
14           "As agreed, a portion at division of fees will be made
15   between Jay Arthur Goldberg, PC and Sheldon Silver, Esquire."
16   Q.  Who signed on behalf of Glenwood?
17   A.  Charles Dorego.
18   Q.  Now, in addition to this separate letter, did your law firm
19   also prepare retainer agreements with the Glenwood buildings?
20   A.  Yes.
21   Q.  If you could turn to Government Exhibit 701, which has
22   already been admitted.
23           THE COURT:  701?
24           MR. GOLDSTEIN:  Yes, your Honor.
25   BY MR. GOLDSTEIN:
```

1    Q.  Do you see that in your binder?

2    A.  Yes.

3    Q.  Do you recognize those documents?

4    A.  Yes.

5    Q.  What are they?

6    A.  They are the retainer agreements that were ultimately

7    signed.

8    Q.  What is the date on these retainer agreements?

9    A.  January 18, 2012.

10   Q.  How does that compare to the date on that separate letter

11   that you just testified about, Government Exhibit 700?

12   A.  I don't remember what the date was.

13            MR. GOLDSTEIN:  If we can pull that up, Mr. Coccaro.

14            THE WITNESS:  January 18, 2012.

15   BY MR. GOLDSTEIN:

16   Q.  So they are dated the same?

17   A.  Yes.

18   Q.  Who signed the retainer letters that are contained in

19   Government Exhibit 701?

20   A.  Charles Dorego.

21   Q.  Is that the same person who signed the separate letter,

22   which is Government Exhibit 700?

23   A.  Yes.

24            MR. GOLDSTEIN:  If we can take a look at Government

25   Exhibit 701, please.  Just 701, not 700.

FBCYSIL4                        Iryami - Direct

 1              THE WITNESS:  I don't have 701.

 2    BY MR. GOLDSTEIN:

 3    Q.  701?

 4    A.  Here.  Yes.  Thank you.

 5    Q.  Where in this retainer letter or any of the retainer

 6    letters that follow it, is there any reference to Sheldon

 7    Silver sharing a fee in the representation of Glenwood?

 8    A.  No.

 9    Q.  There is no reference?

10    A.  No.

11              THE COURT:  Did you say you already have this document

12    in evidence?

13              MR. GOLDSTEIN:  I believe we did through the previous

14    witness, your Honor.

15              THE COURT:  Is there any objection to 701?  I don't

16    have it marked into evidence.

17              MR. MOLO:  No objection.

18              THE COURT:  It's in.

19              (Government's Exhibit 701 received in evidence)

20              MR. GOLDSTEIN:  Thank you, your Honor.

21    BY MR. GOLDSTEIN:

22    Q.  Other than anything that you heard from Jay Goldberg, what

23    knowledge do you have as to why there were two agreements?

24    A.  I don't have any knowledge other than that.

25    Q.  From your perspective, did having the two agreements

FBCYSIL4                          Iryami - Direct

1    satisfy your concerns about your ethical obligations?

2    A.  Yes.

3    Q.  So, from your perspective in terms of the ethical

4    obligations, what was the difference between doing it in one

5    letter or doing it over two letters?

6    A.  My obligation was only to have it in writing.  It was not a

7    requirement to be in the retainer.  It was signed by the same

8    person, the same time.  So I saw no problem.

9    Q.  After your firm signed these retainer agreements with

10   Glenwood and that separate letter, did your firm receive new

11   properties from Glenwood?

12   A.  Yes.

13   Q.  How many new properties did it receive?

14   A.  I think it was six.

15         MR. GOLDSTEIN:  We can set that aside, Mr. Coccaro.

16   BY MR. GOLDSTEIN:

17   Q.  In 2011 you testified that you asked Mr. Goldberg to

18   prepare these new retainer agreements for Glenwood.

19         What, if anything, did you ask him to do with regard

20   to the Witkoff Group?

21   A.  The same.

22   Q.  What did Mr. Goldberg do in response?

23   A.  He took care of it.

24   Q.  Now, do you know whether any new retainer was in fact sent

25   to the Witkoff Group?

FBCYSIL4                        Iryami - Direct

1   A.  I was told they were sent; that it was not signed.

2   Q.  You were told that by whom?

3   A.  Mr. Goldberg.

4   Q.  Do you in fact know whether it was sent?

5   A.  I didn't watch it go in the mail, no.

6   Q.  Now, did you receive any response from the Witkoff Group

7   after Mr. Goldberg had told you that he had sent it?

8   A.  Not that I know of.

9   Q.  In your files, is there any signed retainer agreement with

10  the Witkoff Group that mentions Sheldon Silver?

11  A.  No.

12  Q.  What year, approximately -- withdrawn.

13          What approximate date did you ask Mr. Goldberg to send

14  a new retainer letter to Mr. Witkoff disclosing the fee split

15  with Sheldon Silver?

16  A.  It was around the same time, December 11/January 12, in

17  that time period.

18  Q.  If you can look at Government Exhibit 737 in your binder.

19          Do you recognize that document?

20  A.  Yes.

21  Q.  What is that document?

22  A.  It's a cover letter about a new property for Witkoff.

23  Q.  Is there a retainer agreement attached to the cover letter?

24  A.  Yes.

25          MR. GOLDSTEIN:  Your Honor, the government offers

FBCYSIL4                        Iryami - Direct

1   Government Exhibit 737.

2              THE COURT:  Any objection?

3              MR. MOLO:  No objection, your Honor.

4              THE COURT:  737 is received.

5              (Government's Exhibit 737 received in evidence)

6   BY MR. GOLDSTEIN:

7   Q.  The Witkoff Group LLC -- is that who this is addressed to?

8   A.  Yes.

9   Q.  For what property does this letter concern?

10  A.  Block 1000 Lot 1, which is 165-179 West 47th Street,

11  Manhattan.

12  Q.  Was this one of the buildings that was referred to your

13  firm from Sheldon Silver?

14  A.  Well, it's the same client.

15  Q.  Did you consider all of the Witkoff buildings to have been

16  referred by Sheldon Silver?

17  A.  Yes.

18  Q.  Were you splitting your fee with Sheldon Silver for all of

19  the Witkoff buildings that you represented?

20  A.  Yes.

21  Q.  If you can read the text of this letter.

22             Who is Sarah Parnes?

23  A.  Sarah Parnes was our contact person at the Witkoff Group.

24  Q.  What does the letter say?

25  A.  "Enclosed please find retainer letter setting forth our

FBCYSIL4                     Iryami - Direct

1    proposed fee arrangement and 2013/14 information sheet in

2    connection with the above property.  The retainer should be

3    signed by Steven Witkoff and the information sheet completed

4    and returned to our office."

5    Q.  If we could then turn to the retainer agreement that's

6    attached.

7              What is the date of this retainer agreement?

8    A.  February 13, 2013.

9    Q.  Is that after you had had the discussions with Mr. Goldberg

10   about changing the retainer agreements for the Witkoff Group?

11   A.  Well, that was the year before.  Yes.

12   Q.  And, looking at this document, where in this document is

13   there any reference to splitting the fee with Sheldon Silver?

14   A.  There is none.

15             MR. GOLDSTEIN:  You can set that aside.

16   BY MR. GOLDSTEIN:

17   Q.  There is another binder that's in front of you that

18   contains a series of exhibits beginning with the number 646 and

19   the number 650.

20             If you can flip through.  Do you recognize the

21   documents that are in this binder?

22   A.  Yes.

23   Q.  Are these documents that prior to your testimony today, you

24   looked at to confirm that they were from the books and records

25   of Golberg & Iryami?

FBCYSIL4                        Iryami - Direct

1   A.   Yes.

2   Q.   Without discussing in detail, what is represented in these

3   exhibits?

4   A.   They are invoices to Glenwood for tax reductions we

5   achieved, and the attached documents are the checks received

6   from them and any letters and checks to Mr. Silver.

7   Q.   Are the 646 exhibits for Glenwood and the 650 exhibits for

8   Witkoff?

9   A.   Yes.

10            MR. GOLDSTEIN:  Your Honor, the government offers

11   646-1 through 646-34.

12            THE COURT:  -34?

13            MR. GOLDSTEIN:  -34.

14            And 650-1 through 650-13.

15            THE COURT:  Any objection?

16            MR. MOLO:  May I approach with a question?

17            THE COURT:  Okay.  Yes.  You may approach.

18            (At the sidebar)

19            THE COURT:  Okay.

20            MR. MOLO:  I would object on hearsay grounds.  There

21   is handwriting all over these.  I don't know whose handwriting

22   this is.

23            MR. GOLDSTEIN:  I can put in a greater proffer, but

24   she will testify that this handwriting is either hers or the

25   assistant of the firm's, and it's what they did to figure out

FBCYSIL4                      Iryami - Direct

1    how to split the fees with Sheldon Silver.

2              MS. COHEN:  That's how the records came to us.

3              THE COURT:  Subject to that further.

4              (In open court)

5    BY MR. GOLDSTEIN:

6    Q.  Ms. Iryami, in the exhibits that we just discussed, there

7    is handwriting at the bottom of several of the pages,

8    particularly with regard to -- if you take, for example, a look

9    at Government Exhibit 646-4.

10             Whose handwriting is at the bottom of the first page

11   of that exhibit?

12   A.  That looks like my handwriting.

13   Q.  The handwriting that's on these documents -- was that

14   handwriting done at the time that you handled these invoices

15   and payments or done afterwards in preparation for litigation?

16   A.  No.  At the time.

17   Q.  What was the purpose of writing in hand on these invoices?

18   A.  Our recordkeeping.

19             MR. GOLDSTEIN:  The government again offers the set of

20   exhibits, 646-1 through -34 and 650-1 through 13.

21             MR. MOLO:  No objection.

22             THE COURT:  So 646-01 to -34 are received.  I will

23   note that -03 has previously been received.  And 650-01 through

24   650-13 are received.

25             (Government's Exhibits 646-01 to -34 and 650-01

1    through 650-13 received in evidence)

2              MR. GOLDSTEIN:  Thank you, your Honor.

3              Mr. Coccaro, can we look at the first page of 646-15.

4    BY MR. GOLDSTEIN:

5    Q.  Ms. Iryami, what is reflected on the first page of 646-15?

6    A.  It's an invoice to Glenwood.

7    Q.  Who prepared the invoices that were sent to Glenwood?

8    A.  I did.

9    Q.  What is the date of this invoice?

10   A.  December 1, 2010.

11             MR. GOLDSTEIN:  If we can look at the for professional

12   services rendered section through to the bottom, the

13   handwriting.

14   BY MR. GOLDSTEIN:

15   Q.  What is contained in the Re line?

16   A.  That's the property that we are billing on, the address and

17   the block and lot.

18   Q.  And then it says, "In obtaining reduction in real property

19   tax assessment for the 2010/2011 tax year, there's an

20   assessment reduction of $1,614,000.  There's a tax savings

21   number.

22             What does that number represent?

23   A.  The amount of the reduction times the applicable tax rate

24   is the tax savings.

25   Q.  It says, "The fee as agreed at 25 percent of savings."

FBCYSIL4                        Iryami - Direct

```
1              What is that number?
2    A.   Our contingency fee.
3    Q.   That's $53,879.36?
4    A.   Yes.
5    Q.   For what tax year is that fee for?
6    A.   2010/2011.
7    Q.   Did you also in this invoice include an assessment
8    reduction for a previous year?
9    A.   Yes.  We got both years' settlement at the same time from
10   the tax commission.
11   Q.   So for the 2009/2010 tax year, what was the fee that went
12   to your firm?
13   A.   For just that year?
14   Q.   Correct.
15   A.   $52,235.75.
16   Q.   So for this building for those two tax years, what was the
17   amount that Glenwood paid to your firm?
18   A.   $106,115.10.
19   Q.   And then there's handwriting to the next of that.
20             Whose handwriting is that?
21   A.   My assistant.
22   Q.   What does it say?
23   A.   It's a little cut off.  I think it says, "Pay to Sheldon
24   Silver on 12-21-10 $26,528," and there's a check number that's
25   cut off.
```

FBCYSIL4                        Iryami - Direct

1    Q.  So let's look at the second page of this exhibit.

2             Is this a check from Glenwood for the amount that you

3    invoiced?

4    A.  Yes.

5    Q.  So what is the amount of this check?

6    A.  $106,115.10.

7    Q.  What's the date that this check was received?

8    A.  December 13, 2010.

9             MR. GOLDSTEIN:  Let's look at the next page of the

10   document.

11   BY MR. GOLDSTEIN:

12   Q.  What is reflected on this page?

13   A.  It's a copy of a letter to Mr. Silver with a check for the

14   fees we paid to him.

15            MR. GOLDSTEIN:  Let's look at the letter itself.

16   BY MR. GOLDSTEIN:

17   Q.  This is dated December 23, 2010.

18            So it's about a little less than two weeks after you

19   received the check from Glenwood?

20   A.  Yes.

21   Q.  Can you read for the --

22            MR. GOLDSTEIN:  Mr. Coccaro, if you could enlarge the

23   text of the letter itself.

24   BY MR. GOLDSTEIN:

25   Q.  Can you read for the jury what the letter says.

1   A.  "Enclosed herewith is check in the amount of $26,528.78

2   representing payment for your efforts in connection with

3   reductions in the 2009/10 and 2010/11 real estate tax

4   assessments for the above-captioned property.

5           "Love to the family."

6   Q.  What were Sheldon Silver's efforts in connection for the

7   reductions in the real estate tax assessments for that

8   property?

9   A.  For referring the case and assuming joint responsibility.

10  Q.  Who did the work in achieving those reductions?

11  A.  I did.

12  Q.  What work, if any, did Sheldon Silver do other than refer

13  the case?

14  A.  He didn't.

15  Q.  If you could turn to Government Exhibit 646-3.

16          What is the date of these invoices, Ms. Iryami?

17  A.  May 31, 2005.

18  Q.  I'll try to short circuit this a little bit.

19          Looking through Government Exhibit 646-3, are there

20  multiple invoices at around this time period that went to

21  Glenwood for properties represented by your firm?

22  A.  Yes.

23  Q.  Did your firm receive multiple checks from Glenwood during

24  this time period?

25  A.  Yes.

FBCYSIL4                          Iryami - Direct

1      MR. GOLDSTEIN:  Mr. Coccaro, if we could look at the

2    third page of the exhibit.

3    BY MR. GOLDSTEIN:

4    Q.   There's a check from Glenwood Management Corp. to Jay

5    Arthur Goldberg, PC for.

6              How much is this check for?

7    A.   $158,808.

8    Q.   What is the date?

9    A.   July 1, 2005.

10   Q.   If you could turn to the ninth page of this document.

11             Do you know what 79th Street Realty LLC is?

12   A.   It's an owner of one of the Glenwood buildings.

13   Q.   How much is this check for?

14   A.   $111,471.

15             MR. GOLDSTEIN:  Mr. Coccaro, if you could then turn to

16   the third-to-the-last page of this document.

17   BY MR. GOLDSTEIN:

18   Q.   Here is another check from Glenwood Management Corp.

19             How much is that check for?

20   A.   $96,506.40.

21   Q.   What's the date on that check?

22   A.   July 1, 2005.

23   Q.   Then let's look at the next page of the document.

24             What is this letter representing?

25   A.   A letter from our firm to Mr. Silver enclosing his portion

1    of the attorneys' fees.

2    Q.  And was his portion of the attorneys' fees -- was that for

3    the various checks that you received from Glenwood in the rest

4    of the exhibit?

5    A.  Correct.

6    Q.  And again it says, "I am pleased to enclose a check in the

7    amount of $159,876.90 representing your share of fees for your

8    efforts in connection with reductions in the 2004/05 and/or

9    2005/06 real estate tax assessment for the above-captioned

10   properties."

11           What were Mr. Silver's efforts in connection with

12   those reductions?

13   A.  The same as the other.  Referring the property and assuming

14   direct responsibility.

15   Q.  What knowledge did you have that Sheldon Silver assumed

16   responsibility?

17   A.  I wasn't part of those conversations.

18   Q.  It says, "Sincerely YAK."  What is that?

19   A.  It's a nickname for Jay from friends that he grew up with.

20   Q.  If you could turn to the next page of the document.

21           Is that the check that was sent to Sheldon Silver?

22   A.  Yes.

23   Q.  Whose handwriting that on the check?

24   A.  Mr. Goldberg.

25   Q.  How much is that check for?

1    A.  $159,876.90.

2    Q.  Who did the work to achieve the tax reductions for those

3    properties that resulted in that check?

4    A.  I did.

5    Q.  We're just going to look at one more of these, Ms. Iryami.

6         MR. GOLDSTEIN:  Mr. Coccaro, if you could turn to

7    646-18.

8    BY MR. GOLDSTEIN:

9    Q.  Ms. Iryami, if you flip through 646-18, is this again a

10   series of invoices at about the same time period?

11   A.  Yes.

12   Q.  These are invoices to which company?

13   A.  Glenwood management.

14   Q.  Did Glenwood management in fact pay your firm pursuant to

15   these invoices?

16   A.  Yes.

17        MR. GOLDSTEIN:  Now if we could turn to page 15 of the

18   document, Mr. Coccaro.  Let's turn to page 14 first.

19   BY MR. GOLDSTEIN:

20   Q.  What's reflected on this page of the document that's up on

21   your screen?

22   A.  The check from Glenwood management.

23   Q.  For how many properties does this check cover?

24   A.  Three I think.

25   Q.  Is that the 45 West 60th Street, 320 East 46th Street, and

1    1520 York Avenue?

2    A.   Correct.

3    Q.   What is the amount of this check?

4    A.   $241,065.90.

5    Q.   If you could then look at the next page of the document.

6           What's the date of this document?

7    A.   September 14, 2011.

8    Q.   Can you read the letter.

9    A.   "Enclosed herewith are checks in the total amount of

10   $114,567.49 representing payment for your efforts in connection

11   with reductions in the 2011/12 real estate tax assessments for

12   the above-captioned properties.

13          "Best regards and love to the family."

14   Q.   Looking at the rest of the exhibit -- let's speed this

15   up -- did your firm in fact include checks that totaled that

16   amount?

17   A.   Yes.

18   Q.   This is September 14, 2011.

19          If we could turn to Government Exhibit 646-19.

20          Did your firm invoice Glenwood for the same amount in

21   December of that year?

22   A.   I guess this is the same invoices that was the balance on

23   it.  I'm not sure what.  Sorry.

24   Q.   I'll pose a new question to you.  Let's look at what's

25   included in Government 646-19.

FBCYSIL4                      Iryami - Direct

1       Is this invoice from your firm to Glenwood?

2   A.  It's a statement.

3       MR. GOLDSTEIN:  Can we zoom in on the box of the

4   statement.

5   BY MR. GOLDSTEIN:

6   Q.  There's a reference on the right side to a balance of

7   $458,269.94.

8       Is that a balance that was paid by Glenwood to your

9   firm?

10  A.  Yes.

11  Q.  Whose handwriting is that underneath that?

12  A.  Mine.

13  Q.  Why did you write "Times 25 percent" and come up with a

14  number?

15  A.  It was -- there are no other notes.  I would be guessing.

16  Q.  Was it to calculate Sheldon Silver's fee?

17  A.  I would presume that.

18  Q.  Let's look at --

19      THE COURT:  Are you sharing 25 percent of your fee

20  with anybody else?

21      THE WITNESS:  Well, not on these cases, no.

22      MR. GOLDSTEIN:  Let's look at the last page of this

23  document.  Can we zoom in on the check, please.

24  BY MR. GOLDSTEIN:

25  Q.  Whose handwriting is on this check?

1   A.  Jay Goldberg's.

2   Q.  How much is this check for?

3   A.  $114,567.49.

4   Q.  What is the date of this check?

5   A.  December 19, 2011.

6   Q.  What does it say in the for line for the check?

7   A.  Re Glenwood management CF 11/12.

8   Q.  Do you know what "CF" stands for?

9   A.  Counsel fee.

10  Q.  Counsel?

11  A.  Fee.

12  Q.  Other than refer Glenwood to your firm, what work did

13  Sheldon Silver do to receive this amount of money?

14  A.  He didn't do additional work.

15  Q.  Ms. Iryami, in addition to the amounts that were paid by

16  your firm to Sheldon Silver, were there additional amounts that

17  were scheduled to be paid?

18  A.  Yes.

19  Q.  Approximately how much additional money was scheduled to be

20  paid to Sheldon Silver?

21  A.  I believe it was $153,000, thereabouts.

22  Q.  If we can turn back to your first binder to Government

23  Exhibit 730.

24  A.  730?

25  Q.  Yes.

1          Do you recognize what's contained in Government

2    Exhibit 730?

3    A.  Yes.

4    Q.  What is Government Exhibit 730?

5    A.  It's a schedule of fees that we received from Glenwood from

6    my QuickBooks reports.

7    Q.  So was this generated from your accounting software?

8    A.  Yes.

9    Q.  What is the time period of the fees that are reflected in

10   this document?

11   A.  From 2005 to October 2013.

12          MR. GOLDSTEIN:  Your Honor, the government offers

13   Government 730.

14          THE COURT:  730?

15          MR. GOLDSTEIN:  730, Government Exhibit 7-3-0.

16          THE COURT:  Any objection?

17          MR. MOLO:  No objection.

18          THE COURT:  All right.  730 is received.

19          (Government's Exhibit 730 received in evidence)

20   BY MR. GOLDSTEIN:

21   Q.  You say this came out of QuickBooks.

22          What is QuickBooks?

23   A.  An accounting program.

24   Q.  What is QuickBooks used for?

25   A.  Accounting, recording bills received.  We just use it for

FBCYSIL4                        Iryami - Direct

1    accounts receivable.

2    Q.  You use it to help track how much money comes into the firm

3    and how much money goes out?

4    A.  Well, this program we just use for how much comes in.

5    Q.  How much comes in.

6    A.  Yes.

7    Q.  Now, it says income by customer detail.  January 1, 2000,

8    through June 1, 2014.

9             Does the document actually contain any inputs prior to

10   2005?

11   A.  No.  We didn't have the program before 2005.

12   Q.  So you started keeping track of this information, at least

13   for this program, in 2005?

14   A.  Correct.

15   Q.  Looking at the left side, it says LITWILEO.

16            What is that?

17   A.  It's a client ID for Leonard Litwin, who is the owner of

18   Glenwood.

19   Q.  Is that the client ID that you used to manage your

20   accounting software for Glenwood buildings?

21   A.  We use it for all their files, not just accounting.

22   Q.  For all of the Glenwood files you used LITWILEO?

23   A.  Yes.

24   Q.  Turning to the second page of this document and looking at

25   the totals, so from July 6, 2005, through October 8, 2013, how

FBCYSIL4                         Iryami - Direct

1   much did Glenwood management pay to your law firm?

2   A.   $2,688,908.49.

3   Q.   Of that how much of that did you pay to Sheldon Silver?

4   A.   It would have been 25 percent.

5   Q.   If you could turn to Government Exhibit 731.

6          Do you recognize 731, Ms. Iryami?

7   A.   Yes.

8   Q.   What is this exhibit?

9   A.   It's the same as the last one, but this one is for the

10  Witkoff Group.

11         MR. GOLDSTEIN:  Your Honor, the government offers 731.

12         THE COURT:  Any objection?

13         MR. MOLO:  No objection.

14         THE COURT:  731 is received.

15         (Government's Exhibit 731 received in evidence)

16  BY MR. GOLDSTEIN:

17  Q.   For what time period does this document cover payments from

18  the Witkoff Group?

19  A.   From September 2006 to March 2014.

20  Q.   What is the -- there's an identifier under type that says

21  WITKOSTE.

22         What is that?

23  A.   That's the client ID for all of the Witkoff properties.

24  It's for Steven Witkoff.

25  Q.   Is that what you used as you did for Glenwood for the

FBCYSIL4                    Iryami - Direct

1  Litwin identifier for all purposes?

2  A.  Correct.

3  Q.  So, as reflected in this document, for the time period of

4  September 2006 through March of 2014, how much did your firm

5  receive from the Witkoff Group?

6  A.  $267,223.78.

7  Q.  How much of that did you pay to Sheldon Silver?

8  A.  I believe it was 15 percent.

9  Q.  Now, Ms. Iryami --

10         MR. GOLDSTEIN:  You can set that aside.

11  BY MR. GOLDSTEIN:

12  Q.  Did you think that you were doing anything improper by

13  sharing your law firm's fees for the Glenwood and Witkoff

14  buildings with Sheldon Silver?

15  A.  Of course not.

16  Q.  What did you know about what business Glenwood and Witkoff

17  had before Sheldon Silver?

18  A.  I did not.

19         MR. MOLO:  Objection.

20         THE COURT:  Overruled.

21         Assuming there was any, did you know anything about

22  it?

23         THE WITNESS:  No.

24         MR. GOLDSTEIN:  Nothing further, your Honor.

25         THE COURT:  Okay.  Mr. Molo.

FBCYSIL4                          Iryami – Cross

1           MR. MOLO:  I'm happy to begin, your Honor.  I just

2    wanted to call the Court's attention to the witness, the

3    lawyer --

4           THE COURT:  Come up.

5           (At the sidebar)

6           MR. MOLO:  Mr. Mandel's lawyer had a sentencing this

7    afternoon.

8           THE COURT:  He has a sentencing this afternoon?

9           MS. COHEN:  He said we can put him on whenever.

10          MR. MOLO:  I just didn't know what works.

11          THE COURT:  Let's proceed with her, and then we'll go

12   back to Mr. Mandel.

13          MR. MOLO:  Okay.  That's fine.

14          (In open court)

15          (Pause)

16   CROSS-EXAMINATION

17   BY MR. MOLO:

18   Q.  Good afternoon, Ms. Iryami.

19   A.  Good afternoon.

20   Q.  We've met just briefly out in the hall, and I represent

21   Sheldon Silver.  I'm going to ask you some questions about your

22   testimony.

23          MR. MOLO:  First can we put the charts up again with

24   the big numbers, the $2,000,000 number from Glenwood.  730.

25          Go to the second page there.

FBCYSIL4                     Iryami - Cross

1    BY MR. MOLO:

2    Q.  That number $2.688 million -- that's money that your firm

3    earned; right?

4    A.  Correct.

5    Q.  For work that you did; right?

6    A.  Definitely.

7    Q.  You earned a fee, didn't you?

8    A.  Yes.

9    Q.  And you did that by doing great work for Glenwood; right?

10   A.  Yes.

11   Q.  And, in fact the fee that you paid Mr. Silver -- I think

12   you said it would be 25 percent; correct?

13   A.  Correct.

14   Q.  That was a fee that was a standard fee that you would have

15   paid anyone that referred a case to you; correct?

16   A.  Correct.

17   Q.  There was nothing nefarious about that, was there?

18   A.  Nothing nefarious.

19   Q.  There was nothing evil about that, was there?

20           MR. GOLDSTEIN:  Objection, your Honor.

21           THE COURT:  Overruled.

22           THE WITNESS:  No.

23   BY MR. MOLO:

24   Q.  That's business; right?

25   A.  Correct.

FBCYSIL4                      Iryami - Cross

1   Q.  That's the law business; right?

2   A.  Yes.

3   Q.  And the second chart that we saw -- by the way, they didn't

4   show you the percentage.  They showed you the gross number that

5   your fee was.  They didn't show you the percentage that was

6   paid to Mr. Silver.

7            MR. GOLDSTEIN:  Objection, your Honor.

8            THE COURT:  Sustained.

9   BY MR. MOLO:

10  Q.  The second chart shows the fees that you earned from

11  Mr. Witkoff's company; right?

12  A.  Correct.

13  Q.  And that number, again, was $267,223.

14           By the way, this is over what?  A ten-year period or

15  thereabouts?

16  A.  Yes.

17  Q.  That's hard-earned money, wasn't it?

18  A.  Yes.

19  Q.  That's an honest fee; right?

20           MR. GOLDSTEIN:  Objection.

21           THE COURT:  Overruled.

22  BY MR. MOLO:

23  Q.  Right?

24  A.  Absolutely, yes.

25  Q.  And you earned it as an honest lawyer; right?

FBCYSIL4                           Iryami - Cross

1    A.  Yes.

2            THE COURT:  Please don't talk over each other.  Let

3    her answer, and then ask your next question.  I know you're

4    excited.

5            MR. MOLO:  It's been a long day, Judge.

6            THE COURT:  For us all.

7    BY MR. MOLO:

8    Q.  $267,000 -- that was an honest fee; right?

9    A.  Definitely.

10   Q.  And, again, they didn't show you the percentage that went

11   to Mr. Silver.  That's the gross amount that went to your firm;

12   right?

13   A.  Right.

14           MR. GOLDSTEIN:  Objection.

15           THE COURT:  Sustained.

16           For the record, that's Government's Exhibit 731.

17   BY MR. MOLO:

18   Q.  We heard a little bit about your background.

19           Just to be clear, your firm is one of a handful of

20   firms really that does this tax certiorari work in New York;

21   correct?

22   A.  It's a small bar, yes.

23   Q.  It's a small bar.

24           Mr. Goldberg has decades of experience at that bar;

25   correct?

FBCYSIL4                    Iryami - Cross

1    A.  Correct.

2    Q.  I think he was admitted in 1967; correct?

3    A.  Correct.

4    Q.  He actually worked as a -- served as a tax commissioner in

5    the Ed Koch administration.

6    A.  Correct.

7    Q.  And I think you said too that that was a job that was

8    actually a part-time job so he could be a government employee

9    as a tax commissioner but also have a law practice on the

10   outside; correct?

11   A.  Yes.

12   Q.  In doing that -- a tax commissioner by the way, is a city

13   entity; right?

14   A.  Correct.

15   Q.  After that, he practiced law with a firm called Sherman &

16   Gordon and then formed his own practice; right?

17   A.  Correct.

18   Q.  You joined -- you've been at this for more than two decades

19   yourself; right?

20   A.  Yes.

21   Q.  I don't say that with any suggestion that there's anything

22   wrong with that.

23        MR. GOLDSTEIN:  Objection, your Honor.

24   BY MR. MOLO:

25   Q.  And you have done that with Mr. Goldberg the whole time?

FBCYSIL4                    Iryami - Cross

1   A.  Yes.

2   Q.  But you actually have a lot of distinction within the bar

3   yourself.  You serve as a Secretary of the Condemnation and Tax

4   Certiorari Committee of the city bar -- the association of the

5   bar of the city of New York; right?

6   A.  Yes, and I still do that.

7   Q.  You've been on the Condemnation and Tax Certiorari

8   Committee for more than a decade; correct?

9   A.  Yes.

10  Q.  You are also the vice-president of the real estate tax

11  review bar; correct?

12  A.  Correct.

13  Q.  So, between you and Mr. Goldberg, your experience as tax

14  certiorari lawyers is quite vast.

15  A.  Yes.

16  Q.  Your firm -- I think there was some suggestion that because

17  your firm is smaller and some other firms are bigger -- does

18  the size of the firm necessarily dictate whether the lawyers

19  that are practicing are good or not good?

20  A.  Yes.

21  Q.  Do you have enough lawyers to do the work you need to do at

22  your firm?

23  A.  Yes.

24  Q.  So we'll put that issue to rest.

25          MR. GOLDSTEIN:  Objection, your Honor.

FBCYSIL4                         Iryami - Cross

 1              THE COURT:  Mr. Molo, just ask questions.  Sum up when
 2    the case is over.
 3    BY MR. MOLO:
 4    Q.  You've represented clients that are quite large holders of
 5    real estate besides Witkoff and Glenwood; right?
 6    A.  Yes.
 7    Q.  And that's included, for example, Cammeby's International,
 8    which is a large real estate company owned by Rubin Schron;
 9    right?
10              THE COURT:  How do you spell that?
11              MR. MOLO:  K-a-m-m-e-b-y, International.
12              THE WITNESS:  With a C.
13    BY MR. MOLO:
14    Q.  You also represented Leon Charney, who is a billionaire
15    real estate investor; correct?
16    A.  Correct.
17    Q.  You've also invested the Adjmi family; correct?
18    A.  Yes.
19              THE COURT:  You said "invested."  Do you mean
20    represented?
21              MR. MOLO:  Yes.  Represented.  Excuse me.
22    BY MR. MOLO:
23    Q.  The Adjmi family of real estate developers.  And you've
24    also represented ACC Management, which is a large real estate
25    developer with properties across the United States; correct?

FBCYSIL4                    Iryami - Cross

1    A.  Correct.

2    Q.  And many of these clients have assessments, tax

3    assessments, that are more than $10,000,000; right?

4    A.  Some, yes.

5    Q.  The fees that you charge -- we talked about these

6    percentage fees.

7            Those are typical for tax certiorari work?

8    A.  Yes.  The industry standard.

9    Q.  Your fees are in line with what you understand the industry

10   standards to be?

11   A.  Correct.

12   Q.  Again, your work is 100 percent contingent fee; correct?

13   A.  100 percent.

14   Q.  That means you only get paid if you get a good result for a

15   client.

16   A.  Yes.

17   Q.  In many cases, the firm has reduced the assessments for

18   clients by millions of dollars; right?

19   A.  Yes.

20   Q.  You don't earn the kinds of fees that were shown up there

21   without having gotten huge reductions for clients in their tax

22   liability; right?

23   A.  Correct.

24   Q.  The essence of your job is standing between the government

25   and a private citizen's money; right?

FBCYSIL4                        Iryami - Cross

1          MR. GOLDSTEIN:  Objection, your Honor.

2          THE COURT:  Sustained.

3    BY MR. MOLO:

4    Q.  You're fighting government over money; right?

5          MR. GOLDSTEIN:  Objection.

6          THE COURT:  Overruled.

7          THE WITNESS:  Yes.  We're trying to reduce assessments

8    which lower taxes.

9    BY MR. MOLO:

10   Q.  From everything you understood, Glenwood has been happy

11   with the representation that Golberg & Iryami have given;

12   right?

13   A.  Yes.

14   Q.  And the Witkoff Group was also very happy with the

15   representation it got; right?

16   A.  Yes.

17   Q.  There were some questions asked about you getting some more

18   buildings after the signing of the letter that Mr. Dorego

19   signed and Mr. Silver -- I think it was Government Exhibit --

20   the January 18, 2012 letter.

21          MR. MOLO:  Is that 701?

22          MR. GOLDSTEIN:  It's 700.

23          MR. MOLO:  It's Government Exhibit 700.  Could we put

24   that up.

25   BY MR. MOLO:

FBCYSIL4                        Iryami - Cross

```
 1   Q.  That's the letter that you referred to.
 2              By the way, this groups at least 16 properties
 3   together.  It takes care of it all at once; right?
 4   A.  Yes.
 5   Q.  As you said, this letter satisfies the Attorney
 6   Professional Responsibility Rules in terms of a written
 7   disclosure; correct?
 8              MR. GOLDSTEIN:  Objection, your Honor.
 9              THE COURT:  Overruled.
10              THE WITNESS:  Correct.
11   BY MR. MOLO:
12   Q.  I think the question was asked of you:  After this letter
13   was signed, did you get more properties for you to work on?
14              Leading up to this letter being signed, did you do
15   good work for Glenwood?
16   A.  Yes.
17   Q.  After this letter was signed, did you do good work for
18   Glenwood?
19   A.  Yes.
20   Q.  By the way, before the letter was signed, did Mr. Goldberg
21   ask Glenwood for business?
22   A.  I don't understand that question.
23   Q.  Was he someone who was out there asking for business all
24   the time?  Mr. Goldberg.
25   A.  I don't know if he asked them specifically.  I don't know.
```

FBCYSIL4                    Iryami - Cross

1   Q.  This tax certiorari process that you describe -- the tax

2   certiorari assessments are made by New York City's Finance

3   Commission; correct?

4   A.  Finance department, yes.

5   Q.  This is an agency of the City of New York; correct?

6   A.  Correct.

7   Q.  It is not an agency of the State of New York.

8   A.  No.

9   Q.  Members of the New York City Finance Commission are

10  appointed by the mayor of the City of New York; correct?

11  A.  I believe so.

12  Q.  They're not appointed by the legislature, are they?

13  A.  No.

14  Q.  The finance commission's budget comes from the

15  New York City budget, doesn't it?

16  A.  Yes.

17  Q.  It doesn't come from the state legislature, does it?

18  A.  No.

19  Q.  To challenge these tax certiorari assessments made by the

20  New York City Finance Commission, you filed papers with the

21  New York City Tax Commission; correct?

22  A.  Correct.

23  Q.  The New York City Tax Commission is a branch of

24  New York City government as well; correct?

25  A.  Correct.

FBCYSIL4                        Iryami - Cross

1    Q.  Not a branch of the New York State government; correct?

2    A.  Correct.

3    Q.  And its budget too comes from the City of New York and not

4    the state; correct?

5    A.  Correct.

6    Q.  So when you're representing your clients before the tax

7    commission, you're not doing business before the state;

8    correct?

9    A.  Correct.

10                  (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBC5sil5                        Iryami - cross

1   BY MR. MOLO:

2   Q.  And, if you go to challenge one of these tax commission's

3   decisions for a building in New York, you file papers in the

4   New York County Supreme Court, correct?

5   A.  Correct.

6           THE COURT:  If the property is in Manhattan.

7   A.  In New York, right.  In one of the five boroughs, whichever

8   borough it is.

9   Q.  I'm sorry.  It could be any of the five boroughs.

10          That's part of the Judicial Branch of the government,

11  correct?

12  A.  Correct.

13  Q.  It is not the legislature, right?

14  A.  Correct.

15  Q.  Now, Glenwood became a client of Goldberg & Iryami or its

16  predecessor firm, I guess, the Jay Arthur Goldberg firm I think

17  you testified, in 1996 or 1997; is that right?

18  A.  Correct.

19  Q.  And Glenwood became a client because Mr. Silver referred

20  Glenwood to the firm?

21  A.  Correct.

22  Q.  Mr. Silver is not a tax certiorari lawyer, correct?

23  A.  Correct.

24  Q.  So, Mr. Silver sent Glenwood to the firm and the firm began

25  representing Glenwood?

FBC5sil5                          Iryami - cross

1   A.  Yes.

2              MR. GOLDSTEIN:  Objection.

3              THE COURT:  Sustained.  Rephrase the question.

4              MR. MOLO:  Okay.

5              THE COURT:  Assumes a fact not in evidence.

6   BY MR. MOLO:

7   Q.  Well, did Glenwood begin representing -- I'm sorry.

8              Did Goldberg & Iryami -- let me withdraw that.

9              Did the Jay Arthur Goldberg firm, not

10  Goldberg & Iryami -- it hadn't become Goldberg & Iryami yet --

11  they began representing after Mr. Silver referred Glenwood to

12  the firm, correct?

13  A.  Yes.

14  Q.  Now, and The Witkoff Group became a client of your firm in

15  2003, correct?

16             MR. GOLDSTEIN:  Objection.  That's not the testimony.

17  Q.  When did the Witkoff Group become a client of your firm?

18  A.  I thought it was 2005.

19  Q.  Okay, 2005.

20             And, again, The Witkoff Group was referred by

21  Mr. Silver to the firm, correct?

22  A.  Yes.

23  Q.  And Mr. Silver is not a tax certiorari lawyer, correct?

24  A.  Correct.

25  Q.  So, when Witkoff became your client you began representing

FBC5sil5                    Iryami – cross

1  them in tax certiorari matters?

2  A.  Yes.

3  Q.  And the process that you described much earlier today about

4  filing petitions and appearing before the New York City Finance

5  Commission and, if necessary, going to court, negotiating with

6  the City lawyers, that's the work of what you do in this tax

7  certiorari practice, correct?

8  A.  Correct.

9  Q.  And that is what Goldberg & Iryami has done for Glenwood in

10 representing them in these tax certiorari cases, correct?

11 A.  Correct.

12 Q.  And that's what Goldberg & Iryami has done for The Witkoff

13 Group in representing them in these tax certiorari cases,

14 correct?

15 A.  Correct.

16 Q.  And Mr. Silver didn't do any of that work with

17 Goldberg & Iryami, did he?

18 A.  No.

19 Q.  Now, the question was asked about what Mr. Silver did.  It

20 is common for lawyers to act as rainmakers, isn't it?

21 A.  Yes.

22 Q.  Whether it is a big firm or a small firm, you know from

23 being a lawyer for as long as you have that it is not uncommon

24 for a lawyer to be maybe a very senior partner in a firm and

25 not really do any work on matters, correct?

FBC5sil5                          Iryami - cross

1   A.  Correct.

2   Q.  And that occurs in all sorts of practices, not just tax

3   certiorari practice?

4   A.  Correct.

5   Q.  And I believe Mr. Goldberg, according to what you said

6   earlier, really doesn't do much work on cases now either, does

7   he?

8   A.  Correct.

9   Q.  And he concentrates on bringing in business, correct?

10  A.  Yes.

11  Q.  And it is a successful model for the firm because he knows

12  a lot of people, right?

13  A.  Yes.

14  Q.  And --

15          THE COURT:  You have to answer out loud.

16          THE WITNESS:  I'm sorry.  Yes.

17  Q.  You and Mr. Goldberg split the profits of your firm, right?

18  A.  Since I became a partner, yes.

19  Q.  Since you became a partner, correct.

20          And it sounds like you are really doing all of the

21  real work and the representation, the filing and the court

22  appearances and such, correct?

23  A.  Correct.

24  Q.  And as between the two of you, Mr. Goldberg's share of the

25  profits is larger than yours?

FBC5sil5                          Iryami - cross

1   A.  Larger, yes.

2   Q.  And that's been the case since you have been a partner?

3   A.  Yes.

4   Q.  Now, these referral fees,the referral fees that you pay

5   are, again, standard in the industry, aren't they?

6   A.  Yes.

7   Q.  You know of other tax certiorari firms that pay referral

8   fees to people?

9   A.  I would assume so.  I don't talk about that specifically.

10  Q.  Okay.  That's all right.

11          And a lawyer who wanted to do what you do, just off

12  the street, wouldn't just be able to go do that because it is a

13  very complex process that has to be followed, correct?

14  A.  Correct.

15  Q.  And you are a very highly specialized small bar, right?

16  A.  Yes.

17  Q.  And so not just anybody can represent somebody in tax

18  certiorari work?

19          MR. GOLDSTEIN:  Objection.

20          THE COURT:  Sustained.  Rephrase the question.

21  Q.  Sure.

22          THE COURT:  Would the tax division take their filing?

23          THE WITNESS:  Yes.

24          THE COURT:  If you are a member of the Bar.

25          THE WITNESS:  I don't have to be a member of the Bar

FBC5sil5                        Iryami - cross

1   to file tax question, no.

2   BY MR. MOLO:

3   Q.  It is highly unlikely that anyone who wasn't trained and

4   familiar with the process in tax certiorari would be successful

5   in practicing and representing clients, right?

6           THE COURT:  Overruled.

7   A.  Correct.  You would need to know the ins and outs of the

8   system.

9   Q.  During the course of your own career have you had people

10  come to you with a legal problem that you just weren't

11  well-suited to represent them?  Outside of the tax certiorari

12  area?

13  A.  Yes.

14  Q.  And when that happens you referred them to somebody else?

15  A.  Yes.

16  Q.  And the generation of new business is valuable, isn't it?

17  A.  Very.

18  Q.  So, as a result of that not only might someone like

19  Mr. Goldberg not do any work but you are pleased to pay someone

20  a referral fee for sending their business, new business, right?

21  A.  Correct.

22  Q.  And, again, just to be clear, the percentage that the

23  referring lawyer gets is essentially a percentage of what you

24  get which mirrors the percentage of the reduction in the tax

25  bill that you are getting for your client, right?

FBC5sil5                              Iryami – cross

1    A.  We pay the same percentage to the referring attorney as the

2    percentage we receive.

3    Q.  Referral fees are not kickbacks, are they?

4               MR. GOLDSTEIN:  Objection.

5               THE COURT:  Sustained.

6    Q.  Specifically, with respect to the fees that Mr. Silver was

7    paid, the referral fees, those were only paid if there was a

8    tax reduction?

9    A.  I'm sorry.  Can you repeat that?

10   Q.  That's all right.

11              Specifically the referral fees that Mr. Silver was

12   paid, those were only paid if there was a tax reduction?

13   A.  Definitely.  Yes.

14   Q.  Mr. Silver referred other developers to Goldberg & Iryami

15   besides Glenwood and Witkoff?

16   A.  Yes.

17   Q.  For example, he referred Solly Assa?

18   A.  Correct.

19   Q.  Solly Assa properties is a significant developer, right?

20   A.  Yes.

21   Q.  He also referred Amsterdam Properties, correct?

22   A.  Correct.

23   Q.  And there may have been others.  Do you recall any others?

24   A.  No.

25   Q.  Okay.

```
 1              THE COURT:  642-02?

 2              MR. MOLO:  642-2.

 3   Q.  That's a substitution of counsel form, correct?

 4   A.  Correct.

 5   Q.  And this indicates that the Tuchman firm had been

 6   representing this client which is a Glenwood property; is that

 7   right?

 8   A.  Correct.

 9   Q.  And so it was a client that was referred by Mr. Silver,

10   right?

11   A.  Yes.

12   Q.  So the Tuchman firm was representing them and it shows that

13   now Mr. Goldberg, as of 1999 I guess the firm was still

14   Goldberg, it was not Goldberg & Iryami yet, Mr. Goldberg is now

15   going to be representing the 40th Realty Company, correct?

16   A.  Correct.

17   Q.  Can we go further down on the page?  Is there anything else

18   there?

19          What is that?  That's Mr. Litwin's signature there,

20   correct?

21   A.  Correct.

22   Q.  Now can we show the whole thing again?

23          Nowhere on there does Mr. Silver's name appear as

24   representing this property, correct?

25   A.  Correct.
```

FBC5sil5                           Iryami - cross

1   Q.  Because he is not going to be representing them on the

2   matter, is he?

3   A.  No.

4   Q.  That would be true with any substitution of counsel like

5   that for a matter that Mr. Silver referred to you, right?

6   A.  Yes.

7   Q.  The prosecutor asked you about how Mr. Silver's referral

8   fees were disclosed to Glenwood and Witkoff.  Now, when your

9   firm is retained by a client your standard practice is to

10  prepare an engagement letter, or I think you call it a retainer

11  agreement, right?

12  A.  Yes.

13  Q.  And if that client is referred to you by another lawyer it

14  is your firm that actually prepares the engagement letter,

15  right, not the referring firm?

16  A.  Most of the time.

17  Q.  And Mr. Silver did not prepare any of the engagement

18  letters that went to Glenwood or to Witkoff, did he?

19  A.  No.

20          MR. GOLDSTEIN:  Objection.

21          THE COURT:  Overruled.

22  Q.  Those were prepared by your firm?

23  A.  By my firm, yes.

24  Q.  All right.

25          And you discussed sending out this letter that

FBC5sil5                          Iryami – cross

1    disclosed to clients that other lawyers that referred matters

2    to you were earning referral fees, that was around 2009 I guess

3    it first started, right?

4    A.   Yes.

5    Q.   It was mostly, at the time, in a prospective way for new

6    clients, right?

7    A.   Yes, for new clients.

8    Q.   And, in fact, there was some question about whether it even

9    applied to existing client relationships, isn't this right?

10   A.   Yes.

11   Q.   So, to go back and to do it for existing clients was sort

12   of a belt and suspenders approach, right?

13   A.   Yes.

14   Q.   And, the basic change is that you were required to inform

15   the client, in writing, that there was going to be this fee

16   sharing, that another lawyer was going to share in the fees and

17   that there would be this joint responsibility for the

18   representation, correct?

19   A.   Yes.

20   Q.   And I think you had a great way of phrasing the joint

21   responsibility, that it was responsible for the downside as

22   well as the upside, correct?

23   A.   Correct.

24   Q.   And the upside meant that you got part of the fee, correct?

25   A.   Yes.

1  Q.  And the downside meant, I think as you said, if there was

2  malpractice the lawyer would be responsible for the

3  malpractice?

4  A.  Yes.

5  Q.  No one understood or expected that by having that letter,

6  that language in a letter, an engagement letter for a client

7  that Mr. Silver referred to, that Mr. Silver was going to show

8  up in court on behalf of a client, right?

9  A.  No.

10         MR. GOLDSTEIN:  Objection.

11         THE COURT:  Sustained.

12  Q.  That he was not going to be doing the grunt work that went

13  into -- I don't mean to demean it.

14         MR. GOLDSTEIN:  Objection.

15  Q.  -- but all the detail work that goes into the tax

16  certiorari preparation.

17         THE COURT:  Sustained.  Rephrase the question.

18  Q.  Okay.

19         It was not understood that even if that language were

20  in a letter that Mr. Silver would be participating in the

21  preparation of the petitions for tax certiorari relief, right?

22  A.  There was no expectation of that.

23  Q.  And no expectation that he would be in court on behalf of

24  these clients, right?

25  A.  Correct.

FBC5sil5                    Iryami - cross

1  Q.  No expectation he would be meeting these clients advising

2  them on strategy, right?

3  A.  Correct.

4  Q.  As you said, it was just to disclose and to share the

5  upside and the downside.

6          By the way, you were asked about malpractice

7  insurance.  You have no reason to doubt Mr. Silver had

8  malpractice insurance, did you?

9          MR. GOLDSTEIN:  Objection.

10  A.  No.

11          THE COURT:  Do you know one way or the other?

12          THE WITNESS:  No.  Most lawyers have it.

13          THE COURT:  Most practicing lawyers have it.

14          THE WITNESS:  Yes.

15  BY MR. MOLO:

16  Q.  I think to be clear, too, that you said the reason that you

17  kind of stopped the process in 2009 of sending out these new

18  letters in addition to the fact of there being some ambiguity

19  whether you needed to do it for existing clients was that you

20  were sort of overtaken by the press of events, right?

21          MR. GOLDSTEIN:  Objection, your Honor.

22          THE COURT:  Overruled.

23  Q.  You were sort of overtaken by the press of events?

24  A.  Yes.  Busy with work, personal matters.

25  Q.  There was no conscious decision not to disclose the fact

FBC5sil5                          Iryami - cross

1   that Mr. Silver was referring matters to your firm, right?

2   A.  No.

3            MR. GOLDSTEIN:  Objection.

4            THE COURT:  Sustained.

5            Rephrase that question.

6   Q.  Did you consciously decide that you were not going to

7   disclose that Mr. Silver was referring matters to your firm?

8   A.  No.

9   Q.  And Mr. Silver didn't come up to you sand say, Ms. Iryami,

10  please don't disclose that I'm referring cases to you?

11  A.  No.

12  Q.  Okay.

13           And, I take it your firm doesn't have a huge amount of

14  administrative structure?  I mean, you were saying you have to

15  do some of the bills yourself and such?

16  A.  I do the billing, yes.

17  Q.  From time to time you have simply forgotten to do

18  engagement letters with clients, is that right?

19  A.  Correct.

20  Q.  We talked about letters or you testified in your direct

21  examination about letters that went to Glenwood with that

22  disclosure of information and that was in January of 2012?

23  A.  2012.

24  Q.  And there was a question about Witkoff and I think you were

25  uncertain about whether engagement letters -- revised

FBC5sil5                          Iryami - cross

1   engagement letters had gone to Witkoff, is that right?

2   A.  I was told that they were mailed but I didn't oversee it

3   myself.

4   Q.  I am going to show you what's marked Defendant's Exhibit

5   119.  Have you had a moment to look at that?

6   A.  Yes.

7   Q.  Do you recognize, generally, what it is?

8   A.  Yes.

9   Q.  Is that a document that was made and kept in the ordinary

10  course of the business of your law firm?

11  A.  Yes.

12          MR. MOLO:  Your Honor, I move the admission of

13  Defendant's Exhibit 119.

14          MR. GOLDSTEIN:  No objection, your Honor.

15          THE COURT:  Defendant's Exhibit 119 is received.

16          (Defendant's Exhibit 119 received in evidence)

17          MR. MOLO:  Is there an ELMO?

18          THE COURT:  There was an ELMO, it may have gotten

19  taken down.  It is very low-tech.  I think the high-tech stuff

20  displaced it.

21          MR. MOLO:  I think you are right.

22  BY MR. MOLO:

23  Q.  Directing your attention to Defendant's Exhibit 119,

24  Ms. Iryami; what is it?

25  A.  It is an e-mail from myself to Sarah Parnes at The Witkoff

FBC5sil5                          Iryami - cross

1   Group.

2   Q.  Do you know who Sara Parnes was at The Witkoff Group?

3   A.  She was our contact person.

4   Q.  And it is dated January 17th of 2012, correct?

5   A.  Correct.

6   Q.  2:22 p.m.  It also has there a note that it was read,

7   correct?

8   A.  Yes.

9   Q.  Sort of unusual for --

10          MR. GOLDSTEIN:  Objection.

11          THE COURT:  Okay, please don't do that, Mr. Molo.  I

12  have asked you again and I'm not going to tell you again not to

13  do it.

14          MR. MOLO:  Okay.

15          THE COURT:  Just ask questions.

16  BY MR. MOLO:

17  Q.  Could you please read what it says, just a few lines what

18  the e-mail says?

19  A.  From the beginning?

20  Q.  Yes, from the "Dear Sarah."

21  A.  Dear Sarah, Happy New Year.  Hope all is well with you and

22  the family.  I trust you received the retainer agreements for

23  Steve's signature.  For various reasons we need to formalize

24  our arrangement at this time.  Please call if you would like

25  further explanations.  Thank you, Dara.

FBC5sil5                          Iryami - cross

1  Q.  What were you referring to when you say the retainer

2  agreements?

3  A.  The retainer agreements including the paragraph about

4  Mr. Silver taking joint responsibility.

5  Q.  And those were retainer agreements between

6  Goldberg & Iryami and The Witkoff Group?

7  A.  Correct.

8  Q.  And Steve is Steve Witkoff?

9  A.  Yes.

10  Q.  Do you recall a response to this?

11  A.  No.

12  Q.  Could Witkoff be a bit challenging as a client to represent

13  sometimes?

14  A.  Fairly.  Yes.

15  Q.  In terms of the fee situation with them?

16  A.  They were more difficult with fee negotiation, yes.

17  Q.  And were they reluctant to sign engagement letters as a

18  general matter?

19          MR. GOLDSTEIN:  Objection.

20          THE COURT:  Sustained.

21  Q.  What was generally, how was their reaction to receiving

22  engagement letters, as a general matter?

23  A.  They had not signed any.

24          THE COURT:  They had never signed a retainer

25  agreement?

FBC5sil5                         Iryami - cross

| | |
|---|---|
| 1 | THE WITNESS:  No. |
| 2 | MR. MOLO:  One moment, your Honor? |
| 3 | Q.  The president of Glenwood that was referred to in the |
| 4 | signatory to the agreement which is Government Exhibit 700, |
| 5 | Charles Dorego? |
| 6 | A.  Yes. |
| 7 | Q.  Do you know who he is? |
| 8 | A.  I have spoken to him a few times. |
| 9 | Q.  You know he's a lawyer? |
| 10 | A.  Yes. |
| 11 | Q.  He was a partner at a large law firm, did you know that? |
| 12 | A.  Previously, yes. |
| 13 | Q.  Previously. |
| 14 | So he is an experienced lawyer in the real estate |
| 15 | business, correct? |
| 16 | A.  Yes. |
| 17 | Q.  And you never concealed from Mr. Dorego that Mr. Silver had |
| 18 | referred business to Goldberg & Iryami, right? |
| 19 | MR. GOLDSTEIN:  Objection. |
| 20 | THE COURT:  Overruled. |
| 21 | Did you ever even talk to Mr. Dorego? |
| 22 | A.  I had spoken to him but not about fees or Mr. Silver. |
| 23 | Q.  Okay. |
| 24 | In terms of referrals from other law firms that were |
| 25 | mentioned, some of the law firms you were asked about did work |

FBC5sil5                     Iryami - cross

1   in the real estate area.  Did you get referrals from firms that

2   didn't do real estate work?

3   A.  I believe so.

4   Q.  There is no requirement that a firm refer you work have

5   experience in real estate area, right?

6   A.  No.  They would just be more likely to have clients to

7   refer.

8   Q.  Because they're doing transactional work for them, right?

9   A.  Correct.

10  Q.  You disclosed the amounts of money that Mr. Silver was paid

11  each year in a 1099, didn't you?

12  A.  Yes.  Of course.

13  Q.  So that was filed with the federal government?

14  A.  Yes.

15  Q.  And to the best of your knowledge those were filed

16  accurately?

17  A.  Yes.

18  Q.  The specific checks that you were shown that were made

19  payable to Mr. Silver, were those if not the largest, among the

20  largest checks that Mr. Silver received?

21          THE COURT:  Mr. Silver received?

22          MR. MOLO:  Yeah, the checks that were shown from

23  Goldberg & Iryami.

24          THE COURT:  From them you said?

25          MR. MOLO:  From Goldberg & Iryami to Mr. Silver.

FBC5sil5                         Iryami - cross

1          THE WITNESS:  Probably.  I would have to look at it

2     more closely, but probably.

3     BY MR. MOLO:

4     Q.  He wasn't routinely receiving checks in that amount?

5     A.  No.

6     Q.  And the checks that he received were checks from

7     Goldberg & Iryami, right?

8     A.  Yes.

9     Q.  They weren't checks from Glenwood, correct?

10    A.  Correct.

11    Q.  And they weren't checks from Witkoff, were they?

12    A.  Correct.

13    Q.  Those checks went into your account that you would be paid

14    by Glenwood or Witkoff, right?

15    A.  Right.

16    Q.  And you, in turn, would pay Mr. Silver whatever he was owed

17    under your agreement, correct?

18    A.  Correct.

19    Q.  With a Goldberg & Iryami check, right?

20    A.  Correct.

21    Q.  And you would make whatever disclosures you were required

22    to make under the tax laws, right?

23    A.  1099s, yes.

24          MR. MOLO:  Is this time for a short break or not?

25          THE COURT:  Not really.

1      (Counsel conferring)

2  BY MR. MOLO:

3  Q.  The fact that you, at Goldberg & Iryami, received a check

4  from Glenwood Management, that specific fact was not disclosed

5  to Mr. Silver, was it?

6  A.  I'm sorry.  Can you repeat the question?

7  Q.  The fact that the check that was coming to you was from

8  Glenwood Management for your fee, the fact that it said

9  Glenwood Management, that wasn't something that you told

10 Mr. Silver where the check was from, right?

11 A.  No.

12 Q.  And you asked --

13      THE COURT:  Hang on a second.  I don't understand that

14 question or answer.  Try again.

15      MR. MOLO:  Okay.

16      THE COURT:  Because the checks had memo endorsement,

17 they had an indication of what they were associated with.

18      MR. MOLO:  Right, but it was --

19      THE WITNESS:  I think he meant the payor on the check.

20      Is that what you meant?

21 BY MR. MOLO:

22 Q.  The check that you received for your fee from Glenwood --

23 A.  Right.

24 Q.  -- that was from Glenwood Management, right?

25 A.  Some of them.

FBC5sil5                          Iryami - cross

1    Q.  Right.

2            But you didn't talk to Mr. Silver about which check

3    you got, right?

4    A.  No.  That was not communicated.

5    Q.  In your direct examination it was mentioned that you had

6    come to think about this 2000 -- the disclosure again in 2012

7    because you had read some things in the paper about changes in

8    state rules, right?

9    A.  Correct.

10   Q.  And this was not anything that you said, oh my God, we have

11   got concern about this, this just jogged your memory, right?

12   A.  Correct.

13   Q.  Did you ever conceal from Mr. Michael Hoenig at Glenwood

14   that Sheldon Silver was being paid a referral fee by your law

15   firm?

16           MR. GOLDSTEIN:  Objection.

17           THE COURT:  Overruled.

18   A.  I had no discussions with Mr. Hoenig about that or fees in

19   general.

20   Q.  Ms. Iryami, you were asked a question a little bit earlier

21   this afternoon about having a grant of immunity; is that right?

22   A.  Yes.

23   Q.  So you are testifying here with the understanding that you

24   can't be prosecuted for any of the things that you have talked

25   about provided you provide truthful testimony, right?

FBC5sil5                         Iryami - cross

1    A.   Correct.

2    Q.   Did you engage in any kind of a fraud scheme with

3    Mr. Silver?

4              MR. GOLDSTEIN:   Objection.

5              THE COURT:   Sustained.

6    Q.   Did you consciously attempt to break the law with

7    Mr. Silver?

8              MR. GOLDSTEIN:   Objection.

9              THE COURT:   Sustained.

10   Q.   You didn't do anything criminal, did you?

11             MR. GOLDSTEIN:   Objection.

12             THE COURT:   Sustained.

13             MR. MOLO:   Nothing further, Judge.

14             THE COURT:   May I see the parties at side bar?

15

16

17

18

19

20

21

22

23

24

25

1            (At side bar)

2            THE COURT:  Does the government want me to give a

3    limiting instruction now relative to what a grant of immunity

4    is?

5            MS. COHEN:  What would the instruction be, your Honor?

6            THE COURT:  It would be something along the lines of

7    everyone has a Fifth Amendment right not to answer questions

8    that might tend to incriminate them.  That does not necessarily

9    mean that they've committed a crime.  In this particular case

10   the witness was ordered, notwithstanding her Fifth Amendment

11   right, to provide testimony.  There is a Court order in place

12   ordering her to provide testimony which assures that the

13   testimony that she gave cannot be used against her.

14           MR. GOLDSTEIN:  That would be useful.

15           MS. COHEN:  Yes.  Please, your Honor, especially based

16   on Mr. Molo's questions.

17           MR. MOLO:  I don't know why we need that, but.

18           THE COURT:  Because of the suggestion, the implication

19   of your questions was that there was something nefarious going

20   on with the fact that she was immunized.

21           MR. MOLO:  No.  I was saying that she was here in

22   court with the opportunity, if she had done something that was

23   illegal, to tell the world and not be prosecuted for it.  I

24   think it is a relevant fact for the jury to understand.

25           THE COURT:  You can argue that.

FBC5sil5                        Iryami - cross

1              MR. MOLO:  Can I ask her did she think she did

2     anything wrong?

3              THE COURT:  No.

4              The representation was made that she was going to

5     invoke her Fifth Amendment right and would not testify, would

6     not answer questions.  I presume she had legal advice that says

7     her answers could tend to incriminate her and based on what I

8     heard that did not seem to be an unreasonable invocation.  I

9     think it could have gone either way, frankly, based on her

10    answers to the questions when she seemed -- but, on the other

11    hand, there wasn't a lot of going into exactly what the

12    conversations between her and Mr. Goldberg were relative to why

13    things were or weren't being done.

14             MR. COHEN:  I understand you sustained objections on

15    whether she thought she did anything criminal.  Can't we ask

16    did you do anything wrong, did you think you did anything

17    wrong?  Just that question, yes or no.

18             THE COURT:  No.  Those were the questions you were

19    asking.

20             MR. COHEN:  The question was whether you thought you

21    did something criminal or engaged in a fraud.

22             MS. COHEN:  No.

23             MR. COHEN:  This is a much simpler question.

24             THE COURT:  Is it relevant whether she thinks she did

25    anything wrong?

FBC5sil5                          Iryami - cross

1           MR. COHEN:  In terms of the instruction it might be

2     relevant.

3           THE COURT:  No, it is not, because the standard is

4     whether the answer might tend to incriminate you.  As defense

5     attorneys argue all the time you can have someone who is

6     perfectly innocent but who the truthful answer to questions

7     might tend to incriminate you.

8           MR. COHEN:  As long as you put that into the

9     instruction.

10           THE COURT:  I will put that into the instruction.

11           MR. COHEN:  Okay.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Ladies and gentlemen, you just heard

3     questions about whether she did anything wrong and a reference

4     to the fact that she is testifying under a grant of immunity.

5     Think back to your civics lessons.  Everybody has a Fifth

6     Amendment right not to give testimony that might tend to

7     incriminate them.  That doesn't necessarily mean that they've

8     done anything wrong, but the truthful answer to the question

9     might tend to incriminate them.

10             As to this witness, she was ordered to testify so

11    there is a Court order in place that required her to testify

12    which means that to the extent she gives answers to questions

13    or gave answers to questions that might tend to incriminate

14    her, they can't be used by the government in a prosecution

15    against her.  So, that's all that meant.  Okay?  So it is just

16    that's the standard that was invoked for purposes of providing

17    an order to testify.  Okay?

18             All right.  Mr. Goldstein.

19             MR. GOLDSTEIN:  Thank you, your Honor.

20    REDIRECT EXAMINATION

21    BY MR. GOLDSTEIN:

22    Q.  Ms. Iryami, Mr. Molo asked you questions about whether your

23    firm informed that it was receiving the checks from Glenwood.

24    Do you remember that?

25    A.  Yes.

FBC5sil5                          Iryami - redirect

1    Q.  Mr. Coccaro, can you please put up Government Exhibit

2    636-19, the ninth page?  Can we zoom in on the check, please?

3              Ms. Iryami, is this a check made out from your firm to

4    Sheldon Silver?

5    A.  Yes.

6    Q.  And what does it say in the "for" line?

7    A.  Re Glenwood Management CF 11/12.

8    Q.  And that's the company that paid you that you then in turn

9    used those fees to pay Mr. Silver?

10   A.  I don't know.  I mean, the named company, I don't know

11   where the checks came from in this circumstance.

12             THE COURT:  The check could have been from an LLC.

13   A.  It could have been.  I would have to compare them.

14   Q.  The check itself here to Mr. Silver references Glenwood

15   Management; is that right?

16   A.  Right.  That's our addressee.

17   Q.  You can set that aside.

18             Mr. Molo asked you questions about the tax returns of

19   your law firm, the 1099s that you filed --

20   A.  Yes.

21   Q.  -- do you recall those questions?

22             Were those tax returns filed publicly?

23             MR. MOLO:  Objection, your Honor.  I didn't talk about

24   tax returns.

25             THE COURT:  Overruled.

FBC5sil5                    Iryami - redirect

1  Q.  Were those tax returns filed publicly?

2          MR. MOLO:  Objection, your Honor.  I did not talk

3  about tax returns.

4          THE COURT:  Are the 1099s filed publicly.

5  Q.  Are the 1099s referencing payment to Sheldon Silver, were

6  those filed publicly?

7  A.  No.

8  Q.  In 2011 you testified that you were concerned that there

9  may be a disclosure of income to Sheldon Silver from your law

10 firm; is that right?

11 A.  Just that I knew that it was going to occur and it

12 triggered my memory for the retainers.

13 Q.  So, prior to 2011, prior to when that memory was triggered,

14 did you think that there had been any public disclosure of

15 Sheldon Silver referring or receiving any fees from your firm?

16 A.  I don't think I ever thought about it.

17 Q.  Do you know if after 2011 and prior to this case the fees

18 to Sheldon Silver ever were disclosed?

19          MR. MOLO:  Objection.

20          THE COURT:  Overruled.

21          Publicly you mean?

22 Q.  Publicly.

23 A.  After I found out about the investigation I looked online

24 and I saw a disclosure.

25          MR. MOLO:  Objection.

1521

1    THE COURT:  Sustained.

2    Q.  Prior to anything you read in connection with this

3    investigation, did you have any knowledge as to whether the

4    fees that your firm was paying to Sheldon Silver were disclosed

5    publicly?

6    A.  No.

7    Q.  Mr. Molo also asked you questions about whether Sheldon

8    Silver was involved in preparing the retainer agreements for

9    your firm.

10        Do you remember those questions?

11   A.  Yes.

12   Q.  Mr. Coccaro, can you please pull up Government Exhibit 700?

13   Do you know who prepared Government Exhibit 700?

14   A.  I believe Mr. Goldberg, together with an assistant in my

15   office.

16   Q.  Do you know at whose direction that language and that form

17   came from?

18   A.  I don't know the whole genesis.  I wasn't involved.

19   Q.  Do you know to what extent Sheldon Silver was involved in

20   the content of that letter?

21        MR. MOLO:  Objection, your Honor.

22        THE COURT:  Overruled.

23        MR. MOLO:  This is completely misleading.

24        THE COURT:  Please don't do speaking objections.

25        THE WITNESS:  I don't -- I don't know of any

FBC5sil5                        Iryami - redirect

1    involvement.

2              THE COURT:  Ladies and gentlemen, remember that the

3    questions are not evidence.

4    BY MR. GOLDSTEIN:

5    Q.  Just to be clear, you don't know about any involvement from

6    Sheldon Silver either way; is that right?

7    A.  Correct.

8    Q.  Mr. Molo asked you about other clients that were referred

9    to your firm by Sheldon Silver.  Do you recall that?

10   A.  Yes.

11   Q.  He mentioned Solly Assa?

12   A.  Yes.

13   Q.  And Amsterdam Properties?

14   A.  Yes.

15   Q.  Did your firm get any fees from either of those properties?

16   A.  No.

17   Q.  Did your firm pay anything to Sheldon Silver for getting

18   those properties?

19   A.  No.

20   Q.  Mr. Molo also asked you about other lawyers who referred

21   business to your firm.  Do you recall those questions?

22   A.  Yes.

23   Q.  Has any other lawyer referred business that comes anywhere

24   close to the $3 million in fees that your firm received from

25   Glenwood and Witkoff?

FBC5sil5                    Iryami - recross

1   A.  No.

2   Q.  Mr. Molo asked you questions about what it means to act as

3   a rainmaker in the field of law.

4           Do you remember that?

5   A.  Yes.

6   Q.  What do you know, if anything, about how Sheldon Silver got

7   Glenwood and Witkoff to use your firm?

8   A.  I don't know.

9           MR. GOLDSTEIN:  Nothing further, your Honor.

10  RECROSS EXAMINATION

11  BY MR. MOLO:

12  Q.  Can we have 700 up again, please?

13          I just want to be absolutely clear.  There is nothing

14  to suggest to you that Mr. Silver had anything to do with

15  preparing this document, is that right?

16          MR. GOLDSTEIN:  Objection.

17  A.  Correct.

18          THE COURT:  Overruled.

19          Okay.  Now would be a good time to take a break.

20          Ladies and gentlemen, don't discuss the case.  We will

21  take about a 10-minute break.

22          (Continued on next page)

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              (Jury not present)

2              MR. MOLO:  Your Honor, may I be heard briefly?  Do you

3    want me to approach?

4              THE COURT:  I don't know why shouldn't it be in open

5    court.

6              MR. MOLO:  I am happy to stand here.

7              THE COURT:  Okay.

8              MR. MOLO:  I would like the government to be

9    admonished not to ask questions for which they have no good

10   faith basis for asking them.

11             Throughout this trial we have heard questions about

12   was there peer review, was there an audit done, was there a

13   competitive bidding process whether it came to -- they have no

14   basis for thinking that that was done, would be done, was

15   required.  They know it wasn't required.

16             We had this witness just now asked questions about

17   Mr. Silver being involved in the creation of a document.  They

18   have no basis, none, for suggesting that he did and all they

19   are doing is trying to prejudice this jury, convince them

20   little by little, time after time, that something is amiss,

21   something is wrong when in fact it is not, and they should not

22   be allowed to get away with this.

23             THE COURT:  Mr. Molo, your client signed the document

24   so it is not like it is a total wild hair to suggest he might

25   have had something to do with drafting it.

1          MR. MOLO:  Based on everything we heard this witness

2     say, based on everything we heard every witness say throughout

3     this trial it is completely without any basis for them to have

4     asked this question and especially in light of her testimony.

5     In addition it doesn't address -- and that's just the most

6     recent example.  We had this throughout the trial and they

7     should not be allowed to get away with this.

8          THE COURT:  I have to say, Mr. Molo, I appreciate your

9     outrage but I have not seen them asking questions that did not

10    seem to have a factual basis.  The questions about per review

11    and the like were not to suggest that there was any

12    requirement, it was to suggest that there was no objective

13    criteria that the -- that Mr. Silver could have used because he

14    wasn't using a peer review process or scientific review board

15    or anything else in order to dispense half a million dollars of

16    taxpayer dollars to someone who was referring cases to the law

17    firm that he was receiving fees from.

18         So, the notion that they asked those questions, it

19    seemed to me, was establishing that fact.  It wasn't

20    suggesting, and I don't think the jury understood it to suggest

21    it any way, shape, or form, that there was a state requirement

22    that there be peer review that he was dispensing with.

23         MR. MOLO:  I hope the jury did not understand that to

24    be the case because if they did it was despite the concerted

25    effort to the government to create that impression.

FBC5sil5                         Iryami - recross

1                THE COURT:  Mr. Molo, I am not going to argue with you

2       about it.

3                MR. MOLO:  All right.

4                THE COURT:  I just don't see that that was the

5       implication.  I think the implication was there was no

6       objective criteria behind those grants and I don't think you

7       disagree with that.  You don't have -- I haven't seen a shred

8       of evidence that there was anything objective.  This was a

9       member item, it was treated the way many member items were

10      which is he decided that's who was getting the money.

11               MR. MOLO:  And I don't dis agree with that.

12               THE COURT:  Okay.

13               MR. MOLO:  Okay.

14               THE COURT:  Anything further?

15               MR. MOLO:  No, your Honor.

16               THE COURT:  So, after the break can we get Mr.  --

17               MS. COHEN:  We have Mr. Mandel ready.

18               THE COURT:  Good.  Okay.

19               MS. COHEN:  Thank you, your Honor.

20               THE COURT:  We are now down to seven minutes.

21               (Recess)

22               (Continued on next page)

23

24

25

```
1              (Jury present)

2              THE COURT:  Mr. Mandel, you are still under oath.

3              THE WITNESS:  Yes, ma'am.

4              THE COURT:  Okay, Mr. Goldstein.

5    DAVID MANDEL, resumed.

6    DIRECT EXAMINATION

7    BY MR. GOLDSTEIN:

8    Q.  Good afternoon, Mr. Mandel.

9              When we broke yesterday --

10             THE COURT:  Tuesday.

11   Q.  -- you were testifying about some of the state grants that

12   your organization OHEL had received from Sheldon Silver.  Do

13   you recall that?

14   A.  Yes.

15   Q.  And is it true that OHEL received more grants from Sheldon

16   Silver than from any other public official?

17   A.  Yes.

18   Q.  Did there come a time when OHEL created a summer camp?

19   A.  Yes.

20   Q.  When did that happen?

21   A.  In 2009-2010.

22   Q.  Where is that camp located?

23   A.  Wurtsboro, New York, upstate.  Upstate New York.

24   Q.  Is that in the Catskills?

25   A.  Yes.
```

FBC5sil5                          Mandel - direct

1   Q.   What does the camp do?

2   A.   The camp is a unique place for kids with disabilities, what

3   we describe as typical kids without disabilities and children

4   with disabilities where it is an opportunity for them to

5   interact as life is every day.

6          Too often kids with disabilities are separated in

7   programs in schools, they don't always have friends the way

8   many other children do, and this is a unique place that they

9   live together in a cabin and they eat together and they play

10  together and swim together.  It is a very special place, a very

11  unusual place.

12  Q.   In what ways did Sheldon Silver provide state money to help

13  with the camp?

14  A.   He provided OHEL with grants enabling us towards the

15  purchase and renovation in the camp.

16  Q.   About how much, total -- about how many dollars in grant

17  money did Sheldon Silver provide to help with the camp?

18  A.   There were two grants totaling $4.5 million.

19  Q.   During the course of obtaining those grants, did you have

20  direct conversations with Sheldon Silver about getting that

21  money for the camp?

22  A.   Yes.

23  Q.   I want you to take a look in your binder at what is already

24  in evidence as Government Exhibit 167-1.

25          Mr. Coccaro, can we zoom in on the first paragraph

FBC5sil5                          Mandel - direct

1    through the inset language?

2            Mr. Mandel, this here is a reference that says OHEL

3    Children's Home and Family Service, Inc.; is that your

4    organization?

5    A.  Yes.

6    Q.  It says summer camp improvements, $2 million.  Is that one

7    of the grants that your organization received in support of the

8    camp?

9    A.  Yes.

10   Q.  And what is the date of this communication?

11   A.  March 1, 2012.

12   Q.  Is that approximately when you learned that the camp would

13   receive this $2 million grant?

14   A.  I believe so.  Yes.

15   Q.  If we could just look at Government Exhibit 161, which is

16   also already in evidence, and turn to the second page of this

17   document?

18           Mr. Coccaro, can you highlight the 2/27/12?  There is

19   a reference here, Mr. Mandel, to name, message with a name.

20   Who is that, if you know?

21   A.  Adam Lancer.  He works at OHEL.

22   Q.  What is his position at OHEL?

23   A.  He is Director of Quality Improvement and General Counsel.

24   Q.  And do you see the reference there to 2 MV ESD?

25   A.  Yes.

FBC5sil5                          Mandel - direct

1    Q.  Do you know what ESD is?

2    A.  Empire State Development Corporation, I believe.

3    Q.  Is that the state agency that processed the grant that went

4    to the camp?

5    A.  Yes.

6    Q.  If we can just look at the next page of this document and

7    look at -- we can zoom in on the top -- what is that dated,

8    Mr. Mandel?

9    A.  3/2/12.

10   Q.  And it says:  Message David Mandel (OHEL).

11            Is that your phone number?

12   A.  Yes.

13   Q.  What is the notation underneath the message line?

14   A.  Thanks.  I'm not sure what the next word is -- the message

15   is thanks.  I don't know what the next letters are.

16   Q.  We can set that aside.

17   A.  Okay.

18   Q.  Now, did there come a time when you named the campus for

19   the camp in honor of somebody named Dr. Joe Silver?

20   A.  Yes.

21   Q.  If we could show what's been marked as Government Exhibit

22   585 in your binder for identification; do you recognize that?

23   A.  Yes.

24   Q.  What is that?

25   A.  That's the logo of the camp.

1    MR. GOLDSTEIN:  The government offers 585.

2    THE COURT:  Any objection?

3    MR. MOLO:  No objection.

4    THE COURT:  585 is received.

5    (Government's Exhibit 585 received in evidence)

6  BY MR. GOLDSTEIN:

7  Q.  Can we publish that?

8    So, to begin with, is the name of the camp is Camp

9  Kaylie?

10  A.  Camp Kaylie, yes.

11  Q.  What was Camp Kaylie named after?

12  A.  Camp Kaylie is named after the main benefactors, the Kaylie

13  family.

14  Q.  And then the Dr. Joe Silver Campus.  How did it come to be

15  that you named the campus of the camp after Dr. Joe Silver?

16  A.  We at OHEL approached Mr. Silver and offered that in

17  recognition of the support provided to the camp over the years,

18  a good friend of OHEL and other friends, to provide some

19  recognition and we offered to provide the naming of the camp in

20  some fashion.  Mr. Silver responded that --

21  Q.  Just to be clear, is the Mr. Silver you are talking about

22  now, is that Sheldon Silver, the defendant?

23  A.  Yes.

24  Q.  So, when you approached Sheldon Silver about the naming of

25  the camp --

FBC5sil5                          Mandel - direct

1   A.  Right.

2   Q.   -- what did you offer to him?

3   A.  We offered that we would be -- OHEL would be happy to

4   provide the name to the camp in recognition of any work that he

5   has done in support and Mr. Silver responded -- Mr. Sheldon

6   Silver responded that if we wanted to we could name the camp in

7   recognition of his brother -- his deceased brother, Dr. Joe

8   Silver.

9            Dr. Joe Silver was someone who had worked in camps his

10  entire career as an orthopedist, is a physician, someone who

11  grew up in camps, loved camp, and he suggested that to us.  He

12  also told us that before we would do that that he would have to

13  check it out and get back to us.  And so --

14  Q.  And did he in fact get back to you?

15  A.  He got back to us and said that it would be our choice if

16  we wanted to do that, yes.  It would be OHEL's choice.

17  Q.  And you said that Dr. Joe Silver had relationships with or

18  involvement in camps.  Did he have any involvement with Camp

19  Kaylie?

20  A.  No.  Camp Kaylie was new.

21  Q.  What relationship, if any, did Dr. Joe Silver have with

22  OHEL?

23  A.  Dr. Silver was an orthopedist, a physician.  OHEL sends

24  children in various programs to community physicians over the

25  years.  It was not a significant relationship.

FBC5sil5                        Mandel - direct

```
 1   Q.  Did there come a time -- we can take that down,
 2   Mr. Coccaro.
 3          Did there come a time when OHEL held a Silver Day at
 4   the camp?
 5   A.  Yes.
 6   Q.  And when did OHEL hold a Silver Day?
 7   A.  During the time that camp was in session, it may have been
 8   either in July or August, I don't remember offhand which month,
 9   but it was one day in camp in which we invited the Silver
10   family to come and see the camp, spend time there, and it was
11   an opportunity to also take some photos and for the several
12   hundred kids in camp to acknowledge and to thank the Silver
13   family.  We have some beautiful pictures.
14   Q.  What was the purpose of holding Silver Day?
15   A.  To say thank you.  We -- to acknowledge and to say thank
16   you.
17   Q.  To Mr. Silver?
18   A.  To Mr. Silver and the extended Silver family, yes.
19   Q.  How many Silver days has the camp held?
20   A.  Either two or three.
21   Q.  Did there come a time when Sheldon Silver contacted you
22   about hiring someone named Jonathan Taub?
23   A.  Yes.
24   Q.  How did he first contact you?
25   A.  A phone call.
```

FBC5sil5                        Mandel - direct

1   Q.  And what did Sheldon Silver tell you on that phone call?

2   A.  That there is a young man that he would like to refer to me

3   and if OHEL has an opportunity for a job for him, that he would

4   appreciate it if we could take a look at it.

5   Q.  What, if anything, did he say about whether he would send

6   the resume of Jonathan Taub?

7   A.  I received a resume.

8   Q.  What did he say he knew about Jonathan Taub?

9   A.  I don't recall that he said much about Jonathan Taub.

10  Q.  Prior to your receiving that phone call when, if ever, had

11  Sheldon Silver asked you for assistance in finding a job at

12  OHEL for anybody else?

13  A.  I don't recall specifically that he did.

14  Q.  And after this request regarding Jonathan Taub how many

15  times, if any, had Sheldon Silver contacted you about finding a

16  job for anybody else with OHEL?

17  A.  He hasn't.

18  Q.  You can take a look at your binder, Government Exhibit

19  167-3.  Do you recognize this document?

20  A.  Yes.

21  Q.  What is this document?

22  A.  This is a letter from Mr. Silver to me.

23          MR. GOLDSTEIN:  Your Honor, the government offers

24  167-3.

25          MR. MOLO:  No objection.

FBC5sil5                          Mandel - direct

1                THE COURT:  167-3 is received.

2                (Government's Exhibit 167-3 received in evidence)

3     BY MR. GOLDSTEIN:

4     Q.  If we can publish that?

5                What is the letterhead that this document is on?

6     A.  The Assembly State of New York, Albany.

7     Q.  Mr. Coccaro, if you can zoom in on the text of the letter,

8     please?

9                Mr. Mandel, can you read the text of the letter?

10    A.  Dear David:  I would very much appreciate you reaching out

11    to Jonathan.  I think you would find him to be a real asset.

12    Please let me know how things progress.

13    Q.  Was this letter faxed to OHEL?

14    A.  I believe so.  Yes.  It says it was a fax.

15    Q.  And you testified that you received a resume.  Did you

16    receive that resume from the Speaker's office?

17    A.  Yes.  I believe so.  Yes.

18    Q.  If you can look in your binder at Government's Exhibits

19    384-1 through 384-3 and 384-5 through 384-11?

20    A.  Yes.

21    Q.  What are those documents?

22    A.  Those are internal e-mails at OHEL.

23    Q.  And what is the subject matter of those e-mails?

24    A.  Jonathan Taub.

25    Q.  Are those e-mails concerning the potential hiring of

FBC5sil5                         Mandel - direct

1   Jonathan Taub within OHEL?

2   A.  Yes.

3   Q.  Were the e-mails kept and maintained in the course of

4   OHEL's business?

5   A.  Yes.

6          MR. GOLDSTEIN:  Your Honor, the government offers

7   384-1 through 384-3 and 384-5 through 384-11.

8          MR. MOLO:  No objection.

9          THE COURT:  Okay.  They'll be received.  It is 384-1

10  through 11 excluding 384-4.

11         MR. GOLDSTEIN:  That's right, your Honor.  Thank you.

12         (Government's Exhibits 384-1, 384-2, 384-3, 384-5

13  384-6, 384-7, 384-8, 384-9, 384-10 and 384-11 received in

14  evidence)

15  BY MR. GOLDSTEIN:

16  Q.  So, Mr. Mandel, if you could turn to Government Exhibit

17  384-1 and, Mr. Coccaro, can you publish that, please?  If we

18  can zoom in on the cover page?

19         This is from -- who is this from?

20  A.  Faigie Turner, my secretary, to David Sharvit, who works in

21  OHEL's personnel office.

22  Q.  And it says the subject is Jonathan Taub resume, referred

23  by is Silver.  Do you know why your assistant was forwarding

24  this to David Sharvit?

25  A.  To -- when we get a resume I would normally forward to

FBC5sil5                           Mandel - direct

1    David Sharvit, in personnel, asking him to review it.

2                   (Continued next page)

FBCYSIL6                          Mandel - Direct

1   BY MR. GOLDSTEIN:

2   Q.  So what is David Sharvit's position at Ohel?

3   A.  He's the coordinator of personnel.

4            MR. GOLDSTEIN:  If we could turn to the second page of

5   the document.  If we could zoom in to the top of the resume so

6   we can see the handwriting.

7   BY MR. GOLDSTEIN:

8   Q.  Do you recognize that handwriting?

9   A.  Yes.  It's mine.

10  Q.  What does it say?

11  A.  "David, call me on this, please.  S. Silver.  David.

12  May 21, 2012."

13  Q.  Why did you write that on the top of Jonathan Taub's

14  resume?

15  A.  I'm sure I wanted to speak with David to see if he reviewed

16  the resume, if he contacted him, or if he was contacted by

17  Mr. Taub.  That would be normal for me.

18  Q.  Why did you note Sheldon Silver as a referral source?

19  A.  Because I don't always have such a good memory.  So I

20  always make a point of writing down who makes the referral.

21  It's a tickler system for myself to remind myself.

22  Q.  After you received this resume of Jonathan Taub and the

23  letter and the phone call that you just testified about from

24  Sheldon Silver, did there come a time when Sheldon Silver

25  reached out to you again concerning Jonathan Taub?

FBCYSIL6                        Mandel - Direct

1   A.  Yes.

2   Q.  How did he do that?

3   A.  A phone call.

4   Q.  What do you recall about that phone call?

5   A.  A brief conversation, just checking in on the status, any

6   opportunities that may have come up.

7           MR. GOLDSTEIN:  If we can turn to the next document,

8   384-2.  If we can zoom in on the bottom email.

9   BY MR. GOLDSTEIN:

10  Q.  Mr. Mandel, you just testified that in the phone call from

11  Sheldon Silver he was checking up on the status.

12          What was he checking up on the status of?

13  A.  If there was an opportunity for employment for Mr. Taub.

14  Q.  So what is the date of this email from yourself to David

15  Sharvit?

16  A.  June 20, 2012.

17  Q.  So about how much time had passed from when you got the

18  resume at first and this email?

19  A.  It looks like it's a month and two days, a little over a

20  month.

21  Q.  Can you read to the jury what you wrote in your email to

22  Mr. Sharvit.

23  A.  "David, please check on status of a follow-up with Jonathan

24  Taub, a resume forwarded via Speaker Silver.  Thank you."

25  Q.  Why did you include the subject "Important"?

1   A.  That's really just a style on my part.  I use that word a

2   lot to get people's attention.

3   Q.  Was it important to you to have David Sharvit consider

4   Jonathan Taub for employment?

5   A.  Yes.

6   Q.  Why was that?

7   A.  Speaker Silver is a friend of Ohel.  As I mentioned, we

8   feel friendships are very important, and I felt that it was

9   proper for me to respond in that way.

10  Q.  If you can look at the rest of the email chain.

11          On June 22, you write, "David, status, please."

12  A.  Yes.

13          MR. GOLDSTEIN:  And then if we could turn to

14  Government Exhibit 384-3.

15  BY MR. GOLDSTEIN:

16  Q.  If you look in the middle of this chain of emails, the one

17  from David Mandel.

18          That's now June 22.

19          "Are you in?  I called.  What type of job is he

20  looking for?"

21          Who is the "he" that you're referring to in this

22  email?

23  A.  Jonathan Taub.

24  Q.  Mr. Mandel, you're the CEO of Ohel; correct?

25  A.  Yes.

FBCYSIL6                    Mandel - Direct

1   Q.  What type of job was Ohel considering for Jonathan Taub?

2   A.  Some type of administrative position, entry level, in that

3   category.

4   Q.  How frequently, as the CEO of Ohel, did you get involved to

5   this level of detail if the hiring of an entry-level person for

6   the organization?

7   A.  It's not unusual for me to get involved in these type of

8   conversations with personnel staff when we have friends of the

9   organization or donors call me directly.  So I do get involved

10  when I get those phone calls.  I get a number of them.

11  Q.  When you say "friends and donors," what type of people are

12  you referring to?

13  A.  Members of the board of directors, community members,

14  neighbors, friends.  People call -- people like to call people

15  at the top to get attention.  It's a normal way of doing

16  things.

17          There have been a number of other situations that I

18  would check with Mr. Sharvit on positions at any level in the

19  organization.

20  Q.  As Jonathan Taub went through the process of being

21  considered by Ohel, how did that process work out?

22  A.  He was subsequently hired.

23  Q.  What position was he initially considered to be hired for?

24  A.  He was hired for -- he was hired to work in our volunteer

25  department.

FBCYSIL6                          Mandel - Direct

```
 1              MR. GOLDSTEIN:  If we could look at Government Exhibit
 2      384-6.  Let's look at the bottom email to begin with.
 3      BY MR. GOLDSTEIN:
 4      Q.  Again, that's from David Sharvit to you.
 5              What was David Sharvit's position?
 6      A.  David is head of personnel.
 7      Q.  Will you read for the jury what he's written to you.
 8      A.  Yes.  "Hi, David.  I spoke with Jesse Kenigsberg, and they
 9      are looking to hire someone internal for the position of
10      community HAB supervisor that Jonathan Taub interviewed for."
11      Q.  Who was Jesse Kenigsberg?
12      A.  He is one of the managers in the organization, the head of
13      one of the programs.
14      Q.  And then if you would look at the email above.  You wrote
15      that "Jesse should go ahead.  Please at least offer Jonathan a
16      counselor position which, understandably, he can choose to say
17      no to and, as you say, we keep him in mind.  What is the salary
18      of the supervisor job?"
19              Why did you want to at least offer Jonathan Taub a
20      counselor position?
21      A.  A counselor position is an entry-level position.  If there
22      wasn't a position available to him, our practice is to try as
23      much as possible for who people who want to work in the
24      information and at least offer him a job.
25      Q.  Again, what position was Jonathan Taub ultimately hired to
```

1   do?

2   A.  He was hired to work in our volunteer operation as an

3   assistant to the coordinator of volunteers.

4   Q.  How did you feel his qualifications were for that position?

5   A.  I'm sorry.  I don't follow the question.

6   Q.  What job was Mr. Taub offered?

7   A.  Working as an assistant to the head of volunteers.  He was

8   qualified for it, more than qualified for it.

9   Q.  What was the job as assistant to the volunteers?

10  A.  Outreach.  Ohel is a very active volunteer operation.  We

11  have many volunteers from many different communities.

12          His job would involve reaching out to people, making

13  sure that volunteers get processed and then working with our

14  volunteer coordinator to organize and ensure that matches were

15  made and the volunteer program was running smoothly.

16  Q.  What was the salary for that position?

17  A.  I believe it was just a little bit over $30,000, in that

18  range.

19  Q.  After Ohel hired Jonathan Taub, how did it initially work

20  out?

21  A.  It didn't work out so well.  It wasn't a job that he was

22  suited for, that matched.

23  Q.  So what did you do?

24  A.  We found him another position in the organization.

25  Q.  What was that other position?

FBCYSIL6                          Mandel - Direct

1  A.  Operations assistant.  He was working with -- operations

2  assistant.

3  Q.  What did an operations assistant do?

4  A.  Working with our director of operations.  The operations

5  position at Ohel involves -- Ohel is a large organization with

6  100 homes and apartments and properties that people with

7  disabilities live in.  We have a number of day programs.  We

8  have many vehicles.

9          The head of operations is in charge of ensuring that

10 the vehicles, the homes -- everything is maintained.  And

11 Jonathan was his administrative assistant -- that's a clerical

12 position -- helping to take care of things.

13 Q.  Doing mostly clerical work?

14 A.  It's a position called an administrative assistant.  So

15 clerical is a good portion of it, yes.

16 Q.  When he was transferred to this new position, was he on a

17 probationary status?

18 A.  Yes.  That's routine for us.  Yes.

19 Q.  After he was transferred, how did he initially do in his

20 new position?

21 A.  His initial evaluation had some difficulty.  He was good in

22 some areas, and he was not so good in some areas.

23 Q.  If you can turn in your binder to Government Exhibit 385.

24 Let's look at the 16th page of that document.

25          MR. GOLDSTEIN:  Are you able to pull that up on the

FBCYSIL6                          Mandel – Direct

 1    screen, Mr. Coccaro?

 2              THE COURT:  It's not in evidence yet.

 3              MR. GOLDSTEIN:  I don't mean on the big screen.  I

 4    just meant for Mr. Mandel.

 5              THE COURT:  It's on our screen.

 6              THE WITNESS:  I'm sorry?

 7              THE COURT:  It should be on your screen.

 8              THE WITNESS:  Yes.  I see it.

 9    BY MR. GOLDSTEIN:

10    Q.  Just looking at that document, does that refresh your

11    recollection as to what sort of review Mr. Taub received after

12    he had been transferred?

13    A.  Yes.

14    Q.  What kind of review did he receive?

15    A.  A mixed review.  In some areas he met the performance

16    standard, and in some areas, it was either inconsistent or

17    poor.

18    Q.  You can set that aside.

19              Why did you end up deciding to keep Jonathan Taub at

20    Ohel?

21    A.  We try very hard to give people an opportunity to work.

22    It's not part of our mission per se, but it's part of our

23    practice, especially if people may have difficulty in finding a

24    job.

25              We believe very strongly that if someone finally finds

FBCYSIL6                          Mandel - Direct

1   a job, that they may work.  If they leave this job, they may

2   not have other opportunities.  So we do this quite a bit with

3   individuals.

4   Q.  And what role did the fact that Sheldon Silver had referred

5   him to Ohel play in your analysis?

6   A.  I'm sure it was an important role, that it helped.

7   Q.  Does Jonathan Taub remain employed at Ohel today?

8   A.  Yes.

9   Q.  Did his performance improve after that performance

10  evaluation?

11  A.  Yes.  A subsequent evaluation showed that he improved.

12  Very nicely in fact.

13  Q.  During Ohel's long relationship with Sheldon Silver, which

14  goes back how many years?

15  A.  Twenty-five.

16  Q.  Was the only time that Sheldon Silver asked you to hire

17  someone -- was that for Jonathan Taub?

18  A.  I'm at Ohel 20 years, and I believe that may have been the

19  only time that I can recollect.

20  Q.  Prior to this case, what knowledge, if any, did you have of

21  Jonathan Taub's father, Dr. Robert Taub?

22  A.  I didn't know him.

23          MR. GOLDSTEIN:  Nothing further, your Honor.

24          THE COURT:  Mr. Molo.

25  CROSS-EXAMINATION

FBCYSIL6                          Mandel - Cross

1    BY MR. MOLO:

2    Q.   Good afternoon, Mr. Mandel.  I'm Steve Molo, and I

3    represent Mr. Silver.

4            Ohel -- the name Ohel -- tell the jury what it means.

5    A.   Ohel is a Hebrew word for tent.  It is after the patriarch

6    Abraham whose tent was open on all sides, all four sides.

7            Ohel, when it was founded in 1969, was intended to

8    provide shelter opportunities for people, for individuals,

9    especially those who really had nowhere else to go.

10   Q.   So you're an organization of second chances, if you will?

11   A.   We're an organization of second chances and often final

12   chances.

13   Q.   And I think you testified there are 1,500 employees?

14   A.   We have more than 1,500 employees, yes.

15   Q.   How many people do you service in a given year?

16   A.   Thousands.  We serve thousands of people every day.

17   Q.   And you provide the sorts of social services that

18   government can't provide any longer itself; right?

19   A.   We provide a lot of services that government supports, and

20   at the same time we do fundraising and receive grants for

21   services that government does not support.  Yes.

22   Q.   In some ways, you're the safety net for people.

23   A.   Yes.

24   Q.   The services that you do provide -- could you just explain

25   to the jury the kinds of things that you actually do.

1548

FBCYSIL6                          Mandel - Cross

1  A.  We provide housing for people with psychiatric -- people

2  with mental illness and developmental disabilities, retardation

3  and autism.  We provide day programs.

4          We train people with disabilities to work.  We provide

5  shelters for battered women and children.  We have summer camp

6  opportunities, and we serve many individuals at home that have

7  a child with a disability.  We will send in a staff member to

8  help a family with their child at home with disabilities.

9  Q.  And your annual budget is about $66,000,000?

10 A.  Yes.

11 Q.  And you receive funding from the federal government; right?

12 A.  Yes.

13 Q.  And you also receive funding from the City of New York?

14 A.  Yes.

15 Q.  Any counties or other cities?

16 A.  Nassau County, and we also have some programs in New Jersey

17 and Los Angeles, California.

18 Q.  And you also receive funding from the State of New York;

19 correct?

20 A.  Yes.

21 Q.  A lot of the money that you do run through your

22 organization as part of your budget comes from Medicare and

23 Medicaid; is that right?

24 A.  Yes.

25 Q.  So that's money where the government is actually paying you

1549

FBCYSIL6                         Mandel - Cross

1    for providing services; right?

2    A.   Yes.

3    Q.   That's not grant money.

4    A.   Yes.

5    Q.   And you also have broad base of private donors as I

6    understand it; right?

7    A.   Yes.

8    Q.   That could be individuals as well as foundations?

9    A.   Yes.  Individuals, foundations, corporations, yes.

10   Q.   To be clear, you understand Mr. Silver is the Speaker of

11   the Assembly; right?  The most senior person in the assembly.

12   A.   Yes.

13   Q.   He is the leader of the assembly.

14   A.   Right.

15   Q.   And they asked you questions, the prosecutors, about well,

16   Mr. Silver provides the most funding for Ohel.

17   A.   Right.

18   Q.   But for the time he's been doing that, he's been the most

19   senior person in the assembly; right?

20   A.   Yes.

21   Q.   To be absolutely clear, there are plenty of other people in

22   the assembly who have been friends of Ohel and have sponsored

23   grants for Ohel; is that right?

24   A.   Yes.

25   Q.   In fact, between 2003 and 2004, Assembly Person Cymbrowitz,

FBCYSIL6                        Mandel - Cross

1   Mayersohn, Weinstein and Silver all provided grants to you; is

2   that right?

3   A.  Yes.

4   Q.  Between 2004 and 2005, Assembly Persons Abbate, Boyland,

5   Brennan, Cohen, Colton, Cymbrowitz, Gordon, Green, Hikind,

6   Jacobs, Lentol, Lopez, Millman, Norman, Ortiz, Perry, Robinson,

7   Seddio, Towns, and Weinstein all supported you.

8           Is that right?

9   A.  Yes.

10  Q.  Between 2005 and 2006, Abbate, Boyland, Brennan, Cohen,

11  Colton, Gordon, Green, Hikind, Jacobs, Lentol, Lopez, Millman,

12  Norman, Ortiz, Perry, Robinson, Seddio, Towns, Weinstein, Jacob

13  Silver all provided grant money to you.

14          Is that right?

15  A.  Yes.

16  Q.  In 2006 and 2007, Abbate, Boyland, Brennan, Camara, Cohen,

17  Green, Gordon, Hikind, Jacobs, Lentol, Lopez, Maisel, Millman,

18  Ortiz, Perry, Robinson, Towns, Weinstein, Cymbrowitz I think I

19  mentioned, Goldfeder, Weprin and Speaker Silver all provided

20  funding.

21          Right?

22  A.  Yes.

23  Q.  In 2007 and 2008, Brennan, Camara, Clark, Cymbrowitz,

24  Gottfried, Hikind, Jacobs, Maisel, Mayersohn, Pheffer, Audrey

25  Pheffer, Silver, Weinstein all provided funding.

1              Is that right?

2    A.   Yes.

3    Q.   2008 and 2009, Brennan, Camara, Clark, Gottfried, Hikind,

4    Maisel, Mayersohn, Audrey Pheffer again, Silver, Weinstein,

5    Clark -- they all provided funding.

6              Correct?

7    A.   Yes.

8    Q.   And in the period 2009/2010, Brennan, Camara, Clark,

9    Cymbrowitz, Gottfried, Hikind, Jacobs, Maisel, Mayersohn,

10   Pheffer, Silver, Weinstein, Weprin, Cymbrowitz -- all provided

11   funding.

12             Is that right?

13   A.   Yes.

14   Q.   So you've done a pretty good job of building relationships

15   in the New York legislature; is that right?

16   A.   Yes.  Thank you.

17   Q.   It's been not just the assembly, but there have been

18   members of senate that have supported you too; correct?

19   A.   Yes.

20   Q.   It doesn't sound like Mr. Silver had to go out and engage

21   in some kind of mad rush to find people to support you.

22             MR. GOLDSTEIN:  Objection, your Honor.

23             THE COURT:  Sustained.

24             MR. MOLO:  In the legislature.

25   BY MR. MOLO:

FBCYSIL6                      Mandel - Cross

1    Q.  Now, Mr. Silver and his family you mentioned were honored

2    at Silver Day.  It sounds like quite an honor, frankly.

3              MR. GOLDSTEIN:  Objection.

4              THE COURT:  Sustained.

5              Please don't do that, Mr. Molo.

6              MR. MOLO:  Okay.

7    BY MR. MOLO:

8    Q.  The copresident of Ohel is a man named Mel Zachter; is that

9    right?

10   A.  Yes.

11   Q.  Did Mr. Zachter and Mr. Silver grow up together on the

12   Lower East Side?

13   A.  Yes.

14   Q.  And you knew Mr. Silver as well since your boyhood; right?

15   A.  I'm sorry?

16   Q.  You knew Mr. Silver since you were a young man as well?

17   A.  I knew of him.  As I mentioned, we played hockey together

18   for either one or two years a couple of years ago.

19   Q.  And his brother --

20             THE COURT:  As an adult or as children?  In terms of

21   chronological age.

22             THE WITNESS:  I was in my 20's.  A child.

23             THE COURT:  Okay.

24   BY MR. GOLDSTEIN:

25   Q.  Mr. Silver and your brother also had a friendship; is that

FBCYSIL6                        Mandel - Cross

 1  right?  They played sports together?  You have a brother that
 2  played sports with Mr. Silver?
 3  A.  I have a brother, Joseph.  Yes.
 4  Q.  Almost the same name as Mr. Silver's brother, his late
 5  brother.
 6  A.  Yes.
 7  Q.  And Mr. Silver -- do you also know he has a long
 8  relationship with Moishe Hellman?
 9  A.  Yes.
10  Q.  And he is the co-chair of Ohel's board?
11  A.  He is the copresident.
12  Q.  The copresident.  Okay.
13  A.  Yes.
14  Q.  And he regularly attends -- Mr. Silver regularly attends
15  Ohel dinners and golf outings.  Is that right?
16  A.  Yes.
17  Q.  I think he's regularly been invited to speak at a big
18  dinner that you have for about 1,200 people every year; is that
19  right?  In the fall.
20  A.  Yes.
21  Q.  In fact, you've invited him to speak at that same dinner in
22  a couple of weeks; right?
23  A.  Correct.
24  Q.  He was honored, I think, at that dinner seven years ago.
25  A.  Yes.

FBCYSIL6                        Mandel - Cross

1   Q.  Mr. Silver and his family have donated personal funds to

2   Ohel too, haven't they?

3   A.  Yes.

4   Q.  In fact, between Mr. Silver himself and his late brother,

5   Dr. Joseph Silver, and Mr. Silver's son -- I think they've

6   donated somewhere in the neighborhood of $40,000 or so of their

7   own money; right?

8   A.  Correct.  Yes.

9   Q.  So not just has Mr. Silver given money and raised money in

10  the assembly, he's attracted other public officials, not even

11  from the state government, to be engaged with Ohel.

12          Isn't that true?

13  A.  Yes.

14  Q.  For example, Mayor Mike Bloomberg -- when he was the mayor,

15  Mr. Silver helped get him involved; right?

16  A.  Yes.

17  Q.  And I think he helped get the governor, Cuomo, to come to

18  your dinners once or twice?

19  A.  Yes.  Several years ago.  Yes.

20  Q.  And maybe Joseph Lieberman.  Is that possible?

21  A.  I don't recall Senator Lieberman.

22  Q.  It's been said that Mr. Silver is sort of a celebrity

23  spokesman for Ohel.

24          Is that a fair statement?

25          MR. GOLDSTEIN:  Objection.

FBCYSIL6                          Mandel — Cross

1            THE COURT:  Overruled.

2            THE WITNESS:  Yes.  I'm sorry.

3            MR. MOLO:  That's all right.

4    BY MR. MOLO:

5    Q.  Now, I think you testified you often receive job requests

6    from various sources.  Is that right?

7    A.  Yes.

8    Q.  It could be board members.  Is that right?

9    A.  Yes.

10   Q.  Or community leaders?

11   A.  Yes.

12   Q.  Or friends.

13   A.  Yes.

14   Q.  Or neighbors.

15   A.  Yes.

16   Q.  To the best you possibly can, you try to accommodate

17   requests; right?

18   A.  Yes.

19   Q.  If at all possible, if you can give somebody a job, you'll

20   give them a job.

21   A.  We explain to people that in situations like this, that

22   we'll be happy to give them an interview.  If we have a

23   position available and they're qualified, all things being

24   equal, we're very happy to provide opportunities.

25   Q.  Ohel relies on goodwill and relationships for its growth,

FBCYSIL6                          Mandel - Cross

1    doesn't it?

2    A.   Yes.  Very much so.

3    Q.   For its operation as it is, even without growing it's

4    important; right?

5    A.   Yes.

6    Q.   If the referral comes from somebody who is a particularly

7    strong friend of the organization, you would give them

8    sometimes what is referred to as a plus-factor check or

9    something?

10   A.   That would be normal.

11   Q.   And there are a lot of people that would merit the

12   plus-factor check; right?

13   A.   Yes.

14   Q.   So when Mr. Silver asked if Ohel would give Jonathan Taub

15   an interview, there was nothing extraordinary about that;

16   right?

17   A.   No.

18   Q.   I think he was identified as the son of a friend.

19   A.   Yes.

20   Q.   You have no reason to doubt that Mr. Silver and Jonathan

21   Taub's father were good friends.

22           MR. GOLDSTEIN:  Objection.

23           THE COURT:  Overruled.

24   BY MR. MOLO:

25   Q.   You have no reason to doubt that; right?

FBCYSIL6                        Mandel - Cross

1    A.  I took it at face value.  I didn't know Mr. Taub.

2    Q.  As I understand it, when Mr. Silver called you, you said

3    Jonathan should send his resume so he could see if -- so you

4    could see if there might be an appropriate vacancy; right?

5    A.  Yes.

6    Q.  And you were happy to help if possible.

7            I want to actually show you a little bit more of a

8    complete picture of what we went through --

9            THE COURT:  Don't do that, Mr. Molo.  Ask questions.

10   BY MR. MOLO:

11   Q.  I want to show you a document that's marked Defendant's

12   Exhibit 7.  I'll ask you to take a look at it without saying

13   anything about it.

14           THE COURT:  Just for the record, it's Exhibit 70.

15           MR. MOLO:  7-0.

16   BY MR. MOLO:

17   Q.  Did you get a chance just to look through it?

18   A.  Yes.

19   Q.  Do you recognize this as an Ohel record?  A business

20   record.

21   A.  Yes.

22   Q.  Is this something that Ohel makes and keeps in the ordinary

23   course of Ohel's business?

24   A.  Yes.

25           MR. MOLO:  Your Honor, I move for admission of

1    Defendant's Exhibit 70.

2              THE COURT:  Any objection?

3              MR. GOLDSTEIN:  No, your Honor.

4              THE COURT:  Defense 70 is received.

5              (Defendant's Exhibit 70 received in evidence)

6    BY MR. MOLO:

7    Q.  This is actually the employment file for Jonathan Taub,

8    isn't it?

9    A.  Yes.

10   Q.  Now, do you know whether that resume was actually sent to

11   you by Mr. Silver?  Or could it have been sent by somebody that

12   works for him with the note?

13   A.  I don't know.

14   Q.  You were shown the resume of Jonathan Taub.  It's the

15   second-to-the-last red tab.  I just put these red tabs on pages

16   that I'm going to ask you questions to make it easier for

17   everyone.

18              Do you see the resume there?

19   A.  Yes.

20   Q.  You were asked about the note, and you think you said you

21   wrote "S. Silver" as a tickler for yourself to know where the

22   resume came from.

23   A.  Right.

24   Q.  I want to focus actually on the substance of the resume.

25   A.  Okay.

FBCYSIL6                          Mandel - Cross

1   Q.  First let's look at young Mr. Taub's education.  He

2   actually holds a bachelor's from the University of

3   Pennsylvania; is that right?

4            THE COURT:  That's what the resume says.  I don't

5   think he's independently verified where the man went to

6   college.

7   BY MR. MOLO:

8   Q.  The resume shows him having attended the University of

9   Pennsylvania?  Is that right?

10  A.  Yes.

11  Q.  And where does the resume indicate he went to graduate

12  school?

13  A.  Columbia University.

14  Q.  And he received a master's in special education?

15  A.  Yes.

16  Q.  Is that, by the way, particularly relevant to the work of

17  Ohel?

18  A.  Yes.  It can be.

19  Q.  If we look at the job history going up there, the first --

20  I guess the lowest one would be the oldest.

21           It says senior staff day habitation program.  Hebrew

22  Academy for Special Children, Brooklyn, New York.

23           Do you know that organization?

24  A.  Yes.

25  Q.  What is it?

FBCYSIL6                          Mandel - Cross

1    A.  It's an organization that provides service to children and

2    adults with developmental disabilities -- day programs,

3    housing, various programs.

4    Q.  Is that experience relevant to the work of Ohel?

5    A.  I'm sorry?

6    Q.  Would that be experience relevant to the work of Ohel?

7    A.  Yes.

8    Q.  Above that there is a listing for coordinator Philadelphia

9    Chapter, National Jewish Council for the Disabled, Yachad,

10   New York.

11             Do you know that organization?

12   A.  Yes.

13   Q.  What is that?

14   A.  They provided services, social, recreational programs for

15   children, adolescents with disabilities.

16   Q.  And I take it that's relevant to the work of Ohel?

17   A.  Yes.

18   Q.  And above that there's a listing for supervisor work

19   readiness program, the Hebrew Academy for Special Children.

20             Do you know that organization?

21   A.  Yes.  The same organization as the earlier one.

22   Q.  I take it that experience too would be relevant.

23   A.  Yes.

24   Q.  And above that, there are listings for job work that was

25   done in retail; correct?

FBCYSIL6                          Mandel - Cross

1   A.  Yes.

2   Q.  So for the period I guess it looks like 2003 through 2008,

3   he explored something different.  Correct?

4   A.  Yes.

5   Q.  Now, after you got the resume and he was interviewed, Ohel

6   actually calls references, don't they?

7   A.  Yes.

8   Q.  If you look at the last tabbed page there and you see

9   appraisal of applicant form for Jonathan Taub.

10  A.  Yes.

11  Q.  It says name of employer.  Matt Okin, Black Box Studios,

12  and artistic director.  And there's a comment there.  Thinks

13  "He would be amazing.  One of the most trustworthy people.  If

14  you need him, he is there."

15          Right?

16  A.  Yes.

17  Q.  The reason he left was the company changed.

18          If you go to the next page, it's another appraisal of

19  applicant form, this one from Bill Kaufman of Necessary

20  Objects.  This was the retail company that he worked for.

21          MR. GOLDSTEIN:  Objection.

22          THE COURT:  Is that a question?  Or are you

23  testifying?

24          MR. MOLO:  I withdraw that statement that that was the

25  retail company that he worked for.

1562

FBCYSIL6                         Mandel - Cross

1   BY MR. MOLO:

2   Q.  Do you see under comments, does it state, "Very smart.

3   Nice.  Beautiful heart.  Reliable.  Good with computers.  Grab

4   him" three explanation points; right?

5   A.  Yes.

6   Q.  Would Ohel consider these to be positive references?

7   A.  Typically, yes.

8   Q.  It says, reason applicant left employment on that Kaufman

9   referral -- if we can just make that larger.

10          It says -- doesn't it say "Wasn't employer's choice.

11  Wanted to go back to school.  He doesn't exactly remember."

12  A.  Yes.

13  Q.  Now, you mentioned, Mr. Mandel, after David got the job, he

14  had some job reviews.

15          If you go to the tab that's sort of in the middle of

16  the page.  I think you mentioned that the first one might have

17  been kind of mixed.  If you go to the first page of that where

18  it's tabbed.  It says December 21, 2012.  So he'd been there a

19  few months I guess.

20          At that point, he's an outreach worker; correct?

21  A.  Yes.

22  Q.  When you go through these questions though --

23          MR. MOLO:  Actually, can we scroll down.  Why don't we

24  just zoom in on the first one if you would.

25  BY MR. MOLO:

FBCYSIL6                        Mandel - Cross

1    Q.  Does the employee use time in a productive manner to

2    complete the job?  He meets those requirements.  Does the

3    employee communicate information to supervisors and other

4    staff?  He exceeds.  Employee shows willingness to cooperate.

5    He exceeds.  Does the employee act appropriately in stressful

6    situations.  Meets.

7              MR. GOLDSTEIN:  Is there a question, your Honor?

8              THE COURT:  I don't know.

9              Is there a question, or are you just reading?

10   BY MR. MOLO:

11   Q.  Is that what that says?

12   A.  Yes.

13             MR. MOLO:  Can we go up a little further and look at

14   the other boxes there.

15   BY MR. MOLO:

16   Q.  So, looking at those, number one says, doesn't it say, is

17   the employee punctual for his or her work schedule?  It says

18   inconsistent.

19   A.  Yes.

20   Q.  Other than that, his evaluations all either meet or exceed

21   the job requirements for that.

22             Is that right?

23   A.  Yes.

24   Q.  And I think the next page lists a number of other tasks.

25             MR. MOLO:  If we can get them a little larger, please.

FBCYSIL6                          Mandel - Cross

 1   BY MR. MOLO:

 2   Q.  Those all meet --

 3              MR. MOLO:  Can we go up a little bit more.

 4   BY MR. MOLO:

 5   Q.  Meet or exceed expectations; is that right?

 6   A.  Yes.

 7   Q.  So it notes at the end, I believe, under improvements or

 8   objectives, on that last page, it says that he was transferred

 9   to another department.

10   A.  Yes.

11   Q.  The next evaluation he gets is on April 22 of 2013.

12              MR. GOLDSTEIN:  Objection, your Honor.  That's not

13   what the records show.

14              MR. MOLO:  I'm sorry?

15              MR. GOLDSTEIN:  Can we have a sidebar?

16              THE COURT:  Sure.

17              (At the sidebar)

18              MR. GOLDSTEIN:  He didn't put in the whole personnel

19   form.

20              THE COURT:  This isn't the entire file?

21              MR. GOLDSTEIN:  I think it's all in there, but he says

22   the next evaluation was in April.  In the same time period of

23   the one he just showed is one that has a very negative

24   evaluation.  The next one was not the one that's in April.

25              THE COURT:  Which is what date?

FBCYSIL6                         Mandel - Cross

1        MR. GOLDSTEIN:  It is -- are you going to show him
2   this one?
3        THE COURT:  What's the SS number?
4        MR. GOLDSTEIN:  054187.
5        THE COURT:  It appears to be dated April 23, 2013.
6        MR. GOLDSTEIN:  Is this the one that you were going to
7   show him?
8        THE COURT:  He was going to show him this one.
9        MR. MOLO:  I think that's the one I just went through.
10  Now I'm going to show him this one, which is negative.
11       THE COURT:  That's an evaluation?
12       MR. MOLO:  That's got a different form.
13       THE COURT:  That's the one you're about to show?
14       MR. MOLO:  Yes.  I'm showing the evaluation picture.
15  And then there's one more evaluation.
16       THE COURT:  My beef is you testify.  Just stop it.
17       MR. MOLO:  Okay.
18       THE COURT:  You know how to ask questions.  Just ask
19  questions without giving a speech, which includes facts that
20  typically are not in evidence.
21       MR. MOLO:  Okay.
22       MS. COHEN:  Your Honor, while we're here on that, you
23  have told Mr. Molo that numerous times.
24       THE COURT:  Do you want me to spank him?  I don't know
25  if that's what you want me to do.

1          MR. MOLO:  Judge.

2          MS. COHEN:  It's potentially not a laughing matter

3    because you tell him over and over again.

4          THE COURT:  What do you want me to do?

5          MS. COHEN:  Of course he's doing it intentionally.  He

6    knows how to ask a proper question.

7          (In open court)

8    BY MR. MOLO:

9    Q.  If we could go to that second tab from the front.

10   Actually, it's tabbed to a page that's got sort of a narrative.

11   I'd like you to go forward and actually look at the boxes, the

12   page with the boxes.  It's SS054187.

13         MR. GOLDSTEIN:  Could we put that up, please.

14         THE COURT:  Just the two pages?

15         MR. MOLO:  Just a few pages ahead of where the tab is.

16   BY MR. MOLO:

17   Q.  At this point, it says administrative services.

18         What does that mean?

19   A.  Administrative services is the part of the organization

20   that deals with the maintenance of the home and the buildings

21   and the vehicles, amongst other responsibilities.

22   Q.  The job performance here is not as good as what we just

23   saw; correct?

24   A.  Correct.

25   Q.  There are a number of inconsistent marks; is that right?

FBCYSIL6                          Mandel - Cross

1   A.  Yes.

2   Q.  And, in fact, it's true on the next page there are some

3   meets and some inconsistent.

4         Correct?

5   A.  Yes.

6   Q.  But what follows that is actually a narrative eval which

7   explains some of this.

8         MR. MOLO:  Can we just highlight the first sentence

9   just so it's clear what it is.

10  BY MR. MOLO:

11  Q.  Doesn't it say that "Jonathan joined the administrative

12  services department on December 24, 2012, in a transfer from

13  the volunteer services department, supervised by Jennifer

14  Greunfeld.  As a result, I had the opportunity to interact with

15  him.  Over the past 3 1/2 months, I was Jonathan's direct

16  supervisor"?

17  A.  Yes.

18  Q.  And then the comments -- he's intelligent, but he's hasty

19  to complete -- doesn't it say that he's hasty to complete the

20  tasks and finish the mission and in the process does not always

21  properly analyze and recognize the desired outcome, present it

22  neatly, and communicate his boss what transpired?

23        In the next paragraph, doesn't it say that "I do not

24  always know if there's followthrough; right?

25  A.  Yes.

1    Q.  Further on, there's an additional criticism on the bottom

2    of that page.  Doesn't it say that his impatience to spend time

3    figuring out the correct distribution and perhaps difficulty in

4    accepting more training when it was first given?

5    A.  Yes.

6    Q.  It's continued on the second page.  The very last

7    paragraph -- doesn't it state that, in those two paragraphs,

8    the one in the top -- doesn't it state, "It is difficult to

9    determine whether Jonathan is capable and willing to correct

10   the deficiencies that would improve his performance as an

11   operations assistant"?

12        The last sentence, doesn't it state that, "At this

13   time, I cannot recommend advancing Jonathan from probationary

14   to regular employment status"?

15        Correct?

16   A.  Yes.

17   Q.  That's not a very good performance review.  Would you

18   agree?

19   A.  Correct.

20   Q.  But he remained on probationary status; correct?

21   A.  Yes.

22   Q.  And he was reviewed again in November of 2013; is that

23   right?

24   A.  Yes.

25   Q.  And when we go to -- there's a tab, but if you go two pages

FBCYSIL6                          Mandel - Cross

1    forward, you'll see the checked boxes again, SS 054178.

2    A.  Yes.

3    Q.  Looking at the boxes --

4                MR. MOLO:  If we can make them a little larger so

5    they're easier to see, please, Justin.

6    BY MR. MOLO:

7    Q.  It notes that he is now meeting the requirements.

8                MR. MOLO:  Please show them all.

9                THE WITNESS:  Yes.

10   BY MR. MOLO:

11   Q.  The next page, I believe, has some.  There's also a

12   narrative that's attached to this.

13               Correct?  Which I believe is on the following page.

14               Can you go to the very first sentence again.

15               Doesn't it say, "Jonathan was last reviewed on

16   April 22, 2013, at which time his probation was extended for

17   the reasons outlined in the prior evaluation narrative"?

18   A.  Yes.

19   Q.  And then it goes on though, doesn't it, in the next

20   paragraph to state that, "Immediately following his evaluation

21   in April, Jonathan demonstrated good effort at improving his

22   performance in the areas discussed.  Improvement has been seen

23   over the last several months"?

24               Doesn't it say that?

25   A.  Yes.

FBCYSIL6                         Mandel - Cross

1   Q.  It also goes on in the next paragraph to say that after

2   Esther Mandelbaum retired, Jonathan initiated absorbing some of

3   her fleet-related duties.

4           Doesn't it say that?

5   A.  Yes.

6   Q.  It notes, doesn't it, that he's more active in helping to

7   manage things; correct?

8   A.  Yes.

9   Q.  And that he's proactive; correct?

10  A.  Yes.

11          THE COURT:  He's proactive in distributing mail and

12  packages.

13          MR. MOLO:  Correct.  Proactive in distributing the

14  mail and the packages.

15  BY MR. MOLO:

16  Q.  Which is part of his responsibilities that he had in his

17  job; correct?

18  A.  Yes.

19  Q.  At that point in time, Jonathan, the very last sentence,

20  doesn't it state that, "At this time, I'm recommending that

21  Jonathan's status be changed from probationary to regular

22  full-time employee"?

23  A.  Yes.

24  Q.  And, in fact, that happened; right?

25  A.  Yes.

1  Q.  This was November 14, 2013, almost just two years ago.

2            He's still there; right?

3  A.  Yes.

4  Q.  So you gave him an additional chance, and he redeemed

5  himself?

6  A.  Yes.

7  Q.  Today you consider Jonathan Taub a solid employee of Ohel;

8  right?

9  A.  Yes.  A good employee.

10            THE COURT:  Yes what?

11            THE WITNESS:  A good employee.

12  BY MR. MOLO:

13  Q.  I take it Mr. Silver wasn't calling you regularly to follow

14  up on how's Jonathan doing, did he?

15  A.  No.

16  Q.  Mr. Silver didn't call you after Jonathan had his first

17  performance review coming up and say, make sure you take care

18  of Jonathan Taub, did he?

19  A.  No.

20  Q.  He didn't call you at the time of the second job

21  performance evaluation and say, why did this guy get such a bad

22  evaluation; right?

23  A.  No.

24  Q.  He didn't call you after the third one and say, can't you

25  get Jonathan off probation, did he?

FBCYSIL6                         Mandel - Cross

1    A.  No.

2    Q.  In fact, he did what a friend of the organization would do

3    and sent the resume and saw if he could maybe get a job and

4    maybe help other people; right?

5            MR. GOLDSTEIN:  Objection.

6            THE COURT:  Sustained.  Rephrase the question.

7    BY MR. MOLO:

8    Q.  What Mr. Silver did was give you the resume of somebody who

9    might be able to go out and help your organization help other

10   people; correct?

11           MR. GOLDSTEIN:  Objection.

12           THE COURT:  Overruled.

13           THE WITNESS:  Yes.

14   BY MR. MOLO:

15   Q.  Mr. Mandel, when you were asked questions about the camp

16   and the naming opportunity, it was first suggested that the

17   camp -- excuse me.  Not the camp but the campus I guess.

18   A.  The campus.

19   Q.  The campus might be named after Mr. Silver; is that right?

20   A.  Yes.

21   Q.  And he declined that; correct?

22   A.  Yes.

23   Q.  And then, when it was suggested that it be named after his

24   brother, he said, let me check it out first before committing;

25   correct?

1  A.  Yes.

2  Q.  His brother, by the way, is deceased.  And he was a doctor

3  himself; right?

4  A.  Yes.

5          MR. MOLO:  One moment, your Honor.

6          (Pause)

7          MR. MOLO:  I have nothing further, Judge.

8          THE COURT:  Okay.

9          Any redirect?

10  REDIRECT EXAMINATION

11  BY MR. GOLDSTEIN:

12  Q.  Mr. Mandel --

13  A.  Yes.

14  Q.  -- you were asked a few questions on cross-examination

15  about the communications that you received from Sheldon Silver

16  to you about hiring Jonathan Taub.

17          Do you remember those questions?

18  A.  Sure.  Yes.

19  Q.  What knowledge did you have, if any, about the relationship

20  between Sheldon Silver and Dr. Robert Taub, Jonathan Taub's

21  father?

22  A.  I didn't have any knowledge.

23          MR. GOLDSTEIN:  Nothing further.

24          THE COURT:  Okay, Mr. Mandel.  Thank you.  You can

25  step down.

FBCYSIL6                    Mandel - Redirect

```
 1              THE WITNESS:  Can you.

 2              (Witness excused)

 3              THE COURT:  Can I see the parties at sidebar.

 4              (At the sidebar)

 5              THE COURT:  Who is your next witness?

 6              MS. COHEN:  Brian Meara, your Honor.

 7              THE COURT:  Is he going to be a long witness?

 8              MS. COHEN:  Yes.

 9              THE COURT:  I'm going to stop for the day.  I don't

10     see any reason to put him at the end of the day.

11              MR. COHEN:  Before we go tomorrow, can we know the

12     lineup.

13              MS. COHEN:  Brian Meara, Richard Runes.  Then I don't

14     know.  Now we have to juggle again.  The possibilities are -- I

15     can email you later tonight.

16              MR. COHEN:  I go to bed at 7:45 p.m.

17              MS. COHEN:  It might be PCAB witness which is Darby

18     Putnam.  It might be Lisa Reid and Michael Whyland.  We have to

19     talk to them.

20              MR. COHEN:  You'll be able to tell us tonight?

21              MS. COHEN:  If it isn't before 8:30, it's because we

22     have to reach them, not because I'm trying to hide it.

23              THE COURT:  Okay.  Be nice.

24              (In open court)

25              THE COURT:  Okay.  We're going to stop a little early
```

FBCYSIL6                        Mandel - Redirect

```
 1    tonight.  Don't discuss the case.  Don't read any press

 2    accounts about the case.  Don't listen to any news accounts

 3    about the case.

 4              I will see you tomorrow at 9:15.  Remember that

 5    tomorrow will be a short day.  We'll probably be stopping at

 6    about 3:00.  Have a good evening.

 7              (Jury not present)

 8              THE COURT:  So we talked about who your witnesses

 9    tomorrow are.  So after Friday -- you really think you only

10    have maybe 1, 1 1/2 more days of testimony?

11              MS. COHEN:  Your Honor, we probably have three full

12    days.  It might end earlier on Tuesday than we think.  I think

13    three full days is an accurate estimate.

14              THE COURT:  So that could actually take us into

15    Wednesday if it's three full days because tomorrow is going to

16    be not a half a day but not a full day.

17              MS. COHEN:  True, but I doubt it.  I think we need to

18    be prepared for us to finish our direct case at the end of the

19    day on Tuesday.

20              THE COURT:  So the defense needs to be prepared.  If

21    there's going to be a defense case, you need to be ready to

22    roll into it on Wednesday morning.

23              MS. COHEN:  Can we get some notification ahead of

24    time?

25              THE COURT:  I think probably not.  I think they're
```

FBCYSIL6                         Mandel - Redirect

1    probably going to pop up on Wednesday morning with who their

2    witnesses are.

3             MS. COHEN:  There is one issue, your Honor.  They have

4    notified us about expert witness.  We haven't gotten a proper

5    expert disclosure.  So, if they do intend to call an expert

6    witness, we are entitled to that information.

7             THE COURT:  We got some information on that before,

8    and it was so sketchy that there wasn't much I could do at that

9    point.  If there is more information -- all of you folks can

10   stand up if you'd like.

11            If there's more information on your expert, provide it

12   so that we can have a full discussion of whether this person is

13   testifying or not.

14            Mr. Cohen, you're standing up.  Do you have something

15   to say?

16            MR. COHEN:  So is Mr. Shur.

17            THE COURT:  He seems to be standing up by accident.

18            MR. COHEN:  I don't have that much to say.  Perhaps we

19   can be a little more informative tomorrow.  What would be

20   helpful, since the government is talking about resting maybe

21   Tuesday or Wednesday -- we were originally given a list of say

22   36 witnesses.

23            I think we've gone through roughly 16.  The government

24   is talking about another five.  If we could know who is off the

25   witness list, who is not going to be called, that's going to

FBCYSIL6                          Mandel - Redirect

1    make this a lot easier.

2              In any event, I would expect the government to tell

3    your Honor and tell us who they're calling Monday, Tuesday, and

4    Wednesday.

5              THE COURT:  If you know that there are people you've

6    knocked off the witness list and you're not going to call them,

7    please tell the defense so that they can focus their attention

8    on more relevant factors.

9              MS. COHEN:  We will, your Honor.

10             THE COURT:  Anything further?

11             MS. COHEN:  Not from the government.

12             THE COURT:  Anything further from the defense?

13             MR. MOLO:  No, your Honor.

14             THE COURT:  See you in the morning.

15             (Adjourned to November 13, 2015, at 9:15 a.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2    Examination of:                            Page

 3    MARTIN SCHOENFELD

 4    Direct By Ms. Cohen  . . . . . . . . . . .1318

 5    Cross By Mr. Cohen . . . . . . . . . . . .1334

 6    Redirect By Ms. Cohen  . . . . . . . . . .1345

 7    MICHAEL HOENIG

 8    Direct By Mr. Goldstein  . . . . . . . . .1345

 9    Cross By Mr. Shur  . . . . . . . . . . . .1403

10    Redirect By Mr. Goldstein  . . . . . . . .1421

11    DARA IRYAMI

12    Direct By Mr. Goldstein  . . . . . . . . .1421

13    Cross By Mr. Molo  . . . . . . . . . . . .1481

14    Redirect By Mr. Goldstein  . . . . . . . .1518

15    Recross By Mr. Molo  . . . . . . . . . . .1523

16    DAVID MANDEL

17    Direct By Mr. Goldstein  . . . . . . . . .1527

18    Cross By Mr. Molo  . . . . . . . . . . . .1547

19                     GOVERNMENT EXHIBITS

20    Exhibit No.                            Received

21     440  . . . . . . . . . . . . . . . . . .1325

22     752  . . . . . . . . . . . . . . . . . .1351

23     754  . . . . . . . . . . . . . . . . . .1353
       755-07  . . . . . . . . . . . . . . . . .1359
24     757-1, 757-2, 757-3  . . . . . . . . . .1363
       767, 768, 769  . . . . . . . . . . . . .1363
25     770, 772, and 773  . . . . . . . . . . .1363
       828  . . . . . . . . . . . . . . . . . .1368
```

750 and 750A  . . . . . . . . . . . . . . . .1376

786    . . . . . . . . . . . . . . . . . . . .1384

646-3  . . . . . . . . . . . . . . . . . . . .1387

785    . . . . . . . . . . . . . . . . . . . .1393

692    . . . . . . . . . . . . . . . . . . . .1398

700    . . . . . . . . . . . . . . . . . . . .1400

642-2  . . . . . . . . . . . . . . . . . . . .1432

649    . . . . . . . . . . . . . . . . . . . .1436

662    . . . . . . . . . . . . . . . . . . . .1443

692    . . . . . . . . . . . . . . . . . . . .1453

700    . . . . . . . . . . . . . . . . . . . .1457

701    . . . . . . . . . . . . . . . . . . . .1460

737    . . . . . . . . . . . . . . . . . . . .1463

646-01 to -34 and 650-01 through 650-13  . .1466

730    . . . . . . . . . . . . . . . . . . . .1477

731    . . . . . . . . . . . . . . . . . . . .1479

585    . . . . . . . . . . . . . . . . . . . .1531

167-3  . . . . . . . . . . . . . . . . . . . .1535

384-1, 384-2, 384-3, 384-5 384-6, . . . . . .1536

        384-7, 384-8, 384-9, 384-10

        and 384-11

DEFENDANT EXHIBITS

Exhibit No.                          Received

117  . . . . . . . . . . . . . . . . . . . .1342
119  . . . . . . . . . . . . . . . . . . . .1506
70   . . . . . . . . . . . . . . . . . . . .1558