FBDYSIL1                      Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                        S1 15 Cr. 93 VEC

5   SHELDON SILVER,

6                    Defendant.

7   ------------------------------x
                                        November 13, 2015
8                                       9:30 a.m.

9

10  Before:

11                    HON. VALERIE E. CAPRONI,

12                                        District Judge
                                           and a jury

13

14                         APPEARANCES

15  PREET BHARARA,
         United States Attorney for the
16       Southern District of New York
    CARRIE HEATHER COHEN,
17  HOWARD SETH MASTER,
    ANDREW DANIEL GOLDSTEIN,
18  JAMES M. McDONALD,
         Assistant United States Attorneys

19

20  STROOCK & STROOCK & LAVAN, LLP
         Attorneys for defendant Silver
21  BY:  JOEL COHEN, Esq.
         – and –
22  MOLOLAMKEN, LLP
    BY:  STEVEN FRANCIS MOLO, Esq.
23       ROBERT KELSEY KRY, Esq.
         JUSTIN VAUN SHUR, Esq.
24       JUSTIN M. ELLIS, Esq.
         TUONGVY LE, Esq.
25                         Of counsel

FBDYSIL1                        Trial

1                    (Trial resumed)

2                    (Jury not present)

3                    THE COURT:  Anything before we bring out the jury?

4                    MR. GOLDSTEIN:  Mr. Molo is missing.  We'll try to

5        find him.

6                    MR. MOLO:  Sorry, Judge.  I was across the hall.

7                    THE COURT:  Okay.  Just to give everybody a sense of

8        the schedule today, because we're working a short day, the

9        juror's lunch will be at noon.

10                    So we'll break for lunch at noon.  We'll have a

11        morning break at about 10:30 to break up the morning, and then

12        go through the afternoon without a break.

13                    MS. COHEN:  That's fine, your Honor.

14                    THE COURT:  Do you have a witness?

15                    MS. COHEN:  Yes.

16                    (Jury present)

17                    THE COURT:  Good morning, everybody.

18                    Ms. Cohen, call your next witness.

19                    MS. COHEN:  Your Honor, the government calls Brian

20        Meara.

21                    THE COURT:  Go ahead.

22                    MR. MASTER:  Thank you, your Honor.

23         BRIAN MEARA,

24             called as a witness by the Government,

25             having been duly sworn, testified as follows:

FBDYSIL1                    Meara - Direct

```
 1   DIRECT EXAMINATION

 2   BY MR. MASTER:

 3   Q.  Good morning, Mr. Meara.

 4   A.  Good morning.

 5   Q.  What do you do for a living, sir?

 6   A.  I'm a lobbyist.

 7   Q.  What does it mean to be a lobbyist?

 8   A.  It means you work on behalf of certain clients and try and

 9   achieve things they want to achieve and stop things that they

10   don't want achieved.

11   Q.  And what, if any, governmental body do you specialize in

12   lobbying?

13   A.  State legislature.

14   Q.  For how long have you been a lobbyist?

15   A.  Forty years.

16   Q.  For how long have you known Sheldon Silver, the defendant?

17   A.  Forty-two years.

18   Q.  How would you describe the nature of the relationship that

19   developed over time between yourself and the defendant?

20   A.  A friendship.

21   Q.  Have you been to social events with him?

22   A.  Yes.

23   Q.  Have you been to sporting events with him?

24   A.  Yes.

25   Q.  Have you met members of his family?
```

1    A.  Yes.

2    Q.  Has he met members of your family?

3    A.  Yes.

4    Q.  Would you talk to each other on the phone at times?

5    A.  Occasionally.

6    Q.  Now, based on those discussions, what, if anything, did he

7    tell you about his practice at Weitz & Luxenberg?

8    A.  That he practiced negligence and malpractice, medical

9    malpractice.

10   Q.  What kind of cases did he say he got at Weitz & Luxenberg?

11   A.  Accidents and medical malpractice.

12   Q.  What other cases did he say he brought to the firm?

13   A.  I don't remember any others.

14   Q.  When, if ever, did he tell you he was bringing asbestos

15   cases to the firm?

16   A.  Never.

17   Q.  Other than what you might have heard as a result of the

18   investigation, what have you ever heard about an individual

19   named Dr. Robert Taub?

20   A.  Nothing other than what I've heard through the

21   investigation.

22   Q.  When, if ever, has Sheldon Silver introduced you to

23   Dr. Taub?

24   A.  Never to my recollection.

25   Q.  When, if ever, did you hear Sheldon Silver describe

1     Dr. Taub as a friend of his?

2     A.   Never, as far as I can remember.

3     Q.   Is one of your clients the Fire Officers Association?

4     A.   Yes.

5     Q.   Are they a lobbying client of yours?

6     A.   Yes.

7     Q.   Were they affected by September 11-related health issues?

8     A.   Yes.

9     Q.   When, if ever, did Sheldon Silver tell you he had sponsored

10    September 11-related health research?

11    A.   He never told me.  I don't know if he did.  Health

12    research?  No.  Never.  Only that he had worked on legislative

13    programs in downtown Manhattan to help the people who lived

14    there.

15    Q.   But, with respect to health-related research, what, if

16    anything, did he tell you?

17    A.   Nothing.

18    Q.   Did you ever lobby him on behalf of those fire officers?

19    A.   No -- yes.  Yes.

20    Q.   Did he ever raise the topic of asbestos-related disease or

21    mesothelioma with you?

22    A.   No.

23    Q.   Mr. Meara, did you sign any agreement before you testified

24    here today?

25    A.   Yes.

FBDYSIL1                    Meara - Direct

1   Q.  I'd like you to take a look in your binder as what's been

2   marked for identification -- there's a little sticky.  It's

3   marked as 3512-08.

4   A.  Yes.

5   Q.  Do you recognize that document?

6   A.  Yes.

7   Q.  What is your understanding of that document?

8   A.  My understanding of the document is that I'm described as a

9   fact witness, and I agree to testify on what I know about the

10  issues involved in this case.

11          In return, I would get a no-prosecution agreement for

12  anything I have done or might have done in connection with this

13  case.

14  Q.  Is your understanding that the agreement obligates you to

15  testify truthfully?

16  A.  Absolutely.  That was said to me more than once.

17  Q.  Now, in addition to the Fire Officers Association, is a

18  firm called Glenwood Management another one of your lobbying

19  clients?

20  A.  Yes.

21  Q.  For how long has Glenwood been your client?

22  A.  I think 20 years.  I can't remember exactly.

23  Q.  Who, if anyone, at Glenwood Management recommended you to

24  Glenwood?

25  A.  I believe Richard Runes.

FBDYSIL1                        Meara - Direct

1    Q.  What role does Richard Runes play at Glenwood?

2    A.  He's of counsel to Glenwood.

3    Q.  What, if any, role does he play with respect to lobbyists

4    at Glenwood?

5    A.  He coordinates all the lobbyists and instructs them on

6    things that they care about and are interested in.

7    Q.  Are you one of the lobbyists whose activities he

8    coordinates?

9    A.  Yes.

10   Q.  You've already indicated that there's more than one

11   lobbyist.

12           Do you know approximately how many other lobbyists

13   Glenwood employs?

14   A.  I would guess about eight or nine.  I don't know that for a

15   fact, but I'm guessing.

16   Q.  Are the Fire Officers Association and Glenwood your only

17   lobbying clients?

18   A.  No.

19   Q.  About how many lobbying clients do you have?

20   A.  About 40.

21   Q.  Now, are there certain disclosures that you and Glenwood

22   have to file publicly concerning your representation of

23   Glenwood as a lobbyist?

24   A.  Yes.

25   Q.  Among other things, do you have to disclose the amount

FBDYSIL1                          Meara - Direct

1   you're paid to represent Glenwood?

2   A.  Yes.

3   Q.  I'd like you to take a look at what's in your binder as

4   Government Exhibit 843.

5   A.  Yes.

6   Q.  Do you recognize that document?

7   A.  Yes.

8   Q.  Are those the retainers that you have to file publicly or

9   that are filed publicly concerning your representation of

10  Glenwood?

11  A.  Yes.

12         MR. MASTER:  The government offers Government Exhibit

13  843.

14         MR. MOLO:  No objection.

15         THE COURT:  843 is received.

16         (Government's Exhibit 843 received in evidence)

17  BY MR. MASTER:

18  Q.  So, again, Mr. Meara, where are these documents filed?

19  A.  These were filed with the Lobbying Commission.  Now it's

20  filed with the Joint Commission on Public Ethics.

21  Q.  Are those different state agencies?

22  A.  They were successor agencies.

23  Q.  So this information is available to the public, that is,

24  the fact of your retention --

25  A.  Yes.

1  Q.  -- and the amount you're paid?

2  A.  Yes.

3          MR. MASTER:  Just so we can see an example,

4  Mr. Coccaro, can you just zoom in on what this first one is.

5  BY MR. MASTER:

6  Q.  First of all, it's entitled Brian R. Meara Public

7  Relations, Inc.

8          Is that one of the entities through which you lobby?

9  A.  Yes.

10 Q.  Is there another entity through which you lobby as well?

11 A.  Yes.

12 Q.  What's the name of that entity?

13 A.  Meara, Avella and Dickinson.

14 Q.  Are you currently employed as a lobbyist through both of

15 those entities?

16 A.  I'm the sole owner and sole employee of Brian Meara Public

17 Relations.  I'm a partner in the firm of Meara, Avella and

18 Dickinson.

19         THE COURT:  Mr. Meara, can I ask you to keep your

20 voice up.

21         THE WITNESS:  Sure.

22         THE COURT:  Thank you.

23 BY MR. MASTER:

24 Q.  Just so we can see the first page as an example, it's dated

25 December 4, 2008.

FBDYSIL1                    Meara - Direct

1          To whom is this letter addressed?

2   A.  Mr. Leonard Litwin.

3   Q.  Who is Mr. Leonard Litwin?

4   A.  He's the owner of Glenwood Management.

5   Q.  And it states that this is an agreement whereby your

6   company is agreeing to represent Glenwood.

7          How much were you paid per month during this

8   particular retention period?

9   A.  $5,000 a month.

10  Q.  Did the amounts that you were paid per month to represent

11  Glenwood subsequently change?

12  A.  Yes.

13  Q.  To what amount?

14  A.  $10,000 a month.

15  Q.  Has your representation of Glenwood been continuous since

16  that 20-year-ago period when you were first recommended by

17  Richard Runes?

18  A.  Yes.

19  Q.  To your knowledge, what kind of business does Glenwood

20  Management have?

21  A.  They are major developers of luxury real estate in

22  New York City, rental real estate.

23  Q.  How many buildings does Glenwood have?

24  A.  I think around 20.

25  Q.  Do you know how they're held?  That is, those particular

1    buildings.

2    A.   Each building is held by a limited liability company.

3    Q.   Are you aware of any differences in management or control

4    between Glenwood and its LLCs?

5    A.   No.

6    Q.   Where are the buildings located?

7    A.   I think they're all in Manhattan.  I'm not positive about

8    that, but the vast majority are.  I think they all are.

9    Q.   Now, does Glenwood Management have any business before the

10   state?

11   A.   Yes.

12   Q.   What are the issues that Glenwood cares about when it's

13   appearing before the state?  At least with respect to your

14   lobbying activities.

15   A.   Well, the primary activities that I've been involved in are

16   certain technical amendments to rent stabilization statutes and

17   a tax abatement issue called 421a.

18   Q.   Let's go through each one of those.

19        When you say "technical amendments" to something

20   called rent stabilization, again, what is your general

21   understanding of what it is that Glenwood cares about?

22   A.   There's a system by which a rent-stabilized apartment can

23   be destabilized and go into market rate rental.  Obviously,

24   it's in their interest to make it as easy as possible for them

25   to decontrol apartments and charge market rate.

FBDYSIL1                          Meara - Direct

1          It's in the interest of the tenant movement to make

2     it, to the extent that they can, permanent that once an

3     apartment is stabilized, it stays stabilized.

4     Q.  Again, is rent stabilization a program that is created by

5     the state?

6     A.  Yes.

7     Q.  So, therefore, is it the case that your lobbying

8     activities, with respect to this program, are directed at the

9     state legislature?

10    A.  Yes.  There's another facet of it called a Rent Guidelines

11    Board that's controlled by the city that I don't have anything

12    to do with.

13    Q.  Is it your understanding that that Rent Guidelines Board

14    just sets the year-by-year increase for stabilized units?

15    A.  That's correct.

16    Q.  Now, you were just describing a program called Rent

17    Stabilization and Decontrol.

18          You mentioned another program called 421a.

19    A.  Correct.

20    Q.  So what is 421a?

21    A.  421a is a tax abatement that originally arose many years

22    ago when there was very little construction going on in the

23    city, and there was a tax abatement given to people who would

24    develop buildings in the city.

25          There were several changes later on when it became

1    apparent that the real estate development community in

2    Manhattan and in certain parts of Brooklyn no longer required

3    that kind of tax abatement.

4          But it was negotiated -- and I don't know when it was

5    negotiated -- that they would form a certain kind of a tax

6    abatement for buildings in those areas whereby if the developer

7    would agree to keep 20 percent of the construction for

8    affordable apartments, they could have 80 percent of it at

9    market rate.

10          THE COURT:  So they could keep the tax abatement?

11          THE WITNESS:  Keep the tax abatement only if they did

12    that in certain areas of the city.

13    BY MR. MASTER:

14    Q.  Has Glenwood over the years taken advantage of that

15    particular program?

16    A.  Yes.

17    Q.  Is that also known as the 80/20 program?

18    A.  Correct.

19    Q.  Where did that program get created?

20    A.  In the state legislature.

21    Q.  With respect to new developments by Glenwood, how important

22    is it for Glenwood to have a continued existence of the 421a

23    tax abatement program?

24    A.  For new developments, very important.

25    Q.  Why is that?

1  A.  Because the tax abatement is such that they can make money

2  with their 80 percent market rate and provide affordable

3  housing for people who need it.  It's probably the largest

4  affordable housing program in the city.

5  Q.  In addition to -- so the 20 percent are affordable, and

6  then the 80 percent they're able to charge market?

7  A.  Market rate.  Correct.

8  Q.  If that program is in place, then they can get the tax

9  abatement?

10  A.  They have to agree to put that in place, and then they get

11  the tax abatement.

12  Q.  Now, are these rent stabilization programs with respect to

13  vacancy and decontrol and 421a -- are they permanent programs?

14  A.  No.

15  Q.  What happens to them periodically?

16  A.  They, along with strict rent control, would all expire at

17  once if they were not extended from time to time.

18  Q.  And so is that also called a sunset provision?

19  A.  Yes.

20  Q.  How common is it for laws to sunset in New York State

21  government?

22  A.  Extremely common.

23  Q.  What effect does that have on your job as a lobbyist?

24  A.  It means that when you pass a piece of legislation and it

25  has a sunset provision, you assume that you'll be retained

1   again to get it extended or not.  You hope you are, but ...

2   Q.  How important is it to maintain good relationships with the

3   people who are involved in passing programs so that when it

4   comes up for renewal, you're able to --

5   A.  I'd say it's important, but it's also important to

6   demonstrate to them that the policy is working because if the

7   policy is not working successfully, they're not going to want

8   to extend it.

9   Q.  Based on your understanding, in addition to it being

10  significant to have a continuing 421a program, how significant

11  is it to Glenwood's business to have this favorable decontrol

12  rule?

13  A.  I don't think they would consider it necessarily favorable,

14  but it's important that it be preserved to some extent, and

15  gets adjusted from time to time.

16  Q.  How controversial is legislation concerning these programs

17  when they come up for renewal?

18  A.  Very.

19  Q.  So what are you engaged by Glenwood to lobby on primarily?

20  A.  Those two issues.  Let me just add.  There are hundreds of

21  pieces of legislation filed every year that have to do with

22  housing.  The assembly passes many of them.  The senate passes

23  very few, if any, of them.  The major focus becomes those two

24  issues.

25  Q.  Just describe for the members of the jury, based on your

FBDYSIL1                    Meara - Direct

1    lengthy experience as a lobbyist, how those controversial real

2    estate related issues are typically negotiated.

3    A.  Well, the leadership of all three units of government --

4    the speaker, the majority leader, and the governor -- have

5    certain negotiations and discussions on it.

6           And they come to attentive agreement, which they then

7    have to go back to their respective conferences -- democratic

8    assembly conference, republican senate conference -- and make

9    sure that the members of their conference are comfortable with

10   it.

11          And then, if they are -- if they're not, they have to

12   go back and renegotiate it.  If they are satisfied, then they

13   have to pass the majority of both houses.

14   Q.  So who's agreement is necessary for a deal to be struck?

15   A.  The majority of the members of the assembly and the

16   majority of the members of the senate and the governor.

17   Q.  So does Glenwood attempt to lobby all three branches of

18   government?

19   A.  Yes.

20   Q.  Historically, is there anyone in particular who you have

21   been asked to lobby on these matters?

22   A.  The assembly.

23   Q.  When Sheldon Silver was Speaker of the Assembly, was there

24   anyone in particular who you would lobby?

25   A.  Well, he and the chair of the housing committee.

1   Q.  When you say "he," meaning Sheldon Silver?

2   A.  Yes.

3   Q.  When you would lobby Sheldon Silver on behalf of Glenwood,

4   would you typically lobby by yourself or with anyone?

5   A.  I would rarely lobby him by myself because I didn't feel I

6   was technically capable of describing a lot of the different

7   ins and outs of some of the legislation, especially vacancy

8   decontrol or luxury vacancy decontrol.  So I would typically

9   bring somebody from Glenwood with me.

10  Q.  Typically, who would you bring with you?

11  A.  Richard Runes.  Maybe sometimes Charles Dorego, but I can't

12  specifically recall that.

13  Q.  Why would you do that?

14  A.  Because they knew more about it than I did.  And, if there

15  were any questions, they would be able to answer certain

16  questions that I wouldn't be able to.

17  Q.  Now, before we go forward, do you know anyone named Jay

18  Arthur Goldberg?

19  A.  Yes.

20  Q.  How did you get to know him?

21  A.  He was Mr. Silver's counsel when Mr. Silver first came to

22  Albany.

23  Q.  Did there come a time when Jay Arthur Goldberg contacted

24  you in connection with your role at Glenwood?

25  A.  Yes.

1   Q.  What, if anything, did he ask you?

2   A.  He said to me, I understand you represent -- I don't know

3   if he said Litwin or Glenwood.  He said, do you know who does

4   their tax certiorari work?

5           And I said, no I, I don't.

6           He said, you know I'm a tax certiorari lawyer.

7           I said, yes.  I know you are.

8           So he said, do you think you could get me some of

9   those your buildings?

10          So I said, I don't know.  I have no idea.  I'll ask.

11          So I called Richard Runes, and I said, I have a

12  request from Jay Goldberg -- I don't know if Runes knew him at

13  the time.

14          But I said, he's a childhood friend of Sheldon

15  Silver's, and he's a tax certiorari lawyer.  I've known him for

16  a long time.  I don't know how good a tax certiorari lawyer he

17  is or isn't, but he would like to know if you would be

18  interested in giving him some of the buildings to do the tax

19  certiorari work.

20          And he said, have him call me.

21  Q.  Now, I'd like to direct your attention to 2011.

22          What, if any, legislation important to Glenwood was

23  due to sunset that year?

24  A.  All the housing legislation, including rent stabilization,

25  vacancy decontrol, and 421a.

FBDYSIL1                        Meara - Direct

1  Q.  What, if any, role did you play in lobbying Sheldon Silver

2  with respect to that legislation?

3  A.  I arranged a meeting with myself and Richard Runes with

4  Mr. Silver because Mr. Runes had a proposal that he thought he

5  could make to Mr. Silver which would ameliorate some of the

6  opposition of some of the tenant groups on luxury vacancy

7  decontrol by changing some of the qualifications and,

8  therefore, making it more desirable to the tenant groups, maybe

9  less desirable to some real estate developers, but they were

10 willing to give up some of their advantages in order to make it

11 more palatable for the assembly democrats.

12 Q.  Again, what program was it that Glenwood wished to -- well,

13 you stated there was a program called 421a.

14      Was that also --

15 A.  Yes.

16 Q.  -- something that Glenwood wanted to preserve as part of

17 the negotiations?

18 A.  Yes.  As I recall, that was not a very controversial part

19 of -- it was almost becoming an accepted part of the extender.

20 It wasn't as controversial as I recall.

21      Some of us may recall it being more controversial.  It

22 got more controversial this year, but at that point, I don't

23 think it was very controversial.  But vacancy decontrol was.

24 Q.  What, if anything, did he ask you to do to assist?

25 A.  Who?

FBDYSIL1                          Meara – Direct

 1              THE COURT:  Who is "he"?

 2              MR. MASTER:  I'm sorry.  Richard Runes.

 3   BY MR. MASTER:

 4   Q.  What did Richard Runes ask you to do to assist with this

 5   lobbying activity?

 6   A.  To set up the meeting.

 7   Q.  Who do you recall contacting to set up the meeting?

 8   A.  I assume I called Judy Rapfogel from Mr. Silver's office or

 9   his secretary and asked for a meeting, but I would assume it

10   would have been Judy Rapfogel because I rarely asked for

11   meetings with Mr. Silver with another person if it wasn't just

12   me without checking with her.

13   Q.  Now, I'd like you to take a look at what's just been marked

14   for identification as 103-8.

15   A.  I've got it.

16   Q.  Having reviewed that, does this refresh your recollection

17   as to what the date was of your meeting with Richard Runes and

18   Sheldon Silver?

19   A.  Well, it says it was June 6 at 4:30.  I assume that's the

20   only meeting I had with Richard Runes and Sheldon Silver that

21   year, and that was around the time when the rent laws were

22   being discussed or an extension of the rent laws I guess

23   technically.

24              MR. MASTER:  Your Honor, the government offers

25   Government Exhibit 103-8.

1          MR. MOLO:  No objection.

2          THE COURT:  103-8 is received.

3          (Government's Exhibit 103-8 received in evidence)

4          MR. MASTER:  If you wouldn't mind just turning to page

5    2.

6    BY MR. MASTER:

7    Q.  It states Room 349 Cap.

8          Where was your meeting with Sheldon Silver?

9    A.  I think that's his office in the capital.

10   Q.  Now, did you have any prior meetings with Sheldon Silver

11   about this issue during that year?

12   A.  I don't believe so.

13   Q.  At the meeting, do you recall Mr. Runes actually making a

14   proposal to Sheldon Silver?

15   A.  Yes.

16   Q.  Was the proposal oral or written?

17   A.  I believe it was oral.

18   Q.  Typically would Sheldon Silver want proposals in writing?

19   A.  He didn't really care to have them.

20   Q.  How good was his memory in your experience?

21   A.  Extremely good.

22   Q.  Now, do you remember the exact dollar figures that were

23   proposed in that negotiation?

24   A.  No, I don't.

25   Q.  Do you remember Sheldon Silver's response to the proposal?

1   A.   I believe his -- he didn't say yes, and he didn't say no.

2   He probably said, I understand, or I hear you or something like

3   that.   That would be typical.

4          You didn't really know, when you left the meeting,

5   whether he agreed or disagreed.   He didn't say that.   I guess

6   that's the only way I could describe it.

7   Q.   Now, do you recall how the ultimate legislation compared to

8   Mr. Runes' proposal?

9   A.   I believe it went a little further than he -- I believe.   I

10  can't reconstruct it exactly.   But I believe it went even a

11  little further for tenant protection than we had offered.

12  Q.   But was it relatively close to --

13  A.   I believe it was.   I can't remember exactly.

14  Q.   Was 421a extended?

15  A.   Yes.

16  Q.   How satisfied was Glenwood with the ultimate legislative

17  package that was adopted?

18  A.   They were satisfied.

19  Q.   Do you recall any other in-person meetings or discussions

20  with Sheldon Silver about this issue?

21  A.   No.   I don't recall any.   I'm not swearing that there

22  weren't any, but I don't recall any.

23  Q.   For how long were those programs renewed in 2011?

24  A.   Four years.

25  Q.   So did you anticipate having to lobby again on those same

1602

1    issues in the future?

2    A.  I hoped I would.

3    Q.  Now I'd like to direct your attention to December of 2011.

4         Did there come a time when you were asked to help

5    address the potential signing of a drug treatment center near a

6    Glenwood building?

7    A.  Yes.

8    Q.  Where was the building located?

9    A.  Maiden Lane.

10   Q.  Was that in Sheldon Silver's assembly district?

11   A.  Yes.

12   Q.  Who did you speak to about it?

13   A.  Well, I believe I first called Liz Berger from the Downtown

14   Alliance, which was opposing the program, and had a discussion

15   with her just to get background and get an update on where they

16   had gone and what they had done before I would make a phone

17   call.

18        Then I called Judy Rapfogel, who was already well

19   aware of the program and informed me that they were opposing

20   it.

21   Q.  Did you indicate to her that Glenwood was also concerned

22   about it and opposing it?

23   A.  Yes, but they had already made a decision -- I mean, I

24   don't want to describe her state of mind, but she basically

25   said, we've already made a decision.  It doesn't matter.  We're

1    opposing it.

2    Q.  After you had that conversation with Judy Rapfogel, did

3    there come a time when you learned that the drug treatment

4    center had actually not gone forward?

5    A.  Yes.

6    Q.  What, if anything, were you asked to do for the speaker's

7    office after that drug treatment center was stopped?

8    A.  Well, I wanted the residents of the various buildings, I

9    assume, who lived in the area, to be aware of how helpful he

10   had been.

11          I'm not sure if it was Judy Rapfogel, but somebody

12   from the office, from the speaker's office, called me and said,

13   could you have your tenants notified of Shelly Silver's active

14   participation in stopping the drug treatment program.

15   Q.  I'd like you to take a look at what's in your binder at

16   Government Exhibit 788.

17          Do you recognize that document?

18   A.  Hold on.

19   Q.  Sure.

20   A.  Yes.

21   Q.  What is the document?

22   A.  The document is a draft of a letter praising Mr. Silver for

23   his help in stopping the drug treatment center.

24   Q.  Is that the letter that you were asked to forward to

25   Glenwood?

1    A.  Yes.

2            MR. MASTER:  The government offers Government Exhibit

3    788.

4            MR. MOLO:  No objection.

5            THE COURT:  788 is received.

6            (Government's Exhibit 788 received in evidence)

7    BY MR. MASTER:

8    Q.  What's the date of that letter?

9    A.  December 20, 2011.

10   Q.  I'm sorry.  Just so the record is clear, is it December 21,

11   2011?

12   A.  Yes.

13   Q.  The email is forwarding something from Pat Ryan.

14   A.  Yes.

15   Q.  Who is Pat Ryan?

16   A.  She's my secretary.

17   Q.  The subject is from Brian.  If you wouldn't mind going to

18   the second page.

19   A.  Yes.

20   Q.  There's some handwriting there.

21   A.  Yes.

22   Q.  Whose handwriting is that?

23   A.  Mine.

24   Q.  What is 10 Liberty?  If you know.

25   A.  I assume that's the Glenwood building.  I don't really

1    know, but I'm just guessing.

2    Q.  But, with respect to this letter, is it your understanding

3    that you were being asked by the speaker's office to forward

4    that letter, this letter that's on page 2, to the tenants?

5    A.  Yes.

6    Q.  Again, what's the date of that document?

7    A.  788-1 are you talking about?

8    Q.  788.

9    A.  There's no date on my page.

10   Q.  We'll just look at it on the screen.  It's December 21,

11   2011?

12   A.  Okay.  Yes.

13   Q.  At this time what, if anything, did you know about any

14   financial relationship that Sheldon Silver had with Glenwood?

15   A.  Nothing.

16   Q.  Again, for how long had you been lobbying Sheldon Silver on

17   behalf of Glenwood?

18   A.  Since he became speaker in 1994 I would guess.

19   Q.  Again, you described that you were friends with Sheldon

20   Silver, and you had many conversations with him during that

21   period of time since he became speaker.

22   A.  Many.

23   Q.  I'd like to direct your attention to a few days after that

24   letter that we just saw was sent.

25              Where did you go around Christmastime in December of

FBDYSIL1                        Meara - Direct

1    2011?

2    A.  Florida.

3    Q.  What, if any, phone did you have with you?

4    A.  I had a cell phone.

5    Q.  What was the number that you used at that time?

6    A.  917-273-1764.

7    Q.  Now, what is the phone number that you would typically use,

8    cell phone number that you would typically use, to speak to

9    Sheldon Silver over the course of your relationship?

10   A.  917-603-5187.

11   Q.  Did there come a time, while you were in Florida, when you

12   received a call from Sheldon Silver on the cell phone that you

13   used at the time?

14   A.  Yes.

15   Q.  Now I'd like you to take a look in your binder at what's

16   been marked for identification as Government Exhibit 2308-1-A.

17   It's just a subset of a document that is the subject of a

18   stipulation.

19          MR. MASTER:  So I just ask that it be admitted subject

20   to connection.

21          THE WITNESS:  Sure.

22          THE COURT:  The witness' ruling will stand.

23          (Government's Exhibit 2308-1-A received in evidence)

24   BY MR. MASTER:

25   Q.  Now that it's been admitted, could you please go to where

 1    it says page 12 of 32.

 2    A.  Got it.

 3    Q.  Do you see a call from a phone number 646-438-0067 in those

 4    records?

 5    A.  Yes, I do.

 6    Q.  What is the time of that call?

 7    A.  11:01.

 8    Q.  Again, where were you at the time?

 9    A.  Florida.

10    Q.  Do you recognize that number?

11    A.  No.

12    Q.  You can set that aside.

13         So what did Sheldon Silver say to you on that call,

14    and what did you say to him?

15         MR. MOLO:  Objection.  I don't think there was a

16    foundation.

17    BY MR. MASTER:

18    Q.  Did there come a time when you were in Florida when you

19    received a call from Sheldon Silver?

20    A.  Yes.

21         THE COURT:  In that call?

22         MR. MASTER:  That particular very call that we've been

23    talking about.  Yes.

24         THE WITNESS:  The call from that number?

25    BY MR. MASTER:

1    Q.   No.  Just set that aside.

2    A.   Yes.

3    Q.   Just focus on the conversation that you remember having

     with Sheldon Silver while you were in Florida.

5    A.   Okay.

6    Q.   What did he say to you, and what did you say to him

7    concerning Glenwood?

8    A.   He told me that there were certain disclosure records, the

9    process of which for filing had been changed.  And he had to

10   file a new kind of disclosure form indicating that he had

11   received certain fees from certain people.

12   Q.   What are the certain fees and certain people that he was

13   referring to?

14   A.   He didn't refer to the certain fees and the certain people.

15   What he said was, do you represent Glenwood Management or its

16   LLCs or subsidiaries?  I'm not sure of the term he used.

17         I said, no.  I only represent Glenwood.  I don't

18   represent its LLCs.

19         To which he replied, well, that's not a problem then

20   because I'm only getting fees from the LLCs.

21   Q.   When, if ever before that moment, had you heard that

22   Sheldon Silver was receiving any fees from Glenwood or its

23   LLCs?

24   A.   Never.

25   Q.   What was your reaction --

FBDYSIL1                         Meara - Direct

1        Before I do that, let me ask you:  Was there anything

2   else that Sheldon Silver stated during that call?

3   A.  Not that I recall.

4   Q.  What was your reaction to the call?

5   A.  I was surprised and concerned.

6   Q.  What were you concerned about?

7   A.  I was primarily concerned about the fact that politically

8   in his district I didn't know how popular it would be if it

9   became disclosed that he was representing a large real estate

10  company.

11       I also thought it would be politically a problem for

12  him in his conference in Albany.

13  Q.  What, if anything else, were you concerned about?

14  A.  I didn't understand what the distinction was, and I was

15  hopeful that it wasn't an issue, a legal issue.

16       THE COURT:  I'm sorry.  You didn't understand the

17  distinction between what and what?

18       THE WITNESS:  Between Glenwood and its LLCs.

19  BY MR. MASTER:

20  Q.  Again, is your understanding it's the same people who

21  manage both Glenwood and its LLCs?

22  A.  Yes.

23  Q.  And you stated that it might be a concern for his

24  conference as well.

25       Why were you concerned it would be a concern -- why

FBDYSIL1                        Meara - Direct

1   were you concerned that it would be an issue for his

2   conference?

3   A.  Because his conference is overwhelmingly pro tenant and

4   anti-landlord.

5   Q.  So, after you received that call and experienced those

6   concerns about the political and the possible legal

7   implications, who, if anyone, did you contact?

8   A.  Either Charles Dorego or Richard Runes.  I'm not positive

9   which one.

10  Q.  Were you still in Florida at the time you contacted them?

11  A.  Yes.

12  Q.  Did you convey the information you had just received to

13  them?

14  A.  Yes.

15  Q.  Without saying what words they used, what was their

16  reaction when you told them?

17          MR. MOLO:  Objection, your Honor.

18          THE COURT:  Sustained.

19  BY MR. MASTER:

20  Q.  What was their demeanor when you told them?

21          MR. MOLO:  Objection.

22          THE COURT:  Sustained.

23  BY MR. MASTER:

24  Q.  When you spoke to them, what, if anything, did they say

25  about their prior knowledge of this issue?

1          MR. MOLO:  Objection.

2          THE COURT:  Can the lawyers come up.

3          (At the sidebar)

4          THE COURT:  Walk me through the hearsay problem.  What

5    are you trying to prove?

6          MR. MASTER:  State of mind.  Surprise.  Concern.

7          THE COURT:  And their state of mind is relevant why?

8    So we're talking about Dorego's and Runes' state of mind?

9          MR. MASTER:  Right.  Because then that set in motion a

10   chain of events.

11         THE COURT:  Of other evidence and other testimony?

12         MR. MASTER:  Yes.

13         THE COURT:  What's your objection?

14         MR. MOLO:  This was the subject of our motion in

15   limine, Judge.  It's hearsay.  It's irrelevant.  Their state of

16   mind in that sense is irrelevant.

17         If there are other acts that happened after this,

18   which there are, there are witnesses that can testify about

19   that.  This conversation is hearsay.

20         THE COURT:  Well, I don't think it's hearsay if it's

21   coming in solely for purposes of establishing their state of

22   mind.

23         MR. MOLO:  How is their state of mind relevant here?

24         THE COURT:  It's relevant -- I'm assuming that they

25   also were shocked.

FBDYSIL1                         Meara - Direct

1          MR. MASTER:  Yes.

2          THE COURT:  And were concerned, etc.

3          MR. MASTER:  Yes.

4          THE COURT:  So, therefore, that would tend to show

5     that Silver also had not told them that he was getting fees

6     from Glenwood which was lobbying him without disclosure of the

7     fact that he had a financial interest in them.

8          I suppose that's why it's relevant.

9          MR. SHUR:  If I may, Judge, I just don't know if this

10    is going to bleed into the proffered testimony about them being

11    scared or fearful of cutting off the relationship because of

12    retaliation because that is also the subject of our motion, and

13    that's intertwined with the whole Skelos piece.

14         Because we received Jencks, since we filed our motion,

15    that clearly indicates that the folks at Glenwood were fearful

16    of Skelos, and there are tape recordings I understand in that

17    case that sort of address that.

18         I think it's virtually impossible to sort of unpack

19    that and distinguish their feelings with respect to Mr. Silver

20    versus Mr. Skelos.

21         MR. MOLO:  At a point in time.

22         THE COURT:  But this question is just -- it seems to

23    me that the questions I sustained the objections to I should

24    not have.  So I'm going to let you ask them which is what was

25    their reaction, without going into what they said.

1          I'm happy, if you want, to give the jury a limiting

2    instruction that says they can consider this testimony solely

3    for purposes of the state of mind of Runes and Dorego.

4          MR. MASTER:  Yes.

5          THE COURT:  To the extent that becomes relevant in

6    their consideration.

7          MR. MOLO:  The only problem is, in terms of what their

8    reaction was, they're on the phone.  So it's not like he can

9    say he made a face.  It's a phone call.  I don't know how you

10   can describe someone's reaction on the phone without going into

11   the words that they say.

12         THE COURT:  Then he can go into the words that they

13   said.  I think, when I am talking to someone and I tell them

14   something and there's a long silence or they say, oh, my God or

15   oh, that's a problem, I would say that I could interpret that

16   to say they were surprised and unhappy.

17         Surprised.  Is that going to be the answer?

18         MR. MASTER:  Surprised and concerned.

19         MR. MOLO:  Surprised and concerned.  Okay.  I will

20   take your limiting instruction, yes.

21         THE COURT:  Okay.

22         MS. COHEN:  I think the limiting instruction also has

23   to tie to Glenwood just so it makes sense to the jury.

24         THE COURT:  I think they know who the witnesses are.

25   They've heard about them repeatedly.

1            MS. COHEN:  Okay.

2            MR. SHUR:  Runes is going to testify.

3            MR. MOLO:  Runes is going to testify, and Dorego is on

4    their witness list.

5            THE COURT:  But they're not limited to one witness

6    saying something.  I know that you would like that.

7            MR. MOLO:  Obviously, we accept the fact the Court is

8    giving an early instruction.  We're not withdrawing the

9    objection.

10           THE COURT:  I understand that.

11           MS. COHEN:  Just to be clear, we also want to elicit

12   what Runes and what Dorego said to him when he called him as

13   state of mind for the same reason.

14           THE COURT:  What Runes and Dorego said to whom?

15           MS. COHEN:  To Mr. Meara.

16           THE COURT:  So what's that going to be?

17           MR. MASTER:  It's just simply words conveying the fact

18   that they didn't know; that they were surprised.

19           THE COURT:  That's the same thing.  So the instruction

20   will be --

21           MR. MOLO:  Surprised and concerned.

22           THE COURT:  Surprised and concerned.  They said they

23   did not know.  So I will charge them that they cannot consider

24   that as proof that Dorego and Runes didn't know but only for

25   purposes of conveying what they were thinking at the time.

FBDYSIL1                          Meara - Direct

 1              MR. MOLO:  Okay.

 2              THE COURT:  Because it's hearsay as to what they

 3     actually knew.

 4              MS. COHEN:  Thank you, your Honor.

 5              (In open court)

 6              THE COURT:  Okay.

 7     BY MR. MASTER:

 8     Q.  So when you spoke to Mr. Runes, what was --

 9     A.  Or Mr. Dorego.

10     Q.  Well, did you ultimately speak to both of them?

11     A.  I don't know who I spoke to first, but then there came a

12     time when I spoke to both of them.

13     Q.  So first, with respect to Mr. Runes, what, if any, reaction

14     did he have when you spoke to him?

15              THE COURT:  What did you tell him?  I'm sorry.  I lost

16     track.

17              MR. MASTER:  I might have lost track as well,

18     your Honor.  Let me make sure I tie that together.

19              THE WITNESS:  What did I tell who?

20     BY MR. MASTER:

21     Q.  First of all, after you got off the phone, who did you

22     understand Sheldon Silver to be referring to when he was saying

23     he was getting fees?

24     A.  I didn't understand.  I made an assumption that since he

25     was talking about sharing fees -- and I think he said with

1    Goldberg -- that it was for tax certiorari work, which might

2    include Glenwood.

3    Q.  So did you convey that assumption, your belief, to Richard

4    Runes?

5    A.  Yes.

6    Q.  What was Richard Runes' reaction when you conveyed that to

7    him over the phone?

8    A.  He seemed surprised and concerned.  And he said, we're

9    going to have to seek a clarification on this.

10          THE COURT:  Ladies and gentlemen, the testimony that

11   he's giving about what Mr. Runes said -- and you're also going

12   to get to Mr. Dorego in a second -- you can consider that

13   evidence for purposes of what was in their head, Mr. Dorego's

14   and Mr. Runes' head when they had this conversation.

15          To the extent there's testimony about facts that they

16   said to Mr. Meara -- you can't consider those for the truth.

17   This is all just so you understand what they were thinking at

18   the time.  Okay?  To the extent that that becomes relevant in

19   the case.

20          Okay.

21   BY MR. MASTER:

22   Q.  When you spoke to Mr. Dorego, did you convey your belief as

23   well?

24   A.  Yes.

25   Q.  What was his reaction?

1    A.   Surprised and concerned, and he said, we're going to have

2    to seek clarification.  As I said, I don't know if I had two

3    separate conversations with him or one conversation with Runes

4    and then a conversation with Runes and Dorego, but their

5    reactions were both the same.

6    Q.   Now, what, if any, involvement did you have in seeking the

7    clarification that was referenced in those conversations?

8    A.   None.

9    Q.   Did you ask to be involved in that activity?

10   A.   No.

11   Q.   Why not?

12   A.   I didn't want to be involved.

13   Q.   Why not?

14   A.   I didn't want to be involved because I thought it was a

15   topic that was a dangerous topic for me to be talking about,

16   and I didn't want to get involved.

17   Q.   Why was it dangerous?

18   A.   Because I didn't understand all of the distinctions, and

19   I'm not a lawyer.  So I just chose not to be involved, and they

20   didn't ask me to be involved.

21   Q.   At some point, what were you informed had happened?

22   A.   I was informed that they --

23            MR. MOLO:  Objection.

24            THE COURT:  Again, you can't consider this for proof

25   of what actually happened, but you can consider it for

1    understanding what then Mr. Meara did and said, etc.

2             Go ahead.  I'm sorry to interrupt.

3             THE WITNESS:  Say that again.

4    BY MR. MASTER:

5    Q.  At some point, what were you informed had happened?

6    A.  That they received the clarification they had sought.

7    Q.  What, if any, future discussions did you have about it with

8    others at Glenwood?

9    A.  I don't think I had any.

10   Q.  Again, why not?

11   A.  I didn't want to talk about it.

12   Q.  What, if any, future discussions did you have with Sheldon

13   Silver about it?

14   A.  None.

15   Q.  Why not?

16   A.  I didn't want to talk about it.

17            MR. MASTER:  Nothing further.

18            THE COURT:  Okay.  Ladies and gentlemen, we're going

19   to take an early morning break today because we're leaving at

20   3:00.

21            We're also going to take an early lunch break.  So

22   your lunch will be here at about noon.  For now let's take a

23   ten-minute morning break.

24            THE WITNESS:  Am I done?

25            THE COURT:  No.  You're not done.

1              (Jury not present)

2              THE COURT:  Okay.  Ten minutes.

3              MS. COHEN:  Thank you, your Honor.

4              (Recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBD5sil2

```
 1              THE COURT:  Is there an issue?

 2              MS. COHEN:  Yes, your Honor.

 3              I was just handed a proposed draft stipulation for all

 4    of these documents that purportedly -- I haven't looked at them

 5    yet because I was just handed them; different records,

 6    supposedly, of the Assembly related to various legislation.  I

 7    am told that the defense intends to question Mr. Meara about

 8    this and wants our agreement to the stipulation.  We obviously

 9    cannot agree to a stipulation where we haven't seen the

10    records.  I don't understand why this was not given to us ahead

11    of time to avoid this issue but I also don't know if this

12    witness knows anything about any of this.

13              THE COURT:  Mr. Molo?

14              MR. MOLO:  They're just public documents.  It is just

15    legislation, it is just stuff from the Assembly.

16              THE COURT:  Mr. Molo.

17              MR. MOLO:  Yes.

18              THE COURT:  I am very patient but you cannot hand a

19    redweld, that appears to have about 750 pages of documents in

20    it, to the prosecution at 10:40 and expect a stipulation from

21    them at 10:41.  That's not reasonable.

22              MR. MOLO:  I agree that I don't expect them to read it

23    between now and then.  I frankly did expect that they would

24    know what these things are.

25              THE COURT:  It is a redweld full of paper.
```

FBD5sil2

1          MR. MOLO:  Judge, I know it is, but what the redweld

2     contains, what those pages are, is legislation that is relevant

3     to things in the case.

4          THE COURT:  But you understand that they don't -- they

5     may not want to just take your word for that's what's in there.

6          MR. MOLO:  I understand that.  I understand that.

7          THE COURT:  Okay.  Don't do this again.  That's not

8     the right way to do it.

9          MR. MOLO:  I understand.

10         What I wanted to say is that these are public records

11     that I may or may not use with this witness, I may or may not

12     want to refresh his recollection, I may or may not want to use

13     them as they have used documents to introduce them subject to

14     later admission of the document.  And because these are what

15     they are, I don't think there should be any controversy

16     concerning their admission, just like the Assembly records that

17     they've introduced and we have stipulated to.

18         That's all I'm saying and I have given them to them in

19     advance, so.

20         THE COURT:  You have only given them to them in

21     advance if you are not talking about trying to get them into

22     evidence with Mr. Meara.

23         MR. MOLO:  Okay, and I have got copies of everything.

24     If I do use it, I will give them specific documents and they'll

25     be marked as exhibits even if I use them for refreshing

FBD5sil2

1    recollection.  I have got them.

2                THE COURT:  Okay.

3                MR. MOLO:  Thank you, Judge.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBD5sil2                          Meara – cross

```
 1                (Jury present)
 2                THE COURT:  Mr. Meara, you are still under oath.
 3                Mr. Molo.
 4   CROSS EXAMINATION
 5   BY MR. MOLO:
 6   Q.  Thank you, your Honor.
 7                Good morning, Mr. Meara.
 8   A.  Good morning.
 9   Q.  I am Steve Molo and I represent Mr. Silver.  You and I
10   haven't met before, that I know at least.
11                Mr. Meara, you did not, in any way, conceal that you
12   lobbied Mr. Silver on behalf of Glenwood concerning real estate
13   legislation, did you?
14   A.  Concealed to who?
15   Q.  Anyone.
16   A.  No.
17   Q.  A very public fact, correct?
18   A.  Correct.
19   Q.  And, in fact, there is detailed information about your
20   lobbying of Mr. Silver that is formally made public through
21   reports that you file, correct?
22   A.  That's correct.
23   Q.  And these are reports that are filed with the Joint
24   Commission on Public Ethics?
25   A.  Yes.
```

FBD5sil2                         Meara - cross

1   Q.  And the reports disclose who hired you as a lobbyist?

2   A.  Right.

3   Q.  And they also disclose how much you paid, correct?

4   A.  Yes.

5   Q.  And actually even discloses the specific bill numbers on

6   which you lobby, right?

7   A.  Yes.

8   Q.  I'm going to show you what's marked Defense Exhibit 103,

9   ask you to take a minute it look at it.  Did you recognize

10  generally what it is?

11  A.  Yes.

12  Q.  And is that a form that you fill out and disclose lobbying

13  with the State?

14  A.  My secretary does.  I don't.

15  Q.  I'm sorry, Mr. Meara.  Could you speak up?

16  A.  My secretary does, I don't.

17  Q.  Your secretary, okay.

18          But it is on your behalf, correct?

19  A.  On my behalf, yes.

20          MR. MOLO:  Your Honor, I move for the admission of

21  Defendant's Exhibit 103.

22          MR. MASTER:  No objection.

23          THE COURT:  Defendant's Exhibit 103 is received.

24          (Defendant's Exhibit 103 received in evidence)

25  BY MR. MOLO:

1    Q.  Looking at that document specifically, 103 if we can put it

2    up on the screen, it states this is for the period May to June

3    of 2011 at the top.  Do you see that?

4    A.  Yup.

5    Q.  And it notes that lobbyist is you and that your client is

6    Glenwood Management Corporation, correct?

7    A.  Correct.

8    Q.  And if you go down one, two, three -- four sections it says

9    subjects on which you lobbied?

10   A.  Yes.

11   Q.  And it states real estate issues, correct?

12   A.  Correct.

13   Q.  And if you go down one more section and if we can make that

14   larger, it actually identifies those numbers, they're A 1309,

15   1737; those are actually bills themself, right?

16   A.  Right.

17   Q.  So it is not just that you are lobbying on real estate

18   issues but actually the specific real estate bills that are

19   identified, correct?

20   A.  Correct.

21   Q.  And when you go to the very end, the A 8518 that's

22   identified there --

23   A.  Yes.

24   Q.  -- that is the compromise bill that includes the Rent Act

25   of 2011, correct?

FBD5sil2                          Meara - cross

1    A.  I don't know that.

2    Q.  Okay.

3            Now, I think you testified earlier that you and

4    Mr. Silver have been friends for quite a long time; is that

5    right?

6    A.  42 years.

7    Q.  And you met, as I understand it, while you were a court

8    officer in New York, right?

9    A.  That's correct.

10   Q.  And Mr. Silver, at the time, was working as what is called

11   in the New York Court System, a law secretary for a Judge?

12   A.  That's correct.

13   Q.  And he was sort of like a law clerk for a Judge, correct?

14   A.  He was a law secretary.  I don't know what a law clerk is.

15   Q.  Okay.

16           And that was for a prominent Judge in the Manhattan

17   Supreme Court right here, right?

18   A.  I believe it was a Civil Court Judge.

19   Q.  Right, but right here in Manhattan; right?

20   A.  Yes.

21   Q.  And then the two of you connected again, I guess if you

22   will, a bit more, when he was elected in 1977 to the Assembly

23   for the first time, right?

24   A.  That's correct.

25   Q.  At that point in time you were already working as a

FBD5sil2                          Meara - cross

1   lobbyist in Albany?

2   A.  Yes.

3   Q.  And when you got there, did you sort of show Mr. Silver

4   around Albany a bit?

5   A.  Well, I will put it in my own words.

6   Q.  Sure.

7   A.  I hadn't even known that he was running for the Assembly

8   because we lost touch a little bit and when he showed up I was

9   surprised that he was there.  But then he explained he had won

10  a special election and he was in Albany.  And I don't want to

11  say I showed him around but we spent time together.  We -- you

12  know, we were both young and we would go -- he had a cable

13  television in his hotel lobby and I would go there with other

14  people and eat kosher pizza and watch ball games.

15  Q.  Okay.

16          You actually were pretty good friends when you were a

17  court officer and he was a law secretary, right?

18  A.  Actually, he was only on loan to the criminal court for

19  summer breaks.  He was replacing -- his Judge was replacing

20  another Judge so we spent, you know, time in the same courtroom

21  and talked quite a bit and talked basically about sports and

22  politics and maybe some comparative religion, but that was

23  about it.

24  Q.  Okay, but you were a lobbyist in Albany and you didn't even

25  know that your friend was running for -- I don't mean to be

FBD5sil2                          Meara - cross

```
 1   critical of this -- but you didn't know your friend was running
 2   for the Assembly?
 3   A.  No.
 4   Q.  He didn't take it upon himself to reach out to you, right?
 5   A.  No.
 6   Q.  Okay.  Because that's not really the way --
 7   A.  I was a lobbyist for the court officers' union.  I was not
 8   an important player.
 9   Q.  Okay.
10            And over the years you played some golf together I
11   guess, right?
12   A.  Yes.
13   Q.  And had dinners once in a while?
14   A.  Yes.
15   Q.  And you spent time talking about politics and sports, I
16   suspect?
17   A.  Yes.
18   Q.  And you find him to be somebody who keeps things close to
19   the vest, right?
20   A.  Yes.  Well, he didn't call me to tell me he was running for
21   the Assembly.
22   Q.  I think you mentioned that Leonard Litwin is the chairman
23   and principal of Glenwood; is that right?
24   A.  That's correct.
25   Q.  And you know, through your relationship with Mr. Silver,
```

1    that Mr. Litwin and Mr. Silver have been friendly over the

2    years?

3    A.  Well, I know that -- I believe I introduced them.

4    Q.  Okay.

5          And they would have lunches together from time to

6    time; is that right?

7    A.  Occasionally.

8    Q.  And you --

9    A.  Not many times but a handful of times.

10   Q.  Handful of times.

11         You have actually attended some of those lunches,

12   right?

13   A.  I attended all of them, as far as I know.

14   Q.  And they would go to a kosher restaurant on the Lower East

15   Side called Ratners, right?

16   A.  Or the Grand Street Deli.

17   Q.  Ratners is no longer around anymore, right?

18   A.  I don't know.  I don't even remember the time but we went

19   to both.

20   Q.  Okay.

21         And it was Mr. Litwin that asked you to organize these

22   lunches?  Do you recall?

23   A.  Yes.

24   Q.  And in these lunches, conversations would turn to the

25   future of New York?

FBD5sil2                          Meara - cross

1   A.  Yes.

2   Q.  And what was going on in the city?

3   A.  Yes.

4   Q.  Did it seem like Mr. Litwin took a bit of a shining to

5   Mr. Silver?

6            MR. MASTER:  Objection.

7            THE COURT:  Sustained.

8   Q.  Did he seem genuinely interested in Mr. Silver?

9            MR. MASTER:  Objection.

10            THE COURT:  Sustained.

11   Q.  At this point in time Mr. Silver wasn't even Speaker,

12   right?

13   A.  I'm not sure.

14   Q.  As he has grown older, I guess we heard he is 101,

15   Mr. Litwin doesn't get out much more I take it?

16   A.  I haven't seen him for quite some time.

17   Q.  You also mentioned that Mr. Goldberg and Mr. Silver have

18   known one another for a long time, right?

19   A.  Correct.

20   Q.  And did you know they both attended Yeshiva University?

21   A.  I knew they went to school on the Lower East Side together.

22   I didn't know they both went to Yeshiva.  I knew Mr. Silver

23   went to Yeshiva, I didn't know that Mr. Goldberg went to

24   Yeshiva.

25   Q.  I think you said for a period of time Mr. Goldberg actually

1   worked as a legal counsel to Mr. Silver as an Assembly person

2   for a short period of time, right?

3   A.  That's correct.

4   Q.  That was early in Mr. Silver's legal career, correct?

5   A.  That's correct.

6   Q.  And over the years you would see Mr. Goldberg around from

7   time to time?

8   A.  Yes.

9   Q.  He would come down to Albany -- or go up to Albany --

10  excuse me -- every once in a while?

11  A.  Yes.

12  Q.  Maybe at a swearing in or something like that?

13  A.  No.  He would go when he was working as counsel.

14  Q.  When he was working as counsel.

15  A.  Yes.

16  Q.  After that, after he worked as counsel, from time to time

17  he would go up to Albany and maybe attend a swearing in or

18  something?

19  A.  Usually it would be opening day of Session when the

20  Governor makes the State of the State address.

21  Q.  How many years have you been a lobbyist?  Over 40 you said?

22  A.  Yes.

23  Q.  Would you agree that the process for getting legislation

24  passed -- I'm talking about a bill, I'm talking about the

25  actual law -- it is complex?

FBD5sil2                           Meara - cross

```
 1    A.  Yes.

 2    Q.  There is a lot of interests that have to be addressed,

 3    correct?

 4    A.  I don't know about interest.  You have to provide

 5    substantiation for why something should be done or something

 6    shouldn't be done.

 7    Q.  Sure.

 8          And among the people in the Assembly, 150 Assembly

 9    members, there may be different points of view on a given piece

10    of legislation, right?

11    A.  Correct.

12    Q.  And there also might be different points of view in the

13    Senate on the same piece of legislation, right?

14    A.  That's correct.

15    Q.  As a general matter, though, the Senate now, for some time,

16    has been republican, correct?

17    A.  That's correct.

18    Q.  And the House, or the Assembly, has been predominantly

19    democrat, correct?

20    A.  Ever since I've been there.

21    Q.  And it has, in fact, even gone more democrat in recent

22    years, correct?

23    A.  That's correct.

24    Q.  And for a bill that's proposed in either house to

25    eventually become law, you have to have it passed by majority
```

FBD5sil2                           Meara - cross

1   in the Senate, right?

2   A.   Correct.

3   Q.   And passed by a majority in the Assembly, correct?

4   A.   Correct.

5   Q.   And then the third-party gets involved and that's the

6   governor, correct?

7   A.   That's correct.

8   Q.   Governor's views may be different from either the Assembly

9   or the Senate, right?

10   A.   Correct.  It is called a veto.

11   Q.   It is called a veto, right.  Even if the House and --

12   Senate and Assembly agree, there may be a veto.

13        Now, the Assembly, you said the conference earlier,

14   tends to tremendously favor tenants in legislation that

15   involves housing, right?

16   A.   Correct.

17   Q.   And the Assembly wants these rent regulations to be

18   stronger for the most part?

19   A.   Stronger in favor of tenants, yes.

20   Q.   And the Assembly typically represents mostly -- a lot of

21   the Assembly members are representing people in New York City;

22   is that right?

23   A.   A lot of them -- it has gotten a lot bigger so there are a

24   lot more suburban and upstate members but I would say it's

25   predominantly controlled by New York City democrats.

FBD5sil2                         Meara - cross

1   Q.  And the Senate republicans tend to favor landlords and

2   developers in these issues, right?

3   A.  I don't -- I wouldn't put it that way.

4   Q.  They tend to be less in favor of rent regulation than the

5   Assembly, correct?

6   A.  I would say they're more prone to be free marketers.

7   Q.  Okay.

8   A.  Believe the market should establish what rent should be and

9   not legislators.

10  Q.  So they would be against rent regulation laws, typically?

11  A.  Yes.

12  Q.  Because the rent regulation occurs by law the Senate -- if

13  there is no law there is no rent regulation, right?

14  A.  That's correct.

15  Q.  And so, if these laws are in place and they expire there is

16  no regulation, right?

17  A.  That's correct.

18  Q.  And they do expire periodically I believe you said, right?

19  A.  Yes.

20  Q.  Maybe every four years or so I think?

21  A.  Yes.

22          THE COURT:  Are they ever actually expired?

23          THE WITNESS:  There have been brief expirations for

24  maybe a matter of days, but.

25          THE COURT:  But they --

 1                    THE WITNESS:  They retroactively impose them.

 2                    MR. MOLO:  You are stealing my thunder, your Honor.

 3                    THE COURT:  I'm sorry.

 4                    MR. MOLO:  I'm about to get to that.

 5                    THE COURT:  I thought I missed part of the history of

 6      New York.  I never knew they expired.

 7      BY MR. MOLO:

 8      Q.  So, for these rent regulations to be renewed you have to

 9      get the Senate to vote in favor of them, correct?

10      A.  Right.

11      Q.  And you have got to get the Assembly to vote in favor of

12      them, correct?

13      A.  Correct.

14      Q.  And you have to get the governor to sign off, right?

15      A.  That's correct.

16      Q.  And so, there was a major fight about these rent

17      regulations in 1997.  Do you remember that?

18      A.  Vaguely.

19      Q.  The laws were expiring and the majority leader at the time

20      vowed that he would end rent regulation as we know it.  Does

21      that sort of refresh your recollection?

22      A.  It's been said many times.

23      Q.  The governor at the time was Governor Pataki, right?  '97?

24      A.  Yes.

25      Q.  I'm sorry to do this to you.

1          Well, and Governor Pataki also wanted to get rid of

2     rent regulation, do you recall?

3     A.   I don't recall if he ever said he wanted to get rid of all

4     regulation but I would just say that he believed in the free

5     market.   I think that's a different way to express it than you

6     are expressing it.

7     Q.   And Mr. Silver, at that point in time, led the effort on

8     behalf of the Assembly to fight for rent regulation, right?

9     A.   That's correct.

10    Q.   And eventually they worked out some kind of compromise and

11    rent regulation went forward, correct?

12    A.   That's correct.

13    Q.   In 2003 the rent regulations were set to expire again.   Do

14    you remember that?

15    A.   Yes.

16    Q.   And Mr. Silver pushed very early in the legislative session

17    for rent regulation laws to be renewed and strengthened.   Do

18    you recall?

19    A.   I don't recall but that doesn't surprise me.

20    Q.   You do recall, though, that the Senate republicans very

21    much resisted the efforts to renew and strengthen the rent

22    regulation, right?

23    A.   I do.

24    Q.   And the Senate republicans, though, delayed, very late into

25    the session, in addressing this issue, didn't they?

FBD5sil2                         Meara - cross

 1   A.  They usually do.

 2   Q.  And --

 3          THE COURT:  Do you remember specifically?

 4          THE WITNESS:  No, I don't remember specifically.

 5   Q.  Do you remember in 2003, getting to Judge Caproni's point,

 6   they actually used it to their advantage to pass a bill and

 7   then adjourn the Senate and leave Albany?

 8          MR. MASTER:  Objection.

 9   Q.  Do you remember that?

10          THE COURT:  Overruled.

11          Do you recall that?

12   A.  No.

13   Q.  You don't remember the Senate --

14   A.  I'm not denying it.  I said I don't remember.

15   Q.  I understand.

16          If I show you something -- let's see if this helps you

17   remember.

18          THE COURT:  Just to be clear, he is going to show you

19   something and the question is going to be does that refresh

20   your recollection.  If it does, say yes.  If it doesn't, say

21   no.

22   BY MR. MOLO:

23   Q.  I am going to show you what's been marked Defendant's

24   Exhibit 700 just for identification purposes, ask you to take a

25   look at that.  Don't read it out loud, just take a look at

FBD5sil2                          Meara - cross

1    that.

2    A.  Yes, I recollect that.

3    Q.  Have you had a chance to look at it and does that help you

4    remember now --

5    A.  Yes.

6    Q.  -- that at that point in time the Senate actually passed a

7    bill that was unfavorable -- just a Senate bill that was

8    unfavorable to rent regulation and then just adjourned,

9    correct?

10   A.  Correct.

11   Q.  They left town, right?

12   A.  Correct.

13   Q.  So, the Assembly was left to deal with what the Senate

14   passed or have absolutely no rent regulation, correct?

15   A.  Well, I'm not sure exactly what the Senate passed.

16   Q.  Okay, but essentially they left rent regulation hostage --

17   the Assembly had to either pass the Senate's version or let the

18   laws expire all together, correct?

19           MR. MASTER:  Your Honor, I will object again.  He

20   doesn't recall.

21           THE COURT:  Yes, sustained.

22           Rephrase the question.

23   BY MR. MOLO:

24   Q.  At that point in time, just given the way that the system

25   is set up, the Assembly either had to pass what the Senate gave

FBD5sil2                          Meara - cross

1    them or have no rent regulation, right?

2              MR. MASTER:  Objection.

3              THE COURT:  How do you remember it is the question.

4              THE WITNESS:  I don't remember.

5    BY MR. MOLO:

6    Q.  Do you recall that the 2003 law hurt tenants in that it

7    continued this vacancy decontrol concept?  Do you recall that?

8    A.  You might call it hurting tenants.  I might not call it

9    hurting tenants, I might call it letting landlords get

10   appropriate rents.

11   Q.  So it benefited landlords?

12   A.  Yeah, I guess I could say that.

13   Q.  And you recall that this rent regulation law actually

14   expired again just this summer, correct?  2015?

15   A.  It was renewed.

16   Q.  It was, but there was a period of time where it actually

17   expired, right?

18   A.  Yeah, but that's not uncommon.

19   Q.  So, at the end of the day, though, the Senate has the upper

20   hand in these negotiations to the extent that if it doesn't act

21   on rent regulation there is not going to be law?

22   A.  That's correct.

23   Q.  All right.  So, to that extent the Assembly, on the issue

24   of rent regulation is fighting if you will, with sort of a hand

25   tied behind its back just on that issue.

FBD5sil2                          Meara - cross

1    A.  Yes.

2    Q.  So, in 2011 now the rent regulations were expiring,

3    correct?

4    A.  Correct.

5    Q.  And there were a number of other significant issues that

6    the legislature faced that session, right?

7    A.  There always are.

8    Q.  There always are; it is not just about rent regulation,

9    correct?

10   A.  Correct.

11   Q.  Or as a lobbyist for landlords you might say reinstalling

12   free market systems to housing?

13            MR. MASTER:  Objection.

14            THE COURT:  Overruled.

15            I think we can stipulate there are two sides to the

16   issue.

17   Q.  Let me withdraw that question.

18            And, a major priority of Governor Cuomo's at that time

19   was capping property taxes?  Do you recall that?

20   A.  Yes.

21   Q.  And this bill faced a lot of opposition from the teachers'

22   union in particular?  Do you recall?

23            THE COURT:  What's "this bill"?

24   Q.  The property tax cap that the governor posed.

25   A.  Yes.

1   Q.  And that would be people that were supporters of the

2   Assembly, the teachers' union, strong Assembly supporters?

3   A.  Yes.

4   Q.  And another priority of the developers in the Senate

5   republicans was the 421A tax breaks to build affordable

6   housing; is that right?

7   A.  Correct.

8   Q.  That was expiring at the same time as the rent control

9   laws, right?

10  A.  Right.

11  Q.  And then there was also something called mandate relief.

12  Do you recall that?

13  A.  No.

14  Q.  Same sex marriage was actually before the Assembly at that

15  same point in time in 2011?

16  A.  Yes.

17  Q.  And there was also a big plan to raise tuition in the SUNY

18  system that Governor Cuomo was proposing at that time?

19  A.  Yes.

20  Q.  So, in passing any one of these pieces of legislation there

21  is always some give and take, nothing is sort of done in a

22  vacuum, correct?

23  A.  That's correct.

24  Q.  Now, Mr. Silver had plenty of opportunities to help

25  Glenwood prior to 2011 if he wanted to, didn't he, as a

FBD5sil2                      Meara - cross

1  legislator?

2             MR. MASTER:  Objection.

3             THE COURT:  Overruled.

4  A.  I don't understand the question.

5  Q.  Well, he was the Speaker of the Assembly for over two

6  decades, since 1994, right?

7  A.  Yes.

8  Q.  And rent regulation was reauthorized in 1997 as we just

9  spoke of, correct?

10  A.  Yes.

11  Q.  And it was also reauthorized in 2003, correct?

12  A.  Yes.

13  Q.  And 421A came up for reauthorization in 1998, right?

14  A.  Yes.

15  Q.  And 421A, again which helped developers with tax reductions

16  if they built affordable housing, came up for reauthorization

17  again in 2002; do you remember that?

18  A.  I don't remember the exact dates.

19  Q.  Okay.

20  A.  But periodically it would have to come up.  It would be set

21  to expire and had to be renewed.

22  Q.  All right.

23             And --

24  A.  Different times were different spans, sometimes eight

25  years, sometimes six years, sometimes four years.

FBD5sil2                        Meara - cross

1   Q.  Sure.

2           And all of those bills had significance to Glenwood,

3   right?

4   A.  Yes.

5   Q.  Probably no one of them was, well, live or die for

6   Glenwood, but they were important?

7   A.  421A was pretty much live and die.

8   Q.  Besides those bills, hundreds of other bills came up in the

9   Assembly every year that could have an effect on Glenwood's

10  interest, correct?

11  A.  Correct.

12  Q.  And you were lobbying for Glenwood throughout this period

13  of time, right?

14  A.  Yes.

15  Q.  And Mr. Silver could have taken an extreme step to do

16  something to help Glenwood if he wanted to at that period of

17  time but never did that, right?

18  A.  He passed all those bills.

19  Q.  The bills that were passed were passed?

20  A.  The pro-tenant bills.

21  Q.  Yes.

22  A.  Yes, hundreds.

23  Q.  From 2003 to 2011 there was pretty much a stalemate over

24  rent regulation.  Do you recall?

25  A.  I don't recall a stalemate until 2011.

1   Q.   Between 2003, though, and 2011 there was no significant

2   change in the rent regulation law --

3   A.   That's correct.

4   Q.   -- right, it didn't necessarily change in a way that was

5   more helpful to tenants during that period of time, correct?

6   A.   That's correct.

7   Q.   And nonetheless, Mr. Silver regularly sponsored and voted

8   for many pro-tenant laws that were passed in the Assembly.  Do

9   you recall that?

10  A.   That's correct.

11  Q.   All right.  I'm going to show you Defendant's Exhibit, it

12  is a group, Exhibit 104.

13          THE COURT:  This is 104-B?  You handed me 104-B.

14  Q.   I'm sorry.  These are all a set.

15          Actually, I will ask you about something else for a

16  moment, Mr. Meara. you were asked some questions about a

17  methadone clinic that was going to be created in downtown New

18  York?  Manhattan?

19  A.   Yes.

20  Q.   And you said that you learned of it and you called Liz Berg

21  at the Downtown Alliance, is that right?

22  A.   Berger.

23  Q.   Berger.  Excuse me.  Is that correct?

24  A.   Yes.

25  Q.   And this is in December of 2011, is that right?

1   A.  Apparently, yes.

2   Q.  And so you then called Judy Rapfogel, correct?

3   A.  Correct.

4   Q.  And that's Mr. Silver's chief of staff, correct?

5   A.  Correct.

6   Q.  And she informed you that Mr. Silver was opposing this

7   clinic going into his district, correct?

8   A.  Correct.

9   Q.  And she told you save your breath, we're already on it; is

10  that right?

11  A.  Yes.

12  Q.  And as far as you knew they were already on it then, based

13  on what Ms. Rapfogel told you?

14  A.  I have no reason to doubt.

15  Q.  She's pretty efficient, right?  Well, let me ask you this.

16  She has been Mr. Silver's chief of staff for many years; is

17  that right?

18  A.  That's correct.

19  Q.  And as far as you know this clinic did not go forward in

20  that area, right?

21  A.  Correct.

22  Q.  And at a later point in time someone contacted you from

23  Mr. Silver's office and said can you notify the tenants of a

24  Glenwood building in the district of Mr. Silver's efforts,

25  right?  That was this e-mail that we had earlier?

FBD5sil2                          Meara - cross

1             THE COURT:  Do you understand the question?

2             THE WITNESS:  No.

3             THE COURT:  Rephrase the question.

4   BY MR. MOLO:

5   Q.  In December of 2011 Government Exhibit 788 -- can we put it

6   up on the screen, please -- this is the e-mail and then the

7   second page of it, do you remember this, you were asked about

8   this?

9   A.  Yes.

10  Q.  So, somebody contacted you and said would you notify people

11  in the building that Mr. Silver jumped into action --

12  A.  Correct.

13  Q.   -- and got this taken care of?

14            And you don't know, by the way, whether Mr. Silver

15  himself drafted that, correct?

16  A.  I have no idea who drafted that.

17  Q.  Or whether some staffer of his had some idea to do this,

18  correct?

19  A.  I don't know.

20  Q.  And it was basically asking that the constituents of

21  Mr. Silver's be informed of him taking action that was

22  beneficial to them, correct?

23  A.  Correct.

24  Q.  And informed them that he was there serving their needs,

25  right?

FBD5sil2                        Meara - cross

1    A.   He -- I can't use those words.  I would just say that he

2    was -- he had done what they requested and they wanted them to

3    know about it.

4    Q.   Right.

5    A.   I don't know about that he wanted them to know but the

6    staff wanted them to know about it.

7    Q.   Somebody on the staff wanted them to know that he was

8    taking action on behalf of them?

9    A.   Yeah.

10   Q.   Which probably could have a political benefit for him,

11   correct?

12   A.   Correct.

13   Q.   And it also has the benefit of informing people to know

14   that there is somebody there that can take action for them if

15   they need it, right?

16   A.   That's correct.

17   Q.   Now, do you recall that Mr. Silver, between 2003 and 2011,

18   introduced legislation in the Assembly that would prohibit a

19   landlord from increasing the rent for a vacant apartment more

20   than once a year?

21   A.   I don't recall that.  As I said, there were hundreds of

22   pro-tenant bills introduced in the Assembly every year and many

23   of them passed.  I didn't fight them all because I knew you

24   couldn't stop them, so.

25   Q.   And when they would pass would they include things like

FBD5sil2                          Meara - cross

1   decreasing the percentage that a landlord could increase the

2   rent upon the vacancy?

3   A.  Yes.

4   Q.  And would they include things like -- in fact, was that a

5   provision that would be proposed year after year in the

6   Assembly and then voted in the Assembly?

7   A.  I can't recall but I wouldn't be surprised.

8   Q.  And then it would pass in the Assembly and go to the

9   Senate, right?

10  A.  Right.

11  Q.  And it would die in the Senate, correct?

12  A.  Correct.

13  Q.  And the Senate wouldn't vote in their favor.

14          THE COURT:  Was that a question?

15  Q.  Yes; is that right?

16  A.  Yes.

17  Q.  Okay.

18          Let me show you a document marked Defendant's Exhibit

19  105 -- I have these highlighted, Judge, and I have a

20  highlighted and clean copy for the witness.  The highlighted

21  copy will be easier to follow but I will give you a clean copy,

22  too.

23          Do you know, generally, what this is?

24  A.  Yeah.  It relates to the adjustment to the maximum

25  allowable rent.

FBD5sil2                          Meara - cross

1    Q.  This is a document that's created by the Assembly, right?

2    A.  Correct.

3    Q.  These summaries are done by the Assembly as to what happens

4    with legislation?

5    A.  I believe they're done by the bill director commission --

6    they call it something else, legislative retrieval system.

7    Q.  And these are regular records that they prepare, correct,

8    as far as you recall?

9    A.  Correct.

10            MR. MOLO:  Your Honor, these are subject to the

11   stipulation that we provided.  I would like to offer them

12   conditionally, subject to later admission.

13            THE COURT:  Can I see you up here a second?

14            MR. MOLO:  Sure.

15

16

17

18

19

20

21

22

23

24

25

FBD5sil2                         Meara - cross

1            (At side bar)

2            THE COURT:  So, it is somewhat irregular.  Subject to

3     connection is one thing where there is a representation that

4     you are going to -- this is going to kind of finish the loop.

5     Here it's subject to an agreement with the government where the

6     government had just seen the documents or you calling

7     witnesses.

8            MR. MOLO:  I would have to call someone from the

9     legislature as a document custodian which we have not required

10    the government to do.  I will do that if I have to.

11           THE COURT:  I'm not sure it is a document custodian it

12    is who prepared these things.  He just said they were prepared

13    by somebody else.

14           MR. MOLO:  A commission within the Assembly.  These

15    are summaries of every bill that is --

16           MS. COHEN:  Your Honor, the Defendants referred to a

17    stipulation where we specifically said there is no stipulation

18    and he shouldn't be allowed to do that, your Honor.

19           MR. MOLO:  I understand they're not going to stipulate

20    now.

21           MS. COHEN:  Then why didn't you put --

22           MR. MOLO:  I understand that.

23           THE COURT:  I think the point is don't say that sort

24    of thing in front of the jury when you know you don't have an

25    agreement from the government.

FBD5sil2                          Meara - cross

1                MR. MOLO:  Oh, you know what?  I meant -- I didn't

2      mean to say subject to stipulation, I meant to say subject to

3      connection.

4                THE COURT:  It is not subject to connection, it is

5      really subject to an appropriate witness.

6                MR. MOLO:  Subject to later admission.

7                THE COURT:  What is your objection?

8                MS. COHEN:  My objection is that Mr. Molo continues to

9      do exactly what I complained about yesterday, your Honor, and

10     it is not being controlled.  That is my problem, your Honor.

11               THE COURT:  Okay.  So your objection is going to be

12     overruled.  I'm going to let it in subject to you -- understand

13     you --

14               MR. MOLO:  I have to call a witness.

15               THE COURT:  -- you have to put on a defense case.

16               MR. MOLO:  I understand.  And I understand, too, I

17     will do that.  Just to let you know, there is a couple of

18     others that are not the same thing.

19               MS. COHEN:  Can he not refer to the stipulation in his

20     other questions?

21               THE COURT:  Yes.

22

23

24

25

FBD5sil2                          Meara - cross

1              (In open court)

2              THE COURT:  Counsel, I am going to receive it

3     conditionally.

4              (Defendant's Exhibit 105 received in evidence)

5     BY MR. MOLO:

6     Q.  Mr. Meara, take a look at 105, please?

7              And if we can put it up on the screen?

8              I have it highlighted a bit and this is the top of it,

9     it says bill A053168, correct?

10             THE COURT:  16B.

11    Q.  16B; it is highlighted?

12    A.  5316B.

13    Q.  The A, by the way, notes that it is an Assembly bill as

14    opposed to a senate bill, correct?

15    A.  That's correct.

16    Q.  A Senate bill would have an S at the start of it; is that

17    right?

18    A.  That's correct.

19    Q.  And it notes that the sponsor of the bill is Mr. Silver,

20    correct?

21    A.  Correct.

22    Q.  And that as we go down a bit it provides a very general

23    description, doesn't it, of the purpose of the bill as it

24    relates to adjustment to the maximum allowable rent?

25    A.  Yup.

FBD5sil2                         Meara - cross

1    Q.   And then beneath that there is a history of the actions

2    that are taken -- can we make that larger, please, the

3    actions -- and it notes that in June of 2009 that it passed the

4    Assembly, correct?

5    A.   Correct.

6    Q.   But in January of 2010 it died in the Senate, correct?

7    A.   Correct.

8    Q.   And again it notes that on April 27th of 2010 it again

9    passed the Assembly, correct?

10   A.   Correct.

11   Q.   And it says on the next line that it was delivered to the

12   Senate but it was never passed by the Senate, right?

13   A.   Correct.

14   Q.   And if you turn to the third page of the exhibit --

15   A.   Yes.

16   Q.   -- it states the effect that this bill would have and

17   those effects are that it would extend the amortization period

18   from 40 months to 60 months and give DHCR a stronger oversight

19   role by authorizing it to approve or disapprove increases in

20   whole or in part; is that right?

21   A.   That's what it says.

22   Q.   Okay.

23        And then that has a constraint on the maximum

24   allowable rent, right?

25   A.   Correct.

FBD5sil2                    Meara - cross

1   Q.  So that would be a pro-tenant provision?

2   A.  Correct.

3   Q.  We are now going to show you a document that's marked

4   Defendant's Exhibit 106.  Again, there is a highlighted and

5   clean copy for the witness, your Honor.

6          Mr. Meara, is this a document similar to the one you

7   just looked at in terms of its nature?

8   A.  Yes.

9          MR. MOLO:  Your Honor, I'm going to move the admission

10  of this document, subject to later foundation.

11         THE COURT:  Okay.

12         Any objection?

13         MR. MASTER:  Same as stated at side bar.

14         THE COURT:  Overruled.  Received subject to later

15  action.

16         (Defendant's Exhibit 106 received in evidence)

17  BY MR. MOLO:

18  Q.  Mr. Meara, I'm going to ask you to take a look at this

19  document and, again, this is a different bill, it says A08594,

20  correct, the front page?

21  A.  Yes.

22  Q.  And if you go down to the sponsors, the first co-sponsor is

23  Mr. Silver, correct?

24  A.  Correct.

25  Q.  And when you look at the general purpose of the bill, if

1    you would -- sorry, can we go back up?  There is a part that --

2    that's fine, we will go to the purpose of the bill which is on

3    the second page.  Do you see that there that is highlighted

4    under purpose?  Doesn't it say that this bill amends New York

5    State's rent regulation laws to update the luxury decontrol

6    thresholds to account for the impact of inflation; correct?

7    A.  Correct.

8    Q.  And when we go to the first page, back at first page again

9    under actions you see, doesn't it say that the bill, in the

10   first instance, was on June 13th, 2007, passed by the Assembly,

11   right?

12   A.  Correct.

13   Q.  And on January 1st of 2009 it died in the Senate, right?

14   A.  Correct.

15            THE COURT:  January 9, 2008.

16            MR. MOLO:  2008, excuse me, you are right.

17   Q.  January 9, 2008 it says it died in the Senate, correct?

18   A.  Correct.

19   Q.  And this was a pro-tenant piece of legislation, correct?

20   A.  Correct.

21   Q.  I am going to show you now Defendant's Exhibit Group

22   Exhibit 104.

23            THE COURT:  Is that the same one you gave me before?

24            MR. MOLO:  I believe you got all of these, Judge.

25   Q.  Mr. Meara, I'm going to ask you to take a look at those for

FBD5sil2                         Meara - cross

1    a moment.  You don't have to read them entirely but just see

2    what they are and tell me, are those documents essentially the

3    same nature of exhibits 105 and 106 which we just reviewed?

4    A.  Yes.

5          MR. MOLO:  Your Honor, subject to later foundation, I

6    would like to have these documents admitted conditionally,

7    group 104.

8          THE COURT:  Any objection?

9          MR. MASTER:  Same as before, Judge.

10         THE COURT:  Same ruling.  They'll be conditionally

11   received, 104-A, B, C and D.

12         MR. MOLO:  Correct.

13         (Defendant's Exhibits 104-A,  104-B, 104-C and 104-D

14   received in evidence)

15   BY MR. MOLO:

16   Q.  Mr. Meara, the copy you have in front of you is not

17   highlighted this time but there is highlighting on the screen

18   version of it.

19   A.  Got it.

20   Q.  Okay, and if you look, it is identified as bill no. A10846,

21   correct?

22   A.  Correct.

23   Q.  And it -- can we also highlight just the right above where

24   it says actions, the language there?

25         THE COURT:  Just for the record, this is Exhibit 104-A

1    that you have on the screen.

2              MR. MOLO:  104-A, yes.

3    Q.  In terms of general description, doesn't it say that it

4    limits amount of rent increase after the vacancy of a housing

5    accommodation, correct?

6    A.  Correct.

7    Q.  And if we look at actions we see that it, on May 20th of

8    2004, passed the Assembly, right?

9    A.  Correct.

10   Q.  Delivered to the Senate, correct?

11   A.  Correct.

12   Q.  And Senate -- there is no record of the Senate passing it,

13   correct?

14   A.  Right.

15   Q.  Died in the Senate?

16   A.  Correct.

17   Q.  If we go down to the votes on it we see that Mr. Silver

18   voted for that, correct?

19   A.  Correct.

20   Q.  And as we go to the next page, page 2, there is a summary

21   of the specific provisions and doesn't it say that the bill

22   would decrease from 20 percent to 10 percent the amount a

23   landlord could increase rent upon vacancy and also prohibit a

24   landlord from taking more than one increase in one calendar

25   year; right?

FBD5sil2                         Meara - cross

1   A.  Correct.

2   Q.  And if we go to Defendant's Exhibit 104-B -- by the way,

3   the year of that was 2004, correct?  104-A?

4   A.  Yes.

5   Q.  If we go to 104-B, document of the same nature, right, and

6   the bill no. is A04213 and, again, in terms of the description

7   above the actions it is generally described, isn't it, as

8   limits the amount of rent increase after the vacancy of a

9   housing accommodation, correct?

10  A.  Correct.

11          MR. MASTER:  Your Honor, may we be seen at side bar

12  for just a moment?

13          THE COURT:  Sure.

14

15

16

17

18

19

20

21

22

23

24

25

FBD5sil2                          Meara - cross

1            (At side bar)

2            MR. MASTER:  Your Honor, I wasn't going to say it in

3    front of the jury but he is not even asking the witness if he

4    is familiar with the bill, he is just sort of using Mr. Meara

5    as a prop --

6            THE COURT:  Prop.

7            MR. MASTER:  -- yes, to read bills.  So, if he wants

8    to put on a defense case and have someone actually stand there

9    and read bills we can discuss that, but it doesn't seem an

10   appropriate use of this witness to have him essentially -- I

11   don't know if these are all the bills, if there are other

12   bills.

13           THE COURT:  I was wondering how many of hundreds of

14   bills we are going into.

15           MR. MOLO:  Besides this one there is three more.

16   That's it.

17           THE COURT:  But he doesn't know anything about it.

18   You are not establishing that he knows anything about the bill.

19           MR. MOLO:  He was Glenwood's lobbyist on rent

20   regulation.  These are during this period of time -- I will ask

21   him that, I will ask him whether or not --

22           THE COURT:  Mr. Molo, what seems pretty clear to me is

23   that they engaged on some bills when there was some prospect of

24   them getting through the Senate and by and large they ignored

25   the things that they knew they were going to die in the Senate

FBD5sil2                          Meara - cross

1     because it wasn't worth his time and it wasn't worth Glenwood's

2     money.  That's being a rational viewer of what was going on in

3     Albany at that time.

4               MR. MOLO:  I will ask him --

5               THE COURT:  You can ask him if he knows anything about

6     it and otherwise you are free to put on a case.

7               MR. MOLO:  I understand.

8               THE COURT:  But I think -- by the way, I think you

9     have made the point, that he supports a lot of pro-tenant

10    legislation.

11              MR. MOLO:  Okay.  So you are aware, there were only

12    three others beyond this but I will ask him that question

13    first.

14              THE COURT:  But it takes you five minutes to get

15    through each one.

16              MR. MOLO:  I will speed it up.

17              THE COURT:  Ask him if he knows about it.

18              MS. COHEN:  Your Honor, here is the problem.  If he is

19    going to march through the rest of these three we can stand up

20    and object which makes it looks like we are hiding something.

21    It is unfair to us to let him march through documents over and

22    over again and he keeps doing it.

23              THE COURT:  Ms. Cohen, your whining about not getting

24    a fair trial is not being received.  You are getting a fair

25    trial.

FBD5sil2                          Meara - cross

1              MS. COHEN:  I understand.

2              THE COURT:  Ask him if he knows about it.  If he

3     doesn't know about it, move on.

4              MR. MOLO:  Okay.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBD5sil2                          Meara - cross

1              (In open court)

2    BY MR. MOLO:

3    Q.  Mr. Meara, in 2004, 2005, 2006, 2007, 2008, 2009, 2010 you

4    were employed by Glenwood as a lobbyist, correct?

5    A.  Correct.

6    Q.  And your lobbying for them was focused significantly on the

7    issue of rent regulation; is that right?

8    A.  Correct.

9    Q.  And other real estate-related issues for Glenwood that

10   might come before the Assembly?

11   A.  Correct.

12   Q.  And so, tracking what was going on with rent regulation

13   legislation was important to you at that time?

14   A.  Correct.

15   Q.  Now I'm going to ask you about Exhibit 104-B.

16   A.  Yes.

17   Q.  Can we put it up on the screen, please?  And in this was

18   bill A04213?

19   A.  Correct.

20   Q.  And above the actions generally describing:  Limits the

21   amount of rent increase after the vacancy of a housing

22   accommodation, correct?

23   A.  Correct.

24   Q.  And again, June 7, 2005 it passes the Assembly?

25             THE COURT:  The question is are you familiar with this

FBD5sil2                         Meara - cross

 1   bill.

 2              MR. MOLO:  Okay.

 3   A.  Am I familiar with this exact bill?  No.  But I know that

 4   there were many, many bills passed related to this subject,

 5   passed in the Assembly that died in the Senate.

 6   Q.  Okay.

 7              THE COURT:  Move on.  He is not familiar with the

 8   bill.

 9              MR. MOLO:  Thank you.

10   Q.  By the way, do you recall that in 1997 Mr. Silver actually

11   held up the budget for three months over the issue of rent

12   regulation?

13              MR. MASTER:  Objection.

14   A.  I do remember that.

15              THE COURT:  Overruled.

16              I'm sorry, what did you say?  When he objects you have

17   to --

18              THE WITNESS:  Sorry.  I didn't see him.

19              I think I do remember that.

20   BY MR. MOLO:

21   Q.  Okay, and the budget is maybe the most significant piece of

22   legislation that gets passed each year, correct?

23   A.  Correct.

24   Q.  Now I'm going to ask you some questions about the specific

25   rent regulation legislation in 2011.  In 2011 I take it

FBD5sil2                          Meara - cross

1   Mr. Silver's position remained strongly pro-tenant?

2   A.  Yes.

3   Q.  And any extension, however, of the rent regulation laws,

4   had to be negotiated between the governor and the Senate and

5   the Assembly, correct?

6   A.  Yes.

7   Q.  And in starting in the legislative negotiation it's usually

8   most effective to begin by passing a bill in your chamber, in

9   other words the Assembly chamber, that asks for more than what

10  you really hoped to get, correct?

11  A.  Very common.

12  Q.  Very common.  In fact there is even a name for it, isn't

13  there?

14  A.  One-house bill.

15  Q.  Or how about Christmas tree bill?

16  A.  Christmas tree bill is something different.

17  Q.  Okay.

18          But, the one-house bill that you know is never going

19  to get to the other chambers for approval, it is never going to

20  pass in the other chamber, it tends to be an aggressive

21  statement of what it is that you want, correct?

22  A.  That's correct.

23  Q.  I am now going to show you Defendant's Exhibit 107, it is

24  highlighted as well.  Take a moment to look at it?

25  A.  Yes.

FBD5sil2                          Meara - cross

1    Q.  Is this generally a document of a nature that we reviewed

2    with Exhibits 105 and 106 and 104-A?

3    A.  It appears to me more extensive and includes much more than

4    just those bills.

5    Q.  Correct; it is thicker certainly, correct?

6    A.  Yes.

7    Q.  But its nature is the same in terms of the bill's summary,

8    right?

9    A.  It may go a little further than those go, but.

10            MR. MOLO:  Okay.  Your Honor, subject to later

11   foundation I move for the conditional admission of Defendant's

12   Exhibit 107.

13            THE COURT:  Same objection, I presume?

14            MR. MASTER:  Same.

15            THE COURT:  It is conditionally received.

16            (Defendant's Exhibit 107 received in evidence)

17   BY MR. MOLO:

18   Q.  If we can put it up on the screen?

19            This is 2007 bill no. A 02674A and it lists as a

20   co-sponsor Mr. Silver, correct?

21   A.  Correct.

22   Q.  And when we go to --

23            THE COURT:  Are you familiar with this bill?

24            THE WITNESS:  No.

25   Q.  Okay, were you familiar with the --

FBD5sil2                              Meara - cross

```
 1   A.  I know what it does but I don't remember the conditions

 2   under which it passed.  It passed in April of 2011 which is

 3   probably two months before the final bill was actually

 4   negotiated so it is essentially a statement of what the

 5   Assembly's position is on rent legislation for that year.

 6   Q.  And if you look at page 3 and 4 and 5 which is highlighted

 7   for you --

 8   A.  Yes.

 9   Q.  -- is that the statement of what the Assembly was staking

10   out in terms of legislation as 2011 as its aggressive position?

11   A.  It would appear to be.

12   Q.  All right.

13           THE COURT:  But he doesn't know.  He just said he

14   wasn't familiar with it.

15   Q.  Well, you were familiar with the position the Assembly was

16   taking in 2011 on rent regulation, weren't you?

17   A.  To be aggressive in making it stronger.

18   Q.  And that was your job at the time, right, to monitor what

19   was going on and try and ensure that whatever was passed wasn't

20   as aggressive as it might be, right?

21   A.  Well, I knew what was going to pass in the Assembly would

22   be as aggressive as they wanted it to be and my involvement in

23   it would have been minimal.

24   Q.  Do you know that at the outset they were -- the Assembly

25   was seeking to extend rent regulation for another four years?
```

FBD5sil2                           Meara - cross

```
 1            THE COURT:  He has already testified that he doesn't
 2    really know beyond it was the most aggressive position that the
 3    Assembly was staking out.
 4            MR. MOLO:  This is a different question, whether or
 5    not he knows that in 2011 the Assembly was seeking to have rent
 6    regulation extended for another four years.
 7            THE WITNESS:  They wanted it extended.  I'm not sure
 8    the period of time that they wanted it extended.
 9    BY MR. MOLO:
10    Q.  Do you know whether they wanted to limit the landlord's
11    ability to seize rent regulated units from tenants for the
12    landlord's own personal use?
13    A.  Can I just state this?
14    Q.  Sure.
15    A.  I knew when this bill was introduced what it was.  I didn't
16    go through it every provision because I knew enough about where
17    they were going to go so that I didn't have to so I'm not
18    familiar with every provision in it.
19    Q.  All right, and that's fine.  I'm not asking you about every
20    provision in it.  I don't --
21            THE COURT:  Don't argue with the witness.  Place
22    another question if you have another question.
23            MR. MOLO:  All right.
24            THE COURT:  He has told you he doesn't know the
25    particular provisions of this bill.
```

FBD5sil2                          Meara - cross

1              MR. MOLO:  All right.

2    BY MR. MOLO:

3    Q.  Do you know whether -- I'm not asking about the provisions

4    of this particular bill -- do you know whether a landlord's

5    ability to increase rents based on capital improvements was

6    something that was important to the Assembly?

7    A.  Yes.

8    Q.  And do you know whether they would push for increasing the

9    threshold of rent or income that would trigger the luxury

10   deregulation?

11   A.  Yes.

12   Q.  Okay.

13              Now, at the same time that the Assembly was putting

14   forward its position on rent regulation the Senate was

15   advancing its own bill that would expand 421A, right?

16   A.  I don't recall.

17   Q.  Okay.

18              Did you lobby the Senate on 421A?

19   A.  No.

20   Q.  Do you know whether the bill that was ultimately passed

21   linked 421A extension to rent regulation?

22   A.  Yes.

23   Q.  And it did, correct?

24   A.  Yes.

25   Q.  It also linked the property tax cap that was important to

1   the Governor, correct?

2   A.  I don't remember that because I wasn't involved in it.

3   Q.  Mr. Meara, I ask you to take a look at Defendant's Exhibit

4   110.

5   A.  Yes.

6   Q.  Without reading it aloud or reading every page of it, can

7   you just look through it and see if this is something that is

8   generally familiar to you?

9   A.  Let me put it in these words.  When a bill was negotiated

10  like this with so many complicated terms in it I would give it,

11  without reading it, give it to my client and ask them if it was

12  acceptable or not.  But by the time this bill was into print

13  everybody kind of knew what was in it and they were satisfied

14  with it so I didn't read it.

15  Q.  Okay.  All right.

16          Did you know then what was in it without necessarily

17  reading it?

18  A.  I knew what was in it as my client was concerned.

19  Q.  And it passed the Senate.

20          MR. MOLO:  Can I move its admission subject to later

21  foundation, your Honor, Defendant's Exhibit 110?

22          THE COURT:  Same objection, I assume?

23          Subject to, conditionally received.

24          (Defendant's Exhibit 110 received in evidence)

25  BY MR. MOLO:

1   Q.  This is actually a bill that passed, A08518, correct?

2   A.  Yes.

3   Q.  And Mr. Silver is actually the co-sponsor of this

4   legislation, correct?

5   A.  That's correct.

6   Q.  And again, the general description that was offered it

7   states, doesn't it, that it enacts major components of

8   legislation relating to property tax levies?

9   A.  Correct.

10  Q.  Rent regulation?

11  A.  Correct.

12  Q.  And exemption from local taxation and mandate relief?

13  A.  Correct.

14  Q.  This bill was passed in the Senate June 24th of 2011,

15  right?

16  A.  Correct.

17  Q.  Passed the Assembly the same day, June 24th of 2011, right?

18  A.  Correct.

19  Q.  And the governor signed it into law on June 4th of 2011,

20  right?

21  A.  Correct.

22  Q.  The bill actually, and again based on your recollection,

23  has the tax cap staying in effect, only as long as the rent

24  regulation law stayed in effect, right?

25  A.  I don't know anything about the tax cap.

FBD5sil2                              Meara - cross

1   Q.  And the rent regulation laws were changed through this

2   bill, correct?

3   A.  Correct.

4   Q.  It limited the ability of landlords to increase the rent

5   for vacant rent regulated apartments by limiting them to one

6   increase each year, correct?

7   A.  I didn't know that was in there but it wasn't a concern of

8   mine.

9   Q.  If you go to Section 7 on page 7 --

10          MR. MASTER:  Your Honor, I'm going to object.

11          THE COURT:  Sustained.  He just said he wasn't

12  familiar with that, that was not his concern.

13  BY MR. MOLO:

14  Q.  Well, you were familiar with the rent regulations, weren't

15  you, sir, at the time?  That was the primary issue you were

16  focused on for your client, right?

17  A.  Yes.

18  Q.  And, in fact, the bill does something to strengthen rent

19  regulation by limiting the ability of landlords to increase the

20  rent for vacant rent regulated apartments by limiting them to

21  one such increase a year, correct?

22  A.  Correct.

23  Q.  All right, and this is exactly like the provision that we

24  reviewed in Exhibit 104 that in prior years had passed in the

25  Assembly but died in the Senate, right?

1        MR. MASTER:  Objection.

2        THE COURT:  Sustained.  Sustained.

3        He said he wasn't familiar with those bills and he

4   said he wasn't familiar with this piece.  If you want to prove

5   that up you can, but you can't prove it up through him.

6        MR. MOLO:  All right.

7   BY MR. MOLO:

8   Q.  So, before this bill was passed a landlord could increase

9   the rent for vacant rent regulated apartments as many times as

10  they wanted during the year, right?

11       MR. MASTER:  Same objection, your Honor.

12       THE WITNESS:  I'm not sure.

13       THE COURT:  Are you familiar with that, is that an

14  issue for Glenwood?

15       THE WITNESS:  Not that they told me.

16       THE COURT:  Sustained.

17  Q.  The bill actually made it harder to deregulate apartments,

18  correct?

19  A.  Vacant apartments.

20  Q.  Right.

21  A.  Correct.

22  Q.  All right.

23       The old law allowed an apartment to be deregulated if

24  it was vacant and the rent was at least $2,000 a month, right?

25  A.  That's correct.

FBD5sil2                          Meara - cross

Q.  And the new law that was passed in 2011 prevented

deregulation of a vacant apartment unless the rent was at least

$2,500 a month, correct?

A.  Correct.

Q.  So that was favorable to tenants, correct?

A.  That's correct.

Q.  The bill also made it harder to deregulate an apartment

based on a tenant's income, correct?

A.  Correct.

Q.  The old law allowed an apartment to be deregulated if the

tenant's income was $175,000 a year, correct?

A.  Correct.

Q.  And the new law that was passed in 2011 did not allow

rent -- did not allow deregulation of an apartment unless the

tenant made $200,000 a year, right?

A.  Correct.

Q.  So that was favorable to tenants?

A.  Correct.

Q.  And the bill also made it tougher for landlords to increase

rents based on improvements to an apartment, correct?

A.  I wasn't involved in that but I think I know -- I think I

am familiar with that.

Q.  All right, and the old law allowed landlords to increase

rent by one-fortieth of the cost of the improvement, correct?

A.  Correct.

FBD5sil2                          Meara - cross

1  Q.  And the new law that was passed in 2011 prevented landlords

2  from charging more than one-sixtieth of the cost of the

3  improvement, correct?

4  A.  Correct.

5  Q.  So that was an improvements for tenants, correct?

6  A.  Correct.

7  Q.  So, for this period of time, between 2003 and 2011, there

8  had been no improvements to tenants in the rent regulation

9  laws, correct?

10  A.  That's correct.

11  Q.  But in 2011 there were significant improvements for tenants

12  in the rent regulation law, weren't there?

13  A.  I would say so.

14  Q.  You were asked in your examination earlier by the

15  prosecutors questions about meetings that you had with

16  Mr. Silver as a general matter, right?

17  A.  Correct.

18  Q.  We saw a calendar that showed an appointment that was

19  scheduled, correct?

20  A.  Correct.

21  Q.  Would you typically calendar appointments if you were

22  meeting with another person and Mr. Silver, correct?

23          THE COURT:  In his own calendar?

24  Q.  I'm sorry not your calendar.  That's a bad question.  Let

25  me ask a different one.

1            Would you typically go through Mr. Silver's chief of

2   staff to schedule an appointment if you were going to meet with

3   Mr. Silver and another person?

4   A.  Yes, I would.

5   Q.  But sometimes you would have conversations with Mr. Silver

6   one-on-one, correct?

7   A.  Correct.

8   Q.  And you would have conservations with other legislators

9   one-on-one, correct?

10  A.  Correct.

11  Q.  And that would be conversations that you had with

12  republicans sometimes?

13  A.  Yes.

14  Q.  And sometimes with democrats, correct?

15  A.  Correct.

16  Q.  And there is no law that prohibits you, that you're aware

17  of, that prohibits from you meeting with legislators

18  one-on-one, correct?

19  A.  If there were I would be in big trouble.

20            THE COURT:  You would be out of business.

21  A.  No, it's -- it's free speech.

22  Q.  Sure.

23            And based on your knowledge of Mr. Silver and his role

24  as Speaker of the Assembly, would you say it is fair to say he

25  would meet with pretty much anyone on any issue?

FBD5sil2                          Meara - cross

1    A.  I couldn't say that.

2               MR. MASTER:  Objection.

3               THE COURT:  Sustained.

4    Q.  Did you ever know of people that were having, saying that

5    they refused to meet with him on an issue?

6    A.  Do I --

7    Q.  Did you know of people saying that Mr. Silver absolutely

8    refuses to meet with people on issues?

9               MR. MASTER:  Objection.

10   A.  I don't recall that.

11              THE COURT:  Overruled.

12   Q.  Okay.

13   A.  I don't recall anybody telling me that.

14   Q.  And in order to reach a compromise and get bills passed it

15   is important that legislators receive information, right?

16   A.  I think so.

17   Q.  In fact, you wouldn't lobby somebody without having a basis

18   for whatever it is that you are presenting to them as something

19   that you want done, correct?

20   A.  That's correct.

21   Q.  You have to have your facts in order, right?

22   A.  Correct.

23   Q.  And you have to have a consideration of what the other

24   parts of the legislature are doing, correct?

25   A.  Correct.

FBD5sil2                         Meara - cross

1   Q.  And you have got to be able to have a sense of the art of

2   the possible, right?

3   A.  Yes.

4   Q.  After 42 years working in the Assembly as a lobbyist you

5   have developed a sense for what might be acceptable and what

6   might not be acceptable to either the Senate or the house on

7   major issues, correct?

8   A.  That's correct.

9   Q.  And in that capacity you understand that compromise has to

10  be reached, doesn't it?

11  A.  Correct.

12  Q.  And the bigger the issue, the more compromise becomes

13  important, correct?

14  A.  Correct.

15          MR. MOLO:  Your Honor, it is noon.

16          THE COURT:  How much longer are you going to be?

17          MR. MOLO:  I have another 20 minutes.

18          THE COURT:  Okay.  Why don't we go ahead and break for

19  lunch then.

20          Remember, don't discuss the case during lunch.  If you

21  want to check your phones, do it now.  See you back in the

22  courtroom at 1:00.

23          (Continued on next page)

24

25

1678

FBD5sil2                          Meara – cross

1       (Jury not present)

2              THE COURT:  Anything before I leave?

3              MS. COHEN:  No, your Honor.

4              THE COURT:  Mr. Molo?

5              MR. MOLO:  No, your Honor.

6              THE COURT:  See you at 1:00.

7              (Luncheon recess)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                           AFTERNOON SESSION

                                1:00 p.m.

             THE COURT:  Okay.  Mr. Meara, you're still under oath.

             Mr. Molo.

BY MR. MOLO:

Q.  Good afternoon, Mr. Meara.

A.  Good afternoon.

Q.  You testified in your direct examination about a

September 2011 conversation you had with Mr. Silver while you

were in Florida and Mr. Silver was in New York.

             Is that right?

A.  I was in Florida.  I don't know where Mr. Silver --

Q.  You didn't know where he was; right?

             THE COURT:  Please don't speak over him.

             MR. MOLO:  Excuse me.

BY MR. MOLO:

Q.  You didn't know where he was; right?

A.  No.

Q.  In that conversation, Mr. Silver told you he was going to

have to change the way he was disclosing something; is that

right?

A.  Yes.

Q.  And that all happened in late December of 2011; is that

right?

A.  Yes.

FBD5sil2                        Meara - cross

1    Q.  Mr. Silver's legislative ethics disclosure form isn't due

2    until much later, until May of next year; is that right?

3    A.  He said he had to disclose certain income on his ethics

4    form.

5    Q.  He didn't say that?

6    A.  He said he had to disclose certain information on his

7    ethics form.

8    Q.  At that same time, Golberg & Iryami -- right?  Do you know

9    Mr. Goldberg's firm?

10   A.  Yes.

11   Q.  -- were dealing with disclosing -- making disclosures to

12   clients about the referral fee arrangements that it had with

13   referring attorneys.

14            Are you aware of that?

15   A.  All I know is what Mr. Silver told me.

16   Q.  I'm just asking --

17            THE COURT:  Don't interrupt him.

18            MR. MOLO:  I'm asking him about --

19            THE COURT:  Mr. Molo, he was not finished with his

20   answer.  Please let him finish before you start talking.

21   BY MR. MOLO:

22   Q.  The question I'm asking, so I'm clear, is -- I'm asking

23   about Golberg & Iryami.

24            Are you aware that in late 2011 Golberg & Iryami were

25   sending out letters to clients concerning referral fees?

FBD5sil2                          Meara - cross

1   A.  No.

2           MR. MASTER:  Objection.

3   BY MR. MOLO:

4   Q.  Are you aware that in January of 2012 there was a letter

5   sent by Golberg & Iryami to people at Glenwood concerning

6   Glenwood LLCs and their representation of certain Glenwood

7   LLCs?

8   A.  No.

9   Q.  Now, I believe you said that you learned that Mr. Silver

10  was getting referral fees from LLCs from Mr. Goldberg for tax

11  certioria work --

12  A.  Excuse me.  I said I only know that he disclosed to me that

13  he had to disclose certain fees that he was getting from

14  Glenwood LLCs.

15  Q.  LLCs.

16  A.  LLCs.  He didn't mention anything about Mr. Goldberg.

17  Q.  But he said LLCs.

18  A.  Correct.

19  Q.  The LLCs are what Mr. Goldberg represents in the tax firm;

20  right?

21  A.  Yes.

22  Q.  Now, you said that you called either Mr. Dorego or

23  Mr. Runes.  You're not sure which; is that right?

24  A.  Correct.

25  Q.  And that you thought it was important to tell them about

FBD5sil2                          Meara - cross

1    this because this was a concern of bad publicity for Glenwood;

2    right?

3                   MR. MASTER:  Objection.

4                   THE COURT:  Overruled.

5                   THE WITNESS:  And Mr. Silver.

6    BY MR. MOLO:

7    Q.  Right.  And Mr. Silver.

8                   But your concern here was a concern about publicity;

9    right?

10   A.  Publicity in politics.

11   Q.  Publicity in politics; correct?

12   A.  Correct.

13   Q.  I believe you said after that call --

14                  THE COURT:  After which call?

15                  MR. MOLO:  That's correct.  Excuse me.

16   BY MR. MOLO:

17   Q.  After the call that you had with either Mr. Runes or

18   Mr. Dorego, you understood that they would be seeking some

19   clarification of the relationship; is that right?

20   A.  That's what they said.

21   Q.  That was pretty much the last you knew of things; right?

22   A.  My last what?

23   Q.  That was your last contact on this issue; correct?

24   A.  Well, sometime afterwards, they called and said they

25   received the clarification that they asked for.

FBD5sil2                        Meara - cross

1   Q.  So you understood that they did receive a clarification?

2   A.  Yes.

3   Q.  After that, no one came to you and said, stop lobbying

4   Mr. Silver; correct?

5   A.  Correct.

6   Q.  No one came to you and said, we have to go, you know, make

7   some kind of disclosure to someone, did they?

8   A.  They said they got a clarification.  That's all they said.

9   Q.  Your work as a lobbyist continued?

10  A.  Yes.

11  Q.  For Glenwood?

12  A.  Yes.

13  Q.  And you continued to lobby the assembly; correct?

14  A.  Yes.

15  Q.  And you continue to lobby Mr. Silver specifically on rent

16  regulation issues and other issues; right?

17  A.  No.

18  Q.  You did not?

19  A.  No.

20  Q.  At that point, you were not lobbying Mr. Silver?

21  A.  No.  I was lobbying him on many issues.  I was not lobbying

22  him on rent regulations.

23  Q.  Because that issue had already passed.

24  A.  Yes.

25  Q.  It had come to closure earlier in the year; right?

FBD5sil2                              Meara - cross

1    A.   Yes.

2    Q.   The suggestions that were made in the meeting that you and

3    Mr. Runes had with Mr. Silver --

4    A.   What?  On the legislation?

5    Q.   On the legislation.  Yes.

6    A.   Correct.

7    Q.   Just to go back now, you testified earlier this morning

8    that you and Mr. Runes met with Mr. Silver concerning rent

9    regulation legislation; correct?

10   A.   2011.

11   Q.   2011.  Correct.

12        The proposal that was being put forth by the assembly

13   at the time of your meeting was more aggressively pro tenant

14   than you would have liked; is that right?  Is that a fair

15   statement?

16   A.   Yes.

17   Q.   At that point in time, 421a was not all that controversial;

18   is that correct?

19   A.   Not that year.

20   Q.   At that point in time in 2011.

21   A.   Yes.  It was not.

22   Q.   It was not all that controversial.

23        What you and Mr. Runes did was pick out pieces of

24   prior assembly bills on the issue of rent regulation that had

25   been passed by the assembly but not passed by the senate and

FBD5sil2                      Meara - cross

1    suggested some of those to Mr. Silver as rent regulation

2    changes that would be okay with the senate.

3              Right?

4    A.  I never said okay with the senate.

5    Q.  Okay.  Because you didn't speak for the senate.  As far as

6    Glenwood and developers went, you thought that would be

7    something that that interest group would be acceptable;

8    correct?

9    A.  It was something that would be acceptable to Glenwood.  We

10   did not speak for any other developers.

11   Q.  Those were all things that the assembly had included in

12   their prior pro tenant bills that never made it out of the

13   assembly; right?

14   A.  Not all those things, but some specific provisions.

15   Q.  And you were suggesting these changes as part of a

16   compromise; correct?

17   A.  I would not say "we" were.

18   Q.  You were.  You and Mr. Runes were suggesting these changes

19   as part of a compromise; is that correct?

20   A.  He was.  I was just there.

21   Q.  Mr. Silver listened to what you had to say?

22   A.  Yes.

23   Q.  The presentation was thoughtful, I take it; right,

24   Mr. Meara?

25   A.  I don't understand what that means.

FBD5sil2                          Meara - cross

1    Q.  He made a presentation based on facts; correct?

2    A.  He made a presentation based on things that he perceived

3    might be more acceptable to tenants and, therefore, the

4    democratic conference.

5    Q.  Mr. Silver did not demand from you something of value in

6    exchange for taking legislative action, did he?

7              MR. MASTER:  Objection.

8              THE COURT:  Overruled.

9              THE WITNESS:  No.

10   BY MR. MOLO:

11   Q.  As far as you've seen in the time that you've been down

12   there with Mr. Silver, he does a pretty good job in

13   representing the interests of his conference?

14   A.  Yes.

15             MR. MASTER:  Objection.

16             THE COURT:  Sustained.

17   BY MR. MOLO:

18   Q.  Is he effective at building consensus?

19             MR. MASTER:  Objection.

20             THE COURT:  Sustained.

21   BY MR. MOLO:

22   Q.  Does he designate --

23             THE COURT:  Does he what?

24             THE WITNESS:  Can I just say something, Judge?  I

25   can't see Mr. Master when he goes to stand up.  So I'm

1    answering questions quicker than he has an opportunity to

2    object.

3              THE COURT:  So he's got to speak up.

4              THE WITNESS:  I just need to really see him.

5              THE COURT:  Here is the deal.  He's not supposed to be

6    giving you hand signals.

7              THE WITNESS:  I understand.  He's behind the computer,

8    and I can't see when he goes to stand up.

9              THE COURT:  He has to stand up faster and be louder.

10             MR. MASTER:  Yes, your Honor.

11   BY MR. MOLO:

12   Q.  Based on your experience, it's not uncommon for Mr. Silver

13   to designate a staff person to be a point person on a

14   particular piece of legislation.

15             Is that true?

16   A.  I would say that's true.

17   Q.  In 2011, when it came to real estate legislation,

18   Mr. Silver had Jim Yates that was managing that process for the

19   most part?

20   A.  I don't recall that.

21   Q.  Do you recall Mr. Yates being his counsel?

22   A.  Yes.

23   Q.  And Mr. Yates is a retired judge; is that right?

24   A.  That's correct.

25   Q.  In addition to this real estate legislation, you're aware

FBDYSIL3                         Meara - Redirect

1    that Mr. Silver has worked very hard toward the redevelopment

2    of lower Manhattan through legislation?

3              MR. MASTER:  Objection.

4              THE COURT:  Sustained.

5    BY MR. MOLO:

6    Q.  He's made state education reform significant as part of his

7    legislative initiatives.  Mr. Silver.

8              MR. MASTER:  Objection.

9              THE COURT:  Sustained.  This is Mr. Meara.

10             MR. MOLO:  I'm asking did Mr. Silver do it.

11             THE COURT:  The objection is sustained.

12   BY MR. MOLO:

13   Q.  Have you seen Mr. Silver sponsor legislation that made

14   positive changes for the environment?

15             MR. MASTER:  Objection.

16             THE COURT:  Sustained.

17             (Pause)

18             MR. MOLO:  Nothing further, your Honor.

19             THE COURT:  Okay.  Mr. Master.

20             MR. MASTER:  Thank you, your Honor.  Thank you.

21   REDIRECT EXAMINATION

22   BY MR. MASTER:

23   Q.  Good afternoon, Mr. Meara.

24   A.  Good afternoon.

25   Q.  You were shown a large stack of bills --

FBDYSIL3                          Meara - Redirect

1   A.   Yes.

2   Q.   -- that were passed between, I think, 2004 and April 2011.

3   Right?

4   A.   Yes.

5   Q.   You described the term one-house bill for the members of

6   the jury.

7   A.   Yes.

8   Q.   Can you explain what that means.

9   A.   It means a bill that passes one house and doesn't pass the

10  other house.

11  Q.   How many bills are introduced into the assembly each year?

12  A.   Well, over a two-year legislative period, in excess of

13  10,000.

14  Q.   So is it fair to say that a lot of those 10,000 bills are

15  effectively one-house bills?

16  A.   Or not passed by either house.

17  Q.   Or just introduced in committee and don't ever make it out

18  of one house?

19  A.   Correct.

20  Q.   Is it also fair to say that with respect to rent-related

21  legislation in the assembly, that --

22          MR. MOLO:   Objection, your Honor.  The question is

23  leading.

24          THE COURT:   Well, he hasn't gotten the question out

25  yet.

1           MR. MASTER:  I'll rephrase, your Honor.

2           THE COURT:  Okay.

3    BY MR. MASTER:

4    Q.  Is it also fair to say that with respect to this

5    legislation that was presented to you, what, if any, awareness

6    do you have of an annual tradition of passing pro-tenant

7    legislation in the assembly?

8    A.  A longstanding tradition.

9    Q.  So what, if any, significance does it have that a

10   particular bill is passed on an annual cycle that happens to be

11   pro tenant?

12   A.  I think it affirms the assembly's position that it's pro

13   tenant, and it enables them to state that the republicans vote

14   against them, and they don't get voted on at all in the senate.

15   It's an expression of their concern about tenants.

16   Q.  So is it fair to say that it's not -- many of these bills

17   do not have an expectation of making any headway in the senate?

18           MR. MOLO:  Objection.

19           THE COURT:  Sustained.

20           Rephrase the question.

21   BY MR. MASTER:

22   Q.  You were describing this annual tradition, this

23   longstanding annual tradition.

24           Other than the times when these laws are set to

25   expire, how often do these annually passed one-house bills have

1    a chance of becoming law?

2    A.   You never know.  I mean, I think it's been traditional that

3    the assembly passes one house bills on tenant legislation that

4    the senate is never going to do, but I'll just repeat.

5         It gives the sponsors and the body itself an ability

6    to evidence to constituents and to argue in the press that

7    they're pro tenants and that the republicans are not.

8    Q.   So is it fair to say that it has --

9         THE COURT:  Are you suggesting these are passed for

10   political reasons and not with any expectation they're actually

11   going to become law?

12        THE WITNESS:  Well, politics not in the sense of

13   getting re-elected necessarily but politics in the sense of

14   stating a position that they stake out as their own position

15   and want to express every year that their dedication to

16   protecting tenants continues.

17        THE COURT:  Okay.

18   BY MR. MASTER:

19   Q.   And you stated that this is a position of the democratic

20   conference as a whole?

21   A.   Yes.  Maybe not every member of it but certainly the major

22   majority of it.

23   Q.   Mr. Meara, are you aware of any other member of the

24   democratic conference who is receiving fees from Glenwood or

25   its LLCs?

1              MR. MOLO:  Objection.

2              THE COURT:  Overruled.

3              THE WITNESS:  No.

4    BY MR. MASTER:

5    Q.  Were you aware, during all of those years that those

6    one-house bills were passed, that Mr. Silver was receiving

7    substantial fees from Glenwood and its LLCs?

8              MR. MOLO:  Objection.

9              THE COURT:  Overruled.

10             Were you aware?

11             THE WITNESS:  No.

12   BY MR. MASTER:

13   Q.  You were asked some questions on cross-examination about

14   concerns that you had.  And you stated that they were publicity

15   and political concerns.

16   A.  Yes.

17   Q.  Is it fair to say that you had additional concerns beyond

18   that?

19   A.  Yes.

20   Q.  Just tell the members of the jury what concerns there were

21   beyond just the PR.

22   A.  Well, since I didn't understand the differential between

23   Glenwood and Glenwood LLCs, I thought there must be a reason

24   why somebody would make a distinction, and I didn't understand

25   what it was and whether that distinction was a legal

FBDYSIL3                    Meara - Redirect

1   distinction or not.

2   Q.  Again, as a practical matter, were you able to determine

3   whether there was any distinction in terms of the management

4   and control of Glenwood and its LLCs?

5            MR. MOLO:  Objection.

6            THE COURT:  Rephrase the question, please.

7   BY MR. MASTER:

8   Q.  As a practical matter, what, if any, distinction were you

9   aware of --

10   A.  I was not aware of any.

11   Q.  You were asked some questions on cross-examination about

12   whether the defendant was talkative.

13            Do you remember that?

14   A.  Yes.

15   Q.  Is it fair to say that Sheldon Silver --

16            MR. MOLO:  Objection.  That misstates the testimony.

17            THE COURT:  Overruled.

18   BY MR. MASTER:

19   Q.  Is it fair to say that, in your experience, Sheldon Silver

20   tells you what he wants you to know?

21   A.  Yes.

22   Q.  Again, he didn't tell you until late the end of 2011 that

23   he was getting any fees from Glenwood or its LLC.

24            MR. MOLO:  Objection.

25            THE COURT:  Overruled.

1          THE WITNESS:  Say it again.

2          MR. MASTER:  Sure.

3   BY MR. MASTER:

4   Q.  Is it fair to say that until the very end of 2011, he did

5   not tell you that he was getting any fees from Glenwood or its

6   LLCs?

7   A.  That's correct.

8   Q.  In fact, he did talk to you about Glenwood when you were

9   lobbying for Glenwood.

10  A.  Yes.

11  Q.  In fact, he talked to you about what he did for Weitz &

12  Luxenberg.

13  A.  Yes.

14  Q.  And, again, what, if anything, did he say when he was

15  talking to you about Weitz & Luxenberg about any asbestos cases

16  that he was bringing to the firm?

17          MR. MOLO:  Objection.

18          THE COURT:  Overruled.

19          MR. MOLO:  Lack of foundation.

20          THE WITNESS:  Nothing.

21          THE COURT:  Mr. Molo, if you want me to hear what your

22  objection is, you have to state it and state it clearly.

23          MR. MOLO:  Sorry.  Lack of foundation.

24          THE COURT:  Overruled.  Lack of foundation?

25          MR. MOLO:  He asked about some abstract conversation.

1          THE COURT:  Overruled.

2     BY MR. MASTER:

3     Q.  What, if anything, did he tell you about Dr. Robert Taub?

4     A.  Nothing.

5          MR. MASTER:  Nothing further.

6          MR. MOLO:  One question, your Honor.

7     RECROSS EXAMINATION

8     BY MR. MOLO:

9     Q.  Do you understand this LLC point, that these are referral

10    fees paid to Mr. Silver from Mr. Goldberg?

11         MR. MASTER:  Objection, your Honor.

12         THE COURT:  Sustained.

13         If you'd like to rephrase the question.

14    BY MR. MOLO:

15    Q.  They talked about fees from Glenwood.  These are referral

16    fees --

17         THE COURT:  Sustained.  Ask a straight question to

18    him.

19         MR. MOLO:  On cross-examination.

20    BY MR. MOLO:

21    Q.  The fees that Mr. Silver is receiving are referral fees

22    that Mr. Goldberg is paying to him.

23         Do you understand that?

24    A.  Can I answer in my own words?

25         THE COURT:  Yes.

1          THE WITNESS:  I didn't know what kind of fees they

2     were.  I didn't know if he participated in acting on the tax

3     certiorari applications or not.  I didn't know they were just

4     referral fees.

5     BY MR. MOLO:

6     Q.  Right.  And you left it to Mr. Runes and Mr. Dorego to deal

7     with.

8     A.  Yes.

9          THE COURT:  Okay.  Thank you.  Now you can step down.

10          THE WITNESS:  Thank you very much, Judge.

11          THE COURT:  You're welcome.

12          (Witness excused)

13          THE COURT:  Call your next witness.

14          MS. COHEN:  Your Honor, the government calls Richard

15     Runes.

16          THE COURT:  Ms. Cohen.

17          MS. COHEN:  Thank you, your Honor.

18          MR. MASTER:  May I proceed?

19          THE COURT:  Yes.  Please.

20          MR. MASTER:  Thank you.

21      RICHARD RUNES,

22          called as a witness by the Government,

23          having been duly sworn, testified as follows:

24     DIRECT EXAMINATION

25     BY MR. MASTER:

FBDYSIL3                    Runes - Direct

1   Q.  Good afternoon, Mr. Runes.

2   A.  Good afternoon.

3   Q.  What, if anything, do you do for Glenwood Management?

4   A.  I'm an attorney, and I'm also an attorney that specializes

5   in government relations work.

6   Q.  For how long has Glenwood been one of your clients?

7   A.  For at least 15 years.

8   Q.  What, in summary, do you do for Glenwood in the area of

9   government relations?

10  A.  Glenwood Management manages real estate in New York, and I

11  run or supervise their lobbying program.  I give them advice on

12  dealing with various levels of government -- state, city,

13  local, depending on the issue.

14  Q.  What, if any, role do you play with respect to Glenwood's

15  lobbyists?

16  A.  I supervise their lobbyists.

17  Q.  Until mid 2013, to whom did you report at Glenwood?

18  A.  Mr. Leonard Litwin.

19  Q.  For how long have you worked for Glenwood?

20  A.  I believe I said at least 15 years.

21          THE COURT:  I'm sorry.  Are you in house or Glenwood,

22  or do you have your own firm?

23          THE WITNESS:  No.  It's my own practice, your Honor.

24          THE COURT:  Okay.

25  BY MR. MASTER:

FBDYSIL3                    Runes - Direct

```
 1  Q.  Just to follow up on that, Mr. Runes, you said you had your

 2  own practice.

 3          For how long have you served essentially in this role

 4  as coordinator of government relations for Glenwood?

 5  A.  For at least 15 years.

 6  Q.  Mr. Runes, how would you describe Glenwood Management's

 7  business model?

 8  A.  Well, Glenwood Management, meaning the entire business --

 9  Glenwood Management is a real estate management company that

10  manages luxury rental apartment houses built by Mr. Litwin and

11  his family.

12  Q.  So, given that, is it fair to say that there is only one

13  building type that they specialize in?

14  A.  Yes.  We are pretty much a one-trick pony.  Mr. Litwin and

15  his family just build luxury rental housing, predominantly in

16  Manhattan and New York City.

17  Q.  And you just described Glenwood's management as a one-trick

18  pony.

19          How widely publicized is Glenwood Management's

20  ownership of these luxury rental buildings?

21  A.  I believe it's the largest family-owned luxury rental

22  housing company in New York.

23  Q.  Now, how, if at all, do state laws, regulations, or

24  programs affect Glenwood's business model?

25  A.  Again, when you say "Glenwood," you mean the constituent
```

1    LLCs that own the buildings as well I assume?

2    Q.  Absolutely.

3    A.  Well, the buildings are subject to the New York State Rent

4    Stabilization Law, the Emergency Tenant Protection Act.  The

5    buildings are subject to various state laws, as well as city

6    regulations.

7    Q.  So, when you say "the buildings," you were describing how

8    the buildings are owned by, legally owned, by LLCs.

9              So does that mean that the state laws and regulations

10   affect those LLCs?

11   A.  Yes.  Each building is at least one separate LLC in most

12   cases.

13   Q.  Again, the state laws and regulations that you were

14   describing -- you're saying they directly affect the LLCs?

15   A.  Yes.  For example, the Rent Stabilization Code, the Rent

16   Stabilization Law, the Emergency Tenant Protection Act.  We

17   normally get our financing through the Housing Finance Agency,

18   HFA.  That's a state agency.

19   Q.  Again, we'll get to some of those things later.

20             With respect to the application of these various state

21   programs, for example, HFA financing -- that's a state

22   financing vehicle.

23             That financing -- is that received in the

24   first instance by the LLCs?

25   A.  Yes.

FBDYSIL3                          Runes - Direct

1   Q.  Again, what relationship does Glenwood Management have on

2   top of these LLCs?

3   A.  Well, Glenwood Management manages the apartment houses.

4   Q.  Who is the sole owner of Glenwood Management?

5   A.  Mr. Leonard Litwin.

6   Q.  Who owns all of those Glenwood Management LLCs directly or

7   indirectly?

8   A.  The Litwin family, I believe, through trust.  But I'm not

9   100 percent sure.  They are owned by the Litwin family.  I

10  think there's one building in which they may have a partner.

11  Q.  So, just to be clear, the same family owns both Glenwood

12  and its LLCs?

13  A.  Correct.

14  Q.  Now, you were talking earlier about a few different

15  programs.  First of all, this financing, HFA financing.

16          What is HFA financing?

17  A.  It's the Housing Finance Agency, which is able to float

18  tax-except bonds and thereby provide lower interest rate loans,

19  mortgages, to developers.

20  Q.  You stated that's a state agency?

21  A.  Yes.

22  Q.  What body or bodies need to approve state subsidized

23  financing through HFA?

24  A.  I'm not sure I understand what you mean.

25  Q.  Well, are you aware of an entity called the Public

1   Authorities Control Board?

2   A.   Yes.   The HFA decides who they're going to give part of

3   their bond allocation to.   And, after they do that, it goes on

4   the agenda of the PACB, the Public Authorities Control Board.

5   And it needs to be passed unanimously by the PACB, meaning with

6   no negative votes.

7   Q.   There are a couple of concepts that I think bear further

8   explanation.

9            What is a bond allocation?   What do you mean by that?

10  A.   The federal government provides bond allocations to the

11  various states.   Then within the state, the state allocates

12  that to different agencies for tax-exempt financing.

13  Q.   Is HFA one of those agencies?

14  A.   It is.

15  Q.   So can Glenwood access some of that federally subsidized

16  bond allocation through HFA?

17  A.   Yes.   If the project is approved by HFA.

18  Q.   Let's say it is approved by HFA.

19            Who else needs to approve the financing before it can

20  be received by Glenwood?

21  A.   I believe you just asked about that.   PACB has to approve

22  that.

23  Q.   I'd like you to take a look at what's in your binder as

24  Government Exhibit 753.

25            Do you recognize that document?

1   A.  Yes.

2   Q.  What is that document?

3   A.  Well, it's an email from me to Carol Pittelman and Charlie

4   Dorego.

5   Q.  Does it relate to the PACB?

6   A.  It does.  It's a copy of an agenda from the PACB with

7   regard to 320 West 38th Street.

8           MR. MASTER:  The government offers Government Exhibit

9   753.

10          THE COURT:  Any objection?

11          MR. MOLO:  No objection, your Honor.

12          THE COURT:  All right.  753 is received.

13          (Government's Exhibit 753 received in evidence)

14   BY MR. MASTER:

15   Q.  Mr. Runes, while we're on the subject of the PACB, what's

16   the date of this email?

17   A.  August 17, 2014.

18   Q.  It states, "Charlie, as per your request," and Charlie is

19   Charlie Dorego?

20   A.  Yes.

21          MR. MASTER:  Just turn to the next page, Mr. Coccaro.

22   BY MR. MASTER:

23   Q.  So, Mr. Runes, can you just explain for the members of the

24   jury who sits on the PACB.

25   A.  I have to change my glasses.  I'm sorry.

1              MR. MASTER:  Mr. Coccaro, can you just zoom in on the

2     top.

3              THE WITNESS:  The legislative leaders or their

4     designees serve on it.  In this one, it's Assemblyman Sheldon

5     Silver, Senator John DeFrancisco, who was then chairman of Ways

6     and Means -- senate finance rather -- Assemblyman Joseph

7     Giglio, and Senator Bill Perkins.

8     Q.  What is your understanding of how the vote works on the

9     PACB.

10    A.  I believe that, when a vote is taken, if nobody votes no,

11    it passes.  If one person votes no, it does not pass, like the

12    Security Council in the United Nations.

13    Q.  Meaning that if Sheldon Silver or his designee voted no --

14             MR. MOLO:  Objection.

15             THE COURT:  Overruled.

16    BY MR. MASTER:

17    Q.  -- it would not pass?

18    A.  Correct.  If either one of them did not.

19    Q.  Mr. Runes, if you wouldn't mind going to page 5 and 6 of

20    this document.

21    A.  Yes.

22    Q.  Do you see anything in there --

23             MR. MASTER:  I guess it would be page 6 in the

24    document altogether but page 5 of the agenda.

25             THE WITNESS:  It's page 5 and 6.  14-HF-387A.

FBDYSIL3                        Runes - Direct

 1   BY MR. MASTER:

 2   Q.  Does this relate to a Glenwood building?

 3   A.  Yes.  This is one of our buildings.

 4   Q.  And it's a building located at 320 West 38th Street?

 5   A.  Yes.

 6   Q.  What was the bond amount that this related to?

 7   A.  It says not to exceed $315,000,000.

 8   Q.  Are those tax-exempt bonds that Glenwood had received

 9   through one of its LLCs?

10   A.  I believe so, yes.

11   Q.  It states at the bottom, that "The remaining $40,000,000 of

12   the prior bonds will be redeemed with funds from the borrower,

13   West 38th LLC."

14           And then do you see where it says --

15           MR. MASTER:  At the top of page 6, Mr. Coccaro, if you

16   could just continue.

17   BY MR. MASTER:

18   Q.  "A single-purpose entity controlled by Carol Pittelman and

19   Leonard Litwin."

20           Do you see that?

21   A.  Yes.

22   Q.  Again, who is Carol Pittelman?

23   A.  That's Mr. Litwin's daughter.

24   Q.  Again, Mr. Litwin is the owner of Glenwood Management?

25   A.  He is.

1    Q.  Again, this is listed on the agenda of a particular PACB

2    meeting.

3             What's the date of that meeting?

4    A.  August 13, 2014.

5    Q.  So, again, is this the type of tax-exempt financing that

6    you were talking about?

7    A.  Yes.

8    Q.  Now, I think you were talking about a couple of other

9    programs that are set or created at the state level.

10            Are you familiar with a program called 421a?

11   A.  Yes.

12   Q.  Just describe for the members of the jury what 421a is.

13   A.  421a of the real property tax law is a program that permits

14   developers to build housing in New York City and get what's

15   called a tax abatement for their building so that when the

16   construction is finished, it is assessed initially as though

17   the building wasn't there, and the full assessment phases in

18   over a number of years.

19            Even though it's a state program, it's really city

20   money because it's city property tax.

21            THE COURT:  How many years does it phase in over?

22            THE WITNESS:  Depending on where it's located,

23   your Honor.  It could be 10, 15, or more years.

24            THE COURT:  Okay.

25   BY MR. MASTER:

FBDYSIL3                          Runes - Direct

1   Q.  So it's a cost that's imposed on the city as a result of

2   the state program?

3   A.  Well, it's borne by the city.  I wouldn't necessarily use

4   the word "imposed" because the program is usually designed by

5   whoever the mayor is when it gets renewed.

6   Q.  Again, is the continued existence of 421a -- is that

7   something that's decided at the state level?

8   A.  Yes, because 421a is one of those statutes that has what's

9   called a sunset provision.  It expires, and, therefore, has to

10  be renewed.

11             THE COURT:  Can I see the attorneys at sidebar.

12             (At the sidebar)

13             THE COURT:  How long is this direct going to be?

14             MR. MASTER:  About an hour.

15             THE COURT:  So you'll go until 2:30?

16             MR. MASTER:  Something like that, yes, your Honor.

17             THE COURT:  Okay.

18             How long is your cross going to be?

19             MR. MOLO:  I haven't heard the direct yet.  Maybe

20  we'll get it done today.  My preference is to get it done

21  today.

22             THE COURT:  Okay.  Thank you.

23             (In open court)

24             THE COURT:  Okay, Mr. Master.

25             MR. MASTER:  Yes, your Honor.  Thank you.

1    BY MR. MASTER:

2    Q.  Mr. Runes, there's another program that I wanted to ask you

3    about briefly.  It's called rent control or rent stabilization.

4              Are you familiar with that?

5    A.  Yes.  Those are two separate programs, rent control and

6    rent stabilization.

7    Q.  Are both of those, whatever contours -- are they both set

8    at the state level?

9    A.  Yes, they are.  Both of those statutes are controlled by

10   the state legislature and the governor.

11   Q.  And do those laws also sun set?

12   A.  Yes.

13   Q.  How common is it for laws to sun set in New York State?

14   A.  There are certain types of laws which do sun set.  Most

15   laws do not, but quite a number do.

16   Q.  Are these the types of laws that -- is this category of law

17   one of those laws that sun sets?

18   A.  Well, the rent regulatory laws almost have to sun set

19   because, if they were made permanent, they might not be deemed

20   to be constitutional.  So they get renewed every four or eight

21   years.

22              And, even within that construct, there have to be

23   findings of a continuing emergency.  Otherwise, they would not

24   necessarily be constitutional.

25   Q.  How about with respect to the other programs?  421a and the

1   availability of tax-exempt financing.

2           Are those also laws that sun set periodically?

3   A.  They do.  As a matter of fact, they normally sun set when

4   the rent laws sun set.

5   Q.  What, if any, restrictions does state rent law place on

6   Glenwood's ability to set and increase rent on its units?

7   A.  Well, for those units that are built before 1974 and were

8   rent stabilized and remain rent stabilized, the amount of money

9   that Glenwood can increase the rent is determined by the Rent

10  Guidelines Board, and there are other types of limitations.

11  Q.  How about for the more recent buildings?  The newer

12  buildings.

13  A.  Those newer buildings -- the initial rent is set by

14  Glenwood, if it's approved by the city, the rent roll.  And,

15  thereafter, as long as the tax abatement is on the building,

16  the increases in rent are similarly regulated.

17  Q.  Now, what effect does the regular sunset of all of these

18  programs have on Glenwood's political activities?

19  A.  Well, we obviously care a lot about what happens to those

20  laws when they sun set.  Because, when they sunset is usually

21  when they are amended if they are amended.

22          So we gear up.  But we do run a lobbying or political

23  operation continuously rather than just waiting once every four

24  years to participate in the process.

25  Q.  Why do you continuously participate rather than just paying

1  attention once every four years?

2  A.  Because you need to have good relationships and a good

3  reputation with people all along.  You can't just call them and

4  say, hi.  I'm back.  It's four years.  Renew the laws.

5  Q.  So how important is it to Glenwood's business model to

6  create and maintain these favorable relationships with the

7  leadership of the houses of New York state Legislature?

8  A.  It's pretty important to us.  We try to do that.

9  Q.  What, if any, personal involvement do legislative leaders

10  have on the legislation we've just been talking about?

11  A.  The legislation you're talking about, particularly the rent

12  laws -- the legislative leadership and the governor and their

13  staffs take a fairly hands-on role.

14  Q.  When you say "hands on," what do you mean by that?

15  A.  I think those three people -- the senate majority leader,

16  the speaker, and the governor -- end up making the decision on

17  how those laws are extended.

18  Q.  How is that different from some of the other legislation

19  that you've been involved in over the years?

20  A.  Well, the legislature passes hundreds of bills a year, and

21  a lot of those bills, while they're reviewed by the senate

22  majority's staff or the speaker's staff or the governor's

23  staff, they don't necessarily reach the desks of those leaders

24  themselves.

25  Q.  And so how important is it to Glenwood that on this key

1   legislation you have relationships with legislative leaders?

2   A.  Pretty important.

3   Q.  And even though these sun set and negotiations only happen

4   periodically, how important is it to maintain those

5   relationships over time?

6   A.  It's important.

7   Q.  What role, if any, do legislative leaders play in

8   controlling the flow of legislation in each house?

9   A.  The legislative leaders and their staffs pretty much

10  control the flow of legislation in their respective houses.

11  Q.  If you could just explain to the members of the jury what

12  that means in practical terms.

13  A.  Well, in practical terms, a bill has to be introduced.

14  It's then referred to a substantive committee, whether it's the

15  environmental committee or the judiciary committee, whatever.

16          The bill has to be voted out of that committee.  And

17  then, if it's past a certain date, it has to go to something

18  called the Rules Committee.  And then from the Rules Committee,

19  it goes to the floor.  And then it has to be placed on what's

20  called the active list to be voted on.

21          At any one of those stages, the bill may or may not

22  proceed to the next stage.  If it doesn't proceed to the next

23  stage, it doesn't get voted on on the floor and doesn't become

24  law.

25  Q.  So, when Sheldon Silver was Speaker of the Assembly, what

1    role did he play in controlling the flow of legislation in the

2    assembly?

3    A.  He and his staff would control the flow of legislation to

4    the floor.

5    Q.  How, if at all, does the control over legislation, this

6    power, affect Glenwood?

7    A.  Well, if there are bills we like and they reach it to the

8    floor, that's a good thing.  If there are bills we don't like

9    and they make it to the floor, that's not such a good thing.

10   Q.  Now, does Glenwood Management openly participate in the

11   state political process?

12   A.  We do.

13   Q.  Let's talk about the ways in which it does that.

14            First, does Glenwood lobby the state government?

15   A.  Yes.

16   Q.  Is Glenwood required to publicly file state lobbying

17   disclosures?

18   A.  Yes.

19   Q.  What sort of information is contained in those disclosures?

20   A.  The amount of money that we pay the lobbyists and what

21   bills that we lobby.

22   Q.  So I believe this is already admitted into evidence.  If

23   you wouldn't mind just taking a look at 757-1.

24            MR. MASTER:  If you wouldn't mind publishing that.  I

25   think it's already in evidence.

1    THE COURT:  It is.

2    BY MR. MASTER:

3    Q.  Again, is this the type of information that's publicly

4    filed concerning lobbyists?

5    A.  Yes.

6    Q.  Are you listed in here as one of the lobbyists for

7    Glenwood?

8    A.  I hope so.  Yes.

9    Q.  Do you get a fee, a publicly reported fee, for lobbying on

10   behalf of Glenwood?

11   A.  Yes.

12   Q.  Do you have to file certain documents yourself as a

13   registered lobbyist?

14   A.  I do.

15   Q.  Are those publicly filed as well?

16   A.  They are.

17   Q.  I'd like you to take a look at what's in your binder as

18   Government Exhibit 842.

19        Take a look at it and let me know if you --

20   A.  I'm slow getting there.

21   Q.  Just let me know if you recognize it.

22   A.  Yes.

23        (Pause)

24        MR. MASTER:  Just one moment, your Honor.  I just need

25   to confer with Mr. Molo.

1        THE COURT:  Okay.

2        (Pause)

3   BY MR. MASTER:

4   Q.  Do you recognize that document or series of documents?

5   A.  The series of documents, yes.

6   Q.  Are those the publicly filed lobbying disclosures?

7   A.  They're part of it.  This is the sort of retainer letter

8   setting out the nature of the relationship that has to be filed

9   every year.

10       MR. MASTER:  The government offers Government Exhibit

11  842.

12       THE COURT:  Any objection?

13       MR. MOLO:  No.  No objection.

14       THE COURT:  842 is received.

15       (Government's Exhibit 842 received in evidence)

16  BY MR. MASTER:

17  Q.  Again, Mr. Runes, you were just describing what these were.

18  But are these some of the documents that you have to file

19  publicly to inform the public that you are in fact lobbying on

20  behalf of Glenwood?

21  A.  Yes.

22  Q.  So what is your retainer that was listed in this first

23  document?

24  A.  It was $5,000 a month.

25  Q.  Did it subsequently increase?

1    A.  It did.

2    Q.  Are you paid additional fees on top of that sum to serve in

3    your other roles for Glenwood?

4    A.  Yes.  The smallest of my roles is the actual lobbying.

5    Q.  Does Glenwood participate openly in the state political

6    process through campaign contributions, as well as through

7    lobbying activities?

8    A.  Yes.

9    Q.  Over the past decade, approximately how much has Glenwood

10   donated to state candidates and campaigns?

11   A.  Approximately $10,000,000.

12   Q.  During that period of time, where has Glenwood ranked as

13   compared to other corporate or individual donors to state

14   candidates or campaigns, at least with respect to certain

15   election cycles and campaigns?

16           MR. MOLO:  Objection, your Honor.

17           THE COURT:  You're objecting to the form of the

18   question?

19           MR. MOLO:  I'm sorry?

20           THE COURT:  Is your objection to the form of the

21   question?

22           MR. MOLO:  Well, that, as well as the relevance of

23   this question.

24           THE COURT:  Rephrase the question.

25           The objection on relevance is overruled.

FBDYSIL3                    Runes - Direct

1   BY MR. MASTER:

2   Q.  During that period, where has Glenwood ranked as compared

3   to other corporate or individual donors to state candidates and

4   campaigns?

5   A.  Pretty much at the top.

6          THE COURT:  Ladies and gentlemen, remember we talked

7   maybe last week.  There's nothing illegal about political

8   contributions.  The issue is whether there's a quid pro quo.

9   That's what you're being asked to consider as part of this

10  case.

11  BY MR. MASTER:

12  Q.  Again, are those political contributions disclosed publicly

13  through public filings?

14  A.  When they're made to campaign organizations like an

15  assemblyman or a state senator's campaign organization.

16  Q.  Through what entity or entities does Glenwood make its

17  political contributions?

18  A.  Through the LLCs that own the constituent buildings.

19  Q.  And, again, who manages all of those LLCs that make those

20  contributions?

21  A.  Well, Glenwood Management manages the buildings.

22  Q.  Who makes the decisions about which contributions to

23  make -- withdrawn.

24          Who owns Glenwood Management?

25  A.  Mr. Leonard Litwin.

FBDYSIL3                          Runes - Direct

1   Q.   Before Mr. Litwin left the office in 2013, who approved all

2   political contribution decisions?

3   A.   Mr. Litwin.

4   Q.   Once Mr. Litwin made a contribution decision, how would the

5   decision be carried out?

6   A.   In most instances, a check or checks would be made out to

7   the campaign organization.  And I would receive a phone call or

8   a request as to whether the check should be sent directly to

9   the entity or whether they should be sent to me, and I would

10  have the contributions delivered to the committees.

11  Q.   Again, would the contributions be made out typically in the

12  name of Glenwood Management?  Or would it be made out in the

13  name of the LLCs?

14  A.   Typically -- as a matter of fact, the only way I remember

15  them -- is being made out in the name of the LLCs.  They would

16  be on checks of the accounts of the LLCs.

17  Q.   So, when you were delivering those checks, how would you

18  make it known to the recipients of the checks about any

19  connection that there was between the LLCs and Mr. Litwin?

20  A.   Along with the checks, the Glenwood office would send me

21  envelopes with a 1200 Union Turnpike address.  And I would take

22  the checks, and I would attach my business card to the check

23  with a paper clip, put it in a 1200 Union Turnpike envelope,

24  and deliver it to whichever campaign committee it was going to.

25  Q.   Is 1200 Union Turnpike an address for Glenwood Management?

FBDYSIL3                        Runes – Direct

 1   A.  It is the main office of Glenwood Management.

 2   Q.  Is that also the address for each of the constituent LLCs?

 3   A.  Yes.

 4   Q.  Now, until early this year, who was the leader of the state

 5   assembly?

 6   A.  Sheldon Silver.

 7   Q.  What political party was he part of?

 8   A.  I believe he's still part of the democratic party.

 9   Q.  How solid was Sheldon Silver's majority in the assembly?

10   A.  As I recall, the democrats controlled approximately 105 of

11   150 seats in the assembly.  So, if that's what you mean, it was

12   a pretty solid majority.

13   Q.  Actually, before I continue with this point, with respect

14   to the LLCs, why did you include your business card with the

15   checks?

16   A.  So that people would know that it was coming from Glenwood

17   Management and Mr. Litwin.  If they saw the 1200 Union Turnpike

18   and my card on the check, they would know whose check it was.

19          THE COURT:  Just out of curiosity, why didn't you put

20   them in a letter from Glenwood saying, dear Mr. So and so,

21   enclosed please find my contribution?

22          THE WITNESS:  Because it wasn't Glenwood making the

23   contribution.  It was the LLC, number one.  Number two, that's

24   just the way we did it.

25          THE COURT:  Okay.

FBDYSIL3                          Runes - Direct

1    BY MR. MASTER:

2    Q.  For how long had Sheldon Silver been speaker?

3    A.  For at least 20 years I believe.

4    Q.  As of late 2014, who is the leader of the senate?

5    A.  Senator Dean Skelos.

6    Q.  How solid was his majority?

7    A.  Not so solid.  It was a one- or two-vote majority.

8    Q.  And what, if any, changes in control of the changes had

9    occurred in prior years?

10   A.  A few years before that, the house had actually switched

11   from republican control to democratic control for a period of

12   two years.

13   Q.  So where has Glenwood focused the majority of its political

14   contributions in the legislature?

15   A.  In the state senate.

16   Q.  Why was it important for Glenwood to focus its

17   contributions in the senate?

18   A.  The state senate republicans were more compatible with the

19   issues and opinions of Glenwood.

20   Q.  In addition to contributing, as you said, a majority to the

21   state senate, have you made contributions to political

22   committees that were headed by Sheldon Silver as well?

23   A.  We have.

24   Q.  Which ones?

25   A.  I believe we contributed to DACC, the Democratic Assembly

FBDYSIL3                         Runes - Direct

1    Campaign Committee.

2    Q.  Did you contribute to Sheldon Silver's own campaign as

3    well?

4    A.  I believe we did.

5              MR. MASTER:  If you wouldn't mind just pulling up on

6    the screen what was previously introduced as 755-7.

7    BY MR. MASTER:

8    Q.  I don't know if it's in your binder, sir.

9    A.  It's not here.

10   Q.  These were previously introduced checks.  They're made out

11   to -- I guess on this page -- Friends of Silver.

12             MR. MASTER:  And then if you wouldn't mind paging

13   through.  Continue.  Actually, if you wouldn't mind,

14   Mr. Coccaro, just zooming in on one of those checks.

15   BY MR. MASTER:

16   Q.  So that's a check from East 77th Realty LLC to DACC.

17             Do you see that?

18   A.  I do.

19   Q.  It's dated June 14, 2012?

20   A.  Yes.

21   Q.  Is DACC one of those committees that was headed by Sheldon

22   Silver?

23   A.  Yes.

24   Q.  Friends of Silver you saw earlier -- is that the name of

25   Sheldon Silver's personal political committee?

FBDYSIL3                          Runes - Direct

1    A.  I believe so.

2    Q.  Again, East 77th Realty LLC -- it lists an address of 1200

3    Union Turnpike.

4              Do each of the LLCs have the same address?

5    A.  They do.

6    Q.  Can you just explain for the members of the jury --

7    actually, withdrawn.

8              Could you take a look at Government Exhibit 755-5.

9    A.  Is it in my notebook?

10   Q.  It should be.

11   A.  Yes.

12   Q.  Do you recognize that document?

13   A.  Yes.

14   Q.  Is this one of the documents or one of the ways in which

15   you would inform Glenwood Management of your recommendations

16   concerning political contributions?

17   A.  Yes.

18   Q.  Would you also use this to inform others when Mr. Litwin

19   had made a decision concerning political contributions?

20   A.  Yes.

21             MR. MASTER:  The government offers 755-5.

22             THE COURT:  Any objection?

23             MR. MOLO:  Objection on relevance grounds, Judge.

24             THE COURT:  Overruled.

25             (Government's Exhibit 755-5 received in evidence)

1           MR. MASTER:  Would you mind publishing 755-5.

2    BY MR. MASTER:

3    Q.  Mr. Runes, what's the date on this email?

4    A.  June 10, 2012.

5    Q.  There's an indication at the bottom for DACC of five times

6    25,000.

7           Do you see that?

8    A.  I do.

9    Q.  Can you just explain for the members of the jury how it

10   came about that you were informing Glenwood of that

11   contribution decision.

12          THE COURT:  Is this a contribution decision?  Or is

13   this a recommendation?

14          THE WITNESS:  This was an actual contribution.

15          THE COURT:  Okay.

16   BY MR. MASTER:

17   Q.  Let me clarify.  So sometimes you would send emails to

18   recommend certain contributions?

19   A.  Correct.

20   Q.  And other times you would send an email to confirm

21   decisions that were made by Mr. Litwin?

22   A.  Correct.

23   Q.  Which one of those was this email?

24   A.  This was confirming the decision made by Mr. Litwin.  You

25   can see in the upper right-hand corner a $10,000 contribution

1    for Kennedy For Senate had been changed to $5,000 I believe.

2    Q.  Do you recognize that handwriting?

3    A.  No.

4    Q.  Who at Glenwood had the power to decide whether to increase

5    or decrease contributions?

6    A.  Only Mr. Litwin had the power to approve or disapprove

7    contributions or change the amounts.

8    Q.  Again, one of the contribution decisions that's conveyed

9    here is five times 25,000.

10            Can you just explain for the members of the jury how

11   that came about.

12   A.  I received a phone call -- I believe it was from Brian

13   Meara.  It could have been from Judy Rapfogel -- that the

14   speaker wanted to know when I would be available on a

15   particular Friday to receive a phone call.

16            I believe I told whoever it was that called that I

17   would be available between 12:00 and 1:00 on that Friday.  I

18   received --

19   Q.  Go ahead.

20   A.  I received a phone call from the speaker, and he said he

21   was calling about raising money for DACC, and would Mr. Litwin

22   and Glenwood --

23            MR. MOLO:  Your Honor, I object.  May I be heard?

24            THE COURT:  Okay.

25            (At the sidebar)

1         MR. MOLO:  As I understand the evidence, that in the

2    motions in limine was the fact of Glenwood being a major

3    political contributor.

4         Now we're getting into evidence about conversations

5    and phone calls made by Mr. Silver asking them for political

6    contributions.

7         It seems to me that that's sort of a different nature

8    and sort of suggests that there's some more direct linkage to

9    action and political contributions.

10        THE COURT:  I've charged the jury twice that political

11   contributions per se are not illegal and that what they have to

12   decide is whether there's a quid pro quo.

13        Are you asking me to charge something else?

14        MR. SHUR:  Judge, if I may, I don't know that it's

15   clear from the instruction that the government hasn't alleged

16   and part of the charges isn't that a thing of value in exchange

17   for an official act is a campaign contribution.

18        MR. MOLO:  Is not a campaign contribution.

19        MR. SHUR:  Does that make sense or no?

20        THE COURT:  I lost you.

21        MR. SHUR:  You said that campaign contributions are

22   lawful, and the issue for you is whether there was a quid pro

23   quo.  The government hasn't charged that McCormick campaign

24   contributions are part of the bribery scheme.  My only point is

25   I don't know that that's clear from the instruction.

```
1          THE COURT:  It will be.  That will be imminently

2    clear.  I actually think this jury is sharper than that.

3          MR. SHUR:  I'm not suggesting they're not.

4          THE COURT:  They know well that the issue is money

5    from Weitz & Luxenberg, money from Golberg & Iryami in exchange

6    for grants, jobs, a proclamation, a resolution.  It's not clear

7    to me yet exactly what the quo or the quid was relative to rent

8    yet.  I haven't heard it.

9          MR. MOLO:  In giving that instruction, I would ask

10   then, if it's not going to be excluded, if his testimony is not

11   going to be excluded, that that instruction be given and also

12   to say that there was nothing wrong with Mr. Silver making

13   these phone calls.  He can ask for contributions to his

14   committee.

15         THE COURT:  I'm not sure I'm prepared to say that.

16   The whole issue of him allowing the company -- kind of the loop

17   between Glenwood and Goldberg and him and the separation

18   between the two -- look.  I'm perfectly happy to charge, which

19   I just did, that political contributions are legal, and that's

20   not what this case is all about.

21         It seems to me that covers.  More specific charges we

22   can deal with as part of a longer charge when all the evidence

23   has come in.

24         MR. MOLO:  Okay.  Over our objection.  Thank you.

25         THE COURT:  Understood.
```

1            (In open court)

2     BY MR. MASTER:

3     Q.  So, Mr. Runes, before we broke, I was asking you how it

4     came about that Glenwood made that five times $25,000

5     contribution.  You were staying that you received a call from

6     the speaker.

7            Meaning the defendant?

8     A.  Correct.

9     Q.  Describe what happened on the call.

10    A.  We exchanged pleasantries.  He said he was calling to raise

11    money for DACC and would we consider a contribution for DACC.

12            I said, because I wasn't authorized on my own to make

13    those kinds of decisions, I would make recommendations to

14    Mr. Litwin and he would say yes or no.

15            I was pretty confident that I could suggest to

16    Mr. Silver a $25,000 contribution.  So I said, how about

17    $25,000?

18            He said how about $125,000?

19            So I said, I'll get back to you on that.  It was above

20    my paygrade.

21    Q.  So what did you do to get approval for that $125,000

22    contribution?

23    A.  I spoke to Mr. Litwin about it, and he made the decision to

24    make the contribution.

25    Q.  Why did you recommend that Mr. Litwin approve the request?

FBDYSIL3                     Runes - Direct

1  A.  Within our world, giving $125,000 to the leadership of one

2  house was not a lot of money as compared to how much we gave

3  the other house.  It was good for our relationship.

4  Q.  Again, to your knowledge --

5          MR. MASTER:  If you wouldn't mind turning to the next

6  page.

7  BY MR. MASTER:

8  Q.  Are those some of the checks that were issued to make that

9  contribution?

10  A.  They're kind of hard to read, but I believe so.  They're

11  made out to DACC, and they're for $25,000 each.  So, yes.  I

12  would assume so.

13  Q.  So, in making those contributions to DACC, those checks

14  would be made out in the name of these LLCs; correct?

15  A.  Yes.

16  Q.  But, again, would they all be typically packaged together

17  with a card of yours?

18  A.  They would go in a 1200 Union Turnpike envelope with one of

19  my business cards attached.

20  Q.  Are you familiar with entities called the Real Estate Board

21  of New York, REBNY, and the Rent Stabilization Association or

22  RSA?

23  A.  Yes.

24  Q.  What are they?

25  A.  They are two industry associations representing slightly

1    different types of constituencies within the real estate in

2    New York.

3    Q.   Does Glenwood make political contributions and lobby

4    through those organizations as well?

5    A.   We do.

6    Q.   Through those activities, lobbying, and contributions, do

7    you try to develop relationships that assist you with what

8    New York State government does legislatively?

9    A.   Yes.

10   Q.   So I'd like to direct your attention to 2011.  I think

11   there's an exhibit in your binder, Government Exhibit 1521,

12   which is a demonstrative exhibit.

13            MR. MASTER:  Just to facilitate the witness'

14   testimony.

15            THE WITNESS:  Let me change my glasses again.  I'm

16   sorry.  Yes.

17   BY MR. MASTER:

18   Q.   Do you recognize that document?

19   A.   Yes.

20   Q.   Is that an exhibit that summarizes the status of rent and

21   421a negotiations and legislation at various points in 2011?

22   A.   Yes.  Generally.  It was a much larger set of bills than

23   that, but yes.

24   Q.   But, with respect to --

25   A.   To those issues, yes.

1            MR. MASTER:  The government offers 1521.

2            MR. MOLO:  Objection.

3            THE COURT:  Did you say no objection?

4            MR. MOLO:  No.  Objection.

5            THE COURT:  Let me see you at sidebar.

6            (At the sidebar)

7            THE COURT:  What's your objection?

8            MR. MOLO:  Lack of foundation and also 403(a).

9    There's no indication who created this chart, what it reflects.

10   There are awards here on paper, vacancy decontrol, $2,000 rent.

11   For example, next to that, a vacancy decontrol repealed.

12   Certainly decontrolled units are recontrolled.

13           This witness didn't create this chart.  He's not going

14   to testify to that, is he?

15           MR. MASTER:  He can testify that he reviewed a draft

16   and made a couple amendments.

17           THE COURT:  This was sort of his shorthand of the

18   various positions, and he's in a position to describe more

19   fully what each of the cells on the chart means?

20           MR. MASTER:  Correct.

21           THE COURT:  Okay.  I'm going to receive it as an aid

22   to the jury, not for the truth of the matter asserted.

23           MR. MOLO:  Can it not go into evidence and just be

24   used as a demonstrative exhibit as opposed to being admitted as

25   evidence?

 1            THE COURT:  Do you need it to go to the jury room?

 2            MR. MASTER:  I think it would facilitate the jury's

 3   evaluation of the evidence, but that's something we can take up

 4   later if that's a particular concern.

 5            THE COURT:  We can discuss it later.

 6            MR. MOLO:  Okay.

 7            (In open court)

 8            MR. MASTER:  Yes, your Honor.  May I publish 1521?

 9            THE COURT:  You may.

10            Ladies and gentlemen, I'm not accepting this for the

11   truth of the matter asserted in each of the cells, but it will

12   help you follow his testimony.

13   BY MR. MASTER:

14   Q.  Mr. Runes, we've been talking earlier about rent

15   regulations in 421a.

16            Do you recall that?

17   A.  Yes.

18   Q.  Does this chart fairly and accurately represent, in summary

19   form, the status of various provisions of 421a and rent

20   regulation at different points in time?

21   A.  Yes.  Some of the major issues.

22   Q.  So, with respect to -- let's just go through 421a.

23            So 421a -- what was the status of 421a as of

24   January 2011?

25   A.  I believe it had expired in December.

1  Q.  Do you recall when it had last been renewed?

2  A.  I think it was 2003 or 2007, one of those two.

3          THE COURT:  By virtue of it expiring, did that effect

4  existing buildings or just newly --

5          THE WITNESS:  No, your Honor, it would not.  That's

6  really a good question.  If it expired, you couldn't apply for

7  421a for a new building.  If you had your foundation and

8  footings in prior to the expiration, then it would be

9  applicable.

10 BY MR. MASTER:

11 Q.  What activities does Glenwood regularly engage in with

12 respect to development?

13 A.  Mr. Litwin would buy assemblage and build one or two

14 buildings a year with some frequency.

15 Q.  So how important was it for Mr. Litwin to have 421a

16 continuously available?

17 A.  It would have to be there in order for him to be able to

18 continue building buildings pursuant to his business model.

19 Q.  Are you aware of -- the next column is April 2011.

20 Assembly bill, and it states not extended.

21          Are you aware of there having been a bill that was

22 passed by the assembly on this matter?

23 A.  Yes.

24 Q.  Did that bill extend 421a?

25 A.  It did not.

1   Q.  And then ultimately, there was legislation adopted in

2   June 2011 as part of negotiations.

3           So what ended up happening with 421a in that final

4   bill?

5   A.  It was extended.

6   Q.  Did that extended -- that bill that extended 421a -- did it

7   have a sunset provision?

8   A.  It.

9   Q.  What was the sunset provision?

10  A.  2015.

11  Q.  Actually, just to clarify on 421a, do those bills -- does

12  421a regularly sun set on a cycle?

13  A.  It normally sun sets the same time pretty much that the

14  rent regulatory statutes sun set.

15  Q.  Are you familiar with anything that happened during the

16  Spitzer administration in 2007 concerning 421a?

17  A.  I'm not sure what you're referring to.

18  Q.  Are you familiar with any renewal of 421a in 2007?

19  A.  It was renewed in 2007.

20  Q.  Now, just very briefly, with respect to the columns

21  concerning rent regulation, the first column states status as

22  of January 2011.  "City cannot adopt stronger regulations."

23           What does that mean?

24  A.  That refers to something called the Urstadt law.  It's

25  named after Charles Urstadt.

1           The Urstadt is part of the Rent Stabilization Law.

2   What it essentially says is that only the New York State

3   Legislature, with the signature of the governor, can make the

4   rent laws stronger; that the local legislative bodies in

5   New York City, which would be the city council, have no

6   jurisdiction to make the rent laws more restrictive for

7   landlords.

8   Q.  And then the assembly bill that was passed in April?

9   A.  That would have repealed the Urstadt law.

10  Q.  What was the ultimate result?

11  A.  The Urstadt law was not repealed.

12  Q.  Again, what was the sunset period?

13  A.  June 2015.

14  Q.  Then there's a concept called vacancy decontrol and luxury

15  decontrol.

16  A.  Yes.

17  Q.  With respect to that, what was the status in January 2011?

18  A.  If an apartment became vacant and the rent was over $2,000

19  a month, the apartment would become decontrolled, would no

20  longer be rent stabilized.

21  Q.  What were the provisions of this assembly bill?

22  A.  It repealed vacancy decontrol, and it recontrolled

23  previously decontrolled units.

24  Q.  What was the net result in the final bill?

25  A.  In the final bill, the vacancy decontrol number was raised

1  to $2,500 a month, and there was no reregulation or recontrol

2  of previously decontrolled units.

3  Q.  Again, did that provision have a sunset?

4  A.  June 2015.

5  Q.  Luxury decontrolled -- just explain that briefly for the

6  jury.

7  A.  Luxury decontrol is part of the statute which says, if the

8  tenant in the apartment, as of January 2011, made more than

9  $175,000 a year for two consecutive years and the rent that

10  they paid was over $2,000 a month, then their apartment became

11  decontrolled.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

FBD5sil4                        Runes – direct

 1              THE COURT:  Even if they didn't move out?

 2              THE WITNESS:  Correct.

 3   BY MR. MASTER:

 4   Q.  What was the Assembly bill?

 5   A.  The Assembly bill changed the number from $175,000 to

 6   $300,000 a year on the income and the rent to $3,000 a month.

 7   Q.  And what was the ultimate legislation?

 8   A.  $200,000 a year in income and $2,500 a month in rent.

 9   Q.  Again, does that have a sunset provision?

10   A.  June 2015.

11   Q.  Then there are two additional columns, individual apartment

12   capital improvements and vacancy allowance.  Can you briefly

13   summarize for the jury what those are?

14   A.  With either this consent of the tenant or in the case of a

15   vacancy, if the landlord made improvements to an individual

16   apartment, that landlord could raise the rent on that apartment

17   by one-fortieth of the cost of the improvements.  So, if you

18   spent $40,000 fixing up an apartment, the landlord would

19   increase the rent by $1,000 a month.  Commensurately, with

20   smaller amounts, smaller increases.

21              And the last is vacancy allowance was 20 percent rent

22   increase, no limit on the number of times used whenever an

23   apartment became vacant.

24   Q.  So whenever an apartment became vacant the rent could be

25   increased by 20 percent?

FBD5sil4                          Runes - direct

1    A.  Correct.

2    Q.  These are all provisions of the state rent regulation?

3    A.  Yes.

4    Q.  And again, did each of these end up being the subject of

5    Assembly proposals?

6    A.  Yes, of course.

7    Q.  And then did they each end up being the subject of a final

8    resolution once the legislation was passed?

9    A.  Yes.

10        Do you want me to state what it was?

11   Q.  Well, if you could just briefly explain.

12   A.  The ultimate result was it went from one-fortieth to

13   one-sixtieth for 36-unit buildings or larger and one-fortieth a

14   month for smaller buildings with no expiration.  The Assembly

15   proposal had an expiration of the payments once the actual

16   costs were recouped and on vacancy allowance it remained at 20

17   percent but it could only be used once a year even if there

18   were two vacancies in the course of a single year.

19        THE COURT:  In the single apartment?

20        THE WITNESS:  Correct.

21        THE COURT:  Okay.

22   Q.  Do you recall a meeting with Sheldon Silver and Brian

23   Meara -- I'm sorry.

24        Do you recall attending a meeting with Brian Meara in

25   Sheldon Silver's office prior to the adoption of the June 2011

FBD5sil4                          Runes - direct

1    legislation?

2    A.  I do.

3    Q.  I would like you to just pull up, Mr. Coccaro, Government

4    Exhibit 103-8?

5    A.  Is that in my --

6    Q.  No, it is not.

7    A.  Then I won't look for it.

8    Q.  Please turn to page 2.  June 6th, 2011.  Do you recall a

9    meeting that you attended with Brian Meara in Speaker Sheldon

10   Silver's office on or around that date?

11   A.  Yes.

12   Q.  If you wouldn't mind actually looking in your binder at

13   Government Exhibit 901, if you wouldn't mind just turning to --

14   A.  Okay.

15   Q.  -- the fifth page?

16   A.  Yes.

17   Q.  Mr. Runes, do you recall learning about a meeting that the

18   Governor had convened to discuss the status of rent regulation

19   in June of 2011?

20   A.  Yes.

21   Q.  And does this refresh your recollection as to the date of

22   that meeting?

23            THE COURT:  He has not indicated a failure of

24   recollection.

25            MR. MASTER:  True.

FBD5sil4                          Runes – direct

1          THE COURT:  Close the binder.  Do you know what date

2     it was?

3          THE WITNESS:  No, I don't.

4          THE COURT:  Now look at the screen.  Does that refresh

5     your recollection?

6          THE WITNESS:  Would you ask me the question again,

7     please?

8          THE COURT:  Does that refresh your recollection?

9          THE WITNESS:  No, not that; the description of the

10    meeting.  I'm sorry.

11         THE COURT:  That's okay.

12    BY MR. MASTER:

13    Q.  A meeting that the Governor convened concerning rent

14    regulation.

15    A.  I am not seeing it on the --

16         THE COURT:  Oh, I think.

17         THE WITNESS:  Now, I do.

18    Q.  Excellent.

19         THE COURT:  Does that refresh your recollection of the

20    date?

21         THE WITNESS:  Can I have the previous page?  Because

22    this doesn't have the date on that.  I have it here; Friday,

23    June 3rd.

24    BY MR. MASTER:

25    Q.  And did you personally attend that meeting?

FBD5sil4                          Runes - direct

1   A.  I did not.

2   Q.  Did anyone from Glenwood attend that meeting?

3   A.  They did.

4   Q.  Did the leadership, as well, attend the meeting?

5           MR. MOLO:  Objection.  The witness has said he was not

6   at the meeting.

7           THE COURT:  Sustained.

8           MR. MASTER:  Yes, your Honor.  Your Honor, this

9   previously was the subject of a stipulation, at least as to

10  authenticity.  Any objection to its admission?

11          MR. MOLO:  Yes.  Yes, I object.

12          THE COURT:  Okay.  Can I see the parties?

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At side bar)

2                    THE COURT:  The stip was it was a business record,

3     right?

4                    MS. COHEN:  Correct.

5                    MR. MASTER:  It was a record from the Office of the

6     Governor, right.

7                    THE COURT:  So, let's assume that based on that it is

8     admissible.

9                    MR. MASTER:  Right.

10                   THE COURT:  He wasn't there so what are you

11    planning -- where are you going with this?  Which I think is

12    probably his objection.

13                   MR. MOLO:  Yes.

14                   MR. MASTER:  Not far.  Clearly, your Honor, not far.

15                   THE COURT:  Exactly.

16                   MR. MASTER:  It is simply to say that he was aware

17    that Glenwood participated in a meeting on that Friday and then

18    that next Monday he and Brian Meara met with Sheldon Silver.

19    That's all.

20                   THE COURT:  Okay.

21                   MR. MASTER:  That's all.

22                   THE COURT:  So you are not going to try to bring out

23    anything that happened in that meeting, just the fact of the

24    meeting.

25                   MR. MASTER:  No, no.  That's all.

FBD5sil4                        Runes - direct

1                THE COURT:  Objection is overruled.

1          (In open court)

2          THE COURT:  So the exhibit is received.  The objection

3    is overruled.

4          (Government's Exhibit 901 received in evidence)

5    BY MR. MASTER:

6    Q.  Mr. Coccaro, if you wouldn't mind going to page 5 of the

7    document, or actually page 4 where it says:  Meeting re rent

8    regulation.

9          I know this was the source of confusion earlier but

10   based on your review of the schedule, what was the date of that

11   meeting?

12   A.  I believe it was June 3rd, 2011.

13   Q.  And so when, with respect to that meeting, did you meet

14   with Sheldon Silver?

15   A.  You mean the meeting in Albany with Brian Meara?

16   Q.  Yes.

17   A.  I believe it was after that.

18   Q.  Mr. Coccaro, just pull that up, Government Exhibit 103-8.

19         THE COURT:  Before you put that back up is that

20   document in evidence?

21         MS. COHEN:  It is, your Honor.

22         THE COURT:  I thought it was just used to refresh his

23   recollection.

24         MS. COHEN:  It was used with a prior witness and

25   admitted, your Honor.

1                    MR. MASTER:  103?

2                    MS. COHEN:  103-8, your Honor.

3                    THE COURT:  Okay.  Sorry.  It is in evidence.

4                    THE WITNESS:  That was June 6th.

5    BY MR. MASTER:

6    Q.  So the Monday following the Friday meeting?

7    A.  Correct.

8    Q.  Now, you mentioned Brian Meara.  Who, if anyone among

9    Glenwood's lobbyists, specializes in lobbying the Assembly?

10   A.  Brian Meara.

11   Q.  And for how long has Brian Meara been employed as a

12   lobbyist for Glenwood?

13   A.  More than 10 years.  How much more I don't remember, but

14   could be many more years.

15   Q.  Now, did there come a time during that meeting on June 6th

16   of 2011 when you articulated a position on behalf of Glenwood?

17   A.  I think to the best of my recollection both the Speaker and

18   I stated our positions on certain issues in the rent laws.

19   Q.  And, Mr. Coccaro, if you wouldn't mind just pulling up 1521

20   again?

21             So, with respect to Glenwood's position, what was

22   Glenwood's position with respect to vacancy decontrol that you

23   recall articulating?

24   A.  It was not our public position, this was a confidential

25   discussion.

1    THE COURT:  We won't tell a soul.

2    THE WITNESS:  You all promise to be secret about this,

3    okay?

4    I think I articulated that we could live with an

5    increase to $2,500 a month on the vacancy decontrol, that we

6    could live with $2,500 a month on the luxury decontrol, and an

7    income limitation of $200,000 a year.  Not the other

8    organizations that you previously mentioned meaning REBNY or

9    the rent stabilization association, this was our position.

10   BY MR. MASTER:

11   Q.  And this is something you made clear to Sheldon Silver when

12   you met with him?

13   THE COURT:  Which?

14   THE WITNESS:  What?

15   Q.  That it was Glenwood's position?

16   A.  Yes.

17   Q.  Rather than the position of the entire industry?

18   A.  Yeah, because it wasn't the position of the entire

19   industry.  The rent stabilization association, for example --

20   MR. MOLO:  Objection.

21   THE COURT:  Overruled.

22   Overruled.  Go ahead.

23   A.  The rent stabilization association represented a lot of

24   outer borough landlords with smaller buildings who would have

25   been adversely affected by the increase in those numbers.  We

 1   would not have because our buildings were in Manhattan, they

 2   were luxury buildings and our rents were significantly higher.

 3             So, yes, it was clear that I was articulating the

 4   Glenwood position, not the industry position.

 5   Q.  And how did the positions that you articulated compare to,

 6   at least with respect to vacancy decontrol and luxury

 7   decontrol, the positions that ultimately were adopted?

 8   A.  Those were essentially the positions that did get adopted.

 9   Q.  So, did you participate personally in the final

10   negotiations that led to this bill?

11   A.  No.

12   Q.  How satisfied was Glenwood with the results of those

13   negotiations?

14   A.  We were satisfied in that they did not adversely affect us.

15   Q.  And if you could just explain why you stated that outer

16   borough landlords would be -- were not happy about an increase

17   to $2,500 but why was it not adverse to Glenwood?

18   A.  Our apartments rent for a lot more, they're luxury

19   apartments, so that even in those days we would be getting

20   $4,000 or $5,000 a month for one-bedroom apartments or

21   certainly one of the convertible twos.  In the outer boroughs

22   the apartment houses were smaller, they were older, the rents

23   were lower, and every time the rent laws would expire the

24   number to achieve vacancy or luxury decontrol would become just

25   out of reach of those outer borrow landlords again which was

FBD5sil4                          Runes - direct

1     not necessarily a bad thing.

2     Q.  And so, just to conclude this chart, the sunset date of

3     each of those provisions that you have talked about was June

4     2015?

5     A.  Correct.

6     Q.  So, did you understand, based on those negotiations and the

7     ultimate bill that all of this would be up for renegotiation

8     again in a few years?

9     A.  Yes.

10    Q.  Was Glenwood also satisfied with the extension of or

11    restoration of 421A?

12    A.  Yeah.  Of course.

13    Q.  And again, because this would all be up for negotiation in

14    a few years, how important was it to maintain good

15    relationships with leadership even following passage of this

16    legislation?

17    A.  It's always important to maintain good relationships with

18    leadership.

19    Q.  So let's turn to another topic.  For how long have you

20    known Sheldon Silver?

21    A.  At least since the mid-1970s, even though I may not look

22    it.

23    Q.  I'm sure you were a child at that time.

24        Did you know him to have an outside legal practice?

25    A.  Yes.

FBD5sil4                        Runes – direct

```
 1   Q.  And what type of practice did you understand him to have?

 2   A.  I understood him to have a personal injury practice.

 3   Q.  As of 2011 what, if any discussions, had you had with him

 4   about his legal practice?

 5   A.  I don't think I had any.

 6   Q.  What knowledge did you have of Sheldon Silver having any

 7   experience with real estate work of any kind?

 8   A.  None really as an effect of the practice of law.

 9   Q.  Have you ever met an individual named Jay Arthur Goldberg?

10   A.  I think I met him either once or twice outside of the

11   Speaker's office on the State of the State.

12   Q.  What is the State of the State?

13   A.  It is a constitutionally mandated speech made by the

14   Governor of New York in January of every year.

15   Q.  And, typically, do legislative leaders host gatherings in

16   connection with that event?

17   A.  They do but what happened, until Governor, I think it was

18   Spitzer changed the location, the State of the State would be

19   in the Assembly chamber, both houses of the legislature would

20   meet in the Assembly chamber; the Judges of the Court of

21   Appeals would be there, the Attorney General, the State

22   Controller and other significant people in New York State

23   government.  So, by coincidence, I would make it my business to

24   be outside the Speaker's office as all those people would come

25   by on the State of the State.
```

1   Q.  By coincidence.

2   A.  By coincidence.  Every year.

3   Q.  And so, in connection with that coincidence, did there come

4   a time when you met Jay Arthur Goldberg?

5   A.  I believe so.

6   Q.  And what, if any connection, did you understand him to have

7   to Sheldon Silver prior to 2011?

8   A.  Nothing, really.

9   Q.  Did there come a time -- well what, if any kind of legal

10  work, did you understand him to do?

11  A.  I believe he was a certiorari lawyer.

12  Q.  And did there come a time when you learned that Jay Arthur

13  Goldberg had been hired by Glenwood?

14  A.  Yes.

15  Q.  And what's your knowledge of how it came about?

16  A.  I believe, but I'm not a hundred percent sure, that he was

17  recommended through Brian Meara by Speaker Silver to

18  Mr. Litwin.

19  Q.  And again -- withdrawn.

20          Prior to late 2011 what, if any financial

21  relationship, did you understand there to be between Jay Arthur

22  Goldberg and Sheldon Silver?

23  A.  I didn't know of any financial relationship.

24  Q.  How long ago was this, this recollection -- withdrawn.

25          You stated you just described how you learned it came

FBD5sil4                          Runes - direct

1   about that Jay Arthur Goldberg had been hired.  How long ago?

2              MR. MOLO:  Objection.  That misstates the testimony.

3              THE COURT:  He didn't describe how he knew it.

4              MR. MASTER:  I will withdraw.

5   BY MR. MASTER:

6   Q.  So, who made decisions about who to hire for services like

7   real estate tax cert work?

8   A.  Mr. Litwin.

9   Q.  And how hands on would you describe Mr. Litwin during the

10  time he was with the company?

11  A.  He was very hands on.

12  Q.  And so how actively would he participate in decisions about

13  which vendors to use?

14  A.  Well, I don't know about vendors necessarily, but in terms

15  of lawyers and law firms, my experience was that he would make

16  the decision.  It might be brought to him with either a

17  proposal or a suggestion or whatever, but it would be his

18  decision to make.

19  Q.  I would like to direct your attention to late 2011.

20  Approximately what areas within Sheldon Silver's Assembly

21  district?

22  A.  Lower Manhattan, generally speaking.

23  Q.  And does Glenwood own any buildings in Sheldon Silver's

24  Assembly District?

25  A.  At least one, perhaps two or maybe three, but at least one

1   for sure that I'm aware of.

2   Q.  And is a building called 10 Liberty one of those buildings?

3   A.  Coincidentally, that is the building that I know to be in

4   his district.

5   Q.  Another coincidence.

6   A.  Life is filled with them.

7   Q.  So, Mr. Runes, would you mind taking a look at 793-1?

8   A.  Yes.

9   Q.  Do you recognize that document?

10  A.  Yes.  Let me start working from the back forward, please.

11  Yes.

12  Q.  Do you recognize that document?

13  A.  I do.

14  Q.  What is the document?

15  A.  It is an e-mail string about the proposed methadone clinic

16  at 90 Maiden Lane.

17  Q.  Are you the person sending the e-mail?

18  A.  Yes.  Not all of them, but the one that is --

19  Q.  The final one?

20  A.  The final one, yes.

21          MR. MASTER:  Government offers Government Exhibit

22  793-1.

23          MR. MOLO:  No objection.

24          THE COURT:  793-01 received.

25          (Government's Exhibit 793-01 received in evidence)

FBD5sil4                              Runes – direct

```
1    BY MR. MASTER:
2    Q.  So, what is the date of the final e-mail -- actually, I'm
3    sorry.  Let's actually start from the first e-mail on the
4    second page.
5    A.  On the second page.
6    Q.  It actually carries from Charlie Dorego to you, the first
7    one I want to ask you about, from the first page to the second
8    page, from Charlie Dorego to you dated December 2nd, 2011.  And
9    what does it say there?
10   A.  Can we ask Brian to take Shelly's temp on this.
11   Q.  And the subject is methadone clinic at 90 Maiden Lane?
12   A.  Yes.
13   Q.  So, just describe for the members of the jury what it is
14   that Glenwood became concerned about that's the subject of this
15   e-mail.
16   A.  We -- Glenwood owns an apartment house at 10 Liberty Street
17   which is right next to 90 Maiden Lane, the two streets converge
18   so even though they have two different street names they're
19   actually buildings adjacent to each other and this methadone
20   clinic not only would have been in the building next-door but
21   the entrance to the building next-door that the people going to
22   the methadone clinic would have used was in the back of their
23   building which was actually where our plaza was behind our
24   building where our tenants would sit with their kids or their
25   baby carriages or whatever outside and have a coffee or
```

FBD5sil4                          Runes - direct

1   whatever.

2   Q.  And so, did there come a time when you asked Brian Meara to

3   contact Sheldon Silver's office about this issue?

4   A.  Yes.

5   Q.  And why did you do that?

6   A.  We, along with everybody else in the neighborhood, was very

7   opposed to the methadone clinic.  The downtown area has become

8   a real family area.  Liz Berger, who ran the Downtown Alliance,

9   the Business Improvement District, was apoplectic about this

10  and Charlie Dorego is on her board so we wanted to know where

11  Shelly was on this issue.

12  Q.  And why did you ask to reach out to Sheldon Silver -- why

13  did you seek to reach out to Sheldon Silver in particular as

14  opposed to a City Council official or someone else?

15  A.  Well, it was his Assembly District.  We would have reached

16  out to whoever the Assembly person was but since by coincidence

17  it happened to be the Speaker, we reached out to the Speaker.

18  Q.  My question is a little bit different.  Why did you reach

19  out to a State Assembly member as opposed to, or in this

20  particular case Sheldon Silver, as opposed to a city council

21  member or state senator or some other person?

22  A.  Well, I believe that there was some type of state approval

23  that was required for this clinic.

24  Q.  And so is that why you reached out to a state official?

25  A.  Yes.

FBD5sil4                      Runes - direct

1   Q.  More generally, are you familiar with the term called

2   constituent services?

3   A.  Yeah.

4   Q.  Is it important -- or how important is it for Glenwood to

5   receive constituent services from local elected officials or

6   state elected officials when it needs it?

7   A.  Depending on what the issue is, sometimes it can be very

8   important, sometimes not so important.  We consider this very

9   important.

10  Q.  And so did you -- is your understanding -- withdrawn.

11          What is your understanding of what Brian Meara did?

12  A.  I guess Brian Meara contacted --

13          MR. MOLO:  Objection.  It is this witness' --

14          THE COURT:  Sustained.

15  Q.  Did there come a time when you understood that the

16  methadone clinic --

17          MR. MOLO:  Objection.  Leading.

18          THE COURT:  Try not to lead.

19  Q.  What ended up happening with the methadone clinic?

20  A.  It did not locate there.

21  Q.  And what, if anything, was Glenwood asked to send to its

22  tenants concerning that -- the tenants at 10 Liberty concerning

23  that decision?

24  A.  I believe there was a letter that Glenwood was asked to

25  mail to our tenants with regard to the efforts that the Speaker

1    had taken to help them and the rest of the neighborhood.

2    Q.  If you wouldn't mind pulling up in your binder and what is

3    on the screen as Government Exhibit 788 that is already in

4    evidence?

5    A.  Yes.

6    Q.  If you would just look at the top e-mail, that's from you

7    to Charlie Dorego?

8    A.  Yup.

9    Q.  Does Charlie Dorego use a CharlieDorego@AOL.com address?

10   A.  Yes.

11   Q.  It states:  Letter to tenants of 10 Liberty re Shelly.  Why

12   were you sending that to Charlie Dorego?

13   A.  Because I had received it from Pat Ryan who works for

14   Brian.

15   Q.  And what were you intending to do by sending it to Charlie

16   Dorego?

17   A.  Was for it to be sent to the tenants of 10 liberty.

18   Q.  And again, is this one of those types of constituent

19   services that is important to Glenwood?

20   A.  It is.  Yes.

21             MR. MASTER:  Your Honor, I think we are at 3:00.

22             THE COURT:  I think we are at the bewitching hour.

23   How much longer do you have with this witness?

24             MR. MASTER:  Probably about 20 more minutes.

25             THE COURT:  Then now is a good time to stop.

FBD5sil4                          Runes - direct

1          All right, ladies and gentlemen, have a nice weekend.

2    Don't talk about the case.  Don't read any news accounts about

3    the case.  Don't listen to the radio or watch TV about the

4    case.  Don't think anything about the case until you return

5    Monday morning at 9:15.

6          See you.  Have a nice weekend.

7          THE JURY:  Thank you.  You too.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Okay, so you have 20 minutes left.  How

3   long, approximately, do you think cross is going to be?

4           MR. MOLO:  40, 45 minutes.  Somewhere between 45

5   minutes and an hour.

6           THE COURT:  Okay.  Then who is your next witness?

7           MS. COHEN:  Your Honor, the government will call, we

8   are now into Monday, Darby Putnam, she is a PACB-related

9   witness; Michael Whyland, who is Sheldon Silver's spokesperson

10  in the Assembly; Lisa Reid who is from the Ethics Committee.

11          THE COURT:  Is there any dispute over Reid's

12  testimony?  As I recall when we were last together was it

13  Reid's testimony or some other person.

14          MR. MOLO:  It was Reid's testimony, yeah.

15          MS. COHEN:  Your Honor, it was over Lisa Reid's

16  testimony that there was ancillary conversation about Carolyn

17  Kearns' testimony but I believe your Honor ruled with respect

18  to Lisa Reid's testimony and the limitations on it.

19          THE COURT:  Yes.

20          MR. COHEN:  I don't know if that's exactly accurate.

21          THE COURT:  Hang on a second.  I will come back to

22  that.

23          MR. COHEN:  Okay.

24          THE COURT:  Who is after Reid?

25          MS. COHEN:  Your Honor, the government will probably

FBD5sil4                          Runes – direct

1   call Steve Witkoff -- this all depends how far we get with the

2   day -- and we may call Dr. Landrigan in as well.

3              THE COURT:  Doctor who?

4              MS. COHEN:  Landrigan, from Mount Sinai.

5              THE COURT:  That's it.

6              MR. COHEN:  Talking about Monday?

7              MS. COHEN:  We also may call Judy Rapfogel.  I am not

8   sure we will get all of that in on Monday.

9              THE COURT:  If not.

10             MS. COHEN:  That will spill over to Tuesday.

11             THE COURT:  And we have a few additional witnesses for

12  Tuesday.

13             MS. COHEN:  No, we -- one is sort of like a custodian

14  related to the seventh money laundering charge, Paul Cody, and

15  we also expect to call Jordan Levy and FBI special agent Deanna

16  Pennetta with respect to summary charts.

17             THE COURT:  Okay.

18             MS. COHEN:  Your Honor, we also may call Charles

19  Dorego who is the general counsel of Glenwood.  We would

20  probably do that on Monday, we just don't know everyone's

21  schedule yet.

22             THE COURT:  Does that mean Dorego is definitely going

23  to be a witness, just not Monday or Tuesday?

24             MS. COHEN:  I don't know if he is definitely going to

25  be a witness.  He may be a witness.

FBD5sil4                          Runes – direct

 1              THE COURT:  Okay.

 2              MS. COHEN:  Your Honor, we have been in discussions

 3    with defense counsel related to those December 2014 e-mails.

 4    You remember the issue with the e-mails, your Honor, between

 5    Matthew Howard and Victor Franco regarding the defendant

 6    getting the HCRA grants out of the Assembly files.

 7              THE COURT:  It is not ringing any bells at the moment.

 8              MS. COHEN:  Okay.  Parties have a dispute about that.

 9    It may be that the defense is going to file a motion about it.

10    We are still discussing.  Depending on the resolution of the

11    motion we may call Matthew Howard of the Assembly related to

12    Silver's efforts to obtain copies of HCRA grants.

13              MR. COHEN:  The dispute was about largely whether

14    there was going to be testimony about a conversation between

15    Mr. Howard and Mr. Silver.  That was what was causing the

16    problem and the need, possibly, to file a motion which would

17    require your Honor renting out the Coliseum so that I could

18    testify.

19              THE COURT:  Oh.  Right.  Yes, yes, yes.

20              MS. COHEN:  Now you remember.

21              THE COURT:  Vaguely.  That was days ago.  I hadn't

22    heard back, I assumed it had gotten resolved.

23              MS. COHEN:  We are still trying.

24              MR. COHEN:  It is e-mails, so that that doesn't raise

25    the issue that we are concerned about.

FBD5sil4                         Runes - direct

1          THE COURT:  So that's looking -- I mean, if you call

2     Rapfogel and you call Dorego it seems more like Wednesday

3     before the government is resting than Tuesday.

4          MR. MOLO:  And, your Honor, just to be fair, too, I

5     may be longer than 45 minutes to an hour, it may be an hour or

6     15.

7          THE COURT:  I took your estimate with a big grain of

8     salt.

9          Okay.  And Mr. Cohen, what do you think is the issue

10    with Reid?  I thought we resolved that.

11         MR. COHEN:  I don't know that your Honor resolved the

12    issue with Reid.  You raised a hearsay concern that you had

13    with respect to our wanting to offer testimony about when

14    Mr. Silver spoke to Ms. Reid.

15         THE COURT:  Yes.

16         MR. COHEN:  Saying in substance that he thought this

17    was a better approach in terms of being more informative in

18    terms of the disclosure.  Your Honor was raising a question

19    about that and I forget whether Mr. Shur was arguing it, but

20    the concern that we had was it was going to Mr. Silver's state

21    of mind in making that disclosure to Ms. Reid and we wanted to

22    be more informative about it but I will let Mr. Shur speak to

23    that.

24         THE COURT:  And I think I have pressed for what

25    exactly happened in the conversation and there seemed to be a

FBD5sil4                          Runes - direct

1   difference between what the government said happened in the

2   conversation and what the defense said happened in the

3   conversation, although that may have been confused with this

4   other person that figures into this story.

5          MR. MOLO:  You're right, and if I could add one point

6   is that's because there was there was another witness to the

7   conversation participating in the conversation, Carolyn

8   Kaufman --

9          MR. COHEN:  Kearns.

10         MR. MOLO:  Sorry, Kearns -- another person in this

11   courtroom -- who -- the government hadn't had a chance to call

12   and talk I think there was a privilege issue.

13         THE COURT:  Okay.

14         MS. COHEN:  Judge, I believe your Honor ruled on this.

15         THE COURT:  I thought I had.  I thought that his

16   conversation with Reid, which as I understand it is him saying

17   I have changed my disclosure, I think this is more complete, it

18   seems to me is hearsay.

19         MR. SHUR:  Judge, I guess there is two issues.  Number

20   one, I think that the record needs to be more complete as to

21   that exchange.

22         THE COURT:  I'm open to having you expand the record.

23         MR. SHUR:  Sure.

24         So, my understanding, from interviewing Ms. Kearns and

25   also reviewing some additional Jencks material for Ms. Reid, is

FBD5sil4                         Runes - direct

1    that Carolyn Kearns, who serves as counsel to the majority of

2    the Assembly, Mr. Silver had gone to Ms. Kearns to ask for

3    advice with respect to the financial disclosure form.  She

4    reached out to Ms. Reid and asked Ms. Reid to come to

5    Mr. Silver's office to have a discussion about the form.  There

6    was then a discussion in Mr. Silver's office where Mr. Silver,

7    Ms. Reid and Ms. Kearns were all present and there was an

8    exchange between Mr. Silver and Ms. Reid where Mr. Silver was

9    explaining that he received additional sources of income,

10   meaning sources of income other than Weitz & Luxenberg, and

11   that to make the form more accurate he was going change the

12   form from just Weitz & Luxenberg to including Weitz & Luxenberg

13   and that Ms. Reid said okay.  And Mr. Silver actually didn't

14   tender his disclosure form on that day or at that meeting but

15   that was the gist of the exchange.

16        The defense's position is that it is relevant and not

17   hearsay for two reasons; number one, that it goes to

18   Mr. Silver's state of mind as far as having discussion with

19   ethics counsel regarding change of a form --

20        THE COURT:  We are back to the same place we have been

21   before.

22        In that meeting did he tell Ms. Reid or Ms. Kearns

23   that he was receiving hundreds of thousands of dollars from

24   Goldberg on behalf of an entity who was lobbying him?  That is,

25   did he make full disclosure?

1          MR. SHUR:  The disclosure that he made at that time in

2     explaining why he was making the change to the form and asking

3     whether that change was appropriate was that there were other

4     sources of income.

5          THE COURT:  You haven't said, when you just disclosed

6     to me what happened in the conversation, there was no statement

7     that Mr. Silver asked anybody whether it was appropriate.  What

8     you said was he said I have income from other places so I'm

9     changing the disclosure.

10          MR. SHUR:  I think the context of that conversation,

11     though, is that he asked Ms. Kearns, I have a question

12     regarding the form.  Ms. Kearns then reached out to Ms. Reid to

13     say the Speaker has a question about the form.  So --

14          THE COURT:  What was the question?

15          MR. SHUR:  The question was I receive other sources of

16     income, I am therefore making this change to my form because I

17     think that this is a more appropriate disclosure and a more

18     accurate disclosure and Ms. Reid said okay.

19          THE COURT:  That's not a question, that's a statement.

20          MR. SHUR:  Well, I think given Ms. Reid's -- given the

21     request of Ms. Reid to come to mr. Silver's office because he

22     has a question about the form and given Mr. Silver's

23     statement --

24          THE COURT:  But what was the question?  The question

25     about the form suggests that there is some misunderstanding or

FBD5sil4                        Runes - direct

1   confusion about the form.  What was the -- if you want to put

2   this in as to state of mind, again, I'm not entirely sure what

3   state of mind you are proposing.

4            MR. SHUR:  Judge, I think the question is simply:  If

5   I'm receiving other sources of income, is including

6   Weitz & Luxenberg sufficient.  Is that an adequate answer.

7   Because I think --

8            THE COURT:  But that comes in only if, relative to

9   proving his state of mind if he also discloses what this other

10  income is and how much it is, because otherwise it sounds like

11  he got a $100 income for doing something nominal.

12           MR. SHUR:  I don't know why that would be the

13  assumption if someone says I have other sources of income, that

14  that means it is nominal or somehow incidental.  I don't know

15  that that is a reasonable conclusion from that statement but

16  the second piece of this is that it is Ms. Reid's job to review

17  the financial disclosure forms of every legislator every year

18  and if they're incomplete or there is an answer that's

19  inadequate, she goes back to the legislator.  For example,

20  including Weitz & Luxenberg, that's not adequate because you

21  have to list each source.  Then Ms. Reid would go back to the

22  legislator and say, hey, you can't just include

23  Weitz & Luxenberg, you have to actually list here each source.

24  And she never did that.  And I think that conversation that led

25  to that change is relevant to that piece of her testimony as

1    well in terms of her state of mind.

2              THE COURT:  Why is her state of mind relevant?

3              MR. SHUR:  Well, because this is the person who

4    reviews the forms to determine whether they're complete,

5    they're accurate, and they're complying with the rules.

6              THE COURT:  But your client is charged with honest

7    services fraud and extortion.  Tell me why the state of mind of

8    a bureaucrat who reviews financial disclosure forms is relevant

9    to any material fact that the jury has to decide.

10             MR. SHUR:  Sure.  So, Judge, look.  I think the

11   financial disclosure forms aren't relevant at all because they

12   have nothing to do with the charges.  He is not charged with a

13   false statement for submitting a financial disclosure form.

14             THE COURT:  We are not going backwards.

15             MR. SHUR:  The point is that the government is going

16   to argue that Mr. Silver filled out these forms incorrectly,

17   intentionally, and that is evidence of consciousness of guilt.

18             THE COURT:  I don't think they're quite going to argue

19   that.

20             MR. SHUR:  I would love to hear what the argument is

21   they --

22             MS. COHEN:  The argument is the same as it has always

23   been which is that the defendant filled out the forms in

24   misleading manner and lied on the form.  Not that he filled

25   them out incorrectly as a matter of whatever the rules were for

FBD5sil4                        Runes - direct

1   filling out those forms.

2          And as to your Honor's question about what did Silver

3   disclose, did he make a full disclosure to Ms. Reid or

4   Ms. Kearns, the very simple answer is no.  All he said is

5   exactly what your Honor said that he said and it simply is

6   hearsay if the defendant tries to put it in.

7          MR. SHUR:  To be able to argue that the answer to any

8   questions on the form was misleading, that, in and of itself,

9   raises the question of what is required by the form and whether

10  the answer was adequate or inadequate.

11         THE COURT:  We are not going to argue this again.  We

12  have argued this at length three weeks ago.

13         MR. SHUR:  Well, Judge, with all due respect to the

14  government, the record that was made at that time about what

15  that discussion was like was not the complete record that we

16  have now.

17         THE COURT:  Okay.  Well so far -- you're right,

18  although so far I haven't heard anything further about this

19  conversation that would alter the view that that statement does

20  not tend to prove anyone's state of mind.

21         MS. COHEN:  Your Honor, if I could just add, since it

22  was a privileged conversation that we were not privy to the

23  last time we were before you and since they waived the

24  privilege on Carolyn Kearns --

25         THE COURT:  I think they waived the privilege in open

 1    Court.

 2              MS. COHEN:  Correct, your Honor; and after that we

 3    were able to talk to Ms. Kearns and hear what Mr. Silver told

 4    her, or in this case did not tell her and it is entirely

 5    consistent with what Ms. Reid remembers.  There is nothing more

 6    there, your Honor.

 7              THE COURT:  Okay.

 8              MR. SHUR:  Judge, given the late hour.

 9              THE COURT:  Right.  There is some of you that need to

10    get going.

11              MR. SHUR:  What I would ask is if we can file a motion

12    on this issue?  It won't be a lengthy motion but just

13    addressing these points.  I think that that might be the best

14    avenue.

15              THE COURT:  I'm happy to accept a letter brief from

16    you.  I don't want a motion.

17              MR. SHUR:  Thank you, Judge.

18              THE COURT:  But fair warning, it needs to have

19    something new.  Okay?  Focusing on how this tends to prove your

20    client's state of mind, not Ms. Reid's state of mind -- because

21    Ms. Reid's state of mind is irrelevant.  Okay?

22              One further, just housekeeping.  The stipulation that

23    was raised this morning, obviously Ms. Cohen it is up to you

24    whether you stipulate or not but as with all the various

25    records that the defense stipulated to, I'm going to be really

1  fussy if we end up having somebody from Albany having to come

2  to say these are whatever they are.

3          MS. COHEN:  Your Honor, my objection was being dumped

4  with documents while someone was on the stand, not specifically

5  to a stipulation which had we been presented with ahead of time

6  we probably would have had no problem.

7          THE COURT:  I understand that.  You are quite right

8  that what Mr. Molo did was rude, at a minimum.

9          I also have Defense Exhibit 91 which is like a

10  doorstop.  What is the status of that.

11          MS. COHEN:  Your Honor, we are still in discussion

12  were defense counsel.  There are two documents that were

13  referred to on Ms. Iryami's direct that were failed to be moved

14  into evidence.  We could ask the defense if they would agree if

15  we can move those documents in so we are waiting to hear back

16  from them.

17          MR. COHEN:  This is the resolutions.

18          MS. COHEN:  I think we can work out the stipulations.

19          THE COURT:  These are resolutions, yes.

20          MS. COHEN:  Hopefully we can work out the stipulation,

21  the big notebook and these two e-mails.

22          THE COURT:  All right.  Fine.  Everybody have a nice

23  weekend.

24          MR. COHEN:  Ms. Cohen is having trouble getting sleep

25  over the weekend so she wants to read the resolutions to help

FBD5sil4                          Runes – direct

1    her.

2              THE COURT:  All I can say is so many Eagle Scouts were

3    recognized that it is all that harder to be able to become an

4    Eagle Scout.

5              Have a nice weekend.  See you Monday morning.

6              (Adjourned to 9:15 a.m., November 16, 2015 .)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    INDEX OF EXAMINATION

2    Examination of:                              Page

3    BRIAN MEARA

4    Direct By Mr. Master . . . . . . . . . . . .1582

5    Cross By Mr. Molo  . . . . . . . . . . . .1623

6    Redirect By Mr. Master . . . . . . . . . .1688

7    Recross By Mr. Molo  . . . . . . . . . . .1695

8    RICHARD RUNES

9    Direct By Mr. Master . . . . . . . . . . . .1696

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GOVERNMENT EXHIBITS

Exhibit No.                                          Received

843     . . . . . . . . . . . . . . . . . .1587

103-8   . . . . . . . . . . . . . . . . . .1600

788     . . . . . . . . . . . . . . . . . .1604

2308-1-A   . . . . . . . . . . . . . . . .1606

753     . . . . . . . . . . . . . . . . . .1702

842     . . . . . . . . . . . . . . . . . .1713

755-5   . . . . . . . . . . . . . . . . . .1720

901     . . . . . . . . . . . . . . . . . .1741

793-01  . . . . . . . . . . . . . . . . . .1749

DEFENDANT EXHIBITS

Exhibit No.                                          Received

103     . . . . . . . . . . . . . . . . . .1624

105     . . . . . . . . . . . . . . . . . .1652

106     . . . . . . . . . . . . . . . . . .1654

104-A,  104-B, 104-C and 104-D  . . . . . .1656

107     . . . . . . . . . . . . . . . . . .1665

110     . . . . . . . . . . . . . . . . . .1669