FBG5sil1                           CORRECTED TRANSCRIPT

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                New York, N.Y.

4              v.                            15 Cr. 0093(VEC)

5   SHELDON SILVER,

6              Defendant.

7   ------------------------------x

8                                            November 16, 2015
                                             9:20 a.m.
9

10  Before:

11                HON. VALERIE E. CAPRONI,

12                                           District Judge
                                               and a Jury
13                          APPEARANCES

14  PREET BHARARA
         United States Attorney for the
15       Southern District of New York
    BY:  CARRIE H. COHEN,
16       ANDREW D. GOLDSTEIN,
         HOWARD S. MASTER,
17       JAMES M. McDONALD,
              Assistant United States Attorneys
18
    STROOCK & STROOCK & LAVAN LP
19       Attorneys for Defendant
    BY:  JOEL COHEN
20            - and -
    MOLOLAMKEN, LLP
21  BY:  STEVEN F. MOLO
         JUSTIN SHUR
22       JUSTIN ELLIS
         ROBERT KRY
23       TUONGVY LE

24

25

FBG5sil1                        CORRECTED TRANSCRIPT

1                    (Trial resumed; jury not present)

2              THE COURT:  Okay, ladies and gentlemen.  We got a call

3     from juror no. 1 who twisted her ankle and is unable to make it

4     to Court.  Would the parties like to be heard?

5              MS. COHEN:  Your Honor, do you have any sense of if

6     this is a one day thing or more?

7              THE COURT:  She said she might be able to make it

8     Wednesday, right?

9              THE DEPUTY CLERK:  Yes, Judge.

10             MS. COHEN:  What are your Honor's thoughts, perhaps?

11             THE COURT:  My thought was to solicit the parties'

12    thoughts.

13             MR. COHEN:  Your Honor, it is the juror in the first

14    seat on the right, correct?

15             THE COURT:  Juror no. 1 is the school counselor.

16             MS. COHEN:  Your Honor, perhaps if you can give us a

17    sense of where we are in scheduling given that the government

18    thinks we may rest on Tuesday if we went forward, and what your

19    thoughts are.

20             THE COURT:  I was going to ask you about that.  So, as

21    of Friday afternoon you had one, two, three, four, five, six

22    and maybe eight witnesses before the government rests.

23             MS. COHEN:  We have pared that down a bit and I

24    believe we have --

25             THE COURT:  You have to finish with Mr. Runes.

FBG5sil1                    CORRECTED TRANSCRIPT

1          MS. COHEN:  Correct; and then we have three other

2     witnesses, perhaps four if we get to the last witness today.

3          THE COURT:  Which would be who?

4          MS. COHEN:  Darby Putnam from the PACB, custodian, not

5     very long.

6          THE COURT: Right.

7          MS. COHEN:  Steven Witkoff, Lisa Reid.  We have some

8     stipulations we need to read in as well if we have time.  We

9     will also put on Michael Whyland.  I believe we would only be

10    able to start his direct, not finish it if we get to him.  Then

11    we would finish that on Tuesday.  We might also, on Tuesday,

12    call Charles Dorego and Jordan Levy; Paul Cody who is a shorter

13    witness, more of a custodian, and FBI Special Agent Deanna

14    Pennetta to do summary charts.  So, it is possible that the

15    government would rest late in the day on Tuesday.

16         THE COURT:  Yes.  Okay.

17         MS. COHEN:  And the government would be prepared to

18    close on Wednesday if there is no defense case.

19         THE COURT:  Right.

20         So, here is the thing about closing on Wednesday.  I'm

21    assuming that summations are going to take the better part of a

22    day, that we will be able to get summations and a charge in in

23    one day maybe.  I'm seeing nods at the front table.  How long

24    do you think your summation is going to be?

25         MS. COHEN:  I don't think the government would be more

FBG5sil1                    CORRECTED TRANSCRIPT

1  than three hours or -- about three hours, three and a half I'm
2  being told, to be safe.
3          THE COURT:  Okay?  And how long for rebuttal.
4          MS. COHEN:  An hour.
5          THE COURT:  An hour for rebuttal?
6          MS. COHEN:  I am overestimating so that we don't get
7  called out.
8          THE COURT:  You have been overestimating since we
9  started.
10         MS. COHEN:  Better to overestimate than underestimate.
11         THE COURT:  I guess.
12         Mr. Molo, how long are you going to be?
13         MR. MOLO:  Are they saying three hours for their
14 opening summation and an hour for rebuttal?
15         THE COURT:  Correct.
16         MR. MOLO:  I think that that's excessive.
17         THE COURT:  Okay.  Just how long do you think your
18 summation is going to be?
19         MR. MOLO:  I mean, I think that if each side had two
20 hours total with the government splitting it an hour and a half
21 for their opening summation and a half hour rebuttal and we
22 were given two hours, that would be appropriate given the
23 length of this case.  This is not any --
24         THE COURT:  Mr. Molo, I will give you more than ample
25 opportunity to explain about how long the government is talking

FBG5sil1                    CORRECTED TRANSCRIPT

1    when the time comes.  Right now I am trying to figure out the

2    schedule.

3              MR. MOLO:  I agree.

4              THE COURT:  So it is a full day.

5              MR. MOLO:  It shouldn't be -- yeah, exactly.

6              THE COURT:  It is actually a full day without the

7    charge so the charge is going to be about an hour, maybe an

8    hour and a half, and an hour and a half on top of six and a

9    half hours of summations, even if it is only four and a half

10   hours of summations is an exceedingly long day.

11             MR. MOLO:  Yes.

12             THE COURT:  So, it is conceivable that all of that

13   could be done on Wednesday but the issue, I think if we do it

14   all on Wednesday, is you are out on Thursday, the jury has been

15   told that they're off on Friday.  That means they would not

16   start deliberations until Monday.

17             MS. COHEN:  Your Honor --

18             THE COURT:  Do you have a view on that?

19             MS. COHEN:  The government has a view on that.

20             THE COURT:  The government always has a view.  What is

21   your view?

22             MS. COHEN:  Our view is if it is possible, I know

23   Mr. Molo's Third Circuit argument in Philadelphia is at 9:30

24   a.m., he is scheduled for his 13 minute slot so it is possible

25   that he could be back here in the afternoon.

FBG5sil1                    CORRECTED TRANSCRIPT

1          THE COURT:  I am sure she did not intend that to be as

2     disdainful as it sounded.

3          MR. MOLO:  Your Honor, it is an honor to be stalked.

4          THE COURT:  An honor to be what?

5          MR. MOLO:  Stalked.

6          MS. COHEN:  Other than Mr. Molo's desire I'm not

7     stalking him.

8          Your Honor, it is possible to have Court on Thursday

9     afternoon at 2:00 and perhaps give the charge or, perhaps --

10    depending on where we were at on Wednesday.  I also don't know

11    what the jury's plans are but perhaps if they don't have plans

12    they would prefer to sit on Friday, if that was permissible

13    with your Honor's schedule, given that they would be off

14    Thursday morning.

15         THE COURT:  Yes.  Okay.

16         MR. MOLO:  I don't know how long I'm going to be but

17    to be honest --

18         THE COURT:  Do you know where you are on the calendar?

19         MR. MOLO:  Well, here is the -- the case is the NFL

20    concussion litigation and there is a lot of parties and a lot

21    of parties arguing and the Third Circuit, unlike some other

22    Courts, sets time frames but doesn't necessarily stick to them

23    and the Court has even said that so I could be in that

24    courtroom -- I'm the lead objector's counsel, I could be there

25    until 1:00 for all I know.  We are supposed to start at 9:30.

FBG5sil1                    CORRECTED TRANSCRIPT

1          THE COURT:  Is your case -- is only the concussion

2     case on the calendar?

3          MR. MOLO:  I'm not sure.  It may be the only case on

4     it but to get back here predictably I think would be -- it

5     really is not going to happen.

6          THE COURT:  All right.  So, all of this is to say it

7     seems to me the choices are to finish -- this is putting aside

8     the issue of juror no. 1, we can finish -- I know it is a state

9     secret and probably classified at the highest levels but is

10    there likely to be a defense case?

11         MR. MOLO:  To be --

12         THE COURT:  Look.  If you change your mind you change

13    your mind, just --

14         MR. MOLO:  I understand.  Right now I would say that

15    there will be some defense case.

16         THE COURT:  Okay.

17         MR. MOLO:  Right now.

18         THE COURT:  Do you have a sense of how long it might

19    be?

20         MR. MOLO:  It might be a day.

21         THE COURT:  All of that is arguing that the likelihood

22    is that the case not going to go to the jury until next week.

23    I'm not comfortable with a Thursday afternoon schedule where

24    Mr. Molo could get jammed up in Philadelphia and not make it

25    back and I don't want to drag in a jury unnecessarily.  So, it

FBG5sil1                    CORRECTED TRANSCRIPT

1   seems to me that if we keep going we go until we quit and we

2   decide whether you are going to sum up on Wednesday, which kind

3   of depends on how long all this really takes and whether there

4   will be a defense case or not.  Y'all should be prepared for

5   the possibility that you are going to sum up on Wednesday.  The

6   jury may well not be charged until Monday under that scenario.

7           MS. COHEN:  Is it possible, your Honor, your Honor's

8   deputy would speak to the jury to find out if they can sit on

9   Friday?

10          THE COURT:  Let's cross that bridge when we get to it,

11  okay?  They haven't been told we have Thursday off because I

12  wasn't sure how this was going to shake out.

13          So, that then brings us to if we wait for juror no. 1

14  to be mobile again then all of this definitely pushes to next

15  week.  So, under those circumstances, Mr. Molo, I don't think

16  you have expressed your view on this.

17          MR. MOLO:  I think if we are talking about, she said

18  it was a twisted ankle?

19          THE COURT:  Yes.

20          MR. MOLO:  I would say we should wait.  She has sat

21  through virtually the entire trial.

22          THE COURT:  Seven days of testimony, that's true.  On

23  the other hand, again, that means that this whole case is going

24  to get pushed to next week, assuming she comes back.  It may be

25  that she will not become mobile again.

FBG5sil1                    CORRECTED TRANSCRIPT

1          THE DEPUTY CLERK:  She said he could come back on

2   Wednesday.

3          THE COURT:  Definitely coming back on Wednesday.

4          MR. MOLO:  I wonder whether it might be possible for

5   her to come back tomorrow if she spoke with the Court and maybe

6   there is a way to make provision for her transportation if

7   that's an issue.

8          THE COURT:  I'm confident that's an issue.

9          MS. COHEN:  Your Honor, we have three alternates and

10  given we don't have that much left to the trial, I think it is

11  safe to use one of the alternates if we can't go forward for a

12  couple of days.  We also have witnesses who have traveled from

13  out-of-state and have various issues if it goes beyond Tuesday.

14         MR. MOLO:  I don't think any of these witnesses are

15  from out-of-state, are they?

16         MS. COHEN:  I didn't mean out-of-state, I meant out of

17  town -- sorry -- but they have other commitments that may be

18  out of state.

19         MR. MOLO:  We are still well within the time frame of

20  when the trial is going to end.  The jury has been seated.

21  Maybe we can inquire and see if she can make it here tomorrow

22  with some transportation assistance and which I am sure can be

23  arranged in some fair manner.

24         THE COURT:  I think the Court takes care of that.

25  Unless you would like to pick her up, Mr. Molo, and bring her

FBG5sil1                          CORRECTED TRANSCRIPT

1    down?

2              MR. MOLO:  With the Court's' permission.

3              THE COURT:  All right.

4              MR. MOLO:  I'm sure --

5              THE COURT:  The thought that Ms. Cohen and Mr. Molo

6    would pick her up she would say she would never come back.

7              MS. COHEN:  I would suspect that's correct.

8              THE COURT:  Do you have her number handy?

9              THE DEPUTY CLERK:  Yes.

10             THE COURT:  I will give her a call and see if I can

11   get more information.

12             Can I see Mr. Molo and Ms. Cohen for a brief second

13   with the court reporter?

14

15

16

17

18

19

20

21

22

23

24

25

FBG5sil1                              CORRECTED TRANSCRIPT

1              (At side bar)

2              THE COURT:  I just want to put on the record, I

3    discovered on Saturday afternoon that one of the women that I

4    had Alice Tully tickets with on Saturday is a partner at the

5    Clayman firm which I gathered represents Mr. Runes, which I

6    want you to know about.  We did not discuss the case.

7              MS. COHEN:  Thank you, your Honor.

8              MR. MOLO:  Thank you, your Honor.

9              THE COURT:  And she has nothing to do with his

10   representation.

11             MS. COHEN:  No problem.

12             THE COURT:  Thank you.

13

14

15

16

17

18

19

20

21

22

23

24

25

FBG5sil1                    CORRECTED TRANSCRIPT

1          (In open court)

2          THE COURT:  Okay.  Please let the jury know we have a

3   delay.

4          THE DEPUTY CLERK:  Yes.

5          (Recess)

6          THE COURT:  The juror is being brought in.  I am just

7   waiting for a call back.  I am waiting for them to tell me how

8   long it will take.  I'm guessing it will be about an hour but

9   that's a total wild guess.  So, stay close.

10         MS. COHEN:  Your Honor, is it an hour that the Juror

11  no. 1 is coming to Court today?

12         THE COURT:  Yes, she's coming to Court.

13         MS. COHEN:  Thank you, your Honor.

14         THE COURT:  So, we will go forward today, we just have

15  to wait for her to get here, obviously.  So, don't go far.

16         (Recess)

17

18

19

20

21

22

23

24

25

FBGYSIL2                          Runes - Direct

1              THE COURT:  Okay.  We're back on the record.

2              Do we have a witness?

3              MS. COHEN:  Yes, your Honor.

4              THE COURT:  Do you want to get him on the stand.

5              Good morning.  How are you?

6              (Jury present)

7              THE COURT:  Good morning, everybody.  Thank you for

8     your patience.

9              MR. MASTER:  Good morning, your Honor.

10             THE COURT:  Please.

11             Just for scheduling purposes, we're going to break for

12    lunch -- we've had all the morning break we can stand.  The

13    break for lunch at 1:00.

14             MR. MASTER:  Thank you, your Honor.

15     RICHARD RUNES (cont'd),

16        called as a witness by the Government,

17        having been previously sworn, testified further as

18    follows:

19    DIRECT EXAMINATION

20    BY MR. MASTER:

21    Q.  Good morning, Mr. Runes.

22    A.  Good morning.

23             THE COURT:  Mr. Runes, you're still under oath.

24             THE WITNESS:  Thank you.

25    BY MR. MASTER:

1    Q.  Mr. Runes, when we left off on Friday you were talking

2    about a concept called constituent services.

3           If you could just remind the jury.  What does that

4    mean?

5    A.  Well, constituent services are when a legislator helps

6    their constituents, the people who live in their districts.

7    Q.  Again, does Glenwood Management have any buildings in the

8    legislative district of Sheldon Silver?

9    A.  Yes.

10   Q.  Is 10 Liberty one of those buildings?

11   A.  Yes.

12   Q.  Just before the break on Friday, we were looking at a

13   document in evidence as 788.

14   A.  7- what?  I'm sorry.

15   Q.  788.

16          MR. MASTER:  Mr. Coccaro.

17   BY MR. MASTER:

18   Q.  Do you remember looking at that document on Friday?

19   A.  Yes.

20   Q.  Just, again describe for the members of the jury how it

21   came about that you received that letter.

22   A.  Well, it was sent to me by Pat Ryan who works for Brian

23   Meara.

24   Q.  Who did you understand this letter to the tenants of 10

25   Liberty to be coming from?  If you wouldn't mind --

1    A.  I'm not sure I understand the question.

2    Q.  Sure.

3         If you wouldn't mind turning to the second page,

4    Mr. Runes.

5    A.  Yes.  I'm looking at that.  It says, "Pat, send to

6    R. Runes" with a B.  I understand that was Brian.

7    Q.  Where did you understand this text, the letter to the

8    tenants, to be coming from?

9    A.  Probably from Mr. Silver's office.

10   Q.  What was your understanding about what you were being asked

11   to do with that letter?

12   A.  I was being asked to send it onto Glenwood Management for

13   it to be turned into a letter to our tenants at 10 Liberty, a

14   way of thanking Mr. Silver.

15   Q.  Now I'd like you to take a look at what's in your binder as

16   Government's Exhibit 833.

17   BY MR. MASTER:

18   Q.  Do you recognize that document?

19   A.  Yes.

20   Q.  Now, is the 2011 issue related to the siting of the clinic

21   the only time you thought you might need assistance from

22   Sheldon Silver concerning this type of matter?

23   A.  On that particular issue?

24   Q.  Yes.

25   A.  Yes.

FBGYSIL2                          Runes - Direct

1   Q.  Well, did there come a time when another drug treatment

2   center sought to locate near one of Glenwood's buildings?

3   A.  Yes.  Across the street.  Instead of next door, it was

4   across the street.

5   Q.  Is the email exchange at Government Exhibit 833 related to

6   that?

7   A.  Yes.

8          MR. MASTER:  The government offers Government Exhibit

9   833.

10          MR. MOLO:  I object.  Actually, no objection.

11          THE COURT:  Okay.  833 is received.

12          (Government's Exhibit 833 received in evidence)

13   BY MR. MASTER:

14   Q.  Okay.  Now, Mr. Runes, if you could just explain:

15          How did you realize that an issue related to this

16   arose again?

17   A.  Well, Bill Bernstein, who worked for the Downtown Alliance,

18   which was the business improvement district for lower

19   Manhattan, sent an email to Charlie Dorego which informed him

20   that this issue had arisen again in a different location.

21   Q.  Was it your understanding that the defendant had stopped

22   the drug treatment center --

23          MR. MOLO:  Objection.  Your Honor.

24          THE COURT:  Sustained.

25   BY MR. MASTER:

1    Q.  Just explain then what you did with the information.

2    A.  What information?  I'm sorry.

3    Q.  First, if you could just explain to the jury:  When did you

4    learn about this again?

5    A.  October 15, 2013.

6    Q.  So which elected official's assistance did you anticipate

7    seeking again in 2013?

8    A.  Probably Shelly Silver.

9    Q.  And so how important was it to have a good relationship

10   with Sheldon Silver so that these types of constituent-service

11   issues could be addressed when they arose?

12            MR. MOLO:  Objection.

13            THE COURT:  Sustained.

14            Rephrase the question.

15   BY MR. MASTER:

16   Q.  How important was it to have a good relationship with

17   Sheldon Silver constituent-service issues?

18   A.  Well, to the extent that we had property or a property in

19   his district, it would be important for us to have a good

20   relationship with any legislator where we have our properties.

21            MR. MASTER:  Mr. Coccaro, could you return to

22   Government Exhibit 788.

23   BY MR. MASTER:

24   Q.  Mr. Runes, could you just tell the jury the date of that

25   email.

1    A.   December 21, 2011.

2    Q.   I'd like to direct your attention to the very end of 2011.

3         Did there come a time when you received a call from

4    Brian Meara concerning the defendant?

5    A.   Yes.

6    Q.   Describe what you heard from Brian Meara concerning the

7    defendant.

8         Just describe for the jury what you heard from Brian

9    Meara concerning the defendant.

10   A.   I heard from Brian Meara that Mr. Silver had been

11   participating in the legal fees from the certiorari proceedings

12   on the Glenwood buildings.

13   Q.   How did you hear from him?

14   A.   He called me.

15   Q.   What number did he call you on?

16   A.   I'm not sure because, if you dial my office number in

17   Westchester, it simultaneously rings on my cell phone.  So I

18   don't know which number he called, but I undoubtedly picked it

19   up on my cell phone.

20   Q.   Were you in New York at the time?

21   A.   I was.

22   Q.   So what was your reaction to what he told you?

23   A.   I was very surprised.

24   Q.   Why were you surprised?

25   A.   Because I didn't know that he was participating in those

1    fees.  It had not been disclosed to us.

2    Q.  What, if any, other reaction did you have in addition to

3    surprise?

4    A.  I was concerned.  I was surprised, concerned, upset.

5    Q.  Why were you concerned and upset?

6    A.  Well, I had to deal with or communicate about that with

7    Mr. Litwin and Charlie Dorego.  I was concerned because

8    Mr. Silver was the speaker.  So it was complicated.

9    Q.  So what, if anything, about the fact that it involved the

10   speaker contributed to your concern?

11   A.  Well, it's really good to have a good relationship with the

12   speaker.  I didn't know how this was going to play out.  I

13   didn't know whether this was in fact legal.  There were too

14   many complications for me to be happy about it.

15   Q.  What, if at all, about the fact that you had just learned

16   about past payments contributed to your concern?

17   A.  Well, it had been 10 or 12 years, apparently, that this had

18   been going, and we didn't know about it.

19   Q.  And so what, if any, concerns did that cause you about the

20   ongoing relationship?

21   A.  I'm sorry.  I don't understand the question.

22   Q.  You said you had just learned.

23        What about the fact that you had just learned that

24   there was an ongoing stream of payments gave you particular

25   concerns?

FBGYSIL2                          Runes - Direct

1   A.  Well, I didn't know if it was going to continue, if we

2   could continue it, what Mr. Litwin wanted to do.  There was a

3   whole bunch of things flying around in my head at that time.

4   Q.  What, if any, concerns did you have about potentially

5   ending the stream of payments?

6   A.  How Mr. Silver would view that in terms of how he would

7   react or respond to that.

8   Q.  Again, how important was it to you in the past to have a

9   favorable relationship with him, including in the 2011 rent law

10  negotiations?

11  A.  It was very important that we have a good relationship with

12  both legislative leaders and the governor.

13  Q.  How important was it to you to have a favorable

14  relationship going forward, including any future anticipated

15  negotiations about the rent laws?

16  A.  It's always good to have a good relationship with the

17  speaker.

18  Q.  And you described Glenwood's business model on Friday as a

19  one-trick pony.

20          How, if at all, did that affect your views about the

21  response of the speaker?

22  A.  Well, all we did was build luxury rental housing using the

23  80/20 model using the 421a statutes and other state programs.

24  If those programs were altered or disappeared, it would be

25  difficult for us.

1          We don't build shopping centers.  We don't build

2     office buildings.  That's all we build.

3     Q.  So what, if any, ways were you concerned that the speaker

4     could adversely affect you?

5          MR. MOLO:  Objection.

6          THE COURT:  Overruled.

7          THE WITNESS:  Well, the speaker and his staff control

8     the flow of legislation in the assembly, just as the senate

9     majority leader does in the senate.

10    BY MR. MASTER:

11    Q.  So how, if at all, does that affect you?

12    A.  Theoretically, the speaker could suggest and negotiate

13    changes that would be bad for our business model.

14    Q.  Now, did you speak to anyone at Glenwood about the call

15    that you had received from Brian Meara?

16    A.  Oh, yes.  I spoke first with Charlie Dorego, and then I

17    walked 10 feet over to Mr. Litwin's office and had a discussion

18    with him.

19    Q.  So first let's talk about your discussions with Charlie

20    Dorego.

21         What did you tell him about your call from Brian

22    Meara?

23    A.  Well, Charlie at that time had already, I believe, received

24    copies of the proposed retainers going forward which listed

25    Mr. Silver's name in them and gave notice, the fact that he was

1   participating in the legal fees.

2   Q.  Based on your conversation with Charlie Dorego, what, if

3   any, reaction did he have?

4   A.  He was similarly displeased and unhappy.

5   Q.  What, if any, prior knowledge did he say that he had about

6   this relationship?

7   A.  Nobody that I knew of at Glenwood had any knowledge of the

8   relationship prior to that.

9   Q.  So how soon after your initial call from Brian Meara did

10  you meet with Charlie Dorego about these retainers?

11  A.  Within a day.

12  Q.  Where did you meet?

13  A.  I went to Glenwood's offices in New Hyde Park and met with

14  Mr. Dorego and Mr. Litwin.

15  Q.  First describe what transpired at the meeting with

16  Mr. Dorego.

17  A.  He was upset and concerned.

18  Q.  Did you share your concerns with him as well?

19  A.  Yes.

20  Q.  What, if any, documents did he show you at the meeting?

21  A.  He showed me one of the retainers.

22          MR. MASTER:  Mr. Coccaro, if you wouldn't mind pulling

23  up what's already been admitted as Government Exhibit 692.

24  BY MR. MASTER:

25  Q.  Mr. Runes, it will be on your screen.

1   A.  Yes.

2   Q.  Do you recognize that document?

3   A.  I believe it's a similar document to the one I was shown.

4   I don't know if it was exactly the one I was shown because

5   there are more than 15 of them I believe that came in.

6   Q.  So you were just shown one of them?

7   A.  Yes.

8   Q.  What was your reaction to seeing this document?

9   A.  I'd already reacted to the information contained therein,

10  but it was unsettling.

11  Q.  So you said, after you met with Charlie Dorego, you went to

12  see Mr. Litwin.

13  A.  Correct.

14  Q.  Again, what role does Mr. Litwin play with respect to --

15  did Mr. Litwin play at that time with respect to Glenwood?

16  A.  Well, he ran the things that he wanted to run at Glenwood,

17  and one of the things that he did was decide who were used as

18  attorneys on behalf of the properties.

19  Q.  So what was Mr. Litwin's reaction when you brought this to

20  his attention?

21  A.  He was upset.  He was, in a sense, angry.  He did not want

22  to sign a retainer that listed Shelly as one of the attorneys.

23  And he wanted to know whether it was in fact legal under --

24          MR. MOLO:  Objection, your Honor.

25          THE COURT:  Are you withdrawing the objection?

1          MR. MOLO:  Withdraw the objection.

2          THE WITNESS:  He wanted to know whether it was legal

3   under the lobbying and ethics laws in New York for Mr. Silver

4   to be participating in legal fees on the buildings.

5   BY MR. MASTER:

6   Q.  Before I get into that issue, what, if any, indication did

7   Mr. Litwin give that he had previously known that the defendant

8   was sharing in fees?

9   A.  He had not previously known.

10  Q.  That is what he indicated to you?

11  A.  Absolutely.

12  Q.  Based on Mr. Litwin's instructions -- withdrawn.

13          On this issue of the lobbying law, did you understand,

14  based on your own experience as a lobbyist, that New York State

15  has certain rules strictly barring certain types of financial

16  relationships between legislators and lobbying entities?

17  A.  I knew that there were rules.  They're constantly changing.

18  That's why we had a compliance counsel, to make sure that we

19  were in compliance.

20  Q.  Is that what you understood Mr. Litwin to be asking about?

21  A.  Yes.  I offered that I would call the compliance counsel.

22  He told me to do that, and I did that.

23  Q.  What's the name of the compliance counsel, the lobbying

24  compliance counsel, who you called?

25  A.  David Grandeau.

FBGYSIL2                          Runes - Direct

1   Q.  Is that who you told Mr. Litwin you would contact?

2   A.  Yes.

3   Q.  Did you decide to seek advice as to whether the defendant's

4   receipt of funds from Glenwood could violate any other laws

5   besides lobbying rules?

6   A.  No.

7   Q.  Who else, besides Mr. Dorego and Mr. Litwin, did you tell

8   about the fact that the defendant was getting paid and that

9   there was a proposed set of retainers concerning future

10  payments?

11  A.  Besides Dorego and Mr. Litwin?

12  Q.  Yes.

13  A.  Nobody.

14  Q.  Did you tell Michael Hoenig, the company's CFO?

15  A.  No.

16  Q.  Did you tell Carol Pittelman, Mr. Litwin's daughter who

17  ended up taking over for Mr. Litwin?

18  A.  No.

19  Q.  Did you inform any other lobbyist or staff?

20  A.  No.

21  Q.  Why didn't you inform anyone else?

22  A.  It was nobody else's business.

23  Q.  Now, did you ultimately speak with Mr. Grandeau, as you had

24  been asked to do by Mr. Litwin?

25  A.  Yes.

1   Q.  Again, what is his area of expertise?

2   A.  His area of expertise is lobbying and ethics compliance in

3   New York State.

4   Q.  To your knowledge, does he have any expertise in any other

5   area of law?

6   A.  Not that I'm aware of.

7   Q.  So just describe for the members of the jury what your plan

8   was in addressing this issue with him.

9   A.  My plan in addressing the issue was to call Mr. Grandeau

10  up, have a conversation with him and, in the course of the

11  conversation, give him a hypothetical that I believed to be

12  accurate about this without telling him who the individuals

13  were involved so as to not share with him the information about

14  who was in fact involved.

15  Q.  Now, you had stated that Mr. Grandeau was Glenwood's state

16  lobbying compliance counsel.

17          Did you have any understanding as to whether he had a

18  professional obligation to keep that conversation confidential?

19  A.  Yes.  It was attorney-client privileged.

20  Q.  So then why not tell him that it related to the defendant?

21  A.  Some lawyers are more discreet than others.

22  Q.  Is that why you didn't identify the defendant?

23          MR. MOLO:  Objection.

24          THE COURT:  Overruled.

25          THE WITNESS:  Yes.  This was pretty significant

1    information.  I wanted to keep it as discreet as possible.

2    BY MR. MASTER:

3    Q.  So how did you contact Mr. Grandeau?

4    A.  I called him on the phone.

5    Q.  Again, how did you end up raising the issue in the

6    conversation?

7    A.  I said, by the way, if a real estate management company

8    manages apartment houses and properties and the properties are

9    owned by LLCs and the real estate management company hires

10   lobbyists but the LLCs don't, may a New York State legislator

11   do business with the LLCs?

12   Q.  What was his response?

13   A.  His response was yes.

14   Q.  Now, did you work into this hypothetical that the LLCs were

15   owned by the same family as the management company?

16   A.  No.

17   Q.  Did you work into the hypothetical that the management

18   company actually used the LLCs to make campaign donations to

19   the legislator?

20            MR. MOLO:  Objection.

21            THE COURT:  Overruled.

22            THE WITNESS:  Would you repeat that question.

23   BY MR. MASTER:

24   Q.  Did you tell Mr. Grandeau that the management company used

25   the LLCs to make campaign donations to the legislator?

1    A.  I don't believe so.

2    Q.  Did you tell Mr. Grandeau that the LLCs themselves were

3    receiving state benefits, including tax exempt financing that

4    needed to be approved by the defendant?

5            MR. MOLO:  Objection.

6            THE COURT:  Overruled.

7            THE WITNESS:  No.

8    BY MR. MASTER:

9    Q.  Even if you didn't identify the defendant by name, did you

10   tell Mr. Grandeau that the payments were being made to someone

11   with the defendant's power over your business?

12   A.  No.

13   Q.  Did you ask him whether this might violate any other laws

14   besides lobbying laws?

15   A.  No.  He wasn't an expert in anything but the lobbying and

16   ethics laws.

17           MR. MASTER:  Now, Mr. Coccaro, if you wouldn't mind

18   pulling up what has already been admitted as Government Exhibit

19   646-19.  Just pull up page 8.

20   BY MR. MASTER:

21   Q.  It will be on your screen, Mr. Runes.

22           MR. MASTER:  If you wouldn't mind just zooming in on

23   the check.  It's difficult to read.

24           Mr. Coccaro, if you wouldn't mind maybe going to a

25   prior page, page 7.

1   BY MR. MASTER:

2   Q.  Again, this may be difficult to read, but the question,

3   Mr. Runes, is:

4           Have you seen any checks from Glenwood Management

5   Corporation to Jay Arthur Goldberg before they were shown to

6   you in preparation for your testimony?

7   A.  No.

8   Q.  The hypothetical you just described giving Mr. Grandeau

9   described a management company that hired lobbyists while the

10  relationship was with the LLCs.

11          At the time that you spoke with Mr. Grandeau, did you

12  know that Glenwood Management was paying Jay Arthur Goldberg

13  directly?

14  A.  No.

15  Q.  Again, had you consulted with Mr. Hoenig, the company's

16  CFO, about this matter?

17  A.  No.

18          MR. MASTER:  Mr. Coccaro, if you wouldn't mind just

19  going to page 9 of this document.

20  BY MR. MASTER:

21  Q.  Did you have any knowledge, at the time you consulted with

22  Mr. Grandeau, as to whether Jay Arthur Goldberg identified

23  payments to the defendant as coming from Glenwood?

24  A.  No.

25  Q.  So do you know whether, if you had known all of this

FBGYSIL2                         Runes - Direct

1    information and provided it to Mr. Grandeau, his advice on this

2    lobbying law issue might have been different?

3              MR. MOLO:  Objection, your Honor.

4              THE COURT:  Sustained.

5    BY MR. MASTER:

6    Q.  Well, do you know how, if at all, this information might

7    have affected the advice you obtained from Mr. Grandeau?

8              MR. MOLO:  Objection, your Honor.

9              THE COURT:  Sustained.

10             If you had known this information, would you have

11   conveyed it to your lobbying attorney?

12             THE WITNESS:  If I had known it, I would have conveyed

13   it.

14             THE COURT:  Would you have viewed it as important in

15   seeking his advice?

16             THE WITNESS:  Some of it, yes, perhaps.  But I don't

17   know.

18             MR. MASTER:  You can take that down, Mr. Coccaro.

19   BY MR. MASTER:

20   Q.  Did you consult with any other lawyer on any other type of

21   law?

22   A.  No.

23   Q.  Again, did you reveal the fact that the defendant was

24   sharing fees from Glenwood with anyone else, other than the

25   people you just described?

1          MR. MOLO:  Objection.  That misstates the testimony.

2     The fees were shared with Golberg & Iryami.  It was a referral

3     fee.

4          THE COURT:  Sustained.

5          Rephrase the question.

6     BY MR. MASTER:

7     Q.  Did you share the information you obtained with anyone

8     else?

9     A.  No.

10    Q.  Even after you received a response from Mr. Grandeau, based

11    on the information you had at the time and provided in this

12    hypothetical, did it resolve your concerns?

13    A.  It did not resolve our concerns, but Mr. Litwin made his

14    decisions.

15    Q.  Well, what decision did he decide to make?

16    A.  He decided that he would ask Mr. Goldberg to re-do the

17    retainers and take out the reference to Shelly Silver.  But, if

18    they wanted to send a letter to Charlie Dorego disclosing the

19    sharing of the fees, Mr. Dorego would sign the letter and send

20    it back to them.

21    Q.  How did you describe that other letter?

22    A.  I'm not sure I understand what you mean.

23    Q.  Well, you said that -- I'll just go step-by-step.

24          After you had heard or spoke with Mr. Grandeau, what

25    choices did you believe you had concerning this matter?

1           MR. MOLO:  Objection.

2           THE COURT:  Overruled.

3           THE WITNESS:  Well, the choice that Mr. Litwin faced

4    was to either tell Mr. Goldberg that he was not going to use

5    his services anymore or Mr. Litwin could elect to tell

6    Mr. Goldberg to please change the retainers but give a side

7    letter to Charlie Dorego making the necessary disclosures to

8    him, and they would be signed by Mr. Dorego and sent back to

9    Mr. Goldberg.

10   BY MR. MASTER:

11   Q.  What, if any, concerns did you have about the first option?

12   Saying no.

13          THE COURT:  I'm not quite sure I understood the first

14   option.

15          When you said not use "his" services anymore --

16          THE WITNESS:  Correct.

17          THE COURT:  -- do you mean Goldberg services or

18   Goldberg couldn't use Silver's services?

19          THE WITNESS:  No.  Mr. Litwin could have decided not

20   to use Mr. Goldberg's services any further as a certiorari

21   attorney.

22          THE COURT:  Okay.

23   BY MR. MASTER:

24   Q.  What, if any, concerns did you have about that option?

25          MR. MOLO:  Objection, your Honor.  The witness has

FBGYSIL2                          Runes – Direct

1   testified that Mr. Litwin made this decision.

2            THE COURT:  Overruled.

3            The question was what was his concern.  Was his

4   concern about that option?

5            THE WITNESS:  Well, the concern was not too make an

6   enemy out of Mr. Silver.  We had no desire to do that.

7            THE COURT:  Why would that have made an enemy out of

8   Mr. Silver?

9            THE WITNESS:  If we terminated -- it potentially could

10  have.  I didn't say it necessarily would have.  We would have

11  been terminating a contract with someone that Mr. Silver was

12  sharing in.

13           THE COURT:  Or receiving money from.

14           THE WITNESS:  Yes.

15           THE COURT:  Okay.

16  BY MR. MASTER:

17  Q.  So, faced with these options again, who did you speak to

18  after your conversation with David Grandeau?

19  A.  I spoke to Mr. Litwin.

20  Q.  Is that how you learned of the decision that he ended up

21  making?

22  A.  Yes.

23  Q.  To whom was this side agreement that you described to be

24  addressed?

25  A.  Mr. Dorego.

FBGYSIL2                         Runes - Direct

1    Q.   Why to Mr. Dorego instead of Carol Pittelman or Michael

2    Hoenig?

3    A.   As the general counsel to both Glenwood Management and the

4    LLCs, he would be the one to handle the relationships with

5    attorneys.

6    Q.   Who was tasked with informing the defendant of Mr. Litwin's

7    decision?

8    A.   I was.

9    Q.   How did you go about informing the defendant of this

10   decision?

11   A.   I made an appointment to see him, and I met with him.

12   Q.   Where did you go to meet with him?

13   A.   I met with him in his third-floor office in Albany.

14   Q.   I'd like you to take a look at in your binder at Government

15   Exhibit 103-10.

16   A.   What was the number?  I'm sorry.

17   Q.   103-10.  It's at the very end.

18   A.   Yes.

19   Q.   Is this an entry in a schedule concerning your meeting with

20   the defendant?

21   A.   Yes.

22         MR. MASTER:  Your Honor, this has previously been the

23   subject of a stipulation.  The government offers Government

24   Exhibit 103-10.

25         MR. MOLO:  No objection.

1           THE COURT:  103-10 is received.

2           (Government's Exhibit 103-10 received in evidence)

3   BY MR. MASTER:

4   Q.  If you wouldn't mind turning to page 2 of this document.

5   A.  Yes.

6   Q.  What was the date of the meeting that you had with the

7   defendant in his office in Albany?

8   A.  January 18, 2012.

9   Q.  What was your understanding, at the time that you met with

10  the defendant, as to whether he wanted the relationship to

11  continue?

12  A.  I believe he did.

13          THE COURT:  What did he say?

14          THE WITNESS:  I don't remember his exact words,

15  your Honor.

16          THE COURT:  In substance.

17          THE WITNESS:  In substance, I was there to inform him

18  of how we would proceed going forward, which was to re-do the

19  initial retainers without Mr. Silver's name being included and

20  have a side letter from Mr. Goldberg sent to Mr. Dorego, signed

21  by Mr. Dorego and acknowledged, and sent back to Mr. Goldberg.

22          THE COURT:  What did Mr. Silver say about that?

23          THE WITNESS:  He said fine.

24  BY MR. MASTER:

25  Q.  Was anyone else in the meeting with you?

FBGYSIL2                        Runes - Direct

1   A.  No.

2   Q.  Do you recall any meetings with the defendant in his office

3   between the June 2011 meeting you testified about on Friday and

4   this particular meeting?

5   A.  No.

6   Q.  At the prior meeting, you brought Brian Meara along.

7            Did you bring Brian Meara along this time?

8   A.  No.

9   Q.  Why not?

10  A.  It wasn't necessary.

11  Q.  Did you tell Brian Meara that you would be meeting with the

12  defendant about this issue?

13  A.  I do not believe so.

14  Q.  When, if ever during the meeting, did the defendant tell

15  you that you could say no to the financial arrangement if you

16  wanted to?

17  A.  Repeat that if you would.  I'm sorry.

18            MR. MOLO:  Objection.

19            THE COURT:  Overruled.

20  BY MR. MASTER:

21  Q.  When, if ever during the meeting, did he tell you that you

22  could say no to the financial relationship?

23  A.  I'm not hearing the first part of that question.

24  Q.  When, if ever during the meeting, did he tell you that you

25  could say no to the financial relationship if you wanted to?

FBGYSIL2                    Runes - Direct

1    A.  I don't recall him saying that.

2    Q.  What, if any, other topic did you discuss during the

3    meeting?

4    A.  None that I recall.

5    Q.  So what did you do after the meeting?

6    A.  I left the capital.

7    Q.  Who did you tell after the meeting?

8    A.  I believe I called Mr. Litwin and Charlie Dorego.

9    Q.  Did the meeting resolve the concerns that you had expressed

10   earlier?

11   A.  Not completely.

12   Q.  Why?

13   A.  Because I was uncomfortable with the arrangement.

14            THE COURT:  I'm sorry.  What did you think was

15   accomplished or what did you tell Mr. Silver was being

16   accomplished by putting the same arrangement in a separate

17   letter?

18            THE WITNESS:  I'm not sure, your Honor.  But I believe

19   that the retainer agreements for certiorari proceedings are

20   filed someplace and are available to be viewed; whereas, the

21   side letter would not be.

22            THE COURT:  Did you tell Mr. Silver that?

23            THE WITNESS:  No.

24            THE COURT:  Did you discuss at all what the

25   differences between the two approaches were?

1           THE WITNESS:  No.

2           THE COURT:  Okay.

3    BY MR. MASTER:

4    Q.  To your knowledge, did the defendant ever publicly disclose

5    his relationship?

6    A.  No.

7    Q.  To your knowledge, did Glenwood ever publicly disclose its

8    relationship with the defendant?

9    A.  No.

10   Q.  To your knowledge, prior to this investigation --

11          THE COURT:  I'm sorry.  By "relationship" do you mean

12   the fact that their tax certiorari firm was paying fees to

13   Mr. Silver?

14          MR. MASTER:  Yes.  And the fact of this side letter,

15   the side letter agreement.

16   BY MR. MASTER:

17   Q.  I'm sorry?

18   A.  No.

19   Q.  To your knowledge, prior to the investigation, was anyone

20   outside of the group you discussed this with made aware of the

21   relationship that was reflected in the side letter?

22          MR. MOLO:  Objection.

23          THE COURT:  Overruled.

24          THE WITNESS:  No.

25          MR. MASTER:  Nothing further.

1          THE COURT:  Okay.  Mr. Molo.

2          MR. MOLO:  Thank you.

3    CROSS-EXAMINATION

4    BY MR. MOLO:

5    Q.  Good morning, Mr. Runes, sir.  Good afternoon.

6    A.  Good afternoon.

7    Q.  I'm Steve Molo, and I represent Mr. Silver.  We've met.

8          At the outset of your testimony, the prosecutor asked

9    the question and said, you're a lobbyist and a lawyer for

10   Glenwood.

11         Why don't you tell the jury about your distinguished

12   background.

13   A.  I'm sorry?

14   Q.  Could you tell the jury about your full distinguished

15   background since you graduated law school.

16   A.  Well, after I graduated law school, I worked for the

17   New York City Legal Aid Society, and I became a lobbyist for

18   the New York City Legal Aid Society.

19         And then I started to both practice law and work for

20   the legislature.  For the first several years, I worked for the

21   assembly democrats.  And then for the next several years, I

22   worked for the senate republicans.

23   Q.  While you were working for the assembly, you also

24   maintained a law practice at the same time?

25   A.  I did.

FBGYSIL2                         Runes - Cross

1    Q.   Representing private clients?

2    A.   Correct.

3    Q.   Then what happened after that?

4    A.   Well, after I left the legislature, I became national

5    director of state relations for Ernst & Young.  And then I left

6    that job, opened my own consulting and legal practice which I

7    have to this day.

8    Q.   In that role, you are registered as a lobbyist; is that

9    right?

10   A.   I am.

11   Q.   With the State of New York.  And you regularly file forms

12   informing the state of your lobbying activity; correct?

13   A.   Right.

14   Q.   In addition to serving as a lawyer to your clients in that

15   practice, you also serve as the general counsel to something

16   called American Lawyer Media.

17            Is that right?

18   A.   No.

19   Q.   Had you been?

20   A.   No.

21   Q.   Okay.

22   A.   I'm counsel for external affairs.  I'm not the general

23   counsel.

24   Q.   So counsel for external affairs to ALM, which is American

25   Lawyer Media; right?

FBGYSIL2                          Runes - Cross

1  A.  Yes.

2  Q.  That's the largest nonlaw book publisher of legal

3  publications to the legal profession.

4          Is that right?

5  A.  I guess.

6  Q.  They publish a whole host of magazines to lawyers and

7  newsletters; right?

8  A.  Yes.

9  Q.  In addition to that, you also served on something called

10 the Committee on Character and Fitness of the Appellate

11 Division of the New York Supreme Court.

12          Correct?

13 A.  Correct.

14 Q.  What period of time were you serving on the Character and

15 Fitness Committee?

16 A.  I still serve on it.

17 Q.  When did you assume that role?

18 A.  More than ten years ago.

19 Q.  Could you explain to the jury what the Committee on

20 Character and Fitness is.

21 A.  We interview prospective lawyers to see whether they have

22 the character and fitness to become admitted to the bar.

23 Q.  And that requires a familiarity with the rules governing

24 lawyers?

25 A.  Some familiarity, yes.

FBGYSIL2                         Runes – Cross

1   Q.  How were you selected to serve on the Character and Fitness

2   Committee?

3   A.  I was appointed by the presiding justice of the appellate

4   division, first department.

5   Q.  That was more than ten years ago?

6   A.  Yes.  I believe so.

7   Q.  Who was that at the time?

8   A.  Sullivan.

9   Q.  Justice Sullivan.

10           Were you recommended for that position by someone?

11  A.  I believe I was.

12  Q.  By more than one person?  Do you recall?

13  A.  I don't recall.

14  Q.  In addition to serving as a lawyer and as a lobbyist, you

15  also until recently were a judge.

16           Is that right?

17  A.  Served one term as a Rye City court judge in Rye.

18  Q.  As a judge, which years did you serve as a judge?

19  A.  It was until two years ago and for the preceding six years.

20  So I don't know the exact.

21  Q.  So you ceased being a judge in 2013?

22  A.  '13 or '14.  I don't recall.

23  Q.  So, during the time of all of the events that you've

24  testified here to today, you were also a judge, in addition to

25  a lobbyist and a lawyer.

1    A.  Yes.

2    Q.  You testified a little bit about something called an LLC.

3         Can you explain to the jury what an LLC is.

4    A.  It's a relatively new type of entity that combines the

5    liability protection of a corporation and the tax treatment of

6    a partnership.

7    Q.  An LLC is a separate corporate entity; is that right?

8    A.  It's a separate entity.  I wouldn't call it a corporate

9    entity because it's not a corporation.

10   Q.  LLC stands -- is that limited liability company?

11   A.  Company.

12   Q.  It's recognized as a separate company even though it might

13   have the same ownership as another LLC.

14        Right?

15   A.  Correct.

16   Q.  The IRS recognizes LLCs as separate corporate entities or

17   separate company entities?

18   A.  Yes.

19   Q.  Do you know whether LLCs are considered separate in terms

20   of the liability if someone were to bring a lawsuit against one

21   LLC?

22   A.  Yes.  Each one is totally separate from the others.

23   Q.  Each one has its own separate registration with the

24   New York authorities that regulate LLCs?

25   A.  Yes.

FBGYSIL2                    Runes – Cross

1  Q.  Each one pays its own taxes; is that right?

2  A.  They actually have no entity-level tax in New York.

3  Q.  Okay.

4  A.  Because they get partnership-like tax treatment.

5  Q.  I see.

6  A.  But, yes.  For the purposes of allocating taxes, each one

7  is separate.

8  Q.  And each one would have its own profit and loss?

9  A.  Correct.

10 Q.  And each one would have its own ownership?

11 A.  They are separate and distinct entities.

12 Q.  And the political contribution laws in New York apply to

13 LLCs in terms of the limits that they impose.

14        Is that right?

15 A.  LLCs -- each individual LLC, in terms of political

16 contributions, has the same rights as each individual in

17 New York.

18 Q.  So you don't aggregate it.  Even if one individual owned

19 multiple LLCs, you don't aggregate the limits of those separate

20 LLCs in determining how much an individual might give.

21 A.  That is correct.

22 Q.  Now, you were asked by the prosecutor some questions about

23 participating in the 421a program for building affordable

24 housing.

25 A.  Yes.

1   Q.   421a helps create affordable housing; right?

2   A.   It probably has created in the last 25 years the majority

3   of the affordable housing in New York City.

4   Q.   Hundreds, if not thousands, of units?

5   A.   Correct.

6   Q.   It's provided homes to people in New York that might not

7   otherwise be able to afford them.

8   A.   Correct.

9   Q.   Glenwood prides itself on treating these affordable housing

10  tenants no differently from the tenants that might be paying a

11  full-market value.

12  A.   That is correct.  When we build buildings now, the tenants

13  in the affordable units get the same fixtures, the same

14  appliances.  They're distributed throughout the buildings, not

15  in any particular lower floor or whatever.  They're scattered

16  throughout the buildings randomly.

17  Q.   You talked earlier in your testimony on Friday about tax

18  abatements -- or tax benefits is a good way to put it --

19  available to housing built under 421a.

20       Correct?

21  A.   Yes, it is.

22  Q.   And those tax benefits actually get designed by the City of

23  New York, not by the state.

24       Is that right?

25  A.   That's correct.

1  Q.  Glenwood has --

2  A.  It's a state statute, but it's really a city program.

3  Q.  Glenwood has to apply to New York City Department of

4  Housing Preservation and Development to obtain these 421a tax

5  benefits?

6  A.  Correct.

7  Q.  That's a City of New York agency?

8  A.  Yes, sir.

9  Q.  It is not a State of New York agency?

10  A.  No.

11  Q.  It's not run by the legislature?

12  A.  No.

13  Q.  To your understanding, does -- from your experience, does

14  the New York Housing Preservation and Development Agency have

15  meaningful review in deciding whether to grant these 421a tax

16  benefits?

17  A.  They do, and they also have the power to approve or

18  disapprove the initial rent roll in the building.

19  Q.  Once the HPD, the New York City Department of Housing

20  Preservation and Development, approves an application for 421a

21  treatment, then you have to apply to the New York City

22  Department of Finance; right?

23  A.  I believe so.

24  Q.  Mr. Silver was not in any way involved with Glenwood's

25  application to the New York City Housing Preservation and

FBGYSIL2                          Runes - Cross

Development Agency or the New York City Department of Finance,
was he?

A.  No, sir.

Q.  Mr. Runes, you were asked some questions about the Public
Authorities Control Board or the PACB on direct examination.

          That's an executive branch agency.  Is that right?

A.  I believe so.

Q.  By "executive branch," it comes under the general control
of the governor and not the legislature; right?

A.  Yes, but the legislative leaders are members of the PACB.

Q.  Right.  The governor appoints those members though; right?

A.  Yes.

Q.  Now, the loans that Glenwood received through the PACB were
obtained through a perfectly legitimate process.

          Correct?

A.  Absolutely, yes.

Q.  And that process involved multiple government agencies;
correct?

A.  Yes.

Q.  To your knowledge, Mr. Silver never intervened in any way
for your applications for that PACB approval?

A.  Neither for nor against.

Q.  Now, before a proposal can again get to the PACB, it has to
be approved by one of these other agencies; right?

A.  Correct.

FBGYSIL2                          Runes - Cross

1    Q.  I think the specific proposal you discussed involving 320

2    West 38th Street was approved by the state Housing Finance

3    Agency first?

4    A.  Yes.

5    Q.  And the HFA, the State Housing Finance Authority, is not

6    part of the assembly.

7    A.  No, sir.

8    Q.  And it is not run by the Speaker of the Assembly.

9    A.  No.

10   Q.  It is also an executive branch agency coming under the

11   direction of the governor.

12   A.  Yes.

13   Q.  Now, you testified that the Housing Finance Authority

14   decides who they're going to give part of their bond allocation

15   to.

16         Correct?

17   A.  Yes.

18   Q.  And Glenwood can get access to these bond allocations only

19   if the project is first approved by the Housing Finance

20   Authority.

21   A.  Yes.

22   Q.  So it's really the Housing Finance Authority who primarily

23   decides whether to fund a particular bond issue.

24   A.  Yes.

25   Q.  The government asked you -- the prosecutors asked you --

1   about a tax exempt bond issue at 320 West 38th Street.

2          Before the Housing Finance Authority reviews such a

3   project, it's got this stringent review process; correct?

4   A.  Correct.

5   Q.  It's got safeguards to secure its investment in affordable

6   housing?

7   A.  Yes.

8   Q.  I'm going to show you Defense Exhibit 134.

9          MR. MOLO:  Your Honor, this document is subject to a

10  proposed stipulation.  I would ask that it be offered

11  conditionally.

12         MR. MASTER:  No objection.  It can be admitted.

13         THE COURT:  No objection to admission?

14         MR. MASTER:  Correct, your Honor.

15         THE COURT:  Okay.  134 is admitted.

16         (Defendant's Exhibit 134 received in evidence)

17         MR. MOLO:  If we could just put it on the screen

18  briefly just to see what it is.

19  BY MR. MOLO:

20  Q.  Do you see what's marked Defendant's Exhibit 134 there,

21  Mr. Runes.

22  A.  Yes.

23  Q.  Take a moment just to look at it.

24         Is this the paperwork -- is it paperwork from the

25  New York State Housing Finance Agency regarding Glenwood's

1    application for 320 West 38th Street?

2    A.  It's part of it, yes.

3    Q.  Part of it.

4         If you look at the first page under Public Purpose --

5    A.  Yes.

6    Q.  -- it notes that 21 percent of the units in the building

7    being financed will be rented to households whose incomes are

8    at our below 50 percent of the New York City area median

9    income.

10        Correct?

11   A.  Yes.

12   Q.  It states, "In addition, at least 15 percent of the

13   low-income units will be rented to households whose income are

14   at or below 40 percent of the AMI."

15   A.  Yes.

16   Q.  Glenwood had to set aside a substantial number of units,

17   over 20 percent, for this affordable housing in order for the

18   Housing Finance Authority to approve the project.

19   A.  Yes.

20   Q.  This type of financing is available throughout the state?

21   It's not exclusive to New York City?

22   A.  It really only works in New York City.

23   Q.  For financial reasons.

24   A.  For financial reasons, not for legal reasons but for

25   financial reasons.

FBGYSIL2                    Runes - Cross

1   Q.  But there are a number of developers participating in these

2   80/20 loans; correct?

3   A.  Yes.

4   Q.  Now, I'm going to direct your attention to the second page

5   where it says Credit Enhancement and Security.

6   A.  Yes.

7   Q.  That provides that, on page 2, that a direct pay letter of

8   credit issued by Wachovia or another financial institution or

9   credit enhancement provider acceptable to the agency must be

10  issued.

11          What is that?

12  A.  It's guaranteeing the payment for the bonds I believe.

13  Q.  So Glenwood has to actually guarantee payment of the bond.

14  It's not just getting this money without any security.

15  A.  Correct.

16  Q.  It also says that this is a first mortgage on a fee simple

17  interest must be -- it says a first mortgage on a fee simple

18  interest must be granted in the project property and

19  improvements.

20          So that's a mortgage that would be to the benefit of

21  the state in some way?

22  A.  Yes.

23  Q.  That's another form of security that Glenwood is giving in

24  exchange for this financing.

25          Correct?

FBGYSIL2                          Runes - Cross

1   A.  Yes.

2   Q.  Do you know did the Housing Finance Authority perform some

3   form of credit check or credit analysis on Glenwood?

4   A.  I'm sure they did.

5   Q.  Directing your attention to page 5, the credit and

6   background review.

7          It mentions actually that the --

8   A.  Wait a minute.  I have to get that.

9   Q.  I'm sorry.  Page 5, the document.

10  A.  Yes.

11  Q.  Do you see where it says Credit and Background Review?

12  A.  Yes.

13  Q.  So the credit and background review was performed on a

14  project that also says New Hyde Park Realty LP.

15         That's a Litwin organization; correct?

16  A.  Yes.

17  Q.  And then Mr. Litwin himself; correct?

18  A.  Yes.

19  Q.  Carol Pittelman, who is his daughter, as I understand it?

20  A.  Correct.

21  Q.  Gary Jacob?

22  A.  Yes.

23  Q.  And Stephen Jacobs, Robert Boring, Stephen B. Jacobs Group.

24         These are other entities that were involved in that

25  project?

FBGYSIL2                          Runes – Cross

1    A.   Yes.  Gary Jacobs is with Glenwood.

2    Q.   Okay.  With Glenwood.

3         And then Glenwood Management Corporation as well was

4    subject to that review; correct?

5    A.   Yes.

6    Q.   And the results of that review were satisfactory; correct?

7    A.   Yes.

8    Q.   If you go to page 6 toward the back of the document, it

9    mentions that -- it's got a recommendation there.  Right?

10        It notes that the development staff has reviewed the

11   underwriting data supplied by the borrower -- that would be a

12   Glenwood entity -- and determined that the project revenues and

13   expenses are reasonable.  Given the projections, the project

14   will satisfy the underwriting criteria of the agency.

15        Right?

16   A.   Yes.

17   Q.   Can you just explain in simple terms what that means.

18   A.   That means that they decided that based on the projections,

19   we would be able to pay our obligations.

20   Q.   Based on their analysis.

21   A.   Correct.

22   Q.   You were hired by Glenwood approximately 15 years ago as a

23   lobbyist?

24   A.   At least, yes.

25   Q.   And Mr. Silver had been the speaker for more than two

1    decades; correct?

2    A.   Correct.

3    Q.   During that entire time that you have been working for

     Glenwood?

5    A.   Yes.

6    Q.   Plenty of bills have come up in those last 21 years that

7    might affect Glenwood's interests.

8              Is that correct?

9    A.   Yes.

10   Q.   Like rent control reauthorization in 1997; right?

11   A.   Yes.

12   Q.   And it was reauthorized again in 2003; correct?

13   A.   Yes.

14   Q.   And 421a came up for reauthorization in 1998.

15             Do you recall that?

16   A.   I don't specifically, but I --

17   Q.   You have no reason to doubt it.

18   A.   No.

19   Q.   421a came up again in 2002.

20             Do you recall that?

21   A.   Uh-huh.

22   Q.   All of those bills had some significance to Glenwood; is

23   that correct?

24   A.   Yes.

25   Q.   And Mr. Silver never came to you and said, I want something

1  in exchange for helping Glenwood with these laws?

2  A.  No.

3          MR. MASTER:  Objection.

4          THE COURT:  Overruled.

5  BY MR. MOLO:

6  Q.  And Glenwood never paid Mr. Silver anything in exchange for

7  some official action with respect to those laws?

8          MR. MASTER:  Objection.

9          THE COURT:  To your knowledge.

10          THE WITNESS:  No.

11  BY MR. MOLO:

12  Q.  Mr. Silver's position, during this entire time, as far as

13  you knew, was consistently pro tenant.

14  A.  For sure.

15  Q.  Now, you mentioned, when you were asked about this building

16  at -- forgive me.  Is it 10 Liberty?

17  A.  Yes, sir.

18  Q.  Okay.  10 Liberty -- that it was good to maintain

19  generalized goodwill -- am I phrasing it the right way? -- with

20  public officials whose districts your buildings are located in.

21  A.  Of course.

22  Q.  Let me phrase that again a slightly different way, maybe a

23  little more intelligently.

24          Every building that you have is within some

25  legislative district; correct?

FBGYSIL2                    Runes – Cross

1  A.  Several.  You know, city council, state senate, assembly.

2  Q.  You beat me to my next question.

3       So you have all sorts of public officials that your

4  buildings, in one way or another, are impacted by.

5       Correct?

6  A.  Yes.

7  Q.  Would you say that, as an owner of buildings, it is

8  generally a good idea to maintain generalized goodwill with

9  those public officials?

10  A.  Yes, sir.

11  Q.  And you believed that it was a good idea to maintain

12  generalized goodwill with Mr. Silver.

13  A.  Yes.

14  Q.  You don't know whether that letter that was shown to you --

15  I'll just give you an exact exhibit number so the record is

16  clear -- 788, that letter that was shown to you, Government

17  Exhibit 788, the letter about that property, whether that was

18  prepared by Mr. Silver or someone in his office.

19       Correct?

20  A.  Correct.  I do not know.

21  Q.  Based on your experience, would you believe that that would

22  be likely prepared by somebody on the staff of a public

23  official as opposed to the public official?

24            MR. MASTER:  Objection.

25            THE COURT:  Overruled.

1    THE WITNESS:  Yes.  I would say so.

2  BY MR. MOLO:

3  Q.  Now, I'm going to ask you some questions about the vacancy

4  decontrol changes in 2011 that you mentioned.

5  A.  Yes, sir.

6  Q.  You said you met with Mr. Silver and Brian Meara to discuss

7  those proposed changes.

8    Is that right?

9  A.  That was one of the things we talked about.

10  Q.  You talked about other things as well?

11  A.  Yes.

12  Q.  Other legislative issues?

13  A.  Well, sort of.  Mr. Silver asked how we felt about

14  prevailing wage going into 421a.

15  Q.  Okay.

16  A.  He asked whether I could set up a meeting for the

17  carpenters to meet with the people at Glenwood to lobby us

18  about prevailing wage in certain types of 421a construction.

19  Q.  Explain to the jury how that prevailing wage issue works

20  with 421a.

21  A.  Well, it doesn't.

22  Q.  Okay.

23  A.  The speaker was interested in helping get prevailing wage

24  put into the 421a statute.

25  Q.  Okay.

FBGYSIL2                     Runes – Cross

1   A.   Prevailing wage means if you're not a union contractor,

2   that you, in essence, have to pay the prevailing union wage for

3   certain services and because more and more people were building

4   nonunion.

5   Q.   So he was concerned with protecting the wages of those

6   working people.

7   A.   Correct.

8   Q.   Is that consistent with the positions that you've seen him

9   take on that issue before?

10  A.   Yes.

11  Q.   By protecting the wages of those working people, that's at

12  the expense of the people that are paying those working people;

13  correct?

14          MR. MASTER:   Objection.

15          THE COURT:   Sustained.

16  BY MR. MOLO:

17  Q.   Someone has to pay the higher wage; correct?

18  A.   Yes.

19          MR. MASTER:   Objection.

20  BY MR. MOLO:

21  Q.   Who pays the higher wage?

22          MR. MASTER:   Objection.

23          THE COURT:   Sustained.

24          That's a very complicated question as you know.  We're

25  not going to have an economics class today.

FBGYSIL2                          Runes - Cross

BY MR. MOLO:

Q.  When you met with Mr. Silver, I take it you stated your

position based on facts; correct?

A.  Yes.  It wasn't --

        THE COURT:  Rephrase that question.  Relative to what?

        MR. MOLO:  Sure.

BY MR. MOLO:

Q.  When you were speaking with him about vacancy decontrol,

you were speaking with him based on what you considered a

principles position.

        Is that fair?

A.  Yes.

Q.  And you articulated, you explained, that position to him to

your best ability.

A.  I told him where we were.

Q.  Okay.

A.  On certain subjects within the renewal of the rent laws.

Q.  And the "where we were" is part of negotiation; correct?

A.  Yes.

Q.  Because all legislation is subject to -- let me take that

back.

        From your experience, any significant legislation

requires some negotiation; correct?

A.  Yes.

Q.  And it requires compromise; correct?

FBGYSIL2                    Runes - Cross

1   A.  Yes.

2   Q.  And in the case of rent regulation, it requires compromise

3   between the senate on the other hand and the assembly on the

4   other.

5          Correct?

6   A.  Yes.

7   Q.  Because the assembly tends to be very pro tenant; correct?

8   A.  Yes.

9   Q.  And, if it were up to the senate, there would be no rent

10  regulation; correct?

11  A.  They're more pro owner than the assembly is for sure.

12  Q.  The changes to the bill regarding vacancy decontrol were

13  changes that the assembly had already passed in other bills.

14          Correct?

15          THE COURT:  Mr. Molo, I don't understand what -- you

16  need to put this in timing relative to what changes you're

17  talking about.  Right now your question is vague.

18          MR. MOLO:  It's a fair point.  Your Honor, I'm sorry.

19  I'll be more specific.

20  BY MR. MOLO:

21  Q.  When you were proposing aspects of the bills -- the 2011

22  rent decontrol, vacancy decontrol bills -- these were

23  provisions that you were proposing which the assembly had

24  already passed.

25          Correct?

1   A.  They had already passed more than 50 bills on rent

2   regulation by that time.

3   Q.  And the senate just wasn't agreeing with those bills;

4   correct?

5   A.  No.  Both houses would each pass their respective versions

6   of these rent bills as, I guess, for negotiating purposes.

7   Q.  Okay.

8   A.  Some of them were real; some of them were not.

9   Q.  So, in taking a position in one of these bills, the

10  one-house bills I think they're referred to sometimes -- is

11  that correct?

12  A.  Correct.

13  Q.  In taking a position on a one-house bill, either the senate

14  or the assembly might be more extreme on the position than what

15  they were ultimately willing to agree to.

16        Correct?

17  A.  Usually so.

18  Q.  That's negotiation; correct?

19  A.  One style.

20  Q.  You stake out a broader position and then eventually agree

21  to pull back to what you're willing to live with.

22        Correct?

23  A.  That's one style.

24  Q.  When you met with Mr. Silver and talked about these vacancy

25  decontrol provisions, you did not ask for these changes in

1    exchange for any thing of value from Mr. Silver; right?

2    A.   We actually weren't negotiating in that style.

3    Q.   Right.

4    A.   It was more we each were saying what we thought

5    respectively was reasonable for a renewal of the rent laws.  I

6    wasn't trying to convince him.  He wasn't trying to convince me

7    with one exception.

8              Mr. Silver was quite agitated about the individual

9    apartment increases that somebody would have to pay in the

10   course of their lifetime, three or four refrigerators.

11   Q.   And you certainly never offered Mr. Silver anything of

12   value in exchange for his agreement to go along with a proposal

13   that you were making on rent regulation; correct?

14   A.   No.

15             MR. MASTER:  Objection.

16             THE COURT:  Overruled.

17   BY MR. MOLO:

18   Q.   And Mr. Silver never demand anything of value from you in

19   exchange for him taking some official action to go along with

20   what you were proposing in rent regulations?

21   A.   No.

22   Q.   There was no quid pro quo suggested; correct?

23             MR. MASTER:  Objection.

24             THE COURT:  Sustained.

25             MR. MOLO:  Your Honor, I'm about to start a fairly

FBGYSIL2                          Runes – Cross

1    lengthy line of cross-examination.  I know we got a late start

2    today.  I think this would be a convenient time to break if the

3    Court would agree.

4            THE COURT:  I doubt their lunch is here.  Okay.  I

5    guess we're going to stop early.  We're going to stop for lunch

6    for an hour.  Don't discuss the case.  Be back out at 10 till

7    2:00.

8            (Jury not present)

9            THE COURT:  On the order of witnesses, are we likely

10   to get to Reid today?

11           MS. COHEN:  The government hopes so, your Honor.  I

12   was just handed about ten minutes ago a document.  I don't

13   think it changes anything.

14           THE COURT:  It's five pages.  It has to provide

15   something new.

16           MS. COHEN:  The government does not believe it does.

17           THE COURT:  All right.  Ten till 2:00.

18           Mr. Molo, how much longer do you have for cross?

19           MR. MOLO:  Probably 45 minutes.

20           THE COURT:  Okay.

21           (Luncheon recess)

22

23

24

25

```
 1                    A F T E R N O O N   S E S S I O N

 2                              1:50 p.m.

 3              (Trial resumed; jury present)

 4              THE COURT:  Okay, Mr. Molo.

 5              MR. MOLO:  Thank you, your Honor.

 6    BY MR. MOLO:

 7    Q.  Good afternoon, Mr. Runes.

 8    A.  Good afternoon.

 9    Q.  The tax certiorari work that Goldberg & Iryami did for

10    Glenwood, that had been done for a period dating back to the

11    late 1990s, correct?

12    A.  I think so.  I'm not sure of the dates.

13    Q.  You were not personally responsible for directing that they

14    be hired?

15    A.  Correct.

16    Q.  Initially I mean.

17    A.  Correct.

18    Q.  But you were familiar, generally, with this process as a

19    process by which real estate property taxes are lowered?

20    A.  Yes.

21    Q.  If successful?

22    A.  If successful.

23    Q.  And that's contingent fee work?

24    A.  That's correct.

25    Q.  Fees are only paid if the taxes are lowered.
```

FBG5sil3                           Runes - cross

1   A.  Correct.

2   Q.  And you have no reason to doubt the bona fides of

3   Mr. Goldberg or Ms. Iryami as tax certiorari lawyers?

4            MR. MASTER:  Objection.

5            THE COURT:  Overruled.

6   A.  No, sir.

7   Q.  They did good work for Glenwood, as far as you knew?

8   A.  Yes, sir.

9   Q.  And over time they were rewarded with more business?  Are

10  you aware of that?

11  A.  Yes, sir.

12  Q.  Referral fees; that's something that is common in the legal

13  profession?

14  A.  In certain specialities, yes.

15  Q.  Because lawyers lack the expertise to do a particular type

16  of work then they'll refer it to someone who knows what they're

17  doing?

18           MR. MASTER:  Objection.

19           THE COURT:  Sustained.

20  Q.  You mentioned in certain types of specialities referral

21  work is common.  Do you know some of them?  Can you name some

22  of them?

23  A.  Personal injury work, certiorari work, medical malpractice

24  work, as far as I know.

25  Q.  Okay.  You also know it is common for lawyers to be

1   rainmakers without really doing any work, right?

2              MR. MASTER:  Objection.

3              THE COURT:  Sustained.

4   Q.  Is it common for a lawyer to be --

5              THE COURT:  This is well beyond the scope of direct.

6   Q.  I am going to ask you some questions about the engagement

7   letter with Goldberg & Iryami and the letter that you mentioned

8   that Mr. Silver signed in January of 2012.  Okay?

9   A.  Yes, sir.

10  Q.  Okay.

11             Mr. Silver is not on Glenwood's payroll, is he?

12             MR. MASTER:  Objection.

13             THE COURT:  I'm sorry.  What was the question?

14  Q.  Mr. Silver is not on Glenwood's payroll, is he?

15             THE COURT:  Overruled.

16  A.  No, sir.  Not to my knowledge.

17  Q.  You stated that you learned about Mr. Silver receiving a

18  referral fee or referral fees for Goldberg & Iryami for work

19  they were doing for LLCs in late, very late 2011; is that

20  right?

21  A.  I believe so.

22  Q.  The end of December of 2011; is that right?

23  A.  Yes.

24  Q.  And you testified that you were surprised and concerned

25  when you heard this, correct?

FBG5sil3                          Runes - cross

1   A.  I believe I did.

2   Q.  And that's because you did not have any knowledge of

3   Goldberg & Iryami paying a referral fee to Mr. Silver for work

4   they were doing on the LLCs -- what they were doing for the

5   LLCs?  Excuse me.

6           Do you want me to restate it?

7   A.  Yes.  If you don't mind.  I'm sorry.

8   Q.  You were unaware that Goldberg & Iryami was paying a

9   referral fee to Mr. Silver for tax certiorari work they were

10  doing for these LLCs, correct?

11  A.  Yes.  That is correct.

12  Q.  And you believed that perhaps that payment of referral fees

13  was bad optics?

14  A.  I believe I have used that expression.

15  Q.  And the LLCs were the parties signing these engagement

16  letters with Goldberg & Iryami, correct?

17  A.  I assume so.

18  Q.  They would be the ones who would benefit from

19  Goldberg & Iryami's work, correct?

20  A.  They would be the owners of the property and so they would

21  naturally be the ones who would sign the retainer agreements.

22  Q.  And I believe you said that you told -- after you heard

23  this you told Mr. Dorego about the conversation you had with

24  Mr. Meara, correct?

25  A.  I believe so, yes.

FBG5sil3                        Runes – cross

1   Q.  And Mr. Dorego, though, had already known about this

2   because he had received a revised engagement letter from

3   Goldberg & Iryami in which they disclosed that a referral fee

4   would be paid to Mr. Silver?

5   A.  Yes.

6   Q.  So this was not news to Mr. Dorego at the time you recall

7   it?

8   A.  I don't remember the exact sequence but I have no reason to

9   disagree with you.

10  Q.  And so Goldberg & Iryami was not trying to hide the fact

11  that they were paying this referral fee, they were telling you

12  about it?

13          MR. MASTER:  Objection.

14          THE COURT:  Sustained.

15  Q.  They were certainly informing you through the revised

16  engagement letter at that time, correct?

17          MR. MASTER:  Objection.

18          THE COURT:  Sustained.

19  Q.  Goldberg & Iryami was sending a revised engagement letter

20  that made clear that a referral fee was paid specifically to

21  Mr. Silver at that time, correct?

22          MR. MASTER:  Objection.

23          THE COURT:  Overruled.

24  A.  Yes.  That's correct.  It disclosed the arrangement.

25  Q.  Correct.

FBG5sil3                          Runes - cross

1              And as far as you knew they were writing that letter
2     to be in compliance with the attorneys ethics rules, correct?
3              MR. MASTER:  Objection.
4              THE COURT:  Sustained.
5     Q.  By writing that letter and making that disclosure it was
6     acting in compliance with the attorney disclosure rules,
7     correct?
8              MR. MASTER:  Objection.
9              THE COURT:  Sustained.
10    Q.  The attorney disclosure rules at that point in time had
11    changed and required a written acknowledgment of the payment of
12    a referral fee, correct?
13             MR. MASTER:  Objection.
14             THE COURT:  Sustained.
15    Q.  You're aware of what the rules required at that time,
16    correct, sir?
17             MR. MASTER:  Objection.
18             THE COURT:  Overruled.
19    A.  Yes.  I believe the rules had changed.
20    Q.  Okay.
21    A.  And that required a written disclosure.
22    Q.  And that written disclosure didn't necessarily need to be
23    in the engagement letter, correct?
24             MR. MASTER:  Objection.
25             THE COURT:  Overruled.

FBG5sil3                              Runes - cross

1   A.  I don't believe it had to be in the engagement letter.

2   Q.  It could be a separate letter, correct?

3   A.  Correct.

4   Q.  At this point in time, in the end of December of 2011, you

5   had been a lawyer for more than 35 years; is that right?

6   A.  Thank you for reminding me.

7   Q.  And you were also a Judge at one time and on the Character

8   and Fitness Committee, correct?

9   A.  Yes.

10  Q.  And you're a careful lawyer, aren't you?

11  A.  I try to be.

12  Q.  So at that point in time you consulted with David Grandeau

13  about what to do, correct?

14  A.  Yes, sir.

15  Q.  By the way, Mr. Dorego is a lawyer as well, right?

16  A.  Yes.

17  Q.  And he was in fact a partner at a major law firm here in

18  New York City, correct?

19  A.  I believe so.

20  Q.  And Mr. Grandeau is the former Executive Director of the

21  New York State Lobbying Commission, isn't he?

22  A.  Yes, that was.

23  Q.  His speciality is to address ethical issues relating to

24  lobbying in New York, right?

25  A.  Yes.

FBG5sil3                         Runes - cross

1   Q.  That's why you sought him out, correct?

2   A.  That's why we retained him.

3   Q.  Right; you retained him and you paid him for this advice,

4   correct?

5   A.  Yes.

6   Q.  You thought you were getting the best man for the job?

7   A.  Best person for the job.

8           THE COURT:  Thank you.

9   Q.  Best person for the job.  Excuse me.

10          When you spoke with Mr. Grandeau you made clear you

11  wanted his very best advice, right?

12          MR. MASTER:  Objection.

13          THE COURT:  Did you say that to him?

14          THE WITNESS:  No, your Honor.

15  BY MR. MOLO:

16  Q.  Did you convey to Mr. Grandeau you wanted his advice?

17  A.  Yes, sir.

18          THE COURT:  He called him.

19  Q.  You didn't want him to skimp on anything?

20  A.  No.

21  Q.  This was an issue that was important to you, right?

22  A.  Yes.

23  Q.  You were not just checking some box to say that you had

24  talked to Grandeau or someone like that, right?

25  A.  No, sir.

FBG5sil3                              Runes - cross

1    Q.  You wanted to do the right thing?

2    A.  Yes, sir.

3    Q.  And you gave him information necessary for him to give you

4    good advice, right?

5              MR. MASTER:  Objection.

6              THE COURT:  Did you give him all the information that

7    he needed to give you good advice?

8              THE WITNESS:  I gave him all the information I had to

9    give us advice.

10   BY MR. MOLO:

11             THE COURT:  Except for the name of the legislator.

12             THE WITNESS:  Except for the name, yes.

13   BY MR. MOLO:

14   Q.  He did not say to you, my advice is -- what he told you --

15   except that if you are talking about Speaker Silver my advice

16   doesn't count; did he?

17   A.  No.

18   Q.  He didn't qualify his advice to you based on the fact that

19   it was or it wasn't Speaker Silver?

20             MR. MASTER:  Objection.

21             THE COURT:  Overruled.

22   A.  Correct.

23   Q.  And Mr. Grandeau, I take it at that point in time, was

24   aware that Glenwood had an active lobbying practice in Albany,

25   correct?

FBG5sil3                           Runes - cross

1    A.  He would be aware because he did our compliance work so he

2    would know how many lobbyists we have on the payroll at any one

3    particular time.

4    Q.  And you spoke with Mr. Goldberg about the revised retainer

5    letter; is that right?

6    A.  I don't recall.

7    Q.  You received this revised letter which is Government

8    Exhibit 700 -- can we make it larger, please?

9    A.  I have to switch glasses.  I'm sorry.

10   Q.  Okay.

11   A.  Yes, sir.

12   Q.  And this lists, I guess it's obviously from Jay Goldberg,

13   Goldberg & Iryami, Sheldon Silver, Esq, 700 Broadway, and then

14   it listed a number of LLCs, correct?

15   A.  Those are the block and lot numbers of apartment houses

16   owned by LLCs.

17   Q.  So each of these block and lot numbers is owned by an

18   individual LLC, correct?

19   A.  Yes.  That is correct.

20   Q.  The legal entity that owns these block and lot numbers,

21   these buildings, is an LLC, correct?

22   A.  The owners of them?

23   Q.  Yeah, the owners are LLCs, correct?

24   A.  Yes.

25   Q.  Can we go down a little lower and if we can make that a

1    little bit larger?

2           This notes:  Dear Mr. Silver, this letter is to

3    acknowledge that you have assumed joint responsibility with our

4    firm for the tax certiorari representation of the properties.

5    As agreed, a proportionate division of fees will be made

6    between Jay Arthur Goldberg and Sheldon Silver.

7           Thank you.  Then we can go down.

8           Then it is signed by Mr. Silver and it is signed by

9    Mr. Goldberg and signed by Mr. Dorego?

10   A.  Yes.

11   Q.  It is dated January 21st of 2012, I believe, correct?

12   A.  It appears to be.

13   Q.  And did you get an opportunity to look this letter over

14   before -- this is the letter that you gave Mr. Silver, right?

15   A.  I don't know that I gave Mr. Silver --

16   Q.  When you met with him in Albany?

17   A.  I think -- I don't remember giving him a letter but I think

18   I remember describing the process that needed to be followed.

19   Q.  I see.

20          And the process resulted in this letter that you are

21   talking about here, right?

22   A.  Yes.

23   Q.  Do you know who drafted this actual letter?

24   A.  I do not.

25   Q.  Whether the language came from Goldberg or someone else?

1   A.  I do not.

2   Q.  But before you had this conversation with Mr. Silver in

3   Albany you had seen this letter, right?

4   A.  I don't recall.

5   Q.  Did you tell Mr. Dorego not to sign the letter?

6   A.  No.

7   Q.  You have seen the letter at some point around the end of

8   January or middle of January 2012, right?

9   A.  Yes.

10  Q.  Did you see it before Mr. Dorego signed it?

11  A.  I don't recall.

12  Q.  Did you ever tell him don't sign it?

13  A.  No.

14  Q.  Did you ever tell him you signed it?  Oh my God, take it

15  back and tear it up?

16  A.  No.

17  Q.  And in this engagement by Goldberg & Iryami the LLCs and

18  not Glenwood were the client, correct?

19  A.  That was my understanding, yes.

20  Q.  Therefore the LLCs and not Glenwood were to be paying a fee

21  to Goldberg & Iryami, correct?

22  A.  Each respective LLC.

23  Q.  Right.

24          And Goldberg & Iryami then paid the referral fee to

25  Mr. Silver, right?

FBG5sil3                          Runes - cross

1   A.  I believe that's how it works.

2   Q.  And Glenwood was not making direct payments to Mr. Silver,

3   was he?

4               MR. MASTER:  Objection.

5               THE COURT:  Overruled.

6   A.  No, sir.

7   Q.  Mr. Silver was not on Glenwood's payroll?

8               MR. MASTER:  Objection.

9               THE COURT:  Overruled.

10  A.  No, sir.

11  Q.  After this letter was signed you did not direct Brian Meara

12  to cease having contact with Mr. Silver?

13  A.  No, sir.

14  Q.  And when you met with Mr. Silver to give him the letter --

15  or I'm sorry, to discuss the process surrounding this letter

16  that we just had up on the screen as Government Exhibit 700,

17  when you met with him you did not suggest to him that Glenwood

18  was doing something here with the expectation that Mr. Silver

19  would take some official acts in exchange for Glenwood LLCs

20  continuing to retain Goldberg & Iryami?

21  A.  No, sir.

22  Q.  And when you met with Mr. Silver to discuss this letter he

23  didn't say anything to suggest to you that if the LLCs stopped

24  working with Goldberg & Iryami he would take official action

25  harmful to Glenwood?

FBG5sil3                          Runes – cross

1   A.  No, sir.

2   Q.  Or that he would take official action harmful to the LLCs?

3   A.  No, sir.

4   Q.  You had known Mr. Silver since the time he worked in the

5   legislature, right?

6   A.  Yes.  That's correct.

7   Q.  In fact, at one point in time you even represented him on a

8   small matter; is that right?

9   A.  I believe so.

10  Q.  And at the time you discussed this letter, Government

11  Exhibit 700 with Mr. Silver, you and Glenwood were willing to

12  proceed consistent with the letter, correct?

13  A.  Could you repeat that?  I'm sorry.

14  Q.  Sure.

15         At the time you were having this conversation with

16  Mr. Silver you were telling him that Glenwood and the LLCs are

17  willing to proceed with Goldberg & Iryami?

18  A.  Yes.

19  Q.  It was a choice that Glenwood and the LLCs made at that

20  point in time?

21  A.  Yes.

22  Q.  And during that conversation you also mentioned to

23  Mr. Silver that you were on the Character and Fitness

24  Committee; do you recall that?

25  A.  I don't.

FBG5sil3                    Runes - cross

1   Q.  You were not paying a bribe to Mr. Silver by signing this

2   letter -- or Mr. Dorego was not paying a bribe to Mr. Silver by

3   signing this letter and allowing Mr. Silver to receive his

4   referral fee; is that right?

5           MR. MASTER:  Objection.

6           THE COURT:  Sustained.

7   Q.  And Mr. Silver was not extorting Glenwood or the LLCs, was

8   he?

9           MR. MASTER:  Objection.

10          THE COURT:  Sustained.

11  Q.  If you, as a Judge and a distinguished lawyer, believed

12  that you were being extorted, you would have had an ethical

13  obligation under the New York lawyer ethics rules to report

14  that conduct of another lawyer, correct?

15          MR. MASTER:  Objection.

16          THE COURT:  Sustained.

17  Q.  Well --

18          THE COURT:  Sustained.

19          MR. MOLO:  May I be heard at side bar, please?

20          THE COURT:  No.

21  BY MR. MOLO:

22  Q.  Isn't it true that a lawyer who has --

23          THE COURT:  Sustained.  It is the same question.

24  Q.  You did not report anything about Mr. Silver to any New

25  York lawyer ethical authority at that time, did you?

1             MR. MASTER:  Objection.

2             THE COURT:  Overruled.

3   A.  I did not report Mr. Silver to anyone including the

4   departmental disciplinary committee.

5   Q.  And you continued to have Goldberg & Iryami represent

6   Glenwood LLCs going forward?

7             THE COURT:  I don't think there is any evidence that

8   he was the one who was making the decision who would represent

9   Glenwood.  I think I have heard from several witnesses those

10  decisions were made by Mr. Litwin and Mr. Litwin only.

11            MR. MOLO:  May I ask if whether he was aware of that?

12            THE COURT:  Whether he was aware of what Mr. Litwin

13  did?

14            MR. MOLO:  New assignments that Goldberg & Iryami got

15  after this.

16            THE COURT:  You can ask him if he was aware.

17  BY MR. MOLO:

18  Q.  Mr. Runes, are you aware that Goldberg & Iryami got new

19  assignments to represent Glenwood LLCs following this letter

20  being prepared?

21  A.  Yes, sir.

22  Q.  I show you what's marked Government Exhibit 703 --

23            THE COURT:  Government or defense.

24            MR. MOLO:  Prosecution -- I will put a defense exhibit

25  sticker on it.

1          THE COURT:  Please don't.

2          MR. MOLO:  We will offer them as defendant's exhibits.

3          Just so it is clear, they're not in evidence yet;

4     Government Exhibit 703-1 and 702.

5     BY MR. MOLO:

6     Q.  I am going to direct your attention to Government Exhibit

7     703-1 first, sir.

8     A.  Yes.

9     Q.  Mr. Michael Hoenig is an employee of Glenwood New York

10    City; is that correct?

11    A.  It is Hoenig.

12    Q.  Hoenig.  Excuse me.

13    A.  Yes.

14    Q.  And do you know that Dara Iryami is at Goldberg & Iryami,

15    she is the Iryami of there?

16    A.  Yes.

17    Q.  And looking at this to yourself, reading it to yourself, is

18    this a record that -- the email exchange would have been made

19    in the ordinary course of business of Glenwood?

20    A.  Yes.

21          MR. MOLO:  Your Honor, I move the admission of 703-1.

22          MR. MASTER:  Your Honor, these were documents that

23    were previously discussed with defense.  Yes, we --

24          MR. MOLO:  I can't hear.

25          THE COURT:  I can't hear him either.

1           You don't object?

2           MR. MASTER:  No.  Absolutely not.

3           THE COURT:  That's all you have to say.  No objection.

4           703-1 is received as a defense exhibit.

5           (Defendant's Exhibit 703-1 received in evidence)

6    BY MR. MOLO:

7    Q.  If you look down on the bottom of the list from Mr. Hoenig:

8    As discussed with Charley Dorego, the block and lots for the

9    new properties that you will be handling for us is as follows.

10          And it is dated January 31, 2012, correct?

11   A.  Yes.

12   Q.  So it is after that letter and it lists six new properties,

13   correct?

14   A.  Yes.

15   Q.  And to be absolutely clear, Mr. Runes, all of what you

16   testified to concerning this letter and the disclosure and

17   Mr. Silver being paid a referral fee, all of this happened in

18   January of 2012, correct?

19   A.  Yes.

20   Q.  Maybe the very end of December of 2011, correct?

21   A.  It started perhaps.

22   Q.  And at that point in time you said no one at Glenwood was

23   aware that Mr. Silver was being paid referral fees by

24   Mr. Goldberg, correct?

25   A.  Correct.

FBG5sil3                          Runes - cross

1    Q.  This is long, long after the rent regulation of 2011 was

2    passed, correct?

3    A.  Yes.

4    Q.  I want to ask you some questions about that rent regulation

5    and its effect.

6              MR. MOLO:  May I put this here, Judge?

7              THE COURT:  That's fine.

8              MR. MOLO:  Thank you.

9              THE COURT:  I think we have that.  There is a slide of

10   that that might be much more easily seen by the jury.

11             MR. MOLO:  We can put it up but I want to mark on it.

12             THE COURT:  You are free to mark on it to your heart's

13   content but if you care for the jury to read what you are

14   using, put it up.

15             MR. MOLO:  I care about the jury so put it up.

16   BY MR. MOLO:

17   Q.  In 2011 -- before we get to the chart from last week I want

18   to ask you a couple of short questions.

19             There were a number of other major issues besides the

20   rent regulation that were at issue at the time, correct, the

21   2011 legislative session.  Do you recall?

22   A.  There are every session.

23   Q.  Right.  It is not all about rent regulation, right?

24   A.  For some of us it seems that way but for most people, no.

25   Q.  Same sex marriage was an issue, correct?

1    A.  Correct.

2    Q.  And Governor Cuomo had a plan to raise tuition at SUNY; is

3    that right?

4    A.  I guess.

5    Q.  Mandate relief, is that something that sounds familiar, all

6    right?

7            And anyway, all of those issues are part of the mix in

8    the horse trading that goes on in the Assembly to get laws

9    made, right?

10   A.  In the legislature, yes.

11   Q.  In the legislature, right, exactly; in the legislature as a

12   whole.  A lot of compromises get made during the course of a

13   legislative session; is that right?

14   A.  Yes.

15   Q.  This is Government Exhibit 1521 and the prosecutor asked

16   you last week whether this chart shows "the status of various

17   provisions of 421-a and rent regulation at different points in

18   time and your answer was some of the major issues of 2011; is

19   that right?

20   A.  Yes, sir.

21   Q.  And, in fact, it left out some significant issues related

22   to rent and real estate in 2011, didn't it?

23   A.  It certainly doesn't have them all.

24   Q.  And so, for example -- by the way, you did not prepare this

25   chart, right?

FBG5sil3                    Runes - cross

1  A.  No.  I believe it was prepared by the government.

2  Q.  The prosecutors prepared the chart.

3        THE COURT:  Just ask questions, Mr. Molo.

4        MR. MOLO:  Okay.

5  Q.  I'm going to direct your attention to the bottom of the

6  chart where it says vacancy allowance in the lower corner

7  there.

8  A.  Yes, sir.

9  Q.  On this chart it says under the status, as of January of

10  2011, 20 percent rent increase; no limit on the number of times

11  used.

12        What does that mean?

13  A.  What it means is if a rent-stabilized apartment becomes

14  vacant, in addition to any other increases the landlord might

15  or might not be entitled to that the landlord is entitled to a

16  20 percent rent increase, and if an apartment became vacant

17  twice in the same calendar year it could get two 20 percent

18  vacancy increases.  At that time.

19  Q.  So those who were in favor of rent regulation wanted to

20  limit it to once, correct?  Or --

21  A.  For those who were in favor of rent regulation they wanted

22  either to limit it to once or they wanted it eliminated or they

23  wanted it cut.  There were a variety of proposals.

24  Q.  Okay.

25        And the prosecutor's chart, 1521, where it says April

FBG5sil3                     Runes - cross

1   2011 Assembly bill, it mentioned for vacancy allowance 10

2   percent rent increase but it makes no mention of limitations on

3   the number of times used; is that right?

4   A.  The chart or the bill?  I don't know --

5   Q.  We are talking about the chart right now.

6   A.  The chart makes no mention of the number of times.

7   Q.  Now I'm going to ask you about the bill.

8        MR. MOLO:  Your Honor, these are conditional exhibits,

9   we are seeking stipulation.

10  Q.  Take a moment just to look at that.

11  A.  Yes.

12       MR. MOLO:  Before I ask you a question about it, your

13  Honor, I would move the admission of Defendant's Exhibit 107

14  conditionally --

15       THE COURT:  You have already done that.  It was

16  conditionally received last week.

17       MR. MOLO:  Okay.  107, all right.

18       THE COURT:  Assuming this is the same 107 that we saw

19  last week.

20       MR. MOLO:  It is.  So it is conditionally admitted in.

21  BY MR. MOLO:

22  Q.  Under the co-sponsors of the bill the first name is

23  Mr. Silver, correct?

24  A.  Yes.

25  Q.  And the 10 percent rent increase provision, if you go to

1    the third page under part B it states that this proposed bill,

2    sponsored by Speaker Silver, would decrease from 20 percent to

3    10 percent the amount a landlord could increase rent upon

4    vacancy and also prohibit a landlord from taking more than one

5    increase in any one calendar year; correct?

6    A.   That's what it says.

7    Q.   And as of January, vacancy allowance 20 percent increase;

8    no limit.  This bill would decrease from 20 to 10 percent and

9    have the limit of one increase per calendar year, right?

10   A.   Yes, sir.

11   Q.   So, that was not reflected here and when, in June of 2011

12   the legislation was actually adopted, it actually included the

13   language of one increase per calendar year, correct?

14   A.   Yes, sir.

15   Q.   So, what Speaker Silver had proposed was in fact adopted

16   and favored tenants, correct?

17              MR. MASTER:  Objection.

18              THE COURT:  Sustained.

19              Just for the record, as you established, he is not the

20   sponsor, he is a co-sponsor of this bill.

21              MR. MOLO:  Correct.

22   BY MR. MOLO:

23   Q.   The bill that Mr. Speaker -- that's exactly right, it was

24   sponsored by V. Lopez, co-sponsor Silver, right?  I misspoke.

25   And a number of other people were co-sponsors, right?

1          THE COURT:  So rephrase your question.

2          MR. MOLO:  Sure.

3   BY MR. MOLO:

4   Q.  So, the bill, Exhibit 107, which included this provision

5   concerning one calendar year, that provision which was

6   co-sponsored by Mr. Silver in Exhibit 107, showed up in the

7   final legislation adopted in June of 2011, correct?

8   A.  That portion of that provision?

9   Q.  Correct.

10  A.  Yes, sir.

11  Q.  All right.

12          And the second line of the prosecutor's chart says

13  421-a -- maybe we can mark that larger up there so that the

14  jury can see it -- 421-a, it says status as of January 2011 was

15  expired, correct?

16  A.  Yes.

17  Q.  So at that point in time Mr. Silver was, as the leader of

18  the Assembly at least, he was presiding over the Assembly at

19  the time that it expired, correct?

20  A.  I believe it expired in December of 2010.

21  Q.  Okay, so just a month or so before, correct.  All right.

22          And the prosecutor's chart says that the Assembly

23  position was that 421-a not be extended.  Do you see that?

24          MR. MASTER:  Objection.

25          MR. MOLO:  It is what the chart says, not extended.

FBG5sil3                          Runes – cross

1              THE COURT:  Come up.  I don't understand the

2     objection.

FBG5sil3                        Runes – cross

1                (At side bar)

2                THE COURT:  I had you up because I don't understand.

3       It clearly says not extended.

4                MR. MASTER:  Right, it is not extended in this

5       Assembly legislation.  That's all.  It doesn't say it is

6       abolished or -- but, whatever.  I will redirect on it.  It is

7       fine.

8                THE COURT:  Okay.

9                MR. MASTER:  I'm good.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  The objection is overruled.

3  BY MR. MOLO:

4  Q.  Under 421-a it says not extended, right?

5           THE COURT:  Wait a minute, Mr. Molo.  You are not

6  summing up.  You have to wait for the witness to answer.

7           MR. MOLO:  Okay.

8           THE COURT:  This isn't a summation, you are not

9  self-testifying.

10           MR. MOLO:  Okay.

11           THE COURT:  Let him answer your questions.

12           THE WITNESS:  Could you repeat the question, please?

13           MR. MOLO:  Sure.  Forgive me.

14  BY MR. MOLO:

15  Q.  It says not extended on the prosecutor's chart, correct?

16  A.  Correct.

17  Q.  I'm going to show you what's been marked Defendant's

18  Exhibit 130.

19           MR. MOLO:  This is not conditionally admitted, your

20  Honor.

21           THE COURT:  This is the first time I am seeing it?

22           MR. MOLO:  I would ask it be conditionally admitted,

23  your Honor.  It is something we have subject to the

24  government --

25           THE COURT:  Any objection?

FBG5sil3                         Runes - cross

1          MS. COHEN:  Your Honor, on the conditionally admitted

2     there is no stipulation but the government doesn't object to

3     any of those exhibits.

4          (Defendant's Exhibit 130 received in evidence)

5     BY MR. MOLO:

6     Q.  If you look at this bill summary the sponsor is Mr. Lopez;

7     is that correct?

8     A.  Yes, sir.

9     Q.  And Mr. Lopez was the Democratic Chairman of the Assembly

10    Housing Committee, correct?

11    A.  That is correct.

12    Q.  And this bill was first proposed in January of 2011,

13    correct?

14    A.  I am looking for the -- yes.

15    Q.  And if we go down to the purposes --

16    A.  Yes.

17    Q.  -- it notes that, again, this is the Assembly bill that

18    the bill makes several amendments to the 421-a tax abatement

19    program.  The goals of these amendments are:  To extend the

20    program for an additional three years; adjust definitions to

21    more accurately reflect current construction practices; and

22    provide additional incentives for continued construction of new

23    and affordable housing units; is that correct?

24    A.  Yes.

25    Q.  So, at this point in time the democrats in the Assembly

FBG5sil3                          Runes – cross

1    were proposing to extend 421-a, correct?

2    A.  Yes, sir.

3    Q.  Okay, which is missing from this chart.

4           And the final law, by the way, did extend 421-a; is

5    that right?

6    A.  Yes.

7    Q.  June '11 it says restored.

8           Now, in addition to the vacancy allowance and the

9    421-a provisions there is an entry on the prosecutor's chart

10   that says Rent Regulation and that I think you refer to as

11   referring to the Urstadt law; is that right, sir?

12   A.  Yes, sir.

13   Q.  That's a general law that allows, it provides that the City

14   cannot adopt stronger rent regulation than the state; is that

15   right?

16   A.  That's correct.

17   Q.  And actually, do you know whether the Assembly was actually

18   proposing that the Urstadt law be changed to allow for stronger

19   regulation by the City and by the State?

20   A.  You are talking about in the bill known as Assembly 2674?

21   Defendant's Exhibit 107?

22   Q.  Yes.

23   A.  I believe so.

24   Q.  And so, do you know what the phrase a snowball's chance in

25   hell means?

1                    MR. MASTER:  Objection.

2                    THE COURT:  Overruled.

3                    THE WITNESS:  Yes, sir.  I do believe I do.

4                    THE COURT:  I have always heard icicles but same idea,

5          so.

6          Q.  Do you think that proposal had an icicle's or snowball's

7          chance in hell of passing?

8                    MR. MASTER:  Objection.

9                    THE COURT:  Of passing what?

10         Q.  Of passing the entire legislature with the Senate approval.

11                   MR. MASTER:  Objection.

12                   THE COURT:  Overruled.

13         A.  In my opinion, that provision would not pass either house.

14         Q.  Because it was a very extreme pro-tenant provision,

15         correct?

16                   THE COURT:  So it hadn't passed the Assembly?  These

17         bills are not passed by the Assembly, they're out of the

18         committee?

19                   THE WITNESS:  No.  I interpreted the attorney's

20         question as ultimately passing an agreed upon bill as opposed

21         to this bill which was a wish list bill on the part of the

22         Assembly.

23         BY MR. MOLO:

24         Q.  Okay.

25                   THE WITNESS:  Just like the Senate had wish list bill.

1              THE COURT:  It would sort of be like if the dog

2       actually catches the postman?

3              THE WITNESS:  Yes.

4              That, in my humble experience, nobody voluntarily

5       gives up power.

6       Q.  Right.

7       A.  The Urstadt law gave the New York State legislature

8       tremendous power, it gave it power over rent regulation.  So,

9       to sort of give that power to the New York City Council would

10      be unlikely.

11      Q.  Okay.  And this chart, by the way, shows a progression from

12      the Assembly position to the final bill, right?  The final law,

13      the legislation adopted?

14      A.  Yes, sir.

15      Q.  There is something rather significant missing here, isn't

16      there, in the form of the Senate's position?

17      A.  Yes.

18      Q.  It is sort of like a football game in which you only hear

19      one team score?

20              MR. MASTER:  Objection.

21              THE COURT:  Sustained.

22      Q.  So, here the prosecutors neglected or omitted the Senate

23      position which on vacancy decontrol I take it the Senate didn't

24      want that rent regulation at all, right?

25      A.  I'm sorry.  I don't understand.

FBG5sil3                          Runes - cross

1    Q.  Sure.

2            THE COURT:  Rephrase the question.  I'm not sure what

3    you are asking for.

4    Q.  Okay.

5            If it were up to the Senate there would be no rent

6    regulation at all, right?

7            MR. MASTER:  Objection.

8            THE COURT:  Sustained.

9    Q.  They opposed the vacancy decontrol provisions that were

10   being proposed by the Assembly, correct?

11   A.  Yes.

12   Q.  And so I will write opposed there.

13           What was resolved in the final legislation was a

14   compromise, correct?

15   A.  Yes.

16   Q.  And as far as luxury decontrol, the Senate opposed what the

17   Assembly was proposing of the $300,000 income and the $3,000

18   rent, right?

19   A.  Yes.

20   Q.  And what was resulted was a compromise and the $200,000

21   income and the $2,500 rent, right?

22   A.  Yes, sir.

23   Q.  As far as individual apartment capital improvements,

24   one-fortieth cost of improvements a month and the old law, and

25   there was Assembly push for one-sixtieth cost of improvements a

FBG5sil3                         Runes – cross

1    month and expiration once actual costs recouped.  What was

2    passed was one-sixtieth cost of improvement is actually what

3    the Assembly wanted and the rest of it was a compromise,

4    correct?

5    A.  Yes, sir.

6    Q.  And the last part concerning vacancy allowance, the 20

7    percent increase which could be adjusted or used once per

8    calendar year was a compromise from what the Assembly had

9    proposed, correct?

10   A.  Yes.

11   Q.  So, the entire legislation that was adopted in June of 2011

12   concerning rent regulation was a compromise, right?

13   A.  It was.

14   Q.  There is one other thing that is not reflected here and

15   that is the Senate had the upper hand in negotiating here

16   because the rent regulation laws could expire and if there were

17   no laws then they effectively won, correct?

18            MR. MASTER:  Objection.

19            THE COURT:  Sustained.

20   Q.  Well, it was a powerful benefit to the Senate that they

21   could allow the laws to expire, correct?  In negotiating?

22            MR. MASTER:  Objection.

23            THE COURT:  Rephrase the question.

24            MR. MOLO:  Sure.

25   Q.  In 2011 going into the session -- the legislative

FBG5sil3                          Runes - cross

1    session -- the rent regulation laws, if they expired there

2    would be no rent regulation, correct?

3    A.  Correct.

4    Q.  So, the Senate had an advantage over the Assembly in

5    negotiating on rent regulation law based on that, right?

6              MR. MASTER:  Objection.

7              THE COURT:  Overruled.

8    A.  I suppose so because theoretically all they had to say was

9    no.

10   Q.  Correct.

11             And they had done in the past, hadn't they?

12   A.  I believe so.

13   Q.  In fact, didn't the laws expire as recently as this summer

14   at one point?  Briefly?

15   A.  Yes, sir.

16   Q.  Now, at the same time that this is going on there was

17   another very significant issue from real estate concerns that

18   the prosecutors left off their chart, wasn't there, in 2011?

19   There was the property tax cap, correct?

20   A.  Yes.

21   Q.  Okay.

22   A.  You are talking about on 421-a?

23   Q.  I am talking about general property tax cap.

24   A.  This was not an issue I really was working on.

25   Q.  And the property tax cap, Mr. Silver insisted that that

FBG5sil3                              Runes - cross

1   property tax cap be tied to rent regulation in the new

2   legislation.  Do you recall that?

3                MR. MASTER:  Objection.

4                THE COURT:  Overruled.

5                Are you familiar with that?

6                THE WITNESS:  Yes, I'm familiar with him wanting to

7   tie the two together.

8   BY MR. MOLO:

9   Q.  And the Senate opposed tying the two together, correct?

10  A.  Yes, sir.

11  Q.  And the reason that Mr. Silver wanted to tie the two

12  together, the advantage that would be gained from it was that

13  it would give some negotiating power at the time the rent laws

14  would be expiring?

15               MR. MASTER:  Objection.

16               THE COURT:  Sustained.

17  Q.  By having them tied together it leveled the playing field a

18  bit, didn't it, between those who wanted property tax caps and

19  those who wanted rent regulation?

20               MR. MASTER:  Objection.

21               THE COURT:  Sustained.

22  Q.  They would have to be negotiated at the same time or

23  thereabout; is that right?

24               MR. MASTER:  Objection.

25               THE COURT:  Overruled.  You mean if they were tied

FBG5sil3                    Runes - cross

1   together?

2   Q.  Yes; if they were tied together they would have to be

3   negotiated at the same time, correct?

4   A.  Yes.

5   Q.  So tying them together gave the Assembly a little stronger

6   position than it had going in without that property tax cap

7   being tied, correct?

8               MR. MASTER:  Objection.

9               THE COURT:  Sustained.

10  Q.  Do you know, the property tax cap -- let me put something

11  on your screen, if you will, it is a chart I prepared -- not on

12  the big screen but on the Judge's screen.

13              THE COURT:  Does it have an exhibit number?

14              MR. MOLO:  Defendant's Exhibit 133.

15              MS. COHEN:  Mr. Molo, can we have a copy?

16              THE COURT:  It disappeared off our screens.

17              MR. MOLO:  It isn't on your screen, Judge.

18              THE COURT:  It was and disappeared.  This isn't what

19  was on our screen.

20              THE WITNESS:  No, it was a bigger chart.  This wasn't

21  it.

22              MR. MOLO:  That's the one I want to ask you about.

23              THE COURT:  That's the one he wants.  Okay.

24              Are you familiar with this legislation?

25              THE WITNESS:  Yes.

FBG5sil3                          Runes - cross

1  BY MR. MOLO:

2  Q.  Have you had a chance to look at 133?

3  A.  Yes.

4  Q.  Does it accurately reflect the status of the property tax

5  cap legislation in 2011?

6  A.  I believe it does.

7          MR. MOLO:  Your Honor, may I show this to the jury?

8          THE COURT:  Only if you seek to admit it into

9  evidence.

10          MR. MOLO:  May I admit it into evidence?

11          THE COURT:  Any objection?

12          MR. MASTER:  May we just be heard at side bar for one

13  moment?

14          THE COURT:  Okay.

15          MR. MASTER:  Or under the --

16          THE COURT:  Yes.

17

18

19

20

21

22

23

24

25

1         (At side bar)

2         MR. MASTER:  The only reason why I asked for side bar

3    is because previously Mr. Molo had objected to admission of the

4    prior chart as a demonstrative or -- well, in general, and for

5    them to go back to the jury.  So, I am fine treating both the

6    same way --

7         MR. MOLO:  That's why I didn't move to have it

8    received into evidence.

9         MR. MASTER:  Okay.

10        THE COURT:  Okay.

11        MR. MOLO:  I just want it to demonstrate.

12        MR. MASTER:  As long as they're treated the same way,

13   that's fine.

14        THE COURT:  They'll be demonstrative.

15        MS. COHEN:  We can move them both in.

16        MR. MASTER:  We can move them both in.

17        THE COURT:  That's up to you.

18        MS. COHEN:  The government would like to move its

19   chart into evidence.

20        THE COURT:  They want to get their charts into

21   evidence.  Do you want to get yours in?  I'm going to rule the

22   same way on both of them.  The government would like to have it

23   in evidence.

24        MR. MOLO:  Fine.

25        MS. COHEN:  Fine.

1          MR. MOLO:  I thought we would take them up separately

2     after, outside the jury.

3          THE COURT:  We can deal with it later.

4          MR. MASTER:  We will deal with it later, your Honor.

5          MR. MOLO:  Your Honor, one other issue.

6          I asked him, as chairman of the Character and Fitness

7     Committee if he had obligation that if he knew another lawyer

8     had committed a violation of rules of professional conduct that

9     raises a substantial question as to that lawyer's --

10         THE COURT:  The reason the objection was sustained was

11    whether he did anything right or wrong is irrelevant.  That's

12    not what this trial is all about.  I'm not letting you reargue

13    that.

14         Go back.

15         MR. MOLO:  I didn't get a chance to argue.  The point

16    is because he had an obligation.

17         THE COURT:  So what?  So what?

18         MR. MOLO:  It matters if he was sensitive that he had

19    to report it.

20         THE COURT:  He testified he was very uncomfortable

21    with the whole thing.

22         He is not on trial here.  Step back.

23

24

25

1          (In open court)

2          THE COURT:  Okay, so this is going to be received for

3     now as just a help so y'all can follow the testimony.

4          (Defendant's Exhibit 133 received in evidence)

5     BY MR. MOLO:

6     Q.  The status of the property tax cap, it wasn't in at the

7     beginning of the session in 2011; is that right?

8     A.  Correct.

9     Q.  And the Assembly position during the session was that it

10    should pass but be linked to the rent regulation laws, right?

11    A.  Correct.

12    Q.  And the Senate's position was that it should pass with no

13    linkage to the rent regulation laws, correct?

14    A.  Correct.

15    Q.  And in June of 2011 the legislation was adopted and it was

16    passed with a link to the rent regulation laws, correct?

17    A.  Yes.

18    Q.  And the linkage allowed it to be in force until June of

19    2016 unless rent regulations remained in force, right?

20    A.  Yes.

21    Q.  So there was a linkage now at that point in time?

22    A.  Yes.

23    Q.  Not a perfect symmetry but a linkage?

24    A.  Yes.

25    Q.  Okay.

FBG5sil3                           Runes - cross

1          Glenwood actually wanted the tax cap, didn't you?

2              THE COURT:  The property tax cap?

3   Q.  Yeah, the property tax cap.

4   A.  I don't believe we had an opinion about that -- there was a

5   tax cap we were interested in but it wasn't that tax cap.

6   Q.  Tax cap for what?

7   A.  421-a.

8   Q.  421-a.  Okay.

9              And was that property tax cap in 421-a enacted?

10  A.  No.

11  Q.  And was the property tax cap for 421-a something that the

12  Senate pushed?

13  A.  Yes.

14  Q.  And I take it the Assembly opposed that; is that right?

15  A.  I believe so.

16  Q.  I'm going to show you what's marked Defendant's Exhibit

17  131.

18              THE COURT:  131?

19  Q.  Take a look at it for just a moment.

20  A.  Yes.

21  Q.  And do you recognize what it is generally?

22  A.  Yes.

23  Q.  It is an e-mail.

24              Is that an e-mail exchange between you and Mr. Dorego?

25  A.  It is.

1       MR. MOLO:  Your Honor, I move --

2   Q.  And this is dealing with Glenwood business?

3   A.  Yes.

4       MR. MOLO:  Your Honor, I move admission of Defendant's

5   Exhibit 131.

6       MR. MASTER:  Your Honor, I'm sorry.  I know we just

7   had a side bar, just one more previous one?  Or if I could

8   consult with counsel on this one?

9       THE COURT:  Why don't you consult with him and see if

10  you can resolve it.

11      MR. MASTER:  Yes.

12      (Counsel conferring)

13      MS. COHEN:  We can continue, your Honor.

14      THE COURT:  Any objection?

15      MR. MASTER:  No objection, your Honor.

16      THE COURT:  131 is received.

17      (Defendant's Exhibit 131 received in evidence)

18  BY MR. MOLO:

19  Q.  In this e-mail from Mr. Dorego to you dated June 14th of

20  2011 he is telling that you Glenwood wants the tax -- you are

21  saying we want the tax cap more than anything, correct?

22      THE COURT:  That's Dorego saying that.

23  Q.  That's Dorego saying that to you, correct?

24  A.  Yes.

25  Q.  You can take it down, please.

FBG5sil3                              Runes - cross

1          Now, the increased deregulation threshold that was

2     there for vacancy control in the 2011 rent regulation bill,

3     that, you said, did not affect Glenwood because its apartments

4     were rents already above the deregulation limit?

5     A.  Yes.

6     Q.  Okay.

7     A.  Generally speaking.

8     Q.  Okay.

9          And the real estate business, leading up to 2011,

10    2008, 2009 were pretty tough years for the real estate

11    business, I take it?

12    A.  Not as good as they had been.

13    Q.  I mean, we were in the heart of the financial crisis at the

14    time, correct?

15    A.  Yes.

16          MR. MASTER:  Objection.

17          THE COURT:  Overruled.

18    Q.  I take it at that point in time it was generally not easy

19    to raise rents even in unregulated apartments, right?

20    A.  I'm not sure I follow you.

21    Q.  Well, I mean --

22    A.  I can't tell you what our rent levels were back then in

23    terms of increases.

24    Q.  Well, do you know that Glenwood has a building at 600 West

25    246th Street in Riverdale?

1   A.  Yes, I do.

2   Q.  And that building is owned by an LLC called Briar Hill

3   Realty?

4   A.  Yes.  That's the name of the building.

5   Q.  And 600 West 246th Street was subject to rent regulation

6   from 2008 through 2011; is that right?

7   A.  Some of the units.  Some of the units had been

8   decontrolled.  There are some free-market units in that

9   building and some rent-stabilized units in that building.

10  Q.  And I'm going to show you what's marked Defendant's Exhibit

11  177, take a moment to look at that.

12  A.  Yes.

13  Q.  And the -- do you recognize what that is?

14  A.  It's a rent roll.

15  Q.  For 600 West 246th Street, Riverdale?

16  A.  Yes.

17  Q.  And is that a business record of Briar Hill Realty, LLC?

18  A.  Yes.

19          MR. MOLO:  Your Honor, I move the admission of

20  Defendant's Exhibit 177.

21          THE COURT:  I don't understand the relevance of this.

22          MR. MOLO:  I will explain it.

23          THE COURT:  Okay.  Perhaps you should come up.

24          MR. MOLO:  Okay.

25

1          (At side bar)

2          MR. MOLO:  The legislation changed the rent amount

3    from $2,000 to $2,500 a month for an apartment to be subject to

4    deregulation.

5          THE COURT:  Luxury decontrol.

6          MR. MOLO:  I'm sorry?

7          THE COURT:  For luxury decontrol?

8          MR. MOLO:  For decontrol.

9          MS. COHEN:  I have no idea, your Honor.

10          THE COURT:  All right.

11          MR. MOLO:  And this -- I understood the witness to

12    testify that most of their stuff was over that so it didn't

13    make a difference.  Here is a building at 320 Briar Hill he

14    said is subject to rent regulation and there is a whole bunch

15    of rents --

16          THE COURT:  This was in 2009.

17          MR. MOLO:  I understand, September 21st of 2009.

18    If --

19          THE COURT:  What he just testified is this building

20    has some rent controlled, some non-rent controlled.

21          MR. MOLO:  Okay.

22          THE COURT:  And generally their buildings are

23    expensive enough that they're not subject to the rent

24    stabilization.  Putting in a rent roll of a building in

25    Riverdale with everybody with all the tenants -- I just

1    don't -- this doesn't --

2            MR. MOLO:  It demonstrates that not all of their

3    apartments were --

4            THE COURT:  He said that.

5            MR. MOLO:  No, said that they were not.  And it

6    bothered me.

7            THE COURT:  Mr. Molo, precisely what he said was that

8    in this building some of the apartments are rent controlled,

9    some aren't.

10           MR. MOLO:  Okay.

11           THE COURT:  That was his testimony.

12           MR. MOLO:  Okay.

13           THE COURT:  That's all this proves.

14           MR. MOLO:  No, but it also proves what the rents were

15   and that they were never --

16           THE COURT:  What the rates are is irrelevant.

17           MR. MOLO:  No, it is not.  That's exactly what it is

18   about because whether or not they hit the $2,500 or $2,000 a

19   month makes a difference.

20           THE COURT:  So, what are we going to do?  We are going

21   to put 25 different rent rolls on.

22           MR. MOLO:  No, I want to put this one in.

23           THE COURT:  You are going to put this one on because

24   this is the one that you have found that is favorable to the

25   argument that in fact Glenwood -- that he is lying, apparently,

FBG5sil3                          Runes - cross

1   when Glenwood says --

2             MR. MOLO:  I'm not saying he is lying.

3             THE COURT:  They don't care about that because most of

4   their apartments were above that rent level which is what his

5   testimony is so you are trying to impeach him by showing him

6   that there is a building that is mixed.

7             MR. MOLO:  Okay.

8             THE COURT:  But he has already said that.  He

9   testified to that.  You asked him about this building, he said

10  some of these apartments are, some of these apartments aren't.

11            MR. MOLO:  What he didn't say was whether they would

12  be affected by the $2,500 or the $2,000 and whether it would

13  make a difference.

14            THE COURT:  You can ask him whether they had

15  apartments that were rented for less than $2,500 in 2009.  You

16  are talking about the 2011 rent laws so I'm not sure what

17  difference it makes what the rent was.

18            MR. MOLO:  If something could have been increased

19  subject to rent regulation from $1,100 to $2,500.

20            THE COURT:  It doesn't matter.  This is one building

21  out of 30.

22            MR. MOLO:  I understand that.  It is still a building.

23            THE COURT:  No, because under 403 I am excluding it.

24            MR. MOLO:  All right.

25            THE COURT:  This is taking us down a rat hole that I

FBG5sil3                         Runes – cross

1    don't want to go and it is unnecessary and it is not that

2    probative.

FBG5sil3                          Runes - cross

1                     (In open court)

2     BY MR. MOLO:

3     Q.  Mr. Runes --

4     A.  Yes.

5     Q.  -- you were asked about campaign contributions that

6     Glenwood makes.  I want to ask you --

7     A.  Can I put all this stuff away now?

8     Q.  Yes, you can.  You may.  You can put it aside.

9                     In your experience, lobbyists and their clients often

10    make campaign contributions to elected officials and

11    candidates, right?

12    A.  Yes.

13    Q.  And those elected officials that receive these

14    contributions can take official action on matters directly

15    affecting the people who are making the campaign donations?

16              MR. MASTER:  Objection.

17              THE COURT:  Overruled.

18    A.  Yes.

19    Q.  And Glenwood is not the only such organization to make

20    campaign contributions, is that right, as an organization?

21    A.  No.

22    Q.  Trade unions do it, right?

23    A.  Yes.

24    Q.  Teachers' unions, right?

25    A.  Yes.

FBG5sil3                          Runes - cross

1    Q.  Librarians even did it, right?

2    A.  From what I understand.

3    Q.  And Glenwood made contributions at all levels of state

4    government, correct?

5    A.  Yes.

6    Q.  And the contributions that Glenwood made were primarily,

7    however, to the Senate republicans and to Governor Cuomo over

8    the last five years; is that right?

9    A.  I suppose so.  Yes.

10   Q.  Okay.

11        In fact, Governor Cuomo's campaign received $1.2

12   million from Glenwood from 2005 to 2014; does that sound right?

13   A.  Approximately.

14   Q.  And the Senate Republican Campaign Committee received about

15   $939,000 over that same period?

16   A.  Okay.

17   Q.  And --

18        THE COURT:  Do you have any idea if the number is

19   right?

20        THE WITNESS:  I don't know what the number is.

21        THE COURT:  Then you say I don't know.

22        THE WITNESS:  I don't know.

23   BY MR. MOLO:

24   Q.  If I told you that the Senate Republican Campaign Committee

25   and the Senate Republican Housekeeping Committee received

FBG5sil3                        Runes - cross

1  approximately $1.48 million between 2005 and 2014, does that

2  sound right?

3  A.   I don't know the exact number.

4              MR. MASTER:   Objection.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBGYSIL4                          Runes – Cross

BY MR. MOLO:

Q.  I'm going to just show you –– the prosecutor asked you about donations made to the Democratic Assembly Campaign Committee in a phone call that you received from Speaker Silver; correct?

A.  Yes.

Q.  He was the honorary chair of that committee; is that right?

A.  Of DACC?

Q.  Yes.

A.  I believe so.

Q.  And the amount of money that was being requested, $125,000, paled in comparison to the amount that was given to the senate republicans; correct?

A.  It was not as significant as the amount given to the senate republicans.

Q.  Not just it was not as significant.  It was substantially less; correct?

A.  Substantially less.

Q.  The DACC, by the way, is not Mr. Silver's campaign committee; correct?

A.  I believe that's correct.  It's the Democratic Assembly Campaign Committee.

Q.  So that would mean it would cover the campaigns of all the democratic members of the assembly; right?

A.  I don't know how that works.

FBGYSIL4                        Runes - Cross

1   Q.  But there are, give or take, 100 members of the Democratic

2   Assembly Campaign in the assembly; right?

3   A.  Yes.

4   Q.  As to Mr. Silver's own campaign, Friends of Silver,

5   Glenwood only donated once, and that was a check for $10,000.

6           Are you aware of that?

7           MR. MASTER:  Objection.

8           THE COURT:  Overruled.

9           Do you know if that's true or not?

10          THE WITNESS:  I don't know if that's accurate or not.

11  BY MR. MOLO:

12  Q.  Glenwood chose to spend its campaign contributions

13  primarily elsewhere, outside the assembly.

14          Is that right?

15  A.  Yes.

16  Q.  There's no question in your mind that Mr. Silver was an

17  avid and rabid and aggressive pro tenant advocate; is that

18  right?

19          MR. MASTER:  Objection.

20          MR. MOLO:  I'll withdraw the question.

21  BY MR. MOLO:

22  Q.  There's no question that in your mind there Mr. Tenant --

23          THE COURT:  Mr. Tenant?  Mr. Silver.

24

25  BY MR. MOLO:

FBGYSIL4                        Runes – Cross

1   Q.  He's so much of an advocate, I called him Mr. Tenant.

2              Mr. Silver Was an advocate for the tenants; right?

3              MR. MASTER:  Objection.

4              THE COURT:  Overruled.

5              THE WITNESS:  Yes.

6   BY MR. MOLO:

7   Q.  This was true in 2001, and it's true up through today as

8   far as you know; right?

9              MR. MASTER:  Objection.

10             THE COURT:  Overruled.

11             THE WITNESS:  As far as I know.

12  BY MR. MOLO:

13  Q.  You believe that Mr. Silver always voted against Glenwood;

14  is that right?

15  A.  Uniformly.

16  Q.  Uniformly?

17  A.  Yes.

18  Q.  In fact, Glenwood's view has been that Mr. Silver has

19  actually been insane when it comes to tenant issues; is that

20  right?

21  A.  I don't believe I've ever heard anybody use that particular

22  expression.

23  Q.  I'm going to show you what's marked as Defendant's Exhibit

24  135.

25             I'll ask you to take a moment to look at it.

1   A.  I don't think I was referring to the speaker.

2   Q.  No.  It's an email from, at the top, Mr. Dorego?

3   A.  To me.

4   Q.  To you; correct?

5       And you had forwarded to him a news release; correct?

6   A.  Yes.

7       MR. MOLO:  Your Honor, I move for admission of

8   Defendant's Exhibit 135.

9       MR. MASTER:  Objection, your Honor.  Hearsay and other

10  grounds.

11      THE COURT:  Can I see the parties.

12      MR. MOLO:  Sure.

13      (At the sidebar)

14      THE COURT:  Okay.  What's your objection?

15      MR. MASTER:  Well, this is Mr. Dorego responding to a

16  press release that would be otherwise excluded on hearsay

17  grounds.

18      THE COURT:  It's not coming in for the truth.  This

19  isn't coming in for the truth if that's what was in the bill.

20      MR. MASTER:  I certainly don't mind Mr. Molo

21  confronting Mr. Runes with this statement by Charles Dorego

22  which is not his own statement.

23      I don't see why this is admissible for any purpose.

24      THE COURT:  It's admissible to show that there was

25  tension between Mr. Silver's position as someone who was taking

1    money from Glenwood and his normal position of supporting

2    tenants' rights.  That's why it's relevant.

3           MS. COHEN:  Your Honor, there are Silver's own

4    statements in that press release which are clearly hearsay.

5    I'm sure there's a way to redact that and still make the point

6    that Speaker Silver issued a press release.

7           THE COURT:  Are you trying to keep out his quote?

8           MS. COHEN:  Yes.  In his own news release it's his

9    statement.

10          THE COURT:  If that paragraph is redacted --

11          MR. MOLO:  Your Honor, I object to that.  This is a

12   statement that Dorego is making to Runes after reading what is

13   there that was said by Silver.

14          Whether Silver meant it, whether Silver even said it

15   doesn't maker it.  It's what Dorego says to Runes, which is

16   this is insane.  He's reading what the press release says.

17          THE COURT:  But that doesn't mean it specifically

18   relates to Mr. Silver's statement.

19          MR. MOLO:  There's no other statement.

20          THE COURT:  Yes, there are.  That's not true.  There's

21   a statement by Mr. Lopez.

22          MR. MOLO:  Correct.  But Mr. Silver's statements are

23   in there too.  You can tell the jury it's not offered for its

24   truth, but we shouldn't be deleting Mr. Silver's statements.

25          What I meant by "no other statement" is there's no

1   other statement in that email is what I meant to say.  That

2   email is just forwarding the press release, and Runes says,

3   insane.

4           By the way, this is going to end my examination if

5   that's any incentive to rule my way.

6           THE COURT:  It's not.

7           MR. MOLO:  Nor should it be.

8           The point is it's Runes' statement that what is being

9   proposed is insane.

10          MS. COHEN:  It's not Runes' statement.

11          MR. MOLO:  Excuse me.  It's Dorego's statement to

12  Runes.

13          MR. MASTER:  If it were Runes' statement, I could see

14  you have a ground.

15          MR. MOLO:  I asked him about Glenwood.

16          MR. COHEN:  They're talking about some document that

17  Silver is putting out that has the quotes in it.  That's what

18  he's saying is insane.

19          THE COURT:  Before I rule, you have to establish what

20  was his understanding that Dorego was reacting to.

21          MR. MOLO:  Okay.

22          THE COURT:  Was he reacting to the passage of the bill

23  generally?  If so, I will admit it but without Silver's

24  statement.  If he was reacting specifically to Silver's

25  quote --

1          MR. MOLO:  What if he's just reacting to the news

2     release, which is what I believe he was doing.

3          THE COURT:  It's not even his statement.  So he's

4     reading Dorego's mind.  So, in fact, I'm going to sustain the

5     objection.

6          MR. MOLO:  Your Honor, wait a minute.  I want to make

7     my record.

8          THE COURT:  You can make a record.  Mr. Molo, you're

9     asking him what was in Charlie Dorego's head, and that's

10    generally improper.  I can't imagine why --

11         MR. MOLO:  We've had all kinds of emails admitted

12    throughout this trial saying this was offered for that person's

13    state of mind, that person's state of mind.

14         As far as Glenwood, Dorego is a senior person at

15    Glenwood.  I asked him about what Glenwood's view was.  The

16    jury can take it for what it is.

17         It's evidence of Dorego and, therefore, Glenwood's

18    view of Silver when this is put before them as to what Silver

19    said.

20         THE COURT:  If that's why you're introducing it, for

21    Dorego's state of mind --

22         MR. MOLO:  Glenwood/Dorego.

23         THE COURT:  Glenwood is a company.  So Glenwood

24    doesn't have a state of mind.

25         MR. MOLO:  Okay.

 1              THE COURT:  I don't care what the Supreme Court says.

 2    Companies aren't people.  They don't have states of mind.

 3    Dorego could have a state of mind and does have a state of

 4    mind.

 5              MR. MOLO:  As a senior executive of Glenwood.

 6              THE COURT:  The email itself is ambiguous relative to

 7    what it means relative to his state of mind.

 8              MR. MOLO:  They can ask the recipient.

 9              THE COURT:  But this witness is the witness who is on

10    the stand.

11              MR. MOLO:  Right.

12              THE COURT:  So this witness can't clear that up

13    because it's what's in Dorego's head, not what's in this

14    witness' head.

15              MR. MOLO:  What if I asked him what Mr. Dorego meant

16    by that?

17              THE COURT:  How does he know?

18              MR. MOLO:  They work together all the time.  What if

19    they had discussions about it?

20              THE COURT:  You can ask if he had any specific

21    discussions about it.

22              MR. MOLO:  Okay.

23              THE COURT:  We'll take it one by one.

24              MR. MOLO:  Okay.

25              (In open court)

FBGYSIL4                        Runes – Cross

BY MR. MOLO:

Q.  Mr. Runes, in 2010 did you and Mr. Dorego have

communications between one another concerning proposed

legislation on rent regulation in the assembly?

A.  In 2010?

Q.  Yes.

A.  Yes, sir.

Q.  At some point in 2010, did you forward to Mr. Dorego a

press release describing the assembly's proposed rent

regulation laws in 2010?

A.  This was their wish list --

            THE COURT:  Just yes or no.  Did you forward that?

            THE WITNESS:  Yes.

BY MR. MOLO:

Q.  Did they propose a wish list?

A.  Yes.

Q.  Was that reflected in a press release?

A.  Yes.

Q.  Did you forward that press release to Mr. Dorego?

A.  I did.

Q.  Did Mr. Dorego react to that press release?

A.  He did.

Q.  Did he do it in an email?

A.  He did.

            MR. MOLO:  Your Honor, I move for admission of Exhibit

1   135.

2          THE COURT:  No.  That did not establish the issues

3   that we were discussing.  The objection is sustained.

4   BY MR. MOLO:

5   Q.  Did you and Mr. Dorego have conversations about what he

6   thought about the rent regulation laws that were being proposed

7   in the wish list bill of the assembly in 2010?

8   A.  Yes, sir.

9   Q.  What did Mr. Dorego say to you about that?

10  A.  He thought they were crazy.

11  Q.  Okay.  Thank you.  Insane?

12  A.  Yes.

13  Q.  Thank you.

14         MR. MOLO:  One second, your Honor.

15         (Pause)

16         MR. MOLO:  May I move to admit the email, your Honor,

17  135.

18         MR. MASTER:  Objection, your Honor.

19         THE COURT:  With the redactions that were discussed,

20  it will be received.

21         (Defendant's Exhibit 135 received in evidence)

22         THE COURT:  Okay.  Mr. Master, I think Mr. Molo said

23  that would be it.

24         MR. MASTER:  Thank you.

25  REDIRECT EXAMINATION

1    BY MR. MASTER:

2    Q.  First of all, remember on cross-examination Mr. Molo

3    continually referred to this as the prosecutor's chart?

4            Do you remember that?

5    A.  I do.

6    Q.  Do you remember testifying on Friday afternoon and being

7    asked questions, "Does this chart fairly and accurately

8    represent in summary form the status of various provisions of

9    421a and rent regulations at different points in time?" and

10   answering, "Yes.  Some of the major issues"?

11           Do you remember answering that?

12   A.  Yes.

13   Q.  In fact, you had numerous opportunities to review this

14   chart before it was the subject of your testimony; correct?

15   A.  Yes, sir.

16   Q.  And in fact, on a few occasions you suggested corrections

17   if you thought that the chart did not fairly and accurately

18   represent the status of rent regulation negotiations at various

19   points in time?

20   A.  That is correct.

21   Q.  So, at the time of your testimony, you yourself had adopted

22   what was said in this chart and agreed with -- well, you agreed

23   that it fairly and accurately represented the information

24   summarized in the chart?

25   A.  Yes, sir.

FBGYSIL4                    RUNES - Redirect

1    Q.  The defense asked you on cross-examination and circled this

2    April 2011 assembly bill not extended and suggested that the

3    prosecution left that out of the chart deliberately.

4            Do you remember that?

5    A.  Yes.

6    Q.  And you were shown a bill, Defendant's Exhibit 130.

7            Do you remember when the defense tried to prove their

8    point with Defendant's Exhibit 130?

9            MR. MOLO:  Objection.

10           THE COURT:  Sustained.

11           Just ask questions.

12   BY MR. MASTER:

13   Q.  Do you remember being shown Defendant's Exhibit 130?

14   A.  Yes, sir.

15           MR. MASTER:  Would you mind pulling that up.

16   BY MR. MASTER:

17   Q.  Was that the April 2011 assembly bill that was the subject

18   of the summary chart that you testified about?

19   A.  No.  I do not believe so.

20           MR. MASTER:  If you wouldn't mind zooming in on that

21   chart.

22           THE COURT:  The purpose?

23           MR. MASTER:  I'm sorry.  Zooming in there.

24   BY MR. MASTER:

25   Q.  What happened with this bill?  If you wouldn't mind just

FBGYSIL4                      RUNES - Redirect

1   looking at "Actions" and "Votes."

2   A.   It never came out of the Real Property Tax Committee.

3   Q.   So, in other words, there was no action on this bill?

4   A.   Correct.

5   Q.   So the April 2000 assembly bill -- that was the one that

6   actually passed the assembly?

7   A.   That bill did pass the assembly.

8   Q.   That did not extend 421a?

9   A.   Correct.  It did not have an extender for 421a in the bill.

10  Q.   In the bill that defense counsel showed you following which

11  he circled this -- that had nothing to do with the April 2011

12  assembly bill?

13  A.   Do you mean Defendant's Exhibit 130?

14  Q.   Yes.

15  A.   Correct.

16  Q.   Is it fair to say I can just X this out?

17  A.   That's not my chart.

18          THE COURT:  That would be nobody's chart.

19  BY MR. MASTER:

20  Q.   Defense counsel asked you if the government had omitted a

21  column concerning the senate.

22          Do you remember being asked about that?

23  A.   No.  I remember him saying that.

24  Q.   Are you aware of a bill that passed the entire senate that

25  addressed each of these issues prior to the final bill?

FBGYSIL4                         RUNES - Redirect

1    A.  I think there was one that addressed it but not in that

2    way.

3    Q.  Right.  Addressing each of these issues.

4    A.  Yes.

5    Q.  Was there a one-house bill that was similar that you were

6    aware of?

7    A.  Yes.  Do you mean in the senate or in the assembly?

8    Q.  In the assembly you described it.

9    A.  Right.

10   Q.  Are you aware of a bill that passed the entire senate that

11   addressed each of these issues?

12   A.  I don't remember that.  Sorry.

13   Q.  So there was no bill that was analogous to the April 2011

14   assembly bill in the senate until the final adopted

15   legislation?

16   A.  I believe that's correct.

17   Q.  Now, do you remember being asked at the beginning of

18   cross-examination about your distinguished career to this

19   point?

20   A.  I always worry when people start off that way, but yes, I

21   do.

22   Q.  Now, based on your distinguished career and experience,

23   what was your reaction when you learned that Sheldon Silver was

24   sharing in fees from Glenwood?

25   A.  It was a shock and surprise.  I was not happy.

FBGYSIL4                     RUNES - Redirect

1    Q.  Well, beyond not happy, do you remember telling the

2    government in a preparation session that it was like holding a

3    tiger by the tail?

4    A.  Yes, sir.

5    Q.  Can you just describe for the members of the jury what you

6    meant by the term "holding a tiger by the tail."

7              MR. MOLO:  Your Honor, objection.

8              THE COURT:  Overruled.

9              THE WITNESS:  If you hold a tiger by the tail, you

10   have a difficult choice to make.  Do you let go or not.

11   BY MR. MASTER:

12   Q.  Why did you say that in connection with the situation in

13   which you found yourself in late 2011?

14   A.  It was a difficult situation.

15   Q.  What choices did you believe you had?

16   A.  We had the choice, I believe as I said earlier today, of

17   terminating the relationship --

18   Q.  And thereby letting go of the tiger's tail?

19   A.  Letting go of the tiger's tail or continuing the

20   relationship in the fashion in which we did.

21   Q.  You were asked some questions about your understanding of

22   bar disclosure rules or disclosure rules.

23              Do you remember that?

24   A.  I do.

25   Q.  Are you aware that even before acknowledgment and consent

FBGYSIL4                          RUNES - Redirect

1    in writing were required that the defendant was required --

2              MR. MOLO:  Objection.

3    BY MR. MASTER:

4    Q.  -- to inform --

5              MR. MOLO:  Objection.

6              THE COURT:  Mr. Molo, here is the thing.  I want the

7    question to be finished so I know what I'm ruling on.

8              MR. MOLO:  Okay.

9              THE COURT:  Start over please.

10             MR. MASTER:  Yes.

11   BY MR. MASTER:

12   Q.  Even before the rule change that Mr. Molo asked about, what

13   type of disclosure was the defendant supposed to make to you as

14   Glenwood Management about his receipt of fees from you?

15             MR. MOLO:  Objection.

16             THE COURT:  I don't think that's the question you want

17   to ask.  Rephrase the question.

18             MR. MASTER:  Yes.

19   BY MR. MASTER:

20   Q.  You were asked questions about a rule change.

21             Do you remember that?

22   A.  Yes.

23   Q.  Even before the rule change, was the defendant required to

24   make disclosure to you?

25             MR. MOLO:  Objection.

FBGYSIL4                         RUNES - Redirect

```
 1              THE COURT:  Sustained.
 2              Was Mr. Silver required to make disclosure to
 3    Mr. Runes?
 4              MR. MASTER:  I'll withdraw it.  Just one moment.
 5              (Pause)
 6    BY MR. MASTER:
 7    Q.  When you described the defendant in that witness
 8    preparation session and today --
 9              MR. MOLO:  I object.
10              THE COURT:  Overruled.
11              MR. MOLO:  He's going to try and --
12              THE COURT:  Overruled.  I have to hear the question.
13    BY MR. MASTER:
14    Q.  When you described the concern that you felt, what, if
15    anything, were you concerned that he could do to you if you
16    decided to let go?
17              MR. MOLO:  Your Honor, I object.
18              THE COURT:  Overruled.
19              "He" meaning Mr. Silver?
20              MR. MASTER:  Yes.
21              THE WITNESS:  When you say to me, you mean to
22    Glenwood?
23              MR. MASTER:  Yes.  To Glenwood.
24              THE WITNESS:  It's not a good thing to alienate any
25    legislative leader.
```

FBGYSIL4                          RUNES – Redirect

1   BY MR. MASTER:

2   Q.  Where did Mr. Silver rank in terms of the most powerful

3   people in the state?

4               MR. MOLO:  Objection.

5               THE COURT:  Overruled.

6               THE WITNESS:  He was one of the three most powerful

7   people in the State of New York governmentally.

8   BY MR. MASTER:

9   Q.  How dependent was Glenwood on a favorable legislative

10  climate?

11              MR. MOLO:  Objection.

12              THE COURT:  Overruled.

13              THE WITNESS:  We needed a rational legislative

14  climate.

15  BY MR. MASTER:

16  Q.  You were asked some questions on direct about whether

17  Sheldon Silver voted against Glenwood.

18              Do you remember that?

19  A.  Yes.

20  Q.  Now, in fact, as you testified on Friday, what proposal --

21  you made a proposal concerning luxury decontrol and vacancy

22  decontrol.

23              Do you remember that?

24  A.  Yes.

25  Q.  Did that proposal end up passing --

1    Did that proposal end up reflected in the final bill

2    that passed the assembly?

3         MR. MOLO:  Objection.

4         MR. MASTER:  I will rephrase it, your Honor.

5    BY MR. MASTER:

6    Q.  How satisfied was Glenwood with the legislation that

7    ultimately passed the assembly in June 2011 with Sheldon

8    Silver's vote?

9         THE COURT:  The one that was ultimately signed into

10   law?

11        MR. MASTER:  Yes, your Honor.

12        MR. MOLO:  Objection.

13        THE COURT:  Overruled.

14        THE WITNESS:  I don't know if he voted for it or not,

15   but we were satisfied with that portion of that legislation.

16   BY MR. MASTER:

17   Q.  And that was a bill that passed the assembly under Sheldon

18   Silver?

19   A.  While he was speaker, yes.

20   Q.  Well, are you aware of an occasion on which a major piece

21   of rent regulation legislation passed the assembly over Sheldon

22   Silver's objection?

23   A.  No.

24   Q.  So --

25   A.  I just don't know if he voted on every bill.  I'm not

FBGYSIL4                    RUNES - Redirect

1   trying to be coy.

2   Q.  Are you aware of any vote he took against the bill that you

3   are satisfied with?

4   A.  No.

5   Q.  Again, what role does Sheldon Silver play in controlling

6   the flow of legislation that is important to Glenwood, such as

7   this particular piece of legislation?

8   A.  The speaker and his staff control the flow of legislation

9   in the assembly.

10  Q.  And so, absent the speaker's consent, could that bill even

11  have made it on to the floor of the assembly for a vote?

12  A.  No, not without his consent.

13  Q.  You testified on Friday about these laws that are so

14  important to Glenwood regularly sun set.

15          Do you remember that?

16  A.  Yes.

17  Q.  And so when that bill that Glenwood was satisfied with

18  passed the assembly in June of 2011, did you believe that your

19  work was done?

20  A.  In terms of what?  My work is never done.

21  Q.  Fair point, Mr. Runes.

22          With respect to ensuring that Glenwood continued to be

23  satisfied with rent regulation and related legislation.

24  A.  Could you repeat that.  I'm sorry.

25  Q.  Yes.  Well, again, when were these laws that were passed in

1   June of 2011 scheduled to sun set?

2   A.  2016 -- -15.

3   Q.  Did you anticipate that you would be needing to have a

4   favorable relationship with leadership in 2015?

5   A.  I wanted a favorable relationship with leadership of both

6   houses every year.

7   Q.  Just explain to the members of the jury why that was.

8   A.  Because the leaders in each house control the flow of

9   legislation and the big issues in their respective houses.

10  Q.  You were asked whether the payments that you learned about

11  in late 2011 were bad optics.

12          Do you remember that?

13  A.  Yes.

14  Q.  Mr. Runes, were you concerned only with the optics of the

15  situation?

16  A.  Well, once I'd ascertained at least what I thought was the

17  answer in terms of the legality, yes.  Then I was concerned

18  about the optics.

19  Q.  What were you concerned about if you had terminated the

20  relationship?

21          MR. MOLO:  Objection.  Asked and answered.

22          THE COURT:  Overruled.

23          THE WITNESS:  I did not want to alienate the speaker.

24  BY MR. MASTER:

25  Q.  When you spoke to -- you were just talking about this

1    conversation with David Grandeau.

2              Do you recall being asked in witness preparation

3    sessions why you did not --

4              MR. MOLO:  Objection.

5              THE COURT:  Sustained.

6              Just ask the question.

7    BY MR. MASTER:

8    Q.  Do you recall stating that it was too hot to discuss with

9    anyone?

10             MR. MOLO:  Objection.

11             THE COURT:  Sustained.

12             Why didn't you discuss it with anyone?

13             THE WITNESS:  It was too hot.

14             THE COURT:  Just ask the question, Mr. Master.

15   BY MR. MASTER:

16   Q.  What do you mean by "too hot"?

17   A.  You're talking about the Speaker of the Assembly.  You're

18   talking about an entity, Glenwood Management, which is a very

19   large real estate company.  It was not a subject for gossip.

20   Q.  In fact, it was not a subject -- is it fair to say it was a

21   subject that you were very concerned about?

22   A.  Yes, sir.

23             MR. MOLO:  Objection.

24             THE COURT:  Overruled.

25   BY MR. MASTER:

 1   Q.  You were asked some questions about the role that the LLCs

 2   play in owning property.

 3              Do you remember that?

 4   A.  Yes, sir.

 5   Q.  Again, who owns, directly or indirectly, both Glenwood and

 6   its LLCs?

 7   A.  I don't know who the actual owners of the LLCs are.  But I

 8   believe that the --

 9              MR. MOLO:  Objection.

10              THE COURT:  Overruled.

11              Go ahead.

12              THE WITNESS:  The Litwin family owns the interests in

13   the LLCs through trusts.

14   BY MR. MASTER:

15   Q.  Who made the decision to continue the relationship with the

16   defendant after you learned about it?

17   A.  Mr. Litwin.

18              THE COURT:  After you learned that there were payments

19   being made from Goldberg to Mr. Silver?  He knew that he had a

20   relationship with Mr. Silver for years.

21              MR. MASTER:  Yes.  After you learned about that

22   financial relationship.

23              THE WITNESS:  Mr. Litwin.

24   BY MR. MASTER:

25   Q.  Again, what role does he play with respect to Glenwood

1    Management?

2              MR. MOLO:  Objection.

3              THE COURT:  That has been asked and answered about a

4    thousand times.

5              Do you know that Litwin runs Glenwood?

6              The jury all knows that.

7              MR. MASTER:  Great.  Just checking.

8    BY MR. MASTER:

9    Q.  Who did Sheldon Silver call to inform about this financial

10   relationship?  Was it someone who worked only for the LLC?  Or

11   was it a lobbyist retained by Glenwood?

12             MR. MOLO:  Objection.

13             THE COURT:  Rephrase the question.  You have three or

14   four questions embedded in there.

15             MR. MASTER:  Yes.

16   BY MR. MASTER:

17   Q.  How did you learn about this financial relationship that

18   Sheldon Silver had?

19   A.  From one of our lobbyists, Brian Meara.

20   Q.  Who retains Brian Meara?

21   A.  Glenwood Management.

22   Q.  Who was tasked with informing Sheldon Silver about the

23   proposed resolution?

24   A.  I was.

25   Q.  Who retains you?

FBGYSIL4                          Runes – Recross

1   A.  Glenwood Management.

2   Q.  And so, on both occasions when Sheldon Silver was

3   communicating with someone about this issue, was he

4   communicating with someone who represented only the LLCs?

5   A.  No.

6   Q.  Who was he communicating with?

7   A.  Either Brian Meara or me.

8   Q.  And who do you work for?

9   A.  Glenwood Management.

10          MR. MASTER:  Just a moment.

11          (Pause)

12          MR. MASTER:  Nothing further.

13          THE COURT:  Mr. Molo.

14          MR. MOLO:  Briefly.

15  RECROSS EXAMINATION

16  BY MR. MOLO:

17  Q.  Mr. Runes, you mentioned that without the speaker's

18  consent, the bill would not have made it to the floor vote;

19  correct?

20  A.  Yes.

21  Q.  And that meant that all that was in the bill would not have

22  been up for a vote; correct?

23  A.  Yes.

24  Q.  All the provisions that were pro tenant would not have made

25  it up for a vote; right?

FBGYSIL4                          Runes - Recross

1   A.  Right.

2   Q.  You said that this is a process that's run by Speaker

3   Silver and his staff at that time; is that right?

4   A.  Correct.

5   Q.  And his staff included Jim Yates; is that right?

6   A.  Yes.

7   Q.  Jim Yates was his counsel at the time; is that right?

8   A.  Yes.

9   Q.  And Jim Yates at that time was a respected retired New York

10  Supreme Court judge; is that correct?

11  A.  I think he still is.

12  Q.  He still is a retired, respected Supreme Court judge.

13          And Mr. Yates was well-regarded by the people in the

14  assembly that he dealt with; is that right?

15          MR. MASTER:  Objection.

16          THE COURT:  Sustained.

17  BY MR. MOLO:

18  Q.  Based on your dealings with Mr. Yates and your dealings on

19  this legislation, you understood that Mr. Yates was respected

20  by all parties concerned.

21          Is that right?

22          MR. MASTER:  Objection.

23          THE COURT:  You can ask the foundation questions.

24  BY MR. MOLO:

25  Q.  Did you interact with people who were interacting with

1   Mr. Yates on this legislation?

2   A.  Yes.

3   Q.  Based upon the interaction that you had, was it your view

4   that people respected Mr. Yates in his efforts to get

5   legislation passed?

6   A.  Yes.

7   Q.  He did a pretty good job because the bill got done; right?

8             MR. MASTER:  Objection.

9             THE COURT:  Overruled.

10            THE WITNESS:  Yes.

11  BY MR. MOLO:

12  Q.  If Glenwood had its preference, there would be no rent

13  regulation; is that correct?

14  A.  Yes.  I suppose so.

15  Q.  With Mr. Silver, as well as with every legislator, Glenwood

16  wanted to maintain generalized goodwill.  Is that fair?

17  A.  Yes, sir.

18  Q.  And maintaining that general goodwill with Speaker Silver

19  and the other members of the assembly and senate was something

20  that Glenwood took seriously.

21  A.  Yes, sir.

22  Q.  And the information that you got based on your

23  conversations with Mr. Grandeau, the advice that he gave you --

24  you shared that with Mr. Litwin; correct?

25  A.  Oh, absolutely.

 1              MR. MOLO:  One moment, Judge.

 2              (Pause)

 3              MR. MOLO:  At some point I just want to make an offer

 4      of proof on one issue.

 5              THE COURT:  Does it have anything to do with this

 6      witness?

 7              MR. MOLO:  No.  Nothing further with this witness.

 8              THE COURT:  Let's get him off the stand first.

 9              Anything further?

10              MR. MASTER:  Two questions on recross.

11              THE COURT:  You can ask them from there.

12              MR. MASTER:  Yes, your Honor.

13      REDIRECT EXAMINATION

14      BY MR. MASTER:

15      Q.  You were just asked some questions on recross about your

16      interest in maintaining generalized goodwill.

17              Do you remember that happening just a couple of

18      seconds ago?

19      A.  Yes, sir.

20      Q.  When you learned about Sheldon Silver's ongoing receipt of

21      payments from Glenwood via Goldberg, were you concerned only

22      with generalized goodwill?  Or were you concerned with

23      something more specific?

24      A.  I'm sorry.  I don't understand that.

25      Q.  Was your only concern with maintaining generalized

1    goodwill?  Or were you concerned about harm?

2    A.  I was concerned.  I mean, the possibility of alienating a

3    legislative leader is not a good concept for a lobby.

4    Q.  Is this a relationship that Glenwood invited or sought out?

5    A.  The relationship with the speaker?

6    Q.  The financial relationship with the speaker.

7              MR. MOLO:  Objection.  Objection.

8              THE COURT:  Rephrase the question.  I'm not quite sure

9    what you're asking him.

10   BY MR. MASTER:

11   Q.  Mr. Runes, as far as you know, Glenwood did not initiate

12   payments to Sheldon Silver because of generalized goodwill.

13             MR. MOLO:  Objection.  Misstates the testimony.

14   Misstates the evidence.

15             THE COURT:  Objection, Mr. Molo.

16             MR. MOLO:  Objection.

17             THE COURT:  Rephrase the question.

18   BY MR. MASTER:

19   Q.  As far as you know, Mr. Runes, did Glenwood begin making

20   payments to Sheldon Silver in order to promote generalized

21   goodwill?

22             MR. MOLO:  Objection.

23             THE COURT:  I don't think there was any evidence that

24   Glenwood was paying Mr. Silver beyond making political

25   contributions.

1        I think I know what you're asking.

2             MR. MASTER:  Yes, your Honor.

3             THE COURT:  Try to phrase it so that it gets to what

4   you're actually asking.

5             MR. MASTER:  Just a moment.

6   BY MR. MASTER:

7   Q.  Did Glenwood initiate the relationship whereby Sheldon

8   Silver was splitting fees with Jay Goldberg?

9             MR. MOLO:  Objection, your Honor.  This witness has

10  testified he doesn't --

11            THE COURT:  Overruled.

12            MR. MOLO:  He testified he doesn't know how the

13  relationship started.

14            THE WITNESS:  For 10 or 12 years that Mr. Goldberg

15  initially represented the LLCs on certiorari, we had no idea

16  that Shelly Silver was getting any portion of the fees.  So how

17  could we have initiated it?

18  BY MR. MASTER:

19  Q.  And so, when you learned that Sheldon Silver wanted the

20  relationship to continue, did you do so just out of the desire

21  to maintain generalized goodwill?

22            MR. MOLO:  Objection, your Honor.  That is not the

23  testimony.

24            THE COURT:  Overruled.

25            MR. MOLO:  That's not the testimony.

1            THE COURT:  Overruled.

2            THE WITNESS:  Mr. Litwin decided to keep the

3      relationship going.  It wasn't my decision.  It was his

4      decision.

5            THE COURT:  The question is:  Was that to maintain

6      goodwill or fear of retribution?

7            THE WITNESS:  I cannot tell you what was in

8      Mr. Litwin's mind.

9            THE COURT:  Okay.

10     BY MR. MASTER:

11     Q.  Well, Mr. Runes, you previously testified on

12     direct examination about concern that Mr. Litwin had.

13     A.  He had concern.  I had concern.  Charlie Dorego had

14     concern.

15           THE COURT:  Was the concern retribution?

16           MR. MOLO:  Your Honor, I object.

17           THE COURT:  You can't object to my question.

18           To the extent you've objected, your objection is

19     overruled.

20           THE WITNESS:  The concern was that it could alienate

21     Mr. Silver.

22           MR. MASTER:  Just a moment.

23           (Pause)

24     BY MR. MASTER:

25     Q.  And you were asked questions about wanting to establish

1    goodwill with numerous other politicians in addition.

2            What other politicians did you learn that Glenwood was

3    sharing fees with?

4    A.  None.

5            MR. MOLO:  Objection.

6            THE COURT:  Overruled.

7            Okay.  Thank you, Mr. Runes.  You can step down.

8            THE WITNESS:  Thank you.

9            (Witness excused)

10           THE COURT:  I think this is a good time for our

11   afternoon break.  Let's let Mr. Runes get off the stand.

12           Don't discuss the case.  We'll bring you back in about

13   ten minutes.

14           (Jury not present)

15           THE COURT:  Is this anything with this witness or the

16   next witness?

17           MR. MOLO:  It had to do with this very witness.

18           Your Honor, if asked, Mr. Runes would have testified

19   that he is aware of the lawyer disciplinary rules in New York

20   and if he is aware that the rules require that a lawyer who

21   knows that another lawyer has committed a violation of the

22   Rules of Professional Conduct that raises a substantial

23   question as to that lawyer's honesty, truth worthiness or

24   fitness as a lawyer shall report such knowledge to a tribunal

25   or other authority empowered to investigate or act upon such

FBGYSIL4                    Runes - Redirect

1    violation.

2              He would further testify, if asked, that he did not

3    make such a report to any tribunal or other authority empowered

4    to investigate or act upon such violation and that he's a

5    member of the Character and Fitness Committee.

6              THE COURT:  You established that.  Mr. Runes is not on

7    trial.

8              MR. COHEN:  I thought your Honor's concern at the

9    bench was that we were trying to impeach Mr. Runes with this.

10             THE COURT:  No.

11             MR. COHEN:  It was not to impeach him.  He's going to

12   say that, I didn't think it was necessary under the facts

13   presented to me.

14             THE COURT:  And that's going to take it down as to why

15   he thought it was improper, and we're going to get into his

16   ethics.  This case is not about his ethics.

17             This case is about whether your client committed a

18   crime, not whether he violated the Rules of Professional

19   Ethics, whether he committed a crime and whether Mr. Runes

20   should have reported him to the bar because he saw a set of

21   facts that raised questions of honesty and integrity is between

22   Mr. Runes and the bar.  That's not what this trial is about.

23             MR. MOLO:  Your Honor, it went to his state of mind.

24   They're trying to argue that Mr. Runes -- the prosecution is

25   trying to argue that Mr. Runes was fearful and that he thought

 1    there was something wrong and that there was something illegal

 2    that had occurred.

 3            THE COURT:  He said he didn't want to stop the

 4    payments because he was concerned about what would happen.

 5            MR. MOLO:  Okay.

 6            THE COURT:  Whether he thinks it's illegal or not is

 7    irrelevant.  The only thing that matters is whether the jury

 8    thinks that what he's done is illegal.

 9            Moreover, I would note that, according to Mr. Runes,

10    he didn't know all the relevant facts.

11            MR. MOLO:  The level of seriousness as to the way

12    Mr. Runes was calculating this -- if he thought that Mr. Silver

13    was extorting him, which is what the charge is here, if he

14    really believed that he was extorting him, as somebody who

15    happened to be on the Character and Fitness Committee, in

16    addition to the fact that he's already bound by the rule that I

17    just read, he would have been likely to have raised that.

18            The fact that he didn't raise it with an authority is

19    some evidence of the fact that there was no extortion, some

20    evidence.

21            MR. MASTER:  Your Honor, there's some very clear

22    evidence in response to that.

23            Mr. Runes also -- he testified on direct that the

24    arrangement was made to split the side agreement from the

25    retainers so that it would not be filed with the court and with

1        the bar.

2               So Mr. Runes testified about being very concerned

3        about the firm making arrangements in order to hide this from

4        the public.

5               So I don't understand why this issue, which, as

6        your Honor has pointed out, is entirely collateral, has

7        anything to do with either impeaching Mr. Runes' testimony or

8        proving that extortion was more or less likely to occur.

9        Because, if he was extorted, he might have been too fearful to

10       report it as well.

11              THE COURT:  You've both made your record.

12              Are we going to get to Ms. Reid this afternoon?

13              MS. COHEN:  It's doubtful, your Honor.

14              THE COURT:  Your Tuesday resting is looking more and

15       more at risk to me.  We missed several hours this morning.

16              MS. COHEN:  We hadn't anticipated that.  We are going

17       to 5:30 today.  We are hopeful we can get two witnesses done

18       with today.  Therefore, I don't think it sets us back that much

19       if we do Ms. Reid first thing tomorrow morning.

20              THE COURT:  Good.  We can talk about Ms. Reid at the

21       end of the day.

22              MR. MOLO:  In terms of the timing, I am just going to

23       raise, in light of the juror's situations, whether going to

24       5:30 is --

25              THE COURT:  She'll stay until we send her home.

FBGYSIL4                    Runes - Redirect

1            MS. COHEN:  Just for the record, I don't think there's

2     any indication that she asked to go home early.

3            THE COURT:  Anything further until we come back?

4            MS. COHEN:  No, your Honor.

5            (Recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBG5sil5

1        MS. COHEN:  We have an issue, your Honor.

2        THE COURT:  What's the issue?

3        Go ahead and start lining them up.

4        MS. COHEN:  Your Honor, the defense counsel sent us a

5   video -- The next witness, I should preface this with, is the

6   Associate Secretary of the Public Authority Control Board and

7   she is going to talk about Public Authority Control Board of

8   which Sheldon Silver, when he was Speaker of the Assembly, was

9   a voting member.  The defense sent us a video clip of the

10  meetings of the PACB.

11       THE COURT:  I am familiar with the PACB.

12       MS. COHEN:  And the clip from the meeting is from a

13  meeting that happened in late October.

14       THE COURT:  Of what year?

15       MS. COHEN:  Of this year, your Honor.

16       THE COURT:  Okay.

17       MS. COHEN:  Of this year; so the defendant was no

18  longer a member because he is no longer Speaker of the Assembly

19  and therefore we object to the clip on grounds of relevance.

20       THE COURT:  Okay.

21       MS. COHEN:  I had not heard back from the defense so I

22  assumed that took care of that, but apparently not.

23       THE COURT:  What is the issue?

24       MR. SHUR:  Judge, just to put it in context, the

25  allegation is that these 80/20 loans that Glenwood had applied

FBG5sil5

```
 1    for that had been approved by the Public Authority and then
 2    ultimately get to the PACB that somehow Mr. Silver took some
 3    favorable official action in connection with the
 4    Goldberg & Iryami relationship.  I think we heard from
 5    Mr. Runes that Mr. Silver didn't intervene one way or the other
 6    but the relevance of the video is that the PACB is clearly --
 7    at the time these proposals, these projects, these loans get to
 8    the PACB it is a perfunctory vote meaning it has already been
 9    approved by the Public Authority, it has been approved by the
10    Comptroller and what this meeting -- the prosecutor is right,
11    the video of this meeting is not during the relevant time
12    period.  The purpose of it is to show the format of these
13    meetings and, number one, none of the members actually show up,
14    they all have delegates.  Number two, the presentation is
15    extremely brief and the vote is passed in seconds and my
16    understanding, from watching a number of these videos and from
17    talking to the individuals that participated in the meetings at
18    issue is that all of these meetings are essentially the same.
19              So, if this witness is able to testify that a video of
20    this meeting is just like the meetings that occurred in
21    connection with these 80/20 loans that are relevant, I think
22    the video is admissible and it is relevant.
23              THE COURT:  It seems to me it is cumulative.  I'm
24    going to keep it out.  My recollection is that the work for the
25    PACB typically is done before it actually gets to the PACB and
```

FBG5sil5

1    it is at the staff level, but if the Speaker didn't want

2    something to pass, presumably that would get shook out in the

3    staff --

4              MR. SHUR:  Judge, if you are willing to take judicial

5    notice of that fact.

6              THE COURT:  No, no, no.  You have someone to describe

7    it.  If someone can describe if you don't need a video.  The

8    jury can follow the testimony.

9              MR. SHUR:  Judge, so it is clear for the record, the

10   tape is -- I don't --

11             THE COURT:  Doesn't matter.

12             MR. SHUR:  Less than 60 seconds.

13             THE COURT:  It is cumulative assuming the witness will

14   say all the things that you say she will see.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2                THE COURT:  Call your next witness.

3                MS. COHEN:  Your Honor, the government calls Darby

4     Putnam.

5      DARBY PUTNAM,

6           called as a witness by the Government,

7           having been duly sworn, testified as follows:

8                THE WITNESS:  My name is Darby Putnam and my last name

9     is spelled P-U-T-N-A-M.

10               THE DEPUTY CLERK:  Thank you.  Please, be seated.

11               THE COURT:  Ms. Cohen.

12               MS. COHEN:  Thank you, your Honor.

13    DIRECT EXAMINATION

14    BY MS. COHEN:

15    Q.  Ms. Putnam, where do you work?

16    A.  I work for New York State Division of the Budget.

17    Q.  Is the Division of the Budget part of the Governor's

18    office?

19    A.  It is.

20    Q.  What do you do for the Division of the Budget?

21    A.  I am the Economic Development Budget Examiner.

22    Q.  What does that mean?

23    A.  It means that I am -- I act as liaison between the Empire

24    State Development Corporation as well as their subsidiaries and

25    the Governor's office, Budget Director's office.  I manage

FBG5sil5                          Putnam - direct

1    their budget, their annual budgets.

2    Q.  How long have you worked for the Division of the Budget?

3    A.  Since June 2008.

4    Q.  Where did you go to college?

5    A.  I went to college at Hartwick College.

6              THE COURT:  Hartwick College?

7              THE WITNESS:  Hartwick.

8    Q.  When did you graduate from Hartwick College?

9    A.  In June 2006.

10   Q.  Did you have any advanced degrees after Hartwick?

11   A.  Yes.  After Hartwick I attended Rockefeller College of

12   Public Affairs and Policy in Albany, New York.

13   Q.  Did you receive a master's degree?

14   A.  I did.

15   Q.  What was your master's degree in?

16   A.  Public administration.

17   Q.  While you were getting your Master's Degree, did you have

18   any internships?

19   A.  Yes.  I interned at the New York State Attorney General's

20   Office and New York State Division of Budget.

21   Q.  And after you got your Master's Degree, were you hired into

22   the division of budget?

23   A.  I was.

24   Q.  And what was your first job with the Division of the

25   Budget?

1    A.  I worked as the regulatory budget examiner or --

2    Q.  What does it mean to be a regulatory budget examiner?

3    A.  I did the same job except for I was working with the

4    banking department as well as the Governor's Office of

5    Regulatory Reform and some other smaller agencies.

6    Q.  When you say the banking department, you were referring to

7    the New York State Banking Department?

8    A.  Yes.

9    Q.  And what was your next job you held with the at Division of

10   Budget?

11   A.  Then I was moved up into the Economic Development Budget

12   Examiner.

13   Q.  And that's the job you have now?

14   A.  Yes.

15   Q.  And as part of your job now are you familiar with the

16   Public Authority Control Board?

17   A.  Yes.

18   Q.  Is the Public Authority Control Board commonly referred to

19   as PACB, its acronym?

20   A.  Yes.

21   Q.  What is your job responsibility as related to the PACB?

22   A.  So, I am the assistant secretary to the PACB and I act as

23   a -- I guess a go-between or a facilitator.  I collect PACB

24   applications and resolutions from the authorities and then I

25   summarize them and distribute them to the members of the PACB.

FBG5sil5                         Putnam - direct

1   Q.  And when you say you collect resolutions from the

2   authorities, do you mean from state authorities that have

3   resolutions that the PACB needs to pass?

4   A.  Yes.

5   Q.  And vote on?

6   A.  Yes.

7   Q.  What type of financing does the PACB approve for the state?

8   A.  It approves project financing, grants, loans, posting of

9   bonds, refunding of state bonds.

10  Q.  And when you refer to state bonds, what are you referring

11  to?

12  A.  State income tax bonds, personal income tax bonds.

13  Q.  What is the New York State Housing Finance Agency?

14  A.  The HFA?  It is the authority that gives control or does

15  housing projects throughout the state.

16  Q.  And do the housing projects that the New York State Housing

17  Finance Agency -- withdrawn, your Honor.

18          Does the New York State Housing Finance Agency issue

19  bonds for development of buildings?

20  A.  They do.  Yes.

21  Q.  And are those bonds something that is approved or

22  disapproved or voted on, I should say, by the PACB?

23  A.  Yes.

24  Q.  And you said part of your job is the associate secretary of

25  the PACB, you facilitate meetings and distribute resolutions?

FBG5sil5                          Putnam - direct

1    A.  I do.

2    Q.  What are resolutions?

3    A.  Resolutions are the formal documents that are used to

4    authorize and approve the funding of the projects.

5    Q.  And you said you distribute the resolutions to members of

6    the PACB?

7    A.  I do.

8    Q.  Who are the members of the PACB?

9    A.  Governor Cuomo and the Majority Leader of the Senate and

10   the Speaker of the Assembly.

11   Q.  So when Sheldon Silver was the Speaker of the New York

12   State Assembly was he a member of the PACB?

13   A.  Yes.

14   Q.  And which of the members of the PACB are entitled to vote

15   on resolutions?

16   A.  The Governor, the Speaker and the Majority Leader.

17   Q.  And when the -- when Sheldon Silver was Speaker of New York

18   State Assembly, did he elect himself to be the member of the

19   PACB?

20   A.  He did.

21   Q.  And when Sheldon Silver was the Speaker of the New York

22   State Assembly did the Governor elect himself or someone else

23   to be the voting member of the PACB?

24   A.  He appointed the budget director.

25   Q.  So the Governor's spot was held by the budget director when

FBG5sil5                    Putnam - direct

1   Sheldon Silver was the Speaker?

2   A.  Yes.

3   Q.  And what about the Senate Majority Leader?  When Sheldon

4   Silver was Speaker of the Assembly, who did the Senate Majority

5   Leader elect in the Senate Majority Leader's spot?

6   A.  Senator John DeFrancisco.

7   Q.  Was that senator the Senate Majority Leader at the time

8   Sheldon Silver was Speaker?

9   A.  No.

10  Q.  So, was Sheldon Silver one of the only three voting members

11  that appointed himself to sit on the PACB?

12  A.  Yes.

13  Q.  And the resolutions that the PACB considers for financing

14  of various projects, do they have to be voted on by the three

15  members; the Governor's representative --

16  A.  Yes.

17  Q.  -- the defendant when he was on the PACB, and the Senate

18  majority's representative?

19  A.  Yes.

20  Q.  And does it have to be passed by unanimous vote or majority

21  vote?

22  A.  Yes, unanimous.

23  Q.  Are votes on the resolutions taken at a meeting of the

24  PACB?

25  A.  Yes.

1   Q.   Where are the meetings of the PACB held?

2   A.   They're held in the Capitol Building in Albany.

3   Q.   And can the voting members of the PACB appoint someone to

4   actually attend the meetings in their stead and cast their

5   votes for them?

6   A.   Yes.

7   Q.   Are you familiar with the term proxy?

8   A.   Yes.

9   Q.   What is a proxy?

10  A.   Proxy is a stand-in or representative for an individual.

11  Q.   When Sheldon Silver was Speaker did he send someone in his

12  place, essentially a proxy, to send his vote for him at the

13  actual meeting?

14  A.   Yes, he does, or did.

15  Q.   Prior to the PACB meetings when Sheldon Silver was Speaker,

16  what documents did you distribute to the members of the PACB?

17  A.   I would distribute applications, resolutions, as well as

18  summaries that I produced, an application letter, and an

19  agenda.

20  Q.   Would members of the PACB be able to remove things from the

21  agenda ahead of the meeting if they wanted to?

22  A.   Yes.

23  Q.   And as an example, can you look in your binder, please,

24  which is in front of you, it has been marked Government Exhibit

25  2011 for identification.

FBG5sil5                          Putnam - direct

1    A.   Yes.

2    Q.   And prior to your testimony today did you review certain

3    documents that are maintained by the Division of Budget as

4    custodian for the PACB?

5    A.   Yes.

6    Q.   Is Government Exhibit 2011 one of the documents that is

7    maintained in the books and records of the Division of the

8    Budget for the PACB?

9    A.   Yes.

10           MS. COHEN:  Your Honor, the government would move

11   Government Exhibit 2011.

12           THE COURT:  Any objection?

13           MR. SHUR:  No objection.

14           THE COURT:  Government Exhibit 2011 is received.

15           (Government's Exhibit 2011 received in evidence)

16   BY MS. COHEN:

17   Q.   Thank you, your Honor.

18           Mr. Coccaro, if put this on the screen?

19           Ms.  Putnam, if you can describe what is Government

20   Exhibit 2011?

21   A.   This appears to be a letter distributed by the Secretary of

22   the PACB which addresses -- I don't believe it is an agenda.

23   Q.   If I can direct your attention to the second paragraph?

24   A.   It is, actually.  It would be a revised agenda.

25           I'm sorry.  Thank you.

FBG5sil5                              Putnam - direct

1    Q.  So, Government Exhibit 2011 is a revised agenda for a PACB

2    meeting sent to Public Authority Control Board members?

3    A.  Yes.

4    Q.  And is one of the resolutions that's going to be considered

5    at the PACB meeting a resolution for 10 Liberty Street?

6    A.  It is, yes.

7    Q.  And does the agenda enclose the actual resolution that's

8    going to be voted on at the PACB meeting?

9    A.  Yes.

10   Q.  If you look in your binder there is a set of resolutions,

11   they're marked for identification Government Exhibit 601, 603,

12   605, 616, 619, 625, 627 and 628; and if you recognize those

13   exhibits just, in general, what are they?

14   A.  These are PACB resolutions.

15   Q.  Are the PACB resolutions that are marked in the

16   government's exhibits I just listed maintained in the regular

17   course of the business of the Division of Budget and accurate

18   and true copies of those resolutions as they exist in the

19   Division of the Budget's records?

20   A.  Yes.

21          MS. COHEN:  Your Honor, the government moves

22   Government's Exhibits 601, 603, 605, 616, 6 --

23          THE COURT:  Hang on.  616.

24          MS. COHEN:  Sorry.  601, 603, 605, 616, 619, 625, 627

25   and 628 into evidence.

1          THE COURT:  I'm sorry.  What was after 25?

2          MS. COHEN:  627 and 628.

3          THE COURT:  Any objection?

4          MR. SHUR:  No objection.

5          THE COURT:  Okay.  Those documents are received.

6          (Government's Exhibits 601, 603, 605, 616, 619, 625,

7    627 and 628  received in evidence)

8    BY MS. COHEN:

9    Q.  Mr. Coccaro, as an example if you could pull up Government

10   Exhibit 603?

11         Ms. Putnam, in preparation for your testimony today

12   were you given a list of Glenwood Management properties which

13   was marked Government Exhibit 828 and asked to compare the list

14   of properties to the resolutions that are now in evidence,

15   Government's Exhibits 601, 603, 605, 616, 619, 625, 627 and

16   628?

17   A.  Yes.

18   Q.  What did you find when you compared that list of Glenwood

19   Management properties to the resolutions?

20   A.  They were accounted for on the list.

21   Q.  So that all of the resolutions contained in these exhibits

22   were all related to financing for Glenwood Management

23   properties; is that right?

24   A.  Yes.

25   Q.  So let's look, just walk the jury through one of these

FBG5sil5                          Putnam - direct

1    documents.  Let's look at Government Exhibit 603 and if you can

2    look, please, just tell us what it is?

3    A.  This is a PACB resolution for the housing finance

4    authority.

5    Q.  And is the resolution approving financing for a building?

6    A.  Yes.  Yes, it is.

7    Q.  And if you look at the second paragraph, what building is

8    that?  What is the address of the building?

9    A.  It is 333 East 102nd Street.

10   Q.  And if you look, when you looked at Government Exhibit 828

11   do you know if that is a Glenwood-owned property?

12   A.  Have I looked at this document?

13   Q.  Before you testified you said you had reviewed Government

14   Exhibit 828.

15   A.  Yes.

16   Q.  Do you know if the address 333 East 102nd is a Glenwood

17   property?

18   A.  Yes.

19   Q.  And if you look on the second page of Government Exhibit

20   603 on the first paragraph -- Mr. Coccaro if you can zoom in,

21   thank you -- if you can read what it says there?

22   A.  Whereas, HFA expects to finance the project --

23           THE COURT:  Slow down.  When you read out loud read

24   more slowly so the court reporter doesn't have a hard time.

25   A.  Whereas, HFA expects to finance the project through a

1    variable-rate mortgage loan to East 102nd Street Realty, LLC,

2    or another single-asset entity formed and controlled by members

3    of Glenwood Management Corporation and Levine Builders in the

4    maximum amount of $60 million with scheduled principal payments

5    made to a principal reserve fund on a schedule determined by

6    the credit enhancer; and.

7    Q.  So, is this resolution Government Exhibit 603 for $60

8    million financing for a Glenwood building?

9    A.  Yes.

10   Q.  And if you look at the last page, please, which is the

11   signature page of the resolution, it is actually page 5, the

12   second to last page -- thank you, Mr. Coccaro -- whose vote is

13   required in order to pass this resolution to provide $60

14   million of financing to a Glenwood building?

15   A.  That would be the Governor's proxy, the Director of the

16   Budget; Sheldon Silver; and a member of -- the majority

17   leader's proxy of the Senate.

18   Q.  And you see here at Sheldon Silver's signature line, above

19   it is another name.  Do you know why that is?

20   A.  Do I know why?  That would be his proxy.

21   Q.  And prior to when the voting member in this case, Sheldon

22   Silver, when he was the Speaker, gets an agenda with the

23   resolutions, does that voting member have to go a give a reason

24   if they remove something from the agenda?

25   A.  No.

1   Q.  If you will look at the next document, the next resolution

2   in evidence, Government Exhibit 605, please?  It is the next

3   document in your binder?

4           And if you would zoom in on the first page,

5   Mr. Coccaro, the second paragraph?

6           What financing is being asked to be approved by this

7   resolution?

8   A.  This financing is for a project located at 10 Liberty

9   Street.

10  Q.  And that was that same 10 Liberty Street we saw on that

11  agenda, Government Exhibit 2011?

12  A.  Yes.

13  Q.  If you look at the second page of Government Exhibit 605,

14  please, the third paragraph; if you can read that, please?

15  A.  Sure.

16          Whereas, HFA expects to finance the project through a

17  variable-rate mortgage loan to Liberty Street Realty, LLC, a

18  single-asset entity formed and controlled by Leonard Litwin and

19  members of the Litwin family, in the anticipated amount of

20  $100 million with scheduled principal payments made to a

21  principal reserve fund on a schedule determined by the credit

22  enhancer.

23  Q.  So, is it fair to say this resolution, Government Exhibit

24  605, is about $100 million to a property, 10 Liberty, owned by

25  Leonard Litwin and members of the Litwin family?

1936

1       MR. SHUR:  Objection.  Leading.

2       THE COURT:  Sustained.  Don't lead.

3   Q.  What is being approved here in Government Exhibit 605?

4   A.  A loan for $100 million to Liberty Street Realty and other

5   related properties owned by Leonard Litwin or the Litwin

6   family.

7   Q.  If you look on page 6, please, Mr. Coccaro of this

8   document -- I'm sorry, page 7, which is the signature page

9   which is the signature of the voting members of the PACB?

10  Again, who signs and approves this resolution providing the

11  $100 million to Glenwood Management?

12  A.  The Governor, the majority Speaker and the Majority Leader

13  or a proxy.

14  Q.  And looking now at Government Exhibit 616, the next

15  document in your binder, what is shown in Government Exhibit

16  616 focusing on the second paragraph?

17  A.  This is approving a project for 320 West 38th Street

18  apartments.

19  Q.  Is that an apartment building, based on your review of

20  Government Exhibit 828, as opened by Glenwood Management?

21  A.  Yes.  No.  Yes.

22  Q.  And what is the amount of this financing for Glenwood

23  Management building?

24  A.  It is for $300 million.

25  Q.  Is it $315 million or $300 million?

FBG5sil5                         Putnam - direct

1    A.  This one is for $315 million.

2    Q.  If you look on the second page of Government Exhibit 616,

3    can you read the second paragraph, please?

4    A.  Uh-huh.

5            Whereas, HFA expects to finance the project through a

6    variable-rate mortgage loan to West 38th Street, LLC, or

7    another single-purpose entity controlled by Leonard Litwin, in

8    the anticipated amount of $300 million with scheduled principal

9    payments expected to be made to a principal reserve fund.

10   Q.  And if you will look at the sixth page of Government

11   Exhibit 627, who approves this resolution?

12   A.  That would be the Governor, Majority Speaker, and the

13   Majority Leader.

14   Q.  And the Speaker at the time of this was Sheldon Silver?

15   A.  Yes.

16   Q.  And it is signed by his proxy at that meeting, right?

17   A.  Yes.

18   Q.  If you will look at Government Exhibit 619, the next

19   document in your binder, what is Government Exhibit 619?

20   A.  It is a resolution approving a project for a 330 West 39th

21   Street.

22   Q.  From your review of Government Exhibit 838, do you know who

23   owns 330 West 39th Street apartments?

24   A.  Yes.

25   Q.  Who owns it?

FBG5sil5                          Putnam - direct

1   A.   This would be controlled by Leonard Litwin.

2   Q.   And how much is this resolution in financing for a Leonard

3   Litwin-owned property?

4   A.   $65 million.

5   Q.   If you look at the second page of the Government Exhibit

6   619, again the second paragraph, do you see Mr. Litwin's name

7   there?

8   A.   I do.

9   Q.   And who signs and approves this resolution, 619, approving

10  $65 million of financing to a Leonard Litwin-owned building?

11  A.   That would be the Governor, Speaker, and the Majority

12  Leader.

13  Q.   Again, the Speaker at the time here shown by the signature

14  line is Sheldon Silver as a member of the PACB?

15  A.   Yes.

16  Q.   If you would please look at the next document in your

17  binder, Government Exhibit 625; what is Government Exhibit 625?

18  A.   It is approving a financing for 160 West 62nd Street

19  apartments.

20  Q.   What is the amount of this state financing being provided

21  to 160 West 62nd?

22  A.   That's for $260 million.

23  Q.   And if you would turn to the second page of Government

24  Exhibit 625, second paragraph?

25  A.   Yes.

1    Whereas, HFA expects to finance the project through a

2    variable-rate mortgage loan to West 62nd Street, LLC, or

3    another single-purpose entity sponsored by Leonard Litwin in

4    the anticipated principal amount of $260 million with scheduled

5    principal payments expected to be made to a principal reserve

6    fund.

7    Q.  Who votes to approve this $260 million financing to a

8    Leonard Litwin-owned building?

9    A.  That would be --

10   Q.  Turning to page 7?

11   A.  -- that would be the Governor, the Speaker and the Majority

12   Leader.

13   Q.  At this time the Speaker was Sheldon Silver?

14   A.  Yes.

15   Q.  And the date of this document is October 20th, 2011?  Do

16   you see that at the bottom?

17   A.  Yes.

18   Q.  Looking at Government Exhibit 626, what is Government

19   Exhibit 627?

20   A.  This is a resolution approving a project for 175 West 60

21   Street apartments.

22   Q.  What is the amount of the financing being provided in this

23   resolution?

24   A.  For $165 million.

25   Q.  And if you look at the second paragraph on the second page?

FBG5sil5                          Putnam - direct

1    A.   Whereas, HFA expects to finance the project through a

2    variable-rate mortgage loan to West 60th Realty, LLC, or

3    another single-purpose entity sponsored by New Hyde Park

4    Realty, LP, in the anticipated principal amount of $165

5    million, with scheduled principal payments expected to be made

6    to a principal reserve fund.

7    Q.   From your review of Government Exhibit 838, do you know

8    that West 60th Realty, LLC, is a property related to Glenwood

9    Management?

10   A.   No.

11   Q.   If I can show you Government Exhibit 838 to refresh your

12   recollection?

13   A.   Yes.

14   Q.   Is there a document that might refresh your recollection?

15           MR. SHUR:  She didn't say the --

16           THE COURT:  Overruled.

17   Q.   Is there a document that would refresh your recollection as

18   to whether this was a Glenwood Management property?

19   A.   Yes.

20           MS. COHEN:  Your Honor, permission to show the witness

21   Government Exhibit 838.

22           THE COURT:  Granted.  It is on the screen.

23           THE WITNESS:  Uh-huh.

24   BY MS. COHEN:

25   Q.   Perfect.  Thank you.

1   Ms. Putnam, does looking at Government Exhibit 838

2   refresh your recollection as to whether this property at West

3   60th Street is a Glenwood Management property?

4   A.  Yes.

5   Q.  And so, yes, it refreshes your recollection?

6   A.  Yes.

7   Q.  Do you now recall that having reviewed Government Exhibit

8   838 that the property at 175 West 60th Street is a Glenwood

9   Management property?

10   A.  I do.

11   Q.  Looking at page 6 of Government Exhibit 627, was this

12   resolution for $165 million in financing to a Glenwood property

13   approved by Sheldon Silver as a member of the PACB as well as

14   the other two voting members?

15   A.  Yes.

16   Q.  If you could look, please -- actually, if I could just have

17   you look please, now, at Government Exhibit 1522 in your binder

18   for identification?

19   A.  Okay.

20   Q.  Just if you recognize Government Exhibit 1522, what is it?

21   A.  This is a list of government's exhibits, properties, the

22   amounts approved and the date the resolutions were approved.

23   Q.  Have you reviewed this chart and verified its accuracy

24   based on the resolutions that the Division of the Budget

25   maintains for the PACB?

FBG5sil5                        Putnam - direct

1    A.  Yes.

2            MS. COHEN:  Your Honor, the government moves

3    Government Exhibit 1522 into evidence.

4            MR. SHUR:  No objection.

5            THE COURT:  1522 is received.

6            (Government's Exhibit 1522 received in evidence)

7    BY MS. COHEN:

8    Q.  So, Ms. Putnam, if you can explain what is shown on

9    Government Exhibit 1522 entitled PACB-Approved State Financing

10   for Glenwood Buildings?

11   A.  We have the exhibit numbers, property, the amount approved

12   and the date that it has been approved by the PACB.

13   Q.  So, just going through each column, on the GX that's the

14   Government Exhibit --

15   A.  Number.

16   Q.   -- that's marked on the resolution?

17   A.  Correct.

18   Q.  Under Glenwood building, that's the address of the

19   buildings that the financing was approved on that resolution?

20   A.  Yes.

21   Q.  And on the amount of the state bond, is that the dollar

22   amount of the state financing that was provided to the Glenwood

23   building?

24   A.  Yes.

25   Q.  And the date the resolution was approved, is that the date

1    that the voting members of the PACB approved the resolution

2    awarding that amount of state financing to that Glenwood

3    building?

4    A.  Yes.

5    Q.  And the total amount of state bond financing provided in

6    all of the resolutions that we just reviewed and this ranges

7    from a date October 19, 2000 through August 2014, what is the

8    total amount of state financing?

9    A.  $1,090,000,000.

10             MS. COHEN:  No further questions, your Honor.

11             THE COURT:  Okay.

12             Mr. Shur?

13             MR. SHUR:  Thank you, Judge.

14   CROSS EXAMINATION

15   BY MR. SHUR:

16   Q.  Good afternoon, Ms. Putnam.

17   A.  Good afternoon.

18   Q.  So just, the PACB is the Public Authority Control Board; is

19   that right?

20   A.  That's correct.

21   Q.  And it falls under the New York State Division of Budget?

22   A.  Yes.

23   Q.  And that's your employer; is that right?

24   A.  Yes.

25   Q.  And that's an entity of the Executive Branch of the New

1   York State government?

2   A.   Yes.

3   Q.   And the Governor is the head of the Executive Branch of New

4   York State government, right?

5   A.   Yes.

6   Q.   So the Governor appoints the members of the PACB, right?

7   A.   Yes.

8   Q.   The chairperson of the PACB is a representative of the

9   Governor?

10  A.   It is an appointee, yes.

11  Q.   And is it fair to say that the chairperson who is the

12  Governor's representative decides the agenda for PACB meetings?

13  A.   Yes.

14  Q.   And the chairperson who is the Governor's representative

15  presides over and runs the PACB meetings?

16  A.   Yes.

17  Q.   So, because it is part of the Executive Branch the Governor

18  appoints five members to the PACB; is that right?

19  A.   Yes.

20  Q.   And Mr. Silver, as Speaker of the Assembly, was appointed

21  by the Governor, right?

22  A.   Yes.

23  Q.   And Mr. Silver delegated this responsibility to a member of

24  his staff, correct?

25            MS. COHEN:   Objection, your Honor.

1      THE COURT:  Overruled.

2  A.  Yes.

3  Q.  So, Mr. Silver appointed a member of his staff that --

4  excuse me, a member of his staff to handle his responsibilities

5  when it came to the PACB, correct?

6  A.  Yes.

7  Q.  And it was common for Mr. Silver, as Speaker of the

8  Assembly, to delegate these types of responsibilities, right?

9  A.  Yes.

10  Q.  Mr. Silver's representative attended the PACB meetings on

11  behalf of Mr. Silver, correct?

12  A.  Yes.

13  Q.  Mr. Silver did not personally attend these meetings,

14  correct?

15  A.  Not to my knowledge.

16  Q.  In fact, in nearly 20 years there has been only one PACB

17  meeting that Mr. Silver attended; do you know that?

18  A.  No.

19  Q.  For the resolution that we looked at for the loans to

20  Glenwood Management, Mr. Silver wasn't present at any of those

21  PACB meetings where those matters were discussed, correct?

22  A.  Not to my knowledge.

23  Q.  Okay.  Well, we looked at the resolutions, right?

24  A.  Uh-huh.  We did.

25  Q.  And under Mr. Silver's name it wasn't Mr. Silver who signed

FBG5sil5                          Putnam - cross

1    the resolution, correct?

2    A.  Correct.

3    Q.  It was actually a gentleman by the name of Steve Pleydle,

4    correct?

5    A.  Correct.

6    Q.  Who was Mr. Silver's representative on the PACB at that

7    time, correct?

8    A.  Yes.

9    Q.  And Mr. Silver provided his delegate, Mr. Pleydle in this

10   instance, with discretion as to how to vote on proposals that

11   came before the PACB, correct?

12           MS. COHEN:  Objection, your Honor.

13           THE COURT:  Do you know what the arrangement between

14   Mr. Silver and his rep was?

15           THE WITNESS:  I do not.

16           THE COURT:  Okay.

17   BY MR. SHUR:

18   Q.  So you don't know one way or the other whether Mr. Pleydle

19   talked to Mr. Silver about how to vote on these proposals?

20   A.  I do not.

21   Q.  And the fact that Mr. Silver didn't attend these PACB

22   meetings but instead sent a delegate wasn't unusual, correct?

23   A.  That's correct.

24   Q.  Because the other members of the PACB, they did the same

25   thing, right?

FBG5sil5                    Putnam - cross

1    A.   Yes.

2    Q.   The other members of the PACB included the Governor, right?

3    A.   Yes.

4    Q.   And, like Mr. Silver, the Governor appointed a

5    representative to serve as his delegate on the PACB, right?

6    A.   Yes.

7    Q.   And, like Mr. Silver, the Governor's delegate attended the

8    PACB meetings on behalf of the Governor, correct?

9    A.   Yes.

10   Q.   The Governor did not attend these meetings, right?

11   A.   No.

12   Q.   The PACB also included a member of the New York State

13   Senate that represented the Senate majority, correct?

14   A.   Yes.

15   Q.   I apologize.  I spoke over you.  I didn't hear your answer.

16   A.   Yes.

17   Q.   And that, like Mr. Silver, that Senator was appointed by

18   the Governor?

19   A.   Yes.

20   Q.   And, like Mr. Silver, he was appointed to serve as his or

21   her delegate on the PACB, right?

22   A.   Yes.

23   Q.   And, like Mr. Silver, that Senator's delegate attended the

24   PACB meetings on that Senator's behalf, right?

25   A.   Yes.

FBG5sil5                      Putnam – cross

1   Q.  An the PACB also included a member of the New York State

2   Senate that represented the Senate minority, right?

3   A.  Yes.

4   Q.  And, like Mr. Silver, that senator was appointed by the

5   Governor, right?

6   A.  Yes.

7   Q.  And had a representative that served on that senator's

8   behalf, right?

9   A.  Yes.

10  Q.  And that representative, not the senator himself or

11  herself, attended the PACB meetings, right?

12  A.  Correct.

13  Q.  And the same is true for a representative for an Assembly

14  member that represented the Assembly minority, correct?

15  A.  Yes.

16  Q.  Appointed by the Governor?

17  A.  Yes.

18  Q.  They had a representative that served on their behalf,

19  right?

20  A.  Yes.

21  Q.  And the representative, not that member, actually attended

22  the PACB meetings, correct?

23  A.  Yes.

24  Q.  Now, before a proposal gets to the PACB for a vote it has

25  already been vetted by two different agencies, correct?

1      THE COURT:  Any proposal or just a housing --

2      MR. SHUR:  I will withdraw that question.

3  Q.  Let me ask you about the 80/20 loans that we looked at,

4  okay?

5      Before the 80/20 loans, the proposals that the

6  prosecutor showed you, before they get to the PACB they're

7  reviewed by two different agencies, right?

8  A.  They're reviewed by HFA, correct.  Yes.  And the Division

9  of Budget.

10  Q.  And what about the comptroller's office?

11  A.  The comptroller is privy to the resolutions and

12  applications, yes.

13  Q.  We will talk about the comptroller in a minute.

14      So, the first step in the process of these 80/20 loan

15  applications is that the applicant, here a real estate

16  developer whether it is Glenwood or some other developer, they

17  have to submit an application to the New York State Housing

18  Financing Agency, right?

19  A.  Yes.

20  Q.  Now, the Housing Finance Agency falls under another agency

21  called the New York State Homes and Community Renewal Agency,

22  right?

23  A.  Yes.

24  Q.  And the commissioner of the New York State Homes and

25  Community Renewal Agency is appointed by the Governor, right?

1    A.  Yes.

2    Q.  Not appointed by the Speaker of the Assembly, correct?

3    A.  Correct.

4    Q.  Now, the Housing Finance Agency, is that HFA I believe you

5    referred to it as?

6    A.  Yes.

7    Q.  They're tasked with carrying out the Governor's initiative

8    to finance the development and preservation of affordable

9    housing throughout New York State, right?

10   A.  Yes.

11   Q.  And one of the ways that HFA accomplishes this is that it

12   offers financing to for-profit developers to build affordable

13   housing and preserve existing affordable housing, correct?

14   A.  Yes.

15   Q.  And one of the programs that HFA offers to developers to

16   assist with building and preserving affordable housing is the

17   80/20 loan program, right?

18   A.  Yes.

19   Q.  And this program provides loans to developers who agree to

20   set aside 20 percent of the building's units for affordable

21   housing, right?

22   A.  Yes.

23   Q.  And this is an important program, right?

24   A.  Yes.

25   Q.  Well, it is an important program for families in New York

FBG5sil5                          Putnam - cross

1    with low-income households, isn't it?

2              MS. COHEN:  Objection, your Honor.

3              THE COURT:  Sustained.

4    Q.  This program was developed to encourage new construction of

5    affordable housing throughout New York, correct?

6    A.  Yes.

7              MS. COHEN:  Objection, your Honor.

8              THE COURT:  Overruled.

9    Q.  I'm sorry.  I didn't hear your answer.

10   A.  Yes.

11   Q.  And there are many real estate developers that participate

12   in this program, right?

13   A.  Yes.

14   Q.  Not just Glenwood, correct?

15   A.  Correct.

16   Q.  Now, to apply for an 80/20 loan the developer must first

17   submit an extensive application to the Housing Finance Agency,

18   right?

19             MS. COHEN:  Objection, your Honor.

20             THE COURT:  Rephrase the question.

21   Q.  In order to apply for an 80/20 loan the applicant -- the

22   developer -- has to submit an application to the Housing

23   Finance Agency, correct?

24   A.  Yes.

25             THE COURT:  Are you familiar with the process?  Don't

FBG5sil5                    Putnam - cross

1   just agree with him because you think you are supposed to.  If

2   you are not familiar with the process, say that.  Okay?

3              THE WITNESS:  All right.

4              THE COURT:  He seems very agreeable but you don't have

5   to agree with him.

6   BY MR. SHUR:

7   Q.  The Housing Finance Agency, after it reviews the

8   application, if you know, reviews the application?

9              MS. COHEN:  Objection, your Honor.

10             THE COURT:  Rephrase that question.

11             MR. SHUR:  Sure, sure.

12  Q.  So, the developer submits an application to the Housing

13  Finance Agency, right?

14  A.  I do not know.

15  Q.  You don't know.  Okay.

16             You're aware, though, that the Housing Finance Agency

17  reviews the application for an 80/20 loan for the developer?

18  A.  Yes.

19  Q.  Okay.

20             And let me be more specific.  Before it gets to the

21  PACB which is where you are involved, right?

22  A.  Yes.

23  Q.  The Housing Finance Agency has approved the 80/20 loan,

24  correct?

25  A.  It goes to their board, yes.

FBG5sil5                         Putnam - cross

1    Q.  The HFA has approved the 80/20 loan; is that right?

2              MS. COHEN:  Objection, your Honor.

3              THE COURT:  Overruled.

4              You are saying it goes to their board.  It goes to

5    their board for an up or down vote, right?

6              THE WITNESS:  Correct.

7              THE COURT:  Only if it is approved does it move on to

8    the PACB, right?

9              THE WITNESS:  Correct.

10   BY MR. SHUR:

11   Q.  Before these 80/20 loans can be made the developers must

12   secure a letter of credit from a bank, right?

13   A.  Yes.

14   Q.  And that provides protection to New York State and

15   taxpayers' money, right?

16             MS. COHEN:  Objection, your Honor.

17             THE COURT:  Do you understand the financing, how these

18   things are financed and what the various securities and

19   protections are?

20             THE WITNESS:  Very rudimentary.

21             THE COURT:  Okay.  I think she's the wrong witness for

22   you.

23   BY MR. SHUR:

24   Q.  Let me ask one question because I understood you said

25   rudimentary.

1          As a general matter there is a bank that guarantees

2     payment so that New York State won't lose money if a developer

3     is unable to pay back the interest on the bonds.  You

4     understand that, right?

5     A.   I do.

6     Q.   Okay.

7          So, after the developer's application goes to HFA, it

8     then needs to be submitted to the Office of the New York State

9     Comptroller, correct?

10    A.   I do not know.

11    Q.   Well, before it gets to the PACB, that's where you are

12    involved, do you understand that it has been reviewed by the

13    comptroller's office?

14    A.   No.

15    Q.   Well, at these PACB meetings is there a representative from

16    the comptroller's office?

17    A.   Yes.

18    Q.   And do they acknowledge that they're familiar with and

19    they've reviewed these proposals before there is any vote by

20    the PACB?

21    A.   Yes.

22    Q.   And they provide comments on the proposal to the members of

23    the PACB or their representatives before there is any vote,

24    correct?

25    A.   Yes.

FBG5sil5                         Putnam - cross

1   Q.  And the comptroller's office is also part of the executive

2   branch of New York State government, right?

3   A.  Yes.

4   Q.  Independent from the New York State legislature, correct?

5   A.  Correct.

6   Q.  And the comptroller is New York State's chief fiscal

7   officer, right?

8   A.  Correct.

9   Q.  The role of the comptroller is to ensure that New York

10  State government uses taxpayer money effectively and

11  efficiently, right?

12  A.  Correct.

13  Q.  And the role of the comptroller is to ensure that New York

14  State uses taxpayer money to promote the public good?

15  A.  Correct.

16  Q.  And you understand that the comptroller is responsible for

17  managing and issuing state debt like the 80/20 loans, right?

18  A.  Yes.

19  Q.  Now, the PACB's role is to determine whether state funds

20  are available, correct?

21  A.  Yes.

22  Q.  So, we talked about at these meetings there is no members

23  of the Assembly, right?  There are representatives that will

24  present, right, their delegate or their proxy, correct?

25  A.  Correct.

FBG5sil5                    Putnam - cross

1   Q.  The Governor is not there?

2   A.  Correct.

3   Q.  No members of the Senate are there, right?

4   A.  Correct.

5   Q.  So it is the representatives of the members, right?

6   A.  Yes.

7   Q.  And there is someone from the comptroller's office?

8   A.  Yes.

9   Q.  And there is someone from the Housing Finance Agency,

10  right?

11  A.  Yes.

12  Q.  And the representative from the Housing Finance Agency

13  actually makes a presentation, correct?

14  A.  Yes.

15  Q.  They walk through the proposal, right?

16  A.  Yes.

17  Q.  And they indicate that they have approved it and it has

18  been approved by HFA, correct?

19  A.  Yes.

20  Q.  And after that presentation is made from the representative

21  of the Housing Finance Agency the chair of the PACB -- so this

22  is the Governor's representative -- will ask if anyone has any

23  questions, right?

24  A.  Yeah.  Yes.

25  Q.  At that point if there are no questions he or she will move

1   to adopt a resolution, right?

2   A.  Yes.

3   Q.  Okay, and then there is a vote, correct?

4   A.  Yes.

5   Q.  And the vote needs to be unanimous, right?

6   A.  Yes.

7   Q.  In your experience with the PACB, how many times has the

8   vote not been unanimous?

9   A.  None.

10  Q.  I'm sorry?

11  A.  None.

12  Q.  And when I say not been unanimous I mean for a vote up, for

13  approval of the project that HFA has approved or whatever other

14  agency has reviewed it.

15  A.  Yes.

16  Q.  And how many PACB meetings have you attended?

17  A.  I have been the assistant secretary since December of last

18  year.

19  Q.  Okay.

20  A.  And I have attended occasional meetings prior to that, so

21  at least 12.

22  Q.  Okay.  And how many proposals have you participated in that

23  have been approved?  Because there is multiple proposals that

24  are approved at these meetings, right?

25  A.  Yes.  We are running about 20 proposals a month now.

1  Q.  And I understand that you are new to this position but you

2  have been in the Division of Budget for how long?

3  A.  Since 2008.

4  Q.  And so, is it fair to say that there has been only a couple

5  of times in the 30 or so years that the PACB has existed where

6  there hasn't been a unanimous vote in favor of a project?

7  A.  I do not know.

8  Q.  So, because it has to be unanimous not one member can

9  approve a particular project, right?

10  A.  Correct.

11  Q.  And these 80/20 loans, they still happen today; is that

12  right?

13  A.  Yes.

14  Q.  That program is still in place?

15  A.  Yes.

16  Q.  And developers are taking advantage of this program --

17  A.  Yes.

18  Q.  -- in building affordable housing throughout New York

19  State?

20  A.  Yes.

21  Q.  And that's not just Glenwood but many different developers,

22  correct?

23  A.  Correct.

24  Q.  There was one of the resolutions the prosecutor showed you

25  referenced the Liberty Bond Program.  Are you familiar with

FBG5sil5                          Putnam - cross

 1   that?

 2   A.   No.

 3   Q.   Did you review the resolutions?

 4   A.   I did.

 5   Q.   Do you know what I am referring to where it says Liberty

 6   Bond Program?

 7   A.   Yes.

 8   Q.   Do you know that the Liberty Bond program is part of the

 9   Federal government's commitment to revitalize Lower Manhattan

10   after the September 11 attacks?

11            MS. COHEN:   Your Honor, objection.  She said she

12   didn't know.

13            THE COURT:   She said she is not familiar with the

14   program.

15   BY MR. SHUR:

16   Q.   Ms. Putnam, the PACB meetings are not a secret, right?

17   A.   Correct.

18   Q.   They're actually videotaped and you can view them online,

19   correct?

20   A.   Yeah.

21   Q.   And the documents regarding the particular 80/20 loan or

22   whatever project is before the PACB and the PACB's

23   consideration of that project, that's also publicly available

24   information, correct?

25   A.   Yes.

FBG5sil5                    Putnam - cross

1   Q.  And the public authorities such as the Housing Finance

2   Agency, they maintain documents relating to the proposal and

3   its review and approval of the proposal, correct?

4   A.  I do not know.

5   Q.  You don't know if the Housing Finance Agency maintains a

6   copy of the application that was submitted by the developer?

7   A.  I don't.

8   Q.  And the comptroller's office, they maintained documents

9   relating to the proposal and its review, do you know that?

10  A.  I do not know.

11  Q.  So the PACB, the types of documents that it maintains

12  includes the resolution that we saw, correct?

13  A.  Yes.

14  Q.  There is an agenda, right?

15  A.  Yes.

16  Q.  There is minutes from the meeting?

17  A.  Yes.

18  Q.  And those documents are maintained because they relate to

19  public financing and they're public records, right?

20  A.  Correct.

21          MR. SHUR:  One moment, Judge?

22          THE COURT:  Sure.

23          (Counsel conferring)

24          MR. SHUR:  Nothing further, Judge.

25          Thank you.

1          THE COURT:  Okay.

2          Ms. Cohen?

3          MS. COHEN:  Briefly, your Honor?

4          THE COURT:  Yes.

5          MS. COHEN:  Thank you.

6    REDIRECT EXAMINATION

7    BY MS. COHEN:

8    Q.  You testified there are five members of the PACB, right?

9    A.  There are.

10   Q.  But only three of those members can vote; is that right?

11   A.  Correct.

12   Q.  And that's the Speaker who is Sheldon Silver who appointed

13   himself, the Senate Majority Leader who appointed someone else?

14   A.  Yes.

15   Q.  And the Governor's office who appointed the head of the

16   Division of the Budget?

17   A.  Yes.

18          MR. SHUR:  Objection.

19          THE COURT:  Overruled.

20   Q.  Those are the three members that vote on the resolutions?

21   A.  Correct.

22   Q.  And if any one of those votes, if they voted "no," would

23   mean the resolution didn't pass; is that right?

24   A.  Correct.

25   Q.  And any one of those members could pull a resolution from

1   the agenda before it ever got to the meeting?

2   A.  Yes.

3   Q.  And if a member of the PACB pulled a resolution from the

4   agenda, the public wouldn't know why that member pulled the

5   resolution, right?

6   A.  Correct.

7   Q.  Was there any disclosure at any of the these PACB meetings

8   when Sheldon Silver was a member of the PACB that he was

9   receiving fees from Goldberg management through another law

10  firm?

11          MR. SHUR:  Objection.

12          THE COURT:  Rephrase the question.  You said Goldberg

13  management.

14          MS. COHEN:  Sorry, your Honor.

15  Q.  Was there any disclosure, at any of the PACB meetings when

16  Sheldon Silver was the Speaker of the Assembly and a member of

17  the PACB board, that he was receiving fees from Glenwood

18  Management through a law firm?

19          MR. SHUR:  Objection.

20          THE COURT:  Overruled.

21          MR. SHUR:  Was this witness at those meetings?  I

22  don't think that is clear.

23          THE COURT:  Any meetings that you were at.

24          THE WITNESS:  No.

25  BY MS. COHEN:

FBG5sil5

1   Q.   And in any of the records that were maintained by the

2   division of the budget, is there any disclosure that Sheldon

3   Silver, when he served as a member of the PACB, was obtaining

4   fees from Glenwood Management?

5   A.   Not to my knowledge.

6          MS. COHEN:  No further questions.

7          THE COURT:  Mr. Shur?

8          MR. SHUR:  Nothing, Judge.

9          THE COURT:  Thank you.  You can step down.

10         THE WITNESS:  Thank you.

11         (Witness steps down)

12         THE COURT:  Call your next witness.

13         MS. COHEN:  Your Honor, I think given the time and our

14   management of witnesses, we have several stipulations to read

15   into the record.

16         THE COURT:  Okay.

17         MS. COHEN:  Can we do that?

18         THE COURT:  Sure.

19         MS. COHEN:  Thank you, your Honor.

20         Your Honor, I'm going to offer, pursuant to Government

21   Exhibit S-6 in evidence, certain documents, the stipulation.

22   According to stipulation in evidence certain documents are

23   business records of the Assembly.  I would now like to move

24   certain of those exhibits into evidence and publish them for

25   the jury.

FBG5sil5

1       THE COURT:  Okay.

2       MS. COHEN:  Your Honor, the government would move

3  Government Exhibit 229 pursuant to Government Exhibit S-6.

4       THE COURT:  You are going to do these one at a time so

5  I can keep up and you are going to publish them as you go?

6       MS. COHEN:  I would like to, your Honor.

7       THE COURT:  Okay.

8       MS. COHEN:  But if there is an objection I want to

9  give them a chance before it was published.

10       THE COURT:  Any objection to 229?

11       MR. SHUR:  No, Judge.

12       THE COURT:  229 is received.

13       (Government's Exhibit 229 received in evidence)

14       MS. COHEN:  Maybe if the lights could dim?  Thank you,

15  Mr. Brantley.

16       Just so the record is clear, Government Exhibit 229 is

17  a map of Sheldon Silver's Assembly District obtained from the

18  New York City Board of Elections.

19       The government would move Government Exhibit 286,

20  pursuant to stipulation S-6.

21       THE COURT:  Any objection to 286?  Hearing no

22  objection, 286 is received.

23       Do you know what it is?

24       MS. COHEN:  Your Honor, I will give them my set so

25  they can follow along.

FBG5sil5

1          Your Honor, the government moves Government Exhibit

2     286 into evidence.

3          THE COURT:  Is there any objection to 286?

4          MR. SHUR:  No objection.

5          THE COURT:  What is it?  It is not on the exhibit

6     list.

7          MS. COHEN:  Your Honor, Government Exhibit 286 is a

8     list of invitees maintained by Sheldon Silver's office for

9     Sheldon Silver's State of the State in 2005.

10          THE COURT:  286 is received.

11          (Government's Exhibit 286 received in evidence)

12          MS. COHEN:  Thank you, your Honor.

13          Mr. Coccaro, if you can turn to the second it last

14     page and highlight Dr. Taub's name, if you will find it there.

15          MR. SHUR:  Judge, I'm going to object to the

16     presentation.  We are happy to read the stipulation and have

17     the documents come in but in terms of highlighting or

18     emphasizing or summing up or anything along those lines, I

19     don't think that is appropriate.

20          THE COURT:  Okay.

21          MS. COHEN:  Your Honor, I'm not making any argument

22     about the document, I am just putting it into evidence and

23     showing the relevant page.

24          THE COURT:  Go ahead.

25          MS. COHEN:  Your Honor, the next document would be

FBG5sil5

1     Government Exhibit 108 pursuant to the stipulation S-6.

2               MR. SHUR:  No objection.

3               THE COURT:  Any objection to 108.

4               MR. SHUR:  None, your Honor.

5               THE COURT:  108 will be received.

6               (Government's Exhibit 108 received in evidence)

7               MS. COHEN:  Mr. Coccaro, if you can please publish

8     Government Exhibit 108?  And according to the stipulation

9     Government Exhibit S-6 this was a document found in Sheldon

10    Silver's Assembly offices, it is a January 7th, 2004 dated

11    letter from Dr. Taub to Sheldon Silver requesting state funding

12    for the Mesothelioma Center.

13              The next document the government would move into

14    evidence is Government Exhibit 139 pursuant to the stipulation

15    Government Exhibit S-6.

16              THE COURT:  Any objection to 139?

17              MR. SHUR:  No objection.

18              THE COURT:  139 is received.

19              (Government's Exhibit 139 received in evidence)

20              MS. COHEN:  Mr. Coccaro, if we can publish Government

21    Exhibit 139?  Government Exhibit 139 is a letter from Sheldon

22    Silver on his Assembly letterhead dated January 27th, 2010, to

23    David Mandel at OHEL informing OHEL that it has received

24    $750,000 in state money.

25              The next document the government would move into

FBG5sil5

1    evidence is Government Exhibit 167-2.

2              THE COURT:  Any objection?

3              MR. SHUR:  No objection, Judge.

4              THE COURT:  167-2 is received.

5              (Government's Exhibit 167-2 received in evidence)

6              MS. COHEN:  Government Exhibit 167-2, pursuant to the

7    stipulation Government Exhibit S-6, was a document found in

8    Sheldon Silver's Assembly office, it is a letter from Jonathan

9    Taub to Sheldon Silver with a resume attached and thanking him

10   for his help dated February 2nd, 2012 with some notations on

11   the bottom:  Call list Jonathan Taub.

12             MR. SHUR:  Judge, editorializing.

13             THE COURT:  Oh stop.

14        Is there a resume attached to that?

15             MS. COHEN:  If you can flip to the second page,

16   please, Mr. Coccaro?

17             THE COURT:  Okay.

18             MS. COHEN:  The next document.

19        Your Honor, just referencing Government Exhibit 108

20   for a minute, I know the date of if is January 7th, 2004 and I

21   didn't want to editorialize, but the evidence is clear and the

22   testimony is that this document, from the metadata, is actually

23   dated January 7th, 2005.

24        Now, the next document is Government Exhibit 160.  The

25   government would move Government Exhibit 160 into evidence.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FBG5sil5

1           MR. SHUR:  No objection.

2           THE COURT:  160?

3           MS. COHEN:  160, your Honor.

4           THE COURT:  No objection?

5           MR. SHUR:  None, your Honor.

6           THE COURT:  160 is received.

7           (Government's Exhibit 160 received in evidence)

8           MS. COHEN:  Government Exhibit 160, pursuant to the

9    stipulation of Government Exhibit S-6, was a document found in

10   Sheldon Silver's Assembly offices.  It is a letter to Sheldon

11   Silver from a race coordinator related to the Miles for Meso

12   race dated September 8, 2011, with handwriting on the bottom

13   from R. Taub.

14          MR. SHUR:  No objection.  This is in already in.

15   Sorry, Judge.

16          THE COURT:  No, but thank you.

17          Next document.

18          MS. COHEN:  Government moves Government Exhibit 103-9

19   into evidence.

20          MR. SHUR:  No objection.

21          THE COURT:  Exhibit 103-9 received.

22          (Government's Exhibit 103-9 received in evidence)

23          MS. COHEN:  First page of the Government Exhibit 103-9

24   is the Speaker's appointment schedule, if you turn to the

25   second page of Government Exhibit 103-9 it reflects a meeting

FBG5sil5

1    on November 14th, 2011 with Joyce Wheeler, Dr. Taub, Greg

2    Kirkland, at the district office 250 Broadway.

3              Government moves Government Exhibit 162 into evidence.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBGYSIL6

1          THE COURT:  Any objection?

2          MR. SHUR:  No objection.

3          THE COURT:  162 is received.

4          (Government's Exhibit 162 received in evidence)

5          MS. COHEN:  Government Exhibit 162, pursuant to

6    stipulation Government Exhibit S-6 was found in Sheldon

7    Silver's assembly office.

8          It is a memorandum from Sheldon Silver to Dr. Taub

9    related to Sheldon Silver's office's help navigating the Miles

10   for Meso.  It's dated November 14, 2011.

11         The next document is Government Exhibit 249.  The

12   government moves Government Exhibit 249.

13         MR. SHUR:  No objection.

14         THE COURT:  All right.  249 is received.

15         (Government's Exhibit 249 received in evidence)

16         MS. COHEN:  Your Honor, Government Exhibit 249 on the

17   first page is from the speaker's call list, November 23, 2011.

18         The next page, Mr. Coccaro.

19         The next page reflects a call from Dr. Taub at 1:29

20   p.m.  It's 6:00 p.m., not 1:29 p.m.  My apologies.

21         The government moves Government Exhibit 250 into

22   evidence.

23         MR. SHUR:  No objection.

24         THE COURT:  250 is received.

25         (Government's Exhibit 250 received in evidence)

FBGYSIL6

1          MS. COHEN:  250 is the speaker's call list, again from

2     the same day, November 23, 2011.

3          The second page reflects a cross-out of a call, the

4     Dr. Taub call, the 6:00 Dr. Taub call.

5          The government moves Government Exhibit 103-1 into

6     evidence.

7          THE COURT:  103-1.  Any objection?

8          MR. SHUR:  No objection.

9          THE COURT:  103-1 is received.

10         (Government's Exhibit 103-1 received in evidence)

11         MS. COHEN:  103-1 is from the speaker's appointment

12    schedule.

13         The next page of the document, Mr. Coccaro.

14         This reflects a lunch between Sheldon Silver, Lenny

15    Litwin, and a B. Meara at Ratner's on November 16, 1995.

16         The government moves Government Exhibit 103-2 into

17    evidence.

18         THE COURT:  Any objection?

19         MR. SHUR:  No objection.

20         THE COURT:  103-2 is received.

21         (Government's Exhibit 103-2 received in evidence)

22         MS. COHEN:  Government Exhibit 103-2 is from the

23    speaker's appointment schedule.

24         The second page, Mr. Coccaro.

25         This reflects a meeting on December 29, 1995, with Jay

FBGYSIL6

Goldberg.

THE COURT:  You said 29th.  It says on the screen 28th.

MS. COHEN:  Sorry, your Honor.  A December 28, 1995, meeting with Jay Goldberg at 9:00 a.m.

The government moves Government Exhibit 103-11 into evidence.

MR. SHUR:  No objection.

THE COURT:  103-11 is received.

(Government's Exhibit 103-11 received in evidence)

MS. COHEN:  Government Exhibit 103-11 is from the speaker's appointment schedule.

The second page, Mr. Coccaro.

It reflects a meeting on October 2, 1996, at 9:00 a.m. with Lenny Litwin at 270 Broadway, Sheldon Silver's assembly district office.

The government moves Government Exhibit 251 into evidence.

MR. SHUR:  No objection.

MS. COHEN:  Government Exhibit 251, Mr. Coccaro --

THE COURT:  251 is received.

(Government's Exhibit 251 received in evidence)

MS. COHEN:  Sorry, your Honor.

THE COURT:  That's okay.

MS. COHEN:  It's from the speaker's call list on

FBGYSIL6

1    December 15, 2011.

2         The second page reflects a call from Jay Goldberg,

3    "Wants to meet SS in New York City."

4         The next document the government moves into evidence

5    is Government Exhibit 251-1.

6         MR. SHUR:  No objection.

7         THE COURT:  251-1 is received.

8         (Government's Exhibit 251-1 received in evidence)

9         MS. COHEN:  This is the speaker's call list dated

10   December 21, 2011.

11        If you would turn to the second page, Mr. Coccaro.

12        It reflects another call from Jay Goldberg, "Personal

13   and Important" crossed out.

14        The government moves Government Exhibit 253 into

15   evidence.

16        MR. SHUR:  No objection.

17        THE COURT:  253 is received.

18        (Government's Exhibit 253 received in evidence)

19        MS. COHEN:  Speaker's call list from January 30, 2011.

20        The second page, Mr. Coccaro.

21        It reflects a call from Jay Goldberg with a message to

22   Sheldon Silver, "Fairly important."

23        The government moves Government Exhibit 254 into

24   evidence.

25        THE COURT:  Any objection?

FBGYSIL6

1              MR. SHUR:  No objection.

2              THE COURT:  254 is received.

3              (Government's Exhibit 254 received in evidence)

4              MS. COHEN:  Government 254 is the speaker's call list

5    from January 31, 2012, the next day.

6              The second page, Mr. Coccaro.

7              It reflects a crossed-out call from Mr. Goldberg on

8    the last exhibit, 253.

9              The government moves Government Exhibit 174 into

10   evidence.

11             MR. SHUR:  No objection.

12             THE COURT:  174 is received.

13             (Government's Exhibit 174 received in evidence)

14             MS. COHEN:  Government Exhibit 174 is entitled the

15   Speaker's Correspondence.  It's dated September 3, 2013, and

16   reflects a letter received by Sheldon Silver's office dated

17   August 27 from the Commission to Investigate Public Corruption.

18             The topic, "Requesting from SS to provide description

19   of services he provides in exchange for compensation (other

20   than position as an elected official)."

21             THE COURT:  That was 175?

22             MS. COHEN:  That was 174, your Honor.

23             Now the government has two additional stipulations to

24   read into the record.

25             THE COURT:  Okay.

FBGYSIL6

1          MS. COHEN:  Sorry, your Honor.  We're just retrieving

2     them.

3          (Pause)

4          MS. COHEN:  Mr. Coccaro, if you can pull up Government

5     Exhibit S-2 for identification.

6          What's been marked for identification Government

7     Exhibit S-2 is a stipulation by and between the parties:

8          Number one, if called to testify, a custodian of

9     records from Verizon Wireless would testify that, A, the

10    documents marked for identification as Government Exhibits 1301

11    through 1304, 1305-1, 1305-2, 1306-1, 1306-2, 1307-1, 1307-2,

12    1308-1, 1308-2, 1309-1, 1309-2, 1310-1, 1310-2, 1311-1, and

13    1318, collectively the Verizon Wireless exhibits, are true and

14    correct copies of subscriber information, toll records, and

15    explanatory information maintained by Verizon Wireless for the

16    following cell phone numbers for the date ranges reflected

17    below.

18         Exhibits number 1301, 1305-1, 1305-2 are for phone

19    number 212-360-1114.  The subscriber information for that phone

20    number is Robert Taub, Columbia University.  The date range is

21    June 21, 2012, through January 21, 2015.

22         Exhibit numbers 1301, 1307-1, 1307-2 are for phone

23    number 646-438-0067.  The subscriber information is Gary Klein.

24    The date ranges are December 3, 2009, through January 21, 2015.

25         Exhibits number 1301, 1310-1, and 1310-2 are for phone

FBGYSIL6

number 917-603-5187.  The subscriber information is the

New York State Assembly.  The date range, October 14, 2005,

through January 21, 2015.

        Exhibit numbers 1302, 1306-1, 1306-2 are for telephone

number 646-258-3300.  The subscriber information is Charles

Dorego.  The date range is December 13, 2011, through

November 17, 2014.

        Government Exhibits 1302, 1309-1, and 1309-2 are for

phone number 917-273-5100.  The subscriber name of Richard

Runes.  The date range is January 1, 2011, through January 21,

2015.

        Government Exhibits 1303, 1308-1, 1308-2 are for phone

number 917-273-1764.  The subscriber is Brian Meara Public

Relations.  The date range is January 1, 2009, through

September 302014.

        Government Exhibits 1304, 1311-1, and 1311-2 are for

phone number 917-750-5582.  The subscriber's name is Jay

Goldberg/Golberg & Iryami, PC.  The date range is January 1,

2002, through January 21, 2015.

        Government Exhibits 1305-1, 1306-1, 1307-1, 1308-1,

1309-1, 1310-1, and 1311-1 contain billing and cell call

records for the phone numbers associated with those exhibits.

        The call records reflect the date, the time, and the

number called or calling the phone number associated with the

exhibits.

FBGYSIL6

           The origination column reflects the physical location

of a switch through which the communications of the user of the

phone was routed.

           If the call was an outbound call, the destination

column reflects the physical location of a switch through which

the communications of the phone receiving the call were routed.

           If the call was an inbound call, the destination

column states incoming CL.  The MIN column reflects the length

of the call in minutes.

           Government Exhibits 1305-2, 1306-2, 1307-2, 1308-2,

1309-2, 1310-2, and 1311-2 contain call detail records for the

phone numbers associated with those exhibits.

           The column headings have the meanings set forth in

Government Exhibit 1318.

           The Verizon Wireless exhibits are full and complete

records of the acts, transactions, and events described

therein, were made and/or received and thereafter maintained in

the regular course of business or made at or near the time of

the acts, transactions, and events recorded therein and

contained information set forth by or obtained from persons

with knowledge of those matters.

           If called to testify, a custodian of records from

Verizon, Inc., Verizon, would testify that the documents marked

for identification as Government Exhibits 1312-1, 1312-2, 1313,

1314-1, 1314-2, and 1315, collectively the Verizon landline

FBGYSIL6

records, are true and correct copies of subscriber information

and toll records maintained by Verizon for the following

landline numbers for the date ranges reflected below.

For Government Exhibits 1312-1 and 1312-2, phone

number 914-967-4900, subscribed to Richard Runes for the date

range January 11, 2011, through January 21, 2015.

For Government Exhibit 1313, phone number

212-305-0349.  Subscriber, New York Presbyterian Hospital.

Date range, N/A.

For Government Exhibits 1314-1 and 1314-2, the phone

number is 212-344-1048.  The subscriber is Jay Arthur Goldberg,

PC.  The date range is January 1, 2002, through January 21,

2015.

For Government Exhibit 1315, the phone number is

212-608-5127.  The subscriber is Brian Meara, and the date

range is January 1, 2009, through September 30, 2014.

Government Exhibits 1312-1, 1314-1, 1314-2, and 1315

contain billing and call records for the phone numbers

associated with those exhibits.

The call records reflect the date, the time, and the

number called or calling the phone number associated with the

exhibits.

The from column reflects the physical location of the

switch through which the communications of the calling party

were routed.

1          The to column reflects the physical location of the

2    switch through which the party being called were routed.

3          The duration column reflects the length of the call in

4    minutes.

5          Government Exhibit 1312-2 contains certain call detail

6    records for the phone number associated with that exhibit.

7          The call detail records reflect the date, the time,

8    and the number called or calling the phone number associated

9    with the exhibit.

10         The to address and the to state columns reflect the

11   physical location of a switch through which the communications

12   of the party being called was routed.

13         The MOU column reflects the length of the call in

14   minutes.

15         The Verizon landline records are full and complete

16   records of the acts, transactions, and events described

17   therein, were made and/or received and thereafter maintained in

18   the regular course of business or made at or near the time of

19   the acts, transactions, and events recorded therein and contain

20   information set forth by or obtained from persons with

21   knowledge of those matters.

22         If called to testify, a custodian of records from

23   Cablevision Lightpath would testify that:

24         The document marked for identification as Government

25   Exhibit 1317 is a true and correct copy of subscriber

FBGYSIL6

1    information for the phone numbers 212-558-5567 and

2    212-558-5617.  Those records reflect that both numbers are

3    subscribed to Weitz & Luxenberg, PC at 700 Broadway, Manhattan,

4    New York.

5         Government Exhibit 1317 also contains call detail

6    records from the number 212-558-5617 for the period June 12,

7    2009, to January 21, 2015.

8         The call detail records set forth in Government

9    Exhibit 1317 contain the date, the time, and the number called

10   or calling 212-558-5617.

11        The ORIGNPA, ORIGNXX, and ORIGNSTA columns reflect the

12   number placing the call, and the TERMNPA, TERMNXX, and TERMSTA

13   reflect the number receiving the call.

14        The ORIGCICI and the ORIGSTPR columns reflect the

15   physical location of a switch through which the communications

16   of the calling party was routed.

17        The TERMCITY and TERMSTPR columns reflect the physical

18   location of a switch through which the communications of the

19   party receiving the call was routed.

20        The duration column reflects the length of the call in

21   seconds.

22        Government Exhibit 1317 contains full and complete

23   records of the acts, transactions, and events described

24   therein, was made and/or received and thereafter maintained in

25   the regular course of business, was made at or near the time of

FBGYSIL6

the acts, transactions, and events recorded therein, and

contains information set forth by or obtained from persons with

knowledge of those matters.

Lastly, almost lastly, paragraph 4, if called to

testify, a custodian of records from AOL, Inc., AOL would

testify that Government Exhibit 1350 is a true and correct copy

of subscriber information associated with the email account

charliedorego@aol.com.  All email communications to and from an

AOL account are routed through AOL servers in Virginia.

Government Exhibit 1350 contains full and complete

records of the acts, transactions, and events transcribed

therein, was made and/or received and thereafter maintained in

the regular course of business, was made at or near the time of

the acts, transactions, and events recorded therein, and

contain information set forth by or obtained from persons with

knowledge of those matters.

Paragraph 5, if called to testify, a custodian of

records from Google would testify that Government Exhibit 1351

is a true and correct copy of subscriber information associated

with the email account of rrunes@gmail.com.

Government Exhibit 1351 contains full and complete

records of the accounts, transactions, and events described

therein, was made and/or received and thereafter maintained in

the regular course of business, was made at or near the time of

the acts, transactions, and events recorded therein, and

FBGYSIL6

1    contains information set forth by or obtained from persons with

2    knowledge of those matters.

3              It is further stipulated and agreed that this

4    stipulation may be received in evidence as a government exhibit

5    at trial, signed and dated by the parties, on October 28, 2015.

6              The government would move Government Exhibit S-2 into

7    evidence.

8              THE COURT:  S-2 is received.

9              (Government's Exhibit S-2 received in evidence)

10             MS. COHEN:  The government would also move the

11   exhibits named herein into evidence, and I can run through them

12   unless there's an objection.

13             MR. SHUR:  No objection.

14             THE COURT:  What I need you to do is to give me a list

15   of those exhibits.  They're all in the record now.  They're all

16   received.

17             MS. COHEN:  Thank you, your Honor.  We will do that.

18             (Government's Exhibits 1301 through 1304 received in

19   evidence)

20             (Government's Exhibits 1305-1, 1305-2, 1306-1 received

21   in evidence)

22             (Government's Exhibits 1306-2, 1307-1, 1307-2 received

23   in evidence)

24             (Government's Exhibits 1308-1, 1308-2, 1309-1 received

25   in evidence)

FBGYSIL6

```
1              (Government's Exhibits 1309-2, 1310-1, 1310-2 received
2       in evidence)
3              (Government's Exhibits 1311-1, 1318, 1350, 1351
4       received in evidence)
5              (Government's Exhibits 1312-1, 1312-2, 1313, 1314-1,
6       1314-2, 1315 and 1317 received in evidence)
7              THE COURT:  Thank you.  I think it's the bewitching
8       hour.
9              MS. COHEN:  Agreed, your Honor.
10             THE COURT:  We're going to leave a little early today.
11      Let me give you also what you may view as good news, which is
12      we're running faster than we expected.  So the trial is not
13      going to go a full four to six weeks.
14             Also, due to a conflict that has arisen, we will not
15      sit this Thursday, two days from now.  I'll give you more
16      information on exactly sort of where we are in the trial
17      tomorrow when we see where we are for tomorrow.
18             For today, everybody get home okay.  Don't watch the
19      news.  Don't read the newspapers about the case.  Don't listen
20      to anything on the radio.  Don't talk about the case.  I will
21      see you all in the morning at 9:15.  Have a good evening.
22             JUROR:  Are we still off on Friday?
23             THE COURT:  We'll discuss Friday, but probably.
24      You'll definitely be off Thursday.
25             (Jury not present)
```

FBGYSIL6

1     THE COURT:  Okay.  Let's do some business.  I hope to

2  have a draft charge to you tonight.  It will be emailed to you.

3  I hope, if we get it to you tonight, we'll do a charge

4  conference tomorrow at the end of court.

5     If for some reason we don't get it out tonight, we'll

6  juggle that schedule if I don't get it to you until tomorrow

7  morning, but I anticipate getting it to you tonight.

8     So that leaves the only open issue on my list is the

9  most recent opuscle from the defense relative to the

10  conversation that Mr. Silver had with Ms. Reid.

11     Ms. Cohen, you said there was nothing new, but I

12  actually found something new in it.  What's new is the

13  characterization of the statement that was made from Silver to

14  Reid as he thought that the new disclosure would be more

15  accurate, which appears to be more of a statement of a state of

16  mind than I've heard up until now.

17     MS. COHEN:  I think, your Honor, what Ms. Reid -- I

18  believe these quotes are from the 3500 material.

19     THE COURT:  I assume.

20     MS. COHEN:  Ms. Reid, in her 3500 material, has always

21  said she does not recall the exact words used, but she thought

22  that what Mr. Silver said was something to the effect of, I

23  sometimes get fees from other sources.  And this would be more

24  accurate.

25     She has not always used that term "more accurate."  It

FBGYSIL6

```
1    is in some 3500, not others.  She has always been very clear
2    that she does not recall the exact words that Mr. Silver used.
3    So I don't believe that anything that Mr. Silver said to her
4    which is the state of mind of Mr. Silver.
5            THE COURT:  It seems to me that that comes much, much,
6    much closer to stating what his state of mind is; that is, that
7    altering the disclosure, which I would say was a fairly minor
8    alteration, would make it more accurate.  That's reflecting his
9    view at that time that that would be a more accurate
10   disclosure.
11           Let me just say that if I allow the defense to adduce
12   this, which they seem so eager to do, I'm also going to allow
13   the government to cross-examine her on all the things he did
14   not tell her, which would be necessary for anything that she
15   says -- she didn't seem to approve it beyond just saying, okay,
16   which is not how the defense had represented it as some sort of
17   blessing by Ms. Reid as a representative of the ethics people.
18           At least as reflected in the 3500 material, I don't
19   think it goes that far.  I think it goes to her saying, okay.
20   You think that's more accurate.  Okay.
21           I'm going to allow them to cross, if I let this in, on
22   all the things he did not tell her.
23           MS. COHEN:  Your Honor, without Mr. Silver saying
24   more, I don't know how him saying, if he even said these words,
25   which Ms. Reid has been very clear she doesn't recall the
```

FBGYSIL6

1    actual words used, I don't think there's anything about

2    Mr. Silver saying, I sometimes got fees, and I changed my form

3    because this is more accurate, if he even used that word, that

4    reflects his state of mind at the time since he didn't tell her

5    anything related to his state of mind.  I don't think this

6    changes any of the analysis.

7         THE COURT:  The cases that deal with state of mind

8    allow things that go to what you were thinking at the time.  As

9    reflected, this seems to relate to what he thought at the time,

10   that is, that it would be more accurate.

11        Now, look.  The government has their argument which

12   says it would have been a lot more accurate if he had said, I

13   got fees from Weitz & Luxenberg and Golberg & Iryami.  Now that

14   would be an accurate disclosure.

15        That he thought it was more accurate doesn't really --

16        MS. COHEN:  I don't think there's any evidence that he

17   thought it would be more accurate if he even said those words.

18   I think the evidence is to the contrary.

19        I don't think there's any evidence that he used those

20   exact words.  I think we're going down a path where you're

21   letting the defendant put on rank hearsay.

22        THE COURT:  It's not hearsay because it's not going to

23   prove that it is more accurate.  It's going to his thought

24   process at the time that it would be more accurate.

25        Truth be told, it was more accurate.

FBGYSIL6

| 1 | MS. COHEN:  I don't know that I could concede that, |

1          MS. COHEN:  I don't know that I could concede that,

2     your Honor.  But, in any event, I don't think --

3          THE COURT:  He acknowledges that there are other

4     sources of fees.

5          MS. COHEN:  I'm not sure that's exactly what

6     Ms. Reid's testimony would be.  She's always been very clear

7     that she doesn't know that he said this.  I don't think this

8     changes the analysis and the briefing and the prior.

9          I don't know why your Honor is actually reconsidering

10    this issue because there's nothing new here.

11         THE COURT:  What's new is the reflection of what's in

12    the 3500 material.

13         Mr. Shur, do you want to be heard?

14         MR. SHUR:  Judge, not on this particular piece because

15    we agree with the Court's analysis in terms of it reflecting

16    Mr. Silver's state of mind.

17         If the Court were to entertain argument on the broader

18    argument that none of this evidence relating to the forms or

19    the public statements should be admissible in that there is a

20    significant risk here -- the government wants to put on

21    Ms. Reid for testimony, introduce forms, put on Mr. Whalen all

22    as evidence of an alleged coverup when there is actually no

23    proof of a crime that's being covered up.

24         We've heard witness after witness say there's been no

25    quid pro quo.

FBGYSIL6

```
 1          THE COURT:  There's been no express agreement, which

 2     is not required.  It's very nice of you to keep bringing that

 3     out.  But there's no requirement under the law that the people

 4     sit down together, shake hands, and say, I'll pay you bribes,

 5     and you take care of me.

 6          MR. SHUR:  Understood, your Honor.  I think it goes

 7     well beyond just that one statement.  Obviously, in our Rule 29

 8     motion, we can get deep into the record on that.

 9          But the idea that even if there is some evidence, the

10     evidence is so underwhelming that they're now going to put on a

11     mountain of evidence regarding this alleged coverup.

12          It will do two things:  Number one, it's extremely

13     unfair in terms of the prejudicial impact on it.

14          THE COURT:  What's the information that's going to

15     have a prejudicial impact?  These are the speaker's statements.

16          MR. SHUR:  It's prejudicial and will cause confusion.

17     It's going to create a mini trial.

18          THE COURT:  Focus on where is the prejudice.

19          MR. SHUR:  Where is the prejudice.

20          THE COURT:  What's the prejudice?  You say that these

21     statements are prejudicial.  How?

22          MR. SHUR:  For two reasons:  Number one, with respect

23     the forms, with all due respect to whoever drafted the forms,

24     the questions are horrible.

25          I think if you can get 12 people in a room --
```

FBGYSIL6

1      THE COURT:  We've been through that before.  I'm not

2      reconsidering that view.

3      MR. SHUR:  The government is going to point to these

4      questions and say, he lied in question X, question Y.  That

5      simply is not the case.

6           To put on someone from the Legislative Ethics

7      Commission to potentially take that view -- I don't know what

8      her testimony is going to be.

9           THE COURT:  She's just going to put the forms in

10     evidence.

11          MS. COHEN:  That's correct, your Honor.

12          THE COURT:  Her view is irrelevant.

13          MR. SHUR:  Then we're going to hear from Mr. Whalen

14     who is going to be talking about interactions with the press

15     under less ideal circumstances where you have a bunch of

16     reporters jammed into an elevator with Mr. Silver who is

17     getting questions from left to right.

18          THE COURT:  He lived for those elevator rides.  That's

19     what politicians like.

20          MR. SHUR:  I wouldn't go that far, Judge.  In an

21     hour-long or another situation where there's an hour-long

22     conversation and they're asking him what deodorant he uses, and

23     then two seconds later, they ask some question the government

24     wants to laser in on that and act like he sat down and spent

25     hours and hours answering that question.  That's entirely

FBGYSIL6

1    prejudicial.

2            THE COURT:  That's a completeness issue.  If you think

3    the way they're putting in these statements is not fair because

4    they're not putting in the complete press conference or

5    whatever it is, that's a different objection.

6            But that's not what I understand your objection to be.

7    I understand your objection to be that Mr. Silver's statements

8    to reporters are somehow or another prejudicial.  So I'm still

9    trying to --

10           MR. SHUR:  Because the statements are going to be

11   taken out of context, and they're going to be characterized in

12   such a way that is unfairly prejudicial.

13           THE COURT:  That's why y'all are being paid the big

14   bucks, to make sure they're not being taken out of context.

15           MR. SHUR:  Judge, there is another issue here too

16   which is there will be a trial within a trial when it comes to

17   the forms and the public statements.

18           THE COURT:  Why?  I don't intend to allow a trial

19   within a trial.

20           MR. SHUR:  These forms have evolved over the years.

21   Even the years we're talking about, the questions the

22   government wants to focus on the language keeps changing, in

23   part, because it's unclear.

24           So they keep clarifying these words and tweaking the

25   language because people don't know how to answer them.  People

FBGYSIL6

1   have been providing inconsistent answers, and they need to

2   provide more guidance.  That's what happens over the years.

3           So there's going to be this whole debate about what

4   did that question mean, and when did it mean this and when did

5   it mean that.

6           With respect to the public statement, the government

7   wants to argue that Mr. Silver saying he didn't represent

8   people who had business before the state is going to create a

9   trial within a trial about two things:

10          Number one, what does it mean to represent someone.

11  Number two, what does it mean to have business before the

12  state.

13          You could have expert witnesses testify all day long

14  about different contexts what doing business with or what doing

15  business before the state means.

16          I think that will be extremely confusing to the jury

17  when the probative value of this evidence is so minimal.

18          THE COURT:  Does the government want to be heard?

19          MS. COHEN:  Your Honor.  As to the forms, the

20  government will put the forms in.  The answers are the answers.

21  We're not going to put on any expert testimony about what that

22  meant.

23          We're not going to have a representative from the

24  Legislative Ethics Commission opine on what she thought it

25  meant.  There's no mini trial or a trial within a trial.  The

FBGYSIL6

1    words are the words.

2              With respect to statements that the defendant himself

3    made to the press, they're his statements.  That's what he

4    said.

5              The defendant can argue what it feels is the proper

6    inference.  The government can argue what it feels the proper

7    inference is from those statements.

8              There's no mini trial within a trial.  There's nothing

9    prejudicial.  It's his own statements.

10             THE COURT:  His own statements could be unduly

11   prejudicial.

12             MS. COHEN:  It could be prejudicial.  I don't think

13   it's unduly prejudicial, Your Honor.

14             THE COURT:  I don't really see it in this case.  This

15   whole trial is a circumstantial evidence case.  They've got

16   things that happened, but the government is arguing that the

17   jury should infer from that what the speaker's state of mind

18   was.

19             So, in order to do that, they need to know what was he

20   saying at the time about what was going on.  It seems to me if

21   there's any sort of pieces of evidence that are fair game, it's

22   what came out of the defendant's mouth about what was going on,

23   what his relationship was, what he was doing.

24             As I recall, this was in the context of transparency

25   is good.  Let the sun shine in.  We want to tell everything.

FBGYSIL6

         Well, the government says not so fast.  He didn't want
to tell that he was receiving substantial funds from a law firm
who's only life is representing real estate developers.

         I think a jury could reasonably infer, kind of not for
nothing, that he discloses Weitz & Luxenberg, who would be
consistent with the approach of I'm representing the little guy
and doesn't disclose that he's receiving funds and fees from
Golberg & Iryami, who is on the other side of that balance.

         So a jury can infer that if she chose to.  If they
don't chose to, that's up to them.  It seems to me that the
evidence is not unfairly prejudicial.

         MR. SHUR:  Judge, I would just say this:  I understand
if Mr. Silver was debriefed by the investigators and sat down
for an interview and they asked him point blank about these
allegations and he responded, of course that evidence would be
relevant, would be admissible, and would enlighten the jury
about what Mr. Silver's state of mind was and what he was
thinking.

         But here, in the framework of these disclosure forms,
which, as I said, are extremely convoluted --

         THE COURT:  I would say stay away from the disclosure
forms.  Having filled out disclosure forms for many, many, many
years, they're a total pain to fill out.

         The question which is at issue here is a much more
complicated, convoluted question.  It is disclose every source

FBGYSIL6

1   of income.

2           MR. SHUR:  Judge, I would disagree with that

3   characterization.  I'm familiar with the form that your Honor

4   fills out.  It's a lot different than this one.

5           THE COURT:  It is.  I've filled out not that form

6   because that's a legislative form, but I've filled out the

7   New York State form as well.

8           MR. SHUR:  Understood, Judge.

9           THE COURT:  You don't have to be someone who fills out

10  these forms all the time to read the and he.  It says, disclose

11  every source of --

12          MS. COHEN:  Each source of income, your Honor.

13          THE COURT:  Each source of income.  But you don't have

14  to disclose individual clients.  That's essentially what it

15  asks for.  That's just not that complicated.

16          MR. SHUR:  Judge, the public statements with the --

17          THE COURT:  So let's focus on the statements to the

18  press.

19          MR. SHUR:  Sure.

20          THE COURT:  You're not suggesting that the reporters

21  ask less-clear questions than FBI agents and U.S. Attorney's

22  and investigators, are you?

23          MR. SHUR:  Judge, it's just the context in which the

24  questions are being asked.  Again, we can sort of walk through

25  the different public statements.  But, when you're jammed in an

FBGYSIL6

1    elevator with a bunch of reporters firing questions at you or

2    you're sitting there for an hour --

3              THE COURT:  When you're in an elevator, you forget

4    about a million dollars worth of fees from a real estate

5    developer?

6              MR. SHUR:  No one is asking questions with these

7    allegations in minds.

8              THE COURT:  Of course not.  So what?

9              MR. SHUR:  It makes a difference because the

10   government is going to take the answer and twist it.  My point

11   is this:  It's unduly prejudicial when you're also viewing it

12   at the same time, the type of evidence that we've seen, of what

13   he's actually charged with.

14             He's not charged with lying.  He's not charged with

15   1001 for these financial disclosure forms or for lying to the

16   press.

17             He's charged with bribery.  He's charged with

18   extortion.  We haven't heard any evidence of it.

19             THE COURT:  I think the front table disagrees with

20   that.

21             MR. SHUR:  Now we're going to have a truckload of

22   evidence that the government wants to argue that the coverup is

23   worse than the crime, and that is unduly prejudicial, Judge.

24             THE COURT:  I think where we part company is first on

25   the issue of whether what I'm looking at the moment is a barely

FBGYSIL6

1     breathing government case.  That's not how I view the evidence

2     that has been presented.

3             I'm not prejudging your Rule 29.  As to certain

4     elements, I think we're going to have a serious discussion

5     about what exactly what evidence there is.

6             This isn't a case that is so marginal that it's going

7     to be overcome and the jury is going to be overwhelmed by

8     statements that the Speaker of the Assembly made to members of

9     the press who were asking questions relative to and relevant to

10    what was going on in Albany at the time, focusing on the issue

11    of outside employment.

12            So, in that context, which is my understanding of the

13    statements they're trying to put in, it's hard to see that it's

14    marginally relevant.  So it's clearly relevant.

15            It's his own statements made to reporters when he knew

16    what they were after.  He knew what was going on.  He knew what

17    questions they were going to be asking.

18            So this isn't exactly -- I don't have the same sense

19    of this as sort of a Dan Rather ambush interview for 60 Minutes

20    on somebody's driveway when they're going out to pick up the

21    newspaper one morning.

22            This was in Albany.  This was the Albany press asking

23    questions that Mr. Silver knew were going to be asked because

24    that's what was being talked about at the time.

25            Under those circumstances, the facts that he chose to

FBGYSIL6

         1    describe his outside income in a particular way and not in

         2    another way is relevant to the jury who's going to have to

         3    decide what was going on in the man's head.

         4         So the motion is denied to keep out the press

         5    statements, to keep out the financial disclosure statements.

         6    But I am going to allow you to ask her about his statement that

         7    he thought it would be more accurate to disclose that there

         8    were other sources, but I'm also telling you that that opens

         9    the door for the government to establish that in that

        10    conversation he did not disclose that he was receiving hundreds

        11    of thousands of dollars, that these other fees were not dribs

        12    and drabs from here and there but an ongoing thousands of

        13    dollars that had been going on for a decade.

        14         So, if you want to open that door with that question,

        15    you can.  That's your strategic decision.

        16         Yes.

        17         MS. COHEN:  Can we just ask the defense to let us know

        18    if they intend to open the door this evening so that we can

        19    prepare?  Because we have prepared differently obviously based

        20    on different rulings.

        21         THE COURT:  They're pondering.  I can tell.

        22         MR. COHEN:  While we're pondering, it, your Honor, the

        23    government has dangled out the possibility that Mr. Dorego

        24    would come to this Court and testify what he meant by "insane"

        25    in that email.

FBGYSIL6

1       THE COURT:  Somehow, I don't think that's going to be

2   the focus of his testimony.

3       MS. COHEN:  As usual, you're correct, your Honor.

4       MR. COHEN:  Could we know whether he's going to

5   testify?

6       THE COURT:  Is Mr. Dorego going to grace us with his

7   presence?

8       MS. COHEN:  Your Honor, I have to talk to the team and

9   read the testimony.  I will let them know in a couple hours

10  when we've done that.

11      THE COURT:  So my little cheat sheet says we've got

12  Mr. Witkoff, Ms. Reid, Mr. Whalen maybe Mr. Dorego, Levy, Cody,

13  and Pennatta.

14      MS. COHEN:  Correct, your Honor.

15      THE COURT:  So that leaves Judy Rapfogel.

16      MS. COHEN:  The government is not calling Judy

17  Rapfogel.

18      THE COURT:  So the mystery witness is Mr. Dorego.  So

19  all that seems likely that that will finish up tomorrow; right?

20      MS. COHEN:  Your Honor, that probably will spill over

21  into some part of Wednesday, not necessarily that much.  Some

22  of these witnesses are shorter.

23      We would like to know if there is a defense case that

24  will help us to prepare for closing or not.

25      THE COURT:  I think realistically, if the evidence

FBGYSIL6

goes over until Wednesday, you're summing up on Monday.  I

think whether there's a defense case or not, just realistically

because it's going to be tough for you to get your summations

in.

          Your summations will be better if you have time to

think about them on both sides and really focus them.  So it

seems to me that realistically we're talking about summing up

on Monday, which means probably charge the jury Tuesday morning

and they'll have it at that point, unless your summations are a

lot shorter than you were estimating earlier.  I don't really

like to charge a jury that's bleary eyed.

          Anything further?

          MS. COHEN:  Nothing from the government.

          THE COURT:  Anything from the defense?

          MR. MOLO:  Nothing further.

          THE COURT:  Can you get me a copy of the stipulation.

          MS. COHEN:  Sure.

          (Adjourned to November 17, 2015, at 9:15 a.m.)

2000

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    RICHARD RUNES (cont'd)

4    Direct By Mr. Master . . . . . . . . . . . . .1782
     Cross By Mr. Molo  . . . . . . . . . . . . . .1808
5    Redirect By Mr. Master . . . . . . . . . . . .1894
     Recross By Mr. Molo  . . . . . . . . . . . . .1908
6    Redirect By Mr. Master . . . . . . . . . . . .1911

7    DARBY PUTNAM

8    Direct By Ms. Cohen  . . . . . . . . . . . . .1923
     Cross By Mr. Shur  . . . . . . . . . . . . . .1943
9    Redirect By Ms. Cohen  . . . . . . . . . . . .1961

10                      GOVERNMENT EXHIBITS

11   Exhibit No.                              Received

12    833  . . . . . . . . . . . . . . . . . . . .1785

13    103-10  . . . . . . . . . . . . . . . . . . .1804

14    2011  . . . . . . . . . . . . . . . . . . . .1930

15    601, 603, 605, 616, 619, 625, 627 and . . . .1932

16          628

17    1522  . . . . . . . . . . . . . . . . . . . .1942

18    229  . . . . . . . . . . . . . . . . . . . . .1964

19    286  . . . . . . . . . . . . . . . . . . . . .1965

20    108  . . . . . . . . . . . . . . . . . . . . .1966

21    139  . . . . . . . . . . . . . . . . . . . . .1966

22    167-2  . . . . . . . . . . . . . . . . . . . .1967

23    160  . . . . . . . . . . . . . . . . . . . . .1968

24    103-9  . . . . . . . . . . . . . . . . . . . .1968

25    162  . . . . . . . . . . . . . . . . . . . . .1970
```

```
 1    249     . . . . . . . . . . . . . . . . . .1970

 2    250     . . . . . . . . . . . . . . . . . .1970

 3    103-1   . . . . . . . . . . . . . . . . . .1971

 4    103-2   . . . . . . . . . . . . . . . . . .1971

 5    103-11  . . . . . . . . . . . . . . . . . .1972

 6    251     . . . . . . . . . . . . . . . . . .1972

 7    251-1   . . . . . . . . . . . . . . . . . .1973

 8    253     . . . . . . . . . . . . . . . . . .1973

 9    254     . . . . . . . . . . . . . . . . . .1974

10    174     . . . . . . . . . . . . . . . . . .1974

11    S-2     . . . . . . . . . . . . . . . . . .1982

12    1301 through 1304   . . . . . . . . . . . .1982

13    1305-1, 1305-2, 1306-1  . . . . . . . . . .1982

14    1306-2, 1307-1, 1307-2  . . . . . . . . . .1982

15    1308-1, 1308-2, 1309-1  . . . . . . . . . .1982

16    1309-2, 1310-1, 1310-2  . . . . . . . . . .1983

17    1311-1, 1318, 1350, 1351  . . . . . . . . .1983

18    1312-1, 1312-2, 1313, 1314-1, 1314-2, . . . .1983

19           1315 and 1317
```

20                     DEFENDANT EXHIBITS

21    Exhibit No.                          Received

```
22    134    . . . . . . . . . . . . . . . . . .1818
      703-1  . . . . . . . . . . . . . . . . . .1850
23    130    . . . . . . . . . . . . . . . . . .1860
      133    . . . . . . . . . . . . . . . . . .1872
24    131    . . . . . . . . . . . . . . . . . .1874
      135    . . . . . . . . . . . . . . . . . .1893
25
```