```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                          S1 15 Cr. 93 VEC

 5   SHELDON SILVER,

 6             Defendant.

 7   ------------------------------x
                                           November 17, 2015
 8                                         9:30 a.m.

 9

10   Before:

11                  HON. VALERIE E. CAPRONI,

12                                         District Judge
                                              and a jury
13

14                       APPEARANCES

15   PREET BHARARA,
          United States Attorney for the
16        Southern District of New York
     CARRIE HEATHER COHEN,
17   HOWARD SETH MASTER,
     ANDREW DANIEL GOLDSTEIN,
18   JAMES M. McDONALD,
          Assistant United States Attorneys
19

20   STROOCK & STROOCK & LAVAN, LLP
          Attorneys for defendant Silver
21   BY:  JOEL COHEN, Esq.
          – and –
22   MOLOLAMKEN, LLP
     BY:  STEVEN FRANCIS MOLO, Esq.
23        ROBERT KELSEY KRY, Esq.
          JUSTIN VAUN SHUR, Esq.
24        JUSTIN M. ELLIS, Esq.
          TUONGVY LE, Esq.
25                       Of counsel
```

 1              (Trial resumed)

 2              (Jury not present)

 3              THE COURT:  Before we get to the government's issue,

 4   let me raise something with you that a juror has raised with

 5   Mr. Brantley.  One of the jurors has suggested that some jurors

 6   are talking about the case.  I don't have any more specifics

 7   than that.

 8              So my plan is the first thing in the morning is to

 9   caution them again with maybe more specifics about what it

10   means to talk about the case.  I was also going to add into

11   that they should not read any press reports about the Skelos

12   case.

13              Does the defense want to be heard on that?  I know you

14   were sensitive to the issue of in general lots of criminal

15   cases involving Albany, but it seems to me there is too much

16   overlap between these two cases.

17              MR. MOLO:  I think that's fine, Judge.  I would

18   suggest maybe to say any -- not just mentioning Skelos by name

19   but perhaps saying any other corruption cases that are being

20   tried in New York or anywhere for that matter.

21              These kinds of instructions are always challenging

22   because there's the issue of don't put beans up your nose and

23   then put beans up your nose.

24              So I wonder whether we're better off just saying,

25   don't read about not just this case but any other corruption

1    case that might be going on, especially given the fact that

2    Skelos was the leader of the other chamber.

3            THE COURT:  The reason that I was particularly

4    concerned about it is if it was just that, I'm not sure that I

5    would mention it.  It's the overlap of Glenwood that leads me

6    to be concerned.

7            MR. MOLO:  But certainly admonishing them to not talk

8    about the case is appropriate.

9            THE COURT:  We'll do that at the beginning of the day.

10           Now, what's the issue?

11           MR. GOLDSTEIN:  Good morning, your Honor.

12           THE COURT:  Good morning.

13           MR. GOLDSTEIN:  If you recall when we did motions in

14   limine, the one issue that remained outstanding had to do with

15   recordings of the defendant that mentioned convictions or

16   arrests of other state legislators.

17           THE COURT:  Correct.

18           MR. GOLDSTEIN:  There were two of them.  One of them

19   involved Joe Bruno, and that clip -- we've cut the clip so

20   there's no reference to Joe Bruno.  We've given that to the

21   defense.

22           THE COURT:  Okay.

23           MR. GOLDSTEIN:  The one that we've given your Honor

24   which is reflected in Government Exhibit 3-T involves Anthony

25   Seminerio.  The reason why we think this one should remain as

1    it is and is relevant and probative is, in part, because the

2    defendant specifically talked about Seminerio in this in the

3    statement forms and that of Seminerio, and the timing matters

4    here.

5         Seminerio pled guilty in late June of 2009.  As his

6    sentencing was approaching, he had this interview where he

7    talked about Seminerio and specifically talked about disclosure

8    forms.

9         One of the issues with Seminerio was that he had put

10   on his disclosure forms, Marks Consulting, a consulting firm

11   that was paying him, but he didn't explain the nature of his

12   business.

13        There was nothing in the form that showed the

14   connection with his getting fees from the hospital that was the

15   subject of his conviction.

16        After the defendant gives this interview -- and in his

17   interview he specifically says he's done this for the same way

18   for the last ten years.  He's always had the same thing in his

19   forms, and he's fully disclosed.

20        Specifically referenced was the consulting fees should

21   be required to say the nature of the consulting fees, and

22   that's why I have put it in and have put it in for the last ten

23   years.

24        It's after this that he had that conversation with

25   Lisa Reid, and his form changes in that minor way.  He changes

1    his form in 2010.  Seminerio was sentenced in 2010, a couple

2    months before he changed his form.  When he changes his form,

3    he did not go back and change forms from previous years.

4            At that point, the change in the form wasn't publicly

5    disclosed.  Those forms went to the Ethics Commission, but they

6    weren't posted publicly.

7            THE COURT:  So none of the forms were public at that

8    point?

9            MR. GOLDSTEIN:  They were foilable, but they were not

10   posted publicly.

11           THE COURT:  Okay.

12           MR. GOLDSTEIN:  That changed in 2011.

13           THE COURT:  Okay.

14           MR. GOLDSTEIN:  The amount of the income wasn't posted

15   at all and was redacted if you got them through foil.

16           THE COURT:  Even the letter was redacted?

17           MR. GOLDSTEIN:  Correct.  So we think there's a fair

18   inference with trying to contrast him with Seminerio saying he

19   didn't and Seminerio always did it that way, and then he has

20   this conversation with Lisa Reid where he tells her that he's

21   making this minor change as a way to --

22           THE COURT:  Be more accurate.

23           MR. GOLDSTEIN:  As he will say that, yes.

24           THE COURT:  Apparently.

25           MR. GOLDSTEIN:  Apparently.  Although, without

1  disclosing any of the things that he was disclosing.  And he

2  also continued not to describe the actual nature of his

3  practice, but he makes that one change.

4       We think, if they are going to be eliciting this

5  conversation with Lisa Reid, that they've opened the door to

6  the simple reference to Seminerio here.

7       We would like to be able to ask Lisa Reid who knows

8  this very simply -- and we could ask a leading question -- that

9  Seminerio's conviction was based in part on his disclosure

10 forms, something very, very simple.

11      THE COURT:  He was convicted in state court?

12      MR. GOLDSTEIN:  He was convicted in federal court.  He

13 was convicted in this district.

14      THE COURT:  So it's not based on the financial

15 disclosure form.

16      MR. GOLDSTEIN:  His conviction was related to his

17 disclosure forms.

18      THE COURT:  Was it related to the disclosure form, or

19 was it related to information that wasn't disclosed on the

20 disclosure form?

21      MR. GOLDSTEIN:  I think that's more accurate,

22 your Honor.

23      THE COURT:  Let me read it.  First when does this

24 become an issue?  Is it your first witness?

25      MR. GOLDSTEIN:  It's not for the first witness.

 1             THE COURT:  Because we have the jury back there.

 2             MR. GOLDSTEIN:  Michael Whyland is the witness who

 3   this would come in through, but Lisa Reid is the one who would

 4   be able to testify about anything relating to Seminerio.  So

 5   she would be testifying before Michael Whyland.

 6             THE COURT:  Who is your first witness of the day?

 7             MR. GOLDSTEIN:  Steve Witkoff.

 8             THE COURT:  How long is Mr. Witkoff going to be?

 9             MS. COHEN:  About an hour, and then our next witness

10   will be Lisa Reid, and we weren't sure we would take a break.

11             THE COURT:  I would rather take a break a little early

12   rather than keep the jury waiting when they've gotten here on

13   time.

14             Are there any other issues?

15             MS. COHEN:  There are a few issues, but they don't

16   affect the witness this morning.

17             THE COURT:  Are we still on the same timing that the

18   government believes that they are going to prepared to rest on

19   Wednesday?

20             MS. COHEN:  We have all our witnesses available today.

21   If for some reason we're moving fast, we can put them on.  If

22   we get all our witnesses on, we won't rest because we want to

23   run through all the exhibits.

24             So it would be first thing Wednesday morning.  The

25   more likelihood is that there might be one witness held over

1   until tomorrow morning.

2          THE COURT:  So I'm going to go ahead and tell the jury

3   that they're going to be off on Thursday and Friday for sure.

4          MS. COHEN:  Okay.

5          THE COURT:  Anything further while he's getting them

6   lined up?

7          MR. MOLO:  No, your Honor.

8          MS. COHEN:  Your Honor, if I just ask yet again if

9   there is a defense case, when we can find that out.  If it is

10  potentially Wednesday, I think we are entitled to know that at

11  some point other than Wednesday in court.

12         THE COURT:  Mr. Molo, is there going to be a defense

13  case?

14         MR. MOLO:  As I assess the evidence and consult my

15  client and my colleagues, we'll determine that.

16         THE COURT:  There's not that much more evidence.

17         MR. MOLO:  Than I think I should win on a Rule 29

18  motion.

19         THE COURT:  Assume you don't.

20         MR. MOLO:  If there is, it will not be a lengthy case.

21         THE COURT:  What's the story with the expert?  Has the

22  expert been one way or the other abandoned?

23         MR. MOLO:  I would say I'll tell you this afternoon.

24         THE COURT:  How about before the lunch break.

25         MR. MOLO:  Okay.

```
 1                (Jury present)

 2                THE COURT:  Okay.  Good morning.

 3           I have just a couple of announcements for you before

 4      we start testimony this morning.  First off, we definitely will

 5      not be sitting either Thursday or Friday of this week.

 6           It's likely that we will probably end a little bit

 7      early on Wednesday as well.  That's just to give you some sense

 8      of the timing.

 9           Second off, as you know, at the end of every day, I

10      remind you not to read about the case or listen to it or hear

11      anything about it.

12           Let me broaden that out a little bit.  You shouldn't

13      be reading articles or listening to news accounts about any

14      corruption criminal cases that are going on right now.  So just

15      read about the Giants.

16           The second thing I just want to remind you:  When I

17      tell you every day every time we break don't talk about the

18      case, what I mean is broadly don't talk about it.

19           Don't talk about the lawyers.  Don't talk about me.

20      Don't talk about whether you like the witnesses or don't like

21      the witnesses, whether you like what the lawyers are doing or

22      don't like what the lawyers are doing.

23           Don't talk about anything that's going on in the

24      courtroom or about how you're viewing the evidence or the

25      people involved in the case in any way.  Talk about anything
```

1    else.  Talk about what you're going to cook for Thanksgiving or

2    who's playing, whatever.

3              Ms. Cohen, call your next witness.

4              MS. COHEN:  The government calls Steven Witkoff.

5     STEVEN CHARLES WITKOFF,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MS. COHEN:

10   Q.  Mr. Witkoff, what business are you in?

11   A.  I am in the real estate business.

12   Q.  Do you own a company called The Witkoff Group?

13   A.  I do.

14   Q.  What is The Witkoff Group?

15   A.  It is an owner and developer of buildings in New York City

16   and various other cities.

17   Q.  In general, what types of buildings does The Witkoff Group

18   own?

19   A.  It owns some office buildings, some retail.  It is a

20   developer of rental property and condominiums.  It owns some

21   land, industrial, as well as it is a developer of hotels and an

22   owner of hotels.

23   Q.  When did you form The Witkoff Group?

24   A.  The Witkoff Group was formed in 1999.  And prior to that, I

25   was a partner in a company by the name of Stellar Management.

1   Q.   What did Stellar Management stand for?

2   A.   It stood for Steve and Larry.  Larry Gluck was my then

3   partner.  We were both attorneys before that.

4   Q.   So how did you get started then in the real estate

5   business?  You said you'd been attorneys before getting started

6   in Stellar.

7   A.   Yes.  I was -- after graduating from law school, I was an

8   associate at Dreyer & Traub, which was a leading boutique real

9   estate law firm in the city of New York.

10          We started Stellar Management in 1986.  We bought our

11  first building in 1986.

12  Q.   When you say "we," you're referring to you and your

13  partner, Larry?

14  A.   Yes.

15  Q.   How long did you and your partner own Stellar Management?

16  A.   From 1986 through and including 1997.

17  Q.   When did you form The Witkoff Group?

18  A.   In 1997.

19  Q.   How many buildings does The Witkoff Group own now?

20  A.   Today approximately 20 properties.

21  Q.   Where are those properties located?

22  A.   Some are in Miami; some are in New York.  There's a

23  property in Los Angeles.  We just sold a large office building

24  in London.  I'm trying to think of where else.

25          We just sold something in Boston.  So we've been

1   operating in many of the gateway cities in the United States

2   and sometimes in Europe.

3   Q.   Can you name some of the buildings you own in

4   New York City.

5   A.   Currently?

6   Q.   Yes.

7   A.   The Woolworth Building, 866 Third Avenue, 150 Charles, 10

8   Madison Square Park West, 111 Murray Street, 420 Fifth Avenue.

9   A property at the corner where we're doing a large hotel at the

10  corner of Sunset and Doheny in Los Angeles.   20 Times Square,

11  which is on the corner of 47th and Broadway.   It's a new build

12  retail and hotel development property.

13          The Wyndham in Miami, New World Tower, which is an

14  office building in Miami.

15  Q.   Who manages the buildings that the Witkoff Group owns?

16  A.   We do.

17  Q.   When you say "we," do you mean The Witkoff Group?

18  A.   Yes.

19  Q.   Who owns the buildings that the Witkoff Group manages?

20  A.   We have a significant ownership share in every building

21  that we manage.   Sometimes we own it exclusively.   Other times

22  we would be a general partner in a particular deal.

23  Q.   And when you say "we," are you referring to The Witkoff

24  Group?

25  A.   Yes.

1   Q.  Do you own The Witkoff Group?

2   A.  I'm the principal shareholder.  I own 85 percent of The

3   Witkoff Group.

4   Q.  Are the actual buildings that The Witkoff Group owns -- are

5   they LLCs?

6   A.  They are held in LLCs.

7   Q.  What is the difference between the LLCs and The Witkoff

8   Group in your business?

9   A.  Really nothing.  It's a negligible difference.  The LLCs

10  are really there for tax and liability structuring, and almost

11  everyone in the business uses them.

12  Q.  What impact does the New York State Legislature have on

13  your business?

14  A.  A large impact.

15  Q.  What do you mean by "a large impact"?

16  A.  They oversee the regulatory environment in many respects

17  pursuant to which we operate, from a tax and a -- for instance,

18  if you own multi-family, they oversee the rent stabilization

19  laws.  And from a tax standpoint, the same concept.

20  Q.  Are you familiar with a program, state program, referred to

21  as 421a?

22  A.  Yes.

23  Q.  What is 421a?

24  A.  It's a tax incentive program that is designed to create --

25  to give real estate tax abatements to the developers of

1    low-income housing who can then sell those certificates to

2    condominium builders -- this is one aspect of it -- so they can

3    pass on that abatement to the buyers of those condominiums and

4    create a better selling environment.

5    Q.  Have you built buildings that have 421a?

6    A.  Well, 421a -- also, as part of the older program at least,

7    you got it in some respects as of right.  I have built

8    properties where we got it as of right, and I bought properties

9    where we have certificates.

10   Q.  What does the state have to do with 421a?

11   A.  They promulgate that legislation and set forth all the

12   aspects of that legislation.

13   Q.  So how does 421a affect your business?

14   A.  Well, it affects our business because it creates the

15   environment pursuant to which we decide whether we're going to

16   build a multi-family project, be it rental or condominium, in

17   the city.

18        Everything is about whether we can achieve

19   construction financing and whether the deal can be

20   underwritten.

21        One 421 project we did was the Capital of Chelsea, a

22   rental property.  That was, in those days, dependent on 421 tax

23   abatement.

24        150 Charles, another property where we bought

25   certificates -- that's a property we took through the recession

1    of course.  In those days, without 421a at the time, it

2    probably couldn't have been underwritten for a construction

3    loan.

4    Q.  Are you familiar with a program called 421g?

5    A.  Yes.

6    Q.  What is 421g?

7    A.  It's a very similar program to 421a with deeper benefits

8    that was promulgated pursuant to the downtown revitalization

9    plan.

10   Q.  Who promulgated 421g?

11   A.  I believe the Giuliani administration put forth the

12   downtown revitalization plan.  But, if I'm not mistaken, I

13   think this all had to be legislated by the state senate and the

14   state assembly.

15   Q.  How did 421g benefit real estate developers?

16   A.  421g was very similar to 421a.  Instead of there was a

17   sliding abatement over a 10-year period for 421a, there was an

18   exemption for those who converted obsolete office buildings

19   south of Canal Street.  This dates back to the early 1990's.

20            So you got an exemption, and then it turned into an

21   abatement later on.

22   Q.  What do you mean by you got an exemption and you bought

23   certificates?  If you could just explain that to the jury,

24   please.

25   A.  So in 421g, slightly different than 421a, if you were a

1   developer -- if you were converting older office buildings, the

2   legislation was designed to promote the conversion of office

3   buildings that were built prior to a particular year that were

4   deemed to be obsolete for office building use.

5           So they were looking to encourage developers to

6   convert those properties.  In exchange for spending the money,

7   getting a construction loan, and taking that risk, you got an

8   exemption -- I want to say it was for ten years of real estate

9   taxes for the increased value of the property that you might be

10  creating.  And then you would get an abatement later on.

11          In the 421a program, you could get 421a abatements in

12  certain zones of Manhattan, but you could also buy 421a

13  certificates from low-income housing developers and put that as

14  a part of your condominium project in Manhattan.  That

15  condition didn't exist before 421g.

16  Q.  How did it benefit a developer to buy certificates under

17  421a and put them into another building?

18  A.  So, in those days, when 421a was in existence prior to it

19  sunsetting, if you didn't have 421a certificates, it made it

20  very difficult, if not impossible, to sell condominium units

21  because everybody was buying them.

22          THE COURT:  How did you get a cert?  If someone else

23  built low-income housing, they could sell a cert?

24          THE WITNESS:  Correct.  So, for instance, at 150

25  Charles, we would work with three credible low-income housing

1  developers who might be developing a low-income housing

2  affordable project in The Bronx or Brooklyn or another

3  qualified area.

4       Their incentive to actually do that development was to

5  generate these certificates to sell to us, and then it was what

6  the market would bear for the price for those certificates.

7       THE COURT:  And then you used the cert to reduce the

8  property tax on a building in Manhattan?

9       THE WITNESS:  Correct.

10      THE COURT:  And they used the cash from you to help

11  offset the costs of developing low-income housing elsewhere?

12      THE WITNESS:  Exactly.  But in the case of a

13  condominium, we used the certificates to give that abatement to

14  the end buyer.  So, if you, your Honor, were an end buyer of a

15  condominium, you would then get that real estate tax abatement.

16      THE COURT:  Okay.

17  BY MS. COHEN:

18  Q.  What 421g buildings did The Witkoff Group own?

19  A.  Two, 55 Wall Street and 10 Hanover Square.

20  Q.  And 421g and 421a were both laws passed by the state

21  legislature?

22  A.  Yes.

23  Q.  Are you familiar with the Real Estate Board of New York?

24  A.  I am.

25  Q.  Is it commonly referred to by its acronym REBNY?

1    A.   Yes.

2    Q.   First what is REBNY?

3    A.   REBNY is a lobbying organization that comprises real estate

4    owners, brokers, property managers.  And REBNY generally

5    lobbies and advocates on behalf of anyone in the real estate

6    business.

7    Q.   Who does REBNY lobby?  Which branch of government?

8    A.   Probably every branch.  They're very active.

9    Q.   By "every branch," does that include the state legislature,

10   both sides?  The assembly and the senate.

11   A.   Oh, yes.

12   Q.   What involvement have you had with REBNY?

13   A.   I was a member of the -- I was a member from the early

14   1990's, but I was a member of the Board of Governors from 1998

15   until 2010, and I sat on the executive committee of REBNY from

16   1999 I want to say through 2001.

17   Q.   And when you were on REBNY's executive board and the Board

18   of Governors, what did REBNY lobby the New York State Assembly

19   on?  In general.

20   A.   Probably every bit of real estate legislation that had

21   impact, whether it's some sort of taxing legislation like 421a

22   or 421g.  It would be landmarking legislation.  Anything that

23   real estate taxes -- anything that really affected owners that

24   they might be concerned about.

25   Q.   What knowledge do you have, when you were on the executive

1   committee and on the Board of Governors and even just as a

2   member of REBNY, of REBNY's lobbying of Sheldon Silver related

3   to issues?

4   A.   REBNY's?  I'm sorry.  You have to repeat that question.

5   Q.   When you were a member of REBNY or on the executive

6   committee or on the Board of Governors, what knowledge do you

7   have of how REBNY lobbied Sheldon Silver when he was the

8   Speaker of the Assembly?  On what issues in general?

9   A.   I mean I never lobbied Mr. Silver on behalf of REBNY, but

10  clearly REBNY would be focused on Mr. Silver and other people

11  of authority, of significant authority, in their lobbying

12  efforts.

13  Q.   Why would REBNY have focused on Sheldon Silver when he was

14  the speaker?

15  A.   Well, because he was one of the most powerful people in

16  state politics.  So his opinion would be very, very relevant to

17  them.

18  Q.   Why would his opinion be relevant to REBNY?

19  A.   Because I think he guided policy and how legislation came

20  down.  So his opinion would have been very relevant to them.

21  Q.   When did you first meet Sheldon Silver?

22  A.   Sometime in the mid to late 1990's.

23  Q.   How did you meet Sheldon Silver?

24  A.   I owned a building, 8090 Maiden Lane, that we had bought

25  back then that we were -- this is my best recollection.  We

1    were doing a lease with the Metropolitan Council on poverty or

2    housing.

3              I got a telephone call from a friend of mine, Merryl

4    Tisch, who was involved with this particular charitable

5    organization.  She asked me if I would reduce the rent further.

6    It was already pretty low.  I couldn't say no.  So we reduced

7    it a little bit further.  Things were difficult in those days.

8              As a result of that, my best recollection is that it

9    was Merryl who introduced me to Mr. Silver.

10   Q.  After being introduced to Sheldon Silver by Merryl Tisch in

11   the mid 1990's or thereabouts, how did you get to know Sheldon

12   Silver after?  If at all.

13   A.  We talked periodically about business things affecting the

14   city, real estate business things, because that's what I knew,

15   affecting the city.

16             We had a couple meals together, a couple of lunches

17   together.  We talked periodically about things of that sort.

18   Q.  When you spoke with Sheldon Silver, did you talk to him

19   about personal things?  Or did you talk to him about business?

20   Or something else?

21   A.  No.  It was pretty much business.  I recall, for instance,

22   that in the 90's, we were very concerned about downtown.  The

23   revitalization of downtown Manhattan -- it was 50/50 as to

24   whether it was going well or not.

25             So there was a piece of legislation out there which

 1   was called the REAP laws, this REAP legislation that gave an

 2   incentive to employers if they moved their businesses downtown.

 3            So I was concerned about that because I thought that

 4   we needed to promote downtown Manhattan as a 24-hour city.  So

 5   I spoke to Mr. Silver about that.  But that's a specific

 6   example.

 7   Q.  Was the REAP program a state law?

 8   A.  State law.  Yes.

 9   Q.  How would you describe your relationship with Sheldon

10   Silver since you met him in the mid 1990's?

11   A.  I would describe it as cordial and professional.

12   Q.  Did you socialize with Sheldon Silver?

13   A.  I mean, not that I really can remember.  We had a couple of

14   lunches together, but really I wouldn't characterize it as

15   socialize.

16   Q.  Do you recall one of the lunches you had with Sheldon

17   Silver?

18   A.  I recall a couple of the lunches.

19   Q.  Where were the lunches that you recall?

20   A.  The lunches were at the Prime Grill.

21   Q.  Do you recall one of the lunches at the Prime Grill where

22   Sheldon Silver brought up the topic of Jay Goldberg?

23   A.  Yes.

24   Q.  When was that lunch about?

25   A.  My best recollection is sometime around 2004.

1  Q.  Where was that lunch?

2  A.  At the Prime Grill.

3  Q.  Who requested that lunch?

4  A.  My best recollection is Mr. Silver did.

5  Q.  What was discussed at the lunch at Prime Grill in or about

6  2004 with Sheldon Silver?

7  A.  As it affects Mr. Goldberg?

8  Q.  First in general, and then we can get to Mr. Goldberg.

9  A.  I don't recall the conversation other than the conversation

10  about Mr. Goldberg, which my best recollection, again, is that

11  it occurred towards the ends of the lunch.

12  Q.  What do you recall towards the end of the lunch Sheldon

13  Silver talking to you about with respect to Jay Goldberg?

14  A.  I recall Mr. Silver telling me that he had a friend who was

15  a close friend who was a good, decent -- I seem to recall the

16  word hamish being used.

17          THE COURT:  Do you want to spell that.  In English.

18          THE WITNESS:  I can't.  I'd have to have my

19  grandmother here.

20          THE COURT:  Hamish?

21          THE WITNESS:  It's a Yiddish expression.

22          THE COURT:  I need it spelled for the record.

23          THE WITNESS:  I apologize.  Hamish means a good,

24  decent person.

25          Mr. Silver asked me if I did tax certiorari work in

1   the regular course of my business, and of course I do.  And he

2   said to me that he had a friendship with this man.

3          He was a good, decent man.  He needed some help and

4   would I consider using him for tax certiorari work on buildings

5   that we owned or controlled.

6   BY MS. COHEN:

7   Q.   What did Sheldon Silver say at that lunch about any money

8   he would receive if you hired Jay Goldberg for your buildings?

9   A.   He didn't say anything about that.

10  Q.   What had you heard about Jay Goldberg when Sheldon Silver

11  asked you to hire him for tax cert work?

12  A.   At the time I had not heard anything about Mr. Goldberg.

13  Q.   What did you do after the lunch when Sheldon Silver asked

14  you to hire Jay Goldberg?

15  A.   I spoke to the person in my office who oversees tax

16  certiorari work for us and told her that I had had a lunch with

17  Mr. Silver; that he asked us to consider using Mr. Goldberg and

18  that she should look into his background.

19         And, if all things were equal and if his fees were

20  consistent with fees that we paid other lawyers or in fact

21  lower and if he was a good certiorari lawyer, that she should

22  consider using him.

23  Q.   Who was the individual in your office that you spoke with?

24  A.   Her name was Sarah Parnes.

25  Q.   Why did you tell Ms. Parnes to look into Jay Goldberg, and

1   if all things being equal, to hire him to do tax cert work for

2   your business?

3   A.  I think, A, it was an easy favor for me to do.  As it was

4   explained to me, he was a man who needed help and was trying to

5   earn a good, decent living.  A, it was an easy favor.

6           B, a combination of looking to create goodwill and not

7   alienate Mr. Silver.

8   Q.  Why did you not want to alienate Sheldon Silver?

9   A.  He was one of the most powerful politicians in state

10  politics.  In the event that I wanted to discuss things with

11  him or have access to him about things that might be relevant

12  to my business, I wanted to be able to have that, to have that,

13  to be able to approach him as needed.

14  Q.  If Sheldon Silver had not asked you to hire Jay Goldberg,

15  would you have considered hiring him?

16  A.  Probably not.  I didn't know him.

17  Q.  At the time Sheldon Silver asked you to hire Jay Goldberg,

18  did you have other attorneys doing tax cert work for your firm?

19  A.  We did.

20  Q.  Were you satisfied with those other attorneys'

21  representation of your firm for tax cert work?

22  A.  Yes.  I think generally we were.

23  Q.  Were there any problems with the representation being

24  provided to you by other attorneys doing your tax cert work?

25  A.  Not that I can recall.

1    Q.  What difference is there between attorneys in general that

2    do tax cert work?

3    A.  I mean, in my personal view in the tax certiorari field,

4    not all that much.  It's pretty much pro forma stuff in the

5    filing of the documents and hopefully getting some sort of

6    reduction.  You're entitled to it, or you're not.

7    Q.  What types of things did you anticipate needing to talk to

8    Sheldon Silver about in the future after he asked you to hire

9    Jay Goldberg?  You said it was things related to your business.

10   A.  It could be all the things that you've asked me about.  It

11   could be 421a-type legislation.  It could be legislation that

12   affects affordable housing.

13           It could be REAP-like laws, those sorts of things that

14   we're concerned about and that dictate how we think about

15   running our business and how much business we really want to do

16   in New York.

17   Q.  After Sheldon Silver asked you to hire Jay Goldberg and you

18   spoke with Ms. Parnes, did your company retain Jay Goldberg to

19   represent some of your buildings?

20   A.  We did.

21   Q.  Absent Sheldon Silver's request, would you have retained

22   Jay Goldberg?

23   A.  Probably not.

24   Q.  Did you ever interview or meet or talk with Jay Goldberg

25   prior to hiring him?

1    A.  I did not.

2    Q.  Did you report back to Sheldon Silver that your company had

3    hired Jay Goldberg?

4    A.  My best recollection is I did, but I can't remember exactly

5    how.

6    Q.  Why do you recall -- what do you recall about reporting

7    back to Sheldon Silver that you had hired Jay Goldberg?

8    A.  Well, again, it was an easy favor to do.  So I wanted to

9    advise Mr. Silver that it was then our pleasure to do it and

10   that Sarah decided he was competent.  Other people we knew had

11   used him as well.  We were going to give it a try with him.

12   Q.  Why did you want to let Sheldon Silver know that you had

13   hired Jay Goldberg?

14   A.  Well, it just goes back to what I said before, which is it

15   was an easy favor to do, and we were looking for -- I was

16   looking to create goodwill with Mr. Silver.

17          There was no reason for me -- and I didn't really -- I

18   didn't want to alienate him.  I wanted there to be a positive

19   relationship in the event I needed to speak to him about things

20   in the future.

21   Q.  What type of agreement did your company receive from Jay

22   Goldberg after you agreed to hire him for tax cert work?

23   A.  We received a retainer agreement from him.

24   Q.  If you look, please, in your binder.  The first document

25   should be Government Exhibit for identification 834.  If you

1   can just look at what's been marked for identification as

2   Government Exhibit 834.

3   A.  Yes.

4   Q.  Do you recognize what's marked for identification

5   Government Exhibit 834?

6   A.  I do.

7   Q.  Just without telling us the content, what is it?

8   A.  This is a letter from Mr. Goldberg to Sarah Parnes in my

9   office.

10          MS. COHEN:  Your Honor, the government moves

11  Government Exhibit 834 for identification into evidence.

12          THE COURT:  Any objection?

13          MR. MOLO:  No objection.

14          THE COURT:  834 is received.

15          (Government's Exhibit 834 received in evidence)

16  BY MS. COHEN:

17  Q.  Mr. Witkoff, if you could just explain for the jury what

18  the first page of Government Exhibit 834 is.

19  A.  It is a cover letter where Mr. Goldberg is sending a cover

20  letter where he's setting forth that he's sending over his

21  retaining agreement as well.

22  Q.  And this Ms. Parnes referenced is the same Ms. Parnes that

23  you talked about in connection with hiring Jay Goldberg?

24  A.  Yes.

25  Q.  If you would look at the second page of Government Exhibit

1   834.

2   A.  Yes.

3   Q.  I'm sorry.  What is the date both of the cover letter and

4   the second page?

5   A.  They're both dated January 14 of 2005.

6   Q.  What is the second page of Government Exhibit 834?

7   A.  That is Mr. Goldberg's retainer agreement.

8   Q.  You see there's handwriting on the third paragraph.

9   A.  Yes.

10         MS. COHEN:  Mr. Coccaro, if you could zoom in.

11  BY MS. COHEN:

12  Q.  Whose handwriting is that?

13  A.  That's Sarah Parnes'.

14  Q.  What is indicated in this paragraph and in the handwriting?

15  A.  She has reduced Mr. Goldberg's proposed 25 percent

16  contingency fee to 15 percent.

17  Q.  Do you know why his contingency fee was cut from 25 to 15?

18  A.  She did that to every tax cert lawyer.

19  Q.  If you look, please, at the buildings.

20         MS. COHEN:  Mr. Coccaro, if you could zoom in on that.

21  BY MS. COHEN:

22  Q.  What building is the second, third, and fourth at 233

23  Broadway?

24  A.  That is the Woolworth Building.

25  Q.  Are those all three of the buildings that The Witkoff Group

1    owns and managed?

2    A.  Yes.  Except we didn't manage it.

3    Q.  Which one did The Witkoff Group not manage?

4    A.  At the time we didn't manage 233.

5    Q.  Did there come a time when The Witkoff Group managed it?

6    A.  I'm sorry.  I don't mean to be confusing.  We own that

7    property with another partner, and it was jointly managed but

8    more by his office.

9    Q.  This retainer agreement is not signed.

10            Is this a copy of the retainer agreement that you

11   found in The Witkoff Group's files?

12   A.  Yes.

13   Q.  Why is this agreement not signed by you?

14   A.  I mean, I didn't see this agreement until 2014.  It just

15   wasn't customary for me to -- first of all, I never saw it.  It

16   wouldn't have been customary for us to sign retainer agreements

17   with tax cert firms anyway.  It just wasn't anything that we

18   saw as significant enough for us to sign such an agreement.

19   Q.  If you look at Government Exhibit 384, staying on the

20   second page, and then we can flip back to the first page, where

21   in Government Exhibit --

22            THE COURT:  I'm sorry 384 or 834?

23            MS. COHEN:  834, your Honor.  Apologies.

24   BY MS. COHEN:

25   Q.  So, looking at Exhibit 834, staying on the second page, the

1    retainer letter, and then you can flip to the first page, the

2    cover letter -- where on this document does Sheldon Silver's

3    name appear?

4    A.   It does not appear.

5    Q.   In preparation for your testimony here today --

6              MS. COHEN:  We can take that off the screen,

7    Mr. Coccaro.  Thank you.

8    BY MS. COHEN:

9    Q.   In preparing for your testimony here today, have you

10   reviewed your company's records to determine what buildings

11   Mr. Goldberg earned fees from and when those fees occurred?

12   A.   I have.

13   Q.   Have you reviewed a summary chart based on the review of

14   those documents?

15   A.   Yes, I have.

16   Q.   If you look in your binder, please, at what's been marked

17   for identification Government Exhibit 841 and 841-A, do you

18   recognize those documents?

19   A.   Yes, I do.

20   Q.   What is Government Exhibit 841 without talking about its

21   content, and what is 841-A?

22   A.   841 is a summary chart prepared by my office that lists the

23   buildings that Jay Goldberg represented in tax certiorari

24   proceedings and the amounts of legal fee that we paid

25   Mr. Goldberg and the dates that we paid or authorized those

1   payments.

2   Q.   What is Government Exhibit 841-A?

3   A.   It's all the documentary backup to that chart with the

4   actual applications to the City of New York, proposed

5   settlement letters, the invoice from Mr. Goldberg for

6   professional fees, and various authorizations, and a copy of

7   the refund checks.

8            MS. COHEN:   Your Honor, the government moves

9   Government Exhibit 841 and 841-A into evidence.

10           THE COURT:   Any objection?   Mr. Molo?

11           MR. MOLO:   No objection.

12           THE COURT:   841 and 841-A are received.

13           (Government's Exhibits 841 and 841-A received in

14   evidence)

15           MS. COHEN:   Mr. Coccaro, if you could put Government

16   Exhibit 841 on the screen, please.

17   BY MS. COHEN:

18   Q.   Mr. Witkoff, if you could just explain for the jury and

19   walk through what this chart shows, Government Exhibit 841.

20   A.   Yes.   So on the left-hand side, it lists the properties

21   that Mr. Goldberg represented us on.   So the first property is

22   10 Hanover Square, which was a rental property, a multi-family

23   rental property in downtown Manhattan.

24           The second property is 150 Charles, which is a

25   condominium project in the West Village that was just

 1   completed.

 2            The third building was 866 Third Avenue, which was a

 3   retail complex on 52nd Street and Third Avenue.

 4            The third property is 55 Wall Street, which was a

 5   property that we converted into condominiums in downtown

 6   Manhattan.

 7            Finally, the fifth property is a Rite Aid store

 8   principally in Astoria, Queens.

 9   Q.  What is showing in the column "Legal Fee"?

10   A.  The "Legal Fee" column shows each legal fee that we paid to

11   Mr. Goldberg's firm.  In the case of 10 Hanover, it was one

12   legal fee; whereas, in the case of, for instance, 150 Charles

13   Street, there were evidently five separate tax certiorari

14   proceedings.  So we paid five separate legal fees.

15   Q.  Are there separate tax certiorari proceedings because tax

16   certiorari comes up every year on each building?

17   A.  Yes.

18   Q.  Looking at the date paid or authorized, what does that

19   column represent?

20   A.  That is the actual date that we paid the legal fees to

21   Mr. Goldberg.

22   Q.  Under "Tax Benefit Program," what is that?

23   A.  That lists -- that sets forth that 10 Hanover Square was a

24   property that was getting 421g benefits.  150 Charles Street

25   was a property that was getting 421a benefits, and 55 Wall

 1   Street was a property getting 421g benefits.

 2   Q.  So of the five properties that Mr. Goldberg earned fees are

 3   your company, two were buildings that had 421g benefits; is

 4   that correct?

 5   A.  Yes.  That's correct.

 6   Q.  And one building had 421a?

 7   A.  Yes.  That's correct.

 8   Q.  But three of the five buildings had the state benefits 421a

 9   and 421g?

10   A.  Correct.

11   Q.  And which of these buildings are in Sheldon Silver's

12   assembly district?

13   A.  I'm pretty sure 10 Hanover and 55 Wall Street are in

14   Mr. Silver's district.

15   Q.  And under "Previous Attorney," what does that column

16   represent?

17   A.  Well, on 10 Hanover, the tax certiorari was done by this

18   gentleman, Anthony Como, before we turned it over to

19   Mr. Goldberg.  On 150 Charles, we had no prior law firm.  So

20   that's why it says in/A.

21         On 866 Third, we were using this particular law firm,

22   Podell, before we turned it over to Mr. Goldberg.  And 55 Wall

23   and the Rite Aid did not have previous representation.

24   Q.  Why did the Rite Aid And 55 Wall not have previous

25   representation?

1    A.   Well, 55 wall -- I don't think we closed that deal until

2    2004 or '05, and then it was being gut renovated pursuant to

3    421g.  So there wouldn't have been a need to engage in tax

4    protest procedures.

5           The same thing with 150 Charles prior to 2008.  We

6    owned it since 2004, and it was a warehouse before then.  We

7    were taking it through a -- taxes were pretty low.  We were

8    taking it through a re-entitlement procedure.  That's when it

9    became more valuable.

10          In the case of the Rite Aid property, that's a

11   property that my mom and my uncle owned.  And my dad, who I

12   lost, ran it for them.  I'm not sure -- my father was not a

13   professional real estate person.

14          I'm not sure that he really knew that he could do tax

15   certiorari work.  It's after my father passed away we took it

16   over from my mom and my uncle, and I think Sarah identified

17   that there was an opportunity to knock taxes down.

18   Q.   So the two properties that had attorneys, 10 Hanover Square

19   and 866 Third Avenue -- are those properties that were taken

20   away from those attorneys in order to give it to Jay Goldberg?

21   A.   Yes.

22   Q.   What is the total amount of money that your company paid to

23   Jay Goldberg for tax certiorari work?

24   A.   We paid him over -- through roughly 2015, $288,326.22.

25   Q.   What amount of that $288,326.22 did you know was being paid

1    to Sheldon Silver?

2    A.   Nothing.

3    Q.   Other than Jay Goldberg, what other times did Sheldon

4    Silver recommend for you someone to hire?

5    A.   He didn't recommend anybody else for us to hire.

6         MS. COHEN:   Mr. Coccaro, you can take that down.

7    Thank you.

8    BY MS. COHEN:

9    Q.   Other than Jay Goldberg, what other times did Sheldon

10   Silver ask you to do something for him?

11   A.   I don't recall anything else.

12   Q.   Did there come a time when you learned that Sheldon Silver

13   was getting a cut of the fees that you paid to Jay Goldberg?

14   A.   Yes.

15   Q.   How did you learn that?

16   A.   I learned it from Mr. Goldberg.

17   Q.   How did you learn that from Mr. Goldberg?  What were the

18   circumstances under which you learned that?

19   A.   He called my office multiple times in the early summer of

20   2014 and then finally called up Scott Alpern, my partner.  I

21   didn't return his call because I didn't know who he was.

22        And then he finally called my partner, Scott Alpern,

23   who had a -- my recollection is an initial conversation with

24   him about this.  Scott came and talked to me about it.  I and

25   Scott called him up on the phone, and we spoke to him together

 1   on a speaker phone.

 2   Q.  Do you remember the precise date at the time you spoke with

 3   Mr. Goldberg on the phone with Scott Alpern?

 4   A.  I want to say it was sometime in June of 2014.

 5   Q.  If you look in your binder at Government Exhibit 845 for

 6   identification.  Just tell us if that refreshes your

 7   recollection about the date of the call.

 8   A.  Yes, it does.

 9   Q.  Is the document marked Government Exhibit 845 a document

10   that was maintained in the regular course of The Witkoff

11   Group's business?

12   A.  Yes, it is.

13   Q.  Just in general, without describing it, what is it?

14   A.  It's a message from Scott Alper's then says assistant,

15   Josefa Gonzalez, that a telephone call had come in on the

16   3rd of June 2014 from Mr. Goldberg with his office number and

17   cell phone number and a message that said, "Pretty important."

18           MS. COHEN:  Your Honor, the government moves

19   Government Exhibit 845 into evidence.

20           MR. MOLO:  No objection.

21           THE COURT:  Okay.  845 is received.

22           (Government's Exhibit 845 received in evidence)

23           MS. COHEN:  If you could zoom in, Mr. Coccaro.

24   BY MS. COHEN:

25   Q.  Who is Ms. Gonzalez.

1  A.   Josefa is an assistant.  She just left us two weeks ago.

2  She was with us for 20 something years.  She was the then

3  assistant of Scott Alper.

4  Q.   Is this a message slip that she would have sent to Scott

5  Alper?

6  A.   Yes.

7  Q.   What is the date of the message?

8  A.   June 3, 2014.

9  Q.   If you could just read what the message is.

10 A.   It says from Josefa Gonzalez, sent:  Tuesday, June 3, 2014,

11 at seven minutes after 1:00 in the afternoon.  To:  Scott.

12 Subject:  Calls.  Jay Goldberg with his office number and cell

13 phone number and a message that evidently he must have told

14 her, "Pretty important."

15          MS. COHEN:  You can take that down, Mr. Coccaro.

16 BY MS. COHEN:

17 Q.   When you spoke to Jay Goldberg in response to his call to

18 your office, what did he say, and what did you say?

19 A.   Scott and I called Mr. Goldberg back on the speaker phone,

20 and he informed us that there was an investigation that

21 involved him and Mr. Silver where they were -- the

22 investigation concerned fee splitting on Golberg & Iryami fees

23 as it affected us.

24          He then asked me to remember that I knew about the fee

25 splitting.

1    Q.  What did you say in response?

2    A.  I was incensed and belligerent with him.

3    Q.  Why were you incensed and belligerent?

4    A.  Because I didn't know, and I felt that he was asking me --

5    Mr. Goldberg was asking me to remember something that was just

6    simply not the case in my view.

7    Q.  What did you do after Jay Goldberg asked you to remember

8    that Sheldon Silver had been getting some of his fees?

9    A.  Well, I mean after yelling at him pretty hard -- and I did

10   yell at him -- I said to him -- he said to me -- he actually

11   said to me that we had retainer agreements that said that.

12        So I said, well, wait a second.  I went into Sarah

13   Parnes' office.  She had the 2005 retainer agreement that had

14   no mention of it, came back, told Mr. Goldberg that we had

15   retainer agreements that didn't have that on it.

16        It wasn't signed by me, but irrespective of that, I

17   said to him that I wasn't aware of this.  In fact, if there was

18   fee splitting, he had an obligation to tell us.  That was real

19   problematic in my view.  He apologized to me.

20   Q.  Why was it problematic, in your view, to learn that Sheldon

21   Silver was getting part of the fees you had paid to Goldberg?

22   A.  Well, he's an elected official.  We would have been

23   concerned about making sure that we weren't doing anything

24   wrong, anything illegal, or anything illegitimate.

25        We didn't know about it.  So that's problematic, just

1   simply not to know.

2   Q.  What about Sheldon Silver being an elected official would

3   have made you very concerned that it would be something illegal

4   to split the fee?

5   A.  Well, I had a professional relationship with him.  We did

6   business in the city and in the state, and I was very, very

7   concerned that what I thought had been a favor for someone's

8   friend was now going to turn into being a misperception that we

9   had done something wrong.  I was very concerned about that.

10  Q.  After your discussion with Jay Goldberg, what review of

11  your company's files did you do?

12  A.  I scrubbed those files pretty good.

13  Q.  Other than the retainer agreement 834 from 2005, what

14  documents did you find -- retainer agreements did you find with

15  Jay Goldberg?

16  A.  We found the 2005 retainer agreement, and we found the 2013

17  retainer agreement as well.

18  Q.  If you look in your binder as what's marked Government

19  Exhibit 737 for identification.

20          What is Government Exhibit 737 if you recognize it?

21  A.  It's a cover letter from Mr. Goldberg to Sarah sending

22  another retainer agreement.

23  Q.  Is this a document you found in your books and records that

24  you went to scrub after you got a telephone call from Jay

25  Goldberg telling you about the fee split with Sheldon Silver?

1    A.  Yes.

2          MS. COHEN:  Your Honor, the government moves

3    Government Exhibit 737 into evidence.

4          THE COURT:  737 is already in evidence.

5          MS. COHEN:  Great.  Thank you, your Honor.

6          Mr. Coccaro, if you could please pull it up.

7    BY MS. COHEN:

8    Q.  Mr. Witkoff, what is shown on the first page of Government

9    Exhibit 737?

10   A.  It is a cover letter from Mr. Goldberg to Sarah setting

11   forth a retainer agreement for a particular piece of property

12   that we own and manage.

13   Q.  What is the date of this retainer agreement?

14   A.  February 13, 2013.

15   Q.  If you would turn to the next page.

16          Is this the retainer letter that was enclosed with the

17   cover letter?

18   A.  Yes, it is.

19   Q.  What is the date of this retainer letter from Jay Goldberg

20   to The Witkoff Group?

21   A.  February 13, 2013.

22   Q.  If you look at the third paragraph.

23          MR. COHEN:  If you can zoom in, Mr. Coccaro.

24   BY MS. COHEN:

25   Q.  What is shown in the third paragraph of Government Exhibit

```
 1   737?

 2   A.  It sets forth that the fee to Mr. Goldberg would be

 3   15 percent.

 4   Q.  Mr. Witkoff, anywhere on this retainer agreement,

 5   Government Exhibit 737, or even the cover letter, is there any

 6   mention of Sheldon Silver?

 7   A.  No.

 8   Q.  Other than this retainer, Government Exhibit 737, and the

 9   retainer agreement from 2005, Government Exhibit 834, what

10   other retainer agreements did you find in The Witkoff Group's

11   files?

12   A.  I didn't find any.

13   Q.  Who keeps the files about tax certiorari work in your

14   office?

15   A.  Sarah Parnes does.

16   Q.  Is Sarah Parnes an organized person?

17   A.  She is.

18   Q.  How is her recordkeeping?

19   A.  She was my legal secretary at Dreyer & Traub.  When I left,

20   she came to join us.  She's thorough.

21   Q.  If you look, please, at what's in evidence as Defendant's

22   Exhibit 119 for a minute, please.  It's in your binder one

23   back.

24   A.  Yes.

25   Q.  Have you ever seen this email before?
```

```
 1   A.  No.

 2   Q.  What discussions did you have with Sarah Parnes about any

 3   new retainer agreements in 2012?

 4   A.  I never had a discussion with Sarah about a retainer

 5   agreement in 2012.

 6   Q.  Is there an attachment to this email?

 7   A.  Not that I have.

 8   Q.  If Jay Goldberg wanted to call you, did Jay Goldberg know

 9   how to reach you?

10   A.  Yes.  He knew how to reach us.

11           MS. COHEN:  You can take that down.

12   BY MS. COHEN:

13   Q.  If Sheldon Silver wanted to call you, did he know how to

14   reach you?

15   A.  Yes.

16   Q.  Prior to learning from Jay Goldberg on that telephone call

17   in 2014 that Sheldon Silver was getting part of the fees that

18   you paid to Jay Goldberg, what knowledge did you have of any

19   fees that were being paid to Sheldon Silver from the money you

20   paid to Jay Goldberg?

21   A.  We had no knowledge.

22           MS. COHEN:  No further questions, your Honor.

23           THE COURT:  Before Mr. Molo starts, can I see the

24   parties for just a second.

25           (At the sidebar)
```

```
 1              THE COURT:  Unlike Sarah Parnes, I'm not a
 2   particularly organized person, but I have been trying to keep
 3   track of all of your exhibits.
 4              I do not have 119 marked in.  I also have it as a
 5   speaker's issue list, not as an email from Ms. Parnes.
 6              MS. COHEN:  I think because it's a defense exhibit,
 7   your Honor.
 8              THE COURT:  Okay.  That would explain it perhaps.
 9              Okay.  Thank you.
10              MS. COHEN:  You're welcome.
11              (In open court)
12   CROSS-EXAMINATION
13   BY MR. MOLO:
14   Q.  Good morning, Mr. Witkoff.
15   A.  Good morning.
16   Q.  I'm Steve Molo, and I represent Mr. Silver.  We have not
17   met I don't believe.
18              You met Mr. Silver I guess in the 90's through
19   Mr. Tische; is that right?
20   A.  That's my best recollection.
21   Q.  That's your recollection?
22   A.  Yes.
23   Q.  Mr. Silver is also friends with a mutual friend of yours,
24   Mr. Schron, Ruby Schron; is that right?
25   A.  Yes.
```

1   Q.  Did you know that Mr. Goldberg had done tax certiorari work

2   for Ruby Schron?

3   A.  I actually found it out a little bit after.

4               THE COURT:  After what?

5               THE WITNESS:  After we -- well, it was confirmed for

6   me recently because he did the certiorari work on the Woolworth

7   Building, which was the distinction I was trying to make.

8               But, yes.  I've talked to Ruby at some point and knew

9   that he later on -- that he had done business with

10  Mr. Goldberg.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. MOLO:

2  Q.  And I'm just trying to put a general time on it, I'm not

3  expecting a date or anything like that, but it was before this

4  phone call with Goldberg that you described in December of

5  2014, right?

6  A.  It might have been.  I can't remember exactly but it might

7  have been.

8  Q.  And are you and Mr. Schon partners in some buildings?

9  A.  We are, yes.

10  Q.  And your relationship with Mr. Silver, I take it you

11  describe, as cordial?

12  A.  Oh yes.

13  Q.  In fact, friendly I guess in the context of business --

14  well, let me rephrase it a little bit differently.

15          In the context of the City of New York you have a

16  cordial relationship?

17  A.  Yes.

18  Q.  I think you mentioned you had a few lunches together?

19  A.  We did.

20  Q.  I think you invited him to play golf at your club in

21  Florida once?

22  A.  I think, yes.  I recall at least one time, yeah, that we

23  played golf.

24  Q.  And I take it you generally enjoyed his company?

25  A.  Yes.  When -- yeah.  Yes.

1    Q.  Now, you began your career as a real estate attorney?

2    A.  I did.

3    Q.  And you have got friends who are real estate attorneys, I

4    take it?

5    A.  Yes.

6    Q.  It's common for lawyers to be paid for generating legal

7    business without actually doing work on the business, isn't it?

8              MS. COHEN:  Objection, your Honor.

9              THE COURT:  Overruled.

10             If you know.

11             THE WITNESS:  I think so.

12   Q.  Rainmakers?

13   A.  Yes.

14   Q.  Okay.

15             And when a lawyer can't competently handle a

16   particular type of work it is also common for a lawyer to refer

17   that work to someone who can do it competently, right?

18   A.  Yes.

19   Q.  Because the lawyer who is referring the work can't really

20   represent the client, right?

21   A.  Yes.

22   Q.  And it is also your understanding that it is common in the

23   legal world for people to pay referral fees?

24   A.  I mean, I haven't practiced law in 30 years but my -- yes.

25   I guess I would have to answer yes to that.

1   Q.   Okay.

2           Now, we went through a chart that the prosecutors had

3   put up, 841, we don't need to put it up right now but it had --

4   actually, why don't we put it up for a second, 841.

5           This was the work that the Goldberg & Iryami firm did

6   for The Witkoff Group, I guess at least for the --

7           MS. COHEN:  Your Honor, this is a different chart.

8           MR. MOLO:  Oh, it is?

9           MS. COHEN:  This is not in evidence.  Correct.  We can

10  put up our chart.

11          MR. MOLO:  Can we put up 841?  That's what I had asked

12  for.

13          Justin, do you have it?

14          MS. COHEN:  That's the correct chart.  Thank you.

15  BY MR. MOLO:

16  Q.   I guess in the first four:  10 Hanover, 150 Charles, 866

17  Third, 55 Wall Street; these are all properties that Witkoff

18  Group owned and managed, I take it, or substantially owned and

19  managed, right?

20  A.   Yes.

21  Q.   All right.

22          And the work that Goldberg & Iryami did was

23  acceptable, right?

24  A.   Yes.

25  Q.   You never had a problem with the work that they did, right?

1   A.   No.  No.

2   Q.   And I guess that last bit, the Rite Aid, that was owned by

3   your mom and uncle in Queens?

4   A.   Yes.

5   Q.   All of the, date paid or authorized, the most recent one of

6   those was April 7th of 2014, correct?

7   A.   I actually -- on Rite Aid it was February 11th of 2015.

8   Q.   Right, on the Witkoff properties, though, it's --

9   A.   Yes, April 7th of 2014 was the last one.

10  Q.   Okay.

11          And so, on the Witkoff properties all of those

12  payments preceded this phone call that you had with Jay

13  Goldberg, right?

14  A.   Correct.

15  Q.   And before you even used them you had Sara Parnes vet them,

16  I guess?

17  A.   Yes.

18  Q.   And it is also common, isn't it, for real estate developers

19  to use multiple firms to do this tax cert work?

20  A.   Yes, it is.

21  Q.   Okay.

22          I take it Ms. Parnes is a pretty good negotiator?

23  A.   She is.

24  Q.   I understand that there are people in this business that

25  pay 25 percent for real estate tax work and she got it for 15?

```
 1   A.  That's correct.

 2   Q.  And I also understand that one of the tactics in doing that

 3   is to just not sign engagement letters; is that right?

 4            MS. COHEN:  Objection, your Honor.  Form.

 5            THE COURT:  Overruled.

 6   A.  I guess that could be someone's tactic but in this

 7   particular case I mean I didn't sign that -- that had

 8   nothing --

 9   Q.  Oh no, no, no, no, no.  I'm not suggesting that you did.

10   A.  Yes.

11   Q.  First of all, you wouldn't even see these retainer letters,

12   would you?

13   A.  Never.

14   Q.  As they say, this is way below your pay grade; correct?

15   A.  Correct.

16   Q.  You are building buildings around the world and Ms. Parnes

17   is dealing with these issues for you here and elsewhere, right?

18   A.  Yes.  Absolutely.

19   Q.  So, whether an engagement letter was or wasn't received or

20   it was or wasn't signed is not something that you would

21   necessarily know?

22   A.  Correct.

23   Q.  Now, you met Mr. Goldberg, you said, through Mr. Silver and

24   at the time you said that he was a Hamish?

25            MS. COHEN:  Objection to the beginning of the
```

1   question, your Honor.

2              THE COURT:  Overruled.

3              MR. MOLO:  The objection is to my pronunciation.

4              THE COURT:  Overruled.

5              MS. COHEN:  That was not the objection.

6              THE COURT:  That was objectionable but that's not it.

7              MR. MOLO:  I would agree.

8   BY MR. MOLO:

9   Q.  But, in any event, if you could answer my question,

10  Mr. Witkoff?

11             THE COURT:  Rephrase the question.

12  Q.  The question is basically Mr. Silver said this is a pretty

13  good guy, why don't you throw him some business; is that right?

14  A.  That's -- yes.

15  Q.  And at the time Mr. Silver did not tell you that he wanted

16  you to send Goldberg business in exchange for him doing

17  something for you, did he?

18  A.  No.

19  Q.  In fact, you did not give Mr. Goldberg business in exchange

20  for Mr. Silver's specific exercise of his official authority in

21  some ways; is that right?

22             MS. COHEN:  Objection, your Honor.

23             THE COURT:  Overruled.

24  A.  No.

25  Q.  You were basically doing a favor for somebody who was a

 1   person that you knew in the community, correct?

 2   A.  Yes.

 3   Q.  Generally generating goodwill, correct?

 4   A.  Yes.

 5   Q.  When you were asked about Defendant's Exhibit 119 -- do you

 6   have that e-mail?

 7   A.  Yes.

 8   Q.  And this is a January 17th, 2012 e-mail from Dara Iryami to

 9   Sara Parnes, she says:  I trust you received the retainer

10   agreements for Steve's signature.  For various reasons we need

11   to formalize our arrangement at this time.

12          How did you find -- you didn't go find this e-mail,

13   did you?

14   A.  No.

15   Q.  This is not something that you had tucked in a drawer or

16   had flagged for some reason?

17   A.  No.

18          MS. COHEN:  Objection, your Honor.

19          THE COURT:  Overruled.

20   A.  No.

21   Q.  I want to show you Defendant's Exhibit 136.  Take a minute

22   just to look at that.  Have you had a chance to look through

23   it?

24   A.  Yes, I have.

25   Q.  And do you recognize this document at all?

1    A.  It is the first time I am seeing it.

2    Q.  Okay.

3            Without reading from it, does it appear to be a letter

4    to The Witkoff Group from Mr. Goldberg?

5            MS. COHEN:  Objection, your Honor.  This isn't in

6    evidence.

7            THE COURT:  Sustained, and maybe we can short circuit

8    this.  Come on up.

9            MR. MOLO:  Sure.

10           MS. COHEN:  Thank you, your Honor.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (At side bar)

2      THE COURT:  So, the document is not in evidence.

3      MR. MOLO:  Right.

4      THE COURT:  Ms. Iryami is on and off the stand.

5      MR. MOLO:  Okay.

6      THE COURT:  He hasn't seen the document.  So, where

7   are you going with this?

8      MR. MOLO:  Well, I asked him -- I didn't ask him

9   whether he had seen it.

10      THE COURT:  You just asked him that and he said this

11   is the first time he has seen it.

12      MR. MOLO:  Okay.

13      THE COURT:  Moreover, his testimony relative to the

14   e-mail transmittal seemed to have suggested that you would have

15   known that he hadn't seen it.  But, be that as it may.

16      MR. MOLO:  I will ask him whether he was aware whether

17   there was a letter sent in which there was a discussion of

18   this.  I will ask him --

19      THE COURT:  Whether he was aware of there was a

20   letter?

21      MR. MOLO:  In which there was a letter sent.

22      THE COURT:  That assumes a fact not in evidence which

23   is that the letter was sent.

24      MR. MOLO:  Okay.

25      THE COURT:  You had the opportunity to ask the person

1    who would have known the answer to that question.

2            MR. MOLO:  All right.

3            THE COURT:  And you didn't.

4            MR. MOLO:  Okay.

5            THE COURT:  Okay?

6            MR. MOLO:  All right.

7            MS. COHEN:  So you are not going to be able to ask

8    that question?

9            MR. MOLO:  Do you get to rule or does the Judge?

10           THE COURT:  Please, please stop that.  Really, both of

11   you.

12           You can't ask that question, it assumes a fact not in

13   evidence and the document can't come in through him.

14           MR. MOLO:  Okay.

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court)

2    BY MR. MOLO:

3    Q.  Mr. Witkoff, does 421g that you testified about a little

4    bit earlier, do you recall that was passed around 1995 or 1996?

5    Does that sound right?

6    A.  I think it was even before that.

7    Q.  Even before that.

8                    And that was well before Mr. Goldberg was doing any

9    work for The Witkoff Group?

10   A.  Yes.

11   Q.  And the work that was sent to Mr. Goldberg was not in

12   exchange for Mr. Silver doing anything for you in his official

13   capacity; is that right?

14   A.  Correct.

15   Q.  And you did not know that Mr. Silver was receiving any kind

16   of a referral fee from Mr. Goldberg until the summer, June, I

17   believe, of 2014; is that right?

18   A.  Correct.

19   Q.  And after learning that you actually stopped doing work

20   with Mr. Goldberg, correct?

21   A.  Correct.

22                    MR. MOLO:  One moment, your Honor?

23                    (Counsel conferring)

24   Q.  The reason that you stopped doing business with

25   Mr. Goldberg in 2014 was you fired him, right, as your tax

1    lawyer?

2    A.   Correct.

3            MR. MOLO:   Thank you.

4            THE COURT:   Ms. Cohen, any redirect?

5            MS. COHEN:   Briefly, your Honor.

6    REDIRECT EXAMINATION

7    BY MS. COHEN:

8    Q.   After the lunch where Sheldon Silver asked you to hire Jay

9    Goldberg and that you hired Jay Goldberg, you told Sheldon

10   Silver that you had hired Jay Goldberg, right?

11   A.   Yes.

12   Q.   And after that you talked to Sheldon Silver on various

13   occasions about things related to your real estate business,

14   right?

15   A.   Correct.

16           MR. MOLO:   Objection, your Honor.   Leading question.

17           THE COURT:   Overruled.

18   A.   Yes.

19   Q.   In any of those discussions did Sheldon Silver ever tell

20   you that he was getting part of your fees from Jay Goldberg?

21   A.   No.

22   Q.   And when you had that lunch with Sheldon Silver, what tax

23   certiorari work did you ask Sheldon Silver to do for you that

24   he couldn't handle?

25   A.   Nothing.

1   Q.   You didn't go to Sheldon Silver seeking advice about who to

2   hire for tax certiorari work, did you?

3   A.   No.

4   Q.   And you never asked Sheldon Silver to recommend --

5            MR. MOLO:   Objection.

6   Q.   -- a tax certiorari attorney?

7            MR. MOLO:   Objection.

8            THE COURT:   Overruled.

9   A.   No.

10   Q.   And you were asked some questions on cross-examination

11   about why you hired Jay Goldberg after Sheldon Silver asked

12   you.   Do you recall that?

13   A.   Yes.

14   Q.   And you said that one of the reasons was it generated

15   goodwill?

16            MR. MOLO:   Objection.

17            THE COURT:   Overruled.

18   A.   Yes.

19   Q.   What were the other reasons you hired Jay Goldberg at

20   Sheldon Silver's request?

21   A.   As I had said before it was (A), an easy favor to do and I

22   felt it would generate goodwill and that I didn't want to

23   alienate Mr. Silver because I thought that I might -- I might

24   need access to him in the general course of my business at a

25   future point in time.

1           MS. COHEN:  No further questions, your Honor.

2    RECROSS EXAMINATION

3    BY MR. MOLO:

4    Q.  The hiring was not in anticipation of Mr. Silver taking

5    some specific official act with respect to your business?

6    A.  Correct.

7           THE COURT:  Okay.  Thank you.  You can step down.

8           (witness steps down)

9           THE COURT:  Okay.  I think this is probably a

10   convenient time for us to take our morning break.

11          Don't discuss the case and remember that's broadly

12   defined; nothing having to do with what's going on in the

13   courtroom.  Okay?

14          See you in about 10 minutes.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2         THE COURT:  Okay.  I think the issue is the October

3    29th, 2009 transcript which I gather would require evidence

4    from Ms. Reid explaining what the Seminerio case was?

5         MS. COHEN:  Your Honor, very, very limited, in

6    basically one leading question which is:  Is she aware that

7    Seminerio's conviction was related to what he did or didn't put

8    on his financial disclosure forms.  A question like that.

9         THE COURT:  Okay.  That's not quite right so it would

10   need to be that the scheme involved receipt of fees that

11   weren't disclosed on the financial disclosure form.  But, I see

12   Mr. Molo vigorously shaking his head and therefore I feel that

13   he wants to talk.

14        MR. MOLO:  Judge, this is exactly the peril we are

15   talking about.  First of all, this is irrelevant generally in

16   her testimony, but secondly --

17        THE COURT:  Hang on a second.  It is irrelevant to

18   understanding this transcript?

19        MR. MOLO:  Well, we, yesterday, made the point and we

20   have made the point before, particularly where we are in the

21   case, that getting into disclosure forms is perilous territory.

22        THE COURT:  Yeah, but I'm tired of hearing that.

23        MR. MOLO:  I understand your ruling.  Your ruling is

24   to the contrary but, nonetheless, it is perilous territory.  We

25   have now gone from there from them wanting to play these

1    transcripts, there are five of them that they want to play in

2    which Mr. Silver responds to questions by reporters concerning

3    a whole host of things and in certain instances there is

4    limited statements concerning financial disclosure, not even, I

5    mean, details of the forms.  These are far-ranging

6    conversations and light touches on this issue.  All right?

7              THE COURT:  It is really more about who his clients

8    are, as I understand it.  Certainly this one is and as I recall

9    the other questions and answers.

10             MR. MOLO:  Correct.

11             There is no need, if they want to prove that point we

12   talk about cumulative evidence, I mean, that he has made

13   statements to the press which is what this is about, that he

14   has made statements to the press, made statements publicly

15   saying that I have --

16             THE COURT:  I view those as statements to the public.

17             MR. MOLO:  All right, to the public.

18             THE COURT:  The press is our representatives for

19   purposes of learning things.

20             MR. MOLO:  So he has made statements to the press

21   which are public statements, he has made public statements

22   about what he has done.  The fact that he has done that four

23   times versus five times is irrelevant for purposes of what the

24   government is trying to prove.

25             This transcript and this tape recording are cumulative

1    in the first instance; second, the reference to Seminerio is

2    purely gratuitous.  It talks about his sentencing.  And if we

3    are going to get into what Mr. Seminerio did or didn't do, what

4    the status of Mr. Seminerio's conviction is or isn't, what his

5    defenses were or weren't, the precise details of what it is

6    that he did or didn't disclose on his disclosure forms, we are

7    going to end up in a mini trial and I don't see how we can't do

8    that if they're going to try to argue that -- they're going to

9    try to suggest a level of detail of understanding on both the

10   part of Ms. Reid and the part of Mr. Silver and I guess the

11   part of some reporter and I ask for what possible reason.

12   There is no reason why we would need to go into this during

13   this trial, especially at this stage of this trial, and it is

14   highly -- highly -- prejudicial to be talking about some other

15   legislator who has been prosecuted for anything to do with his

16   disclosure forms.  Mr. Silver is not on trial for making false

17   statements in disclosure forms, making misleading statements in

18   disclosure forms, making incomplete statements in disclosure

19   forms, making Seminerio-like disclosures in his disclosure

20   forms whatever that means.  The risk here is tremendous --

21   tremendous -- that this jury -- they just heard this witness

22   testify, this alleged extortion victim and briber that he

23   didn't pay a bribe and he wasn't extorted and they're going to

24   now be left --

25              THE COURT:  Mr. Molo, I appreciate your high drama but

1    that is not what I heard Mr. Witkoff testify to.

2              MR. MOLO:  They're now going to --

3              THE COURT:  He testified that there was not an express

4    agreement to a specific piece of legislation which is not

5    necessary for extortion.

6              MR. MOLO:  There was no mention of express agreement

7    in my questions, Judge.

8              THE COURT:  In essence that is what you were asking

9    for him for.

10             MR. MOLO:  You are now going to be faced with half a

11   day of testimony at the conclusion of a trial in which we heard

12   about asbestos cases, we heard about OHEL where the poor Taub

13   family has been dragged through the mud here over the

14   prosecutor's allegations, the daughter gets a job working for

15   Judge Schoenfeld --

16             THE COURT:  Stop that, because I could say or the

17   government would say they didn't drag the family through the

18   mud, the problem was what Mr. Silver did, not what they did.

19   So, let's keep it to respectable legal arguments.  Okay?

20             MR. MOLO:  So, the respectable legal argument is we

21   are now left at the end of this trial with two witnesses that

22   are going to testify about public disclosure through statements

23   to the press and through these disclosure forms.  He is not

24   charged with specific illegality on those.  They're using this

25   to show what they claim is consciousness of guilt.  These are

```
 1    very tricky areas because these disclosure forms change from

 2    year to year --

 3             THE COURT:  Please don't make the same argument that

 4    we listened to, that I listened to and dealt with at length

 5    yesterday afternoon.

 6             MR. MOLO:  I'm not, Judge.

 7             THE COURT:  Yes, you are.

 8             MR. MOLO:  If I did and I am, I apologize.

 9             THE COURT:  Please, don't.

10             MR. MOLO:  And I won't.

11             As to where we are, though, with this transcript, they

12    don't need to introduce this transcript where Seminerio is

13    referenced.  They just don't need to do it and they've got four

14    others that they want to introduce or that they're going to

15    introduce over our objection.  We don't need to get into the

16    Seminerio transcript.  It just raises far too many problems and

17    far too many issues and they have not made a showing of

18    necessity.  We have had evidence excluded on a cumulative basis

19    where there was a 60-second clip that Mr. Shur wanted to play

20    yesterday, I understand that, and the Court wants to move the

21    case along.  There is no need for this.

22             THE COURT:  Does the government want to be heard

23    again?

24             MR. GOLDSTEIN:  Briefly, your Honor.

25             There are multiple recordings that we want to put in.
```

 1          THE COURT:  Are they all about this length?

 2          MR. GOLDSTEIN:  Yes, your Honor.  They're all within

 3     two to three minutes long.

 4          THE COURT:  Okay.

 5          MR. GOLDSTEIN:  With regard to the cumulative nature,

 6     yesterday the defense argued that these were things that he

 7     sort of blurted out while being accosted in an elevator.  One

 8     of the things that will come out in the recordings is that he

 9     is consistent and has a consistent and misleading message with

10     regard to all of what he says about his outside income.

11          THE COURT:  What period of time is this over and how

12     does the date of this statement compare to the other statements

13     to reporters that you intend to introduce?

14          MR. GOLDSTEIN:  They're over time so the first one is

15     from 2008 -- May of 2008, the second one is late May 2008, this

16     one is October 2009, and then there is one in December of 2009,

17     and then December of 2014.  And then there are also statements

18     that he made to the press, not in recorded form, that we intend

19     to elicit that were made in 2013 and 2014.

20          THE COURT:  All of the same theme of I only represent

21     poor personal injury claimants.

22          MR. GOLDSTEIN:  Generally, your Honor.  But what is

23     different about this recording and why this recording is

24     particularly relevant --

25          THE COURT:  Tell me again why.

1    MR. GOLDSTEIN:  In this one he is talking about the

2    nature of his -- how his disclosure describes the nature of his

3    practice.

4    THE COURT:  But I guess I don't -- I am struggling to

5    understand why including the reference to Seminerio, either at

6    the very introduction of it or in the last sort of long block,

7    is necessary to make that point.

8    MR. GOLDSTEIN:  We believe that, number one, it is --

9    this entire statement is in response to what was going on with

10   Seminerio at the time, and then number two is what we discussed

11   at the beginning of today which is the timing of this --

12   THE COURT:  But let me deal with that one first.

13   Why does that matter, whether it was in response to

14   Seminerio or it was just in response to reporters being on a

15   periodic jag about the issue of financial disclosure?  Why does

16   the fact that it was in response to the conviction of Seminerio

17   alter the evidentiary impact of what he is saying?  Because if

18   it doesn't, while I'm not as convinced as Mr. Molo that there

19   is a huge amount of prejudice associated with the mention of

20   someone who has been convicted of an honest services fraud

21   scheme, there is some prejudice associated with it and unless

22   there is some corresponding probative value to that aspect of

23   it, the prejudicial impact is going to win.

24   So, how does that alter the probative value of what he

25   is talking about?  Because if you start the tape with the first

1    sort of -- after the little introductory start, you start with

2    Reporter 1: *Do you think that would drive some kind of*

3    *reporting, a more specific reporting requirement?* Everything

4    is really self-contained from there on.

5         MR. GOLDSTEIN:  I think there are two things, your

6    Honor.  Number one is this does go to when he says I do this, I

7    have done this every year for the last 10 years long before

8    Seminerio.  That is a specific reference to how he is telling

9    the public that he has fully disclosed the nature of his

10   practice as compared to Seminerio who did not and who now has

11   legal problems.  And so that, we think, is relevant.

12        Then on the second is the timing, that they want to

13   make an issue of this communication with Lisa Reid that happens

14   a couple of months later and the fact that Seminerio -- he

15   hears he is convicted and is about to be sentenced and is

16   sentenced and receives a substantial prison sentence, that is

17   relative to his later communication to Lisa Reid where he

18   decides to change his disclosure form in a very minor way.

19        THE COURT:  I don't -- I mean, the timing isn't even

20   all that close.  This is kind of in between conviction and

21   sentencing is like six months later.

22        MR. GOLDSTEIN:  I think that's actually not right,

23   your Honor.

24        THE COURT:  I thought that was based on the dates that

25   somebody provided me earlier.

```
 1                MR. GOLDSTEIN:  The sentencing takes place in February
 2      of 2010.  The next time that he has to fill out a disclosure
 3      form is in May of 2010 and it is in May of 2010 that he changes
 4      his form and he does that, it is the next time he has the
 5      opportunity to make a change and they want to make a big deal
 6      out of the fact that he made a change when he just told the
 7      public in response to Seminerio I have done it the same way
 8      every year for the last 10 years.
 9                THE COURT:  That's fine.  I don't have a problem with
10      that.  It is the starting it out with the sentencing report of
11      the former -- of Mr. Seminerio and then including in the end
12      which, frankly that sentence, I think without the prior
13      reference to Seminerio having been convicted -- I'm not sure
14      that it, without the antecedent that it really matters, but I
15      presume that the defense would like that redacted out and
16      that's on my disclosure form and it's been there long before
17      Tony Seminerio.
18                MR. GOLDSTEIN:  Your Honor, this --
19                THE COURT:  But I would say *at least the last 10 years
20      I have done it that way* would stay in.  I presume you can do
21      that kind of digital editing?
22                MR. GOLDSTEIN:  I am sure that we could, your Honor,
23      but that then takes away the motivation for changing his form.
24      That's the issue, is that there is the timing is relevant to
25      why he decided to make this minor change to his disclosure form
```

1    and without the reference to Seminerio we cannot make any

2    argument about that timing.  They are the ones who want to

3    introduce this communication to Lisa Reid and we think that

4    that then opens the door to the argument as then why does he

5    have that communication?  Why does he make the one limited

6    change?  The one thing that happened before then after he told

7    the public that he did this the same way every year for 10

8    years, the one thing that changed is that his colleague got a

9    substantial prison sentence for a crime that was related to the

10   failure to disclose the nature of his practice.  And his

11   practice did not change.

12          THE COURT:  Why doesn't it open the door?  Why doesn't

13   your desire to get in the change open the door?

14          MR. MOLO:  The change doesn't have anything to do with

15   Seminerio.

16          THE COURT:  Well, that's what you say.

17          MR. MOLO:  Well, I mean there is a --

18          THE COURT:  So then what was the motive for the

19   change?

20          MR. MOLO:  Because of the changes that were going

21   on -- Justin -- with the forms.

22          THE COURT:  The question didn't change to alter the

23   answer from Weitz & Luxenberg to Weitz & Luxenberg and others.

24          MR. MOLO:  In 2009 the income changes.  On Goldberg it

25   goes from $806 in 2008 to $14,000 in 2009, and $73,000 in 2010.

1          THE COURT:  That's the amount of income.

2          MR. MOLO:  Correct.

3          So, the fact that this is occurring is not -- I mean,

4    to include the linkage to Seminerio doesn't make any sense.

5    There is not a logical linkage.

6          THE COURT:  That's at least as logical a linkage as a

7    slight bump in his income.

8          MR. MOLO:  A slight bump going from zero in 2007 to

9    $800 in 2008, to $14,000 in 2009 and $73,000 in 2010.

10          MR. GOLDSTEIN:  He had gotten hundreds of thousands of

11    dollars in the past.

12          THE COURT:  Before.

13          MR. GOLDSTEIN:  Before.

14          There is no change in terms of the actual questions on

15    the form at this time.  The only -- and he wants to make,

16    through Lisa Reid, this good faith argument and the fact of

17    this coming in response to a conviction of a colleague tends to

18    undermine that good faith argument.

19          THE COURT:  I think the bigger thing that undermined

20    it is the fact that he was receiving hundreds of thousands of

21    dollars from the law firm and it hadn't previously been

22    disclosed.

23          MR. MOLO:  Well, when you say disclosed, the question

24    is the income is disclosed, there is a question of whether or

25    not the description on the form was adequately descriptive.

```
 1              THE COURT:  Each source was not disclosed.

 2              MR. MOLO:  Which is, were that the case, would not be

 3    a crime.

 4              THE COURT:  That's true but irrelevant to the question

 5    of whether the evidence is probative.

 6              MR. MOLO:  Versus introduction of evidence about a

 7    sentencing record, the conviction of another assemblyman and

 8    having to do with disclosure forms?  I mean, the prejudice here

 9    is extraordinary.

10              THE COURT:  Again, I'm not as convinced as you are

11    that the prejudice is extraordinary.

12              Can the government write a leading question that is

13    accurate in terms of the connection between Seminerio for Reid

14    and then just place it in time as opposed to using this tape?

15              MS. COHEN:  We can certainly write the leading

16    question but without the tape you wouldn't get what Sheldon

17    Silver knew about it so I don't know how that's --

18              THE COURT:  Your point is that, as I understand it,

19    the reason why you think he changed his form, however minor

20    that change was, the fact that we are spending an un-Godly

21    amount of time on this issue for a change that still didn't

22    fully disclose what was going on suggests that we are engaging

23    in a certain amount of angels on the head of a pin.  But, be

24    that as it may, your argument is he changed his disclosure

25    because Seminerio was convicted and Seminerio failed to fully
```

1    disclose the source of consulting fees.

2            MR. GOLDSTEIN:  The nature of his consulting fees.

3            THE COURT:  The nature of the consulting fees.

4            MR. SHUR:  If I may, just to add one more fact in the

5    mix?

6            The government's theory is illogical.  The

7    government's position is that there is this corruption

8    prosecution, Mr. Silver is making a change to the form in

9    response.  Okay.  But then to take it to the next step, he is

10   going to be reaching out to the person who heads the unit

11   within the Assembly who scrutinizes these forms to have a

12   discussion about this change when there is a significant risk

13   that in response to him saying I'm changing this form, here is

14   why I am doing it.  There is going to be follow-up questions

15   and now he is going to have to answer questions about the

16   source of income.

17           THE COURT:  I think given his position and her

18   position the likelihood of that was about the same as

19   Mr. Molo's icicle in hell.

20           MR. SHUR:  Judge, this is the type of speculation that

21   goes into introducing this evidence and making arguments about

22   relevance or whether it is significant.

23           THE COURT:  That cuts against what you want to do

24   because you're the one who wants -- it is the defense's desire

25   to start to open the door by having her testify about his going

1    to her to say he is changing his form because he thinks this

2    makes it more accurate.  That opens the door.  That then is

3    going to result in the government cross-examining her with all

4    the things that he did not tell her --

5              MR. SHUR:  Sure.

6              THE COURT:  -- as part of that.

7              MR. SHUR:  That's separate and apart, though, from

8    introducing some random fact out in the universe when there is

9    a dozen of other reasons that may have triggered.  Mr. Silver

10   made a number of different changes to these forms over the

11   course of years and he actually interacted with Ms. Reid about

12   those changes at different points in time.  She followed up

13   with him about certain answers, he contacted her about certain

14   issues.  The fact that this thing happened out there in the

15   world in connection with some other legislator when he wasn't

16   charged with 1001 for the financial disclosure form, the

17   financial disclosure form was some piece of evidence in some

18   larger trial.  It is just, in terms of weighing probative value

19   versus undue prejudice, I just don't see it, Judge.

20             THE COURT:  But, Mr. Shur, it was enough of an issue

21   that the reporter used it as a jumping off point for his

22   questions to Mr. Silver and it was enough of an issue that

23   Mr. Silver responded in a way that made it appear -- and I

24   think a jury could conclude that Mr. Silver knew exactly what

25   the reporter was talking about and knew that there were

1    concerns about what Mr. Seminerio put on his financial

2    disclosure form.  Then, fast-forward five months later when he

3    is next filling out his financial disclosure form and not only

4    does he change it but he apparently goes out of his way to make

5    sure Ms. Reid knows that he is changing it.

6           MR. SHUR:  Judge, I think you just hit the nail on the

7    head, though:  Five months later.

8           THE COURT:  But it was the next time the financial

9    disclosure form was due, right?

10          MS. COHEN:  Correct, your Honor.

11          MR. GOLDSTEIN:  That's correct.

12          MR. MOLO:  If I may?  Mr. Silver could have amended

13   his form before the sentencing of Seminerio.

14          THE COURT:  He could have.

15          MR. MOLO:  The sentencing of Seminerio occurs in

16   February of 2010.  The conviction, I am not sure of the exact

17   date but it is well before then.

18          THE COURT:  The guilty plea was in the summer of '09,

19   according to my notes.

20          MR. MOLO:  This interview is in October of 2009 and

21   the change that we are talking about occurs in May of 2010.

22          THE COURT:  But again, Mr. Molo, I think your argument

23   would have a lot of persuasive force if in response to the

24   reporter saying:  *In terms of reporting coming out of, I think*

25   *it is the sentencing report of the former assemblyman* and then

1    Mr. Silver provides the name, *Seminerio*; the reporter says *do*

2    *you think we should change the reporting rules?*  He doesn't say

3    *I don't really know what you're talking about.  What was the*

4    *issue with Seminerio?  What did he do?  I don't know what he*

5    *did.  I know what I do.*  Right?  He doesn't say that.  He seems

6    to know exactly what the reporter is talking about.

7             MR. MOLO:  He says -- the reporter says: *I think it*

8    *was the sentencing report of former Assemblyman* -- and then

9    Mr. Silver fills in the blank:  *Seminerio.*

10            I don't think there were a lot of sentencing reports

11    right at that point in time for assemblymen.  But the point

12    being, Judge, the opportunity for confusion and prejudice

13    arising out of -- unless we are going to get into parsing

14    everything that Seminerio did and didn't do with respect to the

15    forms.

16            THE COURT:  We are not doing that.

17            MR. MOLO:  I don't think we should.  All right?  But I

18    don't see how they need to do what they want to do here, to

19    mention him, mention his sentencing, the timing on this, with

20    the May of 2010 date and the change in the form and the

21    conviction of Seminerio in the summer of 2009, the sentencing

22    in February of 2010.  Mr. Silver could have gone and amended

23    his report at any point other than that and he didn't do this

24    until this conversation with Ms. Reid in May of 2010.  The

25    linkage just isn't there.

1          THE COURT:  Again --

2          MR. MOLO:  It's not on the day he got convicted

3    Mr. Silver ran to Lisa Reid and said let me change my form so I

4    don't get convicted.  That would be a very different

5    conversation or a different piece of evidence.  That didn't

6    happen.

7          THE COURT:  No, it didn't.  Again, the defense is

8    opening the door, it is insisting on the conversation with Reid

9    that is of marginal benefit.

10         MR. MOLO:  Well, it is a benefit to show that he is

11   trying to do the right thing.  He takes some level of concern

12   about the accuracy of these forms.

13         THE COURT:  Be very careful about how hard you want to

14   jump on that because that's not what the -- the evidence is

15   that he says to Ms. Reid that he thinks that this will be more

16   accurate.  Not that this will be accurate, it will be more

17   accurate.

18         MR. MOLO:  I understand.

19         THE COURT:  I thought we were aiming for accuracy on

20   those forms, but be that as it may.

21         MR. MOLO:  In life it doesn't mean that everybody is

22   going to articulate something in precise will the words that

23   the prosecutors would find --

24         THE COURT:  But my issue, Mr. Molo, is you are saying

25   that the evidence shows that he was acting in good faith in

1    2010 when he filled out his financial form.

2              MR. MOLO:  Correct.

3              THE COURT:  I'm saying that's one possibility.  It is

4    certainly not the only way a jury, a rational jury could view

5    that evidence.  I think a rational jury could also view that

6    evidence as trying to go to the person and say, oh, I'm doing

7    better in hopes that that will distract from any focus on his

8    form because he has changed it in a minor way, again still not

9    disclosing fully.

10             MR. MOLO:  If they want to argue that they can argue

11   that.  They don't need to do it by introducing evidence of the

12   conviction of Tony Seminerio.

13             THE COURT:  All I am saying is the reason that we are

14   in this is because the defense is insisting and I agreed that

15   you will be permitted to put it in.

16             MR. MOLO:  I understand.

17             THE COURT:  But you have to understand that that then

18   opens the door for the government to put in evidence to show

19   that this was not simply a good faith attempt on your client's

20   part to comply with the law but it was that he was hearing

21   footsteps.

22             MR. MOLO:  They can argue what they want but not

23   connecting it to Tony Seminerio and Seminerio's conviction.

24             THE COURT:  But those are the footsteps.

25             MR. MOLO:  Judge, this is May of 2010.  Those

1    footsteps are a continent away at that point in time.

2            THE COURT:  That's your argument.

3            MR. MOLO:  Well, but here, if this were the issue in

4    the case maybe -- maybe -- that has some level of traction but

5    this is a remote issue in the case.  As Mr. Shur put it

6    yesterday, something that they're alleging is a cover-up as

7    opposed to the crime that they're alleging and --

8            THE COURT:  That's not quite what they're alleging.

9            MR. MOLO:  Well, but the prejudice that is resulting

10   from it, again, they can argue that Mr. Silver wasn't acting in

11   good faith, but to link it to Seminerio when it is that far

12   removed is hugely prejudicial given what Seminerio was

13   prosecuted for and, again, I don't see how we can introduce the

14   evidence without getting into that because -- we don't want to

15   do that.  We don't want to do that and you are not going to let

16   us have a mini trial on that I know that.  I know that.

17           THE COURT:  Again, it is the defense that is opening

18   the door.

19           MR. MOLO:  I mean, yesterday when we examined

20   Mr. Runes and asked him about the reporting rule for lawyers

21   and how if he thought somebody had done something illegal it

22   was incumbent upon him to report that and that was considered

23   too far removed.

24           THE COURT:  No.  The issue was it is not -- Mr. Runes

25   is not on trial.  What his view of whether he should or

1    shouldn't report what he was seeing in terms of a violation of

2    the ethics rules is not the issue on trial and, therefore, it

3    was not appropriate cross-examination.  This is different.

4    This is your opening the door with testimony that Mr. Silver

5    talked to Ms. Reid and said he was changing his form.  This is

6    evidence.  You want to say that is evidence of his good faith

7    in 2010.  The government, in response to that evidence without

8    that evidence, the short answer to this is no.  Right?  But

9    given that they want to respond to say, no, that's not evidence

10   of good faith, that is evidence of the wily Mr. Silver hearing

11   footsteps based on the prosecution of his colleague who was

12   also convicted -- or was charged and ultimately convicted of

13   honest services fraud which, by the way, is what he is being

14   charged with.

15        So, it all starts with the fact that the defense wants

16   to put in evidence that is of marginal probative value relative

17   to his good faith but it creates the issue that then the

18   government is entitled to respond to.

19        MR. MOLO:  We only get to that point because we are

20   getting into this evidence to begin with.

21        THE COURT:  You're right.

22        MR. MOLO:  And I understand that you have ruled that

23   it comes in.  But now that it does, we are starting to

24   degenerate into this but-what-does-it-mean sort of thing that

25   we think creates this problem for the jury.  There is no way

1    this jury is going to sit there, hear that evidence and think,

2    you know, that somehow or another, doing something with these

3    disclosure forms is the crime.  And it just isn't.

4              THE COURT:  I'm sorry.  Hearing what evidence?

5              MR. MOLO:  Hearing evidence about disclosure forms.

6    We are going to hear evidence about Lisa Reid talking about

7    whether or not something was filled out in a certain way.  And

8    there is ambiguity and it does change.  Where he going to hear

9    about Mr. Silver's statements to the press about, you know, in

10   an elevator or wherever it was, in an hour and a half interview

11   where he talks about a whole bunch of things and somebody

12   throws a question at him at the end and he says I disclose.  I

13   do what I'm supposed to do.  I fill out the forms I'm supposed

14   to fill out.  And now we are getting into the fact that another

15   assemblyman was prosecuted, convicted, and sentenced months

16   before -- I mean the closest linkage is the sentence in

17   February 2010 with the change in May 2010 without Mr. Silver

18   changing the forms any time in between there.

19             Judge, it doesn't -- in terms of just the absolute --

20   the fairness to Mr. Silver, the prejudice that results from

21   that conversation, that evidence that has nothing to do with

22   this case -- and again, we may differ on what the quality of

23   the evidence has been up until now, but when they hear that,

24   that is the kind of thing that tips the scales.

25             MR. SHUR:  Judge, there is also --

```
 1                THE COURT:  I disagree on the prejudicial impact.
 2                MR. SHUR:  There is also one other risk that we
 3       haven't talked about which is the fact that this raises --
 4       having a conviction of another Assembly member raises this
 5       issue of there is widespread corruption in Albany, Albany is
 6       the cesspool.  And I will tell you why, Judge.  Because
 7       throughout this trial the government has pointed to things that
 8       have gone on in Albany which is standard practices in terms of
 9       how grants are reviewed in terms of how member items are
10       allocated and suggested that they're improper or that more
11       should be done or that the --
12                THE COURT:  I don't think they're suggesting it is
13       improper.  I think what they suggested was that creates an
14       environment where you can have this sort of a quid pro quo
15       relationship and that's important for the jury to understand.
16       If these things -- if you couldn't put someone in for a member
17       item unless it has gone through some kind of a competitive
18       peer-review process then your client wouldn't have had the
19       unfettered ability to move money to benefit someone who was in
20       turn benefiting him.  So, it is not that -- there was no
21       suggestion --
22                MR. SHUR:  Judge, I don't mean to interrupt.  I take
23       your point, but what the government did in certain instances
24       were with outside agencies, third-parties to say, well, you do
25       a peer review, you do competitive bidding to sort of hold this
```

1    up as this is the gold standard over here; this is what's

2    happening in Albany down here, this is wrong.  So, the

3    government went beyond just the argument that there was the

4    opportunity to engage in these allegations.

5         THE COURT:  Okay.  All right.  So, the notion that

6    putting in evidence that an assemblyman, who I am guessing a

7    New York City jury is not going to know who he is; that an

8    assemblyman was convicted at some point in the past I don't

9    think gives rise to the notion that all of Albany is a

10   cesspool.  I mean, there are 150 members of the Assembly.  That

11   two have been charged to me does not -- it doesn't suggest from

12   that perspective --

13        MR. SHUR:  Maybe not in a vacuum, Judge, but when you

14   take into consideration the government's argument and the

15   suggestions they have made to the jury so far, the pretrial

16   publicity about Albany being a cesspool and the rest of it.

17        THE COURT:  Stop.  We are past that.

18        MR. SHUR:  I understand, Judge.

19        THE COURT:  You will recall in voir dire most of the

20   panel did not know who Sheldon Silver was.  At best they

21   thought they had remembered that they heard something.  So, it

22   is not like we have got a jury --

23        MR. SHUR:  I'm not suggesting that, Judge.

24        THE COURT:  Okay.

25        MR. SHUR:  I am just saying you can't look at it in a

 1    vacuum.

 2          THE COURT:  Well, if the jury was unaware of the

 3    publicity -- the prior publicity, the prior publicity is

 4    irrelevant to ruling on this.

 5          MR. SHUR:  I am aware they said they could be fair and

 6    impartial despite --

 7          THE COURT:  And most of them did not know who he was

 8    is my recollection.

 9          Okay.  Do you have what the question would be?

10          MS. COHEN:  Yes, your Honor.

11          We propose to ask Lisa Reid the following leading

12    question:  A few months prior to when Sheldon Silver told you

13    he was adding the words "including of" to his financial

14    disclosure form, were you aware that Assemblyman Seminerio was

15    being sentenced for a scheme related to his failure to disclose

16    the nature of fees he got on his annual disclosure forms?

17          That's it.

18          MR. MOLO:  Assemblyman Seminerio's being sentenced for

19    his failure to disclose the nature of fees that he got on his

20    annual disclosure forms?  Why don't we put Mr. Silver in a

21    dunking tank and throw baseballs and have him drop down by the

22    prosecutors.  That's ridiculous.

23          THE COURT:  Okay.  That was not a particularly helpful

24    argument, Mr. Molo.

25          MR. MOLO:  The point being that that question is just

1    putting a target on Mr. Silver's back.  That just absolutely is

2    unfair and prejudicial.

3          MR. SHUR:  And it is actually not accurate.  He wasn't

4    charged with 1001 for his financial disclosure form.

5          MS. COHEN:  Your Honor, the scheme he was charged with

6    was specifically linked to his failure to disclose on the form,

7    different from the charges here, but that is why it is

8    particularly relevant to Silver's statement.

9          MR. MOLO:  That's why it is prejudicial, because

10   they're arguing that it is relevant in that way and it

11   certainly isn't.

12         THE COURT:  Suppose it was something like:  Was being

13   sentenced for a scheme in which he received fees that were not

14   fully disclosed.

15         MS. COHEN:  As long as you add were not fully

16   disclosed on the forms because that's the particular relevance

17   to the -- that's fine.

18         THE COURT:  I'm not sure that that -- that may be a

19   sledgehammer that is unnecessary.

20         MS. COHEN:  I don't think it is, your Honor.  I think

21   that's how it links to his statement and that it was about the

22   forms is -- if they're going to be allowed to put in the

23   statement we have to be allowed to come back.

24         THE COURT:  You have to be allowed --

25         MR. MOLO:  The problem with is that statement is I

1    think if you gave that to anybody walking by on the street they

2    would say, oh, he committed the crime of not having disclosed

3    on his form.  He was sentenced for a scheme involving failure

4    to disclose on the form and that's the risk here.

5         THE COURT:  But I think -- look.  It seems to me that

6    that risk can be mitigated with a limiting instruction that

7    says Mr. Silver is not charged with failure to disclose

8    anything on his financial disclosure forms.  His financial

9    disclosure forms are being received solely as circumstantial

10   evidence for dealing with his state of mind.

11        MR. GOLDSTEIN:  Your Honor, honest services fraud does

12   require us to show deception and it is not just for his state

13   of mind with regard to any *quid pro quo*, it is also an element

14   of the crimes that we need to prove.

15        MS. COHEN:  Correct.

16        THE COURT:  Deception is.

17        MR. GOLDSTEIN:  Misrepresentations.

18        THE COURT:  Misrepresentation, right.

19        MR. GOLDSTEIN:  Part of our argument is that he makes

20   material misrepresentations to the public about the nature of

21   his outside income.

22        THE COURT:  In his financial disclosure form.

23        MR. GOLDSTEIN:  Both in his financial disclosure forms

24   and his statements to the public about the nature of his

25   outside income.  It is directly relevant to elements that we

```
 1          need to prove.
 2                  THE COURT:  Give me, again, the leading question.
 3                  MS. COHEN:  A few months prior to when Sheldon Silver
 4          told you that he was adding the words "including of" to his
 5          financial disclosure form, were you aware that Assemblyman
 6          Seminerio was being sentenced for a scheme in which he failed
 7          to disclose the nature of fees he got on his annual disclosure
 8          forms?
 9                  MR. MOLO:  Again --
10                  MR. SHUR:  How is her awareness relevant, exactly?
11                  THE COURT:  Okay.  Focus on the question.  They're
12          using her to get that fact in as opposed to any other way of
13          doing it and there are probably a million different ways of
14          doing it but that's a very focused question that gets the
15          relevant fact in.
16                  MR. SHUR:  Well, doesn't it -- it seems to me --
17                  THE COURT:  "Are you aware of" can be dropped.  "Is it
18          a fact that."
19                  MR. SHUR:  It seems to me if there is going to be tied
20          to this -- I heard the government say is this, this recording
21          that they plan to play through a different witness.
22                  THE COURT:  Correct.
23                  MR. SHUR:  Right?  So, doesn't it make sense to ask
24          that person who actually interacts with Mr. Silver regarding
25          press inquiries and public affairs?
```

1          THE COURT:  I'm not going to argue with the defense

2     over what witness introduces this.

3          MR. SHUR:  Well, the point is that she doesn't know

4     whether or not Mr. Silver was aware of that fact.

5          MS. COHEN:  Your Honor, we are happy to make a factual

6     stipulation on the record to this effect, if that helps.

7          THE COURT:  Is that more palatable to the defense?

8          MR. MOLO:  Any reference of this we are not --

9          THE COURT:  Okay.  You are losing that point so now

10    the question is how do you want it to come in.  I am reminded

11    of an old joke.

12         MR. MOLO:  Can we take a break, Judge?

13         THE COURT:  Yes.  We need a break anyway so talk about

14    it.  Do you need more than five minutes?

15         MS. COHEN:  I would guess, your Honor, we do.  I

16    don't, but I'm guessing they do.

17         THE COURT:  Okay.  10 minutes.

18         MS. COHEN:  Thank you, your Honor.

19         (Recess)

20         MR. GOLDSTEIN:  We can get started.

21         THE COURT:  What did you decide?

22         MR. SHUR:  Judge, we have a proposal that I think

23    would address this issue of opening the door.

24         THE COURT:  Is it a joint proposal?

25         MR. SHUR:  No.

1              THE COURT:  Okay.

2              MS. COHEN:  They didn't tell us what the proposal was.

3    It might be, depending upon hearing it.

4              MR. SHUR:  The defense would elicit from Ms. Reid that

5    she came to Mr. Silver's office, there was a question about the

6    form, that Mr. Silver was in his office when she got there, he

7    had his form in his hand, that he said I've made a change to

8    the form, this is the change because I received other sources

9    of income, but that we do not elicit that Mr. Silver said "I

10   think that this is more accurate" and we do not elicit the

11   response of "that's fine" or "okay."

12             THE COURT:  Okay, so that is clearly unadulterated

13   hearsay.  The only way you had persuaded me to let you put it

14   in is if Ms. Reid is testifying that he said he thought this

15   was more accurate.  That's a state of mind statement.  What you

16   are purporting to introduce is just a statement that he needed

17   to change the form.  You don't need his statement for that.

18             MR. SHUR:  Your Honor, in fact he did contact the

19   ethics officer --

20             THE COURT:  He didn't contact the ethics officer.

21             MR. SHUR:  Yeah, he did.

22             THE COURT:  Says who?

23             MR. SHUR:  Carolyn Kearns.

24             THE COURT:  Carolyn Kearns isn't a witness.

25             MR. SHUR:  Carolyn Kearns called Ms. Reid and said

1    Mr. Silver has a question, can you come to the office.

2              THE COURT:  Okay, so it is, like, triple hearsay to

3    get to that.

4              MR. SHUR:  I think there will be evidence of why she

5    got up out of her chair and came to Mr. Silver's office.

6              THE COURT:  Because Ms. Kearns asked her to.  She was

7    asked by someone to but not by Mr. Silver.

8              MR. SHUR:  And Ms. Kearns is the counsel to the

9    Assembly majority, that's right.

10             THE COURT:  Okay, but none of that -- none of that --

11   as you are proposing it, you have undercut the basis under

12   which it is admissible so that doesn't really help.

13             MR. SHUR:  My point was, Judge, simply that even

14   without that statement that's accurate and in response, "okay,"

15   or "that's fine," then it is still evidence of Mr. Silver's

16   state of mind, the fact that not just that he changed the

17   form --

18             THE COURT:  No, it is not.

19             MR. SHUR:  -- but that he reached out to the ethics

20   officer to have a discussion about it.

21             THE COURT:  He didn't have a discussion about it.

22   That's my whole point and that is my whole problem with why

23   this is not very probative.  If he had had a discussion --

24   look.  Again, I'm not a naif at filling out financial

25   disclosure forms.  People have questions about them.  But when

1    they do they sit down with the person and they say, *Here is my*

2    *situation.    How do I answer this question?*    That's not what

3    happened here.    What happened here, even under the defense

4    version of life, is that the Speaker of the Assembly summoned

5    the woman who is responsible for the bureaucratic aspects of

6    financial disclosure to say I've changed my form.    Okay?

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. SHUR:  Judge, first of all, Ms. Reid is a lawyer.

2     She's not some low-level bureaucrat.  Second of all, she is the

3     person that is tasked with reviewing all the legislators'

4     forms, and she does.  She goes back to the legislators if she

5     thinks there's some deficiency.

6           THE COURT:  How can she do that, Mr. Shur, if she

7     doesn't know that he's getting hundreds of thousands of dollars

8     from a law firm that doesn't appear on the form?

9           MR. SHUR:  Because it says "including," which clearly

10    indicates that there are additional sources of income.

11          THE COURT:  Good luck with that argument.  You're

12    right.  The question is -- what you have proposed doesn't work.

13    So the question is do you want to stipulate that Seminerio was

14    convicted and that the timing of it happened, or we're going to

15    have her ask Ms. Reid the leading question?

16          MR. COHEN:  Your Honor, the government has proposed to

17    stipulate to it.

18          THE COURT:  What's your preference?  I've got a jury

19    waiting.

20          MR. MOLO:  I understand.  We just want to make sure so

21    that we understand what we're talking about.

22          We can elicit the evidence that Ms. Reid came to his

23    office, and he gave her a revised form?  Is that correct?

24          THE COURT:  Well, that's a fact.

25          MR. MOLO:  Correct.

1           THE COURT:  So that's a fact.

2           MR. MOLO:  Ms. Reid comes to his office.  He gives her

3   a revised form.

4           THE COURT:  He gives her a form.  He doesn't even give

5   it to her.

6           MR. MOLO:  So she comes to his office.  He's got the

7   form there.  We don't get into the discussion about --

8           THE COURT:  What does that do?

9           MR. MOLO:  And then there will be evidence that he did

10  revise the form.

11          THE COURT:  No.  There was evidence that his answer in

12  2010 was different than the answer in 2009.

13          MR. MOLO:  Right.

14          THE COURT:  I wouldn't say that's a revised form.

15  That's just a different answer.

16          MR. MOLO:  It's a revised answer from the year before.

17  The answer is revised.

18          THE COURT:  No.  I think your colleague wants to argue

19  that the question changed.

20          MR. MOLO:  How about the fact that he just contacted

21  the ethics office about the change?

22          THE COURT:  But she can't testify to that.

23          MR. MOLO:  Why?  She's the one that came to his

24  office.

25          THE COURT:  She didn't come to the office because she

```
 1   heard from Mr. Silver.

 2           MR. MOLO:  Well, then how about the fact that Kearns

 3   called her and asked her to come to the speaker's office?

 4           MS. COHEN:  Your Honor, I can short-circuit that.  She

 5   doesn't remember Kearns calling her.

 6           MR. SHUR:  I'm confused.  In terms of what Ms. Molo

 7   just said, testimony that Mr. Silver contacted the ethics

 8   office regarding the change in the form --

 9           THE COURT:  She can't testify to that.  She doesn't

10   know that.

11           MR. SHUR:  Yes, she does.  She's the ethics person.

12   How can she not know that?

13           THE COURT:  Because he didn't contact her, and whoever

14   contacted her -- she doesn't remember it.

15           MR. SHUR:  I have not talked with Ms. Reid, but I

16   think that getting contacted by Ms. Kearns in this case is

17   basically the same as being contacted by Mr. Silver.

18           I don't think she had any confusion about why she was

19   coming to Mr. Silver's office is because Mr. Silver's office

20   had contacted her about the forms.

21           THE COURT:  What's her testimony?

22           MS. COHEN:  Your Honor, she remembers nothing about

23   Kearns summoning her to go talk to Silver about a change in the

24   form.  She recalls going to his office she thought to pick up

25   the form.
```

```
 1                THE COURT:  So she doesn't remember why she went

 2       there.

 3                MS. COHEN:  Correct.

 4                THE COURT:  So she's not your witness on that.

 5                MR. SHUR:  Judge, may I ask the question?  If she

 6       says, I don't remember.  I don't know, then it it's done.

 7                THE COURT:  Of course you can ask the question.

 8                MR. SHUR:  Okay.

 9                THE COURT:  You can ask the question, did you receive

10       a call from Ms. Kearns?

11                MR. SHUR:  I would say, Mr. Silver's office contacted

12       you about the change in the form.

13                THE COURT:  She's going to say, I don't remember.

14                MR. SHUR:  If she says, I don't remember -- well, if

15       she says -- I believe there's Jencks to the contrary.

16                THE COURT:  Look.  Are you or are you not going to

17       elicit that Mr. Silver told Ms. Reid that he thought his 2010

18       disclosure was more accurate?  That is what you are permitted

19       under my ruling to adduce.

20                Are you going to adduce that?  Yes or no?

21                MR. SHUR:  Judge, the answer is no, assuming that --

22                THE COURT:  Then this won't come in.

23                Assuming that what?

24                MR. SHUR:  That the Court would permit the government

25       to introduce the evidence regarding the Seminerio case.  That's
```

1   right.

2          MS. COHEN:  Just to be clear, the defense is not going

3   to ask Ms. Reid anything about her conversation with Sheldon

4   Silver about the change in his form?

5          MR. SHUR:  Right.

6          THE COURT:  Look.  If they do, then on redirect you're

7   going to drive through the door, and on whatever the press guy

8   is, you're going to put in the Seminerio tape.  Your fate is in

9   your hands.

10          MS. COHEN:  Your Honor, no.  The government would

11   elicit on direct this conversation rather than let it come out

12   on cross as some big aha moment.  So the government would like

13   to know if they're going to do that.

14          THE COURT:  It's not Ana that moment.

15          MS. COHEN:  Are they not going to do it?

16          THE COURT:  They say they're not.

17          MR. SHUR:  Judge, I'm not sure that's resolved.  Is

18   the question simply that Mr. Silver contacted the ethics office

19   about the change in the form?

20          THE COURT:  According to the government, she doesn't

21   remember that.  You can ask the question.

22          MR. SHUR:  Fair enough.  That wouldn't open the

23   door -- if she says, I don't know, yes, no -- I wouldn't go

24   further than that.  That's not going to open the door to the

25   Seminerio case.  I just want to make sure.

 1              THE COURT:  That's correct.

 2              MS. COHEN:  Your Honor, if I could just have a moment

 3     with the witness.  I just want to tell her that that question

 4     is not going to be asked.

 5              THE COURT:  Okay.  Bring in the jury.

 6              (Jury present).

 7              THE COURT:  Call your next witness.

 8              MS. COHEN:  Your Honor, the government calls Lisa

 9     Reid.

10              THE COURT:  Ladies and gentlemen, let me apologize for

11     keeping you so long.  Trust me.  We were working in here.

12              If you can pull the mike down.

13              THE WITNESS:  Yes, your Honor.

14              THE COURT:  Okay.

15              MS. COHEN:  Thank you, your Honor.

16      LISA REID,

17          called as a witness by the Governemnt,

18          having been duly sworn, testified as follows:

19     DIRECT EXAMINATION

20     BY MS. COHEN:

21     Q.  Ms. Reid, where do you work?

22     A.  I work for the Legislative Ethics Commission of New York

23     State.

24     Q.  What is the New York State Legislative Ethics Commission?

25     A.  The New York State Ethics Commission is a commission at the

 1   New York State Legislature that has jurisdiction over both the

 2   New York State Assembly and the New York State Senate.

 3            It is bipartisan, and it is a group of eight people,

 4   four of whom are legislators and four of whom are appointees

 5   who are not legislators.

 6   Q.   Who appoints the members of the Legislative Ethics

 7   Commission who are not legislators?

 8   A.   Each one of the legislative leaders.  So it would be the

 9   Speaker of the Assembly, the minority leader of the assembly,

10   the president of the senate, and the minority leader of the

11   senate.

12   Q.   What is your title at the New York State Legislative Ethics

13   Commission?

14   A.   I am the executive director and counsel.

15   Q.   How long have you been the executive director and counsel

16   of the Legislative Ethics Commission?

17   A.   It will be seven years in December.

18   Q.   Where did you work prior to being the executive director

19   and counsel of the Legislative Ethics Commission?

20   A.   I was in private practice doing mostly law guardian and

21   real estate work.

22   Q.   Are you a lawyer?

23   A.   Yes.

24   Q.   Where did you go to law school?

25   A.   Albany Law School.

1    Q.   In general, what are New York State legislators required to

2    disclose every year on a financial disclosure form?

3    A.   On the annual statement of financial disclosure, it is

4    the -- the form is specified in statute, and they're required

5    to answer 19 specific questions related to any employment they

6    might have outside the legislature, financial holdings.

7         Debts that are not secured debt for personal reasons

8    like mortgages and things like that are excluded.  But income

9    in excess of $1,000 that's not from their legislative

10   employment and gifts that are not part of the legislative

11   employment, expenses, things like that.

12   Q.   What is the purpose of having legislators file an annual

13   disclosure form every year with the Legislative Ethics

14   Commission?

15   A.   The purpose, I believe, is for them to provide information,

16   which is made available to the public, about interests that

17   they have that are outside of the legislature.

18        Primarily at the time, so the public can judge whether

19   they think perhaps their legislator has a conflict of interest

20   or something in his outside work that's influencing him or her.

21   Q.   When are legislators required to file their annual

22   disclosure form each year?

23   A.   They're required to file them on May 15 or the business day

24   closest to May 15 for the prior calendar year.  Similar to

25   taxes, you would file, for example, in May 2015 for calendar

1    year 2014.

2    Q.   How do members of the legislature actually file their

3    annual financial disclosure forms?

4    A.   They file them with the Legislative Ethics Commission

5    offices.  Some people mail them.  Some people file them by

6    messenger.  The majority of them walk over to our office and

7    deliver them.

8    Q.   Where is the Legislative Ethics Commission's offices?

9    A.   They're in the Alfred E. Smith building, which is directly

10   across the street from the state capital.

11   Q.   What does the Legislative Ethnics Commission do with the

12   financial disclosure forms once they are filed with it?

13   A.   Once the forms are filed, they're logged in that they've

14   been received.  They have an initial review to make sure that

15   they are complete and signed and dated.  By "complete," we mean

16   every question is answered.

17          Then for the next 45-day period, we spend time

18   reviewing them in detail.  So, for example, against prior

19   years' forms or against what we call public outside sources of

20   information.

21          So, for example, if someone says they're an attorney,

22   we're going to check the court records to make sure they're

23   admitted to the bar.  If someone says they're a licensed

24   insurance agent, we're going to check that.

25          And then after our review, if we have questions for

1   the members, we will ask them those questions.  Sometimes they

2   may file an amendment.

3           After their review, we send them to the Joint

4   Commission on Public Ethics, which is another ethics entity in

5   Albany, and they post them on their website for public viewing.

6   Q.  When did the Legislative Ethics Commission begin sending

7   the annual disclosure forms over to the Joint Commission on

8   Public Integrity?

9   A.  Calendar year -- it was in 2012.

10  Q.  Is the Joint Commission on Public Integrity commonly

11  referred to as JCOPE?

12  A.  Yes.

13  Q.  When was JCOPE created.

14  A.  I think they were actually formed in the beginning of 2012.

15  Q.  Prior to JCOPE's forming, what did the Legislative Ethics

16  Commission do with the annual forms if they were filed?

17  A.  We kept them in our offices.

18  Q.  What did JCOPE do beginning in early 2012 with the annual

19  forms that it received from the Legislative Ethics Commission

20  filed by the legislature?

21  A.  They keep the originals and files, and they post the forms

22  of the legislators on their website.

23  Q.  What years did JCOPE post the annual disclosure forms of

24  legislators on its website?

25  A.  It was in 2013 and forward, meaning they were filed in

1    2013.  So it was for calendar years 2012 and forward.

2    Q.  Did JCOPE obtain any prior filing and post them on the

3    website?

4    A.  No.

5    Q.  So there are no filings for legislators of their annual

6    disclosure forms prior to calendar year 2012 on the JCOPE

7    website?

8    A.  Right.

9    Q.  Prior to JCOPE, were legislators' annual financial

10   disclosure forms posted on any website?

11   A.  They were not statutorily.  The only one time we had was

12   when the New York Public Interest Research Group got public

13   copies of them and posted them themselves but formally not by

14   any New York State agency, no.

15   Q.  How would an entity be able to receive a copy of a

16   legislator's ethics form prior to JCOPE?

17   A.  They would have to request them from our offices at the

18   Legislative Ethics Commission, or they -- they could do three

19   things:  They could come in and look at them and not have to

20   take copies.  We would provide copies by fax and mail.  When

21   the technology caught up, we would scan them and send them

22   scanned copies.

23   Q.  Prior to JCOPE's creation in or about 2012, what

24   information on the legislator's annual disclosure forms was

25   redacted when your commission provided them upon request?

FBHYSIL3                          Reid - Direct

1    A.  For many of the questions, they request a category of

2    value.  So, for example, if somebody has outside income when

3    you list your income, there's a category of value for that.

4           If they have real estate, there's a category of value

5    for that.  All of the categories of value were redacted from

6    the forms pursuant to statute.

7    Q.  If a member of the press requested a form from the

8    Legislative Ethics Commission prior to JCOPE, when the

9    Legislative Ethics Commission provided a copy of that

10   legislator's financial disclosure form, would the categories of

11   income also be redacted when it was provided to the press?

12   A.  Yes.

13   Q.  If you look in your binder, please, as what's marked for

14   identification as Government Exhibit 232.  It should be the

15   first document.

16   A.  Yes.

17   Q.  If you recognize it, what is it?

18   A.  It's an annual statement of financial disclosure for

19   calendar year 2009 filed by Assembly Member Silver.

20          MS. COHEN:  Your Honor, the government moves

21   Government Exhibit 232 into evidence.

22          MR. SHUR:  No objection.

23          THE COURT:  Okay.  232 is received.

24          (Government's Exhibit 232 received in evidence)

25   BY MS. COHEN:

Reid - Direct

1   Q.  Ms. Reid, you notice on the upper right-hand corner there's

2   a stamp.

3          If you could just tell the jury what the stamp is that

4   says May 17, 2010.

5   A.  The stamp is the date that the disclosure form was received

6   in our office.

7   Q.  And you mentioned before that categories of income were

8   redacted when the Legislative Ethics Commission provided copies

9   upon request to the public or the press.

10  A.  Yes.

11  Q.  If you look at page 7 of Government Exhibit 232 --

12  A.  Yes.

13  Q.  -- what is shown there at page 7?

14  A.  7 is question 13, which asks for any income in excess of

15  $1,000 from any source other than the person's legislative

16  employment.

17         Here those positions and those sources of income are

18  filled in, but the categories of income are redacted here.

19  Q.  So, if the public or the press obtained a copy of Sheldon

20  Silver's financial disclosure forms prior to 2012, the amount

21  that he earned from his outside income would not be shown

22  there; is that right?

23  A.  Yes.

24  Q.  Ms. Reid --

25         MS. COHEN:  You can set that aside.  Thank you,

1    Mr. Coccaro.

2    BY MS. COHEN:

3    Q.  Ms. Reid, how much do assembly members earn annually from

4    their state office position?

5    A.  The base salary for a legislator is $79,500 per year.

6    Q.  Does the speaker earn any additional amount for serving as

7    speaker?

8    A.  Yes.  There's an additional salary of I believe it's

9    $41,500.  The total would be $121,000 for the year.

10   Q.  If you look in your binder, please, at what's marked

11   Government Exhibit 222 for identification.

12          If you recognize it, what is it?

13   A.  I believe it's a history of salaries of the legislature,

14   but I'm not sure.

15          MS. COHEN:  Your Honor, pursuant to a stipulation,

16   this is a business record of the assembly.  The government

17   would move Government Exhibit 222 into evidence.

18          MR. SHUR:  Judge, we have no objection to it being a

19   business record.  But, if I'm reading this correctly, I think

20   the witness said she wasn't sure what it was.

21          THE COURT:  Did the stipulation describe what it is?

22          MS. COHEN:  No.  I believe it just stated it was a

23   business record of the assembly.  But I am pulling it.  I don't

24   believe it had any specific text about what it is.  But I think

25   the witness testified it's the salary of an assembly or senate.

FBHVSIL3                        Reid - Direct

1          THE COURT:  It does describe what it is.  The

2     stipulation explains it.

3          Would you like to publish that?

4          MS. COHEN:  Correct.  Your Honor, pursuant to the

5     stipulation, it describes this as Sheldon Silver's salary from

6     the time he's been in the assembly, from 1977 through 2014.

7          MR. SHUR:  No objection, Judge.

8          THE COURT:  So 222 will be received.

9          (Government's Exhibit 222 received in evidence)

10    BY MS. COHEN:

11    Q.  Ms. Reid, just looking at Government Exhibit 222, do you

12    see from 1999 on that Sheldon Silver's salary was $121,000?

13          Is that the $121,000 you just testified Sheldon Silver

14    would have gotten as the Speaker of the Assembly?

15    A.  Yes.

16    Q.  That would have been based on the second column, the salary

17    that eventually got raised to $79,500 starting in 1999?

18    A.  Yes.

19    Q.  And then the special allowance would have been for serving

20    as speaker, the $41,500 you testified about?

21    A.  Yes.

22          MS. COHEN:  We can take that down, Mr. Coccaro.  Thank

23    you.

24    BY MS. COHEN:

25    Q.  Ms. Reid, how had the annual financial disclosure form

 1   changed over the time you served as the executive director and

 2   counsel of the Legislative Ethnics Commission?

 3   A.   Since I've served -- well, as we already discussed, the

 4   categories of income are no longer redacted from public view.

 5   The categories of income themselves have changed from I think

 6   the six categories to pages of categories.  It used to be A

 7   through F.  Now I believe it's A through quintuple E.

 8        The questions themselves -- some of them have changed.

 9   There is more disclosure required on the nature of people's

10   professional business.  There's additional information

11   requested regarding descriptions of law practices.  There has

12   been some minimal client disclosure that's been changed.

13        I apologize.  I'm confusing it with what's there now

14   and the upcoming year.  There's more client disclosure in the

15   upcoming year.  And the categories of what's required to be

16   reported in certain circumstances has been changed.

17   Q.   When did the changes happen with regard to more disclosure

18   about outside income and clients?  What year?

19   A.   I believe it was 2013.

20   Q.   If you look in your binder at what's marked Government

21   Exhibits 913 through 924.

22        Do you recognize those documents?  If so, just in

23   general, what are they?

24   A.   They're annual statements of financial disclosures filed by

25   Assembly Member Silver from calendar year 2012 through and

FBHYSIL3                      Reid - Direct

1    including 2013.

2    Q.  I believe you said 2012 -- if you look at the first

3    document, government Exhibit 913 --

4    A.  I'm sorry.  Did I say 2012?  It should be 2002 through

5    2013.  I apologize.

6              MS. COHEN:  Your Honor, the government moves

7    government --

8    BY MS. COHEN:

9    Q.  Before I move them, are these documents, Government

10   Exhibits 913 through 924, documents that are maintained in the

11   regular course of the Legislative Ethics Commission business?

12   A.  Yes.

13             MS. COHEN:  Your Honor, the government moves

14   Government Exhibits 913 through 924 into evidence.

15             MR. SHUR:  No objection.

16             THE COURT:  Okay.  913 to 924 are received.

17             (Government's Exhibits 913 through 924 received in

18   evidence)

19   BY MS. COHEN:

20   Q.  If you can just pull up, I just want you to explain one of

21   these forms for the jury.  If you can start with Government

22   Exhibit 916, please.

23             MS. COHEN:  Thank you, Mr. Coccaro.

24   BY MS. COHEN:

25   Q.  So what calendar year is Government Exhibit 916 for?

1    A.  Calendar year 2005.

2    Q.  This is the annual statement of financial disclosure filed

3    by whom?

4    A.  Assembly Member Sheldon Silver.

5    Q.  If you can just look at the second page -- actually, on the

6    first page there are instructions.

7         Is there something regarding categories?

8    A.  Yes.  That's where the categories of value are laid out.

9    It's categories A through F, and then the dollar value that's

10   associated with each category.

11        THE COURT:  So when you say categories of value, if a

12   member of the assembly had $20,000 worth of income, instead of

13   putting $20,000, they would just put --

14        THE WITNESS:  Category C.  Yes, ma'am.

15        THE COURT:  So, at best, you get ranges of value off

16   the form?

17        THE WITNESS:  Yes.

18   BY MS. COHEN:

19   Q.  Here, if you look at category F, it's $250,000 or over?

20   A.  Yes.

21   Q.  Was there any further range provided at this time, 2006, if

22   you made more than $250,000 in outside income?

23   A.  Not at that time, no.

24   Q.  Did that change at some point?

25   A.  Yes.  It changed for I believe calendar year 2012.

1    Q.  And in 2012 were the categories of income broken down

2    further?

3    A.  Yes. they were broken down significantly further.

4    Q.  We'll get to that in a minute.  Let's just run through a

5    sample of one of Sheldon Silver's annual statements of

6    financial disclosure.

7            If you look on the third page, there's a question

8    5(a).

9            What is that question asking?

10   A.  That question asks for the name and description of any

11   occupation or employment other than the person's legislative

12   employment.

13   Q.  And Sheldon Silver filled it out "Attorney Sheldon Silver,

14   lawyer"?

15   A.  Yes.

16   Q.  If you look at page 4 to 5, which is question 8(a) --

17   A.  Yes.

18   Q.  -- what is that question about?

19   A.  That question asks if someone practices law or is licensed

20   by the Department of State or profession licensed by the

21   Department of Education and asks them to give a description of

22   the subject areas in which they were involved.

23   Q.  And in this disclosure form, Sheldon Silver for calendar

24   year 2006 wrote, "Limited practice of law in the principal

25   subject area of personal injury claims on behalf of individual

1    clients and of counsel to law firm."

2    A.  Yes.

3    Q.  If you look at page 7 of Government Exhibit 916, question

4    number 13.

5    A.  Yes.

6    Q.  What is that question about?

7    A.  That question asks for any income from any source other

8    than the person's legislative employment in excess of $1,000

9    for themselves or for their spouse.

10   Q.  And you see in Sheldon Silver's answer, the category of

11   amount is listed here.

12   A.  Yes.

13   Q.  In 2006, would the public have been able to see the amount

14   Sheldon Silver earned?

15   A.  No.

16   Q.  Again, for 2006, Sheldon Silver listed self, Weitz &

17   Luxenberg, of counsel; nature, fees; category amount, F.

18   A.  Yes.

19   Q.  If you turn to the first page of Government Exhibit 916 --

20   I think we just talked about this before -- category F was

21   $250,000 or over.

22   A.  Correct.

23   Q.  But there was no requirement that it be broken down further

24   once you reach $250,000.

25   A.  Correct.

1    Q.  If you look at page 8 to 9, question 16 carries over from

2    page 8 to 9.  What is that question about?

3    A.  That question asks for type and market value of securities

4    outlined individually or individual spouse.

5          And here securities -- they're not things like your

6    standard checking account.  But they're stocks, bonds, money

7    market funds, things like that.

8    Q.  If you look at the signature page of Government Exhibit

9    916, which appears on page 11 --

10   A.  Yes.

11   Q.  -- who signed this document?

12   A.  Assembly Member Silver.

13   Q.  What is the purpose of a legislator signing his or her own

14   financial disclosure form?

15   A.  To indicate that they filled it out themselves and that

16   they reviewed the document and that it was complete.

17          MS. COHEN:  Thank you, Mr. Coccaro.  We can take this

18   one down.

19   BY MS. COHEN:

20   Q.  In preparation for your testimony here today, did you

21   review Government Exhibits 913 through 924?

22   A.  Yes, I did.

23   Q.  In preparation for your testimony today, did you review a

24   chart that summarized certain of Sheldon Silver's answers to

25   certain questions about his outside income on those disclosure

1  forms?

2  A.  Yes, I did.

3  Q.  If you could look in your binder, please, as what's been

4  marked for identification as Government Exhibit 2009.

5           If you recognize it, what is it?

6  A.  That's the chart that was prepared by my attorney's office

7  at the request of your office which I reviewed for accuracy.

8  Q.  And is the information -- where did you get the information

9  that is contained on Government Exhibit 2009 for

10 identification?

11 A.  When my attorney's office sent it over, I compared it to

12 the original files in my office and confirmed that it's

13 identical to the information that was there.

14 Q.  When you testified you looked at forms, did you look at

15 Sheldon Silver's financial disclosure forms that were on file

16 with the Legislative Ethics Commission?

17 A.  Yes.

18           MS. COHEN:  Your Honor, the government moves

19 Government Exhibit 2009 into evidence.

20           THE COURT:  Any objection?

21           MR. SHUR:  No objection.

22           THE COURT:  2009 is received.

23           (Government's Exhibit 2009 received in evidence)

24 BY MS. COHEN:

25 Q.  So, looking at the first page of Government Exhibit 2009,

FBHVSIL3                      Reid - Direct

1    it says annual statement of financial disclosure question 8(a)?

2    A.   Yes.

3    Q.   What is quoted here under question 8(a)?

4    A.   Question 8(a) quotes the question as it was written on the

5    forms between calendar years 2000 through and including 2011

6    and then the language as it was changed for calendar year 2012

7    and 2013.

8    Q.   If you can just read the language of the form for 2002

9    through 2011 into the record.

10   A.   "If the reporting individual practices law, is licensed by

11   the Department of State as a real estate broker or agent or

12   practices a professional licensed by the Department of

13   Education, give a general description of the principal subject

14   areas of matters undertaken by such individual.

15         "Additionally, if such an individual practices with a

16   firm or corporation and is a partner or shareholder of the firm

17   or corporation, give a general description of principal's

18   subject areas of matters undertaken by such firm or

19   corporation.  Do not list the name of individual clients,

20   customers, or patients."

21   Q.   What is listed under the columns below 2002 through 2011?

22   Just what are all the columns 2002 through 2013?  What does

23   that represent?  The quotations there.

24   A.   The answer that was given for question 8(a).

25   Q.   So for 2002 through 2010, Sheldon Silver's answer to

FBHYSIL3                        Reid - Direct

1   question 8(a) was essentially the same.

2           If you could just read, for example, 2010.

3   A.  "Limited practice of law in the predominant area of

4   personal injury claims on behalf of individual clients and of

5   counsel to law firm."

6   Q.  In 2012/2013, there's a quotation of the language as it

7   reads on the form for those two years for question 8(a).  If

8   you can just read into the record what the question was for

9   those two years.

10  A.  The "If reporting individual practices law, is licensed by

11  the Department of State as a real estate broker or agent, or

12  practices a profession licensed by the Department of Education

13  or works as a member or employee of a firm required to register

14  pursuant to Section One-C of the legislative law of a lobbyist,

15  give a general description of the principal's subject areas of

16  members undertaken by such individual.

17          "Additionally, if such an individual practices with a

18  firm or corporation and is a partner or shareholder of the firm

19  or corporation, give a general description of principal's

20  subject area of matters undertaken by such form or

21  corporation."

22  Q.  Again, Sheldon Silver's answer to question 8(a) for 2012

23  and 2013 is essentially the same as it was when the language

24  changed slightly in 2011.

25          If you could just read for the jury what Sheldon

1    Silver's answer was to question 8(a) for 211 to 2013.

2    A.  "General practice of law with an emphasis on representation

3    of individual clients and personal injury actions and of

4    counsel to law firm."

5    Q.  Where in any of Sheldon Silver's answers to question 8(a)

6    did Sheldon Silver state or describe his law practice as

7    representing asbestos clients?

8    A.  He did not.

9    Q.  Where in any of Sheldon Silver's answers each year, 2002

10   through 2013, did Sheldon Silver describe his law practice as

11   representing real estate developers?

12              MR. SHUR:  Objection.

13              THE COURT:  Overruled.

14              THE WITNESS:  He did not.

15   BY MS. COHEN:

16   Q.  Where in any of Sheldon Silver's answers each year, 2002

17   through 2013, did Sheldon Silver describe his law practice as

18   tax certiorari work?

19   A.  He did not.

20   Q.  If you can please turn to the second page of Government

21   Exhibit 2009.

22              The second page is the annual statement of financial

23   disclosure question 13.

24              Is the quoted language there the question as it

25   appeared on the Legislative Ethics Commission annual financial

1    disclosure form for the years 2002 through 2013?

2    A.  Yes.

3    Q.  Can you read, please, for the jury what the question is.

4    A.  "List below the nature and amount of any income in excess

5    of $1,000 from EACH SOURCE for the reporting individual and

6    such individual's spouse for the taxable year last occurring

7    prior to the date of filing.

8            Nature of income includes but is not limited to all

9    income other than that received from employment listed under

10   item 2 above, from compensated employment, whether public or

11   private, directorships and other fiduciary positions,

12   contractual arrangements, teaching income, partnerships,

13   honorariums, lecture fees, consultant fees, bank and bond

14   interests, dividends, income derived from a trust, real estate

15   rents, and recognized gains from the sale or exchange of real

16   or other property.

17           "Income from a business or profession and real estate

18   rents shall be reported with a source identified by the

19   building address in the case of real estate rents and otherwise

20   by the name of the entity and not by the name of the individual

21   customers, clients, or tenants with the aggregate net income

22   before taxes for each building address for entity.

23           "The receipt of maintenance receipts in connection

24   with a matrimonial action, alimony, and child support payments

25   shall not be listed."

FBHYSIL3                          Reid - Direct

1   Q.  Just focusing on the first sentence of question 13 where it

2   says, "List below the nature and amount of any income in excess

3   of $1,000 from EACH SOURCE for the reporting individual and

4   such individual's spouse for the taxable year last occurring

5   prior to the date of filing," the capital letters under

6   "excess" and "EACH SOURCE" -- did that text appear in capital

7   letters on the financial disclosure form itself?

8   A.  I believe it did, yes.

9   Q.  If you want to look in your binder.  You can look through

10  each of the financial disclosure forms.

11  A.  Yes.

12  Q.  So let's look at Sheldon Silver's answers to question 13.

13          Looking at his answers for 2002, can you just explain

14  what his answers there were.

15  A.  For himself, meaning it was income for himself and not for

16  his spouse, law practice fees, category D, which would have

17  been $60,000 to under $100,000.

18          And then in June of 2003, he filed an amendment that

19  stated that his law practice fees were category C, $20,000 to

20  under $60,000.  And then he also listed self.  Of counsel

21  practice Weitz & Luxenberg, fees.  Category C.

22  Q.  Do you know how legislators can amend their financial

23  disclosure forms?

24  A.  Yes.  They get an amendment form from our office, and they

25  fill out either additional or corrected information and sign it

1   and date it and file it with our office.

2   Q.  When can legislators amend their financial disclosure

3   forms?

4   A.  At any time as long as the financial disclosure form that

5   they're amending is still within our files.

6   Q.  How far back do you keep the financial disclosure forms?

7   A.  It used to be seven years.  Recently we've held onto them

8   longer than that.  So I think we have them now for maybe 10 or

9   11 years.

10  Q.  So, other than the limitation that the Legislative Ethics

11  Commission has to have the form still on its files going back

12  seven or ten years, is there any limitation on how far back in

13  time a legislator can amend their financial disclosure form?

14  A.  No.

15  Q.  Looking at Sheldon Silver's answers to question 13, for

16  2002 through 2013 -- let's just do actually through 2008.

17          This is a quotation.  This is what the words were on

18  the form itself.  Is that right?

19  A.  Yes.

20  Q.  And he reports 2002, starting half year, through 2008,

21  self, Weitz & Luxenberg.

22  A.  Yes.

23  Q.  And the fee amount there, that category -- again, would the

24  public have been able to see that category amount at that time?

25  A.  No.

1   Q.  2002 through 2008.

2   A.  No.

3   Q.  And then for 2009, 2010, 2011, 2012, 2013, did he answer

4   essentially the same, law practice, including Weitz &

5   Luxenberg?

6   A.  Yes.

7   Q.  Where in any of Sheldon Silver's answers did Sheldon Silver

8   list Golberg & Iryami, PC as a source of income?

9   A.  It was not listed here.

10  Q.  And where in any of Sheldon Silver's answers to question 13

11  did he list Jay Arthur Goldberg, PC as a source of income?

12  A.  It wasn't listed.

13  Q.  You see on the bottom there are several footnotes regarding

14  categories of income.

15  A.  Yes.

16  Q.  Can you just explain those for the jury again, please.

17  A.  Beginning in calendar year 2012, the number of categories

18  of income were greatly expanded, and the ranges of income were

19  much more specific.

20          So, beginning in calendar year 2012, when the

21  categories of income changed -- for example, here it says law

22  practice, category K.  Category K would be $350,000 to under

23  $450,000.

24  Q.  Just looking back at Sheldon Silver's answers again, 2002

25  through 2013, 2008 Sheldon Silver reports, "Self, Weitz &

1   Luxenberg."

2   A.  Yes.

3   Q.  2009, Sheldon Silver reports, "Self, law practice,

4   including Weitz & Luxenberg."

5   A.  Yes.

6   Q.  2010, Sheldon Silver writes, "self, law practice including

7   of counsel to W & L, Esquire."

8   A.  Yes.

9   Q.  In 2011, Sheldon Silver writes, "Self, law practice,

10  including of counsel to W & L, Esquire"?

11  A.  Yes.

12  Q.  In 2012 Sheldon Silver writes, "Self including of counsel

13  to W & L"?

14  A.  Yes.

15  Q.  In 2013, Sheldon Silver completes this answer to question

16  number 13, "Self, law practice including of counsel of W & L."

17  A.  Yes.

18  Q.  What is the category amount for Sheldon Silver's income in

19  2012 and 2013?  What does the K and the N correspond to?

20  A.  In 2012 it was category K, which would mean $350,000 to

21  under $450,000.  And category N is $650,000 to under $750,000.

22  Q.  And the forms that were filled out for calendar year 2012

23  and 2013 -- those were the first years these forms were

24  publicly posted on JCOPE's website; is that right?

25  A.  Yes.

```
 1              MS. COHEN:  No further questions, your Honor.

 2              THE COURT:  Okay.  Mr. Shur.

 3  CROSS-EXAMINATION

 4  BY MR. SHUR:

 5  Q.  Ms. Reid, good afternoon.

 6  A.  Good afternoon.

 7  Q.  My name is Justin Shur.  I, along with my colleagues,

 8  represent Sheldon Silver.

 9              We've never met before; right?

10  A.  Not that I know of, no.

11  Q.  We haven't talked about this case before?

12  A.  No.

13  Q.  The financial disclosure forms that Ms. Cohen asked you

14  about -- you mentioned that there's a question regarding

15  outside income; right?

16  A.  Yes.

17  Q.  Legislators are permitted to have outside income; correct?

18  A.  Yes.

19  Q.  New York has a part-time legislature.

20  A.  Yes.

21  Q.  It's always been that way; right?

22  A.  As long as I know of, yes.  Certainly the last hundred

23  years or so.

24  Q.  I won't ask you beyond that.

25              So New York State legislators are allowed to have
```

 1   outside jobs; right?

 2   A.   Yes.

 3   Q.   In fact, many New York State legislators have outside jobs?

 4   A.   Yes.

 5   Q.   And, like Mr. Silver, there are many assembly members and

 6   many senators that their outside job is they're lawyers; right?

 7   A.   A fair number of them, yes.

 8   Q.   And, in addition to their legislative salary, New York

 9   State legislators are allowed to earn income from those law

10   practices; correct?

11   A.   Yes.

12   Q.   And there's no limit on the amount that a legislator can

13   make in his or her outside job?

14   A.   No, there's not.

15   Q.   The financial disclosure forms that Ms. Cohen asked you

16   about -- they were implemented by a law back in the mid 1980's;

17   correct?

18   A.   Yes.

19   Q.   And this law was in 1987, I believe, which required

20   New York State legislators and various other public officials

21   to file these financial disclosure forms?

22   A.   I'm embarrassed to tell you I don't know the exact year,

23   but it certainly sounds about right relative to the time frame.

24   Q.   You certainly shouldn't be embarrassed about that.

25        Mr. Silver voted in favor of that law.

```
 1    A.  Okay.

 2            THE COURT:  Do you know?  Don't agree with him.  Do

 3    you know?

 4            THE WITNESS:  I apologize.  I don't know.

 5    BY MR. SHUR:

 6    Q.  Do you know if Mr. Silver was the cosponsor of that law?

 7            MS. COHEN:  Objection, your Honor.

 8            THE WITNESS:  I don't know.

 9            THE COURT:  Overruled.

10    BY MR. SHUR:

11    Q.  The forms that Ms. Cohen showed you and that you've

12    reviewed covered years 2002 through 2013; is that right?

13    A.  Yes.

14    Q.  Those are actually the calendar years for the information

15    that's being reported; right?

16    A.  Correct.

17    Q.  So, for example, the 2002 form is actually filed in 2013

18    but covers information related to 2002 -- I'm sorry.

19            The 2002 form that's filed in 2003 relates to

20    information from the calendar year 2002.

21    A.  Correct.

22    Q.  These forms I think you said contain 19 different

23    questions; is that right?

24    A.  Yes.

25    Q.  They're about ten pages or so long?
```

 1   A.  Yes.

 2   Q.  And the prosecutor focused on a couple of those questions

 3   which I want to talk about.

 4           Right?

 5   A.  Yes.

 6   Q.  One of those questions was question 8(a).

 7           Do you remember that?

 8   A.  Yes.

 9   Q.  That is a question that applies to legislators who, among

10   other things, practice law.

11   A.  Yes.

12   Q.  If we could take a look at question 8(a).  Why don't we

13   use, just as an example, the 2009 form, which I believe is

14   Government Exhibit 920.

15           MR. SHUR:  If we could actually go to the first page,

16   please.

17           THE WITNESS:  I'm sorry.  What year was that?

18   BY MR. SHUR:

19   Q.  I apologize.  This is for calendar year 2009.

20           THE COURT:  It's the second document in your binder.

21           MR. SHUR:  The government exhibit is 920.

22           THE COURT:  It's the second document in my binder.

23           MR. SHUR:  Not in mine, but that's okay.

24   BY MR. SHUR:

25   Q.  Are you there, Ms. Reid?

 1   A.  Yes.

 2   Q.  So I said this is the form for 2009 because it covers

 3   calendar year 2009; right?

 4   A.  Yes.

 5   Q.  As we see here, there's a date stamped May 17, 2010; right?

 6   A.  Yes.

 7   Q.  And that's the date that it was received?

 8   A.  Yes.

 9   Q.  So it was filed in 2010.

10   A.  Correct.

11   Q.  If we could turn to question 8(a), which is on page 4 of

12   the form.

13   A.  Yes.

14   Q.  So the question asks the reporting individual or the

15   legislator that's completing the form to give -- if we can

16   highlight this language -- to give "a general description of

17   the principal subject areas of matters undertaken by such

18   individual."

19           Did I get that right?

20   A.  Yes.

21   Q.  Do you see that there?

22   A.  Yes.

23   Q.  So the question asks for a general description; right?

24   A.  Correct.

25   Q.  It doesn't ask for a precise or specific description; is

FBHYSTL3                        Reid - Cross

1    that right?

2                MS. COHEN:  Objection, your Honor.

3                THE COURT:  Overruled.

4                THE WITNESS:  The statute says, "a general

5    description."

6    BY MR. SHUR:

7    Q.  It doesn't say precise or specific.

8    A.  No, it doesn't.

9    Q.  It doesn't ask for an in-depth or extensive description?

10   A.  No.  It asks for a general description.

11   Q.  A general description.  Okay.

12              It's asking for a general description of the principal

13   subject areas of matters undertaken by the individual

14   legislator; right?

15   A.  Correct.

16   Q.  So it doesn't ask for each and every subject area; right?

17   A.  No.  It asks for principal subject areas.

18   Q.  It doesn't say, "Provide a complete list of all subject

19   areas;" right?

20   A.  No.  It says the principal subject areas.

21   Q.  That's the main subject areas; right?

22   A.  The principal subject areas, yes.

23   Q.  Would you say "principal" is the same as the "main" subject

24   areas?

25              MS. COHEN:  Objection, your Honor.

FBHYSIL3                          Reid - Cross

 1            THE COURT:  Overruled.

 2            THE WITNESS:  Yes.

 3   BY MR. SHUR:

 4   Q.  The question 8 is asking for -- if we could go a little bit

 5   further -- a "general description of the principal subject

 6   areas of matters undertaken by such individual."

 7            Do you see that?

 8   A.  Yes.

 9   Q.  It doesn't say matters on which the legislator did no work;

10   right?

11   A.  No.

12   Q.  It doesn't say, matters which the legislator referred to

13   other attorneys; correct?

14   A.  No.

15   Q.  It says, "matters that are undertaken by that individual;"

16   right?

17   A.  Yes.

18   Q.  It then goes on to say, "Additionally, if such an

19   individual practices with a firm or corporation and is a

20   partner or shareholder of the firm or corporation, give a

21   general description of principal subject areas of matters

22   undertaken by such firm or corporation."

23            Do you see that?

24   A.  Yes.

25   Q.  So, if the legislator who's filling out this form is

1  employed by a law firm and is a partner or a shareholder of the

2  firm, then the legislator, based on the question, is required

3  to provide a general description of principal subject areas of

4  matters, not just undertaken by the legislator but for matters

5  undertaken by the firm as a whole.

6           Is that right?

7  A.  Yes.

8  Q.  But, if the legislator is not a partner, if the legislator

9  is not a shareholder, the legislator is only required to

10 provide a general description of principal subject areas of

11 matters undertaken by the legislator.

12          Correct?

13 A.  Yes.

14 Q.  Not areas of matters undertaken by other members of the

15 firm.

16          Correct?

17 A.  In this time period, yes.

18 Q.  I just want to make sure I'm clear.  So when you say, "In

19 this time period," for the forms covering years 2002 through

20 2013, the language we just reviewed there that's highlighted

21 stays the same.

22          Right?  I don't mean to suggest this is a test.

23 A.  No, no.  There was a slight change but not a significant

24 change.  Yes.  The language regarding to the clients actually

25 changed for this upcoming year.  I just do want to take a quick

1    look.

2    Q.  I'm just talking about the highlighting language that we

3    just looked at.  We'll get to the other language in a moment.

4    A.  Yes.  That language stayed the same.

5    Q.  Mr. Silver's answer to question 8(a) for the forms from

6    2002 through 2013, with the exception of some minor

7    differences, essentially was the same; right?

8    A.  Correct.

9    Q.  Let's take a look at it.

10            MR. SHUR:  If we could take a look at Government

11   Exhibit 2009.  This is the summary chart.

12            MS. COHEN:  Again, this is not an exhibit in evidence.

13            THE COURT:  That's the wrong chart.

14            MR. SHUR:  What exhibit number is the subject chart?

15            MS. COHEN:  2009.

16            THE COURT:  That was the sticker that he had on it,

17   but it wasn't the same chart.

18            MS. COHEN:  Correct.

19            MR. SHUR:  That's the document that we received.

20            MS. COHEN:  No.

21            THE COURT:  Can you pull it up for him, please.

22            MS. COHEN:  Your Honor, if they want to move this

23   chart in, we'll mark it 2009-1 so there's no confusion in the

24   record.  That was my concern.

25            THE COURT:  I think this is the chart they want.

 1            MS. COHEN:  Great.

 2            MR. SHUR:  This is 2009; right?

 3            MS. COHEN:  Correct.

 4            THE COURT:  Exhibit 2009.

 5            MR. SHUR:  Yes.

 6            THE COURT:  Yes.

 7   BY MR. SHUR:

 8   Q.  So in 2002 -- this is a summary of Mr. Silver's answers to

 9   question 8(a) for the forms covering calendar year 2002 through

10   2013.

11            Is that right?

12   A.  Yes.

13   Q.  So in 2002 through 2008, the forms state, "Limited practice

14   of law in the principal subject area of personal injury claims

15   on behalf of individual clients."

16            Right?

17   A.  Yes.

18   Q.  And then there's also "Of counsel to law firm."

19            Right?

20   A.  2002 through 2006 are exactly the same.  In 2007 and 2008,

21   it says "Limited to practice of law."  There's an added "to"

22   there.

23   Q.  Right.

24   A.  Yes.

25   Q.  With the exception of the added "to" they're the same;

1    right?

2    A.   Yes.

3    Q.   And then in 2009 and 2010, the forms state, "Limited

4    practice of law," and then it says, "In the predominant area"

5    as opposed to "principal subject area;" right?

6    A.   Yes.

7    Q.   Those are basically the same; right?

8    A.   From my understanding, yes.

9    Q.   It says, "In the predominant area of personal injury claims

10   on behalf of individual clients;" right?

11   A.   Right.

12   Q.   And then "Of counsel to law firm again;" right?

13   A.   Yes.

14   Q.   And then for 2011 through 2013, the forms state, "General

15   practice of law with emphasis on representation of individual

16   clients and personal injury actions;" right?

17   A.   Yes.

18   Q.   And then there's the again, "Of counsel to law firm;"

19   right?

20   A.   Yes.

21   Q.   The level of detail provided in the answer to question 8 on

22   Mr. Silver's forms that we just reviewed was similar to the

23   answers to other legislators who were attorneys; is that right?

24            MS. COHEN:   Objection, your Honor.

25            THE COURT:   Sustained.

1    BY MR. SHUR:

2    Q.  In addition to question 8(a), Ms. Cohen asked you about

3    question 13 on the form; right?

4    A.  Yes.

5           MR. SHUR:  If we could go back to -- was it Government

6    Exhibit 920, the 2009 form we were looking at?  Just as an

7    example.

8           If we could turn to question 13.

9           THE COURT:  13?

10          MR. SHUR:  13.

11          I apologize.  Could we go back to the summary chart

12   for a moment.  This might be a quicker way to do this.  If we

13   could go to the summary chart and look at the summary of

14   Mr. Silver's answers to question 13.

15   BY MR. SHUR:

16   Q.  So, in 2002, the answer that Mr. Silver's form included

17   was -- it says "Law practice" under "Source of income;" right?

18   A.  Yes.

19   Q.  And the form listed fees under "Nature of Income;" is that

20   right?

21   A.  Yes.

22   Q.  And then Mr. Silver filed an amended form?

23   A.  Yes.

24   Q.  Where he added to question 13, "Of counsel practice.  Weitz

25   & Luxenberg;" right?

1    A.  Yes.

2    Q.  And that's because he joined Weitz & Luxenberg in

3    September 2002?

4    A.  I don't know.

5            MR. SHUR:  If we could quickly go to Mr. Silver's

6    summary of the responses to question 8(a).

7    BY MR. SHUR:

8    Q.  If you look at the 2002 entry, do you see that in the

9    amendment to the 2002 form Mr. Silver indicated that since

10   September of 2002, "Of counsel to law firm"?

11   A.  Yes.

12           MR. SHUR:  If we could go back to the summary of

13   question 13, please.

14   BY MR. SHUR:

15   Q.  So for the years 2003 through 2008, Mr. Silver's forms

16   indicated for question 13 Weitz & Luxenberg under "Source of

17   Income;" right?

18   A.  Yes.

19   Q.  And he listed "fees" under "Nature of Income;" right?

20   A.  Yes.

21   Q.  Ms. Reid, by the way, when you're reviewing -- you

22   mentioned you review the legislators' forms?

23   A.  Yes.

24   Q.  When you review the form, you don't review each answer sort

25   of in a vacuum or in isolation, but you review it as part of

1  the overall form; right?

2              MS. COHEN:  Objection.

3              THE COURT:  Overruled.

4              THE WITNESS:  I'm sorry.  I'm not sure I understand

5  your question.  Would you mind asking it again.

6  BY MR. SHUR:

7  Q.  Sure.  When you're reviewing a legislator's form and you're

8  going through each question and answer, you mentioned you look

9  at the prior year's form; right?

10  A.  Yes.

11  Q.  The form from the earlier year.

12  A.  Yes.

13  Q.  And you look at all of the information on form; correct?

14  A.  Yes.

15  Q.  For the years 2009 through 2013, Mr. Silver's forms

16  indicated for question 13, "Law practice including of counsel

17  to Weitz & Luxenberg;" right?

18  A.  Well, in 2009 it just says, "Including Weitz & Luxenberg"

19  but in subsequent years, it says, "Including of counsel to

20  Weitz & Luxenberg," yes.

21  Q.  For the years 2009 through 2013, Mr. Silver specifically

22  lists Weitz & Luxenberg as the source of his income, but he

23  wasn't required to do that; right?

24              MS. COHEN:  Objection, your Honor.

25              THE COURT:  Overruled.

1    BY MR. SHUR:

2    Q.  Let's start with that question.

3    A.  I'm sorry.  What was the question?

4    Q.  Sure.  Mr. Silver could have listed simply law practice;

5    right?

6               MS. COHEN:  Objection, your Honor.

7               THE COURT:  Overruled.

8               THE WITNESS:  Not if he was an employee of Weitz &

9    Luxenberg.

10   BY MR. SHUR:

11   Q.  Well, let me ask you this:  During the years that we just

12   looked at -- right? -- 2009 through 2013, the question did not

13   require legislators to disclose their income with

14   particularity.  Right?

15              MS. COHEN:  Objection, your Honor.

16              THE COURT:  Sustained.

17   BY MR. SHUR:

18   Q.  Ms. Reid, you mentioned the forms changed; right?

19              THE COURT:  First off, what question are you asking

20   about?

21              MR. SHUR:  13.

22              THE COURT:  I don't think question 13 changed.

23              MR. SHUR:  It did, Judge.

24              THE COURT:  According to her testimony, this is the

25   question.

```
 1              MR. SHUR:  I apologize.  I'm not talking about within

 2    the 2002 to 2013 time period.

 3    BY MR. SHUR:

 4    Q.  But after that it changed; right?

 5              THE COURT:  Wait a minute.  So your question is:  Did

 6    number 13 on the form change after 2013?  Is that your

 7    question, Mr. Shur?

 8              MR. SHUR:  It is, Judge.

 9              THE COURT:  Okay.  That was very unclear.

10              MR. SHUR:  I apologize.

11              THE COURT:  Did number 13 change after 2013?

12              MS. COHEN:  Your Honor, can we have a sidebar on this?

13              THE COURT:  Let her answer yes or no.

14              MS. COHEN:  Okay.

15              THE WITNESS:  Yes.  The form changed for calendar year

16    2014.

17    BY MR. SHUR:

18    Q.  If I could show you what's been marked Defendant's Exhibit

19    137.

20              THE COURT:  Is this what you want a sidebar over?

21              MS. COHEN:  Correct, your Honor.

22              THE COURT:  Okay.  I'll tell you what.

23              Mr. Shur, do you have other subject matters that you

24    can ask about for a few minutes and we can come back to that?

25    Or is this going to throw off the carefully calibrated routine?
```

 1          MR. SHUR:  I think I could ask some other questions,

 2     Judge.

 3          THE COURT:  I'm looking at the clock, and I'm thinking

 4     we could just break for lunch.

 5          MR. SHUR:  That would make the most sense, at least

 6     from my perspective.

 7          THE COURT:  All right.  Ladies and gentlemen, we're

 8     going to break for lunch at this point.

 9          Do you remember my direction?  Don't talk about the

10     case.  Don't talk about us.  Don't talk about the lawyers.

11     Talk about the Giants.

12          (Jury not present)

13          (Witness temporarily excused)

14          THE COURT:  I gather the government has an objection

15     to Defense 137.

16          MS. COHEN:  Your Honor, the problem -- there are

17     several problems with Defense Exhibit 137.  The form was

18     changed -- the testimony would be, if she was permitted to

19     say -- because of the prosecutions of various legislators in

20     Albany for corruption offenses, which I believe, based on our

21     prior discussions, the defense does not want to get into in

22     this case --

23          THE COURT:  Putting it differently, I hear doors

24     opening.

25          MR. SHUR:  Judge, the significance is not that there

1   were corruption cases that was part of the discussion of

2   changing these forms.  What's significant is that the forms

3   change to say, for question 13, to say, each such source must

4   be described with particularity.

5              I think that's relevant to what the question 13 means

6   in earlier answers, given this language, needed to be added to

7   clarify that.

8              THE COURT:  I hear doors opening.  I mean, my

9   inclination is to say no, because that's going to get us into

10  exactly the subject matter that the defense has been struggling

11  to keep out, which is that there were a number of different

12  legislators prosecuted.

13             This strikes me as the thing that those of you who

14  have ever worked in big organizations see all the time.  So

15  someone does something wrong.  Their explanation is, well, you

16  didn't tell me I had to do that.

17             So you end up with bond debentures rather than a

18  straightforward question because someone will point to

19  something and say, well, it wasn't exactly that.

20             You've got your argument that the question, as you

21  just asked her -- that you says you have to describe it

22  generally --

23             MR. SHUR:  That's a different question, Judge.  That's

24  8(a).

25             THE COURT:  Right.

1           MR. SHUR:  I think the fact that each source must be

2    described with particularity shows that the earlier question

3    did not require that.

4           I don't know that the form is changing to cover

5    something that already has been covered.  There were a number

6    of changes made to these forms as the years have gone by, not

7    just to this form.

8           As she said on direct examination, to ask -- this is

9    what she said on direct examination, to ask for additional

10   disclosure, to ask that additional information be requested

11   from the legislators.  That's what this is doing right here.

12          The prosecutor elicited that testimony on

13   direct examination.

14          THE COURT:  She elicited it on direct examination that

15   the form changed in some aspects.  Certainly it got much more

16   specific in the categories of value.

17          MR. SHUR:  It's true.  The motivation for why it

18   changed is irrelevant.  I'm not going to ask her why it

19   changed.  I'm just going to ask that the change exists.

20          That's a fact.  It's on the form.  The government

21   opened the door to that.  I don't think that opens the door to

22   this floodgate of corruption cases.

23          THE COURT:  You want to use the change in the form to

24   suggest that the prior question was ambiguous.

25          MR. SHUR:  Just like the government wants to point to

1    an ambiguous question and say it's clear as day, which it's

2    not.

3              THE COURT:  I feel like deja vu all over again.  We've

4    had exactly that discussion.

5              MR. SHUR:  I'm not looking to get into the motivations

6    behind the change.  I'm not going to try to elicit testimony

7    that it was a bad question and, therefore --

8              THE COURT:  That's what you're setting up.

9              MR. SHUR:  No, Judge.

10             THE COURT:  That's exactly the argument you're setting

11   up.

12             MR. SHUR:  There are a number of other examples,

13   Judge, where as the forms evolved over the years, there is

14   additional information requested.

15             THE COURT:  Not as to these two questions.

16             MR. SHUR:  Yes.

17             THE COURT:  No.

18             MR. SHUR:  They do.

19             THE COURT:  Question 13 doesn't change at all.

20             MR. SHUR:  8(a) over time -- there's also an 8(b) that

21   gets added to the forms, and 8(b) is relevant to 8(a) because

22   it's requesting additional information about the relationship

23   between the legislator lawyer and their clients.

24             There are a number of evolutions within these forms.

25   I think they're relevant in terms of you can't just in a vacuum

1    look at one of these questions without looking at the entire

2    form.  She even said you review it altogether.

3              THE COURT:  Yes, but each year the legislator has to

4    fill out the form that applies that year.

5              MR. SHUR:  Right.

6              THE COURT:  So the question that was relevant to

7    whether Mr. Silver answered the form honestly and disclosed all

8    of his income is the question that was in the form for the year

9    he filled out.

10             MR. SHUR:  He was filling out these forms through the

11   this entire time period.

12             THE COURT:  But you look at each one.  It's not like

13   in 2011 he goes back to 2002.

14             MS. COHEN:  Your Honor's, certainly the form calendar

15   year 2014, which would have been filled out in May of 2005,

16   could not -- '15 is what I meant to say -- was not his state of

17   mind when he filled out the forms in 2012, 2013, 2014.  So it's

18   also not relevant.

19             MR. SHUR:  Judge, this is a business record of the

20   assembly.

21             THE COURT:  It still has to be relevant.

22             MR. SHUR:  It is relevant.

23             THE COURT:  That's the issue, Mr. Shur.

24             MR. SHUR:  I understand.

25             THE COURT:  Just saying it is relevant doesn't answer

1   the question.

2          MR. MOLO:  Your Honor, they're arguing that the

3   disclosure was incomplete.  It was not particular enough.  So

4   the question --

5          THE COURT:  No.  It's not that it was not particular

6   enough.  It was that he had a source of income that was not

7   disclosed.  It's not a lack of particularity.  It's a lack of

8   failing to disclose a source of income.

9          Weitz & Luxenberg is not Golberg & Iryami.  He

10  received income from Golberg & Iryami.  He did not disclose the

11  income that he received from Golberg & Iryami.

12         MR. MOLO:  It's the practice of law that he discloses

13  on question 8.  The fact that they changed the rule, Judge, is

14  relevant at least to the question of what was required before.

15         THE COURT:  No, it's not.  A subsequent change does

16  not relate back to a prior year.  As of 2014, this is the

17  required disclosure form.  Without going into sort of a

18  red-lined version of why did you make this change, you don't --

19  we don't know.

20         I'm not going down that route.  That is a trial within

21  a trial, which is a distraction.

22         MR. MOLO:  The why is irrelevant.  It's the fact that

23  it changed.

24         THE COURT:  The fact that in 2014 it was different

25  from 2013 tells you nothing about what was going on in 2013.

1    That's the problem.

2            MR. SHUR:  I'm arguing that it does, and here's why.

3    The government is saying with respect to question 13 back in

4    2005, that it requires that each source be described with

5    particularity.

6            THE COURT:  They are not saying that.  They are saying

7    each source must be disclosed.

8            MR. SHUR:  Right.  But the source is Mr. Silver's law

9    practice.

10           THE COURT:  He wasn't practicing law.  He wasn't

11   practicing at all.  He did nothing for the fees.  He was not

12   practicing law.  That's what all of the testimony has been.

13           MR. SHUR:  The referral fees from Golberg & Iryami

14   were paid to Sheldon Silver, Esquire.  That went into his law

15   account, his business account, Sheldon Silver, Esquire.

16           Ms. Reid, according to her Jencks material, would say

17   that if you get checks into your law account, you can simply

18   say, law practice.  That's what the Jencks material says.

19           THE COURT:  I'm not going to let you put the 14 form

20   in.  I don't think it is relevant.  I think getting into it

21   becomes a whole mishegas that is not relevant to this case.

22   I'm not going down that road.

23           Anything further?

24           MS. COHEN:  Yes, your Honor.  If we could just get a

25   sense of how much longer the cross is so we can know who to

 1    line up for the afternoon.

 2              THE COURT:  How much longer?

 3              MR. SHUR:  Maybe a half hour, Judge.

 4              THE COURT:  Okay.  Remember that you're supposed to

 5    tell the government and me whether there's going to be a

 6    defense case.  We'll be back at about -- I'd like to bring the

 7    jury in at 5 till.

 8              MS. COHEN:  Thank you, your Honor.

 9              (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      A F T E R N O O N   S E S S I O N

2                              1:55 p.m.

3            THE COURT:  You have all been given a copy of the

4    charge and proposed verdict sheet.  We will probably talk about

5    it tomorrow.  Sounds like we can do it tomorrow afternoon and

6    not try to cram it in this afternoon.

7            MS. COHEN:  That would be fine, your Honor.

8            THE COURT:  Can we get our witness back?

9            Mr. Shur, you are ready to proceed?

10           MR. SHUR:  Yes, Judge.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Jury present)

 2                    THE COURT:  Okay, Ms. Reid, you are still under oath.

 3                    THE WITNESS:  Yes.

 4                    MR. SHUR:  May I inquire, your Honor?

 5                    THE COURT:  Yes.

 6   BY MR. SHUR:

 7   Q.  Good afternoon, Ms. Reid.

 8   A.  Good afternoon.

 9   Q.  I think where we left off was question 13 on the financial

10   disclosure form?

11   A.  Uh-huh.

12   Q.  And just to be clear, for the years 2002 through 2013,

13   which were the forms the prosecutor had showed you on direct

14   examination, question 13 did not state that each source must be

15   described with particularity, correct?

16   A.  Correct.

17   Q.  As we saw on the summary chart, for a number of different

18   years for question 13 and I believe other questions on the

19   form, Mr. Silver indicated that he was of counsel at

20   Weitz & Luxenberg.

21                    Do you recall that?

22   A.  Yes.

23   Q.  Ms. Reid, you're a lawyer, yes?

24   A.  Yes.

25   Q.  When did you join the Legislative Ethics Commission?
```

1   A.  In December -- actually December 29th, 2008.

2   Q.  And before that you were practicing law?

3   A.  Yes.

4   Q.  In private practice?

5   A.  Yes.

6   Q.  At a law firm?

7   A.  I was in a solo practice.

8   Q.  I'm sorry?

9   A.  I had a solo practice.

10  Q.  You are familiar with the term "of counsel," right?

11  A.  Yes.

12  Q.  At some firms it means that you can practice law outside

13  the firm, correct?

14          MS. COHEN:  Objection, your Honor.

15          THE COURT:  Sustained.

16  Q.  Ms. Reid, if a legislator who is also a lawyer has checks,

17  fees coming into his or her law practice account, it is okay to

18  report only the income from law practice, right?

19          MS. COHEN:  Objection, your Honor.

20          THE COURT:  Sustained.  Rephrase the question.

21  Q.  Sure.

22          If a legislator who is a lawyer has a law practice

23  bank account, right?

24          MS. COHEN:  Objection, your Honor.  Maybe a side bar

25  would be appropriate if we are going to go down this line.

1          THE COURT:  Yes.  Come on up.

FBH5wil4                         Reid - cross

1                    (At side bar)

2          THE COURT:  Where are you going with this?

3          MR. SHUR:  Judge, the disclosure form indicates law

4    practice --

5          THE COURT:  You are talking about question 13,

6    correct?

7          MR. SHUR:  Yes.  So, it indicates law practice

8    including Weitz & Luxenberg.

9          THE COURT:  Yes.  I'm aware.

10         MR. SHUR:  Mr. Silver had a bank account which the

11   Goldberg & Iryami fees went into that was a law bank account,

12   it was Sheldon Silver, Esquire, it was a business checking

13   account, and the Jencks material for this particular witness

14   indicates that if a legislator who is a lawyer has checks

15   coming into the law practice account that the income that you

16   need to report could just be law practice, you don't need to go

17   further than that.

18         THE COURT:  This is the source?

19         MR. SHUR:  Right.

20         THE COURT:  The question is what source.

21         MR. SHUR:  Right; for this question, for question 13,

22   right.

23         MS. COHEN:  No.

24         MR. SHUR:  So that if you are a solo practitioner or

25   you have a practice -- if you are of counsel and you have a

```
 1   practice outside of that firm and you receive referral fees
 2   from another law firm and it goes into your law account, you
 3   just need to list law practice, you don't need to list X, Y and
 4   Z law firm that referred you or that gave you that referral
 5   fee.  That's what the Jencks materials indicates.
 6        MS. COHEN:  That is not what her testimony would be.
 7   That is absolutely not what her testimony would be.
 8        Her opinion about what the forms require, of course
 9   there is nothing on direct about that, it is not the proper
10   subject of cross about her opinion but, anyway, the Jencks
11   material would say and the reasons that you led with those
12   questions about her prior law practice is that when she was in
13   law practice what does she do or what did she assume -- but
14   there is nothing proper about asking her.  She knows nothing
15   about how he was paid or anything about being paid at all.
16        MR. SHUR:  Judge, one way to quickly get to the bottom
17   of this is to simply ask the witness the questions outside of
18   the presence of the jury.
19        On direct examination Ms. Cohen elicited testimony
20   about what is and isn't required to be on these forms.
21        THE COURT:  I don't think so.
22        MS. COHEN:  No.
23        MR. GOLDSTEIN:  She did not do that.
24        THE COURT:  She only asked was that the question and
25   is that the answer.  That's all she elicited.  She wasn't using
```

 1  her as an expert witness --

 2          MS. COHEN:  Correct.

 3          THE COURT:  -- on how legislators are supposed to

 4  fill out the form.

 5          MS. COHEN:  I did not ask her to interpret the form at

 6  all.

 7          THE COURT:  Don't talk at the same time.

 8          MR. SHUR:  She asked her questions about the purpose

 9  of the form, there were questions about why the legislator has

10  to sign the form.  It went beyond just reading the text of the

11  form, Judge, and I think this witness was sponsored as this is

12  sort of the guru when it comes to financial disclosure, she is

13  executive director and counsel.

14          THE COURT:  She's custodian.  She is put on as a

15  custodian.

16          MR. SHUR:  I think there was testimony that she

17  reviews the forms personally and I also plan to elicit

18  testimony that she provides advice to legislators about the

19  forms.  This is what she does.  This is her job.

20          MS. COHEN:  Your Honor --

21          THE COURT:  Yes, but direct was:  This is the form?

22          MR. SHUR:  I don't think this is so outside.  Even if

23  it is beyond the scope of direct I don't know that that's the

24  objection.  I don't think this is so far outside the scope of

25  the direct examination that this question should be precluded.

1            The difficulty, your Honor, is that questions outside

2     the scope of direct that get to her interpretation or view of

3     what that language means ends up causing problems and ends up

4     effectively using her as an expert and what she would also say

5     and the Jencks Act material says is that she thought that it

6     might be illegal for a legislator to get referral fees.

7            MS. COHEN:  That's what she thought.

8            MR. SHUR:  I thought all referral fees were illegal is

9     what the Jencks Act material says but that's not --

10           MS. COHEN:  Her opinion about legal fees is exactly

11    why it is too confusing to go into.

12           MR. SHUR:  Our problem, our objection to the forms

13    coming in is, yes, it says each source.  Now, does that mean

14    that the source is -- if you are a solo, you have an

15    independent practice or you are of counsel and you have

16    practice outside that firm and you are Sheldon Silver, Esquire,

17    is it a source if you are getting referral fees?  Sheldon

18    Silver, Esquire?  Or is the source the law firm that's paying

19    the fees?  And I think I know that your Honor is not going to

20    let me go there but there is a 2015 training material provided

21    by the Legislative Ethics Commission that indicates that in

22    that situation you don't have to disclose the name of the

23    referring firm.  I understand it is outside the time frame and

24    don't plan to go into that but it begs the question, What does

25    each source mean?  Sheldon Silver, Esquire law practice or do

1   you need to go beyond that and look at the referring firm --

2   the government is going to argue that Goldberg & Iryami should

3   have been on these firms and I believe that this witness would

4   say that's not the case.

5          MS. COHEN:  She has no idea whether that's the case or

6   not.  She is not an expert on what he knew what he disclosed or

7   what the forms said.  There was no testimony on that on direct

8   we were careful on that and they are not allowed to use her as

9   an expert.  They have enough evidence to argue to the jury

10  exactly what they want to argue.  It says source.  Source means

11  that.  He can argue that, he can't use her as an expert.

12         MR. SHUR:  I am not using her as an expert.  The

13  Legislative Ethics Commission gives training every year on

14  these forms and this is their view that they --

15         MS. COHEN:  No.

1                    (In open court)

2                    THE COURT:  Ladies and gentlemen, I'm going to send

3     you back to the jury room.  I think this may take a little bit

4     longer than it makes sense to have you sitting out here.

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                  (Jury not present)

 2          THE COURT:  Okay.  We stopped at they give training.

 3   Is the training given to the legislators that said if you are

 4   receiving referral fees for business that you have referred to

 5   another firm that that does not have to be disclosed?

 6          MR. SHUR:  As I mentioned at the bench, Judge,

 7   obviously I did not participate in these training sessions but

 8   we do have material from 2015 that indicates that.  Now, what I

 9   would say here is --

10          THE COURT:  That presumably is when you actually have

11   a practice.  Part of the problem with your theory is Sheldon

12   Silver wasn't practicing law.  There is no evidence that he had

13   a practice of law.

14          MR. SHUR:  Judge --

15          THE COURT:  He didn't do legal work in connection with

16   tax certiorari and he didn't do legal work in connection with

17   personal injury law.

18          MR. SHUR:  I disagree.

19          THE COURT:  There is no evidence that he did.

20          MR. SHUR:  Judge, you can have a law practice where

21   you're referring matters to people, receiving referral fees.

22   You need to have legal liability insurance if that's what you

23   are doing, right?  Because as we saw through Iryami, you're

24   responsible for the upside, you get credit for the upside and

25   you are also responsible for the downside so you need to have

1    legal malpractice insurance.  You have a law practice even if

2    you are actually not doing the work.  And here the checks from

3    Goldberg & Iryami are made out to Sheldon Silver, Esquire, and

4    they're deposited into a business checking account titled

5    Sheldon Silver, Esquire.

6            THE COURT:  Okay, so what are you trying to adduce in

7    terms of there being advice having been given to legislators

8    prior to 2014 that if they are receiving referral fees from a

9    particular law firm that they do not have to disclose that law

10   firm as a source of income.  Because that's your argument.

11           MR. SHUR:  Correct.

12           THE COURT:  Okay, so what evidence do you think that

13   Ms. Reid is going to give you that supports that argument?

14           MR. SHUR:  Okay.  Well, again, this is a proffer

15   because I have not interviewed her in connection with this but

16   I have the handwritten Jencks notes and what I believe she

17   would testify, if I asked her these questions, is that the role

18   of the Legislative Ethics Commission is to provide training --

19   compliance training with these forms and they do it on a

20   periodic basis throughout this relevant time period and that

21   her -- if you're a lawyer/legislator and you receive money that

22   goes into your law account, your bank account, that you can

23   disclose in terms of what is proper disclosure you can simply

24   list law practice and that that would be adequate.

25           THE COURT:  I'm sorry.  That's based on what?

1          MR. SHUR:  The Jencks material.

2          THE COURT:  That's your good faith basis.

3          MR. SHUR:  It specifically says --

4          THE COURT:  What is the 3500 number?

5          MS. COHEN:  3500 number is 3574-07 where Ms. Reid says

6    it depends --

7          THE COURT:  Hang on.

8          MS. COHEN:  3574-07.

9          MR. SHUR:  I don't know that we are looking at the

10   same.  Which date is that?  I don't have a number at the

11   bottom.  This is the June 3rd, 2015 handwritten notes.

12         THE COURT:  What is the 3500 number?

13         MS. COHEN:  I am looking, your Honor.  June 3rd, 2015

14   is 3500 number 3574-04.

15         Just to be clear, there was no training material prior

16   to 2015 having anything to do with this.  And we turned over

17   all the prior training materials to the defense.

18         THE COURT:  Okay.  So I'm looking at 3574-04.

19         MR. SHUR:  Right, Judge.  If you go to page 7 at the

20   very bottom it says:  Checks coming into law practice account.

21   Okay to report only income from law practice.

22         And I should make the point that it's not specifically

23   in connection with referral fees, it is in connection with any

24   money that's coming into the law practice account so that could

25   be from the clients directly or it could be from another law

 1   firm that's providing a referral fee.

 2           MS. COHEN:  Correct, your Honor.  If you look at other

 3   Jencks Act material here when asked about referral fees

 4   Ms. Reid said it depended what the legislator disclosed to me

 5   and I would have to ask more questions and seek more advice

 6   from legal counsel about referral fees.

 7           Completely out of context.

 8           MR. SHUR:  I'm not asking about referral fees, I am

 9   simply asking the question about money that --

10           THE COURT:  But these were referral fees.

11           MR. SHUR:  Right, but for all income that comes into a

12   law practice account that it's proper to simply disclose law

13   practice on the form for question 13.

14           THE COURT:  But you are just ignoring that referral

15   fees may be different.

16           MR. SHUR:  Well, Judge, I'm not ignoring anything.  I

17   know that your Honor has made a ruling about the disclosure

18   forms and compliance material after the relevant time period

19   but in 2015 there is someone from the -- I have the material, I

20   am happy to hand it up -- there is a compliance handout which

21   indicates you do not have to list the referring firm.  I'm not

22   saying I am looking to get into that but I'm saying this is the

23   truth about the way these forms are handled.  If it would be

24   helpful I'm ready to hand it up.

25           THE COURT:  I don't need to --

 1                MS. COHEN:  Your Honor, I think the Jencks Act

 2    material is clear that if Sheldon Silver had disclosed to

 3    Ms. Reid he was getting referral fees she would have asked more

 4    questions and sought legal counsel.  In fact, she thought

 5    referral fees were illegal per se.  So.

 6                MR. SHUR:  Judge, I don't know if I need to respond to

 7    that given we know what the exchange was between Ms. Reid and

 8    Mr. Silver where he said I have additional sources of income

 9    and she didn't ask follow-up questions.  But, that's beside the

10    point.

11                THE COURT:  I don't even know -- okay.

12                It doesn't seem to me that that advances the ball.

13    So, what do you want to ask her?

14                MR. SHUR:  That for lawyers who are legislators when

15    they receive checks coming into their law practice account that

16    it is okay to report only income from law practice.  This is

17    what her Jencks material indicates.  That's it.

18                THE COURT:  So you are not going to -- so then the

19    government, on redirect, is going to distinguish between

20    referral fees and fees from a client.

21                MS. COHEN:  Your Honor, the question is inherently,

22    completely misleading and improper.

23                THE COURT:  That's why you have redirect.

24                MS. COHEN:  I assume there also has to be a relevant

25    question to allowed to be asked and it is not relevant.

FBH5wi14                          Reid - cross

1          THE COURT:  It is quite relevant.  It is relevant.

2          MS. COHEN:  That legislators can deposit sources of

3    income into a bank account?

4          THE COURT:  Okay.

5          MS. COHEN:  I think they're trying to mislead the

6    jury, your Honor, very intentionally.

7          THE COURT:  That's why you have redirect, to make sure

8    the jury understands.

9          MR. SHUR:  To be clear, I want to make sure we are

10   clear in terms of redirect, though, there is in the Jencks

11   material this witness says:  I thought all referral fees were,

12   per se, improper.  Obviously that is just factually and legally

13   incorrect.  I want to make sure that that testimony isn't going

14   to be elicited because she is basically saying what is lawful

15   and what is unlawful, that that's obviously not what I'm

16   asking.

17         THE COURT:  Well, that actually is what you are

18   asking.

19         MR. SHUR:  No.  I'm asking about what is required to

20   be disclosed on the form versus whether referral fees in

21   general are legal versus illegal.  There is a difference

22   between those two.

23         THE COURT:  The question that I'm confident the

24   government is going to ask is when Mr. Shur asked you about

25   funds being deposited into a bank account, did your answer

1    apply equally to whether it was fees generated from a client or

2    a referral fee from another law firm.

3              MR. SHUR:  I don't have a problem with that question

4    if it is phrased that way.

5              MS. COHEN:  That is not the only question, your Honor,

6    because we would have to ask follow-up questions in order to

7    get rid of the misleading impression as to why they're even

8    asking this question of this witness.

9              THE COURT:  I disagree with that.

10             Bring the jury back in.

11             MS. COHEN:  What is the question that he is being

12   permitted to ask?

13             THE COURT:  He can ask about whether if money is being

14   deposited from a source into an attorney's bank account whether

15   it has to be disclosed what the source of it is.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

FBH5wi14                          Reid - cross

1          (Jury present)

2   BY MR. SHUR:

3   Q.  Ms. Reid, I'm not exactly sure where we left off but I will

4   try to pick up.

5   A.  Okay.

6   Q.  So, for question 13, the question sort of evolved over

7   time; is that fair?

8          MS. COHEN:  Objection, your Honor.

9          THE COURT:  Sustained.  Question 13 didn't change

10  during the period we were discussing.

11         MR. SHUR:  It did, Judge.  I apologize.

12  Q.  Even within that time period, 2002 through 2013, there were

13  some changes to question 13; is that right?

14  A.  No.

15  Q.  There weren't?

16         THE COURT:  She's testified to that now three times.

17         MR. SHUR:  I am mistaken.  I apologize.

18  Q.  So, for question 13 for lawyers who were legislators, they

19  did not have to disclose the identity of clients; is that fair?

20  A.  Yes, other than in very specific circumstances I believe

21  beginning in 2013 those clients that had business before the

22  State legislature.

23  Q.  So that was a change that was made in 20 --

24  A.  I would have to go back and look.  I believe it was for

25  calendar year 2013.

1    Q.  If you could just check that.

2            And we are talking about question 13, right?

3    A.  No.  I'm sorry.  I apologize.  That was for question 8.

4    Q.  Question 8.

5    A.  No, they did not for question 13.

6    Q.  So, for question 13, though, the lawyers or legislators who

7    were lawyers did not need to disclose the identity of their

8    clients, right?

9    A.  Correct.

10   Q.  Sort of a sensitive issue as far as disclosing the identity

11   of lawyers --

12            MS. COHEN:  Objection, your Honor.

13            THE COURT:  Sustained.

14   Q.  If you're a legislator and you're a lawyer and there is

15   money being deposited into your law practice account, it is

16   okay to report the source of that income as law practice for

17   question 13, is that right?

18            MS. COHEN:  Objection, your Honor.

19            THE COURT:  Overruled.

20            Do you understand the question?

21            THE WITNESS:  Could you repeat it, please?

22            MR. SHUR:  Sure.

23   Q.  So, if you are a legislator and you are also a lawyer you

24   have a law practice account, right?

25   A.  Uh-huh.

1   Q.  So Lisa Reid, Esquire.

2   A.  Right.

3   Q.  And there is money coming into that account, right, from

4   your law practice?

5   A.  Uh-huh.

6   Q.  For question 13 it is okay to report the source of that

7   income as law practice?

8   A.  Presuming that the income is coming from your clients and

9   it is going into the law practice, yes, you would only need to

10   list the income as coming from your law practice, correct.

11   Q.  Okay.

12         So, I just want to focus on, for the 2009 through 2013

13   period, for question 13.

14   A.  Yes.

15   Q.  The source of income is described as law practice including

16   counsel to Weitz & Luxenberg; is that right?

17   A.  Yes.

18   Q.  And just to be clear, I know we are focused on Mr. Silver's

19   law practice but for question 13 during this time period, 2002

20   through 2013, Mr. Silver disclosed other sources of income for

21   question 13, right?

22         MS. COHEN:  Objection, your Honor.

23         THE COURT:  Overruled.

24   A.  Yes.

25   Q.  I'm sorry, Ms. Reid.  I didn't hear your answer.

1   A.  Yes, he did.

2   Q.  For certain years he listed the salary of his wife Rosa

3   Silver, right?

4   A.  Correct.

5   Q.  In particular, Rosa Silver's salary in connection with her

6   position at the New York City Board of Education, right?

7   A.  I would have to go back and look at it but my memory is

8   yes.

9   Q.  And he also listed income from stocks and bonds and other

10  investments, right?

11  A.  Correct.

12  Q.  So, focusing on 2009 through 2013 where Mr. Silver

13  discloses, as a source of income, law practice including of

14  counsel to Weitz & Luxenberg, I just want to focus on -- can we

15  actually bring that up on the screen?  Maybe you can bring up

16  the government's summary chart.

17          Even with my glasses I am having trouble seeing this.

18          If we can go to question 13, please?

19          THE COURT:  That's question -- okay.

20  Q.  Why don't we blow up, say, 2010.

21          So, this is the source of the income and the nature he

22  disclosed was fees, right?

23  A.  Do you mind if I just look at the --

24  Q.  No.  Of course not.

25  A.  No.

1   Q.  Oh, okay.  I see.  But there is a category of amount

2   listed, right?

3   A.  Correct.

4   Q.  And the category of amount relates back to a schedule that

5   has a range of dollars, right?

6   A.  Correct.

7   Q.  And Ms. Cohen asked you on direct examination about the

8   fact that for a period of time those categories were redacted,

9   right?

10  A.  Correct.

11  Q.  That was pursuant to law, correct?

12  A.  Correct.

13          THE COURT:  They were redacted if the public wanted to

14  see them.

15          MR. SHUR:  Yes.  Right.

16  Q.  But that was based on the law, correct, that was in

17  existence at the time?

18  A.  You are asking the authority for the redactions?

19  Q.  Right.

20  A.  Yes, it was according to Legislative Law Section 80.

21  Q.  So, it says law practice and it says including of counsel

22  to Weitz & Luxenberg which indicates that the income from his

23  law practice isn't limited to the fees received from

24  Weitz & Luxenberg, correct?

25          MS. COHEN:  Objection, your Honor.

 1              THE COURT:  Sustained.  The document speaks for

 2     itself.

 3     Q.  Well, the word "including" indicates there are additional

 4     sources of income from his law practice, right?

 5              MS. COHEN:  Objection, your Honor.

 6              THE COURT:  Sustained.  The document speaks for

 7     itself.

 8     Q.  The way it is written did you understand that Mr. Silver

 9     was receiving money from other sources?

10              MS. COHEN:  Objection, your Honor.

11              THE COURT:  Sustained.

12     Q.  Ms. Reid, as the executive director and counsel of the

13     Legislative Ethics Commission, one of your responsibilities is

14     to review legislators' financial disclosure forms after they're

15     filed?  Is that right?

16     A.  Yes.

17     Q.  And if I remember correctly on direct examination you said

18     there is an initial review that's done, right?

19     A.  Yes.

20     Q.  And that's just to make sure that there aren't any blanks

21     after certain questions, is that fair?

22     A.  Yes.

23     Q.  And then there is a second level review done?

24     A.  Yes.

25     Q.  And do you do that review yourself?

1    A.  I do it, I have other staff that do it, and then the

2    Commission is also responsible for looking at the forms as

3    well.

4    Q.  So there is three levels of review?

5    A.  I wouldn't put it that way, no.  I would say there are

6    three different entities that review it, yes.

7    Q.  And what is your role in that review process?

8    A.  From a staff level I often conduct the reviews myself and I

9    am also responsible for the other staff review.

10   Q.  I see.  Okay.

11            THE COURT:  So you review their work?  You review your

12   staffers' work if they have questions?

13            THE WITNESS:  If they have questions, yes, I usually

14   review them.  Yes.

15            THE COURT:  Okay.

16   BY MR. SHUR:

17   Q.  Is it fair to say that one of the reasons for the review is

18   to ensure that the forms are complete?

19   A.  Yes.

20   Q.  And you take this responsibility to review the forms

21   seriously?

22   A.  Yes.

23   Q.  And you diligently perform that duty?

24   A.  Yes.

25   Q.  And if there is an answer that's incomplete or somehow

FBH5wi14                    Reid - cross

1  deficient on a legislator's form you follow up with the

2  legislator, right?

3            MS. COHEN:  Objection.

4            THE COURT:  Overruled.

5  A.  Yes.  If I see it and if I understand it to be incomplete,

6  yes.

7  Q.  Sure.  Of course.

8            And you follow up with the legislator to explain there

9  is a problem with the form, it's incomplete, or somehow

10 deficient?

11 A.  Either I or my staff does, yes.

12 Q.  And whether it is you or your staff you will explain to the

13 legislator this is what you need to do to complete it or to fix

14 the deficiency?

15 A.  Not exact -- we will ask them.  We will ask them -- we will

16 tell them what the form says and ask if it is an oversight or

17 if it is an accurate representation.  And if it is an

18 oversight, we ask them to file an amendment, yes.  We recommend

19 that they file an amendment.

20 Q.  Okay.

21           And if there is information based on the face of the

22 form that appears to be missing you will recommend that they

23 complete that information, they add it to the form, correct?

24 A.  Either complete it or explain why it is not there, yes.

25 Q.  And do you recall an instance with Mr. Silver where you

 1   reached out to him about one of his financial disclosure forms?

 2   A.  No.

 3   Q.  You don't recall that?

 4   A.  No.

 5   Q.  Regarding his deferred income?

 6   A.  No.

 7   Q.  Okay.

 8          And you mentioned that the legislators can file an

 9   amendment to the form in which he or she includes the

10   additional or the missing information, right?

11   A.  Yes.

12   Q.  They're permitted to do that?

13   A.  Yes.

14   Q.  And you and your staff are there to help the members

15   complete the form and follow this process?

16   A.  Yes.

17   Q.  After Mr. Silver filed his 2009 financial disclosure form

18   which had the language we just looked at where it says

19   including Weitz & Luxenberg, the Legislative Ethics Commission

20   reviewed the form, right?

21   A.  Yes.

22   Q.  And you reviewed it for completeness; is that fair?

23   A.  I'm sure I did.  Yes.

24          THE COURT:  Do you mean she personally or the office?

25   Q.  Well, do you remember personally reviewing the form?

1    A.   I don't remember personally reviewing the form but if my

2    memory serves, I was the only attorney in the office for that

3    year so it would have had to have been me, yes.

4    Q.   And you knew that the answer on the 2009 form had changed

5    from an earlier year?

6              MS. COHEN:   Objection, your Honor.

7    Q.   Let me ask it this way.   When you are reviewing the form, I

8    believe you said on direct examination you would look at the

9    form that was filed for the year before to see if there is any

10   differences, right?

11   A.   Yes.

12   Q.   And there is a difference between the 2008 form and the

13   2009 form here, right?

14             MS. COHEN:   Your Honor, we could have a side bar if we

15   are going down this path, pursuant to your Honor's former

16   ruling.

17             THE COURT:   Overruled.

18             THE WITNESS:   Yes.

19   BY MR. SHUR:

20   Q.   So the answer including Weitz & Luxenberg, did you contact

21   Mr. Silver or did anyone from the Legislative Ethics Commission

22   contact Mr. Silver and tell him that the answer to question 13

23   was incomplete?

24             MS. COHEN:   Objection, your Honor.

25             THE COURT:   Overruled.

1   A.  You're asking if my office contacted Assembly Member

2   Silver?  No, we did not.

3   Q.  Or anyone in his office?

4   A.  No.

5   Q.  Did you contact him and tell him that his answer to

6   question 13 was inadequate?

7   A.  Not that I recall, no.

8   Q.  Or that it was deficient?

9   A.  Not that I recall, no.

10  Q.  Or that he needed to provide additional information in

11  response to question 13?

12  A.  No.

13  Q.  And fair to say that you reviewed Mr. Silver's form for

14  2010, 2011, 2012 and 2013 as well?

15  A.  I'm not sure if I did it personally or my deputy did it but

16  I'm sure it was reviewed, yes.

17  Q.  And his answer regarding his law practice in those years

18  for question 13 said law practice, and then it has that same

19  language we looked at including Weitz & Luxenberg, right?

20  A.  Yes.

21  Q.  And after reviewing those forms in any of those years did

22  you ever reach out to Mr. Silver and say your answer to

23  question 13, Speaker, is incomplete?

24  A.  No.

25  Q.  Did you ever reach out to him and say, Mr. Speaker, you

 1   need to list the other sources of income.  Did you say that?

 2   A.  No.

 3   Q.  Okay.

 4          Did you ever go to him and say it says including

 5   Weitz & Luxenberg, clearly there is other sources of income and

 6   you need to list them here?

 7   A.  No.

 8          MS. COHEN:  Objection as to form, your Honor, prior

 9   question.

10          THE COURT:  Overruled.

11   Q.  Is it fair to say that if you, in reviewing Mr. Silver's

12   financial disclosure form, if you thought that there was any --

13   it was incomplete or somehow deficient, you or a member of your

14   staff wouldn't hesitate to reach out to his office to discuss

15   it, right?

16   A.  No.

17          MR. SHUR:  One moment, Judge?

18          THE COURT:  Sure.

19          (Counsel conferring)

20          MR. SHUR:  Nothing further, Judge.

21          THE COURT:  Okay.

22          Any redirect?

23          MS. COHEN:  Just a few questions, your Honor.

24   REDIRECT EXAMINATION

25   BY MS. COHEN:

1    Q.  Ms. Reid, when you reviewed, for example, Sheldon Silver's

2    form for accuracy, you had no independent knowledge other than

3    what was stated on the form if the responses were accurate;

4    isn't that right?

5    A.  Yes.

6    Q.  Ms. Reid, I think you testified on cross-examination

7    legislators were allowed to earn outside income.  Do you recall

8    that testimony?

9    A.  Yes.

10   Q.  Were legislators allowed to use their official position to

11   obtain referral fees from people or entities with business

12   before the State?

13           MR. SHUR:  Objection.

14           THE COURT:  Overruled.

15   A.  I'm sorry.  Would you reask me the question, please?

16   Q.  Sure.  Were legislators allowed to use their official

17   position in exchange for getting referral fees with people or

18   entities with business before the State?

19   A.  I can say that legislators are not allowed to use their

20   official position for unwarranted privileges for themselves or

21   others.  I don't know, without specific details, whether

22   referral fees for business before the State would be considered

23   an unwarranted privilege.

24   Q.  But, in any event, legislators are not permitted to receive

25   money from people who are doing business before the State for

1   them, right?

2              MR. SHUR:  Objection.

3              THE COURT:  Overruled.

4   A.  In certain circumstances.  I would have to double check the

5   statute, but under paragraph 737 legislators are not allowed to

6   receive income by either doing the work themselves directly or

7   by others for specified appearances before the State.  There

8   are six specified appearances.  I don't know them off the top

9   of my head.  I can certainly look them up.

10             MS. COHEN:  One moment, your Honor?

11             (Counsel conferring)

12             MS. COHEN:  Your Honor, no further questions.

13             THE COURT:  Okay.  Thank you.

14             Ms. Reid, you can step down.

15             THE WITNESS:  Thank you.

16             (Witness steps down)

17             THE COURT:  Call your next witness.

18             MR. GOLDSTEIN:  The government calls Michael Whyland.

19             THE COURT:  Whyland?

20             MR. GOLDSTEIN:  W-H-Y-L-A-N-D, Whyland.

21    MICHAEL WHYLAND,

22         called as a witness by the Government,

23         having been duly sworn, testified as follows:

24             THE DEPUTY CLERK:  Please state your full name and

25   spell your last name, slowly, for the record.

FBH5wi14                        Whyland - direct

1            THE WITNESS:  Sure.  Michael Whyland.  W-H-Y-L-A-N-D.

2    DIRECT EXAMINATION

3    BY MR. GOLDSTEIN:

4    Q.  Good afternoon, Mr. Whyland.

5    A.  Good afternoon.

6    Q.  Are you testifying here pursuant to a trial subpoena?

7    A.  I am.

8    Q.  Where are you employed?

9    A.  I'm employed at the New York State Assembly.

10   Q.  What's your position currently with the Assembly?

11   A.  Communications Director to Speaker Carl Heastie.

12   Q.  Prior to that did you work for Sheldon Silver, the

13   defendant?

14   A.  I did.

15   Q.  What did you do for Sheldon Silver?

16   A.  I was his press secretary.

17   Q.  Let's just go back in time for a moment.  What's your

18   educational background?

19   A.  I have a graduate degree from Brockport State University.

20   Q.  When did you first come to work for the New York State

21   Assembly?

22   A.  I first came to work for the New York State Assembly in

23   1987.

24   Q.  What did you do when you joined the Assembly then?

25   A.  I was hired as a writer for the House Operations Committee.

FBH5wil4                    Whitehead - direct

1   Q.  How long did you stay in the Assembly at that time?

2   A.  For approximately eight years.

3   Q.  What positions did you hold?

4   A.  I was a writer and then I was a regional coordinator for

5   members in Suffolk County.

6   Q.  What did you do after you then left the Assembly at that

7   point?

8   A.  I worked for an engineering and scientific consulting firm

9   in Syracuse, New York.

10  Q.  What kind of work did you do there?

11  A.  Communications director.

12  Q.  When did you return to the New York State Assembly?

13  A.  In 2011, early.

14  Q.  What position did you take at that time?

15  A.  Press Secretary to Speaker Sheldon Silver.

16  Q.  Did you work for Sheldon Silver from 2011 through the

17  beginning of this year?

18  A.  Yes, I did.

19  Q.  As his press secretary?

20  A.  Yes.

21  Q.  What were your responsibilities as Silver's press

22  secretary?

23  A.  I would -- I was the speaker's primary spokesperson,

24  prepared press releases and press statements.  Things of that

25  nature.

FBH5wil4                    Whyland - direct

1    Q.   During the time period that you were Speaker Silver's press

2    secretary, who was your boss?

3    A.   Speaker Silver.

4    Q.   How, if at all, did you know Silver before 2011 when you

5    became his press secretary?

6    A.   I knew he was Speaker of the Assembly but I didn't have a

7    relationship with him prior to that.

8    Q.   Did you have any personal relationship with him prior to

9    working for him?

10   A.   No, I did not.

11   Q.   Once you became press secretary and during your time in

12   that role, how frequently did you speak with Silver?

13   A.   I'm sorry.  Repeat the question?

14   Q.   During the time that you were his press secretary, how

15   frequently did you speak with the defendant?

16   A.   It would depend on the time of year.  I mean it could be --

17   during session it would be daily.  If it was off-session it

18   might be once or twice a week or sometimes more frequently,

19   sometimes less frequently.

20   Q.   How did you communicate with him?

21   A.   Personally, face to face, by phone.  More infrequently by

22   text or by e-mail.

23   Q.   How many phones did the defendant carry?

24   A.   I believe two phones.

25   Q.   Did the defendant also have a car provided by the State?

```
 1   A.  Yes, he did.
 2   Q.  Is there a State employee who acted as the defendant's
 3   driver?
 4   A.  At times he was a driver, yes.
 5   Q.  Did he act as the defendant's driver when the defendant was
 6   in New York?  In the City?
 7   A.  Yes.  I believe so.
 8   Q.  How many people worked in the press office?
 9   A.  It varied, but approximately half a dozen.  Between six and
10   eight employees.
11   Q.  Did you supervise all of those employees?
12   A.  Yes, I did.
13   Q.  As part of your job as press secretary did you or your
14   office assemble clips of newspaper articles for the Speaker?
15   A.  Yes.
16   Q.  Which articles did you assemble?
17   A.  Articles of statewide importance and issues that we were
18   considering or were important to the Assembly.
19   Q.  Did you include any articles that mentioned either the
20   Speaker or yourself?
21   A.  Yes.
22   Q.  What did you do with the articles that mentioned or quoted
23   the Speaker yourself?
24   A.  We would flag those articles and put them at the top of a
25   daily clip distribution.
```

1    Q.  How frequently did you assemble these news clippings?

2    A.  Daily, five times a week.

3    Q.  What did you do with them once they were assembled?

4    A.  We would try and submit them to the Speaker and to other

5    staff.

6    Q.  How did you give them to the Speaker?

7    A.  He had a hard copy.

8    Q.  If he was in New York City how did you give them to the

9    Speaker?

10   A.  It would be by fax.  We would fax them to the district

11   office.

12   Q.  What knowledge do you have as to whether Sheldon Silver

13   read the news clippings that you assembled?

14   A.  I have seen him read the clips.  There is times that he

15   read them, times that he didn't read them.

16   Q.  When, if ever, did the defendant tell you that a reporter

17   had gotten any information wrong regarding his outside income?

18   A.  Never.

19   Q.  When, if ever, did the defendant tell you that any report

20   of his statements about his outside income were not fully

21   accurate?

22   A.  Never.

23   Q.  When, if ever, did the defendant tell you that he had been

24   misquoted about his outside income?

25   A.  Never.

1    Q.  When you communicated with the media as his press

2    secretary, were you authorized to speak on his behalf?

3    A.  Yes, I was.

4    Q.  When, if ever, did the defendant tell you that any

5    statement that you made to the press about his outside income

6    was inaccurate or misleading?

7    A.  Never.

8    Q.  Did part of your role include issuing press releases and

9    press statements?

10   A.  Yes.

11   Q.  Can you tell the jury what is the difference between a

12   press statement and a press release?

13   A.  A press release is more on an issue that we are

14   considering, could be, for instance, minimum wage or a bill

15   that we are passing in the Assembly.  A press statement is a

16   little bit more reactive to the news of the day or something

17   that we want to get out quickly to the members of the media.

18   Q.  So, to take them one at a time, what was the process for

19   issuing a press release?

20   A.  For a press release we would usually know what the issue

21   was beforehand.  We know a bill is coming, it is going to be

22   passed on the floor so we would, you know, start to prepare a

23   press release, talk to various staff members who had knowledge

24   of the issue and then we would draft a press release and

25   circulate it to various staff members for mark-ups.

1    Q.   Were press releases reviewed or approved by the Speaker?

2    A.   Generally not.  Generally not.

3    Q.   And what was the process for putting out a statement?

4    A.   For a statement it would be -- you know, it would expend on

5    what the issue was.  If there was an issue of pressing

6    importance I would talk with more senior staff level

7    individuals and we would discuss what the message was going to

8    be or what we wanted to say and then we would draft a statement

9    from the Speaker, generally, to issue to members of the media.

10   Q.   At what point in the process, if at all, did the Speaker

11   become involved in the issuing of statements?

12   A.   It could be beforehand.  We would discuss it beforehand

13   with him or it could be once we were ready to send it to the

14   press to get his final approval.

15   Q.   Did he end up -- for press statements, did he approve press

16   statements that went out the door?

17   A.   Generally, yes.

18   Q.   I want you to look, there is a binder in front of you.  If

19   you can look in your binder at what has been marked Government

20   Exhibit 158?

21   A.   158.

22   Q.   Do you recognize that document?

23   A.   I do.

24   Q.   Is that a press statement?

25   A.   Yes, it is.

FBH5wi14                    Whyland - direct

1    Q.  Is this a statement that you reviewed or that the Speaker

2    reviewed?

3    A.  I believe so, yes.

4            MR. GOLDSTEIN:  Your Honor, the government offers

5    Government Exhibit 158.

6            MR. MOLO:  No objection.

7            THE COURT:  158 is received.

8            (Government's Exhibit 158 received in evidence)

9    BY MR. GOLDSTEIN:

10   Q.  If we can publish that, Mr. Coccaro?

11           Mr. Whyland, can you read the content of Government

12   Exhibit 158?

13   A.  From the headline.

14   Q.  Skip the headline, go right to the statement itself.

15   A.  Sure.

16           *The Assembly today passed historic ethics reform*

17   *legislation that will require more extensive financial*

18   *disclosure and establish serious penalties for those who*

19   *violate the law.  I salute Governor Cuomo for his leadership*

20   *and perseverance in forging this necessary and important*

21   *agreement.  Transparency and accountability are the pillars of*

22   *good government, and today's action will strengthen our*

23   *citizens' faith in their elected leaders and hold accountable*

24   *those who betray the public trust.*

25   Q.  We can set that aside.

1          So, we have talked about press releases and press

2     statements.  Did the Speaker also make remarks at public

3     events?

4     A.  Yes, he did.

5     Q.  While you were the press secretary for Sheldon Silver, how

6     were those remarks drafted?

7     A.  Remarks generally were drafted by the Speaker's speech

8     writer Bill Wise.

9     Q.  And what was Sheldon Silver's involvement in preparing or

10    reviewing the remarks?

11    A.  It could be a variety of ways.  It could be ahead of the

12    event he would give input to Bill or whoever of what he wanted

13    to say or could be, once the speech or the remarks were drafted

14    he would review them after -- before giving the speech but

15    after it was finally drafted.

16    Q.  How often did Sheldon Silver speak at public events?

17    A.  It depended.  Again, the time of the year, what was going

18    on.  I would say, you know, could be during session it might be

19    on a weekly basis.  If it is off-session it could be less

20    frequently.

21    Q.  In addition to press releases and press statements and

22    public remarks, did Sheldon Silver's district office also put

23    out newsletters?

24    A.  Yes, they did.

25    Q.  And what did those newsletters contain?

FBH5wil4                    Whitaker - direct

1   A.  They contained information of local importance.  Generally,

2   they're more like district-related information; could be

3   something on school overcrowding or other information that he

4   wanted to get out.

5   Q.  Who prepared the district newsletters?

6   A.  I don't know exactly who would prepare them.

7   Q.  Was that done by the district office?

8   A.  Yes.

9   Q.  And where did you work?  Where was your office?

10  A.  In Albany.

11  Q.  In preparation for your testimony here today did you do

12  searches of Assembly files at the request of the government?

13  A.  I did.

14  Q.  Did you look in particular for any press releases,

15  statements or public remarks about a $250,000 grant provided to

16  New York Presbyterian Hospital in or about 2005 to 2006, or a

17  $250,000 grant provided to Columbia University Medical Center

18  in or about 2006 to 2007?

19  A.  Did I find anything?

20  Q.  Did you do that search?

21  A.  Yes, we did.

22  Q.  And which records did you check in doing that search?

23  A.  We would check hard copy files that we had in the office as

24  well as computer hard drives and disks.

25  Q.  What mention of those grants, if any, did you find?

1   A.   We did not find any.

2   Q.   Did you also confirm whether there was any mention of those

3   grants in any of the newsletters issued by the district office?

4   A.   Correct.

5   Q.   What did you find there?

6   A.   We did not find any.

7   Q.   Now, just to be clear, was there a press release put out

8   every time that the Speaker sponsored a state grant?

9   A.   No.

10  Q.   Did the Speaker make remarks every time that he sponsored a

11  state grant?

12  A.   No.

13  Q.   Approximately how many press releases and statements did

14  the Speaker put out each year?

15  A.   Somewhere between 75 and a hundred, roughly.

16  Q.   And in the review that you did of all of the statements and

17  press releases and public remarks, did you find any reference

18  to State funds provided to the research of a Dr. Robert Taub?

19  A.   No.

20  Q.   I'm going to ask you some questions about what Sheldon

21  Silver told you about his outside income.  As an initial

22  matter, how frequently did you have to answer questions from

23  the press about his outside income?

24  A.   Generally it would come about once or twice a year whenever

25  financial disclosure forms were made public.

FBH5wi14                           Whitehead - direct

1    Q.   Approximately what time of year were those forms made

2    public?

3    A.   July.  Early July.

4    Q.   What were the main subjects of the questions that you

5    received from members of the press about his outside income?

6    A.   Sources of his outside income as well as the nature of some

7    of his investments.

8    Q.   And when you received questions from the press about

9    Sheldon Silver's outside income, who did you consult with to

10   answer them?

11   A.   I would consult with the Speaker.

12   Q.   Why did you talk to the Speaker directly about that?

13   A.   Because he would have direct knowledge of what was on his

14   forms.

15   Q.   How often, if ever, did you answer questions about the

16   defendant's outside income without consulting with him?

17   A.   Rarely, if ever.

18   Q.   Why was that?

19   A.   Because I would want him to know what questions were coming

20   in concerning his income -- his outside income and what was on

21   his financial disclosure forms.

22   Q.   When you consulted with him about his outside income, what

23   did he say about what he did to make money outside of the

24   Assembly?

25              MR. MOLO:  Objection.  Lack of foundation.

FBH5wi14                Whylaled         direct

1                    THE COURT:  Overruled.

2     A.  Could you repeat the question?

3     Q.  When you consulted with the defendant about his outside

4     income, what did he say about what he did to make money outside

5     of the Assembly?

6     A.  That he represented ordinary, simple people who have been

7     harmed.

8     Q.  What did he say about who his clients were?

9     A.  His clients were ordinary, simple people who have been

10    harmed.

11    Q.  Did Sheldon Silver ever tell you that he represented anyone

12    other than ordinary people who had been harmed?

13    A.  No.

14    Q.  What did he say to you about how he obtained those clients?

15    A.  He said that people knew him from being a lawyer for 40

16    years and being in the community for 40 years and, you know,

17    and press reports and things of that nature.

18                    THE COURT:  Can I ask you to keep your voice up?

19                    THE WITNESS:  Sure.

20                    THE COURT:  Thank you.

21    BY MR. GOLDSTEIN:

22    Q.  I think there are two things that you said there, the first

23    was that he said that people knew him?

24    A.  Correct.

25    Q.  And you mentioned press reports.  What did Sheldon Silver

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1    tell you in terms of how he obtained clients in relation to the

2    press?

3    A.   That people would read, you know, press reports about him

4    and would know that, you know, he is an attorney.

5    Q.   What did he say to you as to whether he solicited clients?

6    A.   We didn't talk about that.

7    Q.   What did he say as to whether his clients had any business

8    before the State?

9    A.   He said that his clients had no business before the State.

10   Q.   What did he say about whether he made outside legal income

11   from any entity that had business before the State?

12   A.   He said he had -- I'm sorry.  Repeat that one more time?

13   Q.   What did he say about whether or not he had made any

14   outside income from any entity that had business before the

15   State?

16           MR. MOLO:  Objection.  The question suggests facts

17   that are --

18           THE COURT:  Can I see the parties at side bar, please?

19   The jury should stand up and stretch.

20

21

22

23

24

25

```
 1                    (At side bar)

 2              THE COURT:  Your objection is going to be entirely

 3   overruled.  I just wanted to wake up a juror.

 4              Do you want to be heard?

 5              MR. MOLO:  I would like you to rethink that while the

 6   juror is waking up.  I would like you to wake up, too, and rule

 7   the correct way.

 8              MS. COHEN:  I have never told you to wake up, your

 9   Honor, for the record, the next time I'm being yelled at.

10              MR. GOLDSTEIN:  It took 30 seconds.

11              MR. MOLO:  I will object to the leading nature of the

12   questions.

13              THE COURT:  Oh, that's your objection?

14              MS. COHEN:  He can ask him what was said in the

15   conversation.

16              THE COURT:  But he has got to focus -- okay.

17              Ask the basic question.  What did he tell you.  He

18   sort of told him that so now he is going back to say did he

19   tell you about this?  Did he tell you about that?  So, that

20   objection is overruled.

21              MR. GOLDSTEIN:  I am getting to the end of the list,

22   your Honor.

23

24

25
```

```
 1              (In open court)

 2              THE COURT:  The objection is overruled.

 3              Do you want the question again?  Repeat the question.

 4              MR. GOLDSTEIN:  Thank you, your Honor.

 5   BY MR. GOLDSTEIN:

 6   Q.  What did the defendant say as to whether he made any legal

 7   fees or income with any entity with business before the State?

 8   A.  He said he did not receive any income from people who had

 9   business before the State.

10              THE COURT:  He affirmatively told you that?

11              THE WITNESS:  Yes.

12              THE COURT:  Okay.

13   BY MR. SHUR:

14   Q.  What did he say as to whether he represented any companies

15   or corporations?

16   A.  He did not indicate that to me.

17              (Continued on next page)

18

19

20

21

22

23

24

25
```

 1          THE COURT:  That is, he didn't say one way or the

 2   other, or he told you affirmatively he did not represent

 3   companies some.

 4          THE WITNESS:  He didn't say one way or the other.

 5          THE COURT:  Okay.

 6   BY MR. GOLDSTEIN:

 7   Q.  Do you recall any conversations with Sheldon Silver about

 8   asbestos litigation?

 9   A.  Only one time.

10   Q.  Approximately when did you have that one conversation?

11   A.  It was either 2013 or 2014.

12   Q.  How did the subject come up?

13   A.  With response to, I believe, an article in the paper about

14   the state of -- you know, New York being a judicial hellhole.

15   I believe it was around that time.

16   Q.  Did you raise the topic, or did Sheldon Silver raise the

17   topic?

18   A.  I did.

19          THE COURT:  New York being a judicial hellhole?  Is

20   that what you said?

21          THE WITNESS:  Yes.

22          THE COURT:  Not this court.

23          THE WITNESS:  Certainly not this court.

24          THE COURT:  Go ahead.  I'm sorry.  I wanted to make

25   sure I heard him correctly.

 1            MR. GOLDSTEIN:  He snuck it in, your Honor.

 2    BY MR. GOLDSTEIN:

 3    Q.  What was the subject of this conversation?

 4    A.  I had mentioned to him -- you know, the article had

 5    mentioned mesothelioma, and I said that I had some experience

 6    with it; that my father was an asbestos worker, and I disagreed

 7    with the premise of the article that people who have been

 8    harmed deserve to have, you know, representation and deserve to

 9    find remedies.

10            THE COURT:  What did he say?

11            THE WITNESS:  It was in reference to my father who was

12    an asbestos worker.  He said, well, does he have

13    representation?

14            And I said yes.  That's been long settled.  So it was

15    a very brief conversation.

16    BY MR. GOLDSTEIN:

17    Q.  After he asked if your father had a lawyer, did he say

18    anything else to you about asbestos or asbestos litigation?

19    A.  No.

20    Q.  In that conversation, what did he say, if anything, about

21    whether he was making any money from asbestos litigation?

22    A.  He did not say that, anything of that nature.

23    Q.  What, if anything, did he say about his knowledge of a

24    doctor who treats patients with asbestos-related diseases?

25    A.  He didn't mention that.

FBHYSIL5                    Whyland - Direct

1   Q.   Now, in the discussions that you had with Sheldon Silver

2   about responding to inquiries from the press about the nature

3   and sources of his outside income, what did Sheldon Silver ever

4   tell you, if anything, about a man named Dr. Robert Taub?

5   A.   Nothing.

6   Q.   In those conversations, what, if anything, did he ever tell

7   you about his making any money from asbestos cases?

8   A.   Nothing.

9   Q.   What did he say, if anything, about money that he obtained

10  from Glenwood Management?

11             MR. MOLO:  Objection.

12             THE COURT:  Overruled.

13             THE WITNESS:  Nothing.

14  BY MR. GOLDSTEIN:

15  Q.   What did Sheldon Silver say, if anything, about money he

16  obtained from The Witkoff Group?

17             MR. MOLO:  Objection.

18             THE COURT:  Overruled.

19             THE WITNESS:  Nothing.

20             THE COURT:  By "nothing," do you mean he never

21  mentioned receiving income from those sources?

22             THE WITNESS:  Correct.

23  BY MR. GOLDSTEIN:

24  Q.   What did he say, if anything, about money obtained from a

25  law firm called Jay Arthur Goldberg, PC or Golberg & Iryami?

1    A.  Prior to December of 2014?

2    Q.  Prior to this investigation.

3    A.  Correct.  Nothing.

4    Q.  Were there occasions when the press also asked about

5    investments that Sheldon Silver had made?

6    A.  Yes.

7    Q.  What did Sheldon Silver tell you about how he invested his

8    money?

9    A.  That he invested his money the same way that -- in the

10   retirement accounts as do millions of Americans, blue-chip

11   stocks, things of that nature.

12   Q.  What did he tell you about how his investments were chosen?

13   A.  I believe that he told me that he chose his investments

14   himself.

15   Q.  What did he tell you about his ability to pick his own

16   investments?

17   A.  I think he took pride in his ability to pick his own

18   investments.

19   Q.  Did there come a time when there were questions from the

20   press about Sheldon Silver's investment in an entity called

21   Counsel Financial?

22   A.  Yes.

23   Q.  What, if anything, did Sheldon Silver tell you about how he

24   got into Counsel Financial?

25   A.  I don't recall the specifics of the conversation.  I

1    remember we had a conversation about it, but I don't remember

2    what specifically he said.

3    Q.  What, if anything, did he tell you about a man named Jordan

4    Levy?

5    A.  Nothing.  I can't recall if we ever discussed Jordan Levy

6    or not.  I don't believe we did.

7    Q.  What, if anything, did he tell you about whether Jordan

8    Levy helped him get into any investments?

9    A.  I don't recall that.

10   Q.  Now, when Sheldon Silver made remarks in public or to

11   reporters, what was your office's practice with respect to

12   whether to record those remarks?

13   A.  Generally, we would try to record any interaction with a

14   reporter.

15   Q.  Why did you do that?

16   A.  To ensure accuracy.

17   Q.  How do you go about recording the interactions between

18   Sheldon Silver and the public or members of the press?

19   A.  We would have a handheld recorder, or I would do it on my

20   phone more recently.

21   Q.  After you made a recording of these remarks or interviews,

22   what did you do with that?

23   A.  We would archive them in the assembly's database.  We had a

24   database in the press office.

25   Q.  Did you maintain all of the recordings of interactions with

1    the press?

2    A.   Yes.

3           MR. GOLDSTEIN:  Your Honor, can we have a brief

4    sidebar?

5           THE COURT:  Sure.

6           (At the sidebar)

7           MR. GOLDSTEIN:  At this point, we want to go through

8    some of the recordings.  We have binders of the transcripts to

9    give to the members of the jury to go one by one.  I just

10   didn't want to give them out before letting your Honor know.

11          THE COURT:  About how long is it going to take to play

12   all the tapes?

13          MR. GOLDSTEIN:  A half an hour.

14          THE COURT:  So we'll break after that.  Okay.

15   Seminerio?

16          MR. GOLDSTEIN:  We've redacted that.  That's out.  In

17   the middle of the recording where the word "Seminerio" was,

18   there's a silence.

19          MR. MOLO:  The transcript is redacted out.

20          MS. COHEN:  Yes.

21          THE COURT:  Thank you.

22          (In open court)

23          MR. GOLDSTEIN:  With the Court's permission, we are

24   handing out binders to members of the jury with transcripts

25   that will be the subject of the witness' testimony.

```
 1              THE COURT:  Okay.
 2   BY MR. GOLDSTEIN:
 3   Q.  Mr. Whyland, can you turn in your binder to what has been
 4   marked as Government Exhibit 1-T.
 5              Do you recognize what has been set forth in the
 6   transcript of Government Exhibit 1-T?
 7   A.  Yes, I do.
 8   Q.  Is this one of the audio recordings that has been
 9   maintained by the assembly press office?
10   A.  Yes, it was.
11   Q.  Is it a recording of a public interview by a reporter with
12   Sheldon Silver?
13   A.  Yes, it is.
14              MR. GOLDSTEIN:  Your Honor, the government offers
15   Government Exhibit 1, which is the recording itself, and
16   Government Exhibit 1-T, which is the transcript.
17              MR. MOLO:  Subject to the prior objections.  No
18   objection to the recording.  The transcript I don't believe
19   should come into evidence.
20              THE COURT:  So you've got transcripts in front of you.
21   The transcripts are not received into evidence.  The evidence
22   is what you hear on the tape, and the tape is in evidence.  The
23   transcripts are used to help you follow.
24              So you can read the transcripts, but they won't go
25   into the jury room with you.  What goes in will be the tape.
```

```
 1              (Government's Exhibit 1 received in evidence)
 2              MR. GOLDSTEIN:  Mr. Coccaro, can we play Government
 3    Exhibit 1.
 4              THE COURT:  Are you going to be projecting the
 5    transcript as well?  Or no.
 6              MR. GOLDSTEIN:  I would like to.
 7              Mr. Coccaro, can you do that at the same time.  You
 8    can play.
 9              (Audio played)
10              MR. GOLDSTEIN:  Mr. Coccaro, can you start that
11    recording again at 1 minute and 34 seconds.  I may ask you to
12    stop it a couple times along the way.
13              THE COURT:  Can you make the transcript on the screen
14    a little bigger?
15              MR. GOLDSTEIN:  I was getting the head nod no.
16              THE COURT:  If you can't, you can't.
17              MR. GOLDSTEIN:  If you can tee it up at one minute and
18    34 seconds, Mr. Coccaro.
19              (Audio played)
20              MR. GOLDSTEIN:  Can you stop it there.
21    BY MR. GOLDSTEIN:
22    Q.  Mr. Whyland, the statement that, "My clients are, you know,
23    little people is all I'm saying" -- is that consistent with
24    what the speaker told you when talking about who his clients
25    were?
```

```
 1   A.  Yes.

 2           MR. GOLDSTEIN:  If we can pick it up from there.

 3           (Audio played)

 4           MR. GOLDSTEIN:  Stop right there.

 5   BY MR. GOLDSTEIN:

 6   Q.  Mr. Whyland, is that also consistent with what Sheldon

 7   Silver told you about any fees or money he was receiving from

 8   corporations or entities involved in the legislative process?

 9   A.  Yes, it is.

10           MR. GOLDSTEIN:  Mr. Coccaro, can we pull up what's

11   already been introduced into evidence as Government Exhibit

12   646-19 and look at page 19 of that document.

13   BY MR. GOLDSTEIN:

14   Q.  Mr. Whyland, have you ever seen this check before?

15   A.  No.

16   Q.  What, if anything, did Sheldon Silver ever tell you about

17   receiving --

18           MR. MOLO:  Objection, your Honor.

19           THE COURT:  Sustained.  I presume that's as to the

20   exhibit.

21           MR. MOLO:  Yes.

22           THE COURT:  Sustained.

23           MR. GOLDSTEIN:  We can take that down, Mr. Coccaro.

24           If we can start playing the recording where we left

25   off.
```

FBHYSIL5                    Whyland - Direct

```
 1              (Audio played)
 2    BY MR. GOLDSTEIN:
 3    Q.  Mr. Whyland, that last sentence or last two sentences in
 4    response to the question about how do you even get cases -- is
 5    that consistent with what Sheldon Silver told you about how he
 6    got cases?
 7    A.  Yes, it is.
 8    Q.  If you could turn in your binder to Government Exhibit 2-T.
 9              Do you recognize what is set forth in the
10    transcript --
11    A.  I do.
12    Q.  -- of Exhibit 2-T?
13    A.  Yes, I do.
14    Q.  Is that a transcript of an excerpt of an audio recording
15    that was maintained by the assembly press office?
16    A.  Yes, it is.
17    Q.  Is this a recording of a public interview -- is that a
18    recording of a public interview with Sheldon Silver by a
19    reporter?
20    A.  Yes, it is.
21              MR. GOLDSTEIN:  Your Honor, the government offers
22    Government Exhibit 2 and would like to use Government
23    Exhibit 2-T as an aid to the jury.
24              THE COURT:  Any objection?
25              MR. MOLO:  Subject to the same transcript not being in
```

FBHYSIL5                        Whyland - Direct

1    evidence.

2              THE COURT:  He didn't offer the transcript.  He just

3    offered the tape.

4              MR. MOLO:  No objection to the tape.

5              (Government's Exhibit 2 received in evidence)

6    BY MR. GOLDSTEIN:

7    Q.  Before we get started, what is the date of Government

8    Exhibit 2 and 2-T?

9    A.  May 27, 2008.

10   Q.  If you go back to Government Exhibit 1 and 1-T, what was

11   the date that that recording was made?

12   A.  May 6, 2008.

13             MR. GOLDSTEIN:  Mr. Coccaro, if we can now play

14   Government Exhibit 2.

15             (Audio played)

16   BY MR. GOLDSTEIN:

17   Q.  Mr. Whyland, is there anything in the recording that we

18   just listened to that is not consistent with what Sheldon

19   Silver told you about the nature of his practice or the way

20   that he made income from the practice of law?

21   A.  No.

22   Q.  If you could turn to what's been marked as Government

23   Exhibit 3-T in your binder.  3-A-T should be marked in your

24   binder.

25   A.  I have 3-T.

1          THE COURT:  It's 3-A-T.

2          Do you see the little A on the sticker?

3          MR. GOLDSTEIN:  He may have an old version.

4          THE WITNESS:  I have what's on the screen.

5          THE COURT:  He has 3-A-T.

6     BY MR. GOLDSTEIN:

7     Q.  Mr. Whyland, do you recognize what's reflected in the

8     transcript that's set forth in Government Exhibit 3-A-T?

9     A.  Yes, I do.

10    Q.  Is that a transcript of an excerpt of an audio recording

11    that was maintained by the assembly press office?

12    A.  Yes, it is.

13    Q.  Is it a recording of an interview that was done by a

14    reporter with Sheldon Silver?

15    A.  Yes, it is.

16          MR. GOLDSTEIN:  Your Honor, the government offers

17    Government Exhibit 3 and, as an aid to the jury, Government

18    3-A-T.

19          THE COURT:  So the tape is actually just 3, not 3-A?

20          MR. GOLDSTEIN:  That's correct, your Honor.  We've

21    replaced it.

22          THE COURT:  Any objection?

23          MR. MOLO:  No objection.

24          THE COURT:  So 3 is received.

25          MR. GOLDSTEIN:  Your Honor, for our files and our

 1    records, it is 3-A that the government offers.  We'll withdraw

 2    the offer of 3 and offer 3-A.

 3         THE COURT:  Okay.  3 is not received.  3-A is

 4    received.

 5         MR. GOLDSTEIN:  Thank you, your Honor.

 6         (Government's Exhibit 3-A received in evidence)

 7         MR. GOLDSTEIN:  Mr. Coccaro, can we play 3-A.

 8         (Audio played)

 9         MR. GOLDSTEIN:  Mr. Coccaro, can you start that audio

10    again at about one minute.

11         THE COURT:  While he's finding that, there appeared to

12    be a point where the tape stopped.

13         Is that because there were redactions made at the

14    direction of the Court?

15         MR. GOLDSTEIN:  That's correct, your Honor.

16         (Audio played)

17         MR. GOLDSTEIN:  Can you stop the recording there.

18    BY MR. GOLDSTEIN:

19    Q.  Mr. Whyland, prior to 2014, what knowledge, if any, did you

20    have of any change that Sheldon Silver had made to any of his

21    disclosure forms?

22    A.  I had no knowledge.

23         MR. GOLDSTEIN:  We can continue, Mr. Coccaro.

24         (Audio played)

25    BY MR. GOLDSTEIN:

 1   Q.  For this recording, Mr. Whyland, is there anything in this
 2   recording and the transcript that we've just reviewed that is
 3   inconsistent in any way with what Sheldon Silver has told you
 4   about his outside income?
 5   A.  No.
 6   Q.  Prior to late 2014, when, if ever, did Sheldon Silver call
 7   to your attention any change in his financial disclosure forms?
 8   A.  He did not.
 9   Q.  If you can look in your binder as what's been marked as
10   Government Exhibit 4-T.
11          Do you recognize what's reflected in the transcript
12   set forth in Government Exhibit 4-T?
13   A.  Yes, I do.
14   Q.  Is that a transcript of an excerpt of an audio recording
15   that was maintained by the assembly press office?
16   A.  Yes, it is.
17   Q.  Is it a recording of an interview of the speaker by a
18   reporter?
19   A.  Yes, it is.
20          MR. GOLDSTEIN:  Your Honor, the government offers
21   Government Exhibit 4 and, as an aid to the jury, Government
22   Exhibit 4-T.
23          MR. MOLO:  No objection to Exhibit 4.
24          THE COURT:  4 is received.
25          (Government's Exhibit 4 received in evidence)

FBHYSIL5                    Whyland - Direct

 1   BY MR. GOLDSTEIN:

 2   Q.   Mr. Whyland, what is the date of this recording?

 3   A.   December 15, 2009.

 4   Q.   Just to make sure that I ask the question from the last

 5   one, what was the date of Government Exhibit 3-A?  Of that

 6   recording.

 7   A.   October 29, 2009.

 8   Q.   So for Government Exhibit 4, dated December 15, 2009,

 9   Mr. Coccaro, can you play the recording.

10           (Audio played)

11           MR. GOLDSTEIN:  Mr. Coccaro, can you start the audio

12   again at 41 seconds of this recording.

13           (Audio played)

14           MR. GOLDSTEIN:  Can you stop it there.

15   BY MR. GOLDSTEIN:

16   Q.   Again, Mr. Whyland, did Sheldon Silver ever tell you that

17   he made any money off of asbestos cases?

18   A.   No.

19   Q.   Did he ever tell you that he made any money off of real

20   estate tax work?

21   A.   No.

22   Q.   The statements here, "We represent only claimants,

23   individual claimants, in personal injury actions"-- is that

24   what he has told you before?

25   A.   Yes.

```
 1              MR. GOLDSTEIN:  You can continue, Mr. Coccaro.

 2              (Audio played)

 3    BY MR. GOLDSTEIN:

 4    Q.  Mr. Whyland, that last line about the only connection that

 5    some of the speaker's clients live in the State of New York and

 6    pay taxes to the State of New York and no other connection to

 7    the state -- is that consistent with what he's told you?

 8    A.  Yes.

 9              MR. GOLDSTEIN:  Your Honor, I was going to turn to

10    another portion of testimony before this last recording.  I

11    don't know if this was what you wanted to take a break or if

12    you want to proceed.

13              THE COURT:  This would probably be a convenient time

14    to take a break.

15              Don't discuss the case in any way, shape, or form.

16    Just leave the transcripts on your seat.

17              (Jury not present)

18              (Witness temporarily excused)

19              THE COURT:  Ten minutes.

20              MS. COHEN:  We have an issue, your Honor.

21              THE COURT:  Okay.

22              MR. SHUR:  The defense filed --

23              THE COURT:  I've just been handed the daily opuscle.

24              MS. COHEN:  Your Honor, we were handed it in the

25    middle of Mr. Whyland's testimony.
```

 1            MR. SHUR:  It's a two-page letter brief, Judge,

 2    regarding two of the witnesses that I believe the government

 3    are going to call after Mr. Whyland.  I just wanted to flag it

 4    for the Court.  I don't know when your Honor would be willing

 5    to entertain this.

 6            THE COURT:  After I've had a chance to read it and

 7    after the government has had a reasonable chance to read it.

 8            MR. SHUR:  Understood.

 9            THE COURT:  So perhaps -- are these the next two

10    witnesses?

11            MS. COHEN:  Exactly, your Honor.  The next two

12    witnesses that have always been going after this witness.

13            THE COURT:  You didn't have to say that.

14            MS. COHEN:  I know I didn't, but to be handed a

15    document in the middle of someone's testimony is outrageous.

16            THE COURT:  That speaks for itself.  You didn't really

17    have to weigh in.  We'll deal with it at the end of the break.

18            (Recess)

19            THE COURT:  Okay.  So first it is baffling to me that

20    the first time I'm seeing this is at almost 4:00 on the

21    next-to-the-last day of trial from the allegations that have

22    been in the indictment since the indictment was returned and

23    since the defense team has had no difficulty challenging things

24    that are contained within the indictment.

25            Start with that, that I'm not happy that I'm dealing

FBHVSHU5                    Why - and - Direct

 1   with this at 4:00 when I've got a jury in the room when this

 2   could have been dealt with at pretrial.

 3          With that introduction, Mr. Shur, what would you like

 4   to say?

 5          MR. SHUR:  Yes, your Honor.  The first thing I would

 6   say is we apologize for the late filing.  This was actually an

 7   issue that we had raised in our motion to dismiss I believe the

 8   original indictment, although it's sort of a variation, I

 9   think, of the motion.

10          At the time we moved to strike surplusage from the

11   indictment relating to these allegations.  The reason for the

12   late filing is, number one, that the trial sort of moved a

13   little bit quicker than we all had anticipated.

14          Number two, I think the risks that are discussed in

15   the letter and the unfair prejudice is sort of heightened based

16   on some of the evidence we've heard so far in terms of there

17   being a lack of quid pro quo.

18          THE COURT:  To the extent that this rests on your view

19   that there's no quid pro quo, denied.

20          MR. SHUR:  Obviously, the whole point is that the

21   evidence that we're looking to preclude has nothing to do --

22          THE COURT:  The evidence is going to be he invested in

23   a fund that was not generally available and represented to be

24   high yield, low risk, which in and of itself is a little

25   unusual since high-return vehicles are usually high risk.

1          MR. SHUR:  Right.  My understanding is there's going

2     to be evidence from Jordan Levy and from Mr. Cody --

3          THE COURT:  Paul Cody.

4          MR. SHUR:  Yes.  -- that Mr. Silver was given access

5     to all sorts of different private investment vehicles and that

6     he was arguably treated differently from other investors.

7          Sort of these investment vehicles had extraordinary

8     returns and that these people -- again, it might make more

9     sense for the government to proffer, but I'm happy to sort of

10    speculate based on the discovery we received.

11         THE COURT:  I'll take you up on that.

12         What's the evidence going to be?

13         MS. COHEN:  Your Honor, as the defense knows from the

14    3500 material, Jordan Levy -- mostly Jordan Levy and Paul Cody

15    who worked at Counsel Financial and was also involved in some

16    of the other investments --

17         THE COURT:  What is Counsel Financial?  Is it an

18    investment adviser firm?

19         MS. COHEN:  No, your Honor.  It is a private

20    investment.

21         THE COURT:  Is it an investment fund?

22         MS. COHEN:  It's not really a fund, Your Honor.  It's

23    a company that you only get access to if you know someone is a

24    member of the company.

25         You provide them with money, they invest it, and it

1    has a very high interest rate.  It is a private investment

2    opportunity.  There are other seven or so different investments

3    that Silver invested proceeds of his schemes into.

4          Those investments -- he got access to them through

5    Jordan Levy.

6          THE COURT:  Who is Jordan Levy?

7          MS. COHEN:  Jordan Levy is a principal investor and a

8    venture capitalist in all of these seven or so different

9    investments.

10          THE COURT:  Was he a friend of Mr. Silver?  Did he do

11    business before the legislature?

12          MS. COHEN:  He was a friend of Sheldon Silver.  He was

13    also a friend of Perry Weitz and Arthur Luxenberg.  Over time

14    he and the defendant became actually good friends.

15          And the defendant told him that he had extra money to

16    invest, and Jordan Levy invested it in various investments that

17    he had access to because he was a venture capitalist, and

18    that's what he did.

19          Jordan Levy also has business before the state in that

20    he was appointed to something called the Eerie Canal Harbor

21    Development Corporation, whose financing for projects it wants

22    to do goes before the PACB.

23          He had discussions about Sheldon Silver's vote on the

24    PACB and asked him to support the Eerie Canal Project, which

25    Sheldon Silver said he would.  That is the testimony.

1          It is all relevant to Count Seven where the government

2   has to show how the money moved around, what the money was

3   invested in, and we're entitled to bring out evidence about

4   that and how he got access to it and how the money moved.

5          JUROR:  Judge, if I may, the charge is 1957.  So this

6   is not promotion or concealment under 1956.  This is a

7   straight, you took proceeds of a bribery scheme, and you put it

8   in the bank.

9          We'll stipulate -- and we have -- to the fact that

10  this money that the government has identified made its way into

11  a final institution, period.

12         That's the only issue for the jury to decide with

13  respect to 1957, whether or not the proceeds are the proceeds

14  of a bribery scheme.  All of that evidence is in the record

15  already in terms of the two alleged bribery schemes.

16         Now what we're talking about is getting into seven

17  different investment vehicles, the proprietary of those

18  vehicles, whether Mr. Silver had special access or whether he

19  was treated just like other investors, the circumstances

20  surrounding how he got into the investment vehicles.

21         It sounds like now we're also dealing with whether or

22  not Mr. Silver's official position had anything to do with

23  whether or not he got into these investment vehicles and

24  whether he performed the official favors in return.

25         It sounds like this is sort of now unnoticed 404(b)

1    evidence that wear talking about in addition to simply he had

2    access to private investment vehicles.  None of this is

3    relevant to the 1957 charge.

4           MS. COHEN:  Your Honor, as to how the money was

5    invested, the government has to be able to show how the money

6    was invested, how he got access, to tell that story in order to

7    prove Count Seven.

8           The testimony related to the fact that Jordan Levy was

9    on the Eerie Canal Redevelopment Act and had discussions with

10   the defendant -- that was the subject of the motion in limine.

11   Your Honor denied to strike that part as superfluous.

12          THE COURT:  I didn't rule on it.  It didn't make it

13   into the final -- after you superseded, they abandoned it.

14          MS. COHEN:  No, your Honor.  The motion to dismiss the

15   superseding indictment did have that argument in it, and your

16   Honor denied it.

17          THE COURT:  This included stuff specifically about

18   striking the high-yield investment?

19          MS. COHEN:  Yes, your Honor.  It did.

20          THE COURT:  I'd forgotten that.  Okay.  Look.

21          Based on the fact that it's 4:00 now, how much more

22   time do you have with the witness who's on the stand?

23          MR. GOLDSTEIN:  Less than half an hour, your Honor.

24          THE COURT:  How long is the cross going to be?

25          MR. MOLO:  Forty minutes, Forty-five minutes.

 1          THE COURT:  Why is it going to be -- really?  It's
 2  going to be that long?
 3          MR. MOLO:  I don't know.  I would like it not to be.
 4          THE COURT:  Me too.  I think everyone would like it
 5  not to be.
 6          I'm going to bring out the jury.  Let's go.  We can
 7  deal with this after this witness gets off the stand.
 8          MS. COHEN:  Your Honor, is there any chance we'll be
 9  putting these witnesses on today?
10          THE COURT:  No.  I don't think so.
11          MS. COHEN:  I just wanted to know for scheduling.
12  Thank you.
13          (Jury present)
14          THE COURT:  Okay.  Ladies and gentlemen, again, sorry
15  to keep you waiting.
16          Mr. Goldstein.
17          MR. GOLDSTEIN:  Thank you, your Honor.
18  BY MR. GOLDSTEIN:
19  Q.  Mr. Whyland, you testified that reporters typically asked
20  questions about outside income around the time of the
21  disclosure deadlines.
22          Do you recall that?
23  A.  Yes.
24  Q.  And, again, what time of year did that happen?
25  A.  Roughly around July of every year.

1    Q.  When those questions came up, what did you do?

2    A.  I would discuss them with the speaker.

3    Q.  What did you discuss with the speaker?

4    A.  The nature of the questions and how to respond.

5    Q.  If you can turn in your binder to what's been marked for

6    identification as Government Exhibit 273.  It's redacted, but

7    looking at the unredacted portion, do you recognize this

8    document?

9    A.  I do.

10   Q.  Without testifying about the substance of it, what is this

11   document?

12   A.  It's an article from the New York Daily News.

13   Q.  Does this article contain a quote that you gave to the

14   press?

15   A.  Yes.

16   Q.  What was the basis of the information that you gave in your

17   quote?

18   A.  It was the speaker, discussing a response from the speaker.

19           MR. GOLDSTEIN:  Your Honor, the government offers

20   Government Exhibit 273.

21           MR. MOLO:  No objection.

22           THE COURT:  All right.  273 is received.

23           (Government's Exhibit 273 received in evidence)

24           MR. GOLDSTEIN:  If we could publish that, Mr. Coccaro.

25   If you can just zoom in on the front portion so we can see the

FFBHYSIL5                        Whyland - Direct

1    text there.

2    BY MR. GOLDSTEIN:

3    Q.   The byline, by Glenn Blain and Kenneth Lovett of the Daily

4    News, Albany bureau -- are those reporters who you had contact

5    through your job as the press secretary?

6    A.   Yes.

7              MR. GOLDSTEIN:   If we can turn to the second page of

8    the article.

9    BY MR. GOLDSTEIN:

10   Q.   Can you read that to the jury, please.

11   A.   Sure.   "Silver spokesman Michael Whyland said, the speaker

12   invests in blue-chip stocks as do millions of Americans in

13   their retirement accounts."

14   Q.   How did you come up with that response to the reporters?

15   A.   I discussed it with staff and with the speaker.

16   Q.   Is that sentence about investing in blue-chip stocks, as do

17   millions of Americans in their retirement accounts -- is that

18   consistent with what the speaker has told you about how he

19   investments his money?

20   A.   Yes.

21   Q.   If you can turn in your binder to what's been marked for

22   identification as Government Exhibit 274.

23             Mr. Whyland, just before we get to that, what was the

24   date of the article, 273?

25   A.   July 4, 2013.

1   Q.   Is that around the time of when the defendant's disclosure

2   forms came out that year?

3   A.   I believe so, yes.

4   Q.   Looking at Government Exhibit 274, do you recognize this

5   article?

6   A.   Yes, I do.

7   Q.   What is it?

8   A.   It's an article from the New York Times.

9   Q.   What's the date of this?

10  A.   July 3, 2014.

11  Q.   Was this the next year?

12  A.   Yes.

13  Q.   Looking at the unredacted portion, where did you obtain the

14  information that is reflected in the unredacted portion of this

15  article?

16  A.   From the speaker.

17          MR. GOLDSTEIN:   Your Honor, the government offers 274.

18          MR. MOLO:   Objection.

19          THE COURT:   Is that no objection?

20          MR. MOLO:   Objection.

21          THE COURT:   Overruled.

22          274 is received.

23          (Government's Exhibit 274 received in evidence)

24  BY MR. GOLDSTEIN:

25  Q.   If you would look at the first page of the article.   This

FBHYSIL5                          Whyland - Direct

1    is July 3, 2014.

2            Again, is that the time of year that the disclosure

3    forms typically came out?

4    A.   Yes.

5    Q.   Who is the reporter for this article?

6    A.   Thomas Kaplan.

7    Q.   What was the publication?

8    A.   The New York Times.

9    Q.   Is Mr. Kaplan a reporter who you interacted with as part of

10   your job as press secretary?

11   A.   Yes.

12   Q.   And then if we could look at the unredacted portion of the

13   article.

14           Can you please read that to the jury.

15   A.   "On Wednesday a spokesman for Mr. Silver declined to

16   provide details about his specific duties but said Mr. Silver

17   did not represent any clients that had business before the

18   state.

19           "As for Mr. Silver's higher earnings, the spokesman,

20   Michael Whyland, said, 'The speaker's salary fluctuates year to

21   year depending on the disposition of his cases.'"

22   Q.   Now, it says the spokesman, Michael Whyland.

23           Is that you?

24   A.   Yes.

25   Q.   How did you come up with the quote, "The speaker's salary

FBHXSIL5                        Whyland - Direct

1   fluctuates year to year depending on the disposition of his

2   cases"?

3   A.  I discussed it with the speaker.

4           MR. GOLDSTEIN:  If we could turn to Government Exhibit

5   275, please.

6   BY MR. GOLDSTEIN:

7   Q.  Do you recognize this exhibit?

8   A.  I do.

9   Q.  What is this exhibit?

10  A.  It's an article from the New York Daily News.

11  Q.  Is that the same date as the New York Times story?

12  A.  Yes.

13  Q.  Looking at the information in the unredacted portion of

14  this article, where did that information -- where did you

15  obtain that information from?

16  A.  From the speaker.

17          MR. GOLDSTEIN:  Your Honor, the government offers 275.

18          MR. MOLO:  Objection.  Can may I approach?

19          THE COURT:  No.

20          Overruled.

21          275 is received.

22          (Government's Exhibit 275 received in evidence)

23          MR. MOLO:  Judge --

24          THE COURT:  It's received.

25          MR. MOLO:  There are several others.  I want to make

FBHXSIL5                      Whyland - Direct

1    this clear on the record as to the issue.

2              THE COURT:  Your objection is overruled.  The

3    objection is overruled.  I'm not going to have a sidebar at

4    this point.

5              Please proceed.

6              MR. MOLO:  I do need to make clear what the objection

7    is for the record.

8              THE COURT:  I think I know what the objection is.

9              MR. MOLO:  I don't know that you do, your Honor.

10             THE COURT:  Enough, Mr. Molo.

11             Go ahead.

12             MR. GOLDSTEIN:  Thank you, Judge.

13             Mr. Coccaro, if we could zoom in on the top of this

14   article.

15   BY MR. GOLDSTEIN:

16   Q.  These reporters here from the Daily News, Kenneth Lovett

17   and Glenn Blain -- are those the same reporters who were

18   reflected in the prior year's Daily News article that you

19   testified about?

20   A.  Yes.

21   Q.  If we could look at the text -- what is the date of this

22   article?

23   A.  July 3, 2014.

24   Q.  When you made the statements to these reporters from the

25   Daily News, did you communicate with them separately than your

1   communications with the reporter from the New York Times that

2   was reflected in Government Exhibit 274?

3   A.  Yes.

4   Q.  If you could look at what's reflected in the unredacted

5   positioner of this article.

6        Can you please read that to the jury.

7   A.  "Silver spokesman Michael Whyland declined Wednesday to

8   provide further information about the pay increase or what the

9   speaker did to earn the money.

10       "'The speaker's salary fluctuates from year to year

11  depending on the disposition of his cases,' Whyland said.  He

12  stressed that Silver (D-manhattan) has no clients who have

13  business before state agencies."

14  Q.  And the information that you provided to these reporters --

15  where did you get that information from?

16  A.  From the speaker.

17  Q.  Would you look at the second page of this article.

18       Can you please read that for the jury.

19  A.  "Previously Silver has told the news that his role was

20  limited to evaluating potential clients and referring those

21  with legitimate claims to Weitz & Luxenberg, which takes over

22  the case.  He then gets a percentage of whatever settlement or

23  verdict is reached."

24  Q.  Now, were you present when Sheldon Silver told that to the

25  news?

1    A.  No, I was not.

2    Q.  The information that is set forth here -- is this

3    information an accurate depiction of what the speaker has told

4    you about what his role is with regard to the cases he works

5    on?

6    A.  Yes, it is.

7    Q.  Has this information about what he had previously told the

8    news, the Daily News -- has that been reported on other

9    occasions?

10   A.  Yes.

11             MR. MOLO:  Objection.

12             THE COURT:  All right.  Now you stumped me.  I have no

13   idea why you're objecting.  So you get your sidebar.  It better

14   be good, Mr. Molo.

15             (At the sidebar)

16             THE COURT:  So the question is whether it's been

17   previously reported.  What's your objection?

18             MR. MOLO:  The objection on that is that now we're

19   talking about publishing, if you will, that he's saying these

20   statements have been occurring on other occasions.

21             The whole point of this these -- first of all, in most

22   instances Whyland's statements and not Silver's.

23             THE COURT:  He has at length established that.

24             MR. MOLO:  And there are editorial comments around

25   this.  One of these is actually an editorial.  It's not even a

1  news article.  It's one thing to put in Silver's statements

2  which they did which we object to all of those.

3       It's quite another to have Whyland or now Whyland's

4  characterization now with the last question some unidentified

5  publication of some statement of this nature, some other place.

6  That's a wholly inappropriate question.  There's no foundation.

7       THE COURT:  The objection is overruled.  That's for

8  cross.

9       (In open court)

10       THE COURT:  The objection is overruled.

11  BY MR. GOLDSTEIN:

12  Q.  Mr. Whyland, the comment that's in here about Sheldon

13  Silver's role about evaluating potential clients -- is that

14  something that has been reported not just here but in other

15  publications?

16  A.  Yes, it has.

17  Q.  Did Sheldon Silver ever tell you that that was not an

18  accurate depiction of what he spent his time doing?

19  A.  No.

20  Q.  If you can turn in your binder to Government Exhibit 2010.

21       Do you recognize this exhibit?

22  A.  Yes.

23  Q.  What is it?

24  A.  It's a column from the New York Daily News.

25  Q.  Does this column reflect information that -- I'll withdraw

1    that question.

2            What is reflected, without going into the substance of

3    it, in this column?

4    A.   We had an editorial board meeting prior to when I began.

5    Q.   Is the information that is contained in this column -- did

6    you confirm the accuracy of that information with the speaker

7    before this article came out?

8    A.   Yes.

9            MR. GOLDSTEIN:   Your Honor, the government offers

10   Government Exhibit 2010.

11           MR. MOLO:   Objection.

12           THE COURT:   Overruled.   2010 is received.

13           (Government's Exhibit 2010 received in evidence)

14           MR. GOLDSTEIN:   If we can publish Government

15   Exhibit 2010.

16   BY MR. GOLDSTEIN:

17   Q.   Mr. Whyland, what is the date of this article?

18   A.   July 4, 2014.

19   Q.   How does that date compare to the date of the article that

20   we just looked at that was in Government Exhibit 276 -- I'm

21   sorry.  275.

22   A.   It's the day after.

23           (Continued on next page)

24

25

FBH5si16                        Whyland - direct

1    BY MR. GOLDSTEIN:

2    Q.  We can pull up the text.

3         Can you please read that for the jury?

4    A.  Sure.

5         This is Silver's explanation, first provided some time

6    ago to the Daily News editorial board and confirmed Friday by

7    his office:  Although he gave up his trial lawyer's practice

8    decades ago, potential clients still approach him with possible

9    lawsuits over issues like medical malpractice.  He devotes

10   roughly a half day a week, often on Fridays, to reviewing their

11   cases, then refers the most promising ones to the big-time

12   trial lawyer firm of Weitz & Luxenberg.  When those cases end

13   in a payout for damages, the firm cuts him in for a share of

14   its fee.

15   Q.  Again, Mr. Whyland, prior to this coming out, did you run

16   this language by Sheldon Silver to confirm its accuracy?

17   A.  The specific language?  I think the context of the

18   language, yes.

19   Q.  And what did he tell you?

20   A.  That it was accurate.

21   Q.  If we can turn to Government Exhibit 276 in your binder?

22   Do you recognize what is depicted in Government Exhibit 276?

23   A.  Yes.

24   Q.  What is that?

25   A.  That's an article from the New York Daily News.

1   Q.  What's the date of that article?

2   A.  July 4th, 2014.

3   Q.  Does this reflect statements that you made to the Daily

4   News?

5   A.  Yes.

6   Q.  What was the basis for the statements that you made to the

7   Daily News?

8   A.  Conversations with the Speaker.

9           MR. GOLDSTEIN:  The government offers 276.

10          MR. MOLO:  Objection.

11          THE COURT:  Overruled.

12          This is getting cumulative.

13          MR. GOLDSTEIN:  Understood, your Honor.

14          THE COURT:  So, 276 is received.

15          (Government's Exhibit 276 received in evidence)

16  BY MR. GOLDSTEIN:

17  Q.  If we can look just at the top of the article, what is the

18  date of this article?

19  A.  July 4th, 2014.

20  Q.  If you look at the bottom section in the text of the

21  article, can you please read that for the jury?

22  A.  Asked how potential clients find Silver, who is best known

23  as the long-time leader of the Assembly, Aide Whyland said,

24  "He's been a lawyer for more than 40 years." "People know him,"

25  Whyland added.  "It's not unlike any other attorney in this

1    state anywhere."

2    Q.  Is that consistent with what Sheldon Silver told you how he

3    obtained clients?

4    A.  Yes.

5    Q.  You can turn in your binder to Government Exhibit 239 --

6                   This is the last one, your Honor.

7                   THE COURT:  Okay, 239.

8                   THE WITNESS:  I don't know if I have that.

9                   THE COURT:  Nor do I.

10                  THE WITNESS:  Oh, wait.  I have it.

11                  MR. GOLDSTEIN:  Your Honor, do you need a copy?

12                  THE COURT:  Let me check again.  I didn't see it.

13   BY MR. GOLDSTEIN:

14   Q.  Do you recognize this document, Mr. Whyland?

15   A.  Yes, I do.

16   Q.  What is it?

17   A.  It's an off topic document that the press office put

18   together for the Speaker.

19   Q.  And did the press office, in putting this together, run the

20   points that are contained in this by the Speaker?

21   A.  Yes.

22   Q.  What were these talking points intended to be used for?

23   A.  Usually we use talking points for when there is a press

24   event and we have interaction with reporters either at the

25   podium or after a press event and we are talking about topics

FBH5si16                           Whyland - direct

1   that are different from what was the subject of the press

2   event.

3   Q.  And was this to prepare for questions that Sheldon Silver

4   would answer?

5   A.  Yes.

6              MR. GOLDSTEIN:  Your Honor, the government offers 239.

7              MR. MOLO:  Objection.

8              THE COURT:  Overruled.  239 is received.

9              (Government's Exhibit 239 received in evidence)

10  BY MR. GOLDSTEIN:

11  Q.  If you can publish the first page of this and zoom in on

12  the e-mail?

13             From Michael Whyland; is that you?

14  A.  Yes.

15  Q.  And what is the date of this?

16  A.  July 7, 2014.

17  Q.  Who is Jason Fink?

18  A.  He is an aide to the Speaker in the New York City office.

19  Q.  And the subject is off topic.  Can you tell the jury what

20  that means?

21  A.  Off topic is questions that you might get that are not --

22  that you might receive sort of randomly from reporters.

23  Q.  So if the Speaker wanted to talk about some main topic

24  these are questions that might come up that are not part of

25  that main topic?

1    A.   In addition, yeah.   In addition, sort of like the news of

2    the day.

3    Q.   If we can turn to the second page and just look at the

4    first one of these.   What types of questions did you expect

5    might come up in July of 2014 about Weitz income?

6    A.   On this day?   The nature of his income, the source of his

7    income.   Things of that nature.

8    Q.   And how did you and your office come up with the language

9    that is reflected here?

10   A.   From conversations -- prior conversations with the Speaker,

11   not specifically on the day that we were putting this together,

12   but.

13   Q.   Can you please read what is reflected here?

14   A.   Sure.

15        Weitz income.   My salary fluctuates from year to year

16   depending on the disposition of my cases.   I disclose

17   everything that is required.   These are clients who have no

18   business before the state.

19   Q.   Then looking at the second entry that is reflected here,

20   why did you have an entry about Halliburton?

21   A.   I can't recall if we had a specific question about

22   Halliburton prior to that but we, you know, in reviewing his

23   disclosures we saw that there was an investment in Halliburton

24   and we were trying to anticipate possible questions that he may

25   get.

1   Q.  And so, can you please read for the jury the response that

2   was drafted?

3   A.  I invest in many different companies just as millions of

4   Americans do each year in their investment and retirement

5   accounts, and of course I disclose everything that is required.

6   Q.  And this statement, was this statement reviewed by the

7   Speaker before it went out?

8   A.  You know, it is not a statement that went out.  It is

9   something that we prepared for him in case he got the question.

10  I don't know if he specifically reviewed this statement in

11  particular but it is largely consistent with things we have

12  said about his investments.

13  Q.  We can set that aside.

14        At the time period of the articles and those off topic

15  bullet points that you just testified about, July of 2014, what

16  knowledge did you have of any income that Sheldon Silver

17  received outside of Weitz & Luxenberg?

18  A.  I had no knowledge of that.

19  Q.  Were you aware of any other source of income other than

20  income from Weitz & Luxenberg that the Speaker had that was

21  legal income?

22  A.  I only knew that he told me that if he had a case that was

23  outside the scope of Weitz & Luxenberg that he would refer it

24  to another firm.  I don't remember specifically when he told me

25  that but at some point I was aware of that.  And he would refer

1   the case to another firm and then when that case was settled he

2   would get -- there would be a fee.

3   Q.   Where did you understand that fee would be paid through?

4   A.   Through Weitz.   That was my understanding.   I don't know if

5   he specifically told me that, though.

6   Q.   What types of cases did you understand -- for those cases

7   what types of cases did you understand those to be?

8   A.   I didn't know the nature of those cases.   But, again, I

9   always understood it as personal injury cases.

10  Q.   Did Sheldon Silver ever tell you that he had any other

11  legal work besides personal injury cases?

12  A.   No.

13  Q.   Did there come a time in December of 2014 when it was

14  reported in the press that Sheldon Silver received another

15  source of income outside of Weitz & Luxenberg?

16  A.   Yes.

17  Q.   Prior to that press report what knowledge, if any, did you

18  have that he received money from any other source besides

19  Weitz & Luxenberg?

20  A.   I had no knowledge.

21  Q.   After those reports came out in December 2014, how would

22  you describe the level of press attention on Sheldon Silver's

23  outside income?

24  A.   After the initial New York Times reports or that, in

25  December 2014?

FBH5si16                    Whyland - direct

1    Q.  Yes.

2    A.  It was more intense.

3    Q.  Did there come a time that month where reporters approached

4    the Speaker and asked him questions directly about his outside

5    income?

6    A.  Yes.

7    Q.  If you would turn in your binder to what's been marked for

8    identification as Government Exhibit 5-T?

9            THE COURT:  I don't think 5 is in evidence.

10           MR. GOLDSTEIN:  Yes; Mr. Coccaro, if you can pull that

11   down, please?

12   Q.  Mr. Whyland, can you explain to the jury what happened on

13   that date in December when reporters approached the Speaker?

14           THE COURT:  On what day in December?

15   Q.  Mr. Whyland, do you recall what date it was in December?

16   A.  December 11th, 2014, roughly.  I mean --

17   Q.  Can you describe for the jury what happened on December 11,

18   2014?

19   A.  Sure.

20           We were on our way -- the Speaker was in Albany, we

21   were in the Capitol and walking to the convention center also

22   known as The Egg.

23   Q.  And who is it --

24           THE COURT:  What?  Also known as the what?

25           THE WITNESS:  The Egg.

FBH5si16                     Whyland - direct

1    THE COURT:  The Egg.  Okay.

2    BY MR. GOLDSTEIN:

3    Q.  The convention center is known as The Egg?

4    A.  That's right.

5    Q.  Who was it that was walking from the Capitol to the

6    convention center?

7    A.  I was walking with the Speaker.

8    Q.  What happened?

9    A.  We encountered a couple of reporters on the way who were

10   asking us questions.

11   Q.  Where were you located when the questions started?

12   A.  Initially in the hallway on the way to The Egg.

13   Q.  And did that location change?

14   A.  Yes.

15   Q.  Why were you moving to?

16   A.  Into an elevator inside The Egg.

17   Q.  And did the Speaker -- did Sheldon Silver answer the

18   questions that the reporters were asking?

19   A.  Yes, he did.

20   Q.  Did you make a recording of the encounter?

21   A.  Yes, I did.

22   Q.  Is the transcript of that recording reflected in Government

23   Exhibit 5-T?

24   A.  Yes, it is.

25   Q.  Prior to your testimony here today, did you listen to the

1  audio recording of Government Exhibit 5 to confirm that that

2  was the recording of the encounter that you just described?

3  A.  Yes, I did.

4          MR. GOLDSTEIN:  Your Honor, the government offers

5  Government Exhibit 5 and Government Exhibit 5-T to use as an

6  aid to the jury.

7          MR. MOLO:  No objection to 5.

8          THE COURT:  5 is received.

9          (Government's Exhibit 5 received in evidence)

10  BY MR. GOLDSTEIN:

11  Q.  Just before we play this, Mr. Whyland, how many reporters

12  were there for this encounter?

13  A.  Two that I recall.

14  Q.  And other than yourself and the Speaker, was there anybody

15  else from the Assembly or the staff who was present?

16  A.  I don't believe so, no.

17  Q.  So we can play Government Exhibit 5, Mr. Coccaro.

18          (Audiofile played)

19  Q.  Mr. Whyland, we are going to play this one more time to

20  make it clear.  At the time that this interview happened, had

21  it been reported publicly, in any way, who or what the source

22  was, other than Weitz & Luxenberg, of money that went to the

23  Speaker?

24          MR. MOLO:  Objection.

25          THE COURT:  Overruled.

FBH5si16                    Whytaed - direct

1    A.  No.

2    Q.  And there is a point in the audio that is listed on the

3    second page of Government Exhibit 5-T where the initials are MW

4    and it says:  All right.  Thanks guys.

5           Is that you?

6    A.  Yes.

7    Q.  Mr. Coccaro, can you play this again?  And I'm going to ask

8    you to stop it a couple of times along the way.

9           (Audiofile played)

10   Q.  Can you stop it for me, Mr. Coccaro?

11          The sentence here or the question from the reporter:

12   What percentage of it came through Weitz & Luxenberg and what

13   were the rest of it from; was it very shortly before this

14   encounter that the first reports came out that there was an

15   additional source?

16   A.  Yes.

17   Q.  We can continue the recording.

18          (Audiofile played)

19   Q.  Can you stop it there?

20          When, if prior to these reports in December 2014, were

21   you ever told that there was any source of income other than

22   Weitz & Luxenberg?

23   A.  I wasn't told.

24   Q.  And at the time of this encounter of these reporters, what

25   knowledge did you have, if any, that the Speaker was receiving

FBH5si16                    Whyland - cross

1   money from the law firm Goldberg & Iryami?

2   A.   None.

3   Q.   And had that fact been publicly disclosed at that point?

4   A.   No.

5   Q.   We can continue, Mr. Coccaro.

6            (Audiofile played)

7            MR. GOLDSTEIN:  Nothing further, your Honor.

8            THE COURT:  Okay.

9            Mr. Molo.

10  CROSS EXAMINATION

11  BY MR. MOLO:

12  Q.   Mr. Whyland, we actually have met.

13  A.   Pardon?

14  Q.   I am Steve Molo.  We have met?

15  A.   Yes, we have.

16  Q.   I think you testified there was no press release that was

17  issued for the 2005 grant to New York Presbyterian Hospital and

18  the 2006 grant to Columbia?

19  A.   Correct.

20  Q.   Press releases are discretionary; is that right?

21  A.   Correct.

22  Q.   There is no requirement that a press release be issued when

23  there is a grant made, correct?

24  A.   Correct.

25  Q.   They're not mandatory in any way?

FBH5si16                    Whyland - cross

1   A.   No, they're not.

2   Q.   And press releases can be done for different purposes,

3   correct?

4   A.   Correct.

5   Q.   Often they're done for things like announcing major

6   legislation, right?

7   A.   Yes.

8   Q.   And major legislative initiatives, correct?

9   A.   Yes.

10  Q.   And maybe perhaps announcing committee appointments and

11  things like that in the Assembly, correct?

12  A.   Yes.

13  Q.   The Speaker is subject to greater press coverage than the

14  average member of the Assembly, would you agree?

15  A.   Absolutely.   Yes.

16  Q.   And so whatever he does is more likely to garner a little

17  bit more attention with the press than someone else, right?

18  A.   Yes.

19  Q.   He has secured, to your knowledge, hundreds of grants for

20  organizations around the State of New York, right?

21  A.   That's right.

22  Q.   And in doing so he does not always issue press releases,

23  does he?

24  A.   Correct.

25  Q.   In fact, many other members of the Assembly do not issue

1   press releases when they issue grants; is that right?

2              MR. GOLDSTEIN:  Objection.

3              THE COURT:  Sustained.

4   Q.  Do you follow whether other members of the Assembly issue

5   press releases?

6   A.  Not that closely.  Some members, yes.

7   Q.  Are you aware of situations in which grants have been

8   sponsored by an Assembly member but no press release has

9   accompanied that?

10             THE WITNESS:  I don't have specific --

11             MR. GOLDSTEIN:  Objection.

12             THE COURT:  Overruled.

13  A.  I don't have specific knowledge of that but I believe that,

14  you know, that that occurs.  In my experience.

15  Q.  Mr. Silver never told you to conceal the fact that grants

16  were being made to New York Presbyterian Hospital and Columbia?

17  A.  No.

18  Q.  Or had been made.

19             I am going to ask you some questions -- actually, let

20  me ask you about -- Mr. Silver wasn't exactly what you describe

21  as a conversationalist when working with him, was he?

22  A.  Correct.

23  Q.  You didn't discuss your personal lives with one another,

24  correct?

25  A.  Generally not.  No.

FBH5si16                    Whylaed - cross

1    Q.  And he does not discuss his personal finances with you,

2    right?

3    A.  Generally not, no.

4    Q.  And when he discussed with you the notion of investing in

5    blue chip stocks he didn't say I only invest in blue chip

6    stocks, did he?

7    A.  No.

8    Q.  And in terms of who his clients were, Mr. Silver didn't

9    tell you to lie to reporters about who his clients were,

10   correct?

11           MR. GOLDSTEIN:  Objection.

12           THE COURT:  Overruled.

13   A.  I'm sorry.  Repeat the question?

14   Q.  Mr. Silver never told you to lie to reporters about who his

15   clients were, correct?

16   A.  No, he would never do that.  I don't believe he would do

17   that.

18   Q.  He never told you to conceal from reporters who his clients

19   were, right?

20   A.  Correct.

21   Q.  He never told you to lie to other members of the Assembly

22   who his clients were, right?

23   A.  No.

24   Q.  And he had no duty, as far as you knew, to provide you with

25   detailed information about his clients, correct?

FBH5si16                    Whitaked - cross

1          MR. GOLDSTEIN:  Objection.

2          THE COURT:  Overruled.

3   A.  Could you repeat the question?

4   Q.  Sure.

5          He had no duty, as far as you knew, to provide you

6   with detailed information about his clients?

7   A.  No.

8   Q.  And I believe you testified that he actually told you that

9   he would refer cases to another firm from time to time or other

10  firms from time to time and get referral fees; is that right?

11  A.  Yes.

12  Q.  And I believe you said it was your assumption that that

13  money would be paid to Weitz & Luxenberg but you did not know

14  for sure, correct?

15  A.  Correct.

16  Q.  I want to go now to these audio tapes that were played,

17  Government Exhibit T-1.  This exhibit was actually an interview

18  of a taped conversation with a man named Fred Dicker, correct?

19  A.  I'm not sure that it was Fred.  I can't tell from the audio

20  tape.

21  Q.  But it is a reporter from the New York Post, correct?

22  A.  I don't know for sure.  I'm assuming so.  I don't know.

23  Q.  Okay.

24          THE COURT:  You assume so because he was joking about

25  the New York Post?

FBH5si16                     Whylase-cross

1              THE WITNESS:  Right off the top, yeah.

2   Q.  Okay.

3              And the conversation occurs on May 6th of 2008; is

4   that right?

5   A.  That's correct.

6   Q.  The snippet that the prosecutors played occurs at 16

7   minutes and 35 seconds into the conversation; is that right?

8   A.  I don't have the --

9   Q.  Well, the conversation was about 31 minutes long, right?

10  A.  I don't know.  I don't have the -- I don't know if I have

11  the -- I would have to see the whole audio tape.

12  Q.  The prosecutors didn't play the whole audio for you?

13             MR. GOLDSTEIN:  Objection, your Honor.

14             THE COURT:  Overruled.

15  A.  I don't remember if I have the full audio tape but the

16  prosecutors asked me to listen from a certain point.

17  Q.  They asked you to listen just to that snippet, right?

18  A.  Correct.

19  Q.  Let's listen to the snippet again.  Can we please play

20  Government Exhibit 1-T?

21             THE COURT:  1.

22             MR. MOLO:  T-1, whatever it is.

23             THE COURT:  You want to play tape 1.

24  BY MR. MOLO:

25  Q.  Tape 1.

FBH5si16                    Whyland - cross

1                    (Audiofile played)

2   Q.  Can we continue the tape, please?

3                    MR. GOLDSTEIN:  Objection, your Honor.  Can we have a

4   side bar?

5                    THE COURT:  Stop the tape.

6                    Sure.  Come on up.

7                    (Audiofile played)

8                    THE COURT:  Stop the tape, please.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At side bar)

2              MR. GOLDSTEIN:  Your Honor, the defense never made any

3    completeness objection.  They have had these excerpts for

4    weeks.  The implication that we only provided Mr. Whyland with

5    snippets is inaccurate which --

6              THE COURT:  That was -- his testimony was sort of a

7    little unclear.

8              MR. GOLDSTEIN:  But the idea that they can now play

9    the remainder of these recordings which is hearsay, that there

10   is a completeness issue, they could have brought it up with us

11   beforehand.

12             THE COURT:  What are you trying to introduce the

13   balance of the tape for?

14             MR. MOLO:  They completely took that conversation out

15   of context.  He goes on to discuss --

16             THE COURT:  So why wasn't there a completeness

17   objection earlier?

18             MR. MOLO:  I don't know what their -- they have put --

19             THE COURT:  Oh, stop.  You were given the transcript.

20   Don't tell me you didn't know what they were going to play, you

21   knew exactly what they were going to play because they handed

22   you the transcript.

23             MR. GOLDSTEIN:  We also gave them the full recording

24   and the snippets.

25             THE COURT:  I would quit calling them snippets,

FB15si16                          Whitehead - cross

1   perhaps excerpts might be a better word.

2          MR. GOLDSTEIN:  Excerpts.

3          MR. MOLO:  Your Honor, under document completeness I

4   am entitled to have this --

5          THE COURT:  You are but, Mr. Molo, you are a good

6   enough lawyer to know that the right way to do that is to do it

7   when I don't have a jury in the box and then we can then talk

8   about what exactly you are going to play from a completeness

9   perspective.

10          MR. MOLO:  All right.

11          THE COURT:  Not to do it this way.  So, I have no idea

12   what is coming next.

13          MR. MOLO:  Okay.

14          THE COURT:  I have no idea if what's coming next is

15   totally and completely inappropriate hearsay.

16          MR. MOLO:  It's a one-minute excerpt that is --

17          THE COURT:  It doesn't matter how long it is.

18          MR. MOLO:  I am explaining to you what it is.

19          THE COURT:  Do you have a transcript?

20          MR. MOLO:  I do not have a transcript.  The tape is

21   the evidence.  Within one minute, in that minute there is a

22   further conversation of Weitz & Luxenberg and the kinds of

23   cases that Mr. Silver handles.

24          MR. GOLDSTEIN:  If they had raised an objection I

25   could have put it out on direct so the implication that we are

FBH5si16                         Whytake cross

1    withholding something from the jury was not being made.

2            THE COURT:  I am not as concerned about that as what

3    it is that's about to come in and whether it is appropriate to

4    come in or whether it's really appropriate under the doctrine

5    of completeness.

6            MR. MOLO:  It is further conversation of what has just

7    occurred there and I would not risk suggesting to you that it

8    is something and have it not be that.

9            THE COURT:  I would like to think that but what you

10   are doing to me right now is sandbagging me with a portion of

11   the tape that you want to play when you know that you should

12   have done this earlier.

13           MR. MOLO:  Well, I'm sorry I didn't do it earlier.

14           THE COURT:  How many other tapes do you want to play

15   more than what the government played?

16           MR. MOLO:  On some of these other tapes there may be

17   very short pieces that I would offer for the mere purpose of

18   demonstrating there was conversation -- these interviews are

19   not about the -- they're not about the disclosure issue.

20   That's a very small piece of it.

21           THE COURT:  It doesn't matter whether it is about

22   disclosure or not, the question is whether he told the truth.

23           MR. MOLO:  But this one is the one that -- this tape

24   right here that we are talking about in the next minute or so

25   of this tape is a conversation, continued conservation of the

one that they were having about his outside income,

Weitz & Luxenberg, what he does at Weitz & Luxenberg.

          MR. GOLDSTEIN:  Your Honor, unless there is a

completeness issue it is hearsay.

          THE COURT:  That's what he is asserting, is that there

is a completeness issue.

          MR. GOLDSTEIN:  We are in a impossible situation.

They've had these audio recordings for weeks and we could --

          THE COURT:  I understand that.

          MR. GOLDSTEIN:  Okay.

          THE COURT:  On the other hand, I have a responsibility

to make sure that Mr. Silver gets a fair trial.

          MR. GOLDSTEIN:  Understood.

          THE COURT:  That's also in your interest.

          MR. GOLDSTEIN:  Of course.

          THE COURT:  But I'm not happy with how this was done.

          MR. MOLO:  I understand.

          MR. COHEN:  Your Honor, in defense of our conduct, we

literally found this excerpt that Mr. Molo was talking about

last night.

          THE COURT:  That's because you didn't listen to the

tapes in a timely fashion then.  That's not really a good

excuse.  That's a little bit of the puppy ate my homework.

          MR. COHEN:  No.  Actually I don't see that, your

Honor.

 1              THE COURT:  There is absolutely no reason why you

 2    should not have listened to the tapes during your pretrial

 3    period.  That's why they were provided to you in advance of

 4    trial.

 5              MR. COHEN:  But in terms of the issue of sandbagging,

 6    that should be off the table, your Honor.  We have not done

 7    that.

 8              THE COURT:  It doesn't matter, but I don't view that

 9    as an adequate excuse.  But, what else do you have that

10    doesn't --

11              MR. MOLO:  Require the tapes.

12              THE COURT:  -- involve additional tapes?

13              MR. MOLO:  I have got a few relatively short lines of

14    cross-examination including a few questions about some of these

15    blacked out articles and things like that but not a lot.

16              MR. GOLDSTEIN:  Your Honor --

17              THE COURT:  I was going to say pursue those, we will

18    send the jury home, we will listen to the additional excerpts

19    that you want to play and we will make the rulings I should

20    have made before we had a jury sitting in the box.

21              MR. GOLDSTEIN:  The witness doesn't need to be there

22    for a completeness issue.  He wasn't present when those

23    interviews took place, he was just the custodian.

24              THE COURT:  Okay.  I was going to look back, did you

25    move into evidence the entire tape or just the portion that

 1 | corresponds to the transcript?

 2 |          MR. GOLDSTEIN:  Just the portion of the tape that

 3 | corresponds to the transcripts.

 4 |          THE COURT:  Okay.

 5 |          So your motion is to move additional minutes of the

 6 | tape in?

 7 |          MR. MOLO:  Correct.  Yes.

 8 |          THE COURT:  Under a completeness rule?

 9 |          MR. MOLO:  Yes.

10 |          THE COURT:  So, finish what else you have --

11 |          MR. MOLO:  Okay.

12 |          THE COURT:  -- with this witness.

13 |          MR. MOLO:  Okay.

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                    (In open court)

2    BY MR. MOLO:

3    Q.  Mr. Whyland, you were asked about some mostly blacked out

4    articles, correct?

5    A.  Correct.

6    Q.  And I take it Government's Exhibits 239, 276, these

7    statements are just a small piece of what was written, correct?

8              MR. GOLDSTEIN:  Objection, your Honor.

9              THE COURT:  It is part of a longer article.

10   Q.  Yes; these are longer articles, right?

11   A.  Yes.

12   Q.  So the prosecutors have just shown you these --

13             MR. GOLDSTEIN:  Objection, your Honor.

14             THE COURT:  Sustained.

15             Ladies and gentlemen, much of the material is blacked

16   out because it is not admissible into evidence so it wouldn't

17   be appropriate for it to be part of the exhibit.

18   BY MR. MOLO:

19   Q.  These articles and interviews that Mr. Silver is

20   participating in as the Speaker often involve a range of

21   topics; is that right?

22   A.  Correct.

23   Q.  In fact, in most instances where a reporter has an

24   opportunity to get together with the Speaker they want to ask

25   him as much as they can about as many topics as they can, isn't

1   that right?

2          MR. GOLDSTEIN:  Objection.

3          THE COURT:  Overruled.

4   A.  Generally in my experience, yes, they will try to ask as

5   many questions as they can because there may be limited

6   opportunities to talk with the Speaker.

7   Q.  Right.

8          And often these are not situations where there is an

9   opportunity for the Speaker to sit down and plan out what is

10  going to be asked and what his answers are going to be in these

11  interviews; is that right?

12  A.  I'm sorry.  Can you repeat that?

13  Q.  Sure.

14         These interviews with reporters often occur in context

15  where the Speaker is not sitting down and planning out, okay,

16  they're going to ask me these five things and these are my five

17  answers; is that right?

18  A.  Most --

19         THE COURT:  I don't think anybody ever knows what a

20  reporter is going to ask to plan out their five answers.

21         THE WITNESS:  You can try to ask them.

22         Most of the time, no.

23  Q.  Okay.

24         And, from your experience, Mr. Silver generally tried

25  to be accessible to the press to at least a reasonable degree?

FBH5si16                      Whyland - cross

 1   A.   Yes.

 2   Q.   And be generally cooperative with them, correct?

 3   A.   Yes.

 4   Q.   Have you ever seen things get taken out of context as a

 5   press secretary?

 6   A.   Yes, I have.

 7   Q.   Statements that might be reported but not necessarily would

 8   be complete, correct?

 9   A.   Yes.

10   Q.   A fuller story get left on the editing floor, if you will?

11   A.   More often than I would like, yes.

12   Q.   So the whole story sometimes doesn't get told?

13   A.   That's true.

14   Q.   These off topic remarks that you mentioned that were in

15   Government Exhibit 239, these were essentially talking points;

16   is that right?

17   A.   Correct.

18   Q.   And these can be helpful for you in your job; is that

19   right?

20   A.   Yes.  Absolutely.

21   Q.   And from time to time there may be other people in the

22   press office that may be called upon to use these; is that

23   right?

24   A.   Generally not.  Generally it would just be myself or the

25   Speaker.

Q.  And they don't necessarily cover all of the issues that

Mr. Silver may be involved in, correct?

A.  That's correct.

Q.  And when they asked you about the statement in Government

Exhibit 239, my salary fluctuates from year to year depending

on the description of my -- I'm sorry -- depending on the

disposition of my cases; as far as you knew that was right,

right?

        THE COURT:  Take that document down, please.

        MR. MOLO:  I'm sorry.

        THE COURT:  That document is not in evidence as you

put it on the board.  Please don't do that.

BY MR. MOLO:

Q.  And when they asked you about a statement:  I disclose

everything that is required.  As far as you knew you were

telling the reporters what you knew, right?

A.  Correct.

Q.  You and Mr. Silver did not review his disclosure forms in

detail before he filed them, correct?

A.  No.

Q.  That was not your role?

A.  That was not my role.

Q.  And as far as real estate legislation in 2011, you were

working for the Speaker at that point in time; is that right?

A.  Correct.  I was.

1    Q.   In June of 2011.

2         And are you aware, did you know a man named James

3    Yates?

4    A.   Yes, I did.

5    Q.   Jim Yates was counsel to the Speaker, correct?

6    A.   Correct.

7    Q.   A very respected retired judge, correct.

8    A.   Very well respected retired judge, correct.

9    Q.   Mr. Yates led the efforts --

10             MR. GOLDSTEIN:  Objection, your Honor.

11   Q.   -- on the efforts for Sheldon Silver to negotiate the rent

12   and real estate bills in 2011.

13             MR. SHUR:  Objection, your Honor.

14             THE COURT:  Sustained.  Way beyond the scope.

15   Sustained.

16             (Counsel conferring)

17             MR. MOLO:  One moment, your Honor?

18             (Counsel conferring)

19   BY MR. MOLO:

20   Q.   You testified about your father, sir.  Your father is

21   healthy, correct?

22   A.   Yes.

23   Q.   So he was not experiencing a medical problem when you had

24   the conversation with Speaker Silver concerning him?

25   A.   No.

FBH5si16                                Whylated  gr cross

1    Q.  And when he asked you -- I'm sorry.  You testified he told

2    you about clients he represents through Weitz & Luxenberg; is

3    that right?

4    A.  Yes.

5    Q.  And he told you that his practice was representing injured

6    people, correct?

7    A.  Correct.

8    Q.  And that's what Weitz & Luxenberg does, correct?

9              MR. GOLDSTEIN:  Objection.

10             THE COURT:  Sustained.

11   Q.  Did you know that to be his history, Speaker Silver's

12   history in representing those sorts of clients?

13             MR. GOLDSTEIN:  Objection.

14             THE COURT:  I'm sorry.  So the question is does he

15   know that Mr. Silver's history is representing people in

16   personal injury cases?

17             MR. MOLO:  Yeah.

18             THE COURT:  Overruled.

19             THE WITNESS:  I was generally aware, yes.

20   BY MR. MOLO:

21   Q.  You never heard him say that he had expertise in tax

22   certiorari work, did you?

23   A.  No.

24   Q.  Okay.

25             MR. MOLO:  In connection with the issue with the side

1    bar is this witness going to be excused?

2              THE COURT:  Come up, please.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (At side bar)

 2           THE COURT:  I take it you have reached the end of your

 3   cross other than --

 4           MR. MOLO:  Right, dealing with the tapes issue.

 5           THE COURT:  -- the potential excerpts that you wish to

 6   introduce under a completeness theory.

 7           Here is my concern with dismissing the witness, is you

 8   presumably don't know what they want to put in.

 9           MR. GOLDSTEIN:  Correct.

10           THE COURT:  They're going to put in this little piece,

11   you are going to put in that little piece, then we have to put

12   in this little piece.

13           MR. GOLDSTEIN:  Correct.

14           MS. COHEN:  Correct, and given the way this was done

15   we, if your Honor rules that something was incomplete, would

16   like to put it in, if your Honor rules that way, on our

17   redirect rather than have the obvious implication that we hid

18   it from them on cross.  It would be only fair.

19           THE COURT:  So you are done.  I'm going to send the

20   jury home and we will deal with the tapes.  The government

21   resting tomorrow is looking more and more less likely.  We may

22   drag you back from Philadelphia.

23           MR. COHEN:  It is not going to be a long process.

24           THE COURT:  Promises, promises, Mr. Cohen.

25           MR. COHEN:  I have kept them so far.
```

FBH5si16                    Whylat ed      cross

1              (In open court)

2              THE COURT:  Okay, ladies and gentlemen.  We are going

3    to end early for today.  We have some other things we need to

4    talk about.  So, I am going to let you go home early.  Don't

5    talk about the case.  Don't read anything about the case or any

6    other corruption case that you might happen to read about.

7    Don't listen to anything about corruption cases and don't watch

8    any TV about them.  Okay?

9              Have a very good evening.  I will see you tomorrow

10   morning at 9:15.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBH5si16                    Whyland - cross

1              (Jury not present)

2              THE COURT:  Okay, I want a two-minute break.  Does

3     anybody else want a quick break before we deal with these

4     tapes?

5              MS. COHEN:  A two-minute break would be great, your

6     Honor.

7              THE COURT:  I will give you five.

8              MS. COHEN:  Thank you, your Honor.

9              (Recess)

10             MR. GOLDSTEIN:  Your Honor -- are we on the record?

11             THE COURT:  I believe we are.  Do we need to be?

12             MR. GOLDSTEIN:  A scheduling issue for this witness.

13     His attorney is totally unavailable all morning tomorrow.  The

14     government still does have three witnesses so we would ask that

15     Mr. Whyland's, whatever his redirect and any testimony that

16     continues, to take place starting after, I think he thinks he

17     can be back by 2:30, 2:45 starting in the early afternoon.

18             MR. ABRAMSON:  Can we say 3:00?

19             THE COURT:  When are you coming back?

20             MR. ABRAMSON:  Your Honor, I have to do work at

21     Columbia University and I have been putting it off for days,

22     hearings, things that are time-sensitive I have to do with

23     students up there and they're scheduled for the morning to the

24     afternoon and I need enough time to get back down here.

25             THE COURT:  Is there anybody that can cover for you?

 1    I am concerned you will get jammed up at Columbia.

 2              MR. ABRAMSON:  I won't get jammed up at Columbia.  The

 3    problem is the since I'm the attorney that's assigned to the

 4    case, the rules at Columbia don't allow me to substitute

 5    somebody.

 6              THE COURT:  I was thinking down here you could be

 7    substituted for.

 8              MR. ABRAMSON:  Your Honor, I have been with

 9    Mr. Whyland through this whole process.

10              THE COURT:  Get back as quickly as possible because

11    3:00 is getting -- we are bumping up against the end of the

12    day.

13              MR. ABRAMSON:  I will be down here by 3:00, hopefully

14    by 2:00.  I want to give myself a little cushion in case there

15    is a problem getting down here.

16              THE COURT:  Keep them informed of when are you going

17    to get here.

18              All right, let's start with the tapes.  What else do

19    you want to play?

20              MR. MOLO:  I think really this excerpt and maybe a

21    little bit right before the conversation starts that they

22    played.  With the other tapes I'm fine.  I think I really just

23    want to play, on this tape, both sides.

24              THE COURT:  Let's hear what it is.

25              MR. MOLO:  From where that government --

1          THE COURT:  Can you play it in context?  So, actually

2    play T-1 as well.  These are T-1, right?

3          MR. MOLO:  Yes, so play T-1, please, Justin, and play

4    it through.  Play it loudly.

5          (Audiofile played)

6          MR. MOLO:  That's the beginning of the tape --

7          MR. SHUR:  Beginning of the government's exhibit.

8          THE COURT:  That answers whether it was Fred.

9          MR. MOLO:  That's the end of T-1.  Now, please play,

10   continue it on.

11         (Audiofile played)

12         MR. GOLDSTEIN:  Keep on playing.

13         (Audiofile played)

14         MR. MOLO:  That's what we would like to play, your

15   Honor.

16         THE COURT:  Does the government want to be heard?

17         MR. GOLDSTEIN:  I think under a completeness theory

18   what has been played is not incomplete by including the rest of

19   that.  The government wasn't trying to be misleading in any way

20   by not including that portion of the transcript and I am not --

21   under the standards for completeness I don't know -- I'm not

22   sure what it is that is either left inaccurate or incomplete by

23   the recording that's been put into evidence.

24         THE COURT:  How is what was put into evidence

25   completed, Mr. Molo?

FBH5si1s                Why used corss

1    MR. MOLO:  Well, he -- it is completed, one, in the

2  context of the conversation in that he finishes describing what

3  he does at Weitz & Luxenberg, who he represents at

4  Weitz & Luxenberg, he says whether it is a personal injury

5  case, whether it is an asbestos case.  He uses asbestos

6  specifically and talks about the fact that the case comes in

7  and he refers it, he says I don't have a lot of time, I don't

8  do the work on the case and he is telling this to the New York

9  Post.  And this is a --

10    THE COURT:  But the point of this tape was that he

11  represented to the reporter that he represents only personal

12  injury claimants, he does not represent companies or other

13  entities for the position before the state.

14    MR. MOLO:  The government has asserted that personal

15  injury is not asbestos and they have said throughout this trial

16  that Mr. Silver has concealed the fact that he had asbestos

17  clients or asbestos-related clients.  It could not be further

18  from the truth.  I mean, to say that to a reporter of the New

19  York Post and the Post reporter is asking him about

20  Weitz & Luxenberg, Mr. Silver finishes through that passage, we

21  are talking about one minute describing what his role is and

22  how he makes money at Weitz & Luxenberg.  That's what this

23  conversation is about and who his clients are.

24    So, to cut it off where the prosecutors cut it off is

25  tremendously unfair, it gives the jury a false impression about

FBH5si16                    Why hard gr cross

 1    what it is that Mr. Silver said, it furthers the suggestion

 2    that he is concealing this asbestos client -- that he has

 3    asbestos-related clients or that he doesn't do work on the

 4    cases and it could not be farther from the truth.

 5         THE COURT:  Wait a minute.  Are you contending that he

 6    does do work on the cases or he does not do work on cases?

 7         MR. MOLO:  I am saying Mr. Silver does exactly what he

 8    said he did on the tape.  They're claiming that somehow or

 9    another Mr. Silver is trying to portray to the world that he is

10    doing work on these cases when, in fact, he is not.  That has

11    been a theme throughout the prosecution's case and in fact

12    Mr. Silver candidly said I don't do work on these cases, they

13    come in, I have a whole -- I forget the exact phrase used but I

14    have a whole team there -- he doesn't use the word team,

15    something like that, system or team, which this goes into and

16    these people do the work.  And significantly the mention of

17    asbestos, Judge, in light of everything that's happened --

18         THE COURT:  The mention of asbestos is, of the whole

19    clip, is the piece that's the most interesting.  Can I hear it

20    again, please?

21         MR. MOLO:  Sure.

22         THE COURT:  Again, this is why this should have been

23    done pretrial.

24         (Audiofile played)

25         THE COURT:  Okay.  You can be heard.

1          MR. GOLDSTEIN:  Again, I don't think these were

2     answers to new questions posed by the reporter.  They are the

3     general topic of outside income but there is nothing that is

4     left incomplete or inaccurate by the previous portion of the

5     recording that was included, and so under that analysis I think

6     that this does not come in.

7          THE COURT:  I think -- I think up to the disclosure of

8     asbestos cases it definitely does.  Discussion of the

9     witness -- of the client who was raped I don't think does.  And

10    the balance of it is not -- is kind of there is a number of

11    other tapes that say the same thing.

12         MR. MOLO:  I would agree on the client who was raped.

13    I don't think there is any reason that we need to include that.

14         Just in terms of him, Mr. Silver saying that this is

15    how he shares in the fees, he brings the case in and shares in

16    the fee, maybe even the work, I could believe that that has

17    been portrayed through the trial as a misrepresentation of

18    Mr. Silver somehow concealing that fact.  There have been

19    witnesses asked about that by the prosecution and they

20    suggested that there is somehow something wrong with that and

21    that he concealed that and, again, he is not concealing it so I

22    believe that the conversation concerning how the process

23    works -- because at first the question here by the way is --

24         THE COURT:  That's not a completeness issue relative

25    to the nature of the practice that the government introduced.

1    With asbestos I will give it to you because that is then a

2    description of his practice which certainly, based on this

3    witness, the government certainly suggested that it was hidden

4    from his press secretary and therefore, by implication, is

5    hidden from the press.

6              MR. GOLDSTEIN:  Your Honor, if that list of things

7    where he mentions auto accidents, asbestos, this rape case as

8    though they are his clients, without the entire list then it

9    becomes totally out of context and it sounds like he is making

10   a disclosure about asbestos.

11             THE COURT:  So it seems you would prefer the whole

12   from there to the end.

13             MR. GOLDSTEIN:  Correct.

14             THE COURT:  Fine.

15             MR. GOLDSTEIN:  There is no evidence that he had those

16   other clients.

17             THE COURT:  So that clip comes in under a completeness

18   theory.

19             MR. GOLDSTEIN:  We would like it to end, though, at

20   the end, based on your Honor's ruling at the end of that

21   sentence about his list of other clients and not then go into

22   the next subject which, in terms of the amount of effort he

23   spends dealing with the cases and referring them to

24   Weitz & Luxenberg.

25             THE COURT:  That's the piece that I don't think is --

FBH5si16                    Why hard crosss

1    that's not admissible under completeness theory.

2             MR. MOLO:  Well, on that second piece, Judge, this

3    conversation begins with Weitz & Luxenberg and the reporter, it

4    says how do you mean you're -- you are so busy, how do you even

5    get cases?  He is suggesting that somehow or another he is

6    making this money that Mr. Silver is making and he is doing it

7    in some way that he shouldn't be making that money.

8             THE COURT:  No, he is trying to figure out how he gets

9    the referrals.  It turns out to be incredibly prescient

10   question.

11            MR. MOLO:  I mean, I do believe that this completes a

12   conversation concerning Weitz & Luxenberg which, by the way, it

13   isn't a tape that is, whatever, I think it is a 31 minute,

14   seven second conversation, so I have not sought, because I did

15   not want it waste anyone's time, the Jury's or the Court's and

16   wanted to walk out of here alive so I didn't suggest playing

17   these entire tapes on any of these.  This is -- we are talking

18   about a minute.

19            THE COURT:  But that's not the point, Mr. Molo.  This

20   argument doesn't work with me of the "come on, it is just a

21   minute."  It still has to be a minute that is admissible.

22            MR. MOLO:  I agree.

23            THE COURT:  So the first piece of it through the

24   litany of his cases, I buy your argument that that is necessary

25   under a completeness theory given what the government put in.

1          MR. MOLO:  Okay.

2          THE COURT:  The next piece of it isn't admissible

3    under the completeness theory and there is not an exception to

4    the hearsay rule that is oh, come on, it is just 30 seconds.

5    That rule isn't in there.

6          MR. MOLO:  Okay.

7          MR. GOLDSTEIN:  Your Honor --

8          THE COURT:  So, it is out.

9          MR. GOLDSTEIN:  Your Honor, given the way that this

10   has now come out and had they pushed to get this in prior to

11   today we could have made a decision about whether or not we

12   wanted to offer this recording at all.  His reference to these

13   other types of cases we think could end up requiring additional

14   proof as to whether or not he even has the auto accident case

15   and this rape case and so the government, we would like the --

16   we could withdraw this recording from evidence.

17         THE COURT:  I think it is already in evidence, already

18   been played for the jury.

19         Yes?

20         MR. MASTER:  Your Honor.

21         THE COURT:  You are going to try now?

22         MR. MASTER:  Let me try here.

23         See, the issue is that the rule of completeness

24   relates to completing a recording that, as your Honor knows,

25   would otherwise sound incomplete so we had other recordings

1    that basically got largely at the point that is contained in

2    Government Exhibit 1-T.  Had the defense done what they were

3    supposed to do and made the completeness arguments beforehand,

4    we could have made an assessment as to whether we wanted to let

5    in this recording all together and because they pursued it in

6    this manner deliberately, we were deprived of the opportunity

7    make that decision, in other words, we could have decided not

8    to put this in at all.

9         THE COURT:  I understand your angst and aggravation

10   with the defense.

11        MR. MASTER:  It is more than angst and aggravation,

12   your Honor.  I think there is a fundamental principle of

13   fairness here where we were deprived of the opportunity to make

14   a decision that allowed us to assess, again, whether to put in

15   certain evidence and now we are put into a position where

16   literally at the very end of the trial they're trying to spring

17   this on us so that we are not able to make the decision that we

18   would have made more rationally in advance of the admission of

19   this evidence.

20        So, you know, I think that allowing us, if your Honor

21   were to consider it, to just withdraw this recording from

22   evidence all together would be an appropriate option as opposed

23   to dealing with this other issue that Mr. Molo is suggesting

24   that we have tried to hide something or -- I think it creates

25   an implication that is deeply unfair to the government which,

1   as your Honor knows, is also entitled to a fair trial here.  I

2   know that you have been very respectful of that but, again, we

3   are put into an impossible situation because of the tactics

4   here of the defense.

5           THE COURT:  Why shouldn't I just strike it, Mr. Molo?

6           MR. MOLO:  I'm sorry?

7           THE COURT:  There is nothing in that tape that wasn't

8   in the other two tapes, why shouldn't I just strike it?

9           MR. MOLO:  Because the argument that I just heard is

10  that we wanted to conceal from the jury that Mr. Silver said

11  asbestos.

12          THE COURT:  No.  No, no, no.

13          MR. MOLO:  Then they've argued through -- this is

14  total bad faith.  They've argued throughout this trial that he

15  concealed asbestos.  They asked this witness whether it was

16  concealed from his press office and from this gentleman.  They

17  went through the whole thing about his father and asked him

18  about Mr. Silver's conversation with his father.  The whole

19  trial has been about Mr. Silver concealing this asbestos

20  connection and for the prosecutors to now say --

21          THE COURT:  Excuse me.  It is not like in this he

22  discloses to Fred Dickerson that he is getting referrals from a

23  doctor at Columbia that he has given grants to with State tax

24  dollars.

25          MR. MOLO:  Great.  And they can argue that and they

1    can also argue and we can argue that it was a short

2    conversation and had he asked those questions he would have

3    answered those questions.  But, the point is for them to now

4    say that they knew that this tape actually, in its complete

5    discussion said asbestos cases and made a conscious decision to

6    cut it off which is what they did so that they could have some

7    kind of a truly unfair and some kind of tactical advantage,

8    that is really extraordinary.  The bell has been rung before

9    this jury and --

10              THE COURT:  But the bell was rung in every tape.

11              MR. MOLO:  The prosecution can't unring the bell.

12              THE COURT:  Look.  Again.  I don't like the tactic.  I

13   don't like the fact that the defense sandbagged me -- forget

14   sandbagging the government, sandbagged me.  If you had a

15   completeness objection, the way that is typically done is to

16   object at the time before the tape is played so that the ruling

17   can be made of what needs to be played from a completeness

18   perspective, right?  You are an experienced lawyer.  You know

19   that's the way it is supposed to be done so I have to assume

20   that you didn't do it that way for tactical advantage.

21              MR. MOLO:  It was not a tactical advantage, your

22   Honor.  I apologize for that.  It was not something that I

23   intended to spring on the Court or, for that matter, spring on

24   the prosecution, although the prosecution's claims of

25   unfairness ring rather hollow given what we are talking about.

```
1              THE COURT:  You knew what the excerpt was.

2              MR. MOLO:  When I came to court today and I was going

3    to play it.

4              MS. COHEN:  For weeks, your Honor.

5              THE COURT:  No, I don't believe that.  I don't believe

6    that they had not provided the tapes and the excerpts that they

7    intended to play previously.

8              MR. MOLO:  They knew about it too.  This was their

9    tape.  They knew exactly what was there.

10             THE COURT:  That's right.  This was their proposal.

11   Again, from a tactical perspective what should have happened

12   and I think I raised in response to Mr. Shur's ranting and

13   raving that these were all implications that I was going to be

14   hearing lots of reporters in elevators when in fact most of

15   these seemed like office interviews that are very calm and very

16   not rushed and nothing of that nature.  In hearing it I said,

17   look, part of your objection is a completeness objection

18   because he kept saying they're taking clips out of longer

19   tapes.  And I said that's a completeness issue.  But in

20   response to that you didn't say, yes, well, specifically we

21   have a completeness problem with tape no. 1.

22             MR. MOLO:  Well, the issue that was raised with

23   Mr. Shur I believe came up yesterday when we were talking about

24   this --

25             THE COURT:  It has come up several times with
```

1   Mr. Shur.

2          MR. MOLO:  In fairness -- in fairness -- to us we have

3   not known -- we have gotten a whole bunch of exhibits that they

4   have and haven't introduced, we know that, and if for some

5   reason, by the way -- I take full responsibility.  This is my

6   mistake.  It should not be held against Mr. Silver and we are

7   talking about 30 seconds of a tape to complete a conversation.

8   The prosecution knew it was on that tape and they made the

9   decision that they made and now all we are asking for is the

10  fair and complete conversation to be heard.  The jury has heard

11  something that is obviously misleading --

12         THE COURT:  It is not -- I disagree that it is

13  misleading.

14         MR. MOLO:  Okay.

15         THE COURT:  Don't push your luck on this, Mr. Molo.

16         MR. MOLO:  All right.

17         THE COURT:  I get your argument on completeness.  I

18  don't think it is misleading.

19         MR. MOLO:  Okay.

20         THE COURT:  I think the point that the government was

21  making was that Mr. Silver was not candid with the reporters

22  regarding the full scope of who he was getting money from.

23  That's the issue.  Specifically these tapes are compelling

24  evidence on hiding the Goldberg & Iryami income and lying about

25  the fact that he represented no one who had -- he says that

FBH5si16                    Why had cross

 1    multiple times -- no one who has business in front of the

 2    State.  That's the probative value of these.

 3              So, I disagree that they're misleading but, on a

 4    completeness perspective I understand your point.

 5              MR. MOLO:  Okay.

 6              MR. MASTER:  Your Honor, look.  I think your Honor has

 7    already discussed that the striking of -- or raised the

 8    possibility of striking this.  That is the appropriate remedy

 9    here.  If Mr. Molo believes that the transcript is incomplete.

10    Mr. Molo has had these recordings since the initial round of

11    discovery in February.  We specifically identified the full

12    recordings -- I believe there is e-mail correspondence to that

13    effect where we not only gave him the excerpts and the

14    transcripts but also identified the specific raw data from

15    which these recordings were drawn, these excerpts were drawn

16    weeks before trial began which was, I believe it was in

17    mid-October.  So, they've had this for more than a month.

18              It is not misleading, it is not inappropriate.  There

19    are, as Mr. Molo knows, numerous self-exculpatory statements

20    and other recordings that we didn't attempt to introduce

21    because the way that self-exculpatory statements are introduced

22    into trial is through the defendant's testimony.  He is allowed

23    to do that and he is welcome to do that.  But, to do this in

24    this backhanded, sneaky fashion is entirely inappropriate.  And

25    Mr. Molo and Mr. Cohen said at side bar that they discovered

1    this last night.  Last time I checked, it is 5:00 p.m.  Last

2    time I checked they had plenty of opportunity to raise this

3    issue with the Court and with us before Mr. Whyland took the

4    stand and this transcript was introduced.

5            So, I think the way in which this was done is wholly

6    improper, it deprived us of the opportunity to determine

7    whether, on balance, this was a false self-exculpatory

8    misleading account or whether it added to our proof and, in

9    view of that, we move to strike this government exhibit.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. MOLO:  Judge, the jury has heard this.  Again, I

2    understand the point about Golberg & Iryami, but throughout the

3    trial we've heard about concealing asbestos, concealing

4    asbestos.

5          This witness was asked about concealing asbestos.

6    This is what makes this unfair.  This very witness was asked

7    about Mr. Silver concealing these asbestos cases.  So allowing

8    this brief explanation that completes this conversation is

9    appropriate.

10          I'm just taken aback by the fact that the prosecution

11    could argue that somehow this is unfair to them when they knew

12    this was on there.

13          As far as what we got in discovery, Judge, we got so

14    much stuff dumped on us.  Press tapes -- we could have sat for

15    half a year, six months, and listened to every

16    press conference, every press tape, everything that was given

17    to us.

18          It was a tactic that they used to make it more

19    difficult to have the defense be successful frankly.

20          THE COURT:  Look.  I'm not going to -- I've made it

21    very clear that I do not like the way this happened.

22          MR. MOLO:  I agree.

23          THE COURT:  I expect more from you and your team than

24    this kind of tactical sandbagging.  That said, I'm not going to

25    strike it.  I'm going to play the balance through the client

FBHYSIL5

1    that allegedly was raped by the construction worker, but I am

2    going to allow the government to do as they requested, which is

3    to put it in on redirect so that the defense is not allowed to

4    suggest that this was somehow nefarious activity on the part of

5    the government.

6         Because had the defense done what it should have done,

7    the entire tape would have either come in or not.  But since

8    it's in, it's in.

9         MR. MOLO:  Okay.

10        THE COURT:  Any other tapes that you're now suggesting

11   there is more that needs to be played from?

12        MR. MOLO:  Well, I guess, your Honor, the only other

13   issue is whether -- maybe this can be done by stipulation,

14   which would save us all time.

15        THE COURT:  At the moment I have a feeling that the

16   well has been poisoned, and the number of stipulations is going

17   down.

18        MR. MOLO:  Okay.  For example, the fact that the

19   conversations are whatever length that they are, the total

20   conversations.

21        So, for example, that these comments occur in a

22   31-minute-and-7-second conversation.

23        THE COURT:  Why is that relevant?

24        MR. MOLO:  Well, because it's relevant in terms of the

25   context.  They're trying to hold these statements out as if

1    these were some kind of statements that Mr. Silver went to a

2    balcony and made a declaration to a grand public gathering.

3         THE COURT:  They're not suggesting that, but the

4    consistency of exactly the wording that he uses is striking.

5         MR. MOLO:  These 31-minute conversations talking

6    about --

7         THE COURT:  I don't care if it's an hour and a half.

8    He says the same thing, I don't represent people before the

9    government.  I represent little people, which I suspect that

10   your clients would not like to hear, that they're little

11   people.

12        MR. MOLO:  It really is the context that I want to add

13   otherwise.

14        THE COURT:  I don't see that as relevant, how long the

15   conversation was.

16        MR. MOLO:  Or where it occurred?

17        THE COURT:  Or where it occurred.  We've got lengthy

18   discussions about the one in the elevator to the egg or the

19   elevator in the egg.

20        MR. MOLO:  And that he receives a phone call shortly

21   before this passage, and he's told that people are waiting.

22        THE COURT:  How is that relevant?

23        MR. MOLO:  Because, Judge, again, I think it goes to

24   this issue of the prosecution, the government, has tried to

25   take a statement and say, aha.  Gotcha, based on what it is

1    that's on the disclosure form.

2             THE COURT:  It's not based on what's on the disclosure

3    form.  These are based on the facts that have been adduced in

4    trial.

5             MR. MOLO:  Then a statement that he makes to a

6    reporter.

7             THE COURT:  Over and over and over again.

8             MR. MOLO:  Right.  If they've been talking about a

9    whole bunch of other things and this is a short, compressed

10   piece of a conversation, I think it's important for the jury to

11   understand that, that the context in which he makes the

12   statement has some bearing on the fullness and the fulsomeness

13   of his disclosure, "disclosure," his statement to the reporter,

14   his statement to the reporter.  They're treating it as a

15   disclosure.

16            So what he says -- again, the question of what did you

17   have for breakfast?  I had eggs.  Well, did you really?

18   Because you actually had eggs, toast, bacon, orange juice, and

19   coffee.  You didn't disclose the toast, orange juice, bacon and

20   coffee.

21            You might do it one way.  You may make a more fulsome

22   description if you're asked in one context and a less fulsome

23   description in another.

24            THE COURT:  Here is the thing, Mr. Molo, having

25   listened to all these tapes, there is not a modicum of evidence

2278

 1   that Mr. Silver was being rushed or that the reporters were

 2   giving him a hard time.

 3          This is the most civilized conversation between a

 4   reporter and a politician that I've ever heard.  They weren't

 5   rushing him.  They weren't giving him a hard time.

 6          He had more than adequate opportunity to say, "I

 7   represent personal injury people, and I get fees from two of

 8   the largest real estate developers in the state.  He did.

 9          That's what they're going to argue.  So whether it's

10   part of a 30-minute conversation or an hour-and-30-minute

11   conversation or a three-hour conversation, I just don't see the

12   relevance of that.

13          MR. MOLO:  I've made my arguement.

14          THE COURT:  Anything else on the tapes?  All right.

15   I'm hearing nothing.  So the witness is -- is there anything

16   else relative to this witness?  I think I have to establish

17   that before you let him go, that you were done except for this

18   issue.

19          MR. MOLO:  Except for the tape-related issue.

20          THE COURT:  And they've got redirect.

21          MR. MOLO:  Right.

22          THE COURT:  So he'll come back on redirect.  You'll

23   work it out.

24          MR. GOLDSTEIN:  Just to make it clear for the record,

25   we can prepare the witness on this issue.

```
 1              There's some other issue.  I can tell.

 2              MR. MOLO:  I don't think so.

 3              THE COURT:  There's still the issue on the Counsel

 4    Financial.  I've reread what I wrote before.  Now I know why I

 5    didn't remember it, because it was at the very end of the

 6    opinion, and I wasn't overly moved by the motion to strike.

 7              So now the question is why can't.  So the government

 8    wants to call the venture capitalist and the investment adviser

 9    who put together the fund I presume.

10              Is this like a hedge fund?  What is this?  It would be

11    helpful to understand what the evidence is going to be.  Is it

12    a hedge fund investment?

13              According to the indictment, it's not generally

14    available to people.  But that could mean that it's a hedge

15    fund.  So I don't know.

16              MS. COHEN:  There are seven different types of

17    investments, all of which Jordan Levy got Sheldon Silver into.

18              THE COURT:  Jordan Levy is an investment adviser, or

19    he's a venture capitalist?

20              MS. COHEN:  No.  Jordan Levy is a venture capitalist

21    who both invests himself in various investments, some of which

22    he owns a portion of and also finds other investors for those

23    investments.

24              THE COURT:  That's Jordan Levy.

25              MS. COHEN:  Correct.  The other witness is Paul Cody.
```

1    He's more a custodian-of-records-type of witness.  We've

2    actually asked the defense to stipulate to some of the records,

3    and they refused, which is one of the reasons we're calling

4    them, to put in the different records related to Sheldon

5    Silver's investments in Counsel Financial, which is one of the

6    seven different privates investment vehicles that Jordan Levy

7    got him into.

8              THE COURT:  So there are multiple funds?

9              MS. COHEN:  There are different funds.  There's

10   something called Clover Community Fund.

11             THE COURT:  Are these all under the umbrella of

12   Counsel Financial?

13             MS. COHEN:  They're all under the umbrella of JoRon

14   Management.  There are two partners in JoRon Management.  The

15   J-o stands for Jordan Levy.  The R-o-n stands for Ron

16   Schreiber, his partner.

17             So, while the investments in Counsel Financial and

18   some of the investment vehicles are made through JoRon

19   Management, which Jordan Levy can explain.

20             THE COURT:  So, Mr. Shur, it seems to me that in order

21   to prove the money laundering count, they've got to prove that

22   money moved from point A to point B.

23             The allegation in the indictment is that it moved from

24   point A into these investments that were not generally

25   available to the public which presumably are these investments.

FBHYSIL5

 1    So they're entitled to prove what they've alleged.

 2             MR. SHUR:  Number one, the defense has stipulated to

 3    all of the bank records.  The government has stipulated to the

 4    Counsel Financial records as well.

 5             So actually, that's what proves that money moved from

 6    A to B.

 7             THE COURT:  Well, you've stipulated that they're

 8    business records, I presume.

 9             MR. SHUR:  We would stipulate that they were deposited

10    into these financial institutions.  That's not the issue.  What

11    the government wants to do is to walk through -- these are six

12    or seven different investment vehicles.

13             While there might be one common denominator as far as

14    Jordy Levy, they all have these different stories about what

15    they are, who has access to them, how they work, who is a

16    qualified investor.

17             THE COURT:  Are you intending to adduce any of that?

18             MS. COHEN:  Your Honor, the entire testimony of Jordan

19    Levy would take about a half hour, 45 minutes.  We are going to

20    go through each of the investments.  They are all like

21    investments.

22             Sheldon Silver got access to all of them through

23    Jordan Levy.  He will briefly explain what they are in one

24    sentence or less.  This is not going to be extensive testimony.

25             THE COURT:  So give me an example.  What would he say

FBHYSIL7

```
 1    Counsel Financial is?

 2              MS. COHEN:  What would he say Counsel Financial is?

 3              THE COURT:  Pick one.

 4              MS. COHEN:  Your Honor, Counsel Financial loans money

 5    to --

 6              THE COURT:  Does it finance --it finances lawsuits?

 7              MS. COHEN:  It finances lawsuits, your Honor.  So a

 8    person invests in it by giving money to Counsel Financial.

 9    They get a promissory note back for the amount of money they

10    invested, and then they earn interest based on the principle

11    they've invested.

12              Then when the note comes due, they can either reinvest

13    the money, the initial investment and the interest, or they can

14    withdraw it, and it gets rolled over.

15              It's not complicated, but it is an exclusive, private

16    investment, which goes to, as your Honor pointed out in your

17    opinion, that we have to prove that Sheldon Silver knew they

18    were crime proceeds.

19              One of the ways we are entitled to prove that is to

20    show that Sheldon Silver knew they were crime proceeds by

21    trying to -- and what he put them in helps us prove that he

22    knew they were crime proceeds.

23              And he put them in these secret, private, exclusive

24    investments.  And also what he told Jordan Levy or what he

25    didn't tell Jordan Levy about where the money came from.  All
```

1    of that goes to our burden to prove that he knew they were

2    crime proceeds.

3         MR. SHUR:  Judge, I don't see how these investment

4    vehicles, the fact that they were selected -- this is where

5    Mr. Silver put his money has anything to do with whether or not

6    he thought they were ill-gotten gains.

7         They're not secret.  They're actually all disclosed on

8    his financial disclosure form.  All of these hedge fund

9    investments are all on his financial disclosure forms.

10        They're not secret, and they don't show anything in

11   terms of Mr. Silver's state of mind as to whether or not this

12   money was legal or illegal or dirty or not dirty.

13        My understanding from the Jencks and the questions

14   that the government has asked these two individuals is that

15   they intend to elicit testimony about whether or not Mr. Silver

16   told them about the source of the money, where it came from,

17   which opens a whole new can of worms in terms of what types of

18   questions they ask investors before they allow them in.

19        In addition, my understanding is also there's going to

20   be a whole line of questioning about Jordy Levy trading access

21   to these investment vehicles for official favors, which is a

22   totally different allegation and is --

23        THE COURT:  It's in the indictment.

24        MR. SHUR:  There's one sentence in the indictment,

25   Judge.  You know what, jamming that one sentence in the

FBHVSIL5

1    indictment doesn't bless it as 404(b) evidence.  It doesn't

2    work that way.  It's not relevant to the 1957 charge.

3              THE COURT:  Are you going to adduce the fact that he

4    was trading access to these vehicles for state favors?

5              MS. COHEN:  Not at all, your Honor.  As alleged in the

6    indictment, what we intend to allege -- and as I stated earlier

7    that we would intend to elicit -- is that Jordan Levy sat on

8    the Eerie Canal Development Authority and had discussions with

9    Sheldon Silver about voting on the PACB.  That is relevant to

10   the other counts in the indictment, your Honor.

11             THE COURT:  Why is it relevant to the other counts?

12             MS. COHEN:  Because he talked with Sheldon Silver

13   about getting his vote for things that Jordan Levy wanted to

14   pass through the PACB, and Sheldon Silver said to him, I will

15   support that and essentially vote for you.

16             THE COURT:  But Jordan Levy is not one of the

17   extortion schemes or the honest services fraud scheme.

18             MS. COHEN:  Correct, your Honor.  But to the extent

19   there was a lost questioning of a PACB custodian trying to

20   mislead the jury that Sheldon Silver had no control and no

21   ability to do anything on the PACB or no interest in it but he

22   sent proxies and he didn't pay any attention to the meetings,

23   we would be permitted to elicit through this witness that that

24   is not true, and it is limited to that, your Honor.  It is not

25   beyond that.

1          MR. SHUR:  It might be late in the day, and maybe I

2    misheard this, but I heard Ms. Cohen say on the one hand we do

3    not intend to elicit that official favors were traded for

4    access to these funds, and then I just heard her say that we're

5    going to elicit testimony that Jordy Levy asked Mr. Silver to

6    vote one way in the PACB, and he did.  That's in connection

7    with their relationship and his access to investments.

8          Of course that's where they're going with this.  It's

9    not a charged bribery scheme.  It's not a charged extortion

10   scheme.  It's unnoticed 404(b) evidence at best, and it should

11   be permissible under 404(b).

12         THE COURT:  My sense is the reason they want to get it

13   in is the evidence that you adduced or whoever adduced it on

14   cross that did suggest that the PACB was just rubber stamped

15   and Mr. Silver didn't really care about it very much.  Let's

16   hang on to that for a second because 404(b) wasn't noticed as

17   404(b) evidence.

18         I'm more concerned with your core request, again, at a

19   late date in the proceeding, to preclude the evidence of Levy

20   and Cody generally about the investments.

21         I just don't see any basis to preclude them when

22   there's a money laundering charge and they have to prove it.

23         MR. SHUR:  Judge, all they need to prove for money

24   laundering --

25         THE COURT:  So this is classic.  The defense wants to

```
 1    tell the government how to prove their case.  You don't get to
 2    do that.  They're entitled to put in the evidence they're
 3    entitled to put in.
 4         MR. SHUR:  I agree.  If they want to put in someone
 5    from one of these financial institutions to say there was a
 6    wire transfer from A to B -- I'm not telling -- the government
 7    doesn't have to stipulate.
 8         They can put on that testimony.  You're right.  That
 9    is the government's right.  They can try the case they want to.
10    That's the only issue for the jury.  The real issue here --
11         THE COURT:  No, because they've also got to conclude
12    that Silver knew that he was transacting in illicit funds.  It
13    would be circumstantial evidence that he knew he was
14    transacting in illicit funds if he moved the money from a
15    commercial bank account, which I think is where it came from,
16    into funds that had far less transparency in terms of regulated
17    entities and the like.
18         MR. SHUR:  Talk about the furthest thing from hiding
19    something.  You heard these reporters.  They're all over his
20    financial disclosure forms.  Each and every one of these
21    investments is listed on his financial disclosure form.
22         THE COURT:  So that's your cross.
23         MR. SHUR:  Judge, that's not relevant though.
24         THE COURT:  It is relevant.  There's money laundering.
25    So they've got to prove that he knew he was dealing with
```

 1   illicit funds and that he engaged in monetary transactions.

 2          So to engage in monetary transactions, you've got to

 3   prove that there was money that was moved from point A to point

 4   B.

 5          So they're entitled to prove that.  They're entitled

 6   to prove where it got moved.  You just don't like where it got

 7   moved.  I'm at a loss to understand what you think is so bad

 8   about it.

 9          MR. SHUR:  Judge, if they want to put on evidence that

10   he put the money into these hedge fund investments, that's one

11   thing.  It's another thing that he received preferential

12   treatment or special treatment or got access that mom-and-pop

13   investors wouldn't have gotten access to or other investors

14   that are in the hedge fund because of his official position and

15   that somehow he was trading official favors in order to get

16   access to these investments.  That's a completely different

17   animal.

18          THE COURT:  Let's deal with that separately.

19          MS. COHEN:  Your Honor, it is relevant for the

20   government to show that the person that Sheldon Silver chose to

21   give his crime proceeds to was a friend of his who had these

22   exclusive, secret investments.  We are allowed to put in

23   evidence of that.  It's the only way we can prove our count

24   about why he did it.

25          THE COURT:  So you're saying exclusive, secret

1   investments.  So exclusive I get.  How are they secret?

2          MS. COHEN:  What I mean by "secret" is they are

3   private investments.  Yes.  They are on the disclosure forms,

4   and the disclosure forms are in evidence, and the defense can

5   cross Jordan Levy.  They can do whatever they want with that.

6          It's not that they're in secret.  There is also one

7   part of the story, which is that at one point when the

8   disclosure forms were changing, Sheldon Silver asked that his

9   investment in Counsel Financial, which by that time totaled

10  about almost $1,000,000 -- that he asked that it be split into

11  two notes equally split, one note in his name in the amount of

12  about $450,000 and one in the name of his wife, Rosa Silver, in

13  the amount of $450,000 because he did not want to disclose on

14  his form that he had $900,000 plus invested in Counsel

15  Financial.

16         THE COURT:  So he wanted to keep it below whatever the

17  category was?  Or that's your theory?

18         MS. COHEN:  And he wanted to not disclose it.  That is

19  another element of Jordan Levy.  He only would have to disclose

20  his asset which was the promissory note, which, after it was

21  split, was only $450,000 rather than $900,000.

22         THE COURT:  The form doesn't require the disclosure of

23  the spouse?

24         MS. COHEN:  It did not.

25         MR. SHUR:  Judge, you're right.  It doesn't.  He

1   actually disclosed his spouse's note.  They're both on the

2   form.  The value of Mr. Silver's note was lowered in terms of

3   the category, but his wife's note is also on the form as well.

4          Again, I don't see how that's any evidence of

5   concealment.

6          THE COURT:  Well, splitting it is certainly

7   interesting.

8          MR. SHUR:  Judge, actually, my understanding is that

9   the Counsel Financial representative will talk about the fact

10  that many investors have multiple notes, consolidate them,

11  split them.

12         There are tax reasons.  There are state reasons.

13  There are all sorts of legitimate business reasons to

14  consolidate or split the notes.

15         The bottom line though --

16         THE COURT:  That doesn't mean that was why he did it.

17         MR. SHUR:  The bottom line is he actually in certain

18  instances on the forms listed his wife's Counsel Financial note

19  when he wasn't required to.  In any event, I didn't mean to

20  interrupt Ms. Cohen.

21         MS. COHEN:  Your Honor, the testimony would be that

22  Sheldon Silver told Jordan Levy the reason he was splitting it

23  was because, I didn't want to disclose the higher amount on his

24  disclosure forms.  So there's not going to be any debate about

25  that.

```
 1              THE COURT:  That's not helpful for you.

 2              MR. SHUR:  I haven't heard the testimony, Judge.

 3              THE COURT:  I haven't either.  I've just heard a

 4    proffer.  Assuming that's the proffer.  Y'all are getting all

 5    worked up about the fact that they were hedge funds which are

 6    not generally available to the public at large.

 7              I don't think that's going to come as any huge

 8    surprise to the jury.  People have been hearing about hedge

 9    funds for years.  Everybody knows that they're not available to

10    everybody.  They realize they're different from a Fidelity

11    mutual fund or something like that.

12              They've got different risks.  They have got different

13    people who can invest in them.  That's where you move the

14    money.

15              I don't think it's overwhelmingly probative, that that

16    suggests there was something nefarious going on.  But they do

17    have to prove money laundering.  They have to prove that they

18    were ill-gotten gains.

19              The fact that he was moving them into an investment

20    vehicle introduced by his friend as opposed to putting it in

21    Vanguard or putting it in Fidelity or putting it someplace

22    where maybe you would have some compliance officer asking some

23    questions about it seems to me is some circumstantial evidence

24    that he knew that he was dealing with firms that he didn't want

25    to have to answer a lot of questions about.  So it seems to me
```

1   that it's all relevant, and it comes in.

2          That is not to say that I think what comes in is the

3   sort of 404(b)-like evidence of Jordan Levy trying to get

4   Mr. Silver to help him out on a PACB project.

5          But I'm sympathetic to the government's desire to get

6   that in, given what is perhaps a false impression that's been

7   created relative to Mr. Silver's involvement with PACB

8   decision-making.

9          So the question is given those two concerns, I think

10  on a 404(b) rationale, one, I gather the government didn't

11  comply with the rule and didn't give notice that you intended

12  to introduce this evidence as 404(b) evidence.

13         Did you give notice that it's 404(b) evidence?

14         MS. COHEN:  Your Honor, it's in the indictment.  The

15  specific example is in the indictment.

16         MR. SHUR:  I don't have the indictment in front of me,

17  Judge, but that's news to me.

18         THE COURT:  I don't remember seeing anything about

19  PACB in the indictment.

20         MR. SHUR:  Judge, just on the PACB issue, I don't

21  believe Mr. Levy is going to have any knowledge about what, if

22  anything, Mr. Silver may have done on the PACB with respect to

23  these matters.  In fact, the resolution I understand is the

24  same resolution that we saw with the PACB witness.

25         THE COURT:  All PACB resolutions are the same.

1          MR. SHUR:  I mean the signature.  Mr. Silver wasn't

2     present for the meeting.

3          THE COURT:  But this is my whole issue with how that

4     all came out.  The suggestion that because his staffer is the

5     one that goes to the meeting, he has nothing to do with the

6     decision of what's going to happen in the meeting is just not

7     true.

8          He's the speaker.  If he wants to kill a project, he

9     can kill a project.

10          MR. SHUR:  That's not to say that he doesn't delegate

11     that task.

12          THE COURT:  That's right.  But it does mean that if

13     someone wants to make sure that he has at least the assembly

14     vote, making sure that Mr. Silver supports the project goes a

15     long way.

16          MR. SHUR:  Judge, the issue with the PACB isn't so

17     much approval as it is rejecting the proposal.

18          THE COURT:  That's right.

19          MR. SHUR:  Right.  So there's basically a default vote

20     of yes unless there's some issue.  My understanding is that

21     there is the west side stadium, the Jets stadium that got

22     turned down.  There was some other issue with the job.  There

23     were two issues in the course of 30 years where all three

24     members didn't vote up.

25          So it is a perfunctory vote.  I don't think there's

1    anything misleading about it.

2         THE COURT:  I think there are a number of things that

3    have been pulled because they know that they're not going to

4    get the support of one of the three votes that they need.

5         MR. SHUR:  My point is I just don't believe Jordy Levy

6    is going to shed any light on what, if any, role Mr. Silver

7    played with respect to the PACB.  He doesn't have any personal

8    knowledge of it.

9         THE COURT:  That's fine, but the fact that he asked

10   Mr. Silver to support him on whatever it is, the Eerie project.

11        MS. COHEN:  The Eerie Canal Harbor Development.

12        MR. SHUR:  Your Honor, to get into that fact, you're

13   going to have to unpack what the government basically wants to

14   suggest, which is there was some type of quid pro quo here.

15   Therefore, you should assume propensity.  There's quid pro quo

16   here, there, and there.

17        THE COURT:  Hence my concern about it being 404(b).

18        MR. SHUR:  I understand, Judge.

19        THE COURT:  The question is is there a way for the

20   government to accomplish the thing that I think is legitimate

21   without ending up in the 404(b) bucket.

22        MS. COHEN:  We don't intend to ask any questions that

23   connect Jordan Levy's conversation with Sheldon Silver about

24   the PACB to conversations about how to invest his money or any

25   of that.  I'm happy to come up with a couple leading questions

1    to avoid any issue, your Honor.

2         THE COURT:  Okay.

3         MS. COHEN:  If that helps.  I just wanted to correct.

4    In the indictment it mentions that Silver took certain official

5    actions as requested by Investor One in paragraph 31.  It does

6    not specifically say PACB.

7         I misspoke.  I think, in the subject of the motion to

8    dismiss the superseding indictment, that was in our motion

9    papers.  So just to correct that.  I didn't want to misspeak,

10   your Honor.

11        THE COURT:  On the 404(b) balance, I don't think -- as

12   404(b) evidence, I will not let it in.  I just don't think you

13   hit the balance right relative to prejudice versus probative

14   value.

15        But I think you do if you can figure out a way to get

16   it outside of that.  So why don't you y'all give some thought

17   to that.

18        Tell the defense tomorrow morning how you intend to

19   walk him through it.  Okay?

20        MS. COHEN:  I'll do that, your Honor.

21        MR. SHUR:  Thank you, Judge.

22        THE COURT:  If there's an issue, be here at 9:15 so we

23   can discuss it.

24        MR. COHEN:  Your Honor, we'd like to accommodate

25   Mr. Abramson if it's possible to play the tape without

```
 1    Mr. Whyland testifying.

 2              THE COURT:  They haven't done redirect.

 3              MR. COHEN:  I just wasn't sure that they're going to

 4    require redirect.

 5              MS. COHEN:  We will, your Honor.

 6              THE COURT:  Anything else?

 7              MS. COHEN:  There's one while we're here, your Honor.

 8              THE COURT:  Exactly.

 9              MS. COHEN:  I think your Honor had a conversation with

10    the juror that injured her ankle.  Perhaps your Honor could

11    just put the sum and substance of that conversation on the

12    record.

13              THE COURT:  I said, so are you going to be able to

14    walk on Wednesday?

15              And she said, yeah.  I think so.  It turns out she

16    can't.

17              I said, could you come if we send a car for you?

18              She said, yeah.  That was it.

19              MS. COHEN:  Thank you, your Honor.

20              MR. SHUR:  Judge, in terms of scheduling, we have

21    received the Court's proposed jury instructions.  I apologize

22    because I know you mentioned, Judge, when you wanted to have

23    the charging conference.

24              THE COURT:  I wanted to have it tomorrow afternoon,

25    but apparently we're still going to be taking testimony
```

tomorrow afternoon.

Now, the question is going to be whether, depending on when the government is all but rested, because we're accommodating Mr. Whyland's attorney, whether we may end up with a very long lunch break.

I have a commitment from 1:00 to 2:00.  But it's conceivable that we can at least start at 2:00 if the attorney is down here by then and if the other two or three witnesses are off the stand.

MS. COHEN:  Your Honor, I expect that we have three witnesses left.  I expect we'll be able to get them on and off the stand by 1:00, perhaps after the lunch break.

Certainly if Mr. Whyland is taking the stand at 3:00, his redirect will not be more than a half hour.  So I don't know why we couldn't do the charge conference.

MR. SHUR:  Judge, I don't know if Friday -- I don't know the Court's availability --

THE COURT:  That's a possibility.  The other possibility would be Thursday.  Thursday would be better for me.

MR. MOLO:  For the instruction conference?

MS. COHEN:  For the charge conference, your Honor?

THE COURT:  Correct.

I know he's away Thursday, but I wasn't sure if he was the person who was handling this or whether it was Mr. Shur.

 1                MR. MOLO:  I will be there.  Friday won't work at all?

 2    Any time on Friday?

 3                THE COURT:  It will, but it's just not a good day for

 4    me.  Let's play it by ear.  You should review the charge

 5    tonight.

 6                MR. MOLO:  We will.

 7                THE COURT:  If we can do it tomorrow --

 8                MR. MOLO:  I think later in the day Thursday -- I may

 9    be back from Philadelphia by mid-afternoon -- that might be

10    better than tomorrow.

11                THE COURT:  We can't count on you being back.

12                MR. MOLO:  I know.  That's the problem.  Okay.  We'll

13    review it tonight.  I know that, just from a preliminary look,

14    there are a number of issues that we're going to have back and

15    forth.

16                THE COURT:  I'm confident of that.  So that may argue

17    in favor of doing it on Friday.  I'll look at any calendar and

18    let you know tomorrow.

19                MS. COHEN:  Your Honor, if there's going to be a

20    defense case, are we going to proceed to that defense case

21    tomorrow?

22                THE COURT:  What did they tell you after lunch?

23                MS. COHEN:  Nothing, your Honor.

24                THE COURT:  I told you to tell them.

25                MR. MOLO:  We didn't.  I'm sorry.

```
 1              THE COURT:  Is there a defense case or not?

 2              MR. MOLO:  The answer is we're going to talk to them

 3    about some stipulations tonight and hopefully not.

 4              THE COURT:  If there is a defense case, you better

 5    have your people here, or you're going to have rested.

 6              MR. MOLO:  Okay.

 7              MS. COHEN:  Your Honor, if I could just ask, if there

 8    is going to be a defense case, if they could just give us the

 9    identity of the witnesses so they can be prepared tomorrow.

10              THE COURT:  Who are the witnesses if there is a

11    defense case?  Who are the witnesses if there is a defense

12    case?

13              MR. MOLO:  We will tell them this evening as they have

14    been telling us.  Judge, I'm trying to be as precise as I can.

15              THE COURT:  Here is my problem:  I left it to your

16    good faith this morning when I told you to tell them at lunch

17    whether there was a case, and you didn't do it.

18              So you have burned a lot of your chits with me.

19              MR. MOLO:  Okay.

20              THE COURT:  If you don't want to say it and you don't

21    want the press to hear it, tell me that.  Come to sidebar.

22              (At the sidebar)

23              MR. GOLDSTEIN:  If there is a defense case,

24    your Honor, there would be Ms. Rapfogel, Judge Yates, and

25    Ms. Barker.
```

```
 1              THE COURT:  Ms. Who?

 2              MR. COHEN:  Ms. Barker.

 3              MS. COHEN:  Joanne Barker.

 4              MR. MOLO:  Assuming reciprocity.

 5              THE COURT:  Right.  Okay.  So no experts.  Are you

 6     going to have those three people available?

 7              MR. COHEN:  Tomorrow?

 8              THE COURT:  Yes.

 9              MR. COHEN:  If we're going to call them, we'll have to

10     make them available.  We hear you.

11              THE COURT:  You'll make that decision tonight.

12     Assuming that they rest at 3:00 and there's a defense case, I

13     want to start it because --

14              MR. COHEN:  You are going to hear motions, aren't you,

15     your Honor?

16              MR. MOLO:  Okay.  Thank you.

17              (In open court)

18              THE COURT:  Anything else before we adjourn for the

19     evening?

20              MS. COHEN:  Not from the government.

21              MR. MOLO:  No, your Honor.

22              THE COURT:  Then we'll adjourn until tomorrow then.

23              (Adjourned to November 18, 2015, at 9:15 a.m.)

24

25
```

1                              INDEX OF EXAMINATION

2     Examination of:                                    Page

3     STEVEN CHARLES WITKOFF

4     Direct By Ms. Cohen . . . . . . . . . . . .2011
      Cross By Mr. Molo . . . . . . . . . . . . .2044
5     Redirect By Ms. Cohen . . . . . . . . . . .2057
      Recross By Mr. Molo . . . . . . . . . . . .2059
6     LISA REID

7     Direct By Ms. Cohen . . . . . . . . . . . .2096
      Cross By Mr. Shur . . . . . . . . . . . . .2121
8     Redirect By Ms. Cohen . . . . . . . . . . .2173

9     MICHAEL WHYLAND

10    Direct By Mr. Goldstein . . . . . . . . . .2176
      Cross By Mr. Molo . . . . . . . . . . . . .2236
11                            GOVERNMENT EXHIBITS

12    Exhibit No.                                    Received

13    834 . . . . . . . . . . . . . . . . . . . .2028

14    841 and 841-A . . . . . . . . . . . . . . .2032

15    845 . . . . . . . . . . . . . . . . . . . .2037

16    232 . . . . . . . . . . . . . . . . . . . .2102

17    222 . . . . . . . . . . . . . . . . . . . .2105

18    913 through 924 . . . . . . . . . . . . . .2107

19    2009 . . . . . . . . . . . . . . . . . . . .2112

20    158 . . . . . . . . . . . . . . . . . . . .2183

21    1 . . . . . . . . . . . . . . . . . . . . .2199

22    2 . . . . . . . . . . . . . . . . . . . . .2202

23    3-A . . . . . . . . . . . . . . . . . . . .2204

24    4 . . . . . . . . . . . . . . . . . . . . .2205

25    273 . . . . . . . . . . . . . . . . . . . .2215

1    274    . . . . . . . . . . . . . . . . . .2217

2    275    . . . . . . . . . . . . . . . . . .2219

3    2010     . . . . . . . . . . . . . . . . .2224

4    276    . . . . . . . . . . . . . . . . . .2226

5    239    . . . . . . . . . . . . . . . . . .2228

6    5    . . . . . . . . . . . . . . . . . .2234

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25