FBi5sil1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               15 Cr. 0093(VEC)

SHELDON SILVER,

                  Defendant.

------------------------------x

                                             November 18, 2015
                                             9:27 a.m.


Before:

                    HON. VALERIE E. CAPRONI,

                                             District Judge
                                               and a Jury
                          APPEARANCES

PREET BHARARA
      United States Attorney for the
      Southern District of New York
BY:   CARRIE H. COHEN,
      ANDREW D. GOLDSTEIN,
      HOWARD S. MASTER,
      JAMES M. McDONALD,
            Assistant United States Attorneys

STROOCK & STROOCK & LAVAN LP
      Attorneys for Defendant
BY:   JOEL COHEN
            - and -
MOLOLAMKEN, LLP
BY:   STEVEN F. MOLO
      JUSTIN SHUR
      JUSTIN ELLIS
      ROBERT KRY
      TUONGVY LE

FBi5sil1

1              (Trial resumed; jury not present)

2              THE COURT:  I understand that despite me asking you to

3      let me know at 9:15 that things weren't worked out I didn't

4      hear about it until just now.  So, with that introduction,

5      where are you?

6              MS. COHEN:  Your Honor, I talked with Mr. Shur about

7      some leading questions to ask Jordan Levy related to the PACB

8      matter.  He is reviewing them.  He has told me at first blush

9      he does not agree but perhaps we can deal with it at morning

10     break since Jordan Levy would be our third witness today.

11             THE COURT:  Okay.

12             MR. SHUR:  Judge, I'm happy to address it now or at a

13     break.

14             THE COURT:  The jury is here.  My goal, when I ask you

15     to do something so that we can deal with it at 9:15 -- don't

16     look like you are so innocent, you are part of this.  The

17     reason I ask for that is so that we don't keep the jury waiting

18     and make use of the early time to resolve issues.

19             MR. SHUR:  To be clear, Ms. Cohen told me the

20     questions maybe 60 seconds ago.

21             THE COURT:  Okay.  Bring in the jury.

22             Who is your first witness?

23             MR. GOLDSTEIN:  Mr. Whyland's counsel was able to come

24     so we are going to put Mr. Whyland back on the stand.

25             THE COURT:  Oh good.

FBi5sil1

1          MS. COHEN:  Shall we get the witness on the stand

2     before the jury comes in?

3          THE COURT:  They have to line up so go ahead and bring

4     him in.

5          MR. GOLDSTEIN:  Your Honor, we did choose to remove

6     the reference to the rape case from the recording.

7          THE COURT:  Okay.

8          MS. COHEN:  We sent a copy to defense.

9          THE COURT:  Okay.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2              THE COURT:  Okay.  Good morning, everybody.

3              THE JURY:  Good morning.

4              THE COURT:  Sir, you are still under oath.

5   MICHAEL WHYLAND, resumed.

6              THE COURT:  Mr. Goldstein.

7              MR. GOLDSTEIN:  Thank you, your Honor.

8   REDIRECT EXAMINATION

9   BY MR. GOLDSTEIN:

10  Q.  Good morning, Mr. Whyland.

11  A.  Good morning.

12  Q.  Do you recall that defense counsel asked you some questions

13  about whether the government provided you with the full

14  recordings from which the excerpts that we reviewed yesterday

15  were drawn?

16  A.  Yes, I do.

17  Q.  Mr. Whyland, what did the government provide you with in

18  advance of your testimony?

19  A.  It provided me with transcripts of particular parts of the

20  recordings, as well as the full recordings.

21  Q.  So you were provided with the entire audio files?

22  A.  Yes, I was.

23  Q.  And were those recordings from the Assembly's own files?

24  A.  Yes, they were.

25  Q.  Let's go back to what had been marked as Government Exhibit

FBi5sil1                          Whyland – redirect

1    and play a little longer excerpt.  In your binder there is an

2    exhibit marked as Government Exhibit 1A which should also be in

3    the jury binders.

4                    MR. GOLDSTEIN:  Your Honor, the government offers 1A

5    as an audio file for admission and 1A-T as an aid to the jury.

6                    THE COURT:  Any objection?

7                    MR. MOLO:  No objection, your Honor.

8                    THE COURT:  So 1A is admitted.

9                    (Government's Exhibit 1A received in evidence)

10   BY MR. GOLDSTEIN:

11   Q.  Mr. Coccaro, can we go ahead and play 1A from the

12   beginning?

13                    (Audiofile played)

14   Q.  Mr. Whyland, did you know that Weitz & Luxenberg handled

15   asbestos cases?

16   A.  Yes.

17   Q.  Did Sheldon Silver ever tell you that he worked on asbestos

18   cases at Weitz & Luxenberg?

19   A.  Not that I recall specifically, no.

20   Q.  Did he ever tell you that he had any asbestos clients?

21   A.  Not that I recall.

22   Q.  Did he ever tell you that he was paid money for asbestos

23   cases?

24   A.  No, not that I recall.

25   Q.  You never told the press that Sheldon Silver worked on or

FBi5sil1                          Whyland - redirect

1    made money from asbestos cases, right?

2    A.   No.

3    Q.   Why not?

4    A.   Because I had no specific knowledge of it.

5    Q.   Yesterday defense counsel asked you some questions about

6    whether the statements that you testified about yesterday in

7    the audio -- in the audio clips and in the newspaper articles,

8    whether or not they were out of context or incomplete.

9            Do you remember those questions?

10   A.   Yes.

11   Q.   Did Sheldon Silver ever tell you that any article about his

12   outside income was incomplete?

13   A.   No.

14   Q.   Did he ever tell you that any article about his outside

15   income was out of context?

16   A.   No.

17   Q.   Did he ever tell you that any article about his outside

18   income got it wrong?

19   A.   Not that I recall, no.

20   Q.   For how many years did you work for Sheldon Silver?

21   A.   For four years, approximately.

22   Q.   Through all four of those years, among all of the various

23   press stories that were written about Sheldon Silver's outside

24   income, did he ever once ask you to correct the record?

25   A.   Not that I recall, no.  No.

FBi5sil1                        Whyland - recross

1   Q.   Defense counsel also asked if Sheldon Silver ever

2   instructed you to lie to the press.

3           Do you recall that?

4   A.   Yes.

5   Q.   Before you spoke with a reporter about a question related

6   to Sheldon Silver's outside income, who did you speak with?

7   A.   The Speaker.

8   Q.   So what you told the press is what Sheldon Silver told you,

9   right?

10  A.   Yes.

11  Q.   Did you have any independent knowledge of the nature or the

12  sources of Sheldon Silver's outside income?

13  A.   Independent knowledge?  No.

14  Q.   So you only knew what Sheldon Silver told you, right?

15  A.   Yes.

16  Q.   In fact, until this investigation what knowledge, if any,

17  did you have that Sheldon Silver was making hundreds of

18  thousands of dollars from a real estate law firm?

19  A.   I had no knowledge of that.

20          MR. GOLDSTEIN:  Nothing further, your Honor.

21          THE COURT:  Any recross?

22          MR. MOLO:  Very short.

23  RECROSS EXAMINATION

24  BY MR. MOLO:

25  Q.   Mr. Whyland, would you say Mr. Silver had pretty thick

FBi5sil1                         Whyland - recross

1   skin?

2   A.  Yeah, very thick skin.

3   Q.  Very thick skin?

4   A.  Very.

5   Q.  So not only did he not ask you to correct the record

6   regarding his income, he never asked you to correct the record

7   on anything, right?

8   A.  Once or twice, but rarely.  Very rarely.

9   Q.  And you were asked about not having specific knowledge of

10  Mr. Silver's law practice and you knew that he was at

11  Weitz & Luxenberg and they handled asbestos cases, right?

12  A.  Right.

13  Q.  And you didn't know specifically whether he did or not,

14  right?  Correct?

15  A.  Not specifically, no.

16  Q.  And he didn't tell you that, correct?

17  A.  Correct.

18  Q.  Can we play the last 20 seconds of that tape again, the

19  last 25 seconds of that tape?

20          THE COURT:  Of the excerpt that is 1A?

21          MR. MOLO:  Yes.

22          I get to say Mr. Coccaro.  Mr. Coccaro, please; the

23  name most mentioned in the record.

24          THE COURT:  Yes.

25          MR. COCCARO:  I don't object, your Honor.

FBi5sil1                        Whyland - recross

1          THE COURT:  Okay.  He will be sending you a bill,

2    Mr. Molo.

3              (Audiofile played)

4    BY MR. MOLO:

5    Q.  So, when Mr. Silver gave this interview to the New York

6    Post he was telling them that he had asbestos clients, correct?

7    A.  Correct.

8              MR. GOLDSTEIN:  Objection.

9              THE COURT:  Overruled.

10   A.  That is correct.

11   Q.  These recordings you got through the archives of the press

12   office, is that right?  These were retrieved?

13   A.  Yes.

14   Q.  I don't think you were actually working for Mr. Silver at

15   the time of any of these, correct?

16   A.  Only the last recording, the December 24th.

17   Q.  That was at a gaggle?

18   A.  Correct.

19   Q.  By the way, that was just in an elevator with people

20   following him and --

21   A.  Yeah.  Yeah.

22   Q.  -- microphones?

23   A.  Yeah, reporters following him down the hall into an

24   elevator.

25             MR. MOLO:  Thank you very much, your Honor.

FBi5sil1                        Whyland — recross

 1              MR. GOLDSTEIN:  Your Honor, can we have a brief side

 2     bar?

 3              THE COURT:  Okay.

FBi5sil1                          Whyland - recross

1                  (At side bar)

2                  MR. GOLDSTEIN:  Your Honor, Mr. Molo asked the witness

3       about whether or not Sheldon Silver asked to correct the

4       record.  The defense knows one very specific instance of that

5       which was the subject of motions *in limine* which is when it was

6       reported by the New York Times that Sheldon Silver had opposed

7       this redevelopment in his district near his residence for years

8       and he asked, and through Mr. Whyland, asked to attribute it to

9       the Sheldon E. Silver and blamed Sheldon E. Silver for it.

10                 We, through the motions *in limine*, were not planning

11      to put that in but I think Mr. Molo has opened the door to

12      questions about that given his question about the Speaker never

13      asking to correct the record.

14                 MR. MOLO:  I don't think that that was a question

15      about correcting the record and certainly not correcting the

16      record in the context of the way the question was put in the

17      redirect examination.  He asked him whether or not he asked to

18      correct the record in a broad, general sense as well.  He asked

19      the question:  Did he ever ask you to correct the record on

20      any --

21                 THE COURT:  That was redirect off of your cross from

22      yesterday.

23                 MR. MOLO:  Right.  And when he asked that question I

24      asked the recross question.  I mean, I don't see how that's --

25      and the whole Sheldon -- we have been through that.  That was a

FBi5sil1                          Whyland – recross

 1     whole question about an incorrect name.  There was a great deal

 2     of confusion about that.

 3              THE COURT:  With all due respect, your client's

 4     explanation of that strikes the Court as poppycock.  But, be

 5     that as it may, I think it is a huge distraction and I'm not

 6     going to allow you to.

 7              MS. COHEN:  I want to correct one thing which is that

 8     the question on redirect was limited to correcting a record

 9     about outside income.  He did not open the door, it was

10     Mr. Molo's question that brought it up.

11              THE COURT:  I still think it is a distraction at this

12     stage of the game.

13

14

15

16

17

18

19

20

21

22

23

24

25

FBi5sil1                              Cody – direct

1                    (In open court)

2                    MR. GOLDSTEIN:  Your Honor, nothing further.

3                    THE COURT:  Thank you.  You may step down.

4                    (Witness steps down)

5                    THE COURT:  Call your next witness.

6                    MS. COHEN:  Your Honor, the government calls Paul

7       Cody.

8                    MR. GOLDSTEIN:  Shall we collect the binders now?

9                    THE COURT:  Yes.

10                   Turn in your binders.

11       PAUL RICHARD CODY,

12           called as a witness by the Government,

13           having been duly sworn, testified as follows:

14                   THE DEPUTY CLERK:  Please state your full name, and

15       spell your last name, slowly, for the record.

16                   THE WITNESS:  Paul Richard Cody.  C-O-D-Y.

17                   THE DEPUTY CLERK:  Thank you.  Please, be seated.

18       DIRECT EXAMINATION

19       BY MS. COHEN:

20       Q.  Mr. Cody, where do you work?

21       A.  Counsel Financial.

22       Q.  What is Counsel Financial?

23       A.  A commercial lender.  We provide working capital lines of

24       credit to law firms, primarily contingency fee law firms;

25       plaintiff's firms.

FBi5sil1                          Cody - direct

1    Q.  What position do you hold at Counsel Financial?

2    A.  I'm the president.

3    Q.  How long have you been the president of Counsel Financial?

4    A.  Since 2008.

5    Q.  In general, what are your duties and responsibilities as

6    president of Counsel Financial?

7    A.  I am -- they're various.  Oversee the staff, underwriting,

8    general vision of the company.

9    Q.  How did it come about that you were hired as the president

10   of Counsel Financial?

11   A.  My prior position I worked with Jordan Levy and Ron

12   Schreiber at venture capital firms called SoftBank Capital --

13            THE COURT:  Whoa.  Slow, way, way, way, down.

14   A.  There was a number of different companies that were

15   involved, they were generally venture capitalists.  SoftBank

16   Capital.

17            THE COURT:  SoftBank, all one word?

18   A.  All one word, SoftBank; Seed Capital Partners, like

19   planting a seed, S-E-E-D Capital; and JoRon J-O-R-O-N

20   Management.

21   Q.  I will ask you about each one of those in a minute but, in

22   general, what is SoftBank Capital?

23   A.  A company that makes investments in businesses, typically

24   an equity investment in an effort of making a return.

25   Q.  What do you mean by equity investment?

1   A.  Taking ownership position in different businesses.

2   Q.  What is JoRon?

3   A.  JoRon is a privately held company.  It was opportunistic

4   meaning it made investments in multiple types of entities.

5   They were two major partners.  The two major partners are the

6   name sake of the company, JoRon is Jordan, J-O is Jordan Levy

7   and Ron is Ron Schreiber.

8           THE COURT:  How do you spell Schreiber.

9           THE WITNESS:  S-C-H-R-E-I-B-E-R, I believe.

10  Q.  What is Seed Capital?

11  A.  Seed Capital is a venture capital fund that focused on

12  technology equity investments.

13  Q.  And prior to working for JoRon, Seed Capital and SoftBank,

14  what positions did you hold at other companies?

15  A.  When I graduated from college I was -- I worked at a large

16  public accounting firm, KPMG, became a CPA there.  Spent a

17  little time in insurance as a controller of an insurance

18  company called Nova Casualty and a short stint at a defense

19  contractor.

20  Q.  When you said you were a CPA, you were a certified public

21  accountant?

22  A.  Correct.

23  Q.  When did you earn your certified public -- when did you

24  become a certified public accountant?

25  A.  1995.

1   Q.  So, what year did you start as president of Counsel

2   Financial?

3   A.  It was February of 2008.

4   Q.  And how does Counsel Financial get money into the company?

5   How does it find investors?

6   A.  Well, there is two ways that we finance our loans.  One is

7   we have a lending relationship with a large institutional bank

8   and then second we have what is known as subordinated debt

9   which is individual investors that have -- most of them are

10  friends, family, business associates, former business

11  associates of the ownership or management group of the company,

12  they make investments in Counsel Financial typically in the

13  form of subordinated notes, promissory notes.

14  Q.  What do you mean by a promissory note?

15  A.  It is an investment that provides them with an interest

16  rate return for putting an investment in the company and

17  they're typically repaid in three-year time periods at varying

18  interest rates.

19  Q.  How do investors learn about Counsel Financial?

20  A.  One of two ways.  A lot of it, I would say a majority of

21  our investors have been through friends, family or associates

22  of owners of the business or management in the business, but

23  other investors have sought us out that have just been

24  interested in the industry that we are in and have cold-called

25  us or contacted us in some form.

FBi5sil1                    Cody - direct

1  Q.  What is an accredited investor?

2  A.  It is a qualification that is primarily financially driven.

3        So, the investors have to be accredited to invest in

4  Counsel Financial which means they, for an individual the

5  primary tests are you have to have in excess of a million

6  dollars of net worth or you have to have annual income, as an

7  individual, I believe it is $200,000 a year in the preceding

8  two years; as a family I believe it is $300,000 a year.

9  Q.  Why does Counsel Financial require its investors to be

10 accredited investors?

11 A.  The designation as an accredited investor implies an

12 increased level of sophistication.  When you are getting

13 involved in more complex types of transactions and we are not a

14 publicly traded stock so there is a little complexity

15 understanding what our business is and that they have the

16 ability to understand.  It is a presumption that they maybe are

17 involved in other types of investments and that they would be

18 capable of, one, understanding this investment; and two, have

19 the financial wherewithal to make it.

20        THE COURT:  I'm sorry.

21        By this investment do you mean the risks of the

22 investment?  The risks and rewards?

23        THE WITNESS:  Yes, understanding.  We provide

24 materials to our investors so they can absorb and understand

25 the type of investment that they're making.

FBi5sil1                          Cody - direct

| | |
|---|---|
| 1 | THE COURT:  Okay.  Are you regulated by anybody? |
| 2 | THE WITNESS:  No. |
| 3 | THE COURT:  Okay. |
| 4 | BY MS. COHEN: |
| 5 | Q.  So, Counsel Financial is not regulated by any regulatory |
| 6 | body; federal, state, or local? |
| 7 | A.  No.  As a commercial lender we are not -- we have to |
| 8 | follow, obviously, certain rules and regulations but we are not |
| 9 | specifically regulated like a bank. |
| 10 | Q.  And what is the rate of interest, in general, on |
| 11 | investments in Counsel Financial over the past 10 years? |
| 12 | A.  It's ranged from 9 percent to as high as maybe 15. |
| 13 | THE COURT:  A year? |
| 14 | THE WITNESS:  Per year. |
| 15 | THE COURT:  Okay. |
| 16 | BY MS. COHEN: |
| 17 | Q.  So that an investor in Counsel Financial receives 9 to 14 |
| 18 | percent on the money that they invested in Counsel Financial? |
| 19 | A.  Annually, correct. |
| 20 | Q.  And how is it determined what rate of interest a particular |
| 21 | investor will receive in Counsel Financial? |
| 22 | A.  Two primary factors; one is the amount of their investment, |
| 23 | typically a larger investment can earn a higher percent of |
| 24 | interest, and the only other exception is if we are more |
| 25 | aggressively seeking funds we have been a growing company |

1    consistently since I have been there, so as we have been trying

2    to raise funds and support the growth of our portfolio

3    sometimes we will be more aggressive, provide a higher rate of

4    interest to entice people to invest.

5    Q.  Was Sheldon Silver an investor in Counsel Financial?

6    A.  Yes.

7    Q.  How did it come about that Sheldon Silver became an

8    investor?

9    A.  When Mr. Silver first invested, I believe it was in the

10   beginning of 2007, at the time I was working with the other

11   entities, JoRon Management and Jordan Levy was the one who

12   introduced him to Counsel Financial, it is my understanding.

13   Q.  And can you just explain how does JoRon Management or

14   Jordan Levy relate to Counsel Financial?

15   A.  Jordan Levy and Ron Schreiber -- I believe it was Ron was

16   initially an investor in another company that was owned by the

17   management of Counsel Financial, and so they had a friendly

18   relationship over the years.  They had made some investments in

19   the business.

20   Q.  You say they had a friendly relationship, Jordan Levy and

21   Ron Schreiber?

22   A.  Jordan Levy and Ron Schreiber both did.  Jordan was an

23   initial investor, and Ron did, but it was probably at the same

24   time Mr. Silver invested.

25   Q.  So, both Jordan Levy and Ron Schreiber are investors in

FBi5sil1                              Cody - direct

1    Counsel Financial?

2    A.   Correct.

3    Q.   It is your understanding that Jordan Levy introduced

4    Sheldon Silver to invest in Counsel Financial?

5    A.   That's correct.

6    Q.   Other than Sheldon Silver, what other elected officials

7    have had investments in Counsel Financial?

8    A.   I think only one former local politician -- local meaning

9    Buffalo.

10   Q.   When the former --

11             THE COURT:   I'm sorry.  You said local meaning

12   Buffalo?

13   A.   Local or headquartered just outside of Buffalo.

14   Q.   And when the former local politician from Buffalo invested

15   in Counsel Financial, was that politician, had they been voted

16   out of office?

17   A.   Yes.  I don't think they were in office.

18   Q.   Other than that one individual, do you recall anyone else

19   other than Sheldon Silver who had access and invested with

20   Counsel Financial?

21   A.   I do not.

22   Q.   You said Sheldon Silver's first investment in Counsel

23   Financial was 2007?

24   A.   Correct.

25   Q.   How much was Sheldon Silver's first investment in Counsel

FBi5sil1                          Cody - direct

1   Financial?

2   A.  $25,000.

3   Q.  Was there a minimum amount that was required, typically, to

4   invest in Counsel Financial?

5   A.  I don't recall.  At the time I was not at Counsel Financial

6   at the time.  I don't recall a stated minimum, but that would

7   be on the low end.  $25,000 would be on the low end of the

8   range.

9   Q.  Did you know Sheldon Silver?

10  A.  No.  Never met him.

11  Q.  You never met him?

12  A.  No.

13  Q.  What did you know about how Sheldon Silver had money to

14  invest in Counsel Financial?

15  A.  I didn't.  I wasn't aware of his situation.

16         THE COURT:  You need to keep your voice up, please.

17         THE WITNESS:  Okay.

18  Q.  What paperwork does Counsel Financial require potential

19  investors to complete in order to become an investor?

20  A.  Primarily, three documents.  There is a non-disclosure

21  initially which is just when we provide materials that they

22  don't disclose the information, there is a subscription

23  agreement and along with the subscription agreement a

24  questionnaire, and then there is a-the promissory note itself.

25  Q.  Why do you provide potential investors with a

1    non-disclosure agreement?

2    A.   Because we are a privately held company so we don't want to

3    share the information that's disclosed about our business.

4    Q.   And did Sheldon Silver receive a subscription agreement,

5    investor questionnaire and a non-disclosure agreement for his

6    initial $25,000 investment in Counsel Financial?

7    A.   Yes, he would have.

8    Q.   If you can look in your binder, please, at what's been

9    marked Government Exhibit 952 and if you recognize it, what is

10   it?

11   A.   I think I am actually missing 952.  Oh wait, sorry.  It is

12   the very first one.  I have it.

13          This is a subscription agreement and the related

14   investor questionnaire.

15   Q.   Is it a subscription agreement and investor questionnaire

16   for Sheldon Silver?

17   A.   It is.

18   Q.   Is this a document maintained in the books and records of

19   Counsel Financial?

20   A.   It is.

21   Q.   Is it a true and accurate copy of the documents as it

22   exists in the books and records of Counsel Financial?

23   A.   It is.  Yes.

24          MS. COHEN:  Government moves 952 into evidence.

25          MR. SHUR:  No objection.

1           THE COURT:  952 is received.

2           (Government's Exhibit 952 received in evidence)

3    BY MS. COHEN:

4    Q.  Mr. Cody, if you could just explain for the jury what

5    Government Exhibit 952 is?

6    A.  The subscription agreement is an agreement that essentially

7    says that the investor understands the investment that they're

8    making, that they have the authority to move forward on the

9    investment, that they have looked at the materials that we have

10   provided, and that they represent that they are accredited.

11   Q.  If you look at the first no. 1 -- Mr. Coccaro, if you could

12   zoom in on that, please -- it refers to a note.  What is being

13   referred to there?

14   A.  That is the promissory note that is the actual document

15   that is signed that represents that the investor has made an

16   investment in the company and what the company's obligations

17   are in terms of repayment.

18   Q.  Can you look at the second page of Government Exhibit 952

19   which is the second page of the subscription agreement; whose

20   name and signature appears there?

21   A.  Mr. Silver.  Sheldon Silver.

22   Q.  And Exhibit A to the subscription agreement, which is the

23   third page of Government Exhibit 952, is called the investor

24   questionnaire?

25   A.  Correct.

FBi5sil1                          Cody - direct

1    Q.   What is this document?

2    A.   This is the document where the investor makes

3    representations about their -- confirming that they are in fact

4    accredited.

5    Q.   And looking at no. 1, this is the investor questionnaire

6    for Sheldon Silver?

7    A.   Correct.

8    Q.   And do you know the address there listed as 180 Maiden

9    Lane; do you know what that address is?

10   A.   I believe that's the former office of Weitz & Luxenberg.

11   Q.   And what box is no. 2?  What boxes did Sheldon Silver check

12   to confirm that he was -- could be deemed an accredited

13   investor?

14   A.   He checked three separate boxes, the first being an

15   individual having net worth in excess of $1 million, the second

16   being an individual having individual income in excess of

17   $200,000 in the preceding two years or joint -- in this case it

18   would be single so that would be the relevant provision, and

19   then the third being an individual having a net worth of in

20   excess of four times the investment.

21   Q.   And here the investment for this investor questionnaire,

22   this initial investment was $25,000?

23   A.   Correct.

24   Q.   If you look at the second page of Government Exhibit 952,

25   who signed this document and what is the date?

1    A.  Signed by Sheldon Silver.  The date is January 22nd, 2007.

2    Q.  If you can turn to what's been marked for identification in

3    your notebook, the next document, Government Exhibit 950?

4    A.  Yes.

5    Q.  If you recognize Government Exhibit 950, what is it?

6    A.  I do.  This is the promissory note for the $25,000

7    investment.

8    Q.  Is Government Exhibit 950 a document maintained in the

9    regular course of Counsel Financial business?

10   A.  It is.

11   Q.  Is Government Exhibit 950 a true and accurate copy of the

12   document maintained in the books and records of Counsel

13   Financial?

14   A.  It is.

15          MS. COHEN:  Your Honor, the government moves

16   Government Exhibit 950.

17          MR. SHUR:  No objection.

18          THE COURT:  950 is received.

19          (Government's Exhibit 950 received in evidence)

20   BY MS. COHEN:

21   Q.  Mr. Cody, what is Government Exhibit 950?

22   A.  This is the promissory note representing his $25,000

23   investment dated January 12, 2007.  The relevant provisions or

24   the most important provisions is that it is a three-year

25   maturity.  In Section 1 it references that the maturity date is

1   three years later, January 12, 2010.  Section 2 references that

2   the rate of interest is 10 percent and it's typical form of a

3   promissory note for us.

4   Q.  What happens at the end the term of the promissory note at

5   the end of the three years?

6   A.  It is at the investor's option they can either reinvest

7   into a new note or they are repaid.

8   Q.  And if you look at the last page, please, of Government

9   Exhibit 950, who signed this promissory note with Counsel

10  Financial for $25,000?

11  A.  Michael Callahan, who is the chief financial officer.

12  Q.  And I think that's on the preceding page, Mr. Coccaro?

13  A.  For Counsel Financial, yeah; and page 7 was Mr. Silver.

14  Q.  And when a promissory note is signed to invest in Counsel

15  Financial, what happens at or around the same time as the note

16  is signed?

17  A.  The investor would either wire or provide a check for the

18  amount of the investment.

19  Q.  If you will look in your binder, please, at Government

20  Exhibit 951 for identification.  If you recognize the document,

21  what is it?

22  A.  This is a copy of a page from a bank statement or a

23  printout -- online printout from a statement from Counsel

24  Financial's records.  It looks like it was from January 12th,

25  2007 to September -- excuse me -- September 2006 to January

FBi5sil1                          Cody - direct

1  | 2007 for one of the accounts.

2  |     MS. COHEN:  Your Honor, the government moves

3  | Government Exhibit 951 into evidence.

4  |     MR. SHUR:  No objection.

5  |     THE COURT:  951 is received.

6  |     (Government's Exhibit 951 received in evidence)

7  | BY MS. COHEN:

8  | Q.  So, Government Exhibit 951 is a statement from Counsel

9  | Financial's records?

10 | A.  Yes.

11 | Q.  There is a highlighted entry there; what is that

12 | highlighted entry?

13 | A.  That is a record of the incoming wire of $25,000 and it

14 | notes that the wire came from JoRon Management.

15 | Q.  Is this $25,000 wire to pay for Sheldon Silver's promissory

16 | note?

17 | A.  It is.

18 | Q.  Why was the wire from JoRon Management?

19 | A.  My recollection is Mr. Silver provided the funds first to

20 | JoRon Management and JoRon Management wired the funds to

21 | Counsel Financial.

22 | Q.  After Sheldon Silver's initial $25,000 investment in

23 | Counsel Financial, did Sheldon Silver make additional

24 | investments in Counsel Financial?

25 | A.  He did.

FBi5sil1                          Cody - direct

1   Q.  How would you learn that Sheldon Silver had additional

2   money he wanted to invest in Counsel Financial?

3   A.  Typically through Mr. Levy, Jordan Levy.

4   Q.  And what did you know about where the additional money

5   Sheldon Silver had to invest in Counsel Financial came from?

6   A.  I didn't have any idea.

7   Q.  And, in general, for additional investments in Counsel

8   Financial, did the investor have to fill out another

9   subscription agreement and investor questionnaire?

10  A.  Typically, no.  Once they represented they were accredited

11  that covered it.

12  Q.  So what was the process for additional investments in

13  Counsel Financial?

14  A.  Just an expression of interest.

15  Q.  And what documents had -- how did the investments get made?

16  Were they made the same note with promissory note and a wire?

17  A.  Promissory note and wire or check.

18  Q.  If you look at Government's Exhibits 953 and 954 in your

19  binder.

20  A.  Okay.

21  Q.  If you recognize them, what are they?

22  A.  I do; the Exhibit 953 represents a $75,000 investment made

23  on March 29th, 2007, it is the promissory note for that

24  investment; and 954 is a printout evidencing the wire on that

25  same date coming, again, from JoRon Management, for $75,000.

FBi5sil1                      Cody - direct

1    Q.  And is Government Exhibit 953 and 954 documents that are

2    maintained by Counsel Financial in the regular course of its

3    business?

4    A.  Yes, they are.

5    Q.  Are Government's Exhibits at 953 and 954 accurate copies of

6    books and records maintained by Counsel Financial?

7    A.  Yes.

8            MS. COHEN:  Your Honor, the government moves 953 and

9    954 into evidence.

10           THE COURT:  Any objection?

11           MR. SHUR:  No objection.

12           THE COURT:  953 and 954 are received.

13           (Government's Exhibits 953 and 954 received in

14   evidence)

15   BY MS. COHEN:

16   Q.  Mr. Coccaro, if you could put up the first page of

17   Government Exhibit 953?  Thank you.

18           Mr. Cody, what is Government Exhibit 953?

19   A.  This is the promissory note related to the $75,000

20   investment made on March 29th, 2007.

21   Q.  And this is a promissory note for Sheldon Silver about a

22   little more than two months after his initial investment of

23   $25,000?

24   A.  Correct.

25   Q.  And what is the rate of interest on this promissory note,

FBi5sil1                          Cody - direct

1    Government Exhibit 953?

2    A.  11 percent.

3    Q.  If you look at the last page of Government Exhibit 953,

4    whose signature appears?

5    A.  Mr. Silver.  Sheldon Silver.

6    Q.  And what is Government Exhibit 954?

7    A.  This is a printout from the bank statement from the books

8    and records related to the bank statement of Counsel Financial

9    showing an incoming wire of $75,000 on March 29th, 2007 from

10   JoRon Management.

11   Q.  If you can look, please, in your binder, of what's been

12   marked Government's Exhibits 1012-1, it should be the next

13   document.  If you recognize it, what is it?

14   A.  This is an e-mail from myself to HSBC Bank requesting that

15   the wire from JoRon Management is sent over to Counsel

16   Financial.  It provides the wire instructions with a wire

17   approval signed by Jordan Levy.

18   Q.  And is the $75,000 wire approval shown in what's been

19   marked Government Exhibit 1012-1 to cover the promissory note

20   for Sheldon Silver's second investment in Counsel Financial?

21   A.  Yes.

22         MS. COHEN:  Your Honor, the government moves

23   Government Exhibit 1012-1 into evidence.

24         MR. SHUR:  No objection.

25         THE COURT:  Okay, 1012-1 is received.

1              (Government's Exhibit 1012-1 received in evidence)

2    BY MS. COHEN:

3    Q.   Mr. Cody, if you could just explain for the jury what is

4    shown here on Government Exhibit 1012?

5    A.   It is an e-mail from myself to HSBC Bank evidencing the

6    request for a wire of $75,000 from JoRon Management to Counsel

7    Financial Services on March 29th, 2007 signed by Jordan Levy.

8    Q.   Jordan Levy above the signature says:  Okay to wire.  Is

9    that because Jordan Levy had to approve any funds leaving JoRon

10   Management?

11   A.   Correct.  He would have been signatory on the account.

12   Q.   Did Sheldon Silver send payments to JoRon Management

13   corresponding to the amount of the wires that were sent over to

14   counsel Financial?

15   A.   Yes.  That's my recollection.

16   Q.   And how did Counsel Financial get documents to Sheldon

17   Silver related to his investments in Counsel Financial?

18   A.   I believe typically via the mail.

19   Q.   If you can look, please, after this $75,000 investment, did

20   Sheldon Silver make additional investments in Counsel

21   Financial?

22   A.   Yes, he did.

23   Q.   If you can look, please, in your binder at what's been

24   marked Government Exhibit 955 and 956 for identification?  If

25   you recognize them, what are they?

FBi5sil1                    Cody - direct

A.  955 is a check cut from an account from Mr. Silver --

Sheldon Silver's account.  It is a check for $100,000 dated

June 26, 2007, signed by Mr. Silver.

Q.  And what is Government Exhibit 956?

A.  This is an additional promissory note for $100,000

evidencing the investment made from the check on Exhibit 955.

Q.  And is Government Exhibit 955 and 956 documents maintained

in the books and records of Counsel Financial?

A.  Yes.  They are.

Q.  Are Government's Exhibits 955 and 956 accurate copies of

the documents maintained in the records of Counsel Financial?

A.  Yes.

            MS. COHEN:  Your Honor, the government moves

Government Exhibit 955 and 956 into evidence.

            MR. SHUR:  No objection.

            THE COURT:  955 and 956 are received.

            (Government's Exhibits 955 and 956 received in

evidence)

BY MS. COHEN:

Q.  Mr. Coccaro, thank you.

            Is 955 and 956 additional investment of $100,000 by

Sheldon Silver into Counsel Financial?

A.  Yes.  That's correct.

Q.  And looking at the promissory note, please, Government

Exhibit 956, what is the date of this promissory note?

FBi5sil1                          Cody - direct

1    A.  June 29th, 2007.

2    Q.  And what is amount of the promissory note?

3    A.  $100,000.

4    Q.  What is the rate of interest?

5    A.  11 percent.

6    Q.  So this $100,000 is about three months after the prior one

7    of $75,000?

8    A.  Correct.  Yes.

9    Q.  If you can look at the signature page of Government Exhibit

10   956, who signed the promissory note which is Government Exhibit

11   956?

12   A.  Mr. Silver.

13   Q.  What did you know about how Mr. Silver had this $100,000 to

14   invest in Counsel Financial?

15   A.  I didn't know that.

16   Q.  Looking at government exhibits, please, in your binder for

17   identification, Government Exhibit 961 and 962.  If you

18   recognize them, what are they?

19   A.  I do.  They're additional investments.  961 is a check for

20   $125,000 dated April 11th, 2008; then Exhibit 962 is the

21   related promissory note dated April 15th, 2008 for $125,000.

22   Q.  Are what's marked Government's Exhibits 961 and 962

23   documents that are maintained in the books and records of

24   Counsel Financial?

25   A.  Yes.

FBi5sil1                        Cody - direct

1   Q.  Are Government's Exhibits for identification 961 and 962

2   accurate copies of what's maintained in the books and records

3   of Counsel Financial?

4   A.  Yes.

5          MS. COHEN:  The government moves Government's Exhibits

6   961 and 962 into evidence.

7          MR. SHUR:  No objection.

8          THE COURT:  961 and 962 are received.

9          (Government's Exhibits 961 and 962 received in

10  evidence)

11  BY MS. COHEN:

12  Q.  Mr. Coccaro, if you could pull that up?  Thank you.

13         What is Government's Exhibits 961 and 962?

14  A.  961 is a check from Mr. Silver dated April 11th, 2008 in

15  the amount of $125,000 payable to Counsel Financial services

16  signed by Mr. Silver with the notation for investment.

17  Q.  And 962, what is that?

18  A.  962 is the promissory note representing the $125,000

19  investment dated April 15th, 2008 at an interest rate of 11

20  percent.

21  Q.  And if you look at the last page of Government Exhibit 962,

22  who signed the promissory note?

23  A.  Mr. Silver.

24  Q.  What did you know about how Sheldon Silver had another

25  $125,000 in or about April 2008 to invest in Counsel Financial?

FBi5sil1                          Cody - direct

1    A.  I wasn't aware.  I was not familiar with where he got his

2    money.

3    Q.  So, from January 2007 through this promissory note we just

4    looked at, Government Exhibit 962 which is April 2008, Sheldon

5    Silver had invested about $325,000 with Counsel Financial; is

6    that right?

7    A.  That's correct.

8    Q.  If you can look, please, in your binder at what's marked

9    for identification Government Exhibit 965?  If you recognize

10   it, what is that?

11   A.  I do.  This is a statement from Counsel Financial dated

12   June 23rd, 2008 and it looks like it covers investments from

13   March of 2007 through June 23rd, 2008 and it recaps the amount

14   of investments that he has made as well as interest that would

15   have been earned.

16   Q.  Is Government Exhibit for identification 965 a document

17   maintained in the books and records of Counsel Financial?

18   A.  It is.

19   Q.  Is what's been marked Government Exhibit 965 for

20   identification a true and accurate copy of a document

21   maintained in the books and records of Counsel Financial?

22   A.  It is.

23            MS. COHEN:  Your Honor, the government moves

24   Government Exhibit 965 into evidence.

25            MR. SHUR:  No objection.

FBi5sil1                           Cody - direct

1         THE COURT:  965 is received.

2         (Government's Exhibit 965 received in evidence)

3    BY MS. COHEN:

4    Q.  Mr. Cody, is Government Exhibit 965 an account statement

5    from Counsel Financial for Sheldon Silver's account?

6    A.  It is.

7    Q.  Can you just explain for the jury what is shown here in

8    Government Exhibit 965?

9    A.  It shows from the period of March 29th, 2007 through June

10   23rd, 2008 the investments that Mr. Silver made.  It shows the

11   interest that was earned on that investment.  And then, at the

12   bottom, it shows a recap of the current balances as of June

13   23rd, 2008.

14   Q.  How much interest as of June 23rd, 2008 had Sheldon Silver

15   earned on his approximately $325,000 investment?

16   A.  Total interest earned on the statement is $24,829.21.

17   Q.  After June 2008 did Sheldon Silver make additional

18   investments in Counsel Financial?

19   A.  Yes, he did.

20   Q.  If you would look, please, in your binder, for what is

21   marked for identification Government's Exhibits 963 and 964?

22   If you recognize the documents, what are they?

23   A.  I do.  Exhibit 963 is an additional investment check in the

24   amount of $225,000 dated June 20th, 2008, payable to Counsel

25   Financial services, noted investment, signed by Mr. Silver.

FBi5sil1                        Cody - direct

1   Q.   What is Government Exhibit 964?

2   A.   Exhibit 964 was a consolidation of this investment as well

3   as all of his prior investments to this date, dated June 23rd,

4   2008, for a total of $569,504.99.  Maturity date of this is

5   June 23rd, 2011, three years later, at an interest rate of 12

6   percent.

7   Q.   Are the documents marked for identification as Government's

8   Exhibits 963 and 964 documents maintained in the regular course

9   of Counsel Financial's business?

10  A.   Yes, they are.

11  Q.   Are the documents Government Exhibit 963 and 964 true and

12  accurate copies of the documents as they are maintained in the

13  books and records of Counsel Financial?

14  A.   Yes.

15         MS. COHEN:  Your Honor, the government moves

16  Government's Exhibits 963 and 964 into evidence.

17         MR. SHUR:  No objection.

18         THE COURT:  963 and 964 are received.

19         (Government's Exhibits 963 and 964 received in

20  evidence)

21  BY MS. COHEN:

22  Q.   Mr. Cody, Government Exhibit 963, is that an additional

23  investment by Sheldon Silver on or about June 6 -- I mean June

24  20th, 2008, in the amount of $225,000?

25  A.   Yes.  That's correct.

FBi5sil1                    Cody - direct

1   Q.  And if you can explain, please, the promissory note which

2   is Government Exhibit 964, I think you mentioned it is a

3   consolidated note.  Can you explain for the jury what that is?

4   A.  Yes.  That is a consolidation of all of the prior

5   investments Mr. Silver would have made up and through June

6   23rd, 2008 inclusive of this additional check for $225,000, as

7   well as an inclusive of any and all interest that he would have

8   earned or accrued up until that point.

9   Q.  Why did Counsel Financial consolidate Sheldon Silver's

10  investments into one promissory note, Government Exhibit 964?

11  A.  We were at the point where we had multiple notes, it was

12  better to consolidate.

13  Q.  And what is the rate of interest on Sheldon Silver's

14  consolidated note Government Exhibit 964, in the amount of

15  $569,000?

16  A.  12 percent.

17  Q.  If you look at the last page, please, of Government Exhibit

18  964; who signed it?

19  A.  Mr. Silver.

20  Q.  Did there come a time when Sheldon Silver informed Counsel

21  Financial that he wanted to make an investment in the name of

22  his wife, Rosa Silver?

23  A.  Yes.

24  Q.  If you will look, please, in your binder, at what's marked

25  Government Exhibit 968 for identification?  If you recognize

1    it, what is it?

2    A.  I do.  It's a letter from Mr. Silver dated July 30th, 2010,

3    it is addressed to Mr. Ryan Kagels whose the controller for

4    Counsel Financial, stating that he would like to invest

5    $100,000, and this investment would be in the name of his wife,

6    Rosa Silver.

7    Q.  Is Government Exhibit 968 a document maintained in the

8    books and records of Counsel Financial?

9    A.  Yes, it is.

10   Q.  Is Government Exhibit 968 for identification a true and

11   accurate copy of the document as it is maintained in the books

12   and records of Counsel Financial?

13   A.  Yes.

14          MS. COHEN:  Your Honor, the government moves

15   Government Exhibit 968 into evidence.

16          MR. SHUR:  No objection.

17          THE COURT:  968 is received.

18          (Government's Exhibit 968 received in evidence)

19   BY MS. COHEN:

20   Q.  Mr. Cody, if you can just explain to the jury what is this

21   letter from Sheldon Silver to Counsel Financial?

22   A.  It is a letter from Mr. Silver requesting to make an

23   investment of $100,000 in his wife's name in Counsel Financial

24   on July 30th, or approximately thereabouts, for $100,000.

25   Q.  And after Sheldon Silver sent this letter and a check for

FBi5sil1                          Cody - direct

1   $100,000 to open an account in his wife's name, did Counsel

2   Financial open an account at Counsel Financial in the name of

3   Sheldon Silver's wife Rosa Silver?

4   A.  Yes, we did.

5   Q.  What do you know about why Sheldon Silver wanted to open an

6   account in his wife's name?

7   A.  I don't know.

8   Q.  What was the process for setting up Rosa Silver's account?

9   A.  Similar to Mr. Silver's initial account, we would probably

10  ask for a promissory note as well as a subscription agreement

11  and investor questionnaire.

12  Q.  And if you look in your binder, please, at what's marked

13  for identification Government Exhibit 970 and 969?  If you

14  recognize those documents, what are they?

15  A.  I do.  Exhibit the 970 is a subscription agreement.  It is

16  also the accompanying exhibit which is the investor

17  questionnaire for Mrs. Silver's investment in Counsel

18  Financial.

19  Q.  Are what's marked for identification Government's Exhibits

20  970 and 969 documents that are maintained in the books and

21  records of Counsel Financial?

22  A.  Yes, they are.

23  Q.  Are what's been marked for identification Government's

24  Exhibits 970 and 969 true and accurate copies of the documents

25  as they are maintained in the books and records of Counsel

FBi5sil1                          Cody - direct

1  Financial?

2  A.  Yes.

3          MS. COHEN:  Your Honor, the government moves

4  Government Exhibit 970 and 969 into evidence.

5          MR. SHUR:  No objection.

6          THE COURT:  969 and 970 are received.

7          (Government's Exhibits 969 and 970 received in

8  evidence)

9  BY MS. COHEN:

10  Q.  What is shown on 969 and 970?

11  A.  969 is the -- excuse me, 970 is the subscription agreement.

12  The subscription agreement is for Mrs. Silver's investment

13  signed by Mrs. Silver.  The exhibit is the investor

14  questionnaire also signed by Mrs. Silver representing that

15  she's accredited.

16  Q.  And did investors in Counsel Financial sometimes open up

17  accounts in the names of their spouses, partners?

18  A.  Yes.

19  Q.  If you can look, please, at -- I'm sorry.

20          What is the rate of interest on Rosa Silver's

21  promissory note, Government Exhibit 970?

22  A.  On 970 it doesn't represent interest.  On 969, which is the

23  promissory note, $100,000 dated August 11, 2010, at the

24  interest rate of 12 percent.

25  Q.  And if you can look in your binder at what's been marked

FBi5sil1                    Cody - direct

1  Government Exhibit 976, please?  If you recognize it, what is

2  it?

3  A.   976 represents all of Mr. Silver's investments up and

4  through from June 23rd, 2008 up through September 17th, 2010,

5  so it is a statement as of September 17th, 2010 representing

6  all of his investments as well as interest that he would have

7  earned on those investments over that period of time.

8  Q.   Is what's been marked Government Exhibit 976 a document

9  maintained in the books and records of Counsel Financial?

10 A.   It is.

11 Q.   Is what's been marked Government Exhibit 976 for

12 identification a true and accurate copy of a document

13 maintained in the books and records of Counsel Financial?

14 A.   Yes.

15         MS. COHEN:  Your Honor, the government moves

16 Government Exhibit 976 into evidence.

17         MR. SHUR:  No objection.

18         THE COURT:  976 is received.

19         (Government's Exhibit 976 received in evidence)

20 BY MS. COHEN:

21 Q.   Mr. Cody, what is shown here on Government Exhibit 976?

22 A.   A statement from Mr. Silver representing all of his

23 investments in Counsel Financial on September 17th, 2010 --

24 excuse me, as of September 17th, 2010 including all investment

25 activities from June 23rd, 2008.  It shows the principal

1  balances as well as interest earned during that time period.

2  Q.  And what is the principal balance on Sheldon Silver's

3  account at Counsel Financial as of September 17th, 2010?

4  A.  $743,565.93.

5  Q.  And does that amount include or exclude the $100,000

6  Sheldon Silver invested in the name of his wife Rosa Silver?

7  A.  It excludes her $100,000.

8  Q.  How much interest had Sheldon Silver's investments earned

9  at this point?

10 A.  Total interest for that period was $174,060.94.

11 Q.  If you can look, please, in your binder at what's been

12 marked Government Exhibit 964 for identification?  If you

13 recognize it, what is that?

14 A.  This is, again, a consolidated note which represents all of

15 Mr. Silver's investments including any interest he would

16 receive as of September 17th, 2010 in the total amount of

17 $743,565.93.

18 Q.  Is what's been marked for identification Government Exhibit

19 974 a document maintained in the books and records of Counsel

20 Financial?

21 A.  It is.

22 Q.  And is what's been marked Government Exhibit 974 for

23 identification a true and accurate copy of the document as it

24 is maintained in the books and records of Counsel Financial?

25 A.  It is.

FBi5sil1                          Cody - direct

1              MS. COHEN:  Your Honor, the government moves

2       Government Exhibit 974 into evidence.

3              MR. SHUR:  No objection.

4              THE COURT:  974 is received.

5              (Government's Exhibit 974 received in evidence)

6       BY MS. COHEN:

7       Q.  Mr. Cody, is this another consolidated note?

8       A.  It is, correct.

9       Q.  What does this consolidated note consolidate?

10      A.  It represents all of the investments Mr. Silver had made

11      dating back to this January of 2007 and all of his subsequent

12      investments, as well as all the interest that he would have

13      earned up and through September 17th, 2010.

14      Q.  And Government Exhibit 974, the consolidated note for

15      Sheldon Silver in the amount of $743,000, it excludes the

16      $100,000 invested in the name of Rosa Silver; is that right?

17      A.  That's correct.

18      Q.  What is the rate of interest on Sheldon Silver's

19      consolidated note for $743,000?

20      A.  12 percent.

21      Q.  If you look on the last page of Government Exhibit 974, who

22      signs this promissory note?

23      A.  On behalf of Counsel Financial, myself and Mr. Silver as

24      the investor.

25      Q.  And there is an address here that's different from the

FBi5sil1                        Cody - direct

1    prior notes of 700 Broadway; what is this address for Sheldon

2    Silver?

3    A.   That's the Weitz & Luxenberg address, the current address.

4    Q.   Did there come a time when Sheldon Silver wanted to split

5    this consolidated promissory note between himself and his wife?

6    A.   Yes.

7    Q.   How did Sheldon Silver want to split the note?  In what

8    denominations?

9    A.   He wanted to split both his wife's note as well as his

10   note.  The combined total, he wanted to split it in half.

11   Q.   Why did Sheldon Silver want to split the combined note in

12   half?

13            MR. SHUR:  Objection.

14            THE COURT:  Sustained.  Rephrase the question.

15            What did he tell you?

16            THE WITNESS:  I didn't speak to Mr. Silver.

17   BY MS. COHEN:

18   Q.   What did you learn about why Sheldon Silver wanted to split

19   the note in half?

20            MR. SHUR:  Objection.

21            THE COURT:  Sustained.

22   Q.   How did you learn that Sheldon Silver wanted to split the

23   note in half?

24            MR. SHUR:  Objection.

25            THE COURT:  Overruled.

FBi5sil1                              Cody – direct

1    A.   Mr. Levy told me.

2    Q.   Did you receive an e-mail related to splitting the note in

3    half?  Did you have e-mail correspondence with Jordan Levy

4    about splitting Sheldon Silver's note in half between himself

5    and his wife?

6    A.   I don't think I had an e-mail with Mr. Levy.

7    Q.   Is there a document that might refresh your recollection

8    about an e-mail correspondence about the splitting of the note?

9              MR. SHUR:  Objection.

10             THE COURT:  Overruled.

11   A.   Is there an e-mail?  There is an e-mail.  I don't believe

12   there was an e-mail between myself and Mr. Levy, but I do

13   recall an e-mail.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

FBIYSIL2                    Cody - Direct

1   BY MS. COHEN:

2   Q.  Well, is there an email between yourself and other

3   individuals within Counsel Financial about how to split the

4   note and why the note was going to be split between Sheldon

5   Silver and his wife?

6           MR. SHUR:  Objection.

7           THE COURT:  Overruled.

8           THE WITNESS:  Yes, there was an email.

9   BY MS. COHEN:

10  Q.  I'm going to show you what's been marked for identification

11  as Government Exhibit 977.

12          If you'll look at that and tell me if it refreshes

13  your recollection about what you knew about why Sheldon Silver

14  wanted to split the note between himself and Rosa Silver.

15          THE COURT:  Just yes or no.  Does it refresh your

16  recollection?

17          THE WITNESS:  Yes.

18  BY MS. COHEN:

19  Q.  Why did Sheldon Silver want to split the note between

20  himself and Rosa Silver?

21          MR. SHUR:  Objection.

22          THE COURT:  Sustained.

23          MS. COHEN:  Okay.  I'll move on.

24  BY MS. COHEN:

25  Q.  Why did you do with the knowledge that Sheldon Silver

FBIYSIL2                    Cody – Direct

1    wanted to split the note between himself and his wife?

2                MR. SHUR:  Objection, your Honor.  To form.

3                THE COURT:  Overruled.

4                THE WITNESS:  Can you repeat the question.

5    BY MS. COHEN:

6    Q.  What did you do as a result of Sheldon Silver's request to

7    split his note between himself and his wife?

8    A.  We honored the request.

9    Q.  How did you honor the request?

10   A.  We split the note, took the combined balance between the

11   total amount that had been invested by Mr. Silver, including

12   all interest, up until that point as well as the investment by

13   Mrs. Silver, including her interest, and we took that total,

14   and we split that into two separate notes.

15   Q.  If you can look in your binder as what's been marked for

16   identification as Government Exhibits 978 and 979.

17         If you recognize them, what are they?

18   A.  These represent the new notes.  Exhibit 978 represents a

19   note in the name of Mr. Silver in the amount of $458,453.19

20   dated May 24, 2011, in the amount of 12 percent.

21         Exhibit 979, also dated May 24, 2011, in the same

22   amount, $458,453.19, in the amount of 12 percent.  This one is

23   in the name of Rosa Silver.  Both notes were at 12 percent.

24   BY MS. COHEN:

25   Q.  Are government exhibits marked for identification 978 and

1   979 documents maintained in the regular course of Counsel

2   Financial's business?

3   A.  Yes, they are.

4   Q.  Are what's been marked for identification as Government

5   Exhibits 978 and 979 accurate copies of the documents as they

6   are maintained in the books and records of Counsel Financial?

7   A.  Yes.

8           MS. COHEN:  Your Honor, the government moves

9   Government Exhibits 978 and 979 into evidence.

10          MR. SHUR:  No objection.

11          THE COURT:  All right.  978 and 979 are received.

12          (Government's Exhibits 978 and 979 received in

13   evidence)

14  BY MS. COHEN:

15  Q.  Mr. Cody, what's shown on Government Exhibits 978 and 979?

16  A.  The two exhibits -- 978 is the note in the name of

17  Mr. Silver, Sheldon Silver, dated May 24, 2011, $458,453.19

18  with a maturity date of September 17, 2013, at an interest rate

19  of 12 percent.

20          Exhibit 979 is a note in the name of Rosa Silver in

21  the same amount, $458,453.19.  The date was May 24, 2011, also

22  at 12 percent interest rate, also with a maturity date of

23  September 17, 2013.

24  Q.  Are the amounts of $458,000 shown on the promissory notes

25  978 and 979 -- is that the total amount of both Sheldon

FBIYSIL2                    Cody - Direct

1    Silver's investment and the $100,000 that was in Rosa Silver's

2    account?

3    A.   Correct.  It's the sum of those two investments including

4    any interest accrued to that point.

5    Q.   Other than Sheldon Silver's request to split his investment

6    and the investment in the name of Rosa Silver, to combine them

7    and then split them evenly into two different notes, was there

8    any other reason Counsel Financial split the promissory notes?

9    A.   No.

10   Q.   If you look at the last page, please, of Government Exhibit

11   978.

12        Who signed Sheldon Silver promissory note dated

13   May 24, 2011, in the amount of $458,000?

14   A.   On behalf of the company, it was myself.  On behalf of

15   Mr. Silver, it was Sheldon Silver.

16   Q.   Looking at Government Exhibit 979, the promissory note in

17   the name of Rosa Silver date the May 24, 2011, in the amount of

18   $458,000, who signed that note?

19   A.   Again, on behalf of the company, it was myself.  And on

20   behalf of Mrs. Silver, it was Rosa Silver.

21   Q.   Looking at what's been marked for identification, the next

22   document in your binder, Government Exhibit 982.

23        If you recognize it, what is it?

24   A.   This is an additional statement dated May 31, 2013, in the

25   name of Sheldon Silver.  It shows all investment activity on

FBIYSIL2                          Cody - Direct

1    his note from September 17, 2010, through to the date of the

2    statement, May 31, 2013.

3    Q.   Is Government Exhibit 982 a document maintained in the

4    regular course of Counsel Financial's business?

5    A.   It is, yes.

6    Q.   Is Government Exhibit 982 for identification a true and

7    accurate copy of the document as it is maintained in the books

8    and records of Counsel Financial?

9    A.   Yes.

10   Q.   Before I ask to move that one in, if you could also look at

11   Government Exhibit 980.

12        If you recognize that, what is that?

13   A.   This is a statement representing Rosa Silver's investment

14   from August 11, 2010, the date of her initial investment,

15   through to May 31, 2013.

16   Q.   Is Government Exhibit 980 a document that's maintained in

17   the regular course of Counsel Financial's business?

18   A.   Yes.

19   Q.   Is what's been marked Government Exhibit 980 a true and

20   accurate copy of the document that is maintained in the regular

21   course of Counsel Financial's business?

22   A.   It is, yes.

23        MS. COHEN:  Your Honor, the government moves

24   Government Exhibits 982 and 980 into evidence.

25        MR. SHUR:  No objection.

FBIYSIL2                          Cody - Direct

1          THE COURT:  982 and 980 are received.

2          (Government's Exhibits 982 and 980 received in

3   evidence)

4   BY MS. COHEN:

5   Q.  Mr. Cody, are these account statements for Sheldon Silver's

6   account and Rosa Silver's account at Counsel Financial showing

7   the amount of investment as of May 31, 2013?

8   A.  Yes.  That's correct.

9   Q.  How much was Sheldon Silver's investment in Counsel

10  Financial worth as of May 31, 2013?

11  A.  $583,268.89.

12  Q.  How much of that was the principal investment, and how much

13  of that was the interest earned by virtue of being in the

14  investment?

15  A.  It's a little bit difficult to give you that exact number

16  because there is the initial investment, and then there is a

17  reduction of principal related to the transfer.

18          I don't know if I have enough on the statement to

19  determine exactly the split.

20  Q.  Is it fair to say that a --

21          THE COURT:  Hang on a second.  You need to keep your

22  voice up.  I can't even hear you here.  So I'm sure they can't

23  hear you.

24          THE WITNESS:  I'm sorry.

25  BY MS. COHEN:

FBIYSIL2                      Cody - Direct

1    Q.  Is it fair to say that a part of the $583,000 is interest

2    that was earned on the amount of the investment?

3    A.  Yes.

4    Q.  And the interest rate would have been the interest rate on

5    the promissory notes that we saw which was between 11 and 12

6    later consolidated to 12 percent?

7    A.  Correct.

8    Q.  If you look at Government Exhibit 980, is that the

9    statement of the amount of the investment's worth for the

10   account the in name of Rosa Silver?

11   A.  Yes.  That's correct.

12   Q.  What is the total amount of that investment?  The net worth

13   as of May 31, 2013.

14   A.  $583,268.89.

15   Q.  Now, you testified that some of the promissory notes that

16   Mr. Silver had were consolidated to make it -- because he had

17   too many notes, and it was easier for your business to

18   consolidate them into one note.

19   A.  Correct.

20   Q.  Did consolidating the note for the ease of Counsel

21   Financial's business have anything to do with why Counsel

22   Financial split Mr. Silver's $700-plus investment and Rosa

23   Silver's $100,000 investment, consolidated it, and then split

24   it evenly into two notes?

25              MR. SHUR:  Objection.

FBIYSIL2                           Cody - Direct

1              THE COURT:  Overruled.

2              THE WITNESS:  No.

3    BY MS. COHEN:

4    Q.  Annually, what documents did you provide to Sheldon Silver

5    related to his investments in Counsel Financial?

6    A.  I don't know off the top of my head.  I believe that he

7    receives a monthly, if not an annual, statement similar to the

8    one we're looking at here.

9              THE COURT:  Similar to -- I'm sorry.

10             THE WITNESS:  Similar to the one that's exhibit --

11   that's on Exhibit 980 -- 982 for Mr. Silver, 980 for

12   Mrs. Silver.

13             THE COURT:  Okay.

14   BY MS. COHEN:

15   Q.  Prior to testifying here today, did you review a chart that

16   summarized the amounts of Sheldon Silver's investments in

17   Counsel Financial that were held in his name and in his wife's

18   name?

19   A.  Yes, I did.

20   Q.  In reviewing that chart, did you review the government

21   exhibits that you testified about here today?

22   A.  Yes.

23   Q.  I'll have you look in your binder at the last document,

24   Government Exhibit 1061 for identification.

25             If you recognize the document, what is it?

FBIYSIL2                         Cody - Direct

1    A.   This is a summary of all of the investment activity for

2    Mr. Silver, as well as Rosa Silver, from the initial investment

3    in 2007 through the end of 2014, December 31, 2014,

4    representing all of his investments, some cash that was repaid,

5    all accrued interest during that approximately eight-year

6    period, as well as the transfer which gets you down to the

7    exact balances for Mr. Silver and Mrs. Silver as of

8    December 31, 2014.

9              MS. COHEN:  Your Honor, the government moves

10   Government Exhibit 1061 into evidence.

11             MR. SHUR:  No objection.

12             THE COURT:  1061 is received.

13             (Government's Exhibit 1061 received in evidence)

14   BY MS. COHEN:

15   Q.   Mr. Cody, if you could just walk the jury through the chart

16   to explain it.

17   A.   Sure.  The cash invested by Mr. Silver and Rosa Silver from

18   inception was $650,000.  There was a small amount,

19   comparatively, of cash repaid of $8,357.66.

20             Beginning in 2007 through 12-31-2014, there is

21   approximately $7676,6 2 -- not approximately.  Exactly.

22   $767,662.40 earned in interest over that eight-year period.

23             And then the last item shows the transfer from

24   Mr. Silver's account to Mrs. Silver's account in the amount of

25   $348,609.94.

1              So as of December 31, 2014, Mr. Silver had

2    $704,652.37.  Mrs. Silver had the same amount for a total of

3    $1,409,304.74 as of December 31, 2014.

4    Q.  Government Exhibit 1061 shows that the amount of interest

5    earned on the investment was more than double the amount of the

6    investment?

7    A.  It was more than the amount of the investment.  Correct.

8              THE COURT:  It wasn't more than double the amount of

9    the investment.

10             MS. COHEN:  I'm sorry.  I misspoke, your Honor.

11   BY MS. COHEN:

12   Q.  Government Exhibit 1061 -- it shows that the total balance

13   of Sheldon Silver's investment in Counsel Financial, combined

14   with the money in the name of Rosa Silver -- the total is

15   $1.4 million.

16   A.  Correct.

17             MS. COHEN:  Nothing further, your Honor.

18             THE COURT:  Okay.

19             How long is your cross going to be?

20             MR. SHUR:  Maybe a half hour, Judge.

21             THE COURT:  Why don't we go ahead and take our morning

22   break.  We'll take a ten-minute break.

23             (Jury not present)

24             (Witness temporarily excused)

25             THE COURT:  Okay.  So, if he's got a half an hour and

1    then we're going to roll into Mr. Levy -- is that correct?

2              MS. COHEN:  Correct, your Honor.

3              THE COURT:  What's the issue on Mr. Levy?

4              MR. SHUR:  I'm happy to start, Judge.

5              THE COURT:  Did you hand me the questions?

6              MR. SHUR:  I didn't get any document.  Ms. Cohen just

7    told me this morning basically what she intended to ask.  My

8    understanding -- although she can correct me if I'm wrong -- is

9    that she plans to elicit from Mr. Levy that he sat as the chair

10   of a state board.

11             He was appointed by the governor, not by Mr. Silver,

12   to this board that had proposals or a proposal that, after

13   presumably being approved by different agencies, went up to the

14   PACB; that Mr. Levy discussed the proposal with Mr. Silver;

15   that Mr. Levy asked Mr. Silver to vote for it; and that

16   Mr. Silver said he would.

17             Now, Judge, just to sort of take a step back for a

18   moment, the government called a witness from the PACB who

19   testified about the operation and Mr. Silver's involvement.  He

20   was a member.  He had voting rights, etc.

21             They could have certainly -- my understanding from

22   your Honor's comment from yesterday evening is that any of this

23   testimony about the PACB is only relevant to the extent it

24   relates to the Glenwood 80/20 loans and Mr. Silver's

25   involvement in that since that's actually part of the alleged

FBIYSIL2                          Cody - Direct

1    crimes.

2            The government could have called a witness from the

3    PACB who wasn't involved in Mr. Silver's involvement in voting

4    on those particular loans, meaning they could have called Steve

5    Pleydle.  I know they interviewed them.  They could have called

6    Philip Fields.  They interviewed him as well.

7            Those two individuals were Mr. Silver's proxy on those

8    particular votes.  Whether or not they had discussions with

9    Mr. Silver about that, they could have elicited that testimony.

10           THE COURT:  Which particular votes?

11           MR. SHUR:  The 80/20 loans relating to Glenwood.

12   Those are actually percipient fact witnesses about those

13   particular proposals that are relevant to the indictment.

14           What Ms. Cohen wants to introduce through Mr. Levy

15   doesn't add any additional information, relevant information,

16   about Mr. Silver's role with respect to the PACB or, more

17   importantly, Mr. Silver's role with respect to the 80/20 loans

18   that were reviewed by the PACB that are relevant to the

19   indictment.

20           The only relevance -- it's not even relevant.  The

21   only significance -- and my guess as to why the government

22   wants to elicit this testimony -- is it's impermissible 404(b)

23   evidence.

24           Meaning that at the time Mr. Levy was inviting

25   Mr. Silver to make these investments with investment vehicles

1   that he was involved in, he asked Mr. Silver to vote for a

2   project that he was involved in on the PACB, which was not

3   noticed 404(b) and is impermissible.

4           THE COURT:  Okay.

5           MS. COHEN:  Your Honor, what the government would like

6   to elicit from Jordan Levy is not 404(b) evidence.  It is

7   simply evidence that Mr. Silver was aware of the PACB and knew

8   that it was his vote and that he could pull it.  He could vote

9   no.  He could be supportive.

10          It's very limited evidence, your Honor.  It does not

11  relate to the 80/20 programs.  It's to the broader issue that

12  the defense spent a lot of time on cross trying to mislead the

13  jury that Sheldon Silver had nothing to do basically with the

14  PACB.  He was in name only and that he sent his proxy and he

15  didn't attend the meetings.

16          This evidence would tend to disprove that.  It is

17  relevant.  We are doing it in a very limited fashion.  We are

18  not linking it to the 80/20.

19          We are not linking it to Jordan Levy's giving Sheldon

20  Silver access to the investments.  We are doing it in a very

21  limited way for a very limited purpose, which is to rebut the

22  cross of Darby Putnam.

23          It was noticed.  The defense has been on notice about

24  this.  It was the subject of notice to dismiss the superseding

25  indictment.

FBIYSIL2                    Cody - Direct

1          THE COURT:  It's in the indictment.

2          MR. SHUR:  Judge, in addition to the fact -- we

3    discussed yesterday that the fact that it's in the indictment

4    doesn't necessarily bless it as non-noticed 404(b).

5          Setting that aside, it's completely cumulative of the

6    testimony we heard from Ms. Putnam in terms of what

7    Mr. Silver's role is on the PACB.

8          He's a member --

9          THE COURT:  I don't think so.

10          MR. SHUR:  He's a member, and he's a proxy.  He's a

11    member and has the ability to vote up or down.  That is the

12    simple fact.

13          THE COURT:  The clear implication of the

14    cross-examination was that he's a member in name only and

15    really has nothing to do with it.

16          Presuming that that were true, you would have expected

17    his response to Mr. Levy to be, I don't have anything to do

18    with the PACB.  My minions handle that.

19          MR. SHUR:  Judge, if the question is -- this really is

20    the only relevant question to the charges -- is whether

21    Mr. Silver played some personal role in voting on the 80/20

22    loans versus just having someone that had complete discretion

23    vote on those loans without him even knowing about it, well,

24    then Steve Pleydle and Philip Fields are the witnesses who have

25    personal knowledge of those facts.

1          THE COURT:  I disagree that that's the issue.

2          MR. SHUR:  Mr. Runes, the lobbyist --

3          THE COURT:  He doesn't have to -- I disagree with the

4    notion that he had to have had a personal role in voting on the

5    80/20 loans or the whole PACB is irrelevant.

6          MR. SHUR:  I understand, Judge.

7          THE COURT:  That's what you said.

8          MR. SHUR:  Mr. Runes, who was the Glenwood lobbyist,

9    testified that he never lobbied the PACB and that Mr. Silver

10   did not intervene with respect to the 80/20 loans.  That was

11   his testimony.

12         Now, I understand the government -- their theory is,

13   well, one of the reasons that Glenwood did not cut off the

14   relationship with Golberg & Iryami is this speculation, this

15   possibility, that Mr. Silver is going to vote no or take it off

16   the agenda.

17         THE COURT:  Retaliate.

18         MR. SHUR:  Retaliate, even though there was no

19   evidence that they were concerned that he was going to somehow

20   intervene with the PACB.

21         To make that argument, if that's their theory, the

22   only relevant facts are that he has the ability to do that, and

23   that's in the record.

24         This testimony -- in terms of the probative value of

25   this testimony versus the unfair prejudice, which is

1    essentially suggesting to the jury that there was some type of

2    improper relationship between Mr. Levy and Mr. Silver in

3    connection with his official position -- that's not charged

4    anywhere in the indictment, and that's not noticed 404(b).

5              THE COURT:  Why can't that be dealt with with a

6    limiting instruction?

7              MR. SHUR:  Judge, I do not think a limiting

8    instruction comes even near curing the unfair prejudice that

9    that testimony would have.

10             Given the limiting -- it's cumulative.  It really has

11   no probative value.  Mr. Levy -- well --

12             THE COURT:  I disagree.  I think it can be dealt with

13   with a limiting instruction.  I would like to see what the

14   questions are.

15             MS. COHEN:  Sure, your Honor.

16             THE COURT:  I realize that you probably don't have it

17   right now.

18             MR. SHUR:  Judge, one other thing.  Given the nature

19   of Mr. Levy's grand jury testimony in terms of -- he seems to

20   be very verbose.  I've never met the man.

21             THE COURT:  Neither have I.

22             MR. SHUR:  I would ask that the government explain to

23   him your Honor's ruling about other matters that they've asked

24   him about.  I don't want him to be blurting things out to the

25   jury, even though Ms. Cohen hasn't asked the specific questions

FBIYSIL2                         Cody - Direct

1    of him.

2              MS. COHEN:  I think, your Honor, respectfully, I ask

3    very specific questions.

4              THE COURT:  Questions that are so specific they object

5    that you're leading.

6              MR. SHUR:  That's not the point.  I'm not worried

7    about the questions.  I'm worried about him just voluntarily --

8    I want to make sure he's aware of the Court's ruling.

9              THE COURT:  Particularly as to the PACB matters, can

10   you please make sure that he understands that it's contained

11   testimony, to the extent, not having met the man, but he is

12   preferable on that score.

13             MS. COHEN:  Your Honor, I will tell him.  I will write

14   out the questions.

15             THE COURT:  Okay.  Thank you.

16             MS. COHEN:  You're welcome.

17             THE COURT:  You have about five minutes left.

18             MR. MASTER:  Your Honor, I think we'll need a little

19   more time to write out the questions.

20             MS. COHEN:  Your Honor, I don't have to write out the

21   prefatory questions about what board did you sit on and who was

22   appointed.  It's just the critical two questions.

23             THE COURT:  Yes.

24             MS. COHEN:  Thank you, your Honor.

25             (Recess)

FBIYSIL2                        Cody - Cross

1           THE COURT:  Have you shown that to Mr. Shur?

2           MS. COHEN:  Your Honor, I have shown two proposed

3    questions to Mr. Shur, and he's agreed that they are fine.

4    I'll pass them up, assuming you can read my handwriting.

5           THE COURT:  I'll do the best I can.

6           MR. SHUR:  To be clear, Judge --

7           THE COURT:  Subject to the objection.

8           MR. SHUR:  Yes.

9           THE COURT:  Yes.  Of course.

10          (Jury present)

11          THE COURT:  Mr. Cody, you're still under oath.

12          Mr. Shur.

13          MR. SHUR:  Thank you, Judge.

14   CROSS-EXAMINATION

15   BY MR. SHUR:

16   Q.  Mr. Cody, good morning.

17   A.  Good morning.

18   Q.  My name is Justin Shur.  I, along with my colleagues,

19   represent Sheldon Silver.

20          We have never met before; right?

21   A.  Correct.

22   Q.  Mr. Cody, you're the president of Counsel Financial; is

23   that right?

24   A.  That's correct.

25   Q.  And Counsel Financial is a commercial lender?

FBIYSIL2                        Cody - Cross

1    A.  Correct.

2    Q.  It offers loans and lines of credit?

3    A.  Correct.

4    Q.  And it offers these products to law firms; is that right?

5    A.  That's correct.

6    Q.  And Counsel Financial offers these products exclusively to

7    plaintiffs' lawyers?

8    A.  Correct.

9    Q.  And these plaintiffs' lawyers represent individuals who

10   have been injured; right?

11   A.  That's correct.

12   Q.  The loans provided by Counsel Financial help these

13   individuals; right?

14   A.  Yes.  They help the law firms, which, in turn, can help the

15   individuals.  Correct.

16   Q.  They help the law firms obtain the necessary resources so

17   they can help win the cases for their clients.

18   A.  Correct.

19   Q.  The loans provided by Counsel Financial help the lawyers,

20   for example, pay for medical reports?

21   A.  Correct.

22   Q.  And the loans provided by Counsel Financial help lawyers

23   pay for expert witnesses?

24   A.  Correct.

25   Q.  All of these things cost money; right?

FBIYSIL2                         Cody - Cross

1   A.  Yes.

2   Q.  Money that the individual clients who have been injured may

3   not have; right?

4               MS. COHEN:  Objection.

5               THE COURT:  Sustained.

6   BY MR. SHUR:

7   Q.  The lawsuits that the law firms are bringing that Counsel

8   Financial is loaning money to the law firms for -- they're

9   suing major corporations; right?

10  A.  Typically.  The defendants can be large or small.

11  Q.  Let's talk about the larger corporations.

12              Oftentimes those corporations have limitless funds to

13  litigate these cases; is that right?

14              MS. COHEN:  Objection, your Honor.

15              THE COURT:  Sustained.

16  BY MR. SHUR:

17  Q.  Would you say that Counsel Financial loans provided to

18  these law firms help level the playing field?

19              MS. COHEN:  Objection, your Honor.

20              THE COURT:  Sustained.

21              Can I see you at sidebar, please.

22              (At the sidebar)

23              THE COURT:  You can establish that that they finance

24  lawsuits, but tugging at jurors' heartstrings about uneven

25  playing fields -- why is that relevant?

FBIYSIL2                    Cody - Cross

 1                MR. SHUR:  Because it's a worthy investment.  I think
 2       that's why it's relevant.
 3                THE COURT:  There are huge issues about financing
 4       lawsuits that I don't want to get into.  It's not what this
 5       case is all about.  You say it's worthy.  There are lots of
 6       issues associated with this --
 7                MR. SHUR:  I understand, Judge.
 8                THE COURT:  We're not going there.
 9                MR. SHUR:  I'm move on.
10                THE COURT:  Thank you.
11                (In open court)
12       BY MR. SHUR:
13       Q.  Mr. Cody, Counsel Financial is one of the leading law firm
14       financing companies in the country; is that right?
15       A.  That's correct.
16       Q.  Since it was founded, Counsel Financial has provided more
17       than $500,000,000 in credit lines to attorneys; is that
18       correct?
19       A.  That's correct.
20       Q.  And Counsel Financial has received numerous endorsements
21       for its work; right?
22       A.  Correct.
23       Q.  It's been endorsed by the American Association for Justice;
24       right?
25                MS. COHEN:  Objection, your Honor.

FBIYSIL2                           Cody - Cross

 1              THE COURT:  Sustained.

 2   BY MR. SHUR:

 3   Q.  Mr. Cody, the prosecutor on direct examination asked you if

 4   Counsel Financial is regulated.

 5              Do you recall that?

 6   A.  I do.

 7   Q.  It's not an investment adviser; right?

 8   A.  Correct.

 9   Q.  It's not regulated by the Securities and Exchange

10   Commission?

11   A.  That's correct.

12   Q.  But it's a commercial lender; right?

13   A.  Correct.

14   Q.  And there are rules and regulations and laws that apply to

15   commercial lenders; right?

16   A.  That's correct.

17   Q.  That Counsel Financial has to comply with; right?

18   A.  Yes.

19   Q.  Does Counsel Financial employ individuals who one of their

20   responsibilities is to ensure compliance with those laws?

21   A.  Yes.

22   Q.  And you're a CPA; right?

23   A.  I am.

24   Q.  Is Counsel Financial -- is it audited?

25   A.  We are.

FBIYSIL2                          Cody - Cross

1    Q.  Internally?

2    A.  We are audited by the bank, our senior lender, every

3    quarter.  And we are audited annually by a public accounting

4    firm.

5    Q.  So this is an outside accounting firm?

6    A.  Correct.

7    Q.  That conducts an audit of Counsel Financial's books and

8    records?

9    A.  That's correct.

10   Q.  Which firm is that?

11   A.  They're called Freed Maxick.

12   Q.  It's a reputable accounting firm; correct?

13   A.  Yes.  It's a large accounting firm in western New York.

14   Q.  Mr. Cody, I believe you mentioned on direct examination

15   that many of the investors in Counsel Financial are friends and

16   family members of other investors.

17          Is that right?

18   A.  Correct.

19   Q.  But there are also investors who have no relation to

20   existing investors; right?

21   A.  Yes.  That's correct.

22   Q.  Who seek Counsel Financial out; right?

23   A.  Yes.

24   Q.  Because Counsel Financial is not a hidden secret, is it?

25   A.  Not in our industry.

FBIYSIL2                        Cody - Cross

1   Q.  Well, you have physical offices; correct?

2   A.  Correct.

3   Q.  They're located in Williamsville, New York, is that right?

4   A.  That is correct.

5   Q.  That's near Buffalo?

6   A.  It's a suburb of Buffalo.

7   Q.  And Counsel Financial is listed in the Buffalo's local

8   business directory?

9   A.  Yes.

10  Q.  It also has a significant presence on the Internet; right?

11  A.  Correct.

12  Q.  There's a website for Counsel Financial; right?

13  A.  There is.

14  Q.  And Counsel Financial is on Linkedin?

15  A.  Yes.

16  Q.  What about Twitter?

17  A.  Yes.

18  Q.  Facebook?

19  A.  Yes.

20  Q.  There's a Counsel Financial blog; right?

21  A.  Correct.

22  Q.  I believe you mentioned that Jordan Levy is an investor in

23  Counsel Financial.  Is that right?

24  A.  Yes, he is.

25  Q.  I believe you testified that Mr. Levy had introduced

FBIYSIL2                          Cody - Cross

1    Mr. Silver to Counsel Financial; right?

2    A.  Correct.

3    Q.  At the time though that Mr. Silver invested, first

4    invested, in Counsel Financial, you were actually not employed

5    by Counsel Financial.

6             Is that right?

7    A.  That is correct.

8    Q.  You understand that Mr. Levy -- you worked with Mr. Levy;

9    right?

10   A.  I did.

11   Q.  And you understood that Mr. Levy and Mr. Silver were

12   friends; right?

13   A.  Yes.

14   Q.  And it wasn't unusual, in your experience, for Mr. Levy to

15   recommend a friend to Counsel Financial; right?

16   A.  Correct.

17   Q.  Mr. Levy knows a lot of people?

18             MS. COHEN:  Objection, your Honor.

19             THE COURT:  Sustained.

20   BY MR. SHUR:

21   Q.  You worked in the same company as Mr. Levy; right?

22   A.  I did.

23   Q.  You spent a lot of time with him?

24   A.  I did.

25   Q.  He's a big networker; right?

FBIYSIL2                          Cody - Cross

 1          MS. COHEN:  Objection, your Honor.

 2          THE COURT:  Sustained.

 3   BY MR. SHUR:

 4   Q.  In addition to Mr. Silver, Mr. Levy brought in many other

 5   investors to Counsel Financial; right?

 6   A.  He did.

 7   Q.  Approximately how many would you say?

 8   A.  Twenty.

 9   Q.  Twenty investors who were friends?  Yes?

10   A.  Friends or business associates of his.

11   Q.  Okay.

12   A.  That was an approximation obviously.

13   Q.  Of course.  Approximately 20.

14   A.  Yes.  Approximately 20.

15   Q.  I just want to clarify something.  I think you mentioned on

16   direct examination that there was a former mayor of Buffalo

17   that invested in Counsel Financial.

18   A.  I said there was a former politician.  Correct.

19   Q.  Do you know whether he was the mayor of Buffalo?

20   A.  He was prior.  Correct.

21   Q.  This was a friend of Mr. Levy's?

22   A.  Yes.

23   Q.  Mr. Levy introduced him to Counsel Financial?

24   A.  Yes.

25   Q.  He was also a former New York State senator?

FBIYSIL2                          Cody - Cross

1    A.   I don't know that.

2    Q.   The money that the former mayor invested in Counsel

3    Financial wasn't his personal money; right?

4    A.   I believe it was a fund, a campaign fund.

5    Q.   It was his campaign funds?

6    A.   I believe.

7    Q.   So these were funds that the mayor had raised from donors

8    and contributors when he was in public office?

9             MS. COHEN:   Objection.

10            THE COURT:   Overruled.

11            THE WITNESS:   I assume.  I don't know the origination

12   of it.

13   BY MR. SHUR:

14   Q.   But they came from a campaign fund account?

15   A.   I believe so.  Correct.

16   Q.   And Counsel Financial helped him invest this money?

17   A.   Helped him invest -- he made an investment.  The fund made

18   an investment.

19   Q.   Into Counsel Financial.

20   A.   Correct.

21   Q.   There's nothing improper about that; right?

22            MS. COHEN:   Objection, your Honor.

23            THE COURT:   Sustained.

24   BY MR. SHUR:

25   Q.   You mentioned that Mr. Silver and Mr. Levy were friends.

FBIYSIL2                          Cody - Cross

1           Mr. Silver was also friends with other investors at

2    Counsel Financial; right?

3    A.  I'm sure.  I don't know his network.

4    Q.  Well, let me ask a more pointed question.

5           THE COURT:  You said you're sure.  Are you just

6    agreeing with him?

7           THE WITNESS:  Other investors included some of the

8    owners which he had worked with.

9           THE COURT:  Okay.

10          THE WITNESS:  So I assume they were friends as well.

11   BY MR. SHUR:

12   Q.  Let me ask you about that.  Perry Weitz of Weitz &

13   Luxenberg is actually the chairman of Counsel Financial.

14   Right?

15   A.  That is correct.

16   Q.  And Arthur Luxenberg, the Luxenberg of Weitz & Luxenberg,

17   is the vice-chairman; is that correct?

18   A.  That is correct.

19   Q.  And you understood that Mr. Silver was a lawyer at Weitz &

20   Luxenberg; right?

21   A.  I did.

22   Q.  And that he was friends with Perry Weitz?

23   A.  I did.

24   Q.  And friends with Arthur Luxenberg?

25   A.  Yes.

FBIYSIL2                        Cody - Cross

1   Q.  And Mr. Silver wasn't the only other Weitz & Luxenberg

2   lawyer who invested in Counsel Financial; right?

3   A.  That's correct.

4   Q.  Charles Ferguson invested in Counsel Financial; right?

5   A.  Yes, he did.

6   Q.  He's an attorney with Weitz & Luxenberg?

7   A.  Yes, he is.

8   Q.  And there were other Weitz & Luxenberg lawyers that

9   invested?

10  A.  I think so.  Yes.

11  Q.  Is it fair to say that Perry Weitz, being the chairman of

12  Counsel Financial, was an important investor in the company?

13  A.  Yes.

14          MS. COHEN:  Objection, your Honor.

15          THE COURT:  Overruled.

16  BY MR. SHUR:

17  Q.  The prosecutor showed you a few promissory notes.

18          Do you remember that?

19  A.  I do.

20  Q.  Can you tell us, sort of in plain English, what that is, a

21  promissory note, as it applies here.

22  A.  It's the agreement that represents an investor making an

23  investment and our obligation to pay the investment plus

24  interest.

25  Q.  I noticed on the note it says "subordinated promissory

FBIYSIL2                      Cody - Cross

1    note".

2              What does that mean?

3    A.  It means that it's subordinated to our bank.  So, in the

4    event that something were to go wrong or there's a default, our

5    bank, the senior lender, is repaid first.  They have a priority

6    of repayment over the subordinated investors.

7    Q.  So the bank gets paid first before the investor.

8    A.  That's correct.

9    Q.  So is it fair to say that there's some risk to the

10   investment?

11   A.  Yes.

12   Q.  And this risk applied to Mr. Silver's investment just like

13   it applied to every other investor?

14   A.  Yes.  It would be the same.

15   Q.  So if there was a loss to Mr. Silver's account based on the

16   investment, Mr. Silver would incur that loss; right?

17   A.  Correct.

18   Q.  I want to ask you about the term "accredited investor."

19             In particular, there was an investor questionnaire

20   that we looked at.

21             Do you remember that?

22   A.  I do.

23   Q.  It's asking questions about who the investor is and their

24   net worth and their income.

25             Right?

FBIYSIL2                          Cody – Cross

1    A.   Yes.

2    Q.   One of the reasons that Counsel Financial has investors

3    complete this document is I think you mentioned Counsel

4    Financial is a somewhat complex investment.

5              Right?

6    A.   Correct.

7    Q.   And you want to sort of gauge the sophistication level of

8    the investor.

9    A.   That they understand what they're doing.

10   Q.   You want to make sure that -- I didn't mean to cut you off,

11   sir.

12             THE COURT:   Please let him finish the answer.

13             THE WITNESS:   Just that they understand the investment

14   and that they are capable of understanding and making the

15   investment.

16   BY MR. SHUR:

17   Q.   You want to make sure the investor understands the risks

18   and the rewards.

19   A.   Correct.

20   Q.   That's in the investor's best interests; right?

21   A.   It is.

22   Q.   And it's also in Counsel Financial's best interests; right?

23   A.   It is.

24   Q.   And that document is the same document that all other

25   investors in Counsel Financial complete; is that right?

1   A.  That's correct.

2   Q.  And based on the responses provided in Mr. Silver's

3   questionnaire, Counsel Financial determined that he was an

4   accredited investor.

5   A.  Correct.

6   Q.  And, if Counsel Financial determined he was not an

7   accredited investor, he would not have been permitted to

8   invest.

9           Is that fair?

10  A.  That's correct.

11  Q.  The prosecutor asked you if you knew the source of

12  Mr. Silver's money that was invested in Counsel Financial.  And

13  I believe you said you didn't know.  Right?

14  A.  Correct.

15  Q.  To be clear, when Mr. Silver first invested, you didn't

16  work at Counsel Financial; right?

17  A.  Correct.

18  Q.  Mr. Silver never said to you, Mr. Cody, I refuse to tell

19  you where my money comes from, did he?

20  A.  He did not.  I don't know -- I don't recall ever speaking

21  with Mr. Silver.

22  Q.  So you've never had a conversation with Mr. Silver?

23  A.  I don't believe so.

24  Q.  Have you ever met him?

25  A.  I saw him across the room at one point.

FBIYSIL2                          Cody - Cross

1   Q.  You didn't scream across the room, where do you get your

2   money from?

3            MS. COHEN:  Objection, your Honor.

4            THE COURT:  Overruled.

5            THE WITNESS:  I did not.

6   BY MR. SHUR:

7   Q.  You didn't do that?

8   A.  I didn't ask him.

9   Q.  Is it fair to say it wasn't unusual for you not to ask

10  investors where their money came from?

11  A.  Correct.

12  Q.  So you didn't ask investors on a routine basis for their

13  paystubs?

14  A.  I did not.

15  Q.  But you did determine whether or not all of your investors,

16  including Mr. Silver, are accredited investors; right?

17  A.  Correct.

18  Q.  While you didn't have any conversations with Mr. Silver

19  about the source of his funds or anything else for that matter,

20  you did know that he was an attorney at Weitz & Luxenberg;

21  right?

22  A.  I did.

23  Q.  And you did know that Weitz & Luxenberg is a successful law

24  firm; right?

25  A.  Correct.

FBIYSIL2                    Cody - Cross

1   Q.  One of the reasons you knew that was because the chair and
2   the vice-chair of Counsel Financial are the two principals of
3   Weitz & Luxenberg; right?
4   A.  Yes.
5   Q.  The way Mr. Silver made his investment in Counsel Financial
6   was by check; right?  In certain instances.
7   A.  In certain instances, yes.  The first couple were via wire,
8   and then it was via check.
9   Q.  He didn't drop a bag of cash off at your office, did he?
10  A.  He did not.
11  Q.  So I'd like to take a look at some of the checks.  Why
12  don't we start with Government Exhibit 961.
13          MR. SHUR:  If we could publish that to the jury,
14  please.  If we could blow up the check itself.
15  BY MR. SHUR:
16  Q.  Mr. Cody, is this one of the checks that Mr. Silver
17  tendered to Counsel Financial to make an investment?
18  A.  It is.
19  Q.  It's a check from HSBC; right?
20  A.  Correct.
21  Q.  And it's paid to the order of Counsel Financial Services;
22  right?
23  A.  Yes.
24  Q.  And in the "For" line, it says "Investment;" right?
25  A.  Correct.

FBIYSIL2                        Cody - Cross

1   Q.  In fact, it was being used to make an investment; right?

2   A.  Yes.

3   Q.  It's from a business checking account; right?

4           MS. COHEN:  Objection, your Honor.

5           THE COURT:  Sustained.

6   BY MR. SHUR:

7   Q.  Well, on the face of the check, it says it's coming from an

8   account of Sheldon Silver, attorney at law.

9           Do you see that?

10  A.  I do.

11  Q.  Is there any reason to doubt that that's the check or the

12  account it came from?

13  A.  I have no reason to doubt it.

14          (Pause)

15  BY MR. SHUR:

16  Q.  And the address there, 180 Maiden Lane -- do you recognize

17  that address?

18  A.  Yes.  I believe it's the former Weitz & Luxenberg office.

19          MR. SHUR:  Let's take a look at Government Exhibit

20  955, please.

21  BY MR. SHUR:

22  Q.  This is another check that was provided to Counsel

23  Financial by Mr. Silver; right?

24  A.  Yes.

25  Q.  In order to make an investment; correct?

FBIYSIL2                          Cody - Cross

1    A.  Correct.

2    Q.  And, again, it's from an HSBC bank account; right?

3    A.  Yes.

4    Q.  And on the "Subject" line, it clearly says, "Investment;"

5    right?

6    A.  Yes.

7    Q.  That's what the money was being used for; correct?

8    A.  Yes.  For the promissory note.

9    Q.  It's paid to the order of Counsel Financial Services;

10   right?

11   A.  Yes.

12   Q.  That's where the money was being invested?

13   A.  Yes.

14   Q.  And it's from, again, Sheldon Silver, attorney at law;

15   right?

16   A.  Yes.

17   Q.  And then we see Weitz & Luxenberg's business office

18   address; correct?

19   A.  Correct.

20   Q.  Did you receive this check?

21   A.  Me personally, no.  I would think it would have come to my

22   office, our office.

23   Q.  Okay.

24   A.  I'm sorry.  This is in 2007.  So this was before I was at

25   Counsel Financial.

FBIYSIL2                         Cody - Cross

1   Q.  When did you join Counsel Financial?

2   A.  February of 2008.

3           MR. SHUR:  Let's take a look at Government Exhibit

4   963.

5   BY MR. SHUR:

6   Q.  Mr. Cody, this is another check that Mr. Silver provided to

7   Counsel Financial to make in investment; correct?

8   A.  Correct.

9   Q.  And, again, in the "For" line it says "Investment."  Right?

10  A.  Yes.

11  Q.  And it's made out to Counsel Financial Services; correct?

12  A.  Correct.

13  Q.  From the Sheldon Silver, attorney at law account; correct?

14  A.  Correct.

15  Q.  It has the Weitz & Luxenberg business address there; right?

16  A.  It does.

17  Q.  You were at Counsel Financial at this time; correct?

18  A.  Yes, I was.

19  Q.  Was there any confusion about where there money was coming

20  from when you received the check?

21          MS. COHEN:  Objection, your Honor.

22          THE COURT:  I don't understand the question.

23          MR. SHUR:  Sure.

24  BY MR. SHUR:

25  Q.  When you got this check, were you confused about what to do

1    with it?

2    A.  I don't know that I would have received it myself, but no.

3    It was clearly for an investment.

4    Q.  It was clearly for an investment?

5    A.  A promissory note.

6    Q.  It's clearly to Counsel Financial Services; right?

7    A.  Yes.

8    Q.  It's clearly from Sheldon Silver, attorney at law; right?

9    A.  Yes.

10             MS. COHEN:  Objection, your Honor.

11             THE COURT:  Overruled.

12   BY MR. SHUR:

13   Q.  To your knowledge, did anyone reach out to Mr. Silver and

14   say, I don't understand why we're getting this check and where

15   the money is coming from?

16   A.  No, not to my knowledge.

17             MR. SHUR:  One more exhibit, Government Exhibit 916,

18   please.

19             Mr. Coccaro, can we publish it to the jury, please.

20   If we could blow up just the bottom check.  Thank you.

21   BY MR. SHUR:

22   Q.  Mr. Cody, this is another check that was provided to

23   Counsel Financial for an investment; right?

24   A.  Yes.

25   Q.  It's from the Sheldon Silver, attorney at law account, at

1   least according to the face of the check.

2            Right?

3   A.  Correct.

4   Q.  You see that the address is crossed out there?

5   A.  I do.

6   Q.  You understood that Weitz & Luxenberg moved their offices;

7   right?

8   A.  Yes.

9   Q.  From Maiden Lane to Broadway?

10  A.  Correct.

11  Q.  It was around this time period.  Do you recall?

12  A.  I don't recall the specific time they moved, but it was

13  around that time frame, yes.

14  Q.  Made to Counsel Financial Holdings; correct?

15  A.  Correct.

16  Q.  In the "For" line, it says, "New account in the name of:

17  Rosa Silver;" right?

18  A.  Correct.

19  Q.  This was the money that was being provided to Counsel

20  Financial to invest for Mr. Silver's wife.

21  A.  Correct.

22  Q.  Again, did anyone, to your knowledge, follow up with

23  Mr. Silver because they weren't sure what to do with this

24  check?

25  A.  No.  We would have followed up with documentation for the

1    investment.

2    Q.  But is it fair to say it's pretty clear from the check, a

3    new account in the name of Rosa Silver, what the money was to

4    be used for.  Right?

5    A.  Yes.  And there was an accompanying letter.

6              MR. SHUR:  Why don't we take a look at that letter.

7    It's right behind this pop-out.

8    BY MR. SHUR:

9    Q.  The letter is from Mr. Silver; correct?

10   A.  Correct.

11   Q.  It's to Ryan Kagels; correct?

12   A.  Yes.

13   Q.  He's the comptroller of Counsel Financial?

14   A.  He's the controller.  Yes.  He's the controller.  It's a

15   technically incorrect name, but yes.

16   Q.  The "Re" line says "New account for Rosa Silver;" right?

17   A.  It does.

18   Q.  The body of the letter says, "As per our discussion,

19   enclosed please find my check," and then it says, "to be

20   deposited into any wife's new account with Counsel Financial

21   Holdings;" right?

22   A.  Yes.

23   Q.  It says, "As always, many thanks for your continued

24   courtesy and cooperation.  Very truly yours, Sheldon Silver."

25            Right?

FBIYSIL2                        Cody - Cross

1    A.  Yes.

2    Q.  And it has an enclosed?

3    A.  Yes.

4    Q.  And the check was enclosed; right?

5    A.  Yes.

6    Q.  It wasn't unusual for investors at Counsel Financial to

7    have family members invest in Counsel Financial as well; right?

8    A.  That's correct.

9    Q.  In fact, Jordy Levy's family members had invested in

10   Counsel Financial; right?

11   A.  Correct.

12   Q.  His son was an investor?

13   A.  Yes.  I believe so.

14   Q.  His mother-in-law was an investor?

15   A.  Correct.

16   Q.  I believe the prosecutor asked you what you knew about why

17   Mr. Silver opened an investment for his wife.

18           Do you remember that question?

19   A.  I do.

20   Q.  And you said you didn't know anything; right?

21   A.  Correct.

22   Q.  Because you never had a conversation with Mr. Silver;

23   correct?

24   A.  Correct.

25   Q.  When people, existing investors, open investments for their

FBIYSIL2                        Cody - Cross

1   family members, their loved ones, do you ask them why they're

2   doing that?

3   A.  No.

4   Q.  So you didn't ask Mr. Levy why he was opening an account

5   for his son?

6   A.  I did not.

7   Q.  You didn't ask Mr. Levy why he was opening an account for

8   his mother-in-law?

9   A.  I did not.

10  Q.  It's not unusual for a single investor at Counsel Financial

11  to have multiple notes; is that right?

12  A.  That's correct.

13  Q.  Sometimes they consolidate notes; right?

14  A.  Correct.

15  Q.  Sometimes they split notes; right?

16  A.  Correct.

17  Q.  And there are reasons to do that; correct?

18  A.  Yes.

19  Q.  Tax reasons; right?

20  A.  It's the decision of the investor.

21  Q.  Sure.  But there are perfectly legitimate reasons to do

22  that; right?

23  A.  Sure.

24  Q.  At the time Mr. Silver invested in Counsel Financial, how

25  many investments were in the fund?  Do you know?

FBIYSIL2                        Cody - Cross

1                    THE COURT:  How many what?  Investors?

2                    MR. SHUR:  Investments.

3       BY MR. SHUR:

4       Q.  How many investors were in the fund?

5       A.  When he originally invested in 2007 -- this might not be

6       exactly accurate -- but there was, I believe, in excess of 50

7       investors, around 50.

8                    THE COURT:  5-0?

9                    THE WITNESS:  Yes.

10                   THE COURT:  Okay.

11      BY MR. SHUR:

12      Q.  What about towards the end of the investment?

13      A.  I'd have to look at specific dates, but we have over 100.

14      Q.  And those are investors; right?

15      A.  Yes.

16      Q.  And each investor can have multiple accounts; right?

17      A.  Correct.

18      Q.  Do you know how many accounts there are?

19      A.  I don't, but -- I don't know a specific number, but there

20      are probably upwards of 150.

21      Q.  And all of these investors fill out the subscription

22      agreement we saw; right?

23      A.  Yes.

24      Q.  They all fill out the investor questionnaire we saw; right?

25      A.  Yes.

FBIYSIL2                     Cody - Cross

1    Q.   And they all have to sign a promissory note; right?

2    A.   Correct.

3    Q.   And Mr. Silver completed an investor questionnaire; right?

4    A.   He did.

5    Q.   He completed a subscription agreement; correct?

6    A.   He did.

7    Q.   And he signed a promissory note; right?

8    A.   He did.

9    Q.   And Rosa Silver signed a promissory note as well; right?

10   A.   Correct.

11   Q.   They weren't treated any differently from any other

12   investors; correct?

13   A.   That's correct.

14   Q.   You mentioned the promissory note is like a contract.  Did

15   I hear you correctly?

16   A.   I said agreement, but yes.

17   Q.   An agreement.  Okay.

18        Like most agreements, each party has rights; correct?

19   A.   Correct.

20   Q.   And each party has responsibilities; correct?

21   A.   Correct.

22   Q.   This is a legal and binding agreement between Counsel

23   Financial and the investor; right?

24   A.   Correct.

25   Q.   And, like all other investors -- well, let me ask you this.

FBIYSIL2                          Cody - Cross

1    Withdrawn.

2              Their interest rate or the return on the investment in

3    Counsel Financial was based in part on the size of the

4    investment; is that right?

5    A.  Correct.

6    Q.  Is it fair to say that most investors in Counsel Financial

7    received 11 to 12 percent?

8    A.  Yes.

9    Q.  And Mr. Silver received 11 percent for a period of time;

10   right?

11   A.  Correct.

12   Q.  And his account grew, and at some point he received

13   12 percent; right?

14   A.  Correct.

15   Q.  But he didn't receive higher than 12 percent; is that

16   right?

17   A.  He did not.

18   Q.  Some investors received as high as 14 percent; correct?

19   A.  Correct.

20   Q.  For example, Mr. Levy received a higher rate; right?

21   A.  Possibly.  I don't recall.  It's certainly possible.

22   Q.  If he did, it was because his investment was greater;

23   correct?

24              MS. COHEN:  Objection, your Honor.

25              THE COURT:  Overruled.

1          About how much longer are you going to be, Mr. Shur?

2          MR. SHUR:  Judge, I would say ten or 15 minutes.

3          THE COURT:  Okay.

4          THE WITNESS:  The answer is correct.  He had a larger

5     investment.  So if he had a higher interest rate, that would

6     have been part of the reason at least.

7          THE COURT:  You've got to keep your voice up.

8          THE WITNESS:  I apologize, your Honor.

9     BY MR. SHUR:

10    Q.  As far as Mr. Silver's return on his investment, he wasn't

11    treated differently from other investors; right?

12    A.  He was not.

13    Q.  As an investor in Counsel Financial, you can either accrue

14    interest and keep it in your Counsel Financial account, or you

15    could get paid on the interest by Counsel Financial.

16          Right?

17    A.  That's correct.

18    Q.  And Mr. Silver elected to accrue interest; right?

19    A.  Yes, he did.

20          THE COURT:  Does the accrued interest in turn get

21    invested in accrued interest itself at 12 percent or whatever

22    that rate is?

23          THE WITNESS:  It does, yes.  So it compounds.

24          THE COURT:  It compounds.  At the rate of the note?

25          THE WITNESS:  At the rate of the note, yes.

FBIYSIL2                          Cody - Redirect

 1              MR. SHUR:  One moment, Judge.

 2              (Pause)

 3   BY MR. SHUR:

 4   Q.  Just to be clear, you used the phrase "accrued interest."

 5              Can you just sort of tell us what that means, please.

 6   A.  Yes.  There's an interest rate that they receive for the

 7   note.  If it's not paid to them, we pay on a monthly basis if

 8   they want to take their interest.

 9              If they don't decide to take their interest, then the

10   size of their note just grows due to the accrual of interest

11   and the interest staying inside of the note.

12   Q.  That's what Mr. Silver did here; is that right?

13   A.  That's correct.

14   Q.  Just to follow up on something you said, you said, while

15   you never met Mr. Silver, there was one time where you saw him

16   across a room; right?

17   A.  Yes.

18   Q.  Was that at Weitz & Luxenberg?

19   A.  It was.

20              MR. SHUR:  Nothing further, Judge.

21              THE COURT:  Okay.  Ms. Cohen?

22              MS. COHEN:  Very briefly, your Honor.

23   REDIRECT EXAMINATION

24   BY MS. COHEN:

25   Q.  Counsel Financial is not an investment that's opened to the

FBIYSIL2                       Cody - Redirect

```
 1   general public; right?
 2   A.  We don't mark it for investors.
 3   Q.  And you don't advertise for investors; right?
 4   A.  Correct.
 5   Q.  So on the blogs or the Facebooks or Twitter page -- you're
 6   not doing that -- withdrawn, your Honor.
 7            On the blogs or the Facebook or Twitter, you don't
 8   publish a website of Counsel Financial?
 9   A.  We do not.
10   Q.  You were asked some questions on cross-examination about
11   investors who split notes for legitimate reasons; right?
12   A.  Correct.
13   Q.  When Sheldon Silver split his notes combining the $100,000
14   into the $750,000 note and then split it evenly between him and
15   his wife, did you know what reason he was doing that for?
16            MR. SHUR:  Objection.
17            THE COURT:  Overruled.
18            Did you know?  Yes or no?
19            THE WITNESS:  Not directly from Mr. Silver.  My
20   understanding was --
21            MR. SHUR:  Objection, Judge.
22            THE COURT:  Sustained.
23   BY MS. COHEN:
24   Q.  Did you know if Sheldon Silver wanted to split his note for
25   a legitimate reason or a not legitimate reason?
```

1          MR. SHUR:  Objection.

2          THE COURT:  Sustained.

3    BY MS. COHEN:

4    Q.  Mr. Cody, when Sheldon Silver got into Counsel Financial

5    investments on the subsequent investments, was he given access

6    to those investments through Jordan Levy?

7    A.  Jordan was the one who would speak with us more frequently

8    than anybody else.  But, once he had an investment, he could

9    have gone direct, and he may have.  I don't recall

10   specifically.

11   Q.  But Perry Weitz and Arthur Luxenberg didn't have anything

12   to do with getting Sheldon Silver into Counsel Financial?

13   A.  My understanding is it was through Jordan.

14          MS. COHEN:  No further questions, your Honor.

15          THE COURT:  Thank you.  You can step down.

16          (Witness excused)

17          THE COURT:  Call your next witness.

18          MS. COHEN:  Your Honor, the government calls Jordan

19   Levy.

20          (Continued on next page)

21

22

23

24

25

FBi5sil3                    Levy - direct

1          THE DEPUTY CLERK:  Mr. Levy, please, take the witness

2     stand and remain standing.

3      JORDAN LEVY,

4          called as a witness by the Government,

5          having been duly sworn, testified as follows:

6          THE DEPUTY CLERK:  Please state your full name and

7     spell your last name, slowly, for the record.

8          THE WITNESS:  Jordan Levy.  L-E-V-Y.

9          THE COURT:  Ms. Cohen.

10         MS. COHEN:  Thank you, your Honor.

11    DIRECT EXAMINATION

12    BY MS. COHEN:

13    Q.  Mr. Levy, what is your educational background?

14    A.  I have a college degree from State University of New York

15    at Buffalo.

16    Q.  Where did you work after graduating college?

17    A.  New York State Senate.

18    Q.  What did you do in the New York State Senate?

19    A.  I was an administrative assistant to a state senator.

20    Q.  How long did you work in the New York State Senate?

21    A.  Slightly less than five years.

22    Q.  What did you do after you left the New York State Senate?

23    A.  I went to work in an advertising agency.

24    Q.  How long did you work at the advertising agency?

25    A.  Two different agencies over two years.

FBi5sil3                     Levy - direct

1   Q.  What type of job did you have at the two different

2   advertising agencies?

3   A.  I was an account executive.

4   Q.  What does it mean, in general, being an account executive?

5   A.  I would find new customers, and then I would help manage

6   their advertising.

7   Q.  What did you do after you left the advertising business?

8   A.  With one of my clients we started a business.

9   Q.  What type of business did you start?

10  A.  Computer product distribution.

11  Q.  What type of computer products?

12  A.  We were distributing all kinds of products; software,

13  hardware, computers, peripherals, supplies, etc.

14  Q.  How long were you in business distributing computer

15  products with your former client?

16  A.  We started that business in late '82 and we sold the

17  company in the summer of '88 -- 1988.

18  Q.  What else did you do while you ran that business?

19  A.  Nothing.

20  Q.  When you sold the business in 1988, I believe --

21  A.  Correct.

22  Q.  -- what did you do then?

23  A.  I went to work for a company called Software Etc.

24  Q.  What was Software Etc.?

25  A.  They're now known as GameStop.  They're a retailer of video

1    game and computer products throughout the country.

2    Q.  What did you do for GameStop?

3    A.  I was the chief merchant and chief operating officer.

4    Q.  How long did you work at GameStop?

5    A.  One year.

6    Q.  What did you do when you left GameStop?

7    A.  Returned to Buffalo to start another business with my

8    former partner.

9    Q.  Who was your former partner that you started business with

10   in Buffalo?

11   A.  Ron Schreiber.

12   Q.  What business did you start with Ron Schreiber in Buffalo?

13   A.  Initially the computer product distribution business called

14   Software Distribution Services.

15   Q.  And what other businesses, over time, did you develop with

16   Ron Schreiber?

17   A.  When I came back we started a business that was selling

18   closeout and discontinued software and hardware products.

19   After that we started a company called Upgrade Corporation of

20   America.

21              THE COURT:  Did you say upgrade?

22              THE WITNESS:  Upgrade.  Upgrade.  Sorry.

23              THE COURT:  If you can pull the microphone in front of

24   you?

25              THE WITNESS:  Upgrade corporation of America.

FBi5sil3                          Levy - direct

1              THE COURT:  That's too close.

2              THE WITNESS:  I'm not good at this.

3              THE COURT:  Just relax.

4    BY MS. COHEN:

5    Q.  When did you return to Buffalo and begin starting

6    businesses with Ron Schreiber?

7    A.  The second time, Labor Day of 1989.

8    Q.  And, over time, have you continued to develop different

9    businesses and done business with Ron Schreiber?

10   A.  We are still partners today, yes.

11   Q.  And what are you partners in?

12   A.  Today, a number of businesses.

13   Q.  Is there a name for your partnership with Ron Schreiber?

14   A.  Among many, but primarily JoRon Management.

15   Q.  What is JoRon Management?

16   A.  It is a holding company for most of our investments.

17   Q.  In general, what type of investments have you worked on

18   over the past 31-plus years?

19   A.  Most of them have been around the technology sector, but in

20   addition to that there has been a number of other different

21   kinds of investments including real estate and other financial

22   services businesses.

23   Q.  And what do you do with respect to the various investments

24   that you work on?

25   A.  Primarily we are investors, we are not operators.

FBi5sil3                    Levy - direct

1   Q.  Who else are the other investors in the various companies
2   that you help get investors for?
3   A.  It is a wide variety from institutions to individuals.
4   Q.  Do you know what the term "venture capital" is?
5   A.  Yes, I do.
6   Q.  What is venture capital?
7   A.  Venture capital is a term that is used for investing in
8   high-risk investments.
9   Q.  Do you consider some of the investments that you work on to
10  be venture capital investments?
11  A.  Yes, I do.
12  Q.  Do you know the defendant Sheldon Silver?
13  A.  Yes, I do.
14  Q.  How did you meet Sheldon Silver?
15  A.  How I met him initially?
16  Q.  Yes.
17  A.  Through the State University of New York at Buffalo.
18  Q.  How did you meet Sheldon Silver through the State
19  University at Buffalo?
20  A.  The Speaker came to Buffalo to be part of a round table
21  hosted by the University that was put on by the President of
22  the University where community and business leaders sat around
23  the table to talk to the Speaker about issues affecting Western
24  New York and Buffalo.
25  Q.  When was this forum where you first met Sheldon Silver?

FBi5sil3                         Levy - direct

1    A.  I believe 2001.

2    Q.  And after that forum, when was the next time you met

3    Sheldon Silver?

4    A.  I believe it was within the next couple years, playing

5    golf.

6    Q.  And what did you learn when you were playing golf with

7    Sheldon Silver a few years later?

8             I will rephrase it.  You look confused.

9    A.  Thank you.

10            THE COURT:  Yeah, we don't really care how good a

11   golfer he is.

12            THE WITNESS:  Not very.

13            THE COURT:  Sorry, Mr. Silver.

14   BY MS. COHEN:

15   Q.  What did you learn about any mutual friends you had with

16   Sheldon Silver when you played golf with him a couple years

17   after first meeting him?

18   A.  That we were connected through Arthur Luxenberg.

19   Q.  How did you learn that?

20   A.  During our golf, one of his phones rang and it was Arthur

21   Luxenberg.  He, Shelly explained that he was playing golf in

22   Buffalo; I assume on the other end asked with who; he said it

23   was me.  It sets off a ring and we did not know that there was

24   a mutual connection.

25   Q.  After your mutual connection vis-a-vis Arthur Luxenberg to

FBi5sil3                          Levy - direct

1   Sheldon Silver, how did your relationship with Sheldon Silver

2   develop?

3   A.  We played golf again and I saw him frequently in New York

4   City.

5   Q.  Where did you see Sheldon Silver frequently in New York

6   City?

7   A.  Either at his law office at Weitz & Luxenberg or at --

8   playing golf or at sporting events.

9   Q.  When you saw Sheldon Silver at Weitz & Luxenberg, was this

10  at one of the Weitz & Luxenberg lunches?

11  A.  Yes, it could have been.

12  Q.  Did you attend lunches at Weitz & Luxenberg?

13  A.  Regularly.

14  Q.  And did you attend lunches at Weitz & Luxenberg that

15  Sheldon Silver was at?

16  A.  Yes.

17  Q.  You said you attended sporting events.  Did you attend

18  sporting events with Sheldon Silver?

19  A.  Yes, we did.

20  Q.  Did you socialize with Sheldon Silver?

21  A.  Yes, we did.

22  Q.  Did you have meals together?

23  A.  Many.

24  Q.  Did you have his cell phone number?

25  A.  I do.

FBi5sil3                          Levy - direct

1    Q.   What is your cell phone number?

2    A.   716-481-4925.

3    Q.   And how did your relationship -- how would you describe the

4    closeness of your relationship with Sheldon Silver?

5    A.   I would consider Sheldon Silver a close friend.

6    Q.   Did there come a time when Sheldon Silver asked you to

7    invest money for him?

8    A.   Yes.

9    Q.   When was that?

10   A.   Sometime in 2006 or 2007.

11   Q.   What did Sheldon Silver say to you?

12   A.   He asked me if he could invest in some of my investments.

13   Q.   What money did he say he had to invest in your investments?

14   A.   We didn't discuss -- we never discussed that.

15   Q.   What did he tell you about why he wanted to invest through

16   your investments?

17   A.   You know, we have been successful and I think he was

18   interested in investing with us because we had good returns on

19   most of our investments.

20   Q.   And what investments did you get Sheldon Silver into in

21   2006?

22   A.   The first investment, I believe, was in Clover Communities

23   Fund which is a real estate investment fund that invested in

24   senior housing projects mostly throughout Upstate New York.

25              THE COURT:  Clover Communities Fund?

FBi5sil3                    Levy - direct

1             THE WITNESS:  Clover Communities Fund.  Clover, like

2    four-leaf.

3    BY MS. COHEN:

4    Q.  How did it come about that you were able to get Sheldon

5    Silver invested in Clover Communities Fund?

6    A.  The principal, Michael Joseph, is a close friend and been a

7    business partner of mine for a long time.  We were just doing

8    this fund so I thought it would be a good investment for him to

9    be in.

10   Q.  When Sheldon Silver first approached you, did he tell you

11   that he had extra money to invest?

12   A.  I don't think so.  Not -- I don't recall exactly, it is

13   just that he had money to invest.

14   Q.  So when he first approached you he told you he had money to

15   invest?

16   A.  Correct.

17   Q.  And what did he want you to do?

18   A.  He asked me what I thought he should invest in.

19   Q.  And Clover Communities Fund was the first thing you told

20   Sheldon Silver he should invest in?

21   A.  Correct.

22   Q.  Is Clover Communities Fund something you picked for Sheldon

23   Silver to invest in?

24   A.  Yes, I did.

25   Q.  Why did you pick Clover Communities Fund for Sheldon

FBi5sil3                      Levy - direct

1    Silver?

2    A.  Michael Joseph and Clover is a very solid operator, he has

3    been successful.  I thought it would be a good investment for

4    him to be in.

5    Q.  What do you mean by a good investment?

6    A.  It was fairly safe and a very solid -- very solid returns.

7    Q.  What do you mean by solid returns?

8    A.  It would be a -- the internal rate of return would be

9    computed, we thought, in the lower to mid 20s which would mean

10   the simple interest rate would be in the mid to upper teens.

11   Q.  And when you decided to invest Sheldon Silver in Clover

12   Community Funds, was that fund open or closed?

13   A.  At the time of the first investment the fund had been

14   closed.

15   Q.  What does it mean when a fund is closed?

16   A.  It means it is fully subscribed and documents are

17   completed.

18   Q.  So, when a fund is closed can people generally get into the

19   investment anymore?

20   A.  No, they cannot.

21   Q.  So, how was it that you were able to put Sheldon Silver

22   into Clover Communities Fund when the fund was closed?

23   A.  My relationship and influence with the principal, Michael

24   Joseph, allowed me to do that.

25   Q.  Do you recall meeting with the government prior to your

FBi5sil3                        Levy - direct

1  testimony here today?

2  A.  Me?  Yes.

3  Q.  And do you recall when you met with the government that you

4  told the government --

5          MR. SHUR:  Objection.

6          THE COURT:  Yes.  Sustained.  Rephrase the question.

7          MS. COHEN:  Sure.

8  BY MS. COHEN:

9  Q.  What did Sheldon Silver tell you about when he originally

10  approached you and said he had money to invest?  What did he

11  tell you about that money?

12         MR. SHUR:  Objection.  Asked and answered.

13         THE COURT:  Overruled.

14         You can answer.

15  A.  I'm not -- I'm not sure of the question.

16  Q.  If I can show you -- do you remember testifying in the

17  grand jury about this?

18  A.  I do.

19         MR. SHUR:  Objection, Judge.

20         THE COURT:  Overruled.  Would you like to come up?

21         MR. SHUR:  I would like to come up.

22

23

24

25

FBi5sil3                          Levy - direct

 1                (At side bar)

 2                MS. COHEN:  Your Honor, I can simply refresh his

 3     recollection with either 3500 material or his grand jury

 4     material, whichever one the defense prefers.

 5                MR. SHUR:  The predicate for refreshing his

 6     recollection --

 7                THE COURT:  He said he didn't remember anything else.

 8                MS. COHEN:  Correct.

 9                MR. SHUR:  And what is -- let me see.  I haven't seen

10     the passage you highlighted.

11                MS. COHEN:  The answer lines 3 to 6.

12                MR. SHUR:  There was a question asked -- I don't have

13     the realtime in front of me, obviously, but there was a

14     question asked about what Mr. Silver said and he said he had

15     money to invest.  Ms. Cohen asked did he say extra money?  And

16     he said no.  And now they're trying to --

17                THE COURT:  And she is going to ask him was that

18     truthful when you said it.  So, he is being impeached with

19     prior testimony.

20                MR. SHUR:  I don't think -- Judge --

21                THE COURT:  I'm not sure why "extra" is all that

22     critical but.

23                MR. SHUR:  The prosecutor opened on it.  That's why.

24                What is the actual Q&A, Judge?  I apologize.  I don't.

25                THE COURT:  How far back was that, do you remember?

FBi5sil3                        Levy - direct

1           MS. COHEN:  Probably -- I asked it twice, probably 10

2     questions back, your Honor.

3           The court reporter has it, your Honor.

4           THE COURT:  Do you have it handy?  I was thinking I

5     could have it quicker.  The question was:

6     "Q  When Sheldon Silver first approached you, did he tell you

7     that he had extra money to invest?

8     "A  I don't think so.  Not -- I don't recall exactly, it is

9     just that he had money to invest."

10          MR. SHUR:  Okay.

11          MS. COHEN:  Your Honor, I'm happy to first refresh his

12    recollection and then to impeach it or do it either way.

13          THE COURT:  Okay.

14

15

16

17

18

19

20

21

22

23

24

25

1                (In open court)

2    BY MS. COHEN:

3    Q.  Mr. Levy do you recall testifying in the grand jury in this

4    matter?

5    A.  Yes, I do.

6            MS. COHEN:  Your Honor, with your permission, I am

7    going to show Mr. Levy his grand jury testimony directing his

8    attention to page 6, lines 7 through 15, it's 3500 3562-04.

9    Q.  I just ask if that refreshes your recollection about what

10   Sheldon Silver told you about the money he had to -- for the

11   initial investment.

12   A.  I assume you are referring to the highlighted section here?

13   Q.  Yes.

14   A.  Okay.

15           THE COURT:  The question is does that refresh your

16   recollection about what Mr. Silver told you before the first

17   investment.

18           THE WITNESS:  Yes.

19   Q.  So, having read that, do you recall Sheldon Silver told you

20   that he had some extra cash that he wanted to invest?

21   A.  Extra money, correct.

22   Q.  You can set that aside.

23           So, just to be clear, when Sheldon Silver told you he

24   initially had some money he wanted you to invest, he said he

25   had some extra money he wanted you to invest?

FBi5sil3                          Levy - direct

1    A.  That's the term that I used, correct.

2    Q.  And you said you picked Clover Communities Fund for Sheldon

3    Silver's initial investment and the fund was closed at the

4    time?

5    A.  Yes.

6    Q.  And how did you go about getting Sheldon Silver invested

7    into Clover Communities Fund if the fund was closed?

8    A.  Well, what I did with the principal, Michael Joseph, is we

9    each took $50,000 of our own commitment and carved it out so

10   that he would have an opportunity to come in as a nominee under

11   our investments.

12   Q.  Explain for the jury what a nominee is.

13   A.  A nominee is just an individual who is not a direct

14   investor but an investor through someone else or some other

15   entity.  They still have all of the investment opportunity and

16   the investment benefits, but they're not actually listed as a

17   direct investor.

18   Q.  And when someone is, in this case, you decided to assign,

19   you said, $50,000 of whose investment to Sheldon Silver?

20   A.  $50,000 of my investment commitment and $50,000 of Mike

21   Joseph's investment commitment.

22   Q.  And what relationship did Michael Joseph have with Sheldon

23   Silver at the time?

24   A.  He had none.

25   Q.  Why did Michael Joseph assign $50,000 of his investment to

FBi5sil3                          Levy - direct

1   Sheldon Silver?

2   A.  Because I asked him to.

3          THE COURT:  Ms. Cohen, you are saying "his

4   investment."  You are saying "his investment commitment."

5          THE WITNESS:  It was a commitment and at that point no

6   investments had been made, it was just a commitment.  When you

7   commit to a fund it is called over a period of time.

8   BY MS. COHEN:

9   Q.  What does it mean to commit to a fund and it is called over

10  a period of time?  Explain that to the jury.

11  A.  In this case he committed $100,000 to this investment.

12         THE COURT:  He, being Mr. Silver?

13  A.  Mr. Speaker, yes, Sheldon Silver, committed $100,000 to

14  this investment.  The fund was raising $10 million and over a

15  period of a number of years it would call the capital so that

16  it would use it to build the housing projects that it was

17  building.

18  Q.  And because you committed $50,000 of your own investment

19  and Michael Joseph committed $50,000 of his investment and gave

20  that commitment to Sheldon Silver, neither you nor Mr. Joseph

21  would receive any profit based on that total amount of

22  $100,000, any profit would be to Sheldon Silver as nominee?

23         MR. SHUR:  Objection.

24         THE COURT:  Sustained.

25  Q.  How does it work regarding profit when you assign the --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1        THE COURT:  You can't talk over each other.

2   Q.  Who gets the profit when someone is a nominee?

3   A.  It is no different than in the direct investment.  It is

4   the same.  The profit is distributed identically to whether you

5   are named or a nominee investor.  When there is any profit or

6   losses attributable to the investment they're directly passed

7   through to the investor.

8        THE COURT:  Do I understand correctly that basically

9   what happened is you and Mr. Joseph both reduced, by $50,000,

10  the amount of money you invested and instead Mr. Silver

11  invested that $100,000?

12       THE WITNESS:  Committed and then ultimately invested,

13  correct.

14       THE COURT:  Once it got called?

15       THE WITNESS:  Correct.  So, yes.

16  BY MS. COHEN:

17  Q.  How profitable is Clover Communities Fund I?

18  A.  I don't have the exact numbers but we were projecting that

19  the fund -- and I would deliver a return, simple interest in

20  low, 13, 14, 15 percent with a computed internal rate of return

21  in the low to mid 20s.

22  Q.  And what does that mean for the investor?  Is that a good

23  investment?  What type of investment is it?

24  A.  That would be a very good investment.

25  Q.  And is Clover Communities Fund something that's available

1   to the general public?

2   A.  No, it is not.

3   Q.  How is it that one is able to invest in Clover Communities

4   Fund?

5   A.  Well, either they are associated in some way with the

6   manager, Michael Joseph, or one of his business partners or

7   friends that advises someone that they might want to consider

8   looking at this investment.

9   Q.  And after you gave Sheldon Silver a part of your committed

10  investment in Clover Communities Fund I, what other investments

11  did you get Sheldon Silver access to?

12  A.  Over time?

13  Q.  Yes.

14  A.  Well, there was some investments in Counsel Financial

15  Services which I recommended that Sheldon Silver go into.

16  There was investment in a satellite company in Australia that's

17  actually publicly traded that I recommended that he go into.

18  There is an early stage venture capital firm here in New York

19  that I recommended that he go into.  There is a company that I

20  serve as chairman of that's currently publicly traded that

21  delivers service as a provider of portals and premium content

22  to telephone companies and cable companies, in essence a

23  version of Yahoo or MSN for those companies, that I

24  recommended.  And, there was a hedge fund in Dallas, Texas that

25  we are invested in that he came into with us as well.

FBi5sil3                    Levy - direct

1   Q.  We will go through each one of those investments.  I assume

2   they had all had different names?

3   A.  Correct.

4   Q.  In general, after Sheldon Silver first came to you in 2006

5   and told you he had extra money to invest and you invested him

6   in Clover Communities Fund I, how did it come about that you

7   got him invested in other investments that you had access to?

8   A.  Most typically I would go to him and tell him that I had

9   something that I thought would be good for him to invest in.

10  Q.  Were there times when Sheldon Silver came to you and said

11  he had some more money that he wanted you to invest?

12  A.  Likely possibly, yes.

13  Q.  And when Sheldon Silver either told you he had more money

14  that he wanted you to invest or you went to him to tell him

15  about an investment opportunity, what did Sheldon Silver tell

16  you about how he had the money that was available for you to

17  invest?

18  A.  I never asked.

19  Q.  Whether you asked or not, what did Sheldon Silver tell you

20  about how he had the money available for you to invest?

21          MR. SHUR:  Objection.

22          THE COURT:  Overruled.

23  A.  He did not.

24  Q.  He did not tell you anything?

25  A.  Correct.

FBi5sil3                              Levy - direct

```
 1   Q.  When you were discussing Clover Communities Fund I, were
 2   there additional Clover Communities Funds that you invested
 3   Sheldon Silver's money in for him?
 4   A.  Yes; there was fund II, fund III, and direct investment in
 5   a project.
 6   Q.  And were the other Clover Communities Fund as profitable as
 7   the first fund?
 8   A.  Remains to be seen but we hope so.
 9   Q.  And are the other Clover Communities Funds, were they open
10   to the public to invest in?
11   A.  They are not.
12   Q.  And, in general, how did the mechanics work of getting
13   documents to and from Sheldon Silver related to the
14   investments?
15   A.  Generally my staff would handle all the paperwork and
16   documentation and work directly with Sheldon Silver or his
17   accountants on these investments.
18   Q.  When you say your staff, your staff of what company?
19   A.  My staff of JoRon or our venture fund.
20   Q.  And if you look in your binder, actually at the first
21   document which is marked Government Exhibit 1012 for
22   identification and 1012-2 for identification?
23        You mentioned Counsel Financial, is Counsel Financial
24   an investment that you got Sheldon Silver access to?
25   A.  Yes, I did.
```

1    Q.  And did Perry Weitz or Arthur Luxenberg have any role in

2    getting Sheldon Silver invested into Counsel Financial?

3    A.  They had -- they had no role.

4    Q.  So, if you can look in your binder at Government Exhibit

5    1012 and 1012-2 and if you recognize them, what are they?

6    A.  Yes, I do.

7    Q.  What are these documents marked for identification

8    Government Exhibit 1012 and 1012-2?

9    A.  These are -- this is correspondence between Shelly and us

10   about the particular initial investments in Counsel Financial

11   Services.

12          MS. COHEN:  Your Honor, the government moves

13   Government's Exhibits 1012 and 1012-2, that are also the

14   subject of a proposed stipulation that we can read into the

15   record, from JoRon Management.

16          MR. SHUR:  No objection.

17          THE COURT:  So 1012 and 1012-2 are received.

18          (Government's Exhibits 1012 and 1012-2 received in

19   evidence)

20   BY MS. COHEN:

21   Q.  If we can put up Government Exhibit 1012, please.

22          Mr. Levy, what is Government Exhibit 1012?

23   A.  It is a letter from me to Shelly acknowledging his

24   investment and the interest and the return on the investment.

25          THE COURT:  1012, wrong document.

FBi5sil3                    Levy - direct

1          THE WITNESS:  Oh, I'm sorry.  What am I on?  Oh, I

2     see.  I apologize.

3     A.  This is a letter from him acknowledging that he was sending

4     a check for $75,000.

5     Q.  And this is Sheldon Silver's letter to you sending a check

6     for $75,000 to invest in Counsel Financial Services, correct?

7     A.  Correct.

8     Q.  And the second page of Government Exhibit 1012, what is

9     that?

10    A.  A copy of a deposit slip and a copy of his check.

11    Q.  And why is Sheldon Silver's check written out to JoRon

12    Management rather than directly to Counsel Financial?

13    A.  I would only have a guess, it is because we must have -- we

14    wrote the check for him and he gave us the check and we must

15    have made the deposit for him.

16    Q.  And JoRon is the management company you owned with Ron

17    Schreiber?

18    A.  Correct.

19    Q.  If you look at Government Exhibit 1012 please?

20         THE COURT:  1012-2 you mean.

21    Q.  Dash 2.  Sorry, your Honor.

22    A.  Yes.

23    Q.  What is 1012-2?

24    A.  That is a letter from me to Shelly acknowledging that the

25    check was deposited and that he would be receiving, effective

1    March 29, 2007, an interest rate of 11 percent over a

2    three-year term.

3    Q.  Do you recall when you first got Sheldon Silver access to

4    Counsel Financial, was there a minimum amount investment

5    required for Counsel Financial?

6    A.  Typically $250,000.

7    Q.  How was Sheldon Silver able to invest $75,000 as his first

8    investment if the minimum was typically $250,000?

9    A.  Because I made those arrangements.

10   Q.  Locking at -- actually, let's talk about the other

11   investments you got Sheldon Silver access to.  You described

12   them but let's try to put a name on them and try to tell the

13   jury a little bit more about what they are.

14        What is Alpha Orbit?

15   A.  Alpha Orbit is an LLC -- limited liability company -- that

16   we established to invest in a hedge fund in Dallas, Texas.

17   Q.  When you say "we" you are referring to yourself and Ron

18   Schreiber?

19   A.  It is a group of investors that we assembled to invest in

20   this particular investment.

21   Q.  And about how much was each individual's individual

22   investment in Alpha Orbit?

23   A.  Everybody's was different.  We invested $5.2 million.

24   Q.  How did it come about that -- was Sheldon Silver one of the

25   investors in Alpha Orbit?

FBi5sil3                          Levy - direct

1    A.  Yes, he was.

2    Q.  How did it come about that Sheldon Silver was able to

3    become an investor in Alpha Orbit?

4    A.  He mentioned to me that Arthur Luxenberg had told him about

5    the investment and he asked me whether it is something that I

6    thought he should do.

7    Q.  And what did you did tell Sheldon Silver about whether he

8    should invest in Alpha Orbit?

9    A.  I told him that he should but it is a little riskier than

10   most.

11   Q.  And did Sheldon Silver invest in Alpha Orbit?

12   A.  He did.

13   Q.  And is Alpha Orbit an investment that was open to the

14   public to invest in?

15   A.  No, it was not.

16   Q.  What is Lerer Venture?  L-E-R-E-R.

17   A.  Lerer Venture is an early stage venture capital fund here

18   in New York City.

19   Q.  What do you mean by an early stage venture capital fund?

20   A.  They invest in companies before most of us would hear of

21   them, before their revenue at the early stage, business plan,

22   or at early inception of their evolution of a business.

23   Q.  What is your involvement in Lerer Ventures?

24   A.  I co-invest with Lerer Ventures in a number of deals and

25   the principals are close friends.

FBi5sil3                    Levy - direct

1    Q.   Is Sheldon Silver one of the investors in Lerer Ventures?

2    A.   He is.

3    Q.   How did it come about to Sheldon Silver was able to invest

4    in Lerer Ventures?

5    A.   We were going to invest and I asked him if he would like to

6    participate.

7    Q.   What did Sheldon Silver say when you asked him if he wanted

8    to participate in an Lerer Ventures?

9    A.   If I thought it was something he should do, he would.

10   Q.   Did Sheldon Silver invest in Lerer Ventures?

11   A.   Yes, he did.

12   Q.   Is Lerer Ventures something that is open to the general

13   public?

14   A.   It is not.

15   Q.   And if you can look in your binder at Government Exhibit

16   1024 for identification, it relates to Lerer Ventures.  If you

17   recognize that document, what is it?

18   A.   That is a letter that I sent to Shelly acknowledging his

19   investment in Lerer Ventures of $25,000.

20           MS. COHEN:  Your Honor, the government moves, pursuant

21   to the stipulation, Government Exhibit 1024.

22           MR. SHUR:  No objection.

23           THE COURT:  1024 is received.

24           (Government's Exhibit 1024 received in evidence)

25   BY MS. COHEN:

FBi5sil3                          Levy - direct

1  Q.  Mr. Levy, is JoRon Management, is that your company with

2  Ron Schreiber?

3  A.  Yes, it is.

4  Q.  Is this the letter to Sheldon Silver about his $25,000

5  investment in Lerer Ventures that you got him access to?

6  A.  Yes, it is.

7  Q.  What is NewSat?

8  A.  It's a satellite company in Melbourne, Australia.

9  Q.  What do you mean by a satellite company?

10  A.  They are building a satellite that will be up in the sky in

11  2017.

12          THE COURT:  I'm sorry.  The name of the company is

13  NewSat?

14          THE WITNESS:  N-E-W-S-A -- I think it is S-A-T.

15          THE COURT:  S-A-T.

16          THE WITNESS:  Yes; S-A-T, new satellite.

17          THE COURT:  Okay.

18  BY MS. COHEN:

19  Q.  Are you an investor in NewSat?

20  A.  I am.

21  Q.  And is NewSat another investment that you got Sheldon

22  Silver access to as an investor?

23  A.  Yes, I did.

24  Q.  And what is Synacor?

25  A.  Synacor is a company that develops -- builds portals and

FBi5sil3                         Levy - direct

1   premium content products for telephone companies and cable

2   companies.

3              THE COURT:  How do you spell Synacor?

4              THE WITNESS:  S-Y-N-A-C-O-R.

5   BY MS. COHEN:

6   Q.   Is Synacor a company that you have invested it?

7   A.   Yes.

8   Q.   And what are portals?

9   A.   MSN, Yahoo, AOL; those are portals.

10  Q.   Is Synacor an investment that you were able to get Sheldon

11  Silver invested into?

12  A.   Yes, I was.

13  Q.   And Synacor, you said, is now a publicly traded company?

14  A.   That's correct.

15  Q.   At the time you got Sheldon Silver invested into Synacor,

16  was it publicly traded?

17  A.   It was not.

18  Q.   So, at the time you got Sheldon Silver invested into

19  Synacor it was not available to the general public?

20  A.   That's correct.

21  Q.   And for all these investment opportunities that you gave

22  Sheldon Silver access to what fee, if any, did you charge

23  Sheldon Silver for advising him about these investments?

24  A.   Nothing ever.

25  Q.   What fee, if any, did you charge Sheldon Silver for helping

FBi5sil3                          Levy - direct

1  him get access to these investments?

2  A.  Nothing.

3  Q.  What fee did JoRon charge Sheldon Silver for doing all the

4  paperwork related to these investments?

5  A.  Nothing.

6  Q.  In general, what type of investors in these investments --

7  withdrawn, your Honor.

8          In addition to Sheldon Silver you have introduced

9  other investors to these investments that we have just talked

10  about?

11  A.  Correct.

12  Q.  And what type of investors have you introduced, in general,

13  to these investments we have just talked about?

14  A.  Almost, most all are friends.

15  Q.  And they are friends.  Are they friends -- do they have any

16  particular net worth?

17  A.  I guess you would classify them as high net worth.

18  Q.  What documents did JoRon prepare for Sheldon Silver related

19  to all the investments we just talked about that you gave

20  Sheldon Silver access to each year?

21  A.  Well, if you are referring to annually, we would prepare

22  for him a schedule, a listing of all of his investments and our

23  estimation of what we thought those investments were valued at.

24  We would prepare that for him on an annual basis at his request

25  for his public filing.

1    Q.  When you say his public filing, what are you referring to?

2    A.  His responsibility as an elected official he had to file on

3    an annual basis and disclose all of his investments.

4    Q.  If you look at what's been marked for identification

5    Government Exhibit 1051 and if you recognize it, what is that?

6    A.  That is a schedule that we prepared for him, obviously at

7    the end of April 2014, of the current value of all of the

8    investments that he had done that we were involved in with him.

9    Q.  When you say "we" you are talking about JoRon?

10   A.  JoRon, and/or myself personally.

11   Q.  And the investments that even were made for JoRon were ones

12   that you personally got Sheldon Silver access to?

13   A.  Correct.

14              MS. COHEN:  The government moves, pursuant to the

15   stipulation, Government Exhibit 1051 into evidence.

16              MR. SHUR:  No objection.

17              THE COURT:  1051 is received.

18              (Government's Exhibit 1051 received in evidence)

19   BY MS. COHEN:

20   Q.  Mr. Levy, can you please explain for the jury what is shown

21   here going through each of the investments?

22   A.  Well, it's a schedule of each of the individual investments

23   and the current value of those investments as of the date that

24   this was prepared for him.

25   Q.  You see on, all of the investment except for Counsel

1   Financial, it has a paren where it says "JoRon nominee," or in

2   two cases "MJ nominee."  Can you explain for the jury what that

3   means?

4   A.  That means that the investment was done still under the

5   name, under a different name, probably under the name JoRon

6   although it could be different in each case but probably not,

7   and that what we did was we gave Shelly a nominee letter saying

8   he had the investment but wasn't a direct investor into the

9   deal.

10  Q.  Who is MJ?  You talk about JoRon, who is MJ?

11  A.  Michael Joseph.

12  Q.  Michael Joseph was your partner in Clover Communities Fund

13  and other investments?

14  A.  He is the manager of Clover Communities Fund, yes.

15  Q.  If you can walk us through the investments, what is Alpha

16  Orbit?  What is that there?

17  A.  He had an investment of $25,000 as part of, as I said, that

18  $5.2 million investment we made.

19  Q.  $5.2 total investment?

20  A.  Our investment was $5.2 million, correct.

21  Q.  And you gave Sheldon Silver $25,000 of your investment?

22  A.  Well, we had a number of investors but, yes, he invested

23  $25,000.

24  Q.  And Clover Communities Fund I, what is shown there?

25  A.  That's the first fund where, again, we -- Michael Joseph

FBi5sil3                          Levy - direct

1   and I -- made him a nominee and the level of $50,000 is

2   $59,009.79 and $49,009.40, and he was a nominee in that

3   investment.

4   Q.  And Clover Communities Fund II, what is shown there?

5   A.  $99,122.16; a nominee for us that he made under our

6   investment.

7   Q.  And Clover Communities Fund III?

8   A.  That's $8,375.36 and that's what had been called to date

9   for his commitment in Clover Communities Fund III, again, as a

10  nominee.

11  Q.  What do you mean "called to date?"

12  A.  Well, as I explained before, we only call capital as the

13  projects are going to be developed and until such time as this

14  occurred we -- he had only drawn down -- $8,375.36 had been

15  called of his commitment to that investment.

16  Q.  And what is Clover-Brighton Square, MJ nominee?

17  A.  Brighton Square, a project in Tonawanda, New York, that's a

18  building -- a senior housing project that didn't go through the

19  fund, it was a direct investment that we made, again, into this

20  project.

21  Q.  And the $50,000 there, is that $50,000 of Sheldon Silver's

22  money that you were able to invest for him in Clover?

23  A.  In this case it was Michael Joseph.  He was a nominee under

24  Michael's investment.

25  Q.  It was an investment that you gave Sheldon Silver access

FBi5sil3                    Levy - direct

1    to?

2    A.  I arranged, yes.

3    Q.  What is Lerer Ventures II?  Is that the same as Lerer

4    Ventures we talked about?

5    A.  Correct.

6    Q.  What is shown here under Lerer ventures II?

7    A.  Again, we made an investment of $250,000 and we made

8    arrangements for Shelly to put in $25,000.  I'm guessing that

9    this says that only $23,000 has been called.

10   Q.  So the amounts called here, the actual investment is

11   larger?

12   A.  The commitment could be larger.

13   Q.  And under NewSat, what is that?  Is that the NewSat we

14   talked about, the satellite?

15   A.  That investment was made.

16          What took place is NewSat is a publicly traded company

17   on the Australian stock exchange and this -- where we actually

18   participated in a private placement to have the company assist

19   in raising the capital necessary to build the satellite.

20   Q.  Is NewSat one of the investments you said you gave Sheldon

21   Silver access to before it became a publicly traded company?

22   A.  No.  It was a publicly traded company at the time.  This

23   was a -- what often will take place is companies need to raise

24   additional capital to improve their balance sheet, they need

25   capital in order to go an invest in factories, machinery,

FBi5sil3                          Levy - direct

```
 1    equipment, in this case building a satellite which is a
 2    $600 million investment for the company.  They needed a
 3    combination of equity -- capital -- plus debt to build the
 4    satellite so they did a private placement to put additional
 5    capital on their balance sheet.  We participated in this and so
 6    this was cash capital that was actually invested; a publicly
 7    traded company where we received a security.
 8    Q.  And Counsel Financial, what is shown here about the total
 9    value of Sheldon Silver's investment in Counsel Financial?
10    A.  I would guess this is a total invested capital plus
11    interest accrued.
12    Q.  And the total amount is $1.3 million?
13    A.  That's correct.
14    Q.  So what does it show here for the total amount of
15    investments that Sheldon Silver has through the different
16    investments listed here that you got Sheldon Silver access to?
17    A.  $1,655,000.
18    Q.  What did you know about how Sheldon Silver came to have the
19    money that he gave you to make all of these investments listed
20    on Government Exhibit 1051?
21            MR. SHUR:  Objection.  Asked and answered.
22            THE COURT:  Overruled.
23    A.  I didn't know anything.
24    Q.  Did there come a time when Sheldon Silver asked you to put
25    some of his investment in Counsel Financial in the name of
```

FBi5sil3                          Levy - direct

1    another person?

2    A.  Yes.

3    Q.  What person did Sheldon Silver ask you to put his Counsel

4    Financial investment in the name of?

5    A.  His wife Rosa.

6    Q.  What did Sheldon Silver tell you about why he wanted to

7    split his Counsel Financial investment between himself and his

8    wife Rosa?

9    A.  It would allow him to not have to disclose in his annual

10   statements, his documents, his filings, that particular piece

11   of his investment that he had been previously disclosing.

12   Q.  What piece of investment would -- how would dividing his

13   investment -- withdrawn.

14          How did Sheldon Silver want to divide his investment

15   in Counsel Financial?

16   A.  He just split -- it was $600,000 split equally, $300,000 in

17   Rosa's name and 300,000 remaining in his name.

18   Q.  What disclosure did you understand Sheldon Silver was

19   referring to when he said he wanted to split the note in order

20   to avoid to disclose the note under his name?

21   A.  His financial filing as an elected official.

22   Q.  What state boards did you sit on during the time that

23   Sheldon Silver, that you were giving Sheldon Silver access to

24   private investment opportunities?

25   A.  I served on the Erie Canal Harbor Development Corporation.

FBi5sil3                    Levy - direct

1    Q.   What is the Erie Canal Harbor Development Corporation?

2    A.   It is a state authority that was put in place that was

3    responsible for rebuilding the waterfront in Buffalo, New York.

4    Q.   And when the Erie Canal Harbor Development Corporation

5    wanted to do projects, was there any other state entity that

6    had to approve those projects?

7    A.   Different state entities we draw funding from.

8    Q.   Was something called the Public Authority Control Board --

9    or the PACB -- one of the entities that had to approve certain

10   types of funding for projects the Erie Canal Harbor Development

11   Corp wanted to do?

12   A.   On occasion, yes.

13   Q.   And when did you serve as chair of the Erie Canal Harbor

14   Development Corp?

15   A.   I believe I was appointed in 2007 and I served for almost

16   five years, total.

17   Q.   Who appointed you to the Erie Canal Harbor Development

18   Corp?

19   A.   Governor Eliot Spitzer.

20   Q.   And was Sheldon Silver a voting member on the PACB when you

21   were chair of the Erie Canal Harbor Development Corp?

22   A.   Yes, he was.

23   Q.   When you were a chair of the Erie Canal Harbor Development

24   Corporation, did you discuss with Sheldon Silver projects the

25   Erie Canal Harbor Development Corp wanted to do that were going

1    to be put before the PACB for approval?

2    A.  On occasion, yes.

3    Q.  Did Sheldon Silver tell you that he would be supportive of

4    those projects when they came up for a vote at the Public

5    Authority Control Board?

6    A.  Yes, he did.

7              THE COURT:  Ladies and gentlemen, that evidence just

8    now about the Erie County Control Board or the PACB, there is

9    no suggestion that there was anything untoward about those

10   projects.  That evidence was admitted solely for purposes of

11   you evaluating Mr. Silver's connection to the PACB.

12              Ms. Cohen.

13   BY MS. COHEN:

14   Q.  Mr. Levy, you testified earlier that over the years you

15   developed a close friendship with Sheldon Silver.  Do you

16   recall that testimony?

17   A.  Yes, I do.

18   Q.  About how often did you talk to Sheldon Silver?

19   A.  At different points of the year I would talk to him

20   multiple times a week.

21   Q.  When, if at all, did Sheldon Silver mention the name

22   Dr. Robert Taub to you?

23   A.  He never mentioned the name Dr. Taub.

24              THE COURT:  You have to speak up, Mr. Levy.

25              THE WITNESS:  He never mentioned the name.

FBi5sil3                        Levy - direct

1   BY MS. COHEN:

2   Q.  Other than in connection with this case have you ever heard

3   the name Dr. Taub?

4   A.  I have not.

5   Q.  When, if at all, did Sheldon Silver mention the name Jay

6   Goldberg to you?

7   A.  He did not.

8   Q.  Other than in connection with this case, have you ever

9   heard of Jay Goldberg?

10  A.  I have not.

11  Q.  When, if at all, did Sheldon Silver tell you that the money

12  he was giving you to invest he was getting through referral of

13  asbestos cases to him at Weitz & Luxenberg?

14  A.  We never discussed that.

15  Q.  Whether you ever discussed it or not, what did Sheldon

16  Silver tell you about whether any of the money he was giving

17  you came from referral of asbestos cases --

18  A.  Nothing ever.

19  Q.  -- to him at Weitz & Luxenberg?

20  A.  Nothing ever.

21  Q.  What did Sheldon Silver tell you about if any of the money

22  he was giving you came from tax certiorari work from real

23  estate developers that he directed to a law firm?

24  A.  Nothing.  Ever.

25          MS. COHEN:  A moment to confer, your Honor?

FBi5sil3                          Levy - cross

1          THE COURT:  Sure.

2          MS. COHEN:  Nothing further, your Honor.

3          THE COURT:  Okay.

4          Mr. Shur?

5    CROSS EXAMINATION

6    BY MR. SHUR:

7    Q.  Good afternoon.  My name is Justin Shur.  I represent

8    Mr. Silver along with my colleagues.

9          We have never met before, right?

10   A.  Correct.

11   Q.  And I apologize, is it Mr. Levy or Mr. Levy?

12   A.  It is Levy.

13   Q.  Levy.  Thank you.

14         Mr. Levy, you and Mr. Silver are friends, right?

15   A.  Yes, sir.

16   Q.  I think you said you first met Mr. Silver at an event in

17   Buffalo, New York?

18   A.  Correct.

19   Q.  And this was a forum put on by SUNY Buffalo?

20   A.  Correct.

21   Q.  And that's your alma mater?

22   A.  Correct.

23   Q.  And the forum was for community leaders and business

24   leaders to get together?

25   A.  Correct.

FBi5sil3                    Levy - cross

1    Q.  For these folks to discuss opportunities to strengthen the

2    local economy?

3    A.  A hundred percent.

4    Q.  And that's where you met Mr. Silver?

5    A.  Yes.

6    Q.  And fair to say you struck up a relationship with

7    Mr. Silver?

8    A.  I believe so.

9    Q.  And from there on, after this event in Buffalo, you

10   developed a friendship, right?

11   A.  Absolutely.

12   Q.  You and Mr. Silver played golf together, right?

13   A.  Correct.

14   Q.  And as friends you and Mr. Silver went to hockey games

15   together; is that right?

16   A.  That's correct.

17   Q.  You and Mr. Silver went to Sabres games together in

18   Buffalo?

19   A.  Yes.

20   Q.  And you and Mr. Silver went to Rangers games here in New

21   York City at Madison Square Garden?

22   A.  Many.

23   Q.  Mr. Silver is a big Rangers fan?

24   A.  Very big.

25   Q.  We won't hold that against him.

FBi5sil3                     Levy - cross

1            So, as a friend you helped work on Mr. Silver's
2    campaign?
3    A.  Yes, I did.
4    Q.  He didn't pay you for that work, did he?
5    A.  Absolutely not.
6    Q.  You volunteered to help, right?
7    A.  That's correct.
8    Q.  Because he was your friend, right?
9    A.  That's correct.
10   Q.  Mr. Levy, while you and Mr. Silver were friends, did he
11   ever introduce you to his family?
12   A.  Yes.
13   Q.  And did he invite you over to his home?
14   A.  Yes.
15   Q.  Have you been to his home here in Manhattan?
16   A.  Yes, I have.
17   Q.  And what about in Upstate New York?
18   A.  No, I have not.
19   Q.  Fair to say Mr. Silver is low key?
20   A.  Yes.
21   Q.  He is not a loud and boisterous person, right?
22   A.  That's for sure.
23   Q.  And can be a man of few words, isn't that right?
24   A.  Correct.
25   Q.  He didn't share all the details of his life with you,

1    right?

2    A.  No, he did not.

3    Q.  And that was true with respect to both his personal life

4    and his professional life, right?

5    A.  Correct.

6    Q.  And would you agree that sometimes Mr. Silver could be hard

7    to read?

8    A.  Definitely.

9    Q.  I want to talk about -- so Mr. Silver, as I understand it

10   from your direct examination, at some point in time told you he

11   was looking to invest money?

12   A.  Yes.

13   Q.  And I believe -- do you remember the prosecutor asked you

14   that question and showed you your grand jury testimony and it

15   said it was extra money, right, and she said extra cash and you

16   said extra money?  Do you remember that exchange?

17   A.  Yes, I do.

18   Q.  Mr. Silver asked -- said he was looking to invest money,

19   right?

20   A.  Correct.

21   Q.  And when you have money to invest in some project or some

22   proposal it's extra money, right?

23   A.  Can be.

24   Q.  Right, it is not money that is tied up somewhere, right?

25   A.  Correct.

1   Q.  It is money that is available?

2   A.  Correct.

3   Q.  And that's true for other people that have asked for your

4   assistance in making investments, right?

5   A.  Correct.

6   Q.  And fair to say that you would often learn of different

7   investment opportunities over time?

8   A.  Yes.

9   Q.  And on occasion you would invite Mr. Silver to participate

10  in a particular investment?

11  A.  Correct.

12  Q.  And if you learned of an investment that you thought would

13  be a good fit you would tell Mr. Silver about it, right?

14  A.  Yes.

15  Q.  The investments that the prosecutor asked you about you

16  said were good investments, right?

17  A.  Correct.

18  Q.  Mr. Silver was a friend.  You wouldn't recommend a bad

19  investment to him, would you?

20  A.  I would not.

21          THE COURT:  I assume you try not to make bad

22  investments.

23  A.  It just comes with the territory, Judge.

24          THE COURT:  Some are better than others.

25  BY MR. SHUR:

1    Q.  And these various investment opportunities that the

2    prosecutor asked you about, this was over the course of a span

3    of time, right?

4    A.  Many years.

5    Q.  And on occasion you would go to Mr. Silver and tell him

6    about some investment opportunity, right?

7    A.  Yes.

8    Q.  And you would invite him to participate?

9    A.  Correct.

10   Q.  And sometimes he would?

11   A.  Correct.

12   Q.  And sometimes he didn't?

13   A.  Correct.

14   Q.  Fair to say that with the investments that you discussed on

15   direct examination, the people involved in those investments

16   often knew one another?

17   A.  Not always.

18   Q.  Okay.  Well, we will walk through sort of each one and I

19   will ask you about them.

20          Counsel Financial was one of the investments that you

21   are recommended to Mr. Silver, right?

22   A.  Correct.

23   Q.  And you had invited other friends and family members to

24   participate in Counsel Financial?

25   A.  Several.

FBi5sil3                        Levy - cross

1    Q.  And NewSat was another investment that you invited

2    Mr. Silver to participate in, right?

3    A.  Yes.

4    Q.  And you had put together a group to invest in NewSat?  Is

5    that right?

6    A.  Yes, we did.

7    Q.  And that group included Mr. Silver, right?

8    A.  Yes.

9    Q.  And included other people that you knew?

10   A.  Yes.

11   Q.  And Alpha Orbit was another investment that the prosecutor

12   asked you about.  Do you remember that?

13   A.  Correct.

14   Q.  And to be clear, Alpha Orbit is not a hedge fund itself,

15   right?

16   A.  Correct.

17   Q.  It is a limited liability company --

18   A.  Correct.

19   Q.  -- that you established, right?

20   A.  Correct.

21   Q.  For the purposes of making an investment into a hedge fund?

22   A.  Actually into the management company that runs the hedge

23   fund.

24   Q.  I see.  Okay.

25        And you know Arthur Luxenberg, right?

FBi5sil3                         Levy - cross

```
 1   A.  Yes.
 2   Q.  He is one of the founders of the Weitz & Luxenberg law
 3   firm?
 4   A.  Correct.
 5   Q.  And he is a partner of yours in investments?
 6   A.  Yes.
 7   Q.  And I believe you testified that it was Mr. Luxenberg that
 8   told Mr. Silver about the Alpha Orbit investment?
 9   A.  Yes.
10   Q.  And that Mr. Silver then came to you and asked you what you
11   thought about it?
12   A.  Correct.
13   Q.  And you told him, right?
14   A.  I told him it was -- yes.
15   Q.  You told him what you thought about the investment, right?
16   A.  Correct.
17   Q.  And that it was Mr. Silver's decision as to whether or not
18   he would invest?
19   A.  And how much.
20   Q.  Okay.
21        And Synacor was another investment that the prosecutor
22   asked you about; is it a media company?  Did I understand that
23   correctly?
24   A.  Not really.
25   Q.  What type of company is Synacor?
```

FBi5sil3                          Levy - cross

1   A.  It is a company that runs portals and premium content

2   services for telephone companies and cable companies.

3   Q.  I see.  Okay.

4          And I believe you said that the other investments were

5   most -- all of them were mostly -- they were friends of yours?

6   A.  In Synacor's case?

7   Q.  Yes.

8   A.  Could have been institutional investors as well.

9   Q.  Okay.

10  A.  I'm the chairman of the company.

11  Q.  Okay.

12         One of the investments Ms. Cohen asked you about was

13  the Clover Communities Fund?

14  A.  Correct.

15  Q.  And the money raised through that fund is used to build

16  homes.  Did I understand that correct?

17  A.  Senior housing.

18  Q.  Senior housing?

19  A.  Apartments.

20  Q.  And this is generally sort of in the northeast part of the

21  country?

22  A.  Correct.

23  Q.  So these are housing for folks who have retired?

24  A.  Generally, yes.

25  Q.  But who don't want to move down to Florida?

FBi5sil3                          Levy - cross

1              MS. COHEN:  Objection.

2              THE COURT:  Overruled.

3    A.  These are for -- people I think technically have to be over

4    60 years old to live in these and these are mostly people

5    living in places like Buffalo and Rochester and Syracuse that

6    don't want to leave, want to stay and live in a nice apartment.

7    Q.  And stay close to their families?

8    A.  Correct.

9    Q.  And in your view is this a worthy investment?

10             THE COURT:  I don't know what that means.

11   Q.  I will withdraw the question.

12             You also mentioned, is it Lerer Ventures?

13   A.  Correct.

14   Q.  And if I understood you correctly, it provides early stage

15   seed money?

16   A.  It is a venture fund that invested in early stage

17   technology companies.

18   Q.  So it provides money to businesses that are basically just

19   getting off the ground?

20   A.  Very high risk, yes.

21   Q.  Those businesses don't have the capital to grow on their

22   own; is that fair?

23   A.  Correct.

24   Q.  So they look for investors, right?

25   A.  Yes.

FBi5sil3                          Levy - cross

1   Q.  Such as yourself?

2   A.  Correct.

3   Q.  Okay.  Mr. Levy, the prosecutor --

4            THE COURT:  Levy.

5   Q.  I'm sorry, Levy.  Thank you, Judge.

6            And I apologize, sir.

7   A.  Perfectly okay.

8   Q.  Mr. Levy, the prosecutor asked you if you knew the source

9   of Mr. Silver's money.  Do you remember that?

10  A.  Yes.

11  Q.  And you said -- you said you didn't ask him, right?

12  A.  Correct.

13  Q.  You didn't know, right?

14  A.  That's correct.

15  Q.  Okay.

16           It is not as if you asked him and he refused to tell

17  you, correct?

18  A.  Correct.

19  Q.  And fair to say that it wasn't unusual for you to ask a

20  friend where they got their money?

21  A.  Correct.

22           THE COURT:  Is that what you mean?

23           MS. COHEN:  Object, your Honor.

24  Q.  You have other friends who have invested in some of these

25  vehicles that we have talked about, right?

FBi5sil3                     Levy - cross

1   A.  Correct.

2   Q.  Do you ask them where they got their money from?

3   A.  I did not.

4   Q.  Did they volunteer to you where they got their money from?

5   A.  Not that I know of.

6   Q.  Okay.

7        But Mr. Silver was a friend, right?

8   A.  Correct.

9   Q.  And you knew he was a lawyer at Weitz & Luxenberg, right?

10  A.  Correct.

11  Q.  A successful law firm?

12  A.  Correct.

13  Q.  And you knew that he brought cases into the firm, right?

14  A.  I think so.

15       THE COURT:  Are you just speculating?

16       THE WITNESS:  I only know personally of one or two

17  cases.

18  BY MR. SHUR:

19  Q.  Mr. Levy, the prosecutor asked you if Mr. Silver paid you a

20  fee in connection with introducing him to these investments.

21  Do you remember that?

22  A.  Yes.

23  Q.  And you said no, right?

24  A.  Correct.

25  Q.  Mr. Silver never said he wasn't going to -- you never asked

FBi5sil3                         Levy - cross

1    him to pay a fee, right?

2    A.   That's correct.

3    Q.   Because he is your friend, right?

4    A.   Correct.

5    Q.   And you introduced him to these investments because he is a

6    friend, right?

7    A.   Correct.

8    Q.   The other friends that you have introduced to investments

9    like this, did you charge them a fee?

10   A.   No.

11   Q.   Mr. Levy, fair to say you're a social person?

12   A.   Yes.

13   Q.   You know a lot of people, yes?

14   A.   Yes, I do.

15   Q.   You have a lot of friends?

16   A.   I do.

17   Q.   Friends in the business community?

18   A.   Yes.

19   Q.   Friends who are leaders in the community?

20   A.   Yes.

21   Q.   Friend who are politicians?

22   A.   Yes.

23   Q.   At all levels of government; local, state, federal?

24   A.   Correct.

25   Q.   You are friends with the Assembly Member from Buffalo?

FBi5sil3                          Levy - cross

1   A.  Several of them.

2   Q.  And friends with the Mayor of Buffalo?

3   A.  Several of them.

4   Q.  In fact, one of the former mayors of Buffalo was someone

5   who a friend and who you introduced to an investment, right?

6   A.  Correct.

7   Q.  And you are friends with U.S. Senator Charles Schumer?

8   A.  Yes, I am.

9          MS. COHEN:  Objection, your Honor.

10          THE COURT:  Sustained.  I think you have made your

11   point.

12   Q.  Is it fair to say that you are a connector?

13          MS. COHEN:  Objection, your Honor.

14          THE COURT:  I'm not sure what that means.

15   Q.  You connect people to one another, you make introductions?

16          MS. COHEN:  Objection, your Honor.

17          THE COURT:  Overruled.

18   Q.  You can answer the question.

19   A.  I'm not sure of the definition.

20   Q.  Sure.

21          Well, do you introduce people to one another in the

22   business community?

23   A.  I'm a salesman, so part of sales is relationships.

24   Q.  Do you remember Ms. Cohen asked you whether Mr. Silver put

25   some of his investment in Counsel Financial, I believe she

FBi5sil3                         Levy - cross

1    asked you, in the name of another person.

2              Do you remember that question?

3    A.   Yes, I do.

4    Q.   This other person was his wife?

5    A.   Correct.

6    Q.   Rosa, correct?

7    A.   Correct.

8    Q.   And it wasn't unusual, within Counsel Financial, to have

9    investors' family members invest in the fund, right?

10   A.   Correct.

11   Q.   You, yourself, have family members invested?

12   A.   Most of my family.

13   Q.   I forget exactly which investment vehicle it was in

14   connection with but Ms. Cohen at one point had asked you

15   whether you gave Mr. Silver $250,000 of your investment.  Do

16   you recall that question?

17   A.   I think she was, in that case, talking about Lerer.

18   Q.   And to be clear, you didn't give Mr. Silver the money, he

19   invested it in the investment opportunity, correct?

20   A.   That's correct.

21   Q.   I want to discuss a little bit sort of this term nominee,

22   all right?

23   A.   Sure.

24   Q.   So, we looked at a chart where the term nominee appeared a

25   few times, right?  And there is nothing improper about setting

FBi5sil3                        Levy - cross

1    an investment up through a nominee, correct?

2    A.  Not at all.

3    Q.  And I think you said that this was no different than a

4    direct investment, right?

5    A.  That's correct.

6    Q.  So, if Mr. Silver put in $25,000 and the investment made

7    money he would make money, correct?

8    A.  Everything was a pass-through, correct.

9    Q.  And if the $25,000, he lost it all, then he was out of luck

10   and he lost his money, right?

11   A.  Correct.

12   Q.  The reason it was set up through a nominee was because,

13   based on the way the investment was structured, it had to be

14   set up that way to make the investment?

15   A.  Correct.

16   Q.  Right.

17        You weren't hiding anything, right?

18   A.  No.  Not at all.

19   Q.  You weren't hiding Mr. Silver's participation in this

20   investment, right?

21   A.  Not at all.

22        THE COURT:  Mr. Shur, how much longer are you going to

23   be?

24        MR. SHUR:  Judge, I would say 20 minutes, 25 minutes.

25        THE COURT:  Okay.  Well keep going for another five

1    minutes then we are going to break for lunch.

2                MR. SHUR:  Okay Judge.

3    BY MR. SHUR:

4    Q.  Mr. Levy, you understand that Mr. Silver's district is here

5    in lower Manhattan?

6    A.  I do.

7    Q.  And as a friend, Mr. Silver helped set up an appointment

8    for you to see the September 11th Memorial in Lower Manhattan?

9                MS. COHEN:  Objection, your Honor.

10               THE COURT:  Sustained.

11   Q.  Mr. Levy, are you, based on your relationship with

12   Mr. Silver, are you aware that he cared about issues regarding

13   September 11th --

14               MS. COHEN:  Objection, your Honor.

15   Q.  -- that affected his constituents?

16               THE COURT:  Sustained.

17   BY MR. SHUR:

18   Q.  Mr. Levy, I would like to talk to you about, I think is it

19   the Buffalo Waterfront Commission?

20   A.  Erie Canal Harbor Development Corporation.

21   Q.  I see.

22   A.  I didn't name it.

23   Q.  Okay.  What's the Buffalo Waterfront Commission?  Did I

24   just make that up?

25   A.  Yeah.  There probably was one at one time, though.

FBi5sil3                           Levy - cross

1    Q.  Okay.

2            It is a commission, though?  Did I get that right?

3    A.  Yeah.

4    Q.  So, this was -- was it to rebuild the waterfront in

5    Buffalo?

6    A.  Correct.

7    Q.  So the mission of the commission was to rebuild the

8    waterfront area in downtown Buffalo?

9    A.  That's correct.

10   Q.  And this was good for Buffalo, yes?

11   A.  Great for Buffalo.

12   Q.  And you were appointed to be the -- was it the chair?

13   A.  Yes, I was the chair.

14   Q.  And you were appointed by the governor, correct?

15   A.  Correct.

16   Q.  At the time it was Governor Eliot Spitzer?

17   A.  Yes, sir.

18   Q.  You weren't appointed by the New York State Legislature,

19   right?

20   A.  No.  It did not require approval.

21   Q.  And fair to say that you were well qualified for this

22   position?

23   A.  I would like to think so.

24   Q.  Based on your business experience and your knowledge of and

25   your relationships in Buffalo it made sense, right?

FBi5sil3                        Levy - cross

1   A.  And my passion --

2            MS. COHEN:  Objection, your Honor.

3            THE COURT:  Overruled.

4   Q.  I'm sorry?

5   A.  And my passion for Buffalo.

6   Q.  You have a passion for Buffalo, right?

7   A.  Yes, sir.

8   Q.  And you participated in the commission because you cared

9   about Buffalo, right?

10  A.  Yes, sir.

11  Q.  You weren't paid for this position, correct?

12  A.  No.

13  Q.  You did it on a volunteer basis?

14  A.  Yes.

15  Q.  And you grew up in Buffalo, right?

16  A.  Yes.

17  Q.  And you went to school at SUNY Buffalo?

18  A.  Correct.

19  Q.  At some point after graduating from college you moved to,

20  was it Minnesota?

21  A.  I moved to Albany first.

22  Q.  You moved to Albany, and then there came a point where you

23  left New York?

24  A.  Back to Buffalo, then I went to Minnesota for one year.

25  Q.  And you were, was it the chief operating officer of a

FBi5sil3                          Levy - cross

1     company there?

2     A.  Correct.

3     Q.  It was a great opportunity for you, right?

4     A.  Yes.

5     Q.  But after a while you moved back to Buffalo, right?

6     A.  Yes.

7     Q.  Because you consider Buffalo your home?

8     A.  Yes, sir.

9     Q.  And you started a business there?

10    A.  Several.

11    Q.  And you are passionate about building the economy in

12    Buffalo, right?

13    A.  Yes, sir.

14    Q.  And creating jobs there?

15    A.  Yes.

16    Q.  You are involved in community activities within Buffalo?

17    A.  Many.

18              MR. SHUR:  Judge, I don't know if you want to take a

19    break or I'm happy to continue.

20              THE COURT:  Keep going another few more minutes.

21              MR. SHUR:  Okay.

22              THE COURT:  Don't feel that you have to take up all of

23    this time, Mr. Shur.  If you are out of questions you can say

24    you are out of questions.

25              MR. SHUR:  I understand.  Thank you.

```
 1              THE COURT:  Maybe we can get him out of here before
 2    lunch.
 3              MR. SHUR:  Okay.  I will try my best.
 4    BY MR. SHUR:
 5    Q.  You mentioned that there was a project that the commission
 6    was involved in that was going to be reviewed by the PACB,
 7    right?
 8    A.  Yes.
 9    Q.  And you talked with Mr. Silver about the project, right?
10    A.  Yes.
11    Q.  You were passionate about it, correct?
12    A.  Yes.
13    Q.  It was going to be a good thing for Buffalo?
14    A.  Correct.
15    Q.  And he listened to you, right?
16    A.  Yes, he did.
17    Q.  And he asked thoughtful questions about the project, right?
18    A.  Many.
19    Q.  And fair to say Mr. Silver would listen to the folks who
20    wanted to share their views on a particular issue?
21              MS. COHEN:  Objection, your Honor.
22              THE COURT:  Sustained.
23    Q.  Have you been party to discussions with other people where
24    Mr. Silver listened to them about their views on a particular
25    issue?
```

FBi5sil3                          Levy - cross

1          MS. COHEN:  Objection, your Honor.

2          THE COURT:  Sustained.

3    Q.  I had asked you whether Mr. Silver was hard to read

4    sometimes.  Do you remember that?

5    A.  Yes.

6    Q.  Sir, would you say he has a good poker face?

7    A.  Yes.

8    Q.  But he would listen, right, when you talked to him?

9    A.  Yes.

10   Q.  And sometimes wouldn't necessarily commit, right?

11         MS. COHEN:  Objection, your Honor.

12         THE COURT:  Overruled, but I'm going to stop -- answer

13   that question.

14         THE WITNESS:  Or agreed, correct.

15         THE COURT:  Okay.  I'm going to stop you there.  I

16   unfortunately, otherwise I would do my best to get you off the

17   stand but I have a commitment today for lunch so we are going

18   to have a slightly longer lunch, probably not be back until a

19   little bit after 2:00.

20         Don't discuss the case.  If you want to check your

21   phones, check them early and, again, probably a little after

22   2:00 when we bring you back.

23         (Continued on next page)

24

25

FBi5sil3                          Levy — cross

1                    (Jury not present)

2                    THE COURT:  You are going to come back but go with him

3         now.

4                    (Witness steps down)

5                    THE COURT:  Mr. Shur, I have the feeling that you were

6         filibustering.  I don't know why but that's my sense.  But, be

7         that as it may, you have another 10 minutes to go.

8                    MR. SHUR:  If that, Judge.

9                    THE COURT:  That's what I thought.  Okay.  Be back at

10        five after two.

11                   (Luncheon recess)

12                   (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          AFTERNOON SESSION

2                              2:10 p.m.

3            THE COURT:  You're going to finish the cross, finish

4    with Mr. Levy, and then is that it?

5            MS. COHEN:  We are going to call FBI

6    Special Agent Deanna Pennetta.

7            I have talked to defense counsel, and they have

8    informed us that they have no witnesses on their case.  They

9    sent us a bunch of documents yesterday very late, but we have

10   looked at them.

11           We are prepared to -- I'm going to try to discuss them

12   with defense counsel and maybe narrow the gap.  We do not

13   object on grounds of authenticity to any of the documents.

14   It's simply rather whether they are admissible.

15           My proposal to your Honor is at the afternoon break,

16   Your Honor, that we present you those defense exhibits that the

17   government does not agree to, and perhaps you can just rule on

18   the admissibility.

19           THE COURT:  It sounds to me then like you're going to

20   rest before the afternoon break.

21           MS. COHEN:  Correct.  Except we may have a stip to

22   read in.  We can read that in before the break or after the

23   break.  That's up to your Honor.

24           The testimony of this witness and the next witness

25   should be completed, your Honor.  If that's acceptable to
```

FBIYSIL4                    Levy - Cross

 1    your Honor, it may mean a little bit longer of an afternoon
 2    break, but I don't think much longer.
 3                THE COURT:  That's fine.
 4                Mr. Shur, how much longer do you have?
 5                MR. SHUR:  Five minutes, Judge.
 6                MR. MASTER:  Your Honor, there are a couple of brief
 7    matters that we could take up.
 8                THE COURT:  They're about to come out.
 9                MR. MASTER:  Then we'll just deal with it at a break.
10    Thank you.
11                (Jury present)
12                THE COURT:  Mr. Levy, you're still under oath.
13                Mr. Shur.
14                MR. SHUR:  Thank you, Judge.
15    BY MR. SHUR:
16    Q.  Mr. Levy, we were talking about the Eerie Canal Commission.
17                Do you remember that?
18    A.  Yes, sir.
19    Q.  That's not a private company of yours.  That's a public
20    entity; is that right?
21    A.  That's a state authority.
22    Q.  Its mission is to rebuild and rejuvenate parts of Buffalo?
23    A.  Yes, sir.
24    Q.  I think you mentioned it was a matter before the PACB.
25                Do you recall that?

1    A.   There were several.

2    Q.   Before those matters got to the PACB, they're reviewed and

3    approved by the Urban Development Corporation; is that right?

4    A.   Yes.  Actually, Empire State Development Corporation.

5    Q.   Empire State Development Corporation?

6    A.   Yes, sir.

7    Q.   That's an agency within the executive branch of the

8    New York State government?

9    A.   I believe so.

10   Q.   Before we broke for lunch, you had testified that when you

11   would tell Mr. Silver about investment opportunities, sometimes

12   he would decide to invest, and sometimes he would decide not to

13   invest.

14            Right?

15   A.   Correct.

16   Q.   And Mr. Silver turned down investments because it involved

17   the State of New York; right?

18            MS. COHEN:  Objection, your Honor.

19            THE COURT:  Sustained.

20   BY MR. SHUR:

21   Q.   Are you aware that Mr. Silver turned down investments --

22            MS. COHEN:  Objection, your Honor.

23            THE COURT:  You have to let him finish the question.

24            MS. COHEN:  Can we have a sidebar then?  Because I

25   think he's trying to testify.

1    THE COURT:  Please don't do speaking objections.

2    BY MR. SHUR:

3    Q.  Mr. Levy, are you aware that Mr. Silver turned down

4    investments that you brought to him because they involved the

5    State of New York?

6                MS. COHEN:  Objection, your Honor.

7                THE COURT:  Come up.

8                (At the sidebar)

9                THE COURT:  What possible relevance does that have?

10               MR. SHUR:  It goes to Mr. Silver's state of mind,

11   Judge.

12               THE COURT:  Relative to what?

13               MR. SHUR:  Relative to his private business dealings

14   and his public position.

15               THE COURT:  No.  Doing one good thing doesn't mean

16   that you don't do other bad things.

17               MR. SHUR:  Judge, I'm not saying that.

18               THE COURT:  Well, then why is it relevant?

19               MR. SHUR:  Because it's relevant of his good faith.

20               THE COURT:  In that investment.  So what?  Nobody is

21   charging him with corrupt investments.  They're charging him

22   with money laundering and extortion.

23               This has been a theme.  The fact that someone does

24   good things sometimes has nothing to do, unless you want to

25   call character witnesses and have them be subject to

1    cross-examination as character witnesses.

2           The fact that someone does good things doesn't mean --

3    it has nothing to do with their state of mind relative to bad

4    things.

5           MR. SHUR:  Judge, I understand what you're saying.

6    Let me say this.  The government has argued throughout this

7    trial and in opening statements that Mr. Silver abused his

8    public position each and every step of the way.

9           THE COURT:  In the crimes charged.

10          MR. SHUR:  I've heard this over and over again, that

11   these are building blocks but not one single piece of direct

12   evidence but a thousand different pieces that the government is

13   going to cobble together.

14          Now, this is one question that I'm asking to ask this

15   witness that shows in connection with what the government is

16   saying he abused his public position for private gain here that

17   shows the evidence of his acting in good faith with respect to

18   his private dealings in connection with if there is some

19   overlap with this.

20          MS. COHEN:  Your Honor, I would also add that if he

21   adduces it, it's hearsay.  And second, that he moved to exclude

22   all the other evidence about other times when Sheldon Silver

23   talked to Jordan Levy and Jordan Levy told him he wanted things

24   done from Buffalo and he agreed to do them.

25          You specifically asked for that to be excluded.  If

FBIYSIL4                    Levy - Cross

1    you want to open the door to all that.

2              MR. SHUR:  It's nonhearsay, Judge.

3              THE COURT:  Of course it's hearsay.  How else would he

4    know?

5              MR. SHUR:  It's an event.  It is not a statement.

6              THE COURT:  No.  The statement is why he turned it

7    down.

8              MR. SHUR:  The statement is why he turned it down.

9              THE COURT:  Sustained.

10             Mr. Shur, what else is left?

11             MR. SHUR:  I have like three more questions, Judge.

12             THE COURT:  Not on this subject?

13             MR. SHUR:  Not on this subject.

14             THE COURT:  Okay.

15             (In open court)

16   BY MR. SHUR:

17   Q.  Mr. Levy, the prosecutor asked you about Mr. Silver

18   splitting his note between himself and his wife.

19             Do you recall that?

20   A.  I do.

21   Q.  This was a Counsel Financial note; right?

22   A.  Yes, sir.

23   Q.  Investors in Counsel Financial often will consolidate notes

24   and split notes; right?

25   A.  It's possible, yes.

FBIYSIL4                        Levy - Cross

1   Q.   It's not unusual; right?

2   A.   Probably not.

3   Q.   You mentioned a conversation with Mr. Silver in which he

4   requested to split his note between him and his wife; right?

5            Do you recall that?

6   A.   Yes.

7   Q.   Mr. Silver didn't put his entire investment in Counsel

8   Financial under his wife's name; right?

9   A.   He did not.

10  Q.   He split it evenly, 50/50, between him and his wife; right?

11  A.   Yes.

12  Q.   And splitting assets between husband and wife 50/50 is

13  common for estate planning purposes; right?

14            MS. COHEN:   Objection, your Honor.

15            THE COURT:   Sustained.

16  BY MR. SHUR:

17  Q.   I believe you testified that in your conversation with

18  Mr. Silver that he said it had something to do with his

19  disclosure forms.

20            Do you remember that?

21  A.   Yes.

22  Q.   Are you aware that Mr. Silver disclosed both his and his

23  wife's Counsel Financial note on his disclosure forms in the

24  years before the note was split and in the years after?

25  A.   I am not.

1    Q.  Is it fair to say you're not intimately familiar with

2    Mr. Silver's disclosure forms?

3    A.  Not at all.

4            MR. SHUR:  One moment, Judge.

5            (Pause)

6            MR. SHUR:  Nothing further.  Thank you.

7            THE COURT:  Any redirect?

8            MS. COHEN:  Briefly.

9    REDIRECT EXAMINATION

10   BY MS. COHEN:

11   Q.  Mr. Levy, Sheldon Silver told you that he wanted to split

12   his investment in Counsel Financial between himself and his

13   wife because he didn't want to disclose his entire investment

14   at that time in Counsel Financial on his financial disclosure

15   forms that were filed as part of his requirement as a state

16   elected official; correct?

17   A.  That's my recollection.

18   Q.  And there were no other investors in Counsel Financial who

19   were an elected official; correct?

20   A.  At the time they made their investment?

21   Q.  Correct.

22   A.  Correct.

23   Q.  The only other elected official that was ever even mildly

24   related to Counsel Financial was the former mayor of Buffalo.

25   A.  Correct.

FBIYSIL4                    Levy - Redirect

```
 1   Q.  At the time of his investment, that was of his campaign

 2   fund; right?

 3   A.  Yes.

 4   Q.  At the time of the former mayor's investment, he was

 5   leaving office; is that right?

 6   A.  Yes.

 7   Q.  So there was no other investor in Counsel Financial who was

 8   an elected official who asked you to split their investment in

 9   order to avoid disclosing the amount of their investment to the

10   public; is that right?

11             MR. SHUR:  Objection.

12             THE COURT:  Overruled.

13             You can answer.

14             THE WITNESS:  Yes.

15   BY MS. COHEN:

16   Q.  So there was no one else, other than Sheldon Silver, who

17   ever asked you to split a note in order to avoid public

18   disclosure on their legislative ethnics form?

19             MR. SHUR:  Objection.

20             THE COURT:  I think it's now been asked and answered

21   several times.  Sustained.

22   BY MS. COHEN:

23   Q.  You testified on cross-examination that you are friends

24   with lots of politicians, state, local, and federal.

25             Do you recall that?
```

```
1    A.   Yes.

2    Q.   None of those politicians ever asked you for access to any

3    investments, did they?

4    A.   No, they did not.

5    Q.   Sheldon Silver was the only politician that ever asked you

6    for access to the investments?

7    A.   Yes.

8    Q.   And you testified on cross-examination that you knew of

9    only one or two cases that Sheldon Silver had been involved

10   with at Weitz & Luxenberg.

11             Do you recall that?

12   A.   Yes.

13   Q.   And those cases were accident-type cases; isn't that right.

14   A.   I believe so.

15   Q.   They weren't asbestos cases, were they?

16   A.   Not to my knowledge.

17   Q.   And Sheldon Silver never talked to you about any asbestos

18   cases that he was working on; right?

19   A.   Never.

20   Q.   And Sheldon Silver never talked to you about any

21   asbestos-related research he was interested in; right?

22   A.   No.

23   Q.   And Sheldon Silver never told you about any

24   asbestos-related research that he directed state money to;

25   right?
```

1   A.  No.

2   Q.  And you talked to Sheldon Silver upwards of three times a

3   week?

4   A.  Many times a week.

5            MS. COHEN:  No further questions, your Honor.

6            THE COURT:  Okay.  Thank you.  You can step down.

7            (Witness excused)

8            THE COURT:  Call your next witness.

9            MS. COHEN:  Before we call Special Agent Deanna

10  Pennetta, we'd like to read stipulations into the record.  One

11  is a very lengthy bank record stipulation.

12           And, with the permission of your Honor, rather than

13  read each bank record, account number, and account name, I will

14  just refer to the table.

15           THE COURT:  Perfect.

16           MS. COHEN:  Thank you, your Honor.

17           THE COURT:  You have no objection to that; right?

18           MR. SHUR:  No, your Honor.

19           MS. COHEN:  I know you were looking forward to a

20  revisit of the phone record stipulation.

21           THE COURT:  You have no objection to that; correct?

22           MR. SHUR:  No, Judge.

23           MS. COHEN:  There's also a stipulation related to

24  JoRon, but that is short.  So I will read that.

25           THE COURT:  Okay.

FBIYSIL4                         Levy - Redirect

1           MS. COHEN:  Your Honor, the first stipulation the

2      government would like to read into evidence is marked for

3      identification Government Exhibit S-3.

4           Mr. Coccaro.

5           It is a stipulation between the parties in this case.

6      It states as follows:

7           Number one, if called to testify, a custodian of

8      records for JoRon Management, LLC (JoRon), will testify as

9      follows:

10          The documents marked for identification as Government

11     Exhibits 985 and 1007 through 1060 are true and correct copies

12     of records that were maintained by JoRon in the ordinary course

13     of its activities or made or received at or near the time of

14     the acts, transactions, and events record therein and contained

15     information set forth by or obtained from persons with

16     knowledge of those matters.

17          Number two, if called to testify, a custodian of

18     records for Counsel Financial Services, LLC and Counsel

19     Financial Holdings, LLC, collectively Counsel Financial, would

20     testify as follows:

21          The documents marked for identification as Government

22     Exhibits 950 through 957, 961 through 965, 968, 969, 971, 972,

23     974, 976, 978 through 980, 982, and 1061 are true and correct

24     copies of records that were maintained by Counsel Financial in

25     the ordinary course of its business or made or received at or

FBIYSIL4                    Levy - Redirect

1    near the times of the acts, transactions, and events recorded

2    therein and contain information set forth by or obtained from

3    persons with knowledge of those matters.

4           It is signed by the parties, and it is further

5    stipulated and agreed that this stipulation may be received in

6    evidence as a government exhibit at trial, dated October 28,

7    2015.

8           Your Honor, the government moves Government Exhibit

9    S-3 into evidence.

10          MR. SHUR:  No objection.

11          THE COURT:  Received.

12          (Government's Exhibit S-3  received in evidence)

13          MS. COHEN:  The government also moves Government

14   Exhibits 985 and 1007 through 1060 into evidence.

15          MR. SHUR:  No objection.

16          THE COURT:  985 and 1007 through 1060 are received.

17          (Government's Exhibits 985 and 1007 through 1060

18   received in evidence)

19          MS. COHEN:  Thank you, your Honor.

20          THE COURT:  The other documents are already in

21   evidence or not being moved in?

22          MS. COHEN:  Sorry, your Honor.  I didn't turn the

23   page.  I'm sorry.

24          I believe that most of these actually are in evidence

25   through Paul Cody.  We'll review the list.

FBIYSIL4                        Levy - Redirect

1           THE COURT:  Okay.

2           MS. COHEN:  Your Honor, the government would like to

3    read a stipulation into the record that has been marked for

4    identification Government Exhibit S-5.

5           This is the bank record stipulation.  So I won't read

6    the entire chart and just refer to it, which the defense has no

7    objection to.

8           Marked for identification as Government Exhibit S-5 is

9    a stipulation by and between the parties in this case.  It

10   stipulates as follows much.

11          The exhibits set forth in the following chart contain

12   true and correct copies of financial records that were created

13   by a person with knowledge of or created from information

14   transmitted by a person with knowledge of the information shown

15   or created at or near the time the information became available

16   to the records custodian listed in the chart and were created

17   and maintained by the records custodian listed in the chart as

18   part of its regularly conducted business activity.

19          Page 2, if you can just publish that for the jury, is

20   a chart of different government exhibits listing the custodian

21   for that exhibit, the account name associated with the account,

22   and the account number.

23          The chart continues on page 3 of the stipulation,

24   Mr. Coccaro.

25          Number two, JP Morgan Chase Bank NA, Bank of America

FBIYSIL4                      Levy - Redirect

1    NA, Bank of New York Mellon, Barclays Bank of Delaware, Banco

2    Popular, Citibank, HSBC, Morgan Stanley, and Synacor Bank are

3    financial institutions that are ensured by the Federal Deposit

4    Insurance Corporation.

5              It is dated October 28, 2015, signed by the parties.

6    And it is further stipulated and agreed that this stipulation

7    may be received in evidence as a government exhibit at trial.

8              Your Honor, the government moves Government Exhibit

9    S-5 into evidence.

10             THE COURT:  All right.  S-35 is received.

11             (Government's Exhibit S-5 received in evidence)

12             MS. COHEN:  At this time the government also moves the

13   government exhibits referenced in the chart on page 2 and 3 of

14   Government Exhibit S-5 into evidence.  I can name them, or I

15   can hand up the stipulation to your Honor.

16             THE COURT:  Can you just read the numbers into the

17   record.

18             MS. COHEN:  Absolutely.

19             Government Exhibit 1203, Government Exhibit 1204,

20   Government Exhibit 1205, Government Exhibit 1206, Government

21   Exhibit 1207, Government Exhibit 1208, Government Exhibit 1209,

22   Government Exhibit 1210, Government Exhibit 1222, Government

23   Exhibit 1223, Government Exhibit 1224, Government Exhibit 1225,

24   Government Exhibit 1226, Government Exhibit 1227, Government

25   Exhibit 1228, Government Exhibit 1229, Government Exhibit 1230,

FBIYSIL4                        Levy - Redirect

1   Government Exhibit 1231, Government Exhibit 1232, Government

2   Exhibit 1233, Government Exhibit 1234, Government Exhibit 1235,

3   and Government Exhibit 1236 the government moves into evidence.

4                THE COURT:  Okay.  What is 1235?

5                MS. COHEN:  1235, your Honor, is a bank record from

6   Fidelity Investments regarding an account in the name of Arlene

7   Lerer with account number 614321354.

8                THE COURT:  Was is the account 1236?

9                MS. COHEN:  That is an account in Banco Popular in the

10  name of Arlene Lerer, C/O Sheldon Silver, Esquire, care of

11  Sheldon Silver, Esquire, with the account number 5100004897.

12               THE COURT:  There's no objection to those documents;

13  correct?

14               MR. SHUR:  No objection.

15               THE COURT:  They're received.

16               (Government's Exhibits 1203, 1204, 1205 received in

17  evidence)

18               (Government's Exhibits 1206, 1207, 1208 received in

19  evidence)

20               (Government's Exhibits 1209, 1210, 1222 received in

21  evidence)

22               (Government's Exhibits 1223, 1224, 1225 received in

23  evidence)

24               (Government's Exhibits 1226, 1227, 1228 received in

25  evidence)

FBIYSIL4                          Pennetta - Direct

 1                  (Government's Exhibits 1229, 1230, 1231 received in

 2     evidence)

 3                  (Government's Exhibits 1232, 1233, 1234 received in

 4     evidence)

 5                  (Government's Exhibits 1235, and 1236 received in

 6     evidence)

 7                  MS. COHEN:  Thank you, your Honor.

 8                  At this time the government calls Special Agent Deanna

 9     Pennetta from the Federal Bureau of Special Investigation.

10                  MR. MASTER:  Your Honor, we have the same jury

11     binders.  We've added some charts to those binders and request

12     permission to hand them forward.

13                  THE COURT:  Sure.

14                  MR. MASTER:  May I proceed?

15                  THE COURT:  Please.

16      DEANNA PENNETTA,

17           called as a witness by the Government,

18           having been duly sworn, testified as follows:

19     DIRECT EXAMINATION

20     BY MR. MASTER:

21     Q.  Where are you currently employed?

22     A.  With the Federal Bureau of Investigation.

23                  THE COURT:  You have to speak up nice and loud.

24                  THE WITNESS:  With the FBI.

25     BY MR. MASTER:

1   Q.   What's your title with the FBI.

2   A.   Special agent.

3   Q.   For how long have you been a special agent?

4   A.   Almost five years.

5   Q.   What did you do before becoming a special agent with the

6   FBI?

7   A.   I was a certified public accountant.

8   Q.   And what, if any, specialized training did you need in

9   order to get a CPA?

10  A.   I have an undergrad degree in accounting, and then I

11  trained under another CPA, worked for them for two years.  And

12  I passed the Uniform Licensing Exam.

13  Q.   For how long did you work as a CPA?

14  A.   Six years.

15  Q.   In what areas?

16  A.   I worked for three years as a public accountant

17  specializing in not-for-profit organization auditing, and then

18  I worked for a private company preparing their financial

19  statements for three years.

20  Q.   Now, did there come a time when you were asked to review

21  and analyze certain records in connection with the

22  investigation of Sheldon Silver, the defendant?

23  A.   Yes.

24  Q.   What types of records were you asked to review and analyze?

25  A.   They were financial records, bank statements, copies of

1   checks, business records, referral fee reports, invoices.

2   Q.  What about records related to telephones?

3   A.  Yes.  I also reviewed phone records, call data.

4   Q.  Did you participate in the investigation of this case?

5   A.  No.

6   Q.  What role did you play in this matter?

7   A.  All I did was analyze the data that was provided to me,

8   summarize it.

9   Q.  Did you work by yourself, or did others assist you with

10  data entry?

11  A.  No.  Others assisted with data entry.

12  Q.  Once others working with you entered the data, what role

13  did you play in verifying the accuracy of the data and

14  preparing charts based on that?

15  A.  I confirmed the information in the database to the actual

16  paper copies that we received, and then I used the information

17  in the database to kind of sort it, organize it, summarize it.

18  Q.  Now, let's talk about some of the records that you analyzed

19  and the charts you prepared based on that analysis.

20          Were you provided with records for certain cell phone

21  numbers that were used by Sheldon Silver, the defendant?

22  A.  Yes, sir.

23  Q.  Were you also provided with records related to phone

24  numbers used by individuals and entities that are connected in

25  some way to this matter?

1   A.  Yes.

2   Q.  What were you asked to do with those records?

3   A.  I was asked to look through them and determine how many, if

4   any, contacts between the two numbers there were.

5   Q.  And I'd like to direct your attention to what's in your

6   binder as Government Exhibit 1502.

7           For the members of the jury, it's the first tab after

8   the transcripts.

9           Do you recognize that document?

10  A.  Yes.

11  Q.  How do you recognize it?

12  A.  I prepared it.

13  Q.  Did you prepare it based on the analysis of those cell

14  phone records that you were just describing doing?

15  A.  Yes.

16  Q.  Is it a fair and accurate summary of the information that

17  is contained in those phone records?

18  A.  Yes.

19          MR. MASTER:  The government offers Government Exhibit

20  1502.

21          THE COURT:  Any objection?

22          MR. COHEN:  No objection, your Honor.

23          THE COURT:  1502 is received.

24          (Government's Exhibit 1502 received in evidence)

25  BY MR. MASTER:

FBIYSIL4                     Pennetta - Direct

1    Q.  Just explain for the members of the jury what you did to

2    prepare Government Exhibit 1502.

3    A.  We'll start with the Sheldon Silver 5187 phone number.

4    What I did was I reviewed the phone records that I had for that

5    phone number, and I searched for all of the numbers listed

6    under the contact number column and counted up the instances in

7    which either Sheldon Silver made an outgoing phone call to that

8    contact number and how many times that contact number made an

9    incoming phone call to Sheldon Silver's phone.

10            And then I did the same thing for the 0067 cell phone

11   as well.

12   Q.  You're using the last four digits of the phone number when

13   you're referring to this chart.

14            Let's just explain, I guess, for each -- you're saying

15   you looked at two sets of cell phone records?

16   A.  Yes.  I looked at a full set of cell phone records for the

17   5187 phone and a full set of records for the 0067 phone.  The

18   time periods are listed below for the dates that each of the

19   records covered.

20   Q.  So the third column there in the chart -- it's called call

21   frequency chart, Sheldon Silver cell phones.

22            The third column in the chart -- that reflects

23   activity on what you described as the 5187 phone.  That's the

24   917-603-5187 phone?

25   A.  Yes.

1   Q.  And the fourth column over there -- that's activity that

2   you observed on the 646-438-0067 phone?

3   A.  Yes.

4   Q.  So those are the third and fourth columns.

5           What do the numbers in each of the rows represent?

6   Just starting, for example, with the name Brian Meara.

7   A.  So Brian Meara is the contact, and the phone number

8   associated with Brian Meara is 917-273-1764.

9           So I reviewed the 5187, Sheldon Silver's 5187 phone

10  records -- it was a computerized document.  So I was able to

11  search it quite easily -- and found that there were 234

12  incoming phone calls from Brian Meara's 1764 phone number to

13  Sheldon Silver's 5187 phone number.

14          And there were 54 outgoing calls from Sheldon Silver's

15  5187 number to Brian Meara's 1764 number for a total of 288

16  contacts.

17  Q.  So that's the column that is listed under the row of Brian

18  Meara, 1764, and the phone number of 5187?

19  A.  Yes.

20  Q.  The 288 total calls of which 234 came from the Brian Meara

21  phone to the 5187 phone, and then 54 calls placed from the 5187

22  phone to the Brian Meara 1764 phone?

23  A.  Yes.

24  Q.  Again, you said you were able to search -- you used

25  electronic tools to search for phone counts?

FBIYSIL4                          Pennetta - Direct

1    A.  Yes.  The records were electronic.  So I was able to use a

2    search function and count function to determine the number.

3    Q.  Did those phone records also indicate whether the calls

4    were incoming or outgoing?

5    A.  Yes, they did.

6    Q.  So is that the source of the information that's in this

7    particular cell chart?

8    A.  Yes, it is.

9    Q.  Now, in addition to there being contact between the Brian

10   Meara 1764 phone and the Sheldon Silver 5187 cell phone, was

11   there also contact between the Brian Meara of 1764 cell phone

12   and the Silver 0067 phone?

13   A.  Yes.  I did the same -- I performed the same search

14   function for the 0067 phone and found that there were two

15   incoming calls from Brian Meara's 1764 phone, and there were 20

16   outgoing calls from Sheldon Silver's 0067 phone to Brian

17   Meara's 1764 phone for a total of 22 phone calls between the

18   two.

19   Q.  And then, just going down the line, there was another phone

20   record that was provided to you that's associated with Brian

21   Meara, and you observed six -- is it fair to say you observed

22   six incoming calls from the 5127 number to the 5187 cell phone?

23   Correct?

24   A.  Yes.

25   Q.  Now, there are also two phone numbers here that are

1   associated with Arthur Luxenberg.

2           Did you observe activity and contact between the two

3   Sheldon Silver cell phones and those two numbers that are

4   associated with Arthur Luxenberg?

5   A.  Yes.  For Arthur Luxenberg's 6118 phone number, there was a

6   total of 287 calls between that and Sheldon Silver's 5187

7   phone.

8           Of those 287 calls, 210 were incoming, which means

9   they were made from Arthur Luxenberg to Sheldon Silver, and 77

10  were outgoing.  That's from Sheldon Silver to Arthur Luxenberg.

11          The same with Sheldon Silver's 0067 phone number.

12  There was a total of 3672 calls between 0067 and Arthur

13  Luxenberg's 6118 phone number.  151 incoming calls from Arthur

14  Luxenberg to Sheldon Silver and 211 outgoing calls from Sheldon

15  Silver to Arthur Luxenberg.

16  Q.  And, again, you don't have to read each of the entries, but

17  is there activity between the 5163 phone and Sheldon Silver's

18  two cell phones?  The Luxenberg 5613 phone.

19  A.  Yes, there is.

20  Q.  Then there's a phone number associated with someone named

21  Jordan Levy.

22          Is there activity between a phone number associated

23  with Jordan Levy and both of the Sheldon Silver cell phones?

24  A.  Yes, there is.

25  Q.  And there are several numbers associated with Dr. Robert

FBIYSIL4                        Pennetta - Direct

1      Taub.

2              Do you see those numbers listed?

3      A.  Yes, I do.

4      Q.  In your search of the Sheldon Silver 5187 cell phone

5      records, do you see any contact between those three numbers

6      associated with Dr. Robert Taub and the 5187 cell phone?

7      A.  No.

8      Q.  Again, what is the date range for the records associated

9      with the 5187 phone?

10     A.  Those records cover the period of October 14, 2005, through

11     January 21, 2015.

12     Q.  So, for that entire period of time, you observed no contact

13     between Sheldon Silver's 5187 cell phone and those three

14     numbers associated with Dr. Taub?

15     A.  That's correct.

16     Q.  Now, on the 0067 phone, did you observe any contact between

17     Sheldon Silver's 0067 cell phone and those three phone numbers

18     that are associated with Dr. Robert Taub?

19     A.  Yes, I did.

20     Q.  Did you observe any incoming calls from Dr. Taub's phones

21     to the Sheldon Silver cell phone?

22     A.  No.

23     Q.  What calls did you observe?

24     A.  All of the calls were outgoing.  For Dr. Taub's 164 phone

25     number, there were three outgoing calls placed from Sheldon

1  Silver to Dr. Taub, and there was one outgoing call placed from

2  Sheldon Silver to Dr. Taub at his 0349 phone number.

3  Q.  Now, in the case of five calls or fewer, what additional

4  detail were you able to provide in this chart?

5  A.  I also listed the dates which the calls were made.

6  Q.  So, with respect to the calls from Sheldon Silver's 0067

7  phone to the Dr. Taub 1614 phone, what information were you

8  able to provide on this chart?

9  A.  That there was a total of three outgoing calls.  Two were

10  made from Sheldon Silver to Dr. Taub on May 24, 2010, and there

11  was a third call made on December 6, 2011.

12  Q.  Then with respect to the Dr. Taub 0349 phone, what

13  additional information were you able to provide?

14  A.  There was one outgoing call placed from Sheldon Silver to

15  Dr. Taub on October 27, 2010.

16  Q.  There's also a phone number associated with the

17  Mesothelioma Center, Columbia Mesothelioma Center.

18          Do you see that number listed there?

19  A.  Yes.

20  Q.  Did you also search to see if there was any contact of any

21  kind between Sheldon Silver's cell phones and that Mesothelioma

22  Center?

23  A.  I did search, and I did not find any records of contact

24  between those numbers.

25  Q.  Then there are two numbers associated with a Richard Runes.

1          Do you see that?

2   A.  Yes.

3   Q.  Did you see any contact between Sheldon Silver's 5187 cell

4   number and either of those numbers?

5   A.  No, I did not.

6   Q.  Did you see any incoming calls from Richard Runes' numbers

7   to Sheldon Silver's 0067 number?

8   A.  No, I did not.

9   Q.  Did you observe any calls from the 0067 number to either

10  number associated with Richard Runes?

11  A.  Yes, I did.  There was one outgoing call to Richard Runes

12  at the 4900 number on May 18, 2012.  And there were two

13  outgoing calls to Richard Runes' 5100 phone number.  One was

14  made on May 21, 2012, and the second was made on May 3, 2013.

15  Q.  There are numbers associated with Charles Dorego and

16  Glenwood Management.

17          Do you see that?

18  A.  Yes.

19  Q.  Did you see any contact between Sheldon Silver's cell

20  phones, either of them, and either of those numbers?

21  A.  No, I did not.

22  Q.  Then there are contacts between two numbers associated with

23  Jay Arthur Goldberg and either of Sheldon Silver's cell phones.

24          Did you observe any contact between the 5187 number

25  and either number associated with Jay Arthur Goldberg?

FBIYSIL4                        Pennetta - Direct

1    A.  No, I did not.

2    Q.  Did you observe any contact between Sheldon Silver's 0067

3    phone and either Jay Arthur Goldberg phone?

4    A.  Yes.  There were two instances of contact with Jay Arthur

5    Goldberg's 1048 phone.  One was an incoming call from

6    Mr. Goldberg to Sheldon Silver on January 18, 2012.

7         And the second instance was an outgoing call from

8    Sheldon Silver to Mr. Goldberg on October 29, 2013.  There were

9    also 25 outgoing calls from Sheldon Silver to Jay Arthur

10   Goldberg at his 5582 phone number.

11   Q.  You can set that aside.

12        Now, in addition to summarizing call frequency in

13   Government Exhibit 1502, were you asked to look for contacts

14   between certain numbers that were listed on 1502 on certain

15   dates?

16   A.  Yes, I was.

17   Q.  If you wouldn't mind just taking a look in your binder at

18   an excerpt of what was previously admitted as records for

19   Government Exhibit 1307-1, which is Sheldon Silver's 0067

20   number.

21        This is not in the jury binder.  It is in the agent's

22   binder alone.  We will put information up on the screen for the

23   members of the jury.  It's not a summary chart?

24        THE COURT:  Is there an exhibit number?

25        MR. MASTER:  1307-1.

1           THE COURT:  It's already in evidence?

2           MR. MASTER:  It is already in evidence.

3   BY MR. MASTER:

4   Q.  Again, what number is associated with these records?

5   A.  This is for phone number 646-438-0067.

6   Q.  I'd like you to take a look at entries for December 28,

7   2010.

8           MR. MASTER:  Mr. Coccaro, that's page 132 of the

9   exhibit.

10  BY MR. MASTER:

11  Q.  Special Agent Pennetta, it's at 130513 in your binder Bates

12  number.

13          Do you see it there?

14  A.  Yes, I do.

15  Q.  I would just like to call your attention to the bottom of

16  that page.

17          MR. MASTER:  Mr. Coccaro, are you able to zoom in on

18  the bottom of the page?

19  BY MR. MASTER:

20  Q.  Do you see a call in those records on December 28, 2010, at

21  10:54 a.m.?

22  A.  Yes, I do.  It's 2011, not 2010.

23  Q.  I'm sorry.  My apologies.  December 28, 2011, at 10:54 a.m.

24  A.  Yes, I do.

25  Q.  Is that an incoming call or an outgoing call?

 1    A.   That is an outgoing call.

 2    Q.   To what number was that call placed?

 3    A.   917-750-5582.

 4    Q.   Do you see that number on Government Exhibit 1502?

 5    A.   Yes, I do.

 6    Q.   Who is that number associated with?

 7    A.   Jay Arthur Goldberg.

 8    Q.   What is the next call immediately following that call to

 9    the 5582 number associated with Jay Goldberg?

10    A.   There is another outgoing call at 11:01 a.m. to phone

11    number 917-273-1764.

12    Q.   Do you see that number on Government Exhibit 1502 as well?

13    A.   Yes.  That number is associated with Brian Meara.

14    Q.   Is there a physical location reflected on Sheldon Silver's

15    phone records for those calls?

16    A.   Yes.  New York, New York.

17    Q.   Now, if you wouldn't mind turning to what's in your binder

18    and previously admitted as Government Exhibit 1308-1-A.

19         Do you see that in your binder?

20    A.   Yes.

21    Q.   Are those records associated with Brian Meara's 1764

22    number?

23    A.   Yes, they are.

24    Q.   If you wouldn't mind just turning to page 10 of that

25    exhibit or Bates 134609.

1          Do you see a call that corresponds, an incoming call,

2     that corresponds with the outgoing call that we just looked at?

3     A.  Yes.  On 12-28.  It shows an incoming call at 11:01 a.m.

4     from phone number 646-438-0067.

5          MR. MASTER:  Mr. Coccaro, if you wouldn't mind zooming

6     in on that.

7     BY MR. MASTER:

8     Q.  Is there a location, physical location, of the phone that's

9     reflected in this exhibit?

10    A.  Yes.  It shows that Brian Meara's phone was in Lake Worth,

11    Florida, at the time of the call.

12    Q.  Now, just staying with Mr. Meara's records for the moment,

13    I'd like you to turn to the next page, page 11.

14          Do you see a call to -- well, do you see a call in

15    those records at 5:02 p.m. on December 29, 2011?

16    A.  Yes, I do.

17    Q.  To what number was that call made?

18    A.  That was made to 646-258-3300.

19          MR. MASTER:  Mr. Coccaro, if you wouldn't mind just

20    zooming in on that.  It's in the bottom part of the page, if it

21    works.

22    BY MR. MASTER:

23    Q.  You said there's a call to the number 646-258-3300?

24    A.  Yes.

25    Q.  Just going back to 1502, who is that phone number

FBIYSIL4                       Pennetta - Direct

1    associated with?

2    A.   Charles Dorego.

3    Q.   What is the physical location of the phone as reflected in

4    these records?

5    A.   Lantana, Florida.

6    Q.   Is there a state associated with the receiving end of the

7    call?

8    A.   It shows the destination as New York.

9    Q.   Now, if you wouldn't mind turning to the next page, which

10   is page 12.

11           What, if any, additional calls do you see to or from

12   that 3300 number on that date?

13   A.   On December 30, there's a call at 2:44 p.m. made to that

14   phone number, an outgoing call.  There's also a call on

15   December 30 at 2:52, an incoming call, from the 3300 phone

16   number.

17   Q.   What is the location of the Meara phone in both of those

18   calls?

19   A.   Lantana, Florida.

20   Q.   If you wouldn't mind looking down that page to a call that

21   occurred that same day.

22           MR. MASTER:  Mr. Coccaro, if you wouldn't mind zooming

23   in on December 30 at 10:41 p.m.  It's about midway down the

24   page.

25   BY MR. MASTER:

FBIYSIL4                        Pennetta - Direct

1   Q.  Do you see a call to a number 917-273-5100 at that time?

2   A.  Yes, I do.

3   Q.  Do you know from 1502 who is that number associated with?

4   A.  That number belongs to Richard Runes.

5   Q.  Is that an incoming call or an outgoing call?

6   A.  That is an outgoing call.

7   Q.  What is the location of the phone, the Meara phone, as

8   reflected by these records?

9   A.  Lantana, Florida.

10  Q.  What is the location of the Runes phone?

11  A.  New York, New York.

12  Q.  Before we conclude looking at these phone records, I'd like

13  you to turn back to 1307-1.

14          MR. MASTER:  If you wouldn't mind, Mr. Coccaro,

15  turning to page 133 of 1307-1.

16  BY MR. MASTER:

17  Q.  It's in your binder at 130514, Special Agent Pennetta.

18          Do you see any additional calls on December 28, 2011,

19  to the 5582 phone associated with Jay Goldberg?

20  A.  Yes.  There is a phone call at 3:03 p.m., an outgoing call,

21  to 5582.

22  Q.  That's from the Sheldon Silver 0067 number?

23  A.  Yes, it is.

24  Q.  If you wouldn't mind turning to January 8, 2012.

25          MR. MASTER:  That's 136, Mr. Coccaro.

FBIYSIL4                          Pennetta - Direct

1    BY MR. MASTER:

2    Q.  It's Bates 130517, Special Agent Pennetta.

3         Do you see any call in that record on January 8, 2012,

4    at 10:45 a.m.?

5    A.  Yes, I do.  There's an outgoing call to phone number

6    917-750-5580.

7    Q.  Again, that's from the Sheldon Silver 0067 phone to the Jay

8    Arthur Goldberg 5582 phone?

9    A.  Yes, it is.

10   Q.  And now just turning in your binder to calls associated

11   with January 18, 2012.

12        MR. MASTER:  Mr. Coccaro, it's page 138.  It's Bates

13   130519.

14   BY MR. MASTER:

15   Q.  Do you see any outgoing calls to the 5582 phone on

16   January 18, 2012?

17   A.  Yes.  There was one outgoing call at 12:30 p.m.

18   Q.  Do you see what is the location of the phone -- the

19   outgoing call from Sheldon Silver's 0067 phone to the 35582

20   phone?

21   A.  It shows that the 0067 phone was located in Albany,

22   New York.

23   Q.  Where was the location of the receiving phone?

24   A.  New York, New York.

25              (Continued on next page)

FBi5sil5                        Pennetta - direct

1    BY MR. MASTER:

2    Q.  And, do you also see a call immediately following that

3    outgoing call from the number 212-344-1048?

4    A.  Yes, I do.

5    Q.  And just looking back at 1502, who is that number

6    associated with?

7    A.  Jay Arthur Goldberg.

8    Q.  I would like to, before we set these aside, if you wouldn't

9    mind just turning to the records associated with January 30th,

10   2012?  Mr. Coccaro, it is page 40 of the exhibit and I think it

11   is Bates 130521.

12        Do you see a call from the Sheldon Silver 0067 phone

13   to the Jay Arthur Goldberg 5582 phone on that date?

14   A.  Yes.  A call was made at 2:55 p.m.

15   Q.  And Mr. Coccaro, if you wouldn't mind zooming in to that?

16        You can set that aside.  So now, setting aside those

17   phone records, let's talk about another category of records.

18   Did you analyze certain business records for the Law Firm of

19   Weitz & Luxenberg?

20   A.  Yes, I did.

21   Q.  I would like you to take a look at what's on the witness

22   stand there as Government Exhibit 514-1 through 514-155.  Do

23   you recognize those documents?

24   A.  These are the business records that I analyzed.

25   Q.  Describe what those records are and what you did with them.

1    A.  These are copies of checks and referral fee reports and

2    what we did, I worked with some other people to create a

3    database, we entered all the information into a database, and

4    from there I was able to organize and summarize and sort it.  I

5    summarized it by date and by client name.

6    Q.  And are those -- you said date and client name.  Are those

7    referral fee reports associated with referral fees paid to

8    Sheldon Silver?

9    A.  Yes, they are.

10   Q.  And so, Mr. Coccaro, if you wouldn't mind taking a look at

11   Government Exhibit 514-1?

12          Is that the first referral fee report or first

13   referral fee check that you observed based on your review of

14   these records?

15   A.  Yes.  It is the center check on the page.

16   Q.  Mr. Coccaro, if you wouldn't mind zooming in on that check?

17          What is the amount of the check?

18   A.  $176,068.02.

19          MR. COHEN:  Excuse me, your Honor.  Are these in

20   evidence?

21          MR. MASTER:  They are; they were admitted through Gary

22   Klein.

23   Q.  That's the referral fee check.  Were you able to enter the

24   date of that referral fee check in your database?

25   A.  Yes; the date is March 18, 2005.

FBi5sil5                        Pennetta - direct

1    Q.  And then are there reports that are associated with that

2    referral fee check?

3    A.  Yes, there are.

4    Q.  And just explain for the members of the jury what you did

5    with the data that's contained in the referral fee reports?

6    A.  All the information was entered, like I said it was entered

7    into a database including the client name and the dollar amount

8    of the referral fee and the dates of the checks, and I sorted

9    and summarized it by client name and date.

10   Q.  So now I would like you to take a look at what's in your

11   binder as Government Exhibit 441 -- and that is already in

12   evidence.  Did you also analyze that record?

13   A.  Yes, I did.

14   Q.  Just explain for the jury what this reflects.

15   A.  This is another business record from Weitz & Luxenberg and

16   it lists out, as the title shows, referral cases for Sheldon

17   Silver so it shows the client name and the intake date which is

18   the date of the referral from Sheldon Silver that he referred

19   it to the client, to Weitz & Luxenberg, it shows the status of

20   the client's case, and the fee listing as the percentage of the

21   referral fee.

22   Q.  Now, what were you asked to do with Government Exhibit 441

23   and records of New York Presbyterian Hospital related to

24   Dr. Robert Taub which were already introduced as Government's

25   Exhibits 329, 358 and Government's Exhibits 548 to 571?

FBi5sil5                    Pennetta - direct

1   A.  I was asked to review both and to compare the client names

2   from the Weitz & Luxenberg list of Sheldon Silver referrals to

3   the patient names of Dr. Taub.

4   Q.  And what analysis of the database that you prepared of

5   those referral fee reports were you able to perform once you

6   had a list of clients on 441 who were also patients of

7   Dr. Taub?

8   A.  I was able to show the dates and dollar amounts and

9   referral fees that Weitz & Luxenberg paid to Sheldon Silver for

10  referrals related to clients that were also patients of

11  Dr. Taub.

12  Q.  I'm showing you -- I would like you to take a look in your

13  binder at what's been marked for identification Government

14  Exhibit 1509.

15          THE COURT:  Ladies and gentlemen, don't open your

16  binders until it gets into evidence, okay?

17          MR. MASTER:  Sorry.

18  Q.  So, when I say I would like you to take a look at your

19  binder I am just referring to the witness, not the jury.

20          So, Special Agent Pennetta, is this a chart that you

21  prepared based on the analysis you just described performing?

22  A.  Yes, it is.

23  Q.  And just explain again how you prepared this chart.

24  A.  I reviewed the listing of referral clients from Sheldon

25  Silver to Weitz & Luxenberg that we just reviewed, as well as a

FBi5sil5                          Pennetta - direct

1    patient listing from Dr. Taub, and for any of the names that

2    were included on both of those documents I listed them out

3    here.  The intake date is from the sheet that was just up here,

4    the Weitz & Luxenberg list, so that shows the date of the

5    referral and the fees paid to Silver.  On the chart here is a

6    total of the referral fees that Sheldon Silver was paid from

7    Weitz & Luxenberg with regard to each of these clients that

8    were also patients of Dr. Taub.

9    Q.  Is it a fair and accurate summary of the information you

10   just described reviewing and analyzing?

11   A.  Yes, it is.

12            MR. MASTER:  The government offers Government Exhibit

13   1509.

14            MR. COHEN:  I'm going to object.

15            Your Honor, may we approach?

16            THE COURT:  Okay.

17

18

19

20

21

22

23

24

25

FBi5sil5                         Pennetta - direct

1              (At side bar)

2              MR. COHEN:  I spoke to Mr. Master before.  I'm going

3    to have an objection to this exhibit and another couple that he

4    proposes to offer for this reason:  The document refers to Taub

5    Patients to Silver and I don't have any question but that

6    Mr. Silver was paid by Weitz & Luxenberg here and these folks

7    may have been, indeed, patients based on the Columbia records

8    of Dr. Taub.  There is a no proof of tying them together that

9    the patients of Dr. Taub had became Weitz & Luxenberg clients

10   as a result of a referral.  I don't have a problem with the

11   document other than it is Taub patients to Silver because this

12   suggests that they have connected the two.

13             Dr. Taub testified that there were between 20 and 50

14   patients that he referred to Weitz & Luxenberg with Silver, he

15   says, in his testimony -- I have it here -- closer to 25.  In

16   his 9/15 debriefing by the government he lists only about four

17   or five, maybe seven patients that he thinks he may have

18   referred.  So, the problem is obviously we are both going to

19   argue in summation opposite views of how many patients there

20   are that were referred.  The problem with putting this record

21   into evidence, and they'll --

22             THE DEPUTY CLERK:  Excuse me, Judge.  One of the

23   jurors has to go to the rest room.

24             THE COURT:  Take them.

25             MR. COHEN:  We are going to both argue this.  The

1    problem is they are going to take this document, blow it up, it

2    is going to be in the jury room and it is now going to be

3    carved in stone that these 48 patients -- the number here is

4    48 -- these patients were actually referred from Dr. Taub to

5    Mr. Silver and Weitz & Luxenberg.  That's my problem with the

6    document.  There are a couple more documents, too, that they're

7    referring to them as Taub -- basically Taub referrals -- it

8    says Taub patients to Silver.  I don't have any problem with

9    the fact that they were Taub patients.  I don't have any

10   problem with the fact that they were ultimately Silver clients.

11              THE COURT:  Your problem is with the heading of the

12   chart.

13              MR. COHEN:  Correct; and that's going to be true on a

14   number of other documents.

15              MR. SHUR:  Sorry to interrupt.

16              MR. COHEN:  My lawyer.

17              MR. SHUR:  One additional data point.

18              Gary Klein, who is sort of the Weitz & Luxenberg

19   records custodian, his testimony was pretty clear they don't

20   track referrals from doctors because they don't pay the doctors

21   a referral fee and so there was no -- he said there is no

22   definitive way to tell from the intake form just because it

23   says it is a patient of Taub doesn't mean it was referred by

24   Taub.

25              THE COURT:  But they paid referral fees to Silver.

1           MR. SHUR:  Right, but this chart clearly suggests that

2     they were Taub referrals.

3           THE COURT:  No, no.  I understand.

4           MR. SHUR:  Okay.

5           THE COURT:  I understand what the objection to the

6     heading is.

7           MR. COHEN:  Okay.

8           MR. MASTER:  Your Honor, several points in response.

9           First of all, Dr. Taub stated in his testimony that he

10    didn't remember exactly how many patients because he didn't

11    take a -- keep a record of it.  We also heard testimony from

12    numerous witnesses, Arthur Luxenberg, Gary Klein, Charles

13    Ferguson, that with a couple --

14          THE COURT:  With one exception.

15          MR. MASTER:  -- with a couple of the exceptions all

16    the referrals to Sheldon Silver from asbestos cases came from

17    Dr. Taub.  Because Dr. Taub did not have a specific memory of

18    exactly the identity of the patients who were referred and

19    because the Weitz & Luxenberg records, as Mr. Shur described,

20    are not fulsome in terms of tracking the referrals, what we

21    did, which is what we are permitted to do, is to use business

22    records to establish the number of Dr. Taub patients who --

23          THE COURT:  I completely understand what you did.

24          MR. MASTER:  Yes.

25          THE COURT:  I also understand their objection.  Can

1   the heading be changed?

2             MR. MASTER:  So then there is yet another issue here.

3             These were provided to the defense, again, more than a

4   month ago.  This is not -- when the witness is on the stand is

5   awful and is not an appropriate time.  I think this is a fair

6   ground for cross-examination and it is a fair ground for

7   argument on summation.  This is an accurate description, it is

8   Taub patients to Silver.  That is the number --

9             THE COURT:  Taub patients for which Silver received

10  referral fees.

11            MR. MASTER:  Correct.

12            MR. COHEN:  Your Honor, we have no problem -- I will

13  talk to my colleagues but I don't expect we will have any

14  problem with if they want to repair these charts or amend them

15  and put them in on Monday before closing statements.

16            MR. MASTER:  No, that's -- I'm sorry to interrupt.

17            MR. COHEN:  Okay.

18            MR. MASTER:  I hate to interrupt but, yes, because

19  this is while the witness is on the stand is not an appropriate

20  time to object to some --

21            MR. COHEN:  I'm sorry.  We talked about this two days

22  ago.

23            MR. MASTER:  I don't believe we did.  I don't believe

24  we did.

25            THE COURT:  Here is one thing I know.  Nobody brought

FBi5sil5                        Pennetta - direct

1   it to my attention before the witness was on the stand which is

2   not an appropriate time to do it.

3           MR. COHEN:  I'm sorry.

4           THE COURT:  This is exactly --

5           MR. COHEN:  No, no, your Honor.  We had talked about

6   doing it.  We had talked about it this morning and your Honor

7   had a run and we didn't want to interrupt.  They're not

8   proceeding in bad faith and neither are we.

9           MR. MASTER:  I'm not suggesting that you are

10  proceeding in bad faith.  All I am saying is that this was the

11  product of painstaking effort over a period of months to

12  analyze all of these records and put them together.  This was

13  not intended to mislead at all.  I'm happy to describe --

14          MR. COHEN:  I'm not suggesting that the government is

15  misleading.

16          THE COURT:  Nobody is suggesting that.  However, I

17  understand their objection.  I am prepared to allow you to use

18  the chart.  I want you to say that the headline is going to be

19  changed to reflect these are Taub patients for which Silver

20  received fees.  That is an accurate statement of what this is.

21          MR. COHEN:  How about Taub patients who became

22  Weitz & Luxenberg clients?

23          MS. COHEN:  No.

24          MR. COHEN:  That's true.

25          THE COURT:  No.

 1                MS. COHEN:  Your Honor?

 2                THE COURT:  What.

 3                MS. COHEN:  I think the testimony is clear and the

 4    documents support that these are Taub patients that he referred

 5    to Silver, not just that were referred to Silver that he sent

 6    to Silver.  There is nothing inaccurate about that title.

 7                THE COURT:  Well, he doesn't know.  His testimony --

 8    look.  You have got --

 9                MS. COHEN:  I understand he may not know but there was

10    other testimony.

11                THE COURT:  You have all got fair argument.

12                MR. MASTER:  We have all got fair argument.

13                MS. COHEN:  It is our chart.

14                THE COURT:  You want to get it in?

15                MR. MASTER:  Yes.  Absolutely we want to get it in but

16    all Ms. Cohen is suggesting if the defense has some other take.

17    I understand they prepared their own chart to use in

18    cross-examination.

19                MS. COHEN:  Put their own charts on.

20                MR. COHEN:  Not relating to this.

21                MR. MASTER:  Well, you know, not on this specific

22    point, but.

23                MS. COHEN:  They can make their arguments.

24

25

FBi5sil5                        Pennetta - direct

1                    (In open court)

2                    THE COURT:  Ladies and gentlemen, can I ask you all to

3       step into the jury room?

4                    I ask you to step out of the witness box.

5                    (Witness steps down)

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBi5sil5                        Pennetta - direct

1            (Jury not present)

2            THE COURT:  All right.  We are going to resolve now

3      all of the issues that the defense has with the government

4      charts, something that should have been done before the witness

5      was on the stand.

6            MR. COHEN:  Okay.

7            THE COURT:  Mr. Cohen, we have discussed your

8      objection to the heading of 1509.

9            MR. COHEN:  Right.

10           THE COURT:  What other objections do you have?

11           MR. COHEN:  Same heading at 1511.

12           THE COURT:  1511?  1511.

13           MR. COHEN:  I'm sorry, 1508.  1508.  It is the same

14     headliner.

15           MR. MASTER:  Your Honor, just on this point, the

16     defense used this very chart in its opening.  So, just in terms

17     of --

18           THE COURT:  With that heading?

19           MR. MASTER:  Well, they said these are the referrals

20     that Sheldon Silver got from Dr. Taub.  They actually -- they

21     used the 48 referrals, they used this information because we

22     had provided it to the defense well before trial and they in

23     fact embraced it.  So, you know, again, it is very surprising.

24           MR. SHUR:  Judge, just to clarify the record.  The

25     exhibit that was used in opening was a different chart, it was

1    actually made by the defense and while it --

2             THE COURT:  But did it use the 48 number?

3             MR. SHUR:  Well, it included the number and it was

4    described as this is the government's allegation.  We didn't

5    embrace it or concede it.  It actually had a different title.

6    We did not use the same title that was on --

7             THE COURT:  What was the title?

8             MR. SHUR:  I would have to go and --

9             THE COURT:  Okay.  Snap-a-doodle.

10             MS. COHEN:  Your Honor, it is the same 48 number which

11    is the relevant issue here.

12             MR. COHEN:  I don't have a problem with the number,

13    your Honor, if it is not the Taub's referring.

14             MR. SHUR:  We can publish it, your Honor.  And I don't

15    believe, again, in the defense's opening, that there was a

16    concession of any kind, it was simply this is what the

17    government has alleged.

18             MR. MASTER:  I don't think that's accurate.  I think

19    that they embraced this number and, again, it states Taub

20    patients choosing Weitz & Luxenberg and it was specific to

21    Sheldon Silver at Weitz & Luxenberg.  These are the exact same

22    numbers again reflecting that the defense has had this

23    information, the government's summary charts, for quite some

24    time and this is not an issue that we thought would be

25    contested at all because, again, it was embraced by the

FBi5sil5                          Pennetta - direct

1    defense.

2              THE COURT:  Mr. Master, you have made that point.

3              MR. MASTER:  I got it.

4              THE COURT:  I agree with you that I am not happy with

5    how the defense is handling this.  That only gets you so far.

6    It gets me annoyed but doesn't ultimately end the ruling

7    because the chart needs to be right as to what the evidence is

8    or I have to be persuaded that it is right enough that the

9    defense can make their points and the government can make your

10   points.

11             MR. COHEN:  Your Honor, the next one is --

12             THE COURT:  Do you remember when in the opening it

13   was?

14             MR. GOLDSTEIN:  Your Honor, page 55 of the transcript.

15             THE COURT:  Well, thank you.

16             It is all cast in terms of this is what the government

17   says.

18             Okay, what is your other issue, Mr. Cohen?

19             MR. COHEN:  Exhibit 1514 refers to that pie chart pink

20   thing as Weitz & Luxenberg Taub fees.

21             THE COURT:  Well --

22             MR. COHEN:  And up on the left-hand corner, too.

23             THE COURT:  What is that?  I'm not quite sure, what

24   does the top line on 1514 mean?

25             MR. COHEN:  It is not the top line, over to the right

FBi5sil5                          Pennetta - direct

1    where it says --

2              THE COURT:  It is over to the left, you mean?

3              MR. COHEN:  On the right it says where the little pink

4    dot there Weitz & Luxenberg Taub fees.

5              THE COURT:  It is on both sides.

6              MS. COHEN:  Correct, your Honor.

7              THE COURT:  What does that mean?  What does that line

8    represent, Mr. Master?

9              MR. MASTER:  Yes.  So again, Special Agent Pennetta

10   will testify that as a result of the database activity --

11             THE COURT:  Yeah, yeah, yeah, yeah.

12             MR. MASTER:  She was able --

13             THE COURT:  Is that all?  Is that 100 percent -- does

14   the red represents all Weitz & Luxenberg?  No, it is all

15   Silver's -- the pie chart is all of Silver's money from

16   Weitz & Luxenberg of which 75.3 percent reflects asbestos

17   patients of Taub?

18             MR. MASTER:  Yes.

19             THE COURT:  That one seems unobjectionable.

20             MR. COHEN:  Okay.  1507, the numbers at the top are

21   Weitz & Luxenberg Taub fees.

22             THE COURT:  That, again, would be Weitz & Luxenberg

23   fees for Taub patients.  That does not seem objectionable, even

24   under your theory.

25             MR. COHEN:  Okay.  And on the middle on the right it

FBi5sil5                          Pennetta - direct

1    says Taub fees, the first of those five or six insets on the

2    right.

3              THE COURT:  Again, that's Weitz & Luxenberg Taub fees

4    so those are fees to Weitz & Luxenberg from Taub patients?

5              MR. COHEN:  Taub patients, right.

6              THE COURT:  So there is nothing problematic about that

7    labeling.

8              MR. COHEN:  I think the others -- same problem on

9    1515, your Honor, the last one, Weitz & Luxenberg Taub fees,

10   same header there.

11             THE COURT:  Again, those are fees that Mr. Silver

12   received of Taub patients, right?  You have got your argument

13   that not all of them -- I can't imagine -- with all due

14   respect, I can't imagine that Weitz & Luxenberg is going to pay

15   Sheldon Silver a referral fee for a case that he didn't bring

16   in.  Now, if your theory is he may have brought in some Taub

17   patients external to anything that Taub did --

18             MR. COHEN:  Without a referral.

19             THE COURT:   -- you can make your argument, but this

20   doesn't in any way suggest anything to the contrary.

21             MR. COHEN:  That's fine, I suppose, your Honor, if the

22   government is not going to use those charts to suggest the

23   opposite of what your Honor just said.

24             THE COURT:  Oh, they're going to argue till the cows

25   come home that every one of these was referred by Taub to

FBi5sil5                          Pennetta - direct

1   Silver because Silver didn't have any other way to get these

2   mesothelioma patients and that his -- Taub's testimony was

3   about -- I didn't count, I don't know how many cases are all

4   there, I presume it is something north of 20 -- but, having

5   seen Dr. Taub testify you can make your argument that he said

6   20, this is 45, the government hasn't proven that every single

7   one of these patients came Taub to Silver to Weitz & Luxenberg.

8           MR. COHEN:  Well, the problem is this document, which

9   is going to be large in the jury room, they're going to use to

10  say this has been carved in stone.  These are patients

11  referrals from Dr. Taub to Mr. Silver and that's what we are

12  concerned about.

13          THE COURT:  Again, this label I don't think creates

14  that problem.  The only one that I see that arguably creates

15  that problem is the first one which is 1509.

16          MR. COHEN:  I hear you, your Honor.  We are not

17  completely satisfied with what your Honor has done.  We are

18  grateful for what you are doing on the first exhibit and I'm

19  sorry for having brought this to you --

20          THE COURT:  So, your other objections are overruled.

21  The objection as to 1509 is sustained but I'm not going to stop

22  the witness.

23          So, in other words, what you are going to have to do,

24  Mr. Master, is essentially explain that the title is going to

25  be changed but that otherwise the chart is going into evidence.

 1          Had this been raised earlier this could have been done

 2     before today but it wasn't and so that's how we are going to

 3     deal with it because I'm not stopping the train for this.

 4          MR. COHEN:  I hear you.

 5          THE COURT:  Okay.

 6          MR. MASTER:  Your Honor, what is the title that your

 7     Honor is going to pose?

 8          THE COURT:  I have a very clever title for it.  I

 9     don't remember exactly, something like Taub patients for which

10     Silver received referral fees.

11          You are sure you want that change, defense?

12     Personally it seems a little worse to me, but that's your

13     tactical decision.  We will say "Taub patients for which Silver

14     received referral fees."

15          MR. MASTER:  Yes, your Honor.

16          (Counsel conferring)

17          MR. MASTER:  Actually, your Honor, there is one --

18     withdrawn.

19          (Counsel Conferring)

20          MR. COHEN:  We prefer your Honor's proposed change.

21          THE COURT:  Okay.  Got it?

22          MR. MASTER:  Yes, your Honor.

23          THE COURT:  Okay.  Seriously gentlemen, and Ms. Cohen,

24     are there any other issues of this nature that are going to

25     interrupt the testimony between now and when the government

1    stands up and says the government rests?

2              MS. COHEN:  I cannot speak for the defense.  I can

3    tell you that Joel Cohen provided us with one chart that we

4    went over with him and we do not expect any objections because

5    we told him what our problems were ahead of time.

6              THE COURT:  And you think he --

7              MR. COHEN:  This is a bouquet from Ms. Cohen that is

8    really unusual.

9              THE COURT:  It had some dandelions in it, though.

10             Anything else from the defense?  To the extent you are

11   going to try to use exhibits with this special agent, the

12   government has seen them, you made the fixes that the

13   government asked for?

14             MR. COHEN:  Yes.  We are fine, your Honor.  Thank you.

15             THE COURT:  Okay.  There is going to be blood on the

16   floor if that's not true.

17             MS. COHEN:  Your Honor, if we could just have a minute

18   to explain the title change to the agent so there is no

19   confusion on the record about it that is detrimental?

20             THE COURT:  Yes.

21             MS. COHEN:  Thank you.

22             THE COURT:  Anything further?  I realize that y'all

23   aren't getting an afternoon break.  Let's bring the jury back

24   in.

25             I really -- I really -- would like the government to

FBi5sil5                          Pennetta - direct

1    rest today.

2              MS. COHEN:  We are prepared to do so, your Honor.

3              THE COURT:  How much longer do you think you have with

4    her, Mr. Master?

5              MR. GOLDSTEIN:  We would like the defense to rest

6    today.

7              THE COURT:  Me too.

8              MR. MASTER:  We have maybe half an hour, 45 minutes.

9              THE COURT:  Maybe you can shorten some of this.  I

10   think, you know --

11             MS. COHEN:  He will try his best, your Honor.

12             THE COURT:  I realize the phone records took a little

13   longer I think than this will, right?

14             MR. MASTER:  Exactly; and then there is the 1957 count

15   that we have to trace the funds.

16             MS. COHEN:  We have to trace the money.

17             THE COURT:  Okay.  The note from the jury says the

18   projector is off and they can't see all of the records on the

19   projection screen.

20             MR. GOLDSTEIN:  We fixed it.

21             THE COURT:  Okay.  Thank you.

22             (Continued on next page)

23

24

25

1                    (Jury present)

2                    THE COURT:  Okay, Ms. Pennetta, you are still under

3     oath.

4                    Okay, so the issue is 1509, the objection is

5     overruled.

6                    (Government's Exhibit 1509 received in evidence)

7     BY MR. MASTER:

8     Q.  Special Agent Pennetta, can you just look at 1509?

9                    And if the jury could just turn in their binders to

10    1509?

11                   Just for the record, the title of this chart is going

12    to be modified to state the following, and it will be replaced

13    in the admitted exhibits with this title:  Taub Patients for

14    which Sheldon Silver Received Referral Fees.

15                   With that, Special Agent Pennetta, can you explain to

16    the members of the jury how you created this chart?

17    A.  Yes.

18                   I used the business records from Weitz & Luxenberg

19    that listed out the referral -- the referrals from Sheldon

20    Silver, it was the previous exhibit we had up here, it had the

21    client names on it and I compared that to a listing of patients

22    of Dr. Taub and for names that appeared on both lists as

23    clients of Weitz & Luxenberg and as patients of Dr. Taub.  I

24    included them in this chart here.  The Weitz & Luxenberg intake

25    date comes from the business records of Weitz & Luxenberg that

1    shows the date of the referral to Weitz & Luxenberg.  And the

2    fees paid to Silver summarizes the total referral fees that

3    Weitz & Luxenberg paid to Sheldon Silver for each of these

4    clients who are also patients of Dr. Taub.

5    Q.  And so, the total that's on the right-hand column, for

6    example where the patient name Pieper is with intake date of

7    11/18/04 for $461,774.57, is that the total of referral fees

8    paid in all of those referral fee reports you reviewed for that

9    particular patient of Dr. Taub?

10   A.  Yes.

11   Q.  And for each of these entries for which there is a number,

12   are those individuals or clients of Weitz & Luxenberg for which

13   Sheldon Silver received referral fees?

14   A.  Yes.

15   Q.  And what is the total referral fees obtained by Sheldon

16   Silver, paid to Sheldon Silver, for Taub patients referred to

17   Weitz & Luxenberg for which Sheldon Silver got credit?

18   A.  The total referral fees he received was $3,057,901.07.

19   Q.  In addition to compiling this detailed chart with names and

20   intake dates and total dollar amounts, if you wouldn't mind,

21   Special Agent Pennetta first, turning to Government Exhibit

22   1508?  Is that another chart you created based on the

23   information that you just described analyzing?

24   A.  Yes, it is.

25   Q.  And so, describe what you did to create this chart.

1   A.   This chart comes from the list of patients of Dr. Taub as

2   well as the referrals to Weitz & Luxenberg, and this just

3   shows, categorizes by year.  It shows that in 2003 there was

4   one patient of Dr. Taub's who Sheldon Silver referred to

5   Weitz & Luxenberg as a client of theirs for which he received

6   referral fees.

7   Q.   Is it a fair and accurate summary of the information that

8   you analyzed?

9   A.   Yes.

10          MR. MASTER:  The government offers Government Exhibit

11   1508.

12          MR. COHEN:  I have no objection beyond what was stated

13   at the bench, your Honor.

14          THE COURT:  Okay, and that was overruled, so 1508 is

15   received.

16          (Government's Exhibit 1508 received in evidence)

17   BY MR. MASTER:

18   Q.   There is a table on the left-hand side of the bar chart.

19   Is the same data reflected in both charts?

20   A.   Yes, it is.

21   Q.   So the left-hand side is the actual numbers?

22   A.   Yes.

23   Q.   And what's the total count?

24   A.   48.

25   Q.   And then on the right-hand side there is what is known as a

1   bar chart, and just for the members of the jury who haven't

2   seen this type of chart before, can you just explain what it

3   is?

4   A.   This just depicts the same thing that's in the chart to the

5   left.  So, the years are listed across the bottom horizontally

6   and vertically is the number of patients, so you will see that

7   in 2003 there was one patient, and if you look at the

8   corresponding chart on the left you see that 2003 there was one

9   patient, you can follow along.  2004 there were six patient

10  referrals.  And that is the same that is in the chart to the

11  left.

12  Q.   Now, did the referral fee reports that you included in your

13  database include referral fees paid for clients other than

14  those who you were able to determine were patients of Dr. Taub?

15  A.   Yes, they did.

16  Q.   How did you categorize referral fees paid on those other

17  cases that you were not able to establish were patients of

18  Dr. Taub?

19  A.   In my analysis and summary charts I called them

20  Weitz & Luxenberg other fees.

21  Q.   And as part of your analysis, did you prepare a summary of

22  all Weitz & Luxenberg referral fees that you were able to

23  confirm were actually paid to Sheldon Silver broken down by

24  fees for referrals of Dr. Taub patients versus fees for all

25  other cases?

1    A.  Yes, I did.

2    Q.  Is that what is reflected in your binder at Government

3    Exhibit 1514?

4    A.  Yes, it is.

5    Q.  Is that a fair and accurate summary of your analysis?

6    A.  Yes, it is.

7            MR. MASTER:  The government offers Government Exhibit

8    1514.

9            THE COURT:  No objection; Government Exhibit 1514 is

10   received.

11           (Government's Exhibit 1514 received in evidence)

12   BY MR. MASTER:

13   Q.  If you can turn to that?  It is the next one in the jury's

14   binder?  If you can explain to the jury what is reflected in

15   this chart?

16   A.  This shows the different types of referral fees that

17   Sheldon Silver received from Weitz & Luxenberg.

18           As we have already discussed, there were referral fees

19   for patients, Dr. Taub and that's the chart on the left that

20   shows the $3 million number, that's the same as the previous

21   chart we just looked at and, as we just explained, the other

22   fees includes all other referral fees that Sheldon Silver

23   received from Weitz & Luxenberg for clients that were not

24   patients of Dr. Taub.  And then, to the right, there is a

25   corresponding pie chart for just a visual of the different

1   types of fees.

2   Q.  Does the visual also break down the percentage of total

3   fees, referral fees paid to Sheldon Silver that are Dr. Taub

4   patients versus all other sources?

5   A.  Yes, it does.

6   Q.  And what are the percentages?

7   A.  For Dr. Taub patients Sheldon Silver received -- of the

8   total referral fees from Weitz & Luxenberg that Sheldon Silver

9   received, 75.3 percent were from patients of Dr. Taub and 24.7

10  percent were from all other cases.

11  Q.  Now, before we move on this states:  Weitz & Luxenberg

12  referral fees 2005 to 2014.  Why did you start in 2005?

13  A.  That was the date of the first referral fee check that

14  Sheldon Silver received.

15  Q.  And is that what we just looked at 514-1?

16  A.  Yes.

17  Q.  Now, if you wouldn't mind, Special Agent Pennetta, turning

18  to your binder Government Exhibit 1507?

19          THE COURT:  Jury, wait until we get it into evidence,

20  okay?

21  Q.  Now, were you also asked to review and summarize records

22  related to Sheldon Silver's annual salary at Weitz & Luxenberg?

23  A.  Yes, I was.

24  Q.  What types of records did you review?

25  A.  Cancelled checks, paychecks.

1   Q.  And what, if any records, related to Sheldon Silver's New

2   York State salary, were you asked to review?

3   A.  I reviewed a schedule of his annual salary from New York

4   State.

5   Q.  Mr. Coccaro, if you wouldn't mind pulling up that schedule,

6   Government Exhibit 222?

7          While that's happening, in addition to that, were you

8   asked to compile in a database referral fee payments from the

9   Goldberg firm to Sheldon Silver?

10  A.  Yes, I was.

11  Q.  And if you wouldn't mind just taking a look in your binder

12  what's been marked for identification -- or I'm sorry, what's

13  already admitted into evidence as Government Exhibit 646-1 to

14  646-34 and 650-1 to 650-13?  Are those the Goldberg referral

15  fee records that you reviewed?

16  A.  Yes, they are.

17  Q.  Now, with all of this information were you asked to put

18  together a chart that shows dollar amounts of payments Sheldon

19  Silver received from each of those sources by year?

20  A.  Yes.

21  Q.  So, I would like you to take a look at Government Exhibit

22  1507.  Is that the chart you were asked to prepare?

23  A.  Yes, it is.

24  Q.  Does it fairly and accurately represent the information on

25  the chart?

FBi5sil5                          Pennetta - direct

1   A.  Yes.

2              MR. MASTER:  Government offers 1507.

3              THE COURT:  Any objection?

4              MR. COHEN:  No objection, other than what was stated

5   at side bar.

6              THE COURT:  That was overruled.  1507 is received.

7              (Government's Exhibit 1507 received in evidence)

8   BY MR. MASTER:

9   Q.  So now there are two charts here on -- two charts that are

10  in Government Exhibit 1507, first let's describe the top chart.

11             Mr. Coccaro, if you wouldn't mind zooming in on that?

12             You stated earlier that your database reflects fees

13  not only associated with particular clients of

14  Weitz & Luxenberg but also by year?

15  A.  Yes.

16  Q.  And so, were you able to actually compile referral fees by

17  source for each of the years 2005 to 2014?

18  A.  Yes.

19  Q.  And so, is that what's reflected in the first two columns,

20  that is, the Taub fees and the Weitz & Luxenberg other fees?

21  A.  Yes.

22  Q.  And so, are those totals that are listed there the same

23  ones that are listed in the prior exhibit, that pie chart?

24  A.  Yes, they are.

25  Q.  Then there is also another column, Goldberg fees.  Are

1    those fees that you were able to confirm or actually pay to

2    Sheldon Silver for those years by the Goldberg firm?

3    A.  Yes.

4    Q.  That's that column.

5         Then there is NYS salary; what does that column

6    reflect?

7    A.  That shows Sheldon Silver's salary from New York State as

8    reflected in the schedule.

9    Q.  And then the final column, W & L salary; what is that?

10   A.  That is Sheldon Silver's annual salary for

11   Weitz & Luxenberg -- from Weitz & Luxenberg.

12   Q.  And then there is a final column there where it lists

13   totals.  What is the totals column?

14   A.  The total summarizes all the previous columns; it includes

15   the referral fees from Weitz & Luxenberg for Dr. Taub patients

16   and all other clients, the referral fees from the Goldberg

17   firm, Sheldon Silver's New York State salary, as well as his

18   salary from Weitz & Luxenberg.

19   Q.  And then there is a bottom row that says total.  Is that

20   the total for a particular source for each, for all years that

21   are reflected in your chart?

22   A.  Yes.  That row is totaled by source as well as a total of

23   the total column.

24   Q.  Then there is a bar chart beneath.  If you would just

25   explain for the members of the jury what is reflected in that

FBi5sil5                              Pennetta - direct

1    chart?

2    A.   This is just a visual of the chart directly above it.  It's

3    color-coded to make it a little easier to understand.

4            So, the first, the red one is Weitz & Luxenberg Taub

5    fees that we have already discussed and so that shows that in

6    2005 it was just shy of $300,000.  And if you refer back to the

7    chart above, you can see that in 2005 the actual dollar amount

8    of referral fees that Sheldon Silver received was $282,152.36.

9    And it goes like that for each year.  So, if you follow the red

10   lines, that's the dollar amount corresponding on the left-hand

11   vertical axis of fees that Sheldon Silver received for patients

12   of Dr. Taub.  The next one is the green line is for other

13   referral fees that Sheldon Silver received from

14   Weitz & Luxenberg.  The orange is fees from the Goldberg firm.

15   The blue is his New York State salary.  And the purple is

16   Sheldon Silver's salary from Weitz & Luxenberg.

17   Q.   Now, it states in this chart or the title of this chart is

18   fees paid to -- I'm sorry -- Sheldon Silver combined year.  For

19   Weitz & Luxenberg Taub fees, Weitz & Luxenberg other fees and

20   Goldberg fees, did you only include information in this chart

21   if you could confirm that these fees were actually paid to

22   Sheldon Silver?

23   A.   Yes.  I only included referral fees that I was able to

24   trace back that were actually deposited into his bank account.

25   Q.   In your review of business records of Weitz & Luxenberg and

1  the Goldberg firm, were there other business records that

2  reflected additional fees that were paid or that appeared to

3  have been paid or might have been paid to Sheldon Silver but

4  for which you weren't able to confirm a corresponding deposit

5  in the bank account?

6  A.  Yes.  The business records reflected some additional

7  referral fees owed to Sheldon Silver but I was not able to

8  trace those certain dollar amounts to confirm that they were

9  actually deposited into his bank account.  So, those numbers

10  are not included on this chart.

11  Q.  I would like you to take a look at what is in your binder

12  as Government Exhibit 1515.  What is reflected in this chart?

13  A.  This shows the total referral fees that were both paid and

14  what I call accrued, meaning according to the business records

15  these were fees owed to Sheldon Silver, but this is the amount

16  I was not actually able to trace into the bank account and the

17  categories are the Weitz & Luxenberg Taub patient referrals,

18  other fees for Weitz & Luxenberg and referral fees for the

19  Goldberg firm.

20  Q.  And does it fairly and accurately represent your review of

21  these business records?

22  A.  Yes.

23          MR. MASTER:  The government offers Government Exhibit

24  1515.

25          MR. COHEN:  Same objection, your Honor.

1              THE COURT:  Same ruling.

2              1515 is received.

3              (Government's Exhibit 1515 received in evidence)

4    BY MR. MASTER:

5    Q.  I am not sure if it is in the jury's binders so if you

6    wouldn't mind displaying it?

7              In the paid column, is that the information that you

8    were able -- I don't believe it is in the jury's binders.  My

9    apologies to the jury but it is up on the screen.  And so, for

10   this one, what were you able, the paid column, is that the same

11   information that's in Government Exhibit 1507?

12   A.  Yes.  Those numbers correspond to the previous exhibit.

13   Q.  And then there is this new column called Accrued.  Are

14   those additional fees that the business records reflect were

15   owed to Sheldon Silver?

16   A.  Yes.  Those are the additional fees that were owed to

17   Sheldon Silver that I was not able to confirm were deposited

18   into his bank account.

19   Q.  And so, for example, with respect to the Goldberg fees, how

20   much additional accrued fees were you able to determine from

21   the business records were owed to Sheldon Silver?

22   A.  It was an additional $153,408.26.

23   Q.  So, if you were to include both the ones you were able to

24   trace into a bank account and these other ones that you were

25   able to -- that were reflected in business records how much, in

1    total, in Goldberg fees, were either paid or owed to Sheldon

2    Silver?

3    A.  $835,315.72.

4    Q.  Are there additional amounts that you were able to see in

5    the Weitz & Luxenberg records that were accrued to Sheldon

6    Silver for both Taub and others?

7    A.  Yes.

8    Q.  We can set that aside.

9            Now, let's turn to a final category of data that you

10   reviewed.

11           Did there come a time when you were provided records

12   for an HSBC account in the name of Sheldon Silver, counselor at

13   large, Sheldon Silver, Esquire for the account number

14   6460414943?

15   A.  Yes.

16           MR. MASTER:  Those are records, your Honor, previously

17   introduced into evidence by stipulation as Government Exhibit

18   1229.

19           THE COURT:  1249?

20           MR. MASTER:  1229.

21           THE COURT:  1229.

22   BY MR. MASTER:

23   Q.  If you wouldn't mind describing for the members of the jury

24   what records associated with that account you were able to

25   obtain and review?

FBi5sil5                          Pennetta - direct

1   A.  These were bank records so it included things like bank

2   statements; copies of checks both checks that were written from

3   the account and deposits so checks that were deposited into the

4   account as well as deposit slips.

5   Q.  And what did you and others who worked with you do with

6   those 4943 account records?

7   A.  We created another database that included all of the

8   information regarding each transaction in the bank statements

9   to include things like the item descriptions, the dollar

10  amounts, the dates, and any other information that was

11  included.

12  Q.  Now, were the Weitz & Luxenberg and Goldberg fee checks

13  that you saw, based on your review of business records that you

14  have just described, deposited into those 4943 -- the 4943

15  account?

16  A.  Yes, they were.

17  Q.  And how about the New York State salary?  Was that

18  deposited into this account?

19  A.  No.  That was deposited into a different account.

20  Q.  In summary, what were the largest sources of deposit into

21  the 4943 account during the period that you reviewed?

22  A.  The largest were referral fees from Weitz & Luxenberg.

23  Q.  And again, were the Goldberg fees also deposited into that

24  account?

25  A.  Yes.

FBi5sil5                         Pennetta - direct

1    Q.  Were you asked to perform a more detailed analysis of

2    certain payments or disbursements made from that 4943 account

3    to entities called Counsel Financial and JoRon Management?

4    A.  Yes, I was.

5    Q.  And what did you do to analyze those disbursements?

6    A.  I looked at -- I started with the disbursement from the

7    4943 account and I traced the transactions backwards in time --

8    I traced the deposits backwards in time until I reached a

9    number that was at least as great as the disbursement, if that

10   makes sense.

11   Q.  And did you exclude any smaller transactions from that

12   exercise?

13   A.  Yes.  I set a scope limitation of $1,000.  So, in my

14   analysis I only included deposits into the 4943 account

15   immediately preceding the selected disbursements that were

16   greater than $1,000.

17   Q.  When there were multiple deposits on the same date, what

18   did you do?

19   A.  I included all of them because I was not able to determine

20   which items were deposited first.

21   Q.  And so we will explain what you did in more detail in a

22   moment, but for now take a look at Government's Exhibits 1511,

23   1512, and 1513.  Are those charts that you prepared based on

24   the analysis of JoRon and Counsel transactions that you were

25   just describing?

FBi5sil5                        Pennetta - direct

1   A.  Yes, they are.

2   Q.  Do they fairly and accurately summarize your analysis?

3   A.  Yes, they do.

4             MR. MASTER:  The government offers Government's

5   Exhibits 1511, 1512 and 1513.

6             MR. COHEN:  No objection.  I'm sorry.

7             THE COURT:  Okay, 1511, 1512 and 1513 are received.

8             (Government's Exhibits 1511, 1512 and 1513 received in

9   evidence)

10  BY MR. MASTER:

11  Q.  If you wouldn't mind turning to 1511 first?  So now let's

12  start with the scope of your analysis.  What's the title of

13  this chart?

14  A.  Payments Greater than $10,000 to Counsel Financial and

15  JoRon Management from 4943 account 2010 to 2014:  Source

16  Information.

17  Q.  And why is that the scope of the chart?

18  A.  The disbursements I tracked in this chart were the ones

19  that were listed in the indictment.

20  Q.  So, with respect to these particular transactions listed in

21  the indictment you have transaction numbers listed on the left.

22  Just describe for the members of the jury what those

23  transaction numbers represent?

24  A.  Each transaction number corresponds to a disbursement so,

25  for example, the first transaction 1 includes the deposits

FBi5sil5                         Pennetta - direct

1   greater than $1,000 immediately preceding the disbursement

2   that's highlighted in orange.

3   Q.  So let's just walk through a couple of these as examples

4   and then there is a couple of additional charts that provide

5   additional detail that we will go into.

6           So, first with respect to transaction 1, Mr. Coccaro,

7   would you mind pulling up page 1948 of Government Exhibit 1229

8   and just zoom in on that?

9           Now, at the bottom of this transaction number there is

10  an entry that is listed in or that is colored in orange, red,

11  and that's a disbursement in the amount of $100,000.  What is

12  reflected here on your screen?  Is that the disbursement that

13  is reflected in your chart?

14  A.  Yes.  That's a copy of the check.

15  Q.  And so, again, what did you do to track back, track back or

16  trace source information for the funds that were used to fund

17  that check?

18  A.  So I began, as I stated earlier, I began with the

19  disbursement so in this first transaction no. 1 I started on

20  8/12/2010 and reviewed the bank records and worked backwards in

21  time and I listed out all deposits greater than $1,000 that

22  were immediately preceding this $100,000 disbursement.  And I

23  continued listing deposits until the total deposits into the

24  account totaled at least $100,000.

25  Q.  Now, there are four deposits preceding that $100,000

1    disbursement that are listed there.  If you wouldn't mind just

2    explaining what is reflected in this chart concerning the

3    source of those deposits?

4    A.   The first and the last deposit into the account with dates

5    of 7/22/2010 and 8/5/2010 are payroll checks that Sheldon

6    Silver received from Weitz & Luxenberg.  And the middle two

7    dated 7/22/2010 and 7/30/2010 are referral fee checks that

8    Sheldon Silver received from Weitz & Luxenberg, and based on

9    the referral fee reports that I have from the business records

10   from Weitz & Luxenberg I was able to determine that the

11   clients, for which these referral fees were paid, were also

12   patients of Dr. Taub.  And so, that's the W & L Taub fees

13   description to the far right.

14   Q.   And so, 100 percent of the fees or of the referral fee

15   check that are listed there are from the Taub patients?

16   A.   Yes.

17   Q.   And Mr. Coccaro, if you wouldn't mind pulling up again

18   Government Exhibit 1229, page 1938, just to reflect the

19   deposit?

20           While we wait, just returning to this chart, 1511, did

21   each of your -- did each of these transactions follow the -- I

22   mean, did your analysis proceed the same way with respect to

23   each of these transactions?

24   A.   Yes.  For each transaction I began with the selected

25   disbursements which are the ones that were listed in the

1    indictment and I traced deposits greater than $1,000 into the

2    account immediately preceding the disbursement.

3    Q.   And so, let's set aside transactions 2 and 7 for the moment

4    which are referenced in greater detail in 1512 and 1513, but

5    for transaction 3, the disbursement is it a JoRon Management.

6    Is there a description there?

7    A.   Yes.  The description on the check was "capital call Clover

8    Com II."

9    Q.   And again, what source information were you able to

10   determine, based on your review of these records?

11   A.   I was able to determine that there were a number of payroll

12   checks from Weitz & Luxenberg and that there were -- there was

13   a referral fee check from the Goldberg firm with regards to a

14   property of Glenwood Management and there were also referral

15   fees from Weitz & Luxenberg for both for patients of Dr. Taub

16   and for other clients that were not related to Dr. Taub.

17   Q.   With respect to this one at least, when you say other fees,

18   is that the $2.17?

19   A.   Yes.  I broke out the detail to the far right.  So, there

20   was one referral fee check for $8,235.72.  Of that total

21   $8,233.55 related to patients of Dr. Taub and $2.17 related to

22   other referral fees for other clients that were not patients of

23   Dr. Taub.

24   Q.   Mr. Coccaro, you don't need to put up 1513.

25        With respect to transaction 4, with respect to the

FBi5sil5                    Pennetta - direct

1   outflow, is that also a transaction to JoRon Management?

2   A.  Yes.  The disbursement is $33,668.58 to JoRon Management,

3   LLC.

4   Q.  And again, you provided source information with respect to

5   the sources from Weitz & Luxenberg other than the payroll

6   payments.  Were all of the fee checks associated with Taub

7   patients?

8   A.  Yes, they were.

9   Q.  And then with respect to transaction 5, did you observe a

10  $50,000 outflow from the HSBC account to JoRon Management

11  posted on February 22nd, 2013?

12  A.  Yes, I did.

13  Q.  And again, with respect to the source information, what

14  types of sources did you observe for that disbursement?

15  A.  There were two payroll checks from Weitz & Luxenberg.

16  There was also a deposit from a flex spending account.  And

17  then there were numerous referral fee checks from the Goldberg

18  firm related to a client Glenwood Management, and there was

19  also a referral fee check from Weitz & Luxenberg where a

20  portion related -- of that referral fee check related to

21  patients of Dr. Taub and a portion related to other clients.

22  Q.  And again, with respect to the breakdown, is it fair to say

23  that of that $69,755.39 check, all but $26.90 were for Taub

24  patients?

25  A.  Yes.

1   Q.  And transaction 6, which was a $19,000.05 disbursement to

2   JoRon Management, again, what source information were you able

3   to determine for that?

4   A.  There was one payroll check from Weitz & Luxenberg and

5   there was also one referral fee check from Weitz & Luxenberg.

6   This referral fee check also included multiple clients.  Of the

7   $27,281.37 check, $27,278.06 related to clients that were also

8   patients of Dr. Taub and $3.31 related to other clients.

9   Q.  Now, there are two other transactions listed here that have

10  asterisks next to them and are those the subjects of

11  Government's Exhibits 1512 and 1513?

12  A.  Yes.

13  Q.  And so, for transaction 2, is that the subject of

14  Government Exhibit 1512?

15  A.  Yes.

16  Q.  Based on your review, and if you wouldn't mind turning to

17  Government Exhibit 1512, this is the second transaction that is

18  listed in the indictment.  Under transaction 2 where it says

19  disbursements to JoRon Management which there are two

20  disbursements to JoRon Management, what was the immediate

21  source that you were able to determine based on your review of

22  the bank records?

23  A.  I used the same process I described.

24          So, the deposits into the account immediately

25  preceding the two JoRon Management disbursements were greater

1   than $1,000; two were from Dreyfus and one was a referral fee

2   check from Weitz & Luxenberg.

3   Q.   And is that a Dreyfus investment account in the name of

4   Sheldon Silver?

5   A.   Yes, it is.

6   Q.   Now, when you reviewed those bank records were you also --

7   the same 4943 bank records -- did you actually see a

8   disbursement from the 4943 account into that same Dreyfus

9   account before the checks were written from Dreyfus to the 4943

10  account?

11  A.   Yes.

12  Q.   And so, is that what's depicted in Government Exhibit 1512?

13  A.   Yes.

14  Q.   And so, in other words, the Dreyfus account that funded the

15  July 11, 2011 checks to JoRon Management that, in turn, was

16  funded by fees from the 4943 account?

17  A.   Yes.

18  Q.   And so, Mr. Coccaro, if you wouldn't mind pulling up

19  Government Exhibit 1229, page 1986?

20         And while we wait for that, so that you observed a

21  disbursement to that same Dreyfus account in the amount of

22  $150,000, correct?

23  A.   Yes; on September 30th, 2010.

24  Q.   Is that the check -- if you wouldn't mind zooming in,

25  Mr. Coccaro?

FBi5sil5                           Pennetta - direct

1              Is that the check that came out of the 4943 account

2     that went into this Dreyfus account?

3     A.   Yes.

4     Q.   And how did you analyze the source of that check?

5     A.   I used the same logic that I did for the others.  I started

6     with this check and this date and I traced deposits going back

7     in time, deposits into the 4943 account greater than $1,000 and

8     listed them out until I reached a minimum of the $150,000

9     disbursement.

10    Q.   And what did you determine once you used that methodology

11    looking at the source of that check?

12    A.   There were some payroll checks from Weitz & Luxenberg,

13    there were referral fee checks from the Goldberg firm related

14    to a Glenwood Management client.  There were referral checks

15    from -- excuse me -- referral fee checks from Weitz & Luxenberg

16    related to patients of Dr. Taub.  And, there was a deposit from

17    JoRon Management into the account as well.

18    Q.   And so, with respect to this, did that source information

19    include a $193,737.89 fee check from Weitz & Luxenberg?

20    A.   Yes, it did.

21    Q.   And were all of those for patients of Dr. Taub?

22    A.   Yes.

23    Q.   And then if you just wouldn't mind turning to Government

24    Exhibit 1511 again, and this is the last part of testimony,

25    this last transaction, transaction 7, which is a $16,397.72

1    disbursement to JoRon Management.  Do you see that?

2    A.  Yes.

3    Q.  What was the immediate source for that -- for that

4    disbursement?

5    A.  There was some -- there was some deposits from One Liberty

6    Partners, SSA.  There was two Weitz & Luxenberg payroll checks.

7    The majority, I guess, was funded from a deposit from Fidelity.

8    Q.  Is that the source information for that Fidelity deposit

9    what's reflected in Government Exhibit 1513?

10   A.  Yes, it is.

11   Q.  So, Mr. Coccaro, if you wouldn't mind turning to Government

12   Exhibit 1513?

13           We will start by just working backwards on this one,

14   Special Agent Pennetta.  So you were just talking about a check

15   that went from the 4943 account to JoRon Management, right?

16   A.  Yes.

17   Q.  Is that that downward arrow from the 4943 account to the

18   JoRon Management account?

19   A.  Yes; in the center of the page dated May 29th, 2014.

20   Q.  And so, you stated that the largest source of that check

21   was a $100,000 fidelity check?

22   A.  Yes.

23   Q.  And what was the date that that check was posted?

24   A.  May 2nd, 2014.

25   Q.  Now, were you able to go back into that Fidelity account to

1   determine how that account was funded?

2   A.  Yes.  I reviewed the bank account records for the Fidelity

3   account.

4   Q.  And how was that -- what was the deposit into that account

5   immediately preceding the $100,000 check?

6   A.  The deposit immediately preceding that disbursement was

7   posted on 12/31/2013 for $250,000, and that came from a Banco

8   Popular account in the name of Arlene Lerer.

9   Q.  And then on that same date, were you able to look at that

10  account as well?

11  A.  Yes, I was.

12  Q.  And on the same date that the check was written to the

13  Arlene Lerer Fidelity account, did you see a check being

14  deposited into that Banco Popular account?

15  A.  Yes.  On 12/31/2013 a check for $100,000 was deposited from

16  the Sheldon Silver 4943 account into the Arlene Lerer Banco

17  Popular account.

18  Q.  And were you able to figure out the source of that $100,000

19  check?

20  A.  Yes, I was.  I traced that back, again with the same

21  methodology, deposits immediately preceding this $100,000

22  disbursements, deposits greater than $1,000 that totaled at

23  least $100,000.

24  Q.  And is the source information for that reflected in that

25  initial arrow that's on the left-hand side of the chart?

1   A.  Yes.  That's summarized to the left.

2   Q.  And so, what were the main sources of -- what was the

3   largest source of that $100,000 check?

4   A.  The largest source was referral fees from Weitz & Luxenberg

5   for patients of Dr. Taub.

6   Q.  And what was the amount of that check?

7   A.  $149,351.58.

8   Q.  And just with respect, there is this name Arlene Lerer

9   listed here -- Mr. Coccaro, if you wouldn't mind just going to

10  Government Exhibit 1236, if you could pull that up and go to

11  page 162 if you are able to do so?

12          Special Agent Pennetta, while he is doing that, is

13  there any co-signer or care of information on that Arlene Lerer

14  account?

15  A.  For the Banco Popular account?

16  Q.  Yes.

17  A.  Yes, there is.

18  Q.  Who is that account care of?

19  A.  Sheldon Silver.

20  Q.  And so, when Sheldon Silver wrote the check from -- the

21  $100,000 check from the 4943 account to the Banco Popular 4897

22  account he was writing a check from -- that's the deposit into

23  the Banco Popular account?

24  A.  This check is the deposit into the Banco Popular account.

25  Q.  And then Mr. Coccaro, if you wouldn't mind going to

1   Government Exhibit -- the same exhibit on page 372?  Is that

2   the disbursement of $250,000 from that same Arlene Lerer Banco

3   Popular account to the Fidelity account?

4   A.  Yes, it is.

5   Q.  And again, there is a name listed there on the top left.

6   If you wouldn't mind reading into the record the name and

7   address at the top left-hand side of that check?

8   A.  Yes.  The account is in the name of Arlene Lerer, care of

9   Sheldon Silver, Esquire, 700 Broadway, 8th floor, New York, New

10  York, 10003.

11  Q.  And so, as you were tracing this back you saw the $100,000

12  deposited into the Banco Popular account and then on that same

13  date you saw this $250,000 going from Banco Popular to

14  Fidelity?

15  A.  Yes.

16  Q.  And then, as you testified earlier, you saw a few months

17  later $100,000 going back into the 4943 account?

18  A.  From the Fidelity account into the 4943 account, yes.

19  Q.  And again, it's that check that ended up funding the final

20  JoRon Management outflow listed in the indictment?

21  A.  Yes.

22          MR. MASTER:  Just a moment, your Honor?

23          (Counsel conferring)

24          MR. MASTER:  Nothing further.

25          (Continued on next page)

1              THE COURT:  Okay.  Mr. Cohen.

2    CROSS-EXAMINATION

3    BY MR. COHEN:

4    Q.  Ms. Pennetta, good afternoon.  I'm Joel Cohen.  I represent

5    with Mr. Silver with my colleagues.

6              We have not spoken before about this; correct?

7    A.  No.

8    Q.  We have not met?

9    A.  No.

10   Q.  Now, your testimony is your background is that of an

11   accountant; correct?

12   A.  Yes.

13   Q.  And that's why you were assigned by your superior at the

14   FBI to this particular matter; correct?

15             MR. MASTER:  Objection.

16             THE COURT:  Sustained.

17   BY MR. COHEN:

18   Q.  Are you otherwise involved in the investigation that led to

19   charges against Mr. Silver?

20   A.  No.

21   Q.  In fact, the FBI itself is not involved with this

22   investigation other than with respect to a very minor aspect of

23   it; is that correct?

24             MR. MASTER:  Objection.

25             THE COURT:  Sustained.

FBIYSIL6                    Pennetta - Cross

1   BY MR. COHEN:

2   Q.  If I am correct, you said on direct testimony -- please

3   correct me if I'm wrong -- that you have been involved in this

4   case regarding financial records, bank statements, referral

5   reports, invoices, phone records.

6          Am I correct?

7   A.  Yes.

8   Q.  Have I left anything out?

9   A.  I don't believe so.

10  Q.  So you have not been present at any interview of any

11  witness in this case.

12  A.  No.

13  Q.  Your responsibilities were confined to looking at records,

14  whether they're telephone records or bank records or fee

15  referral reports and the like?

16  A.  Yes.

17  Q.  And you have not, in addition to not being present at any

18  interviews -- pardon me -- not being present at any interviews,

19  you have not read any of the testimony of the witnesses who

20  have testified in this trial in the last few weeks.

21          Correct?

22  A.  No.

23  Q.  And you have not read the debriefings by the government of

24  witnesses who were interviewed by the government; correct?

25          MR. MASTER:  Objection.

FBIYSIL6                         Pennetta - Cross

1          THE COURT:  Overruled.

2          THE WITNESS:  I have not read debriefings.

3    BY MR. COHEN:

4    Q.  And you have not read the grand jury testimony of any of

5    the witnesses the government has called before the grand jury.

6    A.  No, I have not.

7    Q.  If you could turn to the last item that Mr. Master talked

8    about, and that is Government Exhibit 1513.

9          MR. COHEN:  If I can call on Mr. Coccaro.

10   BY MR. COHEN:

11   Q.  So you prepared this chart; correct?

12   A.  Yes.

13   Q.  You prepared this chart as a result of looking at the bank

14   records relating to Fidelity, HSBC, and Banco Popular; correct?

15   A.  Yes.

16   Q.  It's on the basis of looking at those records that you

17   formed this chart?

18   A.  Yes.

19   Q.  Do you know who Arlene Lerer is?

20   A.  No.

21   Q.  Do you mean you don't know that Arlene Lerer is

22   Mr. Silver's sister?

23          MR. MASTER:  Objection.

24          THE COURT:  Overruled.

25   BY MR. COHEN:

1  Q.  I take it that you did not know that she actually lives in

2  London, which is the reason for her having an account care of

3  Mr. Silver?

4              MR. MASTER:  Objection.

5              THE COURT:  Sustained.

6  BY MR. COHEN:

7  Q.  Are you not aware that Ms. Lerer needed a short-term loan

8  of $100,000 which was paid back in four months by Ms. Lerer to

9  Mr. Silver?

10             MR. MASTER:  Your Honor --

11             THE COURT:  Sustained.

12             Ladies and gentlemen, remember.  Questions aren't

13  evidence.

14  BY MR. COHEN:

15  Q.  You made this chart based on looking solely at bank

16  records; correct?

17  A.  Well, there were bank records -- if you look at the upper

18  left there, I also incorporated some business records to come

19  up with that information, yes.

20  Q.  I'm sorry.  Business records as well.

21             But not talking to Ms. Lerer or any witnesses who may

22  have known what this transaction constituted?

23  A.  No.  I did not speak to anybody.  I simply reviewed

24  records.

25  Q.  And nobody informed you of the content of any interview

FBIYSIL6                          Pennetta - Cross

1   relating to that transaction.

2   A.  No.

3   Q.  Now, with respect to Exhibit 1509, which is a chart --

4           MR. COHEN:  Mr. Coccaro, please.

5   BY MR. COHEN:

6   Q.  Now, you have determined -- and this chart will be amended

7   as Mr. Master told you.

8           You have determined that these 48 individuals who were

9   patients of Dr. Taub were referred to Mr. Silver by Dr. Taub;

10  is that correct?

11  A.  No.  This list is patients of Dr. Taub that are also

12  clients of Weitz & Luxenberg for which Sheldon Silver was

13  credited with the referral.

14  Q.  Fair enough.

15          In making the determination of what these were, you

16  looked at bank records from Weitz & Luxenberg to Mr. Silver;

17  correct?

18  A.  They were copies of checks, yes.

19  Q.  Copies of checks.  Thank you.

20          You also looked at patient records of Dr. Taub of

21  patients of his at Columbia Presbyterian; correct?

22  A.  There was a listing of patient names.

23  Q.  You did not hear Dr. Taub's testimony in this courtroom?

24  A.  No, I did not.

25  Q.  So you would not know that Dr. Taub testified in open

FBIYSIL6                    Pennetta - Cross

1    court --

2              MR. MASTER:  Objection, your Honor.

3              THE COURT:  Sustained.

4              Mr. Cohen, she's already testified all she knows is

5    what's in the record.  She hasn't read testimony.  She hasn't

6    read interviews, nothing.

7    BY MR. COHEN:

8    Q.  Do you know how many patients Dr. Taub recalls having

9    referred to Mr. Silver, Weitz & Luxenberg?

10             MR. MASTER:  Objection.

11             THE COURT:  Sustained.

12   BY MR. COHEN:  Excuse me a moment, your Honor.

13             (Pause)

14   BY MR. COHEN:

15   Q.  Ms. Pennetta, you have no personal knowledge, do you, of

16   whether any of the patients listed on this exhibit were

17   referred to Mr. Silver by Dr. Taub?

18   A.  I do not.

19   Q.  All you have that enabled you to make this chart was

20   Columbia records and Weitz & Luxenberg and Silver bank records?

21   A.  Yes.

22             MR. COHEN:  Your Honor, may we approach the bench?

23             THE COURT:  Okay.

24             MR. COHEN:  Thank you.

25             (At the sidebar)

FBIYSIL6                        Pennetta - Cross

1              MR. GOLDSTEIN:  Your Honor, this is our problem with

2      the chart, your Honor.  You have a witness who's testifying

3      that all she's looking at is records.

4              THE COURT:  We've established that.

5              MR. COHEN:  All she's looking at are records in the

6      Lerer case.  They made a big deal what that chart represents.

7      She has no idea what that represented.  That's true,

8      your Honor.

9              THE COURT:  I don't know whether it's true or not.  It

10     doesn't matter whether it's true.  The point is she's a records

11     custodian.  She reviewed records.  I'm not going to let you use

12     her as a prop to sum up your case, which is what you're trying

13     to do.

14             My patience for that was limited at the beginning of

15     the trial.  It's even lower now when we're trying to get it

16     done.

17             You've got your summation points.

18             MR. COHEN:  But you're letting that document, which,

19     including the Lerer --

20             THE COURT:  It's in.

21             MR. COHEN:  That's the problem.  You're letting that

22     document in, and you're not giving me an opportunity to

23     basically say the limitations of that document.

24             THE COURT:  You have said the limitations.  You have

25     established that she does not know what goes behind that.  All

1    she knows is that the person was a Taub patient and there were

2    Weitz & Luxenberg fees paid to Silver.

3          You can't use -- I'm not going to allow you to use her

4    as a prop.  If you want to put on a summary witness to say

5    something different, then the defense can do that.

6          I'm not going to allow you to use this witness as a

7    prop to start your summation process.  The same with Lerer.  I

8    don't know if you're right, that what that was was a loan and

9    this and that.  It doesn't matter.

10          MR. SHUR:  Judge, I just want to put on the record,

11    because I understand that the government shortly before trial

12    reached out to the money management for Mr. Silver, Hugh

13    Johnson in upstate New York, and the money manager reached out

14    to us to seek consent about providing information about

15    Mr. Silver's account because this wasn't pursuant to a

16    subpoena.

17          We gave consent.  I understand that the Fidelity money

18    manager explained to the government the same thing that they

19    explained to me, which was that -- I see shaking heads of no,

20    but I'm going to put this on the record because this was what

21    was represented to me.

22          THE COURT:  I'm going to kill you all.  I told you,

23    when the jury was out of the room, to raise anything else.

24    This was not raised.

25          MR. SHUR:  This relates to the government's summation,

FBIYSIL6                    Pennetta - Cross

1   not this exhibit.

2              THE COURT:  Then we're not talking about it.

3              MR. SHUR:  That's fine, Judge.

4              THE COURT:  Go back to your chairs.  Finish your

5   cross.

6              (In open court)

7   BY MR. COHEN:

8   Q.  Ms. Pennetta, please take a look at 1502.

9              MR. COHEN:  Mr. Coccaro, please.

10  BY MR. COHEN:

11  Q.  Now, during your direct examination, Ms. Pennetta,

12  Mr. Master asked you a lot of questions about these phone

13  records.

14             Correct?

15  A.  Yes.

16  Q.  And you said you added up the phone records from

17  Mr. Meara's phones to Mr. Silver and vice versa; correct?

18  A.  Yes.

19  Q.  And Mr. Luxenberg back and forth?

20  A.  Yes.

21  Q.  And Mr. Levy?

22  A.  Yes.

23  Q.  And Mr. Goldberg?

24  A.  Yes.

25  Q.  And Mr. Goldberg it reflects that there were roughly 27

FBIYSIL6                    Pennetta - Cross

1  calls during the period which amounts to how many years?

2  A.  So just about five years, six years, from December of 2009

3  through January of 2015.

4  Q.  How about on the other phone?

5  A.  There were none over ten years.

6  Q.  With respect to Mr. Goldberg, are you aware that he's been

7  sort of a lifelong friend of Mr. Silver?

8          MR. MASTER:  Your Honor.

9          THE COURT:  Sustained.

10         She doesn't know anything that's not in the records.

11 BY MR. COHEN:

12 Q.  Is that accurate?  You know nothing except what's in the

13 records?

14 A.  This is true.

15         THE COURT:  I'm sure she knows lots of other things

16 that are not in the records.

17         MR. COHEN:  Fair enough, your Honor.

18         THE COURT:  But as is pertinent.

19 BY MR. COHEN:

20 Q.  With respect to all of these phone calls that you

21 identified over the course of your direct testimony, you have

22 no idea what those phone calls are about; correct?

23 A.  That's true.

24 Q.  You wouldn't know whether Mr. Meara is calling Mr. Silver

25 to talk about a sporting event, whether Barack Obama is going

1    to defeat Mitt Romney, whether Mr. Meara should bring a cup of

2    coffee for an event that they are going to.

3            Correct?

4            MR. MASTER:  Your Honor, objection.

5            THE COURT:  Overruled.

6            That's going to be it; right?

7            MR. COHEN:  I assume she's going to say no to all of

8    those.

9    BY MR. COHEN:

10   Q.  Ms. Pennetta?

11   A.  I do not know the subject of the conversations.

12   Q.  On any of the conversations that you identified as

13   occurring between each other.

14           MR. MASTER:  I thought he said he was done,

15   your Honor.

16           THE COURT:  Yes.  Me too.

17           THE WITNESS:  On any of the conversations of the phone

18   calls here, no.

19   BY MR. COHEN:

20   Q.  So you are basically a records custodian who's put the

21   records together and put charts together; is that correct?

22           MR. MASTER:  Objection.

23           THE COURT:  I think it might be more accurate to call

24   her a records summary witness as opposed to a custodian.

25           MR. COHEN:  Fair enough.

FBIYSIL6                         Pennetta - Cross

1   BY MR. COHEN:

2   Q.  You're a records summary witness?

3   A.  Yes.

4   Q.  That was a good call, Ms. Pennetta.

5          (Pause)

6   BY MR. COHEN:

7   Q.  Let me show you Defendant's Exhibit 247.

8          Have you seen this before?

9   A.  No.

10  Q.  Please take a look at it.

11         (Pause)

12  BY MR. COHEN:

13  Q.  Do you have an idea of what the percentage of fees that

14  Mr. Silver received from Weitz & Luxenberg as compared to the

15  percentage of fees -- rather, the fees that he received from

16  the Golberg & Iryami firm?

17  A.  A percentage of what total?

18  Q.  How much he received from Weitz & Luxenberg in a given year

19  as opposed to how much he received from Golberg & Iryami.

20  A.  I don't know percentage-wise, but one of the exhibits I did

21  shows the dollar amount differences, but I don't know

22  percentage-wise what that is.

23  Q.  And you have not attempted to figure out the percentage for

24  those; correct?

25  A.  No.

FBIYSIL6                          Pennetta - Cross

1          (Pause)

2          MR. COHEN:  I have no further questions, your Honor.

3          THE COURT:  Any redirect?

4          MR. MASTER:  None, your Honor.

5          THE COURT:  Okay.  Terrific.

6          Thank you, Agent Pennetta.

7          THE WITNESS:  Thank you.

8          (Witness excused)

9          THE COURT:  Can I see the parties for just a second.

10         (At the sidebar)

11         THE COURT:  Are you ready to rest?

12         MS. COHEN:  Yes.  We're just going to ask that several

13    exhibits be moved in.  Then we will rest.

14         They know that.

15         MR. SHUR:  Judge, before the witness started testimony

16    again, Ms. Cohen handed me an exhibit.  It's not for my

17    witness.  I just can't accept it.

18         THE COURT:  My question was whether I need to move the

19    jury out of the room for a minute and let you get your ducks in

20    a row and make sure a bunch of the exhibits from your bank

21    subpoena stipulation haven't been moved into evidence.

22         MS. COHEN:  Correct.  I believe they were all moved in

23    through Paul Cody or JoRon.

24         THE COURT:  They may be; they may not be.  I just want

25    to give you time to make sure that you have everything that you

1    think you've got into evidence into evidence.

2            I'm going to send them out for a brief break.  Okay?

3            MS. COHEN:  Thank you, your Honor.

4            MR. SHUR:  Thank you, Judge.

5            (In open court)

6            THE COURT:  Okay.  Ladies and gentlemen, we're going

7    to take a brief break.  This is a little unusual time.  Don't

8    discuss the case.  We are going to be bringing you back in.  I

9    know that I told you that we might leave early today.  It

10   doesn't look like that's going to happen.

11           But you're still going to have tomorrow, Thursday, and

12   Friday off.  So that is secure.  Don't discuss the case at all

13   in any way.  We'll bring you in probably in about ten minutes.

14           (Jury not present)

15           THE COURT:  Do the parties want my master list of what

16   is in evidence?

17           MS. COHEN:  Please, your Honor.  We'll compare it.

18           THE COURT:  Ten minutes.

19           (Recess)

20           MR. SHUR:  Judge, since the jury is waiting, we're

21   walking through some stipulations, and it sounds like there are

22   going to be some objections.

23           It sounds like it's possible to resolve these issues

24   by extracting certain exhibits.  This might take some more

25   time.  I don't want to waste the Court's time and the jury's

FBIYSIL6                      Pennetta - Cross

1    time.

2              THE COURT:  Basically, both sides are not going to be

3    able to rest today?

4              MS. COHEN:  Not at all.

5              MR. SHUR:  I don't think it's a problem with the

6    government resting.  I'm not speaking on behalf of them.  There

7    is a problem with the proposed stipulations.

8              THE COURT:  It's 10 till 5:00.

9              What are you proposing?

10             MS. COHEN:  There are about ten different sets of

11   documents that the parties don't agree on.  Perhaps your Honor

12   can review them and rule on them.

13             THE COURT:  How long is the defense case?  Is it just

14   a matter of moving documents into evidence?

15             MR. MOLO:  Correct.

16             THE COURT:  So, if we resolve all this, it's literally

17   just a matter of you standing up and saying -- you're not going

18   to try to put someone on the stand to walk the jury through it?

19             MR. SHUR:  Your Honor, I think there's maybe one

20   testimonial stip.

21             MR. MOLO:  By that, reading a page.

22             MR. SHUR:  It's a paragraph.

23             MR. MOLO:  We're not talking about doing what was done

24   earlier.

25             THE COURT:  I understand.  I'm not arguing with what

FBIYSIL6                        Pennetta – Cross

1    you want to do.  I'm watching the clock.

2                 MR. MOLO:  I know.  I'm just explaining.

3                 THE COURT:  If there are things for me to rule on, I'm

4    happy to rule on them if that's all you're looking for at this

5    point.

6                 If you think you can talk to each other and work out

7    some of this stuff, that's fine too.

8                 MS. COHEN:  We just talked to each other, and two

9    we're able to work out.  The rest of them we don't agree on.

10                MR. SHUR:  Judge, in terms of handling the Rule 29

11   motion, I wasn't sure what your Honor's preference was.

12                THE COURT:  What my preference is to have the

13   government rest, to have you do your Rule 29 is preserved, have

14   you rest, and then we can argue it.

15                Is that acceptable to the defense?

16                MR. MOLO:  Whatever you want to do, your Honor.

17   That's fine.

18                THE COURT:  Otherwise, we're not going to finish

19   today.  That's not the end of the world.  It would be nice to

20   finish today.

21                MR. MOLO:  Agreed.  So, with that being said, would

22   you like us to spend some time with the government to see if

23   there are things that we can work out?

24                THE COURT:  I'm hearing from Ms. Cohen that you do not

25   have a partner on the other side that thinks they can get this

FBIYSIL6                         Pennetta - Cross

1    resolved without a ruling.

2              MR. MOLO:  Okay.

3              THE COURT:  So that's why they pay me the paltry

4    amount they pay me.

5              What are the issues?

6              While you're getting this set, did Defense 64 get

7    substituted in with one that actually does not have crazy meta

8    data on it?

9              MS. COHEN:  They did not do that, your Honor.

10             MR. MASTER:  Your Honor, just for the record, I

11   believe that that was a document from the Mesothelioma Applied

12   Research Foundation.  That was the manner in which it was

13   produced to both parties by the custodian.  No one has a better

14   copy.

15             THE COURT:  Okay.  What are the issues?  Let's go.

16             MS. COHEN:  Your Honor, the first defense exhibit I

17   understand they want to move in where there's an issue is

18   Defense Exhibit 179, which is -- it's a copy of a draft

19   addressed to The Witkoff Group from Jay Goldberg on January 3,

20   2012.

21             This was the subject of testimony both by Dara Iryami,

22   and they showed it to Mr. Witkoff, and the objections were

23   sustained.

24             THE COURT:  What did Dara Iryami testify about this?

25             MS. COHEN:  That Jay Goldberg handled the retainer

1      agreement, and she didn't know whether it was sent or not.

2                  MR. MOLO:  No.  There was an email that was

3      introduced --

4                  THE COURT:  It's one that has no attachment.

5                  MR. MOLO:  There was no attachment attached to the

6      email that was sent, but she's following up on engagement

7      letters prepared at that time.

8                  We're offering this as a business record of Golberg &

9      Iryami.  Whether or not Mr. Goldberg handled it or didn't,

10     we've had all types of business records admitted without people

11     testifying about their personal knowledge about their creation.

12                 This is a two-person law firm.  It's an engagement

13     letter -- if we have to call Dara Iryami to call her as a

14     business records witness, I suppose we can do that.  That

15     doesn't seem to make a very sensible use of time.

16                 MS. COHEN:  Your Honor, my objection is not that it

17     was a document found in the files of Golberg & Iryami.  It is

18     that it is simply not relevant if it was ever sent.

19                 There's no testimony that it was sent, and Dara Iryami

20     doesn't know if Jay Goldberg -- which is why they couldn't move

21     it in through Dara Iryami.

22                 MR. MOLO:  We didn't try to move this document in

23     through Dara Iryami.

24                 MS. COHEN:  Correct.

25                 THE COURT:  Stay focused on why it's admissible.

1              MR. MOLO:  It's admissible because she shortly

2     thereafter sends this email following up about the engagement

3     letters.  The government is free to argue that it was never

4     sent.  But I think we also heard testimony from Mr. Witkoff

5     that they never signed engagement letters either.

6              So the fact that they sent this engagement letter,

7     which discloses --

8              THE COURT:  What's the evidence that it was sent?

9              MR. MOLO:  Well, there's an email shortly thereafter

10    following up --

11             THE COURT:  Where is the email?

12             MS. COHEN:  It's a defense exhibit.  Is it 171?  Off

13    the top of my head.

14             Your Honor, I believe it's Defense 119.

15             THE COURT:  I don't have copies of them anyway.

16             MS. COHEN:  We might have extra copies, your Honor.

17             THE COURT:  Mr. Molo, I've got 119, which is the email

18    from --

19             MR. MOLO:  Iryami to Parnes.

20             THE COURT:  That says, "Happy new year.  I hope all is

21    well with you and your family.  I trust you received the

22    retainer agreement for Steve's signature.  For various reasons,

23    we need to formalize our arrangement at this time."What that

24    doesn't say is that this was actually sent.

25             Here is my concern:  I think it's entirely possible

1    that although Iryami thought it was sent, that it was never

2    sent.  I only base that on the fact that Witkoff didn't have a

3    copy of it.

4                MR. MOLO:  Witkoff didn't have a copy of anything.

5                THE COURT:  That's not true.  They had all kinds of

6    records.

7                MR. MOLO:  Witkoff the organization.  I'm sorry.

8                THE COURT:  So the fact that Witkoff -- as I recall,

9    somebody testified there was a search made.  They don't have

10   this.

11               MR. MOLO:  Correct.  That was the testimony.

12   Mr. Witkoff also said they didn't sign engagement letters.

13               THE COURT:  But that doesn't mean that they would have

14   received this and thrown it away.

15               MR. MOLO:  I think it does.

16               THE COURT:  You have to put evidence in to that

17   effect.

18               MR. MOLO:  The government is free to argue whatever

19   they want.

20               THE COURT:  You're trying to put this in as a letter

21   that was sent.

22               MR. MOLO:  We could say it's a business record in the

23   records of Golberg & Iryami.  We know they were sent to

24   Glenwood.  We do know that, that the same letter was sent to

25   Glenwood.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1          They're free to argue that it wasn't sent, and I'm

2     free to argue that it was sent.

3          THE COURT:  You're not free to argue that because you

4     have absolutely no evidence of that.

5          MR. MOLO:  I have the evidence of the email that

6     suggests that it was.  She's following up.

7          THE COURT:  Mr. Molo, the problem is you're missing a

8     link, which is you've got an unsigned copy of the letter that

9     appears in Goldberg's files.

10         MR. MOLO:  Right.

11         THE COURT:  You've got an email that says, I'm

12    following up.  What you don't have is the evidence that this

13    was actually put into the mail.

14         MR. MOLO:  The Hillman doctrine would suggest that the

15    email relates back to that letter and says that a person is

16    logically going to do what they say has been done or they're

17    going to do.

18         THE COURT:  She wasn't the one who was responsible for

19    this.

20         MR. MOLO:  She was obviously responsible enough to

21    send the follow-up email.

22         THE COURT:  Where it dropped and died; right?

23         MR. MOLO:  I'm not saying -- which is consistent, by

24    the way, with Witkoff's practice of not signing engagement

25    letters.

1          THE COURT:  This isn't about Witkoff's practice.  This

2     is about Goldberg's practice.

3          MR. MOLO:  Right.  I agree that they don't follow up

4     further.  That's consistent with what she testified to, that in

5     2009 they first started thinking about it.

6          THE COURT:  This is 2012.

7          MR. MOLO:  I know.  You're saying that they followed

8     up, and it died, and they didn't do anything more.  Back in

9     2009, when they first started thinking about this issue, their

10    testimony was they started, and they were overcome by events,

11    and they just didn't do it.  It's a two-person law firm.

12         THE COURT:  They did it with a lot of other clients.

13         MR. MOLO:  I they did it with some clients.  I agree.

14    There's no question it was created at Golberg & Iryami, and

15    it's a document in their files.

16         THE COURT:  Correct.

17         MR. MOLO:  That's all I want to introduce, and the

18    government can argue whatever they want.

19         THE COURT:  What I'm saying, Mr. Molo, is you can't

20    introduce this document to argue that it was sent to Witkoff

21    because you have no evidence that it was sent.

22         MR. MOLO:  But I can at least say that Golberg &

23    Iryami had done it.  They prepared the letter.

24         THE COURT:  That you can say.

25         MR. MOLO:  That's fine.  I'll do that.

1          MS. COHEN:  How will he do that, your Honor?  He

2    already had Dara Iryami on the stand.

3          THE COURT:  He can only do it if you're going to agree

4    that this was found in the files of Golberg & Iryami.

5          MS. COHEN:  Being found in the files doesn't mean that

6    it's admissible, your Honor.  I object to its admissibility for

7    all the reasons your Honor just stated.

8          Mr. Witkoff did testify he did a search of all of his

9    records, that Ms. Parnes was an immaculate record-keeper, and

10    he found two retainer agreements, one from 2009 not signed, and

11    one from 2013 not signed.

12          THE COURT:  So the question is is it relevant that

13    Goldberg prepared the retainer agreement that had the required

14    disclosure but did not send it.

15          MS. COHEN:  Not without testimony from Goldberg about

16    why he didn't send it, I don't think it's relevant at all.  We

17    don't have that testimony.

18          THE COURT:  Why is it relevant that they prepared it?

19          MR. MOLO:  Because of the follow-up email.  I

20    understand you're saying that the follow-up email doesn't prove

21    it was sent.  I disagree with that.  Nonetheless, the follow-up

22    email was sent where she's saying that, and there was a

23    document prepared in their files at the same time.

24          THE COURT:  So what you're telling me, Mr. Molo, is

25    that, despite you getting me close to letting you put this in,

1    in fact you want to use it to do exactly what I said it's not

2    admissible for you to do.

3              So I'm not going to let you do that.

4              MR. MOLO:  Wait a minute.

5              THE COURT:  If it's relevant, if it's relevant because

6    of the mere fact that Golberg & Iryami prepared a retainer

7    agreement with the required disclosure --

8              MR. MOLO:  Correct.

9              THE COURT:  -- that it was never sent because there's

10   no evidence that it was ever received.

11             So why is it relevant that they prepared it?

12             MR. MOLO:  Why is it relevant that they prepared it?

13   Because the government is contending that they were trying to

14   keep all of this a secret.

15             They were keeping it a secret from everyone, and

16   Golberg & Iryami prepared this document that had it there.  If

17   we have to put on a defense case where we have to recall

18   Ms. Iryami and put her on the stand to do that, the

19   government -- I don't know that they're going to get

20   Mr. Goldberg to testify.  Maybe we'll make a defense motion to

21   immunize Mr. Goldberg to have him come here to put this record

22   in.

23             THE COURT:  Why do you think she's going to be able to

24   put this in?

25             MR. MOLO:  Because throughout this case we have argued

 1   about what it is that these people knew what they were doing at

 2   what point in time.

 3        The story that was told by Iryami was that they had

 4   decided that they needed to make a change in their practices

 5   with respect to disclosures on referral fees, not just for

 6   Mr. Silver but for others.

 7        They began to make that change, with other clients.

 8   The rule required that it occur on a prospective basis, not

 9   necessarily retrospectively.

10        That she at some later point in time decides oh, yeah.

11   They're changing something in the law.  That reminds me.  We

12   need to do this with Mr. Silver.

13        They send these letters out to -- there were retainer

14   agreements prepared.  Granted she did say I don't mean to

15   suggest that she said otherwise, that Goldberg's job was doing

16   that.

17        THE COURT:  So, as a fact witness, she will not be

18   able to testify that the letter was sent.

19        MR. MOLO:  Right, but she can testify to the fact that

20   it was prepared.  She could also probably testify --

21        THE COURT:  She can testify that in was in their

22   files.  So by definition it was prepared.

23        MR. MOLO:  I don't know how it would be in their files

24   without being prepared by their firm as a business record.

25   Frankly, she could testify that, if it's in our files, that

1    means it was sent.  Maybe she says I don't know.  Maybe she

2    says, if it was in our files, that does mean that it was sent.

3              What we do know is that there's a separate piece of

4    evidence which is in evidence which is the fact that there's

5    this email where she's following up shortly thereafter.

6              Maybe she sent a phony email that said, you know, I

7    want to follow up about these --

8              THE COURT:  She thought it had been mailed or it

9    hadn't been.

10             MR. MOLO:  I agree that's clearly possible.

11             MS. COHEN:  She testified about that.

12             MR. MOLO:  The government can prove their case by

13   circumstantial evidence.  I certainly can come back and defend

14   my case in the same way.

15             It's circumstantial evidence that they had sent the

16   letter, if it was prepared and if in fact later there's an

17   email following up on that.  That's all.

18             I get the fact that I can't say that it was definitely

19   put in the mail and all of that.  I get it.

20             THE COURT:  Again, the relevance is?

21             MR. MOLO:  That they prepared it.

22             THE COURT:  That they prepared it?

23             MR. MOLO:  Right.

24             THE COURT:  I don't think the government is arguing

25   that Golberg & Iryami was trying to cover this up, although

FBIYSIL6                    Pennetta - Cross

1    they did enter into that crazy side letter.

2             MR. MOLO:  I would say that that wasn't covering up.

3    There was a disclosure actually.

4             MS. COHEN:  Your Honor, as I said, the government does

5    not dispute that this was a document found in the files of

6    Golberg & Iryami, but there's no evidence that it was sent.

7    Therefore, there's no relevance to the fact that it sat in the

8    files of Golberg & Iryami.

9             THE COURT:  I disagree with that.  I disagree that

10   there is no relevance that it was sent because it suggests that

11   the Goldberg firm, as Iryami testified, intended to clean out

12   their retainer agreements with both Witkoff and Glenwood.

13            MS. COHEN:  Your Honor, I think Dara Iryami's

14   testimony was that Goldberg dealt with these things.  She

15   thought he sent it, but she has no idea if he sent it.

16            He very possibly could not have sent it.  It was not

17   found in the files of Witkoff.  What the defense wants to argue

18   is they want to mislead the jury into believing it was sent.

19   There's no evidence of that.

20            THE COURT:  The evidence is that Iryami thought it was

21   sent.

22            MS. COHEN:  She testified to that, and we let the

23   email to Ms. Parnes go into evidence.  So they can make their

24   arguments.

25            THE COURT:  What does this add -- the email is in

FBIYSIL6                          Pennetta - Cross

1    evidence?

2                MS. COHEN:  Yes, it is, your Honor.  We didn't object

3    to it.

4                MR. MOLO:  The email is in evidence.

5                THE COURT:  It's in evidence without the antecedent,

6    without what it refers to?

7                MS. COHEN:  Because there wasn't anything attached to

8    it, your Honor.

9                MR. MOLO:  I agree.  There wasn't anything attached to

10   it.  I'm not saying that I want to admit it for the fact that

11   this was attached.

12               I'm saying that there was an engagement letter

13   prepared, and that later she does send this email.  That's the

14   sequence of events.

15               That's circumstantial evidence that if they prepared a

16   letter, that it was sent.  The government can come back and say

17   there's no evidence that it was sent.  That's fine.

18               THE COURT:  Are you objecting to it being a business

19   record?  Is your only objection that it's not relevant?

20               MS. COHEN:  It's not relevant.  If it goes in, I think

21   it's unduly prejudicial because I think they're going to use it

22   to mislead the jury.

23               THE COURT:  That's your rebuttal argument.

24               I'm going to admit 179.

25               (Defendant's Exhibit 179 received in evidence)

1            THE COURT:  Mr. Molo, be careful about how you argue

2     it because what you don't want is an objection that is

3     sustained in your summations.

4            What's the next one?

5            MS. COHEN:  Your Honor, the next document is Exhibit

6     175, which is something from the Journal News, a photo of Amy

7     Paulin who your Honor will recall was an assemblywoman.  This

8     is a photo of her at an opera organization.

9            THE COURT:  And the relevance is?

10            MR. MOLO:  She testified that she went to these

11    lunches of this opera organization.  We saw all the pictures of

12    Mr. Silver at the American Cancer Society.  Here is Ms. Paulin

13    at the opera event.

14            THE COURT:  So?

15            MR. MOLO:  It's just corroborating her testimony.  She

16    was at the opera luncheon.  It's a nice picture.

17            MS. COHEN:  Your Honor, it's not relevant.  There's

18    nothing inconsistent.  There's no real reason to put that in.

19            THE COURT:  It doesn't seem relevant to me.  I don't

20    see the relevance.  That stipulation is out.

21            MS. COHEN:  Your Honor, the next exhibit is proposed

22    Defense Exhibit 177, which is a biography of Michael Garcia at

23    Kirkland & Ellis.

24            THE COURT:  That's definitely not coming in.

25            What possible relevance does Mr. Garcia's sterling

FBIYSIL6                          Pennetta - Cross

1    biography have?

2             MR. MOLO:  He represented the senate in the Moreland

3    Commission.

4             THE COURT:  So what?

5             MR. MOLO:  He was a United States attorney.

6             THE COURT:  So what?  Why is it relevant?

7             MR. MOLO:  Because they've argued that there was some

8    coverup, and the Moreland Commission -- the action in

9    challenging the Moreland Commission's action was some evidence

10   or effort to cover up.  In fact, it was anything but that.  It

11   was a legal challenge that was prepared by some of the finest

12   lawyers in America that challenged --

13            THE COURT:  You keep saying that.  Trust me.  There is

14   a long line of attorneys who would argue that that group of

15   attorneys is not the most, the best.

16            MR. MOLO:  One of.

17            THE COURT:  I suppose it depends on how far down the

18   list you're going.  I'm not dissing Mr. Garcia.

19            MR. MOLO:  I'll keep it between us.

20            THE COURT:  All I'm saying is his resume is

21   irrelevant.

22            MS. COHEN:  I thought the relevance was that he hired

23   me, your Honor.

24            Your Honor, the next exhibit is Defense Exhibit 178,

25   which is related to the other objections, the Loeb & Loeb

 1   biography.

 2           MR. MOLO:  This is another former prosecutor.

 3           MS. COHEN:  He didn't hire me, your Honor.  So don't

 4   worry.

 5           THE COURT:  No.  I just don't see the relevance.

 6           MS. COHEN:  Your Honor, we only admitted very limited

 7   evidence on the Moreland Commission.

 8           Your Honor, the next set of exhibits the defense seeks

 9   to admit is Defense Exhibits 180 through 184, which are copies

10   of various pleadings, briefings in the Moreland Commission.

11           THE COURT:  I expected there was going to be a whole

12   lot of evidence about there were efforts made to obstruct the

13   investigation and all that.  There was almost nothing.

14           MS. COHEN:  Correct.  So those aren't relevant,

15   your Honor.

16           THE COURT:  Besides which, why would I admit civil

17   pleadings in the New York State proceeding?  I just don't see

18   how it's relevant.

19           MR. MOLO:  Judge, as to -- we heard testimony from a

20   couple witnesses that there was a motion to quash.

21           THE COURT:  Motion to quash what subpoena?  The

22   subpoena that had been served on Weitz & Luxenberg.

23           MS. COHEN:  Correct, your Honor.

24           MR. MOLO:  There was also a subpoena that was served

25   on the assembly members themselves, the senate members

1    themselves.  Let's put the senate aside from right now.

2              As to the assembly, there was testimony about a

3    briefing of the conference on the Moreland Commission response

4    by the assembly democrats.

5              And we heard in opening statement -- and I'm sure

6    we're going to hear again in summation -- that Mr. Silver, as

7    the leader of the assembly democrats, sought to cover up what

8    was going on, what they claimed to be his illegal conduct in

9    terms of his outside income through challenging the Moreland

10   Commission's authority.

11             The Moreland Commission's authority was challenged on

12   solid, legal grounds.

13             THE COURT:  That's a legal argument.  The jury doesn't

14   know if this is solid legal grounds or total poppycock.  It was

15   never ruled on.

16             MR. MOLO:  Right.

17             THE COURT:  So what are they supposed to do with this?

18   It was never ruled on.

19             MR. MOLO:  What they're supposed to do is see that

20   without the bios there, there's enough testimony in the record

21   that these are bona fide people that filed this complaint or

22   filed this motion to quash, and that they were acting in good

23   faith, whether or not this would have won or not, this was a

24   very public thing.

25             This wasn't Mr. Silver whispering in someone's ear,

1    why don't you kill this thing.

2            THE COURT:  You established all of that.  The actual

3    papers filed is simply not relevant.  There is no way a jury

4    can figure out what this means, and the fact that respectable

5    lawyers filed a motion doesn't mean it's meritorious.

6            Very respectable lawyers file things in front of me

7    all the time.  One side always loses.  That's the nature of

8    litigation.

9            MR. MOLO:  I don't disagree with that.  I don't think

10   that's relevant to whether or not this would have won or lost.

11   The question is was it a good-faith, bona fide effort as

12   opposed to this allegation -- they should then be barred

13   from --

14           THE COURT:  The jury can't figure that out.  This is

15   going to require a Supreme Court justice to figure it out.  As

16   I understand it, it got withdrawn.

17           MR. MOLO:  Then the government should be barred from

18   arguing that anything that was done with respect to the

19   Moreland Commission was done in some kind of a nefarious way to

20   cover anything up.  This was the evidence with respect to the

21   Moreland Commission.  These lawyers acted in good faith, filed

22   a complaint --

23           THE COURT:  They acted on behalf of their client.

24           MR. MOLO:  Correct.

25           THE COURT:  That doesn't mean it's meritorious.

 1              MR. MOLO:  I'm not saying it's going to win.  The

 2      distinction is it doesn't have to win to refute the point that

 3      the government is trying to make, which is that Mr. Silver was

 4      somehow trying to quash this Moreland Commission subpoena in a

 5      way that was nefarious, and it wasn't.

 6              THE COURT:  We'll deal with the issue of what you can

 7      argue and what you can't argue about the Moreland Commission

 8      another day, another time.  It's now 5:15.  The submissions,

 9      the judicial submissions, are not admissible.

10              MR. MOLO:  Okay.

11              MS. COHEN:  Your Honor, the next document the defense

12      seeks to admit are documents related to Columbia's OSHA

13      violations.  Some of this is contained in the contracts.

14              It's Defense Exhibits 162-1, 162-2, 231 through 235.

15              THE COURT:  Why are Columbia's OSHA violations

16      relevant?

17              MR. SHUR:  Judge, it's relevant because the government

18      has argued, with respect to the grant review process, that the

19      Department of Health and the comptroller's office and the AG's

20      office simply rubber stamps any grant recommendations from the

21      assembly.

22              As we pointed out through a number of witnesses, maybe

23      it's not the review process that happens elsewhere, but there

24      is a legitimate review process, and the OSHA -- these emails,

25      these communications, which are business records of the

1    Department of Health and/or the comptroller's office, are

2    relevant because they show not only that they follow the

3    process, but it's a meaningful process in that they identified

4    an OSHA violation at Columbia that held up the approval of the

5    grant for several months as they worked through whether or not

6    this was a live OSHA violation or whether it was resolved.

7            So it shows -- it's not just people shuffling papers,

8    but there's actually a legitimate review.  This issue was

9    identified and dealt with, as it should have been, pursuant to

10   this protocol.

11           MS. COHEN:  Your Honor, some of those OSHA documents

12   are already in the contracts as part of the Vendex review that

13   was done, and they're in evidence.

14           MR. SHUR:  If the objection is it's cumulative, it's

15   not.  There is a reference in the contract that is somewhat

16   ambiguous.  The emails actually show that it was identified on

17   X date and that there was a review of it.

18           This is part of the files of the Department of Health

19   and the comptroller's office.

20           THE COURT:  That just makes them business records.

21   The issue is relevance.

22           MR. SHUR:  I understand.

23           THE COURT:  I'm sorry.  Ms. Cohen, tell me again what

24   your objection is.

25           MS. COHEN:  Sure.  As to that part of the exhibit that

FBIYSIL6                      Pennetta - Cross

1   has the OSHA documents -- those documents are already contained

2   in the contracts that we entered into evidence because it was

3   responsive to the Vendex question.

4           With regard to the extra emails that are there,

5   they're not relevant back and forth about the OSHA violation

6   and Columbia.

7           THE COURT:  They tend to show that there are other

8   steps that have to be taken and that the comptroller

9   actually -- is it the comptroller's that ticks --

10          MR. SHUR:  It was identified by the comptroller's

11  office, and then there was communications between the

12  Department of Health and the comptroller in an effort to

13  resolve this.

14          MS. COHEN:  Your Honor, I think it's the Department of

15  Health that deals with actually getting all the required

16  paperwork for the contract.  So it might be something that the

17  comptroller's office saw, and then they went back to the

18  Department of Health.

19          THE COURT:  Probably so, but they required it to be

20  resolved before they would pass the grant the to next step?

21  I'm going to let this in.  This stipulation --

22          MS. COHEN:  Your Honor, we don't want to actually do

23  the stipulations.  We don't need to do the stipulations.  They

24  can enter the document.  We won't object on business grounds.

25  There's no reason to do the stipulation.

 1          MR. SHUR:  That's fine, Judge.

 2          THE COURT:  The stipulation is out.  The documents are

 3   in.  This little package of documents are in.

 4          MS. COHEN:  Your Honor, the next documents the defense

 5   seeks to admit are Defense Exhibits 160, which is the bills,

 6   the HCRA bill itself.

 7          But then there are a bunch of letters attached to it

 8   which are like the legislative history.  We have no problem

 9   with the bill itself but not the legislative history.

10          THE COURT:  Why is the bill relevant?

11          MR. SHUR:  Judge, I think this is fairly

12   straightforward.  Just to be clear, what we're talking about,

13   it's the bill jacket and the legislative history that was

14   pulled from the New York State archives.

15          It's relevant because the government, in their opening

16   and through various witnesses, have suggested that HCRA and the

17   money that was allocated through the statute was a secret pot

18   of money.  That's how it was referred to.

19          The secret pot of money is actually discussed in this

20   very public law that you can find on the Internet and

21   elsewhere.  That's the relevance, Judge.

22          THE COURT:  But the issue -- I don't think anybody has

23   suggested that the money was secret.  It's that there was not

24   transparency in terms of how it was spent.

25          MR. SHUR:  Judge, in the government's opening, they

FBIYSIL6                    Pennetta - Cross

1    said it's a secret pot of money, and then they asked

2    Assemblywoman Paulin whether she knew anything about it, and

3    she said she didn't.

4            So between those two pieces, the government clearly

5    argued that this was hidden, the existence of the pot of money

6    was hidden from the public.

7            Within the bill, it discusses that there's going to be

8    this pot of money and that some of it will be apportioned to

9    the Speaker of the Assembly as the leader of the assembly, and

10   some of it will be given to the majority, the leader of the

11   senate, and some of it will be given to the Department of

12   Health, the commissioner, and that they'll have discretion as

13   to how to use it.

14           THE COURT:  I'm looking through this, and I'm looking

15   at press releases.  I'm looking at the governor's memo, the

16   Department of Health weighing in in favor of it.

17           I don't think the bill is actually in here.

18           MR. SHUR:  I'm sorry, Judge?

19           THE COURT:  I don't think the bill is in here.

20           (Pause)

21           THE COURT:  In the thing that you handed me, the bill

22   does not appear.

23           MR. SHUR:  Judge, it's the bill jacket, and then

24   there's the voting history and various correspondence relating

25   to the bill.  This was all pulled from the New York State

FBIYSIL6                          Pennetta - Cross

1    archives.

2              THE COURT:  I understand all that.  My point is you

3    want to put the bill in, and this does not include the bill.

4              MR. SHUR:  We're happy to amend this to include the

5    bill.  I apologize.  I thought it included the bill itself as

6    well.

7              THE COURT:  I think all of the rest of this stuff,

8    which are the letters from Blue Cross supporting it, the letter

9    from the American College of Emergency Physicians supporting

10   it -- none of this is relevant.  Under your articulated theory,

11   the bill is relevant.

12             MR. SHUR:  The fact that you have all of these third

13   parties outside of Albany supporting it shows that they're

14   aware of it.  It's not a secret.

15             THE COURT:  I'll give you the bill if you can bring me

16   the bill, if you can find the bill.

17             MR. SHUR:  We have the bill.  I understand the

18   third-party letters, Judge.  What about the press release that

19   the governor did about the bill?

20             THE COURT:  No.  The bill.  Your theory is the bill.

21             MR. SHUR:  The theory is it wasn't a secret.  If

22   there's a press release when the bill comes out, I think that

23   certainly rebuts the government's argument that this was all

24   somehow secret money under the table that no one knew about.

25             MS. COHEN:  Your Honor, I'm sure the press release

FBIYSIL6                         Pennetta - Cross

1    does not list the secret pool of money.

2              THE COURT:  That's not usually language that makes it

3    into press releases.

4              MR. SHUR:  Just for the record, I'm looking at the

5    transcript from the government's opening.  It says, "You will

6    learn during this trial that the money came from a secret pot

7    of money."

8              Then there's a second reference which says, "The

9    secret pot of money that the defendant used to fund Dr. Taub's

10   research."

11             I think that, coupled with Amy Paulin's testimony

12   suggesting that if she wasn't aware of it, the world wasn't

13   aware of it, this is a fair response.

14             MS. COHEN:  When I passed the document up, your Honor,

15   I said if it's a bill, we don't object to the bill itself.

16             MR. SHUR:  I'm now talking about the press release.

17             THE COURT:  As I was concerned, is the government

18   ready to rest?  What do you have to do?

19             MS. COHEN:  Your Honor, we have three exhibits to move

20   in.  Two are the same as two defense exhibits that were moved

21   in.  One I talked with defense counsel, and they have no

22   objection to.

23             We also would like that the transcripts of the

24   recordings, since there's no dispute as to that they are

25   accurate transcripts, be allowed to go back to the jury room as

1   part of their deliberations.

2          That is common in many cases.  There's not a debate

3   that they accurately transcribed what is on the tapes.  We

4   would also ask that the two demonstrative charts regarding the

5   real estate legislation, which is Government Exhibit 1521, as

6   well as the defense chart, Government Exhibit 133, be allowed

7   to go back to the jury room.

8          THE COURT:  We'll start with that.  We'll start with

9   the demonstrative chart on your bill, including your blow-up

10  with the red markers on it.

11         What's your position on that?

12         MR. MOLO:  What do you mean my marking on it?

13         THE COURT:  Your marking and then the original

14  government exhibit that had that.

15         MS. COHEN:  I'm sorry, your Honor, if I was confusing.

16  Defense Exhibit 133 is a different chart.  It is not our chart

17  with the markings.

18         THE COURT:  What's Defense 133?

19         MS. COHEN:  It dealt with the property tax,

20  your Honor.

21         THE COURT:  The property tax what?

22         MR. MOLO:  Cap.  There was legislation that at the

23  same time related to property tax cap.

24         THE COURT:  That was not moved in?

25         MR. MOLO:  We didn't offer it.

FBIYSIL6                    Pennetta - Cross

1             MS. COHEN:  They moved it in as an aid to the jury.

2   So it was shown to the jury, and your Honor said it would be

3   treated the same way as Government Exhibit 1521, as a

4   demonstrative, but wouldn't necessarily go back to the jury

5   room.  There's no debate about the content of either of those.

6             (Continued on next page)

FBi5sil7

| 1 | MR. MOLO:  Is wasn't moved in, it was moved in as --

| 2 | THE COURT:  133.  Do you want to move it in?  Because

| 3 | I'm going to let their chart in.

| 4 | MR. MOLO:  I would say both should say out.

| 5 | THE COURT:  But that's not going to happen so.

| 6 | MR. MOLO:  Both of them in.

| 7 | THE COURT:  So defense 133.  Do you want a different

| 8 | number or it will go in as Defense 133?

| 9 | MR. MOLO:  133.

| 10 | THE COURT:  Okay.  I need my package of defense

| 11 | exhibits.

| 12 | MS. COHEN:  Sorry, your Honor.

| 13 | THE COURT:  The defense has them.  Are you done with

| 14 | it?

| 15 | MR. MOLO:  Yes, your Honor.

| 16 | THE COURT:  What is the chart?

| 17 | MS. COHEN:  Government Exhibit 1521.

| 18 | THE COURT:  So 1521 will be allowed to go to the jury.

| 19 | I will admit 133.

| 20 | MR. GOLDSTEIN:  Defendant's Exhibit 133.

| 21 | THE COURT:  1521.

| 22 | MS. COHEN:  Government Exhibit 1521.

| 23 | THE COURT:  So that's admitted.

| 24 | MS. COHEN:  We will move it in with the jury.

| 25 | THE COURT:  What else?

FBi5sil7

1          MS. COHEN:  The transcripts of the calls.

2          THE COURT:  Transcript of the call.  What is the

3     defense?

4          MS. COHEN:  Transcripts of the calls, transcripts of

5     the recorded statements.

6          THE COURT:  Yes.

7          MS. COHEN:  They would be 1-TA.

8          MR. MOLO:  We have no objection to the recording going

9     in which has been admitted in evidence.  The transcripts are

10    not the evidence and they should not go back to the jury room.

11         THE COURT:  I'm not going to let them go back to the

12    jury room.

13         MS. COHEN:  Your Honor, the government, since we

14    amended Government Exhibit 1 to include the extra excerpt that

15    the defense wanted in and we moved 1A into evidence and 1TA, we

16    ask we remove Government Exhibit 1 and Government Exhibit 1T.

17    They were previously admitted, now they're contained in

18    Government Exhibit 1T-A.  We don't want the implication based

19    on how the defense did it so we would like to move Government

20    Exhibit 1 and Government Exhibit 1T as not in evidence.

21         THE COURT:  I don't know about removing it.  1 is in.

22    No.

23         Anything further?

24         MS. COHEN:  That is it from the government.

25         THE COURT:  Okay.  I'm going to bring the jury out.

FBi5sil7

```
 1    You are going to move these exhibits in.  The defense, I guess
 2    you can move 133 in on Monday when you complete your case.
 3              MR. MOLO:  Okay.
 4              THE COURT:  Here is my plan.  I'm going to bring them
 5    out.  Let you rest -- move your exhibits in, rest.  I'm going
 6    to send them home.  We will then deal with allocuting your
 7    client, your case will go in Monday morning, and you will move
 8    directly into summations.  Okay?
 9              Any objection?
10              MR. MOLO:  I'm sorry.  I was distracted.  So we move
11    whatever our exhibits are, we will deal with these issues.
12              THE COURT:  We will deal with the rest of this this
13    evening so you will be ready to go Monday morning.
14              MR. MOLO:  Okay.
15              THE COURT:  You are going to move a bunch of stuff
16    into evidence.
17              MR. MOLO:  Right.
18              THE COURT:  And roll directly into summations.
19              MR. MOLO:  Fine.  And instruction conference Friday
20    sometime?
21              THE COURT:  Instruction conference on Thursday.  I
22    want to get the jury out here.
23              MS. COHEN:  Can we confirm that the defense is not
24    calling any witnesses?
25              THE COURT:  Yes, they are not calling any witnesses.
```

FBi5sil7

1          MS. COHEN:  Thank you, your Honor.

2          THE COURT:  Correct?

3          (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBi5sil7

1          (Jury present)

2          THE COURT:  Okay, sorry for the delays, folks.

3          Ms. Cohen?

4          MS. COHEN:  Your Honor, the government would like to

5     move into evidence what's been marked for identification

6     Government Exhibit 1521, Government Exhibit 732, Government

7     Exhibit 702, and Government Exhibit 703-1.

8          THE COURT:  Any objection?

9          MR. SHUR:  No objection, Judge.

10          THE COURT:  Okay.  1521, 732, 702 and 703-1 are

11     received.

12          (Government's Exhibits 702, 703-1, 732 and 1521

13     received in evidence)

14          MS. COHEN:  Your Honor, the government rests.

15          THE COURT:  Thank you.

16          All right, ladies and gentlemen, what the government

17     has just told me is that they have now completed their case.

18     You have heard all the evidence you are going to hear from the

19     government.

20          I have told you you are going to be off tomorrow and

21     Friday -- Thursday and Friday, so we are going to start back on

22     Monday.  The defense has the right, if they wish, to put a case

23     in.  I anticipate they're going to at least put some documents

24     in front of you.  The next step after that will be summations,

25     a jury charge and then you will start deliberations.  Okay?  So

FBi5sil7

1    we are getting towards the end.

2              So, I'm going to let you leave at this point.  You are

3    going to be gone for four days; don't think about the case,

4    don't talk about the case, don't let anybody talk to you about

5    the case, don't read about the case, don't listen to anything

6    about the case or any other corruption trial that happens to be

7    going on at this moment.  Okay?  So, put this entirely out of

8    your mind, come back Monday morning refreshed and ready for a

9    long day.

10             So, we need you here at 9:15 Monday morning.  Okay?

11   Thank you, all, and have a very nice weekend.

12             THE JURY:  Thank you.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

FBi5sil7

1          (Jury not present)

2          THE COURT:  Okay, when I left off I was looking

3   through the Governor's press release for anything relative to

4   the pool of money that was going to be at the discretion of the

5   Speaker of the House and I'm not seeing it so, Mr. Shur, can

6   you direct me where in the press release there is any

7   indication that there is going to be a pool of grant money

8   under the discretion of the Speaker of the Assembly?

9          MR. SHUR:  One moment, Judge?

10         THE COURT:  Sure.

11         (Pause)

12         THE COURT:  703-1 was already in evidence.

13         MS. COHEN:  It is in as a defense exhibit, we want to

14  move it in as a government exhibit.

15         THE COURT:  Okay.

16         MR. SHUR:  Judge, as we are reviewing it, there is

17  reference on the second page --

18         THE COURT:  Of the press release?

19         MR. SHUR:  Yes.

20         THE COURT:  To.

21         MR. SHUR:  To $70 million that is being set aside for

22  public health programs.

23         THE COURT:  Right, but it doesn't say it is under the

24  exclusive discretionary control of the Speaker of the Assembly,

25  or presumably that was divvied up a third to the Assembly, a

FBi5sil7

1    third to the Senate and a third to the Governor.  But it

2    doesn't say that.

3              MS. COHEN:  That's not even the same fund.

4              THE COURT:  That's not the pool.

5              MS. COHEN:  No, it isn't, your Honor.  It was 8.5,

6    8.5, 8.5.

7              THE COURT:  Which adds up to what?

8              MR. SHUR:  Not at the time it was passed, is my

9    understanding.

10             THE COURT:  This doesn't really give the sort of

11   transparency that --

12             MR. SHUR:  Well --

13             THE COURT:  I understand your point.  Look, Mr. Shur,

14   if it was in here --

15             MR. SHUR:  If the secret pot of money is in a press

16   release it is not so secret, right?

17             THE COURT:  But it is not in there.  There is nothing

18   in here that says that there is a fund of money that is at the

19   discretion which is what you said, I thought, in your argument

20   why this should be admissible, is that it was clear from --

21   what you said was it is in the bill that there was a third that

22   was given to the Assembly, a third to the Senate, and a third

23   to the Governor so that is not in the press release.

24             MS. COHEN:  And that's why we didn't object to the

25   bill.

FBi5sil7

1          MR. SHUR:  Judge, on the press release, if it is okay

2     with you, I'm going to let Ms. Le address it since she is

3     familiar with the release itself.

4          THE COURT:  I am fine to hear from Ms. Le.

5          MS. LE:  My understanding is that when the bill was

6     originally passed is that the Department of Health -- so the

7     Commissioner of the Department of Health received its own

8     priority pool and it was $15 million.

9          THE COURT:  1-5?

10         MS. LE:  That's what that says in this press release.

11    After that happened, the Senate Majority Leader and the Speaker

12    of the Assembly, or I should say the Senate and the Assembly

13    also wanted their own priority pools and so that was in a later

14    version of the bill I think is what happened.

15         So, this press release only refers to the priority

16    pool that the Department of Health received.

17         THE COURT:  Okay.  So thank you.  That doesn't -- I

18    don't want to ruin your career, Ms. Le, but that doesn't

19    advance your ball, Mr. Shur.

20         MR. SHUR:  Understood.

21         Well, Judge, I think we can agree that the Governor's

22    press release comes out.

23         THE COURT:  None of the -- I will let you put the bill

24    in.

25         MR. SHUR:  That's fine, Judge.

FBi5sil7

1          THE COURT:  Looking through this, I didn't see

2     anything about money going to the discretion of the Speaker of

3     the Assembly.

4          MR. SHUR:  No.  The broader point was simply that the

5     notion that HCRA and the fact that it was going to -- the

6     statute was going to provide for funding for the healthcare

7     program was not a secret.

8          THE COURT:  That wasn't -- but that wasn't what the

9     government said.  The issue is whether there was a pool -- not

10    that the -- there are no secret bills.  I mean, everything has

11    to pass.  Everything is out in the open.  The issue was how

12    were pools of money set up.

13         MR. SHUR:  I understand.

14         THE COURT:  And how much transparency was there.

15         MR. SHUR:  Right.  So the bill, as I mentioned,

16    addresses the fact that the head of the Assembly and the head

17    of the Senate and the Department of Health Commissioner each

18    gets a separate pool or pot of money.

19         THE COURT:  I can't wait to see the bill establishing

20    that because bills tend not to be written with that level of

21    clarity, particularly on something that was done like that.

22    But, perhaps it is that clear and so I don't have it here so I

23    am going to require you though, to bring it to the charge

24    conference and we can talk about it at the charge conference

25    because I do not want to deal with this Monday morning.

FBi5sil7

1            MR. SHUR:  Understood, Judge.

2            THE COURT:  Okay.  What's next?

3            MS. COHEN:  The next documents the defense seeks to

4   admit are marked Defense Exhibits 245 and 246.  They are

5   e-mails, one of them Dr. Taub is on, the other one I don't

6   believe he is on, it is just administrators at Columbia dealing

7   with internally how they use the grant money that they get.

8            Whatever testimony there is on this point and whatever

9   documents should have been introduced through Dr. Taub, that is

10  confusing and is also misleading about how the grant money was

11  spent and how it moved around Columbia to the Mesothelioma

12  Center.

13           THE COURT:  Mr. Molo, what is the relevance?

14           MR. MOLO:  If you go down to 245 on the bottom --

15           THE COURT:  On the back page.

16           MR. MOLO:  I am referring to this part right here from

17  Dr. Taub.

18           THE COURT:  Yes.

19           MR. MOLO:  He testified he sent this grant application

20  to administrators at Columbia.  We went through this whole

21  process -- excuse me, New York Presbyterian and then Columbia.

22  You told me don't go through everything with him, if you recall

23  at a side bar, on Columbia.  There were two grants, the first

24  one was New York Presbyterian as the contracting party; the

25  second one, Columbia as the contracting party.  And I did keep

FBi5sil7

         1    my examination short.  These are business -- well, relatively

         2    speaking -- shorter than it would have been otherwise.  Let's

         3    put it that way.

         4           These are business records of Columbia, we have no

         5    problem stipulating to all the business records.

         6           THE COURT:  Mr. Molo, please don't make that argument

         7    to me anymore.  This is not tit for tat.  It has to be

         8    relevant.

         9           MR. MOLO:  The relevance of this has to do with

        10    significant argument we have made throughout the trial that

        11    administrators at both New York Presbyterian and Columbia

        12    played a role and had visibility into these contracts.  This

        13    wasn't Dr. Taub doing them by himself in secret and that's all

        14    this establishes as part of that process.

        15           THE COURT:  I don't think there is any suggestion that

        16    the two schools were not aware or that Columbia and

        17    Presbyterian weren't aware that they had $250,000 coming into

        18    them.  The issue was they weren't aware of what was behind the

        19    grant.

        20           MR. MOLO:  Okay, which is certainly an argument that

        21    the government can make but as to the level of activity and

        22    what went into these grants this wasn't, as I said to Dr. Taub

        23    you filled out a coupon, sent it in and got the check back.

        24    This refutes that.  And so --

        25           THE COURT:  You can make your argument.

 1                MR. MOLO:  All right, but that's what this goes to.

 2     These are business records of Columbia.

 3                THE COURT:  Again, that's not the issue.

 4                MR. MOLO:  Okay.  But as to the relevance, I think I

 5     have stated it.

 6                MS. COHEN:  Your Honor, my concern is that the defense

 7     is picking and choosing these particular documents because they

 8     want to argue that somehow Dr. Taub himself personally

 9     benefited from the state money.  There were documents that the

10     defense introduced on cross-examination of Dr. Taub that we did

11     not object to that talked about how the state money came into

12     Columbia and I think they are cherry picking two documents

13     without Dr. Taub on the stand so that they can make arguments

14     in closing.

15                MR. MOLO:  I raise my hand.  I will not argue that

16     Dr. Taub personally benefited from the money.  In fact, I asked

17     him that on cross-examination and he said he didn't.  So, that

18     issue --

19                THE COURT:  I don't see it -- he is not going to argue

20     that but I'm not even sure how this document advances that

21     ball.  I mean, this is all about the employees that are going

22     to work on it are in the Division of Oncology, they're trying

23     to figure out how the flow of money is going to work within the

24     hospital.

25                MS. COHEN:  Your Honor, with that representation that

FBi5sil7

```
 1    it's not going to be used to argue that, and if it is, we are
 2    going to object at closing.
 3             THE COURT:  And if you object it will be sustained.
 4             So this document, which is 245 and 246 -- 245,
 5    Mr. Molo, your argument, I understand it.  246, I don't
 6    understand how that is relevant under your explanation of why
 7    it is relevant.
 8             MR. MOLO:  It relates to the -- see, it says Taub
 9    grant and these are the same people that are involved and --
10             THE COURT:  Right, but this is on the disbursement of
11    funds.  You said you wanted to use it to show that there was
12    actual diligence of some amount done at the recipient end.  245
13    advances that cause.  246 doesn't.
14             MR. MOLO:  246 is a person from the comptroller, I
15    believe, or accounting office, this Mr. Elhadidi or
16    Ms. Elhadidi -- forgive me -- but to Karen Colon and Ahema
17    Asare, says Taub grant, and it goes to the processing of these
18    grants as they went along.  This is just showing that this is a
19    level of contact, Judge.
20             THE COURT:  I will give you 245.  246 I think is
21    confusing and its confusion outweighs its relevance but I will
22    give you 245.
23             MR. MOLO:  All right.
24             THE COURT:  Which is kind of the processing aspect
25    that it has to go here and there.
```

FBi5sil7

1        MR. MOLO:  Can we take one out of order, perhaps, if

2    that's okay?

3        THE COURT:  I have got no order.  I am dealing with

4    things as you hand them to me.

5        MR. MOLO:  It is Defendant's Exhibit S-16, stipulation

6    16 with Exhibit 186.

7        MR. MASTER:  What does it relate to?

8        MR. MOLO:  Stipulation concerning Tax Commission of

9    New York Summary Checklist.

10       MS. COHEN:  I have my copy, your Honor.

11       THE COURT:  Thank you.

12       MS. COHEN:  We found a copy from the extra set.

13       MR. MOLO:  I think the Judge has it.

14       THE COURT:  I have it.  What is its relevance?

15       MR. MOLO:  Mr. Runes testified, Judge, his testimony

16   at page 1806 of the transcript was about whether or not these

17   retainer agreements needed to get filed.

18       THE COURT:  Right.

19       MR. MOLO:  And he said I'm not sure, your Honor, but I

20   believe that the retainer agreements for certiorari agreements

21   are filed someplace and are available to be viewed where as the

22   side letter would not be.  That's what his testimony was.  In

23   fact, they don't need to be filed --

24       THE COURT:  Totally and completely irrelevant.  His

25   state of mind was we've got a big old problem because these

FBi5sil7

things have to be filed and therefore we have to work out some

other way to make Mr. Goldberg happy without risking a public

disclosure.  What actually is required is irrelevant.

            MR. MOLO:  Okay.  Well, he says I believe.  It is not

to a certainty.

            THE COURT:  It is irrelevant.  It is irrelevant.  He

was wrong.  Too bad.

            MR. MOLO:  Okay.

            THE COURT:  They could have just left the retainer

agreements the way they were.

            MR. MOLO:  And so, I would --

            THE COURT:  But, instead, they jumped through hoops

that looked suspicious and his explanation is the reason he did

it was because he thought the retainer agreement had to be

filed.

            MR. MOLO:  Okay.

            THE COURT:  That's incriminating.  The fact that he

was wrong is irrelevant.

            MR. MOLO:  To make my record -- I understand.

            THE COURT:  Go ahead.

            MR. MOLO:  To make my record, I would like to offer

this document as a business record which you are not going to

admit on relevance grounds but at least it is in the record.

That's all I want to do.

            THE COURT:  It doesn't work that way.  It is either in

FBi5sil7

1   or it is not in.  I agree with you that it is a business

2   record.

3                MR. MOLO:  Okay.

4                THE COURT:  Assuming that this is correctly a copy of

5   the real estate -- the Tax Commission's Checklist.

6                MS. COHEN:  Your Honor, I don't know.  I would also

7   note that it is 2015 which would not have been the checklist in

8   place at time.

9                MR. MOLO:  Theoretically -- theoretically -- an

10  appellate court looking at the record, right, would say that

11  the Judge made the ruling on relevance but they didn't have

12  before it what it was that we were offering and that's why I

13  want to at least offer this document as if I had a custodian

14  here.  That's all I'm asking, so it is just part of the record.

15               THE COURT:  I don't know what that is.  I mean, how

16  the exhibits get up to the Second Circuit is something you will

17  have to deal with if that becomes an issue.

18               MR. MOLO:  I have to have offered it for it to get up.

19               THE COURT:  You have offered it.

20               MR. MOLO:  So it is part of the record.

21               THE COURT:  Is there objection?

22               MR. MOLO:  Yes, 186.

23               THE COURT:  There is an objection?

24               MS. COHEN:  There is an objection.

25               THE COURT:  Okay.  Sustained.

FBi5sil7

1          MR. MOLO:  Okay.

2          THE COURT:  On relevance.

3          MR. MOLO:  On relevance grounds.

4          THE COURT:  And this is a 2015 checklist and I don't

5    know if that's the same checklist.

6          MR. MOLO:  That's a relevance issue.

7          THE COURT:  Also relevance.

8          MR. MOLO:  As long as it is relevance.

9          Thank you.

10          MS. COHEN:  Your Honor, the next document or the next

11    document in my pile that I got from the defense is Defendant's

12    Exhibit 163 for identification.

13          THE COURT:  I thought this was part of -- I feel like

14    I have seen this before.  There was an e-mail string that you

15    used when you had Mr. Mandel on the stand.

16          MS. COHEN:  Correct, your Honor.

17          THE COURT:  Was this not part of that e-mail string.

18          MS. COHEN:  This was not part of it and the defense

19    did not seek to introduce it on cross.

20          THE COURT:  What is the relevance?

21          MR. MOLO:  This is a Shalom Task Force --

22          THE COURT:  What is the relevance?

23          MR. MOLO:  It is OHEL.

24          THE COURT:  What is the relevance?

25          MR. MOLO:  What is the relevance?  It is part of the

FBi5sil7

1    process of hiring Jonathan Taub.  We had all the testimony

2    about it is another business record.

3              THE COURT:  Why isn't it cumulative?

4              MR. MOLO:  It is not cumulative because it is showing

5    the timing when it was they did it.  Mr. Silver didn't --

6              THE COURT:  There is another e-mail string that is in

7    this same time frame, right?

8              MS. COHEN:  Correct, your Honor.

9              THE COURT:  Do you have that document?  It was in

10   evidence.

11             MS. COHEN:  I would also say David Mandel who is on

12   this e-mail was on the stand and if the defense wanted to

13   introduce this, they should have done it through David

14   Mandel -- unless they didn't like the answer they were going to

15   get from him, your Honor.

16             MR. MOLO:  The resume was sent in February.

17             THE COURT:  No, no.  No, no, Mr. Molo.

18             When Mr. Mandel was on the stand --

19             MR. MOLO:  Right.

20             THE COURT:   -- there was testimony about he forwarded

21   the resume and then there was kind of a lapse of time and then

22   either he got a call or something happened and he pinged, I

23   guess, Sharvit again saying what's happening with Taub.

24             MR. MOLO:  Right.

25             THE COURT:  I want to get him interviewed or

FBi5sil7

1      something -- this is important to Shelly or something.  There

2      was something like that.

3                  MR. GOLDSTEIN:  384-02 has, it is actually a week

4      earlier --

5                  THE COURT:  384-02.  Is that on the screen?

6                  MR. GOLDSTEIN:  Correct, the June 20th --

7                  MS. COHEN:  And there is another one, 384-03, and

8      there is a prior one 384-01.

9                  MR. MOLO:  It is just the timing, Judge.

10                 THE COURT:  Isn't that in here?  So this is just --

11     this is a week later.  This is a week after Mandel is saying to

12     Sharvit, please, check on the status of a follow-up with Taub,

13     the resume forwarded by the Speaker, and then there is back,

14     back, back, he pings him again on June 2nd, that is Mandel

15     pings Sharvit again on June 22nd.  The morning of June 22nd he

16     says we are playing phone tag.  I will let you know as soon as

17     I speak to him.

18                 So, that sets your timing if the timing is when did

19     the resume --

20                 MR. MOLO:  That will work.

21                 THE COURT:  So the resume goes over in February and

22     they don't get to him meaningfully until June.

23                 MR. MOLO:  Correct.

24                 THE COURT:  So that's already in evidence.  That

25     document is in evidence.

FBi5sil7

1              MR. GOLDSTEIN:  This document is in evidence, your

2      Honor.

3              THE COURT:  Okay.

4              MR. MOLO:  It just is another document that further

5      completes this -- I mean, Judge.

6              THE COURT:  Why didn't you put it in when Mr. Mandel

7      was on the stand?

8              MR. MOLO:  Because I'm putting it in now.  You told me

9      don't call --

10             THE COURT:  No, no, no.

11             MR. MOLO:  -- avoid record custodians and we are doing

12     that.

13             THE COURT:  But you had Mr. Mandel on the stand.  This

14     is him -- not even him -- wait a minute.  Is he in here at all?

15             MS. COHEN:  He is in there on the top, your Honor.

16     From David Sharvit to David Mandel.

17             THE COURT:  So it is Sharvit sends it to Mandel a week

18     after that e-mail saying basically we have got him coming in.

19             MR. MOLO:  Which just further completes the record.

20     All I'm doing -- we are not talking about, by the way a

21     mountain of evidence here.  We didn't have any problem with the

22     government stipulating to all the business records they wanted

23     to put in.  This is one business record on this issue.  It is

24     not going to create some grave injustice to allow one record in

25     like this to complete this story.

FBi5sil7

1          THE COURT:  But, again, the fact that you agreed to

2     business records doesn't advance your ball.  Please stop making

3     that argument.

4          MR. MOLO:  Okay.

5          THE COURT:  It really does not advance the cause.

6          MR. MOLO:  But why, in the interest of --

7          THE COURT:  Stop.

8          What is the government's objection to this?

9          MS. COHEN:  Your Honor, the government has no

10     objection to this.

11          THE COURT:  163 is in.

12          What else?

13          MS. COHEN:  Your Honor, the next document that the

14     defense handed the government was Defense Exhibits 161 and 230

15     which the government does have objections to.

16          THE COURT:  Start with 161.  Why is 161 admissible?

17          MR. SHUR:  Judge, the question is why is it relevant?

18          THE COURT:  Let's start with why is it admissible?

19     Because you have got lots of hearsay statements in here, right,

20     including Mr. Silver's hearsay statement.

21          MR. SHUR:  It is a business record of the Attorney

22     General's office.

23          THE COURT:  No, no, no, no.  Look.  Y'all play very

24     fast and loose with what is a business record and what isn't.

25     A business record is something that is prepared by someone with

FBi5sil7

knowledge of the item so here what you are trying to do is if

you have got embedded other hearsay in a business record, you

have to deal with that.  So, here you are trying to get in

Mr. Silver's hearsay statement so what is the exception that

governs that would cover that?  It is not going to be covered

as a business record of the Governor's office or the Attorney

General's office, whose ever press release this is.

          MR. SHUR:  Well, maybe I should talk about the

relevance because I think this is to respond to -- I believe it

was a new certification that the Attorney General's office came

out with that the government introduced relating to the grant

process where sponsors -- the member sponsoring the grant's

name is going to appear and this simply shows that Mr. Silver

was part of the process of implementing this new certification

along with the Attorney General's office and so that's the

relevance of it.  If there is a concern about a particular

statement within the press release, that, we might be able to

redact that if that's the issue.

          THE COURT:  All of these things, sort of all of these

various members and the Governor and the Attorney General,

whoever all is quoted in here, it looks like everybody is

quoted in here, all of that is hearsay.  I just don't -- why is

it admissible?  Because they're all saying that they are great

patrons of transparency.

          MR. SHUR:  The issue is there were these mysterious

FBi5sil7

1    facts that the government introduced from OHEL to Mr. Silver

2    where they said basically, FYI, here are these new forms and I

3    believe Mr. Mandel testified as to why did we send them over?

4    He said well, look.  We work with members of the Assembly on

5    these grants and we got this new paperwork and so we figured we

6    should send it over to them.  And there is this inference that

7    Mr. Silver is first learning about this form when he receives

8    it from OHEL and the fact is that he was part of the process of

9    rolling out these forms and this is what this exhibit shows.

10         MS. COHEN:  Your Honor, there was an entire witness

11    who testified about these disclosure forms.  One of the things

12    that he testified about was that Sheldon Silver was present at

13    the announcement of using these disclosure forms.

14         MR. SHUR:  If you might remember, this is the witness

15    that said he left early and wasn't able to really testify about

16    what occurred at the press conference.

17         THE COURT:  All right, but he said there was a press

18    conference and, as I recall, he testified that everybody was

19    there.

20         MS. COHEN:  Correct.

21         THE COURT:  He doesn't remember what anybody said.

22         MR. SHUR:  He wasn't able to testify about what the

23    press conference was about.

24         MS. COHEN:  You have testimony about it, this is

25    hearsay within hearsay.

FBi5sil7

1           THE COURT:  I don't see this one as being admissible.

2           MR. MOLO:  On that, Judge, you are saying it is not

3       admissible?

4           THE COURT:  Yes.  I don't think 161 is admissible.

5           MR. MOLO:  I just want to say rather than call

6       witnesses, someone to say that Mr. Silver was involved in

7       sponsoring this legislation and was a part of all of this --

8           THE COURT:  This doesn't really say he sponsored the

9       legislation, I don't think.  This was an agreement.  It doesn't

10      even look like it is legislation.

11          MR. MOLO:  All right, that he was part of this

12      initiative, all right.  Rather than calling a witness to do

13      that this is one way to do it.  I am looking here to avoid

14      lengthening the time for the Court and for the jury and for

15      everyone involved.  Rather than subpoena somebody to testify to

16      that, this was a way to do it.

17          Now, I understand that the Court may be reluctant to

18      allow the press release in but I think the government could

19      stipulate to that fact, that Mr. Silver participated in this,

20      because through their own questioning there was a suggestion

21      that this was being done and Mr. Silver wasn't, you know --

22      someone was coming in to clean up this mess that he was part

23      of, helped create.

24          THE COURT:  I thought the suggestion was kind of this

25      got pushed by I don't know whether it was the Attorney General,

FBi5sil7

 1   the Attorney General was pushing it?  But there wasn't

 2   testimony whether Mr. Silver came willingly to the party or

 3   this was a shotgun wedding.  This is making it seem like this

 4   was he was a willing dance partner and I don't know if that's

 5   true but there is no evidence, one way or the other to it.  So,

 6   from that perspective you have got a lot of hearsay from all of

 7   these members which is inadmissible and you have got

 8   Mr. Silver's, in particular, hearsay, that is not admissible.

 9            So, to the extent you want to put on evidence that he

10   was a real proponent of this to rebut the government's

11   suggestion that this was a shotgun wedding, you are welcome to

12   do that, that's why you have a defense case, but this document

13   can't come in to do that.  You can't short circuit it that way.

14   Okay?

15            230.

16            MR. SHUR:  Judge, 230 is simply the attorney general's

17   sign-off on the grant.

18            THE COURT:  On the grant.  This is approval as to

19   form.

20            MR. SHUR:  Right.

21            THE COURT:  He didn't approve this as to legality.

22            MS. COHEN:  Your Honor, this is already --

23            THE COURT:  I thought this was in already.

24            MS. COHEN:  This is in already as part of the contract

25   document.

FBi5sil7

                    THE COURT:  I thought you had this in.  This is one of

many documents that you walked through, Mr. Molo, ad nauseam,

which included the AG's sign-off as to form.

                    MR. SHUR:  For both grants?  I thought it was for one

of the two.

                    MS. COHEN:  It is in for both grants.  What is not in

the contract obviously would be the cover letter to the state

comptroller from the AG's office.

                    THE COURT:  This is from the AG to the comptroller?

                    MS. COHEN:  Correct.  I know the second and third

pages which is the grant contract with the stamp approved as to

form, it was in evidence and there was testimony about it.

                    MR. SHUR:  Right, so what I believe is in evidence is

the stamp on the contract, right, that says the attorney

general has approved it but not the --

                    THE COURT:  So what does this add?

                    MR. SHUR:  It just completes the record, Judge, in

terms of the Attorney General's involvement in reviewing and

approving the grant.

                    THE COURT:  Look.  I think y'all are on very thin ice

on what you are arguing about what the Attorney General does.

The Attorney General, as whoever the witness was testified,

reviews as to legality.  They are not reviewing whether it is a

good idea or a bad idea.

                    MR. SHUR:  Judge, it is what it is in the letter what

FBi5sil7

```
1    they've done and I think it is clear they reviewed as to form.
2    There is mention of the establishment clause.  It is very
3    clear.
4              THE COURT:  I don't see what this adds.
5              MR. SHUR:  It is just completing the narrative --
6              THE COURT:  What is the government's objection?
7              MS. COHEN:  Your Honor, most of these pages of the
8    document are in evidence.
9              THE COURT:  Okay, so what is your objection?
10             MS. COHEN:  I don't understand what relevance the
11   cover letter is unless they're trying to make some argument
12   that there is no evidence in the record to support.  And they
13   could have showed it to the attorney general witness again who
14   was on the witness stand when he was here.
15             MR. SHUR:  Judge, I have to respond because Ms. Cohen
16   now has said a number of times they could have shown it to the
17   witness on the stand.
18             During this last witness' testimony Ms. Cohen handed
19   me a bunch of Goldberg & Iryami records with a summary chart
20   that clearly could have -- they could have shown Ms. Iryami
21   this.  We just said, yes, you can introduce this, we have no
22   objection.  So, the idea that the window has sort of passed for
23   that --
24             THE COURT:  230 is admissible.  The government's
25   objection is overruled.
```

FBi5sil7

1          What's next?

2          MS. COHEN:  Your Honor, the next document that the

3    defense seeks in the pile they gave me to admit is Defense

4    Exhibit 164.

5          THE COURT:  The next document that the defense wants

6    to --

7          MS. COHEN:  I only say that because Mr. Molo said that

8    I was picking and choosing which documents I was showing you.

9          MR. MOLO:  I didn't say that.

10         MS. COHEN:  Defendant's Exhibit 164.

11         MR. MOLO:  I didn't say that.

12         MS. COHEN:  Defendant's Exhibit 164 and 165.

13         THE COURT:  What possible relevance does 164 have?  A

14   press release from the Shalom Task Force that Audrey Pheffer

15   champions the cause of domestic violence.

16         MR. SHUR:  Judge, in the indictment, I understand that

17   the government has sort of, to some extent, abandoned this

18   during the course of trial but in the indictment what is

19   charged is that in exchange for referrals of asbestos cases

20   Mr. Silver directed state grant money to the Shalom Task Force

21   and I think what we have brought out during the course of the

22   trial is the fact that there were three other members of the

23   Assembly that asked Mr. Silver to give money to the Shalom Task

24   Force and he ended up matching what they were giving.

25         THE COURT:  Which doesn't mean he wasn't influenced by

FBi5sil7

1    other things.

2              MR. SHUR:  I understand.  But one of the members was

3    Audrey Pheffer that was leading the charge and wrote to

4    Mr. Silver asking to give money, that's who he is matching, and

5    this supports that, Judge.  This is a business record of the

6    Shalom Task Force and talks about the fact that --

7              THE COURT:  Nope.  Nope.  Nope.  Nope.  This is a

8    press release.  Again, go back and read what a business record

9    is.  This is a press release.  It is not going to qualify as a

10   business record.  It is prepared by well meaning communications

11   people to get a message out.  So, 164 is out.

12             165?  What is 165?

13             MR. SHUR:  Judge, this is along the same lines in

14   terms of the Shalom Task Force grant and what the funds were

15   used for and who was involved in supporting the Shalom Task

16   Force.

17             THE COURT:  Okay.  That's not admissible.

18             Next document?

19             MS. COHEN:  Your Honor, the next is a set of documents

20   marked for identification as Defense Exhibits 166 through 176,

21   243 and 244 for identification.  I believe this is also the

22   last set of exhibits, your Honor.

23             THE COURT:  Terrific.

24             Okay, let's start with 166.

25             MR. MOLO:  166 is a progress report that was prepared

FBi5sil7

 1    by Dr. Taub and it was prepared for 2001-2003, so it was

 2    talking about the work that they were doing at this time.

 3              THE COURT:  This is before any of the grants, right?

 4              MR. MOLO:  This is before he had the grants but it is

 5    showing the work that he was doing and I did put in evidence

 6    concerning his early -- it was a little bit later, his CV, but

 7    showing the work that he is doing, the work that he is doing

 8    continues on.  So, that's what this is.

 9              THE COURT:  I don't see the relevance of that.

10              MR. GOLDSTEIN:  Judge, the one issue with this whole

11    series of documents, these are documents that were electronic

12    drafts that were on, I believe, Dr. Taub's computer that none

13    of which were finalized, as far as we know.  The ones that were

14    actual final copies that appeared in the Assembly are all

15    admitted into evidence already.

16              THE COURT:  In the Assembly, this is like a progress

17    report that looks like --

18              MR. GOLDSTEIN:  Is that one sent to Mr. Milstein?

19              THE COURT:  It is not clear.  It is just a report of

20    progress, 2001 to 2003.  It doesn't say who it went to or why

21    this was being prepared.

22              MR. GOLDSTEIN:  So, our concern for this set of

23    documents is that without a witness to explain what they are

24    and since they are just drafts, that there is an ability for

25    them to be misleading to the jury and to be used for purposes

FBi5sil7

1      that may not be proper.

2              THE COURT:  Mr. Molo, I don't see the relevance of the

3      progress report.  I don't see the relevance of 166.  It is

4      outside the time period that is at issue.

5              MR. MOLO:  All right.

6              THE COURT:  So, 166 is out on relevance grounds.

7              167?

8              MR. MOLO:  Which is 2006.

9              THE COURT:  Dear Philip.  Who is Philip?

10             MS. COHEN:  It is to Philip Milstein, one of the

11     benefactors of the Mesothelioma Center.

12             THE COURT:  Okay.

13             MR. MOLO:  So, the relevance of this is that this is

14     in the relevant time period and it shows that as he is

15     reporting to Milstein he has left out any mention of work on

16     9/11-related -- that was the representation that he had made

17     when he was applying for the grants and in the grant contracts.

18             MS. COHEN:  Your Honor, this is exactly the problem

19     that he didn't do this with the witness on the stand.

20             THE COURT:  Okay, but so what?  Why is that relevant?

21             MR. MOLO:  Why?  Are you asking me?

22             THE COURT:  Yes.

23             MR. MOLO:  Why is it relevant that he didn't do the

24     9/11 work?  They've argued that the reason that he no longer

25     got any money from the state was that the "secret pot of money"

FBi5sil7

```
 1    was no longer secret.  In fact, he wasn't doing the work that
 2    he had contracted to do.
 3               THE COURT:  Well, that you needed to establish with
 4    him on the stand.  You can't do that through this document.
 5               MR. MOLO:  He testified that he wasn't doing -- he
 6    testified as to the contrast.
 7               THE COURT:  Well, then you've got the testimony and it
 8    is duplicative.  Look.  You could have --
 9               MR. MOLO:  It is duplicative for me.  I mean --
10               THE COURT:  You could have put this, used this when he
11    was on the stand so he could testify whether this was a
12    complete document, he could explain whether in fact this
13    information was sort of the same research that he is doing that
14    will assist 9/11 first responders and others who were exposed
15    to asbestos.
16               MR. MOLO:  These are his documents.
17               THE COURT:  Is it a final document?
18               MR. MOLO:  You know what, it goes to --
19               THE COURT:  He is not a party.  He is a witness.
20               MR. MOLO:  A very important witness and at least maybe
21    that goes -- it goes to the weight, perhaps, but not to the
22    admissibility or the minimal relevance of it.
23               THE COURT:  But Mr. Molo --
24               MR. MOLO:  This is a criminal trial where this man
25    testified, Taub testified about what he did, what he
```

FBi5sil7

1    represented to the State, what he did later.  He was all about

2    the computers.  We saw all kinds of drafts that the government

3    had that they were showing from his computer.

4              THE COURT:  And he identified whether they were a

5    draft or a final.

6              You are getting all exercised but with all due

7    respect, if this was an important document I don't understand

8    why you didn't show it to him when he was on the stand.

9              MR. MOLO:  Do you want me to recall him now and have

10   him introduce it?

11             THE COURT:  When did you get it?

12             MR. MOLO:  When we got -- we want to get into when we

13   got this?

14             MS. COHEN:  He got it in discovery in February.

15             MR. MOLO:  We are going to get into a much longer

16   conversation if it is when we got it.

17             THE COURT:  I can't let you put it in without a

18   witness on the stand, without him on the stand explaining what

19   it is because it is not obvious to me and so it is not going to

20   be obvious to a juror what this is and what this means.

21             MR. MOLO:  Well, I think it is, Judge.

22             THE COURT:  Okay.  We are going to have to agree to

23   disagree.

24             MR. MOLO:  No.  What it is is a document of Dr. Taub's

25   reporting on his work at the time.

FBi5sil7

1              THE COURT:  Was it final?  Is it a final document?

2              MR. MOLO:  It is something he drafted at that time.

3              THE COURT:  Is it a final document?

4              MR. MOLO:  As to each of them?  I'm not prepared to

5     tell you right this moment.  All right?  I don't want to say

6     something and be wrong.

7              THE COURT:  Okay.  Then, you know, this was kind of

8     your opportunity to be ready so I will put it in a different

9     pile.

10             MR. MOLO:  Okay.

11             THE COURT:  But the notion that you don't know the

12    answer is this is when we are going through the evidence that

13    the defense wants to present.  So, 167, at the moment, it is

14    not in my reject pile but it is definitely not in the

15    admissible pile.

16             MR. MOLO:  Why don't we defer this group, all right,

17    if that's all right?

18             THE COURT:  So that's all of these.

19             MS. COHEN:  I believe it is 167 through 173.

20             THE COURT:  Okay.  So that set, which will also allow

21    me -- through 170-what?

22             MS. COHEN:  173, your Honor.  I have 167, 168, 169,

23    170, 171 --

24             THE COURT:  173 is a letter to Silver.

25             MS. COHEN:  172, 173.

FBi5sil7

```
 1              THE COURT:  173 is a letter to Silver.

 2              MS. COHEN:  The progress reports to other people and

 3   things are 167 through 171.

 4              THE COURT:  What about 172?  So, that set of documents

 5   is on hold.  Okay.  Then we go to 172?

 6              MS. COHEN:  Correct, your Honor.

 7              THE COURT:  So we have 172, 173, 174, 175, this group.

 8              Okay, this letter, Mr. Molo --

 9              MR. MOLO:  I'm sorry.

10              THE COURT:  Do you need to consult with Ms. Le?

11              MR. MOLO:  Yes, I was.

12              THE COURT:  I'm happy to let you consult.  The next

13   document that I have in my hand -- oh, you do need to consult.

14              (Counsel conferring)

15              MR. COHEN:  Your Honor, while we are waiting for them,

16   Ms. Cohen was going to decide whether she had a problem with

17   the resolutions.

18              MS. COHEN:  What?

19              MR. COHEN:  The resolutions and the proclamation.

20              MS. COHEN:  Talking about the big, looseleaf door

21   stop?

22              MR. COHEN:  Correct.

23              MS. COHEN:  Your Honor, we have no objection to it

24   going in.  I don't see that it is relevant but I don't feel

25   like arguing over it.
```

FBi5sil7

1          MR. COHEN:  Also, Mr. Master and I were going to agree

2    to a document that I showed to the FBI agent this afternoon.

3          Mr. Master?

4          MR. MASTER:  I haven't had the chance to do the

5    calculations.

6          MR. COHEN:  It sounds like tonight is our night.

7          THE COURT:  So that's -- 91 is all the resolutions?

8          MS. COHEN:  I just want to make sure we are talking

9    about the right thing.

10          MR. COHEN:  The book.

11          MS. COHEN:  The book with all the resolutions for all

12    the different Assembly people at their request.

13          MR. COHEN:  Correct.

14          MS. COHEN:  I don't have it with me, your Honor, so I

15    don't know the number.

16          THE COURT:  This is it; lots and lots of Assembly

17    resolutions honoring all kinds of people for all kinds of

18    things.

19          MR. COHEN:  Right.  Okay.  She's not objecting.

20          THE COURT:  Okay.  So 91 can come in.

21          MR. COHEN:  Excuse me.  And Mr. Master and I have to

22    agree but I think we can resolve that tomorrow, Mr. Master?

23          THE COURT:  You will have to resolve it tomorrow

24    before the charge conference.

25          MR. COHEN:  We will do it, correct, Mr. Master?

FBi5sil7

1              MR. MASTER:  Yes.

2              THE COURT:  Okay.

3              All right, Mr. Molo?

4              MR. MOLO:  I withdraw 173.  174.

5              THE COURT:  Wait a minute, I was on 172.

6              MR. MOLO:  Oh.

7              MS. COHEN:  But 173 is withdrawn.

8              MR. MOLO:  172 is a document that was retrieved from

9    Dr. Taub's computer and it is a business record prepared by

10   him.

11             THE COURT:  Hang on a second.  It is not a business

12   record.  Wasn't this document finalized and put into evidence

13   in the final version that actually went to Mr. Silver?

14             MR. GOLDSTEIN:  Actually, the March 29th one, the only

15   record is electronic, it is in as Defense 20 without the

16   metadata.

17             THE COURT:  So this is already in evidence.

18             MR. GOLDSTEIN:  Already in evidence.  If the defense

19   wants to put in the metadata on the front page as an amended

20   exhibit, that's fine.

21             MR. MOLO:  That's fine.  We will do that.

22             THE COURT:  Okay.  So this is actually amended, what

23   is it, Defendant's Exhibit what, Mr. Goldstein?  It is amended

24   Defense Exhibit what?

25             MR. GOLDSTEIN:  Defense Exhibit 20.

FBi5sil7

1          THE COURT:  Okay, fine.

2          174, this is the October '07 letter.  Isn't this

3    already in evidence?

4          MR. GOLDSTEIN:  The final version of this and I

5    believe the next one are both in evidence.

6          THE COURT:  Okay, so why --

7          MR. MOLO:  The metadata.

8          THE COURT:  Why is the metadata for the draft, why is

9    that relevant?  You have the final in.

10          MR. MOLO:  We will do it without the metadata.

11          THE COURT:  So you don't need the draft, right?  You

12    are withdrawing 174?

13          MR. MOLO:  One second.

14          (Counsel conferring)

15          MR. MOLO:  We will go without the draft.

16          THE COURT:  The final is already in evidence.

17          MR. MOLO:  All right.

18          THE COURT:  Okay, so you are withdrawing 174?

19          MR. MOLO:  I will withdraw 173 and 174.

20          THE COURT:  175.

21          MS. COHEN:  What is being withdrawn?

22          THE COURT:  173 and 174.

23          MS. COHEN:  And 172 is withdrawn or in?

24          THE COURT:  172 is going in as amended Defendant 20,

25    so the metadata on front goes in.

FBi5sil7

```
 1              175, Mr. Molo.  Let's go, guys.  I want to get this
 2     done.
 3              MS. COHEN:  I will give him my copy, your Honor.
 4              Mr. Molo, here is your Defense Exhibit 175.
 5              MR. MOLO:  This is an e-mail from Joy Wheeler to
 6     Dr. Taub regarding the visit of -- to Mr. Silver and it is sent
 7     to set up the meeting that was testified to.
 8              THE COURT:  I'm sorry.  Okay.  It's a Wheeler to Taub
 9     e-mail?
10              MR. SHUR:  Right.
11              THE COURT:  Saying that there is an appointment with
12     the Assemblyman.  So, why is this relevant?
13              MR. MOLO:  Well, because they have this meeting.  I
14     mean it is an e-mail --
15              THE COURT:  Yeah, yeah, yeah, but there is evidence of
16     that, right?  You introduced evidence of that.
17              MR. MOLO:  We sat and listened and saw telephone
18     records, there was evidence of telephone calls today, we spent
19     two hours --
20              THE COURT:  Why is this relevant?  I understand why
21     that was relevant, moreover there was no objection, but why is
22     this relevant?
23              MR. MOLO:  She is writing Dr. Taub setting up the
24     meeting saying that Kirkland, the firm's COO, is going to be
25     there and we wanted to --
```

FBi5sil7

1           THE COURT:  Why is it relevant?  What does it prove

2     that is relevant?

3           MR. MOLO:  To show that they were setting up a

4     meeting, that Wheeler and Taub are setting up this meeting.

5           THE COURT:  What is the objection?

6           MS. COHEN:  No objection, your Honor.

7           THE COURT:  Okay, 175 is in.

8           176.

9           MR. MOLO:  Before I go through the argument, is there

10    any objection?

11          MR. GOLDSTEIN:  We need to pull it up.

12          MR. MOLO:  I thought we were just going through the

13    documents that the government was objecting to.

14          THE COURT:  I did too.

15          MS. COHEN:  I did, your Honor.  I didn't feel like

16    arguing for 20 minutes to have you overrule and let it in.

17          THE COURT:  That's what I thought.

18          MS. COHEN:  Your Honor, in order conclude this part of

19    the proceeding the government has no objection to Government

20    Exhibit 176.

21          THE COURT:  Defendant's Exhibit 176?

22          MS. COHEN:  Yes, sorry.

23          THE COURT:  Defendant's Exhibit 176 is in.

24          (Continued on next page)

25

FBIYSIL8

```
 1              THE COURT:  243.

 2              MR. MOLO:  Is there an objection?

 3              MS. COHEN:  Your Honor, could I inquire if there are

 4     some subsets that they have an objection to, so we could just

 5     address those.  This is the last defense exhibit unless there

 6     are others that you didn't give to me.

 7              Are there others?

 8              THE COURT:  243.

 9              Does the government object to 243?

10              MS. COHEN:  Your Honor, I don't really understand why

11     this is relevant.  Plus, there would have to be numerous

12     redactions because there is all of these employees' information

13     at Columbia, Social Security numbers.

14              I don't really understand why this is relevant given

15     all the other evidence on this, and it's cumulative.

16              THE COURT:  You all put in a lot of documents today

17     that had bank account numbers on them.

18              Are those accounts all closed?

19              MR. GOLDSTEIN:  They're all subject to the forfeiture

20     order in the case.

21              MS. COHEN:  It's public.

22              THE COURT:  So you're not worried about them?

23              MR. GOLDSTEIN:  We're not worried about those.

24              THE COURT:  Mr. Molo, why is this relevant?

25              MR. MOLO:  Because, again, this establishes the bona
```

FBIYSIL8

1    fides of these grants.

2              THE COURT:  There's no question that these grants

3    aren't real grants.  No one is suggesting otherwise.

4              MR. MOLO:  I'm entitled to show the jury that, and

5    that's what I'm asking to do with this.  It's one thing to say

6    that to them.  It's another thing to show them that there were

7    actual budgets prepared.  If there's some kind of sensitive

8    information in here, we're happy to redact that.

9              But as to the --

10             THE COURT:  You've got third parties' names and salary

11   numbers.

12             MR. MOLO:  That comes into evidence all the time in

13   all sorts of cases.

14             THE COURT:  Usually they've done something wrong when

15   that happens.

16             MR. MOLO:  If there's something that the government

17   wants us to redact, we'll be happy to look at it and see if it

18   matters.  With respect to what this shows, it shows, again, the

19   bona fides of this grant.

20             By the way, we're not talking about reams of documents

21   here.  These are a handful of documents.

22             THE COURT:  That's not helpful to the argument.

23             Does the government withdraw their objection to this

24   document?

25             MS. COHEN:  No, your Honor.  The redactions, yes.

FBIYSIL8

 1    They agreed to do the redactions of the names and of the

 2    Social Security numbers.  I don't see how entering how much

 3    each employee got paid -- maybe part of the document is

 4    relevant and the other part is just not.

 5             THE COURT:  Do you want -- is what you're really

 6    interested in the cover memo?

 7             MR. MOLO:  I'm sorry?

 8             THE COURT:  Is what you're really interested in the

 9    cover memo?

10             MR. MOLO:  I do think that the attachment kind of lays

11    it out in somewhat of an official way.  But at least the cover

12    memo and maybe the first page that follows it.  The cover memo

13    and the first page that follow it really kind of show it to

14    be --

15             MS. COHEN:  I think actually this budget is actually

16    in some of the grant contracts already.  So it's cumulative.

17    If it's only the first two pages, the government has no

18    objection to the first two pages of Defendant's 243.

19             THE COURT:  So 243 redacted down to the cover memo and

20    the first page will come in.

21             The next document is 244.

22             MR. MOLO:  I think that was the last one they said

23    they had an objection to.

24             THE COURT:  No.  Is there an objection to 244?  This

25    is more OSHA.

FBIYSIL8

1              MS. COHEN:  I have to see it.  I'm sorry.

2              MR. MOLO:  What this is is the OSHA -- it's there on

3      the screen too.  The OSHA issue arose in the first grant, and

4      it was resolved.  This is an email following up on that for the

5      second grant.

6              THE COURT:  We're not talking about the second -- this

7      is a letter or a memo from Columbia to the general counsel to

8      the New York State Department of Labor.  There's nothing on its

9      face that makes it relevant.

10             MR. MOLO:  Yes.  It shows that in 2007 there is this

11     additional back-and-forth between Columbia and the Department

12     of Labor on the second grant, which demonstrates again just

13     more activity that these are not send in the coupon and get

14     your grant.  That's all it shows.  That's all we're going to

15     argue it shows.

16             MS. COHEN:  Your Honor, there's nothing on this that

17     says it's in any way related to the grant, to either grant.

18             THE COURT:  I don't know how it attaches up.

19             MR. SHUR:  Judge, I apologize.  It doesn't seem like

20     it's clear from the exhibit, but this was actually in response

21     to a request to the comptroller's office.  This is part of the

22     comptroller's file in connection with the grant.

23             So, when they flagged that there was an OSHA violation

24     at Columbia, Columbia responded to say, no.  It's been

25     resolved.  It's been wrapped up.  This is how it's been

FBIYSIL8

```
 1   resolved.  There was a fine, and we paid it, etc.  And then the
 2   process moved forward.
 3           I believe there was a stipulation that went along with
 4   it saying that it was a business record of the comptroller's
 5   files.
 6           THE COURT:  That may be, but the question is how do
 7   you link this to that grant?
 8           MR. SHUR:  It's part of the file.
 9           THE COURT:  Okay.  I can't decide that based on what
10   you're telling me.
11           Have you shown the government how you connect this
12   memo?
13           MR. SHUR:  We're happy to do that.
14           THE COURT:  You have to do it before the charge
15   conference, or I'm not going to let it in.
16           MR. SHUR:  Understood.
17           THE COURT:  Any other documents?  So, according to my
18   recordkeeping system, the following defense exhibits will be
19   admitted:
20           Defense Exhibit 243, only the first and second page of
21   that.
22           Defense Exhibit 176, 175, 172, which is going to
23   become the amended Defense 20, Defense Exhibit 230, Defense
24   Exhibit 163, a stipulation, and 245.
25           MS. COHEN:  Your Honor, the stipulations are not
```

1    necessary.  Only the documents.

2            THE COURT:  Do you need the stip?

3            MS. COHEN:  We're not intending that they're not

4    authentic documents.

5            THE COURT:  So it's just authenticity and where they

6    were found.  But this seems obvious that it comes from

7    Presbyterian's files.  Okay?

8            MR. SHUR:  That's judge, fine.  Yes.

9            THE COURT:  So just 245 then.  162-1, 162-2, 231, 232,

10   233, 234, 235, 179, and that's it.

11           The ones that are on hold are 244 --

12           (Pause)

13           MR. SHUR:  Judge, I think there were some stipulations

14   that we provided to the government, and they indicated that

15   they're duplicative and that those documents are already in

16   evidence.

17           If we could just over this evening confirm that.

18   We'll get in touch with the government if there's some

19   confusion if there's any issue there.

20           THE COURT:  Okay.

21           MS. COHEN:  If I can just be clear so that this

22   doesn't become expanded over the evening.  I think it was just

23   Defense Exhibit 134, which I believe was already in evidence.

24   And then there was one other document that is a subset of a

25   state contract that's already in evidence.

FBIYSIL8

1          THE COURT:  So there are two documents that are up in

2     the air that I don't know about yet.

3          MS. COHEN:  If you could check your sheet on Defense

4     Exhibit 134.  We have it as admitted.

5          THE COURT:  Defense 134 is in evidence.

6          MS. COHEN:  Your Honor, apparently there's a whole

7     other set of documents.  I'm happy to go through them now or

8     not.

9          MR. SHUR:  Judge, this is a stipulation that was sent

10    to the government last night.  There is some miscommunication

11    in that some of the documents mentioned in the stipulation were

12    documents that were moved in conditionally through Mr. Runes

13    and Mr. Meara regarding the legislative history.

14          THE COURT:  Yes.

15          MR. SHUR:  There are some additional documents in that

16    same stipulation that were not conditionally moved in.  I just

17    explained that to the assistant.  We'll resolve these issues

18    overnight, Judge.

19          THE COURT:  We'll deal with those tomorrow.

20          MS. COHEN:  Just to be clear, the defendant's stip

21    that he's referring to is S-13.  So whatever documents that are

22    named in here, we will take up.

23          THE COURT:  So there are all those conditional --

24    there were a bunch of documents that were conditionally

25    received.

FBIYSIL8

1          MS. COHEN:  Correct.  I put on the record that we
2     withdraw our conditional objection.
3          THE COURT:  To all of those?
4          MS. COHEN:  I think there were only about five or six
5     of them.
6          THE COURT:  There were.  I don't think I understood
7     that you were withdrawing it to everything.
8          MS. COHEN:  We were, your Honor.
9          THE COURT:  So we'll need to put that on the record.
10    The ones I have on hold are 167, 168, 169, 170, and 171, and
11    244 that the defense needs to come back with more information
12    regarding these documents.  That's due tomorrow before the
13    charging conference.
14         Any other documents, evidence-type things we need to
15    work out?
16         MR. SHUR:  No, Judge.
17         THE COURT:  No.  Okay.
18         Mr. Silver -- Mr. Molo, is Mr. Silver going to
19    testify?
20         MR. MOLO:  Mr. Silver is not going to testify.
21         THE COURT:  Mr. Silver, do you understand that you
22    have a constitutional right to testify, and you have a
23    constitutional right not to testify?
24         THE DEFENDANT:  Yes.
25         THE COURT:  If you don't testify, I'm going to charge

1   the jury they can't hold that against you.

2            Do you understand that?

3            THE DEFENDANT:  Yes.

4            THE COURT:  Then I will give them that charge.

5            THE DEFENDANT:  I understand that.

6            THE COURT:  At the end of the day, whether to testify

7   or not is your decision.  You should listen to your lawyers.

8   They'll give you good advice on it.  But, at the end of the

9   day, it has to be your decision whether to testify or not.

10           Do you understand that?

11           THE DEFENDANT:  Yes.  I understand.

12           THE COURT:  Do you wish to testify?

13           THE DEFENDANT:  I do not wish to testify.

14           THE COURT:  Okay.  Thank you.

15           Here is my plan for tomorrow:  There are still an

16  unusually large number of dribs and drabs that need to be

17  cleaned up.  I would like to do that at 3:00 tomorrow

18  followed -- actually, I would like to start with the charge

19  conference.

20           Can you be here by 3:00?

21           MR. MOLO:  I'm set to start at 9:30.  I'm going to go

22  straight from the Court of appeals to the train station.

23           THE COURT:  So we are going to be set for 3:00.

24           MR. MOLO:  Okay.

25           THE COURT:  If, when you walk out of the Third

FBIYSIL8

1    Circuit, you know that you're not going to be able to make it

2    at 3:00, you must call my chambers.

3            MR. MOLO:  I will.

4            THE COURT:  And you must call Ms. Cohen.

5            MR. MOLO:  Okay.

6            THE COURT:  And you're going to tell us what train

7    you're going to be on so we will know what time you will be

8    here.

9            MR. MOLO:  Okay.

10           THE COURT:  We will then readjust the charge

11   conference.

12           MR. MOLO:  Okay.  Thank you.

13           THE COURT:  That's the plan.

14           MR. MOLO:  I appreciate that.

15           THE COURT:  After the charge conference, we'll deal

16   with this little batch of documents, and we'll deal with this

17   last stipulation that also has documents associated with them.

18           That will be it.

19           MR. MOLO:  We have a motion as well, your Honor.

20           THE COURT:  You have a motion.

21           MR. MOLO:  Right.

22           THE COURT:  We'll argue that tomorrow.  I don't want

23   to hear it tonight.  I'm tired.  You're tired.  We'll hear it

24   tomorrow.

25           MR. MOLO:  Okay.

FBIYSIL8

1          MS. COHEN:  There's one other housekeeping thing.  We

2    had given the defense prosecute proposed transcript changes,

3    which they said they would look at.

4          Have you had a chance to look at them?

5          MR. MOLO:  The transcripts are not going back to the

6    jury; right?

7          THE COURT:  Typically, they are sent back.  The

8    government typically takes the responsibility of cleaning them

9    up and getting rid of the sidebars and the like off of your

10   version so that they can go back.

11         Do the parties have a position on this?  I'll do it

12   either way.  It imposes work on the government.

13         MS. COHEN:  Your Honor, I prefer that the

14   transcripts -- if they want to have readback, they come into

15   court, and we have readbacks in court.

16         MR. MOLO:  Yes, your Honor.  Trial transcripts I would

17   not have go back.  No.

18         THE COURT:  Let me make it very clear that many judges

19   in this district, including this one, have done it.  So it's

20   not like it's I don't have two heads on this.

21         MR. MOLO:  We agree with the government.  If they want

22   a readback, they should come back to the Court, and we'll have

23   a readback.

24         THE COURT:  So we'll fix the charge accordingly.

25         If there are corrections that need to be made to the

FBIYSIL8

1    transcripts, that still needs to be cleaned up.  If you can

2    agree, that's great.  If not, at the end of the day, it's my

3    responsibility.

4              MR. SHUR:  There's just one issue apparently, and

5    we'll resolve it with the government this evening.

6              THE COURT:  A transcript issue?

7              MR. SHUR:  Right.  Correct.

8              THE COURT:  Okay.

9              Anything else?  So the final sort of housekeeping

10   matter is I am going to do the summations down in 110.  So

11   we'll start in 110.  You'll move in the rest of these exhibits

12   down there.

13             Then, as I say, we'll roll into summations from there.

14   The jury is going to start up here, and we'll bring them

15   downstairs once they're all gathered because their swipe cards

16   don't work downstairs.

17             MR. MOLO:  Okay.

18             THE COURT:  So I will see you all at 3:00 tomorrow

19   unless we both get calls from you, Mr. Molo, that says you're

20   delayed.

21             MR. MOLO:  Thank you, your Honor.

22             MS. COHEN:  Thank you, your Honor.

23             (Adjourned to November 19, 2015, at 3:00 p.m.)

24

25

```
1                         INDEX OF EXAMINATION

2    Examination of:                              Page

3    MICHAEL WHYLAND

4    Redirect By Mr. Goldstein  . . . . . . . . .2305

5    Recross By Mr. Molo  . . . . . . . . . . . .2308

6    PAUL RICHARD CODY

7    Direct By Ms. Cohen  . . . . . . . . . . . .2314

8    Cross By Mr. Shur  . . . . . . . . . . . . .2365

9    Redirect By Ms. Cohen  . . . . . . . . . . .2394

10   JORDAN LEVY

11   Direct By Ms. Cohen  . . . . . . . . . . . .2397

12   Cross By Mr. Shur  . . . . . . . . . . . . .2434

13   Redirect By Ms. Cohen  . . . . . . . . . . .2464

14   DEANNA PENNETTA

15   Direct By Mr. Master . . . . . . . . . . . .2473

16   Cross By Mr. Cohen . . . . . . . . . . . . .2539

17

18

19

20

21

22

23

24

25
```

```
 1                        GOVERNMENT EXHIBITS

 2    Exhibit No.                               Received

 3    1A      . . . . . . . . . . . . . . . . .2306

 4    952     . . . . . . . . . . . . . . . . .2324

 5    950     . . . . . . . . . . . . . . . . .2326

 6    951     . . . . . . . . . . . . . . . . .2328

 7    953 and 954   . . . . . . . . . . . . . .2330

 8    1012-1    . . . . . . . . . . . . . . . .2332

 9    955 and 956   . . . . . . . . . . . . . .2333

10    961 and 962   . . . . . . . . . . . . . .2335

11    965     . . . . . . . . . . . . . . . . .2337

12    963 and 964   . . . . . . . . . . . . . .2338

13    968     . . . . . . . . . . . . . . . . .2340

14    969 and 970   . . . . . . . . . . . . . .2342

15    976     . . . . . . . . . . . . . . . . .2343

16    974     . . . . . . . . . . . . . . . . .2345

17    978 and 979   . . . . . . . . . . . . . .2350

18    982 and 980   . . . . . . . . . . . . . .2353

19    1061    . . . . . . . . . . . . . . . . .2356

20    1012 and 1012-2   . . . . . . . . . . . .2417

21    1024    . . . . . . . . . . . . . . . . .2421

22    1051    . . . . . . . . . . . . . . . . .2425

23    S-3     . . . . . . . . . . . . . . . . .2469

24    985 and 1007 through 1060   . . . . . . .2469

25    S-5     . . . . . . . . . . . . . . . . .2471
```

 1    1203, 1204, 1205  . . . . . . . . . . . . . .2472

 2    1206, 1207, 1208  . . . . . . . . . . . . . .2472

 3    1209, 1210, 1222  . . . . . . . . . . . . . .2472

 4    1223, 1224, 1225  . . . . . . . . . . . . . .2472

 5    1226, 1227, 1228  . . . . . . . . . . . . . .2472

 6    1229, 1230, 1231  . . . . . . . . . . . . . .2473

 7    1232, 1233, 1234  . . . . . . . . . . . . . .2473

 8    1235, and 1236  . . . . . . . . . . . . . .2473

 9    1502     . . . . . . . . . . . . . . . . .2476

10    1509     . . . . . . . . . . . . . . . . .2512

11    1508     . . . . . . . . . . . . . . . . .2514

12    1514     . . . . . . . . . . . . . . . . .2516

13    1507     . . . . . . . . . . . . . . . . .2519

14    1515     . . . . . . . . . . . . . . . . .2523

15    1511, 1512 and 1513  . . . . . . . . . . .2527

16    702, 703-1, 732 and 1521  . . . . . . . . .2585

17                    DEFENDANT EXHIBITS

18    Exhibit No.                              Received

19    179  . . . . . . . . . . . . . . . . . . .2566

20

21

22

23

24

25