FBJYSIL1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        S1 15 Cr. 93 VEC

5   SHELDON SILVER,

6              Defendant.

7   ------------------------------x
                                    November 19, 2015
8                                   3:00 p.m.

9

10  Before:

11              HON. VALERIE E. CAPRONI,

12                                  District Judge
                                     and a jury
13

14                  APPEARANCES

15  PREET BHARARA,
        United States Attorney for the
16      Southern District of New York
    CARRIE HEATHER COHEN,
17  HOWARD SETH MASTER,
    ANDREW DANIEL GOLDSTEIN,
18  JAMES M. McDONALD,
        Assistant United States Attorneys
19

20  STROOCK & STROOCK & LAVAN, LLP
        Attorneys for defendant Silver
21  BY:  JOEL COHEN, Esq.
         – and –
22  MOLOLAMKEN, LLP
    BY:  STEVEN FRANCIS MOLO, Esq.
23       ROBERT KELSEY KRY, Esq.
         JUSTIN VAUN SHUR, Esq.
24       JUSTIN M. ELLIS, Esq.
         TUONGVY LE, Esq.
25                  Of counsel
```

FBJYSIL1

1              (Trial resumed)

2              THE COURT:  Mr. Molo.

3              MR. MOLO:  Judge, I think we've set forth in our

4      papers pretty clearly --

5              THE COURT:  Papers?  No papers.

6              MS. COHEN:  If you want an extra copy, I can hand one

7      up.

8              THE COURT:  I'm happy to take one.

9              Mr. Molo, you're going to have to talk.  They weren't

10     delivered.

11             MR. MOLO:  You can follow along.  I gave you a guide

12     to follow along.

13             Judge, as you'll see, when you get a chance to take a

14     look at what we filed, for either proof of honest services

15     fraud or extortion, there's got to be a quid pro quo.

16             Dealing with Dr. Taub first, the key case that we'd

17     like you to look at -- we cited a number of them -- skilling,

18     Ganim.

19             The idea of generalized goodwill and fostering

20     goodwill is not enough.  The testimony from Dr. Taub, as

21     Your Honor has pointed out a number of times -- he did testify

22     that there was no explicit agreement to trade referrals in

23     exchange for or what I would call recommendations to the

24     patient in exchange for state grants.

25             In fact, though he did quite clearly, facing the

FBJYSIL1

1  potential for criminal prosecution and with the advice of

2  counsel, refused to sign that cooperation agreement that said

3  in exchange for.

4          I think that, to the extent there's any ambiguity in

5  the corresponding concerning explicit agreement and what that

6  meant, particularly in light of the rest of the testimony, that

7  his refusal to sign that letter that the government had put

8  forth is the end of the story.

9          It includes the language, "in exchange for," quid pro

10  quo.  It could not be clearer, and he would not do that.  Then

11  he obviously refused to acknowledge -- in fact, denied -- that

12  he would send referrals to Mr. Silver or Weitz & Luxenberg in

13  exchange for the son's job at Ohel, the daughter's free

14  internship, the Shalom Task Force benefit, and the Miles for

15  Meso thing which was, frankly, ridiculous.

16          Kirkland testified that he realized that producing a

17  run in Illinois wasn't quite the same thing as producing it in

18  Manhattan.  There really has been no evidence of a quid pro

19  quo.

20          He's testified that he did want to, as he put it,

21  incentivize Mr. Silver to think favorably of his research and

22  maybe help with his research.  He clearly wanted Mr. Silver to

23  help with Weitz & Luxenberg.

24          THE COURT:  Mr. Molo, can I interrupt for just a

25  second.

FBJYSIL1

1              MR. MOLO:  Sure.

2              THE COURT:  A lot of what you you've just said is

3    persuasive arguments why, if Dr. Taub was a defendant, he would

4    be entitled to a directed verdict in his favor.

5              Focus on why the circumstantial evidence isn't

6    adequate to at least go to the jury against Mr. Silver.

7              MR. MOLO:  Because the evidence against Mr. Silver --

8              THE COURT:  It almost sounds like you're arguing that

9    if Dr. Taub is not guilty, sort of necessarily Silver is

10   not guilty.

11             MR. MOLO:  In effect, that's true.  There have to be

12   two to tango here.  Dr. Taub has clearly said that he was not

13   sending those referrals.

14             The acts, the alleged acts, and the timing of them --

15   by the way, the sporadic nature of those cases going from

16   Dr. Taub to Weitz & Luxenberg over a period of time, not really

17   correlated with any of these acts, including the grants.

18             Some of the years after the grants are the years where

19   most referrals occur.  I have to say, with all due respect, the

20   idea of that resolution was absolutely ridiculous.  He was

21   laughing on the stand when I asked him the question, was that

22   in exchange for.

23             He said, well, it was nice to get the plack.

24             THE COURT:  He had it hanging in his office.

25             MR. MOLO:  All right.  He had it hanging in his

FBJYSIL1

 1    office.  He said it was nice to get the plack.  I'm sure it was
 2    nice to get the plack.
 3            Someone of Dr. Taub's credibility, someone of
 4    Dr. Taub's experience, is not a experience who is going to
 5    exchange referrals in exchange for grants for getting a plack.
 6    That's just not going to happen.
 7            THE COURT:  Again, you're still focusing on Dr. Taub.
 8    You need to focus on what is the circumstantial elements of
 9    what was in Mr. Silver's head.
10            MR. MOLO:  The fact of the matter is there is none.
11            THE COURT:  There's none?
12            MR. MOLO:  Well, the evidence was that he was at Weitz
13    & Luxenberg; that, yes.  That was what he did at Weitz &
14    Luxenberg, generate business.
15            THE COURT:  He gave two $250,000 grants to Taub.
16            MR. MOLO:  Right.
17            THE COURT:  Who was sending him referrals --
18            MR. MOLO:  Right.
19            THE COURT:  Not referrals.  Leads.  Names and
20    addresses of patients, which were worth a lot of money to him.
21    He receives leads that are worth lots of money.  He gives the
22    doctor who's giving him the leads a lot of money.
23            As soon as it's going to become public, the grants
24    cease.
25            MR. MOLO:  The grants cease because HCRA money ended.

FBJYSIL1

1    There's testimony in the record that the HCRA money had ended.

2              THE COURT:  I don't remember that evidence.

3              MR. MOLO:  It was the testimony by the state witness

4    Franco.  Victor Franco testified that the HCRA money ended at

5    that point in time.  There's clear testimony -- and I elicited

6    it from Dr. Taub.  You may remember --

7              THE COURT:  Even if the HCRA money ended, it's not

8    like that ended Mr. Silver's pot of money.  He had other cash

9    that he was able to disseminate for a variety of different

10   reasons.

11             MR. MOLO:  And he didn't because, as I elicited from

12   Dr. Taub, the fax that went from Steve August to Dr. Taub where

13   it says specify what your work is going to be is this 9/11 --

14   remember the piece that talked about is it going to be research

15   related to air quality, 9/11, mesothelioma.  I'm paraphrasing.

16   I'm not reading the exact language.

17             He put that in the grants.  It was in the contract.

18   He also clearly did not do that.  That was clear.  It was

19   communicated --

20             THE COURT:  So your theory is that Mr. Silver could

21   not have given him another grant because of that?

22             MR. MOLO:  Well, I don't think the standard is if he

23   could have given him another grant, that the first two

24   necessarily were corrupt.

25             THE COURT:  You would agree that there is at least

FBJYSIL1

1    more than one way of looking at that evidence.

2            MR. MOLO:  Not fairly.  I don't.  I think a jury --

3            THE COURT:  Okay.

4            MR. MOLO:  I understand you're being dismissive of

5    what I'm saying.

6            THE COURT:  I'm not being dismissive.  I just don't

7    think you're focusing -- most of the time so far, you've spent

8    focusing on Dr. Taub's state of mind.

9            I'm trying to get you to focus on what the

10   circumstantial evidence is that suggests that Mr. Silver had a

11   different state of mind relevant to his relationship with

12   Dr. Taub.

13           MR. MOLO:  What you've just suggested to me is the

14   fact that these two grants went, and that they stopped going

15   after the first two.

16           THE COURT:  Once it was going to become public.

17           MR. MOLO:  I'm telling you that the HCRA money ended.

18   I'm also telling you --

19           THE COURT:  Can you refer me in the record where it

20   indicates that the HCRA money was no longer available.

21           MR. MOLO:  It's in Franco's testimony.  I will get it

22   for you.

23           THE COURT:  Okay.

24           MR. MOLO:  In the meantime, I'll proceed, if that's

25   okay, while we get that for you.

FBJYSIL1

```
 1              THE COURT:  Absolutely.

 2              MR. MOLO:  Beyond that, we have Dr. Taub not

 3    fulfilling his obligation under the contract.  He clearly did

 4    not do that.  If you recall, at the same time --

 5              THE COURT:  How did he not do it the second year but

 6    did do it the first year?

 7              MR. MOLO:  If you recall the timing on these grants,

 8    which they could be renewed.  It says that in the grant itself.

 9    The first one there's a delay in getting it going, and the

10    second one backs up to it in a way that there's almost an

11    overlap.

12              There isn't really a period of time, you know, for a

13    full report.  So it was moved over into the second year.  And

14    he's not living up to what he said he was going to do.

15              That evidence is very clear in the record.  It was

16    clear as to what he was asked to do and what he promised to do.

17    It was clear by his testimony that he didn't do it.

18              THE COURT:  What's the evidence that that was what was

19    motivating Mr. Silver?

20              MR. MOLO:  Because August said --

21              THE COURT:  What's the evidence that he even knew

22    that?

23              MR. MOLO:  Of the 9/11?

24              THE COURT:  That he knew your theory that Dr. Taub

25    wasn't doing what was required under the grant.
```

FBJYSIL1

1          MR. MOLO:  Because he has his -- I'm sorry.  He has

2     those talking points that were introduced into evidence.

3          THE COURT:  "He" who?

4          MR. MOLO:  Dr. Taub.

5          THE COURT:  No.  Silver.

6          MR. MOLO:  Dr. Taub had talking points in anticipation

7     of a conversation with Mr. Silver.  He talked about -- he

8     talked about, if you will recall, he was prepared to discuss

9     the issue of maybe Columbia could partner with Mount Sinai and

10    proceed on doing this research with Mount Sinai, and that would

11    be a reason for him to continue getting that money.  In fact,

12    he didn't live up to the obligation.

13         THE COURT:  Again, what is the evidence -- I

14    understand that's your theory.

15         What is the evidence that Mr. Silver knew that in any

16    way?

17         MR. MOLO:  Well, because he sent reports to the state.

18    He's testified to that.

19         THE COURT:  There's no evidence --

20         MR. MOLO:  It's not my burden --

21         THE COURT:  You have no burden.  I completely agree

22    with that.  You're saying that the circumstantial evidence of

23    big grant, big grant, no grant where the intervening action in

24    there was it was going to become transparent; that a jury

25    cannot conclude from that that there was a corrupt motive

FBJYSIL1

```
 1    involved because of course Dr. Taub didn't get another grant
 2    you say.  He violated the prior one.
 3             That may be a reasonable argument, and it may be
 4    enough to break the circumstantial chain if there's any
 5    evidence that that's what Mr. Silver knew or from which a jury
 6    could conclude that Mr. Silver knew that.
 7             MR. MOLO:  Let me posit it to you another way, from a
 8    different perspective.  The referrals -- I'm going to call them
 9    "referrals" for shorthand.
10             The referrals begin and are solid for a period of time
11    before there's a grant, and they're solid for years after
12    there's a grant, including years in which none of these
13    purported official acts even occur.
14             So, if in fact there was some corrupt arrangement and
15    Mr. Silver had some corrupt intent, it would seem as though
16    there would be something back-and-forth there.
17             I don't think you can look at it just exclusively and
18    say what was in Mr. Silver's mind without asking what was in
19    Dr. Taub's mind.
20             Dr. Taub is saying that there's no agreement and
21    there's no quid quo pro and he's not sending them in exchange
22    for that -- and, in fact, the record evidence is quite clear
23    that his goal was to incentivize Mr. Silver to send Weitz &
24    Luxenberg money.
25             Dr. Taub would have to be -- and he's not.  He would
```

FBJYSIL1

1   have to be the dumbest person in America to think that he could

2   keep referring cases to Mr. Silver so many years after these

3   grants had stopped and that he would somehow get another state

4   grant.  It's just not there.

5           The evidence doesn't support a quid pro quo.  On the

6   Taub piece of it, the government has not met its burden.  If

7   all they have is that two $250,000 grants which, by the way,

8   were not extraordinary grants in the amount of money they were.

9           There were many more grants that were.  These were to

10  Columbia University and to Presbyterian Hospital.  These were

11  not to Dr. Taub personally.

12          If Mr. Silver wanted to be a corrupt briber of

13  Dr. Taub in that sense, he picked an awfully odd way to get him

14  money, by having not money that went directly to -- not money

15  that went directly to Dr. Taub.  It went to Columbia University

16  and to New York Presbyterian.

17          THE COURT:  There's absolutely no evidence that

18  Dr. Taub is corrupt.

19          MR. MOLO:  Right.

20          THE COURT:  Dr. Taub's motive was getting money for

21  research.

22          MR. MOLO:  Right.

23          THE COURT:  So the grants going to the school and the

24  hospital were consistent with what Dr. Taub wanted.

25          MR. MOLO:  Right.

FBJYSIL1

1      THE COURT:  So the notion of, well, he could have

2  given money to Dr. Taub -- that argument has some weight if you

3  think Dr. Taub is personally corrupt.

4      Because then but for a personal benefit to him, he

5  wouldn't be incentivized to provide anything back to Silver.

6  But that's not the evidence, and that's not the claim.

7      MR. MOLO:  It would be an awfully odd quid pro quo for

8  one person to be corrupt and the other not.  That's what the

9  essence of a bribery scheme is.

10     That's another reason why this fails.  Skilling tells

11  us that on the honest services period.  It's got to be in the

12  context of a classic bribery scheme, and that's not the case

13  here.

14     THE COURT:  There's a string of cases that say that

15  you can have -- that within those schemes both sides don't have

16  to be corrupt.  You can have an innocent side and a corrupt

17  side.

18     MR. MOLO:  When you look at Skilling, that's not what

19  Skilling says.  Skilling says it's got to be classic bribery.

20  Classic bribery means both people have to be corrupt.  For an

21  honest services fraud to occur, that's the case.

22     Here we have again, to your point, Judge, the evidence

23  being that Mr. Silver sends two $250,000 grants, one to

24  Presbyterian Hospital and one to Columbia University, a very

25  odd way, I guess, for Mr. Silver to bribe Dr. Taub, if that's

FBJYSIL1

1       the allegation.

2               He's going to send it to these big institutions with

3       all of the review that occurs in those organizations.  I

4       understand on the stateside there's no peer review.  There's no

5       competitive bidding process.  That wasn't required in any of

6       these grants.  These grants were not extraordinary.

7               THE COURT:  It doesn't have to be extraordinary.  He

8       could be guilty of corruption if he gave the man a thousand

9       dollars.

10              MR. MOLO:  I agree with that, but it's at least the

11      evidence that that didn't occur.

12              THE COURT:  That's a question of fact.  You're saying

13      these aren't so big.  They aren't big enough that they would

14      really incentivize a doctor to send clients his way.  Again,

15      you're sort of ignoring all of the other circumstantial

16      evidence.

17              MR. MOLO:  I'm not.  Judge, to that point, I think a

18      key point is why do these referrals continue at a relatively

19      steady pace, a little bit up and down, but it's clearly at a

20      steady pace, after the last grant.

21              If in fact this is some kind of scheme -- Mr. Silver

22      could have gotten, I guess, some other state grant money and

23      sent it to him.  As far as disclosure went, it was Mr. Silver

24      that sponsored the Budget Reform Act that made things more

25      public.

FBJYSIL1

1          It would be a very odd scheme for him to understand

2     that he could do things secretly and say, you know what.  Now

3     that HCRA is expired, I'm going to require that any other money

4     that I might give him that would be public money be made

5     public.  That would be a very, very odd scheme.

6          THE COURT:  That last argument you've made, Mr. Molo I

7     just don't think the evidence supports.  As you are crafting

8     the evidence, it is Mr. Silver was the champion of transparency

9     in state government.

10          There is no evidence of that.  None.  The fact that he

11     may have been a sponsor on a bill where he had a gun to his

12     head does not mean that he's a champion of transparency.

13          MR. MOLO:  Nobody said he had a gun to his head.

14     There's no evidence he had a gun to his head, and I didn't say

15     he is the champion of transparency.

16          I said it would be very odd for him to be able to send

17     these grants without disclosure and then be in favor of and

18     sponsor a bill which would only require disclosure.

19          That doesn't necessarily rise to being the champion of

20     transparency, and it is odd.  This is as thin a case as could

21     ever be imagined.

22          It didn't go the way the prosecutors thought it was

23     going to go.

24          THE COURT:  That's irrelevant.  Whether it did or it

25     didn't is irrelevant.

FBJYSIL1

1          MR. MOLO:  So where we are now is, as I've heard the

2     Court articulate it, the best evidence is that two bona fide

3     state grants went to two bona fide medical institutions that

4     are two of the finest in the world in New York to do bona fide

5     research, and Mr. Silver, who was in the position to sponsor

6     those grants, is now somehow held accountable because New York

7     law allows him to work at Weitz & Luxenberg, make whatever

8     money he makes at Weitz & Luxenberg -- he could have made a

9     billion dollars a year at Weitz & Luxenberg or a dollar a year

10    at Weitz & Luxenberg.  It didn't matter -- and Dr. Taub

11    referred them to patients who got good representation.

12          I understand the Court's view that a lot of this is

13    not necessarily to the issue of whether or not the patients got

14    good representation --

15          THE COURT:  No --

16          MR. MOLO:  Or whether or not there's a quid quo pro.

17    But, when one of the parties says there's no quid quo pro and

18    the other side of that the best evidence is that Mr. Silver

19    sent these grants -- I don't see how that could possibly go to

20    a jury.

21          As to the real estate piece, it's the oddest bribe

22    scheme ever alleged for the bribers to know that they weren't

23    paying bribes.  That fell so flat.  It's incredible.

24          2012 is when -- or the very end of 2011 is when

25    Glenwood testifies that they learn of the Golberg & Iryami

FBJYSIL1

referral fees being paid, and putting aside -- let's just put
aside for a moment that those were perfectly legitimate
referral fees.  Whether or not they were fully compliant with
the legal ethics rules at each step of the way is a different
issue.

          Putting that aside for the moment, how could they
possibly have been bribing Mr. Silver to act on the 2011 rent
control laws when they didn't even know that the money was
being paid.  It's just impossible.

          THE COURT:  But they knew they were doing what
Mr. Silver asked them to do, which is to throw business to
Goldberg.

          MR. MOLO:  Okay.

          THE COURT:  As I remember Witkoff's testimony
specifically, it was, my buddy, Goldberg, needs the money.  Do
me a favor.

          MR. MOLO:  Right.

          THE COURT:  So they did him a favor.  That's
irrelevant?

          MR. MOLO:  Not in exchange for anything.

          THE COURT:  For maintaining -- I'm not sure -- that's
not what Witkoff's testimony was.

          MR. MOLO:  Witkoff's testimony was -- and I asked the
question.  Actually, he volunteered the answer before I asked
the question.  He said general goodwill.  That is what is not

FBJYSIL1

1        allowed.  It does not rise to the level of bribery.

2                Witkoff's testimony was that way, and Runes' testimony

3        with the same thing; that they were interested in

4        maintaining -- in fact, the question was asked of him, well,

5        you were interested in maintaining a good relationship with

6        Mr. Silver.

7                He said, I'm interested in maintaining good

8        relationships with both sides of the aisle in both houses.  He

9        didn't say that.  He said the leadership throughout the

10       assembly is what he said.

11               So this is a very, very odd scheme for that to be

12       alleged where the "briber" doesn't even know that a bribe is

13       being paid.  I just don't see how there is anything about these

14       allegations that rise to the level of getting this to a jury.

15               This case has -- also Runes also testified that

16       Mr. Silver never did anything for them.  In fact, the testimony

17       was quite clear.  He voted against this every time.

18               THE COURT:  Except on whatever the 2013 or 2011 --

19               MR. MOLO:  He didn't say -- the testimony wasn't

20       Mr. Silver voted for us.  It was we went and saw Mr. Silver,

21       and we thought we could live with what was going to happen.

22               But that was the first positive development for

23       tenants in a decade.  So that was a pro-tenant bill, and it was

24       a compromise bill.  The prosecution is trying to turn

25       compromise into some kind of bribery and corrupt intent.  It's

FBJYSIL1

1      just not there.

2                  As to the real estate side of things, it is -- by the

3      way, Runes, as far as that side letter went, is on the

4      Character and Fitness Committee.  He's a judge at the time.

5                  He testifies he went and got this checked out with

6      what the person that he thought was the right person to look at

7      this --

8                  THE COURT:  From a lobbying perspective.

9                  MR. MOLO:  That's right.

10                 THE COURT:  Not from a criminal law perspective.

11                 MR. MOLO:  The man had been a lawyer for 35 years.  He

12     was counsel to ALM.  He was a judge, and he's on the Character

13     and Fitness Committee.

14                 He's going to say, you know what.  Maybe there's a

15     problem with respect to a lobbying regulation, but it just

16     doesn't dawn on me there's a bigger problem if he thought there

17     was a bigger problem?

18                 I mean, certainly the man would have acted on it.  The

19     reason that he didn't was because he knew there was no problem.

20     He testified that Silver -- we never asked Silver to do

21     anything for us.  He never did anything for us, and he voted

22     against us every time.

23                 On the real estate side of things, there is nothing.

24     On the money laundering --

25                 THE COURT:  We don't get to money laundering if you're

FBJYSIL1

1      right on the first two.

2                  MR. MOLO:  That's exactly right.  Judge, I don't see

3      how this can go to the jury.  The ridiculous -- I do use that

4      term advisedly -- the ridiculous allegations concerning the

5      proclamation and concerning the daughter getting a free,

6      nonpaying internship with a judge and the son --

7                  THE COURT:  You keep denigrating these nonpaying

8      internships with judge.  Let me tell you something.  We as

9      judges appreciate those intern.  They're very helpful.  From

10     the students' perspective, they like having it on their resume.

11                 MR. MOLO:  They're useful, and it's beneficial.

12                 THE COURT:  The fact that it was a nonpaying job -- it

13     may be disdainful to you, but I'm confident it's not to the

14     student.

15                 MR. MOLO:  I've had plenty of nonpaying jobs,

16     your Honor.  I still have some.

17                 The point of the matter is to suggest that that is an

18     official act, to help a law student connect with a judge who

19     then writes her letter of recommendation in order to be

20     admitted to the bar --

21                 THE COURT:  It's the call that is the issue.

22                 MR. MOLO:  It does not make sense, Judge.  They have

23     not met their burden.  This case should not go to the jury.

24     We'd like a directed verdict.

25                 THE COURT:  Okay.  Government.

FBJYSIL1

1          MR. MASTER:  Yes, your Honor.  Mr. Molo has left out a

2    huge part of the story, which is Mr. Silver's own words and

3    actions.

4          In his ongoing provision -- let's just focus first on

5    the asbestos scheme -- his provision of a stream of official

6    benefits to Dr. Taub in exchange for these extremely valuable

7    million-dollar mesothelioma leads.

8          Mr. Molo neglected to mention that Sheldon Silver is

9    the one who said that he wanted cases right after Dr. Taub said

10   that he was interested in getting research money.

11         And Sheldon Silver is the one who dangled the

12   possibility of state funding immediately after Dr. Taub,

13   responding to Sheldon Silver's request, began sending a case.

14         So we had evidence that the very first patient who was

15   sent to Sheldon Silver as a mesothelioma lead, the O'Leary

16   case, followed very soon after Dr. Taub asked for support from

17   Weitz & Luxenberg which Sheldon Silver never bothered to

18   pursue.

19         We had evidence of that from Arthur Luxenberg and

20   Perry Weitz, that Sheldon Silver never even presented them with

21   the opportunity.  Instead, Sheldon Silver dangled the

22   possibility of state funding which he controlled, this HCRA

23   pool which was not subject to public disclosure, was not

24   transparent at all.

25         The fact that Dr. Taub began sending these cases when

FBJYSIL1

1   the grant request was "under consideration" by Sheldon Silver

2   is only further evidence of Sheldon Silver's intent here.

3        Not only did he make Dr. Taub wait until after a huge

4   check was deposited into his bank account until he okayed the

5   funding, but he had Dr. Taub come to the state of the state,

6   where he saw -- Dr. Taub saw Sheldon Silver inaugurated, saw

7   the extent of his power, met one of his aides who he felt might

8   be able to help fund the research.

9        Mr. Molo neglected to mention, perhaps by oversight,

10  that Sheldon Silver told Dr. Taub to keep this a secret.

11       THE COURT:  Specifically not to tell their mutual

12  friend as I recall.

13       MR. MASTER:  Correct.  Not to tell the mutual friend

14  who had brought the two of them together about the stream of

15  mesothelioma leads that were going to him at Weitz & Luxenberg.

16       The Bruno case and other cases also hold that secrecy

17  and concealment can be evidence of this corrupt intent.  We

18  have tremendous evidence of that here.

19       Again, not only Sheldon Silver saying, keep it a

20  secret, but we have Sheldon Silver lying repeatedly to the

21  public about how he gets his cases.

22       You just heard evidence from Michael Whyland about how

23  Sheldon Silver would say that he gets cases because people come

24  to him, because he's been a lawyer for 40 years and he knows

25  people in the community.

FBJYSIL1

1            You heard evidence that these mesothelioma cases came

2    from all over the country.  Sheldon Silver never even spoke to

3    them.  He just passed the information on that he got from

4    Dr. Taub, and he gave it to Charles Ferguson, who actually made

5    contact with these people and did the work.

6            He doesn't know them at all.  He just gets the money.

7    He also said falsely that he spends hours a week evaluating

8    potential cases to see which ones have merit.

9            You heard from numerous witnesses that he has no

10   ability to do such evaluation on these cases he was getting

11   from Dr. Taub, and he never did any evaluation, again, both

12   lies.

13           As far as this bogus him not doing 9/11 issue, Sheldon

14   Silver told Dr. Taub that he "couldn't do it anymore."  That

15   was the reason he gave after the grants became transparent.

16           It wasn't, sorry.  You're not living up to your

17   obligations on 9/11.  That never came up.  Sheldon Silver never

18   even asked about the research.  That's what Dr. Taub said.

19           So there's no evidence that he cared one bit about

20   what Dr. Taub was doing with this grant money.  Instead,

21   Sheldon Silver was concerned about discovery of the scheme.

22   All the evidence points to that.  All the evidence points to

23   his corrupt intent.

24           With respect to their effort to break out these

25   individual benefits and the stream of benefits and saying,

FBJYSIL1

1     well, Dr. Taub didn't do it for a proclamation.  Dr. Taub

2     didn't do it for a job for his daughter.

3            First of all, as your Honor says, that's beside the

4     point because it's Sheldon Silver's intent that matters.

5     Moreover, as opportunities arise, the theory of honest services

6     fraud makes clear that it doesn't have to be a single benefit.

7     It could be a stream of benefits.  It could be to be available

8     as opportunities arise.

9            That is exactly what Sheldon Silver did.  When he was

10    requested by Dr. Taub and when Dr. Taub provided leads to

11    valuable mesothelioma cases, he responded.

12           When Dr. Taub asked for a job for his son, Sheldon

13    Silver called Ohel, an organization that is heavily dependent

14    on him for the first and only time in 20 years.  And he said,

15    hire Jonathan Taub.  He followed up, how is it going along is

16    this.  David Mandel got the message.

17           That judge -- that was the first and only time Sheldon

18    Silver has ever contacted that judge to get a job for anyone,

19    other than his mother-in-law.

20           THE COURT:  We can assume that wasn't for corrupt

21    reasons but for other reasons.

22           MR. MASTER:  There may have been many reasons for

23    that, and that's not at issue in this case fortunately.

24           It just shows how important Dr. Taub was.  With

25    respect to that proclamation and resolution, clearly it was

FBJYSIL1

important to Sheldon Silver.

He rushed, and he had his staff got it done, and he was there for that photo op.  He knew how important it was going to be to Dr. Taub.

So the idea that this was a throw-away, this wasn't important to him when he was getting many times his state salary off of this quid pro quo relationship is ridiculous.

THE COURT:  Do you want to talk about real estate?

MR. MASTER:  With respect to real estate, as your Honor pointed out, again, it is Sheldon Silver's intent that matters.  It is clear that he used his official position and his power over these developers who he knew were heavily dependent upon him because they routinely came to him for things.

Glenwood hired a team of lobbyists to lobby him and had all sorts of interactions with him.  He knew Glenwood was a one-trick pony as Mr. Runes described, and he used his official position in order to get them to throw business to his friend.

As your Honor explained in the draft charges, the law reflects third-party benefit kickbacks are sufficient.  So it was sufficient for Sheldon Silver -- if these developers knew that they were paying Jay Arthur Goldberg at his request in order -- not only to foster generalized goodwill, mind you, but, as both Mr. Runes said and as Mr. Witkoff said, again, something Mr. Molo failed to mention, they did not want to

alienate him.  That's at transcript 2025 and 2027 of Steve

Witkoff's testimony, and he said it repeatedly.

          Mr. Molo challenged him to say it was only about

fostering goodwill, and that's not what Steve Witkoff said.  Of

course, who would forget Mr. Runes saying that discovering this

issue was like holding a tiger by the tail; that this was not

something that he was just doing to foster goodwill; that

Glenwood was just doing to foster goodwill.

          It was thrust upon them, and they felt they had no

choice but to continue the relationship because of Sheldon

Silver's power to hurt them.  There is ample evidence of that.

          Again, Sheldon Silver's secrets and lies are relevant

to his state of mind.  All of the efforts by defense to show

that he didn't "have" to disclose certain things on his

disclosure forms fall flat here because he certainly didn't

disclose his income from Golberg & Iryami, from these clients,

to anyone on his disclosure forms and to his own spokesman or

to the public.

          He kept on saying, I represent individuals who have

claims against other individuals, no one with any business

before the state.

          He said that, people come to me for business, just as

he did with respect to the asbestos scheme.  That, of course,

was a lie because you heard from Steve Witkoff that Sheldon

Silver had hit him up for business, and he felt that he should

FBJYSIL1

1    do it because he didn't want to alienate him.

2           So I think for each of the -- and Mr. Runes said that

3    he needed Sheldon Silver to be available to Glenwood on an

4    as-needed basis because things always came up.

5           This was not over in 2011.  This was going to come

6    up -- the rent laws that were so essential to them were going

7    to expire again and come up again.

8           They were afraid that if they harmed Sheldon Silver's

9    economic interests, he would hurt them.  And he had many

10   opportunities to do so on a routine basis, given his role as

11   what many witnesses have explained as the most powerful person

12   in New York.

13          THE COURT:  Mr. Molo.

14          MR. MOLO:  There was no evidence that Mr. Silver said,

15   okay.  On this first grant.  Don't fund it and then now fund it

16   at some point in time.  The evidence is that that process ran

17   its course through the state government.

18          There is no evidence to that fact.  There's no

19   evidence of him -- once he got these letters, just sending it

20   along to the process and letting the process take its course.

21          There's none.  There's not even any circumstantial

22   evidence that he somehow put a thumb on the scale one way or

23   the other with respect to Dr. Taub's grants.  He processed them

24   like others would be.

25          THE COURT:  He was solely responsible for Dr. Taub

FBJYSIL1

1    getting grants, solely.  Solely and individually responsible.

2              MR. MOLO:  Correct.  But what the government just got

3    up and argued is that he somehow laid back and timed it in a

4    way so that he was waiting for Dr. Taub to get him cases.

5              There's no evidence of that.  The evidence is that

6    these grants ran their course once the letters came to him,

7    just like all sorts of grant requests come to Mr. Silver and

8    come to everyone else.  This is the problem with this case.

9              THE COURT:  Most of them are denied.

10             MR. MOLO:  I'm sorry?

11             THE COURT:  Most of them are not granted.  Most

12   requests are not granted.

13             MR. MOLO:  Because there isn't enough money.

14             THE COURT:  But he still had money on the table when

15   he quit funding Dr. Taub.

16             MR. MOLO:  Because he acted, as Mr. Franco said,

17   responsibly.

18             THE COURT:  Oh, please.  The jury may buy that.  They

19   may.  They may buy that that's what was going on.

20             MR. MOLO:  Because what he said, Judge, is that in

21   some instances there were organizations that were dependent

22   upon regular state funding.  And, in some years, that funding

23   wasn't available because of what was appropriated.

24             By having some reserve, they were able to help these

25   organizations move forward.  That's quite clear.  If you

FBJYSIL1

1    remember, there was a little joke in the testimony when he

2    said, we're conservative making a joke of that, him being a

3    democrat, that he was conservative.  It's not a joke, and it's

4    not funny to suggest --

5              THE COURT:  So your argument is that the reason that

6    the funds stopped is because there was not money available?

7              MR. MOLO:  No.  That's not my argument.

8              THE COURT:  Okay.

9              MR. MOLO:  My argument is that there was no more HCRA

10   money available.

11             THE COURT:  There was other money that could have been

12   used for the same purpose.

13             MR. MOLO:  Dr. Taub wasn't doing what he said he was

14   going to do.

15             THE COURT:  So you're back to that.  Okay.  So why all

16   the secrecy then?

17             MR. MOLO:  The secrecy -- there's a heck of a lot of

18   secrecy.  Dr. Taub talks freely with the people that he works

19   with.

20             These are going to Weitz & Luxenberg.  The clients are

21   going to Weitz & Luxenberg.  Dr. Taub is out at the American

22   Cancer Society getting photographed with Mr. Silver.  There's

23   one conversation that they allude to -- they deem it's

24   "Secrecy."

25             Mr. Silver says, don't mention this to our friend.  He

wasn't saying, keep it secret.  Those weren't even the words
that were used.  It was, don't mention this to our friend who
is the intermediary.  So the secrecy isn't there.

                THE COURT:  You don't think the jury can conclude that
that is indicative of a state of mind on the part of your
client that he did not want this known because it was untoward?

                MR. MOLO:  No, not in light of everything else that
occurred.  In it was not otherwise public.  But, in fact, it
was extraordinary public.

                THE COURT:  What wasn't public was that Taub was
sending leads to Silver.  Weitz & Luxenberg knew that.  The
individual patient knew it, but none of the staffers knew it.

                When asked who his clients are, he talks about
personal injury cases.  He doesn't talk about, by the way, I've
got a doctor on staff at Columbia who's sending me all of his
mesothelioma patients.

                MR. MOLO:  In addition to Weitz & Luxenberg, Taub's
testimony was he called Mr. Silver's legislative office and
left messages with the referral information.

                The prosecution introduced scraps of paper that had
that information on it.  Again, it would be a very odd --

                THE COURT:  That doesn't make it public.

                MR. MOLO:  Judge, it's not like he's required --
Mr. Silver is required to issue a press release or Dr. Taub is
required to issue a press release.  This is the normal course

FBJYSIL1

```
 1    of business.  This is the way people conduct their lives.

 2              THE COURT:  Mr. Molo, the issue is it's one thing when

 3    you're conducting your life that way and you're not also doling

 4    out taxpayer dollars.  Mr. Silver is not just any lawyer who's

 5    got a relationship with a doctor at Columbia Presbyterian.

 6    That's the problem.

 7              MR. MOLO:  Right.

 8              THE COURT:  Then, sort of in addition to the

 9    conversation with their mutual friend, when asked about their

10    clients, he does not disclose that he has a source of

11    mesothelioma patients from column Presbyterian Hospital.

12              He portrays his practice very differently.  Your

13    skepticism may win the day with the jury.  But the notion that

14    there is not a question of fact, there's not adequate evidence,

15    circumstantial evidence to go to the jury I don't buy.

16              Do you want to talk about the tax scheme?

17              MR. MOLO:  The tax scheme.  The tax cert scheme.  I'm

18    sorry.  I wasn't focused on that.

19              Again, it's the same issue.  How is someone committing

20    a bribe, paying a bribe, not knowing that they're paying a

21    bribe?  That can't happen.

22              This was discovered after, long after, the legislation

23    at issue.  As to the --

24              THE COURT:  Focus on the extortion claim.

25              MR. MOLO:  The extortion claim -- they testified
```

FBJYSIL1

1    goodwill.  They used the word didn't want to alienate.  There

2    was no testimony Mr. Silver ever raised an eyebrow let alone

3    threatened either of these people; that there was any exchange

4    of an official act.

5            Neither of them said there was an exchange of an

6    official act.  I asked that question expressly of Runes, of

7    Meara, and of Witkoff.  All of them said there was no official

8    act exchanged.

9            So there's just no way that this could be fairly

10   deemed extortion under Sekhar.

11           Again, Judge, this was filed on Pacer at noon.  We

12   should have also sent a copy to your chambers.

13           THE COURT:  We didn't get an alert.

14           MR. MOLO:  We haven't always followed the practice of

15   sending something in addition to filing it on Pacer.  I would

16   invite you, before you rule, to please read what we filed.  It

17   sets the case law out quite clearly.  The case law clearly

18   states that there is no case here.

19           Thank you, your Honor.

20           THE COURT:  Is there anything further from the

21   government?

22           MR. MASTER:  No, your Honor.

23           THE COURT:  Let's have the charge conference.  I will

24   reserve on Rule 29.

25           (Pause)

FBJYSIL1

```
 1              THE COURT:  What's the first comment that the
 2     defendant has?
 3              MR. KRY:  That. one should be non-controversial on
 4     page 13.
 5              THE COURT:  Do you have a comment before page 13,
 6     Ms. Cohen?
 7              MS. COHEN:  We do not, your Honor.
 8              THE COURT:  I might.  Where is the charge on -- so we
 9     had no expert testimony.  Correct?
10              MS. COHEN:  Correct, your Honor.
11              THE COURT:  So that comes out.
12              On cooperating witnesses --
13              MS. COHEN:  What page are you on, your Honor?
14              THE COURT:  Page 9.  Was it just Dr. Taub and
15     Mr. Meara who had cooperation agreements?
16              MR. MOLO:  And Dara Iryami.
17              MR. GOLDSTEIN:  The word "several" should be changed
18     to "two."
19              MR. MASTER:  Actually, your Honor, as we're paging
20     through, I do see in brackets.  We were focused on more
21     substantive evidence.  If you're going page by page 7 to 8,
22     there's bracketed text.  One of the stipulations was --
23              MS. COHEN:  There were testimonial stips.
24              MR. MASTER:  So I believe all of the stipulations had
25     testimonial elements.
```

FBJYSIL1

1              MS. COHEN:  Just the hospital stip had testimony.

2              MR. MASTER:  More substantive testimony.

3              THE COURT:  So it was just one.

4              MR. MASTER:  All of them were framed as "If called to

5    testify, a custodian of witness would say."  They were not

6    factual stips in the sense --

7              THE COURT:  Even though we're sitting at a table, you

8    still have to talk one at a time.

9              MR. SHUR:  There was the hospital stip, the bank

10   records stip, and the email stip all had testimonial aspects.

11             THE COURT:  I'll fix that so it's not one and brackets

12   come off.

13             So page 12.

14             MS. COHEN:  Page 12, your Honor, under summary charts,

15   it says "government has presented."  The defense did as well.

16             THE COURT:  I'll change that to the "parties" have.

17             MS. COHEN:  It's under K on page 12.

18             THE COURT:  Mr. Silver did not testify.  So the first

19   paragraph on page 13 is in.  The second paragraph is out.

20             That brings us -- what's your first comment?

21             MR. KRY:  That was it.

22             THE COURT:  What's your next comment?

23             MR. KRY:  Page 17.

24             THE COURT:  Do you have anything before page 17?

25             MS. COHEN:  No, we do not, your Honor.

FBJYSIL1

1          THE COURT:  Okay.  17, line what?

2          MR. KRY:  Line 14 on page 17 through line 2 on page

3     18.

4          THE COURT:  Okay.

5          MR. KRY:  The defense would want to omit that.  It was

6     already earlier in the general instructions, an instruction

7     differentiating between direct and circumstantial evidence.

8          The concern here is the way this instruction is

9     written is somewhat slanted and almost encourages the jury to

10    draw inferences from circumstantial evidence.  We think a more

11    balanced instruction that basically leaves it up to the jury to

12    decide what weight to give that sort of evidence would be more

13    appropriate.

14         THE COURT:  Do you have any more focused comments on

15    it beyond just leaving it out entirely?

16         MR. KRY:  Just that, that it's already covered in the

17    earlier section of the draft.

18         THE COURT:  Does the government have a view on that?

19         MR. MASTER:  Yes, your Honor.  This is a standard

20    direct and circumstantial evidence instruction in this

21    district.  It is unobjectionable.  It clearly states the

22    applicable law.  So we think it's appropriate.

23         MR. KRY:  In terms of specific, just to give you an

24    example, in the first paragraph the reference to it being a

25    rare criminal scheme where the participants write down or

FBJYSIL1

 1   expressly state that they're acting with fraudulent intent --

 2   it's those types of comments that could be read to imply to the

 3   jury that that's what's going on here.

 4           THE COURT:  I looked at it carefully.  I think it's

 5   neutrally stated in terms of why.  In particular, relevant to

 6   state of mind, we really do have to look at circumstantial

 7   evidence.  So I hear you, but that objection is overruled.

 8           Page 18.

 9           MS. COHEN:  Your Honor, we sent a letter.  Do you have

10   it?

11           THE COURT:  I got your letter.

12           MS. COHEN:  I think it starts on insert the following

13   page 18, line 10, the requested language.  I have an extra

14   copy, your Honor.

15           THE COURT:  You want to insert on page 18, line 10.

16   So before we get to the third element.

17           MS. COHEN:  Correct, your Honor.

18           THE COURT:  "Finally, the government is required to

19   prove only that Mr. Silver acted with intent to defraud.  The

20   government need not prove that any of those alleged to have

21   provided things of value to Mr. Silver acted with criminal

22   intent."

23           MR. KRY:  I don't know that we object to that as an

24   incorrect statement of the law.  It is, again, slanted.  It

25   suggests that the government hasn't shown that other witnesses

FBJYSIL1

```
 1    don't have that intent but that the jury should infer that

 2    Mr. Silver does.

 3              We have a corresponding edit here right at the end of

 4    the same paragraph.  If that instruction is added, we would

 5    also want at least the second part of ours added which

 6    essentially says conversely, even if you find that a third

 7    party intended a payment as a bribe, you must still separately

 8    determine whether Mr. Silver also had the same understanding --

 9    the proposed instruction would be even if you find that a third

10    party intended a payment as a bribe --

11              THE COURT:  Hang on a second.  This is the comment

12    that starts with the payment in receipt of a bribe?

13              MR. KRY:  Right.  I was focusing on the second

14    sentence.

15              THE COURT:  Does the government object to that?

16              MR. MASTER:  Yes.  We think that our proposal is a

17    correct statement of the law.  Again, I think we're both in

18    agreement that this general principle should be added into the

19    charge.

20              So I'm looking here at the defense proposal.  I think

21    our proposal focuses attention appropriately where it needs to

22    be for this charge, which is on Mr. Silver's intent, as opposed

23    to here where it's focused on a third party's.

24              It says that "Even if you find that a third party

25    intended a payment as a bribe," there needs to be no such
```

FBJYSIL1

 1    finding.  So I think in that sense, it's not a correct

 2    statement of the law, and it unnecessarily directs the jury's

 3    attention and inappropriately directs the jury's attention to

 4    determining whether a third party intended to bribe.

 5            THE COURT:  Suppose what I do is I take the first

 6    sentence of the defendant's proposed addition, that is, "The

 7    payment and the receipt of a bribe are not interdependent

 8    offenses because the donor's intent may be completely different

 9    than the donee's."

10            I think I would change that to the giver's intent and

11    the receiver's.  I think these are donations, and I think that

12    may pull you into political donation-type thoughts where we

13    don't want to go.

14            With that idea, getting rid of those words, then go to

15    the government's addition.

16            MR. KRY:  Our preference would be just to give the

17    government's.

18            THE COURT:  I have to say I kind of like your first

19    sentence though.

20            MR. KRY:  We're withdrawing the proposal.

21            MS. COHEN:  If they're withdrawing it, your Honor,

22    we're going with ours.  We would prefer ours.

23            THE COURT:  I appreciate that, but I'm still going to

24    consider that first sentence.  I like the first sentence.  I

25    think it may be helpful to the jury to understand that they

FBJYSIL1

1    really need to separate these two things.

2         I say that with all due respect, particularly if the

3    defense is going to be hammering in summation on what the

4    givers are intending.

5         The jury needs to understand that their focus has to

6    be on Mr. Silver and not the other -- the other evidence may be

7    circumstantial evidence of what he's thinking, but that's the

8    critical issue.  That's what they have to determine.  That was

9    why your first sentence was good.

10         MR. KRY:  Right.  We proposed it in connection with

11    the second sentence.  Leaving the second sentence out, the idea

12    that they can't draw a negative inference about Mr. Silver's

13    intent if they conclude that a third party actually did act

14    with corrupt intent -- we think that the instruction is

15    incomplete without that piece of it.

16         THE COURT:  Okay.  I'll consider that.

17         Where is your next one?  Where is the defense's next

18    change?

19         MR. KRY:  We had a series of minor changes on the rest

20    of that page.

21         Does your Honor have the red line that we sent in?

22    These are all the same change.  All we're proposing is that

23    where the instruction refers to an agreement to exchange

24    something of value from another person in exchange for an

25    official act, it's a better statement of the law and more

FBJYSIL1

```
 1    consistent with what the allegation is here to refer to in
 2    exchange for promise of an official act.
 3              That's the way this is phrased in cases like Bruno and
 4    Rosen as well as Ganim.  So it's certainly not new language.
 5    What it focuses the jury on is in a quid pro quo context.
 6              It's not just an act going one way and a thing of
 7    value going the other.  There has to be some sort of agreement
 8    or promise or commitment or understanding.  So inserting that
 9    word there captures that concept.
10              THE COURT:  My problem is that in a be too precise to
11    capture that concept because you used lots of different verbs
12    there, "promised" being the most active of all of those.
13              MR. KRY:  That is the word that Bruno and Rosen use
14    here, as well as Ganim.
15              THE COURT:  Mr. Master.
16              MR. MASTER:  I think we agree with your Honor that it
17    is just one of many ways in which this quid pro quo can
18    establish a promise might be one way.  In Bruno, for example,
19    one definition in Bruno is --
20              MR. McDONALD:  Your Honor, this same concept comes up
21    in a couple of our other suggested proposals.  The idea that
22    all we're required to show is the defendant's intent.  We can
23    show the defendant's intent through a number of different ways.
24              In some of the cases it's been shown through an
25    agreement.  In other cases it's been shown through a promise.
```

FBJYSIL1

```
1    That's not a requirement.  That's not an element of the

2    offense.

3            All we're required to do is show that the defendant

4    had a corrupt intent.  There are a number of ways we can do it.

5    It constricts the way that we would argue the case and the way

6    that the jury could consider the case.

7            MS. COHEN:  To the extent the word "promise" has

8    appeared in other cases, it's because in those cases under

9    those facts, there was a promise and an agreement.

10           MR. McDONALD:  In fact the agreement cases, a lot of

11   them are conspiracy cases where the other's intent actually was

12   at issue.

13           THE COURT:  In a lot of these cases it's also done

14   with winks and nods and never anything express.  My problem

15   with saying that a bribe occurs when a public official accepts

16   something of value from another person in exchange for the

17   promise of an official act, that implies that there has to be

18   an express promise when there doesn't.  That clearly is not the

19   law.

20           MR. KRY:  That wasn't the intent of the instruction.

21   Whether explicit or implied, there still needs to be more than

22   just an intention to perform an official act.

23           It does have to be Mr. Silver's understanding that

24   there is an agreement or commitment or some sort of

25   understanding to exchange one thing for the other.
```

FBJYSIL1

1              That's what's absent there.  If the right answer is to

2       say the promise of or a commitment to add a couple other words

3       along those lines, we wouldn't object to that.

4              Also on the case law, I don't think it was accurately

5       stated.  In cases like Rosen and Bruno, the quote from Rosen is

6       that "An illegal quid pro quo we have previously defined as a

7       government official's receipt of a benefit in exchange for an

8       act he has performed or promises to perform in the exercise of

9       his official authority."

10             So that's not using "promise."  It's just one example

11      of the way you can have a quid pro quo.  It's a defining

12      element.  That language is also directly from Ganim, and it's

13      phrased the same way in Bruno.

14             So I disagree that a promise is just one way you can

15      have a quid pro quo.  There has to be some sort of promise or

16      commitment or agreement, whether express or implied, but it's

17      got to be there.

18             (Continued on next page)

19

20

21

22

23

24

25

FBJ5sil2                        charge conference

 1          MS. COHEN:  The sentence the defense just read was an

 2     "or" sentence which highlights that it is just one way.  In

 3     certain cases you may have an agreement and promise and not in

 4     another case but there is no element required for the

 5     government to show there is either an agreement or promise.

 6          THE COURT:  So the defense's request for, because I

 7     was working off of the way you structured this portion of the

 8     bribe and kickback charge and you -- I took out a lot of the

 9     verbs that weren't particularly relevant here but at the end

10     you had, "so, a thing of value from another person in exchange

11     for a promise for or performance of an official act."

12          MS. COHEN:  Your Honor, that's not what the government

13     would be required to show.  We don't have to show it was a

14     promise for a specific official act.

15          THE COURT:  Or.  Or.

16          MS. COHEN:  So this is --

17          THE COURT:  This was the defense request.  The

18     original defense request.

19          MS. COHEN:  Promise of an official act, comma.

20          THE COURT:  "In exchange for a promise, or exchange

21     of, an official act."

22          MS. COHEN:  What page of the defense?  Because I'm

23     looking at a different one.

24          THE COURT:  30.  Their initial request to charge.

25          MS. COHEN:  Ah.  Okay.  Thank you, your Honor.

FBJ5sil2                         charge conference

1          MR. McDONALD:  Page 30 of the defendant's original

2     request to charge?

3          THE COURT:  Correct.

4          MS. COHEN:  I'm sorry, your Honor.  You're on page 30.

5          THE COURT:  Of their original request to charge.

6          MS. COHEN:  Correct.

7          MR. MASTER:  Yes, your Honor.  That's acceptable to

8     us.

9          MS. COHEN:  It has the "or performance."  Exactly,

10    your Honor.

11         THE COURT:  So I will make that change and the

12    parallel change will be in the definition of a kickback.

13         MR. KRY:  Right.  And then there is another one on

14    line 22 as well.

15         THE COURT:  Okay, so that also takes in -- the

16    government's request is on line 20 to strike "relationship,"

17    correct?

18         MS. COHEN:  Correct, your Honor.

19         MR. MASTER:  Correct, your Honor.

20         MS. COHEN:  It comes also on page 18, line 19.

21         MR. KRY:  Yes.

22         THE COURT:  Where?

23         MS. COHEN:  Page 18, line 20.

24         THE COURT:  I have it there.

25         MS. COHEN:  Do you want all the relationship ones?

 1              THE COURT:  No.  It is easier for me if we take it

 2      page by page.  So, kickback will have a parallel change.  So

 3      then the defense is saying that down on line 20, after defining

 4      *quid pro quo*, it would be the government must prove that a

 5      bribe or kickback was provided to Mr. Silver, directly or

 6      indirectly, in exchange for a promise of or performance of

 7      official action.

 8              MS. COHEN:  Correct.  And the other change we wanted

 9      instead of "the government must prove that a bribe or a

10      kickback was provided to Mr. Silver," we requested "was sought

11      or received by."

12              THE COURT:  Any objection?

13              MR. KRY:  We don't object to that.

14              THE COURT:  Okay.  Page 19.

15              MR. KRY:  On lines 18 to 10 there is a statement that

16      says, "This element can be proven if you find that Mr. Silver

17      would have taken the same action even if no bribe or kickback

18      had been paid."  The defense objects to that just as not a

19      correct statement on the law, at least not on these facts.

20      Some of the evidence in the case, situations, for example, like

21      with the methadone clinic where there was abundant evidence

22      that Mr. Silver was already planning to oppose that project

23      when he happened to get a call from one of the developers

24      interested in it.  We don't see any authority from the Second

25      Circuit that suggests that that would be sufficient to

FBJ5sil2                        charge conference

1    establish a *quid pro quo* and we also didn't see any Second

2    Circuit authority document phrasing so we think that sentence

3    should be taken out.

4             MR. McDONALD:  Your Honor, there is lots of authority

5    supporting that.  The Coyne case, the Biaggi case.

6             THE COURT:  I thought I had seen it somewhere.

7             MR. McDONALD:  That motivation that is corrupt in part

8    does not insulate participants in an unlawful transaction from

9    criminal liability.  And then there is the *City of Columbus v.*

10   *Omni Outdoor Advertising* case that's been included in our

11   various motions to dismiss briefing which is a 1991 case from

12   the Supreme Court.  "A mayor is guilty of accepting a bribe

13   even if he would have and should have taken, in the public

14   interest the same action for which the bribe was paid."  There

15   is ample authority for it.

16            MR. KRY:  So, the first line of cases that the

17   government referred to is really addressing a separate issue.

18   We are not talking here about mixed motives, the question is in

19   a situation like the methadone clinic where Mr. Silver was

20   obviously not only planning but in the process of opposing it

21   anyway, if that course of conduct wasn't in any way affected by

22   the fact that his chief of staff got a call from one of the

23   developers, how can that be a basis for a *quid pro quo*?  And

24   that's not a issue of motive, it is an issue of being no

25   causation at all.

FBJ5sil2                    charge conference

1           The second point on *Omni Outdoor*, the language quoting

2     there was not the holding of the case.  The case addresses

3     completely different issues and so that language doesn't decide

4     the issue in that case and it hasn't been adopted in any other

5     Second Circuit case so we are noting our objection to that.  I

6     don't think it is an accurate statement of the law, especially

7     on these facts.

8           MR. McDONALD:  And just one final point on this, your

9     Honor.  The instruction doesn't say "will be proven," it says,

10    "can be proven."

11          THE COURT:  Right.

12          MR. McDONALD:  Right.

13          THE COURT:  Okay.  I will take a look at that

14    authority and we will consider your objection.

15          MR. McDONALD:  Just for the record, your Honor, there

16    are a number of other out-of Second Circuit cases.  This is an

17    unbroken line of authority; *United States v. Holzer* from the

18    Seventh Circuit 816 F.2d 304.

19          THE COURT:  Give me the cite of the Supreme Court.

20          MR. McDONALD:  499 U.S. 365; and it does arise in a

21    slightly different context but it makes this point and cites

22    lower court authority.

23          THE COURT:  Just viscerally it makes sense that just

24    because you would do the same thing, if you take a bribe for it

25    but you are going to do the same thing anyway, that doesn't

1    mean it is not a bribe, it just means the person who pays the

2    bribe was an idiot.

3         MR. KRY:  I don't see how a jury could find the *quid*

4    *pro quo* relationship, though, if the fact that the developer

5    who made a call to your chief of staff had nothing to do with

6    what Mr. Silver went on to do in relation to the project.  Our

7    view would be that would not be the basis for establishing a

8    *quid pro quo.*

9         THE COURT:  If that were the be all and end all of the

10   government's case I would be pondering this a lot harder but

11   there is a lot more going on in this case.  But, I understand

12   your point.  Okay.

13        MS. COHEN:  If we can go back?  I think we had a

14   suggested change on page 19 higher up on line 2, it is a

15   carryover sentence.

16        It starts on page 18, line 23:  "The government does

17   not have to prove that there was an express or explicit

18   agreement that official actions would be taken or that any

19   particular action would be taken in exchange for the bribe or

20   kickback so long as it proves that" -- and your suggested

21   charge says "there was an understanding."  We propose to say

22   that Mr. Silver intended to perform.  It is Mr. Silver's intent

23   that matters.

24        MR. KRY:  Right.  So, we object to that one.

25        MS. COHEN:  Do you want me to finish the sentence off?

1    So it would read, our suggested language would say:  "So long

2    as it proves that Mr. Silver intended to perform official

3    actions" and then instead of --

4              THE COURT:  In exchange.

5              MS. COHEN:  We suggested "as the opportunities arose

6    in exchange."  Instead of "would be taken."

7              MR. MASTER:  Official action as opportunities arose

8    would modify official action.

9              MS. COHEN:  As the opportunities arose in exchange for

10   the -- instead of the payment we wrote -- the money or property

11   given, directly or indirectly, to Mr. Silver.

12             THE COURT:  Why couldn't it just say in exchange for

13   the bribe or kickback?

14             MR. McDONALD:  Okay.

15             MS. COHEN:  That's fine, your Honor.

16             THE COURT:  Okay.

17             You object.  Tell me why.

18             MR. KRY:  Right.  So I mean, the essence of a *quid pro*

19   *quo* is there has to be some kind of agreement, understanding,

20   or commitment.  The fact that Mr. Silver intends to do

21   something and that the other party intended to do something

22   else doesn't establish that element.  If the government's

23   objection, which is what I understand to be, is that the focus

24   has to be on Mr. Silver's understanding of the situation, I

25   think the right way to fix that would be to change the end of

FBJ5sil2                          charge conference

this instruction so that it says:  "So long as it proves that

Mr. Silver understood that there was an agreement to perform

official actions in exchange for the money or property given,

directly or indirectly, to Mr. Silver."  But there has to be

something in this instruction that gives that essential element

of a *quid pro quo* which is an agreement, understanding, or

commitment.

          MS. COHEN:  That's the problem, is that the agreement

is not -- doesn't have to be -- they both don't have to have a

meeting of minds element.

          THE COURT:  It is not a contract.

          MS. COHEN:  And it is not a conspiracy.

          THE COURT:  Right.

          MR. KRY:  It is the case that you can have situations

where Mr. Silver thinks there is a meeting of the minds and the

other party doesn't and that's the Anderson line of cases that

says it is not a defense that the public official erroneously

believed that he was taking bribes but the public official

still has to believe that there was a *quid pro quo*.  He has to

understand that there was some kind of arrangement or agreement

or understanding to exchange one thing or the other and so, in

that, he has to believe that there was a meeting of the minds.

That's absolutely the law.

          THE COURT:  But isn't that captured in what the

government wants?  So, it would read:  The government does not

have to prove that there was an express or explicit agreement

that official actions would be taken or that any particular

action would be taken in exchange for the bribe or kickback so

long as it proves that Mr. Silver intended to perform official

actions in exchange for the bribe or kickback -- or would

perform official actions as the opportunities arose in exchange

for the bribe or kickback.  It seems to me the "exchange" verb

captures the *quid pro quo* requirement and the problem with

using the word "agreement," despite the fact that I had it in

there, or understanding, is that it suggests -- like a

requirement of a conspiratorial agreement which is not

required.

          MR. KRY:  Well, the conspiratorial agreement would be

that they have to prove that both parties shared that

understanding and that's not what we are asking for.  What we

do think there has to be is that Mr. Silver has to understand

that there was a meeting of the minds.  It is not enough that

Mr. Silver intended to perform acts in exchange for something.

He has to also believe that the other person had, you know,

formed an agreement, a corrupt agreement to do that.  It is

that piece of it that's lost when you take this out.  So, --

          THE COURT:  Tell me again what case you think holds

that?  He had to believe that the other side believed --

          MR. KRY:  It just seems like it is in the -- that is

the essence of what *quid pro quo* is so in terms of case law,

1    the way it is spelled out *Ganim* certainly has language

2    explaining that -- and this comes back to the discussion we

3    were having earlier about there having to be some kind of

4    promise or the like.

5             So, for example, on page 144 of *Ganim* there is

6    language about knowing that the payment was made in return for

7    official acts so the idea there is that the public official has

8    to know that the other person's expectation is that there is an

9    exchange here.  There is also language earlier on page 144

10   about how the official must know that payment is offered in

11   exchange for a specific requested exercise of his official

12   power in order to violate the statute.  So, I do think the

13   Second Circuit case law shows that the public official has to

14   know that the benefit that's being conferred here is part of

15   some agreement or understanding and it doesn't have to be

16   express but it has to be there.  That's what a *quid pro quo* is.

17            MR. McDONALD:  Your Honor, while you are taking a look

18   at that, *Ganim*, again was a conspiracy case.  We cited in our

19   letter -- or there was a conspiracy charge in the case.  We

20   cited in our letter a number of different cases which make

21   clear that the offer and the acceptance of a bribe or the

22   intent of the two parties, that these are not interdependent

23   crimes, that the element only requires where there is no

24   conspiracy for the government to show a corrupt intent on one

25   side of the transaction.  The other side's intent could be

1    relevant to the extent it sheds light on the defendant's

2    corrupt intent as we have talked about throughout the various

3    motions but there is no requirement at all that there be an

4    agreement, that there be a mutual understanding, that there be

5    a meeting of the minds.  All that's required is that the

6    defendant have a corrupt intent himself.

7              MR. KRY:  We don't disagree with any of that.  That's

8    just not the issue here.  If it is the case that the person

9    paying the bribe has an understanding that there is no *quid pro*

10   *quo* and the person receiving it has an understanding that there

11   is an agreement, then that's still enough.  The issue here is

12   that the defendant has to have that understanding, that there

13   is a *quid pro quo* or an agreement or a commitment.

14             THE COURT:  But it is an exchange.

15             MR. KRY:  But it is more than that because the

16   exchange doesn't connote the fact that there is an agreed upon

17   exchange.  An exchange could be coincidental that one thing

18   went one way and one thing went the other way.  That doesn't

19   get you all the way there for what is a *quid pro quo* which is

20   an understanding or agreement that the one thing is actually

21   going to be a quid for the other person's quo.

22             MR. McDONALD:  Your Honor, the language that we quoted

23   in our letter from *Bruno* says the key inquiry is, "whether an

24   intent to give or receive something of value in exchange for an

25   official act has been proved."  There is no additional

FBJ5sil2                          charge conference

 1   requirement on top of the exchange.

 2          THE COURT:  Okay.

 3          MR. KRY:  And I am familiar with the language of *Bruno*

 4   but it is not obviously addressing the specific issue.  That is

 5   reading in elements to a point that the Court wasn't

 6   considering.  I think this language from *Ganim* makes clear to

 7   the contrary where it is addressing the elements of a *quid pro*

 8   *quo* and not the elements of conspiracy, notwithstanding what

 9   the government said, is that the defendant has to know that

10   this agreed upon exchange exists.

11          THE COURT:  Okay.  I will take a look again at *Ganim*.

12   So you want this.  What do you want added into this?

13          MR. KRY:  So, we didn't object to the way Court

14   phrased it but bearing in mind the government's objection, I

15   think the correct way to address the problem that they want to

16   fix would be to say:  So long as it proves that --

17          THE COURT:  That Mr. Silver intended to perform.

18          MR. KRY:  That Mr. Silver understood there was an

19   agreement to perform official actions as the opportunities

20   arose.

21          MS. COHEN:  Your Honor, that would lend the same

22   problem, that both sides of the coin had to have the same

23   agreement.

24          MR. KRY:  No, no, it was that Mr. Silver understood

25   there was a agreement, not that there was an agreement, that he

FBJ5sil2                        charge conference

1   understood the agreement.  So, it does not raise the issue you

2   are objecting to.

3           MS. COHEN:  I think the "in exchange" language takes

4   care of the problem.

5           MR. KRY:  It doesn't because "in exchange" can mean

6   one thing had to go one way at the same time another thing goes

7   another way.  It is the meeting of the minds, or at least in

8   Mr. Silver's view of the world that is essential here.

9           MR. MASTER:  He has to intend for it to be an

10  exchange, that's what takes it out of that coincidence world,

11  it is that he has to intend for it to be an exchange.

12          MS. COHEN:  Right.  So it is not a coincidence because

13  Mr. Silver intended it to be an exchange.

14          THE COURT:  Intent to perform in exchange for.

15          MS. COHEN:  Correct, your Honor.

16          MR. KRY:  But I still don't -- that doesn't get the

17  idea that there is an agreement or a meeting of the minds.  I

18  mean, intending to exchange could just mean I intend to give

19  one thing back to you at the same time you give something back

20  to me.  That doesn't capture the idea that there was a

21  commitment or a shared understanding.

22          THE COURT:  No, but it is an intent to perform in

23  exchange for.

24          MR. KRY:  Maybe my concern is that the jury could read

25  that differently and I think to adequately capture the concept

FBJ5sil2                          charge conference

1    there needs to be some kind of understanding or agreement there

2    and that understanding phrase wasn't in the Court's original

3    instruction.  So, we would be happy with that if you are trying

4    to address the government's concern that I want to fix that the

5    way we propose fixing it.

6           THE COURT:  I don't like your fix.  I'm not saying

7    entirely that -- I want to look at this because I'm not

8    convinced that this doesn't convey what you want to convey and

9    I am willing to consider other changes of language, but what

10   you just said off the top of your head I don't like because I

11   don't think it reads well.  I don't think it's going to be easy

12   for the jury to understand what is intended.

13          Okay, what is next?

14          MR. KRY:  The next one I think we actually had an

15   agreed one which is deleting the last sentence in the next

16   paragraph.

17          THE COURT:  What page, paragraph, line?

18          MS. COHEN:  I'm on page 19, line 5.

19          MR. KRY:  Right at the end there is a sentence about

20   campaign contributions at the end.

21          MS. COHEN:  Before we get to that?

22          THE COURT:  Page 19, line 5.

23          MS. COHEN:  "It does not matter who initiated the *quid*

24   *pro quo* relationship," we ask that relationship be taken out.

25          MR. KRY:  We don't object to that.

1    THE COURT:  Okay, and you don't like -- and I agree

2    with you, the last sentence should come out that is on line 20.

3    MS. COHEN:  We would like a sentence before that to be

4    inserted.  We agree that that sentence should come out and we

5    have proposed a sentence to come before because without a

6    sentence saying that the campaign contributions can be relevant

7    is evidence to Mr. Silver's intent it looks like they're not

8    relevant to anything.

9    THE COURT:  So, I like the beginning of the

10   government's sentence.  I didn't like the end of it.  I liked

11   the first clause.

12   MS. COHEN:  The government does not allege that the

13   campaign contributions made by Glenwood were unlawful.

14   THE COURT:  Period.

15   MS. COHEN:  We think it is necessary to add something

16   about what they can consider it for which the government

17   contends is evidence relevant to Mr. Silver's intent in that

18   the reason or one of the reasons they could conclude -- they

19   could not but could conclude -- that Mr. Silver approached

20   Glenwood is he knew how dependent they were on the State as

21   evidenced by the campaign contributions.  And one of the

22   reasons that Glenwood's state of mind is relevant is because

23   they were so dependent on the State which is evidenced by the

24   campaign contributions.  But that evidence can be used as

25   relevant which is why, to Mr. Silver's intent, we are not

1   saying it is dispositive but the jury should be told they can

2   consider that evidence.  Otherwise, the way it reads it says

3   they can't consider it for anything.

4              MR. SHUR:  Judge, if you remember correctly, the

5   reason the government wanted this evidence in -- we opposed it

6   initially and the Court's ruling as to the limited purpose for

7   which the jury could consider it was with respect to Glenwood's

8   state of mind that Albany and New York State was important to

9   Glenwood, this is the first time we are hearing that it is

10  being -- it was offered for Mr. Silver's state of mind.

11             THE COURT:  That was also my recollection, that it

12  intended to prove why Glenwood would get sucked into this

13  because they were so dependent on the largess of government as

14  evidenced by the fact that they were a major contributor to the

15  New York State government --

16             MS. COHEN:  -- checks which also plays into the side

17  letter.  I didn't mean to overstate the original ask back in

18  1995 to Mr. Litwin.  So, focusing on Glenwood's state of mind

19  which also relates to the side letter, of course.

20             MR. GOLDSTEIN:  We did make both arguments that it was

21  relevant both to Glenwood in terms of why would Silver go to

22  Glenwood, of all developers, to propose this arrangement and to

23  propose continuing this arrangement is because he knew, among

24  other reasons, because of the campaign contributions, that

25  Glenwood was highly dependent on state action.

1           MR. KRY:  So, for the defense we would be okay with

2     consider such evidence as relevant to Glenwood's state of mind.

3     That was the basis on which the evidence came in.  To go beyond

4     that and say relevant to Mr. Silver's intent, that was not the

5     basis on which it came in and even if there were some theory by

6     which the jury could go from Glenwood's state of mind to

7     Mr. Silver's intent, just phrasing it like this reads kind of

8     like a road map about what inference the government wants the

9     jury to draw.  So, our preference would be the Court's original

10    inclination which is to end it after "were unlawful."  But if

11    something else were to be added it should be on the basis on

12    which the evidence actually came in and not some other theory.

13          MS. COHEN:  Your Honor, maybe we can consider THIS and

14    we can propose some other language that addresses the concern?

15          THE COURT:  Okay.

16          MS. COHEN:  It is not just that they can't consider

17    it.  They can consider it as evidence of something but since

18    the case is not focused on Glenwood's intent -- but, we will

19    think about that, your Honor.

20          THE COURT:  It doesn't focus on Glenwood's intent but

21    Glenwood's intent is relevant.

22          MS. COHEN:  It is relative to Silver's intent because

23    the side letter --

24          THE COURT:  I hear, you but there is a long string

25    that you have to go to get there and I'm not prepared to use

FBJ5sil2                          charge conference

1   the charge to get them there.

2           MR. SHUR:  Judge, I don't have the transcript in front

3   of me at the moment but I believe your Honor gave a limiting

4   instruction at the time that evidence came in to the jury.

5           THE COURT:  I did.  I did.

6           MR. SHUR:  Okay.

7           THE COURT:  But I have this entire paragraph in for

8   the defendant so if the defendant doesn't like the paragraph,

9   tell me.  I gave a limiting instruction at the time.  I don't

10  think it is necessary but I thought you would like it.  And I

11  have done so little that you like.

12          MS. COHEN:  The government doesn't see it that way,

13  just so you know --

14          MR. MOLO:  Don't sell yourself short, Judge.

15          MS. COHEN:  -- neither does the defense.

16          MR. COHEN:  I am glad you are thinking about it,

17  Judge.

18          THE COURT:  So think about it.

19          MS. COHEN:  If they don't want it at all that's fine

20  with us.

21          THE COURT:  The government doesn't want it so

22  recognizing that I will definitely take the first clause and I

23  will consider kind of a second clause that somehow or another

24  tells them that they can consider it generally, it is

25  circumstantial evidence of people's intent or something.  But,

FBJ5sil2                          charge conference

1    if you would rather not have that, I will strike the entire

2    paragraph.

3              MR. MOLO:  All right.

4              THE COURT:  Because I don't think it is necessary.

5              MR. COHEN:  Can we confer?

6              THE COURT:  Absolutely.  But you need to let me know

7    tomorrow by noon.

8              MR. COHEN:  By what time, your Honor?

9              THE COURT:  Noon.

10             MR. COHEN:  Good.

11             THE COURT:  Okay.  Next?

12             MR. KRY:  The government I think had an issue with

13   lines 21 to 23 on that page.

14             THE COURT:  Okay.

15             MS. COHEN:  I just want to orient the court, we wanted

16   to strike, on page 19, starting on line 21 through page 20

17   ending at line 2.

18             THE COURT:  This was trying to get to the basic

19   argument that the defense is making which is it is not enough

20   that money goes with some kind of inchoate hope that things are

21   going to be done on the behalf of the provider because that

22   really is a campaign contribution, that's why people give

23   money.  Hope springs eternal that a politician will do what you

24   want.  So, that's not enough.  So that's what that was trying

25   to get to.

FBJ5sil2                        charge conference

1             MS. COHEN:  I think by adding our sentence above, that

2        we don't allege that they're unlawful, that might take care of

3        it.

4             MR. KRY:  But this paragraph, I don't read, as

5        addressing campaign contributions.  This is a different topic

6        now.

7             THE COURT:  It is really sort of -- it is that there

8        had to be a *quid pro quo*, not just that you are giving the

9        money and hoping that you are getting goodwill.  Sort of pure

10       goodwill is not enough.  Right?  I think everybody agrees to

11       that.  There has to be more than that.

12            MS. COHEN:  Just where it is inserted, then, because

13       it is the thus which we thought modified the campaign

14       contributions.

15            THE COURT:  It was.  It was playing off the campaign

16       contributions.

17            MS. COHEN:  Okay, that's why we thought our sentence

18       dealt with that issue but if this is a different issue on

19       goodwill --

20            MR. KRY:  Strike the thus.  We would certainly be fine

21       with that.

22            We also had a proposal on this paragraph too.

23            THE COURT:  Okay.

24            MR. KRY:  There were two sentences and this will sound

25       familiar because they're the ones that we suggested adding back

FBJ5sil2                          charge conference

1    in the initial charge at the outset of the case.  The language

2    that we want, and this is a direct quote from *Ganim*, is:  This

3    element also is not proved if the benefit is intended to be or

4    is accepted as an effort to buy favor or generalized goodwill

5    from a public official who either is, has been, or will be at

6    some later time in a position to act favorably to the giver's

7    interest, nor is this element proved if a public official

8    accepts a personal benefit if his or her intent in taking those

9    items is solely to cultivate a relationship with the person or

10   persons who provided them.

11          This is not only a direct quote from *Ganim*, this is an

12   instruction that was given in this case that the Second Circuit

13   then said was an accurate statement of the law and it is these

14   two sentences that really get across the concept of generalized

15   goodwill isn't enough, cultivating a relationship isn't enough.

16   So, if there is any instruction in this entire charge

17   conference that the defense believes is critical to accurately

18   conveying the law to the jury, this is it.

19          THE COURT:  So, why doesn't the first sentence that's

20   in there say the same thing but in a more layperson way,

21   recognizing that the audience for Second Circuit decisions is

22   us and the audience for a jury charge is the jury.

23          MR. KRY:  Because there are specific concepts in the

24   *Ganim* instruction about generalized goodwill and cultivating a

25   relationship that aren't in the one that's phrased.  We don't

1    have any objection to the first sentence.  It is certainly also

2    an accurate statement of the law but it really is that concept

3    of generalized goodwill as distinct from a *quid pro quo*

4    agreement that is essential to get across to a jury in a case

5    like this.

6              Also, again, it is not a matter of what the audience

7    for the Second Circuit is.  The Second Circuit was quoting an

8    instruction that was given to the jury in *Ganim* so it not only

9    believed that that wasn't a correct statement of the law, it

10   believed that it was something the jury should have been told.

11             THE COURT:  But not necessarily in those exact words.

12             MR. KRY:  The concepts that need to come out are the

13   idea of generalized goodwill as opposed to *quid pro quo* and

14   cultivating a relationship.

15             MS. COHEN:  Your Honor, if we can just address the

16   generalized goodwill on a more broad basis?

17             MR. MASTER:  Your Honor, we are aware of many cases,

18   in fact many cases recently in public corruption cases in this

19   district, Smith, Stevenson, Annabi and Seabrook did not have

20   this generalized goodwill instruction.  And similarly, they

21   involved public officials who were on trial for seeking or

22   accepting bribes.  So, *Ganim* was not indicating that that was a

23   necessary element of any charge on honest services fraud and

24   those are more recent cases.

25             THE COURT:  Have they gone up to the Second Circuit

FBJ5sil2                           charge conference

1    yet?

2              MR. MASTER:  I believe that Annabi --

3              MS. COHEN:  This issue didn't go up to the Second

4    Circuit yet in those cases but even in *Ganim* --

5              MR. MASTER:  It was in *Ganim* that instruction was

6    given.

7              MS. COHEN:  In the District Court but it is not that

8    that's part of the instruction that was affirmed by the Second

9    Circuit.  The Second Circuit affirmed other parts but it wasn't

10   specifically that part of the instruction that they were

11   addressing.

12             MR. KRY:  Quite the contrary.  The quite the contrary.

13             They quoted this instruction and the Second Circuit

14   said that's an accurate statement of the law so this was

15   specifically passed on.  And the government hasn't shown

16   whether or not this instruction was given in other cases.  We

17   don't know whether it was proposed.  We don't know whether it

18   was overruled.

19             MR. MOLO:  Or whether the evidence supported it and

20   that is the issue here, Judge.

21             MR. MASTER:  The other issue with the instruction is

22   that, in *Ganim*, the defense proposed instruction that as in

23   *Ganim* it involved a conspiracy.  So, here, the second sentence

24   is addressed to defendant's intent.  That is in the defendant's

25   proposed instruction.

 1              THE COURT:  I'm sorry.  The second sentence of what

 2     the defendant is proposing?

 3              MR. MASTER:  The defendant has proposed two sentences.

 4     It says:  Not improved that the benefit intended to.

 5              THE COURT:  I'm sorry.  Say that again.

 6              MR. MASTER:  So the proposed instruction is two

 7     sentences, right?

 8              THE COURT:  Yes.

 9              MR. MASTER:  It says:  If it is intended to be an

10     effort to buy favor or generalized goodwill.  That goes to the

11     intent of the payor, right?  And the second sentence addresses

12     the intent of the public official.  For the reasons we have

13     just been discussing the charge should be focused on the

14     intent.

15              MR. KRY:  We can fix that.  We can fix that.  We would

16     just change it to this element also is not proved if the

17     benefit is understood to be an effort to buy favor or

18     generalized goodwill.  I mean, that takes care of that problem.

19              MS. COHEN:  I don't think that fixes the problem.

20              MR. KRY:  Why not?  It is a question of whether

21     Mr. Silver understood that this was just generalized goodwill

22     or part of a *quid pro quo*.

23              MS. COHEN:  But that Mr. Silver understood, for

24     example, Glenwood's intent to establish goodwill and that is

25     focusing on his understanding of their intent which is not what

1    is at issue here, it is his intent, not his understanding of

2    their intent.

3              MR. KRY:  Absolutely.  If Mr. Silver didn't understand

4    that Glenwood was providing this as part of a *quid pro quo* then

5    he can't be found guilty.  This is the same issue we were

6    talking about before.  Mr. Silver has to understand that there

7    is a *quid pro quo* and that includes understanding that Glenwood

8    had a particular intent when he was making those payments that

9    there was something that was part of a *quid pro quo* and not

10   just payments made to curry favor or build-up generalized

11   goodwill.

12             So, I hear the government's point the way first

13   sentence is phrased but that's easily fixed just by changing

14   the second sentence -- or by changing the second part of the

15   first sentence to:  If the benefit is understood to be an

16   effort to buy favor or generalized goodwill.  That's an easily

17   fixed issue, it is just the concept of generalized goodwill

18   that needs to stay in there.

19             MS. COHEN:  Just to be clear, in *Ganim* they weren't

20   focused on the propriety of that part of the instruction, they

21   were focused on the benefits part of the instruction.  So it is

22   not that they were affirming specifically that you needed to

23   have this goodwill in an instruction.  That was not what was at

24   issue in the Second Circuit.  The District Court did give it

25   but it is not -- the Second Circuit wasn't specifically

FBJ5sil2                      charge conference

1    affirming that.

2              THE COURT:  But in this case part of the defense

3    theory is that there was not a bribe because what the

4    developers were doing, particularly, put Taub to one side, they

5    think it is not as persuasive there.  What the developers were

6    doing was just trying to curry favor.

7              MR. McDONALD:  And that's not an element of the

8    charges against Mr. Silver.  We have to show that the defendant

9    had a corrupt intent and engaged in a quid pro quo with that

10   corrupt intent.  The quid pro quo and the exchange comes out of

11   the quid pro quo.  There is no additional requirement in any of

12   these cases that there be an agreement or an understanding on

13   top of that in your honest services fraud context.

14             In the extortion context the counter --

15             THE COURT:  I'm sorry.  Go ahead.

16             MR. McDONALD:  The counter-parties intent then does

17   become part of the charged conduct in a slightly different way

18   which we talk about in the extortion context.  The extorted

19   parties motivation has to be -- the extorted party, we then

20   have to show, has to be motivated by the public official's

21   position.

22             THE COURT:  Right.

23             MR. McDONALD:  But that's different from in an honest

24   services fraud context the government being required to show

25   that the counter-party also shared either a corrupt intent or

1   even that the defendant understood the counter-party to share a

2   corrupt intent.  That's just not what the cases say.  We have

3   to show that he intended to have an exchange, that's what *quid*

4   *pro quo* means, this in exchange for that.  That's what *Skilling*

5   says, that's what the cases that followed *Skilling* say.  There

6   is nothing else based into that that there needs to be separate

7   agreement on top of the exchange which is what is *quid pro quo*,

8   it is bribery or kickbacks, *quid pro quos*, that's --

9           MR. KRY:  This issue doesn't depend on whether or not

10  they're right about that because regardless of whether you

11  think that Mr. Silver has to understand that the other party

12  had a certain intent, it still matters whether this is just a

13  payment that either party was just trying to build-up goodwill

14  or cultivating a relationship or if it was a *quid pro quo*

15  exchange.  So, it is that specific language, the generalized

16  goodwill, that needs to come out somehow regardless of how it

17  is phrased.

18          THE COURT:  But it has to be in his head.

19          MR. KRY:  His understanding.

20          MR. McDONALD:  With respect, your Honor.

21          THE COURT:  But not his understanding of what's in

22  their head, it has to be what is in his head.

23          MR. KRY:  He at least has to understand what is in

24  their head to the extent of believing there was an exchange

25  going on.  If Mr. Silver believes that Glenwood didn't have any

FBJ5sil2                        charge conference

1    intent to have any kind of a exchange how can there be a *quid*

2    *pro quo* when one party doesn't think there is a *quid pro quo*

3    and the other party doesn't think there is a *quid pro quo*.  No

4    case has ever held that that's bribery.

5              THE COURT:  No.

6              MR. KRY:  So, Mr. Silver at least has to have the

7    understanding that the other party is transferring things of

8    value because there is some kind of meeting of the mind or *quid*

9    *pro quo*.

10             THE COURT:  In exchange for.

11             MR. KRY:  And maybe -- whether or not it is adequately

12   covered by that it is at least covered by that so it is not

13   correct to say that you can't look at what Mr. Silver

14   understood the intent or the actions of what the other people

15   in the transaction were doing because that's inevitably bound

16   up in what you are deciding -- there was an exchange.

17   Mr. Silver has to believe there was an exchange and that

18   requires not only what Mr. Silver thought about what he was

19   doing but also what Mr. Silver thought about what the other

20   people were doing, and if Mr. Silver thought that they were

21   just providing these things of value because it was their way

22   of building up generalized goodwill then the jury can't convict

23   and that's true regardless of what you think about any of the

24   other issues that we have been talking about today.

25             MR. McDONALD:  That's just not the case.  There is no

FBJ5sil2                          charge conference

1  additional requirement that there be some agreement or meeting

2  of the mind or mutual understanding when we are talking about a

3  *quid pro quo* relationship.  The defendant has to have a corrupt

4  intent when entering the exchange.  There has to actually be

5  the exchange and -- well, there doesn't have to be the exchange

6  but in the hypothesis we are talking about where there is an

7  exchange, if the defendant accepts his half of the exchange

8  with the corrupt intent, that's sufficient.  There is no --

9  there is no additional requirement on top of that that the

10  counter party have a specific intent or that the defendant

11  understand that he have the specific intent.

12        THE COURT:  There are cases that say expressly that

13  you can have a disconnect with an innocent bribe giver and a

14  guilty bribe taker.

15        MR. KRY:  Absolutely.  That's Anderson.  We are not

16  disputing that.

17        THE COURT:  That says that it is not the case -- your

18  theory is they could be wrong.

19        MR. KRY:  Sure.  Yes.

20        So, if Dr. Taub was making payments to build-up -- I

21  believed he was making payments to build-up generalized

22  goodwill and Mr. Silver erroneously thought that Dr. Taub was

23  making payments as part of a *quid pro quo* arrangement, what

24  Anderson said is out of luck.

25        THE COURT:  That's sufficient.

1           MR. KRY:  But that is totally different from Dr. Taub

2    having one state of mind and Mr. Silver believing that Taub was

3    making payments to build-up goodwill.  That's absolutely not

4    sufficient and that's why you need this instruction.

5           THE COURT:  All right.  I think we have beat this to

6    death.  I will take a look at *Ganim*.

7           MR. McDONALD:  The only additional things we are

8    talking about as to whether they are connected or not, and I

9    believe Mr. Kry said they are not, we think they are connected

10   because the generalized goodwill instruction really makes sense

11   where the giver's intent is the one that matters.  You don't

12   see --

13          THE COURT:  Right.

14          MR. McDONALD:  -- you don't see them very often, a

15   public official accepting money to get generalized goodwill or

16   accepting a benefit that -- it doesn't make sense in that

17   context.  It makes sense where the giver's intent is at issue.

18          THE COURT:  Okay.

19          MR. McDONALD:  Which is why we object to it.

20          THE COURT:  Okay.  Page 20.

21          MR. KRY:  We don't have anything on page 20.

22          THE COURT:  Government?

23          MS. COHEN:  No.  We are fine.  We are good until page

24   22.

25          THE COURT:  21.

FBJ5sil2                         charge conference

1          MR. KRY:  Bottom page 21, line 23, this is an issue

2     that was covered by the order on the motion to dismiss but we

3     wanted to preserve our objection that for there to be extortion

4     it has to be the case that Mr. Silver obtained property not due

5     to him as a public official and deprived someone of that

6     property.  Under *Sekhar* there has to be both a deprivation and

7     obtaining of property.

8          THE COURT:  So, here is my issue on that and this also

9     went to -- I can't remember whose requested charge which got

10    into charging the jury on that issue.  It seems to me that that

11    is a question of law of whether what is being -- what the

12    property was is in fact property that was capable of being

13    extorted and that was why I essentially charged them that they

14    acquit if they find only the referral of patients because

15    that's not property but believes, which is what their theory

16    is, are both transferable and property.

17         MR. KRY:  That's a separate issue and we have some

18    other objections on that.

19         THE COURT:  Okay.

20         MR. KRY:  This is a slightly different point which is

21    just that right now this charge requires only that there be an

22    obtaining of property under *Sekhar* there has to be both

23    obtaining and deprivation and again, in all candor, you ruled

24    against us on the motion to dismiss.  I want to make our record

25    that we are objecting to that.

1          THE COURT:  Okay.  So.

2          MS. COHEN:  So we don't have to address it?

3          THE COURT:  No.

4          MS. COHEN:  Okay.

5          THE COURT:  That's the issue of whether that -- I

6   remember now.  It is not clear that the Supreme Court really

7   intended that, to them, to become a new element or sub-element

8   of that as opposed to describing what is property that is

9   capable of being extorted.

10         MR. KRY:  Right.  And we read the passage differently

11  but obviously we respect the Court's ruling.

12         THE COURT:  Okay.

13         MR. KRY:  The next page, lines 1 through 3.

14         MS. COHEN:  You are on page 22?

15         MR. KRY:  That's the one.

16         Two references here to Mr. Silver's official position.

17  It says that the property was given to Mr. Silver with the

18  consent of giver and because of Mr. Silver's official position

19  and that Mr. Silver knew that the property was given because of

20  his official position.  That's not an accurate statement of

21  what you need for a *quid pro quo*.  It has to be an exchange for

22  an official act.

23         THE COURT:  I thought this went to the extortion

24  count.

25         MR. KRY:  It does, but extortion and honest services

FBJ5sil2                          charge conference

 1    fraud both have a *quid pro quo* requirement and they're the same

 2    in this respect, there has to be property given up because of

 3    Mr. Silver's -- we said promise of an official act, but in

 4    exchange for an official act would also be fine here too.

 5              It is the point that it is not just his status as

 6    public official.  For it to be *quid pro quo* there has to be

 7    official act on the other side and I would note, too, that on

 8    this one we talked about this exact same issue on the

 9    preliminary instructions and the Court adopted this change and

10    so this is really just conforming the final instructions to the

11    one that is already given.

12              MR. McDONALD:  Your Honor, on this point it comes

13    straight out of *McDonough*.  This language does come straight

14    out of McDonough.  The concept of the *quid pro quo* is fleshed

15    out in the elements.

16              THE COURT:  That is what I -- yeah.

17              MR. KRY:  I meant to say about that --

18              THE COURT:  Why don't we talk about it there because

19    it seems to me the whole idea of this is, this is sort of the

20    ding-ding-ding and then they're defined in substantially more

21    detail when we get back into what does that mean.

22              MR. KRY:  We would want the official position replaced

23    with the exercise of official acts or exchange for official

24    acts throughout.  Wherever your Honor thinks it is most

25    appropriate to talk about that is fine but we would want the

FBJ5sil2                          charge conference

1    change made throughout.  And on the *McDonough* point, I do have

2    a lot to say about that whenever you want to hear it.

3              THE COURT:  Okay.  Why don't we -- it seems to me that

4    probably the most appropriate time to talk about it, although I

5    recognize we trigger a change here, if you persuade me that you

6    are going to get to Element 3.

7              MR. KRY:  Okay.

8              MR. MASTER:  We have a comment on 2.

9              THE COURT:  On page 22.

10             MR. KRY:  Our first one is at 14 to 15; are you before

11   then?

12             MS. COHEN:  We are line 16.

13             THE COURT:  Okay.

14             MR. KRY:  So, on 14 and 15 the instruction says:  The

15   term property includes money and tangible and intangible things

16   of value that are capable of being transferred or given from

17   one person to another.  The reason why we object to this

18   instruction is that I don't think it is the law that any

19   intangible thing of value is necessarily property.  In *Sekhar*

20   the Court explicitly left that issue open.  There are some

21   cases that have held that certain types of intangible things of

22   value may be property but that's a far cry from saying that any

23   intangible thing of value is property.  And it is a significant

24   issue in this case because the entire concept of a mesothelioma

25   lead as being a specie of intangible property is something the

FBJ5sil2                         charge conference

1    government invented for the purposes of this one case.  There

2    is no other case out there that's endorsed that as a species of

3    property.

4         Here, our preference would be just to delete the

5    sentence and leave it as a question of fact for the jury to

6    decide whether these are property or not.  So, that would be

7    our preference.  If the Court is not willing to do that what we

8    would suggest, in the alternative, is that the Supreme Court

9    has held that confidential business information is a species of

10   property, that's the *Carpenter* case, for purposes of mail and

11   wire fraud.  So, an instruction to the effect that the term

12   property includes money, tangible things and certain intangible

13   things such as confidential business information I think would

14   also be an accurate statement of the law.  But, just an

15   instruction that says any intangible thing of value is

16   property, I don't think, is supported by existing law.

17        MR. MASTER:  So, first of all, just to respond to the

18   idea that this was an invented --

19        THE COURT:  Don't respond to that.

20        MR. MASTER:  No.  Okay.

21        So, there was testimony that mesothelioma leads are

22   actually, have a great deal of value and that firms like

23   Simmons pay quite a bit of money to obtain them.  So, with

24   respect to the particular comment on property including money,

25   tangible and certain intangible things of value, if you want to

1    add:  Such as confidential business information --

2            MS. COHEN:  That would just confuse the jury.  There

3    is nothing here having to do with confidential business

4    information.

5            MR. McDONALD:  Just on the point, *Sekhar*, you said

6    *Sekhar* reserved the question but *Sekhar* specifically said that

7    it wasn't disturbing the decisions and it cites the Ninth

8    Circuit's decision in the *Zimmick* case but in the *Zimmick* case

9    the Second Circuit law is exactly the same.  It says that

10   intangible property, like goodwill and customer revenues, are

11   property for purposes of the Hobbs Act.  I mean, it is not

12   limited just to confidential business information.  I think we

13   would resist any specific limitation because it really is

14   quite -- it really is quite broad.

15           THE COURT:  I am struggling for what would be an

16   intangible thing of value that is capable of being transferred

17   or given from one person to another that would not be property

18   for Hobbs Act purposes.

19           MR. KRY:  I mean, I don't think you get to the

20   question of whether you can transfer it or not if it is not

21   property to begin with.

22           THE COURT:  There are many intangible things but this

23   is intangible things that have value and that are capable of

24   being moved from one person to another.

25           MR. KRY:  Right.

FBJ5sil2                        charge conference

1           THE COURT:  So, what example is in that -- fits that

2     definition and isn't property for purposes of Hobbs Act?

3           MR. KRY:  Right.  Part of the problem here is I don't

4     even think we agree that leads can be transferred because there

5     is no deprivation of property, there is only obtaining property

6     and, again, this goes back to the motion to dismiss issue so I

7     think that we don't agree with the premise of that.  It bears

8     keeping in mind that the concurrence in *Sekhar* said for example

9     that the recommendation of a general counsel wasn't even

10    property so you don't get to the issue of whether it's

11    transferable or not.  And so, I do think there are plenty of

12    intangible things that aren't property, there are plenty that

13    aren't transferable property.  This pre-judges the issue of

14    whether this is property and both of those things, I think, are

15    questions that shouldn't -- if they're going to be resolved in

16    a matter of law they should be resolved in our favor which is

17    what we argued on Rule 29 but we certainly shouldn't get a

18    directed verdict that the jury has to conclude that

19    mesothelioma leads are both property and transferable property

20    for purposes of the Hobbs Act.

21          THE COURT:  How would it get charged?

22          MR. KRY:  So our suggestion would be either, one, just

23    leave it to the jury to decide whether property was deprived

24    from one person and transferred to another person --

25          THE COURT:  You keep saying deprived but you have lost

FBJ5sil2                          charge conference

1    that argument.

2           MR. KRY:  I have, so I -- but it is still our

3    position.

4           THE COURT:  That would be your first choice.  You are

5    not going to get that.

6           MR. KRY:  The second one would be when we looked into

7    this issue about what types of intangible property have been

8    held to be property for the Hobbs Act, the one that seemed to

9    come closest to the government's theory here was the

10   confidential business information.  And so, you know, we would

11   be okay with an instruction that said that confidential

12   business information is intangible property and then that we

13   can let the jury decide whether that's what we are talking

14   about here or not.  But I just don't think there is any law

15   that supports the idea that any intangible thing of value is

16   property.

17          THE COURT:  But you haven't given me an example of an

18   intangible thing of value that is capable of being transferred

19   that is not property.

20          MR. KRY:  I just don't think you get to the question

21   of whether it can be transferred or not until you have decided

22   if it is property or not and so I -- it may be that most of the

23   time, if something is capable of being transferred and it has

24   value it might be property but that doesn't make it a true

25   statement of law that any intangible thing of value is property

1    which is what that --

2            THE COURT:  That's not what it says.  It says it

3    includes intangible things of value that are capable of being

4    transferred or given from one person to another which is what

5    the *Sekhar* decision says it has to be, capable of being

6    transferred, and that's why the recommendation didn't work

7    because it is not transferred.  Nothing moves.

8            MR. KRY:  Right.  So there is two separate questions,

9    one, is it property and two is it transferable property.  And

10   so the majority -- you shake your head but that's what *Sekhar*

11   says.  The majority in *Sekhar* reserved in a footnote whether

12   this was property or not and said it is not transferable

13   property so we don't get that.  A concurrence in *Sekhar* said I

14   don't think it is property at all.

15           And so, those are two distinct issues and so we just

16   legally object to the suggestion here that any intangible thing

17   of value is property.

18           THE COURT:  What's the government's position?  You

19   want to keep it as is?  Amend it in some way?  I am perfectly

20   happy with it the way it is.

21           MS. COHEN:  I think it is fine as it is.

22           THE COURT:  I will reconsider if you can give me an

23   example of an intangible thing of value that is capable of

24   being transferred that you think would not be property for

25   Hobbs Act purposes.

 1              MR. KRY:  Thank you.

 2              THE COURT:  I just can't think of one and that's why.

 3     Okay?

 4              MR. KRY:  Thank you.

 5              THE COURT:  All right.

 6              MR. KRY:  I think the government had the next change.

 7              MS. COHEN:  Your Honor, we start on page 22, line 16

 8     through 24 and it goes down, our proposed change is down on

 9     line 20.

10              THE COURT:  Okay.

11              MS. COHEN:  Where it says:  On the other hand, if you

12     conclude that Dr. Taub --

13              THE COURT:  Yes, I thought that change was okay.

14              MS. COHEN:  Okay.  That change would be did nothing

15     more than recommend to his patients that they contact

16     Mr. Silver, then the government...

17              MR. KRY:  Right, and I --

18              MS. COHEN:  Etc.

19              MR. KRY:  I misspoke.  I guess we did have an earlier

20     objection on line 17 but it is kind of one that runs through

21     the entire paragraph.

22              THE COURT:  Okay.

23              MR. KRY:  This is the issue you alluded to before.

24     Evidently the instructions are going to treat whether

25     mesothelioma leads are property or not as a question of law.

1          THE COURT:  Tell me why it is not a question of law.

2          MR. KRY:  Well, because we think it is a question of

3  fact.  It is an element of a criminal offense whether property

4  was transferred from one person to another and so that --

5          THE COURT:  The question is -- that's clearly the

6  question of fact is was there a transfer of property.  The

7  question is the definition of property.  Normally terms get

8  defined.

9          MR. KRY:  Certainly in cases before where, in many

10  cases there can't be any genuine issue about whether or not

11  something is property or not like with money or something like

12  that.  But, in a situation like this where you have a somewhat

13  novel concept of property like mesothelioma leads, our position

14  is that that should be left to the jury as to whether the

15  evidence shows there was a transfer of property or not

16  including whether it is property.

17          MR. MASTER:  I don't want to interrupt, sorry.

18          To address this issue we did just think of one

19  additional amendment we could have:  If you find that Dr. Taub

20  gave such information to Mr. Silver, and that such information

21  had value.  So, that then addresses this concern that Mr. Kry

22  was raising and it leaves it open to the jury to determine

23  whether that information had value.

24          MR. MOLO:  It doesn't have value without it being

25  property.

1          MR. KRY:  That's the point that we were making earlier

2     is that not everything with value that are not property --

3          THE COURT:  There are many things that have value that

4     are not property:  Love, hate.

5          MR. KRY:  And both can be transferred.

6          THE COURT:  They can't be transferred, though.

7          MR. KRY:  They can be obtained.

8          THE COURT:  Can't be transferred, though.

9          So, if you find that Dr. Taub gave such information to

10    Mr. Silver and that information had value and can be

11    transferred then you should proceed to consider this element.

12         MR. KRY:  So, I think that addresses some of the

13    problems in this paragraph but not all of them.  Again, at the

14    end of day, even though it might have value and be capable of

15    being transferred, I don't think it necessarily makes it

16    property and so --

17         THE COURT:  How do you want to define property?  Tell

18    me what the proposed definition from the defense is.

19         MR. KRY:  Right.  So, we had two proposals, one was

20    leave it to the jury and number two was in light of the fact

21    that the Supreme Court had said that confidential business

22    information is property, we would be fine with an instruction

23    that told the jury that.

24         THE COURT:  But that's not appropriate because that

25    doesn't define for the jury what they need to consider to make

FBJ5sil2                        charge conference

1    the determination of whether this is or is not property.  Just

2    to say leave it to the jury is like, well, I can envision this

3    now.  The jury comes back and says we have to find that

4    property was transferred.  What's property?  I mean, we spend a

5    whole year with first year law students talking about what is

6    property and we are going to leave it to a lay juror?

7              MR. KRY:  That's why we have our second suggestion

8    which is the one thing we know that the Supreme Court has held

9    is property for the mail and wire fraud statutes is

10   confidential business information.  And so, if you want to

11   instruct the jury that they have to find that the mesothelioma

12   leads were confidential business information that has value and

13   is capable of being transferred, that would --

14             THE COURT:  Just because the Supreme Court has found

15   that is property does not mean that's the only intangible that

16   is property.  The Supreme Court has never said that.

17             MR. KRY:  That's true.

18             THE COURT:  And there are lots of other cases that

19   point to other intangible types of property that are property

20   for purposes of Hobbs Act.  So, I don't find the defense's

21   suggestion to be helpful.  I am willing to consider -- willing

22   to consider something -- if you give me something that defines

23   it in a way that is true to the law and that would be helpful

24   to a jury, but just saying they have to decide if it is

25   property and then we don't define property isn't helpful.

FBJ5sil2                              charge conference

1    That's why, I mean -- I have is got a definition of property in

2    there.  You don't like my definition so I am happy to consider

3    changes to that definition or I am happy to consider other

4    suggestions but right now I think, with the suggestion the

5    government has provided, it gets an awful long way to the

6    defense position if not entirely.

7              MR. KRY:  Okay.  Well speaking from, as the proponent

8    of the defense position, we just maintain our objection that

9    that's not the instruction.

10             THE COURT:  That's fine.  Okay.

11             MR. KRY:  On line 19.

12             THE COURT:  So let me -- so, this will say, in Count

13   Five, the government alleges that the property that was given

14   was leads from mesothelioma cases.  Leads or information about

15   mesothelioma patients that can be used by attorneys to make

16   contact with and possibly obtain the patients as clients of the

17   firm.  If you find that Dr. Taub gave such information to

18   Mr. Silver and that information had value and can be

19   transferred, you should proceed to consider this element.  On

20   the other hand, if you conclude that Dr. Taub did nothing more

21   than recommend to his patients that they contact Mr. Silver,

22   then the government has not proven that property, as required

23   by this element, was transferred.  In that instance you must

24   find that Mr. Silver is not guilty.

25             MR. KRY:  Right.  So two other objections, one of

FBJ5sil2                         charge conference

1    which is just for preservation on line 19 --

2              THE COURT:  The deprivation request.

3              MR. KRY:  That is, as a result, Mr. Silver deprived

4    someone of their property and obtain it for himself.

5              The second point, my objection to the government's

6    phrasing of this, they say Dr. Taub did nothing more than

7    recommend to his patients that they contact Mr. Silver.  I

8    mean, that's not a fair statement of the concept here because

9    Dr. Taub could have done a lot of other things in addition to

10   that.  The question is did he transfer some property above and

11   beyond his recommendations.  I don't like the nothing more

12   phrasing.  I think the Court's phrasing was "simply referred as

13   patients to Mr. Silver at Weitz & Luxenberg."  I think that

14   that phrasing would be better which is what the Court had.  The

15   problem with "it did nothing more than" suggests if there is

16   anything that Dr. Taub did apart from recommending his patients

17   then all of a sudden this element is met and I don't think that

18   was the intent of the instruction.

19              (Continued on next page)

20

21

22

23

24

25

FBJYSIL3

1          MR. MASTER:  The main issue we're concerned with is

2     the use of the word "referral request" Because it's used in

3     different contexts.

4          MS. COHEN:  "If you conclude that Dr. Taub simply

5     recommended or only recommended.  "Simply" seems not a great

6     word.

7          MR. KRY:  We would prefer "simply."

8          THE COURT:  How about "just."

9          MS. COHEN:  "Just" is fine.

10          THE COURT:  "On the other hand, if you conclude that

11     Dr. Taub recommended to his patients, Mr. Silver at Weitz &

12     Luxenberg --"

13          MS. COHEN:  "Dr. Taub just recommended to his patients

14     that they contact Mr. Silver."

15          THE COURT:  "Recommended" that sentence is a little

16     bit ambiguous.  "On the other hand, if you conclude that

17     Dr. Taub just recommended his patients to Mr. Silver," it's

18     really it's "recommended" Mr. Silver to his patients.

19          So maybe that's it.  It's that we turn the sentence

20     around -- right? -- "If, on the other hand, you conclude that

21     Dr. Taub just recommended Mr. Silver at Weitz & Luxenberg to

22     his patients and did not provide --"

23          MS. COHEN:  Can you just read that again.

24          THE COURT:  "If you conclude that Dr. Taub just

25     recommended Mr. Silver at Weitz & Luxenberg to his patients and

1    did not provide leads regarding the patients to Mr. Silver."

2            MR. MOLO:  Can we have a two-minute break.

3            THE COURT:  Yes.

4            (Recess)

5            THE COURT:  Okay.  Are we done with page 22?

6            MR. KRY:  Yes.  Just one further suggestion here,

7    which is that going with what the Court expressed in terms of

8    the definition of property, we would want to add on line 21 and

9    22 after "and did not provide leads regarding patients to

10   Mr. Silver, or that the leads had no value, then the government

11   has not proven that property is required" just because under

12   the earlier definition the instruction recognizes that the

13   intangible thing has to have value to be property.

14           MS. COHEN:  No.  The information had value.

15           THE COURT:  It will read as follows:  "If you find

16   that Dr. Taub gave such information to Mr. Silver and that

17   information had value and can be transferred, then you should

18   proceed to consider this element."

19           MR. KRY:  Right.  So this is just a conformance change

20   to that.  We have to repeat that in the next sentence.  We have

21   to say, "On the other hand, if you conclude that Dr. Taub just

22   recommended Mr. Silver to his patients at Weitz & Luxenberg and

23   did not provide leads regarding the patients to Mr. Silver or

24   that the leads did not have value or were not --" otherwise, it

25   doesn't track the other sentence.

FBJYSIL3

1          MR. MASTER:  I don't know why we have to keep on

2    saying what it is not.

3          MS. COHEN:  I think that's really confusing.

4          THE COURT:  I'll consider that.

5          MR. KRY:  Thank you.

6          THE COURT:  Or, alternatively, the other way to do it,

7    which might be more understandable is to make the first "If"

8    sentence clearer that they have to find all three things:  "If

9    you find, that, one, he gave information; two, the information

10   had value; and three, the information can be transferred, then

11   you can proceed.  If you find only, then you cannot."

12         Okay?

13         MS. COHEN:  That's fine, your Honor.

14         THE COURT:  Page 23.

15         MR. KRY:  In lines 1 to 3, we have the same issue on

16   the excerpt part of the case.  Again, we think whether it's

17   property or not shouldn't be determined as a matter of law.

18         MR. MASTER:  We're okay with that change.

19         That's your proposed change?

20         MR. KRY:  Yes.

21         MR. MASTER:  We're okay with that.

22         THE COURT:  Okay.

23         MR. KRY:  And then lines 6 to 7 would just need to be

24   modified to track wherever we ended up on the earlier

25   instructions.  Right now the parenthetical presumes that both

FBJYSIL3

1   mesothelioma leads and tax certiorari business are obtainable

2   property.

3          THE COURT:  So that would mean that there should be a

4   sentence in the first paragraph that says, "If you find that

5   the tax certiorari business is not property, then you should

6   acquit."

7          Right?  It has to be property.

8          MR. MASTER:  That's true of --

9          MS. COHEN:  That's true of everything.

10         THE COURT:  Correct.  So for mesothelioma, we

11  specifically say, you've got to find that it was a lead and

12  transferable property.

13         So the government has just agreed that we're okay on

14  the change that says you have to determine that it's property

15  that is capable of being transferred.

16         So the idea would be to track -- as with mesothelioma,

17  that they have to find that it has value, that it's capable of

18  being transferred.

19         MR. KRY:  Our thought was just on line 7 regardless of

20  how it's implemented, we just think the parenthetical --

21         THE COURT:  If they're not property, then they've been

22  told that you have to acquit.  So I'm not sure what you would

23  suggest for that parenthetical.

24         MR. KRY:  It could be deleted, for example.  I'm just

25  concerned that it's confusing to the jury to have a

FBJYSIL3

 1   parenthetical that presumes they've resolved the disputed issue

 2   a particular way.

 3           THE COURT:  I'm okay on deleting it.

 4           Do you care?

 5           MR. GOLDSTEIN:  It clarifies for the jury this part of

 6   the element.  Our concern is to make this even more confusing

 7   than it is.  We now have the jury having to sort of decide

 8   whether tax certiorari business has value and is transferable,

 9   which I think they can do.

10           Here you've now said that they can't proceed unless

11   they make that finding.  And now you're talking about the

12   obtaining of the property, whether the property was not

13   legitimately owed.

14           To point out for the jury what the property is that's

15   the issue here is helpful to the jury.

16           MS. COHEN:  Unless they've already determined that

17   it's property.  You've told them.  If you don't determine it's

18   property, you don't go further.

19           MR. MASTER:  In general, you must prove each element.

20           MS. COHEN:  I think without this, it's much more

21   confusing.

22           MR. MOLO:  Maybe if you have found leads for

23   mesothelioma cases and tax certiorari business as property.  I

24   think Mr. Kry's point is it just creates a level of assumption

25   here that for the jury it would be easy to conclude that that

FBJYSIL3

1      is property.

2              THE COURT:  Let us take a look at it after we make the

3      changes that we just talked about.  I hear you.  I'm not sure

4      that, with the modifications further up, that that's not going

5      to be more confusing than elucidating.

6              MS. COHEN:  I don't think each time you go through the

7      elements you don't go back to the first.  Like when you're

8      talking about a wire, you don't say if you don't prove intent,

9      you don't get to the wire.

10             THE COURT:  So I'll consider that.

11             What's next, Mr. Kry?

12             MR. KRY:  On line 7 we had another deprivation

13     instruction.  We just note our objection on that.

14             THE COURT:  That's the same one.

15             MR. KRY:  The next one we had was online 16.  This is

16     the McDonough issue again.  There's a reference to Mr. Silver's

17     official position, and our position is that that should refer

18     instead to in exchange for the promise of an official act or

19     just in exchange for an official act.

20             THE COURT:  This is the McDonough case; right?

21             MS. COHEN:  Didn't we already rule on that?

22             MR. KRY:  No.  I thought that we had decided we were

23     going to talk about it later.

24             MS. COHEN:  Later is now.

25             MR. KRY:  McDonough -- the language in that case does

FBJYSIL3

```
 1   refer to –– what it says is in order for a jury to find the
 2   defendant guilty of extortion under color of official right,
 3   the government must prove beyond a reasonable doubt that the
 4   victims were motivated to make payments as a result of the
 5   defendant's control or influence over public officials and that
 6   the defendant was aware of this motivation.
 7           And then there's a cite to Margiotta, and that's where
 8   this public officials language is coming from.
 9           If you look at the cite for Margiotta, it actually
10   says official acts.  It uses the correct language.
11           MR. MASTER:  This is a later case.
12           MR. KRY:  The disputed issue here is nothing to do
13   with official position or official acts.  This entire section
14   of the opinion is about a completely unrelated issue, about
15   whether it was problematic that they hadn't specified the
16   particular individuals that allegedly had the motivation at
17   issue here.
18           So the case was not addressing the distinction between
19   public officials and –– sorry.  A public official's status as
20   an official and his official acts.
21           So I think it's unreasonable to read this case as
22   modifying Margiotta which actually talked about official acts.
23   Beyond that, Evans, which is the Supreme Court, which was
24   indisputably addressing this issue, says at page 268, that "The
25   government has to show that a public official has obtained a
```

1  payment to which he was not entitled knowing that the payment

2  was made in return for official acts."

3         So Evans also uses the same language as Margiotta.

4  Evans is another case that specifically focused on the quid quo

5  pro requirement.  It's not a reference in a case that has

6  nothing to do with it.  This is a fundamental issue because a

7  quid pro quo is an exchange of an act for something of value.

8         It's not I'm a politician.  I hold public office, and

9  you're giving me something where there's no quid pro quo.

10  There's a basic difference between exchanging something of

11  value for an official act and exchanging something of value

12  just because somebody is an official.  The second of those

13  things is not a quid pro quo.  It's a quid with a status.  It's

14  not an act for an act.

15         So notwithstanding this reference to public officials

16  in McDonough, I don't think that one sentence can fairly be

17  viewed as changing what's a pretty fundamental requirement for

18  a quid quo pro.

19         I think the law that's stated in Margiotta and stated

20  in Evans is that there has to be an official act in return for

21  the thing of value and not public official status.

22         MR. McDONALD:  Your Honor, we may be able to clarify

23  this.  There really are two separate concepts there, and I

24  think they're both captured here.

25         It's true that extortion under the color of official

FBJYSIL3

1    right requires a quid pro quo or the defendant's intent with

2    respect to the quid pro quo which we've been discussing fraud

3    and services fraud.

4            The thing that extortion under the color of official

5    right adds or the thing that's slightly different in that

6    context from honest services fraud is there the victim's

7    motivation does matter.

8            The victim's motivation in extortion under the color

9    of official right doesn't have to be motivated by a quid pro

10   quo.  The jury has already been charged on the quid pro quo.

11           The victim has to be motivated to part with his

12   property based on the defendant's position or official

13   authority.

14           They are two slightly different concepts.  I

15   understand they're pretty close, but they're slightly

16   different.  To use the same language to define both of them

17   would be even more confusing.

18           MR. KRY:  McDonough, as I mentioned, whatever elements

19   it's talking about it cited Margiotta from that point, the

20   actual quote from Margiotta is "A public official may be guilty

21   of obtaining money under color of official right if the

22   payments are motivated as a result of his exercise of the

23   powers of his public office and he is aware of this fact."

24           That's the language in Margiotta that McDonough then

25   quotes.  Somehow that language then morphs from exercise of the

```
 1   powers of his public office, which is the right focus, into his
 2   status as a public official, which is incomplete.
 3           MR. McDONALD:  It's not incomplete because they're
 4   both captured.  So long as the charge makes clear that there's
 5   a quid pro quo or the defendant's intent with respect to the
 6   quid pro quo.
 7           MR. KRY:  You know what's going to happen is that the
 8   jury is going to see -- this same concept -- it came up twice
 9   before.  It comes up here.  I think it comes up at least two
10   more times.
11           If there are constant references in these instructions
12   that in order to prove extortion you have to prove that the
13   defendant was just motivated by -- the party providing the
14   property was motivated by the victim's official status, that
15   completely changes the focus of the case.
16           I think there's a serious risk that a jury will think
17   that's sufficient to establish a quid pro quo, and it's not.
18           THE COURT:  Suppose with the changes on line 16 I
19   insert "In addition" before -- the third element is that he
20   used the authority of his public office to obtain property for
21   himself or for a third party and that the property was given
22   because of Mr. Silver's official position.  In addition, as was
23   the case when I charged you on honest services fraud, the
24   extortion counts require the government to prove beyond a
25   reasonable doubt the existence of a quid pro quo.
```

FBJYSIL3

1          MR. KRY:  It seems unnecessarily confusing.  I don't

2     know how you can have -- if it was given in exchange for an

3     official act, I don't see why it matters that you instruct that

4     it was given for his official position, because it seems like

5     the official position necessarily includes things that are

6     given in exchange for an official act.

7          It seems to needlessly confuse the jury to inject that

8     concept.  Again, this was a change that was made in the

9     preliminary instructions.

10          So the jury has already been told that what matters

11     for extortion is was property given in exchange for an official

12     act.  So making this change is nothing new, and injecting this

13     concept of official position is just going to confuse the jury

14     if they've already been given the instruction that we want.

15          THE COURT:  I am confident that the jury does not

16     remember a thing that I told them in day one of this trial.

17          MR. KRY:  In that case I will just appeal to our

18     position being a correct state of the law.  Introducing the

19     concept that it's sufficient that a person have done something

20     just because of Mr. Silver's official position runs a serious

21     risk whether or not you delete the words as was the case which

22     I don't think is going to sufficiently clarify this that the

23     jury can convict just because they think that the real estate

24     developers or Dr. Taub provided things of value to Mr. Silver

25     because of his position, which that could be to generate

FBJYSIL3

1    goodwill.

2            It could be to foster a relationship.  A whole bunch

3    of things that aren't quid pro quos.  It's only when it's given

4    in exchange for an official act.

5            MR. McDONALD:  A key point with respect to the

6    victim's motivation in the extortion and the color of official

7    right context is that the victim doesn't have to be motivated

8    by a quid pro quo.  The because of language is somewhat

9    different.

10            So they really are two discrete concepts.  We would

11    like them -- we think they both need to be in there.  We think

12    the "in addition" language would solve it.

13            MR. KRY:  Margiotta says otherwise.  The language I

14    quoted from there and which McDonough purported to be quoting

15    from clearly talks about a result of his exercise of the powers

16    of his public office.

17            I don't think it's fair to read McDonough as somehow

18    radically changing the scope of that requirement.  I just

19    dispute that there's one public official status element that

20    applies to this one part of the extortion charge and exchanged

21    for an official acts element that applies to something

22    different.

23            I think it's one standard, was the payment made in

24    exchange for official acts.  I agree with you that for

25    extortion the alleged victim's mental state also matters.

FBJYSIL3

1          I don't think that's a mental state different from the

2     mental state of a quid pro quo.  It's one and the same thing.

3          THE COURT:  The concept in the next paragraph really

4     captures this.  So, when reading this, it seems to me I may

5     have made it more complicated than I like.

6          So suppose we change the first paragraph to say the

7     third element that "The government must prove beyond a

8     reasonable doubt is that Mr. Silver used the authority of his

9     public office to obtain the property for himself or for a third

10    party and that the property was given and exchanged for

11    official acts as the opportunity arose."

12         And then go to the next paragraph, "To satisfy this

13    element, the government must prove that he obtained property to

14    which he was not entitled knowing that it was given in exchange

15    for official acts, as the opportunity arose, rather than being

16    given voluntarily and unrelated to his public office.

17         "In other words, the government must prove that the

18    extorted party was motivated at least in part by his role as a

19    public official whose control or influence over public

20    officials."

21         MR. KRY:  That does address our concern in the first

22    paragraph.  There are a couple points later on that I'm happy

23    to address now.

24         MR. McDONALD:  Your Honor, we would object to

25    incorporating the "in exchange for."  That effectively requires

1    that the victim -- that effectively requires us to prove that

2    the victim has engaged in a quid pro quo, which is just not the

3    law.  There has to be some victim motivation.  The victim is

4    coerced by the official position.

5            There are all sorts of extortion cases that say in the

6    typical extortion case you have to show a threat or some sort

7    of coercion.  But understand the color of official right

8    context, it's the office itself.

9            It's the public position that creates that coercing

10   effect, vis-a-vis, the victim.  So those cases don't say that

11   the victim has to think that the victim was engaging in a quid

12   pro quo.

13           The reason that the official position was necessary is

14   because that's the source of the coercion under extortion.

15           MR. KRY:  Not in the abstract.  It's the threat of an

16   official act.  These efforts to separate the official act

17   that's the basis for the quid pro quo and the threat of the

18   official act that's the basis for the alleged victim's mental

19   state -- I don't view those as two separate things.  Margiotta

20   clearly didn't because it expressly phrases this in terms of --

21           THE COURT:  Although the facts there were different as

22   I recall, just in terms of what Margiotta was doing.

23           MR. KRY:  I'm not sure that they're different in any

24   relevant respect.  At the end of the day, the question is is it

25   enough that the third parties here were motivated by

1    Mr. Silver's position, or was it because they were motivated

2    that Mr. Silver was going to use that official position to do

3    official acts?

4         That's the same issue that Margiotta was confronting.

5    It's not the issue that McDonough was confronting.  It's also

6    the same issue that Evans was confronting.  All those cases

7    focus on the official act.

8         To then to go back to somebody's mere status as a

9    public official is confusing and not the right state of the

10   law.

11        Also beyond that, the instructions that your Honor

12   read out I don't even think raises that issue.  At least, if I

13   heard it correctly, I don't think it even implicates this

14   issue.

15             MS. COHEN:  It does.

16             THE COURT:  It does.  Because it essentially flips

17   back to what were the victims thinking.

18             MS. COHEN:  I think your Honor should go back to the

19   "in addition."

20             THE COURT:  Whether that's in there or not, I'm

21   hearing the government is objecting to the paragraph that

22   starts on line 19.

23             MR. KRY:  If you go to the "in addition," what we

24   would request is that clarifying language be added at the end

25   of 18 making clear that a quid pro quo relationship requires

1  that and then incorporate some kind of language about things of

2  value being given in exchange for official acts.

3          What I'm concerned about is without that, the jury

4  might infer that the quid pro quo relationship is just an

5  official position.

6          THE COURT:  That's not a quid pro quo.  What's the

7  quo?

8          MR. KRY:  That's the point.

9          THE COURT:  Right.  So they've been charged that a

10  quid pro quo is this or that.

11          MR. KRY:  It's not obvious that quid pro quo means the

12  same thing in an honest services fraud context as an extortion

13  context unless you make that clear to the jury.

14          I think the only way to do that is when you refer to

15  the quid pro quo relationship here just define it the same way

16  you did before about exchanging things of value for official

17  acts.

18          THE COURT:  Remember that the jury is going to have

19  the charge with them in the jury room.  So repeating may not be

20  necessary as opposed to just saying, if you don't remember what

21  quid pro quo is, go back.

22          MR. KRY:  Nonetheless, these instructions have many

23  different concepts in them.  On something as central as to

24  whether the government has to show that there was an exchange

25  of things of value for official acts, I don't think it hurts to

FBJYSIL3

1   remind the jury of that essential feature of a quid pro quo.

2           THE COURT:  It doesn't actually have to be in exchange

3   for official acts though; right?  So if the public official is

4   threatening or promising, that's sufficient because it's the

5   public position that provides the threat.  They don't actually

6   have to act on it.

7           MR. KRY:  No, but it has to be the threat of the act.

8           THE COURT:  That can be implicit from the fact that

9   they're a public official.

10          MR. KRY:  I don't dispute that.  It still has to be a

11  threat of an act.  It has to be threat of an official act.

12          THE COURT:  But it doesn't have to be in exchange for

13  accounts.

14          MR. KRY:  No, but that's contrary to Evans.  Evans

15  says there has to be a quid pro quo.

16          THE COURT:  I think I'm going back to the original

17  language in the first paragraph with the addition of, "In

18  addition" before the last sentence.

19          MR. KRY:  Just to sharpen what we were asking for

20  before, on page 18, there's a sentence that defines what a quid

21  pro quo is.  We would just ask that that language along those

22  lines be given again here.

23          MR. MASTER:  Actually, your Honor, now that I'm seeing

24  the language that Mr. Kry was citing from Margiotta, as far as

25  I read it, it doesn't support what he's saying.

FBJYSIL3

1             It says, "Furthermore, it is not necessary to support

2     a Hobbs Act charge by showing that a public official offered a

3     quid pro quo in the form of some specific exercise of the

4     powers of his office or forbearance to carry out a duty a

5     public official may be guilty of obtaining money under color of

6     official right if the payments are motivated as a result of his

7     exercise of the powers of his public office and he is aware of

8     this fact."

9             In other words, specifically distinguishing it from

10    the specific exercise of the powers of his office.

11            MR. KRY:  We're not talking about specific exercises.

12    There is already an as opportunity arise instruction here

13    somewhere which is supported by cases that the government

14    cited.  That's the distinction that this is drawing here.  I do

15    think that Margiotta clearly refers to being motivated by his

16    exercise of the powers of his public office, not just the

17    existence of his public office.

18            MR. MASTER:  We were prepared to live with the

19    language that Mr. Kry cites in Margiotta.

20            THE COURT:  This really guess into the whole Section 2

21    problem.

22            MR. MASTER:  As far as the articulation of the legal

23    standard, I think the standard that is articulated in Margiotta

24    is fine.  It's an accurate statement.

25            THE COURT:  I hate defining things in terms of what

FBJYSIL3

 1    they don't have to find.

 2              MR. MASTER:  Just even what is required in exchange

 3    for exercise.  The portion that Mr. Kry is stating is --

 4              THE COURT:  "A public official may be guilty of

 5    obtaining under color of official right if the payments are

 6    motivated as a result of his exercise of the powers of his

 7    official office, and he is aware of this fact."

 8              MR. MASTER:  Yes.

 9              THE COURT:  I think that's what the second paragraph

10    says but says it in plainer English.

11              MR. KRY:  It's plainer because it deletes the word

12    "exercise," which is the key point.

13              THE COURT:  So you want exercise given in exchange for

14    the exercise of official act?  Will that make you happy,

15    Mr. Kry?  I am living to make you happy.

16              MR. KRY:  So the second paragraph I don't think is

17    where we have our concern.  Before we got off the first

18    paragraph though, at the end where we say the existence of a

19    quid pro quo relationship, I just wanted to point out that in

20    Evans the Court said that the government need only show that a

21    public official has obtained the payment to which he was not

22    entitled knowing that the payment was obtained in return for

23    official accounts.

24              So in exchange for official acts or in return for

25    official acts as a description of what quid pro quo requires in

FBJYSIL3

1    the context of extortion also comes right under Evans.

2                So I do think it would be very helpful and necessary

3    to clarify for the jury that when we say quid pro quo

4    relationship, just say, in other words, and then we can use

5    this language from Evans.  In other words, that a payment was

6    made in return for official acts.

7                THE COURT:  I thought we had come up with language

8    earlier.

9                If I picked up the definition to keep it consistent --

10   I don't want to play with different language which is defined

11   differently in different places -- it would be going back to

12   what you discussed on page 18 which says, "The government --

13   requires the government to prove beyond a reasonable doubt the

14   existence of a quid pro quo relationship.  The government must

15   prove --"

16               MS. COHEN:  I thought we deleted "relationship."

17               THE COURT:  I did.

18               MS. COHEN:  Okay.

19               THE COURT:  "The government must prove that the

20   property was sought or received by Mr. Silver, directly or

21   indirectly, in exchange for the promise of or performance of

22   official actions."

23               MS. COHEN:  Yes.  I think that would take care of it.

24               THE COURT:  So that will go in at the end of that

25   first paragraph, and it will just -- it's not quite -- it's not

a complete, direct quote from before because that was using

briber kickback, and this is using property.  But it will be

the same words.

MS. COHEN:  And the rest stays the same other than in

"addition"?

THE COURT:  And then on line 21, you want exercise of

official acts?

MR. KRY:  Which line?  Sorry?

THE COURT:  Line 21.

MR. KRY:  No.  That one I'm fine how it is, "knowing

that it was given in exchange for official acts."

The only thing I would change there is the last

sentence where we say rather than being given voluntarily and

unrelated to Mr. Silver's public office, this is now

introducing the public office concept into the quid pro quo

requirement, which is that's the exact risk I'm worried about.

I think the easiest solution is we would be fine with striking

the "rather than" clause.

THE COURT:  If you don't want that clause, I'm sure

the government is happy to dispense with it.  That's in there

as a pro defense charge.

MS. COHEN:  We're fine to cross that.

MR. KRY:  What we do want in there, in its place, is

the language from Ganim that we quoted earlier.  So this would

say, "This element does not prove in the benefit is intended to

be or accepted as an effort to buy favor or generalized

goodwill from a public official who either is, has been, or

will be at some later time in a position to act favorably to

the giver's interest, nor is this element proved if a public

official accepts a personal benefit if his or her intent in

taking those items is solely to cultivate a relationship with

the person or persons who provided them."

That language, again, is straight out of Ganim.  It's

been specifically approved by the Second Circuit.

MS. COHEN:  Your Honor, that's what we've already

discussed and you rejected.

THE COURT:  I don't know that you rejected it.  I

thought I said I would consider it.  I'm not crazy about the

language.  I'm also not crazy about charging what they don't

have to find or kind of what isn't enough because there are

lots of things that aren't enough.

MR. KRY:  Right, but in the context of a case like

this, I do think it is really important to make clear that

these particular things, which are what a lot of the trial

evidence fell into, are not enough.

Without that, I think the jury will be left to wonder

whether efforts to curry generalized goodwill or foster a

relationship are or aren't sufficient to constitute a quid pro

quo.

THE COURT:  I'll consider it.

FBJYSIL3

1           MR. KRY:  Thank you.

2           THE COURT:  Otherwise, you're not objecting to this

3    paragraph; correct?

4           MS. COHEN:  Which paragraph, your Honor?

5           THE COURT:  The paragraph that ends in the carryover

6    to page 24.

7           MR. KRY:  We also have an objection to the sentence

8    that spans the page where it says where Mr. Silver's role as a

9    public official or his control or influence over public

10   officials.

11          Here again we're picking up the McDonough language.

12   The government's explanation that that is some kind of

13   different element from the quid pro quo -- I don't know what

14   that language is doing in this paragraph.  It seems like this

15   should be referring to official acts, not his status as a

16   public officer.

17          So what we had suggested was changing that to the

18   government must prove beyond a reasonable doubt that the

19   extorted parties were motivated at least by Mr. Silver's

20   promise of official acts.

21          THE COURT:  That's not right though.  That makes it

22   sound like there has to be a conversation where he promises

23   some particular activity.

24          MS. COHEN:  I thought we dealt with this already.

25          MR. McDONALD:  I thought we had resolved this issue

FBJYSIL3

           with the first paragraph when we last had the McDonough

           instruction.  It's the same issue.

                    MR. KRY:  What did we decide on?

                    MS. COHEN:  We're adding in addition before as was the

           case.

                    MR. McDONALD:  I think it's the same objection.  Maybe

           I'm misunderstanding.

                    MR. KRY:  Part of the problem is we have the sentence

           starts out, "in other words," and then it says the McDonough

           standard.

                    Even on your own theory of the case that's wrong

           because you're claiming that the McDonough public status

           requirement is something separate from the quid pro quo

           official act requirement.

                    You can't connect those in other words because that

           makes it sound like the quid pro quo is just that they have to

           show that the alleged victim was motivated by his official

           status.

                    So at a minimum, that has to change.  At a minimum, we

           should change "In other words" to "In addition" because those

           are two separate things.

                    THE COURT:  Actually, I'm not sure why the whole

           sentence can't go.  Can't we just say, "To satisfy this

           element, the government must prove beyond a reasonable doubt

           that Mr. Silver obtained property to which he was not entitled

1   by his public office knowing that it was given in exchange for

2   official acts as the opportunity arose."

3           And then go over to the top paragraph on page 23.

4           MR. MASTER:  Since your Honor has already added a

5   sentence talking about quid pro quo in the first paragraph, we

6   actually don't even need the second paragraph.

7           MS. COHEN:  The first paragraph is basically the same

8   as the second paragraph as you modified it, your Honor.

9           THE COURT:  The only modification that I made was to

10  add the words "In addition."

11          MS. COHEN:  Right.  I think those are two parallel

12  paragraphs saying the same thing in slightly different language

13  which may be confusing.

14          MR. KRY:  The jury needs to be adequately instructed

15  about the concept of a quid pro quo since that's a central

16  issue in the case.  So I think any redundancy there is

17  tolerable.

18          THE COURT:  There's going to be redundancy because I'm

19  adding to the first photograph the definition of quid pro quo.

20          MR. KRY:  Right.  I was responding to the government's

21  suggestion that the entire second paragraph be deleted.

22          MS. COHEN:  Except for the addition of going back to

23  the definition of quid pro quo.

24          THE COURT:  That's the first paragraph.

25          MS. COHEN:  Exactly.

FBJYSIL3

 1              MR. KRY:  We still want the first sentence of the

 2      second paragraph.  In addition, we would ask the Court give our

 3      Ganim instruction with those two changes.

 4              Then the issue is whether the last sentence is

 5      necessary as well.  That sentence maybe it makes more sense to

 6      move up to the first paragraph.

 7              THE COURT:  I think the last sentence of the second

 8      paragraph can just come out.  I don't think it adds anything.

 9              MR. KRY:  As the government pointed out, even on their

10      theory, there are two separate requirements.  There has to be a

11      quid pro quo, in other words, an exchange of something of value

12      for official acts under Evans.

13              And then, in addition, there's the element that

14      focuses on the alleged victim's mental state, which requires

15      that the government prove that the victim acted a particular

16      way because of, according to them, the defendant's public

17      office and that the defendant was aware of that motivation.

18              So those are two separate elements.  Again, if you

19      believe the government's theory that there is a second element

20      there.

21              So I do think that that needs to be left in.

22              MS. COHEN:  Your Honor, that's not an accurate

23      statement of the government's position.

24              MR. KRY:  That's what I heard earlier.

25              MS. COHEN:  What is your Honor's current thinking?

1     Just so I can understand where we are.

2              THE COURT:  I'm sort of trying to read and not listen

3     to you for a while.  I think the whole paragraph can come out.

4     I think once the first paragraph is rewritten to include the

5     definition of quid pro quo, it's going to be -- that's going to

6     be adequate to define this element.

7              I'll ponder it.  I know you want the Ganim language,

8     which I will consider.  I'm not persuaded yet that that is

9     necessary or particularly helpful.

10             MR. MOLO:  Your Honor, can I just add one point on the

11    Ganim.  That essentially is a theory of the defense

12    instruction.  I think without that and the facts here --

13    whatever may or may not have been used in another case, it

14    doesn't matter.

15             Those facts fit this instruction.  That's an accurate

16    statement of the law and an actual instruction given by the

17    Second Circuit.  To have this go to the jury without that

18    instruction I think would be a real problem.

19             MR. MASTER:  One response to that, your Honor, is that

20    I don't know if that is a theory of defense instruction.

21    Certainly the defense is entitled, if they want to say that

22    Mr. Silver contends that if such payments were received, they

23    were received only as an effort to cultivate a relationship or

24    understood as goodwill, whatever that is.

25             So it could be framed in that way.  That's

FBJYSIL3

traditionally the way that courts deal with the theories of
defense.

So if Mr. Silver wants to incorporate that concept
there, we certainly won't object to a legally accurate theory
of defense instruction.  I think that's where it should go as
opposed to where Mr. Kry has suggested.

MR. SHUR:  If I understand the Court's concern
correctly, it's that you don't want to charge the jury all the
things that the government doesn't need to prove, which I
understand.

The testimony from the government's witnesses actually
mirrors some of the language in the Ganim instruction.  So I
don't think you're out in left field saying you don't have to
find this.  You don't have to find that.  You don't have to
find this other thing.  This is actually --

THE COURT:  Why not a theory of defense charge as a
way of solving the problem?

MR. MOLO:  Because it's different to be told that a
theory of defense is supported by the law.  They have to be
told that Ganim is the law.

THE COURT:  That's right.  That would be -- rather
than defining elements by what they're not, which I don't like
to -- I've done a little bit of it in here, but I try to
minimize that -- to have it be a separate charge that says this
is the theory of the defense, again, a correct statement of the

1    law.

2              MR. MOLO:  It would have to start with that the Ganim

3    statement is the law and that our theory is that we fit within

4    that definition, that legal definition.

5              THE COURT:  Submit a proposal.

6              MR. GOLDSTEIN:  Our concern --

7              THE COURT:  You don't disagree that Ganim is the

8    correct statement of the law?

9              MR. GOLDSTEIN:  As a general matter, we don't.  As

10   applied here where there were very specific and precise

11   questions asked government witnesses, so you wanted generalized

12   goodwill, and then, yes.

13             That wasn't the only thing that they wanted.  I think

14   what the defense is trying to do here is to get an instruction

15   so that they can then point to their very precise or misleading

16   questions on cross to say this is all that we have.  This is

17   it.

18             Our concern is that that combined with an instruction

19   that they are asking for that is now looking at the intent of

20   the giver, as opposed to the intent of Mr. Silver, sets up a

21   potentially misleading way for the jury to find a lack of

22   intent by Mr. Silver.

23             MR. KRY:  On that point, I think the second sentence

24   or a Ganim instruction they've already conceded correctly

25   focused on Mr. Silver's intent.  We proposed an amendment to

FBJYSIL3

1    the first sentence of our Ganim instruction that resolved, in

2    our view, their objections.

3         I don't think it's true that this instruction raises

4    the issue that it's Mr. Silver's intent that matters.  If the

5    solution is to instruct the jury that the defense contends that

6    Mr. Silver understood that these payments were made to curry

7    generalized goodwill and to foster a relationship and, you

8    know, if you find that that's correct, then you must acquit.

9         I think that might go a long way towards addressing

10   our concerns with this.

11        MR. MASTER:  I don't think that last part is an

12   accurate -- in a theory of a defense instruction, let's say

13   this Ganim concept -- we'll take a look at it.

14        Let's say this Ganim concept is incorporated in the

15   theory of defense.  He can say, therefore, that there was no

16   quid pro quo; that Mr. Silver contends there was no quid pro

17   quo because he understood these payments to be fostering

18   goodwill or cultivating a relationship and that, therefore,

19   there was no quid pro quo.

20        He's allowed to -- Mr. Silver is allowed to argue that

21   from that and use that as incorporated in a court's jury

22   instruction which obviously has to include an accurate

23   statement of the law that, therefore, the government hasn't met

24   its burden.

25        So I haven't seen any proposed defense instructions

1    that say if this is proven, you must acquit or if their theory

2    is right, you must acquit.

3           It just simply says this is what the defense contends

4    and that, therefore, the government hasn't met its burden.

5           MR. KRY:  I don't know that we would object to that

6    part of it too if the phrasing is that the defense contends

7    that Mr. Silver understood that these payments were made by

8    generalized goodwill from a public official and to cultivate a

9    relationship.

10           And, if you conclude that that's correct, then you

11    must find that the government has failed to proffer that there

12    was a quid pro quo?

13           MR. MASTER:  No.  That's not what we're saying.  We're

14    saying that he contends -- we'll take a look at whatever is

15    proposed.

16           MR. KRY:  A theory of defense instruction is no good

17    if there's no consequence if you agree with that theory or not.

18           MR. MASTER:  Then he can say, and, that

19    therefore there is no --

20           MR. KRY:  It can't just be a characterization that our

21    position --

22           MR. SHUR:  It has to be tied to the law.  In bribery

23    cases involving campaign contributions, I've seen theory of

24    defense instructions that it lays out and says the defense's

25    theory that the campaign contributions were given for X, Y, Z.

1           If you find that, then a quid pro quo has not been

2      established under the law, and you have to find the defendant

3      not guilty.

4           MR. GOLDSTEIN:  Campaign contribution cases are unique

5      in terms of what courts are requiring courts to say -- it

6      cannot be that.

7           THE COURT:  Don't get bogged down with that.  The

8      point being that the theory of defense includes the notion that

9      if the government has failed to prove something more than that

10     or, depending on how it's phrased, then the government hasn't

11     proven its case basically.

12          That is to say, the legal argument they're making,

13     whatever -- everything else that's in the charge is true.

14          The defendant says the government has not proven that

15     things of value were given to Mr. Silver were other than his

16     understanding was it was simply to curry favor, generalized

17     goodwill, etc., etc.  If the government has -- the question is

18     how to phrase it.

19          Essentially, if they buy that, then quid pro quo

20     hasn't been proven.

21          MR. GOLDSTEIN:  I understand that as a theoretical

22     matter.  It depends on what they are stating their theory is.

23     One difficulty with this generalized goodwill concept with

24     respect to the facts of this case is you have --

25          THE COURT:  Mixed motives.

FBJYSIL3

1            MR. GOLDSTEIN:  There's mixed motives, by you also

2      have real estate developers who have very concrete legislative

3      things that are on their minds, and the idea that Mr. Silver

4      could think that, oh, all they're doing is just generally

5      trying to get my goodwill is -- is a potential defense.

6            THE COURT:  But if that's what the jury concludes -- I

7      understand.  Your point is how could they possibly conclude

8      that.  That's --

9            MR. SHUR:  That's summation.

10            THE COURT:  Exactly.  But if they do, if they do

11      conclude that Glenwood and Witkoff didn't have in their head

12      80/20 programs and this program and that program, they were

13      just trying to make sure Sheldon Silver picked up the phone

14      when they called, you lose.

15                  (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          MR. GOLDSTEIN:  Because I guess as a matter of how one

2     defines, and the problem is the word generalized goodwill, the

3     way that they describe and the way they asked the questions in

4     the case I think makes a jury potentially think that

5     generalized goodwill is broader than it really is in this

6     context.

7          THE COURT:  That argument sort of, I think, cries out

8     a little bit for the sort of the how we dealt with mesothelioma

9     leads, right?  If they've only proven this, that's not enough.

10         MS. COHEN:  But.

11         MR. GOLDSTEIN:  You have the --

12         THE COURT:  If you have proven this, if there is mixed

13    motives, specific desire for -- I'm not quite sure how that

14    would be worded but that is to draw for the jury the

15    distinction between what the defense is arguing, which the jury

16    will be charged, if that's what they find, that there is not a

17    conviction.

18         MS. COHEN:  I guess -- I mean I thought that -- I

19    don't know that the defense is entitled to its own specific

20    charge on each of the elements; if you don't find this, you

21    find that.

22         THE COURT:  No, no, no.  That's not what I'm talking

23    about.

24         MS. COHEN:  Okay.

25         THE COURT:  But the purpose of a defense theory charge

1    is to make sure that the jury understands that if -- if they

2    buy the defense argument, that that is a legal -- I'm not sure

3    that it is really a legal defense, it really is that the

4    government hasn't proved their case.

5         MS. COHEN:  I think it is different if you have advice

6    of counsel, you give advice of counsel on separate charge.

7         THE COURT:  Right.  But their defense theory in this

8    case is that the things that were given were not given in

9    exchange for public action.  They were given to make sure that

10   he picked up the phone when they called.

11        MR. McDONALD:  Picked up -- if they gave it so that he

12   would pick up the phone when they call, that is not enough to

13   acquit.

14        THE COURT:  I'm trying to get it into *Ganim*

15   vernacular.

16        MR. McDONALD:  It is difficult to have the discussion

17   in the abstract because we don't -- you know, they called in

18   June of 2011.

19        THE COURT:  And he took the meeting.

20        MR. McDONALD:  And he took the call and took the

21   meeting.  That's clearly enough to convict.

22        MS. COHEN:  I think the way your Honor has described

23   it addresses that concern.

24        MR. KRY:  We are not making up the legal standard.

25   This is an instruction that has been approved by the Second

FBJ5sil4                        charge conference

1    Circuit and it is either a correct statement of the law or it

2    is not.  And if the government thinks it is not a correct

3    statement, then they should say so.  If it is a correct

4    statement, then it is only reasonable and fair that the defense

5    be able to prove that this is our theory and if you find that

6    theory is correct, then the government has failed to meet its

7    burden of proof.

8              I don't know what step of that is objectionable.

9              THE COURT:  I think the question is how to word it in

10   the context of this case.

11             MR. KRY:  We think that the *Ganim* language that has

12   been approved by the Court of Appeals is talking about what our

13   defense in this case would be so there is not really any need

14   to tinker with it at all.

15             THE COURT:  What were the facts in *Ganim*?

16             MR. McDONALD:  The mayor of Bridgeport, Connecticut,

17   met a couple people, had a media -- had two people in his state

18   who had companies and they were outside businesses who were

19   paying money, funneling into companies that were then sent up

20   to the Mayor --

21             THE COURT:  Unbeknownst, it was not clear that the

22   payors knew it was going to the mayor.

23             MR. McDONALD:  That was one of the defenses.

24             MS. COHEN:  That was one.

25             MR. McDONALD:  And there was a conspiracy charge

1    there.  Two differences, it was a conspiracy charge there and

2    question of knowledge.

3              MR. MASTER:  By the way, once and future mayor; he got

4    out of jail and won again.

5              THE COURT:  I guess he was a good man.

6              Can you show me in *Ganim* where it is?

7              MR. KRY:  Right there.  That paragraph.

8              MS. COHEN:  What paragraph?

9              MR. KRY:  Page 149, the sentence that starts:  Bribery

10   is not proved if...

11             THE COURT:  I might be confusing this one with another

12   one but they quote the Hobbs Act charge.

13             MR. KRY:  This one did involve both Hobbs Act and

14   bribery counts -- or honest services, rather.

15             THE COURT:  This is where I got that language from.

16   To me, the language that I dropped out was the notion of

17   whether the property was given sort of for innocent reason,

18   that's the language they use.  So, to satisfy this element the

19   government must prove that the defendant obtained a payment

20   which he knew he was not entitled by use of his office.

21   Knowing that the payment was made in return for official acts,

22   rather than being given voluntarily or unrelated to the

23   defendant's official position.  That doesn't quite capture your

24   "it is just used to curry favor."

25             MR. KRY:  Right, or foster a relationship.

1          MR. MASTER:  There is nothing --

2          MR. KRY:  Cultivating a relationship.  Sorry.

3          THE COURT:  So this paragraph, as a whole, really sort

4    of contrasts bribery to lobbying, something that I do not

5    believe that a jury is going to conclude was going on here but

6    if that -- if -- what you want to do is to have me say this

7    without the "that describes legal lobbying," which in some ways

8    makes this feel different than I think what the Second Circuit

9    was talking about.

10          MR. KRY:  Well, our position would be that things of

11   value given just to curry favor or generalized goodwill aren't

12   *quid pro quos* whether they arise in the lobbying context or

13   some other context.

14          THE COURT:  But the way that the Circuit is blessing a

15   charge that contrasts three things:  Bribery from legal

16   lobbying, from campaign contributions.

17          MR. KRY:  So this -- this -- well, this specific

18   paragraph is, I guess, bribery from legal lobbying and because

19   lobbying was the issue there but the reason why that contrast

20   exists is that if a lobbyist is just trying to curry

21   generalized goodwill or build a relationship there is -- you

22   know, there is no *quid pro quo*.  So that -- the same reason

23   that distinction exists is according to the defendant's theory

24   of the case here, the reason why Mr. Silver is not guilty.

25   Because if a jury concludes that all that was going on here

1    were efforts to curry generalized goodwill and build a

2    relationship, then that's not enough.  It is not a *quid pro quo*

3    and that is true in the lobbying context and any other context.

4    But, that is just the opposite of what a *quid pro quo* is.  It

5    is not an exchange of things of value for official acts.

6              MR. McDONALD:  It is the lobbying context that

7    makes -- I mean, the charge rose here and the Second Circuit

8    didn't adopt the language.  It was reviewing the stream of

9    benefits part of the instruction and we think that in this

10   context an instruction that says a generalized goodwill

11   instruction like this, one, focuses the intent on the giver and

12   not on the defendant; two --

13             THE COURT:  No, no, but it can be focused on him.  It

14   can be focused on his intent.

15             MR. McDONALD:  -- and two, is confusing given the

16   other different instructions that would be included in the

17   charge, for example the mixed motive instruction.  I mean, this

18   charge makes it -- if the giver acts partially out of

19   goodwill -- or, sorry, if the defendant's intent is motivated

20   partially out of goodwill and partially out of corrupted intent

21   then --

22             THE COURT:  That's enough.

23             MR. McDONALD:  That's enough.  Exactly.

24             THE COURT:  But if it is not -- look.  I think they've

25   got a point and my concern is that if I don't incorporate into

FBJ5sil4                          charge conference

1    here whether it is in a defense theory or affirmatively in

2    these elements, it is reversible and you don't want that.

3              MS. COHEN:  Certainly not.

4              THE COURT:  I realize that in order to get reversed

5    you have to get a conviction, I'm well aware of that, but the

6    fact is they're entitled -- I mean this is -- if that's all

7    that was going on he is not guilty.  You have got a lot of

8    evidence to point to to show that wasn't what was going on.

9              MR. McDONALD:  I guess it depends on what the "that"

10   is.

11             THE COURT:  The "that" is this concept.  So, it would

12   be bribery is not proved or *quid pro quo* was not proved if the

13   benefit was accepted as simply an effort to buy favor or

14   generalized goodwill.

15             MR. MASTER:  Instead of "simply" we would substitute

16   "solely."

17             MR. KRY:  That's slanted.

18             MS. COHEN:  May I suggest, your Honor, that we take it

19   back, we try to draft something, and then defense can redline

20   it or do whatever they want and we can submit it to your Honor

21   rather than try here to parse it out?  We hear what you are

22   saying.

23             THE COURT:  That's fine.

24             Submit something to them.

25             MR. SHUR:  Is this the defense theory of the case

1   instruction?

2            MS. COHEN:  No, or --

3            MR. SHUR:  Or are you thinking of incorporating it?

4            THE COURT:  I think it should be incorporated into

5   element two of both the honest services and the extortion is

6   where it goes.

7            MS. COHEN:  Element two for both, your Honor?

8            THE COURT:  Maybe element -- no.  It is actually

9   element three of fraud.  Element three of fraud, element two of

10  extortion incorporating this concept but with the focus on what

11  is in Silver's head as opposed to the givers.  Okay?  So I want

12  you to give them a proposal by 9:00 tomorrow morning.  I want

13  you to give me a redline of their proposal by noon.  Okay?

14  Okay.

15            I'm not sure whether that goes into element two or

16  element three of Hobbs Act but you have got the idea, okay?

17            MR. KRY:  Thank you.

18            THE COURT:  Okay, what next?

19            MR. KRY:  Page 24, lines 4 to 5.

20            MS. COHEN:  So, your Honor, we have something before

21  that.

22            MR. GOLDSTEIN:  Bottom of 23.

23            MS. COHEN:  The bottom of 23 is gone so we don't have

24  that.

25            THE COURT:  Right, 23, that second paragraph is likely

 1    out.

 2              MS. COHEN:  Right.

 3              THE COURT:  But that's -- I need to consider whether

 4    that makes sense with the expanded first paragraph, whether the

 5    second paragraph becomes repetitive.

 6              MS. COHEN:  So, we have page 24 what is I think now

 7    going to be first paragraph but it starts line 3.

 8              THE COURT:  Is that where you are too?

 9              MR. KRY:  Yes.

10              THE COURT:  Okay.

11              MS. COHEN:  So it begins page 24, line 3 begins:

12    Again, as I charged you earlier, it is not necessary that the

13    official and -- we would just add and/or.

14              THE COURT:  That would be just or.

15              MS. COHEN:  Or the person giving the property state

16    the *quid pro quo* in express terms.  The next sentence is fine.

17    Then the third sentence --

18              THE COURT:  The defense doesn't like the second

19    sentence.

20              MS. COHEN:  I know, but if I can just finish ours it

21    will maybe be easier to follow.

22              THE COURT:  Okay.

23              MS. COHEN:  *Quid pro quo*, take out the word

24    "relationship," can be implied from Mr. Silver's words and

25    actions so long as -- and then we would rather have -- so long

1   as Mr. Silver obtained property aware that the extorted parties

2   were motivated by Mr. Silver's role as a public official or his

3   control or influence over a public officials.

4           It is in our letter at page 4.

5           MR. KRY:  Can I respond to that?

6           THE COURT:  Yes.

7           MR. KRY:  So, we are fine with changing the "or."  We

8   are fine with dropping the word relationship.  We do object to

9   the second sentence, the concept that it doesn't need to be

10  addressed is already pretty clearly conveyed by the first and

11  third sentences and the second one is really just kind of

12  commentary that could be read to imply that this is what was

13  going on here so we would request that that be removed.  And

14  then, with respect to the government's revision to the last

15  sentence, we don't agree with that.  I mean, we do think that

16  so long as Mr. Silver intends there to be a *quid pro quo* needs

17  to stay in.

18          MS. COHEN:  Our feeling is it is in because it says a

19  *quid pro quo* can be implied.  Twice.

20          MR. KRY:  It is the intends, that's the point.  The

21  relationship can be implied if that's what he intends.

22          MR. MASTER:  So delete the "and the person who was

23  giving property also understands that" --

24          THE COURT:  That's what I would.

25          MS. COHEN:  You are fine with that out?

1              MR. KRY:  If you want to rephrase that in terms of

2         what you think you have to show for extortion in terms of

3         the -- so, if what we have is that so long as Mr. Silver

4         intends there to be a *quid pro quo*.

5              THE COURT:  Period.

6              MS. COHEN:  Period.

7              MR. KRY:  No, and the person who is giving the

8         property and then whatever reason you had for that would be

9         fine, like the official position.

10             MR. MASTER:  Our proposal was deletion.

11             MR. KRY:  You know, I am fine with just deleting it.

12             THE COURT:  Okay.  I think that does it.

13             MS. COHEN:  Okay.

14             MR. KRY:  It is covered elsewhere.

15             MS. COHEN:  Right.

16             THE COURT:  I agree.

17             MS. COHEN:  Your Honor, it would read a *quid pro quo*

18        can be implied from Mr. Silver's words and actions so long as

19        Mr. Silver obtained property aware that the extorted parties

20        were motivated by Mr. Silver's role.

21             THE COURT:  No.  It would be a *quid pro quo* can be

22        implied from Mr. Silver's words and actions so long as

23        Mr. Silver intends there to be a *quid pro quo*.

24             MR. MASTER:  Okay.

25             MS. COHEN:  Okay.

1              MR. MASTER:  Fine.

2              MS. COHEN:  That's fine.

3              THE COURT:  Okay.

4              MS. COHEN:  Intends there to be a *quid pro quo*.

5              MR. KRY:  Lines 9 to 13 on that page is the

6      third-party extortion theory.

7              THE COURT:  Yes.

8              MR. KRY:  This is another one where your Honor ruled

9      against us on the motion to dismiss so we just note our

10     objection to that.

11             THE COURT:  Okay.

12             MR. KRY:  We didn't have anything until page 29.

13             THE COURT:  You had 24, line 19.

14             MR. KRY:  Yes, I think that was --

15             MS. COHEN:  The government's page 24, lines 15 to 18?

16             THE COURT:  No, no.  It is the defense.  I am looking

17     at defense.

18             MR. KRY:  I'm sorry.  You are quite right.  Yes, that

19     should be official acts rather than official position if we are

20     talk about the *quid pro quo*.

21             THE COURT:  This is not exact -- this is misuse of the

22     official position.

23             MR. KRY:  As I read the paragraph it is talking about

24     what the elements of the *quid pro quo* relationship are.

25             MS. COHEN:  What line are you on?  Mitch, what line

1    are you on?

2              MR. KRY:  Line 19 of page 24.

3              MS. COHEN:  Okay.

4              MR. KRY:  And the proposed change would be to change

5    Mr. Silver's official position to Mr. Silver's official acts.

6              MS. COHEN:  No.

7              MR. MASTER:  This is where we get to the concept that

8    Mr. McDonald was talking about.  This is an act for a

9    statement.

10             MS. COHEN:  Of the law.

11             MR. MASTER:  This is routinely given in this district.

12             THE COURT:  I thought this was almost directly from

13   Sand, actually.

14             MR. MASTER:  Yes.

15             MS. COHEN:  It is, your Honor.

16             THE COURT:  Not that Sand can't be wrong but he is

17   usually right.

18             MR. KRY:  Yes.  I guess this is the same issue we

19   talked about earlier.

20             THE COURT:  Okay.  Overruled.

21             MS. COHEN:  Your Honor, we are still on page 24.

22             THE COURT:  Oh we are?  Okay.

23             MS. COHEN:  Because the government had something,

24   lines 15 to 18.

25             THE COURT:  Okay.

1          MR. KRY:  I think we already talked about that.

2          MS. COHEN:  We did?

3          MR. KRY:  Oh no.  I'm sorry.

4          MS. COHEN:  We didn't.

5          MR. KRY:  We object to that.

6          MS. COHEN:  Okay.

7          THE COURT:  15 to 18.

8          I think that is from Sand.

9          MS. COHEN:  That meaning our proposal?

10         THE COURT:  No, my language.  Maybe not, but -- maybe

11    not.  Maybe not.

12         MS. COHEN:  It is just to put in the concept that the

13    extorted party has to be motivated in part.

14         THE COURT:  I'm fine with inserting after motivated,

15    "at least in part."

16         Are you objecting to the balance of that sentence?

17    So, whether the extorted party was motivated at least in part

18    to give property because of a belief that Mr. Silver would take

19    official action in exchange for the property or for some other

20    entirely innocent reason.

21         MS. COHEN:  I think that it is clearer to say

22    Mr. Silver's role as a public official or his control or

23    influence over public officials which is language we used

24    before in the charge.

25         THE COURT:  But, see, this is the *quid pro quo* so this

 1   is --

 2            MS. COHEN:  It is the same instruction on the prior

 3   page which we now might have deleted, but.

 4            MR. KRY:  Right, the *quid pro quo* is separate, that is

 5   separate from *McDonough* requirement so we agree it should stay

 6   the way it is written.

 7            MS. COHEN:  What does Sand say?

 8            THE COURT:  Okay, so I'm going to take it in part,

 9   your change in part and reject it in part so it will read:  "If

10   you find either to be the case, however, each is a factor that

11   you should consider in deciding whether the extorted party was

12   motivated, at least in part, to give property because of a

13   belief that Mr. Silver would take official action in exchange

14   for the property rather than for some other entirely innocent

15   reason."

16            MR. MASTER:  I think we would like to delete the word

17   "relationship" on line 15.

18            THE COURT:  Okay.  What's next?  I can't figure if

19   y'all are pooped out from money laundering the same way I am.

20   It looks like you are.

21            MR. KRY:  29, this is a willfully causing instruction.

22            THE COURT:  Okay, so there is a long story behind

23   willfully causing and me.

24            In an early criminal trial I had I thought you're not

25   trying willfully causing, you tried this case on principal

FBJ5sil4                    charge conference

1    theme.  Government, do you object?  Nah, we don't object.

2    You're right, we tried it on principal theory.  As God as my

3    witness the first note was, well, suppose we find he didn't do

4    it but he was part of the scheme.  I said okay, never again am

5    I going to drop a Section 2 charge when it is indicted.

6              MR. MASTER:  We indicted it.

7              MS. COHEN:  We indicted it.

8              THE COURT:  They indicted it.

9              MR. KRY:  It is still a question whether it is

10   supported by the evidence.

11             THE COURT:  It is all supported by the evidence and

12   Section 2 is implicit in every case.

13             MR. MASTER:  We would like it.

14             MR. KRY:  I'm sure they would.  I'm not -- you know

15   that's not --

16             THE COURT:  What are you concerned about?

17             MR. KRY:  Well, it is a charge that gives the jury

18   another way to find Mr. Silver guilty and those sorts of

19   charges shouldn't be given unless there is an evidentiary basis

20   for them.  I'm not sure what it is what the government is

21   getting at.

22             MS. COHEN:  Since it is always included in the offense

23   there is always evidentiary basis for it.

24             MR. MASTER:  And Mr. Silver is a leader who acts

25   through others, in other words he has people send out faxes for

FBJ5sil4                          charge conference

1    him, he has people who process grants for him.

2              THE COURT:  Right, so that's how it could come up.

3              Again, I was on your side until I got burned by that

4    whole damn Section 2 problem.  The way it can come up is

5    because the jury gets wrapped around the axle on the fact that

6    Mr. Silver himself didn't cut a check for a grant so he didn't

7    do it, somebody else did it.  Is that sufficient?  And as soon

8    as that note comes out you have got a Section 2 issue.  It is

9    not he doesn't have to do it, the benefits can go back, other

10   people can do it.  I don't even -- so, I appreciate your

11   sentiment.  Overruled.

12             MR. KRY:  Okay.

13             THE COURT:  You don't object to the actual wording of

14   the charge, just the charge at all, right?

15             MR. KRY:  Just the charge.

16             THE COURT:  Venue.  Is the defense contesting venue?

17             MR. MOLO:  Mr. Kry and I have a secret history in the

18   Second Circuit on venue.

19             THE COURT:  Sounds like me and Section 2.

20             MR. MOLO:  We are not popular in the Eastern District,

21   but anyway.  I don't think we are popular in the Southern

22   District I just might add.

23             THE COURT:  I was just going to say.

24             MR. MOLO:  But no, I don't think there is an issue.

25             MR. KRY:  Yes, except to the extent venue is always an

 1    issue.

 2              MR. MOLO:  There has got to be --

 3              THE COURT:  You want a charge on it?

 4              MR. MOLO:  Definitely.

 5              THE COURT:  That's what I was asking, if I could

 6    dispense with it.

 7              MR. MOLO:  Definitely.

 8              THE COURT:  Okay.

 9              MR. KRY:  Then on page 30, the false exculpatory

10    statement instruction, this just struck us as unnecessarily

11    emphasizing one aspect of the government's case.  This would be

12    the government's theories on this topic will be part of the

13    body of evidence the jury can consider and there is no reason

14    to single it out and give it special elements.

15              MR. MASTER:  Your Honor, this is a charge that's

16    regularly given in the district.  It conforms with Judge Sand.

17    We have satisfied the factual predicate for it.

18              THE COURT:  It was actually in brackets because when I

19    wrote this it was before I heard any of the press statements.

20    I think the government is entitled to the charge.  I am happy

21    to move it someplace else if you would like it someplace else.

22              MR. KRY:  That's fine.

23              THE COURT:  Okay.

24              MR. KRY:  And then we have our series of additional

25    instructions.

1            THE COURT:  Okay.

2            MR. KRY:  So, the first one is outside jobs and

3     income.  New York State law allows state legislators to hold

4     outside job and make outside income.  There is no limit as to

5     the amount of income they may save from that outside job.  You

6     may not find Mr. Silver guilty merely because he worked

7     part-time as a lawyer.

8            THE COURT:  Okay.  Denied.

9            MR. KRY:  The second one is --

10           THE COURT:  Referral fees.  So, here is one of my

11    issues with this.  Everybody has been trying this case as

12    though that is a correct statement of law.  I'm not actually

13    persuaded that it is.  My understanding is that New York

14    ethical law requires there to be some proportionality between

15    the fee and the work -- you are shaking your head no.

16           MR. COHEN:  No.

17           MR. KRY:  It is actually in the footnote.

18           THE COURT:  Mr. Silver is shaking his head no but I'm

19    not taking legal advice from him.

20           MR. KRY:  In the footnote the rule is quoted, which

21    may shed some light on this.

22           MR. COHEN:  If he signs on, that's obviously an issue

23    in the case.

24           MR. KRY:  Yes, so it is either or.

25           THE COURT:  Of course, there was for many years that

1    was not complied with in connection with Goldberg.  He was

2    still getting referral fees.

3              MS. COHEN:  Correct.

4              MR. MASTER:  It was never complied with.

5              THE COURT:  I don't think most other lawyers are

6    getting referral fees under those circumstances but, be that as

7    it may, I don't -- look.  You have argued the case that this is

8    not about the legality of referral fees but I don't think the

9    charge is -- that's not --

10             MR. COHEN:  Certainly the ethics of it.

11             THE COURT:  I'm sorry?

12             MR. COHEN:  Or certainly not about the ethics of them.

13             THE COURT:  That's my concern.  I don't know that

14   anybody else has a concern about that.

15             MS. COHEN:  The government, as we did in our motions

16   *in limine*, we don't want this charge.  We don't think you

17   should give it to the jury.

18             THE COURT:  I don't think it is necessary.

19             MR. KRY:  If it is a question of accuracy we would

20   also proffer a charge saying something like it is not generally

21   unlawful or unethical because we are also concerned about the

22   jury inferring any time there is referral fees for bringing in

23   business it is automatically something improper.  We can debate

24   the specific circumstances but we also just want to negate

25   that.

1          THE COURT:  But there was absolutely no evidence of

2     that.  Every person who was asked said it was proper and

3     acceptable.  So, denied.

4          MR. KRY:  The third one is on the disclosure forms.

5     It says:  Mr. Silver has not been charged with any crime based

6     on the way in which he filled out the state financial

7     disclosure forms.  You may not find Mr. Silver guilty merely

8     because you believe he should have disclosed more information

9     or different information on his disclosure forms.

10          This is a pretty significant issue in the case.  It

11     came up before that there is a risk that the jury may conclude

12     that how the disclosure forms were filled out is one of the

13     crimes at issue in the case when it is not and we need some

14     sort of instruction to clarify that that is just not what's at

15     issue in the case.  This was a pretty salient topic of the

16     government's presentation and so we can't leave that impression

17     with the jury without some kind of instruction on it.

18          MR. MASTER:  We disagree and this applies to statement

19     instruction no. 3 and 4 because it also details with

20     statements.  There is another instruction about statements to

21     the press.  As we have said, it is actually not the case that

22     he was not charged with a crime related to the way in which he

23     filled out statements, disclosure forms and statements to the

24     press because, again, as part of honest services fraud we have

25     to prove intent to defraud and material misrepresentations or

1      omissions or part of that.  This is part of our case and it is

2      proof of his consciousness of guilt as well as proof of one of

3      the elements of that charge.  So, the idea that this is -- and

4      we are entitled to put together the proof that is relevant to

5      those charges, so.

6              MR. KRY:  The instruction doesn't say you can't

7      consider it, it just says you can't find him guilty merely

8      because you believe.

9              MS. COHEN:  I would also add the instruction is about

10     what he is not charged with.  There is a lot of things he is

11     not charged with and the charge is very clear about what he is

12     being charged with.

13             MR. MOLO:  This particular issue, though, Judge, and I

14     agree with your notion of not telling the jury about what he is

15     not charged with but on this specific point, and this gets back

16     to, there was a lot of debate over whether or not this ought to

17     be admitted at all and then we had the back and forth as to

18     what level it should be, the opportunity for the jury to be

19     confused on this point, specifically, about him making a false

20     statement and that is somehow constituting a crime is much

21     higher than it is than it is in these others areas.

22             As to Mr. Kry's point it does say you cannot find him

23     guilty merely because, it does not say you can't consider it as

24     circumstantial evidence of his intent.

25             THE COURT:  Well, if I was going to give the charge I

1    would want it balanced.  That is to say you can't find him

2    guilty merely because you find he should have disclosed more

3    information or disclosed in a different way.  But, if you find

4    that he did not fully disclose his financial circumstances or

5    however it would be worded, that is circumstantial evidence

6    that you can consider for purposes of --

7           MR. MASTER:  Consciousness of guilt and the fraud and

8    whether he is in fact guilty of honest services fraud.

9           THE COURT:  Then the question would be where should

10    that go.

11           MS. COHEN:  I think it is very clear from your charge

12    that this is not what the crime is.

13           THE COURT:  I agree, but I am inclined to --

14           MR. MOLO:  Let us draft something and --

15           THE COURT:  Okay.  It has to be balanced.

16           MR. MOLO:  I understand.

17           THE COURT:  So are you going to go in the opposite

18    direction; 9 a.m. to them, noon to me.  I am inclined on the

19    financial disclosure form, I am not inclined on the statements

20    to the press.  I think it's clear exactly why they put in

21    statements to the press and it is clear that he is not being

22    charged with lying to the press.  It is clear that it is being

23    used as circumstantial evidence that he was trying to cover up

24    his relationship with Glenwood and Witkoff as well as with

25    Taub.  That's the claim.  Whether the jury buys it or not is a

1    different issue.

2            MR. KRY:  Okay, no. 5 is the state grants process.

3            THE COURT:  Not to mention the fact that if people

4    were charged for lying to the press everybody would be in the

5    stocks.

6            MR. KRY:  State grants process:  You heard testimony

7    in this case about whether certain grants that Mr. Silver

8    awarded were subject to competitive bidding or peer review.  I

9    instruct you that there is no requirement under New York Law

10   that those grant proposals be subjected to competitive peer

11   review.  You may not find Mr. Silver guilty merely because he

12   recommended a grant without that process.

13           THE COURT:  So, again, I wouldn't give that charge

14   unless it was balanced and I am not -- I am inclined to say no

15   because I don't want to go down this track of this alone is not

16   enough but you can consider this for that because, as I think

17   we discussed yesterday or the day before, there was never a

18   suggestion that the lack of a peer review made it illegal.

19   There was the suggestion that the lack of a peer review further

20   confirmed the evidence that it was purely a unilateral decision

21   by the Speaker to give the grant.  This was not a matter of

22   scientific review, it wasn't a matter of peer review.  There

23   was nothing beyond Mr. Silver which may have been for good

24   reasons -- your argument it was good research, could have been

25   for bad reasons, the government's case that he was doing it as

FBJ5sil4                        charge conference

1        a *quid pro quo* with Dr. Taub.

2                So, I don't think and I can't imagine either side is

3        going to make any arguments in summation that is going to in

4        any way suggest that it is illegal because there was no peer

5        review.

6                MR. KRY:  There is still a concern that there were a

7        number -- I mean, they're all cited here in the footnote where

8        this topic came out and in addition to the point your Honor

9        just made, I think the he implication there is that the fact

10       that these were not given without competitive bidding somehow

11       insinuated that they were improper.  And so, I do think an

12       instruction along those lines is appropriate.  If the concern

13       is that this instruction is not balanced enough we could

14       propose a balanced instruction to the government on the same

15       schedule as for the other one.

16               MS. COHEN:  No.  This is a very different issue.  We

17       cannot have every fact in this case be this isn't -- you know,

18       that every testimony isn't a crime.  We can't go down that

19       road.  And you are right, your Honor, we are using it that that

20       created the opportunity whereby Silver could commit the crime.

21       We have never argued the other.

22               THE COURT:  Overruled.  I am not giving that one even

23       if it is.

24               MR. KRY:  This next one is 6, sending a message :

25       Mr. Silver, like any defendant, is entitled to be tried on the

FBJ5sil4                    charge conference

charges in the indictment and only on those charges.  You may

not convict Mr. Silver in order to send a message to the public

or to the community at large and this is supported by a number

of cases.

        Often this issue comes up in the context of arguments

made to the jury and whether they're appropriate but it is

equally true as a statement of law and we think appropriate for

an instruction.

        MR. MASTER:  Your Honor, I think if we were to make an

improper argument in summation, rebuttal summation, perhaps a

corrective instruction would be warranted, but I have never

seen such an instruction given in the absence of the misconduct

that's described in that footnote.

        THE COURT:  If I hear arguments like that in summation

I will give the charge but otherwise I'm not going to.  I don't

anticipate hearing such arguments.

        MR. KRY:  No. 7 is the statute of limitations and this

instruction says:  That the statute of limitations for the

charges here is five years.  That means that if you find that

Mr. Silver committed any of the alleged acts constituting

honest services fraud, extortion, or money laundering before

February 19th, 2010, you may not find Mr. Silver guilty on the

basis of those acts.

        That's a legally correct statement of the law.  It is

definitely implicated by the facts here particularly because

1    the State grants were before that date.  So some of the key

2    official acts that we are relying on, at least for the

3    mesothelioma piece of the case, are outside the statute of

4    limitations and we think the jury should be instructed that

5    they can't find Mr. Silver guilty based on those acts.

6                MS. COHEN:  Your Honor, we alleged a scheme.

7                THE COURT:  Scheme.

8                MR. MASTER:  It is a scheme.

9                MS. COHEN:  Correct.

10               MR. MASTER:  And this is actually a misleading

11   description of what a statute of limitations is.

12               MS. COHEN:  Correct.

13               MR. MASTER:  It says:  If you find that he committed

14   any of them before February 19th, 2010 you may not find him

15   guilty.  So, therefore, if a grant was given in 2005 you must

16   find him not guilty.  That doesn't make any sense.

17               THE COURT:  It would have to be that no part of the

18   scheme continued beyond February 19th, 2010.

19               MR. KRY:  Okay, well that would still certainly be

20   better than no instruction on it.

21               MS. COHEN:  No.

22               MR. MASTER:  I mean if the scheme concluded -- are you

23   really saying that the scheme --

24               MR. KRY:  Yes.

25               MS. COHEN:  Then you should have done a motion --

1          MR. KRY:  There is no requirement that you --

2          MS. COHEN:  -- before jury charge.

3          MR. KRY:  Sure, there is, because the jury could find

4    that -- the situation we are concerned about is what if the

5    only issues on which the jury is undecided are the state grants

6    and everything else.  If it is clear there is not evidence of

7    *quid pro quo* then we re entitled to an instruction that says

8    that only if the jury finds that constitutes a scheme are

9    things that ended seven or eight years ago then he can't be

10   found guilty.

11         THE COURT:  It is if the scheme ended more than five

12   years ago?

13         MR. KRY:  Right.

14         THE COURT:  We are more than five years.

15         MS. COHEN:  But the scheme ended.

16         MR. KRY:  Sure, there is.  All the evidence where, for

17   example, there were repeated denials that all of later things

18   that were done were not done in exchange for official facts.

19   The jury could easily conclude that.  The only thing that is

20   even questionable are the state grants and that everything else

21   is not even a close question and in those circumstances we are

22   entitled to a statute of limitations defense.

23         MS. COHEN:  That's not --

24         MR. GOLDSTEIN:  I'm not sure it is true as a legal

25   matter if he continued receipt of referral fees for patients

 1   that he obtained.

 2             THE COURT:  The question is is that part of the

 3   scheme.  The issue is did the scheme continue.

 4             MS. COHEN:  Yes.  I think we presented substantial

 5   evidence.

 6             MR. SHUR:  The problem is that the jury could find

 7   that the scheme ended before the statute of limitations.

 8             THE COURT:  Right.  I have got your point.

 9             MR. COHEN:  Yes, we should shut up now.

10             THE COURT:  Okay, so this is incorrect because you

11   have got the words in the wrong way.

12             MR. MOLO:  We will correct it.

13             MS. COHEN:  We are going to do 9:00 to noon?

14             THE COURT:  9:00 to noon; and also include in that a

15   suggestion of where you want to put that.

16             MR. KRY:  I think this would just go at the end of the

17   section we were just looking at on page 31.

18             There is one other instruction we gave to the

19   government earlier today which is no. 8, if I can pass that up.

20             MS. COHEN:  Is this the stand-alone instruction you

21   wanted?

22             MR. KRY:  Yup, or it could go in a different section

23   but stand-alone would be fine and it just says:  To prove an

24   official act, the government must prove the exercise of actual

25   governmental power, threat to exercise such power or pressure

1   imposed on others to exercise actual governmental power.

2          We had a different official act instruction in our

3   original proposal.  The Court's proposed instructions don't

4   define the term at all.  This one is relevant because there are

5   a number of other circuits out there that have adopted this

6   particular standard and we think it needs some sort of

7   definition.

8          MR. McDONALD:  Your Honor, under the color of official

9   authority definition is one that's been repeatedly used by the

10  Second Circuit, it is one that's been routinely given in this

11  district.  It was recently used by Judge Wood in the public

12  corruption case that is pending before her in denying a motion

13  to dismiss.  It's --

14         MR. MASTER:  *Rosen*.

15         MR. McDONALD:  Yes, it is used in *Rosen*.  It is

16  used -- it has been -- it has been used time and time again in

17  this circuit and the cases that are decided are from out of

18  circuit and incorporates different concepts that --

19         THE COURT:  What are you saying?  I covered this

20  already?

21         MR. McDONALD:  Yes.  Exactly, your Honor.

22         THE COURT:  What page?

23         MR. McDONALD:  Bottom of page 18.

24         THE COURT:  Official action includes any action taken

25  or to be taken under color of official authority.

1           MR. MASTER:  And so that's the Second Circuit

2   standard.  Different circuits have adopted other slightly

3   different --

4           THE COURT:  Language.

5           MR. MASTER:  Like the Fourth Circuit does modified

6   standard.  And these are all out of cases that Mr. Kry is

7   citing.  They're not the governing law in this district so we

8   think that the instruction on this issue that is in the charge

9   is the correct instruction.

10          MR. KRY:  And I mean it is correct that this is

11  supported by out-of-circuit authority.  We still think that's a

12  correct statement of the law.

13          THE COURT:  You know what I think?  I think that's

14  more words that just say the same thing.

15          MR. KRY:  I'm not sure we agree, but.

16          THE COURT:  Okay.  Well, denied.

17          MS. COHEN:  At the risk of incurring wrath I just have

18  a comma that the government would like added on page 14, line 9

19  after the word Dr. Taub.  We just think there has to be a

20  comma.

21          THE COURT:  Why does there need to be a comma there?

22          MS. COHEN:  To make it clear the government is only

23  required to prove that Silver had the corrupt intent.  Just to

24  set that off.

25          THE COURT:  A comma on line 9?

FBJ5sil4                              charge conference

1               MR. MASTER:  Of page 14.

2               MS. COHEN:  Yes; page 14, line 9, to set off the leads

3       for which were given to Dr. Taub, comma, in exchange.

4               THE COURT:  Okay.  Does defense object to that?

5               MR. KRY:  That's pretty subtle.

6               THE COURT:  I don't think it matters but I'm happy to

7       put it in.

8               MS. COHEN:  Thank you, your Honor.

9               THE COURT:  Okay, any comments on the verdict form?

10              MS. COHEN:  No.  Fine with the government, your Honor.

11              THE COURT:  Okay.  So I expect a submission at noon

12      tomorrow then.  We will try to turn it around and get it back

13      to you probably sometime over the weekend so I'm going to ask

14      you to e-mail in if you have -- if you are concerned -- I don't

15      need you to e-mail the concern, I just need you to tell me if

16      you have concerns in which case I will see you at 8:30 Monday

17      morning.  Okay?  I want you to know what's in the charge before

18      you sum up.

19              MS. COHEN:  Right.

20              MR. MASTER:  Sure.

21              THE COURT:  Okay.  So the only way I can accomplish

22      that is if we do it by 8:30 so we should be down to little,

23      minimal issues by then.

24              MR. GOLDSTEIN:  If we meet at 8:30 would it be here or

25      downstairs?

FBJ5sil4                         charge conference

1           THE COURT:  I would say here but the summations are

2      going to be downstairs.  It is going to be a zoo downstairs so

3      that's my proposal.

4           You had some very strong views on how long summations

5      were.

6           MR. MOLO:  I mean I thought -- I thought I would take

7      two hours or up to two hours and the government wanted I don't

8      know, a day or two, I'm not sure what it was.  I thought that

9      is a bit excessive.  I don't know.

10          THE COURT:  Has the government gotten further -- who

11     is doing summation?

12          MS. COHEN:  Mr. Goldstein.

13          MR. GOLDSTEIN:  I think that the summation, the main

14     summation will be up to three hours, no more than three hours.

15          THE COURT:  Perfect.  I was going to give you a

16     three-hour limit so that's perfect.

17          MR. MOLO:  For the whole.

18          THE COURT:  No.  Three hours for the opening

19     summation.  I am also going to give you three hours if you need

20     it.  If you don't need it, don't use it, but at three hours you

21     will stop.

22          MR. MOLO:  I will repeat myself like a loop and they

23     may remember me better.

24          MS. COHEN:  And the rebuttal?

25          THE COURT:  An hour.

1              MS. COHEN:  An hour for rebuttal.

2              THE COURT:  Okay.

3              MS. COHEN:  That's fine.

4              THE COURT:  My plan is to give you a break midway on

5    both of you.  You can either let me call time at an hour and a

6    half or you can figure out about when you are going to want a

7    break and call it yourself.  Just let me know what you want to

8    do.

9              MR. SHUR:  Judge, I assume you are not going to charge

10   the jury the same day.

11             THE COURT:  No.  I can't.  This is going to be a full

12   day so I will charge them first thing Tuesday morning.  Okay?

13             That was what was on my agenda.  Where are you with

14   your last exhibits?

15             MS. COHEN:  Defense provided us with several new

16   exhibits and we still have arguments over the other exhibits.

17             THE COURT:  Okay, well they have to be resolved so

18   they have to be resolved tonight.

19             MS. COHEN:  We are ready.

20             THE COURT:  Okay.

21             MS. COHEN:  To discuss them now.

22             THE COURT:  Let me go get my copy.

23             My little stack of documents was 167, 168, 169, 170,

24   171 and 244.  That was the open issues.  Are you introducing

25   another document into the open issues?

FBJ5sil4                         charge conference

1              MR. SHUR:  I don't know that it was an open issue but

2        there was the issue of the HCRA law.

3              THE COURT:  Yes.

4              MR. SHUR:  So, we have that, if your Honor would like

5        to take a look at it.

6              THE COURT:  Great.  Can I see it?  Is it flagged where

7        in it it mentioned the pool?

8              MR. SHUR:  I sure hope so.

9              MS. COHEN:  Is this Defendant's Exhibit 137?

10             MR. SHUR:  Yes.  That's right.

11             So, the areas flagged indicate the priority

12       distribution pool which is the pool that was mentioned during

13       the course of the trial and the fact that it is divvied up

14       between the Speaker on behalf of the Assembly, the Senate

15       Majority Leader on behalf of the Senate, and the Commissioner

16       of the Board of Health.

17             THE COURT:  Okay.  So, I think the government had

18       already said that you don't object to the bill itself.

19             MS. COHEN:  Correct, your Honor.

20             THE COURT:  Okay, so 137 is in.

21             MR. SHUR:  Did you need a copy, Judge?

22             THE COURT:  No.

23             MR. SHUR:  Okay.

24             MR. GOLDSTEIN:  We look forward to an hour of the

25       summation of the other side going through that bill.

FBJ5sil4                          charge conference

1            MR. COHEN:  You want us to take three hours there,

2     Andrew?

3            THE COURT:  So you had marked another document as 137

4     so it can't be 137.

5            MR. SHUR:  Okay.

6            THE COURT:  Would you like for me to pick a number for

7     you that you didn't use?

8            MR. SHUR:  Please.

9            THE COURT:  82.

10            MS. COHEN:  Defense 82.

11            THE COURT:  Yes.

12            MR. SHUR:  And then the exhibit numbers, Judge, you

13     just mentioned I believe, the progress reports.

14            THE COURT:  82 is okay.

15            The progress reports, right.

16            MS. COHEN:  Right.

17            MR. SHUR:  I believe Defendant's Exhibit 167 is

18     already admitted as Defendant's Exhibit 17.

19            THE COURT:  Okay, so that's irrelevant.

20            MR. GOLDSTEIN:  It is?

21            MS. COHEN:  I'm not sure that's correct.  Let me get

22     my list.

23            MR. GOLDSTEIN:  Do you have a copy of 17?

24            MR. SHUR:  No, but we can get it.  One second.

25            MS. COHEN:  Defense 17 is Taub's progress report on

FBJ5sil4                              charge conference

1  meso center dated March 1st.  I don't know if this is the same

2  one.  That's the problem, because these were drafts in the

3  computer.  I have no idea if this is the same one.

4            MR. SHUR:  The point is --

5            THE COURT:  You are withdrawing it.

6            MS. COHEN:  Okay.

7            THE COURT:  Because it is already in evidence so it is

8  out.

9            MR. SHUR:  So, we are doing 168, 169, 170 and 171.

10            THE COURT:  One at a time.  The question that was

11  supposed --

12            MR. SHUR:  Draft or final.

13            THE COURT:  What is your evidence that they're final?

14            MR. SHUR:  We have no evidence that they're final

15  reports.  Our understanding -- we received these from the

16  government.  The government indicated that they received them

17  from Dr. Taub from his computer and that they don't know

18  whether they're drafts or finals.  The defense's position is

19  regardless, they're relevant to corroborate the fact that the

20  research that was done was legitimate cancer research but

21  wasn't focused on the 9/11 research that was the focus of the

22  grant project regardless of whether they're drafts or finals.

23            THE COURT:  No, but it seems to me whether they're

24  drafts or finals does matter as well as to whom he is

25  reporting.  So, if he is reporting to someone who is not

1    funding anything having to do with 9/11, he is not going to

2    mention, oh, and by the way, this will also be beneficial to

3    people who were exposed to asbestos by 9/11. And these reports

4    were not going back to the state, right?

5              MR. SHUR:  Well, I think that goes to the weight of

6    the evidence, Judge.

7              MS. COHEN:  Correct, your Honor.

8              MR. SHUR:  Because what we have in the record is the

9    fact that, clearly, Dr. Taub understood that Mr. Silver had

10   concerns that the 9/11 research wasn't being done because he

11   prepared talking points addressing that particular concern,

12   talking points that he would use to talk to Mr. Silver.

13             THE COURT:  Say the first part of that again?  I don't

14   think there is any evidence of the first part of your sentence.

15             MR. SHUR:  Well, the fact that Dr. Taub -- and I

16   believe this is part of his testimony as well -- created

17   talking points for a conversation he was going to have with

18   Mr. Silver in which the talking points are specifically focused

19   on addressing the lack of work that was done with respect to

20   the post 9/11 issues.

21             THE COURT:  The lack of work?  I don't think that's

22   right.  I thought it was addressed to the work that was going

23   to be done.

24             MR. SHUR:  Right, but -- and there is also a

25   progression of letters that Dr. Taub is sending to Mr. Silver

in which it is clear he is sort of beefing up, trying to focus

on doing the 9/11 work because that's what Mr. Silver's

interest was, seeing that work done.  And the whole bit about

working with Mount Sinai is also focused on addressing that

concern that the 9/11 work isn't being done and therefore the

funding could stop.

THE COURT:  I disagree with the first part of that.

There is just no evidence of that.

MR. SHUR:  My point is the progress reports tend to

corroborate that.  Now, whether there is an argument to be had

they're not being sent to the State, they're being sent to

someone else so therefore you are not focused on it, that goes

to the weight, not the admissibility.

THE COURT:  I'm not going to let them in.  If this was

a point you wanted to make you should have used them with the

witness so that he could explain and the questions could be

asked.  Otherwise, it is just an out-of-court declaration that

you are using for a purpose that may or may not be accurate and

it is hearsay and so, no, it is out.

244?

MR. SHUR:  244 is the letter from Columbia to the

Department of Labor regarding resolution of the OSHA violation.

THE COURT:  Correct.

MR. SHUR:  There was a question as to where did the

document come from.

1            THE COURT:  And you linked it up, right?  We received

2       the document from the New York State Comptroller's Office in

3       response to a subpoena and so what we provided to the

4       government was the cover letter from the comptroller's office

5       which enclosed the document which is part of the comptroller's

6       contract file for the second grant so it actually is linked up

7       by the number of the grant.  And so, this was part of the

8       contract file found in the comptroller's office.  A lot of that

9       file is duplicative of what's already been introduced.

10      However, to sort of put it in context we are happy to move in

11      the comptroller's contract file itself which isn't voluminous.

12            MS. COHEN:  Your Honor, part of the problem of putting

13      in these documents, while it may be a business record, while it

14      may be authentic, this whole issue about this OSHA violation

15      that they want to focus on, I think they want to use that to

16      argue improperly to the jury certain facts not in evidence and

17      putting this in is what they're going to use to do that and if

18      they wanted to make some argument about the OSHA violation,

19      held up by first contract or second contract, they needed to

20      call a witness to talk about that.  They choose not do that and

21      I think what they're trying to do is put in a document under

22      the auspices that this is a business record related to the

23      contract when there already are the contracts, they're already

24      in evidence.  There is no reason to add yet another contract in

25      evidence except that I believe they want to use certain

1   documents related to OSHA for some totally improper purpose

2   that is not true and is not what happened and there is no

3   evidence about it.  So, we object.

4              THE COURT:  I'm surprised you don't feel strongly

5   about this.

6              MR. SHUR:  Judge, I'm not sure what the alternative

7   theory is in terms of what actually happened but the facts are

8   that it took a while for the grant to be processed because the

9   comptroller's office identified an OSHA violation.

10             THE COURT:  That's the fact that is the problem.  You

11  are saying the because and maybe that's right and maybe that's

12  not right.

13             MR. SHUR:  But the point is the relevance of the

14  document and all of these business records is it shows that

15  there was a process in place that was followed, it wasn't

16  people just shuffling papers.

17             THE COURT:  And you have got that, you have got the

18  evidence of that.

19                  (Continued on next page)

20

21

22

23

24

25

1           MR. SHUR:  But my point is this is not cumulative.

2      What we have in evidence is people at Columbia processing the

3      work.  We have the Department of Health processing the work.

4      This is a new piece.  It's not cumulative of some other

5      evidence.

6           THE COURT:  It is cumulative of the point that you're

7      using it for, which is there was actually a review process in

8      the state which, my recollection is Mr. Molo went through

9      everything in extreme detail in the cross of Mr. Franco maybe.

10          MS. COHEN:  Mr. Franco and Mr. Whalen and Mr. August.

11          THE COURT:  Overruled.  That one is not coming in.

12          What else?

13          MS. COHEN:  The rest of them, your Honor, I believe

14     are new exhibits.

15          MR. SHUR:  They're not new --

16          MS. COHEN:  There are a bunch that are new.

17          THE COURT:  Stop.  Don't argue about whether it's new

18     or not new.  What's the next document?

19          MS. COHEN:  The next document I have is Defense

20     Exhibit 1088.  Is that right?

21          MR. SHUR:  That's fine.  This is a senate bill on the

22     property tax cap bill that was passed by the senate only.  It's

23     relevant because it shows that the property tax cap was a

24     priority of the senate and that it didn't pass in the assembly.

25          This goes to the defense's argument that Mr. Silver in

1   negotiating the rent regulation tied to the property tax cap

2   which would have a pro-tenants outcome because then going

3   forward it would be tied to a property tax cap which is

4   something the senate cared about, but they didn't care about

5   the rent regs.

6          THE COURT:  That came out.

7          MR. SHUR:  That's not to the exclusion of the evidence

8   that corroborates it.

9          MS. COHEN:  Your Honor, if they wanted to use it, it

10  should have been used with Mr. Runes to see whatever context

11  there is.

12         MR. SHUR:  Ms. Cohen --

13         THE COURT:  Don't even talk to her.  Talk to me or

14  talk to nobody.

15         MR. SHUR:  Done, Judge.

16         THE COURT:  According to this, this passed the senate,

17  and then it died in the assembly.  Then it was returned to the

18  senate, and it was referred to finance.  It appears that it

19  didn't pass.

20         The question is -- I'm sorry.  I don't know what this

21  proves.  Tell me again what this proves.

22         MR. SHUR:  Sure.

23         THE COURT:  It doesn't prove this was a priority of

24  the senate.  It proves that the senate passed it.

25         MR. SHUR:  It wasn't passed in the assembly as part of

FBJYSIL5

```
 1   the effort to tie it to the rent regulation laws.  It was an
 2   open issue that Mr. Silver then tied to the rent regulation
 3   laws.
 4            THE COURT:  How is that shown?
 5            MR. SHUR:  It doesn't definitively prove that, but it
 6   certainly tends to corroborate that argument.  It's a building
 7   block to making that argument.
 8            THE COURT:  The point is that this doesn't -- you're
 9   going to put this in for the jury to figure out from this that
10   there's no tie in this law to rent regulation?
11            MR. SHUR:  No.  That it wasn't passed in the assembly.
12   It was an open item to be tied to the rent regulation law.
13            MS. COHEN:  Your Honor, this is the problem that
14   introducing all these bills with no context.  If they wanted to
15   march the jury through the history of all that, they could have
16   called a witness, and they chose not to.
17            THE COURT:  Tell me again what this bill does.
18            MR. SHUR:  If I understand it correctly, it died in
19   the assembly.  So the assembly did not pass this because of the
20   effort to tie it to the rent regulation law.
21            MS. COHEN:  There's no testimony to that in the
22   record.
23            MR. SHUR:  There is.  Mr. Runes testified that --
24            THE COURT:  He testified that it was this bill that
25   was the issue?
```

FBJYSIL5

1          MR. SHUR:  That the property tax bill that Mr. Silver

2     attempted to tie the property tax bill to the rent regulation

3     law which would be pro-tenant.

4          THE COURT:  There's evidence to that effect?

5          MR. SHUR:  This supports that testimony.

6          THE COURT:  I'm not letting that in.  That would be

7     confusing for the jury.

8          MR. SHUR:  109 is a senate bill that shows that the

9     senate was advocating for a stronger version of 421a, including

10    a new tax exemption for converting commercial buildings into

11    residential buildings.  Then what was ultimately passed -- it's

12    relevant to the compromise between the assembly and the senate.

13         THE COURT:  Here is my feeling on this -- you have a

14    whole stack of these.  This is going to be meaningless to the

15    jury because legislation is meaningless to everyone other than

16    the staffers that work on it.

17         So the only way anybody is going to make heads or

18    tails out of this is by the lawyers telling them what's in

19    here, and that's improper.

20         If you wanted to develop this whole back-and-forth,

21    this bill, that bill, this does this, that does this, that's

22    why Silver had a big kumbaya, him and Mr. Skelos came together

23    and said, this is what we're going to do, you need testimony on

24    that.

25         I just can't let bills go to the jury for the defense

 1    to describe.  So no.

 2              MR. SHUR:  The next one is 143, which is the Budget

 3    Reform Act.  It simply shows that Mr. Silver was a cosponsor of

 4    the bill.  The relevance there --

 5              THE COURT:  It's the what?

 6              MR. SHUR:  Budget Reform Act.

 7              THE COURT:  Of what year?

 8              MR. SHUR:  2007.  The relevance is the government's

 9    argument is that the grants stopped because the Budget Reform

10    Act required additional disclosure.

11              The response to that we want to show that Mr. Silver

12    cosponsored the same bill that it continued to give them grant

13    money.  There's no evidence currently if the record of that.  I

14    did ask Mr. Franco the question.  He said he didn't know.  So

15    this just proves that point.

16              MS. COHEN:  Again, this is sort of the same problem.

17    Introducing all these bills with no context with no one on the

18    witness stand.

19              THE COURT:  Will the government stipulate that Silver

20    was a cosponsor of the bill?

21              MR. SHUR:  That's the only fact.  So that would be

22    sufficient.

23              MS. COHEN:  The Budget Reform Act?

24              THE COURT:  They want it to say that he was a

25    cosponsor of the bill.

FBJYSIL5

```
1              MS. COHEN:  Then we would put on testimony about what
2      cosponsorship means.  Had this come up on the stand, we would
3      have asked a question, what does it mean to cosponsor a bill,
4      and Mr. Runes, among others, would have told us that it's not
5      particularly meaningful.
6              MR. SHUR:  It did come up.  A question was asked.
7              MR. GOLDSTEIN:  Just so the record is clear, the
8      government's theory is not that this bill is the only reason
9      why the disclosure rules changed.
10             It was a series of things that all happened right at
11     this time to enhance the disclosure requirements.
12             MS. COHEN:  The disclosure forms to the Attorney
13     General's office, the internal Ways and Means.
14             MR. GOLDSTEIN:  So whatever probative value, if there
15     really is any, of Sheldon Silver cosponsoring this piece of
16     legislation, among others, is outweighed by trying to put it in
17     at the end of a case where there's no context to it at all.
18             MS. COHEN:  And claim that the cosponsor is something
19     that it's not.  And claim -- the witness, if he had been asked
20     when he was on the stand, would have explained it's essentially
21     meaningless.
22             THE COURT:  Some of my concern is -- because I don't
23     know what all is in here.  It's hard to assess -- I understand
24     what the defense wants to use it for.  It's sort of hard to
25     assess what that -- what it means if he was a cosponsor of this
```

1    bill which does lots of things.

2         MR. SHUR:  We're happy to draft a stipulation that

3    focuses on the relevant piece of the bill so that jurors aren't

4    having to sort through this and trying to make sense of it.

5         It's a very simple fact.  The additional disclosure

6    pursuant to the Budget Reform Act, which the government said is

7    one of the things that caused Mr. Silver to stop giving grant

8    money was cosponsored by Mr. Silver.

9         MS. COHEN:  The stipulation doesn't deal with the

10   issue that had it been raised when people were on the stand, we

11   could have elicited testimony about what it actually means.

12        MR. SHUR:  Judge, the whole point of this -- I just

13   want to make sure there's no confusion -- is we didn't put on a

14   defense case.

15        So we're trying to streamline this by not dragging out

16   the trial any longer than it needs to be about considering

17   facts that are undisputed.

18        I don't think there's any dispute that Mr. Silver

19   cosponsored the Budget Reform Act unless I'm missing something.

20        MR. GOLDSTEIN:  Our argument is that there really is

21   no probative value of that if there's been no testimony as to

22   which parts of the bill he was in favor of, what the background

23   was.

24        THE COURT:  That's been my concern about all this.  I

25   don't know why things happened.  For whatever reason the

FBJYSIL5

1    government decided not to try the case based on what was

2    happening in closed-door meetings and what staffers were saying

3    to each other and why things were happening.

4            So you're just kind of left with the result that

5    things did happen.  I personally think the probative value is

6    not substantial, but I can't say that it's zero.  It's a

7    defense proposal.  I'll let it in, but I would prefer for it to

8    come by virtue of a stipulation.

9            MS. COHEN:  Why don't you draft something.

10           THE COURT:  Okay.  1438.

11           MS. COHEN:  If we can agree on a stip, we want to --

12   we'll just have the first page of it.

13           MR. SHUR:  We'll prepare something.

14           THE COURT:  What's next?

15           MR. SHUR:  144, which is an email chain.  The gist of

16   this, Judge, is that it tends to prove that Ms. Rapfogel,

17   Mr. Silver's chief of staff, had directed the letter regarding

18   the Jonathan Taub resume and job to Ohel as opposed to

19   Mr. Silver.

20           MS. COHEN:  That's exactly the problem with putting in

21   the document without the witness.

22           THE COURT:  Let me read it.  You can only put this in

23   if you have a live witness.

24           MR. SHUR:  Okay.

25           MS. COHEN:  They've already said they're not going to

 1    call witnesses.

 2            THE COURT:  If they change their mind, they change

 3    their mind.  If you're going to change your mind, let me know.

 4            MR. SHUR:  I understand, Judge.

 5            The next document or exhibit is 145-03.  The relevance

 6    of this -- this shows that the other two recipients of the

 7    resolution also received a proclamation, meaning that Dr. Taub

 8    wasn't treated differently than the other two recipients.  All

 9    three of them received resolutions and proclamations.

10            THE COURT:  Is there any objection?

11            MS. COHEN:  Well, I would note that Deb Miller would

12    is on the number two line was on the witness stand.  There must

13    be a reason that they didn't ask her about it.

14            THE COURT:  Do you object?

15            MS. COHEN:  Is there a reason you want to put this in

16    that you didn't ask Deb Miller?  If I could hear that, maybe I

17    wouldn't object.  I'm not so sure.

18            MR. SHUR:  I did not examine Ms. Miller.  So I can't

19    personally answer that question.

20            THE COURT:  The question was why didn't you ask

21    Ms. Miller about the proclamations for the other --

22            MR. SHUR:  I'm not sure that's a relevant question.

23            MS. COHEN:  They actually did ask her about it.  They

24    just didn't put in the document.  I just want to know if

25    there's something else behind it.  If the answer is you forgot,

FBJYSIL5

1    that's fine.

2                 MR. SHUR:  There's no nefarious reason why Ms. Millers

3    wasn't asked about the proclamation.

4                 THE COURT:  I'm going to let 145-03 in.  How many more

5    are there?  I'm asking if the government objects to all of

6    them.

7                 MS. COHEN:  We do.

8                 MR. SHUR:  This is 148 and 150.  Both have to do with

9    the Shalom Task Force.  148 is a letter from Mr. Silver to a

10   few people -- Ms. Waldman, Ms. Lax, Ms. Weintraub -- informing

11   them that he had met with Shalom Task Force leaders recently

12   and thanking them for contacting his office and praising their

13   work.

14                It tends to show that there was a noncorrupt reason

15   for --

16                THE COURT:  No.  You need a witness for that.  You

17   need a witness.

18                150.

19                MR. SHUR:  150 is a little bit different in that --

20   actually a lot different.  It's the letter from Shalom Task

21   Force to Mr. Silver's office requesting the grant money.

22                As you may recall, minimal testimony from Dr. Taub

23   Shalom Task Force came into the case was that he had edited a

24   letter -- it was actually a draft of this letter.

25                The edits of Dr. Taub's letter in the red-lined

1   version that came from his computer -- none of them made it

2   into the final draft which I think tends to show that Dr. Taub

3   wasn't involved in the process of requesting the money.

4           MR. GOLDSTEIN:  There's no evidence that that's the

5   final draft.

6           MS. COHEN:  This is not a signed draft.  If you're not

7   calling a witness from Shalom --

8           MR. SHUR:  This came from the assembly's offices.

9           THE COURT:  No.  You need a witness for that.

10          MR. SHUR:  The next is 149, which is a group exhibit

11  of letters of recommendations for jobs that Mr. Silver wrote

12  for a number of people which show that the Jonathan Taub and

13  Amy Bandler jobs, in terms of Mr. Silver helping out with them

14  getting jobs was not an outlier and again would show -- tend to

15  prove it was not for a corrupt reason.

16          MS. COHEN:  Your Honor, they're hearsay.  They're not

17  relevant.  Other letters of recommendation to other people are

18  not relevant.

19          THE COURT:  One of them appears to be for Saul

20  Weprin's daughter, Joy Weprin.  I assume that's the

21  assemblyman's daughter?

22          MR. COHEN:  Granddaughter.

23          THE COURT:  No.  You need a witness for this.  I have

24  to say -- is this the sole -- is this all of them?

25          MR. SHUR:  No.  It's just a sampling.  We could put

FBJYSIL5

1    together another doorstop, Judge, if you'd like.

2                MR. COHEN:  I could get another resolution box.

3                MR. SHUR:  The next group of exhibits are assembly

4    records from Mr. Silver's office that are remarks that

5    Mr. Silver made at different official events regarding the air

6    quality in lawyer Manhattan after 9/11.

7                THE COURT:  No.  What's the exhibit number?  No.

8                MS. COHEN:  205, 208, 209, 210, 211, 212, 213, and

9    215.

10               MR. SHUR:  And 216 and 217.

11               THE COURT:  Essentially 205 through 217.

12               MS. COHEN:  Skipping 206 and 207.

13               MR. SHUR:  And 214.

14               THE COURT:  What else?

15               MR. SHUR:  This is Exhibit 237.  It is -- this relates

16   to the grants to Columbia.  So the executed contract -- what

17   happens in the grant review process is the contract gets

18   executed, which is in evidence, but there's still additional

19   process that has to take place with the comptroller's office,

20   etc.

21               So this memo actually shows the date on which it was

22   actually approved informing Columbia.  It sort of completes the

23   narrative and completes the time frame that we're talking

24   about.

25               THE COURT:  This was sent -- this doesn't appear to be

FBJYSIL5

1    sent to Columbia or Presbyterian.

2              MS. COHEN:  I have 237 and 240 as different ones.

3              MR. SHUR:  What happened here was -- we could

4    introduce it with the executed contract.  If you read the text,

5    it says attaches your copy of the approved contract.

6              I think we have a business records certification that

7    goes along with it that indicates that this was actually sent

8    to the hospitals.  We have one for each of the two contracts.

9              THE COURT:  Any objection?

10             MR. GOLDSTEIN:  I think the contracts themselves have

11   signature blocks.

12             MR. SHUR:  My point is they're executed, but then

13   there's additional process that takes place before it's

14   actually approved.

15             MS. COHEN:  Isn't that additional process already in

16   the contracts?

17             MR. SHUR:  No.  It says -- these dates are

18   different --

19             THE COURT:  This date is different.

20             MR. SHUR:  -- from the executed contract date or the

21   approved date.  There are additional steps that need to take

22   place.

23             MS. COHEN:  I actually think this is confusing, again.

24   I don't know what extra steps they want to argue at closing

25   that aren't in evidence that were taken.

FBJYSIL5

1          We had numerous witnesses on the stand about the
2     contract.  I just don't get it.  Unless they want to argue
3     about steps that aren't in evidence.

4          THE COURT:  Is your point that the money didn't start
5     flowing until after March 8, 2006?

6          MR. SHUR:  It wasn't even finally approved until that
7     date.

8          THE COURT:  I'm not sure that's true.  This doesn't
9     say that.  This just says attached is the copy of the approved
10    contract.  It doesn't say that it wasn't finally approved until
11    then.

12         My vaguest of all recollections is there are times
13    when an oral goes so the agency can tell the grantee that
14    everything has been approved and then like paperwork follows.

15         MR. SHUR:  Right.  It also indicates that payments
16    aren't to be made until certain steps are taken.

17         THE COURT:  That's all in the contract.  So no.  That
18    one is out.

19         What's next?

20         MR. SHUR:  241 is just the same document.  240 is the
21    same document for the other grant.

22         THE COURT:  So same ruling on that.  No.

23         MS. COHEN:  I have 241.

24         MR. SHUR:  241 is -- I guess it's called a call list.
25    It's an assembly document.  I think actually simpler documents

1    were introduced by the government.

2            The relevance to this one is that page 5 shows that

3    new HCRA is to be processed and includes the second grant to

4    the Meso Center.

5            The relevance of this is that Dr. Taub had sent a

6    request letter to Mr. Silver for the second grant in

7    March 2006.  This shows that it's not approved until June 2006.

8    So it's not as if Mr. Silver is jumping to get this done.

9            Further, Dr. Taub -- this is in evidence.  The

10   government introduced this document into evidence -- that

11   there's an October 2006.

12           So after it was internally approved within the

13   assembly, Dr. Taub, months later in October 2006, is sending a

14   letter to Mr. Silver following up saying, what about my second

15   grant, which shows a little bit of a disconnect between

16   Mr. Silver and Dr. Taub and that he's approved it and that

17   information hasn't been communicated to Dr. Taub.

18           So if you're in a corrupt relationship --

19           THE COURT:  I understand why you want it in.  You need

20   a witness for that.

21           MR. SHUR:  The next document is 300, which is a group

22   exhibit of legislative initiative forms that simply show that

23   Mr. Silver was -- the government opened and said that a lot of

24   worthy public health projects were not funded because

25   Mr. Silver was giving money to Dr. Taub's research.

1              This simply shows that during the relevant time period

2      Mr. Silver was funding a variety of different worthy public

3      health projects.

4              THE COURT:  No.  This can't come in.  This is sort of

5      like he didn't do bad things some days.  They didn't say that

6      he used up all of his money.

7              MR. SHUR:  They did say that other worthy projects

8      weren't funded, which suggested --

9              THE COURT:  By definition, if $250,000 went to this

10     project, that $250,000 couldn't go to the other project.

11             MR. SHUR:  Fair enough.  There are two outstanding

12     issues, and then I think we're done.  One is in response to the

13     discussion yesterday, Judge, about the defense had proposed a

14     stipulation having to do with the fact that the engagement

15     letter and tax cert matter doesn't need to be filed with the

16     Court.

17             THE COURT:  Yes.

18             MR. SHUR:  I understand, if I remember correctly, that

19     your Honor's concern, in terms of the relevance of that

20     information, is that what's relevant is Mr. Runes' state of

21     mind.  He might have incorrectly thought it was filed, and

22     that's what's relevant in terms of the side letter; right?

23             THE COURT:  Yes.

24             MR. SHUR:  In response to that, what we would like to

25     introduce are for one or two tax cert matters that Golberg &

FBJYSIL5

1      Iryami handled for Glenwood, one or two before the side letter

2      and one or two after the side letter, the records that were

3      filed with the relevant agencies would show that the engagement

4      letter was not included.

5                  THE COURT:  How does that solve the problem?

6                  MR. SHUR:  Maybe it's not relevant to Glenwood or to

7      Mr. Runes' state of mind, but it's certainly relevant to

8      Golberg & Iryami who drafted the side letter and who engage in

9      those tax cert matters and filed those documents.

10                 So, clearly, at least with respect to Golberg &

11     Iryami's state of mind, they were not preparing a side letter

12     to avoid having to have Mr. Silver's involvement disclosed to a

13     court because they had to file an engagement letter because

14     they didn't, and that wasn't part of the process, and they knew

15     that.

16                 So I understand maybe not relevant to Glenwood or

17     Mr. Runes, but it's certainly relevant to Golberg & Iryami.

18                 THE COURT:  Why is that relevant?

19                 MR. SHUR:  Well, Golberg & Iryami actually prepared

20     the side letter.  I think the government's argument is that

21     everyone involved in the side letter prepared it because they

22     didn't want Mr. Silver's involvement to be known to the world.

23                 THE COURT:  Iryami didn't know anything about it;

24     right?

25                 MS. COHEN:  Correct.

FBJYSIL5

1          THE COURT:  So any questions to her fell on deaf ears

2     because she didn't know.  The only witness that testified about

3     this that was asked a question was Runes.

4          MR. SHUR:  That's not true.

5          THE COURT:  No.  That was asked the question of why

6     the side letter.  What was being accomplished by a side letter.

7     His testimony, which is the only testimony in the record, is we

8     were -- in essence, he thought the retainer agreement had to be

9     filed, but the side letter wouldn't have to be.

10          MR. SHUR:  Right.

11          THE COURT:  So the only evidence in the record is

12     that.

13          MR. SHUR:  But I think the concern is -- and I think

14     the prejudice -- is that the jury could conclude from

15     Mr. Runes' testimony that that is in fact the case, that it

16     gets filed.  Therefore, Golberg & Iryami also prepared it to

17     avoid the disclosure.

18          THE COURT:  Here is the thing.  If you want to get

19     that in, you're going to have to call somebody who can testify

20     to it and let them be subject do cross-examination.

21          MR. SHUR:  Then the final issue --

22          THE COURT:  Frankly, I would love to have the answer

23     to that.

24          What did they think they were accomplishing?

25          MR. SHUR:  There are some times side letters prepared

FBJYSIL5

1    in connection with transactions.

2              THE COURT:  There's almost always a reason.

3              MR. SHUR:  They didn't call Mr. Dorego.  So we're

4    never going to find out I guess.

5              THE COURT:  Nor did you.

6              MR. SHUR:  We don't have the burden.

7              THE COURT:  I understand that.

8              MR. SHUR:  The last issue is during yesterday's

9    testimony, the agent who testified about the summary charts --

10   there's an issue that came up that -- I don't know if you

11   remember there was sort of a summary chart that involved like

12   almost like a round-trip transaction, if you will.

13             THE COURT:  Yes.

14             MR. SHUR:  So I think I mentioned something at the

15   bench that I should probably correct because just very quickly

16   but I think this background is helpful, there was an account

17   that was frozen in connection with the forfeiture orders that

18   was an investment account of Mr. Silver's that was managed by a

19   company called Hugh Johnson, which is an investment adviser.

20             We had made a request to the government to have the

21   money manager continue to manage the funds.  The government

22   asked us if they could reach out to the money manager and do

23   some due diligence about the money manager, and we agreed.

24             That turned into us consenting to the money manager

25   producing documents relating to Mr. Silver's account

1    voluntarily versus pursuant to subpoena.

2            I think maybe a few weeks before trial, the money

3    manager reached out to us to say that the government inquired

4    about a transaction involving Mr. Silver's sister.

5            Before we voluntarily disclosed information regarding

6    this transaction, we needed Mr. Silver's consent.  Our

7    understanding, based on Hugh Johnson's description to us of the

8    transaction is simply that Mr. Silver's sister also has an

9    account at that investment adviser firm and that there was a

10   check that bounced.

11           I forget exactly what the circumstances were, but

12   there was a short-term loan from Mr. Silver who sent a check to

13   cover the amount that was owed on the sister's account, and she

14   repaid the balance of that prosecute Mr. Silver.

15           Our understanding from talking to Hugh Johnson was

16   that that information was going to be relayed to the

17   government.  The government inquired.  We consented.

18   Apparently, that was never connected up, and they never talked

19   to the government about that is my understanding.

20           MR. GOLDSTEIN:  We reached out, and they never

21   contacted us back.

22           MR. COHEN:  If I am right in what I said at the bench

23   and it's Mr. Silver's sister, there's no nefarious purpose to

24   it.

25           MR. SHUR:  I don't know that we have a problem with

FBJYSIL5

 1    the chart, and it's factually correct.  I don't know if the

 2    government -- what the government plans on arguing in

 3    connection with that chart or that transaction.

 4          But it's simply the business records of that

 5    transaction which indicate it's Mr. Silver's sister and what

 6    the circumstances were surrounding that transaction, whether

 7    that can be done by stipulation or the business records, that's

 8    the last remaining item from the defense.

 9          MR. GOLDSTEIN:  We're not planning to argue in

10    summation that transaction was nefarious except to the extent

11    that --

12          MR. MASTER:  It involved proceeds of the crime.

13          MS. COHEN:  We're not arguing that the loan

14    back-and-forth was nefarious.  It was just to trace the money.

15          THE COURT:  I thought it was very curious.

16          MR. SHUR:  My understanding of the 1957 charge is the

17    money doesn't need to bounce around a bunch of times.  It just

18    needs to be deposited once basically for 1957.  So I wasn't

19    sure why the government highlighted that transaction on the

20    summary chart.

21          If I was sitting on the jury, I'd be saying, who is

22    that person and what is this transaction all about?

23          MR. GOLDSTEIN:  There are parts of the transaction

24    that were highly suspicious.  We provided you with a draft of

25    that chart a month ago.

FBJYSIL5

       1              For us -- we did not hear from Hugh Johnson.  You

       2     didn't tell us that there was some improper insinuation from

       3     the chart.  So then we put it on properly.  So I'm not sure I

       4     understand what the issue is.

       5              MR. SHUR:  The only issue is the business records that

       6     indicate it's Mr. Silver's sister and the circumstances of the

       7     transaction.  We're happy to do a stipulation or to offer it up

       8     as business records.

       9              MS. COHEN:  The records are in evidence.

      10              MR. MASTER:  We also asked you if we could include the

      11     Arlene Lerer Banco Popular and Fidelity accounts.

      12              MR. SHUR:  I don't think the records that were

      13     introduced -- correct me if I'm wrong -- indicate that it was

      14     Mr. Silver's sister and the circumstances of the transaction.

      15              MR. MASTER:  In terms of the circumstances of the

      16     transaction, they are what they are.  There was a substantial

      17     balance in the Fidelity account at the time that the money was

      18     moved in, and there remained a substantial balance afterwards.

      19              So in terms of the representation that this is some

      20     short-term loan, I don't understand why --

      21              MS. COHEN:  It would be hearsay.

      22              THE COURT:  What you're telling me is that -- do you

      23     have the chart?

      24              MS. COHEN:  Mr. Coccaro can pull it up.

      25              THE COURT:  It's a curious transaction.  Is your

FBJYSIL5

1    premise that that $100,000 was because the sister had bounced a

2    check?

3              MR. SHUR:  There was a shortfall.  Right.

4              THE COURT:  But the $100,000 goes in, and $250,000

5    goes out.  So, to the extent there was a shortfall, more than a

6    shortfall came out of the sister's account to the sister's

7    Fidelity account.

8              So $100,000 goes into Banco Popular.  A quarter of a

9    million dollars the same day comes out of Banco Popular down

10   into the Fidelity account.

11             MR. COHEN:  Mr. Silver's only role is lending his

12   sister the money, and then she returns it in four or five

13   months or something like that.  It's on that chart.

14             THE COURT:  The $100,000 just kind of takes a trip

15   through Arlene Lerer's accounts but then comes back and drops

16   into JoRon, which is why they needed to do this, because the

17   HSBC account didn't have a big enough balance until the money

18   round tripped back into the account to do the JoRon investment.

19             So the chart itself was entirely proper.  What you're

20   trying I think to argue is that this was a legitimate

21   transaction where Mr. Silver loaned his sister $100,000.

22             His sister then kind of again, without having anybody

23   on the stand and being able to cross-examine them, you would

24   say, well, why didn't you just deposit the 100K into the

25   Fidelity account?  Why trip it through Banco Popular?

FBJYSIL5

1      MR. COHEN:  What's the value of all this is the

2  question?

3      THE COURT:  They had to do it because for their money

4  laundering count, they've alleged that's one of the

5  transactions, is the deposit of $16,000 on May 29 into JoRon,

6  and they can't trace that -- to trace from the illicit funds,

7  they have to trace through the Arlene Lerer's account.

8      MR. SHUR:  Is that one of the money laundering

9  allegations?

10      MR. MASTER:  It was one of the transactions.  It was

11  transaction 7.

12      MR. COHEN:  I don't think you need that generally for

13  the money generally going from Mr. Silver's accounts into an

14  account at Financial.

15      THE COURT:  You do because you can't trace it

16  otherwise.  They could have charged that the money laundering

17  was moving the money from the HSBC account to the Banco Popular

18  account.  That would have satisfied the 1957 charge, but that

19  wasn't what they charged.

20      MR. COHEN:  I guess the question is:  What are they

21  proposing to say about that transaction?  Ms. Cohen said before

22  that they're not suggesting that there was something nefarious

23  about this.

24      MS. COHEN:  About the loan?

25      THE COURT:  About the round trip.

FBJYSIL5

1            MR. COHEN:  About the return of the loan.

2            MS. COHEN:  No.  We're just showing how the money

3    moved, which we have to show.

4            MR. COHEN:  I don't know if they need to show that.

5            MS. COHEN:  We do.

6            THE COURT:  They have alleged in one of their money

7    laundering counts that illicit proceeds were deposited to JoRon

8    Management.  They have to prove that the funds were illicit

9    funds.

10           MR. COHEN:  They don't need that transaction for that.

11           THE COURT:  They do.  I don't know what you're asking

12   me to do.  If you can work out something with the government --

13           MS. COHEN:  We're not going to make the argument.

14           MR. SHUR:  Just a stipulation that that's Mr. Silver's

15   sister so that it's not some random --

16           THE COURT:  Are you willing to stipulate to that?

17           MR. SHUR:  Part of the problem is her last name is the

18   same name as one of the investments.  It's confusing to the

19   jury.

20           MS. COHEN:  We'll stipulate that Arlene Lerer is

21   Sheldon Silver's sister.  You can just read that in when you

22   put your exhibits in.  Just say that.

23           MR. COHEN:  I also said that the reason why you raised

24   the issue that she was care of on the account in New York, and

25   I said if it was accepted that she was in London.  That's why

FBJYSIL5

```
 1    her name was on the account.
 2              MS. COHEN:  We're not going to go down the road of why
 3    different money is being moved.  We're not going to make the
 4    argument.  We're happy to stipulate it's his sister.
 5              THE COURT:  Will you say during your summation that
 6    there's nothing nefarious about the triangle?
 7              MS. COHEN:  No.  We're not going to be pulling out
 8    anything that's not nefarious.
 9              MR. GOLDSTEIN:  We're not going to say this is a
10    completely legitimate transaction.
11              MS. COHEN:  It's his sister.
12              There is also defense Exhibit 247, Mr. Cohen, which is
13    your chart.
14              MR. COHEN:  Yes.
15              MS. COHEN:  It was identified at trial but not
16    admitted.
17              MR. COHEN:  In fairness, there is a slight change.
18    I've discussed it with Mr. Master.  That is not exactly the
19    exhibit that was shown to the agent.
20              MS. COHEN:  Do you want to make it 247-1?
21              MR. COHEN:  247-1.
22              MS. COHEN:  These are the percentages.  She couldn't
23    do the calculations on the stand.
24              THE COURT:  What's the issue?
25              MS. COHEN:  We don't have an issue, your Honor.
```

FBJYSIL5

1          MR. COHEN:  They're accepting it.

2          THE COURT:  247-1.  Then there will be a sister

3     stipulation.

4          MS. COHEN:  I assume you're not going to do it in

5     writing.  You're just going to say it.

6          THE COURT:  Anything else?

7          MS. COHEN:  There are proposed transcript changes.  We

8     have shown them to the defense.  They are fine with all of them

9     except the one that is the Court's language.  They think we got

10    wrong.  So we leave it up to you, your Honor.

11         MR. SHUR:  That's our position.  It doesn't appear to

12    be correct in the transcript.  I'm not sure that the

13    government's changes --

14         MS. COHEN:  Which is why we leave it up to your Honor.

15         THE COURT:  I don't even know what I'm looking at.

16         MS. COHEN:  Mr. Coccaro can pull it up for you.  It's

17    page 451.

18         MR. GOLDSTEIN:  It's the third entry in this chart.

19         THE COURT:  I think I said it would have been righter

20    if they would have given you more money.

21         MR. SHUR:  That makes sense.

22         MS. COHEN:  Righter.

23         THE COURT:  Not the most articulate.  So "It would

24    have been righter if they would have given you more money, I

25    bet."

FBJYSIL5

1           MS. COHEN:  With that correction, I'm going to give

2      this to the court reporter.

3           Your Honor, now that we've ruled on all the exhibits,

4      can we be told if there are going to be any witnesses on Monday

5      morning?

6           THE COURT:  Is there changing anything?

7           MR. SHUR:  It doesn't change anything, Judge.

8           THE COURT:  So no witnesses.

9           MS. COHEN:  There will be no witnesses?  Confirmed?

10          MR. SHUR:  Correct.

11          MS. COHEN:  And all of these exhibits that have

12     already been ruled on to be admitted.

13          THE COURT:  So just to confirm, you both have

14     responsibilities to exchange proposed drafts including where

15     they go in the charge at 9:00 tomorrow morning.  Submit it to

16     me at noon tomorrow.

17          We'll re-do the charge.  We'll get it out to you as

18     soon as possible.  You need to let me know by Sunday morning if

19     there are any substantial issues.  If so, email to chambers box

20     by noon on Sunday.  If so, we'll meet at 8:30.  Otherwise, you

21     need to be in at 9:15.

22          MR. COHEN:  You have our motion under advisement?

23          THE COURT:  I have your motion under advisement.  I

24     will let you know if it's granted.

25          MR. MOLO:  And they get three hours.  We get three

FBJYSIL5

1    hours?

2            THE COURT:  It's three, three, one.  You get a break

3    midway.  We'll break for lunch.  If all goes well, if the

4    jurors are here on time and there's no new 12 exhibits that you

5    have to have rulings on, we should start summations at about

6    9:45, which means we break for lunch, have an hour break for

7    lunch, defense summation, we take a break, rebuttal summation,

8    they go home for the day.

9            MR. MASTER:  To we're done at 5:30.

10           THE COURT:  More or less.  Feel free to shorten any of

11   these times.

12           MR. SHUR:  Judge, just one minor point.  I don't think

13   you're going to care.  I know it sounds like you're going to

14   charge the jury on Tuesday.

15           THE COURT:  Yes.

16           MR. SHUR:  I have a meeting scheduled at the deputy

17   Attorney General's office on another matter on Tuesday.  I'm

18   going to try to reschedule.  If I can't reschedule, I wasn't

19   sure if I could potentially be excused.

20           THE COURT:  You're excused.

21           If either of you are using demonstrative charts in

22   your summation, you must provide the other side with a copy of

23   the chart by noon Sunday.

24           If there are any objections to each others chart and

25   you can't work them out between you, you need to tell me by

FBJYSIL5

1      5:00 on Sunday and be here at 8:30.

2              If there are new charts and the other side objects,

3      you're not going to get to use your chart.

4              MS. COHEN:  Other than what we've shared.

5              THE COURT:  Other than what you've shared.

6              MR. GOLDSTEIN:  In terms of how one defines "chart,"

7      we're doing like a timeline.

8              THE COURT:  I think we can now go off the record.

9              (Adjourned to November 23, 2015, at 9:15 a.m.)