FBN5sil1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

                v.                           15 Cr. 0093(VEC)

SHELDON SILVER,

                    Defendant.

------------------------------x

                                             November 23, 2015
                                             9:25 a.m.


Before:

                    HON. VALERIE E. CAPRONI,

                                             District Judge
                                               and a Jury
                              APPEARANCES

PREET BHARARA
        United States Attorney for the
        Southern District of New York
BY:   CARRIE H. COHEN,
        ANDREW D. GOLDSTEIN,
        HOWARD S. MASTER,
        JAMES M. McDONALD,
            Assistant United States Attorneys

STROOCK & STROOCK & LAVAN LP
        Attorneys for Defendant
BY:   JOEL COHEN
            - and -
MOLOLAMKEN, LLP
BY:   STEVEN F. MOLO
        JUSTIN SHUR
        JUSTIN ELLIS
        ROBERT KRY
        TUONGVY LE

FBN5sil1

1              (Trial resumed; jury not present)

2              THE COURT:  Okay.  We have a number of matters to

3      discuss.  First off, juror no. 1 is sill not mobile and she's

4      got a doctor's appointment tomorrow.  I'm open to hear the

5      parties if they wish to excuse her.

6              MS. COHEN:  Your Honor, do you know what time is the

7      doctor's appointment and if it is possible to work around it?

8              THE COURT:  The message that she left said she cannot

9      come in tomorrow, she's got to be fitted for an orthotic or a

10     shoe.

11             MS. COHEN:  Your Honor, the government has no problem

12     excusing her.

13             THE COURT:  Mr. Molo?

14             MR. MOLO:  Here we are at the end of the trial, your

15     Honor.  I would appreciate it if the Court can make some

16     further inquiry to find out.

17             THE COURT:  Here is my view.  I picked alternates so

18     that we could finish the trial.  We have three alternates.  We

19     are ready to sum up.  It seems to me that time has come to use

20     an alternate.

21             MS. COHEN:  Your Honor, the government wouldn't object

22     if you wanted to make a phone call.

23             THE COURT:  I got the voice mail from her.  She needs

24     transportation.  I have provided her transportation for three

25     days which is, I think, a gracious amount.  But, the bigger

FBN5sil1

1    problem is she can't be here tomorrow so that would mean we are

2    not going to get this trial done and the jury deliberating

3    before Thanksgiving and that just doesn't make sense when we

4    have alternates.

5              MR. MOLO:  May I have a moment, please?

6              THE COURT:  You may.  Absolutely.

7              (Counsel conferring)

8              MR. MOLO:  Your Honor, as I said, we would prefer to

9    go forward with this jury but if the Court is going excuse her

10   she's going to excuse her.

11             THE COURT:  Okay.  I'm going to excuse her.

12             Mike, go ahead and give her a call and tell her she's

13   excused.

14             The other hanging chad is the defense Rule 29 motion.

15   That motion is denied.

16             You have received now the red lined jury charge?

17             MS. COHEN:  We have them.

18             THE COURT:  I think I have heard everything that I

19   need to hear from the parties on that, so that's the charge.

20   If you detect something that somehow something has gotten

21   radically messed up in the last version let me know, but

22   otherwise, that's it.

23             I got a letter late -- yes.

24             MR. KRY:  Your Honor, I noted that there was a portion

25   of an instruction that I think both sides consented to about

FBN5sil1

1    circumstantial evidence and the fact that the jury could draw

2    an inference from the absence of any corrupt intent on the part

3    of the witnesses and relying on circumstantial evidence of

4    Mr. Silver's good faith.

5          THE COURT:  I did not think that was necessary.  I

6    thought it was redundant of other things that are in the jury

7    charge and it was just entirely unnecessary.

8          MR. KRY:  Thank you, your Honor.  We object to the

9    exclusion of that.

10          THE COURT:  Understood.

11          I have received a letter late last night or maybe it

12    wasn't late last night, it was sometime yesterday, regarding a

13    proposed defense demonstrative evidence that appears to be the

14    New York Stock Exchange with a gigantic American flag in front

15    of it.

16          Mr. Molo, do you want to be heard?

17          MR. MOLO:  I withdraw the exhibit.

18          THE COURT:  I am glad I didn't spend a lot of time on

19    that one.  Okay.

20          I also received an exchange of letters regarding

21    Dr. Taub's testimony regarding receiving requests from

22    Mr. Silver for cases.  Who is talking?  Why don't we start with

23    the defendant who is objecting.

24          MR. SHUR:  Good morning, your Honor.

25          Your Honor, our understanding of the purpose of that

FBN5sil1

1   evidence coming in was simply for Dr. Taub's state of mind in

2   terms of the effect on the listener given it is a hearsay

3   statement, I believe it is double hearsay.

4           THE COURT:  Given -- I'm sorry -- you are going to

5   have to --

6           There is one disadvantage of this courtroom over mine,

7   the acoustics are terrible.

8           MR. SHUR:  Given it is a hearsay statement, Judge.

9           THE COURT:  Ms. Cohen, do you want to be heard?

10          MS. COHEN:  Your Honor, this is not a hearsay

11  statement and as we stated to the Court in our letter, there is

12  absolutely nothing wrong with the government arguing from the

13  testimony at trial that Dr. Taub sent cases to the defendant.

14          THE COURT:  So I went back and looked at the

15  transcript and on page 269 the government asked Dr. Taub:

16  "Q  At some point after that encounter with Sheldon Silver, did

17  you come to learn that Sheldon Silver wanted you to send him

18  mesothelioma cases?

19  "A  Yes."

20          No objection.

21  "Q  Was that a specific request made to you?

22  "A  Yes, it was."

23          Still no objection.  And then the question was:

24  "Q  And what was your understanding of what Sheldon Silver

25  wanted by wanting cases?"

FBN5sil1

1          He started to answer that question which implicated

2     the conversation that he had had with Mr. Chill.  There was an

3     objection that was sustained.  We then came to side bar.  At

4     side bar the parties informed me that there had been a

5     discussion to try to avoid the hearsay problem because, "there

6     is no dispute that it was Sheldon Silver who communicated to

7     Dr. Taub his desire for cases."  And so, whether or not it came

8     through Mr. Chill, the issue was his understanding that Sheldon

9     Silver wanted cases is why he started sending him cases.  Then

10    the question is put:

11    "Q  Now, approximately how much time had passed between that

12    encounter when you asked for help and the request that you

13    received to send Sheldon Silver cases?

14    "A  Between a week and two weeks."

15          And again, there was no objection.  So, what am I

16    missing?

17          MR. SHUR:  Judge, in terms of there being objections

18    or no objections, I think there was a discussion and side bar

19    as to how this evidence would come in but the issue, we

20    believe, is that it came in to show Dr. Taub's state of mind as

21    to why he did it when he did it.  It did not come in for the

22    truth of the matter asserted meaning that Mr. Silver asked

23    Dr. Taub for cases.  And so, the reason that this came up in

24    terms of why the defense filed a letter yesterday is in the

25    Rule 29 -- during the Rule 29 conference the government argued

FBN5sil1

1    that Mr. Silver requested or -- I forget the exact verbiage --

2    but requested cases from Dr. Taub, arguing that evidenced that

3    it came in for the truth of the matter asserted versus it

4    coming in for the purposes of showing Dr. Taub's state of mind.

5         THE COURT:  Ms. Cohen?  Mr. Goldstein?  Somebody?

6         MS. COHEN:  Your Honor, the evidence regarding

7    Dr. Taub is not admitted with any limiting instruction as to

8    state of mind.  There is absolutely no reason the government

9    cannot argue, based on Dr. Taub's testimony which was not

10   objected to and there was no limiting instruction that Dr. Taub

11   sent cases to the defendant at the defendant's request.  The

12   government did not elicit, pursuant to the parties' agreement,

13   anything related to Daniel Chill, which was the reason for the

14   agreement at the side bar.

15        THE COURT:  That was my understanding, that this was

16   all done to avoid getting into the Chill testimony.

17        MR. SHUR:  That's correct, but I don't know that that

18   changes the fundamental principle that it's double hearsay.

19   And while there wasn't a limiting instruction given to the

20   jury, it still came in to show, for the purposes of showing,

21   Dr. Taub's state of mind.

22        THE COURT:  That was not my understanding and that's

23   not -- I don't think that's a fair reading of what happened at

24   side bar.  I think the defense, at side bar, did not object

25   when Mr. Goldstein said that there was an agreement, that there

FBN5sil1

1    was no contention other than that the request came from

2    Mr. Silver and that you were -- you had an agreement of how to

3    work your way through to avoid what was otherwise a hearsay

4    problem.  And there was no suggestion at side bar or objection

5    that the defense wanted that testimony limited only to

6    Dr. Taub's state of mind.

7         MR. SHUR:  Just to make sure that the record is clear,

8    this is -- according to the government this is Mr. Chill or --

9    this is Mr. Silver telling Mr. Chill to tell Dr. Taub that he

10   wants cases.

11        THE COURT:  There is no doubt that that, had they

12   tried to elicit that, that would have been objectionable but

13   again, from the side bar -- because I sustained your objection

14   to exactly that, to what Mr. Chill told Dr. Taub Mr. Silver had

15   told him.  But then, at side bar, Mr. Goldstein said we are

16   trying to work around the hearsay issue and my understanding is

17   that there is no dispute that it was Sheldon Silver who

18   communicated to Dr. Taub his desire for cases.  So, he says:

19   So, I understand why you sustained the objection.

20        I said:  So what's the deal that you are all trying to

21   work around?

22        Mr. Molo says:  They weren't going to introduce the

23   conversation that just almost came in.

24        So, it was clear that there was an understanding that

25   they would not seek to get that conversation in.  That makes a

2835

FBN5sil1

```
 1    lot of sense because short of calling Mr. Chill, they would
 2    have never gotten that conversation in.  That was not my
 3    understanding of the defense's objection and there was no
 4    limiting instruction given at the time because there was no
 5    objection.
 6             Okay.
 7             MR. SHUR:  We understand the Court's ruling.  We don't
 8    want to interrupt the government's closing.  Just for the
 9    record to the extent they make those types of arguments, we
10    object to them.
11             THE COURT:  Your objection is overruled but you now
12    have it for the record.
13             MR. SHUR:  Thank you, Judge.
14             THE COURT:  Thank you.
15             Is there anything else as a preliminary matter that we
16    need to deal with?
17             MS. COHEN:  No, your Honor.
18             THE COURT:  Who is putting all the defense exhibits?
19             MR. SHUR:  I am happy to, Judge.
20             THE COURT:  I am indifferent on who to call on.
21             MR. SHUR:  We are happy to, just for the record --
22    there is two stipulations that were discussed at the last
23    conference but the parties have agreed on and we have copies
24    for your Honor.  I don't know that we plan to necessarily read
25    them to the jury but rather just offer them into evidence.
```

2836

FBN5sil1

1          THE COURT:  Okay.  That's fine.  We are checking on

2     whether we have the jury yet.

3          (Pause)

4          THE COURT:  Good, we have a jury.  Anything further

5     before I bring the jury in?

6          MS. COHEN:  Not from the government.

7          MR. SHUR:  Judge, just for the record, this is

8     Defendant's Exhibit S-8 and S-9 --

9          THE COURT:  Okay.

10         MR. SHUR:  -- that we offer into evidence.

11         THE COURT:  Okay.  Do you want to do it in front of

12    the jury?

13         MR. SHUR:  I don't know that that is necessary.

14         MS. COHEN:  I think you should.

15         THE COURT:  Yes, let's do it in front of the jury.

16         MR. SHUR:  Sure.

17         THE COURT:  Mr. Goldstein, would you like to call your

18    own halfway mark?

19         MR. GOLDSTEIN:  I would like to do it.  It will be a

20    little longer than a half, I think.

21         THE COURT:  Okay.

22         (Continued on next page)

23

24

25

center

FBN5sil1

1            (Jury present)

2            THE COURT:  Good morning, ladies and gentlemen.

3            THE JURY:  Good morning.

4            THE COURT:  Okay.  You will remember when we last saw

5    everybody that was on Wednesday, the government had just rested

6    so now it is the defendant's turn.

7            Mr. Shur?

8            MR. MOLO:  Your Honor, the defense rests.

9            THE COURT:  Okay.

10           MR. MOLO:  I'm sorry.

11           THE COURT:  The defense doesn't rest?

12           MR. MOLO:  The defense doesn't rest.

13           THE COURT:  Mr. Molo got ahead of himself.

14           MR. MOLO:  We still have more work to do.

15           MR. SHUR:  Your Honor, this has already been done but,

16   for the record, the defense moves into evidence two

17   stipulations by the parties marked defendants S-8 and S-9.

18           THE COURT:  S-8 and S-9 are received.

19           (Defendant's Exhibits S-8 and S-9 received in

20   evidence)

21           MR. MOLO:  I am told we can now rest.

22           THE COURT:  The other exhibits are moved?

23           MR. SHUR:  Those are moved.  I am happy to walk

24   through them now, Defendant's Exhibit 137, 143 --

25           THE COURT:  Hang on a second.  137 is not one of the

FBN5sil1

1      exhibits that we had discussed.

2              Can I see the parties at side bar?

FBN5sil1

1                    (At side bar)

2                    THE COURT:  The list of exhibits that we discussed

3      were 20, 82, 143 or a stipulation that that provision is in the

4      law; 145-03, 162-1, 162-2, 163, 175, 176, 179, 230 through 235

5      inclusive, 243, 245, 247-1, and what I was calling the sister

6      stip.

7                    MR. SHUR:  Right.

8                    THE COURT:  Okay?  So I don't know what number you

9      just called but that's not one of them.

10                   MR. SHUR:  Unfortunately it was the same document but

11     it was referred to with two different exhibit numbers.

12                   THE COURT:  Okay.  Does that list correspond to --

13                   MS. COHEN:  What was the other exhibit number you had

14     for Defendant's Exhibit 137?

15                   MR. SHUR:  I believe it is 82, right?  Is that right?

16                   THE COURT:  That could be.

17                   MR. SHUR:  So we are referring to it as 82?

18                   THE COURT:  Because 137 was already used for a

19     different exhibit.

20                   MR. SHUR:  Understood, Judge.  So 20, 82.

21                   THE COURT:  Read them in front of the jury.

22                   MS. COHEN:  I don't have 20 -- what is 20 -- on my

23     list.

24                   THE COURT:  It is this.

25                   MS. COHEN:  Oh, Defendant's Exhibit 172 as amended I

FBN5sil1

1    have.

2              MR. SHUR:  143 was the Budget Reform Act.

3              MS. COHEN:  Right.  That's the stip.

4              MR. SHUR:  We now have a stipulation.

5              MS. COHEN:  Correct.

6              THE COURT:  Okay?  All right.  Thank you.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBN5sil1

```
 1                (In open court)
 2                THE COURT:  Okay.  Go ahead.
 3                MR. SHUR:  Defendant's Exhibit 20, 82, 145-03, 162-1,
 4    162-2, 163, 175, 176, 179, 230 through 235, 243, 245 and 247-1.
 5    And, as mentioned earlier, Defense Exhibits S-8 and S-9 which
 6    are two stipulations by the parties.
 7                THE COURT:  Any objection to those exhibits?
 8                MS. COHEN:  No objection, your Honor.
 9                THE COURT:  Those exhibits are all received.
10                (Defendant's Exhibits 20, 82, 145-03, 162-1, 162-2,
11    163, 175, 176, 179, 230 through 235, 243, 245 and 247-1
12    received in evidence)
13                THE COURT:  Now, Mr. Molo?
14                MR. MOLO:  I am advised that we now can rest, your
15    Honor.
16                THE COURT:  Okay.
17                Does the government have any rebuttal case?
18                MS. COHEN:  No, your Honor.
19                THE COURT:  All right.
20                Ladies and gentlemen, both sides have now rested.
21    That means you have heard all of the evidence that you are
22    going to hear.  The next step is summations.  The government
23    gets to go first and last on summations because they have the
24    burden of proof.  Summations are going to last -- the
25    government summation will take us to the lunch break.  We will
```

FBN5sil1                         Summation - Mr. Goldstein

1    have one break about midway through to give you time to stretch

2    your legs and to have a cup of coffee.  Okay?

3            So, with that, Mr. Goldstein?

4            MR. GOLDSTEIN:  Thank you, Judge.

5            This case is about the corruption crimes committed by

6    this man, Sheldon Silver, the defendant.  It is about whether

7    Sheldon Silver gave the people of New York his honest services

8    as federal criminal law requires.  The simple answer, clear as

9    day, is no.

10           Sheldon Silver was anything but honest.  His services

11   were corrupted by his greed and his lies, by bribery, by

12   kickbacks, by extortion.  And after more than a decade of

13   abusing his official position and taking advantage of those

14   around him to line his pockets with millions of dollars, he

15   finally got caught and the full picture of his corruption was

16   exposed here in this court house.  What you heard during this

17   trial is what Sheldon Silver secretly has been doing for

18   years -- cheating, lying, and getting away with it.  But now,

19   members of the jury, you have learned the truth about the

20   defendant's crimes and he can't get away with it any longer.

21   During the summation I'm going to walk you through the key

22   evidence in this case, the evidence that we presented to you

23   over the last three or so weeks.  I'm going to explain to you

24   how that evidence proves that the defendant is guilty as

25   charged, that he is guilty of every count in the indictment.

FBN5sil1                    Summation - Mr. Goldstein

1          The evidence shows that the defendant made millions of

2     dollars through two corrupt schemes.  First, he sent taxpayer

3     money to a doctor -- Dr. Taub -- who he knew was hungry for

4     research funds.  And why did he do that?  He sent that state

5     money to Dr. Taub in order to get lucrative multi-million

6     dollar patient referrals from Dr. Taub.

7          Second, he abused his enormous power over real estate,

8     over real estate developers in order to get developers to send

9     millions of dollars of their business to his friend Jay

10    Goldberg who was paying him kickbacks on the side.

11         Ladies and gentlemen, the evidence is in.  It is

12    clear.  It is overwhelming.  Before I go through it in more

13    detail I want to start with just a few key points that are not

14    complicated and that don't require a lot of context.  It is

15    evidence that points to one and only one conclusion:  That the

16    defendant is guilty beyond a reasonable doubt.

17         There are three simple reasons right off the bat,

18    three reasons that you know the defendant is guilty:

19         First.  The testimony of Dr. Taub.  Dr. Taub told you

20    all that you need to know about the asbestos scheme right at

21    the beginning of this trial.  He told you again and again

22    exactly why he sent his patients to Sheldon Silver.  Those were

23    the leads that were worth millions of dollars to Sheldon

24    Silver.  He told you that he sent them there, and I quote,

25    because he wanted Silver to help him obtain funding for

FBN5sil1                    Summation - Mr. Goldstein

1    mesothelioma research.  And what did the defendant do in

2    exchange?  He did just what Dr. Taub asked for, he gave

3    Dr. Taub's clinic half a million dollars in taxpayer money.

4    That's it.  *Quid pro quo*.  This for that.  Asbestos referrals

5    for state grants.  Plain as day.  Why did Sheldon Silver do it?

6    He did it for the money.

7              Ladies and gentlemen, I'm going to say this as plainly

8    and clearly as I can.  If you believe Dr. Taub -- if you

9    believe Dr. Taub -- then this part of the case is over.  It is

10   over.  Just look at the e-mails that Dr. Taub sent to his

11   trusted friend and colleague back in 2010 way before Dr. Taub

12   ever thought he would be a witness at this case.  He put it

13   right there in black and white:  *I will keep giving cases to*

14   *Shelly because I may need him in the future -- he is the most*

15   *powerful man in New York State.*  That's Government Exhibit

16   595-1.  That's the reason he gave the cases to Sheldon Silver

17   and Sheldon Silver knew exactly why he was getting those cases

18   from Dr. Taub.  And Sheldon Silver, in turn, used his office

19   again and again to keep those valuable leads coming.

20             So, even if there were no other evidence in this case

21   besides Dr. Taub -- and there is plenty and we will talk about

22   it -- if there is no other evidence, you know that Sheldon

23   Silver is guilty of the asbestos scheme.

24             The second thing right off the top, right off the bat,

25   the secret retainer.  This is on the real estate scheme.  You

FBN5sil1                    Summation - Mr. Goldstein

1   saw it with your own eyes at this trial, a document that the

2   defendant desperately hoped a jury would never ever see, there

3   it is in black and white, the Speaker of the New York State

4   Assembly, a man who postured for himself that he was

5   Mr. Tenant, he was supposed to be the tenant's advocate in

6   those meetings with the Governor and with the leader of the

7   State Assembly and in those meeting he is on a secret retainer

8   to the landlords, to the wealthiest developer of real estate in

9   New York City.  Let me repeat that:  The man the tenants

10  thought was their advocate was on secret retainer to the

11  largest developer of luxury real estate in New York.  That is

12  not honest services.  That is dishonest services.

13          And again, why did he do it?  He did it for the money.

14  While he was negotiating the rent laws, pushing through massive

15  tax breaks for these developers and approving more than a

16  billion dollars in state financing for these developers, he was

17  on secret retainer to that developer.  That's it, clear as day.

18  Even if there were no other evidence on the real estate

19  scheme -- and again, there is plenty and we will talk about

20  some of that evidence -- that document, that secret retainer

21  alone tells you all that you need to know as to why Sheldon

22  Silver is guilty of the real estate scheme.

23          The third thing right off the top, and this you saw

24  again and again in this trial, the secrets and the lies.  The

25  defense has argued throughout their questions in this case and

FBN5sil1                    Summation - Mr. Goldstein

1    in opening statement, and I am sure that they're going to argue

2    again this afternoon that all of this, all of what you saw at

3    this trial is politics as usual.

4              Mr. Molo told you in his opening statement that the

5    defendant's conduct was "normal."  He said it was, and this is

6    a quote, he said it was, "the way that our founding fathers of

7    New York State wanted it to function."  That is outrageous.

8    The founding fathers of this state wanted public officials to

9    abuse their positions to line their pockets of millions of

10   dollars?  You know that's not right.  And here is the thing:

11   The defendant knows it too.  He knows it too because that is

12   why he lied about these schemes to everybody.  He lied

13   repeatedly and he lied to everybody.  And why do people lie?

14   Why do people hide things?  Why do people keep secrets?

15   Because they have something to hide, not because they're doing

16   what our founding fathers wanted them to do.  And in a case

17   about honest services, those lies scream guilt.  He lied on his

18   disclosure forms year after year after year.  You saw those

19   forms.  He never once revealed that he was bringing in hundreds

20   of thousands of dollars from Goldberg & Iryami, his friend's

21   law firm who was paying him kickbacks.  He lied to the public

22   solemnly saying that so many clients came to him for his help

23   that he had to spend hours every Friday reviewing the merits of

24   their cases to see which ones to give to Weitz & Luxenberg

25   when, in truth, as you saw at this trial, all he did was get

FBN5sil1                    Summation – Mr. Goldstein

names and numbers from Dr. Taub and pass them along.  That's
all he did.  Another lie.

He lied to the press and the public again and again
saying that he only represented little people with no business
before the State when he actually was on secret retainer to a
real estate giant whose very business depended on the State,
who appeared before the State all the time.  And remember,
ladies and gentlemen, this was toward the end of the trial; he
made those statements about only representing people with no
business before the State, you heard him, he was tapping the
table as he told that to the reporters -- lying to their faces
tapping the table.  And you know exactly why he was lying --
because he was committing a crime.

What did the defendant do when he wasn't blatantly
lying?  He came up with bogus distinctions even to an actual
close friend like Brian Meara.

Brian Meara, you may recall, was the lobbyist for
Glenwood who has known the defendant for 42 years.  He had no
interest in being a witness at this trial but he told you the
truth and he told you how, back in December of 2011 while Brian
Meara was on vacation in Florida, he got a phone call from the
defendant and the defendant told him that he only represented
Glenwood's LLCs, their buildings, and not Glenwood itself so
what he was doing must have been okay, it must not have been a
crime.  Remember what Brian Meara told you about that?  He told

1    you that that distinction was so false and ridiculous that he

2    was left shaking and disturbed and he made sure never to

3    discuss the subject again.  You heard him.  The topic, it was

4    too dangerous.  I didn't want to be involved.  I didn't want to

5    get involved.

6            And when Sheldon Silver wasn't telling outright lies

7    and making these bogus distinctions he was keeping secrets --

8    keeping secrets from everybody.  He directed Dr. Taub to never

9    tell their mutual friend Danny Chill about the referrals.

10           Danny Chill, Dr. Taub told you, was one of his closest

11   friends and he was the one that introduced him to Sheldon

12   Silver.  But Danny Chill was the one person -- the one

13   person -- who was close to knowing the full corrupt truth

14   because he worked with Dr. Taub on those State grant letters.

15   He knew that Dr. Taub was applying for the State money.  So

16   Sheldon Silver had to make sure that Danny Chill did not know

17   about the referrals.  That would have been too dangerous so

18   Sheldon Silver ordered up a coverup and told Dr. Taub to keep

19   his mouth shut when talking to Danny Chill.

20           The evidence showed that Sheldon Silver was a master

21   of every form of deception -- lying, keeping secrets, even

22   splitting hairs.  Ask yourselves:  Why did he do that?

23           Why do people lie?  Why do people keep secrets from

24   their closest friends?  Why do people try to draw ridiculous

25   distinctions that make people close to them feel uncomfortable?

FBN5sil1                    Summation - Mr. Goldstein

1    People do that when they know that what they're doing is wrong.

2              Now, what have you heard from the defense in this

3    case?  Now, as you know and as Judge Caproni will instruct you

4    and has already instructed you, the government has the burden

5    of proof at all times.  We embrace that burden, we have met

6    that burden here.  The defense doesn't have to put on any case

7    at all but when the defense does make arguments as they did at

8    the beginning of this case, and make arguments through their

9    questions during cross-examination, you should scrutinize those

10   arguments.

11             Ladies and gentlemen, the defense that has been put

12   before you in this case is preposterous because the defense

13   boils down to this:  That this is all just one big coincidence,

14   an accidental payoff that the defendant got $4 million -- $4

15   million -- for doing no work at all, doing nothing other than

16   passing along names, that he got all that money for reasons

17   that have nothing to do with the fact that he was one of the

18   three most powerful people in New York.  Pure coincidence, the

19   defense would have you believe.

20             The defense can't deny that Sheldon Silver sent half a

21   million in state money, taxpayer money to Dr. Taub's research,

22   a doctor who, by the way, made it very clear that he only

23   referred his patients to lawyers who supported research.  The

24   defense can't deny it but the defense would have you believe

25   that those grants and all the money that he was bringing in

Case 1:15-cr-00093-VEC   Document 162   Filed 12/15/15   Page 24 of 241          2850


FBN5sil1                    Summation - Mr. Goldstein

1   from those referrals, that they had nothing to do with each

2   other, no coincidence, no connection.  According to the

3   defense, Dr. Taub referred all those patients to Sheldon Silver

4   just because they were friends.  And you know that that is

5   false, ladies and gentlemen.  You know that it was not just a

6   coincidence that the defendant gave Dr. Taub those grants and

7   that Dr. Taub gave Silver those clients.  That defense is

8   absurd.  And because it is absurd the defense has done here

9   what you saw Sheldon Silver do for years -- distract, confuse,

10  split hairs, make things seem much more complicated than they

11  really are, spend hours asking witnesses irrelevant questions,

12  offering documents that have nothing to do with the facts of

13  this case, point to random pieces of the jigsaw puzzle hoping

14  that you, the jury, don't put it together.

15          I'm going to talk more throughout the summation about

16  some of these defense distractions but there are two arguments

17  right off the bat that the defense has made that are so

18  misleading and wrong that I want to dispense with them right

19  away.  The first one is friendship -- the friendship defense.

20          I want to be clear about this, this is important.

21  What the defense wants you to believe, what they need you to

22  believe is that the $3 million payoff that Sheldon Silver got

23  had absolutely nothing -- zero -- to do with why Sheldon Silver

24  sent those State grants to Dr. Taub and gave him all those

25  other official benefits.  Nothing at all.  Because if Silver

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FBN5sil1                    Summation - Mr. Goldstein

1    sent the grant and gave those benefits even in part, just one

2    part for the money, the $3 million, that it is illegal.  That's

3    it.  If just a part, if one part of his motivation was for the

4    money, then he has committed a crime.  And you know that the

5    money obviously played a role.

6          There are other reasons why this friendship argument

7    doesn't work.  It is not supported by any of the evidence in

8    the case.  There was zero evidence of any friendship at all at

9    the time that Dr. Taub and Sheldon Silver started talking about

10   the referrals and started talking about the grants.  They

11   barely knew each other.  Dr. Taub told you how he had to be

12   introduced to Sheldon Silver back in 2003 when they first had

13   that discussion.  And even through all the time period after

14   that, through all the referrals he has never been to Sheldon

15   Silver's house, Sheldon Silver has never been to his house,

16   they don't do meals together, no sports.

17         Remember, there was a chart that Special Agent Deanna

18   Pennetta from the FBI walked you through toward the end of the

19   case of the phone records of Sheldon Silver and it shows who he

20   spoke to on the phone.  And you can see, looking at this chart,

21   he spoke to his friends, people who were his friends, Brian

22   Meara, Arthur Luxenberg, Jordan Levy, he spoke to all the time,

23   hundreds and hundreds of times.  The defense wants you to

24   believe that Sheldon Silver is not a talkative guy.  That's not

25   true.  But when did he talk to Dr. Taub?  He only talked to

FBN5sil1                    Summation - Mr. Goldstein

1    Dr. Taub about the referrals to get the referrals.

2            And here is another thing to know about this

3    friendship defense:  It doesn't matter -- it doesn't matter --

4    even if you think that Dr. Taub and the defendant really were

5    friends -- something that you don't have to make a decision

6    about -- it doesn't matter at all.  Friendship is not a defense

7    bribery, it is just an attempt to distract you.  Don't just

8    take my word for it.  I expect that when you receive

9    instructions from Judge Caproni on the law at the end of

10   closing arguments that she will tell you that a *quid pro quo*

11   can exist even in a friendly relationship.  So, whether or not

12   Sheldon Silver has some friendship with Dr. Taub it just

13   doesn't matter.  So, that's the friend defense.

14           What is the second defense that you should reject

15   right away?  It is this constant effort by the defense to

16   convince you that people other than Sheldon Silver were

17   innocent of crimes, people like Dr. Taub, Brian Meara, Richard

18   Runes, the other lobbyist for Glenwood, Dara Iryami.  I think

19   the defense asked each of them over and over again if they

20   thought they were bribing Sheldon Silver.  But, here is what

21   the defense ignores and what they want you to ignore:  None of

22   those people are on trial here.  Sheldon Silver is and Sheldon

23   Silver alone.  The only question before you is whether Sheldon

24   Silver was taking official action in order to get those

25   millions of dollars.  And when you look at the evidence you

FBN5sil1                    Summation - Mr. Goldstein

1    know he clearly was and so the defense points this way and that

2    way and they want you to consider whether people who were not

3    even charged with the crime are themselves guilty of a crime so

4    that you won't look at the clear criminal intent of the only

5    person who really is on trial here, the person who had all the

6    power, the person who set the whole thing up, the person who

7    kept everyone in the dark, the person who took in all those

8    millions of dollars -- Sheldon Silver is the one on trial here

9    and it is his corrupt intent, and his alone, that matters.

10           And again, you are not going to have to take my word

11   on this.  I expect that Judge Caproni will tell you as a legal

12   matter that the government is required to prove only that

13   Sheldon Silver acted with an intent to defraud.  I expect her

14   to tell you that the intent of the party giving the thing of

15   value may be different from the intent of the party receiving

16   the thing of value.  This is common sense, ladies and

17   gentlemen.  It is common sense.

18           The fact that these other people around Sheldon Silver

19   did not know or think that they were committing a crime is not

20   surprising or odd at all.  It makes sense.  These were the

21   people who Sheldon Silver used and took advantage of.  They're

22   people who Sheldon Silver kept in the dark.  They were told

23   only what they needed to know.  Brian Meara, Sheldon Silver's

24   friend of 42 years, he told you this.  He told you that Sheldon

25   Silver tells you what he wants you to know.  He tells you what

1   he wants you to know.  And of course Sheldon Silver did not

2   want these people involved in his schemes to know or think

3   about the whole picture, to know that he was abusing his power

4   and taking advantage of them.  So, the fact that they did not

5   fully understand how they were being used by Sheldon Silver is

6   not a defense, it is the opposite.  It is powerful evidence of

7   Sheldon Silver's guilt.  So, all of it, the hours and hours

8   spent on cross-examination on this topic, it was another

9   attempt by the defense to confuse and to distract so that you

10  don't focus on the overwhelming evidence of Sheldon Silver's

11  guilt.  Don't let him get away with that.

12          Now, before we get into the evidence in more detail I

13  do want to spend a minute talking about what is at the heart of

14  the charges in this case and what the government has to prove.

15  It is as simple as this:  Did Sheldon Silver accept payments or

16  things of value intending, at least in part, to take official

17  action in return for those payments as the opportunities arose?

18  The money doesn't have to be Sheldon Silver's only motivation,

19  just one part, any part.  As we talk about the evidence, the

20  answer to that will be clear as day:  Of course Sheldon Silver

21  was motivated, at least in part, by the money.  It was $4

22  million.  Common sense tells you that that played a role.

23          Let me also spend a minute on what the government does

24  not have to prove in this case because the defense tried to

25  confuse you on that as well, tried to confuse you every step of

FBN5sil1                    Summation - Mr. Goldstein

1    the way during this trial about what it is the government

2    actually has to prove and there are three things I want to talk

3    about:

4              One -- and you would not know this about the questions

5    asked by the defense -- but there does not need to be an

6    explicit agreement between Sheldon Silver and Dr. Taub, or

7    between Sheldon Silver and the developers or Jay Goldberg for

8    the defendant to be guilty.  In fact, there does not need to be

9    an agreement at all.  As we just talked about, it is the

10   defendant and only the defendant who is on trial here.  The

11   government has to prove that Sheldon Silver -- and Sheldon

12   Silver alone -- acted with criminal intent.

13             Second, remember all those questions asked by defense

14   counsel about whether any one specific act was made in exchange

15   for a payment?  Well, I expect that Judge Caproni will instruct

16   you that the government does not have to prove that any

17   particular action would be taken in exchange for a private

18   benefit.  Rather, it is sufficient if the defendant would take

19   official action as the opportunities arose and that is what

20   happened here.  When the opportunities came up for Dr. Taub and

21   for the developers, Sheldon Silver kicked into action and used

22   his official power on their behalf and that's it and that's a

23   crime.

24             Third.  Remember all those questions about Sheldon

25   Silver supporting a good cause?  Giving money to a great

FBN5sil1                    Summation - Mr. Goldstein

university?  Passing rent laws that have some protections for
tenants?  None of that matters either.  It's totally irrelevant
whether or not the policies at issue here are good or bad.  I
expect that Judge Caproni will instruct you -- specifically
instruct you -- that it does not matter that the actions that
the defendant took were beneficial or desirable to the public.
It doesn't matter.  In fact, I expect Judge Caproni will
instruct you that you can find the defendant guilty even if you
find that he would have taken the same action -- the same
action -- even if no bribe or kickback had been paid.  So, all
those defense questions about how great some of these things
were, they're meaningless.  And in any event, Sheldon Silver
did not take those actions because they were a good cause and
you know that.  He did these things for the money and I'm going
to have a lot to say about that as we go through them more.

         So, let's dispense with the nonsense, the nonsense
that's been put forward to you by the defense and let's talk
about the evidence, the evidence that you saw at this trial and
this is evidence that Sheldon Silver desperately tried to keep
buried for years.  We are going to start by talking about the
asbestos scheme.

         Now that the evidence that Sheldon Silver tried to
keep secret has been uncovered, the interesting thing about
this case is that he can't deny all the basic facts and the
basic facts, by themselves, undisputed, are devastating proof

1    of the defendant's guilt.  So, here is what you know and what

2    the defendant can't deny:

3              First, the defendant got one hell of a quid from the

4    asbestos scheme.  Government Exhibit 1509, this was admitted

5    toward the end of the trial and is a list of all the patients

6    of Dr. Taub who Sheldon Silver received payment from, referral

7    fees from.  48 names.  48 names, more than $3 million and

8    counting because you also heard that these cases are still

9    paying out.  That's the quid; 48 cases for the $3 million and

10   counting.  Sheldon Silver can't deny it, not any longer.  So,

11   let's look at the quo that Sheldon Silver gave out to get that

12   money.  And the defendant gave Dr. Taub all kinds of quo.

13   There were at least 10 official actions, uses of his power that

14   Sheldon Silver took for Dr. Taub during this scheme.  Ten.

15             What do I mean by official action?  I expect that

16   Judge Caproni will instruct you that official action includes

17   any action taken or to be taken under color of official

18   authority.  Any action taken or to be taken under color of

19   official authority.  It is not limited to voting on a bill,

20   making a speech, passing legislation, it is not limited to

21   that.  It is anything that Sheldon Silver does using the

22   authority of his office.  So, let's look at all the quo, all

23   these things that he did for Dr. Taub.  Each one of these is an

24   official action, each one by itself would be enough for you to

25   convict.

FBN5sil1                    Summation - Mr. Goldstein

1            It starts off in late December 2003, Sheldon Silver

2    invites Dr. Taub to get to apply for state money -- we will

3    talk about this right after he starts getting referrals.

4            Second.  He invites Dr. Taub, in 2005, to the State of

5    the State and he puts Dr. Taub in touch with a staffer to talk

6    about how they're working on his grant, they're working on the

7    application.

8            Third.  He gives Dr. Taub's research the money, the

9    first $250,000 grant.  That was July 2005.

10           Fourth.  A little more than a year later another

11   grant, another $250,000; the second time he gives Dr. Taub

12   exactly what he wanted.

13           Fifth.  January 2007, on official Assembly letterhead

14   he recommends Dr. Taub's daughter to Judge Schoenfeld.

15           Sixth.  He sends a $25,000 grant to the Shalom Task

16   Force.  That's the organization that Dr. Taub's wife sits on

17   the board of.

18           Seventh.  He gives Dr. Taub -- and you saw this at

19   trial -- he gives Dr. Taub an official proclamation from the

20   Assembly touting his achievements.  And then he also gives

21   Dr. Taub and gets the Assembly to pass a resolution -- an

22   official resolution about his achievements.

23           And then, in November 2011 -- ninth -- he meets with

24   Dr. Taub in his office and sends Dr. Taub a letter offering his

25   official assistance with this race to raise money for

FBN5sil1                    Summation - Mr. Goldstein

1    mesothelioma research.

2            And tenth, in 2012, again on official Assembly

3    letterhead, he recommends Dr. Taub's son for a job with the

4    organization OHEL.

5            Every member of Dr. Taub's family gets taken care of

6    by Sheldon Silver.

7            So, that's the quo.  Ten official acts that Sheldon

8    Silver took to benefit Dr. Taub.  And you already know the

9    quid:  48 cases, $3 million and counting.

10           So, the only question, because these things are

11   undisputed -- undisputed -- the only question is why Silver did

12   it.  Why all those official actions to benefit Dr. Taub?  Was

13   this all just an incredible coincidence?  Sheldon Silver pulled

14   all those strings all those years just because?  You know that

15   makes no sense.  You know the quid and the quo are connected.

16   It is obvious, it is common sense.  Why did Sheldon Silver do

17   it?  He did it for the money.  He did it for the money.  And

18   you know that if Sheldon Silver had money as even part, just a

19   part of his motivation for taking those official actions, then

20   he is guilty.  It doesn't need to be his only motivation, just

21   one.  And the evidence on that is absolutely overwhelming.

22           So, we are going to talk about nine reasons -- nine

23   reasons -- that you know that Sheldon Silver is guilty of the

24   asbestos schemes.  Nine reasons that you know that he did it,

25   in part -- and there was a lot more than just a part -- but

FBN5sil1                    Summation - Mr. Goldstein

1    nine reasons that you know that he was doing this, taking these

2    actions for the money.

3         First, right off the bat, Sheldon Silver knew what

4    Dr. Taub wanted.  He knew what he wanted in return for those

5    valuable leads, those mesothelioma leads.

6         Dr. Taub was a one-trick pony.  It is a phrase you

7    have heard at this trial.  He wanted research money.  It was

8    his life's work, that's what he did in his life, he wanted

9    research money to help find a cure for mesothelioma.  To get it

10   Dr. Taub sent his patients only to lawyers who funded

11   mesothelioma research.  He made that perfectly clear.  He told

12   you that again and again.  He sent only his cases to lawyers

13   who supported mesothelioma research because he thought that

14   those lawyers who were making all those millions of dollars

15   from his patients, he thought that they had a social

16   responsibility -- that's the phrase he used -- a social

17   responsibility to give back, to help those patients by paying

18   for research.

19        Through his entire career Dr. Taub told you that he

20   could not remember ever referring a single case to a lawyer who

21   did not fund mesothelioma research, not one.  And before

22   Sheldon Silver started getting cases from Dr. Taub, before he

23   dangled that State money, Dr. Taub did not refer cases to

24   Weitz & Luxenberg because Dr. Taub disapproved of

25   Weitz & Luxenberg because they did not give money to

FBN5sil1                    Summation - Mr. Goldstein

1    mesothelioma research.

2              This is an e-mail that you saw at this trial,

3    Government Exhibit 525-9 and this is what Dr. Taub thought

4    about Weitz & Luxenberg.  This is an e-mail with somebody from

5    the Simmons firm.  At this point in the case the Simmons firm

6    is paying money to support Dr. Taub's research and he is --

7    Dr. Taub is taking a patient of his and recommending them to go

8    to Simmons and not to Weitz & Luxenberg because Simmons

9    supports mesothelioma research around the country.

10   Weitz & Luxenberg, in Dr. Taub's mind, they only care about

11   private jets.  So Dr. Taub, even in the middle of the scheme,

12   disapproves of Weitz & Luxenberg.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

FBNYSIL2                    Summation - Goldstein

1            MR. GOLDSTEIN:  Think about that.  So why does he

2     start referring all these patients to Weitz & Luxenberg?  He

3     does it because Sheldon Silver is supporting his research and

4     only because of that, not because Weitz & Luxenberg is some

5     great firm.  In his mind, all that Weitz & Luxenberg cares

6     about is making money, private jets.

7            Dr. Taub -- his views about this are perfectly

8     well known to Sheldon Silver.  He didn't keep it a secret.  He

9     told Sheldon Silver right off the bat, the first time they met

10    when this whole scheme started in 2003, when they were

11    reintroduced by their mutual friend Danny Chill.  Remember?  It

12    was the beginning of Dr. Taub's testimony.

13           He told you that at that first encounter, he asked,

14    Sheldon Silver, if he could get -- if Sheldon Silver could get

15    Weitz & Luxenberg to fund research, to get Weitz & Luxenberg to

16    pay for mesothelioma research.

17           He tells that to Sheldon Silver again in 2010.  That's

18    Government Exhibit 595-1.  He's talking to a colleague here

19    about a conversation he had with Sheldon Silver.

20           I pointed out to him, to Sheldon Silver, that Perry

21    Weitz, in contrast to other firms, had not given a dime for

22    research, especially to MARF.  MARF was the foundation that

23    does mesothelioma research.

24           So Sheldon Silver knew what Dr. Taub wanted.  He

25    wanted research money, and he knew that Weitz & Luxenberg

FBNYSIL2                    Summation - Goldstein

1    didn't give it.

2              And that got Sheldon Silver thinking, thinking about

3    how he could get rich off of Dr. Taub.  Because Dr. Taub now

4    asked him in 2003, can you help get me some research money from

5    Weitz & Luxenberg?

6              And Sheldon Silver knows that what he wants is cases.

7    So what Sheldon Silver does next?  That's the second reason you

8    know that Sheldon Silver is guilty of the asbestos scheme.

9              Let's look at what he does next.  It is Sheldon Silver

10   who proposes the quid, who makes the request for cases.  And

11   it's Sheldon Silver who proposes the quo, the state money that

12   he is going to use to get those cases.

13             Within days of that first encounter with Dr. Taub,

14   where he told Dr. Taub that he could not get Weitz & Luxenberg

15   to fund the research, he then sends Dr. Taub a message, I want

16   cases.

17             MR. MOLO:  Objection.

18             THE COURT:  Overruled.

19             MR. GOLDSTEIN:  He sends Dr. Taub a message, I want

20   cased.  I want leads.  That message -- after Dr. Taub had asked

21   him for research money, that message was perfectly clear and

22   perfectly criminal.

23             You ask me for something?  You want my help getting

24   you research money?  Then you need to send me something in

25   return.  Let me see what you can give to me before I give you

FBNYSIL2                    Summation - Goldstein

1    something.

2         This was a critical point.  It was not Dr. Taub's idea

3    to send Sheldon Silver cases.  The cases weren't some gift to

4    Sheldon Silver, unconnected to any official action.  Dr. Taub

5    didn't pass them along out of friendship.  They weren't friends

6    in 2003.

7         The defense needs you to think -- they need you to

8    believe -- that these cases were unconnected to the state

9    money.  That doesn't make any sense because it was the

10   defendant who set the whole thing up.

11        He is the one who made the demand.  He set up the

12   exchange.  He is the one who sent the message that he wants the

13   cases, and he outright offered Dr. Taub state grants.  He

14   invited him to apply for state grants right when Dr. Taub

15   started sending him cases.

16        So the whole quid pro quo was Sheldon Silver's idea.

17   He knew what Dr. Taub wanted, and he made darn sure that he got

18   something in return before he gave Dr. Taub what he wanted.

19        You don't have to take my word on this.  This too is

20   right there in black and white that you saw in this trial.

21   Another email during the course of the scheme is Government

22   Exhibit 525-16.  This is when Dr. Taub is seeking Sheldon

23   Silver's help for this Miles for Meso race that they wanted to

24   hold in lower Manhattan.

25        It's late August 2011.  Dr. Taub is talking to someone

FBNYSIL2                    Summation - Goldstein

1    from the Simmons firm about getting Sheldon Silver's help.

2    What did he tell her?  "It will probably cost us.  He is very

3    good at getting people to owe him."

4            Then Dr. Taub puts his name at the bottom of the

5    letter to Sheldon Silver to try to get Sheldon Silver to help.

6    What does he say again?  "I added a line to the letter to

7    Shelly Silver.  If he delivers, I am sure it will cost me."

8            This was written long before this trial right in the

9    middle of the scheme as it was happening.  Dr. Taub told you

10   exactly how it would cost him, exactly how he would have to pay

11   Sheldon Silver.

12           If I would ask him to do something, he would ask for

13   something in return, and he told you that that something was

14   the referrals.

15           That was the one thing that Dr. Taub had to provide to

16   Sheldon Silver, the one thing that Sheldon Silver wanted from

17   Dr. Taub.  That's it, this for that.  I give you official help.

18   You send me cases, this for that, quid pro quo.

19           The third reason that you know that Sheldon Silver is

20   guilty of the asbestos scheme, he figured out a way to give

21   Dr. Taub what he wanted, the research money, in a way to

22   guarantee that Sheldon Silver could keep all the money for

23   himself.

24           Remember.  Dr. Taub started off asking not for state

25   money.  He asked for money from Weitz & Luxenberg.  He asked

1   for private money.

2           What does Sheldon Silver do with that request?  He

3   keeps it totally to himself.  He doesn't pass it along.  He's

4   being paid all this money by Weitz & Luxenberg just to be

5   there, just to add prestige to the firm.  He's not expected to

6   do any work, to bring in any cases.

7           He gets a request from Dr. Taub for research money

8   from Weitz & Luxenberg, and he simply tells Dr. Taub, no.  And

9   he doesn't pass on the request.

10          Arthur Luxenberg, who testified before you, told you

11  he's one of Sheldon Silver's closest friends.  He is an

12  asbestos lawyer.  This was what they do.

13          Sheldon Silver doesn't ask Arthur Luxenberg or Perry

14  Weitz or anybody else at the firm about whether or not they

15  would donate to Dr. Taub's research.

16          Every witness from Weitz & Luxenberg who testified

17  before you told you that they were never asked once a single

18  question by Sheldon Silver about asbestos research, not once.

19  Dr. Taub's name never came up, not until he started getting

20  cases from Dr. Taub.

21          Now, why is this important?  Because it proves that

22  Sheldon Silver did not order up these grants because he thought

23  it was a good cause.

24          If he thought it was a good cause, then why not go to

25  your law firm that is making millions of dollars from these

1    cases and ask them to pony up too?  Why not pass on the

2    request?

3            Can you make a donation?  I just ran into this doctor.

4    He needs research money.  That's not what Sheldon Silver does.

5    He keeps it to himself.  You know why, because he wanted to get

6    the credit.  He wanted to get his 33 percent stake in these

7    cases.  He wanted the money.

8            And, if he wanted the money, in order to get that

9    money to get his credit, he couldn't go to the firm because

10   then Dr. Taub would send the cases to the firm and not to him.

11   So he did three things, three things right off the bat in this

12   scheme, that prove to you that he is guilty, that sets the

13   whole thing in motion.

14           First he lied to Dr. Taub and told him that Weitz &

15   Luxenberg would not support research when he doesn't even pass

16   along the request.

17           Second, just days later, he hits Dr. Taub up for

18   cases, made it clear to Dr. Taub that he wasn't going to get

19   something for nothing.

20           And then third, within weeks of the first referral to

21   Dr. Taub, he dangles the state money.  He invites Dr. Taub to

22   apply for a grant.

23           This is the letter that Dr. Taub started to draft in

24   late December 2003, very soon after he started referring

25   patients to Sheldon Silver.  He learned from their friend,

FBNYSIL2                    Summation - Goldstein

1    Danny Chill, that New York State might be interested in funding

2    his program right at the outset.

3          This is not private money anymore.  Sheldon Silver is

4    not offering up private money.  He's not going to Weitz &

5    Luxenberg.

6          It was his choice at this moment to use his state

7    power, his control over state money, to get cases from Dr. Taub

8    because he wanted the referrals, the money, for himself.  He

9    wanted to use taxpayer dollars to make himself rich.  That's

10   the crime, ladies and gentlemen.

11         So that brings us to the fourth way that you know that

12   Sheldon Silver is guilty of the asbestos scheme, the timing,

13   the timing.  The connection between the grants and the

14   referrals can't be any clearer.

15         Let's start by looking at Government Exhibit 442-2.

16   This is the first case that Sheldon Silver got from Dr. Taub,

17   Catherine O'Leary, November 6, 2003.  It's just six weeks later

18   after he gets this first case that Sheldon Silver tells

19   Dr. Taub, invites Dr. Taub, to apply for research money.

20         Then what happens once that letter comes in to Sheldon

21   Silver's office?  It's now early 2004.  You saw this.  This is

22   an exhibit that's worth writing down the number of, Government

23   Exhibit 107.

24         This is the letter that Dr. Taub sent, the first

25   letter that he sent to Sheldon Silver.  What does it say on the

1   top of this letter? "Shelly is very interested in this."  He's

2   "very interested in this."

3           Really?  Think about this.  Sheldon Silver had met

4   Dr. Taub once before this letter came in, and he gets one

5   letter asking for state money, and suddenly he is very

6   interested in funding a research program outside his district?

7           That letter tells you all you need to know.  Why is he

8   very interested?  He's very interested because he knows that

9   the cases are starting to come.  This is how he is going to

10  start to get the cases.

11          The timing is devastating proof, the referral of

12  Catherine O'Leary, the letter from Dr. Taub to Sheldon Silver,

13  Sheldon Silver "very interested" in funding, one right after

14  the other.

15          That timing proves to you that this was no

16  coincidence.  There's more.  Even though he told his staff that

17  he was very interested right off the bat in funding this, he

18  holds off.  He waits to get a few more cases.  He doesn't order

19  the grants until after he gets paid.

20          He invites Dr. Taub up to the State of the State.

21  That was January 5.  He shows Dr. Taub how powerful he is, puts

22  him in touch with a staffer, hopes the cases keep coming in.

23          But he still doesn't fund it until after the first

24  payoff, and that's Government Exhibit 514-1, the first payoff

25  check with Dr. Taub's cases, $176,000.  That's in March of

FBNYSIL2                    Summation - Goldstein

 1   2005, $176,000, way more than the salary that Sheldon Silver

 2   was making from the state.

 3           After he gets that check is when he orders up the

 4   first grant and sends $250,000 in taxpayer money to Dr. Taub's

 5   research.  $176,000 of payoff money in, $250,000 of taxpayer

 6   money out, not a bad deal for Sheldon Silver.

 7           That brings us to the fifth reason that you know that

 8   Sheldon Silver is guilty of the asbestos scheme.  This is one

 9   that I want you to pay attention to.

10           This is an important point because you should look at

11   what it is that Sheldon Silver really cared about.  When you

12   think about what motivates someone, look at what they ask

13   about.  Look at what they follow up on.  Look at what they pay

14   attention to.

15           Well, what did Sheldon Silver ask questions about?

16   What did he follow up on?  What did he pay attention to?

17   Because that tells you what motivated him.  It tells you what

18   he cared about.  It will tell you just why Sheldon Silver was

19   very interested in funding Dr. Taub.

20           The answer on this is clear, and it speaks volumes.

21   Sheldon Silver only ever asked about the money.  He only ever

22   followed up on the money.  That's all he paid attention to.  He

23   never asked anyone -- in all these years, he never asked a

24   question about the research because he didn't care about the

25   research.

FBNYSIL2                      Summation - Goldstein

1          We've already talked about how he never once asked

2     Perry Weitz or his good friend Arthur Luxenberg about asbestos

3     research, never.  He went to all these lunches at the firm.

4     What do they talk about at these lunches?  They talk about

5     asbestos.  That's what the firm does.

6          Through all those lunches over all those years, not a

7     single question from Sheldon Silver ever about asbestos

8     research, about mesothelioma research, none.

9          You heard the same thing from Gary Klein.  He was the

10    managing attorney at Weitz & Luxenberg, the guy who ran the

11    firm.  Never a question about research.

12         You heard from Charles Ferguson, the head of the

13    asbestos department at Weitz & Luxenberg.  You'd think that if

14    he really cared about research, he would have asked one of

15    these guys one time about asbestos research.  He never did.

16         You heard from Dr. Taub.  From Dr. Taub he never once

17    asked for updates.  He never once asked what he was able to do

18    with all the state money that he was getting from Sheldon

19    Silver.

20         This is remarkable.  He never asked for a status

21    report.  He never asked him to report on his research to

22    anyone.  Not a question.

23         You know that that's what Dr. Taub likes to talk

24    about.  He would love to talk about his research with Sheldon

25    Silver, but Sheldon Silver didn't care.

1          You know what else?  He also wasn't interested in the

2     patients, the cases.  You learned about that too.  The people,

3     the clients, who he was supposedly representing -- Charles

4     Ferguson, the head of the asbestos department -- he told you

5     that Sheldon Silver never contacted these clients, never called

6     them, and never asked about them.  The only time he asked

7     questions was about when he was going to get paid.

8          Here is an anecdote that you heard at this trial.  It

9     came through quickly, but it was from Sheldon Silver's press

10    secretary, his spokesman, Michael Whyland.

11         Michael Whyland told you how he saw a report about

12    asbestos and law firms, and he brings up the issue with Sheldon

13    Silver.  Michael Whyland's dad was an asbestos worker.  What

14    did he tell you about that conversation?

15         All that Sheldon Silver asked was, does your dad have

16    a lawyer?  He didn't ask whether or not his dad was sick.  He

17    didn't ask about whether his dad wanted to be put in touch with

18    this incredible doctor who Sheldon Silver knew so well.

19         All those years where he was his press secretary, he

20    never mentioned Dr. Taub.  He asked if his dad had a lawyer.

21    Michael Whyland told him no, and that was the end of the

22    conversation.

23         That tells you volumes.  That tells you all that you

24    need to know about what Sheldon Silver cared about.

25         So he doesn't care about the patients.  He doesn't

FBNYSIL2                    Summation – Goldstein

1    care about the research, but you saw a lot of evidence in this

2    case about what he did care about.  That was crystal clear at

3    this trial.  He cared about the money.

4           Here are three ways, just three now, but there are

5    many more that you heard in this trial, but three that you know

6    what Sheldon Silver cared about.

7           First one, Sheldon Silver's personal visit to Dr. Taub

8    when the patient flow started to dry up.  Dr. Taub starts

9    getting money from the Simmons law firm, and he stops sending

10   patients to Sheldon Silver.

11          You can see from Government Exhibit 1509 that from

12   2009 through 2010, a whole year passed without a single

13   referral.  A year passes.

14          So what does Sheldon Silver do?  He makes a personal

15   visit to Dr. Taub's office on 168th Street in Manhattan, the

16   other side of the city, and doesn't ask Dr. Taub about the

17   research, how's it going?

18          He asks Dr. Taub one thing, why so few referrals?

19   What's going on?  That's what he cared about, the money.

20          The second way you know this, look at what happened at

21   the end of this trial, what you saw at the end of this trial,

22   the way that Sheldon Silver laundered the proceeds of his

23   criminal schemes to make even more money.

24          Look at all those transactions with Jordan Levy, these

25   private investments in an Australian satellite company, a

FBNYSIL2                    Summation - Goldstein

1   private real estate fund, an exclusive lender that paid him

2   absolutely unbelievable interest rates.

3          He's communicating back-and-forth all the time with

4   Jordan Levy about these investments, wiring money, sending huge

5   checks, finding new private, high-yield investments while

6   telling the public that he's only investing in blue-chip

7   stocks.

8          Sheldon Silver didn't talk about the research, but he

9   talked all the time with Jordan Levy about the money because

10  that is what he cared about.

11         There's a third way you know, a third way, the stamp.

12  This you may not remember, but this is the stamp that Sheldon

13  Silver got to Gary Klein, the guy running the firm at Weitz &

14  Luxenberg, so that he could get paid faster.

15         Remember what Gary Klein told you, that when the

16  kickback checks, the big asbestos referral checks, were

17  starting to be paid to Sheldon Silver, Sheldon Silver got angry

18  and upset because they were taking too long to get to him in

19  the mail.  He couldn't wait a couple of weeks.

20         So he has Gary Klein take this stamp, use it to stamp

21  the checks that Weitz & Luxenberg is paying to Sheldon Silver,

22  and has Gary Klein personally walk the checks over to his

23  branch at HSBC to deposit them for Sheldon Silver so he can get

24  paid the same day.  That is what Sheldon Silver cared about.

25  That's what motivated him.

1          That brings us to the sixth reason that you know that

2     Sheldon Silver is guilty of the asbestos scheme.  He kept it

3     totally secret from everyone.  He told no one what he was up

4     to.

5          He made sure that the people at Weitz & Luxenberg who

6     knew about the cases and knew that he was getting them from

7     Dr. Taub -- not one of them knew about the state grants, not

8     one of them.

9          Remember what Charles Ferguson told you about what

10    Sheldon Silver told him about how he was getting all these

11    cases from Dr. Taub?  He runs into him at a family function,

12    and now suddenly he's going to start getting cases from

13    Dr. Taub.

14         He conveniently left out the most important detail,

15    the state money.  All those lunches, all those conversations,

16    and nobody at Weitz & Luxenberg, nobody, knew about the state

17    grants to Dr. Taub.  He kept that a secret.

18         What about the people who knew the quo, the people

19    inside the assembly who knew the other side?  Not one of them

20    knew a lick about the referrals.  Sheldon Silver kept that

21    secret from them.

22         He also kept the whole thing secret from the public by

23    using a pool of money -- it was called HCRA money -- that was

24    untraceable to Sheldon Silver, untraceable.  He could order up

25    these grants, and nobody would know they were coming from

FBNYSIL2                     Summation - Goldstein

1   Sheldon Silver.

2              Steve August, the staffer from the assembly who

3   testified before you and was looking down the whole time -- he

4   didn't want to look at Sheldon Silver -- he told you how he hid

5   the columns on the Excel spreadsheets that showed that Sheldon

6   Silver had a connection to these grants.

7              And he didn't know.  Nobody within assembly knew about

8   the referrals, and the public didn't even know that Sheldon

9   Silver had ordered up these grants.

10             We already talked about how the one person who could

11  have known, Danny Chill, because he knew about the grants, and

12  he was friends with Dr. Taub.  Sheldon Silver told Dr. Taub to

13  keep his mouth shut.

14             We'll look at that testimony.

15             "What did Silver say to you about Daniel Chill?"

16             He said, "I should not tell Mr. Chill about any

17  referrals."

18             "Why?"

19             "He just wanted it kept between me and Mr. Silver,

20  between me and him."

21             Because, if Danny Chill knew, that would have been too

22  dangerous.

23             What did Sheldon Silver tell the public about how he

24  was getting all this money, all these millions of dollars?  He

25  told the public that he spent hours every day, hours every

1   Friday, reviewing these cases.

2          This is an article in 2014.  Michael Whyland told you,

3   the press secretary told you, that before this article came

4   out, the Daily News had checked in with him as to whether or

5   not these facts were true, these facts in this article were

6   true because they had been reported before, and they wanted to

7   confirm that they were true.

8          Michael Whyland takes it, goes to Sheldon Silver, and

9   Sheldon Silver confirms this is true.  It's all a lie.

10  Although he gave up his lawyer's practice decades ago, clients

11  still approach him with possible lawsuits, medical malpractice?

12  And then he reviews the cases and sends on the ones with merit

13  to Weitz & Luxenberg?  None of that's true.

14         He hits up Dr. Taub.  He hits up the real estate

15  developers.  We'll talk about that a little later on.  They

16  don't come to him.  He doesn't do any evaluation of any case.

17  He doesn't do any work.

18         So he's telling the public a total lie about how he's

19  making his money.  You'd think that if these grants to Dr. Taub

20  were such a good cause that he would have said something, a

21  press statement, an appearance, something about how great they

22  were.  He's a politician.  Totally quiet, totally secret,

23  nothing.

24         That brings us to the next thing that you know that

25  makes Sheldon Silver guilty on the asbestos scheme.  He cuts

FBNYSIL2                    Summation - Goldstein

1   off the funding when he can no longer keep it secret.  There

2   were two grants at the outset, in 2005 and 2006.

3           Dr. Taub wanted four grants.  He wanted annual grants.

4   That was in those letters that you saw that he sent, but then

5   Sheldon Silver cuts him off.

6           Do you remember Dr. Taub telling you about a

7   conversation where Sheldon Silver came up to him and said --

8   came to his office and said, I can't do it anymore.  I can't do

9   it anymore?

10          Well, why is that, ladies and gentlemen?  What

11  happened between 2006 and 2007 that made it so that Sheldon

12  Silver can't do it anymore?  What happened is one thing.  There

13  was one change.

14          There was plenty of money.  This is the spreadsheet

15  that Steve August, another staffer from the assembly, told you

16  that he kept in his drawer so that nobody could see it.

17          This is $2.5 million of money in 2007 that Sheldon

18  Silver himself gave out in member items, money that he had

19  available.  There was plenty of money available.

20          Let's also look at Government Exhibit 131.  There's

21  $38,000,000 extra money available in 2007, another $29,000,000

22  available in 2006.

23          These are all amounts of money that are left over in

24  member items, money that Sheldon Silver could have tapped if he

25  wanted to keep funding Dr. Taub.

1        This was all left-over money that was available to

2   Sheldon Silver in 2007 if he wanted to fund Dr. Taub's research

3   for a third year, more than $100,000,000.

4        He actually spends for himself $2.6 million, way more

5   than ten times any other assembly member.  So there's plenty of

6   money available.  So what changed?  What's the one thing that

7   changed from 2006 to 2007?

8        That was the rules about disclosure.  There was a huge

9   change from 2006 to 2007.  Suddenly all these grants had to be

10  public.  Sheldon Silver lost a lawsuit with the Times Union, a

11  newspaper in Albany.  Now these member items had to be posted

12  on the assembly's website.

13       The Attorney General.  You heard a witness from the

14  Attorney General's office.  They started something where they

15  were requiring people to use these disclosure and

16  accountability forms that would actually list the sponsor of

17  the grant, something that Sheldon Silver had kept secret in

18  these earlier grants.

19       They would list the sponsor, and they would have to

20  sign a certification that there was no conflict of interest,

21  and Sheldon Silver knew about these rule changes.

22       Let's look at Government Exhibit 125 and 126.  In

23  early 2007, Sheldon Silver meets with the people at Ohel and

24  gives them a heads-up.  These new disclosure forms are now

25  being required.  So you're going to have to fill these out.

FBNYSIL2                         Summation - Goldstein

1            Silver is well aware of this change.  He was at the

2     press conference with the Attorney General when he announced

3     these new forms.  What do these new forms require?

4            Let's go to the next slide.

5            They require the sponsoring member to be listed and

6     for the organization that gets the grant to certify that

7     there's no conflict of interest.  That is a risk that Sheldon

8     Silver could no longer take.  That is why he cuts off the

9     funding.  That was the change.

10            Dr. Taub told you he still needed research money.  His

11     work wasn't done.  The one thing that changed were the rules,

12     and Sheldon Silver couldn't keep it secret anymore.

13            That brings us to the next reason that you know that

14     Sheldon Silver is guilty of the asbestos scheme.  What did

15     Sheldon Silver do once he could no longer give Dr. Taub all of

16     the grants?

17            He turned to other ways to use his official power.  He

18     gave all of those other benefits that we looked at early on,

19     all that other quo -- he starts giving that to Dr. Taub instead

20     of the grants because the grant money would be too dangerous.

21            Remember the event at the American Cancer Society?  It

22     was after Dr. Taub had cut off Sheldon Silver somewhat and was

23     sending all those cases to Simmons.

24            Dr. Taub was being honored by the American Cancer

25     Society, and the Simmons firm was paying for a table sponsoring

FBNYSIL2                    Summation - Goldstein

the event, and Sheldon Silver learns about it.

        At the last minute, Sheldon Silver orders up -- he
gets ten people at the assembly to work on a rush job to get
this resolution done, this proclamation done.

        The defense can make fun of these and say, oh, all
these Eagle Scouts get these things, but look at what happened
here, ladies and gentlemen.

        At the last minute, when Sheldon Silver realizes that
the other firm that is getting the patients of Dr. Taub is
sponsoring this event, he springs into action and orders up
these things to make Dr. Taub realize, oh, Sheldon Silver is
still in the picture.  Sheldon Silver is still somebody who is
a powerful man in New York who I may need.

        That happened again and again and again as the years
went on.  Remember the Miles for Meso event that we talked
about before where Dr. Taub realized that it was going to cost
him.

        Do you know what?  It did in fact cost him.  Soon
after Dr. Taub sought Sheldon Silver's help, he starts sending
Sheldon Silver cases, case after case, right after he asks for
help.

        Those cases that he sends -- what does that buy
Dr. Taub?  He gets a meeting in Sheldon Silver's assembly
office and Sheldon Silver's assistance or offered assistance
with this race.

1          Three cases in less than six weeks trying to get

2     Sheldon Silver's help with this race.  If you look at that,

3     before that, there wasn't even a single case for six months.

4     Three cases in six weeks to get his help because that is what

5     it cost Dr. Taub to get a meeting with Sheldon Silver, this for

6     that, quid pro quo.

7          If you want even more evidence about just how clear

8     and obvious the quid pro quo was from Sheldon Silver's

9     perspective, look at what he did with Dr. Taub's son Jonathan

10    with Ohel.

11         The defense tried to suggest that this was just a

12    friend doing something for a friend.  But look at what the

13    evidence actually showed.

14         Ohel is an organization that is hugely dependent on

15    state money.  Sheldon Silver sends millions of dollars of state

16    money to Ohel every year.

17         Sheldon Silver has been working with the CEO of Ohel,

18    David Mandel, for 20 years.  Who is the one person, the only

19    person in 20 years, that Sheldon Silver tries to get hired at

20    Ohel?  It's Dr. Taub's son Jonathan.  One person in 20 years.

21         Look at the timing of this.  Jonathan Taub sends a

22    letter to Sheldon Silver in February of 2012, and Sheldon

23    Silver did with this letter just what he did with the state

24    grants.  He sits on it for a little bit.  He wants to see how

25    many cases he can get out of it.

1              So Dr. Taub sends him another case.  He sends him a

2    case, Begin, in March of 2012.  Still no action.  Then look

3    what happens.  May 17, 2012, he gets Goldman, a new case from

4    Dr. Taub, a case that pays him $170,000.

5              What happens the very next day?  The next day now

6    Sheldon Silver on official letterhead reaches out to Ohel and

7    asks Ohel to hire Jonathan Taub, the next day.

8              The defense wants you to think that this is a

9    coincidence, that these aren't connected.  Sheldon Silver waits

10   for referrals, gets a referral from Dr. Taub, which we know he

11   talks to them on the phone.

12             And then the next day he goes to Ohel, the

13   organization who depends on him -- they have a Silver Day in

14   His Honor.  They named a camp after him -- the organization

15   that he knows will hire Jonathan Taub when he asks.  He reaches

16   out for the first time in 20 years.

17             The defense tried to also make light of what Sheldon

18   Silver did for Dr. Taub's daughter, reaching out to

19   Judge Schoenefeld.  But that too was an extraordinary event.

20   Judge Schoenefeld was made a judge in part through the help of

21   Sheldon Silver.

22             For 30 years, he told you that Sheldon Silver only

23   asked for his help twice.  Once was for Sheldon Silver's

24   mother-in-law to get hired, and the second was to hire Amy

25   Taub, Dr. Taub's daughter, as an intern.

1          Sheldon Silver is doing these things -- he's springing

2     into action -- for Dr. Taub because Dr. Taub is his source of

3     money.  That's why he is doing these things.

4          That brings us to the last reason that you know, the

5     ninth reason, that you know that Sheldon Silver is guilty of

6     the asbestos scheme, your common sense, because there's no

7     other reason that Sheldon Silver would do all of these things

8     other than being motivated, at least in a little part, by the

9     money.

10         We've already talked about this friendship defense,

11    that he did all this because they were friends.  And you know

12    that that's not true.  You know that at the beginning of this

13    when he's giving the grants, they barely know each other.

14         You also heard from Dr. Taub directly.  He told you

15    that whatever friendship they had -- it was rooted in the

16    referrals.  He told you even under cross-examination, this is a

17    business relationship.

18         Do you know what?  When you do business with someone

19    for years and everybody is getting what they want, of course

20    you're going to become friendly.  That's not a surprise.

21    That's not a defense.

22         Let's be clear about the kind of friendship that this

23    was.  It was transactional all along.  The personal nature of

24    it -- they spent Passover at the same hotel sometimes with

25    1,200 other people.  They don't talk on the phone other than

FBNYSIL2                    Summation – Goldstein

1   for the referrals.  They don't spend meals together.

2              You know the one thing Sheldon Silver does with his

3   friends is watch sporting events.  Not with Dr. Taub.

4              Dr. Taub invited 400 people to his daughter's wedding.

5   Sheldon Silver didn't make the cut.  He didn't have his cell

6   phone numbers.

7              There's just no evidence that this is the kind of

8   friendship that would have gotten Sheldon Silver to give all

9   these things to Dr. Taub.  There's no evidence to support it.

10             Outside of that, that defense that there's no evidence

11  for, the only other explanation would be that Sheldon Silver

12  did all this for Dr. Taub because he thought these were all

13  good causes, that he really cared about the research.

14             But we've already talked about that.  That's not what

15  the evidence showed.  The evidence did not show that Sheldon

16  Silver cared at all about the research.

17             That defense doesn't explain the timing.  It doesn't

18  explain the pattern of the referrals.  It doesn't explain any

19  of the other official benefits that Sheldon Silver gave to

20  Dr. Taub.

21             Ladies and gentlemen, the only reason, the only

22  explanation for what Sheldon Silver did that comports with

23  common sense, is that he was motivated by the money.  It's

24  totally obvious.

25             Remember.  To convict the defendant, the money only

FBNYSIL2                    Summation – Goldstein

 1    needs to be a partial motivation, one of his motivations.  Of

 2    course that was one of his motivations.

 3              So that's nine reasons that you know that Sheldon

 4    Silver is guilty of the asbestos scheme.  Each one of them

 5    alone would be sufficient to convict the defendant.  Each one.

 6              Every one of these shows how this was a quid pro quo,

 7    how Sheldon Silver was dispensing official benefits in order to

 8    get valuable leads, in order to get those millions of dollars

 9    for himself.  That's what you learned through the evidence on

10    the asbestos scheme.

11              This would be a good time to break, your Honor.

12              THE COURT:  Okay.  Ladies and gentlemen, we'll take

13    our morning break of about ten minutes.  Don't discuss the

14    case.  Don't talk about anything in connection with it.

15              (Jury not present)

16              THE COURT:  11:30.

17              MS. COHEN:  Thank you, your Honor.

18              (Recess)

19              (In open court)

20              THE COURT:  Mr. Goldstein.

21              MR. GOLDSTEIN:  Thank you, your Honor.

22              Thank you for your close attention, ladies and

23    gentlemen.

24              We're going to turn now to the real estate scheme.

25    Just like with the asbestos scheme, the basic facts are not in

FBNYSIL2                    Summation - Goldstein

1    dispute, and they're not in dispute because the defendant's

2    secrets were uncovered during this trial, not because he

3    doesn't want to dispute them, but because he can no longer

4    dispute them because of the evidence.

5         This is what you know:  You know that Sheldon Silver

6    made hundreds of thousands of dollars, hundreds of thousands of

7    dollars from this real estate law firm, the small real estate

8    law firm called Golberg & Iryami.

9         And he hid that money as referral fees as though he

10   earned them like a private lawyer.  But that's not what he did.

11   That's not what he did.

12        He used his official position -- he abused his

13   official position -- to get these two huge real estate

14   developers to send their business to that law firm so that that

15   law firm would pay him bribes and kickbacks, abuse of his

16   official position to get bribes and kickbacks disguised as

17   attorney referral fees, same MO as with the asbestos scheme.

18        But, as we'll talk about, with the real estate scheme,

19   the deception and the lies are even more staggering, more

20   extraordinary.

21        Here is how it worked:  Sheldon Silver got paid by

22   convincing these two big developers, Glenwood Management and

23   The Witkoff Group, to go to this law firm, Golberg & Iryami,

24   which was paying Sheldon Silver kickbacks on the side.

25        The developers were dependent on state action.  They

FBNYSIL2                    Summation - Goldstein

1    were dependent on Sheldon Silver, one of the three men in the

2    room, the leader of the New York State Assembly.

3           Their businesses worked by getting tax breaks, by

4    getting financing, by getting favors from the state.  And

5    Sheldon Silver had control over an entire part of the

6    government, and they needed Sheldon Silver to get what they

7    wanted.

8           There were particular things that they needed, very

9    specific legislation that these developers needed for their

10   businesses, their tax breaks and other benefits that you

11   learned about something during this trial, something called the

12   421a program, a huge benefit that these real estate developers

13   can take advantage of to build new buildings.

14          This is Government Exhibit 828.  It was admitted at

15   trial through Michael Hoenig, who was the CFO, the top

16   financial guy, at Glenwood.

17          He told you about all of Glenwood's buildings, all

18   these different buildings that Glenwood owns, nearly 30

19   buildings in New York, huge, huge multi, multimillion-dollar

20   properties.

21          This chart shows just how dependent they are on state

22   action, on action from Sheldon Silver.  There's the 421a

23   program, the lifeblood of Glenwood.  If they don't get 421a,

24   they can't build new buildings.

25          Rent regulation.  The New York State government can

1    tell Glenwood Management just how much it can raise its rents

2    every year.  And building after building after building

3    controlled by Glenwood has rent regulation, is dependent on the

4    state for how much they're allowed to charge their tenants.

5         PACB financing.  That's the Public Authority Control

6    Board.  That is a body that you heard about.  You heard a

7    witness from the PACB come and talk to you that Sheldon Silver

8    appointed himself to serve on.

9         The governor, the senate majority leader, and the

10   Speaker of the Assembly -- they each got to pick somebody.  The

11   governor picked somebody else to serve.  The senate majority

12   leader picked somebody else to serve in his stead.

13        Sheldon Silver picked himself because that gave

14   Sheldon Silver personal veto power over everything that came

15   before the PACB, everything.

16        What came before the PACB?  All of the requests for

17   state financing, for hundreds of millions of dollars per

18   building that Glenwood needed to build its buildings.  That all

19   had to go through the PACB, and Sheldon Silver had the power to

20   say no.

21        Because, in order to get through the PACB, in order to

22   get that state money, it had to be unanimous.  If any one of

23   the three people who vote under the PACB -- if any one of them

24   says no, the financing doesn't pass.

25        Let's look at what Glenwood Management got from the

FBNYSIL2                    Summation - Goldstein

1    PACB.  They got more than a billion dollars in financing, more

2    than a billion dollars in financing through the PACB, Glenwood

3    Management alone.

4            At any time not only can he not just say no when he

5    votes, he can pull things from the agenda.  You heard that too.

6    So something that doesn't even get to the PACB -- Sheldon

7    Silver had control over that too, a billion dollars of state

8    financing approved by Sheldon Silver for Glenwood Management.

9            These are the developers who Sheldon Silver went to to

10   hit them up for business so that he can make kickbacks on the

11   side.  That's the background.

12           Let's look at the quid.  Let's look at what Sheldon

13   Silver got from his scheme.  He got $700,000 paid from these

14   developers, paid through Jay Goldberg back to him.  That's what

15   he got in the real estate scheme.

16           Let's look at the quo.  What did he give in return.

17   The official action.  Remember, ladies and gentlemen, what

18   "official action" means in this context.  As we discussed

19   earlier, I expect that Judge Caproni will instruct you that

20   official action goes way beyond voting on bills.

21           It includes any action taken or to be taken, any

22   action taken or to be taken, under color of official authority.

23   Anything that Sheldon Silver does using the authority of his

24   office.

25           And here is the official action that Sheldon Silver

FBNYSIL2                    Summation - Goldstein

1  took during the real estate scheme to keep that money flowing

2  to him.  First he used his official authority to move the

3  developer business from other law firms that they were using,

4  that they were perfectly satisfied with, to his buddy Jay

5  Goldberg who was going to pay him kickbacks on the side.  We'll

6  talk about that more in a minute.

7            Second, Sheldon Silver took private, confidential

8  meetings with the developers and their lobbyists in his office

9  where they could spell out for him their confidential positions

10  on the major real estate legislation coming before Sheldon

11  Silver.

12            This was June 6, 2011.  At this point, the assembly

13  had already passed a bill that had all these public relations

14  pro-tenant provisions, but the real negotiations were about to

15  happen with the three men in the room where Sheldon Silver was

16  one of the three men with all the power.

17            (Continued on next page)

18

19

20

21

22

23

24

25

FBN5sil3                    Summation - Mr. Goldstein

1              MR. GOLDSTEIN:  (continuing)

2         What does he do right before those negotiations

3    happen?  He has a private meeting with Glenwood, with their

4    lobbyists, with Brian Meara and Richard Runes.  What did

5    Richard Runes tell you about that meeting?  At that meeting

6    Glenwood shared its confidential position with Sheldon Silver,

7    a position that the other real estate developers didn't hold.

8    This was Glenwood's confidential position.  They talked behind

9    closed doors about what Glenwood wanted.  That meeting, ladies

10   and gentlemen, that is official action.

11             Mr. Coccaro, if we can go to the next?

12             Remember, Glenwood had a public position and a private

13   position and Mr. Runes told you that when he met as the chief

14   lobbyist for Glenwood in that private meeting he was able to

15   share with Sheldon Silver Glenwood's confidential position.  He

16   made a joke when testifying at trial, he said, I hope nobody is

17   going to know about this -- in this public courtroom.  But back

18   then nobody else, nobody did know.  A private meeting with

19   Sheldon Silver.

20             More official action, when the rent act actually

21   passed very soon after that meeting Glenwood got what it

22   wanted.  We are going to look at the big chart that the

23   government went through when the defense tried to mark up which

24   shows you what happened in this legislation but let's just talk

25   about a couple of things here.

FBN5sil3                    Summation - Mr. Goldstein

1              The one thing Glenwood really wanted, the one thing it

2    needed was this 421-a, the top of the chart.  They needed

3    421-a.  And the assembly's bill -- if you can go back one

4    slide, Mr. Coccaro -- the Assembly's bill passed in 2011 did

5    not extend 421-a.  That's the bill, the April 2011 bill, that's

6    the bill that Mr. Runes testified to you as about the bill for

7    show, it is the public relations bill that the Assembly passes

8    to try to tell everybody how pro-tenant they are.  They never

9    expect it to be passed but that's the position of the Assembly.

10   But what you have to look at is what actually got passed.  What

11   happened is that Sheldon Silver has this meeting with Glenwood,

12   Glenwood puts out its position on the bill, and Glenwood gets

13   what it wanted.  Glenwood gets 421-a, the rent cap only goes up

14   to $2,500 and Glenwood told you -- Mr. Runes told you how they

15   could live with that because their apartments were already

16   above that threshold, their apartments are already very

17   expensive.  So, it didn't matter to them for that little bit

18   from $2,000 to go up.  This, ladies and gentlemen, is official

19   action -- official action that benefited Glenwood Management

20   company.

21             Other quo, other official action, we already talked

22   about the billion dollars in state financing that Sheldon

23   Silver let through and approved before the PACB.  You also

24   heard testimony about little things, little things that Sheldon

25   Silver was able to do when called upon by Glenwood.  There was

FBN5sil3                    Summation - Mr. Goldstein

1    a methadone clinic that you heard a little bit of testimony

2    about that was going to open up near 10 Liberty Street near one

3    of the Glenwood buildings and what did Richard Runes and Brian

4    Meara know that they could do?  They could call up Sheldon

5    Silver and his office and ask for help.  You heard testimony

6    about this.  Sheldon Silver's office was already -- they

7    already had been alerted to this by people downtown but Sheldon

8    Silver helped shut down the methadone clinic and the people at

9    Glenwood were thrilled and Sheldon Silver -- you heard

10   testimony about this -- his office has Brian Meara draft this

11   letter to the tenants of 10 Liberty Street applauding Sheldon

12   Silver for springing into action as soon as it was learned that

13   this clinic was going to come in next-door because Glenwood had

14   the power to call up Sheldon Silver and ask for a favor when

15   needed.  That's what that tells you.

16          More quo.  Sheldon Silver and the government made sure

17   that these rent laws and these tax breaks, the 421-a tax

18   breaks, that they sunset.  What does that mean?  That means in

19   2011, when Glenwood got what it wanted, it is only for a

20   four-year period.  It all expires in 2015 and they're going to

21   have to go through the whole same process again.  And so,

22   Glenwood will be continually dependent on Sheldon Silver and on

23   State action because four years down the line the whole

24   business turns yet again.  And that's why Glenwood hires all

25   these lobbyists, that's why they pay Brian Meara $120,000 a

2895

FBN5sil3                    Summation - Mr. Goldstein

1    year -- basically so they can be able to meet with Sheldon

2    Silver.  It is why they make all those campaign contributions.

3    You saw that they make these contributions through their

4    buildings, through LLCs, millions and millions of dollars so

5    they can maximize as much as they can.  They do all of that

6    because they need official action from Sheldon Silver and from

7    the state government.

8            So, you have $700,000 in his pocket, you have all of

9    these official actions he does on their behalf.  The only

10   question for you, ladies and gentlemen, is if any part of

11   Sheldon Silver's motivation in taking these official actions

12   was because of the money, is because of the $700,000.  And the

13   evidence on that is obvious, it is overwhelming, just like with

14   the asbestos scheme.  Here we are going to give you eight

15   reasons that you know, and going to cut down a reason to save

16   time, eight reasons that you know that Sheldon Silver is guilty

17   of the real estate scheme.

18           The first reason:  Sheldon Silver knew exactly what

19   the developers wanted from him, exactly how much they depended

20   on him.  Why is that important?  That is important because he

21   used that leverage, he used that state leverage, that official

22   leverage to hit them up and get them to move their business so

23   that he could make hundreds of thousands of dollars off of

24   them.

25           Richard Runes, the lobbyist for Glenwood, told you in

FBN5sil3                    Summation - Mr. Goldstein

1    his testimony about just how Glenwood's business worked and

2    just how dependent they were.  They were a one-trick pony.

3    Just like Sheldon Silver took advantage of Dr. Taub's thirst

4    for research funds, Sheldon Silver took advantage of Glenwood's

5    business model.  All they do is build luxury real estate in

6    Manhattan, rentals, and all they do because of that is use

7    state dollars, tax breaks, state rules about rent.  That is how

8    their business survives.  They are a one-trick pony.  And

9    Sheldon Silver knew that full well.  He takes those meetings,

10   they spell it out for him in person.

11        And there is another anecdote that was very telling

12   that Richard Runes told you about.  In 2012 Sheldon Silver came

13   up to Richard Runes and said could Glenwood donate money to the

14   DACC, the Democratic Assembly Campaign Committee?  That's the

15   committee that Sheldon Silver controls to raise money for

16   members of the Assembly, democratic candidates.  Sheldon Silver

17   asked Glenwood for that money and Richard Runes told you that

18   he said I think I could get clearance to give you $25,000.  Not

19   chump change.  Sheldon Silver turned around and said how about

20   $125,000?  And look what happened.  Richard Runes goes back to

21   the head of Glenwood, Leonard Litwin --

22        MR. MOLO:  Your Honor, I object to this argument.

23        THE COURT:  Overruled.

24        MR. GOLDSTEIN:  Richard Runes goes back to the head of

25   Glenwood, Leonard Litwin, and he gets approval.  Do you know

FBN5sil3                    Summation - Mr. Goldstein

1    why?  Because Glenwood can't say no to Sheldon Silver.  They

2    can't say no and Sheldon Silver knows it.

3              MR. MOLO:  Objection.

4              THE COURT:  Overruled.

5              MR. GOLDSTEIN:  Now, during the testimony of the

6    witnesses about the real estate scheme the defense asked a lot

7    of questions about goodwill.  They kept using that word

8    goodwill because the defense was trying to suggest that the

9    only thing these developers were after was Sheldon Silver's

10   goodwill, his friendship.  And the reason they're making that

11   argument and the reason they're asking those questions and the

12   reason why I expect Mr. Molo to make a big deal of this when he

13   stands up this afternoon is because they need you to think this

14   had nothing to do with the money.  But, this is nothing more

15   than a defense tactic.

16             Those questions about goodwill, they asked for only

17   half an answer.  Of course Richard Runes and Steve Witkoff,

18   these developers wanted Sheldon Silver's goodwill.  It is a

19   very easy question to ask.  Of course they wanted goodwill.

20   But that doesn't mean anything.  We all want goodwill.  But

21   what these developers wanted wasn't just goodwill -- of course

22   they wanted that -- they wanted something a lot more, something

23   very concrete, something very specific because their businesses

24   depended on it.  They wanted specific legislation to be passed

25   on a regular basis to give them the tax breaks, the financing,

FBN5sil3                    Summation - Mr. Goldstein

 1    all the things that they needed.

 2            Ladies and gentlemen, this was not about goodwill.

 3    That is not a defense to this case.  It is not a defense to

 4    what Sheldon Silver did.

 5            The second reason that you know that Sheldon Silver is

 6    guilty on the real estate scheme, the way that he used his

 7    official power to get Glenwood and Witkoff to move their

 8    business to Jay Goldberg.  And you know why he did it, he did

 9    it so that he could get his kickbacks from Jay Goldberg.

10            Think about what happened here.  These developers

11    already had their tax cert attorneys.  They had them with big

12    established firms.  They didn't go to Sheldon Silver and say,

13    hey, can you give us some advice on which tax cert firm I

14    should use?  It was the opposite.  Sheldon Silver went to them

15    and asked them to move their business.

16            This is one of the documents that Glenwood had to sign

17    to move their business from an established law firm -- Stroock,

18    Stroock & Lavan -- to Jay Goldberg.  You heard that the general

19    counsel, Charles Dorego, used to be a lawyer at Stroock.  It is

20    a huge firm with an established practice but Sheldon Silver

21    wanted Glenwood to move their business from these other firms

22    to this two-person law firm that was paying him kickbacks.  And

23    that's what he did.

24            You learned there was no friendship with either Steve

25    Witkoff or with the people at Glenwood.  They dealt with each

1    other purely in business.  Steve Witkoff told you that he had

2    lunches less than a handful of times with Sheldon Silver.  And

3    what did he ask every time at those lunches?  It is always

4    about business, it was about the legislation that Steve Witkoff

5    was interested in on behalf of his business.  Business

6    interest.  But what does Sheldon Silver do?  Sometime in 2004

7    he sets up a lunch with Steve Witkoff and at that lunch with

8    Steve Witkoff Sheldon Silver lies to Steve Witkoff.  He tells

9    him that he has a friend in the tax cert business who needed

10   some help, like it was some sort of charity case.  He doesn't

11   tell Steve Witkoff that he is going to get kickbacks on the

12   side.  He tells him that he has a friend who needed some help.

13   And Steve Witkoff told you that when Sheldon Silver makes a

14   request like that you don't want to alienate him.  You don't

15   want to say no.  And so, Steve Witkoff sends his business,

16   moves his business over to Jay Goldberg.  Sheldon Silver made

17   the request.  It is just like it was with Dr. Taub.  People

18   didn't come to him for business.  He wasn't some lawyer who was

19   out there who was giving people advice.  He hit people up using

20   his official power.  That's what he did.

21        And the same thing with Glenwood.  You heard from

22   Brian Meara about the beginning of the relationship with

23   Glenwood when they were sending their business to the Goldberg

24   firm.  It happened through the lobbyists.  The lobbyists of

25   Glenwood, who their job is to talk about official business,

FBN5sil3                    Summation - Mr. Goldstein

1    about legislation with Sheldon Silver and Sheldon Silver

2    arranged the business to go from Glenwood to Goldberg & Iryami

3    through the lobbyists because this was all about business.

4            Let's talk about why he did it.  Why does he hit these

5    firms up?  You saw it in the financial records, the hidden

6    financial records.  You saw exactly what happened, how the

7    kickbacks worked.  Let's look at Government Exhibit 646-15.

8    This is just one example of how it worked, of how it got set

9    up.

10           Glenwood Management would send a check -- here is one

11   for more than $100,000 -- send a check to Jay Goldberg, step

12   one.

13           Step two, Jay Goldberg figures out how much of a cut

14   they're going to give as a kickback to Sheldon Silver.  That's

15   the handwriting, that's the math, $26,000.

16           Step three.  They write the check to Sheldon Silver.

17   Nice bit of business.  And look at the little -- it is hard to

18   see on the screen but look at what Jay Goldberg says to Sheldon

19   Silver in the cover letter when he sends the check:  Enclosed

20   herewith is a check in the amount of $26,000 representing

21   payment for your efforts in connection...  What were those

22   efforts?  What did Sheldon Silver do to make $26,000?  He did

23   nothing.  The only thing he did was hit up Glenwood and Steve

24   Witkoff for their business.  All the work was done by Dara

25   Iryami.  She told you that.  There were no efforts that Sheldon

FBN5sil3                    Summation - Mr. Goldstein

1    Silver put forward, he was getting money for nothing.

2              So, that brings us to the next reason that you know

3    that Sheldon Silver is guilty of the real estate scheme.  As he

4    was making hundreds of thousands of dollars from these

5    developers, from Glenwood in particular, he gave Glenwood what

6    it wanted.  We already talked about and went through that chart

7    and talked about just how Glenwood, in 2011, got what it wanted

8    but it wasn't just in 2011.  They got 421-a renewed in 2003,

9    they got it renewed again in 2007, they got it renewed in 2011,

10   they got their PACB financing, they got their help with that

11   methadone clinic.

12             Now, I expect that Mr. Molo, this afternoon, is going

13   to walk you through all of these pro-tenant bills that the

14   Assembly passed and try to tell you that it Sheldon Silver is

15   totally pure, all he wanted to do was to help the tenants.  But

16   here is what you have to remember:  Those bills, they were all

17   for show.  You heard that at this trial.  Those Assembly bills,

18   Sheldon Silver knew that they were just staking out a position.

19   The real work happened behind closed doors.  The real

20   legislation happened when Sheldon Silver, who was totally

21   compromised getting all this money from Glenwood, is with the

22   governor and the leader of the Senate figuring out just how the

23   rent laws and the tax breaks are going to work.  And time and

24   time again Glenwood got what it wanted.  It got what it needed.

25   That is no coincidence.

1          Richard Runes told you, we can look at his testimony,

2     he told you that Glenwood was satisfied that the positions that

3     they took were essentially the positions that got adopted.

4          Let's go to the next slide.

5     "Q  How satisfied was Glenwood with the results of those

6     negotiations?

7     "A  We were satisfied in that they did not adversely affect

8     us."

9          That's all Glenwood needed.  Glenwood wanted to make

10    sure that their tax breaks stayed in effect and that's what

11    they got.

12         Here is the next reason that you know that Sheldon

13    Silver is guilty of the real estate scheme.  Look what happened

14    each time Glenwood got what it wanted.  Each time Glenwood got

15    421-a passed -- each time -- Glenwood sent new buildings to Jay

16    Goldberg.  Each time.

17         In 2003, two of Glenwood's properties were with the

18    Goldberg firm.  All of this comes from Government Exhibit 750,

19    that was the chart that Michael Hoenig, the chief finance guy

20    at Glenwood, that he kept track of so he knew which all the

21    different law firms that Glenwood was using for its attorneys.

22    In 2003, as Dara Iryami testified, that was the number of

23    buildings that Glenwood gave over to Goldberg initially.

24         What happens in 2003?  421-a gets renewed.  Glenwood

25    sends two new properties to Goldberg, doubles their business.

FBN5sil3                    Summation - Mr. Goldstein

1    And next year they sent two more properties.

2             Then, what happens in 2007?  At that point Goldberg

3    has six of the Glenwood properties.  421-a gets renewed and

4    suddenly -- and you saw this on the chart, you saw how they

5    moved the business from one firm to another -- 16 properties.

6    Glenwood sends over 10 new properties to the Goldberg firm

7    right after they got what they wanted because they know that

8    this is what Sheldon Silver wants.

9             And then again, 2011, in 2011 there is still 16

10   properties, 421-a gets renewed, and what happens right at the

11   beginning of 2012 -- and we will look at this a little bit more

12   in a minute -- six more properties from Glenwood to Jay

13   Goldberg.  Each time.  This is not a coincidence, ladies and

14   gentlemen.  Glenwood is rewarding Sheldon Silver each time they

15   get what they want.  *Quid pro quo*.

16            Now, I expect that Mr. Molo will try to tell you that

17   none of this really matters because at the time that some of

18   this was going on Glenwood did not know about the kickbacks but

19   they learned about that in late 2011.  So, how could it be a

20   bribe if the bribers didn't even know about it?  Well, you

21   should reject this for two reasons:

22            First.  While the developers might not have known at

23   that time that Sheldon Silver was getting a cut, they sure knew

24   that he wanted their business to go to Jay Goldberg.  They were

25   sending huge business to Jay Goldberg -- you saw a summary

1    chart, Glenwood sent nearly $3 million of business to Jay

2    Goldberg at Sheldon Silver's request.  So, they might not have

3    known just how big the benefit to Sheldon Silver was, they may

4    not have known how much money he was personally making, but

5    they knew that Sheldon Silver wanted it and they knew that they

6    were giving him a benefit.

7         Second reason.  You know full well after that secret

8    retainer gets signed that the top people at Glenwood knew, by

9    early 2012, that Sheldon Silver was getting his secret cut,

10   that he was getting his kickbacks.  And what did they do?  They

11   give him six more buildings.  They do it again.  So this idea

12   that the bribers didn't even know that they were paying bribes

13   is simply wrong.  They knew they were giving him a benefit and

14   in 2012 they knew exactly what that benefit was.  And they

15   continued to give him all that money.

16        The next reason you know that Sheldon Silver is guilty

17   of the real estate scheme, the fifth reason:  Silver tried to

18   keep this from the developers as long as he could.  He wanted

19   to maximize the kickbacks and draw as little attention as

20   humanly possible.

21        Remember how this whole thing came out?  You heard

22   this in the testimony of Dara Iryami.

23        Dara Iryami is the one who does all the work at the

24   Goldberg firm.  She does all the work.  She has been working

25   for Jay Goldberg her whole career, her first job out of law

1   school.  And in 2008 she starts getting concerned because there

2   is no retainer in their files that mentions that Sheldon Silver

3   is getting any money from these developers and she worries that

4   they're in violation of the ethics rules so she tells Jay

5   Goldberg.  But Jay Goldberg is the one who is in charge of

6   putting out the retainer agreements and she told you how even

7   though she raised the issue, that they sat on it and it never

8   went out.  And so, another year and year and year passes where

9   there is no disclosure, there is no written retainer, nowhere

10  in writing is the fact that Sheldon Silver is getting a cut

11  from all of these payments from the developers.

12          Then, it is 2011 and Dara Iryami sees reports that

13  make her think that the disclosure rules in Albany are going to

14  change and that suddenly the secret might get out, that Sheldon

15  Silver might have to report that they're making money from --

16  that he is making money from Goldberg & Iryami.  So she asks

17  Jay Goldberg to help them get their ducks in a row and that is

18  what caused quite the problem because she is worried about her

19  attorney ethics and she is worried that this is going to get

20  out and so now Jay Goldberg is faced with a decision and

21  Sheldon Silver is faced with a decision.  They're going to have

22  to tell the developers.  They're going to have to tell them

23  what's going on, what's really been going on for years.

24          Let's also talk about Steve Witkoff.  Steve Witkoff

25  told you about that meeting with Sheldon Silver and he doesn't

1    know all this time.  At the time that he tells Steve Witkoff

2    that Jay Goldberg needed his business Jay Goldberg was already

3    getting millions of dollars of business from Glenwood.

4    Millions.  And so this idea that he needed the business, it was

5    a scam.  And we will talk about this in a minute but when

6    Sheldon Silver -- and they end up signing the secret retainer

7    with Glenwood in 2012, they don't do it with Steve Witkoff.

8    Steve Witkoff never gets a retainer that mentions Sheldon

9    Silver.  In 2013 he gets a retainer that mentions only Jay

10   Goldberg getting fees from his business.  No mention of Sheldon

11   Silver.  It is not until 2014, when law enforcement is digging

12   in, that Jay Goldberg calls up Steve Witkoff and tells Steve

13   Witkoff, oh, you didn't know that Sheldon Silver was getting

14   paid?  He actually tried -- you heard this from Steve

15   Witkoff -- he tried to get Steve Witkoff to lie to say that he

16   had known all along that Sheldon Silver was getting paid.

17          Ladies and gentlemen, this was a scam orchestrated by

18   the Speaker of the Assembly.

19          So, let's look at what happened at the end of 2011 and

20   the beginning of 2012 when, because of Dara Iryami's concern

21   the truth was going to come out -- or she thought it was going

22   to come out and that's the next reason that you know that

23   Sheldon Silver is guilty of the real estate scheme:  The secret

24   retainer.

25          That was Government Exhibit 700 that we showed you at

FBN5sil3                    Summation - Mr. Goldstein

1    the beginning of this morning.  This was a document -- this

2    document was not in anybody's files at Glenwood.  Remember what

3    Michael Hoenig told you, he is the chief finance guy and he

4    does all the real estate tax cert business.  He does all of it.

5    And what did he tell you?  That he went back and looked in

6    Glenwood's files and this secret retainer is not in there.  Not

7    in there.

8         He also told you that there were retainer agreements

9    in Glenwood's files that happened to be signed on the same day

10   also dated January 18th, also signed by Charlie Dorego, the

11   general counsel of Glenwood on behalf of all the buildings, and

12   those retainers that are actually in Glenwood's files, those

13   retainers don't say a word about money to Sheldon Silver.  Not

14   a word.  Totally clean from the files.  The only people at

15   Glenwood who know about this are a few people at the very, very

16   top because it was too dangerous for other people to know, too

17   dangerous for anybody to keep it in a file.  So, let's look at

18   how that letter got signed.

19        You remember the phone call that Sheldon Silver made

20   to Brian Meara in December of 2011?  That call was made on

21   December 28th, 2011.  What else happened on that day?  Sheldon

22   Silver deposited a check from Jay Goldberg for $114,000, on

23   that same day and then Sheldon Silver calls up Jay Goldberg and

24   then Sheldon Silver calls up Brian Meara and that's when he has

25   the conversation with Brian Meara where he says -- for the

first time he indicates to Brian Meara that he is getting money
from Jay Goldberg, from Glenwood, and he says to Brian Meara,
oh, I just represent the LLCs and not Glenwood so it's okay.
That's the conversation that Brian Meara wanted nothing to do
with -- nothing do with.  It is too dangerous a topic.

         But Sheldon Silver wanted to keep the money coming in.
$114,000, you have to come up with some distinction to be able
to keep the money coming in.  And so, they had to figure out a
way to put something down on paper to address Dara Iryami's
concern but to keep it all totally buried and that's what they
did.  They end up having -- Richard Runes told you that he has
a meeting with Sheldon Silver where they talk about how they're
going to do the secret side letter, the secret retainer, not
have retainer agreements that mention Sheldon Silver in
Glenwood's files.  Richard Runes told you that he thought that
if you had those retainer agreements that mention Sheldon
Silver, they might have to get filed somewhere, the secret
could get out.  And so, they signed the secret retainer and
then they buried it.  The only people that keep this in their
files is the Jay Goldberg law firm because Dara Iryami needed
it for her -- she thought she needed it to comply with her
ethics rules.  That is the only place that document was found.

         Think about what is going on here.  The Speaker of the
Assembly is meeting with lobbyists, bringing in hundreds of
thousands of dollars, setting up a whole process with letters

FBN5sil3                    Summation - Mr. Goldstein

1    that keep this whole thing totally secret so that he can keep

2    getting paid.  That is what's going on here, that is a crime,

3    ladies and gentlemen.

4            Let's look at the next reason that you know that

5    Sheldon Silver is guilty of this real estate scheme, because

6    what did Glenwood do?  They signed that retainer and they

7    decided that they had no choice but to keep paying Sheldon

8    Silver.  No choice.  Brian Meara wanted nothing to do with it,

9    Richard Runes told you that it was too hot -- too hot of a

10   subject -- but what else did Richard Runes tell you?  He told

11   you that they had the tiger by the tail.  "If you hold the

12   tiger by the tail, you have a difficult choice to make.  Do you

13   let go or not."

14           The one thing Glenwood could not do, the one thing

15   they could not do was alienate Sheldon Silver and Sheldon

16   Silver knew that.  And so now they're faced with a choice.  In

17   2012 they're faced with a choice, do we keep paying him or do

18   we cut him off?  And Glenwood decides it is in their business

19   interest to go all in, to keep paying Sheldon Silver because

20   that is what Sheldon Silver wanted.  And that, ladies and

21   gentlemen, that's the bribe.  They decide to keep paying

22   Sheldon Silver because Sheldon Silver wanted it because they

23   know that they are dependent on very specific pieces of

24   legislation that they need Sheldon Silver to let through.

25           Let's look at the timing of how this happens.  That

FBN5sil3                    Summation - Mr. Goldstein

1    secret retainer was dated January 18th.  It was signed on

2    January 21st.  What happens eight days later?

3              Eight days later, January 29th, the Goldberg firm asks

4    for even more buildings to discuss with Litwin -- Leonard

5    Litwin -- the head of Glenwood, new pieces.  They want new

6    products.  The side letter is in place, the secret retainer is

7    in place, let's get more.

8              What happens next day?  The next day Jay Goldberg

9    talks to Sheldon Silver.  Fairly important.

10             And the next day after that, on the 31st, six new

11   buildings to Jay Goldberg from Glenwood.

12             Leonard Litwin, Charles Dorego, Richard Runes, the top

13   people at Glenwood and nobody else, they know what's going on

14   and they make the decision to send six new buildings to

15   Goldberg and Sheldon Silver is right in the middle of it.

16             Now, what do you think that Sheldon Silver and Jay

17   Goldberg discussed on that call?  We don't have a transcript of

18   it but here is one of those places, ladies and gentlemen, where

19   you can use your common sense.  What do you think they talked

20   about?  Do you think they talked about the new pieces that

21   Glenwood was going to get that Sheldon Silver was going to get

22   paid off of?  The timing tells you that pretty good because the

23   next day six new pieces come to Goldberg.

24             And here is the thing:  While that's happening and

25   more business is going to Jay Goldberg, because of the way that

1    they did that secret retainer, the whole thing stays buried.

2    Nobody knows -- nobody other than the people paying the

3    kickbacks and Sheldon Silver getting the kickbacks.  Nobody

4    knows.  And that brings us to the next reason that you know

5    that Sheldon Silver is guilty of the real estate scheme --

6    because he had to keep it secret.  He lied and lied, again and

7    again and again, to keep anyone from learning the truth.  Let's

8    take some of these lies that you saw during this trial.

9            His disclosure forms.  Government Exhibit 916 is his

10   2005 disclosure form.  These forms require legislators to

11   disclose each source of income that they are receiving, each

12   source in capital letters.  It's not complicated, folks.  And

13   what does Sheldon Silver disclose?  He only discloses fees from

14   Weitz & Luxenberg where he is of counsel.  No mention of

15   Goldberg & Iryami.  Do you think this was some sort of

16   accident?

17           What did Sheldon Silver get that year from

18   Goldberg & Iryami in a single check?  2005, July, $159,000 of

19   Glenwood money through Goldberg & Iryami to Sheldon Silver.

20   Not a word of that on that disclosure form.  Each source.  You

21   don't think Sheldon Silver knew that that was a source of

22   money?  He knew and he chose to lie on his form because he

23   couldn't let out the fact that he was on secret retainer to

24   Glenwood who was making all this money in kickbacks from

25   Goldberg & Iryami.

FBN5sil3                    Summation - Mr. Goldstein

1          How else did he lie?  He lied to the public -- to the
2     press and the public -- over and over again to keep secret the
3     fact that he was on Glenwood's retainer.
4          You heard these audio recordings toward the end of
5     this trial.  I'm just going to play a little bit for you here,
6     but listen to what Sheldon Silver says about his outside
7     income.  Listen to what he says about how he made his money.
8     There is no doubt that he is lying to the press and to the
9     public so that they do not know what he is up to.  This is from
10    May of 2008.
11              (Audiofile played)
12         Ladies and gentlemen, almost every sentence in that is
13    a lie.  Almost every sentence.  *My clients are individual*
14    *people.*
15         Glenwood?  Witkoff?  They're massive corporations.
16         *Nothing to do with the political life.*  That's all
17    they do is deal with the political life, they're dependent on
18    the State.
19         *They come to him because he has been a lawyer for 40*
20    *years.  They were recommended to him.*  That's not true.  He
21    went to them to get their business because he wanted to make
22    the money.
23         I'm being very clear -- he is being the opposite, he
24    is lying -- I don't represent anybody with any impact on
25    anything we do legislatively at the same time he is meeting

1   with Glenwood and giving them what they want legislatively.

2   *They are individuals who, from some unfortunate circumstance*

3   *are injured and I am called upon to represent them.*  That's not

4   what happened.

5            You know this is a lie about the asbestos cases, too.

6   He is not called upon to represent any of these people.  He

7   doesn't actually represent any of these people.  He doesn't

8   represent anybody at all.  He passes on names and numbers and

9   he doesn't even do that on the real estate side.  On the real

10  estate side he just gets paid, he just gets his kickbacks.

11           Everything is a lie and you saw that again and again

12  and again.  Every time he talked to the press.  And these were

13  not some hurried things, this was deliberate.

14           And remember how we talked about this at the beginning

15  you have to ask yourself why people lie.  Why is he doing that?

16  He is the Speaker of the Assembly.  He is lying because he had

17  a huge criminal secret and he couldn't let it get out and he

18  had to come up with a story for how he was making money and

19  that was his story and it was a lie.

20           Can we go to the next recording?

21           I want to play you one more.  (pause)  We're going to

22  skip it.  They're in evidence.  You can read -- you can listen

23  to those recordings yourselves, Government's Exhibits 1, 2, 3,

24  4, 5 -- all of those recordings, listen to them.  It is Sheldon

25  Silver telling you lies about how he made his money, to cover

FBN5sil3                    Summation - Mr. Goldstein

1   up the crimes that he was committing.

2           The one thing, just on this one, we are not going to

3   play it but Government Exhibit 4, which is the recording of

4   this, it starts off with Sheldon Silver making quite the

5   admission.  We have to make disclosure the key.  Public

6   disclosure prevents activities that may be in conflict.

7           So, he well knows the importance of telling the truth.

8   He knows --

9           MR. MOLO:  The transcript is not in evidence.

10          THE COURT:  Overruled.

11          MR. GOLDSTEIN:  The recording is in evidence and you

12  can listen it to it for yourselves, ladies and gentlemen.  He

13  tells the public we have to make disclosure the key and he

14  tells the public that the same time that he is lying about

15  everything that he is disclosing -- he is lying on his

16  disclosure forms.

17          We already talked about how he lied about how he

18  spends hours every Friday reviewing case files.  You know that

19  that's not true.  You know how he kept this secret and he lied

20  to the people who he actually was close to about what he was

21  doing.  He didn't tell Arthur Luxenberg, Perry Weitz, or

22  anybody at Weitz & Luxenberg that he was making all of this

23  money from the real estate developers.  Brian Meara, his friend

24  of 42, years didn't tell him.

25          Here is something else, another thing that is very

FBN5sil3                    Summation - Mr. Goldstein

1   telling about what Sheldon Silver did to hide from the public

2   what he was up to.  In June of 2011 an ethics bill was passed

3   and Sheldon Silver tried to take some credit for it.  He puts

4   out a statement -- and you saw this in the testimony of Michael

5   Whyland, the press secretary, where he says:  When this gets

6   passed, transparency and accountability are the pillars of good

7   government.  This is June 13th, 2011, all about transparency.

8        Well, what happened exactly three weeks before this?

9   Three weeks?  Sheldon Silver took the million dollars that he

10  had at Counsel Financial and he split it between himself and in

11  his wife's name so that he could falsify his disclosure forms

12  and keep all that money from the public.  May 24th, a couple of

13  weeks before he tells the public that disclosure and

14  accountability and transparency are the key.  He is taking

15  steps to bury all that money that he is making.

16       What did Jordan Levy tell you about why he split that

17  note, why he put more than $400,000 in his wife's name?  He

18  told you that directly.  And this is another friend of Sheldon

19  Silver's who took no joy in testifying at this trial.  No joy.

20  But, he told you the truth.  He told you what Sheldon Silver

21  told him about why he wanted to split that note:  Because it

22  would allow him to not have to disclose it in his annual

23  financial statements, the financial filing he had to make as an

24  elected official.  And, ladies and gentlemen, that financial

25  statement that he lied on, that's in evidence too.  It is

FBN5sil3                    Summation - Mr. Goldstein

 1    Government Exhibit 923 where he is asked about his investments

 2    and there he lists just himself, only his own investment at

 3    that point in Counsel Financial with the value K -- it is the

 4    first time that these values actually get split up in a way

 5    where you can tell about how much money he is making.  And

 6    that's why he didn't want people to know about it anymore.  K

 7    is between $300 and $450,000.  If he hadn't split the note it

 8    would have been close to a million dollars -- it would have

 9    been close to a million dollars and he did not want the public

10    to know how much money he had brought in from his schemes.

11              That's not the only way he kept all this from the

12    public.  You also heard testimony about something that was

13    created by the governor called the Moreland Commission to

14    investigate public corruption.  The Moreland Commission decided

15    that they wanted to find out about the outside income of

16    legislators like Sheldon Silver.  What did Sheldon Silver do as

17    the leader of the Assembly?  He got the Assembly to hire

18    outside counsel to fight the Moreland Commission.  He worked

19    with Weitz & Luxenberg who got a subpoena from the Moreland

20    Commission to fight that subpoena so that the records of his

21    income would not be revealed.

22              I expect that Mr. Molo will tell you, and he said this

23    in his opening statement, that there were all these

24    institutional reasons why Sheldon Silver fought the Moreland

25    Commission, that he was just protecting the Assembly.  Well,

FBN5sil3                    Summation - Mr. Goldstein

1   you know what?  He was also protecting himself.  Remember the

2   first witness at this trial, Assemblywoman Amy Paulin from

3   Westchester?  She was asked about all these great lawyers that

4   Sheldon Silver hired to represent the Assembly to fight the

5   Commission.  She told you she didn't understand the point.  Why

6   not just be honest about your income.  Why not just turn it

7   over.  Look at what she said under questioning from Mr. Molo in

8   cross-examination:

9   "A  I was happy that somebody was looking at some of these

10  things and I was not bothered by the fact that the Moreland

11  Commission was investigating potential corruption in the

12  legislature.  I think that it is good to expose that because I

13  value the institution, I think it is important to protect it,

14  and I think that all of the corruption needs to stop."

15          That was not a view shared by Sheldon Silver.  And

16  what happened to that Commission?  The commission got

17  disbanded, you learned that, and the subpoenas were withdrawn.

18          So that, ladies and gentlemen, those are the reasons

19  that you know that Sheldon Silver is guilty of the real estate

20  scheme.  He was on a secret retainer to the largest developer

21  of luxury buildings in New York, he takes specific legislative

22  action, and other official action to help that developer, he

23  keeps secrets, he lies, and he does it all because he cares

24  about the money.  That is what he cared about.

25          Ladies and gentlemen, when you begin your

FBN5sil3                    Summation - Mr. Goldstein

1    deliberations tomorrow you are going to hear instructions from

2    the Judge about the charges in this case and there are seven

3    charges in this case based on all of the evidence that you have

4    seen during this trial.  There are three separate charges that

5    relate to the asbestos scheme, there are three separate charges

6    that relate to the real estate scheme, and there is a charge of

7    money laundering for Sheldon Silver taking the money that he

8    made from his crimes and moving it into all those private

9    investments through Jordan Levy.

10         Let me just say a few things about these charges but

11    what I ask of you to do is to pay very close attention to what

12    Judge Caproni instructs you on the law.  She will walk you

13    through the elements of each of these charges that the

14    government has to prove beyond a reasonable doubt.  When you

15    think about the evidence, you will know that every single one

16    of those elements has been proven beyond a reasonable doubt.

17         Just to talk about them briefly:

18         Honest services mail fraud and honest services wire

19    fraud on the asbestos scheme, and honest services mail fraud

20    and honest services wire fraud for the real estate scheme; the

21    core of these offenses is the same and it is what we have been

22    discussing this entire morning.  When Sheldon Silver took all

23    those official actions to the benefit of Dr. Taub and to the

24    benefit of the developers, was he motivated, was he influenced

25    in any way by the money?  That's the core of these charges and

FBN5sil3                    Summation - Mr. Goldstein

1    that is what you know very, very clearly from the evidence in
2    this case.  The evidence on that, that the money played even
3    just a part of Sheldon Silver's motivation, the evidence on
4    that is overwhelming.  It is clear as day.  It was always about
5    the money for Sheldon Silver.
6          Now, one of these counts for the asbestos scheme is a
7    mail fraud count and one is a wire fraud count, and the same is
8    true on the real estate scheme.  You will see in the
9    instructions what that means.  The government has to prove that
10   there was a mailing that was done during the course of the
11   scheme and that there was a wire, a telephone call that was
12   done.  And we don't need to spend a lot of time on that because
13   these are not, I believe, in any real estate dispute, but you
14   can know that Special Agent Deanna Pennetta who testified at
15   some length and it was a little bit boring, but that was
16   because she was going through for you all of the telephone
17   calls and all of the wires and some of the mailings that are at
18   issue for these counts.  Here is a chart, Government Exhibit
19   1520.  This is a chart of all of the asbestos wires and
20   mailings that Special Agent Pennetta put together for you.  It
21   tells you what you need to know about these mailings and these
22   calls on the asbestos charge.
23         Special Agent Pennetta also told you about the wires
24   and the phone calls in the real estate scheme.  Remember the
25   phone call from Sheldon Silver to Brian Meara on December 28th,

FBN5sil3                    Summation - Mr. Goldstein

 1    you saw evidence of that?  That is a wire in furtherance of the

 2    real estate scheme.  That's all the government has to prove.

 3              Mailings.  You saw the mailings, all the checks that

 4    were sent by Goldberg & Iryami in the mail to Sheldon Silver as

 5    part of the real estate scheme.

 6              So, there is plenty of mailings, plenty of wires and

 7    that will help prove honest services mail fraud and the honest

 8    services wire fraud.

 9              When it comes to the counts of extortion -- just to be

10    clear, the wires and the mailings that were introduced to you

11    on the asbestos side, they were actually introduced to you by

12    Gary Klein, by the managing attorney of Weitz & Luxenberg.  He

13    told you about the phone records that he dealt with and he also

14    told you about the mailings that Weitz & Luxenberg did with

15    Sheldon Silver.  You can look at his testimony for that.

16              Extortion.  I expect that Judge Caproni will tell you

17    that extortion in this context is not the sort of extortion

18    where somebody is holding somebody up to get their money.  This

19    is a different kind of extortion, it is called extortion under

20    color of official right.  It means using your government power

21    to get property from somebody.  And that, ladies and gentlemen,

22    that you also know is what happened here.  The property that he

23    got were the leads from Dr. Taub -- the information, the highly

24    valuable information that Dr. Taub gave to Sheldon Silver that

25    contained the names and the contact information for people with

1    mesothelioma.  These are things that you heard of at this trial

2    law firms pay a fortune for.  Sheldon Silver got those leads

3    from Dr. Taub and passed them on to Weitz & Luxenberg and he

4    did that using his official power.  That is extortion.

5            On the real estate side, he got the real estate

6    developers to move their tax business from other law firms to

7    Goldberg & Iryami.  That's the property that he extorted from

8    the developers.

9            You will also hear an instruction about venue which

10   simply means that the crimes had to take place here in the

11   Southern District of New York.  They all did.

12           You will hear an instruction about the statute of

13   limitations, whether or not these crimes, these schemes

14   continued past the beginning of 2010.  They all did.  The

15   asbestos scheme, the real estate scheme, these things were all

16   happening, were all past 2010.

17           Before we get to money laundering I want to say one

18   thing about the honest services fraud and extortion charges

19   involving the asbestos scheme that I expect you are going to

20   hear a lot from Mr. Molo about this afternoon.  You will hear

21   in those instructions what is required by a public official

22   getting something in return or in exchange for the use of his

23   official authority.  If you recall, at the end of Dr. Taub's

24   testimony on cross-examination Mr. Molo had him look at a draft

25   agreement -- not a final -- at a draft agreement that the

1    government had given his lawyer about an agreement not to

2    prosecute him if he told the truth.  I would not be surprised

3    if Mr. Molo stands up this afternoon and waves that draft in

4    front of you and says, see?  This proves that there was no

5    exchange between Dr. Taub and Sheldon Silver because the draft,

6    in one sentence there is the word "exchange" and in the final

7    agreement that word isn't there.

8            Now, ladies and gentlemen, you have already heard that

9    Dr. Taub is not on trial here so this whole issue is

10   irrelevant, it is a side show.  Dr. Taub did not need to intend

11   to commit a crime.  But what I ask you to do is to look at the

12   final agreement that Dr. Taub actually saw.  The draft he said

13   was, he saw -- he said his lawyers dealt with, he didn't know

14   about it.  But the final version -- the final version -- he

15   wanted to make sure was accurate and he signed it.  It's

16   Defense Exhibit 27.  Look at that agreement.  It requires him

17   to tell the truth which he did and as I told you at the outset

18   of this case if you believe Dr. Taub, the asbestos scheme is

19   over.  His testimony proves that these grants were in exchange,

20   from Sheldon Silver's perspective, for those referrals.  So, he

21   has to tell the truth.  And look also at what Dr. Taub admitted

22   to in that agreement, it is exactly what he admitted to you

23   here.  He says in that agreement that he referred numerous

24   patients to Sheldon Silver because he wanted to develop a

25   relationship with Sheldon Silver where he could ask for

1    official benefits and then he did, in fact, ask for official

2    benefits and he received them.  That, ladies and gentlemen,

3    that is sending something of value -- these patients -- to a

4    politician so that he will give things to you as opportunities

5    arise.  That's what the law --

6                MR. MOLO:  Objection.

7                THE COURT:  Overruled.

8                MR. GOLDSTEIN:  What is that you will hear in an

9    instruction that we talked about before as what the law

10   requires?  So, I ask you, when you listen to Mr. Molo about

11   this issue, look at what Dr. Taub told you and look at what he

12   actually signed.  The whole thing is a non-issue.

13               So, ladies and gentlemen, there has been a mountain of

14   evidence in this case and it came in very quickly.  We moved

15   through trial very, very quickly.  You saw 25 witnesses, a lot

16   of documents, and I have now been talking to you for a very

17   long time and I'm about to sit down.  I have not covered nearly

18   all of the evidence -- you don't want me to -- but this

19   evidence establishes beyond a reasonable doubt that Sheldon

20   Silver is guilty of all of the charges in this case.  All of

21   them.

22               Before I sit down I want you to step back and look at

23   the big picture.  The big picture of what the evidence has

24   shown and what the defenses have been because it is actually

25   pretty simple.  It is not that complicated.  When you step back

FBN5sil3                    Summation - Mr. Goldstein

1     and you consider the evidence as a whole three things could not

2     be any clearer:

3            First.  These were the defendant's schemes.  We are

4     here today because of what the defendant, Sheldon Silver, did.

5     He set these schemes in motion.  He is the one who hit up

6     Dr. Taub for cases once he learned that Dr. Taub was interested

7     in research money.  He was the one who chose to use his state

8     power over the biggest developers in the city in order to get

9     them to send their business to Jay Goldberg so that he could

10    get his kickbacks.  He was the one who chose to use taxpayer

11    money -- not Weitz & Luxenberg money, not private money --

12    taxpayer money to pay for Dr. Taub's research so that he could

13    get all the financial benefit in return.  He set this up.

14           The second thing, very straightforward, you know the

15    defendant is guilty because he lied about it over and over

16    again.  He could not let his secret get out.  He lied to his

17    friends at Weitz & Luxenberg, he lied to Steve Witkoff to get

18    money out of him, he lied to the press, he lied to the public,

19    he lied to his constituents, he lied to his fellow members of

20    the Assembly.  Why do that, ladies and gentlemen?  He did it

21    because he was committing crimes.

22           Third.  You know that Sheldon Silver was motivated at

23    least in part by the money.  That could not be any clearer and

24    that proves he is guilty because now that his secrets have been

25    revealed there is no denying the quid -- no denying it -- there

FBN5sil3                    Summation - Mr. Goldstein

1   is no denying the quo.  The only question is what motivated

2   him.  And if you find that money played any part, then he is

3   guilty.  And, you know?  There are 4 million reasons why you

4   know the money played a part.

5          So, it is soon going to be the defense's turn to talk

6   to you.  I have touched on a few of the defense arguments that

7   I expect they will make during the summation.  I expect there

8   will be others that I haven't had time to talk about.  But when

9   you listen to Mr. Molo stand before you, for all the arguments

10  that he makes ask yourself two questions:  First, then why the

11  lies and the deception?  Second, did it really have nothing to

12  do with the money?  Really?  Keep those questions in mind as

13  you listen to the defense because the defense needs you to

14  believe that the only thing motivating Sheldon Silver was

15  friendship and goodwill because they know that if you find that

16  the money played any role at all, they he that he is guilty and

17  you well know the money played a role and that is why he lied.

18         So, it is soon going to be your turn, ladies and

19  gentlemen, to evaluate the evidence for yourselves and in doing

20  so we ask you, just as my colleague Ms. Cohen did at the

21  beginning of this case, to listen carefully to the Judge's

22  instructions on the law, to follow them, and we ask you to use

23  your common sense, the same tried and true common sense that

24  you use in your everyday lives that you have developed over

25  your lifetimes of dealing with people and situations, the

FBN5sil3

1    common sense that tells you when a story doesn't ring true or

2    when something doesn't seem right.  I ask you to take a step

3    back, look at all of the facts uncovered during the course of

4    this trial keeping your good sense in mind and the evidence

5    viewed through your common sense points to only one conclusion

6    and that is that the defendant is guilty as charged.

7              And just one more thing to consider.  In response to

8    all the evidence packed, stacked so powerfully against him, the

9    defense continues to claim that all of this was politics as

10   usual.  Politics as usual.  You must reject that.

11             MR. MOLO:  Objection.

12             THE COURT:  Overruled.

13             MR. GOLDSTEIN:  To taint your fellow legislators and

14   the democratic process with your own corruption and say that

15   that's politics as usual, it is not even close, not by a mile.

16   This, ladies and gentlemen, was bribery.  This was extortion.

17   This was corruption.  The real deal.  Do not let it stand.

18   Don't let it stand.

19             Thank you, your Honor.

20             THE COURT:  Okay, ladies and gentlemen.  We are going

21   to break for lunch.  Do not discuss the case.  You have a

22   little more to listen to before you can start discussing it but

23   don't discuss it or talk about anything else in the courtroom

24   and I will see you at 2:00.

25             (Continued on next page)

FBN5sil3

1              (Jury not present)

2              THE COURT:  Okay, folks.  2:00.

3              MS. COHEN:  Thank you, your Honor.

4              (Luncheon recess)

5              (Continued next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FBNYSIL4                    Summation - Molo

                          AFTERNOON SESSION

                             2:00 p.m.

 1          (Jury not present)

 2          THE COURT:  Please be seated, everybody.

 3          MR. COHEN:  Your Honor, may I address some things

 4   before you call in the jury?

 5          THE COURT:  Yes.

 6          MR. COHEN:  Number one, I don't believe your Honor

 7   formally substituted the alternate juror.  I know your Honor

 8   said she was going to do it, but I don't know if that juror

 9   knows he or she is going to be a juror.

10          THE COURT:  I believe that is the case, that they're

11   aware.  I just moved everybody down a slot.

12          MR. COHEN:  Secondly, your Honor, I noted during

13   Mr. Goldstein's summation, that he vouched for witnesses, I

14   believe improperly, specifically saying that Mr. Meara told the

15   truth, and later on, if I heard it correctly, that Dr. Taub

16   told the truth.

17          I don't think that's a proper argument for the

18   government to be making, and they should be admonished against

19   doing so again.

20          THE COURT:  Don't do that in your rebuttal.

21          MR. MASTER:  Yes, your Honor.

22          THE COURT:  You're rebutting?

23          MR. MASTER:  I am, your Honor.

FBNYSIL4                    Summation – Molo

1              THE COURT:  Anything else before we bring the jury in?

2              Mr. Molo, do you want me to call your break halfway

3    through, or do you want to call your own break?

4              MR. MOLO:  I think I have a convenient spot to break,

5    if that's okay, Judge.

6              THE COURT:  That's fine.

7              We're missing a juror.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Okay, ladies and gentlemen, as was the

3     case this morning, we will take a break about halfway through

4     Mr. Molo's summation.

5          Just so there is no question, alternate number one is

6     now juror number 12.

7          Do you understand that?

8          JUROR:  Yes.

9          THE COURT:  Thank you.  Perfect.

10          Mr. Molo.

11          MR. MOLO:  Thank you, your Honor.

12          Good afternoon.  Sheldon Silver did not sell his

13     office.  There was no quid pro quo.  He is not guilty.

14          We've been sitting here -- you've been sitting here

15     patiently for the last three weeks or so, and you've sat

16     quietly and taken notes and paid attention.

17          Now your job shifts.  Your job becomes a more active

18     job.  Your job now is to decide the case and to decide the fate

19     of Mr. Silver.

20          MR. MASTER:  Objection, your Honor.

21          MR. MOLO:  It's an awesome responsibility to sit in

22     judgment of another person.  It's almost a god-like function

23     that you're going to be asked to perform or that you will

24     perform, you've sworn to perform.

25          And I hope and I trust that each of you have summoned

FBNYSIL4                    Summation - Molo

1     the best in yourself to do the right thing and to make the best

2     decision you possibly can, judging the facts and following the

3     law.

4            On behalf of Mr. Silver and my colleagues, I want to

5     thank all of you for being here and taking your time away from

6     your families and your jobs, for being attentive, for being

7     patient.

8            I think, next to serving your country in the military,

9     there is no greater service that any of us can perform for our

10    country than to serve as a juror because, in doing so, you're

11    functioning as part of the administration of justice, the

12    administration of justice.

13           By that I mean following the law, administering the

14    law, as it has been decided by congress, signed in to law by

15    the president.

16           Not just the way we may feel about an issue, not just

17    the way we may think of something being right or wrong or

18    something being thrown at you and saying, aha.  This is the way

19    you should look at this, whether something is right or wrong.

20    No.  The administration of justice, and that means following

21    the law.

22           Each of you knew, when you were seated in this case,

23    that this is an important case.  And the fact that we had

24    opening statements in this august courtroom and we're now here

25    today for that final argument tells you the same thing.

1          Obviously, the courtroom is as packed as it was for

2     the opening statement.  I know you've been faithful to your

3     obligations.  You have paid attention to the evidence.

4          You have not read about the case in the newspaper.

5     It's a big case.  You know who it's the biggest case for is

6     Mr. Silver.  At the end of the day, at the end of the trial,

7     the issue is will you find him guilty of having committed a

8     crime.

9          The evidence and the law does not support that.  The

10    question is did he commit a quid pro quo.  Did he engage in a

11    quid pro quo, this for that.  The answer is no.  Absolutely no.

12    He committed no crime.

13         Now, you're going to hear from Judge Caproni tomorrow

14    morning read a whole set of instructions about how you should

15    consider the evidence that you heard over the last couple of

16    weeks and how you should decide this case.  I'm going to touch

17    on a few of those things.

18         One of them I want to touch on right now is the burden

19    of proof, the burden of proof.  The prosecutors have an

20    absolute obligation to prove their case, each and every

21    element -- not just part of it, not just some of it, not just

22    sort of maybe a little bit of it -- every element beyond a

23    reasonable doubt, beyond a reasonable.

24         Judge Caproni is going to tell you what that means.

25    Basically ask yourself, do I have a doubt?  Is this something

1  that I would go forward with on an important matter in my life,

2  that I would trust what I'm seeing and what I'm deciding beyond

3  a reasonable doubt.

4          Because Mr. Silver, for all of what we heard, the

5  speaker, the man who appoints these people and these jobs,

6  Weitz & Luxenberg, everything that we heard, Golberg &

7  Iryami -- Mr. Silver is presumed innocent, presumed innocent.

8          That is his right under the United States

9  Constitution.  It's a right that every one of us has, and that

10 is why you are here today, because we welcome the opportunity

11 to have these charges brought before each of you and decided by

12 you because Mr. Silver is presumed innocent and because these

13 prosecutors must prove to you beyond a reasonable doubt what

14 they've alleged.

15         Now, I promised you three things at opening statement.

16 First I told you that this was a strange criminal case because

17 no harm had occurred.  I also told you you'd likely hear things

18 and see things that you might not like, might even make you

19 feel a little uncomfortable.  Third, that you would see that no

20 crime had been committed.

21         Now, as to the first, despite all the bluster and

22 bravado we heard, opening statements, during witness

23 examinations, this morning during summation about corruption

24 and greed and a secret pot of money.

25         Do you remember that some?  A secret pot of money.

1    We're going to talk about that later.

2              The prosecutors have failed to demonstrate that any

3    crime had occurred.  Now, when the case began, you might have

4    thought, well, this is a public corruption case.  I'm going to

5    hear about Mr. Silver having cash delivered to his office or

6    there will be tapes of secret meetings or that there would be

7    evidence by someone who said, you know, I paid him off.

8              There was none of it, absolutely none of it.  You

9    heard instead about the State of New York supporting one of the

10   most prominent cancer doctors at one of the most prominent

11   medical institutions in the city, if not the world.

12             You heard from several witnesses how hideous the

13   disease is that that doctor tries to treat and that that doctor

14   is working to find a cure for that and that funding is for him

15   solid.

16             But the state was doing a good thing by supporting

17   that research.  New York has got one of the highest incidents

18   of mesothelioma Dr. Taub testified.  It's third or fourth in of

19   50 states.

20             You heard how tenants benefited for the first time in

21   many, many years with a better tenant regulation law.  You

22   heard about people who were suffering from that terrible

23   disease, mesothelioma, actually going to the finest law firm in

24   America to deal with that and obtaining some economic justice

25   for the wrongs that were done them.

1              You heard about Glenwood and Witkoff, the developers,

2      getting excellent representation from Golberg & Iryami on their

3      tax certiorari matters.

4              You also heard about Mr. Silver being paid a referral

5      fee by Weitz & Luxenberg and by being paid a referral fee by

6      Golberg & Iryami.  You might remember there were many witnesses

7      that were asked the question, are referral fees common?  Are

8      referral fees allowed?

9              Every one of them, two a person, said referral fees

10     are industry standard; that there is nothing wrong with someone

11     accepting a referral fee.  But yet the prosecutors have tried

12     to blow this up into something that's nefarious about a

13     referral fee.

14             And the referral fee that we heard that Mr. Silver was

15     paid was the standard fee that is paid in those types of cases.

16     He was paid essentially a third of a third on the cases from

17     Weitz & Luxenberg.  And Golberg & Iryami paid him the same

18     percentage of their fee as they were getting from the tax

19     reduction that they achieved for the client.

20             When we heard today this morning about step two,

21     Goldberg has to calculate Mr. Silver's referral fee, that was

22     just playacting.  There was no calculation.  It was a

23     percentage of their percentage.  It was a standard fee.

24             We heard a lot, especially at the end, about this

25     business about ask yourself, was he motivated by the money.

FBNYSIL4                    Summation - Molo

1    Was he motivated by the money.

2            Well, you know what?  It's okay to be motivated by the

3    money.  It's not okay to be motivated by the money and to do it

4    in connection with an illegal quid pro quo.

5            Why is it okay to be motivated by the money?  Because

6    New York and all other 50 states have adopted this citizen

7    legislator model.

8            Our legislators in the state of New York are

9    part-time.  We heard from our first witness, Ms. Paulin, that

10   they're in session about six months of the year, and that

11   they're in session two or three days.  Sometimes it's a little

12   more; sometimes a little less.

13           Almost all of them, unless you're in Ms. Paulin's

14   situation where she's got a very wealthy husband, they're able

15   to work and have other jobs.

16           There are things that come from that.  There are

17   challenges that come along with that, but as a result of having

18   this citizen legislator model, we're able to bring people into

19   government who have experiences that are broader than what

20   would be there if it was just a full-time legislator.  That

21   could be right; it could be wrong.  That right now is the law.

22   It has been since the 1700's in New York.

23           Now, I said that you might hear about things that you

24   don't like as a result of that.  We did hear about a legislator

25   directing state grants to organizations, worthy organizations,

1  but state grants to organizations in which they had a strong

2  personal connection.

3          We also heard about a legislator giving a

4  proclamation, a resolution, to someone they knew.  We even

5  heard about a legislator taking action on a bill that could

6  have theoretical or maybe even real impact on the legislator's

7  financial resources.  We heard about all of those things.  But

8  I'm not here to defend what Assembly Member Amy Paulin has

9  done.

10          Because, if you recall, Ms. Paulin, who voted for

11  Mr. Silver for speaker seven times and came in to testify

12  against him, said that she didn't want to answer my questions.

13  She wanted to argue and make speeches.

14          She testified that the prosecutors met with her and

15  several other members of the assembly on a number of occasions

16  or a number of them together -- excuse me.

17          She testified that there were a number of them that

18  were interviewed, and she was picked.  She was picked as their

19  poster child of good government.  This was the person that was

20  the hand-picked selection of these prosecutors.

21          You'll recall, when I confronted her with the

22  proclamations for a major donor that she had made and the

23  grants to the organization where she'd worked -- do you

24  remember that?

25          Believe me.  I'm not saying it's not a good

1    organization.  I'm also not saying it's not worthy of receiving

2    that, but she did that.  She gave a grant to an organization

3    where she was the executive director.  She also gave the grant

4    to the Westchester Opera and goes to their parties.

5           I'm not suggesting that there's something wrong with

6    that, but she did it.  We also heard evidence about her

7    family's wealth portfolio and how it included significant

8    holdings like stock in Con Ed and BP while she was the chair of

9    the Energy Committee.

10          She actually held hearings where the CEO of Con Ed

11   came and testified before her, and her husband owned between

12   $100,000 and $150,000 in stock in that company.

13          She repeatedly sponsored a bill that would have

14   required all New York children to get a vaccination, and that

15   vaccination was from a drug that was manufactured by a company

16   called Merck.  And Merck happened to be a company that her

17   husband owned between $100,000 and $150,000 dollars in stock

18   in.

19          Do you remember how she responded when she was

20   confronted with all of this, the good government representative

21   that the prosecutors trotted out here as their first witness?

22          Here was her testimony.  I asked her:

23   "Q. Is there anything wrong with what you did?

24   "A. You're making me think about it.

25   "Q. I don't know.

 1    "A. Well, I'm actually going to be much more careful and

 2    perhaps advise my husband and that we should not be owning

 3    stock that I have a relationship to."

 4              That's what the good government representative said,

 5    the person the prosecutors brought to you.  They're probably

 6    all going to march together in the Thanksgiving parade.

 7              MR. GOLDSTEIN:  Objection.

 8              THE COURT:  Sustained.

 9              MR. MOLO:  She's probably out blowing up the balloons

10    right now.

11              MR. GOLDSTEIN:  Objection.

12              THE COURT:  Sustained.

13              MR. MOLO:  So what I'm saying to you is what I said in

14    the opening statement.  It's virtually impossible for someone

15    to serve in this citizen legislator model and not have some

16    form of conflict.

17              Again, I'm not saying that Ms. Paulin committed a

18    crime.  I'm not saying she did anything wrong.  I'm just

19    illustrating that conflicts are inherent in this process.

20              Now, as I told you at the outset, absolutely,

21    absolutely no crime has been committed.  The prosecutors have a

22    theory, and that theory, as I told you, was sort of based on

23    looking at life through dirty windows.

24              What we heard in this morning's argument and what we

25    saw throughout the trial, that if a fact gets in the way of

1    that theory, you ignore it.  If you can't ignore it, you twist

2    it, and you try and shape it to make it fit the theory, rather

3    than the facts being the facts and applying the law to the

4    facts.

5           I'm going to review all of the evidence, but I want to

6    address a few specific jury instructions that the judge is

7    going to give you.

8           Now, Judge Caproni is not only going to read her

9    instructions to you tomorrow, but you're going to get a set of

10   these to take back to the jury room with you on paper.

11          While there are seven counts, as we saw earlier, in

12   the charges against Mr. Silver, they really boil down, all of

13   them, to this question of was there an illegal quid pro quo.

14   The answer to that is no.

15          Did Mr. Silver sell his office?  The answer to that is

16   no.  Was there this illegal this for that?  The answer to that

17   is no.

18          Now, the prosecutors' primary charges are what I'll

19   call honest services fraud and extortion.  In the honest

20   services fraud, Judge Caproni is going to explain to you that

21   first the prosecutors will tell you that there must -- she's

22   going to tell you that the prosecutors have to prove that there

23   was a scheme to defraud the public of its honest services and,

24   if they fail to prove that scheme, then you cannot find

25   Mr. Silver guilty.  You must acquit.

1              Judge Caproni will tell you second that the

2     prosecutors must prove beyond a reasonable doubt that

3     Mr. Silver participated in a scheme knowingly, willfully, and

4     with a specific intent to defraud.

5              It's not enough that he did the acts that the

6     prosecutors are claiming that Mr. Silver did or that maybe

7     we've heard many witnesses testify to and maybe undisputed.

8     It's not enough.

9              He's got to have undertaken those acts with a corrupt

10    intent.  The prosecutors must prove that beyond a reasonable

11    doubt.

12             Third, Judge Caproni is going to tell you that the

13    prosecutors must prove beyond a reasonable doubt bribes or

14    kickbacks as part of the scheme and that there was a quid pro

15    quo.

16             She will also tell you, if we could put it up on the

17    screen, first that the government must prove that there was a

18    quid pro quo.  A quid pro quo is Latin, and it means this for

19    that.  It's part of the instructions you're going to get.

20             Beyond that you're going to hear that if you find that

21    Mr. Silver understood that the benefits were provided solely to

22    cultivate goodwill or to nurture a relationship with a person

23    or entity who provided the benefit and not in exchange for any

24    official action, then this element will not have been proven.

25             Goodwill, nurturing relationship.  You remember I

1    asked those questions.  We're going to talk about that in a

2    minute.

3             If this occurred through goodwill, the nurturing of a

4    relationship, not in exchange for an official action, the

5    prosecutors have failed to prove their case, and you must

6    acquit.

7             On the extortion charges, the judge will instruct you

8    that, first, the prosecutors have to prove that Mr. Silver was

9    a public official, and he is and was during these events.

10            You'll also have to be convinced beyond a reasonable

11   doubt that Mr. Silver obtained property that was not

12   legitimately owed to the public office that he occupied.

13            "Property" has a very specific meaning here.

14   Judge Caproni is going to tell you that the term "property"

15   means money and intangible things of value that are capable of

16   being transferred and given from one person to another.

17            As, with the honest services charge, she's going to

18   show you that if you find Mr. Silver understood that the

19   property at issue was given solely to cultivate goodwill or

20   nurture a relationship, you must acquit.

21            There's also a money laundering charge.  You don't get

22   to that until you've found that these other crimes have been

23   committed.  I'm not going to address the jury instructions with

24   respect to that.

25            I'm going to next talk about real estate because

 1    that's where they ended.  I want to talk about real estate.

 2            The real estate allegations are bizarre to say the

 3    least.  The prosecutors have charged that supposedly from

 4    2000 -- this is what they've come up with, that from 2000 until

 5    2015, there was this scheme and that Mr. Silver was taking

 6    bribes from Glenwood and Witkoff in the form of Goldberg

 7    referral fees in exchange for Mr. Silver taking favorable

 8    official action to benefit them and specifically in this 2011

 9    real estate legislation that we talked about.

10            There were charts.  Remember we were marking on the

11    charts.  That's what they've charged.  This makes absolutely no

12    sense.

13            The testimony of everyone involved is clear that there

14    was no quid pro quo.  Mr. Runes and Mr. Meara were clear that

15    during the over two decades that Mr. Silver was the speaker, he

16    never asked Glenwood for anything in exchange for taking

17    legislative action.

18            It was also clear that Glenwood never paid anything to

19    Mr. Silver in exchange for some official action.  They keep

20    talking about Mr. Silver was on the payroll.

21            Mr. Silver wasn't on any payroll.  He was on Weitz &

22    Luxenberg's payroll for a limited amount, and then he also got

23    a referral fee.  But he wasn't on Glenwood's payroll.  He

24    wasn't on Mr. Witkoff's payroll.

25            He received a referral fee, just as any lawyer would,

1   just as Dara Iryami told you any lawyer would, from Golberg &

2   Iryami.  And Mr. Silver had plenty of opportunities over that

3   lengthy period of time to help out Glenwood if he wanted to,

4   but he never did.

5           The transcript, if we may.

6           Mr. Runes was asked, "During the entire time that

7   you've been working for Glenwood?

8   "A. Yes.

9   "Q. Plenty of bills have come up in those last 21 years that

10  might affect Glenwood's interests?  Is that correct?

11  "A. Yes."

12          Mr. Meara's testimony:

13  "Q. Mr. Silver did not demand from you something of value in

14  exchange for taking legislative action, did he?

15  "A. No."

16          Mr. Witkoff also told you that he never gave

17  Mr. Silver anything in exchange for an official action.

18          Mr. Witkoff was asked by me, question:

19  "Q.  Basically, Mr. Silver said this is a pretty good guy.  Why

20  don't you throw him some business; is that right?

21  "A. That's right -- yes.

22  "Q. And at that time Mr. Silver did not tell you that he wanted

23  you to send Goldberg business in exchange for him doing

24  something for you, did he?

25  "A. No.

FBNYSIL4                    Summation - Molo

1    "Q. In fact, you did not give Mr. Goldberg business in exchange

2    for Mr. Silver's specific exercise of his official authority in

3    some ways; is that right?"

4           That was Mr. Witkoff's testimony.

5    "A. No."

6           And Mr. Silver never did anything for the Witkoff

7    Group, and he never did anything, never took any official acts

8    for Glenwood.

9           Now, the timing here establishes that there was no

10   quid pro quo.  As I told you, the developers under this

11   theory -- and it is just that -- didn't even know that a bribe

12   was being paid when it supposedly was being paid.  What kind of

13   bribe is that?  It has to be the strangest quid pro quo ever.

14          How could Glenwood and Witkoff begin paying a bribe to

15   Mr. Silver to take favorable action on the 2011 rent regulation

16   laws when they didn't find out -- which were passed in June by

17   the way, of 2011, which they didn't find out.

18          Glenwood found out at the end of 2011, early 2012,

19   that Mr. Silver was getting a referral fee from Goldberg, and

20   Witkoff didn't find out until much later.

21          What did Mr. Runes say when he was asked about this?

22   "Q. And to be absolutely clear, Mr. Runes, all of what you

23   testified to concerning this letter --" that's the side

24   letter --

25   "Q. -- and the disclosure and Mr. Silver being paid a referral

1    fee -- all of this happened in January of 2012; correct?

2    "A. Yes.

3    "Q. Maybe the very end of 2011; correct?

4    "A. It started perhaps.

5    "Q. And, at that point in time, you said no one at Glenwood was

6    aware that Mr. Silver was being paid referral fees by

7    Mr. Goldberg; correct?

8    "A. Correct.

9    "Q. This is long, long after the rent regulation of 2011 was

10   passed; correct?

11   "A. Yes."

12        Mr. Meara said the same thing.  Mr. Silver has been

13   consistently pro tenant.  You heard nothing other than that

14   during the course of the trial.

15        The Democratic Conference in the assembly of which he

16   is the leader is overwhelmingly pro tenant, and Glenwood

17   executives like Charlie Dorego -- you might remember this

18   because it was kind of an odd moment in the trial.

19        I was examining Mr. Runes, and he testified that

20   Mr. Dorego, the president of Glenwood, said Mr. Silver was so

21   extreme in his pro tenant views he was insane.  That was the

22   word he used "insane."  That this is not exactly how you would

23   expect someone at Glenwood to describe a legislator or a

24   legislative leader that they had in their pocket.

25        Mr. Runes testified that Mr. Silver consistently

1    opposed Glenwood.

2    "Q. Do you believe that Mr. Silver always voted against

3    Glenwood?  Is that right?

4    "A. Uniformly.

5    "Q. Uniformly?

6    "A. Yes."

7              Mr. Silver was not in Glenwood's pocket.  Mr. Silver

8    was not in Witkoff's pocket.  The final law and history leading

9    up to that 2011 rent law demonstrates that there was no quid

10   pro quo.  Everyone conceded that rent regulation didn't get

11   better for tenants from the period much about 2003 to 2011.

12             I asked Mr. Meara that.  I asked Mr. Runes about that,

13   and we heard that consistently, that it wasn't a good time for

14   tenants.  It was sort of a stalemate.

15             Mr. Silver was able in that 2011 session -- and I got

16   this out of Mr. Runes and Mr. Meara -- he was able to link rent

17   regulations to something called a property tax cap bill which

18   the senate wanted; right?

19             By that linkage -- remember there was this imbalance

20   where the senate could say, we're not going to vote on it, and,

21   therefore, we'll let the rent laws expire.  So they had the

22   upper hand.

23             What Mr. Silver did -- and Mr. Meara testified to this

24   and Mr. Runes -- was that Mr. Silver was able to get these

25   things linked together so that there was this property tax cap

1    that expired in 2016, but it was closer in time, and 421a is

2    also linked in there as well.

3            Now, I showed you numerous pro-tenant bills through

4    Mr. Meara and Mr. Runes, I'm not going to go through that

5    again, but these pro-tenant bills died in the senate.

6            We heard today that they weren't real bills.  They

7    weren't going to get a chance to pass, but yes.  They weren't

8    going to pass because the senate wasn't going to pass them.

9            But they were a clear, definitive statement of what

10   the assembly was doing and, more specifically, what Mr. Silver

11   was doing.

12           The final 2011 bill actually made better things better

13   for tenants.  The threshold for deregulated apartments in what

14   is called the luxury decontrol based on tenant's income went up

15   from $175,000 to $200,000 and made it harder to deregulate

16   apartments.

17           The threshold luxury decontrol also went up from

18   $2,000 to $2,500 a month, again, making it harder to deregulate

19   apartments.

20           The final bill made it harder for landlords to hike up

21   tenants' rents on these individual apartment improvement costs.

22   Again, I'm not going to go through all the detail.  It's in the

23   record.  You can trust your memories.  You'll have the

24   exhibits.  You can see what's there when you go back to

25   deliberate.

1          The final bill also limited how much and how often

2     landlords could increase rent when a regulated apartment became

3     vacant.

4          Mr. Meara testified these were all pro-tenant bills.

5     What was the result?  The major pro-tenant changes in the rent

6     regulation in 20 years, I asked Mr. Meara:

7     "Q. So for this period of time, between 2003 and 2011, there

8     have been no improvements to tenants in the rent regulation?

9     "A. That's correct.

10    "Q. But in 2011, there were significant improvements for

11    tenants in the rent regulation law, weren't there?

12    "A. I would say so."

13         The prosecutors have done nothing, nothing to refute

14    that.  It doesn't matter whether Glenwood could live with it.

15    It doesn't matter if Glenwood thought, well, you know, it could

16    have been worse.

17         The fact is this was a negotiated bill.  It was a

18    pro-tenant bill.  It was reached as a result of a compromise.

19    We heard zero testimony, zero evidence about what the senate's

20    position was until I dragged it out of Mr. Runes with their

21    chart, not that Mr. Runes fought me, but the prosecutors didn't

22    submit to you or provide to you the evidence that the senate

23    was overwhelmingly against any improvements to rent regulation

24    laws that favored tenants or changes that favored tenants.

25         We never heard what the governor's position was.  We

1   never heard what all the positions were that might have been

2   reflected in Mr. Silver's caucus.

3           All we heard was that there was a rent regulation.  It

4   didn't matter.  It was a pro-tenant bill that Mr. Silver

5   passed, and you heard Mr. Runes from his lips, and you saw on

6   this screen say that Mr. Silver uniformly voted against

7   Glenwood.

8           This is a theory without evidence, more looking at

9   life through dirty windows.

10          As for private meetings with a lobbyist, the secret

11  meeting that we heard about today, this private meeting.

12  Remember when I asked Mr. Meara about that when he made a

13  little joke.

14          I asked Mr. Meara who was the lobbyist, the question".

15  "Q. And there's no law that prohibits you that you're aware of

16  that prohibits you from meeting with legislators one on one;

17  right?

18  "A. If there were, I would be in big trouble."

19          THE COURT:  The Court actually commented, "You would

20  be out of business."

21          There's no law.  There's no rule.  There's no

22  regulation.  There's no prohibition against a lobbyist meeting

23  one-on-one with a legislator.  That is what lobbyists do.

24          We heard no testimony, no evidence to suggest

25  otherwise, other than the suggestion that, aha, it was a secret

meeting where Glenwood would reveal a secret strategy.

You know, Brian Meara actually said -- I don't know if you heard this part of his testimony or remember it closely when you did hear it, if we may, Brian Meara actually said that the law that was passed was actually less favorable for Glenwood than what it wanted.

Can we put that up, please.

"Q. Now, do you recall --"

This is me asking Mr. Meara"

"Q. Now, do you recall how the ultimate legislation compared to Mr. Runes' proposal?

"A. I believe it went a little further than he -- I believe -- I can't reconstruct it exactly, but I believe it went even a little further for tenant protection than we had offered."

So Glenwood didn't get what it wanted, according to the Glenwood lobbyist.

The prosecutors also failed to mention that Mr. Silver wasn't even primarily responsible for negotiating the bill.  He had put in charge Jim Yates.  It's a name that we heard several times during the course of this trial, during the course of the testimony.

Mr. Yates is a retired, respected, highly respected -- even the prosecutors' legislator witness, Ms. Paulin, acknowledged that Mr. Yates is a highly respected former judge and lawyer who was counsel to Mr. Silver.

FBNYSIL4                    Summation - Molo

1           It is clear that Mr. Yates -- we heard from several

2    witnesses -- was the point person in negotiating these rent

3    regulations.

4           MR. GOLDSTEIN:  Objection, your Honor.

5           THE COURT:  Overruled.

6           MR. MOLO:  What's also clear is that the law emerged

7    as a compromise.

8           Mr. Silver's pro-tenant positions have been long

9    known.  The bills that he sponsored we showed you made that

10   clear.  And no amount of argument, no amount of avoiding facts,

11   no amount of twisting facts is going to change that.

12          The prosecutors also suggested that there was

13   something improper about how Glenwood hired Golberg & Iryami in

14   1997.  There was not.

15          There's no evidence that Glenwood hiring Golberg &

16   Iryami occurred for any illegal purpose.  The prosecutors did

17   not call a single witness from Glenwood itself.  We did not

18   hear from Mr. Dorego.  We did not hear from Mr. Litwin.  I

19   understand Mr. Litwin is elderly, but we did not hear from him.

20          We also didn't hear from his daughter who was involved

21   in running the business as well.  They instead offered you

22   Mr. Meara and Mr. Runes, who are perfectly fine individuals,

23   who were lobbyists for Glenwood, but they were not Glenwood

24   Management.

25          Both Mr. Runes and Mr. Hoenig told you that it was

 1    Leonard Litwin who made the decision to hire Golberg & Iryami

 2    for tax certiorari work.

 3             So you have no evidence, none, that Golberg & Iryami

 4    was hired for any improper purpose.  They were well-qualified

 5    to do tax certiorari work.

 6             It was insulting for Ms. Iryami to have to hear that

 7    during the examination by the prosecutors that while your firm

 8    is not some giant firm and there is this other firm out there

 9    that's a bigger firm, implying really that they weren't good at

10    what they do.

11             Jay Goldberg has decades of experience in tax

12    certiorari business.  We heard that.  We also heard that he

13    used to sit on the New York City Tax Commission.  We also heard

14    that Ms. Iryami is highly experienced for two decades and that

15    she serves on several leadership roles and bar committees that

16    specialize in this area.

17             Glenwood hired and continued to retain Golberg &

18    Iryami because Golberg & Iryami did good work.  I asked

19    Mr. Runes the question:

20    "Q. And you have no reason to doubt the bona fides of

21    Mr. Goldberg or Ms. Iryami as tax certiorari lawyers; Mr.

22    Runes?

23    "A. No, sir.

24    "Q. They did good work for Glenwood, as far as you knew?

25    A.  Yes, sir.

1    Q.  And over time, they were rewarded with more business?  Are

2    you aware of that?

3    "A.  Yes, sir."

4           Mr. Hoenig confirmed that, the internal control

5    person.  And the reduced Glenwood's property tax obligations to

6    the City of New York.

7           By the way, just so we're all clear, the State of

8    New York has nothing to do with tax certiorari business.  It's

9    a city agency that deals with this.  It's the City of New York

10   that Golberg & Iryami are practicing before.  They're not

11   practicing before the State of New York.  The legislature

12   specifically has nothing to do with tax certiorari work.

13          Glenwood rewarded Golberg & Iryami for the good work.

14   And, if tax certiorari shifted to them from other firms, it's

15   because they did good work, and they deserved it.

16          Mr. Witkoff's hiring of Goldberg was also legitimate.

17   The prosecutors also claim that there was something wrong about

18   how The Witkoff Grouped hired Golberg & Iryami in 2005.  There

19   was not.

20          Mr. Witkoff told you that he did not hire Golberg &

21   Iryami as some sort of bribe from Mr. Silver.  Mr. Witkoff had

22   Golberg & Iryami vetted.  Remember.  He said this.

23          He testified -- he used the word "vetted" by a woman

24   named Sarah Parnes in his office, and that's somebody who

25   actually had the responsibility of dealing with the tax

1    certiorari folks.

2          It wasn't Mr. Witkoff himself.  To use a phrase

3    commonly used these days, that was sort of below his paygrade.

4    He was the bigshot at the top of the company, and Ms. Parnes

5    was the person that actually vetted the tax certiorari firms

6    and actually dealt with them.

7          He asked Ms. Parnes, vet Golberg & Iryami, and she

8    came back and said, they're good.  They're good enough for us

9    to hire.

10          So Witkoff hired them.  He clearly said he was doing

11    it as a favor to Mr. Silver, a person who he had known out and

12    about, and Witkoff wanted to generate goodwill with Mr. Silver,

13    not bribe him.

14          Remember the question that Mr. Witkoff was asked:

15    "Q. And at the time Mr. Silver did not tell you that he wanted

16    you to send Goldberg business in exchange for him doing

17    something for you, did he?

18    "A. No.

19    "Q. In fact, you did not give Mr. Goldberg business in exchange

20    for Mr. Silver's specific exercise of his official authority in

21    some way; is that right?

22    "A. No.

23    "Q. You were basically doing a favor for somebody who was a

24    person that you knew in the community; correct?

25    "A. Yes.

1   "Q. Generally generating goodwill; correct?

2   "A. Yes."

3          The prosecutors told you this morning that I would get

4   up here and talk about that goodwill.  They also didn't tell

5   you though, because it didn't fit with their theory, that that

6   goodwill and generation of goodwill is clearly laid out in the

7   instructions that you're going to receive from Judge Caproni

8   tomorrow as I talked about a few moments ago.

9          So this is important.  Golberg & Iryami did solid work

10  for Witkoff.  Everything about Witkoff's hiring shows that they

11  were legitimate.

12         Now, Glenwood and Witkoff were not extorted.  The

13  prosecutors claim that Mr. Silver somehow extorted them into

14  continuing to retain Golberg & Iryami after they found out that

15  Mr. Silver was receiving a legitimate referral fee.  That's

16  wrong.

17         Not a single person has testified that Mr. Silver said

18  or did anything, anything at all, to suggest that he would take

19  some official action that would be harmful to Glenwood or

20  refrain from taking some official action that would be harmful

21  to Glenwood or to Witkoff.

22         Again, to go to the transcript:

23  "Q. And when you met with Mr. Silver to give him the letter --

24  or I'm sorry, to discuss the process surrounding this letter

25  that we just had up on the screen as Government Exhibit 700,

1    when you met with him you did not suggest to him that Glenwood

2    was doing something here with the expectation that Mr. Silver

3    would take some official acts in exchange for Glenwood LLCs

4    continuing to retain Goldberg & Iryami?

5    "A. No, sir.

6    "Q. And when you met with Mr. Silver to discuss this letter he

7    didn't say anything to suggest to you that if the LLCs stopped

8    working with Goldberg & Iryami he would take official action

9    harmful to Glenwood?

10   "A. No, sir.

11   "Q. Or that he would take official action harmful to the LLCs?

12   "A. No, sir."

13            Mr. Runes, as you'll recall, was the point person with

14   Mr. Silver.  He brought him the signed letter by Mr. Dorego,

15   who we didn't hear from -- we heard no testimony from

16   Mr. Dorego -- we're going to talk about that later too.

17            Mr. Runes is the point person assigned to deal with

18   Mr. Silver on this.  He's also somebody who was the head of all

19   the Glenwood lobbyists.

20            There is a no more definitive, no more authoritative

21   answer than what Mr. Runes said.  There's zero proof that

22   anyone from Glenwood or Witkoff thought they were being

23   extorted.

24            Now, you heard that Mr. Litwin made the final decision

25   about hiring tax cert firms and that nobody, not even Carol

1   Pittelman, told you or Mr. Dorego told you that Mr. Litwin

2   thought that Mr. Silver would retaliate against him.

3          Instead, you heard Mr. Runes and Mr. Meara testify

4   about what really concerned them.  This again is one of those

5   situations of the facts are in your way.  And, if they can't

6   get out of your way, twist them to make them fit your theory.

7          Remember the environment we're talking about.  These

8   are people who they have a big company.  Obviously, they're

9   concerned about political issues.  What did Mr. Runes say?

10  "Q. You were unaware that Golberg & Iryami was paying a

11  referral fee to Mr. Silver for tax certiorari work and they

12  were doing so for these LLC; correct?

13  "A. Yes.  That is correct.

14  "Q. And you believe that perhaps the payment of referral fees

15  was bad optics?

16  "A. I believe I have used that expression."

17         He talked about bad optics, about political fallout,

18  about public relations fallout.  That's what they were

19  concerned about.  They weren't concerned about illegality.

20         What did Mr. Meara say:

21  "Q. But your concern here was a concern about publicity; right?

22  "A. Publicity and politics.

23  "Q. Publicity in politics; correct?

24  "A. Correct."

25         We didn't hear from anybody at Glenwood.  These are

FBNYSIL4                     Summation - Molo

1    the two Glenwood lobbyists.  These are the point people.  What

2    did they tell you that Glenwood was concerned about?  Publicity

3    in politics, not illegality.

4             They never said that they were afraid that Mr. Silver

5    would somehow retaliate against them.  The prosecutors asked

6    Mr. Runes point blank to say if he was concerned that

7    Mr. Silver would retaliate, and he refused to testify to that.

8    He was concerned about publicity in politics.

9             This whole business about a tiger by the tail and all

10   of that, yeah.  They were concerned that if that tiger got

11   released and there would be stories in the news media.  There

12   would be bad publicity, bad politics.

13            Glenwood is a political animal.  We know that.  You

14   heard testimony today about Mr. Silver coming and asking for

15   Mr. Runes tell you about a political contribution.

16            You heard Judge Caproni tell you several times during

17   the trial -- and she's going to tell you again tomorrow --

18   there's absolutely no suggestion in this case that political

19   contributions are being used as some form of bribe.

20            But you heard testimony about that.  You also heard

21   that it's the right for people in America to make political

22   contributions and then go seek action favorable to them from

23   someone to whom they gave a political contribution.

24            What we also heard was that Glenwood's big bet is on

25   the senate and on the governor.  They give very little money,

1    very little money, to the assembly.

2            The evidence demonstrated that the total amount given

3    to Mr. Silver, Mr. Silver's personal financial campaign -- not

4    his personal account, but his campaign fund, his personal

5    campaign fund for Sheldon Silver received a few thousand

6    dollars.

7            As far as what was asked for, it paled in comparison.

8    That was for the Democratic Assembly Campaign Committee, and

9    that covered all hundred-plus democratic members of the

10   assembly.  That was campaign funds that were legal.  They were

11   legal.  They were allowed to make those contributions.

12           Mr. Witkoff never said that he had the slightest

13   concern that Mr. Silver might retaliate against him.

14           Do you remember what he said?  This is Mr. Witkoff.

15   "Q. And you were asked some questions on cross-examination

16   about why you were hired by Jay Goldberg after Sheldon Silver

17   asked you.

18           Do you recall that?

19   "A. Yes.

20   "Q. And you said that one of the reasons was to generate

21   goodwill?

22   A.  Yes.

23   Q.  What were the other reasons you hired Jay Goldberg at

24   Sheldon Silver's request?

25   A.  As I said before, A, it was an easy favor to do, and I felt

 1   it was a general goodwill, and I didn't want to alienate

 2   Mr. Silver because I thought that I might -- I might need

 3   access to him in the general course of my business at some

 4   future point in time."

 5           That's it.  What is alienation?  Alienation is a lack

 6   of goodwill.  It means indifference.  It means estrangement.

 7   It does not mean retaliation.  It does not mean official action

 8   against Mr. Witkoff.

 9           You know how we know that?  We know that to a

10   certainty because what did Mr. Witkoff do?  He made a decision

11   to fire Goldberg.  That's how concerned he was about

12   retaliation.  He fired Goldberg.  He said, you know what.  I

13   just don't -- I don't want to do it.  You're fired.  You're

14   gone.  That's how concerned Mr. Witkoff was with retaliation.

15           Mr. Runes didn't act like somebody who was extorted

16   either, this whole tiger by the tail business.  This happened

17   throughout the trial.  We're going to talk about this later.

18           Mr. Runes was asked a question, the very first

19   question:

20   "Q. Sir, you're a lawyer and a lobbyist for Glenwood; is that

21   right?

22   "A. Yes."

23           The prosecutors didn't tell you anything about

24   Mr. Runes' background.  That was left for me to do.  What did I

25   do when I got up?

1              The first questions I asked him on cross-examination

2      was tell us about your background.  What did we learn?  We

3      learned he'd been a lawyer for over 30, 35 years.

4              We learned he sits on the Character and Fitness

5      Committee of the New York Supreme Court, somebody who helps

6      administer the lawyer ethics process.

7              What else did we hear?  We heard that Mr. Runes

8      happens to be a sitting judge.  He's a sitting judge or was a

9      sitting judge at the time that this was going on.

10             So Mr. Runes, with all of that at stake, as well as

11     the benefit of all of that experience, didn't feel it was

12     necessary to run out and get some lawyer who was an expert on

13     extortion or criminal law.  Mr. Runes did what he should do and

14     what he had to do, which was deal with the political issue and

15     check out the lobbying law.

16             So he went to the lobbying lawyer, a man named David

17     Grandeau.  He testified Grandeau was the former executive

18     director of the New York State Lobby Commission.

19             Mr. Runes was as well equipped as anyone to deal with

20     him.  He talked to Mr. Grandeau and satisfied himself that it

21     was okay to move forward with the relationship as it was, and

22     he told that to Mr. Litwin, and they did.

23             In fact, Glenwood gave Golberg & Iryami more business

24     because, as they had for many years, Golberg & Iryami was doing

25     good work.  We didn't hear that it wasn't because their rates

FBNYSIL4                    Summation - Molo

1    were favorable.

2              We didn't hear it wasn't because they were doing a

3    good job.  We just hear this suggestion that this was somehow

4    extorted out of them, and it could not be farther from the

5    truth.

6              You know, as to this letter, Ms. Iryami pointed out

7    that there is no difference in the ethical rules and the

8    ethical requirements which motivated this.

9              Remember she said that there was this change in the

10   ethical rules and that was the motivation for doing the letter

11   in the first place.  They were putting it in the original

12   engagement letter.

13             She testified that there's no difference if it's in a

14   separate letter or if it's in the same letter.  The fact that

15   Glenwood decided that having all the properties listed in one

16   letter made it just easier, better, perhaps less likely to

17   become public and cause bad publicity.

18             That's fine.  We never really heard a good, definitive

19   reason.  There was some suggestion, although Mr. Runes didn't

20   know about whether or not something needed to get filed, but he

21   said he didn't really know.  The evidence is that the

22   disclosure was made in writing, and it was fine.

23             Now, I just want to put up briefly this timeline just

24   to recap where we are in the rent laws.

25             Just so we're clear and everybody understands, Golberg

 1    & Iryami is hired in 1997 by Glenwood.  All this time passes.

 2    Witkoff is hired in 2005.  All this time passes, all the way up

 3    to 2011.

 4            If you buy the prosecutors' theory, their look at the

 5    world through dirty windows, their twisting of facts, Glenwood

 6    suddenly, despite all its success, one-trick pony or not,

 7    despite all its success has an aha moment that says, we got our

 8    boy Shelly here, but we don't know we're paying him, and we've

 9    got our boy Shelly here, and he's going to do something for us

10    on the 2011 rent regulation.

11            What does he do?  He makes it more favorable for

12    tenants than he does for Glenwood.

13            Look at the bills.  These are the things that we put

14    in for various bills that Mr. Silver had passed and sponsored

15    and voted for that were pro tenant that didn't go because the

16    senate blocked them.

17            And then, after the legislation passes, after the

18    legislation passes, Glenwood finds out about the referral fees

19    that are paid, the legitimate referral fees that are paid, the

20    referral fees that Glenwood agreed to continue with some

21    modifications to the engagement process that conformed to the

22    lawyer ethical rules, not anything to do with illegality or

23    criminality.

24            The methadone clinic issue is equally ridiculous.  The

25    prosecutors are claiming that Mr. Silver took official

 1    action -- that's what they're claiming, official action -- to

 2    help Glenwood oppose the opening of a methadone clinic in a

 3    building that Glenwood owned or near a building that Glenwood

 4    owned in Mr. Silver's district, all in exchange for a referral

 5    fee to Mr. Silver, although they don't know that Mr. Silver

 6    received referral fees at the time.

 7              This also happens before Glenwood learns of the

 8    referral fees.  The issue first arose in 2008.  It then arises

 9    a second time in the beginning of 2011.

10              This springing into action, Mr. Silver's springing

11    into action that they talk about, Brian Meara reaches out to

12    Mr. Silver's office, and he speaks with Judy Rapfogel.

13    Remember her?  We didn't hear from her.  The prosecutors didn't

14    call her either.

15              Mr. Meara speaks with her, and he starts to talk about

16    this.  What does she say?  We're already on it.  Save your

17    breath.  We're already on it.  Save your breath.

18              Is that Glenwood getting Mr. Silver to undertake an

19    official action?  Mr. Silver was already on it.  Everybody in

20    the neighborhood was against this.  It's not like this was some

21    great revelation that Glenwood alone had.

22              The letter that comes afterwards distributing the

23    information about Mr. Silver acted on this.  Yeah, well, he

24    did.  You know what?  Some staffer in Mr. Silver's office sends

25    a letter and mentions that he's available, and he does act on

1    behalf of his constituents.  There's nothing wrong with that,

2    nothing illegal about that.  There's no quid pro quo, none.

3              Now, Mr. Silver also did nothing related to this PACB

4    that we heard about.  The prosecutors claim that somehow he

5    took bribes or extorted Glenwood because Glenwood had financing

6    projects that came before this Public Authorities Control

7    Board.

8              The claim again makes no sense.  What did Mr. Runes

9    tell you.  Mr. Runes said that Mr. Silver never intervened in

10   any way in Glenwood applications at the PACB.

11             What did he say in the transcript?

12   "Q. Now, the loans that Glenwood received from the PACB were

13   obtained through a perfectly legitimate process; correct?

14   "A. Absolutely, yes.

15   "Q. And that process involved multiple government agencies;

16   correct?

17   "A. Yes.

18   "Q. To your knowledge, Mr. Silver never intervened in any way

19   for your applications for that PACB approval?

20   "A. Neither for nor against."  Mr. Runes.

21             There was nothing wrong or unusual about PACB loans

22   for affordable housing.  In fact, they're a good thing.  There

23   was nothing wrong or illegal in Mr. Silver's involvement with

24   the PACB.

25             He was barely involved at all.  He didn't attend.

FBNYSIL4                    Summation - Molo

There's no evidence that he attended a single PACB meeting.  He

just sent a representative on his staff.

     It's true that the governor and the senate majority

leader each had nominees that more formally served for them,

but there's no evidence that Mr. Silver actually acted himself.

He always sent proxies.  And that's not surprising, because

there's nothing controversial about the PACB.

     The prosecution made this big deal about it, about how

it has to vote unanimously.  I don't know if you remember this

because this testimony was pretty dry.  They made a big deal

about how they had to vote unanimously for a PACB project to be

approved.

     But, when the prosecution called Darby Putnam, who was

the administration person from the PACB, she said every vote

was always unanimous.

     The prosecutors offered no proof that Mr. Witkoff

bribed Mr. Silver or Glenwood in connection with the PACB.

There's no suggestion that he interfered with anything for

them.  There is no quid pro quo.

     The real estate case is zero.  It is nothing for them.

It is amazing that they took our time, and the half truths that

were told by putting out their board that left out key bills or

failing to introduce the senate's position or the governor's

position and just suggesting -- trying to make it sound like it

was evil because there was a one-on-one meeting between a

FBNYSIL4                    Summation - Molo

1    lobbyist and a legislative leader, dirty windows, a particular

2    point of view, a theory in search of a case.

3           Just as the real estate allegations were devoid of any

4    evidence of a quid pro quo, there's no illegal quid pro quo

5    between Mr. Silver and Dr. Taub.

6           I'm going to talk a little bit about Dr. Taub.  It's

7    funny because I thought I was in this courtroom or in this

8    courthouse in Judge Caproni's courtroom on the fourth floor

9    when Dr. Taub testified.

10          I thought I actually asked him questions on

11   cross-examination.  The reason I'm doubting that is because I

12   heard the argument this morning about what Dr. Taub said and

13   did, and it didn't coincide at all with the testimony.

14          I hope you find it helpful, by the way, that I have

15   gone back to the record like this because you must decide this

16   case, as Judge Caproni is telling you, on evidence.

17          You must administer justice based on evidence.  You

18   cannot make a decision based upon some reaction that you have

19   about legislatures or legislators or state government or

20   part-time legislators.  You can't make a decision based on

21   that.  You have to base it on the evidence and on the law.

22          (Continued on next page)

23

24

25

1           MR. MOLO:  (continuing)  And so, I am compelled to

2     show you the evidence, to show you the documents and show you

3     the testimony, not get up here and spew a theory.

4           So that's what I've done with the real estate and

5     let's do that with Dr. Taub.  As I say, I was in the courtroom,

6     I thought, because here is what he testified to.  I asked him,

7     very, very specifically about all of these allegations.

8           I asked him about the grants.  Do you remember?

9     "Q  You did not have an explicit agreement to exchange patients

10    for grants, did you?

11    "A  I did not."

12          No *quid pro quo*.  No this for that.

13          I asked him about his son's job at OHEL, remember?

14    "Q  You did not exchange referrals of patients to

15    Weitz & Luxenberg for your son getting a job -- your ivy-league

16    son getting a job at OHEL?

17    "A  No."

18          No *quid pro quo*.

19          I asked him about his daughter's unpaid internship

20    with Judge Schoenfeld, the lovely man that came and testified.

21    I asked him:

22    "Q  And you did not refer patients to Weitz & Luxenberg in

23    exchange for an unpaid internship for your daughter, did you?

24    "A  No."

25          You might not remember this but there was some very

1    brief testimony about an organization that Dr. Taub's wife was

2    involved in.  I don't know if anyone remembers it, it is called

3    Shalom Task Force.  Again, a very worthy organization, as was

4    OHEL and what we heard from Mr. Mandel.  And Shalom Task Force

5    deals with domestic violence and the testimony was very brief

6    on it -- the testimony that the prosecutors offered was very

7    brief.  I asked Dr. Taub:

8    "Q  Dr. Taub, you didn't refer patients to Weitz & Luxenberg in

9    exchange for any kind of state grant to Shalom Task Force, did

10   you?

11   "A  No."

12            No *quid pro quo*.

13            And of course we had the testimony about his famous

14   resolution that was presented to him at the American Cancer

15   Society dinner -- and it was actually a cocktail party I guess

16   is the way he described it -- and remember at the time I was

17   asking him, it was toward the end I think of the first day of

18   his testimony and everyone was sort of laughing and Dr. Taub

19   was even laughing on the stand when I asked him about the

20   question.  I said I didn't want to burst your bubble Dr. Taub,

21   but are you aware that these other organizations got a

22   resolution as well?  And I asked him:

23   "Q  And I take it you would not send patients to

24   Weitz & Luxenberg in exchange for receiving a resolution?"

25            And he was laughing, he said:

1    "A  It was nice to get the plaque."

2    "Q  Not to get the plaque, okay."

3          No *quid pro quo*.

4          Dr. Taub clearly told you that with respect to each

5    and every allegation the prosecutors are making there was no

6    *quid pro quo*.  There was no in exchange for.  There was no this

7    for that.  There was no crime.

8          You know, when he testified, remember we went through

9    and we heard it this morning again too from the prosecutors

10   about he had this non-prosecution agreement, that meant he

11   couldn't be prosecuted for coming in to court and saying there

12   was a *quid pro quo* unless doing so would be a lie.  He could be

13   prosecuted for perjury.  And I think one thing we heard from

14   Dr. Taub was after he was rightfully scared to death when the

15   agents came to his door and woke him up and unfortunately made

16   a false statement to them which put him in jeopardy that he was

17   not going to be making false statements.  He was not going to

18   be making false statements in the courtroom here.  But he had

19   that protection.  He had that protection.  So, if he had

20   engaged in a *quid pro quo*, if he had done the this for that, if

21   he had engaged in this bribery scheme, he could have said it.

22         You know, it takes two to tango and the prosecutors

23   are going to say, well, it is not really Dr. Taub's state of

24   mind, it is not really Glenwood's state of mind, it is not

25   really Mr. Witkoff's state of mind, it is Mr. Silver's state of

FBN5sil5                    Summation - Mr. Molo

1    mind.  Well, it is an awfully odd bribery scream to not have

2    two parties on the same wavelength with the same state of mind.

3          What is it they told you to do?  Use your common

4    sense.  Use your common sense.  I agree.  I vote for that.  Use

5    your common sense.  What kind of bribe scheme is it where the

6    person taking the bribes thinks it is a bribe where the person

7    giving doesn't, or the person giving the bribe thinks it is a

8    bribe but the person taking it doesn't.  What kind of extortion

9    is it when the person allegedly being extorted doesn't think

10   they're being extorted.  It is ridiculous.

11         It takes two to tango.

12         Now, in addition to his testimony, if there were any

13   doubt in your mind when you saw that man who was sincere when

14   he made those statements, who was chastened from the experience

15   in dealing with the prosecutors those many times he met with

16   them, 12 times, ask yourself, when you saw this man is this a

17   man who is going to engage in illegal *quid pro quo* for funding

18   for a foundation that his organization, research center had

19   funding from very, very reliable, respectable, rich donors?  He

20   talked about them -- and prominent families who were supporting

21   him and these were two grants that were -- it is always nice to

22   have the money and he said that but it wasn't going to be a

23   make or break situation for him.  But, you know, remember again

24   the same thing happened.

25         The prosecutors' witness, Dr. Taub, they asked him

1    some questions, they immediately -- gave you none, none of the

2    history, none of the feel for the man.  It was I who put up his

3    curriculum vitae.

4            Can we show it, please, Justin.  Let's make it larger?

5            I'm not going to go through the whole thing but I

6    invite you, when you go back to the jury room to go through it.

7            Ask yourself when this man, Yale school of Medicine,

8    Yeshiva University, London University Ph.D.  Affiliated with

9    some of the finest medical institutions in the world, all of

10   those publications in his name, published in the finest, most

11   elite, prestigious medical journals in the world, 79 years old

12   and he is going to engage in some bribe scheme?  It makes no

13   sense.  Absolutely none.

14           He would not engage in illegal *quid pro quo*.

15           Dr. Taub also told you that he had a sense of

16   responsibility he felt toward his donors in addition to

17   himself.  He also told you that he had a sense of

18   responsibility to the institution that he was affiliated with,

19   Columbia.

20           And you might remember he got -- there was one point

21   in his testimony where he actually got a little choked up when

22   I asked him about a lawsuit that he filed against Columbia.  I

23   don't know if you remember this but he, the day after

24   Mr. Silver was announced and charged -- or it was announced

25   that these prosecutors had charged --

1          MR. GOLDSTEIN:  Objection.

2          THE COURT:  Overruled.

3          MR. MOLO:  -- announced the charges against

4    Mr. Silver, Dr. Taub was fired by Columbia.  Remember he told

5    us he loved his job.  Very loyal, been with the institution for

6    a tremendous amount of time, 1981 through the present, Vivian

7    and Seymour Wilson Family Professor of Medicine, the Milstein

8    family is big benefactor of his meso research.  He was hurt.

9          That man, you know, was fired from the institution

10   that he loves, he devoted his life to where he facilitated his

11   work, he made his life's work.  He struggled a bit when I

12   showed him the lawsuit but I asked him about it and he

13   acknowledged it is a lawsuit -- gratefully he is working there

14   today, he said that, but in the lawsuit he acknowledged that he

15   would not be permitted to engage in some bribery scheme, some

16   *quid pro quo* scheme at Columbia.  And he swore -- this was

17   under oath, this is from his -- again, you have this in

18   evidence, this is Defendant's Exhibit 5, the prosecutors didn't

19   introduce it, I introduced this, they didn't tell but this:

20          Plaintiff-petitioner -- that's Dr. Taub -- has

21   faithfully and professionally satisfied the obligations of his

22   employment, title, and tenure since that time.

23          But he actually filed the lawsuit and said that and

24   swore that in court.

25          Now, Dr. Taub refused to be pressured by the

prosecutors into saying there was a *quid pro quo* when none
existed and how did he get dragged into this whole mess?  I
mentioned it briefly earlier.

        6:00 in the morning, agents come to his building,
knock on his door.  Dr. Taub is in his pajamas.  His wife, who
is ill, we heard testimony about that, was recently recovering
from surgery, he is there in the living room with her and the
word he used -- the word he used -- was he was terrified.
79-year-old man terrified.  They didn't pick up the phone and
say, Dr. Taub, can you pick up the phone and meet with us?
They didn't pick up the phone and say, Dr. Taub, can we come to
your office and meet with you?  No.  They knocked on his door
at 6 in the morning, dragged him out of bed with his wife.
Anyone's reaction at that point in time would be to be
terrified.

        And he knew when they were asking him questions about
Mr. Silver and the Moreland Commission was going on, he knew
that the investigation was public and he didn't want to be any
part of it and he panicked and he lied.  He said that, panicked
and lied.  He told the agents he never referred patients to
Mr. Silver and in fact patients of which, which he recommended
to Mr. Silver, he did in fact do so.

        So, he regretted that lie and that was very clear.  He
went and saw a lawyer who was expert in criminal defense work
and he learned that lying to federal agents is actually not

1     just a bad thing, it is a felony, it is a crime, he can go to

2     prison for it.  And along with prison would mean losing his

3     position, being disgraced in his community, and he was in big

4     trouble.

5          So, Dr. Taub's lawyer approached the prosecutors and

6     we heard a spin on that this morning.  The prosecutors

7     threatened him with a felony conviction --

8          MR. GOLDSTEIN:  Objection.

9          MR. MOLO:  -- for making false statements.  And

10    Dr. Taub said this would place his career, as he put it, in

11    terrific jeopardy.  Those were his words.  He and his lawyer

12    began to negotiate a non-prosecution agreement with the

13    prosecutors which is effectively that agreement that he had

14    that protected him here, more or less a get out of jail free

15    card.  And the non-prosecution agreement that the prosecutors

16    offered him required -- what they were offering him required

17    that he admit that he engaged in a *quid pro quo*.  And I want to

18    show you the exact terms of that letter.

19         I don't want to have it described to you and spun to

20    you, I want you to see the actual terms of that letter.  This

21    is what was sent to him originally.  The prosecutors wanted

22    him, in exchange for not prosecuting him, right, for the false

23    statement which he knew he was in big trouble for, they wanted

24    him to say this, that -- will not criminally prosecute Robert

25    Taub for any crimes except for criminal tax violations as to

1    which this office cannot and does not make any agreement

2    related to (a) his referral of patients to Sheldon Silver for

3    legal representation from in or about 2003 up through and

4    including through in or about 2013 in exchange for -- in

5    exchange for -- Dr. Taub's receipt of benefits through official

6    actions taken by Mr. Silver.

7           In exchange for.  *Quid pro quo*.  This for that.

8    That's what the prosecutors wanted Dr. Taub to say, in exchange

9    for not having his life ruined.

10          Dr. Taub knew the prosecutors were asking him to lie

11   and he said no, I'm not going to do that.  He stood tall.

12          See for yourself -- I mean the pressure and what it

13   was doing to him.  Can we show Defendant's Exhibit 25 at the

14   second page?

15          And beyond that, they also said that Taub has

16   previously admitted, and hereby affirms, that, at Silver's

17   request, Taub knowingly referred numerous patients to Silver.

18   At Silver's request.  You heard all about that this morning,

19   that it was Mr. Silver who came to Dr. Taub and demanded the

20   patients, right?  What did Dr. Taub say about that?  Dr. Taub

21   said he wouldn't do it.  He refused to agree that he had

22   committed this crime with Mr. Silver.  The prosecutors knew

23   full well the importance and the significance of that language.

24   You are going to hear in the instructions tomorrow from Judge

25   Caproni "in exchange for" or "exchange for" mentioned at least

1   11 times.  They need that.  Dr. Taub wouldn't do it.

2           He also wouldn't say that the referrals came at

3   Mr. Silver's request.  And what happened?  Because Dr. Taub

4   would not lie, would not commit another crime by making a false

5   statement, the prosecutors were forced to accept the letter

6   that lacked those terms.  When you go back to the jury room you

7   are going to have both the draft and you are going to have the

8   final letter.  Look at them.  I ask you to please look at them

9   and consider the significance of these six words:  "In exchange

10  for," and "at Silver's request."  Dr. Taub would have none of

11  it.

12          It takes two to tango and there certainly was no dance

13  of corruption going on with Dr. Taub.  After considering that

14  evidence alone which we didn't hear discussed, it fully

15  certainly asked in the letters this morning and we never heard

16  the transcript testimony that I read to you, there should be no

17  doubt in your mind that there was no *quid pro quo*.

18          Your Honor, this would be a convenient point to stop.

19          THE COURT:  He means a convenient point to stop for

20  break.

21          Don't discuss the case.  We will bring you back at

22  about 3:30.

23          (Continued on next page)

24

25

1          (Jury not present)

2          THE COURT:  Okay.  Back at 3:30.

3          (Recess)

4          THE COURT:  Mr. Molo, about how much longer are you

5    going to be?

6          MR. MOLO:  I have about another hour and a half

7    allotted.

8          THE COURT:  You do, but don't feel that you have to

9    use it all.  I'm not saying you shouldn't.

10         MR. MOLO:  I was going to ask for two more, but.

11         THE COURT:  I'm sorry?

12         MR. MOLO:  I was going to ask for two more.

13         THE COURT:  Denied.

14         MR. MOLO:  I will certainly conclude my remarks within

15   the hour and a half, hopefully less.

16         THE COURT:  Okay.

17         MR. MOLO:  But I don't want to mislead you indicating

18   that it is going to be an hour.  It is going to probably be

19   more than an hour, maybe less than an hour and a half.

20         (Continued on next page)

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Okay, Mr. Molo.

3          MR. MOLO:  As you know, I am not trying this case

4   myself, I have esteemed colleagues who reminded me to tell you

5   two points in connection with the real estate so this is a

6   flash.  I will let you guess which of them told me to tell you

7   this, that Michael Hoenig actually was a Glenwood employee who

8   did testify, I don't want to misstate the facts, and he was the

9   accountant for Glenwood that did testify.

10          And, on 421-a, one point I want to make, this was a

11  point I wanted to make and should have, is that the testimony

12  was, and this was from Mr. Meara and I'm not going to put it on

13  the screen because I don't have it handy on the screen,

14  referring to 2011:

15  "Q  At that point in time, 421-a was not all that

16  controversial; is that correct?"

17          That is me asking him cross-examination.  His answer

18  was:

19  "A  Not that year."

20          And the question.

21  "Q  At this point in time, in 2011?

22  "A  Yes.  It was not."

23          So, Meara testified that despite what we heard this

24  morning, 421-a was not really that big an issue that year in

25  rent negotiations.

1          Okay, so you heard, repeatedly in opening statement

2     and you heard during the trial, Ms. Cohen and others refer to

3     the HCRA funds as a secret pot of money.  We heard "secret pot

4     of money" all the time throughout this case.  This secret pot

5     of money that Mr. Silver had like he was some leprechaun that

6     can go behind a tree and say, a-ha! Here is money for Dr. Taub

7     and here is some for OHEL and whoever else it might be he

8     wanted to give the money to.

9          To be absolutely clear, notwithstanding what the star

10    legislator Ms. Paulin said, HCRA is actually a law.  It is

11    actually a law.  It is the Health Care Reform Act and it was

12    passed by the legislature and it was signed into law by

13    Governor George Pataki in 1996.  It's a Defense Exhibit 82, I'm

14    not going to put it up on the screen, but when you go back for

15    deliberations you can see HCRA is a law passed by the

16    legislature, signed into law by Governor Pataki in 1996 and

17    that law is public, it is available online.  We heard Victor

18    Franco talk about the fact that these laws are available to

19    people, it is available online, available in libraries.  Nobody

20    is hiding the HCRA law.  And the budget amounts that were

21    funded each year also are by law and those laws are public and

22    whether Ms. Paulin decides to read the laws that she votes for

23    or against or not is up to her, but the fact of the matter is

24    that those laws are public and her colleagues that may be not

25    so stellar legislators in certain corners at least managed to

FBN5sil5                       Summation - Mr. Molo

1    read it because they managed to make requests of Mr. Silver for

2    HCRA funds, requests of Mr. Silver for HCRA funds.

3          And so, we can show you here Defense Exhibit 3, this

4    is a letter from Assemblyman John Lavelle written November

5    2005, coincidentally, so it is right in that time frame that we

6    are talking about and this is what Lavelle says.  He is writing

7    saying:  I am requesting $500,000 in HCRA monies from the

8    Speaker's priority fund to support the construction of a new

9    diagnostic reception center that is operated by the New York

10   Founding Hospital.

11         Okay?  Worthy cause.  I'm sure there is many worthy

12   causes.  I'm sure all of us get asked all the time to donate to

13   many worthy causes that we just don't have the resources to

14   support and in many instances, many, many worthy causes were

15   funded by HCRA money and I am sure there were many cases that

16   the money wasn't there and wasn't available.

17         In 2006 there is a letter, June 6 of 2006, again right

18   in this time frame and this is from Assembly member Crystal

19   Peoples and she says:  I am writing to reaffirm my overwhelming

20   support for innovative and community-pointed HCRA funding

21   proposal which I and other members -- so not just this Assembly

22   member and Mr. Lavelle -- but I and other members from Western

23   New York Assembly delegation recently referred to your office

24   on behalf of Sheehan Memorial Hospital and the Grace Manor

25   Nursing Home.  The amount of funding requested from the

1   Speaker's designated HCRA funding pool totals $486,418.

2           Secret pot of money.  Secret pot of money.  What

3   secret pot of money?

4           People in the Assembly knew that they would go to him.

5   And you will also see and I think you also heard testimony from

6   Mr. Franco that there was a similar amount of money available

7   to the Majority Leader of the Senate and there was a similar

8   amount of money available through the Governor I guess

9   technically, but really through the Department of Health which

10  was the Governor's agency or agent.

11          So, far be it for anyone who is objective about it to

12  call it a secret and no one should call it a secret.  There is

13  other letters I could give you but I'm not going to bore you

14  and go through all of them.

15          And Mr. Franco, as you recall, testified for quite a

16  while and he was a very earnest fellow and said that other Ways

17  and Means staffers were involved in this grant process and they

18  gave Mr. Silver discretion that they exercised.  And there has

19  been a lot made of the fact that Mr. Silver had this authority,

20  right, that he exercised, that he could make these grants or

21  that he had the most grant money of any member of the Assembly.

22          Mr. Silver was elected by the other members of the

23  Assembly who were elected by the citizens in their respective

24  districts.  Mr. Silver didn't make up the system.  He didn't

25  come in and overtake it by storm with troopers that conquered

the State of New York and said I'm going to be the Speaker.  He
was elected through the democratic process from the first
instance from his own district and eventually by the other
members of the Assembly.  And with those positions comes
additional authority and additional benefits and additional
discretion.

          So, much is made of this unfettered so-called
discretion but it's not something that Mr. Silver either seized
or something that he was not, by virtue of his position and by
virtue of the election from his peers, entitled to at that
point.  Excuse me, better put, he is not entitled to anything,
authorized to have.

          Now, despite what the prosecutors told you there was a
lot of process around these HCRA grants.  They claim it was all
secret and in fact many people would have seen that Mr. Silver
was sponsoring a grant to a doctor who did research for
mesothelioma.  Whether they understood that was Dr. Taub or not
they knew what that was.  And the prosecutors made a big deal,
you heard a number of witnesses asked:  Were these grants
subject to competitive bidding?  Remember that?  And were these
grants subject to peer review?  There is no requirement.  There
is nothing in the law.  They will point you to nothing, zero,
and they didn't during the testimony and they can't get up here
and say it now for the first time because it just doesn't
exist, there is nothing in the law that required peer review or

 1   competitive bidding.  Maybe that's a good idea.  Maybe they

 2   ought to write their assembly members and tell them you ought

 3   to put competitive bidding in.  But, that's not the law.  So

 4   the absence of it didn't indicate that there was something evil

 5   going on.  They were trying to make you believe that it was

 6   required.

 7          There was this process that went in place.  Now, I'm

 8   not going to go through all of them, you went through both --

 9   can you put up the exhibit -- you went through with both

10   Mr. Franco and with Dr. Taub, you might recall, there were some

11   testimony that probably seemed a little tedious at times where

12   we went through a whole lot of documents.  That was for a

13   reason.  That tedium, that kind of drag on you was to show

14   you -- not to tell you but to show you that there was a process

15   here, there was a back and forth.  And we heard testimony that,

16   taking for example this grant which was between -- this is the

17   first of the two, notice that the contractor here is not

18   Dr. Taub, it is New York Presbyterian Hospital.  All right?

19   And it's the state Department of Health and the person signing

20   the contract on behalf of Presbyterian is William Polf, Senior

21   Vice President for External Relations, a very senior executive.

22          Who else was involved?  Can we go back, please?  The

23   Department of Health obviously is involved, New York

24   Presbyterian, Columbia was involved in the second grant, they

25   were the actual counter-party, signing party to that, the

1    attorney general had a role, limited role in reviewing these

2    contracts, we had the state comptroller that was involved in

3    reviewing these contracts, and then we have the Assembly

4    itself, not just Mr. Silver but the Assembly staff including

5    people like Mr. August who we heard testimony from

6              So, there was quite a lot of process and quite a lot

7    of exposure to this.  Was it what the prosecutors want?  I

8    don't know.  But that's up to them.  This is a democracy, they

9    can petition the government and change the process if they want

10   if they think their assembly people will listen to them but the

11   fact remains there was process.  Whether it was the best or not

12   I don't know.  But I will tell you this, we will go to the next

13   chart, you will see that these are the things I talked about,

14   right?  I'm not going to pull each one of these out and show

15   them to you but you will use your recollections, collectively

16   and individually, to think about the kinds of things that were

17   there.

18             They made a big deal about the fact that Dr. Taub

19   writes a letter, lays out his plan.  There is some back and

20   forth with the first one.  Remember, August faxes him back and

21   says is this going to meet a purpose but he gets a letter

22   saying you are being awarded it but then they send in the

23   application which seems a little bit contradictory.  How can

24   you be applying and then get awarded?  That's how the process

25   worked not just for Dr. Taub but all the grants.  There is no

1    testimony that the other grants --

2            Remember the documents that we took you through, there

3    is a budget sheet, there was a payment, reporting schedule,

4    program work plan, grantee, information sheet, there was a

5    vendor form that had to be filled out and it was quite a lot of

6    paperwork and what this represents here is remember the e-mails

7    that went back and forth between Dr. Taub and people at the

8    hospital where he says I have taken the application this far,

9    can you help me?  So, he is engaged with quite a lot of people.

10           Can we put that back for a second?

11           See right here, New York State grant application for

12   Mesothelioma Center and you see the grant application, someone

13   at Columbia that this is going to.  So, you know, again, this

14   is sort of just the paperwork that is involved in these sorts

15   of things.

16           Can we go back, Justin?

17           And Department of Health, by the way here, you will

18   see, too, that they had sent all of that.  The Department of

19   Health was very involved.  And there is also, in the record,

20   documents, exhibits that showed actually there was even an OSHA

21   violation that he had to deal with at one point in time with

22   the first grant and then it raised its head in the second

23   grant.

24           So, there was a lot of process.  Whether it is a good

25   or bad process it doesn't matter.  The fact is there was

FBN5sil5                    Summation - Mr. Molo

1   process and these two grants followed that process.

2           Now, Mr. Whalen, who was with the Department of

3   Health, testified it could be as much as 20 different New York

4   State officials may have touched this application, touched

5   these grants and he said that was common.  And that whole

6   process was laid out for you, as I say, with Mr. Whalen and

7   Mr. Franco and with Dr. Taub.

8           Now, the prosecutors claim that these grants stopped

9   because of disclosure concerns.  That's what we heard.  Again,

10  if you look at the world through your dirty windows what do you

11  see?  A dirty world, right?  So they say it is disclosure

12  concerns that cause Mr. Silver to stop sponsoring grants for

13  the Mesothelioma Center.  And one of the initial disclosures, I

14  want to talk about how the disclosure environment changed so

15  you can see that that's not the case.

16          One of the disclosures that the prosecutors pointed to

17  is something called the Budget Reform Act of 1997 and

18  Mr. Silver was actually one of the six co-sponsors of that

19  bill.  It would be an odd way to kind of perpetuate a fraud or

20  deal with a fraud if you sponsored a bill that would allegedly

21  expose it.  And it simply didn't.

22          The second, the other disclosures that began around

23  that time, there was a posting of Legislative Initiative Forms

24  on the Assembly's public website for community project funds

25  and forms which listed the sponsoring Assembly member's name.

1    Mr. Franco actually testified, if you remember this, Mr. Silver

2    went above and beyond what was required and he said that

3    Mr. Silver implemented the practice of posting sponsor sources

4    of funding as well and this wasn't even required by the Budget

5    Reform Act.

6            As far as these grant guidelines that you have heard

7    about and possibly heard about in the rebuttal argument, they

8    wanted to effect -- they wouldn't have required additional

9    scrutiny of grant request.  They would have to a certain level.

10   Mr. Silver actually sponsored those as well or approved them.

11           And, in any event, the initial disclosure required by

12   the Budget Reform Act was simply just putting up the name of

13   the grantee and the amount that would now be listed in the

14   budget.  So, in the case of the mesothelioma grants, New York

15   Presbyterian Hospital and the trustees of Columbia University

16   would be listed and it didn't require the disclosure of the

17   Assemblyman's name and it would not have required the

18   disclosure of the person requesting the grant which would have

19   been Dr. Taub.  So, that is a complete red herring.

20           It was no secret that Mr. Silver had this discretion

21   over the HCRA fund and it was clearly the law and it was

22   allowed.  Any number of people at the Department of Health,

23   comptroller's office, attorney general's office, ways and

24   means, Speaker's own staff involved in processing those two

25   grants would have seen that they were to the Mesothelioma

1    Center and they would have known that Mr. Silver was affiliated

2    with Weitz & Luxenberg.

3           So, if Mr. Silver was really afraid of somehow

4    disclosure or really thought that he was doing something wrong,

5    he would have never made or requested or directed these grants

6    to Dr. Taub in the first place.

7           Now, the real reason that the mesothelioma funding

8    stopped was because Dr. Taub wasn't doing the work that he

9    contracted to do.  Do you remember I asked him about this on

10   cross-examination?  It was on the second day in the morning

11   when I showed him what it was that he said he would do, from

12   the very beginning when there was the fax with Steve August and

13   I asked him about what was in the contracts itself.

14          Understandably, Mr. Silver was and is concerned about

15   air quality issues that emanated from the terrible, terrible

16   events of September 11th.  It is unequivocal that that was a

17   concern when the World Trade Center came down that asbestos was

18   released into the air.  Mr. August testified that Mr. Silver

19   had great interest relating to those issues and he believed

20   that Mr. August testified he believed that Mr. Silver's funding

21   of Dr. Taub emanated from that interest.  That was Mr. August,

22   the prosecution's witness said that.  And Dr. Taub did propose

23   research funding for that 9/11 later purpose.  He testified he

24   was interested in state funding -- this is what he said --

25   because he believed that the citizens of New York State had an

 1    interest in mesothelioma research, especially in light of the

 2    concerns regarding air quality following September 11th.

 3              And Dr. Taub testified he did not get the idea to ask

 4    for state funding until after he began referring cases to

 5    Mr. Silver.  He clearly testified to that.  He was asked by me

 6    on cross-examination, at page 487 of the transcript, line 14:

 7    "Q  Did you believe that one of the ways that New York

 8    Presbyterian and Columbia could attract funding was to stress

 9    the importance of its Mesothelioma Center apart from other

10    programs?

11    "A  Yes.

12    "Q  You thought that this might be of particular interest to

13    Mr. Silver, given the fact that he, as an Assemblyman,

14    represents the area in which the World Trade Center itself was

15    located?

16    "A  Correct.

17    "Q  So you approached Mr. Silver about it; is that right?

18    "A  That was one of the reasons why I thought Mr. Silver should

19    be approached, yes.

20    "Q  In making your approach, you were approaching on behalf of

21    the Mesothelioma Center at Columbia; correct?

22    "A  Yes."

23              Dr. Taub saying to you on the witness stand that he

24    approached Mr. Silver about this.

25              And Dr. Taub's initial letter mentions September 11th

FBN5sil5                    Summation - Mr. Molo

1    and he confirmed to Mr. August in a fax that we talked about.

2              Can we put that up quickly?

3              This is a fax sent by Steve August from Ways and

4    Means.  "Can you please comment on whether the attached is

5    appropriate to your proposal and is sufficiently inclusive of

6    what you may want to do with the funding."

7              Okay?  Can we go to the next page?

8              This is what was said:  "Funds will be used for

9    expenses of research into the clinical diagnoses and treatment

10   of mesothelioma and related cancer and study of the occurrences

11   of such cancer in individuals exposed to asbestos and other

12   materials released into the air during the attacks of September

13   11, 2001."

14             So, from the very beginning this was clear what

15   Dr. Taub was representing and that language is in its -- makes

16   its way to the Legislative Initiative Form and Dr. Taub says it

17   is acceptable, it is in the research proposals, it is in a

18   number of those documents that I showed you before, the back

19   and forth and the grant application and in the final grant

20   contract itself.  It is in the grant contracts themselves when

21   you get them, the one between New York Presbyterian and the

22   Department of Health and the one between Columbia University

23   and the Department of Health.  Look at them, you will see the

24   language is there.  So, in fact that is what the purpose

25   supposedly was.

1          Now, the prosecutors told you that Dr. Taub did not

2     speak with Mr. Silver, didn't communicate with him about his

3     research and that is simply not true.  Again, I heard an

4     argument about that this morning -- theory in search of a case.

5     There were no facts.  The facts are expressly contrary to that.

6          The January 7th, 2005 letter, the March 29th, 2006

7     letter both of which are -- I'm sorry, one is Government

8     Exhibit 303, Defendant's Exhibit 20, the October 11th, 2006

9     letter Government Exhibit 120; October 11th, 2007 letters with

10    and without the explanation, Government's 129 and 30, all talk

11    about Dr. Taub's report and his research.  And we had this

12    somewhat curious point in the trial where Dr. Taub recognized

13    that there was a risk that he was going to lose these grants

14    because he wasn't doing the work that he had represented that

15    he would be doing related to 9/11.

16          I don't, for a moment, question that Dr. Taub was

17    doing important, good work related to mesothelioma.  That's not

18    an issue.  I mean, I think that everything that we saw,

19    everything we heard clearly indicated the man was working hard

20    in the area that he was working.  We heard Mr. Kirkland talk

21    about it.  The man was dedicated to curing this disease, he

22    just wasn't doing what he said he would be doing in connection

23    with the grants that he received from the New York Department

24    of Health.  And you remember?  I'm going to show you

25    Defendant's Exhibit 22, it is a little bit odd.

FBN5sil5                        Summation - Mr. Molo

1            Can we zero in?

2            It says Sheldon Silver September 2006, okay, so now he

3     is able to -- go to the second page, September 2006, last

4     modified:  January 25 2007 speech.doc, is what it says.  So,

5     these are talking points.

6            Can we put them up, please?  Can we enlarge just the

7     big page so that the folks can see that?

8            Okay, so these are talking points that Dr. Taub has

9     prepared pursuant to his own document in anticipation of having

10    a conversation with Mr. Silver and he says here:  After our

11    discussion -- if we can highlight that -- I have spoken to some

12    of the administration officials.

13           So, you wouldn't put in after our discussion unless

14    you had some discussion so he obviously has had some discussion

15    with Mr. Silver and he has prepared talking points and this is

16    what he is prepared to tell him.  He said he has spoken to some

17    of the administration officials and it goes on to indicate that

18    based on this discussion that he refers to here or his other

19    contact with Mr. Silver, however it has occurred, he thinks

20    that the funding is going to end from the state because he

21    talks about for that reason.

22           Can we highlight this here?

23           I think it important that you keep our funding in tact

24    and separate from any programs that are going on at other

25    institutions in the city.

FBN5sil5                        Summation - Mr. Molo

1          Why would someone say that?  Why would someone put

2     that in talking points and notes in preparation for a

3     conversation with Mr. Silver that he didn't think that the

4     funding was not going to be intact?  Right?  He is here

5     thinking he is going to have to try and keep his funding and

6     also that maybe another opportunity might be his merging

7     funding attempts, merging with other institutions.  And he goes

8     on to say in fact we did just -- we are working with Mount

9     Sinai and we are happy to get together with them in context.

10         So, it is clear that Dr. Taub communicated what is

11    going on with the funding that he has been receiving and the

12    fact that he is not performing.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. MOLO:  So, again, he brings opinion.  In the last

2     sentence of the first paragraph, so what we are doing is

3     preparing for the best treatments for an expected onslaught of

4     the disease from the fallout of 9/11, which probably won't

5     happen for several years."So he's trying to invoke 9/11 as a

6     way to keep his funding.

7          Dr. Taub had these concerns in October of 2006.  And,

8     in October of 2007, he formally requested a third grant, and

9     Mr. Silver pushed back.

10         Do you recall this?  The prosecutors were telling you

11    this morning that Mr. Silver sent the grant money and didn't

12    care and didn't do anything.  Mr. Silver clearly pushed back.

13    I had to ask myself this morning was I in the same courtroom in

14    which he testified?

15         Can we show Government's Exhibit 129.

16         Okay.  This is that third grant request.  In it it's

17    got these explanatory notes.  Do you remember this?  It's kind

18    of odd.

19         So, asbestos-related cancers, including mesothelioma

20    and lung cancers, causes thousands of prolonged debilitating

21    pulmonary illnesses, and it goes on.  There are these

22    explanatory notes.

23         He was asked by the prosecutors:

24    "Q. Why did you include explanatory notes in this letter?

25    "A. I was told that much of the language in the letter, the

 1    text of the letter without the notes, was very technical.

 2    Mr. Silver would have liked to have explanations for the

 3    technical terms in the letter so it would be more

 4    comprehensible."

 5              This was not my question, the prosecutors question.

 6    "Q. Did Sheldon Silver also ask you to provide him with a

 7    letter that did not have explanatory notes?

 8    "A. Yes.  I didn't remember exactly the format of the request,

 9    but he wanted the original letter, which was the letter without

10    the explanatory notes.  And, I think, when he said it was too

11    technical, I rewrote the letter and added explanatory notes.

12    That's what happened."

13              So, you know, Mr. Silver had never asked for these

14    explanatory notes before.  Dr. Taub had concerns.  It's amazing

15    that someone would say that there's no communication, no

16    reporting, no concerns by Mr. Silver when Dr. Taub himself

17    testified about both the talking points that he prepared that

18    he had some uncertainty and this letter as well with the

19    annotation.

20              You know, in the end, not too long after that,

21    Mr. Silver, who the record is clear that he did -- let me find

22    the transcript here.

23              He did stop by and see Dr. Taub from time to time when

24    he was at Columbia seeing doctors himself.  He said he dropped

25    in.  Remember.  There was testimony about that.  Dr. Taub said

FBNYSIL6                         Summation - Molo

1    that.

2          In a conversation in Dr. Taub's office, he tells him

3    that he can't do it anymore.  He can't do it anymore.  There

4    was that kind of awkward testimony from Dr. Taub where he said,

5    I can't fund it anymore.

6          The prosecutor said is that really what he said?

7    Maybe he said he can't do it anymore.  The bottom line is

8    Mr. Silver nicely told him, his friend, in his office that I

9    can't do the funding anymore.

10         I asked Dr. Taub, as you'll recall, I put the Steve

11   August document up there and the contract with the language,

12   and he testified that his work wasn't consistent with what he

13   represented it to be.

14         Let me talk a bit about these patients of Dr. Taub

15   that go to Weitz & Luxenberg and why they would do so for a

16   noncorrupt reason.

17         Again, you look at a world through dirty windows, you

18   see a dirty world.  The prosecutors are saying the only way

19   that these patients of Dr. Taub, one of the preeminent

20   mesothelioma doctors in the country, in the world, would find

21   their way to Weitz & Luxenberg, the preeminent mesothelioma law

22   firm in the world, is because Dr. Taub sent them?

23         What world do they live in?  These patients were

24   people who were sick.  Dr. Taub mentioned that he would give

25   them information about the firm.

 1              He also testified quite clearly that he mentioned

 2     several firms to patients.  Sometimes he gave patients a list.

 3     He told the patients, look.  You may have a claim.

 4              He also testified that it's not just any kind of

 5     lawsuit; that these firms that do this work are specialized.

 6     They know the defendants.  They may be suing a number of

 7     different defendants.  We heard that from the Weitz & Luxenberg

 8     lawyers themselves.

 9              So having someone that knew what they were doing

10     mattered.  Very sadly, many of these people had not a whole lot

11     of time to live to deal with this.

12              So, having these people go there, and go there for

13     whatever reason they chose to go there.  Dr. Taub may have

14     mentioned the name.  They may have seen a Weitz & Luxenberg ad

15     on television.

16              They may have been recommended by another lawyer.

17     They may have been recommended by another doctor.  They may

18     have been recommended by a friend.  They may have done research

19     on the Internet.  There's a whole host of reasons why they

20     might go.  There are many reasons why someone would go there.

21              Now, as to Dr. Taub suggesting that a patient contact

22     Mr. Silver, he testified that he thought that by going through

23     Mr. Silver, the patient would sort of be taken care of, given

24     Mr. Silver's stature in the firm.  There's no question that

25     Mr. Silver was not doing the work on the asbestos cases.

1          Dr. Taub told you that he and Mr. Silver traveled in

2     the same circles and socialized over the years, that they were

3     both members of the orthodox Jewish community and went to the

4     same hotels for Passover.

5          He chuckled when I reminded him about the handmade

6     matzo.  Mr. Silver also attended not the wedding -- that's

7     true, but he attended the -- we had this word several times,

8     Sheva Brochos -- the celebration dinner that happened after the

9     wedding, and they occasionally saw each other at social

10    functions.

11         Mr. Silver's late brother-in-law was also a doctor who

12    was friends with Dr. Taub.  Dr. Taub told Mr. Kirkland, if you

13    remember the gentleman from the Simmons law firm -- he told

14    Mr. Kirkland that he and Mr. Silver were lifelong friends and

15    that they would go to synagogue together.

16         He told Mary Hesdorffer at MARF, the longtime friend

17    of his, that he would continue sending cases to Mr. Silver

18    because of their friendship.  This is kind of extraordinary and

19    consistent with what we saw.

20         This was an exhibit the prosecutors told you today,

21    Government Exhibit 595-1.  They showed you a part about saying

22    that Mr. Silver was powerful, but let me show you what else was

23    in that email that they didn't show you.

24         This is a passage from Dr. Taub, "I sent a case to

25    Shelly Silver today and told him about Simmons' $3.15 million

1    gift which might well impact the volume of referrals to Weitz &

2    Luxenberg in the future.  Since he is my friend, I will try to

3    accommodate him."

4              And guess what?  He did.  He kept sending him cases,

5    and he did it because he was his friend.  That friendship

6    caused him to seek Mr. Silver's help in organizing that Miles

7    for Meso walk, and it was that friendship that caused him to

8    request Mr. Silver's help in getting his son a job, getting his

9    daughter the internship, and the ACS award.  And by the way,

10   that thank you letter -- this was after he got the resolution

11   at the American Cancer Society event.

12             This is from Dr. Taub, "Dear Shelly."  This is from

13   Dr. Taub.  Not, "Dear Speaker Silver."  "Dear Shelly, Susan and

14   I," his wife, "wish to thank you for your very kind words at

15   the ACS awards and for providing me with a handsome plaque for

16   my office.  I greatly value your friendship.  I greatly value

17   your friendship."

18             Look.  We all have friends that are best friends, and

19   we all have friends that are people that we hang out with, and

20   then we have friends that we work with, and we have friends

21   that are people that we know socially.

22             There is a spectrum, a continuum, a range of levels of

23   people that we call friends.  But, when he said, "I greatly

24   value your friendship," again, "Dear Shelly," writing to a

25   prominent person who does hold a public office, talking about

1   his wife, they were friends.  They were friends.

2          You could put whatever spin on it you want.  Maybe

3   they didn't go to the Giants game together, or maybe they

4   didn't go bowling together or whatever else Dr. Taub and

5   Mr. Silver might do in their spare time, but the fact of the

6   matter is they're friends.

7          In addition to their friendship and in addition to the

8   fact of Weitz & Luxenberg being so good at what they do,

9   Dr. Taub had a relationship with Weitz & Luxenberg independent

10  of Mr. Silver.

11         Now, he recommended patients to other lawyers at Weitz

12  & Luxenberg.  The prosecutor said that Dr. Taub had never

13  recommended a patient to Weitz & Luxenberg other than through

14  Mr. Silver.  That's not true.

15         You heard testimony from Gary Klein that Dr. Taub

16  recommended a patient to -- these are two names.  Search your

17  memories for it or your notes -- Bonnie Steinwolf and Jim Long

18  to Weitz & Luxenberg lawyers.  That was after Mr. Silver had

19  joined the firm.

20         Dr. Taub also testified -- I asked him these questions

21  on cross-examination -- that he worked with Weitz & Luxenberg

22  as an expert witness and was paid $1,750 an hour to do so.

23  In fact, he said that was the firm that he worked most with as

24  an expert witness.

25         So he had an incentive to maintain that relationship

FBNYSIL6                    Summation - Molo

```
 1    for that reason as well.  He also testified that other doctors
 2    at Columbia sent patients to Weitz & Luxenberg, and other
 3    respected doctors familiar with mesothelioma did so.
 4            It's very clear that -- we saw it reflected in that
 5    email -- that Dr. Taub recommended that patients contact
 6    Mr. Silver because he hoped that Mr. Silver would get Weitz &
 7    Luxenberg to help fund mesothelioma research.
 8            He felt strongly about the firms that did that.  He
 9    said that.  He thought law firms should donate.  He also said
10    that when he met Mr. Silver in 2003, he told him that he was
11    looking for funding from Weitz & Luxenberg.
12            In fact, Weitz & Luxenberg has given substantial
13    donations to work in this area.  You heard Mr. Weitz and
14    Mr. Luxenberg talk about their support for Brigham Women's
15    Hospital and Massachusetts General Hospital and their general
16    support for the medical community in dealing with these issues.
17            It's important to think about this.  If Mr. Silver
18    thought that this could work through some kind of quid pro quo,
19    why wouldn't he just simply go to Perry Weitz and Arthur
20    Luxenberg and say, why don't you give some money to Dr. Taub?
21            It's because he didn't believe that this was a quid
22    pro quo or that it would be.
23            Now, there's no question that Dr. Taub wanted to
24    create goodwill with Mr. Silver, and that's not corruption.  He
25    testified that he wanted to generate goodwill, and that's not a
```

FBNYSIL6                     Summation - Molo

```
1    quid pro quo.  It's not corruption.
2             He said that he wanted to incentivize Mr. Silver to be
3    an advocate and support mesothelioma research.  You know,
4    again, the prosecutors didn't show you that whole email, 595-1,
5    that I put up.
6             Dr. Taub testified that it might be useful to have
7    Mr. Silver there in the future.  He also testified that he's
8    not doing anything in exchange for that.
9             It was perfectly legal for Dr. Taub to suggest that
10   his patients contact Weitz & Luxenberg and to cultivate a
11   relationship with Mr. Silver in the hopes that Mr. Silver would
12   be incentivized to help him as long as there was no agreement
13   with Mr. Silver to send state money or other official acts in
14   return; that there be no quid pro quo, and there is no evidence
15   that there was.  Dr. Taub denied it.
16            Ultimately, as I mentioned, the decision of the
17   patients was the patient's as to who to hire.  It was not the
18   doctor's.  It was not the lawyer's.  The patient would meet
19   with the lawyers, do whatever due diligence it wanted to do,
20   but it was the patient that made that decision.
21            There was this little bit of testimony from
22   Mr. Kirkland too -- I want to talk about this -- in terms of
23   the value of the recommendation.  Remember.  I think the
24   testimony was that some of these people didn't call.
25            But you can go back and check that for your own
```

1    recollection.  Some of them had lawyers.  Many of them had

2    lawyers that came.

3              But Mr. Kirkland said that there's no value, there's

4    no value in the relationship until the patient becomes a

5    client, and the client brings a claim, and then that claim

6    somehow results in money for the law firm.  That's where the

7    value is created.

8              That's not my telling you that.  It's not my argument

9    telling you that.  It's not Weitz & Luxenberg telling you.

10   It's Mr. Kirkland, who was the competitor of Weitz & Luxenberg.

11             Now, I'm obliged to cover with you briefly these other

12   acts that the prosecutor reviewed.  One thing I want to point

13   out is we heard some odd testimony through the trial about

14   the referrals.  This is a chart that the government showed you.

15   These are the numbers of the referrals to Mr. Silver from

16   Dr. Taub in the various years.

17             So, for example, in 2004 and 2005, it was 6.  2009,

18   long after, it was 7.  2001, there's 4.  In 2012.  It was 6.

19   So it's kind of this odd distribution, but that sort of makes

20   sense because Dr. Taub said there's no predictability as to

21   when there might be patients available.

22             He didn't keep a tally of who he sent where and what

23   the result was.  I have to tell you.  If somebody really is

24   engaged in a quid pro quo, especially someone who is as precise

25   as Dr. Taub, a man of science, a man who also would prepare

1    these talking points before a conversation, don't you think

2    he'd actually keep a record of who he sent to Mr. Silver or who

3    he sent to whichever other firm?

4           So this randomness doesn't suggest that there's any

5    rhyme or reason to it as much as it's more how Dr. Taub is --

6    but there's a relative consistency -- yes.  2010 there's one.

7    I'm not going to walk away from that, but in 2009, there are 7.

8           The Shalom Task Force we mentioned a little earlier.

9    The prosecutors claim Dr. Taub provided referrals in exchange

10   for that.  There's no evidence of this grant.  In fact, in

11   addition to denying the quid pro quo, Dr. Taub didn't even

12   remember speaking to Mr. Silver about the Shalom Task Force.

13          The question was at page 344, line 19:

14   "Q. Do you recall speaking with Sheldon Silver ever about this

15   request in particular?

16   "A. I do not."  That was the testimony.

17          Dr. Taub remembered very little about it, and Victor

18   Franco at the Ways and Means Committee said that there were

19   other legislators, other members of the assembly, that

20   requested the money and that Mr. Silver matched their request.

21          Jonathan Taub's job.  I actually feel -- I think this

22   is very sad that the prosecutors would drag all this out and go

23   through this.  Jonathan Taub's job at Ohel was not part of a

24   bribery scheme.  In addition to Dr. Taub's testimony, consider

25   the circumstances.

1          There's nothing unusual or improper of a man who is in

2     the community the way Mr. Silver is, who has had an affiliation

3     with Ohel for many, many years reaching out and trying to help

4     somebody with a job.

5          It would be one thing to suggest that this is just

6     somebody who can't find a job.  He has a master's in special

7     education from Teachers College and Columbia University.  He

8     had experience in several programs in development in

9     Philadelphia at the Hebrew Academy for Special Children.

10         This man was meant for Ohel.  His resume lines up

11    perfectly for it.  That's what we heard through the testimony.

12         He lined up perfectly, in terms of his experience.

13    Mr. Silver has the relationship, which includes, by the way,

14    state grants that were sponsored.

15         You'll recall that he wasn't the only legislator that

16    sponsored state grants to Ohel.  I asked the question of him

17    about various assembly members, and I went on and on and on.

18    There were a lot of people that support Ohel, and Mr. Mandel

19    told us that.

20         Mr. Silver donated personal funds to Ohel.  So the

21    fact that the prosecutors were trying to suggest that these

22    grants somehow were in exchange for Jonathan Taub getting a job

23    at Ohel makes no sense.

24         As far as him waiting until he got a case from

25    Dr. Taub, the chart that they put up was misleading that showed

FBNYSIL6                    Summation - Molo

1    that there was a fee paid, and it showed that there was a case

2    sent like within days of Mr. Silver sending the resume on.

3           That fee isn't paid for years and years after.  So it

4    was very misleading to say that he was getting this money at

5    that point in time.

6           You know, Mr. Mandel was great.  He explained that

7    Ohel gets all kinds of requests like this.  They try to give a

8    leg up to somebody who knows somebody in the organization.

9    That's the way life works.

10          You might remember -- again, this is something that

11   happened again and again throughout the trial -- the

12   prosecutors didn't show you Jonathan Taub's personnel file.  I

13   had to do that.

14          As you'll recall, if you'll recall the references that

15   he got, "Think he would be amazing.  One of the most

16   trustworthy people."  The other reference is "Very smart.

17   Nice, beautiful heart.  Reliable.  Good with computers.  Grab

18   him."

19          Those are the references for Jonathan Taub.  What is

20   Jonathan Taub not supposed to get the job because Mr. Silver

21   makes a recommendation for him?  The man is clearly qualified

22   for the job.  He got it.

23          I took you through the reviews.  He got a good review

24   at first, and he got a second review which was not so good, and

25   he was left on a probationary status, and he got a third review

FBNYSIL6                    Summation - Molo

1    in which he redeemed himself.  Mr. Mandel said that he is a

2    good employee at Ohel today.

3         In addition to that, we heard about the American

4    Cancer Society dinner and the resolution.  You heard about some

5    of the other resolutions that were given when Dr. Taub received

6    his.

7         I asked him those questions.  You'll also see in the

8    binder of resolutions things like congratulating Livingston

9    County, farm of the year, and celebrating the 150th anniversary

10   of the unification of Italy, all great causes.

11        Getting a resolution from the assembly is no big deal.

12   There is no evidence that Mr. Silver went through great efforts

13   to get that for Dr. Taub.  He did get it at the last minute.

14        There is also evidence that he was invited relatively

15   late to the event.  And you saw from the videotape -- remember

16   that little videotape that was played?  It showed how

17   meaningless the process is that occurs for these things to be

18   processed.

19        The other thing that was left out from the

20   prosecutor's presentation when they had the arrows -- there

21   were two other honorees that were quite deserving, a doctor and

22   a community volunteer, who also received the resolutions -- and

23   that Dr. Taub paid for Mr. Silver's ticket for this event.

24        The other thing that happened, which is pretty

25   amazing, if you buy the prosecutors' theory, if you look at the

1    world through dirty windows and see a dirty world, Dr. Taub

2    spoke publicly about the state funding at the ACS event that

3    had happened years earlier.

4              "Some of our earlier research efforts were supported

5    by the New York State Department of Health, which clearly

6    recognized the hazards posed by asbestos to the citizens of

7    New York State and New York City."

8              So Mr. Kirkland said he felt it was odd that

9    Mr. Silver was there because he was a competitor.  It was

10   well known in the world that Mr. Silver was affiliated with

11   Weitz & Luxenberg.

12             Dr. Taub, if he's involved in some fraud scheme, some

13   quid pro quo, is out there publicly stating that he's getting

14   funding from the state, and Mr. Silver actually spoke at the

15   event.

16             And Dr. Taub thanked him for his friendship and his

17   remarks at the event.  This was quite the scheme if the two of

18   them were out there doing this publicly.

19             It's ridiculous but not as ridiculous as what we had

20   to hear about the judge that came, Judge Schonefeld, who came

21   into testify about Aimee Bandler, a lawyer -- again, I feel

22   sorry for these folks that their names are even mentioned in

23   connection with any of this -- gets what most people try to

24   get, some kind of an unpaid internship while they're in school

25   so they can get some experience.

 1            Mr. Silver had been a lawyer for 40 years.  Dr. Taub

 2    says to his daughter, write Mr. Silver.  See if you can get

 3    somebody to help you be a mentor.

 4            Mr. Silver on his own reaches out to Judge

 5    Schoenefeld.  Judge Schoenefeld happily says he'll take on

 6    Aimee.  It turns out that his son went to grade school with

 7    Aimee and that it was an interesting moment in the trial when

 8    he was asked, the judge was asked, and when Ms. Rapfogel called

 9    you or whoever called you on Mr. Silver's behalf --

10    Ms. Rapfogel would be his chief of staff -- did they tell you

11    that Mr. Silver as Speaker of the Assembly would like you to

12    hire Ms. Bandler as an intern?  That was the question.  Did he

13    tell you, the Speaker of the Assembly?

14    "A. I'm not sure I understand the question because we'd known

15    each other so long because I don't know even know why that

16    would even be said that way."

17            So it wasn't Mr. Silver using his position.  It wasn't

18    Mr. Silver performing some official act.  It was Mr. Silver

19    doing what good people do, which is help out other people.

20            The mesothelioma walk I want to briefly touch on.

21    Again, that gets set up with Mr. Kirkland coming to New York.

22    He had a great line where he said, I guess it didn't go forward

23    because I understood that setting up a walk or a run or a race

24    in Alton, Illinois, is one thing.  Setting it up in

25    New York City is quite another.  So it didn't go forward.

1            It took him two months -- if you go back through the

2     documents, it took him two months to get on Mr. Silver's

3     calendar.  The testimony from Mr. Kirkland was that Mr. Silver

4     got up and walked out of the meeting after a short period of

5     time.

6            Now, I want to turn to one other issue right now.

7     Again, as Mr. Silver's lawyer, I'm compelled to tell you this:

8     Now, you're going to get in your instructions from the judge

9     tomorrow an instruction on something called the statute of

10    limitations.

11           You may be scratching your head saying, wait a minute.

12    This stuff seems so old.  How could they possibly be trying to

13    create some kind of crime out of this?

14           The evidence unequivocally supports no crime.  But the

15    statute of limitations instruction that you're going to get

16    says that the statute of limitations for each of the charged

17    crimes is five years.

18           If you find Mr. Silver engaged in a scheme to commit

19    honest services fraud, extortion, or money laundering, but no

20    aspect of the particular scheme occurred after February 19,

21    2010, then you must acquit on that charge because it is barred

22    by the statute of limitations.

23           "If, on the other hand, you find that any aspect of

24    the crime you are considering continued on or after

25    February 19, 2010, then the statute of limitations as to that

FBNYSIL6                        Summation - Molo

1    charge has been complied with."

2              So, in considering both of these charges, you have to

3    consider the statute of limitations, as well as all of the

4    other instructions that you're going to hear.

5              I want to talk about concealment.  Now, the

6    prosecutors, in addition to saying he did it for the money --

7    we talked about that, how because we have a system of citizen

8    legislators, legislators are entitled to make money as long as

9    they don't do it in a corrupt quid pro quo way.

10             The prosecutors introduced evidence regarding

11   Mr. Silver's financial disclosure forms and the statements he

12   made to the press, and he they claim he lied.

13             They claim he lied on the forms and he lied to the

14   press.  That's a complete distraction.  Are we absolutely

15   clear?  When you hear the instructions tomorrow, you're going

16   to know this.

17             Mr. Silver is not charged with any crime, any crime,

18   based on the fact of a false statement on his disclosure form.

19   Also he's not charged with a crime of lying to the press or

20   being less than candid with the press.

21             I guess, if a politician were to be less than candid

22   to the press or making an outright lie to the press for a

23   crime, we probably wouldn't have a government, given what we

24   see throughout the country.

25             That's not to say that Mr. Silver lied to the press,

 1    because he didn't.  He made truthful statements.  In fact,

 2    there were statements that were only made known to you late in

 3    the trial that refute some of the these charges that the

 4    prosecutors are trying to suggest.

 5          Now, he didn't lie on these financial disclosure

 6    forms.  These forms are ten pages long.  You heard testimony

 7    from Lisa Reid.  There are 19 different questions, but the

 8    prosecutors focused on only two of them, question 8(a) and

 9    question 13.

10          Can we put up Government Exhibit 924, the 2013 form,

11    question 8(a), which asks the legislators who are lawyers to

12    give a general description of the principal subject areas of

13    the matters undertaken.  This is the form in question that

14    would apply to Mr. Silver.

15          The prosecutors have argued that Mr. Silver should

16    have mentioned asbestos or tax certiorari cases here.  His

17    response was that he had a limited law practice, and his focus

18    was on personal injury claims.

19          The question asks for this general description, and it

20    asks for matters undertaken.  We've underlined that in red.

21    Why did we do that?  Well, I mean, because that's what the form

22    says.  It's not just you're a lawyer and you go and do

23    anything.

24          We heard all kinds of testimony that being a lawyer

25    doesn't mean that you're qualified or willing or engaged in a

1    practice of representing a particular type of client in a

2    particular type of matter.

3          Gary Klein, the managing attorney at Weitz &

4    Luxenberg, testified that Mr. Silver's principal subject

5    area -- those were his words -- was personal.

6          He told you that Mr. Silver brought general negligence

7    cases to the firm, and he explained that's another type of

8    personal case that includes things like motor vehicle accidents

9    and slip-and-falls.

10         And he explained that Mr. Silver did personally play a

11   role in those cases, a limited role, 71 years old, but

12   nonetheless, he did play a role.

13         He also testified that Mr. Silver did not handle the

14   day-to-day paperwork on those cases.  He didn't draft pleadings

15   or complaints or go to court.  But he did testify that

16   Mr. Silver met with clients and with other lawyers of Weitz &

17   Luxenberg, and he discussed the strategy and what they were

18   doing on the case.

19         So it was those personal injury cases that Mr. Silver

20   undertook within the meaning of that statute.  He didn't

21   undertake asbestos cases, and he certainly didn't undertake tax

22   certiorari cases.

23         They also claimed that because Mr. Silver didn't list

24   Golberg & Iryami in question 13, that he somehow lied about the

25   source of the income, and that's ridiculous.  He didn't lie

1    about anything.

2           Question 13 requests the reporting individual to

3    provide the source of his income.  What was the source of

4    Mr. Silver's income?  Weitz & Luxenberg.  That's where he was

5    employed.  That's where he received his salary.  That's where

6    Mr. Silver had an office.

7           So that's where he practiced law.  So that was his

8    source of income.  However, he didn't just list Weitz &

9    Luxenberg in response to question 13.

10          You saw it in certain years -- he didn't do it every

11   year, but in certain years he had listed the law practice,

12   including of counsel to Weitz & Luxenberg.  That was the

13   phrase, law practice, including of counsel.

14          So Weitz & Luxenberg allowed Mr. Silver to refer cases

15   to other firms.  Mr. Klein testified that he did it.  He

16   received fees for that.  As a result, he had this additional

17   law practice besides Weitz & Luxenberg, and he reported the

18   fees.

19          There's been no suggestion, except till this morning,

20   that Mr. Silver didn't actually report the amounts of the fees

21   that he earned throughout the trial.  There was no testimony of

22   that.

23          The referral fees he received, included the referral

24   fees he got from Golberg & Iryami.  They were made payable to

25   the account, the Sheldon Silver, Esquire account, and deposited

 1    in his law practice account.

 2             The notion that Mr. Silver was somehow trying to hide

 3    his income is just ridiculous.  If he believed there was

 4    something illegal about it, he would not be making these

 5    disclosures.

 6             He didn't conceal anything.  The prosecutors may not

 7    like that.  They may not like the way he filled out the forms,

 8    but whether they like it or not doesn't really matter.

 9             You know who it matters to somewhat?  Not in a

10    criminal context.  Remember Lisa Reid, the woman who testified

11    from the state who was the executive director and counsel to

12    the Legislative Ethics Commission?

13             Ms. Reid testified that one of her primary

14    responsibilities was to review legislator's financial

15    disclosure forms after they're filed.

16             She explained that she reviewed Mr. Silver's forms for

17    completeness, including his answer to question 13, and that he

18    received his fees and that no one ever followed up with

19    Mr. Silver to say his answers were inadequate; that they needed

20    additional information; that he couldn't just say practice of

21    law including Weitz & Luxenberg; that that description was

22    insufficient, or that he needed to list additional fees or

23    things that he had gotten some other way.  No one followed up

24    with Ms. Reid.

25             MR. MOLO:  Judge, can we take a two-minute break right

FBNYSIL6                        Summation - Molo

1    now?

2              THE COURT:  How much longer do you have?

3              MR. MOLO:  I think I have 15, 20 minutes.  If you

4    wouldn't mind.

5              THE COURT:  Okay.  Ladies and gentlemen, we're going

6    to take a very short break.  Do not get too comfortable back

7    there.  Don't discuss the case.

8              (Jury not present)

9              THE COURT:  Mr. Molo, how much time do you need?

10             MR. MOLO:  Five minutes would be great.  Three minutes

11   is great.  I just want to be sure.

12             THE COURT:  So you don't need to leave the courtroom?

13             MR. MOLO:  If I can run out across the hall.

14             THE COURT:  Okay.  Quickly.

15             (Recess)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

FBNYSIL6                    Summation - Molo

```
 1                (In open court)
 2                THE COURT:  Okay, Mr. Molo.  Please proceed.
 3                MR. MOLO:  Okay.  Last push here.
 4                Ms. Reid also --
 5                THE COURT:  Actually, Mr. Molo, let me stop you for
 6      just a second.
 7                Ladies and gentlemen, I got your note.  The answer is
 8      yes.  We're going to take a break.  As soon as Mr. Molo stops,
 9      you'll get five or ten minutes.  You can use your phone to make
10      any arrangements you need to make.
11                All right.  Mr. Molo, proceed.
12                MR. MOLO:  Ms. Reid, who I was just talking about a
13      moment ago, actually testified that it was perfectly okay for
14      the referral fees to go into that account, that Sheldon Silver,
15      Esquire account.
16                We also heard testimony that the Counsel Financial
17      note that they made such a big deal of this morning -- that it
18      was perfectly okay to split it, and that there was disclosure
19      there, and that Mr. Silver's disclosure was quite good.
20                Now, I want to talk briefly about these statements to
21      the media.  You know, for a person who lives a public life to
22      have these snippets just brought before you and said aha, isn't
23      this person evil.  Isn't he deceptive, isn't he lying to you is
24      really dirty pool on the part of the prosecutors I have to say.
25                They covered years and years and years of this man's
```

FBNYSIL6                    Summation – Molo

1    life tearing it a part, a very public life.  And they come to

2    you with four statements that they played for you one minute or

3    1 1/2 minutes, and they tell you, aha.  He's a liar.  He's

4    someone who is not telling you the truth about what his income

5    is because he says he represents the word "little people" and

6    people who are injured.

7           You heard Gary Klein's testimony.  You heard what it

8    is that he did at Weitz & Luxenberg.  You heard from Dara

9    Iryami that he didn't do tax certiorari work.  He didn't

10   represent Glenwood.  He didn't represent Witkoff.  He referred

11   them.  He referred them to people that knew what they were

12   doing.

13          He didn't even represent asbestos clients.  He

14   referred them to lawyers at Weitz & Luxenberg that knew what

15   they were doing.  So of course he didn't represent them.  Of

16   course he didn't.

17          He was telling the truth in this interview context,

18   which, again, the prosecutors didn't play for you all the other

19   subjects that were covered, and they also didn't give you the

20   full context of those interviews, one of them occurring in an

21   elevator with what they call a gaggle.  A press gaggle is how

22   Michael Whyland described it.

23          They're going to snatch that snippet and throw it at

24   you and expect that you're going to believe that that amounts

25   to some grand concealment.  It's tremendously unfair,

1    tremendously unfair.

2            You know what's even more unfair is what they did

3    throughout this trial in opening statements.  They said to you,

4    the defendant stated that he had a personal injury practice at

5    Weitz & Luxenberg, not a word about asbestos, which might have

6    caused the public to wonder what the defendant was doing to get

7    those lucrative asbestos referrals.

8            Then with every witness they asked, did Mr. Silver

9    tell you about asbestos cases?  We heard from witness after

10   witness.  He's not exactly a conversationalist.  He's not

11   somebody who goes around talking his business to all sorts of

12   people.  He kind of keeps his counsel.

13           That was said by Jordan Levy, by Brian Meara, by

14   Arthur Luxenberg, by Michael Whyland.  He just didn't discuss

15   the details of his life.  But, at the end of the trial, we had

16   an amazing revelation.  Do you remember the 2008 interview with

17   the New York Post?

18           After all of the drama, all the questioning of the

19   witnesses, not a word about asbestos we were told in opening

20   statement.  We heard something else.

21           Can we play Government Exhibit 1-A, please.

22           (Audio played)

23           MR. MOLO:  Can you play it one more time.

24           (Audio played)

25           MR. MOLO:  So Mr. Silver told the New York Post in

1    2008 that he was getting asbestos cases.  Let me let you in on

2    a secret.  It's not a good way to keep a secret to tell the

3    New York Post something, especially if you're a politician.

4          So Mr. Silver made it quite clear to the post, who was

5    asking him at the time about his clients and disclosure, that

6    asbestos cases are something that he handles or something that

7    he may bring in and then refer to someone.

8          So that recording refutes the prosecutors' contention

9    that Mr. Silver was keeping this asbestos business a secret.

10   In fact, we have those recordings, Mr. Whyland testified,

11   because Mr. Silver instituted a practice of having them saved

12   generally, these press recordings.

13         We talked about the fact that he doesn't represent

14   companies.  We talked about the fact that he refers these

15   clients, other clients, to people like Golberg & Iryami.

16         He also didn't lie to the press about his investments.

17   They tried to make the argument at trial, during the evidence,

18   that Mr. Silver somehow didn't disclose that there were these

19   private investments.

20         Those private investments are disclosed, and those

21   were not unique to him.  Other people participated in those

22   investments.  He did own -- if you look at his disclosure form,

23   he did own the blue-chip stocks that were talked about in

24   there.  So Mr. Silver did make disclosure.

25         By the way, one thing too about the conversation with

1    Mr. Whyland, and we heard this morning the podium pounding over

2    whether he didn't tell Mr. Whyland that he should go see

3    Dr. Taub.

4          All he cared about was asking Mr. Whyland if his

5    father needed a lawyer.  So he was telling Mr. Whyland, by the

6    way, that he would accept an asbestos case, if he said that;

7    right?  That he would refer it to somebody.

8          Do you remember on cross-examination I asked

9    Mr. Whyland:

10   "Q. You testified about your father, sir.  Your father is

11   healthy; correct?

12   "A. Yes.

13   "Q. Your father is healthy?

14   "A. Yes."  Why would he go see Dr. Taub?

15         The real concealment in this case -- there was

16   concealment.  The real concealment in this case has been by the

17   prosecutors.  The concealment in this case was what they told

18   you in their opening statements, how they put the evidence on

19   that they put on.

20         Again, and again they failed to tell you the full

21   story or put on the witnesses who knew the facts.  There's a

22   long list of witnesses that they could have called that they

23   didn't.

24         The judge is going to give you an instruction,

25   Judge Caproni, that witnesses are available to either side.

1    But the defense does not have a burden of proof, let alone a

2    burden of proof beyond a reasonable doubt.

3              Where was Danny Chill that they talked about earlier,

4    the person who makes the original introduction to Mr. Silver

5    and Dr. Taub?  We didn't hear from Mr. Chill.

6              We didn't hear from Judy Rapfogel, Mr. Silver's

7    chief of staff.  The woman who would know more about his

8    day-to-day goings-on in Albany than anyone is his

9    chief of staff.  She'd been with him for a long time.

10             What about Dean Fuleihan?  Do you remember that

11   Post-it note that was on the letter that they showed you this

12   morning that they introduced that said, "Shelly is very

13   interested in this," and it was a letter from Dr. Taub, and it

14   was signed D.?

15             We heard testimony that that was Dean Fuleihan.  Why

16   didn't the prosecutors call Dean Fuleihan?  Why didn't he tell

17   you what it meant when he wrote, "Shelly is very interested in

18   this"?

19             Would that have meant that Mr. Fuleihan would have

20   come here and told you that it was completely innocent?  We

21   didn't hear from Mr. Fuleihan.  We don't know.

22             What about Mr. Litwin or at least his daughter, Carol

23   Pittelman, the owner of Glenwood?  We never heard from them.

24   Where was Charles Dorego?  Remember.  Dorego was the man who

25   signs that letter that includes all of the referral fees.

1          By the way, let me just address that letter for one

2    second.  Dara Iryami was quite clear about what the language of

3    that letter meant.  Don't let them get up here in rebuttal and

4    try to tell you something different.

5          She said that that letter that was signed meant that

6    Mr. Silver or any person that they did referrals with shared on

7    the upside and shared on the downside.

8          If there was a malpractice action, they would have to

9    be responsible for paying the malpractice.  If the case was

10   successful, they would get the attorneys' fees.  They were

11   splitting that.  That's what that was.  In any event, we didn't

12   hear from Mr. Dorego who signed that letter.

13         Where was Jay Goldberg, Jay Goldberg who is at the

14   heart of all this, the person who has the engagement letter and

15   sends it out?  Ms. Iryami said that he was the person in the

16   firm that took care of engagement letters.

17         We did see the follow-up email that Ms. Iryami sent to

18   Litwin, but the testimony was that Mr. Goldberg was the person

19   that dealt with the engagement letters.

20         What about Sarah Parnes, the person that called for

21   Mr. Witkoff, the woman that actually negotiated with Golberg &

22   Iryami their fees and did that.  How about David Grandeau,

23   David Grandeau the lobbying expert who provided advice to

24   Mr. Runes?

25         We never heard them really ask Mr. Runes why, if he

1    was being extorted, he didn't run to a criminal defense lawyer;

2    that he went to Mr. Grandeau, but we didn't hear from

3    Mr. Grandeau, but we didn't hear the full story from Mr. Runes.

4         Where was Jim Yates, the respected former judge and

5    the counsel to Mr. Silver who actually negotiated the rent laws

6    in 2011?  We didn't hear from Mr. Yates, counsel to Mr. Silver.

7         Where was a single member of the assembly, republican

8    or democrat, who participated in the voting on or review of the

9    real estate legislation in 2011?

10        Now, I don't think any of them will tell you that

11   we're down there, but we don't do anything.  It was a big piece

12   of legislation.  They were informed on it regularly.  The

13   evidence is that they were briefed on that legislation.

14        We didn't hear from a single member of the assembly.

15   We didn't hear from a single member of the senate.  The senate

16   is the other party to these negotiations.  We didn't hear from

17   anyone from the governor's office either, the third party to

18   these negotiations.

19        Where was Stephen Pleydle, the PACB staffer who signed

20   off on these loans to Glenwood?  Remember we heard about the

21   PACB, and Pleydle was the person who was in.  We heard nothing

22   about him.

23        All of these names you see add up quickly.  Those were

24   just the people that weren't called.  You know, there were many

25   times with those who were called as witnesses by the

1   prosecution where you only got half the story.

2            Half the story, by that I mean not a point of view,

3   just the facts, just the fact that Mr. Runes happened to be a

4   sitting judge and a member of the New York Supreme Court

5   Character and Fitness Committee at the same time that the

6   prosecutors are claiming he's engaged in a bribery scheme and

7   in an extortion scheme.

8            MR. GOLDSTEIN:  Objection, your Honor.

9            THE COURT:  Overruled.

10           MR. MOLO:  Just the fact that Dr. Taub had the career

11   and the background that he had.  It wasn't just somebody who

12   happened to know Mr. Silver.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. MOLO:  You know, they suggested to you that HCRA

2     was this secret pot of money and that was what they tried to

3     advance through the testimony of Ms. Paulin.  You saw for

4     yourself on the screen that that wasn't the case.  They showed

5     you that e-mail where they liked part of it because it didn't

6     say that Mr. Silver was a friend of Dr. Taub's.  I had to show

7     you the rest of it so that you see the full picture is that

8     they in fact were friends, or at least that e-mail revealed as

9     much.

10             The prosecutors told you that Mr. Silver was this

11    unfettered decision-maker on the HCRA grants but they didn't

12    tell you about the staff members and other people that were

13    involved or all the process that was there.  They led you to

14    believe that there needed to be this peer review.  They led you

15    to believe that there needed to be some form of competitive

16    bidding for these grants or that it was somehow evil if it

17    wasn't.

18             The prosecutors suggested that there was something

19    improper about Dr. Taub not submitting more progress reports

20    and to the legislature, that somehow the legislature was

21    entitled to that.  What did you hear?  The legislature doesn't

22    get the progress reports, the Department of Health does.  They

23    told you how the Budget Reform Act increased the disclosure on

24    the HCRA grants but they didn't tell that you Mr. Silver

25    actually co-sponsored the law.

1              They told you that before Mr. Silver came along

2     Weitz & Luxenberg didn't really have a relationship with

3     Dr. Taub.  They didn't tell you about the two other lawyers at

4     Weitz & Luxenberg that had that relationship with Dr. Taub.

5              They told you that Dr. Taub signed that

6     non-prosecution agreement.  Remember?  But they didn't tell you

7     that before he would do so he insisted -- he insisted -- that

8     the words "in exchange for" be taken out --

9              MR. GOLDSTEIN:  Objection.

10             THE COURT:  Sustained.

11             MR. MOLO:  And the suggestion that Mr. Silver came to

12    him be taken out.

13             MR. GOLDSTEIN:  Objection.

14             THE COURT:  Sustained.

15             Ladies and gentlemen, it is your recollection of the

16    testimony that controls, not what Mr. Molo says.

17             MR. MOLO:  Same with OHEL.  They led you to believe

18    that Mr. Silver was the only person funding OHEL and that when

19    he learned about there was going to be some disclosure he would

20    have to go out and get more sponsors and I went through that

21    long list of people there.

22             Of course what we just talked about in terms of was

23    asbestos referrals.  There is not enough time today to go

24    through each and every one of these situations and one of these

25    instances that played out in this courtroom, the courtrooms

1    over the last couple weeks, but I think we all deserve better

2    in that the full truth, or at least as much of it as we can

3    listen to on cross-examination, was only borne out after we had

4    the opportunity to do so.

5            This case is about whether there was a *quid pro quo*.

6    And notwithstanding what you heard this morning, you are going

7    to hear tomorrow from the instructions from Judge Caproni that

8    generalized goodwill, desire to have a relationship with

9    somebody is not enough to create an illegal *quid pro quo*.

10   There was no *quid pro quo* on the real estate side of this case,

11   there was no *quid pro quo* on the Dr. Taub side of this case.

12   There was no *quid pro quo*.  There was no crime committed.

13   Sheldon Silver did not sell his office.

14           Now, because the prosecutors have the burden of proof

15   I don't get to speak again but I don't need to because I have

16   you.  And Mr. Silver has you.  And we have your collective

17   memories of what the evidence is.  We have your view of the

18   evidence, your assessment of the witnesses' demeanor on the

19   witness stand, your assessment of the lawyers and the arguments

20   they've made to you throughout this trial when they tell you

21   things like secret pot of money and no mention of asbestos, and

22   that we see quite different things during the course of the

23   trial, when we see it that Dr. Taub had a much stronger view of

24   what was portrayed concerning the lack of a *quid pro quo*, the

25   lack of there being something in exchange for something else,

1    the lack of the this for that.

2              Now, that burden of proof beyond a reasonable doubt,

3    please take that and think about it carefully, think about it,

4    what it means.  Judge Caproni is going to tell you that a

5    reasonable doubt is that which would cause a reasonable person

6    to hesitate to act in a matter of importance in their personal

7    life -- a matter of importance in their personal life.  We all

8    know what that means.  It may be slightly different for each of

9    us but we can all think about what that is and that's the kind

10   of doubt that you need to have, a reasonable doubt.  And the

11   prosecutors have to overcome that, they have to give you proof

12   beyond a reasonable doubt.  To hesitate to act.

13             You have heard the half stories of the prosecutors,

14   you have seen the evidence for yourself.  You have heard

15   Dr. Taub, the people from Glenwood, witness after witness say

16   there is nothing wrong with referral fees, witness after

17   witness say there was no *quid pro quo*.  You have had witness

18   after witness say to you that Mr. Silver did not threaten me to

19   take official action in exchange for anything.  And you know

20   that the New York system of having citizen legislators is

21   flawed if what you want is a perfectly conflict-free

22   environment because we heard from their good government

23   witness, Assembly member Paulin, that it can't really happen.

24             Now, we talked about importance, viewing something of

25   importance and taking something of importance in your lives.

1    There is nothing more important than you are going to do as far

2    as Mr. Silver is concerned than obviously decide this case for

3    him.  I mean, here is a man who has had an unblemished record,

4    served in the Assembly for many, many years.  Take a look at

5    those grant proposals.  Will you do that when you go back

6    there?  The Legislative Initiative Forms.  See the good work

7    that he has done in the Assembly.

8           This has been a tremendous, as you would imagine

9    tremendous blow to a man in that public office.  He has paid a

10   tremendous price.  But we have every confidence in you, we have

11   every confidence you will sit in this God-like function and

12   make a decision --

13          MR. GOLDSTEIN:  Objection.

14          THE COURT:  Sustained.

15          MR. MOLO:  That you will weigh the evidence carefully

16   and that you will not be bullied or bowled over or pushed and

17   prodded by someone's view of what the government should be,

18   what the Assembly should look like, what Assembly members

19   should and shouldn't do but, instead, consider the law, the law

20   that Judge Caproni is going to instruct you on, and the

21   realities of operating in the Assembly subject to that law.

22          You know, Mr. Silver is a fighter.  He has fought for

23   the people of New York for a long time and thank God he is a

24   fighter who is taking on these prosecutors in this case.  A

25   lesser person would have folded.  A lesser person would have

FBN5sil7                    Summation - Mr. Molo

1   said, you know, all of this attention, all of this being drawn

2   on me, I just can't take it.  But Mr. Silver is a fighter.  He

3   knows he is right.  He knows he did not commit a crime.  There

4   was no *quid pro quo*, he did not sell his office.

5          You know, the prosecutors here, the headquarters for

6   their office is in Washington and they're in the attorney

7   general's office.

8          MR. GOLDSTEIN:  Objection.

9          THE COURT:  Sustained.

10          MR. MOLO:  The prosecution here has a burden of proof

11   and they also have a duty and you have a duty, and if you

12   follow the duty and you follow the law as you have been

13   instructed, there is only one conclusion that you can come to

14   and that is there was no *quid pro quo*, that Mr. Silver did not

15   sell his office, and that in fact he is not guilty.  I ask that

16   when you go back and deliberate that you deliberate, you

17   collaborate but do not abdicate, take your own individual

18   responsibilities as part of this jury seriously which I know

19   you will.  When you do, there is only one conclusion you are

20   going to come to, and that is Mr. Silver is not guilty.

21          Thank you for your time.

22          THE COURT:  Thank you Mr. Molo.

23          Ladies and gentlemen, as I promised you, we are going

24   to take a break now.  I'm going to give you a full 10 minutes.

25   So, those of you who need to make child care arrangements and

1    the like, please do that right away.

2              I am told that the government's rebuttal is going to

3    be about an hour, so I assume we are going to get out of here

4    about 6:20, more or less.  So, we are going to try to keep the

5    break right to 10 minutes so I can get you back in the

6    courtroom at 5:20.  Don't discuss the case.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBN5sil7                    Summation – Mr. Molo

1          (Jury not present)

2          THE COURT:  Okay.  10 minutes.

3          (Recess)

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Okay, ladies and gentlemen.  I got your

3    note about scheduling.  I will give you the whole schedule as

4    soon as the rebuttal summation is complete.

5          Mr. Master.

6          MR. MASTER:  Thank you, ladies and gentlemen, for your

7    patience and understanding.  I know it is a very, very long

8    day.

9          THE COURT:  Is your microphone on?

10         A JUROR:  Yes, we can't hear you.

11         MR. MASTER:  I think so.  Thank you.

12         THE COURT:  Okay.

13         MR. MASTER:  It has been a very long day and I

14   appreciate your patience and understanding as you listen to all

15   the jury addresses and get the whole story, not just as

16   Mr. Molo was saying, one side of the story.  That's important

17   here.

18         Mr. Molo spent, I think, almost all of his three hours

19   talking about the intent or lack thereof other people.

20   Apparently, Amy Paulin really must have gotten under his skin.

21   And he spent a lot of time talking about the intent of Rich

22   Runes and other people.  But, ladies and gentlemen, there is

23   one person on trial here, one person alone –– Sheldon Silver.

24   He is the person whose intent and whose conduct you are judging

25   here at this trial as judges of the facts, not as gods, as

FBN5sil7                       Rebuttal - Mr. Master

1    Mr. Molo might make it seem.

2              You are judges of the facts and you are performing the

3    same duty that every jury in every criminal trial since the

4    dawn of the republic performs in every criminal case including

5    every case in which juries return a guilty verdict.  There is

6    no magic formula about it, there is nothing special about it.

7    Your job is to assess the facts impartially without fear or

8    favor and to return a verdict that is consistent with the facts

9    and the law.  And I am confident, the government is confident,

10   that you will do that.

11             So, again, you heard the defense just spend several

12   hours talking about the intent of other people, talking about

13   people who didn't testify at this trial but who, as Mr. Molo

14   acknowledged at the very end of that litany, were equally

15   available to both sides to testify.

16             Why did he do that?  He didn't want you to focus on

17   the people who did testify at this trial and the evidence that

18   did come in at this trial which shows, compellingly, that the

19   defendant is guilty of the charges against him in the

20   indictment.

21             Mr. Molo made it seem in his summation as if

22   everything that happened here was somehow legitimate, as if the

23   state's founding fathers from the 1700s on would have wanted

24   what happened here, would have approved of what happened here.

25   But again, ask yourself, if this was all on the up and up, if

FBN5sil7                         Rebuttal - Mr. Master

1   this was all above board, if this is all what the founding

2   fathers would have wanted then why hide the truth from

3   absolutely everyone?  Why lie about it?  Why hide the truth

4   from your own state employees who are carrying out the

5   directive to send money to Dr. Taub?

6           If you believe that it is so important to reveal

7   conflicts of interest, that disclosure is the key, why

8   deliberately fail to disclose again and again?

9           Again, you heard examples in the main summation and

10  the purpose of this rebuttal summation not to go through all of

11  that again.  You have a full trial record to review.  You heard

12  both parties' summations, I'm just going to have a chance to

13  respond a few of the defense's arguments, not all of them,

14  especially in view of the late hour.  But, again, just a couple

15  of examples here of Sheldon Silver's deception.

16          Again, you remember hearing about how he got all of

17  that money by spending several hours each week on Friday

18  mornings reviewing cases and deciding which ones have merit.

19          That's, Mr. Coccaro, slide 2.

20          Why did he say that?  Why did he say that?  And

21  remember -- Mr. Coccaro, move on to the next slide?

22          Remember how he told Brian Meara, he was asked,

23  Mr. Meara was asked, his friend of 42 years was asked:

24  "Q  What kind of cases did he say at Weitz & Luxenberg?

25  "A  Accidents and medical malpractice.

3039

FBN5sil7                    Rebuttal – Mr. Master

1    "Q   What other cases did he say he brought to the firm?

2    "A   I don't remember any others.

3    "Q   When, if ever, did he tell you he was bringing asbestos

4    cases to the firm?

5    "A   Never."

6             No equivocation or hair splitting here.  Mr. Molo

7    tried in his main summation to say, well, he didn't actually

8    represent them, he just brought them in, he didn't actually

9    work on the cases so therefore what he told other people, what

10   he told the press was hypothetically technically true.  Again,

11   you're the judges of the facts.  You can look at the full

12   picture.  See if he actually disclosed what he was up to with

13   the real estate scheme and the asbestos scheme.

14            You heard those recordings.  They were not

15   recording –– they were brief recordings but you also heard from

16   his spokesman for four years.  It wasn't just a one-minute

17   interaction, it was a four-year relationship in which the

18   defendant passed the same information to Michael Whyland that

19   he said on all of those recordings.  So, this was a deliberate

20   and calculated effort by Sheldon Silver to divert attention,

21   divert suspicion.  This was not a one-minute slip up.  It was

22   consistent, it was calculated, and it was designed so that

23   people did not know how much money he was getting from Dr. Taub

24   so that they would not know at all –– at all –– that he was

25   getting hundreds of thousands of dollars from real estate firms

FBN5sil7                        Rebuttal - Mr. Master

1    that appeared before him on a regular and specific basis.

2            Why could no one know that Dr. Taub was sending cases

3    to him at the same time they would know what he was doing for

4    Dr. Taub using his official state position?  And again, why

5    could no one know that he was getting hundreds of thousands of

6    dollars from real estate developers with all this business

7    before him?

8            Ladies and gentlemen, again, you know why he lied.

9    You know it is because he was committing crimes, he was

10   violating his duty to provide faithful, disinterested and

11   honest services to the public.  There were two secret schemes,

12   there were two *quid pro quo* schemes.  And he didn't want to get

13   caught.

14           And Mr. Molo said something else that, again, you will

15   have a chance to evaluate when you review the law, when you

16   hear the judge's instructions on the law.  It is not actually

17   the case that his statements to the public and his statements

18   that he put out there in his disclosure forms are not relevant,

19   are not proof of any crime.  In fact --

20           MR. MOLO:  Objection.

21           THE COURT:  Overruled.

22           MR. MASTER:  In fact, you will see one of the very

23   first elements of the honest services fraud charge deals with a

24   possession, such as Sheldon Silver's duty to be honest -- to be

25   honest -- with the public and not to deceive the public.

1          Ladies and gentlemen, he violated that duty for very,

2     very specific reasons -- 4 million reasons.

3          The defense had absolutely no credible explanation for

4     why Sheldon Silver lied again and again, year after year,

5     systematically about these two critical issues, these two

6     schemes that were the subject of the testimony at this trial.

7          Again, at the end of the day you heard the evidence,

8     I'm not going to go through Mr. Goldstein's main summation

9     again but you heard the evidence demonstrating that Sheldon

10    Silver on the one hand got millions of dollars worth of

11    referral fees and dozens of patient leads from Dr. Taub at his

12    specific request -- and I will go through that in a minute --

13    and again, in exchange he took specific and official actions as

14    the opportunities arose and they arose again and again and

15    again to send taxpayer money to Dr. Taub and to provide other

16    benefits, specific benefits, to Dr. Taub and his family.  And

17    again, you heard that on the one hand real estate developers

18    sent millions of dollars of business to Jay Goldberg at Sheldon

19    Silver's specific request using his official authority.  In

20    exchange, Sheldon Silver took specific official actions that

21    benefited Jay Goldberg and real estate developers as the

22    opportunities arose.

23          So, just to recap, there is overwhelming proof that

24    Sheldon Silver got millions of dollars, more outside income

25    than any other member of the Assembly even while he served as

FBN5sil7                    Rebuttal - Mr. Master

1    its Speaker.  There is overwhelming proof that Sheldon Silver

2    took official actions benefiting these people.  Again, Mr. Molo

3    didn't even address that, did not touch that.  There is no

4    doubt that he took official actions benefiting Dr. Taub that

5    were elaborated on in the government's main summation and there

6    is overwhelming proof and undisputed proof that he in fact took

7    actions that benefited Glenwood Management approving financing,

8    approving legislation that Glenwood was happy with.

9           Again, there is overwhelming proof that he did these

10   things for these people at the same time that he was getting

11   paid by them.  At the very same time.  And it was not out of

12   coincidence.  There was overwhelming proof that it was not a

13   coincidence, it was not for a good cause, and it was not for

14   some other totally innocent reason.  And, in fact, I think

15   Mr. Molo made a stunning concession -- a stunning concession in

16   his main summation.  He in fact conceded that it was in part

17   for the money.  He tried to justify it by saying, well, that's

18   how the legislature works, it is impossible to avoid a

19   conflict.  That's not accurate.  That's not what the law says.

20   You will look at the legal instructions but he said,

21   Mr. Silver, of course he did it for the money.

22           MR. MOLO:  Objection.

23           THE COURT:  Overruled.

24           MR. MOLO:  I didn't say that that way.

25           MR. MASTER:  Well, your recollection controls, just

FBN5sil7                         Rebuttal - Mr. Master

1    like it controls with respect to the evidence.

2                  In any event, your common sense tells you, and the

3    specific evidence that you heard in this case tells you that in

4    doing these things Sheldon Silver was motivated by money, and

5    in taking the official actions that benefited Dr. Taub he was

6    motivated by money, and taking the actions with respect to

7    these real estate developers he was motivated by money.

8                  Now, again, I don't have time to address all of these

9    arguments and all of the attacks on others that the

10   prosecution, Amy Paulin, others that were set forth in the

11   defense's summation so I'm just going to rush through or go

12   through a few of them.

13                 Let's talk about the non-prosecution agreement.  That

14   was such a focus of Mr. Molo's presentation, Dr. Taub's

15   non-prosecution agreement.

16                 Again, the defense made a big show about a couple of

17   changes in some language between the draft non-prosecution

18   agreement and the final version and again, like many of

19   Mr. Molo's arguments, it is a distraction and it is not

20   consistent with the evidence.  Again, it is your job to review

21   all of the evidence, not just the direct, not just the

22   cross-examination or the redirect, but the exhibits that are

23   introduced at trial.

24                 Mr. Molo suggested in his main summation that Dr. Taub

25   stood up to the government, he refused to sign that draft

FBN5sil7                    Rebuttal - Mr. Master

1    non-prosecution and the government was trying to put words in

2    his mouth.  That's absolutely untrue.  That's absolutely

3    untrue.

4              Mr. Coccaro, can you pull up slide 25?

5              This is what Dr. Taub actually said on the witness

6    stand.  Mr. Molo tried to get him to say that he stood up to

7    the government and stopped something in action but he actually

8    said:  "I don't recall the prosecutors asking me to say

9    anything."

10             No one put words in his mouth.  No one made him do

11   anything.  He made his own decisions and he signed that

12   non-prosecution agreement that you saw at trial.

13             And with respect to the draft agreement, he

14   specifically said that he did not -- did not -- reject the

15   earlier version that was the subject again of so much of

16   Mr. Molo's argument he stated:  "In drafting this agreement, I

17   relied on discussions with my attorney.  I'm not sure exactly

18   what transpired."

19             Again, that was Mr. Molo trying to get him to say what

20   he is arguing was said here but, again, Dr. Taub refused to say

21   it.  He said I actually don't know why this was changed and it

22   is not because I refused to say it.  I actually have no idea.

23             And another example, Mr. Molo suggests that Dr. Taub

24   is standing up to the government and refused to say that these

25   cases came in at Sheldon Silver's request.  Well, again, look

1    at the testimony at trial.  That's going to be your job as you

2    evaluate the evidence.  Transcript page 269, this was a

3    question that was asked of Dr. Taub.

4    "Q  At some point after that initial encounter with Sheldon

5    Silver did you come to learn that Sheldon Silver wanted you to

6    send him mesothelioma cases?"

7                MR. MOLO:  Objection.

8                THE COURT:  Overruled.

9                MR. MASTER:

10   "A  Yes.

11   "Q  Was that a specific request made to you?

12   "A  Yes."

13               So, the testimony at trial supports exactly what the

14   government stated in its main summation which is that right

15   after Dr. Taub asked Sheldon Silver to support research, within

16   a few days -- okay -- within a few days Sheldon Silver made it

17   known to Dr. Taub specifically that he wanted cases -- very

18   specifically that he wanted cases.  And Dr. Taub got the

19   message and Dr. Taub began sending cases immediately

20   thereafter.  That's when Sheldon Silver dangled the research

21   money.

22               Second, just take a look at the final agreement.

23   Again, it is in evidence.  Look at the one that Dr. Taub did

24   sign.

25               And, again, that's just slide 24, Mr. Coccaro.

1          This, itself, is which Mr. Molo is saying was

2     Dr. Taub's accurate and fulsome statement of what he did and

3     what he admitted to.  It specifically says that he intended --

4     he was building a relationship through which he could, and did,

5     make requests of and receive benefits from Sheldon Silver in

6     his capacity as Speaker of the Assembly including requests for

7     and receipt of state funding for his research and other

8     benefits for himself and his family.

9          So, he admitted that in the non-prosecution agreement.

10          Mr. Molo cited again to these snippets of

11     conversations or questions where Dr. Taub said, well, I

12     didn't -- I didn't actually give the cases just for a

13     proclamation, I didn't give it just for a job for my son, I

14     didn't give it just for a job for my daughter but, again -- and

15     there was no explicit agreement.  If you remember that very

16     careful question that Mr. Molo asked.

17          Well, first of all, there is no agreement that is

18     required at all.  You will see that in the jury instructions.

19     But, in any event, there certainly was an understanding between

20     Sheldon Silver and Dr. Taub about these cases, about how the

21     cases would come to him and -- I'm sorry, about how Dr. Taub

22     had asked for things and Sheldon Silver would ask for things in

23     return.

24          If you wouldn't mind just going slide 23, Mr. Coccaro?

25          He specifically said "if I would ask him to do

something" -- that's Dr. Taub -- "he would ask for something in
return."

  *Quid pro quo.*  That's what Dr. Taub stated on the
witness stand under oath.  And again he was asked:
"Q  What was it about your relationship with Sheldon Silver
that made you think that he would ask you for referrals if you
asked for his help with this event?
"A  I had asked -- at the beginning of our relationship, at the
very beginning, I asked if he would convince his company to
send -- to donate funds to MARF and he asked for referrals.
That was a pattern."

  When Dr. Taub would ask for official action or
official benefits Sheldon Silver would demand referrals and ask
for referrals.  And you heard about that again and again at
this trial.  Again, your job is to figure out the intent and to
assess the intent of Sheldon Silver in doing that.  That's your
job as judges of the facts here.  Again, why does Sheldon
Silver do that?  Why does he not bring opportunity to
Weitz & Luxenberg?  Why does he keep it for himself?  Why does
he hide the fact from Weitz & Luxenberg that he is doing all of
these things for Dr. Taub?  Why does he do all these things?
And again, for the reasons that the government stated in its
main summation there is only one answer that's consistent with
all of the other evidence in this case, Dr. Taub's testimony
and the rest of the testimony, and that is that Sheldon Silver

FBN5sil7                        Rebuttal - Mr. Master

1    did so in exchange -- he did those official acts in exchange

2    for those extremely valuable referrals.

3              More on this issue of intent.  You heard, again, the

4    defense spending almost all of its summation talking about

5    others' intent.  But, again, here is what the law is.  I expect

6    Judge Caproni will instruct you that the intent, and this is a

7    quote -- the intent of the party giving the thing of value may

8    be different from the intent of the party receiving it.  The

9    government only has to prove that Mr. Silver, not the bribe

10   giver, understood that as a result of the bribe or kickback he

11   was expected to exercise influence or make decisions for the

12   benefit of the payor and at the time the bribe or kickback was

13   accepted that he intended to do so as specific opportunities

14   arose.

15             So, again, the only thing you need to decide here is

16   Sheldon Silver's intent and ultimately you do not need to find

17   that anyone else who testified at this trial was corrupt to

18   find that Sheldon Silver, again a powerful politician, made

19   millions of dollars off of these charged schemes was corrupt.

20             So, you don't need to find beyond a reasonable doubt

21   that Dr. Taub is guilty of bribing Sheldon Silver to find that

22   Sheldon Silver intended to get mesothelioma cases, the most

23   valuable cases there are -- you heard that at this trial -- and

24   millions of dollars in referral fees by trading his official

25   position and official action for the things he knew Dr. Taub

1    was so desperate for.

2              Again, in any event as you heard in the government's

3    main summation, it is not a surprise that Sheldon Silver kept

4    people in the dark including people he used to accomplish his

5    schemes.  That is how he operated.  The charged schemes were

6    his idea, he came up with it, he orchestrated it and he

7    executed it and he lied to people about it.

8              And, again, you need to find that Sheldon Silver in

9    doing this was motivated only in part by the money, by the

10   prospect of financial gain in taking these official actions.

11   And you know the answer is that he was.

12             So, the defendant really can't be saying because he

13   used a combination of his power and deception to trick real

14   estate developers into hiring Jay Goldberg that he can avoid

15   being accountable for his crimes even if the developers didn't

16   know that Sheldon Silver was getting a cut at least initially;

17   they certainly knew they were sending Jay Goldberg business

18   because Sheldon Silver wanted them to do it.  And Sheldon

19   Silver certainly knew he was getting a cut and he knew what he

20   was doing.  It is not a defense to the charges in this case.

21   At the end of the day, in any event, Dr. Taub knew, Jay

22   Goldberg knew, and Glenwood knew that the defendant was getting

23   paid.

24             Now, Mr. Molo spent time in his summation arguing this

25   was all about goodwill but, again, that argument is also

1    nonsense and it does not help Sheldon Silver at all.

2             First of all, what is goodwill?  It is when someone

3    gives a gift to a politician because they want that politician

4    to like them and have good feelings about them.  That's not

5    what this case is about.

6             Dr. Taub and Glenwood did not just want goodwill from

7    Sheldon Silver.  They didn't just need goodwill.  They wanted

8    and needed specific official actions from the powerful Speaker

9    of the Assembly.  Dr. Taub didn't just want Sheldon Silver to

10   like him or to be his friend, he wanted taxpayer money, he

11   wanted things for his family, he wanted to get a job for his

12   son, he wanted to get a job for his daughter.

13            Real estate developers certainly weren't hoping that

14   Sheldon Silver liked them.  They wanted specific laws passed

15   that didn't hurt their ability to raise rents, they wanted tax

16   breaks, and they wanted a billion dollars in bonds and Sheldon

17   Silver understood that, clearly.  He knew that because he was

18   the one who was receiving these requests.  He absolutely knew

19   that they were asking --

20            MR. MOLO:  Objection.  There is no evidence of that.

21            THE COURT:  Overruled.

22            MR. MASTER:  Those are the facts, ladies and

23   gentlemen.  You can evaluate yourself when you look at the

24   record but the evidence shows that Sheldon Silver knew exactly

25   what these developers and what Dr. Taub wanted.

1          And second, Sheldon Silver was not just passively

2     receiving these gifts from Dr. Taub and from Glenwood.  He was

3     demanding specific things from them, business worth millions of

4     dollars, and you just saw it in that slide that we showed you,

5     it was a pattern.  When Dr. Taub would ask him to do something,

6     Sheldon Silver would demand something in return.

7          And you heard that the request for cases, the initial

8     request came specifically -- specifically -- from Sheldon

9     Silver.

10          MR. MOLO:  Objection.

11          THE COURT:  Overruled.

12          MR. MASTER:  So, for this goodwill argument to work

13     you would need to believe that Sheldon Silver thought that when

14     he, himself, was hitting these people up for millions of

15     dollars in business, he somehow believed that they were going

16     along just because the only thing that these people wanted was

17     his goodwill.  And it is absurd.  It is just absurd.

18          Remember hearing from Mr. Runes, for example, about

19     how discovering that the defendant was secretly sharing in

20     Glenwood's fees was like learning that they were holding a

21     tiger by the tail.  You remember hearing that and that was the

22     reference in the government's initial summation.

23          Now, the defendant is the tiger in that story.  There

24     was testimony throughout the trial about how he was one of the

25     most powerful people in the State and he could destroy

Glenwood's business.  He could do serious harm to Glenwood's

business if he chose to, if he was angry, if the tail was let

go.

          Now, you know, ladies and gentlemen, is it nice to

develop a relationship with a tiger?  Is it nice to get

goodwill from a tiger?  Absolutely.  Absolutely.  But what do

you really want from a tiger?  You don't -- you don't want to

get eaten by the tiger and Sheldon Silver had the ability to

seriously hurt them, to seriously hurt their business, and he

imposed that on them.  He is the one who hit them up for

business, he is the one who said everything is okay, let's get

this signed.  You will see in the testimony he didn't give them

an option to opt out or to leave.  He didn't say totally up to

you.  He said he wanted it done, he is the powerful Speaker of

the Assembly.  He didn't give them an option and they got the

message.  They agreed to hold on to the tiger's tail and enter

into this secret agreement that was kept secret from the

members of the Assembly, from the staff, from everyone -- from

everyone -- so that Sheldon Silver could keep getting paid.

          The same is true with Dr. Taub.  You heard testimony

about the specific things -- the very specific things that

Sheldon Silver did for Dr. Taub and those were each in response

to specific requests for official action from Dr. Taub.

          So, this goodwill argument does not make any sense.

And, in any event, Sheldon Silver is the only one on trial, as

1    we said, and it ultimately is his intent that matters.  So,

2    ladies and gentlemen, how could Sheldon Silver think that this

3    is all about goodwill and relationships, especially when he is

4    the person who hit them up for the business, he is the one who

5    asked them for the business?

6            Again, another analogy for you, it is like when the

7    school yard bully takes everyone's lunch money, gets caught,

8    and says, well, I just wanted to give everyone the opportunity

9    to build goodwill with me, to build a relationship with me.  It

10   doesn't make any sense.  This argument makes no sense,

11   especially in the context of Sheldon Silver being the one who

12   made these demands, who made the asks and who got these people

13   to send him valuable cases and legal business.  It is not

14   supported by the facts of this case.

15           Now, you also heard testimony -- I know that we are

16   running on in time but you also heard arguments about the

17   review, all the review that supposedly was done of these grants

18   that were sent to Dr. Taub.

19           Again, you have to use your common sense on this one

20   because this effort to distract you makes no sense.  Again, the

21   unrebutted testimony at trial shows that Sheldon Silver was the

22   sole decider about who got grants from HCRA.  You heard that

23   there was no public disclosure, zero public disclosure of his

24   decisions and he was the sole decider.  You also heard that he

25   was the sole decider to grant $500,000 in taxpayer money

1    controlled by the Assembly to Dr. Taub and once that decision

2    was made that paperwork was processed.

3            Again, you remember how Dr. Taub said that compared to

4    regular research grants?  It is not that it was inherently

5    corrupt, it was just that there was no review, there was no

6    oversight, there was no competition.  Dr. Taub got the grant

7    because Sheldon Silver said he would get the grant.

8            Mr. Coccaro, if you could just go to slide 27?

9            Again, Dr. Taub told you that the process is the

10   opposite -- the opposite of what he expected with government

11   grants which is first you filled out the paperwork and then you

12   got the grant.  Here he was told he got the grant because

13   Sheldon Silver, at his say-so, gave the grant, and then the

14   paperwork that was the focus of the defense summation was

15   created.

16           Dennis Whalen from the Department of Health said, he

17   was asked:

18   "Q  What role did the Department of Health have related to the

19   HCRA Assembly pool grants?

20   "A  We were -- I guess you could say we were the banker and the

21   bookkeeper.

22   "Q  What ability did the Department of Health have to reject a

23   request?

24   "A  We had none."

25           Again, Sheldon Silver decided in his sole discretion

FBN5sil7                       Rebuttal - Mr. Master

1   at the same time that he is getting all of these referrals

2   worth millions of dollars from Dr. Taub, that Dr. Taub would

3   get that research money knowing that Dr. Taub would send cases

4   to people who supported his research, knowing that Sheldon

5   Silver had made a specific request for those cases -- part of

6   that pattern that you heard about at this trial.

7            So, again, let's think about the review that followed.

8   You saw these slides of these entities.

9            Mr. Coccaro, if you wouldn't mind going to slide 28?

10           All that paperwork.  Where in that paperwork does it

11  show the disclosure -- the disclosure of the relationship, the

12  conflict of interest?

13           MR. MOLO:  Objection.

14           THE COURT:  Overruled.

15           MR. MASTER:  You can look for it.  All of that, that

16  big pile of paperwork that the defense introduced at this

17  trial, look for the disclosures about what the real nature was

18  of the relationship between Sheldon Silver and Dr. Taub.  When

19  you look you won't find anything.  And when you look at all the

20  statements and all of the testimony no one knew the full truth.

21  No one knew the full truth.

22           MR. MOLO:  Your Honor, I object.  There is no

23  suggestion in the record that there was some sort of disclosure

24  in any of these documents that is required.  This is the same

25  thing as throughout the trial.

1              THE COURT:  Overruled.

2              MR. MASTER:  And, Mr. Coccaro, just go to slide 29,

3     the next slide?

4              Again, what kind of review did all of these entities

5     perform when they didn't know that Sheldon Silver was

6     specifically benefiting financially from his relationship with

7     Dr. Taub at the same time -- at the same time -- that he is

8     dispensing taxpayer money to Dr. Taub?

9              You heard from Whalen:  The New York State Department

10    of Health had no idea.  Certainly Victor Franco and Steve

11    August at the Assembly, they were kept in the dark by Sheldon

12    Silver.  You didn't hear it from anyone at the Attorney

13    General's office who knew or had a clue.  Those disclosure and

14    accountability form that ended up being created, they were not

15    in existence at the time.  And Columbia University Medical

16    Center, they of course didn't know what was going on and when

17    they found out about this scheme they said, whoa, that is

18    totally inconsistent with how we do business and, as Mr. Molo

19    said in summation, they tried to fire Dr. Taub when they

20    learned the truth.

21             So, the idea that this was some fulsome review that

22    made sure that everything was vetted that this relationship.

23             MR. MOLO:  Objection.

24             THE COURT:  Overruled.  Don't interrupt, please.

25             MR. MASTER:  That this review was what made everything

1    legitimate, it is completely false.  It is not the story.

2            Again, the relationship, this *quid pro quo*

3    relationship was secret.  It was kept hidden from all of these

4    organizations so how is it possible that they could have

5    approved of all of this, vetted all of this?  What kind of

6    review can an agency or entity perform when they don't have the

7    full truth, they don't have the full story?  Again, it is a

8    distraction.

9            Now, on this outside income issue, again, the defense

10   tried to make a lot of the fact that New York has a part-time

11   legislature.  There is no doubt about that.  Again, it is not a

12   defense to the charges here.  New York, of course, allows a

13   legislator to earn outside income for outside work.  However,

14   when you earn outside income in exchange for official action

15   it's a bribe, it's not a defense to the charge to say, well,

16   I'm not per se prohibited from getting outside income.  If you

17   get outside income in exchange for official action it's

18   illegal.

19           The defense had spoken in its opening about a

20   legislator who is a farmer and another who is a pharmacist,

21   that the farmer actually grows the crops and the pharmacist

22   actually dispenses drugs.  This defendant used his official

23   position to dispense taxpayer money.  He used his official

24   position to dispense power, his authority.  And what he got

25   paid for you know from the evidence you heard at this trial,

 1   was the use of his official position.  And when he did that it

 2   doesn't matter that he is a part-time legislator.  When he did

 3   that it was a bribe, it was not legitimate outside income.

 4          Now, you also heard this discussion about September

 5   11th and this is really stunning.  You heard them go on about

 6   how the September 11th tragedy somehow justified what happened

 7   here and somehow explained what --

 8          MR. MOLO:  Objection.  That is not --

 9          THE COURT:  Sustained.

10          MR. MASTER:  Yes, your Honor.

11          -- well, somehow explains the timing of what happened

12   here.  Now, that is not consistent with the evidence.  That is

13   not consistent at all.

14          Remember what happened before the grant ever got

15   funded.  When the defendant first spoke with Dr. Taub and about

16   Dr. Taub's interest in funding research, they had barely met

17   and they certainly never discussed Dr. Taub's research or any

18   links between 9/11 and mesothelioma.  And so, what is the next

19   thing they discussed?  What is the next thing they discussed?

20   What they discussed was Sheldon Silver's desire, his specific

21   ask for cases, the most valuable cases that there are.

22          So, Sheldon Silver essentially asked Dr. Taub for

23   money before he even extended the opportunity to apply for

24   state funding.  And you know from your common sense and from

25   all the other evidence in this case that that is what prompted

1    Sheldon Silver to dangle the grant opportunity in front of

2    Dr. Taub, the millions of dollars that he got for himself, not

3    the money for research.

4          Then again, after Dr. Taub submitted those research

5    request letters Sheldon Silver did not rush to fund it, he

6    waited until he had gotten over a dozen cases from Dr. Taub and

7    got a first referral fee check worth more than his salary --

8    you saw that in the initial summation -- before he funded the

9    grant in 2005.  If this was research he was so passionate

10   about, he certainly could have funded it a lot earlier.

11         And you also heard that Sheldon Silver never talked to

12   Dr. Taub about the research before it got funded.  And so what

13   did 9/11 have to do with Sheldon Silver's interest in Dr. Taub

14   and his research?  The evidence does not support that it had

15   nothing to do with it.  Anything.

16         Second, let's look at what happened when the grant

17   actually got funded.

18         Is there any evidence that the defendant funded the

19   research because of 9/11?  You heard about Steve August, he was

20   the one who added the reference to September 11 to the grant

21   summary.  He was the one.  And he told you -- and that's page

22   982 at the transcript, that Sheldon Silver never told him that

23   this had anything to do with 9/11.

24         Once the grant was awarded do you see any evidence

25   that Sheldon Silver ever disclosed to the public that he ever

1   supported this grant?  Again, he is interested in addressing

2   these issues in his community.  He never publicized it, he

3   never had Dr. Taub do anything with it with the public.  In

4   fact, the evidence proved the opposite, that these grants were

5   sponsored by him in secret and there was no public disclosure

6   of the grant.

7            Was there ever any evidence that the defendant

8   actually asked about the grant or discussed the grant?

9            Again, Mr. Coccaro, if you can pull up slide 30 there?

10           This was shown on the main summation but, again,

11  Dr. Taub was asks:

12  "Q  How often, if ever, did Sheldon Silver invite you to

13  explain the extent to which you were doing outreach or

14  education to people exposed to asbestos in the 9/11 attacks?

15  "A  He did not."

16           He did not.  He did not express any interest in this

17  issue that supposedly caused him to stop it.  So, let's look at

18  why the grants ended, let's look at the timing about that.

19           Mr. Coccaro, if you could pull up slide 7?

20           Sheldon Silver never told Dr. Taub that the 9/11 issue

21  was the reason why he was stopping the grant, the alleged

22  failure to comply with the terms of the grant.  What he says

23  is:  I can't do this anymore.

24           That's my recollection.  That's my recollection.

25           "I can't do this anymore."  He never said anything

1    about Mount Sinai, never said that the reason for stopping the

2    grant was because he couldn't -- because he was not performing

3    under the grant.  He wasn't performing the outreach and

4    education.

5    "A  I don't remember that being discussed."

6            Again, you heard him at this trial about the real

7    reasons, the real reasons why these grants stopped.  The

8    disclosure and accountable forms -- that's slide 11,

9    Mr. Coccaro -- that would have required disclosure of this

10   relationship of this, of Sheldon Silver's financial interest

11   and the financial benefits he was getting from Dr. Taub.

12           You heard about the Times Union lawsuit, and again,

13   Mr. Molo was painting Sheldon Silver as a champion of

14   disclosure.  This was a lawsuit where the Assembly actually

15   fought disclosure and lost and as a result of that was required

16   to post information about the grants and about their sponsors.

17   That post-dated the second grant that went to Dr. Taub.

18           You heard about the Budget Reform Act and that was a

19   piece of legislation, as Mr. Molo himself was describing, would

20   have required greater disclosure.  And you also heard about and

21   this is Mr. Coccaro, slide 14 -- you heard about increased

22   review by the Assembly.  All of that was timed right after this

23   grant, this second grant was issued.

24           And so, when Sheldon Silver said I can't do this

25   anymore never mentioning 9/11, never mentioning failure to

FBN5sil7                    Rebuttal - Mr. Master

1   comply with the grant your common sense tells you why.  You

2   know why.  It is because there was never disclosure of this

3   relationship, never disclosure of the grant, zero public

4   disclosure, and he didn't want the truth to come out.

5         I know that the time is running short and you have

6   been extremely, extremely patient.  Don't think that just

7   because I don't address a specific argument that there is any

8   merit to it.  Again, you are going to be the ones who are

9   judging the facts just like every jury has in every criminal

10  case.  I am confident that you are going to do that consistent

11  with the law.  You have been very attentive and notwithstanding

12  Mr. Molo's attacks on the prosecution.  We are proud of your

13  service, we thank you for your service, and we know you have an

14  important duty to perform as citizens of this state and as

15  people who are judging the facts and who are deciders of the

16  facts.  It is an important case for Sheldon Silver but it is

17  also an important case for the public.  The public has a right

18  to honest services from its politicians and from its leaders in

19  particular.

20        The founding fathers of this nation founded the nation

21  on a core principle, that this nation shall be governed by the

22  people and for the people.  You might have learned that in

23  school.  I am sure you have heard it before.  But, ladies and

24  gentlemen, what you heard at the trial was that the defendant,

25  with respect to these schemes, he governed using a different

FBN5sil7                    Rebuttal - Mr. Master

model.  It wasn't by the people or for the people.  It was by

Sheldon Silver for Sheldon Silver he exercised his official

position, he exercised his power as the Speaker of the

Assembly, the enormous power that was given to him, that was

entrusted to him.  He used it to dispense money to people who

were paying him.  He used it to dispense benefits to people who

were paying him in *quid pro quo* relationship.  He used that

power and that money to line his pockets.  He took his prime

proceeds and invested it in exclusive accounts with guaranteed

returns and he split the note to hide some of his ill-gotten

gains from the public.

        Ladies and gentlemen, the founding fathers also had

another principle:  No public official, no matter how

powerful -- and Sheldon Silver was extremely powerful -- is

above the law.  That duty of honest services that you heard

about, it applies full-time, even to a part-time legislature.

        Sheldon Silver was absolutely prohibited from trading

his official position and official power for private gain no

matter how he got it or when he got it.  So, if you find that

he was motivated in part by the money in engaging in all those

official acts that you heard about at this trial, he is guilty.

And you know that because he did it in secret for years.  He

kept these secrets for years.  He was able to delay the day in

which he would be held to account for his crimes but thanks to

the investigation that you heard about at this trial, thanks to

FBN5sil7

1   the evidence and the witnesses you saw at this trial, it has

2   been exposed.  It has been laid bare.  It is time to return the

3   verdict, the only verdict that is supported by the law, by the

4   evidence, and by your common sense:  That Sheldon Silver is

5   guilty as charged.

6         Thank you.

7         THE COURT:  Thank you, Mr. Master.

8         Okay.  You have now heard all of the lawyers'

9   arguments.  The only things that are left is I'm going to

10  charge you on the law tomorrow morning and then the case will

11  be in your hands for deliberation.

12        So, our schedule for tomorrow is I need you here again

13  at 9:15.  The goal will be to start promptly at 9:30.  You will

14  get charged and then I want you to work at least until 5:30

15  tomorrow.  I can't work too much past 5:30 because I have a

16  commitment.  On Wednesday I promised you that you would get to

17  leave at noon.  If the jury wants to stay beyond noon, let me

18  know.  This is on the Wednesday before Thanksgiving.  But, if

19  you don't want to say beyond noon I promised you many days ago

20  that you could leave at noon so I will stand by that.  If there

21  is not a verdict by then you will come back on Monday at 9:15

22  to start.

23        The two alternate jurors, you have to be here tomorrow

24  as well.  I will tell you at the end after I have charged the

25  jury the next steps for you.

3065

FBN5sil7

1          But, for now, as every night when you leave me, I tell

2    you don't read about the case, don't talk about the case, don't

3    read about any other corruption cases that are going on.

4          Have a very nice evening.  We are going to start

5    tomorrow morning, again, 9:15 in your regular jury room on the

6    fourth floor where your swipe cards work.  Okay?

7          See you tomorrow morning.  Have a very nice evening.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBN5sil7

```
 1              (Jury not present)

 2              THE COURT:  Okay.  So, from now on we are going to go

 3     back upstairs in the small cramped courtroom, so please be

 4     there at 9:15.  You have gotten the final charge.  We will

 5     charge the jury tomorrow morning.

 6              My plan is to allow the two alternates to leave.  I'm

 7     going to require them to check in daily but I'm not going to

 8     keep them here locked up.

 9              Do the parties want to be heard on that?

10              MS. COHEN:  That's fine with the government as long as

11     you instruct them, as I am sure your Honor will, that they are

12     not to talk about the case, read about the case, or discuss the

13     case.

14              THE COURT:  Mr. Molo?

15              MR. MOLO:  That's fine, your Honor.

16              THE COURT:  Anything further from the parties?  All

17     right.  I will see you all tomorrow morning at not later than

18     9:15.

19              MR. MASTER:  Thank you, your Honor.

20              MS. COHEN:  Thank you, your Honor.

21              (Adjourned to 9:15 a.m., November 24, 2015.)

22                         DEFENDANT EXHIBITS

23     Exhibit No.                              Received

24      S-8 and S-9  . . . . . . . . . . . . . . .2837

25      20, 82, 145-03, 162-1, 162-2, 163, 175, . . .2841
```

FBN5sil7

1              176, 179, 230 through 235,

2              243, 245 and 247-1

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25