FBOYSIL1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        S1 15 Cr. 93 VEC

 5   SHELDON SILVER,

 6              Defendant.

 7   ------------------------------x
                                     November 24, 2015
 8                                   9:30 a.m.

 9

10   Before:

11              HON. VALERIE E. CAPRONI,

12                                      District Judge
                                          and a jury
13

14                   APPEARANCES

15   PREET BHARARA,
          United States Attorney for the
16        Southern District of New York
     CARRIE HEATHER COHEN,
17   HOWARD SETH MASTER,
     ANDREW DANIEL GOLDSTEIN,
18   JAMES M. McDONALD,
          Assistant United States Attorneys
19

20   STROOCK & STROOCK & LAVAN, LLP
          Attorneys for defendant Silver
21   BY:  JOEL COHEN, Esq.
          – and –
22   MOLOLAMKEN, LLP
     BY:  STEVEN FRANCIS MOLO, Esq.
23        ROBERT KELSEY KRY, Esq.
          JUSTIN VAUN SHUR, Esq.
24        JUSTIN M. ELLIS, Esq.
          TUONGVY LE, Esq.
25                   Of counsel
```

FBOYSIL1

1              (Trial resumed)

2              (Jury not present)

3              THE COURT:  Good morning.  Please be seated.

4              A couple of housekeeping items.

5              Does the government have a redacted copy of the

6     indictment?  And do you have a copy of the bill of particulars?

7              MS. COHEN:  Your Honor, we have a copy of the bill of

8     particulars.  We did not know that the indictment was going to

9     go back to the jury, but we can have that done while the charge

10    is being read.

11             THE COURT:  Thank you.  That's fine.

12             MS. COHEN:  Apologies, your Honor.

13             THE COURT:  Second, how do the parties intend to send

14    the exhibits back?  Do you have them all loaded into a laptop?

15             MS. COHEN:  We have them all loaded on a hard copy, on

16    a cart, one of them.  The two teams are just going to get

17    together in the back and check each cart so there's no issue.

18             Your Honor, how do you want the indictment redacted?

19             THE COURT:  The only thing I was going to say that

20    should be taken out is the forfeiture count.

21             I would suggest substituting Developer I and Developer

22    II with Glenwood and Witkoff.

23             MS. COHEN:  And Doctor I with Taub?

24             THE COURT:  Yes.  Whatever he was called.  Yes.

25             Do you want to be heard, Mr. Molo?

FBOYSIL1

1    MR. MOLO:  I just want to talk to the government in

2 terms of the exhibits.

3    Do you have all the defense exhibits?

4    MS. COHEN:  We have copies of all of the government

5 exhibits.  We have a set of the defense exhibits, but I had

6 spoken to Mr. Shur, and I had understood that you all were

7 going to have hard copies of all the defense exhibits, but we

8 can put that together.

9    MR. MOLO:  I just want to make sure.

10    MS. COHEN:  We have a list of all of the defense

11 exhibits.  We have a lot of them loaded.  We can certainly

12 facilitate that.

13    MR. MOLO:  I certainly don't believe it should delay

14 your reading the charge.

15    THE COURT:  Correct.  They have other things to do

16 before they start digging into exhibits.

17    MR. MOLO:  Exactly.

18    THE COURT:  Anything further before I bring the jury

19 out?

20    MR. COHEN:  Yes.  If we can approach, your Honor.

21    THE COURT:  Okay.

22    (Continued on next page)

23

24

25

FBOYSIL1

```
 1              (At the side bar)

 2              MR. COHEN:  Your Honor, we have an obligation to

 3    disclose that this morning, Mr. Hamilton --

 4              MR. MOLO:  By the way, this is on the record.

 5              MR. COHEN:  We're going to ask that it be sealed and

 6    Your Honor will decide later what you want to do with it.

 7              Mr. Hamilton works for Mr. Molo and previously clerked

 8    in the Third Circuit.  He picks up Mr. Silver in the morning to

 9    avoid the press.

10              As they were walking past that outdoor food vendor

11    thing, there were two NBC trucks there.  He observed a

12    Caucasian juror from the jury from the front row.  I don't

13    remember what number he is, a tall guy.

14              He had a newspaper under his arms talking to one of

15    the NBC truck personnel.  I don't know what it means.  I'm

16    bringing it to your attention because we think we have an

17    obligation to bring it to your attention and to do anything

18    that's appropriate.

19              THE COURT:  What do the parties propose?

20              MS. COHEN:  I think it might be an alternate juror.

21              THE COURT:  No.  The large guy in the front row.  He's

22    now juror number 2.

23              MS. COHEN:  I think your Honor should inquire --

24              MR. COHEN:  Individually.

25              MS. COHEN:  -- individually.  If he's read the paper
```

FBOYSIL1

1    and if he's had contact with the news.

2              MR. COHEN:  We're also okay with that.  Like I said --

3              MR. MOLO:  The papers have been following these

4    sidebars.

5              THE COURT:  I'm sorry.  Frankly, there was nothing

6    sensitive about the sidebar I don't think.

7              MR. COHEN:  Does it make sense, your Honor, for you to

8    inquire of him in chambers?

9              THE COURT:  Why?  Tell me what you're concerned about.

10   This seems like kind of a standard Mr. Juror number 3, did you

11   have any contact with the NBC News truck this morning?

12             MR. COHEN:  My only concern is whether it might have

13   been in view of the other jurors.

14             THE COURT:  The other juror wouldn't know.

15             MS. COHEN:  When you talk to him, you may find out.

16   When you ask him and if he says he has read the press, then you

17   would have to ask him if he has talked to other jurors about

18   it.  That makes sense.

19             THE COURT:  The fact that he's got a newspaper is not

20   in and of itself of any concern.  I'm happy that he's reading

21   the newspaper.  I'm happy that anybody is reading the newspaper

22   so that we still have a newspapers 20 years from now.

23             MR. COHEN:  As long as he's not reading the press

24   about the trial.

25             THE COURT:  So the real question is whether I should

FBOYSIL1

 1    do this in open court or in my robing room.

 2              Does the government have a view on that?

 3              MS. COHEN:  I am fine if you do it in your robing

 4    room.

 5              MR. COHEN:  That would be my preference.

 6              THE COURT:  My robing room is quite small.

 7              MR. COHEN:  I don't have any problem with your Honor

 8    doing it alone without counsel.

 9              MS. COHEN:  I think actually it's easier if counsel is

10    there so we can hear what the answer is and the judge doesn't

11    have to report back to us and go back-and-forth.  Unless you

12    think for the juror it's better to do it alone, that's fine.

13              THE COURT:  Do you waive your client's presence?

14              MR. COHEN:  Yes.

15              THE COURT:  We'll deal with this in the robing room

16    real quick, and then we'll start.

17              MR. COHEN:  What's your decision?  With counsel or

18    without counsel?

19              THE COURT:  With counsel.

20              (Continued on next page)

21

22

23

24

25

FBOYSIL1

1             (In open court)

2             THE COURT:  For the record, we're taking a matter in

3  the robing room that involves a potential issue with one of the

4  jurors.

5             (Continued on next page)

FBOYSIL1

1              (In robing room)

2              (Juror present)

3              THE COURT:  Hi.  Come on in and have a seat.

4              This morning, did you have any contact with the guys

5      from the NBC TV crew?

6              JUROR:  Yes.

7              THE COURT:  Do you know them?

8              JUROR:  I know the one girl from the news.

9              THE COURT:  So you just said hello?

10             JUROR:  That's all I did was say hello.  I watch every

11     morning from 4:30 to 7:00.

12             She said really?  My family doesn't even watch me on

13     TV.

14             THE COURT:  That was the extent of your conversation?

15             JUROR:  Yes.

16             THE COURT:  You didn't talk about the case at all?

17             JUROR:  No.

18             THE COURT:  Have you read anything about the case?

19             JUROR:  No.  Katie.  They call her Kat.  I watch her

20     every day.

21             THE COURT:  All right.  Thank you.

22             JUROR:  Okay.

23             Don't discuss this with the other jurors, please.

24             (Juror not present)

25             THE COURT:  Okay?

FBOYSIL1

1              MS. COHEN:  You have no objection?

2              MR. COHEN:  No objections.

3              THE COURT:  Perfect.

4              MS. COHEN:  The government has no objections.

5              (Continued on next page)

3077

FBOYSIL1

1                (In open court)

2                THE COURT:  Anything further before I bring out the

3     jury?

4                MS. COHEN:  Not from the government, Your Honor.

5                MR. MOLO:  No, your Honor.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                  (In open court)

 2                  THE COURT:  Good morning, everybody.

 3                  What you've got on your seat is the charge that I'm

 4       about to read to you.  If you will flip to page 3.

 5                  Okay.  Members of the jury, you have heard all of the

 6       evidence.  I'm now going to instruct you on the law that

 7       governs the case.  There are three parts to these instructions.

 8                  First, I will provide you with some general

 9       instructions about your role and about how you are to decide

10       the facts of the case.  These instructions would apply to just

11       about any trial.

12                  Second, I will give you specific instructions about

13       the legal rules applicable to this particular case.  Third, I

14       will give you instructions on the general rules governing your

15       deliberations.

16                  I will read most of this.  It's not my favorite way to

17       communicate with a jury.  But, because there is a need for

18       precision, it's important that I get the words just right.  So

19       that's why I will be reading.

20                  I have provided you each with a copy of the charge.

21       If it's easier to listen and understand while you are reading

22       along, please do so.  If you would prefer, you can just listen.

23                  Either way, you will have a copy of the charge with

24       you in the jury room so that you can consult it if you want to

25       reread any portion to facilitate your deliberations.  You will

FBOYSIL1                          Charge

 1    also have in the jury room a verdict form on which to record

 2    your verdict.

 3              It is my duty to instruct you on the law, just as it

 4    has been my duty to preside over the trial and decide what

 5    testimony and evidence is relevant for your consideration.

 6              It is your duty to accept my instructions on the law

 7    and to apply them to the facts as you determine them.  On legal

 8    matters, you must take the law as I give it to you.  You may

 9    not substitute your own notions or opinions of what the law is

10    or ought to be.

11              You should not be concerned about the wisdom of any

12    rule that I state.  Regardless of any opinion that you may have

13    as to what the law may be or should be, it would violate your

14    sworn duty to base the verdict upon any view of the law other

15    than that which I give you.

16              If an attorney has stated a legal principle different

17    from what I tell you, you must follow my instructions.  You

18    should not single out any particular instruction as alone

19    stating the law.

20              You should consider my instructions as a whole as you

21    deliberate.  You should not infer from anything I have said or

22    done during this trial that I have any view on the credibility

23    of the witnesses or any view about how you should decide the

24    case.

25              I have no opinion as to the facts or the verdict that

1      you should render in this case.

2              You are the sole and exclusive judges of the facts.

3      You determine the credibility of the witnesses.  You resolve

4      any conflicts that might exist in the evidence.

5              You draw whatever reasonable inferences you decide to

6      draw from the facts as you have determined them, and you

7      determine the weight of the various pieces of evidence.

8              You must base your discussions and decisions solely on

9      the evidence presented to you during trial and that evidence

10     alone.  You may not consider or speculate on matters not in

11     evidence or matters outside the case.

12             As I told you at the outset of the case, it is the

13     duty of the attorneys to object when the other side offers

14     testimony or evidence that the attorney believes is not

15     properly admissible.

16             Therefore, you should draw no inference if an attorney

17     objected to evidence.  Nor should you draw any evidence from

18     the fact that I might have sustained or overruled an objection.

19             You are required to evaluate the evidence calmly and

20     objectively, and you must be completely fair and impartial.

21     Your verdict must be based solely on the evidence introduced at

22     this trial or the lack of evidence.

23             The parties in this case are entitled to a trial free

24     from prejudice or bias for or against either side.

25             Our judicial system only works if you reach a verdict

1    through a completely fair and impartial consideration of the

2    evidence.  In deciding the facts of the case, it would be

3    improper for you to consider any personal feelings you may have

4    about any party or any witness or any other such irrelevant

5    factor.

6           This case must be decided by you as an action between

7    parties of equal standing in the community and of equal worth.

8    All parties are entitled to the same fair trial.  All parties

9    stand equal before the law and are to be dealt with as equals

10   in this court.

11          The defendant here, Sheldon Silver, is charged with

12   several federal crimes about which I will instruct you shortly.

13   Please bear in mind, however, that a charge is not itself

14   evidence of anything and that Mr. Silver is presumed innocent.

15          The defendant has pleaded not guilty.  To prevail

16   against the defendant on a given charge, the government must

17   prove each essential element of that charge beyond a reasonable

18   doubt.

19          If the government succeeds in meeting its burden, your

20   verdict must be guilty on that charge.  If it fails, your

21   verdict must be not guilty on that charge.

22          The burden of proof never shifts to the defendant.

23   The law presumes a defendant to be innocent and, therefore,

24   never imposes upon a defendant in a criminal case the burden or

25   duty of calling any witnesses or producing any evidence.

1          In other words, as to each charge, Mr. Silver starts

2     with a clean slate and is presumed innocent until such time, if

3     ever, that you as a jury are satisfied that the government has

4     proven that he is guilty of that charge beyond a reasonable

5     doubt.

6          The question then becomes what is a reasonable doubt.

7     The words almost define themselves.  It is a doubt based on

8     reason and common sense.  It is a doubt that a reasonable

9     person has after carefully weighing all the evidence.  It is a

10    doubt that would cause a reasonable person to hesitate to act

11    in a matter of importance in his or her life.

12         Proof beyond a reasonable doubt must be, therefore,

13    proof that is so convincing that a reasonable person would not

14    hesitate to rely on it in making an important decision.

15         Proof beyond a reasonable doubt is not, however,

16    beyond all possible doubt.  A reasonable doubt is not a doubt

17    based on caprice or whim.  Nor is it a doubt based on

18    speculation or suspicion.

19         Reasonable doubt is also not an excuse to avoid the

20    performance of an unpleasant duty.  If, after fair and

21    impartial consideration of the evidence, you have a reasonable

22    doubt as to Mr. Silver's guilt with respect to a particular

23    charge against him, then you must find Mr. Silver not guilty of

24    that charge.

25         On the other hand, if, after fair and impartial

consideration of all the evidence, you are satisfied beyond a

reasonable doubt of Mr. Silver's guilt with respect to the

particular charge against him, you must find Mr. Silver guilty

of that charge.

I want to take a moment to describe to you what is and

is not evidence in this case.  As I have said, you may rely

only on evidence in your deliberations.

The evidence in this case is the sworn testimony of

the witnesses, the exhibits, and the stipulations that were

received in evidence.  Other things are not evidence.

A question by a lawyer is not evidence.  The witness'

answers are evidence, not the questions.  Similarly, documents

that lawyers provided to witnesses to refresh their

recollection are not evidence.  Only the witness' answers are

evidence.

Arguments by lawyers are not evidence.  What the

attorneys said in their opening statements and in their

summations was intended to help you understand the evidence and

to reach a verdict.

If your recollection of the facts differs from the

lawyers' statements, it is your recollection that controls.

Statements that I may have made concerning the

evidence are not evidence.  Testimony that has been stricken or

excluded is not evidence, and it may not be considered by you

in rendering your verdict.

1          Anything you may have seen or heard outside the

2     courtroom is not evidence.

3          Now I will discuss what is evidence.  Evidence may

4     come in several forms.  First, the sworn testimony of

5     witnesses, regardless of who called the witness, is evidence.

6     This is true of the witness' direct and cross-examination.

7          The exhibits that were admitted during trial are

8     evidence.

9          The stipulations that both parties agreed to and read

10    during the trial are evidence.  You must accept as true the

11    facts to which the parties stipulated.

12          Some of the stipulations were about what witnesses

13    would have said if they had been called to testify.  You must

14    accept as true the fact that those witnesses would have given

15    that testimony, but it is up to you to determine the weight or

16    importance of the testimony.

17          Generally, there are two types of evidence that you

18    may consider in reaching your verdict, direct and

19    circumstantial.

20          Direct evidence is testimony by a witness about

21    something he or she knows by virtue of his or her own senses,

22    something that he or she has done, seen, felt, touched, or

23    heard.

24          For example, if a witness testified that on the day in

25    question she was in her office and she could see that it was

raining all day, that would be direct evidence about the

weather that day.

        Circumstantial evidence is evidence of one fact from

which you infer the existence of other facts.  For example,

assume that a witness testified that his office does not have a

window.

        On the day in question, however, he saw numerous

people coming into the office with wet raincoats and carrying

dripping umbrellas.

        That testimony about the wet raincoats and dripping

umbrellas is circumstantial evidence that it was raining that

day.

        So, even though you have no direct evidence regarding

the weather, you have circumstantial evidence that it was

raining that day.

        With circumstantial evidence, you must be careful to

draw reasonable inferences that reflect all of the evidence.

        For example, if you live in the city and wake up in

the morning and you see that the sidewalk is wet but the street

is dry, it's not reasonable to infer that it rained last night.

Instead, a more reasonable inference is that the building staff

has hosed down the sidewalk.

        That's all there is to circumstantial evidence.  You

infer on the basis of reason and common sense from one fact.

In my first example, dripping raincoats and umbrellas, the

FBOYSIL1                    Charge

existence or nonexistence of some other fact, in that case, rainy weather.

When circumstantial evidence is presented, it is of no less weight than direct evidence.

You have had the opportunity to observe the witnesses. You are the sole judges of credibility of each witness and the importance of his or her testimony.

Decide what testimony to believe and what not to believe.  Consider each witness' demeanor and manner of testifying; the witness' opportunity to see, hear, and know about the events described; the witness' ability to recall and describe those things; and the reasonableness of the testimony in light of the other evidence in the case.

Consider whether part of the witness' testimony was contradicted or supported by other testimony by what the witness said or did on a prior occasion or by the testimony of other witnesses or by other evidence.

If you find that a witness has willfully testified falsely as to an important matter, you may disregard the witness' entire testimony, or you may accept as much of the testimony as you find to be true and disregard what you find to be false.

A witness may have been mistaken or may have lied in part of his or her testimony while having been accurate and truthful in other parts.

FBOYSIL1                        Charge

1              You have heard from two cooperating witnesses and one

2      immunized witness.  The cooperating witnesses, Dr. Taub and

3      Mr. Meara, have been promised by the government that, in

4      exchange for testifying truthfully and fully, they will not be

5      prosecuted for any crimes that they may have admitted, either

6      here in court or in interviews with the government.

7              This promise was not a formal order of immunity by the

8      Court but was arranged between the witness and the government.

9      The government is permitted to make these kinds of promises and

10     is entitled to call cooperating witnesses.

11             You are instructed that you may convict the defendant

12     on the basis of such a witness' testimony alone if you find

13     that his testimony proves the defendant's guilt beyond a

14     reasonable doubt.

15             The immunized witness, Dara Iryami, testified under a

16     grant of immunity from this Court.  As I explained when she

17     testified, Ms. Iryami was ordered to testify notwithstanding

18     her invocation of her Fifth Amendment right not to be required

19     to incriminate herself.

20             Because I ordered her to testify, her testimony cannot

21     be used against her in any criminal case except in a

22     prosecution for perjury, giving a false statement, or otherwise

23     failing to comply with the order to testify.

24             The government is entitled to call as a witness a

25     person who has been granted immunity by order of the Court, and

1    you may convict the defendant on the basis of such witness'

2    testimony alone if you find that the testimony proves the

3    defendant guilty beyond a reasonable doubt.

4            I've already given you some general considerations on

5    credibility, and I will not repeat them all here.  Nor will I

6    repeat all of the arguments made on both sides.

7            Nevertheless, let me say a few things that you might

8    want to consider during your deliberations on the subject of

9    cooperating and immunized witnesses.

10           The testimony of cooperating and immunized witnesses

11   should be examined by you with great care and caution.  You

12   should ask yourself whether the witness would benefit more by

13   lying or by telling the truth.

14           If you believe that the witness was motivated by hopes

15   of personal gain, was the motivation one that would cause the

16   witness to lie?  Or was it one that would cause the witness to

17   tell the truth?  Did this motivation color the witness'

18   testimony?

19           In sum, you should look at all of the evidence and

20   decide what credence and what weight, if any, you give to the

21   testimony of cooperating and immunized witnesses.

22           You have also heard the testimony of a law enforcement

23   witness.  The fact that a witness may be employed as a law

24   enforcement official or employee does not mean that her

25   testimony is deserving of more or less consideration or greater

FBOYSIL1                         Charge

 1    or lesser weight than that of a witness who is not employed by

 2    law enforcement.

 3            You have heard evidence during the trial that

 4    witnesses have discussed the facts of the case and their

 5    testimony with the government lawyers before the witnesses

 6    appeared in court.

 7            Although you may consider that fact when you are

 8    evaluating a witness' credibility, there is nothing unusual or

 9    improper about a witness meeting with lawyers before testifying

10    so that the witness can be aware of the subjects he will be

11    questioned about, focus on those subjects, and have the

12    opportunity to review relevant exhibits before being questioned

13    about them.

14            Such consultation helps conserve your time and the

15    Court's time.  In fact, it would be unusual for a lawyer to

16    call a witness without such consultations.

17            Going back to witnesses generally, you should consider

18    whether a witness had an opportunity to observe the facts he or

19    she testified about.  You should also consider whether the

20    witness' recollection of the facts stands up in light of the

21    other evidence in the case.

22            In other words, what you must try to do in deciding

23    credibility is to size up a person just as you would in an

24    important matter in your own life when you are trying to decide

25    if a person is truthful, straightforward, and accurate in his

1    or her recollections.

2            There are several persons whose names you have heard

3    during the course of the trial that did not testify.  I

4    instruct you that each party had an equal opportunity or lack

5    of opportunity to call those witnesses.

6            Therefore, you should not draw any inferences or reach

7    any conclusions as to what such witnesses would have said had

8    they been called.  Their absence should not affect your

9    judgment in any way.

10           You should, however, remember my instruction that the

11   law does not impose on a defendant in a criminal case the

12   burden or duty of calling any witnesses or producing any

13   evidence.

14           The parties have presented exhibits in the form of

15   charts and summaries.  These exhibits purport to summarize the

16   underlying evidence that was used to prepare them.

17           I decided to admit these charts and summaries in order

18   to save time and avoid unnecessary inconvenience.  You should

19   consider these charts and summaries as you would any other

20   evidence.

21           Mr. Silver did not testify in this case.  Under our

22   constitution, a defendant has no obligation to testify or to

23   present any evidence because it is the government's burden to

24   prove a defendant's guilt beyond a reasonable doubt.

25           A defendant is never required to prove that he is

FBOYSIL1                        Charge

1    innocent.  Therefore, you should not attach any significance to

2    the fact that Mr. Silver did not testify.

3              You may not draw any adverse inference against

4    Mr. Silver because he did not testify, and you may not consider

5    it against Mr. Silver in any way during your deliberations.

6              Let's now turn to the specific charges against

7    Mr. Silver.  I will at times refer to each count by the number

8    assigned to it in the indictment.

9              You should know that there is no significance to the

10   order of the counts or the specific number of counts charged.

11             Counts One and Two charge that starting in

12   approximately 2000 through approximately January 2015,

13   Mr. Silver committed honest services fraud by engaging in a

14   scheme in which he received fees from the law firm Weitz &

15   Luxenberg for mesothelioma cases, the leads for which were

16   given to Mr. Silver by Dr. Taub in exchange for official acts

17   by Mr. Silver.

18             Count One charges that the scheme was committed

19   through the use of the mails.  Count Two charges that the

20   scheme was committed through the use of interstate wire

21   communications.

22             Counts Three and Four charge that starting in

23   approximately 2000 through approximately January 2015,

24   Mr. Silver committed honest services fraud by engaging in a

25   scheme in which he received fees from the law firm Golberg &

1  Iryami for tax certiorari business which business was given to

2  Golberg & Iryami by Glenwood and Witkoff in exchange for

3  Mr. Silver's official acts.

4         As with Counts One and Two, Count Three charges that

5  the tax certiorari scheme was committed through the use of the

6  mails; whereas, Count Four charges that the scheme was

7  committed through the use of interstate wire communications.

8         Counts Five and Six charge that Mr. Silver committed

9  extortion under color of official right by engaging in the

10 mesothelioma and tax certiorari schemes.

11        Finally, Count Seven charges that Mr. Silver laundered

12 money by transferring more than $10,000 of criminally derived

13 property into various investments.

14        In a moment, I will instruct you on each of these

15 charges in more detail.  You must consider each charge

16 separately and evaluate each on the evidence or lack of

17 evidence that relates to that charge.

18        Although the indictment will be sent into the jury

19 room, the indictment is not evidence.  It is merely an

20 accusation, and it cannot be used by you as proof of anything.

21        As I have stated, Counts One and Three of the

22 indictment charge Mr. Silver with honest services mail fraud,

23 and Counts Two and Four charge Mr. Silver with honest services

24 wire fraud.

25        Honest services fraud involves a scheme to defraud the

FBOYSIL1                    Charge

public of its right to a public official's honest services.
Honest services mail and wire fraud are similar but distinct
offenses.

In order to sustain its burden of proof with respect
to the honest services mail fraud counts charged in Counts One
and Three, the government must prove four elements beyond a
reasonable doubt:

First, that there was a scheme to defraud the State of
New York and its citizens of their intangible right to
Mr. Silver's honest services as an elected legislator and
Speaker of the Assembly;

Second, that Mr. Silver knowingly and willfully
participated in the scheme to defraud with knowledge of its
fraudulent nature and with a specific intent to defraud;

Third, that the scheme involved the receipt of bribes
and kickbacks;

And, fourth, that in executing the scheme, Mr. Silver
used or caused the use of the mails.

In order to sustain its burden of proof with respect
to the honest services wire fraud charged in Counts Two and
Four, the government must prove the same first three elements
as for honest services mail fraud.

The fourth element, however is different.  As to the
wire fraud charges, the government must prove as a fourth
element that, in executing the scheme, Mr. Silver used or

FBOYSIL1                    Charge

1    caused the use of interstate wire communications.

2              The first element that the government must prove

3    beyond a reasonable doubt is that there was a scheme or

4    artifice to defraud the State of New York and its citizens of

5    their intangible right to Mr. Silver's honest services.

6              A scheme or artifice is simply a plan to accomplish

7    some goal.  For ease of reference, I am just going to use the

8    term "scheme."

9              A scheme to defraud is any scheme that makes false

10   representations regarding material facts if the falsity is

11   reasonably calculated to deceive persons of average prudence.

12             A representation is false if it is untrue when made

13   and was known at the time to be untrue by the person making the

14   representation or causing it to be made.

15             A fact is material if the fact is one which would

16   reasonably be expected to be of concern to a reasonable and

17   prudent person in making a decision.

18             Deceitful statements of half-truths or the concealment

19   of material facts may also constitute false representations

20   under the statute.

21             The government must prove that the goal of the scheme

22   was to deprive the State of New York and its citizens of their

23   right to Mr. Silver's honest services.

24             A public official owes a duty of honest and faithful

25   service to the public he serves and to his public employer.

1           When a public official obtains a corrupt payment in

2      exchange for official actions taken or to be taken, the

3      official has breached his duty of honest service.

4           It is not necessary that the government prove that

5      Mr. Silver realized any gain from the scheme or that the State

6      of New York and its citizens actually suffered any pecuniary

7      loss.

8           It is sufficient for the government to prove that the

9      State of New York and its citizens did not receive the honest

10     and faithful services of Mr. Silver.

11          The second element that the government must prove

12     beyond a reasonable doubt is that Mr. Silver participated in

13     the scheme to defraud knowingly, willfully, and with a specific

14     intent to defraud.

15          This element involves Mr. Silver's state of mind,

16     which is a question of fact for you to determine like any other

17     fact question.

18          "Knowingly" means to act voluntarily and deliberately

19     rather than mistakenly or inadvertently.

20          "Willfully" means to act knowingly and purposely with

21     an intent to do something the law forbids; that is to say, with

22     a bad purpose either to disobey or to disregard the law.

23          "Intent to defraud" means to act knowingly and with

24     the specific intent to deceive for the purpose of depriving

25     another of the intangible right of honest services.

1          Direct proof of knowledge and fraudulent intent is

2     almost never available.  You cannot look into a person's mind

3     to see what his or her state of mind is or was, and it is the

4     rare criminal scheme where the participants write down or state

5     expressly that they are acting with fraudulent intent.  Such

6     direct proof of knowledge and intent is not required.

7          In our everyday affairs we are continuously called

8     upon to decide from the actions of others what they intend and

9     what their state of mind is.

10          Experience has taught us that frequently actions speak

11     louder and more clearly than spoken or written words.

12          Therefore, the ultimate facts of knowledge and

13     criminal intent are frequently established by circumstantial

14     evidence based upon what a person does and says, what he does

15     not say and does not do, all the surrounding circumstances, and

16     the rational or logical inferences that may be drawn from them.

17          As I charged previously, circumstantial evidence is of

18     no less value than direct evidence.

19          Because intent to defraud is an element of the crime,

20     it follows that good faith on the part of Mr. Silver is a

21     complete defense to a charge of honest services mail or wire

22     fraud.

23          Mr. Silver has no burden to establish good faith.  The

24     burden is on the government to prove fraudulent intent beyond a

25     reasonable doubt.

1              In this regard, it is not necessary for the government

2     to prove that Mr. Silver was motivated solely by improper

3     considerations.  A defendant may be found to have an intent to

4     defraud even if he also has other intent.

5              The government will have satisfied its burden of proof

6     on this element if you find that Mr. Silver had an intent to

7     defraud, even if he also had other proper or neutral intents

8     for his actions.

9              The third element that the government must prove

10    beyond a reasonable doubt is that Mr. Silver received bribes or

11    kickbacks as part of the scheme to defraud.

12             A bribe occurs when a public official corruptly seeks

13    or accepts, directly or indirectly, something of value from

14    another person with the intent to be influenced in the

15    performance of his public duties.

16             A kickback is similar.  A kickback occurs when a

17    public official corruptly seeks or accepts, directly or

18    indirectly, something of value from another person with the

19    intent to be influenced in the performance of his public duties

20    and the influenced public act itself provides the source of

21    funds to be kicked back.

22             To satisfy this element, the government must prove

23    that there was a quid pro quo.  Quid pro quo is Latin, and it

24    means this for that or these for those.

25             The government must prove that a bribe or kickback was

1    sought or received by Mr. Silver, directly or indirectly, in

2    exchange for the promise or performance of official action.

3           Official action includes any action taken or to be

4    taken under color of official authority.  The government does

5    not have to prove that there was an express or explicit

6    agreement that official actions would be taken or that any

7    particular action would be taken in exchange for the bribe or

8    kickback.

9           The payment and the receipt of a bribe are not

10   interdependent offenses because the intent of the party giving

11   the thing of value may be different from the intent of the

12   party receiving the thing of value.

13          Therefore, the government only has to prove that

14   Mr. Silver, not the bribe giver, understood that as a result of

15   the bribe or kickback, he was expected to exercise official

16   influence or make official decisions for the benefit of the

17   payer and, at the time the bribe or kickback was accepted, he

18   intended to do so as specific opportunities arose.

19          If you find that Mr. Silver understood that the

20   benefits were provided solely to cultivate goodwill or to

21   nurture a relationship with the person or entity who provided

22   the benefit and not in exchange for any official action, then

23   this element will not have been proven.

24          On the other hand, if you find that the government has

25   proven that Mr. Silver accepted payments or things of value

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    intending, at least in part, to take official action in return

2    for those payments as the opportunities arose, then this

3    element will have been proven.

4           It does not matter who initiated the quid pro quo or

5    whether Mr. Silver ever actually performed his part of the quid

6    pro quo.

7           If Mr. Silver did perform his part of the quid pro

8    quo, it does not matter whether the actions he took were

9    desirable or beneficial to the public or that his action was

10   only one in an otherwise lawful process.

11          This element can be proven if you find that Mr. Silver

12   would have taken the same action even if no bribe or kickback

13   had been paid.

14          The honest services fraud laws are concerned with the

15   manner in which public officials take actions, not with whether

16   the official's actions are good or bad or beneficial or

17   detrimental to the public.

18          You heard some testimony about campaign contributions

19   that were given to Mr. Silver and to political campaign

20   organizations associated with Mr. Silver.

21          A person, including a company, has a constitutional

22   right to make campaign contributions to political candidates

23   and political organizations.

24          Contributors have the right to make contributions with

25   the hope that the candidate will support legislation or produce

FBOYSIL1                        Charge

1    political outcomes that benefit the contributor.

2              Similarly, politicians have the right to receive

3    contributions, including from people or entities, that hope the

4    politicians will enact laws helpful to them.

5              The government does not allege that the campaign

6    contributions made by Glenwood were unlawful.  But you can

7    consider its contributions if you find those contributions are

8    relevant to Glenwood's state of mind.

9              For Counts One and Three, the mail fraud counts, the

10   final element that the government must prove beyond a

11   reasonable doubt is the use of the mails to further the scheme

12   to defraud.

13             Use of the mails includes materials sent through the

14   United States Postal Service or through a private or commercial

15   interstate carrier like Federal Express.  To satisfy this

16   element, it does not matter if the mail traveled only within

17   one state.

18             For Counts Two and Four, the wire fraud counts, the

19   final element that the government must prove beyond a

20   reasonable doubt is the use of interstate wire communications

21   to further the scheme to defraud.

22             The wire communications, such as a telephone call or

23   an email transmission, must pass between two or more states.

24             The mailing or wire communication need not itself be

25   fraudulent, but the government must prove that the mailing or

FBOYSIL1                          Charge

1   wire communication was used in some way to further or advance

2   the scheme to defraud.

3          The government has provided Mr. Silver with bills of

4   particulars specifying particular mailings and wire

5   communications that it alleges satisfy the fourth element of

6   Counts One through Four.  The bills of particular will be

7   provided to you in the jury room.

8          As to Counts One and Three, in order to find this

9   element satisfied, you must unanimously agree that at least one

10  specific mailing that is set forth in the bills of particular

11  occurred for each count.

12         You must be unanimous on which mailing you find

13  satisfies this element, but you need only agree on one mailing

14  for each count to find this element satisfied.

15         Similarly, as to Counts Two and Four, in order to find

16  this element satisfied, you must unanimously agree that at

17  least one particular wire communication set forth in the bills

18  of particulars satisfies this element for that count.

19         As with mailings, you must be unanimous on which wire

20  communication the government has proven beyond a reasonable

21  doubt, but you only need to find one wire communication for

22  each count.

23         The government does not need to prove that the

24  mailings or wire communication was made on the exact date

25  listed in the bill of particulars.

FBOYSIL1                    Charge

1          It is sufficient if the evidence establishes beyond a

2     reasonable doubt that the mailing or wire communication was

3     made on a date substantially similar to the date listed in the

4     bill of particulars.

5          Counts Five and Six charge Mr. Silver with extortion

6     under color of official right.  As commonly used, the term

7     "extortion" mean coercing someone to voluntarily give up

8     property as a result of threats of force or violence, a classic

9     example being the school bully forcing the nice boy to give up

10    his lunch money to avoid a punch in the nose.

11         Extortion under color of official right is a little

12    different.  Extortion under color of official right occurs when

13    a person uses his position as a public official to obtain

14    property not due to him as a public official.

15         Counts Five and Six allege that from approximately

16    2000 to January 2015, Mr. Silver engaged in two schemes in

17    which he used his position as Speaker of the Assembly and as an

18    elected legislator to obtain things of value not due to him as

19    a public official, specifically valuable leads for mesothelioma

20    lawsuits and tax certiorari business in exchange for official

21    actions.

22         To sustain its burden of proof on Counts Five and Six,

23    the government must prove beyond a reasonable doubt each of the

24    following four elements:

25         First, that Mr. Silver was a public official or held

 1   public office;

 2            Second, that Mr. Silver obtained property not due to

 3   him as a public official;

 4            Third, that the property was given to Mr. Silver with

 5   the consent of the giver and because of Mr. Silver's official

 6   position and that Mr. Silver knew that the property was given

 7   because of his official position;

 8            And, fourth, that interstate commerce or an item

 9   moving in interstate commerce was delayed, obstructed, or

10   affected in some way or degree.

11            The first element the government must prove beyond a

12   reasonable doubt is that at the time of the events charged in

13   the indictment, Mr. Silver was a public official or held public

14   office.

15            The second element the government must prove beyond a

16   reasonable doubt is that Mr. Silver obtained property that was

17   not legitimately owed to the public office Mr. Silver occupied.

18            The term "property" includes money and tangible and

19   intangible things of value that are capable of being

20   transferred or given from one person to another.

21            In Count Five the government alleges that the property

22   that was given was leads for mesothelioma cases.  Leads are

23   information about the mesothelioma patients that can be used by

24   attorneys to make contact with and possibly obtain the patients

25   as clients of the firm.

FBOYSIL1                          Charge

1        If you find, first, that Dr. Taub gave such

2    information to Mr. Silver; and, two, that the information had

3    value; and, three, that such information can be transferred

4    from one person to another, then you should proceed to consider

5    this element.

6        On the other hand, if you conclude, one, that Dr. Taub

7    only recommended Mr. Silver at Weitz & Luxenberg to his

8    patients; or, two, that Dr. Taub did not provide leads

9    regarding his mesothelioma patients to Mr. Silver; or, three,

10   that the leads did not have value; or, four, that such leads

11   are not transferable from one person to another, then the

12   government has not proven that property as required by this

13   element was obtained.  In that instance, you must find that

14   Mr. Silver is not guilty of Count Five.

15       In Count Six, the government alleges that the property

16   was Glenwood and Witkoff's tax certiorari business that was

17   given to Jay Arthur Goldberg or Golberg & Iryami.

18       If you find that, one, Glenwood or Witkoff gave some

19   of its tax certiorari business to Jay Arthur Goldberg or

20   Golberg & Iryami; and, two, that the developers' tax certiorari

21   business had value; and, three, that such business could be

22   transferred from one person to another, then you should proceed

23   to consider this element.

24       On the other hand, if you determine that, one, neither

25   Glenwood nor Witkoff gave any of their tax certiorari business

to Jay Arthur Goldberg or Golberg & Iryami; or, two, neither of

the developers' tax certiorari business had value; or, three,

such business could not be transferred from one person to

another, then the government has not proven that property, as

required by this element, was obtained.  In that instance, you

must find Mr. Silver not guilty of Count Six.

In order to prove this element, the government must

prove beyond a reasonable doubt that Mr. Silver or a third

party at the direction of Mr. Silver obtained property that was

not legitimately owed to Mr. Silver in his official capacity.

The government does not have to prove that the

extorted property was of a personal benefit to Mr. Silver or

that it was given to him directly.

It is sufficient for this element that the extorted

party gave property to another, either to Mr. Silver or to a

third party at the direction of Mr. Silver.

The third element that the government must prove

beyond a reasonable doubt is that Mr. Silver used the authority

of his public office to obtain the extorted property for

himself or for a third party and that the extorted property was

given, at least in part, because of Mr. Silver's official

position.

In addition, as was the case when I charged you on

honest services fraud, the extortion counts require the

government to prove beyond a reasonable doubt the existence of

1      a quid pro quo.

2               As I explained to you earlier, a quid pro quo is

3      Latin, and it means this for that or these for those.

4               To prove a quid pro quo, the government must prove

5      that property was sought or received by Mr. Silver, directly or

6      indirectly, in exchange for the promise or performance of

7      official action.

8               To satisfy this element, the government must prove

9      beyond a reasonable doubt that Mr. Silver obtained property to

10     which he was not entitled by his public office knowing that it

11     was given in return for official acts as the opportunity arose

12     rather than being given voluntarily and unrelated to

13     Mr. Silver's public office.

14              The government must also prove beyond a reasonable

15     doubt that the extorted party was motivated, at least in part,

16     by the expectation that as a result of the payment, Mr. Silver

17     would exercise official influence or decision-making for the

18     benefit of the extorted party and that Mr. Silver was aware of

19     their motivation.

20              If you find that Mr. Silver understood that the

21     property at issue was given solely to cultivate goodwill or to

22     nurture a relationship with the person or entity who gave the

23     property and not in exchange for any official action, then this

24     element has not been proven.

25              On the other hand, if you find that Mr. Silver

FBOYSIL1                        Charge

accepted the property intending, at least in part, to take

official action in exchange for those payments as the

opportunities arose, then this element has been satisfied.

Again, as I charged you earlier, it is not necessary

that Mr. Silver or the person giving the property state the

quid pro quo in express or explicit terms.

A quid pro quo can be implied from Mr. Silver's words

and actions so long as you find that Mr. Silver intended there

to be a quid pro quo.

The government also does not have to prove that the

property that was extorted was given directly to Mr. Silver.

It is sufficient for the government to prove that the property

was given to a third party at Mr. Silver's direction.

This element can be satisfied even if the extorted

party initiated the quid pro quo and even if the extorted party

and Mr. Silver had a friendly relationship.

If you find either to be the case, however, each is a

factor that you should consider in deciding whether the

extorted party was motivated, at least in part, to give

property because of a belief that Mr. Silver would take

official action in exchange for the property rather than for

some other entirely innocent reason.

The government's burden is to prove that the promise

or performance of official action was at least a part of the

motivation for the extorted party to give over the property.

FBOYSIL1                    Charge

1              Thus, if you find that the transfer of property was

2    for entirely innocent reasons stemming from friendship or any

3    other innocent reason, then this element will not have been

4    proven.

5              The government does not need to prove that Mr. Silver

6    could or actually did perform any specific official act on

7    behalf of the extorted party.

8              If Mr. Silver did take official action on behalf of

9    the extorted party, it does not matter if the actions he took

10   were desirable or beneficial or that he would have taken the

11   same action regardless of the receipt of property from the

12   extorted party.

13             The extortion laws, like the honest services fraud

14   laws, are concerned with the manner in which the public

15   official takes action, not with whether the official's actions

16   are good or bad.

17             If you decide that Mr. Silver obtained property from

18   another under color of official right, then you must determine

19   whether this action affected interstate commerce in any way or

20   degree; that is, you must determine whether there was an actual

21   or potential effect on commerce between two or more states.

22             Commerce between two states just means that items are

23   bought and sold by entities located in different states.  It is

24   not necessary for the government to prove that commerce

25   actually was affected by Mr. Silver's conduct or that

FBOYSIL1                    Charge

 1   Mr. Silver intended or anticipated that his actions would

 2   affect interstate commerce.

 3              It is sufficient if you find that Mr. Silver's conduct

 4   possibly or potentially could have affected interstate or

 5   foreign commerce.

 6              The government only needs to prove a very slight or

 7   subtle actual or potential effect on interstate commerce.

 8              This element is also proven if the natural consequence

 9   of Mr. Silver's actions was an actual or potential effect on

10   interstate or foreign commerce.

11              Count Seven of the indictment charges Mr. Silver with

12   the crime of money laundering.  Specifically Count Seven

13   charges that Mr. Silver knowingly transferred into various

14   investments more than $10,000 received from the criminal

15   schemes alleged in Counts One through Six.

16              You should only consider this charge if you have first

17   found Mr. Silver guilty of at least one of the offenses in

18   Counts One through Six.

19              To sustain its burden of proof on Count Seven, the

20   government must prove beyond a reasonable doubt each of the

21   following elements:

22              First, that Mr. Silver engaged in a monetary

23   transaction in or affecting interstate commerce;

24              Second, that the monetary transaction involved

25   criminally derived property worth more than $10,000;

1          Third, that the property came from specified unlawful

2     activity;

3          Fourth, that Mr. Silver acted knowingly, meaning with

4     knowledge that the transaction involved proceeds of a criminal

5     offense;

6          And, fifth, that the transaction took place in the

7     United States or that Mr. Silver is a United States person.

8          The first element that the government must prove

9     beyond a reasonable doubt is that Mr. Silver engaged in a

10    monetary transaction in or affecting interstate commerce.

11         A monetary transaction is a deposit, withdrawal,

12    transfer, or exchange of funds or a monetary instrument by,

13    through, or to a financial institution.

14         A monetary instrument is anything that represents

15    money such as coins or currency, personal checks, traveler's

16    checks, cashier's check, bank checks, money orders, investment

17    securities, or negotiable instruments.

18         A financial institution is a bank insured by the

19    Federal Deposit Insurance company, FDIC, a commercial bank, or

20    a trust company.

21         The transaction must be in or affecting interstate or

22    foreign commerce.

23         The term "interstate or foreign commerce" means

24    commerce between states, territories, or possessions of the

25    United States or between the United States and a foreign

FBOYSIL1                          Charge

1    country.

2          To satisfy this element, the government must prove

3    that the transaction affected interstate or foreign commerce in

4    some way, however minimal.  There are several ways a

5    transaction can affect interstate or foreign commerce.

6          First, any monetary transaction by or through a

7    financial institution insured by the FDIC affects interstate

8    commerce.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3112

FBO5sil2                          Charge

1              THE COURT:  Therefore, if you find that any of the

2      financial institutions involved in the financial transactions

3      at issue was insured by the FDIC, that aspect of this element

4      will have been proven.

5              Second, if you find that the source of the funds used

6      in the transaction affect interstate or foreign commerce, that

7      is sufficient to satisfy this aspect of the first element as

8      well.

9              Finally, if you find that the transaction itself

10     involved an interstate transfer of funds, that would also be

11     sufficient.

12             The second element that the government must prove

13     beyond a reasonable doubt is that the monetary transaction

14     involved criminally derived property having a value in excess

15     of $10,000.  Properly is criminally derived if it is the

16     proceeds of or comes from proceeds obtained from a criminal

17     offense.  The term proceeds means any property obtained,

18     directly or indirectly, through some form of unlawful activity.

19             The government is not required to prove that all of

20     the property involved in the transaction at issue was

21     criminally derived property.  The government must prove,

22     however, beyond a reasonable doubt, that more than $10,000 of

23     the property involved was criminally derived property in order

24     to satisfy this element.

25             The third element that the government must prove

FBO5sil2                          Charge

1    beyond a reasonable doubt is that the property involved in the

2    financial transaction is the proceeds of specified unlawful

3    activity.  In this case the government has charged that the

4    property was derived from Mr. Silver's participation and the

5    honest services fraud and extortion schemes charged in Counts

6    One through Six.  I charge you as a matter of law that honest

7    services fraud and extortion under color of official right meet

8    the definition of specified unlawful activity.  Thus, if you

9    find that the property at issue was derived, at least in part,

10   from any of the crimes charged in Counts One through Six, this

11   element will have been proven.

12          The fourth element that the government must prove

13   beyond a reasonable doubt is that Mr. Silver knowingly engaged

14   in an unlawful monetary transaction.  As I charged you

15   previously, knowingly means to act voluntarily and

16   deliberately, rather than mistakenly or inadvertently.  The

17   government is not required to prove that Mr. Silver knew the

18   particular offense from which the criminally derived property

19   came.  The government must prove, however, beyond a reasonable

20   doubt, that Mr. Silver knew that the transaction involved

21   criminally derived property, that is, property derived from

22   proceeds of a criminal offense.

23          The fifth element that the government must prove

24   beyond a reasonable doubt is that the transaction took place in

25   the United States and that Mr. Silver is a United States

FBO5sil2                          Charge

1    person.

2         A United States person is a citizen or national of the

3    United States or an alien lawfully permitted to permanently

4    reside in the United States.  Each of the counts of the

5    indictment charges Mr. Silver with acting as a principal and as

6    one who caused the commission of the individually charged

7    crimes.

8         Under federal law, Mr. Silver can be held liable for

9    the crimes set forth in Counts One through Seven either as a

10   principal or as someone who willfully caused others to commit

11   the acts that constitute the offenses charged.  A person

12   willfully causes a crime to be committed if he willfully takes

13   some action that causes another to commit the criminal act and

14   if he intended that the crime actually be committed.  I

15   previously defined willfully and that definition applies here

16   as well.  If Mr. Silver did both of those things then he is

17   guilty just as he would be if he committed the crime himself.

18        To find Mr. Silver liable under this provision of

19   federal law the government need not prove that Mr. Silver acted

20   through a guilty intermediary.  That is, Mr. Silver can be

21   found liable even if he acted through someone who is entirely

22   innocent of the crimes charged in the indictment.

23        In addition to proving the essential elements of each

24   crime charged beyond a reasonable doubt, the government must

25   also establish what is called venue.  That is, that some act

 1    pertaining to the charge occurred in the Southern District of

 2    New York.  The Southern District of New York includes all of

 3    Manhattan and the Bronx as well as Westchester, Rockland,

 4    Putnam, Dutchess, Orange, and Sullivan Counties.

 5         The government does not have to prove that the

 6    complete crime was committed within the Southern District of

 7    New York or that Mr. Silver was ever in the Southern District

 8    of New York.  It is sufficient to satisfy the venue requirement

 9    if any act, in furtherance of the crime charged, occurred in

10    the district.  The act itself need not be a criminal act, it

11    could include, for example, meeting with others involved in the

12    criminal scheme within this district and the act need not have

13    been taken by Mr. Silver so long as the act was part of the

14    crime that you find that Mr. Silver committed.

15         Unlike the elements of the offenses that I have just

16    discussed at length which must be proved beyond a reasonable

17    doubt, the government is only required to prove venue by a

18    preponderance of the evidence.  A preponderance of the evidence

19    means that it is more probable than not that some act, in

20    furtherance of the crime that you were considering, occurred in

21    this district.  If you find that the government failed to prove

22    venue by a preponderance of the evidence as to any count, you

23    must return a verdict of not guilty as to that count.

24         You have heard testimony that Mr. Silver made

25    statements outside the courtroom in which he claimed that his

 1    conduct was consistent with innocence and not with guilt.  The

 2    government claims that these statements in which Mr. Silver

 3    exculpated himself are false.  If you find that Mr. Silver gave

 4    a false statement in order to divert suspicion from himself,

 5    you may but are not required to infer that Mr. Silver believed

 6    that he was guilty.  You may not, however, infer on the basis

 7    of that alone, that Mr. Silver is in fact guilty of the crimes

 8    for which he is charged.  Whether the evidence as to

 9    Mr. Silver's statement shows that Mr. Silver believes that he

10    was guilty and the significance, if any, to be attached to any

11    such evidence are matters for you to decide.

12            You have heard references in this case to the fact

13    that certain investigative techniques were used by the

14    government.  While you must carefully consider the evidence

15    adduced by the government, you should not speculate as to why

16    the government used the techniques it did.  The government and

17    its law enforcement techniques are not on trial.  Your

18    responsibility is to determine whether or not, based on the

19    evidence or lack of evidence, the government has proven

20    Mr. Silver's guilt beyond a reasonable doubt.

21            Some of the people who may have been involved in the

22    schemes at issue in this case are not on trial.  There is no

23    requirement that all members of an illegal scheme be charged

24    and prosecuted or tried together in the same proceeding.  You

25    may not speculate why other persons who may have been involved

1    in the charged schemes are not on trial.

2             You heard testimony regarding and were shown several

3    years of financial disclosure forms filed by Sheldon Silver

4    pursuant to state law.  Mr. Silver has not been charged with

5    any crime based on the way he filled out his financial

6    disclosure forms.  You may not find Mr. Silver guilty on any

7    count merely because you believe he should have disclosed more

8    or different information on those forms.  If, however, you find

9    that Mr. Silver knowingly did not fully disclose information

10   sought on those forms, you may consider that as evidence of

11   Mr. Silver's state of mind or as evidence of an intent to

12   mislead the public or to conceal from the public information

13   regarding the nature and source of his income.

14            The statute of limitations for each of the charged

15   crimes is five years.  If you find that Mr. Silver engaged in

16   the scheme to commit honest services fraud, extortion, or money

17   laundering but no aspect of the particular scheme occurred

18   after February 19th, 2010, then you must acquit on that charge

19   because it is barred by the statute of limitations.

20            If, on the other hand, you find that any aspect of the

21   crime you are considering continued on or after February 19,

22   2010, then the statute of limitations as to that charge has

23   been complied with.

24            You are about to begin your deliberations.  We will

25   send all of the exhibits in to the jury room for your use

1    during deliberations.  If you want any further explanation of

2    the law or to hear any testimony read back, you may request

3    that.  If you ask for any testimony to be reread, please be as

4    specific as possible so that we can identify exactly what you

5    want to be read and not waste time reading testimony you do not

6    want read back.

7              If there is any doubt or question about the meaning of

8    any part of the instructions that I have given to you, you

9    should not hesitate to send me a note asking for clarification

10   or for further explanation.

11             It is very important that you not communicate with

12   anyone outside the jury room about your deliberations or about

13   anything touching on this case.  There is only one exception to

14   this rule.  If it becomes necessary during your deliberations

15   to communicate with me, you should send a note to me, in

16   writing, signed by your foreperson, and give it to the marshal

17   who will be available outside the jury room during your

18   deliberations.

19             No member of the jury should ever attempt to

20   communicate with me except by a signed writing and I will never

21   communicate with a member of the jury on any subject touching

22   open the merits of this case other than in writing or orally

23   here in open court.

24             If you send any notes to the Court do not disclose

25   anything about your deliberations.  Specifically, do not

1   disclose to anyone, not even to me, how the jury stands

2   numerically or otherwise, until you have reached a unanimous

3   verdict or have been discharged.

4           Some of you have taken notes throughout the trial.  I

5   want to emphasize to you that notes are simply an aid to

6   memory.  Your notes may not be given any greater weight or

7   influence in the determination of the case than the

8   recollections of other jurors.  Any difference between a

9   juror's recollection and another juror's notes should be

10  settled by asking to have the court reporter read back the

11  transcript because it is the court record that the jury must

12  rely on when making its determination of the facts and

13  rendering a verdict.

14          You will now retire to decide your verdict on each of

15  the seven counts of the indictment.  As I have already

16  explained, for the government to prevail on a particular charge

17  the government must prove each essential element of that charge

18  beyond a reasonable doubt.  If the government carries its

19  burden, you must find Mr. Silver guilty on that charge.

20  Otherwise, you must find him not guilty and acquit him on that

21  charge.

22          Your verdict on each count must be unanimous.  Each

23  juror is entitled to his or her opinion but you are required to

24  exchange views with your fellow jurors.  That is the very

25  essence of jury deliberation.  If you have a point of view and

1    after discussing it with the other jurors it appears that your

2    own judgment is open to question, then of course you should not

3    hesitate to yield your original point of view if you were

4    convinced that the other view is one that satisfies your

5    judgment and conscience.

6        Do not give up a point of view that you

7    conscientiously believe simply because you are outnumbered.

8    You should vote with the others only if you are convinced on

9    the evidence, the facts, and the law that it is the correct way

10   to decide the case.

11       After any breaks or when you arrive in the morning if

12   your deliberations last more than one day, do not begin to

13   discuss the case until all 12 jurors are present.

14       The first thing you should do when you retire to

15   deliberate is to select one of you to act as your foreperson.

16   Traditionally juror no. 1 is the foreperson but that is only a

17   tradition.  You are free to select any of your members as your

18   foreperson but I urge you not to spend a lot of time on that

19   issue.

20       Once you have reached your verdict you must record it

21   on the verdict form that I have prepared for you.  The

22   foreperson should fill in the verdict sheet, date it, and sign

23   it.  The foreperson should then give a note to the marshal

24   outside your door stating that you have reached a verdict.  Do

25   not specify what the verdict is in the note.  The foreperson

FBO5sil2                          Charge

1    should keep the verdict sheet until I ask for it.  You must all

2    be in agreement with the verdict that is announced in court.

3              Please remain seated while I confer with the

4    attorneys.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At side bar)

2          THE COURT:  Any objection?

3          MR. MOLO:  No objection.

4          THE COURT:  Any objection?

5          MS. COHEN:  Your Honor, we would just request two

6    additional charges.  And apologies for not noticing this

7    earlier because the indictment is going back to the jury.  We

8    had requested a variance in dates and amounts and so we request

9    that your Honor give a variance in dates and amounts similar to

10   the one we proposed in our request to charge.

11         THE COURT:  Any objection?

12         MR. MOLO:  Yes.  I have not even seen this.  I don't

13   see the point in it.

14         THE COURT:  Read it.

15         MS. COHEN:  And it was in our original request to

16   charge.

17         MR. MOLO:  I object to this.

18         THE COURT:  Okay.  Overruled.

19         MS. COHEN:  The other one, your Honor, is just

20   redaction of evidentiary items, just an instruction again in

21   our original request to charge.

22         MR. MOLO:  Objection.

23         We had an instruction conference.  We went through

24   charge drafts and drafts of charges and now, after the jury is

25   charged, they're asking that more instructions be given which

FBO5sil2                          Charge

1    are going to be given a different weight because they weren't

2    part of the whole charge?  This is ridiculous.  I have never

3    seen this happen.  This is absolutely ridiculous.

4              Objection.

5              THE COURT:  Overruled.  But I agree.  The government

6    should have taken it up in the charge conference.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (In open court)

2                THE COURT:  Ladies and gentlemen, just a couple of

3     other things.  The evidentiary items are going back.  You will

4     notice in those items that a number of things have been

5     redacted or are removed from the document.  You are to concern

6     yourself only with the part of the item that has been admitted

7     into evidence.  Don't speculate as to the reason why any other

8     part of the document has been removed or redacted.

9                The second thing is I'm going to send the indictment

10    back.  The indictment refers to various dates and amounts of

11    financial items.  I instruct you that it does not matter if a

12    specific event is alleged to have occurred on or about a

13    certain date or a certain month but the evidence indicates that

14    in fact it was on a different date or in a different month.

15    Nor does it matter if the indictment alleges that a transaction

16    involved a specific amount of money but the evidence indicates

17    that it was different amount.  The law requires only a

18    substantial similarity between the dates, months, and amounts

19    alleged in the indictment and the dates, months, and amounts

20    established by the evidence.

21               Mr. Brantley, could you swear the marshal?

22               THE DEPUTY CLERK:  Yes, your Honor.

23               (Marshal sworn)

24               THE COURT:  Ladies and gentlemen, as you know, I moved

25    the trial to a larger courtroom for the purposes of the

FBO5sil2                          Deliberations

openings and summations.  I did that in order to accommodate

the number of people who wanted to hear the jury addresses

because they could not all fit in this courtroom.  I charge you

that any public interest that might exist in this trial can

play absolutely no role in your decision making.

          I remind you of the very beginning of the case you

took an oath.  Your oath sums up your duty.  You must well and

truly try the matters in issue and render a true verdict

according to the law and the evidence.

          You may now retire to the jury room and begin your

deliberations.  I will ask the two alternates to stay in the

courtroom.

          (10:54 a.m. the jury retired to deliberate)

          (Continued on next page)

FBO5sil2                         Deliberations

1          (Jury not present)

2          THE COURT:  Please be seated, everybody.

3          All right, gentlemen.  You have sat through the whole

4     trial and you are now -- everybody else is deliberating.  I'm

5     not excusing you yet, though.  It is possible, highly unlikely

6     but possible, that one of the jurors may fall sick and we are

7     going to need to call on you.  So, in order to have that happen

8     you are going to remain under the same rules that you have been

9     under.  You can't talk about the case, you can't read about the

10    case, don't read about any other corruption case that's going

11    on now just in case we have to call you in.  If that happens,

12    you will restart deliberations and it will be as though you

13    were a jury all along.

14          What I am going to ask you to do is to call

15    Mr. Brantley every day between 5:00 and 5:30 until he tells you

16    everything is over.  That way if we need you, we know that we

17    will be in contact with you and will call you and let you know

18    that you need to come in.  It is okay for you to go back to

19    work now but just make sure that if you do, let your boss know

20    that it is possible that you are going to be called back for

21    further jury service.

22          So, with that, and the thanks of the Court, you are

23    excused to leave here but, again, don't talk about the case and

24    don't read anything or follow any press on the case.

25          (alternates discharged)

FBO5sil2                        Deliberations

1           THE COURT:  Okay.  I think I ordered their lunch at

2     12:45, so make sure that Mr. Brantley knows where you are in

3     case we get a note.  You are free between 12:45 and 1:45 and I

4     think as I told them yesterday, they need to work at least

5     until 5:30, hopefully not beyond that, I have a commitment

6     tonight so I can't stay late.

7           Anything from the parties?

8           MS. COHEN:  Your Honor, is it okay if we either stay

9     in the courtroom and/or leave stuff on the tables?  Or do you

10    have other matters.

11          THE COURT:  I don't think I have any.  Let me check.

12          THE DEPUTY CLERK:  No.

13          THE COURT:  I don't have anything on today.

14          Their lunch was ordered at 12:45?

15          THE DEPUTY CLERK:  Yes, Judge.

16          THE COURT:  So you can leave things on the table if

17    you want but, again --

18          THE MARSHAL:  A juror left her book.

19          THE COURT:  Okay.

20          -- make sure Mr. Brantley knows where you are.

21          MS. COHEN:  Your Honor, we will review the redacted

22    indictment with defense counsel and alert Mr. Brantley when it

23    is ready, and we have the bill of particulars.

24          THE COURT:  And the exhibits also?

25          MS. COHEN:  And the exhibits are done and in the cart.

FBO5sil2                        Deliberations

1              THE COURT:  They're done and in the cart?  Where is

2      the cart?

3              MS. COHEN:  They're just in 444.  We will alert

4      Mr. Brantley when it is wheeled in.  And also in the cart there

5      is a laptop, nothing else is on it except the recording.

6              THE COURT:  Except the recordings?

7              MS. COHEN:  Correct, that were entered into evidence.

8              THE COURT:  Thank you.

9              (Recess Pending verdict)

10             (Whereupon, at 12:19 p.m. a note was received from the

11     Jury.)

12             THE COURT:  Okay.  Ladies and gentlemen, we have a

13     note from the jury -- from a juror -- it has been marked as

14     Court Exhibit 8.  It reads, as follows:

15             "Dear Judge Caproni, I am wondering if there is any

16     way I can be excused from this case, because I have a different

17     opinion/view so far as this case and it is making me feel very,

18     very uncomfortable... I am feeling pressured, stressed out...

19     told that I'm not using my common sense, my heart is pounding

20     and my head feels weird.  I am so stressed out right now that I

21     can't even write normally.  I don't feel like I can be myself

22     right now.  I need to leave!"

23             Would the parties like to be heard?

24             MS. COHEN:  Your Honor, based on the statements in

25     this note and the fact that it is extremely early in the jury

FBO5sil2                        Deliberations

1    deliberation, the government would request that you call an

2    alternate in and excuse this juror.

3           THE COURT:  Mr. Molo?

4           MR. MOLO:  No.  This is jury deliberations.  She has

5    been charged, she has taken an oath, and she should continue

6    the process, to work it out.  This is what happens in

7    deliberations.

8           THE COURT:  I have to say that's my inclination, is

9    that it is too early for a juror to throw in the towel.

10          MS. COHEN:  My only concern, your Honor, is that based

11   on the way in which she wrote the note, she said her heart is

12   pounding, my head feels weird, I am so stressed out I can't

13   think straight, perhaps it is more severe and we don't want it

14   to affect the rest of the jury early in the deliberation.

15          THE COURT:  Perhaps, but it seems that I can call out

16   the jury and encourage them, let me reread the portion of the

17   charge on deliberation and remind them their deliberations need

18   to be respectful of everyone's view and that they need to

19   continue to deliberate.

20          MS. COHEN:  I don't know, your Honor, if it is

21   possible to perhaps make an inquiry of the juror to see how

22   stressed, or if she's able to think at all.  That might be in

23   order based on the note.

24          THE COURT:  Mr. Molo, you are poised.  I can tell.

25          MR. MOLO:  Well, I assume that you want to hear from

FBO5sil2                          Deliberations

1    me.

2              THE COURT:  I feel that I should.

3              MR. MOLO:  This is jury deliberations.  I don't even

4    know that it is necessary to bring them out and reinstruct them

5    on that.  I mean, I think we can do that but I don't --

6              THE COURT:  I am reluctant to just ignore the note.  I

7    don't think I can do that.

8              MR. MOLO:  By the way, I do agree with that.

9              THE COURT:  So the choice is individually calling her

10   into the robing room to take her temperature to see whether

11   she's really in distress or whether this is just normal

12   deliberations and people need to deliberate.

13             MR. MOLO:  Then I think having them come out and just

14   instructed on that point again is fine.  I think we will see

15   what happens.

16             THE COURT:  Here is the question.  My inclination, my

17   normal process when I bring out the jury after they send me a

18   note is for me to read the note.  I don't know if her fellow

19   jurors know what she just wrote.  My inclination would be to

20   follow my normal process, read the note, recharge the jury on

21   deliberations.

22             MS. COHEN:  Your Honor, because I'm not sure if this

23   is a note from a specific juror and not from the jury, I think

24   it might make sense, initially at least, to inquire of the

25   juror independently.

FBO5sil2                          Deliberations

1            MR. MOLO:  And what I would suggest is that you not

2     read that individual note but just come out, instruct them

3     generally on that because it isn't a note from the jury in that

4     sense, it is a note from a juror, but I think reinstructing

5     them on that point about collaboration and deliberation would

6     be appropriate.

7            MS. COHEN:  I guess, your Honor, I would just say that

8     I think the better course would be to inquire of the juror in

9     the robing room alone and then if your Honor felt the entire

10    jury needed to be instructed on deliberations, that might be

11    appropriate then.

12           THE COURT:  I'm concerned that just calling out the

13    one juror into the robing room is coercive.  That's my concern.

14           MR. MOLO:  I agree.  I think it is only -- it only

15    holds the prospect of making this worse, rather than better, so

16    I would agree.  I think just calling them out and having that

17    instruction reread on the deliberation process is appropriate.

18           THE COURT:  Hang on for a second.

19           MS. COHEN:  I guess, your Honor my concern -- sorry.

20           (Pause)

21           THE COURT:  Okay, Ms. Cohen, I'm sorry.  I cut you

22    off.  You were about to say something?

23           MS. COHEN:  Your Honor, I'm happy to hear what your

24    Honor's proposal is and then I may have a response.

25           THE COURT:  Okay.

 1              So, I am inclined to do the following:  Not to read

 2     the note but to say I have received a note from a juror

 3     regarding the process of deliberation.  I want to remind you

 4     that each juror is entitled to his or her opinion, that you are

 5     also required to respectfully exchange views with your fellow

 6     jurors.  Then, continue with the regular deliberation charge

 7     down to, "you should vote with the others only if you are

 8     convinced on the evidence, the facts, and the law that is the

 9     correct way to decide the case.  That said, let me remind you

10     all that the essence of deliberation is to listen to it and to

11     exchange views with your fellow jurors."

12              MR. MOLO:  I think that's fine, Judge.

13              MS. COHEN:  I think that's fine, although the

14     government still has a preference that you talk to the juror

15     and I'm sure that your Honor would be able to do it in a way

16     that was not coercive at all.  But, based on the text of this

17     note, the government really strongly believes that that is

18     necessary.

19              THE COURT:  Okay.  I appreciate the government's view.

20     I think this was very early to get a note like this which may

21     mean nothing, and I am concerned that talking to the juror

22     individually may make it into more than it is.  That said, I

23     don't think that we can just ignore it, which I have at times

24     early in deliberations when I have gotten a note that says we

25     are hopelessly deadlocked after 10 minutes.  Those I have felt

FBO5sil2                         Deliberations

 1    comfortable to ignore.  This one I don't really feel

 2    comfortable.

 3                Uh-oh.

 4                (Whereupon, At 12:42 a note was received from the

 5    jury)

 6                THE COURT:  Okay.  They're deliberating. it's clear.

 7    So what is our next number, no. 9?

 8                Court Exhibit 9 reads:  "One of the jurors is having

 9    difficulty distinguishing whether or not exchanging NYS funds

10    for something in return is illegal.  Is there a code of conduct

11    (ethics) which clearly outlines this is the case for an

12    Assembly person?"

13                So, given this note, it seems that there is some

14    deliberation going on so I am inclined to combine the answer to

15    these two questions in one felled swoop.

16                So, what are the parties' thoughts on this?

17                MR. MOLO:  The answer to the question is that you have

18    heard the evidence and the evidence shall be what you decide

19    the case on.

20                THE COURT:  I don't think that's an adequate answer.

21                MS. COHEN:  Your Honor, I believe the jury

22    instructions that your Honor gave address at least part of this

23    and they're to follow the law and not the code of conduct.  We

24    can pull from the jury instructions which one, perhaps, to read

25    back.

FBO5sil2                         Deliberations

1            THE COURT:  Yes.

2            MR. COHEN:  It is not showing on our screen.  Can you

3    read that back, please?

4            THE COURT:  Yes.

5            "One of the jurors is having difficulty distinguishing

6    whether or not exchanging New York State funds for something in

7    return is illegal.  Is there a code of conduct (ethics) which

8    clearly outlines this is this is the case for an Assembly

9    person?"

10           Tell you what.  Why don't we take a little break.

11   Let's everybody think about what the right answer to this is.

12   Okay?  So, I will see you again in about 10 minutes, 15

13   minutes.

14           MR. COHEN:  If I can trouble your Honor for a copy?

15           THE COURT:  We will get you a copy.  We don't have a

16   copy machine down here.

17           The press would like a copy for the press.

18           MR. WEISER:  If we can have a copy for the press after

19   you make it an exhibit?  We will share it among the press.

20           THE COURT:  Okay.

21           Mr. Weiser, they seem to be signing their names.  We

22   are going to redact their names from the version that goes to

23   the press.

24           MR. WEISER:  That's fine.  Thank you.

25           (Recess pending verdict)

FBO5sil2                        Deliberations

1              THE COURT:  Okay, with the 15-minute break, what have

2      you thought?

3              MS. COHEN:  Your Honor, the government has a proposal

4      that we would like the Court to instruct the jury.

5              THE COURT:  Okay.

6              MS. COHEN:  I have it written out and I will read it

7      and I can hand it up.

8              The government requests that the Court charge the jury

9      that the jury should take the charge as a whole but direct the

10      jury's attention to page 15, line 17, beginning at the sentence

11      that says, "A public official... continuing through the

12      sentence that ends on line 20.

13              THE COURT:  I'm sorry.  Wait a minute.  Page 15, line

14      what?

15              MS. COHEN:  Line 17, starting with, "A public official

16      owes a duty...

17              THE COURT:  Okay, I probably would have started on 16

18      just for the beginning of the paragraph.

19              MS. COHEN:  Sure.  Then your Honor could read that

20      whole paragraph, 16 through 20, as well as on page 17, the

21      third sentence which begins on line 22 starting with, "Official

22      action... and that sentence ending on line 23.

23              THE COURT:  Page 17, line?

24              MS. COHEN:  22, the sentence that begins, "Official

25      action.

 1              THE COURT:  Right.

 2              MS. COHEN:  Just that one sentence, it ends on line

 3    23.  And then add:  I instruct you as a matter of law that

 4    official action includes distribution of state funds.

 5              MR. MOLO:  Your Honor, I object to that.

 6              THE COURT:  You look like a bobble head.

 7              MR. MOLO:  I'm sorry?

 8              THE COURT:  I said you look like a bobble head shaking

 9    your head.

10              MR. MOLO:  I don't mean to look like a bobble head, I

11    mean to look like a lawyer who wants the jury to be instructed

12    to follow the law.

13              THE COURT:  That's all you want me to tell them, is

14    just follow the law?

15              MR. MOLO:  I think that what I want you to tell them

16    is that they have heard the evidence, they have been instructed

17    on the law, and that they should follow the law and apply the

18    law to the evidence that they have heard.  I think it is

19    improper to call out specific instructions that aren't

20    necessarily addressed to the specific question that is raised.

21              The specific question that is raised deals with

22    whether there is a code of conduct which clearly outlines this

23    as the case for New York Assembly persons.  There is a specific

24    question.  It now sort of being, saying, well, here is how you

25    address that or get around it is advocacy on the part of the

1     government's position and I believe that that's inappropriate.

2              They have been instructed.  They've heard the

3     evidence, they have been instructed on the law and they should

4     follow the law.  I don't see there is any reason that we need

5     to -- this is not a question of deliberation, that issue that

6     we are talking about.  Now we are getting into the question of

7     substantive law so I think it is completely appropriate.  Why

8     don't we also then, if they're going to do that, why don't we

9     talk about instructing them on some things that are the

10    question of willfulness and burden of proof?

11             THE COURT:  Well, I'm not going to totally recharge

12    the jury.

13             MR. MOLO:  Well, that's what I mean.  That's what I

14    think, you know, if we are going to be singling out

15    instructions that the government finds helpful to their

16    position, I would like also the burden of proof in the

17    instruction to be read.

18             THE COURT:  Mr. Molo, don't go off.

19             MR. MOLO:  All right, but that's my --

20             THE COURT:  That's not helpful.

21             MR. MOLO:  That's my point.  I agree it is not

22    helpful.  They have the instructions, they've been instructed

23    on the law.

24             THE COURT:  Mr. Molo, let me tell you my concern with

25    that approach.

1          MR. MOLO:  Okay.

2          THE COURT:  They were just instructed.  They've got

3     the charge.

4          MR. MOLO:  Okay.

5          THE COURT:  This is a clear question which, in some

6     ways the answer is:  Code of conduct is irrelevant.  Under

7     federal law it is illegal to exchange New York State funds for

8     personal benefit.  I mean, that's kind of the short answer to

9     their question.  It is not a matter of the code of conduct.

10    But, just saying I have charged you on the law is obviously

11    inadequate because they have this question which seems like a

12    very basic question and seems -- I mean, I was thinking in

13    terms of I see this as touching on two issues.  It touches on

14    *quid pro quo* and it touches on what is official action.  That's

15    how I am reading the question.  So, my thought was actually to

16    answer that question and to say, I have something written too

17    but to say I am interpreting your question to be one that

18    relates either to the issue of *quid pro quo*, which is relevant

19    to honest services fraud counts and to the extortion counts, or

20    to the issue of what is an official action for purposes of the

21    extortion count.

22          Starting with *quid pro quo*, if you were to find that

23    the defendant exchanged New York public funds for something in

24    return, that would constitute an illegal *quid pro quo*.  That

25    answer comes not from the Assembly's code of conduct but from

1    federal law.  As I charged you before, the thing in return can

2    be to the defendant or to someone else at his direction.  In

3    terms of the extortion count, if you find that dispensing with

4    state funds is part of the responsibility of the defendant as a

5    member of the Assembly or as Speaker of the Assembly, then

6    disseminating public funds is an official act.

7             Do you want to see it rather than reacting to it being

8    read to you?

9             MS. COHEN:  I would like to see it.  We have two just

10   initial reactions.

11            THE COURT:  I would also probably add, look, you can

12   take the charge as a whole.  I am not short circuiting any of

13   the elements but I'm trying to respond to the question asked.

14            MS. COHEN:  And I think responding to the question

15   asked is appropriate since they do have the whole charge and

16   the government would just say in the beginning you talk about

17   *quid pro quo* as it just reads to the extortion count, it should

18   also say the honest services fraud count, what is official

19   action for purposes of the extortion count.  I believe that

20   would apply to both counts.

21            THE COURT:  Okay.  So then --

22            MS. COHEN:  And then I think we --

23            THE COURT:  Well, official action, in which case I

24   don't need the clauses at all.  I can just say I am

25   interpreting your question to be one that relates either to the

FBO5sil2                          Deliberations

1    issue of *quid pro quo* or to the issue of what is an official

2    act.

3            MS. COHEN:  That's fine, your Honor.

4            And then, now that I see it, you have the word that I

5    wanted to add but it is in there.

6            THE COURT:  Mr. Molo?

7            MR. MOLO:  I would object to the reading of this

8    instruction but I would also ask, and I know we just took a

9    break and you went back and did that, seeing what you are

10   proposing now, may we have another five minutes?

11           THE COURT:  Yes.

12           MR. MOLO:  I'm sorry.  Thank you, five, 10 minutes?

13           THE COURT:  Can you keep it at five?

14           MR. MOLO:  Yes.

15           MS. COHEN:  Your Honor, you are also going to instruct

16   the jury, since we don't know who wrote what second note, as to

17   just the deliberation in general?  I think that is appropriate.

18           THE COURT:  Yes.  What I was going to do is my thought

19   was to start with this, to start with the substantive issue,

20   and then segue and then say I also received a note -- what did

21   I say I was going to say?  A second note regarding the process

22   of deliberation.  Okay?  You want five minutes?

23           MR. MOLO:  Yes.  Thank you.

24           (Recess pending verdict)

25           MR. COHEN:  Mr. Molo will be here in one second, your

FBO5sil2                        Deliberations

1    Honor.

2               THE COURT:  Okay.

3               Mr. Molo?

4               MR. MOLO:  Judge, yes.  Here is the issue.  I mean,

5    the instruction that is being proposed, first of all, as to the

6    second paragraph it even has or can be the defendant or someone

7    else at his direction and I'm not sure where that -- I mean, I

8    understand where that comes from within the instructions.  I

9    don't understand exactly where that is responsive to anything

10   raised in the note.

11              The note is very specific and --

12              THE COURT:  Hang on a second.  Let me tell you why I

13   put that in that.

14              MR. MOLO:  Okay.

15              THE COURT:  So, I was mimicking the words in the note

16   which is exchanging New York State funds for something in

17   return.

18              MR. MOLO:  Right.

19              THE COURT:  So, the sentence that says:  If you were

20   to find that the defendant exchanged public funds for something

21   in return, that would constitute an illegal *quid pro quo*.

22              My concern was somehow suggesting that it has to go to

23   him personally as opposed to him or someone at his direction.

24              MR. MOLO:  Which is not incorporated in the note in

25   any way.

1              I mean, the problem that --

2              THE COURT:  What is your other problem --

3              MR. MOLO:  Generally.

4              THE COURT:  -- with the proposal.

5              MR. MOLO:  As to the first of the two substantive

6     paragraphs, your second paragraph, it doesn't include that the

7     exchange -- that the person that is in this case, the public

8     official, must understand that the person is intending to do

9     more than generate goodwill or build a relationship.  There is

10    nothing illegal about directing state funds to Dr. Taub or to

11    Columbia and to New York Presbyterian.

12             THE COURT:  For something in return.

13             MR. MOLO:  For something in return.  But the question

14    is it says but you have got to understand that the person is

15    doing more than generating goodwill or building a relationship.

16             I mean, that's why -- I think this is a very dangerous

17    path.  What we are talking about doing is engaging in a

18    colloquy with the jury over various aspects of the instruction.

19    Both sides and this Court took great pains to try to create a

20    charge that was an accurate statement of the law.  They've

21    disagreed with some of the points that are included, we've

22    disagreed with some of the points that are included but the

23    record is what it is and we have a charge.  And now to be

24    distinguishing certain aspects of it and rewriting,

25    effectively, some of it is very dangerous, and in this case I

1   think it unfairly prejudices the defendant because it does not

2   allow for the defense and also the other provisions relating to

3   mental state.

4           Secondly, there is many other things that the jury, on

5   the third paragraph, needs to find for extortion.

6           I mean, look.  Your Honor was very clear that you want

7   to create a record, as I assume as does the government that is

8   going to not be including some error and on something like this

9   which I think is a very fundamental point that I think can be

10  addressed.  I think the first simple answer is that you have

11  been given instructions and that you have been -- you have

12  heard the evidence.

13          THE COURT:  Mr. Molo, I am not going to do that so at

14  the same time you have made your record that that's what you

15  want me to do and I am not going do that.

16          MR. MOLO:  If you are not going to do that then I

17  think you have to reread the honest services and the extortion

18  charges in their entirety with the defense's as well as with

19  the prosecution points.  To single out a particular element --

20          THE COURT:  And just say the same thing I said before?

21  That's the same as doing nothing, Mr. Molo.

22          MR. MOLO:  Judge, what you said before is the law as

23  to those counts, has been decided in this case in the course of

24  the back and forth between the prosecution and defense.  To now

25  start rewriting these instructions after they've been

instructed, it is not consistent with what they've been

charged, it is not consistent with the practice of not calling

out specific instructions especially on a legal issue, we are

not talking about a procedural issue.

So, I would say that the simplest and the correct

decision that's not going to lead us down some path of, say,

well, what about this or what about that or we are unfairly

influencing something, is to reread that aspect of the charge

on honest services and extortion.  I am talking about read the

whole thing in the entirety, the defense as well as the

prosecution point of view.  That's the fair thing.  And by the

way, it is the way that it is going to get have the record the

safest, I would think.

THE COURT:  I just don't think it accomplishes

anything since the jury has already seen that.

MR. MOLO:  But they haven't been deliberating very

long.  How do we know it has or hasn't accomplished anything at

this stage?  If we were talking about five days of deliberation

maybe there is a different situation there but not now, they've

just been charged.

MS. COHEN:  Your Honor, I think that's covered by you

have to take the charge as a whole in the beginning.

We would also ask the third paragraph of your Honor's

proposed language where it says in terms of the extortion

count.  I think that applies to both honest services fraud and

FBO5sil2                    Deliberations

1    extortion so we ask that that be removed.

2              MR. MOLO:  Actually, if I could raise one more point,

3    too, that Mr. Cohen correctly points out to me.

4              This response actually requires some level of

5    interpretation of the note.  It may be a correct

6    interpretation, it may be an incorrect interpretation, but it

7    is an interpretation of the note and it seems, again, at this

8    very early stage, not something that we ought to be doing.

9    They've been charged and we can reread those provisions.

10             THE COURT:  Do you have an alternative reading of the

11   note?

12             MR. MOLO:  I mean --

13             MR. COHEN:  I do.  All they're asking for is whether

14   there is a code of conduct.  That's what they're asking.

15             MR. MOLO:  That's true.

16             MR. COHEN:  Thank you.

17             THE COURT:  I don't know if there is a code of conduct

18   or not but it is irrelevant.

19             MR. COHEN:  Well, then they should be told very

20   specifically and simply you have the evidence before you, you

21   have had it over three weeks.  The evidence is there, they can

22   look at the evidence, and it is for them to determine whether

23   there is evidence of that.  We probably conclude that there is

24   no such code of conduct but they can't be guided by that, they

25   can be guided by what evidence is before them.

1          They sat and heard the evidence.  There is no evidence

2    that I recall of the existence of a code of conduct but that's

3    for them to decide.  Why don't we just do that at this early

4    stage?  Maybe at a later stage Mr. Molo says there will be

5    reason to consider it based in light of perhaps other notes

6    that come forward.  Why don't you just say you have the

7    evidence, look at it.

8          MS. COHEN:  Your Honor, that ignores the first part of

9    the note which talks about exchanging New York State funds for

10   something in return is illegal, and I think your Honor's

11   proposal properly addresses the note.

12         MR. COHEN:  The first part of their note is what the

13   background of the problem is.  The second paragraph of the note

14   is the specific request that they're asking your Honor about.

15   And it seems to me that at this early stage just give them the

16   answer:  You have the answer.

17         THE COURT:  I don't think you can divorce the second

18   sentence from the first sentence.

19         MR. COHEN:  Well, you are also looking at the second

20   note in light of the first note, obviously, coming from a

21   second person.  I don't know if the person -- I won't say their

22   name aloud because your Honor wanted to keep that private -- I

23   don't know if that person is the foreperson or not.

24         THE COURT:  I don't know either.

25         MR. COHEN:  That could be just another person's view

FBO5sil2                    Deliberations

1  of this.  But, it seems to me if you give the instruction that

2  I am proposing that your Honor does, I think under those

3  circumstances it may inspire another note which will flesh it

4  out in a way that your Honor doesn't have to interpret the note

5  and you will have the plain meaning of what they're saying to

6  us.  But I don't think you have to do that at this stage, your

7  Honor.

8          MS. COHEN:  Your Honor, I don't think the defense's

9  interpretation of the note is a reasonable one and I think the

10 jury's note requires you to give some instruction on the law

11 which is what they have to decide.

12         THE COURT:  Thank you.

13         Here is what I am inclined to do.  I am going to amend

14 what I gave you a little bit so that it will read as follows:

15         I am interpreting your question to be one that relates

16 either to the issue of *quid pro quo* or to the issue of what is

17 an official act.  Starting with *quid pro quo*, if you were to

18 find that the defendant exchanged New York public funds for

19 something in return, that could constitute an illegal *quid pro*

20 *quo* if the other aspects of that element have been proven.

21 That answer comes not from the Assembly's code of conduct but

22 from federal law.

23         If you find that dispensing with state funds is part

24 of the responsibility of the defendant as a member of the

25 Assembly or as the Speaker, then disseminating public funds is

an official act.  But, let me also stress that you should read

the charge as a whole and that each element of the crime

charged must be proven beyond a reasonable doubt.

          MS. COHEN:  Fine with the government, your Honor.

          MR. MOLO:  Your Honor, we would object to the reading

of the instruction and --

          THE COURT:  Okay, I know you object to the reading of

the instruction.  Given that I am going to do something like

this do you have any particular objections?

          MR. MOLO:  Well, again we object to any reading but

with respect to you say could constitute an illegal *quid pro

quo* and if the other aspects -- what is it that you said?

          THE COURT:  -- of that element have been proven.

          MR. MOLO:  I would say it should say like including

that the mental state -- no, because it is a mental state

issue, Judge.  This willfulness and the issue of whether or

not -- especially in light of the evidence in this case,

generalized goodwill and relationship building, that's central

to the defense.  And I think that this is calling out one

aspect of the charge at the expense of or to the exclusion of,

I should say, critical aspects of the defense.

          THE COURT:  Well, that's why the ending of the charge

refers them to the entire charge.

          MR. MOLO:  You know then you would say could

constitute illegal *quid pro quo* if other aspects including

FBO5sil2                    Deliberations

1   whether the defendant accepted these, understood the person to

2   be intending to do more than generate goodwill or relationship

3   building.

4           I mean, again, I understand your desire to do more

5   than just tell them to reread the instructions.  I do go back,

6   though, to the point that Mr. Cohen made that we are so early

7   in the deliberations to be getting into this kind of colloquy I

8   think this is very, very dangerous because you don't know what

9   the next question is going to be that is going to come back.

10          I think the better approach, if you want to direct

11  them to some aspect of the charge that's clearly set forth that

12  balances things out, that's different, but we are really early

13  to be doing this.

14          THE COURT:  Mr. Molo, my problem with that is this

15  question is such a basic question in terms of an issue that I

16  would not have, in a million years, have specifically included

17  this if I had thought that this might be a concern of a juror.

18  I would have said that dispensing state funds is an official

19  act that could be -- I don't know how to word it exactly but it

20  would never dawn on me that that -- kind of that core notion

21  there would be a question about.

22          MR. MOLO:  I understand what you are saying but that's

23  not --

24          THE COURT:  That's a question of law.

25          MR. MOLO:  -- but that's not the question that is

FBO5sil2                          Deliberations

1   asked, Judge.  The question is one of the jurors is having

2   difficulty discerning of whether or not exchanging New York

3   State funds for something in return is illegal.  That is not a

4   question about official acts.  The question is whether

5   exchanging New York State funds for something in return is

6   illegal.  The legality or illegality of that depends upon the

7   mental state and the issues that are set forth in defense.  It

8   is not a question of whether it is a lawful act.  That's a very

9   different question.

10         And then the question:  "Is there a code of conduct

11  (ethics) which clearly outlines this is the case for an

12  Assembly person?"  To me, that clearly is something that is

13  responded to by saying the instructions are what the

14  instructions are.  That's the law you are to follow.

15         And the first point is not about an official act.  And

16  the legality or illegality turns on other legal instructions

17  and the evidence.

18             THE COURT:  Okay.  Anything further?

19             MS. COHEN:  Not from the government.

20             THE COURT:  Okay.

21             Bring out the jury, please?

22             (Continued on next page)

23

24

25

FBO5sil2                    Deliberations

1           (Jury present)

2           THE COURT:  Okay, ladies and gentlemen.  I have

3    received a note from you that has been marked as Court Exhibit

4    no. 9 and it reads:

5           "One of the jurors is having difficulty distinguishing

6    whether or not exchanging NYS funds for something in return is

7    illegal.  Is there a code of conduct (ethics) which clearly

8    outlines this is the case for an Assembly person?"

9           I am interpreting your question to be one that relates

10   either to the issue of *quid pro quo* or to the issue of what is

11   an official act.

12           Starting with *quid pro quo*, if you were to find that

13   the defendant exchanged New York public funds for something in

14   return, that could constitute an illegal *quid pro quo* if the

15   other aspects of that element have been proven.

16           If you find that dispensing with state funds is part

17   of the responsibility of the defendant as a member of the

18   Assembly or as Speaker of the Assembly, then disseminating

19   public funds is an official act.  But, let me also stress to

20   you that you should read the charges as a whole and that each

21   element of the crime charged must be proven beyond a reasonable

22   doubt.

23           I have also received a note from a juror regarding the

24   process of deliberation.  I want to remind you that each juror

25   is entitled to his or her opinion but you are also required to

FBO5sil2                        Deliberations

1    respectfully exchange views with your fellow jurors.  That's

2    the very essence of jury deliberation.  If you have a point of

3    view and after discussing it with other jurors it appears that

4    your own judgment is open to question, then of course you

5    should not hesitate to yield your original point of view if you

6    are convinced that the other view is one that satisfies your

7    judgment and conscience.  Do not give up a point of view that

8    you conscientiously believe simply because you are outnumbered.

9         You should vote with the others only if you are

10   convinced on the evidence, the facts, and the law that it is

11   the correct way it decide the case.

12        That said, let me remind you all that the essence of

13   deliberation is to listen to and to exchange views with your

14   fellow jurors.

15        Please continue your deliberations.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

FBO5sil2                         Deliberations

1            (Jury not present)

2            THE COURT:  Okay.

3            MS. COHEN:  Your Honor, if we could just bring to the

4    Court's attention, we are still looking at the issue, United

5    States v. Baker, 262 F.3d 124.  I have a copy for the Court and

6    for defense counsel.

7            THE COURT:  Thank you.

8            MR. COHEN:  Thank you.

9            THE COURT:  What does this tell me?

10           MS. COHEN:  Your Honor, it relates to the first note.

11           THE COURT:  Okay.  I am comfortable and aware of this

12   line of authority.  I don't think we are there.  That's not

13   what I'm reading that note to say.

14           MS. COHEN:  Understood, your Honor.

15           THE COURT:  Okay.  We will see what happens next.  I

16   will see you in a bit.

17           MS. COHEN:  Thank you, your Honor.

18           (Recess pending verdict)

19           (Whereupon, at 3:58 p.m. a note was received from the

20   Jury.)

21           THE COURT:  Okay.  We have another note.  This one has

22   been marked as Court Exhibit 10.  It says:

23           "Can we please receive further clarification on 5 and

24   6 (counts) regarding the interstate commerce as the law reads."

25           I think I would like to start with Mr. Molo this time.

FBO5sil2                    Deliberations

1    The government always gets to talk first.

2              What do you think they're asking?

3         MR. MOLO:  Well, as to whatever they're asking I think

4    the answer is that they should reread the instruction on

5    interstate commerce.

6         THE COURT:  Okay.

7         Ms. Cohen?

8         MS. COHEN:  Your Honor, certainly reading your Honor's

9    instruction on interstate commerce as it appears in the charge

10   at page 25, but also you could perhaps give them further

11   guidance since it is a legal question about what does commerce

12   mean.

13        THE COURT:  I was actually sort of thinking in the

14   other direction and asking them if they could please further

15   explain their question.

16        MS. COHEN:  That's fine, your Honor; then we can

17   determine whether it is a factual question or a legal question.

18        MR. MOLO:  Your Honor, I believe it's inappropriate to

19   engage in that kind of colloquy with the jury.  Again, today is

20   the first day of deliberations so the defense would like the

21   instruction reread and -- I mean or tell -- the jury to be

22   directed that the instructions on the law are what I have given

23   you and you should reread that instruction which is, I guess,

24   at page 25.

25        THE COURT:  Well, it comes up at 25 for 5 and 6,

FBO5sil2                          Deliberations

1    right?

2              MR. MOLO:  Right.

3              THE COURT:  Well, I can certainly direct them to that

4    portion of the charge on page 25 but it seems to me that if

5    that doesn't answer their question, they need to provide

6    greater clarification of what their question is.

7              I mean, I don't know what else to -- back when the

8    charge wasn't sent to the jury when you got questions like this

9    it was obvious what the answer was, it was to reread the charge

10   because they obviously missed it.  But, when they have it back

11   there the natural inclination is to believe that whatever

12   they're troubled by isn't being answered on page 25.

13             Mr. Molo?

14             MR. MOLO:  The proper course, again, I believe, is not

15   to engage in some kind of colloquy with them and ask them to

16   identify issues that we would then respond to.  The law is set

17   forth in the instructions, it's --

18             THE COURT:  It didn't come down from Mount Sinai,

19   right?

20             MR. MOLO:  I agree.

21             THE COURT:  Or wherever.

22             MR. MOLO:  But it came down from this Court --

23             THE COURT:  Which is close.  I understand that.

24             MR. MOLO:  Right next to Mount Sinai on my map.  But,

25   I think that -- I don't even recall there ever being much

1   dispute on this point in the instructions.

2          THE COURT:  There wasn't.  There was no dispute on the

3   instruction.

4          MR. MOLO:  Yes.

5          THE COURT:  And it was not really argued in anybody's

6   summation.

7          MR. MOLO:  That's my recollection.  So, that's why all

8   the more reason why it seems to me that they be instructed

9   simply to follow the law.  The law has been given to them on

10  that, it is plainly stated, and I think it is a very, very

11  dangerous road to go down if we are going to start asking them

12  what is troubling you or what are the issues or to clarify your

13  question even here.  I think that, at this stage, is not --

14  especially at this stage is not right.

15         THE COURT:  Well, we do that all the time, Mr. Molo.

16  If you don't understand what the question is, it is not

17  uncommon to ask the jury to clarify what their question is.

18         MR. MOLO:  And it is also very clear as to what the

19  law is on interstate commerce in the instructions that they

20  were given.  So, I think --

21         THE COURT:  Well, look.  There may well be a more

22  complete charge on interstate commerce somewhere that has more

23  bells and whistles than I included.  I can't say that this is

24  the only way you can charge interstate commerce.

25         MR. MOLO:  I can't speak to that right now myself

FBO5sil2                          Deliberations

either.  You may be correct.  But, at least for now I don't see

any reason why we need to go any further than that and if they

have further issues with it, they can raise those with us.

             THE COURT:  Again, I don't find that to be a

particularly helpful way of dealing with a jury so do you have

any preference on whether I bring them out to tell them this or

whether I write it on the note?

             MR. MOLO:  I think bringing them out.

             MS. COHEN:  We were going to say the opposite, your

Honor.

             THE COURT:  What a surprise.

             I am inclined not bring them out.  I am inclined to

write it on the note.

             Do we have a copy of the note?  So, I am inclined to

write:  The charge regarding interstate commerce is found on

page 25 of the instructions.  If you need further

clarification, please be more specific.

             MS. COHEN:  That's fine with the government, your

Honor.

             THE COURT:  Mr. Molo?  Recognizing that you don't want

me do this at all, do you have a better way of phrasing that

question?

             MR. MOLO:  No.  We object and I have stated the

objection.

             MR. COHEN:  Could you read it again, please, your

1   Honor?

2           THE COURT:  Okay.  It would be:  The charge regarding

3   interstate commerce is found on page 25 of the instructions.

4   If you need further clarification, please be more specific.

5           Your objection is preserved, Mr. Molo.

6           MR. MOLO:  I didn't respond because I objected.

7           THE COURT:  If you have anything further that you

8   think can be improved from your perspective let me know that.

9   It doesn't waive your objection.

10          MR. MOLO:  I understand.  No.

11          THE COURT:  You have no further thoughts?

12          MR. MOLO:  Right.

13          THE COURT:  Okay.

14          Okay, let's see what happens.  Thank you.

15          MS. COHEN:  Thank you, your Honor.

16          (Recess pending verdict)

17          THE COURT:  Do the parties have commitments so that

18  you can't stay past noon tomorrow?

19          MS. COHEN:  No, your Honor.  The government is

20  prepared to stay.

21          MR. MOLO:  There are -- there is some issues.  I mean

22  I -- can we just talk for a minute and see?

23          THE COURT:  Yes.  Talk.

24          MR. MOLO:  Because I take it that is what you would

25  like to do.

FBO5sil2                         Deliberations

1            THE COURT:  I am going to give the jury the option.

2      I'm not sure they're going to take me up on it but I don't want

3      to give them the option if it is a real problem for the

4      parties.

5            MR. MOLO:  I see.  Okay.

6            (Counsel conferring)

7            (At 5:32 p.m. a note was received from the jury.)

8            THE COURT:  You missed a note, Mr. Molo.  I thought I

9      would tell you.

10            LAW CLERK:  Do you want to read it to them first?

11            THE COURT:  Yes, I guess I can.

12            The note reads, it has been marked as Court Exhibit

13      no. 11:

14            "Can I have a meeting with Judge Caproni after

15      everyone is dismissed?"

16            Signed by the same juror that sent the first note.

17            So, what is the defense position on staying past noon?

18      That's what you went out in the hallway to talk about.

19            MR. MOLO:  We did.

20            THE COURT:  Remember?  That's okay.

21            MR. MOLO:  Yeah, I remember.

22            I think if we can move some things around -- if they

23      want to stay we will move some things around and be able to do

24      that.

25            THE COURT:  All right.

FBO5sil2                          Deliberations

1            What about do the parties want to be heard on the most

2    recent note?

3            MR. COHEN:  One question.  Is it signed by the same

4    person?

5            THE COURT:  Yes.  I said that.  It is signed by the

6    same person who sent the first note which has been marked as

7    Court Exhibit 8.

8            MR. COHEN:  I misheard you.  I thought you said it

9    probably sounds like the same person.

10           THE COURT:  No, it was signed by the same person.

11           MR. MOLO:  Can we go back to our --

12           THE COURT:  Of course.

13           MR. COHEN:  Thank you.

14           (Counsel conferring)

15           MR. COHEN:  Your Honor, we have a proposal, if you

16   would like to hear it.

17           THE COURT:  I would love to hear it.

18           MR. COHEN:  Okay.

19           We thought maybe that you table this issue with this

20   juror for this evening and see if it is still required in the

21   morning and then we could revisit it then.  You are going to

22   let the jury go, I assume anyway, now.  There is no harm, no

23   foul in the proposal we are making and maybe the thing becomes

24   obviated.

25           THE COURT:  Well, that is in essence denying the

FBO5sil2                          Deliberations

1  request, right?  So the question is what do I say.

2              MR. MOLO:  I would think you could say that you have

3  the request, you understand what it is, and that in light of

4  the hour we will take the issue up in the morning.  And you can

5  respond in the morning depending on what it is that we are

6  going to do.

7              MR. COHEN:  He has articulated better than I have.

8              MS. COHEN:  I think, your Honor, that you should, in

9  response to the note, in the robing room with counsel present,

10  talk to the juror.

11             MR. COHEN:  Your Honor, we are not saying that we

12  would be opposed to that in the morning.  We are just saying to

13  table it for the evening.

14             THE COURT:  The idea being what is going to happen

15  between now and then?

16             MR. COHEN:  Maybe the problem gets obviated in the

17  person's own mind.

18             THE COURT:  Well, I suppose that's one possibility.

19  The other possibility would be to meet, in listening mode, and

20  to tell the juror that -- tell her what?  I don't know.

21             MR. MOLO:  I think that's the problem.  I think if we

22  can take it up fresh in the morning that would be -- that would

23  be a better approach and, again, maybe the issue goes away in

24  the morning when the juror comes back and has rethought it and

25  has had the opportunity to refresh themselves at home, come

FBO5sil2                    Deliberations

1    back in the morning.  And if we have to deal with it then we

2    have to deal with it then.  I think the parties will have a

3    better understanding of what is and isn't possible then, too.

4              MS. COHEN:  I'm not sure we would have any better

5    understanding in the morning.  I think your question then

6    what -- it sort of depends what the juror says when you meet

7    with her.

8              THE COURT:  Well, I assume that the juror is going to

9    tell me the same thing that's in the first note, but that's an

10   assumption.

11             MS. COHEN:  Correct, your Honor.  That's sort of the

12   problem.

13             THE COURT:  I think I'm going to go with the defense's

14   proposal, partly because I think I want to mull this over,

15   overnight.  So, I will call the jury out, I'm going to send

16   them home, I'm going to tell them when they come in in the

17   morning, first thing what they need to do is to decide if they

18   want to stay past noon and, if so, they need to send us out a

19   note immediately but they don't have to decide that this

20   evening.

21             I will say I have another note from one of the jury

22   members asking for a meeting and I am telling her what?  That I

23   will --

24             MR. MOLO:  In light of the hour, I think.

25             THE COURT:  In light of the hour I will take that up

FBO5sil2                    Deliberations

1    tomorrow morning if she still wants a meeting in the morning.

2            MS. COHEN:  Correct, your Honor.

3            MR. COHEN:  It may be that the jury does not know

4    about this new note and you are going to communicate to them.

5            THE COURT:  I'm sure they do.  She has it handed it to

6    the marshal.  How are they not going to know?

7            They may not know the content of it, is that your

8    concern?

9            MR. COHEN:  Pardon me?  Yes, the content.  I think

10   that was your concern this morning with the earliest note.

11           THE COURT:  Well, the early one, though, had a lot of

12   information.  This just asked for a meeting.  I mean I don't

13   know --

14           MR. MOLO:  I suppose you could say that you received a

15   note and you don't have to say asking for a meeting.  And you

16   say you received a note and in light of the hour you will

17   address the issue in the morning so there is no mention of a

18   meeting to the full jury.

19           MS. COHEN:  The issue sort of reveals that there is an

20   issue.

21           MR. COHEN:  I'm sorry, Ms. Cohen.  I can't hear you.

22           MS. COHEN:  I think if you just said I received a note

23   we will take up in the morning and not say an issue because

24   that sort of reveals that there is some issue.

25           MR. MOLO:  That's fine too:  A note from one of the

FBO5sil2                          Deliberations

1    jurors, and in light of the hour we will take it up in the

2    morning.

3                 THE COURT:  Okay.

4                 Bring out the jury.

5                 (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBO5sil2                          Deliberations

1           (Jury present)

2           THE COURT:  Ladies and gentlemen, I'm about to send

3    you home for the evening.  I have an assignment for you for

4    first thing in the morning.  I had told you and promised you

5    that I would let you go at noon.  If you want to work longer

6    than noon, I need you to send me out a note first thing in the

7    morning, one way or the other, indicating whether you want to

8    remain longer than noon.  We can stay if you want but I'm

9    leaving it totally up to you whether you want to say or not

10   stay.  Okay?

11          Also, I received a note from a juror.  In light of the

12   hour, I will take up that note in the morning, not this

13   evening.

14          So, with that, let me remind you again don't discuss

15   the case with anybody.  Don't read any news accounts about this

16   case or any other corruption case that's going on.  Don't

17   listen to any news about it, on the radio or the TV.

18          Have a very good evening.  And when you come in

19   tomorrow you don't haven't to come into the courtroom but don't

20   start deliberating until all 12 of you are together.  Before

21   all 12 of you are there you are just a group of people having

22   coffee together.  Okay?  Once 12 of you get there, then you are

23   a jury and then you can start deliberations.  Your first

24   assignment is to tell me whether you want to stay past noon

25   tomorrow.  Okay?

FBO5sil2                        Deliberations

1              With that, have a very good evening.

2              (Continued on next page)

FBO5sil2                        Deliberations

1              (Jury not present)

2              THE COURT:  Okay.  Anything before we leave?

3              MR. MOLO:  No, your Honor.  Nothing from the

4     defendant.

5              MS. COHEN:  Just as a precaution, your Honor?  I know

6     that you are going to call the alternates at the end of every

7     day, if you can perhaps ask them to call in the morning

8     tomorrow?

9              THE COURT:  They've already called today.  We have

10    numbers that we can reach them at.

11             MS. COHEN:  Fine.  Thank you, your Honor.

12             THE COURT:  You're welcome.

13             (Adjourned to 9:30 a.m., November 25, 2015.)

14

15

16

17

18

19

20

21

22

23

24

25